# IN THE

# United States Court of Appeals
## FOR THE FOURTH CIRCUIT

---

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

v.

AQUILIA MARCIVICCI BARNETTE,

*Defendant-Appellant.*

---

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA AT CHARLOTTE

---

## OPENING BRIEF OF APPELLANT

---

John G. Baker
Federal Public Defender for the
Western District of North Carolina

Gerald W. King, Jr.
Chief, Capital Habeas Unit
For the Fourth Circuit
129 West Trade Street, Suite 300
Charlotte, NC 28202
704-374-0720
gerald_king@fd.org

Jacob H. Sussman
SOUTHERN COALITION
FOR SOCIAL JUSTICE
P. O. Box 51280
Durham, NC 27717
704-277-3962
jsussman@scsj.org

Mark E. Olive
ATTORNEY AT LAW
320 West Jefferson Street
Tallahassee, FL 32301
850-224-0004
meolive@aol.com

*Counsel for Appellant*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES .............................................................. iv

INTRODUCTION ........................................................................ 1

STATEMENT OF JURISDICTION .................................................. 3

ISSUES PRESENTED ................................................................. 4

STATEMENT OF THE CASE ........................................................ 6

    A.    Trial and Direct Appeal ............................................ 6

    B.    Remand Proceedings ................................................ 7

    C.    Habeas Proceedings ................................................. 8

SUMMARY OF THE ARGUMENT ................................................. 9

STANDARD OF REVIEW ............................................................ 12

ARGUMENT ............................................................................. 13

    I.    Barnette's convictions and sentences for violations of 18 U.S.C. §§ 2261, 924(c), and 844(h)(1) are unconstitutional ..................................................... 13

        A.    Background ..................................................... 13

        B.    This Court's precedent establishes that the district court erred in concluding that Barnette's challenge to his §§ 2261, 924(c), and 844(h) convictions was procedurally defaulted ...................... 14

        C.    The predicate crimes of violence for Barnette's convictions under § 2261 are uncertain, rendering the convictions and sentences invalid .......................... 17

        D.    The defect with the § 2261 convictions invalidates Barnette's convictions under § 924(c) and § 844(h)(1) .............................. 22

E. The unconstitutional convictions require resentencing for Barnette's other capital convictions ................................................................. 24

II. The district court erroneously denied an evidentiary hearing on Barnette's claim that his death sentence is unreliable because resentencing counsel provided ineffective assistance .......................................................... 27

A. Legal framework ......................................................... 28

B. The district court abused its discretion by employing the wrong standard to determine whether Barnette was entitled to an evidentiary hearing ....................................................... 31

C. Resentencing counsel's failure to maintain and preserve files makes an evidentiary hearing necessary ................................................................. 33

D. Resentencing counsel failed to conduct the investigation they recognized as necessary to a competent defense of Barnette ........................... 34

E. Resentencing counsel unreasonably adopted an incorrect and aggravating theory that Barnette committed the crimes because he was a classic batterer of women ....................................................... 40

F. Resentencing counsel unreasonably failed to discover available evidence that Barnette's crimes could be explained by a mental health crisis ........................................................................... 51

G. Resentencing counsel unreasonably failed to impeach the Government's expert .......................... 66

H. Resentencing counsel's uninformed decision to advise Barnette to testify was unreasonable and prejudicial ........................................................... 70

ii

III. The district court erred in dismissing Barnette's jury misconduct claim without allowing him to conduct juror interviews ................................................................. 78

    A. Background ............................................................. 78

    B. In capital cases, the Eighth Amendment demands that counsel be allowed post-verdict contact with jurors ....................................................... 79

    C. Refusing to allow juror interviews deprived Barnette of his enhanced rights of representation under 18 U.S.C. § 3599 ................................................. 83

    D. Even under the standards applied to non-capital cases, the district court erred by denying Barnette's request for juror interviews ........................ 85

CONCLUSION ............................................................................. 88

REQUEST FOR ORAL ARGUMENT ................................................. 88

# TABLE OF AUTHORITIES

**Page(s)**

**Cases:**

*Andrus v. Texas,*
590 U.S. 806 (2020) ................................................................40, 48, 49

*Barnette v. United States,*
132 S. Ct. 1740 (Mar. 19, 2012) ........................................................ 8

*Borden v. United States,*
593 U.S. 420 (2021) ..........................................................................18

*Bousley v. United States,*
523 U.S. 614 (1998) ......................................................................14-15

*California v. Brown,*
479 U.S. 538 (1987) ..........................................................................80

*Carter v. Lee,*
283 F.3d 240 (4th Cir. 2002)............................................................75

*Christeson v. Roper,*
574 U.S. 373 (2015) ..........................................................................84

*Davis v. United States,*
417 U.S. 333 (1974) ....................................................................15, 16

*Descamps v. United States,*
570 U.S. 254 (2013) ..........................................................................19

*Ford v. Wainwright,*
477 U.S. 399 (1986) ..........................................................................82

*Furman v. Georgia,*
408 U.S. 238 (1972) ..........................................................................80

*Gordon v. Braxton,*
780 F.3d 196 (4th Cir. 2015)............................................................31

*Gray v. Branker,*
529 F.3d 220 (4th Cir. 2008)............................................................52

*Hutchins v. Garrison,*
724 F.2d 1425 (4th Cir. 1983)...............................................75

*Irvin v. Dowd,*
366 U.S. 717 (1961)...............................................80

*Johnson v. Mississippi,*
486 U.S. 578 (1988)...............................................25

*Johnson v. United States,*
559 U.S. 133 (2010)...............................................18

*Johnson v. United States,*
576 U.S. 591 (2015)...............................................8

*Jones v. Murray,*
947 F.2d 1106 (4th Cir. 1991)...............................................75

*Jordan v. Massachusetts,*
225 U.S. 167 (1912)...............................................79

*Martel v. Clair,*
565 U.S. 648 (2012)...............................................83

*McFarland v. Scott,*
512 U.S. 849 (1994)...............................................84, 85

*Miller-El v. Cockrell,*
537 U.S. 322 (2003)...............................................12

*Miller-El v. Dretke,*
1 545 U.S. 231 (2005)...............................................7

*Moreno-Morales v. United States,*
334 F.3d 140 (1st Cir. 2003)...............................................32

*Murray v. Carrier,*
477 U.S. 478 (1986)...............................................15

*Porter v. McCollum,*
558 U.S. 30 (2009)...............................................29

*Peña-Rodriguez v. Colorado,*
580 U.S. 206 (2017)...............................................82

*Reed v. Ross,*
468 U.S. 1 (1984) ..............................................15, 16

*Reyes-Vejerano v. United States,*
117 F. Supp. 2d 103 (D.P.R. 2000) ........................................75

*Rodriguez v. Colorado,*
580 U.S. 206, (2017) ........................................82

*Rogers-Bey v. Lane,*
896 F.2d 279 (7th Cir. 1990) ........................................75

*Rompilla v. Beard,*
545 U.S. 374 (2005) ........................................29, 51, 52

*Sears v. Upton,*
561 U.S. 945 (2010) ........................................29

*Sessions v. Dimaya,*
584 U.S. 148 (2018) ........................................9, 15, 16, 17

*Shepard v. United States,*
544 U.S. 13 (2005) ........................................19

*Strickland v. Washington,*
466 U.S. 668 (1984) ........................................28, 29, 30, 49

*Turner v. Louisiana,*
379 U.S. 466 (1965) ........................................80

*United States v. Barnette,*
211 F.3d 803 (4th Cir. 2000) ........................................6, 7

*United States v. Barnette,*
390 F.3d 775 (4th Cir. 2004) ........................................7

*United States v. Barnette,*
644 F.3d 192 (4th Cir. 2011) ........................................7

*United States v. Birchette,*
908 F.3d 50 (4th Cir. 2018) ........................................81, 82

*United States v. Cabrera-Umanzor,*
728 F.3d 347 (4th Cir. 2013) ........................................18

*United States v. Causey,*
185 F.3d 407 (5th Cir. 1999)..................................................26

*United States v. Davis,*
588 U.S. 445 (2019)........................................................9, 22

*United States v. Evans,*
848 F.3d 242 (4th Cir. 2017)...............................................14

*United States v. Frady,*
456 U.S. 152 (1982)...........................................................15

*United States v. Fugit,*
703 F.3d 248 (4th Cir. 2012)...............................................14

*United States v. Gravely,*
840 F.2d 1156 (4th Cir. 1988)...................................79, 81, 87

*United States v. Hashimi,*
110 F.4th 621 (4th Cir. 2024) ...............................13, 31, 32

*United States v. Jackson,*
32 F.4th 278 (4th Cir. 2022) ...............................................17

*United States v. Mathis,*
932 F.3d 242 (4th Cir. 2019)...............................................18

*United States v. Mayhew,*
995 F.3d 171 (4th Cir. 2021)....................................... passim

*United States v. McKinney,*
60 F.4th 188 (2023) ................................................15, 16, 17

*United States v. Nicholson,*
611 F.3d 191 (4th Cir. 2010)...............................................30

*United States v. Price,*
777 F.3d 700 (4th Cir. 2015).........................................19, 21

*United States v. Roane,*
378 F.3d 382 (4th Cir. 2004)..........................................79, 87

*United States v. Runyon,*
994 F.3d 192 (4th Cir. 2021)...............................30, 38, 52

*United States v. Simms,*
914 F.3d 229 (4th Cir. 2019) ...................................................................18

*United States v. Tucker,*
404 U.S. 443 (1972) ..............................................................................25

*United States v. White,*
366 F.3d 291 (4th Cir. 2004) ........................................................... 13, 65

*United States v. Witherspoon,*
231 F.3d 923 (4th Cir. 2000) ...................................................................31

*Valentine v. United States,*
488 F.3d 325 (6th Cir. 2007) ...................................................................31

*Welch v. United States,*
578 U.S. 120 (2016) ...........................................................................8, 18

*Wiggins v. Smith,*
539 U.S. 510 (2003) ........................................................... 29, 30, 38, 66

*Williams v. Carter,*
76 F.3d 199 (8th Cir. 1996) .....................................................................50

*Williams v. Stirling,*
914 F.3d 302 (4th Cir. 2019) ...................................................................29

*Williams v. Taylor,*
529 U.S. 362 (2000) ................................................................................29

*Woodson v. North Carolina,*
428 U.S. 280 (1976) ................................................................................25

*Yates v. State,*
171 S.W.3d 215 (Tex. App. 2005) ......................................................67, 68

*Zant v. Stephens,*
462 U.S. 862 (1983) ................................................................................25

## Statutes and Other Authorities:

U.S. Const., amend. V ...............................................................................80

U.S. Const., amend. VI ................................................................ *passim*

U.S. Const., amend. VIII .............................................................. *passim*

18 U.S.C. § 16 ............................................................................ 17, 22

18 U.S.C. § 16(a) ....................................................................... 18, 22

18 U.S.C. § 16(b) ................................................................. 17, 18, 21

18 U.S.C. § 844(h) ...................................................................... passim

18 U.S.C. § 844(h)(1) ...................................................... 13, 14, 22, 24

18 U.S.C. § 924(c) ...................................................................... *passim*

18 U.S.C. § 924(c)(1) .........................................................................23

18 U.S.C. § 924(c)(3) .........................................................................22

18 U.S.C. § 924(i)(2)(1) ....................................................................23

18 U.S.C. § 1111 ...............................................................................23

18 U.S.C. § 2261 ........................................................................ *passim*

18 U.S.C. § 2261(a)(1) ................................................................ 17, 20

18 U.S.C. § 2261(b) ..........................................................................20

18 U.S.C. § 3599 ......................................................... 5, 12, 83, 85

18 U.S.C. § 3599(a)(2) .......................................................................83

28 U.S.C. § 1291 .................................................................................3

28 U.S.C. § 2253 .................................................................................3

28 U.S.C. § 2253(c)(2) .......................................................................12

28 U.S.C. § 2254 ...............................................................................75

28 U.S.C. § 2255 ........................................................................ *passim*

28 U.S.C. § 2255(b) .................................................................. *4 passim*

28 U.S.C. § 3231 .................................................................................3

Fed. R. App. P. 22(b) ...............................................................................3

Fed. R. Evid. 606(b) ...............................................................................82

L.R. 22 .....................................................................................................3

## INTRODUCTION

Aquilia Marcivicci Barnette, a federal prisoner under sentence of death, was convicted of two counts of 18 U.S.C. § 2261 under a statutory scheme now deemed unconstitutional. His § 2261 convictions can survive only if their predicate offenses have as an element the intentional use of violent physical force. Because of a defect in Barnette's indictment, it is impossible to identify predicate offenses at all, much less analyze their elements for the minimum conduct required to meet them. It is therefore impossible to know whether § 2261's "crime of violence" requirement is satisfied. This Court should vacate Barnette's convictions under § 2261, as well as the three other convictions that explicitly identify the § 2261 convictions as their predicate crimes of violence, and remand for resentencing on Barnette's remaining capital counts.

After this Court vacated Barnette's 1998 death sentence, Barnette's court-appointed resentencing counsel had the benefit of reviewing the prior trial record and assessing what went wrong. Having reviewed that record, resentencing counsel provided the district court a statement detailing the investigatory tasks they knew they needed to

1

undertake to provide effective assistance. They then utterly failed to complete those tasks. Instead, without having conducted any independent investigation, resentencing counsel committed to explaining Barnette's crimes by adopting the Government's theory that Barnette was an inveterate batterer of women. Had they taken the investigatory steps they identified as necessary, resentencing counsel would have discovered that this theory was not only highly aggravating but also incorrect, and that Barnette's crimes are explained not by a propensity for domestic violence but by a mental health crisis. Despite this extra-record evidence tending to show deficient performance and prejudice, the district court refused even to hold an evidentiary hearing on this claim.

The district court also improperly prevented Barnette from proving his juror misconduct claim by refusing to allow his attorneys to interview the jurors and gather evidence of racial bias or external influence.

To prevent Barnette from being put to death despite these constitutional errors, this Court should remand to the district court for

further discovery and an evidentiary hearing on Counts I and III of Barnette's federal habeas petition.

## STATEMENT OF JURISDICTION

This is an appeal from a final order of the United States District Court for the Western District of North Carolina denying Barnette's motion pursuant to 28 U.S.C. § 2255 to vacate, set aside, or correct his convictions and sentence of death and denying a certificate of appealability. The district court had jurisdiction under 28 U.S.C. §§ 3231 and 2255. Pursuant to Fed. R. App. P. 22(b) and L.R. 22(a), Barnette files this brief and requests a certificate of appealability (COA). If granted, jurisdiction will arise under 28 U.S.C. § 1291 and § 2253.

On March 21, 2021, the district court dismissed Barnette's § 2255 motion, his motion to supplement his § 2255 motion, and his motion for an evidentiary hearing. JA3193–3240. It also declined to issue a COA. JA3239. On December 6, 2023, the district court denied Barnette's Motion to Alter or Amend the Judgment. JA3255–3260. Barnette filed a Notice of Appeal on February 5, 2024. JA3261–3263.

# ISSUES PRESENTED

1. A court assessing whether an offense can serve as the predicate "crime of violence" for a violation of 18 U.S.C. § 2261 must apply the categorical or modified categorical approach to determine whether the most innocent conduct that satisfies its elements meets § 2261's force or elements clause, which requires the intentional use of violent physical force. The § 2261 counts in Barnette's indictment did not identify statutory offenses as their predicate "crimes of violence," making it impossible even to identify the relevant elements, much less to conduct the required analysis. Are Barnette's § 2261 convictions and sentences—and the other convictions and sentences that depend upon them—valid?

2. Federal capital habeas proceedings must include an evidentiary hearing unless the records of the case "conclusively show that the prisoner is entitled to no relief." 28 U.S.C. § 2255(b). Barnette presented extra-record evidence showing that his attorneys provided deficient performance by (1) failing to discover reasonably available mitigation evidence of Barnette's mental health crisis at the time of the crimes, and instead committing to the inaccurate and highly

4

aggravating theory that Barnette was a serial batterer of women; (2) failing to confront a prosecution expert witnesses with readily available impeachment evidence; and (3) making the ill-informed and unreasonable choice to advise Barnette to testify, without investigating or counseling him about the risks. But for these errors, there is a reasonable likelihood that Barnette would not have been sentenced to death. Did the district court err in dismissing Barnette's claim of ineffective assistance of counsel without holding an evidentiary hearing?

3. In determining whether to allow post-verdict contact with jurors, courts balance the need for juror privacy against the possibility that juror interviews might reveal juror misconduct. In conducting this weighing exercise, the district court did not acknowledge that—as a death-sentenced prisoner—Barnette has an increased right to reliability in sentencing under the Eighth Amendment, as well as enhanced rights of representation under 18 U.S.C. § 3599. It also failed to appreciate that Barnette made a substantial threshold showing of juror misconduct. Did the district court err in dismissing

Barnette's juror misconduct claim without allowing post-verdict juror interviews?

**STATEMENT OF THE CASE**

### A. Trial and Direct Appeal

On January 27, 1998, a jury sitting in the United States District Court for the Western District of North Carolina convicted Barnette of eleven counts stemming from the firebombing of Robin Williams's residence in Roanoke, Virginia, the carjacking and murder of Donald Lee Allen in Charlotte, North Carolina, and the murder of Ms. Williams in Roanoke. JA933–939; *United States v. Barnette*, 211 F.3d 803, 811 (4th Cir. 2000). After a penalty phase, the jury recommended a death sentence on three capital counts. *Id.* On February 10, 1998, Barnette was sentenced to death on the capital counts and an aggregate term of life imprisonment on his non-capital counts. *Id.*

On direct appeal, this Court affirmed Barnette's convictions but vacated his death sentence due to the trial court's exclusion of expert surrebuttal testimony during the penalty phase. *Barnette*, 211 F.3d at 825–26. After a second penalty-phase trial in 2002, Barnette was again

sentenced to death on the capital counts, and this Court affirmed the sentences. *United States v. Barnette*, 390 F.3d 775 (4th Cir. 2004).

## B.    Remand Proceedings

The Supreme Court vacated this Court's opinion and remanded in light of *Miller-El v. Dretke*, 1 545 U.S. 231 (2005), which clarified the procedure for evaluating *Batson* claims. *See United States v. Barnette*, 211 F.3d 803, 811 (4th Cir. 2000).

On remand, after conducting a hearing and an *in-camera* review of the jury questionnaires from the resentencing, the district court refused to provide copies of the jury questionnaires to defense counsel, and issued an Order on May 20, 2010, finding no *Batson* violation and that Barnette was not entitled to discovery under the Jencks Act. *United States v. Barnette*, Case No. 3:97CR23, 2010 WL 2085312 (W.D.N.C. May 20, 2010). On appeal, this Court held that "the district court's refusal to provide the defense with clean copies of the juror questionnaires was clearly an abuse of its considerable discretion in managing the remand proceedings," but found that error harmless. *United States v. Barnette*, 644 F.3d 192, 212–13 (4th Cir. 2011). The

Supreme Court denied certiorari. *Barnette v. United States*, 132 S.Ct. 1740 (Mar. 19, 2012).

### C.   Habeas Proceedings

On June 19, 2013, Barnette filed a seven-claim § 2255 motion to vacate his sentence, JA12–118, as well as several motions for factual development of those claims. First, Barnette filed a motion for leave to conduct juror interviews, which the district court denied without requiring a response or a hearing. JA119–135. Second, Barnette filed a discovery motion, JA140–157, which was likewise denied, JA186–200. Finally, Barnette sought an evidentiary hearing on his § 2255 motion. JA201–312.

On June 24, 2016, Barnette moved to supplement his § 2255 motion with claims challenging his convictions under 18 U.S.C. §§ 2261, 924(c), and 844(h) per then-recent Supreme Court decisions in *Johnson v. United States*, 576 U.S. 591 (2015) and *Welch v. United States*, 578 U.S. 120 (2016). JA3088–3121. The district court stayed the § 2255 proceedings pending the Supreme Court's disposition of two

relevant cases: *Sessions v. Dimaya*, 584 U.S. 148 (2018), and *United States v. Davis*, 588 U.S. 445 (2019). JA3127–3133.

On March 12, 2021, the district court denied Barnette's § 2255 motion and his motion for an evidentiary hearing. JA3193–3240. The district court also denied Barnette's motion to supplement as barred by procedural default or, in the alternative, without merit and futile. JA3227–3238. The district court also denied Barnette a COA. JA3239. Barnette appealed to this Court and, following extensions of time, now submits his initial brief and request for a COA.

## SUMMARY OF THE ARGUMENT

*First*, Barnette's five intertwined §§ 2261, 924(c), and 844(h) counts require a "crime of violence" as a predicate for conviction. Supreme Court precedent requires that courts determining whether a predicate offense is a "crime of violence" conduct a categorical analysis of the elements of the underlying statutory offense to determine whether the minimum conduct required to satisfy those elements includes intentional physical force. The indictment charging Barnette with Counts 1 and 10 for interstate domestic violence in violation of 18 U.S.C. § 2261 fails to identify a statutory offense alleged to constitute a

9

"crime of violence," instead laying out the specific conduct Barnette was alleged to have undertaken. Without a predicate statutory offense to look to, it is impossible to analyze the elements of the predicate offenses or the minimum conduct required to meet them, and therefore impossible to know whether the predicate offenses are crimes of violence. Barnette's convictions under § 2261 are therefore invalid. The invalidation of Barnette's § 2261 convictions, moreover, necessarily invalidates the three 924(c) and 844(h) convictions that explicitly identify those § 2261 convictions as their predicate crimes of violence.

*Second*, the district court erred by denying a hearing on Barnette's claim that his resentencing counsel provided ineffective assistance of counsel. Although resentencing counsel filed a statement and motions with the district court detailing how the mitigation investigation for Barnette's first trial was incomplete and unreliable, and identifying the necessary steps for a reasonable re-investigation, they utterly failed to follow through. Resentencing counsel instead decided, without having conducted any meaningful investigation, to adopt the Government's theory that Barnette committed the crimes because he is a classic batterer of women. An adequate mitigation investigation would have

10

informed resentencing counsel and their experts not only that Barnette did not have the uniform history of domestic violence they believed, but also surfaced evidence that Barnette's crimes were due to a mental health crisis precipitated by his childhood traumas and mutually exacerbating mood disorders. Compounding their investigative deficiencies, resentencing counsel also failed to cross-examine the Government's mental health expert about the materially false testimony he had recently provided in another capital case. Resentencing counsel also advised Barnette to testify without considering or consulting their experts as to how his troubled mental health would affect his demeanor and reliability on the witness stand. But for these deficiencies, the sentencing picture before the jury would have been dramatically altered, yielding a reasonable probability that at least one juror would not have sentenced Barnette to death. The district court therefore erred in denying an evidentiary hearing on this claim.

*Third*, the district court erred by denying Barnette's jury misconduct claim without allowing him to interview his jurors. In a capital case, requiring a threshold showing of improper outside

influence before allowing juror interviews violates a death-sentenced prisoner's Eighth Amendment rights, as well as his enhanced rights of representation under 18 U.S.C. § 3599. Moreover, even under the standards applied to non-capital cases, the district court erred by denying Barnette's request for juror interviews, as the conduct of his jurors during his 2002 resentencing met the threshold showing of improper outside influence this Court's precedent requires.

## STANDARD OF REVIEW

"[A] prisoner seeking a COA need only demonstrate 'a substantial showing of the denial of a constitutional right.'" *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003) (quoting 28 U.S.C. §2253(c)(2)). "A petitioner satisfies this standard by demonstrating that jurists of reason could disagree with the District Court's resolution of his constitutional claims or that jurists could conclude that the issues presented are adequate to deserve encouragement to proceed further." *Id.*

This Court reviews the district court's legal conclusions in denying a § 2255 motion *de novo. United States v. Mayhew*, 995 F.3d 171, 176 (4th Cir. 2021). When the district court denies relief without an evidentiary hearing, this Court construes the facts in the light most

12

favorable to the movant, drawing all reasonable inferences in his favor. *United States v. Hashimi*, 110 F.4th 621, 627 (4th Cir. 2024).[1] A district court abuses its discretion if it denies § 2255 relief without an evidentiary hearing "[u]nless the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief." 28 U.S.C. § 2255(b); *see also United States v. White*, 366 F.3d 291, 297 (4th Cir. 2004) ("[I]f the parties produce evidence disputing material facts with respect to non-frivolous habeas allegations, a court must hold an evidentiary hearing to resolve those disputes.").

## ARGUMENT

**I. Barnette's convictions and sentences for violations of 18 U.S.C. §§ 2261, 924(c), and 844(h)(1) are unconstitutional.**

### A. Background

Several of Barnette's convictions required a predicate "crime of violence" as an element of the offense. After the Supreme Court struck

---

[1] In *Hashimi*, this Court noted that it has been "less than perfectly consistent on this point," sometimes analogizing a denial of § 2255 relief without a hearing both to a grant of summary judgment and to a grant of a motion to dismiss." 110 F.4th at 627 n.3. The Court determined that "an evidentiary hearing is necessary in [*Hashimi*] even under the harder-to-satisfy summary judgment standard," and therefore did "not resolve which is the more perfect analogy." *Id.* Barnette respectfully submits that he, too, satisfies either standard.

down the "residual clause" of these offenses' definitions of "crime of violence" as unconstitutionally vague, Barnette moved to supplement his § 2255 motion to challenge his convictions and sentences under 18 U.S.C. §§ 2261, 924(c), and 844(h). JA3088–3121. Despite acknowledging that the definition of "crime of violence" in effect at the time of Barnette's trial was unconstitutional, the district court denied Barnette's motion to supplement, holding that the claim was procedurally defaulted or, alternatively, without merit. JA3227–3238. This was legal error, which this Court reviews de novo. *See United States v. Evans*, 848 F.3d 242, 245 (4th Cir. 2017).

**B.   This Court's precedent establishes that the district court erred in concluding that Barnette's challenge to his §§ 2261, 924(c), and 844(h) convictions was procedurally defaulted.**

The district court found Barnette's challenge to his §§ 2261, 924(c), and 844(h) convictions procedurally defaulted because he did not raise it during his initial trial or on direct appeal. JA3230–3231. That conclusion is incompatible with this Court's recent precedent.

A procedural default is excused where the petitioner shows "'cause' for the default and 'prejudice' resulting therefrom." *United States v. Fugit*, 703 F.3d 248, 253 (4th Cir. 2012) (quoting *Bousley v.*

*United States*, 523 U.S. 614, 622 (1998)). Showing cause generally requires "some objective factor external to the defense" that prevented counsel from raising the claim on direct appeal, *Murray v. Carrier*, 477 U.S. 478, 488 (1986); relevant here, "where a constitutional claim is so novel that its legal basis is not reasonably available to counsel, a defendant has cause for his failure to raise the claim" in trial or on direct appeal, *Reed v. Ross*, 468 U.S. 1, 16 (1984). To establish prejudice, a petitioner must show that the error "worked to his *actual* and substantial disadvantage." *United States v. Frady*, 456 U.S. 152, 170 (1982).

Per the principle in *Reed*, the district court deemed it "arguable that Petitioner's challenges were not previously available in light of the *Johnson* and *Welch* decisions, and later decisions in *Dimaya* and *Davis*," which would establish cause for the default. JA3231. But it concluded that Barnette still "cannot show the necessary prejudice or actual innocence required to excuse any procedural default." JA3231. This Court's decision in *United States v. McKinney*, 60 F.4th 188 (2023), illustrates the errors in the district court's analysis.

In *McKinney*, a § 2255 petitioner who sought to vacate his § 924(c) conviction faced a defense of procedural default. 60 F.4th at 193. As to cause, this Court observed that, at the time of McKinney's plea and direct appeal, "the Supreme Court had affirmatively upheld the constitutionality of residual clauses like the one at issue here," and that any such claim "would have been rejected by our court and every other circuit due to then-controlling Supreme Court precedent." *Id.* at 194–95. The claim was therefore "so novel that its legal basis is not reasonably available to counsel," establishing cause for the default. *Id.* (quoting *Reed*, 468 U.S. at 16). This Court also found prejudice because McKinney's "conviction subjects him to imprisonment for conduct that the law does not make criminal." *Id.* at 196 (citing *Davis v. United States*, 417 U.S. 333, 346–47 (1974)).

Like McKinney, Barnette's direct appeal concluded in 2012, before the Supreme Court overruled its prior precedent by deciding *Johnson*, *Dimaya*, and *Davis*. His claim, too, "falls squarely within *Reed's* 'novelty' framework, and so he has shown cause for his procedural default." *Id.* 195. Like *McKinney*, Barnette's §§ 924(c) and 2261 convictions subject him to penalties that are no longer authorized by

16

law, establishing prejudice. *Id.* at 195–97; *see also United States v. Jackson*, 32 F.4th 278, 283 & n.3 (4th Cir. 2022) (rejecting procedural-default defense because *Davis* "established a new rule of constitutional law made retroactive on collateral review"). Because cause and prejudice existed to excuse any procedural default of the claims Barnette sought to supplement, the district court erred by denying that request.

### C. The predicate crimes of violence for Barnette's convictions under § 2261 are uncertain, rendering the convictions and sentences invalid.

An element of Barnette's two Violence Against Women Act (VAWA) convictions is a predicate "crime of violence." 18 U.S.C. § 2261(a)(1). A "crime of violence" was previously defined as:

> (a) an offense that has as an element the use, attempted use, or threatened use of physical force against the person or property of another, or

> (b) any other offense that is a felony and that, by its nature, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense.

18 U.S.C. § 16. In 2018, the Supreme Court struck down subsection § 16(b), often called the "residual clause," as unconstitutionally vague. *Dimaya*, 584 U.S. at 174–75. Because *Dimaya* is retroactive to cases on

collateral review, Barnette's § 2261 convictions stand only if their predicate offenses satisfy § 16(a), often called the "force" or "elements" clause. *See Welch v. United States*, 578 U.S. 120 (2016). "Physical force" under § 16(a) "means violent force—that is, force capable of causing physical pain or injury to another person." *Johnson v. United States*, 559 U.S. 133, 140 (2010). It must also be intentional. *See Borden v. United States*, 593 U.S. 420, 445 (2021).

To determine whether a predicate offense is a "crime of violence," courts apply the categorical approach, which "focuses 'on the *elements* of the prior offense rather than the *conduct* underlying the conviction.'" *United States v. Mathis*, 932 F.3d 242, 264 (4th Cir. 2019) (quoting *United States v. Cabrera-Umanzor*, 728 F.3d 347, 350 (4th Cir. 2013)). Under the categorical approach, a court determines whether the statutory elements of the predicate offense "necessarily require the use, attempted use, or threatened use of physical force." *United States v. Simms*, 914 F.3d 229, 233 (4th Cir. 2019) (en banc). The offense is a crime of violence only if the most innocent conduct it criminalizes satisfies § 16(b).

Courts apply a modified categorical approach when the predicate offense is "a so-called 'divisible statute,'" which "sets out one or more elements of the offense in the alternative." *Descamps v. United States*, 570 U.S. 254, 257 (2013). That approach authorizes the court to consult specific, limited case documents to determine "which alternative element formed the basis of conviction." *United States v. Price*, 777 F.3d 700, 705 (4th Cir. 2015) (citing *Shepard v. United States*, 544 U.S. 13, 19–20 (2005)). The court then applies the categorical approach to the identified element, asking whether the minimum conduct required to meet it satisfies the force or elements clause. Thus, as with the categorical approach, "[t]he focus of the modified categorical approach remains squarely on the elements of the prior conviction . . . and the reviewing court is not entitled to assess whether the defendant's actual conduct matches the federal statute." *Price*, 777 F.3d at 705.

Because of a defect in the indictment, it is impossible to determine through either approach whether the predicate offenses underlying Barnette's § 2261 counts remain valid crimes of violence, as it is impossible to identify the predicate offense at all. The indictment describes Barnette's alleged conduct as follows:

19

> [Count 1:] On or about the 30th day of April, 1996. . . Aquilia Marcivicci Barnette did travel across a state line, that is, did transport himself from Charlotte, North Carolina to Roanoke Virginia with the intent to injure, harass, and intimidate an intimate partner, Robin Williams, and in the course and as a result of such travel intentionally committed a crime of violence, that is, did firebomb Robin Williams' occupied apartment and an automobile parked in her driveway causing bodily injury to her. In violation of Title 18, United States Code, Sections 2261(a)(1) and 2261(b).
>
> [Count 10:] On or about the 22nd day of June, 1996 . . . Aquilia Marcivicci Barnette did travel across a state line, that is, did transport himself from Charlotte, North Carolina to Roanoke, Virginia with the intent to injure, harass, and intimidate an intimate partner, Robin Williams, and in the course and as a result of such travel intentionally committed a crime of violence, that is, shot and killed Robin Williams causing bodily injury and death to her. In violation of Title 18, United States Code, Sections 2261(a)(1) and 2261(b).

JA933, JA937. The indictment fails to identify a specific predicate crime of violence for either count, neither citing statutory provisions nor cross-referencing other counts in the indictment. Without an identified statutory predicate to look to, the court cannot know even which offense or which elements it must examine, much less whether to apply the categorical or the modified categorical approach. More fundamentally, it is impossible to analyze the elements of the predicate offenses or the minimum conduct required to meet them, and it is therefore impossible

20

to know whether the predicate offenses are crimes of violence under

§ 16(b).

The district court found no merit to this claim because "[t]he

*factual allegations* set forth in the indictment include *acts* that require

the intentional use of force capable of causing physical pain or injury."

JA3259 (emphasis added). That decision comports with neither the

categorical nor the modified categorical approach. The court must

analyze a statute, not an act. The alleged facts of how the offense was

actually committed are not part of the analysis; the only question is

whether the minimum conduct required to sustain a conviction for the

crime satisfies § 16(b). *See Price*, 777 F.3d at 705.

The district court wrote that Barnette "fails to show that the

manner in which the indictment was drafted somehow leads to

uncertainty as to the predicate crimes charged or casts doubt on

whether Petitioner was convicted of offenses that qualify as crimes of

violence." JA3259–3260. Were the predicate crimes so clear, one would

expect the Government in its briefing or the district court in its opinions

to identify and analyze the underlying statutes using the categorical or

modified categorical approach. Tellingly, neither the Government's

response to this claim, JA3134–3162, nor the district court's order denying relief, JA3259–3260, nor the district court's order denying Barnette's motion to reconsider, JA3255–3260, identifies the statutory offenses alleged to be a "crime of violence."

Because there is no way to determine even what offenses underlie Counts 1 and 10, much less whether they qualify as crimes of violence under the "force" or "elements" clause of § 16(a), Barnette's convictions and sentences under § 2261 are invalid.

### D. The defect with the § 2261 convictions invalidates Barnette's convictions under § 924(c) and § 844(h)(1).

Barnette's invalid § 2261 convictions were explicitly identified as predicate offenses for three other counts: 2, 3, and 11. Given that dependency, the invalidation of the former invalidates the latter.

Counts 2 and 11 charged Barnette with knowingly using and carrying a firearm during and in relation to a "crime of violence" in violation of § 924(c).[2] Importantly here, the offenses alleged as the

---

[2] The definition of "crime of violence" in 18 U.S.C. § 924(c)(3) is nearly identical to the one in 18 U.S.C. § 16. It, too, contains an unconstitutionally vague "residual" clause, which was struck down in *United States v. Davis*, 588 U.S. 445 (2019), leaving only the "force" or "elements" clause to define "crime of violence."

predicate crimes of violence for these § 924(c) offenses were the  § 2261

offenses in Counts 1 and 10:

> [Count 2:] On or about the 30th day of April, 1996 . . . Aquilia
> Marcivicci Barnette knowingly used and carried a firearm, that is
> a destructive device, consisting of a bottle filled with flammable
> liquid, during and in relation to a crime of violence for which he
> may be prosecuted in a court of the United States, that is, an act
> of interstate domestic violence in violation of Title 18, United
> States Code, Section 2261 as set forth in Count One. In violation
> of Title 18, United States Code, Section 924(c)(1).

> [Count 11]: On or about the 22nd day of June, 1996 . . . Aquilia
> Marcivicci Barnette knowingly used and carried a firearm, that is
> a sawed-off Winchester semi-automatic shotgun, during and in
> relation to a crime of violence, for which he may be prosecuted in a
> court of the United States, that is the act of interstate domestic
> violence set forth in Count Ten above, and in the course of this
> violation caused the death of Robin Williams, through the use of a
> firearm, which killing is a murder as defined in Title 18, United
> States Code, Section 1111, in that the defendant, with malice
> aforethought, did unlawfully kill Robin Williams by shooting her
> with the firearm willfully, deliberately, maliciously, and with
> premeditation. In violation of Title 18, United States Code,
> Sections 924(c)(1) and (i)(2)(1).

JA934, JA937–38. Accordingly, Barnette's § 924(c) convictions depend

upon his § 2261 convictions to satisfy their "crime of violence" element.

The invalidation of his § 2261 convictions therefore necessarily

invalidates the convictions and sentences for his § 924(c) convictions,

including his death sentence for Count 11.

Similarly, Count 3 of the indictment charged Barnette with a violation of 18 U.S.C. § 844(h)(1) for using and carrying fire and explosive materials during the commission of the § 2261 interstate domestic violence charged in Count 1:

> [Count 3]: On or about the 30th day of April, 1996 . . . Aquilia Marcivicci Barnette knowingly used and carried fire and explosive materials, to commit an act of interstate domestic violence in violation of Title 18, United States Code, Section 2261, a felony prosecutable in a court of the United States. In violation of Title 18, United States Code, Section 844(h)(1).

JA934. The jury instructions for this count made clear that a conviction for Count 3 depended on the § 2261 conviction for Count 1: "you may find the defendant guilty of Count 3 if you find him guilty as charged in Count number 1, and that he knowingly used fire and explosive materials or carried an explosive in the commission of that offense." JA3133. Because Count 1 cannot stand, neither can Count 3.

## E. The unconstitutional convictions require resentencing for Barnette's other capital convictions.

Barnette's sentences of death for Counts 7 and 8 must also be vacated because of the possibility that Barnette's five unconstitutional convictions proved decisive when his jury was deciding his punishment. The Eighth Amendment's prohibition against cruel and unusual

punishment gives rise to a "need for reliability in the determination that death is the appropriate punishment in a specific case." *Woodson v. North Carolina*, 428 U.S. 280, 305 (1976). Capital sentencing decisions must therefore be free from reliance on "factors that are constitutionally impermissible or totally irrelevant to the sentencing process." *Zant v. Stephens*, 462 U.S. 862, 865 (1983).

In *Johnson v. Mississippi*, the Supreme Court held that the enhanced reliability that the Eighth Amendment requires in capital cases demands resentencing where "there is a possibility" that an invalid conviction has informed a death sentence. 486 U.S. 578, 583 (1988). In *Johnson*, the defendant's death sentence was informed by a prior conviction for assault that was later overturned. *Id.* at 581. Even though aggravating circumstances unrelated to the assault conviction remained, the Supreme Court held that a new sentencing was constitutionally required because there was "a possibility that the jury's belief that petitioner had been convicted of a prior felony would be decisive in the choice between a life sentence and a death sentence." *Id.* at 586 (internal quotations omitted); *see also United States v. Tucker*, 404 U.S. 443 (1972) (holding that resentencing was required in a non-

capital case where the original sentence was informed by a conviction that had subsequently been invalidated). Under this possibility standard, resentencing is required when there is a possibility that an invalid conviction influenced even a single juror to recommend death. *See United States v. Causey*, 185 F.3d 407, 423 (5th Cir. 1999) (remanding for resentencing after vacating one capital conviction, explaining that "it is impossible to say" that the death sentences "were not influenced by the fact" that defendants had received three eligible convictions, rather than two").

Barnette's resentencing jury unanimously found eight mitigating circumstances, including his upbringing in a family environment of violence, drugs, and alcohol abuse; his turning himself in to police and cooperating with their investigation; and that he had been a model prisoner. JA2931–2933; JA2950–2952, JA2968–2969. At least one juror found seven additional mitigating factors. *Id.* The jurors weighed that mitigating evidence against the aggravating factors as they decided whether or not to impose death. As a part of their weighing process, the jury also considered Barnette's five invalid convictions, which no doubt rested heavily on their scales. There can be little doubt of a possibility

that Barnette's multiple unconstitutional convictions influenced at least one juror to recommend a sentence of death on the other counts. As reasonable jurists could disagree as to the district court's adjudication of this claim, this Court should grant a COA and remand for a new sentencing hearing.

**II.    The district court erroneously denied an evidentiary hearing on Barnette's claim that his death sentence is unreliable because resentencing counsel provided ineffective assistance.**

In an extraordinary filing nearly seven months after their appointment, Barnette's resentencing lawyers detailed for the district court the precise steps necessary to correct and complete the shoddy mitigation investigation and presentation in Barnette's first trial. They then utterly failed to follow their own directions and do the work they had identified. These unreasonable failures led to four prejudicial deficiencies: (1) Without conducting an appropriate investigation, resentencing counsel opted to explain the crimes by portraying Barnette as a "classic batterer" of women—a gambit that was not only far more aggravating than mitigating, but also incorrect; (2) Resentencing counsel failed to discover or produce for their mental health experts available and compelling evidence showing that

Barnette's crimes resulted from an acute mental health crisis brought on by his childhood traumas and escalating mood disorders; (3) Resentencing counsel failed to impeach the Government's mental health expert on his use of materially false testimony in another capital case; and (4) Resentencing counsel advised Barnette to testify without fully investigating or consulting their experts about how his compromised mental health might distort his accuracy and presentation on the witness stand. The district court erred in denying Barnette a hearing on these claims. As nothing in the record conclusively rebuts the possibility of ineffective assistance of counsel, *see Mayhew*, 995 F.3d at 176–77, this Court should grant a COA and remand for that hearing.

## A. Legal framework

The Sixth Amendment guarantees the "right to the effective assistance of counsel." *Strickland v. Washington*, 466 U.S. 668, 686 (1984). To demonstrate ineffective assistance of counsel, a § 2255 petitioner must satisfy *Strickland*'s two-prong test by showing that (1) "counsel's representation fell below an objective standard of reasonableness," and (2) counsel's deficient performance prejudiced the defense. *Id* at 688, 692. The deficiency prong requires articulating

specific acts or omissions that fell "outside the wide range of professionally competent assistance." *Id.* at 690. The Supreme Court has long looked to the standards for capital defense work published by the American Bar Association (ABA) as "well-defined norms" and "guides to determining what is reasonable." *Wiggins v. Smith*, 539 U.S. 510, 524 (2003) (quoting *Strickland*, 466 U.S. at 688). To establish prejudice under the second prong, the petitioner must demonstrate that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694.

Importantly here, a "well-defined norm" at the time of Barnette's resentencing hearing "provided that investigations into mitigating evidence 'should comprise efforts to discover *all reasonably available mitigating evidence.*'" *Williams v. Stirling*, 914 F.3d 302, 313 (4th Cir. 2019), *as amended* (Feb. 5, 2019) (quoting *Wiggins*, 539 U.S. at 524 (applying this norm to a trial that occurred in 1989)); *see also Williams v. Taylor*, 529 U.S. 362 (2000); *Rompilla v. Beard*, 545 U.S. 374 (2005); *Porter v. McCollum*, 558 U.S. 30 (2009) (per curiam); *Sears v. Upton*, 561 U.S. 945 (2010) (per curiam).

While "strategic choices made after thorough investigation of law and facts" are usually considered reasonable, strategic choices made without a complete investigation are reasonable "precisely to the extent that reasonable professional judgments support the limitations on investigation." *Strickland*, 466 U.S. at 690–91. When, as here, a petitioner claims that defense counsel unreasonably failed to conduct an adequate investigation, "the focus is on 'whether the investigation supporting counsel's decision not to introduce' particular mitigating evidence '*was itself reasonable.*'" *United States v. Runyon*, 994 F.3d 192, 207 (4th Cir. 2021) (quoting *Wiggins*, 539 U.S. at 523). In conducting this inquiry, courts must "consider not only the quantum of evidence already known to counsel, but also whether the known evidence would lead a reasonable attorney to investigate further." *Wiggins*, 539 U.S. at 527.

Whether counsel's performance was constitutionally adequate is a mixed question of fact and law that is reviewed de novo. *See United States v. Nicholson*, 611 F.3d 191, 205 (4th Cir. 2010). Because Barnette's claim was summarily denied, this Court must construe the

facts in the light most favorable to him and draw all reasonable

inferences in his favor. *Hashimi*, 110 F.4th at 627.

> **B.    The district court abused its discretion by employing the wrong standard to determine whether Barnette was entitled to an evidentiary hearing.**

As this Court has made clear, an evidentiary hearing is required

under 28 U.S.C. § 2255 unless it is clear from the pleadings, files, and

records that a movant is not entitled to relief. *See United States v.

Witherspoon*, 231 F.3d 923, 925–26 (4th Cir. 2000). "The burden on the

petitioner in a *habeas* case for establishing an entitlement to an

evidentiary hearing is relatively light." *Valentine v. United States*, 488

F.3d 325, 333 (6th Cir. 2007) (internal quotation and alterations

omitted).

This Court reviews the lower court's decision not to hold an

evidentiary hearing on a § 2255 motion for an abuse of discretion.

*Gordon v. Braxton*, 780 F.3d 196, 204 (4th Cir. 2015). But "[a]lthough

whether to hold a hearing ordinarily is a matter of district court

discretion," a district court abuses its discretion by denying an

evidentiary hearing on "a colorable Sixth Amendment claim showing

disputed facts beyond the record, or when a credibility determination is necessary to resolve the claim." *Mayhew*, 995 F.3d at 176–77.

In denying Barnette an evidentiary hearing, the district quoted § 2255's statutory language requiring an evidentiary hearing unless the records of the case "conclusively show that the prisoner is entitled to no relief." 28 U.S.C. § 2255(b). If then deviated from this standard, holding that "[e]videntiary hearings on § 2255 petitions are *the exception, not the norm*, and there is a *heavy burden* on the petitioner to demonstrate an evidentiary hearing is warranted." JA3196 (emphases added). The district court borrowed that language from a 2003 out-of-circuit opinion, which has never been approved by this Court or any other Court of Appeals. *See Moreno-Morales v. United States*, 334 F.3d 140, 145 (1st Cir. 2003).

In so holding, the district court impermissibly amplified Barnette's burden to obtain an evidentiary hearing. As in all § 2255 cases, the district court's obligation was to draw all inferences in Barnette's favor and ask whether they were "enough to raise significant questions" about the reliability of his death sentence. *Hashimi*, 110 F.4th at 627. By instead requiring Barnette to carry a "heavy burden"

32

in seeking an evidentiary hearing, JA3196, the district court abused its discretion. This Court should grant a COA and remand for the hearing the district court improperly denied him.

### C. Resentencing counsel's failure to maintain and preserve files makes an evidentiary hearing necessary.

Weighing in favor of the need for an evidentiary hearing is the fact that resentencing counsel lost Barnette's case files. All the attorneys who represented Barnette in his 1998 trial and the other attorneys involved in the 2002 resentencing hearing transferred their case files to resentencing counsel Harold Bender. JA3219–3220. Bender provided Barnette's habeas counsel with approximately 300 pages before he died in March 2013, leaving 40 or 50 boxes of files missing. JA3220. Attempting to remedy the situation, the district court ordered the Government to provide to habeas counsel all discovery previously provided to Barnette, all *Brady* material, and correspondence between the prosecution and defense. JA3220. Of course, the Government did not have and could not provide resentencing counsel's notes, memoranda, or correspondence with witnesses and experts. JA3220, JA304 & n.10.

As discussed above, a district court abuses its discretion if it denies relief under § 2255 without holding an evidentiary hearing "[u]nless the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief." 28 U.S.C. § 2255(b). Normally, a district court would be able to review trial counsel's files in making this determination. In this case, the lack of record evidence tending to show the cause of resentencing counsel's failures further supports the need for an evidentiary hearing.

### D. Resentencing counsel failed to conduct the investigation they recognized as necessary to a competent defense of Barnette.

On February 13, 2001, the district court appointed Claire Rauscher and Jean Lawson to represent Barnette in his resentencing trial. JA867. On August 28, 2001, resentencing counsel filed an *ex parte* "Statement of Defense Contentions" with the district court. This document contained both concessions and insights. Despite being appointed nearly seven months earlier, resentencing counsel revealed they had conducted no investigation in support of their representations; in fact, their only work on Barnette's case constituted a "review of the trial transcript, the defendant's criminal record, and the discovery in

the case and the presentation at Marc Barnette's first sentencing proceeding." JA598; *see also* JA409. But resentencing counsel realized from even that cursory review of the file that they could not rely on the investigation and preparation done for the first trial; they wrote that "an approach different from that used in his first sentencing hearing is warranted." JA598. Their review of the file also convinced them that the mitigation investigation for the first trial "omitted critical information," "cast doubt on the reliability" of experts who relied on that information, and called into question "the honesty of the defense presentations," JA605, and resentencing counsel knew that they needed to hire a new mitigation specialist and investigator. JA605, JA445. They accordingly filed *ex parte* motions to hire investigator Jan Barefoot and mitigation specialist Cessie Alfonso, which were granted. JA601–603; JA604–606; JA615–616; JA619–620.[3] "[I]t was clear" to resentencing counsel that

---

[3] Claire Rauscher was removed from the defense team on November 20, 2001, leaving Jean Lawson as Barnette's only attorney for two months until she could find a replacement. JA446, JA411. Harold Bender was eventually appointed as Lawson's co-counsel, but Lawson knew that Bender's "major strength and interest was in the courtroom" and thus "the responsibility and burden of developing the mitigation and case for sentencing" would fall on her. JA412.

they would "need[] to reevaluate everything that the first trial team did, meet with their experts and review all of their data and evaluations, identify additional experts who might be needed, and identify and interview numerous family members, co-workers, and other potential witnesses." JA410; *see also* JA445, JA599–600.

With the roadmap detailed in their statement and their requested investigator and mitigation specialist on board, it appeared that resentencing counsel were ready to get moving. Instead, they idled.

The record demonstrates that resentencing counsel failed to direct their new investigator and mitigation specialist to complete the investigation their statement and motions to the district court recognized as essential. Mitigation Specialist Alfonso explains that she had "no substantive conversations" with Bender in the lead up to trial; initially she was "in somewhat regular contact with Jean Lawson, but things changed a few months into the case and [Alfonso] started hearing less and less often from her." JA316. Although Alfonso understood that Lawson believed the investigation conducted for the first trial had been "incomplete and resulted in inaccuracies and superficial conclusions," neither Bender nor Lawson told Alfonso "what

36

particular aspects of [the prior] mitigation investigation they had serious concerns with." JA316. As a result, Alfonso explains, "it was never made clear to me whether defense counsel wanted me to do a wholesale re-investigation of Marc's background, or instead just focus on specific aspects." JA316.

All in all, Alfonso conducted eleven interviews of mitigation witnesses: eight of Barnette's family members, two people she hoped would know the identity of Barnette's biological father, and Netoshia Heard Tolbert, the mother of Barnette's children. JA316. Despite resentencing counsel's recognition that they needed "to reevaluate *everything* that the first trial team did," JA599–600 (emphasis added), Alfonso did not re-interview several witnesses who had been interviewed before the first trial. JA415–416.

Investigator Barefoot "did not have full-scale involvement in the retrial." JA330. Her primary role was assisting mitigation specialist Alfonso with locating witnesses. JA330. Barefoot's biggest task for the resentencing hearing was serving subpoenas. JA330. In March 2002, resentencing counsel faxed Barefoot a list of "potential mitigation

witnesses." JA414. Several people on that list—including, as discussed below, former girlfriends—were never interviewed. JA415–416.

Despite their recognized need to "thoroughly interview experts and review data obtained during the first trial preparation," JA599, resentencing counsel failed to consult with Dr. Sally Johnson, a forensic psychiatrist employed at the Federal Correctional Institution at Butner, North Carolina. JA405–406. Dr. Johnson was previously court-appointed to evaluate Barnette's competency prior to his 1998 trial. JA406. At that trial, she testified for the defense about Barnette's positive adjustment to incarceration, and that he expressed remorse for his behavior and sympathy for the victim's family. JA406. Resentencing counsel never contacted her, which, as detailed below, deprived them of powerful and readily available mitigating evidence. JA406.

The failure to conduct the investigation that resentencing counsel themselves recognized as necessary was unreasonable and deficient in violation of prevailing professional norms. The Supreme Court and this Court have made resentencing counsel's obligations clear. *Wiggins*, 539 at 523; *Runyon*, 994 F.3d at 207. The fact that some mitigation evidence had been developed for Barnette's original 1998 sentencing proceeding

did not absolve resentencing counsel of those responsibilities. As Russell Stetler, an expert in the standard of care for capital mitigation investigations, explains in a declaration submitted to the district court, "[i]t is incumbent upon successor counsel to conduct the same penalty-phase preparation, including thorough social history investigation and reliable mental health assessments, as counsel would be expected to conduct at an initial trial." JA454. It would therefore be "a dereliction of Counsel's duty under the Sixth and Eighth Amendments and the prevailing professional norms" to rely on prior counsel's mitigation investigation, "particularly since the original jury returned a death sentence." JA454. The fact that resentencing counsel acknowledged the deficiencies in the 1998 investigation and mitigation presentation makes their failure to conduct a reinvestigation even more clearly deficient.

As described in more detail in the relevant sections below, resentencing counsel's failure to conduct the investigation they identified as necessary to Barnette's defense caused them to commit several prejudicial errors.

**E.** **Resentencing counsel unreasonably adopted an incorrect and aggravating theory that Barnette committed the crimes because he was a classic batterer of women.**

In their August 2001 statement, resentencing counsel explained to the district court that their predecessors failed to adequately address the aggravating evidence from three of Barnette's former romantic partners, Netoshia Tolbert, Crystal Dennis, and Alesha Chambers, who testified as prosecution witnesses at Barnette's first trial about his violent behavior. JA599. Counsel had an obligation to investigate the Government's aggravating evidence and prepare to to rebut the case in aggravation. *See Andrus v. Texas*, 590 U.S. 806, 814 (2020). After reviewing the records from Barnette's first trial, resentencing counsel understood that, to do so, they "needed to have a better understanding of those relationships prior to the start of the resentencing trial." JA413; *see also* JA599.

The way to develop that understanding was well-established. For defendants who are psychiatrically disordered, professional norms require an extensive mitigation investigation before counsel can make an informed decision about what mental health experts to employ. JA467. As Stetler explains, "[o]nly after the social history data have

40

been meticulously digested and the multiple risk factors in the client's biography have been identified" is it possible for counsel to "be in a position to determine what kind of culturally competent expert is appropriate to the needs of the case, what role that expert will play, and what referral questions will be asked of the expert." JA478.

Resentencing counsel breached this norm just three months after submitting their statement. In November 2001, without having conducted any new mitigation investigation, resentencing counsel moved to retain an expert in domestic violence, psychiatric nurse and FBI consultant Ann Wolbert Burgess. JA634–36; JA409; JA413. As their motion makes clear, resentencing counsel—while recognizing that the prior investigation was unreliable, and without conducting any investigating of their own—committed to a defense: namely, that Barnette's crimes were "a direct product of the impact of domestic violence and murders of women in the defendant's family upon the defendant," which had rendered him an inveterate abuser of women. JA635. A "pivotal defense theme at this re-sentencing hearing," resentencing counsel continued, "is the impact of multigenerational domestic abuse on the defendant," which can "explain the criminal

conduct of the defendant in light of how his relationship with women was formed." JA634–635.

From the outset, resentencing counsel's commitment to a defense that Barnette's crimes were caused by his propensity for domestic violence—a theory far more aggravating than mitigating—was unreasonable. In the first place, this defense was not supported by a reasonable investigation; since resentencing counsel had not begun one, if their decision was informed by any investigation at all, it was informed by the first trial investigation that they had denounced to the district court. Instead of allowing an investigation to shape the theory of the defense and the experts needed to support it, resentencing counsel did things backwards, making a premature decision to hire Burgess. In so committing, though, resentencing counsel acknowledged that Burgess could not advance the theory they had selected without reviewing the results of a thorough investigation into Barnette's past relationships. They understood that "Dr. Burgess would need to have access to all of Mr. Barnette's social history and mitigation information as well as women with whom he had been in relationships." JA413. Yet, as detailed below, they utterly failed to conduct that needed

investigation or to share with Dr. Burgess the little information they did discover.

Despite their focus on Barnette's history with domestic violence, the defense team interviewed only one woman with whom Barnette had been in a relationship before the second trial. Mitigation Specialist Alfonso interviewed Netoshia Heard Tolbert, the mother of Barnette's children—an interview Alfonso described as "necessarily limited because [she] did not have any direction from defense counsel regarding what was needed for resentencing." JA318.[4] Resentencing counsel also never shared the contents of Tolbert's interview with Dr. Burgess. JA318. Dr. Burgess therefore never learned Tolbert's perspective that "Marc and I shared a deep bond and connection—and our relationship was not some stereotypical one where Marc was the terrible batterer and a monster." JA521. Nor could Dr. Burgess consider Tolbert's

---

[4] Although mitigation specialist Alfonso had extensive training and experience in the area of domestic violence, resentencing counsel "never asked [her] to explore Marc's relationship with other women." JA318. Thus, according to Alfonso, "[t]here was no request by defense counsel, or effort by me, to contact and interview prior girlfriends such as Sheila Sullivan, Crystal Dennis, Kowana Dozier, Tameka Hunter, or Alesha Chambers." JA318.

account that "Marc had an incredibly sensitive and tender side to him, but it would compete with other aspects of his personality that made our relationship very turbulent. None of Marc's lawyers ever really understood that." JA521.

Having failed to conduct the investigation they told the court was necessary, resentencing counsel could not provide Dr. Burgess with the information she needed to form an accurate opinion about Barnette. Instead, resentencing counsel had Dr. Burgess meet with Barnette, his parents, and his brother. JA413. Resentencing counsel did not coordinate or suggest conversations with other witnesses, including Barnette's former romantic partners. JA318, JA413. What is more, they provided Dr. Burgess with social history information from the investigation for the first trial—"the same work [they] had previously concluded and told the court was poorly done and deficient." JA413.

The failure to conduct a reasonable mitigation investigation resulted in Dr. Burgess's inaccurate—and highly aggravating— diagnosis of Barnette as a serial and irredeemable abuser. Dr. Burgess concluded in her report that "Marc Barnette embarked on a domestic crime spree based on his belief that Robin Williams, his ex-girlfriend of

two years, was being unfaithful, a thinking pattern noted with prior girlfriends." JA657. She opined that "[t]he criminal acts may be understood, in part, as a symbolic reenactment of family and childhood patterns." JA657. Likewise at trial, Dr. Burgess testified that "all of the activities and the criminal activities that we see within that time frame is focused on his obsession to get to his ex-girlfriend to reunite with her." JA2350. Dr. Burgess testified to the "pattern of he gets into a good relationship, everything seems to be going well, and then gets into this thinking that there's infidelity . . . that's where the physical abuse can come in." JA2350. She explained: "And it's always the cycle and it *never gets resolved*. It just goes from young woman to young woman, girlfriend to girlfriend." JA2350 (emphasis added).[5]

Dr. Burgess's misleading and highly aggravating picture of Barnette as a classic batterer was due entirely to counsel's failure to conduct a reasonable investigation and provide Dr. Burgess with sufficient information. A reasonable investigation into Barnette's past

---

[5] Resentencing counsel's failures also left Burgess vulnerable to cross examination concerning the limits of her knowledge. The prosecutor asked Dr. Burgess whether she had interviewed Crystal Dennis, Netoshia Tolbert, or Alesha Chambers. JA2394. She admitted that she had not. JA2394.

relationships would have yielded a more accurate and complete (not to mention less aggravating) understanding of Barnette's history with women than resentencing counsel led Dr. Burgess to adopt. Had he been granted an evidentiary hearing in the district court, Barnette would have shown:

-

- Resentencing counsel knew that Temeka Hunter, now Temeka Lee, was Barnette's romantic partner in 1992 and 1993, but they nevertheless failed to interview her or suggest Dr. Burgess do so. JA414. Had defense counsel interviewed Hunter, they would have discovered that there was "never any fighting or jealousy" in their relationship, and Barnette "never acted possessively towards [her]." JA417. Hunter would have told resentencing counsel, "We never argued. He was always respectful. We never got into fights and he never put his hands on me." JA417. Had she testified, Hunter would have explained that "Marc was always sweet and kind to me," and she "would have shared my memories of him with the jury." JA418.

- Resentencing counsel knew that Kowana Dozier was Barnette's romantic partner in 1992 and 1993, but they nevertheless failed to interview her or suggest that Dr. Burgess do so. JA414. ▮▮▮▮▮▮

46

- Resentencing counsel knew that Crystal Dunn had testified for the Government at trial, but they neglected to contact her before the retrial, when she would testify again. Had resentencing counsel interviewed her, they would have learned that the first several months of Dunn's relationship with Barnette "were great" and like being "in dreamland," before he suddenly changed utterly, becoming "controlling and possessive," "completely mad," and "crazy." JA392–393.

After reviewing the information gathered in the post-conviction investigation, Dr. Burgess acknowledged that her "earlier findings, opinions, and testimony were badly marred by inaccurate and incomplete information with which trial counsel provided me." JA367. Based on the new information, Dr. Burgess concluded that "[r]ather than being 'programmed' or engaging in 'repetition compulsion' in each and every one of his intimate relationships, Mr. Barnette had very different types of relationships with different women—and that he did not, in fact, fit the profile of a 'classic batterer.'" JA368 (quoting her testimony at JA2357, JA2352). Barnette's relationships with Sullivan, Hunter, and Dozier "dramatically undercuts the notion that Mr. Barnette was somehow a 'classic batterer' whose relationships always followed the same pattern, including 'obsessive pursuit.'" JA369. His relationship with Dunn, moreover, featured an abrupt shift into a disturbed frame of mind that suggested the mental health issues that

truly underlay his behavior. As discussed in more detail below, Dr. Burgess concluded based on the full picture of Barnette's social history that, "[r]ather than simply acting out as a result of familial dysfunction, as [she] reported and testified about in 2002, Mr. Barnette suffered from debilitating mental health issues that profoundly affected his behavior throughout his life." JA367.

In short, in requesting an evidentiary hearing, Barnette presented extra-record evidence showing that resentencing counsel—without conducting any investigation—accepted as true the Government's contention from the first trial that Barnette was an entrenched abuser of women. Rather than investigating the Government's picture of Barnette, or attempting to mitigate it in any way, resentencing counsel presented inaccurate and highly aggravating expert testimony that Barnette was "programmed" to engage in the "repetitive compulsion" of violence toward women. JA368.

Resentencing counsel's ill-informed choices echo those that the Supreme Court found deficient in *Andrus v. Texas*, 590 U.S. 806 (2020) (per curiam). First, counsel in *Andrus* performed almost no mitigation investigation and overlooked readily available mitigation evidence. *Id.*

at 814. Second, "what little evidence counsel did present backfired by bolstering the State's aggravation case." *Id.* Finally, "counsel failed adequately to investigate the State's aggravating evidence, thereby forgoing critical opportunities to rebut the case in aggravation." *Id.* In light of these deficiencies, the Supreme Court vacated the state-court judgment and remanded for consideration of *Strickland*'s prejudice prong. *Id.* at 824.

As in *Andrus*, "due to counsel's failure to investigate the case in mitigation," *id.* at 817, resentencing counsel unwittingly ratified the Government's case in aggravation by adopting its caricature of Barnette as a relentless abuser of women. Thus, as in *Andrus*, "much of the so-called mitigating evidence [counsel] offered unwittingly aided the [prosecution's] case in aggravation." *Id.* at 817. And as in *Andrus*, resentencing counsel's "introduction of seemingly *aggravating* evidence," through the damaging testimony of Dr. Burgess, "confirms the gaping distance between [their] performance at trial and objectively reasonable professional judgment." *Id.*

In denying an evidentiary hearing on this claim, the district court noted that "[w]hether to call witnesses is a decision by counsel which

the courts do not second-guess." JA3203 (quoting *Williams v. Carter*, 76 F.3d 199, 200 (8th Cir. 1996)). But the thrust of Barnette's claim is not that resentencing counsel failed to call these witnesses to testify, but that they failed to interview them at all. The record is clear that the failure to interview Sullivan, Hunter, and Dozier was not a strategic decision. In fact, resentencing counsel faxed investigator Barefoot a list of "potential mitigation witnesses" in March 2002. JA414. The list included several former girlfriends, including three discussed above. JA414. According to investigator Barefoot's notes, Lawson asked her to try to locate Dozier and Hunter "on the eve of trial," but Barefoot did not have enough time to track them down. JA414.

In denying a hearing on this claim, the district court also concluded that "Dr. Burgess conducted her own extensive investigation," and "Petitioner cannot establish that counsel's poor performance caused any omissions in her investigation." JA3211. But Dr. Burgess's own affidavit submitted during post-conviction contradicts the district court's conclusion.

Barnette's § 2255 motion therefore presents more than "a colorable Sixth Amendment claim showing disputed facts beyond the

50

record," *Mayhew*, 995 F.3d at 176, and the district court therefore erred in denying an evidentiary hearing on this claim.

**F.      Resentencing counsel unreasonably failed to discover available evidence that Barnette's crimes could be explained by a mental health crisis.**

Resentencing counsel's review of the first trial record revealed that an extensive reinvestigation of Barnette's mental health was necessary. As they told the district court in their statement, the investigation for the first trial "was superficial and not-sufficiently in depth to enable the formation of a cohesive theory of mitigation." JA599. As a result, "the psychological, psychiatric and family history was not presented to the jury in an effective manner." JA599. Even setting aside Barnette's relationships with women, discussed above, the record from the first trial raised several red flags regarding Barnette's mental health history and mental status at the time of the crime, including his chronic crying spells and multiple suicide attempts.

The Supreme Court has consistently stressed the importance of reasonably pursuing the kinds of red flags like the ones resentencing counsel identified in the Barnette record. In *Rompilla v. Beard*, the Supreme Court noted that counsel "could not have reasonably ignored

mitigation evidence or red flags" present in the file. 545 U.S. at 391 n.8. This Court has likewise recognized that, in capital cases, defense counsel's performance is constitutionally deficient when they unreasonably fail to investigate red flags. *See Gray v. Branker*, 529 F.3d 220, 229 (4th Cir. 2008) (finding ineffective assistance of counsel where, "without making reasoned strategic decisions, counsel ignored [] red flags and failed to investigate for mental health evidence"); *Runyon*, 994 F.3d at 208 (remanding for an evidentiary hearing on a § 2255 claim of ineffective assistance of counsel because "red flags clearly pointed to potential mitigating evidence"). Resentencing counsel were presented with a virtual raft of them in the 1998 proceedings, which, as Stetler explains, "provided a roadmap for follow-up investigation." JA490. Resentencing counsel failed to follow those directions, and instead undertook an even less thorough investigation than was completed for the 1998 trial.

Resentencing counsel chose to use two of the prior experts for the resentencing: Dr. Seymour Halleck and Dr. Mark Cunningham. Resentencing counsel Lawson "knew that in order for an expert like Dr. Halleck to competently testify about our client's psychiatric make-up and

mental health issues, he would need to have access to all of his social history and mitigation information." JA414. Nevertheless, aside from the flawed information from the first trial, the only information resentencing counsel provided to Dr. Halleck was access to Barnette, his mother, and one former girlfriend, Netoshia Tolbert. JA2248–2249. As for Dr. Cunningham, resentencing counsel decided to expand his role beyond the "future dangerousness" analysis he provided for the 1998 trial, and to ask him to testify "more broadly about Marc Barnette's psychological make-up and mental health issue." JA498. They nevertheless provided no new information to Dr. Cunningham, aside from another meeting with Barnette. JA3069, JA415.

Making matters worse, resentencing counsel provided their mental health experts with the mitigation work from the first trial—the very work deemed incredible and unreliable by resentencing counsel. JA3069; JA415. Resentencing counsel never informed either expert that the 1998 social history investigation (upon which they both relied) was, in trial counsel's view, incomplete and inaccurate. JA3069. Dr. Cunningham, for example, explains that "[b]ecause the defense lawyers never suggested to me that I should question the accuracy or

53

completeness of the information I had previously been given about Mr. Barnette's background, I did not have any reason to question it." JA3069.

Had defense counsel conducted a reasonably thorough investigation, and provided the results to mental health experts, the resentencing jury would have understood that Barnette's crimes stemmed from an acute mental health crisis, rather than a baseless predilection for violence against women.

As detailed in the social history and the expert reports below, Barnette's childhood featured poverty, abuse, and neglect, that, combined with genetic etiologies, compromised his mental health. JA525–531. When Barnette was born, his mother, Sonia, was only 14, and struggling with family traumas that would shape Barnette's life as well. JA525. Her father's service in the Korean War left him with PTSD and drove him to alcoholism. JA525. Her mother was ultimately murdered by an abusive boyfriend. JA526. Her unfaithful husband, Derrick Barnette, violently abused her and her children, leading Barnette to contemplate suicide and frequently run away from home. JA526–527. Derrick ultimately abandoned them, only to reappear with

54

DNA testing showing that he was not the father of Barnette or his brother. JA527. Sonia retreated into romantic involvements, ultimately losing her job and leaving Barnette to care for his brother as they moved from project to project, often with no food at hand. JA527–528. When Barnette was 15, Sonia moved the family to Georgia, where Barnette, reeling from his family's instability, pursued romantic relationships of his own, ultimately fathering two children while still a teenager. JA528–529. A series of romantic relationships followed, some of which featured the violence that Barnette had grown accustomed to during his childhood.

The mental instability amplified by these traumas was evident in the testimony of particular witnesses whom resentencing counsel neglected.





- Kenneth Bailey was Barnette's best friend in high school. JA328. Had resentencing counsel interviewed Bailey, he would have explained: "The assault had a big impact on Marc. He was very agitated after the beating. He was more on edge. It seemed like he walked around with a chip on his shoulder after it happened, like he didn't know who to trust." JA328.

- Jean Nduly is the first cousin of Barnette's mother, Sonia Cooper. JA428. She testified in the first trial, but resentencing counsel failed to interview her. JA431. She could have told resentencing counsel that, a couple of days before the crimes, Cooper called Nduly out of concern that Barnette wasn't acting like himself, and that Nduly told Cooper she "might have to take him to see a psychiatrist or counselor." JA430. Cooper asked Nduly to go talk to Barnette. When Nduly arrived, Barnette "did not get up off the bed," and Nduly remembers "taking his arm and moving it," but his arm was "floppy and limp." JA430.

Even when resentencing counsel did interview witnesses in preparation for the second trial, they failed to provide the relevant information to defense experts. For example, mitigation specialist Alfonso interviewed Barnette's aunt Sheila Cooper, who testified in the mitigation phase of the first trial. JA390. Cooper lived with Barnette when he was in high school. Cooper, who refers to Barnette as "Vicci," could have explained: "Something was not right with Vicci. I have

wondered if he's had Bipolar Disorder or some other mental illness where his mood fluctuates so dramatically." JA38. Cooper remembers that, even as a child, "[t]here were times when Vicci would be in his room acting strangely. He would just sit and stare." JA387. Cooper recalls that, when Barnette and Williams were living together in Virginia, Barnette called and "said he felt like Robin was putting something in his food. He said it felt evil." JA388. After Barnette and Williams broke up, Cooper noted that "Vicci really fell apart." JA388. She recalls that "there were a number of things that changed about Vicci in that time period," and she remembers observing even more odd behavior in Barnette. JA388–389. Barnette told her "that when the crime happened he saw himself standing here in one place while his spirit was over there pulling the trigger. Then he started walking away and his spirit merged back into his body." JA389. None of this information was provided to the defense experts at resentencing. JA415.

Like Barnette's other girlfriends, Tolbert should have alerted resentencing counsel and their experts to a psychiatric explanation for Barnette's crimes. Tolbert observed to post-conviction counsel that "[a]t times Marc would get teary-eyed and other times he would outright

bawl. He was up and down. His mood would change over the course of hours or a day." JA518. Tolbert explained that "a lot of times" she "found Marc naked and crying in the closet." JA517. He would be "sitting on the floor with his knees up to his chest," and Tolbert never knew why he was acting that way. JA517. Tolbert explains, "I tried to tell [Barnette's mother] Sonia that something was terribly wrong with Marc but she responded that something was terribly wrong with me." JA517. Tolbert would testify at an evidentiary hearing that "He acted psychotic . . . When Marc was psychotic he would not reason. You don't even know if he's hearing what you have to say. It's like he's not even there. He will look at you but he's not there." JA518. She would explain that "[w]ith the crazy Marc it felt like there was witchcraft on him and there was some kind of psychosis. I really didn't know what was wrong with him. He was just ill." JA518.

As with the failure to investigate Barnette's history with women, defense counsel's ignoring other mental health red flags led to uninformed and inaccurate expert opinions. Domestic violence expert Dr. Burgess acknowledges that, because her opinion was based on the 1998 materials, she minimized Barnette's psychiatric condition. For

example, she notes that "it was previously suggested to [her] that Mr. Barnette's suicide attempt [as a teen] had been minor or insignificant." JA368. In "reliance on this information from trial counsel," she wrote in her report for resentencing said that Barnette made a "suicidal gesture (rather than a clear attempt to kill himself)." JA368. The information from post-conviction casts his suicidality in a different light, as it "makes clear that Mr. Barnette was, in fact, deeply depressed and affected by the developments in his relationship with Ms. Sullivan, and that those developments, along with his mood disorder, led him to attempt suicide." JA368.

Had Dr. Burgess been provided with the evidence gathered in post-conviction, she "would have rendered a different expert report and testified in markedly and materially different ways." JA367. Indeed, after reviewing the new information, Dr. Burgess would testify at an evidentiary hearing that "[r]ather than any 'symbolic reenactment of family and childhood patterns,'" as she opined at resentencing, "Mr. Barnette's criminal conduct was attributable to a psychotic episode and mental health crisis that he was experiencing." JA367 (quoting her expert report at JA657).

In a report proffered in support of an evidentiary hearing, Dr. Richard Dudley, a physician specializing in clinical and forensic psychiatry, detailed how the mitigation investigation that resentencing counsel knew was necessary but neglected would have changed the sentencing picture. JA535–538. Most critically, this information revealed that Barnette "was suffering from . . . major psychiatric difficulties at the time of the killings, and that therefore his mental state was even more severely impaired than had been previously recognized." JA537.[6]

Based upon the post-conviction investigation, Dudley concluded that Barnette's "extremely difficult childhood significantly impaired his development, resulting in broad-based instability in all major areas of functioning." JA535–536. This instability manifested as "difficulty with attachment/instability in interpersonal relationships, characterized by frantic efforts to avoid real or imagined abandonment, and intense

_____

[6] Dr. Dudley also consulted with Dr. Burgess, which confirmed that "the wealth of information" available to him was "considerably and significantly more than the information that was made available to Dr. Burgess" before the 2002 trial, which allowed for "psychiatric opinions [that] are not only better supported but also much more complex than the opinions rendered at the time of his trial." JA537.

relationships with alternating feelings of extreme idealization and extreme devaluation of the other person." JA536. It also resulted in "instability of self-image, characterized by an unstable sense of self and periods feeling empty and valueless" and "marked reactivity of mood," which is "accompanied by anxiety and irritability and/or suicidal behavior" along with "impulsivity generally associated with self-damaging behavior." JA536. Dr. Dudley noted the consistency of these symptoms with both Borderline Personality Disorder and a major mood disorder, while explaining that the "symptoms of [his] mental illness and appreciating their impact on his ability to function is more important than labeling him with a specific diagnosis." JA536. Those symptoms include "vulnerab[ility] to the development of transient, stress-related paranoid ideation or severe dissociative symptoms" and "rapidly changing, extreme mood states, including mania, depression, and mixed states of mania and depression associated with extreme irritability and paranoid ideation." JA536. As Dr. Dudley explained, these conditions interact with and can exacerbate each other, particularly if the Borderline Personality Disorder's "underlying" and persistent characteristics are amplified by stressors "causing a further

deterioration in the person's ability to function" happen to coincide with "the rapid swings in mood that are a part of [Barnette's] major mood disorder," which "cycle on their own schedule, virtually unrelated to whatever is going on around him." JA536.

> When an individual who suffers from Borderline Personality Disorder perceives that he/she is being abandoned by a significant other, the symptoms associated with this disorder will be exacerbated. However, if that same person is simultaneously in a manic/hyper-elated state due to a separate major mood disorder, the overall response/mental state will be quite different than it will be if he/she were in a depressed state due to that major mood disorder.

JA536.

This evidence would have been powerfully mitigating. In the first place, it would have made Barnette's "mental state at the time of the crimes for which he has been convicted and sentenced to death much clearer, and indicate[d] that at the time of the crimes, [his] capacity to conform his conduct to the requirements of the law was significantly impaired." JA 537. It would have explained how Barnette's Borderline Personality Disorder generated his "frantic efforts to avoid abandonment by Robin Williams, a reversal of his extreme idealization of Robin to extreme devaluation of her, a deterioration of his sense of

self to the point of feeling empty and valueless," and his resulting "irritability and suicidal behavior" and "paranoid ideation." JA 537.

Dudley could also have countered the Government's allegation of future dangerousness by testifying that the "mental health impairments suffered by [Barnette], while dramatic and severe, can be managed and/or controlled"—again, a direct rebuttal to the resentencing characterization of Barnette as irredeemably abusive. JA538. Dudley noted Barnette "had not committed any infractions or received any disciplinary write-ups from the time of his arrest in June 1996 through the time of his retrial in 2002," which was both "noteworthy given how disruptive his behavior and distorted his thinking had been prior to his arrest," but also understandable given that "the structure . . . and the forced reduction . . . of the particular stressors that make [Barnette] acutely vulnerable to an exacerbation of his symptoms and the associated erratic and irrational behavior" provided by his incarceration." JA538. As Dudley noted, this psychiatric "explanation as to why [Barnette] had shown positive and constructive adjustment to prison could have also been presented for consideration as mitigation at the time of trial." JA538.

Dr. Cunningham, the clinical and forensic psychologist who testified at both of Barnette's trials, concluded based on a review of the evidence gathered in post-conviction that "the expert opinion [he] provided to Mr. Barnette's sentencing jury was unknowingly incomplete and rendered me vulnerable to damaging impeachment by the government." JA3069. But for resentencing counsel's deficiencies, Cunningham could have addressed, inter alia, "the details of Marc Barnette's healthy, non-violent relationships" and "his positive adjustment to prison and his lack of disciplinary issues, and how it was consistent with my expectations for his future adjustment"—a critical rejoinder to the portrayal of Barnette as a perseverative batterer of women. JA3069. He also noted Dudley's "strong case" that Barnette "was suffering from a longstanding major mood disorder at the time of the offense," JA3070, critical mitigating evidence as to Barnette's mental state.[7]

---

[7] Along with Drs. Dudley and Cunningham, Dr. Johnson—who testified as a Bureau of Prisons psychiatrist at the first trial but was not even consulted by resentencing counsel—could have testified to Barnette's lack of dangerousness in prison: "Had I been asked, I would have been willing and able to testify at Mr. Barnette's resentencing trial about his positive adjustment to prison and his lack of disciplinary issues, and how it was consistent with his behavior and adjustment during his

The district court denied a hearing on this claim in part because "Dr. Burgess' new opinion that Petitioner suffered a 'psychotic episode' would contradict forensic psychologist expert . . . Cunningham, who testified that there was no indication Petitioner was psychotic at the time of his crimes." JA3211. In reaching this conclusion, the district court failed to appreciate Dr. Cunningham's own acknowledgment that the information gathered in post-conviction "calls into question the completeness of the information [he] had previously been told to rely upon" in reaching his professional conclusion. JA3069. More to the point, in reaching this conclusion, the district court again failed to apply the proper standard governing a § 2255 petitioner's entitlement to an evidentiary hearing. Deciding whether any jurors would have chosen a life sentence had they heard Dr. Burgess's opinion that psychosis or a mental health crisis—rather than a propensity for domestic violence— explains Barnette's crimes requires intensive factfinding and credibility determination. These are precisely the types of determinations that must be resolved after an evidentiary hearing. *See United States v.*

evaluation period in 1997 and consistent with my expectations for his future adjustment." JA406.

*White*, 366 F.3d 291, 302 (4th Cir. 2004) (observing that "where the ultimate resolution rests on a credibility determination . . . an evidentiary hearing is especially warranted") (internal citations omitted).

In sum, Barnette has presented a colorable claim that, had resentencing counsel conducted a reasonably thorough investigation into the "red flags" about Barnette's mental health, there is a "reasonable probability that at least one juror would have struck a different balance," and Barnette would not be on death row. *Wiggins*, 539 U.S. at 537. This Court should therefore grant a COA and remand for an evidentiary hearing on Claim I of Barnette's § 2255 petition.

### G. Resentencing counsel unreasonably failed to impeach the Government's expert.

The district court erred by denying an evidentiary hearing on Barnette's colorable claim that resentencing counsel unreasonably failed to impeach the Government's expert mental health expert on an issue that cut to the core of his credibility. After the defense case-in-chief, the prosecution presented the rebuttal testimony of forensic psychiatrist Dr. Park Dietz, who played a critical role in the Government's attack on Barnette's mitigation and mental health

presentation. In its closing, the Government highlighted Dietz's testimony about Barnette's mental state at the time of the crimes: "Dr. Dietz looked you in the eye and said, Marc Barnette was not psychotic at the time of these crimes." JA2791.

While qualifying Dr. Dietz as an expert, the Government noted several high-profile cases in which Dr. Dietz had previously testified, including "the case of Andrea Yates, the woman who drowned her children in the bathtub." JA2635–2636. During his March 2002 testimony in Yates's case, Dr. Dietz claimed there was an episode of Law & Order—a television show Yates was known to watch—in which a mother was acquitted on an insanity defense after drowning her children in a bathtub. *See Yates v. State*, 171 S.W.3d 215, 218 (Tex. App. 2005). Dr. Dietz testified that he was a consultant for Law & Order and that the episode in question had been broadcast shortly before Yates drowned her own children in a bathtub. *Id.* That was not true; in fact, no such episode of Law & Order existed. *Id.* at 219–20. Yate's conviction was ultimately overturned after an appellate court finding that Dr. Dietz's false testimony could have affected the judgment of the jury. *Id.* at 222.

The Yates trial concluded months before Barnette's resentencing trial, and Barnette has therefore made a colorable claim that resentencing counsel could have used Dr. Dietz's materially false testimony in the Yates case to establish that that he lacked credibility and that his explanations and rationalizations for Barnette's behavior were unreliable.

In denying relief on this claim, the district court concluded that there is no evidence that resentencing counsel acted unreasonably by failing to discover this line of impeachment. JA3213. It noted that both resentencing counsel Lawson and investigator Barefoot stated in their post-conviction affidavits that they investigated Dr. Dietz's background. JA3213. In so holding, the district court again applied the incorrect standard to a request for an evidentiary hearing on a § 2255 claim for ineffective assistance of counsel. At this point, the extra-record evidence tends to show only that resentencing counsel conducted some investigation into Dr. Dietz and they were not aware of Dr. Dietz's false testimony in the Yates case. More fact-finding is needed to determine whether resentencing counsel's research into Dr. Dietz was reasonable,

and if not, whether a reasonable investigation into Dr. Dietz would have surfaced his materially false testimony months before Barnette's trial.

In denying relief on this claim, the district court also concluded that Barnette "cannot demonstrate he suffered prejudice because he cannot show that had trial counsel impeached Dr. Dietz regarding his false testimony, that it would have resulted in a different outcome at trial." JA3213. This conclusion overlooks Dr. Dietz's critical role in the Government's attack on Petitioner's mitigation presentation. The Government's closing argument demonstrates its reliance on Dr. Dietz's testimony: "I contend to you, ladies and gentlemen, that the clearest explanation of Marc came from Dr. Dietz, Marc Barnette is narcissistic, he sees himself as the center of the universe and all things revolve around him and his needs; if anything gets out of whack, he reacts violently." JA2787. The Government's reliance on Dr. Dietz's testimony to secure a death sentence undermines the district court's prejudice analysis. Because the record does not "conclusively show that [Barnette] is entitled to no relief," 28 U.S.C. § 2255(b), he is entitled to an evidentiary hearing on this claim.

### H. Resentencing counsel's uninformed decision to advise Barnette to testify was unreasonable and prejudicial.

The district court erred by refusing to conduct an evidentiary hearing on Barnette's claim that resentencing counsel were ineffective for making an uninformed and unreasonable choice to advise him to testify. Barnette was the very first defense witness; over two days, he testified about the underlying crimes, his jealous and violent behavior in other relationships, his upbringing, and other aspects of his background. JA1889–2151. In sum, he was the first person the jury heard from as to both his crimes and his background. Because Barnette's compromised mental health distorted his understanding of events and relationships, however, his testimony was not mitigating, and was frequently inaccurate and provocative.

The district court erred in concluding that resentencing counsel's advice that Barnette testify fell outside the range of professional standards. JA3215. The ABA norms make clear that resentencing counsel had a duty to consider and counsel Barnette about the possible consequences of taking the stand. Under the heading "The Defense Case Concerning Penalty," the ABA Guidelines provide: "Counsel should consider, and discuss with the client, the possible consequences of

70

having the client testify or make a statement to the sentencing or reviewing body or individual." ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases Guideline 10.11 (2003). Likewise, in the section on Defense Function, the ABA Standards for Criminal Justice provide that "Counsel should consider with the client the potential benefits of the judge hearing a personal statement from the defendants as contrasted with the possible dangers of making a statement that could adversely impact the sentencing judge's decision or the merits of an appeal." ABA Standards for Criminal Justice, Defense Function Standard 4–8.3(f) (4th ed. 2017).

Barnette's § 2255 motion makes a colorable claim that his counsel failed to meet these well-defined professional norms. Resentencing counsel Lawson recalls that she and Barnette "discussed the issue of whether he would testify at his sentencing hearing," that "Mr. Barnette was always very amenable to the advice of counsel," and that she and resentencing counsel Bender "recommended that he testify, and he decided to testify." JA412. At the time, Lawson understood that "a defendant's state of mind, psychological make-up, or even his appearance can affect how the defendant's words might come across to a

71

jury." JA412. She was also "familiar with the notion of having an expert opine to the jury about a defendant's confession or demeanor." JA412. Nevertheless, although Lawson was primarily responsible for preparing Barnette to testify, she never considered having any mental health expert assist in assessing Barnette's mental state. JA412.

Resentencing counsel also failed to discuss whether to advise Barnette to testify with the members of the defense team who knew him best. Mitigation specialist Alfonso explains that she "was definitely surprised—actually, shocked would be the right word—when Marc testified on his own behalf at trial." JA319. According to Alfonso, "[h]ad defense counsel sought my advice or insights about Marc as a potential witness, I would have strongly cautioned them that Marc, despite genuine remorse for what he had done, would likely offend the jury by his testimony." JA319. Alfonso explains: "I would have been concerned that Marc's mental health makeup and experiences, and his general lack of insight, would result in explanations and rationales for his behavior that would alienate jurors, rather than communicate remorse and sorrow. I believe his testimony did just that." JA319.

If resentencing counsel had taken the reasonable step of consulting with contracted mental health experts about whether to advise Barnette to testify, the experts would uniformly have counseled against it:

- Dr. Burgess "would have strongly cautioned them that Mr. Barnette, despite genuine remorse for what he had done, would likely offend the jury by his testimony." JA370. Dr. Burgess would have conveyed her "strong reservations that given his mental health makeup and experiences, and his general lack of insight, Mr. Barnette would explain and rationalize his behavior in ways that would likely anger jurors." JA370.

- Dr. Cunningham would have told resentencing counsel that "although Mr. Barnette expressed genuine remorse for what he had done, he had tremendously limited insight into his own behaviors and was likely to be unable to properly display his remorse when confronted with the stress of examination and cross examination." JA3070. He likewise would have advised resentencing counsel that "Barnette's testimony would likely come across to a jury as self-serving and unsympathetic." JA3070.

- Dr. Johnson would have told resentencing counsel "that although Mr. Barnette expressed genuine remorse for what he had done, he had limited insight into his behaviors and may not be able to display his remorse when confronted with the stress of examination and cross examination." JA407. She would have explained that Barnette's "attempts to deal with his anxiety and his personality functioning would likely limit his ability to relate to the Jury or others in the court room." JA407.

Aside from the uninformed choice to counsel Barnette to testify, resentencing counsel was also ineffective for failing to contextualize

Barnette's testimony with other lay and expert testimony. Stetler observes that "if the client does testify, counsel should surround the defendant's testimony with unbiased or less interested witnesses; otherwise, his testimony can ring hollow, as purely self-serving and manipulative." JA505 (internal quotations omitted). That is precisely what happened at Barnette's resentencing hearing. Reviewing Barnette's testimony, Dr. Dudley notes that Barnette's "psychiatric impairments manifest . . . in statements, explanations, and rationalizations . . . that would appear to be distorted, self-serving, and simply off base." JA538. He observes that, while Barnette's testimony was "consistent with his mental health make-up, . . . to an untrained listener, it likely appeared quite offensive." Dr. Dudley also notes that "it would have also been possible for a mental health expert to then explain to a jury why [Barnette], even after his arrest and conviction for murder, would persist in describing things in ways that no one else could see or agree with." JA538. Inexplicably, though resentencing counsel knew about Barnette's trauma history and serious mental illness, they did not elicit expert or lay testimony designed to help the jury understand Barnette's affect on the witness stand. JA412.

In ruling against Barnette on this claim, the district court quoted

this Court's opinion in *Carter v. Lee* for the proposition that advice

regarding the decision to testify "is a paradigm of the type of tactical

decision that cannot be challenged as evidence of ineffective assistance."

JA3215 (quoting *Carter v. Lee*, 283 F.3d 240, 249 (4th Cir. 2002)). But in

*Carter*, and in every case cited by *Carter* for the proposition at hand,

there had been an evidentiary hearing on whether counsel's advice

regarding their clients' testimony was deficient. *See Carter*, 283 F.3d at

250–51 (deferring to facts found by the state post-conviction court in

holding that counsel's advice that client testify was not deficient

performance).[8] Without factual development and an evidentiary

---

[8] The cases cited for this proposition in *Carter* are: *Hutchins v. Garrison*, 724 F.2d 1425, 1436 (4th Cir. 1983) (declining to overturn the district court's finding, based on a credibility determination made following an evidentiary hearing on a 28 U.S.C. § 2254 petition, that counsel did not exert undue pressure on the petitioner not to testify); *Jones v. Murray*, 947 F.2d 1106, 1114-16 & n.6 (4th Cir. 1991) (relying on facts found in state post-conviction hearing to decide that any ineffective assistance by failing to call a client to testify was not prejudicial); *Rogers-Bey v. Lane*, 896 F.2d 279, 283 (7th Cir. 1990) (concluding based on testimony in state post-conviction hearing that counsel's advice not to testify was a reasonable strategic decision); *Reyes-Vejerano v. United States*, 117 F. Supp. 2d 103, 109 (D.P.R. 2000) (making a credibility determination based on testimony in a § 2255 evidentiary hearing to conclude that there was no ineffective assistance of counsel because of counsel's advice not to testify).

hearing, it is impossible to determine that resentencing counsel's advice that Barnette testify was a reasonable strategic decision versus a dereliction of the duty to provide reasoned advice regarding the choice to testify.

The district court also erred in concluding that resentencing counsel's uninformed advice that Barnette testify was not prejudicial. JA3215. The Government's reliance on Barnette's testimony in its closing argument demonstrates how damaging Barnette's testimony was to his mitigation case. The Government told the jury that Barnette's testimony was "so filled with misinformation that you simply can't believe it." JA2780–2781. The Government also argued that "Marc Barnette minimized his own behavior," JA2781, and that his testimony was "a pathetic attempt to hold himself less responsible." JA2783. The prosecutor noted that Barnette "casually admitted to you during his testimony that he had done these crimes, but every single time that he had made that admission he couched it in terms and shaded it in terms that they had all done something to bring that on." JA2785. The prosecution's reliance on Barnette's testimony reveals the error in the district court's prejudice analysis.

When considering whether Barnette is due a hearing on this claim, it is important to note how very rare it is for a defense attorney to counsel a client to testify in the penalty phase of a capital trial. Drawing on his 34 years of involvement with capital defense teams, Stetler explains: "I cannot think of a single example where the defense team encouraged a client to testify in the penalty phase, although there were several cases in which the issue was carefully discussed and clients were counseled thoughtfully about the extreme risks and downsides of testifying." JA505.

In sum, counsel had a professional obligation to "consider, and discuss with the client, the possible consequences of having the client testify." ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases Guideline 10.11 (2003). In this case, far from conclusively rebutting the possibility of ineffective assistance of counsel, *see Mayhew*, 995 F.3d at 176–77, the evidence indicates that resentencing counsel made an uniformed and unreasonable choice to advise Barnette to testify, with devastating consequences for Barnette's mitigation case. The district court therefore erred by refusing to hold an evidentiary hearing on this claim.

## III. The district court erred in dismissing Barnette's jury misconduct claim without allowing him to conduct juror interviews.

### A. Background

Together with § 2255 motion, Barnette also sought the district court's permission to conduct interviews of the jurors from his 1998 and 2002 trials. JA119–135. Barnette explained that juror interviews were necessary to investigate and develop claims of juror misconduct and ensure that Barnette's death sentence was not the product of bias or outside influence. *Id.*

In support of his motion, Barnette pointed out that there was evidence in the record that jurors from the 2002 sentencing trial decided to impose the death sentence before receiving the entirety of the evidence or the court's final instructions. *Id.* Before the close of the evidence, an alternate juror approached a member of court staff and informed her that other jurors were forming, or had already formed, opinions about whether Barnette should receive the death penalty. JA2510–2525. The trial judge questioned the alternate juror, then brought the entire jury in, asked if anything had happened during the course of the trial to impair anyone's ability to be a fair and impartial

juror, and re-instructed the jury on beginning deliberations prematurely and avoiding extrinsic evidence. JA2525.

The district court denied Barnette's motion to interview jurors, finding that "[t]he unidentified juror's pre-deliberation remarks in this case do not fall into the category of 'extraneous, prejudicial information or outside influence' necessary to justify juror interviews." JA138 (quoting *United States v. Roane*, 378 F.3d 382, 404 (4th Cir. 2004)). It then dismissed Barnette's juror misconduct claim. JA3222–3223.

While this Court reviews a trial judge's denial of a request to interview jurors for abuse of discretion, *see United States v. Gravely*, 840 F.2d 1156, 1159 (4th Cir. 1988), the standard to be applied when ruling on a motion to interview jurors is a legal question this court should address de novo.

### B. In capital cases, the Eighth Amendment demands that counsel be allowed post-verdict contact with jurors.

The Supreme Court has long recognized that a defendant has a right to "a tribunal both impartial and mentally competent to afford a hearing." *Jordan v. Massachusetts*, 225 U.S. 167, 176 (1912). The Sixth Amendment affords all criminal defendants "the right to a speedy and public trial, by an impartial jury." U.S. Const. amend. VI. And the right

to an impartial jury also inheres in the due process guarantee of the Fifth Amendment: "In essence, the right to jury trial guarantees to the criminally accused a fair trial by a panel of impartial, 'indifferent' jurors. The failure to accord an accused a fair hearing violates even the minimal standards of due process." *Turner v. Louisiana*, 379 U.S. 466, 471–72 (1965) (quoting *Irvin v. Dowd*, 366 U.S. 717, 722 (1961)) (internal citations omitted).

For a defendant facing the death penalty, trial by an impartial jury implicates not only Fifth and Sixth Amendment rights, but also the Eighth Amendment prohibition on arbitrary and capricious infliction of the death penalty. *See Furman v. Georgia*, 408 U.S. 238, 295–96, (1972) (Brennan, J., concurring). In *California v. Brown*, for example, the Supreme Court held that an instruction prohibiting juries from considering extrinsic information "fosters the Eighth Amendment's need for reliability in the determination that death is the appropriate punishment in a specific case." 479 U.S. 538, 543 (1987) (internal quotation omitted).

In a non-capital trial, rules regarding post-verdict contact with jurors balance two competing interests. On one hand, in non-capital

cases, "limiting the parties' interactions with jurors after the verdict" serves the purpose of ensuring that jury service comes "to a timely conclusion." *United States v. Birchette*, 908 F.3d 50, 55 (4th Cir. 2018). The judicial system "possesses an interest in protecting the confidentiality of juror discussions and in allowing jurors to resume their normal routines." *Id.* at 55. But weighing against the value of juror privacy is the reality that post-verdict juror interviews are often necessary to discover juror misconduct and ensure the right to an impartial jury. Indeed, as the motion below compiles, the reporters are replete with cases demonstrating that juror interviews are often necessary to reveal juror misconduct that went undetected at trial. *See* JA120, JA129–130 (collecting cases).

Weighing these competing interests—the interest in finality on one hand, and the right to an impartial jury on the other—this Court has held that, to obtain permission to interview jurors after the verdict, a defendant must make a "threshold showing of improper outside influence." *Gravely*, 840 F.2d at 1159. In the case of alleged racial bias, this Court has required a threshold showing that the moving party is "likely to find evidence that 'racial animus was a significant motivating

81

factor in the juror's vote to convict.'" *Birchette*, 908 F.3d at 58 (4th Cir. 2018) (quoting *Peña-Rodriguez v. Colorado*, 580 U.S. 206, 211, (2017)).[9]

The *Gravely* and *Birchette* standards violate a petitioner's Eighth Amendment rights when applied to a death penalty case. For one thing, the risk of juror misconduct is greater in capital trials, because they are frequently high-profile events, and there is therefore an increased likelihood of improper extraneous influence. Even more importantly, because "execution is the most irremediable and unfathomable of penalties," the Supreme Court "has demanded that factfinding procedures aspire to a heightened standard of reliability" in capital cases. *Ford v. Wainwright*, 477 U.S. 399, 411 (1986). The weighing of juror privacy against the need for an impartial jury must resolve in favor of allowing juror interviews in capital cases, and the district court

---

[9] In *Peña-Rodriguez*, the Supreme Court held that the Sixth Amendment requires an exception to no-impeachment rules in Federal Rule of Evidence 606(b) "where a juror makes a clear statement that indicates he or she relied on racial stereotypes or animus to convict a criminal defendant." 580 U.S. at 209. As this Court has observed, *Peña-Rodriguez* does not address what standard courts should apply to attorneys' requests to investigate juror bias through juror interviews. *Birchette*, 908 F.3d at 57 (in a non-capital case, observing that the *Peña-Rodriguez Court* "did not . . . say when parties must be able to interview jurors in search of such evidence").

erred by dismissing Barnette's juror misconduct claim without allowing juror interviews.

### C. Refusing to allow juror interviews deprived Barnette of his enhanced rights of representation under 18 U.S.C. § 3599.

In addition to Barnette's constitutional rights to an impartial jury, dismissing his juror misconduct claim without allowing juror interviews also compromised Barnette's statutory right to qualified legal representation in federal habeas corpus proceedings. Under 18 U.S.C. § 3599(a)(2), district courts must appoint counsel to an indigent prisoner pursuing a federal habeas corpus challenge to a state or federal death sentence. Compared with non-capital petitioners, habeas petitioners facing execution have "enhanced rights of representation" under 18 U.S.C. § 3599. *Martel v. Clair*, 565 U.S. 648, 659 (2012). This enhanced right of representation includes more experienced counsel, a higher pay rate, and more money for investigative and expert services. *Id*. These measures "reflect a determination that quality legal representation is necessary in all capital proceedings to foster fundamental fairness in the imposition of the death penalty." *Id* (internal quotations and alterations omitted). "By providing indigent capital defendants with a

mandatory right to qualified legal counsel in these proceedings, Congress has recognized that federal habeas corpus has a particularly important role to play in promoting fundamental fairness in the imposition of the death penalty." *Christeson v. Roper*, 574 U.S. 373, 135 (2015) (quoting *McFarland v. Scott*, 512 U.S. 849, 859 (1994)). The Supreme Court has recognized that, in the § 2255 context, "the right to counsel necessarily includes a right for that counsel meaningfully to research and present a defendant's habeas claims." *McFarland*, 512 U.S. at 858.

Competent investigation and presentation of a § 2255 petition requires counsel to conduct juror interviews. The ABA Guidelines require habeas counsel to contact jurors in post-conviction proceedings. They make clear that post-conviction counsel should "fully discharge the ongoing obligations imposed by the[] Guidelines, including the obligations to . . . continue an aggressive investigation of all aspects of the case." ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases 10.15.1 (2003). The Guidelines note that "counsel investigating a capital case should be particularly alert to the possibility that, notwithstanding surface appearances, one or more

jurors were unqualified to sit at either phase or the trial and make every effort to develop the relevant facts, whether by interviewing jurors or otherwise." *Id.* at Guideline 10.10.2, Commentary n.260. They also note that "[i]f applicable law places undue limits on such investigations, it should be challenged." *Id.*

As reflected in the professional norms of capital post-conviction practice, juror interviews are a basic part of the standard investigation required in capital post-conviction proceedings. Forbidding habeas counsel from investigating juror misconduct claims, even where there is indication that misconduct took place, undermines a § 2255 petitioner's statutory right 18 U.S.C. § 3599 to meaningful representation of counsel.

**D. Even under the standards applied to non-capital cases, the district court erred by denying Barnette's request for juror interviews.**

Even under the standard this Court applies in the non-capital context, the district court erred in concluding that Barnette's motion for permission to interview jurors did not make the requisite threshold showing to interview the 2002 jurors. In the morning of August 8, 2002, during Barnette's resentencing presentation, a juror approached a

member of the court staff and "asked if [the jury] could be readvised of keeping an open mind policy and not forming opinions." JA2510. The juror declined to say whether the jurors had been deliberating prematurely, but he stated that "opinions are being formed" as to whether Barnette should receive the death penalty. JA2510. When questioned by the trial court, the juror stated, "It seems that we may be forming opinions *early*. You were saying to have an open mind . . . And I was just concerned that maybe the open minds are closing, I don't know. It just seems like it." JA2511. The juror confirmed that his concern stemmed from things said in the jury room, including sentiments like "I hope we can hurry up and get this over with" and "I think we can do this in ten minutes." JA2512. "[A]s far as I can tell," the juror stated, "it's as if the minds are made up here." JA2512.

While the juror later attributed the comments to one juror whom he could not identify and stated that he did not "think anybody else heard it," JA2515, the trial court concluded that it "one juror may have violated the court's instruction by way of stating something that could be interpreted as a statement that he had made up his mind," and contemplated giving the defense "an option to strike that juror at this

86

point in favor of the alternate," if he could be identified. JA2519–2520.

Despite resentencing counsel's prediction that "group dynamics being what it is . . . nobody is going to raise their hand" if questioned in a group, JA2523, the trial court ultimately settled on questioning the jurors collectively and reinstructing them, JA2524–2525.

As discussed above, this Court has held that a district court has the discretion to deny a request for juror interviews when the defendant has failed to make a "threshold showing of improper outside influence." *Gravely*, 840 F.2d at 1159. In other words, a district court need not allow juror interviews when the "defendant's request is a mere fishing expedition," *id.*, or when the defense "failed to proffer *any* evidence that jurors engaged in misconduct or were improperly exposed to outside influences." *Roane*, 378 F.3d at 404 (emphasis added). That is not the case here. The concerns of the reporting juror, and the trial court's determination that at least one juror had violated instructions to the point that it would have allowed the defense to remove him if he could have been identified, is more than ample cause to justify interviewing the jurors. Indeed, juror interviews were a necessary investigatory step to determine whether constitutional error infected the proceeding that resulted in Barnette's sentence of death. The district court therefore

abused its discretion in denying Barnette's juror misconduct claim without allowing juror interviews, and this Court should grant a COA, vacate the dismissal of Claim III of Barnette's § 2255 petition, and remand for juror interviews and further factual development.

## CONCLUSION

This Court should grant a certificate of appealability; vacate Barnette's convictions and sentences for violations of 18 U.S.C. §§ 2261, 924(c), and 844(h); vacate his remaining death sentences; and remand for sentencing on the remaining counts. This Court should also remand for juror interviews, discovery, and an evidentiary hearing on Claims I and III of Barnette's § 2255 petition.

## REQUEST FOR ORAL ARGUMENT

Because of the importance and complexity of the issues presented in this appeal, Barnette respectfully requests that the Court hear oral argument.

Respectfully submitted August 26, 2024,

John G. Baker
Federal Public Defender for the
Western District of North Carolina

*s/ Gerald W. King, Jr.*

Gerald W. King, Jr.
Chief, Capital Habeas Unit for the
Fourth Circuit
FEDERAL PUBLIC DEFENDER
FOR THE WESTERN DISTRICT
OF NORTH CAROLINA
129 West Trade Street, Suite 300
Charlotte, NC 28202
704-374-0720
gerald_king@fd.org

Jacob H. Sussman
SOUTHERN COALITION FOR
SOCIAL JUSTICE
P. O. Box 51280
Durham, NC 27717
704-277-3962
jsussman@scsj.org

Mark E. Olive
ATTORNEY AT LAW
320 West Jefferson Street
Tallahassee, FL 32301
850-224-0004
meolive@aol.com

Counsel for Appellant

# CERTIFICATE OF COMPLIANCE

1.  The foregoing brief has been prepared in a proportionally spaced typeface using Microsoft Word, Century Schoolbook, 14 point.

2.  Exclusive of the table of contents; table of citations; certificate of compliance and the certificate of service, the foregoing brief contains 17,394 words. (Together with this brief, Barnette has filed a motion under Local Rule 32(b) for permission to file an opening brief of 17,394 words.).

3.  I understand that a material misrepresentation can result in the Court striking the brief and imposing sanctions. If the Court so directs, I will provide an electronic version of the brief with the word or line printout.

<u>*s/ Gerald W. King, Jr.*</u><br>Gerald W. King, Jr.