IN THE

# United States Court of Appeals
## FOR THE FOURTH CIRCUIT

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

v.

AQUILIA MARCIVICCI BARNETTE*,*

*Defendant-Appellant.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA AT CHARLOTTE

**JOINT APPENDIX - VOLUME I OF VII**
**(Pages 1 - 546)**

Gerald W. King, Jr.
FEDERAL PUBLIC DEFENDER
FOR THE WESTERN DISTRICT
OF NORTH CAROLINA
129 West Trade Street, Suite 300
Charlotte, NC 28202
704-374-0720
gerald_king@fd.org

Anthony Joseph Enright
OFFICE OF THE
UNITED STATES ATTORNEY
Western District of North Carolina
227 West Trade Street, Suite 1650
Charlotte, NC 28202
704-344-6222
usancw.appeals@usdoj.gov

*Counsel for Appellant*

*Counsel for Appellee*

Additional Counsel for Appellant on Inside Cover

Jacob H. Sussman
SOUTHERN COALITION FOR SOCIAL JUSTICE
P. O. Box 51280
Durham, NC 27717
704-277-3962
jsussman@scsj.org

Mark E. Olive
ATTORNEY AT LAW
320 West Jefferson Street
Tallahassee, FL 32301
850-224-0004
meolive@aol.com

*Counsel for Appellant*

# TABLE OF CONTENTS

## VOLUME I OF VII

JA Page

District Court Docket Sheet [3:12-cv-00327-MOC] ...............................................1

Petitioner Aquilia Marcivicci Barnette's Initial
Motion for Relief Pursuant to 28 U.S.C. 2255
    2013.06.19 [ECF48] ........................................................................ 12

Petitioner Aquilia Marcivicci Barnette's Motion
for Permission to Interview Trial Jurors
    2013.06.19 [ECF49] ........................................................................ 119

Order
    2013.07.18 [ECF50] ........................................................................ 136

Petitioner Aquilia Marcivicci Barnette's Motion for Discovery
    2013.07.19 [ECF51] ........................................................................ 140

Government's Response in Opposition to Petitioner's Motion for Discovery
    2013.09.09 [ECF56] ........................................................................ 158

Petitioner Aquilia Marcivicci Barnette's Reply to Government's
Response in Opposition to Motion for Discovery
    2013.09.16 [ECF57] ........................................................................ 174

Petitioner Aquilia Marcivicci Barnette's Supplemental Brief
Concerning the Government's Production of Information in
Accordance with the Court's Order
    2013.12.06 [ECF59] ........................................................................ 181

Order
    2014.01.22 [ECF62] ........................................................................ 186

Petitioner Aquilia Marcivicci Barnette's Motion for Evidentiary Hearing
    2014.12.22 [ECF73] ........................................................................ 201

Petitioner Aquilia Marcivicci Barnette's Brief
in Support of Motion for Evidentiary Hearing
2014.12.22 [ECF74] ...................................................... 205

Index of Exhibits [ECF74-1] ........................................ 313

Exhibit Bates Nos. 1-50 [ECF74-2]:

Affidavit of Cessie Alfonso.......................................... 316

Affidavit of Ann Austin ............................................... 321

Affidavit of Darrell Austin .......................................... 324

Affidavit of Greg Austin ............................................. 326

Affidavit of Kenneth Bailey ......................................... 328

Affidavit of Jan Barefoot............................................. 330

Affidavit of Derrick Barnette ....................................... 332

Affidavit of Mario Barnette.......................................... 337

Affidavit of Sonia Barnette .......................................... 349

Affidavit of Melvin Bryant ........................................... 364

Exhibits Bates Nos. 51-101 [ECF74-3]:

Affidavit of Ann Wolbert Burgess ................................. 366

Affidavit of Armaud Cooper ........................................ 371

Affidavit of Eric Cooper ............................................. 377

Affidavit of Robert Cooper .......................................... 379

Affidavit of Sheila Cooper ........................................... 382

Affidavit of Crystal Dennis .......................................... 391

Affidavit of Do'Lores Guy............................................ 396

Affidavit of Kesha Heard ............................................. 400

Affidavit of Sally Johnson............................................ 404

Affidavit of Jean Lawson ............................................. 409

ii

Exhibits Bates Nos. 102-150 [ECF74-4]:

    Affidavit of Temeka Lee ................................................................... 417

    Affidavit of Anitra Lyles.................................................................... 419

    Affidavit of Regena Mack.................................................................. 421

    Affidavit of Danielle Mathis .............................................................. 424

    Affidavit of Victor Montgomery........................................................ 426

    Affidavit of Jean Nduly..................................................................... 428

    Affidavit of Shondra Nero.................................................................. 432

    Affidavit of Tessie Nero..................................................................... 439

    Affidavit of Claire Rauscher ............................................................. 444

    Affidavit of Weona Sharpe ................................................................ 447

    Affidavit of Sandra Smith ................................................................. 450

    Declaration of Russell Stetler........................................................... 452

Exhibits Bates Nos. 151-208 [ECF74-5]:

    Affidavit of Netoshia Tolbert............................................................ 515

    Affidavit of John West ...................................................................... 522

Exhibit Bates Nos. 209-231 [ECF74-6]:

    Richard G. Dudley, Jr. MD Report ................................................... 524

# TABLE OF CONTENTS

# VOLUME II OF VII

JA Page

*Continued*, Exhibits to Petitioner Aquilia Marcivicci Barnette's
Brief in Support of Motion for Evidentiary Hearing:

Excerpt of Exhibit Bates Nos. 260-361 [ECF74-7]:

    1998 Trial Sentencing Verdict Sheets ............................................... 547

Exhibit Bates Nos. 362-421[ECF74-8]:

    2002 Resentencing Ex Parte Filings ................................................. 595

Excerpt of Exhibit Bates Nos. 4796-4917[ECF76-19]:

    Ann Burgess RN Report .................................................................. 655

Excerpt of Exhibit Bates Nos. 13475-13574 [ECF77-6]:

    Mark Cunningham Report ................................................................ 667

Excerpt of Exhibit Bates Nos. 14175-14274 [ECF77-14]:

    Seymour Halleck MD Report ........................................................... 669
    Sally Johnson Report ...................................................................... 675

Excerpts of Exhibit Bates Nos. 14748-14834 [ECF78-4]:

    Faye Sultan Report Final ................................................................. 691
    William Tyson Report ...................................................................... 694
    John Warren Report ......................................................................... 696

Response of the United States to Barnette's Motion Under
28 U.S.C. 2255 and Motion for an Evidentiary Hearing
    2015.09.23 [ECF98] ........................................................................ 701

Exhibits to Response of the United States to Barnette's Motion
Under 28 U.S.C. 2255 and Motion for an Evidentiary Hearing
   2023.09.23 [ECF99 through ECF108]:

Ex. 1a:   Joint Appendix Vol. I of V [ECF99]................................ 815

          Federal District Court Docket Sheet .......................... 825

          Indictment filed February 4, 1997.............................. 893

          Guilty Verdict returned January 27, 1998.................... 899

          Defendant's Motion in Limine Regarding the Victim Impact
          Statements, filed June 4, 2002 ................................ 900

          Motion for Allocution by the Defendant, filed June 4, 2002...... 902

          Government's Response in Opposition to Defense Motion in
          Limine to Prohibit and/or Limit Victim Impact Evidence,
          filed June 12, 2002 ........................................... 904

          Government's Response to Motion for Allocution by the
          Defendant, filed June 12, 2002 ............................... 913

          Order Denying Defendant's Motion for Allocution,
          entered June 18, 2002......................................... 917

          Order Denying Defendant's Motion in Limine regarding the
          Victim Impact Statements, entered June 21, 2002.............. 921

          Motion for Relief Pursuant to Ring v. Arizona
          filed July 2, 2002............................................. 924

          Indictment.................................................... 933

          Government's Notice of Intent to Seek the Death Penalty,
          filed August 7, 1997.......................................... 940

          Government's Reaffirmation of Intention to Seek the Death
          Penalty, filed July 30, 2001.................................. 948

          Defendant's Memorandum in Support of Motion Regarding
          Ring, filed July 12, 2002 ..................................... 951

          Government's Response to Defendant's Motion for Relief
          Pursuant to Ring v. Arizona, filed July 12, 2002............. 958

Voir Dire: Prospective Juror Regina Sanders (888) ................... 963

Prospective Juror Edwards (1014) .............................................. 978

Prospective Juror Karen Sanders (1071).................................... 999

Prospective Juror Blakeney (1143)............................................ 1014

# TABLE OF CONTENTS

## VOLUME III OF VII

JA Page

*Continued,* Exhibits to Response of the United States to Barnette's
Motion Under 28 U.S.C. 2255 and Motion for an Evidentiary Hearing
2023.09.23:

Ex. 1b:  Remainder of JA Vol I of V [ECF100] ..........................................1015

Prospective Juror Bryson (1239) ............................................... 1037

Prospective Juror Donaldson (1289) ......................................... 1056

Prospective Juror Campbell (1477) ............................................ 1077

Prospective Juror Moore (1913) ................................................ 1096

Prospective Juror Deana Stanford (1960) .................................. 1113

Parties' exercise of peremptory challenges to the prospective
jurors, July 27, 2002 ................................................................. 1126

Ex. 1c:  Joint Appendix Vol. II of V [ECF101] .......................................... 1207

Resentencing Volume 12, July 29, 2002, (Morning) ................ 1217

Resentencing Volume 12, July 29, 2002 (Afternoon) .............. 1314

Ex. 1d:  Remainder of JA Vol II of V [ECF102] ......................................... 1407

Resentencing Volume 13, July 30, 2002 (Morning) ................. 1432

Resentencing Volume 13, July 30, 2002 (Afternoon) .............. 1532

Resentencing Volume 14, July 31, 2002 (Morning) ................. 1618

# TABLE OF CONTENTS

## VOLUME IV OF VII

JA Page

*Continued,* Exhibits to Response of the United States to Barnette's
Motion Under 28 U.S.C. 2255 and Motion for an Evidentiary Hearing
2023.09.23:

Ex. 1e:   Joint Appendix Vol. III of V [ECF103] ........................................ 1693

Resentencing Volume 14, July 31, 2002 (Afternoon) .............. 1703

Resentencing Volume 15, August 1, 2002 (Morning)............. 1817

Resentencing Volume 16, August 5, 2002 (Morning)............. 1887

Ex. 1f:   Remainder of JA Vol III of V [ECF104] ...................................... 1893

Resentencing Volume 16, August 5, 2002 (Afternoon) .......... 1965

Resentencing Volume 17, August 6, 2002 (Morning)............. 2060

# **TABLE OF CONTENTS**

## **VOLUME V OF VII**

JA Page

*Continued,* Exhibits to Response of the United States to Barnette's Motion Under 28 U.S.C. 2255 and Motion for an Evidentiary Hearing 2023.09.23:

Ex. 1g: Joint Appendix Vol. IV of V [ECF105]........................................ 2173

    Resentencing Volume 17, August 6, 2002 (Afternoon) ........... 2183

    Resentencing Volume 18, August 7, 2002 (Morning).............. 2295

    Resentencing Volume 18, August 7, 2002 (Afternoon) ........... 2404

Ex. 1h: Remainder of JA Vol IV of V [ECF106]...................................... 2423

    Resentencing Volume 19, August 8, 2002 (Morning).............. 2505

    Resentencing Volume 19, August 8, 2002 (Morning).............. 2597

# TABLE OF CONTENTS

## VOLUME VI OF VII

JA Page

*Continued,* Exhibits to Response of the United States to Barnette's Motion Under 28 U.S.C. 2255 and Motion for an Evidentiary Hearing 2023.09.23:

Ex. 1i:    Joint Appendix Vol V of V [ECF107] .......................................... 2672

      Resentencing Volume 20, August 9, 2002 (Morning).............. 2682

      Resentencing Volume 20, August 9, 2002 (Afternoon) ........... 2705

      Resentencing Proceedings, August 12, 2002 ........................... 2753

Ex. 1j:    Remainder of JA Vol V of V [ECF108] 2872

      Resentencing Proceedings, August 13, 2002 ........................... 2900

      Defendant Motion for Mistrial regarding victim impact testimony, filed August 5, 2002 ............................................... 2917

      Written questions from the jurors filed August 13, 2002 ......... 2920

      District Court Judge's answer to jurors' written question filed August 13, 2002 2921 .................................................................

      Jury verdict form with reference to count 7, filed August 13, 2002 ................................................................... 2922

      Jury verdict form with reference to count 8, filed August 13, 2002 ................................................................... 2940

      Jury verdict form with reference to count 11, filed August 13, 2002 ................................................................... 2958

      Judgment and Order imposing sentence, entered August 20, 2002 ................................................................... 2975

      Defendant's Motion for New Trial, Arrest of Judgment and Other Relief, filed August 20, 2002 .......................................... 2980

Order Denying Defendant's Motion for New Trial, Arrest of
Judgment and Other Relief entered September 9, 2002 ........... 3032

Petitioner Aquilia Marcivicci Barnette's Reply with attached Exhibits
2016.04.04 [ECF118] ................................................................. 3038

Petitioner Aquilia Marcivicci Barnette's Supplemental
Motion to Vacate Under 28 U.S.C. 2255
2016.06.24 [ECF119] ................................................................. 3088

Order
2016.12.08 [ECF123] ................................................................. 3122

Order
2016.12.08 [ECF124] ................................................................. 3127

Order
2019.04.09 [ECF125] ................................................................. 3132

Response of the United States to Barnette's Supplemental 2255 Motion
2019.11.21 [ECF132] ................................................................. 3134

Petitioner Aquilia Marcivicci Barnette's Unopposed
Motion for Extension of Time to File a Reply Brief
2019.11.22 [ECF134] ................................................................. 3163

Petitioner Aquilia Marcivicci Barnette's Reply Brief in Support of
Supplemental Motion to Vacate Under 28 U.S.C. 2255
2020.20.20 [ECF136] ................................................................. 3168

Order
2021.03.12 [ECF137] ................................................................. 3193

Judgment in Case
2021.03.12 [ECF138] ................................................................. 3240

Notice of Appearance
2021.03.12 [ECF139] ................................................................. 3241

Motion to Alter and Amend Judgment Pursuant to
Rule 59(e) of the Federal Rules of Civil Procedure
 2021.04.09 [ECF140] ......................................................................3246

Order
 2023.12.06 [ECF141] ................................................................. 3255

Notice of Appeal
 2024.02.05 [ECF142] ................................................................. 3261

**TABLE OF CONTENTS**

**VOLUME VII OF VII - SEALED**

JA Page

SEALED Exhibit to Petitioner Aquilia Marcivicci Barnette's
Brief in Support of Motion for Evidentiary Hearing:

Exhibit Bates Nos. 232-259:

Report of Zachary Rowles Laura McCready ......................................3264

**Query     Reports     Utilities     Help     Log Out**

APPEAL,CLOSED,DEATH,PSLC4

# U.S. District Court
## Western District of North Carolina (Charlotte)
## CIVIL DOCKET FOR CASE #: 3:12-cv-00327-MOC

Barnette v. USA
Assigned to: District Judge Max O. Cogburn, Jr
Related  Case: 3:97-cr-00023-MOC-1
Case in other court:  Fourth, 24-00001
Cause: 28:2255 Motion to Vacate Sentence

Date Filed: 05/23/2012
Date Terminated: 03/12/2021
Jury Demand: None
Nature of Suit: 510 Prisoner: Vacate
Sentence
Jurisdiction: U.S. Government Defendant

**Petitioner**

**Aquilia Marcivicci Barnette**              represented by  **Elizabeth Anne Blackwood (inactive)** , NC
Fax: 704-374-0722
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Gerald Wesley King , Jr.**
Office of the Federal Public Defender,
WDNC
129 W. Trade Street, Suite 300
Charlotte, NC 28202
704-374-0720
Fax: 828-375-2287
Email: gerald_king@fd.org
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Henderson Hill FDO**
Federal Defender of Western NC
129 West Trade Street, Suite 300
Charlotte, NC 28202
704-374-0720
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Jacob H. Sussman**
Tin Fulton Walker & Owen
301 East Park Avenue
Charlotte, NC 28203
704-277-3962
Email: jakesussmanlaw@gmail.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Mark E. Olive ,**
Law Office of Mark E. Olive, P.A.

**JA1**

320 W. Jefferson Street
Tallahassee, FL 32301
850-224-0004
Fax: 850-224-3331
Email: meolive@aol.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Ross Hall Richardson**
Federal Defenders of Western North
Carolina
129 West Trade Steet, Suite 300
Charlotte, NC 28202
704-374-0720
*TERMINATED: 04/03/2014*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

V.

**Respondent**

**USA**                                    represented by **Anthony Joseph Enright**
U.S. Attorney's Office, Western District of
NC
227 W. Trade Street, Suite 1650
Charlotte, NC 28202
704-338-3130
Email: anthony.enright@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**William Michael Miller**
United States Attorneys Office
227 West Trade Street, Suite 1650
Charlotte, NC 28202
704-344-6222
Email: William.Miller@usdoj.gov
*TERMINATED: 11/21/2019*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Interested Party**

**USA2255Group**

**Interested Party**

**Judith C. Emken**

| Date Filed | # | Docket Text |
|---|---|---|
| 05/23/2012 | 1 | MOTION to Vacate, Set Aside or Correct Sentence (2255) re: Criminal Case No. 3:97cr23, filed by Aquilia Marcivicci Barnette. (Attachments: # 1 Motion (*Restricted*)) |

**JA2**

| | | |
|---|---|---|
| | | (tmg) (Main Document 1 replaced on 5/23/2012) (tmg). (Additional attachment(s) added on 10/5/2012: # 2 AMENDED ORDER) (tmg). (Entered: 05/23/2012) |
| 05/23/2012 | | Case assigned to District Judge Richard Voorhees. *This is your only notice - you will not receive a separate document.* (tmg) (Entered: 05/23/2012) |
| 05/23/2012 | 2 | **CJA30 Appointment as to Aquila Marciavicci Barnette. Attorney Mark E. Olive added for Aquila Marciavicci Barnette.. Signed on 5/23/12. (tob)** (Entered: 05/23/2012) |
| 05/23/2012 | 3 | **CJA 30 Appointment as to Aquila Marciavicci Barnette. Attorney Jacob Sussman added for Aquila Marciavicci Barnette.. Signed on 5/23/12. (tob)** (Entered: 05/23/2012) |
| 06/19/2012 | | Notice: You are REQUIRED to click this link to RETRIEVE the **Appellate Local Rule 22(b) Certificate** (tmg) (Entered: 06/19/2012) |
| 08/24/2012 | 10 | **ORDER, ( Status Hearing set for 9/10/2012 11:50 AM in Courtroom, 200 W Broad St, Statesville, NC 28677 before District Judge Richard Voorhees.). Signed by District Judge Richard Voorhees on 8/24/2012. (eef)** (Entered: 08/24/2012) |
| 09/11/2012 | | NOTICE of Hearing: Status Conference set for Monday, 9/17/2012 @ 9:45 AM in Courtroom, 200 W Broad St, Statesville, NC 28677 before District Judge Richard Voorhees. *This is your only notice - you will not receive a separate document.*(smj) (Entered: 09/11/2012) |
| 09/18/2012 | | Minute Entry: STATUS CONFERENCE held before District Judge Richard Voorhees regarding status of all previous files. Plaintiffs attorney: No counsel present for USA. Defendants attorney: Henderson Hill, Jacob Sussman. Former attorney Harold Bender present. Court reporter: Cheryl Nuccio. (cbb) (Entered: 09/18/2012) |
| 10/05/2012 | 17 | **ORDER directing USA to provide discovery. Signed by District Judge Richard Voorhees on 10/5/2012. (tmg)** (Entered: 10/05/2012) |
| 10/09/2012 | 19 | **SEALED ORDER** *(Sealed - Attorney)***: (available to Aquilia Marcivicci Barnette, USA). Signed by District Judge Richard Voorhees on 10/9/2012. (eef)** (Entered: 10/09/2012) |
| 10/16/2012 | | NOTICE of Hearing: In Chambers Conference re: Budget set for 10/24/2012 11:00 AM in Chambers located at 250 Charles R. Jonas Federal Courthouse, 401 W. Trade St., Charlotte NC before District Judge Richard Voorhees. *This is your only notice - you will not receive a separate document.*(bsw) (Entered: 10/16/2012) |
| 10/24/2012 | | Minute Entry: In Chambers Conference re: Budget held before District Judge Richard Voorhees. Plaintiffs attorney: Henderson Hill, Jake Sussman, and Mark Olive joining via conference call.. Defendants attorney: No counsel present from USA.. Court reporter: Laura Andersen. (tjg) (Entered: 10/24/2012) |
| 01/14/2013 | 25 | Ex Parte MOTION *(Sealed - Attorney)* Authorization for expert visit with defendant by Barnette; (available to Aquilia Marcivicci Barnette)Responses due by 1/31/2013 (Attachments: # 1 Exhibit Curriculum Vitae)(Hill, Henderson) Modified on 1/14/2013 to change to ex parte motion (smj). Regenerated NEF. (Entered: 01/14/2013) |
| 02/15/2013 | 29 | Deleted Document. Duplicate Entry. (Entered: 02/15/2013) |
| 03/13/2013 | 31 | Motion For Extension of Time To File 2255 Motion (Sussman, Jacob) Modified on 3/13/2013 to change event from notice to a motion(smj). (Entered: 03/13/2013) |
| 03/15/2013 | 32 | NOTICE by USA re 31 MOTION for Extension of Time *Notice of Government Stipulation to Extend Deadline for Filing Motion Under 28 U.S.C. Section 2255* (Miller, |

## JA3

| | | William) (Entered: 03/15/2013) |
|---|---|---|
| 04/19/2013 | 41 | NOTICE by Aquilia Marcivicci Barnette (available to Aquilia Marcivicci Barnette, USA) (Hill, Henderson) Modified on 4/22/2013 (cbb) to change security and show available parties). (Entered: 04/19/2013) |
| 06/10/2013 | 47 | Unredacted Document *(Sealed - Attorney)* (available to Judith C. Emken) (Attachments: # 1 Remainder of Court Ordered Reports)(Emken, Judith) (Entered: 06/10/2013) |
| 06/19/2013 | 48 | MOTION to Vacate *Pursuant to 2255* by Aquilia Marcivicci Barnette.Responses due by 7/8/2013 (Sussman, Jacob) (Entered: 06/19/2013) |
| 06/19/2013 | 49 | MOTION *for Leave to Conduct Juror Interviews* by Aquilia Marcivicci Barnette.Responses due by 7/8/2013 (Sussman, Jacob) (Entered: 06/19/2013) |
| 07/18/2013 | 50 | **ORDER denying 49 Motion for Permission to Interview Trial Jurors. Signed by District Judge Richard Voorhees on 7/18/13. (smj)** (Entered: 07/18/2013) |
| 07/19/2013 | 51 | MOTION for Discovery by Aquilia Marcivicci Barnette.Responses due by 8/5/2013 (Sussman, Jacob) (Entered: 07/19/2013) |
| 07/30/2013 | 52 | **ORDER TO ANSWER 2255 MOTION. Responses due by 9/16/2013. Signed by District Judge Richard Voorhees on 7/29/2013. (tmg)** (Entered: 07/30/2013) |
| 08/09/2013 | 53 | **ORDER vacating 52 Order requiring the Government to respond to Petitioners Motion to Vacate; Government shall have up to and including 8/19/2013 to respond to Petitioner's discovery request; Petitioner shall have thirty (30) days to file a motion for evidentiary hearing and brief in support; Government shall have sixty (60) days to file a motion, brief, answer, or other responsive pleading; Petitioner shall have forty-five (45) days to reply. Signed by District Judge Richard Voorhees on 8/9/2013. (eef)** (Entered: 08/09/2013) |
| 08/19/2013 | 54 | MOTION for Extension of Time to File Response/Reply re: 51 MOTION for Discovery by USA.Responses due by 9/6/2013 (Miller, William) (Entered: 08/19/2013) |
| 08/21/2013 | 55 | **ORDER granting 54 Motion for Extension of Time to File Response/Reply re 51 MOTION for Discovery Responses due by 9/12/2013. Signed by District Judge Richard Voorhees on 8/21/2013. (eef)** (Entered: 08/21/2013) |
| 09/09/2013 | 56 | RESPONSE in Opposition re 51 MOTION for Discovery by USA. Replies due by 9/19/2013 (Miller, William) (Entered: 09/09/2013) |
| 09/16/2013 | 57 | REPLY to Response to Motion re 51 MOTION for Discovery by Aquilia Marcivicci Barnette. (Sussman, Jacob) (Entered: 09/16/2013) |
| 12/06/2013 | 59 | Supplemental Memorandum by Aquilia Marcivicci Barnette as to 51 MOTION for Discovery by Aquilia Marcivicci Barnette. (Sussman, Jacob) (Entered: 12/06/2013) |
| 01/07/2014 | 61 | **ORDER for Specific Compliance re 59 Supplemental Memorandum. The U.S. Attorney shall have 30 (thirty) days from entrance of this Order to conduct a final search of trial, probation office, and any related law enforcement files for any and all interview statements, documents, recordings, reports, correspondence, etc., previously produced or ordered produced to Petitioners 1998 and 2002 trial counsel; FURTHER ORDERED that upon the conclusion of the ordered search, the U.S. Attorney shall file a document in this Court attesting to the efforts made to comply with the Courts Order issued on Oct. 5, 2012, ECF No. 17. Signed by District Judge Richard Voorhees on 1/7/2014. (eef)** (Entered: 01/07/2014) |
| 01/22/2014 | 62 | **ORDER denying 51 Motion for Discovery. Signed by District Judge Richard Voorhees on 1/22/2014. (eef)** (Entered: 01/22/2014) |

**JA4**

| 01/28/2014 | 63 | NOTICE by Aquilia Marcivicci Barnette *Notice of Unavailability* (Sussman, Jacob) (Entered: 01/28/2014) |
|---|---|---|
| 02/06/2014 | 64 | RESPONSE re 61 Order,, by USA. (Miller, William) (Entered: 02/06/2014) |
| 02/24/2014 | 65 | REPLY to Govt's 64 Response to Court's 61 Order by Aquilia Marcivicci Barnette. (Sussman, Jacob) Modified on 2/25/2014 (cbb) to change event type from Rply Resp to Motion. Regenerated NEF. Modified on 2/25/2014 (cbb) to link to correct document. (Entered: 02/24/2014) |
| 09/02/2014 | 66 | Document Deleted. Filed in Error (Entered: 09/02/2014) |
| 09/02/2014 | 67 | **ORDER that Petitioner shall have thirty (30) days from the entrance of this Order to file a motion for evidentiary hearing and supportive brief, as outlined in the Scheduling Order entered by this Court on August 9, 2013; Further Ordered that the Government shall have sixty (60) days thereafter to file a motion, brief, answer, or other responsive pleading; and Petitioner shall have forty-five (45) days to reply. Signed by District Judge Richard Voorhees on 9/2/2014. (eef)** (Entered: 09/02/2014) |
| 09/10/2014 | 68 | Unopposed MOTION for Extension of Time of Scheduling Order Deadlines by Aquilia Marcivicci Barnette.Responses due by 9/29/2014 (Sussman, Jacob) (Entered: 09/10/2014) |
| 09/12/2014 | 69 | **ORDER granting 68 Motion for Extension of Time to file a motion for evidentiary hearing and supporting brief. Motions due by 12/1/2014. Signed by District Judge Richard Voorhees on 09/12/2014. (jlk)** (Entered: 09/12/2014) |
| 11/14/2014 | 70 | Unopposed MOTION for Extension of Time of Scheduling Order Deadlines by Aquilia Marcivicci Barnette. Responses due by 12/1/2014 (Sussman, Jacob) (Entered: 11/14/2014) |
| 11/19/2014 | 71 | **ORDER granting 70 Motion for Extension of Time, the time within which Petitioner may file a motion for evidentiary hearing and supporting brief is extended by twenty-one (21) days, up to and including December 22, 2014. Signed by District Judge Richard Voorhees on 11/19/2014. (jlk)** (Entered: 11/19/2014) |
| 12/22/2014 | 72 | MOTION to Seal Document by Aquilia Marcivicci Barnette. Responses due by 1/8/2015 (Sussman, Jacob) (Entered: 12/22/2014) |
| 12/22/2014 | 73 | MOTION for Hearing by Aquilia Marcivicci Barnette. Responses due by 1/8/2015 (Sussman, Jacob) (Entered: 12/22/2014) |
| 12/22/2014 | 74 | MEMORANDUM in Support re 73 MOTION for Hearing by Aquilia Marcivicci Barnette. (Attachments: # 1 Index of Exhibits, # 2 Exhibit Bates Nos. 1-50, # 3 Exhibit Bates Nos. 51-100, # 4 Exhibit Bates Nos. 101-150, # 5 Exhibit Bates Nos. 151-208, # 6 Exhibit Bates Nos. 209-231, # 7 Exhibit Bates Nos. 260-361, # 8 Exhibit Bates Nos. 362-421, # 9 Exhibit Bates Nos. 707-721)(Sussman, Jacob) (Entered: 12/22/2014) |
| 12/22/2014 | 75 | Exhibit by Aquilia Marcivicci Barnette. Exhibit to 74 Memorandum in Support of Motion, 73 Motion for Hearing (Attachments: # 1 Exhibit Bates Nos. 1743-1818, # 2 Exhibit Bates Nos. 1916-1940, # 3 Exhibit Bates Nos. 1941-1950, # 4 Exhibit Bates Nos. 1951-1960, # 5 Exhibit Bates Nos. 1961-1990, # 6 Exhibit Bates Nos. 1991-2015, # 7 Exhibit Bates Nos. 2016-2027, # 8 Exhibit Bates Nos. 2028-2041, # 9 Exhibit Bates Nos. 2042-2065, # 10 Exhibit Bates Nos. 2066-2085, # 11 Exhibit Bates Nos. 2086-2100) (Sussman, Jacob) (Entered: 12/22/2014) |
| 12/22/2014 | 76 | Exhibit by Aquilia Marcivicci Barnette. Exhibit to 74 Memorandum in Support of Motion, 73 Motion for Hearing (Attachments: # 1 Exhibit Bates Nos. 2304-2326, # 2 Exhibit Bates Nos. 2327-2349, # 3 Exhibit Bates Nos. 3922-3934, # 4 Exhibit Bates Nos. 4002-4073, # 5 Exhibit Bates Nos. 4246-4250, # 6 Exhibit Bates Nos. 4251-4255, # 7 |

**JA5**

| | | |
|---|---|---|
| | | Exhibit Bates Nos. 4256-4258, # 8 Exhibit Bates Nos. 4259-4260, # 9 Exhibit Bates Nos. 4261-4275, # 10 Exhibit Bates Nos. 4276-4295, # 11 Exhibit Bates Nos. 4296-4320, # 12 Exhibit Bates Nos. 4321-4345, # 13 Exhibit Bates Nos. 4346-4375, # 14 Exhibit Bates Nos. 4376-4420, # 15 Exhibit Bates Nos. 4421-4495, # 16 Exhibit Bates Nos. 4496-4595, # 17 Exhibit Bates Nos. 4596-4695, # 18 Exhibit Bates Nos. 4696-4795, # 19 Exhibit Bates Nos. 4796-4917)(Sussman, Jacob) (Entered: 12/22/2014) |
| 12/22/2014 | 77 | Exhibit by Aquilia Marcivicci Barnette. Exhibit to 74 Memorandum in Support of Motion, 73 Motion for Hearing (Attachments: # 1 Exhibit Bates Nos. 4975-4978, # 2 Exhibit Bates Nos. 4979-5023, # 3 Exhibit Bates Nos. 5024-5068, # 4 Exhibit Bates Nos. 5069-5108, # 5 Exhibit Bates Nos. 5109-5155, # 6 Exhibit Bates Nos. 13475-13574, # 7 Exhibit Bates Nos. 13575-13674, # 8 Exhibit Bates Nos. 13675-13774, # 9 Exhibit Bates Nos. 13775-13824, # 10 Exhibit Bates Nos. 13825-13874, # 11 Exhibit Bates Nos. 13875-13974, # 12 Exhibit Bates Nos. 13975-14074, # 13 Exhibit Bates Nos. 14075-14174, # 14 Exhibit Bates Nos. 14175-14274, # 15 Exhibit Bates Nos. 14275-14374, # 16 Exhibit Bates Nos. 14375-14416)(Sussman, Jacob) (Entered: 12/22/2014) |
| 12/22/2014 | 78 | Exhibit by Aquilia Marcivicci Barnette. Exhibit to 74 Memorandum in Support of Motion, 73 Motion for Hearing (Attachments: # 1 Exhibit Bates Nos. 14448-14547, # 2 Exhibit Bates Nos. 14548-14647, # 3 Exhibit Bates Nos. 14648-14747, # 4 Exhibit Bates Nos. 14748-14834, # 5 Exhibit Bates Nos. 14835-14844)(Sussman, Jacob) (Entered: 12/22/2014) |
| 12/22/2014 | 79 | MOTION File Exhibits Conventionally and Under Seal re 72 MOTION to Seal Document , 74 Memorandum in Support of Motion, 73 MOTION for Hearing by Aquilia Marcivicci Barnette. Responses due by 1/8/2015 (Sussman, Jacob) (Entered: 12/22/2014) |
| 12/23/2014 | 80 | Sealed Document (*Sealed - Attorney*): Exhibits re: 72 MOTION to Seal Document , 74 Memorandum in Support of Motion, 73 MOTION for Hearing (available to Aquilia Marcivicci Barnette) (Attachments: # 1 Exhibit Bates Nos. 232-245, # 2 Exhibit Bates Nos. 246-259, # 3 Exhibit Bates Nos. 722-821, # 4 Exhibit Bates Nos. 822-921, # 5 Exhibit Bates Nos. 922-971, # 6 Exhibit Bates Nos. 972-1021, # 7 Exhibit Bates Nos. 1022-1071, # 8 Exhibit Bates Nos. 1072-1121, # 9 Exhibit Bates Nos. 1122-1221, # 10 Exhibit Bates Nos. 1222-1321, # 11 Exhibit Bates Nos. 1322-1421, # 12 Exhibit Bates Nos. 1422-1471, # 13 Exhibit Bates Nos. 1472-1521, # 14 Exhibit Bates Nos. 1522-1621, # 15 Exhibit Bates Nos. 1622-1646, # 16 Exhibit Bates Nos. 1647-1671, # 17 Exhibit Bates Nos. 1672-1681, # 18 Exhibit Bates Nos. 1682-1691, # 19 Exhibit Bates Nos. 1692-1696, # 20 Exhibit Bates Nos. 1697-1742, # 21 Exhibit Bates Nos. 1819-1823, # 22 Exhibit Bates Nos. 1824-1847, # 23 Exhibit Bates Nos. 1848-1868, # 24 Exhibit Bates Nos. 1869-1915)(Sussman, Jacob) Modified on 8/26/2015 to make documents available to USA(smj). Regenerated NEF on 8/26/2015 (smj). (Entered: 12/23/2014) |
| 12/23/2014 | 81 | Sealed Document (*Sealed - Attorney*): Exhibits re: 72 MOTION to Seal Document , 74 Memorandum in Support of Motion, 73 MOTION for Hearing (available to Aquilia Marcivicci Barnette) (Attachments: # 1 Exhibit Bates Nos. 2101-2110, # 2 Exhibit Bates Nos. 2111-2120, # 3 Exhibit Bates Nos. 2121-2140, # 4 Exhibit Bates Nos. 2141-2154, # 5 Exhibit Bates Nos. 2155-2159, # 6 Exhibit Bates Nos. 2160-2195, # 7 Exhibit Bates Nos. 2196-2202, # 8 Exhibit Bates Nos. 2203-2204, # 9 Exhibit Bates Nos. 2205-2216, # 10 Exhibit Bates Nos. 2217-2223, # 11 Exhibit Bates Nos. 2224-2235, # 12 Exhibit Bates Nos. 2236-2246, # 13 Exhibit Bates Nos. 2247-2258, # 14 Exhibit Bates Nos. 2259-2270, # 15 Exhibit Bates Nos. 2271-2281, # 16 Exhibit Bates Nos. 2282-2291, # 17 Exhibit Bates Nos. 2292-2302, # 18 Exhibit Bates Nos. 2303, # 19 Exhibit Bates Nos. 3767-3921)(Sussman, Jacob) (Entered: 12/23/2014) |
| 12/23/2014 | 82 | Sealed Document (*Sealed - Attorney*): Exhibits re: 72 MOTION to Seal Document , 74 Memorandum in Support of Motion, 73 MOTION for Hearing (available to Aquilia |

**JA6**

| | | |
|---|---|---|
| | | Marcivicci Barnette) (Attachments: # 1 Exhibit Bates Nos. 3935-3940, # 2 Exhibit Bates Nos. 3941-3960, # 3 Exhibit Bates Nos. 3961-3987, # 4 Exhibit Bates Nos. 3988-4001, # 5 Exhibit Bates Nos. 4074-4110, # 6 Exhibit Bates Nos. 4111-4136, # 7 Exhibit Bates Nos. 4137-4159, # 8 Exhibit Bates Nos. 4160-4174, # 9 Exhibit Bates Nos. 4175-4186, # 10 Exhibit Bates Nos. 4187-4210, # 11 Exhibit Bates Nos. 4211-4240, # 12 Exhibit Bates Nos. 4241-4245, # 13 Exhibit Bates Nos. 4918-4945, # 14 Exhibit Bates Nos. 4946-4974, # 15 Exhibit Bates Nos. 14417-14447)(Sussman, Jacob) (Entered: 12/23/2014) |
| 01/07/2015 | 83 | **ORDER granting 72 Motion to Seal Document ; granting 79 Motion to File Exhibits Conventionally and Under Seal. Signed by District Judge Richard Voorhees on 1/7/2015. (eef)** (Entered: 01/07/2015) |
| 01/13/2015 | | Conventionally filed DVD of Exhibits referenced in Aquilia Marcivicci Barnette's 79 Motion to File Exhibits Conventionally and Under Seal, and granted pursuant to the 83 Order, received in the Charlotte Clerk's Office on 1/13/2015. (ejb) (Entered: 01/19/2024) |
| 01/19/2015 | 84 | NOTICE by Aquilia Marcivicci Barnette *Unavailability of Counsel* (Sussman, Jacob) (Entered: 01/19/2015) |
| 02/10/2015 | 85 | MOTION for Extension of Time to File Response/Reply re: 73 MOTION for Hearing by USA. Responses due by 2/27/2015 (Miller, William) (Entered: 02/10/2015) |
| 02/12/2015 | 86 | NOTICE of Appearance by Anthony Joseph Enright on behalf of USA (Enright, Anthony) (Entered: 02/12/2015) |
| 02/19/2015 | 87 | **ORDER granting 85 Motion for Extension of Time to File Response/Reply re 73 MOTION for Hearing Responses due by 5/21/2015. Signed by District Judge Richard Voorhees on 02/19/2015. (jlk)** (Entered: 02/19/2015) |
| 05/14/2015 | 89 | MOTION for Extension of Time to File Response/Reply to Petitioner's 73 Motion for an Evidentiary Hearing by USA. Responses due by 6/1/2015 (Enright, Anthony) Modified on 5/14/2015 to link to document no. 73 (smj). (Entered: 05/14/2015) |
| 05/18/2015 | 90 | **ORDER granting 89 Motion for Extension of Time to File Response/Reply re 73 MOTION for Hearing Responses due by 6/22/2015. Signed by District Judge Richard Voorhees on 5/18/15. (mga)** (Entered: 05/18/2015) |
| 06/17/2015 | 91 | MOTION for Extension of Time to File Response/Reply re: 73 MOTION for Hearing by USA. Responses due by 7/6/2015 (Enright, Anthony) (Entered: 06/17/2015) |
| 06/18/2015 | 92 | **ORDER granting 91 Motion for Extension of Time to File Response/Reply re 73 MOTION for Hearing . Responses due by 6/22/2015. Signed by District Judge Richard Voorhees on 6/18/2015. (tmg)** (Entered: 06/18/2015) |
| 06/22/2015 | 93 | **ORDER that the Courts June 18, 2015 Order re 92 Order on Motion for Extension of Time, 73 MOTION for Hearing , is AMENDED. ( Responses due by 7/22/2015). Signed by District Judge Richard Voorhees on 6/22/2015. (eef)** (Entered: 06/22/2015) |
| 07/17/2015 | 94 | MOTION for Extension of Time to File Response/Reply re: 73 MOTION for Hearing by USA. Responses due by 8/3/2015 (Enright, Anthony) (Entered: 07/17/2015) |
| 07/21/2015 | 95 | **ORDER granting 94 Motion for Extension of Time to File Response/Reply re 73 MOTION for Hearing . Responses due by 8/24/2015. Signed by District Judge Richard Voorhees on 7/21/2015. (eef)** (Entered: 07/21/2015) |
| 08/20/2015 | 96 | MOTION for Extension of Time to File Response/Reply re: 73 MOTION for Hearing by USA. Responses due by 9/8/2015 (Attachments: # 1 Proposed Order)(Enright, Anthony) (Entered: 08/20/2015) |

**JA7**

| | | |
|---|---|---|
| 08/25/2015 | 97 | **ORDER granting 96 Motion for Extension of Time to File Response/Reply re 73 MOTION for Hearing . Responses due by 9/24/2015. Signed by District Judge Richard Voorhees on 8/25/2015. (eef)** (Entered: 08/25/2015) |
| 09/23/2015 | 98 | RESPONSE to Barnette's 48 Motion Under 28 U.S.C. section 2255 and 73 Motion for an Evidentiary Hearing by USA. (Enright, Anthony) Modified on 9/24/2015 to link to motions (smj). (Entered: 09/23/2015) |
| 09/23/2015 | 99 | Exhibit by USA. Exhibit to 98 Response *Exhibit 1a* (Enright, Anthony) (Entered: 09/23/2015) |
| 09/23/2015 | 100 | Exhibit by USA. Exhibit to 98 Response *Exhibit 1b* (Enright, Anthony) (Entered: 09/23/2015) |
| 09/23/2015 | 101 | Exhibit by USA. Exhibit to 98 Response *Exhibit 1c* (Enright, Anthony) (Entered: 09/23/2015) |
| 09/23/2015 | 102 | Exhibit by USA. Exhibit to 98 Response *Exhibit 1d* (Enright, Anthony) (Entered: 09/23/2015) |
| 09/23/2015 | 103 | Exhibit by USA. Exhibit to 98 Response *Exhibit 1e* (Enright, Anthony) (Entered: 09/23/2015) |
| 09/23/2015 | 104 | Exhibit by USA. Exhibit to 98 Response *Exhibit 1f* (Enright, Anthony) (Entered: 09/23/2015) |
| 09/23/2015 | 105 | Exhibit by USA. Exhibit to 98 Response *Exhibit 1g* (Enright, Anthony) (Entered: 09/23/2015) |
| 09/23/2015 | 106 | Exhibit by USA. Exhibit to 98 Response *Exhibit 1h* (Enright, Anthony) (Entered: 09/23/2015) |
| 09/23/2015 | 107 | Exhibit by USA. Exhibit to 98 Response *Exhibit 1i* (Enright, Anthony) (Entered: 09/23/2015) |
| 09/23/2015 | 108 | Exhibit by USA. Exhibit to 98 Response *Exhibit 1j* (Enright, Anthony) (Entered: 09/23/2015) |
| 10/23/2015 | 109 | Unopposed MOTION for Extension of Time to File Response/Reply re: 73 MOTION for Hearing by Aquilia Marcivicci Barnette. Responses due by 11/9/2015 (Sussman, Jacob) (Entered: 10/23/2015) |
| 11/05/2015 | 110 | **ORDER granting 109 Motion for Extension of Time to File Response/Reply re 73 MOTION for Hearing. Replies due by 12/22/2015. Signed by District Judge Richard Voorhees on 11/5/2015. (tmg)** (Entered: 11/05/2015) |
| 12/10/2015 | 111 | Unopposed MOTION for Extension of Time to File Response/Reply re: 73 MOTION for Hearing by Aquilia Marcivicci Barnette. Responses due by 12/31/2015 (Sussman, Jacob) (Entered: 12/10/2015) |
| 12/15/2015 | 112 | Exhibit by USA. Exhibit to 98 Response *Government's Exhibit List regarding Government's Response to Barnette's Motion Under 28 U.S.C. section 2255* (Enright, Anthony) (Entered: 12/15/2015) |
| 12/22/2015 | 113 | **ORDER granting 111 Motion for Extension of Time to File Response/Reply re: 73 MOTION for Hearing Replies due by 2/6/2016. Signed by District Judge Richard Voorhees on 12/22/15. (ssh)** (Entered: 12/22/2015) |
| 01/26/2016 | 114 | Unopposed MOTION for Extension of Time to File Response/Reply re: 73 MOTION for Hearing by Aquilia Marcivicci Barnette. Responses due by 2/12/2016 (Sussman, Jacob) |

**JA8**

|  |  | (Entered: 01/26/2016) |
|---|---|---|
| 02/03/2016 | 115 | **ORDER granting 114 Motion for Extension of Time to File Response/Reply re 73 MOTION for Hearing . Replies due by 3/21/2016. Signed by District Judge Richard Voorhees on 2/3/2015. (tmg)** (Entered: 02/03/2016) |
| 03/15/2016 | 116 | Unopposed MOTION for Extension of Time to File Response/Reply re: 73 MOTION for Hearing by Aquilia Marcivicci Barnette. Responses due by 4/1/2016 (Sussman, Jacob) (Entered: 03/15/2016) |
| 03/17/2016 | 117 | **ORDER granting 116 Motion for Extension of Time to File Response/Reply re 73 MOTION for Hearing Replies due by 4/4/2016. Signed by District Judge Richard Voorhees on 3/16/16. (clc)** (Entered: 03/17/2016) |
| 04/04/2016 | 118 | REPLY to Response to Motion re 48 MOTION to Vacate *Pursuant to 2255*, 73 MOTION for Hearing by Aquilia Marcivicci Barnette. (Attachments: # 1 Exhibit Index of Reply Exhibits, # 2 Exhibit Exhibits: Bates Nos. 14845-14864)(Sussman, Jacob) (Entered: 04/04/2016) |
| 06/24/2016 | 119 | Supplemental MOTION to Vacate *Pursuant to 2255* by Aquilia Marcivicci Barnette. Responses due by 7/11/2016 (Sussman, Jacob) (Entered: 06/24/2016) |
| 08/25/2016 | 120 | **ORDER TO ANSWER 2255 MOTION as to 119 Supplemental MOTION to Vacate Pursuant to 2255. Responses due by 9/29/2016. Signed by District Judge Richard Voorhees on 8/24/2016. (eef)** (Entered: 08/25/2016) |
| 09/20/2016 | 121 | Unopposed MOTION to Stay re 119 Supplemental MOTION to Vacate *Pursuant to 2255* by USA. Responses due by 10/7/2016 (Enright, Anthony) (Entered: 09/20/2016) |
| 09/23/2016 | 122 | Unopposed MOTION to Stay re 121 Unopposed MOTION to Stay re 119 Supplemental MOTION to Vacate *Pursuant to 2255* by Aquilia Marcivicci Barnette. Responses due by 10/11/2016 (Sussman, Jacob) (Entered: 09/23/2016) |
| 12/08/2016 | 123 | **ORDER granting 121 Motion to Place Supplemental Motion under 28 U.S.C. § 2255 in Abeyance; granting 122 Motion to Stay. (See Order for further details). Signed by District Judge Richard Voorhees on 12/8/16. (smj)** (Entered: 12/08/2016) |
| 12/08/2016 | 124 | **ORDER granting 121 Motion to Stay; granting 122 Motion to Stay. Action in the above-captioned case is stayed and held in abeyance pending a decision by the United States Supreme Court in Lynch v. Dimaya or the Fourth Circuit Court of Appeals in United States v. Simms. Respondent shall have 60 days from the date on which the later of the two decisions is issued to file an answer, motion, or other response to Barnett's Supplemental Motion to Vacatte (Doc. No. 119).Signed by District Judge Richard Voorhees on 12/8/16. (mga)** (Entered: 12/08/2016) |
| 09/01/2017 |  | Case reassigned to District Judge Max O. Cogburn, Jr. District Judge Richard Voorhees no longer assigned to the case. *This is your only notice - you will not receive a separate document.*(nvc) (Entered: 09/01/2017) |
| 11/09/2018 | 125 | **ORDER that the Courts previous abeyance Order 124 is modified to provide that Respondent shall have 60 days from the date the Simms, No. 15-4640, decision becomes final after en banc review to file an answer, motion, or other response to Petitioners Supplemental Motion to Vacate 19 .Signed by District Judge Max O. Cogburn, Jr on 11/9/2018. (ams)** (Entered: 11/09/2018) |
| 03/21/2019 | 126 | MOTION to Stay re 125 Order, by USA. Responses due by 4/4/2019 plus an additional 3 days if served by mail (Enright, Anthony) (Entered: 03/21/2019) |

**JA9**

| 04/09/2019 | 127 | **ORDER granting 126 Motion to Stay until the United States Supreme Court decides United States v. Davis, No. 18-43. The United States shall have 60 days after the Supreme Court issues its decision to respond to Petitioners supplemental Motion to Vacate.Signed by District Judge Max O. Cogburn, Jr on 4/8/2019. (ams)** (Entered: 04/09/2019) |
| --- | --- | --- |
| 08/19/2019 | 128 | MOTION for Extension of Time to File Response/Reply *to Petitioner's Supplemental Motion Under 28 U.S.C. § 2255* by USA. Responses due by 9/3/2019 (Enright, Anthony) (Entered: 08/19/2019) |
| 09/16/2019 | 129 | **ORDER granting nunc pro tunc 128 Motion for Extension of Time to File Response/Reply re 119 Supplemental MOTION to Vacate *Pursuant to 2255*. Response due by 10/7/2019. Signed by District Judge Max O. Cogburn, Jr on 9/16/2019. (ams)** (Entered: 09/16/2019) |
| 10/02/2019 | 130 | Second MOTION for Extension of Time to File Response/Reply re: 119 Supplemental MOTION to Vacate *Pursuant to 2255* by USA. Responses due by 10/16/2019 (Enright, Anthony) (Entered: 10/02/2019) |
| 10/08/2019 | 131 | **ORDER granting 130 Motion for Extension of Time to File Response/Reply re 119 Supplemental MOTION to Vacate *Pursuant to 2255*. Response due by 11/21/2019. Signed by District Judge Max O. Cogburn, Jr on 10/8/2019. (ams)** (Entered: 10/08/2019) |
| 11/21/2019 | 132 | RESPONSE re 119 Supplemental MOTION to Vacate *Pursuant to 2255* by USA. (Enright, Anthony) (Entered: 11/21/2019) |
| 11/21/2019 | 133 | NOTICE *of Termination of Counsel* by USA (Miller, William) (Entered: 11/21/2019) |
| 11/22/2019 | 134 | Unopposed MOTION for Extension of Time to File Response/Reply re: 119 Supplemental MOTION to Vacate *Pursuant to 2255* by Aquilia Marcivicci Barnette. Responses due by 12/6/2019 (Attachments: # 1 Proposed Order)(Sussman, Jacob) (Entered: 11/22/2019) |
| 12/02/2019 | 135 | **ORDER granting 134 Motion for Extension of Time to File Response/Reply to Government's response re 119 Supplemental MOTION to Vacate *Pursuant to 2255*. Reply due by 2/22/2020. Signed by District Judge Max O. Cogburn, Jr on 12/2/2019. (ams)** (Entered: 12/02/2019) |
| 02/20/2020 | 136 | REPLY to Response to Motion re 119 Supplemental MOTION to Vacate *Pursuant to 2255* by Aquilia Marcivicci Barnette. (Sussman, Jacob) (Entered: 02/20/2020) |
| 03/12/2021 | 137 | **ORDER denying Motion to Vacate, Set Aside or Correct Sentence (2255); denying Petitioner's Motion to Supplement 119 ; denying Petitioner's Motion for Evidentiary Hearing 73 . Court declines to issue a Certificate of Appealability. Signed by District Judge Max O. Cogburn, Jr on 3/12/2021. (ams)** (Main Document 137 replaced on 3/12/2021) (ams). (Entered: 03/12/2021) |
| 03/12/2021 | 138 | **CLERK'S JUDGMENT is hereby entered in accordance with the Court's Order dated 3/12/2021. Signed by Clerk, Frank G. Johns.(ams)** (Entered: 03/12/2021) |
| 03/24/2021 | 139 | NOTICE of Appearance by Gerald Wesley King, Jr on behalf of Aquilia Marcivicci Barnette (Attachments: # 1 Attachment A)(King, Gerald) (Entered: 03/24/2021) |
| 04/09/2021 | 140 | MOTION to Alter Judgment *Pursuant to Rule 59(e) of the Federal Rules of Civil Procedure* by Aquilia Marcivicci Barnette. Responses due by 4/23/2021 (King, Gerald) (Entered: 04/09/2021) |

## JA10

| 12/06/2023 | 141 | **ORDER denying 140 Motion to Alter Judgment. Signed by District Judge Max O. Cogburn, Jr on 12/6/2023. (ams)** (Entered: 12/06/2023) |
|---|---|---|
| 02/05/2024 | 142 | NOTICE OF APPEAL as to 141 Order on Motion to Alter Judgment by Aquilia Marcivicci Barnette. *Use this link www.ca4.uscourts.gov to retrieve 4th Circuit case opening documents, i.e. Appearance of Counsel, Docketing Statement, Disclosure Statement, and Transcript Order Form.* Note: Your Transcript Order Form must be served on the District Court as well as the Circuit Court. (IFP) (King, Gerald) (Entered: 02/05/2024) |
| 02/06/2024 | 143 | Transmission of DEATH PENALTY Notice of Appeal to US Court of Appeals re 142 Notice of Appeal (rth) (Entered: 02/06/2024) |
| 02/07/2024 | 144 | USCA Case Number 24-1 for 142 Notice of Appeal, USCA Case Manager: Emily Borneisen. (nvc) (Entered: 02/07/2024) |
| 02/07/2024 | 145 | ORDER of USCA as to Aquilia Marcivicci Barnette appointing Federal Defender of the Western District of NC as lead counsel and Mark E. Olive and Jacob H. Sussman as CJA co-counsel on 142 Notice of Appeal [24-1]. (slm) (Entered: 02/07/2024) |

| PACER Service Center | | |
|---|---|---|
| **Transaction Receipt** | | |
| 08/23/2024 08:22:37 | | |
| **PACER Login:** | JillAbernethy | **Client Code:** | |
| **Description:** | Docket Report | **Search Criteria:** | 3:12-cv-00327-MOC |
| **Billable Pages:** | 10 | **Cost:** | 1.00 |
| **Exempt flag:** | Exempt | **Exempt reason:** | Always |

# JA11

| UNITED STATES OF AMERICA | DEATH PENALTY § 2255 |
|---|---|
| vs. | |
| AQUILIA MARCIVICCI BARNETTE | |

**PETITIONER AQUILIA MARCIVICCI BARNETTE'S
INITIAL MOTION FOR RELIEF PURSUANT TO 28 U.S.C. § 2255**

Aquilia Marcivicci Barnette, through undersigned counsel, pursuant to 28 U.S.C. § 2255 and the Fifth, Sixth, and Eighth Amendments to the U.S. Constitution, respectfully moves this Court to vacate the judgment entered against him and/or set aside or correct the sentence of death.

**RELEVANT PROCEDURAL HISTORY**

On February 4, 1997, Aquilia Marcivicci Barnette (hereinafter "Petitioner" or "Mr. Barnette"), was indicted by a federal grand jury in the Western District of North Carolina on eleven criminal charges arising out of the firebombing of the residence of Robin Williams in Roanoke, Virginia, the carjacking and murder of Donald Lee Allen in Charlotte, North Carolina, and the subsequent murder of Ms. Williams in Roanoke. The charges included: interstate domestic violence, in violation of 18 U.S.C. §§ 2261(a)(1) & (b) (Count 1); use of a destructive device during and in relation to a crime of violence, in violation of 18 U.S.C. § 924(c)(1) (Count 2); using and carrying fire and explosive materials during commission of a felony, in violation of 18 U.S.C. § 844(h)(1) (Count 3); making a false statement in connection with the purchase of a

1

**JA12**

firearm, in violation of 18 U.S.C. §§ 922(a)(6) & 924 (Count 4); making a firearm by sawing off the barrel of a shotgun without complying with the provisions of the National Firearms Act, in violation of 26 U.S.C. §§ 5821, 5822, 5861(f) & 5871 (Count 5); possession of a firearm after having been convicted of a felony, in violation of 18 U.S.C. §§ 922(g)(1) & 924 (Count 6); carjacking resulting in death, in violation of 18 U.S.C. § 2119(3) (Count 7); first-degree murder by use of a firearm, in violation of 18 U.S.C. §§ 924(c)(1) & (i)2(1) (Count 8); transporting a stolen vehicle in interstate commerce, in violation of 18 U.S.C. § 2312 (Count 9); interstate domestic violence, in violation of 18 U.S.C. §§ 2261(a)(1) & (b) (Count 10); and first-degree murder by use of a firearm, in violation of 18 U.S.C. §§ 924(c)(1) & (i)2(1) (Count 11).

On January 27, 1998, a jury found Mr. Barnette guilty on all counts of the Indictment. At sentencing, the jury recommended that Mr. Barnette be sentenced to death on Counts Seven, Eight, and Eleven. On February 10, 1998, this Court entered a judgment sentencing Mr. Barnette to death. The Court also imposed sentences on the other eight counts, which resulted in a total sentence of life imprisonment, plus 540 months to be served consecutively.

Mr. Barnette's direct appeal to the United States Court of Appeals for the Fourth Circuit resulted in the reversal of the sentences of death on Counts Seven, Eight, and Eleven, and his case was remanded for resentencing. *United States v. Barnette*, 211 F.3d 803 (4th Cir. 2000). Following a new penalty phase trial in 2002, a jury again imposed the death penalty. On direct appeal, Mr. Barnette's new death sentences were affirmed. *United States v. Barnette*, 390 F.3d 775 (4th Cir. 2004).

On May 15, 2005, Mr. Barnette filed a Petition for a Writ of Certiorari with the United States Supreme Court. Soon thereafter, the Supreme Court decided *Miller-El v. Dretke*, 545

2

U.S. 231 (2005). A supplemental petition for a writ of certiorari was filed on Mr. Barnette's behalf in light of *Miller-El*. The Supreme Court thereafter granted the supplemental petition, vacated the judgment of the Fourth Circuit, and remanded the case in light of *Miller-El*. *Barnette v. United States*, 546 U.S. 803 (2005). Following remand to the Fourth Circuit, Mr. Barnette sought to remand the case to the District Court. After supplemental briefing on the issue, the Fourth Circuit entered an order granting his motion to remand the case to the District Court.

After additional briefing, an in camera review of jury questionnaires, and an additional hearing on the matter, the District Court refused to provide copies of the jury questionnaires to defense counsel. The Court then issued an Order on May 20, 2010, finding no *Batson* violation by the government, and further ruling that Mr. Barnette was not entitled to discovery under the Jencks Act. *United States v. Barnette*, Case No. 3:97CR23, 2010 WL 2085312 (W.D.N.C. May 20, 2010).

Mr. Barnette appealed this Court's Order to the Fourth Circuit Court of Appeals. Following oral argument on January 27, 2011, the Fourth Circuit issued a published opinion affirming the District Court's ruling. *United States v. Barnette*, 644 F.3d 192 (4th Cir. 2011). On March 19, 2012, the United States Supreme Court denied Mr. Barnette's Petition for a Writ of Certiorari. *Barnette v. United States*, 132 S.Ct. 1740 (Mar. 19, 2012).

On April 3, 2012, a sealed motion to appoint counsel for Defendant was filed. [Case No. 3:97CR23, Doc. 682]. On May 23, 2012, the Court appointed the undersigned, *nunc pro tunc* to April 3, 2012, as counsel in this capital § 2255 proceeding. [Doc. 1]

On September 18, 2012, post-conviction counsel Henderson Hill and Jake Sussman

3

appeared before the Court, along with former trial counsel Harold Bender, in connection with the status of Mr. Barnette's trial files. Mr. Bender acknowledged on the record that he was the last attorney (among all of Mr. Barnette's prior counsel) to have trial files pertaining to Mr. Barnette and that he had not located or produced them to post-conviction counsel.[1]

On March 13, 2013, Mr. Barnette, through undersigned counsel, filed a *Notice of Stipulation to Extend Deadline for Filing Motion Under 28 U.S.C. § 2255 and Government Waiver of Statute of Limitations Defense and Motion for Order Confirming Agreed-Upon Extension of Time*. [Doc. 31] In this pleading, Mr. Barnette stated:

> Following extended discussions between undersigned counsel and the government, the government has made a considered, intentional, affirmative decision to waive, forfeit and/or relinquish any statute of limitations defense and consent to the extension of Mr. Barnette's § 2255 filing deadline from March 19, 2013 to June 19, 2013 in this case. *See Wood v. Milyard*, 132 S. Ct. 1826, 1835 (2012); *see also Day v. McDonough*, 547 U.S. 198, 202 (2006). The government has made clear to post-conviction counsel that this waiver is strictly limited to a three (3) month extension of the limitations period from March 19, 2013 to June 19, 2013.

*Id.* at 1.

On March 15, 2013, the government filed its Notice of Government Stipulation to Extend Deadline for Filing Motion Under 28 U.S.C. § 2255 [Doc. 32], and stated as follows:

> NOW COMES the United States, through the U.S. Attorney's Office for the Western District of North Carolina and undersigned counsel, and hereby files this notice of its consent and considered, intentional, affirmative decision to waive, forfeit and/or relinquish any statute of limitations defense regarding the extension of Defendant Aquilia Marcivicci Barnette's § 2255 filing deadline from March 19, 2013 to June 19, 2013. *See Wood v. Milyard*, 132 S. Ct. 1826, 1835 (2012); *see also Day v. McDonough*, 547 U.S. 198, 202 (2006). The government's consent and waiver is strictly limited to a three (3) month extension of the limitations

---

[1] As of this filing, Mr. Barnette, through post-conviction counsel, remains without his trial files. Prior to his death on March 24, 2013, Mr. Bender had produced approximately 300 pages consisting of miscellaneous electronic documents that largely concerned post-trial matters. The approximately 40 to 50 boxes of trial files that Mr. Bender and co-counsel Jean Lawson reportedly possessed at the time of Mr. Barnett's 2002 trial, inclusive of handwritten notes, memoranda, correspondence with the government and experts, etc., have not yet been located or produced.

4

**JA15**

period from March 19, 2013 to June 19, 2013 for Mr. Barnette to file a § 2255 motion.

*Id.* at 1.

In this motion, Mr. Barnette, through undersigned counsel, moves to set vacate his judgment and/or set aside his death sentences as having been obtained in violation of the U.S. Constitution.

<u>STATEMENT REGARDING BRIEFING AND LEGAL ARGUMENT</u>

In accordance with Rule 2 of the RULES ON MOTION ATTACKING SENTENCE UNDER SECTION 2255, this motion sets forth only the facts and grounds entitling Mr. Barnette to relief. It does not contain legal argument or citation.[2]

References to sequentially numbered pages of the transcript of the trial proceedings before this Court are cited as "2002 Tr." followed by the page citation. Transcripts of the first trial before the Honorable Robert D. Potter are cited as "1998 Tr." followed by the page citation. Transcripts of other proceedings are cited as "Tr." and are followed by the date.

---

[2] The parties have conferred and propose the following scheduling after the filing of this Motion, subject to this Court's consideration. Petitioner will file motions for discovery (if any) by July 19, 2013. Respondent will respond to discovery requests by August 19, 2013. After discovery issues are resolved, Petitioner will be allowed thirty (30) days to file a motion for evidentiary hearing and brief in support of his positions. Respondent will then have sixty (60) days to file any motion, brief, answer, or other responsive pleading. Petitioner will have forty-five (45) days to reply.

5

**JA16**

## STATEMENT REGARDING SCOPE OF THIS PETITION
## AND ANTICIPATED AMENDMENT OF CLAIMS

Although the U.S. Supreme Court's denied certiorari in Petitioner's direct appeal on March 19, 2012, thereby triggering Petitioner's one year limitations period, Petitioner was not appointed counsel for post-conviction purposes until May 23, 2012. Under any set of circumstances, ten (10) months within which to investigate and file a § 2255 petition would be quite difficult. In a capital case that involves crimes from 1996 spanning two states, aggravating factors dating back to the early 1990s, a federal capital trial in 1998, a second federal trial in 2002, three direct appeals and two remands, and an unquestionably massive record, the challenge is extraordinary.

As the Supreme Court has made clear, in addition to "the seriousness of the possible penalty," capital habeas corpus proceedings are by their nature "unique and complex." *McFarland v. Scott*, 512 U.S. 849, 855-56 (1994). Habeas litigation involves extra-record investigation and the need for expert resources; post-conviction counsel "cannot rely on the previously compiled record but must conduct a thorough, independent investigation." AMERICAN BAR ASSOCIATION, GUIDELINES FOR THE APPOINTMENT AND PERFORMANCE OF DEFENSE COUNSEL IN DEATH PENALTY CASES (2003) (hereinafter "2003 ABA Guidelines"), Guideline 10.15.1 commentary. The preparation of a comprehensive and thorough post-conviction pleading is a labor intensive endeavor that requires "enormous amounts of time, energy, and knowledge. *Id.* This is particularly true in a federal post-conviction case where the 2255 litigation represents the defendant's only opportunity to present any extra-record facts challenging his conviction or sentence, and there is no state court record on which to rely. Petitioner will have no other forum in which to raise constitutional objections for judicial review.

6

**JA17**

As the post-conviction record in this matter makes clear, an unexpected and profound obstacle has stood in the way of undersigned counsel's diligent efforts to undertake these significant obligations, and made this undertaking vastly more "unique and complex": the failure of prior trial counsel to produce Petitioner's files from his underlying capital trials. As confirmed during a status conference on September 17, 2012, although Harold Bender was the last attorney for Petitioner to possess all trial counsel files for all prior counsel from all prior proceedings—including attorneys Susan Weigand of the Mecklenburg County Public Defender's Office, Paul Williams, George Laughrun, James Cooney, Jean Lawson, Claire Rauscher, and Mr. Bender himself—he could not locate or otherwise produce the files. As of this filing, Petitioner, through post-conviction counsel, still does not have his trial files. Prior to his death on March 24, 2013, Mr. Bender had produced approximately 300 pages on a diskette consisting of miscellaneous electronic documents that largely concerned post-trial matters. The approximately 40 to 50 boxes of trial files that Mr. Bender and co-counsel Jean Lawson reportedly possessed at the time of Mr. Barnette's 2002 trial, inclusive of handwritten notes, memoranda, reports, correspondence with the government and experts, etc., have not yet been located or produced.

As post-conviction counsel have established in previously filed *ex parte* submissions and hearings, the absence of trial files—understood to be scores of missing boxes constituting prior trial counsel's work in two federal death penalty trials which are missing through no fault of Petitioner—has created an impediment and obstacle of the first magnitude. Despite the fact that Petitioner has "been pursuing his rights diligently," the absence of trial files and complete discovery has created an "extraordinary circumstance" that threatens to "[stand] in his way" as he endeavors, through counsel, to competently explore and, ultimately, litigate matters of

7

constitutional importance relating to his death sentences. *Holland v. Florida*, 130 S.Ct. 2549, 2562 (2010) (internal quotes and citations omitted).

As made clear by Supreme Court jurisprudence arising out of capital post-conviction litigation (*see, e.g., Sears v. Upton*, 130 S. Ct. 3259 (2010); *Jefferson v. Upton*, 130 S. Ct. 2217 (2010); *Rompilla v. Beard*, 545 U.S. 374 (2005); *Porter v. McCollum*, 130 S.Ct. 447 (2009); *Wiggins v. Smith*, 539 U.S. 510 (2003); *Williams v. Taylor*, 529 U.S. 362 (2000)), and in light of the Guidelines for the Administration of the Criminal Justice Act and Related Statutes, CJA Guidelines on Case Budgeting and the 2003 ABA Guidelines, the well-established "phases" of capital post-conviction litigation include: record collection (including, and usually starting with, trial counsel files); record review; investigation (including interviewing prior defense team members, trial witnesses, client, etc.); researching and writing the 2255 petition; conducting discovery; responding to the government's answer; preparing for and conducting an evidentiary hearing; and post-hearing briefing. Section 2255 litigation is the appropriate time for a federal litigant to raise violations pursuant to *Strickland v. Washington*, 466 U.S. 668 (1984) or *Brady v. Maryland*, 373 U.S. 83 (1963) as they depend upon ascertainment of facts outside the record. *See, e.g., Massaro v. United States*, 538 U.S. 500 (2003). The records of trial counsel are critical to this endeavor. Because of the extraordinary circumstance here, post-conviction counsel, despite diligent efforts, have been severely stymied in conducting the necessary record review and investigation that must take place.

In the face of this extraordinary obstacle, post-conviction counsel have nonetheless worked diligently to investigate Petitioner's case. During the aforementioned September 17, 2012 hearing, in an effort to continue to diligently investigate Petitioner's case, post-conviction counsel made an oral motion seeking a court order directing the government to produce

8

discovery and related material (to the extent the same would have been provided to trial counsel during Defendant's underlying capital trials). On October 5, 2012, the Court entered such an order. [Doc. 17]

On November 29, 2012, the U.S. Attorney's Office for the Western District of North Carolina provided a diskette to undersigned counsel containing 3428 pages of material. On March 5, 2013, the government produced an additional sixteen (16) separate diskettes (along with duplicate copies of (13) thirteen of the diskettes) of audio/video recordings from discovery. On March 12, 2013, the government informed post-conviction counsel that an additional three (3) audio files of interviews had been duplicated and were available to post-conviction counsel. The government also asserted that all *Jencks* material had been produced to post-conviction counsel pursuant to the Court's order and that it did not have any raw data from any expert, other than what had been previously turned over to post-conviction counsel.

In addition, post-conviction counsel have employed all manner of available process and investigative avenues to seek out and obtain information and records that pertain to Petitioner and his case. The unfortunate and unhelpful combination of the age of this case and the absence of trial files, however, has rendered this process exceedingly challenging. For example, some institutions have destroyed records pertaining to Petitioner that trial counsel had in 2002. Some defense experts no longer have their files pertaining to Petitioner because they assumed that trial counsel would have maintained their copies. To the extent that post-conviction counsel have been able to successfully identify and locate records that pertain to Petitioner by way of tireless investigation and/or extrapolation from what does exist in the court file, post-conviction counsel has not yet received all of the records that were requested.

For the above-stated reasons, despite post-conviction counsel's diligent work in this case,

9

**JA20**

and despite the government's considered, affirmative decision to waive and/or forfeit any statute of limitations argument or defense it could otherwise raise in connection with the timeliness of a 2255 motion filed after March 19, 2013 and by or on June 19, 2013, it remains apparent, due to a variety of factors over which neither Petitioner nor post-conviction counsel has any control, that Petitioner's post-conviction investigation remains incomplete.

Accordingly, post-conviction counsel have made factual allegations that they know to be true, or reasonably believe to be true. Counsel have also made allegations in good faith in order to preserve the right to amend this Motion. As counsel continue their investigation, they will seek to amend, supplement and/or correct inaccuracies (if any) in the facts and claims pled herein, and of course will provide support for each of the grounds for relief asserted, pursuant to the applicable Rules and this Court's discretion.

## STATEMENT REGARDING A CAPITAL HABEAS PROCEEDING

The Supreme Court has repeatedly emphasized that the "duty to search for constitutional error with painstaking care is never more exacting than it is in a capital case." *Kyles v.* Whitley, 514 U.S. 419, 422 (1995) (quoting *Burger v. Kemp*, 483 U.S. 776, 785 (1987)), which is in accord with the "awesome responsibility entrusted to the federal judiciary in its habeas jurisdiction." *Stouffer v. Reynolds*, 168 F.3d 1155, 1173 (10th Cir. 1999). *See also Strickland v. Washington*, 466 U.S. 668, 704 (1984) (Brennan, J., concurring in part and dissenting in part) (observing, in habeas proceedings pursuant to § 2254, that "we have consistently required that capital proceedings be policed at all stages by an especially vigilant concern for procedural fairness and for the accuracy of factfinding"); *Smith v. Mullin,* 379 F.3d 919, 939 (10th Cir. 2004) (noting the court's "heightened attention parallels the heightened demands on counsel in a capital case") (citing ABA STANDARDS FOR CRIMINAL JUSTICE 4–1.2(c) (3d ed. 1993)).

10

**JA21**

Petitioner herein alleges that his death sentences were obtained in violation of his rights under the Fifth, Sixth and Eighth Amendments to the United States Constitution. These violations include deprivations of Petitioner's rights to effective assistance of counsel, due process of law, and to be free of cruel and unusual punishment.

**JURISDICTION AND AUTHORITY TO GRANT RELIEF**

This Court has jurisdiction to entertain this motion and to provide the relief requested herein pursuant to 28 U.S.C. § 2255 and the RULES ON MOTION ATTACKING SENTENCE UNDER SECTION 2255.

**CLAIMS FOR RELIEF**

I.  **Petitioner Marc Barnette was Denied Effective Assistance of Counsel as Guaranteed by the Fifth, Sixth, and Eighth Amendments to the U.S. Constitution and 18 U.S.C. § 3006A**

A.  **Introduction**

Aquilia Marcivicci "Marc" Barnette was convicted and sentenced to death in 1998 by a jury that did not have the benefit of a full and accurate account of his severe mental illness, tragic family dysfunction, trauma he experienced as an adolescent and young man, and the effect that his mental illness and background experiences had on his behavior and functioning. When Mr. Barnette received the promise of re-sentencing, the past repeated itself: he was again sentenced to death by a jury that did not have accurate and complete information about his mental health and his background, and the impact both had on him.

Having failed to conduct an adequate and complete investigation by the start of trial, trial counsel called Mr. Barnette as his own first defense witness at resentencing. Mr. Barnette is mentally ill and his testimony was more aggravating than mitigating. The most charitable thing

11

**JA22**

the prosecutor called it was "spin."   It is unsurprising that after nearly two days on the witness stand, only one juror found that Mr. Barnette "has accepted full responsibility for his actions," and that only one juror found that Mr. Barnette "has remorse."   A mentally ill defendant ought not to be justifying behavior through self-proclaimed mitigation, yet that is precisely what trial counsel attempted to do.   Trial counsel's failure to have mental health experts explain or contextualize Mr. Barnette's testimony merely compounded *sub silento* what was already highly aggravating.

Given the unreasonably inadequate investigation that was undertaken, it is unsurprising that the other mitigating background information that was presented to Mr. Barnette's sentencing jury in 2002 was done in a truncated, contradictory, and incomplete manner.   For example, after presenting Mr. Barnette's testimony about suffering severe physical abuse at the hands of Derrick Barnette, trial counsel presented the testimony of Derrick Barnette himself, which quickly and severely undermined, indeed flatly contradicted, Mr. Barnette's testimony. Reasonable trial counsel would have anticipated this concern and relied on the treasure trove of available information to establish that, unquestionably, Mr. Barnette suffered significant abuse at the hands of Derrick Barnette.   Unfortunately, trial counsel unreasonably failed to take those steps and the jury was presented with two versions of the past in stark contradiction to one another.   As a result, only one juror found that Mr. Barnette "was abused by his father."[3]

Mr. Barnette's chaotic, abusive, and neglectful upbringing culminated in Derrick Barnette revealing to Marc that he was not his father, when Marc was around fourteen years old, and then leaving Charlotte.   These circumstances cemented Marc Barnette's mental illness that

---

[3] Defense mental health experts also relied upon the fact that Derrick "Rick" Barnette was abusive.   But Rick testified that he was not abusive, that Marc's mother left him alone only once to his knowledge, and that even after he told Marc he was not his father he said he would always be there for him and he was.   The government capitalized on this inaccurate and contradictory evidence defense counsel introduced.

12

**JA23**

would prove to be a blight on many of Marc Barnette's relationships for the next few, short, years.  Defense mental health experts unreasonably were not provided available background materials that were necessary for reliable mental illness diagnoses that could withstand cross-examination.  Indeed, a thorough investigation of Marc Barnette's history provides powerful insights into his actions and relationships, and makes clear that he suffers both from borderline personality disorder and a major mood disorder, neither of which he had control over, and which, in combination are doubly disabling.

Trial counsel's deficient efforts prejudiced Mr. Barnette.  If any of this evidence had been properly developed, it is reasonably probable that a unanimous verdict for death would not have been returned.

### B.  <u>Standard</u>

When a jury is asked to determine whether a defendant will live or die for his crimes, "[w]hat is essential is that the jury have before it all possible relevant information about the individual defendant whose fate it must determine."  *Jurek v. Texas*, 428 U.S. 262, 276 (1976).  The Sixth Amendment to the U.S. Constitution guarantees every criminal defendant the right to assistance of counsel, which in turn "protect[s] the fundamental right to a fair trial."  *Strickland*, 466 U.S. at 684.  Moreover, "[t]he right to counsel is the right to the effective assistance of counsel."  *McMann v. Richardson*, 397 U.S. 759, 771 n.14 (1970).  Accordingly, a capital defendant is entitled to have his death sentence reversed where counsel renders constitutionally deficient assistance of counsel.  *See Strickland*, 466 U.S. at 688.

There is a two-prong test governing ineffective assistance of counsel claims.  First, the defendant must show that counsel's performance was deficient in that it fell below "an objective standard of reasonableness" such that "counsel was not functioning as the 'counsel' guaranteed

13

**JA24**

by the Sixth Amendment." *Strickland*, 466 U.S. at 687-89. "Second, the defendant must show that the deficient performance prejudiced the defense." *Id*. at 687. Petitioner's allegations satisfy these requirements.[4]

### C. Information that was Reasonably Available for the Jury's Consideration

#### 1. Major Mental Illnesses and Statutory Mitigation

Dr. Richard Dudley, M.D., a physician, with a specialty in clinical and forensic psychiatry, evaluated Mr. Barnette in person, and relying upon his evaluations and extensive background materials, reached the following expert opinions:

> Mental status examinations of Marc Barnette, performed during this psychiatrist's various visits with/examinations of Marc Barnette were quite revealing. More specifically, each time that this psychiatrist met with Marc Barnette he was oriented to person, place and time, and his memory for both short and long-term events appeared to be good. However, Marc Barnette's mood was markedly different each time that he met with this psychiatrist for reasons that he/ Marc Barnette was unable to identify/explain. At times his mood was severely depressed; at other times his mood was inappropriately elated, and at other times his mood was more mixed (i.e., depressed and manic), with an associated irritability and extreme suspiciousness that at times reached the level of paranoia (i.e., the feelings that he was being harmed were fixed/he wouldn't let them go despite being confronted about them). His affect (i.e., the external representations or expressions of his mood) also changed consistent with the above noted changes in his mood.

> Marc Barnette's family reported observing similar changes in Marc Barnette's mood over the course of his life, starting at least back when he was an adolescent. Unprompted, Marc Barnette's mother noted that these changes in Marc Barnette's mood were often so extreme and would occur so rapidly that she felt that she should take him for some type of mental health evaluation and treatment; she cried as she noted that she just never did that; and she noted that maybe if she had done what she had thought she should do for Marc Barnette, maybe none of this would have ever happened. More detailed exploration with family members and others about Marc Barnette's mood during May and June 1996 revealed rapid changes in his mood during that time period as well.

> Marc Barnette did evidence at least some developing insight, in that he noted that although in the past he didn't really know anything about depression, he now realizes that

---

[4] Petitioner will not present a lengthy discourse in this Motion on the requirements of *Strickland* and why they are satisfied. As noted above, the parties assume that the Court will schedule such arguments for an appropriate time. Petitioner does contend that his allegations make a showing of unreasonable and prejudicial attorney conduct.

**JA25**

the depression and suicidal feelings and attempts that he made were indicative of depression or at least some type of mental health problem. He also noted that some of the things he was feeling back then seem foreign and maybe even crazy now, largely because he has come to understand more about why/how he developed such major issues with trust, starting back with his early childhood experiences. He noted, for example, that his frenzied 'need to know' whether or not Robin was really with Greene now seems strange to him, as does the sense that he could love her so strongly that he would want to take her with him or do a murder/suicide thing.

Otherwise, Marc Barnette's mental status was unremarkable, in that his speech was clear, coherent and goal-directed, his intellectual capacity appeared to be within the average range, and there was no clear evidence of an organic brain syndrome.

Given the above noted, it is the opinion of this psychiatrist, to within a reasonable degree of medical certainty, that Marc Barnette has suffered quite severely as a result of his extremely difficult childhood. More specifically, Marc Barnette's extremely difficult childhood significantly impaired his development, resulting in broad-based instability in all major areas of functioning. There is difficulty with attachment/instability in interpersonal relationships, characterized by frantic efforts to avoid real or imagined abandonment, and intense relationships with alternating feelings of extreme idealization and extreme devaluation of the other person; there is instability of self-image, characterized by an unstable sense of self and periods feeling empty and valueless; there is instability of mood, with affective instability due to marked reactivity of mood often accompanied by anxiety and irritability and/or suicidal behavior; and there is impulsivity generally associated with self-damaging behavior.

Although this psychiatrist believes that identifying Marc Barnette's symptoms of mental illness and appreciating their impact on his ability to function is more important than labeling him with a specific diagnosis, it is the opinion of this psychiatrist that the above described cluster of symptoms meet the diagnostic criteria for Borderline Personality Disorder. A childhood history of abuse, neglect, hostile conflict, and early parental loss or separation is not at all uncommon in individuals who suffer from this disorder; this is clearly the case with Marc Barnette; and therefore it is not surprising that there is an exacerbation of the difficulties associated with this disorder when a caregiver or lover is seen as neglectful, withholding, uncaring, or abandoning. It is also important to note that persons who suffer from this disorder are vulnerable to the development of transient, stress-related paranoid ideation or severe dissociative symptoms, and based on the information currently available to this psychiatrist, this also seems to be the case with Marc Barnette.

In addition, it is the opinion of this psychiatrist, to within a reasonable degree of medical certainty, that Marc Barnette also suffers from a major mood disorder, characterized by rapidly changing, extreme mood states, including mania, depression, and mixed states of mania and depression associated with extreme irritability and paranoid ideation. It at least appears that the onset of this major mood disorder was during Marc Barnette's adolescent years.

15

**JA26**

Such rapidly changing mood states are quite destabilizing for an individual in and of themselves, and are particularly destabilizing during the period of adolescent development when such emotional turmoil is so difficult to understand and manage. Then in addition, the fact that Marc Barnette's major mood disorder is superimposed on his above described broad-based instability in major areas of functioning has resulted in even much more severe impairment in his ability to function, in that each of these major psychiatric disorders potentiate the other.

A full appreciation of how these two psychiatric disorders interact with and can potentiate each other requires additional understanding of the nature and course of each disorder. More specifically, Borderline Personality Disorder is best understood as an underlying disorder, in that its characteristics are enduring/persistent and therefore always impact on the individual and his/her ability to function. However, as noted above, certain types of stressors can exacerbate the difficulties associated with Borderline Personality Disorder, thereby causing a further deterioration in the person's ability to function. In contrast, the rapid swings in mood that are a part of Marc Barnette's major mood disorder cycle on their own schedule, virtually unrelated to whatever is going on around him. However, the mood that he is experiencing at any given time will impact on how he responds to any stressors that he might be vulnerable to as a result of his underlying Borderline Personality Disorder.

More specifically, for example, when an individual who suffers from Borderline Personality Disorder perceives that he/she is being abandoned by a significant other, the symptoms associated with this disorder will be exacerbated. However, if that same person is simultaneously in a manic/hyper-elated state due to a separate major mood disorder, the overall response/mental state will be quite different than it will be if he/she were in a depressed state due to that major mood disorder.

Based on this psychiatrist's review of the information noted above in paragraph 6 and my consultation with Ann Wolbert Burgess, RN, DNSc, the information currently available to this psychiatrist is considerably and significantly more than the information that was made available to Dr. Burgess. In addition, because of the wealth of information currently available to this psychiatrist, my psychiatric opinions about Marc Barnette are not only better supported but also much more complex than the opinions rendered at the time of his trial. More specifically, although there had been various difficulties including violence in some (although not all) of Marc Barnette's relationships with women, additional important information about those relationships, especially his life-changing relationship with Sheila Sullivan, and additional important information that helped establish that he also suffered from other major psychiatric disorders resulted in that much more complex picture of Marc Barnette's mental health difficulties. Additional important information also indicates that he was suffering from these major psychiatric difficulties at the time of the killings, and that therefore his mental state was even more severely impaired than had been previously recognized.

16

**JA27**

Based on my experience in capital litigation, if the information made available to this psychiatrist had been available at the time of his trial, Marc Barnette's extremely difficult childhood, including the effect that his mother's own trauma and family secrets had on her availability/capacity to parent Marc Barnette; the impact of his extremely difficult childhood on his development, the resultant broad-based instability in major areas of functioning, and the associated impairments in his ability to function; his severe major mood disorder and the impact of this disorder on his ability to function; and the ways in which the two psychiatric disorders potentiate each other would have been mental health findings that could have been recognized and presented to Marc Barnette's legal team for consideration as mitigation at the time of his trial. Instead, the mental health opinions presented, which apparently lacked many of the critically important factual bases upon which my opinions are based, were either incomplete, not sufficiently supported, and/or inaccurate.

Of particular importance, with regard to potential mitigation, is the fact that the information currently available to this psychiatrist makes Marc Barnette's mental state at the time of the crimes for which he has been convicted and sentenced to death much clearer, and indicates that at the time of the crimes, Marc Barnette's capacity to conform his conduct to the requirements of the law was significantly impaired.

More specifically, the symptoms of Marc Barnette's Borderline Personality Disorder were clearly exacerbated by his perception of the impending loss of his relationship with Robin Williams, his perception that she had been unworthy of his trust, and his perception that she had viewed him as a fool who could be easily used/taken advantage of. Based on the information currently available to this psychiatrist, Marc Barnette evidenced frantic efforts to avoid abandonment by Robin, a reversal of his extreme idealization of Robin to extreme devaluation of her, a deterioration of his sense of self to the point of feeling empty and valueless, mood reactivity with irritability and suicidal behavior, impulsivity, and stress-related paranoid ideation. Then, over the next couple months, superimposed on these exacerbated symptoms, were the profound and rapid swings in his mood that were symptomatic of his major mood disorder that determined how he ultimately experienced the underlying crisis and its resultant symptoms. In other words, based on the information currently available to this psychiatrist, when Marc Barnette was experiencing an elevated mood he was out with friends, despite the underlying crisis; when he was experiencing a depressed mood he was isolative/stayed in his room, he was crying a lot, and he was suicidal; and when he was experiencing a more mixed state of mania and depression he was agitated, irritable, more paranoid and otherwise even more irrational.

Dr. Dudley's expert opinions, grounded in a thorough post-conviction investigation, more accurately reflect Marc Barnette's relevant mental states, and their mitigating qualities, than the defense evidence that was presented at resentencing. The reason for the significant differences

17

lies with trial counsel's unreasonable failures to conduct an adequate investigation and provide relevant information to their experts.[5]

### 2. A Background of Abuse, Deprivation, Abandonment, and Neglect Leading to Long-Standing Mental Illness and, Ultimately, Tragedy

### i. Family Overview[6]

Aquilia Marcivicci "Marc" Barnette was born on July 7, 1973 in Charlotte, North Carolina. Marc is 39 years old and the father of two young adult children, Angelica and Marc. Marc Barnette spent the first 14 years of his life in Charlotte before moving to Georgia with his mother Sonia Cooper Barnette and brother Mario Barnette. He returned to Charlotte in 1993. He later met Robin Williams, who was living in Roanoke, Virginia, and moved in with Robin in 1995. He returned to Charlotte in April 1996 after their relationship ended. The crimes for which Marc is incarcerated occurred in June 1996.

Marc's mother, Sonia, was born to Jesse and Pearl Cooper on August 17, 1958. She gave birth to Marc when she was 14 years old. Less than a year later, Sonia's mother Pearl was shot and killed by her new husband, Loyd Brown, while Sonia and Marc were sleeping nearby. Pearl's murder and its aftermath severely traumatized Sonia, as well as her younger sister Sheila Cooper, who was also in the house when the murder took place. Many family members report that this event had lasting negative effects on the entire family for decades.

During high school, Sonia dated Derrick "Rick" Barnette. Rick later attended North Carolina A&T for one semester before enlisting with the U.S. Air Force in late 1974. Sonia and Rick were married February 8, 1976, and they lived together until approximately 1984.

---

[5] This failure by counsel infected all expert opinions, including the government's expert. Complete and reliable, information would significantly bolster or change prior defense experts' opinions, and undermine those presented by the government.

[6] This background and social history is taken from records and interviews compiled by post-conviction counsel and post-conviction counsel's mitigation specialist.

For the first 14 years of his life, Marc knew Rick Barnette as his biological father, as well as the biological father of his younger brother, Mario, who was born in 1977. But in 1987, nearly two years after Rick and Sonia's divorce was finalized, Rick moved to have paternity testing done. The results, which Rick revealed to Marc and Mario, showed that Rick was not their biological father. This information had immediate and long lasting negative effects on Marc.[7] Shortly after breaking the news to Marc and Mario, Rick moved to Philadelphia and thereafter maintained minimal contact with Marc and Mario.

### ii. Cooper Family Legacies: Trauma, Abandonment, and Murder

Sonia grew up on the Cooper Family's West Boulevard property in Charlotte. Originally there were several houses on the property and there were generations of Coopers living there. Jesse Cooper, Sonia's father, had served in Korea after entering the Army in 1951. On February 4, 1952, he was severely wounded. According to military records, Jesse was an ammunitions bearer in a rifle platoon and was wounded by enemy shell fire while counterattacking an outpost. He received wounds to his face, right eye, right thigh, and right hand. A letter dated February 11, 1952, from Major General Wm. E. Bergin to Jesse's wife Pearl Cooper reads, in part:

> I deeply regret that it is necessary to inform you that your husband, Private First Class Jesse Cooper, was seriously wounded in action in Korea…. My heartfelt sympathy is with you during this period of anxiety.

According to family members, they understood that after Jesse was injured, enemy soldiers kicked and poked their bayonets at him and kept walking, assuming he had died. Family members recall that notice was sent informing them that Jesse had been missing and that

---

[7] Derrick Barnette testified that when he told his "children" about the paternity test results, Marc "asked more questions at that point because when I told him I wasn't his biological father, he reacted and it was subtle, but I got questions from him more than I got from Mario." [2002 Tr. 3335]

he had, in fact, died. Robert Cooper, Sonia's cousin and Jesse's nephew, recalls that Jesse "could squeeze shrapnel out of his skin in different parts of his body." Jesse would tell Sonia and others that he had "already met Jesus." It was not until 2002, however, with Jesse ailing and in the hospital, that he was awarded a Purple Heart, which apparently had not been previoulsy awarded to him due to an oversight.

Jesse's war experience had long lasting effect on him and the family. Sonia's younger sister, Sheila, says, "He had PTSD. He'd relive that scene. One time I tripped and fell and busted my head. He regressed and just wrapped my head in a bandage." Then Sheila's oldest sister, Tessie, came home and said that Sheila looked pale. Sheila had lost a lot of blood. It was Tessie that made sure Sheila got to the hospital where she received stitches. Sheila still has a scar on her head from that accident.

Jesse loved Pearl unreservedly, even after he discovered that she had cheated on him and later left him. Robert Cooper knew that Pearl was cheating on Jesse because she would sometimes take him with her to a liquor house where she would meet a man. Robert also recalls that Jesse gave Pearl a Cadillac with fins, and that after Jesse found out that she was cheating on him, he took the car back and parked it on the property. He never drove nor moved the car again. Even after Pearl moved out and remarried, Jesse never took off his wedding band.

Pearl worked as a nurse and she initially left Jesse for a man named Herman Mazyck, whom she met through work, although Pearl had started a relationship with Herman well before leaving Jesse. Herman, however, ended up marrying another woman from work. This marriage announcement was a surprise and shock to Pearl. Sheila says this news "broke her heart" and she remembers her mother crying about it. Pearl's good friend, Delores Hart,

20

**JA31**

believes that Pearl was deeply hurt by this turn of events and it was the reason that Pearl later married Loyd Brown, someone Delores did not think offered much for Pearl. Neither Sonia nor her younger sister Sheila liked Loyd Brown. Loyd had been a patient of Pearl's at the hospital where she worked. They later ran into each other at a store and Loyd started calling Pearl. They were married only six months later. They lived at 716 Peaceful Glen Road in Charlotte. Loyd reportedly came to the house—and the marriage—with only a bag of clothes and a stereo.

Jean Barber Nduly, Sonia's cousin, remembers Sonia was never comfortable around Loyd. Although they initially went to live with their mother at Loyd's house, Sheila and Sonia returned to Jesse's house at one point. Delores Hart recalls that Loyd was happy about that and wanted the girls to stay with Jesse. Given how they felt about Loyd and their father, Sonia and Sheila felt the same way. Sheila told her mother that she was tired and "want[ed] to go live with daddy. Tell him to come pick me up." Then Pearl dropped her and Sonia off at Jesse's. While there, Pearl asked Sheila, "Don't you love me?" Sheila never answered her.

Sheila and Sonia (and, at this point, Marc, who was an infant) stayed with Jesse on West Boulevard for only about a month before returning to Loyd and Pearl's house on Peaceful Glen Road. Tessie, Sonia and Sheila's eldest sister, was living in Alaska at the time with her husband Jeff Nero (who was in the service). Tessie recalls that Sonia, Marc, and Sheila only stayed with Jesse briefly because he was not providing for them. Jesse was intoxicated most days after Pearl left, drinking Pabst Blue Ribbon beers (which he called his "tea"). Medical records from 1994 indicate that Jesse drank alcohol from "11:00 p.m. to 6:00 a.m., early a.m., six packs of beer a day" and was a malnourished heavy drinker.

According to Tessie and others, Jesse "was not always the most stable" due to his combat experience: "As long as I can remember he told the same war stories. He re-lived it. He

21

**JA32**

rehashed it. He would shout out at night: 'No! Stop!'" Sonia recalls that Jesse had one flashback episode in which he thought his daughters were nurses. Jesse was taken to Broughton Hospital in Morganton, North Carolina for treatment. Family members recall having to be very quiet around Jesse after he came home from the hospital. Even decades later Mario remembers that Jesse would have night terrors where he would "yell out at the top of his lungs" from the couch in the living room where he slept.

In the spring of 1974, Delores Hart was told by either Sonia or Sheila that Loyd had pulled a gun on Pearl. Delores remembers calling Pearl and telling her to make Loyd leave the house, but Pearl refused.

The week after Mother's Day in 1974, in the early Sunday morning hours following Sonia's high school school prom, Loyd shot Pearl shot and killed Pearl while she was in her bedroom. Unbeknownst to Sonia and her family, Brown had previously been convicted of shooting someone else. After the shooting occurred, Loyd fled; he later turned himself in to the magistrate. A police report states that law enforcement heard a female scream after police knocked on the door of the residence. Sheila, age 12, came running to the door. Police found Pearl's body in bed with blood around her head. There were no signs of life but her body was still warm.

In Loyd's confession, he reported that on the day before, around 5:30 p.m., he came home to find that someone had hit a tree next to the driveway. He said he asked Pearl and kids what happened and "they would not give him an answer." Loyd also confessed that he and Pearl were having "trouble" and "he was running up charge cards which he could not pay."

Sonia, who was 15 years old at the time, says 10-month-old Marc was in a crib in the room that she shared with Sheila when the shooting happened. Sonia had gone to the prom that

22

night; when she got home Loyd was gone and her mother told her that they had argued and he had left the house. Sheila says they had argued because Loyd had not gotten Sonia roses for her prom. Sonia later went to bed and was awakened when the police arrived. She remembers seeing blood on the wall of her mother's room.

After hearing the police banging at the door, Sheila went to find her mother. When she turned on the light to her mother's room, Sheila saw her mother covered in something red. Sheila's first thought was that her mother's red rubber heating pad had somehow exploded; she then realized that her mother was covered in blood. Sheila says she blacked out at some point and later woke up across the street in her friend's bedroom. Confused, Sheila recalls looking out the window and seeing police and emergency personnel still at the house. For the first few nights following Pearl's murder, Sheila recalls her father standing outside all night holding a shotgun to protect the girls and Marc. Sonia remained acutely scared that Loyd would get out of jail and harm them.

Sonia called Tessie to tell her about their mother's murder. Tessie, the older sister, broke down on the telephone. Tessie came back to Charlotte shortly after the murder to help out. Her husband Jeff requested and received a compassionate reassignment by the military from Alaska to Columbia, South Carolina.

Sonia, Sheila, and Marc initially went to stay with Jesse Cooper after Pearl's death. They lived with Jesse for a few months, until fall of 1974, when they moved to South Carolina and lived with Tessie and Jeff.

Sonia was very depressed and withdrawn following Pearl's death, crying a lot. Years later, Sonia was struck with terror when she saw Loyd out on work release. She remained fearful of Loyd until finding out later that he died in prison. Sonia never received any mental

23

health counseling about her mother's murder but assumes she could have benefitted from it. Indeed, Sonia never talked about Pearl's murder with anyone in her family. As Sonia states, "Since I was young I always felt I needed to be the glue. I could see my sisters losing it." Sonia also lived with the fear that history would repeat itself: "I had an inner fear that I would only live to the same age as [Pearl], that the same thing that happened to her would happen to me. I always have this wall up. An emotional wall -- with relationships." As a result, Sonia has fears of "letting someone in" and trusting others.

Sonia says her father, Jesse, also never dealt with Pearl's murder. He never talked to Sonia or Sheila about it. Sonia says, "He'd go into his room and read his bible. He didn't know what to do."

The effects of Pearl's murder have also deeply affected Sheila throughout her entire life. When she was in her 20s, Sheila reports having a "breakdown" that she largely attributes to the psychological trauma she has carried since her mother's murder. Sonia remembers that Sheila's boss in Georgia called her (Sonia) and told her that Sheila was having a breakdown and that they were going to get her some help. Sonia says that Sheila used to have episodes of "uncontrollable crying." Sheila says about her mother's death, "I felt like it was my fault. I felt like it for years. I never told her I loved her. She said it and I didn't say it back." Sheila says that, over the years, if anyone ever talked about what happened to her mother she would "sob like it just happened."

### iii. Sonia's Dating and Marc's Paternity

### a. Who is Marc's Father?

Until a paternity test in 1987 indicated otherwise, it was generally accepted in the family that Rick was Marc's father. Rick, however, always doubted that Marc was his biological son.

24

Sonia and Rick first met at Smith Junior High School. He does not think that he and Sonia were dating at the time she got pregnant. After they found out that Sonia was pregnant, Rick's mother and Sonia's mother (Pearl) talked to each other. Following that conversation, Rick reports, his mother told him that the coming baby was not his. Rick, however, further reports that he was attracted to Sonia and allowed himself to believe the baby was his when Sonia began saying to others that he was the father.

Rick recalls that Sonia dated Larry Wright around the time she became pregnant with Marc. Larry was a classmate of Sonia's and he confirms that he and Sonia did date. Larry recalls Sonia as a beautiful and intelligent girl. Larry knew Pearl, went to their house frequently, and he and Pearl would talk.

Shortly before Sonia found out that she was pregnant, a friend of Sonia's told Larry that Sonia was also dating Rick. Larry says that after Pearl learned of Sonia's pregnancy, Pearl talked with Larry and Sonia and asked them what they were going to do about the coming baby. At this point, Larry said he did not believe the baby was his. Larry says Pearl was surprised by this; she had not known about the relationship between Sonia and Rick. Larry remembers that Pearl and Sonia then decided the baby was Rick's. Larry's parents knew and liked Sonia and they were disappointed that Larry would not be considered the father.

Larry remembers Pearl's murder, and how Sonia's behavior changed dramatically after her mother died, which he attributed to the trauma of the event. Sonia started to dress in a provocative style, use marijuana and cocaine, and, according to Larry, spent time with people that were known to be drug dealers, hired killers, and thugs.

Larry did not see Sonia as often after she and Rick married, yet he has reported that his sexual relationship with Sonia continued sporadically through Sonia's relationship with Rick, as

25

**JA36**

well as after their eventual separation.  When visiting one of her best friends, Starr Reape, who was a neighbor of Larry's, Sonia would sometimes stop by with Marc and Mario.  Larry kept in touch with Sonia enough that when she and Rick split up, he went and helped her, Marc, and Mario move out of the house.

### b.  Sonia: A Mother at 14 Years Old and in a Violent Home

Marc was born when Sonia was 14 years old and Rick was 16 years old. In the fall of 1974, when Marc was about 15 months old, and approximately five months after Pearl Cooper's death, Sonia and Marc (and Marc's young aunt, Sheila) moved to South Carolina to live with Tessie and Jeff Nero.

Rick and Sonia were married in February 1976, and lived together (with Marc) for a short period of time in Omaha, Nebraska, where Rick was stationed with the U.S. Air Force.  Rick was then transferred to Okinawa, Japan for approximately one year; Sonia and Marc stayed behind.  By July 1977, when Marc's younger brother, Mario, was born, Rick had returned from Japan and they were all living together at Rick's mother's home at 1137 Comstock Drive, Charlotte in the Clanton Park neighborhood.  Rick, Sonia, Marc, and Mario then moved to Minot, North Dakota for a year while Rick was stationed there.  They returned to Clanton Park in Charlotte in early 1979. They remained together in Clanton Park until approximately 1984, when Rick and Sonia separated.

Starting upon their return to Charlotte in 1979, Sonia and Rick's relationship became one marked by intense jealousy, mistrust, and violence.  Both Rick and Sonia dated other people while still living together.  Rick recalls that Tessie, Marc's aunt, was terrified by Rick and Sonia's fighting.  Rick confirms that he kicked a hole through the door, and once hit Sonia in the head with a hammer.  Sonia would also be violent towards Rick.  Rick once woke up and

saw Sonia standing over him with a frying pan or pot, about to hit him with it. After one beating by Rick, Sonia recalls that Marc called somebody—the police or DSS—and that someone came out to the house to investigate. Rick also confirms that a social worker came to the house to investigate allegations of child abuse. According to Sonia, Rick would beat Marc with a belt. Sonia would often lock herself in the bathroom because she could not stand to hear the beating.

Mario remembers well his parents' violence, although Marc shielded him from much of it. When Sonia and Rick began to fight, Marc would take Mario into his room and let him play with one of his toys. Marc would not let Mario come out until the fighting was over.

While they lived together, Rick says Sonia would spend a lot of time going out with her friend Tina Davis. Sonia and Tina would drink, smoke marijuana, and use cocaine together. Rick and Sonia both say that much of their fighting was about infidelity. Sonia says she found out that Rick was seeing someone he had known from school. This also turned out to be the woman that Rick later married.

Wendy Sharpe, a relative who lived nearby in Clanton Park, recalls babysitting for Marc and Mario when she was about 12 years old and Marc was about 9 or 10 years old. She says about Marc, "He wasn't a loud rambunctious kid." Wendy recalls that Marc was scared of Rick. Wendy further recalls that Marc would knock on their front door in the middle of the night; Marc would be in bare feet and pajamas. Wendy says Marc was always upset but never said what was causing him to come to their house in the middle of the night, although Wendy believed something was going on between Rick and Sonia. Wendy's family would take Marc in and give him a blanket and a place on the couch to sleep. The next morning Wendy's family would give Marc breakfast and then he would go home. Wendy recalls this occurring over a

27

**JA38**

number of months when Marc was probably around 9 or 10 years old.

### c. Rapid Disintegration of the Family: Violence, Separation, Divorce, Partying, Paternity Tests, and Continued Chaos

Records show that although Rick and Sonia did not officially separate until June 29, 1984, the date they executed a separation agreement, their separation was planned at least 18 months prior to that. In fact, Rick had hired an attorney to draft a separation agreement that included a provision that he pay $250 per month in child support starting December 30, 1982. The initial plan was for Sonia, Marc, and Mario to remain at the Clanton Park home until both reached 18 years old. Rather than Sonia and the boys remaining in the house—which, under the circumstances, might have provided a semblance of stability—that plan was scrapped and Sonia, Marc, and Mario moved into an apartment on North Wendover Road in Charlotte. They remained there for a couple of years until they moved in with Tessie, Jeff, Regena and Shonda Nero on Farm Pond Lane in Charlotte.

Following the separation, Rick did not have a visitation schedule for Marc and Mario. While he previously claimed to have "left the door open," he rarely took steps to initiate contact with Marc and Mario after the first year of the separation. Sonia did occasionally call upon Rick to "discipline" Marc after the separation, although Rick moved to Philadelphia in 1987, further reducing any contact he had with Marc and Mario.

Marc's cousin Regena Nero was upset and surprised by Sonia and Rick's separation. She believes that Rick and Sonia fought a lot. She knew Rick had injured Sonia's ears when he yanked out her pierced earrings (resulting in a lifelong scar). Shonda Nero, Regena's younger sister, says that when she was a teenager she learned that Rick was beating Sonia and cocaine was involved. Shonda recalls that her mom (Tessie) and dad (Jeff) were quite similar—always

28

arguing—and that there was physical violence in her home as well. Further, Regena and Shonda did not get along at all. Shonda would have her first child when she was 15 years old. Marc, of course, was exposed to this chaos and violence while living with the Neros on Farm Pond Lane.

After Sonia's separation from Rick, Regena spent more time with Sonia, who she described as the "party aunt." They would go to clubs, where Sonia would meet other men. Regena confirms that Sonia was using both cocaine and marijuana, and that Sonia would often leave Marc and Mario home alone when she went out, sometimes overnight.

Sonia was with a number of men after Rick. The first was Ollie "Al" McArthur, who Sonia dated around 1985 when she was 27 years old. Sonia describes him as a "hustler" who sold fake jewelry. Al persuaded Sonia to give him a couple thousand dollars, which Sonia later learned he used to pay child support for his kids in Virginia. Al also suggested that Sonia buy a red Corvette with some money she got back from her tax returns one year. Sonia then dated Sam Walton, who was then-County Commissioner Bob Walton's brother. Sam was about 15 years older than Sonia and had a drinking and gambling problem. The next relationship was with a man named Tyrone. Sonia and Tyrone dated for a few months. Tyrone drove a taxi that Sonia helped him purchase.

Sonia was later with a man named Mark Ragin, who owned a nightclub on Wilkinson Boulevard. This was when Sonia, Marc, and Mario were living with the Neros on Farm Pond Road. Regena recalls that she and Sonia shared a room when they were at Farm Pond. She confirms that it was a chaotic household with lots of violent arguments and physical fights. Sonia's relationship with Mark Ragin ended on June 20, 1987, when he was shot to death. Regena and Shonda remember well that Sonia was very upset. Recalls Shonda: "I know Sonia

29

**JA40**

loved him to death. That's who she partied with."   Sonia herself recalls being "devastated."

On March 9, 1987, approximately 18 months after the divorce was finalized, Rick formally sought paternity testing to determine whether he was, in fact, Marc and Mario's biological father.   Rick says this was sought after Sonia, in early 1987, told him that he was neither Marc nor Mario's biological father.   Rick also recalls that Sonia would pester him for child support payments but then spend her money on herself (like when she bought a red Corvette that did not have a backseat).   Notably, the initial attempt to serve Sonia with the paternity testing complaint was unsuccessful because Rick was apparently unaware that Sonia, Marc, and Mario had moved from their Wendover apartment to Farm Pond Lane.   To be sure, this lack of awareness is consistent with reports that Rick was not present for Marc and Mario following his separation from Sonia.

On June 15, 1987, as directed by a court order, Sonia, Marc, and Mario had blood drawn for paternity tests.   On June 24, 1987, only four days after Mark Ragin was shot and killed, blood tests established that Rick was the not the biological father of either Marc or Mario.

Sonia claims she did not discuss the paternity issue with Marc because she "thought it was a ploy."   Yet as a result of the test results, Rick stopped paying child support.   He also told Marc and Mario about the results, a decision he made without first discussing it with Sonia. Unsurprisingly, the news that Rick was not their "real" father shocked Marc and Mario.

Soon thereafter, Rick moved from Charlotte to Philadelphia.   He later moved to Maryland in 1990.   Other than Robin Williams, whom he once met while passing through Virginia, Rick never met any of Marc's girlfriends.   He was unaware of Marc's experiences in Georgia other than Marc's arrest for child abuse charges in 1993 (which he learned about after Marc called him from jail).   Rick never met Marc's children prior to 1996.   He never met

30

Alesha Chambers or knew about Marc's legal troubles related to her. He apparently never learned about the firebombing of Robin Williams' home in April 1996 until after the murders in June 1996.

In 1987, around the time of the paternity testing and Mark Ragin's death, Sonia experienced difficulties at her job. She was repeatedly warned and counseled about tardiness, absenteeism, and telephone abuse (making personal calls). She was fired in November 1987. Her employment records indicate that she "cannot be relied upon," "shows no interest in attendance obligations, even with constant reminders from supervisor," and "can never be relied upon to be at work." When she lost her job, Sonia, Marc and Mario were living at 8816 Softwind Drive in Charlotte in a residence that they rented from Delores Hart, Pearl Cooper's old friend. Delores reports that she ultimately had to evict Sonia and the kids from the residence because Sonia was not paying the rent. The house was also "a mess" with broken windows and terrible upkeep.

In the fall of 1987, Marc began the ninth grade at Smith Junior High School. Despite the turbulence and chaos of the preceding years, he recalled that ninth grade started well. Soon, however, his life was again disrupted when, by the following summer, Sonia told him and Marc that they were moving to Georgia. Marc initially protested; in response, Sonia told Marc that he could stay in North Carolina, a highly impractical option for a ninth grader in Marc's situation to consider.

Despite the physical abuse and abandonment that Marc suffered at Rick's hands, Mario suggests that perhaps Marc should have lived with Rick after the separation. Even though Rick essentially abandoned the family, Mario observed that Rick was more stable than Sonia, and that Sonia's behavior "tended to bother Marc much more" than it did Mario, who described himself

31

**JA42**

as less "fragile" than Marc.

**iv.** **<u>Relocation to Georgia: Chaos and Drug Use Continue, and Marc's First Relationship Leaves Permanent Scars</u>**

Following the move to Georgia, chaos continued to reign in whatever home Marc lived in Initially, Sonia, Marc, and Mario stayed with Sonia's younger sister, Sheila Cooper, in an apartment in Norcross, Georgia. Sheila was then living with her boyfriend, Michael O'Neal (who was married to another woman at the time), and her son, Armaud. Robert Cooper, Sonia and Sheila's cousin, remembers that Sheila was unstable. Like Sonia, she used drugs and partied. Longtime Charlotte neighbor Ann Austin recalls that Sheila was a "wild child" who once left her kids and followed a man to Florida.

Marc, Mario, and Armaud had little supervision or parenting by the adults in the family while they were all living together in Georgia. Sheila and Sonia went out regularly, often not returning until it was time to get the children to school the following morning. Michael O'Neal drank, as did Sonia, and they would argue constantly. Michael, Sheila, and Sonia all also used cocaine. Armaud recalls that his mother had a $1300 white mink coat and that he once found a large box of cocaine in the closet. Mario remembers coming across Armaud playing with a big bag of cocaine that was like a pillow the size of a magazine.

Armaud recalls that Michael dated a "crazy white chick" who once came to the house and Sheila pulled a gun on her. Marc pushed Mario and Armaud into a closet to shield them and the police came. Sonia, Marc, and Mario eventually moved out of the house after Michael aggressively accused Marc of stealing $500.

Armaud recalls Marc being anxious about starting school in Georgia. Shortly after starting school, Marc began a relationship with Sheila Sullivan. Sheila recalls that their

32

relationship was fun and that Marc was very nice. She said that Marc would hang out at a club for kids, where he would dance. Sheila describes herself as being a "thug" back in high school who was always fighting—in contrast to Marc, who Sheila confirms was not a fighter. Sheila also recalls that both her mom and her dad liked Marc a lot.

Marc and Sheila became intimate and sexual at some point during the relationship. Towards the end of 1988, Marc was assaulted by a group of teenage boys, including David Walker, who was a boxer and football player. Walker had been harassing Marc and was interested in Sheila Sullivan. As one of the co-assailants, Melvin Bryant, describes, "After school we went up to him and punched [Marc]." After hitting Marc in the face, the teenagers continued to punch and kick Marc. Both Walker and Bryant were criminally charged. Sheila Sullivan recalls that Marc was "beat up so bad. His eye was black, his face swollen, and his lip cut." Marc was taken to the hospital for x-rays and treatment for his injuries.

After the assault, Sheila cheated on Marc with David Walker, the same boy that had assaulted Marc. According to Sheila, she cheated on him "real bad." Prior to cheating on Marc, Sheila had written another friend to say that she was attracted to David Walker. After Sheila had sex with Walker, Marc was given the letter that Sheila had written. Sheila remembers Marc being very upset.

Marc and Sheila broke up after he learned that she cheated on him. After the breakup, Marc attempted suicide by ingesting pills. According to Sonia, emergency responders were able to get Marc to throw up and he was not taken to the hospital. At a later point in the school year, Marc and Sheila started seeing each other again. Soon thereafter, Sheila learned that she was pregnant. Sheila says that Marc was supportive of her and wanted to help. Sheila's mother, however, found out and Sheila got an abortion. Marc and Sheila's relationship ended

33

**JA44**

more permanently towards the end of the school year (Marc's tenth grade year). Sheila recounts that she was later raped by David Walker, who then committed suicide two or three weeks after they went to court on the rape charge.

### v. Relationship with Tasha, Bouts of Sadness and Crying, and A Home with No Food and No Bed

Family members confirm that Marc's relationship with Sheila Sullivan was a turning point, and that Marc began acting differently afterward. Around the spring of 1989, near the end of Marc's tenth grade year, Sonia, Marc, and Mario moved into their own apartment at The Crossings in Lithonia. Regena Mack, Marc's cousin from Charlotte, visited the apartment and was surprised that it did not have beds for Marc and Mario, and that the fridge only contained nail polish. Sonia was still using both cocaine and marijuana during this period of time.

Marc began dating Natasha "Tasha" Heard during the summer between 10th and 11th grades. Kesha Heard, Tasha's sister, was surprised when Marc and Tasha started dating. She recalls Marc being quiet and mellow, whereas her sister was "not a people person," nor someone who "had a filter" for what she said.

Tasha recalls that Marc missed Charlotte a lot, but also that "something was wrong" with Marc, and that at times he was "very unhappy." According to Tasha, Marc would "sway from being appropriate to being clingy, needy, anxious, and demanding of her total attention." She also says he was "up and down." His mood would change over the course of hours or a day. Tasha recalls that Marc would sometimes cry; she would sometimes find Marc naked and crying in the closet. Marc would have "acute bouts of sadness and crying uncontrollably," which seemed to come out of nowhere.

When they first started dating, Marc spent a lot of time at Tasha's house. Tasha's sister,

34

Kesha, recalls that Marc's mom was not very concerned about him. She was neglectful and seemingly uncaring. Tasha says that Marc and his mom were not close. "We were always together and she was never there. One time [Marc] asked me over to meet his mom. We eyed each other but that's about it." Tasha recalls, "As a teen [Marc and Mario] didn't have adequate stuff." Tasha remembers there wasn't enough food in the house: "There was one bottle of wine in the fridge. No food. No butter. No condiments. No ketchup." Tasha used to give Marc food from her mother; she recalls that Marc would take it, but he would also save some for Mario. She also recalls that Marc and Mario just slept on the carpet and had a blanket. This stood in stark contrast to Sonia's room, where "[t]here were silk sheets on the bed, heels, lots of clothes and jewelry. It was totally different from the rest of the house. There was a plush bed and all that." A few months into the relationship with Tasha, Kesha noticed that Marc stopped dressing well. She remembers one time when Tasha took their mother's credit card and bought Marc clothes and shoes.

Kesha recalls one time when her then-boyfriend, Keith Furlow, got into an argument with her, Tasha, and Marc. They were all at Kesha and Tasha's apartment at The Crossings. Kesha explained that neither she nor her sister was allowed to date and nobody was supposed to be there at the apartment. Keith, who was three times the size of Marc, went to hit Tasha before Marc stepped in, resulting in Keith hitting Marc in the face. There was blood everywhere. Tasha was also punched in the eye; her eye was swollen and her mom ended up taking her to a specialist. Marc called the police, who came and charged Keith with assault. Other than Marc and Tasha, others were unaware that Tasha was pregnant at the time.

### vi.  Becoming a Teenage Parent, Twice

Tasha's mother learned about Tasha's pregnancy following the Keith Furlow assault

35

**JA46**

when a nurse called the house. Kesha recalls, "Mom thought she was calling about Tasha's eye but the nurse told her [Tasha] was pregnant." Although Marc had been going with Tasha to every doctor's appointment, Kesha recalls that her mother began excluding Marc from the prenatal visits. At one point Tasha asked if Marc could go with her to an appointment and her mother said no.

Marc started working after Tasha became pregnant, first at a restaurant and then, later, at a temp agency where his mother also worked. Baby Angelica was born in September of 1990. Tasha's mother would not let Angelica have Marc's last name, which upset Marc, although he did not challenge her about it. Kesha remembers well the day that Angelica was born. She says of Marc, "He sat there looking at [Angelica] as though he couldn't believe she was there -- like he'd gotten a million dollars. He just wanted to hold her. I didn't think he was going to let me hold her."

After Angelica was born, Tasha's mother sent her to live with her grandmother. Tasha then became pregnant again and gave birth to Aquilia Marcivicci Heard on New Year's Eve of 1991. A few months after the birth of their son, Marc and Tasha moved in together in Newnan. Their apartment was at 86 East Berry Avenue. Marc, then 18 years old, signed the lease because Tasha was not old enough to do so. Soon after moving to Newnan, Marc got a job working at Arby's.

Kesha recalls that Marc changed after he and Tasha had children and started living together. There was a lot of strain as a result of the pressure to pay the rent, work, and raise their children. Family members recall that Tasha and Marc were too young and not ready for parenting and living together. Neither was in school, Marc was working at a fast food restaurant, and they were having a hard time paying for food, the lights, and clothing for the kids.

36

**JA47**

There were times when Tasha and Marc fought. Tasha recalls that after Marc and she would fight, Marc would forget things he had done or said. Tasha says, "It was like he was in a trance. He's just ill." Mario recalls that Marc and Tasha fought a lot, but Tasha "would give it back to Marc. She was not passive." Regarding the incident referenced at trial—when Marc pushed Tasha down while she was pregnant—Tasha explains that they were coming from the mall and Marc was talking to another girl on the bus. When they got off the bus, Tasha slapped him. In response, Marc pushed her to the ground. Tasha makes clear that Marc never hit or used force on their children.

### vii. 18 Years Old and Overwhelmed by Relationships and Emotions

Crystal Dennis recalls meeting Marc through Anthony Britt. She recalls that Anthony was trying to get together with Tasha, so Anthony tried to get Marc and Crystal together. When Marc found out, it resulted in a confrontation between Marc and Anthony in May 1992.

Marc reported to police that he acted in self-defense, an assertion corroborated by others, most notably Anthony's good friend, Victor Montgomery. Victor was present that evening and says that Anthony gathered a bunch of friends to go after Marc. Victor tried to talk Anthony out of it but was unsuccessful. Victor says that if Marc had not had a gun that evening he would have been badly beaten, as Marc was small and was being challenged by a group of guys. Victor says that Anthony was the one in the wrong that night and that if he had been in Marc's shoes, he would have done the same thing—or perhaps would have even taken it further. Victor also states that it was true that Anthony was the one that had introduced Marc to Crystal, and that Anthony had started to "mess with" Tasha. Victor says that Anthony started to see Tasha even more while Marc was locked up.

Tasha believes that when Marc went to jail following the Anthony Britt incident, it was a

37

damaging turning point for him: "After he went to jail that time our lives spiraled out of control." Tasha says about Marc, "He came down here [to Newnan] and his whole spirit changed." Even after she had moved out of Marc's apartment in Newnan, Tasha recalls being very stressed and depressed, and that Marc frequently seemed suicidal.

During Marc's 30 days in jail, his only real contact was with Crystal Dennis. Following his release, at the urging of Crystal's mother, she and her two children (by two different fathers) moved into Marc's apartment at 86 East Berry Avenue in Newnan. Crystal says she first became intimate with Marc after she moved in with him.

Crystal described the first three to six months of the relationship as being good. She says Marc would cook for them and even bring Crystal breakfast in bed. In the fall of 1992, both she and Marc re-enrolled in high school. While also working two jobs, Marc was unable to continue going to school once his car broke down a few weeks into the fall semester.

It was around this time, according to Crystal, when things changed: "He became controlling and possessive. He went completely mad. Crazy." For example, Marc would demand that Crystal keep the door open when she was using the bathroom. Once, when Crystal had the door closed, Marc kicked open the door so he could see her using the bathroom. Marc also demanded that Crystal not work, apparently because he did not want her to be around other men. As a result of his demand, Marc took a second job—working at both Arby's and Blockbuster—in order for them to make enough money. After Marc's behavior changed, Crystal stopped wanting to have sex with him. Marc did not thereafter try to force or coerce Crystal into having sex.

While working at Arby's, Marc began a relationship with his co-worker/supervisor, a woman named Kowana Dozier. Kowana recalls that "Marc used to talk about death all the

38

time," leading her to believe that he was suicidal. Marc would ask, "Why am I here? What is my purpose?" Marc would also cry in front of Kowana, which was the first time she had seen a grown man cry. Marc would sometimes cry at work in the back office and sometimes when they were other places. When Marc would cry, which was often, he would sob. Kowana was worried about him: "He was out of control. He was unstable emotionally." Kowana was aware of Marc's situation with both Tasha and Crystal, and the enormous stress he felt. She did not understand why Marc's mother did not come get him and try to help him out.

Kowana and Marc used to talk about their lives and what they wanted. Kowana says, "He wanted someone to love him." According to Kowana, Marc wanted a family, kids, and a white picket fence; he was intense and "he loved hard." When Marc moved back to North Carolina in 1993, he and Kowana lost touch.

### viii. Return to Charlotte: Further Deterioration and the Tragedies of 1996

Marc returned to Charlotte in March 1993 and soon began a relationship with Alesha Chambers that was marked by jealousy, possessiveness, and violence. As the result of Marc's behavior, he found himself facing criminal charges in Mecklenburg County. His court-appointed attorney, Joseph VonKallist, had Marc evaluated by a psychologist to explore Marc's mental status. In June 1994, Dr. Tyson wrote:

> My examination does reveal the existence of psychological and behavioral problems that might be of use as mitigating factors in sentencing. There are a variety of deficiencies in his psychological functioning that might shed light on his behavior. However, he is relatively unwilling to accept psychological interpretations of his behavior and motives. He is not likely to accept assistance that is based on such assessment, particularly as these apply to deficiencies that he believes do not exist. … He may insist on following a course of action that will appear self-defeating to others. He rigidly adheres to thinking patterns that center around justification of his actions. This does not allow him to accept that his actions will be seen as problematic.

39

**JA50**

At the very same time that Dr. Tyson made his findings, Marc was in the beginning stages of his relationship with Robin Williams.

In March 1995, Marc moved to Virginia to live with Robin. As evidenced in the trial and sentencing records here, Marc and Robin had a volatile relationship prior to their break up in June 1996. After the break up, Marc returned to his grandfather's home on West Boulevard, where he started spending much of his time alone in a loft in the house. Mario says that Marc put up a sign that said that he wanted privacy and for others to stay out. Mario also says he saw Marc smoking cigarettes, which was unusual. Marc's aunt Sheila remembers that Marc was on the phone a lot, begging and pleading and crying with Robin.

Marc's cousin, Shonda Nero, could also tell that something was wrong with Marc after he and Robin broke up. Marc spent a few nights at her apartment, where Shonda says that he stayed in his room almost the entire time, keeping the door and blinds closed and neither talking nor eating. Shonda remembers that Marc would have the blankets over his head when she would go into the room where he was staying. If he did come out of the room, he would sit on the floor in the living room and stare at the floor.

Marc has testified that he called and spoke with Robin several times the night after hearing that he did not get a job he wanted with Saturn, and learned that she was with another man. Marc also testified that he drank vodka and took sleeping pills that evening. Later that evening, Marc asked to borrow Mario's car, which he drove to Robin's apartment in Roanoke. As Marc and others have testified, he set fire to her apartment.

Marc returned to Charlotte and in the subsequent days and weeks spent much time sitting on an overturned bucket in the driveway waiting to be picked up by authorities. He sold a number of his possessions at a nearby flea market. Sonia says Marc had put on a lot of

40

**JA51**

weight—she estimates that he might have gained 30 pounds—and that he shaved his head at some point after the fire in Virginia. Sonia says she asked Marc about this and he told her that his hair was bothering him, hurting him, and that he could not think straight.

### 3. **Marc Barnette's Exemplary Years in Prison**

From the time Marc Barnette was arrested in 1996 through to the time of his resentencing in 2002—and, indeed, continuing to the present—he has been engaged with his family, engaged in the prison community, and supportive of those around him and with whom he comes into contact. While he was a model inmate in county jails—as testified to at his 2002 resentencing—he has also been a trustee or orderly at every prison or institution that has such trusted positions (including at USP-Terre Haute). He has maintained positive and supportive relationships with his family and friends through letters, telephone calls, visits, and presents, offering advice over the years about staying out of trouble, getting an education, staying away from drugs and alcohol, and generally getting ahead in life. This type of engagement with his family and community was occurring before his resentencing in 2002.

### D. **Trial Counsel Promised Much but Presented Little: A Bleak and Disjointed Case for the Jury**

As the prosecution repeatedly and effectively emphasized during closing arguments, trial counsel presented a weak and disjointed mitigation case during Mr. Barnette's 2002 resentencing. Trial counsel presented uncorroborated and scattershot evidence concerning Mr. Barnette's violence-marred and turbulent upbringing, incomplete and misleading evidence concerning Mr. Barnette's prior relationships, and expert testimony that was undermined by the failure to provide mental health experts with all of the readily available information about Mr. Barnette's background.

**JA52**

The defense presentation was riddled with false or empty promises. Trial counsel announced during its opening statement the defense would provide the jury with information about Marc Barnette in order to assist them in "decide[ing] what to do about Marc Barnette." [2002 Tr. 2386] Mentioning "abuse," "violence," and "neglect" (yet not mental illness), trial counsel promised the jury that it would hear "the story of Marc Barnette and his family and what shaped him into a young man with terrible emotional problems, behavioral problems that are the product of how he was raised." [2002 Tr. 2387] Regrettably, while trial counsel forecast a number of events and subjects that suggested a comprehensive and compelling mitigation presentation, very little was ultimately presented. Indeed, as the government would later stress in its closing argument, "The defense didn't give [the jury] the tools to find their mitigating factors." [2002 Tr. 3938][8]

Resentencing counsel claimed the story of Marc Barnette and his family would include evidence about his maternal grandfather, Jesse Cooper, who trial counsel explained had been "horribly injured" and "came home shell shocked" from the Korean War. Jesse Cooper, the jury was told during opening statement, drank "a lot" and "didn't take care of his family terribly well. He did all sorts of odd thing that you'll hear about." [2002 Tr. 2387-8] Other than Marc Barnette's personal recollections of his grandfather and Derrick "Rick" Barnette's testimony that Jesse Cooper was "unique" and "eccentric," the jury was provided with no direct evidence about this significant person in Marc Barnette's life history. Nothing about the combat injuries he suffered, the fear within his family that he had died in Korea, the Bronze Star and Purple Heart

---

[8] The only family members to testify were Derrick "Rick" Barnette, Mario Barnette, and Ahmad Cooper. Derrick Barnette utterly gutted the "abuse, violence, and neglect" promised by trial counsel. Mario—in a case involving the murder of an ex-girlfriend and evidence of violence in other intimate relationships—testified that "**it happened from his first girlfriend to his last girlfriend, he gave everything that he could, and only in retrospect can I say maybe he gave too much, you know, but I'm not going to judge that.**" [2002 Tr. 3386] Mario also testified that times with Sonia and Rick were "**happy times**." [2002 Tr. 3392]

42

he earned, the disabilities he suffered, and the role that this damaged war hero played in trying to raise Marc's mother, Sonia, and his aunt, Sheila.

Trial counsel also promised the jury that it would hear about the violent murder of Marc's grandmother, Pearl Cooper, which occurred when he was 10 months old and his mother, Sonia, was 15 years old.   [2000 Tr. 2388]   Not only was no evidence presented about the murder itself-other than stray references to its occurrence that provided little or no detail and context-the defense failed to present evidence about why the murder of Pearl Cooper was even relevant to Marc Barnette's life history.   As a result, the jury never learned about Pearl and Jesse Cooper's divorce, Pearl's subsequent marriage to Loyd Brown (who later murdered her), and Sonia, her sister Sheila, and baby Marc's subsequent move back to Jesse Cooper's house-and the profound impact that these events had on Sonia and Sheila, both arguably Marc's biggest caretakers during his childhood.

Additional examples abound.   Trial counsel promised the jury that it would hear about Sonia's "running around" and "acting the way a damaged young woman would act" in the wake of her mother's murder.   [2002 Tr. 2389]   Yet trial counsel failed to produce a single witness or elicit any pertinent testimony concerning the trauma that Sonia experienced and how it later manifested.

Trial counsel promised the jury that it would hear about Marc's "disordered" thinking after his break-up with Robin, and how "family members will tell you that he would weep on the phone begging her to take him back." [2002 Tr. 2393]   Yet the only evidence the jury received about Marc's behavior prior to the fire and subsequent murders was through Marc Barnette's own testimony (and that which experts reported he had told them).

Even when trial counsel actually introduced evidence concerning a promise it made

43

**JA54**

during opening statement, what was ultimately presented to the jury was wholly underwhelming, a result of ineffective and incomplete investigation and trial preparation. For example, trial counsel told the jury in its opening statement that Sonia and Rick Barnette's marriage was "characterized by reciprocal domestic violence." Highlighting one incident, trial counsel asserted in opening statement: "He hit her in the head with a hammer. She stood over him with a frying pan in her hand. There was crying; there was infidelity; there were accusations of infidelity, all in the presence of Marc." [2002 Tr. 2389] Yet what the jury later learned about this incident from Rick Barnette lacked the markings of a significant example of domestic violence:

> I woke up one time, she had a frying pan over my head. Turned into sort of **a joke**. You know, I was just laying on the sofa. Hadn't done anything that time. And I just asked her what - I woke up and she's standing there with the frying pan. I says, What you going to do? She said, I'm going to hit you with it. Why? I mean, you know, so ....

[2002 Tr. 3329 (emphasis added)][9]

In another instance, trial counsel told the jury that it would hear, as a telling example of Sonia's neglectful parenting, about how Sonia used insurance proceeds to buy a red Corvette that "[s]he couldn't have driven her sons to school if she wanted to," [2002 Tr. 2390] Other than

---

[9] Rick Barnette testified right after Marc. The prosecution used Rick's testimony repeatedly against Marc:

> Q. Would you agree -- well, were you here for Derrick Barnette's testimony?
> A. Yes.
> Q. Okay. And do you recall that Mr. Barnette testified on cross examination that the spankings that he had given the defendant as a child were always directly related to transgressions of family rules?
> A. Yes.

[2002 Tr. 3546 (cross-examination of defense expert Dr. Ann Burgess)]

> Q. And are you aware that Derrick Barnette has not corroborated that he ever beat the defendant with a coat hanger?
> A. Yes. I remember he said he didn't remember ever doing that, so that's correct, yes.

[2002 Tr. 3553 (same)]

44

**JA55**

Marc Barnette mentioning Sonia's Corvette purchase during his testimony, the only evidence concerning Sonia's Corvette came through her youngest son, Mario:

> Q:    Do you remember your mom getting a red Corvette?
>
> A:    Oh, yeah. I loved that car. I think it was an '84 or '86 red Corvette, nice. I got to ride in it one time. Since it was only a two seater I had to sit in the hatch part, but she was definitely the talk of the town with that vehicle. It was nice.

[2002 Tr. 3373]   The relevance of Sonia's decision to buy a sports car-done at a time when money was scarce, she was dating various men, and she was often leaving Marc and Mario home along-was never properly presented to the jury.[10]

Furthermore, trial counsel promised the jury in 2002 that it would hear how Marc Barnette has "changed over the last six years. And you'll hear evidence about why that happened."   [2002 Tr. 2395]   Yet while the jury learned that Marc Barnette had a spotless institutional record during his incarceration since his arrest in 1996, the jury was never provided with evidence about why Marc Barnette had apparently adjusted so well to prison.   This gaping omission-the failure to explain to the jury that Marc Barnette's mental health makeup and severe mood disorders were better controlled and managed in the prison setting-left the jury with little reason to spare his life.

### E.    Trial Counsel Unreasonably and Prejudicially Failed to Conduct an Adequate Investigation and Utilize the Information it Possessed

By trial counsel's own assessment, the social history investigation conducted for Marc Barnette's 1998 trial was "superficial and not-sufficiently in depth."   Trial counsel believed that

---

[10]  As noted elsewhere in this motion, trial counsel's reliance on Marc Barnette as his own mitigation specialist who essentially told the jury "the story of Marc Barnette and his family," [2002 Tr. 2387] was highly problematic and, ultimately, incredibly prejudicial.   Thus, while Marc Barnette testified that his mother bought herself "a bright red, lipstick red 1984 Corvette" that held only two seats, and that this came in the wake of her divorce from Rick, when his mother's "behavior just got real weird," it came through the testimony of a mentally ill defendant who, in the absence of any explanation or context from trial counsel, lacked credibility.

45

**JA56**

Marc's prior defense team had failed to "include some critical things" while investigating and developing his mitigation evidence, and "some potential mitigation witnesses may not have been candid with [the mitigation investigator] in the past." Thus, a serious re-investigation into Marc Barnette's background was required. Despite this candid assessment about the work that had been undertaken previously, trial counsel repeated the past when it unreasonably failed to adequately investigate and pursue readily available and critically important information about Marc's background.

## 1. Trial Counsel's Unreasonable and Prejudicial Misuse of its Investigative Resources

In August 2001, Mr. Barnette's trial counsel submitted an *ex parte* pleading that asserted a need to replace the defense mitigation specialist from the earlier trial due to her failure to develop adequate rapport with Mr. Barnette's family and friends, as well as critical omissions in the background investigation she had previously conducted. The prior investigator's omissions, trial counsel asserted, cast doubt on the reliability of expert witnesses who relied on her work during their testimony.

In related *ex parte* pleadings filed at the same time, trial counsel also noted that they intended to affirmatively address Mr. Barnette's prior relationships with women. Whereas "[p]rior defense counsel sought to minimize the severity of these incidents, or place blame for them on the women involved," Ms. Lawson and Ms. Rauscher were of the belief that the defense "must lay out for the jury the extent of Marc Barnette's history with women in order for them to understand his psychosis. Defense presentation of this evidence to the jury could result in a sentence of life without parole, rather than death." In seeking funds for a private investigator, trial counsel also asserted that some trial witnesses "were hostile to the defense at the

46

**JA57**

defendant's first trial and sentencing and counsel reasonably believe they will not make themselves available to the defense unless they are located and approached."

To this end, trial counsel sought and received funding to retain an experienced mitigation specialist (Cessie Alfonso) and private investigator (Jan Barefoot). Despite a seemingly well intended approach that was appropriately skeptical of the integrity of the prior defense team's work, and cognizant of the need to affirmatively address the government's evidence in aggravation, trial counsel unreasonably failed to follow its own game plan.

For starters, trial counsel failed to reasonably supervise and utilized its mitigation specialist, Ms. Alfonso. Based in New York, Ms. Alfonso interviewed a total of 12 witnesses (including Petitioner). Other than brief contact with Natasha Heard, the mother of Petitioner's two children, Ms. Alfonso was never asked to seek out and speak with women whom Petitioner previously dated. Her suggestions to trial counsel about powerful areas of mitigation were ignored. And her psycho-social report that marshaled what work she had completed was not submitted to trial counsel until July 8, 2002-one week before the start of jury selection. None of the testifying experts were provided with Ms. Alfonso's reports. As a result, a significant amount of mitigating evidence that was in trial counsel's possession was not shared with defense experts or presented to the jury.

### 2. Trial Counsel's Unreasonable and Prejudicial Failure to Re-interview Multiple Witnesses from the 1998 Trial

Despite having the services of two experienced investigators, trial counsel did not seek to interview a number of witnesses who either were interviewed by Petitioner's prior defense team and/or testified at Petitioner's 1998 trial. As a result, trial counsel relied on "superficial and not-sufficiently in depth" interview summaries done by Sindy Maxwell (the mitigation

47

specialist from the 1998 trial) to make determinations about what witnesses to call and how to cross-examine certain government witnesses. This unreasonable trial preparation resulted in a failure to uncover and develop powerful mitigation. For example:

### i. Steve Austin (Best Friend/Prosecution Witness): Family History, Remorse, and a Future in Prison

Steve Austin was, by various accounts, Petitioner's best friend while they were growing up together in Charlotte. Steve and his family lived in the Clanton Park neighborhood, across the street from where Petitioner, Sonia Barnette, Derrick Barnette, and Mario lived before Sonia and Derrick separated. Steve Austin not only knew Petitioner growing up, but he had also gone on double dates with Petitioner and was with Petitioner when he met Robin Williams in Roanoke, Virginia. Mr. Austin also visited Petitioner at the Mecklenburg County Jail prior to the 2002 trial.

Mr. Austin was subpoenaed to testify as a government witness at both the 1998 and 2002 trials. The focus of the government's examinations in both trials concerned Mr. Austin's contacts with Petitioner after Petitioner and Ms. Williams broke up.

Despite the obvious role that Mr. Austin could play as a mitigation witness for Petitioner-and one who would be able to provide such information on cross-examination during the prosecution's case-in-chief-trial counsel failed to re-interview Mr. Austin prior to the 2002 trial. Instead, relying only on Sindy Maxwell's brief (and "superficial and not-sufficiently in depth") interview from 1997, and Mr. Austin's government-directed testimony at trial, trial counsel failed to elicit readily available mitigating evidence from Steve Austin.[11] Worse yet, trial counsel's lack of investigation and prior contact with Mr. Austin resulted in a

---

[11] In preparation for the 2002 trial, the defense first reached out to Steve Austin on July 11, 2002. Jury selection began on July 15, 2002. There is no indication that any interview of Mr. Austin ever occurred.

cross-examination that elicited inaccurate and incomplete information.

Trial counsel failed to elicit any information from Mr. Austin about the fact that Petitioner would sometimes retreat to the Austin home to sleep in order to avoid the chaos and violence in his own home. Trial counsel failed to elicit any information from Mr. Austin about how Petitioner would support and look after Mr. Austin, who suffered from sickle-cell anemia and missed quite a bit a school as a result of his illness. Trial counsel failed to elicit any information from Mr. Austin about the circumstances leading up to Petitioner's sudden move to Georgia (which came after Petitioner's parents split up and Petitioner had to move out of the house with his mother and brother) and how it impacted Petitioner. Moreover, trial counsel failed to elicit any information from Mr. Austin about his visits with Petitioner at the Mecklenburg County Jail prior to the 2002 trial, and the depth and quality of their continuing friendship and the support provided by Petitioner even during Petitioner's incarceration. None of this information was provided to Petitioner's experts or the jury.

### ii. Multiple Family Members: Family History and Mental Health Information

Jean Barber Nduly (first cousins once removed), Jeff Nero (uncle), Shonda Nero (cousin), and John West (step-father) were all family members who had either been interviewed by Sindy Maxwell prior to the 1998 trial and/or testified at the 1998 trial. None of these family members were re-interviewed prior to the 2002 trial, despite their availability and the trove of information they could have provided.

For example, Jean Barber Nduly, who grew up on the same West Boulevard property as Petitioner's mother, could have described the impact that Jesse and Pearl Cooper's divorce had on Sonia; how "uncomfortable" Sonia always was around Pearl's second husband, Loyd Brown;

49

**JA60**

how devastating Loyd Brown's murder of Pearl Cooper was to Sonia, Jesse, and others; how she (Jean) would care for Petitioner when he was an infant because Sonia was still in high school; how she witnessed the aftermath of fights between Sonia and Derrick; how, after Sonia, Petitioner, and Mario returned to West Boulevard from Georgia, the house was always in "chaos" with fighting and drinking. Moreover, Ms. Nduly could have described her interactions with Petitioner prior to the murders, information that supports Petitioner's significant mental health impairments described herein. Yet this information was never provided to Petitioner's experts or the jury.

Jeff Nero, who was married to Petitioner's maternal aunt Tessie, could have described seeking leave from the military so that he and Petitioner's Aunt Tessie could transfer from Alaska, where he had been stationed, closer to Charlotte, North Carolina following Pearl Cooper's murder. Mr. Nero could have described moving to Ft. Jackson, South Carolina, and having Sonia and Petitioner (still an infant) move in with him, Tessie, and their two daughters, Regena and Shonda. Mr. Nero could have described Sonia's behavior in the wake of her mother's murder, which would have corroborated the significant trauma she had experienced. Mr. Nero could have described the drinking, drug use, and neglect of children that persisted in his household, as well as in Sonia and Derrick Barnette's home when they moved to Clanton Park. Moreover, Mr. Nero could have described his interactions with Petitioner prior to the murders, information which supports Petitioner's significant mental health impairments described herein. Yet this information was never provided to Petitioner's experts or the jury.

Shonda Nero, who lived in the same house as Petitioner, could have described the chaos, violence, and stress the she and Petitioner experienced growing up. She could have also described some of Petitioner's relationships with women other than those referenced during the

50

2002 trial; this information would have undercut the prosecution's theory about Petitioner's relationships with women. Yet this information was never provided to Petitioner's experts or the jury.

### iii. Brian Ard (Government Witness): Rebuttal to Aggravation and Independent Mitigation

Brian Ard, Petitioner's former boss at Camelot Records in Roanoke, Virginia, fired Petitioner after allegations of sexual harassment were raised against Petitioner in January 1996. Mr. Ard testified as a government rebuttal witness at trial in 1998, describing the allegations that were raised, and Mr. Ard's subsequent investigation and termination of Petitioner.

Sindy Maxwell interviewed Mr. Ard prior to the 1998 trial. Both Ms. Maxwell's interview, as well as Mr. Ard's later trial testimony, made clear that Mr. Ard could provide mitigating information about Petitioner, despite the fact that he had been called as a government witness. In preparation for the 2002 trial, however, trial counsel unreasonably failed to re-interview Mr. Ard. At the 2002 trial, neither the government nor defense called Mr. Ard as a witness. As a result, the jury did not learn about Mr. Ard's observations of Petitioner and Robin Williams together (which included attending Mr. Ard's wife's baby shower); how, as a favor to Petitioner, Mr. Ard kept a picture of Petitioner's children on Mr. Ard's office wall; how Petitioner was promoted to Assistant Manager, which came with a number of important responsibilities; how Petitioner responded to his termination by crying but also by maintaining a good relationship with Mr. Ard; how Mr. Ard wrote Petitioner positive recommendations for future jobs; and how Mr. Ard wanted to send Petitioner a Bible after his arrest. This information was never provided to Petitioner's experts or the jury.

51

### iv.    Crystal Dennis (Government Witness): Rebuttal to Aggravation and Mental Health Information

Crystal Dennis, Petitioner's former girlfriend, testified as a prosecution witness in both the 1998 and 2002 trial.   Despite trial counsel's stated objective, made months prior to the 2002 trial, that it was necessary to affirmatively address Petitioner's prior relationships with women, they inexplicably failed to interview Ms. Dennis.[12]   As a result, trial counsel failed to learn--and, as a result, failed to share with their experts or the jury--important information about the relationship between Petitioner and Ms. Crystal.

For example, the jury was informed through Ms. Dennis that her half brother, Anthony Britt, introduced her to Petitioner in hopes that they would spend more time together, thereby enabling Britt to begin dating Natasha Heard (the mother of Petitioner's children).   [2002 Tr. at 2815-16]   The jury was then told that Petitioner "got … together" with Ms. Dennis and Mr. Britt started dating Ms. Heard, and that subsequently there were "some words" between Petitioner and Mr. Britt at the railroad tracks in May 1992. [2002 Tr. 2816-17]   The jury was then told that both Petitioner and Britt were criminally charged, and that "sometime after that [Ms. Dennis] and Marc began dating and moved in together."   [2002 Tr. 2817]

This version of events was grossly incomplete and misleading.   Had trial counsel interviewed readily available witnesses—including Ms. Dennis and Anthony Britt's good friend, Victor Montgomery—they would have grasped not only the limited nature of what the government sought to present about this incident, but also the significant role it played in Petitioner's life.   Indeed, at the time when Mr. Britt began scheming to date Tasha Heard, Ms. Heard and Petitioner were continuing to struggle as teenaged parents of two young children.

---

[12]  Ms. Dennis had been interviewed by Ms. Maxwell prior to the 1998 trial.

52

**JA63**

Their daughter, Angelica, was less than two years old and their son, Marc, Jr., was still an infant. Although Mr. Britt was urging Petitioner to spend more time with Ms. Dennis, there had not yet been any sexual activity between them.

On the night of the altercation, Mr. Britt recruited some friends to beat up Petitioner (who had discovered Mr. Britt's plot and discussed it with Ms. Dennis, who was also upset). Accompanied by at least two other men, Mr. Britt confronted Petitioner and threatened to kill him. Knowing that Mr. Britt had been looking for him, Petitioner was carrying a small gun that he used to protect himself that night. According to Mr. Britt's cohort that night, Mr. Britt was in the wrong that night and left Petitioner with no choice but to defend himself. (As was revealed in court, Anthony Britt he was shot and killed by someone in an unrelated dispute over a woman at some point before the 2002 retrial.)

As a consequence of the shooting, Petitioner was charged with battery, reckless conduct, pointing a gun at another, and discharging a firearm near a public highway. Petitioner was arrested and held at the Coweta County Jail. After waiving his right to counsel, Petitioner provided a statement to law enforcement, in which he explained that "[m]y fiance, Natasha Heard and I have been having some trouble lately. Anthony Britt has been talking to her, and that has been making things worse."

After being held in jail for approximately 30 days, Petitioner pleaded guilty to misdemeanor charges and was sentenced to time served. During Petitioner's incarceration, Mr. Britt and Ms. Heard intensified their relationship. Following his release, Petitioner began living with Crystal Dennis. Only at that point did their relationship become intimate.

Due to trial counsel's unreasonable failure to interview Ms. Dennis and others concerning this period of time, the jury never learned that the relationship between Petitioner and Ms.

53

**JA64**

Dennis began as a purely platonic one; that Petitioner believed that Tasha Heard, his children's mother, had intensified a romantic relationship with Anthony Britt during the approximately 30 days that Petitioner spent in jail following his altercation with Mr. Britt in May 1992; that Petitioner's mood swings during their relationship seemed inexplicable to Ms. Dennis; that after his release from jail, Petitioner, despite working two jobs, made a serious effort to go back to high school after Ms. Dennis and his children moved in with him (which was soon derailed when Petitioner's car broke down); and that the fathers of Ms. Dennis' two children had threatened to do bodily harm to Petitioner (before the allegations of abuse were brought against Petitioner in January 1993). As was the case with Steve Austin, despite being a prosecution witness, Ms. Dennis was a witness who could have provided important mitigation evidence. Yet the information she could have shared was never provided to Petitioner's experts or the jury

Moreover, not only did trial counsel fail to learn about (and, as a result, use) any of the aforementioned information, trial counsel's cross-examination of Ms. Dennis, which was uninformed due to the lack of investigation, produced far more aggravating than mitigating evidence. For example, rather than elicit available information that supported Petitioner's serious mental health issues, including a serious mood disorder, trial counsel instead had Ms. Dennis confirm that Petitioner was "controlling," "possessive," and "insanely jealous." [2002 Tr. 2817-18] Reasonably informed trial counsel would have known that the truth was not so simple.

### 3. Trial Counsel's Unreasonable and Prejudicial Failure to Use Information Developed by its Mitigation Specialist

Although trial counsel unreasonably failed to re-interview a number of key witnesses, as noted above, trial counsel did receive important mitigation information from the interviews

**JA65**

conducted by Ms. Alfonso. Inexplicably, however, trial counsel failed to reasonably follow up on Ms. Alfonso's work; as a result, the helpful information that was developed prior to the 2002 trial was not shared with Petitioner's experts or the jury.

Trial counsel learned from Ms. Alfonso that Petitioner's former girlfriend and mother of his two children, Natasha Heard, possessed important mitigation evidence. This information, however, was never provided to defense experts, nor was it elicited from Ms. Heard when she testified.

For example, during cross-examination at trial, trial counsel elicited from Ms. Heard that, when she met Petitioner, there was not much food in the apartment he was living in with his mother; there was "some wine" in the apartment; and Petitioner and his brother Mario did not have beds. [2002 Tr. 2852] Inexcusably, trial counsel failed to elicit far more mitigating information concerning Ms. Heard's recollections of first meeting Petitioner-information she had previously shared with Ms. Alfonso.

Trial counsel could have elicited from Ms. Heard how she believed that Petitioner was a very troubled young man who had been raised by a mother who appeared to be "all about herself." Ms. Heard could have testified about how Petitioner's mother "would not feed the children because there was no food in the house. There was no clothing, no sheets on the beds, no shoes ... just a bed frame with no mattress." Ms. Heard could have further recalled that one time at Petitioner's house the only thing in the refrigerator was a bottle of wine. Yet despite this apparent privation, Petitioner's mother's room was well appointed with a bed, nice quilts, and dressers. Ms. Heard also could have recounted that Sonia was hardly ever around.

Mr. Heard could have further testified that as problems increased in their relationship, she tried to tell Sonia that something was wrong with Marc, only to have Sonia dismiss her concerns

55

by saying there was nothing wrong or to blame her for not understanding Petitioner. Ms. Heard could have informed the jury and any mental health expert that Petitioner's mood swings were quite turbulent, moving from appropriate to clingy, needy, anxious, and overly demanding. There were also several times when Ms. Heard would find Marc in her closet, crying-a fact, while told to the jury, was not placed into any context concerning Marc's behavior and Tasha's larger concerns about him.

Trial counsel were also advised by Ms. Alfonso that Sonia Barnette's background was critically important to explaining Petitioner's background and needed to be communicated to the jury and to experts. This history included Ms. Barnette becoming a mother at age 14; her feelings of loss following her parents' divorce; growing up with a father, Jesse Cooper, who was damaged by combat trauma during the Korean War; the guilt, fear, and trauma she experienced at age 15 with her mother's murder; how she changed in the wake of her mother's violent death; the circumstances surrounding her marriage to Derrick Barnette and issues related to the paternity of Petitioner and his brother, Mario; the nature and extent of abuse that she experienced during her marriage to Rick; her emotional unavailability while Petitioner was an adolescent; and her battles with drugs and alcohol. Ms. Alfonso, a highly experienced mitigation specialist, firmly believed-and communicated as much to trial counsel-that Sonia Barnette's background story was an integral piece of Petitioner's mitigation presentation and needed to be communicated to the jury. Yet Ms. Alfonso's information was never provided to the jury, either directly through Ms. Barnette's testimony or through Petitioner's experts.

Similarly, trial counsel unreasonably failed to inform the jury that Sonia's younger sister, Sheila Cooper, was also traumatized by their mother's murder. Both Sonia and Sheila carried intense feelings of loss, grief, rage, and guilt following their mother's murder. This

56

information, as well, was never provided to the jury.

The issues concerning Petitioner's biological father are important to his psycho-social development. Learning that Rick Barnette was not, in fact, his biological father was profoundly confusing and destabilizing for Petitioner. Nevertheless, trial counsel unreasonably failed to introduce any evidence concerning this fundamental element of Mr. Barnette's characterological and personality development. Compounding the confusion and destabilization was the fact that since adolescence, and in the face of a laboratory test result and court order, Petitioner's mother had unrealistically denied the fact that Derrick Barnette is not the biological father of Petitioner and Mario Barnette.

As Rick Barnette testified, "I took [Petitioner] and Mario out to dinner and I kind of explained to them before what had happened about the blood test and maybe some possibilities of what it could be and what it would mean. And during -- well, after dinner I told them that I was not their biological father, but I would always be their father because they didn't have any choice in this and this was not between me and them, it was between me and their mother." [2002 Tr. 3334] Yet despite these words that were allegedly spoken, Rick Barnette very soon thereafter moved away from Charlotte and, in fact, spent very little time with Petitioner ever again.

The significance of the paternity issue goes beyond simply whether Rick Barnette, the man who meted out exceedingly harsh punishment on Petitioner while growing up, was (or was not) Petitioner's biological father and his abandonment of Marc. Information concerning Petitioner's biological father reveals powerful insights about the family into which he was born and raised. As Cessie Alfonso uncovered—but as trial counsel failed to further develop and inform their experts about—it was well known to Sonia Barnette and at least her mother, Pearl

57

**JA68**

Cooper, that Larry Wright was likely to be Petitioner's biological father.

As a young teenager, Sonia dated both Larry Wright and Rick Barnette. She was sexually active with both teenagers, and when Larry Wright was approximately 15 years old, he was informed by Sonia that she was pregnant. (Sonia was 14 years old at the time.) Larry Wright's parents spoke with Pearl Cooper about the situation, and it was agreed that if Larry was, in fact, the father, his family would acknowledge paternity and provide support. Sonia, however, sought to continue dating Rick Barnette, who was a few years old and was about to start a career in the military which perhaps made him a more appropriate individual to take on parental responsibilities.

Notwithstanding Sonia's relationship with Rick, her claiming him as Marc's father, and their eventual marriage when Petitioner was two years old, Sonia and Larry Wright maintained an active yet sporadic sexual relationship during the ensuing years. Their sporadic sexual relationship continued even after Sonia and Derrick eventually separated. Notably, at the time of the 2002 trial, Larry Wright was a high school and college graudate with a stable job and family of his own. He could have also testified about the significant possibility that he might, in fact, be Marc's father, and the ways he could have done something to help Marc or otherwise played a positive role in his life.

Despite the likelihood that Larry Wright is Petitioner's biological father, and in the face of evidence making clear that Derrick Barnette is not Petitioner's biological father, Sonia Barnette has long publicly maintained that Derrick is Petitioner's father. The impact of Sonia's allegations that Derrick "fixed" the paternity test, and that he is the only one who could be Petitioner's father, is significant. Unfortunately, neither Petitioner's defense experts nor his sentencing jury knew anything about it.

58

Information concerning Larry Wright's relationship with Sonia, conversations between the Cooper, Barnette, and Wright families around the time of Sonia's pregnancy with Petitioner, and the steadfast yet conspicuously false assertion that Sonia has maintained throughout Petitioner's life that Rick is Petitioner's biological father (despite this history and a court-approved blood test) profoundly demonstrates the family dysfunction and confusion that Petitioner grew up in. Yet this information was never provided to the jury, either directly through the testimony of Mr. Wright, Ms. Cooper, Mr. Barnette or Petitioner's experts.

Trial counsel's failure to use the information provided by Ms. Alfonso—and, in turn, use Ms. Alfonso and rely on her expertise—was unreasonable. As the ABA Guidelines make clear, the role of a mitigation specialist is a critically important one:

> The mitigation specialist compiles a comprehensive and well-documented psycho-social history of the client based on an exhaustive investigation; analyzes the significance of the information in terms of impact on development, including effect on personality and behavior; finds mitigating themes in the client's life history; identifies the need for expert assistance; assists in locating appropriate experts; provides social history information to experts to enable them to conduct competent and reliable evaluations; and works with the defense team and experts to develop a comprehensive and cohesive case in mitigation.

2003 ABA Guidelines, Guideline 4.1 (footnotes omitted). There is little question that trial counsel unreasonably failed to use and rely on Ms. Alfonso's expertise and assistance when preparing and presenting Petitioner's case for life.

### 4. Trial Counsel's Unreasonable and Prejudicial Failure to Interview Witnesses who Possessed Important Mitigation Information

Trial counsel also failed to ever interview a number of witnesses who they were well aware of and knew, or should have known, likely possessed important mitigating evidence.

For example, despite trial counsel's early declaration that they would seek to deal head-on with Petitioner's prior relationships with women, they conspicuously failed to interview

59

Case 3:12-cv-00327-MOC   Document 48   Filed 06/19/13   Page 59 of 107

**JA70**

the women with whom Petitioner had been in relationships. The one exception to this failure to interview-trial counsel spoke with Tasha Heard prior to the 2002 trial-was nevertheless problematic, as well, since trial counsel failed to use the information Ms. Alfonso had collected. As a result, an incomplete and inaccurate telling of Petitioner's prior relationships was shared with the jury. Had trial counsel conducted the investigation that they themselves suggested was critically important, significant information would have been learned that would have painted a very different picture of Petitioner and changed defense experts' opinions.

Sheila Sullivan was Petitioner's first girlfriend when he moved from Charlotte, North Carolina to outside of Atlanta, Georgia when he was approximately 15 years old. Although Sheila Sullivan was identified as a potential witness well in advance of the 2002 trial, trial counsel made no effort to locate or interview her. Had trial counsel made reasonable efforts to interview Ms. Sullivan, they would have learned that during Petitioner's relationship with Ms. Sullivan, he was faithful (she was not); he was supportive at different times of crisis or stress (for example, when Ms. Sullivan became pregnant); he was not abusive toward Ms. Sullivan; and he was not suspicious or controlling of her. In addition, Petitioner was the undisputed victim of a brutal assault perpetrated by the very teenager with whom Ms. Sullivan later cheated on Petitioner. Finally, after Petitioner's relationship with Ms. Sullivan went astray, he attempted to commit suicide. Ms. Sullivan and others could have informed defense experts and the jury that Petitioner was profoundly affected by their relationship, and that he had changed as a result.

Although trial counsel were aware of Ms. Sullivan and the likelihood that she would possess such important information, they made no effort to speak with her. As a result, neither Petitioner's defense experts[13] nor the jury were informed about the details of this relationship.

---

[13] Although defense expert Dr. Ann Wolbert Burgess, who testified as an expert in "domestic violence," referenced

60

Trial counsel also failed to explore other key relationships in Petitioner's life, including his relationships with Temeka Hunter and Kowana Dozier.[14]   Petitioner had relationships with both women while he was living in Georgia in 1992 and early 1993.   As was the case with Ms. Sullivan, these relationships did not include violence or jealousy or the other elements of domestic violence that the government and, to a large extent, trial counsel suggested to the jury were consistent features of all of Petitioner's relationships with women.[15]

Trial counsel also failed to interview neighbors of Petitioner from his childhood who could have powerfully detailed the destabilizing and chaotic world that Petitioner grew up in. As noted above, Wendy Sharpe could have testified that Petitioner would sometimes appear at her home late a night, wearing only his pajamas, and spend the night.   Regena Nero could have testified about Rick and Sonia's fighting, and how Rick had injured Sonia's ears when he pulled out her earrings—and how, following the separation, she would party with Sonia while Marc and Mario were home alone.   Evidence of Petitioner seeking refuge at neighbors' homes, violence in his home, and Sonia's unavailability to parent was consistent with Petitioner's claims-largely undeveloped by trial counsel-that his household was often an unpleasant and violent place to be when he was an adolescent, and that he received very little guidance and parenting.

Delores Hart would have been able to testify about the background to Jesse and Pearl

---

Petitioner's relationship with Sheila Sullivan in her report, the information reported about the relationship is incomplete and inaccurate.   Had Dr. Burgess been informed by trial counsel about the full details of this relationship, her analysis and ultimate opinion would have changed.

[14] Petitioner's relationship with Temeka Hunter began in late 1992, after meeting her on a trip back to Charlotte. Temeka was a good friend of Petitioner's cousin, Shonda Nero, which is how they were introduced.   Temeka would have testified that Petiitoner was "a sweet, timid, respectful young man." There were no arguments, much less violence, during the relationship.

[15] Trial counsel could have also called Beth Durant and Ayanna Brewer-Beasley to testify about their relationships with Petitioner before he moved from Charlotte to Georgia, which would have further undermined the assertion that Petitioner's interpersonal relationships with women were consistently marked by violence.

61

Cooper's divorce, as well as the devastating aftermath of Pearl's murder. Moreover, Delores Hart could have explain that, even as a caring family friend, she was compelled to evict Sonia (along with Marc and Mario) after Sonia continually proved unable to pay rent.

The failure to interview these and other witnesses left the jury with a wholly incomplete, and at times incorrect, understanding of Mr. Barnette and his background.

**F. Trial Counsel's Unreasonable and Prejudicial Failure to Adequately Investigate and Present Evidence Which Resulted in the Jury Receiving Incomplete and, at times, Materially Inaccurate Testimony from Defense and Prosecution Experts**

Trial counsel failed to provide the defense experts who testified during Petitioner's resentencing in 2002 with readily available information that would have not only corroborated and substantiated significant aspects of their testimony, but would have also materially changed the nature and scope of their opinions. Because trial counsel failed to conduct an adequate investigation, and failed to provide the defense experts with what evidence they had collected, the jury was presented with incomplete and, at times, inaccurate information about Petitioner's mental health.

**1. Identification and Use of Experts for the 2002 Trial**

After Petitioner's sentences were vacated, he was appointed new trial counsel. On February 13, 2001, Jean Lawson and Claire Rauscher were appointed to represent Petitioner. Nine months after their appointment, trial counsel had yet not consulted with either Dr. Seymour Halleck or Dr. Mark Cunningham about their work from Petitioner's first trial, much less decided what mental health experts to utilize for Petitioner's retrial. On November 15, 2001, trial counsel filed its first motion for funding to consult with the experts from the 1998 trial. On November 28, 2001, with a trial date scheduled for March 12, 2002, trial counsel filed its first set

of motions for funding to retain mental health experts (including Dr. Halleck).

On February 26, 2002, with the trial having been continued to July 2002 following the replacement of Ms. Rauscher with Harold Bender, the Court authorized funding for Dr. Halleck, Dr. Cunningham (or a similarly qualified expert on future dangerousness), Dr. Ann Burgess (a forensic nurse who had no involvement in the 1998 trial), and an as-yet-unidentified psychologist. A few weeks later, in March 2002, Dr. Cunningham formally re-opened his Barnette file after trial counsel and he met to discuss him being an expert witness at the 2002 trial.

Dr. Halleck, Dr. Burgess, and Dr. Cunningham all later testified on behalf of Petitioner in the 2002 trial; however their respective opinions and testimony were significantly undermined by trial counsel's failure to conduct an adequate investigation and provide these experts with readily available evidence concerning Petitioner. As a result, trial counsel's presentation of expert testimony was wholly incomplete and, at times, materially inaccurate

### 2. Trial Counsel's Own Assessment that the Prior Defense Team's Investigation was "Superficial and Not-Sufficiently in Depth"

In August 2001, by way of an *ex parte* filing with the Court, Petitioner's counsel asserted that there were manifold problems with the manner in which the earlier trial team investigated and presented mitigation evidence at the 1998 trial:

> Current counsel have reviewed the testimony and cross-examination at Marc Barnette's first sentencing hearing. It is apparent that the defense presentation was disjointed. The psychological, psychiatric and family history was not presented to the jury in an effective manner. The witnesses were unprepared for cross-examination. The investigation was superficial and not-sufficiently in depth to enable the formation of a cohesive theory of mitigation. Our objective is to assure that he information presented to the jury at this sentencing hearing is the result of thorough investigation, top notch assessment by appropriate experts and is credible and logical enough for the jury to understand the genesis of these crimes and to impose a sentence of life imprisonment, rather than death.

63

**JA74**

[Sealed Doc. 364]

Trial counsel's assessment of the earlier investigation was reiterated to the Court during an *ex parte* hearing on February 26, 2002 concerning defense funding. Trial counsel noted that, during the 1998 trial, "[t]he government pretty well ridiculed this mitigation investigator and pointed out some - she had a timeline and they pointed out some areas where she didn't include some critical things." Moreover, trial counsel noted that "some potential mitigation witnesses may not have been candid with [the mitigation investigator] in the past and then that misinformation or information that we're going to try to present doesn't show up in her report."

Despite trial counsel's view that the first defense team's "investigation was superficial and not-sufficiently in depth to enable the formation of a cohesive theory of mitigation," trial counsel repeated the past when it unreasonably failed to adequately re-investigate and pursue readily available information to provide to its experts, as well effectively utilize the new information it had gathered.

    **3.**   **<u>Trial Counsel Unreasonably and Prejudicially Failed to Provide Defense Experts with Important and Readily Available Mitigation and Mental Health Information</u>**

Both Dr. Seymour Halleck and Dr. Mark Cunningham testified at Petitioner's first trial in 1998. At that time, these experts were provided with and relied upon the investigative work of the first trial team and its mitigation specialist, Sindy Maxwell-the same work that Petitioner's new lawyers believed was "superficial and not-sufficiently in depth to enable the formation of a cohesive theory of mitigation." [Sealed Doc. 364] Despite the shoddiness of the earlier work done on Petitioner's background, however, trial counsel inexplicably had its experts rely on precisely the same information for purposes of their testimony in 2002. As a result, the same deficiencies that plagued Petitioner's first trial-a superficial and incomplete picture of

64

Petitioner's background, available mitigation, and mental health condition-were again presented to the jury. Consequently, critically important information-including the diagnosis of a major mood disorder-was not shared with the jury.

### i. Dr. Halleck

In Dr. Halleck's report from 1997, he suggested that "the diagnosis of Bipolar Disorder II might also be considered," in light of Petitioner's reported different mood presentations throughout his life ("periodic short depressions throughout his life alternating with periods of hyperactivity and possible hypomanic behavior"). Due to trial counsel's failure to conduct an adequate investigation and provide their experts with readily available information, Dr. Halleck later abandoned this view that Petitioner might, in addition to a serious Borderline Personality Disorder, also suffer from a genetically-grounded mood disorder. [2002 Tr. 3405]. Readily available information that was never provided to Dr. Halleck would have supported his original suspicions.

As post-conviction counsel's investigation reveals, and as expert testimony would show at an evidentiary hearing, Mr. Barnette not only suffered from a Borderline Personality Disorder-a disorder born largely out of Petitioner's turbulent childhood history-but he also suffered from a serious and independent mood disorder. The significance of the mood disorder cannot be understated. As Dr. Richard Dudley explains, Petitioner suffers from a major mood disorder that is "characterized by rapidly changing, extreme mood states, including mania, depression and mixed states of mania and depression that are associated with extreme irritability and paranoid ideation." While such rapidly changing mood disorder states are "quite destabilizing for an individual in and of themselves, and are particularly destabilizing during the period of adolescent development when such emotional turmoil is so difficult to manage,"

65

Petitioner's major mood disorder is "superimposed" on Borderline Personality Disorder, "result[ing] in even much more severe impairment in his ability to function, in that each of these major psychiatric disorders potentiate the other."

As expert testimony at an evidentiary hearing would further show, the existence of Petitioner's major mood disorder effectively explains why his symptomatic behavior of Borderline Personality Disorder was, at times, so outsized and severe. Moreover, and perhaps most critically, it would show that that Petitioner's behavior was not simply "reactive" to things going on around him-such as his relationships with women or other external psycho-social stressors-but was also powerfully and uncontrollably driven by a genetic etiology.

Evidence to support this finding was readily available to trial counsel. Indeed, while trial counsel's investigation was inadequate and incomplete, it nonetheless identified "red flags" that, had the information been further explored and shared with defense experts, would have supported the diagnosis of Petitioner's mood disorder. Yet that reasonable pursuit of information and sharing with experts never occurred.

For example, trial counsel's mitigation specialist, Cessie Alfonso, received information from Petitioner's former girlfriend and mother of his two children, Natasha Heard. Ms. Heard reported to Ms. Alfonso that she (Ms. Heard) tried to tell Petitioner's mother that "something was wrong with [Petitioner]" and that Petitioner "was very unhappy." Ms. Heard reported that Petitioner would "sway from being appropriate to being clingy, needy, anxious, and demanding of her total attention." At some point, Ms. Heard reported, Petitioner's mood swings were so dramatic that she did not feel that she could leave his side. Ms. Alfonso's work product was not provided to the defense trial experts.

66

**JA77**

### ii. Dr. Ann Burgess

Trial counsel's inadequate investigation and failure to provide defense experts with readily available information resulted in a highly aggravating and inaccurate diagnosis by Petitioner's own expert. Dr. Ann Burgess, a psychiatric nurse who was tendered as an expert in domestic violence, opined at trial that Petitioner was involved in a "crime spree" that extended from the firebombing of Robin Williams' residence to the murders of Ms. Williams and Donald Allen. Based on her review of information provided by trial counsel, Dr. Burgess testified that the violence during that time period reflected "a clear pattern of this kind of -- not certainly to the degree, but this kind of obsessional need to reunite the relationship with prior girlfriends and [Petitioner's] thinking…. It just goes from young woman to young woman, from girlfriend to girlfriend." [2002 Tr. 3505] Having described "the cycle of violence," wherein, with respect to domestic violence, "a cycle … seems to carry on from generation to generation," Dr. Burgess proceeded to explain that Petitioner's behavior "has its roots very much in the way he was raised and developed." [2002 Tr. 3506]

While Petitioner indisputably witnessed and experienced violence in his home and amongst and between his relatives, trial counsel's failure to conduct an adequate investigation and provide Dr. Burgess with access to readily available information resulted in a limited, incomplete opinion. As a result, Dr. Burgess' testimony framed Mr. Barnette's prior behavior in the context of dysfunction rather than psychiatric illness. Rather than simply "a hereditary predisposition for violence," as the government summarized Dr. Burgess' opinion during closing argument [2002 Tr. Tr. 3923-24], any explanation for Petitioner's past conduct was, in fact, far more complex.

As a preliminary matter, while Dr. Burgess suspected that Petitioner had features of a

67

**JA78**

Borderline Personality Disorder, she was not provided with the full set of information to make an informed diagnosis one way or another. Indeed, trial counsel only provided Dr. Burgess with the work conducted by the first trial team, work that trial counsel themselves had deemed "superficial and not-sufficiently in depth." Dr. Burgess was not provided with Cessie Alfonso's mitigation report or interview summaries. As a result, Dr. Burgess did not have an accurate or complete picture about Petitioner's family history. For example, Dr. Burgess was not made aware of the extent to which Sonia Barnette, Petitioner's mother, was traumatized and affected by her parents' divorce and her mother's subsequent murder. Nor was Dr. Burgess apprised about the extent to which Jesse Cooper, Petitioner's father and an important figure in his upbringing (and his mother's), was damaged by combat trauma and alcoholism. These factors were highly significant, especially in light of the fact that Sonia Barnette was only 14 years old when she gave birth to Petitioner.

Dr. Burgess was further unaware about the truth behind Petitioner's paternity, and the manner in which that issue was handled from the very start. Dr. Burgess was also uninformed about the fact that Petitioner would literally run away to neighbors' homes in the middle of the night during the nadir of Sonia and Derrick Barnette's marriage.

Dr. Burgess was also not provided with accurate and complete information about Petitioner's relationships with women, which is particularly unreasonable given the fact that her expert opinion was focused on that very subject. Indeed, contrary to Dr. Burgess' opinion that Petitioner's relationships with women followed a consistent "theme," [2002 Tr. 3507] the truth was far less simple. Dr. Burgess had no way of knowing this since trial counsel failed to undertake an adequate investigation. This is again particularly notable given trial counsel's earlier suggestion that addressing Petitioner's relationships with women was critically important

68

**JA79**

and their criticism of Petitioner's earlier lawyers who attempted to "hid[e]" or "minimize" those relationships.

The significance of these other relationships which trial counsel unreasonably failed to learn about, in combination with the information about Petitioner's mental health which trial counsel failed to develop and use, is profound. As post-conviction would show at an evidentiary hearing, although there had been various difficulties including violence in some (although not all) of Petitioner's relationships with women, his life-changing relationship with Sheila Sullivan, his relationships with other women that did not fit the same "pattern" of violence described by Dr. Burgess, and the additional important information that helped establish that he also suffered from other major psychiatric disorders, would have resulted in a much more complex picture of Petitioner's mental health difficulties. Had Dr. Burgess been supplied with the accurate and more complete information gathered by post-conviction counsel, it would have materially affected her expert opinion.

### iii. __Dr. Mark Cunningham__

Trial counsel's inadequate investigation and failure to provide each defense expert with readily available information also rendered the defense experts' credibility and opinions acutely vulnerable to impeachment and ridicule by the government. Indeed, the defense expert testimony was severely undermined by the shortcomings of trial counsel's investigation, a point the government repeatedly made through cross-examination and in closing argument. During closing, the prosecution rightly pointed out that the jury was presented with "quick snapshots … uncorroborated information," which begged the question: "[W]hat do I know about the quality of information that [the defense experts] used to form their opinions?" [Tr. 2002 at 3936]

For example, Ms. Alfonso had urged trial counsel to consider the impact of Petitioner's

69

**JA80**

grandfather's wartime experience and mental health concerns. Jesse Cooper, who was nearly killed in combat during the Korean War, was responsible for Petitioner (then an infant), Petitioner's mother, Sonia, and Petitioner's aunt, Sheila, immediately following the murder of Pearl Cooper. From that point in time until Petitioner's arrest for murder in 1996, Jesse Cooper was a central figure in Petitioner's life. Yet while some mention was made about Jesse Cooper and how he was "unique" and a "[l]ittle eccentric," [2002 Tr. 3318] the jury was never informed, either by credible testimony or through Mr. Cooper's own military records, about the severity of his wartime injuries and the profound affect they took on him. Indeed, Mr. Cooper's military and medical records alone would have laid bare not only his heroism on behalf of the United States during combat—he was awarded a Bronze Star and Purple Heart among other commendations—but also the trauma he experienced, his resulting disabilities, and his subsequent alcoholism. Trial counsel's failure to pursue and present this information was unreasonable, and left the defense presentation vulnerable to attacks by the prosecution. For example, during Dr. Mark Cunningham's testimony, the prosecution hammered on the credibility of Dr. Cunningham's assessment that Jesse Cooper was "psychiatrically disabled":

> Q: Okay. Now, what psychiatric tests did you perform on Jesse Cooper to make that determination?
>
> A: I was advised of that by Sheila, his daughter.
>
> Q: My question is what psychiatric tests did you perform on Jesse Cooper to make that determination?
>
> A: I did not test Jesse Cooper.

[2002 Tr. 3718-3719]

Dr. Cunningham's testimony was undermined by trial counsel's failures in myriad other ways, as well. For example, when discussing Petitioner's experience with abandonment-a core

feature of his Borderline Personality Disorder-Dr. Cunningham attempted to mention the fact that Petitioner's mother, Sonia, never publicly accepted the paternity test results establishing that Derrick Barnette was not the biological father of either Marc or Mario.

> A: The only thing I might add is that as Sonia insists that the paternity tests were rigged, she leaves Marc and Mario to deal with this issue by themselves and then there is no shared reality of, okay, this is what happened, let me help you understand this. By denying it, Marc -

> MS. TOMPKINS: Objection. There is no evidence of this.

> THE COURT: Sustained. Members of the jury, don't consider that last comment.

[2002 Tr. 3637]

### 4. Trial Counsel's Unreasonableness Concerning Government Experts

#### i. Dr. Park Deitz

Following the defense case-in-chief, the prosecution presented the rebuttal testimony of Dr. Park Dietz, a well-known forensic psychiatrist from California. Dr. Dietz played a critical role in the government's case. Indeed, his testimony was the fulcrum of the government's attack on Petitioner's mitigation and mental health presentation. The government highlighted Dr. Dietz's testimony in its closing repeatedly: "I contend to you, ladies and gentlemen, that the clearest explanation of Marc came from Dr. Dietz, Marc Barnette is narcissistic, he sees himself as the center of the universe and all things revolve around him and his needs; if anything gets out of whack, he reacts violently." [2002 Tr. 3935] Later, the government contrasted Dr. Dietz's testimony against the evidence supplied by the defense experts:

> Contrast that, ladies and gentlemen, with the Government's expert, Dr. Park Dietz. Dr. Dietz looked you in the eye and said, Marc Barnette was not psychotic at the time of these crimes, Marc Barnette's choices were not predetermined by he [sic] childhood, childhood risk factors do not cause adult behavior, Marc Barnette's behavior was not programmed. He told you this was two crimes with two distinct motives, this was not a domestic homicide, and he told you that Marc Barnette has

71

**JA82**

told so many stories in the past that it's not possible to know what happened. Plain language, plain opinions.

[2002 Tr. 3939] Given the near-celebrity status that Dr. Dietz maintained at the time and his central role as a forensic expert, and given the reasonable likelihood that Dr. Dietz would play a key role in the government's case for the death penalty, trial counsel was well aware that Dr. Dietz's credibility was crucial. Despite this fact, trial counsel failed to impeach Dr. Dietz on a critical issue that cut to the heart of his credibility as an expert witness.

During the government's qualifying of Dr. Dietz as an expert, the prosecution noted a number of high profile cases in which Dr. Dietz had previously testified, including "the case of Andrea Yates, the woman who drowned her children in the bathtub[.]" [2002 Tr. 3793-94] The Yates case, out of Harris County, Texas, had recently concluded in March 2002. By all accounts, Dr. Dietz's testimony for the prosecution had undermined Yates' claim that she was insane at the time of the crimes. At trial, Yates claimed that Satan was inside her and that she had killed her children to save them from "hellfire and damnation." During his testimony, Dr. Dietz claimed that Yates got the idea to drown her children from an episode of "Law & Order" in which a mother was acquitted on an insanity defense after drowning her children in a bathtub. Dr. Dietz testified that he was a consultant for the television program and that the show in question had been broadcast shortly before the Yates provided her reasoning for the murders.

Following the jury's rejection of Yates' insanity defense, it was revealed that Dr. Dietz had provided materially false testimony. Contrary to his forceful and convincing testimony, no such episode of "Law & Order" was ever taped. As a result of Dr. Dietz's materially false testimony, the prosecution abandoned its request for the death penalty and Yates was sentenced to life in prison with the possibility of parole after 40 years. On January 6, 2005, Yates' murder

72

convictions were overturned as a direct result of Dr. Dietz's false testimony given that it more than likely prejudiced the jury. Yates was subsequently retried. On July 26, 2006, a Texas jury found that Yates was not guilty by reason of insanity. Needless to say, Dr. Dietz did not testify at Yates' retrial.

Based on this information, trial counsel was in a position to establish that Dr. Dietz was an unreliable expert witness whose explanations and rationalizations for behavior were suspect and fallible. Yet Petitioner's trial counsel unreasonably failed to impeach Dr. Dietz on the materially false testimony he had provided just a few months prior in the Yates case.[16]

Furthermore, had counsel conducted the type of investigation that was required, and had counsel provided defense experts with the results of that investigation, counsel would have been able effectively to rebut Dr. Dietz, cross-examine him, and perhaps affect his expert opinion.

## ii. **Dr. Sally Johnson**

Trial counsel unreasonably failed to consult with and call to testify Dr. Sally Johnson, a forensic psychiatrist employed by the Bureau of Prisons at the time of Petitioner's two trials. In 1997, pursuant to a court order, Dr. Johnson evaluated Petitioner with respect to his competency and insanity evaluation. She later testified during Petitioner's 1998 trial as a defense witness. Despite being able to testify to a number of mitigating issues—including, but not limited to, positive institutional adjustment, remorse, and mental illness—Dr. Johnson was not called to testify on Petitioner's behalf in 2002, much less even consulted by trial counsel.

When Dr. Johnson testified on Petitioner's behalf in 1998, she was Chief Psychiatrist and

---

[16] Based on the timing of the disclosure in Texas that Dr. Dietz had provided materially false information in the Yates case—March 2002—it would appear that trial counsel should have been in a position to gather and use this information without government disclosure. Based on the current record, however, it is not entirely clear. Accordingly, post-conviction counsel, in the alternative, asserts this as a *Brady/Giglio* claim given the government's apparent failure to provide this information to trial counsel.

73

**JA84**

Associate Warden for Health Services at Butner. Accordingly, Dr. Johnson was administratively responsible for the running of the psychiatric hospital and for the general medical care that was given to the prison's population (which, at the time, consisted of approximately 1,000 inmates). Petitioner was held at Butner from November 17, 1997 through December 19, 1997 for purposes of Dr. Johnson's evaluation. As Dr. Johnson testified in 1998, Petitioner described "coming to grips with what he had done shortly after the crime was committed"; Petitioner "fully intended to kill himself because he believed his life was over"; and Petitioner "describe[d] feeling overwhelmed with the magnitude of his behavior." [1998 Tr. 609] Moreover, according to Dr. Johnson, Petitioner "was able to express remorse for his behavior and to express sympathy for the victim's family." [1998 Tr. 610]. The evidence that Dr. Johnson, a psychiatrist employed by the Bureau of Prisons, provided in 1998 was, to be certain, mitigating. Inexplicably, however, trial counsel failed to present this powerful evidence to Petitioner's 2002 jury.

In addition, trial counsel failed to explore with Dr. Johnson the significance of Petitioner's prison adjustment, and the prospects for his long-term adjustment should he have received a life sentence. By the time of trial in 2002, Petitioner had demonstrated over six years of discipline-free behavior. Such behavior was also absolutely consistent with Dr. Johnson's initial observations of Petitioner in 1997. As reflected in her letter to the Honorable Robert Potter on January 8, 1998, Dr. Johnson found that a review Petitioner's prison record at that time "revealed that he did not receive any incident reports for rule infractions. He reported promptly to all appointments and was cooperative with the evaluation process. He was noted to interact appropriately with other patients." Trial counsel unreasonably failed to interview Dr. Johnson, have her review Petitioner's prison records from the date of his conviction in 1998

74

through to 2002, and comment or opine about Petitioner's adjustment.

**G.** **Trial Counsel Unreasonably and Prejudicially Failed to Advise Petitioner That He Should Not Testify, Failed to Realize That He Should Not Testify, Failed to Properly Prepare Him for Testifying, and Failed to Frame Petitioner's Testimony in the Context of His Severe Mental Health Issues**

As the first defense witness called to the stand, Petitioner, over the course of two days, testified about his role in the charged crimes, his prior conduct in other relationships, his upbringing, and various other aspects of his background. For all intents and purposes, Petitioner was his own mitigation specialist providing testimony about his own psycho-social history. While a qualified mitigation specialist is undoubtedly a core component of any capital defense team, and plays "an integral part of the defense team [to] insure[] that the [mitigation] presentation to be made at the penalty phase is integrated into the overall preparation of the case," ABA Guidelines, Guideline 4.1, Commentary, it is highly unusual—indeed, unprecedented—for that role to be played by a capital defendant, particularly one who is as damaged as Petitioner.

Because of Petitioner's distorted and warped interpretation of events and relationships-a direct consequence of his severe psychological impairments-portions of his testimony were inaccurate and, to the sentencing jury, highly aggravating. Trial counsel's performance in this regard was thus both objectively unreasonable and remarkably prejudicial.[17]

---

[17] Dr. Dudley explains:

Subsequent to the initial referral of Marc Barnette to this psychiatrist, this psychiatrist was also asked to comment on the testimony that Marc Barnette gave at his trial. Given Marc Barnette's above described psychiatric impairments, his lack of insight into the causes of these impairments, and his lack of insight into how these impairments impact on his perceptions and his behavior, the following can be said. Marc Barnette's psychiatric impairments manifest (both to this psychiatrist and others) in statements, explanations, and rationalizations by Marc Barnette that would appear to be distorted, self-serving, and simply off-base, and therefore, it is unsurprising to this psychiatrist that Marc Barnette's testimony at trial appeared unsympathetic. While Marc Barnette's testimony was, in many ways, consistent with his mental health make-up – and thus clouded by distorted and warped interpretations of events and relationships – to an untrained listener, it likely appeared quite offensive. That being said, if Marc Barnette was going to be

75

**JA86**

Trial counsel could have, and should have, kept Mr. Barnette off the witness stand and presented his life history and mental impairments in a mitigating manner. At the very least counsel should have contextualized Petitioner's testimony as, in large measure, his inability to comprehend or explain his own actions, despite still feeling genuine remorse. The total failure to do so permitted the prosecution to assert, essentially unchallenged, that "[Mr. Barnette's] testimony [was] so filled with misinformation that you simply can't believe it. I contend to you, ladies and gentlemen, that those hours that Marc Barnette was on the witness stand is just where he likes to be, the center of attention." [2002 Tr. 3928-29] He was nothing more than a "spin artist." [2002 Tr. 3929]

Trial counsel's failure to explain their client's testimony in the context of his impairments was critically prejudicial. Trial counsel did not offer the jury an understanding of Petitioner's own words. Trial counsel unreasonably failed to explain and argue to the jury that many aspects of Petitioner's testimony in fact revealed signs and symptoms of his multiple impairments, and was consistent with his mental health diagnoses. Left unexplained, Petitioner's testimony sounded, at various turns, damning, callous, and unmitigated.

To be sure, there is little question that trial counsel was on notice that Petitioner's mental health impairments would deleteriously affect his testimony. Trial counsel were aware from Dr. Tyson's 1994 report that Petitioner "may insist on following a course of action that will appear self-defeating to others," and that "[h]e rigidly adheres to thinking patterns that center around justification of his actions," which consequently "does not allow him to accept that his actions will be seen as problematic." They were also aware from Dr. Faye Sultan's 1998 report

---

allowed to testify, it would have also been possible for a mental health expert to then explain to a jury why Marc Barnette, even after his arrest and conviction for murder, would persist in describing things in ways that no one else could see or agree with.

76

**JA87**

that Petitioner had "developed significant perceptual and cognitive distortions," and that "[t]hese perceptual inaccuracies … bred behavior grossly inappropriate to social situations."

**H.** **Trial Counsel Unreasonably and Prejudicially Failed to Investigate and Present Readily Available *Lockett/Skipper* Evidence Concerning Petitioner's Institutional Adjustment and Meaningful Relationships**

Marc Barnette maintained loving and supportive relationships after he was imprisoned, contributed to the efficient and safe functioning of prisons and jails as a trustee/orderly, conveyed appropriate and healthy empathy and sympathy toward others, and provided advice and insights to those he was in contact with. Trial counsel showed that Petitioner was a good inmate (although unreasonably failed to show he was a good employee-inmate (trustee)). Yet counsel unreasonably failed to show that Marc Barnette became a contributing member of a family and community. And Mr. Barnette's contributions had nothing to do with preparing for a resentencing. Dr. Dudley explains:

> Finally, the mental health impairments suffered by Marc Barnette, while dramatic and severe, can be managed and/or controlled. For example, I am aware that Marc Barnette had not committed any infractions or received any disciplinary write-ups from the time of his arrest in June 1996 through the time of his retrial in 2002. This is particularly noteworthy given how disruptive his behavior and distorted his thinking had been prior to his arrest. Yet it is quite understandable/explainable given the structure that MB had while incarcerated and the forced reduction (as a result of his incarcertation) of the particular stressors that make MB acutely vulnerable to an exacerbation of his symptoms and the associated erratic and irrational behavior. This explanation as to why Marc Barnette had shown positive and constructive adjustment to prison could have also been presented for consideration as mitigation at the time of trial.

In opening statements, trial counsel promised the jury that the defense would put forward evidence to show how and why Petitioner had "changed over the last six years." [2002 Tr. 2395] Yet while the jury learned that Petitioner had a spotless institutional record during his incarceration since his arrest in 1996, the jury was never provided with evidence about why Petitioner had adjusted so well to prison. This gaping omission—the failure to explain to the

77

**JA88**

jury that Petitioner's mental health makeup and severe mood disorders were better controlled and managed in the prison setting, and that Petitioner had maintained and continued to develop important relationships with friends and family—left the jury with little reason to spare his life.

Trial counsel presented evidence that Petitioner had no infractions from the time of his arrest in 1996 through the time of trial in 2002. Trial counsel presented evidence from three county detention officers that when Petitioner was at the Mecklenburg County Jail, he had been a "good model inmate," [2002 Tr. 2459] that he "followed all orders and directives," [2002 Tr. 3460] and that he had been "[r]espectful, intelligent, and quiet." [2002 Tr. 3458] Trial counsel also presented evidence from two employees of the Bureau of Prisons to discuss Petitioner's infraction-free incarceration, as well as the conditions of Petitioner's confinement—for example, the type of housing units he had been housed in and type of segregation that he was regularly kept in. Trial counsel also presented an expert witness, Walter Buer, to describe Petitioner's classification within the Bureau of Prison.[18]

Although trial counsel presented data about Petitioner's good behavior and highly restricted confinement in prison, they conspicuously failed to provide the jury with any evidence about *why* Petitioner had seemingly adjusted so well. For example, given Petitioner's psychiatric impairments, trial counsel unreasonably failed to present testimony from any one of Petitioner's mental health experts concerning Petitioner's understandably positive response to structure, and about how the forced reduction of the particular stressors that previously made Petitioner acutely vulnerable to an exacerbation of his symptoms, and the associated erratic and irrational behavior, resulted in Petitioner being a genuinely constructive and productive

---

[18] On cross-examination, the government discussed the import of Buer's testiony: "[G]iven this classification, this arithmetic, the defendant is seen as a dangerous person." [2002 Tr. at 3487] In prison, however, Petitioner is not.

78

**JA89**

individual while imprisoned.

Moreover, trial counsel failed to investigate, prepare, and present readily available evidence that Petitioner had ongoing and significant interpersonal relationships with various family members and friends at the time of his 2002 trial. From the time of his arrest in 1996 until the 2002 trial, Petitioner had been in contact with a significant number of people, including, but not limited to, Sonia Barnette, Tessie Nero, Jesse Cooper, Rick Barnette, Armaud Cooper, and Steve Austin. Petitioner's contacts with these individuals were in person, by letter, or by telephone. Trial counsel failed to inform Petitioner's jury about these contacts and the many ways they were important and meaningful, not only to Petitioner but also to his family and friends. These witnesses could have testified about, *inter alia*, Petitioner's connectedness with his half-siblings (Sonia Barnette's two younger children), as well as Derrick Barnette's biological children; how Petitioner would send family members his art work, which is something they cherished; his sincere interest in maintaining and developing his relationships with Natasha Heard and their two children[19]; as well as his genuine acceptance of responsibility and remorse.[20] Such aspects of Petitioner's character are, by their very nature, relevant to the sentencing determination.

Instead of this powerful and temporally proximate information about Petitioner's relationships, the jury was provided with evidence that suggested Petitioner had perhaps no

---

[19] Based on the evidence presented, it is unsurprising that no juror found beyond a reasonable doubt that Petitioner's children would be harmed by his execution. Left unexplored and not presented by trial counsel, however, was evidence that would have suggested otherwise, and would have shown that Petitioner genuinely wished to have a relationship with his children. In point of fact, today, Petitioner has a durable and meaningful relationship with Ms. Heard and their two children.

[20] Other than from Petitioner himself, the only other evidence presented by trial counsel concerning remorse came from Bobby West, a cemetery manager and pastor who had been involved in the prison ministry since 1971. Mr. West testified about some prison visits with Petitioner that occurred at some point(s) between 1998 and 2002. (No information was provided about the dates and lengths of such visits, or when they occurred.) Mr. West testified that he believed Petitioner to be remorseful for what he had done. [2002 Tr. 3396] Mr. West was not asked to elaborate or explain why he believed this to be the case.

79

**JA90**

ongoing contact with anyone who knew him prior to his arrest in 1996.    For example, Armaud Cooper, Petitioner's cousin, testified that "[Petitioner] was definitely the person that I always looked up to, and he always gave my advice and helped me out, and he even does so to this day, because we write each other very frequently. And it just really hurts to see him in this position, and I love him dearly.  It's just hard to express in words how much I love him. It's just a very hard time." [2002 Tr. 3438-39]    Mario Barnette, Petitioner's brother, testified that he "infrequently" visited Petitioner in the jail. [2002 Tr. 3387]   Rick Barnette, who had visited Petitioner during his incarcerations in both Terre Haute, Indiana and Charlotte, North Carolina, was not asked about his contacts with Petitioner. following his 1996 arrests.[21]   No other family member or friend testified on behalf of Petitioner at his 2002 trial.  There is little question that trial counsel's failure to present this readily available evidence was prejudicial.   Indeed, the jury's findings in mitigation laid this bare, as only two jurors believed beyond a reasonable doubt that Petitioner did well in a structured environment; only one juror believed beyond a reasonable doubt that Petitioner had accepted responsibility for his action; only one juror believed beyond a reasonable doubt that Petitioner had remorse; and no jurors believed beyond a reasonable doubt that Petitioner's brother and children would be harmed by his execution.

I.    **Trial Counsel Unreasonably and Prejudicially Failed to Request a Continuance Despite Being Unprepared**

As noted above, the absence of trial counsel files has severely hampered post-conviction counsel's investigation-and, as asserted below, stands as an independent ground for relief. While contemporaneous notes of counsel and communications are not available to provide insight about trial counsel's decision making, it is markedly clear that trial counsel's "strategy"

---

[21] Perversely, while trial counsel permitted the jury to receive the false notion that Rick Barnette had "been there" for Petitioner prior to the crimes in question (which he had not), they failed to convey the fact that Rick Barnette and Petitioner had, in fact, developed a genuine relationship only after the murders.

**JA91**

was un-informed and based on incomplete investigation. What is also clear is that trial counsel was also madly scrambling on the eve of and during trial to uncover information that should have been investigated and developed well in advance of trial. Despite the clear need for additional time, however, the trial team of Ms. Lawson and Mr. Bender never moved to continue trial.

By way of background, on May 4, 2000, the Fourth Circuit remanded Petitioner's case for a new penalty phase trial. On February 9, 2001, Petitioner was brought back from Terre Haute, Indiana and placed in the Mecklenburg County Jail. On February 13, 2001, Jean Lawson and Claire Rauscher were appointed to represent Petitioner.

For the next six-and-one-half-months, it appears from visitation records at the Mecklenburg County Jail that Ms. Lawson met with Petitioner on three (3) separate occasions (February 22, 2001, May 2, 2001, June 20, 2001) for an approximate total of five (5) hours and forty-five (45) minutes. Jail records do not reflect any visits between Petitioner and Ms. Rauscher, nor do they reflect any visits between Petitioner and any investigator or expert during those six-and-a-half months.[22] Moreover, as of August 28, 2001, trial counsel had not conferred or consulted with either of Petitioner's prior trial counsel (Paul Williams and George Laughrun) or any of the experts previously consulted and/or used during the 1998 trial (Dr. Seymour Halleck, Dr. Faye Sultan, Dr. Ruth Kappius, Sindy Maxwell, Dr. William Tyson, Dr. John Warren, and Dr. Mark Cunningham).

On August 31, 2001, three days after trial counsel submitted their initial request for funding of an investigator, the Court directed that trial would begin on March 19, 2002. With a trial date approximately seven (7) months away, trial counsel had yet to initiate any independent

---

[22] Trial counsel did not submit their first request for expert or investigative funding until August 28, 2001. With respect to Ms. Rauscher's work in this case during those months, she later confirmed that due to other cases, she "was not working on this case" during the months of July and August in 2001. [Tr. 11/29/01 at 4]

81

**JA92**

investigation into Petitioner's case, his background, or his mental health.

On October 31, 2001, two months after the Court ordered that trial would begin on March 19, 2002, and with their investigation barely underway, Ms. Rauscher and Ms. Lawson filed a *Motion to Continue Date for Sentencing Hearing.* In their motion, trial counsel detailed their respective commitments in other cases, including Ms. Lawson's capital trial that was scheduled to start in January 2002, two other capital cases for which Ms. Lawson had responsibility, and other significant cases pending trial. The Court granted trial counsel's motion, although the relief granted was a rescheduling of the trial for one week earlier: March 12, 2002.

On November 29, 2001, during a hearing about trial counsel's motion for reconsideration of the March 12, 2002 start date of trial, Ms. Rauscher withdrew as counsel for Petitioner due to concerns about conflicts with other client's cases.

On January 14, 2002, Harold Bender was appointed to represent Petitioner with Ms. Lawson. At the time of Mr. Bender's appointment, he was already counsel in at least one other capital case that would be tried in Rowan County between May 6, 2002 and May 23, 2002.

Ms. Lawson also had a very active law practice that included representation in a number of other capital cases. Indeed, on January 16, 2002, two days after Mr. Bender was appointed as her co-counsel in Petitioner's case, Ms. Lawson was appointed to represent Jeffery Neal Duke for a capital retrial of a double murder in Gaston County. And one week after Mr. Bender's appointment, Ms. Lawson would begin a capital murder trial that would last until February 7, 2002.

On February 26, 2002, Mr. Bender and Ms. Lawson met *ex parte* with the Court regarding the defense team's budgetary needs. At the time of the hearing, Mr. Bender had been involved in Petitioner's case approximately six weeks, and Ms. Lawson had only recently

82

**JA93**

completed a capital trial in Mecklenburg County. During the hearing, Mr. Bender explained: "The trial date is scheduled for July 15, 2002. And in order for us to get ready for that, we have literally been burning the midnight oil. We don't want this case continued. We're not going to ask for this case continued." While perhaps an understandable position to assert given the context of the *ex parte* hearing-seeking defense funding-Mr. Bender curiously promised something that he had no basis for promising: that trial counsel would not ask for a continuance.

At the point in time when trial counsel promised not to seek a continuance, their mitigation investigation was barely underway, if it had started at all. Various experts had not yet been engaged, and it was already readily apparent that trial counsel was failing to adequately supervise its mitigation specialist, who was based near Albany, New York. As a result, the defense preparation suffered immeasurably. The disorganization and absence of an informed and coherent strategy would later be laid bare by the trial team's presentation at trial.

An "insistence upon expeditiousness in the face of a justifiable request for a delay can render the right to defense with counsel an empty formality." *Unger v. Sarafite*, 376 U.S. 575, 589 (1964). Although a motion to continue is vested in the discretion of the district court, its denial will be reversed if it is "unreasoning and arbitrary." *Morris v. Slappy*, 461 U.S. 1, 11 (1983).

Under the facts and circumstances as they existed here, it was unreasonable for trial counsel not to seek a continuance so they would be adequately prepared to defend Mr. Barnette.

**J.** **Trial Counsel Unreasonably and Prejudicially Failed to Maintain and Preserve Petitioner's Files**

Under RPC 209 of North Carolina's Revised Rules of Professional Conduct, a client's file "belongs to the client"; as such, counsel is commanded to "store a client's file in a secure

83

location where client confidentiality can be maintained."   Here, where Mr. Bender appeared on Petitioner's behalf before the Court as recently as 2009, his obligation to retain and maintain Petitioner's file is indisputable.   Indeed, Mr. Bender was well aware from his years as a criminal defense attorney, and his familiarity with capital post-conviction proceedings that Petitioner's case was-and is-still quite active.   The absence of trial files creates an extraordinary impediment for Petitioner that rises to the level of a constitutional violation.

At a minimum, trial counsel's failure to maintain and preserve Petitioner's files strongly supports the need for an evidentiary hearing in order to resolve any factual disputes which might have otherwise been resolved by reference to trial files.   *See, e.g., Turner v. Wong*, 641 F. Supp. 2d 1010, 1036, 2009 WL 2394152 (E.D. Cal. 2009) (capital case where trial files were lost; district court's findings with respect to trial counsel's performance and prejudice made following federal evidentiary hearing; post-conviction relief granted and petitioner's death sentence vacated due to trial counsel's ineffective assistance of counsel); *Poindexter v. Booker*, 05-CV-71607, 2007 WL 1556671 (E.D. Mich. May 30, 2007) *aff'd*, 301 F. App'x 522, 2008 WL 4997500 (6th Cir. 2008) (non-capital criminal case where trial files were lost; district court's findings with respect to trial counsel's performance and prejudice made following state evidentiary hearing; post-conviction relief granted and petitioner's conviction vacated due to trial counsel's ineffective assistance of counsel).

### K.    Trial Counsel Unreasonably and Prejudicially Failed to Protect Petitioner's Constitutional Rights

All other claims and allegations in this Petition are incorporated into this Claim by this reference.

84

**JA95**

Petitioner was denied his right to the effective assistance of counsel at his capital trials in violation of the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution.

Counsel's ineffectiveness includes, but is not limited to the following:

1. counsel failed to conduct adequate negotiations for a plea agreement resulting in a sentence less than death;

2. counsel failed to conduct an adequate pretrial investigation into the   defenses available to Petitioner, including but not limited to the psychological, medical and psychiatric factors affecting Petitioner's mental state during, before and after his participation in the murders for which he was charged;

3. counsel failed to conduct an adequate pretrial investigation into the voluntariness of Petitioner's statements to law enforcement personnel, and specifically failed to investigate the effect of Petitioner's mental capacity, and his medical and psychological history on Petitioner's mental state at the time he provided the incriminating statements;

4. counsel failed to adequately present information and evidence in pretrial motions and at trial relating to Petitioner's allegedly voluntary waiver of constitutional rights during interrogation by the police;

5. counsel failed to file several pretrial motions to protect his client's right to a fair trial, including discovery motions which would have produced highly relevant and critical information regarding the circumstances surrounding the crimes charged against Petitioner and which would have assisted his lawyers to effectively represent their client;

6. counsel failed to obtain those records, including educational, medical, and mental health records of Petitioner and his family which would have assisted in formulating and supporting defenses in the guilt/innocence and sentencing phases of the case;

7. counsel failed to investigate, develop and present evidence which would have supported defenses in the guilt/innocence phase of the case;

8. counsel failed to adequately prepare for and conduct voir dire;

9. counsel failed to adequately examine potential jurors during voir dire by failing to follow up on responses by potential jurors, including but not limited to failing to discover the verdicts handed down by those jurors with prior jury service; failing to question those who showed a complete lack of

85

**JA96**

understanding regarding mental health issues, alcohol use and other conditions; failing to adequately question those venirepersons whose families and friends had been murdered; failing to adequately question potential jurors whose family members had backgrounds in law enforcement;

10. counsel failed to move to strike unqualified and biased jurors from the venire;

11. counsel failed to object to the prosecution's use of its peremptory strikes in a racial- and gender-based fashion;

12. counsel failed to present evidence and to raise defenses at the guilt/innocence phase of the case, including but not limited to evidence and defenses based upon Petitioner's mental state at the time of the alleged offenses;

13. counsel failed to object to improper remarks made by the proecutor during his guilt/innocence phase closing;

14. counsel failed to raise the proper objections to improper charges given by the trial court to the jury at the conclusion of the guilt phase of trial;

15. counsel failed to properly object to items of improper evidence offered in aggravation at both the guilt/innocence and the penalty phases of trial;

16. counsel failed to conduct an adequate pretrial investigation into Petitioner's life and familial background to uncover and present to the jury evidence in mitigation during the penalty phase of the trial;

17. counsel failed to investigate fully Petitioner's childhood and early life history including interviewing maternal family members, neighbors, friends, and teachers;

18. counsel failed to investigate the obvious signs of abuse and neglect in Petitioner's early life by interviewing witnesses who were acquainted with Petitioner and his care givers when he was a child;

19. counsel failed to retrieve records which would have provided evidence in support of mitigation;

20. counsel failed to follow up on leads from those records counsel did obtain;

21. counsel failed to investigate, develop and prepare evidence in support of mitigation, including information available from Petitioner's family members, friends, neighbors, and teachers;

22. counsel failed to develop mitigating evidence of Petitioner's childhood trauma and provide such evidence to their mental health expert;

86

**JA97**

23. counsel failed to present records that were reasonably available to counsel during the penalty phase of Petitioner's trial;

24. counsel failed to adequately prepare Petitioner's penalty phase witnesses;

25. counsel failed adequately to prepare Petitioner's mental health expert before testifying and failed to provide him with evidence of Petitioner's childhood trauma and other relevant background information;

26. counsel failed to adequately consult with and advise Petitioner regarding whether he should testify;

27. counsel failed to adequately prepare Petitioner to testify;

28. counsel failed to challenge the constitutionality of Petitioner's prior convictions;

29. counsel failed to adequately cross-examine the prosecution's sentencing phase witnesses; these inadequacies included the failure to impeach with prior inconsistent statements, the failure to impeach with criminal records, the failure to impeach with inconsistent statements of other witnesses, the failure to explore questions of bias and motive on the part of the witnesses;

30. counsel failed to object to inappropriate arguments made by the prosecution in its sentencing phase closing;

31. counsel failed to object to those portions of the trial court's charge which failed to adequately define mitigating circumstances and misled the jury in other ways.

But for counsel's ineffective representation, there is a reasonable probability that the result of each phase of trial, and the appeal, would have been different.

**L.      Trial Counsel's Unreasonable Performance was Prejudicial to Petitioner**

The evidentiary picture that was presented to Petitioner's jury would have materially changed if trial counsel had conducted a proper mitigation investigation and presentation. A determination of whether counsel's deficiencies with respect to the provision of effective assistance of counsel caused prejudice is a mixed question of law and fact. For now, Petitioner

87

**JA98**

alleges that counsel's performance caused prejudice and that prejudice is established in the penalty phase because "the totality of the available mitigating evidence" from trial and post-conviction creates "a reasonable probability that at least one juror would have struck a different balance." *Wiggins v. Smith*, 539 U.S. 510, 534, 537 (2003). Defendant will fully brief this issue at the direction of the Court.

> II. **Petitioner Marc Barnette was Deprived of His Rights under the Fifth, Sixth, and Eighth Amendments to the United States Constitution with Respect to Raising and Supporting a Claim of Racial Discrimination in Jury Selection, and the *Batson* Proceedings were Unconstitutionally Conducted**

All other claims and allegations in this Petition are incorporated into this Claim by this reference.

At resentencing, Petitioner was entitled to jurors who were not selected in a racially discriminatory way. *Batson v. Kentucky*, 476 U.S. 79 (1986). A *Batson* challenge sparks a three step inquiry. *Rice v. Collins*, 546 U.S. 333, 338 (2006). "First, the trial court must determine whether the defendant has made a prima facie showing that the prosecutor exercised a peremptory challenge on the basis of race. If so, then[,] [second,] the burden shifts to the prosecutor to present a race-neutral explanation for striking the juror in question." *Id*. (citations omitted). Third, the trial court must "assess the plausibility of that reason in light of all of the evidence with a bearing on it." *Miller El II,* 545 U.S. at 252. This final step involves the court evaluating the "'persuasiveness of the justification' proffered by the prosecutor ...." *Rice,* 546 U.S. at 339 (quoting *Purkett v. Elem*, 514 U.S. 765, 768 (1995) (per curiam)).

In *Miller-El v. Dretke,* 545 U.S. 231 (2005), the Supreme Court held that comparative juror analysis could demonstrate that a prosecutor's stated, race-neutral, reasons for striking a juror were pretextual. "[S]ide-by-side comparisons of some black venire panelists who were

88

**JA99**

struck and white panelists [who were] allowed to serve" are "[m]ore powerful than...bare statistics." *Miller-El*, 545 U.S. at 241. When "a prosecutor's proffered reason for striking a black panelist applies just as well to an otherwise-similar nonblack who is permitted to serve, that is evidence tending to prove purposeful discrimination. *Id.* Additionally, disparate questioning—"contrasting voir dire questions posed respectively to black and non-black panel members"—provides "evidence that prosecutors more often wanted blacks off the jury." *Id* at 255. Petitioner's case was remanded for this type of *Batson*, step three, comparative juror analysis. *Barnette*, 644 F.3d at 213.

At Petitioner's resentencing voir dire, the parties and the Court possessed juror questionnaires filled out by every juror. Questions were asked of jurors based upon these questionnaires. The prosecution also noted the race and gender of the jurors on the face of their copies of the questionnaires. Afterward, the defense relinquished all copies of their questionnaires to the Court and/or the Clerk. Consequently, appellate counsel did not have access to all of the actual filled out juror questionnaires. After the Supreme Court and the Fourth Circuit remanded this case for a *Batson* hearing, counsel for Barnette still did not have the juror questionnaires or the government's annotated copies and this Court denied Petitioner's requests to obtain copies. This was affirmed on appeal, but in a splintered decision. *See United States v. Barnette*, 644 F. 3d 192, 218 (4th Circuit 2011) (Judge Keenan, concurring in part and concurring in the judgment) ("Barnette thus was unable to question any of the explanations provided by the government relating to the presence of the race notations.").

Thus, at Petitioner's first genuine opportunity to present comparative juror analysis in support of his *Batson* claim he was denied one of the most important sources of evidence: the pre-trial questionnaires filled out by prospective jurors. The government and the Court had and

89

used the questionnaires, but they were withheld from Petitioner. This was a fundamentally unconstitutional manner of resolving an allegation of a constitutional violation.

The panel's majority noted this court's refusal to provide Petitioner's counsel with the original juror questionnaires for his use during his *Batson* hearing "exclud[ed] the defendant from this important stage" of the proceedings. *Barnette*, 644 F.3d at 212-13.

> [T]he district court's stated reason for refusing to do so, i.e., because Barnette might have pointed to "disparate questioning," which was "something that he could have raised at his [original] *Batson* hearing," does not withstand close scrutiny. *This is because "disparate questioning" is part and parcel of a comparative juror analysis, which the district court correctly identified as the gravamen of the Supreme Court's holding in Miller–El and the focus of our further remand of the case to the district court after the Supreme Court vacated our judgment in Barnette II.* Moreover, owing to the rejection of comparative juror analysis in this circuit before *Miller–El, see supra* p. 204, it was incumbent on the district court to ensure that Barnette enjoyed the full panoply of tools available with which to fortify any showing he could arising out of that approach to *Batson* challenges, an approach that was not genuinely available to him before *Miller–El* under the law of the circuit.

*Id.* (emphasis added) But the Court then held that being excluded from one's own *Batson* hearing, and being denied the most essential tool to litigate *Batson* the first time it is "genuinely available" for litigation, "does not affect [Petitioner's] substantial rights" and "must be disregarded" under Federal Rule of Criminal Procedure 52(a). *Id.*, at 213.

The panel suggested several reasons why harmless error analysis applied. First, counsel had the clean questionnaires in July of 2002—at the resentencing—so it was unimportant to have them in September of 2009 at the *Miller-El II* hearing. *Barnette*, 644 F.3d at 213 ("this is not a case where Barnette has been denied the opportunity to review and examine these documents thoroughly.).[23]

---

[23] However, as this Court illustrated, seven years is a long time to rely upon memory (Court "could not recall [juror's] demeanor" [*Barnette*, 644 F.3d. at 215]) and, more importantly, the 2002 voir dire was insufficient preparation for a 2009 *Miller-El II* remand: comparative juror analysis was "an approach that was not genuinely available to him before *Miller-El* under the law of this circuit." *Id.* at 213.

Case 3:12-cv-00327-MOC Document 48 Filed 06/19/13 Page 90 of 107

**JA101**

Second, the panel wrote that "Barnette's prior examination of these documents led him to raise the very issue on which the Supreme Court's remand was based." *Id*. In fact the *Batson* argument in Petitioner's appeal from resentencing was based solely on what was said on the record during voir dire—appellate counsel did not have the actual questionnaires to work from. Resentencing counsel should have insisted that the questionnaires be included in the record on appeal.

Third, the lower court assured Barnette that "*we* have reviewed the questionnaires in this case, and we are not persuaded that there is any reasonable likelihood that the outcome of the proceedings below would have been different if Barnette received clean copies of the questionnaire." *Id.* (emphasis added).

Petitioner was entitled to an advocate at his *Batson* hearing. "*Defense counsel could say some things that might persuade the district judge or, failing that, he could say things that might persuade us.* Both functions are crucial to our adversary system and to the principles of due process it serves." *United States v. Thompson,* 827 F.2d 1254, 1261 (9th Cir.1987) (emphasis added); *see also id.* ("with all appropriate respect for our able district judges, there might be arguments they would overlook if unassisted by an advocate. That, at least, is one of the theories behind our adversary system.").

Petitioner continues to contend that the Court should have been provided copies of the completed questionnaires and copies of the government's annotated ones on remand from the Fourth Circuit.[24] Petitioner also contends that resentencing counsel were prejudicially

---

[24] This *Batson* proceeding was not conducted in such a way as to "ferret[] out" (*Miller-El* 545 U.S. at 238) racial discrimination in jury selection. Elements of fairness are well-known and common sense, *see Gardner v. Florida*, 430 U.S. 349 (1977) (right of rebuttal and confrontation in capital proceedings) (right of rebuttal and confrontation in capital proceedings; courts may not consider secret and confidential information); *Lankford v. Idaho*, 500 U.S. 110 (1991) ("a procedure for selecting people for the death penalty that permits consideration of secret information about the defendant is unacceptable"); *Simmons v. South Carolina*, 512 U.S. 154 (1994) (defense must be able to

91

**JA102**

ineffective for unreasonably failing to: effectively present comparative juror analysis based upon the questionnaires they did possess; effectively insist that juror questionnaires be included in the record on appeal; and effectively act for the prosecutor's notes which reflected race and gender annotations.

Furthermore, the *Batson* proceeding that was conducted upon remand was a critical stage of this capital trial at which Petitioner was entitled of the effective assistance of counsel. There are "some occasions when although counsel is available to assist the accused ... the likelihood that any lawyer, *even a fully competent one*, could provide effective assistance is so small that" prejudice from such a "representation" is presumed. *United States v. Cronic*, 659 U.S. 648, 659-60 (1984) (emphasis added). Inasmuch as counsel at the remand *Batson* proceeding could not possibly have provided effective assistance, prejudice is presumed and a new resentencing is required.[25]

### III. Petitioner Marc Barnette was Deprived of His Rights under the Fifth, Sixth, and Eighth Amendments to the United States Constitution as a Result of Misconduct Related to the Jury

All other claims and allegations in this Petition are incorporated into this Claim by this reference.

Petitioner has a constitutional right to a fair trial and impartial jury. *See Parker v. Gladden*, 385 U.S. 363, 365 (1966); *Turner v. Louisiana*, 379 U.S. 466 (1965); *Irvin v. Dowd*, 366 U.S. 717, 729 (1961); *Remmer v. United* States, 347 U.S. 227, 229 (1954).

---

rebut government's argument); *Amadeo v. Zant*, 486 U.S. 214 (1988) (secret discrimination in selection of jurors forbidden); *Armstrong v. Manzo*, 380 U.S. 545, 552 (1965) (due process demands an opportunity to be heard "at a meaningful time and in a meaningful manner."), and these constitutional guarantees were violated here.

[25] This Court is fully aware of the record in this case and the jurors Petitioner has heretofore argued were excused in a racially discriminatory manner. Petitioner incorporates these arguments herein (*see*, *e.g.*, Doc. 658), but will more fully discuss them if the opportunity for briefing arises.

92

**JA103**

Given the posture of this 2255 litigation, as well as the need to seek leave of the Court to contact trial jurors, the facts to support this claim require further development by way of additional investigation, discovery, use of process, and an evidentiary hearing. Nonetheless, Petitioner raises this claim here, lest he be deemed to have waived any such challenge.

Misconduct on the part of the jurors at Petitioner's underlying capital trials included, but was not limited to, improper consideration of matters extraneous to the trial, improper racial attitudes which infected the deliberations of the jury, false or misleading responses of jurors on voir dire, improper biases of jurors which infected their deliberations, improper exposure to the prejudicial opinions of third parties, improper communications with third parties, improper communication with jury bailiffs and/or U.S. Marshals, improper *ex parte* communications with the Court, and improperly prejudging the guilt/innocence and penalty phases of Petitioner's trial. *See*, *e.g.*, *Parker v. Gladden*, 385 U.S. 363, 363-364 (1966) (granting post-conviction relief where bailiff's prejudicial comments about petitioner directed at one juror were overheard by other jurors on public sidewalk outside courtroom); *United States v. Sampson*, 820 F. Supp.2d 151, 158-160 (D. Mass. 2011) (death sentence vacated in capital § 2255 proceedings where juror failed to disclose personal experience with abusive relationship and daughter's incarceration, details of which were similar to trial evidence); *Bauberger v. Haynes,* 2009 U.S. Dist. LEXIS 100216 (M.D.N.C. Oct. 29, 2009) (habeas relief from murder conviction granted where jury foreman borrowed dictionary from public library during recess in deliberations, brought it back to jury room, and read to other jurors definition of "malice"); *Novelo v. Yates*, 2009 U.S. Dist. LEXIS 73376 (C.D. Cal. June 18, 2009) (*adopted by* 2009 U.S. Dist. LEXIS 73384 (C.D. Cal. Aug. 13, 2009)) (hearing ordered in habeas case where juror told defendant's acquaintance about reading news accounts to arrive at verdict); *Roman v. Hedgepeth,* 2008 WL 4553091 (C.D. Cal.

93

**JA104**

Oct. 8, 2008) (habeas relief from non-capital murder conviction granted where jurors held transcript of defendant's police interrogation up to light, revealing two prior convictions and prior incarceration); *Wisehart v. Davis*, 408 F.3d 321 (7th Cir. 2005) (conviction and sentence vacated in capital habeas proceedings where juror told petitioner she learned during trial that petitioner submitted to a polygraph test); *Fullwood v. Lee*, 290 F.3d 663 (4th Cir. 2002) (hearing required in capital habeas case to determine, in part, extent to which juror was strongly influenced by pro-death penalty husband); *Doan v. Brigano*, 237 F.3d 722 (6th Cir. 2001) (habeas relief granted in murder case where juror approximated bruise with lipstick and concluded defendant must be lying about bruises at issue in case); *Romine v. Head*, 253 F.3d 1349 (11th Cir. 2001) (death sentence reversed in habeas proceedings based in part on jurors' use of Bible in deliberations); *Anderson v. Miller*, 2001 WL 1182832 (E.D.N.Y. Oct. 2, 2001) (habeas case remanded for evidentiary hearing to investigate allegations that jurors were intimidated); *Nevers v. Killinger*, 169 F.3d 352 (6th Cir. 1999) (*overruled on other grounds*) (second degree murder conviction vacated in habeas proceedings where jurors watched movie containing footage of police brutality incident similar to instant offense, and heard news reports about case); *Church v. Sullivan*, 942 F.2d 1501 (10th Cir. 1991) (robbery conviction reversed in habeas case where head jailer's wife was heard asking jurors how defendants could have tied up and robbed an elderly couple); *Jones v. Kemp*, 706 F.Supp. 1534 (N.D. Ga. 1989) (jury consideration of extraneous religious information); *United States v. Scott*, 854 F.2d 697, 700 (5th Cir. 1988) (failure to respond truthfully on voir dire).

As a matter of record in this case, Juror Evans raised a concern during the 2002 trial that other jurors were forming, or had formed, opinions about whether Petitioner should receive the death or penalty *prior* to the Court's final instructions [2002 Tr. 3667-3682].

94

By separate motion, Petitioner seeks leave to interview the jurors who served in Petitioner's trials.

IV. <u>**Petitioner Marc Barnette was Deprived of His Rights under the Fifth, Sixth, and Eighth Amendments to the United States Constitution Because the Decision to Prosecute Petitioner in Federal Court Rather than State Court Resulted in a Well-Known Significant Reduction in the Number of African-Americans in the Jury Pool in 1998 and 2002**</u>

All other claims and allegations in this Petition are incorporated into this Claim by this reference.

Petitioner could have been prosecuted—indeed he initially was prosecuted—in state court. Why was it decided, ultimately, to prosecute him capitally instead in federal court? The government's determinations to federally and capitally prosecute Petitioner were improper and violated the Fifth Sixth, and Eighth Amendments because of apparent discriminatory purpose.[26]

Having elected to establish certain procedures for determining whether or not to federally and capitally prosecute an accused, the government is required to apply those procedures in conformance with due process. *See Evitts v. Lucey*, 469 U.S. 387, 393 (1985) (due process interest in state created right to direct appeal); *see also Hicks v. Oklahoma*, 447 U.S. 343, 346 (1980) (liberty interest in state-created capital sentencing procedures). Both Due Process and Equal Protection preclude the government from reaching determinations on the basis of race or bias. *J.E.B. v. Alabama ex rel. T.B.*, 511 U.S. 127, 142 n.13 (1994); *Snyder v. Louisiana*, 128 S. Ct. 1203, 1208 (2008). Petitioner alleges that the government's determinations to federally and capitally charge Petitioner violated each of these fundamental principles.

---

[26] As noted in Claim II, *supra*, the government in the 2002 trial wrote the race and gender of prospective jurors on the face of the juror questionnaires. Race was, thus, a factor in the jury selection process. It is as yet unknown whether the same held true for the 1998 trial.

95

**JA106**

Though prosecutors have discretion in choosing which cases to charge federally versus at the state level, that discretion is not unchecked. *Powers v. Ohio*, 499 U.S. 400, 415 (1991) (prosecutor's discretion bound by Equal Protection clause prohibition on racial discrimination "from all acts and proceedings of the State."). Facially nondiscriminatory procedures that are applied in a discriminatory manner violate Equal Protection. *Yick Wo v. Hopkins*, 118 U.S. 356, 373 (1886). A defendant may establish a prima facie case of purposeful discrimination by showing the totality of the relevant fact gives rise to an inference of discriminatory purpose. Perpetrators do not often publicly announce discriminatory intent and those responsible for key decisions may have "[m]ore subtle, less consciously held racial attitudes." *Turner v. Murray*, 476 U.S. 28, 31 (1986). These considerations are especially problematic when those responsible for the decision have broad discretion, as in the decision to federally and capitally prosecute. *Id*. at 35.

If Petitioner had been prosecuted in state court in North Carolina, the racial composition of the juror pool would have been significantly different than before this Court. The government's federal charging determination had the unconstitutional effect of significantly altering the race of the potential and actual jury pool.

> Most federally prosecuted capital crimes occur in minority-concentrated areas. Thus, expansion of the venire to the federal district level (which often includes white flight suburbs) has a dramatic effect on the circumstance of the prosecution. Moving the relevant "community" from the county to the district dilutes the voice of the population impacted by most of the violent crime. Moreover, as the jury pool gets whiter, the opportunity for implicit race bias increases (and minority group defendants suffer the consequences.

G. Ben Cohen and Robert J. Smith, *The Racial Geography of the Federal Death Penalty*, 85 WASH. L. REV. 425, 435 (2010). White juries are more prone to levy death sentences than juries with minorities. *Id.* at 469-71. In fact, all-white juries give the death penalty 71.9% of

96

**JA107**

the time. *Id*. One African-American on the jury drops the likelihood of a death penalty to 42.9%. *Id*. Prosecutors are aware of these statistics. *Id*.

As is illustrated by the following chart, the racial demographics of the counties from which the federal district court summoned jurors in this case in 2002 and 1998 were different from the state court demographics:

**2000 Census Data**

| County | Total Population | Total Population that identified as one race | White | | Black/Afr.Am. | | Am. Indian | | Asian | | Native Haw.and Other Pac Isl. | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | No. | % | No. | % | No. | % | No. | % | No. | % |
| **Anson** | 25,275 | 25,158 | 12,519 | 49.5% | 12,295 | 48.6% | 113 | .4% | 143 | .6% | 6 | 0% |
| **Gaston** | 190,365 | 188,717 | 157,965 | 83% | 26,405 | 13.9% | 525 | .3% | 1814 | 1% | 50 | 0% |
| **Mecklenburg** | 695,454 | 684,709 | 445,250 | 64% | 193,838 | 27.9% | 2439 | .4% | 21,889 | 3.1% | 339 | 0% |
| **Union** | 123,677 | 122,410 | 102,441 | 82.8% | 15,480 | 12.5% | 475 | .4% | 720 | .6% | 30 | 0% |

In absolute census numbers, the decision to prosecute in federal rather than state court resulted in 4% fewer African-Americans in the jury pool. But the effect was significantly larger than that. The federal court draws jurors only from voter registration lists, while the state combines voter and driver's license lists. N.C. Gen. State § 9-2. It is well known that the combination of voter and drivers license lists provide a truer reflection of the racial demographics of a county. *See United States v. Rogers*, 73 F.3d 774, 775-777 (8th Cir. Iowa 1996); Ramseur v. Beyer, 983 F.2d 1215, 1233 (3d Cir. 1992) ("Moreover, an examination of the source lists reveals that the mechanism used to create the source lists was facially neutral with respect to race. Essex County, New Jersey utilized voter registration and Department of Motor

**JA108**

Vehicle lists to create its jury venire. These lists are constituted using facially neutral criteria and allow no opportunity for subjective or racially motivated judgments."); *Mason v. United States*, 2011 U.S. Dist. LEXIS 150062 at *14-15 (N.D.W.Va. Dec. 5, 2011) ("It should be noted the jury venire in this district is taken from merged voter registration rolls and motor vehicle operators or chauffeur licenses—a much wider list than the voter registration rolls approved in Cecil. *See* Amended Jury Plan, Northern District of West Virginia, 1:05-mc-8.")

Petitioner has demonstrated in Claim VI, *infra*, that death sentences for African Americans are disproportionately high under the Federal Death Penalty Act. He has also demonstrated in Claim II, *supra*, that jurors the prosecution discriminated against African Americans during jury selection. Why did the federal government target this case for capital prosecution? The federal interest in and connection to the case was no greater than the state's. The state expended significant resources in investigating and prosecuting the case. Petitioner avers that it would have been very unlikely that a state court prosecution would have resulted in a death sentence.

### V.    Petitioner Marc Barnette was Deprived of His Constitutional Rights to Due Process and a Fair Trial under *Brady*, *Giglio*, *Kyles*, and *Napue* in Violation of the Fifth, Sixth, and Eighth Amendments to the United States Constitution

All other claims and allegations in this Petition are incorporated into this Claim by this reference.

Given the posture of this 2255 litigation, as well as failure of trial counsel to produce Petitioner's trial files, the facts to support this claim require further development by way of additional investigation, discovery, use of process, and an evidentiary hearing. Nonetheless, Petitioner raises this claim here, lest he be deemed to have waived any such challenge.

**JA109**

The government suppressed information favorable to the defense at both phases of the trial, and the materiality of the suppressed evidence undermines confidence in the outcome of the guilt/innocence and penalty phases of Petitioner's trial, and Petitioner's direct appeal, in violation of *Brady v. Maryland*, 373 U.S. 667 (1965), and *Kyles v. Whitley*, 514 U.S. 419 (1995). The government took advantage of Petitioner's ignorance of the undisclosed favorable information by arguing to the jury that which it knew or should have known to be false and/or misleading. *United States v. Sanfilippo*, 564 F.2d 176, 179 (5th Cir. 1977).

The government failed to disclose benefits or promises extended to witnesses in exchange for their testimony and allowed its witnesses to convey a false impression to the jury; and there is a reasonable likelihood that the false impression could have affected the jury's deliberations. *Giglio v. United States*, 405 U.S. 150 (1972).

The government elicited false and/or misleading testimony from witnesses at trial, in violation of *Napue v. Illinois*, 360 U.S. 264 (1959). The government's knowing presentation of false and/or misleading testimony violated Petitioner's rights under *Mooney v. Holohan*, 294 U.S. 103 (1935). The government knowingly or negligently presented false testimony in pretrial and trial proceedings, and there is a reasonable likelihood that the false testimony could have affected the judgment of the trial court and/or the jury at both phases of the trial. *United States v. Agurs,* 427 U.S. 97, 103 (1976).

Regardless of whether the government knew or should have known that it was presenting false and/or misleading evidence, the mere presentation of such evidence and the jury's reliance upon such evidence at both phases of the trial deprived Petitioner of due process. *Sanders v. Sullivan*, 863 F.2d 218 (2d Cir. 1988). This pervasive government misconduct violated Petitioner's rights under the Fifth, Sixth, and Eighth Amendments.

99

### VI. The Death Penalty is Unconstitutional Because it is Sought on the Invidious Basis of Race and Irrational Basis of Geography

On September 12, 2000, prior to Mr. Barnette's retrial, the Department of Justice released a comprehensive study concerning the administration of the federal death penalty from 1988 to 2000. A supplemental report was issued on June 6, 2001.[27] The essence of the studies' findings was that the federal death penalty had been disproportionately sought against persons of color and irrationally sought on a regional basis. As reported in the studies, after 12 years of discriminatory and irrational charging decisions, federal death row consisted of 19 men, of whom four (4) were White, thirteen (13) were Black, one (1) was Hispanic, and one (1) was "other."

**Federal Death Row Population by Race**



☐ White 23   ■ African-American 26   ☐ Latino 8   ☐ Native American 1

As of May 1, 2011          Source: Federal Capital Habeas Project

---

[27] *See* U.S. Dep't of Justice, The Federal Death Penalty System: A Statistical Survey (1998-2000) (Sept. 12, 2000), available at http://www.justice.gov/dag/pubdoc/dpsurvey.html; U.S. Dep't of Justice, The Federal Death Penalty System: Supplementary Data, Analysis and Revised Protocols for Capital Case Review 10 (Jun. 6, 2001), available at http://www.justice.gov/dag/pubdoc/deathpenaltystudy.htm.

**JA111**

Consistent with the historical roots of the death penalty, 12 of the 19 defendants on federal death row at the time had been sentenced to death in the South. Moreover, the government's authorization rates were much higher in cases involving white victims that in cases involving victims of color.

Over-representation of minorities on Federal death row has continued:

> Race-based arbitrariness threatens the fair administration of the death penalty. Blacks and other minority group members are over-represented on death rows across the country. Statistics suggest that defendants are more likely to be sentenced to death for killing a white victim than a black victim. Blacks are also executed disproportionately—and have been since 1976. Again, the federal death penalty is illustrative. Black inmates constitute twenty-eight of the fifty-seven (49%) inmates on federal death row. As then-Assistant Attorney General Eric Holder emphasized in reaction to a September 2000 Department of Justice study of the federal death penalty, these disparities are alarming in a country where blacks constitute less than 13% of the population. These same disparities persist even now that Eric Holder has been appointed the current Attorney General in the Obama Administration. In fact, early reports indicated that he has authorized the death penalty at the same rate, in the same places, and for the same race as did his predecessors in the Bush Administration.

G. Ben Cohen and Robert J. Smith, *The Racial Geography of the Federal Death Penalty*, 85 WASH. L. REV. 425, 428 (2010) (internal citations omitted).

Based on the government's own irrefutable data, Petitioner's death sentence should be set aside.

## VII. The Manner in Which the Bureau of Prisons Would Carry Out Mr. Barnette's Execution Would Violate the Eighth Amendment

All other claims and allegations in this Petition are incorporated into this Claim by this reference.

Petitioner alleges that the manner of carrying out his execution would violate the Eighth Amendment to the United States Constitution. This constitutional violation would arise because of the combination of drugs to be used, the manner in which said drugs would be procured by the

101

**JA112**

government, the protocol governing the execution, the use of untrained non-medical and unqualified personnel and the physical space in which the execution would be carried out, would all result in the infliction of unnecessary pain and suffering in violation of the Eighth Amendment.

Petitioner's challenge to execution protocols and procedures need not be litigation at this time, in this pleading, as the question is not yet ripe. Moreover, a challenge to lethal injection is properly brought in a separate civil rights action under 42 U.S.C. § 1983. *See Hill v. McDonough*, 547 U.S. 573 (2006) (holding that challenge to lethal injection as cruel and unusual punishment in violation of the Eighth Amendment was cognizable under 42 U.S.C. § 1983, and was not barred as a second or successive habeas petition).

Petitioner will be prepared to litigate this Eighth Amendment challenge in whatever forum is deemed appropriate. However, litigation of this claim at this time would appear to be an inefficient use of resources, inasmuch as Petitioner believes he is entitled to relief on the other claims alleged herein. Nonetheless, he raises it here, lest he be deemed to have waived any such challenge.

### VIII. Cumulative Effect of Errors References in this § 2255 Motion Demand Relief

All other claims and allegations in this Petition are incorporated into this Claim by this reference.

Courts have long recognized that constitutional claims of error are to be considered cumulatively as well as individually, and that cumulative error or prejudice may provide a basis for relief regardless of whether the effect of individual errors warrants relief. *See United States v. Basham*, 561 F.3d 302, 330 (4th Cir. 2009) ("Pursuant to the cumulative error doctrine, '[t]he cumulative effect of two or more individually harmless errors has the potential to prejudice a

Case 3:12-cv-00327-MOC   Document 48   Filed 06/19/13   Page 102 of 107

defendant to the same extent as a single reversible error.'") (citations omitted).   Accordingly, Petitioner asserts that relief is justified due to the cumulative effect of errors raised herein.

### IX.     Petitioner Marc Barnette is Entitled to an Evidentiary Hearing

All other claims and allegations in this Petition are incorporated into this Claim by this reference.

Section 2255 provides that "[u]nless the motion and the files and records of the case *conclusively* show that the prisoner is entitled to no relief, the court shall … grant a prompt hearing thereon, determine the issues and make findings of fact and conclusions of law with respect thereto."   28 U.S.C. § 2255 (emphasis added); *accord United States v. Magini,* 973 F.2d 261, 264 (4th Cir.1992) (stating that a federal court "must hold an evidentiary hearing when the petitioner alleges facts which, if true, would entitle [him] to relief").   Moreover, as the Fourth Circuit has stressed, "[w]hen … the factual allegations 'relate[] primarily to purported occurrences outside the courtroom and upon which the record could, therefore, cast no real light,' and where the ultimate resolution rests on a credibility determination, an evidentiary hearing is especially warranted."   *United States v. White*, 366 F.3d 291, 302 (4th Cir. 2004) (citing *Machibroda v. United States,* 368 U.S. 487, 494-95 (1962) and *Raines v. United States,* 423 F.2d 526, 530 (4th Cir.1970)).

Here, Petitioner's 2255 petition alleges colorable Fifth, Sixth, and Eighth Amendment claims, including numerous facts outside of the record which if proved, would entitled Mr. Barnette to relief.   Pursuant to Rule 8 of the Rules Governing § 2255 Proceedings and Fourth Circuit precedent, Mr. Barnette is entitled to an evidentiary hearing on all of his claims. Although analysis of the scope of such a hearing will have to await the government's responsive filings, at this juncture and to avoid any claim of waiver, Mr. Barnette requests that he be

103

**JA114**

afforded a hearing on any disputed fact which, if proven individually or in combination with other facts, would entitle him to relief.

<u>**REQUEST FOR RELIEF**</u>

Based upon all of the above allegations and the entire record of this case, Petitioner respectfully requests that the Court provide the following interim and final relief:

1. To require the Government to respond to the allegations made herein;

2. To permit Mr. Barnette to utilized the processes of discovery as set forth in Rule 6 of the Rules Governing § 2255 Proceedings;

3. To permit Mr. Barnette to file appropriate memoranda in support of the relief requested herein;

4. To permit Mr. Barnette to amend this § 2255 motion to include any additional claims or allegations not presently know to him or his counsel, which are identified or uncovered in the course of discovery, investigation, and litigation of this motion, and to find that the amendment relates back to the date of the filing of this petition;

5. To conduct an evidentiary hearing to establish the facts he alleges herein and to resolve any factual disputes raised by the government's response to this motion;

6. To permit oral argument as appropriate and required;

7. To vacate Mr. Barnette's convictions and sentences and to order new proceedings to cure any constitutional defects in the prior proceedings; and

8. To grant such further and additional relief as this Court deems in the interests of justice.

104

**JA115**

Dated: June 19, 2013

/s/ Mark E. Olive
N.C. State Bar No. 10615
LAW OFFICES OF MARK OLIVE
320 W. Jefferson Street
Tallahassee, FL 32301
850-224-0004 (tel)
850-224-3331 (fax)
meolive@aol.com

/s/ Jacob H. Sussman
N.C. Bar No. 31821
TIN FULTON WALKER & OWEN PLLC
301 East Park Avenue
Charlotte, NC 28203
704-338-1220 (tel)
704-338-1312 (fax)
jsussman@tinfulton.com

/s/ Henderson Hill
N.C. Bar No. 18563
FEDERAL DEFENDERS OF WESTERN
    NORTH CAROLINA, INC.
129 West Trade Street, Suite 300
Charlotte, NC 28202
704-374-0720 (tel)
704-374-0722 (fax)
henderson_hill@fd.org

Case 3:12-cv-00327-MOC   Document 48   Filed 06/19/13   Page 105 of 107

**JA116**

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that he has served the foregoing motion with the Clerk of Court using the CM/ECF system, which will send notification of such filing to:

Amy Ray
Amy.Ray@usdoj.gov

William M. Miller
William.Miller@usdoj.gov

Dated: June 19, 2013

/s/ Jacob H. Sussman

106

JA117

# VERIFICATION UNDER PENALTY OF PERJURY

Undersigned counsel is authorized by Aquilia Marcivicci Barnette to file the foregoing motion pursuant to 28 U.S.C. § 2255. Undersigned counsel further declares that the contents of the foregoing are true to the best of his knowledge, information, and belief.

Dated: June 19, 2013

/s/ Jacob H. Sussman

107

**JA118**

UNITED STATES OF AMERICA

vs.

AQUILIA MARCIVICCI BARNETTE

<u>DEATH</u> <u>PENALTY</u> <u>§ 2255</u>

## PETITIONER AQUILIA MARCIVICCI BARNETTE'S
## MOTION FOR PERMISSION TO INTERVIEW TRIAL JURORS

Aquilia Marcivicci Barnette, through undersigned counsel, respectfully moves this Court to permit counsel or their representative to interview the jurors in his case. Juror interviews, as explained in further detail below, are essential in these capital 28 U.S.C. § 2255 proceedings to securing rights guaranteed to Mr. Barnette by the Fifth, Sixth, and Eighth Amendments to the U.S. Constitution.

### <u>INTRODUCTION</u>

The relief requested in this motion is permission to interview jurors in Mr. Barnette's 1998 and 2002 trials. As the Court is aware, these § 2255 proceedings are the last opportunity to examine the constitutionality and legality of Mr. Barnette's conviction and death sentence and this Court is the forum in which Mr. Barnette must present all relevant facts. The purpose of the juror interviews sought is to aid Mr. Barnette in the factual development of § 2255 claims relating to juror misconduct and ensure that Mr. Barnette's death sentence was not the product of juror bias or outside influence; the scope of the interviews is strictly limited to development of extra-record evidence.

Juror misconduct of virtually every kind is unearthed in post-conviction proceedings, and

1

has formed the basis for post-conviction relief and further factual inquiry in both state and federal courts, including in capital § 2255 proceedings.  *See, e.g., United States v. Sampson*, 820 F. Supp.2d 151, 158-160 (D. Mass. 2011) (death sentence vacated in capital § 2255 proceedings where juror failed to disclose personal experience with abusive relationship and daughter's incarceration, details of which were similar to trial evidence).  Jurors have been found to bring newspapers and dictionaries into the jury room[1]; consult religious and other sources not in evidence and conduct experiments related to evidence[2]; share extraneous information, including information learned from exposure to news media coverage, amongst each other[3]; have inadvertent but prejudicial *ex parte* contacts with third parties and have been subjected to intimidation during proceedings[4]; and fail to answer questions truthfully during *voir dire*.[5]

---

[1]*See, e.g., Bauberger v. Haynes,* 2009 U.S. Dist. LEXIS 100216 (M.D.N.C. Oct. 29, 2009) (habeas relief from murder conviction granted where jury foreman borrowed dictionary from public library during recess in deliberations, brought it back to jury room, and read to other jurors definition of "malice"); *Novelo v. Yates*, 2009 U.S. Dist. LEXIS 73376 (C.D. Cal. June 18, 2009) (*adopted*, 2009 U.S. Dist. LEXIS 73384 (C.D. Cal. Aug. 13, 2009)) (hearing ordered in habeas case where juror told defendant's acquaintance about reading news accounts to arrive at verdict).

[2]*See, e.g., Fullwood v. Lee*, 290 F.3d 663 (4th Cir. 2002) (hearing required in capital habeas case to determine, in part, extent to which juror was strongly influenced by pro-death penalty husband); *Romine v. Head*, 253 F.3d 1349 (11th Cir. 2001) (death sentence reversed in habeas proceedings based in part on jurors' use of Bible in deliberations); *Nevers v. Killinger*, 169 F.3d 352 (6th Cir. 1999) (*overruled on other grounds*) (second degree murder conviction vacated in habeas proceedings where jurors watched movie containing footage of police brutality incident similar to instant offense, and heard news reports about case); *Doan v. Brigano*, 237 F.3d 722 (6th Cir. 2001) (habeas relief granted in murder case where juror approximated bruise with lipstick and concluded defendant must be lying about bruises at issue in case).

[3]*See, e.g., Wisehart v. Davis*, 408 F.3d 321 (7th Cir. 2005) (conviction and sentence vacated in capital habeas proceedings where juror told petitioner she learned during trial that petitioner submitted to a polygraph test); *Fullwood*, 290 F.3d 663 (hearing required in capital habeas case to determine, in part, whether jury considered extraneous evidence that defendant had been previously sentenced to death for same offense by different jury); *Roman v. Hedgepeth,* 2008 WL 4553091 (C.D. Cal. Oct. 8, 2008) (habeas relief from non-capital murder conviction granted where jurors held transcript of defendant's police interrogation up to light, revealing two prior convictions and prior incarceration).

[4]*See, e.g., Church v. Sullivan*, 942 F.2d 1501 (10th Cir. 1991) (robbery conviction reversed in habeas case where head jailer's wife was heard asking jurors how defendants could have tied up and robbed an elderly couple); *Anderson v. Miller*, 2001 WL 1182832 (E.D. NY Oct. 2, 2001) (habeas case remanded for evidentiary hearing to investigate allegations that jurors were intimidated); *Crawford v. State*, 191 P.3d 1136 (Kan. Ct. App. Sept. 12, 2008) (unpublished opinion) (murder case remanded in habeas proceedings for hearing where members of victim's family threatened to harm her and her son if she did not vote to convict).

2

**JA120**

Capital trials, moreover, are invariably high-profile events in the communities where they take place, giving rise to a greater probability of improper extraneous influence or misconduct and a heightened need for scrutiny of jurors. *See Sheppard v. Maxwell*, 384 U.S. 333, 349-363 (1966); *see also Estes v. Texas*, 381 U.S. 532 (1965); *Rideau v. Louisiana*, 373 U.S. 723 (1963); *Patterson v. Colorado*, 205 U.S. 454, 462 (1907) ("The theory of our system is that the conclusions to be reached in a case will be induced only by evidence and argument in open court, and not by any outside influence, whether of private talk or public print") (Holmes, J.).

Thus, despite *voir dire*, jury instructions, and other aspects of the trial process designed to protect an individual's right to a fair and impartial jury, juror misconduct, which need not be deliberate or malicious, inevitably occurs outside the record and often goes undetected in trial and appellate proceedings. *See, e.g., Parker v. Gladden*, 385 U.S. 363, 363-364 (1966) (granting post-conviction relief where bailiff's prejudicial comments about petitioner directed at one juror were overheard by other jurors on public sidewalk outside courtroom). As such, juror misconduct has been recognized as among those extra-record claims properly raised for the first time in post-conviction proceedings because the facts surrounding the misconduct often only

---

[5]*See, e.g., Conaway v. Polk,* 453 F.3d 567 (4th Cir. 2006) (hearing ordered in capital habeas case where juror concealed familial relationship with co-defendant who cooperated with prosecution and testified against petitioner); *Williams v. True*, 39 Fed. Appx. 830 (4th Cir. June 21, 2002) (unpublished) (affirming district court determination in habeas proceedings that juror's failure to disclose she had been married to investigator for several years, along with non-disclosure of other information, deprived petitioner of fair trial); *Green v. White*, 232 F.3d 671 (9th Cir. 2001) (habeas relief granted in murder case where juror concealed fact of previous felony conviction and other information); *Burton v. Johnson*, 948 F.2d 1150 (10th Cir. 1991) (murder conviction in which battering and abuse issues were prominent reversed in habeas case where juror in *voir dire* failed to disclose her own sexual abuse experience); *United States v. Sampson*, No. 01-10384-MLW, 2011 WL 5022335 (D. Mass. Oct. 20, 2011) (death sentence vacated in capital § 2255 proceedings where juror failed to disclose personal experience with abusive relationship and daughter's incarceration, details of which were similar to trial evidence); *McCurtis v. Michaels*, 2006 WL 3240762 (W.D. La. Oct. 3, 2006) (habeas petitioner granted new trial in sexual battery case where juror failed to disclose his wife was cousin of victim's boyfriend); *Beckworth v. State*, 2009 WL 1164994 (Ala. Crim. App. May 1, 2009) (post-conviction relief granted in capital case where juror failed to disclose he knew state's witness, had been previously employed by FBI, and had read and seen news reports about case); *McQuary v. State*, 241 S.W.3d 446 (Mo. Ct. App. 2007) (hearing ordered in post-conviction proceedings in drug distribution case where juror failed to disclose he knew key state witness); *State v. Dye*, 784 N.E.2d 469 (Ind. 2003) (post-conviction relief granted in capital case where juror failed to disclose her brother had been sentenced to death, two other brothers had been arrested, and she herself had been raped).

3

**JA121**

come to light as a result of investigation in the course of those proceedings. *See*, *e.g.*, *Williams v. Taylor*, 529 U.S. 420, 442-444 (2000) (evidentiary hearing required in capital habeas proceedings where trial record contained no evidence that would have put trial counsel on notice that juror concealed material information, uncovered in post-conviction proceedings, about prior relationships with prosecutor and prosecution witness).  Especially when there is something in the trial record to indicate the need for further inquiry—for example, the Court may recall that Juror Evans raised a concern during the 2002 trial that other jurors were forming, or had formed, opinions about whether Petitioner should receive the death or penalty *prior* to the Court's final instructions [2002 Tr. 3667-3682]—good cause exists to conduct juror interviews and permission should be granted.

Congress "has recognized that federal habeas corpus has a particularly important role to play in promoting fundamental fairness in the imposition of the death penalty." *McFarland v. Scott*, 512 U.S. 849, 859 (1994).  Mr. Barnette's instant § 2255 proceedings, likewise, serve the crucial function of ensuring that his capital conviction and death sentence are reliable and not the product of outside influence or bias on the part of jurors.  Consistent with that crucial function, as well as with the equal protection principles that inform application of the death penalty across federal jurisdictions, and with counsel's professional and ethical obligations, and for the additional reasons set forth in detail below, Mr. Barnette seeks permission to utilize the vital investigatory tool of juror interviews to vindicate his guaranteed right to a fair and impartial jury and ensure misconduct on the part of jurors did not taint his capital trial.

4

**JA122**

## ARGUMENT

### I. THE FIFTH AND SIXTH AMENDMENTS PROTECT A CAPITAL § 2255 PETITIONER'S RIGHT TO A FAIR AND IMPARTIAL JURY.

"In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury . . ." U.S. Const. amend. VI. The Supreme Court has also recognized that the right to an impartial jury inheres in the Fifth Amendment: "In essence, the right to jury trial guarantees to the criminally accused a fair trial by a panel of impartial, 'indifferent' jurors. The failure to accord an accused a fair hearing violates even the minimal standards of due process." *Turner v. Louisiana*, 379 U.S. 466, 471-72 (1965) (quoting *Irvin v. Dowd*, 366 U.S. 717, 722 (1961) (internal citations omitted).

The primacy of juror impartiality has been affirmed time and time again. In *Remmer v. United States*, the Court underscored the gravity of fair jury violations: "In a criminal case, any private communication, contact, or tampering directly or indirectly, with a juror during a trial about the matter pending before the jury is, for obvious reasons, deemed *presumptively prejudicial*." 347 U.S. 227, 229 (1954) (emphasis added). The Court emphasized that the right to juror impartiality must be scrupulously guarded: "The integrity of jury proceedings must not be jeopardized by unauthorized invasions. The trial court should not decide and take final action ex parte on information such as was received in this case, but should determine the circumstances, the impact thereof upon the juror, and whether or not it was prejudicial, in a hearing with all interested parties permitted to participate." *Id.* at 229-30.

In *Parker v. Gladden*, 385 U.S. 363, 365 (1966), a little more than a decade after the *Remmer* decision, the Court again weighed in to protect fair jury trial rights of an aggrieved defendant. In light of evidence that the court bailiff had told jurors that the defendant in their case was "wicked" and "guilty," the Court found numerous trial violations of constitutional

5

## JA123

magnitude:

> the evidence developed against a defendant shall come from the witness stand in a public courtroom where there is full judicial protection of the defendant's right of confrontation, of cross-examination, and of counsel . . . [the bailiff's] expressions were private talk, tending to reach the jury by outside influence . . . we believe that the unauthorized conduct of the bailiff involves such a probability that prejudice will result that it is deemed inherently lacking in due process, . . . it would be blinking reality not to recognize the extreme prejudice inherent in such statements . . . petitioner was entitled to be tried by 12, not 9 or even 10, impartial and unprejudiced jurors."

*Id.* at 364-66 (internal quotations omitted). As a result of these violations in *Remmer*, the Court reversed the decision of the state high court below and granted petitioner post-conviction relief. In sum, the Court's careful protection of the individual's right to an impartial jury and its willingness to order new trials when that right is breached speaks to its fundamental importance. *See Sheppard v. Maxwell*, 384 U.S. 333, 363 (1966); *Irvin v. Dowd*, 366 U.S. 717, 729 (1961); *Mattox v. United States*, 146 U.S. 140, 153 (1892) (granting relief and ordering new trials where juries were not impartial).

> **II.** **FOR AN INDIVIDUAL FACING A DEATH SENTENCE, THE EIGHTH AMENDMENT PROHIBITION AGAINST CRUEL AND UNUSUAL PUNISHMENT ALSO REQUIRES THAT THE JURY BE FAIR AND UNBIASED.**

The capital defendant's right to an impartial jury is further protected by the Eighth Amendment's prohibition against cruel and unusual punishment. U.S. Const. amend. VIII ("Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted"). For nearly half a century, the Supreme Court has recognized that arbitrary and capricious infliction of the ultimate penalty contravenes this prohibition. *See Furman v. Georgia*, 408 U.S. 238, 295-96, (1972) (Brennan, J., concurring); *Id.* at 310 (Stewart, J., concurring); *Id.* at 313 (White, J., concurring); *Gregg v. Georgia*, 428 U.S. 153, 189 (1976); *Godfrey v. Georgia*, 446 U.S. 420, 428 (1980) ("if a State wishes to authorize capital punishment it has a constitutional responsibility to tailor and apply its law in a manner that avoids the

6

**JA124**

arbitrary and capricious infliction of the death penalty"); *see also Caldwell v. Mississippi*, 472 U.S. 320, 340 (1985) (emphasizing "the Eighth Amendment's heightened 'need for reliability in the determination that death is the appropriate punishment in a specific case'") (quoting *Woodson v. North Carolina*, 428 U.S. 280, 305 (1976)); *Penry v. Lynaugh*, 492 U.S. 302, 319 (1989) ("the sentence imposed at the penalty stage should reflect a reasoned moral response to the defendant's background, character, and crime") (quoting *California v. Brown*, 479 U.S. 538, 545 (1987) (O'Connor, J., concurring)).

Trial by a jury tainted by improper extraneous influences or misconduct necessarily manifests such arbitrary decision-making. A jury's decision to impose death based on information not properly presented or admissible at trial circumvents any legislative or judicial attempt to guide their discretion, inviting wanton and capricious infliction of the death penalty. *Jones v. Kemp*, 706 F. Supp. 1534, 1559 (N.D. Ga. 1989) ("The use by deliberating jurors of [a Bible] . . . cannot be reconciled with the Eighth Amendment's requirement that any decision to impose death must be the result of discretion which is carefully and narrowly channeled"); *see also California v. Brown*, 479 U.S. 538, 543 (1987) ("to the extent that the instruction helps to limit the jury's consideration to matters introduced in evidence before it, it fosters the Eighth Amendment's need for reliability in the determination that death is the appropriate punishment in a specific case" (internal quotation omitted)).

### III. ACCESS TO JURORS IN THESE CAPITAL § 2255 PROCEEDINGS IS APPROPRIATE AND NECESSARY FOR SAFEGUARDING AN INDIVIDUAL'S RIGHT TO A FAIR AND IMPARTIAL JURY.

Juror interviews are among the essential means for investigation and factual development of juror misconduct. They take on a uniquely important role in rooting out juror bias and extraneous evidence in capital § 2255 proceedings like Mr. Barnette's: where judicial processes

**JA125**

such as *voir dire* fall short, juror interviews may prove invaluable in protecting an individual's right to a fair and impartial jury. That interest—in juror contact as a means for investigating and raising cognizable § 2255 claims of juror misconduct in this death penalty case—on balance outweighs generalized concerns related to jurors' privacy interests, especially when the juror contact sought would take place several years removed from deliberations.

**A. These Section 2255 Proceedings Play A Vital Role In Protecting Mr. Barnette From Juror Misconduct.**

The singular importance of habeas proceedings bolsters Mr. Barnette's position that juror interviews should be allowed. The most essential, weighty rights are at stake in habeas proceedings, because habeas corpus safeguards the fundamental liberty interest of the individual. *Slack v. McDaniel*, 529 U.S. 473, 483 (2000) ("The writ of habeas corpus plays a vital role in protecting constitutional rights"). The remedy contemplated in these § 2255 proceedings is coextensive with habeas, and § 2255 proceedings provide a vehicle for the vindication of core rights and liberties equivalent to petitions for the writ of habeas corpus. *Sanders v. United States*, 373 U.S. 1, 14 (1963) ("it conclusively appears from the historic context in which § 2255 was enacted that the legislation was intended simply to provide in the sentencing court a remedy *exactly commensurate* with that which had previously been available by habeas corpus" (quoting *Hill v. United States*, 368 U.S. 424, 427 (1962)) (emphasis added)).

It follows that § 2255 provides the proper vehicle for Mr. Barnette to develop and present evidence of fair jury trial violations. *See Wellons v. Hall*, 130 S.Ct. 727, 728-29, 732 (2010) (vacating Eleventh Circuit's denial of an evidentiary hearing to capital habeas petitioner on claims of juror bias and remanding for further consideration in light of post-trial revelations of *ex parte* contacts between jurors and judge); *Williams v. Taylor*, 529 U.S. 420, 440-44 (2000) (granting § 2254 petitioner evidentiary hearing on juror bias claim); *see also*, *e.g.*, *United States*

*v. Smith*, 62 F.3d 641, 650 n.5 (4th Cir. 1995) ("we have often recognized that a claim of jury tampering implicates the Sixth Amendment right to an impartial jury and therefore *is* cognizable on habeas corpus").

Cognizable § 2255 claims such as juror misconduct claims will not be apparent from the face of the trial record, and can be established only by virtue of the discovery of extra-record facts; the facts supporting such claims often do not arise without a post-conviction petitioner's counsel or other agents unearthing them well after trial and appellate proceedings have concluded. *See, e.g., Williams v. Taylor*, 529 U.S. 420, 442-444 (2000) (trial record contained no evidence that juror concealed material information on *voir dire*); *United States v. Sampson*, 820 F.Supp.2d 141 (D. Mass. 2011) (trial record contained no evidence that juror failed to disclose information that, under *McDonough Power Equipment, Inc. v. Greenwood*, 464 U.S. 548 (1984), called her ability to decide the case solely on the evidence into question and that the concealed information would have resulted in her excusal for cause).

Notably, unlike capital habeas petitioners seeking relief pursuant to § 2254, § 2255 petitioners have not had an earlier opportunity for factual development of juror misconduct claims in state post-conviction proceedings. *See, e.g., Wellons*, 130 S.Ct. at 729 (noting Wellons attempted to ascertain facts surrounding alleged improper contacts between judge and jury in both state and federal courts). Thus, these § 2255 proceedings represent Mr. Barnette's first real opportunity for extensive investigation to root out instances of juror misconduct not apparent from the trial record and his last realistic opportunity to have such claims considered.

**B. The Heightened Standards For Reliability In Capital Cases Enhance Mr. Barnette's Interest In Access to Jurors**

The Supreme Court has long recognized that "it would not be safe to lay down any inflexible rule [of juror contact] because there might be instances in which such testimony of the

9

**JA127**

juror could not be excluded without violating the plainest principles of justice." *McDonald v. Pless*, 238 U.S. 264, 269-70 (1915) (internal quotation marks omitted). The Court emphasized that such an instance would arise in "the gravest and most important cases." *Ibid.* Mr. Barnette's is such a case.

As early as 1892, the Supreme Court declared that "[i]t is vital in capital cases that the jury should pass upon the case free from external causes tending to disturb the exercise of deliberate and unbiased judgment. Nor can any ground of suspicion that the administration of justice has been interfered with be tolerated." *Mattox v. United States*, 146 U.S. 140, 159 (1892). The *Mattox* imperative has been reaffirmed repeatedly. *See, e.g.*, *Lowenfield v. Phelps*, 484 U.S. 231, 238-39 (1988) ("we are naturally mindful in such cases that the qualitative difference between death and other penalties calls for a greater degree of reliability when the death sentence is imposed" (internal quotation omitted)); *California v. Ramos*, 463 U.S. 992, 998-99 (1983) ("the qualitative difference of death from all other punishments requires a correspondingly greater degree of scrutiny of the capital sentencing determination"); *Eddings v. Oklahoma*, 455 U.S. 104, 118 (1982) (O'Connor, J., concurring) ("Because sentences of death are qualitatively different from prison sentences . . . this Court has gone to extraordinary measures to ensure that the prisoner sentenced to be executed is afforded process that will guarantee, as much as is humanly possible, that the sentence was not imposed out of whim, passion, prejudice, or mistake" (internal citations omitted)). The severity of the death penalty imposes the strictest possible requirements of reliability upon capital proceedings – both the defendant and the public have an overriding interest in ensuring that the jury has legitimately and fairly decided on death. Allowing juror interviews in these § 2255 proceedings would fit squarely with the strict reliability requirements imposed in capital cases. The flip side—that is, denying Mr. Barnette

**JA128**

this crucial tool for developing the factual basis of juror misconduct claims—would mean valid claims for relief may go undiscovered despite Mr. Barnette's diligence in seeking to investigate relevant facts, risking a manifestly unjust result.

### C. Other Procedural Safeguards And Means Of Factual Development Are Inadequate To Protect Mr. Barnette's Right To A Fair And Impartial Jury.

A § 2255 proceeding is the only available mechanism through which to air juror bias or misconduct that may not be apparent or discoverable by any other means. The essential quality of post-conviction interviews of jurors can only be understood in light of the inadequacies of other processes that the judicial system relies on to root out constitutional defects relating to jurors.

It is well-recognized that *voir dire* is not a sufficient process for ensuring the impartiality of the jury. First, the corrupting influence can take place after jury selection. *See, e.g., Wellons*, 130 S.Ct. at 729; *Remmer*, 347 U.S. at 228; *Turner*, 379 U.S. at 467-68. Second, the effectiveness of *voir dire* is predicated on venire members' forthrightness: "the necessity of truthful answers by prospective jurors if this process is to serve its purpose is obvious." *McDonough Power Equip., Inc. v. Greenwood*, 464 U.S. 548, 555 (1984). *See also Williams v. Taylor*, 529 U.S. 420, 440-44 (2000) (ordering evidentiary hearing where empanelled juror concealed her previous marriage to and divorce from the state's lead-off witness; moreover, juror failed to disclose that one prosecutor had represented her in these divorce proceedings); *United States v. Sampson*, 820 F. Supp.2d 151, 158-160 (D. Mass. 2011) (death sentence vacated in capital § 2255 proceedings where juror failed to disclose personal experience with abusive relationship and daughter's incarceration, details of which were similar to trial evidence); *Conaway v. Polk*, 453 F.3d 567 (4th Cir. 2006) (granting evidentiary hearing on juror bias claim by capital habeas petitioner where juror concealed familial relation to codefendant who

11

**JA129**

cooperated with the prosecution and testified against petitioner); *Jackson v. Alabama State Tenure Comm'n*, 405 F.3d 1276, 1288-89 (11th Cir. 2005) (affirming district court's order of new trial in a civil discrimination suit where one juror never disclosed her prior conviction for murdering her child, despite being asked if she had any prior felony convictions); *Fields v. Woodford*, 309 F.3d 1095, 1101-06 (9th Cir. 2002) (granting evidentiary hearing to habeas petitioner in kidnapping/rape case where juror stated on *voir dire* that his wife had been victim of robbery but neglected to mention that she had been kidnapped and raped and the perpetrator never found).

> **D. Counsel Has A Professional And Ethical Obligation To Contact Jurors Recognized By The U.S. Supreme Court And Pursuant To American Bar Association Guidelines For The Appointment And Performance Of Defense Counsel In Death Penalty Cases.**

Implicit in Supreme Court precedent is the recognition that, in order to provide competent representation, counsel has a duty to contact members of the jury to investigate possible misconduct or bias. *See Williams v. Taylor*, 529 U.S. 420, 440-43 (2000) (federal habeas claim of juror bias preserved only because state post-conviction counsel, who undertook juror interviews, "was diligent in efforts to develop the facts supporting [it]"); *McCleskey v. Zant*, 499 U.S. 467, 498 (1991) ("petitioner must conduct a reasonable and diligent investigation aimed at including *all* relevant claims and grounds for relief in the first federal habeas petition") (emphasis added).

The Court's recognition is further supported by cases acknowledging the importance of the American Bar Association Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases ("ABA Guidelines"), which impose on counsel a professional ethical obligation to interview jurors. The ABA Guidelines have been validated by the Supreme Court as guidelines for assessing the reasonableness of capital counsel's performance. *See*, *e.g.*,

12

**JA130**

*Rompilla v. Beard*, 545 U.S. 374, 387 n.7 (2005); *Wiggins v. Smith*, 539 U.S. 510, 524 (2003) ("the standards for capital defense work articulated by the American Bar Association (ABA) [are] standards to which we long have referred as 'guides to determining what is reasonable'") (quoting *Strickland v. Washington*, 466 U.S. 668, 688 (1984)); *see also Williams v. Taylor*, 529 U.S. 362, 396 (2000) (relying on ABA Standards for Criminal Justice).

These Guidelines oblige counsel to contact jurors in post-conviction proceedings. *See* 10.15.1(E)(4) ("Post-conviction counsel should fully discharge the ongoing obligations imposed by these Guidelines, including the obligations to: . . . continue an aggressive investigation of all aspects of the case"); 10.15.1, Commentary ("As demonstrated by the high percentage of reversals and disturbingly large number of innocent persons sentenced to death, the trial record is unlikely to provide either a complete or accurate picture of the facts and issues in the case. This may be . . . because of juror misconduct"); 10.10.2, Commentary n. 260 ("counsel investigating a capital case should be particularly alert to the possibility that, notwithstanding surface appearances, one or more jurors were unqualified to sit at either phase of the trial and make every effort to develop the relevant facts, whether by interviewing jurors or otherwise. Such inquiries can be 'critical in discovering constitutional errors'") (quoting HERTZ & LIEBMAN, FEDERAL HABEAS CORPUS PRACTICE AND PROCEDURE at 489 n.40); 10.7, Commentary n.197 ("counsel must investigate the possibility that the defendant was judged at either the guilt or penalty phases by one or more jurors who were not impartial").

Rather than being some sort of extraordinary measure, juror interviews, as reflected in the controlling case law and professional norms of practice, are part and parcel of standard

**JA131**

investigations required by undersigned in capital post-conviction proceedings.[6]

#### IV. THE LOCAL RULE CIVIL RULE GOVERNING JUROR CONTACT SHOULD NOT TRUMP MR. BARNETTE'S RIGHT TO A FAIR OPPORTUNITY TO DEVELOP AND PRESENT COGNIZABLE CLAIMS FOR RELIEF CONCERNING HIS DEATH SENTENCES.

The local civil rule in this district requires that counsel receive permission of the court upon a showing of good cause before contacting any trial jurors. *See Local Civil Rule 47.1 (D).* It should be noted that this district's juror contact rule is an outlier compared with those of other districts. A strong majority of federal districts in which there is currently a federal death sentence either have no rule governing juror contact (thus presumptively allowing counsel to contact jury members) or have rules that do not impose a good cause requirement. *See* Local Rule 47.1 (E.D. Ark.); Local Rule 47.1 (W.D. Ark.); LR 47.3 and LCrR 47.3 (N.D. Ga.); LR 83.8 (S.D. Ga.); LCrR31.1 (N.D. Ill.); LR 47-2 (N.D. Ind.); LR 47 and LCrR 24.1 (N.D. Iowa); LR 107.16 (D. Md.); LR 47 - 7.01 (E.D. Mo.); S.D. Ohio Civ. R. 47.1 (S.D. Ohio); LCvR 47.1 (E.D. Okla.); LR 48.1 (E.D. Tenn.); LR CV-47 and Rule LR CR-24 (E.D. Tex.); LR 47.1 and LCrR 24.1 (N.D. Tex.); LR 47 and CrLR24.1 (S.D. Tex.); LR 83.5 (D. Vt.) (no requirement of good cause); *see also* Local Rules for D. Idaho, D. Mass, W.D. Mich., W.D. Mo., D. N.D., and W.D. Tex. (no rule barring juror contact).

Given this divergence in local rules, a limitation or prohibition on Mr. Barnette's access to jurors implicates equal protection principles, irrationally restricting the means by which he can safeguard his constitutional rights based solely on geography and running afoul of its responsibility to "tailor and apply its law in a manner that avoids arbitrary and capricious infliction of the death penalty" consistent with Eighth Amendment requirements. *See Godfrey v.*

---

[6] Upon information and belief, Mr. Barnette's defense counsel at his 2002 trial conducted interviews with jurors from his 1998 trial. Due to the absence of trial files, however, post-conviction counsel has no information about the fruits of those interviews.

**JA132**

*Georgia*, 446 U.S. 420, 428 (1980).  Whereas the local rule in this district potentially thwarts his ability to adequately investigate and develop claims of juror misconduct, § 2255 petitioners in the above-mentioned districts can proceed unfettered.  In other words, should the Court deny access to jurors based on the local rule's good cause requirements, the only reason Mr. Barnette would not be able to fully litigate and raise cognizable habeas claims of juror misconduct would be because his case happens to be in such an outlier district.  To avoid this sort of arbitrary treatment and place Mr. Barnette in a position equal to similarly situated individuals under death sentence who have access to the full range of investigatory tools for identifying juror misconduct, the Court should allow Mr. Barnette the ability to contact jurors.

<u>**CONCLUSION**</u>

For the foregoing reasons, the § 2255 Mr. Barnette respectfully asks this Court for permission to interview the jurors in his case.

**JA133**

Dated: June 19, 2013

/s/ Mark E. Olive
N.C. State Bar No. 10615

LAW OFFICES OF MARK OLIVE
320 W. Jefferson Street
Tallahassee, FL 32301
850-224-0004 (tel)
850-224-3331 (fax)
meolive@aol.com

/s/ Jacob H. Sussman
N.C. Bar No. 31821

TIN FULTON WALKER & OWEN PLLC
301 East Park Avenue
Charlotte, NC 28203
704-338-1220 (tel)
704-338-1312 (fax)
jsussman@tinfulton.com

/s/ Henderson Hill
N.C. Bar No. 18563

FEDERAL DEFENDERS OF WESTERN
  NORTH CAROLINA, INC.
129 West Trade Street, Suite 300
Charlotte, NC 28202
704-374-0720 (tel)
704-374-0722 (fax)
henderson_hill@fd.org

16

**JA134**

<u>**CERTIFICATE OF SERVICE**</u>

The undersigned hereby certifies that he has served the foregoing motion with the Clerk of Court using the CM/ECF system, which will send notification of such filing to:

Amy Ray
<u>Amy.Ray@usdoj.gov</u>

William M. Miller
<u>William.Miller@usdoj.gov</u>

Dated: June 19, 2013

<u>/s/ Jacob H. Sussman</u>

17

**JA135**

AQUILIA MARCIVICCI BARNETTE,    )
    )
    **Petitioner,**    )
vs.    )
    )    **ORDER**
UNITED STATES OF AMERICA,    )
    )
    **Respondent.**    )
_____)

**THIS MATTER** is before the Court upon Petitioner Aquilia Marcivicci Barnette's

Motion for Permission to Interview Trial Jurors.  (ECF No. 49.)  Petitioner seeks to interview

jurors from his 1998 criminal trial and 2002 sentencing trial "to aid . . . in the factual

development of § 2255 claims relating to juror misconduct and ensure that [his] death sentence

was not the product of juror bias or outside influence."  (Motion 1, ECF No. 49.)

Petitioner contends that good cause exists to conduct juror interviews because there is

evidence in the record that some jurors in his 2002 sentencing trial had formed opinions about

whether Petitioner should receive the death penalty prior to receiving the Court's final

instructions.  (Motion 4, ECF No. 49.)  Petitioner refers to comments made by a juror to an

alternate juror that seemed to indicate that the juror may have made up his mind about the

appropriate sentence for Petitioner prior to hearing all of the evidence.  The alternate juror

brought the matter to the Court's attention, and the Court conducted an inquiry on the record.

(3:97cr23, 2002 Sent. Tr. 3667-82.)  When questioned, the alternate juror stated that during a

break near the end of the previous day, one juror, whom he could not identify, made remarks

1

indicating that he did not believe the testimony of a witness for the defense and that he was ready to decide Petitioner's sentence.  (3:97cr23, 2002 Sent. Tr. 3669, 3671.)  None of the other jurors responded, and the alternate juror could not be sure that anyone other than himself had heard the juror's comments.  (3:97cr23, 2002 Sent. Tr. 3672.)  The alternate juror also stated that the jurors had not discussed the case or evidence amongst themselves.  (3:97cr23, 2002 Sent. Tr. 3669-70.)  After questioning the alternate juror, the Court brought the entire jury in, asked if anything had happened during the course of the trial to impair anyone's ability to be a fair and impartial juror, and re-instructed the jury on beginning deliberations prematurely, listening to or reading anything about the trial, discussing the case with other jurors or anyone outside the jury, and having contact with anyone involved in the trial.  (3:97cr23, 2002 Sent. Tr. 3682.)

"Requests to impeach jury verdicts by post-trial contact with jurors are disfavored." United States v. Gravely, 840 F.2d 1156, 1159 (4th Cir. 1988) (citing Tanner v. United States, 483 U.S. 107 (1987)).  Rule 606(b) of the Federal Rules of Evidence reflects that fact by prohibiting the use of juror testimony to impeach a verdict except with regard to whether the jury or a juror was exposed to extraneous prejudicial information or outside influence.[1]  "Extraneous prejudicial information [is] information that was not admitted into evidence but nevertheless bears on a fact at issue in the case."  Robinson v. Polk, 438 F.3d 350, 363 (4th Cir. 2006) (citations omitted).  An "outside influence" is communication or contact between a juror and

---

[1] Federal Rule of Evidence 606(b)(1) states that, "[d]uring an inquiry into the validity of a verdict or indictment,"

> a juror may not testify about any statement made or incident that occurred during the jury's deliberations; the effect of anything on that juror's or another juror's vote; or any juror's mental processes concerning the verdict or indictment.  The court may not receive a juror's affidavit or evidence of a juror's statement on these matters.

A juror may testify, however, about whether "extraneous prejudicial information was improperly brought to the jury's attention;" "an outside influence was improperly brought to bear on any juror;" or "a mistake was made in entering the verdict on the verdict form."  Fed. R. Evid. 606(b)(2).

2

non-juror that influences the partiality of the juror or jury.  See id. (citations omitted).  To obtain permission to interview jurors after the verdict, "a § 2255 movant must make a threshold showing of improper outside influence."  United States v. Roane, 378 F.3d 382, 404 (4th Cir. 2004) (holding that district court did not abuse its discretion in denying motion to interview jurors where § 2255 movants failed to proffer any evidence that jurors engaged in misconduct or were improperly exposed to outside influences) (citing Gravely, 840 F.2d at 1159) (holding that district court did not abuse its discretion in denying post-verdict motion to interview jurors where defendant had made no threshold showing of improper outside influence)).

The unidentified juror's pre-deliberation remarks in this case do not fall into the category of "extraneous, prejudicial information or outside influence" necessary to justify juror interviews.  See Roane, 378 F.3d at 404; Robinson, 438 F.3d at 363; see also United States v. Morales, 655 F.3d 608, 631 (7th Cir. 2011) ("Any inquiry as to bias arising from . . . alleged premature deliberations would run afoul of [Rule 606(b)'s] clear proscription [against post-verdict juror testimony regarding] 'the effect of anything upon that or any other juror's mind or emotions as influencing the juror to assent to or dissent from the verdict ... or concerning the juror's mental processes in connection therewith.'") (quoting Fed. R. Evid. 606(b)); United States v. Logan, 250 F.3d 350, 380–81 (6th Cir. 2001), abrogated on other grounds by Fed. R. Evid. 408 (2006) (holding that premature deliberations constituted an internal jury influence subject to the post-verdict restrictions of Rule 606(b)); United States v. Caldwell, 83 F.3d 954, 956 (8th Cir. 1996) (holding that juror statements "I've heard all of this I need to hear" and "this is just a bunch of crap," overheard by a nonjuror during the trial were intrajury communications which could not be used to impeach the jury's verdict).  Moreover, the juror's remarks came seven days

3

JA138

into the sentencing trial and, according to the alternate juror, appeared to have been a reaction to testimony which immediately preceded it.  (3:97cr23, 2002 Sent. Tr. 3671.)  "The concern with bias is that a juror will decide a case on the basis of a pretrial predisposition against the interest of a party rather than on the basis of the evidence presented during the trial."  United States v. Gianakos, 415 F.3d 912, 923 (8th Cir. 2005).  There is no evidence that the unknown juror had any prior bias against Petitioner or that he acquired any extrinsic information prejudicial to Petitioner.  Consequently, Petitioner has failed to make the threshold showing necessary to support his Motion, and it will be denied.  See Roane, 378 F.3d at 403-404 (rejecting § 2255 movants' argument that district court abused its discretion in denying their juror misconduct claims without first granting them leave to interview the jurors).

**IT IS, THEREFORE, ORDERED** that Petitioner's Motion for Permission to Interview Trial Jurors (ECF No. 49) is **DENIED**.

Signed: July 18, 2013

Richard L. Voorhees
United States District Judge

4

**JA139**

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>vs.<br><br>AQUILIA MARCIVICCI BARNETTE | <u>DEATH</u> <u>PENALTY</u> <u>§ 2255</u> |

**PETITIONER AQUILIA MARCIVICCI BARNETTE'S
MOTION FOR DISCOVERY**

NOW COMES Petitioner Aquilia Marcivicci Barnette, through undersigned counsel and pursuant to the Fifth, Sixth, and Eighth Amendments to the U.S. Constitution and Rule 6 of the Federal Rules Governing § 2255 Proceedings, for discovery in furtherance of his § 2255 petition. The requested discovery, as set forth below, is essential to guarantee Petitioner a fair opportunity to litigate his § 2255 petition and ensure that this Court reviews and resolves his claims for relief with the benefit of a more fully developed factual record.

## I.    Procedural History

Aquilia Marcivicci Barnette (hereinafter "Petitioner" or "Mr. Barnette") was indicted by a federal grand jury in the Western District of North Carolina on eleven criminal charges arising out of the firebombing of the residence of Robin Williams in Roanoke, Virginia, the carjacking and murder of Donald Lee Allen in Charlotte, North Carolina, and the subsequent murder of Ms. Williams in Roanoke.  On January 27, 1998, following a three-week trial, a jury found Mr. Barnette guilty on all counts of the Indictment.  At sentencing, the jury recommended that Mr. Barnette be sentenced to death on Counts Seven, Eight, and Eleven.

1

Mr. Barnette's direct appeal to the United States Court of Appeals for the Fourth Circuit resulted in the reversal of the sentences of death on Counts Seven, Eight, and Eleven, and his case was remanded for resentencing. *United States v. Barnette*, 211 F.3d 803 (4th Cir. 2000). Following a new penalty phase trial in 2002, a jury again imposed the death penalty. On direct appeal, Mr. Barnette's new death sentences were affirmed. *United States v. Barnette*, 390 F.3d 775 (4th Cir. 2004).

On May 15, 2005, Mr. Barnette filed a Petition for a Writ of Certiorari with the United States Supreme Court. Soon thereafter, the Supreme Court decided *Miller-El v. Dretke*, 545 U.S. 231 (2005). A supplemental petition for a writ of certiorari was filed on Mr. Barnette's behalf in light of *Miller-El*. The Supreme Court thereafter granted the supplemental petition, vacated the judgment of the Fourth Circuit, and remanded the case in light of *Miller-El*. *Barnette v. United States*, 546 U.S. 803 (2005). Following remand to the Fourth Circuit, Mr. Barnette sought to re-mand the case to the District Court. After supplemental briefing on the issue, the Fourth Circuit entered an order granting his motion to remand the case to the District Court.

After additional briefing, an *in camera* review of jury questionnaires, and an additional hearing on the matter, the District Court refused to provide copies of the jury questionnaires to defense counsel. The Court then issued an Order on May 20, 2010, finding no *Batson* violation by the government, and further ruling that Mr. Barnette was not entitled to discovery under the Jencks Act. *United States v. Barnette*, Case No. 3:97CR23, 2010 WL 2085312 (W.D.N.C. May 20, 2010).

2

**JA141**

Mr. Barnette appealed this Court's Order to the Fourth Circuit Court of Appeals. Following oral argument on January 27, 2011, the Fourth Circuit issued a published opinion affirming the District Court's ruling. *United States v. Barnette*, 644 F.3d 192 (4th Cir. 2011). On March 19, 2012, the United States Supreme Court denied Mr. Barnette's Petition for a Writ of Certiorari. *Barnette v. United States*, 132 S.Ct. 1740 (Mar. 19, 2012).

On May 23, 2012, the Court appointed the undersigned, *nunc pro tunc* to April 3, 2012, pursuant to the Criminal Justice Act as counsel in this capital § 2255 proceeding. [Doc. 1]

On September 18, 2012, post-conviction counsel Henderson Hill and Jake Sussman appeared before the Court, along with former trial counsel Harold Bender, in connection with the status of Mr. Barnette's trial files. Mr. Bender acknowledged on the record that he was the last attorney (among all of Mr. Barnette's prior counsel) to have trial files pertaining to Mr. Barnette and that he had not located or produced them to post-conviction counsel.[1]

On March 13, 2013, Mr. Barnette, through undersigned counsel, filed a *Notice of Stipulation to Extend Deadline for Filing Motion Under 28 U.S.C. § 2255 and Government Waiver of Statute of Limitations Defense and Motion for Order Confirming Agreed-Upon Extension of Time*. [Doc. 31] In this pleading, Mr. Barnette stated that post-conviction and the government had reached an agreement whereby the government would waive, forfeit and/or relinquish any statute of limitations defense and consent to the extension of Mr. Barnette's § 2255 filing deadline from March 19, 2013 to June 19, 2013.

---

[1] As of this filing, Mr. Barnette, through post-conviction counsel, remains without his trial files. Prior to his death on March 24, 2013, Mr. Bender had produced approximately 300 pages consisting of miscellaneous electronic documents that largely concerned post-trial matters. The approximately 40 to 50 boxes of trial files that Mr. Bender and co-counsel Jean Lawson reportedly possessed at the time of Mr. Barnette's 2002 trial, inclusive of handwritten notes, memoranda, correspondence with the government and experts, etc., have not yet been located or produced.

**JA142**

On March 15, 2013, the government filed its *Notice of Government Stipulation to Extend Deadline for Filing Motion Under 28 U.S.C. § 2255* [Doc. 32], confirming its agreement to the three-month extension of the deadline.

On June 19, 2013, Mr. Barnette, through undersigned counsel, filed his motion under 28 U.S.C. § 2255.

As noted in the § 2255 petition, the parties conferred and agreed to a proposed litigation schedule by which Petitioner's motion for discovery would be filed by July 19, 2013. The government would have until August 19, 2013 to respond. [Doc. 48 at 5, n.2]

## II.     <u>Discovery Under Rule 6</u>

Petitioner's discovery requests are governed by Rule 6 of the *Rules on Motion Attacking Sentence Under Section 2255*. Rule 6 states: "A judge may, for good cause, authorize a party to conduct discovery under the Federal Rules of Criminal Procedure or Civil Procedure, or in accordance with the practices and principles of law." A post-conviction petitioner establishes "good cause" whenever "specific allegations before the court show reason to believe that the petitioner may, if the facts are fully developed, be able to demonstrate that he is . . . entitled to relief." *Bracy v. Gramley*, 520 U.S. 899, 908-09 (1997) (quoting *Harris v. Nelson*, 394 U.S. 286, 299 (1969)); *Quesinberry v. Taylor*, 162 F.3d 273, 279 (4th Cir. 1998) ("Good cause is shown if the petitioner makes a specific allegation that shows reason to believe that the petitioner may be able to demonstrate that he is entitled to relief.").

**JA143**

When a petitioner establishes good cause, discovery must be allowed. The United States Supreme Court has explained that "[t]he very nature of the writ [of habeas corpus] demands that [habeas proceedings] be administered with the initiative and flexibility essential to insure that miscarriages of justice within its reach are surfaced and corrected." *Harris*, 394 U.S. at 291; *Johnston v. Love*, 165 F.R.D. 444, 445 (E.D. Pa. 1996) ("it is the duty of the courts to provide the necessary facilities and procedures for an adequate inquiry.").[2]

In exercising its discretion and in determining whether Petitioner has established "good cause" for the requested discovery, this Court should be guided by the recognition that habeas corpus litigation is a civil proceeding, and the more limited rules addressing discovery in criminal cases do not control. *See*, *e.g.*, *Pennsylvania v. Finley*, 481 U.S. 551, 556 (1987) (habeas proceeding is "not part of the criminal proceeding itself, and it is in fact considered to be civil in nature") (citing *Fay v. Noia*, 372 U.S. 391, 423-424 (1963)); *Browder v. Director Department of Corrections*, 434 U.S. 257, 269 (1978) ("It is well settled that habeas corpus is a civil proceeding"). *See also* Fed.R.Civ.P. 81(a)(4) (Federal Rules of Civil Procedure "apply to proceedings for habeas corpus … to the extent that the practice in those proceedings is not specified in a federal statute … or the Rules Governing Section 2255 Cases").

---

[2] *Accord McDaniel v. United States District Court*, 127 F.3d 886, 888 (9th Cir. 1997) (where Petitioner "presented specific allegations … [he] is entitled to discovery"); *Johnston v. Love*, 165 at 445 (Rule 6's "history makes clear that its purpose is to ensure that the facts underlying a habeas corpus claim are adequately developed, and that it is a court's obligation to allow discovery in cases in which a petitioner has provided a sufficient basis for believing that discovery may be necessary to adequately explore a petitioner's claim for relief." Accordingly, "a court may not deny a habeas corpus petitioner's motion for leave to conduct discovery if there is a sound basis for concluding that the requested discovery might allow him to demonstrate that he has been confined illegally."); *Quesinberry v. Taylor*, 162 F.3d 273, 279 (4th Cir. 1998) ("Good cause is shown if the petitioner makes a specific allegation that shows reason to believe that the petitioner may be able to demonstrate that he is entitled to relief.").

5

**JA144**

Since the purpose of post-conviction discovery "is to ensure that the facts underlying a [habeas] claim are adequately developed," a court must allow discovery whenever "a petitioner has provided a sufficient basis for believing that discovery may be necessary to adequately explore a petitioner's claim for relief." *Id*. Accordingly, a court may not deny a petitioner's discovery motion "if there is a sound basis for concluding that the requested discovery might allow him to demonstrate" his entitlement to relief. *Id*. This is never more so than in the context of a capital case, where the unique finality and irreversibility of the sentence require heightened procedural safeguards. *See*, *e.g.*, *Kyles v. Whitley*, 514 U.S. 419, 422 (1995) (Court's "duty to search for constitutional error with painstaking care is never more exacting than it is in a capital case"). Because Petitioner is under sentence of death, broad discovery is necessary to ensure the extra measure of process that is demanded in capital cases. Accordingly, Petitioner seeks permission to employ the Federal Rules of Civil Procedure, including the use of depositions (Rule 30) and interrogatories (Rule 33).

### III. <u>Specific Discovery Requests</u>[3]

#### A. Trial and Appellate Files of the U.S. Attorney's Office for the Western District of North Carolina and the Department of Justice.

Petitioner has raised ineffective assistance of counsel claims (Claim I), a *Brady/Giglio* claim (Claim V), and other claims pertaining to the conduct of the government in prosecuting this capital case (Claims II, IV, and VI) in his § 2255 petition.

---

[3] Should the Government assert that any of the following items are subject to a privilege and are therefore protected from disclosure in full or in part, Petitioner requests that the Government comply with Fed.R.Civ.P. 26(b)(5). Thus, should the Government assert a privilege in response to any of the following requests, it should: "describe the nature of the documents, communications or things not produced or disclosed in a manner that, without revealing information itself privileged or protected, will enable other parties to assess the applicability of the privilege or protection." Should the Government assert a privilege as to portions of a document, communication or thing that is requested, Petitioner requests that the Government describe the ostensibly protected portion as required under Rule 26(b)(5), and disclose those portions not covered by the privilege being asserted.

**JA145**

As a preliminary matter, Petitioner's on-going investigation of these claims has been impeded by the absence of Petitioner's trial files. Moreover, while the U.S. Attorney's Office has produced information in response to the Court's order to provide Petitioner with trial discovery and correspondence with prior trial counsel [Doc. 17], Petitioner respectfully believes that additional information exists that the government "possessed" or should have "possessed" and which has not yet been produced. This includes witness interview summaries, reports, FBI FD-302s, as well as information concerning its experts and those experts' raw data and materials. It is unclear whether this missing information was not produced to trial counsel, or perhaps was produced to trial counsel but has inadvertently not been produced to Petitioner in post-conviction.[4]

As part of the government's earlier production, Petitioner did not receive (and, thus, does not possess) any witness statements generated by law enforcement during the course of its investigation into the murders of Robin Williams and Donnie Allen concerning a number of witnesses, including, but not limited to: Brian Ard, Alesha Chambers, Jasper Chambers, Joanna Baldwin Coleman, Crystal Dennis, Natasha Heard (Tolbert), Shirley Parker, and Angela Rosser. Thus, Petitioner's request includes, but is not limited to, any and all records regarding:

(1) Government witnesses offered in support of aggravation, including but not limited to prosecution, police, investigative, incarceration, medical, mental health, drug treatment, employment, welfare, social services, and child protective services records regarding prosecution witnesses in the possession or control of the Office of the United States Attorney, Federal Bureau of Investigation, and/or the Charlotte-Mecklenburg Police Department.

---

[4] On June 25, 2002, the Court ordered, *inter alia*, that the government "shall provide" the defendant with "[a]ll raw data pertaining to any mental health test administered to the defendant during the testing by the mental health experts"; "[a]ll documents pertaining to any mental health or physical examination conducted on the defendant which the mental health expert relies upon to any extent for his report"; and "[a]ll tape recordings or transcripts made during the course of the examinations." [Doc. 546]

**JA146**

In addition, as noted above, Petitioner did not receive any information from the government concerning its expert witnesses, including Dr. Scott Duncan, Dr. William Grant, Dr. Park Dietz, and Peter Carlson.[5]  Information concerning these witnesses is critically important for purposes of establishing the alleged ineffective assistance of counsel claims, and assessing the extent to which a *Brady/Giglio* claim exists.

For example, the government called Dr. Park Dietz, a forensic psychiatrist, to testify in rebuttal on August 8, 2002.  During the government's qualifying of Dr. Dietz as an expert, the prosecution noted that Dr. Dietz was "an expert in the case of Andrea Yates, the woman who drowned her children in the bathtub[.]" [2002 Tr. 3793-94]  Not mentioned during Dr. Dietz's testimony was the fact that Dr. Dietz, prior to his testimony in Petitioner's 2002 trial, had given materially false testimony in the Yates case (which later resulted in a reversal of her convictions).

At a minimum, information concerning Dr. Dietz's false statements "would have been relevant to demonstrate the doctor's fallibility."  *United States v. Purkey*, 428 F.3d 738, 759 (8th Cir. 2005).  Given the critical role that Dr. Dietz played in the government's case—"I contend to you, ladies and gentlemen, that the clearest explanation of Marc came from Dr. Dietz, Marc Barnette is narcissistic, he sees himself as the center of the universe and all things revolve around him and his needs; if anything gets out of whack, he reacts violently" [2002 Tr. 3935]—any information concerning his credibility would have been particularly important and material.[6]  Whether the government failed to disclose this information and/or whether trial counsel unreasonably failed to utilize this information is as yet unknown in the absence of discovery.[7]

---

[5] The only reference to any of these prosecution experts contained in the materials produced to post-conviction counsel thus far is in a letter dated December 24, 1997 from the Bureau of Prisons to the U.S. Attorney's Office that references scheduling a time for Dr. Grant and Dr. Duncan to conduct their evaluation of Petitioner.

[6] The government's reliance on Dr. Dietz's testimony, and their vouching for his credibility, permeated closing arguments.  *See*, *e.g*., 2002 Tr. 3939: "Contrast that, ladies and gentlemen, with the Government's expert, Dr. Park Dietz. Dr. Dietz looked you in the eye and said, Marc Barnette was not psychotic at the time of these crimes, Marc Barnette's choices were not predetermined by he [sic] childhood, childhood risk factors do not cause adult behavior,

Thus, Petitioner's request includes, but is not limited to, any and all records regarding:

(2) Government experts offered during trial, including but not limited to reports, draft reports, communications (*e.g.*, letters, emails, etc.) with counsel, raw data, and other materials that were provided to such experts and/or relied upon by them.

In furtherance of this request, Petitioner seeks permission to employ the Federal Rules of Civil Procedure, including the use of depositions (Rule 30) and interrogatories (Rule 33), to supplement whatever documentary production the government makes in response to this request.

### B.  Prosecutorial File of the Mecklenburg County District Attorney's Office.

Petitioner has raised ineffective assistance of counsel claims (Claim I), a *Brady/Giglio* claim (Claim V), and other claims pertaining to the conduct of the government in prosecuting this capital case (Claims II, IV, and VI) in his § 2255 petition.  In order to fully investigate and litigate these claims, Petitioner requires production of the prosecutorial file from the Mecklenburg County District Attorney's Office.

---

Marc Barnette's behavior was not programmed. He told you this was two crimes with two distinct motives, this was not a domestic homicide, and he told you that Marc Barnette has told so many stories in the past that it's not possible to know what happened. Plain language, plain opinions."

[7] Petitioner requests that the Court order the Government to require the F.B.I. to conduct a thorough search of the relevant computer systems to insure that Petitioner has been provided with all reports in this case.  As part of its search, Petitioner also requests that the Government ascertain whether there are any written communications between law enforcement agents or the Government and any prisoner witness in this case and to provide any such documents.

**JA148**

Shortly following his arrest on June 25, 1996, Petitioner was remanded to state custody on murder and robbery with dangerous weapon charges in Mecklenburg County. *See* Case Nos. 96CRS33122-3. On February 4, 1997, Petitioner was federally indicted in the Western District of North Carolina for, *inter alia*, the murders of Donald Allen and Robin Williams. *See* Case No. 3:97cr23. The state charges against Petitioner were later dismissed on October 1, 1997. Although the Mecklenburg County District Attorney's Office subsequently dismissed state charges against Petitioner once the federal government elected to pursue a prosecution and bypass the state court system, Petitioner nevertheless has a right to the prosecutorial file of the Mecklenburg County District Attorney's Office. *Cf.* N.C.G.S. § 15A-1415(f).

Particularly in light of the fact that Petitioner still lacks volumes of information from his as-yet-unproduced trial files, only by the production of all relevant files will Petitioner, and, ultimately, this Court, be confident that Petitioner has been afforded every opportunity for discovery.

In furtherance of this request, Petitioner seeks permission to employ the Federal Rules of Civil Procedure, including the use of depositions (Rule 30) and interrogatories (Rule 33), to supplement whatever documentary production the government makes in response to this request.

**JA149**

**C. Complete Investigative Files of the Charlotte-Mecklenburg Police Department, the Roanoke Police Department, and the Federal Bureau of Investigation.**

In relation to Petitioner's Claims I, II, IV, V, and VI, and for the reasons asserted in the aforementioned requests for the prosecutorial files of the U.S. Attorney's Office for the Western District of North Carolina, the Department of Justice, and the Mecklenburg County District Attorney's Office, Petitioner is entitled to the complete investigative files of the Charlotte-Mecklenburg Police Department, the Roanoke Police Department, and the Federal Bureau of Investigation.

In furtherance of this request, Petitioner seeks permission to employ the Federal Rules of Civil Procedure, including the use of depositions (Rule 30) and interrogatories (Rule 33), to supplement whatever documentary production the government makes in response to this request.

**D. Petitioner's Bureau of Prisons Records.**

In relation to Claims I and V, Petitioner sees discovery of all documents, files, materials and other information in the possession or control of the Bureau of Prisons concerning his incarceration through August 13, 2002. Since the appointment of post-conviction counsel in this matter, Petitioner, through undersigned counsel, has sought to obtain all of Petitioner's Bureau of Prisons records by way of authorized release and Freedom of Information Act requests. To date, post-conviction counsel has not received all responsive documents and materials from the Bureau of Prisons. A Court Order directing the prompt production of these documents would likely produce the records in question.

In furtherance of this request, Petitioner seeks permission to employ the Federal Rules of Civil Procedure, including the use of depositions (Rule 30) and interrogatories (Rule 33), to supplement whatever documentary production the government makes in response to this request.

11

**E. Information Pertaining to Jury Selection in the Western District of North Carolina.**

In relation to Petitioner's jury-composition and selection related claims (Claims II and IV), Petitioner is entitled to the following information:

(1) Complete and unexpurgated copies of the government's copies of juror questionnaires in this case, including all notations regarding the race or gender of the jurors.

(2) Complete and unexpurgated copies of any notes, memoranda, and recordings of any kind made by the government in preparation for or during voir dire in this case.

(3) Complete and unexpurgated copies of the government's copies of juror questionnaires, with accompanying work product associated with jury selection and preparation for jury selection, in all cases in which the two Assistant U.S. Attorneys who prosecuted his case have participated as prosecutors.

(4) A description of any training and instruction, including topics, speakers, modes of presentation, and dates, that the United States Attorney's Office for the Western District of North Carolina provides to its attorneys regarding jury selection.

(5) Any training guide, manual, chapter, videotape, audiotape or other training material regarding jury selection in the possession of any attorney in the employ of the United States Attorney's Office for the Western District of North Carolina.

(6) The name and number of any case prosecuted by either of the Assistant U.S. Attorneys who prosecuted his case in which challenges were made under *Batson*.

(7) The title, forum, dates and written materials from any lecture, speech or panel regarding jury selection in which either of the Assistant U.S. Attorneys who prosecuted his case have participated.

Petitioner further requests a Court Order or permission to subpoena the following from the Clerk and/or Jury Administrator:

(1) Any and all summons, tapes, records or documents of prospective jurors for the years 2000, 2001, and 2002.

(2) Any and all documents, records, memoranda, correspondence or other records regarding the selection of prospective jurors for jury duty during the years 2000-2002, including but not limited to: records, documents, memoranda, correspondence regarding the race of jurors selected for jury duty during the years 2000-2002, and records, documents, memoranda, correspondence regarding the methods and procedures used for selection of prospective jurors during the years 2000-2002.

12

**JA151**

(3) Any and all documents, records, memoranda, correspondence or other records regarding the selection of prospective jurors during the specific trial term in which Petitioner was tried in July and August, 2002, including but not limited to: records, memoranda, correspondence or other records regarding the selection of the prospective jurors; the race of the prospective jurors; and, the methods and procedures for selecting that

In furtherance of this request, Petitioner seeks permission to employ the Federal Rules of Civil Procedure, including the use of depositions (Rule 30) and interrogatories (Rule 33), to supplement whatever documentary production the government makes in response to this request.

**F. Discovery Related to the Racially Biased Manner in which the Federal Death Penalty is Administered.**

Petitioner has alleged in Claim VI that the Federal Death Penalty Act is administered in a racially biased manner. Although the statistics proffered by Petitioner are compelling, he requires discovery regarding the role of race in the DOJ authorization process.

Petitioner asserts that the Government improperly relied upon his race as a reason for certifying this case as a death penalty case in the first instance, and as a reason why it was not decertified after the case was remanded for a second penalty phase trial. If either of these allegations are true, then he is entitled to a new trial or a reduction of his sentence to life in prison.

13

**JA152**

In *Wayte v. United States*, 470 U.S. 598 (1985), the Supreme Court held that "[i]t is appropriate to judge selective prosecution claims according to ordinary equal protection standards." *Id.* at 609 (footnote omitted). The same applies to the Petitioner's claims. To succeed on his claims, Petitioner must show that the federal prosecutorial policy had both a discriminatory effect and a discriminatory intent. *United States v. Armstrong*, 517 U.S. 456, 465 (1996). Initially, Petitioner needs to show "that the totality of the relevant facts gives rise to an inference of discriminatory purpose." *Batson*, 476 U.S. 79, 94 (1986). Once this case is made, the burden shifts to the prosecution to defend its conduct. To do so, the government must offer concrete factual explanations; "[t]he State cannot meet this burden on mere general assertions that its officials did not discriminate or that they properly performed their official duties." *Id.*

While Petitioner has proffered compelling statistics about the disproportionate use of the federal death penalty against racial minorities, *McCleskey v. Kemp*, 481 U.S. 279 (1987), held that such statistics alone were insufficient to demonstrate discriminatory application of the death penalty. *McCleskey* does not mean that Petitioner's proffer is irrelevant, but only that by itself, it may not be sufficient to prove his claim.

In *United States v. Jones*, 159 F.3d 969 (6th Cir. 1998), an African American defendant claimed that the government's decision to prosecute him in federal court instead of state case was discriminatory. The court recognized that "[o]bviously, a defendant need not prove his case in order to justify discovery on an issue." *Id.* at 978. Instead, the Court held, a defendant need only produce "some evidence" of discriminatory prosecution in order to obtain discovery. This "some evidence" standard reflects two competing considerations:

14

**JA153**

Forcing the defendant to come forward with some evidence to support a charge of selective prosecution protects the interests in open and frank discussions within prosecutorial offices; protects the government from harassment or delay by criminal defendants; and frees the judicial system of criminal trials [from] irrelevant massive discovery. At the same time, the relatively low burden recognizes that "most of the relevant proof in selective prosecution claims will normally be in the Government's hands.

*United States v. Heidecke*, 900 F.2d 1155, 1158 (7th Cir. 1990) (citations omitted).

Petitioner's claim shows the wisdom of the "some evidence" standard for ordering discovery. On the one hand, he has certainly presented "some evidence" of discriminatory impact and discriminatory intent. On the other hand, he cannot develop this claim further without additional evidence that is in the Government's exclusive control.

Accordingly, Petitioner seeks the following discovery:

(1) For each death penalty prosecution that was "death eligible" from 1988 to date, Petitioner requests that the Government provide it with the names of the defendants, location of the prosecution, the charges, gender and race of the victims and defendants, and the ultimate outcome of the prosecution (including whether there was a guilty plea).

(2) For each case in sub-paragraph "1," Petitioner requests that the Government identify which such cases were referred to the Department of Justice for consideration of pursuit of the death penalty, and the DOJ's resolution of the referral.

(3) For each case in sub-paragraph "1," any written protocols or standards used by the DOJ for evaluation of referrals for consideration of the death penalty.

(4) For Petitioner's prosecution, he requests that the Government provide him with any memos, writings or communications between the local prosecutors and the DOJ regarding the question of whether to pursue the death penalty in his case, both before and after the Fourth Circuit vacated his death sentences in 2000.

In furtherance of this request, Petitioner seeks permission to employ the Federal Rules of Civil Procedure, including the use of depositions (Rule 30) and interrogatories (Rule 33), to supplement whatever documentary production the government makes in response to this request.

**JA154**

### G. Discovery of All Exculpatory Materials.

The Government remains under a continuing duty to disclose all exculpatory evidence in its possession regarding both the issue of guilt/innocence and the sentencing determination, including that evidence stored on the Federal Bureau of Investigation's "I drive." Accordingly, Petitioner requests that this Court issue an order directing the Government to provide any and all exculpatory evidence or materials in its possession or control.

In furtherance of this request, Petitioner seeks permission to employ the Federal Rules of Civil Procedure, including the use of depositions (Rule 30) and interrogatories (Rule 33), to supplement whatever documentary production the government makes in response to this request.

### CONCLUSION

WHEREFORE, for all of the above reasons, those contained in the § 2255 petition, and the entire record of these proceedings, Petitioner respectfully requests the following relief:

A. That the Government provide a written response to any item of requested discovery to which it objects;

B. That any such written objections include precise descriptions of the documents or things about which the Government objects, along with a description of any withheld item or document, in conformity with Fed.R.Civ.P. 26(b)(5);

C. That the Court permit Petitioner to file a reply memorandum following receipt of the Government's response;

D. That the Court conduct argument on Petitioner's motion;

E. That the Court conduct evidentiary hearings on any material fact in controversy that is relevant to the disposition of this discovery motion; and

F. That the Court grant Petitioner's discovery motion in all respects.

**JA155**

Dated: July 19, 2013

/s/ Mark E. Olive
N.C. State Bar No. 10615
LAW OFFICES OF MARK OLIVE
320 W. Jefferson Street
Tallahassee, FL 32301
850-224-0004 (tel)
850-224-3331 (fax)
meolive@aol.com

/s/ Jacob H. Sussman
N.C. Bar No. 31821
TIN FULTON WALKER & OWEN PLLC
301 East Park Avenue
Charlotte, NC 28203
704-338-1220 (tel)
704-338-1312 (fax)
jsussman@tinfulton.com

/s/ Henderson Hill
Henderson Hill
N.C. Bar No. 18563
FEDERAL DEFENDERS OF WESTERN
  NORTH CAROLINA, INC.
129 West Trade Street, Suite 300
Charlotte, NC 28202
704-374-0720 (tel)
704-374-0722 (fax)
henderson_hill@fd.org

17

**JA156**

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that he has served the foregoing motion with the Clerk of Court using the CM/ECF system, which will send notification of such filing to:

Amy Ray
Amy.Ray@usdoj.gov

William M. Miller
William.Miller@usdoj.gov

Dated: July 19, 2013

/s/ Jacob H. Sussman
Counsel for Mr. Barnette

18

**JA157**

IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION
CIVIL NO. 3:12CV327-RLV

AQUILIA MARCIVICCI BARNETTE )
)
Petitioner, )
)
vs. )
)
UNITED STATES OF AMERICA, )
)
Respondent. )
_____)

## GOVERNMENT'S RESPONSE IN OPPOSITION TO PETITIONER'S MOTION FOR DISCOVERY

The United States of America, by and through Anne M. Tompkins, United States Attorney for the Western District of North Carolina, responds in opposition to Petitioner's Motion for Discovery, filed herein on July 19, 2013 (Doc 51). Each of Petitioner's broad claims for discovery either represent an impermissible fishing expedition based on conclusory allegations not connected to any specific factual allegations, or are premised on claims that fail as a matter of law. Because Petitioner fails to show good cause in support of his requests, this Court should, in its discretion, deny Petitioner's motion for discovery.

**JA158**

# BACKGROUND

On February 4, 1997, the Grand Jury for the Western District of North Carolina charged Petitioner Aquilia Marcivicci Barnette in an eleven-count bill of indictment with various crimes relating to the murders of Robin Williams and Donald Lee Allen. (Indictment, 3:97-cr-23, Doc. 1). Three of the counts in the indictment were death eligible offenses, including one count of carjacking resulting in death, in violation of 18 U.S.C. § 2119(3), and two counts of using a firearm during a crime of violence resulting in death, in violation of 18 U.S.C. § 924(i)(1). Following trial, the jury found Petitioner guilty of all eleven counts and, in a bifurcated penalty hearing, recommended a death sentence as to each capital count. (Judgment, 3:97-cr-23, Doc. 323). In an opinion issued May 2, 2000, the United States Court of Appeals for the Fourth Circuit affirmed Petitioner's convictions but vacated the death sentences because of a procedural error during the penalty phase. *United States v. Barnette*, 211 F.3d 803, 825–26 (4th Cir. 2000).

On remand, following a new penalty phase trial, the jury once again recommended a death sentence as to each capital count. (Judgment, 3:97-cr-23, Doc. 600). The Fourth Circuit affirmed Petitioner's new death sentences on December 6, 2004. *United States v. Barnette*, 390 F.3d 775 (4th Cir. 2004). On October 3, 2005, the United States Supreme Court granted Petitioner's petition for

2

a writ of certiorari, vacated Petitioner's death sentence, and remanded for further consideration in light of *Miller-El v. Dretke*, 545 U.S. 231 (2005), in which the Court clarified the procedure for evaluating claims of purposeful discrimination in jury selection under *Batson v. Kentucky*, 476 U.S. 79 (1986). In turn, the Fourth Circuit remanded the matter to this Court for further proceedings. (Mandate, 3:97-cr-23, Doc. 632).

On remand, Petitioner sought a new jury selection and penalty phase trial or, in the alternative, a new evidentiary hearing on his *Batson* challenges. In connection with a new *Batson* hearing, Petitioner also requested that the district court order discovery, requiring the government to turn over all juror questionnaires, including any notes taken by the prosecutors; provide a description of and any materials related to training and instruction given to attorneys in the United States Attorney's Office for the Western District of North Carolina related to jury selection; and disclose the case name, number, and result of any cases in which the prosecutors' peremptory challenges were the subject of a *Batson* challenge. (Brief on Remand, 3:97-cr-23, Doc. 637). In response, this Court ordered the Government to submit unredacted copies of all juror questionnaires for in camera review, (Order, 3:97-cr-23, Doc. 645), but denied Petitioner's request for "broad and far-reaching discovery," concluding that Petitioner was not authorized

3

**JA160**

"to go on a fishing expedition through the Government's files in hopes of finding some damaging evidence." (Order, 3:97-cr-23, Doc. 649). After conducting an evidentiary hearing, this Court ruled that the prosecutors' use of peremptory strikes did not violate *Batson*. (Order, 3:97-cr-23, Doc. 660). The Fourth Circuit affirmed, finding "no merit in [Petitioner's] contentions that the district court committed prejudicial error in the manner in which it conducted the proceedings below or in its findings of fact and legal conclusions on the merits of [Petitioner's] *Batson* claims. *United States v. Barnette*, 644 F.3d 192, 196 (4th Cir. 2011). On March 29, 2012, the Supreme Court denied Petitioner's petition for a writ of certiorari. *Barnette v. United States*, 132 S. Ct. 1740 (2012).

In an order dated May 23, 2012, this Court appointed counsel to pursue post-conviction remedies on behalf of Petitioner. (Doc. 1). On September 17, 2012, this Court conducted a sealed hearing, in which Petitioner's post-conviction counsel and trial counsel Harold Bender appeared. During the hearing, "it was confirmed that all of the attorneys who had represented [Petitioner] in his underlying capital trial and sentencing proceedings . . . had transferred their case files to Mr. Bender, and that Mr. Bender had been unable to locate any trial counsel files from the underlying capital case. (*See* Doc. 17 at 1). Subsequent to the ex parte hearing, the Court ordered the Government to provide Petitioner's

4

**JA161**

habeas counsel with a complete copy of all material previously provided by the United States Attorney to Petitioner's prior trial counsel, including all discovery materials, as well as a complete copy of all correspondence between prosecutors and Petitioner's prior counsel. (Doc. 17). In response to the Court's order, the Government produced several CDs containing thousands of pages of materials, as well as numerous CDs with audio and video files.

On June 19, 2013, in light of the Government's agreement to a three-month extension of time, Petitioner filed his initial motion for relief pursuant to 28 U.S.C. § 2255. (Doc. 48). In the motion, Petitioner raises seven claims for relief, including (1) that he received ineffective assistance of counsel during the penalty phase of his capital trial; (2) that prosecutors engaged in racial discrimination during jury selection and, relatedly, that the way in which this Court conducted the *Batson* proceedings was unconstitutional; (3) that he was deprived of a fair and impartial jury as a result of juror misconduct; (4) that prosecutors engaged in selective prosecution on the basis of race; (5) that prosecutors failed to disclose material exculpatory or impeachment information, in violation of *Brady, Giglio*, *Kyles*, and *Napue*; (6) that the federal death penalty is unconstitutional because it is sought on the basis of race and geography; and (7) that the manner of execution violates the Eighth Amendment's prohibition on cruel and unusual punishment.

(*Id.*).  That same day, Petitioner filed a motion for leave to conduct juror interviews in support of his claim of juror misconduct, (Doc. 49), which this Court denied in a written order on July 18, 2013, (Doc. 50).

On July 19, 2013, Petitioner filed the instant motion for leave to file discovery.  (Doc. 51).  In his motion, Petitioner requests discovery in seven broad categories, including (1) the trial and appellate files of the United States Attorney's Office for the Western District of North Carolina and the Department of Justice, (2) the prosecutorial file of the Mecklenburg County District Attorney's Office, (3) the complete investigative files of the Charlotte-Mecklenburg Police Department, the Roanoke Police Department, and the Federal Bureau of Investigation, (4) Petitioner's Bureau of Prisons Records, (5) information pertaining to jury selection in the Western District of North Carolina, (6) discovery related to the administration of the federal death penalty, and (7) discovery of all exculpatory material.  (*Id.*).

## STANDARD FOR DISCOVERY

A habeas petitioner, unlike a traditional civil litigant, is not entitled to discovery as a matter of course.  *Bracy v. Gramley*, 520 U.S. 899, 904 (1997).  Discovery in this setting can occur only with leave of the court, upon a showing of good cause.  *See* Rule 6(a) of the Rules Governing § 2255 Cases.  A district court

6

**JA163**

possesses broad discretion in determining whether good cause exists. *United States v. Roane*, 378 F.3d at 403 (holding the district court acted within its discretion in denying discovery in a § 2255 capital case). Accordingly, a court should only allow a petitioner to engage in discovery "if, and to the extent that, the judge in the exercise of discretion and for good cause shown, grants leave to do so, but not otherwise." *Id.* at 402 (quoting Rule 6(a)). Good cause, under Supreme Court and Fourth Circuit precedent, exists "where specific allegations before the court show reason to believe that the petitioner may, if the facts are fully developed, be able to demonstrate that he is . . . entitled to relief." *Bracy*, 520 U.S. at 908–09 (citing *Harris v. Nelson*, 394 U.S. 286, 295 (1969)). Thus, good cause does not exist if a defendant premises a discovery request on a claim that fails as a matter of law. *See Thomas v. Taylor*, 170 F.3d 466, 474 (4th Cir. 1999).

Under this standard, a request for discovery must rely on specific factual allegations. *Quesinberry v. Taylor*, 162 F.3d 273, 279 (4th Cir. 1998); *see also Hall v. United States*, 30 F. Supp. 2d 883, 899 (E.D. Va. 1998) ("Good cause . . . requires specificity as to sought information."). Discovery will not be allowed so that the petitioner can "explore [his] case in search of its existence." *See Rich v. Calderon*, 187 F.3d 1064, 1067 (9th Cir.1999). In short, "Rule 6 does not 'sanction fishing expeditions based on a petitioner's conclusory allegations."

7

**JA164**

*Williams v. Bagley*, 380 F.3d 932, 976 (6th Cir. 2004) (quoting *Rector v. Johnson*, 120 F.3d 551, 562 (5th Cir. 1997)) (holding, in a capital case, that the district court acted within its discretion in denying defendant's motion for discovery).

**RESPONSE TO PETITIONER'S DISCOVERY REQUESTS**

1. <u>Trial and appellate files of the United States Attorney's Office for the Western District of North Carolina and Department of Justice.</u>

Petitioner is not entitled to an order directing the Government to provide additional discovery related to the Government's trial files, where in its order dated October 5, 2012, this Court already directed the Government to produce the very files Petitioner now seeks. (*See* Doc. 17). In response to this Court's order, the Government undertook an extensive review of its files and has produced CDs containing thousands of pages of documents, as well as other audio/video recordings. In so doing, the Government believes it has fully complied with the Court's order. To the extent Petitioner has specific concerns, the Government will continue, as it has thus far, to work with Petitioner post-conviction counsel to resolve those issues. There is simply no need for an additional order from this Court directing the Government to provide that which it has already been directed to produce.

2. <u>Prosecutorial files of the Mecklenburg County District Attorney's Office.</u>

Petitioner fails altogether to identify specific factual allegations to support

8

**JA165**

his request for discovery related to the prosecutorial files of the Mecklenburg County District Attorney's Office.  Petitioner asserts, without elaboration, that he needs discovery of these materials to investigate his various claims.  Petitioner's sweeping request amounts to nothing more than an impermissible fishing expedition.  At this point, given the Government's extensive production of its original trial files, Petitioner is not entitled to rest on "broad and unspecific" assertions to support his request for discovery but instead must tie those requests to specific factual allegations demonstrating that he is entitled to relief.  *See United States v. Wilson*, 901 F.2d 378, 382 (4th Cir. 1990) (affirming the denial of § 2255 discovery requests where "[t]he requests were far too broad and unspecfic").  Because Petitioner's broad request fails to satisfy the good cause standard, his request should be denied.

3. <u>Investigative files of the Charlotte-Mecklenburg Police Department, the Roanoke Police Department, and the Federal Bureau of Investigation.</u>

Similarly, Petitioner makes no effort whatsoever to connect his request for the investigative files of the various law enforcement agencies to his alleged claims for relief.  This failure is fatal to his request for discovery.  In light of his conclusory allegations, Petitioner has not demonstrated good cause, and his request should be denied.

**JA166**

4. <u>Bureau of Prison Records</u>.

Again, Petitioner fails to specifically connect his request for Bureau of Prison Records to any of his alleged claims to relief. In short, Petitioner is simply unable to demonstrate how the requested discovery ties to any specific factual allegations. Furthermore, as Petitioner acknowledges, he has access to and has in fact already requested the BOP records via a Freedom of Information Act records request. As such, Petitioner has not shown good cause to justify the exercise of this Court's discretion to enter an order directing discovery of these records.

5. <u>Information related to jury selection</u>.

Petitioner's request for discovery related to jury selection is tied to a claim that fails as a matter of law. Courts have long held that a petitioner "will not be allowed to recast, under the guise of collateral attack, questions fully considered" on direct appeal. *Boeckenhaupt v. United States*, 537 F.2d 1182, 1183 (4th Cir. 1976); *see also Withrow v. Williams*, 507 U.S. 680, 721 (1993) (Scalia, J., concurring) (collecting cases). Petitioner's claim of racial discrimination in jury selection has been fully litigated both in this Court and on direct appeal. In fact, this Court rejected the very requests for discovery that Petitioner now asserts when the case was remanded for reconsideration in light of *Miller-El*. (Order, 3:97-cr-23, Doc. 660). On appeal, the Fourth Circuit affirmed both the procedure adopted

10

**JA167**

by this Court for addressing Petitioner's *Batson* challenge, as well as its conclusion that there was no evidence of racial discrimination. *See Barnette*, 644 F.3d at 196. Accordingly, Petitioner is now barred from relitigating these issues in this collateral attack, and his claim, therefore, fails as a matter of law. Because Petitioner's request is premised on a meritless claim, he is unable to show good cause, and his request should be denied. *See Taylor*, 170 F.3d at 474–75 (concluding that the district court properly exercised its discretion in denying requests for discovery where the requested information would have no bearing on the petitioner's substantive § 2255 claim).

6. <u>Discovery related to the administration of the federal death penalty</u>.

In connection with his claim of selective prosecution, Petitioner requests extensive discovery from the Department of Justice related to the administration of the death penalty from 1988 to the present. Petitioner claims that he has demonstrated good cause for such sweeping requests by providing national statistics related to the federal death row population by race and geographic location. (*See* Doc. 48 at 100–01). As demonstrated below, however, because Petitioner's claim is insufficient as a matter of law he is unable to show good cause for his broad request.

A selective prosecution claim is "an independent assertion that the

11

Case 3:12-cv-00327-MOC   Document 56   Filed 09/09/13   Page 11 of 16

**JA168**

prosecutor has brought the charge for reasons forbidden by the Constitution." *United States v. Armstrong*, 517 U.S. 456, 463 (1996). In *Armstrong*, the Court considered the showing necessary for a defendant to be entitled to discovery on a claim that the prosecutor singled him out for prosecution based on race. *Id.* at 458. The standard for selective prosecution is "a demanding one" because it asks a court "to exercise judicial power over a 'special province' of the Executive." *Id.* at 464. To satisfy this demanding standard, a claimant must show that the decision to prosecute had a discriminatory effect and was motivated by a discriminatory purpose. *Id.* at 465. "To establish a discriminatory effect in a race case, the claimant must show that similarly situated individuals of a different race were not prosecuted." *Id.* In *Armstrong*, the Court concluded that the defendant's showing—including an affidavit of an employee of the Federal Public Defender that averred all crack defendants represented by the office were black and a newspaper article—did not suffice to warrant discovery on defendants' selective prosecution claim. *Id.* at 471.

The Court later applied *Armstrong* in the death penalty realm, rejecting a request for discovery based on statistics similar to those presented by Petitioner in this case. In *United States v. Bass*, 536 U.S. 862 (2002) (per curiam), the defendant asserted that the government sought the death penalty against him

12

because of his race.  The appellate court determined that the defendant had made a credible showing that similarly situated individuals of a different race were not prosecuted based upon his providing nationwide statistics demonstrating that "the United States charges blacks with a death-eligible offense more than twice as often as it charges whites."  *Id.* at 863.  The Supreme Court reversed the appellate court, holding as follows:

> Even assuming that the *Armstrong* requirement can be satisfied by a nationwide showing (as opposed to a showing regarding the record of the decision-makers in respondent's case), raw statistics regarding overall charges say nothing about charges brought against *similarly situated defendants*.

*Id.* at 863–64 (emphasis in original).  As in *Armstrong*, the Court found that the defendant's showing did not warrant discovery on his selective prosecution claim.

Similarly, in *United States v. Lighty*, 616 F.3d 321, 369–70 (4th Cir. 2010), the Fourth Circuit affirmed the district court's denial of the defendant's request for discovery in support of a claim of selective prosecution.  The defendant presented national statistics regarding the number of African-Americans on death row relative to the general population, as well as among the prison population.  *Id.* at 369.  Concluding that the statistics were insufficient, the *Lighty* court explained that "[i]n order to obtain discovery on a selective-prosecution claim, a defendant must make a 'credible showing of different treatment of similarly situated

13

persons,'" noting that "[t]his showing 'should itself be a significant barrier to the litigation of insubstantial claims.'" *Id.* at 369–70 (quoting *Armstrong*, 517 U.S. at 464, 470)). Furthermore, the Fourth Circuit affirmed the denial of the defendant's request for discovery, holding that he "made no showing that he was similarly situated to non-African-Americans who were not facing the death penalty for engaging in similar conduct" and that "[t]he lack of such evidence [was] fatal to his attempt to obtain discovery because such evidence is necessary to show that there were no 'distinguishable legitimate prosecutorial factors' that would justify a 'different prosecutorial decision.'" *Id.* at 370 (quoting *United States v. Olvis*, 97 F.3d 739, 744 (4th Cir. 1996)); *see also United States v. Jones*, 287 F.3d 325, 332–35 (5th Cir. 2002) (declining to issue a certificate of appealability where petitioner's evidence in support of his claim of racial bias and geographic selectivity in the administration of the federal death penalty failed to show that he was singled out for prosecution while others who were similarly situated were not).

In sum, to establish a claim of selective prosecution based on race, Petitioner must demonstrate that he was similarly situated to other non-African-American defendants who did not face the death penalty. And, in order to show good cause, Petitioner must present "specific allegations" that demonstrate he is entitled to relief before he can obtain discovery. *See Bracy* 520 U.S. 908–09. Accordingly,

14

**JA171**

because Petitioner fails altogether to raise any allegations regarding similarly situated individuals, he is not entitled to the sweeping discovery he requests in support of his selective prosecution claim.

7. <u>Unidentified exculpatory materials</u>.

Petitioner's final request for "all exculpatory evidence," like the *Brady* claim in his § 2255 motion, is speculative and devoid of any specific factual allegations. Accordingly, Petitioner is unable to show good cause and his claim fails.

## <u>CONCLUSION</u>

For the foregoing reasons, the Government respectfully requests that this Court deny Petitioner's motion for discovery.

RESPECTFULLY SUBMITTED, this the 9th day of September, 2013.

ANNE M. TOMPKINS
UNITED STATES ATTORNEY

<u>/s/William M. Miller</u>
Assistant United States Attorney
NC Bar No. 36946
United States Attorney's Office
227 West Trade Street, Suite 1650
Charlotte, North Carolina 28202
(704) 704-344-6222 (phone)
(704) 344-6629 (fax)
William.Miller@usdoj.gov

15

**JA172**

## CERTIFICATE OF SERVICE

I certify that a copy of the foregoing *Motion for Extension* was served on counsel for Petitioner via electronic case filing.

This the 9th day of September, 2013.


                    s/ William M. Miller
                    Assistant United States Attorney

16

**JA173**

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>vs.<br><br>AQUILIA MARCIVICCI BARNETTE | **DEATH PENALTY § 2255** |

## PETITIONER AQUILIA MARCIVICCI BARNETTE'S REPLY TO GOVERNMENT'S RESPONSE IN OPPOSITION TO MOTION FOR DISCOVERY

Subsequent to the government's responsive filing on September 9, 2013, the parties conferred about the status of the government's response to the Court's existing order from October 5, 2012 [Doc. 17], which is referenced in Petitioner's motion as Item A. The parties have agreed that the government will continue to review its trial and appellate files in search of discovery materials subject to the Court's existing order not yet produced. The parties have agreed that the government should have until **October 31, 2012** to conduct this review, after which point the parties will report to the Court whether this particular discovery matter has been resolved. Thus, the parties jointly request that the Court hold discovery matters in abeyance until the parties report back after October 31, 2012.

With respect to the government's responses to Petitioner's other discovery requests (Items B-G), the prosecution incorrectly asserts that Petitioner fails to show good cause in support of his requests. Ignoring the specific factual allegations raised in Petitioner's § 2255 motion, the government has not demonstrated why this Court should deny Petitioner the right to discovery in this death penalty case. Petitioner has met the "good cause" standard required by law.

1

**JA174**

In its response, the prosecution gives short shrift to the principles and purposes underlying discovery in the context of a capital habeas case:

> [T]he rule's history makes clear that its purpose is to ensure that the facts underlying a habeas corpus claim are adequately developed, and that it is a court's obligation to allow discovery in cases in which a petitioner has provided a sufficient basis for believing that discovery may be necessary to adequately explore a petitioner's claim for relief.

*Romero v. Beard*, CIV.A. 08-0528, 2011 WL 3862317 (E.D. Pa. Aug. 31, 2011) (quoting *Johnston v.* Love, 165 F.R.D. 444, 445 (1996)). The prosecution also fails to acknowledge the Court's "duty to search for constitutional error with painstaking care is never more exacting than it is in a capital case." *Kyles v. Whitley*, 514 U.S. 419, 422 (1995).

Petitioner's discovery motion directly links each discovery request to specific factual allegations raised in his § 2255 motion—allegations that, "if the facts are fully developed [would] demonstrate that he is entitled to relief." *Royal v. Taylor,* 188 F.3d 239, 249 (4th Cir. 1999) (internal quotes omitted); *see also Quesinberry v. Taylor,* 162 F.3d 273, 279 (4th Cir.1998) (same). Accordingly, "it is the duty of the courts to provide the necessary facilities and procedures for an adequate inquiry." *Murphy v. Johnson,* 205 F.3d 809, 814 (5th Cir.2000) (citing *Bracy,* 520 U.S. at 909).

## I.    Petitioner's Specific Discovery Requests

### A. Trial and Appellate Files of the U.S. Attorney's Office for the Western District of North Carolina and the Department of Justice.

As noted above, post-conviction counsel have conferred with AUSA William Miller concerning this discovery request, which the government has already been directed to provide pursuant to the Court's Order from October 5, 2012. [Doc. 17] The parties have agreed that the government should have until **October 31, 2013** to continue its review of its trial and appellate files in an effort to comply with the Court's existing order. At that point in time, the parties will

2

**JA175**

report to the Court concerning the status of this unresolved discovery matter.

**B. Prosecutorial File of the Mecklenburg County District Attorney's Office.**

Petitioner has established good cause for this discovery request. As asserted in his discovery motion, these files are directly related to Petitioner's claims of ineffective assistance of counsel (Claim I), *Brady/Giglio* violations (Claim V), and the conduct of the government in prosecuting this capital case (Claims II, IV, and VI). In Petitioner's § 2255 motion, and in each instance, Petitioner has raised "specific allegations … that [he] may, if the facts are fully developed, be able to demonstrate that he is entitled to relief.'" *Royal v. Taylor,* 188 F.3d 239, 249 (4th Cir. 1999) (quoting *Bracy v. Gramley,* 520 U.S. 899, 908–09 (1997)).

The need for this information is particularly acute given the federal government's failure thus far to comply with the Court's October 5, 2012 Order. Although the Mecklenburg County District Attorney's Office did not retain jurisdiction over the case once the federal government elected to pursue its own prosecution, the Mecklenburg County District Attorney's Office nonetheless was in charge of this matter for a number of critical months while law enforcement was conducting its investigation. It is reasonable to believed that much of the information that the federal government is presently obliged to produce—but has not—was kept and maintained in the prosecutorial files of the Mecklenburg County District Attorney's Office.

3

**C. Complete Investigative Files of the Charlotte-Mecklenburg Police Department, the Roanoke Police Department, and the Federal Bureau of Investigation.**

Here, again, Petitioner has established good cause for this discovery request. As asserted in his discovery motion, these files are directly related to Petitioner's claims of ineffective assistance of counsel (Claim I), *Brady/Giglio* violations (Claim V), and the conduct of the government in prosecuting this capital case (Claims II, IV, and VI). In Petitioner's § 2255 motion, and in each instance, Petitioner has raised "specific allegations … that [he] may, if the facts are fully developed, be able to demonstrate that he is entitled to relief.'" *Royal v. Taylor,* 188 F.3d 239, 249 (4th Cir.) (quoting *Bracy v. Gramley,* 520 U.S. 899, 908–09 (1997)).

As noted above, the need for this information is particularly acute given the federal government's failure thus far to comply with the Court's October 5, 2012 Order. The Charlotte-Mecklenburg Police Department, the Roanoke Police Department, and the Federal Bureau of Investigation conducted the investigation; they would have produced (and likely maintained) witness statements which, to date, the federal government has not yet produced (including evidence stored on the Federal Bureau of Investigation's "I drive").

**D. Petitioner's Bureau of Prisons Records.**

Contrary to the government's claim that Petitioner has not shown good cause to justify a court order for the Bureau of Prisons to produce Petitioner's records, Petitioner makes clear that these records pertain to his claims of ineffective assistance of counsel (Claim I) and *Brady/Giglio* violations (Claim V). Indeed, much of Petitioner's retrial in 2002 was focused on his adjustment to the Bureau of Prisons. As made clear in his discovery motion, to date and despite due diligence, post-conviction counsel has not received all responsive documents and materials from the Bureau of Prisons.

4

**JA177**

The U.S. Attorney's Office has not produced any Bureau of Prisons records in response to the Court's October 5, 2012 order, and fails to explain how, if it all, such an order directed to the Bureau of Prisons would not be justified here. Thus, a court order directing the prompt production of these documents would materially assist in the resolution of this discovery issue.

**E. Information Pertaining to Jury Selection in the Western District of North Carolina.**

The Court's prior rejection of Petitioner's request for discovery related to the jury selection was prior to Petitioner's filing of his § 2255 motion. In light of Petitioner's specific claims related to jury selection, his request is supported by good cause. Moreover, Petitioner's discovery request seeks information not previously sought.

**F. Discovery Related to the Racially Biased Manner in which the Federal Death Penalty is Administered.**

The statistics proffered by Petitioner concerning the administration of the Federal Death Penalty at and around the time of Petitioner's trials are compelling and strongly suggest, if not lay bare, the insidious role that race played in twice prosecuting this capital case. Moreover, the fact that Petitioner's was the first capital prosecution brought in the Western District of North Carolina is *prima facie* evidence that his case was singled out—selected from all others before it—to be tried capitally. Petitioner was thus, *ipso facto*, treated different from all other persons charged with murder, including all other similarly situated defendants.

**G. Discovery of All Exculpatory Materials.**

The government's continuing duty to disclose all exculpatory evidence in its possession regarding both the issue of guilt/innocence and the sentencing determination is ongoing and particularly important given its failure to abide the Court's October 5, 2012 Order.

5

**JA178**

# **CONCLUSION**

WHEREFORE, for all of the above reasons, those contained in the § 2255 petition, Petitioner's Motion for Discovery, and the entire record of these proceedings, Petitioner respectfully requests that the Court grants his motion for discovery.  For the reasons stated above, however, Petitioner respectfully requests that the Court hold any ruling on discovery matters until after the government and Petitioner report to the Court after October 31, 2013 whether the existing discovery matter concerning the trial and appellate files of the U.S. Attorney's Office for the Western District of North Carolina and the Department of Justice has been resolved.


Dated: September 16, 2013

/s/ Mark E. Olive
N.C. State Bar No. 10615
LAW OFFICES OF MARK OLIVE
320 W. Jefferson Street
Tallahassee, FL 32301
850-224-0004 (tel)
850-224-3331 (fax)
meolive@aol.com

/s/ Jacob H. Sussman
N.C. Bar No. 31821
TIN FULTON WALKER & OWEN PLLC
301 East Park Avenue
Charlotte, NC 28203
704-338-1220 (tel)
704-338-1312 (fax)
jsussman@tinfulton.com

/s/ Henderson Hill
Henderson Hill
N.C. Bar No. 18563
FEDERAL DEFENDERS OF WESTERN
  NORTH CAROLINA, INC.
129 West Trade Street, Suite 300
Charlotte, NC 28202
704-374-0720 (tel)
704-374-0722 (fax)
henderson_hill@fd.org

6

**JA179**

# CERTIFICATE OF SERVICE

The undersigned hereby certifies that he has served the foregoing motion with the Clerk of Court using the CM/ECF system, which will send notification of such filing to:

William M. Miller
William.Miller@usdoj.gov

Dated: September 16, 2013

/s/ Jacob H. Sussman
Counsel for Mr. Barnette

7

**JA180**

UNITED STATES OF AMERICA

vs.

AQUILIA MARCIVICCI BARNETTE

DEATH PENALTY § 2255

### PETITIONER AQUILIA MARCIVICCI BARNETTE'S SUPPLEMENTAL BRIEF CONCERNING THE GOVERNMENT'S PRODUCTION OF INFORMATION IN ACCORDANCE WITH THE COURT'S ORDER

As of July 19, 2013, when Petitioner filed his motion for discovery, the government had not yet produced witness statements from a number of prosecution witnesses, including, but not limited to: Brian Ard, Alesha Chambers, Jasper Chambers, Joanna Baldwin Coleman, Crystal Dennis, Natasha Heard (Tolbert), Shirley Parker, and Angela Rosser. *Motion for Discovery* at 7 [Doc. 51]. Moreover, the government had not yet produced any Grand Jury materials or information concerning its testifying experts.

On November 15, 2013, undersigned counsel received a diskette containing 165 pages of additional discovery from the prosecution. This production was made pursuant to the Court's Order, dated October 5, 2012. [Doc. 17] The 165 pages consist of the following:

- Interview with Alicia Chambers by ATF S/A Modzelewski (12/30/97) [3445-3446]
- Letter from associate at Camelot Music in Roanoke, Virginia, to Beth McCluney at the U.S. Attorney's Office concerning two Renee Worgan and Shirley Denise Williams, two former co-workers of Petitioner's. [3447-3448]
- Personnel file for Shirley Denise Williams [3449-3469]
- Report of government experts Drs. William Grant and Scott Duncan [3471-3509]
- CV of government expert Dr. Scott Duncan [3510-3516]
- CV of government expert Dr. William Grant [3604-3609]

1

**JA181**

- Fax with accompanying letter from prosecution to defense counsel concerning government expert Dr. Park Dietz [3517-3518]
- Report government expert Dr. Park Dietz [3519-3536]
- CV of government expert Dr. Park Dietz [3537-3599]
- CV of government expert Peter Carlson [3600-3603]

Respectfully, the government's production pursuant to the Court's Order remains deficient.

The government's production on November 15, 2013 provided a single witness statement concerning Alicia Chambers. Notably, the interview report of Ms. Chambers was conducted only two weeks prior to the start of jury selection in the first trial, and was clearly focused on eliciting information to be used at sentencing. Thus, it is logical and reasonable to expect that the government conducted other such interviews in the lead up to trial of the aforementioned prosecution witnesses (as well as others). No such information has been provided to undersigned counsel to date, however, and it is as yet unclear whether the prosecution has attempted to locate this information from the various law enforcement agencies involved (*e.g.*, ATF, FBI, CMPD, etc.). In addition, the government has still not provided Grand Jury transcripts for its testifying witnesses.

In Petitioner's discovery motion, Petitioner also stressed the absence of information from the government concerning its expert witnesses, including Dr. Scott Duncan, Dr. William Grant, Dr. Park Dietz, and Peter Carlson. *Motion for Discovery* at 8 [Doc. 51] The government's production on November 15, 2013 provided reports from Drs. Scott and Grant, as well as Dr. Dietz, and CV's for all four experts. Still missing, however, are "draft reports, communications (*e.g.*, letters, emails, etc.) with counsel, raw data, and other materials that were provided to such experts and/or relied upon by them." [Doc. 17]

Upon information and belief, the "raw data" relied upon by the government's experts include, but are not limited to, the following:

- Interviews of Tasha Heard, Alicia Chambers, and Kesha Heard conducted by government experts Drs. William Grant and Scott Duncan, which are referenced in their report and selectively quoted therefrom. To date, however, the government has not provided any raw data concerning those interviews (e.g., transcripts, recordings, notes, etc.).

- Interview of Petitioner by government expert Dr. Park Dietz, which is referenced in his report and selectively quoted therefrom. Although Dr. Dietz notes in his report that "[a] digital audiotape was produced" from the two day examination of Petitioner, to date, however, the government has not provided any such data.

This critically important information has not, to date, been produced.

As the Court previously noted, "these materials [are needed] to assist Barnette" in the litigation of his § 2255 claims. [Doc. 17] Accordingly, undersigned counsel respectfully requests that the Court direct the prosecution to take reasonable additional steps, including, but not limited to, contacting law enforcement agencies and experts previously involved in this matter to request the material identified in the Court's Order [Doc. 17] but yet not produced to post-conviction counsel.

3

Dated: December 6, 2013

/s/ Mark E. Olive
N.C. State Bar No. 10615
LAW OFFICES OF MARK OLIVE
320 W. Jefferson Street
Tallahassee, FL 32301
850-224-0004 (tel)
850-224-3331 (fax)
meolive@aol.com

/s/ Jacob H. Sussman
N.C. Bar No. 31821
TIN FULTON WALKER & OWEN PLLC
301 East Park Avenue
Charlotte, NC 28203
704-338-1220 (tel)
704-338-1312 (fax)
jsussman@tinfulton.com

/s/ Henderson Hill
Henderson Hill
N.C. Bar No. 18563
FEDERAL DEFENDERS OF WESTERN
   NORTH CAROLINA, INC.
129 West Trade Street, Suite 300
Charlotte, NC 28202
704-374-0720 (tel)
704-374-0722 (fax)
henderson_hill@fd.org

4

**JA184**

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that he has served the foregoing motion with the Clerk of Court using the CM/ECF system, which will send notification of such filing to:

William M. Miller
William.Miller@usdoj.gov

Dated: December 6, 2013

/s/ Jacob H. Sussman
Counsel for Mr. Barnette

5

**JA185**

| | | |
|---|---|---|
| AQUILIA MARCIVICCI BARNETTE, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| vs. | ) | **ORDER** |
| | ) | |
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Respondent. | ) | |
| _____ | ) | |

**THIS MATTER** is before the Court upon Petitioner Aquilia Marcivicci Barnette's

Motion for Discovery.  ECF No. 51.  He seeks discovery related to the claims raised in his

Motion to Vacate, Set Aside or Correct Sentence pursuant to 28 U.S.C. § 2255.  ECF No. 48.

PROCEDURAL HISTORY

On January 27, 1998, Petitioner was convicted in the United States District Court for the

Western District of North Carolina of various crimes relating to the murders of Robin Williams

in Virginia, and Donald Lee Allen in North Carolina.  Jury Verdict, 3:97cr23, Doc. 289.  The

trial jury recommended, and the court imposed, a death sentence for three of the convictions:

one count of carjacking resulting in death, in violation of 18 U.S.C. § 2119(3), and two counts of

using a firearm during a crime of violence resulting in death, in violation of 18 U.S.C. §

924(i)(1).  Special Jury Verdict, 3:97cr23, Doc. No. 309; Judgment, 3:97cr23, Doc. 323.  The

Fourth Circuit Court of Appeals affirmed Petitioner's convictions but vacated the death

sentences because of a procedural error during the penalty phase.  United States v. Barnette, 211

F.3d 803, 825–26 (4th Cir. 2000) (Barnette I).

Following new penalty proceedings before a different jury, Petitioner once again was

1

JA186

sentenced to death for each capital count.  Judgment, 3:97cr23, ECF No. 600.  The Fourth

Circuit affirmed.  United States v. Barnette, 390 F.3d 775 (4th Cir. 2004) (Barnette II).  The

United States Supreme Court granted Petitioner a writ of certiorari, vacated his death sentences,

and remanded his case to the Fourth Circuit for further consideration in light of Miller-El v.

Dretke, 545 U.S. 231 (2005), in which the Court clarified the procedure for evaluating claims of

purposeful discrimination in jury selection under Batson v. Kentucky, 476 U.S. 79 (1986).

Barnette v. United States, 546 U.S. 803 (2005) (mem.).  In turn, the Fourth Circuit remanded the

matter to this Court for further proceedings.  Judgment, United States v. Barnette, No. 02-20 (4th

Cir. Aug. 28, 2007), ECF No. 213.

On remand, the Court conducted an in camera review of the prosecutors' 2002 juror

questionnaires and jury selection notes, held a limited hearing focusing on the third prong of the

Batson test, and reaffirmed its ruling that the prosecutors' use of peremptory strikes during the

2002 jury selection did not violate Batson.  Order, 3:97cr23, ECF No. 660.  The Fourth Circuit

affirmed, United States v. Barnette, 644 F.3d 192, 196 (4th Cir. 2011) (Barnette III), and on

March 29, 2012, the Supreme Court denied Petitioner a writ of certiorari.  Barnette v. United

States, 132 S. Ct. 1740 (2012).

In an order dated May 23, 2012, this Court appointed counsel to pursue post-conviction

remedies on Petitioner's behalf.  ECF No. 1.  On September 17, 2012, the Court conducted a

sealed, ex parte hearing at which Petitioner's habeas counsel and Harold Bender, who had

represented Petitioner during the 2002 penalty phase and subsequent proceedings, appeared.

During the hearing, "it was confirmed that all of the attorneys who had represented [Petitioner]

in his underlying capital trial and [2002] sentencing proceedings . . . had transferred their case

files to Mr. Bender" and that Mr. Bender had been unable to locate any of those files.  Order 1,

2

**JA187**

ECF No. 17. Nor was he able to find his own files from the 2002 penalty phase. Order, supra, at 1. Mr. Bender was semi-retired at the time of the hearing and had relocated from his active practice in Charlotte, North Carolina. He has since died. On October 5, 2012, the Court ordered the United States Attorney for the Western District of North Carolina to provide Petitioner's habeas counsel with a complete copy of all material previously provided by the U.S. Attorney to Petitioner's 1998 and 2002 trial and sentencing counsel, including all discovery materials and copies of all correspondence between prosecutors and defense counsel. ECF No. 17.

On June 19, 2013, Petitioner filed a Motion to Vacate, Set Aside or Correct Sentence pursuant to 28 U.S.C. § 2255. ECF No. 48. In the motion, Petitioner raises seven claims for relief: (1) that he received ineffective assistance of counsel during the 2002 penalty phase; (2) that prosecutors engaged in racial discrimination during the 2002 jury selection and, relatedly, that the way in which this Court conducted Batson proceedings on remand was unconstitutional; (3) that he was deprived of fair and impartial juries in 1998 and 2002 as a result of juror misconduct; (4) that prosecutors engaged in selective prosecution on the basis of race; (5) that prosecutors failed to disclose material exculpatory or impeachment information, in violation of Brady v. Maryland, 373 U.S. 83 (1963), Giglio v. United States, 405 U.S. 150 (1972), Kyles v. Whitley, 514 U.S. 419 (1995), and Napue v. Illinois, 360 U.S. 264 (1959); (6) that the federal death penalty is unconstitutional because it is sought on the basis of race and geography; and (7) that the manner of federal execution violates the Eighth Amendment's prohibition against cruel and unusual punishment. Mot. to Vacate, ECF No. 48. Petitioner also filed a motion for leave to conduct juror interviews in support of his claim of juror misconduct, ECF No. 49, which the Court denied in a written order on July 18, 2013, ECF No. 50.

3

**JA188**

<u>STANDARD FOR DISCOVERY IN § 2255 PROCEEDINGS</u>

On July 19, 2013, Petitioner filed the instant motion for discovery. ECF No. 51. Discovery requests in habeas proceedings are governed by Rule 6 of the Rules Governing § 2255 Proceedings. Unlike a traditional civil litigant, a habeas petitioner is not entitled to discovery as a matter of course. <u>Bracy v. Gramley</u>, 520 U.S. 899, 904 (1997). A petitioner may engage in discovery only with leave of the court, after having demonstrated good cause. Rules Governing § 2255 Cases, Rule 6(a), 28 U.S.C. foll. § 2255 (2013). "Good cause" for discovery exists when a petitioner establishes a prima facie case for relief. <u>See</u> <u>Harris v. Nelson</u>, 394 U.S. 286, 290 (1969). Specifically, discovery is warranted, "where specific allegations before the court show reason to believe that the petitioner may, if the facts are fully developed, be able to demonstrate that he is ... entitled to relief." <u>Bracy</u>, 520 U.S. at 908–09 (quoting <u>Harris</u>, 394 U.S. at 300).

Under this standard, a request for discovery must rely on specific factual allegations. <u>Quesinberry v. Taylor</u>, 162 F.3d 273, 279 (4th Cir. 1998) (citing <u>Harris</u>, 394 U.S. at 300). "Rule 6 does not 'sanction fishing expeditions based on a petitioner's conclusory allegations.'" <u>Williams v. Bagley</u>, 380 F.3d 932, 974 (6th Cir. 2004) (quoting <u>Rector v. Johnson</u>, 120 F.3d 551, 562 (5th Cir. 1997)); <u>see</u> <u>also</u> <u>Teti v. Bender</u>; 507 F.3d 50, 60 (1st Cir. 2007) (observing that "[a] habeas proceeding is not a fishing expedition"). Moreover, good cause does not exist if a defendant premises a discovery request on a claim that fails as a matter of law. <u>See</u> <u>Thomas v. Taylor</u>, 170 F.3d 466, 474 (4th Cir. 1999) (finding that trial court did not abuse its discretion in denying discovery request related to claim that failed as a matter of law); <u>Martinez v. United States</u>, Nos. 10 Cv. 7561(RPP), 06 Cr. 591(RPP), 2012 WL 1071239, at *13 (S.D.N.Y. Mar. 30, 2012) (mooting motion for discovery because substantive claim failed as a matter of law).

4

**JA189**

PETITIONER'S DISCOVERY REQUESTS

Trial and Appellate Files of the U.S. Attorney's Office for the Western District of North Carolina and the Department of Justice

This discovery request is related to the U.S. Attorney's compliance with the Court's October 5, 2012 Order requiring the Government to provide Petitioner's habeas counsel with a complete copy of all material provided by the U.S. Attorney to Petitioner's 1998 and 2002 trial and sentencing counsel. ECF No. 17. The Court has addressed those compliance issues in a separate Order, filed on January 7, 2014. ECF No. 61.

Prosecutorial File of the Mecklenburg County District Attorney's Office

Following his arrest on June 25, 1996, Petitioner was remanded to state custody on murder and robbery with dangerous weapon charges. On February 4, 1997, Petitioner was indicted in federal district court for the murders of Allen and Williams. Indictment, 3:97cr23, Doc. 1. The state charges against Petitioner were dismissed on October 1, 1997. State v. Barnette, Nos. 96CRS33122-23 (Meck. Co. Superior Court 10/1/97).

Although the Mecklenburg County District Attorney dismissed the state charges against Petitioner once the federal government elected to pursue a prosecution, Petitioner claims a right to the District Attorney's case files. Petitioner cites a North Carolina law that requires "[t]he State . . . [to] make available to the defendant's counsel the complete files of all law enforcement and prosecutorial agencies involved in the investigation of the crimes committed or the prosecution of the defendant," N.C. Gen. Stat. § 15A-1415(f). Disc. Mot. 10, ECF No. 51. That statute, however, applies only to defendants in state post-conviction proceedings. § 15A-1415(f).

Furthermore, Petitioner has not identified which factual allegations in his habeas petition would be supported by information in the Mecklenburg County District Attorney's files. See United States v. Wilson, 901 F.2d 378, 382 (4th Cir. 1990) (affirming the denial of § 2255

5

**JA190**

discovery requests where "[t]he requests were far too broad and unspecific").  Consequently, Petitioner has not shown "good cause" to warrant discovery of any of the District Attorney's files.  His discovery request, therefore, is denied.

<u>The Complete Investigative Files of the Charlotte Mecklenburg Police Department, the Roanoke Police Department, and the Federal Bureau of Investigation</u>

Petitioner indicates that this request is related to his ineffective assistance of counsel claims (Claim I), <u>Batson</u> claim (Claim II), selective prosecution claim (Claim IV), <u>Brady</u>/<u>Giglio</u> claim (Claim V), and his claim that the federal death penalty is unconstitutional (Claim VI).  He does not tie his discovery request to any of the factual allegations made in those claims, however.

Petitioner may not obtain discovery based upon a generalized request untethered to specific factual allegations demonstrating that he is entitled to relief.  <u>See</u> <u>Wilson</u>, 901 F.2d at 382.  His discovery request, therefore, is denied.

<u>Bureau of Prison Records</u>

Petitioner seeks discovery of all documents, files, materials and other information in the possession or control of the Federal Bureau of Prisons ("BOP") concerning his incarceration through August 13, 2002.  Petitioner states that habeas counsel have attempted to obtain all of his BOP records by way of authorized release and Freedom of Information Act requests but have not received all responsive documents and materials from the BOP.

Petitioner has not identified the documents and/or materials that counsel have not received from the BOP.  Moreover, during the 2002 penalty phase, this Court denied Petitioner access to some of his prison records after determining that they had no bearing on the issue of Petitioner's future dangerousness.  Sealed Order, 3:97cr23, ECF No. 474.  Petitioner has not provided sufficient information for the Court to order release of BOP records covering Petitioner's incarceration through August 13, 2002.  Consequently, this request is denied.

6

**JA191**

In Claim II of his Motion to Vacate, Petitioner claims that the Batson proceeding conducted by the District Court on remand was unconstitutional under the Fifth, Sixth, and Eighth Amendments. Mot. to Vacate 88-92, ECF No. 48. Specifically, Petitioner contends that the limited hearing held by the Court was a critical stage of the capital trial and that he was denied the effective assistance of counsel and due process at that hearing because counsel were denied copies of juror questionnaires used during the 2002 voir dire. Mot. to Vacate, supra, at 89-92. He asserts entitlement to all of the materials he was denied during the remand proceedings.

When Petitioner's case was remanded for review of his 2002 Batson challenges, he sought a new penalty phase or, in the alternative, an evidentiary hearing on his Batson challenges. Br. on Remand at 14-15, 3:97cr23, ECF No. 637. Petitioner also requested that the Court order the Government to turn over copies of juror questionnaires it had retained from Petitioner's trial, including any notes taken by the prosecutors; provide any materials related to training and instruction given to attorneys in the United States Attorney's Office for the Western District of North Carolina related to jury selection; and disclose the case name, number, and result of all cases in which his prosecutors' peremptory challenges were the subject of a Batson challenge. Br. on Remand, supra, at 13-14. In response, this Court ordered the Government to submit unredacted copies of its juror questionnaires for in camera review, Order, 3:97cr23, ECF No. 645, but denied Petitioner's other discovery requests, concluding that Petitioner was not authorized "to go on a fishing expedition through the Government's files in hopes of finding some damaging evidence," Order at 12, 3:97cr23, ECF No. 649. Subsequent to its in camera review of the Government's juror questionnaires and jury selection notes, which prosecutors also

7

**JA192**

provided, the Court conducted a limited hearing, after which it reaffirmed its trial ruling that the prosecutors' use of peremptory strikes did not violate <u>Batson</u>. Order, 3:97cr23, ECF No. 660.

The Fourth Circuit affirmed, finding "no merit in [Petitioner's] contentions that the district court committed prejudicial error in the manner in which it conducted the proceedings [on remand] or in its findings of fact and legal conclusions on the merits of [Petitioner's] <u>Batson</u> claims." <u>Barnette III</u>, 644 F.3d at 196. Specifically, the court held that this Court did not err in refusing to order disclosure of the prosecutors' copies of juror questionnaires, with accompanying notes. <u>Id.</u> at 209, 211 (noting that Petitioner "was no more entitled to examine the work product of his trial prosecutors during the hearing on remand than he would have been (had he asked to do so) at the initial <u>Batson</u> hearing in 2002"). Moreover, although the Fourth Circuit held that this Court erred on remand in denying Petitioner clean copies of the original juror questionnaires, it found the error harmless. <u>Id.</u> at 212, 213. In other words, the Fourth Circuit concluded that this Court's actions did not affect Petitioner's substantial rights and prejudice the outcome of the remand. <u>See</u> <u>United States v. Harbin</u>, 250 F.3d 532, 542 (7th Cir. 2001) (citing <u>United States v. Olano</u>, 507 U.S. 725, 734 (1993)).

The constitutionality of the <u>Batson</u> remand procedure employed by the Court was resolved on direct appeal. Courts have long held that a petitioner "will not be allowed to recast, under the guise of collateral attack, questions fully considered" on direct appeal. <u>Boeckenhaupt v. United States</u>, 537 F.2d 1182, 1183 (4th Cir. 1976); <u>see also</u> <u>Withrow v. Williams</u>, 507 U.S. 680, 721 (1993) (Scalia, J., concurring) ("[A] prior opportunity for full and fair litigation is normally dispositive of a federal prisoner's habeas claim. If the claim was raised and rejected on direct review, the habeas court will not readjudicate it absent countervailing equitable considerations."). Consequently, Petitioner's claim fails as a matter of law, and good cause does

8

**JA193**

not exist to warrant the discovery Petitioner seeks.  See Taylor, 170 F.3d at 474-75 (concluding that the district court properly exercised its discretion in denying requests for discovery where the requested information would have no bearing on the petitioner's substantive § 2255 claim).

In Claim IV, Petitioner contends that the Government's decision to prosecute him in federal court rather than in North Carolina state court unconstitutionally diluted the pool of eligible black jurors by 4%.  Mot. to Vacate 95-6, ECF No. 48.  This claim also fails as a matter of law.

The Supreme Court has held that "the selection of a petite jury from a representative cross-section of the community is an essential component of the Sixth Amendment right to a jury trial."  Taylor v. Louisiana, 419 U.S. 522, 528 (1975).  "[T]he Constitution does not require that the juror selection process be a statistical mirror of the community," however.  United States v. Cecil, 836 F.2d 1431, 1445 (4th Cir. 1988).  "It is sufficient that the selection be 'in terms of a fair cross-section' gathered without active discrimination."  Id.

To establish a prima facie case that violation of the fair-cross-section requirement occurred, Petitioner must show that "(1) a group qualifying as 'distinctive' (2) is not fairly and reasonably represented in jury venires, and (3) 'systematic exclusion' in the jury-selection process accounts for the underrepresentation."  Berghuis v. Smith, 559 U.S. 314, 327 (2010) (citing Duren v. Missouri, 439 U.S. 357, 364 (1979)).  In other words, Petitioner must show that the source from which the federal district court in the Western District of North Carolina drew eligible jurors in 2002,[1] systematically excluded African-Americans and, therefore, was not representative of the community as a whole.  See Taylor, 419 U.S. at 528.

---

[1] Petitioner's seeks discovery from the Clerk of Court and/or Jury Administrator of the United States District Court of the Western District of North Carolina for years 2000-2002.  Disc. Mot. 12-13, ECF No. 51.  He does not seek related discovery for years 1997-1999.

9

**JA194**

Juries in all four divisions of the Western District of North Carolina are selected according to the District Jury Selection Plan in which potential jurors are randomly selected from the voter registration lists ("VRLs") of the division where the trial is held. Congress has expressly sanctioned the use of VRLs as the source for jury selection in federal courts. See Cecil, 836 F.2d at 1445 (citing 28 U.S.C. § 1863(b)(2)); see also Taylor, 419 U.S. at 528-30 (approving, in dictum, use of VRLs). Furthermore, the Fourth Circuit has upheld the use of VRLs even though minority representation on voter rolls is sometimes less than in the general community. See Cecil, 836 F.2d at 1444-48; see also United States v. McGrady, 173 F.3d 426, *2-*3 (4th Cir. 1999) (unpublished table decision) (finding no fair cross-section violation in use of VRLs by the Western District of North Carolina as source for jury selection).

Petitioner was tried in the Charlotte division of the Western District. Census data provided by Petitioner demonstrates that in 2000, African-Americans comprised 23.9% of the population in the Charlotte division. Mot. to Vacate 97, ECF No. 48. Petitioner has not provided any information regarding the percentage of African Americans registered to vote in the Charlotte division or the percentage of African-Americans eligible to vote but who had not registered to do so. Consequently, Petitioner has failed to provide factual support for his assertion that African-Americans were not fairly and reasonably represented in jury venires in the Charlotte division around the time of his 2002 jury selection.

Furthermore, Petitioner has not alleged that North Carolina "systematically" or "intentionally" excluded African-Americans by its voter registration procedures. Nor has Petitioner alleged that this Court purposefully misapplied or violated the rules and procedures of its own District Jury Selection Plan in order to exclude eligible African-Americans from jury pools in the District, or the Charlotte division in particular.

10

**JA195**

Because Petitioner has not established a prima facie case that his prosecution in federal court violated the fair cross-section requirement of the Sixth Amendment, he has not established "good cause" for discovery on his claim that the decision to prosecute him in federal rather than state court unconstitutionally diluted the pool of eligible African-Americans in his juror pool. See Harris, 394 U.S. at 290. This discovery request is denied.

<u>Discovery Related to Petitioner's Selective Prosecution Claim</u>

In Claim VI, Petitioner contends that the Federal Death Penalty Act ("FDPA") is unconstitutional because, under it, decisions whether to seek the death penalty are based on the race of the defendant and victim(s) and on the locale in which the defendant is charged. Mot. to Vacate 100-01, ECF No. 48. Petitioner seeks discovery from the United States Attorney's Office and the Department of Justice to prove this claim.[2]

The equal protection guarantee embodied in the Fifth Amendment forbids basing prosecutorial decision-making "on an unjustifiable standard such as race, religion or other arbitrary classification." United States v. Armstrong, 517 U.S. 456, 464 (1996) (citation and internal quote omitted). To prevail on an equal protection claim, a claimant must prove the

---

[2] Petitioner seeks the following:

1. For each death penalty prosecution that was "death eligible" from 1988 to date, Petitioner requests that the Government provide it with the names of the defendants, location of the prosecution, the charges, gender and race of the victims and defendants, and the ultimate outcome of the prosecution (including whether there was a guilty plea).

2. For each case in sub-paragraph "1," Petitioner requests that the Government identify which such cases were referred to the Department of Justice for consideration of pursuit of the death penalty, and the DOJ's resolution of the referral.

3. For each case in sub-paragraph "1," any written protocols or standards used by the DOJ for evaluation of referrals for consideration of the death penalty.

4. For Petitioner's prosecution, he requests that the Government provide him with any memos, writings or communications between the local prosecutors and the DOJ regarding the question of whether to pursue the death penalty in his case, both before and after the Fourth Circuit vacated his death sentences in 2000.

Disc. Mot. 15, ECF No. 51.

**JA196**

existence of "purposeful discrimination" and "that the purposeful discrimination had a discriminatory effect on him." McCleskey v. Kemp, 481 U.S. 279, 292 (1987) (citations and internal quotes omitted). To make this showing in the context of a selective prosecution claim, a claimant "must 'establish both (1) that similarly situated individuals of a different race were not prosecuted, and (2) that the decision to prosecute was invidious, or in bad faith.'" United States v. Venable, 666 F.3d 893, 900 (4th Cir. 2012) (quoting United States v. Olvis, 97 F.3d 739, 743 (4th Cir. 1996)). Specifically, a claimant "must prove that the decisionmakers in his case acted with discriminatory purpose." McCleskey, 481 U.S. at 292.

Petitioner acknowledges that he has not provided sufficient evidence to prove an equal protection violation. Disc. Mot. 14, ECF No. 51. He contends, however, that the following is sufficient evidence of racial motivation to warrant discovery: (1) the federal interest in and connection to the case, in his opinion, was no greater than the state's; (2) his was the first capital prosecution brought in the Western District of North Carolina; (3) the decision to prosecute him in federal court rather than in North Carolina state court diluted the pool of eligible black jurors by 4%; (4) 68% of the federal defendants on death row on July 20, 2000 were black; and (5) 63% of the federal defendants on death row on July 20, 2000 had been convicted and sentenced to death in Southern states. Mot. to Vacate 97, 98, 100-01, ECF No. 48.[3]

"Because discovery imposes high costs on the government, the standard for obtaining discovery in support of a selective prosecution claim" is comparably high. Venable, 666 F.3d at 900. To obtain discovery, Petitioner must produce "some evidence making a credible showing

---

[3] Petitioner obtained the federal death row population demographics from a Department of Justice ("DOJ") survey of the administration of the federal death penalty from 1988 to July, 2000. U.S. Dep't of Justice, The Federal Death Penalty System: A Statistical Survey (1998-2000) (Sept. 12, 2000) [hereinafter DOJ Survey], available at http://www.justice.gov/dag/pubdoc/dpsurvey.html. A supplemental report was issued on June 6, 2001. U.S. Dep't of Justice, The Federal Death Penalty System: Supplementary Data, Analysis and Revised Protocols for Capital Case Review 10 (Jun. 6, 2001), available at http://www.justice.gov/dag/pubdoc/deathpenaltystudy.htm.

12

**JA197**

that (1) similarly situated individuals of a different race were not prosecuted; and (2) the decision to prosecute was invidious or in bad faith." Id. (citing Olvis, 97 F.3d at 743).

Here, Petitioner has made no showing that as a death-eligible defendant he was treated differently from persons of other races who engaged in conduct similar to his. "[A]bsent an appropriate basis for comparison, statistical evidence of racial disparity alone cannot establish any element of a discrimination claim." Venable, 666 F.3d at 903 (citing Olvis, 97 F.3d at 745). The statistics Petitioner cites are merely snapshots of the federal death row population on a specific day. They do not reveal the number of non-black individuals who could have been, but were not, federally and capitally prosecuted prior to July, 2000 for committing homicides comparable to those Petitioner committed. See United States v. Bass, 536 U.S. 862, 864 (2002) (per curium) ("[R]aw statistics regarding overall charges say nothing about charges brought against similarly situated defendants."). Consequently, these statistics do not constitute "some evidence making a credible showing that . . . similarly situated individuals of a different race were not prosecuted." Venable, 666 F.3d at 900 (citation omitted).

Even if the Court were to hold that generalized national statistics were sufficient to meet the first test for discovery, Petitioner has failed to present evidence making a credible showing that "the decisionmakers in his case acted with discriminatory purpose." McCleskey, 481 U.S. at 292. As an initial matter, Congress defined the federal interest in Petitioner's case when it outlawed the conduct and made it punishable by death. Whether that interest was less than North Carolina's, or Virginia's, in prosecuting Petitioner is a matter of opinion. Moreover, Petitioner's status as the first federal death penalty defendant in the Western District of North Carolina[4] and

---

[4] Notably, prior to 1994, the federal death penalty was limited to those convicted under the federal Drug Kingpin Act. DOJ Survey, supra, at 1, 13. The availability of capital punishment in federal criminal cases expanded significantly in 1994 with enactment of the Federal Death Penalty Act, which provided that over 40 federal offenses,

13

**JA198**

the effect the federal prosecution may have had on the racial make-up of the jury pool do not indicate that his federal prosecution was based upon racial considerations rather than other factors, such as judicial economy and efficiency (i.e. one federal trial for two murders versus two state trials, each for a single murder).

Petitioner has failed to show "good cause" to warrant discovery for his claim that the Federal Death Penalty is unconstitutional. Therefore, this discovery request is denied.

<u>All Exculpatory Materials</u>

Petitioner contends that he is entitled to all exculpatory material related to guilt or sentencing in the Government's possession, including anything in the files of federal law enforcement agencies that participated in the investigation of his case. Disc. Mot. 16, ECF No. 51. Petitioner is incorrect.

In <u>Brady v. Maryland</u>, the Supreme Court held that the Due Process Clause requires the government to disclose "evidence favorable to an accused upon request ... where the evidence is material either to guilt or to punishment." 373 U.S. at 87. There is, however, "'no general constitutional right to discovery . . . , and <u>Brady</u> did not create one.'" <u>United States v. Caro</u>, 597 F.3d 608, 619 (4th Cir. 2010) (quoting <u>Weatherford v. Bursey</u>, 429 U.S. 545, 559 (1977)). Because Petitioner can only speculate as to what the requested exculpatory evidence, if it exists at all, might reveal, he cannot satisfy <u>Brady</u>'s materiality requirement. <u>See Caro</u>, 597 F.3d at 619 (citing <u>United States v. Agurs</u>, 427 U.S. 97, 109-10 (1976) ("The mere possibility that an item of undisclosed information might have helped the defense, or might have affected the outcome of the trial, does not establish 'materiality' in the constitutional sense.")).

---

including those Petitioner was convicted of committing, could be punished as capital crimes, and in 1996 with enactment of the Antiterrorism and Effective Death Penalty, which added another four federal offenses to the list of capital crimes. <u>Id.</u>

14

**JA199**

Insofar as Petitioner's request is not predicated on <u>Brady</u>, he has not, in any event, established a prima facie case for relief tied to this discovery request.  Consequently, Petitioner has not shown that "good cause" exists for granting his request.  <u>See</u> <u>Harris v. Nelson</u>, 394 U.S. at 290 (establishing that "good cause" for post-conviction discovery exists when a petitioner establishes a prima facie case for relief).

CONCLUSION

Petitioner has not demonstrated good cause for the Court to order discovery under Rule 6(a) of the Rules Governing § 2255 Proceedings.  His motion shall be denied.

ORDER

**IT IS, THERFORE, ORDERED** that Petitioner's Motion for Discovery, ECF No. 51, is **DENIED**.

Signed: January 22, 2014

Richard L. Voorhees
United States District Judge

15

**JA200**

UNITED STATES OF AMERICA

vs.

AQUILIA MARCIVICCI BARNETTE

**DEATH PENALTY § 2255**

### PETITIONER AQUILIA MARCIVICCI BARNETTE'S
### MOTION FOR EVIDENTIARY HEARING

NOW COMES Aquilia Marcivicci Barnette, through undersigned counsel, pursuant to 28 U.S.C. § 2255(b) and Rule 8 of the Rules Governing § 2255 Proceedings, respectfully moving this Court for an order granting an evidentiary hearing. This motion is supported by the brief filed herewith, all exhibits thereto, and all prior pleadings and documents filed in this matter and in *United States v. Barnette*, Case No. 3:97-CR-23. In further support of this motion, Mr. Barnette, through undersigned counsel, shows the following:

Mr. Barnette requested an evidentiary hearing in his *Initial Motion for Relief Pursuant to 28 U.S.C. § 2255* (hereinafter "§ 2255 motion"). The Court subsequently entered a scheduling order on its own motion on August 9, 2013, finding that, upon an initial review of the Motion as required by Rule 4 of the Rules Governing § 2255 Proceedings, it did not "plainly appear" that Mr. Barnette was not entitled to relief. The Court then adopted the parties' agreed upon preliminary litigation schedule. [ECF Doc. 53] Following two unopposed extensions of time, Mr. Barnette, through undersigned counsel, now files this motion for an evidentiary hearing.

1

**JA201**

Section 2255(b) of the Judicial Code provides (with emphasis added):

> Unless the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief, the court *shall* cause notice thereof to be served upon the United States attorney, *grant a prompt hearing thereon*, determine the issues and make findings of fact and conclusions of law with respect thereto.

Rule 8(a) of the Rules Governing § 2255 Proceedings provides:

> If the motion is not dismissed, the judge must review the answer, any transcripts and records of prior proceedings, and any materials submitted under Rule 7 to determine whether an evidentiary hearing is warranted.

The use of mandatory language indicates this Court is required, on its own motion, to order an evidentiary hearing unless there is conclusive evidence Mr. Barnette is entitled to no relief. For the reasons stated in Mr. Barnette's *Initial Motion for Relief Pursuant to 28 U.S.C. § 2255*, the brief file herewith and its exhibits, and all prior pleadings and documents filed in this matter, "the motion the files and records of the case" do not conclusively refute Mr. Barnette's claims and an evidentiary hearing is therefore required.

2

**JA202**

Dated: December 22, 2014

/s/ Mark E. Olive
N.C. State Bar No. 10615
LAW OFFICES OF MARK OLIVE
320 W. Jefferson Street
Tallahassee, FL 32301
850-224-0004 (tel)
850-224-3331 (fax)
meolive@aol.com

/s/ Jacob H. Sussman
N.C. Bar No. 31821
TIN FULTON WALKER & OWEN PLLC
301 East Park Avenue
Charlotte, NC 28203
704-338-1220 (tel)
704-338-1312 (fax)
jsussman@tinfulton.com

/s/ Ross Richardson
Ross Richardson
FEDERAL DEFENDERS OF WESTERN
 NORTH CAROLINA, INC.
129 West Trade Street, Suite 300
Charlotte, NC 28202
704-374-0720 (tel)
704-374-0722 (fax)
ross_richardson@fd.org

3

**JA203**

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that he has served the foregoing pleading with the Clerk of Court using the CM/ECF system, which will send notification of such filing to:

William M. Miller
William.Miller@usdoj.gov

Dated: December 22, 2014

/s/ Jacob H. Sussman
Counsel for Mr. Barnette

4

**JA204**

UNITED STATES OF AMERICA

vs.

AQUILIA MARCIVICCI BARNETTE

**DEATH PENALTY § 2255**

### PETITIONER AQUILIA MARCIVICCI BARNETTE'S
### BRIEF IN SUPPORT OF MOTION FOR EVIDENTIARY HEARING

Aquilia Marcivicci "Marc" Barnette is on federal death row in Terre Haute, Indiana for the 1996 murders of Donald Lee Allen in Charlotte, North Carolina and Robin Williams in Roanoke, Virginia. Mr. Barnette was originally tried and sentenced to death in 1998. After his death sentences were vacated by the Fourth Circuit Court of Appeals, he was resentenced to death by a federal jury in the Western District of North Carolina in 2002.

As detailed in Mr. Barnette's *Initial Motion for Relief Pursuant to 28 U.S.C. § 2255*, filed June 19, 2013, Mr. Barnette is not on death row because of the nonexistence of evidence to support a life sentence. [ECF Doc. 48] Rather, Mr. Barnette is under a sentence of death because of multiple violations of the U.S. Constitution. When a jury is asked to determine whether a defendant will live or die for his crimes, "[w]hat is essential is that the jury have before it all possible relevant information about the individual defendant whose fate it must determine." *Jurek v. Texas*, 428 U.S. 262, 276 (1976). The jury that determined Mr. Barnette's fate in 2002, like the jury that imposed death in 1998, did not have before it all possible relevant information about Mr. Barnette, in violation of his federal constitutional rights.

1

**JA205**

Mr. Barnette requested an evidentiary hearing in his *Initial Motion for Relief Pursuant to 28 U.S.C. § 2255* (hereinafter "§ 2255 motion"). The Court subsequently entered a scheduling order on its own motion on August 9, 2013, finding that, upon an initial review of the Motion as required by Rule 4 of the Rules Governing § 2255 Proceedings, it did not "plainly appear" that Mr. Barnette was not entitled to relief. The Court then adopted the parties' agreed upon preliminary litigation schedule. [ECF Doc. 53] Following two unopposed extensions of time, Mr. Barnette, through undersigned counsel, now files this brief in support of his motion for an evidentiary hearing.

### I. Assuming the Government Contests His Claims for Relief, Mr. Barnette is Entitled to an Evidentiary Hearing

Section 2255(b) of the Judicial Code provides (with emphasis added):

> Unless the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief, the court *shall* cause notice thereof to be served upon the United States attorney, *grant a prompt hearing thereon*, determine the issues and make findings of fact and conclusions of law with respect thereto.

Rule 8(a) of the Rules Governing § 2255 Proceedings provides:

> If the motion is not dismissed, the judge must review the answer, any transcripts and records of prior proceedings, and any materials submitted under Rule 7 to determine whether an evidentiary hearing is warranted.

The use of mandatory language indicates this Court is required, on its own motion, to order an evidentiary hearing unless there is conclusive evidence Mr. Barnette is entitled to no relief. For the reasons stated in Mr. Barnette's *Initial Motion for Relief Pursuant to 28 U.S.C. § 2255*, this brief and its exhibits,[1] and all prior pleadings and documents filed in this matter, "the motion the files and records of the case" do not conclusively refute Mr. Barnette's claims and an evidentiary hearing is therefore required.

---

[1] All of the exhibits filed are incorporated herewith.

2

**JA206**

When a petitioner files a motion to vacate or set aside under 28 U.S.C. § 2255, an evidentiary hearing must be granted "unless the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief." 28 U.S.C. §2255. Citing to the statutory standard, the Fourth Circuit held in *United States v. Magini*, 973 F.2d 261 (4th Cir. 1992) that "[a] federal court in a habeas proceeding *must* hold an evidentiary hearing when the petitioner alleges facts which, if true, would entitle her to get relief." *Id*. at 264 (emphasis added). *See also United States v. Witherspoon,* 231 F.3d 923, 925-26 (4th Cir. 2000) ("Generally, an evidentiary hearing is required under 28 U.S.C. § 2255 unless it is clear from the pleadings, files, and records that a movant is not entitled to relief."); *Raines v. United States,* 423 F.2d 526, 529 (4th Cir. 1970). Indeed, when a movant presents a colorable Sixth Amendment claim showing disputed facts involving inconsistencies beyond the record, a hearing is mandated. *Magini*, 973 F.2d at 264 (internal citations omitted). *See also United States v. White,* 366 F.3d 291, 302 (4th Cir. 2004) (citing *Raines,* 423 F.2d at 530) ("[W]here the ultimate resolution rests on a credibility determination, an evidentiary hearing is especially warranted."); *Raines,* 423 F.2d at 530 ("There will remain … a category of petitions, usually involving credibility, that will require an evidentiary hearing in open court."). The Fourth Circuit has reversed and remanded where district courts have not held evidentiary hearings in order to resolve factual disputes. *See*, *e.g*., *United States v. Diaz*, No. 13-6952, 547 F. App'x 303, 304, 2013 WL 6246774 (4th Cir. Dec. 4, 2013) (holding that district court "abused its discretion in concluding, without an evidentiary hearing, that Diaz did not direct counsel to file a notice of appeal"); *United States v. Mitchell*, No. 11-6711, 484 F. App'x 744, 745, 2012 WL 2365895 (4th Cir. June 22, 2012) (holding that district abused its

3

**JA207**

discretion by failing to hold an evidentiary hearing because one was required in order to make the factual findings necessary to rule on petitioner's § 2255 motion); *United States v. O'Quinn*, No. 05-6412,166 F. App'x 697, 698, 2006 WL 372430 (4th Cir. Feb. 16, 2006) (vacating and remanding because factual dispute existed that required evidentiary hearing on claim of ineffective assistance of counsel).

Although "the burden is on the petitioner in a habeas case" to establish his right to a hearing, that burden is "relatively light … and is significantly lower than his burden to show he is entitled to § 2255 relief." *Valentine v. United States*, 488 F.3d 325, 333-34 (6th Cir. 2007). Mr. Barnette has satisfied this standard. Moreover, the government has not yet filed a responsive pleading in this post-conviction litigation that addresses the facts alleged by Mr. Barnette.[2] As with the facts alleged in Mr. Barnette's § 2255 motion, the government may not dispute the facts contained in this brief and its exhibits. If that is the case, then this Court may grant summary judgment with respect to some or all of the claims for relief.

Mr. Barnette's § 2255 motion raises eight separate claims for relief. Under the standards articulated above, Mr. Barnette is entitled to an evidentiary hearing on all claims, which include:

Claim I: Petitioner Marc Barnette was Denied Effective Assistance of Counsel as Guaranteed by the Fifth, Sixth, and Eighth Amendments to the U.S. Constitution and 18 U.S.C. § 3006

Claim II: Petitioner Marc Barnette was Deprived of His Rights under the Fifth, Sixth, and Eighth Amendments to the United States Constitution with Respect to Raising and Supporting a Claim of Racial Discrimination in Jury Selection, and the *Batson* Proceedings were Unconstitutionally Conducted

---

[2] An answer "must address the allegations in the motion." Rule 5(b) of the Rules Governing § 2255 Proceedings.

4

**JA208**

Claim III: Petitioner Marc Barnette was Deprived of His Rights under the Fifth, Sixth, and Eighth Amendments to the United States Constitution as a Result of Misconduct Related to the Jury

Claim IV: Petitioner Marc Barnette was Deprived of His Rights under the Fifth, Sixth, and Eighth Amendments to the United States Constitution Because the Decision to Prosecute Petitioner in Federal Court Rather than State Court Resulted in a Well-Known Significant Reduction in the Number of African-Americans in the Jury Pool in 1998 and 2002

Claim V: Petitioner Marc Barnette was Deprived of His Constitutional Rights to Due Process and a Fair Trial under *Brady*, *Giglio*, *Kyles*, and *Napue* in Violation of the Fifth, Sixth, and Eighth Amendments to the United States Constitution

Claim VI: The Death Penalty is Unconstitutional Because it is Sought on the Invidious Basis of Race and Irrational Basis of Geography

Claim VII: The Manner in Which the Bureau of Prisons Would Carry Out Mr. Barnette's Execution Would Violate the Eighth Amendment

Claim VIII: Cumulative Effect of Errors References in this § 2255 Motion Demand Relief

## II. Argument

**Claim I: Petitioner Marc Barnette was Denied Effective Assistance of Counsel as Guaranteed by the Fifth, Sixth, and Eighth Amendments to the U.S. Constitution and 18 U.S.C. § 3006A**

Mr. Barnette's § 2255 motion details the myriad ways in which he was denied his constitutional right to the effective assistance of counsel at his 2002 resentencing trial. The information referred to within Mr. Barnette's § 2255 motion, this brief, and the exhibits hereto lay bare the failures by resentencing counsel to reasonably investigate, develop, and present powerful information to the jury. Mr. Barnette's resentencing counsel were confronted repeatedly with "red flags" about Mr. Barnette's mental health

5

issues and the availability—and need to explore—mitigating evidence and information about Mr. Barnette's mental health. Nevertheless, without making reasoned strategic decisions, resentencing counsel ignored these "red flags" and failed to thoroughly investigate available mental health and mitigation. As a result, Mr. Barnette's sentencing jury was provided an inaccurate and incomplete picture. Had resentencing counsel conducted a reasonably thorough investigation, there is a "reasonable probability that at least one juror would have struck a different balance" and Mr. Barnette would not be on death row. *Wiggins v. Smith*, 539 U.S. 510, 537 (2003).

## A. Law Governing Claims of Ineffective Assistance of Counsel

Because of the enormity of the decision to formally and judicially take a human life, the differences between defending a typical criminal case and defending a capital client are many. A primary difference is that a capital case decision maker must be allowed to consider any aspect of a defendant's background and character, and respond by imposing a life sentence. *See Lockett v. Ohio*, 438 U.S. 586, 602-03 (1977). Chief Justice Burger explained that the requirement of individualized consideration for each capital defendant

> ... rests squarely on the predicate that the penalty of death is qualitatively different from a sentence of imprisonment, however long. Death, in its finality, differs more from life imprisonment than a 100-year prison term differs from one of only a year or two. Because of that qualitative difference, there is a corresponding difference in the need for reliability in the determination that death is the appropriate punishment in a specific case.

*Woodson v. North Carolina*, 428 U.S. 304, 305 (1976). *See also* ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases, Guideline 1.1, Comm. (2003) ("Due to the extraordinary and irrevocable nature of the penalty, at every stage of the proceedings counsel must make 'extraordinary efforts on behalf of the accused.'")

6

**JA210**

(internal citation omitted).

The Supreme Court deems the unrestricted scope of mitigating evidence necessary to "be sure that the sentencer has treated the defendant as a 'uniquely individual human bein[g]' and has made a reliable determination that death is the appropriate sentence." *Penry v. Lynaugh*, 492 U.S. 302, 319 (1989) (quoting *Woodson*, 428 U.S. at 305). Further, "[t]he need for treating each defendant in a capital case with that degree of respect due the uniqueness of the individual is far more important than in noncapital cases." *Lockett*, 438 U.S. at 605. In ordinary criminal cases, the law defines crimes and defenses in objective elements that can be perceived in concrete terms. The life and death decision, in contrast, is driven by abstract but powerful concepts, such as retribution, remorse, redemption, and human dignity. "The basic concept underlying the [Eighth Amendment] is nothing less than the dignity of man." *Furman v. Georgia*, 408 U.S. 238, 270 (1972) (Brennan, J., concurring) (quoting *Trop v. Dulles*, 356 U.S. 86, 100 (1958)). In the wake of *Furman v. Georgia*, 408 U.S. 238 (1972), the humanity of the accused is the focal point of capital litigation.

With respect to trial counsel's duties and obligations in these matters, capital counsel have "a duty to bring to bear such skill and knowledge as will render the trial a reliable adversarial testing process." *Strickland v. Washington*, 466 U.S. 668, 687 (1984). Ineffective assistance of counsel under the Sixth Amendment occurs when counsel acts contrary to professional norms, with prejudice resulting. Prejudice is established when attorney conduct undermines confidence in the result or creates a reasonable probability that the result in the case would have been different absent the conduct. *Id.*

In the context of failing to investigate and present mitigation evidence, as was the

7

**JA211**

case in Mr. Barnette's 2002 resentencing trial, the Supreme Court has recently found trial counsel ineffective in five cases: *Williams v. Taylor*, 529 U.S. 362 (2000); *Wiggins v. Smith*, 539 U.S. 510 (2003); *Rompilla v. Beard*, 545 U.S. 374 (2005); *Porter v. McCollum*, 558 U.S. 30 (2009) (per curiam); and *Sears v. Upton*, 561 U.S. 945 (2010) (per curiam). Each of these cases was tried years before Mr. Barnette's 2002 resentencing trial.

To comply with professional norms defense counsel must conduct a thorough and complete investigation into the client's background and social history. *See Williams,* 529 U.S. at 396 ("[t]rial counsel did not fulfill their obligation to conduct a thorough investigation of the defendant's background"); *id.* at 415 (trial counsel's duty is to conduct the "requisite, diligent" investigation into client's background) (O'Connor, J., concurring). Counsel may not abandon their investigation of petitioner's background after having acquired only rudimentary knowledge of his history from a narrow set of sources." *Id.*

In *Rompilla v. Beard*, the Court found trial counsel were found deficient "even when a capital defendant's family members and the defendant himself have suggested that no mitigating evidence is available" and despite the fact that trial counsel consulted with three mental health experts. 545 U.S. at 377, 379. The Court held in *Rompilla* that trial counsel were ineffective because they knew the prosecution intended to use a prior conviction against the defendant yet failed to examine the file prior to trial. *Id.* at 387 ("The notion that defense counsel must obtain information that the [prosecution] has and will use against the defendant is not simply a matter of common sense … [L]ooking at a file the prosecution says it will use is a sure bet: whatever may be in that file is going to

8

tell defense counsel something about what the prosecution can produce.").

In *Porter v. McCollum*, the Supreme Court found trial counsel to have been ineffective despite a "fatalistic and uncooperative" client because "that does not obviate the need for defense counsel" to conduct mitigation investigation. 558 U.S. at 40. In *Sears v. Upton*, the Court found trial counsel ineffective in a 1993 trial even though they had presented seven witnesses in the penalty proceedings. As the Court stressed, "We have never limited the prejudice inquiry under *Strickland* to cases in which there was only 'little or no mitigation evidence' presented to the decisionmaker[.]" 561 U.S. at 954 (quoting *Strickland*, 466 U.S. at 700).

Courts reviewing capital cases must determine whether trial counsel satisfied his or her "duty to conduct the 'requisite, diligent' investigation into his client's background." *Wiggins*, 539 U.S. at 524-25 (citing *Williams v. Taylor*, 529 U.S. 362 (2000)). This assessment "includes a context-dependent consideration of the challenged conduct as seen 'from counsel's perspective at the time.'" *Wiggins*, 539 U.S. at 522 (quoting *Strickland*, 466 U.S. at 689). As the Supreme Court explained in *Wiggins*:

> In assessing the reasonableness of an attorney's investigation … a court must consider not only the quantum of evidence already known to counsel, but also whether the known evidence would lead a reasonable attorney to investigate further.

*Wiggins*, 539 U.S. at 527. Where facts known to counsel suggest further investigation would be fruitful, the failure to investigate results from "inattention, not reasoned strategic judgment." *Id.* at 526. Where, as here, counsel fails to explore and present substantial mitigation evidence, "we focus on whether the investigation supporting counsel's decision not to introduce mitigating evidence of [the defendant's] background was itself reasonable." *Id.* at 523.

9

**JA213**

The fact that the United States was seeking the death penalty against Mr. Barnette is an essential part of the "context-dependent consideration" that *Wiggins* requires of Mr. Barnette's claim of ineffective assistance of counsel. The unfettered constitutional right, found under the Eighth Amendment, to offer mitigating evidence "does nothing to fulfill its purpose unless it is understood to presuppose the defense lawyer will unearth, develop, present and insist on consideration of those 'compassionate or mitigating factors stemming from the diverse frailties of humankind.'" ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases (2003), Guideline 1.1, Comm. (quoting Louis D. Bilionis & Richard A. Rosen, Lawyers, *Arbitrariness and the Eighth Amendment,* 75 TEX. L. REV. 1301, 1316-17 (1997) (citation omitted)). The Fourth Circuit recognizes this obligation, as well. In reversing a death sentence due to trial counsel's ineffective assistance of counsel with regard to sentencing, the Fourth Circuit emphasized:

> [W]e simply adhere to Supreme Court precedent and require that counsel, before settling on a sentencing strategy, make "efforts to discover *all reasonably available* mitigating evidence." *Wiggins,* 539 U.S. at 524 (internal quotation marks omitted); *see Strickland,* 466 U.S. at 690–91. Because [trial] counsel ignored numerous red flags and failed to investigate reasonably available mitigating evidence about [the defendant's] mental impairment, we conclude that their performance was constitutionally deficient …

*Gray v. Branker*, 529 F.3d 220, 234 (4th Cir. 2008) (emphasis in original).

As this precedent makes indisputably clear, the questions for any reviewing court are not whether trial counsel conducted a mitigation investigation or consulted with experts or presented mitigation evidence at trial. Rather, the questions include, but are not limited to, whether trial counsel conducted a thorough investigation of sentencing issues, whether trial counsel conducted a thorough investigation of all reasonably available

**JA214**

mitigating evidence, whether trial counsel conducted a thorough investigation of all reasonably available evidence to rebut any aggravating evidence that may be introduced by the government, whether any of trial counsel's strategic decisions were based on information learned from a thorough investigation, and whether counsel reasonably implemented a chosen "strategy."

In Mr. Barnette's case, resentencing counsel's individual actions and omissions, and their cumulative effect, require vacating Mr. Barnette's death sentences.[3]

**B. <u>Resentencing Counsel Failed to Investigate and Present Powerful Evidence of Major Mental Illnesses and Mitigation</u>**

As detailed in the § 2255 motion, and supported further herein and through the attached exhibits, there was compelling mitigation evidence that resentencing counsel failed to develop and present at Mr. Barnette's 2002 resentencing. The information that trial counsel unreasonably failed to develop and present would have recast the entire defense presentation, told a materially different and mitigating story about Marc Barnette, his mental health, and his social history, and rebutted much of the prosecution's evidence in aggravation. As one defense expert who testified at resentencing explains:

> The new information that I have reviewed [in post-conviction] significantly changes my earlier findings and opinions. Had I been provided with this information during my trial work on behalf of Mr. Barnette, I would have rendered a different expert report and testified in markedly and materially different ways. Indeed, now that I have been provided with additional information from post-conviction counsel, it is my belief that my earlier findings, opinions, and testimony were badly marred by inaccurate and incomplete information with which trial counsel provided me.

[Burgess Affidavit ¶ 9, Bates Nos. 51-55] Resentencing counsel's failures were not due to reasonable strategic decisions following a thorough investigation.

---

[3] To avoid any confusion with Mr. Barnette's counsel during his 1998 trial, references to Mr. Barnette's counsel for his 2002 resentencing will be referred to herein as "resentencing counsel." The legal standards for assessing their performance are the same.

11

**JA215**

In February 2001, Jean Lawson and Claire Rauscher were appointed to represent Mr. Barnette for his resentencing hearing. Nearly seven months into their representation of Mr. Barnette, no mitigation investigation had occurred. On August 28, 2001, Ms. Lawson and Ms. Rauscher filed an *ex parte* document called "Statement of Defense Contentions," in which they identified certain "red flags" from the first trial and concerns they had about the prior defense team's work on Mr. Barnette's behalf. As Ms. Lawson explains:

> Based on our work in the case up to that point, which constituted a review of the first trial transcript, Mr. Barnette's criminal record, and discovery, we wrote that "an approach different from that used in his first sentencing hearing [was] warranted." We believed that the first defense team tried to minimize the features of Marc Barnette's relationships with other women, and, in some instances, sought to blame the women for any difficulties that existed. It was our belief that we would need to address those prior relationships head on, and have a far better understanding of them than what the first defense team had or presented to the Jury.

> Based on our review of the case materials as of August 28, 2001, it was also apparent that the first defense team presented a "disjointed" sentencing case. As we explained in the *ex parte* Statement of Defense Contentions: "[W]itnesses were unprepared for cross-examination. The investigation was superficial and not-sufficiently in depth to enable the formation of a cohesive theory of mitigation."

[Lawson Affidavit ¶¶ 7-8, Bates Nos. 94-101]

Ms. Lawson and Ms. Rauscher believed they "needed to reevaluate everything that the first trial team did." [Lawson Affidavit ¶ 9, Bates Nos. 94-101] Resentencing counsel for Mr. Barnette's resentencing recognized the need to further develop and explore a number of "red flags"—issues and questions that were apparent yet undeveloped—that were readily apparent from a simple review of the transcript of Mr.

12

**JA216**

Barnette's 1998 sentencing hearing. One particularly significant "red flag" concerned Mr. Barnette's relationships with women. The government had introduced a significant amount of evidence at the first trial about Mr. Barnette's relationships in an effort to secure a death sentence. Ms. Lawson and Ms. Rauscher both saw the pressing need to re-investigate those relationships.

> We believed that the first defense team had done a poor job trying to address Marc's relationships with other women, and had, in some instances, appeared to blame the women for any difficulties that existed. It was our belief that we would need to directly address Marc's prior relationships and develop a far better understanding of them than what the first defense team had or presented to the jury.

[Rauscher Affidavit ¶ 6, Bates Nos. 129-131]

In addition to Mr. Barnette's relationships with other women, other "red flags" included such things as:

> [T]he trauma experienced by Mr. Barnette's teenager mother when her mother was shot and killed by her step-father; the combat trauma experienced by Mr. Barnette's maternal grandfather, Jessie Cooper, in the Korean War and its impact on his civilian life; the beatings Derrick inflicted on young Marc for bad grades in school; the impact of the divorce of Derrick and Sonia; Mr. Barnette's hospitalization in Georgia after a brutal beating; the track coach who recognized Mr. Barnette's potential and may have had an outsider's insights into his situation at home; the shooting of Mr. Barnette by his cousin when he returned to North Carolina; Mr. Barnette's suicide attempt as a teenager; and his chronic crying spells, from the time he was with Natasha Heard (sobbing in the closet) until the period after the break-up with Robin Williams (when his mother and Aunt Sheila observed him crying on the telephone).…

> What was the impact of her mother's murder on Sonia? How did her mother's death affect Sonia's ability to care for her son? After the grandmother died, who looked after ten-month-old Marc while Sonia attended school? What did the military and Veterans Administration records document about Jessie Cooper's wounds and post-war functioning? How did Mr. Barnette do in school? What did teachers and coaches know about his home situation? Did he come to school hungry or with visible bruises? Who could confirm the physical maltreatment by his father? What did police reports and medical records say about the incidents when Mr. Barnette was victimized as a teenager?

13

**JA217**

[Stetler Declaration ¶ 54, Bates Nos. 137-199]

The existence of these "red flags" was not lost on Mr. Barnette's resentencing trial counsel, and they made clear to the Court in August 2001 that additional investigation—and, to be clear, re-investigation of ground previously covered—was absolutely necessary. As a starting point, trial counsel explained to the Court in its *ex parte* filing that it needed to replace the original mitigation specialist, Sindy Maxwell, with Cessie Alfonso. As Ms. Lawson explains:

> With respect to hiring Cessie Alfonso, it was evident to defense counsel that we needed to replace Sindy Maxwell, who had handled the mitigation investigation for the first trial team. As we wrote in the *ex parte* Statement of Defense Contentions, "[Maxwell] failed to develop adequate rapport with the defendant's family and friends that would have enabled her to unearth critical biographical information. She prepared a 'time line' purporting to represent the defendant's life history and omitted critical information. These omissions cast doubt on the reliability of other expert witnesses called by the defense. As a result, the honesty of the defense presentations was compromised." Inasmuch as this was a resentencing trial and the primary focus would be on mitigation, and in light of the significant deficits in Ms. Maxwell's earlier work, there was little question in my mind that we needed to replace her with someone new.

[Lawson Affidavit ¶ 12, Bates Nos. 94-101]  As Ms. Rauscher notes:

> The deficits in [Ms. Maxwell's] earlier work were particularly problematic because this was a resentencing trial and the primary focus would be on mitigation.

[Rauscher Affidavit ¶ 11, Bates Nos. 129-131] Because the work previously done "omitted critical information," "cast doubt on the reliability" of experts who relied on that information, and called into question "the honest of the defense presentations," *id.*, it was quite evident to Mr. Barnette's new trial counsel that a different mitigation specialist and reinvestigation was required.

Despite resentencing counsel's recognition that it could not rely on the mitigation investigation done previously, and despite the readily apparent "red flags" from the first

trial, resentencing counsel simply failed to follow through. The above-referenced "red flags"—which provided at least a starting "roadmap for follow-up investigation"—were ignored. [Stetler Declaration ¶ 54, Bates Nos. 137-199] Critical witnesses were never interviewed; powerful mitigation was undeveloped; and the evidence provided to Mr. Barnette's jury in 2002 was, as before, incomplete, inaccurate, and misleading. As just one glaring example, the mental health experts called to testify at Mr. Barnette's resentencing hearing in 2002 were provided with Ms. Maxwell's mitigation work from the first trial—the very work deemed incredible and unreliable by resentencing counsel. Inexplicably, the defense experts were not provided with the mitigation investigation developed by Ms. Alfonso. [Lawson Affidavit ¶ 36, Bates Nos. 94-101; Burgess Affidavit ¶¶ 7, 12, Bates Nos. 51-55]

Even in the absence of glaring "red flags," resentencing counsel had a duty to reassess, reevaluate, and reinvestigate the earlier work done on Mr. Barnette's behalf. As Russell Stetler, the National Mitigation Coordinator for the Federal Death Penalty Projects and investigator with over 34 years of death penalty experience, explains:

> In a capital resentencing proceeding, one cannot assume that all relevant mitigating evidence was developed by prior counsel – particularly since the original jury returned a death sentence. It is incumbent upon successor counsel to conduct the same penalty-phase preparation, including thorough social history investigation and reliable mental health assessments, as counsel would be expected to conduct at an initial trial.

[Stetler Declaration ¶ 4, Bates Nos. 137-199] Indeed, Mr. Stetler opines, "[R]eliance on the existing mitigating evidence and overall penalty-phase preparation in lieu of conducting a thorough and independent investigation of both mitigating and alleged aggravating evidence would constitute a dereliction of counsel's duty under the Sixth and

15

**JA219**

Eighth Amendments and the prevailing professional norms[.]" [Stetler Declaration ¶ 4, Bates Nos. 137-199]

As a direct consequence of resentencing counsel's unreasonable failure to do precisely what it had previously deemed necessary – and what prevailing professional norms requited – Mr. Barnette's resentencing hearing unfolded much like this first one. The jury was not provided with critical information about Mr. Barnette; the information that was provided by resentencing counsel was not reliable; and the experts who testified for the defense were forced to rely on incomplete, inaccurate, and misleading information.

### 2. Resentencing Counsel's Delayed and Interrupted Preparation for the Resentencing Hearing

Although Ms. Lawson and Ms. Rauscher were appointed to represent Mr. Barnette for resentencing on February 13, 2001, no investigation or mitigation development had occurred nearly eight months into their representation. Requests for mitigation and investigative services were not filed until August 28, 2001. Authorizations for mitigation specialist Cessie Alfonso and investigator Jan Barefoot were not granted until October 2001. [Bates Nos. 382-389] By October 31, 2001, over eight months into their representation of Mr. Barnette, resentencing counsel's mitigation specialist, Ms. Alfonso, was "just getting started," and resentencing counsel "had not yet spoken with any other experts—both experts from Marc's first trial (who we needed to assess and decide whether to use again) as well as potential new experts." [Rauscher Affidavit ¶ 14, Bates Nos. 129-131]

Then on November 20, 2001, just as resentencing counsel's work appeared to be beginning, the unexpected removal of Ms. Rauscher as resentencing counsel caused a

16

**JA220**

disruption for Mr. Barnette's defense. As a hearing in November 2011, the Court removed Ms. Rauscher as one of Mr. Barnette's attorneys after she asserted the existence of a conflict due to the resentencing hearing being scheduled for March 12, 2002. [Rauscher Affidavit ¶ 15, Bates Nos. 129-131; Lawson Affidavit ¶ 16, Bates Nos. 94-101] As Ms. Lawson explains:

> The loss of 50% of the defense team was a huge shock to all of us. As a result of her removal, the case then had to be continued from the March 12, 2002 trial date.
>
> From [November 2001] until January 14, 2002, I was Marc Barnette's only attorney. The process of finding a substitute for Claire Rauscher was difficult.

[Lawson Affidavit ¶¶ 16-17, Bates Nos. 94-101]

By January 2002, with Mr. Barnette's resentencing scheduled to begin on July 15, 2002, resentencing counsel's investigation had not gone very far at all. Cessie Alfonso, the new mitigation specialist, had only had her first meeting with Mr. Barnette and his mother, Sonia Cooper, in January 2002. [Alfonso Affidavit ¶ 8, Bates Nos. 1-5] Ms. Lawson's new co-counsel, Harold Bender, was appointed on January 14, 2002 and Ms. Lawson knew that he would not take much responsibility for developing the mitigation for resentencing. As Ms. Lawson explains:

> I had previously worked with Mr. Bender as co-counsel and as counsel for co-defendants. In terms of working up a case, I knew from first-hand experience that Harold Bender's major strength and interest was in the courtroom and that he had a busy private practice. As a result, I knew that the responsibility and burden of developing the mitigation and case for sentencing would be mostly mine.

[Lawson Affidavit ¶ 18, Bates Nos. 94-101] Two days after Mr. Bender joined her as co-counsel for Mr. Barnette, Ms. Lawson was appointed counsel in another capital case in Gaston County. Only days later, she began a capital resentencing in Mecklenburg County that would occupy her into February 2002. [Lawson Affidavit ¶ 20, Bates Nos. 94-101]

17

**3. Resentencing Counsel Unreasonably Failed to Develop Mr. Barnette's Background of Abuse, Deprivation, Abandonment, and Neglect Leading to Long-Standing Mental Illness and, Ultimately, Tragedy**

**a. The Dysfunctional "Investigation"**

In keeping with its *ex parte* filing in October 2001, resentencing counsel hired a new mitigation specialist, Cessie Alfonso, for Mr. Barnette's resentencing hearing. Although resentencing counsel may have understood why Ms. Alfonso was needed to replace Sindy Maxwell and what areas in particular required investigation, they failed to communicate any of that information to her. As Ms. Alfonso explains:

> Sindy Maxwell was the mitigation investigator for Marc's first trial. Jean Lawson had little confidence in Sindy's work because the mitigation investigation had been incomplete and resulted in inaccuracies and superficial conclusions. Neither she nor Harold Bender (nor anyone else on the defense team) discussed with me what particular aspects of Sindy's mitigation investigation they had serious concerns or reservations about.
>
> It was never made clear to me whether defense counsel wanted me to do a wholesale re-investigation of Marc's background, or instead just focus on specific aspects. …

[Alfonso Affidavit ¶¶ 6-7, Bates Nos. 1-5]

Investigator Jan Barefoot, who describes her "primary role in Barnette retrial was to assist Cessie Alfonso … with locating witnesses," similarly notes the absence of communication or direction from resentencing counsel.

> I did not have full-scale involvement in the retrial. Neither Jean Lawson nor Harold Bender sought my input about defense strategy. I do not recall either Jean or Harold describing their trial strategy to me. They would usually just call or fax me with a task or "to do." My biggest responsibility for the Barnette retrial was serving subpoenas. I was not involved with and was unaware of any team meetings or organized means of communicating new information or thoughts about strategy.

[Barefoot Affidavit ¶¶ 6-7, Bates Nos. 15-16]

18

**JA222**

This lack of clarity and failure to communicate by resentencing counsel resulted in an inadequate, unreasonable, and wholly underdeveloped mitigation investigation. By the start of Mr. Barnette's resentencing hearing in July 2002, his defense team had not even interviewed all of the witnesses who had testified for the defense at his first trial, much less the many other witnesses who had never been spoken with in the first place.[4] As Ms. Lawson describes:

> I have reviewed Cessie Alfonso's mitigation report that identifies the persons she interviewed. According to her report, she interviewed Marc, Sonia Barnette, Derrick Barnette, Sheila Cooper, Mario Barnette, Mable Johnson, Jesse Cooper, Armaud Cooper, Larry Wright, Tasha Tolbert, Tessie Nero, and Dorothy Harper. It does not appear that she re-interviewed a number of witnesses who Sindy Maxwell had interviewed prior to the first trial. There were also a number of witnesses who had been identified on a list of "potential mitigation witnesses" in early March 2002 (like Sheila Sullivan, Tameka Hunter [sic], and Kowana Dozier) whom Ms. Alfonso did not interview.

[Lawson Affidavit ¶ 37, Bates Nos. 94-101] Only three of the witnesses interviewed by Ms. Alfonso were called as defense witnesses at the 2002 resentencing hearing. [Alfonso Affidavit ¶ 7, Bates Nos. 1-5]

As post-conviction counsel's investigation lays bare, there was a treasure trove of mitigation information available from a number of readily available witnesses whom resentencing counsel simply and unreasonably failed to pursue. These witnesses were either known to resentencing counsel before the 2002 resentencing or, with little effort, would have been known. Indeed, Ms. Lawson had a list of "potential mitigation witnesses" as early as March 2002 that contained the names of a number of witnesses who could have provided important information about Mr. Barnette but were never asked. [Lawson Affidavit ¶ 29, Bates Nos. 94-101]

---

[4] During Mr. Barnette's 1998 penalty phase, the defense called twenty-two (22) witnesses, half of whom were family members.

### b. Proper Investigation: Major Mental Illness

The extent to which these un-interviewed witnesses, or witnesses who were spoken with briefly but not pursued, could have provided important information and insights about Mr. Barnette—and the many "red flags" that had been readily apparent from the first trial—cannot be overstated. Indeed, with access to this information gathered in post-conviction, Dr. Richard Dudley, M.D., a physician, with a specialty in clinical and forensic psychiatry, reached the following expert opinions:

> Mental status examinations of MB, performed during this psychiatrist's various visits with/examinations of MB were quite revealing. More specifically, each time that this psychiatrist met with MB he was oriented to person, place and time, and his memory for both short and long-term events appeared to be good. However, MB's mood was markedly different each time that he met with this psychiatrist for reasons that he/MB was unable to identify/explain. At times his mood was severely depressed; at other times his mood was inappropriately elated, and at other times his mood was more mixed (i.e., depressed and manic), with an associated irritability and extreme suspiciousness that at times reached the level of paranoia (i.e., the feelings that he was being harmed were fixed/he wouldn't let them go despite being confronted about them). His affect (i.e., the external representations or expressions of his mood) also changed consistent with the above noted changes in his mood.

> MB's family reported observing similar changes in MB's mood over the course of his life, starting at least back when he was an adolescent. Unprompted, MB's mother noted that these changes in MB's mood were often so extreme and would occur so rapidly that she felt that she should take him for some type of mental health evaluation and treatment; she cried as she noted that she just never did that; and she noted that maybe if she had done what she had thought she should do for MB, maybe none of this would have ever happened. More detailed exploration with family members and others about MB's mood during May and June 1996 revealed rapid changes in his mood during that time period as well.

> MB did evidence at least some developing insight, in that he noted that although in the past he didn't really know anything about depression, he now realizes that the depression and suicidal feelings and attempts that he made were indicative of depression or at least some type of mental health problem. He also noted that some of the things he was feeling back then seem foreign and maybe even crazy now, largely because he has come to understand more about why/how he developed such major issues with trust, starting back with his early childhood experiences. He noted, for example, that his frenzied 'need to know' whether or

20

<strong>JA224</strong>

not Robin was really with Greene now seems strange to him, as does the sense that he could love her so strongly that he would want to take her with him or do a murder/suicide thing.

Otherwise, MB's mental status was unremarkable, in that his speech was clear, coherent and goal-directed, his intellectual capacity appeared to be within the average range, and there was no clear evidence of an organic brain syndrome.

Given the above noted, it is the opinion of this psychiatrist, to within a reasonable degree of medical certainty, that MB has suffered quite severely as a result of his extremely difficult childhood. More specifically, MB's extremely difficult childhood significantly impaired his development, resulting in broad-based instability in all major areas of functioning. There is difficulty with attachment/instability in interpersonal relationships, characterized by frantic efforts to avoid real or imagined abandonment, and intense relationships with alternating feelings of extreme idealization and extreme devaluation of the other person; there is instability of self-image, characterized by an unstable sense of self and periods feeling empty and valueless; there is instability of mood, with affective instability due to marked reactivity of mood often accompanied by anxiety and irritability and/or suicidal behavior; and there is impulsivity generally associated with self-damaging behavior.

Although this psychiatrist believes that identifying MB's symptoms of mental illness and appreciating their impact on his ability to function is more important than labeling him with a specific diagnosis, it is the opinion of this psychiatrist that the above described cluster of symptoms meet the diagnostic criteria for Borderline Personality Disorder. A childhood history of abuse, neglect, hostile conflict, and early parental loss or separation is not at all uncommon in individuals who suffer from this disorder; this is clearly the case with MB; and therefore it is not surprising that there is an exacerbation of the difficulties associated with this disorder when a caregiver or lover is seen as neglectful, withholding, uncaring, or abandoning. It is also important to note that persons who suffer from this disorder are vulnerable to the development of transient, stress-related paranoid ideation or severe dissociative symptoms, and based on the information currently available to this psychiatrist, this also seems to be the case with MB.

In addition, it is the opinion of this psychiatrist, to within a reasonable degree of medical certainty, that MB also suffers from a major mood disorder, characterized by rapidly changing, extreme mood states, including mania, depression, and mixed states of mania and depression associated with extreme irritability and paranoid ideation. It at least appears that the onset of this major mood disorder was during MB's adolescent years.

Such rapidly changing mood states are quite destabilizing for an individual in and of themselves, and are particularly destabilizing during the period of adolescent

Case 3:12-cv-00327-MOC   Document 74   Filed 12/22/14   Page 21 of 108

**JA225**

development when such emotional turmoil is so difficult to understand and manage. Then in addition, the fact that MB's major mood disorder is superimposed on his above described broad-based instability in major areas of functioning has resulted in even much more severe impairment in his ability to function, in that each of these major psychiatric disorders potentiate the other.

A full appreciation of how these two psychiatric disorders interact with and can potentiate each other requires additional understanding of the nature and course of each disorder. More specifically, Borderline Personality Disorder is best understood as an underlying disorder, in that its characteristics are enduring/persistent and therefore always impact on the individual and his/her ability to function. However, as noted above, certain types of stressors can exacerbate the difficulties associated with Borderline Personality Disorder, thereby causing a further deterioration in the person's ability to function. In contrast, the rapid swings in mood that are a part of MB's major mood disorder cycle on their own schedule, virtually unrelated to whatever is going on around him. However, the mood that he is experiencing at any given time will impact on how he responds to any stressors that he might be vulnerable to as a result of his underlying Borderline Personality Disorder.

More specifically, for example, when an individual who suffers from Borderline Personality Disorder perceives that he/she is being abandoned by a significant other, the symptoms associated with this disorder will be exacerbated. However, if that same person is simultaneously in a manic/hyper-elated state due to a separate major mood disorder, the overall response/mental state will be quite different than it will be if he/she were in a depressed state due to that major mood disorder.

Based on this psychiatrist's review of the information noted above in paragraph 6 and my consultation with Ann Wolbert Burgess, RN, DNSc, the information currently available to this psychiatrist is considerably and significantly more than the information that was made available to Dr. Burgess. In addition, because of the wealth of information currently available to this psychiatrist, my psychiatric opinions about MB are not only better supported but also much more complex than the opinions rendered at the time of his trial. More specifically, although there had been various difficulties including violence in some (although not all) of MB's relationships with women, additional important information about those relationships, especially his life-changing relationship with Sheila Sullivan, and additional important information that helped establish that he also suffered from other major psychiatric disorders resulted in that much more complex picture of MB's mental health difficulties. Additional important information also indicates that he was suffering from these major psychiatric difficulties at the time of the killings, and that therefore his mental state was even more severely impaired than had been previously recognized.

22

**JA226**

Based on my experience in capital litigation, if the information made available to this psychiatrist had been available at the time of his trial, MB's extremely difficult childhood, including the effect that his mother's own trauma and family secrets had on her availability/capacity to parent MB; the impact of his extremely difficult childhood on his development, the resultant broad-based instability in major areas of functioning, and the associated impairments in his ability to function; his severe major mood disorder and the impact of this disorder on his ability to function; and the ways in which the two psychiatric disorders potentiate each other would have been mental health findings that could have been recognized and presented to MB's legal team for consideration as mitigation at the time of his trial. Instead, the mental health opinions presented, which apparently lacked many of the critically important factual bases upon which my opinions are based, were either incomplete, not sufficiently supported, and/or inaccurate.

Of particular importance, with regard to potential mitigation, is the fact that the information currently available to this psychiatrist makes MB's mental state at the time of the crimes for which he has been convicted and sentenced to death much clearer, and indicates that at the time of the crimes, MB's capacity to conform his conduct to the requirements of the law was significantly impaired.

More specifically, the symptoms of MB's Borderline Personality Disorder were clearly exacerbated by his perception of the impending loss of his relationship with Robin Williams, his perception that she had been unworthy of his trust, and his perception that she had viewed him as a fool who could be easily used/taken advantage of. Based on the information currently available to this psychiatrist, MB evidenced frantic efforts to avoid abandonment by Robin, a reversal of his extreme idealization of Robin to extreme devaluation of her, a deterioration of his sense of self to the point of feeling empty and valueless, mood reactivity with irritability and suicidal behavior, impulsivity, and stress-related paranoid ideation. Then, over the next couple months, superimposed on these exacerbated symptoms, were the profound and rapid swings in his mood that were symptomatic of his major mood disorder that determined how he ultimately experienced the underlying crisis and its resultant symptoms. In other words, based on the information currently available to this psychiatrist, when MB was experiencing an elevated mood he was out with friends, despite the underlying crisis; when he was experiencing a depressed mood he was isolative/stayed in his room, he was crying a lot, and he was suicidal; and when he was experiencing a more mixed state of mania and depression he was agitated, irritable, more paranoid and otherwise even more irrational.

[Dudley Report ¶¶ 63-76, Bates Nos. 209-231]

Ann Wolbert Burgess, a forensic nurse who testified as a defense witness in 2002, agrees that the information gathered in post-conviction and not previously made available

**JA227**

to her in 2002 is critically important and markedly different than what was provided by

resentencing counsel—so much so that it "significantly changes [her] earlier findings and

opinions." [Burgess Affidavit ¶ 8, Bates Nos. 51-55] As Dr. Burgess explains:

> The new information that I have reviewed significantly changes my earlier findings and opinions. Had I been provided with this information during my trial work on behalf of Mr. Barnette, I would have rendered a different expert report and testified in markedly and materially different ways. Indeed, now that I have been provided with additional information from post-conviction counsel, it is my belief that my earlier findings, opinions, and testimony were badly marred by inaccurate and incomplete information with which trial counsel provided me.
>
> For example, a prominent focus of my report and trial testimony was the notion that Mr. Barnette had witnessed and experienced domestic violence during his youth, and that his criminal conduct in April through June 1996 "may be understood, in part, as a symbolic reenactment of family and childhood patterns" (which is how I wrote about it in my report). I also testified that the "roots" of his behavior could be found in the way he was "raised and developed." The information now made available to me makes clear that this emphasis on "multi-generational violence" as an explanation for Mr. Barnette's criminal behavior in question was misplaced and due to incomplete and inaccurate information provided to me by trial counsel. While it is true that Mr. Barnette witnessed and experience domestic violence, it is clear from the new information provided that his criminal conduct could not simply be explained by that upbringing. Rather than any "symbolic reenactment of family and childhood patterns," Mr. Barnette's criminal conduct was attributable to a psychotic episode and mental health crisis that he was experiencing. The incomplete and inaccurate information provided by trial counsel led me to erroneously conclude that Mr. Barnette "ha[d] devoted his adolescent life to a continuous pattern of reenacting and trying to resolve the way he was programmed in childhood." Rather than simply acting out as a result of familial dysfunction, as I reported and testified about in 2002, Mr. Barnette suffered from debilitating mental health issues that profoundly affected his behavior throughout his life.
>
> In my report and trial testimony, I opined that Mr. Barnette may have been suffering from major depression and a personality disorder "not otherwise specified," with paranoid, antisocial, and borderline features. These diagnoses were incomplete and lacking because the information provided to me at the time was also incomplete and lacking. The new information provided by post-conviction counsel makes far clearer the most prominent and important aspects of Mr. Barnette's mental health status during the relevant period of time. Based on this new information, it is my opinion that Mr. Barnette was experiencing a psychotic episode and mental health crisis, and that he also suffered from a mood disorder that was significantly affecting his thinking and behavior.

24

**JA228**

[Burgess Affidavit ¶¶ 9-11, Bates Nos. 51-55]

Dr. Sally C. Johnson, who evaluated Mr. Barnette prior to his 1998 trial in her capacity as the Associate Warden of Health Services/Chief Psychiatrist at FCI Butner, but who was not contacted by resentencing counsel prior to his 2002 resentencing (at which time Dr. Johnson was the Director of Forensic Fellowship Program for Federal Bureau of Prisons/Duke University of Psychiatry and a Psychiatric Consultant to the Medical Director of the Federal Medical Center (FMC) at FCI Butner), also agrees that the information gathered in post-conviction is significant. Had she been contacted by resentencing counsel and provided with readily available information, Dr. Johnson could have testified about Mr. Barnette's health issues and nonviolent relationships with other women. She could have testified about the significance of the murder of Mr. Barnette's maternal grandmother, Pearl Cooper; his maternal grandfather, Jesse Cooper's, post-traumatic stress disorder; how the confusion concerning Mr. Barnette's paternity was handled within the family; his mother Sonia's limitations as a young parent; and the absence of any stable or helpful guidance given to him from others (including his family) for coping with stress, dealing with problems, and navigating his adolescent and teenaged years. [Johnson Affidavit ¶¶ 16-22, Bates Nos. 89-93] Dr. Johnson could have also testified that by 2002, Mr. Barnette had clearly demonstrated "very positive institutional adjustment."

> He presented no problems for correctional officers and had no problems with other inmates. He demonstrated an ability and willingness to abide rules, remained non-violent, and maintained constructive and positive relationships with others.

[Johnson Affidavit ¶ 16, Bates Nos. 89-93]

As post-conviction counsel's thorough investigation demonstrates, resentencing counsel failed to conduct a reasonable investigation that would have produced a complete and accurate understanding of Marc Barnette's relevant mental states, and their mitigating qualities. As a result, Mr. Barnette's resentencing jury in 2002 was not informed of this highly relevant and strongly mitigation information.

### c. Family Overview

Aquilia Marcivicci "Marc" Barnette, called "Vicci" by some relatives, was born on July 7, 1973 in Charlotte, North Carolina. Marc is 41 years old and the father of two young adult children, Angelica and Marc. Marc Barnette spent the first 14 years of his life in Charlotte before moving to Georgia with his mother Sonia Cooper Barnette and brother Mario Barnette. He returned to Charlotte in 1993. He later met Robin Williams, who was living in Roanoke, Virginia, and moved in with Robin in 1995. He returned to Charlotte in April 1996 after their relationship ended. The crimes for which Marc is incarcerated occurred in June 1996.

Marc's mother, Sonia, was born to Jesse and Pearl Cooper on August 17, 1958. She gave birth to Marc when she was 14 years old. Less than a year later, Sonia's mother Pearl was shot and killed by her new husband, Loyd Brown, while Sonia and Marc were sleeping nearby. Pearl's murder and its aftermath severely traumatized Sonia, as well as her younger sister Sheila Cooper, who was also in the house when the murder took place. Many family members report that this event had lasting negative effects on the entire family for decades. During high school, Sonia dated Derrick "Rick" Barnette. Rick later attended North Carolina A&T for one semester before enlisting with the U.S. Air Force

26

**JA230**

in late 1974. Sonia and Rick were married February 8, 1976, and they lived together until approximately 1984. [Rowles Mitigation Report, Bates Nos. 232-259]

For the first 14 years of his life, Marc knew Rick Barnette as his biological father, as well as the biological father of his younger brother, Mario, who was born in 1977. But in 1987, nearly two years after Rick and Sonia's divorce was finalized, Rick moved to have paternity testing done. The results, which Rick revealed to Marc and Mario, showed that Rick was not their biological father. This information had immediate and long lasting negative effects on Marc. Shortly after breaking the news to Marc and Mario, Rick moved to Philadelphia and thereafter maintained minimal contact with Marc and Mario. [Rowles Mitigation Report, Bates Nos. 232-259]

### d. Cooper Family Legacies: Trauma, Abandonment, and Murder

For example, with respect to the Cooper Family and its legacies of trauma, abandonment, and murder, the jury never learned about Jesse Cooper, his military service, his trauma, and his condition as a caretaker for Sonia, Marc, and others. Resentencing counsel's failure to gather Mr. Cooper's military and medical records—a basic task in capital defense—meant they were unable to explain to the jury that Jesse Cooper, Sonia's father, had served in Korea after entering the Army in 1951. On February 4, 1952, he was severely wounded. According to military records, Jesse was an ammunitions bearer in a rifle platoon and was wounded by enemy shell fire while counterattacking an outpost. He received wounds to his face, right eye, right thigh, and right hand. [Rowles Mitigation Report, Bates Nos. 232-259; Jesse Cooper: Military Records, Bates Nos. 5156-5253]

27

**JA231**

A letter dated February 11, 1952, from Major General Wm. E. Bergin to Jesse's wife Pearl Cooper reads, in part:

> I deeply regret that it is necessary to inform you that your husband, Private First Class Jesse Cooper, was seriously wounded in action in Korea…. My heartfelt sympathy is with you during this period of anxiety.

[Jesse Cooper: Military Records, Bates Nos. 5156-5253]

According to family members, after Jesse was injured, enemy soldiers kicked and poked their bayonets at him and kept walking, assuming he had died. Notice was sent informing family members that Jesse had been missing and that he had, in fact, died. Robert Cooper, Sonia's cousin and Jesse's nephew, recalls that Jesse "could squeeze shrapnel out of his skin in different parts of his body." Mr. Cooper, who was never contacted by any of Mr. Barnette's resentencing attorneys or investigators, could have described how the family "thought he was dead" after receiving a letter and a flag from the Army; how "[s]ometimes Jesse would act crazy after he got back from the war," and how "[e]ven in the summertime Jesse would wear a big coat and waterproof boots," and "sit under a tree from sunup to sunset." [Robert Cooper Affidavit ¶¶ 8-10, Bates Nos. 64-66]

Jesse would tell Sonia, who was not called as a witness in 2002, that he had "already met Jesus." [Sonia Barnette Affidavit ¶ 10, Bates Nos. 34-48] It was not until 2002, however, with Jesse ailing and in the hospital, that he was awarded a Purple Heart, which had not been previously awarded to him due to an oversight.

Jesse's war experience had long lasting effects on him and the family. As Sonia explains:

> The war affected him mentally. After he came back from Korea he would have nightmares and call out in the night. Once he had a flashback episode where he

28

**JA232**

thought me and my sisters were nurses. After this he was taken to Broughton Hospital, a state psychiatric hospital in Morganton, NC. After he came home from Broughton we had to be really quiet. We were not supposed to make loud noises around him.

He often ate Vienna Sausages and a pack of saltines for a meal. He basically lived on rations. This was like it was when he was in Korea – eating meat out of a can. He really didn't eat fully cooked meals until I came back to Charlotte from Atlanta in 1993 and started cooking for him.

[Sonia Barnette Affidavit ¶¶ 13-14, Bates Nos. 34-48]

Sonia's younger sister, Sheila Cooper, recalls:

Jesse was really shaken up by his experience serving with the Army in Korea. Jesse would normally sleep outside on our screened in porch. He was sleeping outside like he was still in the war. He had Post Traumatic Stress Disorder and he would sometimes relive his combat experience. He would crouch down with his rifle behind the sofa that was on the porch and peer out. After an episode of doing this, Jesse would end up crying. Then he'd just walk off. I would just watch Jesse when he was doing these things. I didn't know what he was doing and I didn't know what to do. All I knew was that I was not to bother him.

One time I tripped and fell and busted my head. Jesse picked me up as if I was a piece of wood and took me in the house. He lay me on the sofa in the living room and just wrapped my head in a bandage. He treated me like I was a soldier and the best he could do was wrap me in a bandage. He didn't take me to the hospital because he thought we were in the middle of a war. Tessie later came home and saw that I was very pale and had lost a lot of blood. She then made sure I was taken to the hospital. I went in an ambulance to Mercy Hospital and got stitches. I still have a mark on my head from this incident.

[Sheila Cooper Affidavit ¶¶ 9-10, Bates Nos. 67-75]

Jean Nduly, Sonia Barnette's cousin, testified at Mr. Barnette's 1998 trial but was never contacted by resentencing counsel prior to the 2002 resentencing. Ms. Nduly could have testified that:

Jesse Cooper served in the military and he often told stories about the war. He was badly injured in the war and there was a period of time when the family thought he'd been killed. My grandmother always said that Jesse was in the hospital for a long time after he was wounded. Jesse had a glass eye as a result of his injuries. He drank Pabst Blue Ribbon beer and called it his tea. He drank it every day. When he got tipsy he would go lie down and go to sleep, but you still

29

**JA233**

couldn't sneak up on him. In our family the men walked the property to keep people off, and this is something Jesse would do.

[Nduly Affidavit ¶ 6, Bates Nos. 113-116]

Resentencing counsel's failure to investigate and develop this information—through readily available witnesses and records—was highlighted to Mr. Barnette's detriment during resentencing. For example, during Dr. Mark Cunningham's testimony, the prosecution hammered on the credibility of Dr. Cunningham's assessment that Jesse Cooper was "psychiatrically disabled":

> Q: Okay. Now, what psychiatric tests did you perform on Jesse Cooper to make that determination?
>
> A: I was advised of that by Sheila, his daughter.
>
> Q: My question is what psychiatric tests did you perform on Jesse Cooper to make that determination?
>
> A: I did not test Jesse Cooper.

[2002 Tr. 3718-3719] Not only were there a number of readily available witnesses who could have graphically described Jesse Cooper's obvious mental health issues, but there were also records from the U.S. Army, Department of Veterans Affairs, and medical facilities that would have left no question for the jury. [Bates Nos. 5156-3474]

Jesse's condition also factored into the end of his marriage to Pearl, although her own behavior—described as promiscuous by relative Robert Cooper—certainly played a role. Whatever the driving reason behind the end of their marriage, Jesse and Pearl's divorce was a portent for tragedy.

Robert Cooper could have described how Pearl Cooper was promiscuous and left Jesse for another man; how Jesse took the car in which he caught Pearl and another man

30

**JA234**

in and parked it on Cooper Hill, "and never moved it again"; and yet how "Jesse kept his wedding band on until he died." [Robert Cooper Affidavit ¶¶ 12-13, Bates Nos. 64-66]

Do'Lores Guy,[5] who was never contacted by resentencing counsel, could have described how she was very close friends with Pearl, and how Pearl's second husband, Loyd Brown, had been a patient of Pearl's and how when he moved in with Pearl "he only had a stereo, a chair, and clothes. He had nothing." Ms. Guy was aware that Loyd Brown did not want Sonia (Marc's mother) and Sheila (Marc's aunt), who were both young teenagers, to live with him and Pearl, and how he would "rage." [Guy Affidavit ¶¶ 4, 12-13, 16, Bates Nos. 81-84]

Jean Nduly, Sonia's cousin, remembers Sonia was never comfortable around Loyd:

> There was a period of time when Sonia, Sheila, and Vicci came back and stayed with Uncle Jesse. This was while Pearl was with Loyd and after Tessie had moved away. They stayed with Jesse for about a month. Sonia wasn't comfortable around Loyd. I thought he had made a pass at Sonia. Sonia and I laughed and giggled a lot but not after Loyd came into the picture.

[Nduly Affidavit ¶ 9, Bates Nos. 113-116]

As Sonia herself could have testified in 2002:

> I didn't like Loyd from the start. He wasn't genuine. He was stalking my mom. He was trying to take out a life insurance policy on my grandmother. Loyd also ran up credit cards. He was crooked. He took advantage and she was a perfect target. We had moved into a house at that time and my mother had two kids that were girls. Loyd didn't have anything to offer my mom. He came with only a gym bag and a console stereo. That was a red flag to me and I was young and didn't know much about these things. Six months after my mother and Loyd reconnected she said she was marrying him. That was the end of any relationship between my mom and me.

> Loyd treated my mom bad. He wasn't nice to her. I remember seeing him twist my mom's arm behind her back one time during an argument they were having. I had never seen anything like that before.

---

[5] Do'Lores Guy is referred to as "Dolores Hart" in the § 2255 motion.

31

**JA235**

Loyd and I didn't get along and I was unhappy. I said a couple of things about Loyd to my mom. This led us to have arguments which led to us going to live at my father's for a while. However, that arrangement didn't last long. I think we went to live with my father for about a month before going back to live with our mom and Loyd.

[Sonia Barnette Affidavit ¶¶ 23-25, Bates Nos. 34-48]

After the divorce, Sheila and Sonia (and, at this point, Marc, who was an infant) stayed with Jesse on West Boulevard for only about a month before returning to Loyd and Pearl's house on Peaceful Glen Road. Tessie, Sonia and Sheila's eldest sister, was living in Alaska at the time with her husband Jeff Nero (who was in the service). Sonia, Marc, and Sheila only stayed with Jesse briefly because he was not providing for them. Jesse was intoxicated most days after Pearl left, drinking Pabst Blue Ribbon beer.[6] [Tessie Nero Affidavit ¶ 15, Bates Nos. 124-128]

The week after Mother's Day in 1974, in the early Sunday morning hours following Sonia's high school prom, Loyd shot and killed Pearl while she was in her bedroom. Unbeknownst to Sonia and her family, Brown had previously been convicted of shooting someone else. After the shooting occurred, Loyd fled; he later turned himself in to the magistrate. A police report states that law enforcement heard a female scream after police knocked on the door of the residence. Sheila, age 12, came running to the door. Police found Pearl's body in bed with blood around her head. There were no signs of life but her body was still warm. [Rowles Mitigation Report, Bates Nos. 232-259]

In Loyd's confession, he reported that on the day before, around 5:30 p.m., he came home to find that someone had hit a tree next to the driveway. He said he asked

---

[6] Had resentencing counsel obtained Jesse Cooper's medical records, they would have learned that as late as 1994, Jesse drank alcohol from "11:00 p.m. to 6:00 a.m., early a.m., six packs of beer a day" and was a determined to be a "malnourished heavy drinker." [Bates No. 5453]

**JA236**

Pearl and kids what happened and "they would not give him an answer." Loyd also confessed that he and Pearl were having "trouble" and "he was running up charge cards which he could not pay." [Rowles Mitigation Report, Bates Nos. 232-259]

Sonia, who was 15 years old at the time, says 10-month-old Marc was in a crib in the room that she shared with Sheila when the shooting happened. Sonia could have vividly described for the jury the night that Loyd murdered her mother in the next room to where she and Marc were sleeping:

> Vicci, Sheila, and I were all at home when it happened. Vicci was in his crib. I had gone to the prom that night with a friend's brother. When I got back to the house, Loyd was gone. Mom told me she and Loyd had argued and then he had left. I was eating a sandwich when he got back. I later went to bed. Neither Sheila nor I heard any gunshots when it happened. Loyd shot her five times. He must have had a silencer. I was woken up when the police arrived. Loyd had gone out to turn himself in and after he did so they came to the house. Sheila heard the police cars and checked on our mom. She was the first one to find her. I remember seeing blood on the wall. I blacked out after that.

[Sonia Barnette Affidavit ¶ 28, Bates Nos. 34-48]

Sheila Cooper, Sonia's sister, was 11 years old at the time and could have also testified about what happened:

> I was asleep when Loyd shot Pearl; I didn't hear the gun shots. Afterwards, he went and turned himself. Then the police came to the house. I woke up when they banged on the door. When I awoke I was back in my room and Vicci was in his crib. I had on my blue pajamas with frill at the ankles. I knew not to answer the door after 6pm so I went to my mom's room to get her. I saw her and I saw redness. I thought, "Oh mama, your hot water bottle exploded." Then I turned on the light and saw blood all over her front. I started screaming. My mouth tasted weird. I remember the police saying, "He's killed her." Sonia was also screaming. She went and got Vicci.
>
> Then I passed out. I just remember screaming and falling. I ended up waking up across the street at my friend Cynthia Williams' house. I was in bed with her. The second time I awoke, I got up and could see through the window that the police were still at our house. I also saw my dad.

[Sheila Cooper Affidavit ¶¶ 20-21, Bates Nos. 67-75]

**JA237**

Do'Lores Guy could have further testified about how a police officer called her in the middle of the night and asked if she knew Sonia. When Ms. Guy confirmed that she did, the officer asked her, "Can you stay with them? The mama's dead. The husband killed her." Ms. Guy went to stay with Sonia, Sheila, and Marc, who was only a baby. Ms. Guy could have described how scared and upset Sonia and Sheila were, and how "Sonia went into a withdrawal state and depression" afterward. "She would cry easily. She would have crying moods. These were deep-seated feelings. Sonia was depressed and would cry ever since her mother died. That was a change from how she had been before. Sonia was withdrawn and would go through periods of depression." [Guy Affidavit ¶¶ 17-21, Bates Nos. 81-84]

Jean Nduly could have similarly described the impact of Pearl's murder on Sonia and the family:

> I remember the night Pearl was shot. I had talked to Sonia before it happened because it was her prom night. Jesse said, "Jean, we have to get the girls." Pearl had been shot. We went immediately to get them. It was so sad when they came down the steps. They were in a fog. Sonia was in shock and Sheila was really upset. Sonia was trying to console Sheila. The police were at the house and Jesse talked to them. We weren't there very long before we took them back to Jesse's. It was very confusing and scary. Sonia and Sheila were both still so young, and Sonia had Vicci, who was just a baby.
>
> Sonia never talked about her mom's death and we don't pry in our family. She was clearly very sad. It wasn't very long before they moved to Columbia, South Carolina to live with Tessie. After they moved to Columbia I didn't see them as much.

[Nduly Affidavit ¶¶ 11-12, Bates Nos. 113-116]

Sandra Smith, a neighbor who was never contacted by resentencing counsel, recalls:

34

**JA238**

I heard about it when Loyd killed Pearl. Sonia and her younger sister, Sheila, were the ones that found their mother after she'd been killed.

It would be awful for anybody to lose their mom like Sonia and Tessie did. Sonia never talked very much about her feelings or what she thinking about; she was more of an introvert when we were teenagers. She didn't really share what she was going through after her mother was murdered.

[Smith Affidavit ¶ 6-7, Bates Nos. 135-136]

Tessie Nero, Marc's aunt and Sonia's older sister, was not called to testify at Marc's 2002 resentencing, but could have provided important insights about the family in the wake of Pearl's murder:

Pearl married Loyd Brown after I'd left Charlotte and he murdered her within a year of their marriage. I saw him for the first time when I came home for some of his court dates. It was a horrible shock to hear of my mom's death. It happened shortly after mother's day. Sonia, Sheila and Vicci were in the house when he killed her. I came back to Charlotte shortly after it happened. After that, Jeff requested and received a compassionate reassignment to Columbia, South Carolina so we could be closer to home. I drove to Charlotte almost every day in those days after it happened.

Pearl's death was traumatizing. Sheila is the one that found her after she had been shot. After that Sheila got involved with friends that weren't friends. I had to tell her more than once that she wasn't the only one that lost a mother. Sheila stayed out a lot with her friends.

[Tessie Nero Affidavit ¶¶ 12-13, Bates Nos. 124-128] As Sheila Cooper could have testified:

My mother's murder had a profound effect on our family. I was in turmoil on the inside for a long time. Not having a mother to help with stuff going on at school, or with kids, or with work, was difficult. There always felt like a big hole in my life and the lives of my sisters.

[Sheila Cooper Affidavit ¶ 32, Bates Nos. 67-75]

Through Sonia's own testimony, or an expert who had discussed the murder of Pearl with her, the jury could have heard more about the deleterious affect the trauma had on Sonia:

35

**JA239**

For a long time I was frightened that Loyd would get out of jail and harm us. We sent letters to not release him. One time I was in the car on South Boulevard and I saw Loyd out on work release. I was terrified. That stuck with me a long time, up until we found out Loyd had died in prison.

I just had to keep going after my mom's death. Ever since I was young I always needed to be the glue because I could see my sisters losing it. I particularly felt I had to be strong for Sheila. She had a lot of difficulty handling what happened. Once when Sheila's supervisor from work called and told me that Sheila was having a breakdown. She told me they were going to get Sheila some help. At that time Sheila would go into uncontrollable crying. I saw her crying often. Sheila did end up getting some counseling and I think it helped. She's the only one of the three of us that got that. We all needed it.

I have had this inner fear that I would only live to the same age as my mom, and that the same thing would happen to me that happened to her. I always have this emotional wall up. I never allow anyone to hurt me. I have had a fear of letting someone in because I don't know if I can trust them. All of the things that happened in my relationship with Rick (my ex-husband) were triggers for my fears about what happened with my mom.

[Sonia Barnette Affidavit ¶¶ 31-33, Bates Nos. 34-48]

Tessie could have further testified about how Jesse Cooper's condition made

matters even more difficult for Sonia after her mother was murdered:

Sonia, Vicci, and Sheila ended up moving to Columbia to live with us. They didn't stay with our dad after Pearl was killed because Jesse was not providing for them. He was drinking Pabst Blue Ribbon beer. He drank a lot. After the war he was not stable. The effects on him contributed to the split between him and Pearl. As long as I can remember he told the same war stories. He re-lived it and he rehashed it. It was kind of hard to be around him. I didn't realize it back then, but now I see some of the signs that he had been traumatized in the war. I can remember hearing him shout out at night, "No! Stop!" I don't think he drank as much before the war, although I think he really increased his drinking after he and mama split. Then it became every day. Most days after the split and after Pearl's death he was intoxicated. He was never physically or verbally abusive when he was intoxicated. He just talked about the war.

[Tessie Nero Affidavit ¶ 15, Bates Nos. 124-128] Looking back on how Pearl's murder

impacted Sonia and Sheila, Tessie could have testified in 2002 as follows:

I would have explained how both Sheila and Sonia changed a lot after the fact. They were both so young; Sheila was only 11 years old, and Sonia was 15 years

36

**JA240**

old and had Vicci, who was only 10 months. They both started partying more, running around, and being less responsible about things. As I mentioned during my testimony [in 1998], it wasn't something we talked about. Everyone was going through very intense feelings and emotions, but no one knew what to do with those feelings.

[Tessie Nero Affidavit ¶ 31, Bates Nos. 124-128]

Sheila Cooper recounts how the effects of Pearl's murder have also deeply affected her:

I had three visions of my mother's death before it happened and I told my mom about each one. I was just a little girl and she ignored me. After she was killed I felt it was my fault because I'd had the visions of what was going to happen but didn't do more to stop it. I believed that for years.

I cried about my mom all the time. My boyfriend, Michael, saw that. We had a miscarriage and I had to have a DNC. I started going ballistic. They put me under. Michael was there. He was trying to reassure me. He said I was talking to my mother.

I wanted to kill myself. I was working at Georgia Power and Michael and I had a plan to meet for dinner. I was driving to the restaurant. I was racing along and thinking: I'm just going to kill myself. I'm going to run into this pole head on so I can see my mother.

One time while I was working at Georgia Power I went to call Michael and started crying and could not stop. I had a breakdown behind so much stress and I went blind in one eye. Michael suggested I get help. I was crying all the time. I did end up getting help through my job. I saw a therapist and I was prescribed medication. I believe I was prescribed Seroquel.

I never talked to Sonia about what happened to our mother and I've never been to my mom's grave. We never talked about it because I had my own pain to get past. If anyone talked about it I would sob like it had just happened.

[Sheila Cooper Affidavit ¶¶ 25-29, Bates Nos. 67-75]

### e. Sonia's Dating and Marc's Paternity

Until a paternity test in 1987 indicated otherwise, it was generally accepted in the family that Rick was Marc's father. Rick, however, always doubted that Marc was his biological son. Sonia and Rick first met at Smith Junior High School. He does not think

37

**JA241**

that he and Sonia were dating at the time she got pregnant. After they found out that Sonia was pregnant, Rick's mother and Sonia's mother (Pearl) talked to each other. Following that conversation, Rick reports, his mother told him that the coming baby was not his. Rick, however, further reports that he was attracted to Sonia and allowed himself to believe the baby was his when Sonia began saying to others that he was the father. [Derrick Barnette Affidavit ¶¶ 3, 6, Bates Nos. 17-21]

Sonia dated Larry Wright around the time she became pregnant with Marc. [Derrick Barnette Affidavit ¶ 6, Bates Nos. 17-21] Larry was a classmate of Sonia's and he confirms that he and Sonia did date. Larry knew Pearl, went to their house frequently, and he and Pearl would talk. [Rowles Mitigation Report, Bates Nos. 232-259]

Shortly before Sonia found out that she was pregnant, a friend of Sonia's told Larry that Sonia was also dating Rick. After Pearl learned of Sonia's pregnancy, Pearl talked with Larry and Sonia and asked them what they were going to do about the coming baby. At this point, Larry did not believe the baby was his. Pearl was surprised by this; she had not known about the relationship between Sonia and Rick. Pearl and Sonia then decided the baby was Rick's. Larry's parents knew and liked Sonia and they were disappointed that Larry would not be considered the father. [Rowles Mitigation Report, Bates Nos. 232-259]

Sonia's behavior changed dramatically after her mother was murdered. She started to dress in a provocative style, use marijuana and cocaine, and spent time with people that were known to be drug dealers, hired killers, and thugs. [Rowles Mitigation Report, Bates Nos. 232-259]

Larry did not see Sonia as often after she and Rick married, yet his sexual

relationship with Sonia continued sporadically through Sonia's relationship with Rick, as well as after their eventual separation. When visiting one of her best friends, Starr Reape, who was a neighbor of Larry's, Sonia would sometimes stop by with Marc and Mario. Larry kept in touch with Sonia enough that when she and Rick split up, he went and helped her, Marc, and Mario move out of the house. [Rowles Mitigation Report, Bates Nos. 232-259]

Marc was born when Sonia was 14 years old and Rick was 16 years old. In the fall of 1974, when Marc was about 15 months old, and approximately five months after Pearl Cooper's death, Sonia and Marc (and Marc's young aunt, Sheila) moved to South Carolina to live with Tessie and Jeff Nero. [Rowles Mitigation Report, Bates Nos. 232-259]

Rick and Sonia were married in February 1976, and lived together (with Marc) for a short period of time in Omaha, Nebraska, where Rick was stationed with the U.S. Air Force. Rick was then transferred to Okinawa, Japan for approximately one year; Sonia and Marc stayed behind. By July 1977, when Marc's younger brother, Mario, was born, Rick had returned from Japan and they were all living together at Rick's mother's home at 1137 Comstock Drive, Charlotte in the Clanton Park neighborhood. Rick, Sonia, Marc, and Mario then moved to Minot, North Dakota for a year while Rick was stationed there. They returned to Clanton Park in Charlotte in early 1979. They remained together in Clanton Park until approximately 1984, when Rick and Sonia separated. [Rowles Mitigation Report, Bates Nos. 232-259]

Starting upon their return to Charlotte in 1979, Sonia and Rick's relationship became one marked by intense jealousy, mistrust, and violence. As Rick explains:

**JA243**

Sonia and I had fights when we were together. We fought all the time after we moved back to Charlotte and lived in Clanton Park. We had bad fights, physical fights. I hit Sonia in the head with a hammer one time. She had her hand on her head at the time and was peeking through her hand. I hit her on the forehead just above her eyebrow. She ended up calling her sister about it. The police came because of that incident.

[Derrick Barnette Affidavit ¶ 10, Bates Nos. 17-21]

Sonia confirms the domestic unrest: "We were extremely jealous of each other and this led to arguments and physical fights." [Sonia Barnette Affidavit ¶ 40, Bates Nos. 34-48] Sonia elaborates:

It got bad with me and Rick. He would throw my things outside. He once hit me with a hammer. There was also a frying pan incident where I was planning to hit him with a frying pan while he was sleeping.

Rick also beat Vicci. After one particular beating Vicci called somebody and they came out to our house to check on the situation. Rick admitted he had beaten Vicci. It was probably a social worker that came out, someone from DSS. Rick and I were young then. We didn't know as much about the effect that fighting would have on Vicci.

After our separation, Rick still disciplined the kids if they'd done something wrong. He would come over and discipline them when I asked him to. He would usually use his hands or belt. This lasted for about a year while we were separated, but before our divorce.

[Sonia Barnette Affidavit ¶¶ 43-45, Bates Nos. 34-48]

Robert Cooper describes how Derrick Barnette "was a jerk," "put Sonia, Marc, and Mario out," and "acted crazy towards Sonia." [Robert Cooper Affidavit ¶ 16, Bates Nos. 64-66]

Shonda Nero, Marc's first cousin, testified at the 1998 trial but was not contacted by resentencing counsel prior to the 2002 resentencing. Ms. Nero could have testified how she "learned in [her] teenage years that Rick was beating Sonia and that cocaine was involved." [Shonda Nero Affidavit ¶ 7, Bates Nos. 117-123] Ms. Nero could have

40

explained how there was also domestic violence between her parents—Tessie and Jeff Nero—and "[t]hey acted the same was as Sonia and Rick and that made me resent my father." [Shonda Nero Affidavit ¶ 8, Bates Nos. 117-123] Tessie Nero could have testified about the fighting, as well:

> I remember once that Sonia's ear lobe was torn through. Sonia told me this happened when she and Ricky were in an argument and he tore her earring out. I think we were cooking out at the time she told me, but then Ricky walked into the kitchen while we were talking and Sonia changed the subject. Sonia has now had her ear lobe repaired. She had it stitched up. She did this more recently at the medical office where she works.

[Tessie Nero Affidavit ¶ 19, Bates Nos. 124-128] Jean Nduly could have also testified about Sonia and Rick's fighting. [Nduly Affidavit ¶ 15, Bates Nos. 113-116]

The impact of Sonia and Derrick's troubled relationship was clearly felt by Marc. Weona Sharpe,[7] a relative and neighbor of Marc's when they were young, was never contacted by resentencing counsel. Ms. Sharpe could have testified:

> Vicci would knock on our front door in the middle of the night sometimes. This could be midnight or two in the morning. We'd give Vicci a blanket and a place on the couch to sleep. He never said anything about it but there was something wrong for him to show up at our house in the night like that. Vicci would look upset. He would be in pajamas, and barefoot. Mario was never with him. It was always just Vicci.
>
> Vicci always slept on the couch in our living room. We had two couches and one of them let out into a bed. We would feed Vicci breakfast in the morning and he'd hang out a little. We would also call Sonia in the morning and let her know that he was there at our house. It got to a point where we knew who it was when we heard a knock on the door in the middle of the night. Vicci came to our house in the middle of the night numerous times over a period of months. I don't know why he eventually stopped.

[Sharpe Affidavit ¶¶ 12-13, Bates Nos. 132-134]

---

[7] Weona Sharpe is referred to as "Wendy Sharpe" in the § 2255 motion.

41

**JA245**

Perniciously, although it was far from a secret, the domestic violence in the family—whether between Sonia and Derrick, or the murder of Pearl—was not openly discussed. As Ms. Nero explains:

> There have been a lot of secrets and things that aren't discussed in our family. Marc never once talked about Sonia and Ricky, just like I didn't tell about my parents. Also, my mother never talked about her mom, Pearl, and how she was murdered by her husband after she remarried. My sister knew because she was born and was around when it happened, but I didn't know about Pearl's death until I was 13 or 14 years old. Even after learning about it, no one in the family would speak about it.

[Shonda Nero Affidavit ¶ 9, Bates Nos. 117-123] Ms. Nero could have further explained how this environment—which Marc was part of—affected her:

> I got in trouble growing up. I fought all the time. I used to fight the girls that my boyfriend was cheating with; I didn't realize I should be upset with my boyfriend. I went to jail for fighting one time when I gave a girl two black eyes. I was 14 or 15 years old and the fight was over a guy. I was in jail for a couple of hours and then my dad picked me up. I thought he was going to be furious but he busted out laughing. I learned that when my dad was 16 he once broke a guy's nose.
>
> I also got two DWI's in my 20s. The second one was when I was 22 and I ended up having to serve 30 days in jail for it.
>
> I first got pregnant when I was 15. My mom took me to have an abortion at a medical facility in Charlotte. My mom wanted it to be a secret. This was on my 16th birthday. However, they told me they couldn't do it because I was too far along. Now I am thankful I had my daughter Alex and didn't get the abortion.
>
> After I had Alex, my boyfriend Silky and I had another baby named Shauna. We ended up putting her up for adoption. I met Shauna last year for the first time. It was great to meet her. She looks like Alex and she is about to get a tennis scholarship. I also have a third child.
>
> I was never faithful in my relationships but I have always been up front about that. I told the guys I was with when I cheated on them. In the same way that Silky cheated on me, I cheated with other guys. However, I have now been married eight years and I've been faithful.

[Shonda Nero Affidavit ¶¶ 15-19, Bates Nos. 117-123]

**JA246**

### f. Rapid Disintegration of the Family: Violence, Separation, Divorce, Partying, Paternity Tests, and Continued Chaos

Records show that although Rick and Sonia did not officially separate until June 29, 1984, the date they executed a separation agreement, their separation was planned at least 18 months prior to that. In fact, unbeknownst to resentencing counsel because they never sought the records in question, Rick had hired an attorney to draft a separation agreement that included a provision that he pay $250 per month in child support starting December 30, 1982. The initial plan was for Sonia, Marc, and Mario to remain at the Clanton Park home until both reached 18 years old. Rather than Sonia and the boys remaining in the house—which, under the circumstances, might have provided a semblance of stability—that plan was scrapped and Sonia, Marc, and Mario moved into an apartment on North Wendover Road in Charlotte. They remained there for a couple of years until they moved in with Tessie, Jeff, Regena and Shonda Nero on Farm Pond Lane in Charlotte.

Following the separation, Rick did not have a visitation schedule for Marc and Mario. While he testified in 2002 to have "left the door open," he rarely took steps to initiate contact with Marc and Mario after the first year of the separation. Indeed, Rick admits:

> I tried to make clear that although I offered to "keep the door open" for both boys, I had not personally done anything to foster a true relationship with either boy after leaving Charlotte.

[Derrick Barnette Affidavit ¶ 21, Bates Nos. 17-21]

With Rick gone, Sonia used cocaine and marijuana and would often leave Marc and Mario home alone when she went out, sometimes overnight. [Rowles Mitigation Report, Bates Nos. 232-259; Sonia Barnette Affidavit ¶ 52, Bates Nos. 34-48] Sonia was

43

**JA247**

also with a number of men after Rick. The first was Ollie "Al" McArthur, who Sonia dated around 1985 when she was 27 years old. Sonia describes him as a "hustler" who sold fake jewelry. Al persuaded Sonia to give him a couple thousand dollars, and he also got her to give him $600 to help him pay his child support. Al also convinced Sonia to buy a red Corvette. [Sonia Barnette Affidavit ¶ 48, Bates Nos. 34-48]

Sonia then dated Sam Walton, who was then-County Commissioner Bob Walton's brother. Sam was about 15 years older than Sonia and had a drinking and gambling problem. The next relationship was with a man named Tyrone. Sonia and Tyrone dated for a few months. Tyrone drove a taxi that Sonia helped him purchase. Sonia was later with a man named Mark Ragin, who owned a nightclub on Wilkinson Boulevard. This was when Sonia, Marc, and Mario were living with the Neros on Farm Pond Road. [Sonia Barnette Affidavit ¶¶ 49-51, Bates Nos. 34-48]

Sonia's relationship with Mark Ragin ended on June 20, 1987, when he was shot to death. Tessie Nero could have explained as follows:

> Another guy in Sonia's life was Mark Ragin. He had drug connections and was living the fast life. I was afraid for Sonia while she was with him. He was running a club called St. Mark's. I went there a couple times but I didn't know what was going on behind the scenes. Mark didn't have a 9-5 job but he had money. He had a black Corvette and also a Lexus. He was eventually shot and killed. Sonia was upset when he was killed. She had been spending a good deal of time with him.

[Tessie Nero Affidavit ¶ 24, Bates Nos. 124-128] Sonia confirms the impact of Ragin's death: "I was devastated when that happened. I think I was secretly in love with Mark." [Sonia Barnette Affidavit ¶ 51, Bates Nos. 34-48]

On March 9, 1987, approximately 18 months after the divorce was finalized, Rick formally sought paternity testing to determine whether he was, in fact, Marc and Mario's biological father. Rick says this was sought after Sonia, in early 1987, told him that he

44

was neither Marc nor Mario's biological father. Rick also recalls that Sonia would pester him for child support payments but then spend her money on herself (like when she bought a red Corvette that did not have a backseat). As Rick explains:

> I was paying child support to Sonia after we separated. Sonia would call me and demand the money. It would only be two days late but I wouldn't pay it on the right day. When I learned that she went out and bought a red Corvette, I was upset.
>
> When the money became an issue between me and Sonia, I decided to seek a blood test to find out if I was really Vicci's and Mario's father. This was in 1987. I was already suspicious that I wasn't the boys' biological father. When I was with the Air Force, I left for Okinawa, Japan on August 26, 1976. I remember the date because I missed my birthday -- August 27 -- by flying over the International Date Line. I was gone for six months before I came back for a visit. Mario was born the following July 1977, which means Sonia got pregnant while I was away in Okinawa. I brought it up a couple of times with Sonia and she always said, "No, he's yours." I came home from Japan and was present for Mario's birth. I took Sonia to the hospital for it. I had to call and get an extension on my leave from the Air Force. As for Vicci, I always thought Larry Wright was his biological father. Sonia was dating him around the time she became pregnant with Vicci. I believe Sonia told her mother that Larry was Vicci's father. Then Sonia's mother told my mother.

[Derrick Barnette Affidavit ¶¶ 14-15, Bates Nos. 17-21]

On June 15, 1987, as directed by a court order, Sonia, Marc, and Mario had blood drawn for paternity tests. On June 24, 1987, only four days after Mark Ragin was shot and killed, blood tests established that Rick was the not the biological father of either Marc or Mario.

Given the truth—that Larry Wright was Marc's biological father—and what others knew about Sonia's relationship with Rick, the paternity tests results perhaps should not have come as a surprise to other adults. As Shonda Nero explains: "Sonia could have gotten together with someone else besides Rick. She partied and she was a clubber." [Shonda Nero Affidavit ¶ 20, Bates Nos. 117-123]

45

**JA249**

Sandra Smith, who was never contacted by resentencing counsel, further explains:

> While still in high school school, Sonia started dating a guy named Larry. Everybody knew she was dating him. Then she got pregnant with Vicci. After Vicci was born, the family said that Vicci's dad was Ricky Barnette. There was something on the down low about the situation and it was never clear to me what the truth was – although Sonia always made it clear that Ricky was the biological father.
>
> After Vicci was born, I looked after him sometimes when he was a baby. I am a couple years older than Sonia and it was during my first year out of high school when I babysat Vicci. This was when Sonia was still in school. She was so young, which made raising a child difficult enough. But then when Pearl was killed, it brought all sorts of craziness and stress into the equation.
>
> I never knew until last year that a paternity test showed that Ricky was not Vicci's biological father. It surprised me to hear this since Sonia and the family were always adamant that Ricky was the father, even though other people had questions.

[Smith Affidavit ¶¶ 8-10, Bates Nos. 135-136]

Ms. Smith's point—that "Sonia and the family were always adamant that Ricky was the father, even though other people had questions"—was highly significant and yet totally missed by resentencing counsel. As Dr. Dudley notes, "the blood test results [came] out of nowhere, which made [Marc] feel like he was 'thrown overboard.'" [Dudley Report ¶ 22, Bates Nos. 209-231] Adding to the shock that Rick was not his "real" father was how Sonia responded in the face of a blood test: denial. Indeed, Sonia, then and now, says she does not believe the results:

> As part of the divorce, Rick had us do a paternity test for Vicci and Mario. At first he just wanted to question whether he was Mario's father, but then the test results came back and indicated that neither Vicci nor Mario were his. However, I still don't believe the test results. At the time of the test Rick was involved with his current wife, Marcela, and I always thought he should question Marcella about the results; I feel she had something to do with rigging the test.

[Sonia Barnette Affidavit ¶ 46, Bates Nos. 34-48]

Dr. Burgess, who was not made aware of this issue prior to the 2002 resentencing, confirms its significance:

Information concerning Mr. Barnette biological father that was not previously shared with me is also quite significant. While I was previously made aware of the fact that Derrick Barnette denied paternity of both Marc and Mario, I was never provided information concerning Sonia Barnette's troubled and troubling response to that fact – which was complete denial. In the face of a paternity test and actual knowledge that another man was Marc's father, Sonia Barnette continued to tell her sons and others that Derrick Barnette was, in fact, the father. Sonia Barnette's handling of the situation – perpetuating known lies to her children and thereby creating an irreconcilable conflict with what Derrick Barnette was saying – caused deep confusion and distrust on multiple levels. The lies concerning Marc's biological father's identity played an important role in the family dynamic. Far more potent than simply breeding "suspicion" and "grief," it fostered incompatible set of "truths" that were dangerously destabilizing for Mr. Barnette. Indeed, it forced Mr. Barnette to navigate an almost unnavigable path between the two people he believed to be his parents and caretakers.

[Burgess Affidavit ¶ 19, Bates Nos. 51-55]

As Mario Barnette could have testified, debilitating family secrets were not unusual:

The identity of our father has been a family secret. However, there have been a number of other family secrets too. Aunt Sheila informed her son Armaud who his father was but she told him that his father had run off and didn't want anything to do with him. But the truth was that Armaud's biological father and Armaud's father's brothers were trying to find him. Sonia and Aunt Sheila have been very secretive. They won't tell you anything. All of these secrets have been harmful.

[Mario Barnette Affidavit ¶ 32, Bates Nos. 22-33]

In the wake of the divorce and paternity testing, Sonia's difficulties increased significantly. As Mario could have explained:

After our parents separated, we moved a lot. We went from Clanton Park to Windsong Drive to Wendover Road to Farm Pond Lane to Atlanta, Georgia. We lived several places in Atlanta before moving back to Charlotte. The worst times were when we lived at Windsong and Wendover. Financially and mentally they were the worst for mom. This was when she had her crazy period and she lost her way. She was depressed.

47

**JA251**

Our house at Windsong was terrible. There was never any food in the kitchen and there was always a lot of trash.

My mom's friends, Tina and Harlene and Jackie, would go out with her. No babysitters looked after us when mom was out. Vicci was around 13 years old then. He would come home and ask if there was anything to eat. He would make TV dinners for us if we had any and then he would stay around until mom came home. Then he'd be back out that door. He was out drinking with friends. He was trying to find a family with the girls he was with.

One of Sonia's boyfriends was a guy who drove a nice car and was sleazy. He was in and out. He would pop up and then disappear again. He once came back from somewhere and showed us his black case of fake gold. When he disappeared, I assumed he was out on his next hustle.

These were bad times because Sonia was recently divorced and she was out all the time. We also did not see Derrick very much. When we would see him, which wasn't often, Derrick was usually there to beat Vicci with a belt.  Because this was the only time we were seeing Derrick it made our relationship with him even more strained than it had been after we learned he was not our biological father. This was especially true for Vicci.

[Mario Barnette Affidavit ¶¶ 33-37, Bates Nos. 22-33]

Soon thereafter, Rick moved from Charlotte to Philadelphia. He later moved to Maryland in 1990. While the government presented a picture to the jury in 2002 that Rick had "remained a central part of Vicci's and Mario's lives," the reality was that once Rick left Charlotte, he "essentially dropped out of Marc's world." [Derrick Barnette Affidavit ¶ 22, Bates Nos. 17-21]

In 1987, around the time of the paternity testing and Mark Ragin's death, Sonia experienced difficulties at her job. She was repeatedly warned and counseled about tardiness, absenteeism, and telephone abuse (making personal calls). She was fired in November 1987. Her employment records indicate that she "cannot be relied upon," "shows no interest in attendance obligations, even with constant reminders from supervisor," and "can never be relied upon to be at work." [Sonia Barnette: Employment

48

**JA252**

Records, Bates Nos. 4246-4333] Mr. Barnette's resentencing jury heard none of this information.

When Sonia lost her job, she, Marc and Mario were living at 8816 Softwind Drive in Charlotte in a residence that they rented from Do'Lores Guy, an old friend. Ms. Guy could have testified in 2002 about the difficulties that Sonia was experiencing. "Sonia was getting depressed at that time. She was crying then too. I suggested she go see a counselor. However, when I asked her about it, she didn't answer. … I remember talking to Sonia on the phone and she would have crying spells. She was depressed." [Guy Affidavit ¶ 23, Bates Nos. 81-84] Despite being a lifelong friend of the family's, Ms. Guy evicted them from the Softwind Drive residence because Sonia was not paying rent. "The house was a mess. Sonia was always crying. I would try to tell her to get things straight and she'd start that crying. I really hate that I had to put them out but the house was taking a beating and Sonia wasn't paying rent." [Guy Affidavit ¶¶ 24-25, Bates Nos. 81-84] Mr. Barnette's resentencing jury heard none of this information.

As Sonia admits:

I have used drugs before. I used them most heavily in the period of time before we moved to Atlanta. The most was probably with my friend Tina when we were living off Wendover Road. Tina was an avid weed smoker. Then when we lived at the place on Soft Wind my friends would come over and we would use drugs together then too. Vicci would bring up my drug use when he and I would argue. It upset him.

[Sonia Barnette Affidavit ¶ 52, Bates Nos. 34-48]

In the fall of 1987, Marc began the ninth grade at Smith Junior High School. Soon his life was again disrupted when Sonia told him that they were moving to Georgia. Marc initially protested; in response, Sonia told Marc that he could stay in North Carolina, a highly impractical option for a ninth grader. [Dudley Report ¶ 25, Bates Nos. 209-231]

49

**JA253**

## g. Relocation to Georgia: Chaos and Drug Use Continue, and Marc's First Relationship Leaves Permanent Scars

Following the move to Georgia, chaos continued to reign in Marc's home life. Initially, Sonia, Marc, and Mario stayed with Sonia's younger sister, Sheila Cooper, in an apartment in Norcross, Georgia. Sheila was then living with her boyfriend, Michael O'Neal (who was married to another woman at the time), and her son, Armaud. Sheila was unstable and, like and with Sonia, used drugs and partied. [Tolbert Affidavit ¶ 19, Bates Nos. 200-206; Ann Austin Affidavit ¶ 10-11, Bates Nos. 6-8; Robert Cooper ¶ 16, Bates Nos. 64-66] Marc, Mario, and Armaud had little supervision or parenting by the adults in the family while they were all living together in Georgia. Sheila and Sonia went out regularly, often not returning until the morning. Michael O'Neal drank, as did Sonia, and they would argue constantly. Michael, Sheila, and Sonia all also used cocaine. As Mario could have explained in 2002:

> My mom, Vicci, and I moved to Georgia before my 6th grade year in school. We moved in with my Aunt Sheila, Uncle Michael, and my cousin, Armaud. At first we lived with them in an apartment, but we soon moved with them into their house in Lithonia, Georgia. Things were chaotic there. The adults would party and use drugs. Uncle Michael drove a canary yellow Corvette with a T-top roof, but he was never home. All of the adults in the family were always going out, leaving us alone at the house. If I overslept in the morning there was very little chance that any adult would wake me up and make sure I made it to school.
>
> At some point while we were living there Aunt Sheila gave birth to her daughter, Michaela. Sheila barely took care of Michaela. There were many nights when Armaud and Vicci and I would hear Michaela crying and crying in her crib. The crying would get so bad that we would go check on Michaela. We would find that all of the adults were gone and would have to take care of Michaela and soothe her. Sheila and the others would often come home at 3:00 a.m. or close to dawn and we would hear them come in because we were just getting back to bed ourselves from taking care of Michaela.
>
> Armaud once found drugs under the master bathroom cabinet. He is four years younger than me and he was only around seven years old at that time. The drugs

were in plastic bags about the size of a magazine and Armaud thought they were pillows. Vicci and I told Armaud to get away from the drugs.

There were lots of signs that the adults were involved in drug dealing. Sometimes rundown, suspicious looking guys would show up at our house and not stay very long. Another time a U-Haul truck came to our house but nobody was moving anywhere. Our household also seemed to go from extreme highs to extreme lows. At times the adults would be in party and celebration mode, and at other times I understood that we were dead broke, despite the fact that Michael still had his job at General Motors.

A white woman once showed up at our house and it caused a commotion between her and Aunt Sheila. I believe Aunt Sheila got out a gun while the lady was there. I think it was early on a Saturday or Sunday morning when the lady showed up and I woke up to hear her and Sheila yelling at each other. Armaud and I were told to stay in our room. I later learned in bits and pieces that this was Michael's wife and that he had a whole other life with a house and family.

[Mario Barnette Affidavit ¶¶ 39-43, Bates Nos. 22-33]

Armaud Cooper describes similar scenes of chaos, drug use, and violence. Resentencing counsel's failure to conduct a thorough investigation, however, prevented them from eliciting this readily available information from Mr. Cooper when he testified in 2002.

Vicci's lawyer asked me [during the 2002 resentencing] if I noticed "any alcohol or drug consumption." While my answer was true – that I noticed alcohol consumption and was suspicious about drug consumption – it was not complete or very descriptive. I wasn't sure whether it was okay to say more about what had been going on in the house at the time. I did not know whether the lawyers had told other people in the family that we would be getting into some of this family history, which was pretty raw and painful.

For example, my mom was with Michael O'Neal when we all lived together in Lithonia. Michael was a drug dealer. He also had a job at General Motors. Since I was only about 6 or 7 years old when Vicci and his family moved in, it shouldn't be surprising that I didn't notice much "drug consumption." But I certainly could have testified [during the 2002 resentencing] about the fact that drug dealing with was going on in the house and that cocaine was stored in the closet of my room.

As another example, Vicci's lawyer asked me [during the 2002 resentencing] whether Vicci, Mario and I ever talked about "what was going on with the adults" in the household. I responded by saying that Vicci basically tried to make sure

51

**JA255**

"that a lot of stuff went unseen in terms of what [Mario and I] saw." Vicci's lawyers never asked, and I didn't know to offer information, about what that "stuff" was that Vicci was trying to shield us from. One time Michael's ex-wife, Joyce, came to our door with a gun. This woman was acting crazy and I remember Marc pushing me and Mario into a closet. I heard the adults shouting at each other and I heard my mom yell that Joyce had a gun. The police came to the house and there was a lot of commotion. I later learned that Joyce was threatening to kill either Michael, my mother, or both of them.

[Armaud Cooper Affidavit ¶¶ 9-11, Bates Nos. 56-61]

Marc's cousin Shonda Nero could have testified:

When we were little Sheila was the first one to go live in Atlanta. We all thought she was doing well. However, Sheila's boyfriend, Michael O'Neal, was a coke addict and a dealer. He got Sheila turned on to drugs. I remember that Sheila had a yellow Corvette. It was duck yellow with a white rag top. She also had a Nissan Maxima and an SUV. Sonia and Sheila were doing cocaine together and partying to the point where the kids were left to fend for themselves. When I found out that Sheila and Sonia did cocaine I lost all respect for them and disassociated from them. I felt they had been fakes.

[Shonda Nero Affidavit ¶ 30, Bates Nos. 117-123]

Previously abandoned by the man he had believed to be his father, Marc was now abandoned by his mother, too.

Marc's mama was some kind of drunk or partier because he stayed overnight at our house a lot and nobody came looking for him. Marc's mom was not very concerned about him. She was a bad mother. His mother wasn't providing for him.

[Heard Affidavit ¶ 10, Bates Nos. 85-88]

Throughout this period of time, much responsibility was placed on young Marc's shoulders. His aunt Sheila Cooper recalls:

We put a lot of trust in Vicci. We often left him to take care of the younger kids. He was very responsible. I never knew him to break the house rules. If you asked him to pick up a list of things at the grocery store he'd do it and get everything you asked for. Vicci was not a typical teen. He wasn't flippant. He could be trusted. Vicci would apologize if he thought he had hurt your feelings. One time he and Sonia got into a bad argument and he apologized to her. He would

apologize and cry so hard. It would hurt him to the core if he knew he'd hurt someone.

[Sheila Cooper Affidavit ¶ 42, Bates Nos. 67-75]

It was during this confusion and chaotic time following Marc's move to Georgia when he started dating a fellow student named Sheila Sullivan. As Mario Barnette could have explained:

> We first moved to Georgia over the summer and in the fall Vicci and I started school. I was in the 6th grade and he was in the 10th. Then Vicci started seeing Sheila Sullivan. Prior to moving to Georgia, he'd had a crush on Ayana. He really liked her. I think the relationship with Ayana ended because of our move to Georgia.
>
> Vicci was excited about Sheila Sullivan. I remember him talking to his buddies about it. We rode by her house one time. I saw a photo of her and I thought she was cute. Aunt Sheila thought she was cute too.

[Mario Barnette Affidavit ¶¶ 44-45, Bates Nos. 22-33]

This budding and positive relationship subsequently turned ugly, however, when Marc was assaulted. His excitement turned to depression and serious injury—physically and psychologically. As Mario Barnette could have explained:

> Vicci got jumped and beaten up bad one time when we were living in Lithonia, Georgia. It had something to do with Sheila Sullivan. The guy who did it was a little older than Vicci. Vicci was hurt and upset about it. After this Vicci said that nobody was going to catch him off guard again.

[Mario Barnette Affidavit ¶ 46, Bates Nos. 22-33] Melvin Bryant could have described how he and David Walker assaulted Mr. Barnette when they were teenagers attending Lithonia High School. Mr. Bryant could have described how he and Mr. Walker punched and kicked Mr. Barnette without warning; how Mr. Walker was a boxer and "very tough"; how Mr. Barnette suffered physical injuries as a result of the assault; how both Mr. Bryan and Mr. Walker were charged as juveniles; and how the incident was about Sheila Sullivan. [Bryant Affidavit ¶¶ 5-8, Bates Nos. 49-50]

53

**JA257**

Sheila Sullivan could have described that Marc was "beat up so bad. His eye was black, his face swollen, and his lip cut." Marc was taken to the hospital for x-rays and treatment for his injuries. [Rowles Mitigation Report, Bates Nos. 232-259]

After the assault, Sheila cheated on Marc with David Walker, the same boy that had assaulted Marc. According to Sheila, she cheated on him "real bad." Prior to cheating on Marc, Sheila had written another friend to say that she was attracted to David Walker. After Sheila had sex with Walker, Marc was given the letter that Sheila had written. Sheila remembers Marc being very upset. [Rowles Mitigation Report, Bates Nos. 232-259]

Marc and Sheila broke up after he learned that she cheated on him. After the breakup, Marc attempted suicide by ingesting pills. Emergency responders were able to get Marc to throw up and he was not taken to the hospital. At a later point in the school year, Marc and Sheila started seeing each other again. Soon thereafter, Sheila learned that she was pregnant. Sheila says that Marc was supportive of her and wanted to help. Sheila's mother, however, found out and Sheila had an abortion. Marc and Sheila's relationship ended towards the end of the school year (Marc's tenth grade year). Sheila was later raped by David Walker, who then committed suicide two or three weeks after they went to court on the rape charge. [Rowles Mitigation Report, Bates Nos. 232-259]

The relationship with Sheila Sullivan—which the resentencing jury knew nothing about—was significant on multiple levels. As Dr. Burgess explains:

> … Mr. Barnette's relationship with Sheila Sullivan and Mr. Barnette's move to Georgia during high school were both far more complicated and significant than what trial counsel's information had suggested. In stark contrast to information I was previously given, Mr. Barnette had been faithful during the relationship with Ms. Sullivan (while she was not); Mr. Barnette had been a supportive companion during times of stress and crises (including when Ms. Sullivan became pregnant

54

**JA258**

and later terminated the pregnancy); and Mr. Barnette had not been abusive toward Ms. Sullivan or controlling. Moreover, Mr. Barnette was the victim of a brutal assault carried out by another teenager with whom Ms. Sullivan later cheated on Mr. Barnette. This led Mr. Barnette into a serious depression and an attempted suicide. Witnesses describe Mr. Barnette as being profoundly affected by this relationship with Ms. Sullivan.

This information belies the information that had been previously provided to me by trial counsel on many important fronts. For example, it was previously suggested to me that Mr. Barnette's suicide attempt around this time had been minor or insignificant; in reliance on this information from trial counsel, I wrote in my report that Mr. Barnette made "suicidal gesture" (rather than a clear attempt to kill himself). The new information makes clear that Mr. Barnette was, in fact, deeply depressed and affected by the developments in his relationship with Ms. Sullivan, and that those developments, along with his mood disorder, led him to attempt suicide.

[Burgess Affidavit ¶¶ 13-14, Bates Nos. 51-55]

According to Mario Barnette:

The Sheila Sullivan breakup affected Vicci real bad. It was a real heartbreak. He took it hard. It was the first of a pattern where he would have a breakup and then spiral downwards. After the relationship with Sheila ended, his buddies tried to pull him out of it and pick him up, but he said no. He wanted to be by himself in the bedroom. Since we shared a bedroom with him, Armaud and I had to go to the living room so he could sit in there with the lights off. Vicci's buddies eventually were able to get him out. But when he came back in he'd fall back into that hole. That pattern lasted for months.

[Mario Barnette Affidavit ¶ 49, Bates Nos. 22-33] As Mario emphasizes: "Vicci's relationship with Sheila was a turning point. His actions became over the top after that. Vicci had some girlfriends before Sheila but they were not a big deal. It never got to a point of dejection for Vicci." [Mario Barnette Affidavit ¶ 69, Bates Nos. 22-33] Again, resentencing counsel learned none of this evidence.

55

**JA259**

### h. Relationship with Tasha, Bouts of Sadness and Crying, and A Home with No Food and No Bed

Family members confirm that Marc's relationship with Sheila Sullivan was a turning point, and that Marc began acting differently afterward. Around the spring of 1989, near the end of Marc's tenth grade year, Sonia, Marc, and Mario moved into an apartment at The Crossings in Lithonia. The apartment did not have beds for Marc and Mario, and the refrigerator only contained nail polish. Sonia was still using both cocaine and marijuana. [Rowles Mitigation Report, Bates Nos. 232-259]

Marc began dating Natasha "Tasha" Heard during the summer between tenth and eleventh grades. Kesha Heard could have described how she was surprised when she learned that Marc and her sister were dating, since "Marc was quiet and relatively popular. Tasha was loud – she does not have a filter for the things she says – and wasn't really popular at all." [Heard Affidavit ¶ 5, Bates Nos. 85-88] Ms. Heard could have described how unassuming and mellow Marc was when he and Tasha began dating:

> Marc was artistic and liked different music. He was not popular. Even in school he was by himself. He never had an entourage. He was not very smart. He was not a reader and not an academic. He did not write well. His sentences were not as they should have been.

> Marc is low energy. He is real mellow, kicked back, and unassuming. You'd expect to see him in a park drawing. He was often in his own world.

> I've never seen him show any emotion except when holding my niece, which he loved to do.

[Heard Affidavit ¶¶ 6-8, Bates Nos. 85-88]

56

**JA260**

Tasha, who was far more intimate with Marc, describes how Marc's moods would fluctuate.

> At times Marc would get teary-eyed and other times he would outright bawl. He was up and down. His mood would change over the course of hours or a day.

[Tolbert Affidavit ¶ 32, Bates Nos. 200-206]

Tasha elaborates:

> There were times when I found Marc naked and crying in the closet. When my mom was home and active around the apartment, the safest place for Marc to hide out was in the closet. When I'd open the closet door he'd be crying. It was a walk-in closet. Marc would be sitting on the floor with his knees up to his chest. I don't remember what would lead Marc into those situations and I don't know why he was naked because I never asked him. Sometimes I would go in there and sit with him. Sometimes I cried with him. I would try to get his mind on something else. I might suggest things for us to do. It would be a few hours before he felt better. Marc did this a lot of times. It happened every now and then. I once tried to tell Sonia that something was terribly wrong with Marc but she responded that something was terribly wrong with me.

[Tolbert Affidavit ¶ 22, Bates Nos. 200-206]

> The neglect and abandonment by Sonia was clear to Tasha:

> As a teen, Marc and his brother, Mario, didn't have adequate stuff. I used to go over to Marc's apartment at The Crossings every day. I would just walk in. There was a couch in the living room and a TV, but Marc and Mario didn't have adequate clothes and there wasn't enough food in the house. There was one bottle of wine in the fridge. There was no food, no butter, no condiments, and no ketchup. Marc and Mario shared a bedroom but they didn't have beds. They just slept on the carpet and had a blanket. Sonia's room, however, was totally different from the rest of the house. I couldn't believe it when I first went into her room. There were silk sheets on a plush bed, heels, lots of clothes, and jewelry.

> I used to give Marc food from my mom. I would sneak him this food. He would take it but he would also save some for Mario. Sonia was always working or gone. Even though my mama didn't protect me the way she should have, I still had clothes, a bed, and food. One time I stole my parents' credit card and used it to buy clothes for Marc.

[Tolbert Affidavit ¶¶ 20-21, Bates Nos. 200-206]

57

**JA261**

Kesha Heard could have described how Marc was assaulted by her boyfriend, Keith Furlow, after Marc tried to prevent Mr. Furlow from hurting Tasha, who was pregnant.

> We got into an argument and Keith ended up assaulting Tasha and Marc. Keith was three times the size of Marc. Keith had an extremely violent nature. Keith initially made a move to hit Tasha. Then Marc stepped in and Keith hit him in the nose. There was blood everywhere. Keith also punched Tasha in the eye. She was pregnant at the time but only Marc and Tasha knew that. Her eye was badly injured. It was swollen. Marc ended up calling the police and they came. Keith left the apartment before the police got there but I think they went to arrest him. They brought an ambulance to treat both Marc and Tasha. After mom got home they transferred Tasha to the hospital. Mom ended up taking Tasha to be seen by a specialist.

[Heard Affidavit ¶ 12, Bates Nos. 85-88] The Furlow assault was a particularly significant event because after Tasha received medical attention, her mother learned that she was pregnant. [Heard Affidavit ¶ 14, Bates Nos. 85-88]

### i. Becoming a Teenage Parent, Twice

Marc's excitement over becoming a parent—albeit a very young one—was pronounced. As Tasha explains:

> When I was pregnant Marc and I bought baby books and talked about baby names. Also, Marc found a job after I got pregnant with Angelica. Then, from his earnings, he got enough money to buy a crib. Marc took the bus with me to my prenatal doctor visits until my mom stopped letting him. Marc was excited about the baby. He was there at the hospital with me when I gave birth to Angelica.

> Marc talked all the time about getting married. One time he bent down on one knee and proposed to me. I said yes. I was sitting on the edge of the bed and Angelica was born and her crib was there. But we were too young. My mom would never go for that. We often talked about plans and our future. He meant it when we talked about these things.

[Tolbert Affidavit ¶¶ 24-25, Bates Nos. 200-206]

58

**JA262**

Tasha's best friend, Anitra Lyles, could have described a similar picture:

After Marc and Tasha had been dating for a while, Tasha became pregnant with her daughter, Angelica. Marc was excited about being a father. He did well to prepare for Angelica. He was at the hospital when she was born and he was very excited about being a father. I remember Marc holding, hugging, and kissing Angelica when she was little.

[Anitra Lyles Affidavit ¶ 8, Bates Nos. 104-105]

Kesha Heard confirms Marc's excitement about and love for his daughter:

Marc went with Tasha to every doctor's visit; every single one. A lot of boys run off in that situation, but not Marc. However, at the end of Tasha's pregnancy, our mother started excluding Marc from the prenatal visits. Tasha even asked if Marc could go and mom said no. Marc was always respectful of my mother even though she didn't treat him well. Our mom would not let Angelica's last name be Barnette. Marc was upset by this but he didn't challenge her or disrespect her about it.

The best light I've ever seen Marc in was when Angelica was born. He wouldn't leave my sister's side the entire time they were at the hospital. He slept in a chair by her side. When the chair got uncomfortable he slept on the floor. Tasha was in the hospital for about three days. After she was born Marc sat there looking at Angelica as though he couldn't believe she was there - like he'd won a million dollars. He just wanted to hold her. I didn't think he was going to give her up and let me hold her.

[Heard Affidavit ¶¶ 15-16, Bates Nos. 85-88]

After Angelica was born, Tasha's mother sent her to live with her grandmother. Tasha then became pregnant again and gave birth to Aquilia Marcivicci Heard on New Year's Eve of 1991. A few months after the birth of their son, Marc and Tasha moved in together in Newnan. Their apartment was at 86 East Berry Avenue. Marc, then 18 years old, signed the lease because Tasha was not old enough to do so. Soon after moving to Newnan, Marc got a job working at Arby's. [Rowles Mitigation Report, Bates Nos. 232-259]

59

**JA263**

Kesha recalls that Marc changed after he and Tasha had children and started living together:

> I went to college in Carrollton, Georgia. During college I moved to Newnan, Georgia and got a full time job. Then my sister and Marc moved there, too. That's when I really noticed changes in Marc. He and my sister began to fight a lot. There was a lot of strain taking care of the place and the kids. I would go over to their place in Newnan a lot, especially to see their second child, Marc Jr.

> Tasha and Marc were under a lot of pressure taking care of the kids. I know they were having a hard time paying for food, the lights, and clothing for the kids. I know Tasha wasn't working. We got a disability check from our father's veteran status, which Tasha and Marc were relying heavily on.

> I never saw any bruises or marks on Tasha. If I had I would have confronted Marc. Tasha told me that Marc was jealous and controlling. She said he didn't want her to go anywhere or do anything. She complained about it but I never saw anything. I didn't get into it. I didn't hear about this until a while after Marc and Tasha had moved to Newnan.

[Heard Affidavit ¶¶ 17-19, Bates Nos. 85-88]

Neither Marc nor Tasha was in school at the time, Marc was working at a fast food restaurant, and they were having a hard time paying for food, the lights, and clothing for the kids. As Tasha recalls:

> After our second child was born, Marc and I ended up moving to Newnan, Georgia with our two kids. Marc actually signed the lease for our apartment because I wasn't old enough. I was 17 at the time and Marc was 18. Our apartment was on Berry Avenue. I lived there until Marc made me leave. When he came down here to Newnan his whole spirit changed. He acted bizarre.

> Marc had two personalities. One personality was cool and sweet. The other personality would want to fight me and would do stupid stuff. I was always strung out around Marc. My heart rate was always up because I was both excited and on edge. Marc was very impulsive. He could make a decision and it wouldn't make any sense. He was very high strung.  He acted psychotic.

> There were times when I would instigate things with him but this would not lead him to be psychotic angry. When Marc was psychotic he would not reason. You don't even know if he's hearing what you have to say. It's like he's not even there. He will look at you but he's not there.

60

**JA264**

When Marc was the other personality he would forget things he'd done or said. It was like he was in a trance. He didn't talk he just acted. Usually when people are fighting it's all talking and arguing, but not with Marc. When he got in this state it was fighting without talking.

With the crazy Marc it felt like there was witchcraft on him and there was some kind of psychosis. I really didn't know what was wrong with him. He was just ill.

[Tolbert Affidavit ¶¶ 26-30, Bates Nos. 200-206]

While the evidence at resentencing incorrectly suggested that the stress and tension between Marc and Tasha, from her pregnancy onward, was driven solely by Marc's behavior, Ms. Lyles could have provided significant context:

Tasha's mother was very strict and she didn't like Marc. Marc would try to catch the bus to go to the doctor's office with Tasha for her prenatal visits, but Tasha's mom stepped in and did not allow him to go to the appointments with her. And after Angelica was born, Tasha's mother didn't want Marc to see his baby daughter. Tasha's mother interfered a lot and that's part of the reason Tasha and Marc and their kids moved down to Newnan, Georgia. I have seen Marc sad and upset over what Tasha's mother was doing. There was a lot of stress to being a young parent. If Marc and Tasha had gotten more support from her mother, things might have gone better for them.

Tasha became pregnant before I did, but I was only 9 months behind her. She and I both became teenage mothers. I became a mother at age 16. After they had Angelica, Marc and Tasha had second child named Marc Jr. Tasha's mother showed favoritism towards Angelica because Marc Jr. looked just like Marc.

[Lyles Affidavit ¶¶ 9-10, Bates Nos. 104-105]  Ms. Lyles could have also described how, when arguments and fights occurred, both parties were responsible.

Marc and Tasha started arguing and fighting a lot in their relationship. They were like gasoline and fire together. They were both physical with each other. Tasha was not passive in these fights. She would hit, punch, and slap Marc when they were fighting.

[Lyles Affidavit ¶ 6, Bates Nos. 104-105] Tasha would confirm: "I fought too. It was normal to me. All of our fighting was always around trust, jealousy, and who I was talking to." [Tolbert Affidavit ¶ 11, Bates Nos. 200-206]  As Tasha further explains:

61

**JA265**

Marc once pushed me down when I was pregnant. We were coming from the mall and Marc was talking to another girl on the bus. When we got off the bus I slapped him. Then he shoved me to the ground. Then we fought and walked.

Marc and I once got into a fight where I scratched him. This happened in the living room at Marc's mom's place. He hit me and I was so mad I scratched him leaving bright red marks on him. These scratch marks stayed on him for several months. It seemed like they stayed there forever but they eventually faded and turned darker. We had sex after the fight. I was in pity mode, trying to makeup. It was like that a lot.

Another time I bit Marc in the chest. This also left a mark. He and I would rumble. I would slap him, hit him with my fist, kick him, and shove him.

[Tolbert Affidavit ¶¶ 13-15, Bates Nos. 200-206]

### j. 18 Years Old and Overwhelmed by Relationships and Emotions

Crystal Dennis, who testified as a government witness in both the 1998 penalty phase and 2002 resentencing, was never approached by resentencing counsel prior to the second trial. Although Ms. Dennis testified about a number of seemingly aggravating facts concerning Mr. Barnette, competent counsel could have elicited, developed, and presented meaningful mitigation evidence, as well as evidence to rebut the prosecution's contentions.

Ms. Dennis recalls meeting Marc through Anthony Britt. Ms. Dennis could have described how her brother, Anthony Britt, introduced them in an effort to "distract" Marc from Tasha, and how when she and Marc "started spending time together … we weren't physical or intimate; we were just hanging out." [Dennis Affidavit ¶ 3, Bates Nos. 76-80] Victor Montgomery, who was never contacted by resentencing counsel, could have testified about how Britt was his best friend, and how Britt, who also went by "Ant" (for Anthony), "wanted to get together with Tasha, so he set Marc up to be with his sister, Crystal Dennis." [Montgomery Affidavit ¶ 6, Bates Nos. 111-112]

**JA266**

The dynamic that Britt created led to a serious altercation between him and Marc. Ms. Dennis could have described how Britt was "threatening to beat up Marc and tried to jump him one night." [Dennis Affidavit ¶ 4, Bates Nos. 76-80] Victor Montgomery, Britt's best friend, could have testified about what happened:

> We saw Marc walking home to Tasha's apartment. Ant saw him and said he was going to go and straighten Marc out. Ant also said, "I'm going to get his ass." I tried to talk him out of it. I encouraged him to leave Marc alone but Ant and some other guys took off after Marc. I stayed behind at first but then I walked up towards them.

> Marc was a little guy, not a big dude, and he was still new in town. Ant had five or six guys with him. They surrounded him. I saw all of this from a distance as I walked towards them. Marc and Ant had words. Ant was threatening to beat up Marc. Marc pulled out a gun and fired two to three shots. Ant was shot one time in his arm.

> To me, Marc was in the right. Ant and the other guys would have beaten Marc up, and Marc was going to get hurt. I would have done the same thing as Marc in that situation.

[Montgomery Affidavit ¶¶ 7-9, Bates Nos. 111-112]

Ms. Dennis could have explained how when Marc was locked up for the shooting, Mr. Britt "was spending nights over there with Tasha," and how "[b]y the time Marc got out of jail, things were basically over between them." [Dennis Affidavit ¶ 7, Bates Nos. 76-80] Ms. Dennis then moved in with Marc.

Ms. Dennis could have described how the "first three to six months with Marc were great," how he would cook for her, had lots of energy, played with her children, and "was always helping people." Indeed, Ms. Dennis described, she felt that she "was in dreamland." She could have also described how Marc did not have close friends in Newnan, where they lived, and did not talk much about his childhood or his father (who,

63

as far as Ms. Dennis knew, "was out of the picture"). [Dennis Affidavit ¶¶ 8-9, 11-12, 17, Bates Nos. 76-80]

Ms. Dennis could have described how Mr. Barnette's mood and behavior shifted significantly about three to six months into their relationship, how "[a]ll of a sudden he just changed…. He went completely mad. He was crazy." For example, Marc would demand that Crystal keep the door open when she was using the bathroom. Once, when Crystal had the door closed, Marc kicked open the door so he could see her using the bathroom. Marc also demanded that Crystal not work, apparently because he did not want her to be around other men. As a result of his demand, Marc took a second job—working at both Arby's and Blockbuster—in order for them to make enough money. After Marc's behavior changed, Crystal stopped wanting to have sex with him. Marc did not try to force or coerce Crystal into having sex. [Dennis Affidavit ¶¶ 16, 18, 20, 23, Bates Nos. 76-80]

While working at Arby's, Marc began a relationship with his co-worker/supervisor, a woman named Kowana Dozier. Kowana recalls that "Marc used to talk about death all the time," leading her to believe that he was suicidal. Marc would ask, "Why am I here? What is my purpose?" Marc would also cry in front of Kowana, which was the first time she had seen a grown man cry. Marc would sometimes cry at work in the back office and sometimes when they were other places. When Marc would cry, which was often, he would sob. Kowana was worried about him: "He was out of control. He was unstable emotionally." Kowana was aware of Marc's situation with both Tasha and Crystal, and the enormous stress he felt. She did not understand why Marc's

64

**JA268**

mother did not come get him and try to help him out. [Rowles Mitigation Report, Bates Nos. 232-259]

Kowana and Marc used to talk about their lives and what they wanted. Kowana says, "He wanted someone to love him." According to Kowana, Marc wanted a family, kids, and a white picket fence; he was intense and "he loved hard." When Marc moved back to North Carolina in 1993, he and Kowana lost touch. [Rowles Mitigation Report, Bates Nos. 232-259]

A profound consequence of this undeveloped are of resentencing counsel's investigation was that the jury had a wholly inaccurate and misleading understanding of Mr. Barnette's intimate relationships. Disturbingly, resentencing counsel themselves drove much of this misinformation to jury. For example, during the direct examination of Dr. Burgess, resentencing counsel ask the defense expert whether she had "an opinion … as to what Marc's purpose has been consistently in terms of going after his girlfriends?" Dr. Burgess' response, based on inaccurate and incomplete information provided by resentencing counsel, endorsed the premise of the question—that Mr. Barnette would "go after" all of his girlfriends—and testified that is occurred "with each successive girlfriend." [Tr. 2002 3512] Dr. Park Dietz, who testified for the government in rebuttal in 2002, opined that Mr. Barnette's psychological makeup included "a tendency to exploit other people in his relationships with them." [Tr. 2002 at 3800] The truth, however, is far different.

Kowana Dozier, whose relationship with Mr. Barnette is described above, could have explained that "Marc was never violent, possessive, jealous, or aggressive with her." [Rowles Mitigation Report, Bates Nos. 232-259] Temeka Lee (formerly Temeka Hunter)

65

could have described an intimate relationship with Mr. Barnette where "[t]here was never any fighting or jealousy … and he never acted possessively towards me." Ms. Lee could have explained that she and Mr. Barnette "never argued. He was always respectful. We never got into fights and he never put his hands on me." [Lee Affidavit ¶ 7, Bates Nos. 102-103] Danielle Mathis, who was never contacted by resentencing counsel, could have testified about her relationship with Mr. Barnette, which although platonic, demonstrated his ability to engage in healthy relationships with women. [Mathis Affidavit ¶ 6, Bates Nos. 109-110] Eric Cooper, who was spoken to briefly Jan Barefoot prior to the 2002 resentencing but never followed up with or asked to testify, could have described how Mr. Barnette had a girlfriend named Ayana Brewer, and how he "never saw any problems between Marc and Ayana." [Eric Cooper Affidavit ¶ 9, Bates Nos. 62-63]

Dr. Burgess makes clear how resentencing counsel's failures to develop and provide this readily available information was prejudicial:

> This information, along with information concerning relationships with Tameka Hunter [sic] and Kowana Dozier, also dramatically undercuts the notion that Mr. Barnette was somehow a "classic batterer" whose relationships always followed the same pattern, including "obsessive pursuit." As was the case with [Sheila] Sullivan, Mr. Barnette's relationships with Ms. Hunter and Ms. Dozier did not include violence or misplaced jealousy or the other elements of domestic violence or obsessive pursuit.

> The new information provided by post-conviction counsel concerning Mr. Barnette's relationships with Crystal Dennis and Netoshia Tolbert – both of which concededly involved violence by Mr. Barnette – confirms for me that my earlier conclusions, based on information provided by trial counsel, were misplaced. The additional information from Ms. Dennis, Ms. Tolbert, and witnesses to their relationships with Mr. Barnette makes clear that Mr. Barnette was not a "classic batterer," as my report and testimony suggested. Instead, this new information strongly supports the finding that Mr. Barnette suffered from psychiatric issues that were both affected by a mood disorder as well as certain psycho-social "triggers." In my opinion, this is a critically important difference from what was reported previously at trial.

66

**JA270**

During my trial testimony, I was asked by the prosecutor whether I had interviewed Ms. Dennis, Ms. Heard, or another ex-girlfriend. I had not. Trial counsel never suggested to me that speaking with Mr. Barnette's ex-girlfriends or witnesses to those relationships was a possibility.

[Burgess Affidavit ¶¶ 16-18, Bates Nos. 51-55]

### k. Return to Charlotte: Further Deterioration and the Tragedies of 1996

Marc returned to Charlotte in March 1993 and soon began a relationship with Alesha Chambers that was marked by jealousy, possessiveness, and violence. As the result of Marc's behavior, he found himself facing criminal charges in Mecklenburg County. His court-appointed attorney, Joseph VonKallist, had Marc evaluated by a psychologist to explore Marc's mental status. In June 1994, Dr. Tyson wrote:

My examination does reveal the existence of psychological and behavioral problems that might be of use as mitigating factors in sentencing. There are a variety of deficiencies in his psychological functioning that might shed light on his behavior. However, he is relatively unwilling to accept psychological interpretations of his behavior and motives. He is not likely to accept assistance that is based on such assessment, particularly as these apply to deficiencies that he believes do not exist. … He may insist on following a course of action that will appear self-defeating to others. He rigidly adheres to thinking patterns that center around justification of his actions. This does not allow him to accept that his actions will be seen as problematic.

[Tyson Report, Bates Nos. 14773-14774] At the very same time that Dr. Tyson made his findings, Marc was in the beginning stages of his relationship with Robin Williams. He was also still living in and surrounded by dysfunction. As Jean Nduly could have described:

I saw the family more after they came back from living in Georgia. Sheila and her kids also moved back to Charlotte around that time. They all lived in the same house on West Boulevard and it was a house of chaos. Sheila's kids were badly behaved whereas Vicci and Mario were quieter.

Sonia's friend, Tina, also lived with the family at the house on West Boulevard for a while. I didn't care for Tina. She always had wine and she was trying to make passes at Uncle Jesse. If she was there at the house I didn't stay long. Tina

67

**JA271**

drank a lot. Sonia liked her wine, too. Sonia and I only had one incident where we drank together. I didn't drink much because I was driving. We both loved to dance and we went out downtown. Sonia drank enough where she was ready to go to bed when she got home.

[Nduly Affidavit ¶¶ 17-18, Bates Nos. 113-116]

In March 1995, Marc moved to Virginia to live with Robin. As evidenced in the trial and sentencing records here, Marc and Robin had a volatile relationship prior to their break up in June 1996. After the break up, Marc returned to his grandfather's home on West Boulevard, where he started spending much of his time alone in a loft in the house. Mario remembers that Marc "shut down emotionally." [Mario Barnette Affidavit ¶ 81, Bates Nos. 22-33]   Tessie Nero recalls that, after the breakup with Robin, "Vicci was despondent. He wasn't himself.  It was like he had given up all hope." [Tessie Nero Affidavit ¶ 28, Bates Nos. 124-128]

Sheila Cooper recalls:

Vicci really fell apart after he and Robin broke up.  They would still talk on the phone.  He would always be sobbing. It was horrible. My dad would say to go get him off the phone so I'd tell Vicci to get off.

When he came back to Charlotte from Virginia, Vicci was reclusive. He was slow. I remember us encouraging him to come with us to go places. He would sigh and say okay, but then he'd say, "Maybe later. You guys go."

There were a number of things that changed about Vicci in that time period. I remember coming into the house one time and seeing that Vicci's head was bald. I asked him about it but I don't recall how he responded. Vicci also gained a lot of weight. He had started drinking a lot. He also started calling me "Sheila" instead of "Aunt Sheila." One time after he called me "Sheila," I asked him who he was talking to; he didn't say anything back to me.

[Sheila Cooper Affidavit ¶¶ 51-53, Bates Nos. 67-75] Numerous other witnesses were available to testify about visible changes to Marc's demeanor and personality upon his

68

**JA272**

return to Charlotte after breaking up with Robin. For example, Jean Nduly could have

testified as follows:

> A couple of days before the crime Sonia called me about Vicci. She said that he wouldn't work or get a job. He just sits out on a white bucket. He won't go anywhere. She told me that if he keeps this up she would have to take him somewhere. I agreed, telling Sonia she might have to take him to see a psychiatrist or counselor. Sonia asked me to come over and talk to Vicci, so my daughter and I went over to West Boulevard for a visit. When I got there I asked Sonia where Vicci was because he didn't come out to greet me. I called to him, "Vicci, you're not going to come out to talk to me?" He responded that he wasn't. I asked, "What's wrong with you?" and he responded, "I don't know." Vicci was lying on Sonia's bed. I went in there and saw him. I remember taking his arm and moving it. His arm was floppy and limp. He never did get up off the bed while I was there. That was not how he usually reacted when I came over.

> A couple days later Sonia called and told me about Robin's death. She told me, "I wish I'd taken him somewhere." I went over to the West Boulevard house before Vicci was caught. I remember there were news people there trying to come up to the house.

[Nduly Affidavit ¶¶ 22-23, Bates Nos. 113-116]

> Sonia, who resentencing counsel failed to call as a witness, could have provided

additional insights to the jury in 2002:

> Vicci moved into the upstairs loft in the house after he moved back from Virginia. He would generally be quiet and not come down from the loft but I knew he was up there. Up until the fire incident he was on the phone with Robin a lot, usually late at night. I could hear him on the phone crying. He was calling from the land line in our house and the bill got extremely expensive. The phone calls were bad. Sometimes I would just make him get off the phone. He would be on calls for over an hour. He would be crying. I could hear him crying out loud.

> When Vicci first got back from Virginia he talked about getting a job and said he would be okay. Vicci applied for a job at Saturn. He was excited about it but he didn't end up getting the job. After that he was very down; he was disappointed. Things went downhill for him after he didn't get that job. He stayed upstairs in the loft more after that. He put up a curtain in front of the door. He put up a sign for people to keep out.

> When people came over to the house we would call up to him. We would call for him to come down and say hello. He would say, "I'll come down in a bit." But then he wouldn't come down to visit with people.

69

**JA273**

When I learned about the fire at Robin's apartment, I asked Vicci what he had been thinking. He just retreated upstairs. He also started sitting out at the fork in the driveway on an overturned paint bucket after that. He was waiting for the authorities to come and arrest him. Eventually he gave up on that when nobody came for him. Vicci wanted the authorities to get him and take him away.

After some time passed and Vicci was not arrested I started to second guess that he had set the fire at all. I can't recall if the news reports actually said his name. I thought it was strange that nobody contacted me about it or seemed to be looking for him.

Vicci was eating a lot during that time period and he gained a lot of weight. I think he gained about 30 pounds. He also shaved his head. This was about three weeks before the shootings. I asked Vicci why he had shaved his head and he told me his hair was bothering him and he couldn't think straight. He also said his hair was hurting him.

I offered for him to talk to someone like a counselor. He responded, "You can't afford that." I told him it was true that I didn't have the money but I said we could work something out. The subject was dropped after that. I wish I had pushed it more.

A day or two before the shootings, Vicci was still just emotionally flat and non-responsive. Then on the eve of the shootings there was a sports game on the television. Tessie's husband, Jeff, was over at the house and John was there too. They were watching the game and Vicci watched it with them. They were all having some beers together.

I was getting ready for work in my bedroom while they were watching the game. I remember coming out and seeing the three of them. I was wearing a navy blue dress coat. It was double breasted and had lapels. I had a silk scarf around my neck that was tied and I was wearing flats. I remember that Vicci was straddling a chair, sitting on it backwards when I came out. He came over and hugged me. He said, "You make that uniform look good." He kissed me on the cheek and told me he loved me. He said, "Have a good night. I'll see you in the morning." During this time period, Vicci had usually been upstairs in the loft when I left for work, not downstairs socializing. In that short time period before the shootings he was not the Vicci that we raised and know. His feelings were crushed after his breakup with Robin. She broke his heart and he was caught up in that. It was the idea that she cheated on him. He had desperation to show that he was a man.

Vicci needed counseling after his relationship with Robin ended. A neutral person with whom he could have opened up and vented. Someone who could have understood his feelings would have been helpful to him.

70

**JA274**

[Sonia Barnette Affidavit ¶¶ 69-78, Bates Nos. 34-48]

Dr. Burgess explains how this accurate background information would have fundamentally changed her testimony:

> For example, a prominent focus of my report and trial testimony was the notion that Mr. Barnette had witnessed and experienced domestic violence during his youth, and that his criminal conduct in April through June 1996 "may be understood, in part, as a symbolic reenactment of family and childhood patterns" (which is how I wrote about it in my report). I also testified that the "roots" of his behavior could be found in the way he was "raised and developed." The information now made available to me makes clear that this emphasis on "multi-generational violence" as an explanation for Mr. Barnette's criminal behavior in question was misplaced and due to incomplete and inaccurate information provided to me by trial counsel. While it is true that Mr. Barnette witnessed and experience domestic violence, it is clear from the new information provided that his criminal conduct could not simply be explained by that upbringing. Rather than any "symbolic reenactment of family and childhood patterns," Mr. Barnette's criminal conduct was attributable to a psychotic episode and mental health crisis that he was experiencing. The incomplete and inaccurate information provided by trial counsel led me to erroneously conclude that Mr. Barnette "ha[d] devoted his adolescent life to a continuous pattern of reenacting and trying to resolve the way he was programmed in childhood." Rather than simply acting out as a result of familial dysfunction, as I reported and testified about in 2002, Mr. Barnette suffered from debilitating mental health issues that profoundly affected his behavior throughout his life.
>
> In my report and trial testimony, I opined that Mr. Barnette may have been suffering from major depression and a personality disorder "not otherwise specified," with paranoid, antisocial, and borderline features. These diagnoses were incomplete and lacking because the information provided to me at the time was also incomplete and lacking. The new information provided by post-conviction counsel makes far clearer the most prominent and important aspects of Mr. Barnette's mental health status during the relevant period of time. Based on this new information, it is my opinion that Mr. Barnette was experiencing a psychotic episode and mental health crisis, and that he also suffered from a mood disorder that was significantly affecting his thinking and behavior.

[Burgess Affidavit ¶¶ 10-11, Bates Nos. 51-55]

71

**JA275**

**C. Resentencing Counsel Unreasonably and Prejudicially Failed to Conduct an Adequate Investigation and Utilize the Information it Possessed**

By resentencing counsel's own assessment, the social history investigation conducted for Marc Barnette's 1998 trial was "superficial and not-sufficiently in depth." Resentencing counsel believed that Marc's prior defense team had failed to "include some critical things" while investigating and developing his mitigation evidence, and "some potential mitigation witnesses may not have been candid with [the mitigation investigator] in the past." Thus, a serious re-investigation into Marc Barnette's background was required. Despite this candid assessment about the work that had been undertaken previously, resentencing counsel repeated the past when it unreasonably failed to adequately investigate and pursue readily available and critically important information about Marc's background.

**1. Resentencing Counsel's Unreasonable and Prejudicial Misuse of its Investigative Resources**

Cessie Alfonso was hired by resentencing counsel to undertake the thorough mitigation investigation that resentencing counsel knew had not been conducted prior to Mr. Barnette's 1998 trial. Yet resentencing counsel provided no guidance to Ms. Alfonso, failed to direct her investigation, and ignored the powerful information she gathered despite the ineffectiveness of resentencing counsel. Ms. Alfonso explains:

> Following my initial interviews with Marc and his mother, Sonia, in January 2002, I wrote Jean Lawson a detailed letter. Based on my initial meetings, as well as what case materials I had reviewed to that point, I believed Sonia's personal history of trauma, abuse, and loss would be an important feature of the mitigation case to explain Marc's development. For example, Sonia's family had rarely, if ever, spoken about the murder of her mother, Pearl, which occurred when Sonia was a very, very young mother. During my interviews with Sonia and her sisters, it was clear that they had never discussed their respective experiences and emotions – of loss, pain, grief, and guilt – as a result of their mother's murder, and had never healed from the traumatic loss.

**JA276**

Despite my urgings to the defense team that Sonia's own history was critically important, the defense team did not present evidence about it. I was neither consulted about this decision nor told why the defense team did not present this evidence.

[Alfonso Affidavit ¶¶ 8-9, Bates Nos. 1-5] As Dr. Dudley, Dr. Burgess, Dr. Johnson and various lay witnesses explain, Sonia Barnette's own history and trauma are significant factors in understanding Marc Barnette's mitigating background. Despite Ms. Alfonso drawing attention to this important line of mitigation, resentencing counsel unreasonably ignored it.

The same thing happened with respect to information about Jesse Cooper. As Ms. Alfonso explains:

I met with Jesse Cooper, Marc's maternal grandfather, during the course of my investigation. Jesse had been in the Korean War, been injured in combat, and suffered from trauma-related symptoms ever since. I spoke with Jan Barefoot and suggested locating Jesse's military and medical records, but we never got any of them. Due to Jesse's bad health at the time of Marc's retrial, he could not testify. Neither Jean Lawson nor Harold Bender ever talked with me about ways in which the defense might be able to present information about Jesse and his background, such as through records, video, or other witnesses' testimony. Jesse's background in the service, the affects that combat had on him, his drinking, his relationship with Pearl, his reaction to Pearl's leaving the family and subsequent murder, and his efforts to raise Sonia, Sheila, and Marc in the wake of Pearl's death, were all significant pieces of information that I felt were important to the mitigation case. Moreover, Jesse had gone with Marc to Roanoke, Virginia at one point to help Marc get his belongings from Robin Williams' house, and saw some of their break up in the process. Jesse also lived in the same house as Marc after he returned from Virginia, and witnessed Marc's worsening mental health. I was never told why the defense team did not present this evidence.

[Alfonso Affidavit ¶ 11, Bates Nos. 1-5]

With respect to the information about paternity—an issue Dr. Burgess deems "quite significant" and something that was "dangerously destabilizing for Mr. Barnette," [Burgess Affidavit ¶19, Bates Nos. 51-55]—resentencing counsel did *nothing* with the information gathered by Ms. Alfonso.

73

**JA277**

The issue of paternity—namely, the identity of Marc's true biological father—was also significant in Marc's case. In addition to the importance that it would make on a biological level, the lies, rumors, and misunderstandings concerning Marc's biological father's identity played an important and debilitating role in the family dynamic. Sonia had always maintained that Rick Barnette was Marc's father, despite a blood test that established otherwise. Sonia would tell others—including Marc—that Rick had "faked" the test. Notwithstanding Sonia's protests to the contrary, it was evident that Rick was not Marc's biological father and Sonia was well-aware of that fact.

Family secrets can be corrosive and damaging, especially to someone like Marc, who was in the middle of the paternity controversy. Compounding the harm in Marc's situation was the fact that his mother was very vocal in her claim that Rick was lying about the blood test. Thus, I thought it was important to fully explore the paternity issue.

In late March 2002, I spoke with Larry Wright, whom I believed to be Marc's biological father. I regularly updated Jean Lawson about developments in the mitigation investigation, and did so with respect to Wright. Lawson did not suggest any ways in which to develop the evidence concerning Wright. He would not have been the first, or last, witness who was hesitant to get involved as a witness in a capital murder case. There were many ways that the defense could have developed this information. Ultimately, the defense did not present any evidence, or otherwise suggest to the jury, that Sonia was lying to Marc (and others) about the paternity issue. I was neither consulted about this decision nor told why the defense team did not present this evidence.

[Alfonso Affidavit ¶¶ 12-14, Bates Nos. 1-5]

Approximately five months before jury selection was scheduled to begin, Ms. Lawson "faxed a list of 'potential mitigation witnesses' to [Jan Barefoot] in early March 2002. This list was based on names that Marc had provided to [Ms. Lawson] during [her] visits with him." [Lawson Affidavit ¶ 29, Bates Nos. 94-101] As Ms. Lawson explains:

I indicated on this list which witnesses I wanted Jan to locate so Cessie Alfonso could interview them. A number of former girlfriends were on the list — including Sheila Sullivan, Tameka Hunter [sic], and Kowana Dozier — but I don't recall if I specifically asked Ms. Barefoot to locate them at that time. Her notes indicate that, right on the eve of trial, I asked Ms. Barefoot to locate Kowana Dozier and Tameka Hunter [sic], but she did not have enough time to track them down.

[Lawson Affidavit ¶ 29, Bates Nos. 94-101] Ms. Barefoot recalls that she was never

74

**JA278**

asked to locate Ms. Sullivan, and that she was only asked to locate Ms. Dozier on or about July 5, 2002, and Ms. Hunter on or about July 23, 2002—in both instances, too late to locate them for use at trial. [Barefoot Affidavit ¶¶ 9, 15, Bates Nos. 15-16]

Resentencing counsel's unreasonable failure to utilize its investigative resources was further evidenced by its inexplicable management of Ms. Alfonso's "biopsychosocial" report—a standard and necessary tool in capital defense in 2002. Although Ms. Alfonso's report was incomplete (due to resentencing counsel's failure to competently direct Ms. Alfonso), it was certainly more substantive and accurate than what Sindy Maxwell had compiled for the 1998 trial. Indeed, according to Ms. Lawson and Ms. Rauscher, nothing Ms. Maxwell produced was reliable. According to Ms. Alfonso:

> I created a "biopsychosocial" report for the defense team. This type of report, which details the witnesses I interviewed, the documents I received, the psychosocial factors present in the defendant's life, and a chronology of life events [were] standard in capital mitigation work in 2002.
>
> It was never made clear to me by the defense attorneys how, if at all, they intended to use my report. Indeed, it was never made clear to me until the trial itself that defense counsel did not intend to call me as a testifying witness.
>
> I submitted my report to defense counsel on July 8, 2002. I did not have further discussions with either Jean Lawson or Harold Bender about the report.

[Alfonso Affidavit ¶¶ 18-20, Bates Nos. 1-5] Having received the report one week before jury selection started, resentencing counsel failed to take any steps to follow up on the various leads and issues uncovered by Ms. Alfonso, as well as failed to share the report or its contents with its experts. As a result, a significant amount of mitigating evidence that was in resentencing counsel's possession was not shared with defense experts or presented to the jury. Other than Mr. Barnette himself, only three of the witnesses interviewed by Ms. Alfonso were called as defense witnesses in the 2002 sentencing

75

**JA279**

proceeding: Derrick Barnette, Mario Bamette, and Armaud Cooper. [Alfonso Affidavit ¶ 7, Bates Nos. 1-5]

Thus, despite having the resources of an experienced mitigation specialist (Ms. Alfonso) and experienced investigator (Ms. Barefoot), resentencing counsel unreasonably failed to put either to use. Ms. Alfonso comments: "I later met with Harold Bender but had no substantive conversations with him about my work.  Initially, I was in somewhat regular contact with Jean Lawson, but things changed a few months into the case and I started hearing less and less often from her." [Alfonso Affidavit ¶ 4, Bates Nos. 1-5] Ms. Barefoot notes: "I had worked on a number of cases with Harold Bender prior to the Barnette retrial. Harold's manner with me in the Barnette case was similar to his manner in other cases we worked on together: he would give me a set of tasks to accomplish—for example, locate a witness or find a record—but not provide context or explanation." [Barefoot Affidavit ¶ 5, Bates Nos. 15-16] As Russell Stetler, the National Mitigation Coordinator for the Federal Death Penalty Projects and investigator with over 34 years of death penalty experience, opines, "[T]he defense team existed on paper but not in reality." [Stetler Declaration ¶ 61, Bates Nos. 137-199]

**2.** **Resentencing Counsel's Unreasonable and Prejudicial Failure to Re-interview Multiple Witnesses from the 1998 Trial**

Resentencing counsel understood its obligation to re-interview witnesses from the 1998 trial. Referring to the earlier investigation, resentencing counsel explained to the Court: "The investigation was superficial and not-sufficiently in depth to enable the formation of a cohesive theory of mitigation." [Lawson Affidavit ¶ 8, Bates Nos. 94-101] Yet resentencing counsel failed to follow through.  As evidenced by the affidavits of witnesses who had been contacted or testified during the 1998 trial but who were not re-

76

interviewed by resentencing counsel for the 2002 resentencing, valuable information was left undiscovered.

### 3. Resentencing Counsel's Unreasonable and Prejudicial Failure to Interview Witnesses who Possessed Important Mitigation Information

Resentencing counsel failed to interview many witnesses who they were well aware of and knew, or should have known, possessed important mitigating evidence. The attached affidavits and mitigation report lays bare this significant information that was never developed by trial.

The failure to interview these witnesses—including, but not limited to, Brian Ard, Kenny Bailey, Melvin Bryant, Eric Cooper, Robert Cooper, Crystal Dennis, Kowana Dozier, Do'Lores Guy, Temeka Hunter,[8] Kesha Heard, Anitra Lyles, Danielle Mathis, Victor Montgomery, Jean Nduly, Shonda Nero, Weona Sharpe, Sandra Smith, Sheila Sullivan, John West—meant that resentencing counsel had an incomplete and inaccurate understanding of their client's background. As a direct consequence of this information deficit, the jury was misled.

For example, and perhaps most glaringly, despite resentencing counsel's early declaration that they would seek to deal head-on with Mr. Barnette's prior relationships with women, they conspicuously failed to interview the women with whom Petitioner had been in relationships. The one exception to this failure to interview—resentencing counsel spoke with Netoshia Tolbert (then Netoshia "Tasha" Heard) prior to the 2002 trial—was nevertheless problematic, since resentencing counsel failed to use the information Ms. Alfonso had collected. As a result, an incomplete and inaccurate telling of Mr. Barnette's prior relationships was shared with the jury. Had resentencing counsel

---

[8] Temeka Hunter now goes by Temeka Lee.

conducted the investigation that they themselves knew was critically important, significant information would have been learned that would have painted a very different picture of Mr. Barnette and changed experts' opinions.

When, as here, the un-interviewed witnesses who possess mitigating information come in the form of prosecution witnesses, the prejudice is compounded. Resentencing counsel's failure to investigate in these circumstances means that mitigation evidence is undiscovered and aggravating evidence is introduced without an ability to rebut or neutralize. The example of Crystal Dennis, described above, most clearly proves this point.

The Supreme Court is clear that the duty to investigate in a specific case may well include consideration of the aggravating factors on which the prosecution may rely. In *Rompilla v.* Beard, 545 U.S. 374 (2005), the issue before the Court was resentencing counsel's failure to look at information related to the defendant's prior convictions.

> There is an obvious reason that the failure to examine Rompilla's prior conviction file fell below the level of reasonable performance. Counsel knew that the Commonwealth intended to seek the death penalty by proving Rompilla had a significant history of felony convictions indicating the use or threat of violence, an aggravator under state law. Counsel further knew that the Commonwealth would attempt to establish this history by proving Rompilla's prior conviction for rape and assault, and would emphasize his violent character by introducing a transcript of the rape victim's testimony given in that earlier trial… There is no question that defense counsel were on notice, since they acknowledge that a "plea letter," written by one of them four days prior to trial, mentioned the prosecutor's plans.... It is also undisputed that the prior conviction file was a public document, readily available for the asking at the very courthouse where Rompilla was to be tried.

*Rompilla v. Beard,* 545 U.S. 374, 383–384 (2005) (internal citations omitted). Here, the government, through its evidence and argument at Mr. Barnette's first trial, gave notice it would focus on Mr. Barnette's prior relationships in aggravation. Mr. Barnette's

**JA282**

resentencing counsel were well aware of this approach; indeed they highlighted it in their *ex parte* "Statement of Defense Contentions" filed in August 2001. By failing to investigate this information—failing to interview the government witnesses in question as well as others with whom Mr. Barnette had been intimate—resentencing counsel committed the same error as Rompilla's counsel. There is no reasonable strategic reason for failing to interview a witness whom the prosecution has made clear it will present at trial. As the Supreme Court observed in *Rompilla*, "[L]ooking at a file the prosecution says it will use is a sure bet: whatever may be in that file is going to tell defense counsel something about what the prosecution can produce." 545 U.S. at 389. Such an investigation here would have resulted in important mitigating evidence, as well as powerful evidence to rebut the government's evidence in aggravation. [Burgess Affidavit ¶¶ 12-17, Bates Nos. 51-55]

> But once counsel had an obligation to examine the file, counsel had to make reasonable efforts to learn its contents; and once having done so, they could not reasonably have ignored mitigation evidence or red flags simply because they were unexpected.

*Rompilla,* 545 U.S. at 391 n. 8.

**D.** **Resentencing Counsel's Unreasonable and Prejudicial Failure to Adequately Investigate and Present Evidence Which Resulted in the Jury Receiving Incomplete and, at times, Materially Inaccurate Testimony from Defense and Prosecution Experts**

Resentencing counsel failed to provide the defense experts who testified during Mr. Barnette's resentencing in 2002 with readily available information that would have not only corroborated and substantiated significant aspects of their testimony, but would have also materially changed the nature and scope of their opinions. Because resentencing counsel failed to conduct an adequate investigation, and failed to provide

79

**JA283**

the defense experts with what evidence they had collected, the jury was presented with incomplete and, at times, inaccurate information about Mr. Barnette's mental health.

Resentencing counsel recognized as early as August 2001 that there were manifold problems with the manner in which the earlier trial team investigated and presented mitigation evidence at the 1998 trial:

> Current counsel have reviewed the testimony and cross-examination at Marc Barnette's first sentencing hearing. It is apparent that the defense presentation was disjointed. The psychological, psychiatric and family history was not presented to the jury in an effective manner. The witnesses were unprepared for cross-examination. The investigation was superficial and not-sufficiently in depth to enable the formation of a cohesive theory of mitigation. Our objective is to assure that he information presented to the jury at this sentencing hearing is the result of thorough investigation, top notch assessment by appropriate experts and is credible and logical enough for the jury to understand the genesis of these crimes and to impose a sentence of life imprisonment, rather than death.

[Bates No. 366]

Resentencing counsel's assessment of the earlier investigation was reiterated to the Court during an *ex parte* hearing on February 26, 2002 concerning defense funding. Resentencing counsel noted that, during the 1998 trial, "[t]he government pretty well ridiculed this mitigation investigator and pointed out some - she had a timeline and they pointed out some areas where she didn't include some critical things." Moreover, resentencing counsel noted that "some potential mitigation witnesses may not have been candid with [the mitigation investigator] in the past and then that misinformation or information that we're going to try to present doesn't show up in her report."

Despite resentencing counsel's view that the first defense team's "investigation was superficial and not-sufficiently in depth to enable the formation of a cohesive theory of mitigation," resentencing counsel repeated the past when it unreasonably failed to adequately re-investigate and pursue readily available information to provide to its

80

experts, as well effectively to utilize the new information it had gathered.

In the case of Dr. Burgess, mitigation specialist Cessie Alfonso was never asked to develop information or interview witnesses to assist Dr. Burgess in her evaluation.

> Defense counsel never asked me to work with Ann Burgess, the "domestic violence" expert they used, in an effort to explore Marc's relationships with other women. Burgess and I spoke one time on the telephone. There was no request by Burgess for me to contact or interview or explore any particular aspect of Marc's background. Although I interviewed Tasha Tolbert, who had two children with Marc, my interviews with Tolbert were necessarily limited because I did not have any direction from defense counsel regarding what was needed for resentencing.

[Alfonso Affidavit ¶ 17, Bates Nos. 1-5]

Not only did the experts in 2002 not receive the benefit of the work performed by Ms. Alfonso, but there were also asked to rely on the "superficial and not-sufficiently in depth" investigation performed by Ms. Maxwell for the 1998 trial. [Lawson Affidavit ¶¶ 26, 32, 33, Bates Nos. 94-101] Indeed, Dr. Seymour Halleck and Dr. Mark Cunningham both testified at Mr. Barnette's first trial in 1998. At that time, these experts were provided with and relied upon the investigative work of the first trial team and its mitigation specialist. [Bates Nos. 362-367] Despite the shoddiness of the earlier work done on Mr. Barnette's background, however, resentencing counsel inexplicably had these experts rely on *precisely the same information* for purposes of their testimony in 2002. This undermined the accuracy and credibility of the experts' opinions and testimony. It was also grist for the prosecution's mill on cross-examination and in closing argument, when the prosecution rightly pointed out that the jury was presented with "quick snapshots … uncorroborated information," which begged the question: "[W]hat do I know about the quality of information that [the defense experts] used to form their

81

**JA285**

opinions?" [Tr. 2002 at 3936][9]

Resentencing counsel's deficiencies did not exist only with defense experts. As alleged in the § 2255 motion, resentencing counsel unreasonably failed to impeach the government's expert, Dr. Park Dietz, on an issue that cut to the core of his credibility.

Following the defense case-in-chief, the prosecution presented the rebuttal testimony of Dr. Dietz, a well-known forensic psychiatrist from California. Dr. Dietz played a critical role in the government's case. Indeed, his testimony was the fulcrum of the government's attack on Mr. Barnette's mitigation and mental health presentation. The government highlighted Dr. Dietz's testimony in its closing repeatedly: "I contend to you, ladies and gentlemen, that the clearest explanation of Marc came from Dr. Dietz, Marc Barnette is narcissistic, he sees himself as the center of the universe and all things revolve around him and his needs; if anything gets out of whack, he reacts violently." [2002 Tr. 3935] Later, the government contrasted Dr. Dietz's testimony against the evidence supplied by the defense experts:

> Contrast that, ladies and gentlemen, with the Government's expert, Dr. Park Dietz. Dr. Dietz looked you in the eye and said, Marc Barnette was not psychotic at the time of these crimes, Marc Barnette's choices were not predetermined by he [sic] childhood, childhood risk factors do not cause adult behavior, Marc Barnette's behavior was not programmed. He told you this was two crimes with two distinct motives, this was not a domestic homicide, and he told you that Marc Barnette has told so many stories in the past that it's not possible to know what happened. Plain language, plain opinions.

[2002 Tr. 3939] Given the near-celebrity status that Dr. Dietz maintained at the time and his central role as a forensic expert, and given the reasonable likelihood that Dr. Dietz would play a key role in the government's case for the death penalty, resentencing

---

[9] During Dr. Halleck's direct examination, when asked by Mr. Bender about what he had been able to review prior to rendering his opinion and testifying, Dr. Halleck testified: "I think I have reviewed most of the available documentation on this case." [2002 Tr. 3403] Through no fault of his own, it is clear that Dr. Halleck's statement was untrue.

82

**JA286**

counsel was well aware that Dr. Dietz's credibility was crucial. Despite this fact, resentencing counsel failed to impeach Dr. Dietz about his grossly misleading testimony in the high-profile trial of Andrea Yates in Texas, an issue that cut to the heart of his credibility as an expert witness.

During the government's qualifying of Dr. Dietz as an expert, the prosecution noted a number of high profile cases in which Dr. Dietz had previously testified, including "the case of Andrea Yates, the woman who drowned her children in the bathtub[.]" [2002 Tr. 3793-94] The Yates case, out of Harris County, Texas, had recently concluded in March 2002. By all accounts, Dr. Dietz's testimony for the prosecution had undermined Yates' claim that she was insane at the time of the crimes. At trial, Yates claimed that Satan was inside her and that she had killed her children to save them from "hellfire and damnation." During his testimony, Dr. Dietz claimed that Yates got the idea to drown her children from an episode of "Law & Order" in which a mother was acquitted on an insanity defense after drowning her children in a bathtub. Dr. Dietz testified that he was a consultant for the television program and that the show in question had been broadcast shortly before the Yates provided her reasoning for the murders.

Following the jury's rejection of Yates' insanity defense, it was revealed that Dr. Dietz had provided materially false testimony. Contrary to his forceful and convincing testimony, no such episode of "Law & Order" was ever taped. As a result of Dr. Dietz's materially false testimony, the prosecution abandoned its request for the death penalty and Yates was sentenced to life in prison with the possibility of parole after 40 years. On January 6, 2005, Yates' murder convictions were overturned as a direct result of Dr. Dietz's false testimony given that it more than likely prejudiced the jury. Yates was

83

**JA287**

subsequently retried. On July 26, 2006, a Texas jury found that Yates was not guilty by reason of insanity. Needless to say, Dr. Dietz did not testify at Yates' retrial.

Based on this information, resentencing counsel was in a position to establish that Dr. Dietz was an unreliable expert witness whose explanations and rationalizations for behavior were suspect and fallible. Yet Mr. Barnette's resentencing counsel unreasonably failed to impeach Dr. Dietz on the materially false testimony he had provided just a few months prior in the Yates case.

There is no way in which the failure to confront Dr. Dietz with his testimony in Yates can be justified as sound trial strategy or a reasonable strategic choice. Indeed, it is inconceivable that a trial attorney would fail to inform a jury of Dr. Dietz's very recent and significant "misstep" in the Andrea Yates case. The reliability of the government's one and only mental health expert, called to testify in rebuttal, cut directly to the heart of resentencing counsel's defense at resentencing. Inexplicably, resentencing counsel failed to use the available information. That failure simply cannot be condoned as reasonable trial strategy. *See Berryman v. Morton*, 100 F.3d 1089, 1098-99 (3d Cir. 1996) (granting relief, in part, on trial counsel's failure to impeach a prosecution witness).

Although, generally, the decision whether to cross-examine a witness, and "to what extent and in what manner," is "strategic in nature," *United States v. Nersesian,* 824 F.2d 1294, 1321 (2d Cir.1987), courts can "second-guess such decisions" if there is "no strategic or tactical justification for the course taken[.]" *United States v. Luciano,* 158 F.3d 655, 660 (2d Cir.1998). *See also Moore v. Marr,* 254 F.3d 1235, 1241 (10th Cir.2001) (noting that "counsel's failure to impeach a key prosecution witness is potentially the kind of representation that falls outside the wide range of professionally

84

**JA288**

competent assistance") (internal quotation and citation omitted); *Driscoll v. Delo,* 71 F.3d 701, 710 (8th Cir.1996) (failure to question witness with prior inconsistent statement made to investigators constituted deficient performance since there was "no objectively reasonable basis on which competent defense counsel could justify a decision not to impeach a state's eyewitness whose testimony ... took on such remarkable detail and clarity over time"); *Tomlin v. Myers,* 30 F.3d 1235, 1238 (9th Cir.1994) (defense counsel's performance deficient when counsel failed to challenge an in-court identification made by an eyewitness where the case "hinge[d] on an eyewitness's testimony"); *Harris v. Reed,* 894 F.2d 871, 878 (7th Cir.1990) (failure to call witnesses to contradict eyewitness identification of defendant was deficient performance); *Nixon v. Newsome,* 888 F.2d 112, 115-16 (11th Cir.1989) (failure to impeach with prior inconsistent testimony "sacrificed an opportunity to weaken the star witness' inculpatory testimony"); *Blackburn v. Foltz,* 828 F.2d 1177, 1183-84 (6th Cir.1987) (counsel deficient where he failed to impeach an eyewitness with previous inconsistent identification testimony when "weakening [the witness'] testimony was the only plausible hope [the defendant] had for acquittal").

### E. Resentencing Counsel Unreasonably and Prejudicially Failed to Advise Mr. Barnette That He Should Not Testify, Failed to Realize That He Should Not Testify, Failed to Properly Prepare Him for Testifying, and Failed to Frame Mr. Barnette's Testimony in the Context of His Severe Mental Health Issues

As the first defense witness called to the stand, Mr. Barnette, over the course of two days, testified about his role in the charged crimes, his prior conduct in other relationships, his upbringing, and various other aspects of his background. For all intents and purposes, Mr. Barnette was his own mitigation specialist providing testimony about

85

**JA289**

his own psycho-social history. While a qualified mitigation specialist is undoubtedly a core component of any capital defense team, and plays "an integral part of the defense team [to] insure[] that the [mitigation] presentation to be made at the penalty phase is integrated into the overall preparation of the case," ABA Guidelines, Guideline 4.1, Commentary, it is highly unusual—indeed, unprecedented—for that role to be played by a capital defendant, particularly one who is as damaged as Mr. Barnette.

Because of Mr. Barnette's distorted and warped interpretation of events and relationships—a direct consequence of his severe psychological impairments-portions of his testimony were inaccurate and, to the sentencing jury, highly aggravating. Resentencing counsel's performance was thus both objectively unreasonable and remarkably prejudicial.

It is evident that resentencing counsel's decision-making process was superficial. As Ms. Lawson recalls:

> At some point after I was appointed to him, Mr. Barnette and I discussed the issue of whether he would testify at his sentencing hearing and, as I recall, Harold Bender was involved in those discussions occasionally. Mr. Barnette was always very amenable to the advice of counsel. Mr. Bender and I recommended that he testify, and he decided to testify.
>
> I was primarily responsible for preparing Marc Barnette to testify. I never considered, and I don't recall ever discussing with Harold Bender, having any mental health expert weigh in on Mr. Barnette's testimony. At this point in time-2002-I was familiar with the notion of having an expert opine to the jury about a defendant's confession or demeanor. Indeed, often times a defendant's state of mind, psychological make-up, or even his appearance can affect how the defendant's words might come across to a jury.

[Lawson Affidavit ¶¶ 22-23, Bates Nos. 94-101] Despite an awareness of having an expert play a role, resentencing counsel unreasonably failed to do anything to contextualize or explain Mr. Barnette's testimony.

**JA290**

Cessie Alfonso was shocked by Mr. Barnette's role as a testifying witness:

> I was definitely surprised—actually, shocked would be the right word—when Marc testified on his own behalf at trial. I was neither consulted about this decision nor told why the defense team decided to call him as the first defense witness. During my various meetings with Marc, I was never told by Marc— directly or indirectly—that he wanted to testify. I could count on one hand the number of times a defendant testified on his own behalf before the jury in cases I've worked on. Had defense counsel sought my advice or insights about Marc as a potential witness, I would have strongly cautioned them that Marc, despite genuine remorse for what he had done, would likely offend the jury by his testimony. I would have been concerned that Marc's mental health makeup and experiences, and his general lack of insight, would result in explanations and rationales for his behavior that would alienate jurors, rather than communicate remorse and sorrow. I believe his testimony did just that.

[Alfonso Affidavit ¶ 23, Bates Nos. 1-5] Dr. Burgess was also not asked by resentencing counsel to offer her insights or expertise.

> Trial counsel never consulted with me about the decision to have Mr. Barnette testify on his own behalf at trial. Had trial counsel sought my advice or insights about Mr. Barnette as a potential witness, I would have strongly cautioned them that Mr. Barnette, despite genuine remorse for what he had done, would likely offend the jury by his testimony. I would have expressed my strong reservations that given his mental health makeup and experiences, and his general lack of insight, Mr. Barnette would explain and rationalize his behavior in ways that would likely anger jurors.

[Burgess Affidavit ¶ 22, Bates Nos. 51-55]

Dr. Sally Johnson, who evaluated Mr. Barnette in 1997 and was an employee of the Bureau of Prisons in 2002, adds:

> I have been made aware that Mr. Barnette testified on his own behalf at his resentencing trial. Had trial counsel sought my advice or insights in 2002 about putting Mr. Barnette on as a witness, I would have discussed that although Mr. Barnette expressed genuine remorse for what he had done, he had limited insight into his behaviors and may not be able to display his remorse when confronted with the stress of examination and cross examination. His attempts to deal with his anxiety and his personality functioning would likely limit his ability to relate to the Jury or others in the court room.

[Sally Johnson Affidavit ¶ 24, Bates Nos. 89-93]

87

**JA291**

Dr. Dudley provides further insights about the highly problematic nature of having Mr. Barnette testify on his own behalf:

> Given MB's above described psychiatric impairments, his lack of insight into the causes of these impairments, and his lack of insight into how these impairments impact on his perceptions and his behavior, the following can be said. MB's psychiatric impairments manifest (both to this psychiatrist and others) in statements, explanations, and rationalizations by MB that would appear to be distorted, self-serving, and simply off-base, and therefore, it is unsurprising to this psychiatrist that MB's testimony at trial appeared unsympathetic. While MB's testimony was, in many ways, consistent with his mental health make-up – and thus clouded by distorted and warped interpretations of events and relationships – to an untrained listener, it likely appeared quite offensive. That being said, if MB was going to be allowed to testify, it would have also been possible for a mental health expert to then explain to a jury why MB, even after his arrest and conviction for murder, would persist in describing things in ways that no one else could see or agree with.

[Dudley Report ¶ 77, Bates Nos. 209-231]

Resentencing counsel could have, and should have, kept Mr. Barnette off the witness stand and presented his life history and mental impairments in a mitigating manner. At the very least counsel should have contextualized Mr. Barnette's testimony as, in large measure, his inability to comprehend or explain his own actions, despite still feeling genuine remorse. The total failure to do so permitted the prosecution to assert, without challenge or rebuttal, that "[Mr. Barnette's] testimony [was] so filled with misinformation that you simply can't believe it. I contend to you, ladies and gentlemen, that those hours that Marc Barnette was on the witness stand is just where he likes to be, the center of attention." [2002 Tr. 3928-29] He was nothing more than a "spin artist." [2002 Tr. 3929]

Resentencing counsel's failure to explain their client's testimony in the context of his impairments was critically prejudicial. Resentencing counsel did not offer the jury an understanding of Mr. Barnette's own words. Resentencing counsel unreasonably failed to

88

explain and argue to the jury that many aspects of Mr. Barnette's testimony in fact revealed signs and symptoms of his multiple impairments, and was consistent with his mental health diagnoses. Left unexplained, Mr. Barnette's testimony sounded, at various turns, damning, callous, and unmitigated.

There is no question that resentencing counsel was on notice that Mr. Barnette's mental health impairments would deleteriously affect his testimony. Resentencing counsel were aware from Dr. Tyson's 1994 report that Mr. Barnette "may insist on following a course of action that will appear self-defeating to others," and that "[h]e rigidly adheres to thinking patterns that center around justification of his actions," which consequently "does not allow him to accept that his actions will be seen as problematic." [Tyson Report, Bates Nos. 14773-14774] They were also aware from Dr. Faye Sultan's 1998 report that Mr. Barnette had "developed significant perceptual and cognitive distortions," and that "[t]hese perceptual inaccuracies … bred behavior grossly inappropriate to social situations." [Sultan Report, Bates Nos. 14770-14772]

**F. <u>Resentencing Counsel Unreasonably and Prejudicially Failed to Investigate and Present Readily Available *Lockett/Skipper* Evidence Concerning Mr. Barnette's Institutional Adjustment and Meaningful Relationships</u>**

In opening statements, resentencing counsel promised the jury that the defense would put forward evidence to show how and why Mr. Barnette had "changed over the last six years." [2002 Tr. 2395] Yet while the jury learned that Mr. Barnette had a spotless institutional record during his incarceration since his arrest in 1996, the jury was never provided with evidence about why Mr. Barnette had adjusted so well to prison. This gaping omission—the failure to explain to the jury that Mr. Barnette's mental health makeup and severe mood disorders were better controlled and managed in the prison

89

**JA293**

setting, and that he had maintained and continued to develop important relationships with friends and family—left the jury with little reason to spare his life.

Resentencing counsel presented evidence that Mr. Barnette had no infractions from the time of his arrest in 1996 through the time of trial in 2002. Resentencing counsel presented evidence from three county detention officers that when Mr. Barnette was at the Mecklenburg County Jail, he had been a "good model inmate," [2002 Tr. 2459] that he "followed all orders and directives," [2002 Tr. 3460] and that he had been "[r]espectful, intelligent, and quiet." [2002 Tr. 3458] Resentencing counsel also presented evidence from two employees of the Bureau of Prisons to discuss Mr. Barnette's infraction-free incarceration, as well as the conditions of Mr. Barnette's confinement—for example, the type of housing units he had been housed in and type of segregation that he was regularly kept in. Resentencing counsel also presented an expert witness, Walter Buer, to describe Mr. Barnette's classification within the Bureau of Prison.

Although resentencing counsel presented data about Mr. Barnette's good behavior and highly restricted confinement in prison, they conspicuously failed to provide the jury with any evidence about why Mr. Barnette had seemingly adjusted so well. For example, given Mr. Barnette's psychiatric impairments, resentencing counsel unreasonably failed to present testimony from any one of Mr. Barnette's mental health experts concerning Mr. Barnette's understandably positive response to structure, and about how the forced reduction of the particular stressors that previously made Mr. Barnette acutely vulnerable to an exacerbation of his symptoms, and the associated erratic and irrational behavior, resulted in Mr. Barnette being a genuinely constructive and productive individual while imprisoned.

90

**JA294**

As Dr. Dudley explains:

Finally, the mental health impairments suffered by Marc Barnette, while dramatic and severe, can be managed and/or controlled. For example, I am aware that Marc Barnette had not committed any infractions or received any disciplinary write-ups from the time of his arrest in June 1996 through the time of his retrial in 2002. This is particularly noteworthy given how disruptive his behavior and distorted his thinking had been prior to his arrest. Yet it is quite understandable/explainable given the structure that MB had while incarcerated and the forced reduction (as a result of his incarceration) of the particular stressors that make MB acutely vulnerable to an exacerbation of his symptoms and the associated erratic and irrational behavior. This explanation as to why Marc Barnette had shown positive and constructive adjustment to prison could have also been presented for consideration as mitigation at the time of trial.

[Dudley Report ¶ 78, Bates Nos. 209-231] None of the defendant's mental health experts—Dr. Halleck, Dr. Cunningham, Dr. Burgess—were asked to opine about this issue.

Resentencing counsel's failure here is all the more inexplicable given the availability of a compelling expert witness who had previously evaluated Mr. Barnette and, for good measure, maintained a high-level position within the Bureanu of Prison. As detailed in the § 2255 motion, Dr. Sally Johnson had evaluated Mr. Barnette in 1997 with respect to his competency and insanity. She later testified during the 1998 trial as a defense witness. Yet despite being able and available to testify to a number of mitigating issues—including, but not limited to, positive institutional adjustment, remorse, and mental illness—Dr. Johnson was not called to testify on Mr. Barnette's behalf in 2002 or even consulted by resentencing counsel.

As Dr. Johnson now explains:

I testified briefly at Mr. Barnette's trial in Charlotte on February 3, 1998. In court I confirmed that during his stay at the FMC, Mr. Barnette told me he had come to grips with what he had done shortly after the crime was committed, that prior to his arrest he had intended to kill himself because he believed his life was over, and he described feeling overwhelmed with the magnitude of his behavior. I

91

**JA295**

confirmed my assessment that Mr. Barnette expressed remorse for his behavior and expressed sympathy for the victim's family.

[Sally Johnson Affidavit ¶ 14, Bates Nos. 89-93] Following her testimony in 1998, Dr. Johnson had no further involvement with Mr. Barnette or his case until being contacted by post-conviction counsel. [Sally Johnson Affidavit ¶ 15, Bates Nos. 89-93] Had Dr. Johnson been contacted by resentencing counsel before the 2002 resentencing, she would have been able to testify about Mr. Barnette's institutional adjustment to that point, as well as a number of other relevant matters that the jury never heard. Had she testified as a defense witness, Dr. Johnson would have explained to the jury that, at the time, she was the Director of Forensic Fellowship Program for Federal Bureau of Prisons/Duke University of Psychiatry, as well as a Psychiatric Consultant to the Medical Director of the Federal Medical Center (FMC) at FCI Butner. In that position she conducted forensic evaluations for the federal court system on high profile and complex cases, and served as an expert witness. [Sally Johnson Affidavit ¶ 4, Bates Nos. 89-93]

> Dr. Johnson could have opined as follows:
>
> According to my December 29, 1997 report, Mr. Barnette was taken into custody in connection with his crimes on or around June 25, 1996. Thus, by the time of Mr. Barnette's resentencing trial in 2002, he had been in custody for approximately six years – the majority of which time he had spent in the custody of the Bureau of Prisons. Having reviewed Mr. Barnette's prison records from his incarceration during that period of time, it is clear that Mr. Barnette had very positive institutional adjustment. He presented no problems for correctional officers and had no problems with other inmates. He demonstrated an ability and willingness to abide rules, remained non-violent, and maintained constructive and positive relationships with others. Had I been asked, I would have been willing and able to testify at Mr. Barnette's resentencing trial about his positive adjustment to prison and his lack of disciplinary issues, and how it was consistent with his behavior and adjustment during his evaluation period in 1997 and consistent with my expectations for his future adjustment.

[Sally Johnson Affidavit ¶ 16, Bates Nos. 89-93]

**JA296**

Dr. Johnson could have also testified about aspects of Mr. Barnette mental and social history, including the following:

The information provided by post-conviction counsel also clarifies that Mr. Barnette's intimate relationships did not always involve abuse or negative behavior. During his relationship with Sheila Sullivan, Mr. Barnette appeared to have been supportive during times of stress, including when Ms. Sullivan became pregnant and later terminated the pregnancy. There is no evidence Mr. Barnette was abusive toward Ms. Sullivan. Mr. Barnette was the victim of an assault, perpetrated by other young males, during the time of his relationship with Ms. Sullivan. When that relationship fell apart, Mr. Barnette became depressed and attempted suicide. I did not have this information in 1997. Had I had this information, I could have testified then and in 2002 that Mr. Barnette was engaged in a significant, nonviolent relationship with Ms. Sullivan.

Mr. Barnette's relationships with Ms. Tameka Hunter [sic] and Ms. Kowana Dozier also did not include violence or extreme jealousy or elements of domestic violence or obsessive pursuit. I could have so testified to that in 1998 and in 2002.

During my 1997 evaluation, I was unaware of the paternity issues concerning Mr. Barnette's father and how his mother, Sonia Barnette, handled the controversy. In the face of a paternity test, confirming Derrick Barnette was not the father, Sonia Barnette continued to claim he was. This was upsetting and confusing for Mr. Barnette. I could have testified to this in 1998 and 2002.

I was also unaware in 1997 of the details concerning the circumstances of Sonia Barnette's mother's murder (death of Pearl Cooper), and the impact of this trauma on her parenting abilities. Again, I could have testified to this in 1998 and 2002.

The murder of his maternal grandmother, Pearl Cooper; his maternal grandfather, Jesse Cooper's, post-traumatic stress disorder, how the confusion concerning Marc's paternity was handled within the family; his mother Sonia's limitations as a young parent; and the absence of any stable or helpful guidance given to Marc from others (including his family) for coping with stress, dealing with problems, and navigating his adolescent and teenaged years, are all important facts that I would have been willing and able to discuss at Marc's resentencing trial in 2002.

[Sally Johnson Affidavit ¶¶ 18-22, Bates Nos. 89-93]

Ann Burgess was also available to opine about Mr. Barnette's institutional adjustment:

Trial counsel never asked me to explore and opine about Mr. Barnette's institutional adjustment, including the status of his relationships with various

93

**JA297**

family members and friends. At the point in time when I was involved in his retrial, Mr. Barnette had been incarcerated in both county jail and federal prison for approximately six years. Based on the information I have now been provided with to review, it is clear that Mr. Barnette's adjustment to incarceration – his ability to abide rules, be non-violent, maintain constructive and positive relationships with others – was unsurprisingly strong. This is because Mr. Barnette's mental health issues are strongly ameliorated by structure and the absence of psychiatric triggers. Had trial counsel asked me to discuss these issues in my report and during my testimony, I would have certainly been willing to do so.

[Burgess Affidavit ¶ 22, Bates Nos. 51-55]

In addition to failing to have an expert witness provide critically important testimony about Mr. Barnette's institutional adjustment, resentencing counsel also failed to investigate, prepare, and present readily available evidence that Mr. Barnette had ongoing and significant interpersonal relationships with various family members and friends at the time of his 2002 trial. From the time of his arrest in 1996 until the 2002 trial, Mr. Barnette had been in contact with a significant number of people, including, but not limited to, Sonia Barnette, Jesse Cooper, Rick Barnette, Armaud Cooper, and Steve Austin. Mr. Barnette's contacts with these individuals were in person, by letter, or by telephone. As Sonia Barnette explains:

> Vicci and I stay in touch. He's my oldest son and he keeps a check on my health. He asks to make sure I am taking my medication. Vicci usually reminds us about family birthdays and things like that.
>
> Vicci stays in close touch with the family. He calls often. He calls when there is a family function. He asks when family will be together and calls at that time. Then people pass the phone around to talk to him. He will do this on any major holiday or family event. I remember talking to Vicci on the phone at a cousin's wedding and passing the phone around so everyone could speak with him.
>
> Vicci has been staying in touch with his kids. He'll say to me, "Remember to call Angelica. It's her birthday." When his son is acting up Vicci will ask me to call him. He lets me know when to call them and then I do. One time Tasha was feeling down and he asked me to call her, so I did. His kids love him. Vicci and Tasha had their difficulties but she doesn't hate him. She went to visit him at the

94

**JA298**

jail. It is hard with him being locked up and far away, but we try to make his presence felt. Vicci did a painting for Angelica for her to hang up in her house.

Vicci writes and sends cards. He'll send Valentine's Day cards, Mother's Day cards, and birthday cards. He drew cards and pictures for John Mack when he was younger. He did this before Vicci's second trial in 2002.

Vicci has always been in touch with Armaud while he's been locked up. They have a close bond. Vicci was also in close touch with Steve up until Steve died. He's also been in touch with my sisters, Tessie and Sheila.

Vicci will try to take care of me, even from jail. He will ask, "Are you taking your medicine?" One time I had to have a gallstone removed and he was always calling and monitoring how I was doing. He would call to check on me. He also sent me a get well card. It's as much like him being here as he could possibly be, given that he's locked up far away.

We had a landline at the house on West Boulevard. Vicci talked to Jesse on the phone and Jesse prayed for Vicci all the time. My dad would tell Vicci to trust in God and keep praying. Vicci was upset when Jesse started getting ill in 2002.

Vicci was in touch around the time my daughter McKenzie was born. She was born in September 2000. He checked on me when I was pregnant with her. He was concerned that I was being healthy during my pregnancy.

[Sonia Barnette Affidavit ¶¶ 92-99, Bates Nos. 34-48]

Resentencing counsel failed to inform Mr. Barnette's jury about these contacts and the many ways they were important and meaningful, not only to Mr. Barnette but also to his family and friends. These witnesses could have testified about, *inter alia*, Mr. Barnette's connectedness with his half-siblings (Sonia Barnette's two younger children); how Mr. Barnette would send family members his art work, which is something they cherished; his sincere interest in maintaining and developing his relationships with Natasha Heard and their two children; as well as his genuine acceptance of responsibility and remorse.

95

**JA299**

Such aspects of Mr. Barnette's character are, by their very nature, relevant to the sentencing determination. As Netoshia Tolbert, the mother of Marc's two children and a government witness at resentencing, explains:

> I was asked on the stand about Marc re-establishing contact with me after being out of touch for a long time. It was true that this had happened, but I didn't believe then – and I don't believe now – that it was something Marc did in an effort to look good for his trial. It was genuine on his part. Marc and I were so young when we got together and started a family. Despite our difficulties, Marc and I shared a deep bond and connection – and our relationship was not some stereotypical one where Marc was the terrible batterer and a monster. Marc had an incredibly sensitive and tender side to him, but it would compete with other aspects of his personality that made our relationship very turbulent. None of Marc's lawyers ever really understood that.

> Even to this day, Marc and I – and our kids – have a relationship that is real and meaningful. Our daughter Angelica recently went to visit him and it went really well.

[Tolbert Affidavit ¶¶ 53-54, Bates Nos. 200-206]

Unfortunately, because resentencing counsel failed to conduct a reasonably thorough investigation, this powerful evidence was never provided to the jury. Instead of this powerful and temporally proximate information about Mr. Barnette's relationships, the jury was provided with evidence that suggested Mr. Barnette had perhaps no ongoing contact with anyone who knew him prior to his arrest in 1996. For example, Rick Barnette, who had visited Mr. Barnette during his incarcerations at both Terre Haute, Indiana and Charlotte, North Carolina, was not asked about his contacts with Mr. Barnette following his 1996 arrests. No other family member or friend testified on behalf of Mr. Barnette at his 2002 trial.

There is little question that resentencing counsel's failure to present this readily available evidence was prejudicial. Indeed, the jury's findings in mitigation laid this bare, as only two jurors believed beyond a reasonable doubt that Mr. Barnette did well in a

96

**JA300**

structured environment; only one juror believed beyond a reasonable doubt that Mr. Barnette had accepted responsibility for his action; only one juror believed beyond a reasonable doubt that Mr. Barnette had remorse; and no jurors believed beyond a reasonable doubt that Mr. Barnette's brother and children would be harmed by his execution.

**G. <u>Resentencing Counsel Unreasonably and Prejudicially Failed to Request a Continuance Despite Being Unprepared</u>**

While it is markedly clear that resentencing counsel's "strategy" was uninformed and based on incomplete investigation, it is also clear that resentencing counsel was also madly scrambling on the eve of and during resentencing to uncover information that should have been investigated and developed well in advance of resentencing. Despite the clear need for additional time, however, Ms. Lawson and Mr. Bender never moved to continue resentencing.

By way of background, on May 4, 2000, the Fourth Circuit remanded Mr. Barnette's case for a new penalty phase trial. On February 9, 2001, Mr. Barnette was brought back from Terre Haute, Indiana and placed in the Mecklenburg County Jail. On February 13, 2001, Jean Lawson and Claire Rauscher were appointed to represent Mr. Barnette.

For the next six-and-one-half-months, Ms. Lawson met with Mr. Barnette on three (3) separate occasions (February 22, 2001, May 2, 2001, June 20, 2001) for an approximate total of five (5) hours and forty-five (45) minutes. Jail records do not reflect any visits between Mr. Barnette and Ms. Rauscher, nor do they reflect any visits between Mr. Barnette and any investigator or expert during those six-and-a-half months. **[Bates Nos. 2309-2343]** Moreover, as of August 28, 2001, trial counsel had not conferred or

97

**JA301**

consulted with either of Mr. Barnette's prior trial counsel (Paul Williams and George Laughrun) or any of the experts previously consulted and/or used during the 1998 trial (Dr. Seymour Halleck, Dr. Faye Sultan, Dr. Ruth Kappius, Sindy Maxwell, Dr. William Tyson, Dr. John Warren, and Dr. Mark Cunningham).

On August 31, 2001, three days after resentencing counsel submitted their initial request for funding of an investigator, the Court directed that trial would begin on March 19, 2002. With a trial date approximately seven (7) months away, resentencing counsel had yet to initiate any independent investigation into Mr. Barnette's case, his background, or his mental health.

On October 31, 2001, two months after the Court ordered that resentencing would begin on March 19, 2002, and with their investigation barely underway, Ms. Rauscher and Ms. Lawson filed a Motion to Continue Date for Sentencing Hearing. In their motion, resentencing counsel detailed their respective commitments in other cases, including Ms. Lawson's capital trial that was scheduled to start in January 2002, two other capital cases for which Ms. Lawson had responsibility, and other significant cases pending trial. The Court granted resentencing counsel's motion, although the relief granted was a rescheduling of the trial for one week earlier: March 12, 2002.

On November 29, 2001, during a hearing about resentencing counsel's motion for reconsideration of the March 12, 2002 start date of resentencing, Ms. Rauscher was removed as counsel for Mr. Barnette.

On January 14, 2002, Harold Bender was appointed to represent Mr. Barnette with Ms. Lawson. At the time, he was already counsel in at least one other capital case that would be tried in Rowan County between May 6, 2002 and May 23, 2002.

98

**JA302**

Ms. Lawson also had a very active law practice that included representation in a number of other capital cases. On January 16, 2002, two days after Mr. Bender was appointed as her co-counsel in Mr. Barnette's case, Ms. Lawson was appointed to represent Jeffery Neal Duke for a capital retrial of a double murder in Gaston County. [Lawson Affidavit ¶ 20, Bates Nos. 94-101] And one week after Mr. Bender's appointment, Ms. Lawson would begin a capital murder trial that would last until February 7, 2002.

On February 26, 2002, Mr. Bender and Ms. Lawson met *ex parte* with the Court regarding the defense team's budgetary needs. At the time of the hearing, Mr. Bender had been involved in Mr. Barnette's case approximately six weeks, and Ms. Lawson had only recently completed a capital trial in Mecklenburg County. During the hearing, Mr. Bender explained:

> The trial date is scheduled for July 15, 2002. And in order for us to get ready for that, we have literally been burning the midnight oil. We don't want this case continued. We're not going to ask for this case continued.

[ECF Doc. 688 at 2] Based on the limited amount of that that Mr. Bender had been in the case, and the lack of ground covered overall by resentencing counsel, there was simply no basis for promising that resentencing counsel would not ask for a continuance.

At the point in time when resentencing counsel promised not to seek a continuance, their mitigation investigation was barely underway, if it had started at all. Various experts had not yet been engaged, and it was already readily apparent that resentencing counsel was failing to adequately supervise its mitigation specialist, who was based near Albany, New York. As a result, the defense preparation suffered immeasurably. The disorganization and absence of an informed and coherent strategy

99

**JA303**

would later be laid bare by counsel's presentation at resentencing.

An "insistence upon expeditiousness in the face of a justifiable request for a delay can render the right to defense with counsel an empty formality." *Unger v. Sarafite*, 376 U.S. 575, 589 (1964). Although a motion to continue is vested in the discretion of the district court, its denial will be reversed if it is "unreasoning and arbitrary." *Morris v. Slappy*, 461 U.S. 1, 11 (1983). Under the facts and circumstances as they existed here, it was unreasonable for resentencing counsel not to seek a continuance so they would be adequately prepared to defend Mr. Barnette.

**H. <u>Resentencing Counsel Unreasonably and Prejudicially Failed to Maintain and Preserve Mr. Barnette's Files</u>**

As the Court is well aware, Mr. Barnette's case files, going back to his 1998 trial, have not been located despite post-conviction counsel's continuing efforts to locate them. Indeed, on September 17, 2012, "it was confirmed that all of the attorneys who had represented [Mr. Barnette] in his underlying capital trial and [2002] sentencing proceedings … had transferred their case files to Mr. Bender," and that Mr. Bender had been unable to locate any of those files, or his own files for the 2002 resentencing. [ECF Doc. 17][10]

Resentencing counsel's failure to maintain and preserve Mr. Barnette's files is unreasonable and prejudicial. The absence of Mr. Barnette's files—understood to be scores of missing boxes constituting prior counsel's work in two federal death penalty trials which are missing through no fault of Mr. Barnette—has created an impediment

---

[10] Prior to his death on March 24, 2013, Mr. Bender had produced approximately 300 pages consisting of miscellaneous electronic documents that largely concerned post-trial matters. [Bates Nos. 4634-4903] The approximately 40 to 50 boxes of trial files that Mr. Bender and co-counsel Jean Lawson reportedly possessed at the time of Mr. Barnett's 2002 trial, inclusive of handwritten notes, memoranda, correspondence with the government and experts, etc., have not yet been located or produced.

and obstacle of the first magnitude. Despite the fact that Mr. Barnette has "been pursuing his rights diligently," the absence of his files has created an "extraordinary circumstance" that threatens to "[stand] in his way" as he endeavors, through counsel, to vindicate his constitutional rights in connection with his death sentences. *Holland v. Florida*, 130 S.Ct. 2549, 2562 (2010) (internal quotes and citations omitted).[11]

Here, where Mr. Bender appeared on Mr. Barnette's behalf before the Court as recently as 2009, his obligation to retain and maintain Mr. Barnette's file is indisputable. Indeed, Mr. Bender was well aware from his years as a criminal defense attorney, and his familiarity with capital post-conviction proceedings, that Mr. Barnette's case was—and is—still quite active. The absence of these files creates an extraordinary impediment for Mr. Barnette that rises to the level of a constitutional violation. At a minimum, trial counsel's failure to maintain and preserve Mr. Barnette's files strongly supports the need for an evidentiary hearing in order to resolve any factual disputes which might have otherwise been resolved by reference to trial files. *See*, *e.g.*, *Turner v. Wong*, 641 F. Supp. 2d 1010, 1036, 2009 WL 2394152 (E.D. Cal. 2009) (capital case where trial files were lost; district court's findings with respect to trial counsel's performance and prejudice made following federal evidentiary hearing; post-conviction relief granted and petitioner's death sentence vacated due to trial counsel's ineffective assistance of counsel); *Poindexter v. Booker*, 05-CV-71607, 2007 WL 1556671 (E.D. Mich. May 30, 2007), *aff'd*, 301 F. App'x 522, 2008 WL 4997500 (6th Cir. 2008) (non-capital criminal case where trial files were lost; district court's findings with respect to trial counsel's performance and prejudice made following state evidentiary hearing; post-conviction

---

[11] Under RPC 209 of North Carolina's Revised Rules of Professional Conduct, a client's file "belongs to the client"; as such, counsel is commanded to "store a client's file in a secure location where client confidentiality can be maintained."

relief granted and petitioner's conviction vacated due to trial counsel's ineffective assistance of counsel).

### I. Resentencing Counsel Unreasonably and Prejudicially Failed to Protect Mr. Barnette's Constitutional Rights

As alleged throughout his § 2255 motion, Mr. Barnette was denied his right to the effective assistance of counsel at his capital resentencing in violation of the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution. Specifically, Mr. Barnette's references Claim I, Subpart K of his § 2255 motion, and asserts that an evidentiary hearing and relief is justified on these allegations.

### J. Resentencing Counsel's Unreasonable Performance was Prejudicial to Mr. Barnette

Based on Mr. Barnette's *Initial Motion for Relief Pursuant to 28 U.S.C. § 2255*, the merits brief filed in support hereto, and all prior pleadings and documents filed in this matter, there is a reasonable probability that this accurate and thorough description of Mr. Barnette's background and mental illness "might well have influenced the jury's appraisal of his moral culpability." *Williams*, 529 U.S. at 398. *See also Wiggins*, 539 U.S. at 536 ("had the jury been confronted with this considerable mitigating evidence, there is a reasonable probability that it would have returned with a different sentence").

**Claim II:** **Petitioner Marc Barnette was Deprived of His Rights under the Fifth, Sixth, and Eighth Amendments to the United States Constitution with Respect to Raising and Supporting a Claim of Racial Discrimination in Jury Selection, and the *Batson* Proceedings were Unconstitutionally Conducted**

Mr. Barnette respectfully refers to and incorporates herein Claim II of his § 2255 motion. Based on the factual allegations raised in this claim, an evidentiary hearing is required.

Case 3:12-cv-00327-MOC   Document 74   Filed 12/22/14   Page 102 of 108

**JA306**

**Claim III: Petitioner Marc Barnette was Deprived of His Rights under the Fifth, Sixth, and Eighth Amendments to the United States Constitution as a Result of Misconduct Related to the Jury**

Mr. Barnette respectfully refers to and incorporates herein Claim III of his § 2255 motion.

As asserted previously, "[j]uror misconduct of virtually every kind is unearthed in post-conviction proceedings, and has formed the basis for post-conviction relief and further factual inquiry in both state and federal courts, including capital § 2255 proceedings." [ECF Doc. 49 at 1-2] (citing *United States v. Sampson*, 820 F.Supp.2d 151, 158-160 (D. Mass. 2011) (death sentence vacated in capital § 2255 proceedings where juror failed to disclose personal experience with abusive relationship and daughter's incarceration, details of which were similar to trial evidence). As the Fourth Circuit recently explained when reversing and remanded a capital case due to juror misconduct:

> It is clearly established under Supreme Court precedent that an external influence affecting a jury's deliberations violates a criminal defendant's right to an impartial jury. *See, e.g., Parker v. Gladden,* 385 U.S. 363, 364–66 (1966) (per curiam); *Turner,* 379 U.S. at 472–73; *Remmer* [*v. United States,* 347 U.S. 227, 229 (1954)]. Especially troubling are private communications between a juror and a third party. *See Fullwood v. Lee,* 290 F.3d 663, 677 (4th Cir.2002) ("The Supreme Court has clearly stated that private communications between an outside party and a juror raise Sixth Amendment concerns." (citing *Parker,* 385 U.S. at 364)). Indeed, it is well established that "'private talk, tending to reach the jury by outside influence' is constitutionally suspect." *Id.* (quoting *Parker,* 385 U.S. at 364). The Supreme Court recognized this as early as 1892 when it declared that "[p]rivate communications, possibly prejudicial, between jurors and third persons, or witnesses, or the officer in charge, are absolutely forbidden, and invalidate the verdict, at least unless their harmlessness is made to appear." *Mattox v. United States,* 146 U.S. 140, 150 (1892).

*Barnes v. Joyner*, 751 F.3d 229, 240-41 (4th Cir. 2014).

This Court previously denied Mr. Barnette's *Motion for Leave to Conduct Juror Interviews* [ECF Doc. 49] (prior to the government filing a response). Mr. Barnette,

**JA307**

through undersigned counsel, respectfully preserves this claim and his arguments in support thereof.

**Claim IV:**     **Petitioner Marc Barnette was Deprived of His Rights under the Fifth, Sixth, and Eighth Amendments to the United States Constitution Because the Decision to Prosecute Petitioner in Federal Court Rather than State Court Resulted in a Well-Known Significant Reduction in the Number of African-Americans in the Jury Pool in 1998 and 2002**

Mr. Barnette respectfully refers to and incorporates herein Claim IV of his § 2255 motion. Based on the factual allegations raised in this claim, an evidentiary hearing is required.

**Claim V:**     **Petitioner Marc Barnette was Deprived of His Constitutional Rights to Due Process and a Fair Trial under *Brady*, *Giglio*, *Kyles*, and *Napue* in Violation of the Fifth, Sixth, and Eighth Amendments to the United States Constitution**

Mr. Barnette respectfully refers to and incorporates herein Claim V of his § 2255 motion. Based on the factual allegations raised in this claim, an evidentiary hearing is required.

Mr. Barnette further notes, as he has asserted in other pleadings, that the government has not fully complied with the Court's order to produce a complete copy of all material previously provided by the government to Mr. Barnette's counsel for the 1998 trial and 2002 resentencing. [ECF Doc. 17, 64]

**Claim VI:**     **The Death Penalty is Unconstitutional Because it is Sought on the Invidious Basis of Race and Irrational Basis of Geography**

Mr. Barnette respectfully refers to and incorporates herein Claim VI of his § 2255 motion. Based on the factual allegations raised in this claim, an evidentiary hearing is required.

**JA308**

**Claim VII: The Manner in Which the Bureau of Prisons Would Carry Out Mr. Barnette's Execution Would Violate the Eighth Amendment**

Mr. Barnette respectfully refers to and incorporates herein Claim VII of his § 2255 motion.

The Federal Bureau of Prisons maintains an execution protocol that carries out death sentences by an intravenous injection of a lethal substance or substances in quantity sufficient to cause death. Recent reports concerning the execution of Clayton D. Lockett in Oklahoma on April 29, 2014 highlight the constitutional infirmities of executing a condemned person by lethal injection. *See* Cary Aspinwall & Ziva Branstetter, "Botched execution described as 'a bloody mess,' court filing shows," *Tulsa World*, Dec. 14, 2014[12]; Oklahoma Department of Public Safety, *The Execution of Clayton D. Lockett, Case Number 14-0189SI*.[13] Only months after Mr. Lockett's execution, Joseph Wood was executed in Arizona after being injected 15 times with an experimental lethal drug cocktail during the nearly two hours that it took him to die. *See* Mark Berman, "Arizona execution lasts nearly two hours; lawyer says Joseph Wood was 'gasping and struggling to breath,'" *Washington Post*, July 23, 2014.[14]

Based on the factual allegations raised in this claim, an evidentiary hearing is required.

---

[12] Available at: http://www.tulsaworld.com/news/investigations/botched-execution-described-as-a-bloody-mess-court-filing-shows/article_a4b70b76-84f7-5ebd-a5f3-044c205d474a.html.

[13] Available at: http://www.dps.state.ok.us/Investigation/14-0189SI%20Summary.pdf.

[14] Available at: http://www.washingtonpost.com/news/post-nation/wp/2014/07/23/arizona-supreme-court-stays-planned-execution/. A transcript of Mr. Wood's attorney's *Motion for Emergency Stay of Execution*, filed and heard (telephonically) during the course of Mr. Wood's execution, chillingly describes the challenges facing the U.S. District Court as it grappled with whether to halt the execution. Mr. Wood was pronounced dead during the hearing. Transcript available at: http://www.scribd.com/doc/234993495/Transcript-related-to-Joseph-Wood-execution.

**JA309**

**Claim VIII:  Cumulative Effect of Errors References in this § 2255 Motion Demand Relief**

Mr. Barnette respectfully refers to and incorporates herein Claim VIII of his § 2255 motion. Based on the factual allegations raised in this claim, an evidentiary hearing is required.

## CONCLUSION

Mr. Barnette's § 2255 petition alleges colorable Fifth, Sixth, and Eighth Amendment claims, including numerous facts outside of the record, which if proved, would entitle Mr. Barnette to relief. Pursuant to Rule 8 of the Rules Governing § 2255 Proceedings and Fourth Circuit precedent, Mr. Barnette is entitled to an evidentiary hearing on all of his claims. As with the facts alleged in Mr. Barnette's § 2255 motion, the government may not dispute the facts contained in this brief and its exhibits. If that is the case, then this Court may grant summary judgment with respect to some or all of the claims for relief.

**JA310**

Dated: December 22, 2014

/s/ Mark E. Olive
N.C. State Bar No. 10615
LAW OFFICES OF MARK OLIVE
320 W. Jefferson Street
Tallahassee, FL 32301
850-224-0004 (tel)
850-224-3331 (fax)
meolive@aol.com


/s/ Jacob H. Sussman
N.C. Bar No. 31821
TIN FULTON WALKER & OWEN PLLC
301 East Park Avenue
Charlotte, NC 28203
704-338-1220 (tel)
704-338-1312 (fax)
jsussman@tinfulton.com

/s/ Ross Richardson
Ross Richardson
FEDERAL DEFENDERS OF WESTERN
   NORTH CAROLINA, INC.
129 West Trade Street, Suite 300
Charlotte, NC 28202
704-374-0720 (tel)
704-374-0722 (fax)
ross_richardson@fd.org

## <u>CERTIFICATE OF SERVICE</u>

   The undersigned hereby certifies that he has served the foregoing pleading with the Clerk of Court using the CM/ECF system, which will send notification of such filing to:

    William M. Miller
    William.Miller@usdoj.gov


   Dated: December 22, 2014

           /s/ Jacob H. Sussman
           Counsel for Mr. Barnette

Case 3:12-cv-00327-MOC   Document 74   Filed 12/22/14   Page 108 of 108

**JA312**

# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA
## CHARLOTTE DIVISION
## CIVIL ACTION NO.: 3:12-CV-327-RLV

UNITED STATES OF AMERICA

vs.

AQUILIA MARCIVICCI BARNETTE

**DEATH PENALTY § 2255**

## INDEX OF EXHIBITS

| Bates No. | Description |
|---|---|
| 00001-00005 | Post-Conviction Affidavit: Cessie Alfonso |
| 00006-00008 | Post-Conviction Affidavit: Ann Austin |
| 00009-00010 | Post-Conviction Affidavit: Darrell Austin |
| 00011-00012 | Post-Conviction Affidavit: Greg Austin |
| 00013-00014 | Post-Conviction Affidavit: Kenneth Bailey |
| 00015-00016 | Post-Conviction Affidavit: Jan Barefoot |
| 00017-00021 | Post-Conviction Affidavit: Derrick Barnette |
| 00022-00033 | Post-Conviction Affidavit: Mario Barnette |
| 00034-00048 | Post-Conviction Affidavit: Sonia Barnette |
| 00049-00050 | Post-Conviction Affidavit: Melvin Bryant |
| 00051-00055 | Post-Conviction Affidavit: Ann Wolbert Burgess |
| 00056-00061 | Post-Conviction Affidavit: Armaud Cooper |
| 00062-00063 | Post-Conviction Affidavit: Eric Cooper |
| 00064-00066 | Post-Conviction Affidavit: Robert Cooper |
| 00067-00075 | Post-Conviction Affidavit: Sheila Cooper |
| 00076-00080 | Post-Conviction Affidavit: Crystal Dennis |
| 00081-00084 | Post-Conviction Affidavit: Do'Lores Guy |
| 00085-00088 | Post-Conviction Affidavit: Kesha Heard |
| 00089-00093 | Post-Conviction Affidavit: Dr. Sally Johnson |
| 00094-00101 | Post-Conviction Affidavit: Jean Lawson |
| 00102-00103 | Post-Conviction Affidavit: Temeka Lee |
| 00104-00105 | Post-Conviction Affidavit: Anitra Lyles |
| 00106-00108 | Post-Conviction Affidavit: Regena Mack |
| 00109-00110 | Post-Conviction Affidavit: Danielle Mathis |
| 00111-00112 | Post-Conviction Affidavit: Victor Montgomery |
| 00113-00116 | Post-Conviction Affidavit: Jean Nduly |
| 00117-00123 | Post-Conviction Affidavit: Shonda Nero |
| 00124-00128 | Post-Conviction Affidavit: Tessie Nero |
| 00129-00131 | Post-Conviction Affidavit: Claire Rauscher |
| 00132-00134 | Post-Conviction Affidavit: Weona Sharpe |

**JA313**

| | |
|---|---|
| 00135-00136 | Post-Conviction Affidavit: Sandra Smith |
| 00137-00199 | Post-Conviction Declaration: Russell Stetler |
| 00200-00206 | Post-Conviction Affidavit: Netoshia Tolbert |
| 00207-00208 | Post-Conviction Affidavit: John West |
| 00209-00231 | Post-Conviction Report: Richard G. Dudley, Jr. |
| 00232-00259 | **Post-Conviction Report: Zachary Rowles** |
| 00260-00307 | 1998 Trial: Sentencing Verdict Sheets |
| 00308-00361 | 2002 Resentencing: Sentencing Verdict Sheets |
| 00362-00421 | 2002 Resentencing: Ex Parte Filings |
| 00422-00706 | **Alfonso, Cessie: Materials** |
| 00707-00721 | Barber, LeDon: Criminal Records |
| 00722-01742 | **Barefoot, Jan: File** |
| 01743-01765 | Barnette, Derrick: Civil Files |
| 01766-01797 | Barnette, Derrick: Employment Matter |
| 01798-01810 | Barnette, Derrick: Separation and Divorce |
| 01811-01818 | Barnette, Deerick: SSA Earning Report |
| 01819-01823 | **Barnette, Derrick: School Records** |
| 01824-01915 | **Barnette, Derrick: Military Records** |
| 01916-01931 | Barnette, John Thomas: Civil Files |
| 01932-02100 | Barnette, Aquilia "Marc" Barnette: School Yearbooks |
| 02101-02154 | **Barnette, Aquilia "Marc" Barnette: School Records** |
| 02155-02303 | **Barnette, Aquilia "Marc" Barnette: Medical Records** |
| 02304-02308 | Barnette, Aquilia "Marc" Barnette: Newnan Police Dept. |
| 02309-02343 | Barnette, Aquilia "Marc" Barnette: Mecklenburg County Jail |
| 02344-02349 | Barnette, Aquilia "Marc" Barnette: SSA Earning Report |
| 02350-03766 | **Barnette, Aquilia "Marc" Barnette: Federal Bureau of Prisons** |
| 03767-03921 | **Barnette, Aquilia "Marc" Barnette: FMC Butner** |
| 03922-03934 | Barnette, Aquilia "Marc" Barnette:  Artwork |
| 03935-03958 | **Barnette, Mario: School Records** |
| 03959-04001 | **Barnette, Mario: Medical Records** |
| 04002-04065 | Barnette, Mario: Civil Records |
| 04066 | Barnette, Sonia: Marriage Certificate |
| 04067-04073 | Barnette, Sonia: SSA Earning Report |
| 04074-04076 | **Barnette, Sonia: School Records** |
| 04077-04245 | **Barnette, Sonia: Medical Records** |
| 04246-04333 | Barnette, Sonia: Employment Records |
| 04334-04633 | Barnette, Sonia: Civil Records |
| 04634-04903 | Bender, Harold: Files |
| 04904-04905 | Bryant, Melvin: Criminal Records |
| 04906-04917 | Burgess, Ann Wolbert: Report |
| 04918-04974 | **Charlotte Mecklenburg Police Department: Criminal Records** |
| 04975-04978 | Cooper, Armaud: Letters |
| 04979-05155 | Cooper, Diane: Civil Records |
| 05156-05253 | **Cooper, Jesse: Military Records** |
| 05254-05451 | **Cooper, Jesse: Dept. of VA Records** |

**JA314**

| | |
|---|---|
| 05452-13474 | **Cooper, Jesse: Medical Records** |
| 13475-13477 | Cooper, Jesse: Marriage/Divorce Records |
| 13478-13489 | Cooper, Jesse: Civil Records |
| 13490-13503 | Cooper, Sheila: Criminal Records |
| 13504-13508 | Cooper, Sheila: Employment Records |
| 13509-13515 | Cooper, Tessie: Criminal Records |
| 13516-13517 | Cunningham, Mark: Report |
| 13518-13535 | Dietz, Park: Report |
| 13536-14182 | Department of Justice: Records (FOIA) |
| 14183-14221 | Duncan, Scott & Grant, William: Report |
| 14222-14239 | Furlow, Keith: Criminal Records |
| 14240-14245 | Halleck, Seymour: Report |
| 14246-14261 | Johnson, Sally: Report |
| 14262-14416 | Johnson, Sally: Butner Records |
| 14417-14447 | **Maxwell, Sindy: Report** |
| 14448-14539 | Nero, Jefferson: Civil Records |
| 14540-14755 | Nero, Shonda: Civil Records |
| 14756-14769 | Nero, Tessie: Civil Records |
| 14770-14772 | Sultan, Faye: Report |
| 14773-14774 | Tyson, William: Report |
| 14775-14800 | Vital Records |
| 14801-14805 | Warren, John: Report |
| 14806-14834 | West, John: Civil Records |
| 14835-14844 | Photographs |

**Bolded documents** are those that undersigned counsel is seeking to file under seal and/or conventionally. Once the Court rules on Petitioner's pending motions about the manner of filing, undersigned counsel will promptly file them as directed.

3

**JA315**

<u>Affidavit of Cessie Alfonso</u>

I, Cessie Alfonso, appearing before the undersigned and being duly sworn or affirmed, state the following:

1. I am over the age of 18 years old. I am the President and Owner of Alfonso Consultants in Troy, New York.

2. I have owned and operated Alfonso Consultants since 1988. My work primarily focuses on mitigation investigation in the context of capital cases, although I have also been a forensic expert in a number of family law cases. My background is as a nurse, drug counselor, and social worker.

3. I was contacted by Jean Lawson to work on developing mitigation in Aquilia Marcivicci ("Marc") Barnette's resentencing case in 2001. I had never before worked with either Ms. Lawson or her then co-counsel, Claire Rauscher.

4. I later met with Harold Bender but had no substantive conversations with him about my work. Initially, I was in somewhat regular contact with Jean Lawson, but things changed a few months into the case and I started hearing less and less often from her.

5. In handling mitigation at a resentencing, it is important to assess the work previously done and determine what issues or aspects of the client's life were not fully explored, what issues or aspects of the client's life need additional investigation, and what features of the mitigation presentation from the prior trial might have been inaccurate, incomplete, harmful, etc.

6. Sindy Maxwell was the mitigation investigator for Marc's first trial. Jean Lawson had little confidence in Sindy's work because the mitigation investigation had been incomplete and resulted in inaccuracies and superficial conclusions. Neither she nor Harold Bender (nor anyone else on the defense team) discussed with me what particular aspects of Sindy's mitigation investigation they had serious concerns or reservations about.

7. It was never made clear to me whether defense counsel wanted me to do a wholesale re-investigation of Marc's background, or instead just focus on specific aspects. As a result, I started my investigation where I normally do: reviewing documents and then meeting with the client. My first meeting with Marc occurred in January 2002. I subsequently interviewed the following family members: (1) Sonia Barnette (Marc's mother); (2) Mario Barnette (Marc's brother); (3) Derrick "Rick" Barnette (Sonia's ex-husband who disclaimed paternity of Marc and Mario); (4) Sheila Cooper (Marc's maternal aunt); (5) Tessie Nero (Marc's maternal aunt); (6) Armaud Cooper (Marc's cousin); (7) Mable Johnson (Marc's paternal great-great aunt); and (8) Jesse Cooper (Marc's maternal grandfather). I also interviewed Natasha Heard Tolbert, Marc's former girlfriend and mother of Marc's two children. Finally, in an effort to determine

1

**JA316**

the identity of Marc's biological father, I interviewed Larry Wright and Dorothy Harper (Larry Wright's sister).

8. Following my initial interviews with Marc and his mother, Sonia, in January 2002, I wrote Jean Lawson a detailed letter. Based on my initial meetings, as well as what case materials I had reviewed to that point, I believed Sonia's personal history of trauma, abuse, and loss would be an important feature of the mitigation case to explain Marc's development. For example, Sonia's family had rarely, if ever, spoken about the murder of her mother, Pearl, which occurred when Sonia was a very, very young mother. During my interviews with Sonia and her sisters, it was clear that they had never discussed their respective experiences and emotions – of loss, pain, grief, and guilt – as a result of their mother's murder, and had never healed from the traumatic loss.

9. Despite my urgings to the defense team that Sonia's own history was critically important, the defense team did not present evidence about it. I was neither consulted about this decision nor told why the defense team did not present this evidence.

10. Jan Barefoot, a private investigator, was assigned to locate people and information that I might need. For example, Barefoot sought records concerning Pearl's murder, which was committed by Loyd Brown. Barefoot received public records from the police department on June 4, 2002 about the murder. Harold Bender's office sent the records to me on July 3, 2002.

11. I met with Jesse Cooper, Marc's maternal grandfather, during the course of my investigation. Jesse had been in the Korean War, been injured in combat, and suffered from trauma-related symptoms ever since. I spoke with Jan Barefoot and suggested locating Jesse's military and medical records, but we never got any of them. Due to Jesse's bad health at the time of Marc's retrial, he could not testify. Neither Jean Lawson nor Harold Bender ever talked with me about ways in which the defense might be able to present information about Jesse and his background, such as through records, video, or other witnesses' testimony. Jesse's background in the service, the affects that combat had on him, his drinking, his relationship with Pearl, his reaction to Pearl's leaving the family and subsequent murder, and his efforts to raise Sonia, Sheila, and Marc in the wake of Pearl's death, were all significant pieces of information that I felt were important to the mitigation case. Moreover, Jesse had gone with Marc to Roanoke, Virginia at one point to help Marc get his belongings from Robin Williams' house, and saw some of their break up in the process. Jesse also lived in the same house as Marc after he returned from Virginia, and witnessed Marc's worsening mental health. I was never told why the defense team did not present this evidence.

2

Bates No. 2

**JA317**

12. The issue of paternity—namely, the identity of Marc's true biological father—was also significant in Marc's case. In addition to the importance that it would make on a biological level, the lies, rumors, and misunderstandings concerning Marc's biological father's identity played an important and debilitating role in the family dynamic. Sonia had always maintained that Rick Barnette was Marc's father, despite a blood test that established otherwise. Sonia would tell others—including Marc—that Rick had "faked" the test. Notwithstanding Sonia's protests to the contrary, it was evident that Rick was not Marc's biological father and Sonia was well-aware of that fact.

13. Family secrets can be corrosive and damaging, especially to someone like Marc, who was in the middle of the paternity controversy. Compounding the harm in Marc's situation was the fact that his mother was very vocal in her claim that Rick was lying about the blood test. Thus, I thought it was important to fully explore the paternity issue.

14. In late March 2002, I spoke with Larry Wright, whom I believed to be Marc's biological father. I regularly updated Jean Lawson about developments in the mitigation investigation, and did so with respect to Wright. Lawson did not suggest any ways in which to develop the evidence concerning Wright. He would not have been the first, or last, witness who was hesitant to get involved as a witness in a capital murder case. There were many ways that the defense could have developed this information. Ultimately, the defense did not present any evidence, or otherwise suggest to the jury, that Sonia was lying to Marc (and others) about the paternity issue. I was neither consulted about this decision nor told why the defense team did not present this evidence.

15. In April 2002, I traveled to Georgia and met with Sheila Cooper, Armaud Cooper, and Tasha Tolbert. I reported my interviews to Jean Lawson and Harold Bender. They never asked me to do any follow up or interview other potential witnesses in Georgia.

16. I have extensive training and experience in the area of domestic violence. The defense team never asked me to explore Marc's relationships with other women. There was no request by defense counsel, or effort by me, to contact and interview prior girlfriends such as Sheila Sullivan, Crystal Dennis, Kowana Dozier, Tameka Hunter, or Alesha Chambers.

17. Defense counsel never asked me to work with Ann Burgess, the "domestic violence" expert they used, in an effort to explore Marc's relationships with other women. Burgess and I spoke one time on the telephone. There was no request by Burgess for me to contact or interview or explore any particular aspect of Marc's background. Although I interviewed Tasha Tolbert, who had two children with Marc, my interviews with Tolbert were necessarily limited because I did not have any direction from defense counsel regarding what was needed for resentencing.

3

Bates No. 3

**JA318**

18. I created a "biopsychosocial" report for the defense team. This type of report, which details the witnesses I interviewed, the documents I received, the psychosocial factors present in the defendant's life, and a chronology of life events re standard in capital mitigation work in 2002.

19. It was never made clear to me by the defense attorneys how, if at all, they intended to use my report. Indeed, it was never made clear to me until the trial itself that defense counsel did not intend to call me as a testifying witness.

20. I submitted my report to defense counsel on July 8, 2002. I did not have further discussions with either Jean Lawson or Harold Bender about the report. x

21. Defense counsel never asked me for my insights or views about the mitigation presentation. I was not involved with or asked to participate in strategy sessions, nor was I told about how to communicate my information or thoughts to others on the team. In the run up to trial, my tasks were largely focused on completing the report and assisting the lawyers in contacting witnesses who were going to testify. I had some discussion with both Jean Lawson and Harold Bender on July 15, 2002 about concerns that some family members had about the trial. Many of the family members did not trust Marc's lawyers, and they were unclear about what was expected of them at trial. The vast majority of my time in July 2008, once trial started, was spent sitting and talking with family members. I was not able to adequately prepare them for their testimony because I did not have a sense of what the defense lawyers' strategy was.

22. I met with Marc Barnette during the course of my mitigation investigation in this case. By the time of my involvement, Marc had already been incarcerated for over five years. He had clearly made a good adjustment to prison, evidenced by the absence of write-ups and disciplinary issues. Defense counsel never asked me to explore Marc's experience in prison, including the status of his relationships with various family members and friends.

23. I was definitely surprised—actually, shocked would be the right word—when Marc testified on his own behalf at trial. I was neither consulted about this decision nor told why the defense team decided to call him as the first defense witness. During my various meetings with Marc, I was never told by Marc—directly or indirectly—that he wanted to testify. I could count on one hand the number of times a defendant testified on his own behalf before the jury in cases I've worked on. Had defense counsel sought my advice or insights about Marc as a potential witness, I would have strongly cautioned them that Marc, despite genuine remorse for what he had done, would likely offend the jury by his testimony. I would have been concerned that Marc's mental health makeup and experiences, and his general lack of insight, would result in explanations and rationales for his behavior that would alienate jurors, rather than communicate remorse and sorrow. I believe his testimony did just that.

4

Bates No. 4

**JA319**

I swear or affirm that the information in the foregoing paragraphs is true to the best of my knowledge.

_Cessie Alfonso_
Cessie Alfonso

_11/12/2014_
Date

Affirmed and subscribed before me on this the 12 day of November , 2014 in Rensselaer County, New York.

_Dawn C. Cross_
Notary Public

My commission expires: Oct. 17, 2015

Dawn C. Crossley
Notary Public, State of New York
Qualified in Rensselaer County
No. 01CR6249910
Commission Expires Oct. 17, 2015

5

**JA320**

## Affidavit of Ann Austin

I, Ann Austin, appearing before the undersigned and being duly sworn or affirmed, state the following:

1. I am over the age of 18 and competent to testify to the following facts.

2. I am a resident of Charlotte, North Carolina. I work as a tax preparer.

3. I have had three sons: Greg, Darrell, and Steve. Steve was my youngest son. He died in 2005 from Sickle Cell Disease.

4. Steve's best friend ever since he was little was Aquilia Marcivicci Barnette. We call him Vicci. Steve and Vicci remained best friends up until Steve's death.

5. Vicci and his family used to live across the street from me on Comstock ~~Road~~ Drive in the Clanton Park neighborhood of Charlotte. They moved there when Vicci was three or four years old. Vicci lived there with his mother, Sonia, his father, Rick, and his little brother, Mario. The family lived there until Sonia and Rick separated when Vicci was around middle school age.

6. Steve and Vicci played together as kids. The room in the back of my house used to be the boys' room and they had a turntable in there. After school they would come and play in our back yard. Vicci and Steve would go down to the creek in the woods and play. They liked going to the fishing hole and climbing trees.

7. The neighborhood was quiet and friendly. It was a racially mixed neighborhood.

8. Sonia knew our other neighbors, the Davis'. She and Tina Davis were especially good friends and spent a lot of time together.

9. Sonia cried a lot about her mother's death. Sonia missed her mom a whole lot.

10. I knew Sonia's sister, Sheila. Sheila once got Sonia to rent a car for her and Sheila never took the car back to the dealership. The car company tried to make Sonia pay for it. Sonia found out that the car was in Florida and she told the agency. Sheila was off following some man to Florida. She left her kids behind to try to follow this man.

11. Sheila used drugs. When Sheila was living with their father, Jesse Cooper, she would walk away from the house and stay away for days at a time. She would also call Jesse and ask him for money. Sheila did not like to work.

12. I was Sonia's father's insurance agent for a number of years. Jesse would drink beer, which he called his "tea" and he would talk about things he did in the war. Jesse told me how he used to go to the club half the night and smoke his cigarettes when he was stationed overseas. He also talked about getting injured in the war. Jesse had a prosthetic eye from his injuries in the war.

13. Jesse dressed in military clothes even when it was hot. He would wear a flak jacket - one of those green military style coats. Jesse liked his guns and his land. Jesse and I would go down in the woods and shoot guns. We would aim at tin cans.

14. When Vicci was living in Charlotte after moving back from Georgia, he and Steve would see each other often.

15. After Vicci moved back to Charlotte from Virginia, after his breakup with Robin, he was depressed. Sonia should have done more to try to get him some help and find a way to help him deal with his emotions.

16. When he was back home in Charlotte, Vicci told Steve that he was moping around the house, drinking, and talking on the phone with Robin about getting back together.

17. Vicci believed that Robin had been cheating on him. He had found a condom and a phone number in the pocket of Robin's jeans.

18. I couldn't figure out why the police never picked Vicci up after the firebombing incident. There were reports about it on the television.

19. My reaction to hearing that Vicci was responsible for the killings was one of disbelief.

20. Steve remained in close contact with Vicci after he was locked up. Vicci would call him sometimes from jail and Steve would send him money. Steve also visited him. Steve sent Vicci a TV, sneakers, and a t-shirt while he was in jail. Vicci is a fantastic artist and we still have some of the pieces that Vicci sent to Steve.

21. Vicci is the only real friend that Steve had. The two of them got along well, they didn't argue, and they both liked music. Steve was upset about what had happened and Vicci's charges. Steve was scared to death about testifying and saying the wrong word. He didn't want to hurt Vicci.

**JA322**

22. I would have willingly testified for Vicci at his resentencing. I have always thought of Vicci like one of my children and I would have wanted to share with the jury my memories of Vicci and his family. I was not asked to.

I swear or affirm that the information in the foregoing paragraphs is true to the best of my knowledge.

Ann Austin                                          8-23-2014
Ann Austin                                          Date

Affirmed and subscribed before me on this the 23rd day of August, 2014 in Mecklenburg County, North Carolina.

Notary Public

My commission expires: 1/20/16

Bates No. 8

**JA323**

## Affidavit of Darrell Austin

I, Darrell Austin, appearing before the undersigned and being duly sworn or affirmed, state the following:

1.  I am over the age of 18 and competent to testify to the following facts.

2.  I am a resident of Charlotte, North Carolina. I work as a tax preparer.

3.  I am the middle child of three boys. My older brother is Greg Austin. My younger brother was Steve Austin. Steve died in 2005 from Sickle Cell Disease, an illness he had since he was a kid.

4.  Steve was best friends with Aquilia Marcivicci Barnette, who we call Vicci. Vicci and his family lived across the street from me and my family when we were growing up. We lived on Comstock Road in the Clanton Park neighborhood of Charlotte.

5.  Vicci was a good kid who was on the quiet side. Vicci had a funny way of crying as a kid. At times we would make fun of him for it.

6.  Vicci's father was very strict. Vicci had to do what he was told. What his father said was what had to happen. I know Vicci's dad would punish him physically. You knew who was on punishment because you wouldn't see them for a few days.

7.  Vicci and his family later moved to Georgia. After Vicci came back from Atlanta I didn't see him too often, but he and Steve would get together. They would go out together.

8.  My wife is originally from Roanoke and she knew Robin in high school. Robin was two years behind her in school. They weren't close but they knew each other well enough to say hello and talk. My wife also knew someone that Robin used to date. He was her cousin's best friend and his name was Bennie Greene. Robin and Bennie dated for about a year at some point before Robin and Vicci started dating.

9.  Robin and Vicci first met at a night club. Then Robin came over to Greg's for a cookout. Robin seemed nice and Vicci was head over heels in love with her. After they first met, Vicci found ways to get up to Roanoke to see her. All he talked about was Robin.

10. I met Robin a couple of times. After she and Vicci had started dating, he brought her over to Greg's a couple times. They were fine together.

Bates No. 9

**JA324**

11. I was very surprised to hear about the crime. From what I knew, Vicci and Robin were deeply in love.

12. Before Vicci's first trial I got a phone call from someone working with Vicci's legal team but we didn't have a real interview. I was just told that somebody might call on me for the trial. However, I never was called to testify.

13. Before Vicci's resentencing I went to an office and talked to someone who was part of Vicci's legal team. We probably spent 30 minutes to an hour talking about Vicci. They mostly asked me what I knew about the actual crime. They told me they would subpoena me if they needed me. I never heard any more from them. Vicci had been brought back to Charlotte from Indiana at that time.

14. I would have willingly testified for Vicci at his resentencing. I have known Vicci since we were both kids and I would have wanted to share with the jury my memories of him.

I swear or affirm that the information in the foregoing paragraphs is true to the best of my knowledge.

_____  06 09/2014
Darrell Austin                                           Date

Affirmed and subscribed before me on this the ___9th___ day of ___June___, 2014 in ___Mecklenburg___ County, North Carolina.

_____
Notary Public

My commission expires: ___1/20/16___

Zachary Rowles
Notary Public
Durham County, NC

**JA325**

## Affidavit of Greg Austin

I, Greg Austin, appearing before the undersigned and being duly sworn or affirmed, state the following:

1. I am over the age of 18 and competent to testify to the following facts.

2. I am a resident of Pittsburgh, Pennsylvania and I work for Big Heart Pet Brands.

3. I am the oldest child of three boys. My younger brothers are Darrell and Steve. Steve died in 2005 from Sickle Cell Disease.

4. I have known Aquilia Marcivicci Barnette for most of my life. I call him Vicci. Vicci's family and my family lived across the street from each other when I was a kid.

5. My younger brother Steve was best friends with Vicci. When they were kids they would play together all the time.

6. Vicci's little brother was Mario and they were together a lot. Vicci often took care of Mario when they were kids.

7. Vicci and his family eventually moved to Georgia and I didn't see Vicci again until after he moved back to North Carolina.

8. I used to live in Roanoke, Virginia where Vicci and Steve came to visit me a few times. When Vicci came to Roanoke he was friendly, articulate, and good looking

9. I was with Vicci and Steve the night Robin and Vicci met. We were at a night club. Vicci and Robin hit it off very quickly. The next day they saw each other again and they were attached at the hip. Vicci later moved to Roanoke to live with Robin.

10. Robin worked at the hospital and Vicci started working at a hotel. Vicci later got a job at Camelot, a music store. Robin and Vicci shared one car between them. Vicci took Robin to work each day and also picked her up when she was done. They often came by my house. Vicci was very into his relationship with Robin. Everything he did centered on Robin. Vicci and Robin would come over to my apartment on almost a weekly basis. I would also drop by the music store where Vicci worked and talk with him when I was in the mall. Vicci never mentioned that he was having any trouble with Robin. Vicci and Robin always came to the parties I hosted. They always had a good time.

11. I was shocked to learn about the firebombing incident and about Robin's death. It was not the Vicci I knew.

12. Before Vicci's first trial I met Sindy Maxwell who was working with Vicci's attorneys. I answered a few questions about my relationship with Vicci.

1

13. Sindy had me come down to Vicci's trial. My potential testimony was to just be about the fact that I knew Vicci. However, I never testified. I never came out of the back room where I had to wait with Vicci's family. I was not subpoenaed to be there. I was there because Sindy asked me to be there.

14. I was never contacted by anyone named Cessie before Vicci's 2002 resentencing. I would have talked to her or anyone else on Vicci's legal team if I had been contacted.

15. I would have willingly testified for Vicci at his resentencing. I have known Vicci since we were both kids and I would have wanted to share with the jury my memories of him.

I swear or affirm that the information in the foregoing paragraphs is true to the best of my knowledge.

_Greg Austin_ _____
Greg Austin

_August 30, 2014_ _____
Date

Affirmed and subscribed before me on this the _30th_ day of _August_ , 2014 in

_Allegheny_ County, Pennsylvania.

COMMONWEALTH OF PENNSYLVANIA
Notarial Seal
Kristy A. Aiello, Notary Public
Upper St. Clair Twp., Allegheny County
My Commission Expires May 29, 2017
MEMBER, PENNSYLVANIA ASSOCIATION OF NOTARIES

_____
Notary Public

My commission expires: _May 29, 2017_ _____

**JA327**

<u>**Affidavit of Kenneth Bailey**</u>

I, Kenneth Bailey, appearing before the undersigned and being duly sworn or affirmed, state the following:

1. I am over the age of 18 and competent to testify to the following facts.

2. I am enrolled in a culinary arts school, and I also work at a restaurant and do catering in the greater Atlanta area.

3. When I was in the 10th grade, I transferred in to Lithonia High School in Lithonia, Georgia. One of the first people that befriended me was Aquilia Marcivicci Barnette, who everyone called Marc. Marc was also in the 10th grade. We were both in the class of 1991.

4. Marc and I became good friends. He had moved from North Carolina and hadn't been at Lithonia High School very long when I arrived. We were both new to the area. Marc was a good kid and he was nice to be around. We both had younger brothers and sometimes we brought them with us to do things. Marc cared about his younger brother, Mario, and often did things to look after him and make sure he was all right.

5. Marc and I both ran on the Lithonia High School track team. He ran hurdles and I was a sprinter. Marc was a good runner and qualified for County and State meets a few times. When we were in school I worked at McDonald's and Marc had a job too. Besides skipping school a few times, we didn't really get in trouble. When we skipped school we generally just stayed at my house, watched TV, and ate food.

6. Marc dated Sheila Sullivan for a while. She was a classmate of ours. Sheila was not an easygoing person. She was mean and possessive of Marc. She didn't like it when he spent time with me or with other people. Sheila never liked me very much.

7. There was a time when Marc got beaten up really badly. When I was informed about it I immediately went over to the area where it had happened. Marc was still on the ground when I got there and he was battered and bruised. They were waiting on an ambulance for him. There was a crowd around Marc when I went up to him. Some of the people that had beaten him were still there and they told me to get away, so I left.

8. Melvin Bryant and David Walker were two people that were involved in Marc's beating. They were the drug dealers and bad guy types, and people feared them. They had dropped out of school but were still hanging around.

9. The assault had a big impact on Marc. He was very agitated after the beating. He was more on edge. It seemed like he walked around with a chip on his shoulder after it happened, like he didn't know who to trust.

1

**JA328**

10. Marc also dated Tasha. She was a few years younger than us. Marc and Tasha had a child together and eventually Marc dropped out of school and I didn't see him much after that. Marc was very young to have a kid and he was overwhelmed with school, relationships, and being a father.

11. At some point Marc attempted suicide. Although I clearly remember it happened, I cannot recall the details of how or why it happened.

12. I was diagnosed with Bipolar Disorder in 2004. I'm in therapy and I take medication for it. It has been a long struggle since high school to turn my life around and get to where I am now – a place where I am in school, have a family, and am doing positive things with my life.

13. I was never contacted by anybody associated with Marc's legal case before this year. I was very surprised to hear about his crime. It's not something I would have ever expected based on my experiences with Marc.

14. I would have willingly testified for Marc at the sentencing hearing of his capital trial, including the contents of this affidavit.

I swear or affirm that the information in the foregoing paragraphs is true to the best of my knowledge.

Kenneth Bailey                                    12-5-2014
Kenneth Bailey                                    Date

Affirmed and subscribed before me on this the _____ day of _____, 2014 in

_____County, Georgia.


_____
Notary Public


My commission expires: _____

Bates No. 14

**JA329**

<u>**Affidavit of Jan Barefoot**</u>

I, Jan Barefoot appearing before the undersigned and being duly sworn or affirmed, state the following:

1. I am over the age of 18 and competent to testify to the following facts.

2. I am a resident of Charlotte, North Carolina. I am a licensed private investigator, and I am founder and president of Barefoot Private Investigations. I have been in business as a private investigator since 1986.

3. I was hired by Paul Williams and George Laughrun to work on Aquilia Marcivicci "Marc" Barnette's first capital trial. My role was primarily to compile criminal histories for potential defense witnesses, subpoena witnesses, and locate witnesses for Sindy Maxwell, the mitigation specialist. Marc's first trial ended in 1998 with a death verdict.

4. I was hired by Claire Rauscher and Jean Lawson to work on Marc Barnette's retrial in 2001. Claire was taken off the case at some point and replaced by Harold Bender.

5. I had worked on a number of cases with Harold Bender prior to the Barnette retrial. Harold's manner with me in the Barnette case was similar to his manner in other cases we worked on together: he would give me a set of tasks to accomplish—for example, locate a witness or find a record—but not provide context or explanation.

6. My primary role in the Barnette retrial was to assist Cessie Alphonso, the mitigation specialist, with locating witnesses. As the case got closer to trial, there were a handful of additional tasks that I was asked to handle, such as gathering information about the government's expert, Park Dietz.

7. I did not have full-scale involvement in the retrial. Neither Jean Lawson nor Harold Bender sought my input about defense strategy. I do not recall either Jean or Harold describing their trial strategy to me. They would usually just call or fax me with a task or "to do." My biggest responsibility for the Barnette retrial was serving subpoenas. I was not involved with and was unaware of any team meetings or organized means of communicating new information or thoughts about strategy.

8. According to my case file, the first time that Harold or Jean spoke with me about one of Marc Barnette's prior relationships was on or about March 4, 2002, when they discussed Natasha Tolbert and Crystal Dennis. My notes indicate that I was informed by Jean or Harold that these women would not be cooperative.

9. I was not asked to do anything with respect to Crystal Dennis, such as locate her or attempt to speak with her. I was never asked to locate or attempt to speak with Sheila Sullivan. I do not believe her name was ever mentioned to me.

1

Bates No. 15

**JA330**

10. On March 14, 2002, Jean Lawson asked me to locate Natasha Tolbert. I spoke with her that same day and communicated to Jean that she was willing to cooperate with the defense team. My next task related to Natasha Tolbert was not until June 4, 2002, when I left her a message. After that, I spoke with Cessie Alphonso's assistant on July 15, 2002 about Natasha, which I believe had to do with how the defense team wanted to serve her with a trial subpoena.

11. I was asked to research the murder of Peal Cooper on May 29, 2002.

12. I was asked to locate information about Mark Reagin's murder on June 3, 2002.

13. I met with Marc Barnette at the jail on June 13, 2002, and he provided me with names of former girlfriends.

14. Harold Bender and Jean Lawson asked me to locate potential witnesses shortly prior to, during, and following jury selection. Harold and Jean asked me to actually interview these witnesses (and not just serve them) in anticipation of having them testify on behalf of Marc. These witnesses included Candy Epps (who I interviewed on July 10, 2002), Ann Austin (July 11, 2002), Darrell Austin (July 12, 2002), Shovanda Davis (July 12, 2002), Bob West (July 22, 2002), Janet Brewer (July 23, 2002), Eric Cooper (July 25, 2002), and Greg Austin (July 31, 2002). Any information I received from these witnesses would have been forwarded to Harold and/or Jean.

15. As trial quickly approached—and even after trial began—Jean asked me to locate a handful of other witnesses, including Regena Nero (after I was asked to begin locating her on or about June 18, 2002); Kowana Dozier (on or about July 5, 2002); and Tameka Hunter (on or about July 23, 2002).

I swear or affirm that the information in the foregoing paragraphs is true to the best of my knowledge.

_Jan Barefoot_
Jan Barefoot

Date

Affirmed and subscribed before me on this the _3_ day of _November_, 2014 in Mecklenburg County, North Carolina.

_Stephanie D. Young_
Notary Public

My commission expires: _3-11-2018_

STEPHANIE D. YOUNG
NOTARY
★ ★ ★
PUBLIC
MECKLENBURG COUNTY, N.C.

2

**JA331**

# Affidavit of Derrick Barnette

I, Derrick Barnette, appearing before the undersigned and being duly sworn or affirmed, state the following:

1. I am over the age of 18 and competent to testify to the following facts.

2. I am a resident of Charlotte, North Carolina. I am retired after working for many years for the United States Post Office.

3. I was previously married to Sonia Cooper. Sonia and I were married in 1976. We formally separated in 1984 and divorced in 1985. During our marriage we raised Aquilia Marcivicci Barnette, who I called "Vicci," and Vicci's younger brother Mario. Shortly after Sonia's and my divorce was finalized, blood tests established that I was not the biological father for either Vicci or Mario. The blood tests confirmed what I had always suspected – that I wasn't their biological father.

4. I was born in Charlotte and grew up there too. My father's side of my family is from Charlotte and my mother's side is from Ridgway, South Carolina. My mother often took me to our family home in Ridgeway, South Carolina. They had an outhouse and a woodstove.

5. My parents separated when I was five years old and my dad went off to Philadelphia afterwards. I always felt loved by my dad. His name was John Thomas Barnette. I remember my father coming up our steps drunk. He was an alcoholic. He later ended up quitting drinking. I have some good memories and some bad ones of my father.

6. Sonia Cooper and I met and started dating when I was in the ninth grade and she was in the seventh grade. It was good at the beginning. However, I don't think we were together when I found out she was pregnant with Vicci. She had also been dating a guy named Larry Wright, and I had some doubts about whether the baby was my son. I remember that Sonia's mother and my mother talked after it was learned that Sonia was pregnant. Afterwards, my mother told me that the child wasn't mine. However, I wanted him to be mine and I wanted to stay with Sonia so I played the role of his father. After Vicci was born, people said he looked like me so I thought maybe he was, in fact, my son. I was young and still living at home when Vicci was born.

7. When I first met Sonia, her parents were not living together. Sonia was living with her mother, Pearl. Sonia's father, Jesse Cooper, was living on West Boulevard.

8. Jesse had been in the war and you could tell that he'd been traumatized. He probably had PTSD. He had a glass eye because he'd lost one of his eyes in the war. He took the glass eye out sometimes. Jesse drank Pabst Blue Ribbon beers every day. He spent a lot of time walking around his property, and often sat under a tree. He was more of a loner. The way Jesse talked it was like he was still in the military. He would call his property his camp and he would say 'negative' instead of 'no.'

1

**JA332**

9. Loyd Brown was Pearl's second husband and he murdered Sonia's mother. He shot her to death in their house. Pearl's death had a huge affect on Sonia, who was in the house with Vicci and her sister Sheila when it happened. Sonia always wondered why she did not hear the gun go off, and felt responsible for adding stress to her mother's life by having Vicci, which was another mouth for her mother to feed.

10. Sonia and I had fights when we were together. We fought all the time after we moved back to Charlotte and lived in Clanton Park. We had bad fights, physical fights. I hit Sonia in the head with a hammer one time. She had her hand on her head at the time and was peeking through her hand. I hit her on the forehead just above her eyebrow. She ended up calling her sister about it. The police came because of that incident.

11. I spoke with a lawyer about separating from Sonia around 1982. Although I held off on seeking a formal separation until June 1984, our marriage was a terrible mess well before then. Once the separation occurred I told Sonia that she, Mario, and Vicci had to move out.

12. Right after we split up, it was my initial hope that Sonia and I could work out an agreement about the kids. My philosophy was that if the boys wanted to see me, they could come see me. I left the door open. Although I did see the boys a bit right after we first split up, that became far less frequent once I moved away to Philadelphia. I moved to Philadelphia around the time the divorce became finalized.

13. After Sonia and I split up, there were times that I was worried about her leaving the boys alone too much. I remember one time when I called over to Sonia's house and the kids answered the phone. They were home alone so I went and got them. Sonia later called me about the kids. I didn't initially tell her they were with me. Then she called me back and I finally told her that the boys were with me. I thought they were too young to be left alone overnight and I wanted her to understand that.

14. I was paying child support to Sonia after we separated. Sonia would call me and demand the money. It would only be two days late but I wouldn't pay it on the right day. When I learned that she went out and bought a red Corvette, I was upset.

15. When the money became an issue between me and Sonia, I decided to seek a blood test to find out if I was really Vicci's and Mario's father. This was in 1987. I was already suspicious that I wasn't the boys' biological father. When I was with the Air Force, I left for Okinawa, Japan on August 26, 1976. I remember the date because I missed my birthday -- August 27 -- by flying over the International Date Line. I was gone for six months before I came back for a visit. Mario was born the following July 1977, which means Sonia got pregnant while I was away in Okinawa. I brought it up a couple of times with Sonia and she always said, "No, he's yours." I came home from Japan and was present for Mario's birth. I took Sonia to the hospital for it. I had to call and get an extension on my leave from the Air Force. As for Vicci, I always thought Larry Wright was his biological father. Sonia was dating him around the time she became pregnant with Vicci. I believe Sonia told her mother that Larry was Vicci's father. Then Sonia's mother told my mother.

2

Bates No. 13

**JA333**

16. Vicci felt bad when he had to get blood drawn for the paternity test. The test results indicated that neither Vicci nor Mario is my child. I took them to a nice restaurant and sat them down and told them the results of the test. I also told them that nothing had changed about how I felt about them. I told them that if they wanted me, I would be there.

17. I left Charlotte in 1987 and moved to Philadelphia. Contrary to what the prosecutor said during my testimony at Vicci's second trial, the boys did not spend the whole summer with me in Philadelphia.

18. Sonia, Vicci, and Mario moved to Georgia a short while later. I was aware that Sonia had been fired from her job at State Farm Insurance, and was having trouble keeping up with her rent.

19. During Vicci's first trial, I was asked about disciplining him as a result of bad grades. Although it was true that I wanted both Vicci and Mario to do well in school, and that I would discipline Vicci for poor school performance, this really only occurred up until the time that I moved away to Philadelphia. In other words, this was when Vicci was in elementary and maybe junior high school. I had no real involvement in Vicci's schooling after that time.

20. I testified in both trials about an incident in which Sonia held a pan over my head, threatening to hit me. In both trials, I testified that this incident "turned into a joke." I was not asked to explain what I meant by that—which was not that, when the incident happened, anyone thought it was funny or a joke. In fact, at the time, it was scary and illustrated how violent our fights could get. Only later did Sonia and I "joke" about this incident.

21. During Vicci's second trial, the prosecutor tried to make it seem like I had remained a central part of Vicci's and Mario's lives. I tried to make clear that although I offered to "keep the door open" for both boys, I had not personally done anything to foster a true relationship with either boy after leaving Charlotte.

3

Bates No. 19

**JA334**

22. There were things going on in Vicci's and Mario's lives I just didn't know about. For example:

   a. I didn't know how anxious Vicci was about moving to Georgia in 1988.
   b. I didn't know that Sonia would often have no food in the fridge for Vicci and Mario, even though they were only kids.
   c. I didn't know how much Sonia and Sheila were partying when they lived together in Georgia, and that they were using cocaine in addition to drinking.
   d. I didn't know about Vicci's relationship with Sheila Sullivan or about how she became pregnant but got an abortion.
   e. Although I was vaguely aware that Vicci was beat up by some guys at one point, I was unaware how badly Vicci was beaten or how it affected him. I was also unaware that the guy who beat up Vicci ended up with Sheila Sullivan.
   f. I didn't know that Vicci was suicidal during his relationship with Sheila Sullivan.
   g. I didn't know that there was drug dealing going on with Michael O'Neal when Vicci and Mario were living there.
   h. I didn't know about Vicci falling in love with Tasha and having two kids. I didn't know how excited Vicci was to become a father, or how disappointed he was when Tasha's mother prevented him from attending prenatal appointments with Tasha.
   i. I was not present for either of Vicci's children's births, and only met them after Vicci was arrested. I never went to Georgia and saw how or where Vicci was living. I didn't know that Vicci was working two jobs when he was with Tasha and later Crystal, and that he was so stressed out about his situation.
   j. I didn't know the circumstances about Vicci shooting Anthony Britt, and how Britt and others were looking to beat up Vicci. I didn't know what was happening in Vicci's relationships with Tasha and Crystal at that time.
   k. I never met Crystal Dennis. Although I spoke with Vicci from the jail after he was arrested for hitting Crystal's children, I did not visit Vicci or offer him assistance.
   l. I never met Alesha Chambers or became aware of the troubles Vicci had in that relationship.
   m. I never saw or heard anything to make me think Vicci was depressed. I didn't know that he would cry in front of his girlfriends, or that he attempted suicide.
   n. I was unaware of Vicci's break-up with Robin when it happened. I didn't know that he moved back in with Sonia and Mario and Jesse on West Boulevard.
   o. I didn't know about Vicci's involvement in firebombing Robin's place in April 1996 until June 1996. I wasn't in touch with Vicci during that period of time.

23. I met Vicci's girlfriend, Robin, one time when I was on a motorcycle trip and went through Roanoke, Virginia where they were living. I was there for a motorcycle rally. Vicci and Robin came to see me at my hotel. We ate a meal together. Robin was nice and Vicci seemed happy. Vicci described Robin as someone that was his soul mate.

24. I have remained in contact with Vicci since he's been locked up. He is allowed to send email type messages and that has made it easier for us to communicate. I usually send Vicci money at Christmas or for his birthday.

25. I visited Vicci in Indiana after his first trial and before his second trial. I was glad to see him.

4

**JA335**

26. I have several of Vicci's drawings now. There is one of two cars with a reflection that is of a red and black Model T. I also have ones of an airplane, of me fishing, and of a dog in a chair. I've got them framed.

27. Before Vicci's first trial I talked to Sindy Maxwell enough to remember her name. She was in investigator working with Vicci's attorneys. Before Vicci's resentencing I went and met Cessie a couple of time. She was an investigator for Vicci's second team of lawyers.

28. I did meet with the defense team prior to Vicci's trial but we did not talk about my testimony. They didn't talk to me about what they wanted me to say, how to act, how to look, or anything like that.

29. I talked to Seymour Halleck, one of the mental health people for Vicci's legal team.

30. During the second trial, I was asked a few questions about Jesse Cooper. I testified that he was "unique" and a "little eccentric." I also testified that he had been in the military and "was experiencing some problems." Although I never lived with Jesse Cooper, and had not spent much time around him since I was a young man, I was aware that Jesse was pretty damaged by his time in combat. Because no one on Vicci's defense team prepared me to discuss Jesse's situation, I did not know how in-depth to go when describing Jesse's condition. Had I been prepared to discuss Jesse, I would have described more about how the war really seemed to damage him.

31. I love Vicci dearly and I would have willingly shared the contents of this affidavit with Vicci's defense team and with the jury at his trials if I had been asked to do so.

I swear or affirm that the information in the foregoing paragraphs is true to the best of my knowledge.

_Derrick Barnette_        _8-23-2014_
Derrick Barnette            Date

Affirmed and subscribed before me on this the 23rd day of August, 2014 in Mecklenburg County, North Carolina.

_____
Notary Public

My commission expires: 1/20/16

Zachary Rowles
Notary Public
Durham County, NC

5

<u>**Affidavit of Mario Barnette**</u>

I, Mario Barnette, appearing before the undersigned and being duly sworn or affirmed, state the following:

1. I am over the age of 18 and competent to testify to the following facts.

2. I am a resident of Marietta, Georgia. I am employed at Mercedes-Benz of Buckhead in Buckhead, Georgia.

3. Aquilia Marcivicci Barnette is my older brother. He is about four years older than me and I call him Vicci.

4. Vicci's mother and my mother is Sonia. She is the middle child of three sisters. Her older sister is Aunt Tessie. Her younger sister is my Aunt Sheila.

5. My grandfather's name was Jesse Cooper. He is now deceased. He was my mother's father. He lived his adult life on the Cooper property located on West Boulevard in Charlotte, North Carolina. I loved my grandfather. We called him Pop Pop.

6. Jesse was in the Army when he was a young man and he fought in Korea. He was badly injured while he was over there and nearly died. His war time experience stayed with him for the rest of his life.

7. When Jesse got hit by a grenade there was a guy who said he saw body parts flying. Jesse later had a prosthetic eye. My mom once found Jesse's glass eyes in a suitcase when she was little. Jesse's eye would sometimes get wet and he would need a tissue for it.

8. Jesse would go to reunions with his platoon mates. One time it was in South Carolina. Mom took him a couple of times to these reunions for veterans.

9. Jesse had a slim physical build. He and I have always been the same size. We could even share clothes. Jesse often wore a green trench coat. He didn't like the cold. He would wear this trench coat over his church clothes when he went to church.

10. Jesse had nicknames for some people. He called my mother, Sonia, by the nickname of "Sonar" and my Aunt Tessie by the nickname "Scotia." This is because there is supposedly a military term called Scotia and Sonar. That nickname didn't have a deep meaning. It was just a play on words. Jesse also often said "shucks" as a substitute for cursing. When he said it he would raise his shoulders. I remember Jesse saying this about my driving tickets. Another phrase Jesse often used was: "While I'm still in the land of the living." Jesse would say "good morning" even in the afternoon because it was morning in the Pacific. He did it as a joke, to get a rise out of people. Everything was military based. If you asked him the time he'd say 14:00 instead of 2:00 p.m. Jesse also said "etowa" which I think is a term of greeting used in Korea.

Bates No: 22

**JA337**

11.	Sonia sometimes had to put some kind of salve or ointment on Jesse's back because the shrapnel would puss up on his skin. You could see the little rises and scars. Those injuries would start weeping after a while.

12.	Jesse was emotionally affected by the war. He never talked about how he was feeling. Sometimes he'd discuss others, but not himself. Jesse acted like he was on a night shift. He didn't sleep much at night. We all became night owls around him.

13.	Jesse stayed on the front couch in the house at West Boulevard. That house was always still in the works. He complained there were too many windows in the house. Those windows made him vulnerable so he hung sheets over the front windows. Jesse generally stayed in the front area which was the side of the house closest to West Boulevard. That was him being vigilant. He would say, "Somebody has to stay watchful." Jesse would hold down the fort. He felt especially responsible after Vicci got shot in the house by our cousin, LeDon.

14.	Jesse had night terrors. These became less frequent as he got older. When they happened Jesse would yell at the top of his lungs from the living room couch where he slept. When we moved back to Charlotte after living in Atlanta I heard him yell like that several times a year. However, these night terrors might have been more frequent before this time.

15.	Jesse was on medications that knocked him out. However, after the incident when LeDon shot Vicci, he stopped taking his meds for a while so he could be more vigilant.

16.	Jesse drank Pabst Blue Ribbon beer and he called it his "tea."

17.	My mom moved back to Charlotte from Georgia in order to take care of Jesse. He hadn't been going to the VA on a regular basis. Aunt Tessie had been living in Charlotte but she was not taking him to his medical appointments and he wasn't taking any of his medications. After we got back, Sonia started taking Jesse to his doctor's appointments.

18.	People from the neighborhood would often ask Jesse for money. Family members would ask him too. He always had visitors come knock on the door. Jesse's other good friend was a person at the Lakeview Bait and Tackle shop. Jesse knew all the owners and sons that worked there.

19.	Jesse had church members come check on him. Everyone in the neighborhood called him Uncle Jesse. Jesse was pretty involved with the church. He went 2-3 times a day sometimes, and he always went on Sunday.

20.	Jesse almost never drove because of his glass eye.

Bates No: 23

**JA338**

21. Jesse never talked about my grandmother, Pearl. She had been his wife before they divorced. She was later shot and killed by her subsequent husband. Jesse wouldn't even reminisce about her. He was hurt by what happened. You could only get a couple phrases out of him about her. Jesse said that the first person he saw after he was hit by a grenade in the war was Pearl. He asked her, "Are you an angel?"

22. Pearl's murder had a huge effect on our family. My mom and Aunt Sheila were in the house when it happened. They were both school age at the time. Aunt Sheila found her mother's body. Vicci was also there. He was a baby.

23. Pearl's murder is what had Aunt Sheila acting the way she used to. We just called it "Aunt Sheila." She never made decisions that made sense. She would get together with guys who were worthless. She went to college out of the blue for cosmetology. My grandfather was financing this. But then she abruptly switched and wanted to be a nurse. Sheila also maxed out credit cards. There was a time when the feds were looking for her in Florida when she was there with a Hispanic guy and bouncing checks.

24. Aunt Tessie's role has been more of being outside of the immediate family. She is reserved in that way. However, Tessie has taken care of her kids and grandkids. Her younger daughter, Shonda, was troubled. When Shonda was in her early 20s she would disappear for weeks and then come back messed up. Shonda once left with friends, went to the beach, had a car accident, and left the car there. Shonda also got pregnant when she was a young teenager with her daughter, Alex. Tessie had to take care of and raise Alex. Tessie has also been raising Alex's kids.

25. Our younger siblings and cousins have done better than us because they received better parenting than we did. This is true for my half siblings, John Mack and McKenzie. My mom was very young when she was raising Vicci and me but she is older and more stable now.

26. My mom married Derrick Barnette the year before I was born. We moved around a bunch when I was little because my dad was in the Air Force, but then we lived for several years at a house in the Clanton Park neighborhood of Charlotte. Vicci and I had bunk beds when we lived at the house in Clanton Park. Sometimes I would get up for school and Vicci would not be there.

27. My parents once blindfolded me and tricked me into thinking they had cut off my thumb. They did this as a way of trying to get me to stop sucking it. Another extreme measure they took was when my dad once told me not to open the door for anyone. But then I was alone at the house and I opened the door for a family member that I knew. I was disciplined for this. Derrick beat me with a belt. The person that had come to the door was Aunt Pie who is related on my dad's side of the family. I was probably around six years old when this happened.

Bates No: 24

**JA339**

28.    Vicci's best friend, Steve Austin, lived across the street. We admired his family. Vicci brought me over there to show me what a real family is. They were not like our family, they were like the Huxtables. The brothers got along, the parents did not fight, and they would sit down to Sunday dinner together and pray over their food. Vicci told me that if I ever could not get into our house I should go over to the Austin's house.

29.    Vicci saved my life one time when I was choking on ice. He was always a protector for me. He knew his role. His main function was to be a buffer for me from my parents and he did this successfully. He stopped me from seeing my mom and dad fight. They fought all the time. But in order to do that he ended up in the fights with them.

30.    Our house in Clanton Park was small. If our parents were fighting you could hear it even if you could not see it. If Vicci heard something he would run out, close the door, and tell me to stay in the room. He would literally dash out of the room. However, I could hear all this fighting going on.

31.    Eventually our parents separated and divorced. After that happened, the person we knew as our dad, Derrick Barnette, had a paternity test done. The test indicated that he is neither my father nor Vicci's father. He took us out to a restaurant and told us about it. I was about 9 and Vicci was about 13 years old when this happened. It was a total shock to both of us. It was very upsetting.

32.    The identity of our father has been a family secret. However, there have been a number of other family secrets too. Aunt Sheila informed her son Armaud who his father was but she told him that his father had run off and didn't want anything to do with him. But the truth was that Armaud's biological father and Armaud's father's brothers were trying to find him. Sonia and Aunt Sheila have been very secretive. They won't tell you anything. All of these secrets have been harmful.

33.    After our parents separated, we moved a lot. We went from Clanton Park to Windsong Drive to Wendover Road to Farm Pond Lane to Atlanta, Georgia. We lived several places in Atlanta before moving back to Charlotte. The worst times were when we lived at Windsong and Wendover. Financially and mentally they were the worst for mom. This was when she had her crazy period and she lost her way. She was depressed.

34.    Our house at Windsong was terrible. There was never any food in the kitchen and there was always a lot of trash.

35. My mom's friends, Tina and Harlene and Jackie, would go out with her. No babysitters looked after us when mom was out. Vicci was around 13 years old then. He would come home and ask if there was anything to eat. He would make TV dinners for us if we had any and then he would stay around until mom came home. Then he'd be back out that door. He was out drinking with friends. He was trying to find a family with the girls he was with.

36. One of Sonia's boyfriends was a guy who drove a nice car and was sleazy. He was in and out. He would pop up and then disappear again. He once came back from somewhere and showed us his black case of fake gold. When he disappeared, I assumed he was out on his next hustle.

37. These were bad times because Sonia was recently divorced and she was out all the time. We also did not see Derrick very much. When we would see him, which wasn't often, Derrick was usually there to beat Vicci with a belt. Because this was the only time we were seeing Derrick it made our relationship with him even more strained than it had been after we learned he was not our biological father. This was especially true for Vicci.

38. After my mom and dad separated Vicci had to take on responsibilities as the man of the house. He was half brother and half father to me. For instance, I was taught not to use drugs by Vicci, not by my father.

39. My mom, Vicci, and I moved to Georgia before my 6th grade year in school. We moved in with my Aunt Sheila, Uncle Michael, and my cousin, Armaud. At first we lived with them in an apartment, but we soon moved with them into their house in Lithonia, Georgia. Things were chaotic there. The adults would party and use drugs. Uncle Michael drove a canary yellow Corvette with a T-top roof, but he was never home. All of the adults in the family were always going out, leaving us alone at the house. If I overslept in the morning there was very little chance that any adult would wake me up and make sure I made it to school.

40. At some point while we were living there Aunt Sheila gave birth to her daughter, Michaela. Sheila barely took care of Michaela. There were many nights when Armaud and Vicci and I would hear Michaela crying and crying in her crib. The crying would get so bad that we would go check on Michaela. We would find that all of the adults were gone and would have to take care of Michaela and soothe her. Sheila and the others would often come home at 3:00 a.m. or close to dawn and we would hear them come in because we were just getting back to bed ourselves from taking care of Michaela.

41. Armaud once found drugs under the master bathroom cabinet. He is four years younger than me and he was only around seven years old at that time. The drugs were in plastic bags about the size of a magazine and Armaud thought they were pillows. Vicci and I told Armaud to get away from the drugs.

Bates No: 25

**JA341**

42. There were lots of signs that the adults were involved in drug dealing. Sometimes rundown, suspicious looking guys would show up at our house and not stay very long. Another time a U-Haul truck came to our house but nobody was moving anywhere. Our household also seemed to go from extreme highs to extreme lows. At times the adults would be in party and celebration mode, and at other times I understood that we were dead broke, despite the fact that Michael still had his job at General Motors.

43. A white woman once showed up at our house and it caused a commotion between her and Aunt Sheila. I believe Aunt Sheila got out a gun while the lady was there. I think it was early on a Saturday or Sunday morning when the lady showed up and I woke up to hear her and Sheila yelling at each other. Armaud and I were told to stay in our room. I later learned in bits and pieces that this was Michael's wife and that he had a whole other life with a house and family.

44. We first moved to Georgia over the summer and in the fall Vicci and I started school. I was in the 6th grade and he was in the 10th. Then Vicci started seeing Sheila Sullivan. Prior to moving to Georgia, he'd had a crush on Ayana. He really liked her. I think the relationship with Ayana ended because of our move to Georgia.

45. Vicci was excited about Sheila Sullivan. I remember him talking to his buddies about it. We rode by her house one time. I saw a photo of her and I thought she was cute. Aunt Sheila thought she was cute too.

46. Vicci got jumped and beaten up bad one time when we were living in Lithonia, Georgia. It had something to do with Sheila Sullivan. The guy who did it was a little older than Vicci. Vicci was hurt and upset about it. After this Vicci said that nobody was going to catch him off guard again.

47. Sheila Sullivan might have gotten pregnant by Vicci and then had an abortion. Aunt Sheila was a part of it. They met with Sheila's parents. Vicci didn't want an abortion for her.

48. Vicci was hurt when he and Sheila Sullivan broke up. He stayed in the house a lot more after that. I recall him being really sick around that time.

49. The Sheila Sullivan breakup affected Vicci real bad. It was a real heartbreak. He took it hard. It was the first of a pattern where he would have a breakup and then spiral downwards. After the relationship with Sheila ended, his buddies tried to pull him out of it and pick him up, but he said no. He wanted to be by himself in the bedroom. Since we shared a bedroom with him, Armaud and I had to go to the living room so he could sit in there with the lights off. Vicci's buddies eventually were able to get him out. But when he came back in he'd fall back into that hole. That pattern lasted for months.

50. After the relationship with Sheila ended, Vicci stayed out more. He would come home, check on me and Armaud, eat, argue with mom, and then leave again. Sometimes he would disappear. For example, one time Aunt Sheila had to go find Vicci. She was coming home from somewhere and Vicci was walking by himself in the dark. She wanted to know where he was coming from. The adults had been out looking for him a couple times. This occurred around the end of the Sheila Sullivan relationship.

51. Vicci would disappear a lot when he was with either Sheila or his next girlfriend, Tasha. However, he would show back up just in time to wake me up for school or get me food. One time he popped up to pick me up from football practice. He would appear to help me out when I needed something.

52. I ended up going to the same high school in Lithonia as Vicci. Vicci was on the track team and Sonia would go cheer for him at his meets sometimes. She did that several times. This is the reason I played football, so I could experience that too.

53. I think Vicci had recovered from Sheila Sullivan by the time he met Tasha. Also our move to The Crossings apartments helped. I remember Vicci bringing Tasha over to our house.

54. Once Vicci started going out with Tasha he didn't go to school as much. Their relationship was intense. At first they had a honeymoon period that lasted a couple months. Vicci had been pretty deep into his relationship with Sheila Sullivan too, but with Tasha he took it seriously very fast.

55. Tasha became pregnant. Vicci was scared about it at first, but then he was all about supporting family. He would talk about wedding rings and getting multiple jobs. He looked at apartments for them to live in together. He sincerely tried to make it work for them to have a family.

56. Immediately after Tasha got pregnant Vicci started talking about getting married. He wanted to get married but all this other stuff was going on: turmoil; fighting; she pulled a knife on him one time; and they bruised each other up. It was similar to how our mom and dad had been. The idea of getting married was dropped because Vicci and Tasha didn't have the blessings of their families. Tasha's mother was against it and she ended up moving down to Newnan to get Tasha away from Vicci. Tasha's mom made things as difficult as possible for him.

57. Tasha and Vicci had a period of breaking up and getting back together. Vicci seemed less sure about his relationship with Tasha during this time. He was saying he didn't know. They both were with other people. There was an altercation with the other guy she was dating. Vicci was very jealous of the other guy. Vicci and Tasha yelled on the phone, accusing each other and going back and forth about whom the other was sleeping with.

Bates No. 28

**JA343**

58. When Tasha got mad at Vicci she would come over, or follow him home, and they would fight by the door. They fought a lot, but Tasha would give it back to Vicci. She was not passive. With Tasha he would come home with a busted lip.

59. After the birth of their second child, Vicci and Tasha moved to Newnan, Georgia together. They didn't stay together long in Newnan.

60. While living in Newnan, Vicci was harassed by a guy named Anthony Britt. One time Vicci was out walking and Anthony and some of his friends came after him. They were trying to hurt him. It was miraculous that Vicci was able to get out of that situation without being shot or seriously hurt. However, this incident, like the time he was beat up in Lithonia, really affected Vicci. It made him even less trusting of others.

61. After Tasha, Vicci dated Crystal Dennis. Vicci loved Crystal but not as much as Tasha. Crystal had kids but he didn't mind. One time when I visited Newnan I spent time with Crystal's brother who was around my age. The second time I visited Newnan Vicci talked about asking Crystal's grandmother for permission to marry her. When he said that I busted out laughing. I think he was asking sideways permission from me about it. I asked him if he was serious and he told me he was. Mom talked to Vicci and told him to slow down. He did listen a little and he went to talk to Crystal's grandma to get to know the family before going forward with his plans to propose.

62. After he got out of jail for assaulting Crystal's children, Vicci was trying to work something out with Tasha but mom told him to get himself up to Charlotte, so he came back. Once Vicci got back from Newnan he immediately started making bad decisions.

63. Vicci was concerned about his probation. He got a job at Bojangles. He didn't love the job but it was some money in his pocket. He later got a job at a music shop which he liked better. However, he still brooded over the end of the Georgia relationships. Tasha was still in the picture because of their kids.

64. Vicci then started dating Alesha and then things started going badly. Alesha would voluntarily do things with Vicci but when the authorities got involved she would tell a different story. Most of the time the reality of events didn't match up with how she described them. She was always claiming to be a victim but it was not like that. She had a lot of control over him. She asked him to take her here and there, and to come pick her up, and he would do it. She didn't seem to genuinely like him that much.

65. Alesha was too young for Vicci. When Jesse and the rest of the family found out how young she was, nobody liked it. Vicci didn't talk about marrying Alesha like he had with the others. He was just trying to start over and needed a relationship. He should have stopped when he found out her age.

66. Around this time, Vicci's reactions became a lot more irrational. He was a lot quicker to react. You wouldn't want to cut him off in traffic and then pull into a parking lot. A lot of it was from the stress of the relationship with Alesha. He came up to Charlotte to get rid of the nonsense and then he got into the deepest pile of craziness you could find.

67. After Alesha, Vicci's got into a relationship with Robin. He moved up to Virginia to live with her, but he moved back down to Charlotte with us when their relationship wasn't working.

68. Vicci operated fine outside of his relationships but every one of his relationships was chaotic as far back as I can remember. He would attract nice girls but I could see it wouldn't last as soon as they walked in the door. Vicci would put all his eggs in one basket. He would count on his relationship for his self-worth. Over time it became more extreme. For every relationship it became worse two-fold.

69. Vicci's relationship with Sheila was a turning point. His actions became over the top after that. Vicci had some girlfriends before Sheila but they were not a big deal. It never got to a point of dejection for Vicci.

70. Vicci's relationships followed a similar pattern. At first he was always extremely happy. He would spend money on his girlfriend. He would attend family events, smile, and giggle. That's the point where he wants to propose. He would either ask if he should propose or he would be wondering if he was doing the right thing. This is how it happened with Robin. He brought her home for Christmas. He said he wanted to propose but I didn't even know her last name yet.

71. The good period in each relationship would last six months at the most. Then something would happen in each relationship that Vicci would take as a betrayal. He would give it much bigger meaning than it really had. There was always an outside trigger but you never knew what it was going to be.

72. Vicci never talked about his jealousies before a breakup but I don't remember any relationship where he didn't think she was cheating.

73. Besides Vicci, there have been others in the family with mental health issues. Aunt Sheila's son, Michael O'Neal Jr., was diagnosed with Bipolar Disorder. There are signs that my mom struggled with depression several times in her life. There were times when she would just shut down for a period of time, like she had an off switch. I especially remember this happening when we lived at Windsong in Charlotte, before we moved to Georgia. I can recall laying on the couch or the bed with her and wondering what was going on. She would just shut down, barely saying a word or even moving.

Bates No. 30

**JA345**

74. Vicci has always had a lot of energy. There is a manic quality about him. He moves rapidly from one subject to another. He has always gone from one thing to the next. Vicci's typical rate of speech is fast and he switches ideas quickly. He cuts off ideas. Vicci is always on the go. He's hyperactive. He's always here and there at the same time. He has always been on the move like that. He and I exact opposites of each other. I'm more methodical. I am someone who will check it three times before moving on. The only time Vicci really slows down is when he's doing his art.

75. I don't talk about Vicci's girlfriends with him. Once when we were in the living area at the West Boulevard house, Vicci was obviously thinking about Alesha. He asked me if I liked her. I asked him if she and I are the same age. Vicci got upset. He jumped up, gave me a look, and walked off.

76. Vicci is extremely organized. He could be OCD. When I was about six or seven years old he had a Rubik's Cube and a Star Wars Imperial Fighter. He told me not to mess with those things but I did anyway. I tried to put the toys back just as they were but Vicci came in and noticed and was upset.

77. Vicci used to eat a lot when he was on the track team in school, but at other times he didn't really eat all day.

78. Vicci didn't sleep much. He might get a couple of hours of sleep at night and then maybe catch a nap or two during the day.

79. Vicci would always cry after a relationship ended. The only tear of happiness I have ever seen from Vicci was when he told mom he wanted to marry Robin.

80. Vicci only talked about his emotions on the rare occasion. It was so rare it was unbelievable.

81. After Vicci moved back from Virginia he shut down emotionally. He would sleep on the couch during the day but then be up at night. However, he was still sedentary even when he was awake. He would watch TV or read. He was not active. His weight fluctuated quite a bit at that time.

82. Vicci shaved his head after he didn't get a job at Saturn he'd applied for. He was upset.

**JA346**

83. The evening before the shootings occurred, a friend and I came in to the house and Vicci was watching TV. We started playing video games and Vicci came into my room and played with us. He was also on the phone with Armaud. He was telling Armaud to stay in school. Vicci was smiling and talking like he used to before his breakup with Robin. He seemed all right. I hadn't seen him smile in so long. He was asking me about my friend. I didn't realize he had all black on.

84. I visited Vicci at the jail with my mom when he was in Charlotte. Since he's been locked up, Vicci and I write and we talk on the phone. My cousin Armaud and I started a Facebook page for the purpose of collecting and promoting Vicci's artwork. He is a talented artist and we want people to have a way to see it.

85. Armaud and Vicci have always been close and they remain that way even though Vicci is locked up. They talk and write each other. Vicci has sent many of his pieces of art to Armaud who has collected them. His house is like a museum with Vicci's artwork all over the walls.

86. Our half siblings, John Mack and McKenzie, have a solid connection to Vicci as well. A big part of their connection is through Vicci's artwork.

87. Vicci's first legal social worker, Sindy, came over to West Boulevard to meet us at some point before his first trial. That was the first time I met her. Her discussions weren't in depth. She asked me about the drawings on the wall of the house. I met with her a couple of times. As far as testimony preparation they told me to tell the jury how I knew Vicci and things like that. It wasn't specific.

88. The first trial was confusing. They didn't go into Vicci's psychology and what made him up. They were trying to limit the amount of his guilt instead of saying why he is the way he is.

89. Before the second trial I talked to the second social worker, Cessie, over the phone. We also met one time. The second team of lawyers didn't want me to talk about the stuff that happened while we lived at Wendover, such as the fact that even after the divorce dad would come over and beat Vicci.

90. Besides me, not many other family members were asked to testify at the second trial, including my mom. I know she was upset that she wasn't called to testify and help him. They were definitely blaming her and Derrick with the testimony.

Bates No: 32

**JA347**

91.     I love my brother and I would have willingly shared the contents of this affidavit with Vicci's defense team and with the jury at his trials if I had been asked to do so.

I swear or affirm that the information in the foregoing paragraphs is true to the best of my knowledge.

_____          9/15/2014
Mario Barnette                            Date

Affirmed and subscribed before me on this the 15th day of September , 2014 in
Fulton          County, Georgia.

Natasha L. Slan
Notary Public

My commission expires: 3/24/17

**JA348**

<u>**Affidavit of Sonia Barnette**</u>

I, Sonia Barnette, appearing before the undersigned and being duly sworn or affirmed, state the following:

1.     I am over the age of 18 and competent to testify to the following facts.

2.     I am a resident of Charlotte, North Carolina.

***Family Overview***

3.     I have three sons and a daughter. Aquilia Marcivicci Barnette is my oldest child. I call him Vicci.

4.     My dad was Jesse Cooper and my mom was Pearl Cooper. Both are now deceased. They are the parents of me and my two siblings. Tessie is my older sister. She is about seven years older than me. Sheila is my younger sister and she is approximately 4 years younger.

***Cooper Family Background and Pearl Cooper's Death***

5.     I had a good relationship with both my mom and my dad. When my parents were together they lived off of West Boulevard in Charlotte. My dad had lots of family that lived there.

6.     My father was the youngest of seven siblings and they all lived together when they were young. One brother, Joe, died young. Another brother, Henry Jr., was killed when a car fell on him.

7.     The Cooper family raised pigs and made sausage. They grew strawberries, corn, and grapes. They had cured hams that they sold. Also, my grandmother churned butter and made jams.

8.     One of Jesse's sisters was named Edna and she had a daughter named Edith. The family made it appear that Edith was my dad's sister, but really she was his niece. They did this because Edna got pregnant and became a mother when she was really young. My cousin Jean was the one who first found out about this family secret.

9.     Pearl was born out of wedlock and she never knew who her father was.

10.     My father served in the Army and was deployed to the Korean War in 1951 and 1952. He was badly injured in the war. He always said he had already met Jesus because of it. He had Post Traumatic Stress Disorder afterwards.

Bates No. 34

**JA349**

11. What happened was that Jesse and others were walking patrol. Then they saw a figure ahead of them and stepped back. When they did, Jesse stepped on a mine. He was blown up. Korean soldiers came by and they kicked him and poked him with their bayonets. However, he was injured so badly they left him and kept walking. A buddy of his came and got him afterwards. Jesse was put in a body bag because they initially thought he was dead. He had to signal that he was still alive by letting his arm drop. The military sent a telegram to my mother and my grandmother saying Jesse was missing. Jesse spent about a year in a hospital in New Jersey recovering. Before he died in 2002, he was awarded a Purple Heart from the military.

12. He had a lot of shrapnel in his body after the war and we often had to clean his back with alcohol. He also had a prosthetic eye. Jesse never gained any weight after the war. He was probably 90 pounds soaking wet even though he would eat and eat.

13. The war affected him mentally. After he came back from Korea he would have nightmares and call out in the night. Once he had a flashback episode where he thought me and my sisters were nurses. After this he was taken to Broughton Hospital, a state psychiatric hospital in Morganton, NC. After he came home from Broughton we had to be really quiet. We were not supposed to make loud noises around him.

14. He often ate Vienna Sausages and a pack of saltines for a meal. He basically lived on rations. This was like it was when he was in Korea – eating meat out of a can. He really didn't eat fully cooked meals until I came back to Charlotte from Atlanta in 1993 and started cooking for him.

15. He drank Pabst Blue Ribbon beers after the war every day. As an explanation for his drinking he said the doctor had told him he needed to keep his liver flushed. Jesse's sisters said that he drank way too much.

16. My parents had different personalities and different things they wanted. My dad was reserved and very passive whereas my mom would speak her mind and always had the last word. My parents ended up getting separated and then divorced.

17. I was in the fourth grade the first time my parents split up. My sisters and I moved to an apartment with my mom. My mom did give her relationship with Jesse a second chance. They got back together for a little while but it didn't last.

18. Part of the reason they split up is because my dad insisted on taking care of my cousins. He was a father figure to them. However, Pearl wanted more of his attention on our immediate family, not as much on my father's extended family.

Bates No. 35

**JA350**

19. My father wore his wedding ring up until the day he died. He loved my mom. Pearl was later shot and killed by the man she married after Jesse. When we were at her funeral my father told us to straighten up because our mom would have wanted to see us acting proper.

20. My father bought Pearl a 1958 Cadillac. He took it back when their relationship ended. That car remained parked on the property until Vicci's cousin, Don, sold it to a drug dealer for $50. Don did that in 1993 when I was in Atlanta and my dad was at the VA hospital in Salisbury.

21. After my parents split up, my mother dated a man named Herman Mazyck. They had started their relationship even before the separation. My mother would see him at her family's place, not when she was around my father. Herman ended up marrying another lady.

22. My mother then began a relationship with Loyd Brown. He came into the picture when I was 15 years old. My mother had previously met Loyd when she had been his nurse. My mother and Loyd later ran into each other and he started calling her and they started spending time together.

23. I didn't like Loyd from the start. He wasn't genuine. He was stalking my mom. He was trying to take out a life insurance policy on my grandmother. Loyd also ran up credit cards. He was crooked. He took advantage and she was a perfect target. We had moved into a house at that time and my mother had two kids that were girls. Loyd didn't have anything to offer my mom. He came with only a gym bag and a console stereo. That was a red flag to me and I was young and didn't know much about these things. Six months after my mother and Loyd reconnected she said she was marrying him. That was the end of any relationship between my mom and me.

24. Loyd treated my mom bad. He wasn't nice to her. I remember seeing him twist my mom's arm behind her back one time during an argument they were having. I had never seen anything like that before.

25. Loyd and I didn't get along and I was unhappy. I said a couple of things about Loyd to my mom. This led us to have arguments which led to us going to live at my father's for a while. However, that arrangement didn't last long. I think we went to live with my father for about a month before going back to live with our mom and Loyd.

Bates No. 35

26.     I saw Loyd two times while I was back at the West Boulevard place. I told my father about it and he sat up all night with a shotgun across his lap to protect me and Sheila. Sometimes when I was out by the bus I saw Loyd drive by. He was watching us. It was creepy. Another time I was changing classes at South Mecklenburg High School and Loyd was there. We passed each other on the sidewalk. It was scary. He was a stalker and he was stalking me too.

27.     Loyd ended up shooting my mom and killing her. Vicci was a baby, I think Sheila was 11, and I was about 15 years old at the time. The week before this occurred Sheila saw a gun under the bed and had told our mom about it. However, my mother told her that Loyd had that gun for our protection.

28.     Vicci, Sheila, and I were all at home when it happened. Vicci was in his crib. I had gone to the prom that night with a friend's brother. When I got back to the house, Loyd was gone. Mom told me she and Loyd had argued and then he had left. I was eating a sandwich when he got back. I later went to bed. Neither Sheila nor I heard any gunshots when it happened. Loyd shot her five times. He must have had a silencer. I was woken up when the police arrived. Loyd had gone out to turn himself in and after he did so they came to the house. Sheila heard the police cars and checked on our mom. She was the first one to find her. I remember seeing blood on the wall. I blacked out after that.

29.     At the time my older sister, Tessie, was living in Alaska. She had to come home and make funeral arrangements. I was the one to break the news to Tessie. I had to call her on the phone and tell her that our mom was dead. To hear Tessie break down on the phone when I told her what had happened was awful.

30.     After my mom was killed we moved back in with my dad. My daddy kept Vicci while I was at school. Then we moved to Columbia, SC where I went to the 11th and 12th grade. I graduated high school there.

31.     For a long time I was frightened that Loyd would get out of jail and harm us. We sent letters to not release him. One time I was in the car on ~~Charlotte~~ *South* Boulevard and I saw Loyd out on work release. I was terrified. That stuck with me a long time, up until we found out Loyd had died in prison.

32.     I just had to keep going after my mom's death. Ever since I was young I always needed to be the glue because I could see my sisters losing it. I particularly felt I had to be strong for Sheila. She had a lot of difficulty handling what happened. Once when Sheila's supervisor from work called and told me that Sheila was having a breakdown. She told me they were going to get Sheila some help. At that time Sheila would go into uncontrollable crying. I saw her crying often. Sheila did end up getting some counseling and I think it helped. She's the only one of the three of us that got that. We all needed it.

**JA352**

33.     I have had this inner fear that I would only live to the same age as my mom, and that the same thing would happen to me that happened to her. I always have this emotional wall up. I never allow anyone to hurt me. I have had a fear of letting someone in because I don't know if I can trust them. All of the things that happened in my relationship with Rick (my ex-husband) were triggers for my fears about what happened with my mom.

34.     My moods have been affected by my mom's murder. Mother's Day is sad and emotional for me. Things are also very difficult around November 4th, my mom's birthday.

35.     I never talked about my mom's death with other family members or with any kind of mental health counselor. I think it would have helped to have been able to talk to a counselor. It could have helped my whole growth pattern and understanding of emotions. It was a long time before I could even talk about it with anyone. When people asked I would just say my mom passed when I was young. I wouldn't tell them how my mother died. About five years ago I told a coworker the story. I had to grow up before I was able do that.

### *Relationship with Derrick Barnette*

36.     Vicci was born in Charlotte. At first he and I lived with my mom and with my younger sister, Sheila. Vicci was born the summer before I started the 10th grade at West Mecklenburg High School.

37.     I met Derrick Barnette while I was in school at Smith Junior High. People call him Rick or Ricky. We later ended marrying and raising Vicci and his younger brother Mario together.

38.     We moved to Omaha, Nebraska, then to Minot, ~~Minnesota~~ *North Dakota*, and finally back to Charlotte.  Rick was Catholic so we went to a Catholic church. When we lived in North Dakota we went to church every week. Then we sometimes went to a church on Tryon Street after we moved back to Charlotte.

39.     Vicci started going to school in North Dakota. Then, except for the fifth grade, he went to public schools after we moved back to Charlotte. I went to the Amy James School when I was in the 5th grade and my teacher was Ms. Owens. Then Vicci had Ms. Owens when he was in the 4th grade at Barringer Elementary in Charlotte. However, she didn't make him do his work. She would tell me that he would mostly sleep during class.

Bates No. 33

40. In Charlotte we lived in Rick's mother's house. Rick's mother had passed away and left him the house. When we came back to Charlotte, Rick's old girlfriends were around. They knew where he lived because we lived in the house he grew up in. This led to arguments between me and Rick. We were extremely jealous of each other and this led to arguments and physical fights.

41. One time when I questioned Rick about cheating on me he said, "If you look for dirt, you'll find it." I found out that Rick was cheating on me with Marcela, the woman he is now married to. I found this out from Rick's cousin.

42. Most of Vicci's problems involved girls he was in a relationship with. He always saw the arguing, disagreeing, and physical fighting that Rick and I had. It was bad for Vicci to experience that. He took our fighting and emulated it over and over.

43. It got bad with me and Rick. He would throw my things outside. He once hit me with a hammer. There was also a frying pan incident where I was planning to hit him with a frying pan while he was sleeping.

44. Rick also beat Vicci. After one particular beating Vicci called somebody and they came out to our house to check on the situation. Rick admitted he had beaten Vicci. It was probably a social worker that came out, someone from DSS. Rick and I were young then. We didn't know as much about the effect that fighting would have on Vicci.

45. After our separation, Rick still disciplined the kids if they'd done something wrong. He would come over and discipline them when I asked him to. He would usually use his hands or belt. This lasted for about a year while we were separated, but before our divorce.

46. As part of the divorce, Rick had us do a paternity test for Vicci and Mario. At first he just wanted to question whether he was Mario's father, but then the test results came back and indicated that neither Vicci nor Mario were his. However, I still don't believe the test results. At the time of the test Rick was involved with his current wife, Marcela, and I always thought he should question Marcella about the results; I feel she had something to do with rigging the test.

47. After the test came back, Rick took Vicci and Mario out to dinner and told them about not being their father. It was hurtful to them. That's crueler than a whipping. It really hurt Vicci.

Bates No. 39

6

**JA354**

48.     I dated several guys after Rick and I split up and while I was living in Charlotte. The first one was Al. His real name was Ollie McArthur. I was about 27 years old at the time and he was a year or two older than me. I first met him when I was out with my friend Tina. He was from Norfolk, Virginia but he ended up living with me when he was in Charlotte. Al was a hustler. He hustled everybody including me. I gave him a couple thousand dollars. He sold fake jewelry and I often tried to help him with his jewelry sales. Al had two little girls that lived with their mom in Virginia and he had to pay child support. He asked me to help pay. I paid $600 to help him with his child support payments. He also convinced me to buy a red Corvette. Al and I traveled together a lot but I was always the one paying for everything.

49.     I dated Sam Walton after Al. He was about 15 years older than me. His brother was Bob Walton who was a county commissioner in Mecklenburg County. Bob now has a city building named after him. Sam worked as a maître d' at The Fish Market. I met Sam because my friend Harlene introduced us. Sam and I went out on a date together and the next day he sent a huge bouquet of flowers to my work. He knew how to woo the ladies. He had a number of ladies. However, I was the only one he took to meet his family. Sam didn't need money from me like my other boyfriends. In fact, he would give me money. But he did need someone to look out for him. Sam had a serious drinking problem. He would call me after drinking and gambling and need a ride home. He also needed someone to make sure he had eaten.

50.     My next boyfriend was Tyrone. I can't remember his last name. One of his brothers was married to my friend Pam Davis at one time. Tyrone and I dated for a couple of months. He drove a taxi and I helped him buy into that. I used to ride with Tyrone on some of his taxi drives. He was like the others in that he just wanted money.

51.     Another guy I spent time with was Mark Ragin. Mark and I were friends. We never dated. He was dating another girl he called his girlfriend at the time. Mark used to call me his little black white girl. Mark and I spent time together for about a year. It ended when he was shot and killed. I was devastated when that happened. I think I was secretly in love with Mark. Mark had owned a club called St. Mark's and after his death I learned he was a big drug dealer kingpin.

52.     I have used drugs before. I used them most heavily in the period of time before we moved to Atlanta. The most was probably with my friend Tina when we were living off Wendover Road. Tina was an avid weed smoker. Then when we lived at the place on Soft Wind my friends would come over and we would use drugs together then too. Vicci would bring up my drug use when he and I would argue. It upset him.

Bates No. 40

**JA355**

53. Vicci and I had a number of disagreements after my separation from Rick. Once he came home late. He had me sitting up late waiting for him and I choked him when he came home.

### *Living with Family in Georgia and Marc's Relationships*

54. Vicci was skeptical when we moved to Atlanta but he ended up doing track in Georgia, as he had in school in Charlotte. I had to convince him to do that.

55. Vicci got into a fight at school one time. Mario had bought him a baseball cap and a kid took it from him and taunted him. This led to a fight in the bathroom and Vicci ended up getting suspended.

56. I remember Vicci was doing dances and things like that while we were in Lithonia, Georgia. He was a good dancer. He had joined a teen club where they do choreography and dance. The owner of the club called on him to do that after school.

57. One time Vicci got beat up outside of the dance club he went to. They beat him bad. He went to Doctor's Hospital in Tucker, Georgia. I felt terrible because I had been the one to move Vicci and the family to Georgia. My thought was, "Oh my God! I promised him things would be good in Atlanta." It made me feel bad to have put him in that position.

58. After the beating he had black eyes and was bruised. He'd been kicked in the ribs and the jaw, and the inside of his mouth was torn.

59. Since I had a couple of the kids' names that had beaten Vicci, I went to the police department in Decatur and registered a complaint. We ended up going to court about it. I was so angry and it was the only way to lash out. It was just the principle of the thing and the unfairness of it.

60. This beating changed Vicci. He started cutting school because he was afraid. He then dropped out of school after that. The whole incident was a turning point for Vicci.

61. Vicci and Tasha had a daughter and Marc was so excited to be a father. It was a different side of him. He would do everything he could think of to take care of his daughter, Angelica. He was as good a dad as could be.

62. I still lived in Atlanta when Vicci and Tasha moved down to Newnan, Georgia. I visited them in Newnan a couple times.

63. Newnan was not a good place for Vicci. There was a time when Vicci was surrounded by some boys and he ended up shooting one of them.

**JA356**

64. I moved back to Charlotte from Atlanta in 1993 to live with my dad. When I got there the stove and the dishwasher had been stolen from the house. That happened while my dad had been in the hospital in Salisbury. So, at first, I used a kerosene heater for staying warm, and I cooked on the top of it too.

65. I had met John West while I was still in Georgia. We continued to date after I moved back to Charlotte. I became pregnant with our son, John McAllister West, in 1992 and he was born in 1993. Then in 2000 John and I had a daughter, McKenzie Pearl West.

## Robin and Marc

66. Vicci dated a girl named Robin who was from Roanoke, Virginia. I liked Robin. She came down to Charlotte a couple of times to visit. One time she came with Tessie and me to the Down Home Christmas show. Robin was talkative and pleasant. She was also good to my dad and that's important for me. Vicci and Robin never exchanged any unpleasant words in front of me that indicated they weren't happy.

67. When Vicci first moved back from Virginia he drove back in Robin's car. I came home and asked him where Robin was. He explained that they had broken up and he had driven her car back to Charlotte. I told him he needed to bring her car back to her.

68. Vicci went back to get his things in Virginia and return her car to her, I sent my dad and my nephew Armaud with him. Vicci and Robin got into a disagreement while they were getting things out of her apartment. However, they did end up getting Vicci's stuff and bringing it back to Charlotte.

69. Vicci moved into the upstairs loft in the house after he moved back from Virginia. He would generally be quiet and not come down from the loft but I knew he was up there. Up until the fire incident he was on the phone with Robin a lot, usually late at night. I could hear him on the phone crying. He was calling from the land line in our house and the bill got extremely expensive. The phone calls were bad. Sometimes I would just make him get off the phone. He would be on calls for over an hour. He would be crying. I could hear him crying out loud.

70. When Vicci first got back from Virginia he talked about getting a job and said he would be okay. Vicci applied for a job at Saturn. He was excited about it but he didn't end up getting the job. After that he was very down; he was disappointed. Things went downhill for him after he didn't get that job. He stayed upstairs in the loft more after that. He put up a curtain in front of the door. He put up a sign for people to keep out.

**JA357**

71. When people came over to the house we would call up to him. We would call for him to come down and say hello. He would say, "I'll come down in a bit." But then he wouldn't come down to visit with people.

72. When I learned about the fire at Robin's apartment, I asked Vicci what he had been thinking. He just retreated upstairs. He also started sitting out at the fork in the driveway on an overturned paint bucket after that. He was waiting for the authorities to come and arrest him. Eventually he gave up on that when nobody came for him. Vicci wanted the authorities to get him and take him away.

73. After some time passed and Vicci was not arrested I started to second guess that he had set the fire at all. I can't recall if the news reports actually said his name. I thought it was strange that nobody contacted me about it or seemed to be looking for him.

74. Vicci was eating a lot during that time period and he gained a lot of weight. I think he gained about 30 pounds. He also shaved his head. This was about three weeks before the shootings. I asked Vicci why he had shaved his head and he told me his hair was bothering him and he couldn't think straight. He also said his hair was hurting him.

75. I offered for him to talk to someone like a counselor. He responded, "You can't afford that." I told him it was true that I didn't have the money but I said we could work something out. The subject was dropped after that. I wish I had pushed it more.

76. A day or two before the shootings, Vicci was still just emotionally flat and non-responsive. Then on the eve of the shootings there was a sports game on the television. Tessie's husband, Jeff, was over at the house and John was there too. They were watching the game and Vicci watched it with them. They were all having some beers together.

Bates No. 43

77. I was getting ready for work in my bedroom while they were watching the game. I remember coming out and seeing the three of them. I was wearing a navy blue dress coat. It was double breasted and had lapels. I had a silk scarf around my neck that was tied and I was wearing flats. I remember that Vicci was straddling a chair, sitting on it backwards when I came out. He came over and hugged me. He said, "You make that uniform look good." He kissed me on the cheek and told me he loved me. He said, "Have a good night. I'll see you in the morning." During this time period, Vicci had usually been upstairs in the loft when I left for work, not downstairs socializing. In that short time period before the shootings he was not the Vicci that we raised and know. His feelings were crushed after his breakup with Robin. She broke his heart and he was caught up in that. It was the idea that she cheated on him. He had desperation to show that he was a man.

78. Vicci needed counseling after his relationship with Robin ended. A neutral person with whom he could have opened up and vented. Someone who could have understood his feelings would have been helpful to him.

### Marc and Mario

79. Mario is much quieter than Vicci. He is a lot like my dad. He's so calm. Mario wants to be calm and left alone. Vicci is more like my mom. He's outspoken and verbal.

80. Vicci didn't ever need much sleep.

81. Vicci is handsome and I never understood why this had to happen because he always could have walked away from his relationship with Robin and done other things. If he had gone to counseling he would have realized the other stuff he could have done. But he's my child and I should have known something was seriously wrong. I feel like I let him down. I feel like I should have recognized it or stopped him.

### After the Crimes

82. After the shootings an agent came to my work and wanted to talk to me. I think we went into a back office to talk. They wanted to know where Vicci was.

83. Vicci called the house from the road. At first when he called he wasn't making sense. He told me he thought he would go visit his grandmother. I told him he doesn't even know where she lives. Then he asked me where Nanny lives and I told him that she lives in Tennessee. He responded, "Exactly."

Bates No. 44

**JA359**

84. Vicci cried on the phone. I kept asking him why he'd done what he did. He just told me he loved me. I remember I was so scared because I knew he was going to try to hurt himself. I told the law enforcement agent, "Don't hurt him." I told him that the authorities had come and talked to me and he needed to turn himself in. It was really scary because I couldn't really rest; every time the phone rang I expected the worst.

85. Vicci eventually came back to our house. At first we didn't even realize he was there. I think he came in through the window in Mario's room. The next thing I know I saw him. He slept that night on my couch with his head in my lap. We called the authorities in the morning. Vicci showered and put on a dress shirt and tie before he was arrested.

86. I called the agent and told him that Vicci was at the house. Tessie came over to the house as well. Vicci was in my bedroom when the agents came for him and, fortunately, they made the situation calm. They were dressed in suits. Vicci took a little bible with him when he was arrested. They didn't handcuff him in front of me. They did that out at the car in the driveway. That was the last time I got to hug or touch Vicci.

87. I visited Vicci many times at the jail here in Charlotte where the visiting room is a booth with glass. Probably the hardest thing was to visit him and know that something I might say at trial might save him or might hurt him.

88. I also visited Vicci at the northern Mecklenburg jail location on Spectra Drive. He was up there for a couple of months. I visited him there two or three times.

89. I have been to visit Vicci at the jail with many family members. I believe I have been with my sister Tessie, my great niece Alex, and my son John. I may have also visited him with my niece Regena. I think my cousin Jean has also been to see him on her own.

90. Vicci was on suicide watch for a long time while he was at the jail before his trial. I wasn't able to visit him during that time.

91. There was one time when Vicci was moved and I couldn't figure out where the prison system had taken him. I couldn't find him for two weeks. I knew he'd gone to Georgia, but I couldn't get more information about his whereabouts. It turns out that he'd been taken from Georgia to Terre Haute, Indiana.

92. Vicci and I stay in touch. He's my oldest son and he keeps a check on my health. He asks to make sure I am taking my medication. Vicci usually reminds us about family birthdays and things like that.

Bates No.: 45

93. Vicci stays in close touch with the family. He calls often. He calls when there is a family function. He asks when family will be together and calls at that time. Then people pass the phone around to talk to him. He will do this on any major holiday or family event. I remember talking to Vicci on the phone at a cousin's wedding and passing the phone around so everyone could speak with him.

94. Vicci has been staying in touch with his kids. He'll say to me, "Remember to call Angelica. It's her birthday." When his son is acting up Vicci will ask me to call him. He lets me know when to call them and then I do. One time Tasha was feeling down and he asked me to call her, so I did. His kids love him. Vicci and Tasha had their difficulties but she doesn't hate him. She went to visit him at the jail. It is hard with him being locked up and far away, but we try to make his presence felt. Vicci did a painting for Angelica for her to hang up in her house.

95. Vicci writes and sends cards. He'll send Valentine's Day cards, Mother's Day cards, and birthday cards. He drew cards and pictures for John Mack when he was younger. He did this before Vicci's second trial in 2002.

96. Vicci has always been in touch with Armaud while he's been locked up. They have a close bond. Vicci was also in close touch with Steve up until Steve died. He's also been in touch with my sisters, Tessie and Sheila.

97. Vicci will try to take care of me, even from jail. He will ask, "Are you taking your medicine?" One time I had to have a gallstone removed and he was always calling and monitoring how I was doing. He would call to check on me. He also sent me a get well card. It's as much like him being here as he could possibly be, given that he's locked up far away.

98. We had a landline at the house on West Boulevard. Vicci talked to Jesse on the phone and Jesse prayed for Vicci all the time. My dad would tell Vicci to trust in God and keep praying. Vicci was upset when Jesse started getting ill in 2002.

99. Vicci was in touch around the time my daughter McKenzie was born. She was born in September 2000. He checked on me when I was pregnant with her. He was concerned that I was being healthy during my pregnancy.

100. Vicci is into his artwork. He's been doing that since he was first locked up. I have a lot of his pieces. He told me to give some of them up for an art show that his cousin is trying to put together but I want to send copies for the show because I would like to hold on to the originals.

Bates No. 46

**JA361**

101. Vicci has always been into making art. I remember I sent him to his room for something one time when he was five years old and when he came out he had drawn a cool picture of a crab. I asked him if he'd traced it but he hadn't. He used a small picture on the side of a cereal box as his model. I used to buy notebooks and art books for him.

102. McKenzie, Armaud, Angelica, and I have most of Vicci's art pieces. The packaging he mails the pieces in is amazing because it's done with such care. We always put on rubber gloves to unwrap them so as not to damage anything. Vicci once created a picture of a fairy for McKenzie which she put in her locker at school. It came in a tube. There was also a card and an envelope. He had made the envelope too. He is very creative.

103. I have often asked myself where we went wrong. I have also tried to blame myself for what has happened. However, Vicci tells me I cannot blame myself for what has happened to him.

### *Vicci's Trials*

104. I met Sindy Maxwell before Vicci's first trial. She was an investigator working with his attorneys. I remember that she had red hair and was petite. Sindy came out to the house one time and then the rest of our contact was by phone.

105. I testified at Vicci's first trial. It was very difficult. It was emotional and heartbreaking. After my testimony, and after Vicci got the death sentence, I wondered if I had messed up. I wondered whether I had done it right. I felt hurt after the trial because there was blame put on me and the family.

106. I met Cessie Alfonso before Vicci's resentencing. She was an investigator that worked with Vicci's second set of attorneys. Cessie met with us and was personable.

107. I attended Vicci's resentencing but I did not testify. I don't know why I wasn't asked to testify. I never questioned not testifying. I thought maybe they had gotten what they needed from us already and were now getting stuff from others.

Bates No. 47

JA362

108. I would have wanted to testify for Vicci at his resentencing if it could have helped him. I would have gladly testified to the contents of this affidavit. I love my son and I would have wanted to share with the jury my memories of him and our family.

I swear or affirm that the information in the foregoing paragraphs is true to the best of my knowledge.

_____
Sonia Barnette

6/9/14
_____
Date

Affirmed and subscribed before me on this the ___9th___ day of ___June___, 2014 in ___Mecklenburg___ County, North Carolina.

_____
Notary Public

My commission expires: ___1/20/16___

Zachary Rowles
Notary Public
Durham County, NC

## Affidavit of Melvin Bryant

I, Melvin Bryant, appearing before the undersigned and being duly sworn or affirmed, state the following:

1. I am over the age of 18 and competent to testify to the following facts.

2. I am a resident of Stone Mountain, Georgia but I grew up in Lithonia, Georgia and attended Lithonia High School. I graduated from Lithonia High School in 1990. This is where I first met Aquilia Marcivicci Barnette. I call him Marc.

3. I never knew Marc very well but I do remember the incident when David Walker and I beat Marc up. This occurred somewhere between Lithonia High School and Hardy's. It was David's idea to ~~beat~~ Marc ~~up~~ *confront* and it had something to do with Sheila Sullivan. (MB)

4. I was 16 at the time of this incident and I was on the football team. David, Sheila, and I all lived near each other, but Marc lived somewhere else. I only really knew Sheila from riding the bus with her.

5. After school we went up to Marc and punched him. There was no talking before David hit Marc. David threw the first punch and he hit Marc in the face. I probably hit him a couple of times too. Marc went down and then we hit him with some more punches and kicks.

6. I don't remember the extent of the Marc's injuries but his face had quite a few bruises and he had a cut under one of his eyes.

7. This incident occurred around Christmas break. I remember that we weren't in school. It happened on a Friday. I was staying with my aunt over the weekend and my dad called to say that Marc's mom had called him. David and I later had to appear in juvenile court in DeKalb County.

8. David was a boxer. He boxed at a gym. He was very tough. The next year he was assigned to 'open campus' which means he was behind on his credits and was put in a school where they tried to catch him back up. At that time the 'open campus' school was on North ~~Truitt Drive.~~ *Druid Hills Road.* (MB)

9. After David went to open campus, he and I weren't as good friends. David got in some more trouble with the law. He said he'd rather die than go to jail and then I heard that David hung himself. He committed suicide either about going to jail or about a girl. It was a girlfriend that found David dead in a closet. I understand now that David had some serious problems.

**JA364**

10. I was never contacted by any of Marc's trial attorneys or investigators working for them. Had I been contacted, I would readily have shared with them the contents of this affidavit. I did not learn about Marc's crimes, his trial, or that Marc is on death row until I was contacted last year.

11. I would have willingly testified for Marc at the sentencing hearing of his capital trial.

I swear or affirm that the information in the foregoing paragraphs is true to the best of my knowledge.

_____     _____9/17/14_____
Melvin Bryant                                       Date

Affirmed and subscribed before me on this the 17th day of September , 2014 in

___Fulton___ County, Georgia.

_____
Notary Public

My commission expires: ___12/12/17___

Bates No: 50

**JA365**

<u>**Affidavit of Ann Wolbert Burgess**</u>

I, Ann Wolbert Burgess, appearing before the undersigned and being duly sworn or affirmed, state the following:

1. I am over the age of 18 and competent to testify to the following facts.

2. I am presently a faculty member of the William F. Connell School of Nursing at Boston College. I have a Bachelor of Science degree in nursing from Boston University, a Master of Science degree in psychiatric nursing from the University of Maryland, and a Doctor of Nursing Science degree in psychiatric nursing from Boston University. I have held various administrative positions, including the chair of the departments in which I have worked. I have also been the interim dean of the School of Nursing at Boston University and the director of nursing research at Boston University.

3. Throughout my career, I have maintained a clinical and forensic practice, in addition to teaching and researching. I have been certified by the American Nurses Association as a clinical specialist in psychiatric mental health nursing in 1980. In Massachusetts, where I live and work, I have prescriptive authority, meaning I can prescribe medication for patients I am treating. I have testified as an expert witness in numerous legal proceedings. In criminal cases, I have primarily testified for the government.

4. I was contacted by Jean Lawson to work on Aquilia Marcivicci ("Marc") Barnette's case in 2001. I had never before worked with Ms. Lawson or the other lawyers involved in Mr. Barnette's case.

5. I had previously worked on a capital case from Charlotte, North Carolina with attorneys Jim Cooney and Isabel Scott Day. The client was Henry Louis Wallace. I testified as an expert in that case.

6. I no longer have any of my files from my work in the Barnette case.

7. Post-conviction have provided me with my report, dated July 1, 2002, as well as my trial testimony from 2002. According to my 2002 report and trial testimony, I reviewed the following information prior to submitting a report and testifying at trial: a copy of the direct appeal brief from Mr. Barnette's initial trial; Mr. Barnette's school, employment, medical, and other records prepared by Paul Williams and Cindy Maxwell; mental health reports and testimony by mental health experts who testified at Mr. Barnette's initial trial; Mr. Barnette's prison medical records; transcribed interviews of Robin Williams (from 5/30/96), Benjamin Spencer Greene (from 5/1/96), Aquilia "Marc" Barnette (from 6/25/96 and 6/28/96); video and audio-taped copies of Mr. Barnette's police interview; discovery materials from the underlying crimes; trial transcripts from Mr. Barnette's original trial; police reports and statements regarding an incident at Bojangles from 11/12/93; and police reports from the 1974 homicide of Pearl

1

Bates No. 51

**JA366**

Brown. I viewed the home of Mr. Barnette's mother and the path Mr. Barnette took prior to the murder of Donald Allen. I also interviewed Mr. Barnette on June 14 and June 26, 2002; and interviewed Sonia Barnette, Derrick Barnette, and Mario Barnette.

8. For purposes of preparing this affidavit, in addition to my 2002 report and trial testimony, I have reviewed information provided to me by Mr. Barnette's post-conviction counsel that was not previously made available to me. This information includes numerous affidavits gathered by post-conviction counsel, Dr. Richard Dudley's post-conviction mental health report, Zachary Rowles' post-conviction mitigation report, and Cessie Alfonso's mitigation report that she prepared for trial counsel in 2002 (a copy of which I never received or was made aware of).

9. The new information that I have reviewed significantly changes my earlier findings and opinions. Had I been provided with this information during my trial work on behalf of Mr. Barnette, I would have rendered a different expert report and testified in markedly and materially different ways. Indeed, now that I have been provided with additional information from post-conviction counsel, it is my belief that my earlier findings, opinions, and testimony were badly marred by inaccurate and incomplete information with which trial counsel provided me.

10. For example, a prominent focus of my report and trial testimony was the notion that Mr. Barnette had witnessed and experienced domestic violence during his youth, and that his criminal conduct in April through June 1996 "may be understood, in part, as a symbolic reenactment of family and childhood patterns" (which is how I wrote about it in my report). I also testified that the "roots" of his behavior could be found in the way he was "raised and developed." The information now made available to me makes clear that this emphasis on "multi-generational violence" as an explanation for Mr. Barnette's criminal behavior in question was misplaced and due to incomplete and inaccurate information provided to me by trial counsel. While it is true that Mr. Barnette witnessed and experience domestic violence, it is clear from the new information provided that his criminal conduct could not simply be explained by that upbringing. Rather than any "symbolic reenactment of family and childhood patterns," Mr. Barnette's criminal conduct was attributable to a psychotic episode and mental health crisis that he was experiencing. The incomplete and inaccurate information provided by trial counsel led me to erroneously conclude that Mr. Barnette "ha[d] devoted his adolescent life to a continuous pattern of reenacting and trying to resolve the way he was programmed in childhood." Rather than simply acting out as a result of familial dysfunction, as I reported and testified about in 2002, Mr. Barnette suffered from debilitating mental health issues that profoundly affected his behavior throughout his life.

11. In my report and trial testimony, I opined that Mr. Barnette may have been suffering from major depression and a personality disorder "not otherwise

2

Bates No. 52

**JA367**

specified," with paranoid, antisocial, and borderline features. These diagnoses were incomplete and lacking because the information provided to me at the time was also incomplete and lacking. The new information provided by post-conviction counsel makes far clearer the most prominent and important aspects of Mr. Barnette's mental health status during the relevant period of time. Based on this new information, it is my opinion that Mr. Barnette was experiencing a psychotic episode and mental health crisis, and that he also suffered from a mood disorder that was significantly affecting his thinking and behavior.

12. A significant focus of my report concerned Mr. Barnette's relationships with women. My bases for learning about these relationships were reports written by Cindy Maxwell, testimony from the first trial, and meetings with Mr. Barnette. Based on the information that was provided to me, I testified at trial that there was a consistent pattern to all of Mr. Barnette's intimate relationships, namely, that he was programmed to become suspicious, paranoid, and a batterer in each case. Now that I have been provided with new information from post-conviction counsel, it is clear to me that I was previously given incomplete and inaccurate information about Mr. Barnette's relationships. Rather than being "programmed" or engaging in "repetition compulsion" in each and every one of his intimate relationships, Mr. Barnette had very different types of relationships with different women – and that he did not, in fact, fit the profile of a "classis batterer."

13. For example, information provided by post-conviction counsel makes clear that Mr. Barnette's relationship with Sheila Sullivan and Mr. Barnette's move to Georgia during high school were both far more complicated and significant than what trial counsel's information had suggested. In stark contrast to information I was previously given, Mr. Barnette had been faithful during the relationship with Ms. Sullivan (while she was not); Mr. Barnette had been a supportive companion during times of stress and crises (including when Ms. Sullivan became pregnant and later terminated the pregnancy); and Mr. Barnette had not been abusive toward Ms. Sullivan or controlling. Moreover, Mr. Barnette was the victim of a brutal assault carried out by another teenager with whom Ms. Sullivan later cheated on Mr. Barnette. This led Mr. Barnette into a serious depression and an attempted suicide. Witnesses describe Mr. Barnette as being profoundly affected by this relationship with Ms. Sullivan.

14. This information belies the information that had been previously provided to me by trial counsel on many important fronts. For example, it was previously suggested to me that Mr. Barnette's suicide attempt around this time had been minor or insignificant; in reliance on this information from trial counsel, I wrote in my report that Mr. Barnette made "suicidal gesture" (rather than a clear attempt to kill himself). The new information makes clear that Mr. Barnette was, in fact, deeply depressed and affected by the developments in his relationship with Ms. Sullivan, and that those developments, along with his mood disorder, led him to attempt suicide.

3

**JA368**

15. This information also significantly changes the aspects of my report that suggested that Mr. Barnette "sought out peer male companionship who negatively influenced him," and that Mr. Barnette would always fight when challenged. Instead, the truth is that Mr. Barnette was engaged in a solid, nonviolent relationship with Ms. Sullivan in which he ended up getting very badly hurt, both physically and psychologically.

16. This information, along with information concerning relationships with Tameka Hunter and Kowana Dozier, also dramatically undercuts the notion that Mr. Barnette was somehow a "classic batterer" whose relationships always followed the same pattern, including "obsessive pursuit." As was the case with Ms. Sullivan, Mr. Barnette's relationships with Ms. Hunter and Ms. Dozier did not include violence or misplaced jealousy or the other elements of domestic violence or obsessive pursuit.

17. The new information provided by post-conviction counsel concerning Mr. Barnette's relationships with Crystal Dennis and Netoshia Tolbert – both of which concededly involved violence by Mr. Barnette – confirms for me that my earlier conclusions, based on information provided by trial counsel, were misplaced. The additional information from Ms. Dennis, Ms. Tolbert, and witnesses to their relationships with Mr. Barnette makes clear that Mr. Barnette was not a "classic batterer," as my report and testimony suggested. Instead, this new information strongly supports the finding that Mr. Barnette suffered from psychiatric issues that were both affected by a mood disorder as well as certain psycho-social "triggers." In my opinion, this is a critically important difference from what was reported previously at trial.

18. During my trial testimony, I was asked by the prosecutor whether I had interviewed Ms. Dennis, Ms. Heard, or another ex-girlfriend. I had not. Trial counsel never suggested to me that speaking with Mr. Barnette's ex-girlfriends or witnesses to those relationships was a possibility.

19. Information concerning Mr. Barnette biological father that was not previously shared with me is also quite significant. While I was previously made aware of the fact that Derrick Barnette denied paternity of both Marc and Mario, I was never provided information concerning Sonia Barnette's troubled and troubling response to that fact – which was complete denial. In the face of a paternity test and actual knowledge that another man was Marc's father, Sonia Barnette continued to tell her sons and others that Derrick Barnette was, in fact, the father. Sonia Barnette's handling of the situation – perpetuating known lies to her children and thereby creating an irreconcilable conflict with what Derrick Barnette was saying – caused deep confusion and distrust on multiple levels. The lies concerning Marc's biological father's identity played an important role in the family dynamic. Far more potent than simply breeding "suspicion" and "grief," it fostered incompatible set of "truths" that were dangerously destabilizing for Mr.

4

**JA369**

Barnette. Indeed, it forced Mr. Barnette to navigate an almost unnavigable path between the two people he believed to be his parents and caretakers.

20. Information concerning the depth of Sonia Barnette's trauma that was not previously shared with me is also quite significant. Trial counsel provided little accurate information about Sonia Barnette's upbringing and adolescence other than perhaps the fact that her mother was murdered when Sonia was a young mother. The information now being shared with me about Sonia's trauma in the wake of her mother's murder shines important and new light on the family structure and dynamic in which Mr. Barnette was raised. The murder of Pearl Cooper; Jesse Cooper's own post-traumatic stress and how that manifested; the issues concerning Marc's paternity and how that was handled within the family; and Sonia's difficulties as a young mother who ultimately could not hold onto her job, are all facts that would have affected my report and testimony.

21. Trial counsel never asked me to explore and opine about Mr. Barnette's institutional adjustment, including the status of his relationships with various family members and friends. At the point in time when I was involved in his retrial, Mr. Barnette had been incarcerated in both county jail and federal prison for approximately six years. Based on the information I have now been provided with to review, it is clear that Mr. Barnette's adjustment to incarceration – his ability to abide rules, be non-violent, maintain constructive and positive relationships with others – was unsurprisingly strong. This is because Mr. Barnette's mental health issues are strongly ameliorated by structure and the absence of psychiatric triggers. Had trial counsel asked me to discuss these issues in my report and during my testimony, I would have certainly been willing to do so.

22. Trial counsel never consulted with me about the decision to have Mr. Barnette testify on his own behalf at trial. Had trial counsel sought my advice or insights about Mr. Barnette as a potential witness, I would have strongly cautioned them that Mr. Barnette, despite genuine remorse for what he had done, would likely offend the jury by his testimony. I would have expressed my strong reservations that given his mental health makeup and experiences, and his general lack of insight, Mr. Barnette would explain and rationalize his behavior in ways that would likely anger jurors.

Date  11/3/2014

_Ann Wolbert Burgess_
ANN WOLBERT BURGESS

Affirmed and subscribed before me on this the **3rd** day of **Nov.**, 2014 in **Middlesex** County, Massachusetts.

_____
Notary Public
My commission expires: _____

DONALD M LOVELESS
Notary Public, Commonwealth of Massachusetts
My Commission Expires Dec. 31, 2016

5

**JA370**

## Affidavit of Armaud Cooper

I, Armaud Cooper, appearing before the undersigned and being duly sworn or affirmed, state the following:

1. I am over the age of 18 and competent to testify to the following facts.

2. I am a resident of Marietta, Georgia. I am a student in the business school at Kennesaw State University.

3. Aquilia Marcivicci Barnette and I are first cousins and I have known him my whole life. I call him Vicci. He is about eight years older than me. His mother, Sonia Barnette is my mother's older sister. Their other sister, Tessie, is the oldest of the three of them.

4. I didn't have any contact with Vicci's first team of lawyers before his first trial. I was in Charlotte in 1998 when his first trial happened. I went to Vicci's trial for a day. Seeing the trial made me angry and I didn't go back.

5. Between his first trial and his second trial I moved back to Georgia. Before Vicci's second trial I met with his lawyers a couple times. I met with Jean Lawson in late 2001 or early 2002. She and I had lunch at Chili's in Austell, Georgia. It was just the two of us.

6. I also met with the lawyers a day or two before Vicci's trial. Vicci's two attorneys were there. This meeting included me, Mario Barnette, Vicci's brother, and Rick Barnette, Vicci's dad. It was only the attorneys and us. I don't recall ever meeting a person named Cessie Alfonso, or someone who was called a mitigation specialist or investigator.

7. I have had a chance to review my testimony from Vicci's second trial. I was not well-prepared to testify and was unsure about how in-depth or real to get about certain things. As a result, my testimony was really incomplete. Not only was I not prepared about how to testify, the attorneys also didn't ask me a lot of important questions about Vicci and our family.

8. For example, during my testimony, I was asked questions about the time period when Vicci was living with us in Georgia. I mentioned that things started to "deteriorate" in the family around that time. When Vicci's attorney asked me to explain, I wasn't sure what to say because I assumed they wanted me to talk about the more positive aspects of Vicci. So instead of talking about how crazy and unstable things were when Vicci and I were living together, I said that there was a "lack of communication between the adults and children in the house." Although that was true – the adults never clued us into what they were doing, where they were going, or when they would be back – that did not begin to describe what it was like back then.

1

9.  Vicci's lawyer asked me if I noticed "any alcohol or drug consumption." While my answer was true – that I noticed alcohol consumption and was suspicious about drug consumption – it was not complete or very descriptive. I wasn't sure whether it was okay to say more about what had been going on in the house at the time. I did not know whether the lawyers had told other people in the family that we would be getting into some of this family history, which was pretty raw and painful.

10. For example, my mom was with Michael O'Neal when we all lived together in Lithonia. Michael was a drug dealer. He also had a job at General Motors. Since I was only about 6 or 7 years old when Vicci and his family moved in, it shouldn't be surprising that I didn't notice much "drug consumption." But I certainly could have testified about the fact that drug dealing with was going on in the house and that cocaine was stored in the closet of my room.

11. As another example, Vicci's lawyer asked me whether Vicci, Mario and I ever talked about "what was going on with the adults" in the household. I responded by saying that Vicci basically tried to make sure "that a lot of stuff went unseen in terms of what [Mario and I] saw." Vicci's lawyers never asked, and I didn't know to offer information, about what that "stuff" was that Vicci was trying to shield us from. One time Michael's ex-wife, Joyce, came to our door with a gun. This woman was acting crazy and I remember Marc pushing me and Mario into a closet. I heard the adults shouting at each other and I heard my mom yell that Joyce had a gun. The police came to the house and there was a lot of commotion. I later learned that Joyce was threatening to kill either Michael, my mother, or both of them.

12. I was seven or eight years old when our family moved to a house on Stone Mill Manor in Lithonia, Georgia. By the time I was going on 12 we'd moved to an apartment complex on Powers Ferry Road and we were staying with a junkie named Tracy. This was a friend that my mom met through the Atlanta nightlife.

13. During my testimony, Vicci's lawyer asked me to talk about how Vicci and I would ask our mothers to get us a snack or candy from the store when they were going out. I had told the lawyer this story before the trial. As a young kid, I thought of this as a game. In reality, this was an example of how our parents would lie to our faces about what they were doing. Maybe Vicci understood that our mothers were not, in fact, going to the store, but were instead going out to a club or somewhere else. Reading my testimony about it, I don't think it was clear from what I said or what was asked just how messed up it was that this happened so often.

14. Although there was a little bit of discussion during my testimony about my grandfather, Jesse Cooper, there was no discussion about my grandmother, Pearl. This is because no one asked me about her. My mom was in the house when Pearl was shot and killed by her husband Loyd Brown. My mother was the first one to see her body. She was only a child when this happened. My Aunt Sonia was a young teenager. Vicci was just a baby.

2

**JA372**

15. Had I been asked about Pearl's murder during my testimony, I would have talked about how Pearl's murder debilitated the family and we never recovered. It didn't just affect my mom. Our family has a history of sweeping stuff under the rug. For a long time, my mother and Aunt Sonia wouldn't talk about the family's issues – what happened to Pearl, what it was like living with my grandfather, Jesse, even stuff that Vicci was going through before the murders.

16. Pearl's murder affected Sonia, Sheila and Tessie. I know my mother's been depressed. She also had a nervous breakdown. When Tessie gets emotional she stays away. Sonia would try to act like nothing was the matter, but she was never engaged with what was really going on. She would try to float above it.

17. Because their mother was taken from them, neither my mother nor Aunt Sonia had parenting skills. My mom had me when she was 19. My Aunt Sonia was even younger when she had Vicci. I grew up in a household where the adults were always thinking about themselves, drinking, and getting high. Based on what they went through, I understand what they were doing, but they were doing it in excess and not realizing what it did to me and my cousins.

18. Vicci's lawyer never asked me about the fact that after Sonia and Rick Barnette divorced, Rick had a paternity test done that indicated he was not Vicci's father. I knew about this before my testimony in Vicci's second trial. When I learned about it, I figured it was just another secret or issue that was swept under the rug.

19. During my testimony I described Marc as someone I always looked up to, and that he had been like a father figure to me since I never knew my own father until around 2000. Because I did not know what the lawyers wanted me to talk about, and because they never directly asked me, I didn't talk about how Marc was very stressed about life back then. For example, while Vicci and his family were in Atlanta they made four or five moves. They lived two places with me and my mom, and then they lived two more places after Sonia moved the kids out on their own. Then Vicci also went and lived in Newnan. They were always bouncing from place to place.

20. Vicci was anxious about moving from Charlotte to Georgia in the first place. I was younger and I was always watching him. Before his first day at Lithonia High School he spent an hour in the closet.

21. When we lived together in Lithonia, Vicci started dating Sheila Sullivan. She came over to our place sometimes. She came for a family dinner one time, and also one time when the family was watching a movie together. She said virtually nothing. My memory is of her sitting on the couch and doing nothing. However, Vicci liked her a lot. I remember Sheila threatening to kill herself if Vicci didn't get back together with her. She tried to throw herself in front of a car or a bus one time. She called Marc about this.

3

Bates No. 58

**JA373**

22. Vicci was beaten up while we were living in Lithonia. He was hurt badly and had to go to the hospital for it.

23. After Sheila, Vicci dated Tasha. She got close to our family. She was always with us, even more than her own family. She would sneak out of her mother's place and come over. At first, Vicci and Tasha were happy. But they were both too young and weren't ready for everything that happened. They had two children together while they were still teenagers. Even now I'm still in contact with Tasha and their kids. They came to my wedding a few years ago and I see their son, Marc Jr. often.

24. Vicci and Tasha moved to Newnan, Georgia with their two kids. I visited Vicci in Newnan. That was where his relationship with Tasha ended. Things were rough for them. They were out of school and Vicci was working two jobs. He was a teenager trying to handle adult situations.

25. During my cross-examination, the prosecutor asked me whether I was proud of Marc when he spent some time in jail in Georgia. I responded by saying that I wasn't proud of him, but that I was worried about him. And in response to other questions, I testified that I was worried about Tasha, as well. Neither the prosecutor nor Vicci's lawyer asked me any follow up questions about my worries and what I meant. I would have talked about the obvious stress that Vicci and Tasha were under, and how Vicci was losing his ability to keep his life together. I would have explained that I was worried about how Vicci didn't have real support from his mother or my aunt – or anyone, really.

26. After Vicci moved back to Charlotte from Newnan, there was a time when we all lived together there, too. Charlotte was just like Atlanta in that our family was all physically there together, but we were not cohesive. Everybody was doing their own thing.

27. There is a lot of denial in our family and there has been for years. We are a family with a background of emotionally unstable relationships. Not just Vicci, but me too. When things don't go well there can be a tipping point. It was not stable to be in the type of relationships Vicci was in.

28. During my testimony, I was never asked about Vicci's relationship with Robin, even though I had been present when Vicci was moving his stuff out of their apartment in Virginia. After Vicci and Robin broke up, I went with him and my grandfather to Roanoke to get the rest of Vicci's stuff. Things got heated while we were moving Vicci's things out of Robin's apartment and into the moving truck. That was the first time I saw a woman, Robin, outside of the family that showed the other side of her character. Vicci and Robin started arguing when Vicci went to break down the bed. He and Robin had been in the back and they came out arguing. Robin was very boisterous. She had a high voice and was animated. She was taunting Vicci. She was also saying that there had already been another man in her bed. That was when emotions ratcheted up.

4

Bates No. 59

**JA374**

29. After he moved back from Virginia, Vicci was depressed and down. He slept in John Mack's room but spent most of his days upstairs in the loft. He'd spend time in his room, in the dark. No one was too surprised to see him like that. He'd been like that before. He was like that after things didn't work with Tasha, too.

30. At some point Vicci shaved his head with Mario's clippers. I asked him about doing this and he responded that he needed a change. He said he just needed to do something different. I know Vicci also sold some things at a flea market in that time period as well.

31. I remember Vicci often sitting on the bucket at the split in the driveway around that time.

32. Vicci never seemed to be able to control his moods and thoughts very well. When Vicci is feeling up he will talk faster. He was up when he was fixing cars. Things that he liked were cars, art, and music. Vicci could have a lot of energy. He has "bouncing off the walls" type energy. He can go a mile a minute. He would literally run into a room. He could be the most energetic person I know. He always has new ideas and thoughts. However, they are not always the most well thought out ideas.

33. A lot of people in the family have pretty severe emotional highs and lows. My brother, Michael Jr., and my sister, Michaela, have both been diagnosed with Bipolar Disorder and ADHD. They have seen psychiatrists and therapists, and they have been prescribed a number of medications, including Lithium and Ritalin. Their illnesses have caused Michael and Michaela to have erratic behaviors and heavy mood swings. When they are in a good mood they are great, but their mood can turn in a matter of seconds. Both of them are extremely volatile. They get upset easily and fly off the handle. Michael and Michaela are both very impulsive.

34. My mom, Sheila, has always been very impulsive as well. For as long as I can remember, she would do things without really thinking about it. Sheila was always quick to react to things, and she used to be very hot-headed. My grandfather Jesse always said that Sheila had a terrible temper.

35. One of my favorite memories with Vicci was a time we walked together to the store. This was around 1993 and I was 13 or 14 years old. Vicci said to me, "Armaud, come walk with me to the store." So we went walking from the house on West Boulevard. Then we sat and talked. He told me, "You were brought here for a reason. Go to college. Don't stay here. Go to California. Go see the world." Vicci was also always encouraging me to join the Navy. I did end up going to college and I did live in California for a while too.

36. I visited Vicci a number of times when he was locked up in Charlotte before each of his trials. Before his first trial I had to go with an adult because I was still a minor. I've been to see him with Mario, Aunt Sonia, and my mom.

5

Bates No. 60

**JA375**

37. After he got locked up, Vicci would write me lots of letters. I would write him back as well. In his letters, he's always been very supportive of me and I rely on that. To me, that support is proof that Vicci has and can contribute to society in a positive manner.

38. I would have talked with a mental health expert if I'd been asked. I would have testified to any of the above information if I'd been asked about it on the stand.

I swear or affirm that the information in the foregoing paragraphs is true to the best of my knowledge.

_____       9/17/14
Armaud Cooper                 Date

Affirmed and subscribed before me on this the 17th day of September, 2014 in

_____Fulton_____ County, Georgia.

_____
Notary Public

My commission expires: 12/12/17

6

## Affidavit of Eric Cooper

I, Eric Cooper, appearing before the undersigned and being duly sworn or affirmed, state the following:

1. I am over the age of 18 and competent to testify to the following facts.

2. I am a resident of Charlotte, North Carolina. I work as a cook at a Buffalo Wild Wings.

3. Aquilia Marcivicci and I are second cousins. I call him Marc. Marc's grandfather was Jesse Cooper. Jesse's older brother was Henry Cooper, and Henry was my grandfather. Jesse and Henry are now both deceased.

4. Marc and I spent a fair amount of time together when we were in junior high school. At that time Marc was living on Windsong Drive and was going to Smith Junior High School.

5. I lived about 10 houses down the street from Marc, and I went over to his house sometimes. We often went to Marc's house because he was looking after his little brother, Mario. He would make sure Mario was fed, preparing him cereal or other simple things like that.

6. I never met Marc's dad and I don't remember Marc ever talking about his father.

7. Marc and I both liked music and we both liked to dance. He was a good dancer. We would practice, sometimes in the yard or on a piece of cardboard in the street. Sometimes we'd also dance at a school dance or at the skating rink.

8. We lived in a nice neighborhood. Marc and I used to ride bikes and play in the woods. We also went to the movies. We would often go play at the lake which is now part of Central Piedmont Community College. Sometimes a bunch of us would go to the skating rink too. Marc wasn't drinking or using any drugs. We were too busy playing in the creek and riding dirt bikes for that

9. Marc was interested in girls. Marc had a girlfriend named Ayana Brewer. She was beautiful and nice. I was just upset that Marc got together with Ayana before I could. We knew Ayana from school and she also lived in our neighborhood on Gaywood Drive. I never saw any problems between Marc and Ayana. Their relationship ended when Sonia moved Marc and his family to Atlanta.

Bates No: 62

**JA377**

10. I was very surprised and upset when I heard what Marc had done. It was not like him at all. I never saw Marc have a temper, get into a fight, or get in trouble.

11. Before his 1998 trial I was never contacted by anyone on behalf of Marc's legal team, and I did not testify then. Before Marc's 2002 resentencing I briefly spoke with an investigator who was working for Marc's attorneys. However, I was not asked to testify then either.

12. I would have willingly testified for Marc at the sentencing hearing of his capital trial. Marc and I were good friends when we were younger and I would have wanted to share my memories of him with the jury.

I swear or affirm that the information in the foregoing paragraphs is true to the best of my knowledge.

_____     _____6/8/14_____
Eric Cooper                                             Date

Affirmed and subscribed before me on this the ___8th___ day of ___June___, 2014 in
___Mecklenburg___ County, North Carolina.

_____
Notary Public

My commission expires: ____1/20/16____

**JA378**

<u>**Affidavit of Robert Cooper**</u>

I, Robert Cooper, appearing before the undersigned and being duly sworn or affirmed, state the following:

1.      I am over the age of 18 and competent to testify to the following facts.

2.      I am a resident of Charlotte, North Carolina. I was a truck driver for 37 years but now I am retired.

3.      Sonia Cooper Barnette and I are first cousins. My uncle, Jesse Cooper, was her father. Sonia is Aquilia Marcivicci Barnette's mother. We call him Vicci.

4.      Jesse lived with my mother in St. Pauls, North Carolina for a long time to help my mother. She was pregnant and my father was in the Navy at the time. That was before Jesse married Pearl and before Jesse went to the war. My mother became a nurse at Mercy Hospital. My father was later killed when a car fell on him.

5.      I grew up on the family property on West Boulevard in Charlotte. Sometimes we called it Cooper Hill. We had cows and chickens. We churned milk and took care of animals. My Grandma Lilly used to make butter. After churning the butter we would mold it. We sold butter and milk. We also sold clothes. There was a guy living behind us who used to have a cow farm back there but Billy Graham Parkway changed all that.

6.      There were five family houses on Cooper Hill and they were basic. When I was little there was no running water in the houses. We had an outhouse and we had to get our water from either the well or the spring. We would get the water with buckets and bring it back to the house. We poured the water into a number 10 bathtub to bathe. In the winter we boiled the water on the stove before putting the hot water in the tub. In the summer we let the sun heat the water during the day and then bathed at the end of the day. For heat we had stoves that either used wood, or wood and coal. My dad and grandfather would go to the coal yard and buy 50 or 100 pound bags of coal for the stove. We also used wood stoves for cooking. The stove had a side compartment where we could pour in water to heat it up. Later, when I got older, the houses started becoming more modern with running water and things like that.

7.      I knew Jesse Cooper well. Jesse worked at the schools as a custodian until he retired. Jesse would sometimes shoot guns out back. There was a bank down there and we'd go and shoot target practice. We would also go squirrel hunting and coon hunting.

8.      Jesse served in the Army and fought in Korea. Grandma got a letter and a flag from the Army and we thought he was dead. I remember when the soldiers

Bates No. 64

**JA379**

brought the flag to the house. My understanding has always been that some monks ended up finding Jesse after he was injured and they kept him in a Buddhist temple.

9. Jesse was badly injured in the war. I think they had to take a graft off of his leg and put it on his face. Jesse also needed an artificial eye. He could squeeze shrapnel out of his skin in different parts of his body. I saw him do this.

10. Sometimes Jesse would act crazy after he got back from the war. He could be irritable. After he came home Jesse just sat around. Jesse didn't drink before the war. Afterwards, however, he drank a lot of Pabst Blue Ribbon beers and called it his tea. Even in the summertime Jesse would wear a big coat and waterproof boots that you could pump air into to make them tight. He would sit under a tree from sunup to sunset.

11. I remember Jesse's wife, Pearl. She was a good nurse. Jesse loved her a lot but Pearl was promiscuous. Pearl would go meet a big tall guy. They would meet at a hooch house and sometimes she would take me with her.

12. Jesse had a 1959 or 1960 Cadillac that had fins. He gave it to Pearl. She used it to fool around in and he found out. He caught Pearl and another man together in the car. After that Jesse took the car back, parked it on Cooper Hill, and never moved it again.

13. Jesse did not kick Pearl out when he found out she was cheating on him. She ended up moving out because she was going to marry someone else. Even after Pearl left him, Jesse went down to her house sometimes on Arrowood. Jesse kept his wedding band on until he died.

14. After Pearl left Jesse, she married a man named Loyd Brown. Loyd killed her. I was living at Arrowood when that happened. Pearl had a house down there.

15. Sonia's sister Sheila is completely crazy. She was using drugs. Sheila would always ask Jesse for money. She was often messed up. I don't know what drugs she was using. Sheila didn't stay around here too much.

16. I knew of Sonia's husband, Derrick Barnette. He was a jerk. He put Sonia, Marc, and Mario out. I knew that Derrick acted crazy towards Sonia. After a while she had to leave the house.

17. I always stayed in touch with Uncle Jesse. I was never contacted by any of Vicci's trial attorneys or investigators working for them. Had I been contacted, I would readily have shared with them the contents of this affidavit.

Bates No: 65

**JA380**

18.     I would have willingly testified for Vicci at the sentencing hearing of his capital trial. I would have wanted to share with the jury my memories of him and his family.

I swear or affirm that the information in the foregoing paragraphs is true to the best of my knowledge.

_Robert Cooper_ (signature)
Robert Cooper

_6/8/14_
Date

Affirmed and subscribed before me on this the ___8th___ day of ___June___, 2014 in ___Mecklenburg___ County, North Carolina.

_____ (signature)
Notary Public

My commission expires: ___1/20/16___

Zachary Rowles
Notary Public
Durham County, NC

Bates No. 66

**JA381**

## Affidavit of Sheila Cooper

I, Sheila Cooper, appearing before the undersigned and being duly sworn or affirmed, state the following:

1. I am over the age of 18 and competent to testify to the following facts.

2. I am a resident of Smyrna, Georgia. I volunteer at a place called Seven Bridges to Recovery. This is a ministry where we go out and feed the homeless. I volunteer there almost every day.

3. Aquilia Marcivicci Barnette is my nephew. I call him Vicci and I have known him his whole life. His mother, Sonia Barnette, is my older sister. She is about four years older than me. Our oldest sister is Tessie Nero and she is approximately nine years older than me.

4. When I was growing up, my family lived on West Boulevard in Charlotte. My grandparents lived in a small house nearby, and so did some aunts and uncles. My parents, sisters, and I lived in a small two-bedroom house. None of the house had ~~regular~~ city plumbing. We used outhouses. We used washboards for washing clothes. When I was very young I bathed in a basin. In the winter we had to keep the doors in the house open so the heat from the furnace would come in.

5. My parents were Jesse Cooper and Pearl Cooper. My parents had very different temperaments and styles, and this was part of the reason their relationship didn't last. Pearl would yell and was action-packed whereas Jesse was quiet and calm.

6. Pearl once yelled and threw dishes towards Jesse. I was behind the door peeking in on what was going on. She just opened the cabinet and started throwing dishes at him. They were hitting the floor and breaking. I remember my father calmly saying, "Okay Pearl." My dad and I later took the bus to Belk's. We went to the China Department and bought replacement dishes. I remember taking the new dishes out of their tissue paper wrapping at home.

7. My dad never spanked me or Sonia. He only spanked Tessie. He spanked her after she was caught with a boy. As he was spanking her, Pearl was beating him and saying, "Don't beat my children!"

8. Tessie was 16 years old when she got pregnant with her first child, Regena. After becoming pregnant, she married her husband, Jeff Nero. I don't think Jeff was the father. This is not something that was discussed in the family. Sonia told me that Tessie got in trouble and she married so Jeff would be the father. This was not kept a secret from Jeff.

1

Bates No. 67

**JA382**

9.    Jesse was really shaken up by his experience serving with the Army in Korea. Jesse would normally sleep outside on our screened in porch. He was sleeping outside like he was still in the war. He had Post Traumatic Stress Disorder and he would sometimes relive his combat experience. He would crouch down with his rifle behind the sofa that was on the porch and peer out. After an episode of doing this, Jesse would end up crying. Then he'd just walk off. I would just watch Jesse when he was doing these things. I didn't know what he was doing and I didn't know what to do. All I knew was that I was not to bother him.

10.   One time I tripped and fell and busted my head. Jesse picked me up as if I was a piece of wood and took me in the house. He lay me on the sofa in the living room and just wrapped my head in a bandage. He treated me like I was a soldier and the best he could do was wrap me in a bandage. He didn't take me to the hospital because he thought we were in the middle of a war. Tessie later came home and saw that I was very pale and had lost a lot of blood. She then made sure I was taken to the hospital. I went in an ambulance to Mercy Hospital and got stitches. I still have a mark on my head from this incident.

11.   My mother was a nurse. One time I saw that her uniform had a lot of blood on it. I started having visions and hallucinations of what was going to happen to her. I told my mom about the visions but she responded, "You're crazy just like your daddy."

12.   Pearl and Jesse eventually split up and we moved away from West Boulevard with our mom. Jesse would still come see us. My mother was always asking him for money. She worked but it was never enough. I listened in on the phone and heard Jesse said to Pearl, "I pay you every week. What are you doing with the money?"

13.   Pearl had a boyfriend immediately after my parents' separation. His name was Herman Mazyck. He was an orderly. Pearl might have been seeing him even before my parents split up. I didn't like him. He made my parents split up. I remember Herman coming over to our house. He had a lot of children. He used to try to buy me things. Herman ended up marrying another woman he was seeing at the same time. By the time Pearl found out about the other woman, Herman had already married. He had been lying to my mom. This broke her heart. I remember hearing my mother crying about it.

14.   Pearl went for the first person that paid her any attention after it was over with Herman. That turned out to be Loyd Brown and they eventually married. Loyd had been a patient of Pearl's. Loyd eventually murdered Pearl, shooting her in our house.

2

Bates No. 68

**JA383**

15. My mother said to me, "I want you to meet someone." She wanted me to meet Loyd. However, when I saw him I told my mother he was the devil. His house was in the Rosewood Apartments. I remember walking up to his door. He opened the door and I felt I was looking at Satan.

16. Loyd was jealous of Pearl about everything. He didn't want us to do certain things. I played first clarinet in the band at school and one time Loyd didn't want my mom to take me to my concert. I was on the front steps waiting and they were in the house arguing about it. We didn't go to family functions after Loyd came into the picture. One time one of the NAACP people came to our house and Loyd accused Pearl of being with him.

17. Eventually I told my mother I was tired and wanted to go live with my father. I told her, "Tell him to come pick me up." Then Sonia chimed in and said she wanted that too. Pearl took us over to Jesse's house and dropped us off. My mom was upset about it and she asked, "Don't you love me?" I never answered her.

18. After a while Pearl's friend, Delores, came to the house on West Boulevard and said Loyd was beating our mother. Delores had found two rifles in the house. The police had also been out to the house. After that, Sonia and I went back to live with Pearl so she would not be alone. Then I found two rifles that had barrels that looked different.

19. Sonia had her prom on the night Pearl was killed. Pearl and Loyd argued because he had not given Sonia roses for her prom. We were all sick that evening. Pearl had a red rubber hot water bottle on her stomach. My mom, Vicci, and I were all in Pearl's bed and that's where I fell asleep that night. Vicci was less than a year old at the time and I was 11.

20. I was asleep when Loyd shot Pearl; I didn't hear the gun shots. Afterwards, he went and turned himself. Then the police came to the house. I woke up when they banged on the door. When I awoke I was back in my room and Vicci was in his crib. I had on my blue pajamas with frill at the ankles. I knew not to answer the door after 6pm so I went to my mom's room to get her. I saw her and I saw redness. I thought, "Oh mama, your hot water bottle exploded." Then I turned on the light and saw blood all over her front. I started screaming. My mouth tasted weird. I remember the police saying, "He's killed her." Sonia was also screaming. She went and got Vicci.

21. Then I passed out. I just remember screaming and falling. I ended up waking up across the street at my friend Cynthia Williams' house. I was in bed with her. The second time I awoke, I got up and could see through the window that the police were still at our house. I also saw my dad.

3

Bates No. 69

**JA384**

22. After that we stayed at our dad's a while and he stood outside all night with a shotgun to protect us. Nobody thought he could care for us because of his mental condition so then we went to live with Tessie in South Carolina. Even though our mother had walked out on him, Pearl's death was devastating for Jesse. I think when Sonia, Vicci, and I moved away to live with Tessie, it hurt him even more.

23. Tessie took on the role of mother for me and Sonia when we moved to South Carolina. However, I was the built in babysitter. I would babysit Vicci and also Tessie's children. I was only about 12 years old.

24. I have lived with the regret and sadness that I never told my mother that I loved her before she was killed. She said it to me when she dropped us off at Jesse's and I didn't say it back. Instead I just went inside Jesse's house and didn't answer her. That regret will always be with me.

25. I had three visions of my mother's death before it happened and I told my mom about each one. I was just a little girl and she ignored me. After she was killed I felt it was my fault because I'd had the visions of what was going to happen but didn't do more to stop it. I believed that for years.

26. I cried about my mom all the time. My boyfriend, Michael, saw that. We had a miscarriage and I had to have a DNC. I started going ballistic. They put me under. Michael was there. He was trying to reassure me. He said I was talking to my mother.

27. I wanted to kill myself. I was working at Georgia Power and Michael and I had a plan to meet for dinner. I was driving to the restaurant. I was racing along and thinking: I'm just going to kill myself. I'm going to run into this pole head on so I can see my mother.

28. One time while I was working at Georgia Power I went to call Michael and started crying and could not stop. I had a breakdown behind so much stress and I went blind in one eye. Michael suggested I get help. I was crying all the time. I did end up getting help through my job. I saw a therapist and I was prescribed medication. I believe I was prescribed Seroquel.

29. I never talked to Sonia about what happened to our mother and I've never been to my mom's grave. We never talked about it because I had my own pain to get past. If anyone talked about it I would sob like it had just happened.

4

Bates No. 70

**JA385**

30. Pearl's death affected Sonia and me differently. I always wanted to pour out love to people even if it was not reciprocated. I didn't want to miss that opportunity like I had with my mother. I had boyfriends but I never married any of them because marriage didn't turn out well for my parents. I would date a married man because I knew I couldn't marry him. Michael O'Neal was married and my son Armaud's father was too. When I got tired of a relationship I would just leave.

31. Sonia was also affected by our mother's murder. She became very emotional. I remember Sonia sometimes just sitting with tears streaming down her face. Sonia has been the paper keeper and had the records related to our mother's death. She wouldn't let me read the transcript of Loyd's trial until I was about 20 years old.

32. My mother's murder had a profound effect on our family. I was in turmoil on the inside for a long time. Not having a mother to help with stuff going on at school, or with kids, or with work, was difficult. There always felt like a big hole in my life and the lives of my sisters.

33. Sonia married Derrick Barnette. I call him Rick or Ricky. They first met when Sonia was still in school and I met him then too. I never knew about the physical abuse that Sonia and Vicci suffered at the hands of Rick until Vicci's first trial. The other witnesses and I were sequestered at Vicci's first trial, but some of the case files were there in the room with us. I read it and found out that Ricky had been beating on Sonia. I read that he hit Sonia with a hammer while she was holding Vicci. Vicci couldn't protect his mother. I think Vicci called the police one time. However, Vicci did protect his little brother, Mario. Sonia kept all of this information on the inside. She never told anyone what was going on. Just like with our mother's death, Sonia didn't talk about the painful things.

34. I saw Ricky yelling and being mean. I recall times when Tessie and I had to go pick up Sonia's things off the front yard of her house on Comstock Road after Ricky had thrown her clothes out in the yard. It would be a mess. There was one time when either Vicci or Sonia called for help and Rick snatched the phone away and hung up. Tessie and I went over to the house anyway to check on them.

35. Sonia used to have torn ear. She had that for many years and she told me it came from wearing earrings. I later found out that it was because Ricky tore her earrings from her ears.

36. Rick was manipulative. He had some money. I have always believed he rigged the paternity tests concerning Vicci and Mario.

5

Bates No. 71

37. Sonia, Vicci, and Mario moved to Georgia and lived with us when Vicci was in high school. At that time, Vicci was sometimes driving before he had a license. In fact, he drove me to the hospital in 1991 when I was in labor and Sonia was in Marietta with a friend.

38. We were all using drugs when we lived together in Lithonia, Georgia. I first started using drugs when Michael said to me, "I want you to try." Michael and Sonia drank, and we were all using cocaine together. Michael was using cocaine a lot and it became a problem for him. He would only want me to use around him but I found out he was getting high other places because he would get too high to drive home. Michael ended up going to drug rehab several times.

39. There was a time when we were living in Lithonia when Vicci was beaten up. We took him to the hospital after that.

40. There were times when Vicci would be in his room acting strangely. He would just sit and stare. I also saw Vicci crying sometimes, both in Lithonia and later when we were living together on West Boulevard in Charlotte,

41. Vicci dated a girl named Sheila Sullivan soon after he, Mario, and Sonia moved to Georgia. Vicci tried to kill himself at the end of his relationship with Sheila. He was only 15 or 16 years old at the time.

42. We put a lot of trust in Vicci. We often left him to take care of the younger kids. He was very responsible. I never knew him to break the house rules. If you asked him to pick up a list of things at the grocery store he'd do it and get everything you asked for. Vicci was not a typical teen. He wasn't flippant. He could be trusted. Vicci would apologize if he thought he had hurt your feelings. One time he and Sonia got into a bad argument and he apologized to her. He would apologize and cry so hard. It would hurt him to the core if he knew he'd hurt someone.

43. Later, after he got into trouble related to some of his relationships, he didn't seem to be the same. After he moved away from Lithonia he seemed to change a lot.

44. Vicci started dating Tasha when he was living in Lithonia and I liked her a lot. I was happy that he had found somebody nice but then they started having a lot of drama in their relationship. Tasha's mother didn't like Vicci. Vicci was sneaking in Tasha's window.

6

Bates No. 72

**JA387**

45. Tasha and Vicci ended up having two children together and they moved to Newnan, Georgia and got their own place. But they were still teenagers. They were too young to have children or their own apartment. Having your own place creates pressure. You need a job. You need a car to get to the job. You need things in your house. I remember going down to Newnan to visit and they were sleeping on palettes on the floor.

46. Vicci and Tasha ended up splitting up and he got together with Crystal. After that everything was a big mess. His attitude was that he was going to do it on his own. Things would have been better if he'd gotten help from Sonia.

47. I met Alesha, who Vicci later dated when we were all living back in Charlotte. Vicci was excited about Alesha. I remember she and Vicci would be in the room he shared with Mario. I never knew about Vicci getting in legal trouble over Alesha until well after it occurred.

48. Vicci was agitated when he was living back in Charlotte, after he'd moved back from Georgia. For example, I remember him being overly impatient for Sonia to iron his work shirt. This was when he worked at a restaurant. Vicci was different from when he'd been a teenager after moving to Georgia. He was more agitated and stressed at different points in time, and less able to keep himself in check.

49. Vicci was really excited when he and Robin started dating. He wanted us to meet her when she came down to Charlotte to visit. Then Vicci moved to Virginia to live with her.

50. After he and Robin were living together in Virginia, Vicci called and asked me a spiritual question. He said he felt like Robin was putting something in his food. He said it felt evil. I told him it sounded like someone was sleeping with the enemy. I counseled Vicci not to eat Robin's food unless they were eating out of the same pot. I told him to be careful.

51. Vicci really fell apart after he and Robin broke up. They would still talk on the phone. He would always be sobbing. It was horrible. My dad would say to go get him off the phone so I'd tell Vicci to get off.

52. When he came back to Charlotte from Virginia, Vicci was reclusive. He was slow. I remember us encouraging him to come with us to go places. He would sigh and say okay, but then he'd say, "Maybe later. You guys go."

53. There were a number of things that changed about Vicci in that time period. I remember coming into the house one time and seeing that Vicci's head was bald. I asked him about it but I don't recall how he responded. Vicci also gained a lot of weight. He had started drinking a lot. He also started calling me "Sheila" instead of "Aunt Sheila." One time after he called me "Sheila," I asked him who he was talking to; he didn't say anything back to me.

7

Bates No. 73

**JA388**

54. Shortly before the shootings occurred we had a family cookout. Everybody was outside. I realized Vicci was not outside. I found him inside rocking in the rocking chair. The TV was on but he was not watching. I asked him what was wrong and he said he was okay. I had never seen Vicci rocking like that before.

55. They let Vicci call me from Jesse's house to say goodbye before he was arrested and locked up. I didn't know what had happened. He told me, "I'm at Pop Pop's house calling to say goodbye because I've done something and I'm going away for a long time. The officers are here."

56. Vicci later said that when the crime happened he saw himself standing here in one place while his spirit was over there pulling the trigger. Then he started walking away and his spirit merged back into his body.

57. Something was not right with Vicci. I have wondered if he's had Bipolar Disorder or some other mental illness where his mood fluctuates so dramatically. I have two children, Michael Jr. and Michaela, who were each diagnosed with Bipolar and ADHD. Both were diagnosed when they were in elementary school. Both children have had periods where they've been very depressed, both have cut themselves on their arms to try to make themselves feel better, and both have taken many medications, including Depakote, Adderall, and Lithium.

58. My son Michael was diagnosed with Bipolar Disorder when he was in the first grade. This came about after something he said to his teachers. While Michael was in school I was always getting calls about things he'd said or difficulties he was having. He's had evaluations and home visits. We've dealt with school personnel, psychiatrists, therapists, and all sorts of people involved with Michael and our family.

59. Michael has had three suicide attempts. The first time he tried to jump out a window but I was able to catch him by his t-shirt. The next time he had climbed out on the roof and was preparing to jump. He was sitting on the roof crying. The third time we were driving down the street and he got upset. He opened the car door and tried to throw himself out of the car. I then drove Michael to the emergency room at the hospital and told them he was trying to kill himself. He ended up staying at Georgia Regional Hospital for three days.

60. When Michael was about 10 years old he was sent to a psychiatric facility called Inner Harbor. He stayed there for one and a half years. Michael went to school, had therapy sessions, and saw a psychiatrist while he was there.

8

Bates No. 74

**JA389**

61. Michael is often too high or too low. He has difficulty reacting to things and he gets upset easily. Experts have told me that Michael has too much activity in the frontal lobe of his brain. It makes him think too much. Michael can stay up for days at a time. When he tries to get rest his brain won't settle down. After days of staying up, Michael will crash out and sleep for a long time.

62. I remember talking with an investigator named Sindy before Vicci's first trial. I ended up testifying at the trial.

63. After Vicci got a new sentencing hearing, I remember speaking with a woman named Cessie. She came to Atlanta and met me at my job. She seemed discombobulated and all over the place. I didn't even know when the second trial was going to take place until my son Armaud informed me.

64. I don't recall ever talking with Vicci's new lawyers and they never called me to testify. I was living in Georgia at the time but certainly would have been willing to testify for Vicci or talk with anyone they wanted me to talk with.

65. I would have willingly testified for Vicci at the sentencing hearing of his second trial. I care about Vicci and I've known him his whole life. I could have share with the jury my memories of our time together, including the contents of this affidavit.

I swear or affirm that the information in the foregoing paragraphs is true to the best of my knowledge.

_____     9-17-14
Sheila Cooper                                        Date

Affirmed and subscribed before me on this the 17 day of September 2014 in

Cobb County, Georgia.

Melissa Ehrhardt
Notary Public

My commission expires: April 17, 2017

9

**JA390**

## Affidavit of Crystal Dennis

I, Crystal Dennis, appearing before the undersigned and being duly sworn or affirmed, state the following:

1. I am over the age of 18 and competent to testify to the following facts.

2. I am a resident of Fairburn, Georgia. I used to live in Newnan, Georgia. This is where I grew up and this is where I met Aquilia Marcivicci Barnette. I call him Marc.

3. Marc and I first met in 1992. I met him through my brother, Anthony Britt. Anthony is now deceased. Anthony was trying to get together with Marc's girlfriend, Tasha. Anthony brought Marc over to my house one time to introduce us and distract Marc from his girlfriend. Then Marc started calling and coming over to see me on his own. When Marc and I started spending time together, however, we weren't physical or intimate; we were just hanging out.

4. A week or two later, after Anthony introduced Marc and me, Marc found out that Anthony was messing with Tasha. Marc knew that Anthony and Tasha were messing with each other because I told him. I told him because Anthony had told me. This led to a confrontation between Marc and Anthony. Anthony was threatening to beat up Marc and tried to jump him one night after Marc left my apartment. Marc ended up shooting Anthony Britt in self-defense. Afterwards, Marc came back to my apartment and told me what happened.

5. The only time I ever saw Marc with a gun was on the night he shot Anthony Britt. It was in his jacket pocket. I knew it was in his jacket pocket that night because I put his coat up and it felt heavy. Then I saw the handle of the gun in the pocket.

6. Marc was locked up for a little while after the shooting. I visited Marc at the jail while he was locked up. There was one time when Tasha and I both went to visit Marc at the same time. She didn't know about me yet. When she came in for her visit I was already there. We feuded. Then the officer got us quieted down and we both left.

7. Anthony and I had a falling out because of what he had done. It was wrong how Anthony did it. When Marc got locked up Anthony was spending nights over there with Tasha. By the time Marc got out of jail, things were basically over between them and he wanted to get her out of their apartment.

8. Marc and I started out as friends. At first we were not intimate. Then it developed into more of a relationship. After Marc got out of jail, Tasha left and I moved into Marc's apartment with him. The first three to six months with Marc were great.

Bates No: 76

1

**JA391**

9. Marc knew how to cook. He would cook and bring me breakfast in bed. I thought I was in dreamland. He was an energetic person. He liked doing things. He would fix his car. Also, there were times when we went out bowling. He could be fun. He played with my kids. My kids liked Marc and got along with him. At that time my daughter was about two or three years old and my son was about a year old. Marc was real good with them. He would sometimes have his kids too. Tasha let their kids come over. His daughter was the same age as my son. His son, Marc Jr., was just a baby.

10. The only time I saw Marc have a drink was on my birthday. That was just a sip. He never used other drugs, including pot.

11. Marc didn't really have close friends in Newnan. The only people around were Anthony Britt and Victor Montgomery. Marc and I never had other friends over to our apartment except Tasha's sister and Anthony Ball who was dating my sister.

12. Marc didn't talk with me about his childhood. It didn't seem like he had a close family. Marc and his mom would bump heads sometimes. We went up to Atlanta to visit her a couple times. Marc's mom and family dressed nice. I knew they weren't broke. Sonia carried herself in an uppity style. Marc was crazy about his brother. He would talk to his brother if his mom said his brother had done something he shouldn't have. Marc never talked about his dad and I never met his dad. As far as I know his dad was out of the picture.

13. Marc never talked about any girlfriends he'd had before Tasha. He would only talk to me about his problems with Tasha. He said her parents were always in her business. Marc and Tasha kept in touch even after they broke up because of their kids, but she was kind of done with him.

14. At some point Tasha and I started talking. This was while Marc and I were still together. I told Tasha that as long as I'm with Marc and her kids are around, I will treat them like my own kids. After that Tasha let Marc start having the kids. And Tasha started to tell me everything she had gone through with Marc.

15. Tasha ended up marrying one of my best friend's brothers. Also, my kids and Marc's kids kept in touch with each other over the years. My son, Mario, committed suicide about two years ago and Marc Jr. was shook up about it.

16. Marc and I started having sex right after I moved into the apartment with him. It started out frequent and it was okay. We were having sex everyday at the beginning. There wasn't anything unusual about Marc sexually. He never had any sexual problems that I saw. Once our relationship went downhill I didn't want to anymore. This didn't lead to fights or arguments between us. He never tried to make me have sex.

Bates No: 77

**JA392**

17. Marc was always helping people. If someone asked him for something, he would do it. One time he helped a person get their car together.

18. At some point about three to six months into our relationship Marc started to get mad. All of a sudden he just changed. He became controlling and possessive. He went completely mad. He was crazy. I don't know why he changed like this.

19. There were many things that Marc did that were controlling and possessive. For instance, he didn't want me to take a bath if he wasn't there.

20. If Marc was in the house and I went to the bathroom and closed the door he would get mad. One time we were in our apartment and I went to the bathroom and closed the door. Marc kicked the door in and said, "Why are you closing the door?" I responded that I was using the bathroom. Marc told me not to do that so after that I left the bathroom door open when I was in there. My kids were in the other room when Marc kicked the door in. He didn't hit me, he just fussed at me.

21. One time Marc and I were at the grocery store and we saw two guys that I had gone to high school with. They came up and spoke to me, and they spoke to Marc too. Marc seemed cool about it but when we got outside the store he started yelling at me. He yelled, "As long as you ever live don't you ever speak to any other guy as long as you are with me." Then we got in Marc's VW Bug and he drove out of the parking lot so crazy he was up on two wheels.

22. Marc would take my clothes. Some of my clothes would disappear out of the house and I knew he had taken them. He had even bought me some of those clothes. Marc and I never talked about this and I never understood why he would do it.

23. Marc didn't want me to work because he didn't want me to be around other guys. I was working at Burger King at the time and Marc took two jobs so I didn't have to work one. Marc worked at both Arby's and Blockbuster.

24. My cousin Victor stayed next door and Marc didn't want me talking to him. He thought Victor was hitting on me. The only person Marc was okay with me talking to was my cousin Anthony ~~Jones.~~ James. CW

25. Marc sometimes took the keys to my house. I would be at home but I couldn't leave because I didn't have any keys and couldn't lock the apartment.

26. I later found out that Marc had started checking on me. If I left home he'd get off work and come looking for me.

27. I ended up finding out that Marc was cheating on me. I used to do the laundry and one time I found the laundry basket was missing. I learned that Kowana Dozier had done the laundry. He told me she was just a friend who had agreed to wash his clothes. She was his manager at Arby's and I had met her there before. Most of the time he spent with her was probably at work. Marc and I argued about that. I wanted to end things with him when I found out about Kowana.

28. Marc went back to North Carolina to visit a couple times. The second time he went up there he brought his grandfather back with him to visit Newnan.

29. One time when Marc went to visit North Carolina I went to the rent lady and got myself an apartment behind the one we had. I had my cousin and sister help me move out and I didn't tell Marc where I was living. In my mind I was ending our relationship when I moved out. However, after he got back, Marc was calling me. He also watched me to find out where I'd moved to. One night when I got off work and came home, I found him at the top of the stairs. So I let him in and he stayed. Marc came and lived with me for a week or two before the incident occurred where he hit my kids.

30. On the night that Marc hit my kids I came home and Marc was already in bed and the kids were as well. Later, my son Mario said to me, "Mom, look what Marc did." I saw the cut on his arm and back. I asked him why Marc did that and he said it was because they didn't eat. Marc was out when I learned what happened. When he got home he and I went at it. I told my sister what had happened and I left my kids with my mom. My sister stayed over at my apartment that night. The next morning I got up before Marc and went downstairs with my sister. Then Marc woke up and called to me. I went back upstairs and sat on the bed. He hit me in the back of the head with his fist so I grabbed whatever I could find to hit him back. Then my sister called Tavarus Brown and he came over. Tavarus was our friend and my coworker at Burger King.

31. That same morning Marc and I were outside the apartment in the yard arguing when Marc bit me on the shoulder and hit me in the back of the leg. My sister and Tavarus were inside the apartment and they called the police. Marc took off in my car before the police arrived. The police then took photos of me and the kids. I think Marc went to Atlanta, but he called me and I talked him into coming back. He was arrested as soon as he came back. Everybody was shocked at what Marc had done. They had all liked him before that.

32. Marc had never been mean or cruel to my kids before this incident. Marc had been good to the kids and they liked him.

33. Marc called my mom's phone a lot while he was in jail. The phone would be constantly ringing. Marc would also send letters. Marc wanted me to visit him but I never did. He kept telling me he missed me, he loved me, and he was sorry. For the most part I didn't believe him, but maybe he loved me in his messed up way.

34. At some point Marc stopped calling for me. We moved to another location and he didn't have the number. After he got out of jail, I didn't know that he had moved back to Charlotte. I never heard from Marc after he moved.

35. I never talked about Marc with my kids. I do not believe there was any lasting effect on the kids from what Marc did. If Marc had been around longer and it had happened many times it probably would have affected them.

36. I recall talking with someone named Sindy who was working on Marc's case before his first trial.

37. I do not recall anyone from Marc's defense team contacting me before his second trial. I would have been willing to talk with Marc's attorneys or investigators. There was a lot of information that they had not asked me about before and I would have been willing to share it with them. I would have also been willing to talk with any of their experts about Marc. I also would have been willing to testify about Marc, our relationship together, and anything else that would have been asked of me.

38. I rode up to the second trial with Officers Yarbrough and Riggs because I was pregnant. We didn't talk about Marc much in the car on the way up. I was probably asleep most of the way. They were the officers that took the photos of my shoulder and of my son after the incidents with Marc. I remember that Tasha and I were staying at the same hotel and one time after court we went out to eat and we also went shopping. I think I was in Charlotte for one or two days for that second trial. Then, after my testimony, I flew back home. Except when I was on the witness stand in court, no one from Marc's defense team spoke with me.

I swear or affirm that the information in the foregoing paragraphs is true to the best of my knowledge.

_Crystal Dennis_        _9-15-14_
Crystal Dennis           Date

Affirmed and subscribed before me on this the 15th day of September, 2014 in

____Fulton____ County, Georgia.

_Katrina Conrad_
Notary Public

My commission expires: 12/12/17

**JA395**

## Affidavit of Do'Lores Guy

I, Do'Lores Guy, appearing before the undersigned and being duly sworn or affirmed, state the following:

1. I am over the age of 18 and competent to testify to the following facts.

2. I am a resident of Charlotte, North Carolina. I am married and have two daughters. My maiden name was Do'Lores McClure and my name after my first marriage was Do'Lores Hart.

3. I am retired now but I used to work as a paralegal. In 1972 I was recognized as the first official paralegal in the state of North Carolina. I formerly worked at Legal Services in Charlotte. Then I moved to Florida in 1986 and worked for Janet Reno in the state attorney's office in Miami.

4. Before she was murdered by her second husband, I was very close friends with Pearl Brown. Pearl's maiden name was Pearl Anderson. After her first marriage to Jesse Cooper, her name changed to Pearl Cooper. Pearl's second husband was Loyd Brown.

5. Pearl had three daughters. Tessie was the oldest, Sonia was the middle child, and Sheila was the youngest. Sonia Cooper Barnette is the mother of Aquilia Marcivicci Barnette. The family calls him Vicci, and others call him Marc.

6. Pearl worked as a nurse at Mercy Hospital in Charlotte. I knew her since the early 60's. I met Pearl at work. She knew how to meet people.

7. When I first met her, Pearl's husband was Jesse Cooper. Jesse had been in the war. He had a prosthetic eye and I believe he had a plate in the back of his head. Jesse was very slow in speech. He wasn't talkative and he didn't communicate back when people talked to him. By contrast, Pearl was very outgoing.

8. Jesse and Pearl lived off of West Boulevard in Charlotte. I visited them there. They had no indoor plumbing. There were three or four houses there where various family members lived.

9. Pearl and Jesse later divorced. After their separation, Pearl had an apartment in Belvedere Homes off Rozzelles Ferry Road.

1

Bates No. 81

**JA396**

10. Pearl dated Herman Maczyck after she and Jesse split up, and before she got together with Loyd Brown. Pearl and Herman had known each other for quite a while. They met at the hospital where he was an orderly. Herman's wife had been killed and he had a lot of kids. Herman and Pearl were close. They were together even before Pearl left Jesse. Herman could be the father of Sonia, Sheila, or both. Pearl's relationship with Herman affected her decision to leave Jesse.

11. Herman and I grew up in the same church. Herman ended up marrying a nurse who worked at Presbyterian. He stayed with that woman until he died. It was a surprise to Pearl when Herman married the other lady. That's why Pearl jumped and married someone else a short time afterwards.

12. I didn't really know Pearl's second husband, Loyd Brown, but I had met him. She first met him as a patient but then lost contact. Then she met him again. When Loyd moved in with Pearl he only had a stereo, a chair, and clothes. He had nothing. Loyd was driving Pearl's car. I saw less of Pearl after she got together with Loyd. Pearl and I both attended the United House of Prayer on Beatties Ford Road, but Pearl stopped going to church after she got together with Loyd. We were devastated when Pearl married Loyd.

13. Pearl told me once that Loyd had suggested that the kids go stay with Jesse. Tessie was already living on her own, but Sonia and Sheila did go back and live with Jesse.

14. When Sonia was pregnant with Marc, I understood Derrick Barnette to be the father. He would come by to see her. I never knew that Derrick later had a paternity test done, and I never knew the results indicated he was not Marc's father.

15. After Marc was born, Pearl was the one that was mostly taking care of him. However, Pearl worked from 3pm to 11pm each day. Sonia needed help because she was still in high school.

16. Loyd didn't like for you to come over to the house unannounced. I was at the house one time when Loyd stomped through. Pearl had issues with Loyd. Loyd had been raging. One of the kids – Sonia or Sheila – once called me and said that Loyd had drawn a gun on Pearl. I then talked to Pearl and told her to put Loyd out. Pearl didn't do it, saying there wasn't anything in the gun. Loyd murdered Pearl only a week or two later. Pearl didn't deserve to be killed like that.

2

Bates No. 82

**JA397**

17. I remember the night of Pearl's murder. It was Sonia's prom night. I was in my house that night. I dreamt that the police were at my door and telling me to lock up. They were telling me this because someone dangerous was in the neighborhood. Then my phone rang and I woke up. It was Sergeant Smith. He asked me if I knew Sonia. I told him I did. He asked me, "Can you stay with them? The mama's dead. The husband killed her." Then I called my sister and we went down to Pearl's house to stay with Sonia, Sheila, and Marc.

18. The kids were asleep and never heard the gunshots. Sheila heard the police at the door and went to tell her mom. That's when she found her mom dead. Marc was also present in the house. He was only a baby but it had an effect on him. His mother was only a child herself. After Pearl died those kids were clinging to me. When I picked them up they were crying and scared. They sat on the front step.

19. I took Sonia and Sheila and Marc with me. There was a girl whose last name was Williams that lived across the street from Pearl. We were over at her house for a long time that night.

20. I called Jesse to come get them. When I told him what had happened he got real silent. I asked him to come get the kids. He did.

21. After her mom's death, Sonia clung to her older sister, Tessie. Sonia went into a withdrawal state and depression. She would cry easily. She would have crying moods. These were deep-seated feelings. Sonia was depressed and would cry ever since her mother died. That was a change from how she had been before. Sonia was withdrawn and would go through periods of depression.

22. Sonia later married Derrick Barnette. People called him Rick or Ricky. Rick's mom died shortly after their marriage. I went over to their house in Clanton Park when his mother died. Sonia never talked much about her relationship with Rick.

23. I moved to Miami in 1986. While I was living in Florida, Sonia rented my house for a while. This house was on Softwind Drive. This was after Sonia and Rick split up. At that time, Marc was playing the little man part. He was trying to take care of his mother and his brother. Marc was in his teens at that time and I would see him when I came back to visit. Sonia was getting depressed at that time. She was crying then too. I suggested she go see a counselor. However, when I asked her about it, she didn't answer. Things went bad when Sonia and Derrick split up. It had an effect on her. Sonia cried a lot. I remember talking to Sonia on the phone and she would have crying spells. She was depressed.

3

Bates No. 83

**JA398**

24. I came back to the house on Softwind one time and either Marc or Mario had broken the window in the bedroom. There was also a lot of rough wear and tear on the house. It was tough for Sonia after the separation. She had to raise two boys on her own.

25. In the end, I told them they had to leave the house. Sonia wasn't paying rent. I told them I was coming up to collect. The house was a mess. Sonia was always crying. I would try to tell her to get things straight and she'd start that crying. I really hate that I had to put them out but the house was taking a beating and Sonia wasn't paying rent. Tessie came and got them at that point. Sonia and I lost touch with each other after she moved out of the house. This was about 20 years ago.

26. I was never contacted by any of Marc's trial attorneys or investigators working for them. Had I been contacted, I would readily have shared with them the contents of this affidavit. I did not learn about the crimes, Marc's trial, or that Marc is on death row until I was contacted last year.

27. I would have willingly testified for Marc at the sentencing hearing of his capital trial. I have known and cared about Marc's family for a long time. I feel terrible about this situation and I would have wanted to share with the jury my memories of Pearl, Sonia, and Marc.

I swear or affirm that the information in the foregoing paragraphs is true to the best of my knowledge.

_Do'Lores Guy_        _6/8/14_
Do'Lores Guy                     Date

Affirmed and subscribed before me on this the 8th day of June, 2014 in Mecklenburg County, North Carolina.

_____
Notary Public

My commission expires: 1/20/16

Zachary Rowles
Notary Public
Durham County, NC

4

Bates No. 84

**JA399**

<u>**Affidavit of Kesha Heard**</u>

I, Kesha Heard, appearing before the undersigned and being duly sworn or affirmed, state the following:

1.  I am over the age of 18 and competent to testify to the following facts.

2.  I am resident of Union City, Georgia. I am the mother of two teenagers. I work for Cox Communications. My job involves extracting data from Oracle, a software program we use.

3.  I met Aquilia Marcivicci Barnette, whom I call Marc, many years ago when he and my younger sister started dating. They were both in high school. My younger sister is Netoshia Tolbert but everyone calls her Tasha. Tolbert is her married name. When she and Marc were dating her last name was Heard. Tasha and Marc have two children: Angelica and Marc Jr.

4.  I first met Marc in high school. He was meticulous about his clothing and the way he looked. He was preppy.

5.  I was surprised when I learned that Marc and Tasha were dating. Marc was quiet and relatively popular. Tasha was loud – she does not have a filter for the things she says – and wasn't really popular at all.

6.  Marc was artistic and liked different music. He was not popular. Even in school he was by himself. He never had an entourage. He was not very smart. He was not a reader and not an academic. He did not write well. His sentences were not as they should have been.

7.  Marc is low energy. He is real mellow, kicked back, and unassuming. You'd expect to see him in a park drawing. He was often in his own world.

8.  I've never seen him show any emotion except when holding my niece, which he loved to do.

9.  When we lived in Lithonia, Marc was at our house a lot. He would usually eat when he was over at our house. He even stayed the night sometimes when he was not supposed to. Marc would hide under the bed to avoid being found out by my mom. I knew about Marc staying over because Tasha and I were very close and we told each other what was going on. If mom was in her room, Tasha could let Marc in the front door of our apartment without our mother knowing. Or sometimes he'd come through the window. My mother wouldn't really check our rooms. I knew Tasha and Marc were having sex before Angelica was born. I think Marc was the second person Tasha had been with.

Bates No. 85

**JA400**

10. Marc's mama was some kind of drunk or partier because he stayed overnight at our house a lot and nobody came looking for him. Marc's mom was not very concerned about him. She was a bad mother. His mother wasn't providing for him. When I first met Marc, he kept up a nice appearance by the way he dressed. But after a while, Marc stopped dressing very well. One time my sister stole my mother's credit card and bought Marc some clothes and shoes. This was just prior to our mother finding out Tasha was pregnant. Tasha charged a couple hundred dollars on the credit card. Mom didn't want to press charges on Marc because it was Tasha's idea.

11. I remember one incident involving Marc, Tasha, and my boyfriend Keith Furlow. I was about 17 years old when this happened and Keith was a year older than me. We were all at The Crossings apartment where Tasha, my mom, and I lived. Neither my sister nor I were allowed to date and nobody was supposed to be there with us at our apartment.

12. We got into an argument and Keith ended up assaulting Tasha and Marc. Keith was three times the size of Marc. Keith had an extremely violent nature. Keith initially made a move to hit Tasha. Then Marc stepped in and Keith hit him in the nose. There was blood everywhere. Keith also punched Tasha in the eye. She was pregnant at the time but only Marc and Tasha knew that. Her eye was badly injured. It was swollen. Marc ended up calling the police and they came. Keith left the apartment before the police got there but I think they went to arrest him. They brought an ambulance to treat both Marc and Tasha. After mom got home they transferred Tasha to the hospital. Mom ended up taking Tasha to be seen by a specialist.

13. We ended up going to court in DeKalb County over this. This wasn't Keith's first time in trouble. I testified against Keith and that's what convicted him. This was the spring or summer of 1990.

14. Our mom found out about Tasha being pregnant with Angelica when a nurse called the house. Mom thought the nurse was calling about Tasha's eye but the nurse told her Tasha was pregnant. Our mother was very upset to learn that Tasha was pregnant.

15. Marc went with Tasha to every doctor's visit; every single one. A lot of boys run off in that situation, but not Marc. However, at the end of Tasha's pregnancy, our mother started excluding Marc from the prenatal visits. Tasha even asked if Marc could go and mom said no. Marc was always respectful of my mother even though she didn't treat him well. Our mom would not let Angelica's last name be Barnette. Marc was upset by this but he didn't challenge her or disrespect her about it.

Bates No. 86

**JA401**

16. The best light I've ever seen Marc in was when Angelica was born. He wouldn't leave my sister's side the entire time they were at the hospital. He slept in a chair by her side. When the chair got uncomfortable he slept on the floor. Tasha was in the hospital for about three days. After she was born Marc sat there looking at Angelica as though he couldn't believe she was there - like he'd won a million dollars. He just wanted to hold her. I didn't think he was going to give her up and let me hold her.

17. I went to college in Carrollton, Georgia. During college I moved to Newnan, Georgia and got a full time job. Then my sister and Marc moved there, too. That's when I really noticed changes in Marc. He and my sister began to fight a lot. There was a lot of strain taking care of the place and the kids. I would go over to their place in Newnan a lot, especially to see their second child, Marc Jr.

18. Tasha and Marc were under a lot of pressure taking care of the kids. I know they were having a hard time paying for food, the lights, and clothing for the kids. I know Tasha wasn't working. We got a disability check from our father's veteran status, which Tasha and Marc were relying heavily on.

19. I never saw any bruises or marks on Tasha. If I had I would have confronted Marc. Tasha told me that Marc was jealous and controlling. She said he didn't want her to go anywhere or do anything. She complained about it but I never saw anything. I didn't get into it. I didn't hear about this until a while after Marc and Tasha had moved to Newnan.

20. Tasha learned about another girl that Marc was seeing when he was locked up in jail after a shooting incident. She found out when they both went to visit him at the same time. The other girl was Crystal. Tasha was upset after she found out about Crystal. After Marc got out of jail he made Tasha leave and she lived with me. She was depressed about the situation but not angry with him.

21. I was very surprised to find out about Marc's crimes. It didn't seem like him at all. I was never contacted by any of Marc's trial attorneys or investigators working for them. Had I been contacted, I would readily have shared with them the contents of this affidavit.

22. I would have willingly testified for Marc at the sentencing hearing of his capital trial. I would have wanted to tell the jury that one reason I'd ask anybody to spare his life would be for his children. It would be hard on them if he were executed.

23. Under the circumstances, Marc has a good relationship with his children. His daughter Angelica even took the Barnette name when she got married. Now her name is Angelica Barnette Sharpe.

I swear or affirm that the information in the foregoing paragraphs is true to the best of my knowledge.

Kesha Heard

Date 9/17/2014

Affirmed and subscribed before me on this the 17 day of September, 2014 in

Gwinnett County, Georgia.

Notary Public

SANDRA K JONES
NOTARY PUBLIC, GWINNETT COUNTY, GA
MY COMMISSION EXPIRES 2/16/2016

My commission expires: _____

**JA403**

## Affidavit of Sally Ann Cunningham Johnson, M.D.

I, Sally C. Johnson, M.D., appearing before the undersigned and being duly sworn or affirmed, state the following:

1. I am over the age of 18 and competent to testify to the following facts.

2. I have a Bachelor of Science degree from Penn State University. I received my M.D. from Jefferson Medical College and completed my residency in psychiatry at Duke University Medical Center. I am board certified in psychiatry and neurology and have a subspecialty board certification in forensic psychiatry.

3. I am presently a faculty member of the University of North Carolina School of Medicine in the Department of Psychiatry. I joined the Psychiatry faculty at UNC to help establish the Forensic Psychiatry Program and Clinic, an outpatient clinic that provides criminal and civil forensic services, including evaluations and consultations on a broad range of forensic issues to attorneys, the courts, and other agencies. I currently hold faculty appointments at both UNC and Duke Law Schools.

4. From 1979 until 1983, I served as a staff psychiatrist at Federal Bureau of Prisons Federal Medical Center, Federal Complex in Butner, North Carolina (FCI Butner). From 1983 until 1989 I served as the Director of Forensic Services and Clinical Research at FCI Butner. I became the Associate Warden of Health Services/Chief Psychiatrist at FCI Butner in 1989, and the Associate Warden Medical/Chief Psychiatrist in 1999. From 1990 to 2004, I was the Director of Forensic Fellowship Program for Federal Bureau of Prisons/Duke University of Psychiatry. From 2001 to June 30, 2004, I served as a Psychiatric Consultant to the Medical Director of the Federal Medical Center (FMC) at FCI Butner. In this position I conducted forensic evaluations for the federal court system on high profile and complex cases, and served as an expert witness. My curriculum vitae is attached to this affidavit.

5. On November 17, 1997, Aquilia Marcivicci "Marc" Barnette was committed to the FMC at FCI Butner for purposes of a psychiatric or psychological examination pursuant to 18 U.S.C. §§ 4241(b) and 4242(a). He was initially housed in the prison's Admission/Seclusion Unit pending medical, psychiatric, and case management clearances.

6. I evaluated Mr. Barnette during his time at the FMC. Under my supervision, Charles Vance, M.D., a forensic fellow, conducted several interviews with Mr. Barnette. Dr. Michael Schaefer conducted psychological testing of Mr. Barnette.

7. The evaluation of Mr. Barnette resulted in a report dated December 29, 1997 that was sent under seal to the Honorable Robert D. Potter in the Western District of North Carolina.

**JA404**

8. Post-conviction counsel have asked me to discuss and elaborate on my earlier findings and testimony and my interactions with Mr. Barnette's trial counsel; review information that was not previously made available to me; and answer whether I was available to Mr. Barnette's defense counsel during his resentencing trial in 2002.

9. For purposes of preparing this affidavit, I have reviewed the report of December 29, 1997, as well as my testimony given during Mr. Barnette's sentencing in 1998. I have also reviewed additional information provided by post-conviction counsel that was not previously made available to me, including: Mr. Barnette's prison records from his incarceration in the Bureau of Prisons; evaluations and testimony provided by other experts in Mr. Barnette's 1998 trial, as well as his resentencing trial in 2002; a federal petition for habeas corpus filed on Mr. Barnette's behalf; Dr. Richard Dudley's post-conviction mental health report; Zachary Rowles' post-conviction mitigation report; Cessie Alfonso's mitigation report that she prepared for trial counsel in 2002; and affidavits executed by various witnesses (both lay and expert) in the post-conviction litigation.

10. As the December 29, 1997 report indicates, in addition to meeting with Mr. Barnette, I reviewed information provided by both the prosecutors and defense counsel. The government provided me with a cover letter dated November 6, 1997 from Assistant U.S. Attorney Robert Conrad and a packet of materials consisting of pleadings filed in the criminal cases and four volumes of the government's discovery. The defense provided me with a cover letter dated December 9, 1997, and a copy of the Complaint, Indictment, and description of possible punishment facing Mr. Barnette. The defense also provided a letter confirming that Dr. Seymour Halleck had been retained as a psychiatrist; a copy of a 1994 report written by William M. Tyson, M.D. and some records from Blue Ridge Behavior Systems. I also spoke by telephone with defense attorney Paul Williams, prosecutor Robert Conrad, and Sonia Barnette, Mr. Barnette's mother.

11. Given that this was a capital case and, thus, the evaluation was particularly important, the information provided by Mr. Barnette's attorneys in 1997 would be considered sparse and less comprehensive than seen in many capital cases. I understood what "mitigation" was in 1997. The defense provided little in the way of mitigation information or detailed psycho-social information that could have assisted my evaluation. Although I did receive a report and some limited records from Dr. William Tyson, those records were, as my report noted, "brief." They were limited in scope and detail.

12. According to my report, "[Mr. Barnette] was generally cooperative with the evaluation, although he indicated that his attorneys had instructed him not to discuss detailed information about the offense. Nonetheless, he spoke quite openly and freely about his behavior around the time in question."

**JA405**

13. My records also indicate that on December 5, 1997, Mr. Barnette was released to the open population of the Health Services Division, where he remained until he was returned to Charlotte, North Carolina to stand trial. This is because, as stated in the report, Mr. Barnette was not seen as presenting a danger to staff or other inmates. He did not present any management problems. He was not difficult to interact with and he was cooperative with the evaluation process. He did not attempt to feign or malinger signs of symptoms of mental illness during the evaluation period.

14. I testified briefly at Mr. Barnette's trial in Charlotte on February 3, 1998. In court I confirmed that during his stay at the FMC, Mr. Barnette told me he had come to grips with what he had done shortly after the crime was committed, that prior to his arrest he had intended to kill himself because he believed his life was over, and he described feeling overwhelmed with the magnitude of his behavior. I confirmed my assessment that Mr. Barnette expressed remorse for his behavior and expressed sympathy for the victim's family.

15. Until I was contacted by his post-conviction counsel, I had no further contact with Mr. Barnette or anyone involved in his case following my testimony on February 3, 1998. I was not contacted by his defense counsel or anyone involved in his resentencing trial in 2002.

16. According to my December 29, 1997 report, Mr. Barnette was taken into custody in connection with his crimes on or around June 25, 1996. Thus, by the time of Mr. Barnette's resentencing trial in 2002, he had been in custody for approximately six years – the majority of which time he had spent in the custody of the Bureau of Prisons. Having reviewed Mr. Barnette's prison records from his incarceration during that period of time, it is clear that Mr. Barnette had very positive institutional adjustment. He presented no problems for correctional officers and had no problems with other inmates. He demonstrated an ability and willingness to abide rules, remained non-violent, and maintained constructive and positive relationships with others. Had I been asked, I would have been willing and able to testify at Mr. Barnette's resentencing trial about his positive adjustment to prison and his lack of disciplinary issues, and how it was consistent with his behavior and adjustment during his evaluation period in 1997 and consistent with my expectations for his future adjustment.

17. Information has been provided to me by post-conviction that I did not have available to me in 1997. Much of the new information I have provides significant additional detail about Mr. Barnette's upbringing, family situation, and relationships prior to the time of the crimes for which he was convicted.

18. The information provided by post-conviction counsel also clarifies that Mr. Barnette's intimate relationships did not always involve abuse or negative behavior. During his relationship with Sheila Sullivan, Mr. Barnette appeared to have been supportive during times of stress, including when Ms. Sullivan became

3

**JA406**

pregnant and later terminated the pregnancy. There is no evidence Mr. Barnette was abusive toward Ms. Sullivan. Mr. Barnette was the victim of an assault, perpetrated by other young males, during the time of his relationship with Ms. Sullivan. When that relationship fell apart, Mr. Barnette became depressed and attempted suicide. I did not have this information in 1997. Had I had this information, I could have testified then and in 2002 that Mr. Barnette was engaged in a significant, nonviolent relationship with Ms. Sullivan.

19. Mr. Barnette's relationships with Ms. Tameka Hunter and Ms. Kowana Dozier also did not include violence or extreme jealousy or elements of domestic violence or obsessive pursuit. I could have so testified to that in 1998 and in 2002.

20. During my 1997 evaluation, I was unaware of the paternity issues concerning Mr. Barnette's father and how his mother, Sonia Barnette, handled the controversy. In the face of a paternity test, confirming Derrick Barnette was not the father, Sonia Barnette continued to claim he was. This was upsetting and confusing for Mr. Barnette. I could have testified to this in 1998 and 2002.

21. I was also unaware in 1997 of the details concerning the circumstances of Sonia Barnette's mother's murder (death of Pearl Cooper), and the impact of this trauma on her parenting abilities. Again, I could have testified to this in 1998 and 2002.

22. The murder of his maternal grandmother, Pearl Cooper; his maternal grandfather, Jesse Cooper's, post-traumatic stress disorder; how the confusion concerning Marc's paternity was handled within the family; his mother Sonia's limitations as a young parent; and the absence of any stable or helpful guidance given to Marc from others, (including his family). for coping with stress, dealing with problems, and navigating his adolescent and teenaged years, are all important facts that I would have been willing and able to discuss at Marc's resentencing trial in 2002.

23. I have not seen Mr. Barnette since 1997. While I am aware that others have since opined that Mr. Barnette, among other things, suffers from an affective mood disorder, I would need to re-evaluate him before rendering an opinion on that issue.

24. I have been made aware that Mr. Barnette testified on his own behalf at his resentencing trial. Had trial counsel sought my advice or insights in 2002 about putting Mr. Barnette on as a witness, I would have discussed that although Mr. Barnette expressed genuine remorse for what he had done, he had limited insight into his behaviors and may not be able to display his remorse when confronted with the stress of examination and cross examination. His attempts to deal with his anxiety and his personality functioning would likely limit his ability to relate to the Jury or others in the court room.

4

Bates No. 92

**JA407**

25. In 2001 and 2002, during the years leading up to Mr. Barnette's resentencing trial, I was a consultant to the Medical Director of the FMC at FCI Butner. I was available during that period of time and would have been willing, if asked, to review information, reevaluate Mr. Barnette, and testify at his re-sentencing. As noted above, however, no one ever approached or asked to me to do so.

Sally C. Johnson M.D.

Date __11/24/14__

Affirmed and subscribed before me on this the _24th_ day of _November_, 2014 in Orange County, North Carolina

Notary Public

My commission expires: __10/19/2014__

**JA408**

<u>**Affidavit of Jean B. Lawson**</u>

I, Jean B. Lawson, appearing before the undersigned Notary Public and being duly sworn or affirmed, state the following:

1. I am over the age of 18 and competent to testify to the following facts.

2. I became licensed to practice law in Virginia and North Carolina in 1979. As of the time of Marc Barnette's second sentencing hearing, I had been in the private practice of law for all but two years that I served in the Public Defender's Office in the early 1980's. I am currently an Assistant Public Defender with the Mecklenburg County Public Defender's Office in Charlotte

3. I was in solo private practice in 2001 when I was appointed to represent Aquilia Marcivicci "Marc" Barnette for his resentencing. Following Mr. Barnette's sentencing in 2002, I joined the Mecklenburg County Public Defender's Office and gave all of my files to Harold Bender. I no longer possess any documents from my representation of Marc Barnette.

4. Prior to signing this affidavit, I met with Mr. Barnette's post-conviction counsel and reviewed various documents, including pleadings from the underlying case, as well as information that some of the trial experts retained.

5. I handled several murder cases in Federal Court before I was assigned to represent Marc Barnette. One was in the WDNC in which the government finally agreed not to seek the death penalty. The other was in Rhode Island and we actually met with the Department of Justice Death Penalty Committee in Washington, DC. It took a long time, but the government eventually decided not to seek the death penalty. At that point, Learned Counsel was no longer necessary and I withdrew from representing the defendant.

6. I was appointed to represent Mr. Barnette along with Claire Rauscher. Neither Ms. Rauscher nor I had any involvement in the original trial, in which he was represented by George Laughrun and Paul Williams. When Ms. Rauscher and I were appointed in 2001, Mr. Barnette was awaiting a new sentencing hearing.

7. Claire Rauscher and I were appointed in February 2001. On August 28, 2001, we filed an *ex parte* document called "Statement of Defense Contentions," in which we identified a handful of issues about which we wanted the court to be aware. Based on our work in the case up to that point, which constituted a review of the first trial transcript, Mr. Barnette's criminal record, and discovery, we wrote that "an approach different from that used in his first sentencing hearing [was] warranted." We believed that the first defense

1.

Bates No. 94

**JA409**

team tried to minimize the features of Marc Barnette's relationships with other women, and, in some instances, sought to blame the women for any difficulties that existed. It was our belief that we would need to address those prior relationships head on, and have a far better understanding of them than what the first defense team had or presented to the jury.

8. Based on our review of the case materials as of August 28, 2001, it was also apparent that the first defense team presented a "disjointed" sentencing case. As we explained in the *ex parte* Statement of Defense Contentions: "[W]itnesses were unprepared for cross-examination. The investigation was superficial and not-sufficiently in depth to enable the formation of a cohesive theory of mitigation."

9. Thus, as of August 28, 2001, it was clear to me and Claire Rauscher that we needed to re-evaluate everything that the first trial team did, meet with their experts and review all of their data and evaluations, identify additional experts who might be needed, and identify and interview numerous family members, co-workers, and other potential witnesses.

10. In addition to filing our *ex parte* Statement of Defense Contentions, Ms. Rauscher and I also filed *ex parte* motions for funds to hire a private investigator (Jan Barefoot) and mitigation specialist (Cessie Alfonso). I had previously worked with Jan Barefoot on other cases; I had never previously worked with Cessie Alfonso, although I was aware of her professional reputation.

11. Our need for both Jan Barefoot and Cessie Alfonso was very clear. I had handled a number of capital cases by the time I was appointed in Marc Barnette's case, and it was common practice at that time to use both an investigator and mitigation specialist. It was clear from the outset that Jan Barefoot would need to locate various witnesses for Ms. Alfonso to interview. It was also evident to the defense team that there were potentially hostile witnesses with whom we needed to speak. As we explained in our *ex parte* Statement of Defense Contentions, we were aware that some of the witnesses we needed to talk with "were hostile to the defense at the defendant's first trial and sentencing." As a result, we believed that we needed to have an investigator locate and approach these witnesses; they were not necessarily going to come to us. These witnesses included some of Marc Barnette's former girlfriends.

12. With respect to hiring Cessie Alfonso, it was evident to defense counsel that we needed to replace Sindy Maxwell, who had handled the mitigation investigation for the first trial team. As we wrote in the *ex parte* Statement of Defense Contentions, "[Maxwell] failed to develop adequate rapport with the defendant's family and friends that would have enabled her to unearth critical biographical information. She prepared a 'time line'

2

Bates No. 95

**JA410**

purporting to represent the defendant's life history and omitted critical information. These omissions cast doubt on the reliability of other expert witnesses called by the defense. As a result, the honesty of the defense presentations was compromised." Inasmuch as this was a resentencing trial and the primary focus would be on mitigation, and in light of the significant deficits in Ms. Maxwell's earlier work, there was little question in my mind that we needed to replace her with someone new.

13. On August 31, 2001, just a few days after we filed our initial requests for expert funding, the resentencing trial was scheduled for March 19, 2002.

14. The requests for funding to hire Jan Barefoot and Cessie Alfonso were not granted until October 10, 2001. The actual CJA Authorization forms for their work were not issued until October 25, 2001. This delayed our first consultation with Ms. Alfonso until mid-October, 2001.

15. On October 31, 2001, two months after the Court scheduled resentencing for March 19, 2002, Ms. Rauscher and I filed a motion to continue the trial. As we wrote in our motion to continue, both of us had significant commitments in other cases that caused great concern about our ability to be ready by March, 2002. Among my other commitments was a death penalty trial that was scheduled for January, 2002 in Mecklenburg County. In addition, we were also very concerned about having only four-and-a-half months to investigate and prepare a penalty phase presentation for Mr. Barnette. Our mitigation specialist was just getting started and we had a great deal more work to do in a case in which the defendant had already been sentenced to death once.

16. The Court granted our motion to change the March 19, 2002 trial date but, instead of moving the case to a later date, the Court moved the start of trial up to March 12, 2002. Claire Rauscher and I filed a motion asking the Court to reconsider the trial date of March 12, 2002. At a hearing on November 20, 2001, the Court removed Ms. Rauscher from the defense team after she asserted the existence of a conflict due to the scheduling of the resentencing. The loss of 50% of the defense team was a huge shock to all of us. As a result of her removal, the case then had to be continued from the March 12, 2002 trial date.

17. From November 20, 2002 until January 14, 2002, I was Marc Barnette's only attorney. The process of finding a substitute for Claire Rauscher was difficult. David Bruck, the federal death penalty resource counsel, and I had various communications about identifying the right replacement. Some of my initial recommendations, including Calvin Murphy and Reita Pendry, did not work out for one reason or another.

3

Bates No. 96

**JA411**

18. It was ultimately decided that Harold Bender would be Mr. Barnette's second attorney. I had previously worked with Mr. Bender as co-counsel and as counsel for co-defendants. In terms of working up a case, I knew from first-hand experience that Harold Bender's major strength and interest was in the courtroom and that he had a busy private practice. As a result, I knew that the responsibility and burden of developing the mitigation and case for sentencing would be mostly mine.

19. Harold Bender was appointed as co-counsel on January 14, 2002. The sentencing hearing was rescheduled to July 15, 2002.

20. On January 16, 2002, two days after Mr. Bender was appointed in Marc Barnette's case, I was appointed as trial counsel for Jeffery Neal Duke in a death penalty case in Gaston County. On January 21, 2002, I began a death penalty trial on behalf of Frank Robinson in Mecklenburg County. My co-counsel in that case was Calvin Murphy, who had only been appointed to the case on November 30, 2001, less than two months earlier. As a result, I was working especially hard and particularly focused on the Robinson case during the period of time after Ms. Rauscher was removed from Mr. Barnette's case. Frank Robinson's trial started on January 21, 2002, and ended with a hung-jury in the penalty phase on February 7, 2002.

21. In a January 22, 2002 letter from Cessie Alfonso to me, she advised that she believed that a key part of Marc Barnette's mitigation presentation concerned his mother, Sonia. In her letter, Ms. Alfonso suggested that we consider presenting Sonia's testimony at sentencing, with a focus on her own history of grief, trauma and abuse. Reviewing what Ms. Alfonso wrote to me in January 2002, it certainly appears that focusing on Sonia's own grief, trauma, and abuse, and how that impacted her, could have been powerful mitigating evidence.

22. At some point after I was appointed to him, Mr. Barnette and I discussed the issue of whether he would testify at his sentencing hearing and, as I recall, Harold Bender was involved in those discussions occasionally. Mr. Barnette was always very amenable to the advice of counsel. Mr. Bender and I recommended that he testify, and he decided to testify.

23. I was primarily responsible for preparing Marc Barnette to testify. I never considered, and I don't recall ever discussing with Harold Bender, having any mental health expert weigh in on Mr. Barnette's testimony. At this point in time—2002—I was familiar with the notion of having an expert opine to the jury about a defendant's confession or demeanor. Indeed, often times a defendant's state of mind, psychological make-up, or even his appearance can affect how the defendant's words might come across to a jury.

4

**JA412**

24. Marc Barnette's relationships with Tasha Tolbert, the mother of his two children, his ex-girlfriend Crystal Dennis, and his ex-girlfriend Alesha Chambers were used as aggravating evidence during his first trial. As reflected in the *ex parte* Statement of Defense Contentions that Claire Rauscher and I filed in August 2001, it was clear that we needed to have a better understanding of those relationships prior to the start of the resentencing trial.

25. In late November 2001, the defense filed a motion for funds to hire Ann Wolbert Burgess. Dr. Burgess was an expert in the field of violence, in particular domestic violence, and had worked with the FBI. When we sought funding for Dr. Burgess, the defense team believed that she could help us better understand—and explain to a jury—the dynamics of Marc Barnette's relationships with other women, as well as the impact that Sonia and Derrick Barnette's volatile relationship had on him. As we wrote in the motion, the defense intended to "hinge its presentation on the expert testimony of a qualified expert in the field." In the motion, we further wrote that "[d]efense counsel contend that it is absolutely essential, and mitigating, to explain the criminal conduct of the defendant in light of how his relationship with women was formed. These crimes, the defense contends, are a direct product of the impact of domestic violence and murders of women in the defendant's family upon the defendant. It is critical to the defense to make the jury understand the way the defendant was raised and the way his psyche was formed and acted out in the conduct for which he will be sentenced."

26. We intended to have Dr. Burgess focus on Marc Barnette's prior relationships with other women. Ideally, Dr. Burgess would need to have access to all of Mr. Barnette's social history and mitigation information as well as women with whom he had been in relationships. We had Dr. Burgess meet with Mr. Barnette and speak with his mother and father, and his brother, Mario. I do not recall coordinating or suggesting conversations or meetings between Dr. Burgess and any other social history witnesses. Some of the social history information we provided to Dr. Burgess, including information about Mr. Barnette's prior relationships, came from Sindy Maxwell's work on the first trial – the same work we had previously concluded and told the court was poorly done and deficient.

27. With respect to the people with whom Cessie Alfonso ended up speaking, I do not recall coordinating any conversations or information sharing between Dr. Burgess and Ms. Alfonso. Ms. Alfonso did not provide her mitigation report to defense counsel until July 8, 2002, which was one week after Dr. Burgess submitted her report.

5

Bates No. 93

**JA413**

28. Based on my review of Jan Barefoot's notes, it appears that in early March, 2002, Harold Bender and I spoke with her about Mr. Barnette's ex-girlfriends Tasha Tolbert and Crystal Dennis. Both women had testified against him during his first capital trial. We did end up speaking with Tasha Tolbert prior to the second sentencing hearing, but I do not recall having Ms. Tolbert talk to Dr. Burgess.

29. According to a document from Jan Barefoot's files, I faxed a list of "potential mitigation witnesses" to her in early March 2002. This list was based on names that Mr. Barnette had provided to me during my visits with him. I indicated on this list which witnesses I wanted Ms. Barefoot to locate so Cessie Alfonso could interview them. A number of former girlfriends were on the list—including Sheila Sullivan, Tameka Hunter, and Kowana Dozier— but I don't recall if I specifically asked Ms. Barefoot to locate them at that time. Her notes indicate that, right on the eve of trial, I asked Ms. Barefoot to try to locate Kowana Dozier and Tameka Hunter, but she did not have enough time to track them down.

30. The government engaged Dr. Park Dietz to testify against Marc Barnette at resentencing. Although I had never before personally dealt with Dr. Dietz, I was aware of him by reputation. I spent a significant amount of time tracking down prior cases in which Dr. Dietz testified and reviewing that testimony.

31. Around March 2002, Harold Bender and I met with Dr. Mark Cunningham at a death penalty conference. I had previously spoken with Dr. Cunningham about his role in the first trial, when he testified as an expert about "future dangerousness." After Mr. Bender and I met with Dr. Cunningham, we decided to have him testify more broadly about Marc Barnette's psychological make-up and mental health issues.

32. In order for an expert like Dr. Cunningham to testify competently about Mr. Barnette's psychological make-up and mental health issues, he would need to have access to all of his social history and mitigation information. Because of his participation in the first trial, Dr. Cunningham had already been provided with the social history and mitigation information compiled by Sindy Maxwell (which Claire Rauscher and I had previously determined to be deficient). Other than having Dr. Cunningham meet with Mr. Barnette prior to the second sentencing hearing, I do not recall coordinating or suggesting any conversations or meetings between Dr. Cunningham and any other social history witnesses—including anyone who Ms. Maxwell had not spoken with prior to the first trial. Moreover, Cessie Alfonso's mitigation report was not provided to defense counsel until July 8, 2002, and I don't recall whether we gave that report to Dr. Cunningham.

6

**JA414**

33. Dr. Seymour Halleck testified for the defense at Mr. Barnette's first trial. Harold Bender and I decided to use Dr. Halleck again for this second sentencing hearing. I knew that in order for an expert like Dr. Halleck to testify competently about our client's psychiatric make-up and mental health issues, he would need to have access to all of his social history and mitigation information. Because of his participation in the first trial, Dr. Halleck had already been provided with the social history and mitigation information compiled by Sindy Maxwell (which Claire Rauscher and I had previously determined to be deficient). In addition to having Dr. Halleck meet with Marc Barnette prior to the second sentencing proceedings, we made Sonia Barnette and Tasha Tolbert available for him to interview. I do not recall coordinating or suggesting any other conversations or meetings between Dr. Halleck and any other social history witnesses. Cessie Alfonso's mitigation report was not provided to defense counsel until July 8, 2002 and I do not recall when or whether we provided Dr. Halleck with a copy of the mitigation report.

34. Cessie Alfonso's report referred to Mr. Barnette's grandfather, Jesse Cooper, and described the damaging effects of his combat experience. Mr. Bender and I did not gather Mr. Cooper's medical or military records or other information about combat injuries or commendations. We elicited whatever information we provided to the jury about Jesse Cooper from Marc Barnette, Derrick Barnett, and Armaud Cooper.

35. Harold Bender and I were aware of the murder of Pearl Cooper who was Sonia Barnette's mother and Marc Barnette's grandmother. Based on Cessie Alfonso's report and interviews with Sonia, it was evident that Pearl Cooper's murder had a devastating and debilitating effect on the family and impaired Sonia's ability to parent her son, Marc. I do not recall asking any of our experts to focus on Pearl Cooper's death and what effect it might have had on Marc Barnette and the family.

36. It was evident to trial counsel that we would have to explain Marc Barnette's actions at the time of the April 1996 firebombing of Robin Williams' home, and how he spent the ensuing six weeks before the murders. With respect to witnesses to that important time frame, I understand that defense expert witnesses—Dr. Cunningham, Dr. Halleck, and Dr. Burgess—were only provided access to Mr. Barnette, his parents Sonia and Derrick Barnette, and his brother, Mario. Those experts had Sindy Maxwell's investigative reports but not a report from Cessie Alphonso.

37. I have reviewed Cessie Alfonso's mitigation report that identifies the persons she interviewed. According to her report, she interviewed Marc, Sonia Barnette, Derrick Barnette, Sheila Cooper, Mario Barnette, Mable Johnson, Jesse Cooper, Armaud Cooper, Larry Wright, Tasha Tolbert, Tessie Nero, and Dorothy Harper. It does not appear that she re-interviewed a number of witnesses who Sindy Maxwell had interviewed prior to

7

**JA415**

the first trial. There were also a number of witnesses who had been identified on a list of "potential mitigation witnesses" in early March 2002 (like Sheila Sullivan, Tameka Hunter, and Kowana Dozier) whom Ms. Alfonso did not interview.

38. Prior to Marc Barnette's first trial, he was evaluated by Dr. Sally Johnson, a mental health expert who worked for the United States Bureau of Prisons. The defense called Dr. Johnson as a witness during the first trial. We did not call upon Dr. Johnson to testify at the second sentencing hearing and did not ask her to review any new information about our client, including his Bureau of Prisons records.

_Jean B. Lawson_                 _12/8/14_
Jean B. Lawson                          Date

Sworn to and subscribed before me on this the _8th_ day of December, 2014 in Mecklenburg County, North Carolina

_LaDonna Watts_
Notary Public

My commission expires: _4-1-2015_



Case 3:12-cv-00327-MOC   Document 74-4   Filed 12/22/14   Page 1 of 50

Bates No. 101

**JA416**

## Affidavit of Temeka Lee

I, Temeka Lee, appearing before the undersigned and being duly sworn or affirmed, state the following:

1. I am over the age of 18 and competent to testify to the following facts.

2. I am a resident of Jacksonville, Florida. I used to live in Charlotte, North Carolina. At that time my name was Temeka Hunter.

3. I first met Aquilia Marcivicci Barnette in 1992 or 1993. I call him Marc. I met him through his cousin, Shonda Nero. Shonda and I worked together and we became good friends, spending time together outside of work.

4. When I met Marc he was living in Georgia. However, he would make trips to Charlotte to visit family and friends, including Shonda. Marc and I spent time together with Shonda, and Marc and I dated for about three or four months.

5. Our relationship was long distance because Marc was living in Georgia. I saw him when he came to Charlotte to visit his cousin. We also talked on the phone.

6. When we spent time together we didn't go out. We would sit around Shonda's house and talk. We spent all our time together at Shonda's. We were together sexually but we didn't spend an extended amount of time together because I was still living with my now-ex-husband.

7. I didn't know a lot about Marc's life. We never had deep talks. There was never any fighting or jealousy in our relationship, and he never acted possessively towards me. There was nothing like that in our relationship. We never argued. He was always respectful. We never got into fights and he never put his hands on me.

8. I was very surprised to learn about Marc's crimes. I could never see him doing that. I visited Marc at the jail in Charlotte before he went to trial in the late 1990s. He was the same person that I'd known but he was obviously quite disturbed and upset. He was very ashamed. He couldn't look me in the eyes.

9. I have not been in contact with Marc since I visited him that time at the jail. I later got divorced from my husband and moved away from Charlotte.

10. I was never contacted by any of Marc's trial attorneys or investigators working for them. Had I been contacted, I would have shared with them the contents of this affidavit.

Bates No. 102

1

11. I would have willingly testified for Marc at the sentencing hearing of his capital trial. Marc was always sweet and kind to me and I would have shared my memories of him with the jury.

I swear or affirm that the information in the foregoing paragraphs is true to the best of my knowledge.

_Temeka R. Lee_
Temeka Lee

_12-22-14_
Date

Affirmed and subscribed before me on this the _22nd_ day of _December_, 2014 in _Duval_ County, Florida.

_[signature]_
Notary Public

My commission expires: _____

URSULA Y. CORBITT
Commission # EE 224827
Expires September 6, 2016
Bonded Thru Troy Fain Insurance 800-385-7019

**JA418**

## Affidavit of Anitra Lyles

I, Anitra Lyles, appearing before the undersigned and being duly sworn or affirmed, state the following:

1. I am over the age of 18 and competent to testify to the following facts.

2. I am a resident of Riverdale, Georgia. My best friend is Netoshia Tolbert. Everyone calls her Tasha. We have been best friends since we were little kids. Also, our mothers are best friends with each other, and our daughters are too.

3. When Tasha and I were little we both lived in Ellenwood, Georgia. Then Tasha and her family moved to Lithonia, Georgia. This is where Tasha met and started dating Aquilia Marcivicci Barnette. I call him Marc.

4. I was 13 or 14 years old when I first heard about Marc. Tasha told me she had met a guy and she wanted me to meet him.

5. Tasha used to sneak Marc into her bedroom window. Tasha's bedroom was on the second story so she tied up sheets and dropped them out the window so Marc could climb in and out. Tasha's mom would be on the other side of their apartment and Marc would be in Tasha's room. I first met Marc one time when she had snuck him in. The three of us sat around and laughed together.

6. Marc and Tasha started arguing and fighting a lot in their relationship. They were like gasoline and fire together. They were both physical with each other. Tasha was not passive in these fights. She would hit, punch, and slap Marc when they were fighting.

7. Tasha's sister's boyfriend, Keith Furlow, once hit Tasha.

8. After Marc and Tasha had been dating for a while, Tasha became pregnant with her daughter, Angelica. Marc was excited about being a father. He did well to prepare for Angelica. He was at the hospital when she was born and he was very excited about being a father. I remember Marc holding, hugging, and kissing Angelica when she was little.

9. Tasha's mother was very strict and she didn't like Marc. Marc would try to catch the bus to go to the doctor's office with Tasha for her prenatal visits, but Tasha's mom stepped in and did not allow him to go to the appointments with her. And after Angelica was born, Tasha's mother didn't want Marc to see his baby daughter. Tasha's mother interfered a lot and that's part of the reason Tasha and Marc and their kids moved down to Newnan, Georgia. I have seen Marc sad and upset over what Tasha's mother was doing. There was a lot of stress to being a young parent. If Marc and Tasha had gotten more support from her mother, things might have gone better for them.

1

10. Tasha became pregnant before I did, but I was only 9 months behind her. She and I both became teenage mothers. I became a mother at age 16. After they had Angelica, Marc and Tasha had second child named Marc Jr. Tasha's mother showed favoritism towards Angelica because Marc Jr. looked just like Marc.

11. Marc Jr. is an emotional person. He's very sensitive. I have seen him post on Facebook that his father would not be around much longer. I know he must have been suffering to have written that. He had nothing to do with the situation his father is in, so it's not fair that he's had to live with the thought that his father could be executed soon. I believe all children deserve to have their parents.

12. I know that both Angelica and Marc Jr. have been in touch with their father while he's been locked up. He has reached out to them and they have written each other. Angelica once showed me a card that Marc drew for her. It would be extremely hard on Tasha and on both of the kids if Marc were executed.

13. I was never contacted by anyone working on behalf of Marc's legal team before 2013. If I had been contacted, I would have been willing to talk with them. I would also have willingly testified for Marc at the sentencing hearing of his capital trial if I'd been asked. I first met Marc many years ago and he is an important person to Tasha, Angelica, and Marc Jr. I would have shared this with the jury.

I swear or affirm that the information in the foregoing paragraphs is true to the best of my knowledge.

_Anitra Lyles_ (signature)
Anitra Lyles

_10/6/14_
Date

Affirmed and subscribed before me on this the 6th day of October, 2014 in

Fulton County, Georgia.

_Notary signature_
Notary Public

My commission expires: 12/12/17

(Notary seal: KATRINA CONRAD, NOTARY PUBLIC, FULTON COUNTY, GEORGIA)

2

## Affidavit of Regena Mack

I, Regena Mack, appearing before the undersigned and being duly sworn or affirmed, state the following:

1. I am over the age of 18 and competent to testify to the following facts.

2. I am a resident of Charlotte, North Carolina. My maiden name was Regena Nero.

3. Aquilia Marcivicci Barnette and I are first cousins and I have known him since we were both little kids. I call him Vicci. He is about five or six years younger than me. My mother's name is Tessie Nero. Vicci's mother, Sonia Barnette, is my mother's younger sister. Their other sister, Sheila, is the youngest of the three of them.

4. I am the oldest of my siblings and cousins in our family. I was born in Charlotte but we moved to Columbia, South Carolina when I was little.

5. Vicci and Sonia lived with me and my family in Columbia for a while when I was little. I was in the 1st and 2nd grade then and Vicci was a baby.

6. Sonia and Vicci and their family later moved back to Charlotte. My family still lived in Columbia but we came to Charlotte frequently. We would go visit Vicci and his family – his mother, Sonia, his father, Ricky, and his brother, Mario – at their house in Clanton Park. When we were kids it would generally be Shonda, Vicci, Mario, and me. I remember digging up worms in their back yard.

7. I knew the Austins who lived across the street from Vicci and his family. I had a crush on Greg Austin but nothing happened. I was young.

8. My family moved back to Charlotte when I was in the 6th grade. I hated the move. I wanted to stay in Columbia and be a cheerleader, go to high school, and then go to Clemson.

9. I was surprised when Sonia and Ricky split up. I had no idea that was going to happen. I was totally shocked. I was devastated. I understood that they were fighting and also that Ricky had an affair. I heard that Ricky hit Sonia while they were together. I remember seeing Sonia's ear messed up a many years ago as well as more recently. She only just got it fixed more recently. I didn't know until I was an adult that her ear had been damaged when Ricky tore her earrings out.

10. I saw Vicci and Sonia and Mario quite a bit after Sonia's separation. I saw them when they were living on Windsong Trails and Wendover Avenue. I even went to Atlanta to visit them after they moved down there.

11. I was 16, had a car, and wanted to be just like Sonia. She was the fun party aunt. Sonia had a Corvette at one point and would let me drive it.

Bates No. 106

1

**JA421**

12. I would go see Sonia and we would hang out. We would go to clubs together.

13. I knew Sonia's friend, Tina. Tina and Sonia would party together. Sonia and Tina fell out at some point before Tina died.

14. When I was partying with Sonia, Vicci and Mario were at home, with Vicci being the caretaker of Mario. I remember one time that Mario was hit by a car when Sonia and I were out, but I don't remember the details of how it happened. He hurt his collarbone.

15. Sonia and I would meet guys sometimes when we went out. Sonia dated a guy named Al and another named Mark Ragin. Mark owned a club. I heard about it when Mark was shot and killed. Sonia was very upset about that.

16. Sonia, Vicci, and Mario ended up moving down to Georgia to be with Sheila and her family. I visited them there. Sheila's house in Georgia was set up more like a normal house with food and such. Sonia's apartment in Lithonia, however, was definitely different. There were no beds like one would normally have. Sonia used to have a basket of nail polish in the fridge and that's all she had.

17. Sonia and others in the family were using cocaine in both Charlotte and Georgia. They were also using marijuana in both places. I saw more drinking but I knew Sonia did coke, as well.

18. It was always chaotic in my family's house. There were arguments more frequently than not. There were also physical fights. I stayed in my room a lot.

19. I was treated differently by my family. I always looked different than my sister. Shonda has light skin and was thin. My dad said I should go into the Army but said Shonda should go to modeling classes. My mom didn't like me. I wanted to get out of the house. I later got some counseling to learn to be a better parent. As a mom I try to do the opposite of what my mom did.

20. I met two of Vicci's girlfriends: Tasha and Robin. Robin seemed good for Vicci. I saw her at the hospital after Vicci had been shot by our cousin, LeDon. Vicci was in the hospital because of his leg. LeDon was a junkie and crazy.

21. I saw Vicci after he'd moved back to Charlotte from Virginia following his breakup with Robin. This was at the house on West Boulevard. He was very depressed.

22. Never in a million years could I have imagined Vicci doing what he did. It just wasn't my cousin. He was a good kid. I never could believe this about him. I've never even really seen him mad. I would trust him with my child.

2

Bates No. 107

**JA422**

23. I remember talking to a man before Vicci went to trial the first time. He asked me some basic questions about Vicci, including about when he and I worked together at a hamburger place. I think he was a detective with the police, not someone from Vicci's legal team.

24. I had to go to court for Vicci's first trial. We all went. Then we were sequestered in a room. They were all getting called to testify but I never did. I wanted to help and be called. Nobody said anything to me about not being called to testify, but then I was allowed to go into the courtroom. Then the sentence came so fast I didn't even know what had happened.

25. I never met anyone from Vicci's legal team before his second trial, and I didn't testify then either. I don't think I went to court for any of Vicci's second trial. I was not subpoenaed and I was not sequestered that time. I remember seeing Tasha and their kids while they were in town for the trial. I went to Tasha's hotel to say hello to her.

26. I would have willingly testified for Vicci at the capital sentencing hearing of either of his trials. I care about Vicci a lot and I would have wanted to share with the jury my memories of him and his family.

I swear or affirm that the information in the foregoing paragraphs is true to the best of my knowledge.

_Regena Mack_  
Regena Mack

_12/22/2014_  
Date

Affirmed and subscribed before me on this the 22ⁿᵈ day of December , 2014 in

Mecklenburg County, North Carolina.

_____  
Notary Public

My commission expires: _____

LISA A. OTTENS  
Notary Public  
Mecklenburg County  
My Commission Expires  
01-11-2016  
NORTH CAROLINA

3

## Affidavit of Danielle Mathis

I, Danielle Mathis, appearing before the undersigned and being duly sworn or affirmed, state the following:

1.      I am over the age of 18 and competent to testify to the following facts.

2.      I am a resident of Charlotte, North Carolina.

3.      I knew Aquilia Marcivicci Barnette when we were in middle school together. I call him Marc.

4.      Marc and I went to eighth and ninth grade together at Randolph Middle School in Charlotte. In high school we still kept in touch some because we had some mutual friends.

5.      Marc and I may have first met through friends. We either met in school or in our neighborhood. We were living in the same neighborhood at that time. We didn't live far from where I live now.

6.      Marc and I liked each other. We were boyfriend and girlfriend for a short time but it was just kiddy dating. We used to talk on the phone. We didn't have a physical relationship. The most he might have done was give me a hug. Marc used to walk me to all of my classes. He would be at my classroom when my class got out. He left his own class a little early to come to my classroom. Then he would walk me to my next class.

7.      Another person Marc dated was a girl named Melanie. She was a year or two older. After they broke up Marc was able to bounce back emotionally. He didn't seem to get depressed about it.

8.      Marc got along very well with other kids. He was good looking and dressed nice. He would wear polo shirts and handle himself respectfully. Teachers loved him. He was a good person to be around.

9.      Marc was a happy person and he was energetic. Anyone that was around him was going to be upbeat too. Marc was also gentle and honest. He and I used to have some deep conversations and he would make me feel better when I was down. He was very caring and compassionate.

10.     I knew that Marc was really close to his mom and also his younger brother. He was concerned about looking out for them when we were young.

11.     I never knew Marc to get into any trouble or conflict. The only problem he had that I knew about was that other guys were jealous of him because all the girls liked him.

Bates No. 109

**JA424**

12. I last saw Marc when I was about 20 years old. We had not seen each other for several years. He was working at Taco Bell on South Boulevard. We spoke to each other. We said hello and asked each other how the other was doing. Marc looked a little sad at that time. He wasn't his same upbeat self that I remembered.

13. When I heard about Marc being involved in this crime I was shocked. The Marc that I knew wasn't at all violent. I would never have thought this could happen. I'm crushed about his situation. I can't properly describe the feeling that I have. I have lain in bed and cried about it. Something happened to Marc because the person I knew wasn't like that. The people on the news don't know the full picture of who he is.

14. I was never contacted by any of Marc's trial attorneys or investigators working for them. Had I been contacted, I would have shared with them the contents of this affidavit.

15. I would have willingly testified for Marc at the sentencing hearing of his capital trial. I remember Marc as a kind and caring person when I was around him and I would have shared my memories of him with the jury.

I swear or affirm that the information in the foregoing paragraphs is true to the best of my knowledge.

_Danielle Mathis_   _6/9/14_
Danielle Mathis          Date

Affirmed and subscribed before me on this the _9ᵗʰ_ day of _June_, 2014 in _Mecklenburg_ County, North Carolina.

_[signature]_
Notary Public

My commission expires: _1/20/16_

Zachary Rowles
Notary Public
Durham County, NC

**JA425**

<u>**Affidavit of Victor Montgomery**</u>

I, Victor Montgomery, appearing before the undersigned and being duly sworn or affirmed, state the following:

1.    I am over the age of 18 and competent to testify to the following facts.

2.    I am a resident of Decatur, Georgia.

3.    I used to live in Newnan, Georgia and this is where I first met Aquilia Marcivicci Barnette. We met in 1992 after he moved to Newnan. I called him Marc.

4.    Marc stayed next door to my mother's apartment and that's how I first got to know him. I spent a lot of time at my mom's place. When I first met Marc, he was living with his girlfriend, Tasha Heard. Marc and Tasha argued sometimes and I noticed one time that they were physically fighting.

5.    Marc didn't bother anybody. Marc used to work on his car all the time, a red Volkswagen. In general, Marc pretty much stayed to himself.

6.    Anthony Britt was my best friend and his nickname was Ant. We used to hang out together every day. Ant wasn't a rough character but he didn't take any shit. Ant wanted to get together with Tasha, so he set Marc up to be with his sister, Crystal Dennis. We went over to Crystal's house and Marc started talking to her. After that, Ant started fooling with Tasha. He was fooling with Tasha on a regular basis. He would go over whenever Marc wasn't around. I used to talk to Tasha's friend, Anitra, and I started fooling with her.

7.    I remember the night that Marc ended up shooting Ant. At that time, Marc was fooling with Crystal, but going out with Tasha. Anthony was fooling around with Tasha on the low, meaning that Marc wasn't supposed to know. That night that it happened something was said between Marc and Anthony. Marc was supposed to have said something that got Ant mad. Ant and I were standing outside my brother's house. My brother was also Ant's uncle. We could see clear up the street. We saw Marc walking home to Tasha's apartment. Ant saw him and said he was going to go and straighten Marc out. Ant also said, "I'm going to get his ass." I tried to talk him out of it. I encouraged him to leave Marc alone but Ant and some other guys took off after Marc. I stayed behind at first but then I walked up towards them.

8.    Marc was a little guy, not a big dude, and he was still new in town. Ant had five or six guys with him. They surrounded him. I saw all of this from a distance as I walked towards them. Marc and Ant had words. Ant was threatening to beat up Marc. Marc pulled out a gun and fired two to three shots. Ant was shot one time in his arm.

1

Bates No. 111

**JA426**

9. To me, Marc was in the right. Ant and the other guys would have beaten Marc up, and Marc was going to get hurt. I would have done the same thing as Marc in that situation.

10. I was never contacted by any of Marc's trial attorneys or investigators working for them. Had I been contacted, I would readily have shared with them the contents of this affidavit. I did not learn about Marc's crimes, his trial, or that Marc is on death row until I was contacted last year.

11. I would have willingly testified for Marc at the sentencing hearing of his capital trial.

I swear or affirm that the information in the foregoing paragraphs is true to the best of my knowledge.

_____       _9/18/14_____
Victor Montgomery                  Date

Affirmed and subscribed before me on this the _18th_ day of _September_, 2014 in

_Fulton_ County, Georgia.

_____
Notary Public

My commission expires: _12/12/17_

2

Case 3:12-cv-00327-MOC    Document 74-4    Filed 12/22/14    Page 12 of 50

Bates No. 112

**JA427**

## Affidavit of Jean Nduly

I, Jean Nduly, appearing before the undersigned and being duly sworn or affirmed, state the following:

1.    I am over the age of 18 and competent to testify to the following facts.

2.    I am resident of Charlotte, North Carolina. Before I married, my name was Jean Barber.

3.    Sonia Cooper Barnette and I are first cousins. My uncle, Jesse Cooper, was her father. Sonia is Aquilia Marcivicci Barnette's mother. We call him Vicci.

4.    Sonia is the middle child of three sisters. Her older sister is Tessie and her younger sister is Sheila. Tessie is a number of years older than Sonia. She was a teenager when she got pregnant with her first daughter, Regena. Not long afterwards, she married Jeff Nero and they eventually moved away because Jeff was in the service. My family and I never believed that Jeff is Regena's biological father.

5.    I grew up on the Cooper family property on West Boulevard in Charlotte. Sonia and I both lived there when we were little. I am about three years older than Sonia. We used to play together as kids. I often asked if Sonia could come out to play. ~~However,~~ Sonia's mother, Pearl, ~~didn't~~ always let her and her sisters out. Sonia and I also went to elementary school together. She rode the bus with me.

6.    Jesse Cooper served in the military and he often told stories about the war. He was badly injured in the war and there was a period of time when the family thought he'd been killed. My grandmother always said that Jesse was in the hospital for a long time after he was wounded. Jesse had a glass eye as a result of his injuries. He drank Pabst Blue Ribbon beer and called it his tea. He drank it every day. When he got tipsy he would go lie down and go to sleep, but you still couldn't sneak up on him. In our family the men walked the property to keep people off, and this is something Jesse would do.

7.    Pearl and Jesse eventually split up and Pearl and her kids moved away. I was about 10 years old when Pearl and the family moved out. I remember them driving off. I was sad when they moved. Jesse continued to wear his wedding band his whole life.

8.    The first place they moved to was an apartment. Then they moved to South Side. Then they moved to Windsong Trails. Windsong is where Pearl was shot and killed by her second husband, Loyd Brown. After they moved, I would occasionally talk to Sonia over the phone or go over and see her in person. I went over to the place on Windsong one time with Uncle Jesse. I think we went to drop off some money for Pearl.

**JA428**

9. There was a period of time when Sonia, Sheila, and Vicci came back and stayed with Uncle Jesse. This was while Pearl was with Loyd and after Tessie had moved away. They stayed with Jesse for about a month. Sonia wasn't comfortable around Loyd. I thought he had made a pass at Sonia. Sonia and I laughed and giggled a lot but not after Loyd came into the picture.

10. It was cold out during the time the kids came back and stayed with Jesse. ~~Jesse's~~ My grandfather's car had no heat and he would put hot coals in the car to heat it up. I had just gotten out of school at that time and I looked after Vicci some. I think I was going to Central Piedmont Community College then. I just felt like something wasn't right. I remember Sonia saying she was going to go to a dance at school and it was not long afterwards that Pearl was killed.

11. I remember the night Pearl was shot. I had talked to Sonia before it happened because it was her prom night. Jesse said, "Jean, we have to get the girls." Pearl had been shot. We went immediately to get them. It was so sad when they came down the steps. They were in a fog. Sonia was in shock and Sheila was really upset. Sonia was trying to console Sheila. The police were at the house and Jesse talked to them. We weren't there very long before we took them back to Jesse's. It was very confusing and scary. Sonia and Sheila were both still so young, and Sonia had Vicci, who was just a baby.

12. Sonia never talked about her mom's death and we don't pry in our family. She was clearly very sad. It wasn't very long before they moved to Columbia, South Carolina to live with Tessie. After they moved to Columbia I didn't see them as much.

13. As a kid, Vicci was sweet and kind. He was always wanting a hug. My favorite memory involving him was that he would run up and hug me when he saw me coming. I remember when Vicci was first toddling around. All of a sudden he let go of the table and just took off and started walking. Someone exclaimed, "He's walking!" I hadn't seen him crawl or anything yet. He was still tiny. When he stopped he didn't fall, he just sat down.

14. I stayed in the Barnette house in Clanton Park for a while when Sonia and the family were living in North Dakota. This was when Ricky was in the service. I was there about a year. Sometimes I would talk to Sonia on the phone during that time.

15. One time when I went over to Sonia and Ricky's house in Clanton Park they were both very quiet. All the clothes were out of the drawers and out of the closet. There was a pile of his clothes up to the ceiling and another pile of her clothes that was the same. They had been fighting.

16. After Sonia and Ricky split up, Sonia moved to a place off Wendover Road in Charlotte. I didn't talk to them for a while after that.

Bates No. 114

**JA429**

17. I saw the family more after they came back from living in Georgia. Sheila and her kids also moved back to Charlotte around that time. They all lived in the same house on West Boulevard and it was a house of chaos. Sheila's kids were badly behaved whereas Vicci and Mario were quieter.

18. Sonia's friend, Tina, also lived with the family at the house on West Boulevard for a while. I didn't care for Tina. She always had wine and she was trying to make passes at Uncle Jesse. If she was there at the house I didn't stay long. Tina drank a lot. Sonia liked her wine, too. Sonia and I only had one incident where we drank together. I didn't drink much because I was driving. We both loved to dance and we went out downtown. Sonia drank enough where she was ready to go to bed when she got home.

19. I saw Vicci's kids one time at Vicci and Sonia's house. I remember learning that their mother, Tasha, had just shown up at the house one day with both kids and asked Sonia and Vicci to keep them for a while. The kids ended up staying in Charlotte for about three or four months before Tasha took them back.

20. I knew Vicci and his cousin Don, who is my nephew, had a confrontation and the next thing I knew Don had shot Vicci. Don was living in his grandmother's house on the Cooper property. Vicci was still on the floor in his house when I arrived. The police were also there. Vicci ended up in the hospital.

21. I met Vicci's girlfriend, Robin, when they started dating. I met her at the house when Robin was visiting. I remember Vicci smiling and giggling. He acted like they had just started seeing each other. However, Vicci never really talked about Robin with me. He never talked about any of his girlfriends.

22. A couple of days before the crime Sonia called me about Vicci. She said that he wouldn't work or get a job. He just sits out on a white bucket. He won't go anywhere. She told me that if he keeps this up she would have to take him somewhere. I agreed, telling Sonia she might have to take him to see a psychiatrist or counselor. Sonia asked me to come over and talk to Vicci, so my daughter and I went over to West Boulevard for a visit. When I got there I asked Sonia where Vicci was because he didn't come out to greet me. I called to him, "Vicci, you're not going to come out to talk to me?" He responded that he wasn't. I asked, "What's wrong with you?" and he responded, "I don't know." Vicci was lying on Sonia's bed. I went in there and saw him. I remember taking his arm and moving it. His arm was floppy and limp. He never did get up off the bed while I was there. That was not how he usually reacted when I came over.

23. A couple days later Sonia called and told me about Robin's death. She told me, "I wish I'd taken him somewhere." I went over to the West Boulevard house before Vicci was caught. I remember there were news people there trying to come up to the house.

24. I visited Vicci in jail before his first trial. I believe I went there by myself, but I know that Sonia and other family members were going to see him as well.

25. I talked with Sindy Maxwell before Vicci's first trial. We talked in person at an office. I only met with anyone from Vicci's legal team that one time. Then I was told I would be called to court. I ended up testifying at Vicci's trial. I remember that I cried. I can't remember what they asked me. They only asked me a couple of things and that was it. I was not up there long. I didn't know what they were going to ask me before I took the stand. No one asked me about Pearl's murder or what Sonia was like afterward.

26. I was not contacted by anyone concerning Vicci's second trial. I wasn't interviewed by anyone, I didn't testify, and I didn't attend the trial. I didn't even know when it was happening. I only knew Vicci was in town because Sonia told me.

27. I was living in Charlotte in 2002 and I was talking to Sonia during that time so I could have been reached. I would have talked to someone if they'd asked, and I would have testified if someone thought it might help Vicci because I care about him very much.

I swear or affirm that the information in the foregoing paragraphs is true to the best of my knowledge.

_Jean Nduly_        _11/15/2014_
Jean Nduly             Date

Affirmed and subscribed before me on this the 15th day of November, 2014 in Mecklenburg County, North Carolina.

_____
Notary Public

My commission expires: 1/20/16

Zachary Rowles
Notary Public
Durham County, NC

Bates No. 116

**JA431**

## Affidavit of Shonda Nero

I, Shonda Nero, appearing before the undersigned and being duly sworn or affirmed, state the following:

1.    I am over the age of 18 and competent to testify to the following facts.

2.    I am a resident of Charlotte, North Carolina. I was working doing pet grooming but then I had some health issues and I had to stop.

3.    Aquilia Marcivicci Barnette is my first cousin. I call him Marc.^or Vicci. I am about two years older than him.

4.    My mother is Tessie Nero and my dad is Jeff Nero. My mom and Marc's mom are sisters. His mother's name is Sonia Barnette. Tessie is the oldest sister, Sonia is the middle sister, and Sheila Cooper is their youngest sister.

5.    Vicci and I didn't really grow up together. My family and I lived in Columbia, South Carolina when I was little and Vicci and his family mostly lived in Charlotte. However, we would always get together on holidays. In our teenage years we only spent time together once in a while.

6.    Sonia was married to Derrick Barnette when Marc was younger. We called him Rick or Ricky. Their family lived in the Clanton Park neighborhood.

7.    I learned in my teenage years that Rick was beating Sonia and that cocaine was involved.

8.    There was also domestic violence between my mom and dad. They acted the same way as Sonia and Rick and that made me resent my father. There was violence in my home all the time and it was physical. Even though I had an older sister, Regena, my mother would call for me to help. I had to step in the middle of their fights several times when I was a teenager. At the time I just wanted to protect my mother. My mom and I once moved to another apartment for a while. Mom lived away from Jeff for a whole year and a half but then Jeff found the Lord and quit drinking. However, his change was temporary. I still resent my father for all he put us through.

9.    There have been a lot of secrets and things that aren't discussed in our family. Marc never once talked about Sonia and Ricky, just like I didn't tell about my parents. Also, my mother never talked about her mom, Pearl, and how she was murdered by her husband after she remarried. My sister knew because she was born and was around when it happened, but I didn't know about Pearl's death until I was 13 or 14 years old. Even after learning about it, no one in the family would speak about it.

Bates No. 117

10. My sister, Regena, and I have not had much of a relationship since I was 10 years old. She would live in her bedroom and not come out. Regena would only come out to eat when she wanted to, not when everyone else was eating.

11. When I was in my early 20s, Regena called me one time when her lights were about to get cut off and asked me for $300. I lent it to her and then Regena never paid me back. This damaged our relationship for a very long time.

12. My mom and dad married out of high school. Mom was already pregnant before they got married but dad said he would raise the child like his own. My dad told me about this when I was 17 years old. Then I told Regena that Jeff was not her biological father one time. This was within a year of when I was told that we didn't have the same biological father. Regena knows who her father is. She always suspected that Jeff might not be her father. She never called him dad. She and I look nothing alike. She is dark skinned and I am light skinned and she always said she was the black sheep of the family.

13. When we were kids, my dad would have us up at 5am doing calisthenics. We had to lie on the ground with our feet off the ground. It was brutal. We got spanked all the time. We used to have to pull our pants down and get spanked. This went on until I was 12 or 13 years old. At that time I had pubic hair and I did not want him to see it, so I took the belt away.

14. My father's side of the family was about drugs, thugs, and slums.

15. I got in trouble growing up. I fought all the time. I used to fight the girls that my boyfriend was cheating with; I didn't realize I should be upset with my boyfriend. I went to jail for fighting one time when I gave a girl two black eyes. I was 14 or 15 years old and the fight was over a guy. I was in jail for a couple of hours and then my dad picked me up. I thought he was going to be furious but he busted out laughing. I learned that when my dad was 16 he once broke a guy's nose.

16. I also got two DWI's in my 20s. The second one was when I was 22 and I ended up having to serve 30 days in jail for it.

17. I first got pregnant when I was 15. My mom took me to have an abortion at a medical facility in Charlotte. My mom wanted it to be a secret. This was on my 16th birthday. However, they told me they couldn't do it because I was too far along. Now I am thankful I had my daughter Alex and didn't get the abortion.

18. After I had Alex, my boyfriend Silky and I had another baby named Shauna. We ended up putting her up for adoption. I met Shauna last year for the first time. It was great to meet her. She looks like Alex and she is about to get a tennis scholarship. I also have a third child.

Bates No. 118

19. I was never faithful in my relationships but I have always been up front about that. I told the guys I was with when I cheated on them. In the same way that Silky cheated on me, I cheated with other guys. However, I have now been married eight years and I've been faithful.

20. There came a time when Rick had a paternity test done that indicated he was not Marc's biological father. Sonia could have gotten together with someone else besides Rick. She partied and she was a clubber.

21. Just like Marc, I was finding out stuff about my family as I grew up. I was 17 when I found out my sister, Regena, was not my dad's daughter. Regena didn't know this either. My family really isn't who they say they are. My father did drugs and I didn't know this until I was 16 or 17 years old.

22. My family and I moved to North Carolina from Columbia, SC when I was 10 years old. We have been in Charlotte since then. At first we lived off Ottawa Road in the Ottawa Apartments. Then we moved to Farm Pond Road where we lived for 8-10 years. While we were on Farm Pond Lane, there was a time when Marc came and lived with our family.

23. Marc lived with me and my family for a couple of months. He was just a tag-along. He was goofy. He tried to fit in. If you met Marc on the street you would not have the perception that he was a thug.

24. Marc and I really didn't have a close relationship but he and I had fun together. It was not like he had to answer to me. I was like his big sister. Sometimes we would go clubbing. Marc would hang out with my boyfriend. He was happy. He'd dance. I was in a dance group and the guys had another dance group. This was in the 80s and we would get letters put on our t-shirts and sweatshirts. My group was called the GBs - the Gray Babes. We were a group of friends. It was kind of like break dancing movies. One club we went to was called Glory Days. When certain songs came on each group would dance. We used to go and dance all night long. It was fun.

25. Silky was my boyfriend then and he was around a lot. His real name is Antoine McKenzie but he goes by Silky Jones. He is about four years older than me. He and I were together on and off for eight years. He would always be at my house. Silky always looked young, and he was friendly and outgoing. He and Marc became friends. Silky would stay over at our house with me sometimes. Sometimes I would sneak out and sometimes I would sneak him in. I would also steal my mom's car sometimes.

26. I never had any consequences to getting in trouble. I'd come home whenever I wanted. I didn't have to answer to anybody. I never got restricted by my parents.

Bates No. 119

**JA434**

27. When Marc was around us he was always shy towards girls. He would always close up around girls. He dressed in the MC Hammer style with the huge baggy pants and big shirts. He had no definition in his arms. He never had facial hair. It took him longer to reach puberty. He looked so young and his demeanor was so juvenile. He had more of a feminine body type. Marc never told me about girlfriends so I assumed he was gay. I think I even asked him but he just said no and started laughing

28. Marc would sometimes ask me girl advice but not about specific girlfriends. He had a one night stand type of relationship with my friend Lori Osborn one time. Lori lived four doors down from us and was promiscuous. She and Marc had sex. That's all it was. It was never holding hands. .I only found out about Marc and Lori afterwards when each of them told me about it. Lori had a boyfriend at the time so it had to be kept quiet.

29. My mom and dad used to have house parties. They drank and I was the bartender. Mom drank Dewar's and water. They were all partiers. I know Sonia and them used to do drugs. They would snort cocaine and smoke weed. Later I found out my sister did drugs too. She told me she used to do cocaine. She started doing that when she was in her mid-20s.

30. When we were little Sheila was the first one to go live in Atlanta. We all thought she was doing well. However, Sheila's boyfriend, Michael O'Neal, was a coke addict and a dealer. He got Sheila turned on to drugs. I remember that Sheila had a yellow Corvette. It was duck yellow with a white rag top. She also had a Nissan Maxima and an SUV. Sonia and Sheila were doing cocaine together and partying to the point where the kids were left to fend for themselves. When I found out that Sheila and Sonia did cocaine I lost all respect for them and disassociated from them. I felt they had been fakes.

31. Marc didn't have any real problems until he started dating. He always seemed scrawny so nobody took him seriously.

32. I only met Marc's girlfriend, Tasha, one time. I remember that Marc was excited about having his kids, Marc Jr. and Angelica, with Tasha. Marc thought Tasha was someone he would stay with forever.

33. Marc dated my friend Temeka Hunter for a while. Temeka and I worked together at a club called The Party Zone when I was between the ages of 17 and 20. She was married at the time and having marital problems. Temeka and Marc first met when Temeka once came with me to see Marc. After that, Temeka and Marc developed a relationship and started seeing each other. Marc was still living in Georgia at the time.

Bates No. 120

**JA435**

*her* @

34. Marc later dated Robin. He brought ~~me~~ *her* to meet me one time when I was living at the @ Castlewood Apartments. It was just Marc, Robin, me, and possibly my ~~husband~~ *boyfriend* Gerald. We hung out for a little while. Marc and Robin seemed to be happy and in love but something about her rubbed me the wrong way. I remember Robin dictating to Marc like a parent. He was like her little puppet. However, Marc seemed like he was with the person he wanted to be with. I saw them holding hands.

35. Either Marc or Sonia said they thought Robin was putting stuff in his food. They said Marc was always feeling sick to his stomach while he was with her. Robin and her mother were into voodoo stuff. After Marc was locked up I went into his room and found a Seagram's gin bottle that had some milky white stuff in it. It was something Robin made and whenever they got married they were supposed to drink it together.

36. Marc would call me from time to time from Virginia after he'd moved up there to live with Robin. When they broke up I thought it was a temporary thing.

37. I could tell that something was wrong with Marc after he and Robin broke up, and he moved back to Charlotte. He called me and asked if he could stay with me for a little bit. I told him that was fine. At the time I was a single parent and worked nights. When Marc stayed with me he slept in my daughter Alex's bedroom. She was staying at my mom's place at the time. He stayed in the bedroom almost the whole time. He didn't open the blinds, didn't open the door, and didn't eat. When I asked him if he was okay he said he was fine. I asked Marc to go eat, take a walk, and do things like that but he wouldn't do it. This was a change in him because he was normally a happy person. All he would say was that he would get through it and he would be fine. He never discussed his inner feelings. I remember he would have the blankets over his head when I would go in Alex's room. When he did come out of the room he would sit on the floor instead of on the furniture with his head down and his legs stretched out. He never talked. He just acted depressed. He didn't want to discuss it. If he had tried to talk to someone maybe all this wouldn't have had to happen. I told Marc he needed to talk to someone. He stayed with me for about three days.

38. Marc was at my house in Alex's room when I found out about the fire. Marc had come to my house the day after the fire. I first heard about it on the radio, but they didn't say who had done it. When I found out they thought it was Marc, I didn't believe it because Sonia told me that Marc was there at the house the next morning when they woke up. I thought there was no way that was possible.

39. I was working at TJ Maxx when I first saw the news that Robin had been shot. The next day I was off of work. The phone would ring but nobody would be on the other end. I didn't know what was going on. I know I talked to Marc once but I don't know how or when. I have blocked a lot of my memory out. He told me he wanted to get back to his mother. I know I asked Marc what had happened but he wouldn't talk. I told him to get back to me and I'd try to get him in safely.

Bates No. 121

**JA436**

40. When the crimes happened I was blown out of the water. Marc just wanted someone to be with. He wanted to belong to somebody. He wanted to feel needed but he kept getting broken. He just went numb.

41. All of Marc's troubles have been related to girls. It would have been better if he had spoken to someone like a counselor a long time ago. Marc has always been a person who didn't express his feelings. He considers me one of his closest people but I never talked to him. Marc kind of reminds me of my daughter. She listens but she shuts down. You can tell when something is wrong but she doesn't want to talk about it.

42. You can tell when Marc is not doing well because he just closes in on himself. I could see it. He looks very different from when he's feeling confident. His chest was in and he was looking downward. When he was having problems with Robin it totally affected him. I would try to talk to him but he would brush it off and not elaborate. He would tell me that he would be fine.

43. I would ask Marc how he was doing but he wouldn't tell me. He wouldn't say he was hurting. Instead he would say, "I'm going to think about it." I would ask him what he was going to think about. I always wanted him to tell me the story from beginning to end. He didn't trust anybody enough to do that. He could have said he needed me to hold him or he needed me to be there for him. Marc would never give me a real explanation.

44. Marc was never conceited and he didn't have a big ego. He didn't think he was sliced bread. He had dreams and always wanted to take it to a higher level. However, relationships made him feel small. He didn't feel like his mom was there for him. He never had a sense of security in his relationships. My daughter was raised without a father and that is why she loves so hard and has always needed a guy.

45. Marc could have been a very successful person if all this had not happened. He could be energetic, happy, and full of life.

46. After his conviction at the first trial, but when he was still in Charlotte, Marc would call me and write me sometimes. He said he knew he had to pay for what he'd done. He couldn't sleep because all he saw was Robin's face. Marc would see her standing there looking at him. He thought he was going crazy because he was always seeing Robin.

47. Marc wrote me a letter at some point after his first trial. It was an apology. However, he was losing his words because he was in jail. He sounded like he was babbling in the letter. Almost every other sentence would leave out words.

48. I remember going to Sonia's for a 4th of July cookout one year and Marc was on the phone. We passed the phone around and I talked to him for a few minutes.

**JA437**

49. I don't see Marc as a stone-blooded killer. I would never feel threatened by having him in society. Marc could be rehabilitated. From day one I know he was remorseful. He's paying for it on the inside even more than being physically locked up.

50. The only people that talked to me before Marc's trial were two guys that came to my house. I was living at Castlewood Apartments at the time. I think they were detectives. I stood outside and talked to them.

51. I don't remember anyone on Marc's team named Sindy. I never met a Sindy in person but I could have talked to her on the phone. I only got contacted by Marc's legal team right before his first trial. I did testify at Marc's first trial. I was subpoenaed to appear and testify. I never had a briefing about what my testimony would be about. I got no testimony preparation.

52. I was called to the stand and asked how I knew Marc. I thought I was a character witness. I testified that Marc was a happy person. I was never told what kinds of questions I would get asked. This is why my testimony was so short. My testimony could have been better if it had been more planned out. Afterwards, I was so upset I left the courthouse. Part of my testimony was quoted in the paper. They quoted me saying, "This is not the Marc we all know and love."

53. I did not testify at Marc's ~~the~~ second trial. I was never contacted by anyone from Marc's legal team before his trial. I hadn't moved since Marc's first trial. I had the same exact address. I still lived in the Castlewood Apartments in Charlotte.

54. I would have willingly testified for Marc at his second trial. I would have wanted to share with the jury my memories of him and his family.


I swear or affirm that the information in the foregoing paragraphs is true to the best of my knowledge.


_Shonda Nero_                                         _8/24/14_
Shonda Nero                                              Date


Affirmed and subscribed before me on this the 24ᵗʰ day of _August_ , 2014 in _Mecklenburg_ County, North Carolina.

_[signature]_
Notary Public

My commission expires: _1/20/16_

Zachary Rowles
Notary Public
Durham County, NC

**JA438**

<u>**Affidavit of Tessie Nero**</u>

I, Tessie Nero, appearing before the undersigned and being duly sworn or affirmed, state the following:

1. I am over the age of 18 and competent to testify to the following facts.

2. I am a resident of Charlotte, North Carolina. Before I married my husband, Jeff Nero, my maiden name was Tessie Cooper.

3. I work for Tolt Solutions and I have been with them for over four years. I work in accounting administering accounts payable. Before that I worked for 25 years at Wellman Inc.

4. Aquilia Marcivicci Barnette is my nephew and I have known him since he was a baby. People in our family call him Vicci. I am one of three sisters. Sheila Cooper is my youngest sister and Sonia Barnette is the middle sister. Vicci is Sonia's son.

5. My parents were Jesse and Pearl Cooper. Pearl later remarried and her name became Pearl Brown. Mom was a nurse. She worked each day from 3pm to 11pm. She used to fix dinner before going to work and leave it for me and my sisters. She would be gone by the time I got home from school so I saw more of my dad. He didn't work at that time. He was disabled from fighting in the Korean War and had a glass eye. Later, he worked as a school custodian.

6. I tell everyone I was a daddy's girl. I can't ever remember a time where my dad disciplined us. Mom was always the one to discipline us and she was a strict disciplinarian. She was a believer in spanking. We would get it on the backside and on the legs with a switch or a belt. I ended up inheriting my mom's discipline style.

7. I was surprised when my parents broke up. There had been no physical fighting between them before they split up but there were arguments. I remember some of the arguing but I didn't understand it.

8. I am nine years older than Sonia and I was out of the house sooner. I got married as a senior in high school. My husband, Jeff, was going off to Vietnam. His unit was replacing a unit where a friend had been killed. He was in Vietnam for a year. My mom was getting divorced when I was getting married and I lived in her apartment while Jeff was in Vietnam.

9. When I was living with my mom after the separation it was Pearl, Sonia, Sheila, Regena, and me in the house. I think we first lived on Justin Avenue and then we lived in the Southside neighborhood. I graduated from high school in May and my first daughter, Regena, was born in November. When I had Regena I wasn't ready to be a mother. I cried about it. My mom helped me take care of her.

Case 3:12-cv-00327-MOC   Document 74-4   Filed 12/22/14   Page 24 of 50

Bates No. 124

1

**JA439**

10. My younger daughter is Shonda. When Jeff came back from Vietnam he had orders for Germany, but those orders got changed and they gave us Alaska instead. Shonda had her first birthday in Alaska. Before that we were stationed at Fort Benning in Georgia where Shonda was born. We lived in Fort Benning for about a year.

11. I remember my mom dating a man named Herman Mazyck. He is the only person I remember in my mom's life other than my dad. Then Jeff and I moved to Georgia and I never met Loyd Brown, the man she later married.

12. Pearl married Loyd Brown after I'd left Charlotte and he murdered her within a year of their marriage. I saw him for the first time when I came home for some of his court dates. It was a horrible shock to hear of my mom's death. It happened shortly after mother's day. Sonia, Sheila and Vicci were in the house when he killed her. I came back to Charlotte shortly after it happened. After that, Jeff requested and received a compassionate reassignment to Columbia, South Carolina so we could be closer to home. I drove to Charlotte almost every day in those days after it happened.

13. Pearl's death was traumatizing. Sheila is the one that found her after she had been shot. After that Sheila got involved with friends that weren't friends. I had to tell her more than once that she wasn't the only one that lost a mother. Sheila stayed out a lot with her friends.

14. There was a time when Sonia and Sheila moved back in with their dad ~~before~~ after ⅗ Pearl was killed.

15. Sonia, Vicci, and Sheila ended up moving to Columbia to live with us. They didn't stay with our dad after Pearl was killed because Jesse was not providing for them. He was drinking Pabst Blue Ribbon beer. He drank a lot. After the war he was not stable. The effects on him contributed to the split between him and Pearl. As long as I can remember he told the same war stories. He re-lived it and he rehashed it. It was kind of hard to be around him. I didn't realize it back then, but now I see some of the signs that he had been traumatized in the war. I can remember hearing him shout out at night, "No! Stop!" I don't think he drank as much before the war, although I think he really increased his drinking after he and mama split. Then it became every day. Most days after the split and after Pearl's death he was intoxicated. He was never physically or verbally abusive when he was intoxicated. He just talked about the war.

16. I remember trying to figure out what to do with Sonia and Sheila after Pearl was killed. Then Jeff said they could live with us in Columbia, so that's what happened. This put me in more of a motherly role with them. I remember giving them interrogations. I was a stay-at-home mom when we were living in South Carolina. I took care of my kids and Vicci.

**JA440**

17. Sonia ended up marrying Derrick Barnette, who I call Rick or Ricky. I first met him as a teenager when we were living at Jesse's. This was before our parents split up. I thought he was a spoiled brat as an only child. He was used to having his own way. He wasn't really rude but he just had an attitude.

18. I know that Ricky had a paternity test done after he and Sonia split up, and that the test indicated that he is neither Vicci's nor Mario's biological father. I was taken aback that a test was even needed. I never understood the question of why it was needed.

19. I remember once that Sonia's ear lobe was torn through. Sonia told me this happened when she and Ricky were in an argument and he tore her earring out. I think we were cooking out at the time she told me, but then Ricky walked into the kitchen while we were talking and Sonia changed the subject. Sonia has now had her ear lobe repaired. She had it stitched up. She did this more recently at the medical office where she works.

20. After Sonia and Ricky split up, Sonia left her kids home alone a lot. Vicci was about 13 or 14 years old at that time. *SR*

21. When my family and I moved back to Charlotte from South Carolina, Sheila was living in Atlanta and Sonia was in Charlotte working for All State. Sonia moved in with me for a little while before she, Vicci, and Mario moved to Atlanta.

22. I remember one of Sonia's boyfriends she had after her relationship with Ricky ended. His name was Sam Walton and he is now deceased.

23. Another person Sonia dated was a guy named Al. I didn't like him.

24. Another guy in Sonia's life was Mark Ragin. He had drug connections and was living the fast life. I was afraid for Sonia while she was with him. He was running a club called St. Mark's. I went there a couple times but I didn't know what was going on behind the scenes. Mark didn't have a 9-5 job but he had money. He had a black Corvette and also a Lexus. He was eventually shot and killed. Sonia was upset when he was killed. She had been spending a good deal of time with him.

25. Sonia also spent time with her friends Tina and Jackie. Sonia and Jackie went to school together in Columbia. She would visit Sonia in Charlotte sometimes.

26. We were all drinking at that time.

27. Vicci was a typical teenager. I didn't see excessive behavioral problems. He was always well-mannered. He was talented in art. After they moved to Atlanta he had trouble. Things got tough for Vicci during his relationship with a girl named Sheila. He then dated Tasha and they had a volatile relationship.

Case 3:12-cv-00327-MOC   Document 74-4   Filed 12/22/14   Page 26 of 50

Bates No. 126

3

**JA441**

28. After the breakup with Robin, Vicci was despondent. He wasn't himself. It was like he had given up all hope

29. After Vicci was locked up I visited him several times at the jail in Charlotte. At first he was very depressed. Sometimes I visited Vicci with Sonia and other times I visited him with my granddaughter. I have also talked to Marc on the phone a number of times over the years when he's called my house from prison. When he calls he will ask me how I'm doing and how others in the family are doing. Family is important to Vicci.

30. Before Vicci's first trial, I met and talked to Sindy Maxwell, although I don't remember her well. Sindy was working with Vicci's attorneys. I testified at Vicci's first trial and I gave my account.

31. During my testimony, I was asked by Vicci's lawyer about the effect of our mother's murder on me and my sisters. I responded that it had a very profound effect. I was never asked to describe or explain what that meant. Had I been asked that question, I would have explained how both Sheila and Sonia changed a lot after the fact. They were both so young; Sheila was only 11 years old, and Sonia was 15 years old and had Vicci, who was only 10 months. They both started partying more, running around, and being less responsible about things. As I mentioned during my testimony, it wasn't something we talked about. Everyone was going through very intense feelings and emotions, but no one knew what to do with those feelings.

32. Before Vicci's second trial I remember Sonia saying there was a person named Cessie on Vicci's legal team. However, I don't' remember if I ever talked to Cessie.

33. I don't know either of Vicci's attorneys from his second trial: Harold Bender or Jean Lawson. I was living in Charlotte in 2002 but nobody ever came and talked to me at my house before the trial. I think I was living on Wendover Avenue at that time. Sonia has always been in touch with me so anyone could have gotten in tough with me through her. Most of what I heard about Vicci's situation came from Sonia, or from a call from Vicci.

34. I remember that Vicci's second trial was held in the old courthouse instead of in the Federal courthouse. I think I may have attended a little bit of the trial. I don't know why Vicci's legal team didn't have many of our family members testify like they had in his first trial.

35. I never read my testimony from the first trial until someone from Vicci's legal team showed it to me last year.

Bates No. 127

**JA442**

36. I would have willingly testified for Vicci at his second trial. I love my nephew and I would have wanted to share with the jury my memories of him and his family.

I swear or affirm that the information in the foregoing paragraphs is true to the best of my knowledge.

Tessie Nero

Date: 11-15-14

Affirmed and subscribed before me on this the 15th day of November, 2014 in

Mecklenburg County, North Carolina.

Notary Public

My commission expires: 1/20/16

Zachary Rowles
Notary Public
Durham County, NC

## Affidavit of Claire J. Rauscher

I, Claire J. Rauscher, appearing before the undersigned and being duly sworn or affirmed, state the following:

1. I am over the age of 18 and competent to testify to the following facts.

2. I am a member of the North Carolina and Pennsylvania bars. I was a public defender with the Defender Association of Philadelphia before moving to Charlotte, North Carolina and opening up my own private criminal defense practice. From 2005 until 2011, I was the Executive Director of the Federal Defenders of Western North Carolina, Inc. I am currently a partner at Womble Carlyle Sandridge & Rice, LLP.

3. I have handled all types of criminal cases throughout my career, including capital cases and federal cases. All of my capital matters resolved themselves (to life sentences or less) prior to trial.

4. I was appointed to represent Aquilia Marcivicci "Marc" Barnette, along with Jean Lawson, in February 2001. Neither Jean nor I had any involvement in Marc's original trial, which was handled by George Laughrun and Paul Williams. When Jean and I were appointed in 2001, Marc was awaiting a new sentencing hearing.

5. In April 2001, I wrote then-U.S. Attorney Robert Conrad about the Barnette case. I explained that Jean and I were working through 18 boxes of files from prior counsel, 15 volumes of transcripts from the first trial, and one box of discovery that we had received from the government in March 2001.

6. On August 28, 2001, Jean and I filed an *ex parte* document called "Statement of Defense Contentions," in which we identified a handful of issues about which we wanted the court to be aware. Based on our work in the case up to that point, we wrote that "an approach different from that used in his first sentencing hearing [was] warranted." We believed that the first defense team had done a poor job trying to address Marc's relationships with other women, and had, in some instances, appeared to blame the women for any difficulties that existed. It was our belief that we would need to directly address Marc's prior relationships and develop a far better understanding of them than what the first defense team had or presented to the jury.

7. Based on our review of the case materials as of August 28, 2001, it was also apparent that the first defense team presented a "disjointed" sentencing case. As we explained in the motion, "[W]itnesses were unprepared for cross-examination. The investigation was

1

Bates No. 129

superficial and not-sufficiently in depth to enable the formation of a cohesive theory of mitigation."

8. Thus, as of August 28, 2001, it was clear to me and Jean Lawson that we needed to re-evaluate everything that the first trial team did, meet with their experts and review all of their data and evaluations, identify additional experts who might be needed, and identify and interview numerous family members, co-workers, and other potential witnesses.

9. In addition to filing our *ex parte* Statement of Defense Contentions, Jean and I also filed *ex parte* motions for funds to hire a private investigator (Jan Barefoot) and mitigation specialist (Cessie Alfonso).

10. Our need for having both a mitigation specialist and investigator was clear to me. We needed Jan to locate various witnesses for Cessie to interview. As we explained in our *ex parte* motion, it was also evident to us that some of the witnesses we needed to talk with "were hostile to the defense at the defendant's first trial and sentencing." As a result, we believed that we needed to have an investigator locate and approach these witnesses; they were not necessarily going to come to us. These witnesses included some of Marc's former girlfriends.

11. With respect to hiring Cessie Alfonso, it was evident to me and Jean that we needed to replace Sindy Maxwell, who had handled the mitigation investigation for the first trial team. As we wrote in the *ex parte* Statement of Defense Contentions, "[Maxwell] failed to develop adequate rapport with the defendant's family and friends that would have enabled her to unearth critical biographical information. She prepared a "time line" purporting to represent the defendant's life history and omitted critical information. These omissions cast doubt on the reliability of other expert witnesses called by the defense. As a result, the honesty of the defense presentations was compromised." The deficits in Sindy's earlier work were particularly problematic because this was a resentencing trial and the primary focus would be on mitigation. Thus, there was little question that we needed to replace Sindy with someone new.

12. On August 31, 2001, just a few days after we filed our initial requests for expert funding, the resentencing trial was scheduled for March 19, 2002.

13. Our requests for funding to hire Jan Barefoot and Cessie Alfonso were not granted until October 10, 2001. The actual CJA Authorization forms for both Jan and Cessie were not issued until October 25, 2001.

2

**JA445**

14. On October 31, 2001, two months after the Court scheduled resentencing for March 19, 2002, Jean and I filed a motion to continue the trial. As we wrote in our motion to continue, both Jean and I had major commitments in other cases that gave us significant concern about our ability to be ready by March 2002. I had a number of major federal cases on the trial calendar. Jean had other capital cases, including a trial scheduled for January 2002. We were also very concerned about having only four-and-a-half months to investigate and prepare a penalty phase presentation for Marc. Our mitigation specialist was just getting started, and we had not yet spoken with any other experts—both experts from Marc's first trial (who we needed to assess and decide whether to use again) as well as potential new experts.

15. The Court granted our motion to change the March 19, 2002 trial date, but instead of moving the case to a later date, the Court moved the start of trial up to March 12, 2002. Jean and I filed a motion asking the Court to reconsider the trial date of March 12, 2002. At a hearing on November 29, 2001, much to my surprise and dismay, the Court removed me as Marc's lawyer after I asserted what I believed was a conflict due to the scheduling of Marc's resentencing and my other cases.

16. I had no further involvement in Marc's case until 2009, when Marc's case was remanded to the U.S. District Court for a hearing on a *Batson* claim.


_____          11/19/2014
Claire J. Rauscher                        Date


Affirmed and subscribed before me on this the 19th day of November, 2014 in Mecklenburg County, North Carolina

_____
Notary Public

My commission expires: 9/11/2018



3

Bates No. 131

## Affidavit of Weona Sharpe

I, Weona Sharpe, appearing before the undersigned and being duly sworn or affirmed, state the following:

1. I am over the age of 18 and competent to testify to the following facts.

2. My name is Weona Sharpe, but people call me Wendy. I am a resident of Charlotte, North Carolina.

3. I have known Aquilia Marcivicci Barnette since we were both kids. I call him Vicci. I am about two years older than Vicci. We are related through our mothers. My mother, Bessie Sharpe, and his maternal grandmother, Pearl Brown, were first cousins. This makes me second cousins with his mother, Sonia Cooper Barnette.

4. Our families were close when I was growing up. Sonia and her family would often stop by our house and visit. We would also see each other at family reunions. I had heard about Pearl and how she was killed. I was born in 1971 so I was just a child at the time. However, my family did talk about it because I asked. I was told that Pearl was murdered by a man. Pearl had been close to my mom, who told me that Pearl was really outgoing. My aunt said they used to like to go over to Pearl's house.

5. I have also known of Sonia's father, Jesse Cooper. He was like a recluse. He didn't socialize much.

6. My mom died when I was 10. After that we moved to the Clanton Park neighborhood of Charlotte and I lived there until I was 16. My mom's name was Bessie. Mom's death was a suicide. We were at the house when it happened. I saw my mom after she'd died and that had a big impact on me. We've had our share of tragedies in my family.

7. In addition to my mom, there is some history of depression and suicide in our family. I've had one niece and two nephews who've each attempted suicide. None of them have died. I also have an aunt on my mom's side who acts crazy.

8. When we were kids, Vicci and I used to live in the same neighborhood. My family and I lived at 1000 Comstock Drive in Clanton Park. Vicci and his family lived on the same street, a couple blocks down.

9. Vicci and I went to some of the same primary schools. I attended Beverly Woods Elementary and Barringer Elementary. I was two grades ahead of Vicci. I would see him at school and we rode the bus together. Vicci wasn't a loud rambunctious kid. He hung out with his friend Steve Austin. They were really close. They would sit together on the bus.

Bates No. 132

1

**JA447**

10. I used to babysit Vicci sometimes when I was growing up. I would go down to Vicci's house and babysit. This was when I was about 12 years old. I would babysit both Vicci and his younger brother, Mario. They used to just run around the house. It would be just a couple of hours of babysitting at a time. I would babysit if Sonia and her husband Ricky were going out.

11. Our neighborhood was a place where we could spend time in the street and ride bikes. If we got in trouble we might get a whupping from a neighbor and then get another one back home. People knew I was a Sharpe. They might not remember my name but they knew which family I belonged to.

12. Vicci would knock on our front door in the middle of the night sometimes. This could be midnight or two in the morning. We'd give Vicci a blanket and a place on the couch to sleep. He never said anything about it but there was something wrong for him to show up at our house in the night like that. Vicci would look upset. He would be in pajamas, and barefoot. Mario was never with him. It was always just Vicci.

13. Vicci always slept on the couch in our living room. We had two couches and one of them let out into a bed. We would feed Vicci breakfast in the morning and he'd hang out a little. We would also call Sonia in the morning and let her know that he was there at our house. It got to a point where we knew who it was when we heard a knock on the door in the middle of the night. Vicci came to our house in the middle of the night numerous times over a period of months. I don't know why he eventually stopped.

14. As a truck driver, my dad was gone a lot for work and it was usually just me and my sisters at our house. Our dad would usually be gone for the whole week and then come back for a couple of days. He'd try to be here on the weekends.

15. Vicci's dad would try to talk to my older sister Nita in an inappropriate way. He'd come to the door and ask for her. Nita was a teenager at the time – maybe between 18 and 20 years old. She would talk to Ricky for a bit. They would just talk in the living room. She'd sit on one side of the living room and he'd sit on the other. I questioned why he was there, especially when his wife, Sonia, was back at his house. Nita thought it was weird and inappropriate too. We never told Sonia about these visits.

16. After Ricky and Sonia broke up, Ricky dated someone I knew. She was the aunt of a friend of mine. Her name was Blondie Fleming and she was a school teacher. She lived in Clanton Park. I was over at Blondie's house one time when Ricky showed up. I was in high school when this happened.

Bates No. 133

17.     I saw Vicci only a couple of times at family reunions after we grew up a bit. I saw Vicci at a reunion not too long before everything happened. We would usually have our reunion at a park where we would have a limited amount of time to be together. Then we would generally move to someone's house. This particular year we went to my grandmother's house and Vicci stopped by. We were sitting and talking. Vicci was trying to reconnect. He said to me that we needed to get together more. I remember Vicci told me he had been shot by his cousin. I remember that Vicci was planning to move up to Virginia to be with his girlfriend.

18.     The next thing I heard about Vicci was the news about the shootings. Hearing about the crimes was a total shock. It was totally out of his character. It's just not him.

19.     After Vicci was locked up I wanted to go see him. However, I was told by his aunt Tessie that I shouldn't because Vicci was unstable and on suicide watch.

20.     My father has passed away since I became an adult. His name was Willie and he was a truck driver. He wasn't there at home that much when I was a kid. Our father was cold to us. He loved to play with and be around other kids but he never showed any affection toward his own kids. My dad disowned me and my sisters when I was 16. This was when he got remarried and we didn't like his new wife.

21.     I was never contacted by any of Marc's trial attorneys or investigators working for them. Had I been contacted, I would readily have shared with them the contents of this affidavit.

22.     I would have willingly testified for Marc at the sentencing hearing of his capital trial. When I saw him last he was still Vicci. He was still the little kid I grew up with. I would have wanted to share with the jury my memories of him.

I swear or affirm that the information in the foregoing paragraphs is true to the best of my knowledge.


_3Keene A. Sharpe_          _11· 21· 2014_
Weona Sharpe                      Date


Affirmed and subscribed before me on this the 21st day of November , 2014 in

Mecklenburg County, North Carolina.

_Lisa A. Ottens_
Notary Public

My commission expires: January 11th, 2016

LISA A. OTTENS
Notary Public
Mecklenburg County
My Commission Expires
01-11-2016
NORTH CAROLINA

<u>**Affidavit of Sandra Smith**</u>

I, Sandra Smith, appearing before the undersigned and being duly sworn or affirmed, state the following:

1.     I am over the age of 18 and competent to testify to the following facts.

2.     I am a resident of Charlotte, North Carolina. My maiden name is Sandra Mason.

3.     When I was growing up, my family lived in the same neighborhood as Pearl Cooper. Pearl was a nurse who worked at the hospital.  I remember her as nice, sweet, and kind.

       Sonia Cooper was one of Pearl's daughters.  Sonia later had a son named Aquilia Marcivicci Barnette, whom I have always called Vicci.

4.     I was close in age to Sonia's older sister, Tessie. Tessie went to York Road High School. Tessie ended up getting together with a guy named Luther Shankle, who also went to the school.

5.     Pearl was with a man named Loyd.  I heard that Loyd had mental problems and that he had been one of Pearl's patients. Sonia used to refer to him as her "mama's husband." Sonia didn't like Loyd. Before Loyd and Pearl married, I used to go over to the Cooper home.  After they married, however, I didn't go over to their house.

6.     I heard about it when Loyd killed Pearl. Sonia and her younger sister, Sheila, were the ones that found their mother after she'd been killed.

7.     It would be awful for anybody to lose their mom like Sonia and Tessie did.  Sonia never talked very much about her feelings or what she thinking about; she was more of an introvert when we were teenagers.  She didn't really share what she was going through after her mother was murdered.

8.     While still in high school school, Sonia started dating a guy named Larry. Everybody knew she was dating him. Then she got pregnant with Vicci.  After Vicci was born, the family said that Vicci's dad was Ricky Barnette.  There was something on the down low about the situation and it was never clear to me what the truth was – although Sonia always made it clear that Ricky was the biological father.

9.     After Vicci was born, I looked after him sometimes when he was a baby. I am a couple years older than Sonia and it was during my first year out of high school when I babysat Vicci. This was when Sonia was still in school.  She was so young, which made raising a child difficult enough.  But then when Pearl was killed, it brought all sorts of craziness and stress into the equation.

**JA450**

10. I never knew until last year that a paternity test showed that Ricky was not Vicci's biological father. It surprised me to hear this since Sonia and the family were always adamant that Ricky was the father, even though other people had questions.

11. When Vicci was a teenager, he and Sonia moved back into our neighborhood for a year or two. Vicci is close in age to my daughter, Lekeishea, and the two of them became friends. After they moved away again, we lost touch with him and Sonia.

12. I heard about the crime and Marc's trials when they were on the news. My sister, Carrie, works as the Deputy Clerk for the Bankruptcy Court at the courthouse and she once saw Vicci when he was there for his trial. Carrie also knew Vicci and Sonia.

13. I was never contacted by any of Marc's trial attorneys or investigators working for them. I was married and living in Charlotte in 1998 and also in 2002. Had I been contacted, I would readily have shared with them the contents of this affidavit.

14. I would have willingly testified for Vicci at his resentencing. I would have wanted to share with the jury my memories of Vicci and his family.

I swear or affirm that the information in the foregoing paragraphs is true to the best of my knowledge.

_Sandra Smith_        _8-24-2014_
Sandra Smith             Date

Affirmed and subscribed before me on this the 24th day of August, 2014 in Mecklenburg County, North Carolina.

_____
Notary Public

My commission expires: 1/20/16

Zachary Rowles
Notary Public
Durham County, NC

Bates No. 136

**JA451**

# DECLARATION OF RUSSELL STETLER

I, RUSSELL STETLER, declare as follows:

*Summary of Opinions*

1. I was asked by federal habeas corpus counsel for Aquilia Marcivicci Barnette to summarize the prevailing professional norms in the investigation of mitigation evidence at the time of Mr. Barnette's sentencing proceeding in 2002, and to address in particular what mitigation investigation is required in the context of a resentencing. I was also asked to address the relationship between the mitigation (or social history) investigation and capital mental health assessments. Finally, I was asked to review the investigation and presentation of mitigation in the 2002 resentencing proceeding in light of the then prevailing norms.

2. The prevailing norms in mitigation investigation are addressed in detail in this declaration, but the critical points can be summarized succinctly. Counsel's duty to conduct a thorough mitigation investigation was well established in 2002. *See Williams v. Taylor*, 529 U.S. 362, 396 (2000) (ineffective assistance where capital counsel in a 1986 trial "did not fulfill their obligation to conduct a thorough investigation of the defendant's background"). Writing for the Court's majority, Justice Stevens cited the American Bar Association's STANDARDS FOR CRIMINAL JUSTICE (2nd edition 1980) concerning the need to investigate sentencing issues thoroughly. *Id.* at 396. Standard 4.4-1 of the Defense Function described the duty to investigate as follows: "It is the duty of the lawyer to conduct a prompt investigation of the circumstances of the case and to explore all avenues leading to facts relevant to the merits of the case *and the penalty in the event of conviction.*" (Emphasis added.) *Id.* at 4:53. In discussing mitigation, the Commentary continued, "Information concerning the defendant's background, education, employment record, mental and

1

emotional stability, family relationships, and the like, will be relevant, as will mitigating circumstances surrounding the commission of the offense itself." *Id.* at 4:55. The need to investigate mental illness in the context of mitigating evidence was also well established in 2002. *See Ake v. Oklahoma*, 470 U.S. 68, 80 (1985) (due process right to psychiatric assistance when mental condition is relevant to culpability *or punishment*).[1] The Eighth Amendment jurisprudence of the United States Supreme Court has mandated individualized sentencing in death penalty cases since 1976. *See Gregg v. Georgia*, 428 U.S. 153, 156 (1976) (finding Georgia's death penalty statute Constitutional in part because it allowed for mercy based on individualized consideration) and *Woodson v. North Carolina*, 428 U.S. 280, 301 (1976) (finding mandatory statute unconstitutional because it would allow the blind infliction of the death penalty on members of a faceless undifferentiated mass).

3. Effective capital defense throughout the post-*Furman* era has required counsel to conduct a thorough investigation of the client's life. This investigation generally involves a multigenerational inquiry into the biological, psychological, and social influences on the development and adult functioning of the accused. Mitigation investigation involves parallel tracks of collecting and analyzing life-history records, and conducting multiple, in-person, face-to-face interviews. The purpose of this thorough investigation is to develop evidence that will humanize the defendant, help jurors to understand why he may have committed the capital offense, and to evoke compassion and empathy by identifying the client's individual frailties that at once establish human kinship and expose vulnerabilities and disadvantage. A thorough social

---

[1] The High Court noted that "[m]any states, as well as the Federal Government currently make psychiatric assistance available to indigent defendants," citing, among other statutes, N.C. GEN. STAT., § 7A-454 (1981). 470 U.S. at 78 & n.4.

2

**JA453**

history investigation also provides the foundation for reliable mental health evidence and enables counsel to make informed decisions about what kind of mental health experts to consult and what questions they should address. The fruits of a thorough mitigation investigation not only provide capital defendants with the effective representation to which they are entitled under the Sixth Amendment, but assure jurors of the opportunity to consider all the evidence relevant to the reasoned moral judgment they are asked to render, thereby also assuring the courts of an outcome that is reliable and just. Penalty-phase preparation involves more than just investigating mitigating evidence. Although I mainly focus on the need for thorough mitigation investigation in this declaration, penalty-phase preparation involves an equal obligation to conduct thorough investigation of the offenses underlying the capital charges and any other aggravating evidence that the Government may seek to introduce either in its case in chief or in rebuttal of mitigating evidence. The investigation of aggravating and rebuttal evidence is just as important as the mitigation investigation.

4. Habeas counsel have asked me specifically to opine on whether this thorough penalty-phase investigation was required in Mr. Barnette's case even though mitigating evidence had been developed for his original sentencing proceeding in 1998. The answer is a resounding "yes." In a capital resentencing proceeding, one cannot assume that all relevant mitigating evidence was developed by prior counsel – particularly since the original jury returned a death sentence. It is incumbent upon successor counsel to conduct the same penalty-phase preparation, including thorough social history investigation and reliable mental health assessments, as counsel would be expected to conduct at an initial trial. Based on my own experience in over three decades of capital defense work, I am confident in opining that reliance on the existing mitigating

3

Bates No. 139

**JA454**

evidence and overall penalty-phase preparation in lieu of conducting a thorough and independent investigation of both mitigating and alleged aggravating evidence would constitute a dereliction of counsel's duty under the Sixth and Eighth Amendments and the prevailing professional norms, discussed *infra* ¶¶ 15 to 41.

*Background and Qualifications*

5. I am the National Mitigation Coordinator for the federal death penalty projects, which are described more fully at their web site, capdefnet.org. This national position was created in 2005 in response to the increased demand for effective mitigation preparation in death penalty cases following the U.S. Supreme Court's decision in *Wiggins v. Smith*, 539 U.S. 510 (2003), and the February 2003 revision of the ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases.[2] In this capacity, I consult with lawyers, investigators, mitigation specialists, and experts in connection with death penalty cases that are pending in the federal courts at trial or on habeas corpus (under 28 U.S.C. §§ 2254 and 2255).

6. From 1995 to 2005, I served as the Director of Investigation and Mitigation at the New York Capital Defender Office, which was established under New York State's death penalty statute with a mandate to ensure that indigent defendants in capital cases received effective assistance of counsel. The Capital Defender Office was charged with creating an effective system of capital defense throughout New York State by providing direct representation and offering

---

[2] *See* JON B. GOULD & LISA GREENMAN, REPORT TO THE COMMITTEE ON DEFENDER SERVICES, JUDICIAL CONFERENCE OF THE UNITED STATES, UPDATE ON THE COST AND QUALITY OF DEFENSE REPRESENTATION IN FEDERAL DEATH PENALTY CASES, 111-112, September 2010 (Commentary describes authorization of the position "to assist in expanding the availability and quality of mitigation work in death penalty cases in the federal courts" and the role of the National Mitigation Coordinator in case consultations and training).

4

**JA455**

assistance to private counsel assigned by the courts to represent indigent capital defendants. I supervised a statewide staff of investigators and mitigation specialists, and I consulted with lawyers, investigators, mitigation specialists, and experts who were retained or employed by the Capital Defender Office or the private bar in connection with death penalty cases.

7. From 1990 to 1995, I served as Chief Investigator at the California Appellate Project, a nonprofit law office in San Francisco that coordinated appellate and post-conviction representation of all the prisoners under sentence of death in California. In that capacity, I also supervised an in-house staff and consulted with staff attorneys and court-appointed counsel, as well as investigators, mitigation specialists, and experts outside the office who were retained to assist counsel representing death-sentenced prisoners.amb

8. I have investigated all aspects of death-penalty cases since 1980, first working in a private office in California and later in institutional offices. All my work on death penalty cases has been on behalf of indigent clients, either through funding authorized by courts or public defender offices, or as an employee of an indigent defense agency. Since 1980, I have regularly attended seminars and conferences relating to the defense of capital cases at trial, on appeal, and in post-conviction proceedings. Most of these conferences were organized and attended by attorneys specializing in capital work. I investigated mitigation evidence in over two dozen death penalty cases in California in the 1980s.

9. Since 1990, I have lectured extensively on capital case investigation, particularly the investigation of mitigation evidence. I have lectured on these subjects not only in New York and California, but in many other death-penalty jurisdictions, including Alabama, Arizona, Arkansas, Colorado, Connecticut, Delaware, Florida, Georgia, Idaho, Illinois, Indiana, Kansas, Kentucky,

5

**JA456**

Louisiana, Maryland, Mississippi, Missouri, Nevada, New Jersey, New Mexico, North Carolina, Ohio, Oklahoma, Oregon, Pennsylvania, South Carolina, Tennessee, Texas, Utah, Virginia, Washington, and Wyoming, as well as in Puerto Rico, a jurisdiction where only federal death penalty cases are prosecuted. I have lectured at six CLE programs in North Carolina, beginning in 1996. I have also lectured on numerous occasions under the auspices of the Administrative Office of the United States Courts (in connection with federal death-penalty cases and habeas corpus litigation) and at the Fourth Capital Litigation Workshop of the U.S. Army Trial Defense Service. Over the past two and a half decades, I have lectured at over three hundred fifty continuing legal education programs around the country, as well as dozens of additional programs at law schools and related professional conferences in the United States, Europe, and Asia.

10. Since the 1990s, I have lectured on mitigation investigation in death penalty cases at multiple national training conferences sponsored by the following organizations: the NAACP Legal Defense Fund (annual Airlie conference), the National Legal Aid and Defender Association ("Life in the Balance"), and the National Association of Criminal Defense Lawyers ("Making the Case for Life"). At various times over the past twenty-five years, I have served on the planning committees for these national conferences, as well as the annual Capital Case Defense Seminar sponsored by California Attorneys for Criminal Justice (CACJ) and the California Public Defenders Association (CPDA), which is attended by over a thousand practitioners. I was a co-chair of the planning committee for this seminar in 2009 and from 2011 to 2014, and I am returning as a co-chair for the 2015 seminar. I have also taught at the death penalty colleges at the Santa Clara University School of Law in California and the DePaul University College of Law in Illinois. I have taught at a dozen capital defense seminars throughout the country under the

6

**JA457**

auspices of the National Institute of Trial Advocacy and over a dozen "bring-your-own-case" capital brainstorming seminars under the auspices of the National Consortium for Capital Defense Training and its regional counterparts. I also designed and organized the annual Capital Mitigation Skills Workshop under the auspices of the federal Habeas Assistance and Training Counsel Project.

11. Since 1993, I have contributed extensively to the California Death Penalty Defense Manual published by the California defense bar (CACJ and CPDA). This multi-volume reference has a volume devoted to the investigation and presentation of mitigation evidence which I helped to shape in the 1990s. In 1999, I published articles on *Mitigation Evidence in Death Penalty Cases* and *Mental Disabilities and Mitigation* in THE CHAMPION, the monthly magazine of the National Association of Criminal Defense Lawyers, as well as an article entitled *Why Capital Cases Require Mitigation Specialists* in INDIGENT DEFENSE, published by the National Legal Aid and Defender Association. These and other articles of mine were cited in the Commentary to the ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases, rev. 2003, 31 HOFSTRA L. REV. 913 (2003), available at <u>ambar.org/2003guidelines</u>. At the request of HOFSTRA LAW REVIEW, I wrote an article for their symposium issue on the revised ABA Guidelines, entitled *Commentary on Counsel's Duty to Seek and Negotiate a Disposition in Capital Cases (ABA Guideline 10.9.1)*, 31 HOFSTRA LAW REVIEW 1157 (2003). At the request of HOFSTRA LAW REVIEW, I also wrote an article for their symposium issue on the Supplementary Guidelines for the Mitigation Function of Defense Teams in Death Penalty Cases, 36 HOFSTRA L. REV. 1067 (2008). At the request of UMKC LAW REVIEW, I contributed an article to their symposium issue devoted to "Death Penalty Stories," *The Unknown Story of a Motherless Child,*

7

**JA458**

77 UMKC L. REV. 947 (2009). I have recently written three additional articles on prevailing norms in the development of mitigation and mental health evidence. One was written in collaboration with Professor W. Bradley Wendel, *The ABA Guidelines and the Norms of Capital Defense Representation*, 41 HOFSTRA L. REV. 635 (2013). The second, *Mental Health Evidence and the Capital Defense Function: Prevailing Norms*, appeared in 82 UMKC LAW REVIEW 407 (2014). The third (written with Aurélie Tabuteau), *The ABA Guidelines: A Historical Perspective*, has been accepted for publication in HOFSTRA LAW REVIEW 43:3.

12. I am the coauthor of chapters on psychiatric issues in death penalty cases in two books: *Dead Men Talking: Mental Illness and Capital Punishment*, in FORENSIC MENTAL HEALTH: WORKING WITH OFFENDERS WITH MENTAL ILLNESS (Gerald Landsberg, D.S.W., & Amy Smiley, Ph.D., eds.; Kingston, New Jersey: Civic Research Institute, Inc., 2001) and *Punishment*, in PRINCIPLES AND PRACTICE OF FORENSIC PSYCHIATRY, 2nd ed. (Richard Rosner, M.D., ed.; London: Arnold Medical Publishing, 2003; U.S. distribution by Oxford University Press). I am also a coauthor of A PRACTITIONER'S GUIDE TO REPRESENTING CAPITAL CLIENTS WITH MENTAL DISORDERS AND IMPAIRMENTS (Bishop Auckland, U.K.: International Justice Project, 2008).

13. I have qualified as an expert witness in multiple state and federal courts and have provided opinion evidence on standard of care issues in capital cases (especially in the investigation and presentation of mitigation evidence) by live testimony or affidavit over one hundred fifty times in numerous jurisdictions, including Alabama, Arizona, Arkansas, California, Colorado, Florida, Georgia, Illinois, Indiana, Iowa, Kansas, Kentucky, Louisiana, Mississippi, Missouri, Nevada, New York, North Carolina, Oklahoma, Oregon, Pennsylvania, South Dakota, Tennessee, Texas, Utah, Virginia, Washington, and Wyoming. I have testified as an expert

8

**JA459**

witness twenty-three times, including testimony in capital habeas corpus cases in the District of Arizona, the Eastern District of California, the Northern District of Iowa, the Western District of Missouri, and the District of Wyoming, as well as in state capital post-conviction proceedings in Alabama, Arkansas, California, Colorado, Louisiana, Nevada, and Wyoming. I have also testified as an expert witness on mitigation standards in the state and federal trial courts of various states, including pretrial testimony in the United States District Court for the Middle District of Tennessee in 2001.

14. Over the years, I have been directly involved in hundreds of capital cases, including scores of trials and post-conviction hearings. I have also been consulted in various capacities on capital cases in numerous jurisdictions around the country, including many federal death penalty cases.

***Prevailing Norms in the Development of Mitigating Evidence in Capital Cases in 2002***

15. Investigation of a client's background, character, life experiences, and mental health is axiomatic in the defense of a capital case, and has been for as long as I have done this work. In every seminar in which I have participated since 1980, instructors have emphasized the importance of conducting a "mitigation investigation" in preparation for the penalty phase of a capital trial and developing a unified strategy for the guilt-innocence and sentencing phases. When I began working on capital cases, investigation was already firmly established as an integral part of the criminal defense function generally. When the American Bar Association published the second edition of its STANDARDS FOR CRIMINAL JUSTICE (2nd edition 1980), Standard 4.4-1 of the Defense Function described the duty to investigate as follows: "It is the duty of the lawyer to

9

**JA460**

conduct a prompt investigation of the circumstances of the case and to explore all avenues leading to facts relevant to the merits of the case *and the penalty in the event of conviction*." (Emphasis added.) *Id.* at 4:53. The Commentary to this Standard noted concisely, "Facts form the basis of effective representation." *Id.* at 4:54. In discussing mitigation, the Commentary continued, "Information concerning the defendant's background, education, employment record, mental and emotional stability, family relationships, and the like, will be relevant, as will mitigating circumstances surrounding the commission of the offense itself." *Id.* at 4:55.[3] These ABA Standards were cited by Justice Stevens in reference to counsel's obligation to conduct a thorough investigation of a capital defendant's background. *Williams v. Taylor*, 529 U.S. at 396 (2000).

16. These standards covered criminal defense generally. Discussions of *capital* defense provided more specific detail about counsel's duties in investigating mitigating evidence. As early as 1979, Dennis Balske (an effective capital litigator then practicing in the South) emphasized, "Importantly, the life story must be complete." Dennis N. Balske, *New Strategies for the Defense of Capital Cases,* 13 AKRON L. REV. 331, 358 (1979). In 1983, Professor Gary Goodpaster discussed trial counsel's "duty to investigate the client's life history, and emotional and psychological make-up" in capital cases. He wrote, "There must be inquiry into the client's childhood, upbringing, education, relationships, friendships, formative and traumatic experiences, personal psychology and present feelings. The affirmative case for sparing the defendant's life will be composed in part of information uncovered in the course of this investigation. The

---

[3] *See also* Joseph B. Cheshire V, *Ethics and the Criminal Lawyer: The Perils of Obstruction of Justice*, CHAMPION (Jan./Feb. 1989) at 12 ("Defense counsel have a right and a duty to approach and interview every witness that might have any information regarding the particular issue involved in their client's case.").

10

**JA461**

importance of this investigation, and the care with which it is conducted, cannot be overemphasized." Gary Goodpaster, *The Trial for Life: Effective Assistance of Counsel in Death Penalty Cases*, 58 N.Y.U. L. REV. 299, 323-324 (1983). Writing again in 1984, Mr. Balske advised capital defense counsel that they "must conduct the most extensive background investigation imaginable. You should look at every aspect of your client's life from birth to present. Talk to everyone that you can find who has ever had any contact with the defendant." Dennis Balske, *The Penalty Phase Trial: A Practical Guide*, THE CHAMPION (March 1984), at 40, 42. *See also* David C. Stebbins and Scott P. Kenney, *Zen and the Art of Mitigation Presentation, or, the Use of Psycho-Social Experts in the Penalty Phase of a Capital Trial*, THE CHAMPION, (August 1986) at 14, 18 ("capital defense attorneys must recognize that the profession demands a higher standard of practice in capital cases"); and Robert R. Bryan, *Death Penalty Trials: Lawyers Need Help*, THE CHAMPION (August 1988) at 32 ("There is a requirement in every case for a comprehensive investigation not only of the facts but also the entire life history of the client.").

17. At the beginning of the 1980s, a capital defense lawyer in California hired a former *New York Times* reporter to investigate the life history of his client. The reporter, the late Lacey Fosburgh, had previously written a best-selling book about a murder case she had covered for the newspaper, CLOSING TIME: THE TRUE STORY OF THE "GOODBAR" MURDER (1977). After her successful work in developing the capital client's mitigation evidence, Ms. Fosburgh wrote about the critical role she had played:

> A significant legal blind spot existed between the roles played by the private investigator and the psychiatrist, the two standard information-getters in the trial process. Neither one was suited to the task at hand here – namely discovering and then communicating the complex human reality of the defendant's personality in a sympathetic way.
> Significantly, the defendant's personal history and family life, his obsessions, aspirations, hopes, and flaws, are rarely a matter of physical evidence. Instead they are

both discovered and portrayed through narrative, incident, scene, memory, language, style, and even a whole array of intangibles like eye contact, body movement, patterns of speech – things that to a jury convey as much information, if not more, as any set of facts.  But all of this is hard to recognize or develop, understand or systematize without someone on the defense team having it as his specific function.  *This person should have nothing else to do* but work with the defendant, his family, friends, enemies, business associates and casual acquaintances, perhaps even duplicating some of what the private detective does, but going beyond that and looking for more.  This takes a lot of time and patience. (Emphasis added.)[4]

Capital defense lawyers across the country soon recognized the value of nonlawyers with expertise in the development of sentencing evidence – ultimately referred to as "mitigation specialists." The California defense bar prominently featured one such nonlawyer on the cover of its monthly magazine FORUM in 1987.[5]  The national defense bar magazine, THE CHAMPION, discussed the use of social workers in developing mitigating evidence in 1986.[6]  The following year, another article in the same magazine commented tersely, "The mitigation specialist is a professional who, as attorneys across the nation are now recognizing, should be included and will be primary to the defense team."[7]

18.  Since the early 1980s, it has also been standard practice for competent defense counsel to determine whether their capital client suffers from organic brain injury, psychiatric disorders, or trauma outside the realm of ordinary human experience.  Whenever brain-behavior

---

[4] Lacey Fosburgh, *The Nelson Case: A Model for a New Approach to Capital Trials*, in CALIFORNIA STATE PUBLIC DEFENDER, CALIFORNIA DEATH PENALTY MANUAL, 1982 supplement, N6-N10, N7  (July 1982).  This article also appeared in the magazine of the California defense bar, FORUM (Sept.-Oct. 1982).  *See also* Report by the Team Defense Project, *Team Defense in Capital Cases*, FORUM (May-June 1978), and Michael G. Millman, *Interview: Millard Farmer*, FORUM (Nov.-Dec. 1984) at 31-33.

[5] Anne E. Fragasso, *Interview: Casey Cohen*, FORUM (Jan.-Feb. 1987) at 22, 26.

[6] Cessie Alfonso & Katharine Bauer, *Enhancing Capital Defense: The Role of the Forensic Social Worker*, CHAMPION (June 1986) at 26, 26-29.

[7] James Hudson et al., *Using the Mitigation Specialist and the Team Approach*, CHAMPION (June 1987)at 33, 36.

12

**JA463**

relationships are at issue, a thorough investigation of the etiology of brain damage is needed to determine the interplay of genetics, intra-uterine exposure to trauma and toxins, environmental exposures, head injuries, etc. In a capital case, such investigation is particularly important because of the additional mitigating factors that may be disclosed beyond the fact of psychiatric disorder or organicity. *See*, for example, John Hill and Mike Healy, *The Death Penalty and the Handicapped*, FORUM (May-June 1986) at 18-20 (discussing implications of childhood disorders affecting the brain and other disabilities for penalty phases in capital cases); and David C. Stebbins, *Psychologists and Mitigation: Diagnosis to Explanation*, THE CHAMPION (April 1988) at 34, 36 (discussing need for adequate time to overcome clients' distrust and the value of a neuropsychologist or neurologist in cases with head trauma).

19. Over the past fourteen years, the U.S. Supreme Court has found trial counsel ineffective in five cases for failing to investigate potential mitigation evidence: *Williams v. Taylor*, 529 U.S. 362 (2000); *Wiggins v. Smith*, 539 U.S. 510 (2003); *Rompilla v. Beard*, 545 U.S. 374 (2005); *Porter v. McCollum*, 558 U.S. 30 (2009) (per curiam); and *Sears v. Upton*, 561 U.S. 945 (2010) (per curiam). Every case but *Sears* was tried in the 1980s, and *Sears* was tried over twenty years ago, in 1993, nearly a decade before Mr. Barnette's resentencing. In *Williams,* the Court reaffirmed an all-encompassing view of mitigation and found trial counsel ineffective for failing to prepare the mitigation case until a week before trial in 1986 and failing to conduct an investigation of the readily available mitigating evidence (nightmarish childhood, borderline retardation, model prisoner status, etc.). In *Wiggins*, a case tried in 1989, trial counsel were found deficient in their performance, even though they had had their client examined by one mental health expert, because they failed to conduct a complete social history investigation in accordance with the ABA

13

Guidelines. "Despite these well-defined norms, however, counsel abandoned their investigation of petitioner's background after having acquired only rudimentary knowledge of his history from a narrow set of sources." 539 U.S. at 524. In *Rompilla*, tried in 1988, counsel were found deficient "even when a capital defendant's family members and the defendant himself have suggested that no mitigating evidence is available" and despite consulting three mental health experts. 545 U.S. at 377, 379. Similarly, in *Porter*, also tried in 1988, counsel were found deficient despite a "fatalistic and uncooperative" client because "that does not obviate the need for defense counsel" to conduct mitigation investigation. 558 U.S. at 40. Quoting *Williams*, the Court in *Porter* reaffirmed this duty: "It is unquestioned that under the prevailing professional norms at the time of Porter's trial, counsel had an 'obligation to conduct a thorough investigation of the defendant's background.'" (Citation omitted.) *Id.* at 39. Among the mitigation that Porter's counsel failed to present was "brain damage that could manifest in impulsive, violent behavior." *Id.* at 36. In *Sears*, the Court found trial counsel ineffective in a 1993 trial even though they had presented seven witnesses in the penalty proceedings. The Court noted, "We have never limited the prejudice inquiry under *Strickland* to cases in which there was only 'little or no mitigation evidence' presented . . ." 561 U.S. at 954. Post-conviction evidence emphasized significant frontal lobe brain damage causing deficiencies in cognitive functioning and reasoning. *Id.* at 946. Four of these five individuals have subsequently received sentences of less than death, and the fifth case is pending as of this writing. Terry Williams received a life sentence by negotiated disposition in Danville, Virginia, in 2000.[8] On October 15, 2004, the State of Maryland agreed to

---

[8]*See* Frank Green, *Death Penalty Cases Scrutinized: More Hearings Are Being Ordered in Virginia*, RICHMOND TIMES-DISPATCH (Apr. 9, 2001) at A1, *available at* truthinjustice.org/va-dpreview.htm.

14

a disposition sending Kevin Wiggins to a state facility for mental health treatment and rehabilitation services, but making him eligible for parole immediately based on time already served.[9] On August 13, 2007, the Lehigh County (Pennsylvania) District Attorney's Office stipulated to a life sentence for Ronald Rompilla.[10] On July 21, 2010, the Brevard-Seminole (Florida) State Attorney's Office announced that it would allow George Porter, Jr., to be resentenced to life."[11] All five cases involved mental health evidence that was not discovered and presented at trial.

### The Need for a Qualified Mitigation Specialist

20. In a capital case, competent defense counsel have a duty to conduct life-history investigations, but generally lack the skill to conduct the investigations themselves. *See, generally,* Russell Stetler, *Mitigation Investigation: A Duty That Demands Expert Help but Can't Be Delegated,* THE CHAMPION (March 2007) at 61. Moreover, even if lawyers had the skills, it is more cost-effective to employ those with recognized expertise in developing mitigation evidence. Competent capital counsel have long retained a "mitigation specialist" to complete a detailed, multigenerational social history to highlight the complexity of the client's life and identify multiple risk factors and mitigation themes. The Subcommittee on Federal Death Penalty Cases, Committee on Defender Services for the Judicial Conference of the United States, for example, noted in 1998 that mitigation specialists "have extensive training and experience in the defense of

---

[9] *See* Jenner & Block, *12 Year Battle for Kevin Wiggins Comes to an End* (Oct. 15, 2004), jenner.com/news/news_item.asp?id=12759624

[10] *See* Associated Press, *Death Row Inmate Gets New Life Term*, USA Today, usatoday.com/news/topstories/2007-08-13-477084247_x.htm (last visited Apr. 8, 2008).

[11] Kaustuv Basu, *Aging Killer May Get Reprieve from Death Row*, FLA. TODAY (July 21, 2010).

15

**JA466**

capital cases. They are generally hired to coordinate an investigation of the defendant's life history, identify issues requiring evaluation by psychologists, psychiatrists or other medical professionals, and assist attorneys in locating experts and providing documentary material for them to review." The subcommittee report also bluntly commented, "The work performed by mitigation specialists is work which otherwise would have to be done by a lawyer, rather than an investigator or paralegal." The Commentary also stated that, as of 1998, the work of mitigation specialists "is part of the existing 'standard of care' in a federal death penalty case." *Id.*, Commentary to 7. Experts, Sec. II, Recommendations and Commentary. FEDERAL DEATH PENALTY CASES: RECOMMENDATIONS CONCERNING THE COST AND QUALITY OF DEFENSE REPRESENTATION, Federal Judicial Conference (May 1998) (commonly known as "the Spencer Report"), *available at* americanbar.org/content/dam/aba/uncategorized/Death_Penalty_Representation/Standards/Natio nal/federal_judicial_conference_recommendations.authcheckdam.pdf. As noted *supra*, ¶ 17, even before the term "mitigation specialist" was coined, penalty phase biographical investigation was widely accepted in the 1980s as a critical part of the capital defense function.

21. As revised in 2003, the ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases (*hereinafter*, ABA Guidelines (rev. 2003), *available at* ambar.org/2003guidelines) state unequivocally that lead counsel at any stage of capital representation (trial or post-conviction) should assemble a defense team as soon as possible after designation with at least one mitigation specialist and at least one member qualified by training and experience to screen individuals for the presence of mental or psychological disorders or impairments (Guideline 10.4), in order to conduct a thorough and independent investigation

16

**JA467**

relating to penalty (Guideline 10.7 and Guideline 10.11). The original edition of the ABA Guidelines, adopted in 1989 (*available at* ambar.org/1989guidelines), similarly required counsel to begin investigation immediately upon counsel's entry into the case and to "discover all reasonably available mitigating evidence." (1989 Guideline 11.4.1.C.) The 1989 Guidelines also required counsel to retain experts for investigation and "preparation of mitigation" (1989 Guideline 11.4.1.D.(7).) Notably, the 1989 Guidelines specifically stated that "the investigation for preparation of the sentencing phase should be conducted regardless of any initial assertion by the client that mitigation is not to be offered." (1989 Guideline 11.4.1.C.)

22. The ABA Guidelines and the Supplementary Guidelines have received particular recognition in federal court. The Defender Services Program has four goals in its strategic plan: timely provision of assigned counsel, delivery of counsel services consistent with the best practices of the legal profession, cost-effective services, and protection of the independence of the defense function. Among its strategies for achieving the "best practices" goal, the Defender Services Program has adopted a specific strategy for capital representation that states that appointed counsel should comply with the February 2003 ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases and the 2008 Supplementary Guidelines for the Mitigation Function.

*Evolution of Prevailing Norms*

23. The 1989 edition of the ABA Guidelines reflected a national consensus among capital defense practitioners based on their practices in the 1980s. These Guidelines were the result of years of work by the National Legal Aid and Defender Association (NLADA) to develop

17

Case 3:12-cv-00327-MOC   Document 74-5   Filed 12/22/14   Page 3 of 58
Bates No. 153

**JA468**

standards to reflect the prevailing norms in indigent capital defense.   NLADA published its

Standards for the Appointment of Defense Counsel in Death Penalty Cases (available at

americanbar.org/content/dam/aba/migrated/DeathPenalty/RepresentationProject/PublicDocumen

ts/NLADA_Counsel_Standards_1985.authcheckdam.pdf) in 1985.   With initial support from the

ABA's Standing Committee on Legal Aid and Indigent Defendants (SCLAID), NLADA

developed its expanded Standards for the Appointment *and Performance* of Defense Counsel in

Death Penalty Cases (emphasis added) over the course of several years.   In February 1988,

NLADA referred the Standards to SCLAID, which reviewed them and circulated them to

appropriate ABA sections and committees.   SCLAID incorporated the only substantive concerns

expressed (by the Criminal Justice Section) and changed the nomenclature to "Guidelines" as more

appropriate than "Standards."   Each black-letter guideline is explained by a commentary, with

references to supporting authorities.   *See* Introduction to ABA Guidelines, 1989 ed.

24.   Courts have found the various editions of the ABA Criminal Justice Standards and

Death Penalty Guidelines useful in assessing the reasonableness of counsel performance.   As

Justice Stevens noted in writing for the Court's majority in *Padilla v. Kentucky*, 559 U.S. 356, 366

(2010): "We long have recognized that 'prevailing norms of practice as reflected in American Bar

Association standards and the like . . . are guides to determining what is reasonable . . .'"   Justice

Stevens cited *Strickland*, 466 U.S. 668, 688 (1984), *Bobby v. Van Hook*, 558 U.S. 4 (2009) (per

curiam); *Florida v. Nixon*, 543 U.S. 175, 191, and n.6 (2004); *Wiggins v. Smith*, 539 U.S. 510, 524

(2003); and *Williams v. Taylor*, 529 U.S. 362, 396 (2000).   Justice Stevens concluded: "Although

they are 'only guides,' *Strickland*, 466 U.S., at 688, and not 'inexorable commands,' *Bobby*, 558

U.S. at 8, these standards may be valuable measures of the prevailing norms of effective

18

**JA469**

representation . . ." Justice Stevens also cited law review articles and the publications of criminal defense and public defender organizations (the National Association of Criminal Defense Lawyers and the National Legal Aid and Defender Association) as guides to prevailing professional norms. *Id.* at 367. *Accord Hinton v. Alabama*, 134 S. Ct. 1081, 1088 (2014) (per curiam) (capital reversal finding trial counsel ineffective and citing *Padilla*'s analysis of "prevailing professional norms," 559 U.S. at 366, and quoting verbatim the first two sentences of Justice Stevens's analysis of prevailing norms).

25. SUPPLEMENTARY GUIDELINES FOR THE MITIGATION FUNCTION OF DEFENSE TEAMS IN DEATH PENALTY CASES, published in 36 HOFSTRA L. REV. 677 (2008), discuss in detail the skills that mitigation specialists provide to the defense team – skills that most lawyers simply do not possess. Supplementary Guideline 5.1.B, for example, specifies the need for someone with "the training and ability to obtain, understand and analyze all documentary and anecdotal information relevant to the client's life history. Life history includes, but is not limited to: medical history; complete prenatal, pediatric and adult health information; exposure to harmful substances in utero and in the environment; substance abuse history; mental health history; history of maltreatment and neglect; trauma history; educational history; employment and training history; military experience; multi-generational family history, genetic disorders and vulnerabilities, as well as multi-generational patterns of behavior; prior adult and juvenile correctional experience; religious, gender, sexual orientation, ethnic, racial, cultural and community influences; socio-economic, historical, and political factors." *Id.* at 682.

26. Supplementary Guideline 5.1.C continues: "Mitigation specialists must be able to identify, locate and interview relevant persons in a culturally competent manner that produces

19

**JA470**

confidential, relevant and reliable information. They must be skilled interviewers who can recognize and elicit information about mental health signs and symptoms, both prodromal and acute, that may manifest over the client's lifetime. They must be able to establish rapport with witnesses, the client, the client's family and significant others that will be sufficient to overcome barriers those individuals may have against the disclosure of sensitive information and to assist the client with the emotional impact of such disclosures. They must have the ability to advise counsel on appropriate mental health and other expert assistance." *Id.* A core team member, usually the mitigation specialist, must also have the specialized training, as described in Supplementary Guideline 5.1.E, to identify, document and interpret "symptoms of mental and behavioral impairment, including cognitive deficits, mental illness, developmental disability, neurological deficits; long-term consequences of deprivation, neglect and maltreatment during developmental years; social, cultural, historical, political, religious, racial, environmental and ethnic influences on behavior; effects of substance abuse and the presence, severity and consequences of exposure to trauma." *Id.* at 683.

27. Without the thorough social history investigation that a skilled mitigation specialist can provide, it is impossible to ascertain the existence of previous head injuries, childhood trauma, and a host of other life experiences that may provide a compelling reason for the jury to vote for a life sentence. Moreover, without a social history, counsel cannot make an informed and thoughtful decision about which experts to retain, in order to gauge the nature and extent of a client's possible mental disorders and impairments. Mental health experts, in turn, require social history information to conduct a complete and reliable evaluation. *See* Richard G. Dudley, Jr., and Pamela Blume Leonard, *Getting It Right: Life History Investigation as the Foundation for a*

20

Case 3:12-cv-00327-MOC  Document 74-5  Filed 12/22/14  Page 6 of 58
Bates No. 156

**JA471**

*Reliable Mental Health Assessment*, 36 HOFSTRA L. REV. 963 (2008); and Douglas Liebert and

David Foster, *The Mental Health Evaluation in Capital Cases: Standards of Practice*, 15:4 AM. J.

FORENSIC PSYCHIATRY 43 (1994). *See also* George W. Woods, David Freedman, and Stephen

Greenspan, *Neurobehavioral assessment in forensic practice*, 35 INT'L J. OF L. & PSYCHIATRY 432

(2012).

28. The social history investigation should include a thorough collection of objective,

reliable documentation about the client and his family, typically including medical, educational,

employment, social service, and court records. Such contemporaneous records are intrinsically

credible and may document events which the client and other family members were too young to

remember, too impaired to understand and record in memory, or too traumatized, ashamed, or

biased to articulate. The collection of records and analysis of this documentation involve a slow

and time-intensive process. Many government record repositories routinely take months to

comply with appropriately authorized requests. Records are sometimes mistakenly presumed

destroyed when they are in fact simply stored offsite in dusty warehouses that no one is eager to

visit. Great diligence is required to ensure compliance with appropriate requests. Careful

review of records often discloses the existence of collateral documentation which, in turn, needs to

be pursued.

29. The Commentary to ABA Guideline 10.7 (Investigation) notes, "Records should be

requested concerning not only the client, but also his parents, grandparents, siblings, cousins, and

children. . . . The collection of corroborating information from multiple sources – a

time-consuming task – is important wherever possible to ensure the reliability and thus the

persuasiveness of the evidence. Counsel should use all appropriate avenues including signed

21

**JA472**

releases, subpoenas, court orders, and requests or litigation pursuant to applicable open records statutes . . ." 31 HOFSTRA L. REV. at 1024-25.

30. Records invariably provide valuable background information on clients and their families. *See Rompilla v. Beard*, 545 U.S. 374, 390 (2005) (court file – a readily available public document – contained "a range of mitigation leads that no other source had opened up"). In an earlier ineffectiveness case, *Williams v. Taylor*, 529 U.S. 362 (2000), the Supreme Court found the life-history records such powerful mitigating evidence that the High Court added a footnote to quote a caseworker report verbatim:

> The home was a complete wreck. . . . There were several places on the floor where someone had had a bowel movement. Urine was standing in several places in the bedrooms. There were dirty dishes scattered over the kitchen, and it was impossible to step any place on the kitchen floor where there was no trash. . . . The children were all dirty and none of them had on under-pants. Noah and Lula were so intoxicated, they could not find any clothes for the children, nor were they able to put the clothes on them. . . . The children had to be put in Winslow Hospital, as four of them, by that time, were definitely under the influence of whiskey. 529 U.S. at 395, n.19.

This excerpt provides a lucid example of a vivid illustration of family dysfunction – and a story which even the most skilled interviewer could never have elicited simply by talking with family members. The records documented an event that Terry Williams and his siblings were too young to remember, and his parents were too intoxicated to register in memory. Records have no inherent bias, and contemporaneous records are in any event more credible than witnesses who share previously undisclosed memories.

31. Life-history records enable capital defense teams to interview all witnesses more effectively – not only the witnesses who created the records in the first place (like the teachers who produced report cards) but also family members and friends who can organize their memories more accurately if there is hard documentation of dates and places. The frailty of human memory

22

**JA473**

obliges us all to rely on records, and they provide the essential skeletal framework for the social history investigation. They are helpful in preparing witnesses to testify.

32. A social history cannot be completed in a matter of hours or days. In addition to the bureaucratic obstacles to the acquisition of essential documentation, it takes time to establish rapport with the client, his family, and others who may have important information to share about the client's history. It is quite typical, in the first interview with clients or their family members, to obtain incomplete, superficial, and defensive responses to questions about family dynamics, socioeconomic status, religious and cultural practices, the existence of intra-familial abuse, and mentally ill family members. These inquiries invade the darkest, and most shameful secrets of the client's family, expose raw nerves, and often re-traumatize those being interviewed. Barriers to disclosure of sensitive information may include race, nationality, ethnicity, culture, language, accent, class, education, age, religion, politics, social values, gender, and sexual orientation.

33. Only with time can an experienced mitigation specialist break down these barriers, and obtain accurate and meaningful responses to these sorts of questions. In my professional opinion, an experienced mitigation specialist requires, at minimum, hundreds of hours to complete an adequate social history – even working under intense time pressure. One nationally recognized authority in mitigation investigation, Lee Norton, writing in 1992, stressed the cyclical nature of the work and estimated that hundreds of hours will typically be required. *See* Lee Norton, *Capital Cases: Mitigation Investigation*, THE CHAMPION (May 1992) at 43-45. *See also* Pamela Blume Leonard, *A New Profession for an Old Need: Why a Mitigation Specialist Must Be Included on the Capital Defense Team*, 31 HOFSTRA L. REV. 1143, 1154 (2003) (reiterating a decade later that "it takes hundreds of hours to conduct a thorough social history investigation")

23

and David DeMatteo, Daniel C. Murrie, Natalie M. Anumba, and Michael E. Keesler, FORENSIC MENTAL HEALTH ASSESSMENTS IN DEATH PENALTY CASES 244 (2011) ("Typically, mitigation specialists invest hundreds of hours in a detailed mitigation investigation.").

34. Mitigation investigation is particularly complex when the client does not share the attorney's cultural background.[12] Attorneys may too readily overlook symptoms of impairment, attributing them to language difficulties or cultural differences. Cultural issues may involve not only race and ethnicity, but sexual orientation, gender, socioeconomic status, or any other characteristics that define social identity.

35. Mitigation evidence is not developed to provide a defense to the crime. Instead, it provides evidence of a disability, condition, or set of life experiences that can inspire compassion, empathy, mercy and understanding. Unlike insanity and competency, both of which are strictly defined by statute and temporal limitations, mitigation need not involve a mental disease or defect, and it may encompass the entire trajectory of the client's life. In many cases, defendants suffer mental impairments that do not meet the legal definition of insanity or incompetency, but are powerfully mitigating disabilities that are given great weight when juries are charged with assessing individualized culpability.

36. For clients who are psychiatrically disordered, mitigation evidence may explain the succession of facts and circumstances that led to the crime, and how that client's disabilities distorted his judgment and reactions. Psychiatric evidence can provide a context to explain the capital crime and past behaviors as more than simply bad choices made by the client.

---

[12] *See* Scharlette Holdman & Christopher Seeds, *Cultural Competency in Capital Mitigation*, 36 HOFSTRA L. REV. 883 (2008).

24

Bates No. 160

**JA475**

37.  Over the years, I have been involved in hundreds of capital cases, including scores of trials and post-conviction hearings, throughout the country.  I have provided evidence as an expert on the standard of care in investigating capital cases and mitigation by live testimony or affidavit in over one hundred fifty cases around the country. *See supra* ¶ 13.  My personal experience of the effectiveness of mitigation evidence accords with the empirical research of social scientists who have studied the decision-making processes of actual jurors in death-penalty cases.  *See*, for example, Stephen P. Garvey, *Aggravation and Mitigation in Capital Cases: What Do Jurors Think?* 98 COLUM. L. REV. 1538 (1998) and *The Emotional Economy of Capital Sentencing,* 75 N.Y.U. L. REV. 26 (2000) (concluding that mitigation does matter, especially mental impairment and mental illness).  *See also* John H. Blume, Sheri Lynn Johnson & Scott E. Sundby, *Competent Capital Representation: The Necessity of Knowing and Heeding What Jurors Tell Us About Mitigation*, 36 HOFSTRA L. REV. 1035, at 1038 (2008) ("The [Capital Jury Project] studies reveal that many different types of mitigation resonate with jurors.  Low intelligence, mental illness, child abuse, extreme poverty, remorse, lack of a significant prior record, and lesser culpability are just some of the categories of mitigation that, in a particular case, can lead jurors to choose life over death."); *id.* at 1051 ("[E]vidence that the defendant was under the influence of extreme emotional disturbance or mentally ill at the time of the crime is also mitigating to almost half of all jurors.  Almost a third of jurors found exposure to serious child abuse mitigating, and a like number found childhood poverty mitigating.").

*Standard of Care in Capital Mental Health Evaluations*

25

**JA476**

38.   Both anecdotal reports from capital defense practitioners and social science research indicate that defense experts are viewed with great skepticism and often regarded as "hired guns" unless their conclusions are supported by abundant, credible evidence from lay witnesses and historical experts (i.e., the professionals who encountered the capital client long before the alleged offense).[13]   *See*, for example, Scott Sundby, *The Jury as Critic: An Empirical Look at How Capital Juries Perceive Expert and Lay Testimony*, 83 VA. L. REV. 1109 (1997), finding that two-thirds of the witnesses jurors thought "backfired" were defense experts.   Thus, if only for pragmatic reasons, capital defense counsel are well advised not to rely on expert testimony without the corroborative lay witnesses whose identity and potential evidence can only be discovered through life-history investigation.   However, it is equally important to offer well-prepared expert testimony to explain the effects of life experiences on an individual's functioning and behavior. Lay witnesses on their own are unlikely to understand the significance of the symptoms and behaviors they describe, and only an expert is likely to be able to provide an overview of the

---

[13]   During the operative years of the New York death penalty statute (1995 to 2004), for example, the Capital Defender Office offered the testimony of historical experts in several cases. A school psychologist who had tested a client routinely as part of mandated triennial review for Special Education explained the significance of his borderline intellectual functioning (FS IQ 76-81).   People v. George Davis Bell (Ind. 128-97, Judge Cooperman, Queens County, N.Y., 1999).   In another case, a different school psychologist explained the impact of learning disabilities (at age 11, reading just above a second grade level; at 14, just above fourth grade; and at 17, just above fifth grade).   People v. José J. Santiago (Ind. 1210/99, Judge Bristol, Monroe County, N.Y., 2000).   In a third case, a psychiatrist had treated the client's mother after her suicide attempt when the client was nine – thirty years before the capital trial.   From the records, the psychiatrist testified to the history of mood disorders and suicidality in the maternal lineage, as well as family dysfunction, including fights over promiscuity, gambling, and drinking.   From her current perspective, the psychiatrist opined about the devastating impact on the children of the mother's mood disorder, suicidality, and psychiatric removal from the family. People v. John F. Owen (Ind. 547-99 cons. with 414-99, Judge Egan, Monroe County, N.Y., 2001).   *See* Russell Stetler, *The Mystery of Mitigation: What Jurors Need to Make a Reasoned Moral Response in Capital Sentencing*, 11 U. PA. J. L. & SOC. CHANGE 237, 258 (n.92) (2007-08).

26

**JA477**

factors that shaped the client over the course of her life and to be able to offer an empathic framework for understanding the resultant disorders and disabilities.[14] Expert testimony is essential for placing the factual details elicited from lay witnesses into an interpretive context that explains how various life events shaped the capital client's brain and behavior.

39. The proper standard of care for a competent mental health evaluation also requires an accurate medical and social history as its foundation. Because psychiatrically disordered or cognitively impaired individuals are by definition likely to be poor historians, a reliable evaluation requires historical data from sources independent of the client (for clinical, not simply forensic, reasons).

40. Except when clients exhibit such florid symptomatology that immediate clinical intervention is patently warranted, capital defense counsel are well advised to conduct a thorough social history investigation before retaining mental health experts. Only after the social history data have been meticulously digested and the multiple risk factors in the client's biography have been identified will counsel be in a position to determine what kind of culturally competent expert is appropriate to the needs of the case, what role that expert will play, and what referral questions

---

[14] It has long been recognized that lay and expert testimony must be harmonized to be credible to the trier of fact. As one capital defense lawyer pointed out in 1988, "[T]estimony about the psycho-social development of the defendant explains the psychological diagnosis in human terms that the jury can understand." He continued, "Typical psychological testimony on sanity, competency, or diminished capacity sounds like it comes out of a textbook. Despite the best efforts of the mental health professional and the attorneys, most of this type of testimony is incomprehensible to a lay juror. There is also an unfortunate tendency to get caught up in technical terms that bore the jurors and do nothing to humanize the client. It makes little sense to spend several days putting on the testimony of relatives and friends of the defendant about the human characteristics of the defendant, and then put on a psychologist or psychiatrist who immediately turns this around by making the person sound like a casebook study out of some obscure and arcane psychology textbook." David C. Stebbins, *Psychologists and Mitigation: Diagnosis to Explanation*, CHAMPION (Apr. 1988), at 34, 38.

27

will be asked of the expert. Psychiatrists and psychologists have different training and expertise, and within each profession are numerous subspecialties including the disciplines that study the effects of trauma on human development. The potential roles of experts include consultants; fact gatherers needed to measure cognitive capacities or to elicit client disclosures (and/or to assess their credibility); and testifying witnesses, to name but a few. To make informed decisions about the kind of experts that may be needed and the referral questions they will address, counsel first needs a reliable social history investigation.

41. The importance of independently corroborated social history data was also well recognized among mental health practitioners as early as the 1980s. A leading psychiatric text in that period described an accurate and complete medical and social history as the "single most valuable element to help the clinician reach an accurate diagnosis." H. KAPLAN & B. SADOCK, COMPREHENSIVE TEXTBOOK OF PSYCHIATRY 837 (4th ed. 1985). The same text noted that the individuals being evaluated are often poor historians: "The past personal history is somewhat distorted by the patient's memory of events and by knowledge that the patient obtained from family members." *Id.* at 488. Thus, "retrospective falsification, in which the patient changes the reporting of past events or is selective in what is able to be remembered, is a constant hazard of which the psychiatrist must be aware." *Id.* This problem is particularly acute in the forensic context, as two other leading authorities pointed out in 1980:

> The thorough forensic clinician seeks out additional information on the alleged offense and data on the subject's previous antisocial behavior, together with general "historical" information on the defendant, relevant medical and psychiatric history, and pertinent information in the clinical and criminological literature. To verify what the defendant tells him about these subjects and to obtain information unknown to the defendant, the clinician must consult, and rely upon, sources other than the defendant.

28

**JA479**

Richard J. Bonnie & Christopher Slobogin, *The Role of Mental Health Professionals in the Criminal Process: The Case for Informed Speculation*, 66 VA. L. REV. 427, 508-509 (1980). Capital defense lawyers also appreciated this need: "A psychologist armed with all of the records of the client's history is much better equipped to present a sympathetic and truthful explanation of the client's psychological make-up and of how the crime occurred." David C. Stebbins, *Psychologists and Mitigation: Diagnosis to Explanation*, THE CHAMPION (April 1988) at 34, 37.

### *Investigation and Development of the Defense Case in Capital Resentencing Trials*

42. For appellate relief to be meaningful, a capital defendant should be afforded every opportunity to return to his position at the time of his original prosecution. "If a prisoner is successful in persuading a federal court to grant the writ, the court should aim to restore him to the position he would have occupied, had the first trial been constitutionally error-free." *Bittaker v. Woodford*, 331 F.3d 715, 722 (9th Cir. 2003).[15] Resentencing counsel should try to develop whatever mitigating evidence might persuade a single juror to strike a different balance and spare his life. Moreover, resentencing counsel should conduct a thorough investigation of the offenses underlying the capital charges and any other aggravating evidence that the Government might introduce in the penalty phase, whether in its case in chief or in rebuttal. Under the Federal Death Penalty Act, jurors are never required to impose a death sentence. The presumption favoring life is borne out empirically. According to the update to the Spencer Report issued in September

---

[15] *See also United States v. Barnes*, 948 F.2d 325, 330 (7th Cir. 1991) (Effect of motion to vacate is to "nullify [defendant's] sentence" such that he appears before the Court "with a clean slate as far as sentencing [is] concerned; his previous sentence [is] not to be rubber stamped, but instead a new sentencing determination [is] to be made.").

29

**JA480**

2010,[16] there were 2,975 "death eligible" federal capital defendants from 1989 through 2009, of which 463 were authorized by the Attorney General to proceed capitally.[17] By the end of 2009, 262 authorized defendants had been tried, and sixty-eight of those who proceeded to trial were sentenced to death.[18] Roughly three out of four cases avoided death at trial. Others avoided the death penalty earlier through plea bargains.[19] A scant 2 percent of the "death-eligible" federal defendants received the death penalty.[20]

43. The need to conduct a fresh, new, and independent investigation in resentencing is analogous in the first instance to the duty of post-conviction counsel not to rely on the facts developed at trial. *See* ABA Guideline 10.15.1.E.3 (duty to "keep under continuing review the desirability of modifying prior counsel's theory of the case") and 10.15.1.E.4 (duty to "continue an aggressive investigation of all aspects of the case") and Commentary, 31 HOFSTRA L. REV. at 1085-1086.

44. Mitigation investigation is an arduous process. Gathering life-history records is slow and time-consuming, as noted *supra* ¶ 28. Establishing trust and rapport with clients, their family members, and other witnesses also takes time, as noted *supra* ¶¶ 32-33. In the context of resentencing, both these processes are typically more difficult. Records that were not gathered

---

[16] For original Spencer Report, see *supra* ¶ 20; for update, *see* GOULD & GREENMAN, UPDATE ON THE COST AND QUALITY OF DEFENSE REPRESENTATION IN DEATH PENALTY CASES (2010), *supra* n.2.

[17] *Id.* at 5 fig. 1 ("'Death-Eligible' Federal Capital Defendants, 1989-2009, by Calendar Year of Indictment") and 8 fig. 2 ("U.S. Department of Justice Capital Authorizations, 1989-2009, by Year of Authorization").

[18] *Id.* at 8-10. *See also* Stetler & Wendel, *The ABA Guidelines and the Norms of Capital Defense Representation,* 41 Hofstra L. Rev. 635, 684-695 (2013) (VIII. The Majority of Capital Cases Avoid the Death Penalty, also citing data from New York, California, Georgia, North Carolina, South Carolina, Kentucky, Indiana, Missouri, Nebraska, Colorado, New Mexico, Maryland, Delaware, and the U.S. military).

[19] Gould & Greenman, *supra* n. 12, at 9, n. 14.

[20] *Id.* at 5 fig. 1, 10.

30

either at trial or on habeas may have been destroyed. At very least, they are often more difficult to locate and obtain simply because of the passage of time. They may now be available only on microfilm or in offsite storage facilities. Records of now-deceased witnesses will be harder to obtain. The process will be more complicated and time-consuming, and may vary from one institution to another. There may be "witness fatigue," the phenomenon that occurs when witnesses are weary of telling what they know to one more interviewer. Witnesses may have had negative experiences with prior legal teams or court proceedings. Their personal circumstances may have changed in ways that make them more reluctant than ever to become involved in the case. They may also be geographically more scattered. Their memories may have faded or become confused. They may have died or become infirm.[21] Or they may be distrustful of the new legal team because of positive relationships with predecessor counsel. My point is simply that relationships with witnesses are not transferable, and the attitudes and availability of witnesses change over time. Each new team starts the process of building trust and rapport anew. The loss of known witnesses may require resentencing counsel to cast a wider net to identify completely new witnesses with relevant insights. It may seem counterintuitive, but resentencing preparation may require more time than typical pretrial preparation because of the obstacles stemming from the passage of time as well as the need for counsel to familiarize themselves with the voluminous documentary record of all members of the original trial team.

---

[21] I have testified in some cases where the loss of records and witnesses has been so extreme as to prevent counsel from providing effective assistance in the domain of mitigation investigation. After a hearing in which I testified, in *State v. Jonathan Bruce Reed*, Cause No. F81-01988-FK, In the Criminal District Court #4 of Dallas County, Texas, Judge John Creuzot granted defendant's motion to preclude the prosecution from seeking the death penalty because of such losses. The Texas Court of Criminal Appeals overruled the trial court, finding that the issue was not ripe because Mr. Reed had not yet been convicted on retrial. After conviction on retrial, the prosecution elected not to seek the death penalty.

31

45. In resentencing cases, what has happened *since* trial is also important. Whether there are formal allegations of future dangerousness or not, jurors are invariably concerned about whether capital defendants will pose a danger to staff and other inmates. *See* John H. Blume, Stephen P. Garvey, & Sheri Lynn Johnson, *Future Dangerousness in Capital Cases: Always "At Issue,"* 86 CORNELL L. REV. 397 (2000-2001). By the time of resentencing, a client's adjustment to prison, the effects of incarceration on his mental health, and his personal capacity for change need to be thoroughly investigated. Potential witnesses include correctional staff, chaplains, visitors, pen pals, and other inmates.

46. The "clean slate" which is appropriate for a defendant appearing in a capital resentencing is easy to imagine, but hard to achieve. With a truly "clean slate," the Government would know nothing of a capital defendant's potential mitigation themes and the signs and symptoms of his mental disorders and impairments. The Government would have had no preview of the defendant's biography beyond what it knew from criminal records and presentence reports. In order to attain the cleanest slate possible, counsel need to conduct a more thorough mitigation investigation than any of those whose fruits the Government has already seen in the prior trial proceedings. Counsel are bound by no prior strategies or limitations, and their investigation should be afforded the time that is reasonably necessary in the daunting circumstances where they may face lost leads, faded memories, perished documentary evidence, and witnesses who have passed away.

### Review of the Case of Aquilia Marcivicci Barnette

47. At the request of Mr. Barnette's federal habeas corpus counsel, I have reviewed the opinion affirming his conviction but vacating his 1998 death sentence, *United States v. Barnette*,

32

Bates No. 168

**JA483**

211 F.3d 803 (4th Cir. 2000); the opinion affirming his 2002 death sentence, *United States v. Barnette*, 390 F.3d 775 (4th Cir. 2004); the United States Supreme Court opinion remanding the case to the Fourth Circuit for further consideration in light of *Miller-El v. Dretke*, 546 U.S. 803 (2005); the District Court's opinion finding no purposeful discrimination in the Government's peremptory strikes, *United States v. Barnette*, 2010 WL 2085312 (2010); the Fourth Circuit's affirmance of the District Court, *United States v. Barnette*, 644 F.3d 192 (2011); a digest of the transcripts of the 1998 trial and sentencing proceeding; the Special Verdict Form from the 1998 sentencing proceeding, filed in the District Court February 10, 1998; the transcript of the 2002 sentencing proceedings from July 29 through August 13, 2002; the Special Verdict Form from the 2002 sentencing proceeding, filed in the District Court August 15, 2002; and the affidavits of the surviving members of the 2002 trial team, attorney Jean B. Lawson, investigator Jan Barefoot, and mitigation specialist Cessie Alfonso, as well as the affidavits of attorney Claire Rauscher (Ms. Lawson's original co-counsel), Ann Wolbert Burgess, Ph.D. (a psychiatric nurse who testified in the 2002 resentencing) and Sally Ann Cunningham Johnson, M.D. (a psychiatrist who testified at Mr. Barnette's original sentencing proceeding but who was not contacted by the resentencing team). I understand that the other lawyer representing Mr. Barnette in the 2002 resentencing, Harold J. Bender, died in 2013, but he had been unable to locate any files of the trial team beyond about 300 pages of electronic material on a diskette provided to habeas counsel.

*The 1998 Sentencing Proceeding*

48. After a three-week jury trial in January 1998, Mr. Barnette was convicted and sentenced to death for the carjacking murder of Donald Lee Allen and the shotgun murder of Mr. Barnette's ex-girlfriend, Robin Williams. 211 F.3d at 808. Mr. Barnette and Ms. Williams

33

**JA484**

began dating in 1994 and moved in together in Roanoke, Virginia, in 1995, until they broke up in April 1996. *Id.* On April 30, 1996, Mr. Barnette kicked open the front door of Ms. Williams's apartment and set it on fire. *Id.* at 809. Ms. Williams escaped by jumping out a rear window, but was hospitalized with second and third degree burns to her hands and arms. *Id.* A warrant was issued for Mr. Barnette's arrest and the Charlotte Police Department was notified, but the police did not arrest him. On June 21, Mr. Barnette carjacked Mr. Allen's Honda Prelude, killed Mr. Allen, and drove to Roanoke, where he killed Ms. Williams in front of her mother. *Id.*

49. At sentencing, in their case in chief the Government called nineteen witnesses who testified about Mr. Barnette's past violence (both domestic violence and the shooting of an ex-girlfriend's half-brother), including multiple law enforcement personnel from North Carolina and Georgia and three former girlfriends, as well as seven victim-impact witnesses – four from Mr. Allen's family and three from Ms. Williams's.

50. The defense called twenty-two witnesses. Half were family members who testified about Mr. Barnette's childhood hardships, but the narrative was incoherent and the witnesses contradicted one another. The defense attempted to call mitigation specialist Cynthia Neagle ("Sindy") Maxwell as a summary witness, based on her interviews with 50 to 75 mitigation witnesses, but the Government objected, saying that the defense had provided no notice that she would be called as an expert. The Court did not allow Ms. Maxwell to testify as an expert, but she was permitted to testify briefly about a "life line" summary she had prepared. Ms. Maxwell, now deceased, indicated that she had spent 200 to 300 hours investigating mitigation, beginning May 25, 1997. The penalty phase began eight months later on January 29, 1998. Mr. Barnette had been in custody since June 25, 1996 – that is, eleven months before Ms. Maxwell began her work.

34

51. The defense called several corrections staff to testify about Mr. Barnette's positive adjustment and lack of infractions in custody. Four mental health experts also testified. The first was Sally Johnson, M.D., the chief psychiatrist at Federal Correctional Institution Butner, where Mr. Barnette had been sent for a one-month evaluation of his competency to stand trial. Dr. Johnson interposed ethical objections to discussing her diagnoses at sentencing, since her referral questions in the competency evaluation had been narrowly framed. She did testify about what Mr. Barnette had told her about his drinking prior to the murders, and she said he was able to express sympathy and remorse. Psychologist Faye Sultan testified that she had diagnosed Mr. Barnette with a mood disorder (clinical depression) and borderline personality disorder, both of which impaired his capacity at the time of the murders. She also offered the opinion that Mr. Barnette would behave well in prison. Dr. Sultan was effectively impeached on cross-examination for her anti-death penalty bias as reflected in her book, OVER THE LINE, whose autobiographical character is a psychologist who is passionately anti-death penalty. She also had a pending ethical grievance from testimony in a civil case. She had once been reprimanded for "exploitation of client" for discontinuing therapy in order to hire a patient as a receptionist. That morning, NPR had broadcast an interview with Dr. Sultan in which she had said, "If I do my job when I'm testifying in front of a jury, by the time I'm finished, the jury is crying."

52. Forensic psychiatrist Seymour Halleck, M.D., diagnosed Mr. Barnette with substance abuse disorder, major depressive disorder, and bipolar two disorder. He found that intermittent explosive disorder should not be diagnosed because borderline personality disorder appeared to be more appropriate. Some antisocial and narcissistic factors were also present. Mark Cunningham, Ph.D., testified as an expert on violence risk assessment and concluded that there

35

**JA486**

was little likelihood that Mr. Barnette would commit future violent acts in prison.   The Fourth

Circuit described the remainder of the evidence thus:

> In rebuttal, the government called five more witnesses, including Dr. Scott Duncan.
> Dr. Duncan contested Dr. Cunningham's conclusion that Barnette would not be a future
> danger in prison based on three factors, the Psychopathy Checklist Revised [citation
> omitted], research on predicting future dangerousness, and an actuarial analysis comparing
> Barnette to groups of people with characteristics similar to him.   Dr. Duncan found that
> Barnette was likely to be violent in the future.   He testified that, in his opinion, Barnette
> was a psychopath.   Barnette then asked to recall his risk assessment expert, Dr.
> Cunningham, to rebut Dr. Duncan's opinion that Barnette was a psychopath, and related
> testimony based on the Psychopathy Checklist revised, but the district court denied that
> motion.

211 F.3d at 811.   The Fourth Circuit later found that "simple fairness required that Barnette have

the ability to rebut the new evidence the Government's expert introduced in rebuttal" and therefore

remanded for a new sentencing proceeding.   *Id.* at 824.

53.   The jury sentenced Mr. Barnette to death on all three death-eligible counts, after

finding all the statutory and non-statutory aggravating factors established beyond a reasonable

doubt.   The Special Verdict Form offered three groups of mitigating factors.   The first group

contained three statutory mitigation factors, impaired capacity, unusual and substantial duress, and

"other factors in the defendant's childhood, background or character mitigate against imposition of

the death sentence."   A single juror found the third factor established by a preponderance of the

evidence as to each death-eligible count.   No juror found impaired capacity or duress.   The

second group listed sixteen "non-statutory factor(s) in the defendant's background or character,

the circumstances of the crime(s), or other relevant fact or circumstances as mitigation."   The

number of jurors who found these factors varied according to the death-eligible count.   In other

words, the jurors apparently decided whether the factor mitigated each count, rather than simply

whether it was factually established.   For example, the first item (that "defendant assisted police

36

**JA487**

in locating Donald Allen's body") was found by 12 jurors as to Count Seven (carjacking murder committed in expectation of receipt of something of pecuniary value) and Count Eight (intentional killing of Donald Allen), but by only one juror as to Count Eleven (grave risk to one or more persons in addition to the intended victim). This chart summarizes the number of jurors who found each factor in the second group:

| Mitigating factor | Count 7 | Count 8 | Count 11 |
|---|---|---|---|
| Helped police locate Allen's body | 12 | 12 | 1 |
| Voluntarily turned himself in | 9 | 6 | 6 |
| No positive family role model as teen | 6 | 5 | 3 |
| Home condoned domestic violence | 5 | 5 | 6 |
| Physically/emotionally abused by father | 7 | 7 | 7 |
| Neglected by mother when she was drunk | 9 | 8 | 8 |
| Thrust into caretaker role after divorce | 3 | 3 | 3 |
| Worked consistently since age 15 | 5 | 6 | 3 |
| Grew up in home with drugs, alcohol | 12 | 12 | 11 |
| Grew up in home with violence | 11 | 10 | 8 |
| After beating, lost interest in school | 6 | 5 | 5 |
| Went to church with grandfather Jessie | 11 | 12 | 11 |
| Pled to 2 priors, accepted responsibility | 3 | 4 | 3 |
| Confessed to friend and friend's mother | 11 | 11 | 11 |
| Confessed to police | 12 | 12 | 12 |
| Model inmate | 12 | 12 | 12 |

The third group listed twelve "[o]ther non-statutory factors which the defendant contends are" mitigating. This chart summarizes the number of jurors who found each factor in the third group:

37

**JA488**

| Mitigating factor | Count 7 | Count 8 | Count 11 |
|---|---|---|---|
| Unstable home life, frequent moves | 2 | 3 | 3 |
| Showed remorse by trying to kill himself | 1 | 1 | 1 |
| Prayed for the souls of his victims | 4 | 3 | 3 |
| Exhibited psych problems as minor | 6 | 5 | 5 |
| Cooperated with police | 11 | 12 | 12 |
| Will do well in structured prison setting | 6 | 5 | 5 |
| Abandoned by father at age 10 | 1 | 3 | 4 |
| Rejected by father at 13 after blood tests | 2 | 4 | 4 |
| Attemped suicide prior to crimes | 2 | 6 | 2 |
| Age at time of the offense | 2 | 2 | 3 |
| If sentenced to LWOR, will not be danger | 3 | 2 | 1 |
| Execution impact on MB's family | 8 | 9 | 9 |

Prior to sentencing, Mr. Barnette made a statement to the court, which then formally imposed a sentence of death.

54. It is appropriate to pause here to review some of the evident investigative failings in the 1998 penalty proceeding and to identify the "red flags" that should have prompted more thorough investigation. The Supreme Court has consistently stressed the importance of pursuing leads. In *Wiggins*, nothing that trial counsel had uncovered suggested that mitigation would be fruitless: "To the contrary, the many red flags . . . would have prompted a reasonable attorney to conduct additional investigation." 539 U.S. at 525. Similarly, in *Rompilla*, the Court noted that counsel "could not have reasonably ignored mitigation evidence or red flags because they were unexpected." 545 U.S. at 391. In fact, post-conviction experts "found plenty of 'red flags' pointing up the need" for further investigation. In *Bobby v. Van Hook*, 558 U.S. 4, 11 (2009), the Court distinguished the weak claim of ineffectiveness in that case from the compelling claims in *Wiggins* and *Rompilla*, because it was "not a case in which the defendant's attorneys failed to act while potentially powerful mitigating evidence stared them in the face [citation omitted], or would have been apparent from documents any reasonable attorney would have obtained [citation

38

Bates No. 174

**JA489**

omitted]." The 1998 sentencing proceeding in Mr. Barnette's case was itself full of "red flags": the trauma experienced by Mr. Barnette's teenager mother when her mother was shot and killed by her step-father; the combat trauma experienced by Mr. Barnette's maternal grandfather, Jessie Cooper, in the Korean War and its impact on his civilian life; the beatings Derrick inflicted on young Marc for bad grades in school; the impact of the divorce of Derrick and Sonia; Mr. Barnette's hospitalization in Georgia after a brutal beating; the track coach who recognized Mr. Barnette's potential and may have had an outsider's insights into his situation at home; the shooting of Mr. Barnette by his cousin when he returned to North Carolina; Mr. Barnette's suicide attempt as a teenager; and his chronic crying spells, from the time he was with Natasha Heard (sobbing in the closet) until the period after the break-up with Robin Williams (when his mother and Aunt Sheila observed him crying on the telephone). Events that were superficially described needed to be explored in depth. What was the impact of her mother's murder on Sonia? How did her mother's death affect Sonia's ability to care for her son? After the grandmother died, who looked after ten-month-old Marc while Sonia attended school? What did the military and Veterans Administration records document about Jessie Cooper's wounds and post-war functioning? How did Mr. Barnette do in school? What did teachers and coaches know about his home situation? Did he come to school hungry or with visible bruises? Who could confirm the physical maltreatment by his father? What did police reports and medical records say about the incidents when Mr. Barnette was victimized as a teenager? The 1998 procedings provided a roadmap for follow-up investigation.

39

Case 3:12-cv-00327-MOC Document 74-5 Bates No. 175 Filed 12/22/14 Page 25 of 58

JA490

*Preparation for the 2002 Resentencing Proceeding*

55. The Fourth Circuit issued its decision granting a new sentencing proceeding on May 2, 2000. 211 F.3d 803. When the case was remanded to the trial court, two new lawyers were appointed to represent Mr. Barnette on February 13, 2001. Claire Rauscher had extensive experience as a federal criminal defense lawyer. Jean Lawson had handled capital cases in state court and several murder cases in federal court, but none in which the Government had ultimately elected to seek the death penalty. Lawson Aff. at ¶¶ 5, 11. Executions resumed under the Federal Death Penalty Act that summer: Timothy McVeigh was executed on June 11, and Juan Garza on June 19, 2001. On August 28, 2001, new trial counsel filed an *ex parte* "Statement of Defense Contentions," explaining that "an approach different from that used in his first sentencing hearing [was] warranted." *Id.* at ¶ 7. They had determined that the original defense team in 1998 had presented a "disjointed" sentencing case: "[W]itnesses were unprepared for cross-examination. The investigation was superficial and not-sufficiently in depth to enable the formation of a cohesive theory of mitigation." *Id.* at ¶ 8. Mr. Barnette's new trial counsel explained to the Court why they needed to replace the previous mitigation specialist, "[Sindy Maxwell] failed to develop adequate rapport with the defendant's family and friends that would have enabled her to unearth critical biographical information. She prepared a 'time line' purporting to represent the defendant's life history and omitted critical information. These omissions cast doubt on the reliability of other expert witnesses called by the defense. As a result, the honesty of the defense presentations was compromised." *Id.* at ¶ 12. They filed *ex parte* motions to hire private investigator Jan Barefoot (with whom Jean Lawson had worked previously on other cases) and mitigation specialist Cessie Alfonso (with whom Ms. Lawson had never previously worked). *Id.* at ¶ 10. *See also* Rauscher Aff. at ¶¶ 6-11. From the time of their

40

Bates No. 176

**JA491**

appointment until these *ex parte* filings in late August 2001, neither new attorney had spent much time with Mr. Barnette. Mecklenburg County Jail records reflect no visits by Ms. Rauscher in this time frame. Ms. Lawson made three visits on February 22, May 2, and June 20, 2001, for less than six hours altogether.

56. On August 31, 2001, the resentencing proceeding was set for March 19, 2002. Lawson Aff. at ¶ 13. The Court did not grant the *ex parte* funding requests for the investigator and mitigation specialist until October 10, 2001, nearly eight months after the appointment of Mr. Barnette's new lawyers. *Id.* at ¶ 14. On October 31, trial counsel filed a motion to continue the trial. Ms. Lawson has summarized the reasons thus:

> . . . both of us had significant commitments in other cases that caused great concern about our ability to be ready by March, 2002. Among my other commitments was a death penalty trial that was scheduled for January, 2002 in Mecklenburg County. In addition, we were also very concerned about having only four-and-a-half months to investigate and prepare a penalty phase presentation for Mr. Barnette. Our mitigation specialist was just getting started and we had a great deal more work to do in a case in which the defendant had already been sentenced to death once.

*Id.* at ¶ 15. Instead of continuing the trial, the Court moved it up a week to March 12, 2002. Trial counsel sought reconsideration. They ultimately obtained a continuance, but lost one of the two attorneys. According to Ms. Lawson, at a hearing on November 20, "the Court removed Ms. Rauscher from the defense team after she asserted the existence of a conflict due to the scheduling of the resentencing. The loss of 50% of the defense team was a huge shock to all of us. As a result of her removal, the case then had to be continued from the March 12, 2002 trial date." *Id.* at ¶ 16. *See also* Rauscher Aff. at ¶ 15 (". . . much to my surprise and dismay, the Court removed me as Marc's lawyer after I asserted what I believed was a conflict due to the scheduling of Marc's resentencing and my other cases.") It took two months before a second attorney was appointed to

41

Bates No. 177

**JA492**

replace Ms. Rauscher. On January 14, 2002, Harold Bender was appointed, and the case was continued until July 15, 2002. Lawson Aff. at ¶¶ 17-19.

57. Ms. Lawson knew that she would have to develop the mitigation case without much assistance from Mr. Bender. According to her affidavit, "I had previously worked with Mr. Bender as co-counsel and as counsel for co-defendants. In terms of working up a case, I knew from first-hand experience that Harold Bender's major strength and interest was in the courtroom and that he had a busy private practice. As a result, I knew that the responsibility and burden of developing the mitigation and case for sentencing would be mostly mine." *Id.* at ¶ 18. However, she did nothing to lighten her caseload; in fact, she increased it. Two days after Mr. Bender's appointment, she accepted appointment in a death penalty case from Gaston County. *Id.* at 20. Seven days after Mr. Bender's appointment, she began another death penalty trial in state court in Mecklenburg County. Her co-counsel on that case had only been appointed on November 30, so she "was working especially hard and particularly focused on the [Mecklenburg County] case during the period of time after Ms. Rauscher was removed from Mr. Barnette's case." *Id.*

58. The new mitigation specialist, Cessie Alfonso, has indicated that she did not begin interviewing anyone on Mr. Barnette's case until January 2002, three months after the Court authorized her funding. Alfonso Aff. at ¶ 7. According to her affidavit, "[i]t was never made clear to me by defense counsel whether they wanted me to do a wholesale re-investigation of Marc's background, or instead just focus on specific aspects. As a result, I started my investigation where I normally do: reviewing documents and then meeting with the client. My first meeting with Marc occurred in January 2002." *Id.* She subsequently interviewed only eleven people, in addition to the client. *Id. See also* Lawson Aff. at ¶ 37: "I have reviewed Cessie Alfonso's mitigation report that identifies the persons she interviewed. . . . It does not

42

Bates No. 178

**JA493**

appear that she re-interviewed a number of witnesses who Sindy Maxwell had interviewed prior to the first trial. There were also a number of witnesses who had been identified on a list of 'potential mitigation witnesses' in early March 2002 (like Sheila Sullivan, Tameka Hunter, and Kowana Dozier) whom Ms. Alfonso did not interview." Only three of the witnesses interviewed by Ms. Alfonso were called as defense witnesses in the 2002 sentencing proceeding (Derrick Barnette, Mario Barnette, and Ahmad Cooper). *See* Alfonso Aff. at ¶ 7.

59. Ms. Lawson "faxed a list of 'potential mitigation witnesses' to [Jan Barefoot] in early March 2002. This list was based on names that Marc had provided to me during my visits with him. I indicated on this list which witnesses I wanted Jan to locate so Cessie Alfonso could interview them. A number of former girlfriends were on the list – including Sheila Sullivan, Tameka Hunter, and Kowana Dozier – but I don't recall if I specifically asked Ms. Barefoot to locate them at that time. Her notes indicate that, right on the eve of trial, I asked Ms. Barefoot to locate Kowana Dozier and Tameka Hunter, but she did not have enough time to track them down." Lawson Aff. at ¶ 29. Ms. Alfonso only spoke to one of Mr. Barnette's ex-girlfriends, Natasha Heard. Alfonso Aff. at ¶ 7.

60. Mitigation specialist Cessie Alfonso wrote Ms. Lawson a detailed letter in January 2002 following her initial interviews with the client and his mother indicating that the mother's history of trauma, abuse, and loss "would be an important feature of the mitigation case to explain Marc's development." Alfonso Aff. at ¶ 8. Ms. Alfonso said that the team never told her why it did not present this evidence. She was not consulted about the decision not to present it. *Id.* at ¶ 9. Ms. Alfonso wrote a "biopsychosocial" report and submitted it to the team on July 8, 2002. *Id.* at ¶¶ 18, 20. She did not have further discussions with either trial counsel about the report. *Id.* at ¶ 20. Such reports were "standard in capital mitigation work in 2002." *Id.* at ¶ 18. In Mr.

43

**JA494**

Barnette's case, "[i]t was never made clear to me by the defense attorneys how, if at all, they intended to use my report. Indeed, it was never made clear to me until the trial itself that defense counsel did not intend to call me as a testifying witness." *Id.* at ¶ 19.

61. Investigator Jan Barefoot has also confirmed that the defense team existed on paper, but not in reality. She had worked with the first trial team in 1998, but her role was "primarily to compile criminal histories for potential defense witnesses, subpoena witnesses, and locate witnesses for Sindy Maxwell, the mitigation specialist." Barefoot Aff. at ¶ 3. She had worked on a number of cases with Harold Bender before Mr. Barnette's case: "Harold's manner with me in the Barnette case was similar to his manner in other cases we worked on together; he would give me a set of tasks to accomplish – for example, locate a witness or find a record – but not provide context or explanation." *Id.* at ¶ 5. Once again, she understood that her "primary" role was to assist the mitigation specialist. *Id.* at ¶ 6. According to Ms. Barefoot, "I did not have full-scale involvement in the retrial. Neither Jean Lawson nor Harold Bender sought my input about defense strategy. I do not recall either Jean or Harold describing their trial strategy to me. They would usually just call or fax me with a task or 'to do.' My biggest responsibility for the Barnette retrial was serving subpoenas." *Id.* at ¶ 7. She met with Mr. Barnette very belatedly on June 13, 2002, when he "provided me with names of former girlfriends." *Id.* at ¶ 13. Ms. Barefoot was given a number of last-minute assignments "prior to, during, and following jury selection" – a flurry of interviews between July 10 and 31, 2002, "in anticipation of having them testify on behalf of Marc." *Id.* at ¶ 14.

62. Trial counsel's consultation with experts was equally haphazard. They decided in late November 2001 – before there had been any new mitigation investigation – to involve an expert in domestic violence, psychiatric nurse and FBI consultant Ann Wolbert Burgess. Lawson

44

**JA495**

Aff. at ¶ 25. "We intended to have Dr. Burgess focus on Marc Barnette's prior relationships with other women. Ideally, Dr. Burgess would need to have access to all of Mr. Barnette's social history and mitigation information as well as women with whom he had been in relationships. We had Dr. Burgess meet with Mr. Barnette and speak with his mother and father, and his brother Mario. I do not recall coordinating or suggesting conversations or meetings between Dr. Burgess and any other social history witnesses." *Id.* at ¶ 26. Most importantly, there was no attempt to integrate the findings of the mitigation investigation into Dr. Burgess's analysis. *Id.* at ¶ 36. According to Ms. Lawson, "With respect to the people with whom Cessie Alfonso ended up speaking with, I do not recall coordinating any conversations or information sharing between Dr. Burgess and Ms. Alfonso. Ms. Alfonso did not provide her mitigation report to defense counsel until July 8, 2002, which was one week after Dr. Burgess submitted her report." *Id.* at ¶ 27. "Some of the social history information we provided to Dr. Burgess, including information about Mr. Barnette's prior relationships, came from Sindy Maxwell's work on the first trial – the same work we had previously concluded and told the court was poorly done and deficient." *Id.* at 26.

63. Inexplicably, trial counsel did not consult the one neutral expert who had testified favorably to Mr. Barnette at the first trial, Dr. Sally Johnson, the Bureau of Prisons psychiatrist. *See supra* ¶ 51. According to Ms. Lawson, "We did not call upon Dr. Johnson to testify at the second sentencing hearing and did not ask her to review any new information about our client, including his Bureau of Prison records." Lawson Aff. at ¶ 38. Dr. Johnson has confirmed that she "was not contacted by [Mr. Barnette's] defense counsel or anyone involved in his resentencing trial in 2002." Johnson Aff. at ¶ 15. She has also confirmed her availability in 2002:

> . . . by the time of Mr. Barnette's resentencing trial in 2002, he had been in custody for approximately six years – the majority of which time he had spent in the custody of the Bureau of Prisons. Having reviewed Mr. Barnette's prison records from his incarceration

45

**JA496**

during that period of time, it is clear that Mr. Barnette had very positive institutional adjustment. He presented no problems for correctional officers and had no problems with other inmates. He demonstrated an ability and willingness to abide [by] rules, remained non-violent, and maintained constructive and positive relationships with others. Had I been asked, I would have been willing and able to testify at Mr. Barnette's resentencing about his positive adjustment to prison and his lack of disciplinary issues, and how it was consistent with his behavior and adjustment during his evaluation period in 1997 and consistent with my expectations for his future adjustment.

*Id.* at ¶ 16.

64. Mr. Bender and Ms. Lawson decided to use two of the prior experts at the 2002 resentencing, Dr. Halleck and Dr. Cunningham. Ms. Lawson has indicated that she "knew that in order for an expert like Dr. Halleck to competently testify about our client's psychiatric make-up and mental health issues, he would need to have access to all of his social history and mitigation information." *Id.* at ¶ 33. Dr. Halleck had the information compiled by the previous mitigation specialist, but Ms. Lawson and Ms. Rauscher "had previously determined" that it was deficient. *Id.* However, the only additional information they provided to Dr. Halleck was another meeting with Mr. Barnette and access to his mother and one former girlfriend, Tasha Tolbert. *Id.* Once again, according to Ms. Lawson, "I do not recall coordinating or suggesting any other conversations or meetings between Dr. Halleck and any other social history witnesses. Cessie Alfonso's mitigation report was not provided to defense counsel until July 8, 2002, and I do not recall when or whether we provided Dr. Halleck with a copy of the mitigation report." *Id.* *See also* ¶ 36.

65. Mr. Bender and Ms. Lawson met with Dr. Cunningham at a capital defense training program around March 2002 and decided to expand his role beyond the issue of "future dangerousness" that he covered in the first sentencing proceeding. *Id.* at ¶ 31. He, too, had been provided with the previous "deficient" mitigation information, but Ms. Lawson does not recall

46

**JA497**

whether she provided Dr. Cunningham with a copy of Cessie Alfonso's report.  *Id.* at ¶¶ 32, 36.

This time, Dr. Cunningham was expected to testify "more broadly about Marc Barnette's

psychological make-up and mental health issues."  *Id.* at ¶ 31.  Dr. Cunningham met with Mr.

Barnette before the second sentencing proceeding, but did not have access to other new

information or witnesses.  *Id.* at ¶¶ 32, 36.


*The 2002 Resentencing Proceeding*

66.  The resentencing proceeding began on Monday, July 29, 2002.  The Government

called multiple witnesses to establish the factual predicates for three separate crimes: the

firebombing of Ms. Williams's apartment in Roanoke, Virginia, in April 1996; the carjacking and

murder of Donnie Allen in Charlotte, North Carolina, in June 1996; and the murder of Ms.

Williams in front of her mother in Roanoke in June 1996.  The testimony began with the dramatic

story of how Mr. Barnette had firebombed the apartment of Robin Williams in April 1996.

Benjamin Greene, who was staying with Ms. Williams at the time of the firebombing, described

the attack in vivid detail.  Tr., July 29, 2002, at 2397-2417.  Roanoke police investigator K. O.

Hubbard described the scene of the firebombing and also discussed his previous responses to the

address when Mr. Barnette and Ms. Williams lived there.  *Id.* at 2418-2431.  Firefighter Kent

McInhaney described the burns suffered by Ms. Williams.  *Id.* at 2435.  Two neighbors, John

Grubb and Maude Hubbard, described how phone lines had been cut and the prior fights between

Ms. Williams and Mr. Barnette.  *Id.* at 2450, 2455.  Roanoke Sgt. Rick Kahl investigated the fire

at the apartment.  *Id.* at 2470-89.  UVA staff nurse Sarah Aldridge discussed Ms. Williams's

burns, as well as her fears.  *Id.* at 2497, 2499.  Ms. Williams's brother Sydney testified about

letters from Mr. Barnette and Ms. Williams that had been left on her car a week after the fire with

Bates No. 183

messages accusing her of lying. *Id.* at 2519-21. Mr. Barnette's friend Steve Austin described how Mr. Barnette had told him what happened on the night of the firebombing. *Id.* at 2532.

67. Moving on to the carjacking homicide, the Government called Jacob Freshour, who testified that he had sold a shotgun to someone using the name "Mario Barnette." *Id..* at 2543. Elaine Edwards testified about playing pool with Donnie Allen the night he was killed. She subsequently noticed fliers about his disappearance and contacted police. *Id.* at 2556-59. Mecklenburg Officer Robert Holl testified about the discovery of Mr. Allen's abandoned car and how a shotgun was found in a nearby dumpster. *Id.* at 2561-64. He identified photos of multiple items of evidence relating to the Allen homicide. *Id.* at 2572-82.

68. On the second day of testimony, the Government presented firearms and tool mark examiner Todd Nordhoff, who testified about test firing the shotgun and concluded that Mr. Allen was shot at a distance not greater than five feet. Tr., July 30, 2002, at 2606. Forensic pathologist James Michael Sullivan, M.D., described the fatal wounds and opined that the shots were fired at close range, three feet or less. *Id.* at 2614. Mr. Allen could have been conscious up to five minutes; these shots could have caused substantial pain. *Id.* at 2624.

69. The Government set the stage for the murder of Robin Williams with the testimony of her mother's neighbor, Earlene Thompson, who saw a gunman as Ms. Williams ran out of her mother's apartment. *Id.* at 2628-29. Her mother was holding a child. *Id.* at 2628. The gunman pointed his gun at Ms. Thompson. *Id.* at 2631. She went inside and called the police. *Id.* Later she saw the gunman dragging Ms. Williams down the street by her hair. *Id.* at 2633. He then shot Ms. Williams twice and returned to his car and "normally . . . drove off." *Id.* at 2636, 2638. Another neighbor, Sonji Hill, was talking on the phone when she heard a loud boom. *Id.* at 2647. The gunman pointed his gun at her and told her to "hang the motherfucking phone up."

48

**JA499**

*Id.* at 2653. Ms. Hill saw the gunman shoot Ms. Williams. *Id.* at 2655-56. Roanoke Officer Daniel Dean was the first officer to respond to the scene. *Id.* at 2662. He saw Ms. Williams as she lay dying and prayed with her mother as paramedics attended Ms. Williams. *Id.* at 2665. Crime scene technician C. R. Sacra described where the shotgun shells were found. *Id.* at 2669. He noted that the telephone lines had been cut. *Id.* at 2676. Dr. Gregory Wagner testified about the autopsy performed by a pathologist who had now retired. *Id.* at 2691. Autopsy photographs showed skin grafts from the prior burn injuries. *Id.* at 2694-96. Prior testimony of Officer J. L. Krall was read to the jury, documenting the discovery of Mr. Allen's stolen Honda. *Id.* at 2704. Ben Kennedy, a friend of Mr. Allen's brother-in-law, testified that he had actually found the shotgun and other items in the dumpster. *Id.* at 2718-21. Charlotte-Mecklenburg Officer James Michael Sanders arrested Mr. Barnette, who was nicely dressed and holding a Bible when he was arrested. *Id.* at 2726. Mr. Barnette was cooperative and assisted the police in finding Mr. Allen's body. *Id.* at 2730-34. Officer Sanders recounted Mr. Barnette's confession at length. *Id.* at 2737-49. Charlotte-Mecklenburg Officer Tony Rice interviewed Mr. Barnette following the interview by Officer Sanders. *Id.* at 2771-72.

70. On the third day of the resentencing proceedings, Charlotte-Mecklenburg Officer Robert A. Holl covered another interview of Mr. Barnette. Tr., July 31, 2002, at 2793-94. The Government then called numerous witnesses to explore Mr. Barnette's history of violent relationships. Former girlfriend Crystal Dennis was called to testify about how Mr. Barnette was abusive and jealous during their relationship. *Id.* at 2807. He was also prosecuted for cruelty to her children, including whipping them with a clothes hanger. *Id.* at 2809. Mr. Barnette shot at her half-brother Anthony [Britt] in a conflict over another girlfriend, Tasha, with whom Mr. Barnette was involved prior to Ms. Dennis. *Id.* at 2817. Detective James Yarbrough testified

49

**JA500**

about his investigation of the cruelty to Ms. Dennis's children in Noonan, Georgia. *Id.* at 2821-28. Detective Rodney Riggs testified about his investigation of the shooting involving Anthony Britt. *Id.* at 2832. (Britt was later killed in another gun fight over a woman. *Id.* at 2838.) Natasha (Heard) Tolbert, the mother of two of Mr. Barnette's children, testified about their relationship, which began when she was fourteen and Mr. Barnette was sixteen. *Id.* at 2842-43. He once threw Natasha to the concrete when she was pregnant. *Id.* at 2847. He had written the children only once in five or six years after splitting up with Natasha. *Id.* at 2848. On cross-examination, Ms. Tolbert said that the children are excited to see Mr. Barnette, but on redirect she conceded that they love him because he is their daddy, not because they know him. *Id.* at 2859, 2860. Another ex-girlfriend, Alesha Chambers Houston testified to Mr. Barnette's jealousy and possessiveness. *Id.* at 2870. They fought once over a knife. *Id.* at 2877. He picked Alesha up and threatened to throw her from the balcony. *Id.* at 2878-79. Another time he put a knife to her throat when she refused to go with him. *Id.* at 2891-92. He raped her in the back of a car. *Id.* at 2900. She later called the police, but the case was not pursued because of her prior consensual sexual relationship with Mr. Barnette. *Id.* at 2902-04. Charlotte-Mecklenburg Officer W. T. Brandon of the sexual assault unit testified about the rape investigation, but noted that the charges were dropped. *Id.* at 2915-25. Brent McQuickered Burgess testified about witnessing the incident where Mr. Barnette held Ms. Houston at knifepoint. *Id.* at 2931. Co-workers subdued Mr. Barnette. *Id.* at 2934. Donna Burgess confirmed the incident. *Id.* at 2939-41. Charlotte-Mecklenburg Officer Donna Adamo investigated a kidnaping case involving Ms. Tolbert. *Id.* at 2947. Mr. Barnette's mother denied that Ms. Tolbert was at the Barnette home, but the police found her there. *Id.* Mr. Barnette's probation officer Thad Johnson testified

50

**JA501**

that he had a heavy caseload (230-240 people to supervise) and never knew that Mr. Barnette had moved out of North Carolina. *Id.* at 2969, 2973.

71. On August 1, 2002, the Government concluded its case in chief with victim-impact witnesses: Ms. Williams's brother, Kenneth, and her mother, Bertha, Tr., August 1, 2002, at 2984-88, 2989-3012; and Mr. Allen's parents, Bobby and Shirley, and his only sister Denise, *id.* at 3013-3026, 3028-3033, 3034. Nearly all of the Government witnesses had testified in the 1998 sentencing proceeding. There were no surprises.

72. On Monday, August 5, 2002, the defense began its presentation of mitigation evidence. Fourteen witnesses were called. Six were so-called *Skipper* witnesses (*see Skipper v. South Carolina*, 476 U.S. 1 (1986)), rebutting future dangerousness allegations by demonstrating that Mr. Barnette had adjusted well to incarceration. A seventh was a jail minister, Bobby H. West, who found Mr. Barnette remorseful and wondering if God will forgive him for what he did. Tr., August 6, 3394-96. Three correctional officers from Mecklenburg County Jail – Terry Michael Dorsey, Olandas Truesdale, and Tony Harrison – testified that Mr. Barnette was a model inmate. Tr., August 7, 2002, 3457-58, 3459, 3460. A correctional officer from the Bureau of Prisoners, Bruce Ryherd, said that Mr. Barnette was a good prisoner who had progressed from Phase 1 to Phase 2 because of his positive adjustment. *Id.* at 3460-63. Case manager Donna Boyer from United States Penitentiary Terre Haute confirmed that Mr. Barnette was not a disciplinary problem. *Id.* at 3470. Corrections consultant Walter W. Buer, Jr., said that Mr. Barnette would be eligible for a medium security prison based on the normal BOP classification system, but he would remain in a high security penitentiary because of the nature of his sentence.

51

**JA502**

*Id.* at 3486. What was glaringly missing from this testimony, however, was an explanation of *why* Mr. Barnette functions so well in the structured environment of prison.[22]

73. The remaining seven witnesses included three experts, three family members, and Mr. Barnette himself. As I have explained *supra* ¶ 38, defense experts tend to be viewed as "hired guns" unless their opinions are supported by abundant, credible evidence from lay witnesses and professionals, such as teachers and caseworkers, who encountered the capital client long before the alleged offense. Mr. Barnette's 2002 resentencing represents a textbook example of how *not* to present penalty phase expert evidence. The absence of corroborative evidence from objective witnesses outside the family was a direct result of trial counsel's failure to conduct a thorough mitigation investigation. Even more catastrophic was the decision to make Mr. Barnette himself the centerpiece of the resentencing case. He was the first defense witness, and he was on the stand for more than a day.

74. Mr. Barnette did not testify in the 1998 sentencing proceeding. I have seen nothing in the record to suggest that he was insistent about taking the witness stand. On the contrary, Ms. Lawson has stated in her affidavit, ". . . Mr. Barnette and I discussed the issue of whether he would testify at the sentencing hearing and, as I recall, Harold Bender was involved in those discussions occasionally. Mr. Barnette was always very amenable to the advice of counsel. Mr. Bender and I recommended that he testify, and he decided to testify." Lawson Aff. at ¶ 22. She continued, "I never considered, and I don't recall ever discussing with Harold Bender, having any mental health

---

[22] As discussed *infra* ¶ 86, all twelve jurors agreed that Mr. Barnette can serve a useful purpose in prison, but only two thought that he does well in a structured environment. They had been given no means to connect his well-adjusted prison behavior to the beneficial impact of structure on his underlying disorders.

52

**JA503**

expert weigh in on Mr. Barnette's testimony." *Id.* at ¶ 23.   Mitigation specialist Cessie Alfonso

has summed up her reaction thus:

> I was definitely surprised – actually, shocked would be the right word – when Marc
> testified on his own behalf at trial.   I was neither consulted about this decision nor told
> why the defense team decided to call him as the first defense witness.   During my various
> meetings with Marc, I was never told by Marc – directly or indirectly – that he wanted to
> testify.   I could count on one hand the number of times a defendant testified on his own
> behalf before the jury in cases I've worked on.   Had defense counsel sought my advice or
> insights about Marc as a potential witness, I would have strongly cautioned them that
> Marc, despite genuine remorse for what he had done, would likely offend the jury by his
> testimony.   I would have been concerned that Marc's mental health makeup and
> experiences, and his general lack of insight, would result in explanations and rationales for
> his behavior that would alienate jurors, rather than communicate remorse and sorrow.   I
> believe his testimony did just that.

Alfonso Aff. at ¶ 23.   Trial expert Ann Burgess has also confirmed that she was not consulted

about the decision to have Mr. Barnette testify.   According to her declaration, "Had counsel

sought my advice or insights about Mr. Barnette as a potential witness, I would have strongly

cautioned them that Mr. Barnette, despite genuine remorse for what he had done, would likely

offend the jury by his testimony.   I would have expressed my strong reservation that given his

mental health makeup and experiences, and his general lack of insight, Mr. Barnette would explain

and rationalize his behavior in ways that would likely anger jurors."   Burgess Aff. at ¶ 22.   Dr.

Johnson concurs:

> I have been made aware that Mr. Barnette testified on his own behalf at his resentencing
> trial.   Had trial counsel sought my advice or insights in 2002 about putting Mr. Barnette on
> as a witness, I would have discussed that although Mr. Barnette expressed genuine remorse
> for what he had done, he had limited insight into his behaviors and may not be able to
> display his remorse when confronted with the stress of examination and cross examination.
> His attempts to deal with his anxiety and his personality functioning would likely limit his
> ability to relate to the Jury or others in the court room.

Johnson Aff. at ¶ 24.

53

**JA504**

75.   Experienced capital practitioners have long recognized that the decision to have a capital client testify in his own penalty phase is perilous and extremely difficult.   *See*, for example, Edward C. Monahan, *Testifying and Allocution*, KENTUCKY DEPARTMENT OF PUBLIC ADVOCACY, DEATH PENALTY MANUAL 99 (1989) (noting "most difficult" decision; preparing client to testify may take hundreds of hours).   Most importantly, if the client does testify, counsel should "surround the defendant's testimony with unbiased or less interested witnesses"; otherwise, his testimony "can ring hollow, as purely self-serving and manipulative." *Id.* at 100.[23]   In my own thirty-four years of involvement in capital defense teams, I cannot think of a single example where the defense team encouraged a client to testify in the penalty phase, although there were several cases in which the issue was carefully discussed and clients were counseled thoughtfully about the extreme risks and downsides of testifying.

76.   In Mr. Barnette's case only three family members were called as mitigation witnesses, and there were no witnesses outside the family to testify about anything in Mr. Barnette's childhood, developmental years, or early adulthood.   There was no attempt to "surround" his testimony with unbiased witnesses.   Derrick Barnette testified that he became involved with Mr. Barnette's mother, Sonia, when she was in the eighth or ninth grade.   Tr., August 6, 2002, at 3320.   She became pregnant with Marc, and he assumed that the child was his. *Id.* at 3321.   She and the baby lived with her mother and step-father until her step-father shot and

---

[23]   In a capital case, the only widely accepted reason for a client to testify in a penalty phase is to accept responsibility and express remorse.   However, a brief allocution is generally preferred since it avoids cross-examination and factual disputation.   *See* J. Thomas Sullivan, *The Capital Defendant's Right to Make a Personal Plea for Mercy: Common Law Allocution and Constitutional Mitigation*, 15 N.M. L. Rev. 41 (1985).   *See also State v. Zola*, 548 A.2d 1022, 1046 (N.J. 1988) (citing Sullivan article on appropriateness of allocution in capital sentencing) and J. Thomas Sullivan, *Use of the "Zola Plea" in New Jersey Capital Prosecutions*, 21 SETON HALL L. REV. 3 (1990) (tracing history of "mercy pleas" by allocution).

54

Bates No. 190

**JA505**

killed Sonia's mother. *Id.* Derrick enlisted in the air force and later married Sonia. *Id.* at 3323-24. Derrick and Sonia accused one another of infidelity and sometimes fought. *Id.* at 3327, 3330. They split up when Marc was about ten. *Id.* at 3330. Derrick spanked Marc with a belt. *Id.* He denied hitting him with a coat hanger. *Id.* at 3346. Although he confirmed that the worst thing" he ever did to Sonia was to hit her with a hammer (*id.* at 3328), he made light of an incident where she had brandished a frying pan over him when he was sleeping: "Turned into sort of a joke. . . . I woke up and she's standing there with a frying pan." *Id.* at 3329. After the break-up, Derrick arranged paternity testing and learned that he was not the father of either of Sonia's sons. *Id.* at 3334. On cross-examination, Derrick indicated that "spanking" and "beating" could be used interchangeably. *Id.* at 3351. He spanked Marc only when he transgressed the family rules, such as "don't lie" and "do well in school." *Id.* at 3352-53.

77. Mr. Barnette's younger brother Mario testified that Mr. Barnette protected him when their parents were fighting. *Id.* at 3363. After the divorce, Sonia sometimes left the boys on their own, sometimes for days at a time. *Id.* at 3373. She bought herself a two-seater Corvette rather than a family car, but Mario fondly recalled how he loved getting a ride in it once. *Id.* Mario was asked how Mr. Barnette felt about victim Robin Williams, and the following exchange occurred:

A. From looking at him in other relationships, he definitely had a thing about devoting everything –

Q. I'm sorry, I'm having difficulty hearing you.

A. I'm sorry. I was saying from looking at him in other relationships, the outside view, he definitely had a thing about giving it all. And with Robin it seemed a lot easier for both of them. There was never, as far as what I saw when she visited, there were never any fights between them. . . . he was proud of the relationship with her. It had been a long time since I had seen him happy, and he seemed to be making her happy as well.

Q. When you say he gave his relationship his all, what do you mean by that?

55

Bates No. 191

**JA506**

A. Ever since Tosha, my brother would basically fall off the face of the earth when it came to a girlfriend. I mean, it was just like this is where my focus is, and I could see how he would do that. But it happened from his first girlfriend to his last girlfriend, he gave everything that he could, and only in retrospect can I say maybe he gave too much, you know, but I'm not going to judge that.

*Id.* at 3385-86.

78. Mr. Barnette's twenty-year-old cousin, Ahmad Cooper, testified very briefly. *Id.* at 3440. He is eight years younger than Mr. Barnette. *Id.* at 3436. Sonia and her boys moved in with Ahmad and his mother (Sonia's younger sister, Sheila Cooper) in Atlanta when Ahmad was about six. *Id.* at 3440. The adults often went out in their "best outfits" and left the children unsupervised. *Id.* at 3435. Ahmad Cooper looked up to Marc Barnette as a father figure. *Id.* at 3438.

79. Forensic psychiatrist Seymour Halleck, M.D., testified that he had interviewed Mr. Barnette four times in 1998 and four more times in 2002. *Id.* at 3402. He had also interviewed Mr. Barnette's mother in person for about an hour and talked on the telephone to Derrick Barnette and ex-girlfriend Natasha Heard. *Id.* at 3403. Dr. Halleck opined that Mr. Barnette was suffering from major depressive disorder and substance abuse disorder at the time of the capital crimes, as well as borderline personality disorder. *Id.* at 3403-06. Mr. Barnette was also "demonstrating a great deal of anger and rage." *Id.* at 3407. He had qualities of antisocial and narcissistic personality disorders. *Id.* Mr. Barnette "acted out a plan rationally based on irrational motivations." *Id.* at 3413. Dr. Halleck is opposed to the death penalty. *Id.* at 3430-31. No lay witnesses corroborated any of the bases of his opinions.

80. Psychiatric nurse Ann Wolbert Burgess was qualified as an expert in domestic violence. Tr., August 7, 2002, at 3494. She had taught FBI agents about rape victimology at the Behavioral Science Unit at Quantico, Virginia, where she also studied serial offenders (serial

56

Case 3:12-cv-00327-MOC Document 74-5 Filed 12/22/14 Page 42 of 58
Bates No. 192

**JA507**

killers, child molesters, child abductors, etc.). *Id.* at 3495. She recommended Park Dietz, M.D., Ph.D., to the FBI based on her knowledge of his work. *Id.* at 3496. There are multigenerational patterns of violence. *Id.* at 3499-3500. Neglect is a risk factor for domestic violence. *Id.* at 3501. Dr. Burgess had interviewed Mr. Barnette twice and she heard some of his testimony in court. *Id.* at 3502. She talked with his mother and by telephone with Derrick and Mario Barnette. *Id.* at 3503. The whole crime spree from April to June was part of Mr. Barnette's "attempt to reengage with his ex-girlfriend Robin Williams." *Id.* at 3504-05. Mr. Barnette's violence with his domestic partners escalated over time; there was no intervention to curtail it. *Id.* at 3510. Dr. Burgess noted Mr. Barnette's symptoms of depression and suicidality in his childhood and teenage years. *Id.* at 3514-15. At one point, according to Sonia, Mr. Barnette shaved his head because "he couldn't think as clearly with the hair on his head." *Id.* at 3518-19. Abusers do not enjoy the abuse, but perpetrate it to keep control of the individual. *Id.* at 3519. Mr. Barnette's cruel treatment of Crystal Dennis's children and the shooting of Anthony Britt should also be seen in the context of his domestic relationship at the time. *Id.* at 3520-21. His problems with women in unstructured settings would not be replicated in prison. *Id.* at 3522-23.

81. In the Government's lengthy cross-examination, Dr. Burgess was closely questioned about the crimes, Mr. Barnette's efforts to evade arrest in Tennessee, whether the crime scenes were "organized" or "disorganized," and the traumatic impact of domestic violence on the victims of intimate-partner rape and assault. *Id.* at 3523-3565.

82. Forensic psychologist Mark Cunningham was the final defense witness. He had interviewed Mr. Barnette four times for a total of eighteen hours. *Id.* at 3576. He also interviewed Sonia, Derrick, and Mario; Mr. Barnette's aunt Sheila; his friend Steve Austin; his cousin Chanda [sic] Nero; a work supervisor; a correctional officer; and BOP psychiatrist Sally

57

**JA508**

Johnson, M.D. *Id.* at 3576-77. He also listened to the earlier penalty phase testimony beginning August 5, 2002. *Id.* at 3578. His conclusion was that Mr. Barnette was damaged by "a number of fundamental factors," and "that damage placed him at substantially greater risk for disturbed romantic relationships, for criminal activity, and for criminal violence in the community." *Id.* In some cases, Dr. Cunningham relied on information that was either not in evidence or conflicted with lay witness testimony. For example, he opined about Mr. Barnette's mother that "it's tough when your father is psychiatrically and physically disabled, as Jessie was, and your mom has been murdered . . ." *Id* at 3594. Derrick Barnette had testified that Jesse Cooper had been the janitor at his high school who was a "nice guy," "unique," and a "[l]ittle eccentric." Tr., August 6, 2002, at 3318. According to Derrick, Jessie Cooper was "a very educated man" who had earned a degree from North Carolina A & T State University and drank beer – Pabst Blue Ribbon – daily. *Id.* at 3319. Mario testified that Jessie "had a strange way of talking at first" – he called Sonia "Sonar" – and he wore an army coat. *Id.* at 3361. There was no hint of psychiatric or physical disability from either Derrick or Mario. Dr. Cunningham explained that he based his opinion on information from Mr. Barnette's aunt, Sheila Cooper, who had not testified. Tr., August 8, 2002, at 3718. Elsewhere, in referring to Derrick's father as an "alcoholic playboy," Dr. Cunningham said he relied on the "psychosocial history investigation that was done four or five years ago," apparently referring to the Maxwell report that 2002 trial counsel had found erroneous and deficient. *Id.* at 3720; *see supra* ¶ 55.

83. Outside the presence of the jury, Dr. Cunningham was questioned by the Court and the Government about when he was retained by the defense and when he completed the slides that he used in his testimony. He said he "was kind of informally retained I think in about March" of 2002. Tr. August 7, 2002, at 3626. He was not informed that the Court had ordered experts to

58

Bates No. 194

**JA509**

produce their report by June 25. *Id.* Some of his slides were prepared prior to June 25, but others were prepared as late as the preceding weekend. *Id.* at 3626-3627. He had originally been expecting just to testify about risk assessment, but he remembered "when I came out in July, July 8th, that there was a discussion about going ahead and working up mitigation for sure at that time." *Id.* at 3627. His report had summarized "multiple mitigating issues," including "primary attachment instability, multigenerational domestic violence scripts, observed domestic jealousy and violence, paternal abandonment, corruptive modeling, vulnerability to alcohol abuse, depressing and posttraumatic symptoms, poor parental supervision and instruction, and other developmental factors" – all of which "form a nexus to the instant offense." *Id.* at 3629.

84. Dr. Cunningham discussed at length how Mr. Barnette's crimes fit the category of "catathymic homicide," where there is an emotional bond between perpetrator and victim, and violence is driven by emotional turmoil. *Id.* at 3647-51.

85. The Government offered several witnesses in rebuttal. Joanna Baldwin Coleman had worked with Mr. Barnette at Camelot Music Store. She testified to his vulgar sexual and lewd comments, like "I needed his big dick in me." Tr., August 8, 2002, at 3737-38. Another co-worker at the music store, Shirley Williams Parker, testified that she had had sex with Mr. Barnette a couple of times in 1995 (during the time when he was involved with Ms. Williams). *Id.* at 3746. Ms. Williams's friend Angela Rosser testified to Mr. Barnette's bizarre behavior when Ms. Williams attended a funeral with Ms. Rosser. *Id.* 3747-53. Dr. Peter Carlson had retired on December 31, 1999, after spending thirty years with the Bureau of Prisons. *Id.* at 3769. Dr. Carlson testified that life-sentenced prisoners are placed in the general population of high-security prisons, but there are exceptions where those prisoners can sometimes be transferred to less secure prisons. *Id.* at 3772.

59

86.  Forensic psychiatrist Park Dietz, M.D., disagreed with all of the defense experts on various points.   He said that Dr. Halleck should not have diagnosed Mr. Barnette with depression in the period between the firebombing and the murders because Mr. Barnette was drinking heavily during that time and "the effects of alcohol can't be distinguished from the effects of the illness that we call depression."  *Id.* at 3797.   Dr. Dietz disagreed with Dr. Burgess about Mr. Barnette's purpose on the trip to Roanoke: he did not merely want to talk with her.   "It's the most common thing that domestic offenders, including ones that kill their victims, say when they are arrested, they say, I just wanted to talk to her.   But that's not true. . . .   In that case, what he wanted to do and what he acknowledged having thought about doing was to kidnap her and make her take him to Benjamin Green, and he had already thought of killing Robin, he had thought of killing Benjamin."  *Id.* at 3802.   Dr. Dietz disagreed with Dr. Cunningham about categorizing the Donnie Allen homicide under catathymic homicide because Mr. Barnette had no relationship with Mr. Allen and there was no brooding.  *Id.* at 3805.   Mr. Allen's murder was not a domestic homicide.  *Id.* at 3809.

87.  Once again, the jury sentenced Mr. Barnette to death on all three death-eligible counts, after finding both the statutory aggravating factors (pecuniary gain and substantial planning and premeditation) established beyond a reasonable doubt.   The jury agreed that two non-statutory aggravating factors had been proved beyond a reasonable doubt (harm to Mr. Allen's family and intentional killing of two people), but it rejected the contention that Mr. Allen would be likely to commit criminal acts of violence in the future.   The Special Verdict Form again offered three groups of mitigating factors.   No juror found that the statutory mitigating factor of impaired capacity had been established, but eleven found that "other factors in the defendant's childhood, background or character mitigate against imposition of the death sentence."   The

60

**JA511**

Court found that three non-statutory mitigating factors had been established, and the jury followed the Court's instruction and indicated that all twelve jurors had found that Mr. Barnette was neglected by his mother, turned himself in to police, and has been a model prisoner. The jury was deeply divided about the other thirteen non-statutory mitigating factors that were proposed. None of the jurors connected his difficult childhood to his mental health at the time of the offenses. This chart summarizes the number of jurors who found each factor in the third group:

| Mitigating factor | Count 7 | Count 8 | Count 11 |
|---|---|---|---|
| Accepted full responsibility for his actions | 1 | 1 | 1 |
| Has remorse | 1 | 1 | 1 |
| Was abused by his father | 1 | 1 | 1 |
| Family environment of violence, drugs, etc. | 12 | 12 | 12 |
| Repeated exposure to violence in home | 12 | 12 | 12 |
| Attempted to protect Mario | 12 | 12 | 12 |
| History of untreated emotional problems | 9 | 9 | 9 |
| Experiencing depression at time of crimes | 0 | 0 | 0 |
| Does well in structured environment | 2 | 2 | 2 |
| Cooperated with police | 12 | 12 | 12 |
| Can serve useful purpose in prison | 12 | 12 | 12 |
| Irrational/obsessive thoughts during crimes | 6 | 6 | 6 |
| Execution impact on brother and children | 0 | 0 | 0 |

61

**JA512**

*Conclusions*

88.  In summary, trial counsel in 2002 failed to conduct a thorough and expansive investigation of Mr. Barnette's potential mitigating evidence.  They belatedly engaged the services of an experienced mitigation specialist, but gave her little guidance, ignored her own advice about potentially important areas to develop, and made no effort to extend her investigation when she had completed fewer than a dozen interviews.  Among those who were interviewed, there was no attempt to build rapport and trust through multiple, in-person, one-on-one, face-to-face interviews.  The mitigation specialist's biopsychosocial report was not shared with any of the experts who testified.

89.  It is my considered professional opinion that trial counsel's duty to conduct a thorough mitigation investigation was well-established at the time of Mr. Barnette's resentencing proceeding in 2002.  Trial counsel in this case conducted no such investigation, but instead, as in the *Wiggins* case cited *supra* ¶ 19, "abandoned [their] investigation" of Mr. Barnette's background "after having acquired only rudimentary knowledge of his history from a narrow set of sources." 539 U.S. at 524.  They chose the least credible witness – Mr. Barnette himself – to recount his life history with no regard for his lack of insight and judgment.  A mere three family members testified, and they contradicted Mr. Barnette's testimony in critical areas while failing to corroborate the three mental health experts who attempted to provide a framework for understanding Mr. Barnette's behavior.  No juror believed that Mr. Barnette was experiencing depression at the time of his crimes.  Only one found evidence of remorse after observing Mr. Barnette on the witness stand for more than a day.

90.  In conclusion, it is my considered professional opinion that trial counsel's

62

**JA513**

performance in Mr. Barnette's resentencing case fell far below the prevailing norms of 2002 in the investigation and presentation of mitigation evidence. It is also my considered professional opinion that the mental health evidence presented in 2002 lacked the foundational social history that is essential to both reliability and credibility.

I declare under penalty of perjury pursuant to 28 U.S.C. §1746, and under the laws of the States of California and North Carolina, that the foregoing is true and correct and was executed this 9th day of December 2014 at Oakland, California.

RUSSELL STETLER

63

JA514

<u>**Affidavit of Netoshia Tolbert**</u>

I, Netoshia Tolbert, appearing before the undersigned and being duly sworn or affirmed, state the following:

1. I am over the age of 18 and competent to testify to the following facts.

2. I am a resident of Newnan, Georgia. My given first name is Netoshia but most people call me Tasha. Before I married, my last name was Heard.

3. I went to school through the 8th grade but I later passed a GED exam.

4. I was diagnosed with bipolar disorder~over~NT three years ago. I have been prescribed Busperone for this.

5. I have known Aquilia Marcivicci Barnette for decades. I call him Marc. We dated for several years, starting when we were both in high school, and we are still in contact today. Marc and I have two children together. Angelica Barnette Sharpe is our older daughter and Aquilia Marcivicci Heard is our younger son. We call our son Marc Jr. or Little Marc. Marc Jr. looks just like his dad.

6. I know the type of person Marc can be. He can be sweet and smart. But he's also unstable and always has been.

7. I first met Marc when I was 13 years old. We met at my apartment complex, The Crossings. Marc had just moved there and we met at the pool one day. My cousin who is two years younger than me had just run into Marc and they started talking. Then he started talking to me. It was love at first sight. When we were together we used to go to Dogwood Fest and museums and things like that.

8. Marc lived a couple of buildings up from me. Our relationship was pretty intense right from the start. We would spend more of our time at my house because I wasn't allowed to be out. I was living with my mom and my sister at that time. We lived in a second floor apartment. Marc would sometimes climb up sheets that I threw down to him that I'd tied to the bed.

9. Marc and I met over the summer and in the fall we went back to school. We would see each other at school. We would hold hands and Marc would put his arm around me. I was in 8th grade that year and Marc was a grade or two above me.

10. Marc and I started having sex and it eventually led to two babies. I was 14 when I gave birth to Angelica. She was born in September and I turned 15 in November. Sex with Marc was normal and good. Marc and I never used protection except after Angelica was born. I really didn't know much about sex or protection then. Nobody taught me that unprotected sex leads to pregnancy. I got a birth control prescription at some time before Angelica was born but my mom ripped it up.

Bates No. 200

1

**JA515**

11. Mark and I started fighting. I fought too. It was normal to me. All of our fighting was always around trust, jealousy, and who I was talking to.

12. Marc broke up with me for a brief time and I went out with a boy named Tommy. Tommy was someone I knew from school. He was dark skinned. Tommy was a little older than me but he went to Lithonia High School. We had sex in my sister's bed. Marc found out about it. When Marc found out he went crazy. Marc would bring it up in future fights.

13. Marc once pushed me down when I was pregnant. We were coming from the mall and Marc was talking to another girl on the bus. When we got off the bus I slapped him. Then he shoved me to the ground. Then we fought and walked.

14. Marc and I once got into a fight where I scratched him. This happened in the living room at Marc's mom's place. He hit me and I was so mad I scratched him leaving bright red marks on him. These scratch marks stayed on him for several months. It seemed like they stayed there forever but they eventually faded and turned darker. We had sex after the fight. I was in pity mode, trying to makeup. It was like that a lot.

15. Another time I bit Marc in the chest. This also left a mark. He and I would rumble. I would slap him, hit him with my fist, kick him, and shove him.

16. If I talked to certain people he would get mad. I had to watch how I dressed and where I went. Marc spied on me. He would call and say he was outside the house, sitting in the woods watching me. He told me he was looking at the balcony of my apartment and in the window. He frequently accused me of being with other guys.

17. Marc didn't tell me much about his home life or childhood. He did tell me that his father, Rick, took him and Mario out to dinner and told them he was not their father. That devastated him.

18. I never knew about Rick beating on Marc when he was younger. I think this has affected him by making it so he doesn't trust people. Marc doesn't trust anybody. Whatever anyone said to him, he didn't believe it was the truth.

19. Marc and his mom were not close. Marc and I were always together and his mom was never there. One time Marc asked me over to meet his mom. We eyed each other but that's about it. I also met Aunt Sheila. She was using cocaine, drinking, and partying. Her husband Michael was selling drugs. He wore a big chain and looked like a dealer.

Bates No. 201

20. As a teen, Marc and his brother, Mario, didn't have adequate stuff. I used to go over to Marc's apartment at The Crossings every day. I would just walk in. There was a couch in the living room and a TV, but Marc and Mario didn't have adequate clothes and there wasn't enough food in the house. There was one bottle of wine in the fridge. There was no food, no butter, no condiments, and no ketchup. Marc and Mario shared a bedroom but they didn't have beds. They just slept on the carpet and had a blanket. Sonia's room, however, was totally different from the rest of the house. I couldn't believe it when I first went into her room. There were silk sheets on a plush bed, heels, lots of clothes, and jewelry.

21. I used to give Marc food from my mom. I would sneak him this food. He would take it but he would also save some for Mario. Sonia was always working or gone. Even though my mama didn't protect me the way she should have, I still had clothes, a bed, and food. One time I stole my parents' credit card and used it to buy clothes for Marc.

22. There were times when I found Marc naked and crying in the closet. When my mom was home and active around the apartment, the safest place for Marc to hide out was in the closet. When I'd open the closet door he'd be crying. It was a walk-in closet. Marc would be sitting on the floor with his knees up to his chest. I don't remember what would lead Marc into those situations and I don't know why he was naked because I never asked him. Sometimes I would go in there and sit with him. Sometimes I cried with him. I would try to get his mind on something else. I might suggest things for us to do. It would be a few hours before he felt better. Marc did this a lot of times. It happened every now and then. I once tried to tell Sonia that something was terribly wrong with Marc but she responded that something was terribly wrong with me.

23. My older sister's boyfriend, Keith Furlow, once tried to beat me up. He pushed me, I pushed him back, and he punched me in the face. My entire left eye turned bright red. I had to go to the hospital. Marc was there when this happened.

24. When I was pregnant Marc and I bought baby books and talked about baby names. Also, Marc found a job after I got pregnant with Angelica. Then, from his earnings, he got enough money to buy a crib. Marc took the bus with me to my prenatal doctor visits until my mom stopped letting him. Marc was excited about the baby. He was there at the hospital with me when I gave birth to Angelica.

25. Marc talked all the time about getting married. One time he bent down on one knee and proposed to me. I said yes. I was sitting on the edge of the bed and Angelica was born and her crib was there. But we were too young. My mom would never go for that. We often talked about plans and our future. He meant it when we talked about these things.

Bates No. 202

26. After our second child was born, Marc and I ended up moving to Newnan, Georgia with our two kids. Marc actually signed the lease for our apartment because I wasn't old enough. I was 17 at the time and Marc was 18. Our apartment was on Berry Avenue. I lived there until Marc made me leave. When he came down here to Newnan his whole spirit changed. He acted bizarre.

27. Marc had two personalities. One personality was cool and sweet. The other personality would want to fight me and would do stupid stuff. I was always strung out around Marc. My heart rate was always up because I was both excited and on edge. Marc was very impulsive. He could make a decision and it wouldn't make any sense. He was very high strung. He acted psychotic.

28. There were times when I would instigate things with him but this would not lead him to be psychotic angry. When Marc was psychotic he would not reason. You don't even know if he's hearing what you have to say. It's like he's not even there. He will look at you but he's not there.

29. When Marc was the other personality he would forget things he'd done or said. It was like he was in a trance. He didn't talk he just acted. Usually when people are fighting it's all talking and arguing, but not with Marc. When he got in this state it was fighting without talking.

30. With the crazy Marc it felt like there was witchcraft on him and there was some kind of psychosis. I really didn't know what was wrong with him. He was just ill.

31. I've never even seen Marc smoke a cigarette. He didn't use weed, he never used cocaine, and he never drank. When we were younger and back in Lithonia we would sneak out of the house but we never used weed or drank.

32. At times Marc would get teary-eyed and other times he would outright bawl. He was up and down. His mood would change over the course of hours or a day.

33. When we lived in Newnan the same thing happened every night. Marc would come home from work, bathe, and go see Crystal, a girl he'd started spending time with. Then at midnight Marc would come home and we would fight in the living room and throw dishes and such. This happened so many times that one night our neighbors Anthony Britt and Victor were fed up and they broke down the door, held Marc down, and forced me to hit him. They made me kick Marc, hit him, and slap him. That really angered him.

34. When Marc was in this other state, he just acted. It seemed surprising to him if I had a bruise the next day. We never discussed these incidents. He would not say sorry. It was like it never happened. It was a Jekyll and Hyde situation.

Bates No. 203

35. One time Marc came to me and told me he'd found a gun on the railroad tracks but it wasn't functioning. This was the gun that Marc used when he shot Anthony. Marc went to jail following that incident. After he went to jail that time our lives spiraled out of control.

36. After Marc and I broke up, and Marc was living with Crystal, he would call me and say he wanted to take the kids. When Marc had the kids, Crystal would do their hair and things like that.

37. Marc never troubled our kids. He never hit Angelica and he didn't want me to either. I once dropped a comb on Angelica and Marc was more upset about it than anyone.

38. Marc was very hyper. Sometimes he talks so fast I have to tell him to slow down. Marc's regular self goes at things a million miles an hour.

39. Marc Jr. has anxiety problems and he's been diagnosed with ADHD. He was diagnosed when he was three years old. He was a terror in preschool. He would never sit down. I had him on medication but it zombied him. A lot of the reason that Marc Jr. didn't finish school is because I took him off his medications. He was prescribed Ritalin and then Adderol. Marc Jr. acts in a similar way to his dad.

40. However, there were times when Marc seemed depressed. These were times when he didn't have his normal energy. He would be real quiet and he would draw. He would be more introverted. These episodes of depression would last a day or more.

41. I liked it when Marc would draw. His work was beautiful. He wanted to move to Charlotte and become an architect.

42. I was often an instigator in our relationship and it would lead to fights. However, I understood Marc because he didn't feel the love from his parents, and I didn't have a good childhood family situation either. I remember my dad kicking us down the stairs.

43. Overall, the good in our relationship outweighed the bad. That's why I stayed with him. If Crystal hadn't come into the picture we'd still be together. It would have been rough but we'd have gotten better.

44. After Marc had left Newnan and was living in Charlotte, his mom let me know that Marc wanted to spend time with the kids. So I brought them up there for a visit. Marc and Sonia took care of them while they were up there. This was at their house on West Boulevard. During their visit Sonia called and let me know they both had chicken pox. I didn't have any concerns about the kids being properly cared for. I wouldn't have known what to do with chicken pox. They only came back with one or two little scars from the chicken pox. Sonia did a good job caring for them when they were sick.

Bates No. 204

45. Marc once called and gave me his girlfriend's number in case I wanted to reach him. This was Robin's number. I later called him at that number and he said to me, "What are you doing calling me at this number?" He was acting crazy. He asked, "How did you get this number?" I told him he'd given it to me. Marc did not remember this. This occurred right before Angelica started kindergarten because the reason I called Marc was to ask if he could help me pay for some of Angelica's school things.

46. Even though I have now been married for 14 years, if Marc was out tomorrow I'd be with him tomorrow. If all this had never happened Marc and I would be sitting on top of the world. I think we would be very successful and very loving of each other. We just needed to get past that stage of being young. He would have gotten less crazy as he got older. Marc did leave me and I got mad at him but this situation hurts more than anything. Marc now calls me and we cry together.

47. I testified at both of Marc's trials. Both times I was called to testify by the prosecutors. I prayed about it. I wanted to tell the truth but I also didn't want to hurt Marc with my testimony.

48. After the crime and after Marc was locked up, I remember talking to someone named Sindy. I don't remember talking to any mental health experts that were going to testify in either of Marc's trials.

49. I remember meeting a man and a woman at Applebee's in Newnan before the first trial. I was throwing newspapers at that time. I got a call and a man said he was a federal prosecuting attorney. I handed the phone to my husband but he gave it back to me when he learned it was about Marc's case. It was during this call that the attorney set up a meeting with me. We met at Applebee's and talked for a long time. Then we later had a meeting where they questioned me some more. I remember telling folks that all I found in the fridge at Marc's apartment in Lithonia was a wine bottle. There was no food in the house, only liquor bottles.

50. The kids and I visited Marc one time at the jail in Charlotte before his second trial. The kids were excited to see him. This was the first time they had interacted with Marc since they'd visited Charlotte that one time after he had left Georgia. We had to show I.D. when we got to the jail. Then they brought us to a visiting booth. We sat and talked to Marc. It was not long enough. We had some laughs but it was emotional. I was distraught and cried during the visit. Our kids were worried about me because I was crying and being emotional.

51. During the second trial, the prosecutor pulled me into a witness room to talk to me. The prosecutor asked me some questions and said, "Oh good," in response to some of my answers. I talked to the prosecutor for about 5-10 minutes. This was right before they called me to the stand. Then, when I was answering the prosecutor's questions on the stand in court, the prosecutor switched up and got upset at me.

Bates No. 205

**JA520**

52. I don't remember talking to the defense team at all before the second trial.

53. I was asked on the stand about Marc re-establishing contact with me after being out of touch for a long time. It was true that this had happened, but I didn't believe then – and I don't believe now – that it was something Marc did in an effort to look good for his trial. It was genuine on his part. Marc and I were so young when we got together and started a family. Despite our difficulties, Marc and I shared a deep bond and connection – and our relationship was not some stereotypical one where Marc was the terrible batterer and a monster. Marc had an incredibly sensitive and tender side to him, but it would compete with other aspects of his personality that made our relationship very turbulent. None of Marc's lawyers ever really understood that.

54. Even to this day, Marc and I – and our kids – have a relationship that is real and meaningful. Our daughter Angelica recently went to visit him and it went really ~~went~~. we*NT*ll.

55. I would have talked with any of Marc's attorneys or investigators or experts before the second trial if they had asked. I would have told them about all of the above information and would have testified about it in court, as well.

I swear or affirm that the information in the foregoing paragraphs is true to the best of my knowledge.

_Netoshia H Tolbert_        _Sept 16, 2014_
Netoshia Tolbert             Date

Affirmed and subscribed before me on this the __16__ day of __Sept__ , ~~2013~~ _2014_ in

____Coweta____ County, Georgia.

_Charles E Browne_
Notary Public

CHARLES E. BROWNE
NOTARY PUBLIC
Coweta County
State of Georgia
My Comm. Exp. April 5, 2018

My commission expires: _____

Bates No. 206

**JA521**

## Affidavit of John West

I, John West, appearing before the undersigned and being duly sworn or affirmed, state the following:

1. I am over the age of 18 and competent to testify to the following facts.

2. I am a resident of Charlotte, North Carolina.

3. I started dating Sonia Barnette in 1992 in Atlanta, Georgia, and we have been ~~dating~~ *in a permanent relationship* ever since. We currently live together in Charlotte.

4. Sonia's oldest child is Aquilia Marcivicci Barnette. People either call him Marc or Vicci.

5. Sonia and I first met in October or November of 1992. Somebody introduced me to her. Then I got stood up for a company party by someone else so I asked Sonia to go to the party with me and she came. After that we started dating.

6. Around January of 1993 Sonia informed me that she was pregnant. Around this same time my father passed away and I got separated from my second wife. I had a lot going on. In the spring of 1993 Sonia moved up to Charlotte, but I was still living down in Atlanta. Sonia and I were in a long distance commuting relationships for 2-3 years. We would see each other most weekends. I eventually moved to Charlotte to live with Sonia in May of 1996.

7. Our son, John McAllister West was born in late 1993. We call him John Mack.

8. When Marc and I first were getting to know each other, he asked me about my intentions with his mom. Marc told me he thought I was just going to be a temporary person in the family, but I told Marc I intended to stay together with Sonia.

9. Marc was also living there. However, I didn't see him too much because he spent most of his time upstairs in the loft area of the house. We often tried to get him out instead of just moping around the house. I also attempted to get Marc involved with the projects I was doing around the house. However, Marc didn't respond.

10. Sonia's father, Jesse Cooper, was also living in the house with us. He was not talkative. We called Jesse "The Sentry" because he was always up at night. It was like he was a guard on duty. He would sit on the patio and keep watch. Jesse slept on the sofa. He would take cat naps. He never went into a deep sleep. He would nap during the day because he was always up at night.

11. Jesse had been in the Korean War and he had shrapnel all over his body. We used to bring Jesse to the VA Hospital in Salisbury for his appointments and his medications.

Bates No. 207

1

**JA522**

12.　Jesse was quiet and would often sit on the porch. Every Sunday he went to church. He would also go once or twice during the week. I can remember Jesse sitting on the sofa reading his bible. He was very religious. He would also read other books and watch TV. Jesse liked to watch the History Channel and the National Geographic Channel.

13.　Jesse would go outside and investigate the property on a regular basis. While outside, he would often sit in one spot and crouch on his heels. He could sit in a crouch for at least a half hour. Jesse often wore a big overcoat. He wore this in the winter, but he sometimes wore it in the summer too.

14.　Jesse was about 5'10" or 5'11" tall. He had about a 28 inch waist and weighed approximately 120-130 pounds. Jesse had an appetite but he wouldn't eat one big meal. Instead he would ration his food over the course of the day.

15.　Jesse smoked cigars and drank beer. He called his beer his "tea." He drank every day. I remember picking up beer bottles in the woods that were Jesse's.

16.　After Marc was locked up, I visited him at least once at the county jail in Charlotte. I believe I visited him right before his trial. Even since being locked up, Marc has been an important part of Sonia's life as well as our kids, John Mack and McKenzie.

17.　Sonia's mother was murdered when Sonia was a teenager, and that's another extremely difficult thing she's had live with. Her mother, Pearl, is buried in Charlotte but Sonia has never gone to see her mom's grave site. She says she doesn't even know where it is.

18.　If I had been asked to, I would have testified for Marc in the sentencing hearing of either of his capital trials. I would have been willing to share with the jury my knowledge of Marc, of Sonia, and of their family.

I swear or affirm that the information in the foregoing paragraphs is true to the best of my knowledge.

_John H. West_____　　　_8|23|14_____
John West　　　　　　　　　　　　　Date

Affirmed and subscribed before me on this the _23rd_ day of _August_, 2014 in _Mecklenburg_ County, North Carolina.

_____
Notary Public

My commission expires: _____1/20/16_____

Zachary Rowles
Notary Public
Durham County, NC

Bates No. 208

2

**JA523**

# REPORT OF RICHARD G. DUDLEY, JR., MD
# IN THE MATTER OF AQUILIA MARCIVICCI BARNETTE

19 November 2014

1. I, Richard G. Dudley, Jr., M.D., am a physician, with a specialty in psychiatry. I am licensed to practice medicine in the State of New York, and board certified in psychiatry by the American Board of Psychiatry and Neurology. I received my medical degree from Temple University School of Medicine in 1972, after which I completed an internship and a residency in psychiatry in 1975.

2. Since 1984, I have been engaged full-time in the private practice of psychiatry in New York City. Until recently, my private practice has been about equally divided between a clinical practice, focused primarily on the evaluation and treatment of African-American males, and a forensic practice, where I have been retained for both civil and criminal matters. With regard to my forensic practice, I have testified as an expert in psychiatry in both State and Federal courts, throughout the United States, including in North Carolina.

3. In addition to my private practice, I have previously held faculty appointments at The City of New York Medical School at City College, and New York University School of Law. A copy of my curriculum vitae is attached.

4. Towards the end of 2012, I was retained by attorneys for Aquilia Marcivicci Barnette (MB) to perform a psychiatric evaluation in connection with his post-conviction proceedings, with a particular focus on whether or not there were mental health issues that could have been uncovered and considered for presentation as mitigation at the time of his capital trial.

5. More specifically, it is my understanding that in 1996, MB was arrested and charged with the murder of his estranged girlfriend, Robin Williams, and the murder of Donald Allen, who was a man previously unknown to MB, who MB killed will taking the man's car so that he could drive to Robin Williams' home. He was first tried for the killings in 1998, at which time he was found guilty and, following a penalty phase, sentenced to death. MB's sentence was vacated on appeal and he had a new sentencing trial in 2002, following which he again received the death penalty. It is the understanding of this psychiatrist that at present, the case is before the court on appeal; among the questions being raised is the effectiveness of MB's trial counsel; and therefore, as noted above, the referral question to this psychiatrist was whether or not there were mental health issues that could have been uncovered and considered for presentation as mitigation at the time of MB's trial.

6. As part of my psychiatric evaluation of MB I reviewed records and documents pertaining to MB's life and the lives of significant family members; affidavits from lay and expert witnesses; I consulted with MB's legal team and reviewed the detailed social history developed by his legal team based on records, documents and interviews with numerous family members and others who have known MB at various points in his life; I performed my own psychiatric examinations of MB on 4 & 5 February 2013 and 22 April 2013; and I interviewed MB's mother on 8 March 2013. In addition, I reviewed records and documents related to the crimes for which MB was found guilty and sentenced to death;

1

Case 3:12-cv-00327-MOC  Document 74-6  Filed 12/22/14  Page 1 of 23
Bates No. 209

**JA524**

information gathered by trial counsel at the time of the trial; portions of the trial transcript; evaluation reports written in connection with the trial; and I spoke with Ann Wolbert Burgess, RN, DNSc, and Sally Johnson, MD.

7. The following is a summary of the findings of my psychiatric evaluation of MB, followed by a discussion of my opinion on the referral question. In an attempt to not be overly repetitive, given that it is my understanding that the above noted detailed social history reviewed by this psychiatrist will also be available to reviewers of this report, all of the information contained therein will not be repeated here.

8. MB was born to Sonia Cooper on 7 July 1973, about a month before her 15th birthday. Although when Sonia discovered she was pregnant she was known to be dating Larry Wright, who was a boy she was going to school with, she was also sexually active with Derrick Barnette, who was about 2 years older than her; the affair with Derrick was uncovered shortly after Sonia discovered she was pregnant; and for reasons that are not entirely clear to this psychiatrist, Sonia's mother, Pearl Anderson Cooper, designated Derrick as the father of the yet unborn MB.

9. MB's mother, Sonia Cooper, has her own trauma history that has had a long-term impact on her and in turn, an impact on her capacity to parent MB and his younger siblings. First of all, her father, Jessie Cooper, was a war veteran who had been traumatized during the war; upon his return home, he exhibited symptoms consistent with Posttraumatic Stress Disorder (PTSD); he then became an alcoholic, apparently at least in part in an attempt to self-medicate those symptoms; and during her interview with this psychiatrist, Sonia cried as she noted that her father 'lived in that war for the rest of his life'. According to Sonia, as a result of her father's mental health issues, her mother's desire for a different type of life and more attention from her husband, and her mother's conflicts with her father's family, her parents argued a lot; although they separated when she was about 10 years old they eventually got back together; but then, when Sonia was about 12 years old, her parents divorced.

10. Sonia Cooper reported that after her parents divorced, her mother continued in a relationship that Sonia was aware of/she knew the man to be her mother's boyfriend for some years prior to her parents' separation. She reported that when she first met that man the man's wife had died and he was raising his 10 children; however eventually, he met and married a white woman; and she noted that when he suddenly left her mother and married that woman it broke her mother's heart.

11. Sonia Cooper reported that then shortly after that, when she was about 15 years old, her mother met and became involved with Loyd Brown. She noted that it seemed to her that Loyd 'just showed up one day'; her mother told her that she had been his nurse and had nursed him back from 'near death' to health; but she noted that it still seemed to her that Loyd was what would now be described as 'stalking her mother' and so he made her nervous right from the start. Within about 6 months her mother announced that she was going to marry Loyd; Sonia noted that nothing about him was impressive, he wasn't even good looking, he certainly didn't bring anything to the table, and when he moved into their home all he had was a cheap stereo and a gym bag; and so it was clear to her that her mother was on the rebound from the above noted prior boyfriend who had left her mother. Sonia reported that once Loyd was in the home, there was always tension between her and her mother, and their once extremely close relationship rapidly deteriorated.

2

Bates No. 210

**JA525**

12. Sonia Cooper reported that MB was born shortly before her mother met and became involved with Loyd Brown. Although her mother was disappointed when they discovered she was pregnant with MB, she and her mother had dealt with that, at least until Loyd came into their home. She noted that there were always arguments between her mother and Loyd, starting from the time that he started living with them; often those arguments were about her/Sonia and Loyd's feeling that her mother wasn't hard enough on her; and some of their arguments escalated into physical fights, which occurred in front of her and her younger sister, Sheila Cooper, who was then 12 years old.

13. Sonia Cooper reported that on the night of 18 May 1974 she attended a prom with her best friend's brother; before she left for the prom her mother and Loyd Brown argued, and she believes that the argument was again about her; but when she returned home from the prom Loyd was not in the house. Then in the early morning hours of 19 May 1974, she and her sister were awaken by the police; they then discovered that Loyd had returned home and shot/murdered her mother; and when she saw her mother's body and her mother's blood all over the bed she blacked out. Sonia cried uncontrollably as she described that night to this psychiatrist; she remembers sitting in her room, holding the infant MB, and saying over and over again 'is she going to be OK, is she going to be OK'; and she noted that it is the most horrible experience of her life, and noted that she has never really gotten over it.

14. Following the murder of Pearl Anderson Cooper/MB's maternal grandmother, MB, his mother, Sonia Cooper, and his maternal aunt, Sheila Cooper lived with MB's maternal grandfather/Jessie Cooper. Eventually, Sonia's older sister Tessie (who was then in her early 20s) and her husband, Jeff Nero, returned home, at which point MB, his mother and his younger aunt moved in with them. Although Sonia Cooper and Derrick Barnette were finally married in February 1976, Derrick was still in the military (after having tried college); so they didn't actually start living together until about 1978, when MB was about 5 years old; but in the meantime/in July 1977, MB's younger brother Mario was born.

15. Although the relationship between Sonia Cooper Barnette and her husband Derrick Barnette seemed to go well during the years that they lived apart, once they started actually living together things changed. Sonia reported that she and Derrick argued all the time, those arguments eventually escalated into physical fights, he was also overly harsh and physically abusive toward MB, their marriage became sexless, and Derrick began having an affair with the woman who he is currently with. Although apparently Derrick suspected that Sonia was also having an affair, Sonia denies having affairs of her own until after they finally separated in 1984, when MB was about to turn 11 years old.

16. By all reports, once Sonia and Derrick Barnette separated, Derrick essentially abandoned MB and his brother Mario, and eventually he moved out of state. Then, a couple years later/in 1987, Derrick presented MB and his brother with blood tests that showed he was not their father.

17. By all reports, once Sonia and Derrick Barnette separated, Sonia became even less emotionally available to MB and his brother than she already was, essentially leaving them to parent themselves; she was primarily focused on her romantic involvements; and it appears that at least one of those involvements was with a man who was involved in questionable/illegal activities. There was also increased instability in Sonia's home and life; she was unable to pay her bills; and then eventually she was fired from her job.

3

Bates No. 211

**JA526**

Then in 1988, when MB was about 15 years old, she precipitously moved with her sons to Georgia.

18. When MB met with this psychiatrist, he reported that his earliest memories are of an unstable home/moving from place-to-place; a lack of any real foundation; and a sense that his mother and his aunts were still distressed about his maternal grandmother's death, especially when they were drinking.

19. MB reported that then after they started to live with Derrick Barnette, Derrick and his mother argued a lot; there was also violence between them; and he remembers that Derrick was also violent with him/MB. Upon further exploration, he reported that Derrick would punch him, choke him, use a belt, etc., and would then do things like lock him in a room; once this physical abuse started his grades started to deteriorate; and he noted that as a result of Derrick's violence towards him and his mother he didn't want to be at home, and others confirmed MB's report that he would regularly run away from home/from the violence. MB also reported that his mother would never intervene when Derrick's physical abuse would escalate; she would instead hide in the bathroom or otherwise retreat.

20. MB noted that in retrospect, he was just a kid trying to be happy, who was possibly a little hyper. However at the time, he constantly felt that he was screwing up; that there was nothing that he could do right; and so that therefore he had to 'pay the price'. He noted, and others have confirmed, that it was clear that his younger brother wasn't being abused by Derrick Barnette as badly as *he* was, and so that only added to his sense that there was something that he was doing that was causing him to be 'punished' so severely. MB also noted that in addition to trying to protect himself, he was always trying to protect his mother and trying to keep his younger brother from being exposed to Derrick's violence, but he doesn't think that he did a very good job with any of that either.

21. School records and investigative efforts fail to indicate that MB was unruly or disruptive during elementary and junior high school, at least to an extent that he required much, if any, special intervention as an adolescent. References made during the earlier trials about MB attending Catholic school for the fifth grade, which previously suggested special care and attention being paid to MB, appear incorrect. Instead, reports confirm that MB attended one year of Catholic school at the insistence of Derrick Barnette, who had attended the same school, and it came during perhaps the worst year of Derrick and Sonia Barnette's marriage, when their fighting was at its height.

22. MB reported that then after his mother and Derrick Barnette separated, Derrick returned to his old girlfriend, 'leaving him/MB trying to deal with the baggage that Derrick left behind'; then came the blood test results out of nowhere, which made him feel like he was 'thrown overboard'; and then Derrick just moved on, at which point he/MB tried to tell himself 'good riddance', but didn't really feel that. MB reported that meanwhile, his mother also moved on with her life; as a result, she was hardly at home; and so although he therefore had a lot more freedom, on the other hand, he felt that he was all alone and left trying to care for his brother Mario. He noted that life with his mother was also much more unstable; in addition to moving around, there were times when there wasn't even any food in the house; and then in about 1985, when his brother Mario was hit by a car, he felt that he was even failing in his efforts to protect Mario.

4

**JA527**

23. MB noted that in addition, as a result of his mother's financial difficulties, etc., they ended up living in the projects; prior to that, he had only been in that neighborhood to get a haircut, and he had never been there at night; and he was a small, 'nerd' that found himself quite vulnerable when faced with the guys who had grown up there. He noted that he felt like an 'outcast', felt like a 'nobody' and felt he was 'unwanted'; the other guys referred to him as 'sweet ass Marc'; and although he was told to just fight back, he had no idea how to do that.

24. MB reported that then in the summer of 1986, he visited Derrick Barnette's father in Philadelphia (at the time, although he wasn't having much contact with Derrick, this was before the blood test and so he still believed that Derrick was his father); the senior Barnette took him shopping for new clothing; and so when he returned to school in the fall of 1986, wearing his new clothing, he was suddenly popular with the girls. MB noted that all of that attention really went to his head and made him feel a lot better about himself; he noted that he quickly got to the point where he felt he was 'the star'; and he noted that it actually got to the point for the first time in his life that he thought that things might actually be OK for him. He then described the girlfriends that he had over the next two years and he described those relationships in very positive terms (which has been confirmed by post-conviction investigation); he noted that he also developed some good relationships with some male friends and even his academic performance improved; and he reported that then his mother just picked them up and moved them to Georgia.

25. MB noted that he believes that his mother moved them to Georgia because she was running from some trouble that she had gotten into, and so essentially, he believed that his mother screwed up again and he had to pay for that. MB protested moving to Georgia; in response, his mother told him that he could stay in North Carolina, but that she was going with Mario. Not knowing where or with whom he would stay in North Carolina, MB, still a young teenager, felt he had no choice but to move to Georgia with his mother.

26. MB reported that he was about 15 years old and in the 10th grade when they moved to Georgia; the move was 'a complete culture shock' for him; and he noted that he was trying to deal with that without any real support, not even from his mother.

27. MB reported that then he met Sheila Sullivan, who he described as the most beautiful girl in his school; he became involved with her despite all the negative things that many others were telling him about her; and he noted in retrospect, he was obviously extremely naïve. He reported that then others continued to tell him that Sheila was involved with another guy, but each time he asked her about that she denied it; but it eventually got to the point where he found it hard to trust her; and then one day, the guy she had been involved with and a couple of the guy's friends jumped him and beat him so severely that he had to go to the hospital. He felt that Sheila had set all of this up; his face was a mess, he had been kicked in the head, and his ribs were injured; and as a result of his injuries, he was home for over a week. He then noted that it wasn't just his physical injuries; everyone knew what happened, and so he was embarrassed/totally humiliated; and he felt like he 'lost his manhood' as Sheila then left him and got into a relationship with that guy.

28. Upon further exploration, MB noted that 'he felt stripped of everything after those guys just came and took Sheila Sullivan from him like that'. He noted that he had invested so much in her, but he was 'obviously not strong enough/not man enough to keep her'.

5

**JA528**

Then to make matters worse, after that guy was finished with Sheila, he mistreated her by just feeding her to his friends; when she called MB about what happened it really broke his heart; but although he was a total mess with all of this, it seemed to him that she just picked herself up and moved on. Meanwhile, he felt like it was 'the end of the world'; he became severely depressed and he even made a suicide attempt; and he had no idea about how to pull himself/his life back together. When asked if he had ever felt suicidal prior to that, MB reported that he had felt suicidal back when he was living with and so afraid of Derrick Barnette.

29. MB reported that it was after his suicide attempt that Sheila Sullivan was used by those guys; so when they started talking again he was leaning on her and she was leaning on him; but with all that had happened between them they also argued. Sheila was also then sent to an alternative school; but he continued to be in contact with her and they also started having sex again; but then when she told him that she was pregnant and he told her that he didn't know if he could believe her given all the lies that she had told him before, she got angry at him and wouldn't talk to him anymore.

30. MB reported that then in about the Spring of 1989, when he was about 16 years old, he met Natasha Heard, who was about a year younger than him; he still hadn't really pulled himself back together/was still feeling pretty bad about himself; but then Natasha was immediately very interested in him, which did help him feel a lot better. He reported that then he didn't see Natasha during that summer; when he returned to school that fall he heard that Sheila Sullivan was back and then he saw her; and at that point, he went right to Natasha and told everyone that she/Natasha was his girlfriend. After that, he and Natasha immediately became intensely involved with each other; there was lots of sex and they would even skip school together; and he noted that when he was with Natasha, for him it was like there was no one else there. For a while, Sheila harassed Natasha; but he kept telling Sheila that Natasha was his girlfriend; and then eventually Sheila was totally out of the picture. Then at the end of 1989/the beginning of 1990, they discovered that Natasha was pregnant.

31. MB reported that he and Natasha Heard didn't really have any problems until after she was pregnant and dropped out of school. Both Natasha and her sister had previously dated some of the guys who had participated in jumping him back when he was involved with Sheila Sullivan; he was still small and skinny, and those guys still viewed him as a 'wimp who could easily be moved out'; and so although he didn't want to be a jealous tyrant like Derrick Barnette, and he had even told Natasha about his history with Barnette, there were problems between him and Natasha, especially when he would come upon her talking to one of those guys.

32. On 29 September 1990, MB and Natasha Heard's daughter was born; MB was living with his aunt and still attending school, and Natasha was living with her mother and staying home with their daughter; but MB spent time with his daughter each day.

33. Shortly thereafter, MB and Natasha Heard discovered that she was pregnant again, at which point her mother became extremely upset and moved her to another town. Then, at the age of 17, he moved there too and tried to function as a family with the pregnant Natasha and their daughter, and then on 31 December 1991, their second child/their son was born.

34. Upon further exploration, MB acknowledged that he really wasn't prepared to assume all of the responsibility that he was trying to assume while also trying to complete his

6

Bates No. 214

**JA529**

education, and he acknowledged that he was always pretty stressed out. He reported that then, things were further complicated/made more stressful by the fact that Anthony Britt came into the picture; Britt was interested in and started to try to become involved with Natasha Heard; and at the same time, Britt was attempting to get him/MB interested in and involved with Britt's cousin, Crystal Dennis. MB reported that then Britt told Natasha that he/MB was, in fact, involved with Crystal, despite the fact that that wasn't true; and Britt told him that he was involved with Natasha (although much later Natasha told him that that wasn't true either); and as a result, he and Natasha had a big argument, which ended in his sending her back to her mother's.

35. Then in May 1992, during the midst of a confrontation with Anthony Britt, MB shot Britt; he noted that for him, it was the situation with Sheila Sullivan's boyfriend all over again; and he noted that in this second situation he felt that Natasha Heard had set him up just like Sheila had done. As a result of the shooting incident, MB spent time in jail for the first time in his life. He ended up spending close to 30 days on misdemeanor charges. MB recalls that being in jail was extremely stressful, especially with Natasha now moving on (with Britt), two very young children, and his mother very much not in the picture in terms of lending him any help, guidance and/or even emotional support.

36. MB noted that he had become friends with Crystal Dennis but there hadn't even been a sexual attraction between them. However, after Natasha was gone, Crystal's mother pushed for them to get together; they even had sex; but although he wasn't trying to replace Natasha Heard with Crystal and/or replace his kids with Crystal's 2 kids, she and her children moved in with him and he found himself trying to help care for her kids. MB noted however that he had to get social services involved so that he could see his own children, because at least initially, Natasha gave him a hard time about seeing the kids.

37. MB reported that given that he wasn't really attracted to Crystal Dennis, and given that he at least suspected that Crystal was still involved with her old boyfriend, he met and became involved with another woman, Kowana Dozier, who he described as 'a life raft' who helped him feel better again after the problems with Natasha Heard and Anthony Britt. For a while he spent a lot of time with Kowana; they also worked together; and she has reported to post-conviction counsel that MB was highly stressed during this period of time given the situation with Natasha and Crystal. MB reported that then, during a trip back to North Carolina for a funeral, he met and became involved with Tamika Hunter, who was married, and as his relationship with Kowana started to deteriorate, he became increasingly involved with Tamika.

38. On 28 January 1993, MB was charged with cruelty to Crystal Dennis' children, after he reportedly beat them with a hanger. It is interesting to note that in MB's plea colloquy in this matter he stated that "I've been a father figure to the children. And this is one time – I wasn't feeling bad. I wasn't depressed. I didn't lose my temper. It's just that that is how I was raised, we've talked about it before, seems that my ways are a little harsher then hers. And this was one of the times, the only time this ever happened that was harsh."

39. MB reported that once this case was resolved/in about the spring of 1993 he returned to North Carolina with only a bag of clothes. He noted that essentially by then, 'everything had collapsed for him'; he was paying child support to Natasha Heard, and then as a result of his case with Crystal Dennis' children his visits with his own children were

7

**JA530**

being monitored; he was on probation and had lost his job; and he didn't even have a place to live. He noted that he knew that he had messed up, just like he had messed up before/ever since he was a child; he was crawling away in defeat and everyone knew it; and all he could do was try to start over again, despite the fact that he wasn't at all sure how he would do that. MB noted that he didn't even try to continue his relationship with Tamika Hunter/didn't have any expectation that she would leave her husband for him; he noted that by that point in his life, he really found it hard to trust any woman; and so he didn't even think that a new relationship, even with the most wonderful woman, would help him pull himself back together again.

40. When MB returned to North Carolina, he was on probation from his Georgia conviction involving Crystal Dennis' children. Reports suggest an initial effort to be compliant with that probation, although that would later not be the case. MB was living with his mother and brother at his grandfather's home on West Boulevard; his mother was pregnant; and a few months after his return, his mother gave birth to a son. Records also indicate that MB's mother was receiving food stamps at the time.

41. Not long after MB returned to North Carolina, he met and became involved with Alesha Chambers, who was about 4 years younger than him (about 15 years old). Reportedly, Alesha had already started to rebel against her mother, who according to MB had problems of her own; Alesha and MB also quickly developed a highly charged sexual relationship; and Alesha would run away from her family home so as to meet MB for sex.

42. MB noted that it was Alesha Chambers who 'bore the brunt of what he had gone through up until that point in his life'; he noted that he was consumed with and confused by his past, and found it extremely difficult to trust; and as soon as he felt that Alesha was violating the trust he had been able to give her, he became more and more controlling and ultimately started to hit her. By November 1993, MB began being charged with various violent acts against Alesha, and one of the incidences occurred at Alesha's job and ended up involving one of the assistant managers there who alleged that MB assaulted him while he was trying to break up the altercation between MB and Alesha.

43. MB reported however that despite all of the difficulties in his relationship with Alesha Chambers, they continued to see each other, even after she was the complainant in charges made against him. Alesha started also seeing another guy; then he met Robin Williams; and so their relationship became all the more tumultuous. He reported that despite all of these difficulties, in the Spring of 1994/when they finally broke up he became extremely depressed and suicidal again.

44. It was in about May 1994 that MB met Robin Williams, who was living in Roanoke, Virginia. MB reported that Robin and his relationship with Robin were very different than what he had experienced in the past. More specifically, although he fell in love with her the night that he met her, which he still believes is quite reasonable, they didn't immediately have sex. He also told her how much he had been hurt in the past, the difficulties he had gotten into in the context of troubled relationships, and how therefore he was reluctant to get involved with anyone; she then shared that she had also been hurt a lot in the past; and it was clearly his sense that they agreed that if they did become involved with each other, they wouldn't hurt each other like each of them had been hurt before. MB noted that therefore, he found solace in his relationship with Robin; she was supportive of him and even attended the trial that resulted from the charges against him

8

**JA531**

made by Alesha Chambers; and he was supportive of her. So, as their relationship progressed, it was decided that he would move to Virginia to live with her.

45. Notably, during the course of MB's criminal cases involving Alesha Chambers, his attorney had him evaluated by a forensic mental health expert. While this expert's evaluation appeared to be primarily focused on competency issues, both at the time of the alleged crimes involving Alesha and concerning his pending trial, the psychologist also concluded that MB exhibited "a variety of deficiencies in his psychological functioning that might shed light on his behavior. However, he is relatively unwilling to accept psychological interpretations on his behavior and motives." MB and Robin Williams were already in their relationship at the time the evaluation was conducted. It is not clear whether MB was ever informed of this evaluation's results at the time.

46. In September 1994, almost immediately after MB's legal issues concerning Alesha Chambers were concluded (resulting in a conviction to a less serious felony offense), Natasha Heard unexpectedly brought her and MB's two children to Charlotte and left them with MB and his family. Robin Williams happened to be visiting when the children were dropped off, and MB recalls a mixture of confusion and excitement about having his children with him and his family, and watching Robin's positive interactions with them. Between September and December 1994, MB and Robin continued to make plans for MB to move to Virginia. The prospect of Natasha not returning for the children was discussed, and the notion of whether the children would go to Virginia with MB was considered. After approximately three months however, right around Christmas 1994, Natasha, again unexpectedly, returned and took the children back to Georgia.

47. Then in January 1995, on a day when MB was planning to take a bus to Roanoke to look for work, he was shot in his right thigh and right middle finger by a distant relative who apparently lived on the West Boulevard property owned by MB's grandfather, Jesse Cooper. This distant relative, a notorious 'junkie', had been hassling and bullying Jesse Cooper, which was the genesis of the dispute between MB and that relative.

48. As a result of having been shot, MB required the placement of a rod in his right femur and a splint for his finger; for a while, he had some difficulty with pain and ambulation; and he also experienced various psychological trauma-related symptoms after having been shot. MB was quite depressed and agitated during his recuperation. It was the first time that he and Robin Williams experienced any significant conflict. Robin told him that he was being a terrible patient (she worked in hospitals), and he was upset that she was not spending more time with him in Charlotte. MB's depression and agitation were such that he did not return to the house on West Boulevard. Instead, his mother arranged for him to stay with her 'friend'.

49. However in March 1995, MB moved to Virginia/moved in with Robin Williams; within a couple months he was able to find a job and return to work there; but virtually from the time he moved in, problems arose in their relationship. More specifically, MB reported that shortly after he moved in with Robin, he discovered a hotel receipt from an area where Robin had told him that she used to party with her 'supposedly ex-boyfriend', Benjamin Spencer Greene; when he confronted Robin about this she denied that she was still involved with her ex-boyfriend and denied that the hotel receipt indicated anything at all; but he noted that she wasn't a good liar and so he believed that she wasn't telling him the truth. He became depressed and suicidal again and took an overdose of pills; at some level he felt that he should just get out of the relationship with Robin; but he felt that he

9

Bates No. 217

**JA532**

couldn't just leave and return to North Carolina 'defeated all over again'. Early in May 1995, after Robin attended a funeral with one of her girlfriends, MB, who was checking on her, saw her riding off with that girlfriend instead of attending the after funeral reception like she said she was going to attend; he demanded that Robin get out of the car and come with him; and although she eventually got in the car with him, she then jumped out of the car and rolled away from MB. Later in May 1995, in the midst of an argument between MB and Robin, Robin stabbed him in the hand. A couple months later, while cleaning out her old purse in anticipation of buying her a new one for her birthday, MB discovered a condom in Robin's things and confronted her again.

50. MB noted that what was strange about all of the above noted incidences between him and Robin Williams was that Robin just kept standing up to him; she never filed any charges against him for any of the above noted incidences; and she even took him to the hospital after stabbing him in the hand. He reported that then, for about the next 6 months or so, there were no serious arguments between him and Robin; he noted that although he, like Robin, had a history of running from relationships, this time he tried hard to make their relationship work; but despite all of his efforts and the apparent calm between them, she still refused to marry him, saying that she just wasn't the type to marry.

51. Then in January 1996, on the one-year anniversary of the day he was shot, MB was fired from his job, reportedly for 'inappropriate actions and comments to associates in the store of a sexual nature'. Then, when he went to Robin Williams' job so that he could talk with her about what had happened at his job, he couldn't find her. All of this only added to the tension between them, and although they started to argue again, the arguments really weren't about what was really going on between them. MB explained that although, for example, they would argue about how Robin felt that he had treated her mother on some occasion, the real issue not being discussed was that ultimately, she was just like all of the others in that she was 'treating him like a fool'.

52. On 11 April 1996, MB and Robin Williams broke up, and MB returned to North Carolina. He reported however that he was certain that he had been treated like a fool again, which he found particularly devastating given that he had believed that he and Robin had put all of their cards on the table and that they had pledged not to hurt each other like they had been hurt before. He noted that in essence, the ground rules that they had set had been violated; he wanted Robin to at least admit that she had, in fact, broken their ground rules and that she was, in fact, still involved with Benjamin Spencer Greene, but she had repeatedly refused to do so/repeatedly denied that involvement; and he noted that it was all just so much like what had happened to him in the past.

53. MB reported that he just continued to brood about all of this; he just couldn't let it go and move on; and upon further exploration he explained that if Robin Williams had been with Greene all of that time, he had been played a fool yet again, and he just couldn't get that out of his mind. He spent most of his time in his room crying; he took another over dose of pills; but he just couldn't move on.

54. Then on 30 April 1996, MB drove back to Roanoke, Virginia and 'firebombed' Robin Williams' residence; after the fact he heard on the news that Robin and Benjamin Spencer Greene had been in the house; and MB noted that this proved to him that Robin was, in fact, still involved with Greene. MB noted that going to Virginia to firebomb the house was pretty impulsive; he was actually on his way to the store and suddenly decided to do it; at that point he filled cans that were already in the car with gasoline and took off

10

**JA533**

for Virginia. He noted that he felt that he just *had* to know the truth, and noted that he just couldn't let go of that need to know.

55. MB reported that upon his return to North Carolina, he waited to be arrested for the firebombing, but the police never came to arrest him. He continued to obsess about Robin Williams being with Benjamin Spencer Greene, and even pictured Greene visiting her in the hospital; he felt even more like 'his manhood/honor had been challenged', and he was feeling that they knew he was 'soft'; and his feelings were all over the place, including contemplating murder/suicide.

56. MB's family reported that during that next about 6 weeks, MB spent most of the time in his room, withdrawn, and apparently quite depressed. They reported that he also shaved his head, and when he was asked why he told them that 'his hair was hurting him/bothering him and he couldn't think straight'. They reported that then, the night of the carjacking and murder of Donald Allen, he suddenly seemed much better; he was socializing and no longer seemed withdrawn; and at the time, they hoped that this indicated that he was starting to feel better/ was doing OK.

57. MB reported that just before he returned to Virginia the murder/suicide idea had become a clear solution in his mind. He noted that he just couldn't accept the idea of being viewed as 'a punk'; he 'needed to be taken seriously'; but although he had a gun, he really didn't have any real skills in using it, he didn't even have a clear plan about how he was going to do it, and so in a sense, the murder/suicide idea was 'more fantastical than clearly outlined in his mind'.

58. Late in the evening of 21 June 1996, MB shot and killed Donnie Allen and took his car to Virginia. MB noted that all he knew was that he had to get a car to get to Virginia; the shooting of Allen happened so fast, it was in the dark, and he wasn't even sure that he had killed Allen; but he noted that he does realize that he knew he had to have time to get to Virginia before being caught. He noted that he thought he would die in Virginia/wouldn't be coming back to North Carolina; at the time, he thought that after the fact, everyone would see how hurt he had really been; but in retrospect, he feels that the shooting of Allen was a very cowardly act for which he is deeply sorry.

59. Then on 22 June, MB shot and killed Robin Williams. MB noted that he hadn't really come up with a plan during his drive to Virginia; everything was moving so fast that even after he got there he couldn't come up with a clear plan; and so ultimately he ended up just chasing Robin down the street and then finally catching her.

60. MB reported that when he finally caught Robin, she said 'Marc, you are not going to kill me', and that is when he shot her. He noted that when she said that he realized that she thought that he was 'such a fool that he couldn't even be a credible killer'; 'she didn't realize that he had loved her so much that he would do whatever'; and 'he felt that no one, not even Robin, took him seriously'. Upon further exploration, he noted that he was feeling that he has feelings just like everyone else; but no one, not even Robin, considered those feelings; and despite all the talking they did before becoming involved, she still used him/took advantage of him.

61. MB noted that the entire experience/the shooting of Robin Williams was 'so surreal'. Upon further exploration, he explained that it was like he, the person who could never hurt Robin, was watching himself do it, while at the same time, some other part of him was actually doing it. Then, he just felt 'numb' for about the next 24 hours; this was despite the fact that images of the shooting kept playing over and over again in his head;

11

**JA534**

but he, himself, 'didn't feel connected to the shooting despite knowing that he had done it'. The next day, he went into a church, sat down and just started to cry; he kept asking God for forgiveness; and then that night, he tried to kill himself again. MB reported that that time he not only took pills but he sealed the car and tried to rig a hose from the exhaust into the car, but he believes that some man came along and disrupted what he was trying to do.

62. MB reported that it really wasn't until that next morning that what he had done really, really hit him.

63. Mental status examinations of MB, performed during this psychiatrist's various visits with/examinations of MB were quite revealing. More specifically, each time that this psychiatrist met with MB he was oriented to person, place and time, and his memory for both short and long-term events appeared to be good. However, MB's mood was markedly different each time that he met with this psychiatrist for reasons that he/MB was unable to identify/explain. At times his mood was severely depressed; at other times his mood was inappropriately elated, and at other times his mood was more mixed (i.e., depressed and manic), with an associated irritability and extreme suspiciousness that at times reached the level of paranoia (i.e., the feelings that he was being harmed were fixed/he wouldn't let them go despite being confronted about them). His affect (i.e., the external representations or expressions of his mood) also changed consistent with the above noted changes in his mood.

64. MB's family reported observing similar changes in MB's mood over the course of his life, starting at least back when he was an adolescent. Unprompted, MB's mother noted that these changes in MB's mood were often so extreme and would occur so rapidly that she felt that she should take him for some type of mental health evaluation and treatment; she cried as she noted that she just never did that; and she noted that maybe if she had done what she had thought she should do for MB, maybe none of this would have ever happened. More detailed exploration with family members and others about MB's mood during May and June 1996 revealed rapid changes in his mood during that time period as well.

65. MB did evidence at least some developing insight, in that he noted that although in the past he didn't really know anything about depression, he now realizes that the depression and suicidal feelings and attempts that he made were indicative of depression or at least some type of mental health problem. He also noted that some of the things he was feeling back then seem foreign and maybe even crazy now, largely because he has come to understand more about why/how he developed such major issues with trust, starting back with his early childhood experiences. He noted, for example, that his frenzied 'need to know' whether or not Robin was really with Greene now seems strange to him, as does the sense that he could love her so strongly that he would want to take her with him or do a murder/suicide thing.

66. Otherwise, MB's mental status was unremarkable, in that his speech was clear, coherent and goal-directed, his intellectual capacity appeared to be within the average range, and there was no clear evidence of an organic brain syndrome.

67. Given the above noted, it is the opinion of this psychiatrist, to within a reasonable degree of medical certainty, that MB has suffered quite severely as a result of his extremely difficult childhood. More specifically, MB's extremely difficult childhood significantly impaired his development, resulting in broad-based instability in all major areas of

12

**JA535**

functioning. There is difficulty with attachment/instability in interpersonal relationships, characterized by frantic efforts to avoid real or imagined abandonment, and intense relationships with alternating feelings of extreme idealization and extreme devaluation of the other person; there is instability of self-image, characterized by an unstable sense of self and periods feeling empty and valueless; there is instability of mood, with affective instability due to marked reactivity of mood often accompanied by anxiety and irritability and/or suicidal behavior; and there is impulsivity generally associated with self-damaging behavior.

68. Although this psychiatrist believes that identifying MB's symptoms of mental illness and appreciating their impact on his ability to function is more important than labeling him with a specific diagnosis, it is the opinion of this psychiatrist that the above described cluster of symptoms meet the diagnostic criteria for Borderline Personality Disorder. A childhood history of abuse, neglect, hostile conflict, and early parental loss or separation is not at all uncommon in individuals who suffer from this disorder; this is clearly the case with MB; and therefore it is not surprising that there is an exacerbation of the difficulties associated with this disorder when a caregiver or lover is seen as neglectful, withholding, uncaring, or abandoning. It is also important to note that persons who suffer from this disorder are vulnerable to the development of transient, stress-related paranoid ideation or severe dissociative symptoms, and based on the information currently available to this psychiatrist, this also seems to be the case with MB.

69. In addition, it is the opinion of this psychiatrist, to within a reasonable degree of medical certainty, that MB also suffers from a major mood disorder, characterized by rapidly changing, extreme mood states, including mania, depression, and mixed states of mania and depression associated with extreme irritability and paranoid ideation. It at least appears that the onset of this major mood disorder was during MB's adolescent years.

70. Such rapidly changing mood states are quite destabilizing for an individual in and of themselves, and are particularly destabilizing during the period of adolescent development when such emotional turmoil is so difficult to understand and manage. Then in addition, the fact that MB's major mood disorder is superimposed on his above described broad-based instability in major areas of functioning has resulted in even much more severe impairment in his ability to function, in that each of these major psychiatric disorders potentiate the other.

71. A full appreciation of how these two psychiatric disorders interact with and can potentiate each other requires additional understanding of the nature and course of each disorder. More specifically, Borderline Personality Disorder is best understood as an underlying disorder, in that its characteristics are enduring/persistent and therefore always impact on the individual and his/her ability to function. However, as noted above, certain types of stressors can exacerbate the difficulties associated with Borderline Personality Disorder, thereby causing a further deterioration in the person's ability to function. In contrast, the rapid swings in mood that are a part of MB's major mood disorder cycle on their own schedule, virtually unrelated to whatever is going on around him. However, the mood that he is experiencing at any given time will impact on how he responds to any stressors that he might be vulnerable to as a result of his underlying Borderline Personality Disorder.

72. More specifically, for example, when an individual who suffers from Borderline Personality Disorder perceives that he/she is being abandoned by a significant other, the

13

Bates No. 221

**JA536**

symptoms associated with this disorder will be exacerbated. However, if that same person is simultaneously in a manic/hyper-elated state due to a separate major mood disorder, the overall response/mental state will be quite different than it will be if he/she were in a depressed state due to that major mood disorder.

73. Based on this psychiatrist's review of the information noted above in paragraph 6 and my consultation with Ann Wolbert Burgess, RN, DNSc, the information currently available to this psychiatrist is considerably and significantly more than the information that was made available to Dr. Burgess. In addition, because of the wealth of information currently available to this psychiatrist, my psychiatric opinions about MB are not only better supported but also much more complex than the opinions rendered at the time of his trial. More specifically, although there had been various difficulties including violence in some (although not all) of MB's relationships with women, additional important information about those relationships, especially his life-changing relationship with Sheila Sullivan, and additional important information that helped establish that he also suffered from other major psychiatric disorders resulted in that much more complex picture of MB's mental health difficulties. Additional important information also indicates that he was suffering from these major psychiatric difficulties at the time of the killings, and that therefore his mental state was even more severely impaired than had been previously recognized.

74. Based on my experience in capital litigation, if the information made available to this psychiatrist had been available at the time of his trial, MB's extremely difficult childhood, including the effect that his mother's own trauma and family secrets had on her availability/capacity to parent MB; the impact of his extremely difficult childhood on his development, the resultant broad-based instability in major areas of functioning, and the associated impairments in his ability to function; his severe major mood disorder and the impact of this disorder on his ability to function; and the ways in which the two psychiatric disorders potentiate each other would have been mental health findings that could have been recognized and presented to MB's legal team for consideration as mitigation at the time of his trial. Instead, the mental health opinions presented, which apparently lacked many of the critically important factual bases upon which my opinions are based, were either incomplete, not sufficiently supported, and/or inaccurate.

75. Of particular importance, with regard to potential mitigation, is the fact that the information currently available to this psychiatrist makes MB's mental state at the time of the crimes for which he has been convicted and sentenced to death much clearer, and indicates that at the time of the crimes, MB's capacity to conform his conduct to the requirements of the law was significantly impaired.

76. More specifically, the symptoms of MB's Borderline Personality Disorder were clearly exacerbated by his perception of the impending loss of his relationship with Robin Williams, his perception that she had been unworthy of his trust, and his perception that she had viewed him as a fool who could be easily used/taken advantage of. Based on the information currently available to this psychiatrist, MB evidenced frantic efforts to avoid abandonment by Robin, a reversal of his extreme idealization of Robin to extreme devaluation of her, a deterioration of his sense of self to the point of feeling empty and valueless, mood reactivity with irritability and suicidal behavior, impulsivity, and stress-related paranoid ideation. Then, over the next couple months, superimposed on these exacerbated symptoms, were the profound and rapid swings in his mood that were

14

Case 3:12-cv-00327-MOC   Document 74-6   Filed 12/22/14   Page 14 of 23

Bates No. 222

**JA537**

symptomatic of his major mood disorder that determined how he ultimately experienced the underlying crisis and its resultant symptoms. In other words, based on the information currently available to this psychiatrist, when MB was experiencing an elevated mood he was out with friends, despite the underlying crisis; when he was experiencing a depressed mood he was isolative/stayed in his room, he was crying a lot, and he was suicidal; and when he was experiencing a more mixed state of mania and depression he was agitated, irritable, more paranoid and otherwise even more irrational.

77. Subsequent to the initial referral of MB to this psychiatrist, this psychiatrist was also asked to comment on the testimony that MB gave at his trial. Given MB's above described psychiatric impairments, his lack of insight into the causes of these impairments, and his lack of insight into how these impairments impact on his perceptions and his behavior, the following can be said. MB's psychiatric impairments manifest (both to this psychiatrist and others) in statements, explanations, and rationalizations by MB that would appear to be distorted, self-serving, and simply off-base, and therefore, it is unsurprising to this psychiatrist that MB's testimony at trial appeared unsympathetic. While MB's testimony was, in many ways, consistent with his mental health make-up – and thus clouded by distorted and warped interpretations of events and relationships – to an untrained listener, it likely appeared quite offensive. That being said, if MB was going to be allowed to testify, it would have also been possible for a mental health expert to then explain to a jury why MB, even after his arrest and conviction for murder, would persist in describing things in ways that no one else could see or agree with.

78. Finally, the mental health impairments suffered by MB, while dramatic and severe, can be managed and/or controlled. For example, I am aware that MB had not committed any infractions or received any disciplinary write-ups from the time of his arrest in June 1996 through the time of his retrial in 2002. This is particularly noteworthy given how disruptive his behavior and distorted his thinking had been prior to his arrest. Yet it is quite understandable/explainable given the structure that MB had while incarcerated and the forced reduction (as a result of his incarceration) of the particular stressors that make MB acutely vulnerable to an exacerbation of his symptoms and the associated erratic and irrational behavior. This explanation as to why MB had shown positive and constructive adjustment to prison could have also been presented for consideration as mitigation at the time of trial.

79. It is my understanding that post-conviction counsel's investigation is ongoing, thus I am prepared to review any additional information that may become available and supplement or amend my findings, if necessary.


_____

Richard G. Dudley, Jr., M.D.
Psychiatrist
Diplomate, American Board of Psychiatry & Neurology


15

**JA538**

# CURRICULUM VITAE

Richard G. Dudley. Jr, M.D.
210 West 101st Street, Suite 11-K
New York, New York 10025
(212) 222-5122

## EDUCATION:

* Temple University School of Medicine Philadelphia, Pennsylvania
  M.D., 1972

* Northwestern University Medical Center Chicago, Illinois
  R6 Internship

* Northwestern University Institute of Psychiatry Chicago, Illinois
  Psychiatric Residency, completed 1975

## LICENSURE AND CERTIFICATION:

* License for the Practice of Medicine, State of New York

* Diplomate, American Board of Psychiatry and Neurology

## PAST ACADEMIC APPOINTMENTS:

* Visiting Associate Professor of Medicine, Department of Behavioral Sciences
  City University of New York Medical School at City College

* Adjunct Assistant Professor of Law, School of Law
  New York University

Bates No. 224

**JA539**

**PROFESSIONAL EMPLOYMENT HISTORY:**

\* January '76 to Present:              Private Practice of Psychiatry

At present, the practice includes a clinical practice primarily focused on adolescents and adults (evaluation, consultation, and both individual and family psychotherapy); a forensic practice (I regularly appear as a psychiatric expert in various types of legal proceedings throughout the United States); and consultation/education (the development and/or presentation of continuing medical education programs, as well as education programs for other health professionals, attorneys, and the public).

\* September '85 to June '05:        Associate Professor of Medicine
Behavioral Sciences
CUNY Med School at City College

From September, 1985 to August, 1992, I was Director of the Department of Behavioral Sciences, at which time my primary responsibility was to direct the full-year/required course in behavioral sciences. The goal of this course was to help students acquire knowledge, skills and attitudes which would assist them in becoming effective primary care physicians, for a range of persons from different cultural backgrounds, through the incorporation of contributions from the fields of psychiatry, psychology, social work, sociology, and anthropology. After I retired from the position of Director, I continued to teach in the course.

\* September '84 to April '05:       Adjunct Assistant Professor, then

Visiting Lecturer
School of Law
New York University

Initially, as an Adjunct, I team-taught full seminars on "Expert Evidence" and also team-taught Family Law. Then, I transferred to the Law Clinic, funded under a different mechanism, where I team-taught "Expert Evidence" with various law professors in connection with clinical seminars. Lectures included an exploration of the interface between the behavioral and social sciences and the law, and how lawyers might more appropriately work with psychiatric experts. In other settings I have lectured on various other aspects of law and psychiatry to judges, attorneys, law students and others.

2

Bates No. 225

**JA540**

| | |
|---|---|
| * July '82 to June '94: | Teaching Attending Physician<br>Department of Psychiatry<br>New York Medical College<br>Lincoln Hospital Division |

Responsibilities included course, seminar and case conference teaching, as well as individual psychotherapy case supervision for psychiatry residents, and the direction of the psychotherapy group for psychiatry residents. Previously, through the department's Consultation and Liaison Service, I also taught as part of the Chairman's Rounds for the Department of Internal Medicine.

| | |
|---|---|
| * January '79 to October '84: | Assistant Director<br>Professional Services Dept.<br>Roche Laboratories, Div. of<br>Hoffmann-La Roche, Inc. |

The principal responsibilities were to actively and creatively participate in the medical aspects of marketing Roche products and services, and to direct the activities of the Professional Services Product Group. As a participant on Marketing Teams, I helped to develop marketing strategies and plans, train Roche Field Representatives and implement various promotional programs. My responsibilities also included the coordination of Phase IV research efforts, and the development of scientific exhibits, medical education films, monographs, and symposia for physicians.

| | |
|---|---|
| * April '76 to July '82: | Psychiatric Consultant<br>Mental Health Programs<br>Children's Aid Society of<br>New York City |

Responsibilities included teaching, diagnostic evaluations and treatment of selected cases.

| | |
|---|---|
| * December '77 to December '78: | Medical Director<br>Washington Heights-West Harlem<br>Community Mental Health Center |

Responsibilities included the design, development and then day-to-day operation of a full, twelve service community mental health center. When I accepted this position, the center had just been funded, and every program element and support system had to be developed. Once the twelve service chiefs and other key administrative staff were hired, and basic support systems were developed and put into place, I supervised the chiefs, developed in-service training programs and

3

Bates No. 226

**JA541**

worked towards the development of program elements not covered by the original grant, for example, research programs, transitional housing programs, and vocational rehabilitation programs.

\* January '76 to December '77: New York City Department of Mental Health, Mental Retardation & Alcoholism Services

Assistant to the Commissioner January '76 to November '76

June Jackson Christmas, M.D. - Commissioner

Deputy Commissioner February '77 to December '77

Primary responsibilities included the development of new clinical programs/services, as well as the ongoing monitoring, evaluating, and upgrading of the existing mental hygiene service system. This system included all of the medical centers, voluntary hospitals and agencies, and the municipal hospitals and public mental hygiene programs in all five boroughs.

November '76 to January '77: [On leave from the Department]

Coordinator/Team Leader
Carter-Mondale Transition Planning Group

The focus of this effort was to develop policy options in the areas of mental health, mental retardation, alcoholism, drug abuse and the developmental disabilities for the incoming administration.

\* January '74 to December '75 Staff Psychiatrist Lower North Community Mental Health Center Chicago Board of Health

Responsibilities included diagnostic evaluations, treatment and some supervision and teaching. In addition, there was primary responsibility for the Center's adolescent program.

4

**JA542**

**PROFESSIONAL ORGANIZATIONS:**

* American Psychiatric Association - Distinguished Life Fellow
  Scientific Program Committee, 1998-2001
  Delegate, APA Assembly 1979-1983

* New York County District Branch (APA)
  Committee of Black Psychiatrists 1984-1986
  Committee on Legislation 1980-1983
  Committee on Emergency Psychiatry 1978-1979

* American College of Psychiatrists – Fellow
  Awards Committee 1993-2001
  Nominations Committee 1989-1992

* Black Psychiatrists of America
  Nominations Committee 1985-1987
  Program Committee 1980-1982
  President, Metropolitan New York Chapter 1978-1988

* National Medical Association

* New York Academy of Medicine - Fellow

* One Hundred Black Men  1977-1982
  Health Committee 1979-1981

* American Orthopsychiatric Association 1988-1991
  Program Committee 1989-1990

* American Society for Adolescent Psychiatry 1984-1988

* American Academy of Psychiatry & the Law 1984-1988

* American Medical Association 1970-1976
  Council on Long Range Planning and Development 1973-1975
  Council on Mental Health 1971-1975

* American Medical Student Association Foundation 1979-1980
  Board of Directors 1979-1980

* American Medical Student Association 1970-1973
  Director, Video Journal 1971-1973
  Board of Trustees 1971-1972

* Student National Medical Association 1969-1972

5

**JA543**

**OTHER PROFESSIONAL ACTIVITIES:**

* Consultant in creative approaches to medical education, using a variety of media

* Lecturer/speaker for professional health and/or law related organizations and groups, as well as non-professional groups throughout the United States and, to a limited extent, abroad -- frequent guest on various television programs, as well as host and guest on radio programs.

* Commission on Safety and Abuse in America's Prisons, 2005-2006

* Housing Works, Inc., Board of Directors 2005-present

* Vera Institute of Justice, Board of Directors 1989-present

* Hospital Audiences, Inc., Clinical Advisory Board

* Examiner in Psychiatry, American Board of Psychiatry & Neurology

* Highbridge-Woodycrest Center, Inc., Board of Trustees 1991-2004

* Co-Principal Investigator, Minority Education, Research & Training Institute [New York State Department of Mental Health] 1990-1994

* Public Member, Fatality Review Panel, Child Welfare Administration (formerly Special Services for Children), NYC Human Resources Admin. 1990-1992

* Family Court Advisory Committee, First Judicial Department 1987-1989

* Program Development Committee, NYU AIDS Mental Health Project (NIMH Contract No. 278-87-005) first 3 years

* Coordinator of Training for Volunteers Minority Task Force on AIDS 1986-1988

* Poison Control Advisory Committee, N.Y. City Department of Health 1980-1981

* Education/Training Consultant, N.Y. State Office of Mental Health 1979

* Consultant, Conference on Minority Mental Health Manpower, HEW-ADAMHA Minority Advisory Committee 1979

* Member, Mental Health Committee, Task Force on the New York City Fiscal Crisis 1978

* Chairperson, Task Panel on the Mental Health of Black Americans, The President's Commission Mental Health 1978

* Physician Resources, Inc. Board of Consultants 1977-1979

* Board of Directors, and Chairman of the Ambulance Committee, New York City Regional Emergency Services Council 1977-1978

* Task Force on Services to Emotionally Disturbed Adolescents, New York City Human Resources Administration 1977

* Advisory Board, Center for Physician Career Development, American Medical Student Association Foundation 1977

6

**JA544**

* American Bar Association -- Young Lawyer's Section Committee on Mental Health, Physician Member/Consultant, 1974-1975
* The Thresholds (rehabilitation program for young psychiatric patients) Board of Directors 1974-1975

**OTHER SELECTED ACTIVITIES:**

* Walter Nicks Dance Theatre Workshop
  Chairman, Board of Directors 1985-1994
* Amistad World Theatre
  Chairman, Board of Directors 1983-1989
* National Urban League
  Black Executive Exchange Program 1979-1981
  Committee on Mental Health 1976-1979
* National Association for the Advancement of Colored People Advisory Committee, Project Rebound 1977-1978
* National Advisory Committee on Ethics 1975-1978
* New York City Black Citizens for a Fair Media Psychiatric Consultant 1977-1978
* Young Life, Inc. 1968-1972
* Big Brothers of America 1970-1972

**SELECTED HONORS:**

* New Jersey Black Achiever of Business and Education 1982
* Award of Merit, Black Psychiatrist of America 1977
* "Who's Who in America" 1976–1977
* American Biographical Institute
  "Community Leaders and Noteworthy Americans" Ninth Edition
* Dictionary of International Biography – Cambridge, England
  "Men of Achievement" Fifth Edition
* Solomon Carter Fuller Institute
  Traveling Fellow 1975
* Outstanding Young Men of America 1972
* National Medical Fellowship Recipient 1969–1971

7

Bates No. 230

**JA545**

**PUBLICATIONS:**

Davis PC, Chandler E, Dudley RG: The Place of Families in Juvenile Defense: Work After *Miller v. Alabama*. New England Journal on Criminal and Civil Confinement, 19 (No. 2):293-301, 2013

Dudley R.G., Blume Leonard P: Getting It Right: Life History Investigation as the Foundation for a Reliable Mental Health Assessment. The Hofstra Law Review, 36 (No 3): 963-988, 2008.

Dudley RG: Offering Psychiatric Opinion in Legal Proceedings When Lesbian or Gay Sexual Orientation Is an Issue in Mental Health Issues in Lesbian, Gay, Bisexual, and Transgender Communities, Jones BE & Hill MJ (eds), APA Review Psychiatry. Vol. 21, American Psychiatric Publishing, Inc., Washington, D.C. 2002

Dudley RG: All alike but each one different: orphans of the HIV epidemic in Orphans of the HIV Epidemic, Levine C (ed) Unit Hospital Fund, New York. 1993

Dudley RG: Serotonin partial agonists in the treatment of anxiety and depression: Introduction. Journal of Clinical Psychiatry, 51:30, 1990.

Bing EG, Nichols SE, Goldfinger SM, Fernandez F, Cabaj R, Dudley RG, Krener P, Prager M, Ruiz P: The many faces of AIDS: Opportunities for intervention. New Directions For Mental Health Services - Psychiatric Aspects of AIDS, 48:69-81, 1990.

Dudley R.G: Blacks in policy-making positions in Black Families in Crisis- The Middle Class, Coner-Edwards AF and Spurlock J (eds), Brunner/Mazel, New York, 1988.

Davis PC, Dudley RG: The black family in modern slavery. The Harvard Blackletter Journal - Harvard School 4:9-15, 1987.

Davis P, Dudley RG: Family evaluation and the development of standards for child custody determination. Columbia Journal of Law and Social Problems, 19 (No. 4):505-515, 1985.

**LECTURES, PRESENTATIONS, AND EDUCATIONAL VIDEOTAPES**

Described upon request

2/14

RGD:dw

Case 3:12-cv-00327-MOC   Document 74-6   Filed 12/22/14   Page 23 of 23

Bates No. 251

**JA546**