# IN THE

# United States Court of Appeals

## FOR THE FOURTH CIRCUIT

---

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

v.

AQUILIA MARCIVICCI BARNETTE,

*Defendant-Appellant.*

---

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA AT CHARLOTTE

---

## JOINT APPENDIX - VOLUME II OF VII
### (Pages 547 - 1014)

---

Gerald W. King, Jr.
FEDERAL PUBLIC DEFENDER
FOR THE WESTERN DISTRICT
OF NORTH CAROLINA
129 West Trade Street, Suite 300
Charlotte, NC 28202
704-374-0720
gerald_king@fd.org

*Counsel for Appellant*

Anthony Joseph Enright
OFFICE OF THE
UNITED STATES ATTORNEY
Western District of North Carolina
227 West Trade Street, Suite 1650
Charlotte, NC 28202
704-344-6222
usancw.appeals@usdoj.gov

*Counsel for Appellee*

Additional Counsel for Appellant on Inside Cover

Jacob H. Sussman
SOUTHERN COALITION FOR SOCIAL JUSTICE
P. O. Box 51280
Durham, NC 27717
704-277-3962
jsussman@scsj.org

Mark E. Olive
ATTORNEY AT LAW
320 West Jefferson Street
Tallahassee, FL 32301
850-224-0004
meolive@aol.com

*Counsel for Appellant*

# TABLE OF CONTENTS

## VOLUME II OF VII

JA Page

*Continued*, Exhibits to Petitioner Aquilia Marcivicci Barnette's
Brief in Support of Motion for Evidentiary Hearing:

Excerpt of Exhibit Bates Nos. 260-361 [ECF74-7]:

    1998 Trial Sentencing Verdict Sheets ............................................... 547

Exhibit Bates Nos. 362-421[ECF74-8]:

    2002 Resentencing Ex Parte Filings ................................................ 595

Excerpt of Exhibit Bates Nos. 4796-4917[ECF76-19]:

    Ann Burgess RN Report ................................................................. 655

Excerpt of Exhibit Bates Nos. 13475-13574 [ECF77-6]:

    Mark Cunningham Report ............................................................... 667

Excerpt of Exhibit Bates Nos. 14175-14274 [ECF77-14]:

    Seymour Halleck MD Report ......................................................... 669

    Sally Johnson Report ..................................................................... 675

Excerpts of Exhibit Bates Nos. 14748-14834 [ECF78-4]:

    Faye Sultan Report Final ............................................................... 691

    William Tyson Report .................................................................... 694

    John Warren Report ....................................................................... 696

Response of the United States to Barnette's Motion Under
28 U.S.C. 2255 and Motion for an Evidentiary Hearing
    2015.09.23 [ECF98] ...................................................................... 701

Exhibits to Response of the United States to Barnette's Motion
Under 28 U.S.C. 2255 and Motion for an Evidentiary Hearing
  2023.09.23 [ECF99 through ECF108]:

Ex. 1a:   Joint Appendix Vol. I of V [ECF99]................................... 815

          Federal District Court Docket Sheet .......................................... 825

          Indictment filed February 4, 1997.............................................. 893

          Guilty Verdict returned January 27, 1998................................... 899

          Defendant's Motion in Limine Regarding the Victim Impact
          Statements, filed June 4, 2002 ................................................. 900

          Motion for Allocution by the Defendant, filed June 4, 2002...... 902

          Government's Response in Opposition to Defense Motion in
          Limine to Prohibit and/or Limit Victim Impact Evidence,
          filed June 12, 2002 ................................................................. 904

          Government's Response to Motion for Allocution by the
          Defendant, filed June 12, 2002 ................................................ 913

          Order Denying Defendant's Motion for Allocution,
          entered June 18, 2002............................................................... 917

          Order Denying Defendant's Motion in Limine regarding the
          Victim Impact Statements, entered June 21, 2002...................... 921

          Motion for Relief Pursuant to Ring v. Arizona
          filed July 2, 2002..................................................................... 924

          Indictment................................................................................. 933

          Government's Notice of Intent to Seek the Death Penalty,
          filed August 7, 1997................................................................. 940

          Government's Reaffirmation of Intention to Seek the Death
          Penalty, filed July 30, 2001...................................................... 948

          Defendant's Memorandum in Support of Motion Regarding
          Ring, filed July 12, 2002 .......................................................... 951

          Government's Response to Defendant's Motion for Relief
          Pursuant to Ring v. Arizona, filed July 12, 2002........................ 958

Voir Dire: Prospective Juror Regina Sanders (888) .................... 963

Prospective Juror Edwards (1014) .............................................. 978

Prospective Juror Karen Sanders (1071).................................... 999

Prospective Juror Blakeney (1143).......................................... 1014

ORIGINAL

UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | DOCKET NO. 3:97CR23-P |
| | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| | ) | |
| AQUILIA MARCIVICCI BARNETTE | ) | |
| | ) | |

## SPECIAL VERDICT FORM REGARDING THE PUNISHMENT TO BE IMPOSED UPON THE DEFENDANT FOR THE KILLING OF DONALD LEE ALLEN IN COUNT SEVEN

### I. AGE OF DEFENDANT

Instructions: Answer "YES" or "NO".

Do you, the jury, unanimously find that the government has established beyond a reasonable doubt that:

1. The defendant was eighteen years of age or older at the time of the offense in Count Seven?

YES  ✓

NO  _____

*Donald J. Schudel*
FOREPERSON

Instructions: If you answered "NO" with respect to the determination in Section I, then stop your deliberations, cross out Sections II, III, IV, V and VI of this form, and proceed to Section VII. Each juror should then carefully read the statement in Section VII, and sign in the appropriate place

if the statement accurately reflects the manner in which he or she reached his or her decision. You should then advise the Court that you have reached a decision.

If you answered "YES" with respect to the determination in Section I, then proceed to Section II which follows.

## II.  REQUISITE MENTAL STATE

Instructions: For each of the following, answer "YES" or "NO".

1. Do you, the jury, unanimously find that the government has proven beyond a reasonable doubt that the defendant intentionally killed Donald Lee Allen in Count Seven?

YES ___✓___

NO _____

*Donald J. Schudel*
FOREPERSON

2. Do you, the jury, unanimously find that the government has proven beyond a reasonable doubt that the defendant intentionally inflicted serious bodily injury which resulted in the death of Donald Lee Allen in Count Seven?

YES ___✓___

NO _____

*Donald J. Schudel*
FOREPERSON

Bates No. 2261
Court-0002456

**JA548**

3. Do you, the jury, unanimously find that the government has proven beyond a reasonable doubt that the defendant intentionally engaged in conduct intending that Donald Lee Allen be killed and/or that lethal force be employed against Donald Lee Allen which resulted in the death of Donald Lee Allen in Count Seven?

YES ___✓___

NO _____

*Herald J. Schudel*
FOREPERSON

4. Do you, the jury, unanimously find that the government has proven beyond a reasonable doubt that the defendant intentionally engaged in conduct which the defendant knew would create a grave risk of death to a person, other than one of the participants in the offense and resulted in the death of Donald Lee Allen in Count Seven?

YES ___✓___

NO _____

*Herald J. Schudel*
FOREPERSON

Instructions: If you answered "NO" with respect to all of the determinations in this section, then stop your deliberations, cross out Sections III, IV, V and VI of this form, and proceed to Section VII. Each juror should carefully read the statement in Section VII, and sign in the appropriate place if the statement accurately reflects the manner in which he or she reached his or her decision. You should then advise the Court that you have reached a decision.

If you answered "YES" with respect to any one or more of the determinations in Section II, then proceed to Section III which follows.

## III. STATUTORY AGGRAVATING FACTORS

Instructions: For each of the following, answer "YES" or "NO".

Do you, the jury, unanimously find that the government has established the existence of the following statutory aggravating factors beyond a reasonable doubt as to Count Seven:

1. Do you the jury unanimously find that the government has proven beyond a reasonable doubt that the defendant committed the offense in Count Seven in the expectation of the receipt of something of pecuniary value?

YES     ✓

NO     _____

_Donald J. Schudel_
FOREPERSON

2. Do you the jury unanimously find that the government has proven beyond a reasonable doubt that the defendant committed the offense in Count Seven after substantial planning and premeditation to cause the death of Donald Lee Allen?

YES     ✓

NO     _____

_Donald J. Schudel_
FOREPERSON

Case 3:12-cv-00327-MOC   Document 74-3   Filed 12/22/14   Page 4 of 100

Bates No. 263

Court-0002458

**JA550**

Instructions: If you answered "NO" with respect to both of the statutory aggravating factors in this Section III, then stop your deliberations, cross out Sections IV, V and VI of this form, and proceed to Section VII of this form. Each juror should then carefully read the statement in Section VII, and sign in the appropriate place if the statement accurately reflects the manner in which he or she reached his or her decision. You should then advise the Court that you have reached a decision.

If you found the requisite age in Section I, the requisite mental state in Section II and answered "YES" with respect to one or both of the statutory aggravating factors in this Section III, then proceed to Section IV which follows.

IV. NON-STATUTORY AGGRAVATING FACTORS

Instructions: For each of the following, answer "YES" or "NO".

Do you, the jury, unanimously find that the government has established the existence of the following non-statutory aggravating factors beyond a reasonable doubt as to Count Seven:

1. Do you the jury unanimously find that the government has proven beyond a reasonable doubt that the defendant caused harm to the family of Donald Lee Allen as a result of the impact of the killing on the family of Donald Lee Allen?

YES ✓

NO _____

*Donald J. Schudel*
FOREPERSON

**JA551**

2. Do you the jury unanimously find that the government has proven beyond a reasonable doubt that the defendant is likely to commit criminal acts of violence in the future which would be a continuing and serious threat to society?

YES ✓

NO _____

*Donald J. Schudel*
FOREPERSON

3. Do you the jury unanimously find that the government has proven beyond a reasonable doubt that the defendant intentionally killed two people in that in addition to killing Donald Lee Allen, the defendant also killed Robin Williams?

YES ✓

NO _____

*Donald J. Schudel*
FOREPERSON

Instructions: Regardless of whether you answered "YES" or "NO" with respect to the three non-statutory aggravating factors in this Section IV, then proceed to Section V, which follows.

## V. MITIGATING FACTORS

Instructions: For each of the following mitigating factors, in the space provided, indicate the number of jurors who have found the existence of that mitigating factor to be proven by a preponderance of the evidence as to Count Seven.

Bates No. 265

Court-0002460

**JA552**

A finding with respect to a mitigating factor may be made by one or more of the members of the jury, and any member of the jury who finds the existence of a mitigating factor must consider such [a] factor[s] established in considering whether or not a sentence of death shall be imposed, regardless of the number of other jurors who agree that the factor has been established.

The statutory mitigating factors which the defendant contends have been proved by a preponderance of the evidence are:

1. The defendant's capacity to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of the law was significantly impaired, regardless of whether the capacity was so impaired as to constitute a defense to the charge.

Number of jurors who so find _____*O*_____ .


2. The defendant was under unusual and substantial duress, regardless of whether the duress was of such a degree as to constitute a defense to the charge.

Number of jurors who so find _____*O*_____ .


3. The other factors in the defendant's childhood, background or character mitigate against imposition of the death sentence.

Number of jurors who so find _____*1*_____ .


The non-statutory factor(s) in the defendant's background or character, the circumstances of the crime(s), or other relevant fact or circumstance as mitigation are as follows:

The evidence tends to show:

Bates No. 266

**JA553**

1. The defendant assisted police in locating Donald Allen's body.

Number of jurors who so find ___12___.

2. The defendant voluntarily turned himself in.

Number of jurors who so find ___9___.

3. The defendant had no positive family role model during his teenage years.

Number of jurors who so find ___6___.

4. The defendant grew up in a home which condoned domestic violence and he frequently saw his mother abused.

Number of jurors who so find ___5___.

5. The defendant was physically and emotionally abused by his father.

Number of jurors who so find ___7___.

6. The defendant was neglected by his mother when she was drunk and distraught over the break up of her marriage.

Number of jurors who so find ___9___.

7. The defendant was never allowed to resolve issues of childhood before he was thrust into a caretaker's role of caring for his mother, aunt, brother and aging grandfather when his mother divorced his father.

Number of jurors who so find ___3___.

8. The defendant has worked consistently since age fifteen and many times worked more than one job.

Number of jurors who so find ___5___.

 Bates No. 267 Court-0002462

9. The defendant grew up in a home where alcohol and drugs were used frequently.

Number of jurors who so find ___12___

10. The defendant grew up in a home where violence was prevalent.

Number of jurors who so find ___11___.

11. After the beating in Atlanta, the defendant lost interest in school and stopped going to school.

Number of jurors who so find ___6___.

12. The defendant went to church with his grandfather, Jessie.

Number of jurors who so find ___11___.

13. The defendant pled guilty to two prior convictions and accepted responsibility for them.

Number of jurors who so find ___3___.

14. The defendant confessed to his friend Steve Austin and Steve's mother, Ann Austin, with regard to the fire incident in April of 1996.

Number of jurors who so find ___11___.

15. The defendant confessed to the police.

Number of jurors who so find ___12___.

16. Since his arrest the defendant has been a model inmate.

Number of jurors who so find ___12___.


Other non-statutory factors which the defendant contends are:

9

Bates No. 268     Court-0002463

**JA555**

1. An unstable home life and frequent moves during childhood denied the defendant the skills to form normal peer relationships.

Number of jurors who so find ___2___.

2. The defendant showed remorse by trying to kill himself when he realized what he had done.

Number of jurors who so find ___1___.

3. The defendant prayed for the souls of his victims.

Number of jurors who so find ___4___.

4. The defendant exhibited psychological problems as a minor for which his family failed to seek medical attention or treatment.

Number of jurors who so find ___6___.

5. The defendant cooperated with the police.

Number of jurors who so find ___11___.

6. The defendant will do well in the structured environment that prison will offer.

Number of jurors who so find ___6___.

7. The defendant was abandoned by his father at the age of 10 due to the separation of his mother and father.

Number of jurors who so find ___1___.

8. The defendant was further rejected by his father at age 13 when blood tests revealed Derrick Barnette was not his father or his brother's father.

Number of jurors who so find ___2___.

10

Case 3:12-cv-00327-MOC   Document 74-7   Filed 12/22/14   Page 10 of 100

Bates No. 269

Court 0002464

**JA556**

9. The defendant attempted suicide prior to the crimes indicating that he was already having psychological problems.

Number of jurors who so find ____2____.

10. The age of the defendant at the time of the offense.

Number of jurors who so find ____2____.

11. If the defendant is sentenced to life without the possibility of release he will not be a future danger.

Number of jurors who so find ____3____.

12. The defendant's mother, young brother, and [children] will be harmed by the emotional trauma of his execution.

Number of jurors who so find ____8____.

The following extra spaces are provided to write in additional mitigating factors, if any, found by any one or more jurors. If none, write "NONE" and line out the extra spaces with a large "X". If more space is needed, write "CONTINUED" and use the reverse side of this page.

____ NONE _____

_____

Number of jurors who so find _____.

_____

_____

Number of jurors who so find _____.

_____

11

Bates No. 270     Court-0002465



_____ NoNE _____

Number of jurors who so find _____

— _____

_____

Number of jurors who so find _____

Instructions: Regardless of whether or not you choose to make written findings for the mitigating factors in Section V above, proceed to Section VI and Section VII which follow.

## VI.    **DETERMINATION**

Based upon consideration of whether the aggravating factor or factors found to exist as to Count Seven sufficiently outweigh any mitigating factor or factors found to exist to justify a sentence of death, or in the absence of any mitigating factors, whether the aggravating factor or factors as to Count Seven are themselves sufficient to justify a sentence of death, indicate your recommendation using either the following form A, B, or C.

12

Bates No. 271          Court 0002466

**JA558**

## A.     <u>Death Sentence</u>

Based upon consideration of whether the aggravating factors found to exist sufficiently outweigh any mitigating factor or factors found to exist to justify a sentence of death, or in the absence of any mitigating factors, whether the aggravating factors are themselves sufficient to justify a sentence of death, we recommend by unanimous vote that a sentence of death shall be imposed for the killing of Donald Lee Allen in Count Seven.

YES     ✓

NO     _____

If you answer "YES", sign your names here, and then proceed to Section VII. If you answer "NO", the foreperson alone should sign, and you should proceed to Section VI (B):

Date: _FEBRUARY___ _10_, 1998

13

Case 3:12-cv-00327-MOC   Document 74-7   Filed 12/22/14   Page 13 of 103

Bates No. 272

Court-0002467

**JA559**

**B.** **Sentence of Life in Prison Without Possibility of Release**

Based upon consideration of whether the aggravating factors found to exist sufficiently outweigh any mitigating factor or factors found to exist to justify the sentence of death, or in the absence of any mitigating factors, whether the aggravating factors are themselves sufficient to justify a sentence of death, we recommend by unanimous vote that a sentence of life in prison without possibility of release shall be imposed for the killing of Donald Lee Allen in Count Seven.

YES _____

NO _____

If you answer "YES", sign your names here, and then proceed to Section VII. If you answer "NO", the foreperson alone should sign, and you should proceed to Section VI (C):

_____ _____

_____ _____

_____ _____

_____ _____

_____ _____
FOREPERSON

Date: _____ \_\_\_\_, 1998

14

Bates No. 273 Court-0002468

**JA560**

## C.     Lesser Sentence

Based upon consideration of whether the aggravating factors found to exist sufficiently outweigh any mitigating factor or factors found to exist to justify a sentence of death, or in the absence of any mitigating factors, whether the aggravating factors are themselves sufficient to justify a sentence of death, we recommend by unanimous vote that the Court sentence the defendant as provided by law up to life in prison without possibility of release for the killing of Donald Lee Allen in Count Seven.

YES  _____

NO  _____

If you answer "YES", sign your names here, and then proceed to Section VII:

_____   _____

_____   _____

_____   _____

_____   _____

_____   _____
                                                            FOREPERSON

Date:  _____  \_\_\_\_, 1998

15

Bates No. 274     Court-0002469

## JA561

## VII. CERTIFICATION

By signing below, each juror certifies that consideration of the race, color, religious beliefs, national origin, or sex of the defendant or the victim was not involved in reaching his or her individual decision, and that the individual juror would have made the same recommendation regarding a sentence for the crime or crimes in question no matter what the race, color, religious beliefs, national origin, or sex of the defendant, or the victim, would have been.

_(signatures)_

FOREPERSON

Date: FEBRUARY 10, 1998

16

Bates No. 275

Court-0002470

**JA562**

UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION

UNITED STATES OF AMERICA            )        DOCKET NO. 3:97CR23-P
                                    )
                                    )
                                    )
              v.                    )
                                    )
                                    )
AQUILIA MARCIVICCI BARNETTE         )
_____   )

### SPECIAL VERDICT FORM REGARDING THE PUNISHMENT TO BE IMPOSED UPON THE DEFENDANT FOR THE KILLING OF DONALD LEE ALLEN IN COUNT EIGHT

**I.     AGE OF DEFENDANT**

Instructions:  Answer "YES" or "NO".

Do you, the jury, unanimously find that the government has established beyond a reasonable

doubt that:

1.  The defendant was eighteen years of age or older at the time of the offense in Count

Eight?

                                        YES   ✓

                                        NO   _____

_Donald J. Schudel_
FOREPERSON

Instructions:  If you answered "NO" with respect to the determination in Section I, then stop

Case 3:12-cv-00327-MOC   Document 74-7   Filed 12/22/14   Page 17 of 108   Bates No. 276   Court-0002471

**JA563**

your deliberations, cross out Sections II, III, IV, V and VI of this form, and proceed to Section VII. Each juror should then carefully read the statement in Section VII, and sign in the appropriate place if the statement accurately reflects the manner in which he or she reached his or her decision. You should then advise the Court that you have reached a decision.

If you answered "YES" with respect to the determination in Section I, then proceed to Section II which follows.

## II. REQUISITE MENTAL STATE

Instructions: For each of the following, answer "YES" or "NO".

1. Do you, the jury, unanimously find that the government has proven beyond a reasonable doubt that the defendant intentionally killed Donald Lee Allen in Count Eight?

YES ✓

NO _____

_Gerald J. Schudel_
FOREPERSON

2. Do you, the jury, unanimously find that the government has proven beyond a reasonable doubt that the defendant intentionally inflicted serious bodily injury which resulted in the death of Donald Lee Allen in Count Eight?

YES ✓

NO _____

_Gerald J. Schudel_
FOREPERSON

Bates No. 2277   Court 0002472

**JA564**

3. Do you, the jury, unanimously find that the government has proven beyond a reasonable doubt that the defendant intentionally engaged in conduct intending that Donald Lee Allen be killed and/or that lethal force be employed against Donald Lee Allen which resulted in the death of Donald Lee Allen in Count Eight?

YES    ✓

NO    _____

_Donald J. Schudel_
FOREPERSON

4. Do you, the jury, unanimously find that the government has proven beyond a reasonable doubt that the defendant intentionally engaged in conduct which the defendant knew would create a grave risk of death to a person, other than one of the participants in the offense and resulted in the death of Donald Lee Allen in Count Eight?

YES    ✓

NO    _____

_Donald J. Schudel_
FOREPERSON

Instructions: If you answered "NO" with respect to all of the determinations in this section, then stop your deliberations, cross out Sections III, IV, V and VI of this form, and proceed to Section VII. Each juror should carefully read the statement in Section VII, and sign in the appropriate place if the statement accurately reflects the manner in which he or she reached his or her decision. You should then advise the Court that you have reached a decision.

3

Bates No. 278    Court-0002473

**JA565**

If you answered "YES" with respect to one or more of the determinations in Section II, then proceed to Section III which follows.

## III. STATUTORY AGGRAVATING FACTORS

Instructions: For each of the following, answer "YES" or "NO".

Do you, the jury, unanimously find that the government has established the existence of the following statutory aggravating factors beyond a reasonable doubt as to Count Eight:

1. Do you the jury unanimously find that the government has proven beyond a reasonable doubt that the defendant committed the offense in Count Eight in the expectation of the receipt of something of pecuniary value?

YES ___✓___

NO _____

_Donald J. Schudel_
FOREPERSON

2. Do you the jury unanimously find that the government has proven beyond a reasonable doubt that the defendant committed the offense in Count Eight after substantial planning and premeditation to cause the death of Donald Lee Allen?

YES ___✓___

NO _____

_Donald J. Schudel_
FOREPERSON

4

Bates No.:279     Court-0002474

**JA566**

Instructions: If you answered "NO" with respect to both of the statutory aggravating factors in this Section III, then stop your deliberations, cross out Sections IV, V and VI of this form, and proceed to Section VII of this form. Each juror should then carefully read the statement in Section VII, and sign in the appropriate place if the statement accurately reflects the manner in which he or she reached his or her decision. You should then advise the Court that you have reached a decision.

If you found the requisite age in Section I, the requisite mental state in Section II and answered "YES" with respect to any one or both of the statutory aggravating factors in this Section III, then proceed to Section IV which follows.


## IV.   NON-STATUTORY AGGRAVATING FACTORS

Instructions: For each of the following, answer "YES" or "NO".

Do you, the jury, unanimously find that the government has established the existence of the following non-statutory aggravating factors beyond a reasonable doubt as to Count Eight:

1. Do you the jury unanimously find that the government has proven beyond a reasonable doubt that the defendant caused harm to the family of Donald Lee Allen as a result of the impact of the killing on the family of Donald Lee Allen?

YES ____✓____

NO _____

*Donald J. Schudel*
FOREPERSON

5

**JA567**

2. Do you the jury unanimously find that the government has proven beyond a reasonable doubt that the defendant is likely to commit criminal acts of violence in the future which would be a continuing and serious threat to society?

YES ✓

NO _____

_Gerald J. Schudel_
FOREPERSON

3. Do you the jury unanimously find that the government has proven beyond a reasonable doubt that the defendant intentionally killed two people in that in addition to killing Donald Lee Allen, the defendant also killed Robin Williams?

YES ✓

NO _____

_Gerald J. Schudel_
FOREPERSON

Instructions: Regardless of whether you answered "YES" or "NO" with respect to the three non-statutory aggravating factors in this Section IV, then proceed to Section V, which follows.

## V. MITIGATING FACTORS

Instructions: For each of the following mitigating factors, in the space provided, indicate the number of jurors who have found the existence of that mitigating factor to be proven by a preponderance of the evidence as to Count Eight.

A finding with respect to a mitigating factor may be made by one or more of the members of the jury, and any member of the jury who finds the existence of a mitigating factor must consider such [a] factor[s] established in considering whether or not a sentence of death shall be imposed, regardless of the number of other jurors who agree that the factor has been established:

The statutory mitigating factors which the defendant contends have been proved by a preponderance of the evidence are:

1. The defendant's capacity to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of the law was significantly impaired, regardless of whether the capacity was so impaired as to constitute a defense to the charge.

Number of jurors who so find _____ *O* _____.

2. The defendant was under unusual and substantial duress, regardless of whether the duress was of such a degree as to constitute a defense to the charge.

Number of jurors who so find _____ *O* _____.

3. The other factors in the defendant's childhood, background or character mitigate against imposition of the death sentence.

Number of jurors who so find _____ *1* _____.

The non-statutory factor(s) in the defendant's background or character, the circumstances of the crime(s), or other relevant fact or circumstance as mitigation are as follows:

7

**JA569**

The evidence tends to show:

1. The defendant assisted police in locating Donald Allen's body.

Number of jurors who so find ___12___.

2. The defendant voluntarily turned himself in.

Number of jurors who so find ___6___.

3. The defendant had no positive family role model during his teenage years.

Number of jurors who so find ___5___.

4. The defendant grew up in a home which condoned domestic violence and he frequently saw his mother abused.

Number of jurors who so find ___5___.

5. The defendant was physically and emotionally abused by his father.

Number of jurors who so find ___7___.

6. The defendant was neglected by his mother when she was drunk and distraught over the break up of her marriage.

Number of jurors who so find ___8___.

7. The defendant was never allowed to resolve issues of childhood before he was thrust into a caretaker's role of caring for his mother, aunt, brother and aging grandfather when his mother divorced his father.

Number of jurors who so find ___3___.

8. The defendant has worked consistently since age fifteen and many times worked more than one job.

Number of jurors who so find ___6___.

**JA570**

9. The defendant grew up in a home where alcohol and drugs were used frequently.

Number of jurors who so find ___12___.

10. The defendant grew up in a home where violence was prevalent.

Number of jurors who so find ___10___.

11. After the beating in Atlanta, the defendant lost interest in school and stopped going to school.

Number of jurors who so find ___5___.

12. The defendant went to church with his grandfather, Jessie.

Number of jurors who so find ___12___.

13. The defendant pled guilty to two prior convictions and accepted responsibility for them.

Number of jurors who so find ___4___.

14. The defendant confessed to his friend Steve Austin and Steve's mother, Ann Austin, with regard to the fire incident in April of 1996.

Number of jurors who so find ___11___.

15. The defendant confessed to the police.

Number of jurors who so find ___12___.

16. Since his arrest the defendant has been a model inmate.

Number of jurors who so find ___12___.

9

Bates No. 284          Court-0002479

**JA571**

Other non-statutory factors which the defendant contends are:

1. An unstable home life and frequent moves during childhood denied the defendant the skills to form normal peer relationships.

Number of jurors who so find ____3____.

2. The defendant showed remorse by trying to kill himself when he realized what he had done.

Number of jurors who so find ____1____.

3. The defendant prayed for the souls of his victims.

Number of jurors who so find ____3____.

4. The defendant exhibited psychological problems as a minor for which his family failed to seek medical attention or treatment.

Number of jurors who so find ____5____.

5. The defendant cooperated with the police.

Number of jurors who so find ____12____.

6. The defendant will do well in the structured environment that prison will offer.

Number of jurors who so find ____5____.

7. The defendant was abandoned by his father at the age of 10 due to the separation of his mother and father.

Number of jurors who so find ____3____.

8. The defendant was further rejected by his father at age 13 when blood tests revealed Derrick Barnette was not his father or his brother's father.

Number of jurors who so find ____4____.

10

Bates No. 285   Court-0002480

**JA572**

9. The defendant attempted suicide prior to the crimes indicating that he was already having psychological problems.

Number of jurors who so find _____6_____.

10. The age of the defendant at the time of the offense.

Number of jurors who so find _____2_____.

11. If the defendant is sentenced to life without the possibility of release he will not be a future danger.

Number of jurors who so find _____2_____.

12. The defendant's mother, young brother, and [children] will be harmed by the emotional trauma of his execution.

Number of jurors who so find _____9_____.

The following extra spaces are provided to write in additional mitigating factors, if any, found by any one or more jurors. If none, write "NONE" and line out the extra spaces with a large "X". If more space is needed, write "CONTINUED" and use the reverse side of this page.

___. _____NONE_____

_____

Number of jurors who so find _____

___. _____

Number of jurors who so find _____

___. _____

11

Bates No. 286   Court-0002481

**JA573**



_NONE_

Number of jurors who so find _____.

—. _____

_____

Number of jurors who so find _____.

Instructions: Regardless of whether or not you choose to make written findings for the mitigating factors in Section V above, proceed to Section VI and Section VII which follow.

## VI.  **DETERMINATION**

Based upon consideration of whether the aggravating factor or factors found to exist as to Count Eight sufficiently outweigh any mitigating factor or factors found to exist to justify a sentence of death, or in the absence of any mitigating factors, whether the aggravating factor or factors as to Count Eight are themselves sufficient to justify a sentence of death, indicate your recommendation using either the following form A, B, or C.

12

Bates No. 287      Court-0002482

**JA574**

## A. <u>Death Sentence</u>

Based upon consideration of whether the aggravating factors found to exist sufficiently outweigh any mitigating factor or factors found to exist to justify a sentence of death, or in the absence of any mitigating factors, whether the aggravating factors are themselves sufficient to justify a sentence of death, we recommend by unanimous vote that a sentence of death shall be imposed for the killing of Donald Lee Allen in Count Eight.

YES _____✓_____

NO _____

If you answer "YES", sign your names here, and then proceed to Section VII. If you answer "NO", the foreperson alone should sign, and you should proceed to Section VI (B):

Date: _FEBRUARY_ _10_, 1998

13

Bates No. 288        Court 0002483

**JA575**

**B.**   <u>Sentence of Life in Prison Without Possibility of Release</u>

Based upon consideration of whether the aggravating factors found to exist sufficiently outweigh any mitigating factor or factors found to exist to justify a sentence of death, or in the absence of any mitigating factors, whether the aggravating factors are themselves sufficient to justify a sentence of death, we recommend by unanimous vote that a sentence of life in prison without possibility of release shall be imposed for the killing of Donald Lee Allen in Count Eight.

YES  _____

NO  _____

If you answer "YES", sign your names here, and then proceed to Section VII. If you answer "NO", the foreperson alone should sign, and you should proceed to Section VI (C):

_____        _____

_____        _____

_____        _____

_____        _____

_____        _____
                               FOREPERSON

Date: _____ _____, 1998

14

Bates No. 289          Court 0002484

**JA576**

## C. <u>Lesser Sentence</u>

Based upon consideration of whether the aggravating factors found to exist sufficiently outweigh any mitigating factor or factors found to exist to justify a sentence of death, or in the absence of any mitigating factors, whether the aggravating factors are themselves sufficient to justify a sentence of death, we recommend by unanimous vote that the Court sentence the defendant as provided by law up to life in prison without possibility of release for the killing of Donald Lee Allen in Count Eight.

YES _____

NO _____

If you answer "YES", sign your names here, and then proceed to Section VII:

_____    _____

_____    _____

_____    _____

_____    _____

_____    _____
FOREPERSON

Date: _____ \_\_\_\_, 1998

15

Case 3:12-cv-00327-MOC   Document 74-7   Filed 12/22/14   Page 31 of 102   Bates No. 290   Court-0002485

**JA577**

## VII. CERTIFICATION

By signing below, each juror certifies that consideration of the race, color, religious beliefs, national origin, or sex of the defendant or the victim was not involved in reaching his or her individual decision, and that the individual juror would have made the same recommendation regarding a sentence for the crime or crimes in question no matter what the race, color, religious beliefs, national origin, or sex of the defendant, or the victim, would have been.

*[signatures]*

*[signature]*      *[signature]*

Sylvia Wilson      Amanda M. Edwards

Shelley Simpson      Mary J. Jarvis

Guy A. Wallau      James R. Oldensby

Faye H. Boyette      Karen S. Randoyro

Bonnie Stafford      *[signature]*
                              FOREPERSON

Date: *FEBRUARY 10*, 1998

16

Case 3:12-cv-00327-MOC   Document 74-7   Filed 12/22/14   Page 37 of 102   Court-0002486

Bates No. 291

**JA578**

UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION

UNITED STATES OF AMERICA ) DOCKET NO. 3:97CR23-P
)
)
v. )
)
)
AQUILIA MARCIVICCI BARNETTE )
_____)

**SPECIAL VERDICT FORM REGARDING THE PUNISHMENT**
**TO BE IMPOSED UPON THE DEFENDANT FOR THE KILLING OF**
**ROBIN WILLIAMS IN COUNT ELEVEN**

I. **AGE OF DEFENDANT**

Instructions: Answer "YES" or "NO".

Do you, the jury, unanimously find that the government has established beyond a reasonable doubt that:

1. The defendant was eighteen years of age or older at the time of the offense in Count Eleven?

YES _____✓_____

NO _____

_Gerald J. Schiedel_
FOREPERSON

Instructions: If you answered "NO" with respect to the determination in Section I, then stop your deliberations, cross out Sections II, III, IV, V and VI of this form, and proceed to Section VII.

Case 3:12-cv-00327-MOC   Document 74-72   Filed 12/22/14   Page 33 of 102
Bates No. 292   Court-0002487

**JA579**

Each juror should then carefully read the statement in Section VII, and sign in the appropriate place if the statement accurately reflects the manner in which he or she reached his or her decision. You should then advise the Court that you have reached a decision.

If you answered "YES" with respect to the determination in Section I, then proceed to Section II which follows.

## II. REQUISITE MENTAL STATE

Instructions: For each of the following, answer "YES" or "NO".

1. Do you, the jury, unanimously <u>find</u> that the government has proven beyond a reasonable doubt that the defendant intentionally killed Robin Williams in Count Eleven?

YES    ✓

NO    _____

*Jerald J. Schudel*
FOREPERSON

2. Do you, the jury, unanimously find that the government has proven beyond a reasonable doubt that the defendant intentionally inflicted serious bodily injury which resulted in the death of Robin Williams in Count Eleven?

YES    ✓

NO    _____

*Jerald J. Schudel*
FOREPERSON

Bates No. 293    Court-0002488

**JA580**

3. Do you, the jury, unanimously find that the government has proven beyond a reasonable doubt that the defendant intentionally engaged in conduct intending that Robin Williams be killed and/or that lethal force be employed against Robin Williams which resulted in the death of Robin Williams in Count Eleven?

YES    ✓

NO    _____

*Gerald J. Schudel*
FOREPERSON

4. Do you, the jury, unanimously find that the government has proven beyond a reasonable doubt that the defendant intentionally engaged in conduct which the defendant knew would create a grave risk of death to a person, other than one of the participants in the offense and resulted in the death of Robin Williams in Count Eleven?

YES    ✓

NO    _____

*Gerald J. Schudel*
FOREPERSON

Instructions: If you answered "NO" with respect to all of the determinations in this section, then stop your deliberations, cross out Sections III, IV, V and VI of this form, and proceed to Section VII. Each juror should carefully read the statement in Section VII, and sign in the appropriate place if the statement accurately reflects the manner in which he or she reached his or her decision. You should then advise the Court that you have reached a decision.

3

Bates No. 294    Court-0002489

**JA581**

If you answered "YES" with respect to one or more of the determinations in Section II, then proceed to Section III which follows.

## III.   STATUTORY AGGRAVATING FACTORS

Instructions: For each of the following, answer "YES" or "NO".

Do you, the jury, unanimously find that the government has established the existence of the following statutory aggravating factors beyond a reasonable doubt as to Count Eleven:

1. Do you the jury unanimously find that the government has proven beyond a reasonable doubt that in the commission of the offense in Count Eleven, the defendant knowingly created a grave risk of death to one or more persons in addition to the intended victim of the offense?

YES  ✓

NO  _____

*Derald J. Schudel*
FOREPERSON

2. Do you the jury unanimously find that the government has proven beyond a reasonable doubt that the defendant committed the offense in Count Eleven after substantial planning and premeditation to cause the death of Robin Williams.

YES  ✓

NO  _____

*Derald J. Schudel*
FOREPERSON

4

Bates No. 295   Court 0002490

**JA582**

Instructions: If you answered "NO" with respect to both of the statutory aggravating factors in this Section III, then stop your deliberations, cross out Sections IV, V and VI of this form, and proceed to Section VII of this form. Each juror should then carefully read the statement in Section VII, and sign in the appropriate place if the statement accurately reflects the manner in which he or she reached his or her decision. You should then advise the Court that you have reached a decision.

If you found the requisite age in Section I, the requisite mental state in Section II and answered "YES" with respect to any one or both of the statutory aggravating factors in this Section III, then proceed to Section IV which follows.

## IV. NON-STATUTORY AGGRAVATING FACTORS

Instructions: For each of the following, answer "YES" or "NO".

Do you, the jury, unanimously find that the government has established the existence of the following non-statutory aggravating factors beyond a reasonable doubt as to Count Eleven:

1. Do you the jury unanimously find that the government has proven beyond a reasonable doubt that the defendant caused harm to the family of Robin Williams as a result of the impact of the killing on the family of Robin Williams?

YES    ✓

NO    _____

*Donald J. Schudel*
FOREPERSON

5

Bates No. 296    Court-0002491

**JA583**

2. Do you the jury unanimously find that the government has proven beyond a reasonable doubt that the defendant is likely to commit criminal acts of violence in the future which would be a continuing and serious threat to society?

YES ✓

NO _____

*Gerald J. Schudel*
FOREPERSON

3. Do you the jury unanimously find that the government has proven beyond a reasonable doubt that the defendant intentionally killed two people in that in addition to killing Robin Williams, the defendant also killed Donald Lee Allen?

YES ✓

NO _____

*Gerald J. Schudel*
FOREPERSON

Instructions: Regardless of whether you answered "YES" or "NO" with respect to the three non-statutory aggravating factors in this Section IV, then proceed to Section V, which follows.

## V. MITIGATING FACTORS

Instructions: For each of the following mitigating factors, in the space provided, indicate the number of jurors who have found the existence of that mitigating factor to be proven by a preponderance of the evidence as to Count Eleven.

Bates No. 297        Court-0002492

**JA584**

A finding with respect to a mitigating factor may be made by one or more of the members of the jury, and any member of the jury who finds the existence of a mitigating factor may consider such [a] factor[s] established in considering whether or not a sentence of death shall be imposed, regardless of the number of other jurors who agree that the factor has been established:.

The statutory mitigating factors which the defendant contends have been proved by a preponderance of the evidence are:

1. The defendant's capacity to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of the law was significantly impaired, regardless of whether the capacity was so impaired as to constitute a defense to the charge.

Number of jurors who so find ___ O ___.

2. The defendant was under unusual and substantial duress, regardless of whether the duress was of such a degree as to constitute a defense to the charge.

Number of jurors who so find ___ O ___.

3. The other factors in the defendant's childhood, background or character mitigate against imposition of the death sentence.

Number of jurors who so find ___ I ___.

The non-statutory factor(s) in the defendant's background or character, the circumstances of the crime(s), or other relevant fact or circumstance as mitigation are as follows:

The evidence tends to show:

Bates No. 298          Court-0002493

**JA585**

1. The defendant assisted police in locating Donald Allen's body.

Number of jurors who so find ___1___.

2. The defendant voluntarily turned himself in.

Number of jurors who so find ___6___.

3. The defendant had no positive family role model during his teenage years.

Number of jurors who so find ___3___.

4. The defendant grew up in a home which condoned domestic violence and he frequently saw his mother abused.

Number of jurors who so find ___6___.

5. The defendant was physically and emotionally abused by his father.

Number of jurors who so find ___7___.

6. The defendant was neglected by his mother when she was drunk and distraught over the break up of her marriage.

Number of jurors who so find ___8___.

7. The defendant was never allowed to resolve issues of childhood before he was thrust into a caretaker's role of caring for his mother, aunt, brother and aging grandfather when his mother divorced his father.

Number of jurors who so find ___3___.

8. The defendant has worked consistently since age fifteen and many times worked more than one job.

Number of jurors who so find ___3___.

8

Bates No. 299   Court-0002494

**JA586**

9. The defendant grew up in a home where alcohol and drugs were used frequently.

Number of jurors who so find __11.__ .

10. The defendant grew up in a home where violence was prevalent.

Number of jurors who so find __8__ .

11. After the beating in Atlanta, the defendant lost interest in school and stopped going to school.

Number of jurors who so find __5__ .

12. The defendant went to church with his grandfather, Jessie.

Number of jurors who so find __11__ .

13. The defendant pled guilty to two prior convictions and accepted responsibility for them.

Number of jurors who so find __3__ .

14. The defendant confessed to his friend Steve Austin and Steve's mother, Ann Austin, with regard to the fire incident in April of 1996.

Number of jurors who so find __11__ .

15. The defendant confessed to the police.

Number of jurors who so find __12__ .

16. Since his arrest the defendant has been a model inmate.

Number of jurors who so find __12__ .

9

Bates No. 300         Court-0002495

**JA587**

Other non-statutory factors which the defendant contends are:

1. An unstable home life and frequent moves during childhood denied the defendant the skills to form normal peer relationships.

Number of jurors who so find ___3___.

2. The defendant showed remorse by trying to kill himself when he realized what he had done.

Number of jurors who so find ___1___.

3. The defendant prayed for the souls of his victims.

Number of jurors who so find ___3___.

4. The defendant exhibited psychological problems as a minor for which his family failed to seek medical attention or treatment.

Number of jurors who so find ___5___.

5. The defendant cooperated with the police.

Number of jurors who so find ___12___.

6. The defendant will do well in the structured environment that prison will offer.

Number of jurors who so find ___5___.

7. The defendant was abandoned by his father at the age of 10 due to the separation of his mother and father.

Number of jurors who so find ___4___.

8. The defendant was further rejected by his father at age 13 when blood tests revealed Derrick Barnette was not his father or his brother's father.

Number of jurors who so find ___4___.

10

Bates No. 301   Court-0002496

**JA588**

9. The defendant attempted suicide prior to the crimes indicating that he was already having psychological problems.

Number of jurors who so find ___ 2 ___.

10. The age of the defendant at the time of the offense.

Number of jurors who so find ___ 3 ___.

11. If the defendant is sentenced to life without the possibility of release he will not be a future danger.

Number of jurors who so find ___ 1 ___.

12. The defendant's mother, young brother, and [children] will be harmed by the emotional trauma of his execution.

Number of jurors who so find ___ 9 ___.

The following extra spaces are provided to write in additional mitigating factors, if any, found by any one or more jurors. If none, write "NONE" and line out the extra spaces with a large "X". If more space is needed, write "CONTINUED" and use the reverse side of this page.

___. ___ NONE _____

_____

Number of jurors who so find _____.

___. _____

_____

Number of jurors who so find _____.

___. _____

11

**JA589**



NoNE

Number of jurors who so find _____

_____

_____

Number of jurors who so find _____ .

Instructions: Regardless of whether or not you choose to make written findings for the mitigating factors in Section V above, proceed to Section VI and Section VII which follow.

## VI. DETERMINATION

Based upon consideration of whether the aggravating factor or factors found to exist as to Count Eleven sufficiently outweigh any mitigating factor or factors found to exist to justify a sentence of death, or in the absence of any mitigating factors, whether the aggravating factor or factors as to Count Eleven are themselves sufficient to justify a sentence of death, indicate your recommendation using either the following form A, B, or C.

Bates No. 303          Court-0002498

**JA590**

## A. Death Sentence

Based upon consideration of whether the aggravating factors found to exist sufficiently outweigh any mitigating factor or factors found to exist to justify a sentence of death, or in the absence of any mitigating factors, whether the aggravating factors are themselves sufficient to justify a sentence of death, we recommend by unanimous vote that a sentence of death shall be imposed for the killing of Robin Williams in Count Eleven.

YES ___✓___

NO _____

If you answer "YES", sign your names here, and then proceed to Section VII. If you answer "NO", the foreperson alone should sign, and you should proceed to Section VI (B):

_[signatures]_

FOREPERSON

Date: __FEBRUARY__ __10__, 1998

Case 3:12-cv-00327-MOC Document 74-7 Filed 12/22/14 Page 45 of 102

Bates No. 304

Court 0002499

**JA591**

**B.** **Sentence of Life in Prison Without Possibility of Release**

Based upon consideration of whether the aggravating factors found to exist sufficiently outweigh any mitigating factor or factors found to exist to justify a sentence of death, or in the absence of any mitigating factors, whether the aggravating factors are themselves sufficient to justify a sentence of death, we recommend by unanimous vote that a sentence of life in prison without possibility of release shall be imposed for the killing of Robin Williams in Count Eleven.

YES _____

NO _____

If you answer "YES", sign your names here, and then proceed to Section VII. If you answer "NO", the foreperson alone should sign, and you should proceed to Section VI (C):

_____ _____

_____ _____

_____ _____

_____ _____

_____ _____
FOREPERSON

Date: _____ \_\_\_\_, 1998

14

Case 3:12-cv-00327-MOC Document 74-7 Filed 12/22/14 Page 46 of 102

Bates No. 305 Court-0002500

## C. <u>Lesser Sentence</u>

Based upon consideration of whether the aggravating factors found to exist sufficiently outweigh any mitigating factor or factors found to exist to justify a sentence of death, or in the absence of any mitigating factors, whether the aggravating factors are themselves sufficient to justify a sentence of death, we recommend by unanimous vote that the Court sentence the defendant as provided by law up to life in prison without possibility of release for the killing of Robin Williams in Count Eleven.

YES _____

NO _____

If you answer "YES", sign your names here, and then proceed to Section VII:

_____  _____

_____  _____

_____  _____

_____  _____

_____  _____
FOREPERSON

Date: _____ \_\_\_\_, 1998

Bates No. 306

Court-0002501

**JA593**

## VII. CERTIFICATION

By signing below, each juror certifies that consideration of the race, color, religious beliefs, national origin, or sex of the defendant or the victim was not involved in reaching his or her individual decision, and that the individual juror would have made the same recommendation regarding a sentence for the crime or crimes in question no matter what the race, color, religious beliefs, national origin, or sex of the defendant, or the victim, would have been.

Date: FEBRUARY 10, 1998

Bates No. 307

Court-0002502

**JA594**

UNITED STATES OF AMERICA )
)
v. )        Docket No. 3:97CR-23
)
)
AQUILIA MARCIVICCI BARNETTE, )
Defendant )
_____ )

## *EX PARTE* STATEMENT OF DEFENSE CONTENTIONS

Now come Claire J. Rauscher and Jean B. Lawson, court-appointed counsel

for Defendant Aquilia Marcivicci Barnette, and respectfully set forth this summary

of facts and statement of defense contentions in this case. The purpose of this

statement is to advise the Court, *ex parte*, and in a single filing, of the factual basis

for all future requests for relief and for judicial assistance in the defense of this case.

The undersigned counsel for the defendant will incorporate this document, by

reference, in all such requests, thereby avoiding the necessity of repetition.

### Procedural Posture of the Case

On June 22, 1996, Aquilia Marcivicci (Marc) Barnette shot and killed Donnie

Allen in North Carolina so he could drive Allen's car to Virginia, where he shot and

killed his former domestic partner, Robin Williams.

At his trial, conducted before the Honorable Robert D. Potter in January and

February, 1998, Marc Barnette was convicted of (1) Carjacking resulting in death

in violation of 18 USC 2119(3); (2) Use of a Firearm in Carjacking resulting in

death in violation of 18 USC 924(c )and (j); and (3) Use of a Firearm in

Commission of an Act of Domestic Violence resulting in death in violation of (18

USC 924 (c ) and ( i).

1

Case 3:97-cr-00023-RLV   Document 364-1 *SEALED*   Filed 08/28/01   Page 1 of 6

Case 3:12-cv-00327-MOC   Document 74-8   Filed 12/22/14   Page 1 of 60
Bates No. 362

**JA595**

After the sentencing hearing, the jury recommended that Marc Barnette be sentenced to death on each of the three convictions.

The Fourth Circuit Court of Appeals has remanded his case for re-sentencing because the trial judge refused to allow the defense to rebut government opinion testimony about Marc Barnette's alleged "future dangerousness".

On July 30, 2001, the US Attorney filed Notice of Reaffirmation of Intention to Seek the Death Penalty and is requesting a pre-emptory trial setting.

Current counsel were appointed for the purpose of re-sentencing and did not participate in the first trial or the appeal.

<u>Brief Summary of the Facts According to the Government</u>
*(Taken from Marc Barnette's Appeal Brief and the Opinion of the Fourth Circuit Court of Appeals)*

Marc Barnette and Robin Williams were romantically involved and lived together in Robin Williams' apartment in Roanoke, Virginia for approximately one year until she ended the relationship. Marc Barnette then returned to Charlotte, North Carolina and moved in with his mother and brother.

After they separated, however, Barnette continued to call Robin Williams. Sometimes he threatened her. During other telephone calls, he begged her to resume their relationship. In response, Williams changed her locks and, for a period of time, lived with her mother. By all accounts, she did not encourage Barnette in any way.

On April 30, 1996, Robin Williams was in the apartment she had formerly shared with Marc Barnette when he arrived in the middle of the night, cut the phone lines and attempted to enter the apartment. According to Robin Williams' statement to police, Marc Barnette was striking the windows of the apartment with a baseball bat, screaming obscenities and threatening to kill her. He threw a

2

Case 3:12-cv-00327-MOC   Document 74-8   Filed 12/22/14   Page 2 of 60
Bates No. 363
**JA596**

molatov cocktail into the apartment. Williams escaped the burning apartment by jumping out a rear window. In attempting to put out the fire, Williams suffered second and third degree burns on her hands and arms. She was hospitalized for a period of time for treatment of the burns.

Roanoke police issued a warrant for Barnette's arrest but, although Barnette had returned to his mother's home in Charlotte, the Charlotte police did not serve the arrest warrant. While the warrant was unserved, Barnette continued to call Williams and her family and he left cards that she had sent him during their relationship on her car windshield. When she left the hospital, Robin Williams moved in with her mother, Bertha Williams.

Eventually, Barnette obtained a sawed-off shotgun and, on June 22, 1996, determined that he would go from Charlotte to Roanoke to see Robin. Shortly after midnight he walked to a dark intersection of a four-lane divided road near Charlotte-Douglas International Airport and waited for a car to stop for the light. Donnie Allen stopped and Barnette approached Allen's car with the shotgun and told him to get out. He had Allen lay his wallet in the road, directed him to the side of the road near a drainage ditch and shot him in the back, firing three times and killing him. Barnette took Allen's wallet and car and drove to Roanoke.

At approximately 7:00 a.m. on June 22nd, Barnette arrived at Robin's mother's residence in Roanoke. He shot and kicked in the door after cutting the phone lines to the apartment. He chased Robin Williams around the apartment complex as neighbors frantically called 911. He pointed the shotgun at one of these neighbors and told her to get off the phone or he would shoot her. Barnette finally caught Robin when she fell down. He grabbed her by the arm and hair and dragged her back toward her mother's apartment, telling her to "come back with me" and asking her why she "took everything away" from him. Marc Barnette told

3

Robin Williams that he had one shell for her and another for himself. Robin broke free and, as she was running toward her mother, Barnette shot her twice. According to witnesses, Robin Williams died in her mother's arms.

After shooting Robin Williams, Marc Barnette drove to Nashville, Tennessee where he purchased duct tape, Compoz sleeping pills and a garden hose. Twice, he taped the garden hose to the car tailpipe, attempting to kill himself by carbon monoxide poisoning. He also took sleeping pills, but was unsuccessful in his suicide attempts. Marc went to a church and prayed for both his victims, then returned to Charlotte where he turned himself in to authorities, confessed to both murders and led them to the decomposing body of Donnie Allen.

<u>Defense Objectives in this Resentencing</u>

Based upon review of the trial transcript, the defendant's criminal record, the discovery in the case and the presentation at Marc Barnette's first sentencing proceeding, current counsel believe an approach different from that used in his first sentencing hearing is warranted.

Marc Barnette has an entrenched family history of violence toward women that counsel believe predisposed him to the otherwise inexplicable conduct in this case. By family history, both of his grandmothers were murdered by their husband or boyfriend. Marc Barnette's parents engaged in a pattern of physical and emotional abuse of each other that included infidelity. Early in life, Marc Barnette learned to incorporate his girlfriend into his own personna to the extent that he could not separate successfully from a girlfriend. A pattern of self-destructive actions in response to his girlfriends breaking up with him started as early as age 14, when he attempted suicide after being rejected. Subsequent break-ups were followed by Marc Barnette allegedly abducting and raping a girlfriend and, on another occasion, attempting to abduct his girlfriend from her place of employment,

4

Case 3:12-cv-00327-MOC   Document 74-8   Filed 12/22/14   Page 4 of 60
Bates No. 7463

**JA598**

and using a knife to hold off co-workers who were attempting to rescue her.

At his first sentencing hearing, the government presented numerous witnesses who testified that Marc Barnette had a history of abusing women with whom he was intimately involved and on one occasion, abusing the children of his girlfriend. Prior defense counsel sought to minimize the severity of these incidents, or place blame for them on the women involved.

Current counsel believe that hiding the pathological relationship between the defendant and women would be a serious error. We firmly believe we must lay out for the jury the extent of Marc Barnette's history with women in order for them to understand his psychosis. Defense presentation of this evidence to the jury could result in a sentence of life without parole, rather than death.

Current counsel have reviewed the testimony and cross-examination at Marc Barnette's first sentencing hearing. It is apparent that the defense presentation was disjointed. The psychological, psychiatric and family history was not presented to the jury in an effective manner. The witnesses were unprepared for cross-examination. The investigation was superficial and not-sufficiently in depth to enable the formation of a cohesive theory of mitigation. Our objective is to assure that the information presented to the jury at this sentencing hearing is the result of thorough investigation, top notch assessment by appropriate experts and is credible and logical enough for the jury to understand the genesis of these crimes and to impose a sentence of life imprisonment, rather than death.

To this end, defense counsel must (1) thoroughly interview experts and review data obtained during the first trial preparation, (2) determine whether it is appropriate to retain the same experts for the re-sentencing, (3) identify additional experts and tests that are useful and necessary in the defense preparation, (4) identify and interview numerous family members, co-workers and other potential

5

Case 3:12-cv-00327-MOC   Document 74-8   Filed 12/22/14   Page 5 of 60
Bates No. 365

**JA599**

witnesses, and (5) retain experts in additional disciplines, if necessary. Specific requests will be made in separate, ex parte Motions.

**Ex Parte and Privileged Nature of this Document and other requests for Funding of the Defense in this Case**

Marc Barnette is, as he was during his first trial, indigent and therefore is entitled to the necessary costs of his defense at the expense of the government. Because the justification for these funds requires disclosure of privileged and confidential defense preparation, the defendant's Fifth, Sixth, and Eighth Amendment rights, conferred upon him by the Constitution of the United States, require that the Court hold these requests in confidence.

Accordingly, counsel respectfully request that this document, and all subsequent documents filed by the defense requesting assistance from the Court as well as orders concerning defense funding requests, be placed Under Seal.

Respectfully submitted this the 28th day of August, 2001.

Claire J. Rauscher
435 E. Morehead Street
Charlotte, NC 28202-2609
(704) 331-0863

Jean B. Lawson
PO Box 472106
Charlotte, NC 28247-2106
(704) 341-1865

ATTORNEYS FOR
AQUILIA MARCIVICCI BARNETTE

6

# UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA
### CHARLOTTE DIVISION

UNITED STATES OF AMERICA )
)
v. )   Docket No. 3:97CR-23
)
)
AQUILIA MARCIVICCI BARNETTE, )
Defendant )
_____ )

## *EX PARTE* MOTION FOR AUTHORIZATION TO RETAIN A PRIVATE INVESTIGATOR

**NOW COMES** defendant Aquilia Marcivicci Barnette (hereinafter, Marc Barnette) and respectfully requests that this Honorable Court authorize the defense to retain the services of a Private Investigator to assist in preparing for the defendant's resentencing, pursuant to 18 U.S.C. 3006A and 21 U.S.C. 848(q)(10)(B) as well as the Fifth, Sixth and Eighth Amendments to the Constitution of the United States. In support of this Motion, the undersigned show unto the court the following:

1. The defendant's *Ex Parte* Statement of Defense Contentions is incorporated herein by reference to set forth the facts and circumstances that support this request.

2. The government has served the defense with a Notice Reaffirming its Intention to Seek the Death Penalty against the defendant.

3. The Court has determined that the defendant is indigent.

4. Counsel have identified numerous individuals who need to be located and interviewed. The course of the crimes for which the defendant has been convicted spans North Carolina, Virginia and Tennessee. Other potential witnesses live in Georgia and Pennsylvania. Some of these individuals were hostile to the defense at the defendant's first trial and sentencing and counsel reasonably believe they will not make themselves available

Case 3:97-cr-00023-RLV   Document 365-1 *SEALED* (Court only)   Filed 08/28/01   Page 1 of 3

Case 3:12-cv-00327-MOC   Document 74-8   Filed 12/22/14   Page 7 of 60

**JA601**

to the defense unless they are located and approached.

5. The services of a trained private investigator may also be necessary to assist the defense mitigation specialist in finding potential defense sentencing witnesses who are identified during the course of preparation for the sentencing hearing.

6. The services of a trained private investigator are an acknowledged benefit to litigants and are indispensable in the preparation of a capital case defense. Competent counsel would engage these services for a client having the independent means to pay for them.

7. Counsel have contacted Jan Barefoot of Barefoot Private Investigation in Charlotte, North Carolina and determined that she is willing to provide services to this defense. She was authorized by the Court to perform some defense investigation during Mr. Barnette's first trial and sentencing and is familiar with the case.

8. Barefoot Private Investigations charges $75.00 per hour, plus expenses. Counsel believe, based on preliminary evaluation of the case, that the investigation can be performed in less than 100 hours. Counsel expect that Barefoot Private Investigations will incur costs because of the need to travel to other states to locate certain potential witnesses. Accordingly, the undersigned believe that the allocation of $10,000 (fees plus expenses) for investigative services for this indigent capital defendant is necessary and appropriate.

WHEREFORE, the undersigned counsel request that the Court order the government to pay the bills rendered by Barefoot Private Investigations for investigative services and costs in an amount not to exceed $10,000 without further order of the court.

Respectfully submitted on this the 28th day of August, 2001.

Claire J. Rauscher
435 E. Morehead Street
Charlotte, NC 28202-2609
(704) 331-0863

Jean B. Lawson
PO Box 472106
Charlotte, NC 28247-2106
(704) 341-1865

**ATTORNEYS FOR
AQUILIA MARCIVICCI BARNETTE**

Bates No. 370

**JA603**

FILED
CHARLOTTE, N.C.

01 AUG 28 PM 2: 29

U.S. DISTRICT COURT
W. DIST. OF N.C.

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | Docket No. 3:97CR-23 |
| v. | ) | |
| | ) | |
| AQUILIA MARCIVICCI BARNETTE, | ) | |
| Defendant | ) | |
| | ) | |

## EX PARTE MOTION FOR APPOINTMENT OF, AND FUNDS FOR, A MITIGATION SPECIALIST

NOW COMES defendant Aquilia Marcivicci Barnette (hereinafter "Marc" Barnette) and respectfully requests that this Honorable Court authorize the defense to retain the services of a Mitigation Specialist to assist in preparation for the defendant's re-sentencing. In support of this Application, the undersigned show unto the Court the following:

1. The defendant's EX PARTE STATEMENT OF DEFENSE CONTENTIONS is incorporated herein as if fully set forth as a recitation of the facts and contentions that support this request. This request is made pursuant to 18 U.S.C. 3006(a) and 21 U.S.C. 848(q)(10)(B), as well as the Fifth, Sixth and Eighth Amendments to the Constitution of the United States.

2. The government has served the defense with a Notice Reaffirming its Intention to Seek the Death Penalty against the defendant. At his first trial, the defendant received three death sentences.

3. The defendant is indigent.

4. In the defendant's first trial, he was granted the services of a Mitigation Specialist. Counsel have determined that the services rendered by that "specialist" were

insufficient for the defense of this case. In fact, counsel request funding for a different mitigation specialist at this trial.

Cindy Maxwell was the mitigation investigator used by prior counsel. Ms. Maxwell was inexperienced and had little training in the field of sentencing mitigation. She failed to develop adequate rapport with the defendant's family and friends that would have enabled her to unearth critical biographical information. She prepared a "Time Line" purporting to represent the defendant's life history and omitted critical information. These omissions cast doubt on the reliability of other expert witnesses called by the defense. As a result, the honesty of the defense presentation was compromised. The government, in its closing argument, ridiculed her work in this case and emphasized the distortions and misleading "Time Line". (See attached transcript pages). Therefore, in light of the lack of reliability and insufficient mitigation investigation, current counsel believe that retaining a new mitigation expert is required.

5. Current counsel have interviewed and discussed this case with Cessie Alfonso who is a qualified and experienced mitigation investigator. (See attached *Curriculum Vitae*). Ms. Alfonso immediately recognized the critical issues that were not investigated and developed in the first trial and sentencing hearing. Her breadth of experience makes her uniquely suited for this case. The defendant's family was brutalized and traumatized during the defense presentation at the first sentencing. Ms. Alfonso has the personal skills and experience to rehabilitate the family and obtain information necessary to present a strong mitigation case for Marc Barnette. If the Court needs further elaboration, counsel can provide it.

6. Ms. Alfonso charges $100 per hour, plus expenses. At this point in trial preparation, counsel anticipate Ms. Alfonso will need to spend 150 hours on the case.

WHEREFORE, the undersigned counsel for the defendant respectfully request that this Court authorize them to retain the services of Cessie Alfonso as the Mitigation Investigator in this case, with a cap of $15,000 in fees and expenses, without further

authorization from the Court.

Respectfully submitted on this the 28 day of August, 2001.

Claire J. Rauscher
435 E. Morehead Street
Charlotte, NC 28202-2609
(704) 331-0863

Jean B. Lawson /cjr
Jean B. Lawson
PO Box 472106
Charlotte, NC 28247-2106
(704) 341-1865

ATTORNEYS FOR
AQUILIA MARCIVICCI BARNETTE

Bates No. 573

JA606

# ATTACHMENT 1

# PORTION OF TRANSCRIPT OF GOVERNMENT'S CLOSING ARGUMENT

Page 1106

Robin Williams because she dared to tell him no; and yes, I am
here at this time to ask you for the ultimate punishment for
these ultimate crimes.

I will not offer you a slick, color-coded time line, nor
a generic one size fits all slide presentation. While those
things may be worthy of our ad crazy age, I contend and submit
to you they are not worthy of this courtroom. You will not hear
me defend Cynthia Maxwell, a self-described mitigation
specialist, who is qualified for what? To put together these
multicolored notebooks, notebooks of deception that omit the
most important facts surrounding your decision and reduce Donnie
and Robin to a single red circle. Who fails to list the acts of
violence committed by this defendant throughout his life. Why?
She didn't have room on her time line. There wasn't a
conviction, or she didn't think it was sufficiently
significant. Who didn't even list the defendant's history of
probation on his time line. Why? Because she called down a
couple times to Georgia and didn't get an answer, even though we
all know that the probation was in North Carolina, not Georgia.

Who doesn't list on her time line the conduct that you
found the defendant guilty of in the guilt phase of this trial,
it wouldn't fit. That time line that was presented to you in
this case is a onesided distortion not of who this man is and
what he has done, but rather how he can be repackaged and
presented to you. Painters and lawyers have been known

Case 3:97-cr-00023-RLV   Document 366-1 *SEALED* (Court only)   Filed 08/28/01   Page 5 of 11

Case 3:12-cv-00327-MOC   Document 74-8   Filed 12/22/14   Page 14 of 60
Bates No. 375

JA608

historically as people who can turn black into white, and I would submit to you you should add mitigation specialists to that list as well.

I will not ask you to believe in an expert psychologist who comes in and says to you, I quote, I sit before this jury as a psychologist whose obligation and purpose is to present my scientific findings and knowledge about the defendant, but tells a radio audience the very morning she testified in this courtroom that her purpose is to leave you crying. Who when asked about her book under oath in this court told you her book, the book she left off her curriculum, that that book is primarily about child abuse, but later is forced to admit that the week before, she told yet another radio audience that she was touring Europe promoting her book which is, quote, about the death penalty in the United States. Who thinks that it is not important that you should know that she is passionately anti death penalty, who has been sent two reprimand letters from the North Carolina Board of Psychology, not once but twice, one for testifying to a diagnosis that does not exist and one for exploiting her patient. I will not ask you to believe in that witness.

I will not ask you to believe in a traveling slide show presenter from Abilene, Texas who testifies all over the country in death penalty cases for a fee, a fee in the case of a death penalty case in Arkansas of $21,000 and then testifies that two

Case 3:97-cr-00023-RLV   Document 366-1 *SEALED* (Court only)   Filed 08/28/01   Page 6 of 11

Case 3:12-cv-00327-MOC   Document 74-86   Filed 12/22/14   Page 15 of 60
Bates No. 576

JA609

# ATTACHMENT 2

## *CURRICULUM VITAE* OF MITIGATION SPECIALIST CESSIE ALFONSO

Bates No. 377

**JA610**

# Cecilia Cessie Alfonso, A.C.S.W.

32 Sycamore Street
Albany, New York 12208
(518) 489-2481
E-mail: CessieAlf@aol.com

## EDUCATION

1977    M.S.W., Rutgers Graduate School of Social Work
1978    B.A., Hood College - Psychology and Sociology
1965    L.P.N., Montefiore School of Practical Nursing

## LICENSES AND CERTIFICATIONS

1985 Diplomat, National Association of Social Workers, Clinical Registrar, No. 109774,
         Certified Social Work School Field Instructor
1984 L.C.S.W., State of New Jersey, Board of Social Work Examiners, No. 14770
1983 A.C.S.W., National Association of Social Workers, Academy of Social Workers
1982 C.S.W., State of New York, Board of Higher Education, No. 27529

## PROFESSIONAL EXPERIENCE

1989 - Present    **Alfonso Associates**, New Jersey, President
         Clinical and human resource consultation, training services and referral services.  Forensic
         Social work, specializing in Capital Punishment Mitigation.  Provide psychotherapy, clinical
         assessment and training to individuals, families, and agencies in the public and private
         sectors.

1983 - 1988    **Alfonso and Baur**, New Jersey, Partner
         Clinical and human resource consultation, training services and referral services.  Provide
         psychotherapy, clinical assessment and training to individuals, families, and agencies in
         the public and private sectors.

1979 - 1983    **Alfonso Associates**, New Jersey, President, Human Resource Development
         Consultants.  Jersey City, NJ.
         Interdisciplinary group of professionals providing consultation and training to organizations
         in the public and private sectors.  Workshops and seminars: Stress Management, Minority
         Management in the Corporate Sector.  Consultation: Veterans' Administration Hospitals,
         Tri-City Community Center, New Jersey Bell, Gannett Corporation, Bell Laboratory, The
         City People Corporation, Integrity House.

1978 - Present    **Private Practice**, New York and New Jersey - Counselor and Psychotherapist.
         Provide counseling and psychotherapy to individuals and couples.

Case 3:97-cr-00023-RLV    Document 366-1 *SEALED* (Court only)    Filed 08/28/01    Page 8 of 11

Case 3:12-cv-00327-MOC    Document 74-8    Filed 12/22/14    Page 17 of 60
Bates No. 378

JA611

## SEMINARS, CONFERENCES, TRAINING, AND CONSULTATION

Presenter, Statewide Judicial Domestic Violence Training Program - "Cultural Sensitivity in Domestic Violence." February 27, 2001

Presenter, Statewide Judicial Domestic Violence Training Program - "Cultural Sensitivity in Domestic Violence." February 27, 2001.

Trainer/Facilitator, New Jersey Coalition for Battered Women - "The Battered Women's Syndrome Revisited: Where are We Now?" November 8, 1996.

Trainer/Facilitator, New Jersey Coalition for Battered Women - "Understanding the Process and Procedures of Qualifying as an Expert Witness." October 15, 1996.

Trainer/Facilitator, Social Security Administration, NY Federal Plaza - "Cultural Diversity." September 27, 1996

Guest Expert, *Sally Jessy Raphael Show*, NBC - "Domestic Violence." September 23, 1996

Guest Speaker, North Carolina/Center for Death Penalty Legislation. September 18-21, 1996

- Understanding Violence: Prevention Strategies and Mitigation Training
- Substance Abuse
- Cultural Issues - Mitigation
- Problems with Clients
- Mitigation Specialist's Role as Counselor and Advocate for the Client and Client's Family

Guest Expert, *Sally Jessy Raphael Show*, NBC - "Domestic Violence." August 23, 1996

Guest Speaker, Washington Defenders Association Sentencing Alternatives Conference, Seattle, Washington - "Defense-based Sentencing." June 14-15, 1996

Trainer/Facilitator, Connecticut Public Defenders Office Annual Training, Hartford, Connecticut - "Defining Problems and Developing Awareness." June 3, 1996

Guest Speaker, National Association Sentencing Advocates (NASA) Annual Conference, Charlotte, North Carolina - "Sentencing with Hope: For Clients, For Community, For Change." May 29 - June 2, 1996

Guest Speaker, University of Michigan Law School, Ann Harbor, Missouri - "Role of Mitigation Specialist in Death Penalty Cases." March 27-29, 1996

Presenter, National Legal Aid and Defenders Association (NLADA), Washington, D.C. - "Life in the Balance VIII: Defending Death Penalty Cases." St. Louis, Missouri. March 3-6, 1996

Guest Speaker, Albany Law School, Albany, New York - "Use of Non-Lawyer Professionals by Lawyers." February 12, 1996

Presenter, Essex County Office of the Public Defender - "Battered Women Syndrome." November 30, 1995

Presenter, Dade County Public Defenders Office - "Preparation and Presentation of Mitigation in the Penalty Phase." November 17, 1995

Presenter, Washington, D.C. National Defender Investigator Association - "Cultural Mitigation and the Death Penalty Phase." November 16, 1995

Presenter, Women Work! 1995 National Conference, Washington, D.C. - Workshop on Cultural Diversity. November 5-6, 1995

Presenter, New York State Capital Defender Training Conference - "Investigating for Life: Death Penalty and Mitigation." October 27-28, 1995

Guest Speaker, The Nassau Academy of Law - "New Perspectives on an Old Punishment; Facing the Death Penalty in New York." October 13, 1995

Presenter, State of New Jersey Office of the Public Defender - "Battered Women Syndrome." October 10, 1995

Guest Speaker, Criminal Justice Institute, Harvard Law School - "The Client Interviewing Process." September 28-30, 1995

Presenter, Indiana Public Defender Council - "Preparing a Theme for Penalty Phase Defense." September 21, 1995

Presenter, Missouri Capital Mitigation Workshop - "Identifying and Using Cultural Mitigation Evidence." July 13, 1995

Presenter, NAACP CLE Conference, Criminal Justice Institute, Harvard Law School - "Mock Sentencing Hearing." July 7, 1995

Presenter, Met Life, New York, New York, Domestic Violence - "Forging the Future." June 1995

Presenter, Effective Factual Investigation with Albert Kapin, Esq., New York, New York - "A New Era in Capital Representation." June 1995

Presenter, Office of Public Defender, Ethics of Client's Relationship, Maricopa, Arizona - "Clients Relations: How Lawyers Deal with Minority Clients in Crisis in the Criminal Justice Systems." June 1995

Presenter, National Association of Sentencing Advocates (NASA), Third National Conference for Sentencing Advocates, Mitigation Specialists, Attorneys, Judges and Others, Chicago, Illinois - "Meeting the Challenge - For Our Clients, For Our Time." May 4-6, 1995

Presenter, National Legal Aid & Defenders Association (NLADA), Asheville, North Carolina - "Who Are Our Clients," and "Race, Gender, Class in the Courtroom." April 1995

Guest Speaker, Sponsored by the Progressive Action Committee and the Latin American Student Association, held at the University of Connecticut, West Hartford, Connecticut - "Crime, Punishment and Social Work." April 11, 1995

Keynote Speaker, Sponsored by the NYS DEC Diversity Team - "The Crucial Element a Woman Needs to Succeed in a Highly Competitive Market Economy." March 31, 1995

Keynote Speaker, Conference sponsored by NLADA - "Life in the Balance VII: Defending Death Penalty Cases." March 2-5, 1995

Presenter, Wisconsin State Public Defenders' Fall Criminal Defense Conference - "Sentencing Issues for the '90s." October 6, 1994

Presenter, Hudson County Task Force on Women Conference - "Substance Abuse in Domestic Violence." October 14, 1994

Presenter, Missouri Public Defenders' Conference - "Cultural Conflicts in the Courtroom." June 1, 1994

Presenter, CMP Publications, "Take Our Daughters to Work Day." April 28, 1994

Keynote Speaker, Forensic Social Work Conference. April 21, 1994

Panel Presenter, Policy Group of the National Institute of Corrections - "Intermediate Sanctions for Female Offenders." March 29, 1994

Panel Presenter, 1994 Policy Breakfast Series, Cornell University Institute for Women and Work - "Diversity: Trends and Responses to Differences in the Work Place." March 15, 1994

Keynote Speaker, Conference/Luncheon of Albert Einstein College of Medicine, Yeshiva University, Bronx, New York - "Bridging the Cultural Gap." November 18, 1993

Presenter, Sixth Annual Symposium on Minorities and Corrections, Department of Corrections, Office of Program Development Hispanic Services, Mercer County Community College, Trenton, New Jersey - "Alternative Punishment Programs as Alternatives to Incarceration." October 8, 1993

RECEIVED
CHARLOTTE, N.C.

AUG 2 8 2001

Clerk, U. S. Dist. Court
W. Dist of N. C.

FILED
CHARLOTTE, N

01 OCT 10 AM 8

U.S. DISTRICT C
W. DIST. OF N.

**UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION**

UNITED STATES OF AMERICA )
)                Docket No. 3:97CR-23
v.                        )
)                *EX PARTE* ORDER AUTHORIZING
AQUILIA MARCIVICCI BARNETTE, )       MITIGATION SPECIALIST
Defendant                   )
)                  (UNDER SEAL)
_____ )

THIS MATTER is before the Court on defendant's *EX PARTE* Motion for Authorization to hire a Mitigation Specialist.

Based upon the information before the Court, the undersigned finds:

1. That the defendant is indigent.

2. That the defendant received three death sentences in this case in 1998. The Fourth Circuit Court of Appeals has remanded his cases to this Court for resentencing. New counsel have been appointed for the defendant.

3. That the defense has established to the satisfaction of this Court that the defendant is entitled to the services of a Mitigation Specialist to assist in this case. Defense counsel have requested the authority to hire Cessie Alfonso as Mitigation Specialist. Her fee is $100 per hour and counsel reasonably believe that an allocation of $15,000 for her fees and expenses is appropriate.

5. The fees requested by the defense are reasonable and appropriate in this case and the defendant's request for relief should be granted, pursuant to 18 U.S.C. 3006(a), 21 U.S.C. 848(q)(10)(B) and the Fifth, Sixth and Eighth Amendments to the Constitution of the United States.

IT IS, THEREFORE, ORDERED that the defendant's *EX PARTE* Motion for Authorization to Hire a Mitigation Specialist is GRANTED. The defendant's

counsel are authorized to retain the services of Cessie Alfonso, at government expense, at the rate of $100 per hour with a cap of $15,000 pending any further order of the Court.

This the _9th_ day of ~~August~~ Oct, 2001.

Richard L. Voorhees
United States District Court Judge

United States District Court
for the
Western District of North Carolina
October 10, 2001

sdc

* * MAILING CERTIFICATE OF CLERK * *

Re:  3:97-cr-00023

True and correct copies of the attached were mailed by the clerk to the following:

Claire J. Rauscher, Esq.
435 E. Morehead St.
Charlotte, NC  28202

& *Jean Lawson*

cc:
Judge                        ( )
Magistrate Judge             ( )
U.S. Marshal                 ( )
Probation                    ( )
U.S. Attorney                ( )
Atty. for Deft.              ( )
Defendant                    ( )
Warden                       ( )
Bureau of Prisons            ( )
Court Reporter               ( )
Courtroom Deputy             ( )
Orig-Security                ( )
Bankruptcy Clerk's Ofc.      ( )
Other_____         ( )

Frank G. Johns, Clerk

Date: 10/29/01

By: _____
    Deputy Clerk

Case 3:97-cr-00023-RLV   Document 368-1 *SEALED* (Court only)   Filed 10/10/01   Page 3 of 4

Case 3:12-cv-00327-MOC   Document 74-84   Filed 12/22/14   Page 23 of 60
Bates No. 384

JA617

| 1. CIR./DIST./DIV. CODE | 2. PERSON REPRESENTED | | VOUCHER NUMBER |
|---|---|---|---|
| NCW | Barnette, Aquilia Marcivicci | | |

| 3. MAG. DKT./DEF. NUMBER | 4. DIST. DKT./DEF. NUMBER 3:97-000023-001 | 5. APPEALS DKT./DEF. NUMBER | 6. OTHER DKT. NUMBER |
|---|---|---|---|

| 7. IN CASE/MATTER OF (Case Name) U.S. v. Barnette | 8. PAYMENT CATEGORY Felony | 9. TYPE PERSON REPRESENTED Adult Defendant | 10. REPRESENTATION TYPE (See Instructions) Federal Capital Prosecution |
|---|---|---|---|

**11. OFFENSE(S) CHARGED** (Cite U.S. Code, Title & Section). If more than one offense, list (up to five) major offenses charged, according to severity of offense.
1) 18 844H.F -- EXPLOSIVES USED IN COMMISSION OF FELONY

REQUEST AND AUTHORIZATION FOR EXPERT SERVICES

**12. ATTORNEY'S STATEMENT**
As the attorney for the person represented who is named above, I hereby affirm that the services requested are necessary for adequate representation. I hereby request:
☐ Authorization to obtain the service. Estimated Compensation: $ 15,000 OR
☐ Approval of services already obtained to be paid for by the United States from the Defender Services Appropriation. (Note: Prior authorization should be obtained for services in excess of $300.)

_____ Signature of Attorney            _____ Date

☐ Panel Attorney  ☐ Retained Atty  ☐ Pro-Se  ☐ Legal Organization

Attorney's name (First name, Middle initial, Last name, including suffix) and mailing address.
Claire J. Rauscher
435 E. Morehead St.
Charlotte, NC 28202

Telephone Number: _____

**13. DESCRIPTION OF AND JUSTIFICATION FOR SERVICES** (See instructions)

To aid in deft's Defense.

**15. Court Order**
Financial eligibility of the person represented having been established to the court's satisfaction, the authorization requested in Item 12 is hereby granted.

_____
Signature of Presiding Judicial Officer or By Order of the Court

_____          _____
Date of Order                     Nunc Pro Tunc Date
Repayment or partial repayment ordered from the person represented for this service at time of authorization.
☐ YES  ☐ NO

**14. TYPE OF SERVICE PROVIDER**

| 01 ☐ Investigator | 20 ☐ Legal Analyst/Consultant |
|---|---|
| 02 ☐ Interpreter/Translator | 21 ☐ Jury Consultant |
| 03 ☐ Psychologist | 22 ☒ Mitigation Specialist |
| 04 ☐ Psychiatrist | 23 ☐ Duplication Services (See Instructions) |
| 05 ☐ Polygraph Examiner | 24 ☐ Other (specify) |
| 06 ☐ Documents Examiner | |
| 07 ☐ Fingerprint Analyst | |
| 08 ☐ Accountant | |
| 09 ☐ CALR (Westlaw/Lexis,etc) | |
| 10 ☐ Chemist/Toxicologist | |
| 11 ☐ Ballistics Expert | |
| 13 ☐ Weapons/Firearms/Explosive Expert | |
| 14 ☐ Pathologist/Medical Examiner | |
| 15 ☐ Other Medical Expert | |
| 16 ☐ Voice/Audio Analyst | |
| 17 ☐ Hair/Fiber Expert | |
| 18 ☐ Computer (Hardware/Software/Systems) | |
| 19 ☐ Paralegal Services | |

CLAIM FOR SERVICES AND EXPENSES

| 16. SERVICES AND EXPENSES (Attach itemization of services and expenses with dates) | AMOUNT CLAIMED | MATH/TECHNICAL ADJUSTED AMOUNT | ADDITIONAL REVIEW |
|---|---|---|---|
| a. Compensation | | | |
| b. Travel Expenses (lodging, parking, meals, mileage, etc.) | | | |
| c. Other Expenses | | | |

GRAND TOTALS (CLAIMED AND ADJUSTED)

**17. PAYEE'S NAME** (First Name, M.I., Last Name, including any suffix) and MAILING ADDRESS  *NEED TAX ID NUMBER*
Cessie Alfonso
32 Sycamore St.
Albany, NY 12208

TIN: _____ 518/489-2481
Telephone Number: _____

CLAIMANT'S CERTIFICATION FOR PERIOD OF SERVICE FROM _____ TO _____
CLAIM STATUS  ☐ Final   ☐ Interim Payment Number ____   ☐ Supplemental Payment
I hereby certify that the above claim is for services rendered and is correct, and that I have not sought or received payment (compensation or anything of value) from any other source for these services.

Signature of Claimant/Payee: _____    Date: _____

**18. CERTIFICATION OF ATTORNEY:** I hereby certify that the services were rendered for this case.

Signature of Attorney: _____    Date: _____

APPROVED FOR PAYMENT – COURT USE ONLY

| 19. TOTAL COMPENSATION | 20. TRAVEL EXPENSES | 21. OTHER EXPENSES | 22. TOT. AMT APPROVED/CERTIFIED |
|---|---|---|---|

**23.** ☐ Either the cost (excluding expenses) of these services does not exceed $300, or prior authorization was obtained.
☐ Prior authorization was not obtained, but in the interest of justice the court finds that timely procurement of these necessary services could not await prior authorization, even though the cost (excluding expenses) exceeds $300.

_____     _____          _____
Signature of Presiding Judicial Officer      Date              Judge/Mag. Judge Code

| 24. TOTAL COMPENSATION | 25. TRAVEL EXPENSES | 26. OTHER EXPENSES | 27. TOTAL AMOUNT APPROVED |
|---|---|---|---|

**28. PAYMENT APPROVED IN EXCESS OF THE STATUTORY THRESHOLD UNDER 18 U.S.C. 3006A(e)(3)**

_____     _____          _____
Signature of Chief Judge, Court of Appeals (or Delegate)    Date    Judge Code

Case 3:12-cv-00327-MOC Document 74-85 Filed 12/22/14 Page 24 of 60
Bates No. 385

**JA618**

| | |
|---|---|
| UNITED STATES OF AMERICA )<br><br>v. )<br><br>AQUILIA MARCIVICCI BARNETTE, )<br>Defendant )<br>_____ ) | Docket No. 3:97CR-23<br><br>*EX PARTE* ORDER AUTHORIZING<br>PRIVATE INVESTIGATOR<br><br>(UNDER SEAL) |

THIS MATTER is before the Court on defendant's *EX PARTE* Motion for
Authorization to hire a Private Investigator.

Based upon the information before the Court, the undersigned finds:

1. That the defendant is indigent.

2. That the defendant received three death sentences in this case in 1998.
The Fourth Circuit Court of Appeals has remanded his cases to this Court for
resentencing. New counsel have been appointed for the defendant.

3. That the defense has established to the satisfaction of this Court that the
defendant is entitled to the services of a Private Investigator to assist in this case.
Defense counsel have requested the authority to hire Jan Barefoot of Barefoot
Private Investigations as Private Investigator. That investigator's fee is $75 per
hour and counsel reasonably believe that an allocation of $10,000 for her fees and
expenses is appropriate.

5. The fees requested by the defense are reasonable and appropriate in
this case and the defendant's request for relief should be granted, pursuant to 18
U.S.C. 3006(a), 21 U.S.C. 848(q)(10)(B) and the Fifth, Sixth and Eighth
Amendments to the Constitution of the United States.

IT IS, THEREFORE, ORDERED that the defendant's *EX PARTE* Motion

for Authorization to Hire a Private Investigator is GRANTED. The defendant's counsel are authorized to retain the services of Jan Barefoot/Barefoot Private Investigations, at government expense, at the rate of $75 per hour with a cap of $10,000 pending any further order of the Court.

This the 9th day of August, 2001.

Richard L. Voorhees
United States District Court Judge

CJA 21 AUTHORIZATION AND VOUCHER FOR EXPERT AND OTHER SERVICES

| 1. CIR./DIST./DIV. CODE NCW | 2. PERSON REPRESENTED Barnette, Aquilia Marcivicci | | VOUCHER NUMBER | |
|---|---|---|---|---|
| 3. MAG. DKT./DEF. NUMBER | 4. DIST. DKT./DEF. NUMBER 3:97-000023-001 | 5. APPEALS DKT./DEF. NUMBER | | 6. OTHER DKT. NUMBER |
| 7. IN CASE/MATTER OF (Case Name) U.S. v. Barnette | 8. PAYMENT CATEGORY Felony | 9. TYPE PERSON REPRESENTED Adult Defendant | | 10. REPRESENTATION TYPE (See Instructions) Federal Capital Prosecution |

**11. OFFENSE(S) CHARGED** (Cite U.S. Code, Title & Section. If more than one offense, list (up to five) major offenses charged, according to severity of offense.
1) 18 844H.F -- EXPLOSIVES USED IN COMMISSION OF FELONY

**12. ATTORNEY'S STATEMENT**
As the attorney for the person represented who is named above, I hereby affirm that the services requested are necessary for adequate representation. I hereby request:

☐ Authorization to obtain the service. Estimated Compensation: $ 10,000    **OR**

☐ Approval of services already obtained to be paid for by the United States from the Defender Services Appropriation. (Note: Prior authorization should be obtained for services in excess of $300)

_____     Date _____
Signature of Attorney

☐ Panel Attorney   ☐ Retained Atty   ☐ Pro-Se   ☐ Legal Organization

Attorney's name (First name, Middle initial, Last name, including suffix) and mailing address.

Claire J. Rauscher
435 E. Morehead St.
Charlotte, NC 28202

Telephone Number:   704/331-0863

| 13. DESCRIPTION OF AND JUSTIFICATION FOR SERVICES (See instructions) | 14. TYPE OF SERVICE PROVIDER |
|---|---|
| To aid Mr Barnette's Defense. | 01 ☐ Investigator    20 ☐ Legal Analyst/Consultant<br>02 ☐ Interpreter/Translator    21 ☐ Jury Consultant<br>03 ☐ Psychologist    22 ☐ Mitigation Specialist<br>04 ☐ Psychiatrist    23 ☐ Duplication Services (See Instructions)<br>05 ☐ Polygraph Examiner    24 ☐ Other (specify)<br>06 ☐ Documents Examiner<br>07 ☐ Fingerprint Analyst<br>08 ☐ Accountant<br>09 ☐ CALR (Westlaw/Lexis,etc)<br>10 ☐ Chemist/Toxicologist<br>11 ☐ Ballistics Expert<br>12 ☐ Weapons/Firearms/Explosive Expert<br>13 ☐ Pathologist/Medical Examiner<br>14 ☐ Other Medical Expert<br>15 ☐ Voice/Audio Analyst<br>16 ☐ Hair/Fiber Expert<br>17 ☐ Computer (Hardware/Software/Systems)<br>18 ☐ Paralegal Services<br>19 ☐ |

**15. Court Order**
Financial eligibility of the person represented having been established to the court's satisfaction, the authorization requested in Item 12 is hereby granted.

_____
Signature of Presiding Judicial Officer or By Order of the Court

_____     _____
Date of Order      Nunc Pro Tunc Date

Repayment or partial repayment ordered from the person represented for this service at time of authorization.
☐ YES   ☐ NO

| 16. SERVICES AND EXPENSES (Attach itemization of services and expenses with dates) | AMOUNT CLAIMED | MATH/TECHNICAL ADJUSTED AMOUNT | ADDITIONAL REVIEW |
|---|---|---|---|
| a. Compensation | | | |
| b. Travel Expenses (lodging, parking, meals, mileage, etc.) | | | |
| c. Other Expenses | | | |

**17. PAYEE'S NAME** (First Name, M.I., Last Name, including any suffix) and MAILING ADDRESS

Jan Barefoot
Barefoot Private Investigations
227 W. Trade, Suite 2110
Charlotte, NC 28202

TIN: _____
Telephone Number:   704/377-1000

**CLAIMANT'S CERTIFICATION FOR PERIOD OF SERVICE FROM** _____ **TO** _____

**CLAIM STATUS**   ☐ Final    ☐ Interim Payment Number _____    ☐ Supplemental Payment

I hereby certify that the above claim is for services rendered and is correct, and that I have not sought or received payment (compensation or anything of value) from any other source for these services.

Signature of Claimant/Payee: _____    Date: _____

**18. CERTIFICATION OF ATTORNEY:** I hereby certify that the services were rendered for this case.

Signature of Attorney: _____    Date: _____

| 19. TOTAL COMPENSATION | 20. TRAVEL EXPENSES | 21. OTHER EXPENSES | 22. TOT. AMT APPROVED/CERTIFIED |
|---|---|---|---|
| | | | |

**23.** ☐ Either the cost (excluding expenses) of these services does not exceed $300, or prior authorization was obtained.

☐ Prior authorization was not obtained, but in the interest of justice the court finds that timely procurement of these necessary services could not await prior authorization, even though the cost (excluding expenses) exceeds $300.

_____    _____    _____
Signature of Presiding Judicial Officer    Date    Judge/Mag. Judge Code

| 24. TOTAL COMPENSATION | 25. TRAVEL EXPENSES | 26. OTHER EXPENSES | 27. TOTAL AMOUNT APPROVED |
|---|---|---|---|
| | | | |

**28. PAYMENT APPROVED IN EXCESS OF THE STATUTORY THRESHOLD UNDER 18 U.S.C. 3006A(e)(3)**

Signature of Chief Judge, Court of Appeals (or Delegate)    Date    Judge Code

Case 3:97-cr-00023-R Document 369-1 *SEALED* (Court only) Filed 10/10/01 Page 3 of 4

United States District Court
for the
Western District of North Carolina
November 28, 2001

\* \* MAILING CERTIFICATE OF CLERK \* \*

Re:   3:97-cr-00023

True and correct copies of the attached were mailed by the clerk to the
following:

Jean B. Lawson, Esq.
P. O. Box 472106
Charlotte, NC   28226

Claire J. Rauscher, Esq.
435 E. Morehead St.
Charlotte, NC   28202

cc:
Judge                          ( )
Magistrate Judge               ( )
U.S. Marshal                   ( )
Probation                      ( )
U.S. Attorney                  ( )
Atty. for Deft.                ( )
Defendant                      ( )
Warden                         ( )
Bureau of Prisons              ( )
Court Reporter                 ( )
Courtroom Deputy               ( )
Orig-Security                  ( )
Bankruptcy Clerk's Ofc.        ( )
Other_____         ( )

Date: 11/28/01

Frank G. Johns, Clerk

By: _____
       Deputy Clerk

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | **Docket No. 3:97CR-23** |
| v. | ) | |
| | ) | |
| AQUILIA MARCIVICCI BARNETTE, | ) | |
| Defendant | ) | |
| | ) | |

### *EX PARTE* MOTION FOR FUNDS FOR CONSULTATION WITH EXPERTS WHO HAVE HAD CONTACT WITH THE DEFENDANT

**NOW COMES** defendant Aquilia Marcivicci Barnette (hereinafter, Marc Barnette) and respectfully requests that this Honorable Court authorize the defense to confer with experts who have had contact with the defendant in the past, at the expense of the government. This request is made pursuant to 18 U.S.C. 3006A and 21 U.S.C. 848(q)(10)(B) as well as the Fifth, Sixth and Eighth Amendments to the Constitution of the United States. In support of this Motion, the undersigned show unto the Court the following:

1. The defendant's *Ex Parte* Statement of Defense Contentions is incorporated herein by reference to set forth the facts and circumstances that support this request.

2. The government has served the defense with a Notice Reaffirming Its Intention to Seek the Death Penalty against the defendant.

3. The Court has determined that the defendant is indigent.

4. Numerous professionals have had contact with the defendant and investigated his background. Some have performed tests on the defendant that may be relevant to the defense at his re-sentencing hearing. Defense counsel must confer with these individuals to determine what information they have about the defendant and to determine whether it would be appropriate to retain them for the defendant's re-sentencing presentation. These professionals should be paid for reviewing their records and conferring with defense counsel. In addition, they should be reimbursed for the costs of travel and for copying records, reports and underlying raw data, if applicable, for the defense.

5. Defense counsel propose to meet with the following individuals:

> Dr. Seymour Halleck
> 500 Laurel Hill Road
> Chapel Hill, NC 27514

*Dr. Halleck is a forensic psychiatrist who evaluated the defendant and testified at the defendant's first trial. Dr. Halleck charges $300 per hour. Counsel believe that they can obtain Dr. Halleck's services for the purpose of this record review and consultation for not more than $6,000, including travel and copying of records.*

Dr. Faye Sultan and Ruth Kappius
University Psychological Associates
8320 University Executive Park, Suite 104
Charlotte, NC 28262

*Dr. Sultan is a psychologist who evaluated the defendant and testified at the defendant's first trial. Ruth Kappius is, on information and belief, an employee of University Psychological Associates who performed psychological tests on the defendant at the direction of Dr. Sultan. Dr. Sultan charges $150 per hour. Counsel believe that they can obtain the services of Dr. Sultan and Ms. Kappius for the purpose of record review and consultation for not more than $2,000, including travel and copying of records.*

 Cindy N. Maxwell
HomeView
426 Breezewood Drive
Belmont, NC 28012

*Ms. Maxwell served as Mitigation Specialist at the time of the defendant's first trial. She interviewed numerous people who were potential mitigation witnesses and obtained substantial records concerning the defendant. Ms. Maxwell has agreed to participate in interviews with defense counsel and the defense mitigation investigator to clarify her reports and identify aspects of her investigation that may assist in developing the defense mitigation investigation and presentation. She has two bankers boxes of material produced during her investigation, so the costs of copying her records will be significant. Ms. Maxwell charges $65.00 per hour and defense counsel believe they can retain her services for the purpose of record review and consultation for not more than $5,000.00 including travel and costs copying of records.*

William M. Tyson, Ph.D.
Blue Ridge Behavior Systems
10025 Katelyn Drive
Charlotte, NC 28269-8105

*Dr. Tyson is a psychologist who evaluated the defendant in connection with a state criminal prosecution of the defendant. At the defendant's first sentencing hearing, the government presented evidence of that case and argued that case as an aggravating circumstance. Dr. Tyson charges $120 per hour and counsel believe they can retain his services for the purpose of record review and consultation for not more than $1,000.00, including travel and copying of records.*

John F. Warren & Associates
840 W. Fourth Street
Winston-Salem, NC 27101

*Dr. Warren is a forensic psychologist who evaluated the defendant at the request of his Public Defender when the defendant was first charged in these cases in state court. Dr. Warren charges $150 per hour and counsel believe they can retain his services for the purpose of record review and consultation for not more than $2,000.00, including travel and copying of records.*

Dr. Mark Cunningham
500 Chestnut, Suite 1735
Abilene, TX 79602

*Dr. Cunningham is a psychologist who evaluated the defendant and testified at his first sentencing hearing. Dr. Cunningham charges $210 per hour and counsel believe they can retain his services for the purpose of record review and consultation for not more than $8,000, including travel and copying of records.*

**WHEREFORE**, the undersigned counsel for the defendant respectfully request that this Court authorize them to retain the services of the individuals listed above and at the amounts requested, without further authorization from the Court.

Respectfully submitted on this the 15th day of November, 2001.

Claire J. Rauscher
435 E. Morehead Street
Charlotte, NC 28202-2609
(704) 331-0863

Jean B. Lawson
PO Box 472106
Charlotte, NC 28247-2106
(704) 341-1865

**ATTORNEYS FOR
AQUILIA MARCIVICCI BARNETTE**

UNITED STATES OF AMERICA )
)
vs. )  3:97CR23-V
)  **Under Seal**
AQUILIA MARCIVICCI BARNETTE )
)

## SUPPLEMENTAL MOTION TO RECONSIDER ORDER
## AND MOTION TO SEAL

Claire J. Rauscher and Jean B. Lawson, attorneys for defendant Aquilia Marcivicci Barnette,
respectfully request this Court reconsider its Order signed November 2, 2001 (and filed November
6, 2001) and request the court set a scheduling conference. Counsel seek to supplement its motion
with information that was already the subject of ex parte motions and orders. As grounds, it is
averred:

1. Paragraphs 1-15 of defendant's Motion to Reconsider Order and Request for Scheduling
Conference filed November 14, 2001 are incorporated herein.

2. Upon receiving the Government's Notice of Reaffirmation of Intention to Seek the Death
Penalty, defense counsel began working diligently on contacting experts and obtaining other
information. On August 28, 2001, counsel filed Sealed Motions requesting the appointment of a
mitigation specialist and an investigator. In early October, after not hearing any response from the
Court, defense counsel Rauscher contacted clerk Ashlyn Dannelly about these motions. Apparently,
the motions had been misplaced. Ms. Dannelly contacted counsel several days later. The orders
were not signed until October 10, 2001. However, counsel did not receive the orders nor the CJA
Authorization forms until the end of October (Authorization for Mitigation Specialist signed by the

Case 3:12-cv-00327-MOC   Document 74-83   Filed 12/22/14   Page 32 of 60
Bates No. 893

**JA626**

Court October 25, 2001, Authorization for Investigator signed October 19, 2001.) The near two month delay in receiving these authorization has slowed counsel's ability to prepare this matter for a date in early 2002.

3. The delay in obtaining these necessary experts are additional grounds warranting a continuance of the March 2002 date.

**WHEREFORE**, counsel on behalf of Marc Barnette, respectfully request this court reconsider setting the sentencing hearing from March 12, 2002 and set a scheduling conference forthwith.

Respectfully submitted,

Claire J. Rauscher

Jean B. Lawson
Attorneys for Aquilia Marcivicci Barnette

# IN THE DISTRICT COURT OF THE UNITED STATES
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA
### CHARLOTTE DIVISION
### CRIMINAL DOCKET NO.3:97cr23-V

UNITED STATES OF AMERICA )
                        )
        vs.              )
                        )
                        )
AQUILIA MARCIVICCI BARNETTE )
                        )

<u>O R D E R</u>

**THIS MATTER** is before the Court on Defendant's Motion to Reconsider Order and Request for Scheduling Conference, and Supplemental Motion with Motion to Seal, both filed November 15, 2001. Being advised in the premises, and mindful that the original setting of the date for hearing of the resentencing was by consent of the parties, the Court **ORDERS** as follows:

1. The motion to reconsider is denied, and the resentencing will not be continued. The case is scheduled to begin on March 12, 2002.

2. This case bears the highest priority among the cases before the Court, and the Clerk is directed to set this matter for a scheduling conference and motions hearing at the earliest possible time, so that any open motions and scheduling issues will be heard and decided.

3. The Supplemental Motion will be sealed by the Clerk pending further order of the Court.

**THIS** the 19th day of November, 2001.

_____
**RICHARD L. VOORHEES**
**UNITED STATES DISTRICT COURT JUDGE**

Case 3:97-cr-00023-RLV   Document 376-1 *SEALED* (Court only)   Filed 11/20/01   Page 1 of 2

Case 3:12-cv-00327-MOC   Document 74-8   Filed 12/22/14   Page 34 of 60

Bates No. 395

**JA628**

United States District Court
for the
Western District of North Carolina
November 20, 2001

* * MAILING CERTIFICATE OF CLERK * *

Re:    3:97-cr-00023

True and correct copies of the attached were mailed by the clerk to the following:

      Gretchen C. F. Shappert, Esq.
      United States Attorney
      Suite 1700
      Carillon Bldg.
      227 W. Trade St.
      Charlotte, NC  28202

      Anne M. Tompkins, Esq.
      U.S. Attorney's Office
      227 W. Trade St.
      Carillon Bldg., Suite 1700
      Charlotte, NC  28202

cc:
Judge                        ( )
Magistrate Judge             ( )
U.S. Marshal                 ( )
Probation                    ( )
U.S. Attorney                ( )
Atty. for Deft.              ( )
Defendant                    ( )
Warden                       ( )
Bureau of Prisons            ( )
Court Reporter               ( )
Courtroom Deputy             ( )
Orig-Security                ( )
Bankruptcy Clerk's Ofc.      ( )
Other_____         ( )

Frank G. Johns, Clerk

      Date:_____      By: _____
                                          Deputy Clerk

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | Docket No. 3:97CR-23 |
| v. | ) | |
| | ) | |
| AQUILIA MARCIVICCI BARNETTE, | ) | |
| Defendant | ) | |
| | ) | |

### *EX PARTE* MOTION FOR FUNDS FOR AN EXPERT IN "FUTURE DANGEROUSNESS"

**NOW COMES** defendant Aquilia Marcivicci Barnette (hereinafter, Marc Barnette) and respectfully requests that this Honorable Court authorize the defense to retain the services of an expert in "future dangerousness" to assist in this case, at the expense of the government. This request is made pursuant to 18 U.S.C. 3006A and 21 U.S.C. 848(q)(10)(B) as well as the Fifth, Sixth and Eighth Amendments to the Constitution of the United States. In support of this Motion, the undersigned show unto the Court the following:

1. The defendant's *Ex Parte* Statement of Defense Contentions is incorporated herein by reference to set forth the facts and circumstances that support this request.

2. The government has served the defense with a Notice Reaffirming Its Intention to Seek the Death Penalty against the defendant.

3. The Court has determined that the defendant is indigent.

4. At the defendant's first sentencing hearing, the defense called witnesses who had contact with the defendant in several jail and prison facilities who testified that the defendant

Case 3:12-cv-00327-MOC   Document 74-87   Filed 12/22/14   Page 36 of 60
Bates No. 597

**JA630**

was generally well-behaved, with the implication that the defendant would be a "model prisoner" or would not present a danger to others in a prison population. This is appealing evidence in that it allows the jury to consider life imprisonment for a man who has committed a murder beyond the scope of a domestic relationship. A similar presentation is appealing to this defense because the defendant was, in fact, a model prisoner on death row at FCI Terra Haute. According to the defense information, the defendant had no infractions on death row and was a trustee on the unit, which is a distinction reserved for non-violent, cooperative inmates.

5. In addition to lay witnesses who observed the defendant's behavior while awaiting trial on these charges, prior defense counsel were granted the services of an expert in "future dangerousness" who testified generally that people convicted of homicide posed less of a danger of homicidal conduct while incarcerated than the general prison population. This buttressed the defense contention that the jury could give the defendant a life sentence without worrying about what he might do to others while imprisoned for these extremely violent crimes. That expert was Dr. Mark Cunningham.

6. In rebuttal, the government called Dr. Scott Duncan, a psychologist who testified that the defendant was a psychopath, likely to engage in future dangerous conduct while incarcerated. The thrust of this testimony, and the government's argument to the jury, was that the defendant should be executed in order to protect those who would be around him if he was sentenced to life imprisonment.

7. The testimony and arguments in favor of, and in opposition to, allowing sur-rebuttal testimony for the defense demonstrate that the psychologists and counsel for both sides had developed an encyclopedic knowledge of various aspects of psychopathy, which

Bates No. 398

**JA631**

is a hotly contested "discipline".

8. At the defendant's first sentencing proceeding, the jury found that the government had proven beyond a reasonable doubt that "the defendant is likely to commit criminal acts of violence in the future which would be a continuing and serious threat to society". (See Issues and Recommendations of the Jury, dated February 10, 1998). Moreover, as to "future dangerousness" issues tendered to the jury in various formulations, only 6 jurors found that the defendant would "do well in the structured environment that prison will offer", and only 3 jurors found that if the defendant "is sentenced to life without the possibility of parole he will not be a future danger". It is clear that, in the face of unchallenged evidence that the defendant had been a model inmate while awaiting trial, the issue of future dangerousness was resolved against him on the basis of expert testimony presented by the government. This defense requires the means to address that pivotal issue.

9. Counsel reasonably believe that the defendant's "future dangerousness" will be a significant issue at this resentencing and require the assistance of an expert in this hotly contested field. Counsel have not met in person with Dr. Cunningham, but have talked to him about the case. Counsel have been informed that there were some incidents during Dr. Cunningham's last appearance in this court that might allow the government to conduct cross-examination of Dr. Cunningham that would be prejudicial to the defense presentation. Counsel believe that their duty of effective representation of the defendant requires that they consider whether Dr. Cunningham, or another expert, will be most appropriate to assist the defense.

10. Therefore, defense counsel request that the court allow them to retain the services of an expert who is qualified to testify generally addressing the "adaptation to prison" and

"future dangerousness" issues, as well as the appropriateness of a sentence of Life Imprisonment for an inmate who is able to refrain from violence under the most difficult stresses and prison environments. For the purpose of this application, counsel refer to such a witness as a "future dangerousness expert."

11. Dr. Cunningham charges $210 per hour for his services and counsel reasonably believe that he (or any other qualified expert) will require up to a maximum of 30 hours to review data (including thousands of pages of records), consult with counsel, interview the defendant, and prepare counsel for the erudite arguments to the court and with government witnesses about psychopathy that dominated the last sentencing hearing.

Accordingly, counsel request that this Honorable Court authorize the defense to retain the services of either Dr. Cunningham or another expert in future dangerousness, at a rate not to exceed $210 per hour for up to 30 hours work, at the expense of the government.

Respectfully submitted on this the ___ day of November, 2001.

Claire J. Rauscher
435 E. Morehead Street
Charlotte, NC 28202-2609
(704) 331-0863

Jean B. Lawson
PO Box 472106
Charlotte, NC 28247-2106
(704) 341-1865

ATTORNEYS FOR
AQUILIA MARCIVICCI BARNETTE

Case 3:97-cr-00023-RLV   Document 378-1 *SEALED* (Court only)   Filed 11/28/01   Page 4 of 4

Case 3:12-cv-00327-MOC   Document 74-8   Filed 12/22/14   Page 39 of 60
Bates No. 400

**JA633**

UNITED STATES OF AMERICA )
                                )
          v.                )      Docket No.  3:97CR-23
                                )
AQUILIA MARCIVICCI BARNETTE, )
Defendant               )
_____ )

## *EX PARTE* MOTION FOR APPOINTMENT OF, AND FUNDS FOR, AN EXPERT IN DOMESTIC VIOLENCE

**NOW COMES** defendant Aquilia Marcivicci Barnette (hereinafter, Marc Barnette) and respectfully requests that this Honorable Court authorize the defense to retain the services of an expert in domestic violence to assist in preparing for the defendant's resentencing, pursuant to 18 U.S.C. 3006A and 21 U.S.C. 848(q)(10)(B) as well as the Fifth, Sixth and Eighth Amendments to the Constitution of the United States.   In support of this Motion, the undersigned show unto the court the following:

1. The defendant's *Ex Parte* Statement of Defense Contentions is incorporated herein by reference to set forth the facts and circumstances that support this request.

2. The government has served the defense with a Notice Reaffirming its Intention to Seek the Death Penalty against the defendant.

3. The Court has determined that the defendant is indigent.

4. A pivotal defense theme at this re-sentencing hearing is the impact of multi-generational domestic abuse on the defendant and the extent to which it explains (and mitigates) his behavior.

5. The issues concerning the impact of domestic violence on conduct of those who raise children who then commit horrendous and inexplicable crimes is a discrete and very complicated discipline, and the defense proposes to hinge its presentation on the expert testimony of a qualified expert in the field.

6. Counsel request permission of the court to retain the services of Ann Burgess, RN, D.N.Sc. She is well-qualified to assist the defense in this case, having served as a member of the 1984 US Attorney General's Task force on Family Violence, and having written several books on domestic violence that examine the dynamics and culture of male violence. She has been qualified as an expert in this field in the Superior Court of Mecklenburg County, North Carolina, which is within the geographical area covered by this judicial district.

7. Defense counsel contend that it is absolutely essential, and mitigating, to explain the criminal conduct of the defendant in light of how his relationship with women was formed. These crimes, the defense contends, are a direct product of the impact of domestic violence and murders of women in the defendant's family upon the defendant. It is critical to the defense to make the jury understand the way the defendant was raised and the way his psyche was formed and acted out in the conduct for which he will be sentenced.

8. Dr. Burgess charges $200 per hour for her services. Defense counsel anticipate that she will need to make several trips to Charlotte to interview the defendant and his relatives, review several thousand pages of discovery and trial transcripts and review numerous psychological and psychiatric evaluations of the defendant. In addition, she must review records and trial transcripts in another case in which the defendant was charged with multiple acts of aggravated domestic violence against a female partner. The government

presented testimony of this former partner and the defendant's conduct toward her at the defendant's first sentencing hearing.

9. In view of the significant amount of work to be done, counsel and Dr. Burgess anticipate she will spend between 30 and 50 hours on the case.

Accordingly, counsel respectfully request that the Court authorize them to retain the services of Dr. Ann Burgess to assist in this case, at an hourly rate of $200, with a cap not to exceed that rate for 50 hours of work.

Respectfully submitted on this the 28th day of November, 2001.

Claire J. Rauscher
435 E. Morehead Street
Charlotte, NC 28202-2609
(704) 331-0863

Jean B. Lawson
PO Box 472106
Charlotte, NC 28247-2106
(704) 341-1865

ATTORNEYS FOR
AQUILIA MARCIVICCI BARNETTE

# UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA
### CHARLOTTE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA )<br><br>v. )<br><br>AQUILIA MARCIVICCI BARNETTE, )<br>Defendant ) | Docket No. 3:97CR-23 |

## *EX PARTE* MOTION FOR FUNDS FOR PSYCHIATRIST

**NOW COMES** defendant Aquilia Marcivicci Barnette (hereinafter, Marc Barnette) and respectfully requests that this Honorable Court authorize the defense to retain the services of Dr. Seymour Halleck, at the expense of the government, for the purpose of conducting a psychiatric evaluation of the defendant to be a component part of the defendant's resentencing presentation. This request is made pursuant to 18 U.S.C. 3006A and 21 U.S.C. 848(q)(10)(B) as well as the Fifth, Sixth and Eighth Amendments to the Constitution of the United States. In support of this Motion, the undersigned show unto the Court the following:

1. The defendant's *Ex Parte* Statement of Defense Contentions is incorporated herein by reference to set forth the facts and circumstances that support this request.

2. The government has served the defense with a Notice Reaffirming Its Intention to Seek the Death Penalty against the defendant.

3. The Court has determined that the defendant is indigent.

4. In preparation for the defendant's first trial and sentencing proceeding, the Honorable Judge Robert D. Potter authorized the defense to retain the services of psychiatrist

Case 3:97-cr-00023-RLV   Document 380-1 *SEALED* (Court only)   Filed 11/28/01   Page 1 of 3

Case 3:12-cv-00327-MOC   Document 74-84   Filed 12/22/14   Page 43 of 60

**JA637**

Dr. Seymour Halleck. Dr. Halleck conducted a psychiatric evaluation of the defendant. He testified for the defense and was subjected to cross-examination by the government at the defendant's first sentencing hearing.

5. According to Dr. Halleck, and other experts, the defendant has a diagnosable mental illness. Our theory of mitigation is that the defendant's mental illness is exacerbated by a significant, multi-generational family pattern of abuse of domestic partners.

6. Counsel believe that the defendant's psychiatric profile may have changed in the years since he was first sentenced to death. First, some of the dysfunctional psychological stimuli are no longer present in his environment. Also, the defendant has spent years since the occurrence of these crimes for which he faces sentencing, psychoanalyzing himself, with mixed results. In short, he has changed as a result of his experiences over the past several years. Counsel require the services of a psychiatrist who has had contact with the defendant in the past, both to explain the psychiatric issues to the jury, and also to conduct additional evaluation of the defendant.

5. Dr. Halleck charges $300 per hour. Dr. Halleck will have to review several thousand pages of documents, the 15-volume transcript of the defendant's first trial and sentencing hearing, documents relating to the defendant's prior incidents of domestic violence, and documents relating to significant domestic violence in the defendant's family that affect his mental status. Although Dr. Halleck reviewed some of these documents in the course of his last evaluation, in order to assure his mastery of the material that will be relevant to his evaluation and testimony, it is imperative that he take the appropriate amount of time to accomplish his work. Counsel reasonably believe that Dr. Halleck can do the work necessary in this matter in 30 to 50 hours.

Case 3:12-cv-00327-MOC   Document 74-85   Filed 12/22/14   Page 44 of 60
Bates No. 465

**JA638**

Accordingly, counsel respectfully request that the Court authorize them to retain the services of Dr. Seymour Halleck as an expert in psychiatry, at government expense. Counsel further request that the court cap the costs for Dr. Halleck's services to his hourly rate for not more than 50 hours of work without additional authorization of the court.

Respectfully submitted on this the 28th day of November, 2001.

Claire J. Rauscher
435 E. Morehead Street
Charlotte, NC 28202-2609
(704) 331-0863

Jean B. Lawson
PO Box 472106
Charlotte, NC 28247-2106
(704) 341-1865

ATTORNEYS FOR
AQUILIA MARCIVICCI BARNETTE

# UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA
### CHARLOTTE DIVISION

UNITED STATES OF AMERICA )
)
v. ) Docket No. 3:97CR-23
)
)
AQUILIA MARCIVICCI BARNETTE, )
Defendant )
_____ )

## *EX PARTE* MOTION FOR AUTHORIZATION TO RETAIN A PSYCHOLOGIST

**NOW COMES** defendant Aquilia Marcivicci Barnette (hereinafter, Marc Barnette) and respectfully requests that this Honorable Court authorize the defense to retain the services of a psychologist to assist in this defense and to confer with experts who have had contact with the defendant in the past, at the expense of the government. This request is made pursuant to 18 U.S.C. 3006A and 21 U.S.C. 848(q)(10)(B) as well as the Fifth, Sixth and Eighth Amendments to the Constitution of the United States. In support of this Motion, the undersigned show unto the Court the following:

1. The defendant's *Ex Parte* Statement of Defense Contentions is incorporated herein by reference to set forth the facts and circumstances that support this request.

2. The government has served the defense with a Notice Reaffirming Its Intention to Seek the Death Penalty against the defendant.

3. The Court has determined that the defendant is indigent.

4. In the defendant's first sentencing, the jury heard testimony from psychologist Faye Sultan who had conducted an evaluation of the defendant, at government expense.

5. After thoroughly assessing the government's cross-examination of Dr. Sultan as

Case 3:97-cr-00023-RLV   Document 381-1 *SEALED* (Court only)   Filed 11/28/01   Page 1 of 4

Case 3:12-cv-00327-MOC   Document 74-87   Filed 12/22/14   Page 46 of 60

Bates No. 467

**JA640**

shown in the Record, the undersigned counsel conclude that it would be impossible to call Dr. Sultan again as a witness. The government questioned her derisively and extensively about:

A. Her research and publications on "female sexual arousal" (T. pp. 650-652);

B. Her passionate and public anti-death penalty views (T. p. 663);

C. The fact that she had engaged in an interview on WBT radio, given while the trial was pending, during which she expressed anti-death penalty views (T. pp. 666-667);

D. Whether she thought it was ethical for a psychologist to purport to give objective expert testimony while not disclosing her "publicly and passionately one-sided" personal beliefs against the death penalty to the jury (T. p. 673);

E. That she has had four grievances filed against her at the North Carolina Board of Psychologists, including one for testifying to a diagnosis that did not exist. (T. pp. 681, 678-9);

F. That the North Carolina Board of Psychologists had given her an ethical reprimand for "exploitation of a client" (T. pp. 681, 677) and;

G. That she gave an interview to National Public Radio that was broadcast in Charlotte on the day she testified in this proceeding, stating, "[I]f I am doing my job when I am testifying in front of a jury, by the time I'm finished, the jury is crying." (T. p. 686).

6. The issues raised by the government during cross-examination of Dr. Sultan were emphasized to the jury during the prosecutor's closing arguments. (T. p. 1107).

7. For defense counsel to use Dr. Sultan in this re-sentencing would be ineffective assistance of counsel, *per se*. Prior counsel have informed the undersigned that, had they

Case 3:97-cr-00023-RLV   Document 381-1 *SEALED* (Court only)   Filed 11/28/01   Page 2 of 4

Case 3:12-cv-00327-MOC   Document 74-8   Filed 12/22/14   Page 47 of 60
Bates No. 468

**JA641**

been aware of the potential for damning cross-examination of Dr. Sultan, they would not have retained her in the first place.

8. A successful psychological evaluation necessarily requires that the person being examined have a modicum of trust in the examiner's motives and capability. In addition to the cross-examination information about Dr. Sultan described above, Mr. Barnette heard her testify to the jury, during cross-examination, that she writes fiction about death penalty cases and serial killers and that she uses as her characters composites of people with whom she has been involved. (T. p. 660). No valid or honest evaluation will be produced if the person undergoing evaluation is concerned that the examiner considers him to be "fiction fodder".

9. A new psychological evaluation by a different psychologist is warranted, both because of the absolute unsuitability of Dr. Sultan to testify, and because of new information being developed that might lead to different, mitigating conclusions.

10. Counsel have not determined who will best serve as defense psychologist and are waiting to confer with other mental health experts who have had contact with the defendant in the past, as well as the new experts whom the defense expects to call. However, counsel reasonably anticipate that the services of a qualified psychologist can be obtained at a cap of $8,000.

Accordingly, counsel respectfully request that this Court authorize them to select a psychologist, whose name will be tendered to the Court under seal at a time in the near future, and whose fees will be paid, with a cap of $8,000 without further order of the Court.

Respectfully submitted on this the _28th_ day of November, 2001.

Case 3:12-cv-00327-MOC   Document 74-8   Filed 12/22/14   Page 48 of 60
Bates No. 469

**JA642**

Claire J. Rauscher
435 E. Morehead Street
Charlotte, NC 28202-2609
(704) 331-0863

Jean B. Lawson
PO Box 472106
Charlotte, NC 28247-2106
(704) 341-1865

ATTORNEYS FOR
AQUILIA MARCIVICCI BARNETTE

RECEIVED
CHARLOTTE, N.C.

NOV 1 2001

Clerk, U. S. Dist. Court
W. Dist of N. C.

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION

UNITED STATES OF AMERICA )
)
v. )    Docket No. 3:97CR-23
)
AQUILIA MARCIVICCI BARNETTE, )    (UNDER SEAL)
Defendant )
_____ )

### *EX PARTE* ORDER AUTHORIZING FUNDS FOR CONSULTATION WITH EXPERTS WHO HAVE HAD CONTACT WITH THE DEFENDANT

THIS MATTER is before the Court on defendant's *EX PARTE* Motion for

Funds for Consultation with Experts Who Have Had Contact with the Defendant.

Based upon the information before the Court, the undersigned finds:

1. That the defendant is indigent.

2. That the defendant received three death sentences in this case in 1998.

The Fourth Circuit Court of Appeals has remanded his cases to this Court for re-

sentencing. New counsel have been appointed for the defendant.

3. That the defendant has established to the satisfaction of this Court that

defense counsel must confer with several experts and professionals who have had

contact with, or evaluated, the defendant in the past. These consultations will center

on obtaining records, reviewing them with these professionals and experts and

determining whether these individuals would be appropriate for services to the

defense in this current sentencing proceeding.

4. These professionals, and the fee rates and caps proposed by the defense, are:

A. Dr. Seymour Halleck, at the rate of $300 per hour, plus travel and copying costs, with a cap of $6,000;

B. Dr. Faye Sultan and Ruth Kappius of University Psychological Associates, at a rate of $150 per hour, plus travel and copying costs, with a cap of $2,000;

C. Cindy N. Maxwell, at a rate of $65 per hour, plus travel and copying costs, with a cap of $5,000;

D. William M. Tyson, Ph.D., at a rate of $120 per hour, plus travel and copying costs, with a cap of $1,000;

E. John F. Warren, Ph.D., at a rate of $150 per hour, plus travel and copying costs, with a cap of $2,000; and

F. Dr. Mark Cunningham, at a rate of $210 per hour, plus travel and copying costs, with a cap of $8,000.

5. The fees requested by the defense are reasonable and appropriate in this case and the defendant's request for relief should be granted, pursuant to 18 U.S.C. 3006(a), 21 U.S.C. 848(q)(10)(B) and the Fifth, Sixth and Eighth Amendments to the Constitution of the United States.

IT IS, THEREFORE, ORDERED that the defendant's *EX PARTE* Motion for Funds for Consultation with Experts Who Have Had Contact with the Defendant is GRANTED. The defendant's counsel are authorized to retain the services of the experts listed in paragraphs 4A-4F above, at the rates and with the caps listed in those paragraphs.

This the 15th day of November, 2001.

Richard L. Voorhees
United States District Court Judge

United States District Court
for the
Western District of North Carolina
December 12, 2001

\* \* MAILING CERTIFICATE OF CLERK \* \*

Re:  3:97-cr-00023

True and correct copies of the attached were mailed by the clerk to the following:

      Jean B. Lawson, Esq.
      P. O. Box 472106
      Charlotte, NC  28226

cc:
Judge                        ( )
Magistrate Judge             ( )
U.S. Marshal                 ( )
Probation                    ( )
U.S. Attorney                ( )
Atty. for Deft.              ( )
Defendant                    ( )
Warden                       ( )
Bureau of Prisons            ( )
Court Reporter               ( )
Courtroom Deputy             ( )
Orig-Security                ( )
Bankruptcy Clerk's Ofc.      ( )
Other_____    ( )

                                 Frank G. Johns, Clerk

      Date:_____        By: _____
                                Deputy Clerk

| 1. CIR./DIST./DIV. CODE<br>NCW | 2. PERSON REPRESENTED<br>Barnette, Aquilia Marcivicci | | VOUCHER NUMBER |
|---|---|---|---|
| 3. MAG. DKT./DEF. NUMBER | 4. DIST. DKT./DEF. NUMBER<br>3:97-000023-001 | 5. APPEALS DKT./DEF. NUMBER | 6. OTHER DKT. NUMBER |
| 7. IN CASE/MATTER OF (Case Name)<br>U.S. v. Barnette | 8. TYPE PERSON REPRESENTED<br>Adult Defendant | | 9. REPRESENTATION TYPE<br>Federal Capital Prosecution |

10. OFFENSE(S) CHARGED (Cite U.S. Code, Title & Section).... If more than one offense, list (up to five) major offenses charged, according to severity of offense. ...... ...
1) 18 844H.F -- EXPLOSIVES USED IN COMMISSION OF FELONY

### REQUEST AND AUTHORIZATION FOR EXPERT SERVICES

**11. ATTORNEY'S STATEMENT**
As the attorney for the person represented, who is named above, I hereby affirm that the services requested are necessary for adequate representation. I hereby request:
☐ Authorization to obtain the service. Estimated Compensation and Expenses: $ 6,000 _____ OR
☐ Approval of services already obtained to be paid for by the United States from the Defender Services Appropriation. (See instructions)

_____        _____
Signature of Attorney                              Date
☐ Panel Attorney ☐ Retained Atty ☐ Pro-Se ☐ Legal Organization
Attorney's name (First Name, M.I., Last Name, including suffix), and mailing address.
Jean B. Lawson
P.O. Box 472106
Charlotte, NC 28226                          Telephone Number: _____

| 12. DESCRIPTION OF AND JUSTIFICATION FOR SERVICES (See instructions) | 13. TYPE OF SERVICE PROVIDER |
|---|---|
| To aid in defendant's case. | 01 ☐ Investigator   20 ☐ Legal Analyst/Consultant<br>02 ☐ Interpreter/Translator   21 ☐ Jury Consultant<br>03 ☐ Psychologist   22 ☐ Mitigation Specialist<br>04 ☒ Psychiatrist   23 ☐ Duplication Services (See Instructions)<br>05 ☐ Polygraph Examiner   24 ☐ Other (specify)<br>06 ☐ Documents Examiner<br>07 ☐ Fingerprint Analyst<br>08 ☐ Accountant<br>09 ☐ CALR (Westlaw/Lexis,etc)<br>10 ☐ Chemist/Toxicologist<br>11 ☐ Ballistics Expert<br>13 ☐ Weapons/Firearms/Explosive Expert<br>14 ☐ Pathologist/Medical Examiner<br>15 ☐ Other Medical Expert<br>16 ☐ Voice/Audio Analyst<br>17 ☐ Hair/Fiber Expert<br>18 ☐ Computer (Hardware/Software/Systems)<br>19 ☐ Paralegal Services |

**14. Court Order**
Financial eligibility of the person represented having been established to the court's satisfaction, the authorization requested in Item 11 is hereby granted.

_____
Signature of Presiding Judicial Officer or By Order of the Court

_____            _____
Date of Order                    Nunc Pro Tunc Date
Repayment or partial repayment ordered from the person represented for this service at time of authorization.
☐ YES ☐ NO

**15. STAGE OF PROCEEDING**
Check the box which corresponds to the stage of the proceeding during which the work claimed at Item 16 was performed even if the work is intended to be used in connection with a later stage of the proceeding. CHECK NO MORE THAN ONE BOX. Submit a separate voucher for each stage of the proceeding.

| CAPITAL PROSECUTION | HABEAS CORPUS | OTHER PROCEEDING |
|---|---|---|
| a. ☐ Pre-Trial | e. ☐ Appeal    g. ☐ Habeas Petition   k. ☐ Petition for the U.S. | l. ☐ Stay of Execution |
| b. ☐ Trial | f. ☐ Petition for the U.S.   h. ☐ Evidentiary Hearing   Supreme Court | m. ☐ Appeal of Denial of Stay |
| c. ☐ Sentencing | Supreme Court   i. ☐ Dispositive Motions   Writ of Certiorari | n. ☐ Petition for Writ of Certiorari to the U.S. |
| d. ☐ Other Post Trial | Writ of Certiorari   j. ☐ Appeal | Supreme Court Regarding Denial of Stay |
| | | o. ☐ Other |

### CLAIM FOR SERVICES AND EXPENSES     FOR COURT USE ONLY

| 16. SERVICES AND EXPENSES<br>(Attach itemization of services and expenses with dates) | AMOUNT CLAIMED | MATH/TECHNICAL<br>ADJUSTED AMOUNT | ADDITIONAL<br>REVIEW |
|---|---|---|---|
| a. Compensation | | | |
| b. Travel Expenses (lodging, parking, meals, mileage, etc.) | | | |
| c. Other Expenses | | | |

### GRAND TOTALS (CLAIMED AND ADJUSTED)

**17. PAYEE'S NAME (First Name, M.I., Last Name, including any suffix) AND MAILING ADDRESS**
Dr. Seymour Halleck
500 Laurel Hill Road
Chapel Hill, NC 27514          TIN ████████0          Telephone Number: _____

CLAIMANT'S CERTIFICATION FOR PERIOD OF SERVICE FROM _____ TO _____
CLAIM STATUS   ☐ Final     ☐ Interim Payment Number _____    ☐ Supplemental Payment
I hereby certify that the above claim is for services rendered and is correct, and that I have not sought or received payment (compensation or anything of value) from any other source for these services.

Signature of Claimant/Payee: _____        Date: _____

**18. CERTIFICATION OF ATTORNEY**   I hereby certify that the services were rendered for this case.

Signature of Attorney: _____        Date: _____

### APPROVED FOR PAYMENT — COURT USE ONLY

| 19. TOTAL COMPENSATION | 20. TRAVEL EXPENSES | 21. OTHER EXPENSES | 22. TOT. AMT APPROVED/CERTIFIED |
|---|---|---|---|

23. ☐ Either the cost (excluding expenses) of these services does not exceed $300, or prior authorization was obtained; OR
    ☐ In the interest of justice the court finds that timely procurement of these necessary services could not await prior authorization, even though the cost (excluding expenses) exceeds $300.

_____    _____    _____
Signature of Presiding Judicial Officer        Date        Judge/Mag. Judge Code

| 24. TOTAL COMPENSATION | 25. TRAVEL EXPENSES | 26. OTHER EXPENSES | 27. TOTAL AMOUNT APPROVED |
|---|---|---|---|

**28. FOR REPRESENTATIONS COMMENCED AND APPELLATE PROCEEDINGS IN WHICH AN APPEAL IS PERFECTED ON OR AFTER APRIL 24, 1996,**
A. Total compensation and expense payments approved to date (include amounts withheld for interim payments) for investigative, expert and other services for this representation is $ _____
B. Payment approved (compensation and expenses) in excess of the statutory threshold for investigative, expert and other services under 21 U.S.C. 848(q)(10)(B).

_____    _____    _____
Signature of Chief Judge, Court of Appeals (or Delegate)        Date        Judge Code

Bates No. 414

**JA647**

CJA 21 DEATH PENALTY PROCEEDINGS: EX PARTE REQUEST FOR AUTHORIZATION AND VOUCHER FOR EXPERT AND OTHER SERVICES

| 1. CIR./DIST./DIV. CODE NCW | 2. PERSON REPRESENTED Barnette, Aquilia Marcivicci | | VOUCHER NUMBER |
|---|---|---|---|
| 3. MAG. DKT./DEF. NUMBER | 4. DIST. DKT./DEF. NUMBER 3:97-000023-001 | 5. APPEALS DKT./DEF. NUMBER | 6. OTHER DKT. NUMBER |
| 7. IN CASE/MATTER OF (Case Name) U.S. v. Barnette | 8. TYPE PERSON REPRESENTED Adult Defendant | | 9. REPRESENTATION TYPE Federal Capital Prosecution |

10. OFFENSE(S) CHARGED (Cite U.S. Code, Title & Section)   If more than one offense, list (up to five) major offenses charged, according to severity of offense.
1) 18 844H.F -- EXPLOSIVES USED IN COMMISSION OF FELONY

**REQUEST AND AUTHORIZATION FOR EXPERT SERVICES**

**11. ATTORNEY'S STATEMENT**
As the attorney for the person represented, who is named above, I hereby affirm that the services requested are necessary for adequate representation. I hereby request:

☐ Authorization to obtain the service. Estimated Compensation and Expenses: $ 2,000 _____ OR
☐ Approval of services already obtained to be paid for by the United States from the Defender Services Appropriation. (See instructions)

_____          _____
Signature of Attorney                                      Date

☐ Panel Attorney  ☐ Retained Atty  ☐ Pro-Se  ☐ Legal Organization

Attorney's name (First Name, M.I., Last Name, including suffix) , and mailing address.
Jean B. Lawson
P.O. Box 472106
Charlotte, NC 28226                          Telephone Number: _____

**12. DESCRIPTION OF AND JUSTIFICATION FOR SERVICES (See instructions)**

To aid defendant's case.

| 13. TYPE OF SERVICE PROVIDER | | | |
|---|---|---|---|
| 01 ☐ Investigator | | 20 ☐ | Legal Analyst/Consultant |
| 02 ☐ Interpreter/Translator | | 21 ☐ | Jury Consultant |
| 03 ☒ Psychologist | | 22 ☐ | Mitigation Specialist |
| 04 ☐ Psychiatrist | | 23 ☐ | Duplication Services (See Instructions) |
| 05 ☐ Polygraph Examiner | | 24 ☐ | Other (specify) |
| 06 ☐ Documents Examiner | | | |
| 07 ☐ Fingerprint Analyst | | | |
| 08 ☐ Accountant | | | |
| 09 ☐ CALR (Westlaw/Lexis,etc) | | | |
| 10 ☐ Chemist/Toxicologist | | | |
| 11 ☐ Ballistics Expert | | | |
| 13 ☐ Weapons/Firearms/Explosive Expert | | | |
| 14 ☐ Pathologist/Medical Examiner | | | |
| 15 ☐ Other Medical Expert | | | |
| 16 ☐ Voice/Audio Analyst | | | |
| 17 ☐ Hair/Fiber Expert | | | |
| 18 ☐ Computer (Hardware/Software/Systems) | | | |
| 19 ☐ Paralegal Services | | | |

**14. Court Order**
Financial eligibility of the person represented having been established to the court's satisfaction, the authorization requested in Item 11 is hereby granted.

_____
Signature of Presiding Judicial Officer or By Order of the Court

_____          _____
Date of Order                              Nunc Pro Tunc Date
Repayment or partial repayment ordered from the person represented for this service at time of authorization.
☐ YES  ☐ NO

**15. STAGE OF PROCEEDING**
Check the box which corresponds to the stage of the proceeding during which the work claimed at Item 16 was performed even if the work is intended to be used in connection with a later stage of the proceeding. CHECK NO MORE THAN ONE BOX.   Submit a separate voucher for each stage of the proceeding.

**CAPITAL PROSECUTION**
a. ☐ Pre-Trial    e. ☐ Appeal
b. ☐ Trial    f. ☐ Petition for the US.
c. ☐ Sentencing
d. ☐ Other Post Trial

**HABEAS CORPUS**
g. ☐ Habeas Petition    k. ☐ Petition for the US.
h. ☐ Evidentiary Hearing    Supreme Court
i. ☐ Dispositive Motions    Writ of Certiorari
j. ☐ Appeal
  Supreme Court
  Writ of Certiorari

**OTHER PROCEEDING**
l. ☐ Stay of Execution
m. ☐ Appeal of Denial of Stay
n. ☐ Petition for Writ of Certiorari to the U.S. Supreme Court Regarding Denial of Stay
o. ☐ Other

**CLAIM FOR SERVICES AND EXPENSES**   **FOR COURT USE ONLY**

| 16. SERVICES AND EXPENSES (Attach itemization of services and expenses with dates) | AMOUNT CLAIMED | MATH/TECHNICAL ADJUSTED AMOUNT | ADDITIONAL REVIEW |
|---|---|---|---|
| a. Compensation | | | |
| b. Travel Expenses (lodging, parking, meals, mileage, etc.) | | | |
| c. Other Expenses | | | |

**SECTION OF CLAIM AND ADJUSTMENT**

17. PAYEE'S NAME (First Name, M.I., Last Name, including any suffix) AND MAILING ADDRESS
Dr. Faye Sultan
University Psychological Associates
P.O. Box 568
New Salmanter, 28126                 Telephone Number: ___ 704/547-1483

**CLAIMANT/CERTIFICATION FOR PERIOD OF SERVICE FROM _____ TO _____**
CLAIM STATUS  ☐ Final    ☐ Interim Payment Number _____    ☐ Supplemental Payment
I hereby certify that the above claim is for services rendered and is correct, and that I have not sought or received payment (compensation or anything of value) from any other source for these services.

Signature of Claimant/Payee: _____          Date: _____

18. CERTIFICATION OF ATTORNEY    I hereby certify that the services were rendered for this case.

Signature of Attorney: _____          Date: _____

**APPROVED FOR PAYMENT — COURT USE ONLY**

| 19. TOTAL COMPENSATION | 20. TRAVEL EXPENSES | 21. OTHER EXPENSES | 22. TOT. AMT APPROVED/CERTIFIED |
|---|---|---|---|

23. ☐ Either the cost (excluding expenses) of these services does not exceed $300, or prior authorization was obtained; OR
☐ In the interest of justice the court finds that timely procurement of these necessary services could not await prior authorization, even though the cost (excluding expenses) exceeds $300.

_____          _____          _____
Signature of Presiding Judicial Officer                  Date                Judge/Mag. Judge Code

| 24. TOTAL COMPENSATION | 25. TRAVEL EXPENSES | 26. OTHER EXPENSES | 27. TOTAL AMOUNT APPROVED |
|---|---|---|---|

28. FOR REPRESENTATIONS COMMENCED AND APPELLATE PROCEEDINGS IN WHICH AN APPEAL IS PERFECTED ON OR AFTER APRIL 24, 1996,
A. Total compensation and expense payments approved to date (include amounts withheld for interim payments) for investigative, expert and other services for this representation is $ _____
B. Payment approved (compensation and expenses) in excess of the statutory threshold for investigative, expert and other services under 21 U.S.C. 848(q)(10)(B).

_____          _____          _____
Signature of Chief Judge, Court of Appeals (or Delegate)            Date                Judge Code

CJA 31 DEATH PENALTY PROCEEDINGS; EX PARTE REQUEST FOR AUTHORIZATION AND VOUCHER FOR EXPERT AND OTHER SERVICES

| 1. CIR./DIST./DIV. CODE | 2. PERSON REPRESENTED | | VOUCHER NUMBER |
|---|---|---|---|
| NCW | Barnette, Aquilia Marcivicci | | |

| 3. MAG. DKT./DEF. NUMBER | 4. DIST. DKT./DEF. NUMBER | 5. APPEALS DKT./DEF. NUMBER | 6. OTHER DKT. NUMBER |
|---|---|---|---|
| | 3:97-000023-001 | | |

| 7. IN CASE/MATTER OF (Case Name) | 8. TYPE PERSON REPRESENTED | 9. REPRESENTATION TYPE |
|---|---|---|
| U.S. v. Barnette | Adult Defendant | Federal Capital Prosecution |

10. OFFENSE(S) CHARGED (Cite U.S. Code, Title & Section) If more than one offense, list (up to five) major offenses charged, according to severity of offense.
1) 18 844H.F -- EXPLOSIVES USED IN COMMISSION OF FELONY

REQUEST AND AUTHORIZATION FOR EXPERT SERVICES

**11. ATTORNEY'S STATEMENT**
As the attorney for the person represented, who is named above, I hereby affirm that the services requested are necessary for adequate representation. I hereby request:
☐ Authorization to obtain the service. Estimated Compensation and Expenses: $ 5,000 OR
☐ Approval of services already obtained to be paid for by the United States from the Defender Services Appropriation. (See instructions)

_____  _____
Signature of Attorney                                    Date

☐ Panel Attorney  ☐ Retained Atty  ☐ Pro-Se  ☐ Legal Organization
Attorney's name (First Name, M.I., Last Name, including suffix) , and mailing address.
Jean B. Lawson
P.O. Box 472106
Charlotte, NC 28226                        Telephone Number: _____

**12. DESCRIPTION OF AND JUSTIFICATION FOR SERVICES (See instructions)**

To aid in defendant's case.

**13. TYPE OF SERVICE PROVIDER**

| | | | |
|---|---|---|---|
| 01 ☐ Investigator | | 20 ☐ | Legal Analyst/Consultant |
| 02 ☐ Interpreter/Translator | | 21 ☐ | Jury Consultant |
| 03 ☐ Psychologist | | 22 ☒ | Mitigation Specialist |
| 04 ☐ Psychiatrist | | 23 ☐ | Duplication Services (See Instructions) |
| 05 ☐ Polygraph Examiner | | 24 ☐ | Other (specify) |
| 06 ☐ Documents Examiner | | | |
| 07 ☐ Fingerprint Analyst | | | _____ |
| 08 ☐ Accountant | | | |
| 09 ☐ CALR (Westlaw/Lexis,etc) | | | |
| 10 ☐ Chemist/Toxicologist | | | |
| 11 ☐ Ballistics Expert | | | |
| 13 ☐ Weapons/Firearms/Explosive Expert | | | |
| 14 ☐ Pathologist/Medical Examiner | | | |
| 15 ☐ Other Medical Expert | | | |
| 16 ☐ Voice/Audio Analyst | | | |
| 17 ☐ Hair/Fiber Expert | | | |
| 18 ☐ Computer (Hardware/Software/Systems) | | | |
| 19 ☐ Paralegal Services | | | |

**14. Court Order**
Financial eligibility of the person represented having been established to the court's satisfaction, the authorization requested in Item 11 is hereby granted.

_____
Signature of Presiding Judicial Officer or By Order of the Court

_____  _____
Date of Order                     Nunc Pro Tunc Date
Repayment or partial repayment ordered from the person represented for this service at time of authorization.
☐ YES  ☐ NO

**15. STAGE OF PROCEEDING**
Check the box which corresponds to the stage of the proceeding during which the work claimed at Item 16 was performed even if the work is intended to be used in connection with a later stage of the proceeding. CHECK NO MORE THAN ONE BOX. Submit a separate voucher for each stage of the proceeding.

| CAPITAL PROSECUTION | | | | HABEAS CORPUS | | | OTHER PROCEEDING | |
|---|---|---|---|---|---|---|---|---|
| a. ☐ Pre-Trial | e. ☐ | Appeal | g. ☐ | Habeas Petition | k. ☐ | Petition for the U.S. | l. ☐ | Stay of Execution |
| b. ☐ Trial | f. ☐ | Petition for the U.S. | h. ☐ | Evidentiary Hearing | | Supreme Court | m. ☐ | Appeal of Denial of Stay |
| c. ☐ Sentencing | | Supreme Court | i. ☐ | Dispositive Motions | | Writ of Certiorari | n. ☐ | Petition for Writ of Certiorari to the U.S. |
| d. ☐ Other Post Trial | | Writ of Certiorari | j. ☐ | Appeal | | | | Supreme Court Regarding Denial of Stay |
| | | | | | | | o. ☐ | Other |

CLAIM FOR SERVICES AND EXPENSES

FOR CERT. USE ONLY

| 16. SERVICES AND EXPENSES (Attach itemization of services and expenses with dates) | AMOUNT CLAIMED | MATH/TECHNICAL ADJUSTED AMOUNT | ADDITIONAL REVIEW |
|---|---|---|---|
| a. Compensation | | | |
| b. Travel Expenses (lodging, parking, meals, mileage, etc.) | | | |
| c. Other Expenses | | | |

GRAND TOTALS CLAIMED AND ADJUSTED

**17. PAYEE'S NAME (First Name, M.I., Last Name, including any suffix) AND MAILING ADDRESS**
Cindy N. Maxwell
Homeview
426 Breezewood Drive
Belmont, NC 28012

TIN ■■■■■■■■9
Telephone Number: _____

CLAIMANT'S CERTIFICATION FOR PERIOD OF SERVICE FROM _____ TO _____
CLAIM STATUS  ☐ Final  ☐ Interim Payment Number _____  ☐ Supplemental Payment
I hereby certify that the above claim is for services rendered and is correct, and that I have not sought or received payment (compensation or anything of value) from any other source for these services.

Signature of Claimant/Payee: _____  Date: _____

**18. CERTIFICATION OF ATTORNEY** I hereby certify that the services were rendered for this case.

Signature of Attorney: _____  Date: _____

APPROVED FOR PAYMENT - COURT USE ONLY

| 19. TOTAL COMPENSATION | 20. TRAVEL EXPENSES | 21. OTHER EXPENSES | 22. TOT. AMT APPROVED/CERTIFIED |
|---|---|---|---|

23. ☐ Either the cost (excluding expenses) of these services does not exceed $300, or prior authorization was obtained; OR
☐ In the interest of justice the court finds that timely procurement of these necessary services could not await prior authorization, even though the cost (excluding expenses) exceeds $300.

_____  _____  _____
Signature of Presiding Judicial Officer          Date          Judge/Mag. Judge Code

| 24. TOTAL COMPENSATION | 25. TRAVEL EXPENSES | 26. OTHER EXPENSES | 27. TOTAL AMOUNT APPROVED |
|---|---|---|---|

28. FOR REPRESENTATIONS COMMENCED AND APPELLATE PROCEEDINGS IN WHICH AN APPEAL IS PERFECTED ON OR AFTER APRIL 24, 1996,
A. Total compensation and expense payments approved to date (include amounts withheld for interim payments) for investigative, expert and other services for this representation is $ _____
B. Payment approved (compensation and expenses) in excess of the statutory threshold for investigative, expert and other services under 21 U.S.C. 848(q)(10)(B).

_____  _____  _____
Signature of Chief Judge, Court of Appeals (or Delegate)     Date     Judge Code

CJA 31 DEATH PENALTY PROCEEDINGS: EX PARTE REQUEST FOR AUTHORIZATION AND VOUCHER FOR EXPERT AND OTHER SERVICES

| 1. CIR./DIST./DIV. CODE NCW | 2. PERSON REPRESENTED Barnette, Aquilia Marcivicci | | VOUCHER NUMBER |
|---|---|---|---|
| 3. MAG. DKT./DEF. NUMBER | 4. DIST. DKT./DEF. NUMBER 3:97-000023-001 | 5. APPEALS DKT./DEF. NUMBER | 6. OTHER DKT. NUMBER |

| 7. IN CASE/MATTER OF (Case Name) U.S. v. Barnette | 8. TYPE PERSON REPRESENTED Adult Defendant | 9. REPRESENTATION TYPE Federal Capital Prosecution |
|---|---|---|

**10. OFFENSE(S) CHARGED (Cite U.S. Code, Title & Section)** If more than one offense, list (up to five) major offenses charged, according to severity of offense.
1) 18 844H.F -- EXPLOSIVES USED IN COMMISSION OF FELONY

### REQUEST AND AUTHORIZATION FOR EXPERT SERVICES

**11. ATTORNEY'S STATEMENT**
As the attorney for the person represented, who is named above, I hereby affirm that the services requested are necessary for adequate representation. I hereby request:
☐ Authorization to obtain the service. Estimated Compensation and Expenses: $ 1,000 ___ OR
☐ Approval of services already obtained to be paid for by the United States from the Defender Services Appropriation. (See instructions)

_____          _____
Signature of Attorney                              Date
☐ Panel Attorney ☐ Retained Atty ☐ Pro-Se ☐ Legal Organization
Attorney's name (First Name, M.I., Last Name, including suffix), and mailing address.

Jean B. Lawson
P.O. Box 472106
Charlotte, NC 28226                    Telephone Number: _____

**12. DESCRIPTION OF AND JUSTIFICATION FOR SERVICES (See instructions)**

To aid in defendant's case.

**13. TYPE OF SERVICE PROVIDER**

| | | | |
|---|---|---|---|
| 01 ☐ | Investigator | 20 ☐ | Legal Analyst/Consultant |
| 02 ☐ | Interpreter/Translator | 21 ☐ | Jury Consultant |
| 03 ☒ | Psychologist | 22 ☐ | Mitigation Specialist |
| 04 ☐ | Psychiatrist | 23 ☐ | Duplication Services (See Instructions) |
| 05 ☐ | Polygraph Examiner | 24 ☐ | Other (specify) |
| 06 ☐ | Documents Examiner | | |
| 07 ☐ | Fingerprint Analyst | | |
| 08 ☐ | Accountant | | |
| 09 ☐ | CALR (Westlaw/Lexis,etc) | | |
| 10 ☐ | Chemist/Toxicologist | | |
| 11 ☐ | Ballistics Expert | | |
| 12 ☐ | Weapons/Firearms/Explosive Expert | | |
| 13 ☐ | Pathologist/Medical Examiner | | |
| 14 ☐ | Other Medical Expert | | |
| 15 ☐ | Voice/Audio Analyst | | |
| 16 ☐ | Hair/Fiber Expert | | |
| 17 ☐ | Computer (Hardware/Software/Systems) | | |
| 18 ☐ | Paralegal Services | | |
| 19 ☐ | | | |

**14. Court Order**
Financial eligibility of the person represented having been established to the court's satisfaction, the authorization requested in Item 11 is hereby granted.

_____
Signature of Presiding Judicial Officer or By Order of the Court

_____          _____
Date of Order                      Nunc Pro Tunc Date
Repayment or partial repayment ordered from the person represented for this service at time of authorization.
☐ YES ☐ NO

**15. STAGE OF PROCEEDING**
Check the box which corresponds to the stage of the proceeding during which the work claimed at Item 16 was performed even if the work is intended to be used in connection with a later stage of the proceeding. CHECK NO MORE THAN ONE BOX. Submit a separate voucher for each stage of the proceeding.

| CAPITAL PROSECUTION | | HABEAS CORPUS | | OTHER PROCEEDING | |
|---|---|---|---|---|---|
| a. ☐ Pre-Trial | e. ☐ Appeal | g. ☐ Habeas Petition | k. ☐ Petition for the U.S. | l. ☐ Stay of Execution | |
| b. ☐ Trial | f. ☐ Petition for the U.S. | h. ☐ Evidentiary Hearing | Supreme Court | m. ☐ Appeal of Denial of Stay | |
| c. ☐ Sentencing | | Supreme Court | i. ☐ Dispositive Motions | Writ of Certiorari | n. ☐ Petition for Writ of Certiorari to the U.S. |
| d. ☐ Other Post Trial | | Writ of Certiorari | j. ☐ Appeal | | Supreme Court Regarding Denial of Stay |
| | | | | o. ☐ Other | |

### CLAIM FOR SERVICES AND EXPENSES                    FOR COURT USE ONLY

| 16. SERVICES AND EXPENSES (Attach itemization of services and expenses with dates). | AMOUNT CLAIMED | MATH/TECHNICAL ADJUSTED AMOUNT | ADDITIONAL REVIEW |
|---|---|---|---|
| a. Compensation | | | |
| b. Travel Expenses (lodging, parking, meals, mileage, etc.) | | | |
| c. Other Expenses | | | |

### GRAND TOTALS (CLAIMED AND ADJUSTED)

**17. PAYEE'S NAME (First Name, M.I., Last Name, including any suffix) AND MAILING ADDRESS**

William M. Tyson, Ph.D.
Blue Ridge Behavior Systems          TIN: ▮▮▮▮▮▮
10025 Katelyn Drive                  Telephone Number: _____
Charlotte, NC 28269-8109

**CLAIMANT'S CERTIFICATION FOR PERIOD OF SERVICE FROM _____ TO _____**
CLAIM STATUS ☐ Final ☐ Interim Payment Number _____ ☐ Supplemental Payment
I hereby certify that the above claim is for services rendered and is correct, and that I have not sought or received payment (compensation or anything of value) from any other source for these services.

Signature of Claimant/Payee: _____          Date: _____

**18. CERTIFICATION OF ATTORNEY** I hereby certify that the services were rendered for this case.

Signature of Attorney: _____          Date: _____

### APPROVED FOR PAYMENT — COURT USE ONLY

| 19. TOTAL COMPENSATION | 20. TRAVEL EXPENSES | 21. OTHER EXPENSES | 22. TOT. AMT APPROVED/CERTIFIED |
|---|---|---|---|

**23.** ☐ Either the cost (excluding expenses) of these services does not exceed $300, or prior authorization was obtained; OR
☐ In the interest of justice the court finds that timely procurement of these necessary services could not await prior authorization, even though the cost (excluding expenses) exceeds $300.

_____          _____          _____
Signature of Presiding Judicial Officer          Date          Judge/Mag. Judge Code

| 24. TOTAL COMPENSATION | 25. TRAVEL EXPENSES | 26. OTHER EXPENSES | 27. TOTAL AMOUNT APPROVED |
|---|---|---|---|

**28. FOR REPRESENTATIONS COMMENCED AND APPELLATE PROCEEDINGS IN WHICH AN APPEAL IS PERFECTED ON OR AFTER APRIL 24, 1996,**
A. Total compensation and expense payments approved to date (include amounts withheld for interim payments) for investigative, expert and other services for this representation is $ _____
B. Payment approved (compensation and expenses) in excess of the statutory threshold for investigative, expert and other services under 21 U.S.C. 848(q)(10)(B).

_____          _____          _____
Signature of Chief Judge, Court of Appeals (or Delegate)          Date          Judge Code

CSA 31 DEATH PENALTY PROCEEDINGS: EX PARTE REQUEST FOR AUTHORIZATION AND VOUCHER FOR EXPERT AND OTHER SERVICES

| 1. CIR./DIST./DIV. CODE NCW | 2. PERSON REPRESENTED Barnette, Aquilia Marcivicci | | | VOUCHER NUMBER | |
|---|---|---|---|---|---|
| 3. MAG. DKT./DEF. NUMBER | 4. DIST. DKT./DEF. NUMBER 3:97-000023-001 | 5. APPEALS DKT./DEF. NUMBER | | 6. OTHER DKT. NUMBER | |
| 7. IN CASE/MATTER OF (Case Name) U.S. v. Barnette | | 8. TYPE PERSON REPRESENTED Adult Defendant | | 9. REPRESENTATION TYPE Federal Capital Prosecution | |

10. OFFENSE(S) CHARGED (Cite U.S. Code, Title & Section)   If more than one offense, list (up to five) major offenses charged, according to severity of offense.
1) 18 844H.F -- EXPLOSIVES USED IN COMMISSION OF FELONY

REQUEST AND AUTHORIZATION FOR EXPERT SERVICES

**11. ATTORNEY'S STATEMENT**
As the attorney for the person represented, who is named above, I hereby affirm that the services requested are necessary for adequate representation. I hereby request:
☐ Authorization to obtain the service. Estimated Compensation and Expenses: $ 2,000      OR
☐ Approval of services already obtained to be paid for by the United States from the Defender Services Appropriation. (See instructions)

_____          _____
Signature of Attorney                    Date
☐ Panel Attorney  ☐ Retained Atty  ☐ Pro-Se  ☐ Legal Organization
Attorney's name (First Name, M.I., Last Name, including suffix) , and mailing address.
Jean B. Lawson
P.O. Box 472106
Charlotte, NC  28226          Telephone Number: _____

**12. DESCRIPTION OF AND JUSTIFICATION FOR SERVICES (See instructions)**

To aid in defendant's case.

**13. TYPE OF SERVICE PROVIDER**

| | | | |
|---|---|---|---|
| 01 ☐ | Investigator | 20 ☐ | Legal Analyst/Consultant |
| 02 ☐ | Interpreter/Translator | 21 ☐ | Jury Consultant |
| 03 ☒ | Psychologist | 22 ☐ | Mitigation Specialist |
| 04 ☐ | Psychiatrist | 23 ☐ | Duplication Services (See Instructions) |
| 05 ☐ | Polygraph Examiner | 24 ☐ | Other (specify) |
| 06 ☐ | Documents Examiner | | |
| 07 ☐ | Fingerprint Analyst | | |
| 08 ☐ | Accountant | | |
| 09 ☐ | CALR (Westlaw/Lexis,etc) | | |
| 10 ☐ | Chemist/Toxicologist | | |
| 11 ☐ | Ballistics Expert | | |
| 13 ☐ | Weapons/Firearms/Explosive Expert | | |
| 14 ☐ | Pathologist/Medical Examiner | | |
| 15 ☐ | Other Medical Expert | | |
| 16 ☐ | Voice/Audio Analyst | | |
| 17 ☐ | Hair/Fiber Expert | | |
| 18 ☐ | Computer (Hardware/Software/Systems) | | |
| 19 ☐ | Paralegal Services | | |

**14. Court Order**
Financial eligibility of the person represented having been established to the court's satisfaction, the authorization requested in Item 11 is hereby granted.

_____
Signature of Presiding Judicial Officer or By Order of the Court

_____      _____
Date of Order          Nunc Pro Tunc Date
Repayment or partial repayment ordered from the person represented for this service at time of authorization.
☐ YES   ☐ NO

**15. STAGE OF PROCEEDING**
Check the box which corresponds to the stage of the proceeding during which the work claimed at Item 16 was performed even if the work is intended to be used in connection with a later stage of the proceeding. CHECK NO MORE THAN ONE BOX.   Submit a separate voucher for each stage of the proceeding.

| CAPITAL PROSECUTION | | HABEAS CORPUS | | OTHER PROCEEDING | |
|---|---|---|---|---|---|
| a. ☐ Pre-Trial | e. ☐ Appeal | g. ☐ Habeas Petition | k. ☐ Petition for the U.S. Supreme Court | l. ☐ Stay of Execution | |
| b. ☐ Trial | f. ☐ Petition for the U.S. | h. ☐ Evidentiary Hearing | | m. ☐ Appeal of Denial of Stay | |
| c. ☐ Sentencing | Supreme Court | i. ☐ Dispositive Motions | Writ of Certiorari | n. ☐ Petition for Writ of Certiorari to the U.S. | |
| d. ☐ Other Post Trial | Writ of Certiorari | j. ☐ Appeal | | Supreme Court Regarding Denial of Stay | |
| | | | | o. ☐ Other | |

CLAIM FOR SERVICES AND EXPENSES

| 16. SERVICES AND EXPENSES (Attach itemization of services and expenses with dates) | AMOUNT CLAIMED | MATH/TECHNICAL ADJUSTED AMOUNT | ADDITIONAL REVIEW |
|---|---|---|---|
| a. Compensation | | | |
| b. Travel Expenses (lodging, parking, meals, mileage, etc.) | | | |
| c. Other Expenses | | | |

GRAND TOTALS (CLAIMED AND ADJUSTED)

**17. PAYEE'S NAME** (First Name, M.I., Last Name, including any suffix) AND MAILING ADDRESS
John F. Warren & Associates
840 W. Fourth Street
Winston-Salem, NC  27101          TIN: ████████4
                                   Telephone Number: _____
CLAIMANT'S CERTIFICATION FOR PERIOD OF SERVICE FROM _____ TO _____
CLAIM STATUS    ☐ Final        ☐ Interim Payment Number _____    ☐ Supplemental Payment
I hereby certify that the above claim is for services rendered and is correct, and that I have not sought or received payment (compensation or anything of value) from any other source for these services.

Signature of Claimant/Payee: _____          Date: _____

**18. CERTIFICATION OF ATTORNEY**    I hereby certify that the services were rendered for this case.

Signature of Attorney: _____          Date: _____

APPROVED FOR PAYMENT - COURT USE ONLY

| 19. TOTAL COMPENSATION | 20. TRAVEL EXPENSES | 21. OTHER EXPENSES | 22. TOT. AMT APPROVED/CERTIFIED |
|---|---|---|---|

23. ☐ Either the cost (excluding expenses) of these services does not exceed $300, or prior authorization was obtained; OR
☐ In the interest of justice the court finds that timely procurement of these necessary services could not await prior authorization, even though the cost (excluding expenses) exceeds $300.

_____      _____      _____
Signature of Presiding Judicial Officer    Date    Judge/Mag. Judge Code

| 24. TOTAL COMPENSATION | 25. TRAVEL EXPENSES | 26. OTHER EXPENSES | 27. TOTAL AMOUNT APPROVED |
|---|---|---|---|

28. FOR REPRESENTATIONS COMMENCED AND APPELLATE PROCEEDINGS IN WHICH AN APPEAL IS PERFECTED ON OR AFTER APRIL 24, 1996,
A. Total compensation and expense payments approved to date (include amounts withheld for interim payments) for investigative, expert and other services for this representation is $ _____
B. Payment approved (compensation and expenses) in excess of the statutory threshold for investigative, expert and other services under 21 U.S.C. 848(q)(10)(B).

_____      _____      _____
Signature of Chief Judge, Court of Appeals (or Delegate)    Date    Judge Code

| 1. CIR./DIST./DIV. CODE NCW | 2. PERSON REPRESENTED Barnette, Aquilia Marcivicci | | VOUCHER NUMBER |
|---|---|---|---|
| 3. MAG. DKT./DEF. NUMBER | 4. DIST. DKT./DEF. NUMBER 3:97-000023-001 | 5. APPEALS DKT./DEF. NUMBER | 6. OTHER DKT. NUMBER |
| 7. IN CASE/MATTER OF (Case Name) U.S. v. Barnette | 8. TYPE PERSON REPRESENTED Adult Defendant | | 9. REPRESENTATION TYPE Federal Capital Prosecution |

10. OFFENSE(S) CHARGED (Cite U.S. Code, Title & Section) *If more than one offense, list (up to five) major offenses charged, according to severity of offense.*
1) 18 844H.F — EXPLOSIVES USED IN COMMISSION OF FELONY

## REQUEST AND AUTHORIZATION FOR EXPERT SERVICES

**11. ATTORNEY'S STATEMENT**
As the attorney for the person represented, who is named above, I hereby affirm that the services requested are necessary for adequate representation. I hereby request:
☐ Authorization to obtain the service. Estimated Compensation and Expenses: $ 8,000 _____ OR
☐ Approval of services already obtained to be paid for by the United States from the Defender Services Appropriation. (See instructions)

_____  _____
Signature of Attorney    Date

☐ Panel Attorney ☐ Retained Atty ☐ Pro-Se ☐ Legal Organization
Attorney's name (First Name, M.I., Last Name, including suffix), and mailing address.
Jean B. Lawson
P.O. Box 472106
Charlotte, NC 28226
Telephone Number: _____

**12. DESCRIPTION OF AND JUSTIFICATION FOR SERVICES (See instructions)**

To aid in defendant's case.

**13. TYPE OF SERVICE PROVIDER**

| | | | |
|---|---|---|---|
| 01 ☐ | Investigator | 20 ☐ | Legal Analyst/Consultant |
| 02 ☐ | Interpreter/Translator | 21 ☐ | Jury Consultant |
| 03 ☐ | Psychologist | 22 ☐ | Mitigation Specialist |
| 04 ☒ | Psychiatrist | 23 ☐ | Duplication Services (See Instructions) |
| 05 ☐ | Polygraph Examiner | 24 ☐ | Other (specify) |
| 06 ☐ | Documents Examiner | | |
| 07 ☐ | Fingerprint Analyst | | |
| 08 ☐ | Accountant | | |
| 09 ☐ | CALR (Westlaw/Lexis,etc) | | |
| 10 ☐ | Chemist/Toxicologist | | |
| 11 ☐ | Ballistics Expert | | |
| 13 ☐ | Weapons/Firearms/Explosive Expert | | |
| 14 ☐ | Pathologist/Medical Examiner | | |
| 15 ☐ | Other Medical Expert | | |
| 16 ☐ | Voice/Audio Analyst | | |
| 17 ☐ | Hair/Fiber Expert | | |
| 18 ☐ | Computer (Hardware/Software/Systems) | | |
| 19 ☐ | Paralegal Services | | |

**14. Court Order**
Financial eligibility of the person represented having been established to the court's satisfaction, the authorization requested in Item 11 is hereby granted.

_____
Signature of Presiding Judicial Officer or By Order of the Court

_____  _____
Date of Order    Nunc Pro Tunc Date
Repayment or partial repayment ordered from the person represented for this service at time of authorization.
☐ YES ☐ NO

**15. STAGE OF PROCEEDING**
Check the box which corresponds to the stage of the proceeding during which the work claimed at Item 16 was performed even if the work is intended to be used in connection with a later stage of the proceeding. CHECK NO MORE THAN ONE BOX. Submit a separate voucher for each stage of the proceeding.

CAPITAL PROSECUTION
a. ☐ Pre-Trial
b. ☐ Trial
c. ☐ Sentencing
d. ☐ Other Post Trial
e. ☐ Appeal
f. ☐ Petition for the U.S. Supreme Court
Writ of Certiorari

HABEAS CORPUS
g. ☐ Habeas Petition
h. ☐ Evidentiary Hearing
i. ☐ Dispositive Motions
j. ☐ Appeal
k. ☐ Petition for the U.S. Supreme Court
Writ of Certiorari

OTHER PROCEEDING
l. ☐ Stay of Execution
m. ☐ Appeal of Denial of Stay
n. ☐ Petition for Writ of Certiorari to the U.S. Supreme Court Regarding Denial of Stay
o. ☐ Other

## CLAIM FOR SERVICES AND EXPENSES / FOR COURT USE ONLY

| 16. SERVICES AND EXPENSES (Attach itemization of services and expenses with dates) | AMOUNT CLAIMED | MATH/TECHNICAL ADJUSTED AMOUNT | ADDITIONAL REVIEW |
|---|---|---|---|
| a. Compensation | | | |
| b. Travel Expenses (lodging, parking, meals, mileage, etc.) | | | |
| c. Other Expenses | | | |

## GRAND TOTAL (CLAIMED AND ADJUSTED)

**17. PAYEE'S NAME (First Name, M.I., Last Name, including any suffix) AND MAILING ADDRESS**
Dr. Mark Cunningham
500 Chestnut, Suite 1735
Abilene, TX 79602

TIN: ███████
Telephone Number: _____

CLAIMANT'S CERTIFICATION FOR PERIOD OF SERVICE FROM _____ TO _____
CLAIM STATUS ☐ Final ☐ Interim Payment Number _____ ☐ Supplemental Payment
I hereby certify that the above claim is for services rendered and is correct, and that I have not sought or received payment (compensation or anything of value) from any other source for these services.

Signature of Claimant/Payee: _____  Date: _____

**18. CERTIFICATION OF ATTORNEY** I hereby certify that the services were rendered for this case.

Signature of Attorney: _____  Date: _____

## APPROVAL/PAYMENT — COURT USE ONLY

| 19. TOTAL COMPENSATION | 20. TRAVEL EXPENSES | 21. OTHER EXPENSES | 22. TOT. AMT APPROVED/CERTIFIED |
|---|---|---|---|

23. ☐ Either the cost (excluding expenses) of these services does not exceed $300, or prior authorization was obtained; OR
☐ In the interest of justice the court finds that timely procurement of these necessary services could not await prior authorization, even though the cost (excluding expenses) exceeds $300.

_____  _____  _____
Signature of Presiding Judicial Officer    Date    Judge/Mag. Judge Code

| 24. TOTAL COMPENSATION | 25. TRAVEL EXPENSES | 26. OTHER EXPENSES | 27. TOTAL AMOUNT APPROVED |
|---|---|---|---|

28. FOR REPRESENTATIONS COMMENCED AND APPELLATE PROCEEDINGS IN WHICH AN APPEAL IS PERFECTED ON OR AFTER APRIL 24, 1996,
A. Total compensation and expense payments approved to date (include amounts withheld for interim payments) for investigative, expert and other services for this representation is $ _____
B. Payment approved (compensation and expenses) in excess of the statutory threshold for investigative, expert and other services under 21 U.S.C. 848(q)(10)(B).

_____  _____  _____
Signature of Chief Judge, Court of Appeals (or Delegate)    Date    Judge Code

CJA 30 DEATH PENALTY PROCEEDINGS: APPOINTMENT OF AND AUTHORITY TO PAY COURT APPOINTED COUNSEL

| 1. CIR./DIST./DIV. CODE<br>NCW | 2. PERSON REPRESENTED<br>Barnette, Aquilia Marcivicci | | | VOUCHER NUMBER |
|---|---|---|---|---|
| 3. MAG. DKT./DEF. NUMBER | 4. DIST. DKT./DEF. NUMBER<br>3:97-000023-001 | 5. APPEALS DKT./DEF. NUMBER | | 6. OTHER DKT. NUMBER |
| 7. IN CASE/MATTER OF (Case Name)<br>U.S. v. Barnette | 8. TYPE PERSON REPRESENTED<br>Adult Defendant | | 9. REPRESENTATION TYPE<br>Federal Capital Prosecution | |

**10. OFFENSE(S) CHARGED** (Cite U.S. Code, Title & Section) If more than one offense, list (up to five) major offenses charged, according to severity of offense.

1) 18 844H.F -- EXPLOSIVES USED IN COMMISSION OF FELONY

**11. ATTORNEY'S NAME** (First Name, M.I., Last Name, including any suffix) AND MAILING ADDRESS

Bender, Harold Johnson
The Carr House
200 North McDowell Street
Charlotte NC 28204

Telephone Number: (704) 333-2169

**13. NAME AND MAILING ADDRESS OF LAW FIRM** (only provide per instructions)

**12. COURT ORDER**

☒ O Appointing Counsel    ☐ C Co-Counsel
☐ F Subs For Federal Defender    ☐ R Subs For Retained Attorney
☐ P Subs For Panel Attorney    ☐ Y Standby Counsel

Prior Attorney's Name: _____
Appointment Date: _____

(A) Because the above-named person represented has testified under oath or has otherwise satisfied this court that he or she (1) is financially unable to employ counsel and (2) does not wish to waive counsel, and because the interests of justice so require, the attorney whose name appears in Item 11, who has been determined to possess the specific qualifications required by law, is appointed to represent this person in this case.

(B) The attorney named in Item 11 is appointed to serve as: ☐LEAD COUNSEL ☐CO-COUNSEL

Name of Co-Counsel or Lead Counsel: _____
Appointment Date: _____

(C) If you represented the defendant or petitioner in any prior proceeding related to this matter, attach to your initial claim a listing of those proceedings and describe your role in each (e.g., lead counsel or co-counsel).

☐ (D) Due to the expected length of this case, and the anticipated hardship on counsel in undertaking representation full-time for such period without compensation, interim payments of compensation and expenses are approved pursuant to the attached order.

_Signature of Presiding Judicial Officer or By Order of the Court_

01/14/2002
Date of Order      Nunc Pro Tunc Date

(E) Repayment or partial repayment ordered from the person represented for this service at time of appointment. ☐ YES ☐ NO

**CLAIM FOR SERVICES AND EXPENSES**

**14. STAGE OF PROCEEDING**
Check the box which corresponds to the stage of the proceeding during which the work claimed at Item 15 was performed even if the work is intended to be used in connection with a later stage of the proceeding. CHECK NO MORE THAN ONE BOX. Submit a separate voucher for each stage of the proceeding.

CAPITAL PROSECUTION
a. ☐ Pre-Trial
b. ☐ Trial
c. ☐ Sentencing
d. ☐ Other Post Trial

e. ☐ Appeal
f. ☐ Petition for the U.S. Supreme Court
     Writ of Certiorari

HABEAS CORPUS
g. ☐ Habeas Petition
h. ☐ Evidentiary Hearing
i. ☐ Dispositive Motions
j. ☐ Appeal

k. ☐ Petition for the U.S. Supreme Court
     Writ of Certiorari

OTHER PROCEEDING
l. ☐ Stay of Execution
m. ☐ Appeal of Denial of Stay
n. ☐ Petition for Writ of Certiorari to the U.S. Supreme Court Regarding Denial of Stay
o. ☐ Other

**HOURS AND COMPENSATION CLAIMED**      **FOR COURT USE ONLY**

| 15. CATEGORIES (Attach itemization of services with dates) | HOURS CLAIMED | TOTAL AMOUNT CLAIMED | MATH/TECH ADJUSTED HOURS | MATH/TECH ADJUSTED AMOUNT | ADDITIONAL REVIEW |
|---|---|---|---|---|---|
| a. In-Court Hearings (Rate per Hour = $    ) | | | | IN COURT TOTAL (Category a) | IN COURT TOTAL (Category a) |
| b. Interviews and Conferences with Client | | | | | |
| c. Witness Interviews | | | | | |
| d. Consultation with Investigators and Experts | | | | | |
| e. Obtaining and Reviewing the Court Record | | | | | |
| f. Obtaining and Reviewing Documents and Evidence | | | | OUT OF COURT TOTAL (Categories b - j) | OUT OF COURT TOTAL (Categories b - j) |
| g. Consulting with Expert Counsel | | | | | |
| h. Legal Research and Writing | | | | | |
| i. Travel | | | | | |
| j. Other (Specify on additional sheets) | | | | | |
| Totals: Categories b thru j (Rate per hour = $    ) | | | | | |

**CLAIM FOR TRAVEL AND EXPENSES** (Attach itemization of expenses with dates)

| 16. Travel Expenses (lodging, parking, meals, mileage, etc.) | | | |
|---|---|---|---|
| 17. Other Expenses (other than expert, transcripts, etc.) | | | |

**GRAND TOTALS (CLAIMED AND ADJUSTED)**

**18. CERTIFICATION OF ATTORNEY/PAYEE FOR THE PERIOD OF SERVICE**
FROM _____ TO _____

**19. APPOINTMENT TERMINATION DATE IF OTHER THAN CASE COMPLETION**

**20. CASE DISPOSITION**

**21. CLAIM STATUS** ☐ Final Payment    ☐ Interim Payment Number _____    ☐ Supplemental Payment
Have you previously applied to the court for compensation and/or reimbursement for this case? ☐ YES ☐ NO If yes, were you paid? ☐ YES ☐ NO
Other than from the court, have you, or to your knowledge has anyone else, received payment (compensation or anything or value) from any other source in connection with this representation? ☐ YES ☐ NO If yes, give details on additional sheets.
I swear or affirm the truth or correctness of the above statements.

Signature of Attorney: _____    Date: _____

**APPROVED FOR PAYMENT - COURT USE ONLY**

| 22. IN COURT COMP. | 23. OUT OF COURT COMP. | 24. TRAVEL EXPENSES | 25. OTHER EXPENSES | 26. TOTAL AMT. APPROVED |
|---|---|---|---|---|
| 27. SIGNATURE OF THE PRESIDING JUDICIAL OFFICER | | | DATE | 27a. JUDGE CODE |

Case 3:97-cr-00023-RLV    Document 386-1 *SEALED*    Filed 01/14/02    Page 1 of 2

386

Case 3:12-cv-00327-MOC    Document 74-8    Filed 12/22/14    Page 59 of 60
Bates No. 420

**JA653**

FILED
CHARLOTTE, N.C.

JAN 14 2002

U.S. DISTRICT COURT
W. DIST. OF N.C.

# IN THE DISTRICT COURT OF THE UNITED STATES
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA
## CHARLOTTE DIVISION
### CRIMINAL DOCKET NO.3:97cr23-V

UNITED STATES OF AMERICA )
)
vs. )
)
)     <u>O R D E R</u>
)
AQUILIA MARCIVICCI BARNETTE )
)
_____)

**THIS MATTER** is before the Court on its own motion to appoint Harold Bender to represent the defendant in the above-captioned case.

**IT IS, THEREFORE, ORDERED** that Harold Bender is appointed to represent defendant as co-counsel to Jean Lawson. It is further **ORDERED** that the Clerk prepare a CJA 30 appointing Mr. Bender as co-counsel and to mail the CJA 30 to him for his signature.

**THIS** the 11th day of January, 2002.

_____
RICHARD L. VOORHEES
UNITED STATES DISTRICT COURT JUDGE

**DOCUMENT SCANNED**



**Ann Wolbert Burgess, RN, DNSc.**
**228 Highland Avenue**
**West Newton, MA 02465**
**617-965-6261**
**Fax: 617-244-2323**
**bureges@bc.edu**

July 1, 2002

Jean B. Lawson
PO Box 472106
Charlotte, NC 28247-2106

Harold J. Bender
200 N. McDowell Street
Charlotte, NC 28204

### Re: United States of America v. Aquilia M. Barnette

Dear Ms. Lawson and Mr. Bender:

This is a summary of my findings concerning the resentencing trial of Aquilia Marcivicci Barnette in the United States District Court in Charlotte, North Carolina. My report is based on four visits with Mr. Barnette over two days: June 14 and June 26, 2002. My total interview time with Mr. Barnette was approximately 12 hours. In addition, I interviewed Sonia Barnette and talked by telephone with his father, Derrick Barnette, and his brother, Mario Barnette.

I have reviewed the following documents:

1. Copy of James P. Cooney III and George V. Laughrun II corrected brief of appellant;
2. Mr. Barnette's school records, employment records, medical records, and material prepared by Paul William's and Cindy Maxwell;
3. Volumes I and II of Mental Health Expert reports and trial testimony;
4. Prison Medical Records;
5. Transcribed interview of Robin Williams, dated 5/30/96;
6. Transcribed interview of Benjamin Spencer Greene, dated 5/1/96;
7. Transcribed interviews by Mecklenburg Police Department with Acquila Barnette, dated 6/25/96 and 6/28/96;
8. Videotaped and audio taped copy of police interview.
9. Discovery materials;
10. Trial transcripts
11. Police reports and statements re 11/12/93 incident at Bojangles
12. Police report on 1974 homicide of Pearl Henderson Brown

I also viewed the home of Mark Barnette's mother and the path he took to the corner of Billy Graham Parkway and Morris Field and the left side drainage ditch.

MC-0003270    1

## Background

On January 27, 1998, Aquilia Marcivicci Barnette (Marc Barnette) was convicted on all counts relating to the deaths of Robin Williams and Donald Allen including First Degree Murder by Use of a Firearm (2 counts), Interstate Domestic Violence (2 counts), Arson in the Commission of a Felony, Use and Carry a Firearm During a Crime of Violence, Providing False Information to Acquire a Firearm, Making a Firearm, Possession of a Firearm by a Felon, Carjacking Using a Firearm Resulting in Death and Interstate Transportation of a Stolen Vehicle.

## Statement of Facts

On June 25, 1996, Marc Barnette voluntarily surrendered to Charlotte- Mecklenburg police investigators and FBI agents. He had been identified as the person who shot and killed Robin Williams in Roanoke, Virginia on June 22, 1996. During the three days prior to his surrender, Barnette traveled from Roanoke to Knoxville, Tennessee, visited a church and twice attempted to take his own life. After his surrender, Marc Barnette told police that he had killed Robin Williams and that he had killed Donald Allen, from whom he stole the blue Honda automobile he used to travel to Robin Williams' mother's home. Items recovered from the Honda included a June 23 church bulletin, duct tape taken from the tailpipe, a garden hose consistent with a failed attempt at carbon monoxide poisoning, and love letters between Barnette and Williams.

The video and audio tapes of the law enforcement interviews provide the bulk of the facts surrounding these crimes. These tapes were stopped and started several times to allow Barnette to gain control of his emotions and grief.

## Killings of Robin Williams and Donald Allen

This is a domestic homicide. Domestic violence research indicates about 30% of female homicide victims are killed by former intimates who stalked or harassed them prior to death. The Williams crime scene is disorganized in that Marc Barnette made no attempt to hide his identity. His discarded clothing and weapon were found in a dumpster. The gun was easily traced to his brother.

Robin Williams' family testified at trial that Robin met Marc Barnette and fell in love with him in the spring of 1994. Barnette moved to Roanoke, found a job, and began living with Williams. They were both in their early 20's. Within a year, largely as a consequence of Barnette's irrational and obsessive jealousy about Williams and an old boy friend, he moved back with his mother in Charlotte April 10, 1996. According to government testimony, his obsession with Williams did not end as she was "always on his mind". On the one hand, he begged her to reestablish their relationship but he also threatened and accused her of being unfaithful. In response, Williams changed the locks on her apartment and moved in with her mother.

Case 3:12-cv-00327-MOC   Document 76-19   Filed 12/22/14   Page 112 of 122
Bates No. 4907

**JA656**

By April 30, 1996, Williams had moved back into her apartment, accompanied by a male friend, Benjamin Greene. In the early morning of April 30, Greene was awakened by Williams saying, "he is here." Greene saw Barnette striking at the windows with a baseball bat, screaming obscenities and threatening to kill Williams. The telephone lines to the house had been cut. Two small containers of gasoline had been poured on the window frames and door and the front part of the living room was in flames. Greene shot at Barnette who fled. Greene and Williams escaped the burning apartment by jumping out a rear window. Greene was uninjured but Williams suffered second and third degree burns on her hands and arms.

Roanoke police issued warrants for Barnette's arrest. Barnette, after confessing to his mother and best friend, waited at his mother's home for the police to arrest him for the firebombing. However Charlotte-Merklenburg police failed to arrest Barnette and later contended they could not find his home despite the fact that the police had previously answered a number of calls at that address.

In June, Barnette purchased a semi-automatic shot gun, using his brother's identification and name. He told police he sawed off the barrel of the gun, taped a flashlight to it, and packed it in a bag. He then consumed at least six beers, walked to an intersection and waited for a car to stop at the light. Donald Allen stopped at that intersection after midnight on June 22, 1996.

Barnette, holding the shotgun, told Allen to get out, and throw down his wallet. He then (according to what he told police) walked Allen to a drainage ditch, told him to turn around, and shot at him, firing 3 times. Barnette then drove 3 1/2 hours to Roanoke, confronted Robin Williams, said you are coming with me, she refused, and he subsequently shot her. When asked by the police why he did it, Barnette (crying) said he did not know.

**Opinions**

Based on my evaluation, counseling, and research of over several hundreds of women and men entangled in domestic violence situations, it is my opinion within a degree of scientific certainty that

1. Over an 8-week period (April 30-June 22, 1996) Marc Barnette embarked on a domestic crime spree based on his belief that Robin Williams, his ex-girl friend of two years, was being unfaithful, a thinking pattern noted with prior girl friends. The killing of Robin Williams was part of Barnette's obsessional belief that Williams would resume their relationship. The criminal acts may be understood, in part, as a symbolic reenactment of family and childhood patterns. The fatal contact with Donald Allen was a result of Barnette's flawed logic that Allen was both an opportunity and an obstacle to his reunion with Williams.

2. During the 8-weeks prior to the shootings, Marc Barnette may be diagnosed as suffering from an Axis I Major Depressive Episode and Axis II Personality Disorder Not Otherwise Specified (NOS) with paranoid features, antisocial features and borderline features.

MC-0003272

3

**Basis for Opinion**

## 1. Family and Childhood Patterns

Marc Barnette's family history is significant for the consistency of relationships clouded by suspicions of infidelity, paranoia, and domestic violence. This witnessed and experienced history resulted in a learned programming that Marc Barnette incorporated into his personality and repeated as a teenager and young adult.

Sonia Cooper was born to Jessie and Pearl Cooper on 8/17/58. Jessie was a severely injured Korean War veteran who, after returning to the states, withdrew, became depressed and began to drink heavily. On 3/21/71, when Sonia was 13, Pearl and Jessie divorced. Sonia then began dating Derrick Barnette, 2 years her senior.

Marc Barnette was born 7/7/73 to 14-year-old Sonia Cooper. Pearl and Sonia Cooper reported that Derrick Barnette was Marc's father. Pearl Cooper was a primary caretaker for Marc and also worked as an LPN. She married Lloyd Brown on 8/21/73, four days after Sonia's 15th birthday. Brown had a domestic violence history, having been convicted of Assault with a Deadly Weapon for shooting a woman in her right lower stomach with a .22 handgun on 9/10/71 and was given a 6 month suspended sentence.

According to police reports, on 5/19/74 around 2:30am, Lloyd Brown shot Pearl in her lower right temple during a domestic dispute. After their mother's murder, Sonia and her younger sister, Sheila, were moved to Jessie Cooper's home.

Sonia married Derrick Barnette on 2/8/75 when Marc was 2.5 years old. On 2/7/77, Carrie Barnette, Derrick's mother, died. Although her death certificate reports cerebral hemorrhage as the cause of her death, some adults in the family believed, and told the children, that her boyfriend poisoned her because he was upset that she had begun seeing her ex-husband, John Barnette.

On 7/12/77 Mario Barnette was born into the marriage of Derrick and Sonia Barnette. Derrick had joined the Air Force and had been on a tour of duty in Japan with sporadic visits back to his young family. He was discharged from the Air Force in February 1979 and the family moved back to Charlotte.

Derrick Barnette handled the discipline of Marc, who he slapped, spanked or beat for any infraction, e.g., poor grades or not filling the dog's water bowl . From age 3-10, Marc had strict boundaries, enforced by Derrick. Derrick emphasized that lying was not tolerated and prefaced his interrogation of Marc's behavior by saying, "Don't lie to me."

Marc was witness to parental verbal and physical fights that were both private in the home as well as public. For example, one time the parents fought in front of his school mates as Marc was boarding a bus. Marc believed he was singled out for beatings rather than his younger brother. He was beaten primarily by a belt (and, he believes, a coat hanger). Marc became very fearful of his father and angry at his mother (who reported hiding in the bathroom during the beatings) for not having intervened in the excessive punishment.

MC-0003273

4

During his elementary school years, Marc maintained average grades depending on how stressful it was at home. He worried about bringing home bad report cards; he even tried unsuccessfully to sign a report card. He reported two times (for very brief periods) of running away.

In 1983, Marc attended Our Lady of Consolation Catholic school for 5th grade. At that time, Derrick began accusing Sonia of infidelity after he found a letter to Sonia from an incarcerated man stating he could not wait to see Sonia when he was released. Derrick became increasingly violent and abusive toward Sonia. For instance, he kicked the door in at their Comstock Road apartment and, during another argument, he hit Sonia in the head with a hammer. The fights were loud and physical; the police responded at least once to domestic disputes. Marc tried to intervene in the fights, attempting to protect his mother and to shelter his younger brother from the violence.

On July 12, 1994, Derrick and Sonia separated. Derrick was to pay Sonia $400 each month for child support. That fall, Marc attended 6th grade and began to drink alcohol. Sonia and Derrick's divorce was granted on 8/19/85.

Derrick continued to accuse Sonia of infidelity during their marriage and obtained a court order requiring a paternity test. On June 15, 1987, blood was drawn from Derrick, Sonia and her two sons. The result of the paternity test established that Derrick was the father of neither son. Derrick took the two boys to a restaurant and told them about the test results and said, "How would you feel if one of your girlfriends was having babies by another man." Sonia did not accept the results of the blood test, but the Court found that Derrick was not the boys' father and declined to require Derrick to pay support for the children. Derrick stopped paying child support.

**Family Stresses**

A series of family stresses developed following the paternity issue. Sonia lost her job, neglected her sons in favor of dating numerous men, used alcohol and drugs and mourned her boyfriend, a nightclub owner/drug dealer, who was murdered by gunshot the spring of 1988. She moved the family to Atlanta to be near her sister, started her sons in new schools, and became employed as a hospital billing clerk.

The home life was unstable; often the children were left without supervision or food. Marc moved into the big brother role of supervising Mario because he did not trust his mother to care properly for him. As a student, Marc was bright and could earn good grades but his study habits and school and work attendance were not a priority; women consumed his energy. The move to Atlanta meant leaving his support system of family and friends. He sought out peer male companionship who negatively influenced him. When challenged, he would fight and that would result in suspension from school. He started 11th grade in Atlanta but dropped out and never completed his studies.

MC-0003274  5

**JA659**

## Marc Barnette's Relationships

Marc Barnette's teenage relationships were fraught with conflict, especially over infidelity. His first sexual contact was with a cousin when he was 7 and she two years older. He began having sexual relations with girls around age 13. His wish to have a monogamous long-term relationship with a girl never materialized; rather, he became involved with women who, in his mind, were unfaithful and usually with prior boyfriends. While Mark admitted to his own infidelity, he qualified it as a response to the girlfriend's infidelity. Mark admitted elements of violence in the relationships he held with the five women for whom he cared the most.

*Sheila Sullivan.* Marc Barnette's first serious girlfriend was Sheila Sullivan whom he dated in Atlanta. They broke up two times when Marc believed Sheila had cheated on him. One time, Sheila told Marc she was pregnant and that her mother arranged for an abortion, a decision that upset Marc. After the breakup, Marc became depressed and took pills in a suicidal gesture; the EMT were called.

*Tasha Heard.* At age 16, Marc was in the 11th grade. He began to date Tasha, age 14. He began to secretly stay at her house. His mother lectured him for not coming home or coming home late. Sometimes she would lock the door and not let him in. His daughter, Angelica, was born 9/29/90.

Marc and Tasha began fighting. In the spring of 1991, Marc returned to Charlotte for his grandmother Hattie's funeral. On his return, he was told by Tasha that she had an affair with an ex-boyfriend. Marc got into a fight with the boy and both were suspended from school. Marc dropped out of school.

During the summer of 1991, Barnette moved to Newman, GA to be with Tasha. They patched up their differences and their son, little Marc, was born.

Marc and Tasha continued to have difficulty with the relationship. Marc believed Tasha was being unfaithful and began spying on her.

Marc was befriended by Anthony whose half-sister was Crystal Dennis. Crystal learned Anthony was having relations with Tasha. Marc got into a fight with Anthony, whom he shot. On 6/1/92 he was convicted of Pointing a Gun at Another and punished by time served.

*Crystal Dennis.* Crystal Dennis moved into Marc's apartment with her two children the week after Tasha moved out. Marc would sometimes watch the children. Marc stated he found the children "playing doctor" and spanked them with a clothes hanger ("like my father did me"). Crystal's mother and aunt reported the bruising to police and Marc was arrested for cruelty to children. A plea agreement was reached and he was sentenced to 6 years probation and fined $480.

MC-0003275    6

**JA660**

*Alisha Chambers.* Marc returned to live in Charlotte. While visiting friends, he met Alisha Chambers. The relationship was stormy and several times Marc was arrested. The incidents occurred in the context of Marc trying to repair his relationship with Alisha by going to her home, confronting her at work, and demanding that she come with him to talk. On November 12, 1993, Marc was charged with second degree Kidnapping and 3 counts of Assault With a Deadly Weapon when he attempted to take Alisha from her workplace at Bojangles.

In a 11/9/93 police report, the officer wrote that Marc cried and said he could not live without the victim (Alisha) and that everyone and everything was always interfering with their relationship. The officer noted that it sounded like Marc was in a dream world and he thought he could make everything OK if he could just talk with the victim. The officer found Marc to be sincere, intelligent, and sensitive and that he was very upset over his mother's personal lifestyle of drinking, doing drugs and that she had quit her job to take care of her alcoholic father. Marc, according to the officer, seemed to be in emotional turmoil.

On 3/23/94 Alisha accused Marc of assaulting her with a baseball bat. On 3/25/94 Marc was charged with Rape and Kidnapping of Alisha Chambers. Police learned that Marc and Alisha had consensual sex and dropped the rape charge.

*Robin Williams.* Marc met Robin and they start dating 5/7/94. He moved to Roanoke with Robin and worked at Camelot Music. In September 1995, Marc found a condom in Robin's pocket and Benjamin Greene's telephone number. Greene was an old boyfriend; Robin said she was not having an affair but Marc did not believe her.

On 1/25/96 Marc resigned from Camelot Music because of reports he was sexually harassing another employee. He took a job at Electrolux, did well but resigned when he moved back to Charlotte. (He was later told he could have asked for a transfer to the Charlotte area).

In early April 1996, Robin ended the relationship. Marc took Robin's car and drove home to Charlotte. Marc's grandfather Cooper went with Marc back to the apartment the couple shared in Roanoke to pack his belongings. The grandfather reported to others that Robin started cussing Marc the minute he entered the apartment.

In Charlotte, Marc interviewed for a car sales job but lost out on it to someone with more experience. He was continually calling Robin and she would not return calls. He was depressed, crying, taking sleeping pills and drinking Vodka.

On April 28th, Marc Barnette called Robin at her mothers and was told she was having guests. He called back and got a male voice that he suspected was Benny Greene. Marc thought about Robin and Benny Greene being together, drank some beer and vodka and took Mario's car, saying he was going to Revco. Instead, he drove to Roanoke. He banged on Robin's apartment door, heard a gun cocked, knocked out the living room window and poured gasoline on the door and window sills and set it afire.

MC-0003276    7

Bates No. 4912

**JA661**

On 5/7/96, Marc learned it was Benny Greene in Williams' apartment. He obsessed over the newspaper report that named Greene, started drinking, sat on a paint can, and waited for the police to pick him up for the firebombing. He became driven to talk to Robin; he could not understand "why she was doing this to him". Marc said he jeopardized everything for nothing. He had abandoned his kids, skipped on probation, used his brother's identification, but he had to talk to Robin. No one, not even family, could stop him. He believed that Donald Allen would have stopped him or told someone. "It was like jumping off a cliff." (He has since corrected his belief, at the time, that "people would understand".)

Marc confronted Robin and said he wanted her to come with him, give him answers, and to tell him the truth. He threatened to kill her if she did not come with him. Marc remembered Robin looked in his eyes, said he was not going to kill her, and grabbed at the gun. Marc thought to himself, "There she goes again; I'm a weakling. She knows me too well." That angered him and "that's when it happened."

## 2. Psychiatric Diagnosis of Major Depressive Episode

Marc Barnette's had symptoms of depression that were preceeded by an upsetting family conflict (age 8) or a rejection (ages 14, 20). A Major Depressive Episode developed following his breakup with Robin Williams when he was age 22. The symptoms of depression date to his move out of their Roanoke apartment. Mario noted Marc to be severely depressed ("the most I've ever seen"), that he was reclusive, did not interact with the family, began smoking as a new habit, was drinking, not sleeping, only came downstairs occasionally to watch television, blocked off an area upstairs for himself that no one else was to trespass, would call Robin on the phone, and cried alot.

The DSM-IV sets the criteria for Major Depressive Episode as needing 5 or more symptoms present during the same 2-week period and represent a change from previous functioning: at least one of the symptoms is either (1) depressed mood or (2) loss of interest or pleasure. Marc Barnette had both depressed mood and loss of interest over a 3-week period as noted by mother and brother and self-report. He had 6 symptoms needed for diagnosis as follow.

- . marked diminished interest or pleasure;
- . sleep disturbance;
- . fatigue and loss of energy;
- . feelings of worthlessness;
- . diminished ability to think or concentrate or indecisiveness nearly every day;
- . recurrent thoughts of death

## Psychiatric Diagnosis of Personality Disorder Not Otherwise Specified

Marc Barnette also suffers from an Axis II Personality Disorder Not Otherwise Specified. The DSM-IV describes this as a category provided for a situations where the individual's personality pattern meets the general criteria for a Personality Disorder and traits of several Personality Disorders are present. The essential feature of a Personality Disorder is an enduring pattern of inner experience and behavior that deviates markedly from the

MC-0003277

8

expectations of the individual's culture and is manifested in at least two of the following areas: cognition, affectivity, interpersonal functioning, or impulse control.

Mark Barnette has features of Paranoid Personality Disorder which is a pattern of distrust and suspiciousness such that others' motives are interpreted as malevolent. He has elements of Antisocial Personality Disorder which is a pattern of disregard for, and violation of, the rights of others. He has elements of Borderline Personality Disorder which is a pattern of instability in interpersonal relationships, self-image, and affects, and marked impulsivity.

Interviews and testimony of ex-girlfriends describe these patterns. Alisha Chambers said that as the relationship developed, "jealousy set in. He didn't like what I wore and wanted to have a complete say over the entire relationship." Crystal Dennis described Marc Barnette as "very possessive, that she was not allowed to take a bath by herself, that he believed she had been unfaithful and was trying to wash away the evidence." Tasha Heard described Mark's jealousy and an incident when he pulled a gun on people because he thought she had other men in the apartment. Tasha denied to Mark that she was seeing other men or that she had even met Anthony, a man he accused her of seeing, but he did not believe her

*Pattern of Obsession and Obsessional Following*

Marc Barnette's faulty logic and disturbed judgment was noted over and over with his female relationships: Sheila, Tasha, Crystal, Alisha, and Robin. Obsessive pursuit of a person has both romantic and historical tradition. Studies have evolved from celebrity victimization, to a women's issue, to a broad spectrum of interpersonal violence. In fact, the research has grown from a handful of studies by the mid-1990s to over 100 studies as of 2000.

Marc Barnette was unable to detach from certain female relationships despite the woman's rejection; rather the obsession and pursuit continued. The highly respected forensic psychologist J. Reid Meloy has studied and written about patterns of obsession and obsessional following for over 15 years. He uses the term as the repetitive and persistent nature of a thought and that the preoccupation and stability of the individual may vary according to personality and mood of the person. An obsessional follower, according to Meloy, is a person who engages in an abnormal or long-term pattern of threat or harassment directed at a specific individual.

Meloy's analysis of 10 studies (n=180) describes pattern as more than one overt act of unwanted pursuit, rather, it is a pattern of behavior with inferred motivation. His study revealed 85% of obsessional followers had both an Axis I (substance abuse, dependence or mood disorder) and Axis II diagnosis (cluster B disorders not antisocial). An obsessional follower was more likely to have an intense and pathological attachment to his object of pursuit than chronic emotional detachment as noted in antisocial personality. His findings support psychologist Donald Dutton's research on batterers, linking borderline psychopathology, attachment theory and domestic violence.

MC-0003278

9

**JA663**

The obsessional follower's reality testing, according to Meloy, is likely to be seriously impaired. What appears to differentiate these individuals from others appears to be their aggression and pathological narcissism. A real event, such as rejection, challenges the compensatory narcissistic fantasy that he is special, loved, idealized, admired and linked to (or destined to be with) the pursued object. When the fantasy is disturbed, feelings of shame and humiliation are defended by rage. The intense anger fends off any feelings of sadness. Borderline defenses are used: denial, splitting, idealization. Overt paranoia is likely to be directed to third parties perceived as standing in the way of the object. The pattern to use threats, intimidation, or even violence as a mechanism for maintaining the relationship and avoiding abandonment raises the potential for dangerous behavior especially when inhibitions are lowered.

## Marc Barnette

Marc Barnette is a complex personality. He has many strengths and positive personality traits. Up until the 11th grade and the move to Atlanta, he did well in school, had no major infractions with the law, was involved with his family, had male friends, and had a work ethic. Sonia Cooper described Marc growing up as mild tempered and outgoing who was neat in his appearance and loving as a son. Derrick Barnette described his son as nice looking, smart, pretty happy, got along well with the neighbors, artistic, and good at sports, especially track. He said if he had been told Marc could have done this (crime), he would have said, "no way." He was shocked that this could have "happened over a girl". Mario Barnette described his brother as outgoing, interested in music, attentive, caring, but always having some boy-girl conflict.

It is clear that Marc Barnette has severe problems managing his relationships and emotions, perceiving female relationships, and coping with disappointment and rejection. He was rejection sensitive and when depressed, he moved into a biophysiological depression where nothing made him feel better. In his younger, teenage years, when rejected by Sheila, Tasha, Crystal and Alisha, he continued to pursue them and alternated between crying and pulling himself together, saying he just wanted to be with them, that all they had to do was open the door, listen to him, or talk to him. With Robin Williams's rejection, he treated his depression with alcohol which lowered his inhibitions. He threatened her with a weapon (as he had other women) and told her to come with him and give him answers. But she refused, and said he was not going to kill her.

From a clinical perspective, this young man has devoted his adolescent life to a continuous pattern of reenacting and trying to resolve the way he was programmed in childhood. This programming is revealed in the fingerprints of his repetitive, abusive relationships with women starting at age 14. His behavior was not understood by authorties as acting out; rather it was viewed as delinquent behavior and there was no counseling mandated even though one officer noted his emotional turmoil.

The depression, passive suicide attempts and acting out was rooted in the pattern of rejection, suspicion, and accusation. This combined with a deep-seated paranoia that escalated to violent acts that seemed justified from his position. Only when he saw the consequences of his act was he remorseful and realized it did not make sense. He was horrified at the damage he ultimately brought to someone he loved. He was helpless to

MC-0003279 10

Bates No. 4915

**JA664**

understand how he could move into an emotional state for the acts that horrified him. It was a repetition compulsion that was totally out of his control. Once he was emotionally close and dependent on someone, the confusion of his upbringing was triggered and with it came the programmed paranoia. He became suspicious of the very person he wanted to love. As he became more and more suspicious, ultimately the tension and pain behind it was released by a decision that he emotionally felt justified in acting and he abused or hurt her.

At that point, persons who interfered with him were an obstacle to the release of the tension and they were in a dangerous position. They would not know it. He interpreted everything from his position that he had to get to his desired object of pursuit, Robin Williams.

Retrospectively, he thought he was reacting to an external situation in which he was being provoked. But he was depressed and trying to maintain control over his identity confusion (whether or not he belonged, was he legitimate, was he meant to be). His whole existence was challenged. Understanding the mental state he entered when he became close to someone explained the reenactment (repetition compulsion).

His father became suspicious of his wife. Marc became programmed by the father's behavior. His father proved he was justified in his suspiciousness. It is important how a child interprets such information and how it becomes utilized in his own character and makeup. Marc was now programmed to be suspicious of women; they were not to be trusted. In fact, the more one loved the person, the more one could not trust her. This young man had not had a chance to understand his own integration, his own background and how influential was his family and childhood. Instead of understanding these relationships, he acted out aggressively to the women because he believed they were harming him. He felt threatened and needed to be vindicated. His adolescent acting out was the vindication of a small child. He had the emotional and thinking capacity he had when he was 11.

He also had a complex delayed grief reaction. He was told Derrick Barnette was not his biological father and his parents divorce. From his standpoint, he lost his parents on many different levels. He lost his sense of himself. His narcissism was his only coping mechanism. That is, there was only one person to take care of him and that was himself. He had the grandiose ideas of a child, for example, that he could be the big man in sales without prior experience or knowing the business.

Marc Barnette was programmed not to control his emotions. Men (stepgrandfather) kill when offended by a partner. Father spied on mother; men fight with women. Those are narcissistic defenses. A narcissistic individual cannot tolerate any reflection from another person that is not his own. Marc was not antisocial and unable to form attachments; rather, his attachments to people were fraught with ambivalence and he could not detach without anger. His character defenses covered a deep depression that surfaced when he was rejected. His identity was not formed; his attachments had been undermined by the paternity rejection and the betrayal of trust of mother and father. His only way to cope was through his programmed suspiciousness. No one challenged his irrational thinking; it was considered legitimate thinking. But it was also learned paranoia.

MC-0003280    11

The minute Marc Barnette became close to someone, he could not handle the emotion. He could not tolerate separation from a woman; when the woman tried to pull away, the rage and everything came forward. The minute he could not have control over the relationship he became anxious and depressed and sought to soothe himself with alcohol. It was not the affair but that he could not control the woman and have her total focus; it was infantile rage.

When asked about beating Crystal's children, he stated that his father did it. He identified with physical discipline for any infraction. He was so vulnerable to repetition. Any time he was confronted with something that resurrected information from his past as a child, he began to repeat in the form of the aggressor. That was the pattern. After it was over, he thought maybe he went too far, but "that's what my father would do".

Marc sought out Robin Williams; his behavior had a level of organization to it. He believed she had another boyfriend; he wanted answers but most of all he wanted her to declare her love to him and return. The anger intensified when that did not happen.

Please let me know if there are any questions on my report.

Sincerely,

Ann Wolbert Burgess, RN, DNSc.
Clinical Specialist in Psychiatric Nursing

MC-0003281   12

# MARK D. CUNNINGHAM, PH.D.

## CLINICAL & FORENSIC PSYCHOLOGY

*Diplomate in Forensic Psychology • American Board of Professional Psychology*

### Capital Sentencing Evaluation

Re:   United States of America v Aquilia Marcivicci Barnette,
      Criminal Docket 3:97CR23-P in the District Court of the United
      States of the Western District of North Carolina, Charlotte
      Division

Defendant:  Aquilia Marcivicci Barnette

Date of Birth:  7-7-73

Date of Report:    1-9-98

Dates of Evaluation:  1-3-98, 1-4-98

**Evaluation Techniques to date:**  Clinical interview and history,
limited third party interview, records review, literature review,
inspection of Morris Field Drive crime scene.

**Evaluation Techniques still pending:**   Additional third party
interview, additional records review, consultation with other
experts, additional literature review.

**Findings:**  The evaluation findings which follow are provisional to
the extent that additional evaluation techniques remain pending.

Mental status exam revealed an alert, fully oriented male with good
hygiene and appearing his stated age.  He was cooperative with the
extended interview and evaluation.  Speech was clear and coherent
without noticeable defect.  Thoughts were logical and goal directed
though with some circumstantiality, tangentiality, and excessive
detail.   There was no loosened associations.  Recent and remote
memory were intact.   Concentration was adequate though the
defendant became restless as the evaluation progressed.  Insight
was quite limited and judgement, particularly for heterosexual
conflict behaviors and relationship expectations, was poor.
Depressive symptoms are not currently pronounced.  Current suicidal
ideation was denied though this has been problematic in the past.
There was no evidence of a thought disorder.

Multiple mitigating issues are present which are likely to be
relevant to a jury in sentencing.  These include primary attachment
instability and insecurity, childhood geographic instability,
multi-generational domestic violence scripts, observed domestic
jealousy and violence, paternal abandonment, corruptive modeling,
vulnerability to alcohol abuse, depressive and post traumatic
symptoms, poor parental supervision and instruction, and other
developmental factors.  These mitigating factors form a nexus to
the instant offenses.

MC-0000331

There is conceptual and research literature regarding risk assessment of violence potential. Research literature describes actuarial and anamnestic approaches as being most reliable in assessing likelihood of violent behavior. Multiple actuarial studies indicate that the majority of individuals convicted of capital murder will not represent a disproportionate risk of violence while confined in prison. These studies are believed to be applicable to the defendant in forming a base rate estimate of likelihood of violence while incarcerated. This base rate can be individualized to the defendant utilizing anamnestic approaches regarding the nature, pattern, and context of the defendant's past violent acts as well as above listed developmental influences. Also relevant to this individualization is the defendant's past response to incarceration as well as other individualized variables. Individualizing the defendant's likelihood of violence confined for life to federal prison utilizing the above data indicates that his likelihood of violence in prison is below the capital group base rate. The Federal Bureau of Prisons has the capability to confine an inmate in a super maximum security setting which represents a context where the likelihood of violence toward staff or other inmates is even further reduced below the above individualized low probability.

Respectfully,

Mark D. Cunningham, Ph.D.
Clinical and Forensic Psychologist
Diplomate in Forensic Psychology
American Board of Professional Psychology

MC-0000332

## SEYMOUR L. HALLECK, M.D.
### 500 Laurel Hill Road
### Chapel Hill, NC 27514

Forensic Psychiatry       Phone: (919) 967-7999
                                  Fax: (919) 929-0709

December 30, 1997

*Via Fax (704-372-0181) and US Mail*

Mr. Paul J. Williams
Attorney at Law
Suite 801
Cameron Brown Building
801 S. McDowell Street
Charlotte, NC 26024

Re: Aquilia Marcivicci Barnette

Dear Mr. Williams:

        This is a summary of my findings concerning Aquilia Marcivicci Barnette. As you know, he is a 25 year old Black male who is facing two charges of capital murder. My report is based upon four visits with him on July 28, 1997, September 16, 1997, November 24, 1997 and December 18, 1997. My total interview time with Mr. Barnette was approximately 13 hours. In addition, I reviewed Mr. Barnette's medical records, school records, employment records, material prepared by your mitigation expert, autobiographical material prepared by Mr. Barnette, and the reports of two previous psychological examinations performed by Drs. Tyson and Warren.

**Relevent Past History**

        At the time of his birth, on July 7, 1973, the subject's mother was 14 years old and the man who was assumed to be his father was 16 years old. His mother and father saw each other frequently when Mr. Barnette was an infant, but they did not get married until he was approximately 2½ years old. Some of the subject's rearing was left to the grandparents, but, unfortunately, Mr. Barnette's maternal grandmother was killed by her boyfriend when Mr. Barnette was 14 months old. When he was approximately four years old his paternal grandmother died suddenly and there was suspicion that she had been poisoned.

        In his pre-school years, Mr. Barnette's rearing was left to his mother, his mother's older sibling, to a slight extent his grandparents, to his mother's aunts and to a slight extent to his father. There were many moves to different residences during his early

MC-0000282

development.   For a time Mr. Barnette's mother lived with an older sister in South Carolina.  After her marriage to Mr. Barnette, who had by this time enlisted in the military, the family also lived for a time in South Dakota.  There were also several moves to different residences in Charlotte where Mr. Barnette spent the bulk of his pre-adolescent days. Mr. Barnette went through the exercise of trying to figure out how many residences he had lived in by age 13, and he was able to count eleven different places.  This was before his mother took him to live in Atlanta when he was approximately 14 years old.

Mr. Barnette recalls his early family life as abusive as well as chaotic.  The abuse was primarily inflicted by his father who he believes singled him out for severe punishment for the slightest wrong doing.  He feels his father never punished his four years younger brother the same way.  The punishment consisted of long beatings with a belt or coat hanger.  He states that his father would tell him that he was going to beat him until he couldn't lift his arm any longer.  He states that some of the beatings went on for over an hour.  He sustained many bruises as a result of these beatings and claims that on one occasion he convinced somebody to call the Division of Social Services, but that no action was taken.  He lived in constant dread of these beatings from about the time he was 4 years old until he was approximately 10.  He is particularly angry with his mother for not having intervened in the father's excessive punishment and for never responding to his cries for help.  He also reports that on one occasion his father tried to choke him.  He recalls one childhood effort to run away from home but he did not get very far.

In describing his childhood, Mr. Barnette has a powerful recollection that much of the time his parents did not want him around.  He was often told to go outside to play and feared he would be beaten if he went into the house before his parents invited him back.  He often assumed that they were either having sex or fighting while he was out of the house.

He reports that by the time he was 7 or 8 years old his parents were fighting with each other frequently, both accusing the other of various infidelities.  Sometimes they had fist fights and sometimes these took place in public.  He has a vivid memory of his parents fighting in front of his school mates as he was boarding a school bus.  The process of the couple becoming separated and divorced began when Mr. Barnette was 11 years old.

While he was somewhat relieved to know that the separation diminished the probability of punishment by his father, he also notes that his mother's conduct deteriorated at this time.  She became involved with another man (who was later killed) and spent very little time taking care of Mr. Barnette or his younger brother.  She spent whatever money she earned on her new lover, usually extravagantly, and there was very little left for the children.  Mr. Barnette also believes that at about this time his mother began using drugs, particularly cocaine, in an excessive manner.

During the years from about 11 to 16, Mr. Barnette had a very stormy relationship with his mother who he did not trust to take care of him or his brother.  When Mr. Barnette was approximately 15, his father informed him that a paternity test had been done

MC-0000283

Case 3:12-cv-00327-MOC   Document 71-14   Filed 12/22/14   Page 67 of 100
Bates No. 14241

JA670

in the process of reaching a monetary settlement with the mother and these tests indicated that neither Mr. Barnette nor his younger brother were the children of his alleged father. He recalls this as an extremely disturbing moment in his life. He has no idea who his real father might be and he continues to think of the man who married his mother as the only father he has ever had.

With all of the changes in residences there were, not surprisingly, a number of school changes as well. Mr. Barnette recalls attending seven different schools before the age of 15. His performance was erratic. At times he seemed to do quite well and other times did quite poorly. His best year was in 5th grade when he attended a Catholic school and responded extremely well to the discipline and intellectual stimulation. Unfortunately, funds were not available to continue his education at this school for more than one year. There is no evidence that Mr. Barnette had difficulty relating to peers in school. He did not have any serious physical illnesses during these years. While he was smaller than most of his peers, he was a good athlete. This, together with an outgoing personality, gave him some status with other students.

Mr. Barnette began having intimate sexual relationships with a two years older female cousin when he was 7 years old. While these relationships did not at the time culminate in sexual intercourse, there was considerable genital stimulation involved. He also reports two other sexual experiences with girls in school before the age of 10. He began having sexual relationships on a regular basis when he was 13 years old and has had many partners in the ensuing years. He sees himself as always having been obsessed with sex and interested in having sex on a daily basis and sometimes several times a day. He describes himself as always having been attractive to women and insists he has no problem with finding women to have sex with. He denies any interest in homosexual activities and denies that such experiences have occurred. As he reached adolescence, he began to become more infatuated with certain women with whom he tried to sustain a long-term relationship. He was unsuccessful in maintaining any of these relationships for more than a year. He did father two children by one of these women during his adolescent years. The burdens of trying to be involved with the mother of his children and making some effort to care for his children eventually led to his dropping out of high school.

Mr. Barnette acknowledges that he tends to get deeply with women who always turn out to be unfaithful to him. He also admits that he usually has been unfaithful to them as well. He also admits that there has been some element of violence involved in all of the close relationships he has with women. Sometimes these women were violent towards him as well.

After the birth of his first child, Mr. Barnette became somewhat closer to his mother. They have had a close relationship for the past eight or nine years but apparently there has been some violence involved. Mr. Barnette acknowledges that shortly before the murders for which he was charged, he was involved in a fist fight with his mother.

MC-0000284

4

Another pervasive theme in Mr. Barnette's life is a preoccupation with suicide. Thoughts of self-harm seem to come and go and they are rarely sustained. They seem to be effected by his moods, which he and those around him have noted, change rapidly. He believes that his rapid mood changes are also characteristic of some his mother's behavior. At any rate, since about the age of 8 he has had many thoughts of killing himself either by over dosing on pills, jumping off a bridge, or shooting himself. He recalls taking an over dose of Tylenol at age 8 because he was worried about bad grades. He made similar over dose attempts in 10th grade related to disappointing relationships with girls. In May, 1996, while in the process of brooding over the separation from the eventual murder victim, he would sometimes put a pistol in his mouth and think about shooting himself. On one occasion early in May of that year, he took a large number of "sleeping pills" (probably over-the-counter medication) and drank a lot of vodka. At that time he was depressed, not only over the loss of his girlfriend but also at his failure to have received a job as an automobile salesman. He believes that he would have died at this time if he had not vomited up the pills. Mr. Barnette also reports two attempts to asphyxiate himself by running a hose from the exhaust pipe to the car trunk immediately following the murders. One attempt was mechanically unsuccessful and the other was interrupted by a passerby. He was also suicidal in the early weeks following his incarceration, was on suicide watch, and was treated briefly with anti-anxiety and anti-depressant drugs.

Mr. Barnette's experimentation with alcohol and marijuana began when he was approximately 11 or 12 years old. He has been an occasional user of marijuana but a rather frequent and heavy user of alcohol. He has experienced hang-overs, tremors and blackouts.

Mr. Barnette has had several jobs since adolescence and is generally described as a good worker. He has been particularly successful in jobs which involve interacting with the public and sales. Because of his many moves and different involvements, there have been a variety of job changes but he was able to hold at least one fairly responsible job for over one year. He was fired from one job while living in Roanoke, Va., allegedly for sexual harassment. He acknowledges that he did pat a female coworker "on the rear end."

## Psychological Issues Related to the Crime

Mr. Barnette has had some difficulties with the law prior to these current charges, but none resulted in more than two months of incarceration. One of the charges was cruelty to the children of a woman he was living with . He apparently beat them with a coat hanger. He claims he did this when he found them experimenting with each other sexually. His other problems with the law have apparently related to his problems with women and problems with men who were interested in these women.

In 1992, in an altercation with a young man who was interested in one of his girlfriends, Mr. Barnette was arrested for shooting that individual. The case was disposed of when he was convicted of pointing a gun or pistol at another and punished by time served (25 days). When involved in an extremely contentious relationship with a minor woman in late 1993, he was charged with kidnapping, rape and assault with a deadly

MC-0000285

Case 3:12-cv-00327-MOC   Document 71-14   Filed 12/22/14   Page 69 of 100

Bates No. 14243

JA672

weapon against this woman. These charges were later modified and he received probation.

Mr. Barnette has also been involved in another violent relationship with a male cousin over family matters. In this incident it was Mr. Barnette who was shot in the leg and hand. He underwent surgical treatment following this shooting and he was still somewhat disabled at the time he was involved with eventual female victim.

Mr. Barnette began his relationship with the female victim about the same time that he was trying to extricate himself from a relationship with the minor female with whom he had gotten into trouble for charges of kidnapping and assault. The couple immediately fell in love and sustained a relationship for almost two years. He moved to Roanoke to be with her and the couple was planning to get married. He felt that his relationship was different than any he had ever had before. He does think that they fully revealed themselves to one another and trusted one another. In spite of his view of the relationship as idyllic, there were apparently some problems as early as the end of the first year of the relationship, following physical violence between the two of them. She either cut or bit his finger in May, 1995, which was a severe enough injury to require going to the hospital where he had surgery performed.

In the last year of the relationship, there was increasing suspicion on his part that she was interested in other men, particularly an old boyfriend, many accusations of her infidelity on his part and some physical violence. She always denied that she was involved with anyone else and told him that she loved him. In April, 1996 the relationship was clearly falling apart and she asked him to leave the apartment. He went back to Charlotte, brooded, and in May of that year attempted to harm the man whom he believed was her lover. He went to Roanoke and fire bombed the victim's apartment resulting in her receiving serious burns. During the ensuing one and one-half months he found himself unable to work, drank heavily on an almost daily basis and brooded about her disloyalty.

During this period he had difficulty sleeping and concentrating. His energy level diminished, he felt anxious and worthless. He thought about suicide frequently. His self-esteem dropped. There were periods of time during which he was able to talk himself into simply dropping the relationship, but he regularly returned to brooding about it. Eventually, he worked himself up into a rage and he could think only about hurting her and her lover. During the weeks preceding the two crimes for which he has been charged, Mr. Barnette was abusing alcohol, was experiencing rapid mood swings, periods of severe depression punctuated by powerful feelings of anger. Homicidal thoughts alternated regularly with suicidal impulses.

**Mental Status Examination**

Mr. Barnette is a small, wiry, pleasant looking young man who interacts easily with the examiner. He is fully oriented as to time, place and person. He was animated and energetic throughout the interviews, often punctuating some point he is making with his

6

wave of his arm or some exclamation. During the second interview he spent great deal of the time pacing up and back around the small room as he talked continuously. Mr. Barnette obviously likes to talk and will do for long periods of time if not interrupted. He tends to describe his past and current life in an extremely detailed way, sometimes reporting details which are irrelevant and sometimes going off on tangents before he reaches his goal idea.

He is quite explicit in reporting a history of moodiness, suicidiality and also acknowledges there have been times in his life where he has had little need for sleep, has been hyper-active, expansive, irritable and has had unlimited energy. All of this seems to born out by much of his behavior and mood during the interviews. He cried several times during the first two interviews, but he also showed an unusual amount of hyperactivity, volubility and energy. In short, his appearance during some of the examinations was reminiscent of individuals who are experiencing hypomanic episodes.

On formal testing of psychological functions Mr. Barnette shows good recent and remote memory. There is currently no evidence of delusions or hallucinations. He currently has good insight into the irrationality of his previous behavior. He is stunned by the realization that he has been able to act so irrationally and violently. He is truly saddened by the loss of his girlfriend Robin and exhibits great anguish with regard to the death of both victims.

Mr. Barnette has apparently adjusted well to incarceration after the first few weeks of suicidality. This good adjustment has been sustained both at the Mecklenburg County Jail and at the Federal Correctional Institution in Butner. He has the apparent ability to get along well other inmates without being either a target or an aggressor. In our early interviews, he indicated that he would prefer the death penalty to life imprisonment but this view has been changing as he becomes accustomed to incarceration.

Diagnostic Impressions

Mr. Barnette does not fit smoothly into any of the DSM IV categories. He has periodic short depressions throughout his life alternating with periods of hyperactivity and possible hypomanic behavior. I believe that in the weeks between the middle of April and the middle of June, 1996 he met the DSM IV criteria for major depressive episode. He also meets criteria for substance abuse disorder, at least for the past two years. With the evidence of his periodic depressions, at least one major depressive episode, and some history of hypomanic behavior, the diagnosis of Bipolar Disorder II might also be considered.

Respectfully submitted,

*[signature]*

Seymour L. Halleck, M.D.

MC-0000287

COPY

Forensic Evaluation

F I L E D
CHARLOTTE, N.C.

JAN 8 1998

U.S. DISTRICT COURT
W. DIST. OF N.C.

NAME:                      Aquilia Marcivicci Barnette
REGISTER NUMBER:           12599-058
DOCKET NUMBER:             397-CR-23-P
DATE OF BIRTH:             07/07/73
DATE OF REPORT:            12/29/97

IDENTIFYING INFORMATION: Mr. Aquilia Marcivicci Barnette is a 24-year-old, Black male most recently from Charlotte, North Carolina, who was admitted to the Health Services Division of the Federal Correctional Institution, in Butner, North Carolina, on 11/17/97, to undergo psychiatric evaluation. In a Court Order dated 11/05/97, the Honorable Robert D. Potter, Senior, United States District Judge, for the Western District of North Carolina, Charlotte Division, issued an Order requesting that Mr. Barnette be committed to the custody of the Attorney General for the purpose of a psychiatric or psychological examination pursuant to Title 18, United States Code, Section 4241(b) and 4242(a). This Order followed examination of the record and motions in this case by the Court in a finding that there was reasonable cause to believe that the Defendant may presently be suffering from a mental disease or defect rendering him mentally incompetent to the extent that he is unable to understand the nature and consequences of the proceedings against him or to assist properly in his defense. The record further indicated that the Defendant had filed a Notice of his intention to rely upon a defense of Insanity as provided by Rule 12.2 of the Federal Rules of Criminal Procedure and that the Government was entitled to have an examination of the Defendant conducted as provided by Title 18, United States Code, Section 4242. The Court Order indicated that the time period for the examination would be calculated upon the Defendant's arrival at the Institution. It further ordered that the report of the results of the examination be filed with the Court and copies be provided to the Defense Counsel and United States Attorney as required by Title 18, United States Code, Section 4247(c).

Mr. Barnette is charged in an eleven-count indictment with criminal acts occurring between 04/30/96 and 06/22/96. Charges include the following: on or about 04/30/96, travelling across state lines with intent to injure, harass, and intimidate an intimate partner (Robin Williams), and in the course, intentionally committing a crime of violence (firebombing an occupied apartment and automobile in the driveway) causing bodily injury to her, in violation of Title 18, United States Code, Section 2261(a)(1) and 2261(b); on or about 04/30/96, using and carrying a bottle filled with flammable liquid in an act of interstate domestic violence, during, and in relationship to, a crime of violence, and the carrying of the destructive device, in and of itself, in violation of Title 18, United States Code, Section 924(c)(1) and 844(h)(1); on or about 05/21/96, providing false information in connection with false acquisition of a firearm, in violation of Title 18, United States Code, Section 922(a)(6) and 924; between 05/21/96 and 06/22/96, sawing off part of the barrel of the gun, in violation of Title 26, United States Code, Section 5821, 5822, 5861(f) and 5871; on or about 06/22/96, having been convicted of a felony, possessing a firearm in violation of Title 18, United States Code, Section 922(g)(1) and 924; on or about 06/22/96, shooting to death and taking from the person of Donald Lee Allen, a motor vehicle (1994 Honda Prelude), in violation of Title 18, United States Code, Section 2119(3); on or about 06/22/96, using and carrying a firearm during and in relation to a crime of violence (carjacking) and causing the death of Donald Lee Allen (that is murder by shooting him with a firearm), willfully, deliberately, maliciously, and with premeditation in violation of Title 18, United States Code, Section 924(c)(1) and (i)(2)(1); on or about 06/22/96, transporting a motor vehicle from North Carolina to

1.

FS-000475

Virginia, in violation of Title 18, United States Code, Section 2312; on or about 06/22/96, shooting and killing Robin Williams, in violation of Title 18, United States Code, Section 2261(a)(1) and 2261(d); and on or about 06/22/96, using a firearm and in the ourse of the violation, causing the death of Robin Williams (murder), killing with malice aforethought by shooting with a firearm, willfully, deliberately, maliciously, and with premeditation in violation of Title 18, United States Code, Section 924(c)(1) and (i)(2)(1). These charges occurred in the Mecklinberg County in North Carolina and the Roanoke area of Virginia. There are no codefendants. Mr. Barnette is represented by George E. Laughrun, II, and Paul J. Williams. The Assistant United States Attorney assigned to the case is Robert Conrad.

Early in the evaluation period, the Defense Attorneys contested the examination and a number of motions were filed by the defense and prosecution in the case. On 12/03/97, an Order was issued by Judge Potter ruling on several issues. Conclusions of the Order were that the evaluation could proceed; that the Order would be amended for psychiatric examination in compliance with *U.S. vs. Beckford*; that the Defendant would deliver the report of Dr. Tyson completed in 1994, under seal to the Clerk of Court, no later than 12/08/97, at noon, and that the Clerk would immediately forward that report under seal to this evaluator (Dr. Sally Johnson) by way of overnight mail service; and that the government's request for examination of the Defendant by another health professional in addition to the examination in Butner, would be granted.

During this evaluation period, Mr. Barnette was evaluated by Sally Johnson, M.D., Chief Psychiatrist and Associate Warden of Health Services at the Federal Correctional Institution in Butner, North Carolina. Under her supervision, Charles Vance, M.D., Forensic Fellow, conducted several interviews with Mr. Barnette. Psychological testing was completed by Michael Schaefer, Ph.D., and the results of that testing will be included in this report. Other members of the Health Services Division staff had the opportunity to interview and interact with Mr. Barnette during the evaluation period and their observations and assessments were considered prior to the completion of this report. Mr. Barnette did undergo review of his medical history, physical examination, nursing assessment, and social assessment during the evaluation. Defense-retained psychiatrist Seymour Halleck, M.D., had the opportunity to interview Mr. Barnette on site during the evaluation period on two occasions. Arrangements were also made for defense-retained psychologist Mark Cunningham, Ph.D., to evaluate the patient, but he cancelled his session on the day for which it was scheduled. Mr. Barnette had the opportunity to speak with his attorneys by phone and in person during the evaluation period.

Extensive collateral information was made available for review during the evaluation period. Requests for information were made both to the prosecution and defense attorneys. Collateral information that was available included a letter dated 11/06/97 from Assistant United States Attorney Robert Conrad, and a packet of information including: the Bill of Indictment; a Notice Specifying the Defendant as an Armed Career Criminal; a Notice of Intent to Seek the Death Penalty; and a copy of a Brief in Opposition to the Defendant's Motion to Suppress the Statements of the Defendant. The prosecution also forwarded four volumes of material from the Government's discovery for review. In summary, the discovery materials included numerous reports, interviews, forms, notifications, examination reports, transcripts of interviews, narrative summaries and records. Attachment A is a copy of the list of materials provided. A packet of information was also received from Defense Attorney George E. Laughrun, II. It included a letter dated 12/09/97 and a copy of the Complaint, Indictment, and a description of possible punishment facing the Defendant. A letter was received from Paul J. Williams, dated November 20, 1997, verifying that Seymour Halleck, M.D., was being retained as the Defense psychiatrist. A copy of the report written in 1994 by William M. Tyson, M.D., and brief records from the Blue Ridge Behavior Systems, were also received. Included with the above listed material was a

2.

FS-000476

copy of a 07/17/96 letter from Dr. Tyson to Susan J. Weigand, Assistant Public Defender, in Charlotte, North Carolina; a letter from Susan J. Weigand to Dr. Tyson dated 07/12/96; and a copy of the release of information form signed by Mr. Barnette dated 07/12/96. The letter is addressed to Mr. VonKallist who was the attorney assigned to represent Mr. Barnette in the earlier criminal action. The packet also included a page of hand-written notes from February of 1994 to March of 1994 and an unsigned letter to Dr. Tyson from Paul J. Williams, dated 06/17/97, concerning sending raw test data scores and material to Faye E. Sultan, Ph.D. Records were requested from the Mecklinberg County Jail where Mr. Barnette had been housed since 06/25/96, but no records were received. Through phone conversation, we were able to obtain some information regarding his stay at that facility and this will be addressed in the body of the report. Dr. Johnson did have the opportunity to speak by phone, briefly, to Defense Attorney Paul J. Williams and to Prosecuting Attorney Robert Conrad. She also spoke with Sonia Barnette, Mr. Barnette's mother.

DATES OF CONTACT/PROCEDURES ADMINISTERED: During the evaluation period, Mr. Barnette was interviewed individually and jointly by other members of the Health Services Division Team. He was generally cooperative with the evaluation, although he indicated that his attorneys had instructed him not to discuss detailed information about the offense. Nonetheless, he spoke quite openly and freely about his behavior around the time in question. He was viewed as being a generally reliable historian, in that, for the most part, the accounts of his behavior and history coincided with that obtained through collateral sources. Interviews with the Defendant were conducted from the point of his arrival on 11/17/97 until he was returned to Court by the United States Marshal Service on 12/19/97. The following procedures were administered during this evaluation:

Clinical Interviews (ongoing)
Physical Examination (11/17/97)
Minnesota Multiphasic Personality Inventory-2 (MMPI-2) (11/26/97)
Wechsler Adult Intelligence Scale - Revised (WAIS-R) (12/10/97)
Wechsler Memory Scale - Revised (WMS-R) (12/11/97)
Personality Assessment Inventory (PAI) (12/11/97)

At the outset of evaluation period, and repeatedly throughout the evaluation, the limits of the confidentiality of the information provided, as well as the purpose of the evaluation, was discussed with Mr. Barnette. He expressed a full and detailed understanding of the evaluation process and the nature of the report that would be prepared. He clearly understood questions that were being raised by the Courts and how the evaluation had come about.

BACKGROUND INFORMATION: Mr. Barnette was born 07/07/73 in Charlotte, North Carolina, to the union of Sonia Cooper Barnette and Derrick Barnette. He is the oldest child of two born to that union having a younger brother, Mario, who is currently approximately 20 years of age. Mr. Barnette's parents remained married until he was approximately 12 years of age, when they separated and subsequently divorced. Approximately three years later, his father remarried to Marcela Sifford and Mr. Barnette has two step brothers as a result of that union: Marcus who is 21, and Allen who is 25. Although his mother has not remarried she has been involved in a long term relationship resulting in the birth of a younger, half brother John, who is currently approximately four years of age. Mr. Barnette describes his early life in relatively positive terms, although he describes verbal bantering between his parents, some of what he viewed as excessive physical discipline on the part of his father towards himself, and some excessive alcohol use by his mother. Both parents were employed and remain employed. His father works as a computer analyst for the Postal Division and currently lives in Maryland. His mother works in the human resource area and is currently employed with a

3.

FS-000477

temporary job agency placing people into work situations. Mr. Barnette did indicate that as a child he and his brother spent some time alone after school, but this seldom exceeded an hour or so. As a child, Mr. Barnette, went by the nickname as Vicci or Vicc. At his own insistence, people eventually began calling him Marc.

Mr. Barnette denies any family history of criminal involvement, significant psychiatric problems, significant medical problems, or significant drug abuse history. The alcohol use of his mother has already been noted.

Mr. Barnette attended school from Kindergarten through tenth grade and discontinued his educational involvement in the eleventh grade. He began his education in Charlotte, by attending Beverly Woods Elementary School from Kindergarten through third grade. In the fourth grade, he attended Barrenger Elementary School. In the fifth grade, he was enrolled for one year in a Catholic School, Our Lady of Consolation, which was the same school his father had attended as a child. He indicated that during that year both his grades and conduct improved. He could not continue there due to the separation of his parents and subsequent lack of financial resources. In the sixth grade, he attended Cotswald Elementary School. Seventh and eighth grade were completed at Randolph Middle School, and the ninth grade was completed at Smith Junior High, all in Charlotte, North Carolina. At that point in time, his mother with whom he was living, moved to the Atlanta, Georgia area, and he began his high school education at Lasonia High School. During the tenth grade, he started "hanging out with friends," skipping school, and failed to complete sufficient credits to continue with his grade level. He left school on several occasions and to date has not succeeded in completing either his GED or receiving a high school diploma. During the same time period of early high school, he met Natasha Heard, with whom he developed a sexual relationship and fathered two children, Angelica and Aquila, who are currently seven and five years of age respectively. They remain in the custody of their mother and Mr. Barnette has had no contact with them over the last few years.

Mr. Barnette has never been involved in military service. He has been employed in a variety of occupations and work settings and on occasion has been assisted by his mother in obtaining placement in various jobs. His employment settings have included short stints of employment with Brickhouse Pizza, A-1 Service Personnel (a temporary job agency), Arby's, Blockbuster Video, Pizza Hut, TempWorld, Harper's Restaurant, Bojangles, Taco Bell, Hot & Now, Courtyard by Mariott, Best Western Hotel, Camelot Music, and Electrolux. He has spent as little as one week on a job and many employment situations were part time and not continued for more than a few months. He denies ever being on unemployment or receiving any type of disability. At the time of the alleged offenses, he was attempting to obtain employment in automobile fields, but had been unsuccessful in his initial efforts in the Charlotte area. Mr. Barnette does indicate that financial problems resulting from his lack of consistent employment played a role in the breakup of his most recent significant relationship which was with one of the victims, Robin Williams.

Mr. Barnette described a series of significant relationships with females since that described above with Natasha Heard, but has no other children. Following the development of problems in his relationship with Natasha, he began a relationship with Crystal Dennis. She had two children from other relationships, and they moved in with Mr. Barnette for a period of time. After a brief period, he began a relationship with Kwanna Dozier. The relationship was of relatively short duration and he subsequently began a relationship with Alicia Chambers in approximately 1993. This relationship also dissolved and it was followed shortly thereafter by his involvement with one of the current victims, Robin Williams. He moved in with Robin Williams in 1995, but broke up with her in April of 1996 shortly before the first charged offense of April 30th. He is currently not involved in any type of

4.

FS-000478

romantic relationship. As outlined below, his relationship history is intertwined with his criminal history. Mr. Barnette describes himself as heterosexual and denies any type of sexual dysfunction.

Mr. Barnette denies any history of significant drug use or abuse, although he admits to the use of alcohol. He does indicate that in his early teens he did try marijuana, but did not continue the use of this drug. He denies ever trying any other forms of illegal substances.

Mr. Barnette gives a relatively detailed account of his alcohol use beginning at age 12 when he first drank some beer in a group setting. He describes drinking to the point of intoxication on that occasion. He continued his alcohol use (primarily beer) up until the present. He denies any withdrawal symptoms. He did not normally drink to the point of intoxication, but occasionally did so. He describes doing that, for the most part, at home, and not being involved in driving while intoxicated. He does admit to drinking other types of alcohol and in addition to beer, but describes beer as his preferred drink. He was drinking on the day prior to the alleged offenses, but in his words, "I was not sloppy drunk." He does indicate that he had drunk as much as a six pack of beer during the course of the day.

Mr. Barnette has no significant psychiatric treatment history. He did undergo a psychiatric evaluation prior to the alleged offenses in 1994. That evaluation, conducted by William Tyson, Ph.D., was done as a result of his legal situation, which involved significant problems in his relationship with Ms. Chambers. He does claim that while still in high school, he became upset over a relationship and took an overdose of some type of over the counter medication. This did not require hospitalization and he did not receive any specific treatment. He also claims one suicide attempt in response to his current charges. He claims that he purchased a section of garden hose and attempted to asphyxiate himself by carbon monoxide poisoning on 06/22/97. He describes being unsuccessful as a result of a construction worker finding him in the car and interfering with his plan. He has not undergone any alcohol use counselling or treatment, and prior to the alleged offense took no psychotropic medication. After his arrest and incarceration in Mecklinberg County Jail, he experienced anxiety and problems sleeping. He was seen by the psychiatrist there (Dr. Short, first name unknown) who felt he was experiencing an Adjustment Disorder. He was treated with antidepressant and antianxiety medications (Desyrel and Ativan). He describes that his sleep did improve with the medication, but he found himself quite drowsy during the day. On his own, he began to cut back on the medication. He voluntarily discontinued the medication around August of 1997, and has not experienced further problems with sleep or depression. Though he contemplated suicide in close proximity to arrest, he denies any suicidal ideation for months and expresses his motivation to live.

Review of collateral information received from William Tyson, Ph.D., indicates that Dr. Tyson saw Mr. Barnette at Mr. VonKallist's request in regard to legal charges that were pending at the time. Dr. Tyson administered a battery of psychological tests including the Minnesota Multiphasic Personality Inventory-2, Incomplete Sentence Blanks, Adult Survivor of Dysfunctional Family Checklist, Wechsler Adult Intelligence Scale-Revised, Bender Gestalt Test of Visual Motor Performance, and the Rorschach Ink Blot Technique to Mr. Barnette in February of 1994. Dr. Tyson opined that Mr. Barnette was both competent and responsible. He did make vague references to the existence of psychological and behavioral problems, but did not believe these interfered either with his competence or responsibility. Further details were not available.

Mr. Barnette has remained in relatively good physical health throughout his life. He does indicate one traumatic injury which occurred in 1995 and did result in some disability to his right hand and pain in his right leg. He indicates that a distant cousin, Ladin Barber, shot him while he was in his home,

5.

FS-000479

causing an injury to his right hand and leg. Mr. Barnette underwent medical evaluation and treatment, and Mr. Barber subsequently was tried in regard to the charges. Mr. Barnette did serve as a witness during that trial. Mr. Barnette claimed that as a result of the shooting he suffered some emotional upset and that memories of the event bothered him for a period of time. He did not describe any specific mental health treatment as a result of that injury.

Mr. Barnette denies any specific juvenile criminal history. As noted, he did have some episodes of being truant from school and was involved in underage drinking. His adult criminal record, as noted above, is intertwined with his relationship history. Available information indicates that in May of 1992, he was arrested in Newnan, Georgia, and charged with Discharging a Firearm near a Public Highway, Reckless Conduct, Pointing a Gun at Another, and Battery. He was convicted on three of the four accounts with the count of Reckless Conduct being dismissed. He was given time served. The charges stemmed from an incident with an acquaintance of his, wherein he claims he was confronted by the victim and several other individuals while he was walking home. This resulted from some relationship problems he was having, involving the sister of this individual and his girlfriend, Natasha. He claims he had found a weapon prior to the event and had it on his person at the time he was confronted by the victim and his friends. Fearing assault, he discharged the weapon and shot the victim, Anthony Britt. He claims the other individuals fled. Despite the fact he was arrested and charged for the behavior, he viewed the Court as being understanding of his position in the case, and claims that is why he was given a minimal sentence. In November of 1992, he was charged by Natasha Heard with Criminal Trespassing, but the charge was dismissed. In January of 1993, he was arrested on two counts of Cruelty to Children and Simple Battery. He was subsequently convicted on the Cruelty to Children charges in March of 1993, and was given a period of probation and a fine of less than $500. This episode allegedly involved him beating his girlfriend's (Crystal Dennis) children with a wire coat hanger, to the point that the children's grandmother identified the injuries and reported him to Social Services.

In March of 1994, he was initially charged with Rape and Kidnapping in regard to Alicia Chambers. The victim had been involved with Mr. Barnette since some time in 1993. Eventually these charges were pled down to Breaking and Entering and Felonious Restraint. Mr. Barnette received again a period of probation. It was during the time of the resolution of these charges that Mr. Barnette became involved with Robin Williams, one of the victims of the current charged offenses.

Mr. Barnette relates that he met Robin Williams in the fall of 1994. As was noted, this was during the time of resolution of the charges stemming from the relationship with Alicia Chamber.' He indicates that he was feeling down about his legal situation and a friend came by and took him to Virginia on an errand. As a result of that trip, he met Ms. Williams. They immediately "clicked" and during the next few days he fell in love with her. They saw each other off and on for the next several months and then around March of 1995 he moved in with her in Roanoke. She was employed at the local hospital as a secretary. Mr. Barnette alternates between describing the relationship in somewhat ideal terms and talking at length about the problems that developed. Apparently by the fall of 1995, Ms. Williams suspected that he was seeing someone else. He admitted that he was involved in an affair, but discounts the significance of that. He states that by September he began to suspect her of seeing someone else. He describes intermittent arguments where fidelity was the focus. During the same time period, he experienced some difficulty in maintaining a job, after he lost his job with Camelot Music as a result of accusations of sexual harassment. He did admit to involvement with a female employee there. Financial problems developed in that he and Ms. Williams had accumulated a significant amount of debt and were not always able to pay the bills. Although he had entered the relationship with the agreement that the expenses would be split in half, by the spring of 1996, he was unable to contribute his half of

6.

FS-000480

the expenses. Following a day or two of arguing in April, they parted and he returned to Charlotte to his mother's home despite his lack of interest in moving back to that area. He claims that he spoke with her by phone on a few occasions after returning to Charlotte. Although he denies any specific plans of reuniting in the near future, he claims he maintained some thought that at some point down the road, in six months or a year, they would get back together. He does indicate that he returned to Roanoke shortly after he left to retrieve some of his property. He claims that during that visit, Ms. Williams put him down in front of his family and her family, and made it appear that he had been sponging off of her by staying with her in Roanoke.

Mr. Barnette gives somewhat conflicting accounts of his mood state during the early weeks after the breakup. Initially he indicated that he threw himself into efforts to obtain a job and reestablish his life. He describes that an uncle assisted him in trying to get a job at a Saturn car dealership. Mr. Barnette describes that the job fell through and left him "in a funk." He describes himself as sinking to a "low ground zero." In other discussions, Mr. Barnette describes his continued suspicions that Ms. Williams was involved in another relationship. He indicates that during a call to her, after the breakup, it was evident to him that a male was at the apartment. Although Ms. Williams alleges that it was an old friend from school, he knew that, in reality, the individual was a man by the name of Benjamin Green. Mr. Barnette indicates that Ms. Williams had maintained a friendship with Mr. Green for an extended period of time but never let Mr. Barnette meet Mr. Green or know any of the details of their relationship.

Mr. Barnette is charged with firebombing Ms. Williams' apartment in Roanoke, Virginia, on or about April 30, 1996. Initially Mr. Barnette vaguely disclaimed any involvement in that activity. He indicated that someone sent him an article describing the firebombing from a Roanoke paper and it was in that article that he read about a male friend, Benjamin Green, spending the night with Ms. Williams. He claims that information contributed to his mounting anger about his situation and the anger directed toward Ms. Williams. Later, Mr. Barnette did not deny involvement in the firebombing, but claimed his intent at that time was not to kill Ms. Williams.

Collateral information available in regard to that episode was obtained from an interview with Robin Williams that took place on May 30, 1996. She indicated that on April 30, 1996, she was in her residence. Around 3:30 in the morning, she heard several loud bangs on the front door. She raised the blinds and saw Mr. Barnette, who made a series of derogatory statements directed toward her. Apparently, Mr. Barnette took a bat and hit the window. He shot at a pane of glass, cut the phone lines, and smashed Mr. Green's car windows (his car was in the driveway). He then threw some type of incendiary device under the door. He indicated that he was yelling "die, bitch, die." As a result of the firebombing, Ms. Williams suffered burns on her arm and required hospitalization. Mr. Barnette's drivers license was left at the scene, as were the wire cutters that were used to cut the phone lines, and a lighter.

Apparently, following the firebombing incident, Mr. Barnette returned to Charlotte. Despite Ms. Williams identifying him as the suspected perpetrator of the firebombing incident, and warrants for his arrest being issued, it appears confusion between the states of Virginia and North Carolina resulted in him not being arrested and taken into custody on the alleged offenses.

Mr. Barnette describes that he was surprised that no one came to arrest him and that he spent the next several weeks at his mother's home in Charlotte feeling frightened, depressed, and brooding over the loss of the relationship. He was angered that Mr. Green was not injured during the incident at Ms. Williams' apartment. He describes being focussed on feeling as if Ms. Williams had been dishonest

with him. He felt angry that he had shared himself "body and soul" with her and that the relationship had not continued. Mr. Barnette indicated that his rate of alcohol consumption increased in the weeks prior to the current alleged offenses. He continued to drink mostly beer and would drink intermittently throughout the day. He does describe interacting with his brothers, his mother's boyfriend, and his mother during that period of time. Activities included watching television and playing video games. His mother described him as less interactive and states he spent more time in his room.

In regard to the weapons involved in the alleged offenses, Mr. Barnette claims he bought the gun in May, but claims he bought it for his own protection. He indicated that he had numerous difficulties as a result of his relationship problems in the Charlotte area and felt that he might be in some danger. He describes himself as needing to protect himself and two brothers, both from other people and from the snakes that frequented the property where they lived. He admits altering the gun, but states he did this so he could keep it hidden in his room. He described the activity as being "like a kid." He indicated he did not want "a big grandpop shotgun." He liked the product obtained and described it as "neat." He did indicated that altering the gun allowed him to keep it hidden from his younger half brother. He denies that he bought the weapon with the intent of harming Ms. Williams.

Mr. Barnette does describe weapons experience since he was a child. He indicates that at the age of eight or nine his father taught him weapon safety and instructed him that guns were for family protection and were not toys. He indicated that his father had a couple of guns in the house and that he remembers early outings including family camping and target practice. As a youth, he also had an air rifle. He was approximately age ten when he first shot his father's gun. He indicated that his father's guns were all legal, with his father having the appropriate permits and licenses. In 1990, he found a gun on his way to a prenatal appointment with his girlfriend, Natasha Heard. He indicates it was a .22 calibre handgun. He cleaned it up and kept it in the house, again for family protection. It was that gun that was used in shooting Anthony Britt in 1992. After the shooting episode, he tossed the weapon away. Since 1993, he has continued to have access to guns in his mother's house. These guns belonged to his grandfather and included an antique shotgun that was not working and another shotgun that was. Mr. Barnette admitted to using the guns to shoot snakes or rats on the property.

In regard to the time period immediately around the alleged murder, 06/21/96 through 06/25/96, Mr. Barnette provided the following information. On the evening of 06/21/96, he felt his anger building up. There was nothing special about the evening. He spent his time playing video games with his brothers, drinking beer, and watching a game on television. He then went back to his room to do his "nightly thinking about Robin." Mr. Barnette indicates "I just broke. I had had enough." He got dressed and "just split," leaving by the side door with his gun. He indicated he couldn't take it any more. He felt like a failure in the relationship and in his inability to get a job. He describes himself as fuming. In his words, he indicates that "I felt evil come over me. I had never been that angry," and states his anger scared him. He believes that while hanging around the house that day he had drunk five to six beers beginning earlier in the evening. He did not perceive himself as drunk, although he thinks drinking does lower his inhibitions. In his own assessment, had he not been drinking, and the thought of heading to Roanoke crossed his mind, he may not have done it. He describes that he has very clear memories of the evenings, but his attorneys have instructed him not to talk about the details of the crime. He claims that he has talked in detail with his attorney about the events of that evening.

Mr. Barnette describes leaving the house, because he "wanted answers." During various interviews, he described himself as being more upset than he had been in the preceding weeks. He admitted that at times in the preceding weeks, he had thought of killing Robin and that the thought had frightened him. He had talked to his mother about his degree of upset and his mother suggested he seek some

8.

FS-000482

help, but he did not. He was not specific as to what he had told his mother. On the evening preceding the crimes, he felt that he wanted to get back for "everything that had ever hurt me." He describes himself as being "on the end of my road I was going to get her (Robin). I was going to make my point. I was not going to be laughed at any more."

Mr. Barnette shared little about the first victim, Donald Lee Allen. Periodically he indicated he could empathize with Mr. Allen's family and that there was nothing he could say or do which would ameliorate their loss. He did indicate that before he encountered Donald Lee Allen, his rage could have been directed at anybody. He did not know the victim and his encounter with him was one of chance and part of his larger intention of finding transportation to Roanoke. Collateral information indicates that Donald Lee Allen had left his family home in South Carolina, on the evening 06/21/96. At some point after midnight on 06/22/96, Mr. Barnette confronted Mr. Lee Allen who was driving his car and was stopped at an intersection in Charlotte. He approached Mr. Lee Allen with the sawed off shotgun. He took his wallet and ordered him across the street. He told him to turn around and subsequently shot him three times. Mr. Allen was left near a drainage ditch. He then took Mr. Allen's car and drove to Roanoke, Virginia.

Mr. Barnette indicates that he went to the house where Robin was staying with her mother. He chased her when she ran from him. When he caught up with her, he felt his anger was gone and asked her, "where is he....why did you let him shoot at me." He indicated he wanted Robin to come with him and show him where Benjamin Green lived. He states she tried to grab the gun and he threatened to kill her if she didn't come with him. He indicated she looked into his eyes and stated, "you're not going to kill me" and grabbed at the gun. He felt like she knew him too well and she perceived him as a weakling, and his anger escalated. He felt she was defying him, in the middle of the street, with him holding a sawed off shotgun. "That is when it happened". He shot her as she was running towards her mother.

Collateral information including information provided directly by Mr. Barnette around the time of his arrest indicated that he drove to Roanoke in the stolen car and arrived there around 5:30 on the morning of 06/22/96. He waited in the car outside of the home until about 7:00 when he saw his girlfriend walk the dog. At that point, he drove around back, parked the car, and came through a gate in the fence. He pulled the phone connections loose and shot his way in through the back door. Ms. Williams' mother encountered him and yelled for Robin Williams to run. He went out the back door, around the house, and began chasing her. He caught up with her and subsequently shot her in the back as she was trying to run towards her mother. He then ran back to the car and left the area.

Mr. Barnette indicates that upon leaving Roanoke he drove to Tennessee with the intent of killing himself. He subsequently bought a garden hose and some tape, pulled off an exit and attempted to asphyxiate himself through carbon monoxide poisoning. This was unsuccessful. He also took several over the counter Nodoze. During the next few days he contacted a cousin of his and his mother. He returned to his mother's home. His mother apprised him that the law enforcement authorities were looking for him. He told her to go ahead to call them. He indicates he was allowed a few hours to spend with his family and did not resist arrest when the authorities arrived. He was subsequently taken into custody.

Collateral information indicates that Mr. Barnette confessed to the crimes of the charged offenses. He provided details to the police and actually took them to recover the body of the first victim Donald Lee Allen. He was subsequently housed in the Mecklinberg County Jail, and remained there until admitted to this Institution for evaluation.

9.

FS-000483

Mr. Barnette describes coming to grips with what he had done shortly after the crimes were committed. He indicated that he fully intended to kill himself as he believed his life was over. He also describes feeling overwhelmed with the magnitude of his behavior. He describes problems with anxiety and insomnia during the first several weeks in jail. He was referred to the psychiatrist servicing the jail and was started on an antidepressant, Desyrel, and an antianxiety medication, Ativan. These improved his sleep and he eventually discontinued them on his own due to daytime drowsiness. He does indicate that he no longer wished to kill himself after his failing with the carbon monoxide poisoning. Although he has contemplated suicide as a resolution to his current problems, he does not currently have thoughts of harming himself.

COURSE IN INSTITUTION: Upon admission to the Health Services Division of the Federal Correctional Institution in Butner, North Carolina, Mr. Barnette underwent review of his medical history and physical examination. Formal review of medical history, indicated that Mr. Barnette smoked approximately one and a half packs of cigarettes a day since incarceration (approximately fifteen months). He had both chicken pox and measles as a child. He had been treated for tinea versicola (a benign skin problem) and had experienced some muscle pain secondary to the gunshot wound in 1995. He also experienced some arthritis in his right hand and hip secondary to those injuries. He claimed a possible allergy to heparin.

Physical examination, conducted on 11/17/97, showed him to be 5'5" tall and to weigh 145 lbs. Vital signs were within normal limits. Limited range of motion and some numbness were noted on the right second and third fingers secondary to the gunshot wound injury. Scars were noted on his right hip and hand. There were no significant medical problems noted.

Mr. Barnette underwent routine laboratory evaluations. Laboratory studies included a complete blood count and routine blood chemistries including thyroid function studies. All of the results were within normal limits or showed only slight variations that were not viewed as clinically significant at this time. Screening of syphilis, HIV, and Tuberculosis were all negative. Urinalysis was normal. There was no indication to do a chest x-ray or electrocardiogram.

Mr. Barnette remained in good physical health during the evaluation period. He did have minor symptomatic complaints which were treated with symptomatic interventions. These included complaints of low back pain which appeared to be related to the mattress (treated with Motrin) and a single complaint of indigestion which was treated with antacids successfully. He was also seen for a rash and treated for tinea with a trial of selenium sulfide. Later in the evaluation, as he approached returning to court, he experienced some tension headaches. He was treated with Tylenol and Motrin as needed, with good relief.

Nursing evaluation was done upon intake and forensic social assessment was completed during the early part of the evaluation. Information provided was consistent with that obtained in other interviews.

Mr. Barnette was admitted through the Seclusion/Admission Unit which is the routine procedure for new admissions. He was kept in that unit until it was determined that he was suitable to function in the open health services population. He was released to the population in early December and continued in that status until his discharge on 12/19/97.

Mental status evaluation remained consistent throughout the evaluation, with the exception of some mild increase in anxiety toward the end of the evaluation period. Examination showed Mr. Barnette to be a small build, Black male who paid close attention to his hygiene and appearance. He was oriented to

10.

FS-000484

**JA684**

person, time, place and situation and made good eye contact with the interviewers throughout the evaluation. Speech was of normal rate and tone. Vocabulary was indicative of at least average intelligence. He followed questions well. Memory was intact for immediate recall, recent and remote events. Concentration was good upon examination, although in the latter part of the evaluation, he describes some trouble concentrating while reading due to anxiety about his legal situation. No looseness of associations was evident in conversation. There was no reported or observed evidence of hallucinations or delusional thinking. He denied any current suicidal ideation or homicidal ideation. His behavior was consistent with his report. There was no evidence of overt depression or anxiety for the most part. He reported sleep as good and appetite as undisturbed. Mr. Barnette did describe how he managed his anxiety about the situation by only selectively reviewing the events that had occurred. Through conversation he expressed considerable insight into his situation. His judgement on a day to day basis was good. Historically, he demonstrated poor judgement in regard to his behavior on numerous occasions. General information was viewed to be within the average range. He showed good understanding of written and verbal information. He also demonstrated a good ability to integrate himself into the population and quickly learned the rules and regulations of this facility. He received no disciplinary actions or incident reports during the evaluation period.

After receiving funds to place in his commissary and phone accounts, Mr. Barnette maintained phone contact with his family. As noted he maintained contact with his attorneys intermittently throughout the evaluation period. He reported promptly to appointments and was cooperative with interviewing and psychological testing. Mr. Barnette did develop short term friendships with several other inmates in the population, recognizing some from the Charlotte area and some from his time at the Mecklinberg County Jail. He did not express fear for this well being on the compound. He was able to discuss the awareness of his need to remain free from infractions while incarcerated so as not to demonstrate recent episodes of aggressive or problematic behavior.

In regard to the issue to competency to stand trial, Mr. Barnette was able to describe in detail his previous experiences with the legal system. He had a good first hand understanding of the plea bargaining and trial processes. He described his own role as a witness in the past and as a defendant in trial situations. Mr. Barnette had a detailed understanding of the charges against him and the possible penalties associated with each charge. He had a good memory for having reviewed this material with his attorneys and was aware that if he had questions or need for additional details, that information would be available through discussion with his legal counsel. Mr. Barnette talked openly about the severity of the charges against him and his awareness that the death penalty was being sought on several counts, including the two counts of Murder. He expressed a good understanding of the trail process in a death penalty case and the sentencing phase should he be found guilty. Mr. Barnette expressed an awareness of the role of the judge, the jury, prosecutor, and the defense attorneys. He had a detailed understanding of his rights to testify or not testify, and spent considerable time thinking through that decision. He expressed that he had been involved with his attorneys in framing questions for the jury selection process. He also indicated that he had a sense that his attorneys were involving him fully in the decisions being made in his case. He expressed respect and trust in his attorneys, although at times he became frustrated with the infrequency of contact with them during the evaluation. His frustration appeared to be resolved after he received a visit from one attorney near the end of the evaluation period. He felt he had ample time to discuss the status of his case.

In discussing with Mr. Barnette his mental state around the time of the alleged offenses, he disclaimed the presence of any mental illness. As noted, he talked at length about the frustration he felt over the breakup of his relationship with Ms. Williams and the anger at feeling displaced by Benjamin Green (or so he perceived). It was his own opinion that he was both competent to stand trial and responsible

11.

FS-000485

at the time of the offenses, and repeatedly indicated that he was not trying to skirt responsibility for his behavior. At the same time, he expressed hope that his life would be spared. As noted, he retained a full memory for his behavior during the period of time in question. Although he described some alcohol ingestion, he denies that it was to the point of intoxication. He did describes a short sense of getting revenge in regard to the murder, but stated that those feelings vanished quickly with full realization of what had occurred. He was able to express remorse for his behavior and to express sympathy for the victim's families.

During the evaluation period, Mr. Barnette had some contact with the Art Therapy Program. He described that he enjoyed drawing. There was no evidence of loss of reality contact in his work.

Mr. Barnette was cooperative with psychological testing. The results of that testing are outlined below. In summary, they showed him to be of average intelligence and not to be suffering from a major affective or thought disorder.

COGNITIVE ASSESSMENT: Mr. Barnette was administered the Wechsler Adult Intelligence Scale - Revised (WAIS-R) on 12/10/97. He was cooperative with the testing procedures and appeared to concentrate on test items. He appeared concerned to perform well and seemed to give full effort. Mr. Barnette achieved a Verbal I.Q. of 103, a Performance I.Q. of 108, and a Full Scale I.Q. of 105 which places him in the Average range of intellectual functioning across the domains. There was no significant difference between his performance on verbal as compared to non-verbal tasks with him demonstrating well developed skills in both areas. Mr. Barnette did not demonstrate any relative weaknesses on any of the subtests. His relative strengths were in his social judgment & common sense, and his visual-motor organizational abilities. The results of testing are consistent with observations of his level of adaptive functioning and his level of education. The testing provides no evidence of significant cognitive impairment.

Due to Mr. Barnette's reported vague complaints of memory impairment and difficulty in concentrating, the Wechsler Memory Scale- Revised was administered on 12/11/97. The Wechsler Memory Scale measures a subject's memory across a variety of domains including verbal memory, visual memory, general memory, attention/concentration, and delayed recall. Mr. Barnette achieved a Verbal Memory of 106, which places him in the Average range of functioning in this mode of memory. He achieved a Visual Memory of 120, which places him in Superior range of functioning in this mode of memory. His General Memory was 112 which places him in the High Average range of functioning in his overall memory. His Attention/Concentration was assessed to be Average and his Delayed Recall was assessed to be High Average. The overall results of this testing demonstrate Mr. Barnette has no memory impairment in any of the tested domains. His memory is at the average to superior levels. Although his level of attention/concentration is slightly lower than his abilities in other domains, it still falls in the average range when compared to other adults and suggests he should have no major impairments in his concentration/attention.

PERSONALITY ASSESSMENT: Mr. Barnette was administered the Minnesota Multiphasic Personality Inventory - Second Edition (MMPI-2) on 11/26/97. The personality profile produced by Mr. Barnette proved to be of questionable validity. There was some indication he responded inconsistently to test items; endorsing the symptom on one presentation, but not endorsing the same symptom when questioned in an alternative manner. There was also some indication Mr. Barnette may have been over endorsing symptoms as evidenced by his tendency to endorse most of the obvious symptoms of mental illness, but not endorse the more subtle symptoms of the disorders and the fact he elevated eight of the ten clinical scales. The profile, therefore, was interpreted with caution.

12.

FS-000486

Individuals with this profile often experience significant psychological distress despite their attempts to deny or repress their problems. They frequently complain of problems with concentration and having difficulty organizing their thoughts. Their ideas are frequently viewed by others as being unconventional and idiosyncratic. They often feel tense, depressed, anxious, indecisive, hopeless and have a poor self-concept. They are often viewed by others as being angry, rebellious, hostile towards authority figures, and resentful of demands placed on them by others. They are also likely to be immature, unreliable, and egocentric. They frequently develop physical complaints in response to stress, but are unable to see the connection between their stress and their physical ailments. Interpersonally, these individuals have strong needs for attention and affection, but feel conflicted by their fear of dependency. They are very demanding of attention and support and may engage in manipulative behaviors to get their needs met. Although they generally make a good first impression, their long term relationships tend to be very superficial, immature, and based on dependency. They frequently are hypersensitive to the reactions of others and have difficulty maintaining long term relationships.

In order to clarify Mr. Barnette's personality, he was administered the Personality Assessment Inventory (PAI) on 12/11/97. The personality profile produced by Mr. Barnette proved to be valid and interpretable. His pattern of responses suggested he is unhappy, emotional labile, and quite angry. Currently he is experiencing feelings of depression, worthlessness, and anxiety. Person's with similar profiles are typically in a state of crisis characterized by agitation and depression. These feelings may be due to difficulties or rejection in interpersonal relationships. Persons with similar profiles are quite sensitive to actual or perceived rejection by others and often feel abandoned or betrayed by those close to them. Mr. Barnette's responses suggested this might be a more ingrained pattern of anxious ambivalence in intimate relationships. He feels resentment and anger toward the person with whom he is in a relationship, but on the other hand feels dependent and anxious about being rejected. He endorsed feeling confused, indecisive, and distracted, however, there was no indication of active psychotic symptoms. His responses also suggested he has a history of antisocial behavior, and that his alcohol use has negatively impacted upon his life. The results of the PAI are consistent with those of the MMPI-2.

IMPRESSIONS: Diagnostically, according to the <u>Diagnostic and Statistical Manual of the American Psychiatric Association, Fourth Edition</u> (DSM-IV), we view Mr. Barnette as follows:

Axis I:     No Diagnosis or Condition, V71.09

Axis II:    Personality Disorder Not Otherwise Specified, with Antisocial and Narcissistic Features
            301.90.

Axis III:   Status Post Gunshot Wound to the Right Hand and Right Hip;
            Tinea Versicola, Currently Being Treated;
            Tension Headaches, Responsive to Ibuprophen and Tylenol;
            Low Back Pain

As noted above, there is no evidence at this time to support that Mr. Barnette has in the past, or is currently suffering, from a severe mental disease or defect. His personality functioning can be described as consistent with a Personality Disorder Not Otherwise Specified with Antisocial and Narcissistic Features. A Personality Disorder Not Otherwise Specified is a classification given to disorders of personality functioning that do not meet criteria for any specific personality disorder, but instead show features of more than one specific personality disorder. These features, together, do cause

13.

FS-000487

Bates No. 14258

**JA687**

clinically significant distress or impairment in one or more important areas of functioning. According to the DSM-IV, the essential feature of a personality disorder is an enduring pattern of inner experience and behavior that deviates from the expectations of the individual's culture and is manifested in at least two of the following areas: cognition, affectivity, interpersonal functioning, or impulse control. The pattern is inflexible and pervasive across a broad range of personal and social situations and leads to clinical significant distress or impairment in an important area of functioning. The pattern is stable and of long duration and its onset can usually be traced back to adolescence or early adulthood. The pattern is not better accounted for as the manifestation or consequence of other mental disorders, and is not due to the physiological affects of substance abuse or medication or other medical condition. Mr. Barnette's areas of personality dysfunction has been evident since late adolescence. The pattern of his dysfunction has been apparent across several different relationships and over a period of more than five years. Mr. Barnette's personality disorder fails to meet the full criteria for either a diagnosis of Antisocial Personality Disorder or of Narcissistic Personality Disorder, but embodies characteristics of both. In regard to the Antisocial Features, Mr. Barnette demonstrates failure to conform to social norms with respect to lawful behaviors as indicated by repeatedly performing acts that are grounds for arrest; irritability and aggressiveness as indicated by repeated physical assaults; and irresponsibility as indicated by repeated failure to sustain consistent work behavior or honor financial obligations. Mr. Barnette does not have clear evidence of a conduct disorder with onset before the age of 15. Thus, he does not meet the full criteria required to carry an Antisocial Personality Disorder. It is not atypical for an individual suffering from these personality features to demonstrate an inflated and arrogant self appraisal, and to present as somewhat cocky. As is also evidenced by Mr. Barnette, these individuals are often verbally facile and present with a superficial type of charm.

In regard to the Narcissistic Personality Disorder Features, Mr. Barnette again falls short of meeting the full criteria necessary to have this stand as an independent diagnosis. He does demonstrate a grandiose sense of self importance and tends to exaggerate his achievements and talents. There is some evidence to support that he has been preoccupied with thoughts of ideal love. He also exhibits a sense of entitlement and demonstrates unreasonable expectations in regard to his relationships with other individuals.

Although Mr. Barnette's Personality Disorder diagnosis is descriptive of his functioning currently and over the last several years, it does not reach the degree of severity to interfere with his decision making. There is no evidence that he has suffered from any episodes of psychosis. What is apparent, however, is that his presentation of symptoms may cover a relatively fragile self esteem. He presents as very sensitive to injury from criticism, feeling humiliated and degraded in response to any perceived attack on his self esteem. It is not uncommon for individuals with this type of personality structure to react with rage at perceived losses or the break up of significant relationships. This seems to be consistent with Mr. Barnette's behavior during the alleged offenses. Consistent with the antisocial features of his personality disfunction, is his disregard for the safety of others encountered in an effort to strike out at those he perceives as slighting him or humiliating him.

The type of personality disorder demonstrated by Mr. Barnette is not easily amenable to treatment. No psychopharmacologic interventions are indicated. Individual and group psychotherapy approaches, as well as behavior interventions have had some degree of success in modifying the behavior associated with personality disorders, but the prognosis is somewhat guarded and treatment must often take place in a structured place over an extensive period of time.

It appears that shortly after his arrest, Mr. Barnette may have experienced some symptoms of an Adjustment Disorder with Depressed Mood. These were successfully treated with antidepressant and

14.

FS-000488

**JA688**

antianxiety medications. Although he does not currently demonstrate any overt symptoms or excessive anxiety, given the reality of his situation and the stresses he will face in the upcoming months, it is possible that he could again demonstrate symptoms of depression or anxiety. These should be treated symptomatically should they occur. Also, given the severity of his situation, he should be monitored for the onset of suicidal ideation, although there is no current evidence that he is considering this as a viable option.

In regard to Mr. Barnette's current competency to stand trial, it is our opinion that he currently has both a rational and a factual understanding of the charges against him and is able to work with his attorneys with a reasonable degree of rational understanding. It is our opinion that he is currently competent to stand trial. As noted, Mr. Barnette has a detailed understanding of his current legal situation and the workings of the court. He has had previous experience with the trail process. He demonstrates sufficient intellectual functioning to fully allow him to participate in resolution of his legal situation. As noted above, he is not currently suffering from a severe mental disease or defect that should impair his ability to stand trial.

In regard to the issue of criminal responsibility at the time of the alleged offenses, which ranged from 04/30/96, through 06/22/96, it is our opinion that Mr. Barnette was not, during that time, suffering from a severe mental disease or defect which impaired his ability to appreciate the nature, quality or wrongfulness of his conduct. As noted above, it is our impression that Mr. Barnette does suffer from a Personality Disorder, but the dysfunction associated with this disorder does not rise to the degree to impair his understanding of his behavior or to interfere with his ability to understand his actions and make decisions about his behavior. As described in the body of this report, Mr. Barnette has a pattern of problems developing in his relationships with women. During the process of the breakup of his relationship with Robin Williams, he felt belittled and humiliated. He also developed anger and jealousy as to what he perceived as her involvement in a new relationship with Benjamin Green. The early destructive behavior alleged to have occurred around 04/30/96 appeared to be most directly in response to these perceived insults. His realization of the likely consequences of that behavior, in conjunction with access to a weapon and alcohol ingestion, may have contributed to the progression of his anger and wish for revenge. Mr. Barnette admits that during his brooding over the situation, he considered killing Ms. Williams, but denies that was his intent on 04/30/96. This account is contradicted, to some degree, by the account provided by the victim in regard to the firebombing before her death. Mr. Barnette admits to falsely procuring a firearm and to altering it although he denies this with the intent of using it for the commission of the alleged offenses. Collateral information, including his own statements, at the time of arrest, indicate his plan to carjack a vehicle to provide transportation for himself to Roanoke, Virginia, to confront Ms. Williams. During this evaluation period, Mr. Barnette did not clearly identify a motivation for killing Mr. Donald Lee Allen. He does describe himself as being very "scared" at the time he confronted Mr. Lee Allen and again the availability of a weapon appeared to be a factor. Mr. Barnette did describe himself as being on the road to his end on 06/22/97, and indicated that he considered killing both Ms. Williams and himself. His descriptions of his intent in regard to the murder of Ms. Williams are somewhat conflicting and he implies that he may have actually been focussed on Mr. Green more than Ms. Williams. It is unclear how much his conflicting accounts regarding his behavior are indicative of his ambivalence around the time of the actual offenses or are the product of his relating and thinking about the events repeatedly during the last 15 months. Mr. Barnette clearly expresses his feeling that he had been wronged by Ms. Williams, but at the same time does not believe that his behavior was justified in response. He expresses his own opinion that he was responsible at the time of his actions, although he finds it hard to understand how he came to carry them out to completion. Mr. Barnette's behavior prior to and following the murder of Mr. Allen was deliberate and consistent with his plan to travel to Roanoke. The fact that he cut the

15.

FS-000489

**JA689**

phone lines to prevent calls for help from the household is consistent with his understanding of his behavior at that time. The fact that he left the scene after the killing is also consistent with the belief that he was known by other individuals who had observed the situation and that he would be taken into custody if he remained at the scene. It appears that post the murders, Mr. Barnette did attempt to commit suicide. It is also consistent with him understanding the severity of his actions at that point in time and realizing the consequences of his behavior. As noted, Mr. Barnette eventually returned to his family, cooperated with them in notifying the authorities, and did not resist arrest.

Mr. Barnette was returned to the Mecklinberg County area by the Marshal Service on 12/19/97. He was on no psychotropic medication at the time of his discharge from the facility. He is aware of the psychiatric and psychological services available in the Mecklinberg County Jail and how to access to mental health intervention if needed. As noted, he should be observed for deterioration of his mental status including the presentation of depressive symptomatology and suicidal ideation throughout resolution of his legal situation.


Sally C. Johnson, M.D.
Associate Warden Health Services
Chief Psychiatrist
Mental Health Division
FCI Butner, North Carolina

Michael Schaefer, Ph.D.
Staff Psychologist


SCJ/hh

16.

FS-000490

# UNIVERSITY PSYCHOLOGICAL ASSOCIATES, P.A.
8430 University Executive Park, Suite 690
Charlotte, North Carolina 28262
(704)547-1483/Fax (704)547-0052

Faye E. Sultan, Ph.D., Director

**Practicing Psychologists**
Julie A. Pruitt, Ph.D.
Faye E. Sultan, Ph.D.
Barbara J. Tarkin, Ph.D.
Judith Thorne, Psy. D.

**Psychological Associates**
Ruth E. Kappius, M.A.
Gene Haas, M.A.
**Psychiatrist**
Hal Elliott, M.D

**Clinical Social Worker**
Laura B. Hall, CCSW

**Office Manager**
Pattie Rudar

January 2, 1998

Interim Summary of Psychological Evaluation and
Preliminary Diagnostic Impressions
Date of Summary:  December 31, 1997
Client:  Aquilia Marcivicci Barnette
Date of Birth:  7-7-73

Re:  United States v. Aquilia Marcivicci Barnette
3:97CR23-P

At the request of attorneys, Mr. Paul J. Williams and Mr. George V. Laughrun, II, a psychological evaluation of this client was initiated in June, 1997. Formal psychological testing of Mr. Barnette was conducted on 6/20/97. Clinical interviews with Mr. Barnette were conducted on 7/3/97, 7/11/97, 9/3/97, 9/7/97 and 12/28/97, totally approximately 14 hours of contact with this client to date. The following additional sources of data were reviewed and serve as additional clinical bases for all professional opinions offered here: Psychological testing and evaluation results from William M. Tyson, Ph.D. and John Warren, Ph.D., both of whom conducted previous examinations of Mr. Barnette; autobiographical information provided by Mr. Barnette; Mr. Barnette's school records, employment records, criminal records and medical records; and biographical and background material prepared by Mitigation Expert, Cynthia Neagle Maxwell. All observations and opinions offered here are to be considered preliminary and subject to later modification.

The environment in which Mr. Barnette spent his early formative years was characterized by inconsistent and punitive parenting, frequent and disruptive changes in

MC-0002243

housing and schools, and extreme interpersonal chaos. Mr. Barnette was exposed, throughout his childhood, to a world in which the adults around him committed frequent violent acts, physically and psychologically abusing one another under the guise of "relationship." Mr. Barnette was the victim of physical and emotional brutality perpetrated by his father. Violent and aggressive, verbal and physical, acts were the frequently demonstrated response to anger among the adults in Mr. Barnette's childhood life. Conflict resolution skills were never taught to or developed by Mr. Barnette, and a high level of violence characterized every intimate, on-going male-female relationship which Mr. Barnette was familiar.

While other aspects of Mr. Barnette's childhood are certainly important in assessing his overall cognitive and emotional development, it is this constant and consistent exposure to violence which most clearly defines his later social behavior. It is the very personality destruction which results from childhood abuse, coupled with the consistent presence of violence in male-female relationships which ultimately produces the acts of violence and aggression involved in the offenses alleged here.

Clinical interviews, formal psychological testing and other data sources confirm that Mr. Barnette developed significant perceptual and cognitive distortions resulting from this early exposure to violence. These perceptual inaccuracies have bred behavior grossly inappropriate to social situations. The distortions in perception and judgement appears to be prompted by anger. They have taken both the forms of self-mutilating (suicidal) behavior and "other directed" assaultive behavior. In Mr. Barnette's case, a lifelong pattern of pathological attachment to woman has developed. In this attachment "scenario", Mr. Barnette initially conceptualizes himself to be the "rescuer" of the female, investing vast emotional and financial resources into the relationship. The girls/women involved <u>inevitably</u> "do not appreciate" him, "disappoint" him, "fail" him, and, therefore, become the focus for extreme eventual rage, conflict and aggression. Mr. Barnette has a significant history of multiple suicide attempts (dating back to age 8) and multiple violent assaults on girls/women with whom he has established relationships.

MC-0002244

**JA692**

Many symptoms of affective (mood) disorder are evident during the clinical interviews, with the formal psychological testing, and throughout the documents reviewed. Mr. Barnette has experienced periods of moodiness and sucidiality and periods in which he has had "too much" energy, required little sleep, been hyperactive, expansive, and irritable. While Mr. Barnette's symptoms do not fit precisely into any of the diagnostic categories offered by the Diagnostic and Statistical Manual of Mental Disorders - Fourth Edition (DSM-IV), many symptoms of severe mental illness are evident. At the time of the offense in question here, Mr. Barnette met the diagnostic criteria for Major Depression Episode. The diagnosis of Substance Abuse Disorder is also appropriate for the time of the alleged offenses. There is also considerable indication that a diagnosis of Bipolar Disorder II should be consider for Mr. Barnette given his history of hypomanic behavior and evidence of previous depressive episodes.

Respectfully submitted,


Faye E. Sultan, Ph.D.

MC-0002245

# BLUE RIDGE BEHAVIOR SYSTEMS

Madalyn E. Tyson, Ph.D.                    William M. Tyson, Ph.D.

10025 Katelyn Dr.          Charlotte  NC    28269-8105

(704) 549-4395

June 19, 1994

Joe VonKallist
Mecklenburg County Office of the Public Defender
720 East Fourth St., #308
Charlotte, NC  28202


RE:  Aquilia Marcivicci Barnette
     File #:  93 CrS 76062, 76063


Dear Mr. VonKallist:

Aquilia Marcivicci Barnette is a twenty year old single black male who was seen
for psychological examination subsequent to charges entered in the Superior
Court for Mecklenburg County.  The defendant was seen for clinical interview on
2/08/94 and 2/26/94.  He was administered a battery of psychological testing
including the Minnesota Multiphasic Personality Inventory (MMPI); Incomplete
Sentences Blank (ISB); Adult Survivor of Dysfunctional Families Checklist
(ASDF) (2/8/94) and the Wechsler Adult Intelligence Scale – Revised (WAIS-R);
Bender Gestalt Test of Visual Motor Performance (Bender); and Rorschach Ink
Blot Technique (Rorschach) on 2/26/94.  You provided background information and
investigative material as to the charges, circumstances, and history.  The
opinions stated here are based on these data.

This defendant was informed that I was not functioning as an agent for the
defense, that findings could be entered into the court record without his
agreement, that he had a right to refuse the psychological examination without
prejudice to his case, and that usual privilege to "psychologist – patient"
communication would not apply to the findings of this interview.  He consented
to the examination.

It is my opinion that he is capable of proceeding to trial and that he was
competent at the time of the alleged offense.  This examination does not yield
evidence sufficient to question capacity to proceed to trial or competence at
the time of the alleged offense.  The defendant appears able to appreciate the
charges against him, appears able to appreciate the consequences if convicted,
and appears reasonably able to cooperate with his attorney in preparing a
defense.  Further, no evidence has emerged on which to question his ability to
appreciate the wrongfulness of his acts or differentiate right from wrong at
the time of the alleged offenses.

My examination does reveal the existence of psychological and behavioral
problems that might be of use as mitigating factors in sentencing.  There are a
variety of deficiencies in his psychological functioning that might shed light
on his behavior.  However, he is relatively unwilling to accept psychological
interpretations of his behavior and motives.  He is not likely to accept
assistance that is based on such assessment, particularly as these apply to
deficiencies that he believes do not exist.

I do not have any concerns about his ability to understand and competently
enter into plea negotiations.  He may be difficult to represent due to the

FS-000374

obstinacy of his defensiveness. He may insist on following a course of action that will appear self-defeating to others. He rigidly adheres to thinking patterns that center around justification of his actions. This does not allow him to accept that his actions will be seen as problematic.

Thank you for your attention. Please let me know if I may be of further assistance to you or the Court.

Respectfully,

William M. Tyson, Ph.D.
Licensed Psychologist

FS-000375

## MEMO TO FILE

### RE: Aquilia Marcivicca Barnett
### DOB: 7/7/73

### Date of Memo: 7/12/96

### Referral Information

Mr. Barnett was referred by his attorney, Susan Weigand, for an evaluation of psychological functioning in the charges of first degree murder and armed robbery.

### Acute Problems

Mr. Barnett said that at the present time he has a metal rod in his leg that is irritating his knee and his hip. He said he is also having bad dreams and headaches along with backaches and muscle spasms. He stated these began when he was shot in 1995 and they have increased in severity since this last incident. He said the causes of these problems are due to "gunshot injuries and breaking up with his sweetie and taking her life." Mr. Barnett went on to say that this has been a five-year buildup where he has been having trouble remembering things and he has thought that he is losing his mind. He stated he needed some kind of help emotionally, but he could not talk it out with Robin. He said he did not know how to handle stress and that he had many family worries, financial worries, and many nights he would get up in the middle of the night and just take a drive because he was unable to sleep. He said "I let everything get to me." He went on to state that as he was filling out the FICA, many of the questions he had never been asked before and as he filled them out it brought back bad memories which he said has been very upsetting to him as well.

### Significant Others

Mr. Barnett list two people that know him best as Robin Williams, his ex-fiance, who is deceased, and Sonja Barnett, his mother, who can be contacted at (704) 399-5479.

### Previous Residences

From 1987 through 1988 Mr. Barnett lived in Charlotte with his mother. From 1988 through 1990 he lived in Atlanta with his mother. He left there so he could be near his children. From 1990 through 1992 he lived with his girlfriend. The reason he left there was because they were not getting along. From 1992 to 1995 he was back in Charlotte with his mother. The reason he left once again was because of trouble with his girlfriend. In 1995 and 1995 he lived in Roanoke with his girlfriend, Robin. He left there when they broke up. In 1996 until present he has been in Charlotte and was living with his mother until he was arrested and put in detention at the North Charlotte Jail in Mecklenburg County, North Carolina.

FS-000848

## Educational History

Mr. Barnett states he can read, write, add and subtract. The highest grade completed was eleventh. He said his reason for dropping out was when he got into a fight and didn't want to return. He stated he also had kids to take care of. He has never failed any grades and never taken any special education or learning disability classes. He states that he did not enjoy going to school. He attended Beverly Woods Elementary School, as well as Barringer Elementary, and Our Lady of Conotelation. He went to junior high school at Randolph Junior High, as well as Smith Junior High and attended high school at Lithonia High School in Georgia.

## Employment History

In 1991 Mr. Barnett worked at Arby's as a co-leader and the reason he left there was because he moved. In 1991 he also worked at Blockbuster Video as a cashier. From there he moved. In 1991 he worked at A-1 Servia Personnel, which is a temporary service. The reason he left was because he moved. In 1992 he worked at Pizza Hut as a waiter. He left there for more money. In 1993 he worked at Harper's on Woodlawn as a waiter. From there he was jailed. In 1993 through March of 1995 he worked at Arrawood Courtyard as an auditor. There he moved. March of 1995 through January of 1996 he worked at Camelot Music as an assistant manager. He left there for more money. From January of 1996 through April of 1996 he worked for Electrolux in sales and from there he moved. During the past five years he has not been unemployed. His longest period of employment with any one company was 1½ years at Courtyard Marriott. He doesn't remember what his longest period of unemployment would be. On a scale from one to six (one being poor, six being very good) he rates his adjustment to work at a six. He said "I adjust easily to my surroundings and just try to blend in."

## Family of Origin/Childhood Development

Mr. Barnett's primary caretakers before the age of six were his mother and father who he says he loves. His mother and father were also his primary caretakers until the age of 11 and then his mother took over and took care of him until he was 17 years of age. Her name is Sonja Barnett, age 37, and he said the quality of their relationship is a love-hate off-and-on relationship. He said they did things like go shopping, went to car shows and movies, when he was growing up. His mother did spend a lot of time playing with him when he was very small. His father's name is Derek Barnett (unsure of age). He said he hardly ever sees his father and will talk to him "once in a blue moon." He said when he was growing up they washed cars, went on trips, shot guns, listened to music, went to movies, and cooked dinner together. He said when he was very young his father spent time playing with him a lot outside. His parents did divorce when he was 11 years old and he lived with his mother afterwards. His father remarried and his mother has had a couple of live-in boyfriends. He did see his parents fight and yell all the time. He said he can remember them having physical fights, as well as yelling matches. He said the only person he was afraid of as a child was his father. He said "he was strict as hell." He stated that his parents did use drugs. He said "they used to drink beer and smoke weed and listen to jazz with their friends."

Mr. Barnett was disciplined as a child by being beat with a belt by his father. As a teenager he said he would get kicked out of the house sometimes or just leave. He said there were problems with discipline. He said they would revolve around his school grades and him getting

FS-000849

into trouble around the house.  He said that his father beat him too much and it used to leave welts and bruises on him.  Mr. Barnett was healthy as a child with no long periods of sickness or injury.  His parents would often argue and scream about them cheating on each other.  He said he thinks he was physically abused by his father.  He describes this as being beat much too hard for his wrongdoings.  He states he was never sexually abused.  He does not remember if he had any trouble with bed-wetting, but he has had problems with starting fires, as well as being cruel and mean to pets or other animals.  His best childhood memory was his first sexual experience at age 7.  His worst childhood memory was his dad punching him in the face, choking him, and chasing him into the street with his belt.  His best friend as a child was Steve Austin.  He liked him because he said he felt safe at his house and had all the toys in the world.  He said for fun they used to play with toy cars and play hide-and-seek, as well as other childhood games.  His closest friend as a teenager was himself.  He describes his closest relationship as being with his ex-fiance, Robin.  She was his best friend, a friend for life, but they didn't talk much.  He said as a teenager he spent most of his time by himself, but he did date.  He states he got his girlfriend pregnant twice.

Mr. Barnett has two brothers, Mario Barnett, age 18, who lives with his mother; and John Barnett, age 2, who also lives with his mother.


## Sexual History

Mr. Barnett's first sexual memory was playing with his cousin under the covers on sleepovers.  The first time he was sexual with another person was on a sleepover with a female cousin and him putting his fingers in her.  His first experience with sexual intercourse was on a sleepover putting himself inside her while kissing.  His sex life right now is nonexistent since he is incarcerated.  Previously it was great with his ex-fiance.  He said "Robin and I made the best love that we both can experience."  He said the only unusual sexual experiences he has had would be with devices, ropes and cuffs, making love in public places, and outside in the woods.  He said he has had a legal problem because of sexual behavior when he was fired from a job for harassment.  He has never had any homosexual experiences and he said he has had relationships threatened because of affairs.  He said "I've been cheated on in every relationship I've ever had."  He states he used to watch X-Rated videos once a week or every two weeks.  He does look at X-Rated magazines.  He states he does not currently have a sexually transmitted disease, but has had them in the past.


## Marital Status

His girlfriend has had two of his children and their names are ████████ Barnett, female, born ███/90, and the other parent's name is Netoshia; and ████ Barnett, II, born ███ 1/91, and the other parent's name is Atard.  He is currently not married, nor has he ever been married.


## Legal History

Mr. Barnett has been in trouble with the law.  He said that alcohol did play a part in this trouble.  He said "I've been drunk and made bad decisions."  He said he has learned from his legal problems that people don't care about him.  He has been sued in the past for not paying medical bills in Virginia where his ex-fiance pulled a knife on him and cut his finger almost

FS-000850

completely off. When asked what his plans are following release from jail he said "I don't have any."

### Military History

Mr. Barnett has never served in the military.

### Religious History

During his growing up years, Mr. Barnett states religion was very important. He said his parents always sent him to church with his grandparents. He attends church now. When I asked what his thoughts were about God he said "I love Him and He has saved my life."

### Financial Status

On a scale from one to six (one being very poor, six being very rich) growing up he rates his financial status at a three, five years ago a two, and right now a one.

### Leisure Activities

He said he spends most of his spare time doing nothing but praying at the present since he is incarcerated. He states that his quality of sleep is poor and that he is a very high-stressed person. He has constant pain in his neck and back.

### Medical History

Mr. Barnett states that currently he is having a hard time with his right hand. He states that it is "crippled" (which does not appear to be the case when this interview took place, he was able to write, although his index finger remained stiff, he seemed to be able to function with that hand). He has a history of accidents and surgeries. He presently is not taking any medication. He does not know if he is allergic to any medication. He does not have a family doctor, does not remember when his last physical was. He said in his blood relatives there is a positive history of alcohol abuse. He has been knocked unconscious, although he does not remember for how long. This was in 1993 when he was hit in the head with a stick and had a hematoma form on the right portion of his head behind his right ear.

### Mental Health History

Mr. Barnett has not seen a professional for counseling for substance abuse or any other problems. He states he has attempted suicide and he has thought about it.

FS-000851

### Substance Abuse History

Mr. Barnett said he has been told that he drinks too much and has experienced pass outs, blackouts, tremors and hangovers. His main substance abuse would be alcohol that he uses several times weekly and his first use or intoxication was at age 11. His secondary drug would be marijuana that he has not used during the past month. His first use was at age 12.

### Miscellaneous

If he could be granted any three wishes he would wish 1) to go back in time and change what happened, 2) for money, and 3) for happiness. If he was going on a long journey he would take Robin because she was everything he ever wanted and liked to travel. He does not have any tattoos. He has shoplifted in the past. He does not enjoy gambling. He is angry with himself. He has been told that he has a problem controlling his temper. When he does get angry he throws things, curses, spits, argues, fights, and cries. His anger has got him into trouble with the law, as well as at school.

## MENTAL STATUS EXAMINATION

Mr. Barnett is a slender, black man appearing his stated age. His reaction to the examiner was cooperative. He is oriented x four. His mood is variable. His affect is appropriate to his situation. His speech was very loquacious. Psychomotor activity is within normal limits. Organization of thinking is clear. Concentration and attention seemed clear. There is no evidence of hallucinations or delusions. His memory is grossly intact. His intellectual functions are estimated Average. When asked what is the thing to do while in the movies if you are the first person to see smoke and fire, his response was "holler fire."

FS-000852

# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA
### CHARLOTTE DIVISION
### CIVIL NO. 3:12CV327-RLV

AQUILIA MARCIVICCI BARNETTE )
                                                  )

        Petitioner, )

                                   )

   vs. )

                                   )

UNITED STATES OF AMERICA, )

                                   )

        Respondent. )

_____ )

## RESPONSE OF THE UNITED STATES TO
## BARNETTE'S MOTION UNDER 28 U.S.C. § 2255
## AND MOTION FOR AN EVIDENTIARY HEARING

Aquilia Marcivicci Barnette has moved under 28 U.S.C. § 2255 to vacate the death sentence that he received in 2002, upon the recommendation of a unanimous jury, for the 1996 murders of Robin Williams and Donald Allen. Petitioner's Initial Motion for Relief, June 19, 2013 (Dkt. No. 48, 3:12-CV-327) (hereinafter "Mot.") at 1. Barnette contends that this sentence was obtained in violation of his "rights to effective assistance of counsel, due process of law, and to be free of cruel and unusual punishment." *Id.* at 11. Barnette does not challenge his criminal convictions or contend that he is entitled to a sentence short of life imprisonment. Mot. 1; Petitioner's Brief in Support of Motion for Evidentiary Hearing, Dec. 22, 2014 (Dkt. No. 74, 3:12-CV-327) (hereinafter "Barnette Br.") at 1.

**JA701**

Barnette's motion and the files and records of the case, including the materials identified by Barnette's brief in support of his motion for an evidentiary hearing, conclusively show that Barnette is entitled to no relief. Accordingly, the United States respectfully requests that this Court deny Barnette's motion under Section 2255 without an evidentiary hearing.

## BACKGROUND

**A. Barnette firebombs the home of Robin Williams after she ends their relationship. Months later, he returns and kills her after killing Donald Allen to steal his car.**

1. Barnette firebombs Robin Williams's apartment.

In 1994, Robin Williams met and began dating Barnette. At the time, Barnette lived in Charlotte, North Carolina, and Robin lived at her mother's house in Roanoke, Virginia. After maintaining a long-distance dating relationship for approximately one year, Robin moved from her mother's house into an apartment with Barnette at 1616 Keswick Avenue in Roanoke in March of 1995. Exhibit 1 ("Ex."), at 1036.[1] Robin's relationship with Barnette was rocky from the outset. Ex. at 1037–38. Robin confided to friends that Barnette had become physically and mentally abusive. Ex. at 457–58. Barnette often beat Robin and became increasingly obsessed with a theory that Robin was seeing other men. Ex. at 407, 419, 458, 1042–46, 1052, 1054.

In April of 1996, Robin ended her relationship with Barnette. Ex. at 1059.

---

[1] Exhibit 1 consists of the Joint Appendix filed by Barnette in the Court of Appeals for the Fourth Circuit in his appeal from the sentence he received in 2002. Dkt. No. 60, No. 02-20 (4th Cir. June 12, 2003). The Joint Appendix contains relevant portions of the record.

2

Robin informed Barnette that he was no longer welcome at the apartment. Ex. at 1059. On the day he left, Barnette choked Robin after confronting her about alleged infidelity. Ex. at 1089. Barnette poured bleach over Robin's clothes and took items owned by Robin when moving his belongings from the apartment. Ex. at 1064.

Barnette moved to his mother's house in Charlotte and became increasingly angry with Robin for ending their relationship. Ex. at 1064, 1072. Barnette did not want to believe that Robin simply did not wish to be with him and assumed that Robin was seeing someone else. Ex. at 1070–71. Barnette attempted to restart his relationship with Robin by harassing her by telephone to the point where Robin threatened to have her phone number changed. Ex. at 1069.

To ease Robin's fears of staying in her apartment alone, Robin's long-time friend, Benjamin Greene, went to the apartment to stay with her on April 29, 1996. Ex. at 406–07. That night, Barnette repeatedly called Robin by telephone and questioned her about why she broke up with him. Ex. at 409, 1069, 1072. Barnette became angry after learning that Greene was in the apartment with Robin. Ex. at 1072–73.

That same night, Barnette borrowed his brother's car, filled two plastic containers with gasoline, and drove several hours to Roanoke. Ex. at 1074–75. In Roanoke, Barnette stopped at a Wal-Mart and purchased a baseball bat. Ex. at 1076. Barnette stopped at a dead-end street near Robin's apartment, retrieved

3

a pair of pliers and the baseball bat, and approached the apartment. Ex. at 1076–77. Barnette cut the telephone lines to the apartments in Robin's building to prevent anyone from calling the police. Ex. at 1077.

At 4:00 a.m. on April 30, 1996, Robin awoke to a disturbance outside of her apartment and said to Greene, "he's here." Ex. at 409. Robin tried to call the police for assistance, but the phone line was dead. Ex. at 410. Greene looked out of the window of the apartment and saw Barnette smashing the windows of Greene's car with a baseball bat. Ex. at 410. Robin screamed out the window, "Why [are] you doing this?" Ex. at 411. Barnette replied, "[Y]ou're going to die tonight. I'm going to kill you." Ex. at 411.

Barnette threw a fire bomb into the living room through a gap that he had kicked in the front door, yelling "Die, bitch, die." Ex. at 413, 484, 1078. Barnette had doused the door and window sills with gasoline, and the firebomb ignited the curtains and quickly engulfed the front portion of the apartment in flames. Ex. at 413–14, 1078. Barnette then used one of the containers of gasoline he had brought with him to set fire to Greene's car, which was parked outside of the apartment. Ex. at 413, 1079. Barnette then fled in the car that he had borrowed from his brother. Ex. at 416, 1080.

The entire front of the apartment was engulfed in flames, preventing Robin and Greene from escaping through the only door to the outside. Ex. at 414, 534. Greene and Robin ran to Robin's bedroom on the second floor. Ex. at 414 They knocked the blinds down, and they jumped. Ex. at 414.

4

**JA704**

Robin sustained in the fire painful and disfiguring second- and third-degree burns, which required extensive hospitalization and skin grafting.  Ex. at 417, 439–440, 498.  Robin identified Barnette as the perpetrator, and Roanoke police obtained a warrant for Barnette's arrest on charges of arson and attempted murder.  Ex. at 424, 427, 489.

2.     <u>Barnette prepares to return to Roanoke to kill Robin</u>.

After firebombing Robin's apartment, Barnette drove back to Charlotte.  Ex. at 1081.  Barnette saw his picture on television news programs that identified him as wanted by the police for the firebombing.  Ex. at 1082.  He recognized that he "had time to sit and think about what he had done," and he expected that he "was about to go to prison for about thirty years."  Ex. at 1086.  Although he was aware that he was wanted by the police, Barnette did not turn himself in.  Ex. at 1084.  Instead, Barnette went out with friends, visited clubs, met girls, and drank.  Ex. at 536–37.

On May 20, 1996, Barnette purchased a 12-gauge Stevens shotgun from a pawn shop in Charlotte.  Ex. at 544–45.  When making the purchase, Barnette produced a Virginia driver's license in his brother's name, Mario Vonkeith Barnette.  Ex. at 547.  Barnette presented the false identification because he was on probation in Charlotte and was "hiding out," to avoid being arrested and extradited.  Ex. at 1089.  Barnette completed a federal firearms-transaction form and falsely indicated that he was neither a convicted felon nor a fugitive against whom charges were pending.  Ex. at 549.

5

**JA705**

The following day, Barnette exchanged the Stevens shotgun for a 12-gauge semi-automatic Winchester shotgun, asserting that the Stevens shotgun malfunctioned. Ex. at 551–52. Barnette again used his brother's name and completed another federal firearms-transaction form. Ex. at 552–53. Barnette again falsely stated that he was neither a convicted felon nor a fugitive against whom charges were pending. Ex. at 552–53.

Barnette hid the Winchester shotgun under his bed for approximately one week before sawing off both the stock and barrel ends of the gun. Ex. at 1091–92. Barnette "thought about going to Roanoke and killing Robin." Ex. at 1091. He also thought about killing himself at the same time. Ex. at 1091. He "felt like, well, if [I] was going to go, [I] wasn't going to walk down the middle of the street with some huge gun." Ex. at 1093. So Barnette sawed the ends of the firearm down and wrapped hockey-tape around it to "make it easier to conceal." Ex. at 1093. Barnette then test fired the firearm in its sawed-off condition. Ex. at 1093.

Over a period of weeks, Barnette began "collecting stuff thinking about what [he] actually would do" if he got to Roanoke to kill Robin. Ex. at 1091, 1093. Barnette considered what would happen, how he would get to Robin, and what he would need. Ex. at 1093. And he placed the items that he would need in "the bag that [Barnette] would always pack when [he] would go to see Robin." Ex. at 1093. The items that Barnette collected in the bag included shotgun shells, a crowbar, bolt cutters, and a flashlight. Ex. at 1093. On June 20, 1996, Barnette coated the lens of the flashlight with a red color and taped it to his shotgun as

6

part of his violent plan.  Ex. at 1093–94.  The next day, Barnette thought to himself that this was the day that Robin was going to die.  Ex. at 1094–95.

    3.    <u>Barnette carjacks and murders Donald Allen in Charlotte</u>.

Shortly before midnight on June 21, 1996, Barnette walked from his mother's house to the intersection of Billy Graham Parkway and Morris Field Road in Charlotte, toting the gym bag that he had packed and his sawed-off semi-automatic shotgun.  Ex. at 1096.  Another intersection adjacent to Barnette's mother's house was illuminated with a "lot of lights."  Ex. at 1097.  Barnette instead walked to the Morris Field intersection, which was "almost completely black when the light's not green."  Ex. at 1098.

Barnette crouched by the bushes near the intersection and prepared "to carjack somebody."  Ex. at 1098.  Barnette threw his bag into the bushes by the side of the road, opened it, and loaded his gun.  Ex. at 1098.  Barnette recognized that a car occupied by only one person would be easier to carjack and waited until a vehicle arrived at a time when there was no other traffic.  Ex. at 1099.

Barnette ran to a dark blue Honda Prelude driven by 22-year-old Donald Allen, pointed his shotgun into the open window, and opened the door of the car, commanding Donald to "get out."  Ex. at 559, 694, 723, 1100.  Barnette pointed Donald to where his bag was stashed and ordered Donald to give Barnette his wallet.  Ex. at 1100.  Donald complied, throwing his wallet near where the bag was stashed.  Ex. at 1100.  Barnette then directed Donald where to go, marching him down to a ditch.  Ex. at 1101, 1274.  Barnette directed Donald to turn

7

**JA707**

around.  Ex. at 1101.  Donald pleaded, "Don't shoot" and "Don't hurt me."  Ex. at 1101.

After Donald did everything Barnette told him to do and begged for his life, Barnette shot Donald multiple times.  Ex. at 610–11, 1100, 1102.  Barnette retrieved his bag and Donald's wallet, got into Donald's car, and drove off toward Roanoke, where Robin was.  Ex. at 1102–03, 1274–78.  Donald died a short time later.  Ex. at 619–20.

3.     <u>Barnette drives to Roanoke and murders Robin Williams</u>.

On his way to Roanoke in the Honda Prelude that he stole from Donald, Barnette stopped to purchase gasoline with money from Donald's stolen wallet. Ex. at 1104.  Barnette arrived in Roanoke when it was still dark.  Ex. at 1110. Barnette parked the car within sight of the house where Robin lived with her mother, Bertha Williams, while Robin recuperated from the burns that she had sustained from Barnette's firebombing of her apartment.  Ex. at 515, 1110. Barnette sat in the car and waited for morning.  Ex. at 1110.

Early in the morning, Barnette moved Donald's car to the alley behind the house.  Ex. at 1112.  Before moving the car, Barnette saw Robin open the door and let her dog out.  Ex. at 1110–11.  Barnette also observed a car stop at the house and drop off Bertha Williams's eight-month-old grandchild.  Ex. at 1111.

Barnette entered the yard of the house where Robin was living with her mother through a rear gate and cut the telephone wires with pliers to prevent a call for assistance.  Ex. at 1113.  Barnette then proceeded to the other side of the

8

house and attempted to open the door to the kitchen, where Bertha Williams had been baking brownies for a church bake sale. Ex. at 988. By this time, Bertha had moved to the living room with her grandchild. Ex. at 988.

Barnette "emptied the gun," at the door, firing three shots that caused a spray of pellets to hit walls and furniture inside the home, and kicked the door open. Ex. at 670, 1113–14. Bertha took her granddaughter into her arms and looked out the front door, but did not see anyone. Ex. at 988. Robin ran to her mother. Ex. at 989. Fearing that Barnette had fired into the house, Bertha told Robin to "just run." Ex. at 989.

Robin followed her mother's advice and ran out the front door. Ex. at 989. Bertha Williams turned around and saw Barnette standing in the kitchen with his gun in his hand, demanding to know where Robin was. Ex. at 989. Bertha Williams said, "[S]he's running. Leave her alone." Ex. at 989. Barnette reloaded the shotgun. Ex. at 1114.

Barnette pursued Robin, who fell several times as Barnette chased her. Ex. at 1117. "He was very calm." Ex. at 626. Barnette caught Robin a short distance from her mother's house, grabbed her arm, and ordered her to come with him. Ex. at 1118. When Robin resisted and said no, Barnette grabbed Robin by the hair and began dragging her back toward her mother's house. Ex. at 647, 1118. Barnette told Robin he was going to kill her. Ex. at 1118.

Unable to call the police because Barnette had cut the telephone lines, Bertha Williams went outside and yelled for help. Ex. at 645, 989. A neighbor,

9

Sonji Hill, called 911. Ex. at 643. Hill hung up the phone when Barnette, who was approximately 50 feet away, pointed his shotgun at Hill and threatened to shoot her if she did not hang up. Ex. at 646.

Bertha Williams pleaded with Barnette to leave Robin alone, reminding him that he had "already disfigured her for life." Ex. at 990. Robin managed to get away from Barnette. Ex. at 990. Her mother took Robin by the arm and began to lead her back to the house. Ex. at 990.

As Robin and her mother turned away from Barnette, Barnette shot Robin twice. Ex. at 990. Robin fell to the ground at her mother's feet. Ex. at 990. Robin died of the wounds that Barnette inflicted upon her a short time later. Ex. at 990.

4.  <u>Barnette flees, is arrested, and confesses</u>.

Barnette fled in the Honda Prelude that he had stolen from Donald, travelling first to Knoxville, Tennessee and then to Charlotte, where he abandoned the stolen vehicle at a shopping center on June 24, 1996. Ex. at 1122, 1138. Law-enforcement officers discovered the abandoned vehicle the same night. Ex. at 692–94. From a nearby dumpster, officers recovered a gym bag containing, among other items, the loaded shotgun with a flashlight affixed to the barrel that Barnette had used to murder Donald and Robin. Ex. at 696, 706.

Barnette was arrested at his mother's house in Charlotte on June 25, 1996, and, after receiving the warning required by *Miranda v. Arizona*, 384 U.S. 436 (1966), gave detailed statements to law-enforcement officers recounting the

10

murders and carjacking.  Ex. at 715, 719–37, 1140.  Among other things, Barnette told law-enforcement officers that Donald's body could be found in a drainage ditch at the corner of Billy Graham Parkway and Morris Field Road. Ex. at 715, 719–20.  When the officers were unable to locate the body, they took Barnette to the location, where he pointed out Donald's body in the woods at the end of the drainage ditch hidden by foliage.  Ex. at 722.  Barnette also identified the blue Honda Prelude as the vehicle he had stolen from Donald and driven to Roanoke.  Ex. at 723.

### B. Barnette is indicted, tried, convicted, and sentenced to death.

Barnette was charged by a grand jury in the Western District of North Carolina on February 4, 1997, with eleven offenses against the United States related to the murders of Donald Allen and Robin Williams.  Ex. at 69–74.  Three of the eleven counts were capital offenses, including one count of intentional killing in the course of a carjacking, 18 U.S.C. § 2119(3), and two counts of using and carrying a firearm during and in relation to the commission of a crime of violence that resulted in the death of a person under circumstances constituting murder, 18 U.S.C. §§ 924(c), 924(i)(1), (2).  Ex. at 72–73.  After a three-week trial in January 1998, the jury found Barnette guilty of all counts.  Ex. at 75.  "No witness at trial disputed the facts of the crimes." *United States v. Barnette*, 211 F.3d 803, 808 (4th Cir. 2000) ("*Barnette I*").

After Barnette was found guilty, the trial moved to the sentencing phase.

11

**JA711**

The United States sought to prove two statutory aggravating factors supporting the death sentence for each murder. For Allen's murder, the United States presented the statutory aggravating factors of (1) committing an offense in the expectation of receiving something of pecuniary value, and (2) using substantial planning and premeditation in the offense. *Id.* at 810 n.2. For Robin's murder, the United States presented the statutory aggravating factors of (1) the creation of a grave risk of death to one or more persons in addition to the victim and (2) the use of substantial planning and premeditation in the commission of the crime. *Id.* at 810 n.3. The United States also sought to prove three non-statutory aggravating factors, which were the same for each victim: (1) the harm caused to the family of the victim as a result of the killing; (2) the risk that Barnette would likely be a danger in the future; and (3) the existence of multiple victims in the crime. *Id.* at 810 n.3; Ex. at 119.

At the conclusion of the evidence, the jury unanimously found the existence of all of the statutory and non-statutory aggravating factors on each of the three capital counts of conviction. Ex. at 119. The jury also concluded that the aggravating factors outweighed the 29 mitigating factors that at least one juror found on each of those counts. *Barnette I*, 211 F.3d at 811. The jury sentenced Barnette to death on the three capital counts on which he was charged. *Id.*

## C. A second jury again sentences Barnette to death.

The Court of Appeals for the Fourth Circuit affirmed Barnette's conviction

12

**JA712**

"in all respects" but reversed Barnette's sentence of death on the three capital offenses. *Barnette I*, 211 F.3d at 826. The Fourth Circuit held that the district court had erroneously excluded a defense expert that Barnette had sought to call as a surrebuttal witness during the sentencing proceeding and remanded for resentencing. *Id.* On remand, the United States presented the same statutory and non-statutory aggravating factors that it had presented to the jury that had previously returned a sentence of death. Ex. at 111–16.

During the resentencing proceeding, Barnette sought to establish two statutory mitigating factors with respect to each capital count. Ex. at 1974–75, 1985–86, 1998. He sought to establish that Barnette's capacity to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of the law was significantly impaired. Ex. at 1975, 1985–86, 1998. And he sought to establish that other factors in his childhood, background, or character mitigated against imposition of the death penalty. Ex. at 1975, 1985–86, 1998.

Barnette also sought to establish sixteen nonstatutory mitigating factors with respect to each count. Those factors included that (1) Barnette accepted full responsibility for his actions; (2) Barnette had remorse; (3) Barnette was abused by his father; (4) Barnette was affected by growing up in a family environment of violence, drugs, and alcohol abuse; (5) Barnette had repeated exposure to violence in his home; (6) Barnette attempted to protect his brother from the damaging effects of parental violence and neglect; (7) Barnette had untreated emotional problems; (8) at the time of his crimes, Barnette was experiencing a depressive

13

**JA713**

episode; (9) Barnette does well in a structured environment; (10) Barnette cooperated with police; (11) Barnette could serve a useful purpose to others in a prison environment; (12) at the time of his offenses, Barnette was experiencing irrational and obsessive thoughts; (13) Barnette's brother and children would be harmed by his execution; (14) Barnette was neglected by his mother; (15) Barnette turned himself into police; and (16) Barnette had been a model prisoner. Ex. at 1975–76, 1986–87, 1998–99.

> 1. <u>The United States's case for the death penalty</u>.

Over the course of four days, the United States presented its case that the death penalty was an appropriate sentence for Barnette's offenses. Ex. at 62–63, 959. The United States presented evidence of Barnette's crimes, the substantial danger that he presented to others, and the harm that Barnette's murders inflicted upon the families of Robin Williams and Donald Allen. It also presented evidence of Barnette's history of violent conduct to show that Barnette presented a risk of future dangerousness.

Benjamin Greene described the details of the night that Barnette firebombed Robin's apartment. Ex. at 402–20. The first responders who arrived at Robin's apartment that night also testified. Ex. at 422, 437. The jury heard from Robin's neighbors who witnessed the fire, including Maude Hubbard who lived next to Robin and to whom Robin ran for help immediately after she escaped. Ex. at 454–62. Hubbard explained how she attempted to call Robin's mother but could not because her telephone line had been cut. Ex. at 460.

14

**JA714**

Another neighbor, John Grubb, testified that he was able to call 911 because he had previously secured his telephone line. Ex. at 448–49. Sergeant R.S. Kahl of the Roanoke City police department testified about his investigation, including the destruction the firebombing caused to Robin's apartment. Ex. at 471–85.

Sarah Aldridge, a nurse at the burn-wound center at which Robin was treated for approximately 12 days, testified about the severe injuries Robin suffered at the hands of Barnette. Ex. at 491–505. Aldridge testified that Robin was "in a great deal of pain" for several days after she was admitted. Ex. at 498. Robin suffered from circumferential burns that required skin grafting and injuries that required multiple surgical procedures to repair. Ex. at 497–501. Robin and members of her family were trained about how to manage dressing Robin's wounds after she was discharged and began her recovery at home. Ex. at 503.

Sydney Williams, Robin's brother, testified that approximately one to two weeks after the firebombing, a number of cards were left on Robin's car that contained handwriting and were signed, "Marc." Ex. at 505, 515–522. One of those cards said, "Robin, you don't have to . . . lie about Benny, if you love him so much you should have never . . . faked your love for me." Ex. at 519. Others said, "Why did you lie," "You let him come between us," "You lied to me," "Why wasn't I good enough for you," "If you loved him so much, why did you even bother with me," and "You never really loved me." Ex. at 519–22. Sydney Williams also described growing up with Robin and how Robin would take care of Sydney's

15

**JA715**

little daughter even better than Sydney had.  Ex. at 505–09.  He explained how Robin's death left a void in his life.  Ex. at 525.

Barnette's friend, Steve Austin, described Barnette's meeting Robin at a social gathering about a year before they moved in together, and he described Barnette's conduct after the firebombing.  Ex. at 528–37.  Austin explained that he saw Barnette approximately a week after the firebombing, when police were looking for him.  Ex. at 530.  Barnette described the firebombing to Austin, explaining that he had put gas in a container and "went on up there."  Ex. at 532–34.

Austin explained that a few weeks after the firebombing, he and Barnette "went out clubbing," "picked up girls, and stuff like that."  Ex. at 536–37.  Austin described an occasion between the firebombing and the murders where he and Barnette met some girls at a club.  Ex. at 536–37.  He and Barnette "went over to their house and played cards and had some drinks, just laughing and joking basically."  Ex. at 536–37.

Jacob Freshour, a manager of the pawn shop from which Barnette procured his semi-automatic shotgun, testified about Barnette's use of his brother's identification to purchase the firearm.  He explained that the purchaser identified himself as Mario Barnette both during the initial purchase and the exchange.  Ex. at 543–55.  And he explained that the purchaser represented that he had not been convicted of a crime punishable by more than one year of imprisonment and that he was not a fugitive.  Ex. at 547–55.  The purchaser

16

walked out of the store with the shotgun.  Ex. at 555.

The jury heard evidence about Donald Allen's murder.  Elaine Edwards, who had met Donald shortly before Barnette murdered him, testified that she called police when she saw a flier that had identified Donald as missing.  Ex. at 555–60.  Officer Robert Holl of the Charlotte-Mecklenburg Police Department described Donald's body when it was found.  Ex. at 560–85.  Todd Nordhoff, an expert in firearm and tool-mark identification with the Charlotte-Mecklenburg Police Department, and Dr. James Sullivan, the medical examiner who conducted an autopsy on Donald's body, testified that Donald was shot three times from less than five feet away and died from his shotgun wounds.  Ex. at  590–621.  The jury also heard the testimony of Officer J.L. Krall of the Charlotte-Mecklenburg Police Department, who discovered Donald's car at a shopping center in Charlotte, and the testimony of Ben Kennedy, an Allen family friend who identified the vehicle and discovered Barnette's gym bag in a dumpster nearby.  Ex. at 688–710.  That bag contained, among other things, a sawed-off shotgun with a flashlight taped to the magazine, clothes, bolt cutters, and a crowbar.  Ex. at 696–97, 706.

The jury heard from several eyewitnesses, first responders, and investigators who described the details of Barnette's murder of Robin in front of her mother.  Robin's neighbors, Sonji Hill and Earlene Thompson, described seeing Robin run from her mother's house, followed by Barnette, who calmly chased, dragged, shot, and killed Robin as she moved toward her mother.  Ex. at

17

621–652. Thompson testified that Barnette pointed his gun directly at her as she stood on her porch. Ex. at 628–29. Hill described how Barnette also pointed his gun at her when she tried to call 911 and told her to "hang up the motherfucking phone." Ex. at 646. The jury heard from Officer Daniel C. Dean, the first police officer to arrive on the scene after the murder, Ex. at 652–59, and from Officer Chad Scara, an evidence technician who described, among other things, the extensive damage that Barnette caused by shooting into the Williams home. Ex. at 659–74. Dr. Gregory Wanger, an Assistant Chief Medical Examiner in Roanoke, described the results of Robin's autopsy and concluded that she died from the shotgun wounds she received to the back and chest. Ex. at 675–85.

The jury also heard Barnette's detailed confessions. Officer James Sanders of the Charlotte-Mecklenburg Police Department, who arrested Barnette after the murders, testified that Barnette described the location of, and directed police to, Donald's body. Ex. at 710–723. Sanders, Detective Tony Rice, and Officer Holl, of the Charlotte-Mecklenburg Police Department, testified about the detailed statements Barnette gave describing his murder of Donald and Robin. Ex. at 723–89. The jury also heard recordings of Barnette's statements to the officers. Ex. at 723–89.

In addition to evidence about Barnette's murder of Robin and Donald and the danger his conduct presented to those around him, the United States introduced evidence of the violence that Barnette had inflicted upon others, including Barnette's former girlfriends and their children. Crystal Dennis

18

**JA718**

described how Barnette hit and kicked her during her relationship with him. Ex. at 789–95. She also testified that Barnette whipped her children with a coat hanger, cutting them open. Ex. at 795–98. James Yarborough, of the Sherriff's Office in Noonan, Georgia, explained that Barnette pleaded guilty to charges of cruelty to children arising out of those beatings. Ex. at 806–12. Rodney Riggs, another law-enforcement officer in Noonan, Georgia, testified that Barnette confessed to shooting Crystal Dennis's brother, Anthony Britt, with a .22 caliber revolver. Ex. at 817–22. Barnette pleaded guilty to several offenses arising from that shooting. Ex. at 825–26.

Natasha Tolbert, the mother of Barnette's two children, testified about how Barnette beat her. Ex. at 827–35. She explained that, among other things, Barnette hit her "everywhere," including when she was pregnant. Ex. at 830. On one occasion, when Tolbert was pregnant with his daughter, Barnette slammed Tolbert against concrete. Ex. at 831. Tolbert also testified that Barnette had no contact with his children—no Thanksgiving visits or Christmas visits, presents, or cards—for five or six years prior to his trial for the murders of Robin and Donald. Ex. at 832–34. Barnette wrote to Tolbert a month prior to his second sentencing hearing and, for the first time in many years, asked to visit his children. Ex. at 833. Tolbert took them up from Georgia to visit their father. Ex. at 834.

Alesha Houston, who had begun dating Barnette when she was 15 and he was approximately 19 or 20, testified about serious injuries that Barnette

19

inflicted upon her. Ex. at 849–872. Houston described how Barnette "punched [her] in the side of her face, bruised her che[e]k, [and] chipped [her] front tooth." Ex. at 859. She also explained that she still had a bald spot on her head where Barnette had pulled her hair out. Ex. at 856. Houston described another occasion when Barnette appeared at her door and beat her with a baseball bat. Ex. at 878–80. Her injuries required between 12 and 15 stitches. Ex. at 880.

Houston described how Barnette abducted her after she had broken up with him. She described how Barnette kicked down the door of her uncle's house, yanked the phone out of the wall when she tried to call 911, shoved a towel down her throat to keep her from screaming, and cut her fingers with a knife. Ex. at 858–60, 864. Barnette physically picked Houston up and threatened to throw her off the balcony before placing her in his Jeep and taking her to his house against her will. Ex. at 867–69. Barnette fled his house when the police eventually arrived. Ex. at 867. Barnette cried when speaking to Houston on the telephone to gain sympathy and convince her not to press charges against him, because he did not want to be in trouble with the police. Ex. at 871.

Houston also testified how Barnette threatened her life with a knife. Ex. at 872–87. Barnette confronted Houston on her way to work at Bojangles fast-food restaurant shortly after the abduction, asking if Houston was going to press charges. Ex. at 872–73. Barnette placed a large butcher knife in Houston's back and attempted to get her to go with him. Ex. at 873. When Houston's manager at Bojangles approached, Barnette placed the knife to Houston's throat and

20

threatened to kill her.  Ex. at 874–75.  Other employees from Bojangles and another nearby restaurant disarmed Barnette, and he was arrested.  Ex. at 874–76.

Houston also described an occasion on which Barnette threatened to shoot her with a gun if she did not accompany him, drove her to the woods against her will, and then raped her.  Ex. at 881–85.  Barnette took her to an area of the woods near his mother's house, ripped Houston's shirt off, and proceeded to strangle her with it.  Ex. at 882.  Houston explained that she tried to fight him off, but Barnette raped her in the back seat of the vehicle while she cried.  Ex. at 882.

Afterward, Barnette took Houston back to his mother's house and sought to make sure that he did not press charges against her.  Ex. at 882–84.  He asked how her hand was doing in the light of the 12 to 15 stitches she received after Barnette had beat her with a baseball bat.  Ex. at 880, 882.  And he called her a taxi cab, waited with her, and tried to make her feel good about what had happened so she would not call the police when she got home.  Ex. at 884.  Houston did, however, call the police.  Ex. at 885–86.

The jury heard testimony from police who investigated Barnette's rape of Houston and a number of other witnesses who corroborated the events that Houston described.  Detective Terry Brandon of the Charlotte-Mecklenburg Police Department testified about his investigation after Houston reported Barnette's sexual assault and the charges brought against Barnette.  Ex. at  896–

21

**JA721**

907.  Brent Burgess, who waited tables at a restaurant next to the Bojangles at which Houston worked, observed Barnette's placing the knife to Houston's throat. Ex. at 912–17.  Officer Donna Burgess of the Charlotte-Mecklenburg Police Department, who responded to that incident, testified that she recovered the knife from the scene and charged Barnette with several offenses.  Ex. at 918–24. Debra Adamo, formerly an officer with the Charlotte-Mecklenburg Police Department, testified about Houston's kidnapping by Barnette.  Ex. at 926–35.

The jury also heard from Thad Johnson, the probation officer who supervised Barnette during the probation terms he served following convictions for felonious restraint and breaking and entering.  Ex. at 939–42.  Johnson explained that Barnette often failed to appear for office visits as required.  Ex. at 949.  Johnson also explained that Barnette's probation terms required him to refrain from committing criminal offenses, required him to live in North Carolina, prohibited him from carrying a firearm, and required him to stay away from Houston.  Ex. at 943–44.  Johnson explained that Barnette did not tell him that he was living in Roanoke, Virginia.  Ex. at 949.  Johnson also explained that Barnette told him that he was employed by the Courtyard Marriott in Charlotte and did not tell him that he was working at Camelot Music in Roanoke.  Ex. at 950–55.

Members of Robin's family testified, describing the deep loss that Barnette's conduct had caused them.  Robin's brother, Kenneth Williams, testified that Robin was the one who held his family together.  Ex. at 966.

22

**JA722**

Robin's mother, Bertha Williams, testified as an eyewitness to Robin's relationship with Barnette, Robin's recovery from the severe burns that he inflicted on her, and Robin's death at Barnette's hands. Ex. at 963–94. Bertha Williams testified about an occasion that she had picked Robin up after Barnette had hit her, and that Robin broke up with Barnette after Barnette tried to choke her in the middle of the night, stole her car, and locked her out of her apartment. Ex. at 984–85. Bertha Williams testified that when Robin was recovering at the burn center after Barnette firebombed Robin's house, she almost "[n]ever left her side." Ex. at 986. And Bertha Williams described the day that she lost her daughter, holding Robin's arm as Barnette shot and killed her. Ex. at 988–89. Bertha Williams explained that when Barnette murdered her daughter, he took away the joy of her life. Ex. at 992.

Members of Donald Allen's family also testified, describing the loss they experienced at Barnette's hands. Shirley Allen, Donald's mother, explained that Donald, the youngest of five children, had been a "miracle" baby, born premature with only a 25% chance to live. Ex. at 994–96. Shirley Allen told the jury that Donald had purchased the Honda Prelude for which Barnette had killed him in blue because blue was her favorite color. Ex. at 1000. And she explained that she had not slept a full night in six years, waking up every morning at 2 AM, the time that Donald died. Ex. at 1006. Donald's sister, Denise Allen Hogue, and Donald' father, Bobby Gene Allen, testified about their loss, and their search for Donald when he went missing. Ex. at 1009–24. They had placed missing-person

23

**JA723**

fliers around the area and rode around in vain, looking for him.  Ex. at 1009–24.

Bobby Allen explained that he filled up two thermos bottles with water and

carried them with him while searching for Donald, in case Donald had been tied

to a tree and was thirsty.  Ex. at 1021.  Donald had not attended church with the

family on Sunday, as he usually had, and that concerned the family particularly.

Ex. at 1020.  Bobby Allen explained that he knew Donald had been killed when

he learned on television that a body had been discovered.  Ex. at 1022.

    2.    <u>Barnette's case in mitigation</u>.

Over the course of four days, Barnette's attorneys presented his case in

mitigation, which included testimony from thirteen different witnesses.  Defense

counsel focused extensively on Barnette's background and that of his family, with

emphasis on the domestic violence and alcohol and drug abuse to which he was

exposed and the neglect and abuse that he endured from his parents.  Barnette's

attorneys also focused on Barnette's mental health, with emphasis on the

symptoms of depression that he manifested, the borderline-personality disorder

with which experts diagnosed him, and signs of other mental-health issues that

went unremedied.  Expert witnesses called by Barnette's attorneys focused on

how Barnette's background placed limits on the choices Barnette had and made

them difficult.  And Barnette's defense focused extensively on the theory that

Barnette's violent conduct was confined to the context of domestic relationships of

the kind that he was unlikely to encounter again if he received a sentence of life

imprisonment.

24

Barnette's attorneys began by calling Barnette, who testified on his own behalf, apologizing and taking responsibility for the murders. Barnette described his relationship with Robin, admitting that he mistreated her when they lived together and that he was "in the wrong." Ex. at 1035–1068, 1062. He explained that things started off good with Robin but he felt that she was "betraying" him after becoming suspicious that Robin had been unfaithful to him with Benjamin Greene. Ex. at 1035–1068. He explained that he was devastated after breaking up with Robin and moving out of her house. Ex. at 1068.

Barnette described his firebombing of Robin's house and explained that he "was doing something [he] had no business doing." Ex. at 1071–80. He explained that he had taken sleeping pills and alcohol and became angry after calling Robin on the telephone and learning that she had company. Ex. at 1070–72. He testified Benjamin Greene shot at him from the house after he had set it ablaze, and he believed that Robin was telling Greene to shoot him. Ex. at 1079–80. He testified that he traveled back to Charlotte feeling angry and scared. Ex. at 1080–83.

Barnette testified that he learned he was wanted and told his friend that he was "not going to run." Ex. at 1083. He "stayed home the majority of the time" waiting for the authorities "to show up," "wondering why it was taking them so long." Ex. at 1084. He explained Robin was "all that was on [his] mind" when his friend took him out to clubs to meet girls. Ex. at 1085–86. And he testified that when he obtained the shotgun and assembled materials to return to

25

Case 3:12-cv-00327-MOC   Document 98   Filed 09/23/15   Page 25 of 114

**JA725**

Roanoke he "thought about going to Roanoke and killing Robin and killing [him]self." Ex. at 1091–93.

Barnette described his murder of Donald Allen. Ex. at 1095–1103. He testified that he waited on the side of the road "to carjack somebody." Ex. at 1098. He explained that he needed a car to get to Roanoke. Ex. at 1096–98. And he needed to get to Roanoke to "get to Robin." Ex. at 1096–98. Barnette told the jury, "I'm sorry," and said, "I shouldn't never been there." Ex. at 1099.

Barnette also described his murder of Robin. Ex. at 1108–1122. He testified that he told Robin, "I got one for you and I got one for me" before he shot her. Ex. at 1118–21. He explained that he did not shoot himself after shooting Robin because he panicked after seeing what the gun did to Robin. Ex. at 1128. He testified that he later procured a hose and tried unsuccessfully to kill himself on several occasions by using it to pipe exhaust into the car. Ex. at 1123–30, 1133–36. He further explained that he went to church shortly after the killings to pray for the souls of Robin and Donald. Ex. at 1130–33.

From the stand, Barnette told Robin's family, "I hate myself for what I did to you." Ex. at 1121. He stated he wished he "could give her back" because he knew they missed her. Ex. at 1121. And he said, "I'm so sorry." Ex. at 1121.

Defense counsel presented evidence of Barnette's childhood through lay witnesses including Barnette; his stepfather, Derrick Barnette; his brother, Mario Barnette; and his cousin, Ahmad Cooper. Among other things, Barnette's attorneys focused on the abuse that Barnette suffered at the hands of his father;

26

the violence that he witnessed growing up, particularly between Derrick and his mother, Sonia Barnette; and the neglect he suffered as a result of his mother's irresponsible behavior, inattention, and drug and alcohol abuse.

Defense witnesses told the jury that Barnette was born when his mother, Sonia, was fourteen years old and Derrick was 16 years old. Ex. at 1297, 1316. Derrick and Sonia had dated previously, but they were not together when Barnette was born. Ex. at 1297. Derrick joined the air force and later married Sonia. Ex. at 1299–1302. Barnette's brother Mario Barnette was born when Derrick was stationed overseas. Ex. at 1299–1302.

Barnette's attorneys presented evidence that Barnette's stepfather, Derrick Barnette, beat Barnette when he was a child. Barnette explained that his father would scold him, yell at him, "smack [him] upside the head" and punch him. Ex. at 1151. Derrick Barnette would then tell Barnette to "take off all of [his] clothes" and beat him until Derrick "got tired." Ex. at 1152. Barnette testified that Derrick hit him on his "face, mouth, back, scrotum, penis," and legs. Ex. at 1157. He described an occasion in first grade when school officials hit him with a "huge plexiglass paddle" after he was caught "playing doctor" with a girl. Ex. at 1151. After Barnette got home, he received "one of the worst" beatings from his father. Ex. at 1151.

Defense counsel also presented evidence of the violence to which Barnette was exposed in his home. The jury heard that Barnette regularly witnessed Derrick beating his mother, Sonia. Derrick explained that Sonia "always liked to

27

**JA727**

dance and go out," and routinely did so without Derrick. Ex. at 1302. Sonia went out with increasing frequency, and Derrick observed her getting out of cars belonging to other people to come home at 2 or 3 in the morning. Ex. at 1303. Derrick began accusing Sonia of infidelity and interrogating her about it in front of Barnette and Barnette's brother, Mario. Ex. at 1303. In the context of those arguments, Derrick became physically violent against Sonia. Ex. at 1303.

Defense counsel presented evidence that Barnette saw Derrick and Sonia routinely get into fights over "who was cheating on who," which could not have gotten "more physical." Ex. at 1152. Barnette described an occasion when Derrick was punching his mother in the middle of the street in full view of Barnette and his classmates on a school bus. Ex. at 1156. Barnette also described an occasion when Derrick hit Sonia with a hammer while Barnette yelled at them to stop fighting. Ex. at 1153. Barnette explained that his mother was bleeding, and Derrick told her she was not. Ex. at 1153. Mario Barnette testified that Barnette routinely shielded Mario from those fights, asking him to go to another room when they would escalate. Ex. at 1338–39.

Barnette's attorneys introduced evidence that Derrick and Sonia separated shortly after Barnette completed fifth grade and later got divorced. Ex. at 1158–59. Sonia began going out at night with her girlfriends more often, leaving Barnette and his brother, Mario, at home alone. Ex. at 1159–60. During warmer months, Sonia would leave and not return until the next morning, or in some cases, until two to three days later. Ex. at 1160. Barnette described an occasion

28

**JA728**

when Mario was hit by a car when his mother was away. Ex. at 1160. Barnette called his aunt Tessie and was unable to locate his mother. Ex. at 1160–61.

Barnette's attorneys introduced evidence about the men that Barnette's mother dated. Ex. at 1161. Sonia dated a man named "A1" from Richmond who took Sonia "out clubbing" and helped her develop a drug habit that included cocaine. Ex. at 1161. Barnette explained how he stumbled across a plate with white residue and a cut straw, which he knew was used for cocaine from the film Scarface. Ex. at 1163. Mario recalled a string of men whom he described as shifty eyed and "barely outside of con men." Ex. at 1348. Barnette explained that he looked up to another one of his mother's boyfriends, Marc Regan, who "was the biggest drug dealer in the city of Charlotte at the time." Ex. at 1164. Regan was killed in a dispute over drugs and money, and Barnette's mother "went into a . . . tailspin, and she didn't recover for some time after that." Ex. at 1165.

Barnette's attorneys introduced evidence that Sonia's "responsibleness disappeared" after she got divorced. Ex. at 1162. The jury heard that Sonia traded in her "very sensible car" for a "lipstick red 1984 Chevy Corvette," which had only two seats to accommodate the three people in their family at the time. Ex. at 1162. Later, "all of the money seemed to disappear," Sonia "couldn't keep food in the refrigerator," and she was evicted from the apartment in which she was staying with Barnette and his brother because she "couldn't pay the rent." Ex. at 1162–63. The family moved to live with Barnette's aunt Tessie, and then

29

into another apartment.  Ex. at 1164–65.

Defense counsel introduced evidence that Sonia lost her job and moved the family to live with Barnette's aunt Sheila and cousin Ahmad at their home in Georgia.  Ex. at 1168–70.  Barnette described how the move prevented him from attending Providence High School for tenth grade.  Ex. at 1168–70.   He described how "devastating it was to be taken out of everything [he] knew and loved."  Ex. at 1168–70.

Barnette's attorneys called Barnette's cousin, Ahmad Cooper, who testified about the conditions at their home in Georgia.  Ex. at 1407–15.  Ahmad testified that Barnette had no bed at the house, and that they were frequently unsupervised.  Ex. at 1409–1410.  Ahmad explained that it was Barnette who would make sure that he and Mario were fed and that they did their homework.  Ex. at 1410.  Barnette's mother and aunt would arrive at the home for 30 minutes to an hour to change into their best outfits before leaving again until the next morning or later.  Ex. at 1410.  Ahmad also explained that he observed "a lot" of alcohol consumption and suspected drug use, although he "never saw any firsthand."  Ex. at 1411.

Defense counsel also introduced evidence of the circumstances surrounding Barnette's discovery that Derrick Barnette was not his biological father.  Ex. at 1166–67.  Derrick had previously questioned whether Barnette and his brother were Derrick's biological children, but he did not confirm that he was not their biological father until he took a paternity test at the time that he and Sonia

30

separated. Ex. at 1310. Barnette explained that he felt "gloom" after Derrick told him he was not his biological father. Ex. at 1166–67. Barnette further explained that "after that" he "really did not trust or care about [his] mother as much." Ex. at 1167. Barnette testified that, as of the day that he testified during his 2002 penalty trial, he did not know who his biological father was. Ex. at 1167.

The jury also heard about an occasion on which Barnette's cousin, LaDon Barber, kicked in the door of his family's house and shot Barnette in the leg. Ex. at 1040–41. The injury required surgery. Ex. at 1041. And Barnette had a rod in his leg as a result of the injury. Ex. at 1041.

Barnette's defense also focused on the background of Barnette's parents and grandparents. The jury heard about this family background from Barnette himself, his stepfather, and his brother.

The defense focused in detail on the background of Barnette's maternal grandfather, Jesse Cooper. Ex. at 1293–95. Although Jesse Cooper and Barnette's maternal grandmother, Pearl Cooper, had divorced by the time Derrick Barnette began dating Sonia, Derrick explained that he had known Jesse Cooper since before the ninth grade because Jesse Cooper worked as a janitor at Derrick's school. Ex. at 1293–97. Jesse Cooper was an educated man who had experienced problems since his military service during the Korean War. Ex. at 1294–94. The jury heard that he was hit with mortar fire during that war and was believed dead. Ex. at 1042. His family was notified, he was read last rights,

31

**JA731**

and he was covered up before he moved an arm and revealed that he was still alive. Ex. at 1042. That incident left him totally disabled. Ex. at 1042.

Defense witnesses explained that that Jesse Cooper drank "every day." Ex. at 1295. Derrick would take Jesse to the store for Pabst Blue Ribbon. Ex. at 1295. He explained that Jesse "would stay at home and he would drink his beer." Ex. at 1295.

Defense counsel presented testimony that that Jesse Cooper had taught Barnette and his brother how to shoot firearms. Ex. at 1336–37. Mario Barnette also explained that Jesse Cooper told many war stories and talked in a way influenced by his military experience. Ex. at 1335–36. Mario described Jesse's routine dress as "army coat, looks like he basically just stepped off the boat, shades on, the eye patch, fully clothed, just kind of his own person." Ex. at 1336.

Defense counsel also presented testimony that Barnette's maternal step-grandfather, Leroy Brown, shot and killed Barnette's maternal grandmother, Pearl Cooper, when Barnette was an infant. Ex. at 1297–98. The jury heard that the murder occurred in the house while Barnette's mother, Sonia, and his aunt, Sheila, were present. Ex. at 1299. Sheila was the first to find Pearl Cooper after she was shot, and told Sonia, who called Derrick. Ex. at 1297, 1299. Derrick explained that, after receiving that phone call, he initially got in bed with his mother for comfort before going to be with Sonia. Ex. at 1297–98. The jury heard that Brown served five years in jail for the murder, and that Sonia moved in with her oldest sister and brother-in-law in South Carolina after staying with

32

her father for a short time.  Ex. at 1298–99.

Defense counsel also introduced testimony about the background of Derrick Barnette's parents and aunts.  Derrick explained that his mother and father separated when Derrick was five years old.  Ex. at 1300.  Derrick's father was an alcoholic for a time, until he "just abruptly stopped drinking and had a good job."  Ex. at 1300.  Derrick testified that his father was not there for him physically as a child, but that "he was there emotionally," and Derrick had a close relationship with his father until his father died.  Ex. at 1300.  Mario Barnette explained that he had never known Derrick's mother, because she had been poisoned.  Ex. at 1346.  Barnette and his brother as children regularly stayed with two of Derrick's great aunts Hattie and Mabel, who fed them and supplied them with care packages.  Ex. at 1345–46.

Defense counsel also focused extensively on Barnette's exemplary behavior in prison.  The jury heard from several correctional officers who testified about Barnette's good behavior in prison.  Ex. at 1432–63.  Olandas Truesdale and Tony Harrison, who knew Barnette during his stay at the Mecklenburg County Jail, both described Barnette as a "model inmate."  Ex. at 1432–34.  Bruce Ryherd of the United States Penitentiary in Terre Haute testified that Barnette had moved from "phase one" of his special confinement unit to "phase two," which affords more recreation and more liberal activity time, because of his good behavior.  Ex. at 1435–39.  Vicki Boyer, of the same institution, testified that Barnette was "no disciplinary problem" and that Barnette had demonstrated talent as an artist.

33

**JA733**

Ex. at 1443–46.

The jury also heard from Walter W. Buer, a correctional consultant, and Pastor Bobby West, one of Barnette's spiritual advisors. Ex. at 1448, 1369. Buer opined that Barnette would likely remain in a high-security United States Penitentiary. Ex. at 1448, 1449–61. And West testified that he prayed with Barnette, read the Bible with him, and believed that Barnette was remorseful for what he did. Ex. at 1369–71.

Barnette's defense directly addressed Barnette's relationships with women other than Robin, beginning with Barnette's own testimony. Barnette described his relationships with women, including the nonviolent relationship Barnette had with a girl he met in high school in Georgia named Sheila Sullivan. And he described and took responsibility for the violent relationships with the witnesses called by the government. Expert witnesses called by Barnette's attorneys followed up on Barnette's testimony, describing the connections between Barnette's background and domestic violence and explaining that his violent conduct was limited to the context of domestic relationships of the kind unlikely to arise while Barnette remains in prison.

Defense counsel's focus included the romantic relationship Barnette had in high school with Sheila Sullivan, which ended with what Barnette felt was a betrayal. Ex. at 1172. Barnette testified that he "spent probably 95 percent of [his] time with her," that he believed that "she loved [him]," and that she was his "best friend." Ex. at 1173. He explained that two other boys beat him up after

34

making a move on Sullivan.  Ex. at 1172.  Toward the end of the school year, Barnette learned that Sheila had been unfaithful with him and had engaged in sexual relations with another boy named David and David's cousin.  Ex. at 1173–74.  Barnette described that he felt "a serious betrayal."  Ex. at 1174.  He explained that he felt "horrible," and that although it "vaguely felt like some[thing] that happened when [he] was a child," it was the first time he felt like he had suffered a "serious betrayal, with a lot of hurt and a lot of pain."  Ex. at 1174.

Barnette described how he tried to get rid of the pain he felt from Sullivan's betrayal by committing suicide.  Ex. at 1174.  He took pills that made him "violently sick" and called Sullivan on the phone to tell her what she had done.  Ex. at 1175.  He told Sullivan, "I can't take this, you were everything," and five minutes later the paramedics arrived.  Ex. at 1175.

Defense counsel also focused in detail on the relationships Barnette had with the witnesses who had testified against him, Natasha Tolbert, Alesha Houston, and Crystal Dennis.  Ex. at 1176–1228.  Barnette admitted to the mistreatment that his former girlfriends had described.  Ex. at 1176–1228.  He explained how happy he was about his children and that he had bought a newspaper to commemorate the day that his daughter was born.  Ex. at 1182–83.  And he explained that he had recently reestablished relationships with his children in the months prior to the resentencing hearing.  Ex. at 1241–42.

After presenting the jury with details about Barnette's crimes, his

35

**JA735**

background, his relationships with women, and his positive institutional adjustment, defense counsel introduced the testimony of Dr. Ann Burgess, an "expert in domestic violence." Ex. at 1464–68. Dr. Burgess described domestic violence as an "intentional aggressive act that injures somebody" where "there is a connection through family." Ex. at 1470–71. Dr. Burgess offered several opinions about domestic violence, including that "multi-generational violence" exists and that neglect is a "critical factor" in domestic abuse. Ex. at 1474–75.

Dr. Burgess testified that she believed that Barnette's criminal conduct between April 30 and June 26, 1996, was part of a domestic "crime spree" that was focused on "his obsession to get to his ex-girlfriend to reunite with her." Ex. at 1478. She opined that Barnette's behavior was rooted in the way Barnette was raised. Ex. at 1480. She described the significance of various events in Barnette's past, including the death of Barnette's grandmother, Pearl Cooper; the fact that Derrick Barnette was "in and out" of Barnette's childhood as a caretaker; the behavior of Barnette's mother and aunt in getting dressed up and "going out"; episodes where Barnette sat in a closet crying; and the domestic violence between his parents where they were "challenging each other about issues of fidelity." Ex. at 1480–83, 1489.

Dr. Burgess focused heavily on Barnette's relationships with women, including Robin and Barnette's earlier girlfriends who testified during the case by the United States. Dr. Burgess testified that Barnette's abuse of women and his attacks on Robin were part of a "cycle" that "never gets resolved." Ex. at

36

Case 3:12-cv-00327-MOC   Document 98   Filed 09/23/15   Page 36 of 114

**JA736**

1479.  Barnette "gets into a good relationship, everything seems to be going well, and then gets into this thinking that there's infidelity, thinking that there's jealousy.  All of those negative feelings come forward and then he starts to try to control the relationship, and that's where the physical abuse can come in."  Ex. at 1479.

Dr. Burgess described Barnette's misconduct as limited to the context of domestic relationships when he is in the community, as distinguished from the structured setting of a prison.  Ex. at 1496–97.  Dr. Burgess evaluated Barnette's violent conduct, including his murder of Donald and his shooting of Anthony Britt, and concluded that what drove Barnette's misconduct from April through June of 1996 was "obsessional thinking" that focuses only on the "one area" of domestic, boyfriend-girlfriend relationships.  Ex. at 1495–96, 1534–36.  Dr. Burgess opined that Barnette "gets into difficulty when it's in the context of . . . some kind of boy/girlfriend type of relationship" but "not in the context of . . . doing daily routine and things like that."  Ex. at 1496.  She explained that Barnette "[d]oes what he's supposed to do when he's in a structured setting."  Ex. at 1496–97.

Barnette's attorneys also called as a witness Dr. Mark Cunningham, a clinical and forensic psychologist who testified over the course of two days about Barnette's mental health and the effect that his background had on his conduct.  Ex. at 1539–1698.  Dr. Cunningham concluded that "Barnette's development was damaged by a number of fundamental factors, and that damage placed him at

37

substantially greater risk for disturbed romantic relationships, for criminal activity, and for criminal violence in the community." Ex. at 1551. Dr. Cunningham also concluded that there was "no indication that Barnette was psychotic at the time of these offenses or that he was so mentally retarded or deficient that he did not know what he was doing." Ex. at 1551. But he opined that although Barnette had a choice about his conduct, he did not have the same choice as everybody else; he had the choice that "you get after you get done with his development." Ex. at 1552.

Dr. Cunningham explained that the Department of Justice had conducted research and identified "risk factors that increase the likelihood of delinquency and violence" and "protective factors" that serve as a buffer against those behaviors. Ex. at 1555. Dr. Cunningham opined that many of those risk factors and others were present in Barnette's history. Ex. at 1555–62, 1569–97. And he offered a number of opinions about the existence or absence of protective factors. Ex. at 1562–69.

Dr. Cunningham identified several risk factors present during Barnette's early childhood. Ex. at 1556–59. Those risk factors included, for example, a family history of criminal behavior and substance abuse; family management problems based on Barnette's moving from place to place, receiving care from different adults, and receiving erratic or abusive discipline; family conflict, which included conflict between Derrick and Sonia and Barnette's mixed feelings about his mother; and parental attitudes, which included Sonia's implicitly condoning

38

criminal behavior by dating drug dealers.  Ex. at 1556–59.

Dr. Cunningham identified additional risk factors present from age six. Ex. at 1560.  Those factors included, for example, risks associated with "transition and mobility," based on the instability caused by frequent moves during Barnette's early childhood and after his mother's divorce from Derrick; availability of firearms; exposure to immediate portrayals of violence; risks associated with family-management, family conflict, and attitudes favorable toward crime and substance abuse.  Ex. at 1561–62.  Dr. Cunningham noted that the large group of risk factors present in Barnette's life were "family factors," which he opined had "some relationship to why his violence has substantially been in a family setting."  Ex. at 1570.

Dr. Cunningham also identified numerous "protective factors" that tend to serve as a buffer against criminal behavior but were absent in whole or in part from Barnette's life.  Ex. at 1562.  Dr. Cunningham noted that Barnette was not a female, and girls are less likely to respond to a bad childhood with violence.  Ex. at 1563.  He also noted that Barnette's intelligence was below the range that typically qualified intelligence as a protective factor.  Ex. at 1563.  Dr. Cunningham explained that Barnette did not fully benefit from "[s]ocial bonding to a positive role model" because his father did not stay actively involved in his life.  Ex. at 1565.

Dr. Cunningham further explained that Barnette required "early interventions" that he did not receive.  Ex. at 1567.  Dr. Cunningham opined that

39

Sonia's becoming a mother at age 14 when her father had been "psychiatrically and physically disabled, as Jessie [Cooper] was," and her mom had been murdered, presented "a case for a social work agency." Ex. at 1567. He explained that his parents required "marital counseling" and "anger management classes" in the light of their domestic conflicts, in addition to "parenting instruction." Ex. at 1568. Dr. Cunningham also opined that Barnette required therapy after Derrick informed him that he was not his biological father, and that he required the long-term assistance of a mental health professional in the light of his practice of "sitting in a closet naked crying." Ex. at 1569.

Dr. Cunningham summarized Barnette's troubled history and explained that part of the way he tried to address it was by making "premature commitments," which influenced his behavior toward Robin. Ex. at 1616. Although most boys break up with the girls they date at age 16, Barnette became prematurely attached in his teenage relationships and considered those breakups to be a "tremendous injury." Ex. at 1616–17. According to Dr. Cunningham, by the time Barnette began his relationship with Robin he was "carrying this sense that he has been betrayed and abused by these women all along." Ex. at 1617. "Then when it happens with her, she catches the rage and the distrust and the anger not only for these relationships, but for what happened with his mom and dad as well." Ex. at 1617.

Dr. Cunningham concluded that Barnette's crimes were appropriately considered part of a "catathymic homicide," where there is an "emotional bond or

40

**JA740**

attachment" between victim and perpetrator and they "are in a relationship with each other." Ex. at 1620–21. He explained that a catathymic homicide is ordinarily likely to be carried out by a "man with a disturbed attachment history," and explained that Barnette's behavior was consistent with that kind of perpetrator. Ex. at 1620–21.

Dr. Cunningham offered several other detailed insights into Barnette's behavior and mental health. Dr. Cunningham described research that connected Barnette's developmental experience with the kinds of offenses he carried out. Ex. at 1618–26, 1655–66. He explained that Barnette's conduct could be driven by emotional turmoil and still carried out with considerable planning and premeditation. Ex. at 1625. He also described a number of "depressive symptoms" that he ascribed to Barnette during the weeks of the firebombing to the murders. Ex. at 1625–29.

Barnette's counsel also introduced testimony from Dr. Seymour Halleck, an expert in forensic psychiatry, who focused in detail on Barnette's mental health and offered several specific diagnoses. Ex. at 1372, 1376–82. Among other things, Dr. Halleck concluded that between April and June of 1996, Barnette suffered from "a major depressive disorder"; "withdrawal"; and "a substance abuse disorder" because he "sometimes drank too much." Ex. at 1378–81. Dr. Halleck described seeing "a few indications" of "attention deficit hyperactivity disorder," but not enough to make a diagnosis. Ex. at 1380. And Dr. Halleck described several characteristics of Barnette, including "periodic

41

preoccupation with suicidality," "impulsivity" with regard to sex and drugs, "transient episodes of being paranoid," and a "great deal of anger and rage." Ex. at 1382.

Dr. Halleck concluded that Barnette "had a very serious personality disorder" known as "borderline personality disorder." Ex. at 1381. Dr. Halleck explained that Barnette's disorder was characterized "by an enormous fear of abandonment." Ex. at 1381. Dr. Halleck also explained that Barnette "showed rapid fluctuations in mood, and amazingly so even as a child." Ex. at 1381. He explained that Barnette "would switch his mood in just a second, like turning on a light switch. He could be feeling happy and all of the sudden he would be extremely sad." Ex. at 1381.

Dr. Halleck also concluded that Barnette had "the qualities of an antisocial personality disorder and some of the qualities of a narcissistic personality disorder." Ex. at 1382. He concluded that these qualities were less prominent than Barnette's borderline-personality-disorder diagnosis. Ex. at 1382.

Dr. Halleck also offered opinions about how events in Barnette's childhood affected him. Ex. at 1382–85. Dr. Halleck explained that the frequent moves Barnette's family made; the death of his grandmother, Pearl Cooper; abuse by Derrick; Derrick's absence; the fact that Derrick was not Barnette's biological father; and the violence Barnette witnessed between Derrick and Sonia had an effect on Barnette. Ex. at 1382–86. He testified that the way his parents raised him, "coupled with the many other bad things" that happened to him, "ultimately

42

**JA742**

made him more susceptible to depression, substance abuse, and borderline personality disorder and eventual violent behavior." Ex. at 1383.

Dr. Halleck also described his opinion about the limited choices available to Barnette. Ex. at 1388. He explained that Barnette did have a choice about whether "to walk away from the situation and go on with his life or kill these people." Ex. at 1386. But Dr. Halleck explained that he believed that Barnette "was in a position where the choices available to him were extremely hard and difficult to make." Ex. at 1388. Dr. Halleck opined that Barnette saw irrational and exaggerated benefits in completing the murders and "that he was impaired in his ability to evaluate the risks of the situation" in the light of the influence of substances, his status as a "severely disturbed person with a borderline personality disorder, and also all of the role modeling he had experienced." Ex. at 1389–90.

3.     The rebuttal case by the United States.

The United States presented a rebuttal case in the light of testimony presented during Barnette's defense. The rebuttal case included testimony from witnesses who had worked with Barnette and observed his interactions with Robin. It also included testimony from expert witnesses who responded to the expert opinions introduced by defense counsel.

Barnette had testified that he was fired from Camelot Music in Roanoke Virginia for sexual harassment after behaving as "a clown" and "joking around,"

43

Ex. at 1056–57, and the United States called as witnesses two individuals who had worked with Barnette at Camelot. Ex. at 1706–08, 1717–18. Joanna Coleman testified that Barnette sexually harassed her at work. Ex. at 1706, 1710–13. She testified that Barnette told her that she "needed sex," "needed his big dick in [her]," and that "he'd tie [her] up." Ex. at 1710. She explained that Barnette was not joking. Ex. at 1711, 1715. Shirley Williams Parker, who had also worked at Camelot, testified that Barnette took her to the apartment in Roanoke he shared with Robin and had sex with her on several occasions. Ex. at 1717–20.

The United States also called Angela Rosser, who grew up with Robin and testified about an event that Barnette had described during his direct examination. Ex. at 1719–20. Barnette had testified about a time when he became angry with Robin when, while driving, he had observed Robin in another car with Rosser when he had expected Robin to be attending the funeral of Rosser's niece. Ex. at 1043–47. Barnette explained that he had been driving because he wanted to "be there for her" at the funeral. Ex. at 1045. Rosser testified that when Barnette discovered her and Robin out driving to the store, he began crying and hollering, and asking "why did she leave him?" Ex. at 1722. Robin got into the car that Barnette was driving. Ex. at 1723. Rosser followed the car and observed Robin jump from the moving vehicle and begin rolling. Ex. at 1723–24. Rosser brought Robin home. Ex. at 1724. Rosser testified that, based on what she observed, Barnette had not been trying to find Robin to

44

comfort her on the day of the funeral.  Ex. at 1724.

The United States called Dr. Peter Carlson, an expert in Bureau of Prisons classifications, who testified about the amenities available to inmates sentenced to life imprisonment.  Ex. at 1739–47.  Dr. Carlson explained that inmates could have a variety of different jobs and a "full spectrum" of recreation was ordinarily available, including "ball fields, soccer, baseball," aerobic activities, board games, watching television, and playing cards.  Ex. at 1744.  He also described opportunities to obtain a high school degree, a GED, or to take correspondence courses from a college.  Ex. at 1744.  Dr. Carlson further described the opportunities inmates have to visit with family, which can include monthly visits for each visitor and more if the visiting room is not overcrowded.  Ex. at 1745–46.

Finally, the United States called Dr. Park Dietz, an expert in forensic psychiatry.  Ex. at 1763.  Dr. Dietz agreed with Dr. Halleck about the symptoms that Barnette experienced during the time of his crimes but did not conclude that a diagnosis of major depression was appropriate.  He explained that "it could be major depression, but it could also be excessive drinking over that period of time."  Ex. at 1766–67.  Dr. Dietz agreed with Dr. Halleck's diagnosis of "borderline personality disorder" and concluded that Barnette also had "narcissistic personality disorder" and that he had shown a "great deal of antisocial behavior."  Ex. at 1768–69.  Dr. Dietz also concluded that Barnette's homicides had a robbery component, because Barnette took Donald's car and wallet.  Ex. at 1770.  And he concluded that Barnette had traveled to Roanoke to kill Robin and Benjamin

45

**JA745**

Greene.  Ex. at 1770–71.

Dr. Dietz offered opinions that contradicted the defense theme that Barnette's violent conduct was confined to domestic relationships.  He addressed Dr. Burgess's opinion that "the defendant's motive for violence was domestic in nature," identifying "very different motives" in the two homicides that Barnette committed.  Ex. at 1776–77.  He described "[t]he Robin Williams homicide [as] a domestic homicide with anger and jealousy and revenge being all present, and anger being the dominant one."  Ex. at 1777.  "But," he opined, "the Donald Allen homicide is a homicide of opportunity, of expediency."  Ex. at 1777.  Barnette was able to obtain Donald's car without killing him, but Barnette killed Donald "because he didn't want Donald Allen to call the police, and that is not the same as a domestic homicide."  Ex. at 1777.  Dr. Dietz further opined that the murder of Donald Allen was not a "catathymic homicide," which Dr. Cunningham had described.  Ex. at 1774.

4.      Barnette's death sentence.

The jury returned a verdict of death after deliberating for just over 7.5 hours.  Ex. at 2018–24.  For each of the three capital counts against Barnette, the jury found beyond a reasonable doubt each of the five aggravating factors that the United States sought to prove, except the factor related to future dangerousness.  Ex. at 2044–46, 2062–65, 2080–82.  Unlike the jury that had sentenced Barnette in 1998, the 2002 jury did not find that Barnette was "likely to commit criminal acts of violence in the future which would be a continuing and

46

serious threat to society."  Ex. at 2046, 2065, 2082.  At least one juror found that Barnette proved fifteen mitigating factors by a preponderance of the evidence. Ex. at 2048–50, 2067–69, 2085–86.

The jury unanimously found that Barnette proved eight mitigating factors. Ex. at 2048–50, 2067–69, 2085–86.  Twelve jurors found that Barnette was affected by growing up in a family environment of violence, drugs, and alcohol abuse; that Barnette had repeated exposure to violence in the home; that Barnette attempted to protect his brother from the damaging effects of parental violence and neglect; that Barnette cooperated with police; that Barnette can serve a useful purpose to others in a prison environment; that Barnette was neglected by his mother; that Barnette turned himself in to police; and that Barnette had been a model prisoner.  Ex. at 2048–50, 2067–69, 2085–86.

At least half of the jurors found that Barnette proved three additional mitigating factors.  Ex. at 2048–50, 2067–69, 2085–86.  Eleven jurors found that "other factors in the defendant's childhood, background or character mitigate against imposition of the death sentence."  Ex. at 2048–50, 2067–69, 2085–86. Nine jurors found that "Barnette had a history of untreated emotional problems." Ex. at 2048–50, 2067–69, 2085–86.  And six jurors found that, at the time of his offenses, "Barnette was experiencing irrational and obsessive thoughts."  Ex. at 2048–50, 2067–69, 2085–86.

At least one juror found that Barnette proved four additional mitigating factors.  Two jurors found that "Barnette does well in a structured environment."

47

Ex. at 2048–50, 2067–69, 2085–86. One juror found that Barnette had remorse, that he accepted full responsibility for his actions, and that he was abused by his father. Ex. at 2048–50, 2067–69, 2085–86.

The jury considered whether the aggravating factors found to exist sufficiently outweighed any mitigating factors found to exist and unanimously recommended a sentence of death for Barnette on each of the three capital counts of which he had previously been convicted. Ex. at 2054, 2072, 2090. In the light of the jury's verdict, this Court sentenced Barnette to death on each of those three counts. Ex. at 2092.

The Court of Appeals for the Fourth Circuit affirmed Barnette's death sentence. The Court affirmed originally in 2004. *Barnette II*, 390 F.3d 775, 812 (4th Cir. 2004) ("*Barnette II*"). The United States Supreme Court vacated that decision and remanded in the light of its 2005 decision, *Miller-El v. Drekte*, 545 U.S. 231 (2005), which held that a proper analysis of a claim of discrimination in juror selection requires a court to engage in comparative juror analysis. *United States v. Barnette*, 644 F.3d 192, 196, 205 (4th Cir. 2011) ("*Barnette III*"). This Court held an evidentiary hearing and concluded that Barnette had not proved any purposeful discrimination in the selection of his jury. *Id.* at 196. The Fourth Circuit affirmed this Court's decision. *Id.* at 217.

## Discussion

Barnette's motion under 28 U.S.C. § 2255 seeks relief from his death sentence on eight grounds, each of which he contends requires an evidentiary

48

**JA748**

hearing.  First, Barnette contends that he was denied the effective assistance of counsel.  Mot. 11; Barnette Br. 4.  Second, he attempts to reassert the contention rejected by this Court and affirmed by the Fourth Circuit that the selection of his resentencing jury was tainted by racial discrimination.  Mot. 88; Barnette Br. 4, 102.  Third, Barnette seeks to preserve arguments rejected by this Court when it denied an earlier motion for leave to conduct juror interviews.  Mot. 92–95; Barnette Br. 5, 103–04.  Fourth, Barnette contends that the decision to prosecute him in federal court violated his constitutional rights.  Mot. 95–98; Barnette Br. 5, 104.  Fifth, Barnette contends that he did not receive discovery to which the Constitution entitled him.  Mot. 98–100; Barnette Br. 5, 104.  Sixth, Barnette contends that the death penalty is unconstitutional because it is sought on the basis of race and geography.  Mot. 100–101; Barnette Br. 5, 104.  Seventh, Barnette contends that the manner that the Bureau of Prisons would carry out his sentence would violate the Eighth Amendment.  Mot. 101–02; Barnette Br. 5, 104.  Finally, Barnette contends that the cumulative effect of errors referred to in his motion under Section 2255 entitles him to relief.  Barnette Br. 5, 106.

This Court should deny Barnette's motion without an evidentiary hearing. Barnette's "motion and the files and records of the case conclusively show" that Barnette "is entitled to no relief."  28 U.S.C. § 2255(b).  Although he has obtained a host of affidavits and records that he contends support his motion, Barnette is not entitled to a hearing.  He would not be entitled to relief even if the evidence that is not "contradicted by the record, inherently incredible, or [a conclusion]

49

rather than [a] statement[] of fact," *Jackson v. United* States, 638 F. Supp. 2d 514, 528 (W.D.N.C. 2009), "was believed," *United States v. Terry*, 336 F.3d 312, 314–15 (4th Cir. 2004). Accordingly, "an evidentiary hearing is unnecessary." *Id*; *Jackson*, 638 F. Supp. at 617 (denying a motion to vacate a federal death sentence without an evidentiary hearing).

> **A. Barnette cannot establish that the performance of the attorneys who represented him in 2001 and 2002 was constitutionally deficient.**

Barnette first contends that the performance of the attorneys who represented him during his 2002 penalty trial was constitutionally deficient. To establish ineffective assistance of counsel, Barnette has the burden to prove that the performance of his attorneys fell below an objective standard of reasonableness, judged "from counsel's perspective at the time." *Strickland v. Washington*, 466 U.S. 668, 689 (1984). He must also establish prejudice in the form of "a reasonable probability" that, "but for the deficient performance, he would not have been sentenced to death." *Buckner v. Polk*, 453 F.3d 195, 201 (4th Cir. 2006) (quoting *Strickland*, 466 U.S. at 694).

The *Strickland* standard that Barnette must meet to demonstrate constitutionally deficient performance by his attorneys is well established. Barnette has obtained an opinion from an expert, Russell Stetler, who reviewed affidavits from some of the members of Barnette's defense team, about the extent to which the performance of Barnette's attorneys comported with prevailing norms. Stetler Aff. ¶¶ 47, 90. But "[e]xpert testimony is not necessary to

50

**JA750**

determine claims of ineffective assistance of counsel." This Court is amply "qualified to understand the legal analysis required by *Strickland*." *Earp v. Cullen*, 623 F.3d 1065, 1075 (9th Cir. 2010); *Gates v. Davis*, No. C 88-2779 WHA, 2014 WL 8186134, at *9–10 (N.D. Cal. Mar. 9, 2014) (declining to consider an affidavit from Stetler about "prevailing professional norms" and "whether or not the actions of petitioner's trial counsel were adequate"). Three attributes of the standard are particularly relevant to the theories advanced by Barnette.

First, the Supreme Court has explained that "counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Strickland*, 466 U.S. at 690. Counsel has a duty to "make reasonable investigations" or "make a reasonable decision that makes particular investigations unnecessary." *Id.* at 691. But the "heavy measure of deference" that *Strickland* dictates applies "to counsel's judgments" about whether and to what extent to investigate. *Id.* at 691. "There are countless ways to provide effective assistance in any given case." *Id.* The burden rests with Barnette to "overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Id.* at 689.

Second, an attorney is not unreasonable for declining to introduce evidence that operates as a "doubled edged sword," with potential both to help and hurt the defense case. *Truesdale v. Moore*, 142 F.3d 749, 754 (4th Cir. 1998). "Failure to present particular mitigating evidence often leads to claims that counsel

51

**JA751**

should have introduced such evidence or investigated further." *Id.* "On the other hand, the introduction of evidence that the jury does not credit or that the state turns to its advantage leads to ineffectiveness claims also." *Id.* Accordingly, the Fourth Circuit instructs that the best course for a court reviewing a theory that counsel failed to introduce additional mitigating evidence "is to credit plausible strategic judgments," *id.*, which *Strickland* instructs attorneys are presumed to have made, 466 U.S. at 690.

Finally, although a capital defendant has the right to ask a jury to consider "any aspect" of his "character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death," *Lockett v. Ohio*, 438 U.S. 586, 605 (1978), "more is not always better." *Chandler v. United States*, 218 F.3d 1305, 1318 (11th Cir. 2000). Counsel is not required to "present all mitigation evidence." *Id.* To the contrary, "[g]ood advocacy requires 'winnowing out' some arguments, witnesses, evidence, and so on, to stress others." *Id.*; *see also United States v. Terry*, 366 F.3d 312, 318 (4th Cir. 2004). Similarly, an attorney is not required to investigate or seek out every piece of evidence that he is allowed to present in mitigation. "[T]here comes a point at which evidence from more distant relatives can reasonably be expected to be only cumulative, and the search for it distracts from more important duties." *Bobby v. Van Hook*, 558 U.S. 4, 11 (2009).

Under various headings, Barnette advances five theories in support of his claim that the performance of the attorneys who represented him at his 2002

52

**JA752**

penalty trial was constitutionally deficient. First, Barnette contends that his attorneys were constitutionally deficient for failing adequately to investigate and present to the jury evidence in mitigation. Barnette Br. 11–85, 89–97. Second, Barnette contends that the advice of his attorneys related to his own testimony at the 2002 penalty hearing was constitutionally deficient. *Id.* at 85–89. Third, Barnette contends that evidence of the behind-the-scenes conduct of his defense team demonstrates that the performance of his attorneys was constitutionally deficient. *Id.* at 97–100. Fourth, Barnette contends that the inability of his attorneys to locate all records from the 2002 penalty proceeding after it concluded demonstrates a violation of his constitutional rights. *Id.* at 100–01. Finally, Barnette refers to a list of conclusions in his motion and contends, without elaboration, that that his attorneys rendered constitutionally deficient performance by failing to protect his constitutional rights. *Id.* at 102.

Barnette's theories fail as a matter of law. The discussion that follows addresses each theory in turn and explains why Barnette cannot establish that the performance of his attorneys fell below the objective standard of reasonableness established by the Constitution. It then explains why Barnette cannot meet his burden to show prejudice.

1. <u>Barnette cannot establish that the attorneys who represented him during the 2002 resentencing hearing were constitutionally deficient for failing adequately to investigate and present evidence.</u>

Barnette has obtained a variety of records and affidavits from a host of witnesses and contends that his attorneys failed to conduct an adequate

<div align="center">53</div>

investigation and unreasonably failed to present evidence reasonably likely to persuade his 2002 jury to recommend a different sentence. Throughout his brief and motion under various headings, Barnette makes six contentions. He contends that his attorneys were deficient to the extent that (1) they did not develop or present additional evidence about the background of Barnette or his family; (2) they did not develop or present additional evidence about relationships Barnette had with women other than Robin Williams; (3) they did not develop or present additional evidence that Barnette was depressed; (4) they did not pursue a different strategy with respect to expert witnesses; (5) they did not introduce additional evidence about Barnette's positive institutional adjustment after his arrest; and (6) they did not introduce additional evidence about Barnette's continuing interpersonal relationships.

Even if this Court were to consider as true the competent evidence identified by Barnette, Barnette would be unable to show that the performance of his attorneys was deficient. Most of what he contends his attorneys ought to have investigated, developed, or introduced was, in fact, introduced by his attorneys, or it is cumulative. Other evidence is a double-edged sword or of little to no mitigating value. To the extent that Barnette's attorneys did not further pursue any of the evidence or information that Barnette now identifies, they acted well within the board boundaries of reasonable discretion.

54

**JA754**

a. Barnette cannot establish that his attorneys were deficient to the extent they did not develop or present additional evidence about Barnette's background or that of his family.

Barnette's attorneys presented a detailed history of Barnette and his family that spanned four generations, extending from Barnette's grandfather's experience in the Korean War to his son's prowess on the football field. As the verdict form reflects, Barnette successfully convinced the entire jury that Barnette grew up in a family environment of violence, drugs, and alcohol abuse; that Barnette was repeatedly exposed to violence; that he attempted to protect his brother from the violence and neglect of his parents; and that he was neglected by his mother. To the extent they declined to develop and introduce even more evidence about this history, Barnette has failed to identify competent evidence which, if believed, would overcome the presumption that his attorneys acted reasonably.

Barnette's attorneys did not perform unreasonably to the extent they declined to develop and present additional evidence about the background of Barnette's maternal grandfather, Jesse Cooper. *Cf.* Mot. 42–43; Barnette Br. 27–32. Barnette's attorneys presented substantial evidence about Jesse Cooper, his experience during the Korean War, the way he acted and the role he played in the lives of Barnette and his brother, and what they perceived about him through the testimony of Barnette, Derrick Barnette, and Mario Barnette. Because the jury heard about Jesse Cooper in detail from those witnesses, counsel was not deficient for declining to introduce additional testimony from other witnesses

55

**JA755**

such as Sonia Barnette or her cousins, Jean Nduly and Robert Cooper, about Jesse Cooper's conduct and demeanor. *Cf.* Barnette Br. 28–30. *See Rhode v. Hall*, 582 F.3d 1273, 1287 (11th Cir. 2009) ("Counsel is not required to present cumulative evidence . . . .").

Barnette's attorneys were not deficient to the extent that they did not subject Jesse Cooper to psychiatric tests or investigate records of Jesse Cooper's military service during the Korean War, which ended nearly twenty years before Barnette was born. *Cf.* Mot. 42–43; Barnette Br. 27–28, 30. Counsel is not required to "present all mitigation evidence," and "[c]onsidering the realities of the courtroom, more is not always better." *Chandler*, 218 F.3d at 1318 (11th Cir. 2000). Barnette testified about his own relationship with Jesse Cooper, and his attorneys could reasonably have concluded that evidence that did not bear on that relationship or affect Barnette directly had little mitigating value. Evidence about Jesse Cooper's military record and psychiatric evaluations accordingly risked diverting attention from Barnette's own background and mental health, and Barnette has identified nothing that suggests the extent to which his attorneys declined to pursue more information about Jesse Cooper was unreasonable.

Nor did Barnette's attorneys perform unreasonably to the extent they did not develop and present additional evidence about Barnette's maternal grandmother, Pearl Cooper, and the effect on Barnette's mother of Pearl's murder when Barnette was an infant. *Cf.* Mot. 43–44; Barnette Br. 25, 26–27, 30–31, 93.

56

**JA756**

Barnette's attorneys presented evidence about Pearl Cooper's murder at the hands of his step grandfather from Derrick Barnette. Barnette's expert witnesses also described Sonia's relationship with Pearl and her stepfather and the effect the murder had on Barnette's mother, and in turn, on Barnette. Ex. at 1383 (testimony of Dr. Halleck); Ex. at 1592, 1684 (testimony of Dr. Cunningham). Barnette's attorneys were not unreasonable for declining to introduce the testimony of six additional witnesses, including Pearl's friend, Do'Lores Guy; Sonia Barnette; Sonia's cousin, Jean Nduly; Sonia's sisters, Tessie Nero, and Sheila Cooper; and a neighbor who "heard about it" when Pearl was killed, Sandra Smith. *Cf.* Barnette Br. 31–37.

Indeed, in addition to being cumulative, increased focus on the effect of Pearl Cooper's murder on other members of her family would have been a double-edged sword. The United States sought to prove that the harm Barnette caused the Williams family and the Allen family when he murdered Robin and Donald was an aggravating factor. Accordingly, the jury might well have considered the ill effects of a murder in the family against Barnette. Additional testimony suggesting that Barnette was affected by Pearl Cooper's murder when he was an infant risked reminding the jury about the experience of Bertha Williams's eight-month old granddaughter, who had been in the kitchen with her mother just before Barnette shot through the door with his shotgun and proceeded outside to murder Robin.

The record establishes that Barnette's counsel reasonably sought to focus

57

**JA757**

on Barnette's own background and his experiences during his own troubled childhood.  Counsel was not unreasonable for focusing on Pearl's murder to the extent that it affected Barnette and declining to spend more of the jury's attention on additional, largely cumulative testimony about the way the murder affected Sonia and her sisters.

The performance of Barnette's attorneys was not deficient to the extent that they did not introduce additional evidence about Barnette's relationship with his parents.  The jury heard ample evidence Barnette was abused by his father, that Barnette's parents fought violently when they were together, that after Barnette's parents separated Barnette's mother dated criminals and used cocaine, and that Barnette moved from home to home as a child.  The testimony about these events by the additional witnesses identified by Barnette, Barnette Br. 37–44, 47–50, would have been cumulative and risked diverting the limited attention of the jury from the evidence that Barnette's attorneys did present.  Barnette cannot overcome the presumption that his attorneys were reasonable to the extent they declined to pursue and introduce this evidence.  *Van Hook*, 558 U.S. at 11 ("[T]here comes a point at which evidence from more distant relatives can reasonably be expected to be only cumulative, and the search for it distractive from more important duties.").

Contrary to what Barnette suggests, Barnette Br. 43, his attorneys were not constitutionally deficient for declining to seek a draft separation agreement prepared in 1982 that was never implemented.  This plan was "scrapped,"

58

**JA758**

according to Barnette, and according to his father, Barnette's parents did not separate until 1984. Derrick Barnette Aff. ¶ 43. Barnette has identified nothing to suggest that he was ever aware of the draft agreement or that it has any relevance to any mitigating factor beyond what the jury already heard about the separation. "An attorney need not pursue an investigation that would be fruitless," *Harrington v. Richter*, 562 U.S. 86, 108 (2011), and Barnette's attorneys were not deficient to the extent they did not investigate this draft agreement.

Barnette's contention that his attorneys were deficient to the extent they did not develop or introduce additional evidence about Barnette's paternity or the circumstances surrounding Derrick Barnette's paternity test is meritless. The jury heard that a paternity test established that Derrick was not Barnette's biological father. They heard about how Barnette learned that fact. And they heard directly from Barnette how that knowledge affected him and his relationship with both his mother and father.

Barnette's contention that his mother, Sonia, was adamant that Derrick was Barnette's father and in denial about the paternity results was "totally missed by resentencing counsel" is contradicted by the record. Barnette Br. 46. Barnette's expert witness Dr. Cunningham testified that Sonia held out Derrick as Barnette's father as a "pretense," Ex. at 1606, and specifically noted that "Sonia insists that the paternity tests were rigged." Ex. at 1610. Indeed, Barnette's attorney during the 2002 resentencing hearing asked Dr. Cunningham

59

**JA759**

several questions in an attempt to elicit testimony about Sonia's denial of the results of the paternity test. Ex. at 1610–11. The court sustained objections to the line of questions. Ex. at 1610.

Barnette's assertion that another expert who testified in 2002, Dr. Burgess, "was not made aware of this issue prior to the 2002 resentencing," Barnette Br. 47, says nothing about the effectiveness of Barnette's attorneys. Like Dr. Cunningham, Ex. at 1549, Dr. Burgess interviewed Sonia Barnette, Ex. at 1477, the source that Barnette today cites for information about her denial, Barnette Br. 46 (quoting Sonia Barnette Aff. ¶ 47). Dr. Burgess could have used her interview to obtain that evidence if it were significant to her analysis. Any failure to do so does not establish ineffective assistance of counsel. *See McHone v. Polk*, 392 F.3d 691, 705 (4th Cir. 2004) (holding that ineffectiveness attributable to a defendant's expert cannot support a claim of ineffective assistance of counsel).

Nor was the decision by Barnette's attorneys to call Derrick Barnette as a witness constitutionally deficient. *Cf.* Mot. 12. Derrick Barnette testified extensively about events in the lives of Barnette and his family members that his resentencing counsel contends were critical. For example, Derrick Barnette described Jesse Cooper's history and daily behavior, the circumstances surrounding the murder of Pearl Cooper, the environment in which Barnette was born to teenage parents, and the results of the paternity test he took revealing that Derrick was not Barnette's biological father. He also described Sonia

60

Barnette's behavior going out dancing, and he described the physical violence that occurred in the house, including the time that he hit Sonia "in the head with a hammer." Ex. at 1304.

Barnette's contention that Derrick "flatly contradicted" Barnette's testimony that he suffered abuse at Derrick's hands is not supported by the record. Derrick confirmed that he beat Barnette with a belt, including while Barnette was naked, and with a switch. Ex. at 1319, 1321, 1325–26. He testified that his purpose was "intimidation." Ex. at 1326. And he testified that he hit Barnette on the penis and scrotum. Ex. at 1328. He also explained that Sonia did not like it when he beat Barnette, but did nothing to stop him. Ex. at 1307. On cross examination, Derrick testified that he never "intentionally hit him above his legs" and that the reason he had beat Barnette was to punish him for "transgress[ing] the family rules." Ex. at 1328. But he did not testify that any of Barnette's statements describing the abuse that he received were false. Moreover, Derrick had told the experts who interviewed him that he did not consider the beatings he administered to have been "all of that excessive," Ex. at 1384 (testimony of Dr. Halleck). Accordingly, his attorneys could reasonably have concluded that the jury would have heard Derrick's take on his conduct toward Barnette in any event. The decision to call Derrick Barnette as a witness was not unreasonable.

In the same motion in which he challenges the decision to call his father as a witness, Barnette suggests that his attorneys were deficient for *not* calling his

61

**JA761**

mother, Sonia Barnette, even though the jury unanimously found her to have neglected him. Mot. 56. Barnette's defense blamed Sonia Barnette for much of Barnette's troubled background, and introduced evidence that throughout Barnette's life she struggled to keep a job, drank, did drugs, made poor decisions about how to care for her family, failed to care for her children for days at a time, and exposed Barnette to drug dealers and criminals through the men that she dated. Indeed, Barnette today contends that his attorneys ought to have introduced *even more* evidence about Sonia's misconduct and poor judgment. Barnette Br. 48–53, 56, 67–68. Like the expert testimony that the jury heard at trial describing Sonia as creating a "pretense," Ex. at 1606, Barnette's brief also raises serious questions about Sonia Barnette's credibility. *See* Barnette Br. 46 (describing Sonia as in "denial," "then and now.").

The record amply establishes that the decision not to call Sonia Barnette as a witness was a reasonable strategic decision. His attorneys interviewed her, as did his mitigation specialist and his experts. Alfonso Aff. ¶ 8; Burgess Aff. ¶ 7; Lawson Aff. ¶ 35; Ex. at 1378 (testimony of Dr. Halleck); Ex. at 1477 (testimony of Dr. Burgess); Ex. at 1549 (testimony of Dr. Cunningham). And his attorneys explained to the jury that Sonia Barnette was in the courtroom "every day," specifically referring to their decision not to call her as a witness. Ex. at 1939. Sonia Barnette's testimony presented obvious risks that she would attempt to minimize the misconduct that was a primary focus of the defense case or lack credibility. Their strategic decision not to call her as a witness was entirely

62

**JA762**

reasonable.

Barnette's contention that the resentencing jury did not hear that Barnette's mother struggled to keep a job, dated "sleazy" boyfriends, did drugs, and disrupted Barnette's life by moving the family to Georgia, drank, and generally contributed to an atmosphere of "chaos," Barnette Br. 48–53, 56, 67–68, is contradicted by the record. The jury heard detailed evidence that Sonia Barnette struggled to keep food in the refrigerator, dated sleazy men including drug dealers, got evicted from the apartment in which she was living with her sons, and lost her job and moved the family to Georgia at a time that deprived Barnette of an opportunity to attend the school that he wanted to attend. The jury found that Barnette's mother neglected him after Barnette himself described the conditions under which he lived with his mother. His attorneys were not constitutionally deficient for declining to present additional evidence of the same conditions.

Barnette's attorneys were not constitutionally deficient to the extent they did not introduce testimony from Mario Barnette about the real father of his cousin. Cf. Barnette Br. 47. That cousin himself testified that he had been estranged from his biological father but found him later in life. Ex. at 1414. He testified about his relationship with his father and what it meant to him. Ex. at 1414. Additional testimony about the subject from Mario would have been cumulative and potentially distracting from other more salient issues.

63

b. Barnette cannot establish that his attorneys were deficient to the extent they did not develop or present additional evidence about relationships Barnette had with women other than Robin Williams.

Barnette's contention that his attorneys were deficient to the extent they did not present additional evidence about Barnette's relationships with women other than Robin Williams, Mot. 41, 69; Barnette Br. 54–67, is misplaced. Barnette's defense focused extensively on Barnette's relationships with women, contending that his violent conduct was confined to the context of domestic relationships. His attorneys were not constitutionally deficient for declining to select a different strategy or to introduce evidence that would have been cumulative, distracting, or potentially harmful.

Barnette's contention that "the resentencing jury knew nothing about," Barnette's relationship with Sheila Sullivan, Barnette Br. 53–56, is contradicted by the record. Barnette himself described in detail his romantic relationship in Georgia with Sheila Sullivan and the betrayal he felt when it ended. He also described the fight that he endured over her. His attorneys were not constitutionally deficient for declining to introduce cumulative evidence about that fight from Barnette's assailants or additional testimony about the relationship that Barnette described.

The record also contradicts Barnette suggestion that his expert, Dr. Burgess, was unaware of the details of Barnette's relationship with Sullivan due to deficiencies by Barnette's attorneys, Barnette Br. 54–55. Dr. Burgess spent two days interviewing Barnette, Ex. at 1476. Any failure to elicit more

64

**JA764**

information about that relationship that was significant to her analysis does not establish a constitutional deficiency by his attorneys. *See McHone*, 392 F.3d at 705.

Barnette's attorneys were not constitutionally deficient to the extent that they did not develop or introduce additional evidence about Barnette's relationship with Natasha Tolbert. Cf. Barnette Br. 56–62. Tolbert testified at trial, and the jury heard evidence directly from her about what Barnette's brief contends to have been important. Tolbert testified that Barnette treated her well at the beginning of the relationship. Ex. at 830, 839. *Cf.* Barnette Br. 56. She testified about finding Barnette crying in the closet while naked. Ex. at 837–38. *Cf.* Barnette Br. 57. She testified that Barnette came from an abusive home, Ex. at 838. *Cf.* Barnette Br. 57. And she testified that Barnette was happy when his children were born, identifying photos of Barnette and his children when they were little, Ex. at 840–43. *Cf.* Barnette Br. 59–60. The jury also heard Barnette describe his own excitement about becoming a parent. Ex. at 1182–83.

To the extent that Barnette's attorneys did not introduce evidence that Barnette called the police after Tolbert's sister's boyfriend hit both Tolbert and Barnette, Barnette Br. 58, their representation was not constitutionally deficient. Barnette's attorneys presented ample evidence about Barnette's relationship with Tolbert. Nothing about that incident suggests that it was unreasonable for his attorneys not to pursue it further. *See Chandler*, 218 F.3d at 1318.

Nor were Barnette's attorneys constitutionally deficient for not developing

65

**JA765**

or introducing additional evidence that "when arguments and fights occurred" between Tolbert and Barnette, "both parties were responsible." Barnette Br. 61–62. The jury already heard that when Barnette hit Tolbert, Tolbert "hit him back." Ex. at 830. And the jury heard about at least one occasion when Tolbert hit Barnette and Barnette did not hit back. Ex. at 838–39. But the United States also presented evidence that Barnette slammed Tolbert on the concrete while she was pregnant. Ex. at 831. And defense evidence tending to shift blame for problems in the relationship away from Barnette risked undermining several of the mitigating factors that his defense sought to prove, including that he had remorse and that he accepted "full responsibility" for his actions. Ex. at 1975. *See Moody v. Polk*, 408 F.3d 141, 151 (4th Cir. 2005) (holding that a failure to introduce evidence that could be a "double-edged sword" is not constitutionally unreasonable).

Barnette's attorneys were not constitutionally deficient to the extent that they did not develop or introduce additional evidence about Barnette's relationship with Crystal Dennis. *Cf.* Barnette Br. 62–64. The jury already heard about the events that Barnette identifies in his brief, including that Natasha Tolbert was Barnette's fiancée when Crystal Dennis's brother, Anthony Britt, told Crystal about Barnette. *Cf.* Barnette Br. 62, 63–64. The jury also heard that Britt had been talking to Tolbert, Ex. at 821, which led to a fight during which Barnette shot Britt. *Cf.* Barnette Br. 62–63. The jury already heard Dennis explain that "everything was good" at the beginning of their

66

**JA766**

relationship, and that Barnette did "everything. Cooked. Cleaned. Worked," Ex. at 792. *Cf.* Barnette Br. 63–64. Barnette identifies nothing that demonstrates his attorneys were deficient to the extent they did not elicit additional testimony from Dennis or introduce additional evidence about their relationship.

Barnette's attorneys were also not constitutionally deficient for declining to introduce more details about the fight during which Barnette shot Dennis's brother, which Barnette characterizes as a "serious altercation." Barnette Br. 63. The jury heard details about that fight, including that Britt started it by pushing and threatening Barnette and that Barnette fired three gunshots, hitting Britt with one of them. Ex. at 821–22. To the extent Barnette's attorneys did not develop or introduce testimony from "Britt's best friend" or show that the fight was the product of a "dynamic that Britt" created, Barnette Br. 63, his attorneys were not constitutionally deficient. That evidence risked focusing even more of the jury's attention on Barnette's violent conduct. And placing emphasis on Britt's responsibility for the fight would again have risked undermining defense arguments that Barnette took "full responsibility" for his actions. Ex. at 1975. *See Polk*, 408 F.3d at 151.

Nor was Barnette's counsel constitutionally deficient to the extent they did not develop and introduce evidence about relationships Barnette had with four women in which Barnette contends he was not violent, possessive, aggressive, or jealous. Barnette Br. 65–66. At best, this evidence would have shown merely that that Barnette did not severely injure, burn, rape, or kill every woman with

67

**JA767**

whom he was involved.  But this evidence was also a double-edged sword that presented a significant risk of undermining other more powerful mitigating evidence that Barnette did present.

Emphasis by the defense on these other, "healthy" relationships, Barnette Br. 66, risked undermining the opinions of defense experts Drs. Halleck and Cunningham that the choices available to Barnette were more limited than those available to many because of Barnette's background.  Ex. at 1386–87, 1551–52. Dr. Halleck, for example, testified that Barnette's choice in the situation he faced with Robin Williams "was either to walk away from the situation and go on with his life or kill these people."  Ex. at 1386–89.  He opined that for Barnette, the choice was "extremely difficult and hard to make."  Ex. at 1386–89.  Evidence that Barnette had participated in numerous healthy relationships would have risked suggesting that Barnette could have maintained a similarly healthy relationship with Robin Williams instead of burning and killing her.

Emphasis on these other relationships also risked undermining Dr. Burgess's opinion that Barnette's conduct was part of a pattern of domestic violence that confined his violent conduct to boy/girl relationships.  Dr. Burgess herself explains that information about Barnette's healthy relationships "dramatically undercuts" the notion that Barnette's "relationships always followed the same pattern."  Barnette Br. 66 (quoting Burgess Aff. ¶¶ 16–18). The evidence accordingly risked weakening Barnette's compelling and ultimately successful argument against future dangerousness — that his violent conduct

68

followed a pattern confined to the context of domestic relationships. Barnette has not demonstrated that his attorneys were constitutionally deficient to the extent they did not develop and present this evidence. *See Moody* 408 F.3d at 151 (holding that a failure to introduce evidence that could be a "double-edged sword" is not constitutionally unreasonable).

> c. Barnette cannot establish that his attorneys were constitutionally deficient to the extent they did not develop or present additional evidence that Barnette was depressed.

Barnette's attorneys were not constitutionally deficient to the extent they did not introduce additional evidence that Barnette was depressed after he broke up with Robin. Mot. 43–44; Barnette Br. 68–70. Barnette himself explained how he felt that his breakup with Robin was "devastating," and that he felt he "was back to square not even one, zero." Ex. at 1068–73. He told the jury that he drank a "big cup of vodka straight" and began taking three boxes of sleeping pills. Ex. at 1071. His brother also described how he observed Barnette's "withdrawal from the family" during the months between the firebombing and murders. Ex. at 1362–63. And Barnette's expert witnesses opined that Barnette was depressed, Ex. at 1389 (testimony of Dr. Halleck); 1488 (testimony of Dr. Burgess); 1619 (testimony of Dr. Cunningham), specifically discussed how "the deterioration" of Barnette's "relationship with Robin Williams" contributed to the murders, and explained how the period of time between the firebombing and murders represented an opportunity for intervention that went unmet. Ex. at 1490–91, 1608. Testimony from additional witnesses who observed Barnette's

69

depressed behavior would have been cumulative, and declining to pursue or introduce it was well within the reasonable discretion of Barnette's trial counsel.

        d.     Barnette cannot establish that his attorneys were constitutionally deficient to the extent they did not pursue a different strategy with respect to expert witnesses.

At trial, the United States sought to prove the aggravating factor of future dangerousness with Barnette's "long history of violence," Ex. at 1030, and his defense sought to rebut that factor by contending that Barnette's violent tendencies were limited to the context of romantic relationships with women of the kind unlikely to arise in prison. Ex. at 1288–89. Dr. Burgess opined that Barnette "gets into difficulty when it's in the context of some . . . kind of boy/girlfriend type of relationship" but not "in the context of doing . . . daily routine and things like that." Ex. at 1496. She described Barnette's romantic relationships as following a "pattern," where the relationship starts off well, Barnette becomes suspicious about infidelity, and Barnette then becomes aggressive. Ex. at 1479–82. And she explained that this pattern had "roots very much in the way [Barnette] was raised and developed." Ex. at 1480.

Dr. Burgess specifically described all of Barnette's violent conduct as confined to the context of domestic violence. She explained that she viewed Barnette's confrontation with Britt, a male, as "within the context of a relationship," and his killing of Donald Allen as part of a "domestic" crime spree in which his ex-girlfriend, Robin, was the target. Ex. at 1495, 1536–37. Dr. Cunningham reinforced this conclusion, describing Barnette's crimes as

catathymic homicides and opining that "all of the violence that is identified with Marc Barnette has a family connection to it, or a domestic connection to it." Ex. at 1573. Dr. Burgess contrasted the context of the romantic relationships that gave rise to Barnette's prior violence with that of a "structured setting," where she opined that Barnette "does what he is supposed to do." Ex. at 1496.

This defense strategy was effective. The jury in 2002 — unlike the jury that heard the case against Barnette in 1998 — rejected future dangerousness as an aggravating factor. Ex. at 2046, 2064, 2082. It declined to find that Barnette "was likely to commit criminal acts of violence in the future which would be a continuing and serious threat to society." Ex. at 2046, 2064, 2082.

Barnette nevertheless now contends that his attorneys were deficient in five respects related to the expert testimony that the jury heard. Barnette Br. 11, 20–26, 66–67, 71, 78–85; Mot. 17–18, 62–75. First, Barnette contends that Dr. Burgess's affidavit, in which she offers an opinion different from her 2002 testimony, demonstrates that his attorneys were constitutionally deficient. Barnette Br. 11, 23–24, 66–67, 71; Mot. 67–69. Second, with no affidavits or other evidence from Drs. Halleck and Cunningham, Barnette contends that his attorneys were deficient for declining to provide those experts with additional information. Third, Barnette contends that his attorneys were deficient for declining to call as a witness Dr. Sally Johnson, who had found him competent to stand trial in 1998, Ex. at 1231. Fourth, Barnette contends that his attorneys performed deficiently to the extent that they did not impeach one of the rebuttal

71

experts called by the United States, Dr. Dietz. Finally, Barnette has obtained an opinion from a new expert that Barnette suffered from borderline personality disorder and a major mood disorder. He contends that this opinion supports his theory that the performance of his attorneys was constitutionally deficient. Each of these contentions fails.

First, Barnette's contention that his attorneys were constitutionally deficient because Dr. Burgess now says she would have testified differently, Barnette Br. 11, 23–24, 66–67, 71; Mot. 67–69, is meritless. Dr. Burgess now states that Barnette's "criminal conduct could not simply be explained by [his] upbringing." Barnette Br. 24 (quoting Burgess Aff. ¶ 8). Instead, she now opines that "Barnette's criminal conduct was attributable to a psychotic episode and mental health crisis that he was experiencing." *Id.* She further opines that Barnette "suffered from a mood disorder that was significantly affecting his thinking and behavior." *Id.* Dr. Burgess's new opinions do not establish that Barnette's attorneys were constitutionally deficient.

Dr. Burgess's new opinion is, at best, a double-edged sword that would have risked undermining Barnette's defense against the future-dangerousness aggravating factor. An opinion that Barnette's killing was due to a psychotic episode and mood disorder risked hindering the defense theory that Barnette's violent conduct was limited to a specific pattern that echoed his experience as a child, confined to domestic relationships that he would not face in prison. Burgess's new opinion would have potentially opened the door to an argument

72

**JA772**

that he remained a serious threat to society, whether or not he ever had another girlfriend, because he might experience a psychotic episode or mood disorder in prison. *See Jones v. Catoe*, 9 F. App'x 245, 254 (4th Cir. 2001) (describing evidence in a penalty trial that the defendant was psychotic as a double-edged sword).

Moreover, Dr. Burgess's change of position says nothing about the effectiveness of Barnette's attorneys. The trial record reflects that Dr. Burgess did her own work to develop her opinions. Among other things, she conducted her own interviews of Barnette and his family members, reviewed extensive records, and visited the scene of one of Barnette's murders. Ex. at 1477. She explained her "purpose . . . in talking to Marc Barnette, reviewing these records, and interviewing these other sources." Ex. at 1478. That purpose was not to comply with a request by counsel; Dr. Burgess explained that *her* purpose "was to try to understand what had happened, to try to explain what had happened, how this had come to this point." Ex. at 1478. And the information that she had was sufficient to allow her to testify that she had formed an "opinion with a reasonable degree of scientific certainty." Ex. at 1478. Nothing in Dr. Burgess's affidavit or elsewhere demonstrates that any failure by Dr. Burgess to obtain the information she needed to provide accurate opinions was the product of a constitutional deficiency by Barnette's counsel, nor does Barnette identify any evidence that defense counsel placed any limits on the scope of Dr. Burgess's investigation. *See McHone*, 392 F.3d at 705.

73

Barnette's contention that Dr. Burgess was "[i]nexplicably" not provided with the "mitigation investigation developed by Ms. Alfonso," Barnette Br. 15, is misplaced. Barnette's attorney, Jean Lawson, explains that Alfonso's report was completed a week after Burgess's report. Lawson Aff. ¶ 27. Burgess had spoken to Alfonso on the telephone, Alfonso Aff. ¶ 17, and was able to form opinions to a "reasonable degree of scientific certainty" without Alfonso's report, ex. at 1478. Dr. Burgess did not seek additional information from Alfonso, Alfonso Aff. ¶ 17, and Dr. Burgess does not state that she ever gave Barnette's counsel any indication that she lacked what she needed to give accurate opinions. As explained above, Dr. Burgess's opinions provided a powerful, and ultimately effective, rebuttal of the United States's theory of future dangerousness. Barnette's attorneys were not unreasonable to the extent they did not ask Dr. Burgess to revise her opinions in the light of Alfonso's report.

Furthermore, Dr. Burgess's new opinion directly contradicts that of another defense expert. Dr. Cunningham, a "clinical and forensic psychologist," interviewed Barnette on four occasions, interviewed a host of other individuals familiar with Barnette, reviewed a host of records, and testified unequivocally that there was "no indication that Marc Barnette was psychotic at the time of these offenses." Ex. at 1549–51. Dr. Burgess was not tendered as an expert in psychology; she was tendered as "an expert in domestic violence." Ex. at 1468. Her new opinion, contradicted by that of a forensic psychologist, would have undermined her credibility as an expert in her field. It would have risked

74

undermining Dr. Cunningham's credibility. And it would have risked confusing the jury about one of the most powerful components of the defense case — the theory that Barnette's violent conduct was confined to domestic boy/girl relationships that he would not face in prison.

Second, Barnette is similarly unable to demonstrate that his attorneys were constitutionally deficient to the extent that they did not provide Drs. Halleck and Cunningham with more information. *Cf.* Barnette Br. 81–82; Mot. 69–71. Barnette's premise that these experts relied on *"precisely the same information"* for their testimony in both 1998 and 2002, Barnette Br. 81 (emphasis in original), is contradicted by the record. Of course both witnesses had the benefit of their own work and other materials from the 2002 proceedings, Ex. at 1377–78, but Dr. Halleck testified that he also interviewed Barnette four times in 2002 alone. Ex. at 1377–78. And in June, the month before the 2002 resentencing, Dr. Halleck interviewed Natasha Tolbert, Sonia Barnette, and Derrick Barnette. Ex. at 1378. Dr. Cunningham testified that he conducted more than 18 hours' worth of interviews of Barnette. Ex. at 1549–50. He also interviewed Sonia Barnette; Derrick Barnette; Mario Barnette; Aquilia Barnette's friend Steve Austin; Aquilia Barnette's former supervisor, Brian Ard; Shonda Nero; Tony Harrison; Elizabeth Joy; and Dr. Sally Johnson, the psychiatrist who evaluated Barnette at the Federal Correctional Institution at Butner, North Carolina. Ex. at 1549–50. *See also* Mecklenburg County Jail Visitation List (Dkt. No. 76–1, 3:12-cv-327, at Bates No. 2309) (identifying

75

Cunningham as a visitor to Barnette in 2002).

Barnette has not identified anything that demonstrates that Dr. Halleck or Dr. Cunningham did not have everything they needed to provide the jury with full and accurate opinions. Barnette has not identified anything that suggests that either expert requested additional materials from Barnette's attorneys or that any failure by the experts to obtain information they needed from the materials they reviewed or the extensive interviews that they conducted was the fault of Barnette's attorneys. And Barnette has not obtained affidavits from Dr. Cunningham or Dr. Halleck or any other evidence showing that their testimony would have been different if Barnette's attorneys had provided them with additional information.

Third, Barnette cannot establish that his attorneys were constitutionally deficient to the extent that they did not introduce testimony from Dr. Sally Johnson, the psychiatrist at the Federal Correctional Institution at Butner, North Carolina, who evaluated Barnette in advance of his 1998 trial. *Cf.* Barnette Br. 25; Mot. 73–75. Barnette contends that Dr. Johnson could have testified about how Barnette's background affected him and how he adjusted well to and behaved well in prison, Barnette Br. 25, 91–92. But the jury that sentenced Barnette already heard days' worth of testimony on those subjects from experts and correctional officers. Barnette has not established that Johnson would have offered an expert opinion that the jury did not already hear. And expert witnesses that Barnette did call reviewed Johnson's work with Barnette,

76

**JA776**

interviewed Johnson, and presented opinions to the jury based on information in Dr. Johnson's report. Ex. at 1392, 1515, 1520–21, 1550, 1628–29, 1638–39, 1730. Moreover, Dr. Halleck concluded that "differences" existed between what Barnette told Dr. Johnson and what other sources described and that Barnette was not "as open" when speaking with Dr. Johnson as he later became. Ex. at 1392. Those differences presented an obvious risk that Dr. Johnson's testimony on cross examination would reflect poorly on Barnette. Barnette's attorneys were not unreasonable for declining to call Dr. Johnson.

Fourth, the failure of Barnette's attorneys to cross examine the United States's rebuttal expert witness, Park Dietz, about his false testimony during the guilt phase of the March 2002 trial of Andrea Yates in Texas, *Cf.* Barnette Br. 82–85; Mot. 71–73, was not constitutionally deficient. The State of Texas called Dr. Dietz as an expert witness in their case against Yates for drowning her own children in a bathtub. *Yates v. Texas*, 171 S.W.3d 215, 218 (Tex. Ct. App. 2005). "On cross examination, [defense] counsel asked Dr. Dietz about his consulting work with the television show, 'Law & Order,' which [the defendant] was known to watch." *Id.*

Dietz testified in the *Yates* case that he was a consultant on two episodes of Law & Order, one depicting "a woman with postpartum depression who drowned her children in the bathtub and was found insane" that he said aired shortly before the occurrence of Yates's crime. *Id.* 218–19. After the jury returned a verdict of guilty, however, the producer of Law & Order informed Yates's

77

attorney that "there was no show with a plot as outlined by Dr. Dietz." *Id.* at 220. "Dietz acknowledged that he had made an error in his testimony." *Id.* The Texas trial court denied a defense motion for a mistrial, but allowed the jury considering Yates's punishment to hear a joint stipulation stating that Dietz "would testify that he was in error and that no episode" of Law & Order as described in his testimony "was ever produced." *Id.* at 219–20.

In 2005, the Texas Court of Appeals reversed Yates's convictions. *Id.* at 222. It held that the trial court erred by denying Yates's motion for a mistrial based on Dr. Dietz's false testimony. *Id.*

Although the *Yates* trial occurred within the months before Barnette's resentencing in 2002, nothing suggests that either the United States or Barnette's attorneys were aware that Dietz had given false testimony during that trial. Indeed, both Jan Barefoot and Jean Lawson state in their affidavits that they investigated Dietz's background. Barefoot Aff. ¶ 6; Lawson Aff. ¶ 30. Neither of them suggests that they or anyone else on the defense team was aware of his false statements in the *Yates* case. Dietz's false statements, although relevant to his credibility, were unusual and not about a matter upon which he had focused his opinions in Barnette's case. His attorneys accordingly had no reason to believe that they had overlooked helpful impeachment evidence. *See Pepe v. Walsh*, 31 F. Supp. 3d 441, 493 (N.D.N.Y. 2012) (holding that an attorney is not ineffective for failing to "investigate and discover" an issue unknown to him unless he "had some reason to conduct that investigation").

78

**JA778**

Moreover, Barnette cannot establish that he suffered prejudice from his attorneys' failure to discover Dietz's false testimony and use it to impeach Dietz. Much of Dr. Dietz's testimony echoed that of defense witnesses. Dr. Dietz agreed with Dr. Halleck's diagnosis of borderline personality disorder. And his diagnoses of narcissistic personality disorder and antisocial behavior echoed Dr. Halleck's assessment that Barnette had attributes of both conditions. Dr. Dietz also agreed with the depression-related symptoms that Dr. Halleck attributed to Barnette; he even explained that Dr. Halleck's conclusion that they were the result of "major depression" could be correct. Ex. at 1766–67. Dietz concluded that it was inappropriate to make that diagnosis because the symptoms were ambiguous: "[I]t could be major depression, but it could also be excessive drinking over that period of time." Ex. at 1766–67.

Dr. Dietz's primary disagreement with defense experts focused on the extent to which Barnette's violent behavior was confined to domestic relationships. Unlike Drs. Burgess and Cunningham, Dr. Dietz concluded that Barnette's killing of Donald was not part of a domestic violence crime spree or a catathymic homicide. Dr. Dietz testified that Barnette's killing of Donald was motivated by expediency and to prevent Donald from calling the police after Barnette had obtained his car.

Notwithstanding Dr. Dietz's testimony, the defense convinced the jury that the United States failed to prove that Barnette remained a future danger. Barnette contended that he posed no danger while serving a life sentence in

79

prison because his violent conduct was confined to the context of a domestic relationship, and he "had no girlfriend in prison." Ex. at 1288. And the jury rejected future dangerousness as an aggravating factor.

Barnette cannot establish a reasonable probability that the outcome of his trial would have been different had Dr. Dietz's been impeached with his testimony from the Andrea Yates trial. Barnette won on the point on which Dr. Dietz's testimony primarily focused. The jury heard largely the same testimony on other issues from Dr. Cunningham. And many of the other opinions presented by Dr. Dietz were minor or intuitive. For example, the jury did not need Dr. Dietz to be credible to understand that there was a robbery component to Barnette's killing of Donald Allen or that his killing was motivated by a desire to avoid the police. The government's evidence and Barnette's own testimony amply established that Barnette took Donald's car and wallet and that Barnette killed Donald after Donald had voluntarily surrendered them. Ex. at 1100. Accordingly, Barnette cannot establish that any failure to impeach Dr. Dietz deprived him of his constitutional right to the effective assistance of counsel.

Finally, Barnette's contention that his attorneys unreasonably failed to develop and introduce evidence of "major mental illness" described by a new expert hired by postconviction counsel, Barnette Br. 20–23; Mot. 14–18, is meritless. Barnette quotes at length from a report prepared in November 2014 by Dr. Richard G. Dudley, a psychiatrist retained by Barnette's postconviction attorneys. Barnette Br. 20–23; Dudley Report, at 1. Dudley concludes that

80

Barnette meets the diagnostic criteria for "Borderline Personality Disorder" and that he "suffers from a major mood disorder, characterized by rapidly changing, extreme mood states." Barnette Br. 21. Nothing about Dr. Dudley's report or anything else identified by Barnette demonstrates that the performance of Barnette's attorneys was constitutionally deficient.

Contrary to what Barnette now contends, the attorneys who represented him in 2002 *did* present evidence of the mental illness described in Barnette's postconviction brief and the postconviction psychiatric expert report. Dr. Halleck, the expert in forensic psychiatry that Barnette called during his resentencing hearing, testified that Barnette had "borderline personality disorder," which he described as a "very serious personality disorder." Ex. at 1381. As explained previously, this diagnosis was even shared by the United States's expert, Dr. Dietz. Ex. at 1768. Dr. Halleck also described the mood characteristics emphasized by Dudley, explaining during the resentencing hearing that Barnette "showed rapid fluctuations in mood, and amazingly so even as a child." Ex. at 1381. He described learning that Barnette would "switch his mood in just a second, like turning on a light switch. He could be feeling happy and all of the sudden he would be extremely sad." Ex. at 1386.

Barnette's new expert concludes that his opinions are "better supported" and "much more complex" than the opinions rendered at the time of his trial, Barnette Br. 22, but even if these conclusions were true they would not establish deficient performance by Barnette's attorneys. Dr. Halleck conducted four

81

**JA781**

interviews with Barnette; he conducted interviews with Natasha Tolbert, Sonia Barnette, and Derrick Barnette; and he reviewed extensive records related to Barnette's case. Ex. at 1378. Barnette has not established that Dr. Halleck did not have everything he needed to fully support his opinion or that any deficiency was the fault of Barnette's attorneys instead of the expert. *See Gilliam v. Sec'y for Dep't Corr.*, 480 F.3d 1027, 1035 (11th Cir. 2007) ("That other experts may have been more persuasive does not mean that counsel's failure to retain those other experts was unreasonable."). And Barnette's attorneys were not constitutionally deficient for declining to present to the jury opinion testimony that was "more complex." Barnette Br. 22. Contrary to Barnette's postconviction more-is-always-better narrative, a reasonable attorney could certainly conclude that additional complexity would not be a virtue, particularly in a proceeding in which defense counsel was already asking the jury to listen to expert testimony over the course of several days. Ex. at 1372–1698. *Chandler*, 218 F.3d at 1318.

> e. Barnette cannot establish that his attorneys were constitutionally deficient to the extent they did not introduce additional evidence about Barnette's institutional adjustment after his arrest.

Barnette's attorneys were not constitutionally deficient to the extent they did not introduce additional evidence about Barnette's institutional adjustment while in prison. *Cf.* Mot. 77–79; Barnette Br. 89–94. Barnette's attorneys called a number of witnesses from correctional institutions who testified that Barnette was a model prisoner. Ex. at 1432–63. Indeed, they established Barnette's status as a model prisoner as a matter of law and convinced all twelve jurors that

82

**JA782**

Barnette can serve a useful purpose to others in a prison environment, Ex. at 2048–51, 2067–69, 2085–87.

The record undermines Barnette's contention that his attorneys failed "to provide the jury with any evidence about why" Barnette had adjusted to prison so well. Barnette Br. 90; Mot. 45. Barnette presented a substantial amount of evidence that, in the light of his background and mental health, he only "gets into difficulty when it's in the context of some type of relationship, some kind of boy/girlfriend kind of relationship." Ex. at 1496. And he didn't "have a girlfriend in prison." Ex. at 1288. Contrary to his contention that his attorneys failed to present expert testimony on this subject, Barnette Br. 90, this subject was a key theme of the testimony of Dr. Burgess, who explained that he "does what he's supposed to do in a structured setting" such as prison because the context is different from that of a "boy/girlfriend type of relationship" in the community. Ex. at 1496–97.

Additionally, evidence of positive institutional adjustment in prison is potentially mitigating because it can show that "the defendant would not pose a danger if spared (but incarcerated)," *Skipper v. South Carolina*, 476 U.S. 1, 5 (1986), and Barnette and his attorneys succeeded in convincing the jury to reject the contention that Barnette posed a risk of future dangerousness. Ex. at 2046, 2064, 2082. It was entirely reasonable for Barnette's attorneys to take the approach they did to institutional-adjustment evidence. Barnette cannot establish a reasonable probability that a different approach would have resulted

83

in a different, more favorable, outcome.

> f. Barnette cannot establish that his attorneys were constitutionally deficient to the extent they did not introduce additional evidence about Barnette's continuing interpersonal relationships.

Barnette's contention that his attorneys failed to present evidence that "Barnette had ongoing and significant interpersonal relationships" at the time of his 2002 trial, Mot. 79–80; Barnette Br. 94, is not supported by the record. Barnette testified that he had reestablished a relationship with his children in the months prior to his 2002 penalty trial. Ex. at 1241–43. He explained that he had recently spoken to his son and learned that he had "just made football first year out." Ex. at 1242. He explained that his daughter was mad at him because she had written him a letter a week earlier and he had not yet replied. Ex. at 1242. Derrick Barnette testified that he visited Barnette in jail, along with Barnette's daughter and Natasha Tolbert. Ex. at 1334. And Mario Barnette testified that he had visited his brother in jail, explaining that he felt that Barnette had given him "everything that he could." Ex. at 1361–62.

Like much of the additional evidence Barnette contends his attorneys ought to have introduced, additional evidence of Barnette's continuing personal relationships would have cut both ways. The United States sought to prove the harm caused to the families of Donald Allen and Robin Williams as a result of Barnette's crimes as an aggravating factor. Any evidence about Barnette's continuing relationships risked reminding the jury that Robin Williams and Donald Allen would not have opportunity to have children or watch them grow

84

up.  And it risked reminding the jury that the Williams family and the Allen family would never have the opportunity to visit their loved ones again.  Indeed, the United States introduced additional evidence of the opportunities for visitation available in prison as part of its rebuttal case.  Ex. at 1745–46.  Barnette's attorneys were not constitutionally deficient to the extent they did not develop or present more evidence about Barnette's continuing interpersonal relationships.

> 2. <u>Barnette cannot establish that his attorneys were deficient to the extent they advised him to testify</u>.

Barnette's attorneys were not constitutionally deficient to the extent that they advised Barnette to testify.  *Cf.* Barnette Br. 85–89; Mot. 75–77.  Barnette confessed to his crimes, he took police to the scene of Donald's murder and helped them locate the body, and he had a track record as a model inmate.  And, as Barnette's motion and brief note, Barnette grew up in unfortunate circumstances.  Accordingly, Barnette had an opportunity to persuade the jury that Barnette accepted responsibility for his actions, that he showed remorse, and that his background had a particularly negative effect on him.  At the same time, his attorneys faced a difficult task.  Barnette's crimes were extraordinarily violent and committed with extensive premeditation.  Barnette was aware that he was wanted by police after firebombing Robin's home.  Instead of turning himself in to police at that time, he played cards, went out clubbing, and assembled weapons and tools to return to Roanoke to kill Robin.

85

**JA785**

Barnette's attorneys were not deficient for recognizing that Barnette's own testimony offered him the best chance of convincing a jury that his background mitigated his conduct, proving that he took responsibility, and proving that he expressed remorse. And they were not deficient to the extent they advised him to testify.

Barnette's contention that the advice of Barnette's attorneys was deficient in the light of the risk that Barnette's testimony might offend jurors, Barnette Br. 86–89, is misplaced. The United States introduced strong evidence, including Barnette's confession, that Barnette firebombed Robin, plotted for months to return to kill her, shot her in front of her mother after killing an innocent bystander for his car and threatening several others in the process. The jury also heard — directly from Barnette's victims — that Barnette had raped, beat, cut, threatened, and kidnapped other women. Barnette's attorneys could reasonably have predicted that the jury would have been "offend[ed]," "alienat[ed]," "anger[ed]," and unable "to relate" to Barnette, Barnette Br. 87–88, if he had not testified, so the risks associated with his testimony gave him little to lose. Barnette's testimony also provided an opportunity, as mentioned above, for Barnette to explain how events in his background affected him and to personally take responsibility and express remorse.

Indeed, Barnette succeeded in persuading the jury to find a host of mitigating factors to which Barnette's testimony spoke. Twelve jurors found that Barnette was affected by growing up in a family environment of violence, drugs,

86

**JA786**

and alcohol abuse.  Twelve jurors found that Barnette had repeated exposure to violence in the home.  Twelve jurors found that Barnette attempted to protect his brother from the damaging effects of parental violence and neglect.  One or more jurors found that other factors in Barnette's background or character were mitigating, that Barnette accepted full responsibility for his actions, and that Barnette expressed remorse. The conclusion by his attorneys that the benefits of Barnette's testimony outweighed the risks was not unreasonable.

> 3. <u>Barnette cannot establish that the behind-the-scenes conduct of his defense team reveals constitutionally deficient performance.</u>

Evidence gathered by Barnette's postconviction attorneys of the behind-the-scenes conduct of Barnette's 2001–02 defense team does not establish that the performance of the attorneys who represented him at that time was constitutionally deficient.  *Cf.* Mot. 46–63.  Barnette has collected affidavits and materials from some members of that team, including attorneys Claire Rauscher and Jean Lawson, mitigation specialist Cessy Alfonso, private investigator Jan Barefoot, and expert witness Dr. Burgess.  Barnette Br. 12–19, 72–76.  These materials do not include an affidavit from his attorney Harold Bender, who died in March of 2013.  Barnette Br. 100 n.10.  Nor do they include affidavits from the other expert witnesses that Barnette worked with in 2002.

The affidavits that Barnette describes do not purport to identify or describe all of the steps that Barnette's trial team took to prepare for his trial. And although they identify a handful of things that Barnette's attorneys decided

87

**JA787**

not to do — such as not calling Sonia Barnette as a witness, Lawson Aff ¶ 21 — they do not state that these decisions were the product of anything other than fully considered strategic choices.

Although they do not purport to be complete, the materials Barnette has gathered reveal that Barnette's defense team in 2001 and 2002 conducted a thorough investigation and made reasonable choices about what to present to the jury. Barnette's defense team conducted a review of materials from Barnette's first trial, Lawson Aff. ¶ 6, which included "18 boxes of files from prior counsel, 15 volumes of transcripts . . . and one box of discovery" received in March 2001, Rauscher Aff. ¶ 5. Their review included the testimony of 22 defense witnesses, including, among others, Natasha Tolbert, Crystal Dennis, Alesha Chambers Houston, John Thomas Barnette, Ayanna Brewer Beasley, E.A. Joye, Jean Nduly, Jessie Cooper, Shonda Nero, Tessie Nero, Sheila Cooper, Mario Barnette, Tina Davis, Anthony Belton, Dr. Sally Johnson, Nadine Wilson, Tony Harrison, Ricky Paylor, Faye E. Sultan, Dr. Halleck, Dr. Cunningham, and Cynthia Maxwell. Ex. at 34–36.

In the light of the insight afforded by records of Barnette's earlier trial, Barnette's resentencing trial team made decisions about what to do differently from Barnette's first trial team. They hired a new mitigation specialist to perform a "[b]iopsychosocial investigation." Alfonso Report 1 (July 8, 2002) (Defense Bates No. 424). And they hired a private investigator to "locate various witnesses for Ms. Alfonso to review." Lawson Aff. ¶ 11. In the end, Barnette's

88

resenting team assembled "40 to 50 boxes of trial files."  Barnette Br. 100 n.10.

The defense mitigation specialist, Cessy Alfonso, conducted a detailed investigation and put together an analysis of "psychosocial factors" and a "chronology of Barnette's life events."  Alfonso Report 1.  Alfonso interviewed twelve witnesses:  Barnette; his mother, Sonia; his stepfather, Derrick; his aunts, Sheila Cooper and Tessie Nero; his brother, Mario; his stepfather's great aunt, Mable Johnson; Barnette's grandfather, Jesse Cooper; Barnette's cousin, Armaud Cooper; Barnette's mother's former boyfriend, Larry Wright; Larry Wright's sister, Dorothy Harper; and the mother of Barnette's children, Natasha Tolbert.  Alfonso Report 1–2.  Additionally, Alfonso reviewed eighteen categories of records.  *Id.* at 2.  Several of those categories included materials developed for or records of Barnette's earlier trial.  Other categories included family criminal histories, records surrounding Pearl Cooper's death, employment records of Barnette and Sonia; credit records for Sonia and Sheila Cooper; medical records associated with a gunshot wound received by Barnette, in addition to several others.  *Id.* at 2.

Barnette's contention that his defense team "ignored" the information obtained by their mitigation specialist, Cessy Alfonso, Barnette Br. 18–19, 72–73; Mot. 46–47, 54–59, ignores the words of the affidavits Barnette obtained and turns the presumption of reasonableness that applies to counsel's conduct on its head.  None of the affidavits obtained by postconviction counsel of people with

89

personal knowledge, such Jean Lawson, Cessy Alfonso, or Claire Rauscher, state that Barnette's attorneys did not fully consider the information obtained by Alfonso and make strategic decisions about what evidence to develop and use at trial. Alfonso provided Barnette's attorneys with a detailed report, and much of what Alfonso described was presented to the jury through expert witnesses, Barnette, or family members. Alfonso Report 1–28. Barnette places emphasis on the fact that Alfonso did not provide her report to counsel until shortly before the 2002 trial began. But Alfonso was in contact with counsel and provided them with written correspondence and reports of interviews before the full report was finished. Lawson Aff. ¶21; Alfonso Aff. ¶¶ 4, 15. Barnette has identified nothing that suggests that anything in Alfonso's report was a surprise, that his attorneys "ignored" it, or that his attorneys did not make reasonable decisions about what steps to take in the light of the information Alfonso obtained.

That Barnette's counsel did not present at trial all of the information gathered in Alfonso's report, such as all of the details Alfonso gathered related to Sonia Barnette's upbringing, Jesse Cooper's history, or Barnette's paternity, *cf.* Barnette Br. 72–74, does not establish that his attorneys ignored critical information or made unreasonable decisions. Indeed, his attorneys presented evidence about each of those components of Barnette's background. The decision not to focus in greater detail on Sonia or Jesse's background, when Barnette's own background was troubled and far more relevant to the mitigating factors that his defense sought to establish, was not unreasonable. And although

90

**JA790**

Alfonso raised, without confirming, the possibility that Larry Wright might be Barnette's biological father, Barnette Br. 74, Alfonso Report 4–5, Barnette testified that he did not know who his biological father was. Barnette has identified nothing to suggest that Larry Wright had any influence on him or any testimony to offer that would have assisted his mitigation case. Barnette's attorneys were not unreasonable for declining to pursue evidence about Larry Wright or Barnette's paternity further than they did.

Barnette's private investigator, Jan Barefoot, also did exactly what Barnette's attorneys quite reasonably hired her to do, assist Alfonso with locating witnesses. Barefoot Aff. ¶ 6. She also performed a number of other tasks. *Id.* ¶ 6. Among other things, she was asked to interview witnesses, including Candy Epps, Ann Austin, Darrell Austin, Shovanda Davis, Bob West, Janet Brewer, Eric Cooper, and Greg Austin. Barefoot Aff ¶ 14. She passed the information she received from these witnesses to Harold Bender or Jean Lawson, Barefoot Aff. ¶ 14, and Barnette has identified nothing that shows that Barnette's attorneys did not make reasonable use of Barefoot's services.

Barnette's defense team made a strategic decision to address Barnette's prior relationships with women "head on." Lawson Aff. ¶ 7. The team hired Dr. Burgess, an expert in the field of "domestic violence," not to determine whether Barnette was psychotic, *cf.* Barnette Br. 24, but instead to explain to a jury "the dynamics of Marc Barnette's relationships with other women, as well as the impact that Sonia and Derrick Barnette's volatile relationship had on him."

91

Lawson Aff. ¶ 25–26. Dr. Burgess gave a compelling opinion that helped spare him from the aggravating factor of future dangerousness notwithstanding the overwhelming evidence the United States presented of Barnette's violent conduct against men, women, and children.

Barnette's defense attorneys also met with Dr. Cunningham and Dr. Halleck, who had testified during Barnette's earlier trial. Lawson Aff. ¶32–33. The team decided to have Dr. Cunningham testify not only about Barnette's future dangerousness, but also about Barnette's psychological makeup and mental health issues. Lawson Aff. ¶ 32. This testimony reinforced Dr. Burgess's opinion and presented a detailed explanation of how Barnette suffered from serious mental illnesses and how his unfortunate upbringing affected the choices he faced when he committed his crimes.

Barnette's defense team considered Barnette's prior penalty trial to have been "disjointed," Lawson Aff. ¶ 8, and accordingly employed a different strategy in 2002. The jury in Barnette's 2002 resentencing heard a detailed history of Barnette's background and that of his family from Barnette, Mario Barnette, Derrick Barnette, and Ahmad Cooper, instead of the eleven members of Barnette's family who testified at his first trial, Barnette Br. 19 n.4. The decision to limit the number of witnesses and focus the jury's attention on some issues to the exclusion of others is not deficient representation; it is an essential component of "[g]ood advocacy." *Chandler*, 218 F.3d at 1318.

Barnette's contention that his attorneys were constitutionally deficient to

92

the extent that they did not interview more witnesses, Barnette Br. 77–79; Mot. 47–54, is meritless. Barnette identifies 19 witnesses that he contends his trial counsel failed to interview. Barnette Br. 77. The record demonstrates that Barnette's attorneys were familiar with the substance of the testimony that many of these witnesses had to offer. Other witnesses who appeared at trial spoke to the events observed by the witnesses that Barnette alleges went uninterviewed. Or, as in the case of Eric Cooper, Crystal Dennis, Jean Nduly, Shonda Nero, and Brian Ard, the witnesses had testified at Barnette's earlier trial or were interviewed by Jan Barefoot, who relayed what she learned to defense counsel. Ex. at 34–36; Barefoot Aff. ¶ 14; *see Decastro v. Branker*, 642 F.3d 442, 452 (4th Cir. 2011) ("The Sixth Amendment does not always compel counsel to undertake interviews and meetings with potential witnesses where counsel is familiar with the substance of their testimony." (ellipses omitted) (quoting *Huffington v. Nuth*, 140 F.3d 572, 580 (4th Cir. 1998))). And, with respect to all 19 witnesses, Barnette has failed to demonstrate that his attorneys had reason to believe that the witnesses might reveal valuable, non-cumulative, mitigating evidence. *See Bobby v. Van Hook*, 558 U.S. 4 (2009) ("[G]iven all the evidence they unearthed from those closest to [the defendant's] upbringing and the experts who reviewed his history, it was not unreasonable for [defense] counsel not to identify and interview every other living family member or every therapist who once treated his parents.").

Barnette's attorneys were not unreasonable to the extent they declined to

93

interview more people about the childhood fights that Barnette described at trial.

His attorneys reasonably declined to spend their limited resources interviewing

Melvin Bryant, who was involved in the 10th-grade fight Barnette described at

trial or Kenny Bailey, who was Barnette's friend at the time of that beating.

Barnette provided counsel with the details of that fight, and counsel was able to

introduce evidence about the fight through Barnette. His attorneys also

reasonably declined to interview Victor Montgomery, a friend of the boy that

Barnette shot, Anthony Britt, who describes the fight between Barnette and

Britt. Barnette Br. 63. Montgomery corroborated the shooting, *id.*, and his

attorneys had no reason to believe that his information or testimony would be

helpful to Barnette's defense.

Nor were Barnette's attorneys unreasonable to the extent that they

declined to interview some of Barnette's former girlfriends and the friends and

relatives of those girlfriends. Barnette's attorneys were aware of the substance of

Crystal Dennis's testimony from Barnette's trial, and as explained previously,

her testimony in 2002 already included the elements that Barnette contends

would have been helpful to his mitigation case. As also explained previously, it

was entirely reasonable for Barnette's attorneys not to focus on non-violent

relationships Barnette had with women, and it was accordingly reasonable for his

attorneys not to devote investigative resources to interviewing former girlfriends

Kowana Dozier, Temeka Hunter, Sheila Sullivan, or former platonic friend

Danielle Mathis. Ex. at 64–66. Nor was Barnette's defense counsel deficient for

94

**JA794**

declining to interview Eric Cooper a second time after Jan Barefoot about the fact that he never "saw any problems" between Barnette and ex-girlfriend Ayana Brewer. Barnette Br. 66. Similarly, the defense team was familiar with Barnette's relationship with Natasha Tolbert from interviews with Tolbert, Barnette Br. 77–78, records from the prior trial, Ex. at 34–36, and Barnette's own statements. It was entirely reasonable for his attorneys not to spend time interviewing Tolbert's friend, Anitria Lyles, or Tolbert's sister, Kesha Heard, about that same relationship. *Cf.* Barnette Br. 61–62.

Barnette's attorneys performed reasonably to the extent they declined to spend additional time interviewing distant family members, neighbors, and landlords from Barnette's childhood. The defense team presented testimony about Jesse Cooper, ample evidence of fighting between Derrick and Sonia Barnette, and ample evidence about the revelation that Derrick Barnette was not Barnette's biological father. Declining to interview Do'Lores Guy, the family's one-time landlord; Sonia's cousin Jean Nduly and Barnette's cousin Shonda Nero, who testified at Barnette's first trial; and neighbors Sandra Smith and Weona Sharpe, for additional information about these matters was not unreasonable.

Finally, Barnette has failed to establish that his attorneys were deficient to the extent they declined to interview John West, Sonia Barnette's current boyfriend, West Aff. ¶ 3, or Brian Ard, the manager of the Camelot Music store where Barnette worked who received sexual-harassment complaints about Barnette, Ex. at 1712–13. Barnette Br. 77. Ard was interviewed by Dr.

95

**JA795**

Cunningham, Ex. at 1549–50, and Sindy Maxwell, Mot. 51. He was also a witness called by the United States during Barnette's 1998 trial. Mot. 51. Barnette offers nothing but his own allegations about what Brian Ard might have had to say. *See* Mot. 51. Even if these allegations are true, they would not establish that Barnette's defense team was unreasonable for declining to interview Ard again. And Barnette has identified nothing that would have given his attorneys any reason to interview West.

Barnette has not established that any of the witnesses he contends his attorneys ought to have interviewed had evidence that was critical to his case, and, to the extent his attorneys declined to interview them, their performance was reasonable. The Fourth Circuit has explained that "the failure to investigate everyone whose name happens to be mentioned by the defendant does not suggest ineffective assistance." *Huffington v. Nuth*, 140 F.3d 572, 580 (4th Cir. 1998) (quoting *Gray v. Lucas*, 677 F.2d 1086, 1093 n.5 (5th Cir. 1982)). And where, as here, the witnesses are not "alibi witnesses or eyewitnesses critical to the determination of guilt," the presumption of reasonableness that attaches to an attorney's decision not to interview witnesses is particularly salient. *Id*; *see also United States v. Terry*, 366 F.3d 312, 317 (4th Cir. 2004) (explaining that the court must afford "enormous deference" to the "decision whether to call a defense witness"). Barnette has identified no evidence to overcome that presumption.

Barnette's contention that his attorneys were constitutionally deficient for declining to request a continuance, Mot. 81–83; Barnette Br. 97–100, is also

96

misplaced.  Barnette was represented by two experienced attorneys.  He has identified nothing that demonstrates that his attorneys were unprepared to proceed without a continuance.  Moreover, Barnette does not explain how the outcome of his resentencing trial would have been different if it had occurred later.  He has not demonstrated that his attorneys were unable or otherwise failed to present any evidence that they intended to present because of the timing of the 2002 trial.

The record from the 2002 trial and the affidavits and materials gathered by postconviction counsel reveal that Barnette's experienced and skilled death-penalty qualified resentencing attorneys gathered a wealth of information about Barnette, including about his background and mental health, and made reasonable strategic choices about what information to present to the jury.  They consulted with Federal Death Penalty Resource Counsel David Bruck.  Lawson Aff. ¶ 17.  They presented a detailed history of Barnette's family spanning four generations.  They detailed directly and through expert witnesses the unfortunate childhood that Barnette suffered, and how what he observed growing up shaped his relationships with women.  They presented testimony from highly qualified experts about the borderline-personality disorder and other mental-health issues that Barnette suffered.  They presented detailed expert testimony about how Barnette's upbringing and experience limited the choices Barnette had available to him.  They gave the jury the opportunity to hear Barnette explain how his background affected him, express remorse, and take responsibility for his

97

actions directly. They proved that Barnette was a model inmate during the six years he had been incarcerated. And they effectively placed Barnette's ample history of violence against men, women, and children in a context limited to romantic relationships with women, defeating the strong case the United States had presented for the aggravating factor of future dangerousness.

Barnette's attorneys in 2001 and 2002 faced an enormous challenge, and the evidence identified by Barnette fails to demonstrate that they did anything other than rise to that challenge. The United States presented a strong and compelling case that Barnette should receive the death penalty for exceptionally heinous crimes that he committed with extraordinary premeditation and deliberation, which followed a history of violent conduct and risked the lives of others. Barnette's attorneys represented Barnette vigorously and effectively. "There are countless ways to provide effective assistance in any given case," *Strickland*, 466 U.S. at 689, and Barnette has identified several alternative choices that his attorneys could have made. Most of those alternatives involved the presentation of cumulative evidence or evidence capable of hurting Barnette's defense as much as helping. But, in any event, Barnette has not demonstrated that the choices that his attorneys made in 2001 and 2002 were objectively unreasonable.

    4.    <u>Barnette cannot establish his attorneys were constitutionally deficient to the extent they have failed to locate records after the 2002 penalty trial was completed</u>.

Barnette's contention that the present-day inability of the attorneys who

represented him during his 2002 trial to locate records from that trial entitles him to relief from his death sentence on a theory of ineffective assistance of counsel, Mot. 83–84; Barnette Br. 100–01, is meritless. Barnette identifies no authority that the Sixth Amendment compels attorneys to maintain all of their records for more than 10 years, in case their clients elect to accuse them of ineffective assistance of counsel. In any event, a posttrial failure to preserve all records would not entitle Barnette to relief from his death sentence. Barnette cannot establish the kind of prejudice required for relief; he cannot establish that alleged post-sentencing deficient performance affected the sentence he received. *See Buckner v. Polk*, 453 F.3d 195, 201 (4th Cir. 2006). Nor can Barnette establish any other kind of prejudice. Barnette has gathered an enormous amount of evidence, including from the living members of Barnette's trial team, the witnesses who testified at trial, and individuals with whom the defense team spoke. He has identified nothing that shows that any of the records that his attorneys have been unable locate contain evidence that would support a viable claim cognizable under 28 U.S.C. § 2255.

5. <u>Barnette cannot establish that his attorneys failed to protect Barnette's constitutional rights.</u>

Barnette alleges generally that his attorneys failed to protect his constitutional rights. Mot. 85–87. This allegation consists of a numbered list of thirty-one conclusory allegations, each of which begins with "counsel failed . . . ." Mot. 85–87. None of these allegations identify any specific facts about what his

99

attorneys purportedly failed to do.  Mot. 85–87.  Nor are any of the allegations accompanied by an explanation of why Barnette believes the performance of his attorneys was unreasonable or prejudicial.  Mot. 85–87.  In neither his motion under Section 2255 nor his brief in support of his motion for an evidentiary hearing does Barnette purport to identify any evidence to support his allegations.  To the contrary, his brief does no more than "reference[]" the list in his motion without elaboration and conclude that an "evidentiary hearing and relief is justified."  Barnette Br. 102.

Barnette's allegations are insufficient as a matter of law.  Conclusory assertions unsupported by specific facts are facially inadequate to entitle a movant under Section 2255 to relief or an evidentiary hearing.  *See United States v. Roane*, 378 F.3d 382, 400–01 (4th Cir. 2004); *Jackson*, 638 F. Supp. 2d 514, 581 (W.D.N.C. 2009) (rejecting "bald assertions and conclusory allegations" as facially insufficient to support a claim on a motion under Section 2255).  And Barnette's failure to identify any evidence confirms that he is not entitled to an evidentiary hearing.  He has not identified evidence in support of his claims that, if true, would establish that the performance of his attorneys fell below an objective standard of reasonableness or that deficient conduct by his attorneys resulted in prejudice.

6. <u>Barnette cannot establish a reasonable probability that, but for allegedly deficient conduct by his attorneys, he would not have been sentenced to death.</u>

Barnette is not entitled to relief from his death sentence on a theory of

100

ineffective assistance of counsel because he cannot meet his burden to show that "a reasonable probability exists that, but for the deficient performance, he would not have been sentenced to death." *Buckner v. Polk*, 453 F.3d 195, 201 (4th Cir. 2006). With respect to evidence that Barnette contends the jury ought to have heard, "that showing requires [Barnette] to establish a 'reasonable probability that a competent attorney, aware of the available mitigating evidence, would have introduced it at sentencing,' and 'that had the jury been confronted with this mitigating evidence, there is a reasonable probability that it would have returned with a different sentence.'" *Wong v. Belmontes*, 558 U.S. 15, 20–21 (brackets and ellipses omitted) (quoting *Wiggins v. Smith*, 539 U.S. 510, 535–36 (2003)). In the light of Barnette's burden, this Court must "reweigh the evidence in aggravation against the totality of available mitigating evidence." *Id.* Barnette cannot prevail unless this Court concludes that a reasonable probability exists that, absent counsel's errors, "the sentencer would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." *Decastro v. Branker*, 642 F.3d 442, 450 (4th Cir. 2011) (ellipses omitted) (quoting *Williams v. Ozmint*, 494 F.3d 478, 484 (4th Cir. 2007)).

No reasonable probability exists that the jury would not have sentenced Barnette to death if his attorneys in 2001 and 2002 had done what his postconviction attorneys contend they should have done. The vast majority of attorney conduct Barnette challenges was not prejudicial for the same reasons that it was not unreasonable. A large portion of the evidence that Barnette

101

contends his attorneys ought to have investigated, developed, or presented —for example, testimony about Barnette's family history, the violence and neglect Barnette witnessed and suffered while growing up, the behavior of his parents, Barnette's borderline personality disorder and rapid changes in mood, and his relationships with women other than Robin — would have been cumulative. *See Cullen v. Pinholster*, 131 S. Ct. 1388, 1409 (2011) (finding no reasonable probability that evidence that "largely duplicated the mitigation evidence at trial" would have changed the jury's verdict); *Buckner v. Polk*, 453 F.3d 195, 206 (4th Cir. 2006) (no prejudice from failure to introduce additional evidence that was "largely cumulative."). And much of it — for example, Dr. Burgess's opinion that Barnette was experiencing a psychotic episode and mood disorder, additional evidence that Barnette had nonviolent relationships with women, and evidence of his continuing interpersonal relationships while in prison — is "a double-edged sword" that "a jury could well find to be aggravating rather than mitigating." *Johnson v. Moore*, Nos. 97–33, 97–7801, No. 1998 WL 708691, at * 13 (4th Cir. Sept. 24, 1998); *Ponticelli v. Sec'y, Fla. Dep't of Corrs.*, 690 F.3d 1271, 1296 (11th Cir. 2012) (explaining that courts have rejected arguments of prejudice "where mitigation evidence was a two-edged sword or would have opened the door to damaging evidence"). Other evidence — for example, evidence of the draft separation agreement that Derrick Barnette prepared and scrapped or the assault Barnette and Natasha Tolbert endured at the hands of her sister's boyfriend — is "of questionable mitigating value," *Cullen,* 131 S. Ct. at 1410, with

<div align="center">102</div>

<div align="center">**JA802**</div>

no reasonable probability of affecting the outcome.

Much of the conduct by his resentencing attorneys that Barnette now challenges was directed at mitigating factors that the jury found unanimously or the aggravating factor that the jury rejected. Barnette cannot establish prejudice as a result of the approach his attorneys took to presenting evidence that he grew up in a family environment of violence, drugs, and alcohol abuse; that Barnette had repeated exposure to violence in the home; that Barnette attempted to protect his brother from the damaging effects of parental violence and neglect; and that Barnette was neglected by his mother. The jury not only heard evidence about all of those facts; it found those facts to be true and still sentenced Barnette to death. Similarly, Barnette cannot establish a reasonable probability that a different approach to evidence about his institutional adjustment would have resulted in a different sentence. Barnette's attorneys successfully proved that Barnette was a model prisoner and that he could serve a useful purpose to others in prison, and again, the jury still sentenced him to death. Finally, Barnette cannot establish prejudice from the approach his attorneys took to addressing Barnette's relationships with women. His defense convinced the jury to reject the United States's theory of future dangerousness after contending that Barnette's violent conduct was confined to the context of domestic relationships of the kind he would not face in prison. But the jury still sentenced Barnette to death.

Most importantly, Barnette has failed to identify any evidence that, in the

103

**JA803**

light of the overwhelmingly strong case for the death penalty presented by the United States, establishes a reasonable probability that a different approach by counsel would have convinced the jury that the "balance of aggravating and mitigating circumstances did not warrant death." *Decastro v. Branker*, 642 F.3d 442, 450 (4th Cir. 2011). The jury heard that Barnette drove to Roanoke, cut the telephone lines of Robin's house, and firebombed the only exit while she and Benjamin Greene were inside. The jury heard that Barnette yelled to Robin, "[D]ie, bitch, die," and "you're going to die tonight. I'm going to kill you." Ex. at 411, 413, 484. The jury heard that Robin escaped with severe burns, and while she attempted to recover, Barnette went out with friends, visited clubs, met girls, and drank. They also heard that Barnette purchased a shotgun, sawed off the barrel, and assembled materials, planning and preparing to return to Roanoke to kill. The jury heard that Barnette lied in wait for Donald Allen's blue Honda Prelude, and that even after he gave the car and his wallet up willingly, Barnette shot him multiple times. The jury heard that Barnette followed his plan to drive to Roanoke with the shotgun and fired it into the door of the kitchen where Barnette's mother had just been standing with her eight-month-old grandchild, baking brownies for a church bake sale. And the jury heard that Barnette calmly chased, dragged, shot, and killed Robin Williams right in front of Robin's mother, threatening multiple neighbors along the way.

In addition to the firebombing and murders that Barnette carried out with extensive premeditation, the jury heard testimony about an extraordinary

104

**JA804**

amount of violence that Barnette carried out against other women and those around them.  The jury heard that Barnette beat the mother of his children, Natasha Tolbert, while she was pregnant, slamming her against the concrete. The jury heard that Barnette beat the children of Crystal Dennis, cutting them open, and shot Dennis's brother.  And the jury heard that Barnette threatened Alesha Chambers at knifepoint, beat her with a baseball bat, cut her, kidnapped her, and raped her.  The jury would have heard all of this evidence regardless of the approach taken by his resentencing attorneys.

No reasonable probability exists that the jury would not have sentenced Barnette to death if his attorneys had taken any of the approaches that he today contends they ought to have taken.  Additional evidence about matters such as Barnette's childhood and background, what happened to his parents and grandparents, nonviolent relationships he had with other women, and ongoing interpersonal relationships; knowledge that Dr. Deitz had falsely claimed to have consulted on an episode of Law & Order during a different case; hearing Barnette's confession but not his testimony; "more complex" opinions about Barnette's mental health; and more evidence that Barnette was depressed is not reasonably likely to have weighed against the powerful aggravating factors heard by the jury in a way that would have achieved a different result.  "The likelihood of a different result must be substantial, not just conceivable." *Harrington v. Richter*, 562 U.S. 86, 112 (2011).  And Barnette has failed to identify competent evidence which, if believed, establishes a reasonable probability that, but for

105

alleged deficiencies of his attorneys, he would not have received a sentence of death.

### B. Barnette cannot establish that the selection of the jury for his 2002 penalty trial was tainted by racial discrimination.

The Fourth Circuit rejected Barnette's contention that his 2002 jury was selected in a racially discriminatory way, *Barnette III*, 644 F.3d at 217, and he cannot resurrect that contention by asserting it under 28 U.S.C. § 2255. *Cf.* Mot. 88–92. Barnette's claim under *Batson v. Kentucky*, 476 U.S. 79 (1986), was litigated at all three levels of the courts of the United States. *Barnette III*, 644 F.3d at 196–97. In 2010, with guidance from the Supreme Court and the Fourth Circuit, this Court held a hearing and rejected Barnette's *Batson* claim, finding that "Barnette had not met his burden of proving that the prosecution engaged in purposeful discrimination when it exercised peremptory strikes against five African-American members of the jury venire during jury selection for the sentencing phase in 2002." *Id.* at 196. The Fourth Circuit affirmed, explicitly rejecting "Barnette's contentions that the district court committed prejudicial error in the manner in which it conducted the proceedings below or in its findings of fact and legal conclusions on the merits of Barnette's *Batson* claim." *Id.* Barnette cannot pursue his *Batson* theory again on collateral review. *See United States v. Bell*, 5 F.3d 64, 66 (4th Cir. 1993); *Boeckenhaupt v. United States*, 547 F.2d 1182, 1183 (4th Cir. 1976); *Clinton v. United States*, No. 3:10-CR-208-RJC-DSC, 2015 WL 5155372, at \*6 (W.D.N.C. Sept. 2, 2015).

106

**JA806**

**C.      Barnette cannot establish misconduct related to the jury.**

Barnette cannot establish that he was denied his "constitutional right to a fair trial and impartial jury." *Cf.* Mot. 92.  Barnette makes a host of conclusory allegations about the jury, including that they considered matters extraneous to the trial, harbored "improper racial attitudes," and gave false or misleading responses on voir dire.  Mot. 95.  Barnette does not identify anything that suggests he raised this issue previously before this Court or on direct appeal.  His procedural default forfeited any challenge to his sentence on this ground.  *See Jackson v. United States*, 638 F. Supp. 2d 514, 600 (W.D.N.C. 2009).  Although procedural default can be overcome by a showing of either cause and prejudice or actual innocence, Barnette does not purport to make either showing.  *Id.* at 612.

Barnette's juror-misconduct theory is not only foreclosed by Barnette's procedural default; it is also meritless.  "Before proceeding down the path of impeaching a jury verdict, a § 2255 movant must make a threshold showing of improper outside influence."  *United States v. Roane*, 378 F.3d 382, 404 (4th Cir. 2004).  As Barnette recognizes, Barnette Br. 103–04, this Court already determined that Barnette failed to make that threshold showing when it denied Barnette's motion to conduct juror interviews.  Order, at 4, No. 3:12-CV-327 (July 13, 2013) (Dkt. No. 50).  Accordingly, Barnette cannot establish juror misconduct.

**D.      The decision to prosecute Barnette in federal court did not violate Barnette's constitutional rights.**

Barnette cannot establish that the decision to prosecute him in federal

107

**JA807**

court violated his constitutional rights. Barnette committed multiple murders in multiple states, killing Donald Allen in North Carolina, taking his car, and driving to Virginia to kill Robin Williams. Barnette's preparation, relevant conduct, and flight occurred across state lines. And Barnette committed no fewer than eleven offenses against the United States, including, among others, use and carriage of fire and explosive materials to commit an act of interstate violence, 18 U.S.C. § 844(h)(1), 924(c)(1); use of a firearm that results in death while violating the Interstate Domestic Violence Act, 18 U.S.C. § 924(c), (i); commission of a carjacking that results in death, 18 U.S.C. § 2119(3); and use of a firearm in a carjacking that results in death, 18 U.S.C. § 924(c), (j). Ex. at 69–71.

Although the United States was uniquely positioned to present evidence of Barnette's criminal conduct, which occurred across state lines, while representing the interests of the communities that he harmed in multiple states, Barnette contends that he was selected for prosecution in federal court "because of apparent discriminatory purpose." Mot. 95. Barnette has identified nothing to suggest that he ever raised this selective-prosecution theory previously before this Court or on direct appeal. Barnette's procedural default forfeited this challenge. *Jackson*, 638 F. Supp. 2d at 615. And again, Barnette does not purport to show cause and prejudice or actual innocence. *Id.* at 612.

Like several of Barnette's other theories, his challenge to the decision to prosecute him in federal court is not only foreclosed by his procedural default; it is also meritless. "The Attorney General and United States Attorneys retain

108

**JA808**

'broad discretion' to enforce the Nation's criminal laws." *United States v. Armstrong*, 517 U.S. 456, 464 (1996). "As a result, 'the presumption of regularity supports' their prosecutorial decisions and, 'in the absence of clear evidence to the contrary, courts presume that they have properly discharged their official duties.'" *Id.* (alterations omitted) (quoting *United States v. Chemical Foundation, Inc.*, 272 U.S. 1, 14–15 (1926)).

Barnette's citation to year 2000 census data and his allegation that the "racial demographics" of the counties from which Barnette's federal jury pools were drawn were different from "state court demographics," Mot. 97, are not capable of meeting Barnette' burden to prove that "the federal prosecutorial policy 'had a discriminatory effect and that it was motivated by a discriminatory purpose.'" *Armstrong*, 517 U.S. at 466. "To establish a discriminatory effect in a race case, the claimant must show that similarly situated individuals of a different race were not prosecuted." *Id.* The United States Supreme Court has explained that "raw statistics regarding overall charges say nothing about charges brought against *similarly situated defendants.*" *United States v. Bass*, 536 U.S. 862, 864 (2002) (emphasis in original). Raw census statistics say equally little about charges brought against similarly situated defendants. And they are insufficient for Barnette to "prove that the decisionmakers in *his* case acted with discriminatory purpose," as he must to prove a constitutional violation. *McCleskey v. Kemp*, 481 U.S. 279, 292 (1987). Accordingly, Barnette cannot establish that the decision to prosecute him in federal court violated his

109

**JA809**

constitutional rights.  *Armstrong*, 517 U.S. at 466.

**E.    Barnette cannot establish that he was denied any constitutional right to discovery or that the United States knowingly presented false or misleading testimony.**

Barnette cannot establish that he was denied any constitutional right to discovery or that the United States knowingly elicited false or misleading testimony.  *Cf.* Mot. 98–100.  Barnette makes a number of conclusory allegations about the conduct of the United States before and during his trial.  Mot. 98–99.  His allegations do not describe any specific facts, and he identifies absolutely no evidence in support of any of his allegations.

Barnette's allegations fail for two reasons.  First, Barnette again does not identify anything that suggests he raised this issue previously before this Court or on direct appeal.  His theory is accordingly forfeited by his procedural default, which he does not purport to overcome by a showing of cause and prejudice or actual innocence.  *See Jackson*, 638 F. Supp. 2d at 600.  Second, his allegations are, like several others in his motion, insufficient on their face because they are conclusory and unsupported by evidence or even specific allegations of fact.  *See id.* at 581 (rejecting "bald assertions and conclusory allegations" as facially insufficient to support a claim on a motion under Section 2255).

**F.    The death penalty is constitutional.**

Barnette contends that his "death sentence should be set aside" in the light of a 2000 study by the Department of Justice that he contends suggests that the "federal death penalty had been disproportionately sought against persons of

110

**JA810**

color and irrationally sought on a regional basis." Mot. 100–01. Barnette has identified nothing to suggest that he ever raised this issue previously before this court or on direct appeal. Barnette's procedural default accordingly forfeited this theory, as it forfeited several others that Barnette purports to raise, because Barnette does not purport to demonstrate cause and prejudice or actual innocence. *Jackson*, 638 F. Supp. 2d at 612, 615.

Like the other arguments foreclosed by Barnette's procedural default, Barnette's challenge to the death penalty based on the 2000 statistics also fails on the merits. Bare statistical discrepancies, including any revealed by the 2000 Department of Justice study described by Barnette, are insufficient to establish a violation of Barnette's constitutional rights. *United States v. Bass*, 536 U.S. 862, 863 (2002); *United States v. Sampson*, 487 F.3d 13, 26 (1st Cir. 2007). The United States Supreme Court has considered these same statistics and explained that they "say nothing about charges brought against *similarly situated defendants*." *Bass*, 536 U.S. at 864 (emphasis in original). Accordingly, they do not establish a constitutional violation. *Id.* And Barnette has "presented no specific evidence of purposeful discrimination either against himself or against those southern and minority defendants upon whom he purports to base his claim." *Sampson*, 487 F.3d at 26; *accord United States v. Lawrence*, 735 F.3d 385, 439 (6th Cir. 2013).

111

**JA811**

### G. Barnette's challenge to the manner that his death sentence would be carried out is misplaced.

Barnette's contention that "the manner of carrying out his execution would violate the Eighth Amendment" is misplaced. Mot. 101–02; Barnette Br. 105–06. Barnette concedes that this contention is not ripe. Mot. 102; *see also Jackson*, 638 F. Supp. 2d at 615. And, in any event, as Barnette acknowledges, Mot. 102, "[a] motion pursuant to § 2255 is not the appropriate procedural mechanism for placing this issue before a court." *Jackson*, 638 F. Supp. 2d at 615.

### H. Barnette is not entitled to relief based on the "cumulative effect of errors."

Barnette's contention that he is entitled to relief from his death sentence due to "cumulative error or prejudice," Mot. 102–03, is meritless. Barnette has failed to establish any "instance in which [his] rights have been violated. 'It necessarily follows that the cumulative error doctrine finds no foothold in this case.'" *Jackson*, 638 F. Supp. 2d at 617 (quoting *United States v. Sampson*, 486 F.3d 13, 51 (1st Cir. 2007)).

### CONCLUSION

Barnette's motion and the files and records of the case conclusively show that Barnette is entitled to no relief. Accordingly, the United States respectfully requests that this Court deny Barnette's motion without an evidentiary hearing.

112

**JA812**

RESPECTFULLY SUBMITTED, this 23rd day of September, 2015.

JILL WESTMORELAND ROSE
ACTING UNITED STATES ATTORNEY

/s/Anthony J. Enright
Assistant United States Attorney
United States Attorney's Office
227 West Trade Street, Suite 1650
Charlotte, North Carolina 28202
(704) 344-6222 (phone)
(704) 344-6629 (fax)
anthony.enright@usdoj.gov

113

**JA813**

## CERTIFICATE OF SERVICE

I certify that on this 23rd day of September, 2015, I caused to be served a copy of the foregoing response to be served on counsel for Barnette via electronic case filing.

<div style="text-align: right;">

s/ANTHONY J. ENRIGHT
Assistant United States Attorney

</div>

Case 3:12-cv-00327-MOC   Document 98   Filed 09/23/15   Page 114 of 114

**JA814**

## IN THE

# United States Court of Appeals

## FOR THE FOURTH CIRCUIT

## UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

V.

## AQUILIA MARCIVICCI BARNETTE,

*Defendant-Appellant.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA

## JOINT APPENDIX - VOLUME I OF V
### (Pages 1 - 371)

HAROLD J. BENDER
LAW OFFICE OF HAROLD J. BENDER
200 North McDowell Street
Charlotte, NC 28204
(704) 333-2169

ROBERT J. CONRAD, JR.
UNITED STATES ATTORNEY
WESTERN DISTRICT OF NC
Suite 1700, Carillon Building
227 West Trade Street
Charlotte, NC 28202
(704) 344-6629

MARK E. OLIVE
ATTORNEY AT LAW
320 West Jefferson Street
Tallahassee, FL 32301
(850) 224-0004

ANNE M. TOMPKINS
ASST. UNITED STATES ATTORNEY
WESTERN DISTRICT OF NC
Suite 1700, Carillon Building
227 West Trade Street
Charlotte, NC 28202
(704) 344-6222

*Counsel for Appellant*

*Counsel for Appellee*

**Additional Counsel Listed on Back of Cover**

LANTAGNE LEGAL PRINTING 801 East Main Street Suite 100 Richmond, Virginia 23219 (804) 644-0477
A Division of Lantagne Duplicating Services

Case 3:12-cv-00327-MOC   Document 99   Filed 09/23/15   Page 1 of 200

**JA815**

JILL WESTMORELAND ROSE
ASSISTANT UNITED STATES ATTORNEY
WESTERN DISTRICT OF NORTH CAROLINA
100 Otis Street, Room 233
U.S. Courthouse Building
Asheville, North Carolina 28801
(828) 271-4661

JA816

# TABLE OF CONTENTS

Federal District Court Docket Sheet . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Indictment filed February 4, 1997 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 69

Guilty Verdict returned January 27, 1998 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 75

Defendant's Motion in Limine Regarding the Victim
    Impact Statements, filed June 4, 2002 . . . . . . . . . . . . . . . . . . . . . . . . . . . 76

Motion for Allocution by the Defendant, filed
    June 4, 2002 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 78

Government's Response in Opposition to
    Defense Motion in Limine to Prohibit
    and/or Limit Victim Impact Evidence,
    filed June 12, 2002 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 80

Government's Response to Motion for Allocution
    by the Defendant, filed June 12, 2002 . . . . . . . . . . . . . . . . . . . . . . . . . . 89

Order Denying Defendant's Motion for Allocution,
    entered June 18, 2002 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 93

Order Denying Defendant's Motion in Limine
    regarding the Victim Impact Statements,
    entered June 21, 2002 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 97

Motion for Relief Pursuant to *Ring v. Arizona*
    filed July 2, 2002 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 100

    Attachments:

    Indictment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 103

1

**JA817**

**JA818**

Government's Notice of Intent to Seek
the Death Penalty, filed August 7, 1997 . . . . . . . . . . . . . . . . . . . . . . . . . . . . 110

Government's Reaffirmation of Intention
to Seek the Death Penalty, filed July 30, 2001 . . . . . . . . . . . . . . . . . . . . . 118

Defendant's Memorandum in Support of Motion
Regarding *Ring*, filed July 12, 2002 . . . . . . . . . . . . . . . . . . . . . . . . . . . 121

Government's Response to Defendant's Motion for
Relief Pursuant to *Ring v. Arizona*,
filed July 12, 2002 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 128

Voir Dire:

Prospective Juror Regina Sanders (888) . . . . . . . . . . . . . . . . . . . . . . . . . . 133

Prospective Juror Edwards (1014) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 148

Prospective Juror Karen Sanders (1071) . . . . . . . . . . . . . . . . . . . . . . . . . 169

Prospective Juror Blakeney (1143) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 184

Prospective Juror Bryson (1239) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 205

Prospective Juror Donaldson (1289) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 224

Prospective Juror Campbell (1477) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 245

Prospective Juror Moore (1913) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 264

Prospective Juror Deana Stanford (1960) . . . . . . . . . . . . . . . . . . . . . . . . . 281

Parties' exercise of peremptory challenges to the
prospective jurors, July 27, 2002 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 294

2

Case 3:12-cv-00327-MOC   Document 99   Filed 09/23/15   Page 5 of 200

**JA819**

Case 3:12-cv-00327-MOC   Document 99   Filed 09/23/15   Page 6 of 200

**JA820**

### *Volume II*

Resentencing Volume 12, July 29, 2002, (Morning) . . . . . . . . . . . . . . . . . . . . . . 372

Resentencing Volume 12, July 29, 2002 (Afternoon) . . . . . . . . . . . . . . . . . . . 469

Resentencing Volume 13, July 30, 2002 (Morning) . . . . . . . . . . . . . . . . . . . . 587

Resentencing Volume 13, July 30, 2002 (Afternoon) . . . . . . . . . . . . . . . . . . . 687

Resentencing Volume 14, July 31, 2002 (Morning) . . . . . . . . . . . . . . . . . . . . 773

### *Volume III*

Resentencing Volume 14, July 31, 2002 (Afternoon) . . . . . . . . . . . . . . . . . . . 845

Resentencing Volume 15, August 1, 2002 (Morning) . . . . . . . . . . . . . . . . . . . 959

Resentencing Volume 16, August 5, 2002 (Morning) . . . . . . . . . . . . . . . . . . 1029

Resentencing Volume 16, August 5, 2002 (Afternoon) . . . . . . . . . . . . . . . . . 1107

Resentencing Volume 17, August 6, 2002 (Morning) . . . . . . . . . . . . . . . . . . 1202

### *Volume IV*

Resentencing Volume 17, August 6, 2002 (Afternoon) . . . . . . . . . . . . . . . . . 1312

Resentencing Volume 18, August 7, 2002 (Morning) . . . . . . . . . . . . . . . . . . 1424

Resentencing Volume 18, August 7, 2002 (Afternoon) . . . . . . . . . . . . . . . . . 1533

Resentencing Volume 19, August 8, 2002 (Morning) . . . . . . . . . . . . . . . . . . 1634

Resentencing Volume 19, August 8, 2002 (Afternoon) . . . . . . . . . . . . . . . . . 1726

3

**JA821**

**JA822**

## *Volume V*

Resentencing Volume 20, August 9, 2002 (Morning) .................... 1799

Resentencing Volume 20, August 9, 2002 (Afternoon) ................... 1822

Resentencing Proceedings, August 12, 2002 .......................... 1870

Resentencing Proceedings, August 13, 2002 .......................... 2017

Defendant Motion for Mistrial regarding victim
    impact testimony, filed August 5, 2002 .......................... 2034

Written questions from the jurors filed August 13, 2002 ................. 2037

District Court Judge's answer to jurors' written question
    filed August 13, 2002 ......................................... 2038

Jury verdict form with reference to count 7, filed
    August 13, 2002 ............................................. 2039

Jury verdict form with reference to count 8, filed
    August 13, 2002 ............................................. 2057

Jury verdict form with reference to count 11, filed
    August 13, 2002 ............................................. 2075

Judgment and Order imposing sentence, entered
    August 20, 2002 ............................................. 2092

Defendant's Motion for New Trial, Arrest of Judgment
    and Other Relief, filed August 20, 2002 ........................ 2097

Order Denying Defendant's Motion for New Trial,
    Arrest of Judgment and Other Relief
    entered September 9, 2002 .................................... 2149

**JA823**

Case 3:12-cv-00327-MOC   Document 99   Filed 09/23/15   Page 10 of 200

**JA824**

Docket as of May 29, 2003 0:16 am                          Web PACER (NCWD)

# U.S. District Court

## Western District of North Carolina (Charlotte)

## CRIMINAL DOCKET FOR CASE #: 97-CR-23-ALL

### USA, et al v. Barnette

Filed: 02/04/97
Dkt# in other court: None

### Case Assigned to: Judge Richard L. Voorhees

ROBERT ERICKSON (0)                    Robert Erickson
      interested party                 [COR LD NTC] [PRO SE]
                                       US Dept of Justice
                                       Criminal Division, Appellate
                                       Section
                                       P.O. Box 899
                                       Washington, DC 20044

Pending Counts:
    NONE
Terminated Counts:
    NONE
Complaints:
    NONE

### Case Assigned to: Judge Richard L. Voorhees

Case 3:12-cv-00327-MOC  Document 99  Filed 09/23/15  Page 11 of 200

**1**

**JA825**

AQUILIA MARCIVICCI BARNETTE
(1)
       defendant
[term  02/20/98]

James P. Cooney
 [term  04/26/02]
[COR LD NTC pda]
James P. Cooney, III
[COR LD NTC pda]
Kennedy, Covington, Lobdell &
Hickman
Hearst Tower
214 N. Tryon St., 47th Floor
Charlotte, NC 28202-4006
704/331-7400
George V. Laughrun, III
 [term  02/20/98]
[COR LD NTC cja]
Goodman, Carr, Laughrun, Levine
& Murray, P.A.
301 South McDowell Street
Suite 602 Cameron Brown
Building
Charlotte, NC 28204
704/372-2770
Harold J. Bender
[COR LD NTC cja]
Law Office of Harold Bender
200 North McDowell Street
Charlotte, NC 28204
704/333-2169
Paul J. Williams
 [term  02/20/98]
[COR LD NTC cja]
301 S. McDowell Street
Suite 801
Charlotte, NC 28204
(704) 372-5601
Claire J. Rauscher
 [term  11/29/01]
[COR LD NTC cja]
435 E. Morehead St.
Charlotte, NC 28202
(704) 331-0863
Jean B. Lawson
[COR LD NTC cja]
P. O. Box 472106
Charlotte, NC 28226
704/543-1785

## Docket Proceedings

| Date | Doc# | Image | Docket Entry |
|------|------|-------|--------------|
| 02/04/97 | 1 | | INDICTMENT as to Aquilia Marcivicci Barnette (1) count(s) 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11 (jlk) [Entry date 02/05/97] |
| | | | |

| | | | |
|---|---|---|---|
| 02/04/97 | 2 | | PETITION by USA for Writ of Habeas Corpus ad prosequendum as to Aquilia Marcivicci Barnette (jlk) [Entry date 02/05/97] |
| 02/05/97 | -- | | Arrest WARRANT issued as to Aquilia Marcivicci Barnette (jlk) [Entry date 02/05/97] |
| 02/06/97 | 3 | | WRIT of Habeas Corpus ad Prosequendum issued as to Aquilia Marcivicci Barnette for 2/18/97 (tob) [Entry date 02/06/97] |
| 02/14/97 | 4 | | NOTICE of Summary of Charges and Maximum Penalties by USA as to Aquilia Marcivicci Barnette (jlk) [Entry date 02/14/97] |
| 02/18/97 | -- | | ARREST of Aquilia Marcivicci Barnette (tob) [Entry date 02/25/97] |
| 02/18/97 | -- | | Initial Appearance as to Aquilia Marcivicci Barnette held before CH. Deft not eligible for detention, currently under state order of detention. Deft request CAC. CH allows. (Defendant informed of rights.) (tob) [Entry date 02/25/97] |
| 02/18/97 | 6 | | NOTICE SPECIFYING DEFENDANT AS AN ARMED CAREER CRIMINAL by USA as to Aquilia Marcivicci Barnette (tob) [Entry date 02/25/97] |
| 02/24/97 | 5 | | Arrest WARRANT Returned Executed as to Aquilia Marcivicci Barnette on 2/18/97 (jlk) [Entry date 02/24/97] |
| 02/26/97 | 7 | | CJA 30 as to Aquilia Marcivicci Barnette : Appointment of Attorney George V. Laughrun III - Voucher# D21062, Paul J. Williams - Voucher# D21072 (tob) [Entry date 03/05/97] |
| 03/05/97 | 7 | | NOTICE of Hearing as to Aquilia Marcivicci Barnette :, set Arraignment for 9:30 3/26/97 for Aquilia Marcivicci Barnette before Magistrate Judge Carl Horn III (tob) [Entry date 03/05/97] |
| 03/26/97 | -- | | Arraignment as to Aquilia Marcivicci Barnette held before CH. (tob) [Entry date 03/26/97] |
| 03/26/97 | 8 | | Arraignment Order as to Aquilia Marcivicci Barnette setting Calendar Call for 9:30 4/29/97 for Aquilia Marcivicci Barnette ; ( Signed by Magistrate Judge Carl Horn III ) (tob) [Entry date 03/26/97] |
| 03/26/97 | 9 | | Standard Discovery Order as to Aquilia Marcivicci Barnette (tob) [Entry date 03/26/97] |
| 03/26/97 | 10 | | NOTICE OF INSANITY DEFENSE by Aquilia Marcivicci Barnette (tob) [Entry date 03/26/97] |
| | | | |

Case 3:12-cv-00327-MOC  Document 99  Filed 09/23/15  Page 13 of 200

3

**JA827**

| 04/10/97 | 11 | | MOTION by Aquilia Marcivicci Barnette EX PARTE MOTION (jlk) [Entry date 04/11/97] |
|---|---|---|---|
| 04/10/97 | 12 | | MOTION by Aquilia Marcivicci Barnette EX PARTE MOTION (jlk) [Entry date 04/11/97] |
| 04/10/97 | 13 | | MOTION by Aquilia Marcivicci Barnette EX PARTE MOTION (jlk) [Entry date 04/11/97] |
| 04/10/97 | 14 | | MOTION by Aquilia Marcivicci Barnette EX PARTE MOTION (jlk) [Entry date 04/11/97] |
| 04/10/97 | 15 | | MOTION by Aquilia Marcivicci Barnette EX PARTE MOTION (jlk) [Entry date 04/11/97] |
| 04/10/97 | 16 | | NOTICE of Index to exparte motions by Aquilia Marcivicci Barnette. (jlk) [Entry date 04/11/97] |
| 04/10/97 | 17 | | NOTICE of Index to pretrial motions by Aquilia Marcivicci Barnette. (jlk) [Entry date 04/11/97] |
| 04/10/97 | 18 | | MOTION by Aquilia Marcivicci Barnette to Continue from the April, 1997 trial term (jlk) [Entry date 04/11/97] |
| 04/10/97 | 19 | | MOTION by Aquilia Marcivicci Barnette for complete recordation and presence of the Defendant (jlk) [Entry date 04/11/97] |
| 04/10/97 | 20 | | MOTION by Aquilia Marcivicci Barnette for Pretrial conference (jlk) [Entry date 04/11/97] |
| 04/10/97 | 21 | | MOTION by Aquilia Marcivicci Barnette for Discovery prior to the govt. decision to seek death penalty and for expedited Hearing (jlk) [Entry date 04/11/97] |
| 04/10/97 | 22 | | MOTION by Aquilia Marcivicci Barnette for Disclosure of mitigating information (jlk) [Entry date 04/11/97] |
| 04/10/97 | 23 | | MOTION by Aquilia Marcivicci Barnette for potential list of jurors (jlk) [Entry date 04/11/97] |
| 04/10/97 | 24 | | MOTION by Aquilia Marcivicci Barnette for individual jury voir dire and sequestration of jurors during jury selection |
| (jlk) [E | ntry | | ate 04/11/97] |
| 04/10/97 | 25 | | MOTION by Aquilia Marcivicci Barnette to permit voir dire of potential jurors regarding their conceptions about parole eligibility on a federal |

Case 3:12-cv-00327-MOC Document 99 Filed 09/23/15 Page 14 of 200

4

JA828

| | | | |
|---|---|---|---|
| | | | life sentence (jlk) [Entry date 04/11/97] |
| 04/10/97 | 26 | | Brief and MOTION by Aquilia Marcivicci Barnette for specific jury selection procedures (jlk) [Entry date 04/11/97] |
| 04/10/97 | 27 | | NOTICE ofMemorandum of Law: Constitutional Voir Dire and the Principles of Witt and Morgan by Aquilia Marcivicci Barnette (jlk) [Entry date 04/11/97] |
| 04/10/97 | 28 | | MOTION by Aquilia Marcivicci Barnette for sequestration of witnesses during trial (jlk) [Entry date 04/11/97] |
| 04/10/97 | 29 | | MOTION by Aquilia Marcivicci Barnette in Limine re: photographs of victims following death or autopsy (jlk) [Entry date 04/11/97] |
| 04/10/97 | 30 | | NOTICE of Stipulation: identity of bodies by Aquilia Marcivicci Barnette (jlk) [Entry date 04/11/97] |
| 04/10/97 | 31 | | MOTION by Aquilia Marcivicci Barnette to Suppress photographs (jlk) [Entry date 04/11/97] |
| 04/10/97 | 32 | | MOTION by Aquilia Marcivicci Barnette in Limine re: bloody garments (jlk) [Entry date 04/11/97] |
| 04/10/97 | 33 | | MOTION by Aquilia Marcivicci Barnette to Suppress statements of Defendant (jlk) [Entry date 04/11/97] |
| 04/10/97 | 34 | | MEMORANDUM by Aquilia Marcivicci Barnette in support of [33-1] motion to Suppress statements of Defendant (jlk) [Entry date 04/11/97] |
| 04/10/97 | 35 | | MOTION by Aquilia Marcivicci Barnette for a list of goverment witnesses (jlk) [Entry date 04/11/97] |
| 04/10/97 | 36 | | MOTION by Aquilia Marcivicci Barnette to Dismiss Counts 1, 2, 3, 10 & 11 (jlk) [Entry date 04/11/97] |
| 04/10/97 | 37 | | MOTION by Aquilia Marcivicci Barnette to Dismiss Counts 1, 10 & 11 (jlk) [Entry date 04/11/97] |
| 04/10/97 | 38 | | MOTION by Aquilia Marcivicci Barnette to Dismiss Counts 1, 2, 3, 10, 11 of the Indictment for improper venue pursuant to 18 USC 3235 (jlk) [Entry date 04/11/97] |
| 04/10/97 | 39 | | MOTION by Aquilia Marcivicci Barnette to Dismiss Counts 2, 7, 8 & 11 for the lack of jurisdiction under the commerce clause and incorporated memoramdum of law. (jlk) [Entry date 04/11/97] |
| | | | |

Case 3:12-cv-00327-MOC   Document 99   Filed 09/23/15   Page 15 of 200

**5**

**JA829**

| 04/10/97 | 40 | | MOTION by Aquilia Marcivicci Barnette to bar imposition of death penalty (jlk) [Entry date 04/11/97] |
|---|---|---|---|
| 04/10/97 | 41 | | MOTION by Aquilia Marcivicci Barnette to limit prosecutors rebuttal evidence (jlk) [Entry date 04/11/97] |
| 04/10/97 | 42 | | MOTION by Aquilia Marcivicci Barnette for Leave to File additional motions (jlk) [Entry date 04/11/97] |
| 04/10/97 | 43 | | MOTION by Aquilia Marcivicci Barnette to Extend Time to file other motions (jlk) [Entry date 04/11/97] |
| 04/11/97 | 44 | | ORDER as to Aquilia Marcivicci Barnette granting [18-1] motion to Continue from the April, 1997 trial term as to Aquilia Marcivicci Barnette (1), to Continue in Interests of Justice Time excluded from 4/29/97 to 9/8/97, reset Calendar Call for 9:30 9/8/97 for Aquilia Marcivicci Barnette ( Signed by Judge Robert D. Potter ) (jlk) [Entry date 04/11/97] |
| 04/11/97 | 45 | | ORDER as to Aquilia Marcivicci Barnette; the meeting between defense and USA shall be postponed not later than 5/12/97; Motion Hearing set for 9:30 4/23/97 for Aquilia Marcivicci Barnette for [21-2] motion for expedited Hearing before Judge Robert D. Potter, set for 9:30 4/23/97 for Aquilia Marcivicci Barnette for [21-1] motion for Discovery prior to the govt. decision to seek death penalty before Judge Robert D. Potter, set for 9:30 4/23/97 for Aquilia Marcivicci Barnette for [22-1] motion for Disclosure of mitigating information before Judge Robert D. Potter; the USA shall respond in writing to Deft's motions, Response to Motion reset to 4/17/97 for USA for [22-1] motion for Disclosure of mitigating information, reset to 4/17/97 for USA for [21-1] motion for Discovery prior to the govt. decision to seek death penalty, reset to 4/17/97 for USA for [21-2] motion for expedited Hearing ( Signed by Judge Robert D. Potter ) (jlk) [Entry date 04/11/97] |
| 04/11/97 | 46 | | ORDER as to Aquilia Marcivicci Barnette granting [19-1] motion for complete recordation and presence of the Defendant as to Aquilia Marcivicci Barnette (1); Court Reporter shall take down and record all hrgs. on motions, all jury voir dire, opening statement, testimony, closing arguments, bench conferences and each proceeding involved in this trial. ( Signed by Judge Robert D. Potter ) (jlk) [Entry date 04/14/97] |
| 04/11/97 | 47 | | ORDER as to Aquilia Marcivicci Barnette denying [20-1] motion for Pretrial conference as to Aquilia Marcivicci Barnette (1) ( Signed by Judge Robert D. Potter ) (jlk) [Entry date 04/14/97] |
| 04/11/97 | 48 | | ORDER as to Aquilia Marcivicci Barnette directing the USA to respond to the remaining defense motions numbered 6-26 on the Deft's Index to Pretrial Motions; Response to Motions due not more than 10 days after the USA is advised by the US Atty. General that he is authorized to seek the death penalty ( Signed by Judge Robert D. Potter ) (jlk) [Entry date 04/14/97] |
| | | | |

Case 3:12-cv-00327-MOC Document 99 Filed 09/23/15 Page 16 of 200

6

**JA830**

| | | | |
|---|---|---|---|
| 04/11/97 | 49 | | ORDER as to Aquilia Marcivicci Barnette, Sealing all Ex Parte Motions by the Defendant ( Signed by Judge Robert D. Potter ) (jlk) [Entry date 04/14/97] |
| 04/14/97 | 50 | | RESPONSE by USA as to Aquilia Marcivicci Barnette re [22-1] motion for Disclosure of mitigating information (jlk) [Entry date 04/15/97] |
| 04/14/97 | 51 | | RESPONSE by USA as to Aquilia Marcivicci Barnette re [21-1] motion for Discovery prior to the govt. decision to seek death penalty, [21-2] motion for expedited Hearing (jlk) [Entry date 04/15/97] |
| 04/17/97 | 52 | | ORDER as to Aquilia Marcivicci Barnette denying [21-1] motion for Discovery prior to the govt. decision to seek death penalty as to Aquilia Marcivicci Barnette (1)denying [22-1] motion for Disclosure of mitigating information as to Aquilia Marcivicci Barnette (1), terminated deadlines for the hrg. set for 4/23/97; Counsel shall reschedule their meeting at a mutually agreeable time. ( Signed by Judge Robert D. Potter ) (jlk) [Entry date 04/17/97] |
| 05/20/97 | 53 | | MOTION by Aquilia Marcivicci Barnette to renew exparte motion referred to: Judge Robert D. Potter (jlk) [Entry date 05/20/97] |
| 05/22/97 | -- | | Minute entry as to Aquilia Marcivicci Barnette : Status conference held. Proposed tentative schedule discussed. The following schedules were discussed: (1) Pltf's conf w/Atty Gen. and notice of intent to seek death penalty, ETT and jury sel procedure. Court takes proposed scheduling under advisement. (srg) [Entry date 05/23/97] |
| 05/23/97 | 54 | | SEALED ORDER as to Aquilia Marcivicci Barnette granting in part the [53-1] motion to renew exparte motion as to Aquilia Marcivicci Barnette (1) ( Signed by Judge Robert D. Potter ) (jlk) [Entry date 05/23/97] |
| 05/28/97 | 55 | | Memorandum of May 22, 1997 Status hearing re: authorization to seek death penalty, jury questionnaire, jury selection, and estimated trial time as to Aquilia Marcivicci Barnette, ( Signed by Judge Robert D. Potter ) (sdc) [Entry date 05/29/97] |
| 05/28/97 | -- | | SEALED TRANSCRIPT filed in case as to Aquilia Marcivicci Barnette for dates of 5/28/97 Crt Rptr: Scott Huseby (chh) [Entry date 05/30/97] |
| 05/29/97 | -- | | TRANSCRIPT filed in case as to Aquilia Marcivicci Barnette for dates of May 22, 1997 Crt Rptr: Scott Huseby (chh) [Entry date 05/30/97] |
| 07/28/97 | 56 | | MOTION by Aquilia Marcivicci Barnette EX PARTE MOTION re: records (jlk) [Entry date 07/29/97] |
| 08/04/97 | 58 | | Preliminary Jury instructions to entire venire as to Aquilia Marcivicci Barnette (jlk) [Entry date 08/04/97] |
| | | | |

Case 3:12-cv-00327-MOC  Document 99  Filed 09/23/15  Page 17 of 200

7

**JA831**

| 08/04/97 | 59 | | NOTICE of Proposed juror questionnaire by USA as to Aquilia Marcivicci Barnette (jlk) [Entry date 08/04/97] |
| 08/04/97 | 57 | | RESPONSE by USA as to Aquilia Marcivicci Barnette re [26-1] motion for specific jury selection procedures, [24-1] motion for individual jury voir dire and sequestration of jurors during jury selection (jlk) [Entry date 08/11/97] |
| 08/07/97 | 60 | | MOTION by Aquilia Marcivicci Barnette EX PARTE MOTION re: examination (sdc) [Entry date 08/07/97] |
| 08/07/97 | 61 | | NOTICE of intent to seek the Death Penalty by USA as to Aquilia Marcivicci Barnette (jlk) [Entry date 08/07/97] |
| 08/08/97 | 62 | | SEALED ORDER as to Aquilia Marcivicci Barnette granting [56-1] motion EX PARTE MOTION re: records as to Aquilia Marcivicci Barnette (1) ( Signed by Judge Robert D. Potter ) (jlk) [Entry date 08/08/97] |
| 08/08/97 | 63 | | SEALED ORDER as to Aquilia Marcivicci Barnette granting [60-1] motion EX PARTE MOTION re: examination as to Aquilia Marcivicci Barnette (1) ( Signed by Judge Robert D. Potter ) (jlk) [Entry date 08/11/97] |
| 08/14/97 | 64 | | ORDER as to Aquilia Marcivicci Barnette, for Hearing re: the first draft of the prosposed juror questionnaire; a hrg. shall be set for 8/25/97 at 10:00 a.m.; Court Reporter Supervisor shall have a court reporter present & USM shall have the Deft. present. (Signed by Judge Robert D. Potter ) (jlk) [Entry date 08/14/97] |
| 08/21/97 | 65 | | ORDER as to Aquilia Marcivicci Barnette granting [23-1] motion for potential list of jurors as to Aquilia Marcivicci Barnette (1)granting in part, denying in part [24-1] motion for individual jury voir dire and sequestration of jurors during jury selection as to Aquilia Marcivicci Barnette granting in part [25-1] motion to permit voir dire of potential juror regarding their conception about parole eligibility on a Federal Sentence (1)granting in part, denying in part (see order) [26-1] motion for specific jury selection procedures as to Aquilia Marcivicci Barnette (1)granting in part [28-1] motion for sequestration of witnesses during trial as to Aquilia Marcivicci Barnette (1) [29-1] motion in Limine re: photographs of victims following death or autopsy is deferred as to Aquilia Marcivicci Barnette (1) [31-1] motion to Suppress photographs is deferred as to Aquilia Marcivicci Barnette (1) [32-1] motion in Limine re: bloody garments is deferred as to Aquilia Marcivicci Barnette (1) [33-1] motion to Suppress statements of Defendant is deferred as to Aquilia Marcivicci Barnette (1)granting [35-1] motion for a list of goverment witnesses as to Aquilia Marcivicci Barnette (1)denying [36-1] motion to Dismiss Counts 1, 2, 3, 10 & 11 as to Aquilia Marcivicci Barnette (1)denying [37-1] motion to Dismiss Counts 1, 10 & 11 as to Aquilia Marcivicci Barnette (1)denying [38-1] motion to Dismiss Counts 1, 2, 3, 10, 11 of the Indictment for improper venue pursuant to 18 USC 3235 as to Aquilia Marcivicci Barnette (1)denying [39-1] motion to Dismiss Counts 2, 7, 8 & 11 for the lack of jurisdiction under the |

Case 3:12-cv-00327-MOC Document 99 Filed 09/23/16 Page 18 of 200

**JA832**

| | | | |
|---|---|---|---|
| | | | commerce clause as to Aquilia Marciviçci Barnette [40-1] motion to bar imposition of death penalty as to Aquilia Marcivicci Barnette (1) [41-1] motion to limit prosecutors rebuttal evidence is deferred as to Aquilia Marcivicci Barnette (1)granting [42-1] motion for Leave to File additional motions as to Aquilia Marcivicci Barnette (1) granting [43-1] motion to extend time to file other motions until 12/5/97 ( Signed by Judge Robert D. Potter ) (jlk) [Entry date 08/21/97] |
| 08/25/97 | 66 | | SEALED TRANSPORT ORDER as to Aquilia Marcivicci Barnette - contents of this order not to be released ( Signed by Judge Robert D. Potter ) (bsw) [Entry date 08/25/97] [Edit date 08/27/97] |
| 08/25/97 | 67 | | RESPONSE by USA as to Aquilia Marcivicci Barnette re [33-1] motion to Suppress statements of Defendant (bsw) [Entry date 08/25/97] |
| 08/25/97 | -- | | Minute entry as to Aquilia Marcivicci Barnette : Case called for draft questionnaire hrg. Atty Thomas Walker and Bob Conrad present for govt., Atty Geo. Laughrun and Paul Williams present for deft. The govt obj'd to the following questions: 56,57,96,99,100,104, and inquired about individual questions the court might ask of jurors. Defts obj'd to the foll: 46,52,57,93,94, and 99, (46 removed). Deft's questions reg Phase II noted. Court inquires as to add'l questions by counsel and a schedule was determined. Three (300) Hundred proposed jurors will be called. A tentative voir dire scheduling of 2.5 hrs morning and afternoon sessions. The courtroom deputy has been instructed to pass out a total of five questionnaires to parties. Court adjourns until 9/29/97. Cheryl Nuccio, Court Reporter, RDP presiding. (srg) [Entry date 08/25/97] |
| 08/26/97 | 68 | | ORDER sua sponte as to Aquilia Marcivicci Barnette; Court Reporter shall furnish the defense w/ copies of each transcript and the USA if requested; Court Reporter shall copy all transcripts SEALED; Court Reporter shall sumbit a voucher for payment to the Court, and transcripts furnished to the USA shall be paid by that office ( Signed by Judge Robert D. Potter ) (jlk) [Entry date 08/26/97] |
| 08/26/97 | 69 | | MEMORANDUM re: Interim Payments for Representation as to Aquilia Marcivicci Barnette; Commencing 8/16/97, counsel shall submit a voucher for the period from that date thru 11/15/97; the third and last voucher shall be from the period of 11/16/97 thru 5/1/98; at the conclusion of the representation, each counsel shall submit a final voucher; Answers to questions concerning appointment can be found in the Guidelines for the Administration of the Criminal Justice Act; further clarification should be addressed to the Judge Robert D. Potter's office. ( Signed by Judge Robert D. Potter ) (jlk) [Entry date 08/27/97] |
| 08/27/97 | 70 | | ORDER as to Aquilia Marcivicci Barnette amending the jury questionnaire; Counsel for Govt. and the Deft. will respond by 9/15/97 w/any suggestions or objections to the enclosed second draft of the jury questionnaire. ( Signed by Judge Robert D. Potter ) (jlk) [Entry date 08/27/97] |
| 08/27/97 | 71 | | Renewal of the MOTION by Aquilia Marcivicci Barnette EX PARTE MOTION re: expert (jlk) [Entry date 08/28/97] |

Case 3:12-cv-00327-MOC   Document 99   Filed 09/23/15   Page 19 of 200

**9**

**JA833**

| | | | |
|---|---|---|---|
| 08/27/97 | 72 | | Additional Proposed Voir Dire Questions by Aquilia Marcivicci Barnette (jlk) [Entry date 08/28/97] |
| 08/27/97 | 73 | | Proposed Courtroom Orientation and Preliminary Jury Instructions for entire Venire by Aquilia Marcivicci Barnette (jlk) [Entry date 08/28/97] |
| 08/28/97 | 74 | | SEALED ORDER as to Aquilia Marcivicci Barnette granting [71-1] EX PARTE MOTION re: expert as to Aquilia Marcivicci Barnette (1) ( Signed by Judge Robert D. Potter ) (jlk) [Entry date 08/28/97] |
| 08/28/97 | 75 | | AMENDMENT to ORDER as to Aquilia Marcivicci Barnette Amending Response to Pre-trial Motion deadline from 12/5/97 to 11/14/97 at 3:00 p.m.; any reponse to these motions filed on or before 11/14/97, must be responded by the other party on or before 11/24/97 at 3:00 p.m. ( Signed by Judge Robert D. Potter ) (jlk) [Entry date 08/28/97] |
| 08/29/97 | 76 | | MOTION by Aquilia Marcivicci Barnette to Preclude the intoduction of victim impact evidence pertaining to the victims family members' characterizations and opinions about the crime, deft., and/or the appropriate sentence referred to: Judge Robert D. Potter (jlk) [Entry date 09/02/97] |
| 08/29/97 | 77 | | MOTION by Aquilia Marcivicci Barnette to bar the admission of victim impact evidence as fundamentally unfair and violative of due process referred to: Judge Robert D. Potter (jlk) [Entry date 09/02/97] |
| 08/29/97 | 78 | | MOTION by Aquilia Marcivicci Barnette to require a pretrial judicial review of all victim impact evidence the govt. intends to introduce at the capital sentencing proceedings referred to: Judge Robert D. Potter (jlk) [Entry date 09/02/97] |
| 08/29/97 | 79 | | MOTION by Aquilia Marcivicci Barnette to declare title 18 USC 3593 (a)(2) unconstitutional as applied to death penalty sentencing proceedings referred to: Judge Robert D. Potter (jlk) [Entry date 09/02/97] |
| 08/29/97 | 80 | | MEMORANDUM by Aquilia Marcivicci Barnette in support of [76-1] motion to Preclude the intoduction of victim impact evidence pertaining to the victims family members' characterizations and opinions about the crime, deft., and/or the appropriate sentence (jlk) [Entry date 09/02/97] |
| 08/29/97 | 81 | | MOTION by Aquilia Marcivicci Barnette to Preclude the consideration of the victim impact statements at the penalty phase of this matter referred to: Judge Robert D. Potter (jlk) [Entry date 09/02/97] |
| 08/29/97 | 82 | | MOTION by Aquilia Marcivicci Barnette to Continue from the September, 1997 trial term referred to: Judge Robert D. Potter (jlk) [Entry date 09/02/97] |
| 09/02/97 | 83 | | ORDER as to Aquilia Marcivicci Barnette granting [82-1] motion to |

Case 3:12-cv-00327-MOC   Document 99   Filed 09/23/13   Page 20 of 200

**10**

**JA834**

| | | | |
|---|---|---|---|
| | | | Continue from the September, 1997 trial term as to Aquilia Marcivicci Barnette (1), to Continue in Interests of Justice Time excluded from 9/8/97 to 1/5/98, reset Calendar Call for 9:30 1/5/98 for Aquilia Marcivicci Barnette ( Signed by Judge Robert D. Potter ) (jlk) [Entry date 09/02/97] |
| 09/03/97 | -- | | TRANSCRIPT filed in case as to Aquilia Marcivicci Barnette for dates of August 25, 1997 Crt Rptr: Cheryl A. Nuccio (jlk) [Entry date 09/03/97] |
| 09/09/97 | 84 | | RESPONSE by Aquilia Marcivicci Barnette in opposition to [70-1] order amending the jury questionnaire. (jlk) [Entry date 09/09/97] |
| 09/09/97 | 85 | | SEALED CJA 30 as to Aquilia Marcivicci Barnette Authorization to Pay Paul Williams $ (UNDER SEAL) ( Signed by Judge Robert D. Potter ) (jlk) [Entry date 09/09/97] |
| 09/09/97 | 86 | | SEALED CJA 30 as to Aquilia Marcivicci Barnette Authorization to Pay George Laughrun, II $ (UNDER SEAL) ( Signed by Judge Robert D. Potter ) (jlk) [Entry date 09/09/97] [Edit date 09/09/97] |
| 09/18/97 | 87 | | MOTION by Aquilia Marcivicci Barnette to have Court Reporter designate race and gender of potential jurors referred to: Judge Robert D. Potter (sdc) [Entry date 09/18/97] |
| 09/18/97 | 88 | | MOTION by Aquilia Marcivicci Barnette to handle Baston vs. Kentucky Challenges referred to: Judge Robert D. Potter (sdc) [Entry date 09/18/97] |
| 09/18/97 | 89 | | MOTION by Aquilia Marcivicci Barnette for daily transcripts of trial testimony at both guilt, innocence and penalty phase referred to: Judge Robert D. Potter (sdc) [Entry date 09/18/97] |
| 09/18/97 | 90 | | MOTION by Aquilia Marcivicci Barnette to permit defense counsel to question potential jurors challenged for cause by the government referred to: Judge Robert D. Potter (sdc) [Entry date 09/18/97] |
| 09/18/97 | 91 | | MOTION by Aquilia Marcivicci Barnette to prohibit government from "death qualifying" the jury referred to: Judge Robert D. Potter (sdc) [Entry date 09/18/97] |
| 09/18/97 | 92 | | MOTION by Aquilia Marcivicci Barnette to prohibit govt. from peremptorily excusing jurors on the basis of race referred to: Judge Robert D. Potter (sdc) [Entry date 09/18/97] |
| 09/18/97 | 93 | | MOTION by Aquilia Marcivicci Barnette in Limine to disclose prior criminal records of all govt. witnesses referred to: Judge Robert D. Potter (sdc) [Entry date 09/18/97] |
| | | | |

Case 3:12-cv-00327-MOC   Document 99   Filed 09/23/15   Page 21 of 200

**11**

**JA835**

| | | | |
|---|---|---|---|
| 09/18/97 | 94 | | MOTION by Aquilia Marcivicci Barnette to Compel govt. to disclose whether it intends to offer evidence under 803(24), 804(b)(5) & 404(b) referred to: Judge Robert D. Potter (sdc) [Entry date 09/18/97] |
| 09/18/97 | 95 | | MOTION by Aquilia Marcivicci Barnette for an order requiring the the govt. to disclose full nature and extent of consideration offered to or sought by the govt. or its agents on behalf of informants or jailhouse "snitches" referred to: Judge Robert D. Potter (sdc) [Entry date 09/18/97] |
| 09/18/97 | 96 | | MOTION by Aquilia Marcivicci Barnette to reveal grant of immunity or other concessions referred to: Judge Robert D. Potter (sdc) [Entry date 09/18/97] |
| 09/18/97 | 97 | | MOTION by Aquilia Marcivicci Barnette to require sequestration of all law enforcement witnesses at the suppression hearing referred to: Judge Robert D. Potter (sdc) [Entry date 09/18/97] |
| 09/24/97 | 98 | | MOTION by Aquilia Marcivicci Barnette to Suppress Court Identification to be made by Benjamin Spencer Greene, aka Benny referred to: Judge Robert D. Potter (jlk) [Entry date 09/24/97] |
| 09/24/97 | 99 | | MOTION by Aquilia Marcivicci Barnette to Suppress prior convictions referred to: Judge Robert D. Potter (jlk) [Entry date 09/24/97] |
| 09/24/97 | 100 | | MOTION by Aquilia Marcivicci Barnette for Early Production of Jencks Material referred to: Judge Robert D. Potter (jlk) [Entry date 09/24/97] |
| 09/25/97 | 101 | | RESPONSE by USA as to Aquilia Marcivicci Barnette re [90-1] motion to permit defense counsel to question potential jurors challenged for cause by the government, [91-1] motion to prohibit government from "death qualifying" the jury (jlk) [Entry date 09/25/97] |
| 09/26/97 | -- | | TRANSCRIPT filed in case as to Aquilia Marcivicci Barnette for dates of 3/26/97 Crt Rptr: Cheryl Nuccio (jlk) [Entry date 09/26/97] for dates of 2/18/97 Crt Rptr: Cheryl Nuccio (jlk) [Entry date 09/26/97] |
| 09/26/97 | 102 | | MOTION by Aquilia Marcivicci Barnette EX PARTE MOTION re: records (jlk) [Entry date 09/26/97] |
| 09/26/97 | 103 | | MOTION by Aquilia Marcivicci Barnette for a court instruction to the jury that life w/o the possibility of release means what is says referred to: Judge Robert D. Potter (jlk) [Entry date 09/26/97] |
| 09/26/97 | 104 | | MOTION by Aquilia Marcivicci Barnette for the last argument by defense referred to: Judge Robert D. Potter (jlk) [Entry date 09/26/97] |
| 09/26/97 | 105 | | MOTION by Aquilia Marcivicci Barnette to direct the govt. to refer to life w/o the possibility of release throughout the trial referred to: Judge Robert D. Potter (jlk) [Entry date 09/26/97] |

| | | | |
|---|---|---|---|
| 09/26/97 | 106 | | MOTION by Aquilia Marcivicci Barnette for Discovery referred to: Judge Robert D. Potter (jlk) [Entry date 09/26/97] |
| 09/29/97 | 107 | | ORDER as to Aquilia Marcivicci Barnette granting [97-1] motion to require sequestration of all law enforcement witnesses at the suppression hearing as to Aquilia Marcivicci Barnette (1) ( Signed by Judge Robert D. Potter ) (jlk) [Entry date 09/29/97] |
| 09/29/97 | 108 | | Witness list by USA as to Aquilia Marcivicci Barnette (srg) [Entry date 09/30/97] |
| 09/29/97 | 109 | | Exhibit list by USA as to Aquilia Marcivicci Barnette (srg) [Entry date 09/30/97] |
| 09/29/97 | 110 | | Exhibit list by Aquilia Marcivicci Barnette (srg) [Entry date 09/30/97] |
| 09/29/97 | -- | | ORAL ORDER as to Aquilia Marcivicci Barnette denying [33-1] motion to Suppress statements of Defendant as to Aquilia Marcivicci Barnette (1) ( Entered by Judge Robert D. Potter ) (srg) [Entry date 09/30/97] |
| 09/29/97 | -- | | Evidentiary Hearing as to Aquilia Marcivicci Barnette held. Deft instructed to listen to the 06/28/96 Mag tape re the deft and a transcript of same will be supplied at a later time. The Govt proceeds to call the following wits to testify: Rodney Riggs, James Yarbrough, Tony Brandon, James Sanders, Tony Rice and Robert Holl. Deft's atty x-ex'd all wits. Upon completion of evid, closing arguments were held, suppression motion DENIED. Judge: RDP Court Rptr: S. Huseby (srg) [Entry date 09/30/97] |
| 09/29/97 | -- | | TRANSCRIPT filed in case as to Aquilia Marcivicci Barnette for dates of 06/28/96 Crt Rptr: Scott Huseby. Transcribed by Huseby from Mag's Tape. Exhibits admitted on 09/29/97 by Pltf and Deft are located in file (srg) [Entry date 09/30/97] |
| 10/02/97 | 111 | | MOTION by Aquilia Marcivicci Barnette for Discovery of statements and Brady & Giglio material for witnessing at penalty phase of trial referred to: Judge Robert D. Potter (jlk) [Entry date 10/02/97] |
| 10/02/97 | 112 | | MOTION by Aquilia Marcivicci Barnette for Bill of Particulars with respect to notice of intent to seek the death penalty referred to: Judge Robert D. Potter (jlk) [Entry date 10/02/97] |
| 10/03/97 | 113 | | ORDER as to Aquilia Marcivicci Barnette, Response to Motion reset to 10/10/97 for USA for [111-1] motion for Discovery of statements and Brady & Giglio material for witnessing at penalty phase of trial (Signed by Judge Robert D. Potter ) (jlk) [Entry date 10/03/97] |
| 10/03/97 | 114 | | ORDER as to Aquilia Marcivicci Barnette, Response to Motion reset to 10/10/97 for USA for [112-1] motion for Bill of Particulars with respect to notice of intent to seek the death penalty ( Signed by Judge Robert D. |

Case 3:12-cv-00327-MOC Document 99 Filed 09/23/15 Page 23 of 200

13

**JA837**

| | | | |
|---|---|---|---|
| | | | Potter ) (jlk) [Entry date 10/03/97] |
| 10/03/97 | 115 | | RESPONSE by USA as to Aquilia Marcivicci Barnette re [104-1] motion for the last argument by defense (jlk) [Entry date 10/03/97] |
| 10/03/97 | 116 | | RESPONSE by USA as to Aquilia Marcivicci Barnette re [106-1] motion for Discovery (jlk) [Entry date 10/03/97] |
| 10/03/97 | 117 | | RESPONSE by USA as to Aquilia Marcivicci Barnette re [105-1] motion to direct the govt. to refer to life w/o the possibility of release throughout the trial (jlk) [Entry date 10/06/97] |
| 10/06/97 | 118 | | Amendment by Aquilia Marcivicci Barnette re: [112-1] motion for Bill of Particulars with respect to notice of intent to seek the death penalty (jlk) [Entry date 10/06/97] |
| 10/07/97 | -- | | TRANSCRIPT filed in case as to Aquilia Marcivicci Barnette for dates of 9/29/97 Crt Rptr: Scott Huseby (jlk) [Entry date 10/07/97] |
| 10/08/97 | 119 | | ORDER as to Aquilia Marcivicci Barnette, Motion Hearing set for 9:30 10/21/97 for Aquilia Marcivicci Barnette for [81-1] motion to Preclude the consideration of the victim impact statements at the penalty phase of this matter before Judge Robert D. Potter, set for 9:30 10/21/97 for Aquilia Marcivicci Barnette for [79-1] motion to declare title 18 USC 3593(a)(2) unconstitutional as applied to death penalty sentencing proceedings before Judge Robert D. Potter, set for 9:30 10/21/97 for Aquilia Marcivicci Barnette for [78-1] motion to require a pretrial judicial review of all victim impact evidence the govt. intends to introduce at the capital sentencing proceedings before Judge Robert D. Potter, set for 9:30 10/21/97 for Aquilia Marcivicci Barnette for [77-1] motion to bar the admission of victim impact evidence as fundamentally unfair and violative of due process before Judge Robert D. Potter, set for 9:30 10/21/97 for Aquilia Marcivicci Barnette for [76-1] motion to Preclude the intoduction of victim impact evidence pertaining to the victims family members' characterizations and opinions about the crime, deft., and/or the appropriate sentence before Judge Robert D. Potter ( Signed by Judge Robert D. Potter ) (jlk) [Entry date 10/09/97] |
| 10/08/97 | 120 | | ORDER as to Aquilia Marcivicci Barnette, as to the Juror Questionnaire ( Signed by Judge Robert D. Potter ) (jlk) [Entry date 10/09/97] |
| 10/08/97 | 121 | | ORDER as to Aquilia Marcivicci Barnette granting in part, denying in part [72-1] additional proposed jury questions as to Aquilia Marcivicci Barnette (1); the Court will consider any suggestions or objections to these proposed questions at the next hearing. ( Signed by Judge Robert D. Potter) (jlk) [Entry date 10/09/97] |
| 10/09/97 | 122 | | ORDER as to Aquilia Marcivicci Barnette (follows oral order denying [33-1] motion to Suppress statements of Defendant as to Aquilia Marcivicci Barnette (1) entered 9/29/97 ) ( Signed by Judge Robert D. Potter ) (jlk) [Entry date 10/09/97] |

JA838

| | | | |
|---|---|---|---|
| 10/09/97 | 123 | | ORDER as to Aquilia Marcivicci Barnette granting [88-1] motion to handle Baston vs. Kentucky Challenges as to Aquilia Marcivicci Barnette (1) ( Signed by Judge Robert D. Potter ) (jlk) [Entry date 10/09/97] |
| 10/09/97 | 124 | | ORDER as to Aquilia Marcivicci Barnette granting [87-1] motion to have Court Reporter designate race and gender of potential jurors as to Aquilia Marcivicci Barnette (1) ( Signed by Judge Robert D. Potter ) (jlk) [Entry date 10/09/97] |
| 10/09/97 | 125 | | ORDER as to Aquilia Marcivicci Barnette granting [89-1] motion for daily transcripts of trial testimony at both guilt, innocence and penalty phase as to Aquilia Marcivicci Barnette (1) ( Signed by Judge Robert D. Potter ) (jlk) [Entry date 10/09/97] |
| 10/09/97 | 126 | | ORDER as to Aquilia Marcivicci Barnette granting [102-1] motion EX PARTE MOTION re: records as to Aquilia Marcivicci Barnette (1) ( Signed by Judge Robert D. Potter ) (jlk) [Entry date 10/09/97] |
| 10/09/97 | 127 | | RESPONSE by USA as to Aquilia Marcivicci Barnette re [112-1] motion for Bill of Particulars with respect to notice of intent to seek the death penalty (sdc) [Entry date 10/09/97] |
| 10/09/97 | 128 | | RESPONSE by USA as to Aquilia Marcivicci Barnette re [111-1] motion for Discovery of statements and Brady & Giglio material for witnessing at penalty phase of trial (sdc) [Entry date 10/09/97] |
| 10/10/97 | 129 | | ORDER as to Aquilia Marcivicci Barnette granting [90-1] motion to permit defense counsel to question potential jurors challenged for cause by the government as to Aquilia Marcivicci Barnette (1) ( Signed by Judge Robert D. Potter ) (jlk) [Entry date 10/10/97] |
| 10/14/97 | 130 | | ORDER as to Aquilia Marcivicci Barnette denying [91-1] motion to prohibit government from "death qualifying" the jury as to Aquilia Marcivicci Barnette (1) ( Signed by Judge Robert D. Potter ) (jlk) [Entry date 10/14/97] |
| 10/15/97 | 131 | | ORDER as to Aquilia Marcivicci Barnette [73-1] proposed jury instructions is deferred until 10/21/97 as to Aquilia Marcivicci Barnette (1) (Signed by Judge Robert D. Potter ) (jlk) [Entry date 10/15/97] |
| 10/16/97 | 132 | | SUPPLEMENTAL ORDER as to Aquilia Marcivicci Barnette, Motion Hearing set for 9:30 10/21/97 for Aquilia Marcivicci Barnette for [106-1] motion for Discovery before Judge Robert D. set for 9:30 10/21/97 for Aquilia Marcivicci Barnette for [111-1] motion for Discovery of statements and Brady & Giglio material for witnessing at penalty phase of trial before Judge Robert D. Potter, set for 9:30 10/21/97 for Aquilia Marcivicci Barnette for [112-1/118-1] motion for Bill of Particulars with respect to notice of intent to seek the death penalty before Judge Robert D. Potter ( Signed by Judge Robert D. Potter ) (jlk) [Entry date 10/16/97] |
| | | | |

Case 3:12-cv-00327-MOC   Document 99   Filed 09/23/15   Page 25 of 200

**JA839**

| 10/16/97 | 133 | | ORDER as to Aquilia Marcivicci Barnette denying [104-1] motion for the last argument by defense as to Aquilia Marcivicci Barnette (1) ( Signed by Judge Robert D. Potter ) (jlk) [Entry date 10/16/97] |
|---|---|---|---|
| 10/16/97 | 134 | | ORDER as to Aquilia Marcivicci Barnette granting [103-1] motion for a court instruction to the jury that life w/o the possibility of release means what is says as to Aquilia Marcivicci Barnette (1) ( Signed by Judge Robert D. Potter ) (jlk) [Entry date 10/16/97] |
| 10/16/97 | 135 | | ORDER as to Aquilia Marcivicci Barnette denying [105-1] motion to direct the govt. to refer to life w/o the possibility of release throughout the trial as to Aquilia Marcivicci Barnette (1) ( Signed by Judge Robert D. Potter ) (jlk) [Entry date 10/16/97] |
| 10/17/97 | 136 | | RESPONSE by Aquilia Marcivicci Barnette to [121-1] order Re: Voir Dire (jlk) [Entry date 10/20/97] |
| 10/17/97 | 137 | | MOTION by Aquilia Marcivicci Barnette to Extend Time to file pretrial motions referred to: Judge Robert D. Potter (jlk) [Entry date 10/20/97] |
| 10/17/97 | 138 | | MOTION by Aquilia Marcivicci Barnette to Strike [61-1] statutory mental state factors and aggravating factors from Govt's notice of intent to seek death penalty referred to: Judge Robert D. Potter (jlk) [Entry date 10/20/97] |
| 10/17/97 | 139 | | MOTION by Aquilia Marcivicci Barnette to Strike [61-1] non-statutory aggravating factors from notice of intent to seek death penalty by USA referred to: Judge Robert D. Potter (jlk) [Entry date 10/20/97] |
| 10/17/97 | 140 | | ORDER as to Aquilia Marcivicci Barnette granting [94-1] motion to Compel govt. to disclose whether it intends to offer evidence under 803 (24), 804(b)(5) & 404(b) as to Aquilia Marcivicci Barnette (1) ( Signed by Judge Robert D. Potter ) (jlk) [Entry date 10/20/97] |
| 10/17/97 | 141 | | ORDER as to Aquilia Marcivicci Barnette denying [93-1] motion in Limine to disclose prior criminal records of all govt. witnesses as to Aquilia Marcivicci Barnette (1), denying [95-1] motion for an order requiring the the govt. to disclose full nature and extent of consideration offered to or sought by the govt. or its agents on behalf of informants or jailhouse "snitches" as to Aquilia Marcivicci Barnette (1), denying [96-1] motion to reveal grant of immunity or other concessions as to Aquilia Marcivicci Barnette (1) ( Signed by Judge Robert D. Potter ) (jlk) [Entry date 10/20/97] |
| 10/20/97 | 142 | | ORDER as to Aquilia Marcivicci Barnette, for Hearing on the Deft's Response to the lastest voir dire order; hrg. is set for 10/24/97 at 1:30 p.m. ( Signed by Judge Robert D. Potter ) (jlk) [Entry date 10/20/97] |
| 10/20/97 | 143 | | ORDER as to Aquilia Marcivicci Barnette granting [137-1] motion to Extend Time to file pretrial motions until 11/17/97 at 3:00 p.m. as to Aquilia Marcivicci Barnette (1); Govt. shall have until 11/26/97 at 12:00 |

| | | | |
|---|---|---|---|
| | | | noon to file any response to Deft's motions. ( Signed by Judge Robert D. Potter) (jlk) [Entry date 10/20/97] |
| 10/20/97 | 144 | | ORDER as to Aquilia Marcivicci Barnette, Response to Motion reset to 2:00 10/31/97 for USA for [138-1] motion to Strike [61-1] statutory mental state factors and aggravating factors from Govt's notice of to seek death penalty, reset to 2:00 10/31/97 for USA for [139-1] motion to Strike [61-1] non-statutory aggravating factors from notice of intent to seek death penalty by USA ( Signed by Judge Robert D. Potter ) (jlk) [Entry date 10/20/97] |
| 10/21/97 | 145 | | ORDER as to Aquilia Marcivicci Barnette, Motion Hearing set for 1:30 10/24/97 for Aquilia Marcivicci Barnette for [98-1] motion to Suppress Court Identification to be made by Benjamin Spencer Greene, aka Benny before Judge Robert D. Potter, set for 1:30 10/24/97 for Aquilia Marcivicci Barnette for [99-1] motion to Suppress prior convictions before Judge Robert D. Potter, set for 1:30 10/24/97 for Aquilia Marcivicci Barnette for [100-1] motion for Early Production of Jencks Material before Judge Robert D. Potter ( Signed by Judge Robert D. Potter ) (jlk) [Entry date 10/21/97] |
| 10/23/97 | 146 | | Brief and MEMORANDUM by USA as to Aquilia Marcivicci Barnette in support of Voir Dire questioning of prospective jurors. (jlk) [Entry date 10/23/97] |
| 10/23/97 | 147 | | RESPONSE by USA as to Aquilia Marcivicci Barnette re [76-1] motion to Preclude the intoduction of victim impact evidence pertaining to the victims family members' characterizations and opinions about the crime, deft., and/or the appropriate sentence, [81-1] motion to Preclude the consideration of the victim impact statements at the penalty phase of this matter (jlk) [Entry date 10/24/97] |
| 10/24/97 | 148 | | MOTION by Aquilia Marcivicci Barnette in Limine referred to: Judge Robert D. Potter (srg) [Entry date 10/24/97] |
| 10/24/97 | -- | | Motion Hearing held as to Aquilia Marcivicci Barnette re: Motions. Court will file Order as to pending Motions. Attys to file proposed Jury procedure issues. Court adjourns at 4:30 p. m. until 10/27/97. Judge: RDP Court Rptr: Christine Taylor/Huseby (srg) [Entry date 10/24/97] |
| 10/27/97 | 149 | | ORDER as to Aquilia Marcivicci Barnette denying as moot [106-1] motion for Discovery as to Aquilia Marcivicci Barnette (1); it is further ordered that the lab analysis, photographs, and other discoverable evidence arising from the fire bombing and murder be made available to defense counsel when received and that the govt. make every effort to obtain that evidence. Signed by Judge Robert D. Potter ) (jlk) [Entry date 10/28/97] |
| 10/27/97 | 150 | | ORDER as to Aquilia Marcivicci Barnette denying [118-1] [112-1] motion for Bill of Particulars with respect to notice of intent to seek the death penalty as to Aquilia Marcivicci Barnette (1) and denying [111-1] motion for Discovery of statements and Brady & Giglio material for |

Case 3:12-cv-00327-MOC Document 99 Filed 09/23/15 Page 27 of 200

17

JA841

| | | | |
|---|---|---|---|
| | | | witnessing at penalty phase of trial as to Aquilia Marcivicci Barnette ( Signed by Judge Robert D. Potter ) (jlk) [Entry date 10/28/97] |
| 10/27/97 | 151 | | Proposed Courtroom Orientation and Jury Selection Procedure by USA as to Aquilia Marcivicci Barnette (jlk) [Entry date 10/28/97] |
| 10/28/97 | 152 | | ORDER as to Aquilia Marcivicci Barnette granting [92-1] motion to prohibit govt. from peremptorily excusing jurors on the basis of race as to Aquilia Marcivicci Barnette (1) ( Signed by Judge Robert D. Potter ) (jlk) [Entry date 10/28/97] |
| 10/28/97 | 153 | | ORDER as to Aquilia Marcivicci Barnette denying [76-1] motion to Preclude the intoduction of victim impact evidence pertaining to the victims family members' characterizations and opinions about the crime, deft., and/or the appropriate sentence as to Aquilia Marcivicci Barnette (1), denying [77-1] motion to bar the admission of victim impact evidence as fundamentally unfair and violative of due process as to Aquilia Marcivicci Barnette (1), denying [79-1] motion to declare title 18 USC 3593(a)(2) unconstitutional as applied to death penalty sentencing proceedings as to Aquilia Marcivicci Barnette (1) ( Signed by Judge Robert D. Potter ) (jlk) [Entry date 10/29/97] |
| 10/28/97 | 154 | | ORDER as to Aquilia Marcivicci Barnette granting [78-1] motion to require a pretrial judicial review of all victim impact evidence the govt. intends to introduce at the capital sentencing proceedings as to Aquilia Marcivicci Barnette (1), granting [81-1] motion to Preclude the consideration of the victim impact statements at the penalty phase of this matter as to Aquilia Marcivicci Barnette (1) ( Signed by Judge Robert D. Potter ) (jlk) [Entry date 10/29/97] |
| 10/29/97 | 155 | | ORDER as to Aquilia Marcivicci Barnette denying [99-1] motion to Suppress four prior convictions as to Aquilia Marcivicci Barnette (1) ( Signed by Judge Robert D. Potter ) (jlk) [Entry date 10/29/97] |
| 10/31/97 | 156 | | OBJECTION and RESPONSE by Aquilia Marcivicci Barnette in opposition to [151-1] proposed jury instructions and jury selection procedure. (sdc) [Entry date 10/31/97] |
| 10/31/97 | 157 | | RENEWAL OF MOTION by Aquilia Marcivicci Barnette for Disclosure of witnesses to be offered by the govt. who may be considered "snitches" or cooperating witnesses referred to: Judge Robert D. Potter (sdc) [Entry date 10/31/97] |
| 10/31/97 | 158 | | RESPONSE by USA as to Aquilia Marcivicci Barnette re [138-1] motion to Strike [61-1] statutory mental state factors and aggravating factors from Govt's notice of intent to seek death penalty, [139-1] motion to Strike [61-1] non-statutory aggravating factors from notice of intent to seek death penalty by USA (sdc) [Entry date 10/31/97] |
| 11/05/97 | 159 | | MOTION by USA as to Aquilia Marcivicci Barnette for Pretrial Psychiatric or Psychological Examaninations referred to: Judge Robert D. Potter (jlk) [Entry date 11/05/97] |

| | | | |
|---|---|---|---|
| 11/05/97 | 160 | | ORDER as to Aquilia Marcivicci Barnette denying [139-1] motion to Strike [61-1] non-statutory aggravating factors from notice of intent to seek death penalty by USA as to Aquilia Marcivicci Barnette (1) ( Signed by Judge Robert D. Potter ) (jlk) [Entry date 11/05/97] [Edit date 11/05/97] |
| 11/05/97 | 161 | | ORDER as to Aquilia Marcivicci Barnette granting [159-1] motion for Pretrial Psychiatric or Psychological Examaninations as to Aquilia Marcivicci Barnette (1); the Deft. is hereby committed to the custody of the Atty. General to be placed in a facility for the purposes of exam; the time period for the exam shall be calculatd to begin upon the Deft's arrival at the designated institution; the report of the results of the exam shall be filed w/the Court and copies given to the Defense and the USA. ( Signed by Judge Robert D. Potter ) (jlk) [Entry date 11/05/97] |
| 11/05/97 | 162 | | ORDER as to Aquilia Marcivicci Barnette, Response to Motion reset to 4:00 11/12/97 for USA for [157-1] motion for Disclosure of witnesses to be offered by the govt. who may be considered "snitches" or cooperating witnesses; Govt. must inform the Court first whether the govt. intends to call any informants and/or snitches who could possibly create a conflict, and second whether the govt. agrees that a hrg. is necessary. ( Signed by Judge Robert D. Potter ) (jlk) [Entry date 11/05/97] |
| 11/07/97 | 163 | | RESPONSE by Aquilia Marcivicci Barnette to [159-1] motion for Pretrial Psychiatric or Psychological Examaninations (jlk) [Entry date 11/07/97] |
| 11/07/97 | 164 | | CJA 31 as to Aquilia Marcivicci Barnette Authorization to Pay (Sealed Info.) $ (Sealed Info.) for Expert Services Voucher D026457 ( Signed by Judge Robert D. Potter ) (jlk) [Entry date 11/07/97] |
| 11/10/97 | 165 | | MOTION by Aquilia Marcivicci Barnette EX PARTE MOTION re: records (jlk) [Entry date 11/10/97] |
| 11/10/97 | 166 | | MOTION by Aquilia Marcivicci Barnette EX PARTE MOTION re: investigator (jlk) [Entry date 11/10/97] |
| 11/12/97 | 167 | | ORDER as to Aquilia Marcivicci Barnette denying [138-1] motion to Strike [61-1] statutory mental state factors and aggravating factors from Govt's notice of intent to seek death penalty as to Aquilia Marcivicci Barnette (1) ( Signed by Judge Robert D. Potter ) (jlk) [Entry date 11/12/97] |
| 11/12/97 | 168 | | ORDER as to Aquilia Marcivicci Barnette, Response to Motion reset to 11/19/97 for USA RE: [148-1] motion in Limine ( Signed by Judge Robert D. ) (jlk) [Entry date 11/12/97] |
| 11/12/97 | 169 | | SEALED ORDER as to Aquilia Marcivicci Barnette granting [165-1] motion EX PARTE MOTION re: records as to Aquilia Marcivicci Barnette (1) (Signed by Judge Robert D. Potter ) (jlk) [Entry date 11/12/97] |

Case 3:12-cv-00327-MOC   Document 99   Filed 09/23/15   Page 29 of 200

**19**

**JA843**

| | | | |
|---|---|---|---|
| 11/12/97 | 170 | | RESPONSE by USA as to Aquilia Marcivicci Barnette RE: Order [162-1] & [157-1] motion for Disclosure of witnesses to be offered by the govt. who may be considered "snitches" or cooperating witnesses (jlk) [Entry date 11/12/97] |
| 11/12/97 | 171 | | SEALED ORDER as to Aquilia Marcivicci Barnette granting [166-1] motion EX PARTE MOTION re: investigator as to Aquilia Marcivicci Barnette (1) ( Signed by Judge Robert D. Potter (jlk) [Entry date 11/12/97] |
| 11/12/97 | 172 | | ORDER as to Aquilia Marcivicci Barnette denying [163-1] response to motion for pretrial exam. or psychiatric exam. and denying the request to allow counsel to w/d any reference to insanity in the March 26, 1997 Notice; Govt. shall report no later than 11/19/97 the status of the Deft's pysch. exam. and the expected date of his return as to Aquilia Marcivicci Barnette (1), ( Signed by Judge Robert D. Potter ) (jlk) [Entry date 11/12/97] |
| 11/13/97 | 173 | | ORDER as to Aquilia Marcivicci Barnette denying [157-1] motion for Disclosure of witnesses to be offered by the govt. who may be considered "snitches" or cooperating witnesses as to Aquilia Marcivicci Barnette (1) ( Signed by Judge Robert D. Potter ) (jlk) [Entry date 11/13/97] |
| 11/14/97 | 174 | | ORDER as to Aquilia Marcivicci Barnette granting in part, denying in part [151-1] Proposed Instructions of Jury and Courtroom Orientation & Jury Selection Procedure as to Aquilia Marcivicci Barnette (1) granting in part, denying in part [156-1] Objections & opposition response as to Aquilia Marcivicci Barnette (1) (SEE ORDER FOR DETAILS) ( Signed by Judge Robert D. Potter ) (jlk) [Entry date 11/14/97] |
| 11/14/97 | 175 | | Request for reciprocal discovery by USA as to Aquilia Marcivicci Barnette (jlk) [Entry date 11/14/97] |
| 11/14/97 | 176 | | MOTION by USA as to Aquilia Marcivicci Barnette to Compel Production and Discovery of the Defendant's prior psychiatric evaluation referred to: Judge Robert D. Potter (jlk) [Entry date 11/14/97] |
| 11/17/97 | 177 | | ORDER as to Aquilia Marcivicci Barnette, Reply/Objection to Preliminary Jury Instructions deadline is set no later than 11/25/97 at 4:00 p.m. ( Signed by Judge Robert D. Potter ) (jlk) [Entry date 11/17/97] |
| 11/17/97 | 178 | | ORDER as to Aquilia Marcivicci Barnette, set Jury Selection to begin at 9:30 1/5/98; 2:00 1/5/98; 9:30 1/6/98; 2:00 1/6/98; 9:30 1/7/98 & 2:00 1/7/98 for Aquilia Marcivicci Barnette; Clerk shall summon 50 jurors for each session; any Reply/Objections to the Jury Questionnaire shall be not later than 11/26/97 at 4:00 p.m.; final objections to the Jury Questionnaire shall be filed not later than 12/10/97; Clerk shall complete the preparation of the 325 copies of the questionnaire not later than 12/16/97 and have them available for Court personnel on 1/5/98 thru 1/7/98. ( Signed by Judge Robert D. Potter ) (jlk) [Entry date 11/17/97] |

| | | | |
|---|---|---|---|
| 11/17/97 | 179 | | CJA 31 as to Aquilia Marcivicci Barnette Authorization to Pay (Sealed info.) $ (Sealed info.) for Expert Services Voucher # d026456 ( Signed by Judge Robert D. Potter ) (jlk) [Entry date 11/17/97] [Edit date 11/17/97] |
| 11/17/97 | 180 | | SEALED MOTION by Aquilia Marcivicci Barnette EX PARTE MOTION re: expert (jlk) [Entry date 11/17/97] |
| 11/17/97 | 181 | | MOTION by Aquilia Marcivicci Barnette allowing the Deft. to be dressed in civilian clothes during jury selection and the trial referred to: Judge Robert D. Potter (jlk) [Entry date 11/17/97] |
| 11/18/97 | 182 | | RESPONSE by USA to the Court's order [172-1] regarding the status of the defendant's psychiatric examination and expected return of Aquilia Marcivicci Barnette (jlk) [Entry date 11/19/97] |
| 11/18/97 | 183 | | RESPONSE and memorandum of law by USA as to Aquilia Marcivicci Barnette in opposition to [148-1] motion in Limine (jlk) [Entry date 11/19/97] |
| 11/18/97 | 184 | | ORDER as to Aquilia Marcivicci Barnette granting [181-1] motion allowing the Deft. to be dressed in civilian clothes during jury selection and trial as to Aquilia Marcivicci Barnette (1) ( Signed by Judge Robert D. Potter ) (jlk) [Entry date 11/19/97] |
| 11/19/97 | 185 | | WRIT of Habeas Corpus ad Prosequendum executed as to Aquilia Marcivicci Barnette on 11/18/97 (jlk) [Entry date 11/20/97] |
| 11/20/97 | 186 | | MOTION by Aquilia Marcivicci Barnette to Amend [172-1] order for psychiatric examination in compliance with U.S. vs. Beckford referred to: Judge Robert D. Potter (jlk) [Entry date 11/20/97] |
| 11/20/97 | 187 | | RESPONSE by Aquilia Marcivicci Barnette to [176-1] motion to Compel Production and Discovery of the Defendant's prior psychiatric evaluation (jlk) [Entry date 11/20/97] |
| 11/21/97 | 188 | | ORDER as to Aquilia Marcivicci Barnette, Motion Hearing set for 9:30 11/26/97 for Aquilia Marcivicci Barnette for [176-1] motion to Compel Production and Discovery of the Defendant's prior psychiatric evaluation before Judge Robert D. Potter, set for 9:30 11/26/97 for Aquilia Marcivicci Barnette for [186-1] motion to Amend [172-1] order for psychiatric examination in compliance with U.S. vs. Beckford before Judge Robert D. Potter; Court notes that the Deft. will not be present for this hrg., therefore, if Defense counsel objects to a hrg. w/o the Deft., the Court will rule on these matters w/o a hrg. ( Signed by Judge Robert D. Potter ) (jlk) [Entry date 11/21/97] |
| 11/21/97 | -- | | TRANSCRIPT filed in case as to Aquilia Marcivicci Barnette for dates of 10/24/97 Crt Rptr: Christine Taylor (jlk) [Entry date 11/21/97] |

Case 3:12-cv-00327-MOC   Document 99   Filed 09/23/15   Page 31 of 200

**21**

**JA845**

| | | | |
|---|---|---|---|
| 11/21/97 | 189 | | CJA 30 as to Aquilia Marcivicci Barnette Authorization to Pay George Laughrun, II $ (Sealed Info.) Voucher # D021062 ( Signed by Judge Robert D. Potter ) (jlk) [Entry date 11/24/97] |
| 11/24/97 | 190 | | ORDER as to Aquilia Marcivicci Barnette denying [148-1] motion in Limine as to Aquilia Marcivicci Barnette (1) ( Signed by Judge Robert D. Potter ) (jlk) [Entry date 11/24/97] |
| 11/24/97 | 191 | | MOTION by Aquilia Marcivicci Barnette EX PARTE MOTION re: case budget (jlk) [Entry date 11/24/97] |
| 11/25/97 | 192 | | MEMORANDUM/Brief by USA as to Aquilia Marcivicci Barnette RE: [188-1] order Motion Hearing set for 9:30 11/26/97 for Aquilia Marcivicci Barnette for [176-1] motion to Compel Production and Discovery of the Defendant's prior psychiatric evaluation before Judge Robert D. Potter, set for 9:30 11/26/97 for Aquilia Marcivicci Barnette for [186-1] motion to Amend [172-1] order for psychiatric examination in compliance with U.S. vs. Beckford before Judge Robert D. Potter (jlk) [Entry date 11/25/97] |
| 11/25/97 | 193 | | RESPONSE by Aquilia Marcivicci Barnette in support of [177-1] order Reply/Objection to Preliminary Jury Instructions (sdc) [Entry date 11/25/97] |
| 11/25/97 | 194 | | RESPONSE by Aquilia Marcivicci Barnette in support of [178-1] order re: jury questionnaire (sdc) [Entry date 11/25/97] |
| 11/26/97 | -- | | Motion Hearing held as to Aquilia Marcivicci Barnette re: [186-1] motion to Amend [172-1] order for psychiatric examination in compliance with U.S. vs. Beckford, [176-1] motion to Compel Production and Discovery of the Defendant's prior psychiatric evaluation. Argument presented to Court by cnsl for both parties. Court will file Order as to pending motions. Judge: R. D. Potter Court Rptr: Scott Huseby (crl) [Entry date 11/26/97] |
| 11/26/97 | 195 | | RESPONSE by USA as to Aquilia Marcivicci Barnette to to cases cited by dft 11/26/97 re: psychiatric examination (bsw) [Entry date 12/01/97] |
| 11/26/97 | 196 | | MEMORANDUM/RESPONSE by USA as to Aquilia Marcivicci Barnette RE: [188-1] order and to Court's inquiry concerning the Defendant's psychiatric examination at FCI Butner. (jlk) [Entry date 12/02/97] |
| 12/02/97 | 197 | | MEMORANDUM/RESPONSE by USA as to Aquilia Marcivicci Barnette's [193-1] response to the Court's preliminary instructions to the jury. (jlk) [Entry date 12/02/97] |
| 12/02/97 | 198 | | MEMORANDUM/RESPONSE by USA as to Aquilia Marcivicci Barnette's [194-1] response to the Court's proposed jury questionnaire. (jlk) [Entry date 12/02/97] |

Case 3:97-cr-00237-MOC   Document 99   Filed 09/23/15   Page 32 of 299

**22**

**JA846**

| | | | | |
|---|---|---|---|---|
| 12/03/97 | 199 | | | ORDER as to Aquilia Marcivicci Barnette denying [192-1] memorandum by Aquilia Marcivicci Barnette (1) that the Court deny the Govt's motion for pretrial psychiatric exam.; granting [186-1] motion to Amend [172-1] order for psychiatric examination in compliance with U.S. vs. Beckford as to Aquilia Marcivicci Barnette (1); granting [176-1] motion to Compel Production and Discovery of the Defendant's prior psychiatric evaluation as to Aquilia Marcivicci Barnette; Deft. shall deliver that report UNDER SEAL to the Clerk not later than 12/8/97 at 12:00 noon; Clerk shall immediately forward report UNDER SEAL to Dr. Sally Johnson at FCI Butner by way of Federal Express Mail or any other overnight mail service; granting Govt. request [192-1] for exam. of deft. by another health professional in addition to exam. in Butner. ( Signed by Judge Robert D. Potter ) (jlk) [Entry date 12/03/97] |
| 12/03/97 | 200 | | | CJA 30 as to Aquilia Marcivicci Barnette Authorization to Pay Paul Williams $ (sealed info.) Voucher # d021072 ( Signed by Judge Robert D. Potter ) (jlk) [Entry date 12/03/97] [Edit date 12/03/97] |
| 12/04/97 | 201 | | | MOTION by Aquilia Marcivicci Barnette EX PARTE MOTION re: records (jlk) [Entry date 12/04/97] |
| 12/05/97 | 202 | | | ORDER as to Aquilia Marcivicci Barnette granting [201-1] motion EX PARTE MOTION re: records as to Aquilia Marcivicci Barnette (1) ( Signed by Judge Robert D. Potter ) (jlk) [Entry date 12/05/97] |
| 12/08/97 | 203 | | | ORDER as to Aquilia Marcivicci Barnette granting [175-1] Request for reciprocal discovery as to Aquilia Marcivicci Barnette (1) ( Signed by Judge Robert D. Potter ) (jlk) [Entry date 12/08/97] |
| 12/08/97 | 204 | | | SEALED NOTICE by Aquilia Marcivicci Barnette of the report and documents to be tendered per court order (No. 199) as to Aquilia Marcivicci Barnette. cc: Dr. Sally Johnson. (jlk) [Entry date 12/08/97] |
| 12/08/97 | 205 | | | SEALED ORDER as to Aquilia Marcivicci Barnette re: defense experts ( Signed by Judge Robert D. Potter ) (jlk) [Entry date 12/08/97] |
| 12/08/97 | 206 | | | SEALED ORDER as to Aquilia Marcivicci Barnette granting [180-1] motion EX PARTE MOTION re: expert as to Aquilia Marcivicci Barnette (1) (Signed by Judge Robert D. Potter ) (jlk) [Entry date 12/08/97] |
| 12/08/97 | 207 | | | Memorandum & ORDER as to Aquilia Marcivicci Barnette re: expert fees ( Signed by Judge Robert D. Potter ) (jlk) [Entry date 12/08/97] |
| 12/09/97 | 208 | | | ORDER as to Aquilia Marcivicci Barnette granting in part, denying in part [194-1] response to Court's Proposed Jury Questionnaire as to Aquilia Marcivicci Barnette (1) (Signed by Judge Robert D. Potter) (SEE ORDER FOR DETAILS) (jlk) [Entry date 12/09/97] |
| 12/09/97 | 209 | | | ORDER as to Aquilia Marcivicci Barnette granting in part, denying in part [193-1] Deft's responseto Court's Preliminary Instructions to Jury as |

Case 3:12-cv-00327-MOC   Document 99   Filed 09/23/15   Page 33 of 200

**23**

**JA847**

| | | | |
|---|---|---|---|
| | | | to Aquilia Marcivicci Barnette (1) & granting in part, denying in part [197-1] Govt's response to the Deft's Response to the Court's preliminary instructions to the Jury as to Aquilia Marcivicci Barnette (1) (Signed by Judge Robert D. Potter) (SEE ORDER FOR DETAILS) (jlk) [Entry date 12/09/97] |
| 12/09/97 | 210 | | CJA 31 as to Aquilia Marcivicci Barnette Authorization to Pay (Sealed info.) $ (Sealed info.) for Expert Services Voucher # d026456 ( Signed by Judge Robert D. Potter ) (jlk) [Entry date 12/09/97] |
| 12/09/97 | 211 | | AMENDED Proposed Courtroom Orientation and Jury Selection Procedure by USA as to Aquilia Marcivicci Barnette (jlk) [Entry date 12/09/97] |
| 12/10/97 | 212 | | NOTICE by Deft. of introduce mental health testimony at the penalty phase as to Aquilia Marcivicci Barnette (jlk) [Entry date 12/11/97] |
| 12/11/97 | 213 | | AMENDED ORDER as to Aquilia Marcivicci Barnette, Partially amending [174-1] order Re: voir dire (SEE ORDER FOR DETAILS) ( Signed by Judge Robert D. Potter ) (jlk) [Entry date 12/11/97] [Edit date 12/11/97] |
| 12/12/97 | 214 | | RESPONSE by Aquilia Marcivicci Barnette to [211-1] govt's amended proposed courtroom orientatation and jury selection procedure. (jlk) [Entry date 12/12/97] |
| 12/12/97 | 215 | | MOTION by Aquilia Marcivicci Barnette for Discovery of govt. experts and qualifications referred to: Judge Robert D. Potter (jlk) [Entry date 12/12/97] |
| 12/12/97 | 216 | | ORDER as to Aquilia Marcivicci Barnette granting [215-1] motion for Discovery of govt. experts and qualifications as to Aquilia Marcivicci Barnette (1); govt. shall comply not later than 12/19/97 at 4:00 p.m. ( Signed by Judge Robert D. Potter ) (jlk) [Entry date 12/12/97] |
| 12/15/97 | 217 | | NOTICE OF INTENT to Use Evidence pursuant to Fed. R. Evid. 807, Residual Exceptions by USA as to Aquilia Marcivicci Barnette (jlk) [Entry date 12/16/97] |
| 12/15/97 | 218 | | MEMORANDUM by USA as to Aquilia Marcivicci Barnette in support of notice of intent to use [217-1] evidence. (jlk) [Entry date 12/16/97] |
| 12/16/97 | 219 | | CJA 21 as to Aquilia Marcivicci Barnette Authorization to Pay (Sealed info.) $ (Sealed info.) for Expert Services Voucher # d026456 ( Signed by Judge Robert D. Potter ) (jlk) [Entry date 12/16/97] |
| 12/16/97 | 220 | | MOTION by Aquilia Marcivicci Barnette EX PARTE MOTION re: records (jlk) [Entry date 12/16/97] |
| | | | |

Case 3:12-cv-00327-MOC   Document 99   Filed 09/23/15   Page 34 of 200

24

JA848

| | | | |
|---|---|---|---|
| 12/16/97 | 221 | | ORDER as to Aquilia Marcivicci Barnette that the USM transport the Deft. back to this District on 12/19/97 ( Signed by Judge Robert D. Potter ) (jlk) [Entry date 12/16/97] |
| 12/16/97 | 222 | | SEALED ORDER as to Aquilia Marcivicci Barnette granting [220-1] motion EX PARTE MOTION re: records as to Aquilia Marcivicci Barnette (1) (Signed by Judge Robert D. Potter ) (jlk) [Entry date 12/16/97] |
| 12/19/97 | 223 | | MOTION by Aquilia Marcivicci Barnette EX PARTE MOTION re: subpoenas (jlk) [Entry date 12/19/97] |
| 12/19/97 | 224 | | MOTION by Aquilia Marcivicci Barnette to include all witnesses to be attached to jury questionnaire referred to: Judge Robert D. Potter (jlk) [Entry date 12/19/97] |
| 12/19/97 | 225 | | NOTICE OF INTENT to Use Evidence of other crimes, wrongs or acts pursuant to Rule 404(b) by USA as to Aquilia Marcivicci Barnette (jlk) [Entry date 12/19/97] |
| 12/19/97 | 226 | | MEMORANDUM by USA as to Aquilia Marcivicci Barnette in support of [225-1] notice to use evidence of prior acts of domestic abuse pursuant to rule 404(b) (jlk) [Entry date 12/19/97] |
| 12/19/97 | 227 | | RESPONSE & MEMORANDUM by Aquilia Marcivicci Barnette to [217-1] govt. notice of intent to use evidence pursuant to Fed. R. Evid. 807 residual exceptions. (jlk) [Entry date 12/19/97] |
| 12/19/97 | 228 | | MOTION by USA as to Aquilia Marcivicci Barnette to Compel examination and to Produce reports of expert's examinations, tests, documents and tangible things referred to: Judge Robert D. Potter (jlk) [Entry date 12/19/97] |
| 12/19/97 | 229 | | NOTICE by USA of expert testimony as to Aquilia Marcivicci Barnette (jlk) [Entry date 12/19/97] |
| 12/22/97 | 230 | | ORDER as to Aquilia Marcivicci Barnette granting [223-1] motion EX PARTE MOTION re: subpoenas as to Aquilia Marcivicci Barnette (1), Sealing ( Signed by Judge Robert D. Potter ) (bsw) [Entry date 12/22/97] |
| 12/22/97 | 231 | | ORDER as to Aquilia Marcivicci Barnette denying/overruling [214-1] opposition memorandum as to Gov's amd proposed courtrm orientation and jy selection procedure ( Signed by Judge Robert D. Potter ) (bsw) [Entry date 12/22/97] |
| 12/22/97 | 232 | | ORDER as to Aquilia Marcivicci Barnette granting [224-1] motion to include all witnesses to be attached to jury questionnaire as to Aquilia Marcivicci Barnette (1) ( Signed by Judge Robert D. Potter ) (bsw) [Entry date 12/22/97] |

Case 3:12-cv-00327-MOC   Document 99   Filed 09/23/15   Page 35 of 200

**25**

**JA849**

| 12/22/97 | 233 | | ORDER as to Aquilia Marcivicci Barnette, Clerk to Produce to dft's cnsl by 12/29/97 copy of indictmt and list of witnesses to be produced at trial ( Signed by Judge Robert D. Potter ) (bsw) [Entry date 12/22/97] |
|---|---|---|---|
| 12/22/97 | 234 | | ORDER as to Aquilia Marcivicci Barnette, Gov to Produce no later than 12/29/97 at 12:00 Noon a list of witnesses and place of abode to clerk ( Signed by Judge Robert D. Potter ) (bsw) [Entry date 12/22/97] |
| 12/22/97 | 235 | | ORDER as to Aquilia Marcivicci Barnette granting [228-1] motion to Compel examination as to Aquilia Marcivicci Barnette (1) - 1) Dft to submit to exam by Drs. Grand and Duncan on 12/29/97 2) results of such exam not be rls to prosecutors 3) Clerk to deliver sealed Reports from FCI Butner and Dr. Tyson to USMS for delivery to Drs. Duncan and Grant and shall be returned to Clerk upon completion of exam 4) Clerk shall maintain all reports under seal unless otherwise ordered by this court ( Signed by Judge Robert D. Potter ) (bsw) [Entry date 12/22/97] |
| 12/22/97 | 236 | | ORDER as to Aquilia Marcivicci Barnette, re: copy of prelim instructions as to venire of jury ( Signed by Judge Robert D. Potter ) (bsw) [Entry date 12/22/97] |
| 12/22/97 | 238 | | MEMORANDUM by Aquilia Marcivicci Barnette and objection to [236-1] order re: copy of prelim instructions as to venire of jury (jlk) [Entry date 12/23/97] |
| 12/22/97 | 239 | | RESPONSE by Aquilia Marcivicci Barnette to [225-1] Notice to use 404 (b) evidence and motion to restrict use of rule 404(b) evidence. (jlk) [Entry date 12/23/97] |
| 12/22/97 | 240 | | MOTION by Aquilia Marcivicci Barnette to Sever Counts 1, 2, 3, 4, 5, 6, 9, 10 & 11 from Counts 7 & 8 referred to: Judge Robert D. Potter (jlk) [Entry date 12/23/97] |
| 12/22/97 | 241 | | RESPONSE by Aquilia Marcivicci Barnette to [228-1] motion to Compel examination and [235-1] court order (jlk) [Entry date 12/23/97] |
| 12/23/97 | 237 | | MOTION by Aquilia Marcivicci Barnette EX PARTE MOTION re: records (jlk) [Entry date 12/23/97] |
| 12/29/97 | 242 | | Witness list by USA as to Aquilia Marcivicci Barnette (jlk) [Entry date 12/29/97] |
| 12/29/97 | 243 | | Witness list by Aquilia Marcivicci Barnette (jlk) [Entry date 12/29/97] |
| 12/30/97 | 244 | | SEALED ORDER as to Aquilia Marcivicci Barnette granting [237-1] motion EX PARTE MOTION re: records as to Aquilia Marcivicci Barnette (1) (Signed by Judge Robert D. Potter) (jlk) [Entry date 12/30/97] |
| | | | |

**JA850**

| | | | |
|---|---|---|---|
| 12/30/97 | 245 | | MOTION by USA as to Aquilia Marcivicci Barnette to supplement and amend the govt. witness list referred to: Judge Robert D. Potter (jlk) [Entry date 12/30/97] |
| 12/30/97 | 246 | | Amended Witness list by USA as to Aquilia Marcivicci Barnette (jlk) [Entry date 12/30/97] |
| 12/30/97 | 247 | | ORDER as to Aquilia Marcivicci Barnette granting [238-1] Objections to the preliminary instructions to the entire venire by Aquilia Marcivicci Barnette ( Signed by Judge Robert D. Potter ) (jlk) [Entry date 12/30/97] |
| 12/30/97 | 248 | | ORDER as to Aquilia Marcivicci Barnette granting [245-1] motion to supplement and amend the govt. witness list as to Aquilia Marcivicci Barnette (1) ( Signed by Judge Robert D. Potter ) (jlk) [Entry date 12/30/97] |
| 12/30/97 | 249 | | ORDER as to Aquilia Marcivicci Barnette denying [240-1] motion to Sever Counts 1, 2, 3, 4, 5, 6, 9, 10 & 11 from Counts 7 & 8 as to Aquilia Marcivicci Barnette (1) ( Signed by Judge Robert D. Potter ) (jlk) [Entry date 12/30/97] |
| 12/30/97 | 250 | | RETURN OF SERVICE Executed by USM as to Aquilia Marcivicci Barnette 11/17/97 served with Order for psych. examination (jlk) [Entry date 12/31/97] |
| 12/31/97 | 251 | | MOTION by Aquilia Marcivicci Barnette to prohibit court from exercising jury excuses w/o presence of the Deft. and his counsel referred to: Judge Robert D. Potter (jlk) [Entry date 12/31/97] |
| 12/31/97 | 252 | | ORDER as to Aquilia Marcivicci Barnette denying [239-1] Deft's opposition and motion to restrict use of Rule 404(b) evidence as to Aquilia Marcivicci Barnette (1) ( Signed by Judge Robert D. Potter ) (jlk) [Entry date 12/31/97] |
| 12/31/97 | 253 | | ORDER as to Aquilia Marcivicci Barnette granting [251-1] motion to prohibit court from exercising jury excuses w/o presence of the Deft. and his counsel, however, the Clerk's office may have routinely excused some potential jurors on the grounds of age, disability or illness as to Aquilia Marcivicci Barnette (1) ( Signed by Judge Robert D. Potter ) (jlk) [Entry date 12/31/97] |
| 01/05/98 | 254 | | SEALED ORDER as to Aquilia Marcivicci Barnette making attached letter a part of the record ( Signed by Judge Robert D. Potter ) (jlk) [Entry date 01/05/98] |
| 01/05/98 | 255 | | ORDER as to Aquilia Marcivicci Barnette, that the last sentence on page iv of the preliminary instructions to the entire venire should read "if you do not recommend a punishment of death or life imprisonment without the possibility of release, the Court will then sentence the Deft. to a punishment as provided by law" ( Signed by Judge Robert D. Potter ) (jlk) [Entry date 01/06/98] |

Case 3:12-cv-00327-MOC   Document 99   Filed 09/23/15   Page 37 of 200

27

**JA851**

| 01/05/98 | 256 | | MOTION by Aquilia Marcivicci Barnette to Amend [243-1] witness list by Aquilia Marcivicci Barnette referred to: Judge Robert D. Potter (jlk) [Entry date 01/06/98] |
|---|---|---|---|
| 01/05/98 | 257 | | Deft's tender of Psychiatric Reports (Sealed) received as to Aquilia Marcivicci Barnette (jlk) [Entry date 01/06/98] |
| 01/05/98 | 258 | | Second MOTION by Aquilia Marcivicci Barnette for Giglio Material referred to: Judge Robert D. Potter (jlk) [Entry date 01/06/98] |
| 01/05/98 | 259 | | MOTION by Aquilia Marcivicci Barnette for Reciprocal Discovery referred to: Judge Robert D. Potter (jlk) [Entry date 01/06/98] |
| 01/05/98 | -- | | Letter from a potential juror asking to be excused from jury duty as to Aquilia Marcivicci Barnette (jlk) [Entry date 01/06/98] |
| 01/05/98 | -- | | Jury selection begun as to Aquilia Marcivicci Barnette (1) count(s) 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11. Questionnaires were distributed and completed by potential jurors. Jurors ordered to report back week of 1/12/98. Judge: RDP Court Rptr: Scott Huseby (srg) [Entry date 01/09/98] |
| 01/06/98 | 260 | | ORDER as to Aquilia Marcivicci Barnette granting [256-1] motion to Amend [243-1] witness list by Aquilia Marcivicci Barnette as to Aquilia Marcivicci Barnette (1) ( Signed by Judge Robert D. Potter ) (jlk) [Entry date 01/06/98] |
| 01/06/98 | 261 | | ORDER as to Aquilia Marcivicci Barnette re: [259-1] motion for Reciprocal Discovery as to Aquilia Marcivicci Barnette (1); Clerk of Court shall forward copies of the Sealed report from FCI Butner together with a copy of this order to Drs. Sultan, Halleck & Cunningham via Federal Express. ( Signed by Judge Robert D. Potter ) (jlk) [Entry date 01/06/98] |
| 01/06/98 | -- | | Jury Selection as to Aquilia Marcivicci Barnette held/continued. Questionnaires distributed and completed by potential jurors. Ordered to report back week of 1/12/98. Judge: RDP Court Reporter: Scott Huseby (srg) [Entry date 01/09/98] [Edit date 01/09/98] |
| 01/07/98 | 262 | | SEALED ORDER as to Aquilia Marcivicci Barnette [11-1] withdrawing EX PARTE MOTION as to Aquilia Marcivicci Barnette (1) ( Signed by Judge Robert D. Potter ) (jlk) [Entry date 01/07/98] |
| 01/07/98 | 263 | | ORDER as to Aquilia Marcivicci Barnette; it is ORDERED that the officials at FCI Butner forward under seal copies of the complete file, excluding the Forensic Evaluation to: Seymour Halleck, Dr. Faye Sultan, Dr. Mark Cunningham, William Grant & Scott Duncan; FCI Butner shall forward under seal the copies of the raw test data to: Dr. Faye Sultan, Dr. Mark Cunningham & Dr. Scott Duncan; neither of the above-referenced experts shall disclose any of the information to counsel for Deft. or govt. ( Signed by Judge Robert D. Potter ) (jlk) [Entry date 01/07/98] |

Case 3:12-cv-00327-MOC   Document 99   Filed 09/23/16   Page 38 of 550.

| 01/07/98 | 264 | | CJA 31 as to Aquilia Marcivicci Barnette Authorization to Pay (Sealed Info.) $ (Sealed Info.) for Expert Services Voucher # d026454 ( Signed by Judge Robert D. Potter ) (jlk) [Entry date 01/07/98] |
| --- | --- | --- | --- |
| 01/07/98 | -- | | Jury Selection as to Aquilia Marcivicci Barnette held/continued. Questionnaires distributed and completed by potential jurors. Ordered to report back week of 1/12/98. Judge: RDP Crt Rptr: Scott Huseby (srg) [Entry date 01/09/98] |
| 01/08/98 | 265 | | Notice & ORDER as to Aquilia Marcivicci Barnette stating that the Court intends to ask essentially the questions proposed by the govt. re: Courtroom orientation covering: Individual Voir Dire on Death Penalty; Questions regarding Pretrial Publicity; Questions on Racial Bias; General Questions; both defense and counsel will have not more than 20 minutes to question each juror after the completion of the Court's voir dire ( Signed by Judge Robert D. Potter ) (jlk) [Entry date 01/08/98] |
| 01/08/98 | 266 | | Notice and ORDER as to Aquilia Marcivicci Barnette of Court's proposed questions to the entire panel ( Signed by Judge Robert D. Potter ) (jlk) [Entry date 01/08/98] |
| 01/08/98 | 267 | | Forensic Evaluation (Sealed) received as to Aquilia Marcivicci Barnette (jlk) [Entry date 01/08/98] |
| 01/08/98 | 268 | | ORDER as to Aquilia Marcivicci Barnette re: [217-1] allowing and deferring govt. notice of intent to use evidence, residual exceptions (see order for details) as to Aquilia Marcivicci Barnette (1) and denying Deft's opposition set out in paragraphs 1-10 and 12 of the Deft's response to govt. notice [227-1] as to Aquilia Marcivicci Barnette (1) ( Signed by Judge Robert D. Potter ) (jlk) [Entry date 01/08/98] |
| 01/09/98 | -- | | TRANSCRIPT filed in case as to Aquilia Marcivicci Barnette for dates of 11/26/97 Crt Rptr: Scott Huseby (jlk) [Entry date 01/09/98] |
| 01/12/98 | -- | | Jury Selection as to Aquilia Marcivicci Barnette held (srg) [Entry date 01/16/98] |
| 01/13/98 | 269 | | MOTION by Aquilia Marcivicci Barnette EX PARTE MOTION re: records (jlk) [Entry date 01/13/98] |
| 01/13/98 | 270 | | MOTION by Aquilia Marcivicci Barnette EX PARTE MOTION re: subpoenas (jlk) [Entry date 01/13/98] |
| 01/13/98 | 271 | | SEALED ORDER as to Aquilia Marcivicci Barnette granting [270-1] motion EX PARTE MOTION re: subpoenas as to Aquilia Marcivicci Barnette (1) ( Signed by Judge Robert D. Potter ) (jlk) [Entry date 01/13/98] [Edit date 01/14/98] |
| 01/13/98 | 272 | | SEALED ORDER as to Aquilia Marcivicci Barnette granting [269-1] motion EX PARTE MOTION re: records as to Aquilia Marcivicci |

Case 3:12-cv-00327-MOC  Document 99  Filed 09/23/15  Page 39 of 200

**29**

**JA853**

| | | | |
|---|---|---|---|
| | | | Barnette (1) (Signed by Judge Robert D. Potter ) (jlk) [Entry date 01/13/98] |
| 01/13/98 | -- | | Jury selection begun as to Terminated motions: Judge: (srg) [Entry date 01/16/98] |
| 01/13/98 | -- | | Jury Selection as to Aquilia Marcivicci Barnette held/continued. Potential jurors voir dired individually for cause. Judge: RDP, Court Rep. Scott Huseby. (srg) [Entry date 01/16/98] held/continued. Potential jurors voir dired for cause. Judge RDP; Court Rep., Scott Huseby. (srg) [Entry date 01/16/98] |
| 01/14/98 | 273 | | Deft's tender of the Capital Sentencing Evaluation (Sealed) received as to Aquilia Marcivicci Barnette (jlk) [Entry date 01/14/98] |
| 01/14/98 | 274 | | PETITION by USA for Writ of Habeas Corpus ad testificandum as to Aquilia Marcivicci Barnette (jlk) [Entry date 01/14/98] |
| 01/14/98 | 275 | | SEALED WRIT of Habeas Corpus ad Testificandum issued for (Sealed info.) for 2/2/98 at 9:00 a.m. in case as to Aquilia Marcivicci Barnette (jlk) [Entry date 01/14/98] |
| 01/14/98 | -- | | TRANSCRIPT of Exam. of Prospective Juror David Singer filed in case as to Aquilia Marcivicci Barnette for dates of 01/13/98 Crt Rptr: Scott Huseby (srg) [Entry date 01/16/98] |
| 01/15/98 | 276 | | WRIT of Habeas Corpus ad Testificandum issued for Randy Tate for 1/20/98 at 9:30 a.m. in case as to Aquilia Marcivicci Barnette (jlk) [Entry date 01/15/98] |
| 01/15/98 | -- | | Jury Selection as to Aquilia Marcivicci Barnette held/continued. Potential jurors voir dired indiv. for cause. Jurors #13 and 24 reported for further questioning. The cause phase was completed and seven remaining jurors were released. Seventy jurors chosen. Sequestation of wits invoked. Court takes a recess until Tues., Jan. 20, 1998 at 9:00 a.m. Judge: RDP, Crt. Rptr: Scott Huseby. (srg) [Entry date 01/16/98] |
| 01/15/98 | -- | | TRANSCRIPT of exam of Prospective Jurors Amanda Edwards and James Helms filed in case as to Aquilia Marcivicci Barnette for dates of 01/12/98 Crt Rptr: Scott Huseby (srg) [Entry date 01/16/98] |
| 01/16/98 | 277 | | ORDER as to Aquilia Marcivicci Barnette that upon completion of the examination of the Deft., Dr. Grant and Dr. Duncan shall prepare a report and deliver it under seal to the Clerk; Clerk shall maintain the report under seal until further order of the Court ( Signed by Judge Robert D. Potter ) (jlk) [Entry date 01/16/98] |
| 01/20/98 | -- | | TRANSCRIPT filed in case as to Aquilia Marcivicci Barnette for dates of 01/12/98 Crt Rptr: Scott Huseby (srg) [Entry date 01/20/98] |
| | | | |

Case 3:12-cv-00327-MOC   Document 99   Filed 09/23/15   Page 40 of 200

JA854

| | | | |
|---|---|---|---|
| 01/20/98 | -- | | TRANSCRIPT of Jury Selection filed in case as to Aquilia Marcivicci Barnette for dates of 01/12/98 Crt Rptr: Scott Huseby (srg) [Entry date 01/20/98] |
| 01/20/98 | -- | | Jury Selection as to Aquilia Marcivicci Barnette held/continued as to peremptory challenges. Twelve Jurors and four alts selected. Questionnaires of interr'd prospective jurors (111) to be SEALED. Govt's motion is allowed as the Allen Family and William Family being allowed to remain in the courtroom during trial testimony. Jurors to report at 9:00 a.m. Court takes a recess at 12:30 p.m. Judge RDP, Ct Rptr. S. Huseby. (srg) [Entry date 01/20/98] |
| 01/21/98 | -- | | Jury impaneled as to Aquilia Marcivicci Barnette (srg) [Entry date 01/22/98] |
| 01/21/98 | -- | | Jury trial as to Aquilia Marcivicci Barnette held/begins. Open statements by Attys of record. The Govt proceeds to offer evidence by calling the following wits for exam.: K. O. Hubbard, J. H. Drewery, Davie L. Deck, Thomas P. Simpson, Expert, Forensic Chemist, Kent McIlhany, B. S. Green, (tape recording offered as Exh 51A & 51B) John Grub, R. S. Kahl, Steve Austin and A. C. Austin. Court takes a recess at 4:00 P. M. for the day. Judge:RDP RDP Court Rptr: S. Huseby (srg) [Entry date 01/22/98] |
| 01/21/98 | 299 | | Exhibit list by USA as to Aquilia Marcivicci Barnette filed in open court. (srg) [Entry date 02/03/98] |
| 01/22/98 | 278 | | SEALED MOTION by Aquilia Marcivicci Barnette EX PARTE MOTION re: add'l funds (jlk) [Entry date 01/22/98] |
| 01/22/98 | 279 | | MOTION by Aquilia Marcivicci Barnette in Limine re: victim impact evidence referred to: Judge Robert D. Potter (jlk) [Entry date 01/22/98] |
| 01/22/98 | -- | | TRANSCRIPT as JURY SELECTION filed in case as to Aquilia Marcivicci Barnette for dates of 01/13/98 Crt Rptr: Scott Huseby (srg) [Entry date 01/22/98] |
| 01/22/98 | -- | | TRANSCRIPT of PROCEEDINGS filed in case as to Aquilia Marcivicci Barnette for dates of 01/21/98 Crt Rptr: Scott Huseby (srg) [Entry date 01/22/98] |
| 01/22/98 | -- | | Jury trial as to Aquilia Marcivicci Barnette held/continues. The following wits were caled for exam.: M. Burden, M. G. Hubbard, R. Williams, K. Williams, S. Williams, M. A. Etters, L. L. Quinn, T. Hodges, Dan Wilbur, Sarah Aldridge, J. Freshour, E. Thompson, S. M. Hill, D. C. Dean, C. R. Lee, C. R. Sacra, and B. L. Williams. (Two 911 Tapes played, see exhibit lst. Court takes a recess at 3:30 P. M. until 9:30 a. m., 01/23/98. Judge: RDP Court Rptr: S. Huseby (srg) [Entry date 01/22/98] |
| 01/22/98 | -- | | MOTION in open court by Aquilia Marcivicci Barnette for seq of |

Case 3:12-cv-00327-MOC   Document 99   Filed 09/23/15   Page 41 of 200

31

**JA855**

| | | | |
|---|---|---|---|
| | | | families, and for Declaration of Mistrial (srg) [Entry date 01/22/98] |
| 01/22/98 | -- | | ORAL ORDER as to Aquilia Marcivicci Barnette denying [0-0] oral motion for Declaration of Mistrial as to Aquilia Marcivicci Barnette (1), denying [0-0] oral motion for seq of families as to Aquilia Marcivicci Barnette (1) ( Entered by Judge Robert D. Potter ) (srg) [Entry date 01/22/98] |
| 01/22/98 | 280 | | SEALED ORDER as to Aquilia Marcivicci Barnette granting [278-1] motion EX PARTE MOTION re: add'l funds as to Aquilia Marcivicci Barnette (1) ( Signed by Judge Robert D. Potter (jlk) [Entry date 01/22/98] |
| 01/23/98 | 281 | | ORDER as to Aquilia Marcivicci Barnette denying as moot [100-1] motion for Early Production of Jencks Material as to Marcivicci Barnette (1) ( Signed by Judge Robert D. Potter (jlk) [Entry date 01/23/98] |
| 01/23/98 | -- | | TRANSCRIPT of proceedings filed in case as to Aquilia Marcivicci Barnette for dates of 01/22/98 Crt Rptr: Scott Huseby (srg) [Entry date 01/26/98] |
| 01/23/98 | 283 | | Proposed Jury Instructions by Aquilia Marcivicci Barnette as to Aquilia Marcivicci Barnette (srg) [Entry date 01/26/98] |
| 01/23/98 | -- | | Jury trial as to Aquilia Marcivicci Barnette held/continues w/Govt's evidence. The following wits were exam'd: David W. Oxley, M.D., F.C.A.P., EXPERT, Forensic Path., Bob Allen, Elaine Edwards, Tracy L. Strickland, David Nelson, Carole Phillips, J. L. Krall, A. R. Krise, Richard L. Womble, James M. Sanders, Tony Rice, R. A. Holl, L. A. Payne, Charles D. Bryant, Todd J. Nordhoff, EXPERT, Fire Arms, James M. Sullivan, Med. Exam., EXPERT, Forensic Path. The U. S. rests. The Deft. admitted the following exhibits: 1, 3, 4, 5, 6, 7, 8, 10, 11, 12, 16, 18, 23, & 25. The jury was excused and instructed to report Tues., 01/27/98. Deft informed the Court that he had no argument w/Cts 4 thru 9, and moved for dismissal of Cts 1,2,3,10, & 11 pursuant to Rule 924c and 824h. MOTION DENIED. Deft's Motion for Judg. of Acquittal is DENIED. Robert A. Holl is to be kept under subp. Court takes a recess until Tues., 01/27/98 at 9:30 a.m. Judge: RDP Court Rptr: Scott Huseby (srg) [Entry date 01/26/98] |
| 01/23/98 | -- | | MOTION in open court by Aquilia Marcivicci Barnette for Judgment of Acquittal , and to Dismiss for Lack of Jurisdiction Cts. 1,2,3,10, and 11 (srg) [Entry date 01/26/98] |
| 01/23/98 | -- | | ORAL ORDER as to Aquilia Marcivicci Barnette denying [0-0] oral motion to Dismiss for Lack of Jurisdiction Cts. 1,2,3,10, and 11 as to Aquilia Marcivicci Barnette (1), denying [0-0] oral motion for Judgment of Acquittal as to Aquilia Marcivicci Barnette (1) ( Entered by Judge Robert D. Potter ) (srg) [Entry date 01/26/98] |
| 01/26/98 | 282 | | Proposed Jury Instructions by USA as to Aquilia Marcivicci Barnette (jlk) [Entry date 01/26/98] |

Case 3:12-cv-00327-MOC   Document 99   Filed 09/23/13   Page 42 of 200

| | | | |
|---|---|---|---|
| 01/26/98 | -- | | TRANSCRIPT of Proceedings filed in case as to Aquilia Marcivicci Barnette for dates of 01/23/98 Crt Rptr: S. Huseby (srg) [Entry date 01/26/98] |
| 01/27/98 | 284 | | ORDER as to Aquilia Marcivicci Barnette, for issuance of subpoenas ( Signed by Judge Robert D. Potter ) (jlk) [Entry date 01/27/98] |
| 01/27/98 | 286 | | REQUEST FOR SPECIAL Proposed Jury Instructions (unsigned) by Aquilia Marcivicci Barnette as to Aquilia Marcivicci Barnette (srg) [Entry date 01/29/98] |
| 01/27/98 | -- | | TRANSCRIPT Jury Trial filed in case as to Aquilia Marcivicci Barnette for dates of 01/26/98 Crt Rptr: S. Huseby (srg) [Entry date 01/29/98] |
| 01/27/98 | 287 | | Defendant's Confirmatrion of NOTICE of Intent to introduce Mental Health Testimony at the Penalty Phase by Aquilia Marcivicci Barnette as to Aquilia Marcivicci Barnette (srg) [Entry date 01/29/98] |
| 01/27/98 | 288 | | PROFFER CONCERNING VICTIM IMPACT EVIDENCE by USA as to Aquilia Marcivicci Barnette (srg) [Entry date 01/29/98] |
| 01/27/98 | -- | | Jury trial as to Aquilia Marcivicci Barnette held/continues w/admission of Deft's exhs. Deft RESTS w/o testimony from any wit. FINAL ARGUMENT by Attys Walker and Laughrun. Judge's CHARGE. Jury retires to deliberate at 11:40 a.m. 12:00 til 1:00 LUNCH. Jury resumes deliberation at 1:00 p. m. and returns to open Court w/GUILTY VERDICT of ELEVEN COUNTS at 2:45 p.m. Court takes a recess at 3:15 p. m. until 1/29/98 at 2:00 p. m. Judge: RDP Court Rptr: Scott Huseby (srg) [Entry date 01/29/98] |
| 01/27/98 | 289 | | JURY VERDICT as to Aquilia Marcivicci Barnette Guilty: Aquilia Marcivicci Barnette (1) count(s) 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11 (srg) [Entry date 01/29/98] |
| 01/28/98 | 285 | | MOTION by Aquilia Marcivicci Barnette for New Trial referred to: Judge Robert D. Potter (jlk) [Entry date 01/28/98] |
| 01/29/98 | 290 | | ORDER as to Aquilia Marcivicci Barnette denying [279-1] motion in Limine re: victim impact evidence as to Aquilia Marcivicci Barnette (1) ( Signed by Judge Robert D. Potter ) (jlk) [Entry date 01/29/98] |
| 01/29/98 | 291 | | Psychiatric Report (Sealed) received as to Aquilia Marcivicci Barnette (jlk) [Entry date 01/29/98] |
| 01/29/98 | -- | | TRANSCRIPT of JURY TRIAL filed in case as to Aquilia Marcivicci Barnette for dates of 01/14/98 Crt Rptr: S. Huseby (srg) [Entry date 01/29/98] |
| 01/29/98 | -- | | TRANSCRIPT JURY TRIAL filed in case as to Aquilia Marcivicci |

Case 3:12-cv-00327-MOC  Document 99  Filed 09/23/15  Page 43 of 200

**33**

**JA857**

| | | | |
|---|---|---|---|
| | | | Barnette for dates of 01/27/98 Crt Rptr: S. Huseby (srg) [Entry date 01/29/98] |
| 01/29/98 | 292 | | SEALED PETITION by Aquilia Marcivicci Barnette for Writ of Habeas Corpus ad testificandum as to Aquilia Marcivicci Barnette (jlk) [Entry date 01/29/98] |
| 01/29/98 | 293 | | WRIT of Habeas Corpus ad Testificandum issued for (Sealed Info.) for (Sealed info.) in case as to Aquilia Marcivicci Barnette (jlk) [Entry date 01/29/98] |
| 01/29/98 | -- | | Jury trial/SENTENCING PHASE as to Aquilia Marcivicci Barnette held/ begins. Open. statements by Attys of record. Govt recalls Robert Holl for exam. Court takes a recess at 5:00 p. m. until 9:30 a.m. 01/30/98. Judge: RDP Court Rptr: S. Huseby (srg) [Entry date 01/30/98] |
| 01/29/98 | 300 | | Exhibit list by USA as to Aquilia Marcivicci Barnette for SENTENCING PHASE. (srg) [Entry date 02/03/98] |
| 01/30/98 | 294 | | PENALTY PHASE INSTRUCTIONS by Aquilia Marcivicci Barnette (jlk) [Entry date 01/30/98] |
| 01/30/98 | 295 | | PROPOSED Jury instructions as to Aquilia Marcivicci Barnette FOR THE SENTENCING PHASE by the Govt. (srg) [Entry date 01/30/98] |
| 01/30/98 | -- | | TRANSCRIPT of JURY TRIAL filed in case as to Aquilia Marcivicci Barnette for dates of 01/20/98 Crt Rptr: S. Huseby (srg) [Entry date 01/30/98] Marcivicci Barnette for dates of 01/29/98 Crt Rptr: S. Huseby (srg) [Entry date 01/30/98] |
| 01/30/98 | -- | | Jury trial as to Aquilia Marcivicci Barnette held/continues w/Sent. Phase. Govt calls the following wits for exam.: James Yarbrough, Natasha Heard, Crystal Dennis, Rodney Riggs, Alesha Chambers Houston, Jasper Chambers, W. T. Brandon, Debra M. Adamo, Pamela D. Richrdson, Donna Burgess, Casey McCrickard, Bob Allen, Shirley Allen, Dennis Allen, Denis Dean Allen, Sydney Williams recalled, Kenneth Williams, Bertha Williams. Court takes a recess at 5:00 p. m. for the day. Judge: DRP Court Rptr: S. Huseby (srg) [Entry date 02/02/98] |
| 01/30/98 | -- | | MOTION in open court by Aquilia Marcivicci Barnette for Declaration of Mistrial, and for Judgment of Acquittal (srg) [Entry date 02/02/98] |
| 01/30/98 | -- | | ORAL ORDER as to Aquilia Marcivicci Barnette denying [0-0] oral motion for Judgment of Acquittal as to Aquilia Marcivicci Barnette (1), denying [0-0] oral motion for Declaration of Mistrial as to Aquilia Marcivicci Barnette (1) ( Entered by Judge Robert D. Potter ) (srg) [Entry date 02/02/98] |
| 02/02/98 | -- | | TRANSCRIPT of Jury Trial filed in case as to Aquilia Marcivicci Barnette for dates of 01/30/98 Crt Rptr: S. Huseby (srg) [Entry date |

Case 3:12-cv-00327-MOC   Document 99   Filed 09/23/15   Page 44 of 200

**34**

**JA858**

| | | | |
|---|---|---|---|
| | | | 02/02/98] |
| 02/02/98 | 296 | | SEALED CJA 31 as to Aquilia Marcivicci Barnette Authorization to Pay (Sealed Info.) $ (Sealed Info.) for Expert Services Voucher # d026460 ( Signed by Judge Robert D. Potter ) (jlk) [Entry date 02/02/98] |
| 02/02/98 | -- | | Jury trial as to Aquilia Marcivicci Barnette held/continues w/the Sent. Phase. Deft's Motion to strike test of Crytal Dennis and for a mistrialis denied. Exhibits 2,2a,17,21,26,26a,45,46,47a-1,48a-d,49,50,51,52,53a-b, admitted. Deft calls the following wits for exam: John Thomas Barnette, Ayanna Brewer Beasley, E. A. Joye, Jean B. Nduly, Jessie Cooper, Shonda Nero, Tessie Newo, Sheila Cooper, and Mario Barnette. Court takes a recess for the cay at 5:00p.m. Judge: RDP Court Rptr: S. Huseby (srg) [Entry date 02/03/98] |
| 02/02/98 | 298 | | AMENDED Proposed Jury Instructionsa and SPECIAL VERDICT FORMS by USA as to Aquilia Marcivicci Barnette (srg) [Entry date 02/03/98] |
| 02/02/98 | 304 | | Exhibit list by Aquilia Marcivicci Barnette as to Aquilia Marcivicci Barnette (srg) [Entry date 02/05/98] |
| 02/03/98 | 297 | | Deft's REQUEST FOR SUPPLEMENTAL Jury instructions as to Aquilia Marcivicci Barnette (srg) [Entry date 02/03/98] |
| 02/03/98 | -- | | Jury trial as to Aquilia Marcivicci Barnette held/continues w/Deft's evidence. The following wits were exam'd: Investigator Bowling, C. N. Maxwell voir dired out of Jury's presence and Court rules she didnot qualify as Expert. Deft's Exh. #57 was admitted for RECORD ONLY. Court allows admittance of Exh. #56, Tina Davis' affidavit to be read into record. Deft continues to exam Stg. Anthony Belton, Dr. Sally Johnson, Expert, Forensic Psychiatrist, Nadine Wilson, Tony Harrison, Ricky Paylor, Faye E. Sultan, Expert, Domestic Viol., and Dr. Seymore Halleck, Expert, Forensic Psychiatrist. The FORENSIC EVALUATION OF DEFT. placed UNDER SEAL. Judge: DRP Court Rptr: S. Huseby (srg) [Entry date 02/04/98] |
| 02/03/98 | -- | | TRANSCRIPT of Sentencing Phase in Jury Trial filed in case as to Aquilia Marcivicci Barnette for dates of 02/02/98 Crt Rptr: S. Huseby (srg) [Entry date 02/04/98] |
| 02/04/98 | -- | | Jury trial as to Aquilia Marcivicci Barnette held/continues w/Sent. Phase. Deft recalls Cynthia N. Maxwell. Dr. Mark Cunningham, Expert, Forensic Psychologist was examined. Deft's #19, Video was viewed. Court takes a recess at 5:00 p. m. until 9:30 a.m. Judge: RDP Court Rptr: S. Huseby (srg) [Entry date 02/05/98] |
| 02/04/98 | 301 | | MOTION by Aquilia Marcivicci Barnette in Limine RE TESTIMONY OF DR. CUNNINGHAM referred to: Judge Robert D. Potter (srg) [Entry date 02/05/98] |
| | | | |

Case 3:12-cv-00327-MOC  Document 99  Filed 09/23/15  Page 45 of 200

JA859

| | | | |
|---|---|---|---|
| 02/04/98 | 302 | | Proposed Jury instructions re Expert Wit. as to Aquilia Marcivicci Barnette (srg) [Entry date 02/05/98] [Edit date 11/15/01] |
| 02/05/98 | 303 | | MOTION by Aquilia Marcivicci Barnette in Limine referred to: Judge Robert D. Potter (srg) [Entry date 02/05/98] |
| 02/05/98 | -- | | TRANSCRIPT of Jury Trial, Sent. Phase filed in case as to Aquilia Marcivicci Barnette for dates of 02/03/98 Crt Rptr: S. Huseby (srg) [Entry date 02/05/98] |
| 02/05/98 | -- | | TRANSCRIPT of Jury Trial, Sent Phase filed in case as to Aquilia Marcivicci Barnette for dates of 02/04/98 Crt Rptr: S. Huseby (srg) [Entry date 02/05/98] |
| 02/05/98 | -- | | Jury trial as to Aquilia Marcivicci Barnette held Judge: RDP Court Rptr: S. Huseby (srg) [Entry date 02/05/98] |
| 02/05/98 | -- | | ORAL ORDER as to Aquilia Marcivicci Barnette denying [303-1] motion in Limine as to Aquilia Marcivicci Barnette (1) ( Entered by Judge Robert D. Potter ) (srg) [Entry date 02/05/98] |
| 02/05/98 | -- | | Jury trial as to Aquilia Marcivicci Barnette held/resumes. Deft RESTS. Govt proceeds w/REBUTTAL EVIDENCE by exam the following: Brian Ard, Shirley D. Williams, Joanne Baldwin, Thad Johnson, Probation Officer, (Court orders that Deft's Atty is allowed to view Deft's State Probation File during.) Dr. Scott A. Duncan, USP, Atlanta, Expert, Forensic Psychologist. The Govt RESTS. Deft's renewed Motions as recorded are DENIED. Jurors were excused for the day at 1:45 p.m. and are to return on Monday, February 9, 1998 at 9:30. Judge: RDP Court Rptr: S. Huseby (srg) [Entry date 02/05/98] |
| 02/06/98 | 305 | | NOTICE of Mitigation Factors by Aquilia Marcivicci Barnette (jlk) [Entry date 02/06/98] |
| 02/06/98 | 306 | | MOTION by Aquilia Marcivicci Barnette for allocution referred to: Judge Robert D. Potter (jlk) [Entry date 02/06/98] |
| 02/09/98 | -- | | TRANSCRIPT of Jury Trial filed in case as to Aquilia Marcivicci Barnette for dates of 02/05/98 Crt Rptr: S. Huseby (srg) [Entry date 02/10/98] |
| 02/09/98 | 307 | | MEMORANDUM by USA as to Aquilia Marcivicci Barnette in opposition to [306-1] motion for allocution (srg) [Entry date 02/10/98] |
| 02/09/98 | 308 | | ORDER as to Aquilia Marcivicci Barnette rel Clerk of responsibility for said exhs. ( Signed by Judge Robert D. Potter ) (srg) [Entry date 02/10/98] |
| 02/09/98 | -- | | Jury trial as to Aquilia Marcivicci Barnette held/resumes w/ FINAL |

| | | | |
|---|---|---|---|
| | | | ARGUMENTS by Attys. Upon completion of arguments, the Judge's CHARGE was given. Jury retires to deliberate at 3:36 p.m. Jury requested recess at 5:00 p. m. until 02/10/98 at 9:30 a. m. Court adjourns. Judge: RPD Court Rptr: S. Huseby (srg) [Entry date 02/10/98] |
| 02/10/98 | -- | | ORAL ORDER as to Aquilia Marcivicci Barnette Court orders that QUESTIONNAIRES 1-111 be placed w/the official file pending appeal. ( Entered by Judge Robert D. Potter ) (srg) [Entry date 02/11/98] |
| 02/10/98 | -- | | Jury trial as to Aquilia Marcivicci Barnette held/resumes w/deliberations. Jury returns to open Court w/VERDICT. DEATH SENTENCE imposed as to each of the following counts: 7,8,& 11. Deft will be sentenced at a later date on counts 1-6, 9 & 10. Deft's atty noticed the court of pending appeal. Court adjourns at 5:30 p.m. Judge: RDP Court Rptr: S. Huseby (srg) [Entry date 02/11/98] |
| 02/10/98 | -- | | Sentencing held Aquilia Marcivicci Barnette (1) count(s) 7, 8, 11 Judge: RDP Crt Rptr: S. Huseby (srg) [Entry date 02/11/98] |
| 02/10/98 | 309 | | SPECIAL JURY VERDICT REGARDING THE PUNISHMENT TO BE IMPOSED UPON THE DFT FOR KILLING OF DONALD LEE ALLEN IN CTS. 7 & 8, AND KILLING OF ROBIN WILLIAMS IN CT. 11 as to Aquilia Marcivicci Barnette (srg) [Entry date 02/11/98] |
| 02/11/98 | -- | | TRANSCRIPT of SENTENCING PHASE filed in case as to Aquilia Marcivicci Barnette for dates of 02/09/98 Crt Rptr: S. Huseby (srg) [Entry date 02/11/98] |
| 02/12/98 | 310 | | MOTION by Aquilia Marcivicci Barnette to Extend Time to file motion for a new trial (jlk) [Entry date 02/12/98] |
| 02/13/98 | -- | | TRANSCRIPT filed in case as to Aquilia Marcivicci Barnette for dates of 2/10/98 Crt Rptr: Scott Huseby (jlk) [Entry date 02/13/98] for dates of 1/15/98 Crt Rptr: Scott Huseby (jlk) [Entry date 02/13/98] |
| 02/13/98 | -- | | TRANSCRIPT of Proceedings filed in case as to Aquilia Marcivicci Barnette for dates of 01/15/98 Crt Rptr: S. Huseby (srg) [Entry date 02/19/98] |
| 02/17/98 | 311 | | ORDER as to Aquilia Marcivicci Barnette granting [310-1] motion to Extend Time to file motion for a new trial until 3/10/98 as to Aquilia Marcivicci Barnette (1) ( Signed by Judge Robert D. Potter ) (jlk) [Entry date 02/17/98] |
| 02/18/98 | 312 | | ORDER as to Aquilia Marcivicci Barnette denying as moot [32-1] motion in Limine re: bloody garments as to Aquilia Marcivicci Barnette (1) ( Signed by Judge Robert D. Potter ) (jlk) [Entry date 02/19/98] |
| 02/18/98 | 313 | | ORDER as to Aquilia Marcivicci Barnette denying [306-1] motion for allocution as to Aquilia Marcivicci Barnette (1) ( Signed by Judge |

Case 3:12-cv-00327-MOC   Document 99   Filed 09/23/15   Page 47 of 200

37

JA861

| | | | |
|---|---|---|---|
| | | | Robert D. Potter ) (jlk) [Entry date 02/19/98] |
| 02/18/98 | 314 | | ORDER as to Aquilia Marcivicci Barnette granting [301-1] motion in Limine RE TESTIMONY OF DR. CUNNINGHAM as to Aquilia Marcivicci Barnette (1) ( Signed by Judge Robert D. Potter ) (jlk) [Entry date 02/19/98] |
| 02/18/98 | 315 | | ORDER as to Aquilia Marcivicci Barnette denying [41-1] motion to limit prosecutors rebuttal evidence as to Aquilia Marcivicci Barnette (1) ( Signed by Judge Robert D. Potter ) (jlk) [Entry date 02/19/98] |
| 02/18/98 | 316 | | ORDER as to Aquilia Marcivicci Barnette denying as moot [98-1] motion to Suppress Court Identification to be made by Benjamin Spencer Greene, aka Benny as to Aquilia Marcivicci Barnette (1) (Signed by Judge Robert D. Potter ) (jlk) [Entry date 02/19/98] |
| 02/18/98 | 317 | | ORDER as to Aquilia Marcivicci Barnette denying as moot [258-1] motion for Giglio Material as to Aquilia Marcivicci (1) ( Signed by Judge Robert D. Potter ) (jlk) [Entry date 02/19/98] |
| 02/18/98 | 318 | | ORDER as to Aquilia Marcivicci Barnette denying [285-1] motion for New Trial as to Aquilia Marcivicci Barnette (1) ( Signed by Judge Robert D. Potter ) (jlk) [Entry date 02/19/98] |
| 02/18/98 | 319 | | ORDER as to Aquilia Marcivicci Barnette granting in part, denying in part [31-1] motion to Suppress photographs as to Aquilia Marcivicci Barnette (1) ( Signed by Judge Robert D. Potter ) (jlk) [Entry date 02/19/98] |
| 02/18/98 | 320 | | SEALED ORDER as to Aquilia Marcivicci Barnette denying as moot [15-1] motion EX PARTE MOTION as to Aquilia Marcivicci Barnette ( Signed by Judge Robert D. Potter ) (jlk) [Entry date 02/19/98] |
| 02/18/98 | 321 | | ORDER as to Aquilia Marcivicci Barnette granting in part, denying in part [29-1] motion in Limine re: photographs of victims following death or autopsy as to Aquilia Marcivicci Barnette (1) ( Signed by Judge Robert D. Potter ) (jlk) [Entry date 02/19/98] |
| 02/19/98 | 322 | | MOTION by Aquilia Marcivicci Barnette for George Laughrun, II & Paul Williams to Withdraw as Counsel for Defendant referred to: Judge Robert D. Potter (jlk) [Entry date 02/19/98] |
| 02/20/98 | -- | | Sentencing held Aquilia Marcivicci Barnette (1) count(s) 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11 Judge: RDP Crt Rptr: S. Huseby (srg) [Entry date 02/20/98] |
| 02/20/98 | 323 | | JUDGMENT Aquilia Marcivicci Barnette (1) count(s) 6: Life imprisonment, $100.00 assessment; Aquilia Marcivicci Barnette (1) count(s) 10: Life imprisonment to be served concurrently with Ct. 6; $100.00 assessment; Aquilia Marcivicci Barnette (1) count(s) 1: 240 |

Case 3:12-cv-00327-MOC  Document 99  Filed 09/23/15  Page 48 of 200

| | | | |
|---|---|---|---|
| | | | mos. imprisonment to be served concurrently with Ct. 6; $100.00 assessment; if the Deft. is released from prison, the Deft. shall serve 5 years Supervised Release; Aquilia Marcivicci Barnette (1) count(s) 4, 5 & 9: 120 months each Ct. to run concurrently with each other and w/Ct. 1; $100.00 assessment each Ct.; Aquilia Marcivicci Barnette (1) count(s) 2: 360 mos. imprisonment to consecutively to all other Cts.; $100 assessment; Aquilia Marcivicci Barnette (1) count(s) 3: 180 mos. imprisonment to run consecutively with all other Cts.; $100.00 assessment, resulting in a TOTAL SENTENCE OF LIFE IMPRISONMENT, PLUS 540 MONTHS CONSECUTIVE; Aquilia Marcivicci Barnette (1) count(s) 7, 8 & 11: Sentenced to death ( Signed by Judge Robert D. Potter ) ( Crim Judge Vol: 63 Page: 116) (jlk) [Entry date 02/20/98] [Edit date 02/20/98] |
| 02/20/98 | 324 | | NOTICE OF APPEAL by Aquilia Marcivicci Barnette (1) count(s) 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11 cc: Counsel, USM and USPO (jlk) [Entry date 02/20/98] |
| 02/20/98 | -- | | Notice of appeal and certified copy of docket as to Aquilia Marcivicci Barnette to USCA: [324-1] appeal (jlk) [Entry date 02/20/98] |
| 02/25/98 | 325 | | MOTION by Aquilia Marcivicci Barnette EX PARTE MOTION re: add'l funds (jlk) [Entry date 03/02/98] |
| 03/02/98 | -- | | TRANSCRIPT filed in case as to Aquilia Marcivicci Barnette for dates of 2/20/98 Crt Rptr: Scott Huseby (jlk) [Entry date 03/02/98] |
| 03/05/98 | 326 | | ORDER as to Aquilia Marcivicci Barnette granting [322-1] motion for George Laughrun, II & Paul Williams to Withdraw as Counsel for Defendant (Terminated attorney Paul J. Williams for Aquilia Marcivicci Barnette, attorney George V. Laughrun for Aquilia Marcivicci Barnette as to Aquilia Marcivicci Barnette (1) ( Signed by Judge Robert D. Potter ) (jlk) [Entry date 03/05/98] |
| 03/05/98 | -- | | Updated transmittal re: Order to w/d counsel for defendant and certified copy of docket as to Aquilia Marcivicci Barnette to USCA: [324-1] appeal (jlk) [Entry date 03/05/98] |
| 03/09/98 | 327 | | WRIT of Habeas Corpus ad Testificandum executed for Tony Hampton on 2/4/98 in case as to Aquilia Marcivicci Barnette (jlk) [Entry date 03/09/98] |
| 03/09/98 | 328 | | WRIT of Habeas Corpus ad Testificandum executed for Tony Hampton on 3/5/98 in case as to Aquilia Marcivicci Barnette (jlk) [Entry date 03/09/98] |
| 03/09/98 | -- | | USCA Case Number as to Aquilia Marcivicci Barnette Re: [324-1] appeal USCA Number: 98-5 Case Mgr: Elizabeth A. Barth (jlk) [Entry date 03/09/98] |
| 03/10/98 | 329 | | MOTION by Aquilia Marcivicci Barnette for a new sentencing hearing |

Case 3:12-cv-00327-MOC   Document 99   Filed 09/23/15   Page 49 of 200

**JA863**

| | | | |
|---|---|---|---|
| | | | referred to: Judge Robert D. Potter (jlk) [Entry date 03/10/98] |
| 03/10/98 | 330 | | MOTION by Aquilia Marcivicci Barnette EX PARTE MOTION re: add'l funds (jlk) [Entry date 03/10/98] |
| 03/10/98 | 331 | | MOTION by Aquilia Marcivicci Barnette EX PARTE MOTION re: add'l funds (jlk) [Entry date 03/10/98] |
| 03/13/98 | 332 | | CJA 31 as to Aquilia Marcivicci Barnette Authorization to Pay (Sealed Info.) $ (Sealed Info.) for Expert Services Voucher # d026457 ( Signed by Judge Robert D. Potter ) (jlk) [Entry date 03/13/98] |
| 03/13/98 | 333 | | CJA 20 as to Aquilia Marcivicci Barnette Authorization to Pay George Laughrun $ (Sealed Info.) Voucher # d021062 ( Signed by Judge Robert D. Potter ) (jlk) [Entry date 03/13/98] |
| 03/13/98 | 334 | | CJA 30 as to Aquilia Marcivicci Barnette Authorization to Pay Paul Williams $ (Sealed info.) Voucher # d021072 ( Signed by Judge Robert D. Potter ) (jlk) [Entry date 03/13/98] |
| 03/16/98 | 335 | | WRIT of Habeas Corpus ad Testificandum returned unexecuted for Randy Tate in case as to Aquilia Marcivicci Barnette (jlk) [Entry date 03/16/98] |
| 03/19/98 | 336 | | RESPONSE by USA as to Aquilia Marcivicci Barnette re [329-1] motion for a new sentencing hearing (chh) [Entry date 03/20/98] |
| 03/20/98 | 337 | | SEALED ORDER as to Aquilia Marcivicci Barnette granting in part, denying in part [330-1] motion EX PARTE MOTION re: add'l funds as to Aquilia Marcivicci Barnette (1) ( Signed by Judge Robert D. Potter ) (chh) [Entry date 03/23/98] |
| 03/20/98 | 338 | | SEALED ORDER as to Aquilia Marcivicci Barnette granting in part, denying in part [331-1] motion EX PARTE MOTION re: add'l funds as to Aquilia Marcivicci Barnette (1) ( Signed by Judge Robert D. Potter ) (chh) [Entry date 03/23/98] |
| 03/31/98 | 339 | | SEALED CJA 31 as to Aquilia Marcivicci Barnette Authorization to Pay (sealed info.) $ (sealed info.) for Expert Services Voucher # d026456 ( Signed by Judge Robert D. Potter ) (jlk) [Entry date 04/01/98] [Edit date 04/01/98] |
| 03/31/98 | 340 | | SEALED CJA 31 as to Aquilia Marcivicci Barnette Authorization to Pay (sealed info.) $ (sealed info.) for Expert Services Voucher # d026455 ( Signed by Judge Robert D. Potter ) (jlk) [Entry date 04/01/98] [Edit date 04/01/98] |
| 03/31/98 | 341 | | Sealed CJA 31 as to Aquilia Marcivicci Barnette Authorization to Pay (sealed info.) $ (sealed info.) for Expert Services Voucher # d026460 |

Case 3:12-cv-00327-MOC   Document 99   Filed 09/23/15   Page 50 of 200

40

JA864

| | | | |
|---|---|---|---|
| | | | ( Signed by Judge Robert D. Potter ) (jlk) [Entry date 04/01/98] [Edit date 04/01/98] |
| 03/31/98 | 342 | | SEALED CJA 31 as to Aquilia Marcivicci Barnette Authorization to Pay (sealed info.) $ (sealed info.) for Expert Services Voucher # d026454 ( Signed by Judge Robert D. Potter ) (jlk) [Entry date 04/01/98] |
| 04/01/98 | 343 | | ORDER as to Aquilia Marcivicci Barnette denying [329-1] motion for a new sentencing hearing as to Aquilia Marcivicci Barnette (1) ( Signed by Judge Robert D. Potter ) (jlk) [Entry date 04/01/98] |
| 04/01/98 | -- | | Updated transmittal re: Order filed 4/1/98 and certified copy of docket as to Aquilia Marcivicci Barnette to USCA: [324-1] appeal (jlk) [Entry date 04/01/98] |
| 04/13/98 | 344 | | SUUPLEMENTAL NOTICE OF APPEAL by the Deft. cc: Counsel, USM and USPO (jlk) [Entry date 04/14/98] |
| 04/13/98 | -- | | Notice of supplemental appeal and certified copy of docket as to Aquilia Marcivicci Barnette to USCA: [344-1] appeal (jlk) [Entry date 04/14/98] |
| 04/14/98 | 345 | | NOTICE OF APPEAL by Aquilia Marcivicci Barnette re [343-1] order denying motion for a new sentencing hearing. (jlk) [Entry date 04/14/98] |
| 04/14/98 | -- | | Notice of appeal and certified copy of docket as to Aquilia Marcivicci Barnette to USCA: [345-1] appeal (jlk) [Entry date 04/14/98] |
| 04/16/98 | 346 | | PRESENTENCE INVESTIGATION REPORT (Sealed) as to Aquilia Marcivicci Barnette (jlk) [Entry date 04/16/98] |
| 04/23/98 | -- | | USCA Case Number as to Aquilia Marcivicci Barnette Re: [344-1] appeal USCA Number: 98-11, to be consolidated w/98-5(L) Case Mgr: Elizabeth Barth (jlk) [Entry date 04/23/98] |
| 04/23/98 | -- | | USCA Case Number as to Aquilia Marcivicci Barnette Re: [345-1] appeal USCA Number: 98-11, to be consolidated w/98-5(L) Case Mgr: Elizabeth Barth (jlk) [Entry date 04/23/98] |
| 04/23/98 | 347 | | NOTICE of Order from the FCCA appointing James P. Cooney as CJA co-counsel as to Aquilia Marcivicci Barnette (jlk) [Entry date 04/23/98] [Edit date 04/23/98] |
| 04/23/98 | 348 | | NOTICE of Order from the FCCA replacing James P. Cooney, III in place of Paul Williams as lead counsel for appellant of appeal as to Aquilia Marcivicci Barnette (jlk) [Entry date 04/23/98] |
| 04/23/98 | 349 | | NOTICE of Order from the FCCA consolidating appeals for purposes of briefing and oral argument as to Aquilia Marcivicci Barnette (jlk) [Entry |

Case 3:12-cv-00327-MOC   Document 99   Filed 09/23/15   Page 51 of 200

41

**JA865**

| | | | |
|---|---|---|---|
| | | | date 04/23/98] |
| 04/23/98 | -- | | Certification of Readiness as to Aquilia Marcivicci Barnette Re: [345-1] appeal, [344-1] appeal, [324-1] appeal sent to USCA (jlk) [Entry date 04/23/98] |
| 05/11/98 | 350 | | by USA as to Aquilia Marcivicci Barnette. Letter regarding exhibits: 61A. 61B. 63B, 63C, & 63F being photographed and ret'd to victims' families. All other exhibits retained by Bureau of Alcohol, Tobacco & Firearms in Charlotte in their evidence vault. (srg) [Entry date 05/11/98] |
| 12/18/98 | 351 | | MOTION by Aquilia Marcivicci Barnette to release sealed material referred to: Judge Robert D. Potter (jlk) [Entry date 12/18/98] |
| 12/18/98 | 352 | | ORDER as to Aquilia Marcivicci Barnette granting [351-1] motion to release sealed materials/prospective juror questionaires as to Aquilia Marcivicci Barnette (1) ( Signed by Judge Robert D. Potter ) (jlk) [Entry date 12/18/98] |
| 12/21/98 | 353 | | MOTION by Aquilia Marcivicci Barnette to release sealed materials of certainn prospective jurors referred to: Judge Robert D. Potter (jlk) [Entry date 12/21/98] |
| 12/21/98 | 354 | | ORDER as to Aquilia Marcivicci Barnette granting [353-1] motion to release sealed materials of certain prospective jurors as to Aquilia Marcivicci Barnette (1) ( Signed by Judge Robert D. Potter ) (jlk) [Entry date 12/21/98] |
| 12/30/98 | -- | | TRANSCRIPT filed in case as to Aquilia Marcivicci Barnette for dates of February 6, 1998 Crt Rptr: Scott A. Huseby (chh) [Entry date 12/30/98] |
| 08/11/99 | -- | | Certified and transmitted record on appeal to U.S. Court of Appeals in 42 volumes as to Aquilia Marcivicci Barnette : [345-1] appeal, [344-1] appeal, [324-1] appeal (jlk) [Entry date 08/11/99] |
| 05/04/00 | 355 | View 30 pgs $ 2.10 | Published Opinion from Fourth Circuit Court of Appeals. Affirmed in part, vacated in part and remanded. (clc) [Entry date 05/09/00] |
| 05/16/00 | -- | | NOTICE of FCCA as to Aquilia Marcivicci Barnette that the time for filing a pet for rehearing has been extended (clc) [Entry date 05/17/00] |
| 06/19/00 | -- | | 4th Circuit's NOTICE of filing of ptn for rehrg as to Aquilia Marcivicci Barnette (bsw) [Entry date 06/20/00] |
| 07/06/00 | 356 | View 1 pg $ 0.07 | JUDGMENT OF USCA (certified copy) as to Aquilia Marcivicci Barnette Re: [345-1] appeal, [344-1] appeal, [324-1] appeal remanding for resentencing Aquilia Marcivicci Barnette (1) count(s) 7, 8, & 11 |

Case 3:12-cv-00327-MOC   Document 99   Filed 09/23/15   Page 52 of 200

42

JA866

| | | | |
|---|---|---|---|
| | | | (bsw) [Entry date 07/11/00] [Edit date 08/14/02] |
| 07/18/00 | 357 | View 3 pgs $ 0.21 | MOTION by USA as to Aquilia Marcivicci Barnette for a status conference referred to: Judge Robert D. Potter (jlk) [Entry date 07/18/00] |
| 10/17/00 | -- | | CASE reassigned to Judge Richard L. Voorhees (clc) [Entry date 10/26/00] |
| 10/17/00 | 358 | View 4 pgs $ 0.28 | ORDER as to Aquilia Marcivicci Barnette, reassigning case to RLV ( Signed by Judge Robert D. Potter ) (clc) [Entry date 10/26/00] |
| 10/17/00 | -- | | Motion(s) no longer referred as to Aquilia Marcivicci Barnette : [357-1] motion for a status conference as to Aquilia Marcivicci Barnette (1) (clc) [Entry date 12/29/00] |
| 01/09/01 | -- | | Motion(s) no longer referred as to Aquilia Marcivicci Barnette : [357-1] motion for a status conference as to Aquilia Marcivicci Barnette (1) - reassigned to RLV (bsw) [Entry date 01/09/01] |
| 01/11/01 | 359 | View 3 pgs $ 0.21 | MOTION by USA as to Aquilia Marcivicci Barnette for status conference and inquiry as to status of cnsl referred to: Judge Richard L. Voorhees (clc) [Entry date 01/12/01] |
| 01/26/01 | -- | | Deadline updated as to Aquilia Marcivicci Barnette, set Calendar Call for 2:30 2/13/01 for Aquilia Marcivicci Barnette before Judge Richard L. Voorhees (ssh) [Entry date 01/26/01] [Edit date 01/26/01] |
| 02/02/01 | 360 | View 3 pgs $ 0.21 | ORDER as to Aquilia Marcivicci Barnette, for deft to be brought to Charlotte, NC no later than Feb. 13, 2001 for resentencing ( Signed by Judge Richard L. Voorhees ) (sdc) [Entry date 02/02/01] |
| 02/12/01 | -- | | Record on Appeal as to Aquilia Marcivicci Barnette returned from U.S. Court of Appeals: [344-1] appeal, [324-1] appeal (clc) [Entry date 02/12/01] |
| 02/13/01 | -- | | Miscellaneous Hearing as to Aquilia Marcivicci Barnette held to determine status of counsel. Deft is still indigent. (ssh) [Entry date 02/16/01] |
| 02/13/01 | -- | | ORAL ORDER as to Aquilia Marcivicci Barnette , Appointing Counsel Claire Rauscher and Jean Lawson ( Entered by Judge Richard L. Voorhees ) (ssh) [Entry date 02/16/01] |
| 02/13/01 | 361 | View 1 pg $ 0.07 | CJA 30 as to Aquilia Marcivicci Barnette : Appointment of Attorney Jean B. Lawson. Voucher # (ssh) [Entry date 02/16/01] |
| 02/13/01 | 362 | View | CJA 30 as to Aquilia Marcivicci Barnette : Appointment of Attorney |

Case 3:12-cv-00327-MOC Document 99 Filed 09/23/15 Page 53 of 200

**43**

**JA867**

| | | | |
|---|---|---|---|
| | | 1 pg<br>$ 0.07 | Claire J. Rauscher Voucher # (ssh) [Entry date 02/16/01] |
| 07/30/01 | 363 | View<br>3 pgs<br>$ 0.21 | MOTION by USA as to Aquilia Marcivicci Barnette for Pre-emptory Setting and Reaffirmation of Intention to Seek the Death Penalty referred to: Judge Richard L. Voorhees (sel) [Entry date 08/01/01] |
| 08/28/01 | 364 | View<br>1 pg<br>$ 0.07 | SEALED NOTICE of ex parte Statement of Defense Contentions by Aquilia Marcivicci Barnette (sel) [Entry date 08/29/01] |
| 08/28/01 | 364 | View<br>1 pg<br>$ 0.07 | SEALED DOCUMENT as to Aquilia Marcivicci Barnette (sel) [Entry date 08/29/01] |
| 08/28/01 | 365 | View<br>1 pg<br>$ 0.07 | SEALED DOCUMENT as to Aquilia Marcivicci Barnette (sel) [Entry date 08/29/01] |
| 08/28/01 | 366 | View<br>1 pg<br>$ 0.07 | SEALED DOCUMENT as to Aquilia Marcivicci Barnette (sel) [Entry date 08/29/01] |
| 08/31/01 | 367 | View<br>2 pgs<br>$ 0.14 | ORDER as to Aquilia Marcivicci Barnette, Reset Sentencing for 3/19/02 for Aquilia Marcivicci Barnette before Judge Richard L. Voorhees ( Signed by Judge Richard L. Voorhees ) (sel) [Entry date 08/31/01] |
| 10/10/01 | 368 | View<br>1 pg<br>$ 0.07 | SEALED DOCUMENT as to Aquilia Marcivicci Barnette (sdc) [Entry date 10/10/01] |
| 10/10/01 | 369 | View<br>1 pg<br>$ 0.07 | SEALED DOCUMENT as to Aquilia Marcivicci Barnette (sdc) [Entry date 10/10/01] |
| 10/31/01 | 370 | View<br>4 pgs<br>$ 0.28 | MOTION by Aquilia Marcivicci Barnette to Continue from March 2002 Sent Term referred to: Judge Richard L. Voorhees (sel) [Entry date 10/31/01] |
| 11/02/01 | 371 | View<br>4 pgs<br>$ 0.28 | RESPONSE by USA as to Aquilia Marcivicci Barnette in opposition to [370-1] motion to Continue from March 2002 Sent Term (sel) [Entry date 11/02/01] |
| 11/06/01 | 372 | View<br>2 pgs<br>$ 0.14 | ORDER as to Aquilia Marcivicci Barnette granting [370-1] motion to Continue from March 2002 Sent Term as to Aquilia Marcivicci Barnette (1), Reset Sentencing for before Judge Richard L. Voorhees ( Signed by Judge Richard L. Voorhees ) (sel) [Entry date 11/06/01] |
| 11/15/01 | 373 | View<br>1 pg<br>$ 0.07 | SEALED DOCUMENT as to Aquilia Marcivicci Barnette (sdc) [Entry date 11/15/01] |
| | | | |

Case 3:12-cv-00327-MOC   Document 99   Filed 09/23/15   Page 54 of 200

JA868

| 11/15/01 | 375 | View 5 pgs $ 0.35 | MOTION by Aquilia Marcivicci Barnette for Reconsideration of [372-1] order Reset Sentencing for before Judge Richard L. Voorhees, for Hearing/Scheduling Conference referred to: Judge Richard L. Voorhees (sdc) [Entry date 11/15/01] |
| --- | --- | --- | --- |
| 11/20/01 | 376 | View 1 pg $ 0.07 | SEALED DOCUMENT as to Aquilia Marcivicci Barnette (sel) [Entry date 11/20/01] |
| 11/20/01 | 377 | View 2 pgs $ 0.14 | ORDER as to Aquilia Marcivicci Barnette denying [375-1] motion for Reconsideration of [372-1] order Reset Sentencing for before Judge Richard L. Voorhees as to Aquilia Marcivicci Barnette (1), granting [375-2] motion for Hearing/Scheduling Conference as to Aquilia Marcivicci Barnette (1) ( Signed by Judge Richard L. Voorhees ) (sel) [Entry date 11/20/01] |
| 11/20/01 | 383 | View 1 pg $ 0.07 | SEALED DOCUMENT as to Aquilia Marcivicci Barnette (sel) [Entry date 12/12/01] |
| 11/28/01 | 378 | View 1 pg $ 0.07 | SEALED DOCUMENT as to Aquilia Marcivicci Barnette (sel) [Entry date 11/29/01] [Entry date 11/29/01] |
| 11/29/01 | 381 | View 1 pg $ 0.07 | SEALED DOCUMENT as to Aquilia Marcivicci Barnette (sel) [Entry date 11/29/01] |
| 11/29/01 | 380 | View 1 pg $ 0.07 | SEALED DOCUMENT as to Aquilia Marcivicci Barnette (sel) [Entry date 11/29/01] |
| 11/29/01 | -- | | Miscellaneous Hearing as to Aquilia Marcivicci Barnette held. Atty Rauscher states conflicts. Court removes attorney Rauscher and orders new cnsl be appointed. (ssh) [Entry date 11/29/01] |
| 11/29/01 | -- | | MOTION in open court by Aquilia Marcivicci Barnette for Claire Rauscher to Withdraw as Attorney (ssh) [Entry date 11/29/01] |
| 11/29/01 | -- | | ORAL ORDER as to Aquilia Marcivicci Barnette granting [0-0] oral motion for Claire Rauscher to Withdraw as Attorney (Terminated attorney Claire J. Rauscher for Aquilia Marcivicci Barnette as to Aquilia Marcivicci Barnette (1), Appointing Counsel ( Entered by Judge Richard L. Voorhees ) Court will advise of new cnsl. (ssh) [Entry date 11/29/01] |
| 12/07/01 | 382 | View 2 pgs $ 0.14 | ORDER as to Aquilia Marcivicci Barnette, Status Conference set for 12/10/01 @1:30 PM ( Signed by Judge Richard L. Voorhees ) (bsw) [Entry date 01/04/02] |
| 01/08/02 | 384 | View 2 pgs $ 0.14 | ORDER as to Aquilia Marcivicci Barnette, Continuing, Reset Sentencing for 7/22/02 for Aquilia Marcivicci Barnette before Judge Richard L. Voorhees ( Signed by Judge Richard L. Voorhees ) (sel) [Entry date |

Case 3:12-cv-00327-MOC   Document 99   Filed 09/23/15   Page 55 of 200

**45**

**JA869**

| | | | 01/08/02] |
|---|---|---|---|
| 01/14/02 | 385 | View<br>2 pgs<br>$ 0.14 | ORDER as to Aquilia Marcivicci Barnette, Appointing Counsel, Harold Bender ( Signed by Judge Richard L. Voorhees ) (sel) [Entry date 01/14/02] |
| 01/14/02 | 386 | View<br>1 pg<br>$ 0.07 | CJA 30 as to Aquilia Marcivicci Barnette : Appointment of Attorney Harold Bender (tob) [Entry date 01/16/02] |
| 01/24/02 | 387 | View<br>3 pgs<br>$ 0.21 | ORDER as to Aquilia Marcivicci Barnette, Reset Sentencing for before Judge Richard L. Voorhees ( Signed by Judge Richard L. Voorhees ) (sel) [Entry date 01/30/02] |
| 01/24/02 | 389 | View<br>1 pg<br>$ 0.07 | SEALED DOCUMENT as to Aquilia Marcivicci Barnette (sel) [Entry date 01/30/02] |
| 01/24/02 | 391 | View<br>1 pg<br>$ 0.07 | SEALED DOCUMENT as to Aquilia Marcivicci Barnette (sel) [Entry date 01/30/02] |
| 01/24/02 | 392 | View<br>4 pgs<br>$ 0.28 | ORDER/MEMORANDUM as to Aquilia Marcivicci Barnette, to all counsel appointed under the cja in the case of US v. Barnette ( Signed by Judge Richard L. Voorhees ) (sel) [Entry date 01/30/02] |
| 01/24/02 | 393 | View<br>4 pgs<br>$ 0.28 | ORDER/MEMORANDUM as to Aquilia Marcivicci Barnette, to all persons providing services in the case purs to subsection (e) of the CJA, 18 USC Section 3006A, and 21 USC Sections 848(q))9) and (q)(10)(B) in this case. ( Signed by Judge Richard L. Voorhees ) (sel) [Entry date 01/30/02] |
| 01/24/02 | 394 | View<br>1 pg<br>$ 0.07 | SEALED DOCUMENT as to Aquilia Marcivicci Barnette (sel) [Entry date 01/30/02] |
| 01/24/02 | 395 | View<br>1 pg<br>$ 0.07 | SEALED DOCUMENT as to Aquilia Marcivicci Barnette (sel) [Entry date 01/30/02] |
| 01/24/02 | 396 | View<br>1 pg<br>$ 0.07 | SEALED DOCUMENT as to Aquilia Marcivicci Barnette (sel) [Entry date 01/30/02] |
| 01/24/02 | 398 | View<br>1 pg<br>$ 0.07 | SEALED DOCUMENT as to Aquilia Marcivicci Barnette (sel) [Entry date 01/30/02] |
| 01/30/02 | 388 | View<br>1 pg<br>$ 0.07 | SEALED DOCUMENT as to Aquilia Marcivicci Barnette (sel) [Entry date 01/30/02] |

Case 3:12-cv-00327-MOC   Document 99   Filed 09/23/15   Page 56 of 200

46

JA870

| 01/30/02 | 390 | View 1 pg $ 0.07 | SEALED DOCUMENT as to Aquilia Marcivicci Barnette (sel) [Entry date 01/30/02] |
|---|---|---|---|
| 01/30/02 | 397 | View 1 pg $ 0.07 | SEALED DOCUMENT as to Aquilia Marcivicci Barnette (sel) [Entry date 01/30/02] |
| 01/30/02 | 406 | View 1 pg $ 0.07 | SEALED DOCUMENT as to Aquilia Marcivicci Barnette (sel) [Entry date 02/14/02] |
| 02/06/02 | 399 | View 1 pg $ 0.07 | SEALED DOCUMENT as to Aquilia Marcivicci Barnette (sel) [Entry date 02/07/02] |
| 02/11/02 | 400 | View 1 pg $ 0.07 | SEALED CJA DOCUMENT as to Aquilia Marcivicci Barnette (jlk) [Entry date 02/11/02] |
| 02/11/02 | 401 | View 1 pg $ 0.07 | SEALED CJA DOCUMENT as to Aquilia Marcivicci Barnette (jlk) [Entry date 02/11/02] |
| 02/11/02 | 402 | View 1 pg $ 0.07 | SEALED CJA DOCUMENT as to Aquilia Marcivicci Barnette (jlk) [Entry date 02/11/02] |
| 02/11/02 | 403 | View 1 pg $ 0.07 | SEALED DOCUMENT as to Aquilia Marcivicci Barnette (jlk) [Entry date 02/11/02] |
| 02/13/02 | 404 | View 1 pg $ 0.07 | SEALED DOCUMENT as to Aquilia Marcivicci Barnette (sel) [Entry date 02/14/02] |
| 02/13/02 | 405 | View 1 pg $ 0.07 | MEMORANDUM by Aquilia Marcivicci Barnette in support of [405-1] motion EX PARTE MOTION (sel) [Entry date 02/14/02] |
| 02/13/02 | 405 | View 1 pg $ 0.07 | SEALED DOCUMENT as to Aquilia Marcivicci Barnette (sel) [Entry date 02/14/02] |
| 02/13/02 | 408 | View 1 pg $ 0.07 | SEALED DOCUMENT as to Aquilia Marcivicci Barnette (Deft's Budget Projection for Attorney Fees and Related Costs) (sel) [Entry date 02/14/02] |
| 02/15/02 | 409 | View 1 pg $ 0.07 | SEALED DOCUMENT as to Aquilia Marcivicci Barnette (sel) [Entry date 02/19/02] |
| 02/15/02 | 410 | View 1 pg | SEALED DOCUMENT as to Aquilia Marcivicci Barnette (sel) [Entry date 02/19/02] |

Case 3:12-cv-00327-MOC   Document 99   Filed 09/23/15   Page 57 of 200

47

JA871

| | | $ 0.07 | |
|---|---|---|---|
| 02/22/02 | 411 | View 1 pg $ 0.07 | SEALED cja DOCUMENT as to Aquilia Marcivicci Barnette (jlk) [Entry date 02/22/02] |
| 02/22/02 | 412 | View 1 pg $ 0.07 | SEALED cja DOCUMENT as to Aquilia Marcivicci Barnette (jlk) [Entry date 02/22/02] |
| 02/26/02 | 413 | View 1 pg $ 0.07 | SEALED DOCUMENT as to Aquilia Marcivicci Barnette (sel) [Entry date 02/26/02] |
| 02/26/02 | 415 | View 1 pg $ 0.07 | SEALED DOCUMENT as to Aquilia Marcivicci Barnette (sel) [Entry date 02/26/02] |
| 02/26/02 | 417 | View 1 pg $ 0.07 | SEALED DOCUMENT as to Aquilia Marcivicci Barnette (sel) [Entry date 02/27/02] |
| 02/26/02 | 418 | View 1 pg $ 0.07 | SEALED DOCUMENT as to Aquilia Marcivicci Barnette (sel) [Entry date 02/27/02] |
| 02/26/02 | 419 | View 1 pg $ 0.07 | SEALED DOCUMENT as to Aquilia Marcivicci Barnette (sel) [Entry date 02/27/02] |
| 02/28/02 | 421 | View 1 pg $ 0.07 | SEALED CJA DOCUMENT as to Aquilia Marcivicci Barnette (jlk) [Entry date 02/28/02] |
| 03/07/02 | 422 | View 1 pg $ 0.07 | SEALED DOCUMENT as to Aquilia Marcivicci Barnette (sel) [Entry date 03/08/02] |
| 03/20/02 | 423 | View 1 pg $ 0.07 | SEALED DOCUMENT as to Aquilia Marcivicci Barnette (sel) [Entry date 03/20/02] |
| 03/20/02 | 425 | View 1 pg $ 0.07 | SEALED DOCUMENT as to Aquilia Marcivicci Barnette (sel) [Entry date 03/20/02] |
| 03/20/02 | -- | | SEALED TRANSCRIPT filed in case as to Aquilia Marcivicci Barnette for dates of February 26, 2002 Crt Rptr: Cheryl A. Nuccio (sel) [Entry date 03/20/02] |
| 03/29/02 | 427 | View 1 pg $ 0.07 | SEALED CJA DOCUMENT as to Aquilia Marcivicci Barnette (jlk) [Entry date 03/29/02] |

| 03/29/02 | 428 | View<br>1 pg<br>$ 0.07 | SEALED CJA DOCUMENT as to Aquilia Marcivicci Barnette (jlk) [Entry date 03/29/02] |
| 04/04/02 | 429 | View<br>1 pg<br>$ 0.07 | SEALED DOCUMENT as to Aquilia Marcivicci Barnette (sel) [Entry date 04/04/02] |
| 04/15/02 | 431 | View<br>1 pg<br>$ 0.07 | SEALED CJA DOCUMENT as to Aquilia Marcivicci Barnette (jlk) [Entry date 04/15/02] |
| 04/15/02 | 432 | View<br>1 pg<br>$ 0.07 | SEALED DOCUMENT as to Aquilia Marcivicci Barnette (sel) [Entry date 04/16/02] |
| 04/16/02 | -- | | Miscellaneous Hearing as to Aquilia Marcivicci Barnette set 11:00 4/24/02 for Aquilia Marcivicci Barnette (ssh) [Entry date 04/16/02] |
| 04/19/02 | 433 | View<br>39 pgs<br>$ 2.73 | Proposed Jury Instructions by Aquilia Marcivicci Barnette as to Aquilia Marcivicci Barnette (sel) [Entry date 04/22/02] |
| 04/19/02 | 435 | View<br>2 pgs<br>$ 0.14 | ORDER as to Aquilia Marcivicci Barnette, Motion Hearing set for 1:00 6/25/02 for Aquilia Marcivicci Barnette for [434-1] motion EX PARTE MOTION before Judge Richard L. Voorhees, set for 1:00 6/25/02 for Aquilia Marcivicci Barnette for [405-1] motion EX PARTE MOTION before Judge Richard L. Voorhees ( Signed by Judge Richard L. Voorhees ) (clc) [Entry date 04/22/02] |
| 04/19/02 | 436 | View<br>1 pg<br>$ 0.07 | SEALED DOCUMENT as to Aquilia Marcivicci Barnette (clc) [Entry date 04/22/02] |
| 04/22/02 | 438 | View<br>1 pg<br>$ 0.07 | SEALED DOCUMENT as to Aquilia Marcivicci Barnette (sel) [Entry date 04/23/02] |
| 04/22/02 | 439 | View<br>1 pg<br>$ 0.07 | SEALED DOCUMENT as to Aquilia Marcivicci Barnette (sel) [Entry date 04/23/02] |
| 04/22/02 | 440 | View<br>1 pg<br>$ 0.07 | SEALED DOCUMENT as to Aquilia Marcivicci Barnette (sel) [Entry date 04/23/02] |
| 04/24/02 | 441 | View<br>28 pgs<br>$ 1.96 | AMENDED Proposed Jury Instructions by Aquilia Marcivicci Barnette (sel) [Entry date 04/24/02] |
| 04/24/02 | -- | | Status Conference as to Aquilia Marcivicci Barnette held Judge: Voorhees Court Rptr: Nuccio (ssh) [Entry date 04/26/02] |
| | | | |

Case 3:12-cv-00327-MOC  Document 99  Filed 09/23/15  Page 59 of 200

**JA873**

| 04/25/02 | 443 | View 9 pgs $ 0.63 | RESPONSE by USA as to Aquilia Marcivicci Barnette in opposition to [441-1] instructions jury (sel) [Entry date 04/26/02] |
| 04/25/02 | 444 | View 23 pgs $ 1.61 | MOTION by USA as to Aquilia Marcivicci Barnette to adopt/approve courtroom orinetation and jury selection procedure referred to: Judge Richard L. Voorhees (sel) [Entry date 04/26/02] |
| 04/29/02 | 445 | View 1 pg $ 0.07 | SEALED DOCUMENT as to Aquilia Marcivicci Barnette (sel) [Entry date 04/29/02] |
| 04/29/02 | 446 | View 1 pg $ 0.07 | SEALED DOCUMENT as to Aquilia Marcivicci Barnette (sel) [Entry date 04/29/02] |
| 04/29/02 | 447 | View 1 pg $ 0.07 | SEALED DOCUMENT as to Aquilia Marcivicci Barnette (sel) [Entry date 04/29/02] |
| 05/01/02 | 448 | View 1 pg $ 0.07 | SEALED DOCUMENT as to Aquilia Marcivicci Barnette (sel) [Entry date 05/01/02] |
| 05/02/02 | 449 | View 6 pgs $ 0.42 | MOTION by USA as to Aquilia Marcivicci Barnette for proper service of pleadings referred to: Judge Richard L. Voorhees (sel) [Entry date 05/02/02] |
| 05/02/02 | 450 | View 42 pgs $ 2.94 | REPLY by Aquilia Marcivicci Barnette to response to USA's Response to Deft's Proposed Jury Questionnaire (sel) [Entry date 05/02/02] |
| 05/02/02 | -- | | Motion Hearing held as to Aquilia Marcivicci Barnette re: [449-1] motion for proper service of pleadings. Court rules moot Judge: Voorhees Court Rptr: Nuccio Court also discusses jury procedure. (ssh) [Entry date 05/06/02] |
| 05/03/02 | 451 | View 1 pg $ 0.07 | SEALED DOCUMENT as to Aquilia Marcivicci Barnette (sel) [Entry date 05/03/02] |
| 05/03/02 | 452 | View 1 pg $ 0.07 | SEALED DOCUMENT as to Aquilia Marcivicci Barnette (sel) [Entry date 05/03/02] |
| 05/03/02 | 453 | View 1 pg $ 0.07 | SEALED CJA DOCUMENT as to Aquilia Marcivicci Barnette (jlk) [Entry date 05/07/02] |
| 05/03/02 | 454 | View 1 pg $ 0.07 | SEALED CJA DOCUMENT as to Aquilia Marcivicci Barnette (jlk) [Entry date 05/07/02] |

Case 3:12-cv-00327-MOC   Document 99   Filed 09/23/15   Page 60 of 200

| 05/03/02 | 455 | View<br>1 pg<br>$ 0.07 | SEALED CJA DOCUMENT as to Aquilia Marcivicci Barnette (jlk) [Entry date 05/07/02] |
| 05/03/02 | 456 | View<br>1 pg<br>$ 0.07 | SEALED CJA DOCUMENT as to Aquilia Marcivicci Barnette (jlk) [Entry date 05/07/02] |
| 05/03/02 | 457 | View<br>1 pg<br>$ 0.07 | SEALED CJA DOCUMENT as to Aquilia Marcivicci Barnette (jlk) [Entry date 05/07/02] |
| 05/07/02 | 458 | View<br>1 pg<br>$ 0.07 | SEALED CJA DOCUMENT as to Aquilia Marcivicci Barnette (jlk) [Entry date 05/07/02] |
| 05/13/02 | 462 | View<br>3 pgs<br>$ 0.21 | MOTION by Aquilia Marcivicci Barnette that all requests by potential jurors to be excused be heard in defendant's presence referred to: Judge Richard L. Voorhees (sdc) [Entry date 05/15/02] |
| 05/13/02 | -- | | by Aquilia Marcivicci Barnette as to Aquilia Marcivicci Barnette (sel) [Entry date 05/15/02] |
| 05/13/02 | -- | | SEALED DOCUMENT as to Aquilia Marcivicci Barnette (sel) [Entry date 05/15/02] |
| 05/14/02 | 461 | View<br>4 pgs<br>$ 0.28 | ORDER as to Aquilia Marcivicci Barnette, for proposed jury questionnaire ( Signed by Judge Richard L. Voorhees ) (sel) [Entry date 05/15/02] |
| 05/16/02 | 463 | View<br>1 pg<br>$ 0.07 | SEALED CJA DOCUMENT as to Aquilia Marcivicci Barnette (jlk) [Entry date 05/16/02] |
| 05/20/02 | 464 | View<br>15 pgs<br>$ 1.05 | Jury instructions/Proposed Courtroom Orientation and Jury Selection Procedure as to Aquilia Marcivicci Barnette (sel) [Entry date 05/20/02] |
| 05/20/02 | 465 | View<br>42 pgs<br>$ 2.94 | Proposed Jury Instructions/Questionnaire and Disagreement Summary by Aquilia Marcivicci Barnette (sel) [Entry date 05/21/02] |
| 05/20/02 | 466 | View<br>9 pgs<br>$ 0.63 | NOTICE of Deft's Proposed Procedures for Jury Orientation and Selection by Aquilia Marcivicci Barnette (sel) [Entry date 05/21/02] |
| 05/21/02 | 467 | View<br>9 pgs<br>$ 0.63 | RESPONSE by USA as to Aquilia Marcivicci Barnette in opposition to [465-1] instructions jury (sel) [Entry date 05/21/02] |
| 05/21/02 | 468 | View<br>2 pgs<br>$ 0.14 | MOTION by USA as to Aquilia Marcivicci Barnette to Extend Time within which to file motions referred to: Judge Richard L. Voorhees (sel) |

Case 3:12-cv-00327-MOC   Document 99   Filed 09/23/15   Page 61 of 200

**51**

**JA875**

| | | | |
|---|---|---|---|
| | | | [Entry date 05/21/02] |
| 05/21/02 | 469 | View 1 pg $ 0.07 | SEALED DOCUMENT as to Aquilia Marcivicci Barnette (sel) [Entry date 05/22/02] |
| 05/22/02 | 472 | View 1 pg $ 0.07 | SEALED CJA DOCUMENT as to Aquilia Marcivicci Barnette (jlk) [Entry date 05/24/02] |
| 05/22/02 | 473 | View 1 pg $ 0.07 | SEALED CJA DOCUMENT as to Aquilia Marcivicci Barnette (jlk) [Entry date 05/24/02] |
| 05/23/02 | 471 | View 3 pgs $ 0.21 | ORDER as to Aquilia Marcivicci Barnette denying [468-1] motion to Extend Time within which to file motions as to Aquilia Marcivicci Barnette (1) ( Signed by Judge Richard L. Voorhees ) (sel) [Entry date 05/23/02] |
| 05/28/02 | 475 | View 1 pg $ 0.07 | RETURN OF SERVICE Executed as to Aquilia Marcivicci Barnette 5/24/02 served with Criminal Subpoena (sel) [Entry date 05/28/02] |
| 05/31/02 | 476 | View 3 pgs $ 0.21 | ORDER as to Aquilia Marcivicci Barnette denying [462-1] motion that all requests by potential jurors to be excused be heard in defendant's presence as to Aquilia Marcivicci Barnette (1) ( Signed by Judge Richard L. Voorhees ) (sel) [Entry date 05/31/02] |
| 05/31/02 | 477 | View 15 pgs $ 1.05 | Revised Proposed Jury Instructions, Courtroom Orientation and Jury Selection Procedure by USA as to Aquilia Marcivicci Barnette (sel) [Entry date 05/31/02] |
| 06/04/02 | 478 | View 1 pg $ 0.07 | MOTION by Aquilia Marcivicci Barnette to Suppress Prior Conviction referred to: Judge Richard L. Voorhees (sel) [Entry date 06/05/02] |
| 06/04/02 | 479 | View 1 pg $ 0.07 | MOTION by Aquilia Marcivicci Barnette for Disclosure of of Mitigating Information referred to: Judge Richard L. Voorhees (sel) [Entry date 06/05/02] |
| 06/04/02 | 480 | View 2 pgs $ 0.14 | MOTION by Aquilia Marcivicci Barnette for individual Voir Dire of potential jurors regarding their beliefs about parole eligibility on fed life sentence referred to: Judge Richard L. Voorhees (sel) [Entry date 06/05/02] |
| 06/04/02 | 481 | View 1 pg $ 0.07 | MOTION by Aquilia Marcivicci Barnette for complete recordation and presence of deft at all proceedings referred to: Judge Richard L. Voorhees (sel) [Entry date 06/05/02] |
| 06/04/02 | 483 | View 2 pgs $ 0.14 | MOTION by Aquilia Marcivicci Barnette in Limine to bar medical testimony referred to: Judge Richard L. Voorhees (sel) [Entry date |

Case 3:12-cv-00327-MOC   Document 99   Filed 09/23/15   Page 62 of 200

52

**JA876**

| | | | 06/05/02] |
|---|---|---|---|
| 06/04/02 | 484 | View 2 pgs $ 0.14 | MOTION by Aquilia Marcivicci Barnette for daily transcripts referred to: Judge Richard L. Voorhees (sel) [Entry date 06/05/02] |
| 06/04/02 | 485 | View 2 pgs $ 0.14 | MOTION by Aquilia Marcivicci Barnette for allocution by the deft referred to: Judge Richard L. Voorhees (sel) [Entry date 06/05/02] |
| 06/04/02 | 486 | View 2 pgs $ 0.14 | MOTION by Aquilia Marcivicci Barnette in Limine regarding the victim impact statements referred to: Judge Richard L. Voorhees (sel) [Entry date 06/05/02] |
| 06/04/02 | 487 | View 9 pgs $ 0.63 | MOTION by Aquilia Marcivicci Barnette for Discovery and Inspection referred to: Judge Richard L. Voorhees (sel) [Entry date 06/05/02] |
| 06/04/02 | 488 | View 5 pgs $ 0.35 | MOTION by Aquilia Marcivicci Barnette for Brady Material and other incorporated memorandum of law referred to: Judge Richard L. Voorhees (sel) [Entry date 06/05/02] |
| 06/04/02 | 489 | View 2 pgs $ 0.14 | MOTION by Aquilia Marcivicci Barnette that the defense be afforded the last argument to the jury referred to: Judge Richard L. Voorhees (sel) [Entry date 06/05/02] |
| 06/04/02 | 490 | View 3 pgs $ 0.21 | MOTION by Aquilia Marcivicci Barnette for individual voir dire of potential jurors and sequestration of the venire during voir dire referred to: Judge Richard L. Voorhees (sel) [Entry date 06/05/02] |
| 06/04/02 | 491 | View 3 pgs $ 0.21 | MOTION by Aquilia Marcivicci Barnette to permit defense counsel to question potential jurors challenged for cause by the govt referred to: Judge Richard L. Voorhees (sel) [Entry date 06/05/02] |
| 06/04/02 | 492 | View 3 pgs $ 0.21 | MOTION by Aquilia Marcivicci Barnette to bar imposition of death penalty referred to: Judge Richard L. Voorhees (sel) [Entry date 06/05/02] |
| 06/04/02 | 493 | View 2 pgs $ 0.14 | MOTION by Aquilia Marcivicci Barnette for Discovery o govt experts, qualifications and reports referred to: Judge Richard L. Voorhees (sel) [Entry date 06/05/02] |
| 06/04/02 | 494 | View 2 pgs $ 0.14 | MOTION by Aquilia Marcivicci Barnette for Reconsideration of Proposal for Proceeding wherein potential jurors fill out juror questionnaire referred to: Judge Richard L. Voorhees (sel) [Entry date 06/05/02] |
| 06/04/02 | 495 | View 2 pgs $ 0.14 | MOTION by Aquilia Marcivicci Barnette to require the govt to refer to "Life Imprisonment w/out possibiliity of release throughout the trial referred to: Judge Richard L. Voorhees (sel) [Entry date 06/05/02] |

Case 3:12-cv-00327-MOC Document 99 Filed 09/23/15 Page 63 of 200

**53**

**JA877**

| 06/04/02 | 496 | View<br>1 pg<br>$ 0.07 | MOTION by Aquilia Marcivicci Barnette for Leave to File futher motions referred to: Judge Richard L. Voorhees (sel) [Entry date 06/05/02] |
| --- | --- | --- | --- |
| 06/04/02 | 497 | View<br>2 pgs<br>$ 0.14 | CERTIFICATE OF SERVICE by Aquilia Marcivicci Barnette (sel) [Entry date 06/05/02] |
| 06/04/02 | 498 | View<br>1 pg<br>$ 0.07 | SEALED DOCUMENT (Objections to the Clerk Excusing Certain Jurors at their Request) as to Aquilia Marcivicci Barnette (sel) [Entry date 06/05/02] |
| 06/05/02 | 482 | View<br>4 pgs<br>$ 0.28 | MOTION by Aquilia Marcivicci Barnette for order prohibiting the govt from peremptorily challenging jurors on the basis of their sex or race to: Judge Richard L. Voorhees (sel) [Entry date 06/05/02] |
| 06/07/02 | -- | | TRANSCRIPT filed in case as to Aquilia Marcivicci Barnette for dates of January 5, 1998 Crt Rptr: Scott A. Huseby (sdc) [Entry date 06/07/02] |
| 06/07/02 | 500 | View<br>1 pg<br>$ 0.07 | SEALED DOCUMENT as to Aquilia Marcivicci Barnette (sdc) [Entry date 06/07/02] |
| 06/07/02 | 501 | View<br>1 pg<br>$ 0.07 | SEALED DOCUMENT as to Aquilia Marcivicci Barnette (sdc) [Entry date 06/07/02] |
| 06/10/02 | 502 | View<br>1 pg<br>$ 0.07 | SEALED DOCUMENT as to Aquilia Marcivicci Barnette (sel) [Entry date 06/11/02] |
| 06/10/02 | 503 | View<br>1 pg<br>$ 0.07 | SEALED DOCUMENT as to Aquilia Marcivicci Barnette (sel) [Entry date 06/11/02] |
| 06/11/02 | 504 | View<br>1 pg<br>$ 0.07 | SEALED CJA DOCUMENT as to Aquilia Marcivicci Barnette (jlk) [Entry date 06/11/02] |
| 06/11/02 | 505 | View<br>1 pg<br>$ 0.07 | SEALED CJA DOCUMENT as to Aquilia Marcivicci Barnette (jlk) [Entry date 06/11/02] |
| 06/12/02 | 506 | View<br>4 pgs<br>$ 0.28 | RESPONSE by USA as to Aquilia Marcivicci Barnette re [485-1] motion for allocution by the deft (sel) [Entry date 06/12/02] |
| 06/12/02 | 507 | View<br>2 pgs<br>$ 0.14 | RESPONSE by USA as to Aquilia Marcivicci Barnette re [484-1] motion for daily transcripts (sel) [Entry date 06/12/02] |
| 06/12/02 | 508 | View<br>2 pgs | RESPONSE by USA as to Aquilia Marcivicci Barnette re [481-1] |

Case 3:12-cv-00327-MOC   Document 99   Filed 09/23/15   Page 64 of 200

54

**JA878**

| | | | |
|---|---|---|---|
| | | $ 0.14 | motion for complete recordation and presence of deft at all proceedings (sel) [Entry date 06/12/02] |
| 06/12/02 | 509 | View<br>8 pgs<br>$ 0.56 | RESPONSE by USA as to Aquilia Marcivicci Barnette re [496-1] motion for Leave to File futher motions (sel) [Entry date 06/12/02] |
| 06/12/02 | 510 | View<br>3 pgs<br>$ 0.21 | RESPONSE by USA as to Aquilia Marcivicci Barnette re [495-1] motion to require the govt to refer to "Life Imprisonment w/out possibiliity of release throughout the trial (sel) [Entry date 06/12/02] |
| 06/12/02 | 511 | View<br>9 pgs<br>$ 0.63 | RESPONSE by USA as to Aquilia Marcivicci Barnette in opposition to [486-1] motion in Limine regarding the victim impact statements (sel) [Entry date 06/12/02] |
| 06/12/02 | 512 | View<br>3 pgs<br>$ 0.21 | RESPONSE by USA as to Aquilia Marcivicci Barnette re [489-1] motion that the defense be afforded the last argument to the jury (sel) [Entry date 06/12/02] |
| 06/12/02 | 513 | View<br>6 pgs<br>$ 0.42 | Witness list by USA as to Aquilia Marcivicci Barnette (sel) [Entry date 06/12/02] |
| 06/12/02 | 514 | View<br>3 pgs<br>$ 0.21 | RESPONSE by USA as to Aquilia Marcivicci Barnette re [487-1] motion for Discovery and Inspection (sel) [Entry date 06/12/02] |
| 06/13/02 | 515 | View<br>1 pg<br>$ 0.07 | SEALED DOCUMENT as to Aquilia Marcivicci Barnette (sel) [Entry date 06/13/02] |
| 06/13/02 | 519 | View<br>9 pgs<br>$ 0.63 | ORDER as to Aquilia Marcivicci Barnette [513-1] witness list as to Aquilia Marcivicci Barnette (1), granting in part, denying in part [494-1] motion for Reconsideration of Proposal for Proceeding wherein potential jurors fill out juror questionnaire (granting the request that the jury will not be told that case is death penalty case as to Aquilia Marcivicci Barnette (1), [477-1] instructions jury as to Aquilia Marcivicci Barnette (1), [464-1] instructions jury as to Aquilia Marcivicci Barnette (1), [465-1] instructions jury as to Aquilia Marcivicci Barnette (1), [441-1] instructions jury as to Aquilia Marcivicci Barnette (1) ( Signed by Judge Richard L. Voorhees ) (sel) [Entry date 06/13/02] |
| 06/13/02 | 520 | View<br>9 pgs<br>$ 0.63 | Addendum by Aquilia Marcivicci Barnette, USA as to Aquilia Marcivicci Barnette re: Jury Questionnaire (sel) [Entry date 06/13/02] |
| 06/13/02 | 521 | View<br>3 pgs<br>$ 0.21 | REPLY by Aquilia Marcivicci Barnette to response to [496-1] motion for Leave to File futher motions (sel) [Entry date 06/14/02] |
| 06/14/02 | 522 | View<br>4 pgs<br>$ 0.28 | RESPONSE by USA as to Aquilia Marcivicci Barnette in opposition to [491-1] motion to permit defense counsel to question potential jurors challenged for cause by the govt (sel) [Entry date 06/14/02] |

Case 3:12-cv-00327-MOC   Document 99   Filed 09/23/15   Page 65 of 200

55

## JA879

| 06/14/02 | 523 | View 13 pgs $ 0.91 | RESPONSE by USA as to Aquilia Marcivicci Barnette re [486-1] motion in Limine regarding the victim impact statements (sel) [Entry date 06/14/02] |
|---|---|---|---|
| 06/14/02 | 524 | View 13 pgs $ 0.91 | RESPONSE by USA as to Aquilia Marcivicci Barnette re [478-1] motion to Suppress Prior Conviction (sel) [Entry date 06/14/02] |
| 06/14/02 | 525 | View 38 pgs $ 2.66 | Voir Dire Questions by USA as to Aquilia Marcivicci Barnette (sel) [Entry date 06/14/02] |
| 06/17/02 | 526 | View 6 pgs $ 0.42 | ORDER as to Aquilia Marcivicci Barnette, to Amend [525-1] voir dire jury questionnaire ( Signed by Judge Richard L. Voorhees ) (sel) [Entry date 06/17/02] |
| 06/17/02 | 535 | View 1 pg $ 0.07 | SEALED CJA DOCUMENT as to Aquilia Marcivicci Barnette (jlk) [Entry date 06/19/02] |
| 06/18/02 | 527 | View 3 pgs $ 0.21 | ORDER as to Aquilia Marcivicci Barnette denying [496-1] motion for Leave to File further motions as to Aquilia Marcivicci Barnette (1) ( Signed by Judge Richard L. Voorhees ) (sel) [Entry date 06/18/02] |
| 06/18/02 | 528 | View 3 pgs $ 0.21 | ORDER as to Aquilia Marcivicci Barnette granting [490-1] motion for individual voir dire of potential jurors and sequestration of the venire during voir dire as to Aquilia Marcivicci Barnette (1) ( Signed by Judge Richard L. Voorhees ) (sel) [Entry date 06/18/02] |
| 06/18/02 | 529 | View 3 pgs $ 0.21 | ORDER as to Aquilia Marcivicci Barnette mooting [482-1] motion for order prohibiting the govt from peremptorily challenging jurors on the basis of their sex or race to: Judge Richard L. Voorhees as to Aquilia Marcivicci Barnette (1) ( Signed by Judge Richard L. Voorhees ) (sel) [Entry date 06/18/02] |
| 06/18/02 | 530 | View 3 pgs $ 0.21 | ORDER as to Aquilia Marcivicci Barnette granting [484-1] motion for daily transcripts as to Aquilia Marcivicci Barnette (1) ( Signed by Judge Richard L. Voorhees ) (sel) [Entry date 06/18/02] |
| 06/18/02 | 531 | View 4 pgs $ 0.28 | ORDER as to Aquilia Marcivicci Barnette denying [485-1] motion for allocution by the deft as to Aquilia Marcivicci Barnette (1) ( Signed by Judge Richard L. Voorhees ) (sel) [Entry date 06/18/02] |
| 06/18/02 | 532 | View 4 pgs $ 0.28 | ORDER as to Aquilia Marcivicci Barnette denying [489-1] motion that the defense be afforded the last argument to the jury as to Aquilia Marcivicci Barnette (1) ( Signed by Judge Richard L. Voorhees ) (sel) [Entry date 06/18/02] |
| 06/18/02 | 533 | View 3 pgs $ 0.21 | ORDER as to Aquilia Marcivicci Barnette denying [492-1] motion to bar imposition of death penalty as to Aquilia Marcivicci Barnette (1) ( Signed by Judge Richard L. Voorhees ) (sel) [Entry date 06/18/02] |

| | | | |
|---|---|---|---|
| 06/18/02 | 534 | View<br>3 pgs<br>$ 0.21 | ORDER as to Aquilia Marcivicci Barnette granting [481-1] motion for complete recordation and presence of deft at all proceedings as to Aquilia Marcivicci Barnette (1) ( Signed by Judge Richard L. Voorhees ) (sel) [Entry date 06/18/02] |
| 06/20/02 | 538 | View<br>1 pg<br>$ 0.07 | SEALED DOCUMENT as to Aquilia Marcivicci Barnette (sel) [Entry date 06/21/02] |
| 06/21/02 | 536 | View<br>3 pgs<br>$ 0.21 | ORDER as to Aquilia Marcivicci Barnette denying [495-1] motion to require the govt to refer to "Life Imprisonment w/out possibiliity of release throughout the trial as to Aquilia Marcivicci Barnette (1) ( Signed by Judge Richard L. Voorhees ) (sel) [Entry date 06/21/02] |
| 06/21/02 | 537 | View<br>4 pgs<br>$ 0.28 | ORDER as to Aquilia Marcivicci Barnette granting [491-1] motion to permit defense counsel to question potential jurors challenged for cause by the govt as to Aquilia Marcivicci Barnette (1) ( Signed by Judge Richard L. Voorhees ) (sel) [Entry date 06/21/02] |
| 06/21/02 | 539 | View<br>5 pgs<br>$ 0.35 | ORDER as to Aquilia Marcivicci Barnette denying [486-1] motion in Limine regarding the victim impact statements as to Aquilia Marcivicci Barnette (1) ( Signed by Judge Richard L. Voorhees ) (sel) [Entry date 06/21/02] |
| 06/25/02 | 540 | View<br>1 pg<br>$ 0.07 | SEALED DOCUMENT as to Aquilia Marcivicci Barnette (sel) [Entry date 06/25/02] |
| 06/25/02 | 542 | View<br>4 pgs<br>$ 0.28 | ORDER as to Aquilia Marcivicci Barnette denying [478-1] motion to Suppress Prior Conviction as to Aquilia Marcivicci Barnette (1) ( Signed by Judge Richard L. Voorhees ) (sel) [Entry date 06/25/02] |
| 06/25/02 | 543 | View<br>3 pgs<br>$ 0.21 | ORDER as to Aquilia Marcivicci Barnette granting [480-1] motion for individual Voir Dire of potential jurors regarding their beliefs about parole eligibility on fed life sentence as to Aquilia Marcivicci Barnette (1) ( Signed by Judge Richard L. Voorhees ) (sel) [Entry date 06/25/02] |
| 06/25/02 | 544 | View<br>5 pgs<br>$ 0.35 | ORDER as to Aquilia Marcivicci Barnette denying [493-1] motion for Discovery o govt experts, qualifications and reports as to Aquilia Marcivicci Barnette (1), denying [488-1] motion for Brady Material and other incorporated memorandum of law as to Aquilia Marcivicci Barnette (1), denying [487-1] motion for Discovery and Inspection as to Aquilia Marcivicci Barnette (1), denying [479-1] motion for Disclosure of of Mitigating Information as to Aquilia Marcivicci Barnette (1) ( Signed by Judge Richard L. Voorhees ) (sel) [Entry date 06/25/02] |
| 06/25/02 | 545 | View<br>4 pgs<br>$ 0.28 | ORDER as to Aquilia Marcivicci Barnette denying [478-1] motion to Suppress Prior Conviction ( Signed by Judge Richard L. Voorhees ) (sel) [Entry date 06/25/02] |
| 06/25/02 | 547 | View<br>1 pg | SEALED CJA DOCUMENT as to Aquilia Marcivicci Barnette (jlk) [Entry date 06/26/02] |

| | | | |
|---|---|---|---|
| | | $ 0.07 | |
| 06/25/02 | -- | | Status hearing held (ssh) [Entry date 06/26/02] |
| 06/26/02 | 546 | View<br>4 pgs<br>$ 0.28 | ORDER as to Aquilia Marcivicci Barnette, regarding mental health evidence ( Signed by Judge Richard L. Voorhees ) (sel) [Entry date 06/26/02] |
| 06/27/02 | 548 | View<br>1 pg<br>$ 0.07 | Substitution of Govt Attorney, Anne Tompkins, replacing attorney Gretchen C. F. Shappert for USA (sel) [Entry date 07/01/02] |
| 07/02/02 | 549 | View<br>21 pgs<br>$ 1.47 | MOTION by Aquilia Marcivicci Barnette for relief purs to Ring v. Arizona referred to: Judge Richard L. Voorhees (sel) [Entry date 07/03/02] |
| 07/02/02 | 550 | View<br>1 pg<br>$ 0.07 | SEALED DOCUMENT as to Aquilia Marcivicci Barnette (sel) [Entry date 07/03/02] |
| 07/03/02 | 551 | View<br>34 pgs<br>$ 2.38 | MOTION by Aquilia Marcivicci Barnette to Dismiss Proceeding wherein the govt seeks to have the deft sentenced to death, to Stay these sentencing proceedings pending resolution of the matter by the US Supreme Court referred to: Judge Richard L. Voorhees (sel) [Entry date 07/03/02] |
| 07/05/02 | 555 | View<br>3 pgs<br>$ 0.21 | MOTION by Aquilia Marcivicci Barnette to allow the defense access to govt info about potential jurors and witnesses referred to: Judge Richard L. Voorhees (sel) [Entry date 07/09/02] |
| 07/08/02 | 552 | View<br>1 pg<br>$ 0.07 | SEALED CJA DOCUMENT as to Aquilia Marcivicci Barnette (jlk) [Entry date 07/08/02] |
| 07/08/02 | 553 | View<br>1 pg<br>$ 0.07 | SEALED CJA DOCUMENT as to Aquilia Marcivicci Barnette (jlk) [Entry date 07/08/02] |
| 07/08/02 | 554 | View<br>2 pgs<br>$ 0.14 | MOTION by Aquilia Marcivicci Barnette in Limine for court determination of evidentiary issues before testimony is placed before the jury referred to: Judge Richard L. Voorhees (sel) [Entry date 07/09/02] |
| 07/09/02 | 558 | View<br>1 pg<br>$ 0.07 | SEALED CJA DOCUMENT as to Aquilia Marcivicci Barnette (jlk) [Entry date 07/09/02] |
| 07/11/02 | 559 | View<br>1 pg<br>$ 0.07 | SEALED DOCUMENT as to Aquilia Marcivicci Barnette (sdc) [Entry date 07/11/02] |
| 07/11/02 | 560 | View<br>2 pgs | ORDER as to Aquilia Marcivicci Barnette denying [551-1] motion to |

Case 3:12-cv-00327-MOC   Document 99   Filed 09/23/15   Page 68 of 200

**58**

**JA882**

| | | $ 0.14 | Dismiss Proceeding wherein the govt seeks to have the deft sentenced to death as to Aquilia Marcivicci Barnette (1) ( Signed by Judge Richard L. Voorhees ) (sdc) [Entry date 07/11/02] |
|---|---|---|---|
| 07/11/02 | 561 | View<br>4 pgs<br>$ 0.28 | RESPONSE by USA as to Aquilia Marcivicci Barnette re [551-1] motion to Dismiss Proceeding wherein the govt seeks to have the deft sentenced to death (sel) [Entry date 07/11/02] |
| 07/11/02 | 562 | View<br>2 pgs<br>$ 0.14 | NOTICE of Intnet to Admit Expert Testimony by USA as to Aquilia Marcivicci Barnette (sel) [Entry date 07/11/02] |
| 07/11/02 | 563 | View<br>3 pgs<br>$ 0.21 | RESPONSE by USA as to Aquilia Marcivicci Barnette re [554-1] motion in Limine for court determination of evidentiary issues before testimony is placed before the jury (sel) [Entry date 07/11/02] |
| 07/12/02 | 564 | View<br>7 pgs<br>$ 0.49 | MOTION by Aquilia Marcivicci Barnette in support of Dismissal of the Intent to Seek the Death Penalty pursuant to Ring vs. Arizona referred to: Judge Richard L. Voorhees (jlk) [Entry date 07/12/02] |
| 07/12/02 | 565 | View<br>5 pgs<br>$ 0.35 | RESPONSE by USA as to Aquilia Marcivicci Barnette re [564-1] motion in support of Dismissal of the Intent to Seek the Death Penalty pursuant to Ring vs. Arizona (jlk) [Entry date 07/12/02] |
| 07/12/02 | 566 | View<br>4 pgs<br>$ 0.28 | ORDER as to Aquilia Marcivicci Barnette denying [554-1] motion in Limine for court determination of evidentiary issues before testimony is placed before the jury as to Aquilia Marcivicci Barnette (1) ( Signed by Judge Richard L. Voorhees ) (jlk) [Entry date 07/15/02] |
| 07/12/02 | 567 | View<br>4 pgs<br>$ 0.28 | ORDER as to Aquilia Marcivicci Barnette, upon both the govt. and the defense proposals for courtroom orientation and jury selection procedures. ( Signed by Judge Richard L. Voorhees ) (jlk) [Entry date 07/15/02] |
| 07/12/02 | 568 | View<br>7 pgs<br>$ 0.49 | Preliminary Jury instructions after completion of the juror questionnaire as to Aquilia Marcivicci Barnette (jlk) [Entry date 07/15/02] |
| 07/12/02 | 569 | View<br>4 pgs<br>$ 0.28 | NOTICE and ORDER as to Aquilia Marcivicci Barnette, of Court's proposed questions to the entire jury panel ( Signed by Judge Richard L. Voorhees ) (jlk) [Entry date 07/15/02] |
| 07/15/02 | -- | | Jury selection begins for Sentencing as to Aquilia M. Barnette; Judge: Voorhees Court Rptr: Nuccio (a.m.) Kelly (p.m.) (jlk) [Entry date 07/15/02] |
| 07/15/02 | -- | | ORAL ORDER as to Aquilia Marcivicci Barnette denying [555-1] motion to allow the defense access to govt info about potential jurors and witnesses as to Aquilia Marcivicci Barnette (1) ( Entered by Judge Richard L. Voorhees ) (jlk) [Entry date 07/15/02] |

Case 3:12-cv-00327-MOC   Document 99   Filed 09/23/15   Page 69 of 200

**59**

**JA883**

| 07/16/02 | 570 | View<br>2 pgs<br>$ 0.14 | MOTION by Aquilia Marcivicci Barnette to order the govt. not to refer to this as a "capital" sentencing hearing referred to: Judge Richard L. Voorhees (jlk) [Entry date 07/16/02] |
|---|---|---|---|
| 07/16/02 | -- | | TRANSCRIPT filed in case as to Aquilia Marcivicci Barnette for dates of 7/15/02 (a.m.) Crt Rptr: Cheryl Nuccio (jlk) [Entry date 07/16/02] for dates of 7/15/02 (p.m.) Crt Rptr: Joy Kelly (jlk) [Entry date 07/16/02] |
| 07/16/02 | -- | | Jury Selection continues for sentencing phase as to Aquilia Marcivicci Barnette; Judge: Voorhees; Court Reporter: Nuccio (a.m.) Kelly (p.m.) (jlk) [Entry date 07/16/02] |
| 07/17/02 | 571 | View<br>48 pgs<br>$ 3.36 | MEMORANDUM by Aquilia Marcivicci Barnette in support of [564-1] motion in support of Dismissal of the Intent to Seek the Death Penalty pursuant to Ring vs. Arizona (sel) [Entry date 07/18/02] |
| 07/18/02 | -- | | Jury Selection as to Aquilia Marcivicci Barnette held. Cheryl Nuccio Court reporter a.m. Joy Kelly Court reporter p.m. (ssh) [Entry date 07/18/02] |
| 07/18/02 | -- | | TRANSCRIPT filed in case as to Aquilia Marcivicci Barnette for dates of 7/16/02 morning Crt Rptr: Cheryl A. Nuccio (ssh) [Entry date 07/19/02] [Edit date 07/26/02] for dates of 7/16/02 afternoon. Crt Rptr: Joy Kelly (ssh) [Entry date 07/19/02] |
| 07/19/02 | -- | | Jury Selection as to Aquilia Marcivicci Barnette held. Cheryl Nuccio court reporter a.m. Joy Kelly court reporter p.m. (ssh) [Entry date 07/19/02] |
| 07/19/02 | -- | | TRANSCRIPT filed in case as to Aquilia Marcivicci Barnette for dates of 7/18/02 morning Crt Rptr: Cheryl Nuccio (ssh) [Entry date 07/19/02] for dates of July 18, 2002 afternoon. Crt Rptr: Joy Kelly (ssh) [Entry date 07/19/02] |
| 07/20/02 | -- | | Jury Selection as to Aquilia Marcivicci Barnette held. Cheryl Nuccio court reporter all day. (ssh) [Entry date 07/20/02] |
| 07/20/02 | -- | | TRANSCRIPT filed in case as to Aquilia Marcivicci Barnette for dates of 7/19/02 morning Crt Rptr: Cheryl Nuccio (ssh) [Entry date 07/20/02] |
| 07/22/02 | -- | | Jury Selection as to Aquilia Marcivicci Barnette held. Cheryl Nuccio Court reporter a.m. Joy Kelly Court reporter p.m. (ssh) [Entry date 07/22/02] |
| 07/22/02 | -- | | TRANSCRIPT filed in case as to Aquilia Marcivicci Barnette for dates of 7/20/02 Crt Rptr: Cheryl Nuccio (ssh) [Entry date 07/22/02] for dates of 7/19/02 afternoon Crt Rptr: Joy Kelly (ssh) [Entry date 07/22/02] |
| 07/23/02 | -- | | Jury Selection as to Aquilia Marcivicci Barnette held. Court reporter |

Case 3.12-cv-00327-MOC- Document 99   Filed 09/23/15  Page 70 of 200

**60**

**JA884**

| | | | |
|---|---|---|---|
| | | | Cheryl Nuccio a.m. Joy Kelly p.m. (ssh) [Entry date 07/23/02] |
| 07/23/02 | -- | | TRANSCRIPT filed in case as to Aquilia Marcivicci Barnette for dates of 7/22/02 morning. Crt Rptr: Cheryl Nuccio (ssh) [Entry date 07/23/02] for dates of 7/22/02 afternoon Crt Rptr: Joy Kelly (ssh) [Entry date 07/23/02] |
| 07/24/02 | -- | | Jury Selection as to Aquilia Marcivicci Barnette held. Cheryl Nuccio court reporter a.m. Joy Kelly court reporter p.m. (ssh) [Entry date 07/24/02] |
| 07/24/02 | -- | | TRANSCRIPT filed in case as to Aquilia Marcivicci Barnette for dates of 7/23/02 morning Crt Rptr: Cheryl Nuccio (ssh) [Entry date 07/24/02] |
| 07/24/02 | 572 | View 1 pg $ 0.07 | SEALED CJA DOCUMENT as to Aquilia Marcivicci Barnette (jlk) [Entry date 07/24/02] |
| 07/24/02 | -- | | TRANSCRIPT filed in case as to Aquilia Marcivicci Barnette for dates of 7/23/02 afternoon Crt Rptr: Joy Kelly (ssh) [Entry date 07/24/02] |
| 07/25/02 | -- | | Jury Selection as to Aquilia Marcivicci Barnette held. Cheryl Nuccio court reporter a.m. Joy Kelly court reporter p.m. (ssh) [Entry date 07/25/02] |
| 07/25/02 | -- | | TRANSCRIPT filed in case as to Aquilia Marcivicci Barnette for dates of 7/24/02 morning Crt Rptr: Cherly Nuccio (ssh) [Entry date 07/25/02] for dates of 7/24/02 afternoon Crt Rptr: Joy Kelly (ssh) [Entry date 07/25/02] |
| 07/25/02 | 573 | View 1 pg $ 0.07 | SEALED CJA DOCUMENT as to Aquilia Marcivicci Barnette (jlk) [Entry date 07/26/02] |
| 07/25/02 | 575 | View 1 pg $ 0.07 | SEALED CJA DOCUMENT as to Aquilia Marcivicci Barnette (jlk) [Entry date 07/26/02] |
| 07/26/02 | 574 | View 1 pg $ 0.07 | SEALED CJA DOCUMENT as to Aquilia Marcivicci Barnette (jlk) [Entry date 07/26/02] |
| 07/26/02 | 576 | View 3 pgs $ 0.21 | ORDER as to Aquilia Marcivicci Barnette, allowing attorneys to bring cell phones into courtroom ( Signed by Judge Richard L. Voorhees ) (sel) [Entry date 07/26/02] |
| 07/26/02 | -- | | Jury Selection as to Aquilia Marcivicci Barnette held. Cheryl Nuccio Court reporter a.m. Joy Kelly Court reporter p.m. (ssh) [Entry date 07/26/02] |
| | | | |

Case 3:12-cv-00327-MOC   Document 99   Filed 09/23/15   Page 71 of 200

61

JA885

| 07/26/02 | -- | | TRANSCRIPT filed in case as to Aquilia Marcivicci Barnette for dates of 7/25/02 morning Crt Rptr: Cheryl Nuccio (ssh) [Entry date 07/26/02] for dates of 7/25/02 afternoon Crt Rptr: Joy Kelly (ssh) [Entry date 07/26/02] |
|---|---|---|---|
| 07/26/02 | 578 | View<br>1 pg<br>$ 0.07 | MOTION by Aquilia Marcivicci Barnette to Seal exparte application doc. #577 referred to: Judge Richard L. Voorhees (ssh) [Entry date 07/29/02] |
| 07/27/02 | -- | | Jury Selection as to Aquilia Marcivicci Barnette held. Cheryl Nuccio court reporter (ssh) [Entry date 07/27/02] |
| 07/27/02 | -- | | TRANSCRIPT filed in case as to Aquilia Marcivicci Barnette for dates of 7/26/02 morning Crt Rptr: Cheryl Nuccio (ssh) [Entry date 07/27/02] |
| 07/29/02 | -- | | Jury trial as to Aquilia Marcivicci Barnette held Judge: Richard L. Voorhees Court Rptr: Cheryl Nuccio a.m. Scott Huseby p.m. (ssh) [Entry date 07/29/02] |
| 07/29/02 | 579 | View<br>1 pg<br>$ 0.07 | Supplement to defendant's witness lise filed by Aquilia Marcivicci Barnette (ssh) [Entry date 07/29/02] |
| 07/29/02 | 580 | View<br>2 pgs<br>$ 0.14 | MOTION by Aquilia Marcivicci Barnette in Limine concerning evidence of April, 1996 firebombing referred to: Judge Richard L. Voorhees (ssh) [Entry date 07/29/02] |
| 07/29/02 | -- | | ORAL ORDER as to Aquilia Marcivicci Barnette denying [580-1] motion in Limine concerning evidence of April, 1996 firebombing as to Aquilia Marcivicci Barnette (1) ( Entered by Judge Richard L. Voorhees ) (ssh) [Entry date 07/29/02] |
| 07/29/02 | 581 | View<br>2 pgs<br>$ 0.14 | MOTION by Aquilia Marcivicci Barnette in Limine -medical examiner testimony and exhibits referred to: Judge Richard L. Voorhees (ssh) [Entry date 07/29/02] |
| 07/29/02 | -- | | ORAL ORDER as to Aquilia Marcivicci Barnette denying [581-1] motion in Limine -medical examiner testimony and exhibits as to Aquilia Marcivicci Barnette (1) ( Entered by Judge Richard L. Voorhees ) (ssh) [Entry date 07/29/02] |
| 07/29/02 | -- | | TRANSCRIPT filed in case as to Aquilia Marcivicci Barnette for dates of 7/26/02 afternoon Crt Rptr: Joy Kelly (ssh) [Entry date 07/29/02] for dates of 7/26/02 afternoon SEALED TESTIMONY of prospective juror #257. (Placed in back cover of 7/26/02 afternoon transcript) Crt Rptr: Joy Kelly (ssh) [Entry date 07/29/02] for dates of 7/27/02 all day Crt Rptr: Cheryl A. Nuccio (ssh) [Entry date 07/30/02] |
| 07/30/02 | -- | | Jury trial as to Aquilia Marcivicci Barnette held Judge: Richard L. Voorhees Court Rptr: Cheryl Nuccio a.m. Scott Huseby p.m. (ssh) [Entry |

JA886

| | | | |
|---|---|---|---|
| | | | date 07/30/02] |
| 07/30/02 | -- | | TRANSCRIPT filed in case as to Aquilia Marcivicci Barnette for dates of 7/29/02 morning Crt Rptr: Cheryl Nuccio (ssh) [Entry date 07/30/02] for dates of 7/29/02 afternoon Crt Rptr: Scott A. Huseby (ssh) [Entry date 07/30/02] |
| 07/30/02 | -- | | Corrected pages of TRANSCRIPT filed in case as to Aquilia Marcivicci Barnette Crt Rptr: Joy Kelly (ssh) [Entry date 07/31/02] |
| 07/30/02 | 583 | View 1 pg $ 0.07 | SEALED DOCUMENT as to Aquilia Marcivicci Barnette (sel) [Entry date 07/31/02] |
| 07/30/02 | -- | | TRANSCRIPT filed in case as to Aquilia Marcivicci Barnette corrected pages filed as directed by the Court on 7/20/02 Crt Rptr: Joy Kelly (placed in folder with other transcripts filed on 7/30/02) (ssh) [Entry date 08/02/02] |
| 07/31/02 | -- | | Jury trial as to Aquilia Marcivicci Barnette held Judge: Richard L. Voorhees Court Rptr: Cheryl Nuccio a.m. Scott Huseby p.m. (ssh) [Entry date 07/31/02] |
| 07/31/02 | -- | | TRANSCRIPT filed in case as to Aquilia Marcivicci Barnette for dates of 7/30/02 morning Crt Rptr: Cheryl Nuccio (ssh) [Entry date 07/31/02] for dates of 7/30/02 afternoon Crt Rptr: Scott Huseby (ssh) [Entry date 07/31/02] |
| 08/01/02 | -- | | TRANSCRIPT filed in case as to Aquilia Marcivicci Barnette for dates of 7/31/02 morning Crt Rptr: Cheryl A. Nuccio (ssh) [Entry date 08/02/02] for dates of 7/31/02 afternoon Crt Rptr: Scott A. Huseby (ssh) [Entry date 08/02/02] |
| 08/02/02 | -- | | TRANSCRIPT filed in case as to Aquilia Marcivicci Barnette for dates of 8/1/02 morning session only held. Crt Rptr: Cheryl Nuccio (ssh) [Entry date 08/02/02] |
| 08/05/02 | -- | | Jury trial as to Aquilia Marcivicci Barnette held Judge: Richard L. Voorhees Court Rptr: Cheryl Nuccio a.m. Scott Huseby p.m. (ssh) [Entry date 08/05/02] |
| 08/05/02 | -- | | MOTION in open court by Aquilia Marcivicci Barnette for Judgment of Acquittal at the close of govt's evidence. (ssh) [Entry date 08/05/02] |
| 08/05/02 | -- | | ORAL ORDER as to Aquilia Marcivicci Barnette denying [0-0] oral motion for Judgment of Acquittal at the close of govt's evidence. as to Aquilia Marcivicci Barnette (1) ( Entered by Judge Richard L. Voorhees ) (ssh) [Entry date 08/05/02] |
| | | | |

Case 3:12-cv-00327-MOC   Document 99   Filed 09/23/15   Page 73 of 200

**63**

**JA887**

| 08/05/02 | 584 | View 2 pgs $ 0.14 | Deft's supplemental Witness list by Aquilia Marcivicci Barnette (ssh) [Entry date 08/05/02] |
|---|---|---|---|
| 08/05/02 | 585 | View 3 pgs $ 0.21 | MOTION by Aquilia Marcivicci Barnette for Declaration of Mistrial referred to: Judge Richard L. Voorhees (ssh) [Entry date 08/05/02] |
| 08/05/02 | -- | | ORAL ORDER as to Aquilia Marcivicci Barnette denying [585-1] motion for Declaration of Mistrial as to Aquilia Marcivicci Barnette (1) ( Entered by Judge Richard L. Voorhees ) (ssh) [Entry date 08/05/02] |
| 08/06/02 | -- | | Jury trial as to Aquilia Marcivicci Barnette held Judge: Richard L. Voorhees Court Rptr: Cheryl Nuccio morning. Scott Huseby afternoon (ssh) [Entry date 08/06/02] |
| 08/06/02 | -- | | TRANSCRIPT filed in case as to Aquilia Marcivicci Barnette for dates of 8/5/02 morning Crt Rptr: Cheryl A Nuccio (ssh) [Entry date 08/06/02] for dates of 8/5/02 afternoon Crt Rptr: Scott Huseby (ssh) [Entry date 08/06/02] |
| 08/07/02 | -- | | Jury trial as to Aquilia Marcivicci Barnette held Judge: Richard L. Voorhees Court Rptr: Cheryl Nuccio a.m. Scott Huseby p.m. (ssh) [Entry date 08/07/02] |
| 08/07/02 | -- | | TRANSCRIPT filed in case as to Aquilia Marcivicci Barnette for dates of 8/6/02 morning Crt Rptr: Cheryl Nuccio (ssh) [Entry date 08/07/02] for dates of 8/6/02 afternoon Crt Rptr: Scott Huseby (ssh) [Entry date 08/07/02] |
| 08/07/02 | 586 | View 10 pgs $ 0.70 | Proposed Jury Instructions by Aquilia Marcivicci Barnette (ssh) [Entry date 08/08/02] |
| 08/07/02 | 587 | View 4 pgs $ 0.28 | MOTION by Aquilia Marcivicci Barnette in Limine to exclude future dangerousness referred to: Judge Richard L. Voorhees (ssh) [Entry date 08/08/02] |
| 08/08/02 | -- | | Jury trial as to Aquilia Marcivicci Barnette held Judge: Richard L. Voorhees Court Rptr: Cheryl Nuccio morning. Scott Huseby afternoon. (ssh) [Entry date 08/08/02] |
| 08/08/02 | -- | | TRANSCRIPT filed in case as to Aquilia Marcivicci Barnette for dates of 8/7/02 morning Crt Rptr: Cheryl Nuccio (ssh) [Entry date 08/08/02] for dates of 8/7/02 afternoon Crt Rptr: Scott Huseby (ssh) [Entry date 08/08/02] |
| 08/08/02 | 588 | View 2 pgs $ 0.14 | Proposed Jury Instructions by USA as to Aquilia Marcivicci Barnette (ssh) [Entry date 08/08/02] |

Case 3:12-cv-00327-MOC   Document 99   Filed 09/23/15   Page 74 of 200

**64**

**JA888**

| | | | |
|---|---|---|---|
| 08/09/02 | 589 | View<br>1 pg<br>$ 0.07 | SEALED CJA DOCUMENT as to Aquilia Marcivicci Barnette (jlk) [Entry date 08/09/02] |
| 08/09/02 | 590 | View<br>1 pg<br>$ 0.07 | SEALED CJA DOCUMENT as to Aquilia Marcivicci Barnette (jlk) [Entry date 08/09/02] |
| 08/09/02 | -- | | Jury trial as to Aquilia Marcivicci Barnette held Judge: Richard L. Voorhees Court Rptr: Cheryl Nuccio morning. Scott Huseby afternoon Court hold charge conference in open court with all parties. (ssh) [Entry date 08/09/02] [Edit date 08/09/02] |
| 08/09/02 | 591 | View<br>2 pgs<br>$ 0.14 | Defendant's Proposed Mitigating Circumstances by Aquilia Marcivicci Barnette (ssh) [Entry date 08/09/02] |
| 08/09/02 | 592 | View<br>10 pgs<br>$ 0.70 | Defendant's proposed Jury instructions as to Aquilia Marcivicci Barnette (ssh) [Entry date 08/09/02] |
| 08/09/02 | -- | | TRANSCRIPT filed in case as to Aquilia Marcivicci Barnette for dates of 8/8/02 morning Crt Rptr: Cheryl Nuccio (ssh) [Entry date 08/09/02] for dates of 8/8/02 afternoon Crt Rptr: Scott Huseby (ssh) [Entry date 08/09/02] for dates of 8/9/02 morning Crt Rptr: Cheryl Nuccio (ssh) [Entry date 08/09/02] |
| 08/09/02 | 593 | View<br>1 pg<br>$ 0.07 | ORDER as to Aquilia Marcivicci Barnette, for Return of re-sentencing hearing exhibits ( Signed by Judge Richard L. Voorhees ) (ssh) [Entry date 08/09/02] |
| 08/12/02 | -- | | Jury trial as to Aquilia Marcivicci Barnette held Judge: Richard L. Voorhees Court Rptr: Steve Huseby (ssh) [Entry date 08/12/02] |
| 08/12/02 | -- | | TRANSCRIPT filed in case as to Aquilia Marcivicci Barnette for dates of 8/9/02 afternoon Crt Rptr: Scott Huseby (ssh) [Entry date 08/12/02] |
| 08/13/02 | -- | | Jury trial as to Aquilia Marcivicci Barnette held Judge: Richard L. Voorhees Court Rptr: Steve Huseby (ssh) [Entry date 08/13/02] |
| 08/13/02 | -- | | TRANSCRIPT filed in case as to Aquilia Marcivicci Barnette for dates of 8/12/02 Crt Rptr: Steve Huseby (ssh) [Entry date 08/13/02] |
| 08/13/02 | 596 | View<br>18 pgs<br>$ 1.26 | SPECIAL JURY VERDICT regarding the punishment to be imposed upon the defendant for the killing of Donald Lee Allen with reference to cnt. 7. (ssh) [Entry date 08/14/02] |
| 08/13/02 | 597 | View<br>18 pgs<br>$ 1.26 | SPECIAL JURY VERDICT regarding the punishment to be imposed upon the defendant for the killing of Donald Lee Allen with reference to cnt. 8 (ssh) [Entry date 08/14/02] |

Case 3:12-cv-00327-MOC Document 99 Filed 09/23/15 Page 75 of 200

JA889

| 08/13/02 | 598 | View 18 pgs $ 1.26 | SPECIAL JURY VERDICT regarding the punishment to be imposed upon the defendant for the killing of Robin Williams with reference to cnt 11. (ssh) [Entry date 08/14/02] |
|---|---|---|---|
| 08/14/02 | 594 | View 1 pg $ 0.07 | SEALED CJA DOCUMENT as to Aquilia Marcivicci Barnette (jlk) [Entry date 08/14/02] |
| 08/14/02 | 595 | View 1 pg $ 0.07 | SEALED CJA DOCUMENT as to Aquilia Marcivicci Barnette (jlk) [Entry date 08/14/02] |
| 08/14/02 | -- | | TRANSCRIPT filed in case as to Aquilia Marcivicci Barnette for dates of 8/13/02 Crt Rptr: Steve S. Huseby (ssh) [Entry date 08/14/02] |
| 08/20/02 | 599 | View 6 pgs $ 0.42 | MOTION by Aquilia Marcivicci Barnette for New Trial, Arrest of Judgment referred to: Judge Richard L. Voorhees (sel) [Entry date 08/20/02] |
| 08/20/02 | 600 | View 7 pgs $ 0.49 | JUDGMENT Aquilia Marcivicci Barnette (1) count(s) 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11 . 240 mos. imprisonment to be served concurrently with Ct. 6; $100.00 assessment; if the Deft. is released from prison, he shall serve 5 years supervised release.: JGM: Count 6, LIFE Imprison; Count 10, Life Imprison; Count 1, 240 mos Imprison; Count 4, 5, and 9, 120 mos Imprison; Count 2, 360 mos Imprison; Count 3, 180 mos Imprison: All of these counts to run concurrently and remain the same from original jgm: Count 7, and 8, and 11 after being remanded from the 4th Circuit, Death Penalty; Special Assessment, $800; If released from prison, 5 years SRT. ( Signed by Judge Richard L. Voorhees ) ( Crim Judge Vol: 95 Page: 5) (sel) [Entry date 08/21/02] |
| 08/23/02 | 601 | View 1 pg $ 0.07 | SEALED CJA DOCUMENT as to Aquilia Marcivicci Barnette (jlk) [Entry date 08/26/02] |
| 09/09/02 | 602 | View 5 pgs $ 0.35 | ORDER as to Aquilia Marcivicci Barnette denying [599-1] motion for New Trial, Arrest of Judgment as to Aquilia Marcivicci Barnette (1) ( Signed by Judge Richard L. Voorhees ) (sel) [Entry date 09/09/02] |
| 09/13/02 | 603 | View 2 pgs $ 0.14 | NOTICE OF APPEAL by Aquilia Marcivicci Barnette (1) count(s) 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11 Filing Fee $ IFP cc: Counsel, USM and USPO (jee) [Entry date 09/19/02] |
| 09/19/02 | -- | | Notice of appeal and certified copy of docket as to Aquilia Marcivicci Barnette to USCA: [603-1] appeal. cc:USM, USP & USA (jee) [Entry date 09/19/02] |
| 09/26/02 | -- | | USCA Case Number as to Aquilia Marcivicci Barnette Re: [603-1] appeal USCA Number: 02-20 Case Mgr: Beth Walton (jee) [Entry date 09/26/02] |
| | | | |

| 09/30/02 | 604 | View 1 pg $ 0.07 | SEALED DOCUMENT as to Aquilia Marcivicci Barnette (tme) [Entry date 09/30/02] |
| 10/18/02 | 605 | View 1 pg $ 0.07 | SEALED CJA DOCUMENT as to Aquilia Marcivicci Barnette (jlk) [Entry date 10/18/02] |
| 10/18/02 | 606 | View 1 pg $ 0.07 | SEALED CJA DOCUMENT as to Aquilia Marcivicci Barnette (jlk) [Entry date 10/18/02] |
| 10/18/02 | 607 | View 1 pg $ 0.07 | SEALED CJA DOCUMENT as to Aquilia Marcivicci Barnette (jlk) [Entry date 10/18/02] |
| 10/28/02 | 608 | View 1 pg $ 0.07 | SEALED DOCUMENT as to Aquilia Marcivicci Barnette (sel) [Entry date 10/28/02] |
| 10/29/02 | 609 | View 1 pg $ 0.07 | SEALED CJA DOCUMENT as to Aquilia Marcivicci Barnette (jlk) [Entry date 10/29/02] |
| 10/29/02 | 610 | View 1 pg $ 0.07 | SEALED CJA DOCUMENT as to Aquilia Marcivicci Barnette (jlk) [Entry date 10/29/02] |
| 10/29/02 | 611 | View 1 pg $ 0.07 | SEALED CJA DOCUMENT as to Aquilia Marcivicci Barnette (jlk) [Entry date 10/29/02] |
| 10/29/02 | 612 | View 1 pg $ 0.07 | SEALED CJA DOCUMENT as to Aquilia Marcivicci Barnette (jlk) [Entry date 10/29/02] |
| 10/29/02 | -- | | Certification of Readiness as to Aquilia Marcivicci Barnette Re: [603-1] appeal sent to USCA (jee) [Entry date 10/29/02] |
| 11/04/02 | 613 | View 1 pg $ 0.07 | SEALED CJA DOCUMENT as to Aquilia Marcivicci Barnette (jlk) [Entry date 11/04/02] |
| 11/15/02 | 614 | View 1 pg $ 0.07 | SEALED DOCUMENT as to Aquilia Marcivicci Barnette (sel) [Entry date 11/15/02] |
| 12/16/02 | 615 | View 1 pg $ 0.07 | SEALED DOCUMENT as to Aquilia Marcivicci Barnette (sel) [Entry date 12/17/02] |
| 05/20/03 | 616 | View 1 pg $ 0.07 | SEALED CJA DOCUMENT as to Aquilia Marcivicci Barnette (jlk) |

Case 3:12-cv-00327-MOC Document 99 Filed 09/23/15 Page 77 of 200

**JA891**

Case Flags:
APPEAL
CLOSED


END OF DOCKET: 3:97cr23-0

| PACER Service Center | | | |
|---|---|---|---|
| **Transaction Receipt** | | | |
| 06/08/2003 15:29:00 | | | |
| **PACER Login:** | jt0061 | **Client Code:** | |
| **Description:** | docket report | **Search Criteria:** | 3:1997cr00023 |
| **Billable Pages:** | 78 | **Cost:** | 5.46 |

Case 3:12-cv-00327-MOC   Document 99   Filed 09/23/15   Page 78 of 200
**68**


**JA892**

FEB 04 '97

UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF NORTH CAROLINA U.S. DISTRICT COURT
CHARLOTTE DIVISION                    W. DIST. OF N.C.

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | DOCKET NO. 3:97CR23-P |
| | ) | |
| | ) | **BILL OF INDICTMENT** |
| | ) | |
| | ) | Violations: |
| | ) | 18 U.S.C. § 844(h)(1)&(2) |
| | ) | 18 U.S.C. § 922(a)(6) |
| v. | ) | 18 U.S.C. § 922(g)(1) |
| | ) | 18 U.S.C. § 924 |
| | ) | 18 U.S.C. § 924(c)(1) |
| | ) | 18 U.S.C. § 924(i)2(1) |
| | ) | 18 U.S.C. § 2119(3) |
| | ) | 18 U.S.C. § 2261(a)(1) |
| | ) | 18 U.S.C. § 2312 |
| AQUILIA MARCIVICCI BARNETTE | ) | 26 U.S.C. § 5861(f) |
| | ) | |

THE GRAND JURY CHARGES:

## COUNT ONE

On or about the 30th day of April, 1996 in Mecklenburg County, in the Western District of North Carolina and in the Western District of Virginia, the defendant

### AQUILIA MARCIVICCI BARNETTE

did travel across a state line, that is, did transport himself from Charlotte, North Carolina to Roanoke, Virginia with the intent to injure, harass, and intimidate an intimate partner, Robin Williams, and in the course and as a result of such travel intentionally committed a crime of violence, that is, did firebomb Robin Williams' occupied apartment and an automobile parked in her driveway causing bodily injury to her.

In violation of Title 18, United States Code, Sections 2261(a)(1) and 2261(b).



## COUNT TWO

On or about the 30th day of April, 1996, in Mecklenburg County in the Western District of North Carolina and in the Western District of Virginia, the defendant,

### AQUILIA MARCIVICCI BARNETTE

knowingly used and carried a firearm, that is a destructive device, consisting of a bottle filled with flammable liquid, during and in relation to a crime of violence for which he may be prosecuted in a court of the United States, that is, an act of interstate domestic violence in violation of Title 18, United States Code, Section 2261 as set forth in Count One.

In violation of Title 18, United States Code, Section 924(c)(1).

## COUNT THREE

On or about the 30th day of April, 1996, in Mecklenburg County in the Western District of North Carolina and the Western District of Virginia, the defendant,

### AQUILIA MARCIVICCI BARNETTE

knowingly used and carried fire and explosive materials, to commit an act of interstate domestic violence in violation of Title 18, United States Code, Section 2261, a felony prosecutable in a court of the United States.

In violation of Title 18, United States Code, Section 844(h)(1).

## COUNT FOUR

On or about the 21st day of May, 1996, in Mecklenburg County in the Western District of North Carolina, the defendant,

### AQUILIA MARCIVICCI BARNETTE

in connection with his acquisition of a firearm, a Winchester semi-automatic shotgun, from Quik Pawn Shop, a licensed firearms dealer, knowingly made false and fictitious statements which were likely to deceive Quik Pawn Shop as to a fact material to the lawfulness

2

JA894

of such acquisition of said firearm by the defendant under chapter 44 of Title 18, in that the defendant represented that he was Mario Vonkeith Barnette and that he had not been convicted of a crime punishable by imprisonment for a term exceeding one year, when in fact, as the defendant then well knew, he was not Mario Vonkeith Barnette and, he had been so convicted.

In violation of Title 18, United States Code, Sections 922(a)(6) and 924.

## COUNT FIVE

Between May 21, 1996 and June 22, 1996, exact date unknown, in Mecklenburg County within the Western District of North Carolina, the defendant,

### AQUILIA MARCIVICCI BARNETTE

knowingly made a firearm, that is he did saw off a portion of the barrel of a Winchester shotgun, without complying with the provisions of the National Firearms Act Contained in Chapter 53 of Title 26 of the United States Code.

In violation of Title 26, United States Code, Sections 5821, 5822, 5861(f), and 5871.

## COUNT SIX

On or about the 22d day of June, 1996, in Mecklenburg County within the Western District of North Carolina, the defendant,

### AQUILIA MARCIVICCI BARNETTE

having been convicted of a crime punishable by imprisonment for a term exceeding one year, to wit: in case # 76063 on September 20, 1994 in Mecklenburg County Superior Court of the crime of Felonious Restraint, did knowingly possess a firearm, that is a Winchester semi-automatic shotgun, which had been shipped and transported in interstate or foreign commerce.

In violation of Title 18, United States Code, Sections 922(g)(1) and 924.

3

DOCKET NO. 3:97CR23
U.S.A. v. AQUILIA MARCIVICCI BARNETTE

### COUNT SEVEN

On or about June 22, 1996, in Mecklenburg County within the Western District of North Carolina, the defendant,

### AQUILIA MARCIVICCI BARNETTE

with intent to cause death or serious bodily harm, did knowingly, willfully and unlawfully take by force, violence and intimidation, that is, he shot to death and took from the person of Donald Lee Allen, a motor vehicle which had been shipped, transported and received in interstate or foreign commerce, that is a 1994 Honda Prelude, Vehicle Identification No. JHMBA8142RC004261.

In violation of Title 18, United States Code, Section 2119(3).

### COUNT EIGHT

On or about the 22d day of June, 1996, in Mecklenburg County in the Western District of North Carolina, the defendant,

### AQUILIA MARCIVICCI BARNETTE

knowingly used and carried a firearm, that is a sawed-off Winchester semi-automatic shotgun, during and in relation to a crime of violence, for which he may be prosecuted in a court of the United States, that is, the carjacking set forth in Count Seven above, and in the course of this violation caused the death of Donald Lee Allen, through the use of a firearm, which killing is a murder as defined in Title 18, United States Code, Section 1111, in that the defendant, with malice aforethought, did unlawfully kill Donald Lee Allen by shooting him with the firearm, willfully, deliberately, maliciously, and with premeditation.

In violation of Title 18, United States Code, Sections 924(c)(1) and (i)2(1).

### COUNT NINE

On or about the 22d day of June, 1996, in Mecklenburg County within the Western District of North Carolina, and elsewhere the defendant,
### AQUILIA MARCIVICCI BARNETTE,

4

did unlawfully transport in interstate commerce a stolen motor vehicle, that is, a 1994 Honda Prelude, Vehicle Identification No. JHMBA8142RC004261, from the State of North Carolina to the Commonwealth of Virginia, knowing the same to be stolen.

In violation of Title 18, United States Code, Section 2312.

### COUNT TEN

On or about the 22d day of June, 1996 in Mecklenburg County, in the Western District of North Carolina and in the Western District of Virginia, the defendant

### AQUILIA MARCIVICCI BARNETTE

did travel across a state line, that is, did transport himself from Charlotte, North Carolina to Roanoke, Virginia with the intent to injure, harass, and intimidate an intimate partner, Robin Williams, and in the course and as a result of such travel intentionally committed a crime of violence, that is, shot and killed Robin Williams causing bodily injury and death to her.

In violation of Title 18, United States Code, Sections 2261(a)(1) and 2261(b).

### COUNT ELEVEN

On or about the 22d day of June, 1996, in Mecklenburg County in the Western District of North Carolina and in the Western District of Virginia, the defendant,

### AQUILIA MARCIVICCI BARNETTE

knowingly used and carried a firearm, that is a sawed-off Winchester semi-automatic shotgun, during and in relation to a crime of violence, for which he may be prosecuted in a court of the United States, that is the act of interstate domestic violence set forth in Count Ten above, and in the course of this violation caused the death of Robin Williams, through the use of a firearm,

5

which killing is a murder as defined in Title 18, United States Code, Section 1111, in that the defendant, with malice aforethought, did unlawfully kill Robin Williams by shooting her with the firearm willfully, deliberately, maliciously, and with premeditation.

In violation of Title 18, United States Code, Sections 924(c)(1) and (i)2(1).

A TRUE BILL:

FOREMAN

MARK T. CALLOWAY
United States Attorney

Robert J. Conrad, Jr.
Assistant United States Attorney
Chief, Criminal Division

Thomas G. Walker
Assistant United States Attorney

6

FILED
CHARLOTTE, N.C.

# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF NORTH CAROLINA

JAN 27 1998

U.S. DISTRICT COURT
W. DIST. N.C.

UNITED STATES OF AMERICA

**V.**

AQUILIA MARCIVICCI BARNETTE

JURY NOTATIONS OF VERDICT

Case Number: 3:97CR23-P

*Indicate whether you have found the Defendant "Guilty" or "Not Guilty".*

AS TO COUNT ONE THE JURY FINDS THE DEFENDANT _GUILTY_

AS TO COUNT TWO THE JURY FINDS THE DEFENDANT _GUILTY_

AS TO COUNT THREE THE JURY FINDS THE DEFENDANT _GUILTY_

AS TO COUNT FOUR THE JURY FINDS THE DEFENDANT _GUILTY_

AS TO COUNT FIVE THE JURY FINDS THE DEFENDANT _GUILTY_

AS TO COUNT SIX THE JURY FINDS THE DEFENDANT _GUILTY_

AS TO COUNT SEVEN THE JURY FINDS THE DEFENDANT _GUILTY_

AS TO COUNT EIGHT THE JURY FINDS THE DEFENDANT _GUILTY_

AS TO COUNT NINE THE JURY FINDS THE DEFENDANT _GUILTY_

AS TO COUNT TEN THE JURY FINDS THE DEFENDANT _GUILTY_

AS TO COUNT ELEVEN THE JURY FINDS THE DEFENDANT _GUILTY_

_Donald J. Schrudel_
.JURY FOREPERSON

_1-27-98_
DATE

UNITED STATES OF AMERICA    )
                                     )

v.                              )    **MOTION *IN LIMINE* REGARDING THE**
                                   )    **VICTIM IMPACT STATEMENTS**

AQUILIA MARCIVICCI BARNETTE,   )
                Defendant.     )

_____ )

    **NOW COMES** the Defendant, by and through his attorneys, and moves the Court for an order prohibiting the Government from using victim impact evidence in this matter. In support of this Motion, the Defendant shows:

1.    The Defendant has been convicted of first degree murder and is before the Court for re-sentencing.

2.    The Government has filed notice pursuant to Title 18 U.S.C. Section 3593 (a), that it intends to seek the death penalty and has reiterated that notice in a pleading filed July 30, 2001.

3.    The Defendant acknowledges that there is no per se bar to the admission of certain impact evidence. See <u>Payne v. Tennessee</u>, 501 U.S. 808 (1991). However, victim impact evidence is not a permissible aggravating factor as set forth in 18 U.S.C. Section 3591 (c).

4.    The Court, by admitting such victim impact statements, would prejudice the Defendant if it allowed emotional testimony concerning

**JA900**

the lives of the victims which are not relevant to any aggravating factor to be proven.

5.  In the event that the Court is inclined to allow the Government to present some victim impact evidence, the Defendant requests a pretrial judicial review of the evidence.

6.  The Court must make a determination after hearing the evidence, outside the presence of the jury, as to its prejudicial impact on this proceeding.

**WHEREFORE,** the Defendant moves the Court that an order be entered prohibiting the Government from introducing any victim impact evidence, or at a minimum, hold a hearing outside the presence of the jury as to the prejudicial effect of such evidence.

This the 4⁴ day of June 2002.

JEAN B. LAWSON
Post Office Box 472106
Charlotte, North Carolina 28226
704/341-1865

HAROLD J. BENDER
200 North McDowell Street
Charlotte, North Carolina 28204
704/333-2169

Attorneys for Defendant BARNETTE

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | **Docket No. 3:97CR-23** |
| v. | ) | |
| | ) | |
| AQUILIA MARCIVICCI BARNETTE, | ) | |
| Defendant | ) | |
| | ) | |

## MOTION FOR ALLOCUTION BY THE DEFENDANT

**NOW COMES** the defendant, by and through counsel and, pursuant to Federal Rule of Criminal Procedure, Rule 32(c)(3)(C), moves this Court that he be allowed to make a statement to the sentencing jury, before the Court instructs the jury on the law and it begins deliberations as to punishment in this matter.

In support of this Motion, the undersigned show unto the Court as follows:

1. This matter is before the Court for sentencing to be imposed by a jury. The jury will determine whether the defendant is sentenced to Life Imprisonment Without the Possibility of Release or Death by execution.

2. That pursuant to Federal Rule of Criminal Procedure 32(c)(3)(C) the defendant has the right to personally make a statement before the sentencing authority before it begins its deliberations.

3. The defendant has a due process right to address the Court before sentence is imposed, see Ashe v. North Carolina, 586 F.2d 334 (4th Cir. 1978).

4. That this same right should apply even when the sentencing authority is a jury.

5. The defendant notes that this issue has been decided adverse to his position. See, <u>United States v. Hall</u>, 152 F.3d 381 (5th Cir. 1988) and <u>United States v. Barnette</u>, 211 F.3d 803 (4th Cir. 2000).

**WHEREFORE**, the undersigned respectfully request that the Court allow the defendant to make a statement to the jury before the jury begins its sentencing deliberations, and that defendant not be subjected to cross-examination.

Respectfully submitted on this the 4th day of June, 2002.

Jean B. Lawson
PO Box 472106
Charlotte, NC 28247
(704) 341-1865

Harold J. Bender
200 N. McDowell Street
Charlotte, NC 28204
(704) 333-2169

ATTORNEYS FOR AQUILIA MARCIVICCI BARNETTE

**JA903**

UNITED STATES OF AMERICA    )      DOCKET NO. 3:97CR23-V

                     )

v.                    )

                     )

AQUILIA MARCIVICCI BARNETTE,   )
      Defendant.          )

## GOVERNMENT'S RESPONSE IN OPPOSITION TO DEFENSE MOTION IN LIMINE TO PROHIBIT AND/OR LIMIT VICTIM IMPACT EVIDENCE AT GUILT AND SENTENCING PHASES

NOW COMES the United States of America, by and through Robert J. Conrad, Jr.,

United States Attorney or the Western District of North Carolina, and responds in opposition to

the Defendant's Motion in Limine To Prohibit and/or Limit Victim Impact Evidence and shows

unto the Court as follows:

### Introduction

The Defendant's motion seeks (1) that the Government be prohibited from presenting

victim impact evidence as it is not a permissible aggravating factor as set forth in 18 U.S.C.

Section 3591(c), or in the alternative (2) to have a pretrial judicial review of the evidence for the

court's determination of the "prejudicial impact on this proceeding" of "emotional testimony

concerning the lives of the victims which are not relevant to any aggravating factor to be

proven." In support of this claim, the Defendant argues that the Federal Death Penalty Act does

not specifically recognize victim impact as an aggravating factor or that the Court conduct a

separate, pretrial hearing for a judicial review of the evidence. The Government contends that

victim impact is a permissible aggravating factor, and that a pretrial hearing is not required.

<center>**Argument**</center>

1. **The Non-Statutory Aggravating Factor For "Victim Impact Evidence" As Alleged in this Case Is In Complete Accord With Pertinent Provisions Of The Federal Death Penalty Act And Applicable Decisions Of The Federal Courts.**

The non-statutory aggravating factor for victim impact evidence is alleged as follows in the Government's Notice of Intent to Seek the Death Penalty, filed on August 7, 1997 and re-affirmed by notice filed July 30, 2001:

**Victim Impact Evidence.**

A) Donald Lee Allen's personal characteristics and the harmful effect and scope of the instance offenses on the Allen family. See 18 U.S.C. 3593(a)(2) and *Payne v. Tennessee*, 111 S. Ct. 2597, 2608-09 (1991).[1]

---

[1] The cited portion of *Payne v. Tennessee* includes the following:

> We are now of the view that a State may properly conclude that for the jury to assess meaningfully the defendant's moral culpability and blameworthiness, it should have before it at the sentencing phase evidence of the specific harm caused by the defendant...."the victim [should be considered] as an individual whose death represents a unique loss to society and in particular to his family."

<center>* * * *</center>

> We thus hold that if the State chooses to permit the admission of victim impact evidence and prosecutorial argument on that subject, the Eighth Amendment erects no *per se* bar. A State may legitimately conclude that evidence about the victim and about the impact of the murder on the victim's family is relevant to the jury's decision as to whether or not the death penalty should be imposed.

111 S. Ct. at 2608-09 (noting that there is no reason to treat victim impact evidence differently than other relevant evidence is treated and that to do otherwise would deprive the state of the full moral force of the evidence and deprive the jury of all necessary information; internal citations omitted).

The Defendant's instant motion invites this Court to do precisely what the Supreme Court in Payne said should not be done.

<center>**JA905**</center>

**B)** Robin Williams' personal characteristics and the harmful effect and scope of the

instant offenses on the Williams family. See 18 U.S.C. 3593(a)(2) and *Payne v. Tennessee,* 111

S. Ct. 2597, 2608-09 (1991).

The victim impact evidence alleged in the Notice of Intent to Seek the Death Penalty is in

complete accord with pertinent provisions of the Federal Death Penalty Act (FDPA) and

applicable precedents of the federal courts. See *Payne v. Tennessee,* 111 S.Ct. 2597 (1991);

*Jones v. United States,* 119 S.Ct. 2090 (1999). In 18 U.S.C. § 3593(a), the FDPA states that

aggravating factors for capital sentencing "may include factors concerning the effect of the

offense on the victim and the victim's family, and may include oral testimony, a victim impact

statement that identifies the victim of the offense and the extent and scope of the injury and loss

suffered by the victim and the victim's family." In spite of this explicit statutory language, the

defendant contends that victim impact is not a permissible aggravating factor under the FDPA.

In so arguing, the defendant ignores the federal statutory scheme, which explicitly allows for the

jury to consider both statutory aggravating factors, from which the Government may choose, and

which are listed at 18 U.S.C. § 3592(c)(1)-(15), as well as "any other aggravating factor for

which notice has been provided under subsection (a) found to exist." 18 U.S.C. § 3593(d). As

noted above, as required by statute, the Government has previously given notice of victim impact

as a non-statutory aggravating factor.

In *Jones v. United States,* 119 S.Ct. 2090 (1999), the Supreme Court affirmed a sentence

of death under the Federal Death Penalty Act (FDPA), which was based in part on a "victim

impact" non-statutory aggravating factor which read in its entirety that "Tracie Joy McBride's

family constitute an aggravating factor for the offense." *Id.* at 2097 & n.3, 2105, 2106-07

(reaffirming constitutionality of considering victim impact evidence, citing *Payne v. Tennessee,*

and upholding consideration of non-statutory aggravating factor for victim impact under Federal Death Penalty Act)(and authorities cited therein). The Court characterized the victim impact factor submitted to Jones' jury as "somewhat vague...as written" and indicated that non-statutory aggravating factors should be more "precisely defined in writing." *Id.*, at 2107, 2110. However, the Court expressly held that even this "loosely drafted" form had a "core meaning" such that it was not unconstitutionally vague and was "inherently individualized" so that it was not unconstitutionally overbroad. *Id.*. The Court also held that there was no impermissible duplication between this victim impact factor and a "loosely drafted" and overlapping victim vulnerability factor which read in its entirety "Tracie Joy McBride's young age, her slight stature, her background, and her unfamiliarity with San Angelo, Texas." *Id.* Further, the Court stated that "[i]n the context of considering the effect of the crime on the victim's family, it would be more natural to understand 'personal characteristics' to refer to those aspect [or traits] of the victim's character and personality that her family would miss the most." *Id.* The victim impact factor in the instant case is much more precisely drafted than the victim impact factor accepted by the Supreme Court in *Jones* and there is no overlapping victim vulnerability factor in the instant case. Accordingly, there is no vagueness, overbreadth, or potential duplication in the instant case.

Numerous federal courts throughout the country have permitted victim impact evidence, in federal capital cases, regarding the character of the victim and the harm to the victim's family. See, *e.g. United States v. McVeigh*, 153 F.3d 1166 (1998) cert. denied, 119 S.Ct. 1148 (1999). In *McVeigh*, the Court held that Congress expressly provided, in 18 U.S.C. § 3593(a), for consideration of victim impact evidence as a non-statutory aggravating factor under the Federal Death Penalty Act; upholding the non-statutory aggravating factor of victim impact evidence,

**JA907**

finding that "(t)he devastating effects that the deaths of the victims had on their families and loved ones is certainly 'part and parcel of the circumstances' of the crime properly presented to the jury at the penalty phase of trial." *McVeigh* at 1219, quoting *Bonin v. Vasquez*, 807 F.Supp. 589, 613 (C.D.Cal.1992), aff'd, 59 F.3d 815 (9th Cir.1995). In *McVeigh*, the Court held that "*Payne* allows introduction of victim impact testimony to aid the jury in making a 'reasoned moral response' when imposing sentence upon a defendant convicted of a capital offense *Id.* at 1217. The Court further held that "(b)ecause the consequences of the crime are an important ingredient in the moral equation, the government can present testimony demonstrating the harm cause by the defendant's actions." *Id.* The Government contends that the admissibility of victim impact evidence in the form of a non-statutory aggravating factor is well settled in the federal courts. [2]

The victim impact evidence presented in *Jones v. United States* regarding the victim's personal characteristics and the impact of the offense on her family evidently came from persons who were not present at the crime and involved matters not known to the defendant at the time of the crime, there being no suggestion that anyone else was present when the victim was murdered or that the defendant previously knew the victim. *Id.* at 2096 In light of the Court's statement

---

[2]See *United States v. Battle*, 173 F. 3d 1343, 1348-50 (11th Cir. 1999)(affirming death sentence under FDPA; holding that brief, non-inflammatory victim impact testimony of prison guards [evidently not present at the crime] as to effects of victim prison guard's death and impact of death sentence at prison was relevant and permissible); *United States v. Hall*, 152 F. 2d 381, 404-07 (5th Cir. 1998)(affirming death sentence under FDPA; holding victim impact evidence may be presented in penalty phase and admission of non-testimonial victim impact statements, as opposed to live testimony, from victim's relatives [evidently not present at the crime] harmless), cert. denied, 526 U.S. 1117 (1999); accord *United States v. Frank*, 8 F. Supp. 2d 253, 280 (SDNY 1998) (holding FDPA explicitly authorizes evidence of harm to the victim's family); *United States v. Johnson*, 1997 WL 534163, *5 (N.D. Ill. Aug. 20, 1997)(not reported)(same); *United States v. Davis*, 912 F.Supp. 938, 947 (E.D.La. 1996)(same), reversed in part on other grounds, sub. nom., *United States v. Causey*, 185 F. 3d.407 (5th Cir. 1999).

JA908

that "[i]n the context of considering the effect of the crime on the victim's family, it would be more natural to understand 'personal characteristics' to refer to those aspect [or traits] of the victim's character and personality that her family would miss the most[,]" *Id.*. at 2107, it seems more than fair to say that the Court in *Jones* clearly contemplated that victim impact evidence in a case, like the instant case, under the Federal Death Penalty Act may properly include matters not known to the defendant at the time of the crime and matters presented by persons who were not present at the crime.[3] Thus, the victim impact evidence alleged in this case is proper and permissible under the Federal Death Penalty Act.

2. **Victim Impact Evidence Should Not Be Treated Differently Than Any Other Relevant Evidence And Special Procedures Are Not Required By Applicable Provisions of the Federal Death Penalty Act Or Decisions of Federal Courts.**

The Defendant asks the Court to invoke special procedures to prevent presentation of emotional or improper victim impact evidence. No such special procedures are required. The Government's selection of victim impact evidence is guided by case law and statute. In accord with *Payne v. Tennessee*, 18 U.S.C. § 3593(a)(2) expressly permits evidence "concerning the effect of the offense on the victim and the victim's family, and may include oral testimony, a victim impact statement that identifies the victim of the offense and the extent and scope of the injury and loss suffered by the victim and the victim's family."

---

[3]Accord *United States v. McVeigh*, 153 F.3d at 1198-99 (sustaining victim impact evidence in guilt phase identifying deceased victims and describing injuries caused by defendant's conduct) and 1216-20 (sustaining victim impact evidence in penalty phase including testimony of relatives [many evidently not present at the crime] of deceased victims regarding last contacts, efforts to discover fate of victims, victim histories, and impact on families). See also *United States v. Barnette*, 211 F.3d 803, 810-11 (4th Cir. 2000)(noting without comment that in the sentencing phase of a federal capital trial seven family members [many evidently not present at the crimes] of the two deceased victims" testified about the effect the killings had on them"; vacating death sentence under FDPA on other grounds).

*Payne v. Tennessee* did not require special procedures, and Justice Rehnquist, writing for the majority, stated that "[t]here is no reason to treat such evidence differently than other relevant evidence." 501 U.S. at 827; see also 501 U.S. at 831 ("Given that victim impact evidence is potentially relevant, nothing in the Eighth Amendment commands that States treat it differently that other kinds of relevant evidence."). Any concern that victim impact evidence–even if emotional–must necessarily be unduly inflammatory is unfounded, as Justice O'Connor concluded in *Payne*, "I do not doubt that the jurors were moved by this testimony–who would not have been? But surely this brief statement did not inflame their passions more than did the facts of the crime." *Id.* at 832.

A hearing out of the presence of the jury is not necessary to determine the sufficiency and reliability of the evidence in aggravation because much aggravating evidence comes out in the guilt phase of the trial, the penalty phase of the trial is an adversary proceeding, and the court can exclude evidence if the probative value is outweighed by the danger or unfair prejudice. United States v. Frank, 8 F. Supp. 2d 253, 278-79 (S.D.N.Y. 1998). In 18 U.S.C. §3593 (c), the statute itself notes that, "(a)t the sentencing hearing, information may be presented as to any matter relevant to the sentence, . . . except that information may be excluded if its probative value is outweighed by the danger of unfair prejudice." Accord *United States v. Beckford*, 964 F. Supp. 993, 1005 (E.D.Va. 1997)(denying a defense motion for a hearing on the evidence in aggravation, using, instead, a proffer from the government).[4] See also United States v. Nguyen, 928 F.Supp.1525, 1550 (D.Kan. 1996)(denying a defense motion for pretrial discovery of

---

[4] In United States v. Davis, 912 F.Supp. 938 (E.D.La 1995), the court ordered a pretrial hearing to determine the reliability and presentation of evidence of non-statutory aggravating factors. However, this was error because the court failed to consider 18 U.S.C. § 3593(c) which provides for making such determinations at the sentencing hearing.

evidence in aggravation), <u>aff'd</u> <u>on</u> <u>other</u> <u>grounds</u>, 155 F.3d 1219 (10th Cir. 1998); <u>United States v.</u>

<u>Chanthandara</u>, 928 F. Supp. 1055 (D.Kan. 1996)(same).[5]

The Government respectfully requests that the Court not require the grieving family members and friends to testify twice; once in a separate proceeding for defense benefit, then again in front of the jury. Rather, the Court should treat victim impact evidence the same as other kinds of relevant evidence and base its evidentiary rulings on the evidence presented at the sentencing hearing, as provided by statute. The Court has traditional powers and safeguards to protect any due process concerns without the extreme measure of requiring an entirely separate proceeding before the jury.

WHEREFORE, the government prays that the Defendant's Motion in Limine to Prohibit and/or Limit Victim Impact Evidence should be denied for the foregoing reasons.

Respectfully submitted this, the 12th day of June, 2002.

ROBERT J. CONRAD, JR.
United States Attorney

ANNE M. TOMPKINS
Assistant United States Attorney

by JILL WESTMORELAND ROSE
Assistant United States Attorney

---

[5]<u>But</u> <u>see</u> <u>United States v. Glover</u>, 43 F.Supp.2d 1217 (D.Kan. 1999). The Government submits that <u>Glover</u> was simply wrongly decided on this point, because <u>Glover</u> relies on <u>State v.</u> <u>Muhammad</u>, 145 N.J. 23, 678 A.2d 164 (1996), which interprets a New Jersey statute that is significantly different from 18 U.S.C. §3593(a). The New Jersey statute, unlike the FDPA, permits victim impact evidence in rebuttal only after the defense has presented mitigating evidence. Thus <u>Muhammad</u> is clearly inapposite and reliance theron is clearly misplaced. The Courts interpreting them, which the Defendant's motion virtually ignores.

JA911

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 12th day of June, 2002, the foregoing motion was duly served on the defendant herein by mailing a copy thereof, postage prepaid and properly addressed to defendant's attorneys of record as follows:

Mr. Harold J. Bender
200 North McDowell Street
Charlotte, North Carolina 28204

Ms. Jean B. Lawson
P.O. Box 472106
Charlotte, North Carolina 28247-2106

_____
Assistant United States Attorney



| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | DOCKET NO. 3:97CR23-V |
| | ) | |
| v. | ) | |
| | ) | |
| | ) | |
| | ) | |
| AQUILIA MARCIVICCI BARNETTE | ) | |

## GOVERNMENT'S RESPONSE TO MOTION FOR
## ALLOCUTION BY THE DEFENDANT

Comes now the United States of America, by and through Robert J. Conrad, Jr., United States Attorney for the Western District of North Carolina, and says unto the Court the following in response to the defendants Motion to Allocute:

1. The defendant has requested that he be allowed to allocute before the jury in an unsworn statement without cross-examination during the penalty phase.

2. The defendant asserts that he has both a statutory and constitutional right to address the jury in this manner.

3. The Government responds that no such right exists.

### ARGUMENT

In *United States v. Barnette*, 211 F.2d 803 (4th Cir.2000), the Fourth Circuit adopted the Fifth Circuit's holding in *United States v. Hall*, 152 F.3d 381 (5th Cir.1998) in concluding that the Constitution does not afford a criminal defendant the right to make an unsworn statement of remorse before the jury which is not subject to cross-examination. See *Barnette*, 211 F.3d at 820. Further, in dicta, the *Barnette* court went on to state the "neither are we of the opinion that

Case 3:12-cv-00327-MOC  Document 99  Filed 09/23/15  Page 99 of 200

89

## JA913

Rule 32 has such a requirement." *Id.*

Rule 32(c)(3)(C) provides that "before imposing sentence, the court must ... address the defendant personally and determine whether the defendant wishes to make a statement and to present any information in mitigation of the sentence." The defendant, in essence, contends that this Rule renders allocution an empty gesture in capital cases because the district court has no discretion to disregard the jury's recommendation. However, Title 18, United States Code, section 3593(c) counsels against construing Rule 32(c)(3)(C) as establishing any type of unconditional right for the defendant to make an unsworn statement of remorse to the jury. *See Hall*, 152 F.3d at 392. The section sets forth with great specificity the type of information that may be submitted to the jury during the penalty phase of a capital trial, and the circumstances under which it may be presented.

There is no impediment to the Defendant testifying in mitigation during the penalty phase of his trial, so long as that testimony is subject to cross examination. Further, to adopt the Defendant's argument to construe Rule 32(c)(3)(C) as creating a *per se* right of unsworn allocution before the jury that is not subject to cross-examination would in no way increase the accuracy and reliability of the capital sentencing process. *Id*; see also, *United States v. Johnson,* 136 F.Supp.2d 553, 566 (WDVA 2001).

The defendant alleges that denial of allocution before the jury, prior to deliberations abrogates his Constitutional right to a meaningful opportunity to present a complete defense. However, in this case, the defendant is not being denied the opportunity to be heard. Rather, through sworn testimony subject to cross-examination, the defendant will be afforded a "meaningful opportunity" to invoke the discretion of the sentencing jury if he chooses to testify in mitigation. Further, the Defendant will, in accordance with Rule 329c)(3)(C) , be granted his statutory right to allocute before the imposition of his sentence by this Court. Through these procedures, the Defendant's right to due process will be fully satisfied. *Id.*

For the foregoing reasons, the Government respectfully requests that the Court deny the

JA914

defendant's motion for allocution.

This, the 12th day of June, 2002.

ROBERT J. CONRAD, JR.
UNITED STATES ATTORNEY


ANNE M. TOMPKINS
ASSISTANT U.S. ATTORNEY


JILL WESTMORELAND ROSE
ASSISTANT U.S. ATTORNEY

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 12th day of June, 2002, the foregoing motion was duly served on the defendant herein by mailing a copy thereof, postage prepaid and properly addressed to defendant's attorneys of record as follows:

Mr. Harold J. Bender
200 North McDowell Street
Charlotte, North Carolina 28204

Ms. Jean B. Lawson
P.O. Box 472106
Charlotte, North Carolina 28247-2106

_____
Assistant United States Attorney

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
Case Number: 3:97CR-23-V

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| | ) | |
| | ) | ORDER |
| | ) | |
| AQUILIA MARCIVICCI BARNETTE, | ) | |
| Defendant | ) | |
| | ) | |

FILED
CHARLOTTE, N. C.
CHARLOT... N. C.
JUN 1 8 2002
U. S. DISTRICT COURT
W. DIST. OF N.C.

This matter is before the Court upon Defendant's Motion for Allocution. Defendant moves that he be allowed to make a statement to the sentencing jury before the Court instructs the jury on the law and before the jury begins deliberations as to punishment. Defendant argues that he has a right to make a statement to the sentencing jury pursuant to Federal Rule of Criminal Procedure 32(c)(3)(C). The Government responds that Defendant has no statutory or constitutional right to address the jury in an unsworn statement without cross-examination during the penalty phase.

The Fourth Circuit Court of Appeals decided this issue on Defendant's direct appeal following his original conviction and sentencing in this matter. The Fourth Circuit found that Rule 32 does not "answer the question of whether a defendant has a right to address members of the jury, as opposed to the sentencing judge, before they retire to determine the sentence." *United States v. Barnette*, 211 F.3d 803, 820 (4th Cir. 2000). Therefore, the Fourth Circuit looked to a case directly on point, *United States v. Hall*, 152 F.3d 381 (5th Cir. 1998), *cert. denied*, 526 U.S. 1117, 119 S.Ct. 1767, 143 L.Ed.2d 797 (1999), in determining whether Defendant has the right to address the sentencing jury. "In that case, the point on appeal was whether or not the criminal defendant had a Constitutional right to make an unsworn statement of remorse before the jury

which was not subject to cross examination. The court held that he did not, and we follow that case. Neither are we of the opinion that Rule 32 has such a requirement." *United States v. Barnette*, 211 F.3d 803, 820 (4th Cir. 2000).

IT IS THEREFORE ORDERED that the Motion for Allocution by the Defendant is hereby DENIED.

This the 18th day of June, 2002.

RICHARD L. VOORHEES
UNITED STATES DISTRICT COURT JUDGE

JA918

sel

United States District Court
for the
Western District of North Carolina
June 18, 2002

\* \* MAILING CERTIFICATE OF CLERK \* \*

Re:   3:97-cr-00023

True and correct copies of the attached were mailed by the clerk to the following:

Gretchen C. F. Shappert, Esq.
United States Attorney
Suite 1700
Carillon Bldg.
227 W. Trade St.
Charlotte, NC  28202

Anne M. Tompkins, Esq.
U.S. Attorney's Office
227 W. Trade St.
Carillon Bldg., Suite 1700
Charlotte, NC  28202

Jean B. Lawson, Esq.
P. O. Box 472106
Charlotte, NC  28226

Harold J. Bender, Esq.
Law Offices of Harold J. Bender
200 N. McDowell St.
Charlotte, NC  28204

cc:
Judge                        ( )
Magistrate Judge             ( )
U.S. Marshal                 (✓)
Probation                    (✓)
U.S. Attorney                ( )
Atty. for Deft.              ( )
Defendant                    ( )
Warden                       ( )
Bureau of Prisons            ( )
Court Reporter               ( )
Courtroom Deputy             ( )
Orig-Security                ( )
Bankruptcy Clerk's Ofc.      ( )
Other_____       ( )

Date: 6/15/12

Frank G. Johns, Clerk

By: _____
Deputy Clerk

# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA
### Case Number: 3:97CR-23-V

UNITED STATES OF AMERICA )
                              )

                              )

                              )

                              )    **ORDER**

                              )

AQUILIA MARCIVICCI BARNETTE, )

      **Defendant**                 )

_____ )

F I L E D
CHARLOTTE, N. C.

         1 2002

U. S. DISTRICT COURT
W. DIST. OF N. C.

This matter is before the Court upon Defendant's Motion in Limine for an Order prohibiting the Government from using victim impact evidence in this resentencing matter. The Defendant argues that admission of victim impact statements would prejudice the Defendant if emotional testimony is allowed concerning victims' lives which are not relevant to any aggravating factor. In the alternative, the Defendant moves that the Court hold a hearing outside the presence of the jury to determine the prejudicial effect of victim impact evidence. The Defendant argues that 18 U.S.C. § 3592(c), which contains a list of the Federal Death Penalty Act's statutory aggravating factors, does not specifically recognize victim impact evidence as an aggravating factor.

The Government has responded in opposition to this motion. The Government argues that victim impact is a permissible non-statutory aggravating factor, and that a pretrial hearing is not required to assess the prejudicial effect of victim impact evidence.

The Federal Death Penalty Act specifically states that aggravating factors in capital sentencings "may include factors concerning the effect of the offense on the victim and the victim's family, and may include oral testimony, a victim impact statement that identifies the victim of the offense and the extent and scope of the injury and loss suffered by the victim and

**JA921**

the victim's family." 18 U.S.C. § 3593(a). Pursuant to the requirements set forth in 18 U.S.C. § 3593(a), the Government gave notice of their planned use of victim impact as a non-statutory aggravating factor in their Notice of Intent to Seek the Death Penalty, filed August 7, 1997 and reaffirmed by a Notice filed July 30, 2001. The victim impact alleged in the Notice of Intent to Seek the Death Penalty is also in accord with applicable federal case law. See *Payne v. Tennessee*, 111 S.Ct. 2597 (1991); *Jones v. United States*, 119 S.Ct. 2090 (1999).

Furthermore, the Supreme Court, in holding that there was no *per se* bar to the admission of victim impact evidence in *Payne v. Tennessee*, stated that "[t]here is no reason to treat such evidence differently than other relevant evidence is treated." 501 U.S. at 827. That language supports a finding that a hearing out of the presence of the jury is not necessary at this time to determine the prejudicial effect of victim impact evidence.

The Court notes that 18 U.S.C. § 3593(c) specifically states that information relevant to an aggravating factor in a federal capital sentencing proceeding is "admissible regardless of its admissibility under the rules governing admission of evidence at criminal trials except that information may be excluded if its probative value is outweighed by the danger of creating unfair prejudice, confusing the issues, or misleading the jury." Application of that clause will adequately protect the Defendant's interests. Moreover, the Court is mindful that it would be unnecessarily burdensome for victim family witnesses, for example, to testify twice, first at voir dire and again before the jury. Such witnesses may have already testified at the first trial and the transcripts thereof provide counsel with advance notice of the likely content of their testimony. The Court will take such steps during the sentencing hearing as may be necessary or advisable to determine whether the probative value of certain relevant evidence would be outweighed by the danger of unfair prejudice.

JA922

It is THEREFORE ORDERED that Defendant's Motion for an order prohibiting the

Government from introducing any victim impact evidence and for a hearing outside the presence

of the jury as to the prejudicial effect of such evidence is DENIED.

This the 21st day of June, 2002.

RICHARD L. VOORHEES
UNITED STATES DISTRICT COURT JUDGE

**JA923**

# UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA
### CHARLOTTE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | **Docket No. 3:97CR-23** |
| v. | ) | |
| | ) | |
| AQUILIA MARCIVICCI BARNETTE, | ) | |
| Defendant | ) | |
| | ) | |

## MOTION FOR RELIEF PURSUANT TO RING v. ARIZONA

**NOW COMES** defendant Aquilia Marcivicci Barnette, by and through his undersigned counsel, and respectfully requests that the Court grant him relief pursuant to the dictate of the United States Supreme Court in Ring v. Arizona, ____ U.S.____, 2002 WL 1357257 (June 24, 2002) and Apprendi v. New Jersey, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000). This request is also made pursuant to the Fifth, Sixth and Eighth Amendments to the Constitution of the United States.

In support of this Motion the undersigned show unto the Court:

1. On February 4, 1997, the United States sought and obtained an indictment charging the defendant with violations of the following statutes: 18 U.S.C. §§ 2261(a)(1) and b (2 counts; 18 U.S.C. § 924(c)(1); 18 U.S.C. § 844; 18 U.S.C. § 922; 26 U.S.C. §§ 5861(f) and 5871; 18 U.S.C. §§ 922(g) and 924(e); 18 U.S.C. § 2119(3); 18 U.S.C. §§ 924(c) and (I) (2 counts; and 18 U.S.C. § 2312(i).

   A copy of the indictment is attached hereto and incorporated herein as Exhibit 1.

2. On August 7, 1997, the United States Attorney filed a document entitled, "Notice of Intent to Seek the Death Penalty", pursuant to Title 18, Section 3593(a).

**JA924**

3. Regardless of the facts and circumstances of the case, the issue of death would not be a sentencing option in these cases and for this defendant in the absence of the Notice of Intent to Seek the Death Penalty.

4. On January 27, 1998, the matters alleged in the indictment were put before a jury and the defendant was convicted on all counts alleged in the indictment. Thereafter, a sentencing hearing was held upon the government's discretionary request for an aggravated punishment and the defendant was sentenced to death by the jury on three of the counts charged in the indictment.

5. On May 2, 2000, the United States Court of Appeals for the Fourth Circuit remanded the defendant's cases for resentencing, due to an error committed in the trial.

6. On July 30, 2001, the government filed a "Reaffirmation of Intent to Seek the Death Penalty", again pursuant to 18 USC Section 3593(a). This discretionary act by the government again triggered a proceeding whereby the government seeks an aggravated sentence for the defendant.

7. At no time has a Grand Jury considered the matters alleged by the government to be aggravating and, thus triggering its attempt to seek an aggravated sentence for the defendant.

8. A sentence of death is an aggravated sentence for the crimes for which the defendant was convicted.

9. The United States Supreme Court has held that the Sixth Amendment does not permit a defendant to be "exposed ... to a penalty exceeding the maximum he would receive if punished according to the facts reflected in the jury verdict alone".
Apprendi v. New Jersey, 530 U.S. 466, 483, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000).

## CERTIFICATE OF SERVICE

I, Harold J. Bender, do hereby certify that I have served a copy of the foregoing

Motion for Relief Pursuant to <u>Ring v. Arizona</u> upon the following by depositing a copy of the

same in the United States Mail, postage prepaid, and addressed to:

Ms. Anne Tompkins
Assistant United States Attorney
United States Attorney's Office
Suite 1700, Carillon Building
227 West Trade Street
Charlotte, North Carolina 28202

This the ____ day of July, 2002.

Harold J. Bender
Bender, Barnett & Falls
200 North McDowell Street
Charlotte, North Carolina 28204
704-333-2169
Attorney for Defendant BARNETTE

# COPY

UNITED STATES OF AMERICA )
                               )       Docket No. 3:97CR-23
         v.                )
                               )
AQUILIA MARCIVICCI BARNETTE, )
     Defendant             )

## MOTION FOR RELIEF PURSUANT TO RING v. ARIZONA

NOW COMES defendant Aquilia Marcivicci Barnette, by and through his undersigned counsel, and respectfully requests that the Court grant him relief pursuant to the dictate of the United States Supreme Court in Ring v. Arizona, ____ U.S.____, 2002 WL 1357257 (June 24, 2002) and Apprendi v. New Jersey, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000). This request is also made pursuant to the Fifth, Sixth and Eighth Amendments to the Constitution of the United States.

In support of this Motion the undersigned show unto the Court:

1. On February 4, 1997, the United States sought and obtained an indictment charging the defendant with violations of the following statutes: 18 U.S.C. §§ 2261(a)(1) and b (2 counts; 18 U.S.C. § 924(c)(1); 18 U.S.C. § 844; 18 U.S.C. § 922; 26 U.S.C. §§ 5861(f) and 5871; 18 U.S.C. §§ 922(g) and 924(e); 18 U.S.C. § 2119(3); 18 U.S.C. §§ 924(c) and (I) (2 counts; and 18 U.S.C. § 2312(i).

   A copy of the indictment is attached hereto and incorporated herein as Exhibit 1.

2. On August 7, 1997, the United States Attorney filed a document entitled, "Notice of Intent to Seek the Death Penalty", pursuant to Title 18, Section 3593(a). A copy of that Notice is attached hereto and incorporated herein as Exhibit 2.

## 102A

Case 3:12-cv-00327-MOC   Document 99   Filed 09/23/15   Page 113 of 200

3. Regardless of the facts and circumstances of the case, the issue of death would not be a sentencing option in these cases and for this defendant in the absence of the Notice of Intent to Seek the Death Penalty.

4. On January 27, 1998, the matters alleged in the indictment were put before a jury and the defendant was convicted on all counts alleged in the indictment. Thereafter, a sentencing hearing was held upon the government's discretionary request for an aggravated punishment and the defendant was sentenced to death by the jury on three of the counts charged in the indictment.

5. On May 2, 2000, the United States Court of Appeals for the Fourth Circuit remanded the defendant's cases for resentencing, due to an error committed in the trial.

6. On July 30, 2001, the government filed a "Reaffirmation of Intent to Seek the Death Penalty", again pursuant to 18 USC Section 3593(a). This discretionary act by the government again triggered a proceeding whereby the government seeks an aggravated sentence for the defendant. (See attached Exhibit 3)

7. A sentence of death is an aggravated sentence for the crimes for which the defendant was convicted.

8. At no time did the government submit the matters alleged to be aggravating (i.e., those contained in its Notice of Intent to Seek the Death Penalty, Exhibit 2) to a grand jury.

9. The government has neither sought, nor obtained, a grand jury indictment alleging any of the aggravating factors upon which the government relies in seeking death.

<div align="center">

102 $\beta$

</div>

**JA928**

10. The United States Supreme Court has held that the Sixth Amendment does not permit a defendant to be "exposed … to a penalty exceeding the maximum he would receive if punished according to the facts reflected in the jury verdict alone".
Apprendi v. New Jersey, 530 U.S. 466, 483, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000).

11. The United States Supreme Court has now issued its opinion in Ring v. Arizona, ____ U.S.____, 2002 WL 1357257 (June 24, 2002), holding that capital sentencing aggravators "operate as 'the functional equivalent of an element of a greater offense,' (citing Apprendi), and therefore the Sixth Amendment requires that they be found by a jury." Also, the United States Supreme Court has remanded the case of United States v. Allen, ____ U.S. ____, 2002 WL 1393602 (June 28, 2002) in light of Ring.

12. The Fifth Amendment to the United States Constitution provides that "[n]o person shall be held to answer for a capital, or otherwise infamous crime unless on a presentment or indictment of a grand jury . . ." The Sixth Amendment Notice and Jury Trial guarantees require penalty enhancements be charged in the Indictment.

13. A grand jury could have refused to find probable cause to indict the defendant on elements that could aggravate the defendant's sentence. By failing to allege those matters to the grand jury, the government waived any aggravated sentence which is now alleged in its Notice (Exhibits 2 and 3). The government's failure to do so deprives the defendant of his right to grand jury determination of the charge on which he is about to be tried in violation his Fifth and Sixth Amendment rights.

WHEREFORE, the undersigned respectfully pray:

1. That the Court strike the government's Notice of Intent to Seek the Death Penalty;

102C

JA929

2. That the Court impose non-aggravated sentences due to the constitutional insufficiency of the government's attempt to secure aggravated sentences;

3. That the Court deem the Death Notice to be not properly pled and void due to lack of inclusion in the Indictment;

4. That the Court prohibit the government from introducing aggravating circumstances to the jury;

5. For such other relief as is justified and appropriate.

Respectfully submitted on this the ___ 2 day of July, 2002.

Jean B. Lawson
PO Box 472106
Charlotte, NC 28247
(704) 341-1865

Harold J. Bender
200 N. McDowell Street
Charlotte, NC 28204
(704) 333-2169

ATTORNEYS FOR AQUILIA MARCIVICCI BARNETTE

102 Λ

# CERTIFICATE OF SERVICE

I, Harold J. Bender, do hereby certify that I have served a copy of the foregoing

Motion for Relief Pursuant to <u>Ring v. Arizona</u> upon the following by depositing a copy of the

same in the United States Mail, postage prepaid, and addressed to:

Ms. Anne Tompkins
Assistant United States Attorney
United States Attorney's Office
Suite 1700, Carillon Building
227 West Trade Street
Charlotte, North Carolina 28202

This the _____ day of July, 2002.

Harold J. Bender
Bender, Barnett & Falls
200 North McDowell Street
Charlotte, North Carolina 28204
704-333-2169
Attorney for Defendant BARNETTE

102 𝐸

JA931

**JA932**

FEB 04 '97

UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF NORTH CAROLINA    U.S. D:.......F COURT
CHARLOTTE DIVISION                     W. DIST. OF N.C.

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | DOCKET NO. 3:97CR23-P |
| | ) | |
| | ) | **BILL OF INDICTMENT** |
| | ) | |
| | ) | Violations: |
| | ) | 18 U.S.C. § 844(h)(1)&(2) |
| | ) | 18 U.S.C. § 922(a)(6) |
| v. | ) | 18 U.S.C. § 922(g)(1) |
| | ) | 18 U.S.C. § 924 |
| | ) | 18 U.S.C. § 924(c)(1) |
| | ) | 18 U.S.C. § 924(i)2(1) |
| | ) | 18 U.S.C. § 2119(3) |
| | ) | 18 U.S.C. § 2261(a)(1) |
| | ) | 18 U.S.C. § 2312 |
| AQUILIA MARCIVICCI BARNETTE | ) | 26 U.S.C. § 5861(f) |
| | ) | |

THE GRAND JURY CHARGES:

### COUNT ONE

On or about the 30th day of April, 1996 in Mecklenburg County, in the Western District of North Carolina and in the Western District of Virginia, the defendant

**AQUILIA MARCIVICCI BARNETTE**

did travel across a state line, that is, did transport himself from Charlotte, North Carolina to Roanoke, Virginia with the intent to injure, harass, and intimidate an intimate partner, Robin Williams, and in the course and as a result of such travel intentionally committed a crime of violence, that is, did firebomb Robin Williams' occupied apartment and an automobile parked in her driveway causing bodily injury to her.

In violation of Title 18, United States Code, Sections 2261(a)(1) and 2261(b).



DOCKET NO. 3:97CR23
U.S.A. v. AQUILIA MARCIVICCI BARNETTE

## COUNT TWO

On or about the 30th day of April, 1996, in Mecklenburg County in the Western District of North Carolina and in the Western District of Virginia, the defendant,

### AQUILIA MARCIVICCI BARNETTE

knowingly used and carried a firearm, that is a destructive device, consisting of a bottle filled with flammable liquid, during and in relation to a crime of violence for which he may be prosecuted in a court of the United States, that is, an act of interstate domestic violence in violation of Title 18, United States Code, Section 2261 as set forth in Count One.

In violation of Title 18, United States Code, Section 924(c)(1).

## COUNT THREE

On or about the 30th day of April, 1996, in Mecklenburg County in the Western District of North Carolina and the Western District of Virginia, the defendant,

### AQUILIA MARCIVICCI BARNETTE

knowingly used and carried fire and explosive materials, to commit an act of interstate domestic violence in violation of Title 18, United States Code, Section 2261, a felony prosecutable in a court of the United States.

In violation of Title 18, United States Code, Section 844(h)(1).

## COUNT FOUR

On or about the 21st day of May, 1996, in Mecklenburg County in the Western District of North Carolina, the defendant,

### AQUILIA MARCIVICCI BARNETTE

in connection with his acquisition of a firearm, a Winchester semi-automatic shotgun, from Quik Pawn Shop, a licensed firearms dealer, knowingly made false and fictitious statements which were likely to deceive Quik Pawn Shop as to a fact material to the lawfulness

2

Case 3:12-cv-00327-MOC   Document 99   Filed 09/23/15   Page 120 of 200

104

JA934

of such acquisition of said firearm by the defendant under chapter 44 of Title 18, in that the defendant represented that he was Mario Vonkeith Barnette and that he had not been convicted of a crime punishable by imprisonment for a term exceeding one year, when in fact, as the defendant then well knew, he was not Mario Vonkeith Barnette and, he had been so convicted.

In violation of Title 18, United States Code, Sections 922(a)(6) and 924.


## COUNT FIVE

Between May 21, 1996 and June 22, 1996, exact date unknown, in Mecklenburg County within the Western District of North Carolina, the defendant,

### AQUILIA MARCIVICCI BARNETTE

knowingly made a firearm, that is he did saw off a portion of the barrel of a Winchester shotgun, without complying with the provisions of the National Firearms Act Contained in Chapter 53 of Title 26 of the United States Code.

In violation of Title 26, United States Code, Sections 5821, 5822, 5861(f), and 5871.


## COUNT SIX

On or about the 22d day of June, 1996, in Mecklenburg County within the Western District of North Carolina, the defendant,

### AQUILIA MARCIVICCI BARNETTE

having been convicted of a crime punishable by imprisonment for a term exceeding one year, to wit: in case # 76063 on September 20, 1994 in Mecklenburg County Superior Court of the crime of Felonious Restraint, did knowingly possess a firearm, that is a Winchester semi-automatic shotgun, which had been shipped and transported in interstate or foreign commerce.

In violation of Title 18, United States Code, Sections 922(g)(1) and 924.

3

## COUNT SEVEN

On or about June 22, 1996, in Mecklenburg County within the Western District of North Carolina, the defendant,

### AQUILIA MARCIVICCI BARNETTE

with intent to cause death or serious bodily harm, did knowingly, willfully and unlawfully take by force, violence and intimidation, that is, he shot to death and took from the person of Donald Lee Allen, a motor vehicle which had been shipped, transported and received in interstate or foreign commerce, that is a 1994 Honda Prelude, Vehicle Identification No. JHMBA8142RC004261.

In violation of Title 18, United States Code, Section 2119(3).

## COUNT EIGHT

On or about the 22d day of June, 1996, in Mecklenburg County in the Western District of North Carolina, the defendant,

### AQUILIA MARCIVICCI BARNETTE

knowingly used and carried a firearm, that is a sawed-off Winchester semi-automatic shotgun, during and in relation to a crime of violence, for which he may be prosecuted in a court of the United States, that is, the carjacking set forth in Count Seven above, and in the course of this violation caused the death of Donald Lee Allen, through the use of a firearm, which killing is a murder as defined in Title 18, United States Code, Section 1111, in that the defendant, with malice aforethought, did unlawfully kill Donald Lee Allen by shooting him with the firearm, willfully, deliberately, maliciously, and with premeditation.

In violation of Title 18, United States Code, Sections 924(c)(1) and (i)2(1).

## COUNT NINE

On or about the 22d day of June, 1996, in Mecklenburg County within the Western District of North Carolina, and elsewhere the defendant,

### AQUILIA MARCIVICCI BARNETTE,

4

did unlawfully transport in interstate commerce a stolen motor vehicle, that is, a 1994 Honda Prelude, Vehicle Identification No. JHMBA8142RC004261, from the State of North Carolina to the Commonwealth of Virginia, knowing the same to be stolen.

In violation of Title 18, United States Code, Section 2312.

## COUNT TEN

On or about the 22d day of June, 1996 in Mecklenburg County, in the Western District of North Carolina and in the Western District of Virginia, the defendant

### AQUILIA MARCIVICCI BARNETTE

did travel across a state line, that is, did transport himself from Charlotte, North Carolina to Roanoke, Virginia with the intent to injure, harass, and intimidate an intimate partner, Robin Williams, and in the course and as a result of such travel intentionally committed a crime of violence, that is, shot and killed Robin Williams causing bodily injury and death to her.

In violation of Title 18, United States Code, Sections 2261(a)(1) and 2261(b).

## COUNT ELEVEN

On or about the 22d day of June, 1996, in Mecklenburg County in the Western District of North Carolina and in the Western District of Virginia, the defendant,

### AQUILIA MARCIVICCI BARNETTE

knowingly used and carried a firearm, that is a sawed-off Winchester semi-automatic shotgun, during and in relation to a crime of violence, for which he may be prosecuted in a court of the United States, that is the act of interstate domestic violence set forth in Count Ten above, and in the course of this violation caused the death of Robin Williams, through the use of a firearm,

5

DOCKET NO. 3:97CR23
U.S.A. v. AQUILIA MARCIVICCI BARNETTE

which killing is a murder as defined in Title 18, United States
Code, Section 1111, in that the defendant, with malice
aforethought, did unlawfully kill Robin Williams by shooting her
with the firearm willfully, deliberately, maliciously, and with
premeditation.

In violation of Title 18, United States Code, Sections
924(c)(1) and (i)2(1).

A TRUE BILL:

FOREMAN

MARK T. CALLOWAY
United States Attorney

Robert J. Conrad, Jr.
Assistant United States Attorney
Chief, Criminal Division

Thomas G. Walker
Assistant United States Attorney

6

JA938

# EXHIBIT 2

FROM :US ATTORNEYS OFFICE            704 344 6629            1997.08-07    15:23    #517 P.02/09

F I L E D
.CHARLOTTE, N.C.

AUG. 7. 1997

U.S. DISTRICT COURT
W. DIST. OF N.C.

### UNITED STATES DISTRICT COURT FOR THE
### WESTERN DISTRICT OF NORTH CAROLINA
### CHARLOTTE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | DOCKET NO. 3:97CR23-P |
| | ) | |
| | ) | **NOTICE OF INTENT TO** |
| v. | ) | **SEEK THE DEATH PENALTY** |
| | ) | |
| | ) | |
| AQUILIA MARCIVICCI BARNETTE | ) | |

COMES NOW, the United States of America, pursuant to 18 U.S.C. § 3593(a), by and through its undersigned counsel, and notifies the Court and the defendant in the above-captioned case that the Government believes the circumstances of the offenses charged in Counts Seven, Eight, and Eleven are such that, in the event of conviction, a sentence of death is justified under Chapter 228 (Sections 3591 through 3598) of Title 18 of the United States Code, and that the Government will seek a sentence of death for each of these offenses: Count Seven, carjacking resulting in the death of Donald Lee Allen, in violation of 18 U.S.C. § 2119(3); Count Eight, use and carrying a firearm in a carjacking resulting in death, in violation of 18 U.S.C. § 924(c) and (j)[1]; and Count Eleven, use and carrying a firearm during a crime of violence which resulted in the death of Robin Williams, in violation of 18 U.S.C. § 924(c) and (j), 18 U.S.C. § 2261(a)(1) and (b).

I.      As to the murder of Donald Lee Allen, as charged in Counts Seven and Eight, the Government proposes to prove the following factors as justifying a sentence of death.

---

[1]Counts Eight and Eleven charge a violation of Section 924(i)2(1). That section has been recodified as Section 924(j) and will be referenced as such in this Notice.

A. Statutory Proportionality Factors Enumerated Under 18 U.S.C. § 3591(a)(2)(A)-(D).

1. INTENTIONAL KILLING. The defendant intentionally killed Donald Lee Allen. Section 3591(a)(2)(A).

2. INTENTIONAL INFLICTION OF SERIOUS BODILY INJURY. The defendant intentionally inflicted serious bodily injury that resulted in the death of Donald Lee Allen. Section 3591(a)(2)(B).

3. INTENTIONAL ACTS TO TAKE LIFE OR USE LETHAL FORCE. The defendant intentionally participated in an act, contemplating that the life of a person would be taken or intending that lethal force be used in connection with a person, other than one of the participants in the offense, and Donald Lee Allen died as a direct result of the act. Section 3591(a)(2)(C).

4. INTENTIONAL ENGAGEMENT IN ACT OF VIOLENCE. The defendant intentionally and specifically engaged in an act of violence, knowing that the act created a grave risk of death to a person, other than one of the participants of the offense, such that participation in the act constituted a reckless disregard for human life and the victim, Donald Lee Allen, died as a direct result of the act. Section 3591(a)(2)(D).

B. Statutory Aggravating Factors Enumerated Under 18 U.S.C. § 3592(c).

1. PECUNIARY GAIN. The defendant committed the offense in expectation of the receipt of something of pecuniary value. Section 3592(c)(8).

2. SUBSTANTIAL PLANNING AND PREMEDITATION. The defendant committed the offense after substantial planning and premeditation to cause the death of Donald Lee Allen. Section 3592(c)(9).

2

3.  MULTIPLE INTENTIONAL KILLINGS IN A SINGLE CRIMINAL EPISODE. The defendant intentionally killed or attempted to kill more than one person in a single criminal episode. Section 3592(c)(16).

C.  Other, Non-Statutory, Aggravating Factors Identified Under 18 U.S.C. § 3593(a)(2).

1.  VICTIM IMPACT. Donald Lee Allen's personal characteristics and the harmful effect and scope of the instant offenses on the Allen family. 18 U.S.C. § 3593(a)(2) and *Payne v. Tennessee*, 501 U.S. 808, 111 S. Ct. 2597 (1991).

II.  As to the murder of Robin Williams, as charged in Count Eleven, the Government proposes to prove the following factors as justifying a sentence of death.

A.  Statutory Proportionality Factors Enumerated Under 18 U.S.C. § 3591(a)(2)(A).

1.  INTENTIONAL KILLING. The defendant intentionally killed Robin Williams. Section 3591(a)(2)(A).

2.  INTENTIONAL INFLICTION OF SERIOUS BODILY INJURY. The defendant intentionally inflicted serious bodily injury that resulted in the death of Robin Williams. Section 3591(a)(2)(B).

3.  INTENTIONAL ACTS TO TAKE LIFE OR USE LETHAL FORCE. The defendant intentionally participated in an act, contemplating that the life of a person would be taken or intending that lethal force be used in connection with a person, other than one of the participants in the offense, and Robin Williams died as a direct result of the act. Section 3591(a)(2)(C).

3

4.     INTENTIONAL ENGAGEMENT IN ACT OF VIOLENCE. The defendant intentionally and specifically engaged in an act of violence, knowing that the act created a grave risk of death to a person, other than one of the participants of the offense, such that participation in the act constituted a reckless disregard for human life, and the victim, Robin Williams, died as a result of the act. Section 3591(a)(2)(D).

B.     Statutory Aggravating Factors Enumerated Under 18 U.S.C. § 3592(c).

1.     GRAVE RISK OF DEATH TO ADDITIONAL PERSONS. The defendant, in the commission of the offenses, or in escaping apprehension for the violation of the offense, knowingly created a grave risk of death to one or more persons in addition to the victim of the offense. Section 3592(c)(5).

2.     SUBSTANTIAL PLANNING AND PREMEDITATION. The defendant committed the offense after substantial planning and premeditation to cause the death of Robin Williams. Section 3592(c)(9).

3.     MULTIPLE INTENTIONAL KILLINGS KILLINGS IN A SINGLE CRIMINAL EPISODE. The defendant killed or attempted to kill more than one person in a single criminal episode. Section 3592(c)(16).

C.     Other Non-Statutory, Aggravating Factors Identified Under 18 U.S.C. § 3593(a)(2).

1.     VICTIM IMPACT. Robin Williams' personal characteristics and the harmful effect and scope of the instant offenses on the Williams' family. 18 U.S.C. § 3593(a)(2) and *Payne v. Tennessee*, 501 U.S. 808, 111 S. Ct. 2597(1991).

4

113

**JA943**

III.    Additional non-statutory aggravating factors applicable to both the murder of Allen, as charged in Counts Seven and Eight, and the murder of Williams, as charged in Count Eleven, identifiable under 18 U.S.C. § 3593(a)(2).

A.      FUTURE DANGEROUSNESS OF THE DEFENDANT. The defendant, who has committed a pattern of violence towards others, is likely to commit criminal acts of violence in the future which would be a continuing and serious threat to society. *Simmons v. South Carolina*, 114 S. Ct. 2187, 2193 (1994).

1.      Other Acts of Violence. The defendant has committed, attempted to commit, and/or threatened to commit other acts of violence, in addition to the capital offense(s) committed in this case and the statutory factors alleged in this Notice, including but not limited to one or more of the following:

a.      In or about 1990, Natasha Heard lived with the defendant in Newnan, Georgia. During this co-habitation, Heard and the defendant had two children. Throughout this relationship, the defendant was physically abusive towards Heard. Before giving birth to their daughter, the defendant slammed Heard onto a concrete area. This violent act by the defendant occurred when Heard was six months pregnant. This assault was one of many beatings inflicted by the defendant upon Heard during and after their dating relationship and co-habitation.

b.      On or about May 2, 1992, in Newnan, Georgia, the defendant used a .22 caliber handgun to shoot Anthony Britt. This offense resulted in the defendant's conviction for Pointing a Firearm at Another.

5

c.  On or about January 23, 1993, in Newnan, Georgia, the defendant used a coat hanger to beat the infant children of Crystal Dennis. This resulted in the defendant's conviction for two counts of Felonious Cruelty to Children. At the time of the beatings, the defendant was in a dating relationship with Dennis. Throughout the course of their dating relationship, the defendant behaved violently and on numerous times assaulted Dennis.

d.  On or about November 9, 1993, the defendant broke into an apartment occupied by Alesha Chambers. Chambers at the time was the defendant's girlfriend. On that date the defendant forcibly entered the residence, removed Chambers and threatened to kill her.

e.  On or about November 12, 1993, the defendant waited for Alesha Chambers at a bus stop in Charlotte, North Carolina. The defendant grabbed Chambers, held a knife to her throat and threatened to kill her. The defendant was convicted in the Superior Court of Mecklenburg County for the crime of Felonious Restraint.

f.  On or about March 15, 1994, the defendant used a baseball bat to assault Alesha Chambers.

g.  On or about March 25, 1994, the defendant forced Alesha Chambers to leave her residence, sexually assaulted Chambers and threatened to kill her.

6

2. <u>Low Rehabilitative Potential</u>. As a result of his prior criminal conduct and convictions, the defendant has been incarcerated and served probationary sentences. The efforts and treatments to rehabilitate the defendant and/or deter him from violent conduct have failed.

B. THE DEFENDANT KILLED TWO PEOPLE. The defendant killed Donald Lee Allen and Robin Williams. This aggravating factor is listed in the alternative to the aggravating factor under Section 3592(c)(16) previously referenced in Sections I and II of this Notice.

RESPECTFULLY SUBMITTED, this the ___7___ day of August, 1997.


MARK T. CALLOWAY
United States Attorney

ROBERT J. CONRAD, JR.
Assistant United States Attorney
Chief, Criminal Division


THOMAS G. WALKER
Assistant United States Attorney


Certified to be a true and correct copy of the original.
U. S. District Court
Frank G. Johns, Clerk
Western Dist. of N. C.
By _____
Deputy Clerk
Date 8-7-97

7



117

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION

FILED
CHARLOTTE, N.C.

01 JUL 30 PM 4: 13

U.S. DIST.
W. DIST. OF N.C.

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | DOCKET NO. 3:97CR23-V |
| | ) | |
| v. | ) | **GOVERNMENT'S REAFFIRMATION** |
| | ) | **OF INTENTION TO SEEK THE** |
| | ) | **DEATH PENALTY AND REQUEST** |
| AQUILIA MARCIVICCI BARNETTE | ) | **FOR A PREEMPTORY TRIAL** |
| | ) | **SETTING** |

NOW COMES the United States of America, by and through Robert J. Conrad, Jr.,

United States Attorney, and states as follows:

On July 23, 2001, the Capital Crimes Unit of the Department of Justice informed United

States Attorney Robert J. Conrad, Jr., that the Department was reaffirming its previous

authorization for the government to seek the death penalty in this case.

WHEREFORE, the undersigned respectfully move this Court to calendar this case for

sentencing with all due speed. In support of this request, the undersigned state as follows:

1. The defendant murdered Donald Allen and Robin Williams on or about June 21,

1996.

2. The government's original Notice of Intention to Seek the Death Penalty was filed

on or about August 7, 1997.

3. The guilt phase of the defendant's trial commenced in this Court on January 21,

1998. No witnesses at trial disputed the facts of the crimes, and the jury found the

defendant guilty on each of the eleven counts in the Bill of Indictment.



RLV

4. During the sentencing phase of the trial, the jury unanimously found the existence of all the government's statutory and non-statutory aggravating factors on each of Counts 7, 8 and 11 and determined that these factors outweighed the 29 mitigating factors. The jury unanimously recommended that the Court sentence the defendant to death on the three capital counts in the Bill of Indictment.

5. The defendant appealed his case to the Fourth Circuit Court of Appeals. His conviction was affirmed on May 2, 2000 and his case was remanded to this Court for resentencing.

The undersigned respectfully contend that the ends of justice and the government's interest in finality support an immediate recalendaring of this matter for sentencing.

This the __30__ day of July, 2001.

GRETCHEN C. F. SHAPPERT
ASSISTANT UNITED STATES ATTORNEY

ANNE M. TOMPKINS
ASSISTANT UNITED STATES ATTORNEY

2

Case 3:12-cv-00327-MOC Document 99 Filed 09/23/15 Page 135 of 200

JA949

<u>**CERTIFICATE OF SERVICE**</u>

I certify that I have served a copy of the attached Government's Reaffirmation of Intention to Seek the Death Penalty and Request for a Preemptory Trial Setting to the defendant by mailing a copy of it, self-addressed and postage prepaid, to counsel for the defendant at the following address:

Claire J. Rauscher
Attorney at Law
435 East Morehead Street
Charlotte, NC 28202-2609

Jean Lawson
Attorney at Law
P.O. Box 4275
Charlotte, NC 28226-0099

This the 30 th day of July, 2001.

PAMELA R. HOLT
Legal Secretary

**JA950**

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | **MEMORANDUM IN SUPPORT** |
| v. | ) | **OF MOTION REGARDING** *RING* |
| | ) | |
| AQUILIA MARCIVICCI BARNETTE, | ) | |
| Defendant. | ) | |
| | ) | |

Pending before the Court is the Defendant's Motion to Dismiss the Notice of Intent to Seek Penalty of Death in this case. This Memorandum in Support of the Motion for Relief is filed in light of the Supreme Court's decision in *Ring v. Arizona*, ___ U.S. ___, 2002 U.S. LEXIS 4651, on June 24, 2002 and the remand of *United States v. Allen*, ___ U.S. ___, 2002 WL 1393602.

In *Ring*, the Supreme Court held that, under the Sixth Amendment to the United States Constitution, "Arizona's enumerated aggravating factors operate as 'the functional equivalent of an element of a greater offense.'" 2002 U.S. LEXIS 4651 at *44 (*quoting Apprendi v. New Jersey*, 530 U.S. 466, 494 n.19 (2000)). Consequently, the Sixth Amendment "requires that they be found by a jury." *Id.*, 2002 U.S. LEXIS 4651 at *44.

The Arizona scheme required that, for the defendant to be death eligible, the sentencing judge was required to find at least one enumerated aggravating factor. *See id.*, 2002 U.S. LEXIS 4651 at *17-18. At the sentencing hearing, the judge found two aggravating factors – "that Ring committed the offense in expectation of receiving something of 'pecuniary value, ... [and] that the offense was committed 'in an especially heinous, cruel or depraved manner.'" *Id.*, 2002 U.S.

**JA951**

LEXIS 4651 at *21-22. It was the finding of those factors by a judge alone, consistent with Arizona law, which the Court found unconstitutional.[1]

*Ring* is fundamentally a decision about the substance of criminal law, not merely procedures, requiring changes to the elements of death eligible offenses under federal law. It is clear that, as a result of the need for substantive changes, the current procedures in the FDPA are unconstitutional and require amendment.

The government in *United States v. Moussaoui* (01-455-A; EDVA) and *United States v. Fell* (___ DVt) has apparently recognized the need to obtain a new indictment alleging aggravating factors. The complex statutory and constitutional problems posed by *Ring* in relation to the FDPA are unlikely to be solved by the government's simplistic solution of a superceding indictment.

Here, the question is whether the grand jury requirement of the Fifth Amendment requires that the aggravating factors upon which the government intends to rely in seeking the death penalty against Aquilia Marcivicci Barnette be the subject of grand jury consideration and indictment. That question plainly must be answered affirmatively. The very premise of the Court's decision in *Ring* is that, however denoted by the particular statutory scheme, aggravating factors are "the functional equivalent of elements of the offense." Consequently, those factors must be presented to the grand jury and included in the indictment. *See Jones v. United States*, 526 U.S. 327, 229 n.6 (1999) (*cited in Ring*, 2002 U.S. LEXIS 4651 at *31)); *Hamling v. United States*, 418 U.S. 87, 117 (1974) (holding that indictment must contain "those words of

---

[1]     The FDPA and the Arizona capital scheme are similar in that each lists death as a theoretical sentence in the statute defining the offense, and then includes aggravating factors which are necessary to actually establish death eligibility in a separate statute.

2

Case 3:12-cv-00327-MOC  Document 99  Filed 09/23/15  Page 138 of 200
**122**

**JA952**

themselves fully, directly, and expressly, without any uncertainty or ambiguity, set forth all the elements necessary to constitute the offense intended to be punished"). *See also, United States v. Williams*, 152 F.3d 294, 299 (4th Cir. 1998) ("To pass constitutional muster, an indictment must "... indicate the exact elements of the offense and fairly inform the defendant of the exact charges, ...").

It is clear that, in light of *Ring* and its necessary implications, the FDPA is unconstitutional on its face. The FDPA does not define aggravating factors as elements of the capital offense and, consequently, does not provide for grand jury consideration of aggravating factors, or for the inclusion of such factors in the indictment. Rather, it treats aggravating factors strictly as "sentencing factors," committing to "the attorney for the government" the sole responsibility for determining which statutory aggravating factors will be included in the Notice of Intent to Seek a Penalty of Death and even what the nonstatutory aggravating factors will be. It therefore commits to the government the ability to determine upon what factors a sentence of death may be predicated, 18 U.S.C. § 3593(a); *Jones v. United States*, 527 U.S. 373, 377 n.2 (1999), subject only to the court's determination of constitutional adequacy. *See, e.g., United States v. Friend*, 92 F. Supp.2d 534, 541-42 (E.D.Va. 2000) (*discussing inter alia Tuilaepa v. California*, 512 U.S. 967, 972 (1994); *Arave v. Creech*, 507 U.S. 463, 474 (1993)). Committing to the prosecution the power to determine what are the "elements" of a capital offense is plainly incompatible with the constitutional rule set forth in *Ring*.

The government in the *Moussaoui* and *Fell* cases is correct in recognizing that aggravating factors in a federal capital prosecution must be approved by the grand jury and included in the indictment. Because *Ring* is, first and foremost, a decision of substantive constitutional criminal

3

law, rather than simply a decision about criminal procedures, it is the legislative branch, *i.e.*, Congress, not the executive or judicial branch, which must correct the constitutional flaws in the statute.

The essence of criminal law is the establishment and definition of criminal offenses and the penalties applicable to them. Ever since the landmark case of *United States v. Hudson*, 11 U.S. (7 Cranch) 32, 34 (1812) (Marshall, CJ), it has been clear that only Congress is vested with this power. For an act to be criminal, "the legislative authority of the Union must first make an act a crime, fix a punishment to it, and declare the Court that shall have jurisdiction of the offense." "...[N]o one doubts the *power of Congress* to 'create, define, and punish, crimes and offenses, whenever they shall deem it necessary and proper by law to do so." Simply put, "'the power of punishment is vested in the legislative, not in the judicial department.'" *United States v. Laub*, 253 F. Supp. 433, 456 (E.D.N.Y. 1966) (*quoting United States v. Wiltberger*, 5 Wheat. (18 U.S). 76, 95 (1820)). *See also Bousley v. United States*, 523 U.S. 614, 620-21 (1998) ("For under our federal system it is only Congress, and not the courts, which can make conduct criminal") (*citing United States v. Lanier*, 520 U.S. 259, 267-68 n.6 (1997); *Hudson*, 11 U.S. (7 Cranch) at 34). "It requires no further citation to support the equally cardinal principle that the power of punishment is not vested in the executive department." *Laub*, 253 F. Supp. at 456.

The *Ring* Court noted that, in *Jones*, 526 U.S. at 229, it had concluded that the federal carjacking statute, which included higher maximum penalties based on the degree of injury inflicted, defined "three distinct offenses" rather than "a single crime with a choice of three maximum punishments." *Ring*, 2002 U.S. LEXIS 4651 at *30-31. As a result, the Court had concluded that the "facts ... necessary to trigger the escalating maximum penalties fell within the

4

jury's province to decide." *Id.*, 2002 U.S. LEXIS 4651 at *31.

The *Ring* Court was compelled to address in detail the apparent conflict between its decisions in *Apprendi* and *Walton v. Arizona*, 497 U.S. 639 (1990), in which the Court had upheld the same capital sentencing scheme challenged in *Ring*, where the sentencing judge, rather than a jury, had to make the factual findings upon which death eligibility was predicated. *See, Ring*, 2002 U.S. LEXIS 4651 at *27-28. Ultimately, the Court held that *Walton* was incompatible with *Apprendi* and therefore overruled *Walton. See Ring*, 2002 U.S. LEXIS 4651 at *37, 44. In reaching that conclusion, the Court repeatedly noted that its decision was animated by the principle that sentencing factors which increase maximum punishments, however denoted, establish distinct offenses with distinct elements, *see Ring*, 2002 U.S. LEXIS 4651 at *30-39, just as it had concluded in *Jones*. Quoting *Apprendi*, 530 U.S. at 494 n.19, the Court stated that a "sentence enhancement" which increases "the maximum authorized statutory sentence ... is the functional equivalent of an element *of a greater offense* than the one covered by the jury's guilty verdict." *Ring*, 2002 U.S. LEXIS 4651 at *39 (emphasis added). The Court adopted Justice O'Connor's view, also expressed in *Apprendi*, that Arizona's capital murder statute "'authorizes a maximum punishment of death *only in a formal sense.*'" *Ring*, 2002 U.S. LEXIS 4651 at 37 (emphasis added) (*quoting Apprendi*, 530 U.S. at 541 (O'Connor, J., dissenting)). *See also, Ring*, 2002 U.S. LEXIS 4651 at *39 (*quoting Apprendi*, 530 U.S. at 495) ("'Merely because the state legislature placed its hate crime sentence enhancer within the sentencing provisions of the criminal code does not mean that the finding of a biased purpose to intimidate is not an essential element of the offense'").

Thus, *Ring* is not simply a case about rules of criminal procedure. Rather, it addresses the

5

JA955

fundamental criminal law question of whether a fact which increases the maximum punishment applicable to a crime actually creates a new and distinct crime, one which, as noted above, is "a greater offense than the one covered by the jury verdict."

The government in other cases has apparently conceded that the *Ring* trilogy makes new indictments alleging the whole crime, including aggravators, necessary. Regardless of the government's attempts to cure the ill specified by *Ring* by bringing new, compliant indictments prior to trial as in *Moussaoui* and *Fell*, that questionable "patch" cannot apply in this case. The double jeopardy clause of the Fifth Amendment to the Constitution of the United States forbids it.

## CONCLUSION

For the foregoing reasons, in addition to those presented in the Defendant's Motion to Strike Notice of Intent to Seek Penalty of Death, the Court should strike the death penalty in this case and prohibit the government from seeking the death penalty against the Defendant.

Respectfully submitted, this the _11_ th day of July, 2002.

Harold J. Bender
200 N. McDowell Street
Charlotte, NC 28204
(704) 333-2169

Jean B. Lawson
PO Box 472106
Charlotte, NC 28247
(704) 341-1865

ATTORNEYS FOR AQUILIA MARCIVICCI BARNETTE

6

# CERTIFICATE OF SERVICE

I, Harold J. Bender, do hereby certify that I have served a copy of the

foregoing Memorandum in Support of Motion Regarding *Ring* upon the following by depositing

a copy of the same in the United States Mail, postage prepaid, and addressed to:

Ms. Anne Tompkins
Assistant United States Attorney
United States Attorney's Office
Suite 1700, Carillon Building
227 West Trade Street
Charlotte, North Carolina 28202

This the 11 day of July, 2002.

Harold J. Bender
Bender, Barnett & Falls
200 North McDowell Street
Charlotte, North Carolina 28204
704-333-2169
Attorney for Defendant BARNETTE

IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | DOCKET NO. 3:97CR23 |
| | ) | |
| v. | ) | |
| | ) | |
| ACQUILIA MARCIVICCI BARNETTE | ) | |
| | ) | |

## GOVERNMENT'S RESPONSE TO DEFENDANT'S
## MOTION FOR RELIEF PURSUANT TO *RING v. ARIZONA*

NOW COMES the United States of America, by and through Robert J. Conrad, Jr., United

States Attorney for the Western District of North Carolina, responding to defendant's Motion for

Relief Pursuant to *Ring v. Arizona* filed herein on July 2, 2002, and states:

1. The case of *Ring v. Arizona*, __ U.S. __, 122 S.Ct. 2428, 2002 WL 1357257 (June 24,

2002), cited by defendant in support of his motion does not affect the Federal Death Penalty Act of

1994 (codified at 18 U.S.C. 3591-98) and is therefore not applicable to the capital resentencing

proceedings in the case at bar. Likewise, *Apprendi v. New Jersey*, 530 U.S. 466 (2000) does not

affect the Federal Death Penalty Act of 1994 and affords no relief to the defendant in the subject

capital resentencing proceedings.

2. The issue raised in *Ring v. Arizona* "is whether [an] aggravating factor may be found by

the judge, as Arizona law specifies, or whether the Sixth Amendment's jury trial guarantee, made

applicable to the States by the Fourteenth Amendment, requires that the aggravating factor

determination be entrusted to the jury." *Ring*, 2002 WL 1357257, at *9 . The Supreme Court

decided the issue by holding that the Arizona statute which allows the trial judge, sitting alone

following a jury adjudication of a defendant's guilt of first-degree murder, to determine the presence or absence of the aggravating factors required by Arizona law for imposition of the death penalty violates the Sixth Amendment right to a jury trial in capital prosecutions; overruling *Walton v. Arizona*, 497 U.S. 639, 110 S.Ct. 3047, 111 L.Ed.2d 511 (1990). *Id.* at *1. The Supreme Court also held that "[b]ecause **Arizona's** enumerated aggravating factors operate as 'the functional equivalent of an element of a greater offense,' *Apprendi*, 530 U.S., at 494, n.19, 120 S.Ct. 2348, the Sixth Amendment requires that they be found by a jury." *Id.*

3. The defendant has been convicted of violations of 18 U.S.C. §§ 924(c)(1) and (i)(2)(1)[1] as charged in Counts 7, 8 and 11 of the Bill of Indictment. Title 18 U.S.C. §§ (i)(2)(1) (now 18 U.S.C. § 924(j)) is a substantive offense, not a sentence enhancement or an "aggravated sentence" as contended by the defendant in his motion. *See United States v. Nguyen*, 928 F.Supp. 1525, 1523-33 (D.Kan. 1996) (finding 18 U.S.C. § 924(j) [then designated 924(i)(1) and later redesignated 924(j) without any substantive changes] to be a statutory definition of a capital offense and to be constitutional), *aff'd*, 155 F.3d 1219, 1225-27 (10th Cir. 1998), *cert. denied*, 525 U.S. 1167 (1999).

4. The Fifth Amendment provides that "[n]o person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a Grand Jury." U.S. Const., amend. V. The indictment returned against the defendant on February 4, 1997 sufficiently alleged a capital offense against the defendant upon which he could be tried and, if convicted, could be sentenced to death. The penalties listed for the violations of 18 U.S.C. § 924(j)(1) as charged in Counts 7, 8 and 11 are "death or by imprisonment for any term of years or for life" if the killing is

---

[1]Title 18, United States Code, Section 924(i)(2)(1) has been recodified as Section 924(j).

2

a murder (as defined in section 1111). *Compare* 18 U.S.C. § 924(j)(2) ("if the killing is manslaughter (as defined in section 1112), [shall] be punished as provided in that section").

5. The decision whether to seek the death penalty is firmly within the prosecutor's discretion. *McCleskey v. Kemp.* 481 U.S. 279, 296-97 (1987).

6. The Federal Death Penalty Act (codified at 18 U.S.C. 3591-98) requires the government to file with the court, and to serve on the defendant, a notice of intent to seek the death penalty "a reasonable time before the trial or before acceptance by the court of a plea of guilty." 18 U.S.C. § 3593(a). The notice of intent must (1) include a statement that the government believes the circumstances of the case justify imposing a sentence of death and that if the jury finds the defendant guilty the government will seek a sentence of death and (2) set forth any aggravating factors that the government, if the defendant is convicted, intends to prove as justification for a sentence of death. *Id.* The government's Notice of Intent to Seek the Death Penalty filed on August 7, 1997, and its Reaffirmation of Intent to Seek the Death Penalty filed on July 30, 2001, comply with the requirements of 18 U.S.C. § 3593(a). There is no requirement under 18 U.S.C.§ 3593(a) that a notice of intent to seek the death penalty must be submitted to the grand jury.

7. The Federal Death Penalty Act does not require aggravating factors to be submitted to a grand jury. Such factors only come into play after a grand jury indicts and a petit jury convicts a defendant of the offenses charged. 18 U.S.C. § 3593(b).

8. Aggravating factors, statutory and non-statutory, are determined by the sentencing jury. 18 U.S.C. § 3592.

3

**JA960**

WHEREFORE, the United States respectfully requests the Court to deny the defendant's

Motion for Relief Pursuant to *Ring v. Arizona* in its entirety.

This the ___ 12ᵗʰ ___ day of July, 2002.

<div style="margin-left:40%">

ROBERT J. CONRAD, JR.
UNITED STATES ATTORNEY

JILL WESTMORELAND ROSE
ASSISTANT UNITED STATES ATTORNEY

ANNE TOMPKINS
ASSISTANT UNITED STATES ATTORNEY

</div>

4

**JA961**

## CERTIFICATE OF SERVICE

This is to certify that I have served the opposing parties in this action with a file-stamped copy of the foregoing Government's Response to Defendant's Motion for Relief Pursuant to *Ring v. Arizona*, by depositing in the United States mail a copy of same in a properly addressed envelope, to:

Mr. Harold Bender
200 North McDowell Street
Charlotte, North Carolina 28204

Ms. Jean B. Lawson
Post Office Box 472106
Charlotte, North Carolina 28247-2106

July 12, 2002

ANNE M. TOMPKINS
ASSISTANT UNITED STATES ATTORNE

PROSPECTIVE JUROR: Good afternoon.

THE COURT: I believe your name is Ms. Sanders.

PROSPECTIVE JUROR: That's correct.

THE COURT: Has anything happened since the time you filled out your preliminary questionnaire that might tend to change any of the answers you gave?

PROSPECTIVE JUROR: No.

THE COURT: Okay. Let me ask the attorneys if they would introduce themselves, and I'll ask Ms. Sanders if she knows any of them.

MS. ROSE: Hi. My name is Jill Rose, and I, along with Anne Tompkins, represent the United States in this matter.

PROSPECTIVE JUROR: Okay. I don't know them.

THE COURT: Okay.

MS. LAWSON: I'm Jean Lawson.

MR. BENDER: I'm Harold Bender. Jean and I represent Marc Barnette. We are assisted by David Ball and Debra Miller.

PROSPECTIVE JUROR: No, I don't know them.

THE COURT: All right. Thank you very much. Now that will conclude my questions. I'll ask the government to inquire.

<u>REGINA SANDERS</u>

VOIR DIRE EXAMINATION

BY MS. ROSE:

Q. From the court's instructions this morning, you understand that the previous jury has found this defendant guilty.

A. Yes.

Q. Do you have any difficulty accepting that verdict?

A. Well, I would say somewhat. Not that I -- you know, not being on the first -- or the original trial, but I guess, you know, I would have to accept it.

Q. What about -- what are your concerns about not accepting that verdict? What would concern you about it?

A. Not accepting it. I'm saying not being on the original trial, I guess and not hearing all the details, the facts of the case, you know, the evidence.

Q. Yes, ma'am. Now, of course, at this stage it's just to determine the sentence.

A. Right.

Q. And since guilt has been established, it's going to be a question of the evidence that's put before you here.

A. Uh-huh.

Q. Can you accept that evidence --

A. Yes, I could.

Q. -- as all the evidence that you would need to make a decision?

A. In that case I could, yes.

Q. And the court will instruct you on how to accept that evidence and what -- how you should work through that process. Is that something you could do?

A. I could.

Q. You are self-employed.

A. Part-time, yes.

Q. And you've indicated, however, that is not -- despite working for yourself, that you're not going to be put in too much of a hardship --

A. No.

Q. -- if you're here during the length of this trial.

A. No, it wouldn't be.

Q. You said you do resumes and mailings.

A. You know, general office, I guess, service for individuals, groups, relatives, you know.

Q. Is it just kind of an independent contractor?

A. Entrepreneur from home, yes. Home based.

Q. Folks just contract you to help them pick up office duties or...

A. Like with one organization I do their mailings. Individuals. Could be church bulletins, family reunions, weddings, mailings or, you know, just general...

Q. How do you get those referrals?

A. A lot of them are through friends, relatives, and businesses.

Q. How long have you been doing that type of work?

A. I'd say about two and a half years.

Q. Is that -- that allows you to be available for your children.

A. Yeah. Pretty much, yeah.

Q. Understanding that this is a case wherein there are only two possible verdicts, either life in prison without release or the death penalty, do you have any difficulty sitting on a case of this nature?

A. No.

Q. What is your opinion of the death penalty?

A. I guess depending on the case, you know, it could be applied to one case and not applied to another. I guess it just depends on the case.

Q. Can you listen to the facts and the evidence and the law to make your determination?

A. I believe I could.

Q. You did say in your questionnaire in response to the question of your personal views of the death penalty that you feel the death penalty is applied to certain cases almost automatically and I do have strong feelings about the fairness of the death penalty as applied on an individual case basis. Would you describe that a little more, please.

A. I just feel that some cases and I guess individuals involved in certain cases, it seems like without any

consideration, just automatically the case is assigned a death penalty case; whereas, other cases of the same, I guess magnitude, you know, are not automatically assigned, you know, the death penalty.

Q. The law sets forth, the legislature, and as approved by the Supreme Court, sets forth the type of cases in which the death penalty may be appropriate. So that's determined by law. But whether the death penalty is appropriate in our system is determined by the jury after hearing the evidence and the law. That's the procedure.

A. All right.

Q. And that would be the procedure here. Do you understand that's the procedure?

A. I understand.

Q. And do you feel like that given that procedure, you could approach this case with a fair and open mind?

A. I think somewhat, yes, I could.

Q. Somewhat?

A. I believe somewhat, yes. I don't know. I just -- you know, as I said on my questionnaire, it's just that some cases, like I said, it's applied, you know, I think unfairly.

Q. In this case -- once again, you may have read about cases. Is that where you're getting this opinion?

A. Pretty much so.

Q. From what you've read or heard in the media?

A.    Right.

Q.    And you weren't part of that process.

A.    No.

Q.    So you don't really know.  You only know what's been reported.  Is that fair to say?

A.    That's fair to say.  But I've also seen the, what is it, the people that I guess have been sentenced, too, so, you know, I could see the type of individuals.

Q.    And what -- and what about that gives you concern?

A.    I don't know.  It just seems like in most cases there is certain, I don't know, socioeconomic backgrounds, certain race, certain age, you know, those factors kind of.  You know, I think about that.

Q.    Setting those thoughts aside, or impressions that you may have formed about what you've read or seen, can you do that?

A.    I believe I could, yes.

Q.    And since you are part of this process, can you pay attention to the facts and the evidence?

A.    Oh, yeah.

Q.    Can you follow the law that the judge gives you?

A.    (Affirmative nod.)

Q.    And take part in the deliberations?

A.    Yes, I could.

Q.    With a fair and open mind?

A.    Yes, I would keep an open mind.

Q. Recognizing that within the federal system, number one, there are only certain cases for which the death penalty is appropriate. Do you understand that?

A. I understand.

Q. And that this -- these three charges for which the defendant has been convicted are such cases.

A. Oh, I understand that.

Q. One of two verdicts in this case. That's been narrowed for you by the law. Do you understand that?

A. I understand.

Q. And could you listen to the law that the judge gives you?

A. I could listen to it, yes.

Q. And could you follow the law realizing that is your duty as a juror to follow the law?

A. Yes.

Q. Can you describe what forms -- you told us a little bit about things you've read. But prior to reading or paying attention to the media or following certain jury verdicts or cases, what else has formed your opinions about the death penalty? What social or personal or religious beliefs have factored into your ultimate beliefs?

A. Well, I don't know. I guess the -- like you're saying, the TV media, I guess, has formed, you know, most of my opinion of the death penalty.

Q.   And everything you read and hear may not be correct --

A.   I know that, yes.

Q.   -- is that a fair statement?

A.   That's fair.

Q.   But once again, since you're part of this process, could you set those things aside?

A.   Oh, yes.

Q.   Participate in this process?

A.   I could, yes.

Q.   Most importantly, follow the law and pay attention to the evidence?

A.   Yes, I could.

Q.   You noted in your questionnaire that you had heard of Dr. Park Dietz.

A.   I think I have, yes.  His name sounds familiar.

Q.   And from -- from what source do you think you've heard of him?

A.   I think a media source.  I'm not sure if he was in the newspaper or the TV media, I'm not sure.  I think from some media source.  Not a personal source, no.

Q.   Okay.  And would you -- should Dr. Dietz testify in this case, would you treat his testimony just as you would any other witness?

A.   Yes, I would.

Q.   Assessing his credibility as he testifies.  Would you do

that?

A.   Yes.

Q.   And of course, weigh the evidence that he presents or what you hear from him along with all the evidence in the case.

A.   Yes, I could.

Q.   Only -- my last question is knowing that you -- or with your work you've made arrangements to be with your children. Is that going to create any hardship for you?  Do you have backup child care for them?

A.   Well, I'm working on that now, you know, in the event that I have to serve on the jury.

         MS. ROSE:  Thank you very much.

         PROSPECTIVE JUROR:  Okay.

         MS. ROSE:  Appreciate your answers.

         PROSPECTIVE JUROR:  Thank you.

                 VOIR DIRE EXAMINATION

BY MS. LAWSON:

Q.   Hi, Ms. Sanders.  I have a couple questions for you, too.

         First of all, I wanted to thank you for your patience in being here and coming here and making arrangements for your child.  It's obviously an imposition for everyone who comes in for jury duty, but I guess you can see how important it is that we take this time and talk to all of you.

One of the reasons we talk to you and ask you questions that may seem a little personal is because we need to know where you've been in your life and what you've learned and basically who you are because who you are is who goes into deliberate on Marc Barnette's fate. So I hope you understand we don't mean to pry in any rude way.

A. I understand that.

Q. I saw that you grew up in the air force.

A. Yes, ma'am. I'm an air force brat, as they call them.

Q. You're one of those people who was confined to quarters instead of put on restriction.

A. Right.

Q. Where did you live growing up?

A. I was born in Anchorage, Alaska, actually. I've lived in California. I've lived in Oregon, Texas, Mississippi, Florida, New Jersey, Pennsylvania, Chicago, Japan for a while. Like I said, I've been, you know -- I think I've been to, what, 40 of the continental United States, or lived or been in.

Q. That's got to be hard going from school to school. How did you -- all that travel affect how you grew up and who you are today?

A. I think it affected me in a positive way. I enjoyed the traveling experience. I enjoyed meeting people of different backgrounds, different cultures. I think it affected me

positively. I still to this day enjoy traveling.

Q. Your dad retired from the air force.

A. Yes, he did.

Q. Do you think that the experiences you had getting around the world influenced your decision of a college major?

A. Oh, yeah, it did.

Q. Tell us a little bit about why you picked sociology and what things that you felt were important.

A. Like I said, I really find people fascinating. I guess the way they act, their characteristics. I wanted to actually go into psychology, but that was just a little bit -- I don't know, some of these like Charles Manson cases kind of scared me a little bit, so I said, well, I do know -- might just want to stick to sociology. And just the fact of helping people, teaching people, aiding people, that always appealed to me.

Q. You've had kind of a varied work career.

A. Yes, I have. Yeah, it's been kind of -- you know, when I get into my field, then there's a -- they're not hiring that many social workers or you need to, you know, upgrade, I guess, to your master's or something. By then I've latched on to helping people, like when I was at the Housing Authority, helping people in that manner. Just, you know -- and improving on your, you know, your skills.

Q. But then you went from there to the board room basically with a very high pressured job.

A. Yeah, then I went on to work with the chief financial officer of a company. But that, to me, that's just another way of enhancing the skills that you have. Meeting different types of individuals. Just, I don't know.

Q. Did you plan on being a social worker when you were majoring in that in college or was that just something that meant a great deal to you?

A. It was something at the time it did mean a great deal to me. I've always enjoyed working with other individuals and helping people. And I, you know, I just decided, well, like I said, for a while that was a good career to be in and then after a while it was just, you know, it was hard to get employment in that field.

Q. Without the advanced degree.

A. I beg your pardon?

Q. Have you got the master's degree?

A. No. I started on my master's, but I didn't complete it.

Q. You know, all those things that you've been through, that you learned, that you are, is something that you take into the jury room with you as you consider how Marc is going to spend the rest of his life. Do you understand that?

A. I understand.

Q. And you don't leave those behind because if you needed everybody the same or needed them to leave who they are outside the jury room, then you'd only need one juror.

A.   Right.

Q.   So all of you who sit on this jury are going to bring your own background with you.

A.   Right.

Q.   And share, basically, that in terms of how you make your decision.

A.   Right.

Q.   And you have a right to expect the other jurors to respect your opinion, your decision, your ideas.  How do you feel about that?

A.   Well, I could work with other people on the jury.

Q.   I understand that.  And of course, you would have a duty to respect their opinions.

A.   Right.

Q.   And their decisions.  All the while working with them, cooperating with them.  But if -- for instance, if you came to a decision that you felt secure in and other people disagreed with you, you would certainly listen to what they had to say.  But if, after listening to them, you still held on to your decision or your feeling or your opinion, would you change your opinion just to make them happy or end it all?

A.   No, I'd pretty much stick with my original opinion.

Q.   So your personal conviction.

A.   Yes.

Q.   And again, you would -- there's a reciprocal right.  You

honor other people's decisions and expect them --

A.   Right.

Q.   -- to honor yours.

And you understand that at the end of this process of discussing the different things that the judge is going to ask you to discuss in this case, all of you must be satisfied -- well, all of you must be satisfied beyond a reasonable doubt that the only correct punishment for Marc Barnette is death when considered with that the alternative is life imprisonment without the possibility of release.  Okay?

A.   Uh-huh, I understand.

Q.   You are never -- you understand you're never required to vote for death unless you and all twelve other jurors are convinced of that beyond a reasonable doubt.

A.   I understand that it would have to be unanimous, uh-huh.

Q.   And you've heard a little bit about what Marc did as Judge Voorhees told you?

A.   Yes, the judge told us this morning.  Yes, I did.

THE COURT:  Ms. Lawson, we're going to need to break for lunch.

MS. LAWSON:  In fact, I'm done, Your Honor.

THE COURT:  Beg your pardon?

MS. LAWSON:  I'm done.

THE COURT:  Oh, you are.

MS. LAWSON:  Yes.

146

THE COURT: Well --

MS. LAWSON: Thank you very much.

PROSPECTIVE JUROR: Thank you.

THE COURT: Very well. You'll be given a sheet of paper, then, that will enable you to -- well, instruct you to call us so that we'll be able to keep up with you if we need you further.

PROSPECTIVE JUROR: All right.

THE COURT: Thank you very much.

PROSPECTIVE JUROR: Thank you.

(Ms. Sanders exited the courtroom.)

(Lunch recess at 12:35 p.m.)

902

(No response.)

THE COURT: All right. Thank you very much.

Anything further from the attorneys before we reassemble?

MS. TOMPKINS: No, sir.

MS. LAWSON: (Negative nod.)

THE COURT: All right. We'll ask madam clerk to take the jurors where they need to go while we're waiting to pose individual questions.

MS. HANKINS: Ladies and gentlemen, if you'll just follow me.

(Prospective jurors exited the courtroom.)

THE COURT: May we have number 104 at this point.

(Diane Edwards entered the courtroom.)

THE COURT: Okay. I believe you're Ms. Edwards.

PROSPECTIVE JUROR: Yes.

THE COURT: Good morning.

PROSPECTIVE JUROR: Good morning.

THE COURT: One of the questions I would ask you would be in your questionnaire you indicated that you might not be able to accept the prior verdicts in this case. Now, having heard the orientation of the court, would you answer that in the same way now?

PROSPECTIVE JUROR: No.

THE COURT: All right. Thank you.

PROSPECTIVE JUROR: I would say that I could.

THE COURT: All right.

PROSPECTIVE JUROR: Given the situation.

THE COURT: The government may inquire.

MS. ROSE: Thank you.

DIANE EDWARDS

VOIR DIRE EXAMINATION

BY MS. ROSE:

Q. Good morning.

A. Good morning.

Q. As previously introduced, I'm Jill Rose. This is Anne Tompkins. And we represent the United States of America in this matter.

I see -- first of all, thank you for coming in on a Saturday. Also, thank you for the time that you took to fill out this questionnaire. It's been very helpful for us. Hopefully, it will speed along the process.

I did notice that you're a second grade teacher's assistant.

A. Uh-huh.

Q. And I'll just say off the bat that we've had a number of teachers that have come through. And knowing that this case could very well go into the beginning of the school year, they have expressed some concerns about getting the year off right, setting up their procedures, their protocol, kind of building

149

a rapport with their students. And I know a teacher's assistant position is important, but being kind of the backup system to the teacher, do you feel like you could be here with us through this trial and not have your job responsibilities weighing on you too much in that the primary teacher is there and I imagine that your school can get you a substitute?

A. I think that they could get along. You know, being that I am, like you said, an assistant, a backup, I'm not responsible for plans or, you know, anything like that. I'm basically --

Q. Obviously, you'll miss the opportunity to get to know the children right off the bat.

A. Uh-huh.

Q. But maybe they'll get a mean substitute and you can come in as their savior, I don't know.

So I appreciate your willingness to do that and I imagine that you've spoken with them at the school and they understand that this may be an obligation.

A. Yes.

Q. Okay. Very good. Thank you.

In looking at your questionnaire, you as a teacher probably were very upset with us with some of the poor wording on these questions because they confused a number of people. Don't hold that against us. But there was a question on here, it said would you always vote to impose the penalty of life

imprisonment without the possibility of release in a case where an accused has been found guilty of first degree murder? There were five or six of those questions. They were always and never and kind of double negatives.

Having heard what the court has told you, is that still the case, that no matter what the facts or circumstances are, that you would always impose life imprisonment and not consider the potential death penalty as a punishment?

A. I think what I was trying to go with there is to say always and never, you know, I don't know. I think given -- I think I would have to hear the evidence and I think I would go with what the law dictated based on what I heard in a particular case.

Q. What is your opinion, your beliefs about the death penalty?

A. Well, I think, as I said on there, I think it's -- I don't think anybody wins. I think it's a sad situation for both sides. I think if the situation warrants it beyond a shadow of a doubt in my mind and that's what the law allows in that case, I think I could impose it.

Q. Now, the law is never going to require you to find anything beyond a shadow of a doubt. It's beyond a reasonable doubt.

A. Reasonable doubt.

Q. And that's a different standard.

A. Okay. Right.

Q. And I'm not picking at you over semantics, but there is a difference there.

A. Absolutely.

Q. And so would you listen to the jury's -- I mean, the jury instructions, the instructions from the court as to the law and follow that law?

A. Yes.

Q. And would you have the ability to wait until you had heard all the evidence from both sides and, of course, the law and then meet together with your other jurors to discuss the case before you made up your mind?

A. I think so. That would be definitely my goal.

Q. And would you keep an open mind as to what the punishment should be until that time?

A. Yes.

Q. The -- as to the question concerning whether any immediate family, close friend had appeared or testified as a witness, you indicated that was your sister who testified in a case about --

A. It was a neglect situation of a student in her class many years ago.

Q. Nothing about that impacts you.

A. No.

Q. You said you had some friends in law enforcement. Would

you be able to judge the testimony of a law enforcement officer in the same way as you would a civilian witness or an expert witness or anybody else who comes before the court?

A.    Uh-huh.

Q.    The court would instruct you to listen to their testimony, to judge their demeanor, weigh it with the other evidence and determine their credibility or believability.

A.    Uh-huh.

Q.    Can you do that?

A.    Yes.

Q.    As to the question have you been to court before for other than a minor traffic violation, what was that concerning?  You checked yes, that you had.

A.    I don't know unless I was just referring to previous jury experience.  I mean, I've never been to court for anything myself.

Q.    You have served as a juror in what type of case?

A.    In -- in civil court at the Mecklenburg County Courthouse.  Just a car accident.

Q.    How long ago was that?

A.    Oh, I've served a couple of times.  It's been, you know, three, four years ago maybe.

Q.    Nothing about that experience that's left you with an opinion about the court system that would affect your ability to be a fair and impartial juror here.

JA983

A. I don't think so. It was fine.

Q. Do you feel like your opinions on the death penalty are based on any religious teaching or readings? Where did you form your opinion and how long have you held the opinion that you have expressed?

A. I guess it's one -- it's one of those things that you deal with whenever you hear about it going on and how would I really feel? What would I do in that situation? What do I think? I don't think it's based really on a religious teaching, you know. I am -- I go to church. I'm a religious person. But I know a lot of religious circles right now are very against it. That it's barbaric and it's not, you know. And then there are Christian circles that teach an eye for an eye and that's -- you know, that it's -- I think mine is really just based on what -- that it's an appropriate punishment for a heinous act that, you know, given -- in an appropriate circumstance, if it is an appropriate punishment, then it should be carried out. I don't think it's based really on anything religious, you know, right or wrong.

Q. It sounds as if, once again, that your opinion is pretty open and that it would depend on the facts and the circumstances and the evidence that you heard.

A. Yeah, I'd like to -- yeah.

Q. You could consider both penalties --

A. Uh-huh.

Q.  -- in a case of this nature.

A.  Uh-huh.  I think so.

MS. ROSE:  Thank you very much.

THE COURT:  Mr. Bender.

MR. BENDER:  Thank you, Your Honor.

VOIR DIRE EXAMINATION

BY MR. BENDER:

Q.  Good morning, Ms. Edwards.

A.  Hi.

Q.  Again, thanks for coming in on Saturday.  And thank you for the time you spent filling out this questionnaire.  It is most helpful to us and hopefully it will speed up the process.

I notice, first of all, that your mother was a college professor.

A.  Uh-huh.

Q.  Tell me where.  What was the area of study?

A.  She was a -- is a professor of English.  She has a Ph.D in English, which she started college when I was in kindergarten and went through and obtained her doctorate and has taught everywhere we've lived.  We've lived in Florida; she taught there.  In Charlotte she's taught at UNCC and at Queens.  And most recently before her retirement, at the University of South Carolina at Lancaster.

Q.  And what was her area of study?

A. English.

Q. Oh, you told me that. I'm sorry. And your father was an insurance executive?

A. An executive, yeah.

Q. Right.

A. Yeah.

Q. And were the moves, Florida, wherever, were they based on his position or hers?

A. His.

Q. His position.

A. Uh-huh.

Q. Okay. So he didn't -- well, tell me what you mean by insurance executive. Not an agency --

A. He worked for the Equitable Life. He started out when he was eighteen years old as a payroll clerk and just moved up through the company and ended up working for the home office in New York City as a -- he was in charge of leasing and that kind of thing for the entire country.

Q. And when Equitable moved part of its operation here to Charlotte --

A. Uh-huh.

Q. -- that's when you moved here?

A. Yes.

Q. And you have a BS in psychology.

A. Yes.

Q. And from what university?

A. UNC Charlotte.

Q. Tell me what you do as a teacher's assistant.

A. Well, aside from the obvious, assisting the teacher, I am -- work with small groups of children in reading groups, small groups in math groups. I'm responsible for all the, basically, clerical work for the classroom. I keep the attendance, take up money for field trips, get supplies together and ready for activities, take the kids to lunch, take them outside, take them to the bathroom. That kind of thing.

Q. And your husband is also a teacher and a baseball coach.

A. Uh-huh.

Q. I am assuming that's on the high school level?

A. Yes.

Q. As opposed to middle school.

A. Uh-huh.

Q. And how long has he been a baseball coach?

A. He's -- he's been -- well, he's been teaching for eighteen years and he's coached some type of sport all through that time.

Q. Whether it be football --

A. He's coached football, basketball, and baseball most recently.

Q. You have a friend that is a police officer.

JA987

A.    He's an acquaintance that goes to my church.

Q.    And also a friend who is a drug enforcement officer.

A.    That's the father, actually, of a friend of one of my son's good friends, and they don't live in Charlotte anymore.

Q.    You indicated, I believe, that you somewhat disagree that police officers are people who -- well, the question about do you think they mainly tell the truth.

A.    Uh-huh.

Q.    Do you remember that question?

A.    Yes.    Something about would you value their opinion automatically higher than someone else's.

Q.    Right.

A.    I don't know about automatically.

Q.    All right.

A.    But, I mean, I would certainly give it, you know, consideration as him being under oath.

Q.    And the judge will probably instruct you at the appropriate time that everybody who comes in here and takes an oath, you have the right to decide whether they're telling you the truth or not.

A.    Right.

Q.    You do that every day --

A.    Yeah.

Q.    -- whether it's with the kids, you know, at school.    You decide, based on whatever factors you think are important to

you, whether somebody is telling you the truth.

A.    Uh-huh.

Q.    Just because somebody happens to be in a uniform, you shouldn't give that uniform or that position any more credibility simply because of that fact.

A.    Uh-huh.

Q.    Would you be able to do that?

A.    Yes.  I think that's pretty much what I intended to say --

Q.    Right.

A.    -- on the questionnaire.

Q.    Ms. Edwards, this case, as you no doubt know, is probably the most serious case with the gravest consequences of any case you will ever sit on, and probably anybody else will ever sit on.  Literally, you are going to decide whether Marc lives in prison for the rest of his life without the possibility of release or whether he dies.

A.    Uh-huh.

Q.    So you come to this with a lot of -- from a lot of different areas.  Your religious background, the way in which you were brought up, your family, your education, whatever it might be, you have a background unlike anybody else's.  If everybody were the same, we'd only need one juror; but they're not, so we need twelve because the prosecution has to satisfy all twelve beyond a reasonable doubt.  So as you come here for

this purpose, you -- as we sometimes say, you walk in your own shoes. Everybody else needs to respect and honor your opinions, your beliefs formed over a lifetime of experiences.

A. Uh-huh.

Q. Would you -- would you agree with that?

A. Uh-huh.

Q. And by the same token, you need to respect and honor the opinions, beliefs of other jurors.

A. Uh-huh.

Q. Would you have any problem with that?

A. No.

Q. Do you think you could do that throughout this process?

A. I think so.

Q. That is, insist on your rights; but by the same token, give the rights to the other jurors.

A. Uh-huh.

Q. You made a comment about you would have to hear the evidence and then you would go with what the law dictates.

A. Uh-huh.

Q. Okay. Tell me a little bit about that last thing about what the law dictates.

A. Well, clearly, I'm not a lawyer so I think that whatever -- and one thing I think you already said, or maybe you said it, you are never required to -- I can't remember now what you said, but I'm not going to make -- I'm not going to make a

decision that's not allowable, you know, in the case. I'm going to take -- I think I would take the evidence, I would take the judge -- the instructions the judge gave and make my decision within -- you know, within that realm of what's possible, what I'm told is possible.

Q. And I bring this up because sometimes jurors come in with the idea that the law or the judge is going to tell me what's right --

A. Uh-huh.

Q. -- and I'm going to follow that and I'm going -- and that's going to be my decision, whatever the judge or the law tells me. Unfortunately, it's not that way.

MS. ROSE: Well, objection. They do have to follow the law.

THE COURT: Well --

MR. BENDER: But the law does not --

THE COURT: -- my comment is, of course, you follow the law, but you apply the law to the evidence.

PROSPECTIVE JUROR: Right.

THE COURT: And you find your verdict accordingly, and the judge has no role in finding the facts.

PROSPECTIVE JUROR: Right.

THE COURT: Okay.

BY MR. BENDER:

Q. Yeah, and that's my point is that the law is not going to

tell you -- it's going to give you the process and you're going to follow that process, but the law and the judge is not going to say, okay, following that process, which is not a mathematical formula, but if you follow that process, then you're going to do X. That's not going to happen. That's why it's so important people from different backgrounds come in here and use their own experiences in reaching a decision. Okay?

A.    Okay.

Q.    Now, you are going to get some aggravating circumstances. And if you look at them, your own experiences, walking in your own shoes, if you say I am not entirely satisfied, fully convinced beyond a reasonable doubt --

MS. ROSE:  Objection.  Entirely satisfied and fully convinced is not a part of the Fourth Circuit standard.

THE COURT:  Overruled in this context.

Q.    Then -- it's got to be beyond a reasonable doubt. And if it's not, you're not so satisfied beyond a reasonable doubt of any one of the aggravating circumstances, then the appropriate sentence is life imprisonment without the possibility of release.  Do you understand that?

A.    Uh-huh.

Q.    You had a little hesitation.  Is it because of the way I worded the question or is it...

A.    I don't -- yes, say that again.

Q. Okay. Let me just back up one step. Maybe I can help, maybe not.

A. I think I know what you're saying, but...

Q. Okay. You come to this phase, this sentencing hearing --

A. Uh-huh.

Q. -- without an automatic decision.

A. Right.

Q. Okay. Something has to happen. Nothing happens, then life imprisonment without the possibility of release is the appropriate punishment.

A. That's the appropriate punishment were it not proven to me beyond a reasonable doubt that the other sentence is appropriate.

Q. Well, first of all, the aggravating circumstances exist. Aggravating means something that would tend to indicate that death was the appropriate punishment.

A. Uh-huh.

Q. If the government didn't put on any evidence, or if you as a juror said I am not convinced beyond a reasonable doubt of these aggravating circumstances --

A. Uh-huh.

Q. -- life imprisonment without the possibility of release would be the appropriate punishment.

A. Okay, I see. If I am not convinced beyond a reasonable doubt --

Q.   Beyond a reasonable doubt, right.

A.   -- then that is the appropriate -- that's what the judge would tell me.

Q.   Right.

A.   Okay.  Yeah, I understand that.

Q.   Okay.  And what we're trying to do is find twelve folks who have -- begin the process with a level -- all of us have a level playing field.

A.   Uh-huh.

Q.   Not tilting one way or the other.

A.   I understand that.

Q.   Now, you have heard a brief factual background; you haven't heard all the evidence, but you've heard a brief factual background that this was the murder of two young adults without any legal defense, that is, self-defense, legal insanity.  A murder to which he confessed, two murders to which he confessed.  Okay?

A.   Uh-huh.

Q.   Having told -- been told that, do you have an opinion or a belief as to whether it may be difficult or in any way impair you from considering -- not asking you how you would vote, but from considering life imprisonment without the possibility of release?

A.   I don't think that's a judgment I can make without hearing the rest -- you know, all the evidence.

JA994

Q. Sure. So right now, even hearing what you've heard, which is not evidence --

A. Uh-huh.

Q. -- but it's a brief overview, even hearing what you've heard, we're still starting on a level playing field?

A. Uh-huh. Yes.

Q. And then very briefly, you've got some mitigating circumstances which we will present. And it doesn't have to be beyond a reasonable doubt, that high standard. It's the civil standard that you knew --

A. Uh-huh.

Q. -- in the prior jury. And you weigh those. You weigh the mitigating circumstances against the aggravating circumstances. And if you are convinced beyond a reasonable doubt that the aggravating circumstances sufficiently outweigh the mitigating circumstances, you still have to do a weighing process.

After you do that weighing process, there's one more weighing process. That is, even in the absence of mitigating circumstances, even if nobody finds any value to the mitigating circumstances, even with that you still have to weigh yourself, in your own mind, whether this -- these aggravating circumstances are sufficient beyond a reasonable doubt to call for the imposition of death.

A. Right. I understand that.

Q. And if you're not so satisfied at any one of these steps, then the appropriate punishment is life imprisonment without the possibility of release. Do you understand that?

A. I understand that.

Q. Okay. Tell me, is that a process that you think you could go through?

A. I think so, uh-huh.

Q. With an open mind?

A. Uh-huh.

Q. Have you ever, Ms. Edwards, have you ever known family, friends, students' parents, or students that have been involved in an abusive relationship?

A. No, not that I'm aware of.

Q. None of your children have come to school with what you thought might have been --

A. Not me personally. Like I said, several years ago my sister had a student that she ended up having to go to court for, but I don't really know all the details other than she had to go and it was a neglect situation.

Q. Sort of a neglect --

A. Uh-huh.

Q. -- situation.

A. Uh-huh.

Q. Other than that, you don't...

A. No.

Q. And the reason we ask those kind of questions is that you may hear some evidence of abuse, neglect, that sort of thing in this matter. We need to know sort of your predisposition in that regard. In your studies of psychology, have you taken any courses where you've discussed how abuse, neglect, may affect children?

A. I wouldn't -- that was so long ago. Not specifically that I can bring to mind right now. I mean, I -- you know, you have your own opinions about how abuse, neglect is going to affect children, but, you know, nothing that I've researched or studied or --

Q. Sure.

A. -- you know, anything like that.

Q. Well, just tell us how you feel about that.

A. I mean, I think it can be detrimental to a child's sense of well-being, their security, if they're afraid, if they're scared, if they don't feel safe. You know, that that's what you kind of are attuned to at school. You know, you look for children that are happy, that come to school and they're well fed and they're anxious to learn. And if you don't see that in a child, then you might -- you know, that kind of might be something to look for. But like I said, me personally, I've not seen that. The school I work at, it's just not a -- not an issue.

MR. BENDER: Your Honor, may I have a moment?

THE COURT: Yes.

(Counsel conferred.)

MR. BENDER: Ms. Edwards, thank you for your honest answers and your help in this process.

PROSPECTIVE JUROR: Okay. Thank you.

MR. BENDER: Thank you.

THE COURT: Ms. Edwards, the clerk will give you a sheet of paper; and if you'll call the number that's on there as indicated, we'll be in touch with you later.

PROSPECTIVE JUROR: Okay. Thank you very much.

THE COURT: Thank you.

(Ms. Edwards exited the courtroom.)

THE COURT: Okay. Number 105.

(Doris Goldsmith entered the courtroom.)

THE COURT: Good morning, Ms. Goldsmith.

PROSPECTIVE JUROR: Good morning.

THE COURT: I think you indicated in your questionnaire that you might have difficulty accepting the prior guilty verdict without reservation. Having heard the little orientation the court gave earlier, is that still your opinion?

PROSPECTIVE JUROR: Well, I understand that that's not part of the equation.

THE COURT: Yes. So that being the case, are you willing to move forward --

THE COURT: You can't say?

PROSPECTIVE JUROR: I guess so. You know, I just -- it's hard for me to go over 40 -- 30, 40 minutes or so.

THE COURT: That's about the time on it?

PROSPECTIVE JUROR: (Affirmative nod.)

THE COURT: Okay. Any questions?

MS. ROSE: No, sir.

MR. BENDER: No questions.

THE COURT: All right. Thank you very much for participating with us.

(Mr. Waldroop exited the courtroom.)

THE COURT: 108.

(Karen Sanders entered the courtroom.)

THE COURT: Good morning.

PROSPECTIVE JUROR: Good morning.

THE COURT: And I believe your name is Ms. Sanders.

PROSPECTIVE JUROR: Yes.

THE COURT: One thing I wanted to ask you about is that one of the questions you were asked was as follows, in your preliminary questionnaire. It said knowing that another jury has returned verdicts of guilty in this case, can you accept those guilty verdicts without reservation, and you didn't answer that. May have just overlooked it. But in any event, you heard the court's instructions this morning. Do you think for purposes of this sentencing hearing you could

accept the fact that the defendant has already been found guilty of the three offenses that I mentioned?

PROSPECTIVE JUROR: Yes, sir.

THE COURT: All right. The government may inquire.

MS. ROSE: Thank you.

KAREN SANDERS

VOIR DIRE EXAMINATION

BY MS. ROSE:

Q.   Good morning, Ms. Sanders.

A.   Good morning.

Q.   And thanks for coming in on a Saturday --

A.   You're welcome.

Q.   -- to meet with us and allow us to ask you some questions, and as well for taking the time to fill out this questionnaire. I know it was lengthy and had a whole lot of issues.

I see that you are employed full-time. Have you talked with the folks at your office about being away for a lengthy period if you were selected as a juror?

A.   (Affirmative nod.)

Q.   That's not going to present any hardships for you?

A.   No.

Q.   Very good.

I'm flipping through your questionnaire here, if you would give me just a moment.

One of the questions was have you ever known anyone who was murdered, and you said yes and indicated that was something -- it was private; that you really didn't feel comfortable speaking about it. Knowing the nature of this case, are the circumstances such that that might affect your sitting as a fair and impartial juror?

A. No, ma'am.

Q. Obviously, we would need to know a little bit about those circumstances to understand.

A. It's been probably when I was in high school. It was my best friend's mother that was murdered.

Q. Was that out of a domestic situation?

A. Yes.

THE COURT: Let me ask you if you would prefer for privacy reasons to speak to this -- to the attorneys about this over here by the side-bar as opposed to here in open court?

PROSPECTIVE JUROR: No, I'm fine.

THE COURT: Okay. All right. Go ahead.

Q. Had you visited in that home?

A. Yes.

Q. Describe a little bit about those particular circumstances, if you would, please.

A. She was shot. It was -- like I say, it was my best friend's mother. She was shot and killed.

Q.    By who?

A.    And it's been -- by some other woman.  It's been, I'd say, probably maybe like in '8 -- actually, may have been -- probably early '80s, I think it was.

Q.    And did you -- were there any court proceedings related to those offenses?

A.    As far as I know it was.  I'm not real sure whatever happened with it.  It's been a while ago.

Q.    Did you attend any of those proceedings with your friend?

A.    No.

Q.    Or offer support --

A.    No.

Q.    -- in that way?

      Did you maintain your friendship?

A.    Oh, yes.  We're still friends.

Q.    Are you still friends?

A.    Uh-huh.

Q.    You said it was a domestic situation.  Had there been domestic violence that -- to which that was related?

A.    No, not that I know of.  I think it was just a -- I don't know if they were married.  I don't know if it was -- it was like his girlfriend or something like that.  So I don't know if the man -- if that was her husband or just boyfriend.  I can't remember.  It was his -- she was shot by another woman.

Q.    Okay.  But once again, it sounds like it was a long time

Q. ago.

A. It was.

Q. Once again, that is something that wouldn't factor into your deliberations here?

A. No.

Q. And it's not in any way involved --

A. No.

Q. -- would that be fair to say?

A. Yes.

Q. Did you attend any court proceedings in relation to your former relationship, your former marriage?

A. Did I attend any...

Q. Obviously, you probably had to go to court to get a divorce.

A. Right.

Q. But any circumstances other than that --

A. Oh, no, just for the divorce.

Q. -- that brought you into the court system?

What is your opinion of the death penalty? You said you weren't sure at the time that you filled this out. And obviously, some of the questions on here may have made you go home and reflect upon that whole issue. Can you describe for us what your opinions are of the death penalty.

A. I guess without hearing more detail -- I'm kind of torn between the death penalty. Just kind of depends, I guess,

really on the case and just hearing the details and more information about it. I'm just kind of torn between that. I don't really have a strong yes for death penalty and I don't have a strong no for the death penalty. It just depends on the situation.

MR. BENDER: Excuse me, Ms. Sanders, I think I heard everything you said, but could you keep your voice up a little bit so we can hear you?

PROSPECTIVE JUROR: Okay.

MR. BENDER: Thank you.

Q. Anything about -- I see you attend church. Anything about your faith or any religious training, perhaps even your upbringing that has affected your thinking?

A. No, ma'am.

Q. As the judge told you, the defendant's guilt has already been established and the issue before this jury is solely sentencing. You'll be presented with evidence. You will hear the law. And at that point it would be your job, along with the other jurors, to determine whether the defendant would get life in prison without the possibility of release or the death penalty.

Given your uncertainties about the death penalty, is it a verdict that you could consider?

A. Life -- you're asking me if that's a verdict I can consider?

Q. Whether you can consider the death penalty as a verdict.

A. Yes, that's something I can consider.

Q. And don't get me wrong because your opinions -- we're not hear to challenge your thoughts or opinions, truly. In fact, we welcome hearing them because our whole aim is to select, you know, fair jurors. So you don't -- you don't have to apologize for your opinion. You don't have to change it. You don't have anything to prove to us. But certainly your honesty is of high significance to everyone here.

Would you give consideration of the death penalty equal consideration with life imprisonment?

A. Yes.

Q. And do I understand you to say that that would be based -- that your determination would be based upon the facts --

A. Yes.

Q. -- and the evidence presented to you?

A. Yes.

Q. You did indicate on your questionnaire that you would always vote to impose the penalty of life without the possibility of release in a case of this nature. That's a little bit different than your responses today.

A. Okay. Read that question again, please.

Q. I know it was confusing initially, so -- the question is would you always vote to impose the sentence -- or the penalty of life imprisonment in a case like this?

A. No.

Q. And you said yes, so that was a misunderstanding with a poorly worded question that we have on here?

A. No, I wouldn't always --

Q. So once again, you go back to I would have to hear the facts and the evidence --

A. Right.

Q. -- and the law.

A. Yes, ma'am.

Q. Did -- in -- one of the questions was to describe yourself politically and you said none. There was kind of a scale, do you remember that? It had numbers and it was extremely conservative to extremely liberal, kind of somewhere in between. You indicated that none of those choices described your political beliefs or your political inclinations. Can you describe that for us, please.

A. Okay. When you're asking me describe myself politically, meaning -- can you give me a little...

Q. Well, the question was how would you describe yourself politically. Pick the spot on the scale that seems correct, and the scale was one through six with one being extremely conservative and six being extremely liberal. In other words, politically -- do you have leanings toward either the conservative or the liberal...

A. Probably conservative.

Q. And you haven't heard anything about this case at all in the press other than what you heard --

A. No.

Q. -- from the court earlier?

A. No, ma'am, other than what I heard from the court.

Q. So at this time you could sit -- nothing about the facts or circumstances create a difficulty for you in evaluating a case of this nature and rendering a verdict.

A. No.

Q. Now that you've heard what it's about -- a little more what it's about, do you feel you would be a fair and impartial juror?

A. Yes, ma'am.

Q. Listen to all the facts and the evidence and follow the law?

A. Yes, ma'am.

MS. ROSE: Thank you.

PROSPECTIVE JUROR: Uh-huh.

VOIR DIRE EXAMINATION

BY MS. LAWSON:

Q. Ms. Sanders, hi. I'm Jean Lawson. This is Harold Bender and Marc Barnette.

We've been listening to your answers to the questions so I won't go over those again. And obviously, your answers to the questionnaire has been helpful to us. We really

appreciate your participation in this process and waiting to be called out.

I had a couple of questions. One thing that jumped out at me is how long ago -- how long have you been working at Duke Power?

A. Fourteen years.

Q. I imagine you have to put out a lot of fires when people call in about their bills. Can you tell us --

A. I'm not actually on the phone. We're in the systems account services department where we get the inquiries from the phone when the customers call in. So it is like we solve the problems from the calls from customers and they send everything to our department, and we just work from printed out inquiries and do whatever is requested from the customer.

Q. Do you like that job?

A. Yes, ma'am.

Q. Did you do anything else at Duke Power before you got into that particular department?

A. I've done a couple of different things. I worked in our damage claims department where, let's say if anyone was to do any damages to any of Duke properties, we had to bill the customer. Or if anyone cut an underground line, we had to bill the customer. But basically, it's been mostly just the customer service account, what I'm doing now. I did do -- when I first began at Duke Power, I was in word processing,

JA1008

you know, centralized dictation. And just kind of small things in between. But mostly it was with customer service.

Q. Well, I notice that what was interesting to me was your job before that, you put down that you worked for NCNB.

A. Yeah, which was word processing also.

Q. Yeah.

A. I was there about two years, I think it was.

Q. I still call it NCNB, too, but that's two bank names ago.

A. Yes.

Q. So you worked there back when it really was NCNB.

A. Yes, ma'am.

Q. You told us about a really painful experience from when you were in high school and I imagine that was very difficult for you, as it would be for any teenager. And this -- these murders involve a shotgun. And everybody feels the same way, same amount of sadness at that tragedy. Does the fact that any -- that the same type of weapon was used in the situation involving your best friend's mother cause you to be unable to listen to the evidence? You know, do your feelings about that so bother you that you wouldn't be able to listen to the evidence in this case?

A. No, ma'am.

Q. The process of how you go through this deliberation and make a decision will be explained more fully by Judge

Voorhees. He's kind of given you an overview. But I know you served on a civil jury before, and just to remind you, a civil burden of proof is by 51 percent, a preponderance of the evidence. You know, one side convinces you a little more than the other. Do you remember that?

A. Yes. It was a long, long time ago, but somewhat.

Q. Yeah. In this type of proceeding, the burden is beyond a reasonable doubt which is a much higher standard. And each juror has to be satisfied to their own satisfaction about, you know, when something has been proved to them beyond a reasonable doubt.

You come in here with your own life experiences and education and you keep that with you as you serve on this jury. And you have a right to have other jurors honor your decisions and your opinions. And would you require them to do that, to treat your opinions with dignity and respect?

A. Yes, ma'am.

Q. And by the same token, you have an obligation to honor other jurors' opinions.

A. Yes.

Q. And I'm sure that you would do that and insist that other jurors do the same.

A. Yes, ma'am.

Q. Okay. And you -- nobody is going to tell you how to vote in this situation. Okay. What the judge tells you is that

you have to go through a process where you think about things. You have to think about these aggravators. You have to apply a certain burden of proof, which is beyond a reasonable doubt.

And if you find aggravating circumstances, then you don't automatically proceed to a sentence. You think about mitigating circumstances, things that may call for a sentence of life imprisonment without the possibility of release for Marc.

And you go through a weighing process. And that's not mathematical. You know, one thing can certainly outweigh three of another because you give it weight. And each juror has to determine in their own minds how much weight to give it.

And when you get to the very end of this process, you still have to make up your own mind what you think is the appropriate punishment.

So again, nobody is going to tell you what you have to do. Do you have any problem with that?

A.   No, ma'am.

Q.   Do you believe you can be fair in this situation?

A.   Yes, ma'am.

MS. LAWSON:  May I have a moment, please?

THE COURT:  Yes.

(Counsel conferred.)

Q. What is your opinion of life imprisonment without the possibility of release as a punishment for somebody who has killed two people?

MS. ROSE: Objection.

THE COURT: Overruled.

Q. I'm not asking you to say whether you would impose that, but just do you have any particular feeling about that as an option?

A. Will I be comfortable with that?

Q. No, I'm not even trying to pin you down that much. But would you be able to consider it as an option?

A. Yes, ma'am.

MS. LAWSON: Thank you very much.

THE COURT: Is that all?

MS. LAWSON: Yes, sir.

THE COURT: All right. Thank you very much. The clerk will give you a piece of paper that gives you a telephone number. And if you'll call that number as indicated on the notice, we'll be in touch with you and let you know what further participation we might ask of you in this case. Thanks again.

(Ms. Sanders exited the courtroom.)

THE COURT: Okay. 110.

(Chris Bolling entered the courtroom.)

THE COURT: Good morning.

PROSPECTIVE JUROR: Good morning.

THE COURT: You're Mr. Bolling.

PROSPECTIVE JUROR: Yes, I am.

THE COURT: All right. The attorneys will have some questions for you that will talk about some of the matters that were brought up in your preliminary questionnaire.

PROSPECTIVE JUROR: Okay.

THE COURT: You may proceed.

MS. TOMPKINS: Thank you, Your Honor.

CHRIS BOLLING

VOIR DIRE EXAMINATION

BY MS. TOMPKINS:

Q. Thanks for coming in on Saturday. We appreciate that. It helps us out a lot. And thank you for the time it took filling out the questionnaire. I'm going to be asking you some questions based on your answers on the questionnaire based on the context of this sentencing hearing.

A. Okay.

Q. I'm not going to or not trying to challenge your opinions about anything or debate you on any issue at all. We're just asking you questions to try to find out what your philosophy is about certain things, what your opinions are, that sort of thing, so...

A. Uh-huh.

Q. As a starting point in this case, as the judge told you,

*    *    *



183

THE COURT: Okay. And there's some other issues in your questionnaire, but would there be any questions from the attorneys?

MS. TOMPKINS: No, sir.

MR. BENDER: No, Your Honor.

THE COURT: Thank you very much, Ms. Arrigo. You may be excused.

(Ms. Arrigo exited the courtroom.)

THE COURT: 84.

(Mark Blakeney entered the courtroom.)

THE COURT: Okay. I believe your name is Mr. Blakeney.

PROSPECTIVE JUROR: Yes.

THE COURT: All right, sir. I think the attorneys will have some questions for you.

MARK BLAKENEY

VOIR DIRE EXAMINATION

BY MS. TOMPKINS:

Q. Good morning.

A. Good morning.

Q. My name is Anne Tompkins, again, and this is Jill Rose. We represent the United States in this case. And I'm going to be asking you some questions now that come from the answers that you gave us on your questionnaire.

Just as a starting point, I want you to know that any of