# IN THE

# United States Court of Appeals

## FOR THE FOURTH CIRCUIT

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

v.

AQUILIA MARCIVICCI BARNETTE,

*Defendant-Appellant.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA AT CHARLOTTE

## JOINT APPENDIX - VOLUME III OF VII
### (Pages 1015 - 1692)

Gerald W. King, Jr.
FEDERAL PUBLIC DEFENDER
FOR THE WESTERN DISTRICT
OF NORTH CAROLINA
129 West Trade Street, Suite 300
Charlotte, NC 28202
704-374-0720
gerald_king@fd.org

*Counsel for Appellant*

Anthony Joseph Enright
OFFICE OF THE
UNITED STATES ATTORNEY
Western District of North Carolina
227 West Trade Street, Suite 1650
Charlotte, NC 28202
704-344-6222
usancw.appeals@usdoj.gov

*Counsel for Appellee*

Additional Counsel for Appellant on Inside Cover

Jacob H. Sussman
SOUTHERN COALITION FOR SOCIAL JUSTICE
P. O. Box 51280
Durham, NC 27717
704-277-3962
jsussman@scsj.org

Mark E. Olive
ATTORNEY AT LAW
320 West Jefferson Street
Tallahassee, FL 32301
850-224-0004
meolive@aol.com

*Counsel for Appellant*

# TABLE OF CONTENTS

# VOLUME III OF VII

JA Page

*Continued,* Exhibits to Response of the United States to Barnette's Motion Under 28 U.S.C. 2255 and Motion for an Evidentiary Hearing 2023.09.23:

Ex. 1b:   Remainder of JA Vol I of V [ECF100]..........................................1015

      Prospective Juror Bryson (1239)................................................. 1037

      Prospective Juror Donaldson (1289)......................................... 1056

      Prospective Juror Campbell (1477)........................................... 1077

      Prospective Juror Moore (1913) ................................................ 1096

      Prospective Juror Deana Stanford (1960) ................................. 1113

      Parties' exercise of peremptory challenges to the prospective jurors, July 27, 2002................................................................. 1126

Ex. 1c:   Joint Appendix Vol. II of V [ECF101] .......................................... 1207

      Resentencing Volume 12, July 29, 2002, (Morning)................ 1217

      Resentencing Volume 12, July 29, 2002 (Afternoon) .............. 1314

Ex. 1d:   Remainder of JA Vol II of V [ECF102]........................................ 1407

      Resentencing Volume 13, July 30, 2002 (Morning)................. 1432

      Resentencing Volume 13, July 30, 2002 (Afternoon) .............. 1532

      Resentencing Volume 14, July 31, 2002 (Morning)................. 1618

the questions that any of us ask you this morning, none of us are trying to challenge your opinions about anything. We just simply want to find out what they are in the context of this sentencing hearing that we're about to begin. So all we want is your honest answers and we're not trying to debate you or anything like that or make you change your mind about anything.

A. Okay.

Q. As a starting point in this case, this jury that would hear the sentencing must be able to accept without reservation verdicts of a prior jury as to the defendant's guilt. You won't hear any evidence about guilt, or at least we won't have a burden of proof as to guilt. Would you be able to do that, accept the prior jury's verdict without reservation?

A. Yes.

Q. Okay. Now, do you understand that after a person is found guilty of crimes for which the death penalty or life imprisonment are both possible punishments, that nothing automatic happens. That there's a sentencing hearing, which is what we're doing here. Do you understand that?

A. Yes.

Q. You don't automatically get life; you don't automatically get death. And our burden of proof in this case is proof of aggravating factors that we contend exist and that we contend call for the imposition of the death penalty. Do you

FORM FED  PENGAD • 1-800-631-6989

understand that's our burden of proof in this case?

A. Uh-huh, yes.

Q. And did you understand the defense, if they chose to put on evidence, their burden of proof as to mitigating factors that they will contend call for the imposition of life imprisonment without the possibility of release. Do you understand they have a lesser burden of proof?

A. (Affirmative nod.)

Q. We have a burden of proof of proof beyond a reasonable doubt, and unanimously. Their burden of proof is by a preponderance of the evidence, and any one or more jurors can find a mitigating factor in order for that juror to consider it. Okay?

A. Yes.

Q. Do you understand that?

A. Yes.

Q. All right. Based on -- after that, I'm sure you remember from the judge's instructions, that there's a weighing process that the jury would go through which would help the jury to decide on the sentence in the case. Either a death penalty or life without the possibility of release. Is that a process that you believe that you can take part in?

A. Yes.

Q. Okay. And not having heard any evidence yet as to aggravating or mitigating factors, would you say that at this

point you have an open mind about both of those as possible punishments?

A. Yeah, I have an open mind, yeah.

Q. Okay. Now, in your questionnaire, you left some of it blank. How long have you lived in Charlotte?

A. Since '82.

Q. Since '82. And what do you do?

A. I work for Continental. Continental Tire.

Q. Continental Tire. What do you do for them?

A. I'm a trucker. I bring the material to the tire builders.

Q. Are you a long distance or a short distance?

A. No, it's not outside the plant. It's a trucker inside the plant.

Q. Okay. That's a job inside the plant?

A. Yes.

Q. What do you do?

A. Bring materials to the tire builders.

Q. So although it sounds like you drive a truck, you --

A. It's like a forklift. We just drive a truck.

Q. All right. Now, does your work know that you've been called for jury service?

A. No.

Q. So where did you tell them you were today?

A. Oh, I got to go -- I work at night.

Q. All right. Would you think that you would continue working at night during this trial or would you tell them that you had jury service and that you were basically working all day?

A. It depends how I feel.

Q. Do you have a Monday through Friday schedule?

A. No. I work 12 hours off -- you know, work two days, off three; work three days, off two.

Q. Okay. Given that, and that you would have to come in here during what we would call regular work hours or approximately nine to five --

A. Uh-huh.

Q. -- every day, would you be able to come in here and pay attention while you were in here and listen to all the evidence and not be thinking about the job or tired from working overnight?

A. I'd try my best.

Q. Okay. So that's not going to be -- job is not an issue, then, for you, I take it.

A. No.

Q. I'm going to go through your questionnaire a little bit. See what pops up as to questions I want to ask you. Do you know anybody that's ever been to court for any kind of domestic violence?

A. No.

Q.   Or anybody who's been the victim of domestic violence?

A.   No.

Q.   Have you heard anything about this case?

A.   No.

Q.   Now, you put that there was a question here in the questionnaire about our burden of proof, proof beyond a reasonable doubt.  And you've noted that you thought that was -- that made it too hard on the prosecution.

Would you be able to follow the law that proof beyond a reasonable doubt is the burden of proof that we have and follow the law as the court would give it to you about holding us to that burden of proof?

A.   Yeah.

Q.   Okay.  And you don't think that's too hard on us or --

A.   No.

Q.   -- you wouldn't make it any easier on us than it is. It's a high burden of proof, proof beyond a reasonable doubt. But you'd be able to follow the law as to that?

A.   Yeah.

Q.   Now, just since this is a case in which both life imprisonment and the death penalty are possible punishments, tell us what your philosophy is about the death penalty in general.

A.   I got to hear all the facts.

Q.   Okay.  And obviously, I'm not asking you to preview what

you would do in this particular case. You haven't heard any evidence yet. But just in terms of your life philosophy or how you feel about it in general, not specifically to the facts of this case, but what is your opinion about the death penalty?

A. I really don't know.

Q. Okay. I mean, it's hard.

A. Yeah.

Q. You know, you come in here and sit and we're all staring at you and, you know, throwing questions at you. Is it something that you hadn't really thought a whole lot about until you started filling out the questionnaire?

A. Yeah, I haven't really thought about it.

Q. Yeah. Not -- now that you know that's going to be part of your consideration here, are you open to the possibility that either the death penalty or life imprisonment without release are possible punishments that you can consider within your life philosophy?

A. Yes.

Q. Okay. Have you followed cases in your life that -- where the death penalty was a possible punishment?

A. Not really.

Q. Okay. Just something that until we've put you on the spot about it, you --

A. Yeah.

Q.     -- started thinking about it.

You filled out the questionnaire and it asked what is your personal view of the death penalty, and you said not very strong. Have you given some additional thoughts since filling this questionnaire out knowing that you were going to be coming back in to talk to us?

A.     Yeah.

Q.     What kinds of thoughts have you had since that time?

A.     Somebody life on the line.

Q.     Uh-huh.

A.     That's all. You know. Life in prison or death.

Q.     Pardon me?

A.     Life in prison or death.

Q.     Right. And again, just to -- because those are -- the certainty here is that one of those two forms of punishment will be handed down in this case. And so I think all we need to know from this -- at this moment is that your personal beliefs about either one don't prevent you or substantially impair you in your ability to consider both forms of punishment.

So it sounds like you are not prevented based on your philosophy about the death penalty from considering it.

A.     Yeah.

Q.     Now, would you be able to -- in the questionnaire you said you didn't feel -- did not have strong feelings or you

didn't support it very strongly at all. What's that based on?

A. What is that based on?

Q. What made you check that mark on the questionnaire?

A. I don't know.

Q. Okay. Did that just come from you don't have strong feelings one way or the other?

A. Yes.

Q. Okay. And so your uncertainty is not really based on thinking pro and con; it's just based on the fact that you hadn't really been confronted with this issue yet.

A. Yes.

Q. Okay. You did note that -- there was a question that said if you oppose the death penalty, would you say that you could not support it in any case or you might sometimes support it in the most horrible case. Does that sum up your point of view?

A. Yes, sometime, yeah.

Q. Okay. It's obviously an important issue for both sides, but at the end of this case, after we've presented all of our evidence, we're going to stand up in front of this jury and ask this jury to impose the death penalty. So it's important to us that all the jurors can at least consider it as a possible form of punishment. So would you put yourself in that category?

A.   Yes.

Q.   Okay.   Even though it's not a strongly held or a long held belief.   Is that fair to say?

A.   Yes.

Q.   Now, based on the facts as the court has -- the court gave you a factual overview of the basis for the guilty verdicts.

A.   Uh-huh.

Q.   Have you made up your mind one way or the other at this point having not heard any of the evidence as to aggravating and mitigating factors?   Would you say that you have not made up your mind at this point?

A.   I haven't.

Q.   Okay.   Because you haven't heard any evidence in the case.

A.   Yes.

Q.   Now, have you ever been -- you've never been on a jury before, correct?

A.   No.

Q.   How do you feel about group decision making?   Is that something that you're comfortable with?

A.   Yeah.

Q.   Have you ever had any experience at work or otherwise where --

A.   Have to vote on something?

Q.    Right.

A.    Yeah.

Q.    Okay.    Would you consider yourself to be the kind of guy who can have your opinion and talk to others about their opinions about things and listen openly to others and have others listen to you?

A.    I'm kind of quiet.

Q.    Yeah.

A.    You know, well, I listen.

Q.    Okay.    You're a good listener.    And so I take it you would be able to listen to other people's opinions.

A.    Yes.

Q.    Do you feel comfortable expressing your opinion in a group?

A.    Yeah.

Q.    Okay.    From TV and otherwise, you know what a jury process is like --

A.    Uh-huh.

Q.    -- in general.    Do you think that you would be comfortable in a group setting like that?    This is a -- this is the most serious kinds of -- kind of decision that a person can make.    Is that something that you think you can do?

A.    Maybe, yeah.

Q.    Do you feel a little bit uncomfortable about that?

A.    Yeah.

193 A

Q. Why is that?

A. Because I don't want, you know, to sentence nobody to death, really.

Q. Why is that?

A. I don't want to, you know, sentence nobody to death.

Q. You don't want to do that.

A. Not really.

Q. Now, if the government proves beyond a reasonable doubt what its burden of proof is and -- and the defense, if it chose to put on evidence, put on evidence of mitigating factors, would your belief system allow you, if the facts and the law led you to a death penalty, would your belief system allow you to vote for death?

MR. BENDER: Objection, Your Honor.

THE COURT: Overruled.

A. Yeah.

Q. It's just the seriousness of it --

A. Yes.

Q. -- causes you some concern.

A. Uh-huh.

Q. But you would not be prevented from doing that.

A. No.

Q. All right. So it sounds like you're understanding the serious nature of what we're doing here.

A. Uh-huh.

193 B

Q. And that's what's causing you concern more than not being able to do it. It's really simply not wanting to do it.

A. Yes.

Q. But if the law takes you there, the facts take you there, would you be able to?

A. Yes.

Q. And you're hesitating. Tell me why you're hesitating in answering that.

A. I've never done it before.

Q. Right. Okay. And I know we're putting you on the spot, but -- so your belief system would allow you to participate in this process; is that right?

A. Yes.

MS. TOMPKINS: All right. Thank you. I appreciate your answers to my questions.

MR. BENDER: Thank you, Your Honor.

VOIR DIRE EXAMINATION

BY MR. BENDER:

Q. Good morning, Mr. Blakeney.

A. How you doing?

Q. All right. Mr. Blakeney, were you born and raised in Charlotte?

A. I was born in Charlotte; was raised in Maryland.

Q. In Maryland? And then you came back to Charlotte when?

A. In '82 after I graduated.

Q.    After you graduated high school?

A.    Yeah.

Q.    Up in Maryland.

A.    Yes.

Q.    Tell me a little bit about your family situation in Maryland.

A.    My father had his own business and he got tired of it and moved back south.  Too fast, you know.

Q.    What kind of business did he have up in Maryland?

A.    He had his own trash service.

Q.    Trash service?

A.    Yeah, trash company.

Q.    And as you were growing up, did you help him in that business?

A.    Yes.

Q.    After school and on weekends, that sort of stuff?

A.    Weekends, yes.

Q.    And how many brothers and sisters do you have?

A.    I have two sisters and a half brother.

Q.    What -- did your mom work outside the home, your mother work outside the home?

A.    Yes.

Q.    What kind of work did she do?

A.    Beautician and a nurse.

Q.    And your sisters and your -- the half brother you told

me?

A.   Uh-huh.

Q.   Anyway, what do they do?

A.   My sister work for the United States Department in D.C. My sister work for -- other sister work for Family Dollar Warehouse.  And my brother drive a truck for Yellow Freight.

Q.   Okay.  Now, other than the one that lives in D.C., are all of them back here now?

A.   Yes, except the one in DC, yeah.

Q.   And is your father still alive?

A.   No.

Q.   And when did he pass away?

A.   '89.

Q.   Natural causes?

A.   He was shot back in D.C.  They have a -- he only had one lung and he died of pneumonia.

Q.   And that was as a result of being shot?

A.   Yes.

Q.   So he was back here, and was it some sort of robbery?

A.   No, he was in D.C. when he got shot.

Q.   Okay.  Tell me the circumstances about that as you know them to be.

A.   I really don't know what happened.  I was young.

Q.   Okay.

A.   Because I was here at my grandparents' house.

Q. You were living here with your grandparents?

A. For the summer.

Q. Anybody ever caught and prosecuted for the shooting?

A. I really don't know.

Q. Okay. And was your mother down here at that time?

A. No, she was there.

Q. She was up there --

A. Yeah.

Q. -- in D.C. --

A. Yes.

Q. -- as well.

Did you continue to live down here with your grandparents?

A. No. We went back up there.

Q. But in 199 -- 82 -- '82 or '92 that you came back here?

A. '82.

Q. '82. And you lived -- were you married at that time?

A. No.

Q. Okay. Who did you live with when you came back in '82?

A. My father and mother moved back.

Q. So your father was just visiting in D.C. when he got killed, when he got shot?

A. No. He was living there. We was living in D.C.

Q. All right. I'm sorry, I'm confused and I'm confusing you and I don't mean to. Okay. Tell me what your -- you

indicated, I believe, that your wife worked outside the home.

A.   Yes.

Q.   What type of job does she do?

A.   She secretary for a dentist.

Q.   And how long has she had that job?

A.   Two years.  Something like that.

Q.   Tell me a little bit about being a trucker with Continental Tire.  What do you do?  You say it's a forklift?

A.   Bring the material to the tire builders.

Q.   Is that the raw rubber?

A.   Rubber.  Bring like the metal in the tires, stuff like that.

Q.   Okay.  And you work twelve hours on for two days and then three days off?

A.   Yes.

Q.   What's that schedule?

A.   Twelve hours -- work two days, then I be off for two days; then I go back work for three days, be off three days.

Q.   How long has General -- excuse me, Continental been back at work?  Y'all were off for --

A.   Yeah, we were on strike for a year.  We been back for what, about three years.

Q.   Okay.  Have you been able to make up all the time lost in terms of financially?

A.   Yes.

Q. Okay. Anything going on at Continental Tire with regard to the union contract that's going to happen in the next little bit that concerns you or not?

A. No.

Q. What do you do with your time off?

A. Take my kids, you know, football practice, work out, walk the dog.

Q. Play a little sports?

A. Yes. Play basketball.

Q. What's your time? When do you go in -- when do you go in to work?

A. Seven to seven.

Q. Seven to seven?

A. Yes.

Q. And you don't think that's going to create any hardship or problem?

A. Sometime I might be sleepy, but I can stay awake.

Q. Okay. Mr. Blakeney, are you any kin to a Charlotte police officer named Larry Blakeney?

A. I'm not sure.

Q. If you are, you don't --

A. I'm not...

Q. It's not somebody you spend any time with --

A. Huh-uh.

Q. -- talk with about his job.

Now, you indicated on here, it might just be the nature of the question. The question said, in general law enforcement officers are very much more likely than other people to tell the truth when testifying in trial if they're called as a witness in a trial. And you said you agree with that, and that is that a police officer by virtue of who they are and their position are more likely to tell the truth than any other witness.

A. Yeah.

Q. Okay. Is there some reason why you agree with that?

A. They should tell the truth, you know, law officers.

Q. The judge, I think, Mr. Blakeney, will explain to you during the jury selection process that every witness who comes in here, okay, is supposed to tell the truth.

A. Yeah.

Q. And that you take your belief system, whatever it might be, and apply it and tell whether somebody is telling you the truth or not. Okay?

A. Uh-huh.

Q. Do you think you can do that?

A. Yeah.

Q. Okay. I mean, if some witness comes in here who is not a police officer and tells you one thing and you say, yeah, I believe that. That sounds -- sounds like everything else.

A. Can use -- I guess use your own judgment.

Q. You've got to use your own judgment.

A. Yes.

Q. That's a good way to put it. Exactly. And in doing that, you can't give more weight or more believability automatically --

A. Uh-huh.

Q. -- to somebody simply because they're a police officer or whatever. Okay?

A. Uh-huh.

Q. And if you don't believe a police officer, you have every right as a juror to discard his testimony. Okay?

A. Right.

Q. You don't automatically have to accept it as being true simply because he's a police officer.

A. Yeah.

Q. Could you do that?

A. Yes.

Q. And you have -- as a juror, you come in here with all sorts of background. Okay. Your education, the way you were raised, your religion, whatever it is. You are an individual juror. You've walked in your own shoes --

A. Yes.

Q. -- for all these years. And you don't leave that outside the door. What you do is you use all of that, along with the other members of the jury, to come up with a decision,

whatever that might be. Do you understand that?

A. Uh-huh.

Q. Now, you have the right to be -- to have your decision honored by other members of the jury.

A. Yeah.

Q. Right?

A. Uh-huh.

Q. And by the same token, you need to honor the other people's decisions. All right?

A. Uh-huh.

Q. Okay. So they have to honor and respect your opinion and belief --

A. Uh-huh.

Q. -- because you are who you are. And you have to honor and respect their --

A. Yeah.

Q. -- beliefs and opinions.

A. Yes.

Q. Do you think you would be able to do that process, go through that --

A. Yes.

Q. -- with other jurors?

A. Uh-huh.

Q. Okay. And you have to be satisfied beyond a reasonable doubt. That's a very high burden --

A.   Yeah.

Q.   -- under the law.

     And if you're not so satisfied beyond a reasonable doubt of any aggravating circumstance, then the appropriate punishment will be life imprisonment without the possibility of release.  Okay?

A.   Yeah.

Q.   And if that's your belief, you have every right to stick to it.  Okay?

A.   Right.

Q.   Would you be able to do that?

A.   Yes.

Q.   And you have not -- I don't believe you've ever served on a jury before.

A.   No.

Q.   Okay.  One of the indications here, and maybe you've already answered it, was that you think the burden beyond a reasonable doubt is a little too high, too hard on the prosecutors.  Maybe you didn't understand that question when you answered it.

A.   Yeah.

Q.   The law is they must satisfy --

A.   Yeah.

Q.   -- you beyond a reasonable doubt.  Okay?

A.   Yes.

Q. And if they don't, then they haven't met their burden or their requirements.

A. Uh-huh.

Q. All right. So we can't have jurors who have their own views of that. We have to have people who will make sure that the prosecution meets that burden. And if they don't, then they have to say life imprisonment without the possibility of release. Could you do that?

A. Yes.

Q. Would you make sure inside yourself that the prosecution has to meet this high burden; I'm not going to be satisfied with anything less?

A. Yeah.

Q. Is it -- you indicated here, I am uncertain how I feel about the death penalty on the questionnaire.

A. Uh-huh.

Q. Is that the way you are right now as you sit here?

A. Yes.

MR. BENDER: Mr. Blakeney, we appreciate your honest answers and your help in this process. Thank you very much.

THE COURT: Mr. Blakeney, the clerk will have a sheet of paper for you. It gives you a number to call. So we would appreciate it if you would follow the instructions on that notice.

PROSPECTIVE JUROR: Okay.

THE COURT: 121.

(Carla Bryson enters the courtroom.)

THE COURT: Good afternoon.

PROSPECTIVE JUROR: Good afternoon.

THE COURT: I believe you are Ms. Bryson.

PROSPECTIVE JUROR: Yes, I am.

THE COURT: Looking over your questionnaire I had something I wanted to ask you about, and that would be you are a teacher, I believe.

PROSPECTIVE JUROR: I am.

THE COURT: And would you tell us a little bit about that?

PROSPECTIVE JUROR: Yes. The upcoming year will be my fourth year teaching. I teach seventh grade language arts in middle school in Gaston County.

THE COURT: I take it your school year starts sometime in August.

PROSPECTIVE JUROR: That's correct.

THE COURT: You would be expected to report earlier for teacher work days.

PROSPECTIVE JUROR: Yes. I am to begin -- I am to report, I believe, July 30th.

THE COURT: July 30th. That's a pretty short fuse, isn't okay it?

PROSPECTIVE JUROR: It is.

JOY KELLY, RPR
U. S. OFFICIAL COURT REPORTER
CHARLOTTE, NORTH CAROLINA
Case 3:12-cv-00327-MOC   Document 100   Filed 09/23/15   Page 23 of 192
205

JA1037

THE COURT: I happen to be from Gaston County but I didn't realize that their school year started that early.

PROSPECTIVE JUROR: Teachers begin on the 30th, and school itself, the students won't return until August 12th.

THE COURT: Okay. Okay. Now, you didn't specifically request to be excused on the grounds of a hardship but we do want to evaluate with you what kind of concerns you might have if you were serving on this jury from, say, Monday week, which would be the 29th of July, on into the third week in August. What kind of concerns would you have for the welfare of the students and that sort of thing?

PROSPECTIVE JUROR: I wouldn't really be concerned. What I would do, I would have to, of course, do is compose lesson plans for them. But I feel confident that when I get there that we will be ready to begin the curriculum. The first three weeks -- in the teaching profession we call it the honeymoon phase where you're getting to know the students and students are getting to know you, so it's not that they are really missing much of the curriculum.

THE COURT: Okay. Very well. The government may inquire.

CARLA BRYSON

VOIR DIRE EXAMINATION

BY MS. ROSE

JOY KELLY, RPR
U. S. OFFICIAL COURT REPORTER
CHARLOTTE, NORTH CAROLINA
Case 3:12-cv-00327-MOC   Document 100   Filed 09/23/15   Page 24 of 192
206

JA1038

Q    Thank you for your willingness to serve, for the time you have been waiting and for filling out this questionnaire.  It's been really helpful.

As the judge has told you, another jury found the defendant guilty.  I noted from your questionnaire that you felt that it would be difficult to accept the prior jury's verdict of guilt without your having heard anything?

A    I'm sorry, please repeat that.  Or could you read the question verbatim.  I may have marked incorrectly.

Q    And there were a lot of questions here, and in that you teach language arts, you probably will reprimand us on some of our wording that was poor.

This says, "Knowing that another jury has returned verdicts of guilty in this case, can you accept those guilty verdicts without reservation?"  And you checked no.  It may have been inadvertent, that your opinion may have changed since you heard what the Court said.  Tell us your thoughts.

A    When I filled that question out I believe my -- what I was under the impression is that they have found him guilty, and that I guess I'm assuming I was going to be on the jury which would decide whether or not he was guilty or innocent. So I think when I answered that question what I was thinking was they had found him guilty, would you have a problem or I mean, would you automatically assume that he's guilty because they found him guilty.  I think that's the way I

JOY KELLY, RPR
U. S. OFFICIAL COURT REPORTER
CHARLOTTE, NORTH CAROLINA
Case 3:12-cv-00327-MOC   Document 100   Filed 09/23/15   Page 25 of 192
207

JA1039

understood that question, not knowing that I would be considered only for the sentencing phase.

Q    And part of your job as a sentencing juror would be to accept that he is guilty.

A    Right.

Q    Without reservation and without requiring the government to put on any evidence concerning his guilt.

A    Okay.

Q    That's kind of the position where you are now.  What are your thoughts about that?

A    No, I have no problems with accepting the guilty verdict.

Q    Very good.  You haven't heard anything about this case at all, as I understand it?

A    No, I haven't.

Q    Your father was in law enforcement?

A    And still is.

Q    Is he in Gaston County?

A    Yes, he is.  He's in Gaston County.

Q    What is his particular position?

A    He is a deputy sheriff part-time.  He works at the courthouse.  I really don't know the specifics.  I have been there once or twice and seen him at the door checking purses.

THE COURT:  Is his name Bryson?

JOY KELLY, RPR
U. S. OFFICIAL COURT REPORTER
CHARLOTTE NORTH CAROLINA
Case 3:12-cv-00327-MOC   Document 100   Filed 09/23/15   Page 26 of 192
208
JA1040

PROSPECTIVE JUROR: No, it's not.

THE COURT: Tell us his name.

PROSPECTIVE JUROR: He's Willie Jeeter (ph).

THE COURT: Okay. Thank you.

BY MS. ROSE

Q    Anything about your father being in law enforcement that would affect your ability to fairly evaluate all the witnesses' testimony, whether they are a civilian or a law enforcement officer?

A    No.

Q    I understand -- we had a question on there that said would you agree that in general law enforcement officers are more likely than others to tell the truth and you said, "I somewhat agree."

A    I do. I somewhat agree that law enforcement officials are more inclined -- are more predisposed to be honest. It's because of my dealings with my father and I feel like he's an honest individual, therefore, I assume that other people may be honest as well.

Q    If the Court were to instruct you that as a member of the jury, that you should take the testimony that you hear from any witness, whether they are an expert witness, a lay witness or a law enforcement witness, and to evaluate that based upon whether it's their credentials, their training, their experience, and evaluate it within -- when weighed

JOY KELLY, RPR
U. S. OFFICIAL COURT REPORTER
CHARLOTTE NORTH CAROLINA
Case 3:12-cv-00327-MOC   Document 100   Filed 09/23/15   Page 27 of 192
209

JA1041

against the other evidence, their demeanor, to determine their credibility. Could you do that?

A    Yes.

Q    Did your father ever work in a investigative capacity?

A    Yes, he did.

Q    You said he's part-time. Has he kind of semi-retired and is now taking a lighter duty?

A    He retired from the county police where he did serve as a detective, and not really ready to retire and still somewhat young, he decided he would go back into law enforcement as part-time. He's still retired but he does have a little part-time job that doesn't mess with his retirement.

Q    Back when he was working kind of in a more reactive role, did he talk to you about the cases or investigations in which he was involved?

A    No.

Q    What kind of detective was he? I don't know how it works in Gastonia.

A    I think -- like I didn't really ask him this question -- I think he was a criminal detective, in that as much as I know, he worked things like break-ins and -- that's pretty much all I can remember. Maybe something about a break-in or something.

Q    Describe for us your personal view of the death

JOY KELLY, RPR
U. S. OFFICIAL COURT REPORTER
CHARLOTTE, NORTH CAROLINA
Case 3:12-cv-00327-MOC  Document 100  Filed 09/23/15  Page 28 of 192
210

JA1042

penalty. And I know what you wrote here, I'm not ignoring your questionnaire. But you have had some time to reflect upon the questionnaire and some of the issues that were raised by it, and so if you would, talk to us about that a little bit, please?

A    I can't really say. And my points I guess hasn't really changed. I can't say I'm really for the death penalty or totally against it. I really haven't formed any serious hard core judgment on that.

Q    And, of course, this -- you said you don't have any religious, moral, social or political beliefs that would help you form,. I guess, your nonopinion basically --

A    Right.

Q    -- where you are now. But is there anything about your background, whether it's your -- you know, the way you were brought up, personal experiences, whether you were taught religious teachings that affected where you fall out on this whole issue?

A    No, I can't say my background has had anything to do with it. I guess for the most part I fell like I've kind of been a straggler. Sometimes I'm for; sometimes I'm against. It's really nothing I've ever considered, you know, am I for it or am I against it.

Q    Now, the way it works here in a sentencing hearing is this: The government would put on evidence of aggravating

JOY KELLY, RPR
U. S. OFFICIAL COURT REPORTER
CHARLᴏᴛᴛᴇ ᴺᴏᴿTH CAROLINA
Case 3:12-cv-00327-MOC   Document 100   Filed 09/23/15   Page 29 of 192
211

JA1043

factors. And an aggravating factor is a factor that would tend to support the imposition of the death penalty. The defense does not have to put on evidence, but if they choose to put open evidence, they can put on evidence of a mitigating factor or a factor which intends to support the imposition of life imprisonment without release. The judge would give you the law. And it would be your job to evaluate that evidence, evaluate the aggravating and mitigating, and to weigh them and to work through that process until you were able to render a verdict.

Knowing that little bit about the process, as you sit here today, could you render either of those verdicts?

A    Yes, I can.

Q    I'm not being critical when I say your nonopinion. As you said you don't go either way, you almost don't have an opinion on the death penalty. Would it be fair to say that you would approach it based upon the facts, the evidence and the law?

A    That would be the only way I could approach it. Like I said, I have no opinion one way or the other. The only way I could come to a conclusion or some type of -- yeah, the only way I could come to a conclusion would be based on the evidence and instructions.

Q    Is there anything that would prevent you from rendering either of those verdicts? That would prohibit you from

JOY KELLY, RPR
U. S. OFFICIAL COURT REPORTER
CHARLOTTE NORTH CAROLINA
Case 3:12-cv-00327-MOC   Document 100   Filed 09/23/15   Page 30 of 192
212

JA1044

being able to go either way?

A    No.

Q    I guess the important thing is the Court will instruct you to wait until you have heard all the evidence before you made up your mind, of course, with the evidence and the law, and that together with the other jurors to work through that process, and would you feel comfortable doing that?

A    Yes.

Q    You know at some point after hearing all of the evidence and hearing the law you are going to have to make a decision and you're going to have to be certain about where you fall out.  Are you going to be able to get there?

A    I feel so, yes.

        MS. ROSE:  Thank you.

        PROSPECTIVE JUROR:  You're welcome.

        MR. BENDER:  Thank you, Your Honor.

                    VOIR DIRE EXAMINATION

BY MR. BENDER

Q    Good afternoon.  Jean Lawson and I represent Marc. We're assisted by Debra Miller.  You've heard this before.

    Ms. Bryson, I appreciate all your help in filling this out, listening to your comments here.  There are no right or wrong answers.  Any answer you give us that's heartfelt is the right answer and that's all we're looking for.  Nobody is going to get upset with you about your opinions.  We're

JOY KELLY, RPR
U. S. OFFICIAL COURT REPORTER
CHARLOTTE, NORTH CAROLINA
Case 3:12-cv-00327-MOC   Document 100   Filed 09/23/15   Page 31 of 192
213

JA1045

not going to try to change it, we just want to know who you are.

Tell me a little bit about your sister and her work with mentally disabled people.

A    My sister is employed at Pathways.  I don't know if it's the same in Mecklenburg County as it is in Gaston County.

I don't really know much about what she does.  What I do know is that I don't think that she works with anyone that is profound.  I think what she does is she assists them in being integrated into the community.  I know that she also takes them to doctors' appointments, makes sure they receive their medicines on time, things of that nature.

Q    Have you ever visited with her while -- at her work?

A    Yes, I have.

Q    And I'm not familiar with that orientation.  Are there psychiatrists or psychologists there at that facility?

A    I have no idea.

Q    And I notice that your mother was a teacher.

A    Uh-huh.

Q    Is she retired now?

A    No, she's not.

Q    Do you all happen to teach at the same school?

A    No, we do not.  She teaches elementary and I do middle school.

JOY KELLY, RPR
U. S. OFFICIAL COURT REPORTER
CHARLOTTE NORTH CAROLINA
Case 3:12-cv-00327-MOC  Document 100  Filed 09/23/15  Page 32 of 192
214

JA1046

Q    Why did you decide to be a teacher?  What was it about that profession?

A    I will be totally honest, when I went to school I went into school under the intention that I really wanted to become a lawyer.  I really did.  And I went to a large university.

The first class I took that I thought was going to propel me into the law field was political science.  There were probably 300 students and I flunked political science.  And I said that's probably not the way for me.  (Laughter)  So I changed my major to English and I graduated with a degree in English.  Had absolutely nothing to do with it.  Nowhere to do.  My mama said, "Well, you're sitting there with a degree that I've paid all this money for.  Why don't you do something with it?"  I said, "Well, okay, perhaps."  I just decided that I'd go back and I got my certification in teaching.  And I've enjoyed it since I've done it.  It's just that I didn't go off to college with that intent.

Q    You're probably glad you're teaching English rather than being a lawyer.

A    I think so.

Q    When you say a large university, I notice that you spent sometime in Charleston.

A    Uh-huh.

Q    Was it Charleston Southern or --

JOY KELLY, RPR
U. S. OFFICIAL COURT REPORTER
CHARLOTTE, NORTH CAROLINA
Case 3:12-cv-00327-MOC   Document 100   Filed 09/23/15   Page 33 of 192
215

JA1047

A    Yes.  When my husband graduated from college and we married, we moved to Charleston.  He had a job working for the federal government.  And I decided -- that's when I began my work towards certification and a master's program there.

Q    And where was the large university?

A    UNC Chapel Hill.

Q    I think most of us would congratulate you on that choice.

You mentioned your husband working with the federal government.  Is he still working with the federal government?

A    No, he's not.

Q    What was he doing at that point?

A    He was an electrical engineer for the Department of Defense.

Q    You have two brothers.  What do they do?

A    My older brother works for Lowe's Home Improvement, and my youngest brother owns a skating rink.

Q    Everybody is still living in Gaston County?

A    Yes.

Q    Ms. Bryson, I guess this is your only time for jury service?

A    It is.

Q    When you come in to jury service like this you bring

JOY KELLY, RPR
U. S. OFFICIAL COURT REPORTER
CHARLOTTE NORTH CAROLINA
Case 3:12-cv-00327-MOC  Document 100  Filed 09/23/15  Page 34 of 192
216

JA1048

with you, and you don't leave outside the door -- but you bring with you all your life experiences, life experience attitudes, whether it's based on religion, your family upbringing, your education, your job experience, whatever it may be. And as such it's sometimes been described as you walk in your own shoes. You're your own person. And you make weighing decisions and decisions based on all of that. Do you understand that?

A    Uh-huh.

Q    Okay. And as a juror you have the right with other jurors to honor your decisions and the way in which you arrive at those. Will you insist on that with other jurors?

A    Will I insist that they honor my decision?

Q    Right. And the way in which you arrive at your decision.

A    Absolutely. It's a respect then. I have to respect how they have arrived at their decisions. They must, in turn, respect the way I've arrived at mine.

Q    Okay. And I was going to turn that around but you turned it around for me. That everybody has to respect each other in the way in which they arrive at their decision because everybody is different. If we weren't, we'd only need one juror and this process would have ended a long time ago.

So if you have a -- one of the things that you're going

JOY KELLY, RPR
U. S. OFFICIAL COURT REPORTER
CHARLOTTE, NORTH CAROLINA

Case 3:12-cv-00327-MOC   Document 100   Filed 09/23/15   Page 35 of 192
217

JA1049

to have to decide is whether you have been satisfied beyond a reasonable doubt, the highest in the law, of certain aggravating circumstances. Aggravating circumstances are things that make this offense in this case more deserving of the death penalty. And you have to decide beyond a reasonable doubt whether that's been proven. If it has not, then the appropriate burden is life in prison without the possibility of release. So if you have that doubt, if you're not convinced beyond a reasonable doubt, will you stick with that decision?

A    When you say that decision, which decision?

Q    If that decision -- and I'm not trying to put words in your mouth or make you decide one way or the, that's not proper -- but I'm giving you an example, if you're not satisfied beyond a reasonable doubt that any aggravating circumstance has been proven beyond a reasonable doubt, the decision should be -- the appropriate decision is life without the possibility of release. In other words, don't just -- don't agree to get along.

A    Right.

Q    You stick by your own decision in the decision-making process.

A    (Nods head)

Q    While we're talking about decisions and decision-making process, can you think of anything in your life experience

JOY KELLY, RPR
U. S. OFFICIAL COURT REPORTER
CHARLOTTE. NORTH CAROLINA
Case 3:12-cv-00327-MOC  Document 100  Filed 09/23/15  Page 36 of 192
**218**

**JA1050**

where you had to make a particularly difficult decision? You don't have to tell me what it is, but if you can, if you have one, sort of focus on it.

A    Okay.

Q    Okay. Whatever that decision was you resolved it, you decided one way or another.

A    Uh-huh.

Q    How did you come to make that decision in that very difficult circumstance?

A    The decision in particular -- well, not in particular -- that I am thinking of, the way that I came to the decision that I did is I kind of had to weigh options; I had to weigh the pros. I had to weigh the cons.

In this particular situation, when the pros far outweigh the cons, then that was the decision I made based on the outcome.

Q    Okay. Okay. And how did you feel afterwards?

A    It was a good decision.

Q    Yeah.

A    I'm satisfied with it.

Q    No regrets about it?

A    No, none.

Q    One of your brothers had some problem with the law involving worthless checks and that sort of stuff.

A    Uh-huh.

JOY KELLY, RPR
U. S. OFFICIAL COURT REPORTER
CHARLOTTE NORTH CAROLINA
Case 3:12-cv-00327-MOC  Document 100  Filed 09/23/15  Page 37 of 192
219

JA1051

Q    How did your father deal with that?

A    My father was very upset, to say the least.  And my father is at the point now where he's helping him to work through it and to get everything cleared up so he's back on the right track.

Q    Other than it being a financial situation, was there anything else you think that led your brother to sort of stray a little bit off the straight and narrow?

A    No.  Strictly financial.  Okay.

Q    Have you ever had any experience familywise, friend or maybe in your college or university experience with domestic abuse?

A    No.

Q    Any of your children that you teach, your students, ever come to you and said, "Ms. Bryson, the reason I don't have my homework is because my parents were arguing last night."

A    No.

Q    Anything along that --

A    No.

Q    The reason we ask is you may hear some testimony about domestic abuse and its affects on children.  You didn't study any of that when you were at Chapel Hill?

A    Not that I recall, no.

Q    Your feeling about the death penalty is sort of, "I'm

really unsure."

A   That's because I am too.

Q   No, I'm trying to ask you, you are unsure, right?

A   That's correct.

Q   All right.  These are two very severe punishments, life imprisonment without the possibility of release which means that Marc dies in prison.  You have to think about this every day of your life.  And death you obviously know is a very severe punishment.

Anything about either one of those that will prevent you from considering, as you sit here right now, either one of those possible options?

A   I kind of got lost in the question there but your question, I think, was is there anything that would prevent me from --

Q   From being on a level playing field.

A   No.

Q   Let's just put it that way.  You're not leaning one way or the other?

A   No.

Q   Do you have an opinion or belief about someone in a prison having an useful life or value their life, spending a life in prison without the possibility of release?

A   I'm sorry, could you rephrase that?

Q   You have a belief or an opinion that someone who is

JOY KELLY, RPR
U. S. OFFICIAL COURT REPORTER
CHARLOTTE NORTH CAROLINA
Case 3:12-cv-00327-MOC   Document 100   Filed 09/23/15   Page 39 of 192
221

JA1053

incarcerated for the rest of his life can have some useful life in that environment?

A    Yes.

Q    Okay.  Have you ever known anybody who has started out on the wrong path but yet has been able to change their life and come back to the right path?

A    I can't say I have known anyone personally.  I do attend church and I have been in church where I have heard of people who have done that but I don't know them personally.

MR. BENDER:  May I have a moment?

THE COURT:  Yes.

MR. BENDER:  Ms. Bryson, thank you for your honest answers and all your help in helping us with this decision. Thank you.

PROSPECTIVE JUROR:  Thank you.

THE COURT:  Thank you, Ms. Bryson.  The clerk will have a notice for you that is a piece of paper that gives you a phone number we'd like to you call and tells you about when you can call so we can get back in touch with you.

PROSPECTIVE JUROR:  Okay.

(Ms. Bryson exits the courtroom.)

(Recess taken.)

THE COURT:  We need 119, please.

(Gary Silverstein enters the courtroom.)

JOY KELLY, RPR
U. S. OFFICIAL COURT REPORTER
CHARLOTTE NORTH CAROLINA
Case 3:12-cv-00327-MOC   Document 109   Filed 09/23/15   Page 40 of 192
222

JA1054

THE COURT: Is your name Gary Silverstein.

PROSPECTIVE JUROR: Yes.

THE COURT: The parties will have some questions for you. The government may inquire.

MS. TOMPKINS: Thank you, Your Honor.

GARY SILVERSTEIN

VOIR DIRE EXAMINATION

BY MS. TOMPKINS

Q    Mr. Silverstein, I'm Anne Tompkins, this is Jill Rose and we represent the United States in this case.

We're going to ask you some questions now based on the answers you gave in your questionnaire and focused towards the context of this sentencing hearing. As you know, ad nauseam by now, this is a case that involves the death penalty and life without the possibility of release that are the two possible punishments. The questions I'm going to ask you are not meant to embarrass you or put you on the spot or challenge your opinions about anything. They are just simply to find out information that's relevant for us as we search for a jury in this case.

As a starting point for this hearing, you and the rest of the jury would have to accept without reservation the verdicts rendered by a prior jury in the guilt phase of this case. Would you be able to do that?

A    Yes.

JOY KELLY, RPR
U. S. OFFICIAL COURT REPORTER
CHARLOTTE NORTH CAROLINA
Case 3:12-cv-00327-MOC  Document 100  Filed 09/23/15  Page 41 of 192
223

JA1055

about a two-hour period but I --

THE COURT: Could it be Judge Mullen who also has white hair?

PROSPECTIVE JUROR: Unfortunately, I can't remember.

THE COURT: Okay. In any event, is there anything about that involvement, even though it be in this court, that in your opinion now would affect your ability to be fair and impartial in dealing with the case that would be before you?

PROSPECTIVE JUROR: I wouldn't think so.

THE COURT: Okay. Well, the attorneys may want to ask you some more about that in a minute.

You indicate, if I'm not wrong about it, that you supported the death penalty but would never vote to impose it. I'm not sure if I have that right, but in any event, do you have any hard and fast view about the death penalty?

PROSPECTIVE JUROR: I don't think that's the right interpretation, at least if I was answering questions the way I intended.

THE COURT: Right. And the questions are confusing, I think that's fair to say. So we'll let the government inquire and go on from that.

MS. TOMPKINS: Thank you, Your Honor.

JAMES DONALDSON

JOY KELLY, RPR
U.S. OFFICIAL COURT REPORTER
CHARLOTTE NORTH CAROLINA
Case 3:12-cv-00327-MOC   Document 100   Filed 09/23/15   Page 42 of 192
224

JA1056

## VOIR DIRE EXAMINATION

**BY MS. TOMPKINS**

Q    Mr. Donaldson, I'm Anne Tompkins.  This is Jill Rose. We represent the United States in this case.  I'm going to ask you some questions that come from your questionnaire that we appreciate you filling out.

It's obviously in the context of this sentencing hearing in which there are two possible punishments, life without release and the death penalty.  So a lot of my questions are going to focus on those issues since that is really the context of this hearing.

None of questions I ask or anybody asks are meant to challenge you or change your opinion about anything.  Just trying to figure out who you are in the context of this sentencing hearing.

A    Okay.

Q    And there were some confusing questions, and I think I'm clear about where you stand, but I'll work through those as we get to them.  Tell me what you do as Core Properties?

A    I'm the CFO, chief financial officer.

Q    What kind of company is Core Properties?

A    They are a real state company.  Brokerage and development.

Q    Were you or are you part of the litigation?

A    Yeah, I'm involved in that.

JOY KELLY, RPR
U. S. OFFICIAL COURT REPORTER
CHARLOTTE. NORTH CAROLINA

Case 3:12-cv-00327-MOC   Document 100   Filed 09/23/15   Page 43 of 192
**225**

## JA1057

Q    As a witness or how?

A    No.  Just through --

Q    The financial?

A    My responsibility as a CFO.

Q    The financial impact it may have?

A    Right.

Q    Again, if during the trial you were selected and you come to realize that Judge Voorhees is the judge on that, would you be able to set aside that -- if any thoughts came to mind and listen to this case and the facts, apply the law as he gives it to you irrespective of that?

A    I believe so.  At this point, we're very early on in that, and there's really -- we haven't gotten far enough where I have an opinion one way or the other.

Q    This obviously doesn't have anything to do with that.

     And in terms of your work, do they know you have been called for jury service?

A    Yes.

Q    And would you consider it to be an extreme hardship for you to be here or are they ready for you to satisfy your jury duty?

A    I think it will be extremely difficult but we can get through.

Q    So you have worked out with them the possibility that you may be called for this jury?

JOY KELLY, RPR
U. S. OFFICIAL COURT REPORTER
CHARLOTTE NORTH CAROLINA
Case 3:12-cv-00327-MOC   Document 100   Filed 09/23/15   Page 44 of 192
226

JA1058

A    Yes.

Q    And your wife is at home with the kids?

A    Right.

Q    That would not be an issue.

Let me go through this, bear with me just a second.

No prior jury service?

A    No.  I was called once in New York but never actually sat for a jury.

Q    And you're aware, I'm sure, of the deliberative process that a jury goes through?

A    Right.

Q    Anything about that kind of decision-making process that you don't like or can't do or would not be willing to be part of?

A    No.

Q    You would be willing to listen to other people express their opinions, express your opinions, and try to come to a consensus, if possible?

A    Yes.

Q    And it looks like that you, in assessing law enforcement witnesses, you would be able to assess law enforcement witnesses in the same way you assess any kind of witness, just based on their testimony and how it fits in with other evidence and be instructed by the Judge about assessing credibility?

JOY KELLY, RPR
U. S. OFFICIAL COURT REPORTER
CHARLOTTE, NORTH CAROLINA
Case 3:12-cv-00327-MOC   Document 100   Filed 09/23/15   Page 45 of 192
227

JA1059

**A**     I think so.

**Q**     The Judge went through -- you would, in fact, as a starting point in this case, be able to accept a prior jury verdict; is that correct?

**A**     Yeah, I believe so.

**Q**     Okay.  You had answered no at the time you filled out the questionnaire that you would not be able to do that. Obviously you've probably come to know a little bit more about this process.

**A**     Right.

**Q**     Based on what you heard about the process, would you require the government to reprove the defendant's guilt which would otherwise not be a burden of proof of ours?

**A**     No, I don't think so as long as I didn't hear anything that had been contradicted what had been decided in the past.

**Q**     This jury, as a starting point, like I said, must accept that prior jury's verdict and move forward from there and assess the government's presentation of evidence, which would be evidence that goes toward aggravating factors which we contend exist and call for the imposition of the death penalty, and same way if the defense wanted to put on evidence of mitigating factors which we contend call for the imposition of life imprisonment without the possibility of release.  That's going to be the structure of the evidence

JOY KELLY, RPR
U. S. OFFICIAL COURT REPORTER
CHARLOTTE. NORTH CAROLINA
Case 3:12-cv-00327-MOC   Document 100   Filed 09/23/15   Page 46 of 192
**228**

**JA1060**

that you're going to hear. Any problem with that?

A    No.

Q    And the government has the burden of proof, proof beyond a reasonable doubt and unanimous in the presentation of our aggravating factors, and you understand that the defense has a different burden of proof, preponderance of the evidence, and only one juror can find a mitigating factor in order for it to be considered by that juror. Are you okay with all of that?

A    Yes.

Q    Do you understand the weighing process that the jury would go through in order to make its determination?

A    Yes, I do.

Q    And I think the Court asked you little bit -- we had a series of "always" and "never" questions on the questionnaire that were somewhat difficult to understand, although you've noted you would never vote to impose the death penalty, I would take that to be a mistake?

A    The way I interpreted the question was whether or not you would always vote to impose it.

Q    Okay. And what are your thoughts about that?

A    And no, I would not always vote. I think it's too tough to put an absolute on. But it was the general saying I do support it.

Q    When the questions are asked your view about your

JOY KELLY, RPR
U. S. OFFICIAL COURT REPORTER
CHARLOTTE. NORTH CAROLINA

Case 3:12-cv-00327-MOC   Document 100   Filed 09/23/15   Page 47 of 192

229

JA1061

feelings about the death penalty, they are outside the context of this case but philosophical. We're not asking you what are you going to do in this case. You haven't heard any evidence in this case. So when I'm asking you questions, it's just really more your philosophy about the death penalty.

A    Right.

Q    In this case you haven't -- you've heard facts from the court that will give you a factual background but you haven't heard any evidence of aggravating or mitigating factors at this point. Would you say that at this point in this case you have an open mind about either the death penalty or life imprisonment without release as possible punishments?

A    Probably not a hundred percent. Just based on the comments of the Judge and the fact we're here today.

Q    Now, it would be important for you to set aside any opinions that you may have formed based that factual basis and to come into this proceeding with an open mind. And we all come into the courtroom with life experiences and opinions, and we don't ask you not to have any when you come in, but we ask you, if possible, to set aside opinions that you may have formed and wait to make your decision in the case based on the evidence you will hear in the courtroom. Would you be able to do that?

JOY KELLY, RPR
U. S. OFFICIAL COURT REPORTER
CHARLOTTE. NORTH CAROLINA
Case 3:12-cv-00327-MOC   Document 100   Filed 09/23/15   Page 48 of 192
230

JA1062

A     I think so.

Q     And as I sometimes say, the defense and the government want folks to come in here on an even keel, even playing field, not to come in with predetermined viewpoints about things and it would be important for you to be able to do that.  Are you saying that you can do that?

A     I think I can.

Q     Do you understand there's nothing automatic after a finding of guilt on a charge for which the death penalty and life imprisonment without release are possible punishments?

A     Right.

Q     There's no automatic sentence.  The jury decides after hearing certain kinds of evidence as will be presented in this case.

     Now, in this case what you do know is that the defendant has been found guilty of first degree murder, two first degree murders, and a carjacking resulting in death that was a premeditated, deliberate murder.  Both of them.  Would you -- you understand, again, there's no automatic sentence after that?

A     Right.

Q     The government has a burden of proof that goes beyond presentation of premeditated deliberate murder.  Do you understand that?

A     Okay.

JOY KELLY, RPR
U. S. OFFICIAL COURT REPORTER
CHARLOTTE, NORTH CAROLINA
Case 3:12-cv-00327-MOC   Document 100   Filed 09/23/15   Page 49 of 192
231

JA1063

Q    And that our aggravating factors will be presented in the context of this courtroom, but that after premeditated deliberate murder there's not an automatic death sentence and there's not an automatic life sentence.  You understand that?

A    Yes.

Q    And based on that, would you be able to follow the Court's instructions about waiting to hear all the evidence, waiting to hear the law and entering into that deliberative process with your fellow jurors?

A    Yes.

Q    And other than the factual background that the Court gave you, you don't know anything about this case?

A    No.

MS. TOMPKINS:  All right.  Thank you.  I appreciate you answering my questions.

VOIR DIRE EXAMINATION

BY MS. LAWSON

Q    Mr. Donaldson, hi, how are you?

A    I'm fine.  Thank you.

Q    Harold Bender and I represent Marc Barnette who is seated here, and you now know what he did.  You heard it from Ms. Tompkins; you heard it from Judge Voorhees.

When you come into this courtroom there are no right or wrong answers.  There are only your truthful, honest

JOY KELLY, RPR
U. S. OFFICIAL COURT REPORTER
CHARLOTTE NORTH CAROLINA
Case 3:12-cv-00327-MOC   Document 100   Filed 09/23/15   Page 50 of 192
232

JA1064

answers. Those are the right ones, the ones that you really feel, you are really thinking, and nobody is going to try to change your mind about that. And I hope you understand where my question comes from, and that is, I heard you say something -- that suggested to me after you heard the facts you had a feeling about what ought to happen in this case. Is that basically what you were conveying?

A    I think that's fair to say.

Q    Could you talk a little bit about that, what made you get the feeling?

MS. TOMPKINS:  Objection.  That's not the standard.

THE COURT:  Overruled.

Q    You can answer that.

A    I just think based on the description the Judge gave of the incidents I think that gives you some level of feelings as to where it goes.  But that's not to say I wouldn't have tried to put that aside and then make an impartial decision after hearing all the evidence.

Q    Thank you for your candor.  That's important.

In some other places in the questionnaire had some interest in your candid answers.  One was about -- there was a statement in there about police officers tend to tell the truth more often than other people and you marked you disagree with that.  Can you tell us a little bit about why you disagree with that?

A    I interpret that to mean that they would -- that the question is referring to police officers versus any average person.  And I don't think they are less likely to tell the truth, but I'm not sure that they get a greater weight than anybody else here.

Q    So if Judge Voorhees instructed you consistently with that, you would be able to weigh the testimony just the way you expressed it?

A    Yes.  I think it depends on the situation and the people you were hearing.

Q    What do you think of the sentence of life imprisonment without the possibility of release as a punishment for two first degree murders?

        MS. TOMPKINS:  Objection.

        THE COURT:  Overruled.

Q    Go ahead.

A    I'm not sure if I've got a real opinion on it.  You mean in contrast to the other possibility?  Again supporting the death penalty, I'm not sure that it's an adequate punishment.

Q    That's fair enough.  You mentioned that your approval, you're belief in the death penalty, your support for it is based on social issues.  Could you elaborate on that, please?

A    I guess it's -- I view it as less a punishment for a

JOY KELLY, RPR
U. S. OFFICIAL COURT REPORTER
CHARLOTTE NORTH CAROLINA
Case 3:12-cv-00327-MOC   Document 100   Filed 09/23/15   Page 52 of 192
234

JA1066

past crime and more as an important deterrent for future ones.

Q   So the social impact of deterrents would be something that someone else would look at say, "I don't think I'll commit that crime."

A   Exactly.

Q   Are there any other factors that feed into your position?

A   No.  I think that's largely it.

Q   Cost of incarceration?

A   No.

MS. LAWSON:  Your Honor, I make a motion.

THE COURT:  Would you have other questions?

MS. TOMPKINS:  Yes, Your Honor.

### VOIR DIRE EXAMINATION

BY MS. TOMPKINS

Q   Mr. Donaldson, you do know some of the facts about the case, the underlying facts of the guilty verdicts.  But you haven't heard any evidence on aggravating or mitigating factors.

Based on that, do you have an open mind about what possible punishments, either life imprisonment without release or the death penalty, that those are both open options for you as a juror?

A   Yes, I understand they are both there.

JOY KELLY, RPR
U. S. OFFICIAL COURT REPORTER
CHARLOTTE NORTH CAROLINA
Case 3:12-cv-00327-MOC   Document 100   Filed 09/23/15   Page 53 of 192
235

JA1067

Q    Are you able to consider at this point having heard none of the evidence both of those options?

A    I certainly would make every effort to put any preconceived notions I got today aside to do that.

Q    And today you wouldn't automatically vote one way or the other?

A    No.

MS. TOMPKINS:  That's all.

THE COURT:  You may ask other questions.  Motion be denied.

MS. LAWSON:  Thank you.

### VOIR DIRE EXAMINATION

BY MS. LAWSON

Q    You also mentioned in your questionnaire that the punishment should be enforced more promptly.  Would you tell us a little bit about that?

A    I just think in situations where the penalty is imposed that it should actually be imposed.

Q    Have you read or heard about appeals and things of that nature?  And if you have, can you tell us how that ties into your perspective on the speed with which it should be carried out?

A    I can't think of specific cases where I had read about the appeals.  There seems to be a number in Texas.  But it does seem that there's a very long period of time between

JOY KELLY, RPR
U. S. OFFICIAL COURT REPORTER
CHARLOTTE, NORTH CAROLINA
Case 3:12-cv-00327-MOC   Document 100   Filed 09/23/15   Page 54 of 192
236

JA1068

sentencing and the actual carrying out of the sentence.

Q    What impact does that have on your feelings about the death penalty in general?

A    I don't think that has any effect on my feelings in general.

Q    You have told Ms. Tompkins several times that you would try your best to set aside your feeling that you developed once you heard the fact situation in this case and only you know whether you can do that.  None of us can tell you.  And if you had any concerns or any reservations about your ability to consider both punishments on these facts, this is the time, consistent with your oath as a juror, to tell us that.  Do you?

A    No, I don't have any specific concerns.  I've never been in this exact situation before, so it's difficult.  I can't say with 100 percent certainty.  I'd like to think I could put that aside.

Q    And I hope you understand I'm not trying to belabor the point, but there's still some equivocation there.  And that's very difficult for us of going into this process selecting a jury with someone who has some reservation, if that's what it is.  I'm not sure that's what you're expressing.

A    I wouldn't call it reservation.  I believe -- I think I can do it.

JOY KELLY, RPR
U. S. OFFICIAL COURT REPORTER
CHARLOTTE. NORTH CAROLINA
Case 3:12-cv-00327-MOC   Document 100   Filed 09/23/15   Page 55 of 192
237

JA1069

Q    I'm sure in your work you do a lot of decision making in your own mind as well as in groups.  Would you take a second and think about an important decision you have had to make in your life experience, you don't have to tell us what it is, but once you have it fixed in your mind just let me know.

A    Okay.

Q    How did you come to get to whatever decision you made on that?

A    Just basically by taking available information, weighing the pros and cons and making the best decision I thought was available at the time.

Q    Did you ask for any input from other people?

A    Yes.

Q    Did you feel the input helped you make the decision?

A    Yes.

Q    Were you satisfied with the decision after you made it?

A    Yes.

Q    Have you ever had a time when you went dissatisfied with the decision you made, the important decision?

A    I wouldn't say dissatisfied.  There's been moments that have looked better than others but overall satisfied.

        MS. LAWSON:  May we have and moment, Your Honor?

        THE COURT:  Yes.

Q    Just a couple more questions, Mr. Donaldson.

JOY KELLY, RPR
U. S. OFFICIAL COURT REPORTER
CHARLOTTE NORTH CAROLINA
Case 3:12-cv-00327-MOC   Document 100   Filed 09/23/15   Page 56 of 192
238

JA1070

Briefly what we're going to be looking at here is starting with the knowledge that Marc Barnette murdered Donald Allen, murdered Robin Williams --

MS. TOMPKINS: Objection.

THE COURT: I haven't heard the whole question yet.

Q    That's where we start in this process.  And from there the government has to establish aggravating circumstances.

THE COURT: I think you need to take into account the fact that one of the --

MS. LAWSON: I understand.

THE COURT: -- alleged aggravating factors is --

MS. LAWSON: Yeah, I understand --

THE COURT: -- in the predicate of your question.  Okay.  Go ahead.

BY MS. LAWSON

Q    And it may be that in the fact of the convictions there's an aggravating circumstance, okay, but when we start, it's the government's duty to go forward and present evidence of aggravating circumstances.  Do you follow me?

A    Yes.

Q    The burden of proof on the government is beyond a reasonable doubt, so whatever aggravating circumstance they would advance, you, individually, and all 12 jurors would have to determine that that's been proven beyond a reasonable doubt.  And, you know, the common sense meaning

JOY KELLY, RPR
U. S. OFFICIAL COURT REPORTER
CHARLOTTE NORTH CAROLINA
Case 3:12-cv-00327-MOC   Document 100   Filed 09/23/15   Page 57 of 192
239

JA1071

of that, it's the highest burden in our law. Internally you know what beyond a reasonable doubt means, right?

A    Right.

Q    If the government doesn't prove the existence of any aggravating circumstance, the punishment would be -- it's like a default, it would be life imprisonment without the possibility of release. Do you follow me?

A    Yes.

Q    Okay. If they do prove aggravating circumstances --

MS. TOMPKINS: Objection.

THE COURT: Overruled.

Q    -- the next thing the jury would have to do -- and this is called guided decision making, that's what the Supreme Court calls in this context -- the jury would have to consider whether there are any mitigating circumstances. And a mitigating circumstance is a circumstance about Marc or about the offenses or anything else that a juror may need to have mitigating value about in a situation that calls for imposition of a sentence of life imprisonment without the possibility of release, okay?

Now, for the mitigating circumstances, those don't need to be proven beyond a reasonable doubt, but just by a preponderance of the evidence, the 51 percent. And it doesn't have to be unanimous. One juror can find a mitigating circumstance and it can be considered by that

JOY KELLY, RPR
U. S. OFFICIAL COURT REPORTER
CHARLOTTE NORTH CAROLINA
Case 3:12-cv-00327-MOC   Document 100   Filed 09/23/15   Page 58 of 192
240

JA1072

juror and any other juror who wants to find mitigation, okay?

A    Uh-huh.

Q    Does it seem unfair to you that the government has such a high burden in a situation like this?

A    No.

Q    It's possible even that you don't find any mitigating circumstances, but the jury could move on to the next step, which is a weighing step, and that is to weigh the mitigating circumstances, if there are any, against the aggravating circumstances. And they don't need to be -- it's not mathematical. It can be one mitigating circumstance outweighs five aggravating circumstances or the reverse, okay. Each individual juror has to decide what weight to give the circumstances.

And irrespective of how those come out in your weighing process -- well, if you all find -- that is the 12 of you -- that the aggravating circumstances don't outweigh the mitigating circumstances, you go to the default punishment of life imprisonment without the possibility of release. Did I explain that? You look like you're following me.

A    I'm with you.

Q    Yeah. But even if you find that of the aggravating circumstances outweigh the mitigating circumstances, it would be your duty to go to a last step, which is to --

JA1073

MS. TOMPKINS: Objection.

THE COURT: Overruled.

Q    -- make the decision whether the imposition of a sentence of death is more appropriate, the only appropriate sentence when considered with the alternative punishment of life imprisonment without the possibility of release. That's the process.

A    Okay.

Q    Knowing what you know and feeling the way you feel, do you think you are able to engage in that process and give meaningful consideration to a sentence of life imprisonment without possibility of release?

A    Yes, I think so.

Q    Do you have any reservations about your ability to do that?

A    No, I don't have any reservations.

Q    Now, when you go to deliberate, each of the jurors come from different backgrounds, different educational levels, different religious perspectives, and that's part and parcel of who they are and what you and the others bring into the deliberations. If we didn't need 12 different people, we'd just need one juror to impose punishment. Do you follow me?

A    Uh-huh.

Q    So I guess my question is are you prepared to insist that the other jurors honor and respect your opinion and

JOY KELLY, RPR
U. S. OFFICIAL COURT REPORTER
CHARLOTTE, NORTH CAROLINA
Case 3:12-cv-00327-MOC   Document 100   Filed 09/23/15   Page 60 of 192
242
JA1074

your decision you make?

A    Yes.

Q    By the same token, even if you disagree with another juror's position, are you willing to listen to respectfully and able to honor it?

A    Yes.

Q    I guess the last question I would ask you is -- and I asked it different ways -- if you think -- well, if you know you can be fair in this case?

A    Yes, I think I can be fair.

        MS. LAWSON:  Thank you very much.

        THE COURT:  Thank you, sir.  The clerk will give you a piece of paper that has a telephone number on it and we would appreciate if you would call the number given as instructed on the notice.

        Now, it appears that we have seven more and that we're going to have to lay some of these over until tomorrow.  Do I hear a number?

        MS. TOMPKINS:  120 has a vacation, July and August.

        THE COURT:  Okay.  Do you want to take -- okay. Let's say we'll take that one up for sure.  Anyone else?

        MS. TOMPKINS:  102 has a vacation planned August 5th through the 9th.

        THE COURT:  Is that Womble?

        MS. TOMPKINS:  Yes.

JOY KELLY, RPR
U. S. OFFICIAL COURT REPORTER
CHARLOTTE, NORTH CAROLINA

Case 3:12-cv-00327-MOC  Document 100  Filed 09/23/15  Page 61 of 192
243

JA1075

No. 97 is a school bus driver. I'm not sure how that may play out.

THE COURT: I have about five notes on No. 97, so maybe we ought to bring that person in.

MR. BENDER: Judge, since you invited us to speak on that subject --

THE COURT: I did. As a matter of fact, I don't even have to do that to think that counsel might rise to the occasion. (Laughter)

MR. BENDER: Maybe we ought to take those three and see how they go and let the other three come back tomorrow -- or the other four.

THE COURT: Four. Agreeable.

MS. TOMPKINS: That's agreeable.

THE COURT: All right. Let's call for 100, 95, 123 and 118. This 123 says he knows a lot about this case, follows state and local trials and he checks virtually every media there is as far as where he got his information on this case. I think we might want to keep him in the group today. Now, as a matter of fact, No. 95 says he has a hardship and would lose business and put five people out of work. As a taxpayer he doesn't like long-term sentences and that sort of thing. So let's keep -- I think we'll keep working on those, now, see if there are any that are more or less in the ballpark. No. 100 says he would never vote to

JOY KELLY, RPR
U. S. OFFICIAL COURT REPORTER
CHARLOTTE NORTH CAROLINA
Case 3:12-cv-00327-MOC   Document 100   Filed 09/23/15   Page 62 of 192
244

JA1076

PROSPECTIVE JUROR: Destin, Florida.

THE COURT: Where is that?

PROSPECTIVE JUROR: Destin, Florida. Panhandle.

THE COURT: Are you going to fly, drive?

PROSPECTIVE JUROR: Drive.

THE COURT: Right. And you have your hotel booked?

PROSPECTIVE JUROR: Saturday to Saturday.

THE COURT: Right. Any questions?

MS. ROSE: No, sir.

THE COURT: Thank you very much for participating in this part of this process and you'll be excused.

PROSPECTIVE JUROR: Thank you.

(Mr. Gregory exits the courtroom.)

THE COURT: 127.

(Betty Campbell enters the courtroom.)

THE COURT: Good afternoon.

PROSPECTIVE JUROR: Good afternoon.

THE COURT: I believe you are Ms. Campbell.

PROSPECTIVE JUROR: Yes, I am, sir.

THE COURT: We have a couple of questions for you, and one of them would be having to do with the issue that you heard about as we -- as the Court gave you these preliminary instructions or orientation instructions, and -- which had to do with the fact that in this facet of the case we're here only for sentencing, and the only business of the

JOY KELLY, RPR
U. S. OFFICIAL COURT REPORTER
CHARLOTTE, NORTH CAROLINA

Case 3:12-cv-00327-MOC Document 100 Filed 09/23/15 Page 63 of 192
245

JA1077

jury would be to render a decision concerning whether either the death penalty on one hand or the life sentence without the possibility of release on the other would be the sentence as justified. And there's a lot of law that could be explained along those lines, but I think we gave you capsule of it earlier.

And in your questionnaire that you filled out the other day I believe you said you disagreed with capital punishment. Is that a fair statement?

PROSPECTIVE JUROR: I wouldn't say it's a totally 100 percent disagree, but I do lean in that direction quite a bit, maybe more than 50 percent, but not necessarily a hundred percent, if that makes sense.

THE COURT: Right. Well, the whole idea, questions at this stage of a proceeding is to determine if the jurors are leaning one way or another before they've even really considered any evidence and that sort of thing. Because each of the parties have a right to have jurors that come into the process neutral or as much as possible. And tell us a little bit about your views on the death penalty, if you would.

PROSPECTIVE JUROR: I guess I have some concern with the statement "sure beyond a reasonable doubt," that clause.

THE COURT: Right. Right. Of course, that's the

JOY KELLY, RPR
U. S. OFFICIAL COURT REPORTER
CHARLOTTE, NORTH CAROLINA
Case 3:12-cv-00327-MOC Document 100 Filed 09/23/15 Page 64 of 192
246

JA1078

burden that the government has to prove aggravating factors. That is factors that the government says should cause a juror to consider the death penalty. On the other hand, the defendant has the possibility, if they wish to do so, to put up evidence about mitigating factors, or factors that would argue the other way. And the question is whether you could consider both types of evidence and render a decision within the context of the law.

PROSPECTIVE JUROR: Oh, yes. Yes. I don't have no problem with that.

THE COURT: The government may inquire.

**BETTY CAMPBELL**

**VOIR DIRE EXAMINATION**

BY MS. ROSE

Q    And to follow up on the Judge's question, and in rendering a decision within the context of the law may involve deciding with other people to impose the death penalty. Could you do that?

A    Siding with them?

MS. LAWSON: Objection, Your Honor. I didn't understand your statement, I'm sorry. I misunderstood.

BY MS. ROSE

Q    The Judge said within the context of the law could you make a decision on this case and you said yes. And one of the potential penalties here is the death penalty.

JOY KELLY, RPR
U. S. OFFICIAL COURT REPORTER
CHARLOTTE, NORTH CAROLINA

Case 3:12-cv-00327-MOC   Document 100   Filed 09/23/15   Page 65 of 192

247

**JA1079**

A     Right.   I understand that.   Uh-huh.

Q     So given some of your personal difficulties with the death penalty, realizing that may be kind of a philosophical decision but now you're here.

A     Right.

Q     A lot of folks say, "I may believe in it," or -- but when it's right there in their face or when it becomes a personal decision that makes it more difficult.   So -- and we understand that.   So if that's your hesitancy or you have some uncertainty about it personally, and your ability to personally perhaps impose that penalty, then we need to know that.   What are your thoughts?

A     Well, you know, in this situation then I would be open to facts on both sides.   I mean, that's what I would be here for, is to look at both sides and make an informed decision based on what I have been given or what has been presented to me.

Q     Right.   And could that informed position involve you voting the death penalty?

A     Yes.   Yes, it could.

Q     And you may recall my name is Jill Rose and this is Anne Tompkins and we're representing the government here.

A     I'm sorry?

Q     To back up and start at the beginning -- but I wanted to follow up with your discussion with the Judge before we

JOY KELLY, RPR
U. S. OFFICIAL COURT REPORTER
CHARLOTTE, NORTH CAROLINA

Case 3:12-cv-00327-MOC   Document 100   Filed 09/23/15   Page 66 of 192
248

JA1080

moved on.

I see that you work. And I take it you have made some arrangements with your work to be away, if necessary, for two or three weeks?

A    It wouldn't be a problem. I haven't really discussed it with them but it wouldn't be a problem.

Q    But you know they will work with you on that?

A    Yes.

Q    As the Judge said, a jury found the defendant guilty of the murder of two people, carjacking resulting in death. Do you have any difficulty accepting that jury's verdict?

A    No.

Q    And understand, particularly having some more discussions with us, that this job here is just a sentencing?

A    Yes.

Q    Making a decision as to one of those two possible verdicts?

A    Yes, I do understand that.

Q    You've never served as a juror before?

A    No, I have not.

Q    Okay. Tell us a little bit about what forms your opinions or your beliefs or your philosophy on the death penalty, where does that come from?

A    I guess pretty much the one statement I made. Beyond a

JOY KELLY, RPR
U. S. OFFICIAL COURT REPORTER
CHARLOTTE, NORTH CAROLINA

Case 3:12-cv-00327-MOC   Document 100   Filed 09/23/15   Page 67 of 192
249

JA1081

reasonable doubt, relating that -- you know, there's 12 jurors and they must come to one decision. But within that 12, every one is sure beyond a reasonable doubt. I guess that has always kind of, you know, like stuck in my mind.

Q Right. And, you know, that burden of proof is the burden of proof that is used throughout this country in every criminal proceeding, whether it's at the state or federal level, that's the burden of proof that the government always carries. Do you think that burden of proof is too heavy or requires too much of the government?

A Well, maybe on an individual personal basis, it's a possibility, but as a whole, as a juror, when you're in after your ideas, your pros and cons, a person might tend to maybe feel more comfortable with the decision when they all come to one agreement.

Q You know, beyond a reasonable doubt just means applying your reason and common sense.

A Right.

Q It doesn't mean without any doubt. It does not mean beyond the shadow of a doubt. It's just reasonable. A reason and commonsense standard. You understand that?

A Yes.

Q Now, in your questionnaire -- and I know we talked about this -- your answer to the question, "What is your personal view of the death penalty?" You said "I disagree

JOY KELLY, RPR
U. S. OFFICIAL COURT REPORTER
CHARLOTTE, NORTH CAROLINA
Case 3:12-cv-00327-MOC   Document 100   Filed 09/23/15   Page 68 of 192
250

JA1082

with capital punishment."

A    Which is, I guess, my answer to what we just previously discussed.  It's all just....

Q    You were concerned about the burden of proof?

A    Yes.

Q    But knowing that it's a reasonable doubt standard, you understand how all of that works?

A    Yes.  A standard of the court system.

Q    Have you changed your mind?  Probably when you came in and filled out your questionnaire you never thought about these issues so seriously.  And you had some time to think about it between the time this was completed, and, of course, coming in today.

Has your -- what have your thoughts been?  You probably drew the conclusion that this might have something to do with a capital case.  Have you changed your mind or what were your thoughts during that intervening time period?

A    Believe it or not that's the one -- that is the one statement from that questionnaire that did kind of come back to visit me.  And -- I guess -- somewhat still have mixed feelings about it.  But I think I could make an informed decision or have a open mind when we're weighing the two sentences, one against the other.

Q    But certainly given the fact you don't believe in capital punishment, that's a tough decision.

JOY KELLY, RPR
U. S. OFFICIAL COURT REPORTER
CHARLOTTE, NORTH CAROLINA
Case 3:12-cv-00327-MOC   Document 100   Filed 09/23/15   Page 69 of 192
251

JA1083

MS. LAWSON: Objection. That's not what she said.

PROSPECTIVE JUROR: I'm not saying 100 percent. I felt like in the past, or even maybe now, in my mind it leans, I'll just say percentagewise, maybe 55 or 60 percent; I don't 40 percent, I do -- that sort of thing. But not a 100 percent. But I know there's always exceptions in any situation or, you know, given different forms of evidence. Well, in this case we're just deciding the sentence anyway. But, you know, there could be a number of factors that could pull the pendulum back the other way.

Q    It sounds like you're saying you just have to hear the evidence and the law?

A    Yes.

Q    Why would you favor abolishing the death penalty?

A    Preponderance of the evidence again. Just kind of goes back.

Q    And explain what you mean there by preponderance of the evidence.

A    Unclear, undefined evidence. Maybe understated, overstated. Just different factors.

Q    Have you ever had any experience, your friends or family or acquaintances, with domestic violence?

A    No.

Q    I'm just looking to see -- your only experience with the court system has been the lawsuit over the car accident.

JOY KELLY, RPR
U. S. OFFICIAL COURT REPORTER
CHARLOTTE, NORTH CAROLINA

Case 3:12-cv-00327-MOC  Document 109  Filed 09/23/15  Page 70 of 192

252

JA1084

A    A lawsuit -- a car accident.

Q    There was a question here that said that, "Have you known -- you or anyone you know sued anyone?" Yes. Car accident. "Have you or anyone you know ever been sued?" Yes, car accident.

A    Yes.

Q    And I didn't know if that experience was the one that kind of led you to question or to explore the burden of proof issue that you talked about?

A    Well, it could -- the fact that I had some legal classes, I'll say, maybe that has something to do with it too. You know, during some of my schooling, I've taken some courses of -- that might have something to do with it.

Q    Would you be able to listen to the law?

A    Oh, sure.

Q    And follow it?

A    Yes.

Q    Not with what you might believe the notion of the law would be or your understanding of the law but what the Court says the law is?

A    Yes.

Q    All right. Thank you very much.

        THE COURT: Ms. Campbell, I was a little bit unclear about your degree of concern about the death penalty. I think a couple of times you indicated that it

JOY KELLY, RPR
U. S. OFFICIAL COURT REPORTER
CHARLOTTE, NORTH CAROLINA

Case 3:12-cv-00327-MOC   Document 100   Filed 09/23/15   Page 71 of 192
253

JA1085

was something like 55, 45. In other words, you leaned against imposing the death penalty something like 55 percent to 45 percent. Something along those lines?

PROSPECTIVE JUROR: Yes.

THE COURT: So that's kind of where you start. There's going to be a little bit of a difference in which of the two penalties you could even consider before you heard any evidence; is that right?

PROSPECTIVE JUROR: Right.

THE COURT: Okay. Would there be any other questions?

MS. LAWSON: On that issue or in general?

THE COURT: Beg your pardon?

MS. LAWSON: On that issue?

THE COURT: On that issue.

MS. LAWSON: Yes, sir.

### VOIR DIRE EXAMINATION

BY MS. LAWSON

Q Ms. Campbell, you took your law class, and I assume you learned, I'm sure you did, that you apply the law as it's written, or in this case as Judge Voorhees will give it to you.

A Yes.

Q And when you were talking about 55 to 45 percent, were you attempting to give a sort of a general feeling about

JOY KELLY, RPR
U. S. OFFICIAL COURT REPORTER
CHARLOTTE, NORTH CAROLINA
Case 3:12-cv-00327-MOC Document 100 Filed 09/23/15 Page 72 of 192
254

JA1086

your personal view on a societal issue?

A     I think that's more what I was talking about.  It was just a personal thing, never having been summoned for jury duty, just my own personal belief and thinking just in a everyday general conversation.

Q     And we appreciate your candor because everybody comes in with certain ideas and notions.  You know, you're not a blank slate.  You have lived your life and you can look out and make decisions about things.

       I guess the question is, are you willing to sit back and equally consider the evidence and the potential punishments before you go back and deliberate and make a decision?

A     Oh, most definitely.

Q     So even though in your -- you know, in the past as you're looking at it you may not be aggressively for capital punishment, you're still willing to let the government put on its evidence and you're still willing to listen to it, right?

A     Most definitely.  This is like the real world.  That was just a personal view before.  You know, but when you come into real life situations, then, you know -- that you put personal beliefs aside and listen to the facts at hand.

Q     Thank you.  I appreciate your clarifying that.

       THE COURT:  You may inquire.

BY MS. LAWSON

JOY KELLY, RPR
U. S. OFFICIAL COURT REPORTER
CHARLOTTE, NORTH CAROLINA

Case 3:12-cv-00327-MOC  Document 100  Filed 09/23/15  Page 73 of 192
255

JA1087

Q    Ms. Campbell, we have already been introduced, all of us, and just have a few questions to ask you.  And I guess you picked up on it by now, that although the potential outcome of this case is going to resolve the issue of what we do about Marc Barnette.

A    Yes.

Q    We start from the fact that he confessed to two murders and he's guilty of them beyond a reasonable doubt.

A    Yes.

Q    And you understand that and you accept the fact that that's beyond a reasonable doubt?

A    Yes, I do.

Q    Okay.  So where we start is the fact that 12 jurors are going to have to listen to the evidence and make a decision.

A    Okay.

Q    And you understand you come in here and you walk in your own shoes, bring your own experiences, your own education, your own background with you.

A    Yes.

Q    And you're not required to leave that, take that out of your equation.  You are who you are.

A    Okay.

Q    I guess what I want to make sure of is that when you, knowing who you are, if you can make up your own mind and expect other people in the jury to respect your decision --

JOY KELLY, RPR
U. S. OFFICIAL COURT REPORTER
CHARLOTTE, NORTH CAROLINA
Case 3:12-cv-00327-MOC   Document 100   Filed 09/23/15   Page 74 of 192
256

JA1088

A     Yes.

Q     -- and your wishes in this regard?

A     I understand.

Q     But by the same token, would you expect or would you accord the other jurors that same right to have an opinion even if it's different from yours?

A     Oh, most definitely, yes.  No problem with that.  To me that's understandable.

Q     Okay.  So as I understand it, you would require the government to take you to a point beyond a reasonable doubt that death is the appropriate punishment when compared to the only alternative, which is life imprisonment without the possibility of release?

A     Yes.

Q     Before you would vote for that?

A     Yes, I could.

Q     I just have a couple of quick questions.  In looking at your work, do you work for Bank of America or the temporary service or both?

A     With Bank of America through the temporary service.

Q     Okay.  And how long have you done this job that you have been doing?

A     Oh, about nine months now.  It's been almost a year.

Q     In terms of the -- is it an awful lot of accounting or --

JOY KELLY, RPR
U. S. OFFICIAL COURT REPORTER
CHARLOTTE, NORTH CAROLINA
Case 3:12-cv-00327-MOC   Document 100   Filed 09/23/15   Page 75 of 192
257

JA1089

A    Yes, somewhat.  Yes, it is.  Not accounting in the general sense.  It is not -- it is not a part of the accounting department, but because we are responsible for all the armor, on-ground, inbound transportation for the company, a lot of the reports, statistical data that we produce, it's similar to accounting but we are not a part of the accounting department.

Q    Sort of independent accounting then?

A    It's a -- I'm so relatively new there, that's pretty much the best I can do with that.

Q    It sounds interesting.  Do you enjoy it?

A    Yes, I do.  Yes, I do.

Q    Are you active at St. Paul's?

A    No, I'm not.

Q    Does your faith play any kind of role in who you are and how you conduct your life?

A    Yes, it does.

Q    Ms. Rose asked you a little bit about domestic violence.  There's going to be evidence of domestic violence in this case.  Are you familiar -- have you either seen or read about the effect the of domestic violence on children who grow up in that environment?

A    I've heard of issues, you know, through the TV.  Maybe read magazines or newspapers from time to time.

Q    Do you have an impression in your own mind about what

JOY KELLY, RPR
U. S. OFFICIAL COURT REPORTER
CHARLOTTE, NORTH CAROLINA
Case 3:12-cv-00327-MOC   Document 100   Filed 09/23/15   Page 76 of 192
258

JA1090

effect domestic violence has on children?

A     Yes.  I -- I have my ideas.

Q     Can you share them with us?

A     Well, personalitywise, in their own personal lives, I think it would have the impact of maybe even communicating with people, getting along with people.  Maybe being somewhat of an introvert, you know, playing a impact on their overall personality and lifestyle.

Q     I'm grateful for your answers.  Thank you for taking the time to talk to us.

A     Thank you.

        MS. ROSE:  I make a motion, Your Honor.

        THE COURT:  Okay.  You may be excused.

        PROSPECTIVE JUROR:  Thank you.

        THE COURT:  Thank you very much for your attention to this matter.

        MS. LAWSON:  Your Honor, may I be heard, please before --

        THE COURT:  No.

            (Ms. Campbell exits the courtroom.)

        THE COURT:  Okay.  Now you may be heard.

        MS. LAWSON:  Your Honor, a person doesn't have to be entirely neutral before they can it on a jury of this kind.

        She was maneuvered into giving a quantifiable

JOY KELLY, RPR
U. S. OFFICIAL COURT REPORTER
CHARLOTTE, NORTH CAROLINA

Case 3:12-cv-00327-MOC   Document 100   Filed 09/23/15   Page 77 of 192
259

JA1091

response. And you can be 55 percent toward or have a 55 percent preference to life as long as you can set that aside and she said she could.

THE COURT: Don't you think her answers were consistent with her answers on the preliminary jury questionnaire?

MS. LAWSON: No. I think her -- well --

THE COURT: I mean she said she disagreed with capital punishment.

MS. LAWSON: It's what is your personal view of the death penalty. That is as open a question as can be. It doesn't say well, compared to the life imprisonment without the possibility of release. She can disagree with it but still follow the law. She can have problems with how it's applied and still follow the law and that's the standard.

THE COURT: Well, wait just a minute.

Okay. Her answer was your personal view of the death penalty. Disagree with capital punishment. The only reason I mention that is because you said she was maneuvered into making a statement about these percentages. Now I think that her questionnaire answers indicate that that was where she started from, not the point to which she was maneuvered.

MS. LAWSON: Okay. But then if you go to the next page, she gives the straight up, four in a row, "no"

JOY KELLY, RPR
U. S. OFFICIAL COURT REPORTER
CHARLOTTE, NORTH CAROLINA
Case 3:12-cv-00327-MOC   Document 100   Filed 09/23/15   Page 78 of 192
260

JA1092

answers, which means she's saying she would never -- I mean, they are as confusing to me as they are to the jurors -- she says no, she wouldn't never vote to impose the death penalty, which means she can vote to impose it. She also said that she wouldn't always, in No. 116, vote to impose the penalty of life. So she's demonstrated, as have many, many other jurors who came through here, a willingness to consider it and an indication that she's not totally bound by her statement "I disagree with it." Most of the jurors who have been passed on many of them have said, "I favor. I strongly favor it." And yet they have -- they have been able to articulate exactly what she did, which is consider all the circumstances and follow the law.

Her ability to consider death is not substantially impaired to the point that she should be stricken from the jury panel.

THE COURT: I think one has to make a judgment about the overall presentation of the juror. And in that case one is left with the firm conviction that she would not give, as you all have been indicating, a level playing field. And that being the case, she was properly stricken.

I understand what you're saying and I think there are some nuances that the Court has to pay strict attention to.

There were several jurors early in the process who

JOY KELLY, RPR
U. S. OFFICIAL COURT REPORTER
CHARLOTTE, NORTH CAROLINA

Case 3:12-cv-00327-MOC  Document 100  Filed 09/23/15  Page 79 of 192

261

JA1093

were stricken, not because they didn't give correct literal answers, if there is such a thing, but because the Court was convinced they could not give the defendant a fair trial.

In the case of this last juror, I believe that juror would not do likewise as to the government.

MS. LAWSON: Your Honor, can I ask if that was based solely on her answers or on her demeanor or ....

THE COURT: It was a combination. She twice came back to the well that in terms of her decision-making faculties, she would tilt in favor of not imposing one of the two options of sentences.

And it's not calculus, as we have been saying, either in terms of what the jurors do or what the Court has to do in terms of evaluating the essential fairness of the juror.

MS. LAWSON: Yes, sir. Obviously for the record we object.

THE COURT: Certainly. Exception.

No. 130, please.

(Sheila Sherrill enters the courtroom.)

SHEILA SHERRILL

VOIR DIRE EXAMINATION

THE COURT: Good afternoon. And you are Ms. Sherrill.

PROSPECTIVE JUROR: Yes, sir.

JOY KELLY, RPR
U. S. OFFICIAL COURT REPORTER
CHARLOTTE NORTH CAROLINA
Case 3:12-cv-00327-MOC   Document 100   Filed 09/23/15   Page 80 of 192
262

JA1094

THE COURT: There are a couple of questions I'd like to inquire about, that is to say the answers that you gave on your questionnaire.

Do you recall being with us a couple of weeks ago and doing that questionnaire?

PROSPECTIVE JUROR: Yes, sir.

THE COURT: And you indicated that -- I think that you would always vote for the death penalty --

PROSPECTIVE JUROR: Yes, sir.

THE COURT: -- in a case of murder.

PROSPECTIVE JUROR: Yes, sir.

THE COURT: Would that pretty much be the case irrespective of the particulars of the individual murder?

PROSPECTIVE JUROR: Yes, sir.

THE COURT: Okay. Would there be any questions?

MS. TOMPKINS: No, sir.

THE COURT: We want to thank you very much for participating with us. You'll be excused.

(Mr. Sherrill exits the courtroom.)

THE COURT: No. 136.

(Susan Cohen enters the courtroom.)

THE COURT: Good afternoon. I believe you are Ms. Cohen.

PROSPECTIVE JUROR: That's right.

THE COURT: All right. I think the attorneys will

JOY KELLY, RPR
U.S. OFFICIAL COURT REPORTER
CHARLOTTE, NORTH CAROLINA
Case 3:12-cv-00327-MOC  Document 100  Filed 09/23/15  Page 81 of 192
263

JA1095

THE COURT: Yes, sir. All right. We appreciate very much your participating with us, and we hope you can serve on another case with us another time.

(Mr. Aaron exits the courtroom.)

THE COURT: No. 181, please.

(Debra Moore enters the courtroom.)

THE COURT: Good afternoon, Ms. Whitney, pardon me while I fumble through some papers.

PROSPECTIVE JUROR: It's Moore.

THE COURT: I'm sorry, you are Ms. Moore.

PROSPECTIVE JUROR: Uh-huh.

THE COURT: You indicated that your uncle had been assaulted and murdered in New York City.

PROSPECTIVE JUROR: That's correct.

THE COURT: That's a very sad thing, no doubt. Could you tell us when that happened?

PROSPECTIVE JUROR: 1981.

THE COURT: Okay. And is that something that was a major event in your family's life at that time.

PROSPECTIVE JUROR: Yes.

THE COURT: Could you tell us a little bit about what happened, if it's not too hard for you to do that?

PROSPECTIVE JUROR: As I remember it, he had gone out on a Sunday morning to get his newspaper and this person followed him back into the house and robbed him and stabbed

JOY KELLY, RPR
U. S. OFFICIAL COURT REPORTER
CHARLOTTE. NORTH CAROLINA
Case 3:12-cv-00327-MOC   Document 100   Filed 09/23/15   Page 82 of 192
264

JA1096

him several times with knife.

THE COURT: All right. Now, the question for us today, I think, would be whehter that experience in your family's life would influence you in your ability to consider the evidence in a case of this type?

PROSPECTIVE JUROR: No.

THE COURT: That's something that in your mind wouldn't impair you at all in your ability to consider evidence in this case and be fair to both parties?

PROSPECTIVE JUROR: I don't think it would impair my ability to look at the evidence or whatever.

THE COURT: Okay. The government may inquiry.

**DEBRA MOORE**

**VOIR DIRE EXAMINATION**

BY MS. ROSE

Q   Hi, Ms. Moore. My name is Jill Rose, this is Anne Tompkins and we represent the United States in this case.

Thank you for your patience back here this afternoon. We appreciate your time as well that you took to fill out the questionnaire. It's been very helpful.

I see you work in a law firm. Do they do any criminal law?

A   No.

Q   How long have you been with this firm?

A   Three years with this firm.

JOY KELLY, RPR
U. S. OFFICIAL COURT REPORTER
CHARLOTTE. NORTH CAROLINA
Case 3:12-cv-00327-MOC   Document 100   Filed 09/23/15   Page 83 of 192
265

JA1097

Q    And right before that you worked for legal service?

A    Legal Services of Southern Piedmont.

Q    Now, legal services represent indigent criminal defendants?

A    No criminal.  Civil.

Q    Just civil.  So in looking back, you haven't really been involved in any criminal aspects --

A    No.

Q    -- of the paralegal field.

I see now it's more patient-hospital issues.

A    Right.

Q    You have made arrangements, I see, with your work such that if you're here for three weeks it's not a tremendous -- obviously it's an inconvenience, we wouldn't say that --

A    It will be an inconvenience.

Q    -- but it's not a hardship?

A    Not a hardship.

Q    We appreciate you doing that, taking care of that.

Looking at your questionnaire, let's see, your daughter was a witness in court.

A    Yes.

Q    How long ago was that?

A    Seven years probably.

Q    That was not in her current job with the Postal Service?

JOY KELLY, RPR
U. S. OFFICIAL COURT REPORTER
CHARLOTTE. NORTH CAROLINA
Case 3:12-cv-00327-MOC   Document 100   Filed 09/23/15   Page 84 of 192
266

JA1098

A    No.  No.

Q    What -- it was an armed robbery?

A    She was at a -- going to pay her rent at a building and apparently someone tried to rob somebody in the building and she was in her car preparing to leave.  And apparently they thought she saw him run out or whatever, and she was questioned with other people who were there.

Q    So that didn't rise to the level of her going and testifying in court?

A    No.  I believe she just spoke with some detectives or whatever and they told her that they may call her but they didn't.

Q    And you've never been called -- maybe you have been called to jury duty but hadn't had a chance to serve?

A    I have been called to civil jury duty but I was not chosen.

Q    You also have not been -- have any close friends family or otherwise who have been victims of domestic violence?

A    No.  Just worked with women who work with them.

Q    Tell us about that.

A    As a paralegal at legal services, we interviewed and represented women who needed to file domestic violence claims.  Abuse.

Q    Helping them with protective orders?

A    Got protective orders.  We did weekly -- I guess you'd

JOY KELLY, RPR
U. S. OFFICIAL COURT REPORTER
CHARLOTTE. NORTH CAROLINA
Case 3:12-cv-00327-MOC   Document 100   Filed 09/23/15   Page 85 of 192
267

JA1099

call them just open -- time for people to come in and ask questions about how they go about getting a protective order.

Q    And did you assist them in filling out that paperwork?

A    Assisted them in the paperwork and assisted them in preparing them for court.

Q    Did you actually go to court with them?

A    I couldn't represent them in court but as a paralegal I assisted the attorney in preparing the documentation.

Q    Okay.  So you heard a lot of information about domestic violence situations from them?

A    Uh-huh.

Q    Did any of them come back for other like -- did you all do divorces as well?

A    No.  We mostly did custody work and domestic violence protective orders.

Q    Dealing with the custody issues and the domestic violence, did you hear of children in those homes with domestic violence?

A    Yes.

Q    Was that a concern that was expressed?

A    Uh-huh.

Q    Did you ever follow up with those folks to see how the children were doing or how --

A    No, that really wasn't a part of what we did.

JOY KELLY, RPR
U. S. OFFICIAL COURT REPORTER
CHARLOTTE. NORTH CAROLINA
Case 3:12-cv-00327-MOC   Document 100   Filed 09/23/15   Page 86 of 192
268

JA1100

Q    Did you form any opinions about the effects of domestic violence on children?

A    Yeah, I guess.  I formed -- I think that -- after you do something like that for so long you have to form an opinion.

Q    What kind of conclusions did you come to?

A    About the children?

Q    Yes, ma'am.

A    I felt that they were in bad situations sometimes and it was sad.

Q    But that despite that, they were often -- not situations which they could never come off of?

A    No, I wouldn't think they couldn't.  But like I said, I never really knew about what happened after we assisted them.

Q    You heard what the Judge said by way of his introduction about the jury finding the defendant guilty, and that as a starting point this jury must accept the finding of those guilty verdicts.  And on your questionnaire you said you weren't sure you understood that question, and you probably didn't because you didn't know where it was coming from.  Now that you have heard more from the Court, you do feel comfortable with that?

A    Yeah.

Q    So your sister works with children and teenagers.  Has

JOY KELLY, RPR
U. S. OFFICIAL COURT REPORTER
CHARLESTON, NORTH CAROLINA
Case 3:12-cv-00327-MOC  Document 100   Filed 09/23/15  Page 87 of 192
269

JA1101

she talked with you about her work? Does she do family counseling?

A She does family counseling. She lives in New York and we only see each other about twice a year and when we talk, we're not talking about work.

Q I bet you're not. Tell us about your opinion about the death penalty.

A My opinion of the death penalty. I don't know. I -- I -- I think I believe that that was -- I don't have an opinion about it.

Q When you filled out this questionnaire --

A Uh-huh.

Q -- you probably got some idea of where this case was going?

A Uh-huh.

Q And you have had several weeks to reflect maybe on your answers, maybe planted some seeds in your mind. What have you been thinking since you filled out this questionnaire about the death penalty? Have you considered it?

A I think since -- thinking about it, I at the time thought that we were going to have to listen to the case and make a decision about whether a person was guilty or not. So those were my thoughts. Knowing now that that's already been done and we just have to decide whether he's going to get the death penalty or life, I -- I -- I think it just

JOY KELLY, RPR
U. S. OFFICIAL COURT REPORTER
CHARLOTTE, NORTH CAROLINA
Case 3:12-cv-00327-MOC Document 100 Filed 09/23/15 Page 88 of 192
270
JA1102

depends on what the evidence is.

I'm willing to look at it and make a decision based on what I hear. I don't have a view one way or the other about the death penalty.

Q You -- it's kind of hard to qualify it as maybe a nonopinion or a -- but what's helped you -- what brings you to that point?

I see you're active in your church. Do your religious beliefs have any bearing on that? Anything about your upbringing? Tell us what's helped to get you to that position or no position.

A I think that if -- my religion basically says that those things are -- it's -- we don't determine those things. That it's God's will to say. That's what my religion would say.

Q Would you be able to then go against your religion?

A I would be willing to listen to the facts, whatever is presented, and make a decision based on that.

Q What --

A I -- I don't know.

Q What if the facts went a way that went against your religion?

A I'm sorry, what did you say?

Q What if the facts were in opposition given your position, given your religion, what then?

JOY KELLY, RPR
U. S. OFFICIAL COURT REPORTER
CHARLOTTE, NORTH CAROLINA
Case 3:12-cv-00327-MOC   Document 100   Filed 09/23/15   Page 89 of 192
271

JA1103

A    I don't think my religion would have any bearing on that. I said that's what we -- that's what overall we believe, but I -- I -- I don't feel strongly one way or the other. I -- I -- again, I would just have to make that decision based on what's before me. I can't sit here and say one way or the other.

Q    Do you at this point feel that the government, who is going to stand up before this jury and say you need to return a verdict of death, are we on an equal playing field with you in your ability to consider that?

A    Yes.

Q    You hesitated. I mean -- I know these are tough questions because we're just -- it seems all philosophical. But it's more than philosophical because it's the here and now.

It's not whether you, in reading an article in the newspaper or hearing about some facts or maybe even reading a book, say, "Yeah, I understand that death penalty thing and I'm not for it or against it." But now you're in the position of someone who has to be ultimately fair to both sides. And that's what everybody is entitled to. That's what makes the cogs of the justice system roll. And if you're not in that position, don't feel like you have to be one thing or another but who you are --

A    I understand.

JOY KELLY, RPR
U. S. OFFICIAL COURT REPORTER
CHARLOTTE, NORTH CAROLINA
Case 3:12-cv-00327-MOC  Document 100  Filed 09/23/15  Page 90 of 192
272

JA1104

Q    -- but don't feel you have to serve on a case that you may not be well served?

A    I understand.

Q    We're not saying you wouldn't be a good juror, but this may not be the case for you.

A    Right.  I understand.

Q    We're just asking for honesty, please.

A    I don't have a view one way or the other.  I would look at the facts, whatever is before me, and make that decision at that time.  I don't know what my opinion would be.  I can't say what it would be at this point.  I'm -- that's just it.

Q    What about not necessarily -- can you fairly consider both potential penalties here?

A    I think I can.

Q    And that's all we can ask.  Thank you.

        THE COURT:  Now, Ms. Moore, let me ask you a question.

        As you've heard before, we're just looking at your straight-up answers as honestly you can make them.  And assume that you know absolutely nothing about this case.  In other words, the facts of the case you know nothing about but you are aware of your duty to weigh whatever facts the government wants to put in as to whether it could prove to you beyond a reasonable doubt certain aggravating factors.

JOY KELLY, RPR
U. S. OFFICIAL COURT REPORTER
CHARLOTTE, NORTH CAROLINA

Case 3:12-cv-00327-MOC   Document 100   Filed 09/23/15   Page 91 of 192
273

JA1105

And the defense would endeavor to prove to you, if it saw fit, certain mitigating factors. And you would be asked to consider those if they are proved beyond -- by a preponderance of the evidence, then you may consider those. So that would be your duty.

Looking at facts under the scheme of proof where the government has a larger burden to prove facts and the defendant then may offer evidence, if he sees fit, but in the end it's the jurors' decision whether the death penalty is justified or whether a life sentence is the appropriate sentence. And the question for you would be whether you personally, given your personal beliefs, could render a decision one way or the other in that framework, or whether you would simply already be predisposed in that regard?

PROSPECTIVE JUROR: I would not already be predisposed.

THE COURT: Okay. Thank you very much.

MS. ROSE: Thank you, Judge. I don't have any other questions.

VOIR DIRE EXAMINATION

BY MR. BENDER

Q    Good afternoon, Ms. Moore.

A    Good afternoon.

Q    I guess you remember that I'm Harold Bender and Ms. Jean Lawson and we represent Marc and we're assisted by

JOY KELLY, RPR
U. S. OFFICIAL COURT REPORTER
CHARLOTTE, NORTH CAROLINA
Case 3:12-cv-00327-MOC   Document 100   Filed 09/23/15   Page 92 of 192
274
JA1106

David Ball in this matter. We appreciate your honest answers and candor in this matter so far. We'll just take a minute of your time.

As juror you come in here with whatever your life experience has been. That's made up of your religion, your education, your work experience, your upbringing with your sister and I guess four other brothers?

A    Four --

Q    Four brothers?

A    Four sisters, one brother.

Q    Well, okay. I apologize for getting that wrong.

A    Okay.

Q    Anyway, you come in here with all of that. You're your own person. You walk in your own shoes. Do you understand that?

A    Uh-huh.

Q    Do you agree with that?

A    I agree with that.

Q    And as such you are entitled or actually have the right to your values, your opinions, your beliefs to be honored and respected by other jurors, whatever they may be. Do you understand that?

A    Uh-huh.

Q    Do you agree with that?

A    I agree with that.

JOY KELLY, RPR
U. S. OFFICIAL COURT REPORTER
CHARLOTTE. NORTH CAROLINA

Case 3:12-cv-00327-MOC   Document 100   Filed 09/23/15   Page 93 of 192

275

JA1107

Q    Will you insist on it if you're a juror?

A    I will.

Q    And by the same token, each and every juror that you serve with has the same right to have their beliefs and opinions honored in this process. Would you be able to do that, honor their opinion and beliefs, even if they may be different than yours?

A    Yes.

Q    Because they have the same right.

A    Right.

Q    And if you have a strongly held belief that you just simply can't set aside, you have the right to maintain that throughout. Do you understand that?

A    I understand that.

Q    You're not just going to go along to get along sort of in this very serious matter.

A    Uh-huh.

Q    That's not inferring in any way that you're not supposed to have dialogue with other members of the jury and try to come to an appropriate decision in this matter. Do you understand that?

A    Uh-huh.

Q    That's sort of the jury process. Okay.

    I think most of the questions about domestic violence have been answered but I do want to ask one question.

JOY KELLY, RPR
U. S. OFFICIAL COURT REPORTER
CHARLOTTE. NORTH CAROLINA
Case 3:12-cv-00327-MOC   Document 100   Filed 09/23/15   Page 94 of 192
276

JA1108

When people would come in in an abusive situation and needed a protective order or whatever else the legal services did, would you have occasion to meet the children? Did they sometimes bring their children in with them?

A    Uh-huh.  They would bring them to the office.

Q    Have you had occasion to interact with them?

A    Not necessarily.  Normally we put them in a place where they can play.

Q    Okay.

A    Because we -- that wasn't our responsibility.

Q    Right.  How long were you with legal services?

A    About 15 years.  15, 16 years.

Q    Okay.  And was that when you decided you wanted to be a paralegal or continued to work in the legal field?

A    Right. I guess.  I just got a job as a legal secretary, in fact, and I guess the longer I enjoyed the work and just -- that's what I did.

Q    Tell us a little bit about what you do -- let me get the name here of the law firm -- Turner, Enochs and Lloyd?

A    Uh-huh.

Q    Tell us a little bit about what you do with that law firm.

A    I work in the health law section of the firm and the firm has a contract with a major hospital and -- to help people in the hospital who do not have a means of making

JOY KELLY, RPR
U. S. OFFICIAL COURT REPORTER
CHARLOTTE, NORTH CAROLINA

Case 3:12-cv-00327-MOC   Document 100   Filed 09/23/15   Page 95 of 192

277

JA1109

payments, so they don't have insurance or whatever.

Q    Right.

A    So our firm provides legal experts to the financial counselors at the hospital to advise them about other sources of payment. And my major field is Medicaid and Medicare.

Q    And I notice something about administrative hearings. Are there administrative hearings in the Medicaid, Medicare field?

A    Yes. If we decide that the patient should apply for Medicaid, and if they are denied, we go to administrative hearings with the Department of Social Services.

Q    Are they normally held before an administrative law judge?

A    Initial hearings are held before Medicaid supervisors and the state appeal hearings are heard before state hearing officers and they don't really call them administrative law judges because I think that's the Social Security side of it.

Q    And you don't get involved in Social Security disability or anything like that, do you?

A    We do. We have to be familiar with the Social Security rules regarding disability because that's a piece of Medicaid. People apply if they are disabled so you have to apply the Social Security rules to that.

JOY KELLY, RPR
U. S. OFFICIAL COURT REPORTER
CHARLOTTE NORTH CAROLINA
Case 3:12-cv-00327-MOC   Document 100   Filed 09/23/15   Page 96 of 192
278

JA1110

Q    Okay.  You have -- you've told us about one sister in New York.  Where are your other sisters?

A    I have another sister there who is retired.  She was a principal of a school in the Bronx and she retired about three years ago.  I have a brother who is a school teacher, a sister who is a nurse, and another sister who is a minister and works for a collection agency.

Q    And are all of them located in and around New York City?

A    No.  Just the two sisters.  My two older sisters live in New York and the rest of us are here.

Q    Okay.  Do you attend your sister's church?

A    My sister -- we go to church together.

Q    You indicate she was a minister?

A    She is a -- she doesn't have a church.  She's an associate minister at our church and is on the ministerial staff there.

Q    You never have been engaged in criminal law?

A    No.

Q    Ms. Moore, thank you very much for your honest answers and your help in helping us in this process.  Thank you, ma'am.

PROSPECTIVE JUROR:  Thank you.

THE COURT:  The clerk will give you a sheet of paper, Ms. Moore, that gives you a number to call.  We

JOY KELLY, RPR
U. S. OFFICIAL COURT REPORTER
CHARLOTTE, NORTH CAROLINA

Case 3:12-cv-00327-MOC   Document 100   Filed 09/23/15   Page 97 of 192

279

JA1111

appreciate it.

(Ms. Moore exits the courtroom.)

THE COURT: 204.

(Marybeth Whitney entersthe courtroom.)

THE COURT: Good afternoon.

PROSPECTIVE JUROR: Hello.

THE COURT: I believe you are Ms. Whitney.

PROSPECTIVE JUROR: Right.

THE COURT: And the attorneys will have some questions to you.

PROSPECTIVE JUROR: Okay.

THE COURT: The government may inquire.

MS. TOMPKINS: Thank you, Your Honor.

MARYBETH WHITNEY

VOIR DIRE EXAMINATION

BY MS. TOMPKINS

Q   Good afternoon. Again, I'm Anne Tompkins, this is Jill Rose. We represent the United States in this case.

I'm going to ask you some questions that come from your answers on the questionnaire.

A   Okay.

Q   Since this is a sentencing hearing in which there are two possible punishments, life imprisonment without release and the death penalty, a lot of my questions are going to focus on your philosophy about the death penalty given this



that.

PROSPECTIVE JUROR: It would be. I'm a single parent, so if that were the case -- I just started working a second job so that would definitely be a hardship.

THE COURT: Any questions further.

MS. TOMPKINS: No, sir.

THE COURT: Thank you very much for bringing that to our attention.

MS. TOMPKINS: Thank you, Your Honor.

(Ms. Falls exits the courtroom.)

THE COURT: 222, please.

(Deana Stanford enters the courtroom.)

THE COURT: Good afternoon.

PROSPECTIVE JUROR: Good afternoon. I believe you are Ms. Standfield.

PROSPECTIVE JUROR: Stanford.

THE COURT: I'm sorry. Stanford.

As you well know, the jury will be asked certain questions, the government may have some and then the defense may have some.

MS. ROSE: Thank you, Your Honor.

DEANA STANFORD

VOIR DIRE EXAMINATION

BY MS. ROSE

Q    Good afternoon. My name is Jill Rose. This is Anne

JOY KELLY, RPR
U. S. OFFICIAL COURT REPORTER
CHARLOTTE, NORTH CAROLINA

Case 3:12-cv-00327-MOC   Document 100   Filed 09/23/15   Page 99 of 192

281

JA1113

Tompkins again.

Thank you, Ms. Stanford, for being with us this afternoon and for taking the time to fill out this questionnaire previously. It was very helpful.

As the Judge told you earlier, this is just a sentencing hearing, verdicts of guilty having already been returned on the charges.

Can you accept the verdict of the previous jury?

A    Yes.

Q    You wouldn't require the government to come back in and reprove that guilt to you?

A    No.

Q    This is a whole separate phase.

Now, in a case -- you heard a little bit about the circumstances that supported the finding of guilt in this case. Obviously you wouldn't be here if the sentence were automatic. Even in cases where there is a first degree murder, it's not automatic death penalty, it's not automatic life imprisonment without the possibility of release. That's the purpose of the hearing.

Knowing now a little bit more about what this is about, is there anything personally, religiously, philosophically, morally that would prevent you from sitting on this case as a fair and impartial juror giving both sides equal consideration?

JOY KELLY, RPR
U. S. OFFICIAL COURT REPORTER
CHARLOTTE, NORTH CAROLINA

Case 3:12-cv-00327-MOC   Document 100   Filed 09/23/15   Page 100 of 192
282

JA1114

A    No.

Q    In looking at your questionnaire, one of the questions was your feeling on the death penalty and you did not respond to that.  Would you please tell us your opinions on the death penalty?

A    I think in certain circumstances that it's probably warranted.

Q    However, you did note you don't feel strongly at all about it.  Would you tell us what has helped to formulate your opinions on the death penalty?

A    I'm not quite sure I understand what you're asking.

Q    Well, religion, upbringing, reading, friends?  It's the law of the land.  It's a legal penalty.

A    Right.

Q    But what has helped you form your determination that it's okay in certain circumstances but you don't feel strongly about it --

A    I think what I meant is I don't feel a definite one way.  I think it would depend on the case.

Q    You said -- you did check here, "I am uncertain how I feel about the death penalty."

A    I think I was responding to uncertain whether I'm a solid -- I'm not solid one way or the other.

Q    Can you keep -- equally and fairly can you keep both punishments or penalties in your consideration?

JOY KELLY, RPR
U. S. OFFICIAL COURT REPORTER
CHARLOTTE, NORTH CAROLINA
Case 3:12-cv-00327-MOC   Document 100   Filed 09/23/15   Page 101 of 192
283

JA1115

A    Yeah.  Oh, yeah.

Q    The way this hearing works, as the Judge explained a little bit, is that the government would present aggravating factors, evidence of aggravating factors, an aggravating factor being a factor or circumstances that would tend to support the death penalty.

A    Uh-huh.

Q    Legally.  The defense doesn't have to put on any evidence.  If they do, it will be in the form of mitigating factors, which is evidence or circumstances which would tend to support their position of life imprisonment without release.

A    Uh-huh.

Q    And then it becomes the job and duty within the legal framework given by the Judge, the job and the duty of the jury to weigh the aggravating against the mitigating and determine then based upon that weighing process which one is the true verdict.

A    Okay.

Q    That's kind of the procedure here.

A    Okay.

Q    As we sit here today, are either of those options open to you equally?

A    Yes.

Q    You don't lean either way?

JOY KELLY, RPR
U. S. OFFICIAL COURT REPORTER
CHARLOTTE. NORTH CAROLINA

Case 3:12-cv-00327-MOC  Document 100  Filed 09/23/15  Page 102 of 192
284

JA1116

A    No.  No.  It would depend on the situation.

Q    You want to hear the evidence?

A    Yeah.  I mean yes, honestly.

Q    And then once you've heard the evidence and the law then you can consider both of them?

A    Yeah.

Q    Thanks for answering that for us.

Now, let's see, you did note earlier -- double-check -- that you had heard something about that case.

A    Yes.

Q    Where?

A    I can recall reading an article in "The Observer".

Q    Recently?

A    No.  It's been when the incident originally occurred.

Q    Do you recall any of the specifics any differently than what you heard?

A    Not any differently than he reminded -- the name did not ring a bell at all until he started giving information about it and then I recalled that.

Q    Anything about hearing that that where you automatically formed an opinion as to the result of what should happen?

A    No.

Q    Once again, that's not evidence.  You've got to wait and hear the evidence as it comes from that witness stand

JOY KELLY, RPR
U. S. OFFICIAL COURT REPORTER
CHARLOTTE, NORTH CAROLINA
Case 3:12-cv-00327-MOC   Document 100   Filed 09/23/15   Page 103 of 192
285

JA1117

and you said you could do that?

A    Yeah.

Q    You're a nurse and have you let them know you may be out of pocket for a couple, three weeks?

A    Yes.

Q    Thank you for doing that.

Anything about -- anything about your chosen profession, your career, that falls into that balancing of the death penalty given you've taken that oath about saving a life, do you feel those two come together, are you looking at one as job related and the other as law of the land.  Talk to us a a little bit about that.

A    I see them as differently.

Q    We may have some medical testimony during the course of the trial, and the Judge will tell you that whether it's medical or law enforcement or psychological or just an everyday lay witness that it's the job of the jurors to consider that evidence and determine the believability or the credibility of witnesses.  And can you do that for all of those folks, equally and fairly?

A    Yes.

Q    Flipping through here let me see.  You have a cousin who is with CMPD?

A    Correct.

Q    Do you talk with them about their work?

JOY KELLY, RPR
U. S. OFFICIAL COURT REPORTER
CHARLOTTE, NORTH CAROLINA
Case 3:12-cv-00327-MOC   Document 100   Filed 09/23/15   Page 104 of 192
286

JA1118

A    When I see him I do.  He's a parole officer now.

Q    What's his name?

A    Mat Thompson.  Used to be with robbery.

Q    Have you ever seen him in the hospital?  You don't work in emergency, do you?

A    No.  No.  And no, it's just family things I see him at actually.

Q    Do you deal with any domestic violence in your work, victims of domestic violence?

A    Rarely.  I mean it does happen but I don't sit there --

Q    Do you deal with -- other than perhaps your medical training, psychologists, psychiatrists?

A    No.

Q    You said the two most important things you can teach your children, things you learned from your parents, common sense.  That's really what we need here in the courtroom. We don't ask you to leave that at the door.  When you come in you use your reason and common sense as you evaluate the testimony and the evidence.  I don't know if you can teach common sense but it's a good thing to have.

A    I hope it's in their gene pool.

Q    Your mother served as a juror in murder trial.  Did she talk to you about that at the time?

A    It's a number of years ago.  20 years ago.  Just that it was a murder thing.  Afterwards I think she told us a

JOY KELLY, RPR
U. S. OFFICIAL COURT REPORTER
CHARLOTTE, NORTH CAROLINA

Case 3:12-cv-00327-MOC   Document 100   Filed 09/23/15   Page 105 of 192

287

JA1119

little bit more, but we were young enough that we didn't need detail. She felt like we didn't need details on anything. I have no idea what it was about.

Q In that you have a cousin who is a police officer, and I touched on this briefly, but there was a question in here in general do you think law enforcement is more likely to tell the truth than anybody else. You said "I somewhat agree." Is that based on what?

A They are human.

Q Will you weigh their testimony like you would anybody else's?

A Probably.

Q Just because they are wearing a badge doesn't mean that --

A I mean I think everybody tries to tell the truth but everybody has their own perception, also, of how things occur.

Q And that's the job of the jury to take what you hear from the witness stand, all the witnesses, and evaluate the credibility, believability by their demeanor, by how it fits in with the other evidence and talk about that together with other jurors.

A Right.

Q The Judge will instruct you as to that. All right. Thank you very much.

JOY KELLY, RPR
U. S. OFFICIAL COURT REPORTER
CHARLOTTE, NORTH CAROLINA

Case 3:12-cv-00327-MOC Document 100 Filed 09/23/15 Page 106 of 192
288

JA1120

**VOIR DIRE EXAMINATION**

**BY MS. LAWSON**

Q    And you thought it was almost over?

A    I know.

Q    Ms. Stanford, I'm Jean Lawson. Harold Bender and I represent Marc Barnette. We're assisted by David Ball.

I'm not going to ask a whole lot of questions, but we have been reading your questionnaire and listening to you.

Just a couple, though. Did you -- what made you become a nurse? Was it your mother's example?

A    Probably that was the most -- the largest factor. I kind of always knew that's what I wanted to do. Just -- people need to feel better and that was my make-them-feel-better-kind of thing.

Q    Was she also in labor and delivery?

A    She actually was when I was a very young child. But most of her working years were not in that. Not in a hospital.

Q    Did she move into doctor's office?

A    Both doctor's office and occupational health.

Q    Did you do any other kind of nursing duty before -- nurses, I think -- what you've got is really one of the happier jobs in a hospital. What did you have to do to work your way through to get there?

A    Actually I did not. When I was in school, though, I

did work in the operating room so that's the only other experience I have had.

Q    Do you find when you're assisting in the labor aspect that you get to know your patients?

A    Oh, very much so.

Q    There will be some evidence in this case of very young girls giving birth to children.  Have you experience assisting those children having children?

A    A few, yeah.

Q    Is there anything special that you take away from that, anything special that affects how you look at children and that kind of early maternity, those issues, and how it affects them and the children later in life?

A    Probably.  I think it's probably very individual.  The person -- you know, you can't say across the board every 16-year-old is going to be a terrible mother when they are 30, if that's what you mean.

Q    Yeah.

A    I think everybody -- I mean everybody can be so different.  There's a lot that really do well.  But in the very beginning of it, I can't see that far forward -- you know, you can't predict that far forward.

Q    Plus you're not seeing them in the most normal of circumstances?

A    Right.

JOY KELLY, RPR
U. S. OFFICIAL COURT REPORTER
CHARLOTTE, NORTH CAROLINA
Case 3:12-cv-00327-MOC   Document 100   Filed 09/23/15   Page 108 of 192
290

JA1122

Q      Your husband's job as a fire fighter, has he ever delivered a baby?

A      Actually he has, yeah.

Q      How long ago was that and how did that affect you?

A      It was prior to us ever meeting.  I think it was in a car in a gas station because they stopped there and called the medics or EMTs.

Q      So it's a family thing?

A      It's become that way.

Q      There's a certain amount of evidence the jury is going to hear in this case about domestic violence.  And having been in a hospital setting, do you have any experience outside of what you see in the hospital in terms of research, reading studies or perhaps even knowing people who are involved in domestic violence situations?

A      Not very much at all.

Q      So I take it that whatever you hear you'll be able to listen to, won't be so distressed by the subject matter that you would close an ear to it?

A      No.

Q      In this jury service you bring everything that makes you you into the courtroom.  All your background, your experiences, the things that you hold important, talking about family values in the questionnaire.  You don't leave those outside the courtroom door.  That is part of who you

JOY KELLY, RPR
U. S. OFFICIAL COURT REPORTER
CHARLOTTE. NORTH CAROLINA

Case 3:12-cv-00327-MOC   Document 100   Filed 09/23/15   Page 109 of 192

291

JA1123

are and it's you as an individual, everything you are as a juror. And you have a right to have the other jurors listen to you and respect your decisions and your opinions and honor them. Do you agree with that?

A Yes.

Q And by the same token the other jurors have that same right to have you listen to them but also to be allowed to have their opinions and decisions respected?

A Uh-huh.

Q Do you have any difficulty with that proposition?

A No.

Q Okay. And if during the course of your deliberations, after listening to the other jurors, if you remain persuaded of a particular decision or opinion, are you able to hold on to that opinion?

A I would think so, yes.

Q So you wouldn't kind of go along to get along? You wouldn't give up a strongly held position that you had simply because it was easier than holding on to it?

A No.

Q I know you said that your mother's experience on a murder trial, you didn't get the details. Did you pick up anything from her about her jury experience in general, for instance, did she ever say, "I'll never go back on a jury again"?

JOY KELLY, RPR
U. S. OFFICIAL COURT REPORTER
CHARLOTTE, NORTH CAROLINA
Case 3:12-cv-00327-MOC Document 100 Filed 09/23/15 Page 110 of 192
292

JA1124

A    Actually what I picked up from her was that's something we all need to do, that's something we all need to experience. So I didn't have a problem coming. Initially I didn't put any request to be let out of this because that's something we all need to do as citizens. And I think that started from possibly -- well, from upbringing too, but her having done that, I guess I saw, well, she did her part. I ought to also.

Q    Where did you get your nursing from?

A    UNC Charlotte.

MS. LAWSON: Thank you very much. We appreciate you answering questions. I'm the last one.

THE COURT: The Court has a notice for you. It has a phone number on it and if you'd call that as indicated we'd appreciate it.

PROSPECTIVE JUROR: Okay.

(Ms. Stanford exits the courtroom.)

THE COURT: 212 please.

(Stephen Maskol enters the courtroom.)

STEPHEN MASKOL

VOIR DIRE EXAMINATION

THE COURT: Good afternoon, sir.

PROSPECTIVE JUROR: Hello.

THE COURT: Your name is Mr. Maskol.

PROSPECTIVE JUROR: That's right.

JOY KELLY, RPR
U. S. OFFICIAL COURT REPORTER
CHARLOTTE, NORTH CAROLINA

Case 3:12-cv-00327-MOC   Document 100   Filed 09/23/15   Page 111 of 192
293

JA1125

F L E D
IN COURT
CHARLOTTE. N. C.

JUL 29 2002

U.S. DISTRICT COURT
W. DIST. OF N. C.

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | DOCKET NO. 3:97-cr-23-V |
| vs. | ) | |
| AQUILIA MARCIVICCI BARNETTE, | ) | VOLUME 11 |
| Defendant. | ) | |

JURY SELECTION
BEFORE THE HONORABLE RICHARD L. VOORHEES
UNITED STATES DISTRICT COURT JUDGE
JULY 27, 2002

<u>APPEARANCES</u>:

On Behalf of the Government:

    ANNE M. TOMPKINS, ESQ.
    JILL WESTMORELAND ROSE, ESQ.
    227 West Trade Street, Suite 1700
    Charlotte, North Carolina

On Behalf of the Defendant:

    JEAN B. LAWSON, ESQ.
    P.O. Box 472106
    Charlotte, North Carolina

    HAROLD J. BENDER, ESQ.
    200 North McDowell Street
    Charlotte, North Carolina

Cheryl A. Nuccio, RMR-CRR
Official Court Reporter
United States District Court
Charlotte, North Carolina

SATURDAY MORNING, JULY 27, 2002

THE COURT: Good morning. Doesn't feel unbearably hot in here, just yet anyway.

MR. BENDER: Judge, may I bring something to the court's attention before we begin?

THE COURT: Yes.

MR. BENDER: Last night as I was reviewing the transcripts of the jury selection, there was a gentleman by the name of Kraig, spelled with a K, Allen who appears as the last potential juror on July the 25th. He was the -- just to refresh Your Honor's recollection, he was the man who worked for Joe Gibbs Racing. Was a janitor.

THE COURT: I recall him.

MR. BENDER: Yeah. I asked him about the 18 and the 20 car and questions along those lines.

THE COURT: Yes, sir.

MR. BENDER: I had your law clerk check the times that you had for us. The government took thirteen minutes. I took sixteen minutes. And in ten pages of transcript for the government and four pages of transcript for me, there's nothing in there about the 18 or the 20 car. There's nothing in there about the walk in your own shoes thing, which I have been consistent in ad nauseum and -- I'm not concerned about this juror. We have sufficient notes to make a reasoned decision on him. What concerns me is if we're not getting a

full, complete, accurate transcript, we need to know that and we need to do something about it, so...

THE COURT: Well, you're quite right. We will inquire of Ms. Kelly and ask her to review her notes again and the -- her computer program as recorded on disk and her -- and the backup tape, if necessary, to determine what happened. And we'll have to ask her, then, if that could be happening in other instances.

MR. BENDER: Right.

THE COURT: In other words, why it happened and what might be the cause.

MR. BENDER: It's a concern and I'm sure it's a concern shared by the government.

THE COURT: I'm quite sure.

MR. BENDER: I have one other --

THE COURT: You didn't come across other instances of that as of so far?

MR. BENDER: So far --

THE COURT: Okay.

MR. BENDER: -- I did not.

THE COURT: Okay.

MR. BENDER: I have one other matter. Judge, we will be -- as you call a number, we may be asking to renew a cause challenge for various reasons. And I don't know whether you want to call all twelve, let me address any that might be

in the twelve, or, as one is called, if I think I have a renewed cause challenge. I just don't know how you want us to do that.

THE COURT: That might be the efficient way to do it.

MR. BENDER: Okay.

THE COURT: Because as to certain ones it might be moot and save a little time.

MR. BENDER: Right.

THE COURT: So what we'll do is -- I have Ms. Calkins' list and it's a random ordering of the 65 jurors who in the end were qualified.

And the first juror in the box is number 132. That is Martens, M-a-r-t-e-n-s.

And the second one is juror 15. That is Mills, M-i-l-l-s.

The third is 243. That is Patterson.

Fourth is Bryson, number 121.

Fifth is 70, Sanders.

Sixth is 100, Lyles, L-y-l-e-s.

And seven is Anderson, number 26.

And eight is 186, Robinson.

And nine is 266, Reinhardt, R-e-i-n-h-a-r-d-t.

Ten is Matteson, M-a-t-t-e-s-o-n, number 133.

MR. BENDER: Your Honor, with regard to that one, we

would renew our cause challenge.

THE COURT: All right. Number 141 is eleven. That is Greenwood.

And twelve is number 82, Johnson.

Inasmuch as there may be more than one juror with the same name, I will -- although you have the number to identify, I will put the first name with these.

Going from one to twelve, it's Ann Martens.

And two is Kimberly Mills.

And three is Carol Patterson.

And four is Carla Bryson.

And five is Regina Sanders.

Six is Lee Lyles.

And seven is Steward Anderson.

And eight is Rita Robinson.

And nine is Joseph Reinhardt.

And ten is Randall Matteson.

Eleven is Joanna Greenwood.

And twelve is Sheila Johnson.

Do you have it there when we talked to Mr. Reinhardt?

MR. BENDER: I believe it was yesterday afternoon -- yesterday. I believe he was yesterday afternoon.

THE COURT: I believe you're right.

THE COURT REPORTER: You wouldn't have that one

yet. Joy is not here.

THE COURT: Do you want to add anything to what you already argued?

MR. BENDER: Judge, it's Matteson that I was renewing my objection.

THE COURT: Oh, Randall Matteson.

MR. BENDER: Yes.

THE COURT: Okay.

MR. BENDER: I'm sorry.

THE COURT: That was 7/24. Did you want to be heard about him?

MR. BENDER: Yes, sir, Your Honor.

The cause challenge made at the time was concerning his agreement that police officers tend to tell the truth. And on page 15 -- well, beginning on page 1561, at the bottom of the page about page -- line 17, on down through 1562, I make a motion at line 7.

Then there's a follow-up voir dire by Ms. Tompkins. And his answer during rehabilitation was, as Ms. Tompkins tried to rehabilitate him, he said, I wouldn't say I wouldn't absolutely believe them, but I tend to believe them more.

Question: Right. Because they're a sworn officer.

Right.

And based on --

THE COURT: Now, what line are you on?

MR. BENDER: I am on -- I go down through line 7 is where I made my motion.

THE COURT: I don't -- I've got page 1561, but line 7 --

MR. BENDER: 1562, Judge, I'm sorry. It starts at the bottom of page 1561 and goes to the top of page 1562.

THE COURT: Well, tell me what page you're on. That helps.

MR. BENDER: I'm on page 1561 at the bottom beginning at line 17.

THE COURT: Okay.

MR. BENDER: Through the end of that page, through the top of page 1562 down through line 7 where I make my motion.

THE COURT: All right, sir.

MR. BENDER: Okay. Rehabilitation. And then line -- through line 12 -- 12 through 19 is where the juror says -- actually, on line 16 it says, I wouldn't say I wouldn't absolutely believe them, but I tend to believe them more.

Right. Because they're a sworn officer.

Right.

Based on that Eighth Circuit case that I tendered to the court, I ask that our cause for challenge -- our renewed cause for challenge be granted.

The Fourth Circuit case that we looked up when this

Case 3:12-cv-00327-MOC   Document 100   Filed 09/23/15   Page 118 of 192

300

JA1132

issue first arose, in my opinion, doesn't answer this question. The Fourth Circuit case simply says it's not pro se error -- per se error for the -- for the court not to ask about the law enforcement questions during a --

THE COURT: All right. Taking all of his answers together, including that there are corrupt police all over the news nowadays, the court denies the motion.

MR. BENDER: Okay.

THE COURT: Okay. So we have twelve in the box. Is the government prepared to tell us which ones it will strike?

MS. TOMPKINS: Yes, sir. Government will strike number 15, which is juror number 2 -- how are you going to do that? By juror number?

THE COURT: Well, tell us where they are in the box.

MS. TOMPKINS: Okay. Juror number 2, juror number 4, juror number 5, juror number 7, and juror number 8.

MR. BENDER: Your Honor, as to juror number 4, we make a Batson challenge. As to juror number 5, we make a Batson challenge.

THE COURT: All right. Now, your -- what is your prima facie case?

MR. BENDER: Judge, of the jurors called --

THE COURT: Jurors what?

MR. BENDER: Of the jurors called, the twelve here.

THE COURT: Yes.

MR. BENDER: Okay. These are the only two black females in the -- in the twelve. There is a black male, Mr. -- juror number 6.

The questioning, as I recall, of these jurors was that we have -- that -- their answers were no different than anyone else, any white female or any white male or --

THE COURT: Well, aren't you anticipating the government's -- whatever statement they might make about that?

MR. BENDER: Well --

THE COURT: I'm glad to hear anything else you want to say about it.

MR. BENDER: Well, of course, our client is African-American and these are two African-American females who said they could be fair in this matter. There are seven black females in the pool and the government is eliminating two of them, and we believe it's based on race and the exercise of peremptory challenge should not be allowed for these blacks.

THE COURT: Okay. You're saying as of the twelve that are in the box, there are three African-Americans.

MR. BENDER: Yes, sir.

THE COURT: Is that right?

MR. BENDER: Yes, sir.

THE COURT: Okay.

MR. BENDER: And two of those are black females and they are eliminating -- asking to be allowed to eliminate two of them. They answered just like everybody else.

As to Ms. Bryson, she is a graduate of --

THE COURT: Wait just a minute, if you will.

MR. BENDER: Yeah.

(Pause.)

THE COURT: Okay. What -- are you through, Mr. Bender?

MR. BENDER: Well, Judge, this young lady's father was in law enforcement. He was a detective with the Gaston County Police Department. He is now with the sheriff's department. She is a college graduate.

She says that -- in her -- on her death penalty questions, I can't say I'm really for the death penalty or totally against it. I haven't formed any serious, hard core judgment on that. And she says, Sometimes I'm for it; sometimes I'm against it. So I think that's the kind of juror we want.

THE COURT: Okay. What does the government say by way of explanation?

MS. TOMPKINS: Just for the record also, we just want to note that there's a black female victim in the case so that factually there's not an obvious racial bias. There's a

black victim and a white victim.

In this particular juror's case, on the questionnaire she noted that her personal view of the death penalty waivers; and that she was not sure whether she favored abolishing the death penalty; and marked on the questionnaire that she was uncertain about how she felt on the death penalty.

In questioning, she called herself, quote, a straddler. And again, said that she was uncertain about how she felt about the death penalty.

And for those reasons, the government is exercising a peremptory strike on her.

THE COURT: All right. Now, let's go to number 50, Regina Sanders.

MR. BENDER: No 70, Judge.

THE COURT: Excuse me, her number is 70.

(Pause.)

MS. TOMPKINS: I'm sorry, Your Honor. Ms. Sanders --

THE COURT: Wait just a minute.

MS. TOMPKINS: I'm sorry.

THE COURT: I think we need to hear from Mr. Bender as to his prima facie case, or Ms. Lawson.

MS. LAWSON: Yes, Your Honor. Ms. Sanders is an African-American female. Mr. Barnette is an African-American

male.

Ms. Sanders is -- her statements to the court were July 19th in the afternoon starting at page 888. She is an entrepreneur. Operates a part-time mailing business from her home. She has started a master's level program in sociology. She is as well educated if not more educated than a number of members in the jury. She indicated that she understood the law. Would accept the law as stated by the court. That she had no hesitation in accepting the guilty verdict.

What she did, though, Your Honor, is she expressed the opinion that some socioeconomic groups may have been selected for capital punishment, and I think that that may be why the government is striking her. I think I'd refer you to the bottom of page 891 of the transcript. The problem is that she says the truth. She recognizes something that she recognizes out of her experience is a matter of race. And that's critical because that's exactly what _Batson_ addresses is the recognition by African-Americans that some cases are singled out for capital punishment. I don't think that there's any clearer indication of why _Batson_ exists and that is that some people of the African-American race believe that some people are singled out for capital punishment. That's, you know, a perception that people of that race may well hold. And that's a distinction. It's a distinction that we don't see in other jurors, the white jurors, and that's why

JA1137

she's being taken off the jury, because she expressed a view that some people are singled out, some socioeconomic groups.

THE COURT: That's the basis -- I mean, <u>Batson</u> has a basis but we're not arguing the basis of it.

MS. LAWSON: Right.

THE COURT: You would -- would you say that her concern that certain groups have been unfairly selected for punishment, would you think that would go -- that would indicate an extraneous influence on her decision making process apart from the facts of this case?

MS. LAWSON: What I'm saying is that they wouldn't. She said they wouldn't. But that she recognizes that there is a socioeconomic issue there that is of some concern.

Other jurors expressed discrete concerns. For instance, some jurors said that they would only approve of the death penalty as punishment if the victim was a police officer or if the victim was a legislative official. What she's saying is some valid expression of concern about how it's applied in general, how cases are selected for capital prosecution. And I think that that expression of opinion is -- you know, indicates a valid, well-educated concern, but she said that she could follow the law.

THE COURT: All right. Is that all?

MS. LAWSON: Yes, sir.

THE COURT: I'll hear from the government.

Case 3:12-cv-00327-MOC   Document 100   Filed 09/23/15   Page 124 of 192

JA1138

MS. TOMPKINS: Your Honor, Ms. Sanders said that she had strong feelings about the fairness of the death penalty and actually the unfairness of its application against socioeconomic, race and age factors which she thought made the application of the death penalty unfair. And she stated that because of this, it is applied unfairly and she was not sure she could be fair. And for that reason we are exercising a peremptory strike.

And also, just for the record, and each time I'll reiterate that there is an African-American female victim in the case.

THE COURT: Okay.

MS. LAWSON: I would just point out, Your Honor, that at page 893, she confirmed that she would take part in the deliberations with a fair and open mind. Said, I would keep an open mind. And, you know, the balance of her colloquy makes it clear that she'll do exactly what the other jurors said they would do fairly and impartially.

THE COURT: The court finds that in both of these cases the government has made a race neutral explanation. Consequently, the burden falls on the defendant to make an overall showing concerning a purpose of discrimination.

Is there anything further that the defense would like to say to that?

MR. BENDER: No, Your Honor.

JA1139

THE COURT: Okay. Those challenges are disallowed. So numbers -- jury box numbers 2, 4, 5, 7, and 8 are stricken at the request of the government.

I'll ask the clerk to replace those jurors and that is to be done by going down the list. And the juror number 13 is -- goes into box 2 and that is Timothy Rock.

And 4, juror number 14, goes into box 4, and that is Scott Dockery.

MR. BENDER: Judge, do you also have their juror numbers?

THE COURT: Yes, sir, I'm sorry. Mr. Dockery is 160.

MR. BENDER: Okay.

THE COURT: And Mr. Rock is 263.

MR. BENDER: Thank you.

THE COURT: Okay. And then in number 5, seat 5 is number 98, James Donaldson.

MR. BENDER: Renew a challenge.

THE COURT: Okay.

MR. BENDER: Are you ready to hear from me at this time?

THE COURT: Not quite.

MR. BENDER: Okay.

THE COURT: Just a second.

MR. BENDER: Okay.

THE COURT: And then number 7, going down our list, number 16 goes to seat -- let's see, seat 7 is juror number 29, David Kelly.

And finally, seat 8 is juror number 17 on the random list, number 181 originally, Debra Moore.

(Pause.)

THE COURT: Okay. Juror number 98, I think you said you wanted to renew your challenge for cause.

MR. BENDER: Yes, sir, Your Honor. And there are three comments that he made I'd like to bring to the court's attention.

The first is on page 1295 of the transcript.

THE COURT: Okay. If you'll wait just a second, I'll get hold of that.

MR. BENDER: Okay.

(The transcript was tendered to the court.)

THE COURT: Okay. Thank you.

MR. BENDER: On 1295 when the government was questioning him, beginning on page -- line 8 through line 16.

THE COURT: Okay. Is that all?

MR. BENDER: No, sir. On that page -- in that colloquy he says, about an open mind about either death or life without the possibility of release, he said probably not a hundred percent did he have an open mind.

Then again, on page 1299, beginning at line 11, 11

through 20 on that page.

THE COURT: Okay.

MR. BENDER: Okay. In that one he was asked, What do you think about life imprisonment without the possibility of release as a punishment for first degree -- two first degree murders?

He said, I'm not sure if I've got a real opinion on it. You mean in contrast to the other possibility? Again, supporting the death penalty. I'm not sure that it's an adequate punishment, referring to life without the possibility of release.

And then later on on page 1302, beginning on line 6 through line 17.

(Pause.)

THE COURT: Do you want -- I mean, are you -- I don't know when you -- a long pause, I don't know if you're done or...

MR. BENDER: I don't know whether -- no.

THE COURT: I want you to make your case --

MR. BENDER: Okay.

THE COURT: -- for why we should renew our consideration of that challenge.

MR. BENDER: I was giving the court time enough to read it, so...

THE COURT: Okay.

MR. BENDER: Anyway. But in that --

THE COURT: I am following, by the way.

MR. BENDER: Okay. In that there -- concerns or reservations about consideration of both punishments, and his answer was no, I don't have any specific concerns. Never been in this exact situation, so it's difficult. I can't say with a hundred percent certainty. I'd like to think I could put that aside.

So those are three instances, Judge, where we believe he was properly challenged for cause. We make -- we renew that cause challenge. Ms. Campbell was released for cause over our objection because she said something about 45 -- 55 and 45 percent. And so here's a man who's saying I can't -- you know, I can't do it a hundred percent. I can't tell you I have an open mind. I can't tell you I can put that aside. I support the death penalty to the extent that I don't believe life without the possibility of release is an adequate punishment.

So all of that, we say, should grant us this cause for challenge.

THE COURT: Would the government wish to reply?

MS. ROSE: That was not our general sense. I remember long questioning of that juror. And on the law enforcement questions he was very open. On the death penalty he was very open. He wasn't -- he didn't have a long

explanation. Just said I support it. I understand -- understand it. Didn't get any sense that he couldn't be anything other than a fair and impartial juror.

The totality of his questioning, he came across as someone who would consider both options and attempt to be fair and impartial. We ask that you deny that motion.

THE COURT: Okay. The renewed challenge will be denied based on the context of what he said as he said it and his overall demeanor and presentation.

So we have -- now have those new five in the box, and the question is whether the government will offer any challenges to them?

MS. ROSE: Yes, we would, Your Honor. Juror number 8 -- or not number 8, seat number 8, juror number 181.

MR. BENDER: Your Honor, we'd challenge that on the same basis.

THE COURT: Okay. Is that a Batson challenge --

MR. BENDER: Yes.

THE COURT: -- to number 8?

MR. BENDER: Yes.

THE COURT: That is, seat number 8 which is Debra Moore.

MR. BENDER: Yes.

THE COURT: Number 181. So is that the only challenge the government is offering?

MS. ROSE: Yes, Your Honor.

MR. BENDER: Judge, again, of the six strikes that have been used by the government, three of them have been used as to black females. For the record, Marc Barnette is an African-American. We acknowledge that Robin Williams was also an African-American, but that Donald Allen was a white male.

There are only seven black females in the pool. The government has essentially eliminated almost half of them by their challenges. I can get her transcript. I don't have it right before me, but -- our notes would indicate that she was a perfectly good juror. If you'll give me a moment, I'll try to find that transcript.

MS. HANKINS: The afternoon of the 25th.

THE COURT: Page 1914.

MR. BENDER: Okay, the 25th.

MS. HANKINS: Afternoon.

MR. BENDER: Afternoon.

THE COURT: July 24th.

MS. HANKINS: 25th.

THE COURT: I'm not sure it's afternoon. It may be in the morning.

MS. HANKINS: I think she was called on the morning, but we must not have gotten to her until the afternoon because the red transcript is the afternoon.

THE COURT: Okay.

MR. BENDER: Judge, in her answers, she said that she really didn't have an opinion about the death penalty. She's willing to look at it, make a decision, from what I hear. Don't have a view one way or the other. She also says, I don't feel strongly one way or the other. I just have to make a decision based on what's before me. I can't sit here and say one way or the other. And really, very short questioning by the government on this matter. I don't have a view one way or the other. Look at the facts, whatever is before me, make that decision at that time. Don't know what my opinion would be.

All of that is an indication that -- to us that based on the limited amount of questioning by the government, that this challenge is solely based on race considerations.

THE COURT: Okay. The court grants the prima facie case.

Would there be a reply by the government?

MS. ROSE: Yes, Your Honor. Note that -- one thing the record is not going to reflect is her long hesitation in responding to a number of questions. One of those that I made particular notes about was when we asked are we on the equal playing field question, there was a very long hesitation before she could tell me whether the government was on an equal playing field.

Another thing that is of great concern is that we

talked about her religious beliefs in the context of the death penalty. And my quote made there is she said, We don't do those things, when I asked her what her re -- how her religious beliefs factored into her views of the death penalty, and she said we don't do those things. My follow-up question was something along the line of are you willing to go against your religion, and she said I don't know.

THE COURT: And I believe she said in her questionnaire, It's God's will to say.

MS. ROSE: Right. And based upon those, along with the very long hesitancy, particularly to that question of are we equal here as we sit before you, the government offers those reasons to support the strike.

THE COURT: Okay. Would there be anything further from the defense on this matter?

MR. BENDER: No, Your Honor.

THE COURT: Okay. The government finds that to be a race neutral explanation and -- and does not find their overall -- that there's a purpose of discrimination on the part of the government here. And that is based primarily on her having religious bent against the death penalty or throwing in the question whether she could apply it in view of those beliefs and her overall demeanor.

THE COURT REPORTER: You said the government finds, did you mean the court?

THE COURT: The court finds.

Okay. So the next replacement, then, for seat number 8 is number 18 on the random list, original number 31, Lisa McIntire.

Will there be any strike offered of that juror?

MS. TOMPKINS: No, Your Honor. The government is satisfied with this panel.

THE COURT: All right. The matter of strikes, then, goes to the defendant as to those presently in the box.

MR. BENDER: May we have just a moment, Your Honor?

THE COURT: Yes, sir.

(Counsel conferred.)

MR. BENDER: Okay.

THE COURT: All right, sir.

MR. BENDER: Your Honor, we would exercise peremptory strikes as to seat number 2, Mr. Rock, number 263.

THE COURT: Okay. Let's see now. Hold that up right there for a second.

(Pause.)

THE COURT: All right, sir. 13.

MR. BENDER: The next strike would be as to seat number 3, Ms. Patterson, number 243.

THE COURT: All right, sir.

MR. BENDER: Number 4, Mr. Donaldson, number 98.

MS. HANKINS: That's number 5.

MR. BENDER: 5. Okay, 5, I'm sorry.

THE COURT: 5.

MR. BENDER: I'll start looking at Ms. Lawson so I can keep straight.

Seat number 6, Mr. Lyles, number 100.

Seat number 7, Mr. Kelly, number 29.

Seat number 8, Ms. McIntire, number 31.

Seat number 10, Mr. Matteson, number 133.

And seat number 12, Ms. Johnson, number 82.

We're satisfied with the remainder.

THE COURT: All right. That would appear to be eight strikes.

MR. BENDER: Yes, sir.

(Pause.)

THE COURT: All right. Any challenges to those?

MS. TOMPKINS: No, sir.

THE COURT: Okay. The court will then replace those as follows:

Random number 19, juror number 136 goes into seat 2. That's Susan Cohen.

And random 20, seat number 45, is Peggy McManus going into seat 3.

And number 226, then, goes into seat 5. And she -- he is John Fowler.

And seat 6 is filled with number 85, John

JA1149

Youngblood.

And seat 7 filled by number 223, Kristal Roseboro.

Seat number 8 is number 5, Barbara Iosue, I-o-s-u-e.

And seat 10 is 108, Karen Sanders.

And 12 -- excuse me -- yeah, seat 12, number 36, Bryan Williams.

And we'll hear from the defendant when you're ready about strikes for those seats.

MR. BENDER: Sort of like the NBA draft. Are we on the clock?

THE COURT: Actually, the only clock is governed by the fact that this room is getting hotter and the judge has the warmest clothing on of all.

(Counsel conferred.)

MR. BENDER: I believe we're ready, Judge.

THE COURT: All right, sir.

MR. BENDER: We would use a strike against seat number 6, Mr. Youngblood, number 85.

We would use a strike --

THE COURT: Let's see. Can you also --

MR. BENDER: Excuse me.

THE COURT: -- use seat numbers.

MR. BENDER: Yeah, that's --

THE COURT: All right. Seat 6 is number 85,

Youngblood.

MR. BENDER: Right. Seat 8, number 5, Iosue.

THE COURT: Thank you.

MR. BENDER: And that would be our strikes.

THE COURT: All right, sir.

Okay. Now, number 6, replacement for 85, Youngblood, will be number 83, George Fitzsimmons.

And replacement for seat 8, Iosue, is random 28, initial number 125, and that is Sean Mather.

MR. BENDER: May I inquire of the court if we have heard anything from him about his situation involving his new baby or his wife or anything?

THE COURT: No.

MR. BENDER: Okay.

(Counsel conferred.)

MR. BENDER: Judge.

THE COURT: Yes, sir.

MR. BENDER: In seat number 6, Mr. Fitzsimmons, number 83, we would use a strike.

Seat number 8, Mr. Mather, number 125, we would use a strike.

THE COURT: Okay. So that would be twelve regular strikes.

MR. BENDER: Yes, sir.

THE COURT: And in place of seat 6, Fitzsimmons,

will go number 38, David Miller.

And in place of number 8, Mather, goes number 43, Luther Ray, Jr.

(Counsel conferred.)

MR. BENDER: Judge.

THE COURT: Yes, sir.

MR. BENDER: In seat number 8, Luther Ray, number 43, we would strike.

THE COURT: Okay. Just that one?

MR. BENDER: Yes, sir.

THE COURT: Okay. And in his place will go random number 31, juror number 118, Jacob Santinelli.

(Counsel conferred.)

MR. BENDER: Judge, we're satisfied.

THE COURT: All right, sir. Let's hear from the government, then, as to those seats where the defendant replaced anybody, and that would be 2, 3, 5, 6, 7, 8, 10, and 12.

MS. TOMPKINS: Of the new panel, Your Honor, the government would strike seat number 2.

THE COURT: Okay. Wait one second.

MS. TOMPKINS: Okay.

(Pause.)

THE COURT: Okay. The government --

MS. TOMPKINS: That's juror number -- original

number 136, Susan Cohen. We will strike --

THE COURT: Okay. As to seat number 6, you are striking --

MS. HANKINS: Seat number 2, Judge.

THE COURT: Excuse me, number 2.

MS. TOMPKINS: Number 2.

THE COURT: Thank you. You're striking Ms. Cohen.

MS. TOMPKINS: Yes.

THE COURT: All right.

MS. TOMPKINS: We will strike seat number 6, David Miller.

THE COURT: That would be number 38.

MS. TOMPKINS: Yes.

THE COURT: Okay.

MS. TOMPKINS: And seat number 10, Karen Sanders.

THE COURT: 108.

MS. TOMPKINS: Yes. And we're satisfied with the rest.

THE COURT: Okay. So that's three strikes on top of your six.

MR. BENDER: Judge, may we have just a moment --

THE COURT: Yes.

MR. BENDER: -- concerning Batson?

THE COURT: You may.

MR. BENDER: We may or may not challenge. We need

FORM FED ® PENGAD · 1-800-631-6989

to get our notes together.

THE COURT: Yes.

(Pause.)

MS. TOMPKINS: That is --

MS. HANKINS: That was three in addition to their six, and I show they have five.

MS. TOMPKINS: Six on the first round.

THE COURT: One, two, three, four, five. You had challenged 2, 4, 5, 7, and 8, and then you replaced 8. That made six.

MS. HANKINS: Okay.

MS. TOMPKINS: Yes. That's my --

THE COURT: And then you've got three more, and that makes nine.

MS. TOMPKINS: That's my tally.

MS. HANKINS: I didn't count Moore. Okay.

MR. BENDER: There will be a Batson challenge, Judge.

THE COURT: All right. Can you tell me which one?

MR. BENDER: The transcript or the juror?

THE COURT: No, which juror are you about to look at so I can look at my own notes.

MR. BENDER: Right. It's Ms. Sanders, 108, which is seat --

MS. ROSE: 10.

MR. BENDER: -- 10.

THE COURT: Okay.

MR. BENDER: With regard -- excuse me, Judge.

THE COURT: Okay. Let me -- I'm trying to find her. I think I can do that.

MR. BENDER: It was on the Saturday transcript, July 20.

THE COURT: Yes.

(Pause.)

THE COURT: All right, sir. Go ahead, please.

MR. BENDER: Ms. Sanders is employed full-time and was asked about her job. She said there would be no problem.

This was the lady who had put down on her -- on her questionnaire concerning knowing somebody who was murdered. She put private. Your Honor said if you want to -- if you want to have a side-bar, we can. She said no, that's fine. It was my best friend's mother. Visited in the home with them. They're still friends.

With regard to the death penalty, she said, Without hearing more detail, I'm kind of torn between the death penalty. It just kind of depends, I guess, really on the case and just hearing the details, more information about it. Don't have a strong yes for the death penalty. Don't have a strong no for the death penalty. Depends on the situation. Can she consider the death penalty? Yes, that's something I

can consider.

Judge, this is -- Marc is African-American. Robin Williams, one of the victims, is African-American. Donald Allen is white. This juror is African-American. This is the, I guess the third -- well, it's four out of seven African-American females that have been excused by the government.

THE COURT: Now, you were saying earlier that there were at the outset four African-American females?

MR. BENDER: African-American females in the pool, there were seven.

THE COURT: There were seven in the entire pool.

MR. BENDER: Right.

THE COURT: And how many males, black African-American males?

MR. BENDER: We've got it written down here somewhere. We had it all broken down by race.

There were five African-American males.

THE COURT: All right.

MR. BENDER: And very -- very short amount of questioning also in this matter. Religious training has nothing to do with her position on the death penalty.

The cumulative effect of the government's strikes is to -- out of -- out of nine strikes, they have exercised four against African-Americans. And I think the cumulative effect

is that the strikes are race based and discriminatory in nature. And there's nothing in her transcript or her questioning that would indicate in any way that she is not a qualified juror to sit on this case.

THE COURT: Let me hear from the government.

MS. TOMPKINS: Your Honor, as to Ms. Sanders, on her -- first of all, I will say this. Of the nine strikes the government has exercised at this point, we've exercised three strikes against white females, four on black females, including Ms. Sanders, one black male, and one white male. We have passed black males to the defense which have been, some of whom have been struck by the defendant, so --

THE COURT: I'm sorry, I didn't hear that last.

MS. TOMPKINS: We've passed black males to the defense, some of whom have been struck by the defense.

Specifically as to Ms. Sanders, on her jury questionnaire, on the question, What is your personal view of the death penalty, she answered not sure. On the question, What is -- what of the following describes your attitude towards the death penalty, she noted she was uncertain about how she felt about the death penalty. And on the jury questionnaire question of which it says, If you favor the death penalty, would you say you favored it, and then the range was very strongly, somewhat strongly, not very strongly at all, and she noted other. So on her questionnaire she

noted hesitancy about her ability to consider the death penalty.

In the questioning overall, there was a feeling that she was hesitant in her answers. She was somewhat noncommunicative with the government. We noted long hesitations before answering the question on her opinion on the death penalty. And she did answer that she was kind of torn. Again, when asked, Can you consider the death penalty, she gave a very hesitant answer. She hesitated a long time before she answered.

So based on her noncommunicative answers, her hesitant answers, her uncertainty about her ability to consider the death penalty, both in the questionnaire and in questioning, we are exercising a strike on her.

MR. BENDER: Judge.

THE COURT: Yes, sir.

MR. BENDER: Judge, perhaps the record does reflect -- I said there were four out of nine were used against African-Americans. It now appears there were five out of nine.

MS. TOMPKINS: I've got four including Ms. Sanders.

MR. BENDER: I thought you said four against African-American females and one against --

MS. TOMPKINS: Yes.

MR. BENDER: -- a black male.

MS. TOMPKINS: Yes.

MR. BENDER: So five out of nine have been exercised against the African-American race, male or female.

MS. TOMPKINS: But the government has also passed both black female and black males to the defense, so just for the record.

THE COURT: Well, the court finds that the explanation is race neutral, and in the overall context of her answers and her demeanor, that -- considering the arguments of both parties, that the government's purpose is not a discriminatory purpose. So that's the rationale.

Now, as to those three seats, the replacement jurors for seat 2 will be number -- random number 32, juror number 231. And that is Jennifer Joles.

And as to number 6, seat 6, the replacement is number 222, Deana Stanford.

And finally, as to seat 10, the replacement is number 138, Gary Moore.

MS. TOMPKINS: The government is satisfied.

THE COURT: All right. The defendant would then exercise strikes against -- if any, against seats 2, 6, and 10.

(Counsel conferred.)

MR. BENDER: Your Honor, we're ready.

THE COURT: All right, sir.

MR. BENDER: We will excuse in seat number 2 Ms. Joles, number 231.

THE COURT: Okay.

MR. BENDER: That would be the only strike we'll use.

THE COURT: Let's see. Seat number 6 was -- had juror Stanford in it.

MR. BENDER: Yes.

THE COURT: So Ms. Joles, I think, was in seat 2.

MR. BENDER: Yes. I thought that's what I said.

THE COURT: Okay. If that's what you said, that's fine. Seat 2, Ms. Joles.

That's 14 strikes of regular jurors.

Ms. Joles is replaced by random 35, juror number 84, Mark Blakeney.

(Counsel conferred.)

MR. BENDER: Your Honor, we are satisfied with the panel.

THE COURT: All right, sir.

So the government may consider a strike against seat number 2, if it sees fit.

MS. ROSE: And the government would do so, Your Honor.

THE COURT: You would strike number 84, Blakeney?

MS. ROSE: Yes, sir.

MR. BENDER: Judge, this would be a <u>Batson</u> challenge. We have a transcript here somewhere.

THE COURT: All right, sir. We'll hear you when you're ready, Ms. Lawson.

MS. LAWSON: Yes, sir. Just one moment, if you don't mind.

(Pause.)

MS. LAWSON: Okay. Your Honor, of course, we'd make a challenge pursuant to <u>Batson</u>. Mr. Barnette is African-American, so is this potential juror.

I made a special note of this juror's questioning, Your Honor, at the time it went on. Mr. Blakeney is a truck driver. He drives inside the plant. And this was the first time the government ever asked this question that's on page 1146, line 21.

Question: All right. Now, does your work know that you've been called for jury service?

Answer: No.

So where did you tell them you were today?

Well, I got to go -- I work at night.

It struck me as being -- it simply struck me as being an attempt to remove a black juror right off the bat in terms of the questioning by starting with his work without really finding out too much about him and what he does. And it was striking that they did that. The questioning of him

starts on page 1143, and this line of questioning starts at 1146. I think also the government realized that they had done that because after that, they asked most of the jurors does your work know where you are? Have you talked to them? Have you told them where you are? It started with the questioning of this African-American juror.

He indicated that he was able to follow the law. He says I've got to hear all the facts. He acknowledged that it's hard to impose the death penalty, but that he would do it. And in fact, the government says at page 1150, line 21, So it sounds like you are not prevented based on your philosophy about the death penalty from considering it. He says, Yes. Meaning, you know, the response was consistent with the question.

Again, did that just come from you not having a strong feeling one way or the other? Yes.

There was no reason, nothing about him that would suggest that he would be anything but a juror who could perform his duties satisfactorily.

And again, I think in the context of how the government started the approach to him, it was evident that they didn't talk to him. They wanted to see if they could find a way to get rid of him right off the bat.

That's also, Your Honor, six out of ten African-American jurors that have been struck by the

government.

THE COURT: Let's hear the government's response.

MS. ROSE: In looking back at the notes, I noted that there was once again a great hesitancy in responding to questions. I think the quote, though, that most sticks out and that most concerned the government here was the fact that he said, I don't want to sentence anyone to death.

He was not -- I did notice here that he was very quiet. In fact, I don't remember whether it was us or the defense that questioned him about the fact that he wasn't very chatty with anyone, and he indicated that yes, he was a quiet person.

His views of the death penalty were not very strong. He was -- he indicated on his questionnaire he was uncertain about how he felt about the death penalty, and that combined with the quote, I don't want to sentence anyone to death.

THE COURT: Okay. First of all, the court puts no stock in the timing about the question on work conflict in that the court was encouraging the lawyers to get to any potential conflict that would possibly resolve the question of that juror's readiness to be a juror as quickly as possible.

But moving on to the substantive arguments about it, the court finds that a race neutral explanation has been presented. And that considering the arguments of both

parties, that the -- there has been no showing of a purposeful discrimination in regard to the striking peremptorily of this particular juror. So that -- even when one considers the overall pattern of strikes of the government. So that strike is recognized.

And number -- seat number 2, then, is filled by random number 36, juror number 208, Allen Kraig -- excuse me, Kraig Allen.

MR. BENDER: Your Honor, we would exercise a peremptory strike as to 208, Mr. Allen.

THE COURT: All right. Wasn't it the government's --

MR. BENDER: Oops.

MS. TOMPKINS: Thank you for that.

Before that, we were satisfied.

THE COURT: So the government having been satisfied as to Mr. Allen, it goes back to defendant and the defendant strikes number 2, seat 2, number 208, Kraig Allen.

MR. BENDER: Judge, may I just -- the state of the record being what it is, I can't recall whether -- whether I made a challenge for cause on him or not.

THE COURT: Let's see.

No, you made one to Matteson and Donaldson.

MR. BENDER: Yeah, I don't remember, and the record --

THE COURT: But you -- yeah.

MR. BENDER: And the record certainly doesn't reflect.

THE COURT: You wouldn't have made one, I don't think, until he was put in the box.

MR. BENDER: Right.

THE COURT: Now, this is the one, I think, you were saying there might be some absence of information --

MR. BENDER: Right.

THE COURT: -- in the transcript.

MR. BENDER: In the transcript, that's right. And that's kind of where I'm coming from. I don't remember whether I challenged him for cause or not and the transcript just simply doesn't reflect.

THE COURT: Well, I don't have any notes in the affirmative on that, but it may be that you did.

Are we in a position to contact Ms. Kelly?

THE COURT REPORTER: I think we could probably give her a call.

THE COURT: Let's try to do that.

THE COURT REPORTER: It appears to me that there are just pages missing off the end.

THE COURT: Let's try to call her and we'll take a break.

(Brief recess at 11:17 a.m.)

Okay. The issue has to do with Mr. Kraig Kelly as to the transcript in his case.

MR. BENDER: Kraig Allen.

THE COURT: I'm sorry, Kraig Allen, thank you. Now, page 2028 was missing out of the transcript the court has and the -- and Ms. Nuccio has made a rendition of page 2028 based on a telephone discussion with Ms. Kelly, Joy Kelly. And it appears to fit in in such a way that it would be 2028. Comes right up to adjournment on that particular day.

So the question I have for you, Mr. Bender, first of all, have you seen that page 2028?

MR. BENDER: Yes, sir, we had that one in our transcript.

THE COURT: Okay.

MR. BENDER: That's one of the four pages we referred to.

THE COURT: Right. And you have contemplated the fact that there was another person in the race -- the NASCAR racing business and you asked her questions about cars.

MR. BENDER: Right, yeah.

THE COURT: Right.

MR. BENDER: Yeah.

THE COURT: And is it your firm opinion that

something else may have been asked of Mr. Allen that is not in the transcript?

MR. BENDER: Absolutely.

THE COURT: All right. Well, then, it seems to me we'll have to bring the court reporter in and ask her to go over the backup tape. And if this one is already certified, recertify it to the court that based on that, that it is in fact the official transcript.

MR. BENDER: And based on what we have here and what, I think, most of us believe, and certainly I do, this is not the complete transcript. And based on that, I would ask that Mr. Kraig Allen be excused for cause because no reviewing court would ever be able to know exactly what went on because if I talked for sixteen minutes, they talked for thirteen minutes, it's virtually impossible for them to have ten pages, we have four. And I think everybody here in the courtroom -- well, I'm not going to assume anything, but I did ask about the 18 and the 20 car. The others were -- and I can tell you exactly what car numbers they were when I was talking to the other person. But that was definitely asked because I remember getting a smile from some people about that. And in his shoes colloquy, I just -- I was pretty good about that.

MS. TOMPKINS: If I may respond?

THE COURT: Beg your pardon?

MS. TOMPKINS: May I respond to that?

THE COURT: Yes.

MS. TOMPKINS: As to Mr. Allen, earlier Mr. Bender said that he had enough information on his notes to be able to make a decision about whether or not they would or wouldn't select him as a juror.

And in terms of the appellate record or the complete record, I'm not sure that there are any appellate issues that relate to Mr. Allen. There's not going to be a <u>Batson</u> motion on him. There are no foreseeable appellate issues that relate to him as a juror. The government doesn't have a record to make its decisions on jury selection, and that's beside the point. The real point being -- obviously, the issue is are we getting a complete recordation as we --

THE COURT: That's the issue.

MS. TOMPKINS: Right.

THE COURT: And we have to examine that.

MS. TOMPKINS: And I want to examine that, but that's a separate issue from whether or not Mr. Allen should be just stricken for cause for that reason alone.

THE COURT: Well, striking Mr. Allen for cause might moot the issue about his transcript, but it doesn't solve the problem of whether the transcript is accurate in respect to his statements; and if it's not, we certainly want to investigate that in terms of the accuracy of the overall transcript in such dimension as it might -- as the facts might

suggest.

So we'll take a lunch break until 1 o'clock and ask Ms. Kelly to come in and bring her transcript and backup tape-recording and we'll have a factual hearing on the state of the transcript and then proceed from there with the balance of jury selection.

(Lunch recess at 11:50 a.m.)

SATURDAY AFTERNOON, JULY 27, 2002

THE COURT: Okay. The record will show that the parties are here by their attorneys and the defendant is here.

Ms. Kelly.

MS. KELLY: Yes, sir.

THE COURT: A question arose as to the completeness of the transcript concerning the testimony -- the statements, questions and answers during voir dire of Mr. Kraig Allen.

MS. KELLY: Yes, sir.

THE COURT: And have you looked into that?

MS. KELLY: Yes, sir.

THE COURT: What can you tell us about that?

MS. KELLY: I have checked the tape with my transcript and it is complete. I have printed out the page that was missing from the court file. And that is where I'm at.

THE COURT: So if --

MS. KELLY: There's nothing missing from the whole -- I mean, as far as my transcript and matching it with the tape, there is nothing missing.

THE COURT: Okay. What -- how was the quality of the backup tape?

MS. KELLY: Okay. Just okay. I was having problems with interference with some of the stuff. Some of it's good; some of it's not. My recorder is one of those kind of things that, I don't know, something is wrong with it. But it does -- it's okay if you want to listen to it.

THE COURT: Okay. Now, the -- when you're operating your backup recorder --

MS. KELLY: Yes, sir.

THE COURT: -- what mike -- from what microphones does it pick up?

MS. KELLY: My own personal one connected to the recorder.

THE COURT: All right. And where is that located when you're working?

MS. KELLY: It is located on the table here that I work at.

THE COURT: Okay. It's not one of these mikes at the counsel table?

MS. KELLY: No, sir.

THE COURT: The mikes at counsel table serve what

function?  Can anyone answer that?

Ms. Hankins, can you answer that?

MS. TOMPKINS:  They amplify.

THE COURT:  You're tapping that and it amplifies your voice.

MS. TOMPKINS:  Yes.

THE COURT:  And of course, there is a microphone in the ceiling which, as I understand it, also picks up voices and amplifies them through the speakers that are located in the jury box and there is one here at the bench.  And I guess that -- those are the only speakers.

But I have a concern about the fact that defense counsel has moved its mikes below the table and out of sight.  And I take it that's because you're concerned there might be a -- in talking at counsel table, it might be picked up -- that is, confidential talk at counsel table might be picked up.

MR. BENDER:  That's correct, Your Honor.

THE COURT:  And I don't know that that would be a problem unless it turns out the jurors aren't hearing you well.  In which case, you might need to add additional amplification.

MR. BENDER:  And of course, if they do -- we have some that are hard of hearing and all of them have said, you know, I'll raise my hand if I can't hear.  So I've got to assume they'll do that.

THE COURT: Well, I think they will.

MR. BENDER: Yeah. Can I just inquire?

THE COURT: You may, but before -- while I'm talking about the mikes, are you aware of any function of the mikes at counsel table with reference to the -- to your, Ms. Nuccio, reporting?

THE COURT REPORTER: I've had a hard time hearing. I can't take me and talk at the same time.

But I -- we sit down below everybody. Ms. Hankins' computer makes a humming noise that we hear above everything else. It's like a vacuum cleaner running. And as you're running it, you can't hear anything beyond it; but everybody else who stepped away from the vacuum cleaner can hear fine. So we have that to deal with as well. And it is very difficult to hear -- as jurors have been sitting next to me here, at times I haven't been able to hear and I've asked them to repeat. It's just -- we're in a very difficult spot here. That's all I'd say.

THE COURT: Well, you all are the first counsel that have ever expressed any concern about it. Is this a continuing concern based on the mike -- the -- the people at the marshal's office downstairs overhearing anything?

MR. BENDER: Yes, sir.

THE COURT: Is that the problem?

MR. BENDER: Yeah, or just anybody overhearing. And

I know that it's piped in downstairs, you know. They've said they turned the volume down.

THE COURT: Well...

MR. BENDER: We'll do what the court wants.

THE COURT: I'd appreciate it if you would go downstairs with the marshals at some point, the next day or so, and let it be on and let somebody be up here talking and you can hear what, if anything, you can make out.

MR. BENDER: Okay.

THE COURT: I mean, there -- the purpose of having it down there, if there's a commotion in the courtroom. There's no need for it to be at a level of any individual words. And I've been assured that they not only don't hear individual words from counsel table, but that if they did, they understand that it would be a violation of federal law for them to disclose it to anybody.

So that would be -- that concern has to do with the job of the court reporter being made as easy as we can within reason.

Yes. Inquire, please.

MR. BENDER: Ms. Kelly, everything that you transcribed and certified is contained in these four pages --

MS. KELLY: Yes, sir.

MR. BENDER: -- within the transcript.

MS. KELLY: Yes, sir. I've checked that, yes, sir.

MR. BENDER: Okay.

MS. KELLY: I've checked it. I've checked the tape against the transcript.

MR. BENDER: Okay.

MS. KELLY: To be sure that -- I understood there was concern that you felt like there was several pages missing and there was nothing -- there was a page missing, I understand, from the original which didn't print out for some reason, but that's the only thing I could find.

MR. BENDER: Well, my concern really is --

MS. KELLY: Uh-huh.

MR. BENDER: -- that the government went questioning for thirteen minutes and there are ten pages of transcript. I questioned for sixteen minutes and there are four pages of transcript. I also questioned that juror about the 18 car and the 20 car by number.

MS. KELLY: Uh-huh.

MR. BENDER: And it's not in here. I also questioned that juror about, you know, you walk in your own shoes. It's not in here. That's my concern.

MS. KELLY: Well, according to the tape, your -- the tape contains the beginning and the ending of your examination. None of what you expressed is on there.

THE COURT REPORTER: None of which what, Joy?

MS. KELLY: Expressed -- none of what you just said

could I find on the tape. You know, walking in your own shoes. I mean, if you want to listen to the tape, I brought it here for it to be listened to.

THE COURT: Beg your pardon?

MS. ROSE: May I ask a question as well?

THE COURT: Yes.

MS. ROSE: The times that are recorded, do you note the times on your record or are those just someone's notes, and how closely are those notes being kept? Do we really have an accurate time of the specifics of when everyone's questioning began and when it ended? Was there some -- there's no official record of that and nothing -- like no stopwatch is being kept officially, anything of that nature. It was just kind of glancing at our watches type of thing.

THE COURT: I can respond to that.

Okay. The only record of time that I know of, the court kept time for purposes of the 20 minute limit on each attorney. And Ms. Rose questioned from 5:36 to 5:49. That was thirteen minutes. And the defendant started at 5:49, but I don't have a record of when he finished because it was within the 20 minutes. So we don't have anything printed definitive about how long Mr. Bender questioned that juror. It was the last juror of the day. However, I have no reason to question his recollection about it except to look at the transcript and listen to the tape. I do recall him

questioning about the car numbers, but I don't recall if it was this witness or another witness or both, personally.

So I would -- I think we're in a position where we -- if you want to listen to the tape, then we should listen to it.

MS. KELLY: Yes.

THE COURT: Can you go ahead and begin it where Mr. Bender began his questioning.

MS. KELLY: Yes.

MS. TOMPKINS: Put it on this table maybe.

MS. ROSE: Or sit it by the mike.

THE COURT: Put it right in front of the microphone.

(Ms. Kelly complied.)

THE COURT: Start it over.

Where is the transcript? Is this it?

MS. KELLY: That is the page that was missing.

THE COURT: Beg your pardon?

MS. KELLY: That's the page that was missing. That didn't get printed.

MS. TOMPKINS: Do it a little bit back so we'll be sure we get the absolute beginning.

MS. KELLY: Certainly.

THE COURT: All right. What page is this?

THE COURT REPORTER: 2024.

MS. LAWSON: 2024.

THE COURT: Mr. Bender begins on what page?

MR. BENDER: 2024.

THE COURT: Okay. 2014?

MR. BENDER: 2024.

(The tape was played.)

THE COURT: Okay. I timed that at seven minutes, you know, roughly. Same way I timed all the presentations.

Now, Ms. Kelly, can you tell us what -- what is going on with the clicking when you hear a clicking sound in the recording?

MS. KELLY: No, I can't. I don't know what that is. It happened -- it's been going on periodically. It's like some kind of interference maybe from the lights or something. I'm not sure what that is. So I have decided not to use that recorder and have been using another recorder.

THE COURT: All right. I was about to say that that would be indicated here --

MS. KELLY: Yeah.

THE COURT: -- to attempt to eliminate that problem.

Ms. Nuccio, have you had difficulty of a similar noise that might have been caused by an electrical interference?

THE COURT REPORTER: (Negative nod.)

THE COURT: The answer there is no.

THE COURT REPORTER: I use a different machine.

THE COURT: Beg your pardon?

THE COURT REPORTER: I use a different recorder.

THE COURT: Right.

Well, Mr. Bender, it appears to be connected. That is to say, the questioning that you did goes from a beginning point to an ending point with apparently even flow and it would appear that you were talking about the racing matters as a preface, so to speak, or simply a colloquy between you and the juror at the beginning of the conversation, and there was some clicking in that area.

Could you play that area over again.

MS. KELLY: Sure.

THE COURT: At the very beginning.

(Ms. Kelly complied.)

THE COURT: Would you back up some.

MS. KELLY: Yeah.

(The tape was played.)

MS. KELLY: I think I'm a little too far for you, right? That was Ms. Rose.

THE COURT: Yeah, we want to go forward past Ms. Rose.

(Ms. Kelly complied.)

THE COURT: All right. That's enough.

Now, is your -- when you take notes, you use a machine. What do you call that machine?

MS. KELLY: Stenograph.

THE COURT: And your Stenograph notes, did they show connected conversation between counsel and this juror according to what you related here in the transcript?

MS. KELLY: Yes, sir, that's how it works. It's connected with the notes. The translation of the English is attached to the word.

THE COURT: Right.

MS. KELLY: To the steno stroke.

THE COURT: All right. Well, I find that the transcript is accurate with the exception that line 17, page 2026, he said, The things that my dad had done for black people not to black people. That was borne out on the tape.

MS. KELLY: Okay.

THE COURT: Other than that, it appears to be accurate.

So the motion to excuse this juror for cause will be denied unless -- I mean, to the extent it's grounded in an inaccurate or incomplete transcript. Did you want to make a -- either a new or renewed -- I didn't hear any challenge to him on there. I didn't reflect one in my notes or recall one, so I guess at this point if you wanted to challenge him for cause, it would have to be a new motion.

MR. BENDER: Okay. Your Honor, for the record, I would show that Ms. Susan Sikes, juror number 131, who appeared on July the 23rd in the morning session, is in public relations and advertising and does some NASCAR work.

She was asked, So you deal with the 24, the 28, and the 20.

To which she responded, Oh, we have a fan, do we?

And I responded, You can see a little red on my neck.

That was the individual that I -- that is clearly in here that I talked about car numbers with. I talked about car numbers with Mr. Allen as well, the 18 and the 20. Those are the two cars that Joe Gibbs Racing has. It doesn't appear on there.

I would also note for the record that with regard to one of the jurors -- if I can just have a minute. It's been denominated that Ms. Lawson did the questioning and, in fact, as we go through, you will see that the court is referring to Mr. Bender.

THE COURT: Could you direct me where you're looking?

MR. BENDER: Well, I'm trying to find it. Ms. Lawson and I saw it.

(Pause.)

MR. BENDER: Your Honor, this would be the

348

JA1180

transcript of July 24th, the afternoon session. Voir dire examination.

THE COURT: Okay. July 24.

MR. BENDER: Page -- page 162 -- excuse me, 1671.

THE COURT: And what is going on at that point?

MR. BENDER: Well, it just denominates Ms. Lawson as being the person doing the questioning when, in fact, it was Mr. Bender who was doing the questioning.

MS. KELLY: Yes, I see that.

THE COURT: Beg your pardon?

MS. KELLY: That's my mistake.

THE COURT: All right. You'll correct that.

MS. KELLY: Yes, sir.

MR. BENDER: Okay. Your Honor, based on all of that, I ask that since the record is not complete, that Mr. Kraig Allen be excused for cause.

THE COURT: All right. Now, your recollection about the numbers is based on the fact that you follow NASCAR.

MR. BENDER: Yes, sir.

THE COURT: And people who follow NASCAR know the car numbers just as they would proper names.

MR. BENDER: That's kind of the way we -- we do that. Matter of fact --

THE COURT: Everybody knows about the 3 car, for example.

MR. BENDER: Yes, sir.

THE COURT: Even with mild acquaintance with NASCAR. And those who know NASCAR know which numbers go with which racing team.

MR. BENDER: Yes, sir.

THE COURT: So based on that and your comments about it, the court will grant that motion for excusing Mr. Allen for cause.

MS. TOMPKINS: Your Honor, may the government just be heard briefly on that?

THE COURT: You may.

MS. TOMPKINS: I had this playing right in front of me. The garbled point right at the beginning was when Mr. Bender was talking about those two cars and the -- Mr. Allen said, Yes, both of them, which to me was his answer to whatever the two car numbers are which was --

THE COURT: Wait just a second. You were looking where?

MS. TOMPKINS: I'm not looking at the record. I was listening, just listening as we were just playing it. Harold begins his questioning of Mr. Allen and there is a point where there is static. What you can hear from Mr. Allen is, Yes, both of them, which --

THE COURT: Wait, I'm sorry. I just want to get that back in front of me.

MS. TOMPKINS: And I'm not speaking from the printed record; I'm speaking from just my listening.

THE COURT: I understand, but it stands to reason that what you are saying about what happened would be grounded in the record.

MS. TOMPKINS: Right. And it was in that garbled section which ended with everyone's laughter.

THE COURT: Everybody, as I recall, laughed because the question was, What's Coach Gibbs going to say to you when you say I can't be there for three weeks? And the answer was, He better get used to cleaning his own bathrooms, and everybody laughed at that.

MS. TOMPKINS: And that's correct. And what I'm saying is that Mr. Bender is making a big deal about the fact that the car numbers don't appear in the record when clearly his reference to the car numbers was during that static moment in the tape that preceded, What is Coach Gibbs going to say when you're not there? It is clear --

THE COURT: Oh, I see. Where it says both of them.

MS. TOMPKINS: Both of them.

THE COURT: That's in the record. And that's where the clicking was going on.

MS. TOMPKINS: And that was his reference to those two car numbers. So -- and my point is is that Mr. Bender is making a big deal about the fact that the record is terribly

JA1183

incomplete because there is no reference to the two car numbers when his response clearly indicates, and my notes from that conversation reflect, and my memory of that conversation also bolsters that that was his response to Mr. Bender talking about those two car numbers and then the conversation naturally proceeds to racing and Coach Gibbs, laughter.

THE COURT: I believe that's correct.

MS. TOMPKINS: And then on to substantive issues.

THE COURT: And the question was, That involves cleaning, and then there's a hyphen or a dash. Now, wouldn't the court reporter ordinarily where something is inaudible put inaudible in parenthesis at that point?

MS. KELLY: Yes, sir.

THE COURT: And opposed to the double...

MS. KELLY: That's my natural instinct when I'm writing, that's correct. I would put -- or I would ask. I would certainly ask. That means like --

THE COURT: I think you would.

MS. KELLY: Excuse me. That indicates to me that there was some interruption or something else going on.

THE COURT: Right.

MS. KELLY: I mean, talking at the same time, that kind of thing.

THE COURT: You certainly would want to put, I believe, inaudible in there rather than just a double hyphen.

MS. KELLY: Would you like me to change that?

THE COURT: Yes.

MS. KELLY: Okay.

THE COURT: But I would -- I think that a finding is in order that it is a very minimal ellipsis in the record, but it's an ellipsis; and based on that, the court's ruling will stand. So Mr. Allen will be stricken for cause.

(Pause.)

THE COURT: Just for clarification to the record to the extent it might need it, the court's finding in that regard is that where the double hyphen appears on line 2, page 2025, there was an inaudible statement by Mr. Bender about two numbered racing cars and the answer to that which involves one sentence, or not more than two, I would think, and that the answer to that particular statement came as follows: Both of them, and goes on to accurately reflect from there.

So the next juror in line to fill seat number 2 is number 32, and that is Edward Brunck, B-r-u-n-c-k.

So the question, then, would be, Mr. Bender or Ms. Lawson, would you seek to challenge that juror?

MR. BENDER: Point of clarification, Judge. The -- Mr. Allen was put in as a -- well, I guess passed by the -- passed by the government and a cause challenge was granted, so do we go back to the government for the government to be -- as to Mr. Brunck or us? I don't know.

MS. TOMPKINS: Well, I would say we passed him. They made a challenge for cause.

THE COURT: Yeah, he -- the government had passed on him.

MR. BENDER: Okay.

THE COURT: So -- as you say, you made a challenge for cause. So if you -- I have no problem in throwing it back to the government because your pass, in effect, was mooted because he was as good as not there. So in his place you have Mr. Brunck. At the defense request, the court will ask the government if it wants to excuse Mr. Brunck?

MS. TOMPKINS: Yes, we will exercise a peremptory strike on him.

THE COURT: So in place of Mr. Brunck -- and that makes nine challenges by -- let's see. Six, seven, eight, ten challenges by the government.

MR. BENDER: Your Honor, we have eleven.

THE COURT: Okay. Mr. Blakeney makes eleven.

MS. HANKINS: (Affirmative nod.)

THE COURT: The clerk agrees and both parties agree.

So in his place the next juror is number 172, Larry Young.

MS. LAWSON: I'm sorry, Your Honor, who?

THE COURT: 172.

MS. LAWSON: Thank you.

THE COURT: The court inquires whether he will be passed by the government or not?

MS. TOMPKINS: If I may have one moment.

(Counsel conferred.)

MS. TOMPKINS: The government is satisfied.

THE COURT: All right. The defense, then, has the opportunity to challenge or not Mr. Young.

MR. BENDER: We'll use a peremptory challenge on number 172, Mr. Young.

THE COURT: Okay. And that being the case, we have next in line 104, Diane Edwards.

(Counsel conferred.)

MR. BENDER: Your Honor, we're satisfied with the jury.

THE COURT: All right. Comes back to the government, then, concerning seat 2 and whether it will exercise a challenge concerning Ms. Edwards.

MS. TOMPKINS: Your Honor, we're satisfied.

THE COURT: All right. So Ms. Edwards, then, becomes juror number 2.

Okay. Now, then, as indicated we proceed to the matter of alternates. And the next juror in line would be number 40 in the random order and number 6, Corey Phifer, is alternate number 1.

And number 2 is number 126, Ralph Holder.

MR. BENDER: Your Honor, we would challenge for cause on Mr. Holder.

THE COURT: All right. We'll hear you in just a minute about that.

Number 3 is number 233, Elizabeth Pendergrass.

All right. Number 4, then, alternate number 4 is number 8, Wanda Butler.

Okay. The government will have the first opportunity to strike.

MR. BENDER: Could I just be heard?

THE COURT: You're right. Go ahead.

MR. BENDER: With regard to Mr. Holder, he appeared in the afternoon session of July the 22nd.

Does the judge have it? Do you have it, Your Honor? Okay.

THE COURT: We're almost ready to hear you about that.

MR. BENDER: Thank you.

(Pause.)

THE COURT: Okay.

MR. BENDER: On page 1276.

THE COURT: Yes, sir.

MR. BENDER: Beginning on line 2, What's your personal view of the death penalty?

If convicted beyond a reasonable doubt, it should be carried out.

Is that the way you feel?

He says, I think that's the way I feel. Then he says, Well, I don't think, that is the way I feel.

THE COURT REPORTER: I don't think that is the way I feel?

MR. BENDER: Well, I don't think, comma, that is the way I feel.

And then further down, beginning on line 14, it -- through line 25, and then over to line 1 of the next page, 1277, he replies, I have an opinion that if you've been convicted, you have been tried and convicted, death penalty is involved, I think 22 years is too long to drag something out. I think that it should be administered and I have no problem with that.

Based on those responses, I ask the court to reconsider our challenge for cause.

THE COURT: Okay. What's the government say to that?

MS. TOMPKINS: Your Honor, I don't have a copy of his -- I don't have a transcript so --

MR. BENDER: Here.

MS. TOMPKINS: -- I can't view it in its totality.

THE COURT: Go ahead and look at it. You have a

copy, do you not?

MS. TOMPKINS: Pardon me?

THE COURT: Somewhere.

MS. TOMPKINS: I'm sorry?

THE COURT: Are you not receiving the daily copy?

MS. TOMPKINS: Well, we're not -- we've chosen not to pay for them.

THE COURT: All right.

MS. TOMPKINS: So I mean, we could for $125 a day.

If you don't mind that I'm looking. Off the top of my head, Your Honor -- I'll let Ms. Rose look at that. From my notes which I took, he did say that he had no opinion about the verdict. That he could wait. He understands that this jury would sentence him only. A lot of the defense questioning was about another juror who may possibly -- another person called for jury service. But -- and apparently -- I don't know that he was challenged for cause at the time, but the court denied that at a time directly after this man's questioning, and nothing has changed since then.

So again, we're reviewing the specifics.

(Pause.)

MS. TOMPKINS: Question by the government, As you sit here today, do you have any predisposed notions about what the ultimate penalty should be in this case?

He said, I've really searched my mind. I haven't

heard the evidence. And to do what you're supposed to do as a juror in this case, this particular case, no, I don't.

Question: As you sit here today, could you wait until you've heard all the evidence?

Yes, ma'am.

And keep an open mind?

Yes.

So on the totality of this juror's answers, I'd ask you to deny that motion for cause.

And he says several times during this, we went back and asked him several times had he formed an opinion, could he be fair, could he wait until he heard all the evidence and the law, and he responded yes, he could do that. Ending on page 1269. And the other quotes that I read were from 1266.

(Pause.)

THE COURT: Okay. The court will grant the motion to excuse for cause on reconsideration. And Mr. Holder, then, is stricken for cause.

MR. BENDER: Judge, does that mean everybody else moves up one?

THE COURT: It does. I should think it would.

MR. BENDER: Okay. So that 2 becomes 233, Pendergrass, and 3 becomes Wanda Butler, number 8.

THE COURT: And the number 4 becomes number 22, George Evans.

MS. HANKINS: Huh-uh, missed one.

THE COURT: Beg your pardon? Oh, wait a minute. Excuse me, number 193, Andrea Bryant, is next in order.

Thank you, Madam Clerk.

So is the government considering its position on these four?

MS. ROSE: Yes. The government would move to excuse alternate number 2, number 233, and alternate number 4, number 193.

THE COURT: Any challenge to those two?

MS. LAWSON: Yes, Your Honor. To Pendergrass, Your Honor, number 233.

THE COURT: Is that a Batson challenge?

MS. LAWSON: Yes, Your Honor. If I may have just a moment, Your Honor, I'll be prepared to proceed expeditiously.

(Pause.)

THE COURT: Okay. You may be heard.

MS. LAWSON: Your Honor, thank you. By way of prima facie showing, Mr. Barnette is African-American. Potential juror Elizabeth Pendergrass is African-American.

Ms. Pendergrass, the challenge to her would be the seventh challenge by the government of -- out of their thirteen. Almost half of the jurors that they have exercised peremptory challenges to have been African-American which is

grossly disproportionate to the -- their representation in the pool.

Ms. Pendergrass was forthright. No delays in her answers. Well-educated. A foster mother, as you may recall. Cub Scout leader. Involved with children. Told the court that although she had put on her form that she would not impose the death penalty, I think that she also made it clear that that was in the abstract, and that she had never been called on to do such a thing. But when the government talked to her, she said that she would consider both choices.

On page 2053, line 8, Ms. Rose is saying, So the death penalty is one of your two choices here. So you would have to be fully willing to consider it.

And Your Honor said, Do you have a question?

And Ms. Rose says, Would you?

And her answer is, I would be willing to consider it.

Question: And would you consider it the same way that you would consider life imprisonment?

I would.

It's perfectly clear that she is fully capable of making an appropriate decision in this case. And I think that there is no way that the juror would be ill suited to sit on this case. And given the number of challenges that the government has exercised against African-American jurors, we

would ask you to sustain our _Batson_ challenge.

THE COURT: Okay.

MS. ROSE: Are you ready for me?

THE COURT: I'm ready.

MS. ROSE: On her questionnaire, her personal view of the death penalty is I believe in life imprisonment. She has mixed feelings about lethal injection. She goes on to say, If you favor the death penalty, would you favor it, and she marks other and says, Imprisonment strongly. She says on her questionnaire --

THE COURT: Where did that last come from?

MS. ROSE: Her questionnaire.

THE COURT: Right.

MS. ROSE: And then I'll address her court statements.

She also, in response to question 123 on the questionnaire, says, If you oppose the death penalty, would you say that you, and it asks for a commentary portion. And she said, I would strongly support the death penalty if it meant life imprisonment.

Now, she further went on to say during her questioning whenever I asked her about the death penalty, she said, I don't really have a view. I believe in life imprisonment. That she favored imprisonment strongly.

THE COURT: Now, are you talking about her verbal

responses here?

MS. ROSE: Yes.

THE COURT: What page?

MS. ROSE: I don't have the transcript. Those are quotes from the notes. As I was questioning her, Ms. Tompkins was making notes.

MS. LAWSON: Your Honor, I just ask you please to review her statements in the transcript that you have. It's --

THE COURT: That's what I intend to do.

MS. LAWSON: It's July 26, the morning. It's volume 10.

THE COURT: I have it in front of me.

MS. ROSE: And we can take a look at those or the court can review those as well.

The other thing I would add, Your Honor, that this doesn't reflect, and even Ms. Lawson and Mr. Bender commented to me at the break on that day at how hostile she was toward me in my questioning. That she was very -- we weren't really joking about it, but it was very clear that she was not cooperating with the government and was clearly being openly -- she openly disliked me; and certainly I think the government has the right, if they have the challenges, to strike someone from the jury who is openly hostile to them.

The quote to which I referred Your Honor is on 2052,

line 15 and 16.

THE COURT: Okay. Given the drift of this juror toward life imprisonment, the court finds that the explanation of the government for a nonpretextual reason is sustained. The court will therefore overrule the Batson objection, considering the arguments of both sides.

So the government's first strike was to number 2, Pendergrass.

And the next one on the list is George Evans, number 22.

MS. HANKINS: Judge, do the other ones slide down again?

THE COURT: No.

MS. HANKINS: Just fill that in, okay.

THE COURT: And the next strike was to number 4 which is Andrea Bryant. And the one to replace her would be number 123, Gary Bowman.

Now, will there be any further challenges by the government of peremptories?

MS. ROSE: No, Your Honor.

THE COURT: Do you accept the jury?

MS. ROSE: Yes.

THE COURT: The alternates --

MS. ROSE: Yes, sir.

THE COURT: -- as presented?

All right. It goes, then, to the defendant.

MR. BENDER: Just a moment, Your Honor.

THE COURT: The government has used its two challenges.

(Counsel conferred.)

MR. BENDER: Your Honor, are you ready?

THE COURT: Yes, sir.

MR. BENDER: We will excuse as an alternate juror, I guess she's in alternate seat number 2, Ms. Butler, number 8.

THE COURT: No, let's see. I have number two as George Evans.

MR. BENDER: I thought we were moving.

THE COURT: No. When we did the one for cause, it was -- I consider that --

MR. BENDER: Okay.

THE COURT: -- as if that person no longer was in the mix so the other ones moved up.

MR. BENDER: Okay.

THE COURT: But now we're just looking at particular slots and the slots that came open by way of peremptories were 2 and 4, so the next one on the list went to seat 2 and that was Evans.

MR. BENDER: Okay.

THE COURT: And the one after that went to seat 4

and that was Bowman.

MR. BENDER: Okay. All right. That's fine. We still exercise that strike.

THE COURT: All right. Against Mr. Bowman.

MR. BENDER: No, Butler.

THE COURT: Against --

MR. BENDER: Wanda Butler.

THE COURT: Oh, I get you. Number 8. Very good.

MR. BENDER: Right. We're satisfied with the others.

THE COURT: All right, sir.

Now, the next one on the list is Larry Shattuck, number 153.

(Counsel conferred.)

MR. BENDER: Your Honor, I think we have our jury and our alternates.

THE COURT: All right, sir. Thank you.

So reviewing, the defendant has one alternate strike left and the government used its alternate strikes. The government used eleven regular strikes, leaving nine. Defendant used fifteen strikes, leaving five.

So the jury, then, will be seat one, number 132, Ann Martens.

Seat number 2 -- okay. The clerk has given me a clean sheet of paper. Diane Edwards, 104.

Number 3, 45, Peggy McManus.

4, Scott Dockery, number 14.

And 5 is John Fowler, number 226.

6 is Deana Stanford, number 222.

Number 7 is Kristal Roseboro, number 223.

Number 8, Jacob Santinelli, number 118.

Number 9, Joseph Reinhardt, number 266.

Number 10, 138, Gary Moore.

Number 11, 141, Joanna Greenwood.

Number 12 is Bryan Williams, 36.

And alternate 1 is Corey Phifer, number 6.

Number 2, George Evans, number 22.

Number 3 alternate is Mr. Larry Shattuck, 153.

And 143, Gary Bowman, is number 4.

Okay. Scott Dockery is number 16 -- I mean 160, sorry. I misspoke and said something about him being number 14, but that's incorrect.

Okay. For the information of the parties, the court proposes to have the jurors starting from the front row to the left 1 through 6, leaving two seats. And on the back row, starting from the left, 7 through 12, leaving two seats. Then as to this cluster of four seats, on the far right, number 1 would be on the left front seat. Number 2 is the left -- the right front seat. And number 3 is the left rear seat. And number 4, it actually has a 4 on it, that's the number 4 rear

seat.

MR. BENDER: That's the only person who could find their seat.

THE COURT: That's right. And if they're milling around, we'll understand.

Is there anything else relative to jury selection?

MR. BENDER: No, Your Honor.

THE COURT: I would hear the parties as to how many we think we might want to bring in just as a reserve against what we were talking about the other day, the possibility that once faced with the reality of jury service, somebody might come up with a panicky type excuse or otherwise come up with something that suffice for cause or simply didn't show and somebody who couldn't get into court on Monday.

MR. BENDER: Your Honor, we would suggest four, which would be the same number as the alternates.

THE COURT: Well --

MS. TOMPKINS: That sounds fine.

THE COURT: -- five for good measure?

MR. BENDER: Sounds good.

MS. TOMPKINS: Five would be fine.

THE COURT: All right. I hate to inconvenience anybody, but we'll work from five. And I would advise the clerk which five those are, and that would be the next five on the list.

Now, this list, I have asked the clerk to take a copy of the random list that we've been using and file it as Court Jury Selection Exhibit Number 1. And she won't file it, however, until Monday, until we make sure we don't need anybody else, so that we retain the random and unpredictable slate of jurors who might be coming in next.

Now, the order of business would be, I take it Monday we would hear the parties. First of all, does anybody anticipate any motions at this point?

(Counsel conferred.)

MR. BENDER: As I recall, Your Honor has ruled on motions in limine sort of on a case-by-case basis.

THE COURT: That is my recollection.

MR. BENDER: That's the only thing we would have.

THE COURT: Yes, sir.

MR. BENDER: We don't anticipate filing any more.

THE COURT: All right, sir. So we'll bring the jury in, have them seated. I will ask them that question about whether anything new has come up to affect their ability to be fair and impartial. And then assuming we have no shake up of jurors at that point, we will proceed with opening statement -- well, the court would give that preliminary instruction reminding the jurors of the essential framework of law within which the facts will be found and the preliminary jury instructions that are contained in the bench book that I went

over with you, and you can look at a copy of it if you wish. But in any event, it's the innocuous stuff that we take up at the beginning of every trial, particularly about juror conduct. Then I will take -- the parties will be offered the opportunity to make opening statements.

Would there be any view about the time you might want for an opening statement?

MS. ROSE: 30 minutes.

MS. LAWSON: I don't think we'll take longer than that, Your Honor.

THE COURT: All right. That's certainly not -- we'll look at that as a contemplated outer limit, keeping in mind that these aren't arguments; they're statements of how counsel might forecast the evidence to proceed. And then we would go into evidence.

I thank all of you for your professionalism and your very capable approach to these matters.

MR. BENDER: Thank you. Have a good weekend.

THE COURT: Yes, sir. Wait one second.

(The court and Ms. Dannelly conferred.)

THE COURT: Oh. Let me ask the government to depart. Not that we've gotten tired of you or anything, but we have certain budgetary matters to take up --

MS. TOMPKINS: Do what?

THE COURT: -- that are ex parte in nature.

MS. TOMPKINS: Oh, no problem.

THE COURT: We just need you to be out of the room for the time being.

MS. TOMPKINS: Okay. We'll just leave and then we'll come back. We didn't know if it was going to be lengthy.

THE COURT: I definitely think it won't be lengthy.

(Ex parte hearing.)

(Evening recess at 2:35 p.m.)

371

JA1203

Case 3:12-cv-00327-MOC   Document 100   Filed 09/23/15   Page 190 of 192

**JA1204**

JA1205



RECEIVED
JUN 1 6 2003
US ATTORNEY'S
OFFICE
CHARLOTTE, NC

**JA1206**

# IN THE

# United States Court of Appeals

## FOR THE FOURTH CIRCUIT

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

v.

AQUILIA MARCIVICCI BARNETTE,

*Defendant-Appellant.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA

## JOINT APPENDIX - VOLUME II OF V
### (Pages 372 - 844)

HAROLD J. BENDER
LAW OFFICE OF HAROLD J. BENDER
200 North McDowell Street
Charlotte, NC 28204
(704) 333-2169

ROBERT J. CONRAD, JR.
UNITED STATES ATTORNEY
WESTERN DISTRICT OF NC
Suite 1700, Carillon Building
227 West Trade Street
Charlotte, NC 28202
(704) 344-6629

MARK E. OLIVE
ATTORNEY AT LAW
320 West Jefferson Street
Tallahassee, FL 32301
(850) 224-0004

ANNE M. TOMPKINS
ASST. UNITED STATES ATTORNEY
WESTERN DISTRICT OF NC
Suite 1700, Carillon Building
227 West Trade Street
Charlotte, NC 28202
(704) 344-6222

*Counsel for Appellant*

*Counsel for Appellee*

**Additional Counsel Listed on Back of Cover**

LANTAGNE LEGAL PRINTING 801 East Main Street Suite 100 Richmond, Virginia 23219 (804) 644-0477
A Division of Lantagne Duplicating Services

Case 3:12-cv-00327-MOC   Document 101   Filed 09/23/15   Page 1 of 200

JILL WESTMORELAND ROSE
ASSISTANT UNITED STATES ATTORNEY
WESTERN DISTRICT OF NORTH CAROLINA
100 Otis Street, Room 233
U.S. Courthouse Building
Asheville, North Carolina 28801
(828) 271-4661

JA1208

# TABLE OF CONTENTS

Federal District Court Docket Sheet . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Indictment filed February 4, 1997 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 69

Guilty Verdict returned January 27, 1998 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 75

Defendant's Motion in Limine Regarding the Victim
Impact Statements, filed June 4, 2002 . . . . . . . . . . . . . . . . . . . . . . . . . . . . 76

Motion for Allocution by the Defendant, filed
June 4, 2002 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 78

Government's Response in Opposition to
Defense Motion in Limine to Prohibit
and/or Limit Victim Impact Evidence,
filed June 12, 2002 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 80

Government's Response to Motion for Allocution
by the Defendant, filed June 12, 2002 . . . . . . . . . . . . . . . . . . . . . . . . . . 89

Order Denying Defendant's Motion for Allocution,
entered June 18, 2002 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 93

Order Denying Defendant's Motion in Limine
regarding the Victim Impact Statements,
entered June 21, 2002 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 97

Motion for Relief Pursuant to *Ring v. Arizona*
filed July 2, 2002 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 100

Attachments:

Indictment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 103

1

**JA1209**

JA1210

Government's Notice of Intent to Seek
the Death Penalty, filed August 7, 1997 . . . . . . . . . . . . . . . . . . . . . . . . . . . 110

Government's Reaffirmation of Intention
to Seek the Death Penalty, filed July 30, 2001 . . . . . . . . . . . . . . . . . . . . 118

Defendant's Memorandum in Support of Motion
Regarding *Ring*, filed July 12, 2002 . . . . . . . . . . . . . . . . . . . . . . . . . 121

Government's Response to Defendant's Motion for
Relief Pursuant to *Ring v. Arizona*,
filed July 12, 2002 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 128

Voir Dire:

Prospective Juror Regina Sanders (888) . . . . . . . . . . . . . . . . . . . . . . . . . 133

Prospective Juror Edwards (1014) . . . . . . . . . . . . . . . . . . . . . . . . . . . 148

Prospective Juror Karen Sanders (1071) . . . . . . . . . . . . . . . . . . . . . . 169

Prospective Juror Blakeney (1143) . . . . . . . . . . . . . . . . . . . . . . . . . . 184

Prospective Juror Bryson (1239) . . . . . . . . . . . . . . . . . . . . . . . . . . . 205

Prospective Juror Donaldson (1289) . . . . . . . . . . . . . . . . . . . . . . . . . 224

Prospective Juror Campbell (1477) . . . . . . . . . . . . . . . . . . . . . . . . . . 245

Prospective Juror Moore (1913) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 264

Prospective Juror Deana Stanford (1960) . . . . . . . . . . . . . . . . . . . . . . . 281

Parties' exercise of peremptory challenges to the
prospective jurors, July 27, 2002 . . . . . . . . . . . . . . . . . . . . . . . . . . . 294

2

**JA1211**

**JA1212**

## *Volume II*

Resentencing Volume 12, July 29, 2002, (Morning) . . . . . . . . . . . . . . . . . . . . . . 372

Resentencing Volume 12, July 29, 2002 (Afternoon) . . . . . . . . . . . . . . . . . . . 469

Resentencing Volume 13, July 30, 2002 (Morning) . . . . . . . . . . . . . . . . . . . . . 587

Resentencing Volume 13, July 30, 2002 (Afternoon) . . . . . . . . . . . . . . . . . . . 687

Resentencing Volume 14, July 31, 2002 (Morning) . . . . . . . . . . . . . . . . . . . . . 773

## *Volume III*

Resentencing Volume 14, July 31, 2002 (Afternoon) . . . . . . . . . . . . . . . . . . . 845

Resentencing Volume 15, August 1, 2002 (Morning) . . . . . . . . . . . . . . . . . . . 959

Resentencing Volume 16, August 5, 2002 (Morning) . . . . . . . . . . . . . . . . . . 1029

Resentencing Volume 16, August 5, 2002 (Afternoon) . . . . . . . . . . . . . . . . . 1107

Resentencing Volume 17, August 6, 2002 (Morning) . . . . . . . . . . . . . . . . . . 1202

## *Volume IV*

Resentencing Volume 17, August 6, 2002 (Afternoon) . . . . . . . . . . . . . . . . . 1312

Resentencing Volume 18, August 7, 2002 (Morning) . . . . . . . . . . . . . . . . . . 1424

Resentencing Volume 18, August 7, 2002 (Afternoon) . . . . . . . . . . . . . . . . . 1533

Resentencing Volume 19, August 8, 2002 (Morning) . . . . . . . . . . . . . . . . . . 1634

Resentencing Volume 19, August 8, 2002 (Afternoon) . . . . . . . . . . . . . . . . . 1726

**JA1213**

**JA1214**

### *Volume V*

Resentencing Volume 20, August 9, 2002 (Morning) .................... 1799

Resentencing Volume 20, August 9, 2002 (Afternoon) ................... 1822

Resentencing Proceedings, August 12, 2002 ........................ 1870

Resentencing Proceedings, August 13, 2002 ........................ 2017

Defendant Motion for Mistrial regarding victim
    impact testimony, filed August 5, 2002 ........................ 2034

Written questions from the jurors filed August 13, 2002 ................ 2037

District Court Judge's answer to jurors' written question
    filed August 13, 2002 ........................ 2038

Jury verdict form with reference to count 7, filed
    August 13, 2002 ........................ 2039

Jury verdict form with reference to count 8, filed
    August 13, 2002 ........................ 2057

Jury verdict form with reference to count 11, filed
    August 13, 2002 ........................ 2075

Judgment and Order imposing sentence, entered
    August 20, 2002 ........................ 2092

Defendant's Motion for New Trial, Arrest of Judgment
    and Other Relief, filed August 20, 2002 ........................ 2097

Order Denying Defendant's Motion for New Trial,
    Arrest of Judgment and Other Relief
    entered September 9, 2002 ........................ 2149

4

## JA1215

**JA1216**

2365



UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION

UNITED STATES OF AMERICA     )     DOCKET NO. 3:97-cr-23-V
                             )
     vs.                     )
                             )
AQUILIA MARCIVICCI BARNETTE, )     VOLUME 12
                             )     MORNING
          Defendant.         )
_____)


TRIAL PROCEEDINGS
BEFORE THE HONORABLE RICHARD L. VOORHEES
UNITED STATES DISTRICT COURT JUDGE
JULY 29, 2002


APPEARANCES:

On Behalf of the Government:

     ANNE M. TOMPKINS, ESQ.
     JILL WESTMORELAND ROSE, ESQ.
     227 West Trade Street, Suite 1700
     Charlotte, North Carolina

On Behalf of the Defendant:

     JEAN B. LAWSON, ESQ.
     P.O. Box 472106
     Charlotte, North Carolina

     HAROLD J. BENDER, ESQ.
     200 North McDowell Street
     Charlotte, North Carolina


                    Cheryl A. Nuccio, RMR-CRR
                     Official Court Reporter
                   United States District Court
                    Charlotte, North Carolina

JA1217

MONDAY MORNING, JULY 29, 2002

(Jury not present.)

THE COURT: Good morning. The defense has made two motions in limine, one concerning the firebombing and one concerning medical examiner testimony and exhibits. Does the government wish to be heard?

MS. ROSE: Yes, Your Honor. As to both medical examiner's testimony and exhibits and the motion in limine concerning the evidence of the April 1996 firebombing, the government requests that you deny the motion.

Each of those incidents and evidence of each -- from each of those go to the government's aggravating factors, future dangerousness, as well as substantial planning and premeditation. As well, in determining punishment all relevant evidence, whether it's harmful or helpful, should be considered provided it's otherwise admissible according to United States law. In order to enable the resentencing jury to fulfill its responsibility -- or the sentencing jury to fulfill its responsibility, the government is authorized to offer evidence for the purpose of putting this jury in the very same position of having at least as much knowledge as the previous jury.

And on those grounds we would ask that you deny the motions.

THE COURT: Okay. The court will deny the motions.

(The court and Ms. Hankins conferred.)

THE COURT: Okay. Are the parties ready to bring the jury in to make a final inquiry of them?

MR. BENDER: Yes, sir.

MS. TOMPKINS: Yes, Your Honor.

MS. LAWSON: Yes, sir.

THE COURT: All right. After which time we will go forward with the -- some -- an overview of the instructions, as I said, conduct of jurors, that sort of thing.

I would propose to read the counts of the indictment, Seven, Eight, and Eleven, since this jury will not have heard that heretofore and perhaps give them a little clarity on exactly what it is -- what is being referred to when we talk about the counts of the indictment.

Okay. If there's nothing further, we'll ask the jury to come in, please.

(Jury entered the courtroom.)

THE COURT: Good morning, members of the jury.

THE JURY: Good morning.

THE COURT: Before we begin, I'd like to ask you this one question; and if you have an affirmative answer to this, please just raise your hand at this point. Since you answered the written questionnaire and participated in jury selection over the last couple of weeks, has anything happened or has anything come to your mind which you believe may

prevent you from being fair and impartial as to both parties in this case?

(No response.)

THE COURT: Okay. Thank you very much.

Excuse me just a second.

(The court and Ms. Hankins conferred.)

THE COURT: Okay. I'll ask the clerk to impanel the jury, please.

(All sixteen jurors were duly impaneled.)

THE COURT: Thank you, Madam Clerk.

Members of the jury, I'll go over some instructions with you by way of a preliminary statement.

It will be your duty, members of the jury, to find from the evidence what the facts are. You and you alone will be the judges of the facts. You will then apply to those facts the law as the court will give it to you. You must follow that law whether you agree with it or not.

Nothing the court may say or do during the course of this trial -- that means the presiding judge. Nothing the court may say or do during the course of the trial is intended to indicate or should be taken by you as indicating what your verdict should be. The evidence from which you will find the facts will consist of the testimony of the witnesses, documents and other things received into the record as exhibits, and any facts that the lawyers may agree to or

stipulate to.

Now, certain things are not evidence and must not be considered by you. And I'll list these for you now.

First of all, the statements, the arguments, and the questions by the lawyers are not evidence. So you have to make a distinction in your mind between what is said by the lawyers out here and what is said from the witness stand, because only what is said from the witness stand as sworn testimony is the evidence.

Objections to questions are not evidence. The lawyers have an obligation to their respective clients to make objections when they believe evidence being offered may be improper under the rules of evidence. You should not be influenced by the objection or by the court's ruling on it.

You should not -- now, then, if you are -- you are instructed that if some item of evidence is received for a limited purpose only, you must follow that instruction.

Testimony that the court has excluded or told you to disregard is not evidence and must not be considered.

Anything you may have seen or heard outside the courtroom is not evidence and must be disregarded. You are to decide the case solely on the evidence presented here in the courtroom.

Now, there are two kinds of evidence, direct and circumstantial. Direct evidence is direct proof of a fact,

such as testimony of an eye witness. Circumstantial evidence is proof of facts from which you may infer or conclude that other facts exist. I'll give you other instructions on this and other matters toward the end of the case, but keep in mind you may consider both types of evidence.

Now, in making all the determinations you're required to make in the sentencing phase, you may consider only the evidence that will be presented at this sentencing phase of the trial. You may not consider as evidence anything that the court or the attorneys said during the orientation and jury selection process.

Now, in deciding what the facts are, you may have to decide what testimony to believe and what testimony not to believe. You may believe all that a witness says or only part of it or none of it. In deciding what testimony of any witness to believe, consider the witness's intelligence, the opportunity the witness had to have seen or heard the things testified about, the witness's memory, any motives the witness may have for testifying a certain way, the manner of the witness while testifying, whether that witness said something different at an earlier time, the general reasonableness of the testimony, and the extent to which the testimony is consistent with other evidence that you believe.

You will hear testimony from certain law enforcement officers. The fact that a witness may be employed by a

governmental unit as a law enforcement official does not mean that his or her testimony is deserving of more or less consideration or greater or lesser weight than that of an ordinary witness. It is for you to decide after weighing all the evidence in light of the instructions I give to you about the factors relevant to determining the credibility of any witness whether you accept the testimony of a law enforcement witness and what weight, if any, it deserves.

So today we begin the sentencing phase of this matter. Before the trial -- excuse me, before the parties begin with their presentations, I wish to give you a brief summary of the applicable law. I'll give you a full instruction on the law at the conclusion of this hearing.

Now, the defendant has been found guilty of the offenses contained in Counts Seven, Eight, and Eleven of the bill of indictment. Now, I'll read those to you right now to give you some background in that.

An indictment is not evidence. It is only an accusation. With that in mind, I'll simply read the -- these Seven, Eight, and Eleven counts.

The court would mention the fact that during the jury selection process, you heard perhaps certain references to the charges of conviction as being carjacking resulting in death and perhaps first degree murder by use of a firearm. As you'll hear from the way these counts are worded, there's a --

this will be the full legal statement of what the charges were.

In Count Seven, the government alleged that on or about June 22, 1996, in Mecklenburg County, within the Western District of North Carolina, the defendant, Aquilia Marcivicci Barnette, with intent to cause death or serious bodily harm, did knowingly, willfully and unlawfully take by force, violence and intimidation, that is, he shot to death and took from the person of Donald Lee Allen, a motor vehicle which had been shipped, transported and received in interstate or foreign commerce, that is, a 1994 Honda Prelude with the vehicle identification number given in that count. In violation of Title 18, U.S. Code, Section 2119(3).

Count Eight alleges that on or about the 22nd day of June, 1996, in Mecklenburg County, in the Western District of North Carolina, the defendant, Aquilia Marcivicci Barnette, knowingly used and carried a firearm, that is, a sawed-off Winchester semi-automatic shotgun, during and in relation to a crime of violence for which he may be prosecuted in a court of the United States, that is, the carjacking set forth in Count Seven above, and in the course of this violation, caused the death of Donald Lee Allen through the use of a firearm, which killing is a murder as defined in Title 18, U.S. Code, Section 1111, in that the defendant, with malice aforethought, did unlawfully kill Donald Lee Allen by shooting him with the

firearm willfully, deliberately, maliciously, and with premeditation. In violation of Title 18, U.S. Code, Section 924(c)(1) and (i)(2)(1).

And then in Count Eleven, the government alleged that on or about the 22nd day of June, 1996, in Mecklenburg County, in the Western District of North Carolina and in the Western District of Virginia, the defendant, Aquilia Marcivicci Barnette, knowingly used and carried a firearm, that is, a sawed-off Winchester semi-automatic shotgun, during and in relation to a crime of violence for which he may be prosecuted in a court of the United States, that is, the act of interstate domestic violence set forth in Count Ten, and in the course of this violation, caused the death of Robin Williams through the use of a firearm, which killing is a murder as defined in Title 18, U.S. Code, Section 1111, in that the defendant, with malice aforethought, did unlawfully kill Robin Williams by shooting her with a firearm willfully, deliberately, maliciously, and with premeditation. In violation of Title 18, U.S. Code, Sections 924(c)(1) and (i)(2)(1).

Now, you must consider whether imposition of a sentence of death is justified as to any one, two or three of those counts, or whether the defendant should be sentenced to life imprisonment without the possibility of release. You must make this decision separately for each count. You are

not required to make the same decision on each count and your deliberations must be separate as to each count. The law leaves this decision exclusively to you, the jury, to determine. And if you determine that the defendant should be sentenced to death or to life imprisonment without possibility of release, the court is required to follow and impose that sentence.

I will now instruct you as to the process you must follow separately in making your verdict. Now, this process must be followed as to each of Counts Seven, Eight, and Eleven separately.

Two terms you have already heard and will hear throughout this phase of the case are aggravating factors and mitigating factors. These factors have to do with the circumstances of the crime or the personal traits, character or background of the defendant, and perhaps victims.

The word aggravate means to make worse or more offensive or to intensify.

The word mitigate means to extenuate or to make less severe or to make -- or to moderate.

An aggravating factor is a fact or circumstance which would tend to support imposition of the death penalty.

A mitigating factor is any aspect of the defendant's character or background, any circumstance of the offense, or any other relevant fact or circumstance which might indicate

that the defendant should not be sentenced to death.

Now, in the death penalty statute, aggravating factors are listed. These are called statutory aggravating factors. As I instructed you -- or you may have heard earlier, before you may consider imposition of the death penalty for any one, two or all three of Counts Seven, Eight or Eleven, you must find that the government proved at least one of these aggravating factors specifically listed in the death penalty statute and your finding must be unanimous and beyond a reasonable doubt.

There also may be nonstatutory aggravating factors which are those not specifically set out in the death penalty statute. Again, your finding that any nonstatutory aggravating factors exist must be unanimous and beyond a reasonable doubt if, in fact, you make such a finding.

Now, you must determine the existence of the aggravating factors separately for each of Counts Seven, Eight, and Eleven. You are not allowed to take an aggravating factor from one count and apply it to another count.

The defendant has the burden of proving any mitigating factors; however, there is a different standard of proof as to mitigating factors. You need not be convinced beyond a reasonable doubt about the existence of a mitigating factor. You need only be convinced that it is more likely true than not in order to find that it exists.

FORM FED ⊛ PENGAD • 1-800-631-6989

A unanimous finding is not required. Any one of you may find the existence of a particular mitigating factor.

Now, if you have found that at least one statutory aggravating factor exists, you then must weigh the aggravating factors you found to exist against any mitigating factors you found to exist to determine the appropriate sentence.

You must also make a finding concerning the intent or the mental state of the defendant as to each offense. And that would be -- the burden is on the government there again to prove that beyond a reasonable doubt to all the jurors.

Now, I'll give you detailed instructions regarding the weighing of aggravating and mitigating factors before you begin your deliberations; however, I instruct you now that you must not simply count the number of aggravating and mitigating factors and reach a decision based on which number is greater. You must consider the weight and value of each factor. And if there are no mitigating factors found by the jury, you must still weigh the evidence and consider whether a penalty of death would be justified given your other findings and your overall assessment of the case.

Now, then, I instruct you that during the trial, you're not to discuss the case with anyone or permit anyone to discuss it with you or in your presence. And that includes your fellow jurors. So until you retire to the jury room at the end of the case to deliberate on your verdict, you're

simply not to talk about it. If someone at home or elsewhere asks you about it, you must tell them the court has told you not to talk about it until it's over, at which time you may talk about it if you wish.

Second, do not read or listen to anything touching on this case in any way. And if anyone should try to talk to you about it notwithstanding the court's instructions, you must bring that to the court's attention promptly.

And third, do not try to do any research or make any investigation about the case on your own.

And lastly, do not form any opinion until all the evidence is in and you have heard the arguments of counsel and the instructions of the court as to the law.

So, you keep an open mind until you start your deliberations at the end of the case. Only at that point have you heard everything you need to hear to make any -- form any opinions or make any conclusions, and you do that in deliberation with your fellow jurors.

Now, if you wish, you may take notes; but if you do, you must leave them in the jury room when you leave at night. And remember, they are for your own personal use. Sometimes it is distracting to take notes and you want to be sure if you do that, that you are paying attention to what is being said by way of testimony.

Now, the order of business here will be as follows:

First, the government will have an opportunity to make an opening statement which is simply an outline to help you understand the evidence as it comes in. Next, the defense attorneys may, if they wish, make an opening statement at this time. Opening statements are neither evidence nor arguments.

Now, the government would then present its witnesses and counsel for the defendant may cross examine them.

Following the government's case, the defendant may, if he wishes, present witnesses who the government may cross examine.

After all the evidence is in, the attorneys will present their closing arguments to summarize and interpret the evidence for you, and the court will instruct you on the law. After that, you retire to deliberate on your verdict.

Now, as you have heard, some of you -- if you -- something is said from the witness stand or perhaps by counsel or the court that you don't understand or if it's mumbled or indistinct, just raise your hand and we'll have it repeated for you. It's important that all of you decide the case based on the same evidence so it's important that all of you hear what is being said. So don't hesitate to do that.

Now, occasionally the court needs to speak with the attorneys about some matter of law or something administrative or logistical and sometimes we may save time by taking that over here at the side-bar with the court reporter. And we do

that to save the time it would take to send the jury out. But there will be other times when we would ask you to step into the jury room so we can accomplish whatever it is that we need to talk about outside the presence of the jury. But if we do take a side-bar over here, you may stand and stretch and be at ease and you may chat with one another, but not about the case.

Thank you very much for your attention to these instructions.

Will the government have its opening statement at this time?

MS. ROSE: Yes, we will, Your Honor.

May it please the court: June 21st is the summer solstice and that's the longest day of the year. On June 21st, 1996, the defendant used those long hours to put the finishing touches on his deadly plans.

The evidence will show that throughout the course of that day he gathered together tools that he would use for death and destruction. He packed a bag with a crowbar, handcuffs, wire cutters, shotgun shells, and a Winchester .12 gauge semi-automatic shotgun.

The evidence will show that the defendant had sawed off the stock and the barrel himself. Had taped a small flashlight to the top of the barrel, and had taken the time to color the lens red so that he could see in the darkness yet

avoid detection.

And toward the end of that very long day, the defendant began to implement his deadly plans. He dressed in black head to toe: black pants, black shirt, black hat. He gathered his bag that he had so carefully packed, left his home on West Boulevard, walked about a mile down the dark roadside of Billy Graham Parkway to the intersection of Morris Field Road. That intersection was dark and lightly traveled.

As he arrived there close to midnight, the defendant had his bag and he was ready. Soon, very soon, two people would die.

And on that very same summer day, 22-year-old Donnie Allen of McConnell, South Carolina, worked his job at the Jacobson Division of Textron. At the end of the day he went home to his family. Ate dinner, took a shower, and visited with his parents. None of them knew it would be their last. How could they?

About 7:30 Donnie said he was going to go out, meet some friends, play some pool. And he drove up to Coyote Joe's on Wilkinson Boulevard and he did just that. He met some friends and played some pool. At about midnight he left. Went out on Wilkinson Boulevard, down Morris Field Road to the intersection of Billy Graham Parkway.

And on that hot summer evening, Donnie had his window down. And as he sat there waiting for the light to

change, the evidence will show the defendant put a shotgun in his face and ordered him out of the car. Donnie complied. The defendant wanted his wallet. Donnie gave it to him. You'll hear from the evidence that the defendant ordered Donnie across the road, down a small incline into a ditch to a concrete culvert. The evidence will also show that Donnie Allen's last words were, Please don't shoot. Don't hurt me.

The defendant ordered him to turn around, shot him three times, twice in the back. He then picked up his bag, got in Donnie's car and headed for Roanoke. Donnie Allen died in the ditch, in the dark, in the weeds alone and could only be identified by his dental records when he was found several days later.

The defendant took Donnie's car and drove to Roanoke. He took Donnie's money and bought gas. And somewhere along the way he changed out of his black clothing. The defendant was going to Roanoke for one reason: one down, one to go.

Robin Williams, the former girlfriend of the defendant, lived in Roanoke. She had broken up with him in April. And on April 30th he had gone to her apartment, firebombed it such that she had to jump from a second story window to save herself. She suffered severe burns. She spent a number of days at the University of Virginia Burn Center, and she was home recuperating at her mother's on Lowden Avenue

in Roanoke. Robin Williams was disfigured, but she was alive and the defendant was coming to finish what he started.

He got to the Williams' home a little before daybreak. As he sat there, he watched the morning come to life. Robin's brother dropped off his baby for Mrs. Williams to keep. Robin let her dog out.

And as Mrs. Williams was in the kitchen playing with her grandbaby, baking brownies for a church luncheon, the defendant slipped from Donnie's car, grabbed his sawed-off shotgun and some spare shells, his wire cutters and cut the phone lines to the Williams' home. He blasted his way in the back door with three shots, kicked the door in. And as Mrs. Williams stood there holding her grandbaby, he calmly reloaded his gun. All Mrs. Williams could do was scream run, Robin, run. Run, Robin, run. Robin did just that.

The evidence will show she ran out the front door chased by the defendant. She ran through the neighborhood. He finally caught her, dragging her, sometimes by the hair, across her neighbor's lawn screaming at her; she begging for her life. Her mother came to try to save her. Robin broke away from the defendant, ran toward her mother, and he shot her in the back. She fell at her mother's feet and died. There was nothing her mother could do to save her.

The defendant got in Donnie's car. He didn't come back to Charlotte. He drove across the state of Virginia into

Tennessee to Knoxville where he went to a hotel, stole a license plate to avoid detection. He then later came back to Charlotte, abandoned Donnie's car behind a shopping center on Independence Boulevard.

Several days later he arranged to be arrested by law enforcement at his mother's home. When they got there, the defendant was dressed in slacks, a button down and suspenders. Not the black clothes he had on when Donnie was murdered. And the evidence will show he was clutching a shotgun when he shot Donnie and Robin in the back, not a Bible as he was clutching when law enforcement got there. He did later confess to both killings.

You're going to hear evidence that this was not the first time the defendant had been violent. That he's had a history of violence. Criminal arrests, felony convictions, and turbulent relationships with women.

Now, members of the jury, that's a summary of the evidence we expect you to hear during the government's case. And the purpose of that evidence is to prove each of the aggravating factors beyond a reasonable doubt to each of you.

Now, there are going to be aggravating factors related to each of the two murders.

First, as to the murder of Donnie Allen, that the defendant committed the murder for pecuniary gain; that is, that he wanted something of value: Donnie's car, the money

that was in Donnie's wallet.

Secondly, that the defendant committed Donnie's murder after substantial planning and premeditation.

The third aggravating factor is that the defendant has committed a pattern of violence throughout his life such that if he is allowed to live, he will be a serious and continuing threat.

Fourth, is the harmful scope and effect of Donnie's murder on the Allen family.

And fifth, that the defendant killed two people.

Now, there are also going to be aggravating factors related to Robin's murder.

First, that during the commission of Robin's murder, the defendant created a grave risk of harm to others; that being her mother and a neighbor, Sonji Hill.

Secondly, that the defendant murdered Robin after substantial planning and premeditation.

Third, that the defendant has committed a pattern of violence such that once again, if he is allowed to live, he will be a serious and continuing threat.

Fourth, the horrible scope and effect of Robin's murder on her family.

And fifth, that the defendant murdered two people.

In proving each of these aggravating factors to you beyond a reasonable doubt, the government will have shown that

there is but one true verdict in this case and that is a verdict of death for the murders of Robin Williams and of Donnie Allen.

In murdering Donnie and Robin, the defendant brought together two people who were strangers. Two people who under any other circumstances would never have been joined together in any way. But he joined them together in a very gruesome way. He joined them together in death.

The defendant murdered Donnie and Robin. The evidence will show he shot them in the back. The evidence will show they begged for their lives. The evidence will show he showed them no mercy and they are gone, but we're here. The Williams family, the Allen family, and the United States of America is here and we are here for justice.

THE COURT: May the defense have an opening statement at this point?

MS. LAWSON: Yes, Your Honor. Thank you.

THE COURT: Yes, ma'am.

MS. LAWSON: We're all here to decide what to do about Marc Barnette, and what you heard from the government is what brings us here. It's what caused him to be convicted of these crimes. But that's just the starting point.

And in the two years that Harold Bender and I have represented Marc, we've been trying to figure out the same thing that you're undoubtedly thinking. How, in the name of

heaven did this happen? And over this period of time, we've talked to a lot of people. We've researched. We've talked to experts, people who know more about these things than we do. And we think we found some information for you that you need to consider. And that's all we can do, is give you information to allow you to make a good decision.

Now, in giving you this information, we're going to talk about abuse. We're going to talk about violence. We're going to talk about neglect. And none of those excuse what Marc Barnette did and we're not offering it for that purpose. We're offering it for information for you to use when you make your decision.

Now, the information that we've been able to get goes back to before the Korean War. It's the story of Marc Barnette and his family and what shaped him into a young man with terrible emotional problems, behavioral problems that are the product of how he was raised. Some uncertain heredity, his physiology.

See, Marc's family were the Coopers, Jesse and Pearl Cooper. Before the Korean War, Jesse and Pearl were married and had a daughter. Her name is Tessie. Jesse went off to the Korean War and fought for us and was horribly injured. He spent a long time in a VA hospital recuperating, and then came back to his family home, to Pearl and to Tessie.

Now, Jesse, by all accounts of his conduct, came

home shell shocked. He started drinking a lot. He didn't take care of his family terribly well. He did all sorts of odd things that you'll hear about. He and Pearl stayed together for a while and had two more daughters, Sonia and Sheila. Sonia is Marc's mother. Pearl stayed for a while longer, but Jesse's behavior got to be too much for her and she left him. They divorced. She took the girls with her. Tessie had grown and moved from the home.

Eventually, Pearl married a man by the name of Leroy Brown who lived with Tessie -- I mean, with Sonia and Sheila in a house here in Charlotte. And one night when Sonia went to a junior prom, Pearl and Leroy were fighting about the cost of Sonia's dress. That night Leroy Brown shot and killed Pearl, his wife, Sonia's mother. Before we get to that, though, we talk about Marc.

Marc was born in July of 1973. When the nurse put Marc in his mother's arms, she was fourteen years old. A child herself. And Pearl was helping Sonia raise this child until the day she was murdered. That day Marc was ten months old. So the girls went back and lived with Jesse for a while and Jesse behaved the way he always had, and Tessie came back and took her sisters in. She was a very young woman herself. She raised them, and Sonia still had Marc with her. And eventually Sonia married Marc -- married the man who was supposed to be Marc's father. His name is Rick Barnette.

Now, Sonia and Rick did not have a good marriage. It was characterized by reciprocal domestic violence. He hit her in the head with a hammer. She stood over him with a frying pan in her hand. There was crying; there was infidelity; there were accusations of infidelity, all in the presence of Marc.

Rick was in the service and the family moved to North Dakota. The fighting continued. Sometimes it was worse than others. Rick got reassigned to Okinawa, so he sent Sonia and the children -- the child back to Charlotte.

And with Rick gone, Sonia started running around. She started acting the way a damaged young woman would act. You'd expect that behavior from somebody who had been through young motherhood, the murder of her mother, being raised by a slightly older sister. Sonia ran around. She drank. Did drugs. Didn't take care for Marc very well. Neglected him.

Eventually, Marc was joined by a little brother. His name is Mario. And while Sonia was running around, Marc took care of his little brother.

Eventually, Rick came back from the service, from Okinawa and the fighting continued and the violence continued. And he was a very strong disciplinarian, but most of the violence in the household was the two parents accusing each other, hurting each other. And that's what Marc saw as he grew up.

Eventually, Marc and Sonia separated and the boys stayed with Sonia. She continued to neglect the children. A good example is she lost her car in an accident and used the insurance proceeds to buy a new car, a red Corvette. She couldn't have driven her sons to school if she wanted to. Mario on one occasion was hit by a car. Sonia couldn't be found. Stayed out all night, leaving the boys alone.

Rick didn't like what was going on, didn't like paying child support for these children, and eventually began to do some math and realized or began to suspect that he was in Okinawa at the time that Mario was conceived. So he forced paternity testing and learned that he was not the father of Mario nor the father of Marc. And to this day nobody knows who Marc's father is. Well, one person does. It's Sonia. But she either can't or won't tell anyone.

Now, what Marc is is the product of his heredity that's somewhat cloudy, his physiology and how he was raised, and the people he knew and the examples he learned how to follow. And during the course of this evidence, you'll see that he grew up to be a terribly damaged young man. And one of the prime ways in which he was damaged is evidenced by the relationships that the government is going to talk to you about.

At a very young age, a young teenager, he had a girlfriend by the name of Sheila. When she broke up with him,

he took a batch of pills. It wasn't a very sophisticated suicide attempt, but it showed the level of his distress.

Not too long after that, he met a girl named Tasha. Tasha would become the mother of his two children, Angelica and little Marc. Tasha, when she gave birth to Angelica, was fourteen years old. Their relationship was characterized by fighting, by violence, by accusations of infidelity, the same things that had plagued his parents' marriage. It was not a pretty marriage or relationship. In fact, they never did marry.

Eventually, Marc left Tasha and lived with Crystal. Again, fighting, accusations of infidelity, jealousy, assaults. Crystal had two small children and Marc had occasion to discipline them once and hit them with a hanger. He himself had been hit with objects as opposed to hands. He was charged with cruelty to children and pled guilty. He was told to get counseling, and he didn't. Instead, he came back to Charlotte.

And in Charlotte he met a girl by the name of Alecia. Now, with Alecia you begin to see how pathological Marc's behavior was. He loved her. And it was a very, very difficult relationship. Again, a lot of fighting. A lot of breakups. A lot of reunions. And in the course of his relationship with Alicia, you see that he became obsessed with her. He did terrible things in broad daylight in front of

JA1242

people.

One time he kicked in a door and ran into a room to get to her, never even seeing the people who were in the room.

Another time he grabbed her off a bus as she went to work and held her trying to talk to her. And when people came to rescue her, he used a knife to hold them at bay.

Eventually he was charged with some of the incidents relating to Alecia and pled guilty and was put on probation. But he didn't report for probation because he was already involved with Robin Williams and he moved to Roanoke to be with Robin. And he loved her the way he had never loved anybody else. To the point that he was insanely jealous of her. Totally wrapped up in her. And she completed him. And eventually he began to think that she was seeing somebody else. He found evidence, telephone numbers, other things, and they fought even more. And they broke up early in 1996. And Marc came back to Charlotte to live in the same place with his mother that he always lived.

In coming back to Charlotte, Marc left behind the thing that was most important to him, the person who completed him, and that was Robin Williams. And although nobody diagnosed him then, it was clear to any person that he was sliding into a major depression. He couldn't sleep. He watched all sorts of bizarre television shows. He couldn't

get a job, although he tried on one occasion and just couldn't pull it together. He began wandering around and acting strange and nobody in the household did anything, got him any help.

And of course, his thinking by then was pretty disordered. He kept calling Robin on the telephone, and family members will tell you that he would weep on the phone begging her to take him back. He cried a lot. But he had been crying even when he was with Tasha. He would crawl in a closet and cry. So you can see the depth of the feelings that he had throughout his life.

In any event, one night he thought when he called Robin that there was a man with her, and he got angry because he was obsessed with Robin. And that's the night that he went up to Roanoke. The purpose was to call this man out into the parking lot. To find out why he was with his Robin. Not very logical, but that's what happened. When nobody came out, he started bashing the car's windows in that he figured belonged to this man who eventually turns out to be Benny Greene. Eventually, he threw a firebomb into the apartment and it burned.

He returned to Charlotte and the next day found out that, in fact, Robin had been injured and that Benny Greene had been in the apartment. He didn't get calmer; he got angrier. He waited for the police to come. He was aware that

there was a warrant for him. Sometimes he'd sit down at the bottom of the driveway waiting for the police to come. His family and his friends knew that the police were looking for him. And they saw him get sadder and more depressed and more withdrawn walking around the house or the yard, watching shows like Tales from the Crypt, not eating. In fact, on one occasion he shaved his head and told his mother he had done it because he was having trouble thinking.

Now, this disordered kind of thinking persisted until he became so obsessed with getting to Robin, to find out why she had broken up with him, why she was with this other man, that he began to put together things that he thought he'd need to get Robin to talk to him. And when he went up to Roanoke, his plan, his idea was something so murky, so confused, so the product of a disordered mind that all he wanted was to get to Robin. He couldn't get to her without getting a car, and there was no car at his house that was operational. The only thing he needed to do, that he wanted to do was to get to Robin. And that's why he left his home and got a car. No excuse. But his thinking was that disordered that he would kill a man for his car.

And he drove to Roanoke and he waited for Robin. And it's clear that he didn't know what he was going to do once he saw Robin. The thoughts swirling in his mind. You know, take her someplace and talk to her. Scare her into

resuming the relationship. Kill her, kill himself. Kill both of them. These thoughts, these obsessional thoughts whirling around in his mind.

And when he finally got to Robin, he still didn't know what he was going to do, but eventually he killed her. At the same time he shot her, though, he wanted to try to catch her. His conflicted thinking, his irrational thinking persisted.

He ran away. He tried to kill himself when he was in Tennessee but failed. And so he came home to his family. Dressed respectfully, held the Bible that he used to read with his grandfather Jesse, called the police and confessed. Told them where to find Donnie Allen's body.

Now, that's how he got to the point where he was convicted. The second part of all this is who has he been since? You'll hear evidence that in the six years that he's been in custody because of these offenses, he has been a model prisoner. Not the first infraction. He's an example to other people in the jail and he's been an example to other people in the prison. He's been so orderly that they've allowed him to be a trustee in one of the institutions in which he's been housed. So the man who sits here now is a very different man. He's changed over the last six years. And you'll hear evidence about why that happened.

You'll hear a lot of evidence about Marc coming from

JA1246

the government witnesses. And again, all we can ask is that you listen to it because all we're trying to do is give you information that will help you make your decision. Thank you.

THE COURT: You may call your first witness.

MS. ROSE: Government will call Benny Greene.

BENJAMIN SPENCER GREENE,

being first duly sworn, was examined and testified as follows:

THE COURT: You may proceed.

MS. ROSE: Thank you.

DIRECT EXAMINATION

BY MS. ROSE:

Q. Good morning, sir. Would you state your name for the members of the jury, please.

A. Yes. Benjamin Spencer Greene.

Q. And how old are you, Mr. Greene?

A. I'm thirty.

Q. Do you live here in Charlotte?

A. Yes, I do.

Q. Where do you work?

A. I work for Nabisco.

Q. What's your position at Nabisco?

A. Truck driver.

Q. How long have you been an employee of Nabisco Corporation?

A. I've been there eight years.

Q. And you might need to speak up a little bit, Mr. Greene. I don't know if everyone can hear you. Thank you.

Prior to moving to Charlotte, where did you live?

A. I lived in Roanoke, Virginia.

Q. How long had you been in Roanoke?

A. Been in Roanoke for twenty-seven years.

Q. Is that your place of birth?

A. Yes, it is.

Q. Did you attend school in Roanoke?

A. Yes, I did.

Q. While you were in high school, did you meet Robin Williams?

A. Yes, I did.

Q. How long had you known Robin?

A. Since tenth grade. Sixteen years old.

Q. Did you two become friends?

A. Yes, we did.

Q. Did you ever have a romantic relationship with Robin?

A. No.

Q. How would you describe the relationship that you did have?

A. With Robin, it was basically a going out to eat, going to the movies type of relationship. It was never romantic. Anything like that.

Q. And did you also hang out with a group of girls who were her closest girlfriends?

A. Yes.

Q. After you graduated from high school, did you two continue to keep in touch?

A. Yes, we did.

Q. During the course of your friendship over those years, did you get to know the Williams family?

A. Yes, I did.

Q. Did you visit in their home?

A. Yes, I did.

Q. Would you just describe for the members of the jury the kind of person that Robin was.

A. She was a very caring, down to earth, good hearted woman.

Q. Was she a lighthearted person?

A. Yes. Just real humorous and, I mean, she was a good friend.

Q. I'm going to show you what has been marked as Government's Exhibit 67W. I'd ask you to take a look at that exhibit. Tell us who that is.

A. That's Robin.

Q. She had a bright smile, didn't she?

A. Yes, she did.

Q. And was that characteristic of Robin?

A.    Yes, it was.

MS. ROSE:  Your Honor, I would move to admit Government 67W.

THE COURT:  Okay.  It may be admitted.

(Government's Exhibit Number 67W was received into evidence.)

Q.    Do you recall when Robin began her relationship with the defendant?

THE COURT:  Wait just a minute.  Was the jury able to see that?

THE JURY:  (Negative nods.)

THE COURT:  Can you see it now?

THE JURY:  (Affirmative nods.)

MS. ROSE:  It may just now be receiving its signal.

BY MS. ROSE:

Q.    Do you recall when the defendant and Robin began their relationship or did she talk to you about it?

A.    No.  She never talked and I never asked.

Q.    Did you know that she was seeing someone?

A.    Yes, I knew she was involved.

Q.    How did you know that?

A.    Through her mother.

Q.    During Robin's involvement with the defendant, did you see her very often?

A.    No.

Q. Did your contacts with her drop off?

A. Yes, it did.

Q. When the defendant and Robin broke up, how did you learn about it?

A. That's a good question. I don't know if it was either through her mother or Robin herself. I don't know.

Q. At some point, though, in that April, did you see Robin?

A. Yes, I did.

Q. What did she tell you at that time?

A. She told me she would -- she had just got out of an abusive relationship and that she was afraid to stay at her place, her apartment.

Q. And as a result of that, what did you offer to do?

A. I offered to stay over there a couple nights of the week.

Q. And why was that?

A. Well, my job was around the corner from it for one thing. It wasn't no big problem for me to go to work. And second of all, I told her if she -- she was paying rent, she shouldn't be afraid to stay in her apartment.

Q. And at that point did Robin tell you much about the relationship with the defendant? Did she describe some of the things that occurred during the course of that relationship?

A. She -- she never really told me and I never did really ask. There's only on one occasion I asked because her -- in

her bedroom her closet doors was broke and I asked her what happened, and that was the only really -- before the incident that we actually talked about it. We never really talked about it.

Q. Did she tell you why her closet doors were broken?

A. Yes.

Q. What did she tell you?

A. She told me he slammed her into -- into the closet doors.

Q. On April the 29th of 1996, did you, in fact, go with Robin the first night back at her apartment?

A. Yes, I did.

Q. And did you stay with her that evening?

A. Yes, I did.

Q. If you can recall, when did you arrive at the Keswick Apartments on that particular evening?

A. I arrived first. It was around 7:00, 7:30. It was just getting dawn -- dusk, I believe it was, that night.

Q. Was Robin home from work yet?

A. No, she wasn't.

Q. While you were waiting on her to arrive, what did you do?

A. I sat in my car. I think one of her neighbors came out and asked me -- told me she wasn't there and I said, yes, I knew she -- I was waiting on her. And I think the neighbor --

she had called the neighbor and told the neighbor that she was on the way -- to tell me that she was on the way.

Q.   Would you describe a little bit the layout of the apartment.  It's a two-bedroom apartment.

A.   Yes.  When you walk in the door, the living room is right there.  To your left is the kitchen.  And then you go down the hallway, then the second -- the bedroom was on the left-hand side and then Robin's room was on the right-hand side.

Q.   What did you carry with you on that particular evening?

A.   (No response.)

Q.   Go ahead, I'm sorry.

A.   I carried my gun with me.

Q.   Why did you do that?

A.   I always -- I always carried it because I go to work early in the morning.  I always carried it.

Q.   Now, the area where you worked, which is close to the Keswick Apartments, was that one of the nicer areas of Roanoke?

A.   No, it's not.

Q.   Now, I'm going to show you Government's Exhibit 7F, already admitted.  Can you describe for the members of the jury what Government's Exhibit 7F is.

A.   Yes.  That's -- that's the back of the apartment.

Q.   And can you just -- which apartment, if that's shown there, was the one that Robin had?

Q.   Now, after you got to the apartment that evening, what did you and Robin do?

A.   Well, we had rented some movies.  I had brought my VCR and we hooked it up and we just watched movies.  That's what we did that evening.

Q.   Now, during the course of the evening, did she receive a number of phone calls?

A.   Yes, she did.

Q.   Tell the jury about that.

A.   Yes.  The phone kept ringing and sometimes she would answer it and sometimes she wouldn't.  And she kept on repeatedly hanging up.

Q.   At some point did you go to bed?

A.   Yes, I did.

Q.   Did you go to bed before Robin?

A.   Yes, I did.

Q.   What's the next thing that you recall happening on that evening?

A.   I recall Robin waking me up screaming and crying and saying that he was here.

Q.   Did you know who she meant when she said he's here?

A.   No, I didn't.

Q.   About what time was this when you were awakened?

A.   I can't recall what time it was.

Q.   Was it after midnight but before morning?

FORM FED ● PENGAD · 1-800-631-6989

A.    Yes.

Q.    What did you do when Robin woke you up?

A.    I told her to call the police.

Q.    Was she able to do that?

A.    No.

Q.    Why not?

A.    The phone line was dead.

Q.    What's the next thing that happened?

A.    We went to the window, the kitchen window there.

Q.    Was that on the front, the side or the back of the home?

A.    The front -- the front of the home.

Q.    You might need to back up a little bit.  Go ahead.

A.    We went -- we went to the kitchen window in the front of the apartment.

Q.    What did you see?

A.    I seen a man out there bashing my car in with a bat.

Q.    With a baseball bat?

A.    Yes, with a baseball bat.

Q.    What did you do?

A.    Well, at first I guess it kind of shocked me.  I didn't -- I didn't do anything at first.  She was -- she was conversating with him.  She was asking him why was he -- why were you doing this.

Q.    How was she communicating at that point?

A.    She was screaming.

Q. Was the window open?

A. It was a hole in the window.

Q. Had that already been broken in?

A. Before I got there, no.

Q. So --

A. It was broken in.

Q. During the course of that evening --

A. Yeah.

Q. -- that window was broken?

A. That window had a hole in it, yes.

Q. And Robin is speaking out the window. What's being said?

A. She was -- she was saying, Why were you doing this? And she kept on screaming, Why were you doing this?

Q. What was the defendant saying?

A. He was saying that you're going to die tonight. I'm going to kill you.

Q. What did he actually say?

A. He said, I'm going to kill you.

Q. What did you and Robin do at that point?

A. At that point? We -- we was still at the window at that point. He was still kicking the front door in. He was trying to kick the front door in.

Q. Had he left your car at that point?

A. Yes, he had.

Q. Okay. I'm going to show you a couple exhibits already marked and previously admitted. First, Government's Exhibit 1C. What is that exhibit?

A. That's my car.

Q. Exhibit 1D?

A. Side of my car.

Q. Now, that's not what your car looked like when you pulled up at Robin's that night or before you went to bed.

A. No.

Q. And Government's Exhibit 1E?

A. That's my car.

Q. Was that taken later on in the early morning hours --

A. Yes, it --

Q. -- of April 30th?

A. After it happened, yes.

Q. You said the defendant was at the front door. What was happening?

A. He was trying to kick the door in.

Q. Which window (sic)?

A. The front door.

Q. Was the door locked?

A. Yes, it was.

Q. Do you recall how many locks were on that door?

A. She had quite a bit of locks on the door. I'm going to say at least three.

Q.   Was the defendant able to get in?

A.   No.

Q.   What happened?

A.   What happened?  After he -- my car got bashed in, he threw a substance in the door.

Q.   So the door was knocked at least somewhat open.

A.   Yeah, it was cracked.  It was just a little bit, just enough, about that far right there apart (indicating).

Q.   Was there a chain on the door?

A.   I can't recall if it was a chain on the door or not.

Q.   Do you recall if the door frame or the door itself was broken?

A.   Yes.

Q.   Had about a six inch, is that an accurate description --

A.   Yes.

Q.   -- of what you've just shown us, about six inches?

     You said a substance was thrown in.  Describe that.

A.   Yes.  It was -- it was a lit bottle and it had a rag hanging out of it.  It was lit.

Q.   A lit bottle?

A.   Yes.

Q.   Who threw the bottle through the door?

A.   The same guy that was bashing my car in.

Q.   Where did it go when it came through the front door?

A.   It hit the living room curtains and it caught the corner

of the bottom of the living room curtains. It caught fire right there.

Q. Did it catch fire rather quickly?

A. Yes, it did.

Q. What happened next?

A. After it caught the curtain, Robin tried to put it out.

Q. How did she try to put it out?

A. I think she had a towel or something. She tried to put it out. I can't remember if she tried to put it out with a towel or her hands. I can't remember that. I think she tried to put it out with a towel.

Q. Were you all able to get out the front door?

A. No.

Q. Where was the defendant as things were catching fire?

A. At that point I didn't -- I didn't look. When the house was -- caught on fire, I didn't -- I didn't look where he was at right there.

Q. What did you two do?

A. Well, we ran -- we ran to her bedroom and we knocked the shade -- we knocked the blinds and everything down. We jumped from the second story window.

Q. I'm going to show you Government's Exhibit 2A previously admitted. Describe that exhibit, if you would, please, Mr. Greene.

A. Yes. That's the front of the apartment.

Q. And the window that's broken, is that the kitchen window you were describing earlier?

A. Yes, it is.

Q. Show you what's been marked and admitted as Government's Exhibit 2C. What is Government's Exhibit 2C?

A. That's the back of the apartment, the second story window we jumped out of.

Q. And am I accurately pointing to the window which was Robin's bedroom window?

A. Yes.

Q. And Government's Exhibit 2H.

A. Yes, that's the window.

Q. Robin's bedroom.

A. Yes, it is.

Q. Looks like there are some scrape marks there on the brick. Do you know what those are from?

A. Yes. That's -- that's from our knees, I believe. Our knees and arms.

Q. Were you wearing shoes when you all left or were you barefooted?

A. We was barefooted.

THE COURT: Mr. Greene.

Q. Did you have on your night clothes --

THE COURT: Excuse me just a second. That microphone spits back to you when you're too close to it, so

stay back a little bit and then just try to keep your voice up. I think that will work out. Thank you.

MS. ROSE: Thank you.

BY MS. ROSE:

Q. Did you have on your night clothes or did you all have a chance to change into other clothing?

A. We had what clothes on we went to bed in.

Q. Now, before you and Robin jumped from the window, did you see where the defendant went?

A. Yes. Yes, I did.

Q. Where?

A. Right -- right before the -- after the curtains caught on fire, Robin was -- I was still at -- she was trying to put the fire out. I was still at the window. Yes, I seen a car come down the hill with its lights off. He ran and jumped in the passenger side and then the lights came on and the car drove off.

Q. Now, did you get your gun out?

A. I had my gun -- I had my gun out before then, yes.

Q. What did you do?

A. I just -- I shot it.

Q. Did you shoot at the defendant?

A. No. I shot over his head.

Q. And what was your purpose of shooting over his head?

A. To scare him off.

Q. Now, once you got outside, had you gotten any injuries from the fire?

A. No. I had a scrape from jumping out of the window. That's probably -- that's probably about it.

Q. What about Robin?

A. She got burnt trying to put the fire out.

Q. What was Robin doing -- once you were able to get out of the apartment, you're on the ground, what's Robin doing?

A. She's knocking -- knocking on doors of her neighbors trying to get them out, telling them the house was on fire.

Q. Were you able to see any visible injuries to her at that time?

A. Yes, I was.

Q. Describe for the jury what you saw.

A. Yes. Her skin was hanging off her forearm.

Q. Did a neighbor or someone give her a towel or something to wrap her arm in?

A. Yes. Yes, they did.

Q. How quickly thereafter did the police or paramedics arrive?

A. They was there pretty fast. I say within a couple minutes. Five minutes at least.

Q. Did you receive any medical attention?

A. No.

Q. And did you see Robin getting medical attention?

A.   Yes.  They -- they split us up pretty fast when they came.  They stuck me in one ambulance and her in another so I didn't really -- after that -- after they came they split us up, so I didn't really see her after that.

Q.   I'm going to show you Government's Exhibit 2D previously admitted.  Which room in the apartment is Government's Exhibit 2D, can you tell?

A.   No, I can't tell.  Looks like the living room.

Q.   Okay.  Now, when's the next time that you saw Robin?

A.   The next time I saw Robin, UVA hospital.  That was the last time.

Q.   University of Virginia Medical Center up in Charlottesville?

A.   Yes.

Q.   Did you go visit her while she was receiving treatment there?

A.   Yes, I did.

Q.   How was she doing emotionally when you saw her?

A.   She was -- she was more apologetic about my VCR being burnt up more than anything.

Q.   She apologized to you.

A.   Yes, she did.  And I told her I can replace that.  That's no big problem.

Q.   Did you then see her after she returned home from the hospital?

A.   Yes, I did.

Q.   Where did you see her then?

A.   I seen her at -- at her mom -- mother's house and she came to my parents' house, also.

Q.   So you all began visiting with one another again as old friends.

A.   Yes.

Q.   Did she begin then to talk to you a little bit about her relationship with the defendant?

A.   Actually, she -- yes.  She talked more about it after the incident, yes.

Q.   What did she tell you?

A.   She only told me a couple things.  And like she would come home and he would smell her panties to make sure that she hadn't been sleeping with anybody.  Things like that.  And I told her why didn't she tell her brothers.  And she was afraid that her brother would kill the guy, basically.

Q.   Did she tell you that she wasn't sharing what had been occurring with her family members or friends?

A.   No.

Q.   Did she talk about emotionally how she was doing at that point?  She's in recovery for the burns, but how is she doing emotionally?  What did she tell you?

A.   I think emotionally, I mean, to me she was still pretty much the same person towards me.  Emotionally wise, I didn't

-- I wasn't around her that long to, you know, to get the emotional part from her.

Q. When did you hear that Robin had been murdered?

A. That morning.

Q. What morning?

A. I can't remember the date.

Q. The morning --

A. Yeah, the morning.

Q. The morning that she was killed?

A. Yes, that morning.

Q. How did you hear?

A. Detective Kahl came by the house. He was calling my parents' house and he told me to stay there. And when I finally got in touch with him, he told me the news.

Q. Did Robin tell you whether she felt safe in her mother's home?

A. She told me she felt safe at her mother's house.

Q. Did the apartment, was it fully burned?

A. Yes, it was.

Q. Were you able to recover anything out of there that belonged to you?

A. Only thing was in there was my work uniforms that I was going to work the next day and my VCR. That was the only thing in there that I lost.

MR. ROSE: Mr. Greene, thank you.

CROSS EXAMINATION

BY MR. BENDER:

Q. Mr. Greene, approximately how many times had you stayed with Robin after she and Marc Barnette had split up?

A. That was the first time.

Q. That was the first time that night?

A. Yes, sir.

Q. You had heard from Robin that she was afraid to stay there by herself because of this jealous person that she had been involved with, didn't you?

A. Yes.

Q. And before you went to bed that night, the phone would ring fairly constantly, wouldn't it?

A. Yes, it would.

Q. Sometimes Robin would just ignore it, wouldn't pick it up, right?

A. Right.

Q. Other times she might pick it up and then hang it up; is that right?

A. That's correct.

Q. And at other times she might pick it up and speak into it, didn't she?

A. That's correct.

Q. And this all happened before you went to bed.

A. This happened before I went to bed.

THE COURT: Okay. The jury is seated. You may call your witness.

MS. TOMPKINS: Government calls K.O. Hubbard.

K.O. HUBBARD,

being first duly sworn, was examined and testified as follows:

DIRECT EXAMINATION

BY MS. TOMPKINS:

Q. State your name, please.

A. Investigator Hubbard.

Q. Can you spell your name to the court reporter.

A. H-u-b-b-a-r-d.

Q. And how are you employed?

A. Police officer with the City of Roanoke Police Department in Virginia.

Q. All right. And if you can keep your voice up --

A. Okay.

Q. -- so we can all hear you. Thank you.

How long have you been a police officer?

A. Be twelve years in October.

Q. Pardon me?

A. Twelve years in October.

Q. Were you employed and on duty as an officer during the early morning hours of April 30th, 1996?

A. Yes, I was.

Q. Did you respond to a call for service at an apartment

located at 1616 Keswick Avenue in Roanoke, Virginia?

A. Yes, I did.

Q. About what time did you receive that call service?

A. About four a.m.

Q. And when you responded, what did you see when you arrived?

A. When I got there I could tell the apartment was fully involved in flames. Also, a vehicle on the side of the street...

THE COURT REPORTER: I'm sorry, the apartment was --

THE WITNESS: Fully involved in flames.

THE COURT REPORTER: And then something about a vehicle?

THE WITNESS: Yes. Also there was a vehicle in front of the apartment, also.

BY MS. TOMPKINS:

Q. And what kind of vehicle was that?

A. It was a red Honda.

Q. And what did you notice about the Honda, if anything?

A. The hood of the Honda was on fire at that time.

Q. And when you say fully involved, describe what that looks like.

A. Flames coming out all of the windows of the apartment.

Q. Was the police -- or the fire department on the scene yet?

A. No, they got there probably a minute after I did.

Q. The red Honda, where was that parked in relation to the apartment building?

A. It was directly in front of the apartment.

Q. Directly in front of 1616?

A. Yes, ma'am.

Q. What did you do next?

A. I located Williams and Greene.

Q. Where were they?

A. They were toward the rear of the apartment building.

Q. Did you see anybody else outside?

A. It was several people outside.

Q. All right. What did you notice about Robin Williams?

A. She had a towel wrapped around one of her arms. She was real nervous and jittery, and she talked real nervous and fast.

Q. What did she tell you?

A. She told me, I told you he was crazy. Asked her who? She said her ex-boyfriend, Aquilia Barnette. At that point I think they transferred her to the hospital by ambulance and I finished talking to her at the scene.

Q. Okay. Did you -- at the scene did you speak to Benjamin Greene?

A. Yes, I did.

Q. What did he tell you?

A. He told me he heard some knocking outside. Looked outside. He noticed Williams' ex-boyfriend Aquilia Barnette beating his vehicle with a baseball bat. At that point he put the bat down, started lighting Molotov cocktails and throwing them at the apartment. One went through the window. I believe the second one he said bounced off. Barnette picked it up again and threw it inside the apartment.

Q. And was that -- did you later learn that the person who did that's name was Barnette?

A. Yes.

Q. And what is -- and was it your term or Mr. Greene's term, Molotov cocktail?

A. I can't recall.

Q. Okay.

Q. What is a Molotov cocktail?

A. It's a bottle has some type of flammable fluid in it. Has cloth on the top of it, basically like a cloth. And throw it. When it breaks, the fire from the flame -- from the cloth inside the bottle spread from the fluid and usually a pretty good sized fire results from it.

Q. All right. So it's sort of a homemade --

A. It's kind of a homemade bomb --

Q. -- instrument?

A. -- I guess you could say.

Q. All right. What did Benny Greene tell you he did in

response?

A. He said he fired some shots out the window at Barnette to scare him.

Q. And what did you do with Mr. Greene's gun, if anything?

A. I secured it. He gave it to me voluntarily. I secured it at the police department.

Q. And he gave it to you freely?

A. Yes.

Q. All right. And you mentioned that you later went to the hospital to talk to Robin; is that correct?

A. Yes, I did.

Q. How long after she left in the ambulance did you follow?

A. It was a few minutes. I don't know exactly.

Q. Which hospital did you go to?

A. Roanoke Memorial Hospital.

Q. All right. And did you see her at the hospital?

A. Yes, I did.

Q. Where was she?

A. She was in the emergency room.

Q. And did you -- were you able to interview her in the emergency room?

A. Yes, I did.

Q. And how was her condition different if at all from how she was at the scene?

A. She was a lot calmer. She was a lot calmer at the

emergency room.

Q. And what, if anything, did you notice about any injuries that she had?

A. They had started working on her and they took the towel off her arm and the skin on her arm had -- some had bubbled up and other parts of it was peeling off.

Q. All right. Now, what information did she give you at the hospital?

A. Name, date of birth, address here in Charlotte.

Q. Whose name, date of birth?

A. Aquilia Barnette.

Q. And had she given you his name at the scene?

A. No.

Q. And did you ask her if she knew who was responsible?

A. Yes.

Q. Okay. And that's when she gave you his name?

A. Yes.

Q. Okay. So she knew his name, his date of birth. What else?

A. Address.

Q. And that address was where?

A. I believe it was 3413 West Boulevard, Charlotte, Virginia -- I mean, Charlotte, North Carolina, excuse me.

Q. All right. And what did you do -- what else -- information did you get from Robin Williams?

A. I believe...

Q. If any.

A. Vehicle. Vehicle description. She gave me was an older, I believe a B210 Nissan, blue with primer spots, if I remember correctly.

Q. And what was -- what vehicle -- how did that relate to the incident?

A. That was the vehicle he left in.

Q. That Mr. Barnette left in?

A. Yes.

Q. Okay. And what did you do with that information?

A. Put a lookout for our state police and North Carolina State police in Charlotte.

Q. I'm going to show you some photographs that have previously been admitted. Government's Exhibit 1A, do you recognize that?

A. Yes, I do.

Q. What is that?

A. That's 1616 Keswick after the fire had been put out.

Q. I'm going to show you Government's Exhibit 1B. Do you recognize what that is?

A. The same building.

Q. Okay. And when you said fully involved, was -- did you see flames coming out of those windows?

A. Yes, ma'am.

Q. I'm going to show you what's been marked and admitted as Government's Exhibit 1C. Is that the red Honda that you spoke of?

A. Yes, ma'am.

Q. And that was the condition that it was in when you saw it?

A. Yes.

Q. That's Government's Exhibit 1D previously admitted.

A. It's the same vehicle, yes, ma'am.

Q. And Government's Exhibit 1E?

A. Yes.

Q. And that's the damage that you saw --

A. Yes, ma'am.

Q. -- that night?

Now, before April 30th, 1996, had you ever been to 1616 Keswick Avenue?

A. Yes, ma'am, on two occasions.

Q. And tell the jury about those two other occasions that you had been to that apartment.

A. The first one was June of '95. I responded to an attempted suicide. Got there, learned that Ms. Williams and Mr. Barnette got into an argument.

Q. Do you remember what time of day or night it was when you responded?

A. I'm not sure. It had to be -- I worked midnight shift

then, so it had to be early morning hours.

Q. And when you got there in June of '95, who did you meet?

A. Ms. Williams and Ms. Barnette -- Mr. Barnette.

Q. Did you speak to Mr. Barnette?

A. Yes, I did.

Q. Okay. What did he tell you?

A. They had got in an argument and Ms. Williams had threatened to break up with him. I asked him -- of course, the call was suicide from taking pain pills --

THE COURT REPORTER: You asked him what, I'm sorry?

THE WITNESS: Ma'am?

THE COURT REPORTER: You asked him what? I had a hard time understanding you.

THE WITNESS: Oh. He was taking pain pills for an injury he had at work. Apparently, he told Ms. Williams he was taking a bunch of them to commit suicide.

BY MS. TOMPKINS:

Q. What was the type of call for service?

A. It was an attempted suicide.

Q. Okay. And did you ask Mr. Barnette whether he had in fact attempted suicide?

A. I asked him. He said no, he just said it just because she had threatened to break up with him and he was mad. Also, rescue was called and his vital signs was normal.

Q. You said that -- I'm sorry, I didn't hear that.

A. Rescue responded.

Q. Okay.

A. And they found his vital signs was normal.

Q. Okay. So he had said that he had not, in fact; that he was mad at her. Is that what you said?

A. Yes.

Q. And that he had just said that he was attempting suicide.

A. Yes.

Q. Now, what was the other incident that you had responded to 1616 Keswick?

A. It was -- I can't remember the exact date.

Q. Okay. Was it, well, close in time to the arson?

A. It was before the arson. Again, Mr. Barnette and Ms. Williams had got into an argument. He had left with her car and keys and apparently she had locked herself out of her apartment.

Q. Well, had she locked herself out or had -- what did she tell you happened?

A. I can't remember exactly. Sometime during the argument that she got locked out of her apartment.

Q. Okay.

A. She went to a neighbor's house and called and she said her mom was on her way with an extra key to let her in. And since it was cold outside, I let her sit in my vehicle until

her mom arrived.

Q.    All right.  So she had called 9-1-1 from a neighbor's house?

A.    Yes, ma'am.

Q.    And when you responded, where was she?

A.    I believe she met me out -- she was in the neighbor's house and when she saw me pull up, I believe she came outside.  She was at the neighbor's house.

Q.    Okay.

A.    When she saw me pull up, she came outside.

Q.    And do you remember what type of call that was?

A.    No, I don't.

Q.    Just a general call for service?

A.    Yeah.

Q.    And did you file a report?

A.    I can't remember.

MS. TOMPKINS:  Thank you.  That's all the questions I have.

CROSS EXAMINATION

BY MR. BENDER:

Q.    Mr. Hubbard, on the 30th or the 29th of April when you arrived at the apartment, it was engulfed in flames, was it not?

A.    You said it was?

Q.    Yeah.

A.   Yes, it was.

Q.   And there -- fire department there was trying to put it out.

A.   Well, they got there after I did.

Q.   Okay.  And was the medic personnel already on the scene?

A.   No, sir.

Q.   Okay.  And where was Robin Williams when you talked to her first?

A.   She was toward the rear of the apartment building.  She was toward the rear of the apartment building.

Q.   Okay.  And she made a comment to you like, I told you he was crazy, or made that comment to somebody.

A.   Yes.

Q.   Okay.  Do you know who she was directing that to?

A.   Barnette.

Q.   Barnette?

A.   Yes, sir.

Q.   Well, he wasn't there.

A.   No.

Q.   But her comment, I told you he was crazy, was she telling you that she had told you that he was crazy or was she telling Benny Greene?

A.   She was telling me.

Q.   Telling you.

A.   Yes, sir.

FORM FED  ® PENGAD · 1-800-631-6989

**JA1278**

Q. Okay. And since you had been there before, you -- you were aware that this was sort of a tumultuous relationship. Sort of -- not a very good relationship that she was involved in.

A. No, sir.

Q. You had been there on two occasions, hadn't you?

A. Yes, sir.

Q. Prior to this. Both were prompted by some sort of argument.

A. Yes.

Q. According to what you -- according to what you were told.

A. Yes.

Q. And the second time the argument -- that was in early April before the firebombing incident, wasn't it?

A. Yes.

Q. And that was when Marc Barnette had taken her car, some argument had ensued and he had taken her car.

A. Yes, sir.

Q. Left her at the apartment by herself.

A. Yes, sir.

Q. And the first -- the first incident was when -- back in June of '95. Sometime in June of '95.

A. Yes.

Q. The attempted suicide. Robin had called 9-1-1 regarding

the attempted suicide, hadn't she?

A. Yes.

Q. And when you -- when you got there, you talked to Marc Barnette, didn't you?

A. Yes.

Q. Okay. And he was very distraught over this relationship, wasn't he?

A. Yes, somewhat.

Q. He told you he was.

A. Yes.

Q. He was upset about it. Told you that, too, didn't he?

A. Yes.

Q. And in fact, he said he didn't -- he really didn't try to commit suicide. He simply told her that he had tried to commit suicide for her to have some sort of sympathy on him or that sort of thing, didn't he?

A. Yes, sir.

MR. BENDER: Thank you, sir. Appreciate it.

MS. TOMPKINS: No further questions.

THE COURT: You may step down.

THE WITNESS: Thank you.

(Witness stepped down.)

MS. TOMPKINS: Next witness is Kent McIlhany.

KENT MCILHANEY,

being first duly sworn, was examined and testified as follows:

DIRECT EXAMINATION

BY MS. TOMPKINS:

Q.    State your name, please, and spell it for the court reporter.

A.    Kent McIlhany.  K-e-n-t.  M-c-I-l-h-a-n-y.

Q.    How are you employed?

A.    How?

Q.    How are you employed?

A.    I'm a first lieutenant paramedic/fire fighter for Roanoke City Fire Department.

Q.    How long have you been in that position?

A.    Ten years.

Q.    And back in April of 1996, what was your position with the fire department?

A.    I was a cardiac technician/fire fighter at that time.

Q.    Is that like an EMT?

A.    It's a step -- a couple steps above EMT.  It's just one step below paramedic.

Q.    And do you have any special training to become a cardiac technician?

A.    Yes, ma'am.

Q.    What is that?

A.    Through classes.  Approximately around 400 hours worth of training.

Q.    What are the duties of a cardiac technician/fire fighter?

**436**

**JA1281**

A. We respond to any EMS or fire related calls that come in through the 9-1-1 system. And we handle medical emergencies, fire emergencies, wrecks, anything involving any kind of injury or illness.

Q. All right. Do you travel in a fire truck or in an ambulance?

A. At this time both. At that time I was on an ambulance --

Q. Okay.

A. -- only.

Q. Now, back in -- on April 30th, 1996, were you on duty in the early morning hours?

A. Yes, ma'am.

Q. Did you respond to a call for service that morning?

A. Yes, ma'am.

Q. What type of call was it?

A. It was a call for a structure fire.

Q. And what did you do in response to that?

A. We got on the ambulance, me and my partner that I was with, and responded to the address that was given to us.

Q. Was that 1616 Keswick Avenue in Roanoke?

A. Yes, ma'am.

Q. And what did you see when you got there?

A. When we arrived the fire department was already there. We parked on a side street to stay out of the way of the fire trucks and exited the vehicle. There was a house/duplex type

apartment building that had obviously had some fire damage in it. And we proceeded to walk towards that scene.

Q. When you say we, did you have your partner with you?

A. Yes, I did.

Q. Did you see Robin Williams?

A. She was walking towards me from the direction of the residence.

Q. And is that the person that you later came to know as Robin Williams?

A. Yes, ma'am.

Q. Describe what happened next.

A. She was walking towards me so I naturally met her, and obviously she was injured in some way. She had a towel wrapped around her -- around her arm. And I began -- made contact with her to find out what her injuries were.

Q. What was her demeanor at that time?

A. She was in shock. Appeared to be scared and upset.

Q. All right. What did you do next?

A. I took her to the ambulance and put her inside where -- it was a little bit cool that evening. I took her inside, put her in the ambulance where it was warm and began to see what kind of injuries she had and what treatment I might have to render at that time.

Q. And what observations did you make?

A. She had second degree burns on her right arm

approximately about halfway down her arm; and second and third degree burns on the left arm, again, about halfway down; also, on the wrist and hand on the left side. These burns were more severe than on the right and --

Q. Let me ask you to describe to the jury the classification of burns.

A. There are basically three classifications of burns. There's first degree which is kind of like a moderate or mild sunburn that you would get.

Second degree is a really severe sunburn. You get blisters.

And then third degree is where you actually have -- the tissue is destroyed all the way down to the fatty tissue. All your skin tissue is destroyed and sometimes even beyond that. And you actually get kind of a blanched look to the skin and that skin sometimes will even come off of the area that's affected.

Q. Okay. Now, on Robin's arms, relate those to the injuries on her arms.

A. She had blisters and a reddening appearance on the right arm from about halfway down to around her wrist. The left arm, as I said before, was more severe. She had the blisters and reddening and then she also had blanched appearances in places on her -- around her wrist and hand. On the left side it was actually completely around the entire arm and hand,

what we call circumferential burns, and those are extremely severe burns.

Q. What does the phrase full thickness burn mean?

A. That, again, is like a third degree burn. It burns completely through all the tissue into the fatty layer of tissue and is complete tissue death.

Q. And what kind of treatment does a third degree burn require?

A. Usually it requires extensive care at a burn center. It's long recovery. A lot of times they have to do skin grafts and things of that nature to remedy it.

Q. Did -- I'm sorry.

A. That's okay.

Q. Did you notice any other injuries on Robin Williams?

A. She had some abrasions on her knees and an abrasion kind of in the lower right part of her chest/abdomen area.

Q. All right. Did you have a conversation with her, ask her any questions?

A. Yes. Basically asked her standard -- we ask exactly what happened so we have an understanding of how they got injured and what other kind of injuries might be occurring. And I asked her, you know, basically what happened to her. And she said that she had been awoken by some noise, some yelling and screaming, and then had went to see what that was. And then heard a louder noise near the front of the residence. And

when she arrived at that part of the house, there was fire at the front door. And she said she hollered at her friend who was staying with her. At that point the house was on fire; they needed to get out. They tried to exit the front of the residence and that's when she received her burns. At that point they went to a window at the rear of the residence and climbed out, which is a second story window. It's approximately 15 feet or so off the ground. Both of them climbed out and jumped out on to the ground from there.

Q. What other comments did she make about what had happened to her that night?

A. She told me that her ex-boyfriend had been bothering her, calling her and harassing her, and that she recognized his voice that night screaming and yelling at her prior to jumping out the window and that she knew that it was him, and she was obviously really scared of that situation.

Q. All right. Now, did you question her about her pain level?

A. Yes. As we transported her to the hospital, her pain level seemed to increase. Initially in injuries you have a lot of adrenaline so the pain may not be there as much. But as she started to calm down a little bit and realized she was, I guess, in a safer environment and that her injuries weren't as life threatening as she might have thought at first, she -- her pain level increased. So I recognized that in talking to

her. So we have, basically, a question that we ask to rate your pain on a scale of one to ten. Ten is usually the highest; one is the lowest. And she rated hers at a seven, which is fairly high.

Q. Did she give you any information about how she burned her arms, at what point she burned her arms?

A. She told me that as she tried to exit the front of the residence to get out, that's when she received the burns.

Q. And what treatment did you provide her at that time?

A. Put her on oxygen which is, again, standard that we do in case she inhaled any smoke or heated air; put her on the heart monitor to monitor her heart function; and start an IV line for fluid replacement. Burns typically require a lot of fluid replacement. And transported her from there.

Q. Okay. Transported her to the hospital.

A. Correct.

Q. Were you back in the back of the ambulance with her during the ride to the hospital?

A. Yes, ma'am.

Q. Did she make any other comments on the way to the hospital?

A. She told me that, again, she was very scared of what had happened. She couldn't believe that her ex-boyfriend had done this. And she was very concerned about whether he was -- whether they had caught him or not, whether he was still out.

She was scared that he might still have a way of getting to her. And she was also very concerned about her medical condition and what was going to happen with her in the future.

Q. What did you tell her?

A. I told her that basically her injuries were pretty severe. They didn't -- they weren't life threatening, but they were pretty severe. She was going to require a lot of therapy and treatment. It was going to take quite some time to recover from this. And there was a good chance that she would lose a lot of function or some function, particularly in the left hand, due to the nature of the burns.

Q. Was she crying?

A. Yes. Yes.

Q. Now, did you do a written report after you finished?

A. Yes, we did.

Q. Okay. And what level of detail do you put in that?

A. Relatively -- since it is a medical report, we tend to detail the -- what we found with the patient, the injuries involved, our treatment, and a brief medical history if it's pertinent, and just a basic description of what happened with the patient.

Q. Would you have necessarily put in all of the things that Robin said to you on the way to the hospital in your medical report?

A.    At that time, no, I wouldn't have.

Q.    And where did you complete your report?

A.    At the hospital.

Q.    Did you check up on Robin after you dropped her off?

A.    Yes.  I stayed at the hospital that evening probably for total time of about an hour or so.

Q.    Was that typical?

A.    Not completely typical.  You kind of get interested in certain cases with certain people and this particular one was interesting just due to the fact that the nature of the incident, and we seemed to kind of make a little bit of a connection even though it was a short period of time.  She felt safe and trusted me a little bit, so I just felt obligated to kind of stick by her for a little while.

Q.    Okay.  I'm going to show you some photographs that have been previously admitted into evidence.  That is Government's Exhibit 23J.  Is that consistent with the burns that you noted that night?

A.    Yes.

Q.    And this is Government's Exhibit 23K.  Again, is that consistent with the burns you noted that night?

A.    Yes, it is.

Q.    And finally, Government's Exhibit 23I.  Are those consistent with the circumferential burns that you had mentioned before?

A.    Yes, ma'am.

MS. TOMPKINS:  Thank you.  That's all the questions I have.

MR. BENDER:  I have no questions.  Thank you.

THE COURT:  You may step down.

(Witness stepped down.)

MS. TOMPKINS:  Government calls John Grubb.

JOHN GRUBB,

being first duly sworn, was examined and testified as follows:

DIRECT EXAMINATION

BY MS. TOMPKINS:

Q.    State your name, please, and spell it for the court reporter.

A.    John Grubb.  Last name is G-r-u-b-b.

Q.    And where do you live?

A.    I live in Salem, Virginia.

Q.    Where were you living back in April of 1996?

A.    In Roanoke, Virginia.

Q.    And April of 1996, how long had you lived in Roanoke?

A.    I think about five years.

Q.    Where were you living?

A.    At 1618 Keswick Avenue.

Q.    Was that in the Keswick Apartments?

A.    Yes.

Q.    Who lived there with you?

A.   My three children.

Q.   You and your three children?

A.   Yes.

Q.   How old were your kids at that time?

A.   I think they were eight, thirteen, and fifteen.

Q.   I'm going to show you a photograph that's been marked and introduced as Government's Exhibit 7G.  Is this the apartment building where you were living?

A.   Yes, ma'am.

Q.   Okay.  And which -- can you see the front door to your apartment from this picture?

A.   No, it's on the back side.

Q.   On the back side.  Was it back on the back side over here (indicating)?

A.   Yes, ma'am.

Q.   Okay.  So describe for the jury how this apartment building is configured.  How many apartments are in that building?

A.   There's four.  There's two on the back side, so those two are like the basement apartments.

Q.   So there's an entry way here and an entry way here (indicating)?

A.   Correct.

Q.   Front door?

A.   Correct.

Q. Is there one way in and out of each one of those apartments?

A. That's correct.

Q. Just the front door?

A. Right.

Q. And then there's an apartment on the front or back, as the case may be?

A. Correct.

Q. And then another apartment.

A. Yes, ma'am.

Q. And you were back here (indicating)?

A. Yes, ma'am.

Q. And was this where Robin Williams lived?

A. Correct.

Q. Okay. Now, did you know your other neighbors?

A. I knew the lady that lived upstairs. My kids referred to her as Granny.

Q. And was that Robin's next door neighbor?

A. Correct.

Q. Okay. Did you know who lived beside you?

A. I knew his name. His name was Tony. I don't know his last name. And I don't recall her name either.

Q. Did you know Robin Williams and Marc Barnette when they lived there?

A. Just seeing them around. Didn't know them personally.

Q. I'm going to take you back to April 30th, 1996. What happened in your apartment at approximately 4 o'clock in the morning?

A. I was awakened by what I first thought was gunfire, like hitting glass, shattering glass. And I immediately, of course, hit the floor. And then I could also hear screaming.

Q. What did you hear?

A. It was to the effect of, Oh, my god. Oh, my god. I don't believe he's done this.

Q. What did you do next?

A. Proceeded to call 9-1-1.

Q. What -- can you describe the screaming noises. How did that sound to you?

A. Oh, it was very loud, curdling. Somebody was in dire need of help.

Q. Did you recognize the voice?

A. I thought it was coming from Robin Williams' apartment.

Q. So you called 9-1-1.

A. Correct.

Q. And your phone was working?

A. Yes.

Q. What, if anything, when you moved into that apartment building, did you do in relation to the telephones?

A. I had secured my phone line because the telephone lines were right there at my apartment and they were quite a mess,

so I had secured mine so -- because I work in the security industry. I secured mine so nobody could tamper with it.

Q. So you -- I'm going to show you what's been marked and admitted as Government's Exhibit 6C. Is that the phone box at your apartment at Keswick?

A. Yes, ma'am.

Q. So when you first moved in, what was the state of those wires?

A. Pretty bad.

Q. Okay. They were jumbled up.

A. Yeah.

Q. And that's your line of work; is that right?

A. Correct.

Q. So you wanted -- when you say secure your phone, what do you mean by that?

A. So it can't be tampered with or cut.

Q. Okay. And you did that for your phone line alone.

A. Yes.

Q. Okay. So you called 9-1-1. What did you do next?

A. When I was talking to the lady on 9-1-1, I was telling her what was occurring. And while I was on the phone with 9-1-1, somebody started banging on my door and yelling, Help me, help me, and it was a female voice.

Q. In a female voice?

A. Uh-huh.

Q. Did you open the door?

A. No. The 9-1-1 operator, I believe she told me not to.

Q. Okay. And I didn't know exactly what was going on out there, so I didn't.

Q. Did you eventually go outside?

A. Yes.

Q. And what did you observe?

A. There was nobody there at the door. So I proceeded to go around the apartments. And when I got to the side of the apartment, there was flames shooting out the side of the apartment.

Q. And was that Robin's apartment?

A. Correct.

Q. What did you do next?

A. I proceeded back into my apartment to get my kids out of the apartment.

Q. What did you do with your kids?

A. Put them in my car.

Q. At some point did you see Robin Williams?

A. Yes, ma'am.

Q. Where did you see her?

A. On the side of the apartments.

Q. What was she doing?

A. She was sitting in the grass crying and she had towels wrapped around her arms.

Q.    What did you do next?

A.    My main concern was with my children, so I basically stayed around the car with my children.

Q.    Were other neighbors out?

A.    Yes.

Q.    Other neighbors had been awakened; is that right?

A.    Yes.

Q.    Did emergency personnel arrive on the scene?

A.    Yes.

Q.    And describe what happened next.

A.    They proceeded to put out the fire and give medical attention to Robin Williams, but I was basically trying to keep my kids away from everything.

Q.    Okay.  Did you have to go to work that morning?

A.    I went later in the evening.  I didn't go directly first thing in the morning.

Q.    Okay.  So later -- later on you went to work?

A.    Uh-huh.

Q.    What happened when you got to work?

A.    Well, I proceeded to work, but then I got a telephone call from my son.

Q.    What did he tell you?

A.    That he had found a driver's license and pliers around the side of the house.

Q.    And what did you tell him to do?

A.   I told him not to touch anything around the apartment and keep the driver's license inside the apartment.

Q.   And what did you do next?

A.   Then I went home to take a look at it.

Q.   You went home, I'm sorry?

A.   I proceeded to go home because I thought it was important.

Q.   Looking at Government's Exhibit 7G, do you know on which side of the apartment building your son found it?  Was it on this side of the apartment building (indicating)?

A.   Correct.

Q.   Okay.  What was there around the area where you found the driver's license and the pliers?

A.   Talking about the landscape or...

Q.   Was there any -- what's over on that side of the apartment building?

A.   There's a window right there.  It goes to my children's apartment at that time.  It's like a -- they call it a window well.

Q.   Right.

A.   Where it goes down inside the ground.

Q.   Okay.  And is that where he found the driver's license?

A.   Correct.

Q.   Had your son picked up the driver's license?

A.   Yes, ma'am.

Q. Okay. What did you do when you got home?

A. I looked at it and decided to call the police department.

Q. Okay.

A. Felt it was...

Q. Did the police come out?

A. Yes.

Q. Okay. And is this the driver's license that your son picked up?

A. Yes, ma'am.

Q. And that has been previously marked and admitted as Government's Exhibit 7B. And you handed that to the police officer who responded to the scene?

A. Correct.

Q. Was that Officer Kahl?

A. I don't recall the name.

Q. Okay. And you did not touch the pliers; is that correct?

A. No, ma'am.

Q. I'm going to show you what's been marked and admitted as Government's Exhibit 6A. And located there, is that the pair of pliers that your son located at the scene?

A. Yes, ma'am.

Q. Did you point those out to Officer Kahl?

A. Correct.

being first duly sworn, was examined and testified as follows:

DIRECT EXAMINATION

BY MS. ROSE:

Q. All right. Ma'am, would you introduce yourself to the jurors, please.

A. My name is Maude G. Hubbard.

Q. And your last name is H-u-b-b-a-r --

A. b-b-a-r-d.

Q. All right. Now, where do you live, Ms. Hubbard?

A. Roanoke, Virginia.

Q. How long have you lived in Roanoke?

A. Just about all my life.

Q. You don't want to tell us how long that is, though, do you?

A. No. I'd say thirty, forty years, whatever. I won't tell you my age.

Q. Now, living in Roanoke, did you get to know Bertha Williams and her family?

A. I did.

Q. How do you know the Williams family?

A. Well, we all go to church together. We all church -- the same church together.

Q. What church is that?

A. Mt. Olive.

Q. And did you see the Williams children grow up?

A. Yes, I did.

Q. And did you know Robin Williams pretty well?

A. I did. Very well.

Q. At some point did she move in to an apartment near yours at Keswick Avenue?

A. Right.

Q. Now, Ms. Hubbard, I'm going to show you what's been previously admitted as Government's Exhibit 7G. And did you live next door to Robin at the Keswick Apartments?

A. I did.

Q. I'm going to point, there's a white car pointed there, was this your apartment?

A. (No response.)

Q. That's not your car, but is that the apartment that you lived in back then?

A. Right.

Q. Now, how long had you been living at that address when Robin moved in?

A. I'd been there approximately about five years, I think. I'm not for sure.

Q. Now, did the folks who lived in that complex and Robin and the other Williams children as well, did they have a nickname for you?

A. Yes. Everyone called me Granny.

Q. In late 1995, do you recall Robin moving in to the

apartment next to yours?

A. Yes, I do.

Q. And did you see her as she was making preparations to move in?

A. Yes, ma'am, I did.

Q. Tell us about that.

A. Well, she was moving in new furniture and one thing like that. And, you know, me and her talk occasionally right often.

Q. Did you two have that kind of relationship where --

A. Yes, we did. We had a very good relationship.

Q. If you would, describe for us what Robin was like as a person.

A. She was just a beautiful, wonderful person. She'd always come to me because like I was her mother because, see, I have children also and I could -- me and her could, you know, talk with one another. And she would come and talk with me often about so many different things. And she would tell me things. She would say, Don't tell my brothers. You know, she didn't want her brothers to know that she was going through it, but me and her would talk.

She would always say, Granny, fry some potatoes. She loved potatoes and onions. And she would always come and she would say, Granny, I can smell that good food in there. And sometimes I would go in there and cook it and me and her, she

would eat, you know. She would say, Get up, Granny, get up, because I was a late sleeper. And she would always come by and holler at me wondering how I was doing and all. She was just a beautiful and wonderful person.

Q. Now, did she work every day?

A. Yes, she did.

Q. And she would often come and get you up before she went to work?

A. No, no, no, no, no. No, ma'am. Not -- all the time I would just sometimes know that she was going to work and she would holler when she'd be coming in.

Q. Okay.

A. And we would sit out there and talk. So many things she would tell me, but -- she'd tell me don't tell my brothers and don't tell my mother, and I made her that promise and I didn't call Sister Bertha and ask -- tell her until things got so -- because she would come there to my phone and call her mother and, you know, I just -- it's just -- it's a hard thing for me because I love Robin. Robin was a beautiful person and she reminded me so much of my children. See, I'm a mother of six children myself. I got grown children and grown grandchildren. And so, you know, therefore, I know the feeling. I know the feeling.

Q. Yes, ma'am. And Robin was very close to her family, wasn't she?

FORM FED ● PENGAD · 1-800-631-6989

A. Oh, Lord, yes. And her mother. Her and her mother, they just loved one another. And her brothers, they loved their sister. They loved their sister. And their sister loved them brothers. They were just a close-knit family period.

Q. Now, since you lived next door to Robin's apartment, was there a common wall between your apartments?

A. Well, there was a wall -- you know how those duplex, two down and two up. On the side because my bedroom was next to her bedroom. You know, like off like that, you know.

Q. And because you shared that wall between your bedrooms, were you often able to hear what was happening?

A. Oh, yes, definitely. Definitely I did, yes.

Q. And what did you hear?

A. I heard her crying and begging him don't hit me no more. Don't fight me. Don't do this to me. Don't do this. Don't do that. And sometimes she would -- she'd -- I imagine she would be wrestling with him to get out of there because he knew that if Robin got out of there, Robin was going to call -- was going to come to my apartment and I was going to call her mother. He knew that.

Q. Did you, after these incidents would occur, did you discuss them with Robin?

A. What did you say?

Q. When something would happen or when you would hear noises or crying or something from next door, did you talk to Robin

Q. You might not remember the date, but do you remember her moving back in and her friend Benny Greene being there?

A. Yeah, I seen Benny Greene there. But she told me that she -- her girlfriend was going to move in with her. She said a girlfriend is going to move in with her. She said but in the meantime he just going to stay there until the girl -- something happened why the girl had never -- didn't move in with her. But Benny Greene did not -- no, he wasn't moving in with Robin, huh-uh.

Q. Well, they were friends.

A. They were just friends, absolutely.

Q. During the middle of the night or early in the morning hours of April 30th of 1996, what did you hear?

A. Well, the fact of it I didn't hear it. They had to come and wake me up, see, because I'm a diabetic. And see, when I went to sleep, well, you know, you get in them sleeps, people that been diabetic, they know -- I didn't hear -- Mr. Grubbs downstairs is the one, his little son came up, J.R., and was hollering, Granny, Granny, Granny, Granny. And you know, by me staying by myself, I didn't get up. You know, I don't open up no door when I'm there by myself.

And anyway, when they said that, I come to the door. They said, Come on, come on out and get out of here. Said, come on, they done throwed a thing through the -- through the window.

FORM FED ® PENGAD · 1-800-631-6989

And I seen her, I said, Lord have mercy, what's done happened? What's done happened?

And they said that boy done throwed that -- come in throwed that thing through the apartment.

And I said, Oh, Lord have mercy.

And about that time, Robin and a lady up the street, Joyce Coleman, came down, but as she -- I heard this person hollering, I don't deserve this. I don't deserve this. Oh, Mama, Mama, Mama, I don't deserve this. Why, why me? But I couldn't catch her voice. And she went on up there and come back. This is when she called, Granny, Granny, open the door. Granny, open the door for me. Open the door.

When I opened the door, they had a towel wrapped around her arm.

Q. You talking about Robin?

A. Robin.

Q. And I said, Oh, Lord have mercy, you know.

And she said, Call my mama. Call my mama. Call Mama, Granny. Call her.

And that time I went to pick up the phone, my phone was dead. The wires had been cut. So I couldn't -- so at that time the police, or whatever, came, they carried her right on. I said, Well, when she come, I'll tell Sister Bertha when she come that they done take her -- take her on to the emergency center. We got to get away, we got to get this girl

away from here. And I had no way of getting in touch with her because the phone line was -- and I didn't know it until the next morning, Mr. Grubbs came up and he's the one took and, you know, put the phone -- fixed it. But the wires was cut.

And in the meantime, in the evening I didn't know what was going on. I'd be sitting there, we didn't have no screen doors, just had the doors cracked open, you know, get air. And he had a video, but I seen -- but I didn't know what he was doing.

Q. He --

A. He had a video, yes. He was sitting there on that porch and he videoed how far from here to here, how I guess the -- from the time what he was going to do.

Q. Who was videoing?

A. Marc.

Q. Oh, okay.

A. Marcus.

Q. All right. Now, after the -- after the fire, did you have a chance to talk to Robin that evening?

A. No, they shipped -- took her right on. I didn't get to say any more to her. I didn't see Robin anymore.

Q. When she got back from the hospital, did you see her at church or at her mother's home?

A. I saw her at church, and that's when she had that black glove on her arm.

Q. How was she doing at that time?

A. Well, she was doing fairly well, but she was still upset condition that she was in. Her hands, they had a black glove because it burnt all up in here. And she was, you know, kind of furious and she was just, you know, she just wasn't herself. She wasn't the same Robin because I could tell this, you know. She was going through something or another. I, you know, imagine that anybody like that, I would guess you'd have to be. You can't be the same person that you were when all other time you was, you was outspoken and out laughing and had a beautiful smile at all times. Just -- she was just a beautiful person. As I said, you know, whatever, you know, the Lord do's is up to the good Lord; it's not up to me, but I just say, you know, what goes around comes around. You don't -- you can't take something that you can't give back. Take a life.

Q. Now, Ms. Hubbard, did you -- other than at church, did you ever see Robin, did you visit in their home or visit with her after the fire?

A. What did you say now?

Q. Did you visit with Robin in her mother's home after the fire?

A. No, I did not. No, I did not.

MS. ROSE: Thank you very much. Wait just a minute. They may have some questions for you, ma'am.

CROSS EXAMINATION

BY MR. BENDER:

Q.   Ms. Hubbard...

A.   Yes.

Q.   Just a few questions.

A.   Yes.

Q.   The first time you ever met Marc Barnette was at church with Robin, wasn't it?

A.   No, I don't think so.

Q.   Didn't he sometimes go to church with Robin before they moved in the apartment?

A.   Well, I seen him there about once, I think.  About once.

Q.   And when Robin first moved in, she was very happy, wasn't she?

A.   Yeah, she seemed like a happy person.

Q.   She was very much in love with Marc and he was very much in love with her at first.

A.   I -- well, I guess.

Q.   Okay.  Seemed like they were.

A.   Yes.

Q.   Seemed like they got along pretty well at first.

A.   At first, right.

Q.   Yeah.  And then that began to change.

A.   Right.

Q.   And she would confide in you that she couldn't get him to

move out.

A. That's right.

Q. And they had been there for about a year and a half, hadn't they?

A. Somewhere like that.

Q. And she was -- she was bothered by him because he was so jealous and so possessive of her.

A. That's right.

Q. She told you that.

A. Right.

Q. Okay. And the day that the U-Haul was there, there was some other people there --

A. Yeah, there was some other people, but I didn't know them.

Q. You didn't know who it was.

A. No, I did not.

Q. Okay. Any argument going on that you heard that day?

A. Not that day because Robin wasn't there.

Q. Okay.

MR. BENDER: All right. I appreciate it, Ms. Hubbard. Thank you.

THE WITNESS: Thank you.

MS. ROSE: Thank you, ma'am.

THE WITNESS: Uh-huh.

(Witness stepped down.)

MS. ROSE: May we approach, Your Honor, on a scheduling matter?

THE COURT: Excuse us, members of the jury. We'll take a side-bar and you all may be at ease.

(Side-bar conference as follows:)

MS. ROSE: We've moved pretty quickly this morning and we've got to hook up some equipment to play a tape and wondered if we could go ahead and take our lunch break at this time.

THE COURT: Does it take that long?

MS. ROSE: Well, we -- or if you want to take a quick break. I mean, do you think we can get the computer over here?

MS. TOMPKINS: I need to speak with Jan Chapman and see whether or not they have it over here. I think we were expecting it to be after lunch.

THE COURT: For your next witness?

MS. ROSE: Yes.

THE COURT: What kind of a tape?

MS. TOMPKINS: A statement that Robin made to the arson investigator.

MS. ROSE: It's a pretty lengthy witness.

THE COURT: What's that?

MS. ROSE: It's a pretty lengthy witness.

THE COURT: Yeah. All right. We'll take a break.

MS. ROSE: May we approach, Your Honor, on a scheduling matter?

THE COURT: Excuse us, members of the jury. We'll take a side-bar and you all may be at ease.

(Side-bar conference as follows:)

MS. ROSE: We've moved pretty quickly this morning and we've got to hook up some equipment to play a tape and wondered if we could go ahead and take our lunch break at this time.

THE COURT: Does it take that long?

MS. ROSE: Well, we -- or if you want to take a quick break. I mean, do you think we can get the computer over here?

MS. TOMPKINS: I need to speak with Jan Chapman and see whether or not they have it over here. I think we were expecting it to be after lunch.

THE COURT: For your next witness?

MS. ROSE: Yes.

THE COURT: What kind of a tape?

MS. TOMPKINS: A statement that Robin made to the arson investigator.

MS. ROSE: It's a pretty lengthy witness.

THE COURT: What's that?

MS. ROSE: It's a pretty lengthy witness.

THE COURT: Yeah. All right. We'll take a break.

MR. BENDER: For an hour and a half like you've promised us?

THE COURT: He's been working me this entire trial. I do think we'll start at 9:30 until we see that we're getting behind or something.

MS. LAWSWON: Your Honor, we need to make a record on the record.

THE COURT: We'll do that as soon as the jury is out.

(End of side-bar conference.)

THE COURT: Okay. Members of the jury, we'll go ahead and take our lunch break. Let's see, hour and a half, so that would be twenty after one. So that's how long we will have.

Please remember the usual instructions. Keep an open mind about the case. And we'll see you at twenty minutes after one.

(Jury exited the courtroom.)

THE COURT: The record will show that at the last side-bar conference, the government made the request that the -- we take an early lunch so that the next witness who has a recording to play can be ready. That is to say, they have to set up equipment for the recording. So the court allowed that, and also spoke about the fact that we would be starting at 9:30 hereafter unless we get into a bind about time.

And keep in mind, please, that in the future we will try not to have to do this because the court reporters are set up one in the morning, one in the afternoon. We can't always make arrangements for the afternoon court reporter on the spur of the moment, so be sure and have your morning's work ready to go and enough to do that. Thank you.

(Lunch recess at 11:50 a.m.)

\*    \*    \*

United States of America vs. Aquilia Marcivicci Barnette

7/29/2002

Page 2468

IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF NORTH CAROLINA

CHARLOTTE DIVISION

COPY

UNITED STATES OF AMERICA                )

                                        )    CASE NO. 3:97CR23-V

        v.                              )      July 29th, 2002

                                        )    Afternoon Session

AQUILIA MARCIVICCI BARNETTE,            )

            Defendant.                  )

TRANSCRIPT OF SENTENCING HEARING

BEFORE THE HONORABLE RICHARD L. VOORHEES

UNITED STATES DISTRICT COURT JUDGE

F L E D
IN COURT
CHARLOTTE, N. C.

JUL 3 0 2002

U. S. DISTRICT COURT
W. DIST. OF N. C.

APPEARANCES:

FOR THE GOVERNMENT:

    ANNE M. TOMPKINS, Esq.

    JILL WESTMORELAND ROSE, Esq.

    Assistant United States Attorney

    227 West Trade Street

    Suite 1700

    Charlotte, North Carolina  28202

FOR THE DEFENDANT:

    JEAN B. LAWSON, Esq.

    P.O. Box 4275

    Charlotte, North Carolina  28226

    HAROLD J. BENDER, Esq.

    200 North McDowell Street

    Charlotte, North Carolina  28204

Reported by:  Scott A. Huseby,

              Registered Professional Reporter,

              Certified Court Reporter,

Case 3:12-cv-00327-MOC  Document 101  Filed 09/23/15  Page 108 of 200

469



JA1314

United States of America vs. Aquilia Marcivicci Barnette

7/29/2002

Page 2469

PROCEEDINGS

(Lunch recess.)

THE COURT: For the information of the parties, it appears we will be continuing court through Friday unless something else appears.

Now, then, let me speak about the exhibits. There is a little box up here with red lights on it which I haven't had occasion to use before. I take it you are monitoring from down there when these exhibits begin to appear on the jury screen.

MS. TOMPKINS: But for one exhibit, all exhibits we have shown this morning were previously admitted in the guilt phase. And unless they have been, we will monitor and not show them to the jury until they have been admitted by the Court.

THE COURT: All right, but I'm holding you all responsible for not showing them something that hasn't been preadmitted. Thank you. May we have the jury, please.

(The jury returned to the courtroom.)

THE COURT: Members of the jury, I'm sorry we were not able to get back to you sooner than we did. We had some equipment to set up and that sort of thing. Anyway, we'll move along. You may call your witness.

MS. TOMPKINS: Next witness is Sergeant

United States of America vs. Aquilia Marcivicci Barnette

7/29/2002

Page 2470

Rick Kahl.

                          RICK HALL,

being first duly sworn, was examined and testified as
follows:

                    DIRECT EXAMINATION

               BY MS. TOMPKINS:

     Q.    State your name, please, and spell your name
for the court reporter.

     A.    I'm Sergeant R.S. Kahl, that's K-A-H-L, Roanoke
city police department, Roanoke, Virginia.

     Q.    And how long have you been with the Roanoke
city police department?

     A.    20 years.

     Q.    What were your duties in April of 1996?

     A.    I was assigned fire investigations.  I was in
CIV or criminal investigations bureau.

     Q.    And when did you get promoted to sergeant?

     A.    December 2000.

     Q.    I'm going to take you back to April of 1996.
Did you conduct an investigation of a fire, an
intentionally set fire to the apartment at 1616 Keswick
and the vehicle outside that apartment?

     A.    Yes, I did.

     Q.    And from whom did you receive information about
that fire?

Reported By:
800-333-2082          Huseby, Inc., an Affiliate of Spherion  (704) 333-9889          Fax (704) 372-459
Case 3:12-cv-00327-MOC   Document 191   Filed 09/23/15   Page 110 of 200
471

JA1316

United States of America vs. Aquilia Marcivicci Barnette 7/29/2002

Page 2471

A. From fire investigator David Deck who works for the fire department.

Q. When did you first receive that information?

A. I received it the morning I arrived into work which was a little after 9:00 o'clock.

Q. Was that on April 30th?

A. Correct.

Q. 1996?

A. Correct.

Q. What did fire marshal Deck tell you?

A. He advised that he responded to a call or a fire call at 1616 Keswick which is a quadriplex in the city of Roanoke, an intentionally set fire. There was a lot of damage to the apartment. The victim that had resided there was transported to the UVA burn center.

Q. Did you go out to the scene at Keswick Avenue?

A. I went out there a little bit later in the morning to meet him and talk to some people up there.

Q. Okay. And en route to the apartment complex, what happened?

A. I was contacted by the dispatcher to advise that I needed to speak with a young boy there about 8 years old, his name was Jacob Grubb, who resided in one of the apartments. And what they had told me is that he found some potential evidence from the fire there.

Reported By:
Huseby, Inc., an Affiliate of Spherion (704) 333-9889
800-333-2082 Fax (704) 372-4593

Case 3:12-cv-00327-MOC Document 101 Filed 09/23/15 Page 111 of 200
472

JA1317

United States of America vs. Aquilia Marcivicci Barnette

7/29/2002

Page 2472

Q.   Now, describe to the jury what you observed when got out to the Keswick apartments.

A.   Well, what I observed is there is four apartments in this building.  There is two in the front, which would be I guess the south side, and there is two in the back.

Q.   I'm going to show you previously marked and introduced Exhibit 7G.  There is a pointer up there which you can use to describe your testimony as you describe what you found when you went out there.

A.   Okay, this right here is 1616, that apartment right there.  That was where Robin Williams resided.  And this one would be 1614 and that's where Maude Hubbard resided.  And the two in the back, on the bottom, right there would be where Grubbs resided, which was 1618.  And right here would be where Tony St. Clair and Wanda Coopman resided.

Q.   Who did you speak to when you went out there?

A.   I spoke with Ms. Maude Hubbard that day extensively.

Q.   What did she tell you?

A.   Well, she told me a little bit about Robin and the fact that there had been some problems over there, ongoing domestic problems at 1616 Keswick.

Q.   And if you touch with that pen, if you touch

United States of America vs. Aquilia Marcivicci Barnette 7/29/2002

Page 2473

the corner of the screen, it will clear that on the black part.

A. Which part? Oh --

MS. TOMPKINS: May I approach, Your Honor?

THE COURT: Yes.

BY MS. TOMPKINS:

Q. Did you make contact with Jacob Grubb?

A. Yes.

Q. Was his father there at that time?

A. Not at that time. I spoke with him later, but Jacob was there when I arrived.

Q. What did you learn from him?

A. Well, what he showed me, it would be on this side of the lower level (indicating), there is some phone wires to the apartment, all four apartments and the line next to the set of phone wires was a pair of pliers. And he had in his hand an operator's license that belonged to Aquilia Marcivicci Barnette, which he -- when I asked him where he found it, he pointed in the direction next to the pliers.

Q. And that was over on that side of the building where you've made that mark?

A. Right, exactly.

Q. If you clear that screen, I'm going to show you what has been marked and admitted as Government's

Case 3:12-cv-00327-MOC  Document 101  Filed 09/23/15  Page 113 of 200
474

United States of America vs. Aquilia Marcivicci Barnette

7/29/2002

Page 2474

Exhibit 6A. When you got there, were the pliers still in place?

A. Correct.

Q. Could you just make a mark on there to show the jury where those pliers are?

A. Right there (indicating).

Q. Did you collect the pliers?

A. Yes.

Q. Did you also notice the phone lines?

A. Yes.

Q. And I'm going to show you what has been previously marked and introduced as Government's Exhibit 6C. Are those the phone lines by the side of the building?

A. Correct.

Q. How close in proximity are those phone lines to the pliers?

A. Just a few feet.

Q. And when you got out there, had the phone lines been repaired by John Grubb?

A. Correct.

Q. I'm growing to now show you what has been previously marked and introduced Government's Exhibit 7B. Is that the driver's license that Jacob Grubb gave you?

Reported By:
800-333-2082          Huseby, Inc., an Affiliate of Spherion  (704) 333-9889          Fax (704) 372-4593
Case 3:12-cv-00327-MOC   Document 101   Filed 09/23/15   Page 114 of 200

475

JA1320

United States of America vs. Aquilia Marcivicci Barnette

7/29/2002

Page 2475

A.   Correct.

Q.   And whose driver's license is that?

A.   Aquilia Barnette.

Q.   And what address does that show?

A.   1616 Keswick Avenue Northeast, Roanoke, Virginia.

Q.   All right.  Did Mr. Grubb come home while you were out there or did you speak to him later?

A.   Spoke to him over the phone.

Q.   And what did he tell you?

A.   Well, he just verified that he repaired the phone lines and he also told me about his son, what he had found and what he had told him and he called the police on behalf of his son.

Q.   What else did you find out there at the scene?

A.   On Maude Hubbard's driveway, I found what appeared to be a Bic blue lighter.

Q.   I'm going to show you what has been previously marked and introduced as Government's Exhibit 6B, and is that the Bic lighter that you found?

A.   Correct.

Q.   And is that where you found it?

A.   Correct.

Q.   And where is Maude Hubbard's apartment in relation to Robin Williams?

United States of America vs. Aquilia Marcivicci Barnette

7/29/2002

Page 2476

A.   Right next-door.

Q.   Okay.  Did you go up inside the burned apartment?

A.   Yes.

Q.   And describe for the jury what you saw.

A.   Well, immediately when you walked in, there was only one way into the apartment through the front door, its only access, entry and exit.  And when I walked in, the entire living room which is the first room you walk into was damaged.

Q.   I'm going to show you what has been previously marked and introduced as Government's Exhibit 2G.  Is that what the living room of the apartment looked like when you saw it?

A.   Correct.

Q.   What about other areas of the apartment?

A.   Well, the other areas had some smoke damage and they would be to the back, toward the back.  It wasn't a very big apartment.

Q.   I'm going to show you what has been previously marked and introduced as Government's Exhibit 2F.

A.   That looks to be the same room.  It's just another view of that side window.

Q.   How would you describe -- was the apartment inhabitable at all?

United States of America vs. Aquilia Marcivicci Barnette

7/29/2002

Page 2477

A.    Not at that time, no.

Q.    Okay.  Now, did you have occasion to interview Benny Greene?

A.    Yes.

Q.    When was that?

A.    On the 1st of May.

Q.    That was the next day?

A.    Correct.

Q.    What did he indicate to you as his relationship to Robin Williams?

A.    He was a good friend of hers, nothing more than that.  They met and were good friends from high school, and she asked to him to stay with her during a time of need and she was afraid of Mr. Barnette.

Q.    Now, what else did you do, if anything, about the investigation at that time?

A.    Well, at -- I summoned an evidence technician to collect the evidence which he had done on the 1st when I was out there, and I made contact with the Williams family.  I spoke with Ray Williams on the 1st of May.

Q.    Do you know what relationship Ray Williams was to Robin Williams?

A.    I believe he is the uncle.

Q.    Okay.  You spoke to him on May 1st, 1996?

United States of America vs. Aquilia Marcivicci Barnette

7/29/2002

Page 2478

A. Correct.

Q. And what did he tell you?

A. He told me that Robin was in the hospital, would be in there for some time. I explained to him that when she came back, I needed to talk to her concerning the incident at Keswick. He was made aware at the time that there were warrants outstanding for the suspect which was Aquilia Barnette and that we were looking for him.

Q. And did you check to make sure that warrants had been issued?

A. Yes.

Q. And what else did you verify at that time?

A. Well, I verified that we had warrants and made sure that the surrounding districts or areas were aware just that we were looking for him.

Q. Okay. When you first checked about warrants, how -- what was the -- how far were the warrants sent basically or to be on the lookout?

A. Well, initially they were -- first teletype that was sent out was just in the Virginia area, but we expanded that to North Carolina area as well, including Charlotte.

Q. Okay. And as you received more information and better information, did you make sure that got into the

Reported By:
800-333-2082          Huseby, Inc., an Affiliate of Spherion  (704) 333-9889          Fax (704) 372-4593
Case 3:12-cv-00327-MOC   Document 101   Filed 09/23/15   Page 118 of 200
479

JA1324

United States of America vs. Aquilia Marcivicci Barnette

7/29/2002

Page 2479

computer system?

A. Correct.

Q. Now, during the course of your investigation, did you receive a phone call from any member of or a phone message from any member of the Williams family?

A. Yes.

Q. And when was that?

A. 7th of May.

Q. May 7th?

A. May 7th.

Q. What was that message?

A. It was a message from Kenneth Williams. He had a -- he had a phone number that he passed on, that was given to me of a possible number that we needed to look into.

Q. Pardon me?

A. A possible phone number.

Q. Okay, that the --

A. That the suspect may have been calling from or had some knowledge of.

Q. What was that phone number?

A. That number was 704-568-9286.

Q. So that was the telephone call that had been placed to the Williams home?

A. I don't know the details behind it. It was

United States of America vs. Aquilia Marcivicci Barnette

7/29/2002

Page 2480

just a phone message given to me of a possible number.

Q. Okay. Did you have the opportunity to talk with Robin Williams?

A. Yes.

Q. When was that?

A. Well, initially when I talked to Ray Williams at first, he told me she was going to be in the hospital for some time. I explained that I need for her to call me or someone to call me when she had come back home. And she called me either the 13th or 14th of May to let me know that she was home. At that time I was going out of town for a couple of weeks. We set up a time on the 30th of May to meet at her residence at 911 Louden Avenue which was in Roanoke.

Q. Did you meet with Robin Williams on May 30th, 1996?

A. Yes.

Q. Where was that meeting?

A. It was in her living room of her home.

Q. Was that at her mother's house at 911 Louden Avenue?

A. Correct.

Q. Did you -- what did you notice about Robin's condition physically?

A. Well, obviously there was -- she had extensive

United States of America vs. Aquilia Marcivicci Barnette

7/29/2002

Page 2481

burn marks or burns to her right and left arm and hand. I believe it was one of her hands were burned and she had some cloth stockings on both arms as well. And during my interview she did show me, you know, the damage and what, you know, what the doctor instructed her to do to try to help herself out.

Q. She showed you her burns?

A. Yes.

Q. And what did she tell you about the therapy that she was --

A. Well, she said she was going through some extensive rehabilitation for what had happened, and so she was trying to get through all of that.

Q. What was her demeanor on the day that you took that interview?

A. She -- surprisingly, she was very upbeat, cordial, very friendly to me and the fact that she wanted to move on with her life and get this behind her.

Q. Now, when you interviewed her at her home, did she give you some additional information about the defendant, Marc Barnette?

A. Yes. One of the things that we were trying to find is where he might be staying and she gave me an address of 3413 West Boulevard, which was apparently in Charlotte, North Carolina.

United States of America vs. Aquilia Marcivicci Barnette

7/29/2002

Page 2482

Q. Okay.

A. She had never been to that residence before, so she wasn't sure whether it existed or not. But she gave me that address, verified it through the other information I had along with some phone numbers that she gave me. She gave me four phone numbers.

Q. And what phone numbers were those? What was the purpose of her giving you those phone numbers?

A. Trying to locate Barnette.

Q. Okay. And were those -- without going through what the phone numbers were, were those phone numbers of places where she thought he might be?

A. Yeah, possibly.

Q. Okay. And do you know what -- whose phone numbers those were?

A. A couple of them, one was unknown, actually two were unknown and two that we had an idea.

Q. And what were those phone numbers?

A. Well, we were unsure of the one, 399-5479, we were unsure if that was his or not. It was a possibility that it was his. But there's one that was to a hotel and one to a Sandra Nero, N-E-R-O, and an unknown number.

Q. Was the number to Ms. Nero, was that the same number that Kenneth Williams had given you earlier?

Case 3:12-cv-00327-MOC   Document 101   Filed 09/23/15   Page 122 of 200
48.3

JA1328

United States of America vs. Aquilia Marcivicci Barnette

7/29/2002

Page 2483

A. Correct.

Q. Now, when you interviewed Robin on April 30th, 1996, was she able to clearly remember the events?

A. Yes, she was.

Q. On, I'm sorry, on May 30th, she was able to clearly remember the events of April 30th?

A. Yes.

Q. Did she tell you who she saw throw the fire bomb at her apartment?

A. Yes, it was Aquilia Barnette.

Q. Did she tell you anything about what he said when he did that?

A. He was yelling die, bitch, die.

Q. Did you record your interview with Robin on that day?

A. Yes.

MS. TOMPKINS: At this time, Your Honor, we would like to play that taped interview.

THE COURT: You may.

MS. TOMPKINS: They were admitted in trial as trial exhibits 10A and 10B, tape and transcript.

(Tape played for the jury; transcript displayed to the jury.)

BY MS. TOMPKINS:

Q. Sergeant Kahl, was that your last contact with

Case 3:12-cv-00327-MOC   Document 101   Filed 09/23/15   Page 123 of 200
484

JA1329

United States of America vs. Aquilia Marcivicci Barnette

7/29/2002

Page 2484

Robin Williams?

A. I believe so, yes.

Q. When did you find out that she had been murdered?

A. The day it happened.

Q. What did you do?

A. At that time I contacted the FBI, got them involved.

Q. Did you contact Benny Greene?

A. That day?

Q. Yes.

A. No.

Q. Did you ever contact Benny Greene about that?

A. I don't know if it was me or someone else, I don't recall.

MS. TOMPKINS: Thank you, that's all the questions I have.

CROSS-EXAMINATION

BY MR. BENDER:

Q. Sergeant Kahl, the statement that she gave to you was on May 30th --

A. Correct.

Q. -- 1996? And she had been out of the hospital, that is Ms. Williams had been out of the hospital for about 2 weeks prior, prior to that?

Reported By:

800-333-2082          Huseby, Inc., an Affiliate of Spherion  (704) 333-9889          Fax (704) 372-4593

Case 3:12-cv-00327-MOC   Document 101   Filed 09/23/15   Page 124 of 200

485

JA1330

United States of America vs. Aquilia Marcivicci Barnette

7/29/2002

Page 2485

A. Correct.

Q. And I believe you were on vacation for a couple of weeks?

A. Correct.

Q. And that's why this didn't take place when Ms. Williams was immediately released from the hospital?

A. Correct. It was -- when I talked to her at the time, she was resting well and it was agreed upon by us to set that date when I come back.

Q. But your investigation had been ongoing even though you had not had access to Ms. Williams?

A. Correct.

Q. You talked to some neighbors out there and they described a domestic disorder concerning Ms. Williams and her boyfriend?

A. Correct.

Q. And did you ever talk to other police officers who had responded to domestic calls at that address?

A. Well, my understanding that the disorders that I was made aware of, none were reported to the police. My recollection is that very few, if any, were reported to the police.

Q. You didn't talk to K.O. Hubbard about two instances where he had to go out there for domestic abuse matters?

United States of America vs. Aquilia Marcivicci Barnette

7/29/2002

Page 2486

A. I may have, yes. I don't remember.

Q. Okay. And he made reports about those?

A. Correct.

Q. So does that sort of refresh your recollection that they had been --

A. I do remember talking to Hubbard, but I don't -- I know he had some dealings with the family, I don't -- I'm sure if he went out there on a domestic, he would have made reports of it.

Q. Now, you also in the course of your investigation talked to members of Ms. Williams' family, didn't you?

A. Correct.

Q. And one of them was a Ray Williams?

A. Correct.

Q. And he verified that Ms. Williams had broken off a relationship with Mr. Barnette and this appeared to be what motivated him to do this offense, didn't it?

A. Right.

Q. And then in her interview, Ms. Williams told you essentially the same thing about this relationship that they had?

A. Correct.

Q. That it was broken off abruptly and that she was trying to get him to understand why she broke off

Reported By:
800-333-2082        Huseby, Inc., an Affiliate of Spherion  (704) 333-9889        Fax (704) 372-4593
Case 3:12-cv-00327-MOC   Document 101   Filed 09/23/15   Page 126 of 200
487

JA1332

United States of America vs. Aquilia Marcivicci Barnette

7/29/2002

Page 2487

this relationship, is that right?

A. Correct.

Q. And he was calling over and over again to the point where she even threatened to have her number changed?

A. Correct.

Q. And he just wouldn't accept the fact that she wanted to break up with him?

A. That's according to Robin, yes.

Q. And on the night of this fire bombing incident, she told you that she had been to her mother's house and that she got a call or perhaps several calls from Marc Barnette?

A. Correct.

Q. And that she told Marc she was going out that night?

A. Correct.

Q. And Marc sort of begged her and said, according to her, no, stay and talk to me, talk to me, stay, stay on the phone and talk to me?

A. Correct.

Q. That's what she told him. And she described somebody who was very, very jealous?

A. Correct.

Q. And he knew, according to her, that she had a

Case 3:12-cv-00327-MOC  Document 101  Filed 09/23/15  Page 127 of 200

488

United States of America vs. Aquilia Marcivicci Barnette

7/29/2002

friend staying with her?

A. Yes.

Q. And he was very angry about that, according to her?

A. Correct.

Q. Now, let me talk to you a little bit about the warrants that were issued. How many felony warrants were issued for Marc's arrest and when were they issued?

A. They were issued that night that the fire occurred.

Q. And what were they?

A. I believe there were two attempted murder, two fire bomb arson offense warrants. I believe there was four total felony warrants.

Q. And that was April 30th, 1996?

A. Correct.

Q. As of May 2nd, 1996, the Charlotte police department had received a telex or some information from your department about Marc Barnette being wanted for those offenses, didn't they?

A. As of the 2nd, yes.

Q. And as of the 2nd, they were notified of the address of 3413 West Boulevard in Charlotte?

A. Correct.

Q. And that was 6 weeks, 7 weeks before the murder

United States of America vs. Aquilia Marcivicci Barnette

7/29/2002

of Robin Williams?

A.   Correct.

Q.   And was he arrested for these outstanding offenses?

A.   Not until after the murder.

Q.   So during the 7 weeks that the Charlotte police department knew he was wanted for serious charges, wouldn't you classify them as serious charges?

A.   Correct.

Q.   So for 7 weeks, the Charlotte department knew where he was located?

A.   Well, the information was given to them and there was a teletype response that I received back saying that the address was not valid.

Q.   Well, tell us the address where he was arrested.

A.   My understanding is --

            MS. TOMPKINS:  Objection.

            THE COURT:  Overruled.

            THE WITNESS:  My understanding was the 3413 West Boulevard.

            BY MR. BENDER:

Q.   And that was the exact same address that you had sent in the teletype to the Charlotte police department?

Reported By:
800-333-2082          Huseby, Inc., an Affiliate of Spherion  (704) 333-9889          Fax (704) 372-4593
Case 3:12-cv-00327-MOC   Document 101   Filed 09/23/15   Page 129 of 200
490

JA1335

United States of America vs. Aquilia Marcivicci Barnette

7/29/2002

Page 2490

A.   Correct.

MR. BENDER:  Thank you, Sergeant Kahl.

MS. TOMPKINS:  No further questions.

(Witness excused.)

MS. ROSE:  Government would call Sarah Aldridge.

SARAH ALDRIDGE, being first duly sworn, was examined and testified as follows:

DIRECT EXAMINATION

BY MS. ROSE:

Q.   Would you state your name, please, ma'am?

A.   Sarah Powell Aldridge.

Q.   Would you spell your last name?

A.   A-L-D-R-I-D-G-E.

Q.   Where do you live, Ms. Aldridge, what area?

A.   I live in the Charlottesville area.

Q.   Charlottesville, Virginia?

A.   Yes, ma'am.

Q.   Where do you work?

A.   University of Virginia Health Systems.

Q.   How long have you been employed with the UVA Health Systems?

A.   Since July of '95.

Q.   And what is your position there?

Case 3:12-cv-00327-MOC   Document 101   Filed 09/23/15   Page 130 of 200

491

JA1336

United States of America vs. Aquilia Marcivicci Barnette

7/29/2002

Page 2491

A.    I am currently a staff nurse in a clinic.

Q.    Is there a particular area of practice for you at this time?

A.    Yes, ma'am, medicine clinic.

Q.    Are you working with just -- I mean, is that an emergency room?

A.    No, it is an outpatient clinic.

Q.    Back in 1995, 1996, where within the UVA Health System were you working?

A.    I was in the Decamp Burn Wound Center.

Q.    And had you -- was part of your training in burn treatment?

A.    Yes.

Q.    And officially, you are a registered nurse?

A.    Yes, ma'am.

Q.    Whenever you were hired by the UVA medical center, did you have to undergo any additional training before you could work in the burn unit?

A.    Prior to beginning the burn unit, I was working in wound care in another facility, in a long-term care facility, so I came with some basic knowledge. From the time I began in July of '95 until I left in '99, I was undergoing continuous training as were all of the nurses expectations at that time in critical care. I had become a level one trauma provider at an intensive care

United States of America vs. Aquilia Marcivicci Barnette

7/29/2002

Page 2492

unit.

Q. So what does that mean?

A. That means that I was qualified to care for a trauma patient from the time they entered the intensive care unit until the time we discharged them.

Q. Now, the burn unit there, is that classified, is that entire unit classified as an intensive care unit?

A. The burn unit at the University of Virginia is unique in that it provided care from the most critical patients through to their release as an acute care patient, so we had varying levels of care that we provided.

Q. Is it a large unit?

A. At that time, it was 16 beds.

Q. So the maximum amount of patients who could receive care there would have been 16?

A. Yes, ma'am.

Q. Were there any folks that were coming in at the -- kind of on an outpatient basis, those who were receiving a different level of care than the intensive patients?

A. I'm not sure I understand the question.

Q. Did you have -- were there patients who came in daily who had been discharged but who lived in the area

Case 3:12-cv-00327-MOC   Document 101   Filed 09/23/15   Page 132 of 200
493

## JA1338

United States of America vs. Aquilia Marcivicci Barnette

7/29/2002

Page 2493

who would come in daily to receive treatments?

A. Rarely.

Q. If you would for the members of the jury just describe a little bit about your work there in the burn unit, what does a burn patient, what kind of care do they typically receive?

A. On admission, a burn patient is taken to what we call our tank room or our procedure room. There they undergo debridement of their wounds which means we remove any nonviable tissue. They are examined. They are photographed. The initial care is provided. Initial dressings are provided. Over the next 2 to 3 days, the wounds finally declare themselves whether they are going to be partial or full thickness wounds. During that time, they are taken each day back to the procedure room and again undergo further debridement of their wounds until finally grafting is accomplished and they are ready to leave the hospital several days after that.

Q. A couple of medical terms you used there, debridement, what does that mean, is that cleansing?

A. Not exactly. It involves cleansing, yes. They are bathed in a sure cleanse we call it. It's a preparation that treats the wound. It cleanses it. It also removes any bacteria that may be growing in it, and

Reported By:
Huseby, Inc., an Affiliate of Spherion  (704) 333-9889

800-333-2082

Fax (704) 372-4593

Case 3:12-cv-00327-MOC   Document 101   Filed 09/23/15   Page 133 of 200
494

JA1339

United States of America vs. Aquilia Marcivicci Barnette

7/29/2002

Page 2494

then it's a process of removing nonviable skin or in essence dead skin that will not regenerate and will not heal.

Q. You talked about some thickness burns. What does that entail?

A. A first degree burn or a partial thickness burn would be much like your sunburn. A second degree or full partial or deep partial would be your burns much like you receive on a stove if you touch the unit and get a blister that will heal on their own, very painful but would heal. A third degree burn or a full thickness is a burn that you would receive that is going to require surgical intervention to heal.

Q. And that surgical intervention is typically in the form of what?

A. Typically in the form of going to the operating room, removing that skin, that nonviable skin and replacing it with a donor. Usually if the patient is not extensively burned or the burns do not cover more of their body than not, the donor site can come from typically a thigh and then it's placed in the affected area.

Q. So the thigh would be the first harvest or donor area for the skin grafts?

A. Usually, depending on where the burn is.

Reported By:
800-333-2082          Huseby, Inc., an Affiliate of Spherion (704) 333-9889          Fax (704) 372-4593
Case 3:12-cv-00327-MOC   Document 101   Filed 09/23/15   Page 134 of 200
495

JA1340

United States of America vs. Aquilia Marcivicci Barnette

7/29/2002

Page 2495

Q. What -- someone with the third degree burns that you talked about, the full thickness burns, what is the pain level of an injury like that?

A. It's a little misleading. A third degree burn initially is not painful because the nerve endings have been so damaged that they don't -- feeling is not generated in that area. The partial thickness and the second degree are the most painful initially. However, the third degree burn, once it's treated and once that layer of skin has been removed and the grafting has been accomplished, throughout that process it becomes more and more painful.

Q. And how long typically is it a painful wound or a painful injury?

A. Again, it varies. The acute phase will be until after the graft has adhered, and then that patient is going to experience pain over the region upwards of a year longer.

Q. Now, you talked about the graft adhering. During that -- about how lengthy is that process?

A. Generally a patient stays in the hospital 3 to 5 days after the surgery that places the graft. At the end of the third day, the dressing is taken off, removed, the graft is evaluated for the adherence. If any spots need to be redone, they are done at the end of

Reported By:
Huseby, Inc., an Affiliate of Spherion (704) 333-9889

800-333-2082                                           Fax (704) 372-4593

Case 3:12-cv-00327-MOC   Document 101   Filed 09/23/15   Page 135 of 200
496

JA1341

United States of America vs. Aquilia Marcivicci Barnette

7/29/2002

Page 2496

that time. If it looks like the skin is going to take, then it's redressed. And they will stay in the hospital another couple of days to make sure infection is not going to set in.

Q. And I don't want you to go into too much detail because I know it is a surgical procedure, but just real briefly, how do you take skin from one part of your body and make it stay in another place?

A. A technique that is roughly equated to shaving the skin off of the arm or the leg is used to remove it. It's called a diatom, and it's much like a cheese slicer and it just layers the skin up. That's removed and then it's laid, if I was go going to use this arm as the donor, and then lay it over on the hand. Then it's stapled into place and mashed very tightly.

Q. Do you recall meeting Robin Williams there in the burn unit?

A. Yes, ma'am.

Q. Do you remember specifically what day you first met her?

A. I think it was the day after she was admitted.

Q. Early in May?

A. Yes, ma'am.

Q. If you would, just describe her condition at the time that you saw Robin.

Reported By:
800-333-2082        Huseby, Inc., an Affiliate of Spherion (704) 333-9889        Fax (704) 372-4593
Case 3:12-cv-00327-MOC   Document 101   Filed 09/23/15   Page 136 of 200
497

JA1342

United States of America vs. Aquilia Marcivicci Barnette

7/29/2002

Page 2497

A.   She was very withdrawn the first several days. She was in a great deal of pain.  She had entered our unit and on her admission eval, she had had to have what we call escharotomies, which increased the pain level. It simply -- because her burns were circumferential meaning they went all the way around her arm, she had to be opened so that the swelling that occurs in a burn wouldn't impede the venous return or the blood flow in that arm causing further damage.  And so this increased her pain level in particular.

She was given pain medication routinely.  She required a significant amount of pain medication initially.  As a young person and a very healthy person coming in, she did progress well and did heal well.

Q.   As she began to heal, did you get to know her a little bit or speak with her on some frequency?

A.   Yes, ma'am.

Q.   Tell the jury about that.

A.   Robin came in and was very quiet with us initially.  There was concern that she would need some counseling and that kind of thing.  I had her the day before she was discharged, and by that time she had begun to open up a bit about her injuries and she discussed with me what her plans for discharge were and where she was planning to go.

United States of America vs. Aquilia Marcivicci Barnette

7/29/2002

Page 2498

Q. What did she tell you?

A. She told me that she was planning to return to the southwest Virginia area with her mother, that she had hoped to live a normal life, although she didn't feel that it was possible.

Q. Did she describe in particular any fears or concerns?

A. Yes. She told me that she felt like there was nothing she could do to hide from her attacker, that she felt like that she would probably not survive her relationship.

Q. While Robin was there at the hospital, did she -- was she surrounded by friends or family, did you see folks coming there to offer her support?

A. Yes, ma'am. Her mother was with her virtually continually. The burn unit is a closed unit and when we have a patient that has been the victim of attack, we keep the security at a higher level. So we had a lot of phone calls and a lot of people that wanted admittance, but the number of visitors was kept very low for her security at this time and also for her ability to heal and rest properly.

Q. And as you recall, how long was she there?

A. About 12 days, 12 to 13 days.

Q. Is that an average length of stay for the type

United States of America vs. Aquilia Marcivicci Barnette

7/29/2002

Page 2499

of burns that she had?

A. For the type of burns she had, that was about average.

Q. I'm going to show you some exhibits which have been previously marked and received into evidence, Government's Exhibit 23I, would you take a look at that exhibit and describe that photograph?

A. This is her left forearm and hand. It appears to be pretty badly scarred. It's a bit dark photo, but it looks like a post burn.

Q. And is that what her injuries, the condition of her injuries or the healing process when she left the medical center?

A. Yes.

Q. I will also show you what has been previously identified and received as Government's Exhibit 23K.

A. That appears to be her right arm. Her right arm injuries were not as deep as her left arm injuries, and that looks like it would be about what they were when she left.

Q. And 23J?

A. Again, her left arm showing significant scarring, looks to be some contractures in her left fingers beginning.

Q. What does that mean?

United States of America vs. Aquilia Marcivicci Barnette

7/29/200

Page 2500

A. As the scarring develops, it becomes taught and shrinks. It is very difficult to keep the hands as supple and as flexible as they were. It takes a lot of exercise, a lot of therapy on them to keep -- to keep movement in the joints. And as they tighten frequently, they have to be redone, the scars have to be revised, openings have to be made so that you can't have movement again.

Q. What is the process for that?

A. Again, it's surgical.

Q. I show you what has been marked and received as Government's Exhibit 23F.

A. That appears to be a donor site that is well healed.

Q. So that would be part of the skin grafting removal area?

A. Yes, ma'am.

MS. ROSE: If I may approach the witness, Your Honor.

THE COURT: Yes.

BY MS. ROSE:

Q. I'm going to hand you what I have marked as Government's Exhibit 63D. Take a look at that. Are you able to identify that exhibit?

A. Yes, ma'am.

Reported By:
800-333-2082      Huseby, Inc., an Affiliate of Spherion  (704) 333-9889      Fax (704) 372-459.

Case 3:12-cv-00327-MOC   Document 101   Filed 09/23/15   Page 140 of 200
501

JA1346

United States of America vs. Aquilia Marcivicci Barnette

7/29/2002

Page 2501

Q.   And 63D 1?

A.   Yes, ma'am.

Q.   What are each of those exhibits?

A.   These are compression garments.  They are used to minimize scarring to help increase circulation and to help increase mobility and decrease the contractures.

MS. ROSE:  Your Honor, I would move at this time admission of Government's Exhibits 63D and 63D 1.

THE COURT:  Let them be admitted.

BY MS. ROSE:

Q.   And an individual like Robin who was having her hand or arm treated, what -- you said that these were used to assist in recovery or --

A.   Yes, ma'am.  Once the graft is in place, it's kept down through a compression garment.  Those would be her long-term garments.  Initially we do it through Ace wraps.  And then as she progresses on an outpatient basis, she would wear these compression garments for at least a year.

Q.   And the longer one of course for her forearm, is that correct?

A.   That was probably for her forearm, yes, ma'am.

Q.   And these have to be worn how many hours a day?

A.   Most of the time, patients are asked to wear

Case 3:12-cv-00327-MOC  Document 101  Filed 09/23/15  Page 141 of 200

JA1347

United States of America vs. Aquilia Marcivicci Barnette

7/29/2002

them 20 to 24 hours.

Q. When Robin left the unit, had you all, you or anyone else from the floor advised her of precautions she should take not only in recovery but protection as well?

A. Yes, ma'am. We spoke with her. I spoke with her about her discharge plan. I had advised her that she needed to seek counseling, that it would be wise to leave the area and not return to her home at that time, perhaps go to somewhere else. We of course gave her her medical discharge information including follow-up appointments, how to take care of her skin, how to do her wound care at home. She still had significant wounds on her right arm that she would need to dress frequently, as well as had to care for her donor sites that would take several weeks to heal completely, and how to care for her new graft.

Q. Now, was she given particular orders as far as a local Roanoke doctor to see or her local hospital or did you all train her in ways to care for herself, is that something that requires specific medical attention?

A. It requires specific medical attention in that she and her family would have been trained to do the dressings. I don't recall exactly who was going to perform her treatments, whether she was going to have

United States of America vs. Aquilia Marcivicci Barnette

7/29/2002

Page 2503

home care for a while or if she was -- some of her family were going to do it. Typically it's the kind of thing that a family could do with close follow-up back in our clinics. And I know that her follow-up clinics, she seen by the plastic surgery department and through some therapy at the university.

Q. So she was planning for her future with her recovery?

A. Yes, ma'am.

Q. Did you notice a change in Robin's demeanor? You indicated the first couple of days she was very quiet, withdrawn, of course heavily medicated. How was her demeanor as she left?

A. She was more open. She was still hesitant to trust and she appeared hesitant to trust us. She did open up more on the last couple of days and spoke of her personal situation.

MS. ROSE: Thank you. I have no other questions of this witness, Your Honor.

CROSS-EXAMINATION

BY MS. LAWSON:

Q. Ms. Aldridge, just a couple questions. You and the other professionals at the hospital were concerned about Robin Williams' safety, weren't you?

A. Yes, ma'am.

Reported By:
Huseby, Inc., an Affiliate of Spherion (704) 333-9889

800-333-2082

Fax (704) 372-4593

Case 3:12-cv-00327-MOC Document 101 Filed 09/23/15 Page 143 of 200
504

JA1349

United States of America vs. Aquilia Marcivicci Barnette

7/29/2002

Page 2504

Q. And that's because you know that by the time a spouse or former boyfriend or girlfriend starts doing things like this, it may not stop, is that right?

A. Yes, ma'am.

Q. And in fact it may get worse?

A. Yes, ma'am.

MS. LAWSON: Thank you, no further questions.

THE COURT: You may step down.

MS. TOMPKINS: Government calls Sydney Williams.

SYDNEY WILLIAMS, being first duly sworn, was examined and testified as follows:

DIRECT EXAMINATION

BY MS. TOMPKINS:

Q. Can you state your name, please?

A. Sydney Williams.

Q. And I know it's hard, but can you keep your voice up?

A. Yes, I'm fine.

Q. Spell your name for the court reporter.

A. S-Y-D-N-E-Y, W-I-L-L-I-A-M-S.

Q. And are you Robin's brother?

A. Yes.

Case 3:12-cv-00327-MOC   Document 101   Filed 09/23/15   Page 144 of 200
505

JA1350

United States of America vs. Aquilia Marcivicci Barnette

7/29/2002

Page 2505

Q.   Do you have any other brothers?

A.   Yes, one.

Q.   And who is that?

A.   Kenneth Williams, right there (indicating).

Q.   Okay.  If you could pull the mike a little bit closer to you and just make sure you keep your voice up so we can hear you.

A.   All right.

Q.   Now, are you the oldest?

A.   Yes.

Q.   How old were you when Robin was born?

A.   I would say I was about 9.

Q.   And how old was Kenny?

A.   About 5.

Q.   What do you remember about Robin as a child?

A.   About her as a child?

Q.   Uh-huh.

A.   Well, she was my little sweetheart.  I used to do a lot of work around the house and everything, and my mom used to give me money and I'd go to flea markets and yard sales and buy her dresses and things like that.

Q.   What kind of little girl was she?

A.   I tried to keep her with me all the time.  I tried to make her a tomboy, but she was all woman.

Q.   And you said that you -- make sure you keep

United States of America vs. Aquilia Marcivicci Barnette

7/29/2002

Page 2506

your voice up so these people over here can hear you.

A.   Okay.

Q.   That you bought her dresses.  How did you do that?

A.   Well, you know, I might help my mom out cleaning up or I might wash a car, maybe cut a yard or something and might get 5 or 6 dollars and go to a yard sale or flea market or anything just to buy her something.

Q.   Did you help get her ready for school?

A.   Yes, I did.

Q.   What did you do?

A.   Well, I used to do her hair, I get her dressed, just anything I could do for her.

Q.   Now, did there come time when you moved out of the house?

A.   Yes.

Q.   When was that?

A.   I was about 15 then.  I would say she was about 8.

Q.   Where did you go?

A.   That's when I met my girlfriend that's still there.

Q.   Okay.  And are you still with her?

A.   Yes.

Reported By:
800-333-2082          Huseby, Inc., an Affiliate of Spherion  (704) 333-9889          Fax (704) 372-4593
Case 3:12-cv-00327-MOC  Document 101  Filed 09/23/15  Page 146 of 200
507

JA1352

United States of America vs. Aquilia Marcivicci Barnette

7/29/2002

Page 2507

Q.    And how old were you when you moved out?

A.    About 15, 16, somewhere around there.

Q.    Now, when you moved out, how did your relationship with Robin change?

A.    Well, it dropped off for a while, but, you know, I still went to see her and she'd come to see me. And I used to work at the hospital and she did, too. And like, you know, like me going in the evening or something like that and she would come in at night and we'd talk to each other before like I'm getting off and she's coming in, you know, things like that. Then she would come by my office and get me, take me to the house and we'd all sit around and have a good time.

Q.    And what was Robin's relationship with her mother like growing up?

A.    Even when she was grown, she was still sleeping in the bed with mom.

Q.    And what was she like when y'all were all in the house together with your mom?

A.    Still a baby.

Q.    What kind of woman did your little sister become?

A.    More of a mother figure, because like at the time I had just had my first little baby and she used to want to keep the baby with her more than I did.

United States of America vs. Aquilia Marcivicci Barnette

7/29/2002

Q. So although you were the oldest, she sort of mothered you?

A. Well, I could talk to her about anything. I felt more comfortable to talk with her than anybody else.

Q. Now, even after you moved out, did you and Robin and the family still stay close?

A. Yes. I mean, you know, we always have family outings and dinners and we'd go to each other's house and have dinners.

Q. All right. After you moved out, did the family still go to church together?

A. Yes.

Q. Now, do you know the defendant, Marc Barnette?

A. Yes.

Q. And how do you know him?

A. Only through my sister.

Q. Do you remember when Robin started seeing Marc?

A. Yes.

Q. Where was she living when they first started seeing each other?

A. With my mom.

Q. Had she always lived at home?

A. Yes.

Q. Did you ever see Marc come over to your mom's

Case 3:12-cv-00327-MOC  Document 101  Filed 09/23/15  Page 148 of 200

509

JA1354

United States of America vs. Aquilia Marcivicci Barnette

7/29/2002

Page 2509

house to visit Robin?

A. Well, I seen -- he came up one or two -- well, no, I used to get off of work at night and like I say, she was off at work, I used to see them sitting there like right down the street from my house is a water tank and a bike trail, I used to see them out there sitting, talking, you know, just at night. And I said what you doing, and she said this is Marc, he is my friend and we're just talking. And I said, well, be safe and you know if you need me, I'm right down the street. I used to see them there frequently or they would come and sit in front of my house like that and talk.

Q. Did you live nearby?

A. Yes, I only stayed about maybe two or three blocks down the street.

Q. Okay. So you were always nearby?

A. Yes.

Q. Now, did there come a time when Robin moved into an apartment with Marc?

A. Yes.

Q. Did you ever go over to that apartment?

A. Yes.

Q. Prior to the fire bombing incident, did you ever see any signs that Robin might be in danger?

A. I didn't. I didn't.

Reported By:
800-333-2082          Huseby, Inc., an Affiliate of Spherion  (704) 333-9889          Fax (704) 372-4593
Case 3:12-cv-00327-MOC  Document 101  Filed 09/23/15  Page 149 of 200
510

JA1355

United States of America vs. Aquilia Marcivicci Barnette

7/29/2002

Page 2510

Q. Now, I'm going to take you back to April of 1996. Where were you working at that time?

A. I was working at a place, a golf company, golf course.

Q. At a golf course at Roanoke?

A. Yes.

Q. What did you do there?

A. I used to cut the greens and the roughs and all of that and like rake sand traps, just everything that have to do with a golf course.

Q. How close was the golf course to Robin and your mom's house?

A. I would say maybe a 7 or 8-minute drive.

Q. Now, did you live close enough to the golf course to come home for lunch?

A. Yes.

Q. Do you remember April 30th, 1996 when the fire bombing happened?

A. Yes, I was awokened by a phone call.

Q. Who called you?

A. My brother's wife, Sharon.

Q. What did she tell you?

A. She just said to come down to Robin's apartment because her apartment was on fire.

Q. Did you go over to Robin's apartment then?

Case 3:12-cv-00327-MOC   Document 101   Filed 09/23/15   Page 150 of 200
511

United States of America vs. Aquilia Marcivicci Barnette

7/29/2002

Page 2511

A.    Yeah, I went straight there.

Q.    You went straight there?  What did you see when you got there?

A.    Well, fire trucks was there, and the house was just a mess.  And I went in, and she was already gone to the hospital.

Q.    What did you do next?

A.    Well, I stayed there until the police -- I mean, until the fire department had secured the apartment and everything and I went to the hospital to get my mom.

Q.    Where was your mother?

A.    I think she was at already at home or at the hospital, I'm not really sure right now, but I went to the hospital.  Then she was all right, so I think I went home and picked my mom up and my mom was packing something to go to Charlottesville.

Q.    When you got to the Roanoke hospital, was Robin still there or had she been transported?

A.    She was already gone.

Q.    Okay.  Do you know where she had been transported?

A.    To the University of Virginia.

Q.    Did you and your mom drive to the University of Virginia just right then?

Reported By:
800-333-2082              Huseby, Inc., an Affiliate of Spherion  (704) 333-9889              Fax (704) 372-4593
Case 3:12-cv-00327-MOC  Document 101  Filed 09/23/15  Page 151 of 200
512

JA1357

United States of America vs. Aquilia Marcivicci Barnette

7/29/2002

Page 2512

A. Yes.

Q. About how long did it take to drive there?

A. I would say about an hour and a half.

Q. And you and your mom went?

A. Uh-huh.

Q. Did you see her when you got there?

A. Yes.

Q. How was she?

A. My sister?

Q. Uh-huh.

A. She was in the bed and like had a lot of medications in her, I guess. But as soon as I walked in and seen her, I got sick so I had to run to the rest room myself.

Q. Why was that?

A. I think it was just my nerves.

Q. Now, were you able to talk to her while she was at the hospital at UVA?

A. Yes, I talked to her.

Q. And what did she tell you about what happened?

A. Well, she just kept saying -- well, the first time I seen her, I just couldn't believe that she was in the condition that she was in, like burnt and things like that. And I said, well, baby, just get yourself together and we are going to take care of you, like

United States of America vs. Aquilia Marcivicci Barnette

7/29/2002

Page 2513

that. And so whenever she needed some other things like that, well, they already had a list of things that she needed. So I already knew that I had to drive right back to Roanoke and get them things and come back.

Q. Okay. So she had a list of things that she needed from home?

A. Yes.

Q. Did you drive back and forth between Roanoke and Charlottesville?

A. Well, depends on what she needed. Maybe I would go -- sometimes I went twice a day, sometimes I went once a day, sometimes every other day.

Q. Did she tell you who was responsible?

A. Yes.

Q. And what did she tell you about that?

A. It was Aquilia Barnette. She said she looked him straight in the face.

Q. Now, did you do anything to try and find Marc while she was in the hospital?

A. Yeah. Well, see, in our community, we got like Roanoke, Salem and Vinton is all close together, Roanoke, Salem and Vinton, and I know I burned up $200, $300 worth of gas just riding and looking.

Q. And that was in the days or weeks that followed the fire?

United States of America vs. Aquilia Marcivicci Barnette

7/29/2002

Page 2514

A. Yes.

Q. Now, when you went to see Robin in those weeks after the fire, what was her state of mind?

A. Well, she didn't know how her life was going to turn out. She kept saying she didn't know if she was ever going to get married because she had never had a child yet or anything like that, and she didn't know if anybody would really want her in life or anything. And I said, well, baby we all want you in life.

Q. Was that because of her burns?

A. Yes.

Q. Now, when she got out of the UVA burn center, where did she go?

A. She went to my mom's house.

Q. Did you go see her there?

A. Yes.

Q. How often?

A. Every day. I mean, it might be after work or maybe on my lunch break or whatever, something like that.

Q. And how was she?

A. She was in decent spirits, but she was still scared to come outside or do anything like that.

Q. Now, while Robin was in the hospital and after she got home, where was her car parked?

Reported By:
Husseby, Inc.
800-333-2082    Case 3:12-cv-00327-MOC  Document 101  Filed 09/26/17  Page 354 of 200    Fax (704) 372-4593
515

JA1360

United States of America vs. Aquilia Marcivicci Barnette

7/29/2002

Page 2515

A. Oh, well, see, I took her car to my home and put it in the yard and blocked it in with my truck and my other car.

Q. And that was a couple of blocks away from Louden Avenue?

A. No -- well, yeah. See, that's about maybe like 3 miles, maybe 4 miles away.

Q. When she first got back from UVA, was her car still parked at your place?

A. Yes, because she couldn't drive it. It was gears and she couldn't use her hands unless it was straight.

Q. Now, after Robin got home, was there an occasion that you came home for lunch?

A. Yes.

Q. And when you left that morning, was there anything on Robin's car?

A. No, it wasn't.

Q. And when you got home for lunch, what, if anything, did you notice?

A. Okay. I went in the house and so when I walked by the car, I just didn't look back, I just walked by it. And when I came back out, I made a couple sandwiches and I came back out and I seen a bunch of like cards on the windshield. So I picked them up, and

Case 3:12-cv-00327-MOC   Document 101   Filed 09/23/15   Page 155 of 200
516

JA1361

United States of America vs. Aquilia Marcivicci Barnette

7/29/2002

Page 2516

they was, you know, I guess it was correspondence from Barnette and my sister. And so what I did, it made me really, really nervous, so I just --

Q. Why were you nervous?

A. Because she had just been burned and I couldn't find him and I didn't know where he was at, so I got in the car and went straight down to my mom's. And I went in the house and I said, how you doing, and she said, I'm going okay, what you doing? I said, well, I'm just on lunch break, just coming to check on you. I didn't tell her nothing.

Q. Why didn't you tell her anything?

A. Because I didn't want to upset her.

Q. Would she have been upset?

A. Yeah, I'm quite sure she would have. So I said, I'm going back to work right now. So what I did, I just left the house and I went straight over to my aunt's house because my Uncle Ray was there. And I said, Uncle Ray, I think you need to come on and just go to mom's with her and just stay there with her because I found these cards here.

Q. You showed the cards to Uncle Ray?

A. Yeah, you know, I showed them to him and just to like as far as him to go on and go with me.

Q. What did you do with the cards?

Case 3:12-cv-00327-MOC   Document 101   Filed 09/23/15   Page 156 of 200

517

JA1362

United States of America vs. Aquilia Marcivicci Barnette

7/29/2002

Page 2517

A. What did I do with them at that time?

Q. Yes.

A. I just kept them in my car.

Q. Did you ever turn them over to police?

A. Oh, yes, I did that. I'm talking about that day that I found them and I went to get my uncle, when I carried him to my mom's house I just kept the cards in my possession.

Q. Did you look at the cards?

A. Yes.

Q. Could you tell by the writing on the cards who they were to and from?

A. Yes.

Q. And who were they to and from?

A. The cards was like snap to, I don't know to who or from, but then it had like just scribbling on them and everything.

Q. All right. I'm going to show you a series of those cards, and I will begin with what has been previously marked and admitted as Government's Exhibit 50A. Does that appear to be a birthday card?

A. Yes.

Q. I'm going to open it up and show the inside. Can you read that?

A. Uh-huh.

United States of America vs. Aquilia Marcivicci Barnette

7/29/2002

Page 2518

Q.   Is that a happy 21st birthday card?

A.   Yes.

Q.   Does it say -- is it signed by Pooh?

A.   Yes.

Q.   Do you know if that was the nickname for Robin?

A.   I don't know, because she used to use the word Pooh a lot.

Q.   All right.  Now, on the back of that card, did there appear to be writing on that?

A.   Yes.

Q.   And what does that say?

A.   Robin, you don't have to laugh about -- to lie about Benny, if you love him so much, you should have never fucked -- fucked --

Q.   Faked your love for me?

A.   Yeah, faked your love for me.

Q.   And what about in the box, what does that handwriting there say?

A.   I can't see the second, these, what --

Q.   Does that say these are just a sample of your lies?

A.   Yeah, that's what it is.

Q.   And that was one of the cards you found on her --

A.   Yes, it was about three or four, maybe five

Reported By:
800-333-2082          Huseby, Inc., an Affiliate of Spherion  (704) 333-9889          Fax (704) 372-4593
Case 3:12-cv-00327-MOC   Document 101   Filed 09/23/15   Page 158 of 200
519

JA1364

United States of America vs. Aquilia Marcivicci Barnette

7/29/2002

Page 2519

cards.

Q.    All right.  I'm going to show you another card that has been previously marked and introduced as Government's Exhibit 50B.  Is that one of the other cards that you found?

A.    Yes.

Q.    All right.  And is there handwriting on that?

A.    Yes.

Q.    And what does that say?

A.    Why did you lie.

Q.    I'm going to show you another card that's been previously marked and admitted as Government's Exhibit 50C.

A.    Uh-huh.

Q.    And what does the handwriting on that card say?

A.    Okay.  You let him come between us.

Q.    Okay.  And before that, was that a love card before that, just by looking at the message in the card, I love the heck out of you?

A.    Yes.

Q.    I'm going to show you an item that's been previously marked and admitted as Government's Exhibit 50D.  What does the handwriting on the front of that card say?

A.    You lied to me.

United States of America vs. Aquilia Marcivicci Barnette

7/29/2002

Page 2520

Q. Okay. Is there a, looks like a little signature on there, a little Marc?

A. Yes.

Q. Is that the same Marc that you'd seen on other cards?

A. Yes.

Q. Now I'm going to show you what has been previously marked and admitted as Government's Exhibit 50E. Can you read the handwriting on that card?

A. Why wasn't I good enough for you.

Q. Is that the same Marc on it?

A. Yes .

Q. I'm going to show you what has been previously marked and admitted as Government's Exhibit 50F. Can you read the handwriting on that card?

A. If you loved him so much, why did you even bother with me, and it's still got the little sign.

Q. All right. And I'm going to show you what has been marked as Government's Exhibit 50G. Can you read the handwriting on that?

A. You never really loved me.

Q. Okay. Now, when you looked at those cards, were those cards that had all been signed by Robin?

A. Had they been signed by Robin or are you talking about --

United States of America vs. Aquilia Marcivicci Barnette

7/29/2002

Page 2521

Q. Had they been -- were they cards that Robin had sent to Marc Barnette?

A. I don't really know which way the cards were sent to.

Q. Okay. The cards that went between them?

A. Yes.

Q. What did you do with those cards eventually?

A. Turn them to the police.

Q. Did you ever tell Robin about those cards?

A. I know I told my uncle and my mom and I don't know if she found out through them or not. I didn't never tell her.

Q. About how long after the fire bombing at her apartment did you find those cards on her car?

A. I would say it was after about maybe a week, maybe 2 weeks.

Q. Okay. After she got back from the hospital?

A. No, she was still in the -- no, it was after she had came from the hospital.

Q. And you said you drove around looking for Marc. Did you find him?

A. No.

Q. Did you tell Kenny, your other brother?

A. Yes.

Q. Did he help you look for Marc?

United States of America vs. Aquilia Marcivicci Barnette

7/29/2002

A.   Well, I'm quite sure he did his own looking whether he was out in his car.

Q.   Okay.  Now, how did you come to learn about your sister's murder?

A.   While I was at work.

Q.   Was that a Saturday morning?

A.   Yes.  I work seven days a week.

Q.   And was that at the golf course?

A.   Yes.

Q.   Tell the jury what happened that morning.

A.   Okay.  Well, we used to go to work and like stay for like -- like we used to go Saturdays and Sundays and we work like four hours and get paid for like six.  So we have to rake sand traps and everything like that.  So I had maybe like maybe four to seven sand traps to do.  It usually would take like 2 and a half to 3 hours to do.  You know, I was finished in about 45 minutes.  I don't know what it was, I was just -- I don't know what it was, I was just finished them in 45 minutes, maybe an hour.

Q.   And what happened next?

A.   Okay.  And then my supervisor rode up on me and told me I had to go home.  So I turned around, I was going to talk to my friend for like two more minutes and he said, Sydney, I need to go home now, so I knew

800-333-2082          Reported By          Fax (704) 372-4593
Huseby, Inc., an Affiliate of Spherion  (704) 333-9889
525

JA1368

United States of America vs. Aquilia Marcivicci Barnette

7/29/2002

Page 2523

something was wrong. So I got in the golf cart and went to my car, and I had just gotten to my mom's house and I seen my pastor and four or five, maybe ten church members and my mom sitting on the porch and police and everything, so I knew something was wrong. So I went to the porch and said, mom, what is wrong? She said, well, my baby's been shot. And I said, who, Robin? And she said, yes. I said, well, is she all right? And she said, well, I don't know. I guess she just didn't want to tell me. And I said, well, where Kenny at? She said, well, he gone to the hospital. I said, well, I seen my pastor and everybody there around my mom, so I went to the hospital. And I got there and my brother was there, and she was gone, you know. And I said, well, Kenny all we can do is --

Q. What did Kenny tell you when you got there?

A. He said she's dead, man. He said, would you like to go see her? And I said, Kenny, I mean, I can't handle it right now, you know. I said, our priority is to take care of mom now because she okay, and I think he left his car and he got in my car. And I been living in Roanoke all of my life and I got lost five to six times trying to get home.

Q. How far is it from the hospital to home?

A. Oh, maybe 10 to 12 miles, something like that.

Case 3:12-cv-00327-MOC  Document 101  Filed 09/23/15  Page 163 of 200

JA1369

United States of America vs. Aquilia Marcivicci Barnette

7/29/2002

Page 2524

Q.   And did you and Kenny go home?

A.   Yes, we went to mom's house.

Q.   And what was the scene like there?

A.   Well, I was distraught and Kenneth went up on the porch.  I believe mama already knew, but when we came back that morning, she really knew.  And Kenny went up there and I was standing back there and everybody was around mom and he went ahead and told her, and it just got hot all of a sudden all day.

Q.   Now, Sydney, tell us how has Robin's death affected your life?

A.   Well, it affected me in so many ways that I got a void in my life that I can't fill, and I done tried all kind of ways, but all I can do is put it in the Lord's hands.  I know that she used to take care of my little daughter even though she was just a baby even better than I did and now sometimes I need a little help with her, you know.  I wish she was here to help me.  I just wish she was here because it will take a whole lot of void out of my life.

Q.   What do you miss most about Robin?

A.   Just sitting and talking and going to the movies.  You know, seems like I go to the hospital and just sit down and she will come out and we will talk.  I miss talking and just being with her.  I miss it all.

United States of America vs. Aquilia Marcivicci Barnette

7/29/2002

Page 2525

MS. TOMPKINS: Thank you, Sydney, no further questions.

MR. BENDER: No questions, Your Honor.

THE COURT: Members of the jury, we will take our afternoon break at this time and we will call for you in about 15 minutes.

(The jury left the courtroom.)

(Brief recess.)

THE COURT: Are the parties ready to resume?

MS. TOMPKINS: Yes, sir.

THE COURT: May I have the jury, please.

(The jury returned to the courtroom.)

THE COURT: You may call your next witness.

MS. ROSE: Steve Austin.

STEVE AUSTIN, being first duly sworn, was examined and testified as follows:

DIRECT EXAMINATION

BY MS. ROSE:

Q.   Would you introduce yourself to the jury, sir?

A.   Steve Austin.

Q.   You can pull that mike a little closer to you. Mr. Austin, where do you live?

Reported By:
800-333-2082        Huseby, Inc., an Affiliate of Spherion  (704) 333-9889        Fax (704) 372-4593

United States of America vs. Aquilia Marcivicci Barnette

7/29/2002

Page 2526

A.    11405 Wood Fire Road in Charlotte.

Q.    That's here in Charlotte?

A.    Yes.

Q.    How long have you lived in Charlotte?

A.    All of my life.

Q.    Do you work, sir?

A.    Yes.

Q.    Where do you work?

A.    Philip Morris.

Q.    How long you been employed at Philip Morris?

A.    Seven years.

Q.    Now, are you a friend of the defendant Marc Barnette?

A.    Yes.

Q.    How long have you two been friends?

A.    All of our lives.

Q.    Where did you meet him?

A.    He used to live right across the street from me.

Q.    Did you grow up together?

A.    Yes.

Q.    What do you call him?  Do you have a name that you refer to him as?

A.    Vichi.

Q.    Vichi?

United States of America vs. Aquilia Marcivicci Barnette

7/29/2002

Page 2527

A.   Yes.

Q.   Have you stayed in contact with the defendant over the last several years?

A.   Yes.

Q.   Now, who is Greg Austin?

A.   My brother.

Q.   Where does Greg Austin live?

A.   He now lives in Ohio.

Q.   Prior to moving to Ohio, where did he live?

A.   In Roanoke, Virginia.

Q.   How long had he been living in Roanoke in 1996?

A.   I would say about two or three years.

Q.   Did you and the defendant visit your brother in Roanoke?

A.   Yes.

Q.   About how frequently would you two do that?

A.   I would do it all the time; I don't know how many times me and Vichi went up there.

Q.   When you and the defendant would go up to visit your brother, did you go out to the night spots and socialize?

A.   Yes.

Q.   And on one of those occasions were you with the defendant when he met a lady named Robin Williams?

A.   Yes.

United States of America vs. Aquilia Marcivicci Barnette

7/29/2002

Page 2528

Q.   And did they thereafter begin a relationship?

A.   Yes.

Q.   And did the defendant initially maintain that relationship long distance from Charlotte?

A.   Yes.

Q.   About a year or so after they met did he move up to live with her in Roanoke?

A.   Yes.

Q.   While they were living in Roanoke, did you visit with them at their apartment on Keswick?

A.   I would stay with my brother, but Vichi would come and pick me up and we would go back over to their apartment.

Q.   Whose car did he drive when he came to pick you up?

A.   Robin's.

Q.   I'll show you previously identified and admitted Government Exhibit 7G.  Is this the apartment that you visited --

A.   Yes.

Q.   -- on occasion?  How many times would you say you went there with the defendant?

A.   Numerous.

Q.   Pardon?

A.   Several times.

800-333-2082          Reported By
Huseby, Inc., an Affiliated Spherion  (704) 333-9889          Fax (704) 372-4593
529

JA1374

United States of America vs. Aquilia Marcivicci Barnette

7/29/2002

Page 2529

Q. Would Robin be there on those occasions?

A. Sometimes, yes.

Q. She worked during the day, didn't she?

A. Yes.

Q. At some point do you recall the defendant and Robin breaking up and him coming back to Charlotte?

A. Yes.

Q. Shortly after he moved back to Charlotte did you hear about the fire bombing up in Roanoke at Robin's apartment?

A. Yes.

Q. How did you hear about that?

A. Well, I have another brother, he had a girlfriend that lived in Virginia, and one particular morning she called asking had we seen Vichi, and I was like, no, why, and she told me that the house had been fire bombed and the police were looking for Vichi.

Q. What did you do when you heard that?

A. I told her I hadn't seen him or heard from him, and I called his mom to see if she had heard from him and she was like --

Q. And had his mother heard from him at that point?

A. No.

Q. How long prior to the fire bombing had it been

United States of America vs. Aquilia Marcivicci Barnette

7/29/2002

Page 2530

before you had seen him?

A. Before the fire bombing? I don't know.

Q. More or less than a week?

A. I can't remember.

Q. All right. Why did you call his mother's home?

A. To see if she had heard from him or seen him.

Q. Did he normally stay there?

A. Yes.

Q. When did you finally hear from the defendant?

A. It was almost a week later, four or five days later.

Q. And during that time period had you been calling or looking for him in his regular places?

A. Yeah. I mean, I called his mom every now and then; that's about it.

Q. When you finally did hear from the defendant, what did he tell you?

A. He called me and told me to come and pick him up, that he needed to talk to me.

Q. Did you, in fact, go pick him up?

A. Yes.

Q. And where did you pick the defendant up?

A. He was somewhere off of Independence Boulevard in a McDonald's parking lot.

Q. Now, where was that Independence related to his

United States of America vs. Aquilia Marcivicci Barnette

7/29/2002

Page 2531

mother's -- or where was that in relation to his mother's home on West Boulevard?

A. It is like across town.

Q. Was he there with a car?

A. No.

Q. Did he indicate to you how he had gotten to that McDonald's on Independence?

A. No.

Q. Where did you go when you picked him up?

A. We went over to my mom's house.

Q. Where does your mother live?

A. She lives in Clanton Park.

Q. And was there anybody with you at the time other than the defendant?

A. Yeah, I had a friend girl with me.

Q. Did you take her to your mother's home in Clanton Park as well?

A. Yes.

Q. What did you do when you got to your mother's house?

A. I told my mom to entertain my company while I talked to Vichi out on the back, and me and Vichi went out on the back and we started talking.

Q. What did he tell you?

A. He told me about the fire bombing. He was

United States of America vs. Aquilia Marcivicci Barnette

7/29/2002

Page 2532

saying that he had been trying to get back together with Robin after they had broken up and -- you know, through phone contact and one particular night he, day or night, I'm not sure, but he called her and, you know, they were talking and he heard a guy's voice in the background and it was like the guy kept messing with her, tickling her, whatever, playing with her while they were on the phone and you know he really wasn't concerned about that, is what he told me, that he was just desperately trying to get Robin back and one minute she would say, yeah, we can get back together and the another minute she would say, no, we can't get together, just kind of messing with him.

So eventually they got off of the phone, and I don't know if he had drinks or what, but some kind of way he got in his brother's car and he went up there. And he say he stopped at a gas station and got some gas and he had a baseball bat and a little container and he said he put some gas in the little container and went on up there and got -- finally got to the apartment, and he said that he was telling the guy to come outside, because the guy's car was there at the apartment, so he is telling the guy to come outside and the guy would never come outside so he took the bat and just started beating up the guy's car and this guy had a gun, he

United States of America vs. Aquilia Marcivicci Barnette

7/29/2002

Page 2533

stuck his arm out the door just shooting around but he never would come outside. And so Vichi say he took the little container of gas and threw it through the kitchen window.

Q. Did he say whether he saw Robin get out of the apartment?

A. He said she had came out the back window. He said that the guy pushed her out the back window. When he threw the gas thing in there he heard the screams or whatever, and I guess he went back and got in the car. He said the guy ran out the front door and Robin was out the back window.

Q. During the conversation did the defendant tell you whether he and Robin had ever talked about what they would do if the apartment caught on fire?

A. He told me that she would -- she said that she would jump out the back window.

Q. And in your visits to that apartment, there was only one way in and one way out through the door?

A. Right, front door.

Q. Did the defendant tell you that he had abused Robin before?

A. (Shakes head.)

Q. You will have to speak. You can't just nod because we are recording.

Case 3:12-cv-00327-MOC   Document 101   Filed 09/23/15   Page 173 of 200

JA1379

United States of America vs. Aquilia Marcivicci Barnette

7/29/2002

Page 2534

A. No.

Q. Did he tell you on that night that he yelled, die, bitch, die?

A. No.

Q. Did he tell you about going up to Roanoke and putting the cards on her car windshield?

A. No.

Q. Did he tell you about calling her mother's home after the fire?

A. No.

Q. He didn't tell you that part? After the defendant told you basically what had happened up in Roanoke, what did you two then do?

A. I took him back where I got him from.

Q. Back to the McDonald's parking lot?

A. Yeah.

Q. Did he indicate to you whether he had a ride or where he would be going from there?

A. No.

Q. After that about how long was it before you saw the defendant again?

A. A couple of weeks, three weeks or so. It wasn't long, I know that.

Q. For a couple of weeks you didn't see him at his mother's?

United States of America vs. Aquilia Marcivicci Barnette

7/29/2002

Page 2535

A. Yeah.

Q. You didn't see him at your house?

A. Say it again.

Q. You didn't see him during that two weeks, you didn't know where he was?

A. No, I didn't know where he was, but I know pretty soon after that we had just got back together.

Q. And what did you two do on the next occasion that you got together?

A. Went out clubbing, stuff like that.

Q. What do you mean when you say you went clubbing?

A. Went to a club, picked up girls and stuff like that --

Q. And, in fact --

A. -- just hanging out.

Q. I'm sorry, I didn't mean to interrupt you, sir.

A. I said just hanging out basically.

Q. Clubbing and meeting girls. Did he actually meet a girl that you two later got together with?

A. Yes.

Q. What did you do on that occasion?

A. We met these girls at a club and, you know, exchanged numbers and stuff, and like that weekend we went over to their house and played cards and had some

United States of America vs. Aquilia Marcivicci Barnette

7/29/2002

Page 2536

drinks, just laughing and joking basically.

Q. Now, that all happened before -- after he burned Robin but before he killed her, that was in the inbetween time?

A. Right.

MS. ROSE: All right, sir, thank you very much.

CROSS-EXAMINATION

BY MR. BENDER:

Q. Mr. Austin?

A. Yes.

Q. When did you and Marc, you know him as Vichi, some other people call him Marc, but when did you and Marc first meet each other?

A. Like I said, we grew up together. I have known him all of my life.

Q. Tell us a little bit about what Marc was like growing up.

A. A clown.

Q. What do you mean by that?

A. He was a really good guy, talented, adventurous, just an all-around good guy, kind of quiet.

Q. When you say talented, did he have any particular talents?

A. Yeah. He had a lot of talents. He could work

United States of America vs. Aquilia Marcivicci Barnette

7/29/2002

Page 2537

on cars, build model airplanes, draw, and -- he just -- he could do a lot of stuff. He was good with his hands, I'll put it like that.

Q. And y'all grew up together across the street from each other. It wasn't on West Boulevard, was it?

A. No.

Q. Where was it?

A. It was in Clanton Park.

Q. And that was when he was living with his mother, Sonia, and Rick Barnette?

A. Right.

Q. And I believe was that Rick Barnette's house that they lived in?

A. Yes.

Q. Did y'all ever go to school together?

A. No.

Q. Did you see each other, how often as you grew up?

A. We saw each other all the time until he moved to Atlanta.

Q. When he moved to Atlanta?

A. Until he moved to Atlanta.

Q. And I believe that was because his mother had moved down there --

A. Right.

United States of America vs. Aquilia Marcivicci Barnette

7/29/2002

Page 2538

Q. -- and took the boys with her?

A. Right.

Q. It wasn't his choice to go down there, was it?

A. No.

Q. Now, when did y'all get reacquainted after he moved to Atlanta? Did he come back?

A. Yes, they came back. And, I mean, they would visit quite often and we would get together sometimes; but when he came and moved back, we would get together a lot.

Q. Where was he living at that time, when he came back?

A. That's when they were living off of West Boulevard.

Q. 3413 West Boulevard?

A. Right.

Q. Describe that place, that house, if you would.

A. It was a house that they were basically remodeling. It was up off of the street, away from the street, kind of secluded in the woods.

Q. It had the house number on the mailbox?

A. Yeah. The mailbox was on the street.

Q. Okay. Did Marc ever tell you that after this fire bombing that he sat out by the street and waited for the police to come?

United States of America vs. Aquilia Marcivicci Barnette

7/29/2002

A. Yeah. That's before we had started hanging out again, he would tell me that, you know, nobody came and got him yet. That's basically why we just started hanging out again, they never came and got him.

Q. You met Robin the same night that Marc met Robin, didn't you?

A. Right.

Q. Tell us how that happened.

A. We were at a club in Virginia and -- it was me, Vichi, and my brother, my oldest brother, and Robin was there with a few of her friends, and we just started dancing and talking. After the club was over, we all walked outside together and he was talking to Robin.

Q. And did you ever go back with him when he went back to see Robin before they moved in together?

A. Probably. We probably rode up there together, because I would go see my brother all the time and he may have been along for the ride just to go see Robin.

Q. Describe in the first few months or years of their relationship, describe what you saw between Robin and Marc.

A. They was like just crazy in love with each other. You know, I have never seen him so happy, I will just put it like that. I have never seen anybody in love the way that they displayed it, you know.

United States of America vs. Aquilia Marcivicci Barnette

7/29/2002

Page 2540

Q. And about when was the last time you saw he and Robin together?

A. I don't know.

Q. When he came back to Charlotte, you didn't -- after he moved back and before the incident, the fire bombing incident, had y'all talked on the phone about him being back in Charlotte?

A. Yeah.

Q. And did you -- had you tried to take him out to clubs during that time, before the fire bombing?

A. Yeah, I had -- well, I was trying to take him out not to just clubs but anywhere, trying to keep his mind off of Robin, and I would introduce him to some of my lady friends and whatever. I just do anything to try to keep his mind off of it.

Q. And was that what happened in the time between the fire bombing and the murder, trying to keep his mind off of Robin?

A. That was before the fire bombing and after the fire bombing.

Q. Describe what Marc was like after he came back from Roanoke after he and Robin broke up.

A. He was really just down and out, you know, but he would always keep it to himself. He never really went into the depth about it, but you could tell that

Case 3:12-cv-00327-MOC  Document 104  Filed 09/23/15  Page 180 of 200

United States of America vs. Aquilia Marcivicci Barnette

7/29/2002

Page 2541

she was on his mind, and, you know, he just felt bad about the whole break up situation.

Q. Do you know whether anybody, his family or anybody tried to get him help, counseling, anything like that?

A. No, I don't know.

Q. What does your mother do?

A. She does taxes.

Q. And that's Ann Austin?

A. Yeah.

Q. And did your mother do Marc's taxes for him?

A. Yes.

Q. So Marc worked regularly?

A. Yeah, he always had a job.

Q. Mr. Austin, the government subpoenaed you to be here, didn't they?

A. Yes.

Q. Tell us how you were served with that subpoena by the government.

A. How what?

Q. How did the government come and serve you with that subpoena?

A. They came to my job.

Q. How many folks?

United States of America vs. Aquilia Marcivicci Barnette

7/29/2002

Page 2542

A. I only saw one.

Q. Okay. And what did they do to serve you?

A. They pulled me off of my job, took me away in the back entrance and set me in a room and gave me a subpoena.

Q. Okay. Now, the day that your friend Marc said that he needed to talk to you and you picked him up from there and you brought him home, did he also talk to your mother the same day?

A. Yes.

Q. And do you know that he has a cousin, Shawn Denero, who lives in Tanglewood Apartments right behind that McDonald's that you are talking about?

A. I didn't know that at the time.

Q. Do you know that now?

A. Yes.

MR. BENDER: Thank you that's all.

MS. ROSE: Thank you, Mr. Austin. No other questions.

THE COURT: You may step down. Call your next witness.

MS. TOMPKINS: The government calls Jacob Freshour.

JACOB FRESHOUR, being first duly sworn, was examined and testified as

Case 3:12-cv-00327-MOC Document 101 Filed 09/23/15 Page 182 of 200

JA1388

United States of America vs. Aquilia Marcivicci Barnette

7/29/2002

Page 2543

follows:

DIRECT EXAMINATION

BY MS. TOMPKINS:

Q. State your name, please, and spell your last name for the court reporter.

A. Jacob Freshour, F-R-E-S-H-O-U-R.

Q. How are you currently employed?

A. E-commerce manager with PCA International. We have the portrait studios in Wal-Mart.

Q. How were you employed in May of 1996?

A. I was the manager of Quick Pawnshop on Freedom Drive.

Q. For how many years did you work for Quick Pawn?

A. And seven altogether.

Q. And what was your position at Quick Pawn?

A. After the first year I was always in management.

Q. And you were at the Freedom Drive store, is that right?

A. Yes, ma'am.

Q. Now, on May 20th, 1996, did you sell a 12-gauge shotgun to an individual at your pawnshop on Freedom Drive?

A. Yes, ma'am.

Q. What kind of firearm is that?

United States of America vs. Aquilia Marcivicci Barnette

7/29/2002

Page 2544

A.    A pump shotgun, it is a shotgun that you have to pull it back, pump it back, per se, to bring the shell up into the chamber.

Q.    Was that a Stevens 12-guage shotgun?

A.    A Stevens 12-guage shotgun, yes, ma'am.

Q.    Is that a long barrel?

A.    That would be a long barreled shotgun.

Q.    Describe that pump action.

A.    You would pull the pump back this way (indicating) and it would put the shell up in the chamber to fire.

Q.    Okay.  Now, tell the jury what you remember about that sale.

A.    The first thing that I remember was it was right after we opened, probably between 9:00 and 9:30. The customer came in.  There wasn't much conversation during the transaction, and I guess the reason I remember that is that's pretty unusual when I deal with somebody.  I usually do a good job of drawing them out, trying to build your customer base, being assured they are purchasing the item that they want to purchase. There wasn't a lot of conversation.  It was a fairly quick transaction.  We looked at a few long guns, a few shotguns, and that was the gun that the individual selected.

Case 3:12-cv-00327-MOC, Document 101, Filed 09/23/15, Page 184 of 200

800-333-2082

Reported By:
Huseby, Inc., an Affiliate of Spherion (704) 333-9889

Fax (704) 372-4593

JA1390

United States of America vs. Aquilia Marcivicci Barnette

7/29/2002

Page 2545

Q.   Okay.   Now, in 1996 when an individual purchased a firearm, what kind of paperwork needed to be filled out?

A.   ATF required you to fill out a yellow form to transfer ownership of the gun to the individual from the shop.

Q.   Was it actually yellow?

A.   Yes, ma'am.

Q.   I'm going to show you what has been previously marked and introduced as Government's Exhibit 18A.   Do you see that?

A.   Yes, ma'am.

Q.   And do you recognize it?

A.   Yes.   That's an ATF form to transfer ownership of a gun.

Q.   And that was the paperwork that was required in 1996 for any firearm sale?

A.   Yes.

Q.   Who requires that to be filled out?

A.   That's a federal law, the Alcohol, Tobacco, and Firearms.

Q.   Do you know what the purpose of that is?

A.   To identify the buyer and to transfer ownership of the gun.

Q.   All right.   What was the name of the person

United States of America vs. Aquilia Marcivicci Barnette

7/29/2002

Page 2546

that was given to you who was purchasing that firearm?

A. Mario Von Keith Barnette.

Q. And do you require identification from people who are purchasing firearms?

A. Either a picture state issued ID or state issued driver's license.

Q. What form of ID does this form show was given to you on that day?

A. A Virginia ID.

Q. Is that shown right here at the bottom?

A. Yes, ma'am.

Q. Now, in 1996 could a person from a different state come to North Carolina and buy a firearm?

A. As long as it was a long gun, a shotgun.

Q. Not a handgun, is that fair?

A. Not a handgun.

Q. Now, how was this form filled out in 1996, who filled out the top and who filled out the bottom of this form?

A. The top form is filled out by the customer.

Q. This section here (indicating), for example, the customer fills out the name, height, weight, race --

A. Exactly.

Q. -- residence, date of birth, and place of birth, is that correct?

Reported By:
800-333-2082          Huseby, Inc., an Affiliate of Spherion  (704) 333-9889          Fax (704) 372-4593
Case 3:12-cv-00327-MOC   Document 101   Filed 09/23/15   Page 186 of 200
547

JA1392

United States of America vs. Aquilia Marcivicci Barnette

7/29/2002

Page 2547

A. Yes, ma'am.

Q. Now, what about the next section, the series of questions under certification of transferree, who fills that out?

A. That's filled out by the customer.

Q. So the customer reads those questions and fills them out themselves, is that right?

A. Yes.

Q. Is there any way that at that time you at the pawnshop could verify the answers given?

A. No.

Q. Now, what is the purpose of those questions?

A. To determine if you are a felon, fugitive from justice, illegal alien, that type of thing.

Q. And, for example, Question A, can you read that? Is that close enough to you?

A. Yes.

Q. What does it ask?

A. Are you under indictment or information in any court for a crime punishable by imprisonment for a term exceeding one year --

Q. Go ahead.

A. -- or formal acquisition of a crime made by a prosecuting attorney as distinguished from an indictment presented by a Grand Jury.

Reported By:
800-333-2082        Huseby, Inc., an Affiliate of Spherion (704) 333-9889        Fax (704) 372-4593
Case 3:12-cv-00327-MOC Document 101 Filed 09/23/15 Page 187 of 200
548

JA1393

United States of America vs. Aquilia Marcivicci Barnette

7/29/2002

Page 2548

Q.   And what was the answer to that?

A.   No.

Q.   Now, what was the question in Section B?

A.   Have you been convicted in any court of a crime punishable by improvements for a term exceeding one year?  Note, the yes answer is necessary if the Judge could have given a sentence of more than one year.  The yes answer is not required if you have been pardoned for a crime or the conviction has been expunged or set aside, if you have had your civil rights restored and under the law where the conviction occurred you are not prohibited from receiving or possessing any firearm.

Q.   And what was the answer given to whether or not this person had been convicted of a crime punishable by a term exceeding one year?

A.   No.

Q.   And over on C, what was the question asked?

A.   Are you a fugitive from justice.

Q.   And what was the answer given?

A.   No.

Q.   Okay.  Other questions were, are you -- under D, what was that question?

A.   Are you an unlawful user of or addicted to marijuana or any depressant, stimulant, or narcotic drug or any other controlled substance.

Case 3:12-cv-00327-MOC   Document Reported Filed 09/23/15   Page 188 of 200
800-333-2082          Huseby, Inc., an Affiliate of Spherion  (704) 333-9889          Fax (704) 372-4593

549

JA1394

United States of America vs. Aquilia Marcivicci Barnette

7/29/2002

Page 2549

Q.  And what was that answer?

A.  No.

Q.  And E, F, G, and H, are those questions about whether or not they have been committed to a mental institution, have been dishonorably discharged from the Armed Forces, whether they are an illegal alien and whether they are a citizen?

A.  Yes.

Q.  And all of those questions were answered no?

A.  All of those questions were answered no.

Q.  And down below that there is a certification. What does it tell a person that, what happens if they would answer yes to any of the questions above?

A.  If they answer yes to any of the above questions, they are prohibited from purchasing or possessing a firearm except as otherwise provided by federal law.

Q.  And that's right there on that form, and at that point there was no way for you all to verify any of that information?

A.  No.

Q.  Okay.  And did the person purchasing the firearm sign that?

A.  Yes.

Q.  And the signature says what name?

Reported By:
800-333-2082        Huseby, Inc., an Affiliate of Spherion (704) 333-9889        Fax (704) 372-4593
Case 3.12-cv-00327-MOC  Document 101  Filed 09/23/15  Page 189 of 200
550

JA1395

United States of America vs. Aquilia Marcivicci Barnette

7/29/2002

Page 2550

A.    Mario Barnette.

Q.    Okay.  And down at the bottom of the form does that show the type of the firearm purchased?

A.    Yes, ma'am.

Q.    Okay.  And that was what kind of firearm again?

A.    Model 77B shotgun, Stevens 12-guage.

Q.    And is that your signature down here?

A.    Yes, ma'am.

Q.    And does that automatically transfer ownership?

A.    That transfers ownership legally, yes.

Q.    No waiting period or anything like that?

A.    No waiting period.

Q.    So on that morning the person calling himself Mario Barnette walked out of Quick Pawn with that 12-guage shotgun?

A.    Yes, ma'am.

Q.    What happened the next day?

A.    The next day about the same time, between 9:00 and 9:30, the same individual came back and said that the gun did not work properly, and we warrantied our guns for a year, so we looked at some more guns, exchanged it for another gun, filled out another ATF form transferring ownership of the second gun, and the first gun reverted back to us.

Q.    Did you verify one way or the other whether

Reported By:
800-333-2082          Huseby, Inc., an Affiliate of Spherion  (704) 333-9889          Fax (704) 372-4593
Case 3:12-cv-00327-MOC   Document 101   Filed 09/23/15   Page 190 of 200
551

JA1396

United States of America vs. Aquilia Marcivicci Barnette

7/29/2002

Page 2551

that shotgun you sold him the day before was, in fact, working or not?

A. No. We didn't have any way to verify that on premises.

Q. So did you just -- you took his word for it that the gun was defective in some way?

A. Yes, ma'am.

Q. And that was a policy at Quick Pawn, is that right?

A. That was the policy at Quick Pawn.

Q. Now, what time of day did that person come back in?

A. It was the same time, early in the morning just after opening, 9:00 or 9:30.

Q. And what type of firearm was exchanged?

A. We exchanged it for a semiautomatic shotgun.

Q. Okay. I'm going to show you now what has been previously marked and introduced as Government's Exhibit 18B. Is that the form that you filled out on May 21st, 1996?

A. Yes, ma'am.

Q. Okay. And again on the top of that form, that again was filled out by the purchaser, the person calling himself Mario Von Keith Barnette, is that correct?

United States of America vs. Aquilia Marcivicci Barnette

7/29/2002

Page 2552

A. Yes, ma'am.

Q. Now, there is a difference in this one, it notes Virginia driver's license. Did the person give you a different form of ID on the 21st?

A. No, ma'am. It was the same ID. The driver's license or ID notation was for our records. On the yellow form itself what we are concerned about is the state and the number on the identification, and we just notated it to have our -- just for our own use, basically.

Q. Okay. Do you know -- do you remember from day one, from the 20th to the 21st, was it the same kind of identification?

A. Yes, ma'am.

Q. Okay. So one of those days it was incorrect?

A. Clerical error.

Q. Okay, clerical error. Otherwise, the information is exactly the same as the day before, is that correct?

A. Yes, the same number on the identification and the same number on the rest of form.

Q. Okay. And all of the answers to the questions asked prohibiting transfer of firearm were answered no?

A. Yes, ma'am.

Q. And down at the bottom, what kind of firearm

Case 3:12-cv-00327-MOC   Document 101   Filed 09/23/15   Page 192 of 200

United States of America vs. Aquilia Marcivicci Barnette

7/29/2002

Page 2553

was that that was purchased?

A.   It was a Winchester 12-guage shotgun.

Q.   All right.  Is that a long barreled gun?

A.   Long barreled gun, yes.

Q.   Okay.  And is that a pump action or semiautomatic?

A.   Semiautomatic.

Q.   What is the difference, if you know?

A.   On a semiautomatic you don't have to do the pump action; once you load the gun, it will feed the shells itself up into the chamber.

Q.   Okay.  So there is no movement on the barrel?

A.   No movement on the barrel.

Q.   Okay.  Then it goes to the second page of Government's Exhibit 18B.  Do you recognize that?

A.   Yes, ma'am.

Q.   What is that?

A.   That would be the sales receipt for the second shotgun.

Q.   And how much was paid for that Winchester semiautomatic?

A.   With tax, $211.99.

Q.   And does that show the method of payment?

A.   Let's see.  Yeah, the method of payment would have been cash.

United States of America vs. Aquilia Marcivicci Barnette

7/29/2002

Page 2554

Q.   All right.  And, again, that person calling themselves Mario Von Keith Barnette walked out of the Quick Pawn with that shotgun?

A.   Yes, ma'am.

MS. TOMPKINS:  Thank you.  That's all the questions I have.

MS. LAWSON:  No questions.

THE COURT:  You may step down.

MS. ROSE:  The government would call Elaine Edwards.

ELAINE EDWARDS,

being first duly sworn, was examined and testified as follows:

DIRECT EXAMINATION

BY MS. ROSE:

Q.   Would you please introduce yourself to the members of the jury?

A.   Elaine Ann Reincke Edwards.

Q.   Will you spell everything but Elaine and Ann?

A.   Yes, Reincke is R-E-I-N-C-K-E.

Q.   And Edwards?

A.   With an S, E-D-W-A-R-D-S.

Q.   Where do you live, what state?

A.   Currently?

Q.   Yes.

United States of America vs. Aquilia Marcivicci Barnette

7/29/2002

Page 2555

A.    San Antonio, Texas.

Q.    How long have you lived out in Texas?

A.    A little over a year.

Q.    What took you there?

A.    Personal reasons.

Q.    Now, do you work?

A.    Yes.

Q.    What is your line of work?

A.    I work at a cemetery and funeral home.

Q.    Before moving to Texas where did you live?

A.    In Mt. Holly, North Carolina.

Q.    Did you grow up in Mt. Holly?

A.    No.  I grew up in Charlotte and South Carolina.

Q.    Where in South Carolina?

A.    York.

Q.    I want to turn your attention back some time to June 21st of 1996 and particularly the evening of that date.  Do you recall what you did on that evening?

A.    My girlfriends and I went out to Coyote Joe's over on Wilkinson Boulevard.

Q.    And is that a place where you frequently went to listen to music, dance, and play pool?

A.    Correct.

Q.    Do you recall about what time you got there on the evening of June 21st, 1996?

Case 3:12-cv-00327-MOC   Document 101   Filed 09/23/15   Page 195 of 200
556

JA1401

United States of America vs. Aquilia Marcivicci Barnette

7/29/2002

Page 2556

A.    It think it was about 10:30.

Q.    And on that occasion did you see someone you knew as Donnie Allen?

A.    Yes.

Q.    How did you know Donnie?

A.    Well, I had just met him that night but he looked familiar and my girlfriends and I needed a partner to play pool, and so when I looked at him, I said, hi, you look familiar, and I asked him if he went to the same school I did and he said yes.  So I said, we are about to play pool, do you want to, and he said yes and so then I asked him about some friends that I knew, he knew, and then we just exchanged names and everything of who we knew.

Q.    What school had you two gone to together?

A.    York Comprehensive High School.

Q.    You talked about people that you knew in common?

A.    Yes, uh-huh.

Q.    What was Donnie's demeanor on that particular evening?

A.    He was a really nice guy.  He was real timid. He didn't speak much.  We just played pool and that was it.  He is real quiet.  He was a real nice guy.

Q.    After you played that one game of pool did you

Reported By:
800-333-2082    Huseby, Inc., an Affiliate of Spherion   (704) 333-9889   Fax (704) 372-4593
Case 3:12-cv-00327-MOC   Document 101   Filed 09/23/15   Page 196 of 200
557

JA1402

United States of America vs. Aquilia Marcivicci Barnette

7/29/2002

Page 2557

see him anymore that evening?

A.    No, I did not.

Q.    A few days later did you see something that reminded you about him and seeing him that Friday night?

A.    Yes.

Q.    What was it?

A.    Over in York they had flyers over in Eckerd's and Food Lion of him, and so I asked the person in Eckerd's and they didn't know much about it, and then in Food Lion I asked about it again and they said that they are looking for him.   And they said if you have any information, just give them a call.

Q.    Was that -- did you see that flier on that Sunday?

A.    Yes.

Q.    I'll show you what has been previously identified and admitted as Government's Exhibit 26A.  Take a look at that exhibit.   Are you able to recognize it?

A.    Yes.

Q.    What is that?

A.    That's the flier from the -- that they had on the doors, and they had one over at the pharmacy where you pick up your medications over in Eckerd's.

Q.    Did you see it both at Eckerd's and another

Reported By:
800-333-2082    Huseby, Inc., an Affiliate of Spherion  (704) 333-9889    Fax (704) 372-4593
Case 3:12-cv-00327-MOC   Document 101   Filed 09/23/15   Page 197 of 200
558

JA1403

United States of America vs. Aquilia Marcivicci Barnette

7/29/2002

Page 2558

store?

A. In Food Lion, yes.

Q. Would you read the flier to us, please, ma'am?

A. Missing, Donnie Allen since 6-29 -- 6-21-96, Friday night, last seen in McConnell, South Carolina around 6:30 to 7:00, in his dark blue Honda Prelude car, has been found in the Charlotte, North Carolina area. 22 years old, 6 foot 1, 150 to 155 pounds. Reward if information leads to finding him. Please call -- do you want me to read out the numbers?

Q. And it listed numbers to include the York County Police or to the Charlotte-Mecklenburg Police Department?

A. Yes.

Q. It had information on there about his mustache being darker and his hairs, and a difference in his hair, and then it says in quotes, please call?

A. Uh-huh.

Q. And that was Sunday or Monday, best of your recollection, that you saw that?

A. I'm going to say it was Sunday. It's just been so long, but I do believe it was Sunday, because Monday, you know, everyone has to work, so I wouldn't be out there.

Q. After having seen the flier that day, what did

United States of America vs. Aquilia Marcivicci Barnette

7/29/2002

Page 2559

you then do?

A.   I went to my mom and dad's, because I lived in Gastonia and they lived in South Carolina, and so I went over there and I told my mom and dad and they told me definitely call and find out what was going on, so I did.

Q.   Who did you call?

A.   I called the York County PD.

Q.   What information did you provide to York County?

A.   Pretty much the same thing that I just previously just talked about, that I had just met the man, and, you know -- that was it, that I did see him at Coyote Joe's that night.

MS. ROSE:   Thank you.   No further questions.

MS. LAWSON:   No questions.

THE COURT:   Call your witness.

MS. TOMPKINS:   The government calls Bob Hall.

ROBERT A. HOLL,

being first duly sworn, was examined and testified as follows:

DIRECT EXAMINATION

BY MS. TOMPKINS:

Reported By:
Huseby, Inc., an Affiliate of Spherion  (704) 333-9889
800-333-2082                                                                Fax (704) 372-4593

Case 3:12-cv-00327-MOC   Document 101   Filed 09/23/15   Page 199 of 200

560

JA1405

United States of America vs. Aquilia Marcivicci Barnette

7/29/2002

Page 2560

Q. Would you state your name, please.

A. Robert A. Holl.

Q. And could you spell your last name for the court reporter.

A. H-O-L-L.

MS. TOMPKINS: Before I begin with him, Your Honor, at this point the government is calling Officer Holl for the limited purpose of the crime scene at Billy Graham and Morrisfield, subject to re-call later on the confession.

THE COURT: All right.

MS. TOMPKINS: Thank you.

BY MS. TOMPKINS:

Q. How are you employed?

A. City of Charlotte, Charlotte-Mecklenburg Police Department.

Q. How long have you been a police officer?

A. Since 1983.

Q. And what is your current employment?

A. I'm assigned to the HITS Unit, Highway Interdiction Traffic Safety, I'm a detective, I investigate traffic fatalities.

Q. In June of 1996 what was your assignment with the Charlotte-Mecklenburg Police?

A. Felony investigations, homicide.

Reported By:
800-333-2082          Huseby, Inc., an Affiliate of Spherion  (704) 333-9889          Fax (704) 372-4593
Case 3:12-cv-00327-MOC   Document 101   Filed 09/23/15   Page 200 of 200
561

JA1406

United States of America vs. Aquilia Marcivicci Barnette

7/29/2002

Page 2561

Q. And as of June of 1996, how long had you been a homicide detective?

A. Eight years.

Q. By June of 1996, approximately how many homicides had you participated in the investigation of?

A. At least 200.

Q. On Tuesday morning, June 25th, 1996, did you become involved in the investigation of the murder of Donald Lee Allen?

A. Yes, ma'am.

Q. What role were you assigned?

A. I was initially assigned to the processing of the victim's vehicle that had been located earlier that morning.

Q. And actually when you were first assigned, was it a missing persons case?

A. Yes, ma'am.

Q. What did you do first?

A. I met with a detective from the missing persons section of the department. He briefed me as to his involvement. I then made contact with the crime scene technician that was actually processing the car. Shortly after that, which would be approximately 7:30 in the morning, my immediate supervisor was notified by me. He came to the location of the department where the car

United States of America vs. Aquilia Marcivicci Barnette

7/29/2002

was assigned, and I was assigned to the case to process the vehicle.

Q. And do you know where the car had been found?

A. Behind Independence Shopping Center, which is approximately the 4000, 5000 block of East Independence Boulevard in Charlotte.

Q. And at the time you were first assigned, where was the vehicle located?

A. At the garage area of the law enforcement center. It was brought in due to inclement weather.

Q. And for what purpose was it brought in?

A. To fingerprint, process the vehicle for any type of evidence that may be inside the car, at that point in time in order to try to find out where the owner of the vehicle was.

Q. What did you do next?

A. Once I learned what had been done with the vehicle and then once I had been assigned to the vehicle itself, I advised the crime scene technician as to what would be collected in the car at that particular time, which included any paper items that were in the vehicle, fingerprinting the car, photographing the car, any blood that could be found in the car, anything that would help lead us to find the missing person.

Q. Okay. Did the crime scene search technician

United States of America vs. Aquilia Marcivicci Barnette

7/29/2002

Page 2563

advise you about what had been found inside the car?

A. She advised me as to what had been found inside the car and around the car where the car was located at the Independence Shopping Center, which it was located to the rear of the building.

Q. And what else was found in the vicinity of the car at the Independence Shopping Center?

A. Inside a dumpster, a gym bag, a Winchester semiautomatic 12-guage shotgun, bolt cutters, crowbar. Inside the vehicle, when I saw it, along with the papers, a pair of handcuffs hanging from the inside rearview mirror.

MS. TOMPKINS: May I approach the witness, Your Honor?

THE COURT: Yes.

BY MS. TOMPKINS:

Q. I'm going to show you what has been previously marked and admitted as Government's Exhibit 31E1 and ask you if you recognize that?

A. Yes, I do.

Q. What is that?

A. The 12-guage shotgun that was located at the scene of where the vehicle was located.

Q. And is that a full length shotgun, or what had been done to modify it?

Reported By:
800-333-2082 Case 3:12-cv-00837-MOC, an Affiliate of Sphericon (704) 333-9889 Document 102 Filed 09/23/15 Page 3 of 286 Fax (704) 372-4593

564

JA1409

United States of America vs. Aquilia Marcivicci Barnette

7/29/2002

Page 2564

A.    It had been cut down to an overall length now, whether I measured it originally, 23 inches.

Q.    Okay.  So the barrel has been sawed off?

A.    The barrel has been sawed off, along with a MAG flashlight attached with electrical tape to the end at the time that I observed it, which was mid morning of that day, the 25th, red chips of what appeared to be paint attached to the electrical tape, to the rear of the vehicle in the back, what you would call the trunk area, where the hatch would come up, there were red chips of paint that were located there.  There was also a second MAG light that I located up in the passenger compartment of the vehicle.

MS. TOMPKINS:  Your Honor, may the witness step off of the witness stand and display that.

THE COURT:  He may.

BY MS. TOMPKINS:

Q.    Officer Holl, show the jury, as you go past the jury, show them the taped items.  Had the stock of that -- I'm not sure what -- the handle of that firearm, has that been cut down as well?

A.    Yes.  The barrel has been cut, the MAG light, the tip of the lens has been colored red.

Q.    Now, when that was first recovered, was that -- the lens of that MAG light intact?

Reported By:
800-333-2082    Huseby, Inc., an Affiliate of Spherion  (704) 333-9889    Page 4 of 286   Fax (704) 372-4593
Case 3:12-cv-00327-MOC   Document 132   Filed 09/23/13   Page 4 of 286
565

JA1410

United States of America vs. Aquilia Marcivicci Barnette

7/29/2002

Page 2565

A.    Yes, it was.

Q.    And since that time has it broken?

A.    Correct.

Q.    What was your next step in your investigation?

A.    Once the processing of the vehicle was completed, I ended up meeting with two of my supervisors, along with the missing persons section. I then contacted ATF, Alcohol, Tobacco, and Firearms, to start a trace on the weapon. By around 9:30 that morning, missing persons investigators were assigned to -- made contact with authorities in Tennessee, because there was a tag on the car, a license plate that was a Tennessee tag that came back stolen. The VIN number for the car did not come back stolen but came back to the now -- the decedent.

I then received a telephone call approximately 10:15 in the morning from an FBI Agent Womble; reference, a case in Roanoke, Virginia where a woman was killed by a shotgun and the vehicle in question that the defendant was driving was a Honda Civic with gold pinstripes. I was also told that the FBI was looking for an individual by the name of Aquilia Barnette.

Q.    Is there a way that officers and agents from different law enforcement agencies have access to information, for example, about a stolen car?

United States of America vs. Aquilia Marcivicci Barnette

7/29/2002

Page 2566

A. Yes, there is.

Q. Okay. And what is that?

A. NCIC, National Crime Information Center.

Q. And what -- was that one of the ways that Agent Womble knew about the Honda Prelude?

A. Agent Womble was assigned to a task force which our officers were also assigned to, which he had gained information through the task force of our unit working and had heard that we had come in contact with a Honda. The particular car that I was processing was a Honda Prelude with gold lettering on the front and the back of the H for Honda and on the back trunk the word Prelude.

Q. And if officers in Roanoke, Virginia had put information -- could they also put information into that same system that could be accessed by officers anywhere?

A. Anywhere in the nation, yes.

Q. And it was from there that Agent Womble knew that folks in Roanoke were looking for a blue Accord, or a blue Honda, that is?

A. I know that Agent Womble came to me already stating that he was looking for a Honda Civic, and he already had warrants on Aquilia Barnette for the death that occurred in Virginia.

Q. Okay. So the FBI was already looking particularly for the defendant, Aquilia Barnette?

Reported By:
800-333-2082     Huseby, Inc., an Affiliate of Spherion (704) 333-9889     Fax (704) 372-4593
Case 3:12-cv-00327-MOC   Document 102   Filed 09/23/15   Page 6 of 286
567

JA1412

United States of America vs. Aquilia Marcivicci Barnette

7/29/2002

Page 2567

A. Yes, ma'am.

Q. And they knew where he lived, police had the address?

A. Correct.

Q. Okay. Had you been by that address?

A. I went -- during the investigation I went by that address in order to speak to the defendant's mother, and also prior to testifying I took counsel out to that particular address. Even though I had been there, I missed the driveway by a half a block, I had to turn around and go back up to the driveway where the defendant lived at that period of time.

Q. And do you know in 1996 whether or not house numbers were on the mailbox at West Boulevard?

A. When I went out there, there was a mailbox with a post; I didn't see any house numbers on it. The house sits back in the woods.

Q. So can you see the house from the road?

A. No, ma'am.

Q. Do you -- can you tell that there is a house back behind where the mailboxes are?

A. Not during the summer I couldn't.

Q. Now, what did you tell Special Agent Womble when you talked to him about your investigation?

A. At 10:15 I told him everything that I knew at

United States of America vs. Aquilia Marcivicci Barnette

7/29/2002

Page 2568

the time, and shortly after 11:00 that morning he arrived at the law enforcement center. I took him down to a secured area where the car was and once again briefed him on what I had at that point in time, and he readvised me that he was looking for the defendant in question.

Q. And was there -- did Agent Womble tell you anything about the type of weapon that was used in the Roanoke murder?

A. Originally on the telephone conversation he told me that it was a 12-guage shotgun that was used and I had told him at that point in time that the 12-guage Winchester had been recovered where the car was located.

Q. Later that day did you learn that Aquilia Barnette had been arrested?

A. I learned that he had been arrested on my way back from McConnell, South Carolina, because I went down to the victim's residence.

Q. For what purpose did you go to McConnell, South Carolina?

A. At that point in time, having a missing person's case and the possibility that foul play was involved, went down in order to process the victim's room, went down to his residence, gained access with his parents, he lived with his parents, had the York County

United States of America vs. Aquilia Marcivicci Barnette

7/29/2002

Page 2569

Sheriff's Department and Lieutenant Thompson to meet me there along with their crime seen units in order to methanol his bedroom.

Q. What does that mean?

A. It's special tape that is used to lift up any type of hair that may be on dressers, floors, pillowcase, also any combs in order to get any head hair, and also fingerprint the bedroom in order to obtain fingerprints if the time comes that we do find the victim and we can start processing through DNA as to who this individual is.

Q. So it was after you were on your way back from McConnell that you learned that the defendant had been arrested?

A. Correct.

Q. What did you do next?

A. I was instructed to stand by the law enforcement center, that the defendant, along with the FBI agent and one of our officers assigned to the task force were en route out to the possible crime scene of where Donald Allen was located with the cooperation of the defendant.

Q. What did you learn -- when you said en route to the crime scene, where was that?

A. The scene of possibly where Donald Allen was

Case 3:12-cv-00327-MOC  Document 102  Filed 09/23/15  Page 9 of 286
570

JA1415

United States of America vs. Aquilia Marcivicci Barnette

7/29/2002

Page 2570

located at the intersection of Morrisfield and Billy Graham. And subsequently it was established that the victim was located there. I was directed to get one of our vehicles to go out to the scene, and at 17:40, 20 minutes of 6:00 in the evening, I arrived out there and processed the crime scene.

Q. This is all happening on the same day that you initially were assigned a missing person?

A. Correct.

Q. Now, you all went to Billy Graham and Morrisfield Drive. Who provided the information for you to go out there?

A. Aquilia Barnette.

Q. So he had made a statement to colleagues of yours at the Charlotte-Mecklenburg Police Department?

A. Made statements and took them out to where the victim was located.

Q. Now, did you go out to Billy Graham and Morrisfield Drive?

A. Yes, ma'am.

Q. Where is that intersection located in Charlotte? Pick a point of interest that we would all be somewhat aware of.

A. A half a block away from the entrance/exit to Josh Birmingham Road, which takes you out to Charlotte

Reported By:
800-333-2082   Huseby, Inc., an Affiliate of Spherion   (704) 333-9889   Fax (704) 372-4593
Case 3:12-cv-00327-MOC  Document 102  Filed 09/23/15  Page 10 of 266
571

JA1416

United States of America vs. Aquilia Marcivicci Barnette

7/29/2002

Page 2571

Douglas International Airport.

Q. So out towards the airport?

A. Correct.

Q. How far is that intersection, the intersection of Morrisfield and Billy Graham, from the intersection of Billy Graham and West Boulevard?

A. Eight-tenths of a mile.

Q. And how far is the defendant's mother's home from the intersection of West Boulevard and Billy Graham?

A. One block.

Q. Pardon me?

A. One block.

Q. Now, describe what the intersection of Morrisfield and Billy Graham looked like in June of 1996.

A. West Boulevard is -- or, correction, Morrisfield is two lanes of travel, including the turn lanes, going southbound with one northbound lane, multiple lanes of traffic on Billy Graham, no overhead street lighting, and there is one business that is located directly across the street from where the victim was located about a half a block further north of the intersection, so it's isolated right at the intersection itself.

Reported By:
800-333-2082  Huseby, Inc., an Affiliate of Spherion  (704) 333-9889  Fax (704) 372-4593
Case 3:12-cv-00327-MOC  Document 102  Filed 09/23/15  Page 11 of 286
572

JA1417

United States of America vs. Aquilia Marcivicci Barnette

7/29/2002

Page 2572

Q. So in 1996 were there any street lights at that intersection?

A. No, ma'am.

Q. And since that time have they put street lights in?

A. I believe six.

Q. I'm going to show you what has been previously marked and admitted as Government Exhibit 34A. Do you recognize what that is?

A. Yes, I do.

Q. What is that?

A. Aerial photograph of the intersection of Morrisfield and Billy Graham where the victim, Donald Allen, was located.

Q. Okay. And is that a photograph that was taken on the day that Donald Allen's body was found at that location?

A. Yes, it was.

Q. And, again, do you note whether or not there are any lights at any of those intersections?

A. The only lights there are the traffic lights. Other than that, there are no street lights.

Q. Now, in contrast to the intersection at West Boulevard and Billy Graham, how did that intersection look in June of 1996?

United States of America vs. Aquilia Marcivicci Barnette

7/29/2002

Page 2573

A.   At the intersection of West Boulevard, on the same side of the street is where you see the vehicles on this particular photograph, eight-tenths of a mile back, so in other words, this direction at the top of the photograph --

Q.   Back in this direction (indicating) heading that way?

A.   Correct.  The intersection has a low income housing project right on the intersection itself.

Q.   Is that called Boulevard Homes?

A.   Yes, it is.  Across the street from that there are numerous single family dwellings, including the defendant's mother's residence that sits back in the woods, and it's heavily lighted with street lights on West Boulevard.

Q.   Are there any residences or apartment complexes or businesses close to this intersection?

A.   The only business that is here is approximately half a block back up in that direction (indicating).

Q.   All right.  Now, when you got to that location, what did you do?

A.   I was advised by my immediate supervisor where the victim was located.  I went over to where the victim was located, which was down a drain runoff culvert on a rock bed.  The crime scene technician had not arrived

United States of America vs. Aquilia Marcivicci Barnette

7/29/2002

yet.

Q. Who was there when you got there?

A. Sergeant Nathy, who was my immediate supervisor, and two homicide investigators.

Q. All right. And so before crime scene search technicians got there, where did you go?

A. I just went over to visually look at it. The scene had already been roped off with yellow banner tape. And once the crime scene technician arrived, I advised her what was going on, and the first thing we did was go in and photograph.

Q. Was the defendant at the scene when you were there?

A. No.

Q. All right. I'm going to show you what's been previously marked and admitted as Government's Exhibit 34B. Describe for the jury what that is.

A. Over at this particular location is where Morrisfield is located. This is the street sign for Billy Graham, so Billy Graham would run in that particular direction. The culvert runs parallel with Morrisfield, cement and structure, it's approximately 100 to 135 feet in length, which it ends down in this general location into a rock bed.

Q. Now, how far -- there is a vehicle that's

Reported By:
800-333-2082    Huseby, Inc., an Affiliate of Sphirion   (704) 333-9889    Fax (704) 372-4593
Case 3:12-cv-00327-MOC   Document 12   Filed 09/23/15   Page 14 of 286
575

JA1420

United States of America vs. Aquilia Marcivicci Barnette

7/29/2002

Page 2575

parked at the side of that photograph. How far is the roadway from this little culvert?

A. There is approximately 10 feet of grass and then there is a rock shoulder the width of the vehicle, and then there is one lane of travel.

Q. And where is the stoplight in relation to this photograph?

A. Well, the intersection itself would approximately be another 15 feet in that direction.

Q. I'm going to put back up Government's Exhibit 34A. Does that show where the -- a car would stop at that red light, at that intersection?

A. Yes, a car would stop right there.

Q. And can you see that culvert area from this photograph?

A. I'm sorry?

Q. Can you see the culvert?

A. The culvert starts over in this location, curves down into the trees, and the victim was located right in there (indicating).

Q. I'm going to show you what has been marked as Government's Exhibit 34C and ask you if you can recognize what that is?

A. It's the culvert that starts the curve and goes down into where the rock bed is located at the end.

Reported By:
800-333-2082 Huseby, Inc., an Affiliate of Spherion (704) 333-9889 Page 15 of 286 Fax (704) 372-4593
Case 3:12-cv-00327-MOC Document 102 Filed 09/23/15 Page 15 of 286
576

JA1421

United States of America vs. Aquilia Marcivicci Barnette

7/29/2002

Page 2576

Q. About how many feet further down is that from the previous photograph?

A. Approximately 40 feet. You can see at the -- down in this particular location a stain on the culvert, which is blood. The first trail of blood was located approximately 20 feet further up from where the victim was located.

Q. All right. I'm going to show you a photograph that's been marked and introduced as Government's Exhibit 34D. And does that depict -- what does that depict?

A. It depicts the culvert. Morrisfield would be over here, Billy Graham, the 65 feet further south from where the victim was located, and this area right in here is where the trail of blood goes down and --

Q. All right. I'm going to show you another photograph which may help you. What else did you want to comment about that photograph, if anything?

A. My screen went dark.

MS. TOMPKINS: Can we just take a moment and do a little technical something?

THE COURT: Yes.

THE WITNESS: Right there is where the victim was located (indicating).

BY MS. TOMPKINS:

United States of America vs. Aquilia Marcivicci Barnette

7/29/2002

Page 2577

Q. I'm going to show you now a photograph that's been previously marked and introduced as Government's Exhibit 34E. And what does that depict?

A. Once again, it depicts the same culvert. All of the dark area is blood. There is a large pool of blood that was located in here, a second pool of blood that was located here. All of the blood ran down to this general location. A shotgun shell spent, in other words, had been fired, located at number one, number two, and there was a third one found right in that general area, number three.

Q. All right. I'm going to show you what has been marked and introduced as Government's Exhibit 34F. Does that show a closer view of the two previously identified shotgun shells spent?

A. Yes, ma'am.

Q. And the dark areas, is that blood stains?

A. Correct.

Q. Did you have a crime scene search technician collect those items?

A. Different areas of the blood were swabbed, collected, spent shot shells were collected. There is a shot cup wadding that was located down where the victim was eventually located that was collected, along with a pair of pants that were located to the right of the

JA1423

United States of America vs. Aquilia Marcivicci Barnette

7/29/2002

Page 2578

culvert as we have been looking at the particular photograph.

Q. Officer Holl, looking at Government's Exhibit 34E one more time, standing there could you see the body of Donald Allen?

A. No.

Q. Okay. Now, I'm going to show you what has been previously marked and admitted as Government's Exhibit 34H, and on that rock in the middle, can you tell what that is?

A. That's part of the shotgun.

Q. Right there?

A. Part of the shotgun shell that was located.

Q. Is that the wadding from the shotgun shell?

A. Yes, it is.

Q. What is wadding?

A. Wadding is part of what keeps the -- your ammunition inside the red portion. You have the brass portion that the hammer will strike against and then the other end is where your ammunition will come out of, and the wadding and the cup end up holding everything intact.

Q. Now, I'm going to show you a photograph that has been previously marked and introduced as Government's Exhibit 34Q. Are those markings made by

Reported By:
800-333-2082          Huseby, Inc., an Affiliate of Spherion  (704) 333-9889          Fax (704) 372-4593
Case 3:12-cv-00327-MOC   Document 102   Filed 09/23/15   Page 18 of 286
579

JA1424

United States of America vs. Aquilia Marcivicci Barnette

7/29/2002

Page 2579

crime scene search?

A.   Yes, they are.

Q.   Okay.   And Numbers 2, 3, and 5, are those the shotgun shells found?

A.   Correct.

Q.   The three spent shotgun shells?

A.   Yes, ma'am.

Q.   So that third shell casing was found further down in the culvert?

A.   By a couple of feet from Item Number 3.

Q.   Now, at the bottom of that culvert, what did it look like, what did it end into?

A.   It ends into a large rock bed.   The culvert itself is a steep pitch going downhill, and at the bottom it turns into rock, for example, to slow down the water runoff into the natural area.   There is approximately another 15 to 20 feet of rock bedding.

Q.   All right.   Now, at the bottom of the rock culvert, what did you see?

A.   The victim, Donald Allen.

Q.   And describe the positioning of his body.

A.   The victim was located on the rock bed itself just off the culvert.   His feet were towards the rock culvert, his head was down into the wooded area.   The victim was located on his back, his left leg was

United States of America vs. Aquilia Marcivicci Barnette

7/29/2002

Page 2580

straight, out to a 45-degree angle. His right leg was bent slightly at the knee, but the kneecap was still semistraight in front of him. His left arm was bent at the elbow with a forearm pointing up in a direction like this bent out to the side. The right arm was slightly bent at the elbow with his hand resting on his right thigh. His head was tilted, canted slightly to the left.

Q. All right. I'm going to show you what has been previously marked and admitted as Government's Exhibit 34I and ask you if you recognize what is depicted in that photograph?

A. The victim, Donald Allen, on his back.

Q. And where in that photograph would the concrete culvert have ended?

A. It's not in there.

Q. Okay. It's not in this photograph, it's further back?

A. It's further -- the culvert is in that direction.

Q. Okay. And the rocks that you mentioned, are those the rocks that we see in the bottom of that photograph?

A. Yes, ma'am.

Q. I'm going to show you what has been previously

Reported By:
800-333-2082 First MD Inc., an Affiliate of Sphere Inc. (704) 233-1889 (704) 372-4593
Case 3:12-cv-003  -MOC  Document 19-3  Filed 09/23/13  Page 20 of 286
581

JA1426

United States of America vs. Aquilia Marcivicci Barnette

7/29/2002

Page 2581

marked and introduced as Government's Exhibit 34J and ask you to describe what that is?

A. Once again, it's the victim, Donald Allen, laying on his back in a thick wooded area, laying on top of the rock.

Q. All right. I'm going to show you what has been previously marked and introduced as Government's Exhibit 34K. And what is depicted in that photograph?

A. The victim, Donald Allen. He was wearing what I would call a golf shirt, pullover shirt with a small collar on it, three buttons at the top. The top button was not buttoned, the other two were, blue jeans, brown belt, the shirt was tucked in. The color of the shirt I could not depict because of the decomposition of the body. Dark purple and white Nike Air Pegasus sneakers, with -- the right shoe was untied, left shoe was tied, watch on the left wrist, gold facing with a brown strap, and a gold necklace around the neck that was tucked inside the shirt.

Q. How many days had it been since Donald Allen was missing?

A. From the 22nd just past midnight, which was a Saturday, and located the late afternoon, early evening of the 25th. Weather temperatures, or weather at the time, clear, same temperature that it is outside today.

United States of America vs. Aquilia Marcivicci Barnette

7/29/2002

Page 2582

Q. I'm going to show you what has been previously marked and introduced as Government's Exhibit 34L. From what angle, if you know, was that photograph taken? Where would Billy Graham and Morrisfield be from there?

A. Billy Graham Parkway would be this line right here (indicating), 65 feet back from where the victim was located, myself and another investigator actually measured that ourselves because of the thickness of the trees and the brush, so we could get in there and do it.

Q. All right. I'm going to show you now a photograph marked and introduced as Government's Exhibit 34M, and, again, if you could orient that photograph to Billy Graham and Morrisfield, please.

A. This is part of the rock bed. This is going up a steep embankment to Billy Graham. Morrisfield would be over in that direction.

MS. TOMPKINS: And could you clear that just a second.

BY MS. TOMPKINS:

Can you point out for the members of the jury the body of Donald Lee Allen in that photograph.

A. (Indicating).

Q. I'm going to show you a photograph previously marked and introduced as Government's Exhibit 34N and ask you again to orient that photograph to the roadway.

United States of America vs. Aquilia Marcivicci Barnette

7/29/2002

Page 2583

A.   Billy Graham Parkway is up in there and we are standing out towards Morrisfield shooting down into the trees.

Q.   All right.  And can you tell in that photograph where Donnie Allen's body is?

A.   No, you cannot.

Q.   Pardon me?

A.   No, ma'am.

Q.   All right.  What did you do next after crime scene search took photographs and collected evidence?

A.   Went back -- I went to --

Q.   Let me ask you this:  How were you dressed out there on the scene that day?

A.   Coat and tie; and working the crime scene itself, went into a biohazard outfit because of the decomposition of the victim.

Q.   Did you take measurements?

A.   Yes.

Q.   Okay.  And what was the distance between the first blood spot and Donald Allen's body?

A.   20 feet.

Q.   And what about the second large blood spot and Donald Allen's body?

A.   Approximately 10 feet.

Q.   And the shell casings were arrayed down the

United States of America vs. Aquilia Marcivicci Barnette

7/29/2002

Page 2584

culvert, is that right?

A. Yes, ma'am.

Q. And did you later continue your investigation back at the law enforcement center?

A. Yes, ma'am.

MS. TOMPKINS: That's all the questions I have for Investigator Holl at this time, subject to re-call, Your Honor.

MR. BENDER: I have no questions of Mr. Holl at this time.

THE COURT: All right, sir, you may step down.

Members of the jury, we will take our evening break at this time. Let me remind you to keep an open mind about the case. Do not discuss it. Remember the other instructions that I have given you. Avoid any news accounts of it. Remember the other instructions I have given you. Thank you very much for your attention to the case today, and we will see you in the morning. It will be 9:30 instead of 9:00 tomorrow. Thank you very much.

(The jury left the courtroom.).

THE COURT: The record will reflect that Mr. Huseby has been good enough to come in this afternoon to do the court reporting. Ms. Kelly won't be

Reported By:
800-333-2082 Huseby, Inc., an Affiliate of Spherion (704) 333-9889 Fax (704) 372-4593
Case 3:12-cv-00327-MOC Document 102 Filed 09/23/15 Page 24 of 286
585

JA1430

United States of America vs. Aquilia Marcivicci Barnette

7/29/2002

Page 2585

with us for this case any longer.  Ms. Nuccio was here this morning and yesterday morning.

Anything before we recess for the evening?

MS. TOMPKINS: No, Your Honor.

MR. BENDER:  No, Your Honor.

THE COURT:  Thank you.

I, Scott A. Huseby, do hereby certify that the foregoing transcript is a true and correct transcript from the record of proceedings in the above-entitled matter.

7-30-02

SCOTT A. HUSEBY, RPR, CSR          DATE

Notary Public

JA1431

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION

UNITED STATES OF AMERICA ) DOCKET NO. 3:97-cr-23-V
   )
  vs.   )
   )
AQUILIA MARCIVICCI BARNETTE, ) VOLUME 13
   ) MORNING
  Defendant. )
_____)

TRIAL PROCEEDINGS
BEFORE THE HONORABLE RICHARD L. VOORHEES
UNITED STATES DISTRICT COURT JUDGE
JULY 30, 2002

<u>APPEARANCES</u>:

On Behalf of the Government:

 ANNE M. TOMPKINS, ESQ.
 JILL WESTMORELAND ROSE, ESQ.
 227 West Trade Street, Suite 1700
 Charlotte, North Carolina

On Behalf of the Defendant:

 JEAN B. LAWSON, ESQ.
 P.O. Box 472106
 Charlotte, North Carolina

 HAROLD J. BENDER, ESQ.
 200 North McDowell Street
 Charlotte, North Carolina

   Cheryl A. Nuccio, RMR-CRR
   Official Court Reporter
  United States District Court
   Charlotte, North Carolina

JUL 3 1 2002

U. S. DISTRICT COURT
W. DIST. OF N. C.

TUESDAY MORNING, JULY 30, 2002

(Jury not present.)

THE COURT: The parties ready to begin?

MS. TOMPKINS: Yes, Your Honor. I do have a couple of matters.

THE COURT: All right.

MS. TOMPKINS: Officer Krall, K-r-a-l-l, who testified in the guilt phase of the trial and was scheduled to testify today, had emergency abdominal surgery. I talked to her this morning and she's bedridden and she's unable to come in and testify. Her testimony was finding Donnie Allen's vehicle, and it's -- there's really no substitute person to testify to that.

And what the government proposes is that we read her trial testimony into evidence; that I would ask the questions and Ms. Rose would answer the questions verbatim as they came in in the guilt phase, both direct and cross, in lieu of her testimony. And that we show her -- the photographs and the evidence that came in through her in the trial.

And we did talk to defense counsel about that. They don't have any problem with us doing that.

THE COURT: All right. Very well. Would that be your next witness?

MS. TOMPKINS: No. It will be either late this morning or early this afternoon.

THE COURT: Okay.

MS. TOMPKINS: The only other thing is when Dr. Sullivan testifies, I've put this podium out here in the middle of the room and I'm going to at the appropriate time in his testimony bring it here in front of the jury box and put a portable x-ray reader in front of the jury box so that -- put it up high so that they can see the x-ray as he talks about it, and then we'll take that podium out of the courtroom.

THE COURT: All right.

MS. TOMPKINS: Also, just for point of clarification, when Ms. Rose and I do Officer Krall's testimony, would you like us to remain seated at the table or have Ms. Rose take the witness stand?

THE COURT: I think that's what you might do.

MS. TOMPKINS: Have Ms. Rose take --

THE COURT: If there is no objection.

MR. BENDER: No.

THE COURT: All right.

MS. ROSE: The witness stand?

THE COURT: Yes.

MS. ROSE: Okay.

MS. TOMPKINS: Thank you, Your Honor.

THE COURT: Now, the doctor, is that one of those who was objected to in the motion in limine?

MS. LAWSON: Yes, Your Honor.

MS. TOMPKINS: Yes.

THE COURT: Right. Well, again, the court having done the balancing test, prejudicial effect against probative value, finds that it's more probative than prejudicial.

MS. LAWSON: May it please the court, just one clarification. The photographs were not admitted, the photographs taken during the autopsy.

MS. TOMPKINS: Right.

MS. ROSE: We're not using those.

MS. LAWSON: You don't endeavor to do that again.

THE COURT: I beg your pardon?

MS. TOMPKINS: In Dr. Sullivan's testimony, there was a motion in the guilt phase of the trial in which autopsy photos of Donald Allen's autopsy were disallowed, and the government is not going to be attempting to get those into evidence here in the sentencing phase.

THE COURT: All right.

Okay. May we have the jury, please.

(Jury entered the courtroom.)

THE COURT: Good morning, members of the jury.

THE JURY: Good morning.

THE COURT: You may call your next witness.

MS. TOMPKINS: The government calls Todd Nordhoff.

TODD NORDHOFF,

being first duly sworn, was examined and testified as follows:

DIRECT EXAMINATION

BY MS. TOMPKINS:

Q. State your name, please, and spell your last name for the court reporter.

A. My name is Todd Nordhoff, N-o-r-d-h-o-f-f.

Q. And what do you do for a living?

A. I'm a firearm and tool mark examiner with the Charlotte-Mecklenburg Crime Laboratory.

Q. How long have you been in that position?

A. For sixteen years.

Q. Tell the jury what education and training you've had in the field of firearm and tool mark identification.

A. I have a bachelor of science degree in psychology from the University of Michigan. I completed master's course work in forensic science at Michigan State University. I have done internships with the Michigan State Police Laboratory in East Lansing, Michigan, in firearm and tool mark identification, and with the Charlotte Crime Laboratory here in Charlotte in the firearm and tool mark identification.

I have attended the FBI academy in firearm and tool mark related training. I have attended numerous training seminars put on by the Association of Firearm and Tool Mark Examiners. And I did approximately two and a half years of on-the-job training.

Q. Do you have continuing education requirements that you --

to stay certified?

A. I am not certified.

Q. Is there any certification in your field?

A. There is. They just started it within the last two or three years and I have not gone through the certification program yet.

Q. Have you kept your education up during the course of your sixteen years?

A. Yes. I attend training seminars whenever I'm allowed.

Q. Okay. And during your sixteen years at the Charlotte-Mecklenburg Crime Lab, approximately how many firearms have you examined?

A. I have no way of knowing exactly. Several thousand.

Q. And how many times have you testified in court as an expert -- as a firearm and tool mark identification expert?

A. Approximately a hundred thirty-five.

Q. Now, have you also given opinions in your expert testimony about the distance from the muzzle of the firearm to the object fired at?

A. Yes, I have.

MS. TOMPKINS: Your Honor, at this time we would tender Todd Nordhoff as an expert in firearm and tool mark identification.

THE COURT: All right. He will be so declared.

Now, members of the jury, the witness here has been

described as an expert in tool mark and firearms examination. The court will instruct you that such a witness is permitted to testify even though he did not actually witness any of the events involved in this trial. A person's training and experience may make him an expert in a technical field. The degree of expertise is a relative thing, however, and it's for you to evaluate. In other words, the law allows such a person to state an opinion here about matters within that particular field.

Merely because the witness expresses an opinion does not mean, however, that you must accept this opinion at all events. The same as with any other witness, it's up to you to decide whether to believe the testimony and whether you choose to rely upon it. Part of that decision will depend on your judgment about whether his background of training and experience is sufficient for him to give the expert opinion that you hear. You must also decide whether his opinions are based on sound reasons, judgment, common sense, and information. Thank you.

BY MS. TOMPKINS:

Q. Now, Mr. Nordhoff, did you conduct analysis of evidence gathered by crime scene search and other investigators in the case of Aquilia Marcivicci Barnette?

A. Yes, I did.

Q. Did that analysis include the analysis of a firearm,

spent shotgun shells, live ammunition, and a man's shirt?

A. Yes, it did.

Q. Did that also include wadding, shotgun pellets, and shot cups?

A. Yes.

Q. Did you prepare a report of your findings?

A. I prepared, I believe, three different reports.

Q. Okay. I'm going to show you Government's Exhibit 40 which has been previously admitted into evidence. Is that the report that you -- or at least page 1 of a crime lab report that you did on your findings in the case of Aquilia Barnette? Can you see it on your screen?

A. Yes, I can. I'm just --

Q. Okay.

A. Yes, that's the first page of one of the reports.

MS. TOMPKINS: Can you zoom out so we can see the whole thing.

Q. Is that your signature at the bottom of that page?

A. Yes, it is.

Q. Now, did you analyze a firearm?

A. Yes, I did.

MS. TOMPKINS: May I approach the witness, Your Honor?

THE COURT: Yes.

Q. Let me show you what's been previously marked and

admitted as Government's Exhibit 31E1. Is that the firearm that you analyzed?

A. Yes, it is.

Q. Okay. I think the tape has gotten old --

A. Yes.

Q. -- on that and it's not taped on anymore.

What types of analysis did you perform on that firearm?

A. I examined it to determine what it is; that it was safe for me to test fire it, and I test fired it.

Q. Okay. And was it operable?

A. Yes, it was.

Q. Now, did you measure the length of the barrel?

A. Yes, I did.

Q. And for what purpose?

A. To determine how long it was, whether it met legal statute.

Q. All right. And what was the barrel length?

A. Fourteen inches.

Q. And was that the legal or illegal length?

A. That's illegal.

Q. What else did you do on your analysis of the firearm?

A. As I said, I test fired it and obtained discharged shot shells for later comparison to evidence shot shells.

Q. Okay. Did you also receive spent shotgun shells from crime scenes both in Charlotte and in Roanoke, Virginia?

A.    Yes, I did.

Q.    And the purpose of your discharging shotgun shells was for that comparison?

A.    Yes.  Other than the pure operability of the firearm, that's correct.

Q.    Describe for the jury the process that you go by and what happens after you've shot a shotgun shell for comparison purposes.

A.    Okay.  I guess, starting from the beginning, you would load the shotgun shell in the magazine.  This particular shotgun holds two in the magazine and one in the chamber.  I generally shoot two at a time so that I can compare my tests together.

So what I do is load two into this magazine and then pull the bolt back.  It's kind of hard to deal with the ties here, but pull the bolt back.  One of the live shot shells pops up; and when I let go of the bolt, it slides it into the chamber.  At that point pull the trigger.  The pellets go out the end of the bore.  The discharged shot shell is extracted from the chamber by a little hook here, and it strikes another piece of metal and throws it out the side of the shotgun.  At that point another live shot shell comes out of the magazine; and when the bolt slides back closed, it chambers it making it ready to fire again.

Do you want me to explain the comparison then or --

Q.   Yes.   Tell the jury after you've shot, how do you -- how do you retrieve the shell or the spent -- the casing and by what process do you make that comparison?

A.   Okay.   We would pick up the shot shell that would fall on the floor in our shoot room.   We shoot into a large rubber trap -- we call it a trap -- that safely captures the pellet. After we shoot, the shot shells are discharged from the side of the firearm.   We just pick those up off the floor.

And what I look at on those is I compare the two shot shells under a comparison microscope to look at marks that are left by different parts of the shotgun.   When the shotgun is fired, the -- as I said, the pellets all come out the muzzle. The shot shell pushes back against this part here which is the bolt.

When that bolt was manufactured, it was milled in a process where it was ground and the milling of that leaves little tiny scratch marks on it.   Those scratch marks are unique to every gun.   No two milling processes are the same because it's a grinding type stone or harder metal, or whatever they use to do the milling.   And it's a random process of the stone or the grinder against the metal here in the bolt and the surface is unique to this gun.

And what happens, when that shot shell pushes back against it, it leaves impressions in the primer of the shot shell and sometimes also on the outer portion of the case

head.

What I do is compare those marks under a comparison microscope which is basically two microscopes side by side and we put one under each side and look at the tiny little marks that are impressed in the shot shells. And if I can get those to agree from one to the other on my test, then I know that the shotgun is making reproducible marks from shell to shell to shell.

So what I do then is compare one that I've fired from the gun to one that was sent to me as evidence to determine whether or not it was fired in the gun by looking for those -- that same set of marks.

Q. All right. Now, what type of shotgun is that?

A. It's a Winchester Model 140 .12 gauge semi-automatic shotgun.

Q. Okay. Now, let me take you to page 2. And did you receive from police -- go ahead and zoom in a little bit on that, Jan -- discharged .12 gauge shotgun shells?

A. Yes, I did.

Q. And did you go through that process in order to determine whether those shotgun shells had been fired from that shotgun?

A. Yes, I did.

Q. And what was your -- what were those findings?

A. That the shot shells were discharged in this shotgun.

Q. And did you receive those shotgun shells from both the crime scene at Morris Field and Billy Graham Parkway and in Roanoke, Virginia?

A. Yes, over a period of time.

Q. Okay. Now, what is wadding?

A. Wadding is a part of the shot shell that sits between where the powder is in the bottom -- I don't have one. If you can imagine a canister, a large size. You have the primer that I was speaking of at the bottom and then there's powder and then there's the wadding. It's a, in this case, plastic buffer, and then on top of the wadding sits a shot cup that protects the barrel when it kind of -- when it goes out from the chamber through the barrel, it protects the barrel from the leading that would be produced with the pellets which are inside the shot cup. So the shot cup and the pellets all get pushed out and the wadding is the cushion between the powder and the shot cup.

Q. And does that project out as well?

A. Yes, it does.

Q. And so the result after a shotgun is fired is that the shell casing is present and the wadding separates those pellets?

A. That's correct. The shot shell in this case, since it ejects from the gun, would be present. Not all shotguns do. Double barrel shotgun, you have to break it open manually and

take the shells out. Or a single shot top break, something like that. But in this case it's a semi-automatic so that it ejects the shells automatically.

Q. Are you able to determine where the wadding comes from in a particular shot shell?

A. A particular shot shell? No.

Q. And what analysis can you do with wadding?

A. Generally with wadding, I would look at it to determine who the manufacturer was and what caliber it was. That's generally all we can do. However, sometimes if the barrel has been sawed off and it's real rough at the muzzle, it will leave marks that I could match back to that muzzle, but that's rare.

Q. Okay. Now, you mentioned about this barrel being sawed off. What is the effect of sawing off a barrel from a shotgun?

A. One of the major effects in terms of ballistics is that the pellets, when they leave the barrel, they spread out more quickly. The longer the barrel -- they spread out in a cone shape as they leave the barrel. And the longer the barrel is, the more narrow that cone is. So it would -- the pellets would tend to scatter more quickly with a shorter barrel.

Q. So the spray pattern is wider?

A. That's correct, yes.

Q. Okay. And would the distance between the muzzle and the

thing or person shot, would you be able to look at that spray pattern to make a determination of distance?

A. Based on test firing the weapon with similar ammunition, yes.

Q. Now --

MS. TOMPKINS: May I approach the witness, Your Honor?

THE COURT: Yes.

Q. I'm going to show you what's been previously marked and introduced as Government's Exhibit 31J and ask you if you recognize that? The control number is on the back.

A. Yes. This is an envelope which I received pursuant to this case previously. It's identified as containing a live Federal shot shell from the center console.

Q. Okay. Is that from -- who collected that?

A. It's A.C. Ray is --

Q. Crime scene search technician?

A. -- the crime scene search technician, yes.

Q. And did you note that on page 1 of your -- of the report that you received that?

A. (No response.)

Q. At number 18.

A. Yes, that's number 18. That's the first item.

Q. And is that consistent with the kind of shot shell that would be fired from that shotgun?

A.    Yes, it is.

Q.    And I'm going to show you now what's been marked as Government's Exhibit 31L.  Do you recognize that?

A.    Yes.  This is an envelope also which I received.

Q.    And where did -- and what does it contain?

A.    It's identified as containing two live Federal shot shells from the shotgun magazine.

Q.    Okay.  And did those shot shells come from the magazine of that firearm?

A.    They were identified to me as having come from that, yes.

Q.    Okay.  And are they consistent with the type of shells shot from that firearm?

A.    Yes, they are.

Q.    All right.  And the shell casings that you got from crime scene, those were all consistent as being shot from that firearm; is that right?

A.    They were -- they were all the correct caliber and they were indeed fired from this.

Q.    Okay.  Based on --

A.    Within the shotgun.

Q.    Based on your comparison microscope analysis?

A.    Yes.

Q.    Okay.  Did you also conduct an analysis of a garment worn by Donald Allen?

A.    Yes, I did.

Q.    Okay.  For what purpose?

A.    For the determination of primarily muzzle to target distance or garment distance.

Q.    And show the jury how that is done.

A.    Okay.  What I do with that is I examine the -- in this case with the shotgun, the pattern or the hole in the garment and get the general size and the characteristics, whether it's a single hole or a lot of little tiny holes from a lot of pellets.

And then what I will do is take the suspected firearm and ammunition that's similar to what was used in the shooting case and I will do test fires at different distances starting -- depending on the size of the pattern that I have in the evidence, from contact and go out until a point at which the pattern is larger and I can say certainly that it had to have been closer than that spot or that distance.  I would, depending on how many live shells I have and factors like that and how much of the material I have to shoot into, I shoot sometimes, you know, three or four, sometimes five or six different shots at different distances trying to bracket the distance where the hole or holes in the evidence have to be within the close and the -- the fire range of that bracket.

Q.    Did you use similar ammunition?

A.    Yes, I did.

Q. Okay. You didn't use the live ammunition that was recovered; is that correct?

A. No, I don't generally like to use the evidence ammunition unless it's absolutely necessary. If I can go out and buy a box similar of the same type, the same loading, then I would use that preferably because we don't like to destroy evidence if we don't have to.

Q. And in your test firings, what distances did you do test firings against cloth for your comparison purposes?

A. In this case I shot at one, two, three, four, five, and six feet.

Q. Okay. I'm going to show you a photograph that's been previously marked and admitted as Government's Exhibit 39A. Did you analyze the garment worn by Donnie Allen?

A. I examined the shirt represented by this photograph --

Q. Okay.

A. -- that was identified as being worn by Donnie Allen.

Q. And describe for the jury how you conducted your analysis using the test firings that you'd done in comparison with this garment.

A. Okay. As I said before, I looked at the holes in the garment. And primarily here we have single holes, single large holes with small satellite holes around them. And so what I did was when I -- I test fired my tests into cloth. It was a similar type cloth to what the shirt was made of. And

at the different distances. And then I compared the holes in the cloth that I shot versus the holes in the shirt here.

Q. All right. And take each of these one at a time and describe for the jury the results of your analysis.

A. Okay. Well, the results are pretty much the same for -- are the same for all three shots --

Q. Well, let me stop you. One of the holes, this hole is elongated. Why is that?

A. That would be consistent with the shot not coming straight into the garment. It would be consistent with the shot coming in at an angle; and because of that the -- more of the material is taken out as the pellets go through. But you notice it's about the same width as the other two so that tells me that that's what happened as opposed to it being further away where the hole would be larger all the way around, it's the same width, and it's just a glancing type shot as opposed to a direct entry type shot.

Q. All right. And the other two holes here and here, the fact that they're round, what does that tell you?

A. That they are more or less straight into the garment as opposed to an angle entry.

Q. All right. And based on that, there were three shots; is that correct?

A. That's correct.

Q. Now, tell the jury what the results of your analysis were

in terms of your opinion as to the distance from the muzzle to this shirt.

A. Okay. Based on my testing with the shotgun and like ammunition, I determined that the distance was greater than contact but less than five feet.

Q. And how is that?

A. As I said -- well, contact -- a contact shot tends to just rip all the fabric and just really shreds it up. I've seen a lot of contact shots and I know it's not a contact shot based on that. And from one, two, three, four, five, at five feet I started getting significant pellet -- lots of holes around the main hole. Not just one or two holes, but lots of holes around the main hole. And at six feet it was even greater.

So I can say with certainty in my -- to my training and experience that these holes were made from a distance of less than five feet but greater than contact.

Q. All right. And let me just show you, I'm going to show you a close-up of this hole right now. That's Government's Exhibit 39D. And is there any spray pattern or pellet holes outside of the main hole?

A. No. There is -- you can see it's kind of shredded around the outside, but there are no holes, small satellite holes around that hole.

Q. Okay.

A.    The large hole.

Q.    And based on your test firings, that shows you less than five feet; is that correct?

A.    That's correct.

Q.    Okay.  And I'm going to show you what's been previously marked and admitted as Government's Exhibit 39E, the second hole.  Now, there are two smaller holes.  Are those pellets necessarily?

A.    No.  They -- actually, they're elongated -- or the one is elongated on the lower left there.  That may have been caused by the wadding or the shot cup as it was striking the garment.

Q.    Okay.  So that hole is consistent with the other hole in terms of the distance.

A.    Yes.

Q.    Okay.  And that distance of greater than a contact wound and less than five feet, is that consistent for all three?

A.    Yes, that's correct.

          MS. TOMPKINS:  Thank you.  That's all the questions I have.

                    CROSS EXAMINATION

BY MR. BENDER:

Q.    Mr. Nordhoff, when the shotgun shell is ejected, is it ejected to the right and slightly backward?

A.    Not necessarily backward.  It can be backward, forward or

just straight out. It varies from gun to gun and from shot to shot sometimes.

Q. When you test fired it, which way did the shotgun shells eject?

A. To the right, but I couldn't tell you, I don't remember whether it was forward or backward.

Q. And depending on what it may strike on the surface, on the ground, depends on where it ultimately locates, right?

A. Yes, that's correct. What the surface of the ground is, whether it bounces, whether it rolls; or if it's a soft surface, it may just stay right where it lands.

Q. Okay. And did you receive these shotgun shells, the spent shells, from latent print examination?

A. Some of them I did. I'd have to check exactly which ones in my notes.

Q. If you could.

A. Okay.

Actually, I received the live shot shells from latent prints. The discharged shot shells I did not -- did not go to fingerprints that I know of.

Q. Okay. You didn't send them there after your examination?

A. No, I didn't. After I examined them, I would have handled them and probably the only fingerprints they would have found would have been mine.

MR. BENDER: Okay. Thank you.

MS. TOMPKINS: I just have one follow-up, Your Honor.

REDIRECT EXAMINATION

BY MS. TOMPKINS:

Q. The location of the spent shells, does that have any -- is that of any help to you in determining the distance between muzzle and point of contact?

A. No.

MS. TOMPKINS: Thank you.

MR. BENDER: Nothing further.

THE COURT: You may step down.

THE WITNESS: Thank you.

(Witness stepped down.)

MS. TOMPKINS: Government calls Dr. James Sullivan.

JAMES MICHAEL SULLIVAN,

being first duly sworn, was examined and testified as follows:

DIRECT EXAMINATION

BY MS. TOMPKINS:

Q. Can you state your name, please.

A. Dr. James Michael Sullivan.

Q. And where do you work and what's your position there?

A. I'm a forensic pathologist employed as medical examiner for Mecklenburg County.

Q. All right. Are you licensed to practice medicine in

in homicides, suicides or accidents, and also in cases of sudden, unexpected death.

Q.   All right.   Did you conduct an autopsy on a person that was identified as Donald Lee Allen?

A.   Yes.

Q.   And when was that?

A.   June 26, 1996.

Q.   And was the identification of Donald Lee Allen later confirmed by the use of dental records?

A.   Yes.

Q.   Did you prepare an autopsy report to detail your findings?

A.   Yes.

Q.   I'm going to show you what's been marked as Government's Exhibit 43A.   Is that the autopsy and the report that you conducted on Donald Lee Allen?

A.   This is part of it.   This is actually that part called Report of Investigation by Medical Examiner, but it's part of the overall report.

Q.   Okay.   Now, describe for the jury what you observed about the body of Donald Lee Allen.

A.   The examination showed the body of a young adult white male in a state of marked decomposition with three gunshot wounds to the body.   All of the wounds were to -- directed to the right side of the body.

**JA1455**

Q. Keep your voice up, please.

A. Yes. Three shotgun wounds to the body. All three wounds were directed to the right side of the body. They included a shotgun wound to the right shoulder, a shotgun wound to the right upper arm, and a shotgun wound to the right back, the right chest. All of the wounds appeared to be of close range.

Q. All right. Did you prepare a diagram of your findings?

A. Yes, I did.

Q. I'm going to put that diagram on the screen. Can you see that?

A. Yes.

Q. Can you clear that screen. There's a mark on it.

(Witness complied.)

Q. Thank you.

Now, you mentioned that there were three shotgun wounds to Donald Allen's body. Is there any way for you to make a determination about the order of those shotgun wounds?

A. No, there's no way to do that.

Q. And did you label those wounds arbitrarily?

A. Yes.

Q. Now, you had mentioned that the shotgun wounds were close range. When you say close range, how do you make that determination and what do you mean by close range?

A. In this case my estimate was that all of the wounds --

the distance from the barrel to the skin surface was under three feet. The estimate of the range is made based on usually the configuration of the wound on the skin, the entrance wound site, the size of the wound, and the shape of the wound.

Additionally, in this case I did remove the shirt from Mr. Allen and looked at the shirt briefly to help ascertain an estimate of the range since two of the wounds had some deformation due to decomposition. The shirt was helpful in establishing that all three of the wounds seemed to be of the same range.

Q. All right. Now, did you observe the presence of wadding in any of the wounds?

A. Yes. I recovered plastic wadding material from what was labeled shotgun wound number 1 and what was --

Q. Let me just stop you quickly --

A. Yes.

Q. -- and ask you if that was any help in making a determination about the range of the shot?

A. Yes, that also can aid. Wadding is usually not found in wounds if the distance from the barrel to the skin is greater than five feet. The wadding will follow the pellet charge into the wound if the distance is closer than five feet in most circumstances.

Q. All right. And would it be fair to say that the smaller

the hole for a shotgun wound, the closer the range?

A.    Yes.

Q.    And did you make those observations when you did your autopsy?

A.    Yes.

Q.    Now, did you have -- what problems, if any, did you have in making your -- in your examination in making the determination of range?

A.    Well, again, because of the decomposition present and what is destruction of tissue by insects after death which routinely occurs with decomposition, two of the entrance wound sites were altered from their original configuration, basically enlarged.  That would have been what was labeled shotgun entrance wound site number 2 and number 3.  The shotgun wound entrance site that was labeled number 1 retained fairly clear rounded and tight --

Q.    Show on the diagram where shotgun wound number 1 is.

A.    Be on the back outer aspect of the right shoulder and that was a round, smooth margin wound of a fairly small diameter (indicating).

Q.    The wound was of a small diameter?

A.    Yes.

Q.    And was the entry wound on the front or the back of this person?

A.    Toward the back of the right shoulder.

Q. All right. Now, what other observations did you make about shotgun wound number 1 on Donald Allen?

A. This wound was directed primarily to the left and slightly forward and slightly upward. It caused fracturing of the top end of the right upper arm bone, the humeral head.

Q. Tell the jury what the humeral head is.

A. The humerus is the upper arm bone, and the top part of it is a rounded bone that's essentially the ball of a ball and socket joint, and that is called the humeral head. That was fractured and dislocated from the rest of the shaft.

The pellet charge continued, as I said, primarily to the left and caused injury around the outer aspect of the right collarbone in soft tissues there, which is where I recovered the wadding we referred to, as well as a sample of pellets from that wound.

Q. All right. Now, in your autopsy, what observations did you make about the range for this particular wound?

A. Well, again, that characteristic of that size diameter of a wound that's fairly smooth margined essentially does not show any evidence of a spread out of pellets --

Q. Okay.

A. -- causing satellite pellet wounds. In terms of forensic pathology, that's a close range wound and generally with most shotguns, under three feet. May be some variance, obviously, with different weapons and ammunition, but an estimate would

be for that sort of wound, under three feet.

Q. Okay. Could you clear that screen and then go to shotgun wound number 2 on the body of Donald Allen and describe your findings.

A. Shotgun wound number 2 was to the right arm with the arm in what we call anatomic position, which would be as it's displayed here in this diagram with the palm facing forward, which is usually not how most people are carrying their arm, but we describe the wound in anatomic position.

The wound is directed from the back forward. And the entrance site, again, is enlarged due to the state of decomposition of the body. Again, looking at the shirt, I could tell that the entrance wound site on the shirt was exactly the same in terms of the width or diameter as shotgun wound number 1. So even though the wound has been enlarged due to decomposition, I give the same estimate of range of a close range wound.

This wound, as I mentioned, the pellet charge was directed essentially forward. With the arm in the usual carrying position turned in, it would be more likely directed to the left. And this pellet charge caused fracture and dislocation of the shaft of the humerus, that is, the upper arm bone and injuring --

Q. When you say fracture and dislocation, was that -- the upper arm bone was broken?

FORM FED ● PENGAD · 1-800-631-6989

A. Yes, completely broken.

Q. And separated?

A. And separated. An injury to the soft tissue in that area. There was a partial exit site on the front of the arm through which at least some of the pellet charge exited. I did recover a sample of pellets in the soft tissues of the right upper arm. And I did not see any evidence of plastic wadding in that wound. It may have exited.

Q. Okay. Was that a through and through wound?

A. Well, again, this is a partial exit. There are still --

Q. Okay.

A. There's still a good bit of the pellet charge in the arm, but a portion of the pellet charge had exited.

Q. Now, clear that screen, if you would, and go to shotgun entrance site number 3.

A. Shotgun wound number 3 was to the chest. The entrance site was on the far right side of the upper back. This wound also, the entrance site was enlarged due to the factors of decomposition. And again, I made my estimate of the range based on looking at the entrance site in the shirt, which, again, seemed to be exactly the same diameter and width as shotgun wound number 1.

This wound was directed primarily to the left, slightly forward and slightly upward. It caused fracture of several ribs on the right back and the posterior chest. And then

pellet charge continued with pellet injury to the right lung and to the liver. The liver will extend up into the -- what you would think of as the chest cavity. The top of the liver will extend upward into that chest cavity. And the top part of that had sustained pellet injuries.

And I recovered a sample of pellets and, again, plastic wadding material from that wound.

Q.   Did you -- of the pellets and wadding, did you collect that and submit it to the police department?

A.   Yes.

Q.   Let me first show you what has been previously marked and admitted as Government's Exhibit 34K. You had talked about decomposition. What in this picture will show you the cause of that decomposition?

A.   Well, the picture of the body shows the effects of decomposition. One is a dark discoloration to the skin. During decomposition -- that is, tissue and fluids in the blood break down. Included in that is hemoglobin in the blood and will often cause a discoloration, dark brown or green or dark red discoloration. At the same time there is bacterial proliferation and it produces gas and will cause distension of the tissues of the body. The body beings to appear puffy.

And additionally, in this photograph, the -- some of the white material seen on the upper chest near the armpit area, that is maggot activity.

A. That's correct. It should be just one shaft. It's fractured in the middle and separated.

Q. All right.

A. Then this cluster of pellets here is that associated with what was described as shotgun wound number 3. It has caused fracturing of ribs toward the right side of the back and is directed to the left, slightly upward and slightly forward. It caused pellet injury to the lung and to the liver. In this area it's a little bit difficult to explain three dimensionally, but the lung will come down approximately this far in the body and the dome of the liver is curved and sits up underneath the diaphragm into what you would think of as the chest cavity. So in this area the liver and the lung, so to speak, overlap two dimensionally and the pellet charges caused injury to both (indicating).

Q. Now, with each wound do you have an opinion about the blood loss from each of those wounds?

A. Well, there would be fairly rapid blood loss, exsanguination, predominantly, I believe, due to the injury in this area to be the brachial and humeral vasculature which would be injured and there would be fairly rapid blood loss from that. There would be a lesser degree of blood loss in this area from the injury to the lung and to the solid organ or liver --

Q. Okay. So shotgun wound number 1, which was the wound to

**618**

**JA1463**

the arm which fractured the upper arm bone, that was the -- that would be the wound that would cause the most blood loss?

A. No, I think it actually would be shotgun wound number 2.

Q. Number 2?

A. The mid shaft.

Q. Okay. In the mid shaft, right.

And shotgun wound number 1 and number 3 that went into the chest, less blood loss; is that correct?

A. That's correct.

Q. Okay. All right. You can take your seat.

(Witness resumed the witness stand.)

Q. Now, do you have an opinion to a reasonable medical certainty about whether Donnie Allen died immediately from those wounds inflicted?

A. Yes, I'd have an opinion. No, he did not die immediately from these wounds.

Q. Okay. And do you have an opinion to a reasonable medical certainty about how long Donnie Allen would have been conscious?

A. Not specifically to the second or minute, but I could give a range of what I think would be a maximum time.

Q. Okay. Explain --

A. Which would be --

Q. Explain what your answer is and how you came to that conclusion.

A. Basically would be in terms of -- again, not immediately and not in seconds. I think it would be in terms of minutes, probably a few minutes. I would -- and again, this is just a rough estimate, put a maximum time -- I don't believe anyone would retain consciousness longer than five minutes, but it could be much sooner than that.

Q. So a matter of minutes, up to five minutes that he could have remained conscious.

A. Roughly.

Q. Okay. Now, do you have an opinion about the painfulness of each of the shotgun wounds inflicted upon Donnie Allen?

A. Well, certainly there's substantial pain with a shotgun wound; and with these three wounds, yes, there would be substantial pain.

Q. And finally, based on the autopsy, do you have an opinion satisfactory to yourself and to a reasonable medical certainty about the cause of death?

A. Yes. The cause of death is multiple shotgun wounds.

MS. TOMPKINS: Thank you, Dr. Sullivan. No further questions.

MS. LAWSON: No questions. Thank you, Dr. Sullivan.

THE COURT: You may step down.

(Witness stepped down.)

MS. TOMPKINS: Can we take a break and take that

down?

THE COURT: (Negative nod.)

MS. TOMPKINS: No?

MS. ROSE: The government will call Earlene Thompson.

EARLENE THOMPSON,

being first duly sworn, was examined and testified as follows:

DIRECT EXAMINATION

BY MS. ROSE:

Q. Good morning. State your name, please, ma'am.

A. Earlene Thompson.

Q. Where do you live, Ms. Thompson?

A. As of right now? 215 Cherry Avenue.

Q. In what city?

A. Roanoke, Virginia.

Q. And we'll need you to pull that microphone closer so that the members of the jury are able to hear your testimony. Be sure you speak up.

Do you work there in Roanoke?

A. Yes, I do.

Q. What kind of work do you do?

A. I'm a secretary.

Q. Where?

A. At Lewis Gail Hospital.

Q. How long have you worked there?

A. Almost two years.

Q. Now, in June of 1996, did you live at 904 Loudon Avenue Northwest, Apartment A?

A. Yes, I did.

Q. How long in June had you been living at that apartment?

A. About a month.

Q. Had you been there long enough to get to know some of the neighbors?

A. Basically speaking. Speaking to the neighbors. That was about it.

Q. Who lived there with you?

A. My two daughters.

Q. How old were they at the time or how old are they now?

A. Now they're thirteen and sixteen.

Q. Now, describe, if you would, for the members of the jury, the layout of that apartment. Was it a single home or --

A. It was a duplex.

Q. Did you know who lived on the other side?

A. Yes, I did.

Q. Who was that?

A. Sonji Hill.

Q. Had you lived at that address long enough to get to know the Williams family who lived across and down the street?

A. I did live at the address eventually to get to know them. At the beginning I spoke and waved to everybody. As

far as like talking, conversations, stuff like that, no, there wasn't much of that.

Q. Now, in the early morning hours of Saturday, June the 22nd, of 1996, describe what you heard or what woke you up that morning.

A. At first it sounded like fireworks, firecrackers going off at first.

Q. What did you do?

A. I got up immediately. I had the phone in my hand. I went to the door. Actually looked outside, and I saw a man standing at the Williams' house on the side of their house.

Q. Now, I'm going to show you what has been marked as Government's Exhibit 21-O previously admitted. Do you recognize what's depicted within that exhibit?

A. Yes.

Q. Would you point to your residence.

A. I lived here on the side (indicating).

Q. And is the Williams' home in that photograph?

A. Yes, it is.

Q. Would you just put an "X" on the Williams' home.

(Witness complied.)

Q. Now, when you said you walked outside, did you walk out on the back side of the house, the part that we see here?

A. No. I lived on the front side where I placed the "X" at.

Q.   All right.  I'm going to show you what's been marked as Government's Exhibit 21R.  If you'll clear that screen, please.

(No response.)

Q.   Okay.  Would you mind clearing that in the corner where it says clear last mark.

A.   Where am I doing it at?

Q.   Let me come help you.

Right here.

A.   Oh, okay.

Q.   Remove last mark.  And you can use that to mark.

A.   Okay.

Q.   All right.  Can you identify that photograph?

A.   Yes.

Q.   What --

A.   That's my apartment, the duplex.

Q.   Mark which side of the duplex that you lived on.

(Witness complied.)

Q.   When you -- you said you picked up the phone and went outside.  What did you see?

A.   I saw a guy at the Williams' house on the side going up the steps.

Q.   Point to the side where you saw someone at the Williams' home.

(Witness complied.)

Q.   What else did you see?

A.   I saw Ms. Williams holding a child.

Q.   Where was Ms. Williams when you saw her holding the child?

A.   She was at the side door at the time.

Q.   The individual that you had seen at the side door, had that male gone inside or was he still outside?

A.   No, he was still outside.

Q.   What happened then?

A.   That's when I seen Robin actually run out the front door.

Q.   If you would clear that mark, please, up there in the upper corner, and show where Robin came out.

        (Witness complied.)

Q.   The front door of the Williams' home?

A.   Yes.

Q.   Were you at that point able to see the male who had gone in her side door?

A.   I seen him.  He didn't actually go into the side door because when she ran out the front door, he actually came back out.  He actually came back like coming towards the street.

Q.   So he went in the side door and came back out the side door?

A.   He didn't actually go in the side door at all.

Q.   Well, did you -- when you saw Robin at the front door,

were you able to hear anything?

A. I heard Ms. Williams say, Robin, run.

Q. If you'll clear those marks, please.

(Witness complied.)

A. And show the members of the jury the direction in which Robin ran.

(Witness complied.)

Q. Now, you're standing on your front porch still at this time?

A. Yes.

Q. You said you had the phone. What were you doing?

A. Calling 9-1-1.

Q. When you saw Robin come out and run that way, if you'd clear those marks and indicate to the members of the jury where you saw the defendant go.

(Witness complied.)

A. He actually was coming out towards the street when I actually made contact with him.

Q. Describe how the defendant was moving.

A. He wasn't running. He was actually -- it was like a trot -- it was like a space. He was trotting like. He was very calm. When I actually looked at him, he looked like he was actually there. He looked like he was set out to do a deed, and he did it.

Q. Well, did you see anything in his hand?

A.   A gun.

Q.   Can you describe the gun?

A.   It looked like a shotgun.

Q.   How was the defendant holding the gun?

A.   He was holding it like this (demonstrating).

Q.   Stand up and show us.

A.   He was actually holding the gun like this (demonstrating).  And he pointed the gun.

Q.   Where did he point the gun?

A.   Towards me.

Q.   Now, at this point are you still standing on your front porch?

A.   Yes.

Q.   Had you gone down the steps or were you on the porch itself?

A.   No, I was actually on the porch itself.  And I went back into my house when I saw the gun like point towards me.

Q.   Did -- as the defendant pointed the gun at you, did you actually get a look at him?

A.   Yes.

Q.   When -- did you make eye contact?

A.   We made eye contact.  And I just turned and went back into my house.

Q.   Okay.  You may sit down.  Thank you.

     (Witness complied.)

police.  I was basically in shock that I was seeing all this.

Q.    If you would clear those markings.

        (Witness complied.)

Q.    And indicate when you came out of your home, by that -- after you'd gone back in and come right back out, where was Robin?

A.    He was dragging her back down this street right here (indicating).

Q.    Describe what you mean by dragging.

A.    He was like pulling -- looked like he was pulling her by her hair, actually pulling her back down the street.

Q.    Could you hear anything at this time?

A.    I could hear commotions.  I couldn't really hear from where I was at on my steps.  Ms. Williams was actually -- you know, she was hollering help her baby.

Q.    By that point is she outside?

A.    Ms. Williams?  Yes, Ms. Williams is right there with her.

Q.    If you'll clear that mark, please.

        (Witness complied.)

Q.    I'm going to show you what's identified as Government's Exhibit 21Q.  Indicate on that exhibit where you next saw the defendant and Robin come back in to your view when you came back out on your porch.

A.    Right here (indicating).

Q.     Let me also show you -- if you'll clear that, please, ma'am.

(Witness complied.)

Q.     Government's Exhibit 21R previously admitted.  Orient us there to where you're standing.

A.     I was right here in the middle (indicating).

Q.     And where was the defendant and Robin?

(Witness indicated.)

Q.     Where was Mrs. Williams?

(Witness indicated.)

Q.     What could you hear at that time?

A.     I can basically just hear.  At the time I was focused.  I heard Ms. Williams say, Help my baby.  She was hollering.  She was crying.

Q.     What was the defendant doing?

A.     I could hear certain like -- I couldn't really hear the conversation.  I could just hear -- you know, I knew they were saying something to each other.  I just don't know what.

Q.     So the defendant was speaking.

A.     Yes.

Q.     And Robin was speaking as well.

A.     Yes.

Q.     Was Ms. Williams saying anything at that point that you could understand?

A.     No.  That I could understand, no.

Q. While you're out there on your porch, is your neighbor Sonji still on her porch --

A. Yes.

Q. -- with the phone?

A. She is.

Q. Now, at this point are you still talking to the 9-1-1 --

A. No.

Q. -- communicator?

A. No.

Q. What happened -- if you'll go ahead and clear those marks.

(Witness complied.)

Q. And describe what happened next.

A. He actually -- he had shot one time. The first time he had shot looked like Robin had just like threw up her hands. And then he shot -- she had turned to run up to the yard.

Q. All right. She was running that way (indicating)?

A. Yeah, she was running up, and that's when he shot her again and she fell right in here (indicating).

Q. Where -- describe -- back up a little bit. You said that the defendant had her by her hair, by her arm as they're having conversation. Describe how Robin got away or what happened such that she could get away.

A. Looked like she just actually snatched, just jerked herself away out of his grip.

left.

A.   He went across the street to here.   It's like a little alley that's right behind here that's leading up into Ms. Williams -- that, you know, you can go behind Ms. Williams and all the yards (indicating).

Q.   Okay.   21P.   If you'll clear those.

        (Witness complied.)

Q.   Once again, show -- where was Robin's body in Government's Exhibit 21P?

A.   Right here in the yard (indicating).

Q.   And where -- let me come up and change this color for you.

        MS. ROSE:   If I may approach, Your Honor?

        THE COURT:   Yes.

Q.   Now, mark the direction of the defendant's travel.

        (Witness complied.)

Q.   Is that where you lost sight --

A.   Yes.

Q.   -- of the defendant where you stopped marking?

A.   Uh-huh.

Q.   Now, you can see to the right of those final markings that there -- it looks like a street back there.   Does that street continue on to the left side of the photograph behind the houses and trees?   Are you -- referring --

A.   I'm not really familiar with that.   I know it's an

alley.

Q. When you saw the defendant go to the alleyway, describe what happened next.

A. To me he calmly backed out and just left.

Q. Fast, slow, squealing of tires? Describe how he left.

A. It was no squealing of tires. It wasn't like he was speeding off. It was really -- it was slow. It was just he just backed out normally and just drove off.

Q. Now, where is Ms. Williams at this point?

A. At this point she's running back and forth. She's screaming. She's hysterical. She's -- she's up on the porch -- she's up on the steps for a second. She's running back and forth to Robin, Help my baby. Help my baby.

Q. Were you able to offer any assistance at that point?

A. No, because I was -- I was in shock. I couldn't offer anybody any -- do anything for anybody at the time, but call 9-1-1.

Q. After the defendant left, how long was it before either an ambulance or law enforcement got there?

A. To me it seemed like it took forever for them to get there.

Q. Time was just on a different way for you at that point.

A. Yes.

Q. Did you talk to law enforcement on that occasion?

A. I did.

Q. Did you tell them -- you gave an interview at some point later.

A. I did.

Q. Now, also at some time later, did you get an opportunity to hear a transcript of -- or hear a recording of your 9-1-1 call?

A. Yes.

Q. And did you also review a transcript of that call --

A. Yes.

Q. -- for its accuracy?

MS. ROSE: Your Honor, at this time the government would like to publish previously marked and admitted Exhibits 20A and 20C. They're synched.

THE COURT: Beg your pardon?

MS. ROSE: They're synchronized.

THE COURT: All right.

MS. ROSE: Would you clear the screen, please.

(Witness complied.)

(Government's Exhibits Numbers 20A and 20C were published to the jury.)

Q. Do you recall that conversation with 9-1-1?

A. Yes, I do.

Q. Now, do you still live on Loudon Avenue?

A. No, I don't.

MS. ROSE: All right. Thank you. I don't have any

other questions of this witness.

CROSS EXAMINATION

BY MR. BENDER:

Q.   Yeah, Ms. Thompson, do you remember testifying in the guilt/innocence phase of this trial some time ago?

A.   I'm sorry?

Q.   Do you remember testifying under oath in the guilt/innocence phase of this trial some time ago?

A.   Yes, I do.

Q.   Okay.  And at that time you indicated that Ms. Williams was right here about the distance from this juror to you, didn't you?  At the time the shots were fired.

A.   I can really vaguely remember.  I mean, I can remember every detail what happened.  At that time I was basically -- I was upset.  As far as distance, I just did an estimate.  I just said a distance.

Q.   Right.  And that was -- that was the distance back at that time was from that juror.

A.   At that time they was close.  They was really close to each other at that time.  You just said give a distance and I just gave one.

Q.   And that was the distance at that time, right?

A.   No, it wasn't.

Q.   Do you remember being asked:  When you said how far was Ms. Williams from Robin when the shot was fired, I believe you

**634**

**JA1479**

referred to someone on the jury in a white shirt. You're referring to the second juror from the end on the front row.

A. I don't remember where they were at, but I did remember stating a guy sitting in the jury that was sitting in white.

Q. Your response was, Yes I'm referring to somewhere in that distance.

A. Yes.

Q. Okay. And that was your testimony at that time, right?

A. I mean, it's still my testimony. Far as distance and stuff like that, as I explained then. I mean, if you're telling me to give you an estimate, I'm not really good as far as giving estimates, stuff like that. I can give you distance and at the time, yeah, I did say that.

Q. Okay. And that was your best recollection.

A. Yes.

Q. And Ms. Hill was on the phone on the porch calling 9-1-1.

A. Also, yes.

Q. Right. And what you saw was a young man with a shaved head. Do you remember?

A. I don't remember, no.

Q. Do you remember he didn't have any hair on his head?

A. No, I don't.

Q. Okay. And do you remember telling the police that the man you saw didn't have any hair on his head?

**635**

**JA1480**

A. No. I mean, what I'm saying is then I can't remember, it's so far along, what he had on or what colors.

Q. Okay.

A. Actually, if his head was shaved or not.

Q. Okay.

A. Only thing I can remember is looking into his eyes and...

Q. And he was yelling and screaming and out of control, wasn't he?

A. Who?

Q. Huh? The man.

A. I'm sorry, who was?

Q. The man was yelling.

A. No, the man was not yelling. He was not screaming. He was not out of control.

Q. Okay.

A. It was her mother basically was screaming.

Q. Okay.

A. And very upset.

Q. Okay. And was Robin -- was Robin arguing with him, screaming at him?

A. Like I told -- like I said the first -- you know, when I stood up and said I basically couldn't hear the conversation. I know there was some words. That was it.

MR. BENDER: Okay. All right. Thank you. That's all.

JA1481

REDIRECT EXAMINATION

BY MS. ROSE:

Q.   I do have a question, Ms. Thompson.  When you said you were referring -- if I may approach the witness -- to the second person on the end, that could have been this person, could have been this person (indicating).

A.   Yes.

Q.   Do you remember which one it was?

A.   I seen so many people they saying white that day, so I mean, only thing I can say is they was so close I was just trying to basically give an angle.  Ms. Williams and Robin was close.  They was close.  And I would say -- and I think if I honestly can remember, if I was referring to someone up at this end closest to me.

MS. ROSE:  All right.  Thank you.  I don't have any other questions.

MR. BENDER:  I don't have any questions.

THE COURT:  Okay.  You may step down.

(Witness stepped down.)

THE COURT:  Okay.  Members of the jury, we'll take our morning break at this time.  Please remember the usual instructions.  We'll call for you in about fifteen minutes.

(Brief recess at 11 o'clock a.m.)

(Jury not present.)

THE COURT:  Mr. Bender.

MR. BENDER: Yes, sir, Judge. We have noticed on our screen here, I guess it's the ELMO system is what they call it. Ours is very out of focus and we can hardly read anything. We showed it to the prosecutors and I think they agree at lunch, they say they're going to have a technical person over here to straighten that out. Just want to let the court know.

THE COURT: Okay. In the meantime, I wonder if the one at the government table could be put at an angle so that it's visible from defense table.

MS. TOMPKINS: I'll do that.

THE COURT: Do it.

MR. BENDER: Y'all won't be able to see it.

MS. TOMPKINS: We know what (inaudible).

MR. BENDER: Okay.

THE COURT: All right.

MR. BENDER: Appreciate that. With my eyes I may have to get a little closer.

MS. TOMPKINS: That's okay.

THE COURT: Well, feel free to move around as you see fit.

MR. BENDER: All right. Thank you.

THE COURT: May we have the jury, please.

(Jury entered the courtroom.)

THE COURT: All right. The jury is with us.

MS. ROSE: The government will call Sonji Hill.

SONJI HILL,

being first duly sworn, was examined and testified as follows:

DIRECT EXAMINATION

BY MS. ROSE:

Q. Would you state your name, please, ma'am.

A. Sonji Hill.

Q. And spell your first name.

A. S-o-n-j-i.

Q. Where do you live, Ms. Hill?

A. I live at 150 Laconia Avenue.

Q. In Roanoke, Virginia?

A. Yes, Roanoke, Virginia.

Q. Do you work up there in Roanoke?

A. Yes, I do.

Q. What kind of work do you do?

A. I work at Allstate Insurance Company. I'm a trainer.

THE COURT REPORTER: Austin?

THE WITNESS: Allstate.

Q. How long have you been employed with Allstate Insurance?

A. Thirteen years.

Q. Now, in June of 1996, did you live at 904 Loudon Avenue, Apartment B?

A. Yes, I did.

Q. Is that a duplex?

A. Yes, it is.

Q. And was Earlene Thompson your next door neighbor, the person who shared the other side of that duplex with you?

A. Yes, she is.

Q. Who lived in the apartment with you?

A. My three children.

Q. Now, on -- in June of 1996, how long had you been living in that apartment?

A. I had been there since '92.

Q. Had you gotten to know the neighbors?

A. Yes.

Q. Did you know the Williams family?

A. Yes.

Q. Do you recall the early morning hours of June the 22nd of 1996?

A. Yes.

Q. Would you describe for the jury that morning. What happened that morning?

A. From the beginning?

Q. Yes, ma'am.

A. I was unfortunately talking on the phone.

Q. About what time?

A. It was early morning. Six. To my coworker. She actually lived in Rocky Mount. We did that quite frequently.

Q. So this was a coworker with Allstate Insurance?

A. Yes.

Q. And you're talking about Rocky Mount, North Carolina?

A. Rocky Mount, Virginia.

Q. Rocky Mount, Virginia.

A. Yes.

Q. Okay. This is early in the morning, you're talking on the phone. What happened?

A. I heard a loud boom and I went to -- my bedroom is actually beyond the living room, and I went to the front door to see what it was.

Q. Show you what's been marked and previously admitted as Government's Exhibit 21R. Do you recognize that dwelling in the photograph?

A. Yes, I do.

Q. What is it?

A. That is my apartment. My old apartment.

Q. If you would, you can pick up that little pen there and mark which side of the apartment that you lived on.

A. I lived on this side (indicating).

Q. And you said you came and looked out a window. Which window?

A. I actually came to the door.

Q. Can you see the door in that picture or is it --

A. No, you can't see it. It's behind the pole.

Q. Behind the telephone pole?

A.   Yes.  You can see this part of it.  I'm sorry, I'm coloring.  I'm sorry.

Q.   Do you know how to remove that mark?  Do you see that?  You have to tap it several times.

A.   I'm sorry, I thought you just wanted me to remove that.

(Witness complied.)

Q.   All right.  Thank you.  So you went to your front door.  What did you see?

A.   I saw Robin come out of the front door.

Q.   Show you an exhibit that's been marked as 21P.  If you would indicate on Government's Exhibit 21P where it was that you saw Robin Williams.

A.   She came out this door (indicating).

Q.   Could you see anything else going on at the house at that moment?

A.   No.

Q.   Any other people around the front of the house --

A.   No.

Q.   -- beside the house at that time?

A.   No.

Q.   When you saw Robin come out -- let me ask you this first.  Did you know Robin?

A.   Yes.

Q.   How long had you known her?

A.   I knew her in -- as long as I've been there.  They lived

Q.  Did you have your phone with you at that time or not?

A.  Yes, I did.

Q.  What were you doing?

A.  I was -- I had hung up with my girlfriend and then I was -- saw the commotion and I hung up the phone.

Q.  Did you make any other phone calls?

A.  Yes.  I called --

Q.  Who did --

A.  -- 9-1-1.

Q.  Are you talking to 9-1-1 at this point?

A.  I didn't talk to 9-1-1 until actually they came out of the house.  Both of them were out of the house and up the hill.

Q.  Describe, then, if you will, just mark on Government's Exhibit 21P the direction where Robin -- when she came out of the front door, where did she go?

A.  She came this way and it's a hill (indicating).

Q.  So you can't see it in that picture, but there's an incline going up toward the back of your home; is that accurate?

A.  Yes.

Q.  Did you -- when she came around to the side of the house, did you stay there on the porch?

A.  She actually went around the back and came back down the other side.  Yes, I stayed on the porch.

Q. My point is did you lose sight of her --

A. Yes.

Q. -- at some point?

A. Yes.

Q. Did you then pick up sight of Robin again?

A. Yes, I did.

Q. Where was that?

A. I picked her up on this side of the house (indicating).

Q. All this time you're still on your front porch?

A. Yes.

Q. If you'll clear those markings.

(Witness complied.)

Q. Show us the direction that the defendant went.

A. He took the same path she took.

Q. During this time, tell us what's happening with you. What are you doing?

A. I am talking to 9-1-1 and the defendant -- Ms. Williams came out and told me to call -- to -- they were asking who it was.

Q. Well, let me ask you this first. How far behind Robin and the defendant was Ms. Williams? How long did it take her to come out of the house?

A. They were out of sight by the time she came out of the house.

Q. So they had already gone to the side or the back of your

duplex --

A.    Right.

Q.    -- by the time she came out?

A.    Yes.

Q.    Did you see which door she came out of, the side door or the front door?

A.    I don't know.

Q.    Did she have the baby with her at that time?

A.    No.

Q.    Are you talking to 9-1-1?

A.    Yes.

Q.    While you're talking to 9-1-1, what was the defendant doing?

A.    They were -- when I got -- when they came back to me or meanwhile?

Q.    At some point they come back around the side.  Are you hearing anything at that point?

A.    I'm hearing Ms. Williams.  While I'm on the phone, the police are asking who is it, who is it, and I have to -- I'm asking her who it is.

Q.    Now, she's doing what?  What's Ms. Williams doing?

A.    She's hollering.

Q.    What's she saying?  Can you hear what --

A.    She was hollering to me, Call 9-1-1.  Call 9-1-1.  I called 9-1-1.

Q. While you're talking to 9-1-1, what did the defendant do to you?

A. The defendant -- to me? He pointed the gun at me and told me to hang up the motherfucking phone.

Q. Is that a quote?

A. Yes, that's a quote.

Q. Did you make eye contact with the defendant?

A. Yes.

Q. Show the jurors what the defendant did with the gun when he looked at you and told you to hang the motherfucking phone up.

A. He pointed at me.

Q. What did you do?

A. I hung the phone up.

Q. Did you stay outside or --

A. No, I went back in the house.

Q. When you got in the house, what did you do?

A. When I got in the house, 9-1-1 called me back and --

Q. They called you back.

A. They called me back.

Q. When he points the gun at you, did you think he -- what did you think he was going to do?

A. Thought he was going to shoot me.

Q. At this point where is Robin? The defendant points a gun at you; where is Robin?

A.    She is in front of him.

Q.    Is she still moving?

A.    Yes.

Q.    Describe for the jury how the defendant was moving.  When he came out of the house and as he's coming across the street and up the hill, how is he moving?

A.    He was -- he was trotting.  Not necessarily running fast.  He was trotting.

Q.    When they come back around to the side, what happens?

A.    When they get to where I can see them?

Q.    Yes.

A.    After he points the gun at me?

Q.    Yes.

A.    He concentrates back on her and -- well, he drug her from the hill down by her hair.

Q.    On this -- are you able to -- let me show you another photograph, Government's Exhibit 21R.  If you would mark on there where you saw the defendant dragging Robin by the hair.

A.    He was dragging her this way (indicating).

Q.    Did they stop at about that point?

A.    Yes.

Q.    What happened then?

A.    Then he let her hair go and she walked away.

Q.    Did she walk away, pull away?  Describe actually what happened.

A. She just sort of casually walked away.

Q. Where was Mrs. Williams?

A. She was over -- this is the front door. She was here. Below the steps, I'm sorry. Not on the steps, below the steps (indicating).

Q. At some point did she move towards Robin?

A. Yes.

Q. If you would, just make an "X" where Robin was.

(Witness complied.)

Q. Where was the defendant?

A. The defendant was here and Robin was here (indicating).

Q. And by the time Mrs. Williams got over to Robin, where was -- where was Mrs. Williams?

A. She was about here (indicating).

Q. Then what happens when Robin gets away?

A. He pulled the trigger the first time and it didn't -- the gun didn't go off. But then he pulled the second time and it went off.

Q. Now, how many shots do you recall hearing at that time?

A. One.

Q. Okay. Now, are you still on the phone with 9-1-1?

A. Yes.

Q. When Robin was shot, was she moving toward her mother?

A. Yes.

Q. Did they get close to each other?

A. When she fell she didn't fall forward, she fell backwards, so Ms. Williams had to come to her.

Q. Were they far apart?

A. No.

Q. What did -- as this is happening, what is Mrs. Williams doing? What is she saying?

A. She's crying out, Jesus, Jesus. He shot my baby.

Q. Where are you standing?

A. I am actually in the house. This window right here has mini blinds and I was pulling the mini blinds down and I could see everything.

Q. Are you on the phone with 9-1-1 at that point?

A. Yes, I am.

Q. After Robin was shot and fell to the ground, her mother is there, what does the defendant do?

A. He just walks away.

Q. Walks?

A. He started walking, then he trotted to the car. The car is actually in -- behind Ms. Williams' house is an alley and the car was parked in the alley.

Q. Show you Government's Exhibit 21P. Show us where the defendant -- if you'll clear those. You'll have to tap it several times to clear those markings.

(Witness complied.)

Q. Show where the defendant went.

FORM FED ⊕ PENGAD · 1-800-631-6989

A.    Here (indicating).

Q.    Did you see where the car was parked?

A.    I didn't see it until he backed out.

Q.    Did he back out or pull out forward?

A.    He backed out.

Q.    And where did he go when he backed out?

A.    He went this way (indicating).

Q.    Now, at this point is anybody there other -- out there at the corner other than Mrs. Williams and Robin?

A.    Earlene, my next door neighbor, and her --

Q.    While you're talking to 9-1-1, did you see Earlene as well?

A.    No.

Q.    Show you government -- you never made eye contact with her.

A.    I could hear her, but I couldn't see her because I was concentrating on him.

Q.    Okay.  But you knew she was out there on the porch.

A.    Yes.

Q.    Government's Exhibit 21Q, can you see the road -- or the alleyway where the defendant's car was parked or where he pulled out?

A.    Here (indicating).

Q.    And where was -- where did Robin, if you can see in this photograph, where did Robin eventually fall and die?

A.    She would have been over here (indicating).

Q.    Were you -- during the course of this, you said you had hung up the phone with 9-1-1.  They called back.

A.    Yes.

Q.    While you were speaking with them, were they asking you some questions about the identity --

A.    Yes.

Q.    -- of the person that was there?

Tell the jury about that.

A.    They were asking what his name was.  What did he have on.

Q.    Did you ask someone what's his name?

A.    Yes.  I asked Ms. Williams what his name was.

Q.    And what did Mrs. Williams do?

A.    She gave me his name.  She said Marc.

Q.    You gave them his name.

A.    Uh-huh.

Q.    And describe the way he had gone.  Have you since had a chance to listen to the recording of your 9-1-1 calls?

A.    At the previous case, but since then I have not.

Q.    And did you also see the transcript --

A.    Yes.

Q.    -- of your conversation?

MS. ROSE:  Your Honor, those were previously marked and admitted.  I would ask to publish them to the jury at this

time.  It would be 20A and 20B.

THE COURT:  Okay.  Let them be admitted.

(Government's Exhibits Numbers 20A and 20B were published to the jury.)

Q.  Is that where the defendant pointed the gun at you?

A.  Uh-huh.

Q.  You'll need to speak up.

A.  Yes.

Q.  Whose voice was screaming Jesus in the background?

A.  Ms. Williams.

MS. ROSE:  I don't have any other questions.

MR. BENDER:  I have no questions.

THE COURT:  You may step down.

(Witness stepped down.)

MS. ROSE:  The government will call Daniel Dean.

DANIEL C. DEAN,

being first duly sworn, was examined and testified as follows:

DIRECT EXAMINATION

BY MS. ROSE:

Q.  Good morning, sir.  Would you please introduce yourself to the jury.

A.  Daniel C. Dean.  Police officer, City of Roanoke, Virginia.

Q.  Thank you.  And you might want to pull that mike a little bit closer to you just so we can be sure we can hear you.

Are you a patrol officer with the Roanoke Police Department?

A.   Yes, I am.

Q.   How long have you been working at that department?

A.   Eleven years.

Q.   And were you also working patrol back in the early morning hours of June the 22nd of 1996?

A.   Yes, I was.

Q.   At that time did the Roanoke Police Department have area assignments for the different officers who were on patrol?

A.   Yes, they do.

Q.   Were you assigned to the area that included Loudon Avenue?

A.   No, I was not at that -- on that particular day.

Q.   Okay.  Describe for the jury what those circumstances were that morning.

A.   I was assigned to work the downtown area of the city which is in the south side of the Roanoke city area.  The city is divided into four quadrants.  The Loudon Avenue area is the northwest section of the city.

That morning, it was a little after seven a.m., I was sitting in the parking lot of the YMCA which is located at Fifth and Church Street Southwest in Roanoke.  At that time we received a radio dispatch call from the dispatchers of an incident that was occurring in the 900 block of Loudon Avenue

Northwest.

Q. And that was about 7:10 or a little after seven, something like that?

A. Yes.

Q. Or do you have a particular note of the specific time?

A. I believe it was 7:10. In that area.

Q. Now, how far -- at the YMCA where you're located, how far was that from the 900 block of Loudon?

A. It's less than a mile.

Q. Did you actually respond to that call?

A. Yes, I did. As the dispatcher was relaying the call, the dispatcher relayed that there was a man -- a subject brandishing a weapon. I sat there. I still didn't respond because that wasn't my section of the city. Once the call dispatcher escalated into there were subjects fighting at the 900 block of Loudon, then she relayed that there was a -- shots fired and a person was down in the 900 block of Loudon. At that point I did respond to the call. I activated my blue lights and my siren on my patrol vehicle and headed to that location.

Q. So you initially thought whoever was assigned to that quadrant of the city is going to be heading there first; but as things escalated, you described them, you headed that way as well.

A. Yes, I did.

Q.    In fact, were you the first officer to get there?

A.    Yes, I was.

Q.    What did you see when you arrived at the 900 block?

A.    When I arrived, I positioned my vehicle in the 800 block of Loudon Avenue and I observed several people in the 900 block of Loudon Avenue, and particularly at the intersection of Ninth and Loudon.  There was a person on the ground with a subject standing beside them.

Q.    Government's Exhibit 21P, if you would take a look at that, Officer.  And let me assist you, if I may approach, Your Honor?

        THE COURT:  You may.

Q.    If you would mark where you parked your patrol car.

A.    I believe I was in this area here is where I parked the patrol car (indicating).

Q.    And where did you see the female lying on the ground?

A.    Here (indicating).

Q.    You can clear these marks by touching like that.

    All right.  At this point was there an ambulance there or any other assistance?

A.    No, ma'am, there wasn't.  The ambulance hadn't arrived yet.

Q.    What did you do?

A.    I exited my vehicle and I approached the two subjects that were at the intersection where one was laying on the

ground.

Q. Who was the second person that was there?

A. Standing?

Q. Yes.

A. She was later identified to me as Bertha Williams.

Q. Robin's mother.

A. Yes.

Q. Show you Government's Exhibit 21R. If you would, please, sir, mark where Robin's body was lying.

A. It was here. This mark would be her feet and her head was at this point here. Her body was in that position (indicating).

Q. And where was Mrs. Williams?

A. She was standing directly beside her.

Q. Right beside her. If you'll clear those, please, sir.

(Witness complied.)

Q. Did you see anybody at that moment out on their porch on the house in the photograph?

A. I don't recall seeing anyone. There were people in the roadway walking around, several people, but I don't recall seeing people on the porch.

Q. Did you go up --

A. Yes.

Q. -- to Mrs. Williams?

A. I approached them. As I was approaching, I noticed that

there was a shotgun shell laying in the roadway near the intersection. I went by that to Ms. Williams on the corner. I noticed -- I bent over to get -- down to a lower level with the person that was on the ground. I noticed that she had a large wound to her upper chest area.

Q. Was she on her back or on her stomach?

A. She was on her back.

Q. Was she still alive?

A. She -- there -- she was -- she made two breaths. There wasn't -- didn't appear to be any inhaling. There was a short exhale, a stop, and then a longer exhale, and then that was the last breathing motions that I witnessed. Her body went completely limp and there was no other motion.

Q. Was her mother there with her?

A. Yes, she was.

Q. At that point what did you do?

A. I -- I ensured that rescue was en route. I was trying to tell Ms. Bertha Williams that there was an ambulance on the way. She was very, very hysterical. She was crying. She was telling me not to let her baby die. She said this several times. Repeated it over and over. Please don't let my baby die. I ensured her that there was an ambulance on the way and they were going to take care of her.

Q. Is Ms. Williams, while she's, you know, begging you to save her daughter, is she standing up, is she on the ground?

A. She's standing.

Q. Are you trying to offer her assistance?

A. At that -- not at that point. I was trying to just console her at that -- you know, to keep her from being so hysterical. Then I did -- once -- I tried -- this wasn't working, so I decided that I was just going to escort her away from this area to see if that would help her some. And I -- she took my elbow and I escorted her across the street to her residence, which I later learned was 911 Loudon.

Q. Did she point out to you which of those homes was hers?

A. Yes.

Q. At this point you say other people are coming out.

A. Yes. There were people out in the street and on the sidewalks in the area.

Q. Once you got her settled at her home, by that point had paramedics or other law enforcement officers arrived?

A. Yes, other officers had arrived in the area. An ambulance and paramedics had arrived. They were actually attending to her daughter. As we sat on the porch, we could see them attending to her from the porch.

Q. Did you actually sit down with Ms. Williams there?

A. She sat down in a chair and I knelt beside her and she asked me to pray with her and we said a prayer together on the porch.

Q. What did you pray?

A. I don't recall exactly what was said. She still after that was still very hysterical.

MS. ROSE: All right, sir. Thank you. I don't have any other questions.

MR. BENDER: I have no questions.

THE COURT: You may step down.

(Witness stepped down.)

MS. TOMPKINS: Next witness will be Officer C.R. Sacra.

CHAD RHYNE SACRA,

being first duly sworn, was examined and testified as follows:

DIRECT EXAMINATION

BY MS. TOMPKINS:

Q. State your name, please, and tell us how you're employed.

A. I'm Officer Chad Rhyne Sacra. I'm employed by the Roanoke City Police Department, Roanoke, Virginia.

Q. How long have you been with the Roanoke City Police Department?

A. Been with the department for fourteen years.

Q. What are your current duties?

A. I'm an evidence technician for the city of Roanoke.

Q. How long have you been an evidence technician?

A. Currently I've been an evidence technician for approximately eight years.

Q. Since about 198 -- 1994?

A. Yes.

Q. Describe for the jury the duties and responsibilities of an evidence technician.

A. Evidence technician is responsible to arrive at major crime scenes. And once you've arrived, you maintain security of the crime scene. You search the crime scene for evidence related to the case. You document, take notes, measurements for diagrams, photography, collect the evidence, and preserve it for later submissions.

Q. Are you -- you're a sworn officer; is that correct?

A. Yes, I am.

Q. All right. So you use evidence as an investigative technique.

A. We do.

Q. Okay. Do you attempt to use the physical evidence that you find on a scene along with interviews and other investigators' interviews to try to piece together what has happened?

A. Certainly.

Q. Did you do that in this case?

A. As far as my part of the case, I generally work with the physical evidence itself. I look at the evidence and what it suggests. And then I collaborate with detectives who have gone out and obtained witness statements and such to

determine.

Q. And you did that function in this case; is that correct?

A. Yes, I did.

Q. Let me take you back to June of 1996. Were you on duty in the early morning hours of June 22nd, 1996?

A. I was.

Q. And did you become aware of a call for service for a shooting at the 900 block of Loudon Avenue?

A. I did.

Q. Do you remember what time that was?

A. The call that I received came in approximately 7:20 in the morning.

Q. What did you do next?

A. At that time I went to our evidence unit and then responded directly to that scene.

Q. What did you see when you got there?

A. When I arrived, patrol units had already started establishing a cordoned off area or an area boundaried by crime scene tape. There was a Roanoke Emergency Medical Services unit that was in the process of rolling away from the intersection when I arrived.

I parked outside the roped-off area and I went directly to the sergeant who was on the scene at the intersection of Ninth and Loudon.

Q. Did you speak to the sergeant?

A.    I did.

Q.    And what did you learn?

A.    Sergeant had indicated that the person in the back of the emergency medical unit had been located laying beside the street in a grassy area across the street from where we were speaking.  She also indicated that there appeared to be some evidence there in the middle of the street.  She indicated to me a residence at 911 Loudon Avenue where the situation was supposed to have been started.

We walked down there and I started noticing officers posted in different places there at that residence.  And after I had established that security was well maintained, then I started my evidence collection duties.

Q.    I'm going to show you a series of photographs.  Now, you mentioned that the sergeant indicated to you that there was evidence located there in the street.

A.    Yes.

Q.    What was that?

A.    There was a .12 gauge Federal number 8 shot shotgun casing laying in the street.

Q.    I'm going to show you what's been previously marked and introduced as Government's Exhibit 21Q.  Does that photograph depict approximately where the shotgun shell was?  Can you tell from that photograph?

A.    My recollection, the -- where the police unit is in that

shot --

Q. Is where the shotgun shell was?

A. The shotgun shell casing would have been to its rear trunk area just off the passenger side.

Q. All right. I'm going to show you a photograph marked and introduced as Government's Exhibit 21-O. Does that -- would you be able to point out where that shotgun shell was on that photograph? There's a stylus up there. Let me show you how to use that. You can use that to make a mark and then clear it by hitting that up there.

A. Okay. I would estimate the shotgun shell casing to have been (indicating).

Q. Okay.

A. A little --

Q. Did you collect that shotgun shell?

A. Yes, I did.

Q. Okay. And let me show you what has been marked and introduced as Government's Exhibit 21JJ. Did you photograph the shotgun shell as it lay in the street?

A. I did.

Q. And is that that shotgun shell?

A. Yes, ma'am.

Q. Now, did the sergeant in charge indicate that that corner of Ninth and Loudon was one of the crime scenes that you were to be collecting evidence from?

A. Yes. When I arrived and she indicated there was evidence located there.

Q. Okay.

A. That's...

Q. What else did you notice at that location?

A. There was a reddish area adjacent to the street in the grass which I attributed to blood. The sergeant indicated that the victim had been laying there prior to being transported by the rescue unit.

Q. All right. And again, I'm going to show you Government's Exhibit 21Q. Can you point out on there where the blood was.

A. I don't see it clearly, but I --

Q. Okay. I tell you what I'll do is I'm going to take that down and show you Government's Exhibit 21EE.

A. Okay.

Q. And is that a photograph that you took of the blood left on that corner?

A. It is.

Q. Okay. And that is -- is that the roadway at the top of that photo?

A. Yes, ma'am.

Q. Okay. And there is a white -- is that a piece of paper?

A. Probably left behind by rescue personnel.

Q. Okay. And that was directly there at the corner?

A. It was off the corner approximately 15 feet.

Q. Okay.

Q. What did you do next?

A. After collecting the photograph and then collecting, measuring the shotgun shell, I also took samples of that red stain for comparison.

After having cleared that area and searching that area for any additional evidence, I then moved to the residence at 911 Loudon Avenue.

Q. When you approached 911 Loudon, did you go to the front door or around the back?

A. When I went to the residence, I first went to where the -- I saw an officer standing on the east side of the residence. I needed to find out what type of evidence he was there to protect. When I arrived there, I saw what he was protecting, and then moved to the backyard to overview a fence and a gate that was open in the back.

Q. All right. And what was that officer standing to protect?

A. There were several pieces of evidence at that location. Three shotgun shells which had been fired. There was some blood on the interior side of the storm door. The metal entry door on that side into the kitchen area had three holes in it. The door was open.

Q. All right. I'm going to slow you down just a little bit. As you went around to the back of the house, is there an

alleyway back there?

A. Yes, there is.

Q. Okay. I'm going to show you what's been marked and introduced previously as Government's Exhibit 21LL. Is that a photograph of the alleyway in the back of that house?

A. Yes, it is.

Q. All right. And is depicted in that photograph the back of 911 Loudon, can you tell?

A. I'm not able...

Q. Okay. But that's a photograph of the alleyway --

A. Yes.

Q. -- back behind the house?

Now, what did you observe, if anything, in the alleyway?

A. I searched the alleyway from Ninth Street all the way until it dead ends. That alleyway proceeds up past the residences and dead ends before it ever reaches Tenth Street. At the end of that alleyway I found what appeared to be two tire tracks in the grass at the dead end of that area. It appeared to have acceleration marks in the grass where the grass was churned up and the dirt was churned up. However, at that time I couldn't establish how long it had been there or who may have caused that damage.

Q. I'm showing you what's been marked as Government's Exhibit 21P. Can you mark on there where the alleyway begins and ends, if you can.

A. This would be Ninth Street. The alleyway works its way in that direction and follows behind the houses and dead ends up in this area (indicating).

Q. Okay.

Q. That's not a through alleyway; is that correct?

A. No.

Q. I'm going to show you what's been previously marked and introduced as Government's Exhibit 21MM. Describe what that is.

A. That's a photograph of the acceleration mark in that grass.

Q. Okay. Did that appear to be fresh to you?

A. Relatively. But as I stated, I was unable to say with certainty the amount of time it had been there.

Q. Did you prepare a diagram of the outside crime scene?

A. Yes, I did.

Q. And before you prepared that diagram, did you make measurements to make an accurate diagram?

A. I did.

Q. I'm going to show you now what's been marked and previously admitted as Government's Exhibit 21L. Is that your diagram?

A. It is.

Q. Take the jury through this diagram, if you would, showing them the -- what you've noted in the legend and where those

things are located.

A. Okay. When I arrived on the scene, I arrived in this location. I met with Sergeant Martin. We spoke from this location (indicating).

The "A" indicated there indicates a .12 gauge spent shotgun shell, Federal number 8 shot.

"B" adjacent to the street indicates the blood in the grass at the street's edge.

Q. Now, take the jury back to "D", the gate and the fence, and describe what you saw about the gate and the fence at the rear of Loudon Avenue.

A. The gate was about one-third partially open. The fence line around the residence is continuous without breaks and that gate at the rear of the residence leading into the alley was about a third open.

Q. Okay. Can you clear those marks and indicate where the....

(Witness complied.)

Q. There you go.

A. This is the gate (indicating).

Q. Thanks. All right. Did you proceed into the back of that house?

A. I proceeded to search up to the house.

Q. All right.

A. At which time I found "F" which is actually attached to

the rear of the house. It's a telephone box where the wires come into the residence. And in looking at those wires, they appeared to have been cut, and I did substantiate there was no telephone service into the house.

Q. All right. And using that diagram, what did you see at "E" on your diagram?

A. "E" was an east side kitchen door located here. At that location were three .12 gauge spent shotgun shells, Federal brand, number 8 shot.

Q. All right. I'm going to -- if you could clear by tapping the corner of that screen.

(Witness complied.)

Q. Thank you.

I'm going to show you what's been marked and introduced as Government's Exhibit 21S. Do you recognize that?

A. I do. That's the phone box attached to the rear of the residence.

Q. All right. And did you -- show you now what's marked as Government's Exhibit 21T. Is that a close-up?

A. Yes, it is.

Q. And does that show the cut phone wires?

A. It's difficult to see, but, yes, it does.

Q. Is that too light?

A. You can see in this location a clear shot of one of the lines.

what that depicts.

A. There's three spent shotgun casings: one here, one here, and one here (indicating).

Q. And that's --

A. Number --

Q. Go ahead.

A. They were all Federal brand number 8 shot.

Q. All right. Going back to 21W. What observations did you make about that back door?

A. In regards to seeing the shotgun shell casings laying there beneath and beside the door and looking at the damage to the door, it appeared that a shotgun had been used at very close range to fire into the dead bolt of the door to probably access the residence.

Q. Did you notice any smudges or marks on that door?

A. I did.

Q. What was that?

A. Towards the bottom you could see down in the lower portion of that door, there were smudge marks. There was no clear shoe wear impression there; however, it appeared as if somebody had kicked that door.

Q. And when you went inside of the house, was there confirmation that that door had, in fact, been kicked?

A. Yes. The -- once I entered the residence, I found that the door jam itself for which the dead bolt would slide into

and lock the door, that was broken. The dead bolt came out of the lock mechanism and fell on to the floor. So the frame itself was splintered from some other force other than a shotgun shell.

Q. I'm going to show you now what's been marked and introduced as Government's Exhibit 21V. Tell the jury what that is.

A. That is a photograph of the three cylindrical holes next to the dead bolt lock.

Q. And based on your training and experience, what can you tell the jury about those three shots?

A. Based on the size of the shot that would be encased in those shotgun cases that I recovered, the number 8's would indicate a smaller size shot. For that small of a shot to have caused this type of damage, the shotgun would have been very close to the door, if not almost contacting the door because that shot would tend to spread once it leaves the barrel beyond three to five feet.

Q. Is that shot known sometimes as bird shot?

A. Yes, ma'am.

Q. I'm going to now show you what's been marked and introduced as Government's Exhibit 21Y. Describe for the jury what that depicts.

A. You can see in this shot the interior side of that door, how it's splintered in. You can see this door frame here is

**JA1516**

A.   What you see in several different locations are wood shavings throughout the kitchen area.  There is a wall right here which was directly in the doorway's path.  And on the opposite side of that wall is where the calendar was hanging. The kitchen is off to this area.  And as you move towards where the picture was taken from, that is the dining room area (indicating).

Q.   Did you notice damage on this footstool?

A.   Yes, I did.

Q.   And what was that?

A.   There were several strike marks from what appeared to be the bird shot that came through the home.

Q.   Did you notice damage on any other dining room table, dining room chairs?

A.   As far as shot damage, I noticed shot damage to the side of this stove, to the opposite side of this wall, the one adjacent to the door.  I located shot damage on the ottoman, also on the leg of this table, and then on the west wall behind this table as well as the south wall (indicating).

Q.   I'm going to show you now Government's Exhibit 21Z.  Is that the shot damage on the side of the stove?

A.   It appears to be.

Q.   Show you Government's Exhibit 21DD.  Is that shot damage on the dining room table leg?

A.   Yes, ma'am.

Q.   And dining room chair leg?

A.   Yes, ma'am.

Q.   And on the floor, is that wood chips from that?

A.   Yes, ma'am.

Q.   I'm going to show you what's been marked as Government's Exhibit 21AA.  Is that shot damage on the -- on a wall?

A.   Yes, it is.

Q.   And is that indicative of bird shot?

A.   It's about the same size as what I would expect to find.

Q.   All right.  And Government's Exhibit 21CC, is that also shot damage on the wall?

A.   Yes, ma'am.

Q.   So in your opinion, when those -- when the three shots were fired into that dead bolt, what happened to the spray from those shots?

A.   The -- the bird shot itself continued in several -- in three distinctive paths.

One struck the side of the stove, glanced off that and then continued into the wall right behind the door.

A second shot went across the dining room striking the ottoman, striking the dining room table and continuing to the west wall.

A third shot went through the door and ended up in the south wall.

Q.   Did you prepare a diagram?

A.    I did.

Q.    And is Government's Exhibit 21K previously marked and introduced, is that the diagram that you prepared?

A.    Yes, it is.

Q.    Now, on the legend "A" is sunglasses.  Where did you find a pair of sunglasses?

A.    It was adjacent to the wall that we discussed with the calendar.

Q.    Okay.  And show the jury where the entry doorway that we've been speaking of is on that diagram.

A.    It is located here (indicating).

Q.    All right.  Now, on your legend, do you note that "B" is shot damage?  Circle all the areas in that home where there was shot damage, if you would.

A.    There was shot damage on the side of the stove, on this wall, on the ottoman, dining room table leg, west wall, and south wall (indicating).

Q.    All right.  Now, where was it that you found blood?

A.    There was a small area of red stain on the interior surface of that storm door (indicating).

Q.    All right.  And note for the jury where on this diagram you located the spent Federal shotgun shell, .12 gauge.

A.    Three shotgun shell cases located on the exterior:  one here, one here, and one here (indicating).

Q.    Officer Sacra, you mentioned before that in your position

specialty is forensic pathology.

Q.    Where are you employed?

A.    I'm employed by the Office of the Chief Medical Examiner.  That's in the Health Department in Roanoke, Virginia.  We cover thirty-six counties and sixteen cities.

Q.    How -- what's your position there with the medical examiner's office?

A.    My title is Assistant Chief Medical Examiner.

Q.    And how long have you been affiliated with the medical examiner's office there in Roanoke?

A.    In Roanoke I started in 1999.

Q.    Prior to that time, where did you work?

A.    For eleven years I was a state medical examiner in Alabama.  Prior to that I was employed as an assistant chief medical examiner in Virginia in the Tide Water and Northern Districts.  I was also a medical legal fellow early on in my training in Richmond, Virginia.

Q.    Tell the members of the jury about your education, your training, and your experience.

A.    I received my medical degree from Ohio State University in Columbus, Ohio.  I completed my anatomic, clinical training there in the hospital in 1983.  Following that, from 1983 to 1984, I was a medical legal fellow with the Medical College of Virginia in Richmond, Virginia.  During that time I was also a Richmond metropolitan medical examiner.  After I completed

that, I was employed as assistant chief medical examiner, first in the Northern District and then later in the Tide Water District before going to Alabama.

I'm board certified by the American Board of Pathology in anatomic, clinical, and forensic pathology. I'm licensed to practice medicine in Alabama and Virginia. I'm a member of the National Association of Medical Examiners where I've served two terms as a member of the board of directors.

MS. ROSE: Your Honor, at this time I would tender Dr. Wanger as an expert in forensic pathology.

THE COURT: He will be so declared as an expert in that field.

And members of the jury, you will remember my earlier instruction about how to deal with the testimony of an expert witness. Thank you.

BY MS. ROSE:

Q. The jury has heard from another forensic pathologist, but if you would, just give a quick definition of what a forensic pathologist is.

A. Well, pathology deals with injury and illness in man. And forensic pathology deals with the determination of the cause and manner of death of those persons that die a suspicious or violent death. The tool we use for that is called the autopsy.

Q. And under what circumstances does the office of the chief

medical examiner receive a body for autopsy? Are there certain requirements before you all will review?

A. Yes, ma'am. Most of the requirements in the statute are concerning suspicious or violent deaths. We also have some public health and infant responsibilities as well. But usually it's a suspicious or violent death.

Q. And what areas did you say you covered there within Western Virginia?

A. I cover the Western District. We cover thirty-six counties and fourteen -- thirty-six counties and fourteen cities.

Q. If you would, just give an overview of the autopsy procedure in general.

A. The autopsy starts with an external examination. The external examination looks for surfaces that have been injured or may have evidence of disease. That's followed by an internal examination through a series of incisions. There's a Y-shaped incision on the chest and abdomen. There's an incision made in the head. The internal organs are removed and examined for evidence of injury or illness.

Q. Now, in your work at the medical examiner's office in Roanoke, do you work with a Dr. Oxley?

A. No, Dr. Oxley is retired. I essentially took his position.

Q. And in taking his position, did you have an opportunity

to review the records, notes, photographs, and the report of investigation prepared by Dr. Oxley when he performed the autopsy of Robin Williams?

A. Yes, ma'am, I did.

Q. Show you what's been previously marked as Government's Exhibit 24A. Do you recognize that document, Dr. Wanger?

A. Yes, ma'am.

Q. What is it?

A. It's a copy of the autopsy report of Ms. Williams.

Q. And you have reviewed that document?

A. Yes, ma'am, I have.

Q. What were the initial observations of the body of Robin Williams?

A. Well, on the external examination, Ms. Williams had a number of old injuries and some new injuries.

The new injuries consisted of shotgun wounds. There was a shotgun wound underneath the left arm and there was a shotgun wound entrance in the left back. There was also a tear on the knee; the skin had split.

And there were older injuries consisting of what appeared to be burns that had been grafted. There were skin donor sites on the thighs and skin had been grafted on to the left forearm. There was also a burned area on the right forearm.

Q. I placed upon the screen an attachment to the report of autopsy that's been previously marked and identified as the

body diagram portion. If you would, Dr. Wanger, describe for us what's recorded on the body diagram area.

A. Okay. There's a front and back to the diagram. The front is on the left side of the diagram, your left, and the right, obviously, the back.

On the left underarm area, which I'm circling here, is an area where there's a shotgun wound entrance. Most of the pellets have gone in as a single group. They're starting to spread a little bit creating some small scalloping or semicircular marks on the edge of the wound. As pellets go out of a weapon, they go in as a group. As you get further and further away, they start to spread. Essentially, you'll start losing the big hole and get little holes; and eventually you get far enough away you get nothing but little holes. So if you're fairly close to the weapon, it still is a central group. All of the pellets are going in. And this is an entrance wound here (indicating).

On the back is another entrance wound here. That one is a bit more round, so it's probably a little closer (indicating).

There are diagrams that Dr. Oxley made showing the areas where there are old burn injuries on this arm (indicating).

He also described, although it's not on the diagram, some older smaller areas of burn injury on the right arm.

In order to have these burns heal, it's sometimes

necessary to put a graft on there and the best grafts are obviously your own skin. And so down here on the thighs, there's these rectangular areas where skin has been taken and put on the burn areas. These are grafts to help it heal (indicating).

Also on the diagram there's an area here where there's a laceration or tear on the knees as well as some abrasion. That's obviously, there's been some force to the knee that caused it to do that (indicating).

He described some older areas of injury as well in the area of the ankle which were old abrasions or skin scrapes (indicating).

Q. If you'll clear those.

(Witness complied.)

Q. Thank you. I'll show you what has been previously marked and identified as Government's Exhibit 23A. If you would, Dr. Wanger, describe Government's Exhibit 23A.

A. Okay. This is a photograph depicting the face of Ms. Williams. It does have our autopsy number on the ruler, although it's upside down in the photograph. "W" refers to our district. We're the Western District. And it's the 329th autopsy in 1996. That's what the numbers stand for there.

You can see the face clearly and then at the bottom of the photograph up towards the right, your right, her left -- here we go -- we have the wound here. Right here. And you

can see the edge through here is a little irregular scallop (indicating).

Q. And what's the significance of that?

A. If it's not completely round, it may indicate that the pellets are starting to spread a little bit and you're seeing some pellets are starting to creep out towards the margin of the solid pellet column and they'll create little semicircular defects in the skin at the edge.

Q. And the area where you've marked the scalloping, would that be an entrance or an exit wound?

A. This is an entrance in the left chest and armpit area. Pellets have gone through and disrupted the tissue underneath the arm and that side of the chest.

Q. And the direction of travel of that would have been what?

A. It would have been front to back and somewhat to the left.

Q. Show you Government's Exhibit 23B previously marked --

A. Okay. This --

Q. -- identified and admitted.

A. This is a depiction of the arm as it's raised. It may be a little hard to orient. But if you look at me and just imagine that you're getting a picture here and catching a little bit of my face. That's what you're looking at here.

What we saw earlier is a little bit covered by the ruler,

these edges along here. The wound has gone through here, the pellets have gone through here and disrupted the soft tissues in here (indicating).

There's a lot of important structures under your arm. There's a large bundle of nerves and there's a major artery that goes to your arm. Your artery is about the size of your finger so it's a good diameter vessel, and that causes a lot of bleeding when it's been lacerated or torn.

Q. Show you Government's Exhibit 23C.

A. Okay. Again, we're -- we're seeing a little more detail here on the entrance area. And you can see how there's some scalloping here and here where the pellets -- it's not a completely round circle there (indicating).

Q. Previously marked, identified Government's Exhibit 23D.

A. Okay. This picture depicts the left back area. Ms. Williams has been rolled somewhat on her right side for this photograph. Her head is towards the top of your screen; her feet are towards the bottom of the screen. More or less in the center or lower half here of the photograph is a round circular defect. That's a shotgun wound entrance. That's what it looks like when the pellets all go in as a group. They go in sort of as a column and they make a large single hole. And that's a very characteristic appearance for an entrance wound of a shotgun that's fairly close.

Q. Lighten this up for you. 23G previously marked and

admitted.

A.   On the diagram I circled a knee for you.  This is a picture of that knee where the skin is somewhat abraided here and then there's a tear in the skin.  The tear medically is called a laceration.

Q.   And does that appear to be a fresh laceration?

A.   Yes, ma'am.

Q.   We had heard some evidence of her falling.  Would that be consistent with a fall?

A.   Yes, ma'am.  If she struck her knee on the way down, it it could do that.

Q.   Government's Exhibit 23F.

A.   Okay.  This is a picture showing the thigh area, one of those rectangular shaped areas I circled for you on the diagram.  This is where the skin is taken to put on the burns.  There's one on this thigh and the other thigh (indicating).

Q.   And that procedure would be called skin grafting?

A.   Yes, ma'am.

Q.   And that would be -- what would be known as a harvest point?

A.   Yes, ma'am.

Q.   A donor area.

     Government's Exhibit 23I.

A.   Okay.  What you're seeing on this photograph is the left

arm and it's showing an area where it's darkened here and roughened. That's where there's been a graft here. And that's where all the burn injury had been and the graft had been put on there. It's a darker, rougher looking scar (indicating).

Q. What kind of burn would create an area like that?

A. Well, in order to require graft to heal, usually it's a full thickness burn. In other words, it's gone through all the layers of the skin so there isn't anything to grow back. If you have a lesser burn, there may be little islands of skin left that will fill in and eventually scar and cover the defect. But if you burn down through all the layers of the skin, there isn't anything left there to come back so you have to graft it. And so this was a fairly thick burn.

Q. Previously marked, identified, admitted Government's Exhibit 23J.

A. This is the other surface of the left forearm. Again, we have this area of grafting an old burn here, extends out onto the back of the hands. You can see the difference between the normal skin up here and the more scarred and retracted graft tissue down there (indicating).

Q. Once again, some of that skin that's harvested from the leg is placed here to assist in the healing?

A. Yes, ma'am.

Q. Previously marked, identified, admitted Government's

Exhibit 23K.

A.    Okay.  This is a -- this is a right arm with an area of some burning, too, and probable graft.  It looks like a graft was put in there as well (indicating).

Q.    Dr. Wanger, based upon the examination of Robin Williams' body, do you have an opinion formed to a medical certainty as to her cause of death?

A.    Yes, ma'am.

Q.    And what is that opinion?

A.    She died from shotgun wounds to the chest and back.

Q.    And given those wounds, how long could an individual live?

A.    Well, as I told you, a major artery was injured underneath the arm.  In addition to that injury, the one that went in the back injured the liver, the heart, and the lungs. Both of these would have bled profusely.  In a matter of minutes she probably would have been unconscious.

        MS. ROSE:  I have no other questions of Dr. Wanger, Your Honor.

        MR. BENDER:  No questions, Your Honor.

        THE COURT:  You may step down.

        THE WITNESS:  Am I excused, Your Honor?

        THE COURT:  Yes, sir, you may be excused.

        THE WITNESS:  Thank you.

        THE COURT:  No objection?

MR. BENDER: No objection.

(Witness was excused.)

THE COURT: Members of the jury, we'll take our break at this time and ask you to be back with us at five minutes after two. Thank you for your attention to the case today and please remember all the instructions. Thank you.

(Lunch recess at 12:35 p.m.)

*  *  *

686

JA1531

Page 2699

IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF NORTH CAROLINA

CHARLOTTE DIVISION



COPY

UNITED STATES OF AMERICA          )
                                  )    CASE NO. 3:97CR23-V
     v.                           )    July 30th, 2002
                                  )    Afternoon Session
AQUILIA MARCIVICCI BARNETTE,      )
          Defendant.              )

TRANSCRIPT OF SENTENCING HEARING

BEFORE THE HONORABLE RICHARD L. VOORHEES

UNITED STATES DISTRICT COURT JUDGE

APPEARANCES:

FOR THE GOVERNMENT:

     ANNE M. TOMPKINS, Esq.
     JILL WESTMORELAND ROSE, Esq.
     Assistant United States Attorney
     227 West Trade Street
     Suite 1700
     Charlotte, North Carolina  28202

FOR THE DEFENDANT:

     JEAN B. LAWSON, Esq.
     P.O. Box 4275
     Charlotte, North Carolina  28226
     HAROLD J. BENDER, Esq.
     200 North McDowell Street
     Charlotte, North Carolina  28204

Reported by:  Scott A. Huseby,
              Registered Professional Reporter,
              Certified Court Reporter,

Reported By: Scott A. Huseby, RPR
800-333-2082          Huseby, Inc., an Affiliate of Spherion  (704) 333-9889          Fax (704) 372-4593
Case 3:12-cv-00327-MOC   Document 102   Filed 09/23/15   Page 126 of 286
687

JA1532

Page 2700

P R O C E E D I N G S

(Lunch recess.)

THE COURT: Anything for the Court before we resume?

MS. LAWSON: No, Your Honor.

THE COURT: All right. May we have the jury, please?

MS. ROSE: The first witness will be my reading of the testimony.

THE COURT: All right.

(The jury returned to the courtroom.)

THE COURT: Good afternoon, members of the jury. I believe the government proposes to put into evidence prior testimony, is that correct?

MS. TOMPKINS: That's correct, Your Honor. It will be the testimony of Officer J.L. Krall who is unavailable to testify today.

THE COURT: All right. Members of the jury, when a witness such as this has previously testified as a sworn witness and is examined by the government and also counsel for the defendant, then the jury is to consider such testimony and consider that it is entitled to the same consideration and is to be judged as to credibility and weight and otherwise considered by the jury insofar as possible in the same

Case 3:12-cv-00327-MOC Document 102 Filed 09/23/15 Page 127 of 286
688

JA1533

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
7/30/2002

Page 2701

way as if the witness had been present and had testified from the witness stand here. Because of this, you may consider the statements as if they were made at this trial and rely on them as much or as little as you think proper. Thank you.

MS. TOMPKINS: The government would call Officer J.L. Krall, and Ms. Rose will read her testimony.

THE COURT: All right.

MS. TOMPKINS: Just for the record, Your Honor, I'm going to be reading this verbatim and Ms. Rose's answers will be verbatim.

THE COURT: Right. And your questions will be those that were tendered by government counsel and Ms. Rose will answer in the same words as the witness, Officer Krall, is that correct?

MS. TOMPKINS: That's correct, and I have the cross-examination which I will also read.

THE COURT: All right.

MS. TOMPKINS: And her answers will be verbatim, answers to the cross-examination questions.

THE COURT: All right, thank you.

BY MS. TOMPKINS:

Q. Officer, would you state your full name, please?

Reported By: Scott A. Huseby, RPR
800-333-2082      Huseby, Inc., an Affiliate of Spherion  (704) 333-9889      Fax (704) 372-4593
Case 3:12-cv-00327-MOC  Document 102  Filed 09/23/15  Page 128 of 286
689

JA1534

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
7/30/2002

Page 2702

A.    Officer J.L. Krall.

Q.    And Officer J.L. Krall, you work for the Charlotte-Mecklenburg police department, is that correct?

A.    Yes, I do.

Q.    And what do you do for the Charlotte-Mecklenburg police department?

A.    Patrol officer.

Q.    How long have you been a police officer?

A.    Five years.

Q.    I want to turn your attention back to June 24th of 1996.  On that particular day, were you working as a Charlotte police officer and on duty?

A.    Yes, I was.

Q.    Were you assigned back in June, and particularly on June 24th of 1996, were you assigned to a particular area of the city limits of Charlotte in which you were supposed to patrol?

A.    Sure, the Baker Three district.

Q.    I'm sorry, would you repeat that?

A.    Baker Three district.

Q.    And if you would keep your voice up like that so all of the members of the jury can hear what you say, tell the members of the jury what in general the Baker Three district covers here in the city of Charlotte.

Reported By: Scott A. Huseby, RPR
800-333-2082        Huseby, Inc., an Affiliate of Spherion  (704) 333-9889        Fax (704) 372-4593
Case 3:12-cv-00327-MOC  Document 102  Filed 09/23/15  Page 129 of 286
690

JA1535

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees
3:97CR23-V
7/30/2002

Page 2703

A. It's Independence, Sharon Amity, all the way out to the county line.

Q. And as a patrol officer, what is your general primary responsibility and duty within that particular district of Charlotte?

A. I patrol Independence, Sharon Amity, all the way down to Independence, Village Lake, patrol and answering calls.

Q. Back on that particular date at around 9:00 o'clock at night, were you on duty and in your patrol car?

A. Yes, sir, I was.

Q. Did you happen to be patrolling the parking lot behind the 5600 block of Independence Avenue in Charlotte?

A. Yes, I was.

Q. What businesses are located at that address?

A. It's Harris-Teeter, TJ Maxx, Sports Authority, whole bunch of little strip mall stores.

Q. Those strip mall stores and the parking lots which adjoin those stores, is that an area that you had patrolled before that particular date?

A. Yes, it is.

Q. How often would you patrol those particular parking lots both in front of and behind those

Reported By: Scott A. Huseby, RPR
800-333-2082          Huseby, Inc., an Affiliate of Spherion  (704) 333-9889          Fax (704) 372-4593
Case 3:12-cv-00327-MOC   Document 102   Filed 09/23/15   Page 130 of 286
691

JA1536

businesses?

A.  That's my assigned area every day that I work.

Q.  So it would be fair to say that on a daily basis, you would patrol that area?

A.  Yes, I do.

Q.  When you were -- did you patrol that area on June 24th at about 9:00 o'clock at night?

A.  Yes, I did.

Q.  Did you see a vehicle parked behind one of the businesses there at that location?

A.  Yes, I did.

Q.  What about the vehicle got your attention, if you would relay that to the members of the jury?

A.  It was a dark blue Honda.  I easily know the cars that always park behind the building.  It's 9:00 o'clock at night, the shops are closing, and I've never seen that vehicle back there before.

Q.  And was that in a lot behind 5610 East Independence Boulevard?

A.  Yes, sir.

Q.  What did you do when you noticed that vehicle that got your attention?

A.  Pulled in behind it and ran the tag through our terminal.

Q.  Tell the members of the jury what you mean by

Reported By: Scott A. Huseby, RPR
800-333-2082    Huseby, Inc., an Affiliate of Spherion  (704) 333-9889    Fax (704) 372-4593
Case 3:12-cv-00327-MOC  Document 102  Filed 09/23/15  Page 131 of 286
692

JA1537

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
7/30/2002

Page 2705

running the tag, if you would.

A.   We have a computer in our car where we can run vehicle information, check to see if the car is stolen or who the owner of the car is.

Q.   What tag was on to Honda Prelude when you ran the tag?

A.   It was a Tennessee tag, 031 RBT.

MS. TOMPKINS:   May I approach the witness, Your Honor?

THE COURT:   Yes.

BY MS. TOMPKINS:

Q.   I'm going to show you, Officer, Government's Exhibit 28B.   Is that the tag you saw on the back of the Honda Prelude that you saw in the parking lot?

A.   Yes, it is.

Q.   When you ran that particular tag, that being the Tennessee tag 031 RBT, what if anything did you learn?

A.   I learned that it was stolen from a David Nelson in Tennessee.

Q.   And when you say it was stolen, you are referring to the tag being stolen?

A.   Yes.

Q.   Once you learned that information, what did you do?

Case 3:12-cv-00327-MOC   Document 102   Filed 09/23/15   Page 132 of 286
693

JA1538

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
7/30/2002

Page 2706

A.    The tag wasn't coming back to that particular car, so I checked the VIN number on the Honda.

Q.    And when you say VIN number, you are referring to the vehicle identification number?

A.    Yes, sir.

Q.    Is that number a unique number to each individual car?

A.    Yes, it is.

Q.    And what was the vehicle identification number on the Honda Prelude that you inspected?

A.    It was JHMBA8142RC004261.

Q.    When you ran -- well, did you run that VIN number?

A.    Yes, I did.

Q.    When you ran the VIN number through your computer, did you learn who that car belonged to?

A.    Yes, I did.  It belonged to a Donald Allen of 2075 McConnells Road, South Carolina.

Q.    Once you learned that that Honda Prelude belonged to Donald Allen from McConnells, South Carolina, what did you do next?

A.    Asked my dispatcher to send a message down to the sheriff's department in South Carolina to see if they could locate the owner of the vehicle.

Q.    See if they could find Mr. Allen?

Reported By: Scott A. Huseby, RPR
800-333-2082          Huseby, Inc., an Affiliate of Spherion  (704) 333-9889          Fax (704) 372-4593
Case 3:12-cv-00327-MOC   Document 102   Filed 09/23/15   Page 133 of 286
694

JA1539

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees
3:97CR23-V
7/30/2002

Page 2707

A.   Yes, sir.

Q.   Did you -- once you made that request of dispatch, what happened next?

A.   She came back and she told me that they were unable to locate Mr. Allen, so I contacted my sergeant and he told me to leave the vehicle where it was.

Q.   Did you then leave the scene?

A.   Yes, I did.

Q.   At some point after you left the scene, did you get another -- did you get a call concerning Mr. Allen's Honda Prelude?

A.   Yes, I did.  The communications supervisor contacted me and advised me that Mr. Allen was now being reported as a missing person.

Q.   When you were first at the location with the Honda Prelude, did you know at that point that Mr. Donald Allen had been reported missing?

A.   I did not.

Q.   When you learned of that information from the dispatcher over your radio, what did you do?

A.   I went back to the Honda.

Q.   After you were there with the Honda the second time, did any other officer arrive there on the scene?

A.   Yes, sir, Officer T.C. Lontz.

Q.   Shortly after Officer Lontz arrived, did

Reported By: Scott A. Huseby, RPR
800-333-2082          Huseby, Inc., an Affiliate of Spherion  (704) 333-9889          Fax (704) 372-4593
Case 3:12-cv-00327-MOC   Document 102   Filed 09/23/15   Page 134 of 286
695

JA1540

United States of America vs. Aquilia Marcivicci Barnette    3:97CR23-V
Proceedings Before Judge Richard L. Voorhees    7/30/2002

Page 2708

anyone -- anybody else arrive there on the scene?

A.   Yes, sir, Mr. Allen's brother-in-law, Kenny Hogue, and a friend, Ben Kennedy, arrived.

Q.   What, if anything, happened between you and Mr. Kennedy and Mr. Hogue?

A.   I was talking to Mr. Hogue and he advised me that Mr. Allen came up to Coyote Joe's to meet a girl.

Q.   And was missing since then?

A.   Yes, sir.

Q.   At some point did Ben Kennedy, the gentleman that was with Mr. Hogue, did he do something there near the Prelude that got your attention?

A.   Yes, he did.  He yelled to us that he had found a gun.

Q.   Did you turn towards him when he yelled that?

A.   Yes, sir. I turned towards him and he standing behind us beside a blue dumpster.

Q.   Did you go over to where he was standing?

A.   Yes, I did.

Q.   And did you look inside the dumpster?

A.   Yes, I did.

Q.   What, if anything, did you see?

A.   There was a gym bag and inside the gym bag there was a sawed-off shotgun with pistol tape grip and a magazine flashlight taped to the magazine of the

Reported By: Scott A. Huseby, RPR
800-333-2082          Huseby, Inc., an Affiliate of Spherion  (704) 333-9889          Fax (704) 372-4593
Case 3:12-cv-00327-MOC   Document 102   Filed 09/23/15   Page 135 of 286
696

JA1541

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
7/30/2002

Page 2709

shotgun.

Q. Did you see anything else in the bag?

A. There was some black pants, black baseball cap, white towel, garden hose, bolt cutters, crowbar.

Q. After you noticed those items in the dumpster, what did you and Officer Lontz do at that point?

A. We called for another officer and we taped the area off.

Q. When you stay taped the area off, are you referring to, you secured the area?

A. Yes, sir.

Q. Did you keep anyone, the people that were there, from going near those items once you saw them?

A. Yes we did.

Q. And did that also include the Honda Prelude?

A. Yes, I did.

Q. At some point, did Officer Fred Allen arrive there on the scene?

A. Yes, he did.

Q. What, if anything, did you see Officer Allen do?

A. He helped place the crime scene tape up around.

Q. Okay. Did you ever attempt to get inside the Honda Prelude?

A. Yes, I did. It was locked.

Reported By: Scott A. Huseby, RPR
800-333-2082          Huseby, Inc., an Affiliate of Spherion  (704) 333-9889          Fax (704) 372-4593
Case 3:12-cv-00327-MOC   Document 102   Filed 09/23/15   Page 136 of 286
697

JA1542

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
7/30/2002

Page 2710

Q.   Were you able -- were you ever able or any other officer ever able to obtain a key to get inside the vehicle?

A.   Yes, sir.  Mr. Allen's brother gave me the key which I gave to my sergeant and he opened up the trunk of the car.

Q.   Were you with your sergeant when he opened up the trunk?

A.   Yes.

Q.   When he opened up the trunk of Donnie Allen's Prelude, what, if anything, did you see in the trunk of the car?

A.   There was a South Carolina tag -- it says tab -- FBE 685 along with some dirt in the trunk.

Q.   Now, that South Carolina tag that you observed in the trunk, FBE 685, did you do any investigation to determine if that was the legal tag for Donnie Allen's Honda Prelude?

A.   Yes, sir.  I checked the tag and it was the legal tag.

Q.   So that was the tag that was supposed to be on there instead of the Tennessee tag?

A.   Yes, sir.

Q.   Did you eventually see crime scene technicians respond to that scene?

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
7/30/2002

Page 2711

A.   Yes, I did.

MS. TOMPKINS:  May I approach the witness, Your Honor?

THE COURT:  Yes.

MS. TOMPKINS:  This is outside of the context of the transcript, but rather than approach I'm going to show the photographs on the system that we have here today.

THE COURT:  All right, you may.

MS. TOMPKINS:  And then I will resume.

BY MS. TOMPKINS:

Q.   Officer, I'm going to show you Government's Exhibits 30A, 30B, 30C, 30E and 30F, if you would take a look at each of those items and tell me what those are, please.

A.   This is from Mr. Allen's vehicle.

Q.   Which one is this, 29?

MS. TOMPKINS:  Your Honor, she is referring to Government's Exhibit 30A.

BY MS. TOMPKINS:

Q.   That's a photograph of the front of the Honda Prelude, is that correct?

A.   Yes, it is.  This --

Q.   I'm now showing you Government's Exhibit 30B.

A.   This is rear shot of his vehicle and our patrol

Reported By: Scott A. Huseby, RPR
800-333-2082          Huseby, Inc., an Affiliate of Spherion  (704) 333-9889          Fax (704) 372-4593
Case 3:12-cv-00327-MOC   Document 102   Filed 09/23/15   Page 138 of 286
699

JA1544

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
7/30/2002

Page 2712

vehicles.

Q. And you are referring to 30B?

A. Yes, sir.

Q. Looking now at 30C, is that a photograph of the tag as you saw it when you opened the trunk of Donnie's car?

A. Yes, it is.

Q. Okay, 30E, would that be part of the items that you noticed when you looked into the dumpster?

A. Yes, sir, it is.

Q. And lastly, looking at 30F, what is shown in that photograph?

A. It's a gym bag, and there is a pistol grip shotgun covered up by some black pants.

Q. Do all of those items fairly and accurately illustrate the items that you saw in the dumpster in Donnie Allen's car the night that you located it in that location?

A. Yes, it is.

MS. TOMPKINS: Your Honor, the Court then admitted those photographs into evidence.

BY MS. TOMPKINS:

Q. Did you notice anything about the inspection sticker that was on the Honda Prelude?

A. Yes, sir. There is little parts of a green

Reported By: Scott A. Huseby, RPR
800-333-2082          Huseby, Inc., an Affiliate of Spherion (704) 333-9889          Fax (704) 372-4593
Case 3:12-cv-00327-MOC   Document 102   Filed 09/23/15   Page 139 of 286
700

JA1545

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
7/30/2002

Page 2713

sticker in the bottom left-hand corner of the windshield.

Q.   And what did that indicate to you when you made that observation?

A.   I knew that South Carolina had green inspection stickers.

MS. TOMPKINS:  No further questions, Your Honor.  Okay, now on cross-examination.

BY MS. TOMPKINS:

Q.   Officer Krall, when you were at the scene and examined the contents of the dumpster, did you find or see a church bulletin and make a note of that in your report?

A.   Yes, sir, there was a church bulletin.

Q.   And was there an address on the church bulletin?

A.   I don't recall.

Q.   Do you know if there was a reference in the church bulletin to the state of Tennessee?

A.   I don't recall.

Q.   Did you also find two letters to a person named Vici, or Vicci, excuse me, from a person named Pooh?

A.   Yes, I did.

Q.   Did you make a note of that in your report?

A.   Yes, I did.

United States of America vs. Aquilia Marcivicci Barnette    3:97CR23-V
Proceedings Before Judge Richard L. Voorhees    7/30/2002

Page 2714

Q.    Did you also find some hose, like a garden hose with some tape taped around the end of the hose?

A.    Yes, I did.

Q.    Did you make a note of that in your report?

A.    Yes, I did.

MS. TOMPKINS:  He asked to approach the witness.

BY MS. TOMPKINS:

Q.    Let me first show you a photograph marked for purposes of identification as Defendant's Exhibit Number 13, and ask you if you recognize it and if so, what it shows?

MS. TOMPKINS:  And we do not have Defendant's Exhibit 13.

THE WITNESS:  It appears to be an envelope, a church bulletin and part of a garden hose wrapped with duct tape.

BY MS. TOMPKINS:

Q.    And do you recall whether you saw those items at the scene as you have previously testified to?

A.    Yes, sir, I did.

Q.    And I will hand you a photograph marked for the purpose of identification as Defendant's Exhibit Number 14 and ask you if you can identify the photograph?

A.    Yes, sir.  It's a garden hose and a Sears bag.

Reported By: Scott A. Huseby, RPR
800-333-2082          Huseby, Inc., an Affiliate of Spherion  (704) 333-9889          Fax (704) 372-4593
Case 3:12-cv-00327-MOC   Document 102   Filed 09/23/15   Page 141 of 286
702

JA1547

United States of America vs. Aquiiia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
7/30/2002

Page 2715

Q. And is that the garden hose or part of the garden hose that you observed at the scene as you have previously testified to and noted in your report?

A. Yes, sir.

Q. Finally I hand you Defendant's Exhibit Number marked Defendant's Exhibit 15 and ask you if, before I show you the photograph, you observed any box of Compoz sleeping pills?

A. I don't remember seeing any.

Q. You don't remember seeing that?

A. No, sir.

MS. TOMPKINS: No further questions.

MS. ROSE: Your Honor, at this time the government would call Ben Kennedy.

BEN KENNEDY,

being first duly sworn, was examined and testified as follows:

DIRECT EXAMINATION

BY MS. ROSE:

Q. Would you state your name, please, sir.

A. Ben Kennedy.

Q. Where do you live, Mr. Kennedy?

A. Currently here in Charlotte, Running Brook Road.

Q. How long have you lived in Charlotte?

Reported By: Scott A. Huseby, RPR
800-333-2082          Huseby, Inc., an Affiliate of Spherion  (704) 333-9889          Fax (704) 372-4593
Case 3:12-cv-00327-MOC   Document 103   Filed 09/23/15   Page 142 of 286
703

JA1548

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
7/30/2002

Page 2716

A.    Approximately 9 years.

Q.    Do you work?

A.    Yes, ma'am.

Q.    Where do you work?

A.    U.S. Airways.

Q.    And what is your position with U.S. Airways?

A.    Customer service and health and safety inspector.

Q.    Are you a neighbor of Kenneth Hogue?

A.    I was for 2 years.

Q.    And what is Kenneth Hogue's relationship to the Allen family, to Donnie Allen's family?

A.    Brother-in-law.

Q.    Do you recall back in June of 1996 when Donnie Allen was missing?

A.    Yes, ma'am.

Q.    And did your neighbor Kenny Hogue kind of keep you apprised of what was going on with his search?

A.    Yes, ma'am.

Q.    On June 25th of 1996 after Kenny Hogue got a call from Bob Allen, Donnie's father, did he call you?

A.    Yes, ma'am.

Q.    Tell the members of the jury about that phone call.

A.    He told me that he'd received a call and they

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
7/30/2002

Page 2717

think they had located Donnie's car and asked if I would

drive over to see the car and help him identify the car,

if that was Donnie's.

Q. And about what time in the evening was that?

A. It was about 9:30.

Q. And did you in fact accompany Kenny Hogue over

at Independence?

A. Yes, ma'am.

Q. When you got there, what did you see?

A. We saw Donnie's car and I think there were two

officers there at time, and Kenny stepped out and

identified Donnie's car as well as I. And --

Q. Had you met Donnie?

A. Yes, ma'am.

Q. Did he come and visit his sister and Kenny with

some frequency?

A. Yes, ma'am.

Q. And during that 2 years, did you get to know

Donnie Allen?

A. Yes, ma'am.

Q. Would you describe for the jury the shopping

center where the car was located?

A. On Independence, it's a Harris-Teeter and

Carolina Sports Authority and some small shops in

between.

Reported By: Scott A. Huseby, RPR
800-333-2082     Huseby, Inc., an Affiliate of Spherion  (704) 333-9889     Fax (704) 372-4593
Case 3:12-cv-00327-MOC   Document 102   Filed 09/23/15   Page 144 of 286
705

JA1550

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
7/30/2002

Page 2718

Q. Was it in the front of the shopping center or in the back?

A. In the back.

Q. While Kenny was talking with some officers, what did you do?

A. Just out of curiosity -- they said there was nothing in the car, and so just out of curiosity I walked over and looked in the dumpsters behind the shopping center.

Q. Were there a number of dumpsters there?

A. There was probably four or five, all seemed to be full but one.

Q. And when you saw that all were full but one, what did you then do?

A. I went and opened the lid on the one dumpster which seemed to be empty.

Q. When you looked inside, what did you see?

A. I saw some black clothes, a bag, a sawed-off shotgun, garden hose, wire cutters and a flat crowbar.

MS. ROSE: If I may approach, Your Honor.

BY MS. ROSE:

Q. I'm going to show you a couple of exhibits, Mr. Kennedy. I'm going to show you Government's Exhibit 31E-1 and ask you to take a look at that exhibit, if you would, please, sir, and tell me if you are able to

Reported By: Scott A. Huseby, RPR
800-333-2082      Huseby, Inc., an Affiliate of Spherion  (704) 333-9889      Fax (704) 372-4593
Case 3:12-cv-00327-MOC   Document 102   Filed 09/23/15   Page 145 of 286
706

JA1551

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
7/30/2002

Page 2719

identify it or if you've seen it before?

A.    Yes, ma'am.

Q.    Where did you see Exhibit 31E-1?

A.    That's the shotgun that was in the dumpster.

Q.    Also going to show you what has been marked as Government's Exhibit 31A-1.  What is 31A-1?

A.    That's the handbag that was in the dumpster.

Q.    And within that, Government's Exhibit 31A-3?

A.    The flat crowbar that was laying on the bag.

Q.    And 31A-2?

A.    The wire cutters that were in the dumpster.

MS. ROSE:  All of these exhibits, Your Honor, having been previously identified and admitted.

BY MS. ROSE:

Q.    When you first saw the bag, was it zipped or open or describe the condition?

A.    It looked like someone had just thrown it into the dumpster and the items had fallen out.  The bag was laying on its side and the items were laying in the bottom of the dumpster.

Q.    I'm going to show you Government's Exhibit 30D.  What is 30D?

A.    A dumpster.

Q.    Is that the dumpster that was there behind the parking lot where these items were located?

Reported By: Scott A. Huseby, RPR
800-333-2082          Huseby, Inc., an Affiliate of Spherion  (704) 333-9889          Fax (704) 372-4593
Case 3:12-cv-00327-MOC  Document 102  Filed 09/23/15  Page 146 of 286
707

JA1552

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
7/30/2002

Page 2720

A.   To the best that I can tell, yes, ma'am.

Q.   Government's Exhibit 32A, are you able to see that now, Mr. Kennedy?

A.   Yes, ma'am, those are the items in the bottom of the dumpster.

Q.   Is that how they were located when you first glanced into the dumpster?

A.   Yes, ma'am.

Q.   Government's Exhibit 32B?

A.   It's the garden hose and the ball cap that were in the dumpster.

Q.   Does there appear to be a church bulletin there as well?

A.   Yes, ma'am.

Q.   Government's Exhibit 32C?

A.   I believe it's the shirt and pants that were in the dumpster.

Q.   Now, all of these --

A.   Or excuse me, maybe a towel.  I can't really tell from the picture.

Q.   And all of these photographs, sir, were they taken outside the dumpster there in the parking lot?

A.   Yes, ma'am.  After the officers got there, they took them out and marked each item individually.

Q.   Government's Exhibit 32D?

Case 3:12-cv-00327-MOC   Document 102   Filed 09/23/15   Page 147 of 286

708

JA1553

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
7/30/2002

Page 2721

A. Pants and the dumpster and the handbag.

Q. Government's Exhibit 32E?

A. The handbag, tools and pants that were in the dumpster.

Q. 32F?

A. Sawed-off shotgun which was in the dumpster.

Q. Are those all of the items that you saw when you looked in the dumpster on that particular evening?

A. Other than a few cans or bottles, yes, ma'am.

Q. I show you one other photograph, sir. This would be Government's Exhibit 30F. Can you describe that exhibit?

A. That's the inside of the dumpster. You can see the handbag, pants laying across it, and the handle of the shotgun.

Q. And is that exactly how those items were located when you first saw them?

A. Yes, ma'am.

Q. While you were there, did the officer then take these items which have been depicted in the photographs as well as the ones that you identified, were they then taken into custody?

A. Yes, ma'am.

MS. ROSE: I don't have any other questions of Mr. Kennedy, Your Honor.

Case 3:12-cv-00327-MOC Document 102 Filed 09/23/15 Page 148 of 286

JA1554

Page 2722

MS. LAWSON: Just one.

CROSS-EXAMINATION

BY MS. LAWSON:

Q. Mr. Kennedy, on that hose that you saw in the dumpster, it had duct tape wrapped around one end, did it not?

A. Yes, ma'am.

MS. LAWSON: Thank you very much.

THE COURT: You may step down.

THE WITNESS: Thank you.

MS. ROSE: Government would call officer Mike Sanders.

JAMES MICHAEL SANDERS, being first duly sworn, was examined and testified as follows:

DIRECT EXAMINATION

BY MS. ROSE:

Q. Would you introduce yourself to the jury, please, sir?

A. I am James Michael Sanders.

Q. Where do you work?

A. Charlotte-Mecklenburg police department.

Q. How long have you been an officer there?

A. Approximately 21, 22 years, going on 22.

Q. Currently, what is your position?

Reported By: Scott A. Huseby, RPR
800-333-2082          Huseby, Inc., an Affiliate of Spherion  (704) 333-9889          Fax (704) 372-4593
Case 3:12-cv-00327-MOC   Document 102   Filed 09/23/15   Page 149 of 286
710

JA1555

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
7/30/2002

Page 2723

A.    I'm a detective with the felony bureau, but I'm assigned to the FBI's violent crime fugitive task force.

Q.    And was that the position which you held in June of 1996?

A.    That's correct.

Q.    What does the violent crimes fugitive task force do?

A.    It's set up to pretty much go after the most violent offenders.  We open preliminary investigations and follow them through.  Our main objective is to do what they call a UFAP which is unlawful flight to avoid prosecution.  It's people that commit serious crimes here, take off to another state, we go after them.

Q.    Now, do you recall Tuesday, the 25th of June of 1996?

A.    Yes, I do.

Q.    And what do you recall as it relates to this case about that date?

A.    On that particular date, I was contacted by Special Agent Phil King, advised to report to the FBI office and to make contact with Special Agent Womble, that we would be involved in an apprehension.

Q.    In the apprehension of what?

A.    The person we would be apprehending would be Mr. Barnette.

Reported By: Scott A. Huseby, RPR
800-333-2082          Huseby, Inc., an Affiliate of Spherion  (704) 333-9889          Fax (704) 372-4593
Case 3:12-cv-00327-MOC   Document 102   Filed 09/23/15   Page 150 of 286
711

JA1556

Page 2724

Q. Now, at some point did you meet with FBI Agent Womble?

A. Yes, I did. We met at the FBI office.

Q. And once you met with Agent Womble, did you then learn who it was that you would be arresting?

A. I did. At that time, they explained it would be Mr. Barnette and explained where we were going and what it was in reference to.

Q. Did you know at that time what charges the defendant was being arrested on?

A. I did. He had a UFAP as well as it was murder charges out of Roanoke, Virginia.

Q. The UFAP being the unlawful flight to avoid prosecution from another district?

A. That's correct.

Q. Upon getting that initial information, what did you and the FBI agents then do?

A. It was determined that Special Agent Womble and myself would go in one vehicle to 3413 West Boulevard which is the residence of Mr. Barnette -- I think it's 3413, let me make sure -- right, 3413 West Boulevard, and D.C. Laney and Rick Walton would ride in the second vehicle.

Q. Are they Charlotte-Mecklenburg officers or part of the task force that you are on?

Reported By: Scott A. Huseby, RPR
800-333-2082      Huseby, Inc., an Affiliate of Spherion (704) 333-9889      Fax (704) 372-4593
Case 3:12-cv-00327-MOC Document 102 Filed 09/23/15 Page 151 of 286
712

JA1557

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
7/30/2002

Page 2725

A.    They are part of the task force.

Q.    Now, were you able to find 3413 West Boulevard?

A.    We were.  It's pretty hard to find the way it sits up off the road into the back.  It's a driveway that looks in pretty terrible shape at the time.

Q.    Describe how you found that residence.

A.    We drove in and at first, it looked like we were not going to find the residence.  We just continued on going up into a, kind of a wooded area, and the residence is on back up off the road.

Q.    When you pull in, does it go directly to a home, was there another residence there?

A.    There is another -- it may be even abandoned, I don't recall for sure, but there is another place to the right as you are going in I believe it was.

Q.    Now, how far is it from West Boulevard, that location on West Boulevard down to the intersection of Billy Graham Parkway and Morris Field Road?

A.    You can go down to the Billy Graham Freeway and you can just make a right and it's the next intersection down.

Q.    Have you ever checked the distance on it?

A.    I have not personally.

Q.    When you got to the defendant's home, was he there?

Reported By: Scott A. Huseby, RPR
800-333-2082          Huseby, Inc., an Affiliate of Spherion  (704) 333-9889          Fax (704) 372-4593
Case 3:12-cv-00327-MOC  Document 102  Filed 09/23/15  Page 152 of 286
713

JA1558

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
7/30/2002

Page 2726

A. Yes, he was.

Q. Were there other folks there?

A. There were other family members, his mother and I believe his grandfather and I believe there were some younger children.

Q. Describe how the defendant was dressed on that occasion.

A. He had dress slacks, white shirt, I believe they were green dress slacks, suspenders, a white shirt, dark socks and dress shoes.

Q. And was he holding anything in particular at that time?

A. He was holding a Bible.

Q. Did his family appear to be supportive and loving?

A. Very much so. His mother was very interested in him at that point in time.

Q. About what time of day was this when the defendant was arrested?

A. We actually placed him under arrest at 3:12 p.m.

Q. Now, do you know what had taken place prior to you meeting with the FBI agents over at the FBI office in order to meet the defendant, had there been some phone calls exchanged and an arrangement made to go by

Reported By: Scott A. Huseby, RPR
800-333-2082          Huseby, Inc., an Affiliate of Spherion (704) 333-9889          Fax (704) 372-4593
Case 3:12-cv-00327-MOC   Document 102   Filed 09/23/15   Page 153 of 286
714

JA1559

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
7/30/2002

Page 2727

and pick him up?

A. It was my understanding that arrangements had been made with agents and Mr. Barnette's mother.

Q. Through his mother?

A. Correct.

Q. When you arrested the defendant, was he advised of the charges?

A. He was, not at first. We walked him out to Agent Womble's car, placed him in the right rear seat, and at that time his hands were handcuffed in front of him and he was verbally advised by Special Agent Womble.

Q. Why didn't you handcuff him whenever you went to the house?

A. Pretty much family was very distraught. The family seemed so loving, and it was just -- it was a decision we had made, to walk him out.

Q. You said there were also perhaps some children there?

A. Smaller children.

Q. When you arrested him, handcuffed him and got him in the car, was he also advised of his Miranda rights?

A. Yes, he was, verbally.

Q. Now, would you describe to the members of the jury whenever a defendant is advised of their Miranda

Reported By: Scott A. Huseby, RPR
800-333-2082        Huseby, Inc., an Affiliate of Spherion  (704) 333-9889        Fax (704) 372-4593
Case 3:12-cv-00327-MOC  Document 102  Filed 09/23/15  Page 154 of 286
715

JA1560

United States of America vs. Aquilia Marcivicci Barnette     3:97CR23-V
Proceedings Before Judge Richard L. Voorhees     7/30/2002

Page 2728

rights, is there a particular form that is used?

A. There is -- normally there is a form used, but at this particular time we had not used it, he was just verbally advised.

Q. Now, after the defendant was arrested, where did you then go, what happened next?

A. I got into the left rear side beside Mr. Barnette, Special Agent Womble was the driver of the first vehicle, D.C. Laney and Rick Walton got in the second vehicle and we transported him to the FBI office.

Q. When you got there, what happened?

A. We placed Mr. Barnette in the interviewing area. It's a booking area room at the FBI office.

Q. And what's the purpose of that, the booking area or the booking procedure?

A. That's where we take everyone that we are going through, we take them down for the purpose of filling out forms, getting a criminal history, things as far as their identification and fingerprint them before taking them to the jail.

Q. And as part of that arrest process, is the defendant asked questions about injuries, prior medical information, employment, whether they have drug or alcohol addictions, things of that nature?

A. That's correct.

Reported By: Scott A. Huseby, RPR
800-333-2082     Huseby, Inc., an Affiliate of Spherion (704) 333-9889     Fax (704) 372-4593
Case 3:12-cv-00327-MOC   Document 102   Filed 09/23/15   Page 155 of 286
716

JA1561

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
7/30/2002

Page 2729

Q.    Did the defendant answer positively to any of those?

A.    The defendant stated that he did not have an alcohol or drug problem.  He did inform me that he had a prior injury or informed us that he had a prior injury, I believe it was his right leg, said he had an entry exit wound on his right leg and he now had a pin in that same location.

Q.    Did he tell you the nature of that injury?

A.    Yeah, he said he had been shot in the past.

Q.    Following those preliminary questions, what happened next in the process?

A.    Special Agent Womble advised Mr. Barnette that the case in Roanoke, Virginia was a murder trial, and he informed Mr. Barnette that he believed that there was more than enough evidence to place Mr. Barnette at the scene of the murder trial in Roanoke.  And Mr. Barnette stated at that point in time, I'm sure there is, I'm sure that's right.  At this point, Special Agent Womble advised Mr. Barnette that we were involved or he was involved in a missing person case that had occurred here in Charlotte, and Special Agent Womble advised Mr. Barnette that we believe the vehicle that Mr. Barnette had driven to Roanoke, Virginia to commit that murder was the same vehicle that belonged to the

Reported By: Scott A. Huseby, RPR
800-333-2082          Huseby, Inc., an Affiliate of Spherion  (704) 333-9889          Fax (704) 372-4593
Case 3:12-cv-00327-MOC   Document 102   Filed 09/23/15   Page 156 of 286
717

JA1562

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
7/30/2002

Page 2730

missing person here in Charlotte.

Q. Now, prior to you or Agent Womble bringing up the missing person, had the defendant said anything about Donnie Allen?

A. No, he had not.

Q. Whenever you all told him that you felt like he was involved in that, what did the defendant do?

A. Didn't state anything at first. When Special Agent Womble explained to him -- as I stated earlier, Special Agent Womble asked him if there was something that we needed to know about a person, if he needed medical attention we needed to know about it, and if he didn't need medical attention, if he was just bound in any way and needed assistance, that we needed to know about it.

Q. After going through that scenario, kind of laying out as the situation may be with Mr. Allen, what did Mr. Barnette do?

A. At that time, Mr. Barnette requested a pencil and paper, still didn't say anything. Special Agent Womble supplied Mr. Barnette with a piece of paper out of the notebook that he was writing or using for the interview and I supplied Mr. Barnette with an ink pen.

Q. Then what happened?

A. Mr. Barnette wrote on this piece of paper. He

Reported By: Scott A. Huseby, RPR
Huseby, Inc., an Affiliate of Spherion (704) 333-9889
800-333-2082
Fax (704) 372-4593

Case 3:12-cv-00327-MOC Document 102 Filed 09/23/15 Page 157 of 286
718

JA1563

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
7/30/2002

Page 2731

gave the location of Donald Allen's body. He wrote on the paper, corner off Billy Graham and Morris Field Road, period, left side drain ditch.

Q. So the quote is, corner off Billy Graham and Morris Field Road, period, left side drain ditch?

A. That's correct.

Q. And I see you referring to some notes there. Are you referring -- let me show you what has been previously marked, admitted as Government's Exhibit 36, ask you to take a look at that exhibit and tell the jury what it is.

A. This would be my supplement made from beginning into the whole investigation.

Q. And that's your report of what occurred?

A. That's my report, correct.

Q. And are you referring to a copy of that?

A. I am.

Q. Government's 36. Now, do you during the course of an interview or investigation take very clear notes, try to be specific?

A. Yes, ma'am. As a general rule, they are to assist in your later supplement.

Q. Once the defendant gave you the piece of paper with that identifying information, what did you all do?

A. At that point I stepped out of the interview

Case 3:12-cv-00327-MOC  Document 102  Filed 09/23/15  Page 158 of 286
719

JA1564

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
7/30/2002

Page 2732

room, telephoned the Charlotte-Mecklenburg police dispatch and requested a homicide supervisor. Shortly I was contacted by homicide supervisor Sergeant Sanders, requested that I telephone him at his office. I called him at his office and I explained to him what had taken place up to this point. At this time, Sergeant Sanders advised me he would be en route to the FBI office.

Q. And once Sergeant Sanders got to the FBI office, did all of you then leave that building?

A. Yes, we did. Sergeant Sanders requested that I go in and ask Mr. Barnette if he would take us to the location he had written on the paper which was the corner of Billy Graham and Morris Field, the left side drain ditch.

Q. Did you know at that time why Sergeant Sanders was requesting that the defendant be brought to that intersection?

A. At the time, just to make sure that we were going to the exact location and it wasn't the wrong street or anything, just to clarify.

Q. And once again, did you and the other officers take the defendant, put him in the car and head for that direction?

A. We did. We took two vehicles once again, placed Mr. Barnette in the right rear seat, hands still

Case 3:12-cv-00327-MOC   Document 102   Filed 09/23/15   Page 159 of 286
720

JA1565

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
7/30/2002

Page 2733

handcuffed in front of him.  I got into the left rear seat.  Special Agent Womble was the driver of vehicle one.  Sergeant Sanders and at that time D.C. Laney were in vehicle number two.  We proceeded to go from the FBI office toward the location he had given us.

Q.    About what time of day was that?

A.    That would have been 4:57 p.m.

Q.    And as you started getting closer to that intersection or to Morris Field Road, who was giving directions?

A.    Mr. Barnette was giving directions the whole time.  He had explained to us -- as we were pulling out of the FBI office, he explained to us that we would be getting onto Wilkinson Boulevard and we would be going outbound on Wilkinson Boulevard.

Q.    If you would, describe the defendant's demeanor during this trip.

A.    He was very calm at that point, giving good directions, very -- no problems at all at that point.

Q.    And had he been calm and collected from the time that you arrested him that day?

A.    He had.  Up until that point, he was doing real well.

Q.    Now, once you reached Morris Field and Billy Graham, what happened?

Reported By: Scott A. Huseby, RPR
800-333-2082          Huseby, Inc., an Affiliate of Spherion  (704) 333-9889          Fax (704) 372-4593
Case 3:12-cv-00327-MOC  Document 102  Filed 09/23/15  Page 160 of 286
721

JA1566

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
7/30/2002

Page 2734

A. When we reached Morris Field and Billy Graham, just prior to getting to the intersection of Billy Graham, the defendant advised Special Agent Womble to pull over to the right side of the road on Morris Field. And then at that point, the defendant pointed across the street and said the drain ditch directly across Morris Field.

Q. Did you or one of the other officers go down into the drainage ditch to see if the body of Donnie could be located?

A. That's correct. I advised Sergeant Sanders and D.C. Laney what Mr. Barnette had stated and the two of them went down, walked across.

Q. And did in fact one of them come back and ask another question?

A. Yes, they did. They had a little bit of a problem locating him because he was further down into it, and Mr. Barnette advised me to tell them to go further down.

Q. Do you recall his specific words?

A. I'm not sure if I -- I don't recall the exact words. I don't have them on here.

Q. Once the sergeant was told that the body was further into the woods or down the ditch, what happened?

A. The body was located.

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
7/30/2002

Page 2735

Q.   Now, were there any more statements made at that time by the defendant?

A.   Not at that particular time, no.

Q.   After -- did you then leave that area with the defendant?

A.   We did.  Special Agent Womble was the driver. D.C. Laney got into the right front passenger seat. Mr. Barnette remained in the right rear and I remained in the left, and we started toward the law enforcement center.

Q.   When you got to the law enforcement center, before getting out of the car, did you do anything there?

A.   We did.  Just prior to getting to the law enforcement center, we discussed Mr. Allen's vehicle.  I asked Mr. Barnette if he could remember anything about the vehicle to identify it from another vehicle. Mr. Barnette advised that it was a blue Honda Prelude. Just prior to pulling underneath, Special Agent Womble asked Mr. Barnette if he wanted to see the vehicle and he was sure he could identify it, Mr. Barnette stated he was sure.  We pulled up under the police station.  The vehicle was parked in a parking space under the old police station near other vehicles.  Mr. Barnette was able to point at it and say that's the blue Honda.

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
7/30/2002

Page 2736

Q. Now, I take it that when the car was located at the shopping center behind Independence that it had been moved to the police department for what purpose?

A. Just secure it.

Q. Was there also evidence collection or processing of that car being done?

A. Yes, there was.

Q. After you drove past the parking area, where is the next place you went with the defendant?

A. I carried Mr. Barnette up in the crime against persons section, it's the felony section, to place him in an interview room.

Q. And at that point, were you the only individual who was interviewing the defendant or what was the setup?

A. At that particular time, D.C. Laney and myself, we hadn't started an interview at all. Prior to placing him in, I asked Mr. Barnette if he needed to go to the rest room or if he wanted something to eat or drink. He declined on anything to eat or drink but did say he had to go to the rest room, so we walked him down the hall to a rest room on the vice section on that floor.

Q. Once he had used the rest room, did you then take him back to the interview room?

A. He was placed back in the interview room,

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
7/30/2002

Page 2737

correct.

Q. And prior to talking any further with him, was he once again advised of his Miranda rights?

A. He was. At that time, Special Agent Womble entered, took the handcuffs off from him. Special Agent Womble exited the interview room and Sergeant Sanders and myself remained in the interview room. Sergeant Sanders informed Mr. Barnette that his rights still carried over as was explained to him earlier.

Q. About what time in the evening was it then?

A. 6:15 p.m.

Q. Who went into the interview room with you at 6:15?

A. Sergeant Sanders and myself entered the interview room.

Q. Whenever you advised the defendant that his Miranda rights still applied as they were explained to him earlier at the FBI office, what did he say?

A. He acknowledged he understood his rights.

Q. Did you then begin to ask the defendant some questions about Donnie Allen's murder?

A. Sergeant Sanders pretty much started the interview. He asked him where he had met the person that owned the vehicle, I believe.

Q. I believe if you look at -- it would be the

Reported By: Scott A. Huseby, RPR
800-333-2082          Huseby, Inc., an Affiliate of Spherion  (704) 333-9889          Fax (704) 372-4593
Case 3:12-cv-00327-MOC  Document 102  Filed 09/23/15  Page 164 of 286
725

JA1570

United States of America vs. Aquilia Marcivicci Barnette    3:97CR23-V
Proceedings Before Judge Richard L. Voorhees    7/30/2002

Page 2738

third, fourth page of your report beginning at 6:15, if you would just tell the members of the jury what you recall the defendant saying that particular evening.

A. Okay. Upon asking him if he remembered where he met the subject that owned the car which was later determined to be Donald Allen, he stated that he had been doing some drinking at his residence, been thinking about a lot of things, thinking about his girlfriend. He stated he had taken a shotgun, placed it inside a bag with some shells and then he proceeded to tell how he had started over to Billy Graham and Morris Field.

Q. Did he tell you about what time it was when he got to Morris Field and Billy Graham?

A. He felt like it was around 2:00 a.m. and that was actually early Friday morning, or Saturday morning, I'm sorry, Friday might, Saturday morning.

Q. Did the defendant tell you what about this intersection was the reason that he had gone there?

A. Yes, he did. He stated he had prior knowledge of that particular intersection. I believe he said he went to church somewhere in that area, so he knew that intersection was dark. And his purpose was to go there and to car-jack somebody for their car to get a way to Roanoke.

Q. And did he describe for you what happened when

Reported By: Scott A. Huseby, RPR
800-333-2082    Huseby, Inc., an Affiliate of Spherion  (704) 333-9889    Fax (704) 372-4593
Case 3:12-cv-00327-MOC   Document 102   Filed 09/23/15   Page 165 of 286
726

JA1571

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
7/30/2002

Page 2739

he saw the blue Honda Prelude come up to the light?

A. He did. He stated as the Honda stopped for the red light, the window was down and he walked directly up to him and pointed a shotgun and ordered him out of his vehicle.

Q. Did he tell you whether the driver of the car did what he asked him to do?

A. He did. He took it a step further. He stated that when he ordered him out of the vehicle, he stepped out of the vehicle. He stated he didn't have any money at the time, so he ordered the defendant to give him his wallet and the defendant did give him his wallet.

Q. You mean the victim?

A. I'm sorry, the victim did give him his wallet. Then he stated that he told the victim to walk across the street, across Morris Field and the victim walked immediately across, still pointing the shotgun at him the whole time. He stated he told the victim to turn around, the victim was facing him, and he told him to turn around and he shot him.

Q. Did he say when the driver turned around, the defendant said that he shot him multiple times?

A. Yes, he did.

Q. After that, did he tell you what he did with Donnie Allen's car?

Reported By: Scott A. Huseby, RPR
800-333-2082          Huseby, Inc., an Affiliate of Spherion  (704) 333-9889          Fax (704) 372-4593
Case 3:12-cv-00327-MOC   Document 102   Filed 09/23/15   Page 166 of 286
727

JA1572

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
7/30/2002

Page 2740

A. He stated he got into the car and he drove back down Morris Field Road. He believes he went towards Wilkinson Boulevard and he ended up on 77 headed toward Roanoke.

Q. Did he tell you about stopping somewhere to get gas and how he was able to purchase that gas?

A. He did. He stated he couldn't recall where the gas station was, but he did stop to get gas and he paid cash for the gas.

Q. Did he then tell you that he headed for Roanoke and got to his girlfriend's mother's house?

A. He did.

Q. What did he say?

A. He stated he drove to Roanoke and he parked across the street from his girlfriend's mother's residence and just started watching the house. He stated that this was around 5:30 a.m. Saturday morning.

Q. What was the defendant doing at this time, what is his demeanor at this point?

A. He said he was talking to himself pretty much discussing the way his girlfriend went out with another guy, taking his life away from him. He said there was times that he thought about he just wanted to talk to her and there was times he knew he just wanted to kill her, back and forth.

Reported By: Scott A. Huseby, RPR
800-333-2082        Huseby, Inc., an Affiliate of Spherion  (704) 333-9889        Fax (704) 372-4593
Case 3:12-cv-00327-MOC   Document 102   Filed 09/23/15   Page 167 of 286
728

JA1573

Page 2741

Q. Did he tell you what happened about 7:00 o'clock that morning?

A. Yes, he did. He said he observed Robin come out with her dog.

Q. What did he then do?

A. When she went back into the house, he stated that he pulled his car around behind the house or pulled the blue Honda Prelude behind the house, took the shotgun, he exited his vehicle, went down behind the house, said he went through a gate. There's a fenced-in area with a gate. He opened it up. He said he knew that they might try to call the police, so he pulled the wires out of the phone. Then at that point he walked up to the -- he stated the right rear side door, so apparently the rear door is pretty much to the rear but on the side as well of the residence. He tried to get in the back door. He couldn't. He stated he took the shotgun and shot at the lock on the door a couple of times, he wasn't sure if it was one or two, and he still had to forcefully push his way into the door.

Q. What did he say he saw when he stepped inside the door?

A. He stated upon stepping inside the door, he saw Robin and her mother. They appeared to be looking out the front door trying to figure out where the noise was

United States of America vs. Aquilia Marcivicci Barnette                    3:97CR23-V
Proceedings Before Judge Richard L. Voorhees                          7/30/2002

Page 2742

coming from. And in his opinion, he stated that they must not have known it was him trying to come into their house because they were looking as if it was taking place somewhere else.

Q. What did he say he heard Robin's mother say?

A. He stated when Robin's mother turned around and observed him, she hollered run, Robin, run.

Q. And what did the defendant do?

A. At that point, the defendant said he observed Robin run out the front door and across. He ran back out the rear door that he had just came into, ran around the house, and then he ran through the same way Robin had ran to get away and started chasing Robin.

Q. Did he tell her why he was able to catch, or did he tell you, I'm sorry, how he was able to catch Robin?

A. Yes, he did. He stated that he was able to catch her because she had fallen twice which allowed him to catch up with her, and he was able to grab her with his left hand.

Q. Now, at that point did he indicate that he was kind of unclear on what had happened from that point on?

A. He pretty much -- well, he stated to me that she tried to pull away a couple of times and he grabbed her by the arm, and when she got away once he grabbed

Reported By: Scott A. Huseby, RPR
800-333-2082          Huseby, Inc., an Affiliate of Spherion (704) 333-9889          Fax (704) 372-4593
Case 3:12-cv-00327-MOC   Document 102   Filed 09/23/15   Page 169 of 286
730

JA1575

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
7/30/2002

Page 2743

her by hair. And then he made a statement to her, don't worry, I've got one for me and one for you, something along those lines.

Q. Did he tell you that he shot her as she was running toward her mother, he did remember that?

A. Yes, he did. He said as she broke away, he could see her running at her mother and he shot her, couldn't remember how many times he shot her, but he knew he put the shotgun up and shot her.

Q. After that, what did he tell you he did?

A. He said he ran back to the Honda Prelude and drove away. But he did look over and see her laying on the ground, so he knew he had shot her and he drove away.

Q. Did he tell you where he went?

A. Yes, he did. He said he drove to Knoxville, Tennessee.

Q. Did you ask him what he had done with Donnie Allen's billfold?

A. We did ask him, and I don't believe he could tell us. I think he wasn't sure what had happened to it at that point.

Q. What did you ask him next after you asked about the billfold?

A. When we asked him about the billfold, pretty

Reported By: Scott A. Huseby, RPR
800-333-2082          Huseby, Inc., an Affiliate of Spherion (704) 333-9889          Fax (704) 372-4593
Case 3:12-cv-00327-MOC   Document 102   Filed 09/23/15   Page 170 of 286
731

JA1576

United States of America vs. Aquilia Marcivicci Barnette        3:97CR23-V
Proceedings Before Judge Richard L. Voorhees        7/30/2002

Page 2744

much what brought the billfold up was that was the way he knew who Donnie Allen was. We had asked him. He stated that he had seen Donnie Allen's identification in the billfold.

Q. Did he tell you what he did when he got into Tennessee?

A. Yes, he did. He stated that was where he went to the First Calvary Baptist Church in Knoxville.

Q. Did he talk about anything else he did?

A. He said he had purchased a garden hose and some tape, he had intended to commit suicide.

Q. Did he also indicate that he removed the tag off of the car, put it in the trunk and replaced it with another tag he had gotten at a motel?

A. Yes, he did. He was asked this a couple of different times. He stated that he knew that the police, just law enforcement in general would be out looking for him and that particular car, so he wanted to remove the South Carolina tag and put another tag on it.

Q. When asked about what kind of gun he had, what did he tell you?

A. He said it was a Winchester shotgun.

Q. Did he describe how he had gotten that gun?

A. He told me earlier that he couldn't remember exactly when, but he said earlier he had purchased the

Reported By: Scott A. Huseby, RPR
800-333-2082        Huseby, Inc., an Affiliate of Spherion  (704) 333-9889        Fax (704) 372-4593
Case 3:12-cv-00327-MOC  Document 102  Filed 09/23/15  Page 171 of 286
732

JA1577

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
7/30/2002

Page 2745

shotgun at a pawnshop on Freedom Drive. He didn't know the name of the pawnshop, but he stated he had purchased it in his brother's name, he used his brother's ID.

Q. What was his brother's name?

A. Mario Barnette.

Q. Did you ask him if there was anything else specific that he could recall about this gun?

A. Yes, I did. He was able to describe the gun really well. He stated that he had altered the shotgun by cutting the barrel off, he had cut the stock off, stated that he had taken a flashlight and taped it to the barrel. When asked why he did this, he stated he used hockey type tape to tape it to it because he used the gun to hunt snakes and varmits around the house.

Q. Did he tell you a little bit about what he did in Knoxville, Tennessee, did he go back to that situation?

A. Yes, he did. He stated at one point in time, he had taken the hose and put it in the exhaust and taped it to the exhaust and attempted suicide, but he said this was at a Sears, I believe, and a security guard had approached him and stopped him.

Q. Did he also tell you that he'd tried to commit suicide with some sleeping pills?

A. Yes, he did. He stated he had -- couldn't

Reported By: Scott A. Huseby, RPR
800-333-2082          Huseby, Inc., an Affiliate of Spherion  (704) 333-9889          Fax (704) 372-4593
Case 3:12-cv-00327-MOC   Document 102   Filed 09/23/15   Page 172 of 286
733

JA1578

United States of America vs. Aquilia Marcivicci Barnette    3:97CR23-V
Proceedings Before Judge Richard L. Voorhees    7/30/2002

Page 2746

remember where he'd gotten them, said that he had obtained some sleeping spills and had taken some of those, attempted it a second time, and he said a white construction worker which he didn't know had stopped him again at that point.

Q. Now, at that point, did you know or did either of you say anything to him about the fact that he had a loaded shotgun in the car when he was doing these other attempted suicides?

A. He stated that he still had the shotgun with him in the trunk of the car, I believe it was.

Q. Did he talk to you about coming back to Charlotte?

A. Yes, he did. He stated he stopped at a gas station, I believe it was on 40 East, and I believe at that point he had made a phone call to some of his relatives and he had to ask for directions at the gas station to get back towards Charlotte.

Q. In fact, did he say he called his mother on Sunday and told her he was sorry for what he had done and told her what he had done?

A. He stated that he had talked to her, yes, correct, he had telephoned his mother and told her about the incident in Roanoke.

Q. When he got back to Charlotte, what did he do?

Reported By: Scott A. Huseby, RPR
800-333-2082          Huseby, Inc., an Affiliate of Spherion  (704) 333-9889          Fax (704) 372-4593
Case 3:12-cv-00327-MOC  Document 102  Filed 09/23/15  Page 173 of 286
734

JA1579

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
7/30/2002

Page 2747

A. When he got back to Charlotte, he said he parked his vehicle near his cousin's house near the Sports Authority, said that he got out of the vehicle, got a beige bag, which was the same beige bag that he had used prior to going to the intersection, said he put the garden hose and shotgun inside the beige bag and put them inside a dumpster which was near the rear of the car.

Q. Did he indicate that that location where he'd abandoned the car was near a relative's home, do you recall that?

A. Yes, he sure did. It was a Shonda -- said it was a cousin.

Q. Shonda Nero?

A. That's correct.

Q. And that then she picked him up, did he say that specifically?

A. I don't remember if he said she picked him up or not. I know that he went to her location.

Q. Did you -- did there come to be some discussion about Donnie Allen's golf clubs which were in his car?

A. Yes, there was. He brought -- when we asked him about any other things that he could tell us about the car, that was when Mr. Barnette stated that at one time he had observed golf clubs in the car but he didn't

Page 2748

know what had happened to them, they were no longer in there.

Q. And those clubs were never recovered?

A. Not to my knowledge.

Q. Did the defendant talk about the gun, how it was configured as far as the shells that it would hold?

A. Yes, he did. On a couple of difficult occasions, he explained that the shotgun would hold three rounds, that he could put two in the tube and one in the chamber.

Q. Did he also indicate whether he had extra shells with him?

A. He did. He stated when he first left his residence on Friday night or early Saturday morning, that he had placed extra shells in the beige bag that he carried with him.

Q. When he talked about Donnie Allen, did you or Sergeant Sanders ask if the man had tried to run or resist?

A. I asked him at one time if the man had resisted and he stated no, that when he told him to get out of the car, he did. When he told him to give him his wallet, he gave him his wallet. When he told him to walk across the street, he did. When he told him to turn around, he stated he did, and at that point he

Reported By: Scott A. Huseby, RPR
800-333-2082    Huseby, Inc., an Affiliate of Spherion (704) 333-9889    Fax (704) 372-4593
Case 3:12-cv-00327-MOC  Document 102  Filed 09/23/15  Page 175 of 286
736

JA1581

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
7/30/2002

Page 2749

started shooting him.

Q. At that point then, did the defendant ask to call some family members?

A. Yes, he did. He requested to talk to his mother.

Q. And did he talk about then, begin to talk about his state of mind?

A. He started mentioning he had in the past been feeling depressed. He had seen a commercial, I think it was a Charter Pines commercial about depression. He even talked about at one time a cousin had found some sleeping pill boxes or something and called to check on him, said that it had really bothered him, her leaving him.

Q. Did he tell you why he was at Billy Graham and Morris Field specifically?

A. He stated the reason that he picked that intersection specifically is the only light there is the red light itself, red, yellow and green light, it's really dark, no one can see. And he knew that whoever stopped at the red light with a car, he was going to approach and take the car from them, even went to tell us that we really needed to have some lights put up at that intersection in the future.

Q. At about 7:21 that evening, was that interview

Reported By: Scott A. Huseby, RPR
800-333-2082          Huseby, Inc., an Affiliate of Spherion  (704) 333-9889          Fax (704) 372-4593
Case 3:12-cv-00327-MOC   Document 102   Filed 09/23/15   Page 176 of 286
737

JA1582

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
7/30/2002

Page 2750

concluded?

A.    It was.

Q.    Did the defendant take a break at that point?

A.    He was offered an opportunity to eat and drink and he declined.

Q.    Did he make any phone calls at that time, did he call his mother?

A.    Not quite at that time.  Let me -- no, not at that time, he did not.

MS. ROSE:  I don't have any further questions at this time.

CROSS-EXAMINATION

BY MR. BENDER:

Q.    Mr. Sanders, you were assigned to the Charlotte violent crimes fugitive task force at that time?

A.    That's correct.

Q.    Are you still assigned there?

A.    Yes, sir, I am.

Q.    How long prior to June of 1996 were you assigned there?

A.    I'm not sure when I had actually came onto the task force.  I'm not even sure.

Q.    Was there an unlawful flight to avoid prosecution warrant out for Marc Barnette as a result of the violence that occurred in Roanoke against Robin

Reported By: Scott A. Huseby, RPR
800-333-2082        Huseby, Inc., an Affiliate of Spherion  (704) 333-9889        Fax (704) 372-4593
Case 3:12-cv-00327-MOC   Document 102   Filed 09/23/15   Page 177 of 286
738

JA1583

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
7/30/2002

Page 2751

Williams on August -- excuse me, April 30th, 1996?

A.   That was my understanding.

Q.   So from April 30th, '96 through 25th or 26th, somebody with the FBI or law enforcement knew there was an unlawful flight to avoid prosecution warrant outstanding for him for the fire bombing?

A.   Yes, sir, I would think so, yes.

Q.   When you drove in that driveway, there was a mailbox with 3413 West Boulevard out there, wasn't it?

A.   I don't recall seeing the mailbox.  I'm not saying it wasn't there, I just don't recall seeing it.

MR. BENDER:  Your Honor, since it's not our turn to introduce evidence, I do need to have him identify this.

THE COURT:  You may.

MR. BENDER:  I'm not well versed in this, so I need somebody to focus it down for me.

BY MR. BENDER:

Q.   Can you see that mailbox?

A.   Yes, sir, I do.

Q.   Is that the photograph of West Boulevard?

A.   Yes, sir.

Q.   Headed towards Billy Graham?

A.   That's correct.

Q.   And do you see the house number of 3413 on the

Case 3:12-cv-00327-MOC  Document 102  Filed 09/23/15  Page 178 of 286

United States of America vs. Aquilia Marcivicci Barnette    3:97CR23-V
Proceedings Before Judge Richard L. Voorhees    7/30/2002

Page 2752

mailbox there?

A.    I see it on this mailbox, correct.

Q.    Okay.  You have no reason to doubt that it was there?

A.    I couldn't say whether it was or wasn't.  I never seen it -- I don't recall ever seeing it.  It very well could have been, but I wouldn't want to stake anything on it.

Q.    Okay.  What attempts were made by the violent -- Charlotte violent crimes fugitive task force to locate Marc Barnette on the fugitive warrant from April 30th through June 26th?

A.    I couldn't tell you.  The only thing that I knew about this started on the date of this incident.  June 25th was my first of being informed of any of it.

Q.    Okay.  So you don't know if any attempts were made, do you?

A.    Not by me personally, no.  I had no knowledge of it before June 25th.

Q.    Have you looked through the files and tried to determine that?

A.    I have not, no.

Q.    This is a fairly comprehensive report that you did concerning the events of June 25th, 1996, wasn't it?

A.    Yes, sir.

Reported By: Scott A. Huseby, RPR
800-333-2082    Huseby, Inc., an Affiliate of Spherion  (704) 333-9889    Fax (704) 372-4593
Case 3:12-cv-00327-MOC  Document 102  Filed 09/23/15  Page 179 of 286
740

JA1585

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
7/30/2002

Page 2753

Q. And it was done on June 26th, that is, it was written by you and put in the computer by you on June 26th, 1996, wasn't it?

A. Right, my notes were done that day. I'm not so sure of the exact date it was put in the computer, but I believe it would have been the 26th.

Q. Fairly fresh in your mind as to what happened?

A. Yes, sir.

Q. And you or at least Special Agent Womble knew where to go, went out there, turned in the driveway and went to the residence?

A. Yes, sir.

Q. And you were in the car?

A. Right.

Q. And at that time, you found Marc Barnette either in the house or out of the house, which one?

A. Inside the house.

Q. Inside, okay. He was not permitted to take his Bible with him, was he?

A. I don't believe so. I don't think they'd let him have it at the jail.

Q. Gave you no problem?

A. No, he did not.

Q. Cooperated with you?

A. Well, there was no alternative. At that point,

Reported By: Scott A. Huseby, RPR
800-333-2082        Huseby, Inc., an Affiliate of Spherion  (704) 333-9889        Fax (704) 372-4593
Case 3:12-cv-00327-MOC   Document 102   Filed 09/23/15   Page 180 of 286
741

JA1586

United States of America vs. Aquilia Marcivicci Barnette          3:97CR23-V
Proceedings Before Judge Richard L. Voorhees          7/30/2002

Page 2754

he knew why we were there.

Q.    Right.  He turned himself in basically?

A.    Correct.

Q.    And he didn't give you any trouble when you went back to the FBI office?

A.    No, he did not.

Q.    And at first, he was being asked about this unlawful flight to avoid prosecution warrant for the murder in Roanoke, wasn't he?

A.    Correct.

Q.    That was what he was initially asked about was the Roanoke murder?

A.    He was not asked about the Roanoke initially, no, he was just informed that that was another case.  He was actually asked about the missing person case.

Q.    He told you he had been employed up in Roanoke with Electrolux from February through April of 1996, is that --

A.    That's correct.

Q.    And he told you that he had returned home in about April of 1996 due to a break-up with his girlfriend, Robin Williams?

A.    That's correct.

Q.    And he gave you his address where he had been staying as 3413 West Boulevard?

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
7/30/2002

Page 2755

A. Correct.

Q. Gave you his telephone number there?

A. Yes, he did.

Q. And that was 704-399-5479?

A. That's correct.

Q. And that was one of the numbers that the violent crimes fugitive task force had as of April 30th, 1996 on how the locate Mr. Barnette, wasn't it?

A. I can only tell you what happened on the 25th. I know what happened on that date.

Q. When Agent Womble said that he believes that more than enough evidence to arrest him for the murder in Roanoke, he said, I'm sure there is, I'm sure that's right?

A. That's correct.

Q. He didn't deny anything about that, did he?

A. He did not.

Q. And then when Agent Womble said we have got a missing persons situation we are trying to look into too, we think the car that you were driving had something to do with that, he said let me see a piece of paper and a pen?

A. That's correct.

Q. And at that time, he actually -- did he write out or did he draw a diagram of the intersection?

Reported By: Scott A. Huseby, RPR
800-333-2082          Huseby, Inc., an Affiliate of Spherion  (704) 333-9889          Fax (704) 372-4593
Case 3:12-cv-00327-MOC   Document 102   Filed 09/23/15   Page 182 of 286
743

JA1588

Page 2756

A.   I don't have that with me.   I know he had written it out, but I think there was a diagram on there.   Seems I do remember a diagram.

Q.   And he did that voluntarily?

A.   Yes, he did.

Q.   And then I believe your brother is Rick Sanders?

A.   That's correct.

Q.   And at that time, Rick was a homicide supervisor?

A.   He was.

Q.   And when you made the call for any supervisor about the diagram and the information you just received, it just happened to be Rick who called back?

A.   Right, he was on duty.

Q.   And he said something like ask him if he will go with us?

A.   Right, upon arrival.

Q.   So you went back in the room, talked to Marc, asked him if he would go with you and he said he would?

A.   That's correct.

Q.   Now, at this time, you had no idea what had happened to Donald Allen, had you?

A.   No, sir, did not.

Q.   So Marc Barnett actually took you to where the

Reported By: Scott A. Huseby, RPR
800-333-2082        Huseby, Inc., an Affiliate of Spherion  (704) 333-9889        Fax (704) 372-4593
Case 3:12-cv-00327-MOC   Document 74-2   Filed 09/23/15   Page 183 of 286
744

JA1589

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
7/30/2002

Page 2757

body was, gave you directions and rode with you?

A. Yes, sir.

Q. And when you got to that location and Special Agent Womble pulled over to the right side of the road, Marc Barnette pointed in the direction across Morris Field?

A. That's correct.

Q. And started crying?

A. That's correct.

Q. He started crying right then?

A. Yes, sir.

Q. And said there is a drain that runs on the other side of the ditch down the hill kind of in the curb?

A. That's correct.

Q. And that's where his body was located?

A. It was.

Q. You didn't go down there, though, did you?

A. No, sir, I remained with Mr. Barnette.

Q. And so there were some news vans out there that day, weren't there?

A. I believe I recall some coming later.

Q. Well, y'all were only there for less than 30 minutes, that is, with Marc at the scene, but some news vans came before y'all left at 5:36, didn't they?

Reported By: Scott A. Huseby, RPR
800-333-2082        Huseby, Inc., an Affiliate of Spherion  (704) 333-9889        Fax (704) 372-4593
Case 3:12-cv-00327-MOC   Document 102   Filed 09/23/15   Page 184 of 286
745

JA1590

United States of America vs. Aquilia Marcivicci Barnette          3:97CR23-V
Proceedings Before Judge Richard L. Voorhees          7/30/2002

Page 2758

A.   Yes.  Before we left, there was a news van, correct.

Q.   Do you know how some news organization got word about this crime scene?

A.   Well, I wouldn't know about this one, but it's not uncommon for them to monitor channels.  If anyone slips and uses what we call a private line, you are taught as a rookie it's not really private.  It's a bad saying for it because they do monitor.

Q.   So somebody may have made a mistake?

A.   It could have been that someone called requesting anything and they got wind of it and they will come out.

Q.   And after y'all left, Mr. Barnette was still crying as you left?

A.   He got himself composed as we were leaving.  There was no problem upon leaving.

Q.   And you asked him if he could identify the vehicle and he said he knew it was a blue Prelude?

A.   That's correct.

Q.   Thought about it.  Took him down and rode him around and he said, that's it?

A.   That's correct.

Q.   Still very cooperative with you?

A.   He was.

Reported By: Scott A. Huseby, RPR
800-333-2082          Huseby, Inc., an Affiliate of Spherion  (704) 333-9889          Fax (704) 372-4593

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
7/30/2002

Page 2759

Q.   Now, at that point you put him in a room.  I guess after you took him to the rest room, you put him in another room?

A.   In an interview room.

Q.   Interview room?

A.   That's correct.

MR. BENDER:  Your Honor, we have marked Defendant's Exhibit 1 and 1A.  Since we are not permitted to introduce evidence, I would like to just show it to him.

BY MR. BENDER:

Q.   They say you can identify it without seeing it.  Can you?

A.   Well, I can tell you that it states Marc Barnette, 6/25/96.

Q.   I thought that's what you would do.  I need you to take a look at it and see if you are familiar with it and can identify it.

THE COURT:  Let's take a break and maybe you can do it that way.

MR. BENDER:  Yes, that will be good, Judge.

THE COURT:  Members of the jury, we will take a break and we'll call for you in about 15 minutes.  Keep an open mind about the case, don't discuss it, and

Case 3:12-cv-00327-MOC  Document 102  Filed 09/23/15  Page 186 of 286

JA1592

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
7/30/2002

Page 2760

remember the other instructions. Thank you.

(The jury left the courtroom.)

THE COURT: What is that a tape of?

MR. BENDER: It's a tape -- it's a video of the 6:15, starts at 6:15 on the 25th of Mr. Barnette being interviewed by I think Mike Sanders and Rick Sanders during that time.

THE COURT: So you want this witness to review that while the break is underway?

MR. BENDER: Yeah, and then we will come back and introduce it before the jury. And what we have done, Judge, is this is the one we got from -- it's the entire one that we have from the government. We have taken 15 minutes of that and put it on another tape, that's 1A, so we need to introduce the full one in case they want to play the whole thing under the rules of evidence.

THE COURT: Well, Defendant's Exhibit 1 is which one?

MR. BENDER: That is the entire interview of -- that began at 6:15 that day.

THE COURT: And 1A?

MR. BENDER: 1A is an excerpt from that, 15-minute excerpt.

THE COURT: Now, do you propose to play

Reported By: Scott A. Huseby, RPR
Huseby, Inc., an Affiliate of Spherion (704) 333-9889
800-333-2082 Fax (704) 372-4593

Case 3:12-cv-00327-MOC Document 102 Filed 09/23/15 Page 187 of 286

748

JA1593

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
7/30/2002

Page 2761

that at this time for the jury?

MR. BENDER: No, Your Honor, we were going to play it in our evidence, but we have to have him identify it.

THE COURT: You can let him identify it when we come back from the break.

MR. BENDER: All right.

THE COURT: And he may -- presumably he will need to look at at least some of it during the break.

MR. BENDER: Sure.

(Brief recess.)

THE COURT: Did you take care of that business?

MR. BENDER: We did, Your Honor.

THE COURT: May we have the jury, please.

(The jury returned to the courtroom.)

MR. BENDER: May I, Your Honor?

THE COURT: Yes, sir.

BY MR. BENDER:

Q. Let me just back up a minute before I ask you what we were talking about before the break. After Marc came back from the rest room and you put him in the interview room, that is an interview room with video and audio capabilities, is it not?

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
7/30/2002

Page 2762

A. That is correct.

Q. Okay. And so far as you knew, the video and the audio were operational at that time?

A. When we first placed him in, but later we found out it was not.

Q. All right. And you later found out that the video was fine, the audio was low and there was some words that were unintelligible, is that correct?

A. That's correct.

Q. But as far as the video was concerned --

A. Yes, sir.

Q. -- it was fine?

A. Yes, sir, the video worked fine.

Q. And with regard to Defendant's Number 1, during the break you and I have had an opportunity to review that, is that a video of that interview that was conducted by you and Rick Sanders at approximately 6:15 p.m. on June the 25th, 1996?

A. That's correct.

Q. And as to Defendant's Exhibit 1A, is that about a 15-minute excerpt of that video from 6:15 p.m. on June the 25th, 1996?

A. That's correct.

Q. Okay. And you've had an opportunity to review as much of it as you needed to to verify that?

Reported By: Scott A. Huseby, RPR
Huseby, Inc., an Affiliate of Spherion  (704) 333-9889
800-333-2082                                                                      Fax (704) 372-4593

Case 3:12-cv-00327-MOC   Document 102   Filed 09/23/15   Page 189 of 286
750

JA1595

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
7/30/2002

Page 2763

A. Right.

Q. Now, the video recorder, the camera itself, is not visible, is it?

A. No, sir.

Q. It's sort of a hidden camera in there?

A. Right.

Q. And the audio, or the microphone for the audio is also not visible, is that right?

A. Right. Well, they are not where you would readily identify them. They are visible, but not --

Q. Okay. It's not like a tape recorder where people know that they are being recorded?

A. No, sir.

Q. That did happen later, did it not --

A. Yes, sir, it did.

Q. -- at some point? Did you participate in that audio recording with an actual tape recorder?

A. Yes, sir, I did.

Q. Now, during this time that you were, you and Rick Sanders were with Marc in that interview room, he told you that he was so mad at her, meaning Robin, for taking his life away --

A. Yes, sir --

Q. -- and that --

A. -- he did.

Reported By: Scott A. Huseby, RPR
800-333-2082          Huseby, Inc., an Affiliate of Spherion  (704) 333-9889          Fax (704) 372-4593
Case 3:12-cv-00327-MOC   Document 102   Filed 09/23/15   Page 190 of 286
751

JA1596

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
7/30/2002

Page 2764

Q. He also said, I hated her for that, but I also loved her?

A. Yes, sir, I believe so.

Q. Okay. Do you need to refresh your memory with looking at your notes?

A. I do recall that, yes. Yes, sir.

Q. And he was crying at that time, was he not?

A. I don't remember right off if he was crying at that particular time, but I believe that was one of the emotional times that he had that he was crying.

Q. Okay. All right. You put that in your report, didn't you?

A. That's correct. That was when he got down to the point where I couldn't -- he wasn't audible.

Q. All right. And then Rick Sanders asked him what happened next and he said he just didn't know what he wanted to do, he thought about her, thought at times that he just wanted to talk to her and at other times he wanted to kill her?

A. That's correct.

Q. And when he was asked again what happened, he said, when she cheated on me, I didn't know about it, is that correct?

A. That's correct.

Q. Okay. And he said, she was willing to marry

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
7/30/2002

Page 2765

me, she's the only one that was willing to marry me. Do you remember him saying that?

A. That's correct.

Q. He also said that when he got to Roanoke in the early morning hours, saw Robin's car, he just sat there and was continuously talking to himself?

A. That is correct.

Q. And he said that at one point something told him to kill her and to then kill himself?

A. That's correct.

Q. He said he just didn't have shit to live for?

A. That is correct.

Q. He said he didn't really know whether he had shot Robin once or twice, but he did know that he had shot her in the back?

A. That is correct.

Q. Now, he went on to tell you about going to Tennessee and changing the license plates and that sort of thing, didn't he?

A. Yes, sir.

Q. And he told you about going to church?

A. He did.

Q. Okay. And he went to church to pray for Donald Allen, didn't he?

A. That's what he stated, yes.

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
7/30/2002

Page 2766

Q. And then he talked about buying a garden hose, some duct tape, taping up the garden hose, putting it in his car and trying to commit suicide?

A. That's correct.

Q. And you know from your investigation of this that there was actually a garden hose, some duct tape, found in the car, part of the garden hose had been cut?

A. That's correct.

Q. Okay. And even on the exhaust pipe of the Honda Prelude there was some tape residue, some sticky residue around the exhaust pipe?

A. I have no knowledge of that.

Q. You didn't know that?

A. No, sir.

Q. Okay. And that -- when he told you about the gun, what he told you later turned out to be true, about where he bought it, sort of when he bought it, he sawed it off on both ends, taped it up, that sort of thing?

A. That is correct.

Q. And at the time you talked to him, you yourself did not know where he bought it and that he himself had cut it off and that sort of thing, did you?

A. I did not.

Q. Until he told you?

A. Right.

Reported By: Scott A. Huseby, RPR
Huseby, Inc., an Affiliate of Spherion (704) 333-9889
800-333-2082
Fax (704) 372-4593
Case 3:12-cv-00327-MOC   Document 102   Filed 09/23/15   Page 193 of 286
754

JA1599

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
7/30/2002

Q.   He told you about getting some sleeping pills and another suicide attempt with the garden hose?

A.   That is correct.

Q.   And he was interrupted by some construction worker?

A.   Correct.

Q.   That told him something like, no matter how bad it is, you don't need to do that, or words to that effect?

A.   Right.

Q.   He told you that he remembered crying a lot and going into the church and praying while he was crying, didn't he?

A.   That's correct.

Q.   And he was praying for Donald Allen?

A.   That's what he stated, correct.

Q.   And he had also indicated to you that he came to realize at some point, maybe through the Charter Pines commercials, that he was in a state of depression and might have needed some help?

A.   Stated that he had seen them in the past, correct.

Q.   All right.  And that some family member had taken -- had called him because they were worried about him trying to commit suicide, words to that effect?

Case 3:12-cv-00327-MOC   Document 102   Filed 09/20/13   Page 194 of 286

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
7/30/2002

Page 2768

A. With the sleeping pills, correct.

Q. Right. Okay. Now, at some point during all of this you allowed Marc to go call his mother, Sonia?

A. That is correct.

Q. You took him out to the telephone?

A. Right.

Q. He wanted to talk to her and wanted to tell her everything, particularly about Donald Allen?

A. That's correct.

Q. Okay. And you overheard him saying a statement to her, I just had to get to Roanoke?

A. That's correct.

MR. BENDER: Thank you, sir. That's all.

REDIRECT EXAMINATION

BY MS. ROSE:

Q. Officer Sanders, was the UFAP, the unlawful flight to avoid prosecution, was that not issued after the murders in Roanoke?

A. That was for the murder in Roanoke, correct.

Q. That wasn't issued for the arsons?

A. No.

Q. It would have been issued after June 22nd?

A. Correct.

Q. Now, do you know whether when you went out there with Agent Womble of the FBI -- you knew that the

Reported By: Scott A. Huseby, RPR
800-333-2082 Huseby, Inc., an Affiliate of Spherion (704) 333-9889 Fax (704) 372-4593
Case 3:12-cv-00327-MOC Document 102 Filed 09/23/15 Page 195 of 286
756

JA1601

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
7/30/2002

Page 2769

defendant had made arrangements to be picked up?

A.    That is correct.

Q.    And that his mother had given directions .so that you all could locate his residence?

A.    That was my understanding, that we had directions to go to the house.

Q.    And the photograph that you looked at, you don't know when that picture was taken?

A.    I have no knowledge, no.

MS. ROSE:    I don't have any other questions.

RECROSS-EXAMINATION

BY MR. BENDER:

Q.    So are you now telling us that even though the Roanoke Police Department had issued some information to the SBI and the Charlotte Police Department on April the 30th, 1996 that they had outstanding warrants for two attempted murders and one felonious arson, that the FBI, the violent crimes fugitive unit, had no knowledge?

A.    I personally had no knowledge of it, no, sir. I was not informed of anything until the 25th, myself.

Q.    Okay. So y'all had -- the fugitive unit had no knowledge of this?

A.    Once again, I did not personally, no.

MR. BENDER:    All right. Thank you.

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
7/30/2002

Page 2770

THE COURT:  You may step down.

MS. TOMPKINS:  The government calls Tony Rice.

TONY RICE,

being first duly sworn, was examined and testified as follows:

DIRECT EXAMINATION

BY MS. TOMPKINS:

Q.    State your name, please, and how you are employed.

A.    Tony Rice, R-I-C-E.  I'm a detective with the Charlotte-Mecklenburg Police Department.

Q.    How long have you been with the Charlotte-Mecklenburg Police Department?

A.    A little over 20 years.

Q.    And for how long have you been an investigator or detective?

A.    Probably about 14 of those 20.

Q.    What are your current duties?

A.    Currently I'm assigned to the criminal intelligence unit where we provide dignitary protection and threat assessments for events coming to Charlotte.

Q.    In June of 1996 what were your duties?

A.    I was an investigator assigned to the homicide section.

Reported By: Scott A. Huseby, RPR
800-333-2082   Huseby, Inc., an Affiliate of Spherion (704) 333-9889   Fax (704) 372-4593
Case 3:12-cv-00327-MOC   Document 102   Filed 09/23/15   Page 197 of 286
758

JA1603

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
7/30/2002

Page 2771

Q. How long were you a homicide detective?

A. Approximately five years.

Q. Were you involved in the investigation of Aquilia Marcivicci Barnette back in June of 1996?

A. Yes, ma'am, I was.

Q. And what was your part of that investigation?

A. I responded to a crime scene and I had taken a statement from Mr. Barnette.

Q. So you conducted an interview with the defendant, is that correct?

A. Yes, ma'am.

Q. And on what date did you conduct that interview?

A. June 25th, 1996.

Q. Is that the date that he was arrested?

A. It is.

Q. Where did that interview take place?

A. It took place at the law enforcement center.

Q. Approximately what time was that?

A. Of the interview?

Q. Yes.

A. Approximately 7:40, 7:45 at night.

Q. Do you know whether an interview had already been conducted prior to your interview of the defendant?

A. Yes, ma'am.

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
7/30/2002

Page 2772

Q. Tell the jury about that interview.

A. Detective Sanders and Sergeant Sanders had conducted an interview with Mr. Barnette prior to my interview.

Q. And was that in a room that has an audio and video equipment built in?

A. Yes, ma'am, it is.

Q. And that was in the old law enforcement center --

A. Correct.

Q. -- that's no longer?

A. It was demolished.

Q. After that interview was completed, was the videotape reviewed?

A. Yes, myself and Detective Sanders reviewed the tape.

Q. And what determination was made after reviewing that videotape?

A. The audio itself of the tape was of poor quality in certain parts, you just -- you couldn't understand it.

Q. And that was the interview that was conducted by Sergeant Sanders and Detective Mike Sanders?

A. That's correct.

Q. Did you then do an additional interview?

Reported By: Scott A. Huseby, RPR
800-333-2082          Huseby, Inc., an Affiliate of Spherion  (704) 333-9889          Fax (704) 372-4593
Case 3:12-cv-00327-MOC   Document 102   Filed 09/23/15   Page 199 of 286
760

JA1605

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
7/30/2002

Page 2773

A.    Yes.

Q.    Okay.  And what was the purpose of your interview?

A.    The purpose of my interview was to obtain a statement pertaining only to an incident that occurred outside of Charlotte.

Q.    Why was it that you wanted to get a -- was that the Roanoke incident?

A.    The Roanoke incident, yes, ma'am.

Q.    Why was it that you wanted to get a statement only for the Roanoke incident?

A.    We figured at some point in time that that jurisdiction would want a statement from Mr. Barnette and we would go ahead and get that for them.

Q.    Okay.  Now, because of the poor quality of the audio portion of the videotape from the prior interview what did you do?

A.    When we conducted this interview we added a desktop type tape recorder, cassette recorder, inside the interview room.

Q.    Who was in the interview room with you?

A.    Myself and Detective Sanders.

Q.    Okay.  And approximately how long after the interview with Detective Sanders and Sergeant Sanders did your interview take place?

Reported By: Scott A. Huseby, RPR
800-333-2082    Huseby, Inc. an Affiliate of Spherion 0704/333-9889    (704) 372-4593
Case 3:12-cv-00327-MOC    Document 102    Filed 09/26/13    Page 200 of 236

761

JA1606

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
7/30/2002

Page 2774

A.   I would say approximately 15, 20 minutes.

Q.   And did you, with your auxiliary cassette recorder did you make an audiotape of that interview?

A.   Yes, ma'am, we did.

Q.   Did you stop the recorder at any points in time during that interview?

A.   Yes, the recorder was stopped twice during our interview.

Q.   And for what purposes did you stop the recorder?

A.   Clarification on questions that I had asked of Mr. Barnette.

Q.   Was a transcript of that interview prepared?

A.   Yes, ma'am.

Q.   And a cassette tape?

A.   A transcript of the cassette tape, yes, was prepared.

MS. TOMPKINS:   If I could have a moment, Your Honor.

THE COURT:   Yes.

MS. TOMPKINS:   At this point the government would request to publish to the jury previously admitted Government's Exhibits 37A and 37B, the cassette taped interview and the transcript.

THE COURT:   You may.

Reported By: Scott A. Huseby, RPR
800-333-2082          Huseby, Inc., an Affiliate of Spherion  (704) 333-9889          Fax (704) 372-4593
Case 3:12-cv-00327-MOC   Document 102   Filed 09/23/15   Page 201 of 286
762

JA1607

United States of America vs. Aquilia Marcivicci Barnette          3:97CR23-V
Proceedings Before Judge Richard L. Voorhees                         7/30/2002

Page 2775

(Audio played for the jury.  Transcript displayed to the jury.)

                MS. TOMPKINS:  What happened at the time you stopped the recorder now?

                THE WITNESS:  Clarification, I believe.

(Audio played for the jury.  Transcript displayed to the jury.)

                THE COURT:  Now, members of the jury, you have heard the tape recording, the audio portion, and you also viewed a transcript that was presented on your screens simultaneously with the audiotape, and that transcript also undertakes to identify the speakers engaged in the conversation.

        You are permitted to view the transcript as you did for the limited purpose of helping you follow the conversation as you listen to the tape recording and also to help you keep track of the speakers.  The transcript, however, is not evidence.  The tape recording itself is the primary evidence of its own contents.

        You are specifically instructed that whether the transcript correctly or incorrectly reflects the conversation or the identity of the speakers is entirely for you to decide based on what you have heard about the preparation of the transcript and upon your own

Case 3:12-cv-00327-MOC  Document 102  Filed 09/23/15  Page 202 of 286
763

JA1608

Page 2776

examination of it in relation to what you heard on the tape recorder. If you decide that the transcript is in any respect incorrect or unreliable, you should disregard it to that extent. Differences in meaning between what you hear in the recording and read in the transcript may be caused by such things as the inflection in a speaker's voice. You should, therefore, rely on what you hear rather than what you heard- rather than what you read, when there is a difference. Thank you.

MS. TOMPKINS: That's all the questions I have, Your Honor.

CROSS-EXAMINATION

BY MS. LAWSON:

Q. Good afternoon, Investigator Rice. How are you?

A. Fine. How are you?

Q. Fine, thank you. Let me ask you first to clarify something that may be very confusing. Your interview with Marc Barnette would have been the third police interview of that day, is that correct?

A. I'm aware of one prior to mine, but I'm not aware of a third.

Q. Okay. You are aware that when Marc Barnette turned himself in Special Agent Womble and Investigator

United States of America vs. Aquilia Marcivicci Barnette    3:97CR23-V
Proceedings Before Judge Richard L. Voorhees           7/30/2002

Page 2777

Sanders went out to his mother's house and he told them what happened and took them to Billy Graham Parkway, are you aware of that?

A.    Portions.  I'm aware that Agent Womble and Investigator Sanders had some interaction with him; but to the extent, I don't know.

Q.    Okay.  Were you aware that he was interviewed at the FBI office after he turned himself in?

A.    No, ma'am, not that I recall.

Q.    Okay.  So your involvement came after that --

A.    Yes.

Q.    -- when he was at the law enforcement center?

A.    That's correct.

Q.    And are -- is it your testimony that Investigator Sanders and Sergeant Sanders, the two brothers, attempted to interview Marc Barnette and, in fact, interviewed him in the room with the concealed camera and he talked to them about Donald Allen's murder and Robin Williams' murder, do you recall that?

A.    Yes.

Q.    And it was Investigator Mike Sanders who testified just before you came in?

A.    I believe so, yes.

Q.    And you all reviewed that interview about both murders and determined that the audiotape, the sound was

Reported By: Scott A. Huseby, RPR
800-333-2082          Huseby, Inc., an Affiliate of Spherion  (704) 333-9889          Fax (704) 372-4593
Case 3:12-cv-00327-MOC   Document 102   Filed 09/23/15   Page 204 of 286
765

JA1610

Page 2778

inadequate?

A.    Correct.

Q.    And you then decided that you needed the interview purely for the Roanoke case?

A.    Yes, ma'am.

Q.    And that was the interview we just saw?

A.    Yes, ma'am.

Q.    And you and Sergeant Sanders conducted that one?

A.    Investigator Sanders and myself did.

Q.    Okay. Now, it's correct, isn't it, that you told Marc Barnette that you wanted to talk exclusively about the Roanoke case in that interview so that those investigators would have that information?

A.    Correct.

Q.    And when you testified that you stopped the tape a couple of times for clarification, do you remember what you had clarified?

A.    Not specifically. I believe it was related somehow to that previous question that we were speaking of, how that might relate back to Charlotte.

Q.    Okay. Let me ask you if the other time that the tape was stopped he wasn't crying heavily?

A.    I don't understand your question, I'm sorry.

Q.    The other -- well, have you testified that both

Case 3:12-cv-00327-MOC   Document 102   Filed 09/23/15   Page 205 of 286
766

JA1611

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
7/30/2002

Page 2779

times the tape was stopped it was so that he could clarify something?

A. Correct.

Q. Do you recall previously testifying that the recorder was cut off for the first time for Mr. Barnette to compose himself, he hung his head, cried, and we started back?

A. That may well be true, yes.

Q. So if you testified to that at an earlier occasion, that would have been closer to when you actually made your notes?

A. Yes.

Q. Before you started the interview you went into the interview room and noticed that he had been crying heavily even before you started taping?

A. Yes.

Q. And you knew that he had just gone through the entire story with Sergeant Sanders in the tape that had no good audio?

A. Correct.

Q. And he told you that he knew that Donald Allen was the man that he had shot because he had seen his name on his billfold, on his license?

A. He did not tell me that, no.

Q. So you -- but you observed the tape recorded

Case 3:12-cv-00327-MOC   Document 102   Filed 09/23/15   Page 206 of 286
767

JA1612

United States of America vs. Aquilia Marcivicci Barnette 3:97CR23-V
Proceedings Before Judge Richard L. Voorhees 7/30/2002

Page 2780

interview, the videotaped interview with the two Sanders investigators?

A. Yes.

Q. Okay. And you recall him saying that?

A. Yes. He told Detective Sanders and Sergeant Sanders that.

Q. Okay. And you wrote it down in a supplement?

A. Yes, ma'am.

Q. Okay. And that's what you used to testify here today?

A. Correct.

Q. Okay. And you also know that he told Sergeant Sanders and Investigator Sanders that he had gone to church to pray for the man --

A. Yes, ma'am.

Q. -- he had killed? Now, he did tell you before he started the interview that he was confused on some issues, that he didn't remember everything?

A. Yes.

Q. But did he appear to be trying to be truthful and as clear as he possibly could?

A. In my opinion, yes.

Q. Did you notice anything about his demeanor other than the crying that was of significance to you?

A. No, ma'am.

Reported By: Scott A. Huseby, RPR
800-333-2082          Huseby, Inc., an Affiliate of Spherion  (704) 333-9889          Fax (704) 372-4593
Case 3:12-cv-00327-MOC   Document 102   Filed 09/23/15   Page 207 of 286
768

JA1613

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
7/30/2002

Page 2781

Q.    And then at some point he was offered the opportunity to call his mother?

A.    I believe so, yes.

Q.    And do you recall noting in your supplement that he said he wanted a few moments to compose himself before he talked to his mother?

A.    Yes, I do.

Q.    So even after the interview that's just been played, he was -- well, describe how he was that he needed to compose himself.

A.    I'm sorry, I didn't understand the question.

Q.    How was he acting that he needed some time to compose himself?

A.    It's my recollection that that statement made by Mr. Barnette was between the -- it was at the end of the first interview prior to my interview taking place.

Q.    Okay.  The rights that you heard referred to by Sergeant Sanders in that tape recording, what rights were those?

A.    His Miranda.

Q.    Do you know what you all had told him in terms of his Miranda rights?

A.    Those rights were given to him by Agent Womble and I think witnessed by Investigator Sanders.

Q.    So you were aware that Agent Womble had talked

Reported By: Scott A. Huseby, RPR
800-333-2082        Huseby, Inc., an Affiliate of Spherion  (704) 333-9889        Fax (704) 372-4593
Case 3:12-cv-00327-MOC   Document 102   Filed 09/23/15   Page 208 of 286
769

JA1614

United States of America vs. Aquilia Marcivicci Barnette                3:97CR23-V
Proceedings Before Judge Richard L. Voorhees                                  7/30/2002

Page 2782

to him after giving him his Miranda rights?

A. To what conversation they had, no. I was under the understanding, they told me, that, in fact, he had been given his Miranda and waived.

Q. Okay. And do you know the Miranda rights that Investigator, or Special Agent Womble gave him?

A. Do I know them?

Q. Yeah. Every police officer memorizes them, right?

A. Yes.

Q. Okay. Would you tell the jury what Special Agent Womble would have told Marc Barnette when he gave him his Miranda rights?

A. It was done, to the best of my knowledge, on a preprinted form that the FBI uses, which is separate from ours, and verbatim I cannot tell you what that form says.

Q. What are the -- would you just recite the Miranda rights that you've referred to?

A. The person has the right to remain silent, anything they say can and will be used against them in a court of law; they have the right to an attorney; if they cannot afford an attorney, one will be presented to them free of charge before any questioning; if they decide to answer questions now, they have still have the

Reported By: Scott A. Huseby, RPR
800-333-2082          Huseby, Inc., an Affiliate of Spherion  (704) 333-9889          Fax (704) 372-4593
Case 3:12-cv-00327-MOC   Document 102   Filed 09/23/15   Page 209 of 286
770

JA1615

Page 2783

right to stop answering questions until they have spoken to an attorney.

MS. LAWSON: No further questions, thank you.

MS. TOMPKINS: No questions.

THE COURT: You may step down.

MS. ROSE: Your Honor, may we approach?

THE COURT: Yes. Excuse us, members of the jury. You may be at ease.

(Beginning of bench conference.)

MS. TOMPKINS: The next witness is Agent Officer Bob Holl. We will not finish it. He is about we have a tape to play and the tape lasts for an hour, so we can either start and break in the middle or break for the day and start in fresh tomorrow.

THE COURT: Do you have a preference?

MR. BENDER: Yes, sir, I think you know what it is.

MS. TOMPKINS: I think it would be cleaner if we could start fresh in the morning.

THE COURT: You don't have something you could go over?

MS. TOMPKINS: Same kind of thing as the other witnesses.

THE COURT: Members of the jury, we have

Reported By: Scott A. Huseby, RPR
800-333-2082          Huseby, Inc., an Affiliate of Spherion (704) 333-9889          Fax (704) 372-4593
Case 3:12-cv-00327-MOC   Document 102   Filed 09/23/15   Page 210 of 286

JA1616

Page 2784

reached a good stopping point -- now that we have a court reporter, we have reached a good stopping point, and so we will ask you to remember the usual instructions and take care about those things and we will see you in the morning at 9:30.  Thank you for your attention to the case today.

(The jury left the courtroom.)

THE COURT:  Anything for the Court before we recess for the day?

MS. LAWSON:  Your Honor, can we reconstruct the side-bar in the presence of the defendant?

THE WITNESS:  Yes.  Thank you for reminding me.  The side-bar had to do strictly with whether we wanted to go forward with the next witness, it being approximately 20 minutes until 5:00 and the witness is expected to play a tape that takes about an hour, so rather than break it in the middle at 5:00, we decided to go forward in the morning, so that was the gist of it.

*    *    *

Reported By: Scott A. Huseby, RPR
800-333-2082     Huseby, Inc., an Affiliate of Spherion  (704) 333-9889     Fax (704) 372-4593
Case 3:12-cv-00327-MOC   Document 102   Filed 09/23/15   Page 211 of 286
772

JA1617

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION

UNITED STATES OF AMERICA    )    DOCKET NO. 3:97-cr-23-V
                            )
        vs.                 )
                            )
AQUILIA MARCIVICCI BARNETTE, )    VOLUME 14
                            )    MORNING
        Defendant.          )
_____)


                    TRIAL PROCEEDINGS
        BEFORE THE HONORABLE RICHARD L. VOORHEES
           UNITED STATES DISTRICT COURT JUDGE
                   JULY 31, 2002

<u>APPEARANCES</u>:

On Behalf of the Government:

        ANNE M. TOMPKINS, ESQ.
        JILL WESTMORELAND ROSE, ESQ.
        227 West Trade Street, Suite 1700
        Charlotte, North Carolina

On Behalf of the Defendant:

        JEAN B. LAWSON, ESQ.
        P.O. Box 472106
        Charlotte, North Carolina

        HAROLD J. BENDER, ESQ.
        200 North McDowell Street
        Charlotte, North Carolina


                Cheryl A. Nuccio, RMR-CRR
                 Official Court Reporter
               United States District Court
                 Charlotte, North Carolina

Case 3:12-cv-00327-MOC   Document 102   Filed 09/23/15   Page 212 of 286

*773*

**JA1618**

WEDNESDAY MORNING, JULY 31, 2002

(Chambers conference. Defendant not present.)

THE COURT: Counsel have joined the court in chambers for a scheduling conference.

MR. BENDER: Yes, sir. This is concerning scheduling. The government's case, I think originally we thought it would take a week and it's moved, I think, a little more rapidly than anybody thought. As a result, we're having witness problems. And we have a certain sequence in which we want to present our evidence which we think would be the most effective way. And as a result of that and our witness problems, we want to ask the court to allow -- regardless of when they end, to allow us to start on Monday, Monday morning.

THE COURT: Would your problem necessarily preclude Friday, say?

MS. LAWSON: We've spent the better part of last night and this morning trying to figure out how to patchwork it together and finally realized this morning that we were compromising our client's presentation of the case by trying to fit people in on Friday in a patchwork fashion. We certainly considered trying to alter our presentation to accommodate the problems and also to, you know, keep the case going, but finally concluded that we're not going to be able to do the job we had planned to do and we set to do if we have

to take people out of order, basically.

THE COURT: What is your best estimate of the defense case time?

MR. BENDER: We believe we will be through sometime on Wednesday, maybe even Tuesday.

THE COURT: Of next week?

MR. BENDER: Of next week, yeah. But definitely Wednesday.

THE COURT: And I know the government has at least one rebuttal witness.

MS. ROSE: We have probably a day of rebuttal evidence.

MS. ROSE: We anticipate concluding by lunch tomorrow.

THE COURT: Okay. Okay. I think we can handle that. So in deference to the defense sequence and scheduling problems, we'll contemplate concluding government evidence this week, beginning defense evidence next week.

MR. BENDER: Okay.

MS. LAWSON: Thank you very much.

MR. BENDER: Thank you, Judge.

THE COURT: Very well.

MS. ROSE: Thank you.

THE COURT: Thank you all very much.

(End of chambers conference.)

THE COURT: May we have the jury, please.

(Jury entered the courtroom.)

THE COURT: Good morning, members of the jury.

THE JURY: Good morning.

THE COURT: We took up some scheduling matters while you were waiting and we appreciate you being here on time, however, even though we weren't able to get to you right away.

You may call your first witness.

MS. TOMPKINS: Government calls Investigator R.A. Holl.

ROBERT A. HOLL,

being first duly sworn, was examined and testified as follows:

DIRECT EXAMINATION

BY MS. TOMPKINS:

Q. State your name, please.

A. Robert A. Holl.

Q. And remind the jury of who you are.

A. I was the investigator that worked the case of the victim Donald Lee Allen.

Q. And you testified previously about processing the crime scene at Morris Field and Billy Graham; is that correct?

A. That's correct.

Q. In June of 1996, tell the jury what position you held.

A. Homicide investigator, felony investigations, Charlotte

Police Department.

Q. Now, on the date that the defendant, Aquilia Barnette, was arrested, where were you while he was being interviewed by your colleagues?

A. Morris Field and Billy Graham at the crime scene where the victim was located.

Q. And you did not participate in any of those interviews at that date; is that right?

A. That's correct.

Q. Now, was a federal detainer put on him on that date?

A. Yes, there was.

Q. And what was the -- what is that?

A. He was in -- basically, in the custody of the federal authorities, from what I was told by an FBI agent, for the murder in Virginia. Once he's placed in the Mecklenburg County Jail, a local law enforcement agent cannot get that individual out of the Mecklenburg County Jail system.

Q. So after his interviews with Charlotte-Mecklenburg Police Officers Sanders and Rice, after that time a federal detainer was put on him; is that right?

A. My understanding a detainer was on him at the time he was actually arrested.

Q. Okay. And Federal Agent Womble, who was part of his arrest process.

A. Correct.

Q. Now, when was that detainer lifted?

A. Around noontime Friday, the 28th of June.

Q. And what was the effect of that?

A. It automatically put him in state custody. The murder warrants for Mecklenburg County, then, were served on him that afternoon.

Q. And that federal detainer was not related to the murder necessarily, but was it related to the unlawful flight to avoid prosecution?

A. From Virginia, yes, ma'am.

Q. Okay. Now, June 28th, 1996, the defendant was in state custody; is that correct?

A. That afternoon.

Q. And what did you do on that afternoon?

A. After being instructed by one of my immediate supervisors, myself and one investigator went over to the Mecklenburg County Jail. The defendant was in front of the state magistrate being served with a warrant. I then took custody of that individual and brought him over to the Law Enforcement Center for the purpose of interviewing him.

Q. Now, did you advise him of his right to counsel?

A. When I got back to the station. When I first arrived, I asked him if he needed to utilize the restroom. He stated no. Asked him if he wanted anything to eat. He said yes, because he missed both meals being transported between the

jail system within Mecklenburg County. I had an investigator go out and get the food that he requested.

Then I sat down with him, put him in an interview room and advised him of his constitutional rights according to Miranda.

Q. How do you do that? Describe for the jury that process.

A. The form I used was the same form that was utilized on a prior interview with him with Investigator Sanders, and basically goes over the -- you have the right to remain silent. You have the right to have an attorney present during questioning. Had the blanks on it where his name, date of birth and everything completed.

My standard of what I do, one portion of the waiver I had the defendant actually read. That way I know he can comprehend what's going on. Also, that I know for a fact that he can read what he's looking at.

Q. All right. Did he appear to understand the rights as you advised him?

A. He understood the section that he read out loud. I then had him initial it at the end of that sentence. Once he stated that he understood his rights, I asked him if he would sign the form, which he did.

Q. And he did waive his right to silence and to an attorney; is that correct?

A. Yes, ma'am.

Q. Describe for the jury the process that you used to conduct an interview.

A. When I first sat down with him, in order to establish a rapport with him, knowing that eventually I wanted to start a taped interview with him. A tape recorder can be an inhibitor. You put a tape recorder in front of somebody, they may get nervous; they may not. Not knowing the individual, I sat down and just spoke to him. Got his general information -- name, address, date of birth -- in order to get a flow of communication going between the two of us. He actually spoke to me first. Answered a couple questions that he had, and then went into an interview of the defendant of asking him, Marc, what happened?

Q. Okay. Now, did you note in your report that initial interview that you did before you started the recorder?

A. Yes, I did.

Q. Now, what was his demeanor when you spoke to him on June 28th, 1996?

A. Calm and cooperative.

Q. Did he give you a statement?

A. Yes, he did.

Q. Did you tape record that statement?

A. Yes, I did.

Q. And did you have a transcript of that statement prepared?

**780**

**JA1625**

A.     I did.

MS. TOMPKINS:  Your Honor, at this time we would like to publish to the jury what has been previously marked and introduced as Government's Exhibits 38A and 38B.

THE COURT:  Okay.  Let them be admitted.  Now, one is the tape and one is the transcript; is that right?

MS. TOMPKINS:  That's correct.  38A is the tape. 38B is the transcript.

THE COURT:  Okay.  Members of the jury, you'll recall my instruction earlier about use of a transcript and the instruction I gave you about that.  Essentially, that it's the tape that's the evidence, not the transcript.  So if there is any difference, you'd be guided by what you hear, not what you see on the paper.  Thank you.

(Government's Exhibits Numbers 38A and 38B were published to the jury.)

BY MS. TOMPKINS:

Q.     Investigator Holl, I've got some follow-up questions for you.

Do you know, based on your training and experience, what the effect of coloring the lens of a flashlight red is?

A.     Yes, I do.

Q.     What is that?

A.     It dulls the light.  Through prior military experience, it allows the individual with the light to see a small

distance in front of them but not to let others looking at them see the direct light.

Q. And you mentioned that -- was there a second flashlight found in the vehicle?

A. Yes, there was.

Q. And describe that to the jury.

A. It's the same as what was on the shotgun. Small mag light with a red lens on the cover.

Q. And were there handcuffs found in the vehicle?

A. On the interior rear view mirror.

Q. And did the defendant tell you that those were his?

A. Yes, he did.

Q. Now, in the interview, what color did the defendant say the Prelude was?

A. Black.

Q. Now, at that point were you aware that he had been interviewed previously by Investigator Rice?

A. No, I did not.

Q. You weren't aware that he had previously identified that as a blue Prelude?

A. No, I did not.

Q. How many days did the defendant drive that vehicle?

A. From the morning of the 22nd until late the 25th.

Q. And -- so he had driven the car three days, correct?

A. Correct.

Q.   And he had scraped off the inspection sticker; is that right?

A.   Yes, ma'am.

Q.   And did he talk to you about changing the license tag?

A.   Yes, he did.

Q.   And he had talked to you about two times where he had attached a hose to the tail pipe; is that correct?

A.   With duct tape.

Q.   Now, based on the -- what you learned from investigators, what did you do in terms of the tail pipes on the Honda Prelude?

A.   From what I learned from the interview that Investigator Sanders conducted, I went back down to the Prelude which I kept in custody underneath the Law Enforcement Center and had the tail pipes cut off the car.

Q.   Why is that?

A.   Because I recalled from the initial viewing of the car back when I processed the vehicle to the time of what I was told that the defendant had put a hose in the tail pipe and connected it with duct tape, that I didn't see any residue of the tape to establish that.

Q.   I'm going to show you what's been marked as Government's Exhibit 71 which is a box and ask you to examine that box and tell me if you recognize it.

A.   Yes, ma'am.

Q. What is that?

A. It's a box that states that it contains the exhaust pipes from a Honda Prelude.

Q. All right. And did you ask for those to be cut off?

A. I did.

Q. Okay. Could you open that box.

(Witness complied.)

Q. What does that contain?

A. The rear exhaust system from the Honda Prelude.

MS. TOMPKINS: And may I approach, Your Honor?

THE COURT: Yes.

Q. And let me show you -- are they packaged up?

A. Yes, they are.

Q. Are they in substantially similar condition or the same condition they were when you had them cut off the Honda Prelude?

A. Yes, ma'am.

Q. And I'm going to show you what's been marked as Government's Exhibit 71A and 71B. Are both of those in substantially the same condition as when you had them cut off?

A. Yes, they are.

MS. TOMPKINS: Your Honor, at this time I would move admission of Government's 71, 71A, and 71B.

THE COURT: Let them be admitted.

**784**

**JA1629**

(Government's Exhibits Numbers 71, 71A, and 71B were received into evidence.)

Q.   Now, take those out of the bags, Investigator Holl.

(Witness complied.)

Q.   As a homicide investigator, did you ever have the occasion to go to the scene of a suicide by carbon monoxide poisoning?

A.   Yes, ma'am, I have.

Q.   Approximately how many times?

A.   Approximately a dozen.

Q.   And were those carbon monoxide poisonings by the same -- by the mechanism of using a hose attached into the vehicle?

A.   It was either by attaching a hose inside to the vehicle from the exhaust system or a car was inside a closed garage with the door closed, the windows open on the car, the victim inside the motor vehicle with the engine running.

Q.   Now, on the occasions wherein the person committed suicide by use of a hose and a tail pipe, on those occasions did you have the opportunity to view the tail pipes in the suicides that you investigated?

A.   Yes.

Q.   Okay.  And when you looked at the tail pipes from Donnie Allen's Prelude, was that consistent with what you had previously seen in carbon monoxide suicides?

A.   No, it's not.

Q. In what way?

A. There's no tape residue that I have noticed on the tail pipes that I did not notice on the day that I had these cut off.

Q. And were the tail pipes then and are they now consistent with the defendant's story of having twice taped a hose to those tail pipes in order to attempt suicide?

A. No. When duct tape is attached, being that duct tape is so sticky, when duct tape connects to itself, you cannot peel it apart. When duct tape gets on something that's hot, the glue actually transfers over to the item that it's attached to. It doesn't come off. You can take the tape off, but the glue doesn't come off.

Q. And in Mr. Barnette's statement to you, the second suicide attempt he said he went unconscious; is that correct?

A. That's correct.

Q. And how hot does the tail pipe get when the car is running?

A. I don't know temperature wise. I know that if you touch it, you're going to get burned.

Q. And again, did you notice at the time that you had those tail pipes cut off the Prelude tape residue?

A. No, ma'am.

Q. Did you see any melted tape on the end of the hose?

A. The hose I'd have to say I didn't look at.

Q.    Okay.  Was there any melted duct tape in the trunk of the vehicle?

A.    No, there was not.

MS. TOMPKINS:  Thank you.  That's all the questions I have.

CROSS EXAMINATION

BY MR. BENDER:

Q.    Mr. Holl, you found some -- a garden hose that had been cut, did you not?

A.    I'm sorry, sir?

Q.    You found a garden hose that had been cut.

A.    That was located by a different investigator and the crime scene technician out at the scene where the car was located.

Q.    But you found it.  Somebody did.

A.    Correct.

Q.    You found some Compoz, some No Doz, some sort of over-the-counter sleeping product?

A.    A sleeping product box of Compoz that contained twelve -- originally unopened would contain twelve; there were six left, which is consistent with what the defendant said he took.

Q.    Okay.  And you found a receipt from a Sears in Knoxville for the hose.

A.    Yes, I did.

Q.    Okay.  And a church bulletin.

FORM FED ® PENGAD · 1-800-631-6989

JA1632

A.   Yes.

Q.   Along with all the other stuff in the bag that you've described.

A.   Yes, sir.

Q.   And this was the fourth interview that had been conducted?

A.   When I conducted my interview, I only knew of one prior to that.

Q.   Okay.

A.   And that was the one from Investigator Mike Sanders.

Q.   Okay.  You didn't know about Tony Rice's --

A.   No.

Q.   -- interview?

A.   No, I did not.

Q.   Or the interview by Agent Womble at the FBI office?

A.   No, I did not.

Q.   But you were the chief investigator.  You were the lead investigator in this matter.

A.   I was the investigator that was assigned to the case involving Mr. Allen.  There were two supervisors, two sergeants that were, per se, calling the shots as to what would be done and what would not be done on the case.

            MR. BENDER:  Okay.  I think that's all.  Thank you.

            THE WITNESS:  Yes, sir.

            THE COURT:  You may step down.

(Witness stepped down.)

THE COURT: Members of the jury, we'll take our morning break at this time. Please recall the usual instructions. We'll call for you in about fifteen minutes.

(Brief recess at 10:57 a.m.)

THE COURT: May we have the jury, please.

(Jury entered the courtroom.)

THE COURT: Government would call Crystal Dennis.

CRYSTAL DENNIS,

being first duly sworn, was examined and testified as follows:

DIRECT EXAMINATION

BY MS. ROSE:

Q.   Would you state your name, please, ma'am.

A.   Crystal Dennis.

Q.   You'll need to speak up so that the members of the jury can hear you.

Ms. Dennis, where do you live?

A.   Noonan, Georgia.

Q.   Pull that mike towards you, please, or move up.  I know you're pregnant.  It's hard.

(Witness complied.)

Q.   You live in Noonan, Georgia?

A.   Yes, ma'am.

Q.   How long have you lived in Noonan, Georgia?

A.   All my life.

Q. Do you have family there?

A. Yes.

Q. Do you work?

A. Yes.

Q. Where do you work?

A. I'm getting my apprenticeship cosmetology.

Q. Do you know the defendant in this case, Marc Barnette?

A. Yes, I do.

Q. How did you meet the defendant?

A. I met him through my half brother, Anthony Britt.

Q. And what was his relationship with Anthony?

A. I guess at the time, I guess they was friends or buddies, or whatever.

Q. When you met the defendant, was he involved in a relationship with someone else?

A. Yes, he was.

Q. Who was that?

A. Natasha Heard.

Q. Heard, H-e-a-r-d?

A. Uh-huh.

Q. And was Anthony Britt Natasha's brother?

A. No, he was my brother.

Q. I'm sorry. What did you call the defendant?

A. Marc.

Q. Did -- when you first met, what were your initial

impressions?

A.    I thought he was cute and he was sweet.

Q.    How frequently did you see him?

A.    Every day.

Q.    Was that generally because he was with your brother or did he come -- at some point come see you specifically?

A.    He would come over to my mom house where I was staying to see me.

Q.    And eventually, did you two get involved in a relationship?

A.    Yes, we did.

Q.    And at some point, then, did the two of you actually move in together?

A.    Yes, we did.

Q.    Did -- was it your apartment or his apartment?

A.    His apartment.

Q.    And what was the name of that apartment complex?

A.    Chestnut Lane Apartments.

Q.    And that was in Noonan?

A.    Yes, it was.

Q.    When you and the defendant moved in together, did you have children from another relationship?

A.    Yes.

Q.    How many?

A.    Two.

Q. How old were your children?

A. I think at that time they was probably one or two.

Q. When you first moved in together, describe the relationship.

A. Everything was good. I mean, he was sweet. I mean, did everything. Cooked, cleaned, worked.

Q. Did your children like him?

A. Yes.

Q. Did he seem to act like he liked the children?

A. Yes.

Q. In fact, at that time what shift were you working?

A. Well, when we first met I wasn't working. Well, I was working -- yes, I was. I was working at Burger King when we first met.

Q. Did you eventually quit your Burger King job?

A. Yes, I eventually quit.

Q. Why?

A. Just like at the time going through things with him. He didn't want me working.

Q. Now, did he have any relatives in the area?

A. No, not at that time.

Q. Eventually did he have some family there?

A. The only person I know that was there was just him and Natasha. His mom lived in Atlanta.

Q. Okay. And how far is that from Noonan?

JA1637

A. All depends. Usually about 40, 45 minutes to an hour.

Q. Did you meet his mother?

A. Yes.

Q. Did she come to visit you all frequently?

A. She came on occasion she came down, yes, and we went to visit her.

Q. During your relationship did the defendant talk to you about his mother or his childhood?

A. No.

Q. Did he ever indicate that he had a sad, vicious or violent childhood?

A. No.

Q. Did he seem to have a close relationship with his mother?

A. Yes.

Q. After a while did the nature of your relationship change?

A. Yes, it did.

Q. In what way?

A. Marc had got to the point where he didn't want me leaving the house without him. I couldn't go anywhere, couldn't go visit my friends or do anything unless he was with me.

Q. What else did he do?

A. He was jealous, abusive.

Q. Abusive in what way?

A. He would hit me, jump on me, fight.

Q. How frequently did that happen?

A. It's hard to remember it was so many times. It was over any little thing. Probably maybe once or twice out of the week we would go without fighting.

Q. Now, did -- during this time, had you gotten another job?

A. Yeah. I went back to Burger King. Well, I went to Dan River and I wasn't there long because of transportation wise, but eventually I wound up going back to Burger King because I moved out with him and got my own apartment.

Q. But before you moved out from the defendant, where were you working?

A. At that time no where.

Q. Well, didn't you have a second shift job such that he would care for your children?

A. That was the time I was at Dan River when I had the second shift job.

Q. And what was Dan River?

A. We did pillowcases and sheets.

Q. And what time was second shift at that particular plant?

A. I think I was working from three till eleven.

Q. And what were the child care arrangements?

A. Well, he was off at night and I worked. Well, he was off during the morning and I work at night so he would keep the

kids while I was at work.

Q. On January the 23rd, 1993, if you'll turn your attention to that date. What happened?

A. I recall I think Marc had got up and left. I don't remember if he went to the store or -- he went somewhere, and my son came into the room and he told me -- he was showing me the marks. He told me to look what Marc did.

And I was like, Well, how did he do this?

He was like, He hit us. He whipped us with a clothes hanger.

And I was like, Why did he whip you with a clothes hanger?

He was like, Because we didn't eat all our food.

Q. And what was your son's name?

A. Mario.

Q. And was the defendant around when Mario told you this?

A. No, he wasn't.

Q. How long after it had happened did Mario tell you what the defendant had done?

A. I'm thinking it was the same night because the marks, the cuts and everything was open. That next morning he got up and told me about it because they was in bed asleep when I got home.

Q. Your son at that point was old enough to be very communicative?

A. Yes, uh-huh.

Q. When they told you the defendant had beaten them with a coat hanger, what did you do?

A. I was upset and when he got home I confronted him about it and we got to fighting. And the next day I had to go to work, I took them to my mom's house.

Q. Now, you say you got in a fight. Describe what the defendant did to you when you confronted him about --

THE COURT: Excuse me just a minute. The microphone isn't cooperating with us. If you stay back from the microphone but keep your voice up, it will work fine.

But don't tell her to move closer to the mike. It's just a matter of keeping their voice up, okay. Thank you.

Q. All right. Now, --

THE COURT: I'm sorry, we were hearing extraneous noises and the machine wasn't working well. Go ahead.

Q. When you confronted the defendant, what did he do?

A. We got to arguing and then we started fighting. You know, he started punching me and hitting me and I tried to fight back.

Q. Where did he hit you?

A. In my face. He kicked me. Wherever he could hit me, he hit me.

Q. Did he leave after that argument or stay there?

A. He left after that argument and then he come back.

them, I sent my kids there.

Q.   Did the defendant eventually leave and go to his mother's?

A.   Yes, he left.  He took my car and went to Atlanta where his mom was.

Q.   Did he have a car?

A.   He had a car, but his brakes was locked up on it.  He couldn't move it.

Q.   Had you given him permission to take your car?

A.   No.

Q.   When he went to his mother's in Atlanta, how long did he stay?

A.   If I'm not mistaken, I think it was one day because the detectives, when they came to my mom house, somehow they wired the phone and got me to sweet talk him to come back down because that was the only way I could get my car back.

Q.   And were you able to talk him into coming back?

A.   Yes.

Q.   Did you recover your car?

A.   Yes.  They arrested him that day.

Q.   And -- all right.  I'm going to show you what's been previously admitted, marked, and identified as Government's Exhibit 52E and 52F.  Actually, let me approach the witness. Tell me if you can identify these.

A.   Yes.  This is my son Mario and this is where he had --

the marks on his back where he had beaten him with the clothes hanger.

Q. Are those the photographs that were taken by the Noonan Police Department?

A. Yes.

Q. And do they fairly and accurately represent the injuries your son had suffered at that time?

A. Yes.

MS. ROSE: Your Honor, at this time I would move to admit previously marked Government's Exhibit 52E and 52F.

THE COURT: Let them be admitted.

(Government's Exhibits Numbers 52E and 52F were received into evidence.)

Q. Government's Exhibit 52E, can you tell us what that is.

A. That is where he's pointing to the marks in his back where he was beaten with a clothes hanger. Where he got the cuts.

Q. Government's Exhibit 52F.

A. That's the lowest part -- the lower part of his back where he also had the cuts on his back from the clothes hanger.

Q. Did you also at this time speak with individuals from the Child Protective Service about what had happened to your children?

A.    No, huh-uh.

Q.    Show you Government's Exhibit 52C.  Take a look at that exhibit, please, ma'am.  Are you able to identify it?

A.    Yes.  This is another cut from the clothes hanger on the lower part of his side.

Q.    On the other side?

A.    On the other side.

Q.    Was that taken at the same time as the other photographs?

A.    Yes.

Q.    And does that photograph fairly and accurately represent Mario's injuries?

A.    Yes.

         MS. ROSE:  At this time, Your Honor, I would move to admit 52C.

         THE COURT:  Let it be admitted.

         (Government's Exhibit Number 52C was received into evidence.)

Q.    And what is the hand pointing to there?

A.    That hand pointing is showing to one of the cuts that was made from the clothes hanger.

Q.    Also, Mario's arm?

A.    His arm.  I can't really tell because I knew he had chicken pox.  I think some of the spots from his arm are from the chicken pox that he had.

Q.    Okay.  After you met with detectives, did they initiate charges against the defendant?

A.    Yes.

Q.    And was he eventually convicted of those charges?

A.    Yes.

Q.    Did the two of you ever reconcile?

A.    No.

Q.    And did you move from the apartment that you two had shared at that time?

A.    Yes.

Q.    How old are your children now?

A.    They're thirteen and fourteen.

Q.    How are they doing?

A.    They're doing fine.

Q.    Had any lasting effects?

A.    No.

            MS. ROSE:  Thank you.  I have no other questions at this time.

                        CROSS EXAMINATION

BY MS. LAWSON:

Q.    Good morning, Ms. Dennis.  How are you?

A.    Fine.

Q.    Good.  Let me just back up to the beginning of your relationship with Marc Barnette.  When you first met him, you said your half brother, Anthony Britt, introduced you to him.

A. Yes.

Q. And is it correct that Anthony wanted him to spend time with you so that he could begin dating Tasha, Tasha Heard?

A. Eventually later that's what I found out, yes. That's how it all went down.

Q. Okay. So before you met Marc, he was with Natasha Heard who was called Tasha, right?

A. Yes.

Q. And that was in Noonan, Georgia?

A. Yes.

Q. And that's Coweta County?

A. Yes.

Q. So Anthony got you together with Tasha -- I mean, you together with Marc so he could spend time with Tasha, and there was -- there was some trouble about that between Marc and Anthony, wasn't there?

A. Yes, there was.

Q. And do you recall a time when Marc was over at your house and Anthony came over to the house and they had some words?

A. They wasn't at my house. What had happened was when Marc was leaving my house heading home, they got into it at the railroad tracks where he was heading home.

Q. Marc was on his way home from your house?

A. Yes.

Q. And so your understanding -- okay. What happened -- who

was with Anthony Britt when they met at the railroad tracks?

A.    If I'm not mistaken, I think it was my brother Anthony, I think Felton James, and I think Victor -- Victor Montgomery.

Q.    And as a result of what happened at the railroad tracks, Marc shot Anthony, didn't he?

A.    He shot at him, yes.

Q.    And Anthony was charged with some kind of fighting charge and Marc was charged with a misdemeanor arising from that; is that right?

A.    Yes.

Q.    And it was sometime after that that you and Marc began dating and moved in together; is that right?

A.    Yes.

Q.    Now, I believe you testified that in the beginning Marc cooked, cleaned, worked a job. The children liked him; he liked them. And he took care of them.

A.    Yes.

Q.    Now, your mother lived in Noonan; is that right?

A.    Yes.

Q.    But you didn't take them over to her.

A.    No.

Q.    Now, you also testified that he was -- well, he was controlling.

A.    Yes.

Q.    Possessive.

A.    Yes.

Q.    Insanely jealous.

A.    Yes.

Q.    And was he that way through your whole relationship or did that just start after a while?

A.    It just started after a while.

Q.    For the first, what, three to six months everything --

A.    Yes, from the first three to six months.

Q.    He followed you sometimes.

A.    Yes.

Q.    If you left the house, he wanted to know where you were going.

A.    He came looking for me, yes.

Q.    And during the arguments that you had, occasionally you'd hit him back, right?

A.    Yes.

Q.    He accused you of dating other men.

A.    Yes.

Q.    Seeing other men.

A.    Yes.

Q.    Being unfaithful to him.

A.    Yes.

Q.    Now, when he -- when you reported -- or was it your mother who reported the incident with your children?

A.    Yes.

Q.   And if Captain Yarbrough recorded their ages as three and five, would that refresh your recollection about how old they were when it happened?

A.   Probably was, yeah.

Q.   Okay.  Now, he left before the police got there; is that right?

A.   Yes.

Q.   And you -- what did you say to him to get him to come back?

A.   Well, the only thing that they told me to do was talk him into coming back.  That was the only way I could get my car back, you know.  That we would work things out, whatever.

Q.   Okay.  And he came back.

A.   Yes, he came back.

Q.   Okay.  And that's when he was arrested and put in the Coweta County Jail.

A.   Yes.

Q.   Now, after he got out of the Coweta County Jail -- strike that.

     While he was in the Coweta County Jail, you visited him, didn't you?

A.   Yes.  I visited on behalf because he kept calling my mom house, and the only way I would get him to stop was to go see what he wanted because my mom had got tired of him ringing her phone.

Q. Okay. Were you there at her house?

A. Yes, because I didn't have a phone at the time.

Q. Okay. So he kept calling to try to reach you and talk to you?

A. Yes.

Q. How many times would you say he called?

A. It's been so long, I can't recall how many time he called a day.

Q. Numerous times each day?

A. Yes.

Q. What did he say to you when you went to see him at Coweta County Jail about this?

A. He was just -- just talk and see if I could talk to the D.A. to get them to drop charges, or whatever.

Q. Did he tell you he still had feelings for you?

A. Probably did. I can't recall.

Q. Do you recall that he moved back in with you for about a week after he got out of jail?

A. It wasn't a week he moved in with me, he moved back in with me. He only was there to call to get somebody to come and get him because his car was messed up. And I think at that time he was seeing some girl on a job that he was working with. I don't know how he got back up there. But no, he didn't move back in with me.

MS. LAWSON: No further questions.

MS. ROSE: I have no other questions.

THE COURT: You may step down.

(Witness stepped down.)

MS. ROSE: James Yarbrough.

JAMES YARBOUGH,

being first duly sworn, was examined and testified as follows:

DIRECT EXAMINATION

BY MS. ROSE:

Q. Would you state your name and spell your last name, please, sir.

A. My name is James Yarbrough. It's Y-a-r-b-r-o-u-g-h.

Q. Where do you work?

A. Coweta County Sheriff's Office.

Q. Is that in Georgia?

A. Yes. It's in Noonan, Georgia.

Q. How long have you been employed with the sheriff's department?

A. I've been with the sheriff's department since 1994. I've been in law enforcement for twenty-five years.

Q. Back in 1993, what was your position in law enforcement?

A. I was a detective with the Noonan Police Department. I was a sergeant.

Q. And in January of 1993, did you meet a Ms. Crystal Dennis and make a report concerning assault on she and her children?

A. Yes, I did.

Q.   Do you recall where you met with her?

A.   At her mother's home.

Q.   And who was there besides Ms. Dennis?

A.   Ms. Dennis, her mother, her children, and we had a Department of Family and Resource worker there, also.

Q.   What did she tell you had occurred?

A.   She advised me that a couple nights before, that her boyfriend was watching her children while she worked a second shift job.  During that time he whipped the children using a metal coat hanger.  He caused excessive pain to the children.  He left scars and marks and welts on the children.  They were a three-year-old and a five-year-old.

Q.   A boy and a girl?

A.   That is correct.

Q.   Did you, on the occasion that you spoke with Ms. Dennis, look at the children?

A.   Yes, I did.  And I also photographed the injuries made to the children.

Q.   Describe the injuries that you saw on that occasion.

A.   The injuries were not on the backside of the child, they were more up on the chest and the back side area of the children, on the backs of the children.  The -- some of the marks on the children were -- you know how the curved hook is on the metal coat hanger, you could see that mark on the children.  And it had started -- it had scabbed up, some of

them, and you could still see where the hook, the imprint was made on them.

Q. Were you able to communicate with the children and talk to them about what had happened?

A. Yes.

Q. I'm going to show you what have been marked and identified as Government's Exhibit 52E, 52F, 52C. First 52C. Can you identify that photograph?

A. Yes. That's the mark on the little three-year-old, Mario Weaver. That's one of the marks from the coat hanger on his side.

Q. 52E?

A. Some more of the marks on his back.

Q. And 52F?

A. On his arm. The marks.

Q. And are those photographs that you took?

A. Yes, it is.

Q. All right, sir. After you photographed the children and -- did you also speak to Ms. Dennis about any injuries that she had?

A. Yes. She told me that when she confronted her boyfriend, the defendant, about this, that he became argumentative. That he struck her and tried to choke her.

Q. And did you check her to see if there were any wounds or injuries?

A.   Yes.  The side of her face was swollen where she had been struck.

Q.   Now, did you make an incident report --

A.   Yes, I did.

Q.   -- of your contact with her?

Show you what I have marked as Government's Exhibit 53A. If you would take a glance at 53A.  Are you able to identify those documents?

A.   Yes, I am.  This is my incident report from that date.

Q.   All right.

MS. ROSE:  Your Honor, I would move to admit Exhibit 53A.

THE COURT:  Let it be admitted.

(Government's Exhibit Number 53A was received into evidence.)

Q.   Once you completed your incident report and documented what you learned, what did you then do?

A.   Went to our local magistrate and had warrants issued on the defendant for cruelty to children and for simple battery to his girlfriend.

Q.   And was the defendant arrested on those charges?

A.   Yes, he was.

Q.   Describe the circumstances under which he was arrested.

A.   He was not at the scene where the incident -- where we interviewed the children and Ms. Dennis.  But a few days later

he came back to Coweta County. He was arrested at that time at her apartment when he arrived.

Q. And was that the Pinewood Villas?

A. Yes. 1C Pinewood Villa.

Q. When he was arrested, was the defendant interviewed?

A. Yes, he was.

Q. Who interviewed him?

A. I did.

Q. Do you recall the date and time of that interview?

A. The date was the 28th day of January, 1993. The time exactly I do not recall.

Q. Show you what I've marked as Government's Exhibit 53B. If you would take a look at 53B. What is it?

A. That is the statement given by the defendant about the incident about the cruelty to children and striking Crystal Dennis.

Q. And when was -- does it have a date on there as to when --

A. Yes, it does.

Q. -- that was taken?

A. The 28th day of January, 1993.

MS. ROSE: I'd move to admit Government's Exhibit 53B, Your Honor.

THE COURT: Let it be admitted.

(Government's Exhibit Number 53B was received into

evidence.)

Q. What did the defendant tell you had happened?

A. He advised me that he was baby-sitting the children while Crystal was at work. That the three-year-old had removed the laces from his shoes and that's why he spanked him with a metal hanger. He did not recall why he struck the five-year-old little girl, Jessica.

Also, he said when they argued, sometimes he did strike Crystal. He said not that often, but he did at times strike her.

Q. Did he indicate that he and Crystal had had problems before over the discipline of the children?

A. Yes, he did. He did mention that they had problems and he thought it was due to her mother's interference.

Q. Did -- did he indicate any other reason other than the shoelaces? Did he say anything about them playing doctor or doing something that he felt to be inappropriate?

A. No, he did not.

Q. Did he offer any other explanation saying why he thought hitting children with a coat hanger would be appropriate?

A. Not that I recall.

Q. Did he talk to you about anything in his background?

A. No, ma'am.

Q. Did you follow up with those charges which ended in a resolution of that case?

A.    Yes, I did.

Q.    What was that?

A.    In our March term of that same year, 1993, of our grand jury, he was indicted on charges of cruelty to children. He later pled guilty to those charges and he received six years on each count to run concurrent. Period of time on probation for those charges.

Q.    And concurrently, is that kind of court talk for they run together?

A.    That is correct.

Q.    You said he received probation.

A.    Yes, he did.

Q.    Show you what I've marked as Government's Exhibit 53D. What is that exhibit?

A.    This is his Superior Court in Coweta County final disposition sheet that states the outcome of the court case itself.

            MS. ROSE:  I'd move to admit 53D, Your Honor.

            THE COURT:  Let it be admitted.

            (Government's Exhibit Number 53D was received into evidence.)

Q.    As a part of the term or condition of his probation, was the defendant ordered to undergo any counseling or treatment?

A.    Yes, he was.

Q.    And was that a usual judgment in a case of this nature?

A. Yes, it is.

Q. Were these convictions misdemeanors or felonies?

A. Felonies.

MS. ROSE: I have no other questions.

CROSS EXAMINATION

BY MS. LAWSON:

Q. Good morning, Captain Yarbrough. How are you?

A. Just fine.

Q. Good. In connection with your investigation, Marc Barnette admitted that he had struck the children with the hanger.

A. Yes, ma'am.

Q. Were you aware that Mario Dennis said to his mother that he was hit for not eating his food?

A. No, I'm not familiar with that.

Q. Okay. This is the first time you heard that when you were in court here?

A. That's the first I've heard of it.

Q. Do you recall filing a police report that said that when you talked to Marc Barnette, he said that after Crystal complained to him about striking her children, that he quit doing it?

A. I believe that's in his statement.

Q. Okay. Now, pursuant to subpoena, did you provide us with a copy of all the records of the Coweta County Jail concerning

Marc Barnette's stay there during the time he was charged with these offenses?

A. Yes, ma'am, I believe they were faxed to you.

Q. Okay. And the subpoena was for all records, including any disciplinary records; is that correct?

A. It was for all jail records, I believe.

MS. LAWSON: May I approach the witness, Your Honor?

THE COURT: Yes.

Q. Let me show you Defendant's Exhibit Number 2, Captain Yarbrough. And ask you to take a look at it and see if you recognize those?

A. Yes, I do.

Q. What are they?

A. The first is the warrant application on the cruelty to children on the first child and the second child. Deposition form, final deposition. Then the booking report when he was booked in on charges.

Q. These charges that you've just talked about?

A. No, this charge here is an older case.

Q. Oh, that's the shooting of Anthony Britt?

A. I do not know.

Q. Okay.

A. Bonding procedure. Questions that are asked of an inmate when he comes in. Anything that's issued to him, whether it

be clothing, toothbrush. All the general questions. Visitors' log: who he would like to visit him. Medical questions. Waiver of first appearance form before the judge. Property receipts. She declared what he was charged with. Another warrant I did not take. Bond slip where he made bond on a charge previously. And another bond slip when he made bond on another charge. And another one.

Q. There are no disciplinary records or reports of any misconduct or infractions during any stay in the Coweta County Jail, is there?

A. No, ma'am.

Q. And it would have been in that file.

A. It should have been in the file, yes, ma'am.

Q. If it existed.

A. If it existed at that time.

Q. Okay. Thank you.

Captain Yarbrough, is Investigator Rodney Riggs here with you today?

A. Yes, Lieutenant Riggs is here.

MS. LAWSON: Okay. Thank you very much. No further questions.

MS. ROSE: If I might have just a moment, please, Your Honor.

(Pause.)

REDIRECT EXAMINATION

BY MS. ROSE:

Q. I'm going to approach and show you Defendant's Exhibit 2, an attached page. What is this page of Exhibit 2?

A. This is his medical questionnaire. All the questions he was asked when he first came in. If he had any problems with trauma, bleeding, anything going on, hepatitis, tuberculosis, any diseases. Are you under a doctor's care at this time?

Q. Just for jail purposes or whether it's liability or so that you can make sure that you were providing adequate care --

A. That's correct.

Q. -- while in custody.

As to when the defendant was asked if he had mental or emotional upset, what was the response?

A. No.

Q. Attempted suicides?

A. No.

MS. ROSE: All right. Thank you, sir. I don't have any other questions.

MS. LAWSON: No questions, thank you.

THE COURT: You may step down.

THE WITNESS: Thank you, sir.

(Witness stepped down.)

MS. TOMPKINS: Next witness will be Rodney Riggs.

RODNEY RIGGS,

JA1661

being first duly sworn, was examined and testified as follows:

DIRECT EXAMINATION

BY MS. TOMPKINS:

Q.   Will you state your name, please.

A.   Rodney Riggs.

Q.   And what is your occupation?

A.   I'm a detective with the Noonan Police Department in Noonan, Georgia.

Q.   How long have you been with the police department in Noonan, Georgia?

A.   Twenty-seven years.

Q.   In May of 1992, what was your assignment with the police department?

A.   I was a detective sergeant in criminal investigations.

Q.   And you conducted investigations of what kinds of cases?

A.   Assaults, thefts, crimes against persons.  Whatever type of criminal case arose.

Q.   All right.  Now, on or about May 7th, 1992, did you become involved in an investigation that involved Aquilia Barnette?

A.   Yes, ma'am, I did.

Q.   What was the nature of that investigation?

A.   On May the 2nd the Noonan Police Department had received a call about a shooting that occurred on Augusta Drive at the railroad tracks.  The uniformed division responded and found

that an Anthony Britt had been shot in an altercation there, and Britt identified the person that shot him as a person he knew as Marc. I took over the investigation and identified that person as Marc Barnette, and later arrested Barnette for various charges because of that altercation.

Q. Was Anthony Britt also charged for his role in that altercation?

A. Yes, he was.

Q. And what was Anthony Britt charged with?

A. He was charged with disorderly conduct.

Q. And what was Barnette charged with?

A. Battery, reckless conduct, pointing a gun at another, and discharging a firearm.

Q. And are those -- those are misdemeanor charges?

A. Yes, they are.

Q. And how is it -- now, Anthony Britt was shot; is that correct?

A. Yes.

Q. Were you able to determine what kind of firearm was used?

A. Yes, ma'am.

Q. And how was that?

A. Through the bullet that was removed from Britt.

Q. Okay. And how can a person be shot and have that be a misdemeanor charge?

A.   Because of the circumstances arising about the altercation and the fact that the wound was not life threatening.

Q.   Okay.  So you -- were you able to arrest Barnette on those charges?

A.   Yes, ma'am.

Q.   Okay.  And did you take a statement from him?

A.   Yes, I did.

MS. TOMPKINS:  May I approach, Your Honor?

THE COURT:  Uh-huh.

Q.   I'm going to show you two exhibits.  First, Government's Exhibit 54A, and ask you if you recognize what that is?

A.   Yes, ma'am.  This is the Noonan Police Department report about the assault of Barnette on Britt.  It happened in May of 1992.

Q.   And make sure that you speak into that microphone for me.

A.   All right.

Q.   And I'm going to show you now Government's Exhibit 54B and ask if you recognize that?

A.   Yes, I do.  This is a waiver of counsel form that I read to Marc Barnette before I interviewed him on May the 7th, 1992.

Q.   All right.

MS. TOMPKINS:  Your Honor, move admission of

Government's Exhibit 54A and 54B.

THE COURT: Let them be admitted.

(Government's Exhibits Numbers 54A and 54B were received into evidence.)

MS. TOMPKINS: Do you have copies of these with you at the stand?

A. Yes, ma'am, I have the originals.

Q. Okay. I have copies with me.

Now, describe for the jury just briefly how you advised the defendant of his rights.

A. The Noonan Police Department has a standard form that's called Waiver of Counsel. It has a blank on it to write the person's name of who you're interviewing. It has the rights commonly known as Miranda warnings on there. And then it has a place for the date and time and for the signature of the person who you're interviewing.

Q. And did the defendant appear to understand his rights?

A. Yes, ma'am, he did.

Q. And did he waive those rights?

A. He did.

Q. And did he make a statement to you?

A. Yes, ma'am, he did.

Q. And is that statement attached to the waiver of rights form?

A. Yes, ma'am, it is.

Q. On Government's Exhibit 54B; is that correct?

A. Yes, ma'am.

Q. Okay. Read that statement to the jury, please.

A. This is Marc Barnette's statement.

Q. And if you would, just keep your voice up. You've got a very low voice.

A. Okay. My fiancee, Natasha Heard, and I have been having some trouble lately. Anthony Britt has been talking to her and that has been making things worse. I have also been talking to Anthony's sister, Crystal Dennis, and Anthony has been telling her things about me.

On Friday, May the 1st, I got off work. I went by Crystal's apartment on Hannah Street. While I was there Anthony came over. Several times that evening Anthony asked me to come outside with him. I never did because I had nothing to say to him.

I finally left Crystal's apartment about 1:30 a.m. and was walking home. When I got on Augusta Drive near the railroad tracks, Anthony came on the street and hollered at me. I turned around and saw there was several other people with him. Anthony came running up to me and started arguing with me. He was telling me what he was going to do to me and said that I had been talking about his son. I told Anthony I didn't want any trouble and I kept walking. Anthony followed me and kept talking to me about my fiancee and what he was

going to do to me. He finally got in front of me and I tried to go around and he pushed me. I tried going around him a second time and he pushed me again. I had my pistol with me and when he pushed me the second time, I pulled my pistol and I shot once and hit Anthony. I shot two more times, but I didn't hit anybody.

I was afraid at that time because of the crowd that was with Anthony. When I shot, the crowd took off running and I ran toward my apartment. When I got near my apartment, I threw the gun into the woods. The gun is a .22 caliber revolver.

And the statement is signed by Marc Barnette.

Q. All right. And is that also signed by you?

A. Yes, ma'am, it is.

Q. And in that statement, did the defendant say he already had that .22 caliber gun with him that evening?

A. Yes, ma'am.

Q. Okay. Did you ascertain whether or not Anthony Britt or any of the people with him had firearms that night?

A. There was no indication that no one else had a firearm that night.

MS. TOMPKINS: Thank you. That's all the questions I have.

CROSS EXAMINATION

BY MS. LAWSON:

Q.   Detective Riggs, how are you?

A.   Fine, thank you.

Q.   Good.  You, being a veteran police officer when this occurred, conducted a thorough investigation of the case, did you not?

A.   Yes, ma'am.

Q.   And as a result of that investigation, you charged Marc Barnette with nothing but misdemeanors.

A.   That's correct.

Q.   And misdemeanors are less serious charges than felonies.

A.   That's correct.

Q.   And in fact, shooting somebody can be a felony in the state of Georgia, can't it?

A.   Yes, ma'am.

Q.   All right.  So your election to charge him with misdemeanors was based on your investigation of the case.

A.   Yes, ma'am.  The totality of the facts around the circumstance.

Q.   Okay.  And as of late 1997, 1998, you were aware that Mr. Britt had himself -- well, had been killed in a gun battle; is that right?

A.   That's right.

Q.   And that gun battle was concerning an altercation with another man over a woman.

A.   That's correct.

Q.   And that the man was trying to leave the apartment complex.  Mr. Britt approached him.  An argument ensued and gunfire took place and Britt was killed.

A.   That is correct.

Q.   That's what you report.

A.   Yes, ma'am.

Q.   Okay.  So this situation in which Mr. Britt was killed was somewhat similar to what you've just testified about when Marc Barnette was charged.

A.   Yes, ma'am, somewhat similar.

Q.   So basically, that charge -- that fight between Britt and Mr. Barnette was over women.

A.   Yes.

          MS. LAWSON:  No further questions.  Thank you.

          MS. TOMPKINS:  I do have a couple redirect.

                    REDIRECT EXAMINATION

BY MS. TOMPKINS:

Q.   Now, did you follow up with the -- what happened with the charges to Mr. Barnette?

A.   He was convicted of, I think, three of the four charges.

Q.   Was -- well, let me show you what's been marked as Government's Exhibit 70.  Do you recognize that?

A.   Yes, ma'am.

Q.   What is that?

A.   This is a certified copy of a docket book of the Noonan

Municipal Court.

Q. And does that show the results of these criminal charges?

A. Yes, ma'am, it does.

MS. TOMPKINS: We'd move the admission of Government's Exhibit 70, Your Honor.

THE COURT: Let it be admitted.

(Government's Exhibit Number 70 was received into evidence.)

Q. And does it also have Anthony Britt's charge on there?

A. Yes, ma'am, it does.

Q. Tell the jury what happened with all the charges stemming from this incident.

A. On Anthony Britt's charge of disorderly quarreling, he pled guilty and received a fine of $33.

On Barnette's charge of discharging a firearm in the city, he pled guilty and spent time in jail, and the letters T-W-O are there for the sentence. That stands for time worked out. So he spent time in jail for that.

Q. The time he spent in jail, was that the time he had spent in jail from the time of his arrest until the time that the case was resolved?

A. Yes, ma'am.

Q. Do you know how many days that was?

A. From May the 7th, 1992, to June the 8th, 1992.

Q. So about 30 days?

A. Yes, ma'am.

Q. Okay.

A. On the charge of battery, he pled guilty to that and the sentence was also time worked out. The charge of reckless conduct was dismissed. And the charge of pointing a gun at another, again, he pled guilty and time worked out on that.

Q. All right. Now, Anthony Britt, as you testified, was later murdered; is that correct?

A. Yes.

Q. And it was characterized as a gun battle?

A. Yes.

Q. Now, on the night of the incident with Barnette and Anthony Britt, that wasn't a gun battle, was it?

A. It was not a gun battle on that night, no.

Q. Okay. Only one person brought their gun to that battle; is that right?

A. Yes, ma'am.

MS. TOMPKINS: Thank you. That's all.

THE COURT: You may step down.

(Witness stepped down.)

MS. ROSE: Natasha Heard.

(Pause.)

MS. ROSE: She's on her way, Your Honor. She had stepped out of the witness room.

(Pause.)

NATASHA TOLBERT,

being first duly sworn, was examined and testified as follows:

DIRECT EXAMINATION

BY MS. ROSE:

Q. State your name, please, ma'am.

A. Natasha Tolbert.

Q. Spell your last name, please.

A. T-o-l-b-e-r-t.

Q. And prior to being married, were you Natasha Heard?

A. Uh-huh.

Q. H-e-a-r-d?

A. Yes.

Q. Where do you live?

A. In Noonan.

Q. Noonan, Georgia?

A. Uh-huh.

Q. How long have you been a resident there?

A. Ten years.

Q. Do you know the defendant --

A. Yes, I do.

Q. -- in this case?

How do you know the defendant?

A. I'm his children's mother.

Q. When did you meet him?

A. I don't recall the year.

Q. Well, how old are your children?

A. Eleven and ten.

Q. Is the eleven-year-old male or a female?

A. Female.

Q. What's her name?

A. Angelica Heard.

Q. And the ten-year-old?

A. Aquilia Heard.

Q. He's a male, right?

A. Yes.

Q. Now, how did you meet the defendant?

A. At a pool in Lathonia.

Q. In?

A. Lathonia.

Q. Laconia?

A. Lathonia.

Q. Lathonia.

A. Uh-huh.

Q. I take it that's in Georgia.

A. Yes.

Q. Where is that in relationship to Noonan?

A. Approximately maybe 25 miles north.

Q. How old were you at that time?

A. Fourteen.

A. Yes.

Q. Whose apartment was that?

A. Marc's.

Q. Did he move out of his home with his mother to live with you?

A. Yes.

Q. For you two to move in together?

A. Uh-huh.

Q. With whom were you living at that time?

A. My mother.

Q. And did you also have a grandmother living in the area?

A. Yes, I did.

Q. Did you stay with her some?

A. Yes, I did.

Q. Where did the two of you live?

A. In Noonan off of Berry Avenue.

Q. Did you continue with your schooling?

A. No.

Q. Did he?

A. No.

Q. What was he doing at that time?

A. At the time of when?

Q. When you moved in together. When he quit school, did he have a job?

A. Yes, he did.

Q. Where was he working, if you recall?

A. Arby's.

Q. And did you have a job?

A. No.

Q. When you first started the relationship, describe for the jury how you two got along.

A. Great.

Q. How did you two get along at the beginning?

A. We did. We got along real good.

Q. How did he treat you?

A. He treated me well. Real good. Well.

Q. At some point did that change?

A. Yes.

Q. Tell us about that.

A. I'm nervous, so I don't know how to explain it.

Q. Well, just tell us what happened. What you recall.

A. Well, sometimes he just would get mad and stuff and we would get to -- get to fighting physically.

Q. Did he hit you?

A. Yes.

Q. Where?

A. I don't know. Just everywhere, I guess.

Q. And what would you do under those circumstances?

A. Hit him back.

Q. Now, while you were pregnant, did this occur?

A.    Uh-huh.

Q.    Tell the members of the jury what happened as you were getting off the bus and had a disagreement with the defendant.

A.    I don't quite remember it all that well, but I know that me and him did get into a tussle and I do remember him slamming me on the concrete.

Q.    And how far along were you in your pregnancy at that time?

A.    I don't know.

Q.    Do you remember which child you were pregnant with?

A.    Uh-huh.

Q.    Which one?

A.    Angelica.

Q.    After that incident, did you see the defendant later that night?

A.    Yes.

Q.    What happened when he came over to your house on that evening?

A.    I think I told him about it.

Q.    And what did he do?

A.    I don't remember.

Q.    At some point did you and the defendant break up?

A.    Yes.

Q.    Or end your relationship?

A.   Uh-huh.

Q.   Do you remember what year that was?

A.   No.

Q.   How old were the children?

A.   I want to say maybe Marc was about a month and maybe Angelica was maybe two or one.  Something like that.

Q.   Where did the defendant go when that relationship ended?

A.   I don't know.

Q.   Do you recall whether he went to live with his mother?

A.   No, I don't.

Q.   Did he go to Charlotte or Atlanta?

A.   I don't know.

Q.   You don't know because you didn't have any contact with him, did you?

A.   No.

Q.   In fact, he didn't contact you or the children for five or six years; is that correct?

A.   I remember one letter.

Q.   During a six-year period.  No Thanksgiving?

A.   No.

Q.   No Christmas?

A.   (Negative nod.)

Q.   Didn't send the children Christmas presents?

A.   (Negative nod.)

Q.   Send them a Christmas card?

A.   (Negative nod.)

Q.   You need to answer out loud.  The court reporter is taking --

A.   Oh, no.

Q.   Phone calls to the children maybe on their birthday?

A.   No.

Q.   You went a long time without hearing from him or seeing him or having contact with him in any way.  Is that fair to say?

A.   That's true.

Q.   Until about a month ago.

A.   Yes.

Q.   Tell us about that.

A.   What do you want to know?

Q.   How it was that the defendant made contact with you about a month ago.

A.   I don't remember really.  I just know that we came up. And I think he wrote me a letter and asked could he visit, have a visit with the kids.

Q.   Okay.  About a month ago you got that letter?

A.   Uh-huh.

Q.   The first in many years.

A.   Yes.

Q.   And how did -- did you come up here to visit him?

A.   Yes.

Q.  And how did you get up here?

A.  I drove.

Q.  How were you able to afford that trip up?

A.  I work.  Me and my husband.

Q.  And you visited with the defendant.

A.  Uh-huh.

Q.  And you took the children to see him.

A.  Yes.

Q.  That was the first time the children had seen him since he left them at a month and two years old or so; is that correct?

A.  That's correct.  Well, no, I don't -- that's not right. Because before then he did come and got them and I think they stayed in Charlotte for about three months.

Q.  Three months.

A.  Three months.

Q.  Now, you testified in this case previously, didn't you?

A.  Yes.

Q.  At that time do you recall saying that you had not seen the defendant in five years?

A.  That's correct.

Q.  And nor had your children.

A.  That's correct.

Q.  And earlier today you told me that you had not seen him or heard from him but one time in all those years.

A.    That's right.

      MS. ROSE:  Thank you.  I don't have any other questions.

                    CROSS EXAMINATION

BY MR. BENDER:

Q.    Good morning, Ms. Tolbert.

A.    Good morning.

Q.    You're now married, are you not?

A.    Yes, I am.

Q.    Okay.  Tell us to whom you are married.

A.    Lovey Tolbert.

Q.    And what does he do?  What sort of work?

A.    He's a correctional officer.

Q.    And that's in the state of Georgia?

A.    Yes, it is.

Q.    Now, Ms. Tolbert, when you and Marc first met, you were living in Lathonia?

A.    Yes.

Q.    And both of you were living in an apartment complex --

A.    Yes.

Q.    -- that had a swimming pool.

A.    Yes.

Q.    And I believe y'all met at the swimming pool.

A.    Uh-huh, that's correct.

Q.    He seen you walk by and he followed you over there,

something like that.

A. Something like that.

Q. Okay. All right. And as a result of that, y'all started talking and dating.

A. Yes.

Q. Okay. And was he living with his mother at that time?

A. Yes.

Q. Okay. Not much food in that apartment, was there?

A. No.

Q. What else was in that apartment that his mother had?

A. Alcohol.

Q. Lot of alcohol?

A. I don't know about a lot, but I've seen it.

Q. Okay. Some wine?

A. Uh-huh.

Q. Some maybe hard liquor, that sort of stuff?

A. (Affirmative nod.)

Q. Maybe even some beer?

A. I don't know.

Q. Okay. Not much furniture in that apartment.

A. Well, I think they had a living room set, but I know that they didn't have beds.

Q. Didn't have any beds?

A. Huh-uh.

Q. Okay. And Marc and his brother Mario lived there with

his mother.

A. Yes.

Q. And so when you and Marc began dating and became intimate, that is, sexually intimate, would he -- would he usually come to your apartment?

A. Yes.

Q. Okay. Describe that apartment for us.

A. My apartment?

Q. Yeah. With your mother or with whomever you were living at that time.

A. She had her room, and on this side of the apartment were my room, my sister's room.

Q. Uh-huh. Y'all had furniture.

A. Oh, yeah.

Q. Had beds.

A. Yes.

Q. And during the periods of time you were there in Lathonia, do you remember Marc ever going in the closet?

A. Yes, I do.

Q. Tell us about that.

A. I don't know why he did it, but sometimes I would find him in there. Sometimes he wouldn't have no clothes on. He'd be in there crying.

Q. Okay. Be in the closet naked crying.

A. Uh-huh.

Q. Did he ever tell you why he was that emotional or what it was about?

A. No.

Q. Now, I think both of you came from an abusive home, didn't you?

A. Yes.

Q. Tell us about your home life.

A. My dad, he beat me, my mom, my sister, you know.

Q. Okay. And when this incident occurred that you told us about, you were living in Noonan at that time.

A. Yes.

Q. And you had moved there and then Marc came some time later?

A. No.

Q. Did y'all move there together?

A. Yes.

Q. And that's where your grandmother lived.

A. Yes.

Q. And Marc was working at Arby's?

A. Yes.

Q. And I think you had been to -- had you been to Underground Atlanta --

A. Yes, we had.

Q. -- that day? And Marc had -- Marc had been talking to some girl that you didn't know there and I believe you slapped

FORM FED ® PENGAD · 1-800-631-6989

## JA1683

him.

A.    Yes, I did.

Q.    Okay.  And he didn't slap you back there.

A.    No.

Q.    Or react in any way, did he?

And on the way -- and on the bus ride back, you were talking to some young man that you knew but he didn't know.

A.    That's correct.

Q.    And you got off the bus, that's when he got mad at you --

A.    Yes.

Q.    -- didn't he?

And although this relationship started out, I think you used the word great, he was very kind, caring, took care of you, did all the things that you wanted a man to do for you, didn't he?

A.    Yes.

Q.    But then it began to go -- get a little rough.

A.    Yes, it did.

Q.    Is that right?

A.    Yes.

Q.    And he became possessive, jealous.  Didn't want you wearing any makeup; is that right?

A.    That's right.

Q.    And was that after Angelica was born?

A.    I don't remember.

Q. Okay. What -- what was Marc's attitude when he found out that you were pregnant with Angelica?

A. He was happy. He was happy.

Q. Would he go with you to your prenatal care?

A. Yes.

Q. Y'all would sometimes have to ride the bus.

A. Yes.

Q. And then, I guess, walk the rest of the way.

A. Yes.

Q. And Marc would be with you.

A. Yes.

Q. And how old were you at that time?

A. Fourteen.

Q. Tell us what Marc did on the day that Angelica was born.

A. He bought a newspaper.

Q. Why did he buy a newspaper that day?

A. Because he wanted to -- wanted her to see what was going on the day she was born.

Q. It's been marked previously and introduced as Defendant's Exhibit 40.

Ms. Tolbert, Defendant's Exhibit 40, is that the newspaper he bought on the day that she was born?

A. Yes, it is.

Q. Okay. And he wanted Angelica to have something --

A. Yes, sir.

Q. -- on the day she was born.

Do you remember any photographs that might have been taken the two of y'all took and kept in a scrapbook?

A. Yes, I do.

Q. And the scrapbook, how long have you made this scrapbook or kept it?

A. It's been a while.

Q. Okay. While they're looking at those, how old is Angelica now?

A. She's eleven.

Q. And how old is little Marc?

A. He's ten.

Q. What is little Marc doing today?

A. He's playing. He's trying out for football.

Q. Down in Noonan?

A. Yes.

Q. And Angelica came with you up here?

A. Yes, sir.

Q. When you were up here previously, did the children want to see their dad?

A. Yes, they did.

Q. Were they excited about seeing their dad?

A. Very much.

Q. Have the children been wanting to write him --

A. Yes.

Q.    -- for some period of time?

A.    Yes.

MR. BENDER:  May I approach, Your Honor?

THE COURT:  Yes.

Q.    Defendant's Exhibit Number 3, can you identify that for us?

A.    Uh-huh.

Q.    What is Defendant's Exhibit Number 3?

A.    That's Marc and Angelica during Christmas time.

Q.    Okay.  And is there a Christmas tree in the background?

A.    Yes, it is.

Q.    And Defendant's Exhibit Number 4, what is that a picture of?

A.    That's a picture of Marc holding up a picture of him and his family.

Q.    Okay.  And is he standing in front of the partially decorated Christmas tree?

A.    Yes, he is.

Q.    Defendant's Exhibit Number 5, could you tell us what that is.

A.    That's a picture of Angelica and Marc when they was little.

Q.    Okay.  And Defendant's Exhibit Number 6?

A.    That's another picture of brother and sister graduating from kindergarten.

842

JA1687

Q.   And Defendant's Exhibit Number 7?

A.   Is what I made for them brothers and sisters.

Q.   Okay.  So it shows both of them.

A.   Uh-huh.

Q.   The photograph with the Christmas tree, that's a picture of this Marc Barnette, right?

A.   That's right.

Q.   Okay.  When y'all were living together down in Noonan.

A.   I think we were in Lathonia then.

Q.   Okay.  But Angelica had been born because he's holding her in one of those pictures.

A.   That's right.

Q.   Now, have you, through the years, been able to show your children that photo album so that they knew who their father was?

A.   Yes, I have.

Q.   And how do they feel about their father?

A.   They love him.

          MR. BENDER:  Thank you.  That's all.

                    REDIRECT EXAMINATION

BY MS. TOMPKINS:

Q.   All but -- let's see.  There's a picture of the defendant with Angelica when she was little --

A.   Uh-huh.

Q.   -- right?

FORM FED    PENGAD · 1-800-631-6989

Q. Uh-huh.

A. Well, I graduated a year ago for dental assistant and I've been doing that for a while, and now I've left that to make sure my youngest child, you know, go to school and I'm throwing papers part-time now.

Q. So you went ahead and finished your education and got your dental assistant degree.

A. Yes, I have.

MS. ROSE: Very good. All right. Thank you very much.

THE COURT: You may step down.

(Witness stepped down.)

THE COURT: We'll take our lunch break at this time, members of the jury. Ask you to be back with us at 2 o'clock. Thank you very much for your attention to the case. Remember the instructions.

(Lunch recess at 12:31 p.m.)

* * *

JA1690

**JA1691**



Case 3:12-cv-00327-MOC  Document 102  Filed 09/23/15  Page 286 of 286

**JA1692**