# IN THE

# United States Court of Appeals

## FOR THE FOURTH CIRCUIT

---

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

v.

AQUILIA MARCIVICCI BARNETTE,

*Defendant-Appellant.*

---

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA AT CHARLOTTE

---

### JOINT APPENDIX - VOLUME IV OF VII
### (Pages 1693 - 2172)

---

| | |
|---|---|
| Gerald W. King, Jr. | Anthony Joseph Enright |
| FEDERAL PUBLIC DEFENDER | OFFICE OF THE |
| FOR THE WESTERN DISTRICT | UNITED STATES ATTORNEY |
| OF NORTH CAROLINA | Western District of North Carolina |
| 129 West Trade Street, Suite 300 | 227 West Trade Street, Suite 1650 |
| Charlotte, NC 28202 | Charlotte, NC 28202 |
| 704-374-0720 | 704-344-6222 |
| gerald_king@fd.org | usancw.appeals@usdoj.gov |
| *Counsel for Appellant* | *Counsel for Appellee* |

Additional Counsel for Appellant on Inside Cover

Jacob H. Sussman
SOUTHERN COALITION FOR SOCIAL JUSTICE
P. O. Box 51280
Durham, NC 27717
704-277-3962
jsussman@scsj.org

Mark E. Olive
ATTORNEY AT LAW
320 West Jefferson Street
Tallahassee, FL 32301
850-224-0004
meolive@aol.com

*Counsel for Appellant*

# TABLE OF CONTENTS

## VOLUME IV OF VII

JA Page

*Continued,* Exhibits to Response of the United States to Barnette's
Motion Under 28 U.S.C. 2255 and Motion for an Evidentiary Hearing
2023.09.23:

Ex. 1e:　Joint Appendix Vol. III of V [ECF103] ........................................ 1693

　　　　Resentencing Volume 14, July 31, 2002 (Afternoon) .............. 1703

　　　　Resentencing Volume 15, August 1, 2002 (Morning).............. 1817

　　　　Resentencing Volume 16, August 5, 2002 (Morning).............. 1887

Ex. 1f:　Remainder of JA Vol III of V [ECF104] ...................................... 1893

　　　　Resentencing Volume 16, August 5, 2002 (Afternoon) .......... 1965

　　　　Resentencing Volume 17, August 6, 2002 (Morning).............. 2060

## IN THE

# United States Court of Appeals

## FOR THE FOURTH CIRCUIT

## UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

v.

## AQUILIA MARCIVICCI BARNETTE,

*Defendant-Appellant.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA

## JOINT APPENDIX - VOLUME III OF V
### (Pages 845 - 1311)

| | |
|---|---|
| HAROLD J. BENDER | ROBERT J. CONRAD, JR. |
| LAW OFFICE OF HAROLD J. BENDER | UNITED STATES ATTORNEY |
| 200 North McDowell Street | WESTERN DISTRICT OF NC |
| Charlotte, NC 28204 | Suite 1700, Carillon Building |
| (704) 333-2169 | 227 West Trade Street |
| | Charlotte, NC 28202 |
| | (704) 344-6629 |
| | |
| MARK E. OLIVE | ANNE M. TOMPKINS |
| ATTORNEY AT LAW | ASST. UNITED STATES ATTORNEY |
| 320 West Jefferson Street | WESTERN DISTRICT OF NC |
| Tallahassee, FL 32301 | Suite 1700, Carillon Building |
| (850) 224-0004 | 227 West Trade Street |
| | Charlotte, NC 28202 |
| | (704) 344-6222 |
| *Counsel for Appellant* | *Counsel for Appellee* |

**Additional Counsel Listed on Back of Cover**

LANTAGNE LEGAL PRINTING 801 East Main Street Suite 100 Richmond, Virginia 23219 (804) 644-0477
A Division of Lantagne Duplicating Services

JILL WESTMORELAND ROSE
ASSISTANT UNITED STATES ATTORNEY
WESTERN DISTRICT OF NORTH CAROLINA
100 Otis Street, Room 233
U.S. Courthouse Building
Asheville, North Carolina 28801
(828) 271-4661

JA1694

# TABLE OF CONTENTS

Federal District Court Docket Sheet ............................................. 1

Indictment filed February 4, 1997 ............................................... 69

Guilty Verdict returned January 27, 1998 ........................................ 75

Defendant's Motion in Limine Regarding the Victim
    Impact Statements, filed June 4, 2002 .................................. 76

Motion for Allocution by the Defendant, filed
    June 4, 2002 .......................................................... 78

Government's Response in Opposition to
    Defense Motion in Limine to Prohibit
    and/or Limit Victim Impact Evidence,
    filed June 12, 2002 ................................................... 80

Government's Response to Motion for Allocution
    by the Defendant, filed June 12, 2002 ................................. 89

Order Denying Defendant's Motion for Allocution,
    entered June 18, 2002 ................................................. 93

Order Denying Defendant's Motion in Limine
    regarding the Victim Impact Statements,
    entered June 21, 2002 ................................................. 97

Motion for Relief Pursuant to *Ring v. Arizona*
    filed July 2, 2002 ................................................... 100

    Attachments:

    Indictment ........................................................... 103

1

**JA1695**

**JA1696**

Government's Notice of Intent to Seek
the Death Penalty, filed August 7, 1997 . . . . . . . . . . . . . . . . . . . . . . . . . . . 110

Government's Reaffirmation of Intention
to Seek the Death Penalty, filed July 30, 2001 . . . . . . . . . . . . . . . . . . . . . 118

Defendant's Memorandum in Support of Motion
Regarding *Ring*, filed July 12, 2002 . . . . . . . . . . . . . . . . . . . . . . . . . . 121

Government's Response to Defendant's Motion for
Relief Pursuant to *Ring v. Arizona*,
filed July 12, 2002 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 128

Voir Dire:

Prospective Juror Regina Sanders (888) . . . . . . . . . . . . . . . . . . . . . . . . . 133

Prospective Juror Edwards (1014) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 148

Prospective Juror Karen Sanders (1071) . . . . . . . . . . . . . . . . . . . . . . . . 169

Prospective Juror Blakeney (1143) . . . . . . . . . . . . . . . . . . . . . . . . . . . 184

Prospective Juror Bryson (1239) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 205

Prospective Juror Donaldson (1289) . . . . . . . . . . . . . . . . . . . . . . . . . . 224

Prospective Juror Campbell (1477) . . . . . . . . . . . . . . . . . . . . . . . . . . . 245

Prospective Juror Moore (1913) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 264

Prospective Juror Deana Stanford (1960) . . . . . . . . . . . . . . . . . . . . . . . 281

Parties' exercise of peremptory challenges to the
prospective jurors, July 27, 2002 . . . . . . . . . . . . . . . . . . . . . . . . . . . . 294

2

Case 3:12-cv-00327-MOC   Document 103   Filed 09/23/15   Page 5 of 200

**JA1697**

**JA1698**

### *Volume II*

Resentencing Volume 12, July 29, 2002, (Morning) . . . . . . . . . . . . . . . . . . . . . 372

Resentencing Volume 12, July 29, 2002 (Afternoon) . . . . . . . . . . . . . . . . . . . . 469

Resentencing Volume 13, July 30, 2002 (Morning) . . . . . . . . . . . . . . . . . . . . 587

Resentencing Volume 13, July 30, 2002 (Afternoon) . . . . . . . . . . . . . . . . . . . . 687

Resentencing Volume 14, July 31, 2002 (Morning) . . . . . . . . . . . . . . . . . . . . 773

### *Volume III*

Resentencing Volume 14, July 31, 2002 (Afternoon) . . . . . . . . . . . . . . . . . . . . 845

Resentencing Volume 15, August 1, 2002 (Morning) . . . . . . . . . . . . . . . . . . . . 959

Resentencing Volume 16, August 5, 2002 (Morning) . . . . . . . . . . . . . . . . . . . . 1029

Resentencing Volume 16, August 5, 2002 (Afternoon) . . . . . . . . . . . . . . . . . . . 1107

Resentencing Volume 17, August 6, 2002 (Morning) . . . . . . . . . . . . . . . . . . . . 1202

### *Volume IV*

Resentencing Volume 17, August 6, 2002 (Afternoon) . . . . . . . . . . . . . . . . . . 1312

Resentencing Volume 18, August 7, 2002 (Morning) . . . . . . . . . . . . . . . . . . . 1424

Resentencing Volume 18, August 7, 2002 (Afternoon) . . . . . . . . . . . . . . . . . . 1533

Resentencing Volume 19, August 8, 2002 (Morning) . . . . . . . . . . . . . . . . . . . 1634

Resentencing Volume 19, August 8, 2002 (Afternoon) . . . . . . . . . . . . . . . . . . 1726

**JA1699**

**JA1700**

*Volume V*

Resentencing Volume 20, August 9, 2002 (Morning) . . . . . . . . . . . . . . . . . . . 1799

Resentencing Volume 20, August 9, 2002 (Afternoon) . . . . . . . . . . . . . . . . . 1822

Resentencing Proceedings, August 12, 2002 . . . . . . . . . . . . . . . . . . . . . . . . 1870

Resentencing Proceedings, August 13, 2002 . . . . . . . . . . . . . . . . . . . . . . . . 2017

Defendant Motion for Mistrial regarding victim
    impact testimony, filed August 5, 2002 . . . . . . . . . . . . . . . . . . . . . . . . 2034

Written questions from the jurors filed August 13, 2002 . . . . . . . . . . . . . . . . 2037

District Court Judge's answer to jurors' written question
    filed August 13, 2002 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2038

Jury verdict form with reference to count 7, filed
    August 13, 2002 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2039

Jury verdict form with reference to count 8, filed
    August 13, 2002 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2057

Jury verdict form with reference to count 11, filed
    August 13, 2002 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2075

Judgment and Order imposing sentence, entered
    August 20, 2002 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2092

Defendant's Motion for New Trial, Arrest of Judgment
    and Other Relief, filed August 20, 2002 . . . . . . . . . . . . . . . . . . . . . . . . 2097

Order Denying Defendant's Motion for New Trial,
    Arrest of Judgment and Other Relief
    entered September 9, 2002 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2149

4

Case 3:12-cv-00327-MOC   Document 103   Filed 09/23/15   Page 9 of 200

**JA1701**

**JA1702**

Page 2863

IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF NORTH CAROLINA

CHARLOTTE DIVISION

COPY

UNITED STATES OF AMERICA                    )

                                            )    CASE NO. 3:97CR23-V

         v.                                 )    July 31st, 2002

                                            )    Afternoon Session

AQUILIA MARCIVICCI BARNETTE,                )

         Defendant.                         )

         TRANSCRIPT OF SENTENCING HEARING

    BEFORE THE HONORABLE RICHARD L. VOORHEES

       UNITED STATES DISTRICT COURT JUDGE

APPEARANCES:

FOR THE GOVERNMENT:

    ANNE M. TOMPKINS, Esq.

    JILL WESTMORELAND ROSE, Esq.

    Assistant United States Attorney

    227 West Trade Street

    Suite 1700

    Charlotte, North Carolina   28202

FOR THE DEFENDANT:

    JEAN B. LAWSON, Esq.

    P.O. Box 4275

    Charlotte, North Carolina   28226

    HAROLD J. BENDER, Esq.

    200 North McDowell Street

    Charlotte, North Carolina   28204

Reported by:   Scott A. Huseby,

               Registered Professional Reporter,

               Certified Court Reporter,

F   L E D
I. COURT
CHARLOTTE, N. C

AUG  1 2002

U. S. DISTRICT COURT
W. DIST. OF N. C

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
7/31/2002

Page 2864

P R O C E E D I N G S

THE COURT: Ms. Hankins had contact with a juror and I asked her to put that on the record, please. You don't have to mention the nature of the medical.

THE CLERK: One of the jurors brought it to my attention that he was having a medical problem and might need a couple of hours to see a doctor. And I told him was the problem something that he felt that he needed to be excused or he didn't feel like he could sit here, and he said no, that honestly the problem had been going on since last Friday and he's been dealing with it fine and he really doesn't want to miss anything.

And so I told him that there was a good possibility that we may not work on Friday, would that give him a chance to get an appointment with a doctor and he said yes, that would work fine and he is going to try to do that. And then I told him if that did not work out or if he could not get an appointment or if he felt that -- if he had any further pain and he wished to be excused, just come back and we would go from there, just to let me know and we would go from there.

THE COURT: Which is the juror number?

THE CLERK: Number 118, Mr. Sentinelli. But he advised me that on the break, he is going to get the phone number and go ahead and make his doctor's

United States of America vs. Aquilia Marcivicci Barnette          3:97CR23-V
Proceedings Before Judge Richard L. Voorhees                         7/31/2002

Page 2865

appointment for Friday and everything should be okay.

THE COURT: All right. Anything further about that?

MS. LAWSON: Your Honor, just to make inquiry, if Mr. Sentinelli, because of whatever this problem is, has been able to concentrate on the evidence or if he has been impaired any way in doing that.

THE COURT: What did he say about that, Ms. Hankins?

THE CLERK: He said -- when I asked him, I said, you know, is it something painful that you really need to and he said, oh, no, no, I'm fine, I've been here all week, and he said no. So I don't think it was something that would be to the level that it would impair his concentration.

THE COURT: Well, I think that's adequate. She told him if he has any problem, let us know if it's disturbing your ability to be a juror.

Now, would there be any objection to the Court telling all of the jurors that we won't be working Friday?

MS. TOMPKINS: No objection.

MR. BENDER: No objection.

THE COURT: I'm sure they would appreciate knowing that. May we have the jury, please.

Reported By: Scott A. Huseby, RPR
800-333-2082          Huseby, Inc. an Affiliate of Spherion (704) 333-9889          Fax (704) 372-4593
Case 3:12-cv-00327-MOC  Document 103  Filed 09/23/15  Page 13 of 200
847

JA1705

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
7/31/2002

Page 2866

(The jury returned to the courtroom.)

THE COURT: Members of the jury, I wanted to tell you that we will not have court on Friday, and so you can have that day for your own personal purposes or business purposes as the case may be.

One other thing I would bring up at this point, there's been some testimony about certain statements said to have been made by the defendant to investigating authorities concerning certain matters. When you consider this testimony, you should ask yourselves these questions: first, did the defendant say the things the witness told you the defendant said. To answer this question, you must decide if the witness was honest, had a good memory, and whether he or she actively understood the defendant.

Second, if the defendant did make a statement, was it correct. Here you must consider all of the circumstances under which the statement was made, including the defendant's personal characteristics, and ask yourselves whether a statement made under these circumstances is one you can rely on.

After you've answered these questions, you may rely on the testimony about the statement as much or as little as you think proper.

You may call your next witness.

Reported By: Scott A. Huseby, RPR
800-333-2082      Huseby, Inc., an Affiliate of Spherion  (704) 333-9889      Fax (704) 372-4593

United States of America vs. Aquilia Marcivicci Barnette    3:97CR23-V
Proceedings Before Judge Richard L. Voorhees    7/31/2002

Page 2867

MS. TOMPKINS:  Government calls Alesha Chambers Houston.

ALESHA CHAMBERS HOUSTON, being first duly sworn, was examined and testified as follows:

DIRECT EXAMINATION

BY MS. TOMPKINS:

Q.    Could you state your name, please?

A.    Alesha Chambers Houston.

Q.    And throughout your testimony, I just ask you to keep your voice up as best you can so that it will carry all the way back.

A.    Okay.

Q.    How old are you?

A.    25.

Q.    And what business are you in?

A.    I work with Bank of America in security.

Q.    In April of 1993, how old were you?

A.    15.

Q.    And what school did you go to?

A.    Myers Park.

Q.    And in the 1992, '93 school year, what grade were you in?

A.    Tenth.

Q.    Did you have a part-time job?

Case 3:12-cv-00327-MOG  Document 103  Filed 09/23/15  Page 15 of 200
800-333-2082    Huseby, Inc., a    849    herton (704) 333-9889    Fax (704) 372-4593

JA1707

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
7/31/2002

Page 2868

A. Yes.

Q. And where was that?

A. At Bojangles.

Q. And was that here in Charlotte?

A. Uh-huh.

Q. Which Bojangles was that?

A. On Woodlawn.

Q. About that time, did you meet the defendant, Marc Barnette?

A. Yes.

Q. What did you call him?

A. Marc.

Q. How did you meet him?

A. I was at my cousin's and we were out sitting on her porch, and him and a friend walked by.

Q. Then what happened?

A. He came over and talked to us. We exchanged numbers that day, and I called him later and it went from there.

Q. How old was he at the time?

A. 19, 20, I'm not sure.

Q. Did y'all begin dating?

A. Yes.

Q. How long did that dating relationship last?

A. Maybe about 3 months.

Reported ~ ~ ~ ~ Huseby, RPR
800-333-2082 Case 3:12-cv-00327-MOC Document 103 Filed 09/23/15 Page 16 of 300 (704) 372-4593
Huseby, Inc., an A          non (704) 333-9889
850

JA1708

United States of America vs. Aquilia Marcivicci Barnette    3:97CR23-V
Proceedings Before Judge Richard L. Voorhees    7/31/2002

Page 2869

Q.  Describe for the jury how that relationship was at the beginning.

A.  It was very nice in the beginning, probably an ideal relationship.

Q.  In what ways was it ideal?

A.  I mean, you know, he was real caring, thoughtful, did a lot of good, fun things together, things like that.

Q.  And where was he living when y'all first started seeing each other?

A.  With his mother.

Q.  Where did she live?

A.  On West Boulevard.

Q.  Do you know who else lived in that house?

A.  I think an aunt of his named Tina, his brother Mario and his grandfather.

Q.  What is his grandfather's name?

A.  Jessie.

Q.  Do you know what the age difference between Marc and Mario is?

A.  Mario was my age, so about 4 years.

Q.  Four years younger?

A.  Yes.

Q.  Now, when the relationship began to turn at some point during your relationship, what began to

Reported By: Scott A. Huseby, RPR
800-333-2082    Case 3:12-cv-00327-MOC, aDocument 103    Filed 09/23/15    Page 17 of 100    Fax (704) 372-4593
851

JA1709

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
7/31/2002

Page 2870

happen, what did he do?

A. At first he became very possessive. You know, he always questioned where I went, who I talked to, what I wore, who I kept company with, things like that.

Q. What kind of issues did he have with what you wore?

A. He didn't like for me to be revealing with my clothing, cover as much as possible, I suppose.

Q. And you said that he was controlling. In what ways was he controlling?

A. Basically he wanted me with him all the time, and if I was not with him, he wanted tight tabs or where I was.

Q. And as long as you did that, how was the relationship?

A. Everything was fine, uh-huh.

Q. And what if you didn't go along with how he wanted it to be?

A. We would get into an argument, argument followed with violence.

Q. Now, did Marc drink much when you were with him?

A. No.

Q. Did you ever know Marc to take drugs?

A. No.

Reported By: Scott A. Huseby, RPR
800-333-2082          Huseby, Inc.          Spherion (704) 333-9889          Fax (704) 372-4593
Case 3:12-cv-00327-MOC   Document 103   Filed 09/23/15   Page 18 of 200
852

JA1710

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
7/31/2002

Page 2871

Q.    Now, do you recall a specific incident when y'all were dating when he reacted violently to what you were wearing?

A.    Yes.  My cousin and I had gone to a strip mall close by our house and we were walking back.  He interceded us on the way back and he was in a vehicle and he veered the car so that he was like trying to run into us, I suppose, and he just started yelling where you been and what you doing with that on, you know you are not supposed to wear that shit.  And he told me to get in the car, and I got in the car because I was embarrassed and I didn't know what would follow if I didn't.

So I got in the car and we drove down some highway on the way to his house, and he was cursing and fussing.  And he took his fist and punched me in the side of my face, bruised my check, chipped my front tooth.  And I was telling him at first I didn't want to go with him anyway because I had a meeting to go to that evening at work and I kept telling him, you know, I have to go to a meeting, take me back to my aunt's house, and he wouldn't.  When he hit me in any face and chipped my front tooth, I grabbed my purse and took out a compact to check, you know, what damage he done to my face, and he smashed my purse and threw it on the side of the

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR2?
7/31/2(

Page 2872

highway and proceeded to his mother's house.

Q. Where were you living at the time?

A. At that time, I was living at home with my mom.

Q. And were there times when you lived with other family members?

A. Yes.

Q. Who else did you live with?

A. I lived with my aunt for a short period of time and I also lived with an uncle later on in that year.

Q. And were you having some turmoil at home?

A. Yeah.

Q. Was your father part of your family?

A. My stepfather, yeah.

Q. Was there turmoil between your mother and your stepfather?

A. No, it was more or less between her and I, between -- yeah, between her and I about him basically.

Q. And how old were you at that time, when the chipped tooth incident happened?

A. I was still 15.

Q. And what did he say -- did you say anything to him about the damage that he had done to your face and your teeth?

A. Yes, I asked him, why would he hit me like that and he made a comment to say that he didn't want me to

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
7/31/2002

Page 2873

be pretty to anyone else.

Q.   How long had y'all been together when that happened?

A.   Maybe a month.

Q.   Now, did there come a time when you and Marc lived for a while in a hotel in Charlotte?

A.   Uh-huh.

Q.   Where was that?

A.   It was off of North Tryon, I can't remember the name of it.

Q.   Was that in the summer of 1993?

A.   Yes.

Q.   Was it a Motel 6?

A.   No.

Q.   Now, during the time that you and Marc were staying at the hotel, were there any incidents of violence?

A.   Yes, there was.  I can't --

Q.   Was there a time when he found a number of someone in your purse?

A.   That wasn't while we were staying there, that was an entirely -

Q.   Okay.

A.   We had -- the incident you are talking about, we were at a Motel 6 and --

Reported By: Scott A. Huseby, RPR
Huseby, Inc., an Affiliate of Spherion  (704) 333-9889
800-333-2082                                                      Fax (704) 372-4593
Case 3:12-cv-00327-MOC  Document 103  Filed 09/23/15  Page 21 of 200
855

JA1713

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
7/31/2002

Page 2874

Q. Tell the jury about that incident.

A. Like you were saying, we were at a Motel 6 and we were about to leave, I believe. I was on my way to a hair appointment and I had a book bag with me, and he went through my book bag while I was in the bathroom, I believe, and he found a phone number of a person. He was just a friend. Actually he found an address of the person's college that he was going to. And when I come out of the bathroom, he just attacked me. Well, first he asked me, you know, whose is this, and I explained to him he was just a friend of mine that I wanted to correspond with, and he attacked me. He punched me with his fist. He pulled a big clump of my hair out. To this day, I'm still bald in that spot where he pulled my hair out. That's basically it.

Q. And was that -- when in the relationship did that incident happen? How long had you known him?

A. Maybe about 4 or 5 months.

Q. Did you have an on again, off again relationship?

A. Yeah, yeah.

Q. Now, was your conflict with your mother in part because of things like living with Marc at the hotel?

A. Yeah, of course, she didn't want me to be with him. She knew off the top when she first saw him what

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
7/31/2002

Page 2875

kind of person that he was, but of course I didn't listen, me being young and native.

Q. Did there come a time when you tried to break up with Marc?

A. Uh-huh, several different occasions I tried to.

Q. Several times?

A. Uh-huh.

Q. And how did that go when you would try to break up with him?

A. Oh, no, you do not break up with Marc Barnette. You're going to be with him until he decides when the end comes. And most of our fights, our physical fights were about me trying to leave the relationship.

Q. Now, what did you do when -- what would he do when you wanted to break up, what was his reaction to you? You said that he wouldn't let it happen. What would he do?

A. First he'd sit down and we'd ask and he'd ask why I wouldn't want to be with him. Many times I told him I'm not going to be with a violent person, I don't enjoy being beat. I don't understand why he didn't understand my reasoning, but of course that led to violence.

Q. And what would you do in response to that, would you stay with him?

Reporte ̄ ̃ ̇ ̇ ̇ Huseby, RPR
800-333-2082 Case 3:12-cv-00373-MOC Document 103 Filed 09/23/13 Page 23 of 200 Fax (704) 372-4593
857

JA1715

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
7/31/2002

Page 2876

A.    I don't know if you really understand what I'm about to say, but you have to kind of play the game with him.  You have to appease him, make him think whatever it is he wants to think until you can make a move to get on with your life.  It's just a mind game with him, you have to -- I can't explain it any better than that.

Q.    Did you go through those episodes sort of a cycle like that with him?

A.    Yes, repeatedly.

Q.    Now, I'm going to talk to you about an incident that happened on November 9th, 1993, and in November of 1993 were you living with your uncle?

A.    Yes.

Q.    Where was that?

A.    He lived off of West Boulevard on Watson Drive.

Q.    How far was that from Marc's mother's house on West Boulevard?

A.    It's about maybe 4 miles.

Q.    Was there an incident that took place on November 9th in which the police were called to your uncle's house?

A.    Yes.  I had just gotten in from work, and I had taken a shower, put on some -- it was November, but I was inside so I had on shorts, a T-shirt, some socks. And at the time, before everything occurred I was

Reported By: Scott A. Huseby, RPR
800-333-2082    Huseby, Inc., an A...   ...ion (704) 333-9889    ...age 24 of 200  Fax (704) 372-4593

Case 3:12-cv-00327-MOC  Document 103   Filed 09/23/15  Page 24 of 200

858

JA1716

United States of America vs. Aquilia Marcivicci Barnette  3:97CR23-V
Proceedings Before Judge Richard L. Voorhees  7/31/2002

Page 2877

folding clothes, and at one point or another the phone rang and it was my mom. I talked to her shortly. When I hung up from her, he came knocking at the door and I told him that I wouldn't let him in, you know, what did he want. He said he just wanted to talk, just wanted to talk.

Q. Let he stop you. What was the status of your relationship at that time, were you trying to break up with him?

A. Yeah, yeah, we were not together. The phone rang again while he was still out there banging and I was talking to one of my uncle's girlfriends, and he got quiet for a second so I thought maybe he left. Next thing I know or heard, a booming sound. I knew it was him entering the premises. I ran, hung up from her, got a knife, came back to the phone, and I proceeded to call 911. By the time all that transpired, he was inside the house. I missed my phone call. He yanked the phone out of the wall, threw it. I still had the knife and we wrestled with it for awhile. He finally got it out of my hand and he cut several of my fingers doing that.

Q. How had he gotten in the door?

A. Can you give me one second?

Q. Okay, I'm sorry.

A. He apparently kicked the door in to get inside.

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
7/31/2002

Page 2878

Like I say, after we struggled with the knife and whatever and he kept telling me to come with him, I was not going with him. Somehow or another, he threw me over his shoulder. And my uncle had a balcony right off of his apartment and he would say if I wasn't going with him out the front door, then I would leave over the balcony. I was screaming at the top of my lungs trying to get someone to hear me, you know, to help me or call the police or something. And luckily someone drove by the bottom and he took me back inside because we still was at the front door. And on my way, I'm trying to grab things to get him to, you know, to stop him from taking me.

Anyways, we went to a vehicle he had waiting, put me in it, and we drove to Checkers on Wilkinson to pick up his brother Mario from work.

Q.    Now, let me just slow you down. Did he actually physically pick you up at the balcony?

A.    Of course, I was much smaller than I am now, but oh, yeah, he did.

Q.    How much did you weigh at that time?

A.    110.

Q.    And did he threaten to throw you off of the balcony?

A.    Uh-huh.

Case 3:12-cv-00327-MOC Document 103 Filed 09/23/15 Page 26 of 200

JA1718

United States of America vs. Aquilia Marcivicci Barnette    3:97CR23-V
Proceedings Before Judge Richard L. Voorhees    7/31/2002

Page 2879

Q.   What did he say?

A.   I can't remember his exact words right now, but I do know that he said that he would throw me off of the fucking balcony if I didn't go where he wanted me to go.

Q.   All right.  And so did he carry you down the stairs?

A.   Uh-huh.

Q.   And how did y'all leave the premises?

A.   In, it's like a Jeep-like vehicle that he had.

Q.   So he was driving a Jeep?

A.   Uh-huh.

Q.   Did he place you in the Jeep?

A.   Uh-huh.

Q.   What were you thinking and feeling at that time?

A.   I couldn't believe it.  I mean, things like that happened to me before, but at that time, that was one of the most extreme things that he had done.  I was trying my best to calm myself down so I could think and focus on what I was going to do in order to get away from him.

Q.   I'm going to show you a series of photographs.

MS. TOMPKINS:  If I may approach the witness, Your Honor?

THE COURT:  Yes.

Reported By: Scott A. Huseby, RPR
800-333-2082          Huseby, Inc., an A        ion  (704) 333-9889          Fax (704) 372-4593
Case 3:12-cv-00327-MOC   Document 103   Filed 09/23/15   Page 27 of 200
861

JA1719

Page 2880

BY MS. TOMPKINS:

Q.   I'm showing you what has been marked as Government's Exhibits 58A through 58F, if you would just mind scrolling through those and tell me if you recognize what those are?

A.   Uh-huh.  The first picture is a picture of my uncle's door, the one that he kicked in.

Q.   That's 58A?

A.   Yes, with the lock kicked out.  The second is just a better view of the picture.  Third, same thing. The fourth picture, 58D, is a picture of the actual dead bolt lock with wood lying on the floor.  58E is a picture of how we left the house, the phone that was on the wall, my work hat.  The towel that he stuffed down my throat to make me quiet is on the table, another shot of the house with the towel and the phone.

MS. TOMPKINS:  Your Honor, we'd move the admission of Government's Exhibits 58A through 58F.

THE COURT:  Let them be admitted.

BY MS. TOMPKINS:

Q.   I'm going to show these to you now, for the jury, if you don't mind going through and describing with the photo what Government's Exhibit 58A is.

A.   That's the picture of the door closed with the lock.

Repo                    A. Huseby, RPR
800-555-2082  Case 3:12-cv-00327-MOC  Document 103  Filed 09/23/15  Page 28 of 200  Fax (704) 372-4593
Huseby, Inc.,        862        Charlotte (704) 333-9889

JA1720

United States of America vs. Aquilia Marcivicci Barnette     3:97CR23-V
Proceedings Before Judge Richard L. Voorhees          7/31/2002

Page 2881

Q.   And over on this side, is that the broken lock on the door?

A.   Uh-huh.

Q.   And I'm showing you Government's Exhibit 58B. Is that the inside of the door?

A.   Uh-huh, from the inside with the lock lying on the floor.

Q.   Is that the lock on the floor right there?

A.   Yes.

Q.   And that was a dead bolt?

A.   Uh-huh.

Q.   And 58C?

A.   Again, inside picture of the door.

Q.   And that's a close-up of the dead bolt having been knocked out?

A.   Uh-huh.

Q.   58D?

A.   Shows the dead bolt lock lying on the floor.

Q.   So the door had been locked when he was banging on the door?

A.   Uh-huh.

Q.   I'm going to show you Government's Exhibit 58E, and tell the jury what is in that photograph.

A.   That's the picture of the living room like I said earlier with the phone that was torn off of the

Reporte    Huseby, RPR
800-333-2082    Huseby, Inc., an    erion (704) 333-9889    Fax (704) 372-4593
Case 3:12-cv-00327-MOC   Document 103   Filed 09/23/15   Page 29 of 200
863

JA1721

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
7/31/2002

Page 2882

wall lying on the floor, my work hat. The towel that he used to stuff down my mouth to keep my quiet is on the table.

Q. Now, when you came in -- when he came into the house, were you on the telephone with 911?

A. Yes.

Q. And how did he get the phone out of your hands?

A. He just smashed it out of the wall, out of my hand, everything.

Q. Out of the wall and out of your hand?

A. Uh-huh.

Q. Now, you mentioned that there is a towel. Is that the towel right here?

A. Actually it's up on the table.

Q. Right here (indicating)?

A. Yeah.

Q. Tell the jury what happened with the towel.

A. Because I kept screaming, of course he wanted me to be quiet, and he stuffed the towel down my throat.

Q. And then when you quieted down, did he take the towel out?

A. Actually I took it out. I smashed it out myself.

Q. And that was when y'all were wrestling around?

A. After he got the knife out of my hand, uh-huh.

Reported By: Scott A. Huseby, RPR
800-333-2082   Case 3:12-cv-00327-MOC   Document 103   Filed 09/23/13   Page 30 of 200   (704) 372-4593
864

JA1722

United States of America vs. Aquilia Marcivicci Barnette    3:97CR23-V
Proceedings Before Judge Richard L. Voorhees    7/31/2002

Page 2883

Q.    And now I'm showing you Government's Exhibit 58F.

A.    Uh-huh.

Q.    And that's the living room?

A.    Yeah, mostly the same thing.  It's the phone, the towel.

Q.    Is that the couch where y'all wrestled with the knife?

A.    Yes.

Q.    And you said that he was able to get the knife out of your hand?

A.    Uh-huh.

Q.    But that you got cut?

A.    Yeah.

Q.    Now, what were you wearing that night?

A.    I had on a T-shirt, some shorts and socks.

Q.    And this was November?

A.    Uh-huh.

Q.    About what time was it?

A.    Maybe 11:00'ish.

Q.    Okay.  So it was November 8th going into November 9th?

A.    Yeah.

Q.    What happened when you got into the vehicle, when he placed you in the vehicle?

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
7/31/2002

Page 2884

A.   When he got into the driver's side, he told me where we're going, we're going to pick up his brother and that when he got in, you know, I better be quiet as to what was going on.  We drove to his brother's job in complete silence.  I don't remember -- I know I definitely didn't say anything.  He may have said something, but I don't remember at the time.

Q.   Did you feel like you could get out of the car any time you wanted to?

A.   Huh-uh.

Q.   How were you feeling?

A.   I was just scared.

Q.   Did you do as you were told?

A.   Uh-huh.

Q.   After you picked up Mario, what happened?

A.   He acted as if everything was fine.  You know, he talked to Mario about his night at work and, you know, we drove back -- we drove to his mother's house.

Q.   And what happened when you got to his mother's house?

A.   I don't remember whose room it was, but I know we sat in a room and talked for a while.

Q.   You and he talked?

A.   Uh-huh.

Q.   Again, what was your feeling, what were you

Reported By: Scott A. Huseby, RPR
800-333-9082        (704) 372-4593
Case 3:12-cv-00327-MOC, Document 103   Filed 07/08/13   Page 32 of 206
866

JA1724

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
7/31/2002

Page 2885

feeling at that time?

A. Still scared.

Q. Had you gone to his house willingly?

A. Oh, no, huh-uh.

Q. You'd gone against your will?

A. Uh-huh, I was forced to go, uh-huh.

Q. What happened next?

A. Once we were inside the house?

Q. Uh-huh.

A. After a while of talking, I heard some commotion out front and apparently it was the police. They had come -- I later found out that they were called by my mother. She knew where I was, of course. His mother answered the door. She said that she didn't know her son was there, but I wasn't there. And first of all, she didn't greet us, but she saw us walking into the house when we first got there. And when I heard her say that I wasn't there, Marc flew out the back door and I came out of the room shortly after to let them know that yes, I was there. And when I came out, she was like what is that girl doing in here, you know, she is not supposed to be there, like she didn't know that I was there earlier.

Q. You heard Marc's mother talking to the police?

A. Uh-huh.

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
7/31/2002

Page 2886

Q. Now, when you came out of the room, had Marc already left out the back?

A. He had already gone, uh-huh, he left out the patio door, uh-huh.

Q. Had he heard the police coming to the door?

A. Yeah, uh-huh.

Q. Now, when y'all were sitting in there talking, what were y'all talking about?

A. You know, why I didn't want to be with him, why did I make him do what he did, things like that.

Q. So you walked out, and was there a police officer there?

A. Yes.

Q. Was that a male or a female officer?

A. Actually there were two. I think it was a male and a female officer there.

Q. And what happened next?

A. She asked me who I was and I told her my name, Alesha Chambers. And she said -- I know eventually she asked me, you know, did I want -- you know, was I there willingly and I told her no. And she wanted to talk and I told her that I didn't feel comfortable talking in the house, if I could go outside and talk to her. And she said yes and she took me outside and we talked in the driveway.

Reported By: Scott A. Huseby, RPR
800-336-2082   3:12-cv-00327-MOC   Document 103   Filed 09/28/15   Page 34 of 200   (704) 372-4593
868

JA1726

United States of America vs. Aquilia Marcivicci Barnette                    3:97CR23-V
Proceedings Before Judge Richard L. Voorhees                    7/31/2002

Page 2887

Q. Did you make a statement to her that night?

A. Yes, I told her everything that happened earlier that evening.

Q. And did you sign that statement?

A. Uh-huh.

Q. What happened next?

A. She was radioed and told that they had him on the phone at my uncle's house. Apparently he had gone to where he was and he had called back looking for me. So once we got back there, you know, they told me if I could get his location on the phone so they could go pick him up, if I would go ahead. And I talked to him. When I first got on the phone, he was --

Q. Let me slow you down one second.

A. Okay.

Q. First of all, I want to show you, if I may approach, I want to show you what's been marked as Government's Exhibit 55A and ask you to turn to the last page of that. Is that your signature?

A. Yes.

Q. Glance over that, and is that the statement that you gave to Officer Adamo that evening?

A. Uh-huh.

Q. You don't have to read the whole thing, but --

A. Yeah.

Reported By: Scott A. Huseby, RPR
800-333-2082        Huseby, Inc., an A        rian (704) 333-9889    Page 35        Fax (704) 372-4593
Case 3:12-cv-00327-MOC, Document 103    Filed 09/23/15    Page 35 of 200
869

JA1727

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
7/31/2002

Page 2888

MS. TOMPKINS: Your Honor, move admission of Government's Exhibit 55A.

THE COURT: Let it be admitted.

BY MS. TOMPKINS:

Q. So Officer Adamo drove you back to Watson Drive?

A. Uh-huh.

Q. Who was there?

A. My uncle, my mother, a lot of police officers. I can't remember who else.

Q. Okay. And was the phone ringing when you got there?

A. He was already on the line when I got there.

Q. And who was he talking to, do you know?

A. A police officer.

Q. Did the police ask you to talk to him?

A. Yes, to try to find out his location.

Q. And tell us about that phone call.

A. I got on the phone.

Q. Were the police listening on another line?

A. Yes, on another extension, uh-huh. I got on the phone and he was crying hysterically. I could barely understand what he was saying. At one point --

Q. What was he saying?

A. Basically, you know, same thing he said when I

Reported By: Scott A. Huseby, RPR
800-333-2082   Huseby, Inc., an Af            on (704) 333-9889   Page 36 of 200   Fax (704) 372-4593
Case 3:12-cv-00327-MOC   Document 103   Filed 09/23/13   Page 36 of 200
870

JA1728

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
7/31/2002

Page 2889

was at his mother's house, you know, why, why, why, why didn't I want to be with him, why did I cause all this trouble for him, things like that. At one point in the conversation, he asked me to meet with him and I told him okay. And when I said okay, he became very calm. The tears stopped, the babbling stopped. He was talking to me like I'm talking to you in just one split second. And he was able to tell me where he was, and the police all hung up and they went to go pick him up.

Q. Is that the first time that you ever heard Marc cry?

A. Yeah, I think so.

Q. Were there other times in the relationship where Marc cried?

A. After that, yeah, uh-huh.

Q. After that?

A. Uh-huh.

Q. And what kinds of instances would Marc cry?

A. When the police became involved, you know, he really did not want to be in trouble with the police and he would cry, I guess sympathy cry or whatever, trying to make me not press charges against him, but that was the only time.

Q. Now, was Marc arrested that night as far as you know?

Reported By: Scott A. Huseby, RPR
800-333-2082 Case 3:12-cv-00327-MOC Document 103 ion (704) 333-9889 Page 37 of 200 Fax (704) 372-4593
Huseby Inc. an A1
871

JA1729

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
7/31/2002

Page 2890

A.    Yes.

Q.    And was there a trial?

A.    Yes.

Q.    Was Marc convicted of felonious restraint and breaking and entering?

A.    Yes.

Q.    And did you testify in that trial?

A.    Uh-huh.

Q.    Now, do you know whether he got jail time or probation?

A.    I'm not sure, to be honest.

Q.    Now, I'm going to take you to another incident that happened a few days later, it was actually 3 days later on November 12th, 1993.

A.    Okay.

Q.    Were you working at Bojangles at that time?

A.    Still, uh-huh.

Q.    Now, on November 12th, 1993, did you work that day or go to work that day?

A.    Uh-huh.

Q.    What happened on that day?

A.    I caught the city bus to work, and the bus lets me off at like the intersection of Woodlawn and South Boulevard. Aunt after I crossed South Boulevard to walk to work, I saw him. And basically he wanted to know why

Case 3:12-cv-00327-MOC    Document 103    Filed 09/23/15    Page 38 of 200

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
7/31/2002

Page 2891

I got him in trouble, if we could work out what happened. He wanted to know if I was going to press charges and testify at the trial, things like that.

Q. And this was just after he had been arrested?

A. Yes.

Q. Now, when you first saw him that day, was it at your house or was it after you got off the bus?

A. After I got off the bus.

Q. And where was he when you got off the bus?

A. He was standing in a parking lot, but I forget which business was in that parking lot.

Q. So you spoke to him?

A. Uh-huh.

Q. And were you walking to Bojangles?

A. Uh-huh, yeah.

Q. What kinds of things was he saying to you?

A. I can't remember exactly what I said to him, but I did let him know, you know, please get away from me, leave me alone, I'm on my way to work, whatever. And by me telling him that I wasn't going to go with him, he put a knife in my back to try to get me to go with him.

Q. What kind of knife was it, did you see it?

A. Yeah, the knife had a big blade on it. It was a big knife.

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
7/31/2002

Page 2892

Q. Was it a knife that you would use to cut your food or was it a big kitchen knife?

A. Yeah, it was like a butcher's type knife.

Q. And you were in the parking lot, is that right?

A. Uh-huh.

Q. And he put that knife in your back?

A. Uh-huh.

Q. What happened next?

A. By that time, we were in the back of the place where I worked. And I don't know how, but people from my restaurant and the one next-door, TK Tripps, they all came out. And he was like, you know, he was telling me to act like nothing was wrong, don't let them know what is going on.

Q. And where was the knife at this point?

A. Still in my back -- no -- yeah, still in my back. And my manager ran up to me -- well, he approached us, and he took the back of the knife and put it at my throat.

Q. Marc did?

A. Yeah, uh-huh.

Q. When your manager ran up?

A. Yeah. When the manager saw this, him and the guy from TK Tripps, both ran toward us. Marc pushed me off him. I don't know who, but somebody grabbed me and

Reported By: Scott A. Huseby, RPR
800-333-2082        Huseby, Inc. an Af...        (704) 333-9889        Fax (704) 372-4593
Case 3:12-cv-00327-MOC   Document 103   Filed 09/23/15   Page 40 of 200
874

JA1732

United States of America vs. Aquilia Marcivicci Barnette          3:97CR23-V
Proceedings Before Judge Richard L. Voorhees          7/31/2002

Page 2893

they beat him with some stick.  They beat him with a stick.

Q.    Now, when Marc had the knife to you, what did he tell you he was going to do?

A.    He was going to kill me.

Q.    Did he say that?

A.    Uh-huh.

Q.    What else did he say, he was going to kill you and --

A.    He was going to kill me and then he was going to kill himself.

Q.    So the folks from TK Tripps and Bojangles rushed him, is that right?

A.    Uh-huh.

Q.    Now, as they rushed him, did Marc say anything to you?

A.    You know, just to act as if nothing was wrong.

Q.    And those guys beat him with a stick, is that correct?

A.    Uh-huh, yeah.

Q.    And did the police come?

A.    Yeah, the police -- yeah, they came, and he was arrested at that time also.

Q.    When the guys came up and beat him, what did you do?

Reported By: Scott A. Huseby, RPR
800-333-2082          Huseby, Inc., an Af____ ___ ___ ·on  (704) 333-9889          Fax (704) 372-4593
Case 3:12-cv-00327-MOC  Document 103  Filed 09/23/15  Page 41 of 200
875

JA1733

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
7/31/2002

Page 2894

A.   Somebody, I don't know -- like I said, I don't know who, but some guy, I was just in his arms.  I was just so -- just shaking and scared and glad for it to be over, crying.

MS. TOMPKINS:  If I may approach, Your Honor.

BY MS. TOMPKINS:

Q.   I will show you what has been marked as Government's Exhibit 55B, and ask you if you recognize what that is?

A.   Yeah, that's the statement from that day.

Q.   Is that your signature at the bottom of that statement?

A.   Uh-huh.

MS. TOMPKINS:  Move admission of Government's 55B, Your Honor.

THE COURT:  Let it be admitted.

BY MS. TOMPKINS:

Q.   And did you basically tell the police in this statement what you told us today?

A.   Yes.

Q.   And was Barnette arrested?

A.   Yes.

Q.   Now, before the court date, did he contact you?

A.   Yeah, he contacted me by phone.

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
7/31/2002

Page 2895

Q. And what did he say to you?

A. Basically he was asking me not to appear because he knew that if I didn't appear, that the charges would probably be dropped, still trying to work out the relationship, things like that.

Q. Still wanted to work things out?

A. (Nods head.)

Q. Did you go through a period of time after those two incidents in November where you didn't see him?

A. Yes.

Q. Did you begin to see somebody else?

A. Well, not seeing this person in a relationship type, but he was a friend of mine, yes.

Q. And describe him to the jury and why you began hanging out with him.

A. The person I'm speaking of, he was a body builder, very, very big guy, and I knew that not too much would happen to me with this guy around. So it was sort of like I was seeking protection from Marc with this guy.

Q. So it wasn't as much a romantic kind of thing?

A. No.

Q. All right. Now, I'm going to take you to an incident in March of 1994. Do you remember seeing Marc Barnette at your mother's house?

Reported By: Scott A. Huseby, RPR
Huseby, Inc., an A ... ion (704) 333-9889
800-333-2082 Case 3:12-cv-00327-MOC Document 103 Filed 09/23/15 Page 43 of 200 Fax (704) 372-4593
877

JA1735

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
7/31/2002

Page 2896

A.   Yes.  I was at home waiting for this guy to pick me up and take me to work and someone knocked at the door, and I assumed that it was this guy because like I say, I was waiting on him.  So I didn't ask who it was or look in the peephole, I just opened the door and it was Barnette standing at the door.  And I asked him, you know, what are you doing here, what do you want.  And he entered in the house, same thing, trying to work it out, stuff like that.  At that time, I told him that I was waiting on company to come, if he would please leave.  And when he heard that I was waiting on someone to come, he got angry.  Behind our door was a baseball bat my mom kept for protection.  He took it and he beat me with the baseball bat.

Q.   Were you injured?

A.   Oh, yeah.  He cut my hand open with the bat, I had to get stitches for it, black and blue all over.

Q.   Now, how long of a beating was that?

A.   Probably took minutes, but it seemed like it took forever.

Q.   And how did he leave you?

A.   He left me on the floor crying.  It was like he collected him himself and realized what he was doing, and he just dropped the bat and ran out the door.

Q.   And what did you do?

United States of America vs. Aquilia Marcivicci Barnette 3:97CR23-V
Proceedings Before Judge Richard L. Voorhees 7/31/2002

Page 2897

A.   Called my mom, because I knew I had to go to the emergency room and she had insurance for me, so I was calling her to let her know to give them whatever information they needed for me.  And I got on the bus and went to the emergency room.

Q.   Now, did you call the police?

A.   At some point in time, I did.  I don't remember exactly when.

Q.   Did you end up ever reporting this incident to the police?

A.   No, you are right.

Q.   Let me strike that.  Did you tell your mom what had happened?

A.   Yes, I told my mom what happened, yes.

Q.   Did you tell her that it was Marc -- did you tell her that Marc Barnette had beaten you with a bat?

A.   No.  Of course, she did not like him like I said earlier, and I did not want her to know that he was there.  Not protecting him, but I just didn't feel like getting into an argument with her about him.  I told her that I got cut on some glass that I was picking up in the front yard.

Q.   And that's when you called her to get her insurance information?

A.   Uh-huh.

Reported By: Scott A. Huseby, RPR
800-333-2082  Huseby, Inc., an Af        on (704) 333-9889        Fax (704) 372-4593
Case 3:12-cv-00327-MOC   Document 103   Filed 09/23/15   Page 45 of 200
879

JA1737

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
7/31/2002

Page 2898

Q.   Because you did not want her to know that he had come over?

A.   Yeah.

Q.   Were you in fact seeing him?

A.   No.

Q.   So you got on the bus and took yourself to the hospital?

A.   Yes.

Q.   How many stitches did you get?

A.   Between 12 and 15, I can't remember how many.

Q.   All right.  I'm going to take you to an incident that happened then 10 days after that, on March 25th, 1994.  Do you remember that date?

A.   I'm trying to recall.  Yes, I do.

Q.   Did you have stitches in your hand?

A.   Yes, I had sutures actually.  The stitches had dissolved, I had sutures left.

Q.   And had you been dropped off from work?

A.   Uh-huh.  Again, my manager dropped me off.

Q.   What happened next?

A.   Sorry?  He left before I got to the door.  I think I had my key in the door, I'm not sure, but Marc stepped from around the side of the house.  And I was startled because I didn't expect for anybody to be there, let alone him.  Of course, we conversated.  I

United States of America vs. Aquilia Marcivicci Barnette     3:97CR23-V
Proceedings Before Judge Richard L. Voorhees                7/31/2002

Page 2899

can't remember exactly what was said.  I do know that he

wanted me to go with him again.  I told him no.  He said

he had a gun, that if I didn't go with him, he was going

to shoot me.  So we got into his vehicle, drove --

Q.    Did you ever see a gun?

A.    No.

Q.    Did he ever make a display of any sort?

A.    What he did, he had his hand in his pocket.  I

supposed that his gun was in his pocket with his hand.

And he like had his jacket at my side.

Q.    Were you compelled to do what he asked because

of that threat?

A.    Uh-huh, uh-huh.

Q.    What were you thinking at that time?

A.    No, not again, what is it that he wants, you

know.  I was going to do whatever it took to come out of

the situation alive, but still I didn't want to be with

him.

Q.    What did he say to you or what happened next?

A.    Once we got in the vehicle --

Q.    What kind of car was it?

A.    It was a care he was trying to fix up, like a

Buick Regal or something.

Q.    So you got in the car with him?

A.    Uh-huh.

Reported By: Scott A. Huseby, RPR
800-333-2082          Huseby, Inc., an A          ion  (704) 333-9889          Fax (704) 372-4593
Case 3:12-cv-00327-MOC  Document 103  Filed 09/23/15  Page 47 of 200
881

JA1739

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
7/31/2002

Page 2900

Q. And where did y'all go?

A. To his mother's house.

Q. That's the house over on West Boulevard?

A. Uh-huh.

Q. What did he say to you that he wanted?

A. He more or less wanted to make sure that I didn't press charges against him again. He wanted to see how my hand was doing, again talking about the relationship, things like that.

Q. Now, did he make any moves on you physically?

A. Uh-huh. We were both in the back seat of the car sitting in the wooded area near his mom's house, and he tried to have -- well, he wanted to have sex with me and, of course, no. I still had on my work uniform. He ripped -- first he put his hand on my shirt and ripped my bra off, and then once he got the bra off he ripped my shirt off and he proceeded to strangle me with my shirt. And at that time, I was losing breath and I told him, you know, do whatever you are going to do, just get it over with, and he did. He raped me in the back seat, and I was crying, you know, telling him, this wasn't right and he just stopped.

Q. Did you try to fight him off?

A. Uh-huh. Oh, yeah. When he ripped my shirt, we scuffled for a while. I broke my pinkie nail during the

Reported By: Scott A. Huseby, RPR
800-333-2082    Huseby, Inc., an    erica    (704) 333-9889    Fax (704) 372-4593
Case 3:12-cv-00327-MOC   Document 103   Filed 09/23/15   Page 48 of 200
882

JA1740

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
7/31/2002

Page 2901

fight.  I was trying to get him off of me.

Q.  You said that you wanted to do whatever just to get it over with and get out alive?

A.  Yes.

Q.  Was that what was in your mind at the time?

A.  Yeah.

Q.  What happened next?

A.  After that incident took place, we went inside his house.  I think it was to his bedroom, I'm not exactly sure.  Once inside the bedroom, we talked for a little while.  He wanted to have sex again.  And at that time, this is going to be rude or however you take it, but I was thinking to myself that let me go ahead and have sex with him, if he satisfies himself, he will go to sleep and I can leave, and that's what took place. We had sex.  He was falling -- I saw he was getting tired and I said, can I go home, I wanted to go home. And because his mother was there and he didn't want me to be found there by her, he was willing to call me a cab so that I could leave, and that's what he did.  He called a cab.  By the time we got outside, we saw the cab coming down the street.  So he took a little flashlight to try and get the cab to come and get me.

Q.  So he waited down by the road to help the cab find your house?

Reported By: Scott A. Huseby, RPR
Huseby, Inc., an (704) 333-9889
800-333-2082    Fax (704) 372-4593
Case 3:12-cv-00327-MOC   Document 103   Filed 09/23/15   Page 49 of 200

883

JA1741

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
7/31/2002

Page 2902

A.    Yeah.

Q.    Now, was that Marc Barnette being nice to you?

A.    No, that's Marc Barnette doing damage control. He didn't want his mom to find out that I was in the house, and I guess he was trying to make me feel good about what happened and not call the police once I got home.

Q.    Now, what happened when you got home?

A.    I told mom what happened and we called the police.

Q.    Did you want her to call the police?

A.    Oh, yeah, uh-huh.

Q.    What was your emotional state at that time?

A.    I remember telling my mom I wanted to kill him and I did tell her I wanted to kill him, because I was just so tired of the cycle going through it with him. And I felt dirty about what happened. I went and took a shower trying to get as clean as possible. The police got there, told them what happened, and they took me down for a rape kit.

Q.    And without getting too graphic, tell the jury what you have to go through to have a rape kit done.

A.    Oh, it's not fun at all. They take hair samples. They take samples from under your nails. They take pubic hair samples. They slough off some of your

Case 3:12-cv-00327-MOC   Document 103   Filed 09/23/15   Page 50 of 200
884

United States of America vs. Aquilia Marcivicci Barnette          3:97CR23-V
Proceedings Before Judge Richard L. Voorhees                     7/31/2002

Page 2903

skin.  They get samples of that.

Q.   So you went and had a pelvic exam and had hair samples taken?

A.   Yes, a pelvic exam as well, yes.

Q.   Now, when you gave your statement to the police, did you give a complete statement to the police initially?

A.   No.

Q.   Why not?

A.   Not because I was lying about what happened, it's just that part of the events I wanted to not come out due to my mom finding out more or less.

Q.   What didn't you want your mother to know about?

A.   I think a few days before this incident, Barnette and I had been together, we were together sexually, and I didn't want her to know about that entire incident, so I just didn't say anything about it.

Q.   You told them about what happened that night only?

A.   Uh-huh.

Q.   Did the police later, after they had spoken to Marc Barnette, did they come and confront you with that?

A.   Yes.

Q.   And did you then tell them that in fact was what happened?

Reported By: Scott A. Huseby, RPR
800-333-2082          Huseby, Inc., an A          rien, (704) 333-9889          Fax (704) 372-4593
Case 3:12-cv-00327-MOC   Document 103   Filed 09/23/15   Page 51 of 200
885

JA1743

Page 2904

A.    Uh-huh.

Q.    Did that have an impact on the charges that were filed?

A.    Yes, I think so.

MS. TOMPKINS:  May I approach the witness, Your Honor?

THE COURT:  Yes.

BY MS. TOMPKINS:

Q.    I'm going to show you what has been marked as Government's Exhibit 55C and ask you to look at Page 3 of that.  Just glance over it, if you would.

A.    Okay.

Q.    Is that the statement that you gave to investigator -- a rape investigator from the police department?

A.    Yes.

Q.    And is that your signature at the back of that?

A.    Uh-huh.

MS. TOMPKINS:  Move admission of Government's Exhibit 55C, please.

THE COURT:  Let it be admitted.

BY MS. TOMPKINS:

Q.    Now, did you see the defendant any after that point?

A.    No.

Reported By: Scott A. Huseby, RPR
800-333-2082   3:12-cv-00327-MOC   Document 103   Filed 09/23/15   Page 52 of 200   (704) 372-4593
Huseby, Inc., ... (704) 333-9889

886

JA1744

United States of America vs. Aquilia Marcivicci Barnette 3:97CR23-V
Proceedings Before Judge Richard L. Voorhees 7/31/2002

Page 2905

Q. Moved on with your life?

A. As best I could, yeah, yeah.

MS. TOMPKINS: Thank you, Alesha, that's all the questions I have.

CROSS-EXAMINATION

BY MS. LAWSON:

Q. Hello, how are you, Ms. Houston?

A. I'm fine, how are you doing?

Q. I just have a few questions to ask you, I hope you don't mind.

A. Okay.

Q. First of all, going to the last incident where you made a statement to Investigator Graue where Marc had you in the car and ripped off your shirt and your bra, you did -- you lied to the police basically and they found out about it?

A. No, I didn't lie, I just omitted information.

Q. You omitted the fact that you and he had consensual sex earlier?

A. Yeah.

Q. And as a result of that, they didn't charge Marc Barnette with rape?

A. Yeah.

Q. But you testified that in the beginning of your relationship, everything was very nice, very happy, you

Reported By: Scott A. Huseby, RPR
Huseby, Inc., an A....ion (704) 333-9889
800-333-2082 Fax (704) 372-4593

Case 3:12-cv-00327-MOC Document 103 Filed 09/23/15 Page 53 of 200

887

JA1745

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
7/31/2002

Page 2906

were very much in love, is that right?

A.   Yes.

Q.   He treated you well?

A.   In the beginning, yes.

Q.   And then at what point did he start to change?

A.   A couple of months, maybe like I said about 3 months after.

Q.   Was that then in the summertime when you spent 3 months living with him in that motel?

A.   It wasn't that long.

Q.   Two months?

A.   Maybe.

Q.   And so it was while you were at the motel that you think it started?

A.   It started before then, but I just didn't know any better at that time.

Q.   And it spiraled, didn't it, it got worse and worse with the passage of time?

A.   Yeah.

Q.   And he was accusing you of being unfaithful to him?

A.   Uh-huh.

Q.   And that piece of paper that he found in your book bag, was he searching your book bag?

A.   Uh-huh, yes.

Case 3:12-cv-00327-MOC  Document 103  Filed 09/23/15  Page 54 of 283

JA1746

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
7/31/2002

Page 2907

Q.    And he found a piece of paper, and was it apparent from the piece of paper that it was a man, the college student?

A.    Yes.

Q.    So it had some kind of man's name on it?

A.    Yes.

Q.    And he accused you of being unfaithful?

A.    Yes.

Q.    And you hadn't been unfaithful, had you?

A.    No.

Q.    And the hitting was generally about you not doing what he wanted you to do?

A.    Yes.

Q.    And he objected to your dressing in a more revealing way because he felt that other men would start looking at you?

A.    Yes.

Q.    And he followed you or wanted to know where you were because he was concerned that you might be seeing other men?

A.    Yes.

Q.    And that was really the central issue between the two of you is that if you did anything that made him think you were being unfaithful, even though you weren't, he would get angry and start hitting, is that

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
7/31/2002

Page 2908

basically it?

A. No, because some incidents occurred because we had pending court cases and he, like I said, didn't want me to testify in those court cases.

Q. Well, let's get to that, but when you had periods -- the periods that your mother disapproved of, when he was hurting you it was because he thought, wrongfully, but he thought you were being unfaithful or you were dressing in a way that other men would look at you, things of that nature?

A. Sometimes, yeah.

Q. And then as you started taking out charges, you started telling the police what was happening, he not only asked you to drop the charges, but he kept talking to you about resuming the relationship, is that right?

A. Uh-huh, yes.

Q. And in fact what you went to the Motel 6 -- well, no, the hotel on Clanton Road, and when was that, that you went to the one on Clanton Road?

A. I'm not exactly sure if you're asking me for a date.

Q. No, I mean before or after November?

A. Before, before.

Q. Before November. And even then, you said that he was trying to work things out with you?

Case 3:12-cv-00327-MOC Document 103 Filed 09/23/15 Page 56 of 200

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
7/31/2002

Page 2909

A.    Yeah.

Q.    And the night that he kicked your uncle's door in, is it your testimony that he walked 4 miles to get to you that night?

A.    No.  At first I thought he did, but I later found out that he drove.

Q.    So he had a car?

A.    Uh-huh.

Q.    Now, he is not much bigger than you are, is he, about 5 foot 4?

A.    Yeah, not now he is not much bigger than me, no.

Q.    What was different about him back then, heavier?

A.    I was smaller and at that time, he was.  He was taller than me and he was bigger than I was.

Q.    Okay.  And again, I'm not contesting that, but he was about 5 foot 4, and he managed to swing you up over his shoulder after kicking in the door?

A.    (Nods head.)

Q.    And you told the police all of this?

A.    Yes.

Q.    And you told them that he threatened to kill you?

A.    Yes.

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
7/31/2002

Page 2910

Q.   You told your mother?

A.   Yeah.

Q.   You told your Uncle Jasper?

A.   Yes.

Q.   And it was pretty obvious that he would do almost anything to get to you, is that right?

A.   Yes.

Q.   And in fact before, several weeks before he kicked down the door at your Uncle Jasper's, he did the same thing, he kicked it in once before then?

A.   Yes.

Q.   And he ran right into the room where you were and there were other people there and he snatched some kind of scarf off of your head, right?

A.   Yes.

Q.   And said what, what did he say?

A.   I don't remember.

Q.   Did it have something to do with why are you doing this to me?

A.   Probably.

Q.   And by doing this to me, he was referring to breaking up?

A.   Yes.

Q.   And that was part of the escalation of events that led to, for instance, him holding you at knife

800-333-2082    Case 3:12-cv-00327-MOC   Document 103   Filed 09/23/15   Page 58 of 200   (704) 372-4593

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
7/31/2002

Page 2911

point outside of the restaurant on November 12th?

A. I think that was more or less of us going to court, yeah.

Q. And on November 9th when he called your mother's house and was talking to you and crying uncontrollably, is that the night that that was happening?

A. Yes.

Q. He was talking to you both about not going to court but also getting back together again?

A. Yes.

Q. And the minute you said something about getting back together again, it was like a switch flipped?

A. Uh-huh.

Q. Now, you told the police when they came out to his mother's house and got you that night that she knew you were in there?

A. Uh-huh.

Q. That you were scared of his mother?

A. Yes.

Q. And you didn't want to talk to her?

A. Yes.

Q. Why were you scared?

A. She carries on with this facade. I'm not exactly sure 00 it's not because she is trying to

Reported By: Scott A. Huseby, RPR
800-333-2082     Huseby, Inc., an          erion (704) 333-9889          Fax (704) 372-4593
Case 3:12-cv-00327-MOC   Document 103   Filed 09/23/15   Page 59 of 200
893

JA1751

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
7/31/2002

Page 2912

protect Marc, I think, but I think it's more or less of her trying to protect this image that she carries on. And I don't want her -- I don't appreciate her talking to me any kind of way trying to protect this image of her that she has, so --

Q.  Is it image of herself?

A.  Image of herself and her family, yeah.

Q.  Okay.  What did she do that makes you feel this way about her, can you tell the jury a little bit about that?

A.  She is just -- the only word that comes to mind that you may understand is she is just fake.  She is real fake.

Q.  I'm sorry, I couldn't hear you.

A.  She is fake.

Q.  Fake, F-A-K-E?

A.  F-A-K-E, yes.  She just -- to me, she is just so, so busy trying to live this -- live up to this image of hers that she's created.

Q.  What image is it that's she created?

A.  That her family is nice, that they have money and she is nice and stuff like this, just -- and that her family is all together.

Q.  And what is the truth?

A.  That it's not.

Reported By: Scott A. Huseby, RPR
800-333-2082          Huseby, Inc., an          prion (704) 333-9889          Fax (704) 372-4593
Case 3:12-cv-00327-MOC   Document 103   Filed 09/23/15   Page 60 of 200

894

JA1752

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
7/31/2002

Page 2913

Q. Tell the jury about that.

A. With the exception of Mario and the grandfather, they have a lot of problems.

Q. Like?

A. At that time, she was abusing drugs, her and the aunt that lived there, just a lot of things going on in that house.

Q. In fact, at times when you and Marc were close, he talked to you about the fact that his mother was pregnant and using drugs, didn't he?

A. Yes.

Q. And he told you that he was really worried about whether the baby would be born drug addicted, didn't he?

A. Yes.

Q. And those were the times when you kind of liked Marc because he was sensitive about that?

A. Yeah.

Q. And he talked to you about an incident in his childhood when he was near his mother and his father hit his mother in the head with a hammer and blood flew all over?

A. Yeah.

Q. And that was when you and Marc were getting along?

Reported By: Scott A. Huseby, RPR
800-333-2082    Huseby, Inc. an Af    on (704) 333-9889    Fax (704) 372-4593
Case 3:12-cv-00327-MOC   Document 103   Filed 09/23/15   Page 61 of 200
895

JA1753

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
7/31/2002

Page 2914

A. Yeah.

Q. Did he tell you how that affected him?

A. He didn't really say how it affected him, but I could tell by the way he was telling the story that it really, really bothered him to see that.

Q. He also told you how relieved he was when his mother's baby was born not addicted to drugs, didn't he?

A. Yeah, he did.

MS. LAWSON: No further questions, thank you.

MS. TOMPKINS: Nothing further.

THE COURT: You may step down.

MS. ROSE: W.T. Brandon.

W.T. BRANDON,
being first duly sworn, was examined and testified as follows:

DIRECT EXAMINATION

BY MS. ROSE:

Q. Would you introduce yourself, please, sir?

A. Terry Brandon.

Q. And you are an officer?

A. Yes, a detective in the sexual assault unit.

Q. In the Charlotte-Mecklenburg police department?

A. That's correct, yes.

Q. How long have you been with that department?

Reporter Rev. Scott A. Huseby, RPR
800-333-2082 3:12-cv-00327-MOC, Document 103 Filed 09/03/13-9889ge 62 of 200x (704) 372-4593
896

JA1754

United States of America vs. Aquilia Marcivicci Barnette    3:97CR23-V
Proceedings Before Judge Richard L. Voorhees    7/31/2002

Page 2915

A.    Been with the department since March of '87, and I've been with the sexual assault unit since August of '93.

Q.    March of 1994, you were actively involved as an investigator within the sexual assault unit there?

A.    Yes, I was.

Q.    And did you in relation to that position begin an investigation into the defendant Barnette?

A.    Yes.

Q.    What were the circumstances?

A.    On March 25th of 1994 at approximately 7:17 a.m., I received a call from patrol which they stated they were in the preliminary investigation of a rape case and requested our assistance.

Q.    And did you become involved then?

A.    Yes, myself and Investigator Graue responded to 3413 West Boulevard, where officers were on the scene at that time.

Q.    Now, had you been to that residence before?

A.    No, I had not.

Q.    Will you describe kind of the location?

A.    The location is off of West Boulevard down near the intersection of Billy Graham, and it's actually before you get to Billy Graham off of West Boulevard. And as you are driving down, it's pretty easy to drive

Reported Bv: Scott A. Huseby, RPR
800-333-2082    Huseby, Inc., an A        rion (704) 333-9889    Fax (704) 372-4593
Case 3:12-cv-00327-MOC   Document 103   Filed 09/23/15   Page 63 of 200
897

JA1755

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
7/31/2002

Page 2916

by the driveway that you would actually turn up in because it's real heavy wooded area. It looks like a driveway, just kind of goes up and it ends. But actually as we were driving out, I asked the officers exactly where were they and they kind of guided me to that location, and there is a house back up off of the roadway you can't actually see.

Q. When you got there, there were some patrol officers already staking care of initially things?

A. Yes, they had more or less secured the scene and secured the suspect vehicle, and also Barnette was sitting in the back seat of the vehicle at that time. He had been arrested on an unrelated trespassing charge.

Q. So those were other outstanding warrants not related to any sexual assault?

A. Right, this was unrelated to what we were investigating at that time.

Q. When you got there, did you talk with the defendant?

A. Yes, we did.

Q. Did you tell him why you were there and what charges you were investigating?

A. Yes, I told him that we were investigating an allegation made against him that he was the suspect in a rape and kidnapping.

Reported By: Scott A. Huseby, RPR
800-333-2082       Huseby, Inc.       (704) 333-0889       Fax (704) 372-4593
Case 3:12-cv-00327-MOC   Document 103   Filed 09/23/15   Page 64 of 200
898

JA1756

United States of America vs. Aquilia Marcivicci Barnette                    3:97CR23-V
Proceedings Before Judge Richard L. Voorhees                    7/31/2002

Page 2917

Q.   Now, at that point did you already have some preliminary information so that you knew where to begin your investigation or any particulars?

A.   Yes.  Like I said, at about 7:17 we received a call and the patrol officers had given us the preliminary investigation, the information that they knew at that time, according to what the victim had been saying had happened to her and the items that she had missing.

Q.   Based upon that information, did you ask the defendant if you could search his car which was parked there outside the house?

A.   Yes, we did ask him that and did obtain consent from Barnette about searching his vehicle, and I also asked him could we search the residence, too, his room, and he gave us consent to search that also.

Q.   Could you describe the car that you searched?

A.   It was a '79 model purple Buick Regal.  As I approached the vehicle, I could see in the passenger front seat there was a fingernail and also sort of a lavender purplish shirt that was in the front seat area. There was no back seat in the car and it had some oil cans and things of that in the back seat area.

Q.   As part of your evidence collection, did you in fact collect the broken fingernail and the shirt?

Page 2918

A.    Yeah.   What I did was at that point went ahead and called for crime scene to respond to our location. Before any of the evidence was collected, it was photographed and then that evidence was collected by our crime scene technicians.

Q.    Now, was that, the recovery of a broken fingernail, consistent with what you had learned from Ms. Chambers?

A.    Yes.   At one point I did go to the hospital, and I did observe on her right small end finger a broken fingernail or what appeared to be a fingernail broken off, and it appeared to be that fingernail that we saw in the vehicle.

Q.    You said you'd also gotten permission to search in the home.  Describe what you found there or where, particularly within the house you did search.

A.    We conducted our search and focused mainly on the defendant's bedroom.  As you walked in, the floor was plywood, there was no carpeting on the floor.  There was a box spring mattress set up along the wall area. There was -- the seat, the back seat from the vehicle, it was in that room also with clothes items thrown about on top of it.  There were other clothes items on the floor.  And there was a lady's black bra on the floor also in the room.

United States of America vs. Aquilia Marcivicci Barnette          3:97CR23-V
Proceedings Before Judge Richard L. Voorhees          7/31/2002

Page 2919

Q. Did you collect evidence there?

A. Yes, it was also photographed and collected by our crime scene technicians.

Q. Were there other people present at the defendant's home?

A. Yes, his grandfather and -- Mr. Cooper and his mother and an aunt.

Q. At that time, did you interview anyone?

A. I interviewed the grandfather. Detective Graue, she interviewed or talked to the mother and the aunt. But I did interview the grandfather.

Q. I'm going to show you what has been marked as Government's Exhibits 56A and 56B. If you would, please, take a look at those exhibits. Are you able to identify them?

A. Yes.

Q. What is 56A?

A. A is the subpoena witness and also property disposition form and adult waiver of rights which I read to Barnette on that day and he signed it, and also a statement from Mr. Cooper, the grandfather. This is the arrest affidavit that I filled out when we charged Barnette with first degree kidnapping and first degree rape, two counts. And I can't make out what this other right here is.

Reported By: Scott A. Huseby, RPR
800-333-2082          Huseby, Inc., an          erion  (704) 333-9889          Fax (704) 372-4593
Case 3:12-cv-00327-MOC   Document 103   Filed 09/23/15   Page 67 of 200
901

JA1759

Page 2920

Q. That's second degree rape looks like, but is that part of your internal paperwork for the department?

A. Yes, it is, sure is.

Q. All right. Now, 56B, what is that?

A. This is the statement that I obtained from Barnette on that day when I talked to him and he gave a statement. It consists of about seven pages. And I took his statement and then part of the way through, he wanted to add something and I gave it to him, and that's why there is a change in handwriting styles. Part of that is what he wrote himself.

Q. So you wrote part based upon what he was telling you?

A. Yes.

Q. And then he took over and completed that?

A. Yes.

MS. ROSE: Your Honor, at this time I'd move to admit Government's Exhibits 56A and 56B.

THE COURT: Let them be admitted.

BY MS. ROSE:

Q. Do you have copies of these?

A. Yes, I do.

Q. Where was the defendant interviewed?

A. At the law enforcement center, which was the old police department located at 825 East Fourth Street.

Reported By: Scott A. Huseby, RPR
800-333-2082   Huseby, Inc.   (704) 333-9889   Fax (704) 372-4593
Case 3:12-cv-00327-MOC Document 103 Filed 09/23/15 Page 68 of 200
902

JA1760

United States of America vs. Aquilia Marcivicci Barnette          3:97CR23-V
Proceedings Before Judge Richard L. Voorhees          7/31/2002

Page 2921

Q.   And about what time that day did you speak with him?

A.   I read him his rights at 10:19 a.m., and looks like we finished up obtaining his statement at 2:49 p.m.

Q.   Now, had you already, or had you spent any time with Ms. Chambers at that point?

A.   Yes, I had, yes.

Q.   Had you already completed your investigation related to her and taken her statement?

A.   What we did was had patrol take a preliminary statement from her.  It's customary in the sexual assault unit we will go back and reinterview the victim a day or two later because it's so hectic when all that is going on.  And usually the statement is taken at the hospital, so we usually go back for a second statement.  But to answer your question, I did have the patrol officer obtain a statement from her, and that was the information that we were using.

Q.   So you knew the scenario of the events that had taken place before you spoke with the defendant?

A.   That's correct.

Q.   And that assisted in asking the proper questions or knowing --

A.   Yes.

Reported By: Scott A. Huseby, RPR
800-333-2082          Huseby, Inc., an A?          ion  (704) 333-9889          Fax (704) 372-4593
Case 3:12-cv-00327-MOC   Document 103   Filed 09/23/15   Page 69 of 200
903

JA1761

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
7/31/2002

Page 2922

Q.    -- what you needed to ask.  Was she still at the hospital having the rape kit done or receiving medical treatment?

A.    Yes, when we went to -- when we went to his residents, yes, she was at the hospital.

Q.    You Mirandized the defendant before you spoke with him on this occasion?

A.    Yes.

Q.    Where you said that was part of the package that you identified as Government's Exhibit 56A.  What did the defendant tell you had taken place on this occasion?

THE COURT:  Wait just a minute.  Members of the jury, I will instruct you a little further about statements made to investigating authorities.  Whether this statement was voluntarily given, and if so, what weight to give it is entirely up to you.  In other words, these are questions of fact which are up to a jury to decide.  In determining whether a statement was voluntary and what weight to give it, if any, you should consider what we call the totality of the circumstances. You may consider, for example, whether the statement was induced by any promise or threat.  You may also consider any other factor which your common sense tells you is relevant to the issue of voluntariness.  Thank you.

Case 3:12-cv-00327-MOC   Document 103   Filed 07/03/15   Page 70 of 200

904

JA1762

United States of America vs. Aquilia Marcivicci Barnette      3:97CR23-V
Proceedings Before Judge Richard L. Voorhees      7/31/2002

Page 2923

BY MS. ROSE:

Q.   What did he tell you had occurred?

A.   He said that on that Wednesday prior to this day here, which would have been Friday morning, that he and Alesha, the victim, had stayed in a motel that day and had consensual sex, had left the motel and she was going to get her hair done.  The next morning, he called her early.  Apparently he had the hotel room still in his name, called her real early that morning to try and get in touch with her.  She was -- she did not answer the phone the first time about 6:49.

The second time he called was shortly after that, and he spoke with her.  She stated then she could not get away to meet him, that -- let me see here, I'm kind of summarizing some of this.  That he then worked on his vehicle throughout the day, made a few trips to a parts house where he purchased parts for the car that he was working on which was that purple Buick. He was having a steering, power steering problem and it was leaking fluid.

He finished work on the car about 10:00 p.m. that night, went in, checked his mail, voice mail, saw that he had a call, he was hoping that it was her, the victim, saw that it was somebody else.  He then called her work where he spoke with her, she answered

800-333-2082      Huseby, Inc., an A:      ion  (704) 333-9889      Fax (704) 372-4593
Case 3:12-cv-00327-MOC   Document 103   Filed 09/23/15   Page 71 of 200
905

JA1763

Page 2924

the phone. She said she was going to have to stay until closing. Then he found out what time she closed. He stated that he stayed home and didn't go anywhere after that, that he was home the rest of the night until his aunt came and woke him up and said some people are looking at your car and it was the police that was down there looking at his car.

Q. And he went on to say that his aunt knew he was home all night long, he didn't go anywhere, and said he didn't move his car after he came in around midnight?

A. That's correct, yes.

Q. And he also said that Alesha that had made all of this up?

A. Yes.

Q. Did he also tell that you that his car could be easily broken into and that he thought somebody had framed him by putting evidence in the car?

A. Yes, he made that statement and it was -- added it to his statement that day.

Q. In fact, that's part of what he wrote?

A. Right.

Q. Did he go on to say that he and Alesha did have a relationship, that they had some rocky points but that they were involved in this relationship together?

A. Yes, and also that he felt like her moths was

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
7/31/2002

Page 2925

making her stay away from him, but he did mention in his statement that he knew that she parked -- she knew that he parked his car there and was easy to get into, and that she did put those items in his car.

THE REPORTER: That she did put those items in his car?

THE WITNESS: That she did put the items in his car, planted them.

BY MS. TOMPKINS:

Q. After the interview was completed, what happened next?

A. After that was completed, we would have finished up our investigation with collecting hair standards and then would have completed the arrest processing and sent him to jail.

Q. Do you know what eventually happened with those charges which you lodged against the defendant?

A. I think they were actually dropped by the DA's office.

Q. Was he not convicted of felonious restraint or were they dropped totally?

A. I can't remember. I don't remember.

MS. ROSE: All right, thank you very much.

CROSS-EXAMINATION

BY MS. LAWSON:

Reporter: Pon Scott Huseby, RPR
800-333-2082 Case 3:12-cv-00327-MOC-DCK Document 103 Filed 09/23/13 Page 73 of 200 (704) 372-4593
907

JA1765

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
7/31/2002

Page 2926

Q. Investigator Brandon, how are you?

A. Doing fine.

Q. Would it refresh your recollection that he was -- the DA's office would not prosecute this particular case that you investigated and that the felonious restraint had to do with him taking her out of the Jasper Chambers apartment in November?

A. I don't remember the disposition of this case.

MS. LAWSON: May we have a moment, Your Honor? I need to find a document.

THE COURT: Yes, you may.

MS. LAWSON: May I approach the witness, Your Honor?

THE COURT: Yes.

BY MS. LAWSON:

Q. Investigator Brandon, perhaps it would help you to start somewhere around here. Read this and see if it refreshes your recollection about the disposition of the case that you have been testifying about, just read it to yourself.

A. Okay.

Q. Does that help you?

A. Yes.

Q. What do you now recall about what happened with the charge that you investigated?

800-333-2662    Case 3:12-cv-00327-MOC   Document 103   Filed 09/23/15   Page 74 of 200    (704) 372-4593

JA1766

United States of America vs. Aquilia Marcivicci Barnette    3:97CR23-V
Proceedings Before Judge Richard L. Voorhees    7/31/2002

Page 2927

A.    That according to that statement there, that the case was rejected for prosecution.

Q.    Now, in part was that because of the follow-up interview that police officer Graue took with Alesha Chambers where she indicated that she had been intimate with Marc Barnette on several occasions between the day that they broke up in early March and this occasion?

A.    I would probably think that the DA's office would have to review the entire -- I don't know if I could just say that the DA's office would reject the case based on one statement versus another.  But just in looking at the entire case, and the likelihood that it would get a conviction is what they have to try and determine, you know.

Q.    Did you feel that you had a strong case?

A.    I felt like there was probable cause to arrest Mr. Barnette for what had happened, and, yeah, I felt like there was probable cause.

MS. LAWSON:  May I approach the witness, Your Honor?

THE COURT:  Yes.

BY MS. LAWSON:

Q.    Investigator Brandon, let me ask you if you would take a look at Exhibit 10 and see if that is not the follow-up interview conducted by Officer Graue of

Reported By: Scott A. Huseby, RPR
800-333-2082    Huseby, Inc., an /    rion (704) 333-9889    Fax (704) 372-4593
Case 3:12-cv-00327-MOC  Document 103  Filed 09/23/15  Page 75 of 200
909

JA1767

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
7/31/2002

Page 2928

Alesha Chambers.

A. Yes, it is.

Q. And the DA's office had a copy of that when they considered whether to prosecute this as a rape case?

A. Oh, yes, they would have had it.

Q. And this is an official document of the police department and you have yourself reviewed it?

A. Yes.

Q. And the problem with the prosecution was that Alesha Chambers said that she had been sneaking around with him and her brother had seen them together and that's why they broke up?

A. Yes.

Q. And that's the day that he hit her with the baseball bat?

A. Yes.

Q. And that would according to this be March 15th, 10 days before the March 25th incident that you've been talking about?

A. That's correct, yes.

Q. And she told Investigator Graue on the 25th that she told him she didn't want to be with him anymore, she was trying to push him away and he was trying to hug her, he lost it, is that what she told

Reported By: Scott A. Huseby, RPR
Huseby, Inc., an A                ion
800-333-2082                                    (704) 333-9889        Fax (704) 372-4593
Case 3:12-cv-00327-MOC   Document 103   Filed 09/23/15   Page 76 of 200

910

JA1768

United States of America vs. Aquilia Marcivicci Barnette 3:97CR23-V
Proceedings Before Judge Richard L. Voorhees 7/31/2002

Page 2929

Investigator Graue?

A. Yes.

Q. Basically, Investigator Brandon, you felt that Alesha Chambers was hurt in some way by Marc Barnette and you were unable to get the DA's office to prosecute the case, is that right?

A. That's correct.

Q. Were you aware of the other incidents in November, on November 9th and November 12th, during the course of your investigation?

A. You are speaking of November of '93?

Q. Right.

A. I knew there was a prior kidnapping.

Q. Did you sense that Marc Barnette's family took any of this seriously?

A. No.

MS. LAWSON: No further questions, thank you.

REDIRECT EXAMINATION

BY MS. ROSE:

Q. In fact, when you interviewed his grandfather, he made a statement saying that Marc had been home all night?

A. That's correct, yes, he did.

Q. And the family tended to close around him in a

Reported By: Scott A. Huseby, RPR
Huseby, Inc., and
800-333-2082 (704) 333-9889 Page 77 of 200 Fax (704) 372-4593

Case 3:12-cv-00527-MOC Document 103 Filed 09/23/15 Page 77 of 200

911

JA1769

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
7/31/2002

Page 2930

protective way?

A. Yes. The mother, her comment was that he's been dating her, you know, I don't think he did that.

MS. ROSE: Okay, thank you.

THE COURT: Members of the jury, we will take our afternoon break at this time.

(The jury left the courtroom.)

(Brief recess.)

THE COURT: May we have the jury, please.

(The jury returned to the courtroom.)

THE COURT: The jury is with us.

MS. ROSE: Brent Burgess.

BRENT M. BURGESS, being first duly sworn, was examined and testified as follows:

DIRECT EXAMINATION

BY MS. ROSE:

Q. Hi. Would you introduce yourself to the jury, please, ma'am.

A. I'm Brent McQuickerd Burgess.

Q. And where do you live?

A. I live in Mebane, North Carolina.

Q. Do you work there?

A. No. Currently I'm a stay-at-home mother.

Q. Because you have a new baby, right?

Reported By: Scott A. Huseby, RPR
800-333-2082   Huseby, Inc. and Associates (704) 338-9889   Fax (704) 372-4593
Case 3:12-cv-00327-MOC   Document 103   Filed 09/23/13   Page 78 of 200
912

JA1770

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
7/31/2002

Page 2931

A. Yes.

Q. Prior to that time, though, where were you working?

A. I worked at the Chapel Hill Police Department from '94 to '98, and then from '98 to 2000 I worked at IBM in RTP.

Q. Now, did you formerly live in Charlotte?

A. Yes. I went to school at UNC Charlotte.

Q. And while attending UNC Charlotte did you have a job?

A. Yes.

Q. Where did you work?

A. I worked at TK Tripps waiting tables.

Q. And where is that located?

A. Woodlawn, I believe. I don't remember the street.

Q. Woodlawn. Is there a Bojangles next to that TK Tripps --

A. Yes.

Q. -- or was there at the time?

A. To the left.

Q. Back in November of 1993 were you, in fact, waiting tables at TK Tripps?

A. Yes.

Q. On that date, November the 12th of '93, will

Case 3:12-cv-00321-MOC    Document 103    Filed 09/23/15    Page 79 of 200

913

JA1771

Page 2932

you tell the members of the jury what happened as you were getting into work that day?

A.   I was in the back of the kitchen and we were preparing for dinner and our assistant manager came in from the back parking lot of the rear door and said, Brent, I need you to call 911, and he said it so casually I thought he was kidding, and I said for what for and he said, no, I'm serious, there is a guy beck here in the back parking lot that has a knife to a girl's throat, call 911. And as he was saying this, he was unscrewing like an industrial size bedroom handle from the broom and he headed out the back door. And our hostess heard it, so she went ahead and called, and I followed him out the back door.

Q.   When you got outside, when did you see?

A.   Behind our parking lot there is like a little residential street and a residential area behind it, and there was a black male holding a black female on that street and he had a knife to her throat.

Q.   How was she dressed? Was she in a particular uniform?

A.   I don't -- I can't remember.

Q.   You don't recall whether it was a Bojangles uniform or other --

A.   I mean, it may have been, because I know she

Case 3:12-cv-00327-MOC, Document 103    Filed 09/23/15    Page 80 of 200

914

JA1772

United States of America vs. Aquilia Marcivicci Barnette 3:97CR23-V
Proceedings Before Judge Richard L. Voorhees 7/31/2002

Page 2933

worked there.

Q. Now, what was happening at the point that he had the knife to her throat, was there any conversation going on or words being exchanged?

A. From what I remember, he was walking backwards and he had her kind of up over her shoulder and there were several employees from Bojangles and a couple of our employees that were approaching him and, you know, everybody was kind of yelling back and forth. I don't remember anything specific said.

Q. Can you describe the knife?

A. It was a large kitchen knife, sort of like a butcher knife. It was visible -- I was 30 or 40 feet away; I could see it plainly.

Q. What was he doing it with the knife?

A. He had it, from what I remember, he had it to her throat and he, I guess he became distracted from all of the people approaching him, and I think that's what allowed her to get away.

Q. And was your manager out there with this big bedroom handle?

A. Yes. He --

Q. Describe what happened.

A. He was the closest to him because he had a, you know, sort of a weapon with him. And so when she got

Reported By: Scott A. Huseby, RPR
800-333-2082 Huseby, Inc., an A rien (704) 333-9889 Page 81 of 200 Fax (704) 372-4593
Case 3:12-cv-00327-MOC Document 103 Filed 09/23/15 Page 81 of 200
915

JA1773

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
7/31/2002

Page 2934

away, she ran to someone.  And he started going towards Kevin Daly, our assistant manager, swinging the knife in his direction and Kevin was kind of walking backwards and with the bedroom handle trying to hit him with it, and he hit him several times.  And this industrial size broom, mop handle broke over his arm or some part of his body before he actually dropped the knife, and they wrestled him to the ground and held him there until the police arrived.

Q.   And when the police arrived, did you, in fact, make a statement?

A.   Yes.  I sat next to the police officer in his car and told him what I saw and he wrote the police report.

MS. ROSE:  If I may approach, Your Honor.

BY MS. ROSE:

Q.   I'm going to hand you what I've marked as Government Exhibit 60.  If you would, Ms. Burgess, take a look at that exhibit.  Are you able to identify it?

A.   Yes, and that's my signature, uh-huh.

Q.   Is that the statement that you gave the Charlotte officer on that particular evening?

A.   Uh-huh, yep.

Q.   And did you basically tell the officer what you've told the jury here today?

Reported By: Scott A. Huseby, RPR
800-333-2082    Huseby, Inc., an Af    ion (704) 333-9889    Fax (704) 372-4593
Case 3:12-cv-00327-MOC   Document 103   Filed 09/23/15   Page 82 of 200
916

JA1774

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
7/31/2002

Page 2935

A.    Yes.

MS. ROSE:  I would move for admission of Government's Exhibit 60, Your Honor.

THE COURT:  It will be admitted.

MS. ROSE:  And I have no other questions at this time.

CROSS-EXAMINATION

BY MS. LAWSON:

Q.    Good afternoon.  How are you?

A.    Good.

Q.    Good.  Your manager -- well, do you know Jeffery Jordan?

A.    Jeffery Jordan?

Q.    Right.

A.    No.

Q.    Is he a coworker -- would it refresh your recollection to know he was a coworker of yours at the Bojangles.

A.    I worked at TK Tripps --

Q.    I'm sorry.

A.    -- not at Bojangles.

Q.    I see.  One of the witnesses to this event said that when he was hit with the stick two or three times it didn't seem to do anything because he was acting crazy.  Would you agree with that assessment?

Reported By: Scott A. Huseby, RPR
800-333-2082          Huseby, Inc., an A:              ion  (704) 333-9889          Fax (704) 372-4593
Case 3:12-cv-00327-MOC  Document 103  Filed 09/23/15  Page 83 of 200
917

JA1775

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
7/31/2002

Page 2936

A.    It was a chaotic situation.  I mean, I guess I would agree with that, yeah, I mean, because, yeah, he had to hit him several times before he dropped the knife.  That's why it broke over him.

MS. LAWSON:  No further questions.  Thank you.

MS. ROSE:  I have no other questions.  Thank you.

THE COURT:  You may step down.

MS. TOMPKINS:  The government calls Officer Donna Burgess.

DONNA BURGESS,
being first duly sworn, was examined and testified as follows:

DIRECT EXAMINATION

BY MS. TOMPKINS:

Q.    State your name, please.

A.    Donna Burgess.

Q.    And how are you employed?

A.    Charlotte-Mecklenburg Police Department.

Q.    How long have you been with the police department?

A.    15 years in February.

Q.    And what are your current duties?

A.    I'm assigned to the patrol division in Adam 1.

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
7/31/2002

Page 2937

Q.    What were your duties back in November of 1993?

A.    At that time I worked in the Adam 2 district in patrol.

Q.    And does the Adam 2 district include Independence Boulevard?

A.    No.  Adam 2 would basically be --

Q.    I'm sorry, Woodlawn?

A.    Yeah, Woodlawn.

Q.    Tell the jury where Adam 2 was back in those days.

A.    It would be South Tryon Street, West Boulevard, Clanton Road, Remount, basically kind of like the southwest.

Q.    Okay.  Now, were you employed and on duty as patrol officer on November 12th, 1993?

A.    I was.

Q.    And did you respond to a call for service on that day to Exmore Drive?

A.    I did.

Q.    Where is that?

A.    Exmore is located basically off of Woodlawn Road and you would turn on Nations Crossing.  It's a little back street that would back up to Nations Crossing, and Old Pineville, actually.

Q.    Is there a Bojangles there?

Reported By: Scott A. Huseby, RPR
800-333-2082   Huseby, Inc., an A          rion  (704) 333-9889   Page 85   Fax (704) 372-4593
Case 3:12-cv-00327-MOC   Document 103   Filed 09/23/15   Page 85 of 200

919

JA1777

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
7/31/2002

Page 2938

A. There is.

Q. And a TK Tripps?

A. There is.

Q. What did you see when you responded to that location?

A. There were several people standing at the back of the business on Exmore, several males and females.

Q. All right. And what did you do next?

A. We -- actually, we responded to a call. We got there, were told that a male had come up and tried to kidnap a female. Several people, from what I can remember, responded to her and helped her.

Q. So they had already done that?

A. Well, when we got there, the suspect was sitting down on the street, several people were standing there with the victim.

Q. Okay. Did another or other officers respond to that call?

A. Actually, I think several of us responded to that, it came out as an E call, which means an emergency call.

Q. And was the defendant -- had the defendant been subdued by civilians?

A. He had.

Q. Okay. And when you got there did another

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
7/31/2002

Page 2939

officer take him into custody?

A. I think I actually took him into custody. He was placed in a patrol car and we talked to all of the witnesses, of course, talked to the victim about what had occurred and he was placed under arrest.

Q. Okay. And by the time you were able to place him under arrest, was the situation calm?

A. I wouldn't say it was calm.

Q. How would you describe it?

A. Just a lot of people, you know -- any time we get to a scene like that, it's rather hectic until we can find out, you know, what is going on, make sure everybody is okay. I think we had medic respond to the scene. So any time we respond like that, it's a little -- it's a little hectic until we can figure out what is going on here and we get everybody secured and make sure everybody is okay.

Q. But my point being when you got there, was the defendant subdued?

A. He was.

Q. Let me show you what's been marked as Government's Exhibit 59 and ask you if you recognize it?

A. I do. This is a case report that I filled out that described what took place on this date and time.

MS. TOMPKINS: Move admission of

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
7/31/2002

Page 2940

Government's Exhibit 59, please.

THE COURT: Let it be admitted.

BY MS. TOMPKINS:

Q. Who did you talk to on the scene?

A. We would have talked to the victim, of course, and we would have talked to all of the witnesses.

Q. Who was the victim?

A. It would have been Alicia Chambers.

Q. Did you speak to her?

A. I did.

Q. What did she tell you?

A. She stated that someone she knew had come in and had taken her by knife point out the back of the business, where she was -- I think she was on the way to work and that he had come up to her and had a large knife and had basically kidnapped her at the back of the business.

Q. All right. Did you find a knife there at the scene?

A. I did.

Q. Did you collect it?

A. I did.

Q. How would you describe that knife?

A. I put down that it was a large knife, so I'm thinking that would have been a butcher knife.

United States of America vs. Aquilia Marcivicci Barnette          3:97CR23-V
Proceedings Before Judge Richard L. Voorhees          7/31/2002

Page 2941

Q.   Did she tell you the man's name who had kidnapped her, basically, with the knife?

A.   She did.

Q.   Who was that?

A.   That would have been Marc Barnette, Aquilia Barnette.

Q.   Okay.  And you are referring to what in your supplement?

A.   This would have been a suspect witness that we fill out, we put down all of the information, who would be listed as a suspect, and then at the bottom of it would be listed who would be the witness and the report.

Q.   And what did you learn from witnesses at the scene?

A.   Just what happened.  Several people stated that they observed what took place.  There were several witnesses, and we took statements from all of those folks out there.

Q.   Okay.  And just tell us what you learned from those folks.

A.   Several of the witnesses stated that they had observed the male come up and take the female, had a knife to her throat and had basically taken her up to the back where we ended up, you know, finding him, up on Exmore.

Reported By: Scott A. Huseby, RPR
800-333-2082          Huseby, Inc., an Af          ion  (704) 333-9889          Fax (704) 372-4593
Case 3:12-cv-00327-MOC   Document 103   Filed 09/23/15   Page 89 of 200
923

JA1781

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
7/31/2002

Page 2942

Q. What was your initial charging decision?

A. Initially I charged him with, of course, first degree kidnapping, and I think he had several charges because there were other victims in this case report, assault with a deadly weapon, being the knife.

Q. Now, do you have as a police officer get to make the ultimate charging decision?

A. No. What happens in this, when we get a case report, we go ahead and make the arrest, we have to paper the case and take it to the district attorney's office. Some of the cases we do that before we arrest a person, we will take it -- if we have a felony case, we will talk to the district attorney about it and determine what kind of charges. In this case, you know, we did the arrest and then I papered it and took it to the district attorney, and they will ultimately make the decision on what the person will be charged with.

Q. Now, at the scene you spoke with Alicia Chambers?

A. I did.

Q. What was her demeanor at the scene?

A. Very upset, crying, very -- you know, very upset about what had taken place.

Q. Do you know if she was injured in any way?

A. I don't recall that she was injured in any way.

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
7/31/2002

Page 2943

MS. TOMPKINS: If I could have a minute. Thank you, Officer Burgess, that's all the question I have for you.

THE WITNESS: Thank you.

CROSS-EXAMINATION

BY MS. LAWSON:

Q. Officer Burgess, you mentioned that you took out some assault charges. Did that involve Marc Barnette swinging the knife at other people other than Alicia Chambers out there?

A. I believe it did.

Q. And are you familiar with Officer TE Russell, who took a statement from one of the people out there?

A. Yes, ma'am.

Q. Officer Russell wrote down that Marc Barnette was, according to witness Jeffery Jordan, trying to carry her away and that he thinks he hit him two or three times with a stick but he was acting crazy, do you recall anything about that being said?

A. All I could say, there were several victims out there that we took case reports on.

Q. Were you familiar with one of the people who said that Marc had kicked his car on a prior occasion when he was running him off from Bojangles?

A. No, ma'am, I'm not.

Reported By: Scott A. Huseby, RPR
800-333-2082 Case 3:12-cv-00527-MOC Huseby, Inc. Document 103 Filed 09/23/15 Page 91 of 200 Fax (704) 372-4593
925

JA1783

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
7/31/2002

Page 2944

Q. Can you tell the jury how Marc Barnette was acting when you put him in the patrol car?

A. I don't think -- I don't recall that we at that point had any problems with him. He was, I think, not -- I don't recall having any problems with him at that point.

Q. And can you tell from your police report what time this occurred, what time of day?

A. Yes, ma'am. That would have occurred at 4:00 in the afternoon, actually 4:18.

MS. LAWSON: Thank you very much.

THE WITNESS: Thank you.

MS. TOMPKINS: The government calls Special Agent Debra Adamo.

DEBRA ADAMO, being first duly sworn, was examined and testified as follows:

DIRECT EXAMINATION

BY MS. TOMPKINS:

Q. State your name, please, and spell your last name for the court reporter.

A. Debra Adamo, A-D-A-M-O.

Q. How are you currently employed?

A. I'm a special agent with the Federal Bureau of Investigation.

Page 2945

Q. Where are you located?

A. Phoenix, Arizona.

Q. And what is your position with the FBI now?

A. Currently I work financial institution fraud.

Q. How long have you been an FBI agent?

A. A little over six years.

Q. Before you were an FBI agent, what did you do?

A. I was a police officer with the Charlotte-Mecklenburg Police Department.

Q. And for how long were you with Charlotte-Mecklenburg Police?

A. About six years.

Q. And what were your duties for those six years?

A. For about the first four years I was in patrol, worked as a patrol officer, for the last two years I was a detective in property crimes working burglaries, house break-in's, and strong-armed robberies.

Q. In November of 1993 were you a patrol officer?

A. Yes, I was.

Q. Now, in preparation for your testimony today, did you review police reports from November 9th, 1993?

A. Yes, I did.

Q. Did you respond to a call for service on that date?

A. Yes.

Case 3:12-cv-00327-MOC   Document 103   Filed 09/23/15   Page 93 of 200

927

JA1785

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
7/31/2002

Page 2946

Q. What kind of call was that?

A. I was dispatched out to assist another officer who was on a call for service which was a 911 hang-up call.

Q. And do the police respond when there is a hang up to 911?

A. Yes.

Q. Why is that?

A. Obviously they don't know what the situation is, someone could be having an emergency and need police but they just can't say what they need, so they will send a unit out to check on the residence.

Q. Who was the officer that you got a call to respond and help?

A. Officer Lizi Joye.

Q. And did she or were you directed to a particular place?

A. Yes. She asked me to go to an address off of West Boulevard to look for a Mr. Barnette and girlfriend Alicia Chambers.

Q. Where was Officer Joye?

A. She was at Ms. Chambers' residence on, I believe Watson Drive.

Q. What did -- what happened when you got to the location at West Boulevard?

A.   I went to the home, knocked on the door, a female answered that I assumed was Mr. Barnette's mother, spoke to her asking her if Ms. Alicia Chambers was there at that address, she allowed me to come into the house, and I did locate Ms. Chambers in the home.

Q.   When you first came in and spoke with Marc Barnette's mother, what did she tell you about whether or not Marc Barnette or Alicia Chambers were there?

A.   She said that they were not there.

Q.   And did you later or -- moments later see Alicia Chambers?

A.   Yes, I did.

Q.   And where did she come from?

A.   Actually, as the mother backed into a larger room away from the door, she looked to the side of the room and made the comment, what are you doing here, and I walked into the room and looked in the direction in which she was looking at and saw Ms. Chambers sitting in a chair up against a wall.

Q.   What happened next?

A.   The mother continually was yelling what are you doing here.  I asked Ms. Chambers if she wanted to come with me.  She nodded yes.  I allowed her to come with me outside.  She had no shoes on, it was very cold and muddy and wet outside, so I had to carry her to my

Reported By: Scott A. Huseby, RPR
800-333-2082          Huseby, Inc., an A           ion  (704) 333-9889          Fax (704) 372-4593
Case 3:12-cv-00327-MOC  Document 103  Filed 09/23/15  Page 95 of 200
929

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
7/31/2002

Page 2948

patrol car. Because the mother was very agitated at her presence there, I decided I needed to take her on away from the residence.

Q. And what was Alicia Chambers' demeanor inside the house?

A. Very quiet. She didn't say a word. She looked very confused, very frightened.

Q. And you are small woman, but you were able to carry Alicia to your car?

A. Yes.

Q. Did she have any shoes on?

A. No shoes.

Q. She had socks on only?

A. Yeah. I recall just, you know, very small little white socks or slip-ons, you know, just over her feet.

Q. And this was in November, is that right?

A. Yes.

Q. When you got Alicia out to your car, what happened?

A. She had told me that she was taken there against her will and that she was afraid of the mother, that's why she didn't say anything in the house. So I took her away from the house. I didn't take her directly back to her home, because I knew there was

Reported By: Scott A. Huseby, RPR
800-333-2082    Case 3:12-cv-00327-MOC   Document 103   Filed 09/23/15   Page 96 of 200   Fax (704) 372-4593
930

JA1788

United States of America vs. Aquilia Marcivicci Barnette     3:97CR23-V
Proceedings Before Judge Richard L. Voorhees     7/31/2002

Page 2949

probably family members there and they would probably all want to console her, see if she was okay, and I wanted to get a good and accurate statement from her as to what happened before they spoke with her.

Q. Did you take a statement from her?

A. Yes, I did. I stopped in a parking lot of a business that was closed and took her statement.

Q. Did you also complete a supplement detailing the events of that night?

A. Yes, I did.

Q. I'm going to show you now what has been marked as Government's Exhibit 57 and ask you if you recognize what that is?

A. Yes, I do.

Q. What is that?

A. This is a statement that I wrote, actually I believe it's two statements, one, mine as to the events that occurred and secondly a statement that I had wrote on behalf of Ms. Chambers.

Q. So as Ms. Chambers told you what had happened that night, did you write it down?

A. Yes, I did.

Q. And did she sign that statement?

A. Yes, she did.

Q. After you -- well, tell the jury what Ms.

Reported By: Scott A. Huseby, RPR
800-333-2082     Huseby, Inc., an A... ion (704) 333-9889     Page 97 of 200     Fax (704) 372-4593
Case 3:12-cv-00327-MOC     Document 103     Filed 09/23/15
931

JA1789

Page 2950

Chambers told you had happened.

A. She told me that she was in her home, her ex-boyfriend, Mr. Barnette, had called her, she was trying to break up with him, he was angry about this and she didn't want to speak with him on the phone, he told her that, well, then I'm coming over there, she told him not to, the -- she hung up with him, she later spoke with her mom, or aunt actually, I can't recall, but she was on the phone with someone else and she heard him banging on the door, later -- she did not answer the door but later she heard him banging harder on the door, believing that he was trying to break into the residence, so she hung up the phone, she said she went to get a knife to try to protect herself in case he did enter the residence and then she called 911, at which time he did enter the home and grab the phone out of her hands, yanking it out of the wall.

Q. And did she tell you then that he had carried her out to his vehicle?

A. Yes. She said that she was screaming trying to get the attention of the neighbors, he took a towel and put it in her mouth to muffle her screams, took her out, put her in his car, told her that he would kill her if she didn't come with him. I believe they went to pick up his brother from work. She said she just sat there

United States of America vs. Aquilia Marcivicci Barnette                3:97CR23-V
Proceedings Before Judge Richard L. Voorhees                7/31/2002

Page 2951

in the car quietly because she was scared and then he took her back to his home.

Q. Okay. And what did she tell you happened once they got to his home?

A. I believe she -- I don't recall exactly what she said happened at the home but that she was afraid of the mother --

Q. All right?

A. -- and the family that lived at the residence, his family.

Q. Was Marc Barnette there at the home when you got there, at West Boulevard?

A. She said that he was, that whenever I came to the door he fled out the back door.

Q. What did you do after you took a statement from Alicia Chambers?

A. I took her back to her residence.

Q. Was that at Watson Drive?

A. Yes.

Q. I'm going to show you what's been previously marked and admitted as Government's Exhibit 58D. Do you recognize that as part of the door that was broken off?

A. Yes, I believe that is. It's been several years, but yes.

Q. And let me show you what has been previously

Reported By: Scott A. Huseby, RPR
800-333-2082    Huseby, Inc., an        (704) 333-9889        Fax (704) 372-4593
Case 3:12-cv-00327-MOC  Document 103  Filed 09/23/15  Page 99 of 200
933

JA1791

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
7/31/2002

Page 2952

marked and admitted as Government's Exhibit 58E. Is that the telephone cord?

A. Yes. Yeah, I definitely remember the type of telephone that it was that was yanked.

Q. Now, were you all able to put that telephone back together?

A. Yes. I picked it up and put it back in the wall, because I was told that he was calling the house --

Q. Okay.

A. -- and I wanted to listen in on the conversation if she -- if he called back again.

Q. So there was another phone in the house that was ringing?

A. Yes.

Q. Now, were you able to listen in on a phone call that Alicia Chambers had with Marc Barnette?

A. Yes, I did.

Q. And tell the jury about that.

A. Whenever he first began to speak with her, he was crying, very emotional, just saying how much he loved her, that he just wanted to be with her, so forth. She asked him, well, can you meet me somewhere and we will talk about it. She did this at the direction of myself, because we wanted to get him into custody that

Reported By: Scott A. Huseby, RPR
Huseby, Inc., an H (704) 333-9889 (704) 372-4593
800-393-2082
934

Case 3:12-cv-00327-MOC Document 103 Filed 09/23/15 Page 100 of 200

JA1792

night.  He didn't -- did not come to meet with her, but he immediately switched from crying and being emotional to being very unemotional.  He spoke very clearly and deliberately, it was as if he had just turned his tears off completely, and began to say things like, you know, why are you going to charge me, are you going to charge me, why are you talking to the police, you know I'm going to pay for that door, so forth.

Q.   What happened next?

A.   Officer Joye then took the telephone conversation over and told Marc, you know, that he needed to come in and see us.  Obviously, he did not. We were unable to get him into custody that evening.

MS. TOMPKINS:  Thank you.  That's all the questions I have.

CROSS-EXAMINATION

BY MR. BENDER:

Q.   Special Agent Adamo, you received a call from Elizabeth Joy to go to 3413 West Boulevard?

A.   Yes.  She requested assistance, not specifically just me, but officers in the area to respond there to look.

Q.   And you did?

A.   Yes.

Q.   And when you got there, you knocked on the door

Reported By: Scott A. Huseby, RPR
800-333-2082          Huseby, Inc., an A          rion (704) 333-9889          Fax (704) 372-4593
Case 3:12-cv-00327-MOC  Document 103  Filed 09/23/15  Page 101 of 200
935

JA1793

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
7/31/2002

Page 2954

and were allowed to come in?

A. Yes.

Q. And you met someone who you believed to be Marc's mother?

A. Yes. The woman at the door was -- appeared to me to be in charge of the household. She was the one that answered the door, and she was very boisterous as far as what are you doing here whenever she was addressing Ms. Chambers and stating, you are not invited here, get out of here. So, yes, I believed her to be the mother.

Q. She was almost combative with Ms. Chambers, wasn't she?

A. Yes, she was.

Q. Okay. Yelling at her?

A. Yes.

Q. And telling you to get her out, don't ever let her come back, words to that effect?

A. Yes.

Q. And later that night after you took Ms. Chambers' statement and took her back to her residence -- it was really her uncle's residence, wasn't it?

A. Yes. I believe she was living there with an aunt or uncle; I'm not certain.

Reported By: Scott A. Huseby, RPR
800-333-2082          Huseby, Inc.- an Affiliate of Spherion  (704) 333-9889          Fax (704) 372-4593
Case 3:12-cv-00327-MOC   Document 103   Filed 09/23/15   Page 102 of 200
936

JA1794

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
7/31/2002

Page 2955

Q. Okay. And y'all took a statement from Jasper Chambers, who owned that house, do you remember?

A. I don't know if I took a statement from him, perhaps another officer. I would have to look back to be certain.

Q. And do you remember whether you or Elizabeth Joy in your presence in talking to Jasper Chambers were told that about five weeks prior to this --

MS. TOMPKINS: Well, objection, she said she didn't know.

THE COURT: Overruled.

BY MR. BENDER:

Q. About five weeks prior to this night he had kicked the door in and ran past family members to Alicia Chambers as if the family members were not even in the room?

A. I don't recall that statement. Perhaps the other officer took that statement.

Q. Okay. And when you were on the phone with him, you were on one extension and Ms. Chambers was talking with him?

A. Yes. I merely listened in.

Q. And did Elizabeth Joy listen in as well?

A. I believe she was standing with me listening on the same extension.

Reported By: Scott A Huseby, RPR
800-333-2082 Case 3:12-cv-003 Huseby, Inc., Document 103 Filed 09/23/13 (704) 333-9889 Page 103 of 200 Fax (704) 372-4593
937

JA1795

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
7/31/2002

Page 2956

Q.   And Marc was crying and was very upset, or at least seemingly so?

A.   Yes.  Initially, yes.

Q.   And he was saying things like, I didn't mean it, you know I wouldn't hurt you, I just want to be with you, I love you, right?

A.   That sounds correct, yes.

Q.   And all you had to do was open the door?

A.   Correct.

Q.   And then when she said could we meet somewhere, trying to get him where y'all could arrest him, like flipping a switch, he just quit?

A.   Correct.

Q.   And do you remember him saying that everyone and everything were always interfering with their relationship?

A.   I don't specifically recall that.

Q.   And that he thought he could make everything right if he could just talk to her?

A.   I don't recall that.

Q.   Okay.  One other thing, Ms. Chambers said that she -- that she didn't want to talk to you in the house because the mother was -- did drugs in that house?

A.   She said that they did drugs in the house.  To me that possibly meant any family member.  She didn't

800-338-2082  Case 3:12-cv-00327-MOC  Huseby, Inc. Document 103   Filed 09/23/13 (704) 333-1988 Page 104 of 200 Fax (704) 372-4593

938

JA1796

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
7/31/2002

Page 2957

specify the mother.

Q. Okay. All right. And she was also afraid of the mother and that's why she --

A. She did say that she was frightened of the mother.

Q. Okay.

MR. BENDER: Thank you, ma'am.

MS. TOMPKINS: Thank you. Nothing further.

THE COURT: You may step down.

THE WITNESS: Thank you.

MS. TOMPKINS: The government calls Thad Johnson.

THAD JOHNSON,

being first duly sworn, was examined and testified as follows:

DIRECT EXAMINATION

BY MS. TOMPKINS:

Q. State your name, please.

A. Thad Johnson.

Q. How are you currently employed?

A. I'm currently employed in the private sector --

Q. Okay.

A. -- with Wachovia Bank here in Charlotte.

Q. If you didn't want to say --

Reported By: Scott A. Huseby, RPR
800-333-2082    Huseby, Inc., an Af         on (704) 333-9889        Fax (704) 372-4593
Case 3:12-cv-00327-MOC  Document 103  Filed 09/23/15  Page 105 of 200
939

JA1797

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
7/31/2002

Page 2958

A.    I apologize.

Q.    Did you used to be a state probation officer?

A.    I did, yes, ma'am.

Q.    And is that with the North Carolina State Probation and Parole?

A.    That's correct, yes, ma'am.

Q.    For how many years did you do that?

A.    About nine and a half years.

Q.    What was your job title?

A.    Adult probation/parole officer.

Q.    Now, back in September of 1994 were you a state probation officer?

A.    Yes, ma'am.

Q.    What does an adult probation officer do?

A.    Okay.  Basically, we supervise a probation case.  When an individual is placed on probation in the State of North Carolina, we just help enforce their court contract or conditions of probation judgment and supervise the client for the suspended sentence.

Q.    All right.  And when you say a court contract, is that the probationary judgment that defendants sometimes get?

A.    Yes, that's correct.

Q.    And are there conditions of probation that people on probation must adhere to?

Reported By: Scott A. Huseby, RPR

800-333-2082     Huseby, Inc., an Af     (704) 333-9889     (704) 372-4593
Case 3:12-cv-00327-MOC   Document 103   Filed 09/23/15   Page 106 of 200
940

JA1798

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
7/31/2002

Page 2959

A.    Yes, ma'am.

Q.    Did you supervise Aquilia Marcivicci Barnette on probation?

A.    Yes, ma'am.

Q.    I'm going to show you what has been marked as Government's Exhibit 72 and ask you if you recognize what that is?

A.    Yes, ma'am, I do recognize what it is.

Q.    What is that?

A.    It's the probation file for Mr. Barnette.

Q.    All right.  Is that his original probation file?

A.    Yes, ma'am.

Q.    Now, are there two documents in the front of that file that constitute two cases of probation?

A.    Yes, ma'am.

Q.    Tell the jury, taking each one one at a time, what those probationary cases were.

A.    Sure.  The first case, it's for felonious restraint.  Should I read the case number or just --

Q.    When was the date of conviction on that?

A.    The date of conviction was --

Q.    Or if you know the date of offense.

A.    Yeah, the conviction date was September 20th of '94.

Reported By: Scott A. Huseby, RPR
Huseby, Inc., an A          ion (704) 333-9889          Fax (704) 372-4593
800-333-2082                                                           
Case 3:12-cv-00327-MOC   Document 103   Filed 09/23/15   Page 107 of 200
941

JA1799

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
7/31/2002

Page 2960

Q.   Okay.

A.   And the offense date was November 8th of 1993.

Q.   Okay.  And that was a conviction for felonious restraint?

A.   Yes, ma'am.

Q.   And is that Case 1 probation?

A.   That is correct, that is Case 1.

Q.   And what does the other document say?

A.   It's Case 2 of probation, which is for breaking and entering.

Q.   And what is the offense date on that?

A.   The offense date, it's the same date, 11-8-93.

Q.   All right.  What is Case 1 and Case 2 of probation?  What does that mean?

A.   When someone is placed on probation, they can have more than one supervised case if they commit another crime, it could be on the same day or it could actually be a subsequent offense that occurred actually while they were on probation, so a person could have more than one probation case.

Q.   What was the defendant's sentence for his convictions of felonious restraint and breaking and entering?

A.   It was a one-year sentence suspended for three years.

Reported By: Scott A. Huseby, RPR
800-333-2082          Huseby, Inc., an Aff          on (704) 333-9889          Fax (704) 372-4593
Case 3:12-cv-00327-MOC   Document 103   Filed 09/23/15   Page 108 of 200
942

JA1800

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
7/31/2002

Page 2961

Q. Okay. So that meant that he got sentenced to one year active, that active portion of his sentence was suspended, is that correct?

A. Yes, ma'am.

Q. And that you would supervises him for three years?

A. Correct.

Q. Was there a condition that he be placed on electronic house arrest?

A. Excuse me, I apologize. It was a special condition of one of the cases, I'm not sure which one, but, yes, it was a special condition.

Q. All right. Now, are there regular conditions of probation and special conditions?

A. Yes, ma'am.

Q. Okay. What is regular condition of probation number one?

A. Okay. Regular condition number one -- can I refer to the judgment?

Q. Sure, absolutely.

A. Let's see here, commit no criminal offense in any jurisdiction.

Q. All right. And is it also a regular condition of probation that a probationer remain in the State of North Carolina --

Reported By: Scott A. Huseby, RPR
800-333-2082      Huseby, Inc., an A_____ion (704) 333-9889      Fax (704) 372-4593
Case 3:12-cv-00327-MOC   Document 103   Filed 09/23/15   Page 109 of 200

943

JA1801

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
7/31/2002

Page 2962

A. Yes, ma'am.

Q. -- unless given permission to leave?

A. Absolutely, yes, ma'am.

Q. Is it a condition of probation that a probationer live in the state of North Carolina --

A. Yes, ma'am.

Q. -- unless given permission to leave?

A. Exactly.

Q. Is there a condition of probation that the defendant not possess a firearm?

A. That is correct.

Q. Were there specific or special conditions of probation that Barnette stay away from Alicia Chambers?

A. Yes, absolute -- yes, it was a special condition, yes, ma'am.

Q. All right. Now, when a person is placed on probation, how is it that you monitor that person?

A. Okay. Well, there are several ways that we initiate contact. We initiate contact by mail, through letters, also through telephone, and through home visits. So those are the general ways that we would contact the probationer.

Q. Now, when Mr. Barnette was first placed on probation, was that September 22nd, 1994 or approximately at that time?

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
7/31/2002

Page 2963

A. Yes, ma'am.

Q. And did he give information about what his address and his employment was at that time?

A. Yes, ma'am.

Q. And what was that?

A. The address was listed as 3413 West Boulevard in Charlotte, North Carolina.

Q. And what was his employment?

A. Courtyard Marriott in Charlotte, North Carolina.

Q. Did the defendant have to, based on the records that you have before you, spend some time in jail as part of his condition of his probation, if you will refer to 9-22-94?

A. Yes. He had a 20-day -- it was part of the special probation that he serve 20 days active, and then he began the probation.

Q. All right. Now, periodically during the course of Mr. Barnette's probation, did you try to verify the information that he had given you?

A. Yes, ma'am.

Q. And how would you do that?

A. The first time I went to the residence I was unable to verify. I actually had to go to the residence three times to verify the address because there was no

Reported By: Scott A. Huseby, RPR
800-333-2082          Huseby, Inc., an A1          ion (704) 333-9889          Fax (704) 372-4593
Case 3:12-cv-00327-MOC   Document 103   Filed 09/23/15   Page 111 of 200
945

JA1803

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
7/31/2002

Page 2964

clear address marking on West Boulevard here in Charlotte for the actual house number, so I did go and verify the residence. A lady who identified herself as his mom stated that he lived there off and on but she would get a message -- I gave her an appointment for him to come in.

Q. Okay. Now, you said it took you three times to find that residence?

A. Yes, ma'am.

Q. Did you actually go and leave and --

A. I did, yes.

Q. So that would be an event for a date that you tried to find the residence and went home unsuccessful?

A. Exactly.

Q. And you did that three times?

A. Yes, ma'am. The third time I found the residence.

Q. All right. Did you have an office visit with the defendant?

A. Yes, ma'am.

Q. And referring to your notes, when was that, or did you have --

A. The first contact.

Q. The first contact you had with him.

A. The first contact I had with him was, in the

Reported By: Scott A. Huseby, RPR
800-333-2082    Huseby, Inc., an A...    ...ion (704) 333-9889    Fax (704) 372-4593
Case 3:12-cv-00327-MOC   Document 103   Filed 09/23/13   Page 112 of 200
946

JA1804

United States of America vs. Aquilia Marcivicci Barnette    3:97CR23-V
Proceedings Before Judge Richard L. Voorhees    7/31/2002

Page 2965

office, was on September -- I'm sorry, July 24th of 1995.

Q. Okay. And before that date had another probation officer done some supervision?

A. Yes, ma'am, that's correct.

Q. And based on the notes in that file, were letters sent to the defendant?

A. Yes, ma'am.

Q. And before the time that you took over supervision, had the defendant failed to appear for office visits?

A. Yes, ma'am.

Q. Did he fail to appear for office visits in January, February, and March?

A. Yes, ma'am.

Q. Now, in March of 1995 do the notes of his probation report indicate that the probation officer had called the Courtyard Marriott and that the defendant was not employed there?

A. That's correct.

Q. Was that on March 20th, 1995?

A. Yes, ma'am.

Q. Was that you?

A. Yes, ma'am.

Q. And it was after that date that you attempted

Reported By: Scott A. Huseby, RPR
800-333-2082    Huseby, Inc., an A1    ion (704) 333-9889    Fax (704) 372-4593
Case 3:12-cv-00327-MOC    Document 103    Filed 09/23/15    Page 113 of 200
947

JA1805

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
7/31/2002

Page 2966

to find the residence unsuccessfully, is that correct?

A.   That's correct, yes, ma'am.

Q.   In July, this was some months after he was placed on probation, you had a contact with him, is that correct?

A.   Yes, ma'am.

Q.   What do your notes of July 17th, 1995 reflect?

A.   He reported on that day as scheduled.  He stated to me at the time he was recovering from a gunshot wound, that he was shot in the leg and his femur was shattered, he didn't contact the office because of getting shot and he was recover from that, was his comment.

Q.   All right.  Let me actually get you to flip the page before.  You are looking at July 24th?

A.   I apologize, yes, I am.

Q.   And let me get you to look at July 17th.

A.   July 17th?

Q.   1995.

A.   Excuse me one moment.  I do apologize, yes, he did report on July 19th.

Q.   Okay.  Just read at the top of that page that begins, I rode.

A.   Okay.  Actually he didn't report on that day, but I made contact that day, or tried to make contact.

Case 3:12-cv-00327-MOC   Document 103   Filed 09/23/15   Page 114 of 200

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
7/31/2002

Page 2967

That was July 17th of '95. I rode up and down West Boulevard Drive, finally found residence, I talked to defendant's mom, defendant is not living there but does come in from time to time, she did not have his address, the other address he was living at at the time but said she will give him a message to report on July 19th of '95 at 4:30.

Q. Okay. So on July 17th, 1995 you had contact with the defendant's mother?

A. Yes, ma'am.

Q. And did she tell you on that date that he was living in Roanoke, Virginia?

A. No, ma'am.

Q. Okay. Did she say that she knew what his telephone number was in Roanoke, Virginia?

A. No, ma'am.

Q. Okay. But she said that he did come in from time to time?

A. Yes.

Q. And that she would relay that message?

A. Yes.

Q. And on July 19th did the defendant, in fact, call you?

A. Yes, he did.

Q. And where did he tell you he was working at

Reported By: Scott A. Huseby, RPR
800-333-2082 Huseby, Inc., an A! ion (704) 333-9889 Fax (704) 372-4593
Case 3:12-cv-00327-MOC Document 103 Filed 09/23/15 Page 115 of 200
949

JA1807

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
7/31/2002

Page 2968

that time?

A. He called and told me that he was working for a temporary agency called Temp World.

Q. Is that here in Charlotte?

A. Yes, yes, in Charlotte.

Q. All right. And it was on that date that he told you that he had been shot in the leg and was recovering?

A. Yes, ma'am, yes.

Q. Now, on July 19th, 1995 what notation did you have about the defendant's mother?

A. His mom called and confirmed that he would be in on July 24th, is when we had rescheduled the appointment.

Q. All right. On that date did you call Temp World to confirm his employment?

A. I did. I called Temp World here in Charlotte, and the phone numbers indicated an address on Park Road in Charlotte, and they indicated that he was not employed.

Q. Okay. So did you know at that time that he was employed at Camelot Music in Roanoke, Virginia?

A. No, ma'am, absolutely not.

Q. On July 24th, 1995 did you have an office visit?

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
7/31/2002

Page 2969

A.    Yes.  Yes, ma'am.

Q.    Okay.  Did the defendant actually show up in your office in Charlotte?

A.    Yes.

Q.    And what did he tell you on that date?

A.    That's when the comment I had made a few moments ago, that he had been recovering from a gunshot wound, he had been shot in the leg and that his femur was shattered  and that he had not been reporting because he was recovering from his gunshot wound.  At that point I took a photo, which is standard on the first contact that each officer makes.  I took a photo. He indicated at the time to me that he was employed at the Courtyard Marriott, Arrowood Road, Charlotte, North Carolina, and that Sheila Cooper was his supervisor and that he was working as security night audit from 11:00 to 7:00.

Q.    Now, this was about ten months after he was placed on probation, is that right?

A.    That's correct.

Q.    And just so the jury knows, what, in those days, what was your case load?

A.    Case load was, as I remember, was around 230, 240, somewhere in that range.

Q.    230 or 240 people?

Reported By: Scott A. Huseby, RPR
800-333-2082  Case 3:12-cv-00327-MOC  Document 103   Filed 09/23/15  Page 117 of 200  Fax (704) 372-4593
951

JA1809

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
7/31/2002

Page 2970

A. Exactly, at one time. And I was actually the second probation officer that had supervised the case at that point.

Q. And so ten months into his probation you had your first face to face with him, is that correct?

A. That's correct.

Q. And he told you on July 24th, 1995 that he worked at the Courtyard Marriott?

A. Yes, ma'am.

Q. And that his supervisor was Sheila Cooper?

A. Yes, ma'am.

Q. He gave you a schedule?

A. He did. He indicated that at that -- for that particular time he was working 11:00 to 7:00 but the schedule could vary so he could not give an exact schedule every week but that particular week he was working 11:00 to 7:00.

Q. And what kind of problem did that present in terms of his probation?

A. Well, as far as house arrest, it created -- initially we didn't have equipment because we had limited number of units and with so many people on probation we didn't have enough devices to cover, and part of the EHA, or electronic house arrest program, you had to be on a set schedule all the time. I mean, your

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
7/31/2002

Page 2971

work schedule couldn't fluctuate at all.

Q. And that -- did you know who Shelia Cooper was at the time?

A. I did not. I mean, he indicated that she was his supervisor at Courtyard Marriott.

Q. Did you know that Sheila Cooper was living at his mother's residence on West Boulevard?

A. No, ma'am.

Q. Did you know that Shelia Cooper was his aunt?

A. At the time I did not know that.

Q. And did you know that he was, again, living and working in Roanoke, Virginia?

A. No, ma'am, I did not.

Q. Now, did you continue to attempt to verify his employment?

A. Yes, ma'am.

Q. And was his employment actually verified by the Courtyard Marriott, Sheila Cooper?

A. It was.

Q. Did you actually call and speak to Sheila Cooper?

A. I did.

Q. And let me just refer to you to 11-14-95. Are you there?

A. Yes.

Reported By: Scott A. Huseby, RPR
800-333-2082 Huseby, Inc., an /          rion (704) 333-9889          Fax (704) 372-4593
Case 3:12-cv-00327-MOC Document 103 Filed 09/23/15 Page 119 of 200
953

JA1811

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
7/31/2002

Page 2972

Q. And what does that say?

A. I called Marriott, defendant's place of employment, verified still there, left message for defendant to call ASAP.

Q. And in the meantime between July and November, had the defendant no-showed for office visits?

A. That's correct.

Q. Okay. And did he call and -- sometimes no-show and sometimes call with an excuse?

A. He did.

Q. Now, did there come a point where you considered his probation to be violated?

A. Yes, ma'am.

Q. And when was that?

A. The probation violation report, I just need to refer to my notes, if I may.

Q. Feel free.

A. They should be attached. The violation report is dated 12-19-95.

Q. Okay. And -- 12-19-95?

A. Yes, ma'am.

Q. Okay. And what happens when a violation report is issued?

A. A probation warrant is issued.

Q. A warrant for his arrest?

Reported By: Scott A. Huseby, RPR
800-333-2082        Huseby, Inc., an Af   ion (704) 333-9889        Fax (704) 372-4593
Case 3:12-cv-00327-MOC  Document 103   Filed 09/23/15  Page 120 of 200
954

JA1812

United States of America vs. Aquilia Marcivicci Barnette    3:97CR23-V
Proceedings Before Judge Richard L. Voorhees    7/31/2002

Page 2973

A.    A warrant for his arrest is issued.

Q.    And you had his address as the address on West Boulevard, is that correct?

A.    That is correct.

Q.    Now, would the defendant have been allowed to move from West Boulevard to Roanoke, Virginia with your permission?

A.    We do have where another state could supervise for us as a courtesy, but they would have to be in compliance with the probation judgment before that could take place, but that is allowed as long as they are in compliance.

Q.    Right.  So he could have said to you, I'm moving to Roanoke, Virginia?

A.    He could have, and possibly it could have been worked out.

Q.    Did you ever know that he had moved and was living out of state?

A.    No, ma'am, not at all.

Q.    And did you ever know until after the case that he hadn't worked for Courtyard Marriott during the entire course of his probation?

A.    No, I didn't know that.

MS. TOMPKINS:  Thank you.  That's all the questions I have.

Case 3:12-cv-00527-MOC   Document 103   Filed 09/23/15   Page 121 of 200

JA1813

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
7/31/2002

Page 2974

THE WITNESS: Thank you.

CROSS-EXAMINATION

BY MS. LAWSON:

Q. Mr. Johnson, do your notes reflect that a young woman by the name of Robin Williams accompanied him to one of the probation appointments that you had scheduled with him?

A. Yes, ma'am. I believe on the very first appointment -- yes, she did come with him, yes.

Q. And can you just summarize -- well, your statement about the electronic house arrest appears to be that you didn't put him on electronic house arrest when he was first placed on probation because you didn't have enough equipment, is that essentially what you said?

A. That is correct, yes, ma'am.

Q. And do I also understand you to say that one of the reasons you had trouble keeping up with looking for him and calling people about him was because you had a case load of 230?

A. No. I -- it could explain the difference as far as timing, but, yeah, we had a very -- huge case load, 230 people, 240 people. I actually specialized in domestic violence, so my case load was 230, 240 domestic violence cases that were somewhat related to domestic

Page 2975

violence here in Mecklenburg County.

MS. LAWSON:  No further questions.

THE WITNESS:  Thank you.

MS. TOMPKINS:  Thank you.  Your Honor, can we have a side-bar?

THE COURT:  Excuse us, members of the jury.  You may be at ease.

(Beginning of bench conference.)

MS. TOMPKINS:  I'm requesting to the Court that -- at this time the next witnesses are the victim impact witnesses, I think it would be bad to start that and go for 10 minutes and --

THE COURT:  How long do you anticipate?

MS. TOMPKINS:  In total I would say two hours, two or three hours.

THE COURT:  All right.  Why don't we adjourn until tomorrow.

(Conclusion of bench conference.)

THE COURT:  Members of the jury, we have reached a good stopping point, so we will do that and ask you to be with us again at 9:30 in the morning. Please keep an open mind about the case and remember all of the instructions.  Thank you .

(The jury left the courtroom.)

THE COURT:  How long does the defense say

Reported By: Scott A. Huseby, RPR
800-333-2082          Huseby, Inc., an Afi          on  (704) 333-9889          Fax (704) 372-4593
Case 3:12-cv-00327-MOC   Document 103   Filed 09/23/15   Page 123 of 200
957

JA1815

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
7/31/2002

Page 2976

the defense evidence might take at least by way of some supposition at this point?

MR. BENDER:  Two and a half to three days.

THE COURT:  Starting next Monday?

MR. BENDER:  Yes.

THE COURT:  All right.  That last side-bar had to do strictly with scheduling, by the way, whether to go until 5:00 or break at this time, and -- at ten minutes until 5:00, the next witness being longer than ten minutes.  Thank you very much.

I, Scott A. Huseby, do hereby certify that the foregoing transcript is a true and correct transcript.

SCOTT A. HUSEBY

8-1-02

DATE

Reported By: Scott A. Huseby, RPR
800-333-2082  3:12-cv-00327-MOC, Document 103   Filed 07/24/13   Page 124 of 200  (704) 372-4593
958

JA1816



UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION

| UNITED STATES OF AMERICA | ) | DOCKET NO. 3:97-cr-23-V |
|---|---|---|
| vs. | ) | |
| AQUILIA MARCIVICCI BARNETTE, | ) | VOLUME 15 |
| Defendant. | ) | MORNING |

TRIAL PROCEEDINGS
BEFORE THE HONORABLE RICHARD L. VOORHEES
UNITED STATES DISTRICT COURT JUDGE
AUGUST 1, 2002

<u>APPEARANCES</u>:

On Behalf of the Government:

    ANNE M. TOMPKINS, ESQ.
    JILL WESTMORELAND ROSE, ESQ.
    227 West Trade Street, Suite 1700
    Charlotte, North Carolina

On Behalf of the Defendant:

    JEAN B. LAWSON, ESQ.
    P.O. Box 472106
    Charlotte, North Carolina

    HAROLD J. BENDER, ESQ.
    200 North McDowell Street
    Charlotte, North Carolina

        Cheryl A. Nuccio, RMR-CRR
        Official Court Reporter
        United States District Court
        Charlotte, North Carolina

FORM FED ® PENGAD • 1-800-631-6989

THURSDAY MORNING, AUGUST 1, 2002

THE COURT: May we have the jury.

MS. LAWSON: Your Honor...

THE COURT: Wait just a second.

MS. TOMPKINS: Your Honor, in the -- the next witnesses are the victim impact witnesses. We've got a series of photographs that we'd like to show. I'm speaking specifically of photographs of Robin Williams that I'd like to show to her mother, Bertha Williams. There are approximately twenty-three photographs of Robin throughout her life. I showed them to defense counsel beforehand seeking a stipulation as to their admissibility so that we wouldn't have to go through that. And I believe they're stipulating to their admissibility, but were objecting to the number of photographs. So at this point, then, I'd like to hand them up to the court --

THE COURT: All right.

MS. TOMPKINS: -- for the court's --

MS. ROSE: And I'll have the same, Your Honor. I have, I think, thirteen photographs related to Donnie Allen for the court to review as well.

THE COURT: All right.

(Photographs were tendered to the court.)

MS. TOMPKINS: Here, these are actually three more through Kenny Williams.

Case 3:12-cv-00327-MOC   Document 103   Filed 09/23/15   Page 126 of 200

(Photographs were tendered to the court.)

MR. BENDER: May I be heard?

THE COURT: Yes, sir.

MR. BENDER: The Fourth Circuit opinion in this case refers to pain and says, in effect, that this victim impact evidence went beyond the quick glimpse of the life that was permitted by pain; however, on the whole, it did not contaminate the proceedings. And they went to do an analysis of -- and actually broke it down by percentage of how much of the overall testimony went to the victim impact evidence.

The government has now had the opportunity to try to refine their victim impact evidence because of error that they urged upon the court at the time. I just don't think that's fair. I think there comes a point where it's too much. How much is too much? I don't know. But I think that's what the Fourth Circuit was telling us is in the context of the prior proceeding, this was okay. But, you know, another straw might be the one that breaks the camel's back.

As I read Ms. Bertha Williams' testimony, there was no photograph introduced through her testimony. She introduced a poem, I think something called More About Robin that she read to the jury, and a hospital gown. But there was no photograph that was introduced and now they want to introduce twenty-some photographs. Is that too much? We urge upon the court that it is. I think you have to make the

decision where that line is and are they going to be crossing that line. This is a little more than a quick glimpse of life that pain provides. So -- and also with regard to Allen. Some of them may be proper. A limited number of them, but I think all of these may be crossing that line because the Fourth Circuit has pretty well set forth what they -- in the context of the prior proceeding, what they thought was appropriate. And I think they said it was only about 22 percent. That's why it's okay to do that.

THE COURT: Okay. In terms of the probative value of the photographs, they're all appropriate. The government may offer them to show the phases of the victim's life. It does seem there may be some duplication in there that's unnecessary, so I think the government should be cognizant of that. But in terms of the numbers, a great many of them simply show the same thing and are therefore unnecessary. But they're also for that reason not inflammatory or otherwise prejudicial to the defendant. So the court will allow the photographs.

May we have the jury, please.

MS. TOMPKINS: Your Honor, quickly, I'm sorry. Just for the record, I just wanted the -- it to reflect that Ms. Williams' testimony will be both factual, that is, testimony that was received previously in the guilt phase that she will be testifying about facts about the arson and the murder, as

FORM FED ● PENGAD • 1-800-631-6989

well as victim impact. So just for the record, the weight of her testimony or the length of it will be reflective that the government is calling her one time rather than twice for humanitarian reasons and that her testimony will be -- could have been cut up into two segments, one that was related to the facts and one as related to victim impact, and so the record reflects that.

MS. ROSE: And the same for the Allen family who can testify factually about Donnie's missing person's reports that were filed and their search for him as well as their victim impacts.

THE COURT: All right. That's efficient. May we have the jury, please.

(Jury entered the courtroom.)

THE COURT: Good morning, members of the jury.

THE JURY: Good morning.

THE COURT: You may call your next witness.

MS. TOMPKINS: The government calls Kenneth Williams.

KENNETH WILLIAMS, being first duly sworn, was examined and testified as follows:

DIRECT EXAMINATION

BY MS. TOMPKINS:

Q. State your name, please.

A. Kenneth Williams.

Q.   Can I get you to pull that mike a little bit closer.  It works, just speak up.  I know it's difficult.

A.   My name is -- my name is Kenneth Williams.

Q.   Do you go by Kenny?

A.   Yes, ma'am.

Q.   Are you married?

A.   Yes, ma'am.

Q.   And who is your wife?

A.   Sharon Williams.

Q.   What do you do for a living, Kenny?

A.   I'm a locomotive engineer.

Q.   Okay.  How long have you been doing that?

A.   Thirteen years.

Q.   Are you Robin's brother?

A.   Yes, ma'am.

Q.   Older brother?

A.   Younger brother.

Q.   Younger brother.  What's the age difference between you two?

A.   About five years.

Q.   Okay.  And Robin was younger than you, correct?

A.   Yes, ma'am.

Q.   She's -- she was about five years younger?

A.   Yes, ma'am.

Q.   How old are you now?

A. Thirty-five.

Q. I'm going to show you what's been stipulated to admissibility Government's Exhibit 67Z. Is that Robin?

A. Yes, ma'am.

Q. About how old was she when that picture was taken?

A. Probably out of, you know, high school probably. Last year of high school. Probably about the twelfth, maybe.

Q. Tell the jury about your relationship with Robin.

A. It was a real happy relationship. Fun. We laughed a lot. Played a lot. Shared a lot of things together. It's kind of hard for me because we was like a whole lot alike.

Q. In what ways were you all alike?

A. Well, you know, she was the type person that would protect other people's feelings to hide her own. What I'm saying is is that she would rather see a smile on -- on you -- have you happy, but yet she was all right. You know what I mean? And that's the way I am, you know. I like to see other people happy.

Q. And Robin was the same way?

A. (Affirmative nod.)

Q. What was -- what was it like growing up with Robin? What was she like as a young woman?

A. Happy. Fun. You know, kind, soft-hearted. You know, just an average kid that had, you know, say, full of life, you know. Just like that. Fun.

Q. Now, did there come a time where you moved out of the home?

A. Yes, ma'am.

Q. Okay. And was Robin still living at the home?

A. Yes, ma'am.

Q. And did your relationship with Robin change at all?

A. No, it didn't change. But I, you know, I moved out and I came back and forth. But we was basically -- our family is real close knitted, you know.

Q. And how did Robin fit into that?

A. She was really the piece that hold it together. You know, she was the one that instigated a lot of stuff. Laughter, and you know. She was really the one that held us all, you know, together and stuff.

Q. Kenny, I'm going to show you a picture that's marked as Government's Exhibit 67AA. Tell the jury about this picture.

A. What you want to know?

Q. When was that?

A. Probably back in '89, '90 maybe. Somewhere around in there.

Q. Was Robin -- how old was Robin about?

A. I don't know. I believe it was after she had graduated. What it is, see, I had the motorcycle in the yard because she wouldn't dare ride up and down the street with it.

Q. She wouldn't ride with you on the street?

FORM FED ® PENGAD • 1-800-631-6989

A.   No, she said, I ain't riding this thing.

Q.   But she wanted to get her picture taken on it.

A.   Yeah.

Q.   I'm going to show you, Kenny, what's been marked as Government's Exhibit 67X.  And if you don't mind holding that up to the jury.  And tell the jury who each one of those people are.

A.   It was me, that's my brother, that's my little sister, and that's my mother.

Q.   And about when was that?

A.   I don't know.  I believe that was in about the sixth grade.  Sixth or seventh grade, maybe.

Q.   What was your role in the family when you all were growing up?

A.   Well, me and my brother -- my mama worked in the morning time so we kind of made sure she got dressed, her hair was done.  And I was kind of like the one that really, you know what I'm saying, protected her, you know.  You know, I was always the one to know where she went.  And if she was where she wasn't supposed to be, I go get her, you know.  But, you know, we really -- we looked after each other.  All of us, basically, are alike in a lot of ways.  And I miss her.

Q.   Now, Kenny, after the firebombing, did you go visit Robin in the hospital?

A.   Yes, ma'am.

Q. Where were you when you learned of that?

A. I was out of town in West Virginia.

Q. Driving the train?

A. Yes, ma'am. The type job I have, I travel a lot. I take trains up the road and back down the road.

Q. Did you get back to Charlottesville to see Robin?

A. Yes, I did.

Q. And when she got back home, did you see her?

A. Yes, ma'am.

Q. And how was she?

A. She was all right, I guess. Like I could tell that she was upset, but, you know, she was kind of like -- she liked to reassure you that, you know, she was all right, you know what I mean, but yet she wasn't, you know, but I knew, you know, because all of us have this type bond. We could feel each other, you know. And --

Q. Now, Kenny, I'm going to -- on the day that Robin died, how did you learn of her death?

A. I was asleep and -- me and my wife was asleep and got a phone call and I -- and I hurried up and got in the car and drove -- drove down the street through stop signs and red lights, but I didn't know she was -- had died or nothing. I was just going to try to protect her. And when I got there, she was inside the ambulance and my mama told me to follow the ambulance to the hospital. And when I went there, they came

and told me.

Q.    What did you do?

A.    Whew.  I -- well, by then my -- my brother had came.  And I left out of the emergency room and walked across the street to like a little park to get myself together, I guess.  Then we got back in his car and went to the house.  I don't recall how we made it to the house, how we got to the house, but we got to the house.

And my mother was sitting on the porch with people and she said, Kenny, how is Robin?  How is my baby?

I said, Mama, she gone.  It's just like, you know, yesterday it happened to me.

Q.    What do you miss most about Robin, Kenny?

A.    I miss her smile.  She always had the same smile like that.  I miss her smile.  I miss her conversation.  I miss her laughter, you know.  I miss playing with her and hugging her.  Everything.

MS. TOMPKINS:  Thank you, Kenny.  I appreciate it.

MR. BENDER:  No questions.

THE COURT:  You may step down.

(Witness stepped down.)

MS. TOMPKINS:  The government calls Bertha Williams.

BERTHA WILLIAMS,

being first duly sworn, was examined and testified as follows:

JA1827

DIRECT EXAMINATION

BY MS. TOMPKINS:

Q.   State your name, please.

A.   Bertha Williams.

Q.   Are you Robin's mother?

A.   I am.

Q.   How old was Robin when she died?

A.   She was twenty-three.

Q.   When's her birthday?

A.   Her birthday?

Q.   (Affirmative nod.)

A.   June -- October 13th, 1972.

Q.   So Robin would be thirty this year?

A.   Yes.

Q.   How old was Robin when she died?  Twenty-three?

A.   Twenty-three.

Q.   Now, you also have two sons, Kenny and Sidney; is that right?

A.   Yes.

Q.   How old were they when Robin was born?

A.   I think Sidney was eight.  Kenny had just turned six.

Q.   Do you have any grandchildren?

A.   I've got one -- I got three, I think.

Q.   Okay.  And what are their names?

A.   Destiny is six and Tonya is fourteen, and I've got a

JA1828

button. I've got one coming.

Q. Tell the jury what Robin was like when she was a little girl.

A. She was always an upbeat little girl. She was a great talker. She talked, turned cartwheels and run. That's what she would do all the time. She'd talk, turn cartwheels and run. Shy was always happy. Always upbeat. And everybody she met was her cousin. Everybody was her cousin. If you were an older person, you were -- they were her Granny. But all the young people were her cousin. Didn't matter who it was. I met some more cousins today, that's what she said.

Q. I'm going to show you, Ms. Williams, a picture marked Government's Exhibit 67A. Is that Robin's baby picture?

A. That's her. One of her baby pictures, yes, ma'am.

Q. I'm going to show you now Government's Exhibit 67B.

A. Those were some of her cousins. Those were some of her cousins. And she fed them. They would all run into the house to eat two or three times a day.

Q. All right. And I'm going to show you Government's Exhibit 67C. About how old was Robin in that picture?

A. She was about five.

Q. Now, I'm going to show you now Government's Exhibit 67Y. What was that a graduation from?

A. Her kindergarten picture.

Q. Was she a proud kindergarten student?

A. Oh, yes, she was a proud kindergarten. She was the hool-a-hoop champion. At graduation she did all the hool-a-hoop things. She took the hoop through her arms and up her legs and everywhere. She was the center of attraction that day.

Q. Show you what's been marked as Government's Exhibit 67F. Is that a school picture of Robin?

A. I think she was about eight.

Q. Okay.

A. Seven or eight then.

Q. Now, as Robin grew up, what kind of little girl did she grow up to be?

A. Well, she was a prissy little girl. She turned cartwheels and did all kinds of things. But when she went to kindergarten, she never would wear any pants. She always wanted to wear a dress. Never -- I never could get her in a pair of pants. All the time it was a dress. She never liked tennis shoes. I'd buy her tennis shoes and she would take them outside and throw them away. I'd go to try to find them and they were gone. She was a great talker and she just loved people. And she loved to scream and sing and dance. And she just -- was just an upbeat child.

Q. Did she -- show you what's been marked as Government's Exhibit 67V.

A. That was the first haircut she ever had.

Q.    And tell the jury about that haircut.

A.    She was about thirteen and she had her hair cut and she had a stiff neck for a week.

Q.    Why is that?

A.    Because she didn't want her hair to be out of place. She walked like this (demonstrating) for a week. I said, What are you doing?

And she said, Look, at my hair, Mommy. Look at my hair. She just loved it.

All of her teachers talked about how she came in the classroom with her head up just so they would notice that she cut her hair. She had a stiff neck about a week.

Q.    Now, tell the jury about your relationship with Robin.

A.    Robin and I were inseparable. Wherever I went, she went. Whatever I did, she did. If I wouldn't eat it, she wouldn't eat it. If she thought I liked it, she liked it. She was my bed partner. She had her own bed. She'd start out in her bed, but she'd wake up in the morning in mine. Every time.

Q.    And how --

A.    All the time.

Q.    How would you know she was in bed with you?

A.    Because she'd put her cold feet on me and we'd fuss about get your feet off of me. Well, Mommy, Mommy. And she'd snuggle up. And she put some socks on her feet just to keep

me warm.

Q. Did you all --

A. She didn't like the cold.

Q. She didn't like the cold.

Did y'all have a Saturday morning standing date?

A. Saturday morning -- Saturday mornings was our time together. Whatever I wanted to do on Saturday mornings, she did. She didn't spend time with her friends at the mall until in the evening. But Saturdays was our day. She wouldn't have anything to do with her friends until after we were together.

Q. What did she call you?

A. She called me Mommy.

Q. All her life?

A. All her life. She'd run in the house and she'd grab me and dance me around in the floor and I'd say, Stop, stop, Robin, stop. And she'd grab me in a bear hug, hold me real tight, and then she'd rock me from side to side, and then she'd say, Ah, you all right, Mommy, and then she'd go on about her business. I miss her.

Q. Now, did Robin -- after Robin graduated from high school, what did she do?

A. She went to ECPI. She got a computer degree from ECPI.

Q. I'm going to show you Government's Exhibit 67M.

A. That's her. That's when she graduated from ECPI.

Q. What kind of degree did she get?

A. A computer specialist degree.

Q. And did she get a job in that field?

A. Yes, she got a job at the hospital.

Q. What did she do at the hospital?

A. She was a secretary there.

Q. Was she still living at home?

A. Yeah, she lived at home.

Q. What shift did she work?

A. She worked straight three to eleven.

Q. And how did she let you know everything was all right?

A. Well, every day at 2:30, any time between 2:20 and 2:30, because I worked days, the phone would ring in the department where I worked. And everybody -- there was 27 workers. Everybody knew at 2:30 when that phone rang it was Robin to tell me that she was going to work. I'm leaving now, Mommy, and I'll talk to you later. Nobody answered the phone because they knew it was her and they would yell at me, if I was in another room, they'd say, Bertie, that's your call, and it would be. It would always be her.

Q. She'd call you at work?

A. She'd call me to let me know she's leaving home.

Q. And what about at night?

A. She'd call me every night -- when she left home, she called me every night at 11:30 to tell me good night and tell me that she loved me. I'm going to bed now, Mommy. Good

night and I love you. Every night. Every night. I don't care what was going on, she'd call to let me know.

Q. Now, I'm going to show you a picture that's labeled Government's Exhibit 67Q. Do you know when that was taken?

A. It was taken on her job. I think that's her friend Ginger.

Q. That was her job at the hospital?

A. At the hospital. I think that's her friend Ginger.

Q. I'm going to show you a photograph that's labeled Government's Exhibit 67P.

A. That's holding my grandbaby, Sidney's child. That's Destiny. That's the baby that I had in my arms on that fateful morning.

Q. Now, Robin had a purple shirt on there. Tell the jury about the color purple.

A. That's her favorite color. She loved purple.

Q. Now, Ms. Williams, do you remember when Robin met Marc Barnette?

A. I remember.

Q. How was that -- how was that relationship? How did that go for you?

A. Well, when she met him, she told me she went out to a club one night and she told me that -- I got up on Sunday morning, went to church and I came home. She didn't go. And she said, Mama, I met somebody last night. And I said, You

did? And she went on to talk about him. She said, He seems like he's real nice, Mommy. He's okay. She said, He's going to call me later and I'm going to go get him. And I went on to church. And apparently he called her and she did go get him and brought him to the house, but I didn't meet him then.

Q. Did you meet him as they began dating?

A. As they began dating and she kept talking to him on the phone. He eventually came up and he went to church with her one Sunday and that's when I met him when he came up and went to church with her.

Q. And over the next year, did they date long distance?

A. They did.

Q. And did Marc come up and visit with your family?

A. Marc came up. He come up sometime on weekends.

Q. And how did y'all accept Marc?

A. We accepted him because Robin wanted him. We accepted him. We didn't -- we didn't know anything about him. But she liked him, so if she liked him, we liked him. We treated him like family. We never mistreated him.

Q. Did he come to Thanksgiving and Christmas and other family events?

A. Yeah, he was there. When he stayed with her, he was at Thanksgiving and Christmas. Whatever we had. Cookout, family outings. He was always included.

Q. How did Robin tell you that she and Marc were going to

move in together?

A.    Well, we were -- we were at lunch one day and she said, Mama, she said, Marc and I are going to move in together.

And I told her no.  I said, You don't know that much about this boy.  I said, Why you want to do that?

She said, Mommy, she said, I can't stay home forever.

And I just looked at her and I thought, well, she's right.  She's twenty-one years old.  She had her own job.  She had her own car.  She had her own savings account.  She worked -- made her own money.  She was a level-headed girl.  Very responsible.  Independent.  So I didn't have any other choice but to tell her, well, you're right.

The only drawback from that was he wanted her to come to North Carolina to live, and she said they had been looking at things in North Carolina.  But her brother Sidney told her no.  Said, If he's a man, he'll come here.  And so I guess she told him because he came to Roanoke.

Q.    All right.  And Robin moved out; is that right?

A.    She did.

Q.    Did Robin have a dog?

A.    She had a dog, Marcie.  She had it since she was about twelve years old.  Since she was about twelve.

Q.    I'm going to show you Government's Exhibit 67S.  Is that Robin's dog Marcie?

A.    That's Marcie.

Q.    And is that Destiny?

A.    That's Destiny.

Q.    Now, when Robin moved out, did she take the dog with her?

A.    He wouldn't let her have it.  She told -- he told her that he didn't like dogs.  Dogs make too much mess and shed too much and she couldn't have it.  But when he came up, he brought a cat.  He wouldn't let her have her dog, but he brought a cat.

Q.    Did she come back over to the house to visit her dog?

A.    Oh, yeah.  That was her dog.  She carried him around like he was a baby.

Q.    Now, after Marc moved up, did Robin ever give you any indication that things were not going well?

A.    Everything seemed to go okay for two or three months and about, must have been about June she told me, she said, Mommy, I'm not happy.

      And I said, Well, if you're not happy, send him home.

Q.    Is that June of '95?

A.    Yes, ma'am.  I said, If you're not happy, I said, tell him to go home.

      She said, Well, I'm going to see if we can work it out.

      But it continued and continued and continued and she couldn't ever, ever get rid of him.  She wanted to and she was unhappy.  Then she'd have some good days and she had some bad

days, I believe. Sometimes she'd come, she'd be real happy. She'd be just like herself. And some days she'd come home, she'd be down in the dumps. She'd be smiling, but you can tell by her facade that she wasn't -- she was upset.

Q. Did you direct her down to the Roanoke city offices to help her out?

A. I told her to go -- I said, Well, go downtown and tell them to come and send him out because it was her apartment; it was not his. They told her downtown that there was nothing that she could do. That if he was there and he was helping pay bills and things, that it was a money thing and that he had a right to be there. But they told her to write him a 30-day notice. And this didn't happen up until January. And so she wrote him a notice and she was scared to give it to him so she put it where he could find it.

Q. Did she know whether he found it?

A. Apparently he did because she never did see it anymore. She called me, she said, Mama, Marc has got -- he found the notice, Mama.

I said, What did he say?

She said, He hasn't said anything.

Q. Now, Ms. Williams, did you know that in June of 1995 the police had responded out to their apartment on Keswick Avenue?

A. No, I didn't know it until the last trial I heard it.

She never told me.

Q. For the attempted suicide call.

A. They never told me that.

Q. Were there times when Robin would come home and spend nights with you while she was living with Marc?

A. Whenever -- whenever whatever happened, she would come home. I would always know when something bad really happened because she would come home and she stayed two or three days. And she'd come home and she'd come home and get in the bed with me and snuggle up. She never ever would tell me anything.

I said, What's the matter, Robin?

She said, Oh, Mama, I don't know what's wrong with Marc. And that was the only thing she would ever say. I don't know what's wrong with Marc.

And she'd stay for two or three days and then she'd come home or she'd call me from work and she'd say, Mommy, I'm going home tonight.

I'd say, What? I said, You're going home? I said, How do you ever expect to teach him a lesson if you're not -- if you're going to come home stay a while and then go back?

She said, I don't know, I'm going back.

Well, he would have called her and he would have called her and sweet talked her and she'd take him back.

Q. Did Robin want to help Marc?

A. Oh, yeah. She said, Oh, Mommy, he'll be all right. Oh, Mama, it will be all right. And she was always trying to protect him. I'd go to fussing, He'll be all right, Mama. He just needs some help. He'll be all right, Mama.

Q. Ms. Williams, do you remember a time when you went out to Robin's apartment on Keswick Avenue to bring her home?

A. I went out there one time to bring -- I went home one night -- went one night to bring her home. Wasn't the last time, but he had been in North Carolina for a week for some reason and she told me that he didn't -- she didn't want to go back to get him. She said, I don't want to go get him, Mama.

I said, Well, if you don't want to go get him, I said, leave him. She had made up her mind that she wasn't coming to get him.

And I was at work and some time he had called her and she called me and she said, Mommy -- she was down in the dumps, but she said, Mommy, I'm going to get Marc.

I said, What? I said, I don't believe that.

She said, Well, he called me. And I guess he had called and played on the -- crying or whatever he did on occasions and, you know, he just -- she just went -- sweet talked her.

Q. Did you ever --

A. And about three days after that, they called -- she called me and told me to come down and I went down there because he had hit her.

Q.  What happened when you got there?

A.  I walked in the house and he was just a ranting and raving and going on.  And I walked over to him and I said, Why are you hitting her?  And I hit him.  I said, You do not hit her.  Leave her alone.

And he said, Don't hit me.  Don't hit me.  I give you the utmost respect.

I said, I know you do and you need to give it to Robin.

I took Robin.  I said, Come on, Robin, let's go.

Robin and I left the house.  And he told Robin if she left, he was going to kill hisself.

And I said, Come on, Robin.  He's not going to kill hisself.

Robin got in her car.  I got in my car and we pulled off.  We got around the back of the house and we looked up and he was standing up in the bathroom window like this (demonstrating).  And she stopped the car.  And I stopped my car and I said, Why are you stopping?

Oh, Mama, he's going to kill hisself.

I said, He's not.  He's not going to kill hisself.  You come on.  And I made her come on home.  And I said, By morning, I said, he'll be all right.  He's not going to kill hisself.

And sure enough, 7 o'clock in the morning he called the house to talk to her.

Q. Now, Ms. Williams, when they broke up, Robin and Marc, did you go over to the apartment with Robin?

A. She had called me the night before and told me -- well, she -- think about it. She had called me the night before and told me to come and get her and I went to get her. And she was outside. She didn't have on any shoes. She didn't have on anything but a gown. She couldn't get in. He had taken her car. She -- Granny wasn't at home so she had to walk to the houses on the far side to call me to come and get her. And I went and got her and I took her in the car and we came on home.

Q. Was that the night that she was locked out and called the police?

A. She was locked out.

Q. Now, after --

A. Outside in the cold. Well, she told me, she said, Mama, she said she had worked twelve hours that day from seven in the morning to seven at night. She'd come home. And she said she took a shower and she had taken a shower and she laid on the sofa and something told her to unlock the front door. Apparently -- apparently, he had been arguing with her or something and she said she didn't want to go to sleep. She was afraid to go to sleep. But she drifted off to sleep anyway. And when she woke up, he was choking her in her sleep. He was choking her and she had to fight.

Apparently, he -- apparently, he went out there and got in her car and took off with her car because she didn't have a key. I didn't have a key because they had two keys so he had both the keys. Apparently, she run out to get to her car and she couldn't get back in.

Q. Now --

A. And that was the last straw for her.

Q. Okay. After that, they broke up?

A. She called North Carolina. She told his mama that he wasn't welcome back in her house anymore.

Q. After they broke up, did you go back over -- and Marc moved his things out, what did you and Robin discover in the apartment?

A. We went back -- we went back the night after he had come up and moved his stuff out. She went back to get her clothes and her clothes were covered with bleach. He had bleached all her clothes. She had clean clothes in the basket in the closet that she had washed. All her clothes had bleach all over them. Bleach all over everything. Bleach all down in her (inaudible) and everything. She didn't have any clothes.

She had been telling me before this, she would always come home, she said, Mama, I don't have any clothes.

And I said, Well, why? Because she -- she had a clothes fettish. She would always buy new clothes. She loved to dress. She had everything imagine. She was a dresser. And I

couldn't understand why she didn't have any clothes and I just thought maybe she didn't have any clothes because she didn't want to wear what she had. So we'd go out and we'd buy her more clothes. And she later told me that anything that he thought that she looked nice in, he got rid of. She wore it one day, wore it twice and she'd go back to get it and it was gone.

Q. Ms. Williams --

A. She had never told me.

Q. -- I'm going to talk to you a little bit about Robin's recovery after the firebombing. The jury has heard about the firebombing incident.

Did you stay with her at UVA Burn Center?

A. Yes, ma'am. I stayed the whole time except maybe about five hours I had to come home, but I never left her. Never left her side.

Q. And how did she do during her recovery at UVA?

A. She did really well, but she would scream out at nighttime. They would have to give her heavy medication because she would scream out at night that she would be so afraid and she would scream at night. And I'd have to go to her and take care of her.

Q. Ms. Williams, I'm going to show you what's been previously marked and introduced as Government's Exhibit 63D1 and 63D. Are those the compression garments that Robin wore?

A. Yes, ma'am. She had to wear them because of the burns on her arm.

Q. Now, when Robin got back to Roanoke, did y'all order more of those?

A. She ordered one for every outfit -- of every color.

Q. And why is that?

A. Because she liked to dress and she wanted everything to match. So she ordered one of every color.

Q. I'm going to show you what is marked as Government's Exhibit 63C. Show that to the jury if you will.

(Witness complied.)

Q. What is that first?

A. This is a gown that was sent to the University of Virginia from the hospital, the group of people that she worked with. This was signed by all the nurses and the doctors and everybody that knew her. They sent this to her for her to wear while she was there.

MS. TOMPKINS: Move admission of Government's Exhibit 63D (sic), Your Honor.

THE COURT: Let it be admitted.

(Government's Exhibit Number 63C was received into evidence.)

Q. And those were from her colleagues at Memorial where she worked? Community?

A. Where she worked at Memorial.

Q.    And that came to the burn center?

A.    Yeah, they sent it down.  They made it and sent it to her.

Q.    Now, Ms. Williams, I'm going to talk to you about the events of the morning of June 22nd, 1996.  Tell the jury what happened that day.

A.    Well, I got up around 6 o'clock because I was expecting my grandbaby to come so I could baby-sit her while her mother went to work.  I got up and went and sat out on the front porch and read the paper waiting on her to come.  She's supposed to been there by 6:30 and she was just a few minutes late.  So when she did come, I got the baby and I went in the house and sat her in the floor in the den and cut on the TV so she could watch the cartoons and I went in the kitchen to make brownies because we were having a bake sale at church.  And as soon as I got the brownies made and got them in the stove, I went back in the den where she was.  It was about 7 o'clock. And I sit down in the chair.

And all at once I heard this big boom.  I said, What is that?  And I got up and I looked around the door to look.  I said, My stove must be blowing up.  I was a nervous person so I wouldn't go.  I wouldn't go look.  I just sit back down. Then I heard it again.  I said, What in the world is that?  So I got up and I went and looked out the front door and looked around the back of the house, but I couldn't see my back door

because the way my house is made, and I stepped back in the house and I heard it again.

And by that time Robin had run down the steps and she said, Mama, what is that?

And I said, I don't know. I said, I don't know, Robin. I said, It must be Marc.

And she started turning around and around and around in the floor. She said, Oh, Mama, what must I do? What must I do? What must I do?

I said, I don't know, Baby. I said, I don't know, Baby. I said, Just run. Just run.

And I had the baby in my arms and she run out the front door and I was standing looking at her running up the upgrade by the apartment house. And I turned around and when I turned around, Marc was standing looking at me. And he brought his gun down and throwed it on me. And I said, Marc, don't shoot my grandbaby.

He said, Where is she at? Where is she at?

I said, She's running. Leave her alone. Out the door he went and up the upgrade. And I said -- I run back in the house and I picked up the telephone and there was no dial tone. And I went out on the porch and I started screaming. By that time my brother was down. Had come from the back of the house down the steps. And I said -- I started screaming for anybody, Help. Help. Call 9-1-1. I said, This boy is

FORM FED ⊕ PENGAD • 1-800-631-6989

**JA1847**

going to kill my baby. Call 9-1-1. Call 9-1-1.

Then I run across the street and I could hear them coming over the hill and she kept telling him, No, I'm not going. No, I'm not going. By the time I got around, they were down middle ways to here.

I walked across -- started across and Robin started away -- I said, Leave him -- leave her alone, Marc. I said, You have already disfigured her for life. Leave her alone. I said, Come on, Robin. And she started walking away and I caught her by the arm and we started back. And by the time she stepped up on the knobbed upgrade of the -- the yard, he shot and she threw up her hands. And I looked back at him. He brought that gun down and shot again and she fell. And she fell.

I said, Oh, she fell. Oh. And I got down to assess her body and I said, Oh, he shot her in the side. And I grabbed her and I said, Robin, hold on, Robin. And she went huh, huh (demonstrating). That's when she -- she was just gasping for her breath. And I said, Oh, Robin, wait a minute. Hold on, Robin, hold on.

And I run -- I ran to Sonji's and I said, Give me the phone. Give me the phone.

And she said, I don't have a phone that come down the steps. I said, I need the phone. I need the phone. So I ran up to her porch and I called my pastor and I said, Pray.

Pray. I said, This boy has shot Robin. Please pray. Pray.

And I run back down. I ran back down and I ran back to her body and after I got to her body and then the policeman came. I said, Please don't let my baby die. I said, Please, please don't let my baby die. And then -- then the ambulance and everything came. And I said, Is she dead? Is she dead? Is she dead? Is she dead?

And they said, I don't know, ma'am. Then somebody told me, Well, I got a little pulse.

And I thought, Oh, no, no, and I knew she was dead. She just died. She just died. He just shot her and she just fell at my feet.

She was petrified. She couldn't say anything. And I said, Come on, Robin. Come on, Robin. And she just looked at me and just walked away. She couldn't say a word. She was so afraid.

Q. Ms. Williams, did Kenny and Sidney come over later that morning?

A. Somebody called -- somebody called him. I don't know who called him, but Kenny came. And I sent Kenny to the hospital. Somebody went to Sidney's job and told Sidney and Sidney came and they went to the hospital.

Then they came home and I said, Kenny, is she -- is my baby dead?

And he said, Mama, she's gone. She's gone.

I didn't get to tell her good-bye. She was the joy of my life. Marc knew she was the joy of my life. The only little girl I had. The only little girl I had.

You knew that, Marc. You took her life. Took away her future. You know how much she meant to me.

Q. Ms. Williams... Ms. Williams, that morning, do you remember praying?

A. How could you do that, Marc?

MS. TOMPKINS: May I approach?

A. How can you kill my baby? Why you kill my baby, Marc? She loved you, you know that. She never mistreated you, Marc.

I'm sorry. I'm sorry. I'm sorry. I apologize. I apologize.

Q. Ms. Williams, every year do you all remember Robin by putting a memorial in the newspaper?

A. Yes, ma'am.

Q. Show you Government's Exhibit 68.

A. We put one on her birthday every year.

Q. And y'all have done that every year?

A. Yes, every year. I don't want her to be forgotten. She was such a good person.

Q. Ms. Williams, I'm going to show you what's been marked as Government's Exhibit 63E. If you can, did you -- did you write a poem after Robin died?

A.    I did, yes, ma'am.

Q.    And is that a copy of the poem?

A.    Yes, ma'am.

MS. TOMPKINS:  Move admission of Government's Exhibit 63E.

THE COURT:  Let it be admitted.

(Government's Exhibit Number 63E was received into evidence.)

Q.    If I could get you to take a deep breath.  Could you read that poem to the jury.

A.    The name of my poem I wrote for her is Stuck at 23!

There should have been a college degree.

There should have been wedding bells and the patter of little feet.

There should have been more laughter, hugs and kisses for me, (Mommy).

But now you're stuck at 23!

How can I forget how much you loved me, and how many times we always agreed.

How you knew my wants, my needs, and the way we cared -- and the way you cared for me.

But now you're stuck at 23!

I love you, my daughter.  You meant the world to me.

So soar like the angel that I know you to be.

Now you are free, free, indeed, although you're stuck at

23!

MS. TOMPKINS: Thank you, Ms. Williams. I don't have any further questions.

MS. LAWSON: No questions.

THE COURT: You may step down, Ms. Williams.

THE WITNESS: Thank you.

(Witness stepped down.)

MS. ROSE: Government will call Shirley Allen.

SHIRLEY ALLEN,

being first duly sworn, was examined and testified as follows:

DIRECT EXAMINATION

BY MS. ROSE:

Q. Good morning. Would you introduce yourself to the jury, please, ma'am.

A. Shirley Allen.

Q. And Ms. Allen, where do you live?

A. In McConnells, South Carolina.

Q. And you're married to Mr. Allen?

A. Yes.

Q. Bob Allen. How many children do you have?

A. We have five.

Q. What are their names and ages?

A. David is the oldest. He's forty-five. And Dennis is the next. He's forty-three. And Denise is, I think, forty-one. And Dean is thirty-nine. And there's eleven years between

Dean and Donnie. Donnie, if he was living, he'd be twenty-eight.

Q. He would be twenty-eight.

A. Yes.

Q. Now, Donnie came last and later in life for you.

A. Yes, he did.

Q. Would you tell the members of the jury about that. You found out you were going to have another baby eleven years after your last.

A. Well, I mean, you know, we really wanted another child. And, of course, the older children, they was real shocked and surprised, you know, that we was going to have another child. And -- but we all was very excited about it and, you know, we looked forward to him coming and all.

Q. Did he come a little sooner than expected?

A. Yes. He came three months early. He was born in March and he wasn't supposed to be born until June.

Q. What was Donnie's birthday?

A. March the 30th, 1974.

Q. And how much did he weigh when he was born?

A. He weighed 2 pounds 14 ounces.

Q. I'm going to show you Government's Exhibit 66A. Stipulated admission. Was that taken how long after his birth, his premature birth?

A. Probably -- he was probably about two days old.

Q. How long was he in the hospital?

A. He had to stay 48 days.

Q. And back in 1974, premature birth, particularly 2 pounds, was significant.

A. Yes. Because he -- he lost down some of his weight. I think he lost down about 2.9 and it took 48 days for them to get him back up to around 4 pounds when we brought him home from the hospital.

Q. He spent quite a bit of time there. It was a little bit of a miracle for him to live?

A. It sure was because they only gave him a 25 percent chance to live when he was born.

Q. And as he grew up, describe his relationship with his siblings.

A. Well, by him having older -- two older brothers and an older sister and, of course, Dean was eleven years older than him, he was just a joy to everybody. They all shared. And he had to be fed every three hours and it would take an hour to feed him and we would take turns, you know, taking care of him. They all helped me. We all shared in his care. And Denise especially. She was, you know, she's just like another mother to him. She was thirteen. And they just -- I was lucky to even spend time with him because they was all fighting over who was going to take him riding or who was going to take care of him and he was just a joy to every one

of us.

Q. Now, as -- what kind of young man did he begin to grow into?

A. He was just happy-go-lucky. He, you know, he was just -- we just showed him all the love and everything and he just loved everybody he met. You know, anybody that ever met him, they'd always remember him because it didn't matter what age, the little kids, our younger grandchildren, he would just take and play with them. And if we had a church thing, he would take the little babies and hold them and he'd go around, he'd hug all the older ladies, the widow ladies in the church. When he come in on Sunday morning, it didn't matter who it was, he went around hugged everybody.

Q. Now, he was younger. Did he and his father have a --

A. They were very close, yes. And he always -- our other children call my husband Dad and Donnie called him Poppa.

Q. As he got a little older, he got involved in sports.

A. Yeah, he was a good baseball player. He loved sports.

Q. When he got into high school, he grew to be a tall young man, didn't he?

A. Yeah. He was a little over 6 foot. Maybe something -- maybe 6'1".

Q. And what kind of hobbies did he engage in during high school?

A. Well, he -- he was on the golf team. He won, I think,

his team won the top honors, I think, the year before he graduated in '92. I think it was '91. And he was an excellent golfer and he practiced all the time. He would go and hit golf balls at driving ranges. He'd get out in the backyard and hit golf balls. Matter of fact, my husband, we still find golf balls where he'd hit them way back in the back of our property.

And I know our grandson Josh, our oldest grandson Josh, he has kind of taken up golf. Donnie told him, said, Josh, if you're going to be good at it, you've got to get out and you got to work at it. You got to practice, you know. And he always tried to advise the younger grandchildren what, you know, to get out and give it your all, in other words, you know, if you're going to go after something.

Q.   Did -- in fact, did he get a scholarship --

A.   Yes, he won a --

Q.   -- to further his education?

A.   He got a golf scholarship and he went to York Tech and --

Q.   What did he study there?

A.   Auto mechanics, I think. And I don't know, several different things.

Q.   And where was he eventually employed after he finished his education?

A.   Well, he worked at Spring Lake Country Club, you know, all during his high school. And he went from there, he had a

friend that he would go see and he kind of taught him how to work on these big greens mowers and things. And so this man knew some of the people that worked at Jacobson Textron and they told them about Donnie and he helped Donnie to go put -- you know, told Donnie about it. He went over and put his application in and he was working at Jacobson Textron as a technician. He worked on those big mowers all the time.

Q. Now, at some point -- did he have some other hobbies other than just golf?

A. He loved to hunt. Our oldest son David, he got Donnie interested in hunting. Or he just -- well, he had a best friend, Brian Jones. He and Brian would go hunting together. They would go any kind of hunting. He loved to deer hunt and he -- David -- he had just bought him a bow and some arrows and he was trying to learn to shoot the bow, you know. He would go out in the yard with a target and a bale of hay and practice shooting and he was -- he was always -- he would always just hit it dead center. I'd watch him. He was real good at it, you know.

Q. Did there come a time when he had worked and earned some money and wanted to purchase a new car?

A. Yes. Well, first he got -- he had a little show truck and he would take it. He would work -- he would go to all different places and take it and show it. And it was real low to the ground. It wasn't a real practical vehicle. And he

said he wanted to go buy him a car that he could drive, you know, go and -- it would be better, you know, he could get around in it better and he didn't want to mess his little show truck up. So he took his show truck, which he took it and traded it in on his Honda. And, of course, they give him way far less. He wouldn't let his dad go with him or didn't ask his dad to go with him and he wanted to do it on his own. Dean went with him and they went and --

Q. And did he get the -- his blue Honda Prelude?

A. Well, yes. He told me he was going to get a red one when he left. He said, Mama, I want a red one.

I said, You get whatever color you want, you know.

So he came back and he had a blue one, the dark blue. And I said, Well, why did you -- he blowed the horn and we went -- I went out and looked at it. And I said, Well, Son, why did you get a blue one?

He said, Well, Mama it had everything on it that I wanted on it. And he said, And I know your favorite color is blue so that's why I got blue.

Q. Government's Exhibit 66L. Is that the car --

A. Yes, it is.

Q. -- that Donnie owned?

A. Yes, it is.

Q. Would you tell the members of the jury about Friday evening, July 21st, 1996 (sic).

A.   Well, we had all worked that day, Dean, Bob, Donnie and I.   And I was real tired.   We was all real tired.   Donnie was, matter of fact, was the last one to come in that evening. They had grilled steaks out and had a big meal at work. They'd always on their breaks, they'd go out and play horseshoes and do things, you know, or they would all bring food and they would share a meal together.   And I had picked up some pizzas for dinner that night because I was too tired to cook.   And I asked him -- he came in and I asked him, I said, Would you like to have some pizza.

He said, No, mom, I ate a big meal and I don't want anything right now.

So we was all just resting and I had one of my legs, I had -- it was hurting real bad and I just went in the bedroom and just stretched out across the bed and put a pillow under my leg and we -- you know, Dean was out -- we was all doing our own thing, so to speak.   And Bob was outside doing something.

And when I got up, I asked Bob, I said, Where is Donnie? He said, Well, he just walked by me.   He was in the laundry room washing his hands and he said, Donnie walked by me and I asked him, I said, Donnie, where are you going?   And he said, Well, I'm just going out for a while, Dad -- or Poppa.   He always called him Poppa.   And he said, I won't be gone long.

And we -- we trusted him.   I mean, you know, he would go

JA1859

out. He was twenty-two years old. But he would always call in if he was late or, Mama, you know, I'm over here hanging out. I'll be home after while, or whatever. And you know, we don't -- we didn't ask him exactly where he was going. You know, and what he was going to do because, you know, we knew he would be okay.

So my husband told me he had gone out. And we -- it was midnight or after and my husband went to bed. And Dean, I told Dean, I said, This is not like Donnie. He just don't stay out at night. He just don't do it. At least he would call. And I sat up all night that night, but we never did get a call.

So on Saturday we had to go to a wedding in Mt. Holly, North Carolina, and Donnie was going to go with us. And I kept telling my husband, I said -- and he was supposed to go to his hunt club that morning for a meeting real early in the morning. I said, I can't understand because Donnie would have been here because he was going to go to his hunt club meeting and then go to the wedding with us in Mt. Holly.

And so we got up and I was -- I could -- I knew something was wrong but, you know, you just think, well, I'm going to go ahead and do this. So we went on to the wedding and Denise was at the wedding and I told her, I said, Denise, Donnie didn't come in last night. She said, Mama, this is just not like Donnie. And I said, No, it's not. So we went on and

went to the wedding.

We come home that afternoon. I told my husband, I said, We got to go out and hunt him. Something is wrong. And I think -- and I said, well -- my husband said, Maybe he'll call. Maybe he's just spending the night with somebody.

And so he didn't call and so we went on -- we went out hunting. He had previously been going with this girl. He was engaged to her from '95 -- August -- in August, he got engaged in 1995, and they broke up in January 1996, and I thought maybe he had went to see her, you know. And we didn't know exactly where she lived. And we -- she lived in a trailer park and we hunted and hunted. We couldn't find his car or, you know, and so we went on. I said we're going to have to do something. So we went to Moss Justice Center in York.

Q.  And what day is this again?

A.  This was on a Sunday, I think.  Sunday morning.

Q.  Did you go to church that day?

A.  Yes.

Q.  Did you go to the sheriff's department before or after church?

A.  After church.  And we went up there and we put out a missing persons bulletin on him.

Q.  Gave them the information about his car?

A.  Yes.

Q.  When he was last seen?

JA1861

A. Gave them everything, uh-huh.

Q. Did you make it to church that night?

A. No.

Q. Was that rare for you and your husband?

A. Yes, it was. And we called all the other children and told them, you know, Donnie was missing. And Dennis, he packed -- he just come on down there. And Denise took her children to her mother-in-law's. And they just moved in. They was there. And David. All the other children just came. And all of our friends. The whole house was just full of church friends and family.

Q. By -- by Monday evening or Tuesday, what's happening at your house?

A. Well, it was Monday evening, Dennis was answering the phone, I think, and David or some of the children in the bedroom. And they said -- they come in there and asked me, said they -- or told us that they found Donnie's car and it was locked and they wanted to know, they said the policeman wanted to know if we had a key. And I said, Yes, in there on Donnie's desk in his bedroom is a key.

And so Dennis, I think one of the other children went in there and got it and it was about three or four carloads of Donnie's friends, our family that went over. They told them where to come and they went over there. And of course, our son-in-law Kenny from Mt. Holly, he got there before all the

rest of them got there, and Kenny and his friend found the gun in the dumpster in the back and Donnie's car was sitting there. And they knew something was wrong because Donnie always kept his car immaculate. I mean, it was clean all the time. There was dirt and stuff all in the inside of the car. You know, they could look in it.

Q. Now, when did you -- when did -- how did you learn of your son's death?

A. Well, it was -- let me think. Tuesday we was all still in shock, like I said, and everybody -- we just had friends that just took over. They brought food in. And we was all around and it was in the afternoon. Bob and the children knew it before I did because they had called and told them that they found a body on Morris Field Road and they was pretty sure it was Donnie's. And they wanted to know -- which I didn't know at the time. They was asking about Donnie's necklace with a cross and his watch. And so they was pretty sure and all about it.

And Dennis came in and asked me who Donnie's orthodontist was and I told him. And see, I didn't know they was going to get the dental records, of course. I couldn't put it together because I was still in such shock. I just, you know, walking around like I didn't know what was going on.

So finally, they knew it was Donnie's body and my husband came in and told me that they had found him. And then I

walked by the TV and it showed them bringing Donnie's body out and it was -- I just can't tell you how bad it was.

Q. How -- I don't know if you can put in words the loss of your child, but how has Donnie's murder affected your family, affected you?

A. Oh, it's -- our lives is -- will never be the same. It just -- he was such a joy and he just -- I mean, like I haven't slept a full night in six years. I sleep like two hours at a time. And I wake up 2 o'clock every morning and I couldn't figure out why. I kept telling Denise and my children, I said, you know, I can't figure out why, but every morning at 2 o'clock I'd wake up. Then I found out that was when Donnie died.

Q. Did you -- show you Government's Exhibit 67K. When was this picture of Donnie made?

A. That was his senior school -- well, that was at his senior prom picture.

Q. And did, after Donnie's death, someone in the family find a poem that was meaningful to you that has brought some comfort to you?

A. Yes. Denise, our daughter, she seen this in a -- a poem in a book and she ordered all of us a copy of it and had Donnie's picture put to one side and had it framed and his birth date on there and the date of his death on there.

Q. And that's this photograph --

A.  Yes, that's --

Q.  -- that's contained with the poem?

Did you bring a copy of that to share since it's brought a lot of comfort to you?

A.  Yes.  I don't know whether I'll be able to read it.  I'll try.  Let me see.  I think this is the wrong paper because it doesn't have the poem on it.

Q.  That's okay.

A.  Okay.

Q.  It's at line 5.

A.  Pardon?

Q.  At line 5 on your piece of paper.

A.  Line 5?  Oh, I'm sorry.  Excuse me.  I was looking up above.

It said, I'm free.  Don't grieve for me for now I'm free.  I'm following the path God laid, you see.  I took his hand when I heard him call.  I turned my back and left it all.  I could not stay another day to laugh, to love, to work or play.  Tasks left undone must stay that way.  I found that peace at the close of the day.  If my parting has left a void, then fill it with remembered joys.  A friendship shared, a laugh, a kiss, oh, yes, these things I too will miss.  Be not burdened with times of sorrow.  I wish you the sunshine of tomorrow.  My life -- my life's been full.  I savored much, good friends, good times, a loved one's touch.  Perhaps my

time seemed all too brief. Don't lengthen it now with undue grief. Lift up your hearts and peace to thee. God wanted me now. He set me free.

Q. And were those sentiments the kind that you would expect from Donnie?

A. Yes, it was.

Q. From his personality and his feelings?

A. Yes.

MS. ROSE: Thank you for sharing. I have no more questions.

MR. BENDER: No questions.

(Witness stepped down.)

MS. ROSE: Denise Allen, if you would come around, please.

THE COURT: We'll be taking our morning break.

MS. ROSE: Okay.

THE COURT: We'll take our morning break, members of the jury. We'll call for you.

(Brief recess at 11 o'clock a.m.)

THE COURT: Are the parties ready to resume?

(No response.)

THE COURT: May we have the jury, please.

(Jury entered the courtroom.)

THE COURT: All right. You may --

MS. ROSE: Denise Allen, come around, please.

DENISE ALLEN HOGUE,

being first duly sworn, was examined and testified as follows:

DIRECT EXAMINATION

BY MS. ROSE:

Q. Would you introduce yourself to the jury, please, ma'am.

A. Yes. My name is Denise Allen Hogue.

Q. And you live here in Mecklenburg County?

A. Yes, I do. I live in Mt. Holly. No, I live in Gaston County.

Q. And you are Donnie's only sister.

A. Yes.

Q. Whenever you learned of Donnie's disappearance, did you help your family as you all were looking for him or trying to find what might have happened to him?

A. Yes. I found out on Sunday that he still wasn't home and so I went to my mom's. I had to wait till the next morning to go down there because I had to take my children to my mother-in-law's house, and I went straight down there. We were sitting at the house and just waiting and hoping for some word and I just said I can't just sit here. I've got to do something. So I got in my car and rode up and down the road near their house and just looked. Just called his name and looked in ditches and everything. Just hunting him.

Q. How long did you do that that day?

A. I don't know. Hours. I really don't know how long. The

preacher stopped and would check on me because I was by myself, but I just couldn't stop. And while I was looking, I just had a real overwhelming feeling come over me that he's not with his car. At one time I thought maybe, you know, we thought maybe a bad wreck. But I just thought, no, he's not with his car. And I went from praying, Lord, just let us -- let him be okay to just, Lord, let us find him.

Q. At that point did you go home and help your parents put together a flyer?

A. Yes, ma'am. Yeah, I went home and -- well, and then I went back out to look some more and I was showing his picture and this lady asked me in the hardware if I had thought to make up flyers, and I said, oh. And of course, I hadn't. I was just addled. So I made these flyers up and then just started distributing them around.

Q. Okay. Where did you distribute them?

A. Down around the York area where Mom and Dad live and then I had gone to Rock Hill and was getting hundreds of them made. And we were on our way, we were getting ready to go to the Charlotte area because we thought possibly he may have gone over there that evening, and that's when something told me to call home. And I called home to check on things and my brother Dennis answered the phone and he told me to get home, to get back there.

Q. You got back to your parents, what did you find?

A. Well, I was with some friends at that time. They were going to help me put out the flyers and they wouldn't let me drive back to my mom and dad's. They drove me back there. And we got there and Dennis, my brother, met me out in Mom and Dad's garage and he told me at that time that they had found a body on Billy Graham and Morris Field Drive and that they thought it was Donnie, possibly Donnie. And he said, Sis, if you don't think you can go in there, we haven't told Mom yet, and if you think you're going to get too upset, don't go in there. And I said -- Dennis just looked at me. I couldn't cry or anything. You know, I didn't want to believe it. I didn't want to accept it. So I just went on in the house and stayed in the living room and we just kept quiet because we wanted to know for sure before we told Mom anything.

Q. Your dad knew at that point that they had found the body.

A. Yes.

Q. And you all had given some family member information about Donnie's orthodontist --

A. Right.

Q. -- for dental records?

A. Dennis came into the kitchen and asked mom about -- he started out telling my mother that Caleb's teeth were protruding and he was going to have to have braces and just went about it like that in a nonchalant way, and my mom

started telling him, oh, yeah, you know, who Donnie's orthodontist was. And I was sitting beside my cousin in the couch in the living room and I knew as soon as I heard that, oh, my Lord, they're going for the dental records. And I think that's when I really knew, you know. But then they came out shortly after that, Dad told Mom they had found Donnie.

Q. Now, after Donnie's burial, did you learn of a special request he had made to one of your children?

A. Yes, I did. My oldest son is 19 years old. He's handicapped, in a wheelchair. And he looks almost identical to Donnie. He really looks a lot like Donnie.

Q. Is he, in fact, here at the courthouse?

A. Yes, he is here today.

Q. What is his condition?

A. Well, for insurance purposes they put cerebral palsy, but he really doesn't exactly have cerebral palsy. He was premature like Donnie was and they had to do an emergency section and take him. He just didn't get the oxygen he needed at some point in time right before he was born or right after possibly, too, and has brain damage.

Q. And he's wheelchair bound?

A. Exactly. Total care.

Q. Can he communicate?

A. No.

Q. And you say he looks a lot like Donnie?

A. Yes, ma'am, he does. And Donnie had -- the way I found out about it is Mom called me -- I can't really remember if it was Mom or Donnie that actually called me and asked me for my social security number. And because of Brandon, my son, Donnie wanted to put me on his life insurance policy because of Brandon. He told my mother if anything ever happened to him, he wanted Brandon to be taken care of.

Q. And after his burial, did you learn that he had, in fact, made you and Brandon the beneficiary of his work benefits?

A. Yes, I did.

Q. Did you at a later time put together just some quips from family video footage of particularly Christmases and things with Donnie?

A. Yes, ma'am.

Q. Tell us about that.

A. Well, like I say, it was get-togethers. We always get together every Christmas, Thanksgiving, and all of our birthdays. At one time we got together for everybody's birthday, but the family is so large we kind of cut it down to just the grandkids. But a lot of the pictures are from all our get-togethers and Donnie's on there a lot going around hugging everybody. He was always giving everybody hugs, thanking them for presents and smiling real big like he always did.

Q. And the -- does it have footage of his last Christmas

with the family?

A.   Yes, it does.

MS. ROSE:  Your Honor, that has been marked as Government's Exhibit 62 and I move for its admission and permission to play a portion of that at this time.

THE COURT:  It will be admitted.

(Government's Exhibit Number 62 was published to the jury.)

A.   That Christmas they gave him a truck, a little car truck.

There he was saying, I got to give out hugs.

Q.   How old was he here?

A.   That was right after he had his braces off.  That's when I was telling him to show me his pearly whites, and I'm really not exactly sure how old he was.

Q.   Did Donnie's car have some special significance for him, the blue Prelude that he had bought?

A.   Yes.  He was real proud of his car.  It was his pride and joy.  He always kept it shined up and cleaned.  And like Mom said, he knew Mom's favorite color was blue and that's one reason he got a blue car.

And we were going to try to sell it afterwards, but I cleaned it up and I told my husband, I said, You know, it's kind of hard to put that for sale sign in the window.

And he said, If you don't want to sell it, don't sell

it.  You know, you can't change your mind later.

So I went straight out there, took the sign out of the window and kept his car.

Q.  Just a part of Donnie.

A.  Yes.  Just couldn't let go of it.

MS. ROSE:  All right.  Thank you.

MR. BENDER:  No questions.

THE COURT:  You may step down.

(Witness stepped down.)

MS. ROSE:  Bob Allen, would you come up, please.

BOBBY GENE ALLEN,

being first duly sworn, was examined and testified as follows:

DIRECT EXAMINATION

BY MS. ROSE:

Q.  Would you tell us your name, please, sir.

A.  My full name is Bobby Gene Allen.  I go by Bob.

Q.  All right.  Mr. Allen, you live in McConnells, South Carolina?

A.  That's correct.

Q.  We've met some of the other members of your family.  How long have you and Ms. Allen been married?

A.  Forty-eight years.

Q.  Did you grow up in South Carolina?

A.  Down near Grover.  In the edge of South Carolina.

Q.  Just briefly describe your upbringing.

A.    Well, we were a poor family.  My dad was a sharecropper. We moved from one place to another.  Then when we got out of school, then, we would pick cotton and look after the farm work.  Then we went to public work.  Then Shirley and I got married and moved to Mt. Holly, raised our children.  We lived in Mt. Holly for thirty-two and a half years.

Q.    Now, did you and Donnie, with him being your youngest, have a special relationship?

A.    Yes, we did.

Q.    Tell us about that.

A.    Well, we were close.  Donnie was special to the whole family.  By being born prematurely and we didn't get to take him anywhere for two years because they wouldn't let us take him out of the house because he was so young and they was afraid he would get some germ.  We couldn't give him his polio shots until after two years of age.

And then he grew up and we would play games together.  We would -- I took him hunting.  Built a tree stand in a cedar tree and I took him with me and I climbed up in that tree and pulled my rifle up on a rope.  I told Donnie, I said, take the loop in that rope and put it over your head and under your arms.  And I said, Climb up here with Poppa.  He always called me Poppa.  I said, You won't fall, because he was afraid to climb.  And he did that and we spent the better part of that day in that tree looking for deer.  We didn't get anything,

but we enjoyed the day in that tree together.

Q.   Did you and Donnie enjoy many days together just the two of you?

A.   Yes, we did.

Q.   What other hobbies did he have or activities did the two of you enjoy together?

A.   Well, he was a good golfer.  He won the club championship, junior club championship in York in 1992.  He and I would go to Cowens Ford Country Club up on Lake Norman. We were members up there.  And we would play in the father/son tournament, and very seldom we would come in over third place.  He was an excellent golfer.

Q.   And that, of course, helped him with getting a golf scholarship for his education.

A.   That's correct.

Q.   And after that he began work at Textron.

A.   That's correct.

Q.   Did you have an opportunity to talk with some of his coworkers and supervisors about his work performance?

A.   Yes, I did.  His supervisor called me one day and talked with me about him.  He told me that -- he said, Mr. Allen, I'm not telling you this because he's your son, but he says, we're very fortunate to have Donnie as an employee.  He said, He is the most mature twenty-year-old I have ever seen.

Donnie had gone to Madison, Wisconsin, and gone through

school out there and he would -- would have gotten a raise the week after he was killed.

Q. Now, Donnie lived at home with you and Mrs. Allen.

A. That's correct.

Q. If you would, just describe the last time you saw your son.

A. Well, I had been in the garden tying some tomato plants up. I was in the laundry room washing my hands. Donnie had come in from work and he had laid down and rested a little while. And he came by me in the laundry room and he said, Poppa, I'm going out a while. I'll be back after while. And I didn't realize that would be the last time I'd ever see him.

Q. Did you know that he liked to go to Coyote Joe's to play pool?

A. Well, we didn't know at that time where he had gone. We talked to Dean. My wife and myself had gone to Pidgeon Forge for the weekend prior to that and Dean told us that Donnie had gone to Coyote Joe's and had met a girl over there. So that's where we began our search was at Coyote Joe's.

Q. Was pool one of his hobbies?

A. Yes, it was. He and I purchased a pool table together. He asked me if I would go in with him and buy one, and it's in our garage now. And he played pool regularly.

Q. When Donnie didn't come home that evening, was that

unusual?

A.   Yes, it was.   Donnie always called if he was going to be late.   He would go by his friend's house, Stanley Chambers, and he would find out what they had for supper and he'd call home and see what we had, and he would decide whether he wanted to eat with Stanley and his wife or come home and eat with us.   So he always kept in contact with us.

Q.   Saturday morning rolls around, what do you and Mrs. Allen do?

A.   Well, he didn't come in and we were concerned about it. But being a twenty-two-year-old and going out and meeting a young lady, we figured maybe, well, we'd give him the benefit of the doubt and he'd come in later that day.   So we did not -- was not too concerned about it at that time.

Q.   As the day progressed, what happened?

A.   Well, we were more concerned because he was supposed to have come in and gone with us to a wedding that afternoon. And then later we found out that he was supposed to have gone with Stanley to their hunt club and done some work at their hunt club.   So we were real concerned about it then.

Q.   Did you go on to church as usual on Sunday morning?

A.   Yes, we did.   We went to church services and we had a covered dish dinner after the service and my wife and myself was on the hospitality committee and we were looking after everything there at the dinner.   And some of our friends came

up to us and told us, says, You just don't seem like yourself today. And we didn't tell them what the problem was, but -- that we were concerned about Donnie not coming home.

So later that day, Shirley and I went out and we begin to ride around and see if we could find the girl that he used to be engaged with. And we met a highway patrolman and they -- there were two gentlemen in the car and they pulled into York Seafood, and I pulled in behind them, got out and talked with them and told them what the problem was. And they told us to go down to Moss Justice Center and file a missing person's report. So --

Q. And Moss Justice Center, is that part of the York County Sheriff's Office?

A. Yes, it is.

Q. Now, did Donnie regularly go to church with you and Mrs. Allen?

A. Yes, he did. Donnie went to church with us Sunday mornings, Sunday nights and Wednesday nights. He was a regular church goer.

Q. So when he didn't meet you at church Sunday, you were particularly concerned.

A. Yes, we were.

Q. After you filed the missing person's report, what did you then do?

A. Well, we just went home. And on Monday we got a call

that they had located his car. The South Carolina Highway Patrol out of Chester called us and told us. And we went to East Independence Boulevard to where his car was and took the key. And our son-in-law was over there and they had found the shotgun. I gave them the key and they opened the trunk of the car. And of course, they took pictures and everything. They sent us on home. We left from there with the --

Q. Even though they found Donnie's car, were you still making efforts to find him?

A. Yes. We went out Tuesday. I told my wife and my daughter, I said, I'm going out and hunt our buddy. I said, He may need some water. I filled two thermos bottles with water and carried them with me.

Q. And what was your purpose in carrying some water at that point?

A. I thought maybe that he may have been tied to a tree or something somewhere and that we might be able to find him. That's the reason I did that. And we went out and that's when we went to Coyote Joe's and searched the parking lot and the wooded area around there, Stanley Chambers and Rick Eldridge and myself. And we left there and we went back up Wilkinson Boulevard and turned to the right on Morris Field Road and rode down to Billy Graham Parkway and turned to the left, and we didn't know at that time that Donnie's body was laying in the ditch to the left of us just a few feet from us.

Q. Did you see something on the TV that night?

A. Yes, we did. We went on back home and we -- we were sitting in our bedroom. The detectives were there. And they called us and they questioned us about a cross that Donnie had on, a necklace with a cross on it. And I told them that he did. And they questioned us then about his dental report, wanted to know where he had had his dental work done. So Dennis talked to my wife and found out where he had had that done. And about that time, there was a piece that came on the TV and it was an overhead view of the Morris Field Road and Billy Graham Parkway there and the reporter said there is a body in there. And at that time I knew it had to be Donnie. I went in and told my wife. I said, They found Donnie's body. She broke down and cried.

Q. Following the discovery of Donnie's body, did your church family and your friends help you all through that time?

A. Yes, they did. Our church family and friends came in. They took over all the housework and everything that was to be done around there. And they just put their arms around us and loved us and took care of us.

Q. Did -- because of the significance of your church to Donnie and the way your church had helped you through your loss, what did you do as a memorial for him?

A. Well, there was so many gifts that came in from all of our friends. There was over $1,600 that came in as a memorial

to Donnie. And we took that money and purchased three crosses and put it in the front of our church in memory of Donnie.

Q. Do you see those when you attend weekly?

A. Those church -- those crosses are there. The center one is lit up every Sunday morning.

Q. Did you also do some things at your home?

A. I didn't understand that.

Q. Did you do some things at your home as a memorial to Donnie?

A. Yes.

Q. Would you tell us what they are.

A. Well, my mind is not right clear right now, so...

Q. Did you and Donnie play horseshoes together a lot?

A. Yes, we did. We played -- as he would come in from work, he'd come in and rest a while. And he'd come by me and he'd say, Old Man, you want to get beat in a game of horseshoes?

And I asked him, I said, Son, do you really think you can whip your dad?

He says, Well, I can try.

So we'd go out and we'd pitch maybe a half a dozen games of horseshoes and he might beat me one game out of the six, so -- but since that time I haven't pitched any horseshoes in those pits. And I planted a sequoia tree which is a giant redwood in one of those pits, and it's about 2 foot high right now, in memory of Donnie.

Q.   What's -- can you describe for us the impact of your loss.

A.   Describe what?

Q.   The impact of your loss.

A.   Oh, it's something that we'll never get over. It's like the sunshine has been taken out of our lives for the rest of our lives.

Q.   What's the first thing you do when you open your eyes in the morning?

A.   I sit up in the bed and I reach over and I get my Bible, and I have a bookmarker in there with Donnie's picture on it. And I say, Good morning, my buddy up in heaven. And I read my daily Bible readings.

            MS. ROSE:   Thank you, sir.

            MS. LAWSON:   No questions.

            (Witness stepped down.)

            MS. ROSE:   Your Honor, at this time the government would move for admission of Government's Exhibit 65A, 65B, and 65C pursuant to 18 U.S.C. 3593(c). These are the transcripts of the trial of this matter.

            THE COURT:   Let them be admitted.

            (Government's Exhibits Numbers 65A, 65B, and 65C were received into evidence.)

            MS. ROSE:   And with that the government would rest, Your Honor.

THE COURT: Members of the jury, we'll take a short break. Please remember the usual instructions. Thank you.

(Jury exited the courtroom.)

THE COURT: Now, I understand that you have concluded your direct case and it's the intention of defense to open its case on Monday.

MS. LAWSON: Yes, Your Honor.

THE COURT: All right. Anything to be done at this time before I dismiss the jury for the day?

MS. LAWSON: Just one issue and that has to do with the admission of the transcript of the prior trial.

THE COURT: Yes.

MS. LAWSON: Of course, we object to that. It's discretionary.

The problem is that that trial -- that prior trial contains evidence that was not presented to this jury. It would be improper for them to consider anything other than the fact of the conviction. The government was allowed to present evidence of the underlying crimes during this case, so it duplicates what they would find in the trial transcript. The trial transcript also includes motions hearings, issues that were not properly before the jury that heard the guilt/innocence phase to even consider.

And so in total, it would prejudice Mr. Barnette in a number of ways. One is by disclosing information that's not

subject to disclosure to the sentencing jury. Second, it duplicates the testimony already taken. If they want to introduce or give the jury access to the evidence on which they base this sentencing decision, they can certainly introduce the transcripts of what happened here, what was said here. But we're not able to confront testimony in a prior transcript or address whatever impact it may have on the jury that does this sentencing.

So we (A) object and (B), if you're going to admit it, request that it not be published to the jury under any circumstance.

THE COURT: Well, let me ask the government what purpose it may have in introducing that document?

MS. ROSE: Just one of the things that 3593(c) says is that at the sentencing hearing, information may be presented as to any matter relevant to the sentence, including the mitigating, aggravating. Information presented may include the trial transcript and exhibits if the hearing is held before a jury or judge not present during the trial.

It's not something we're looking to publish to the jury, Your Honor. We're just completing the record.

THE COURT: Well, that -- if you're not going to publish it to the jury, then it's really a moot point but -- whether it's admitted or not. The court will admit it into the record, but not as an exhibit and not for the jury's

attention unless the government makes a particularized showing.

MS. ROSE: All right. Thank you.

THE COURT: Does that take care of your motion?

MS. LAWSON: Yes, sir.

THE COURT: All right. Thank you all very much.

Let's bring the jury back and we'll send them on for the week until Monday.

(Jury entered the courtroom.)

THE COURT: Okay. Members of the jury, we've concluded our business for the week. I think we told you that we wouldn't be working on Friday. The government now having rested its case, we'll move along with the case on Monday. And I can't give you a good estimate about how long the trial will take, but it's possible that the case will wind up toward the end of next week or I would think certainly the beginning of the following week. But we'll, of course, move it along as well as we can for the sake of all concerned.

So I'll remind you about some instructions that are particularly important.

I instruct you not to discuss the case with anyone until you actually begin your deliberations, whether members of your family, people involved in the trial or anyone else, and that includes your fellow jurors. If someone should approach you and try to discuss the trial with you

notwithstanding the court's instruction, please let me know about that.

Also, you must not read or listen to any news reports of the trial. Remember, you must not talk about anything with any person who is involved in the trial even about something that has nothing to do with the trial.

And if you need to speak to the court about anything, please give a note to the marshal and he'll hand it to me, or she will.

I may not repeat these things for you at every break, but you've heard most of this before.

I remind you not to do any research or investigation on your own.

Keep an open mind about the case.

Don't form any opinions about it until you've heard all the evidence as it's important that you have all the story before you make any conclusions about it.

Thank you again for your attention to these matters and the evidence today. We'll see you on Monday morning at 9:30.

(Recess at 11:50 a.m.)

\* \* \*

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION

UNITED STATES OF AMERICA ) DOCKET NO. 3:97-cr-23-V
)
vs. )
)
AQUILIA MARCIVICCI BARNETTE, ) VOLUME 16
) MORNING
Defendant. )
_____ )

TRIAL PROCEEDINGS
BEFORE THE HONORABLE RICHARD L. VOORHEES
UNITED STATES DISTRICT COURT JUDGE
AUGUST 5, 2002

APPEARANCES:

On Behalf of the Government:

    ANNE M. TOMPKINS, ESQ.
    JILL WESTMORELAND ROSE, ESQ.
    227 West Trade Street, Suite 1700
    Charlotte, North Carolina

On Behalf of the Defendant:

    JEAN B. LAWSON, ESQ.
    P.O. Box 472106
    Charlotte, North Carolina

    HAROLD J. BENDER, ESQ.
    200 North McDowell Street
    Charlotte, North Carolina

            Cheryl A. Nuccio, RMR-CRR
              Official Court Reporter
           United States District Court
            Charlotte, North Carolina

MONDAY MORNING, AUGUST 5, 2002

(Jury not present.)

THE COURT: Okay. The court will deny the motion for mistrial.

MS. LAWSON: Thank you, Your Honor.

THE COURT: The mike is not on.

MS. HANKINS: I'm sorry, Judge.

THE COURT: Thank you.

MS. LAWSON: Your Honor, we have one other motion.

THE COURT: All right.

MS. LAWSON: Pursuant to Rule 29, we move to dismiss the count and the notice relating to future dangerousness of the defendant on the ground that the government has produced no evidence whatsoever that Mr. Barnette would be dangerous in the future.

THE COURT: Anything from the government?

MS. TOMPKINS: Your Honor, the government produced witnesses of the defendant's history of violence and the government will be asking the jury to use his long history of violence as a predictive measure of a future of violence.

THE COURT: All right. The motion will be denied.

The parties ready to resume with evidence at this time from the defense side?

MR. BENDER: We are, Your Honor.

THE COURT: All right. May we have the jury,

please.

(Jury entered the courtroom.)

THE COURT: Good morning, members of the jury.

THE JURY: Good morning.

THE COURT: The defense may call its first witness.

MR. BENDER: Your Honor, our first witness will be Marc Barnette.

AQUILIA MARCIVICCI BARNETTE,

being first duly sworn, was examined and testified as follows:

DIRECT EXAMINATION

BY MR. BENDER:

Q. State your name for the jury, please.

A. Aquilia Marcivicci Barnette.

Q. Marc, some of the jurors may have noticed the shackles around your leg. Are you currently serving an active sentence for being convicted of eight separate counts in an indictment in addition to the three that we are here for sentencing purposes?

A. Yes, I am.

Q. And did they all arise out of the very same incident that we've been talking about that occurred in June of 1996?

A. Yes, sir.

Q. Were they violence against women acts, two counts?

A. Yes, sir.

Q. Use and carry of a firearm during a crime of violence?

A. Yes.

Q. Arson in commission of a felony?

A. Yes.

Q. Providing false information to acquire a firearm?

A. Yes.

Q. Making a firearm?

A. Yes.

Q. Felon in possession of a firearm?

A. Yes.

Q. Use and carry a firearm and carjacking resulting in death?

A. Yes.

Q. And interstate transportation of a stolen motor vehicle?

A. Yes, sir.

Q. Marc, when did you first meet Robin?

A. I met Robin, it was May 7th, 1994, in Roanoke, Virginia, at a nightclub after hours party.

Q. Tell us the circumstances of you going to Roanoke, Virginia.

A. I had just not too long ago ended for good the relationship with Alecia Chambers and because of the legal issues that I had with her and different things that were going on, my best buddy Steve was trying to get me -- get my head up because I was down in the dumps and I didn't know what to do, so he just came up with this great idea that I could go

with him to see his brother in Virginia.

Q. And is his brother Greg Austin?

A. Greg Austin, his oldest brother.

Q. And did you and Steve go there?

A. Yeah. I wanted to get out of Charlotte.

Q. And do you remember what nightclub you went to in Roanoke?

A. I don't recall the name of the club. It was just a place they had downtown. One of the few spots in Roanoke. We hung out all day, me, Steve, Greg. His other brother Darrell was there. We got bored and they suggested we go out there, so we went out there.

Q. And sometime after you got there, did you -- did you meet Robin? Did you see her?

A. Yes.

Q. Talk to her?

A. I saw her.

Q. Okay. And did you talk to her that evening?

A. We talked that night. Had a few words, but nothing clicked. We danced and -- but nothing really clicked.

Q. Okay. Before you left the club that night, did y'all exchange phone numbers?

A. As we left the club, we saw each other kind of in the parking lot where we parked our cars and we talked some more and talked to her friends. Steve talked to one of her

friends. And we just -- it clicked then for some reason and we exchanged phone numbers and addresses.

Q. Okay. Sometime later that evening or the next morning, did you actually call Robin or did she call you?

A. We talked that night after we got home and we agreed that we would go out the next day. I called her at around 9:30 and she said she'd be there about ten, and she was there at 9:59.

Q. And did you actually meet the very next day?

A. That was the next day at 9:59 the next morning. It was a -- it was a Sunday. It was Mother's Day.

Q. And did you meet her mother on that day?

A. I didn't get a chance to meet Bertha that day.

Q. And what did you -- how did you spend that Sunday, Mother's Day?

A. She took me around Roanoke. She showed me all the places to go, the sights. It's a valley area so it has a lot of mountains. It's absolutely beautiful. It was her -- like her nephew or godson's birthday so I got to help, you know, do the birthday party thing. Go to the grocery store. And we just -- we went to the mall. We just hung out. Just hung out and had a great time.

Q. And about what time did you leave that day?

A. Steve and I, we did not leave Roanoke until maybe 1:30 in the morning because we didn't want to leave.

Q. Stayed there all -- all day into the early morning hours

of Monday?

A.    All day.  Well, all day and all night.  She came over to where I was staying.  We were having a cookout as well, so it just -- I mean, we spent all day together.

Q.    After you got back to Charlotte, did you stay in contact with Robin?

A.    Yes.  I -- we stayed in touch through the phone, writing letters, sending cards.  All that stuff.

Q.    Did you go back to see her the next weekend?

A.    That next weekend I caught the Greyhound bus and spent probably Friday, Saturday, and some of Sunday with her.

Q.    Okay.  Did you have occasion to meet any of her family at that time?

A.    I believe that was the first weekend I met her family.

Q.    Did you have occasion after that to meet her family?

A.    Yes.  I spent a lot of time with them.

Q.    Describe your relationship with her family prior to April of 1996.

A.    Robin's family basically became my family.  They accepted me with open arms.  I would have -- I loved being in Roanoke.  I loved being around them.  They fed me.  They housed me.  I became a part of them.

Q.    At that time were you working in Charlotte?

A.    At that time I was -- I had just actually accepted a new job and that was at Courtyard Marriott on Arrowwood Road.

Q.   Okay.   Tell us how the relationship between you and Robin developed, if it did.

A.   We actually told each other we loved each other the first day we met when we spent that day together.   I had never had a day like that.   I had never met anyone like that.   We just continued to fall deeper and deeper in love.

Q.   Now, did there come a time when some discussion arose between the two of you as to whether you would move in together either here in Charlotte or in Roanoke?

A.   It was fall, I believe, of '94 and I had to fly back to Charlotte.   I had to be at work and I didn't know it.   We could not stand separating.   And it kind of tore -- tore us apart.   We were at the airport waiting in the concourse and she said, Vicci, she said, this is just getting too hard.   And she said, What do you think about us moving in together?

Q.   Okay.   And did you discuss moving to Charlotte?

A.   Yes, we did.

Q.   Whose idea was it to move to Roanoke?

A.   She told me what her brother Sidney had said about moving up there.   She did not want to leave her mother.   She did not want to leave her family.   And I respected that.   I just wanted to be with her so there was no problem.

Q.   And when did you actually move in together?

A.   We moved in, I believe it was mid March of 1995.

Q.   And was that over on Keswick Avenue?

A.    Yes.

Q.    Describe that apartment for us, if you will.

A.    Keswick is a duplex, I think if you've seen it.  It has stairs to the apartment.  It has a gravel driveway.  It's up on a hill.  It's -- when you walk in, you've got this fuchsia colored carpet.  The living room is right there.  Kitchen is to the left.  The bathroom is straight ahead.  The back den, other extra bedroom is to the back left.  And our bedroom was to the back right.

Q.    Did you get a job in Roanoke at that time?

A.    I actually -- I got two jobs.  I worked for Best Western.  I was still doing night audit.  And I also got a part-time job at Camelot music store in the mall.

Q.    Describe the relationship that you and Robin had right after y'all moved in together in March of '95.

A.    After we moved in together, it was amazing.  I had never experienced anything quite like it.  We were -- it was just the absolute best.

Q.    Did there come a time when y'all began to argue over a receipt that you had found?

A.    A few weeks after I'd been there, I was going to wash the car and I was cleaning out all her junkie papers out of her glove compartment and I stumbled across a Super 8 motel receipt for two people.

Q.    And as a result of finding that, did you confront Robin

about it?

A. I called her on her job and I was highly upset because I had no prior knowledge of it and it -- it hit me as something highly suspicious.

Q. And what explanation did Robin give you?

A. She told me that after I had been shot earlier in the year, she needed to get away. Some of her friends took her to Greensboro and they went shopping and that's where it came from.

Q. And did you accept that explanation?

A. As hard as it was, I knew my past as far as feelings of jealousy and here I had this amazing thing starting out, so I swallowed it.

Q. Do you remember a night that you were working at Best Western when this issue arose again?

A. I had talked to her on the phone while I was at work since I worked at night and she did not like staying at home at night while I worked. And it came up on the phone and we got into an argument.

Q. What, if anything, did you do as a result of that argument over the motel receipt?

A. I made her very upset because I had brought it up again after I promised not to. She said she had enough of that, and she didn't know if it was going to work out with me making those kinds of accusations. So the more we argued, the more I

got upset and wondered why she would bring it -- bring that point up that she wanted -- didn't know if it would work out. So I called a cab and I caught the cab home and left my job unattended.

Q. You were the only one at the motel that night?

A. I was the only one at the front desk and I left.

Q. And where did you go?

A. I told him to go straight to my house.

Q. And when you got to your house, what did you find?

A. Robin was there with her friend Angela Rosier, and that made me suspicious as to was Angela putting words in her head. I wasn't ready to take responsibility that my jealousy, my accusations was what was leading to that. So we just furthered to argue that night.

Q. Did you actually lock yourself in the bathroom?

A. Yes, I did.

Q. Okay. What, if anything, did you tell Robin that you were going to do in the bathroom?

A. I had been taking Tylenol 3 with codeine for my leg and I told her I would take every last one of them.

Q. Did she or Angela ever call EMT's or anybody?

A. Yes, they did.

Q. Okay. And was that the incident we heard about where you had threatened suicide?

A. That's the first incident with her.

1039

Q. Okay. Did you and Robin sort of make things -- patch things back up after that?

A. After the EMT left, Angela left, we sat there and talked. She really felt for me. She drove me back to work.

Q. Now, you mentioned a couple of times being shot and taking medication for pain. Was this back in January of 1995?

A. January 25.

Q. Okay. You were -- you had not moved to Roanoke at that time?

A. Not at that time.

Q. Tell us the circumstances surrounding you getting shot in January of 1995.

A. I have a cousin named LaDon Barber and he and my grandfather have a very bad relationship or had a very bad relationship. He was very strung out on drugs and stuff. He would always get my grandfather give him money. When my family returned to Charlotte in 1993, we put a stop to that. But after him getting out of prison, he came back in '94 for some reason. So we caught him doing it again, but we ran him off. Later we found out that he had destroyed the top of our well because we were on well water. So we put out a warrant for him for trespassing.

Later on we saw him, my brother and I, trespassing on our property. So we followed him across the street into the

Boulevard Home projects and we watched him to where he went; and when the police came, we pointed him out and had him arrested. Well, he -- he, of course, didn't like that, but it happened again. We caught him trespassing again and called the police on him again.

This day that this happened, I was about to leave that afternoon for Roanoke. I had my resumes in order, had my suits in order. I heard a loud crash at my front door and I heard my grandfather kind of yell. He had kicked in the door and knocked my grandfather on the ground. As soon as I got up out of my bed, I ran to my bedroom door and he ran into me and he shot me in my leg and in my hand.

Q. As a result of that, did you have any type of surgery?

A. I had to have emergency surgery that afternoon and they had to try to save my leg.

Q. I believe you have a rod in your leg right now.

A. I have a rod from my hip down to my knee with two screws and a bolt.

Q. And your grandfather is Jesse Cooper.

A. Yes.

Q. What was his condition at that time?

A. He was elderly. Very frail. He was trying to get over an infection because he had been bitten by a spider. He was frail.

Q. Had he -- had he had some problems during the Korean

War?

A. The record shows that for all intents and purposes, my grandfather was killed during the Korean War. They were shelled and he got hit by mortar fire. They pronounced him dead, read him his rights, called the family, and covered him up. But for some reason he was able to move an arm and they re-examined him and they found that he wasn't dead. He was still alive.

Q. And he was totally disabled from that point on?

A. From that point on. It took them several years for them to reconstruct him and for him to try to get his life back.

Q. Now, getting back to you and Robin. After the incident where you left the Best Western unattended, later made up, she took you back, did this issue ever arise again?

A. The issue about the receipt only came back up in conjunction with some other things that started to happen.

Q. Okay. In July of '95 did you and Robin have another argument about her seeing other people or perhaps you seeing other people?

A. We -- she has several friends. Some of them were guy friends. When Robin and I first met, we basically laid everything on the table. There were going to be no secrets. Friends, guy friends, it didn't matter, you could have them. I could have friend girls. It didn't matter. We had both been scarred by previous relationships. But there was one

person that she was -- seemed to be very secretive about and his name -- she told me his name. His name was Benjamin Greene. She went to high school with him. He was friends with her family, friends with her friends. But for some reason I never got to meet him like I met some of her other friends.

Q. Did there come a time when you and Robin had a fairly big argument and she had a knife after you?

A. In the end of July we got into an argument about that, my jealousy making me crazy. I took her car keys. I went in the bedroom and I sat on the bed and watched TV. And when we got into the argument, Robin wanted to leave and I didn't want her to. She kept asking me, telling me, Vicci, give me my keys, and I played dumb. I don't know where your keys are. The next thing I know, she came in to the bedroom and she had our long butcher knife.

Q. And what ensued after that with regard to the knife?

A. I told her I didn't have her keys. She said I'm not playing with you. She said, I want my fucking keys. She went and sat in the living room and I laughed because I did not think she was serious. But the more I thought about it, the more upset I became and I just got -- I got angry. So I went into the living room and I threw her keys on the couch and I asked her what was she doing, why would she pull a knife on me. So that's when I tried to take the knife from her, and I

got what I deserved. My finger was almost totally cut in half.

Q. And after you had your finger cut, did Robin take you to the emergency room?

A. She -- I started bleeding everywhere. She worked at Community Hospital. She got me a towel. Got me to the car. She took me to the emergency room.

Q. And about how many stitches did you have to have?

A. The stitches were just to close it up. I had to have surgery to reconnect all my ligaments and tendons.

Q. And when did you have that surgery?

A. I believe I had it sometime in early August.

Q. Did there come a time when Robin was going to a funeral by herself and made you very suspicious?

A. Robin's -- one of her friend's daughter had drowned and she was -- she was a beautiful little girl. I went to the wake with her, but Robin was going to go to the funeral. And I was still wrapped up in my bandages and stuff and I needed to take my medication, so she told me just to stay at home. She got me something to eat. And she told me I could have -- you know, have the car even though I wasn't supposed to drive. She wanted me to drop her off at her friend's.

Q. And did you do that?

A. I took her over to her friend's and dropped her off. I had wanted to go, but because it was time for me to take my

medication, I needed to, you know, go home. And she said she would come home later.

After I left -- dropped her off, because of the argument that led to what happened to my finger, things just really weren't going well between us, to say the least.

Q. And you didn't go home and stay, obviously.

A. I kept driving around. I knew it was time for me to take my medication, but I just -- I wanted to be with her and I wanted to be there for her as she was being there for her friend. So I kept driving around and I didn't go back home. Eventually I saw one of the cars at the house that had been parked there. The car started to follow me and I -- I couldn't understand. I kept looking in the rear view mirror wondering is that the same car. I was sure it was. And I thought I saw her in the back. I pulled over and let the car go by and got behind it. The car pulled into a subdivision and stopped, and that's when Robin got out.

Q. And what was her attitude with you after she got out of that car?

A. She got out of that car and got into her car in the passenger side with me and she was -- she was trembling. She had a very shaky voice. And she was very apologetic.

Q. Okay. Did you accept her apology?

A. I didn't know how to at that time because of the suspicions that were rising in my mind. I didn't understand

why if I took her to her friend's to be there for them, why she was out riding around, and I didn't take her explanation.

Q. What happened after that?

A. I sped off and left her friends behind because I told her I wanted to talk to her alone without Angela or whoever the other girl was getting involved. And I ran a stop sign and stopped pretty quickly.

Q. Did you accuse her of being unfaithful to you at that time?

A. At that time as well as others. I accused her of having them take her somewhere to meet someone.

Q. Did she actually try to jump out of the car while you were driving?

A. She tried to get out of the car after I ran the stop sign. She asked me what was I doing. She tried to get out of the car and she dangled from the car, and that's when I stopped her -- or stopped the car.

Q. Did you eventually get back to the apartment that day?

A. We left after Angie and her friend caught up to us and they asked us what was going on, was she all right. She said everything is fine. Everything is fine. She said, I'm going to take him back home. We went back home that evening.

Q. And how were things at that time when you got back home?

A. We just weren't talking to each other. She was -- she was highly upset, as is understandable. I started to have a

lot of pain in my hand because I had done this while my hand was in a semi cast. So she had to take me to the hospital again.

Q. And I believe as a result of all that, you -- your fingers to this day aren't right.

A. No. I still can't bend my hand.

Q. Now, you told us about LaDon Barber shooting you. When did you have to go to court and testify against him?

A. I had to go to court, I believe it was September of '95 to -- not too many months after we had made up just from that incident I just described.

Q. Did Robin come to Charlotte with you?

A. She was -- things still weren't really well and she didn't want to come. She didn't want to take the time off from her job.

Q. Had Robin been to Charlotte to visit before?

A. Robin had been to Charlotte several times.

Q. Had she stayed at your house?

A. She stayed at my house as well as my job because I got discounts and stuff.

Q. And that was the Courtyard?

A. That was Courtyard Marriott.

Q. And all of this was prior to you moving up there.

A. Yes.

Q. Okay. After you moved to Virginia, did you and Robin

have occasion to come back to Charlotte to visit --

A. Yes.

Q. -- your family?

A. Yes. We come back all the time.

Q. Were you involved in a church?

A. Very much. That's one of the things that I believe that led me to meet Robin.

Q. And who would you go to church with?

A. I was, as my grandfather called it, I was his wing man. I was what he says is the only grandchild that would go with him.

Q. And I believe you went to church with Robin and her family in Roanoke.

A. When we first met I had occasion to go with Bertha on a few occasions.

Q. Did you -- while you were here testifying against LaDon Barber, did you have occasion to speak to Robin on the telephone?

A. I talked to her mostly every night. Some of those nights I stayed with my best friend Steve; some of those nights I stayed at home, so I did get a chance to talk to her.

Q. Okay. What was the result of the trial involving LaDon Barber?

A. He -- there was a hung jury by one juror. So instead of him wanting to be retried, he agreed to take a lesser sentence

and he was convicted and sentenced to that time.

Q. Have you ever had any more problem out of LaDon Barber?

A. We didn't see each other that much before then and, no, you know, we weren't going to see each other after that.

Q. Was there anything you did that precipitated LaDon Barber's assault on you?

A. No. Just having him locked up and having him arrested.

Q. After the -- after the trial, did you return to Roanoke?

A. I did return.

Q. And were you still working at Best Western at that time?

A. At that time I had been promoted at Camelot so I had -- I had quit my job at Best Western.

Q. Working full-time at Camelot?

A. I was at -- started management training.

Q. And where was Robin working at this time?

A. Robin is still working at Community Hospital.

Q. Were both of you now working the same shift, sort of a day shift?

A. Yes. One of the big main reasons I did decide to leave Best Western is Robin continually expressing how she didn't like to stay there. The promotion came right in time so now our schedules kind of meshed.

Q. After you got back from Charlotte after the LaDon Barber trial and you're working full-time at Camelot, did an incident occur while you all were making love one night?

A. We were making love. This is probably a day or two after I'm home. And she called me somebody else's name.

Q. What name did she call you?

A. She called me Derrick, her ex-boyfriend.

Q. How did that make you feel?

A. I was hurt.

Q. What did you do?

A. I got up and went in the bathroom and took a shower. Got an extra comforter, blanket and went and slept on the couch.

Q. What, if anything, did she do?

A. I can't -- I can't recall what she did.

Q. Did she ever apologize to you?

A. She -- she tried to say, Baby, I'm sorry. Baby, I'm sorry. Tried to get into the bathroom. Tried to get me to come back to bed, but I didn't want to hear it.

Q. Sometime after that, how were things getting along with you and Robin?

A. Things were generally good. If I wasn't bringing up issues of infidelity, things were fine. That was the only issue we argued about. Not bills. Not -- I mean, the thing we did get into disagreement about was if we didn't have enough time together. But infidelity was the key issue we argued about.

Q. Now, she was working at the hospital and you were working at Camelot and you only had one car. How did you work that

out?

A. Oh. She -- Robin -- you have to understand Robin. She loved her job. And she loved to be there on time. We would wake up at 5 o'clock every morning if she worked the morning shift. And because I did not have to be at the store maybe until nine or work nights, I always kept her car. And that's the way she preferred it because I could drop her off, I could go to work, and then I could pick her up, you know, and switch and she could drop me back off.

Q. So you would normally pick her up in the evening?

A. I'd pick her up. Sometimes we'd switch at lunch. If I worked at night and closed the store, she would take me.

Q. Okay. An incident occurred where you were going to pick her up and she needed a coat from the apartment. Tell us about that.

A. It was probably fall '95. I was at home that day. I don't think I worked. So we talk on the phone lovey-dovey. Where do you want to go eat? What do you want? You know, she felt like pizza. So it was one of those times, I think it might have been September where it's warmer during the day than it is at night. So Robin had this beautiful leather coat so I went to get it. But if you know Robin, she keeps all her trash in her pockets. So I was pulling out trash, pulling out cigarette packs, empty packs, tissue, and I come across a telephone number of Benjamin Greene.

Q. And how did that make you feel?

A. Because we had got into it about him on other occasions and my suspicions were what they were, it made me feel extremely hurt.

Q. Did you go pick up Robin?

A. I went and picked her up. We stopped at a pizza place on the way back. Got our pizza. We came home.

Q. And you couldn't take it any longer, could you?

A. No. I sat there and I tried just to not bring it up. Number one, I didn't want her to know that I had found it. But I just -- I couldn't hold it.

Q. What happened?

A. I started berating her, screaming, cursing at her. Asking her why she had his number if he was just a friend? How come I had met other guy friends, even other ex-boyfriends but not him? Why did she have this number? Did he come over when I was out of town? I asked her how long she had had the number. Did she see him while I was gone? You name it, I said it. I called the number several times. It was a pager number. I asked her what was the code. I berated her. Asked her was the code 69. Everything you could imagine I said, I said.

Q. And what was Robin's attitude as you were saying all of this?

A. She got real quiet. She didn't really explain it. She

**1052**

**JA1910**

said, I don't know where it came from.

Q.   Did that make -- cause you more rage?

A.   The fact that she did not give me a satisfactory explanation made things worse.  I felt like if she would have just told me some kind of good story, made something good up: I ran into him at the mall, he gave me the number.  I saw him the other day.  But her explanation was I don't know how it got there.  I don't know where it came from.

Q.   Now, your -- was your relationship with Robin beginning to get better or worse during this period of time?

A.   It was -- it was wavering.  There were the great times and then there were the not so great times.

Q.   When is Robin's birthday?

A.   October 13th, 1972.

Q.   October 1995, did you get Robin a birthday present?

A.   I was -- I was excited because the year before I wasn't -- I got her a gift, but it was your usual first birthday, first new relationship type gift.  This time I knew Robin.  I knew her better.  I knew how she was.  Very practical.  If you got her something that she could not use, it would sit.  So I was excited and I spent the whole day trying to find her something.  I found -- I replaced her tennis shoes.  She had the raggediest pair of tennis shoes that you ever could imagine, so I bought her these beautiful pair of tennis shoes.  And then I went and I found her a new black purse.

Q. And had you been in her closet looking through her clothes prior to buying that?

A. Yes. I wanted to know what kind of purse she might like. So the only way to do that was to look at some of her old purses. And all of them were mostly all black, but that's what she liked, so I wanted to get it right because I didn't want it to sit.

Q. While you were going through her old purses, tell us what you found.

A. This was a purse that she had broke within the past couple of months. She had one when we first met and it was there also. But this purse, I looked inside and it had an empty condom wrapper.

Q. How did that make you feel?

A. Because I thought about it. I said, No, no, this can't be right. I said, This is not happening. I said, Well, this purse is the purse she just broke so this is the last purse that she used. And it just all started to fall into place with what I considered the lame explanations about the hotel receipt, the phone number, what she said to me that night. It just all started to pile up.

Q. Did you ever confront her about it?

A. We got into it that night.

Q. When you say got into it, were you physical with her?

A. Yes.

Q. How many times were you physical with Robin?

A. I never beat up on Robin. She wasn't the type of girl who would put up with that. What I -- things that happened with Robin is I would push her and put my finger in her face. Putting your finger in Robin's face was just as much as slapping her, and that was a lot for her to take.

Q. Did Robin give you any explanation for the empty condom package?

A. She once again said she didn't know how it got there.

Q. And how did that make you feel?

A. It made me feel like she was betraying me. She was lying to me. She was playing on my intelligence. That -- I told her, I said, Robin, I said, even I can come up with a better lie than that. And it hurt me a great deal.

Q. Were you ever able to push these incidents into the background?

A. We would get into arguments and she might leave and go stay with her mom and I would get upset, rant and rave for an evening or -- the next day we'd cool off a little bit. But if I wanted to keep Robin, I had to let it go. I had to push it to the back of my mind. So I had to do that on a couple of occasions.

Q. Did you still love Robin?

A. Excuse me?

Q. Did you still love Robin?

A.   Did I still love her then?

Q.   Yeah.

A.   Absolutely.

Q.   Was she your soul mate?

A.   Yes, she was.

Q.   When you were working at Camelot music during this period of time, did there come a time when you got fired from Camelot music?

A.   After I had taken the full-time job, I got promoted to assistant manager of the store; but on January 25, 1996, my employment was terminated.

Q.   Tell us why you got terminated from Camelot music.

A.   The man who hired me, me and him were like buddy-buddy. We both lived in Atlanta. We just clicked. He promoted me over several people. And one of the last people that got hired by the previous assistant manager, we never clicked and she didn't really care for me. I didn't really care for her. Well, in November of '95 during the holiday rush, we were trying to blow off some steam, have a good time. And if you heard what Steve said, I'm a clown.

Well, we were playing a game of, I guess you'd say smack ass. We were smacking people on the butt as hard as we could running around the store during close. Well, this girl Renee, she's an older woman actually, she wasn't in on the fun and I didn't know it. So I came in the office and I smacked her

right in the butt, and she yelled and she said, Don't do that again. I thought she was playing. She was on the floor doing some stock. I snuck up on her, I did it again and I laughed. And she got very cross and she told me, I'm serious. Don't do that again. I said, Okay. I'm sorry. Didn't think anything else about it.

Q. Were you sometime later confronted by your manager and charged with sexual harassment?

A. In January of '96, two months later, I had asked Renee to do something. She disagreed with me. I came into work maybe the next day and Brian said he needed to talk to me. And that's when he confronted me with that and said that I had sexually harassed her.

Q. Had there been another occasion where you had made a fairly inappropriate sexual remark to another female employee?

A. We had an employee that worked there before I got promoted and I really liked her. She was real sweet. Real pretty. We were joking around one day and I made a sexual comment to her that was very inappropriate when I look back on it. At the time I was just goofing off and I wasn't serious, but she took it as such.

Q. Tell us what you told her.

A. We were talking about sex and guys and stuff and I joke -- I told her, I said, You need this big black dick. And I

was just playing, but she took it seriously.

Q. Was that another one of the reasons why you were terminated?

A. He brought that up and said that that had been told to him.

Q. After you were terminated from Camelot for the reasons you've told us, did you get another job?

A. I told Robin I didn't know what I was going to do. I took the two -- next two weeks off to try to make a decision whether -- because of the -- how the relationship was going, whether I wanted to move back to Charlotte or whether I was going to stay in Roanoke. She let on that she wanted me to stay, so I found a job at Electrolux Corporation doing what you call hard core sales door to door. That's what I did next.

Q. And how long -- how long did that last?

A. That lasted until the day we broke up.

Q. Was there any time that Robin talked about trying to get a restraining order against you?

A. Prior to me losing my job at Camelot, we had some more blowups and she had stated that she wanted me to leave. But I always thought I could save the relationship and did not want to leave.

Q. Initially did you -- when this relationship started and you moved in together, was there any talk of marriage?

**1058**

**JA1916**

A. Because of the type of relationships that Robin and I had been in, when we first met and would go out, get a pitcher of beer, pull out my cigars, pull out our cigarettes and we would talk three hours. Just talk, talk, talk about all of our relationships and everything that had happened in the past. We both said that the next relationship has to lead to marriage because we were sick and tired of the bad relationships. So we discussed -- discussed it and I told her, I said, I'm not moving to Roanoke just to live with some girl. I love you too much for that. I said, If there is not marriage in the future, I don't want to come. So we did discuss it.

Q. Did Robin love you?

A. I believe she did.

Q. April 1996, had things deteriorated to the point that you moved out?

A. We got into the biggest fight in April '96. I had just -- I thought things were deteriorating and they weren't going to get better. So before I left and moved back to Charlotte, I was going to force her to admit to me the truth about Benjamin Greene. And the way that I went about that is I tried to choke her.

Q. Tried to do what?

A. I tried to choke her.

Q. And what was her reaction to being choked?

A. She fought. I pushed Robin. I've thrown food at Robin. I threw a glass of brandy at Robin. But I had never tried to choke her. When I did that, we fought and we fought and she ran out the house.

Q. What did you do?

A. I said, Forget about it. I got my jacket, got my set of keys. I said, I'm leaving. That's it. Because I knew I crossed that line. That was the last straw for her. So I locked the door and I left.

Q. And where did you go?

A. First I went to the grocery store pay phone, called her. She was upset. Asked where was her car. I told her I had her car. She wanted me to bring it back. I said, No, I'm not coming back until you -- until we talk the thing out.

Her brother got on the phone, told me I had better bring the car back or he was going to kill me.

And now she got back on the phone, I told her, I said, Well, I know I'm not bringing the car back, I said, if he's going to threaten me like that. But you know, I was in the wrong. And so eventually I didn't know what to do. I just -- I drove back to Charlotte because that's the only place I had to go.

Q. You took her car and came back to Charlotte.

A. Yes, sir.

Q. Now, how soon after that did you go back to Roanoke to

get your belongings out of her apartment?

A. I forget what day it was, but that night, because I got there like maybe 5 o'clock in the morning. I called Robin that afternoon. I told her I talked to my mom. I told her I was sorry. I told her I knew that was it, that was my last chance. I told her I was getting a -- going to get some money together and I will be up there, I think it might have been a Thursday, that afternoon we would meet -- either meet at the apartment that Friday, the next morning, or I would pick her up and I would get a truck and move all my stuff out.

Q. Had you quit your job at Electrolux at that time?

A. No, I hadn't. I had to call my boss to come out to the apartment while I was in the middle of moving all of my belongings to pack up two cleaners because things were just totally a mess that afternoon and I could not pack my stuff up, move out and pack his cleaners up and deliver them to him.

Q. You rented a U-Haul and went back up there. You took her car.

A. Well, I took her car. I got my cousin to go with me and my grandfather went with me because he didn't want anything to happen with me after I told him that her brothers were pretty much -- pretty upset with me. I got a room at the Marriott. We stayed at the Marriott that night. The next morning I went -- we got a truck. I went in Robin's car, picked her up. Her

uncle was with her. Drove back to the -- Penske. It was the Penske place. Gave her all my keys. Gave her all the extra keys. She went to the apartment and we got in the truck and followed.

Q. Okay. Now, that night when you stayed at the Marriott, did you ever go back over to Keswick?

A. Yes, I did.

Q. Did your grandfather and your cousin go back over there with you?

A. No. They didn't know I had left.

Q. So you left the hotel, the Marriott.

A. Yes.

Q. And what did you do going back over to Keswick?

A. I went to the apartment, and I knew that it was my fault that it was over, but I was pretty upset because I didn't want it to end, so I went into the apartment and I destroyed a lot of her clothes.

Q. How did you do that?

A. I poured bleach all over them.

Q. Did you take anything else out of the apartment?

A. We had -- she had bought a VCR and a TV from Circuit City and I paid half for it. She paid the other half. She put it on her credit card and I gave her the cash. So I got mad and said, you know, I didn't pay all this money for this and I'm not leaving anything, so I took the VCR.

Q. And that was the night before you actually went back over there with your grandfather and your cousin to pack up that truck?

A. I had told him I was going to the store, but I didn't. I went to the apartment.

Q. So the next morning you come back over there with the Penske or the U-Haul, whatever truck it was.

A. Yes, sir.

Q. And her uncle is over there and Robin is over there.

A. Robin was there. Her uncle. He had been in the car when I picked them up. Her brother and his wife, Kenny and Sharon, arrived shortly after we got there.

Q. And describe that scene as you were getting your stuff out.

A. It was a mess. Lot of tears. Lot of yelling. Lot of accusations. I knew I wouldn't be coming back and I wanted the truth. And I accused her of stuff; she accused me of stuff. She berated me. She yelled at me. My cousin, he -- he was trying to help me pack and my grandfather was trying to help me pack all my stuff. But her brother, he threatened me, as I would if that was my sister. I don't blame him for anything. But it was a -- Robin, she cried and she cried. And it was the end. I mean, this was the absolute end. There was not going to be no more making up. It was -- this was it so it was very emotional.

Q.   Did you and your grandfather and your cousin come back to Charlotte?

A.   So -- yeah, we came back to Charlotte.   We packed up the truck and I drove away.

Q.   Where did you live when you came back to Charlotte?

A.   I crawled back home to my mom.

Q.   And did you put your stuff in the house at 3413 West Boulevard?

A.   I moved back to -- I didn't take my old bedroom.   I believe that was going to my little baby brother.   I moved into the loft studio which is on the top of the house and I moved in there.

Q.   Describe that house on 3413 West Boulevard, if you would.

A.   Our house is a Jim Walters home.   If you're familiar with Jim Walters, you can get it up to a certain percentage complete and then you complete the rest.   And since I'm like a shade tree mechanic, handyman, amongst other things, that was something we were comfortable doing.

So when you walk in the front door, you have the living room or you can go straight and you have a partition.   And you get to the back area, you have the den.   Over to the left you have a bathroom with my brother's room and my old room which is a smaller room.   If you come out of my brother's room and go straight, you can go straight to the kitchen after you

cross the den. It's a square house pattern. My mother's room sits to the front with her own bathroom. The kitchen has its own door. When you walk in the kitchen door, the stairway goes right to the loft.

Q. Okay. And when you moved back in April of 1996, who all was living at that house?

A. Oh. I believe you had my baby brother John Mack, my brother Mario, my mother, my grandfather, and me.

Q. Were you working at that time? Were you able to get a job?

A. I made several plans and this was like going to be a new beginning. I had let some of my old tendencies come up with Robin and I knew that some kind of way I had to shake that, but the first thing I had to do was show that I could be responsible and that I wanted to get a better job. My boss in Roanoke at Electrolux wanted me to come back; but if I couldn't live with her, I had no plans to go back.

So I talked to my uncle who's been in car sales for probably 30 years, 25 maybe, about finding a job at a dealership.

Q. Okay. And did you actually make application?

A. I made two. I told him I didn't want to do hard core sales anymore. I didn't want to work -- he worked at Sam Johnson for years. I don't like that kind of stuff. I told him I would like to try to get on at Saturn because it's more

retail oriented. So he set up an interview, but he said he promised nothing. He just told the guy to give me an interview.

Q. Now, you've said that you felt like it was over between you and Robin when you moved out on April the 10th, or whenever it was.

A. Yes.

Q. Did you ever call her again?

A. I felt like -- as I have a tendency to do, I knew it was over, but I had to try. I knew she still loved me. I still very much loved her. So I had to try to at least get a base -- beginning with her. Friends. Something. I offered -- I said, you know, can we maybe go back to having a long distance relationship because all she ever kept saying was we just can't live together anymore. And I took that as saying that, well, even though we can't live together, maybe there could be something else.

Q. And how often would you talk on the phone?

A. When I first came home, we talked every two days, every other day, maybe.

Q. And what was her attitude towards you at that time?

A. In the beginning she was -- she was like, Vicci, you know, I don't know why you keep thinking that I would cheat on you. She never would say no, she didn't love me. She would always say yes. But she would never say no, we couldn't get

back together. She would always say she didn't know.

Q. Did that give you some hope?

A. That gave me just a little -- enough hope that I kept trying.

MR. BENDER: Your Honor, this may be a good time for a short recess.

THE COURT: Okay. Members of the jury, we'll take a break at this time and we'll call for you in about fifteen minutes. Please remember the usual instructions. Thank you.

(Brief recess at 10:40 a.m.)

THE COURT: The jury is with us.

MR. BENDER: Thank you, Your Honor.

AQUILIA MARCIVICCI BARNETTE

DIRECT EXAMINATION (Cont'd.)

BY MR. BENDER:

Q. Marc, you had told us about your various conversations with Robin after you came back to Charlotte. Did you ever go back to Roanoke between the time you moved in to Jesse Cooper's house and the end of April 1996?

A. No, I don't think so.

Q. Okay. So the communications you had with Robin were all by telephone.

A. Oh, yes. Yes.

Q. What was your mental or emotional condition at that time after you came back to Charlotte?

A. It goes back to the things that Robin and I discussed when we started our relationship. It wasn't about the getting to something that was going to be temporary. I had fallen on my face enough and she had been displeased with past relationships enough that when this ended, devastating is just to say the least. That doesn't, you know, enclose the whole feeling that I had because I now felt I was back to square, not even one, zero. I had lost my baby. I didn't have a job. I was back home with Mom. I was twenty-two. I had gone through this too many times before and it was -- had happened all over again. So I was desperate for something positive, anything positive to happen.

Q. Were you drinking alcohol at that time?

A. When I first got back, Steve was, Man, you're back in town. We went out, went to the club. He introduced me to a couple girls, or whatever. But you know, I started to try to live a little bit, but Robin was just still on my mind. I would go out with him. We'd go over to some of the girls' house who he helped me meet and I'd sit there and stare into space. And he'd say, Vicci, Vicci. Say, I know you're still not thinking about that, but I was. So I didn't see him for a while. And I went home feeling sorry for myself. The day that the manager called from Saturn and said he hired somebody else, and he couldn't have picked a worse day.

Q. And had you consumed some alcohol from the time you got

back?

A.   After I got the call around eleven a.m., Robin wasn't really -- I had kind of called her too much. She had threatened to have her phone changed. So I felt like if I got that job, I could do things. I could produce. I could show her that I could maybe change my ways. I could do some better things. I didn't get the job that day so that afternoon I went to the ABC store and I bought maybe a half a gallon of Absolut Vodka.

Q.   And did you begin to drink?

A.   Yes, I did.

Q.   Later that afternoon or early evening, did you try to call Robin?

A.   I tried to call her, it was around evening time. Called to the apartment. And I know Robin. We were like hand and glove. She does not like being by herself -- at home by herself at night. When I left, I took my bed, all the bedroom furniture, the thing that had the TV in it, a lot of dishes, and I took the VCR, so she had to replace all that. She had been staying at her mom's. So I knew that if she wasn't there, she hadn't replaced the stuff yet so she had to be at her mom's. So I called her at her mom's.

Q.   And did you talk to her?

A.   The first time no, I talked to her uncle Ray. He said she was in the shower and -- which I had no right to, I felt

suspicious.

Q. And did you call back later?

A. I called her back. I gave her maybe half an hour to 40 minutes. Called back. I needed to talk to somebody and there at that time in my life was no one who could calm my nerve, who could make me feel better other than her. So I called her back and I talked to her, but she told me she was having a -- somewhat of a date.

Q. How did that make you feel?

A. I was very needy right then. Nothing ever seemed to work. I just was constantly thinking of all the good times that I screwed up, I threw away. And I really needed her right then. She told me that she was going out, I was hurt.

Q. Did you continually call?

A. I called maybe one additional time to the house. She said, Vicci, hold on. She clicked the phone. She said -- she clicked back, she said -- she said, Well, I got to go. She said, My friend is at the apartment.

I said, Well, how the hell did he know where her apartment was? I said, Who is this guy?

She said, His name is Tim. And she gave me this story about they went to school together. She ran into him at the mall. They were going to have drinks at the apartment. So I started questioning her about how he knew where the apartment was. I never knew a Tim. I never seen a Tim. I've met other

guys, but not him.

Q. And did you later call back to the apartment?

A. After she said she had to leave, I left. My grandfather was going to the store so I went with him. And I thought that at that point that she told me that, hey, I'm going back to the apartment, me and a guy friend, going to have some drinks, I'll talk to you later. That just kind of -- it made matters worse in my mind. If she loved me, if she cared about me, this was my time in need. No matter what I had done, we will always be there for each other. When she said that, it made me feel like she truly no longer cared about me. So when my grandfather went to the store, I tagged along and I bought maybe three boxes of sleeping pills.

Q. And when your grandfather came back from the store, what did you do?

A. I went back up to my loft room, fixed me a big cup of Vodka straight, proceeded to start taking sleeping pills.

Q. What, if anything, happened?

A. I called Robin and -- at the apartment, talked to her on the phone. She said, Vicci, she said, I've got company. She said, I don't want to talk to you right now.

Q. How did that make you feel?

A. I really felt like -- I felt like garbage. I felt like trash. I felt like, you know, this is it. Screw it. I'm not going to threaten this time. I'm going to take every last one

of these pills. You know, I'm going to tell her, I said, Hey, you never loved me. You never cared about me. I said, Ain't been but nine, ten days, you've already got somebody over there. I said, you know, Steve tried to get me to go out with these girls, I didn't pay them any attention. I kept thinking about you.

She said, Well, Vicci -- this is one of Robin's sayings -- you should have thought about that.

Q. Did any of this make sense to you while it was going on?

A. No. I -- I mean, I knew I had messed up. And I knew we had for at times was the perfect relationship. But I always felt like I could make it better. I always felt like I could fix it. And I knew how much she loved me. I hadn't felt that for a long time. But in my mind committing suicide was at that time a huge cry for help, but I was serious. And I had to figure some way to get her to know I was serious. I was tired of starting over. I was tired of the breakups and the feelings of not being loved and she was key to everything around me and I felt like if I could just talk to her and get her to understand my true feelings, that she would tell this guy to hit the road and Vicci come on back.

Q. That didn't happen, did it?

A. No. I started to get just more and more angry. She would hang up on me. I'd call back, curse her out and hang up on her. Eventually, it started getting later, later. It was

probably getting close to 1 o'clock. And she had told me that he had left. He had went to the store to get some more beer or get some beer because she had wine. And she said, Vicci -- I said, But Robin, I said, don't you love me?

And she said, I do.

I said, Well, don't you want me there?

She said, Yes, but I just can't put up with that anymore.

So I got real nasty. Started saying some real nasty stuff to her about the guy that was there and what they were going to do. Were they going to fuck? And it just -- I became more and more belligerent.

And finally, he had come back and she said that -- she said, It's time for me to go. She said, He told me it's rude to talk on the phone while you have company. And she hung up.

Q. Was the alcohol and the sleeping pills having any effect on you at all?

A. It was just making me real leery. I was staggering a lot, but because I was becoming so upset, temperature was really rising and especially from the alcohol. If my cousin was here, she could tell you, I can't handle alcohol too well. So I threw up all over my bedroom floor.

Q. Was your brother Mario home at that time?

A. He came home maybe fifteen minutes later. I heard the

door shut, his car keys, and I heard his bedroom door shut.

Q. What did you do at that point?

A. I felt like she was serious. She really didn't care. So I thought about going to, I think the place was still open 24 hours, drugstore to get some more sleeping pills. So I went -- I put my money in my pocket. I still had on the suspenders, the shirt that I had from earlier in the day looking for jobs. I went to my brother's room. I said, Mario, I said, I need your keys. I need to go to the store.

He said, No.

I said, Mario, I said, I'm just going around the corner. I'm just going to the store.

He said, Oh, man. He said, I got to go somewhere.

I said, Mario, just give me the keys.

He said, On my dresser.

So I took the keys and I ran to the car. And I -- when I pulled out of -- on to West Boulevard right at the intersection of Billy Graham, I was in the lane to go to Woodlawn, and I just kept thinking, thinking, and thinking. And I said, I'm not going to let this guy, I'm not going to let it happen. I'm not going to let it happen. So I backed up. I got in the right-hand lane and I turned and went up Billy Graham, got on 85, got on 77, and I headed for Roanoke.

Q. Did you have anything with you like the gas can or anything?

A.   What I was saying earlier, I'm like a shade tree mechanic.  One of my cars, projects that I was working on needed transmission fluid, so I had two like plastic, almost like oil that you go to Pep Boys and get, but they were transmission fluid.  All my tools were in the car -- in his car because I had been working on his car doing body work, priming, sanding, bondo.  All that stuff I kept in his car. So that was in the car.

Q.   How old was Mario at this time?

A.   I was twenty-two so he had to be eighteen at the time.

Q.   And what kind of car was it that you were in?

A.   It was my father's car.  My father had a couple of old cars.  It was a 280Z.  Probably a '74 model, maybe.  Black. It had a lot of primer spots because we were -- I was filling some rust holes for him, trying to anyway.  So that's what it was.

Q.   Now, as you drive up 77 headed towards Roanoke, did you ever stop anywhere?

A.   I stopped at a gas station and was getting some gas. That's when I thought about the transmission fluid things.  I was going to go get that guy and I was going to do something to him.  I pulled the bag out and as I was putting gas in his car, I poured the transmission fluid out, stuck the gas filler into the thing and filled two plastic containers up with gas.

Q. And when you got to Roanoke, did you go to a Wal-Mart?

A. By where I used to work at Valley View mall they have a -- one of those Wal-Marts, Super Wal-Mart, stays open all night. I hadn't had a gun since the incident with Ant Britt in '92. I didn't know what I was going to do, but I didn't think I could kick the door in because it was a steel door, plus my leg. So I was going to do something to get him out of the apartment and I didn't know if this guy was 6'7", 6'6", three hundred pounds, I didn't care. But I needed an equalizer, and I was going to also fix his car for him when I got there. So I stopped at the Wal-Mart and I bought an Easton -- Eaton aluminum baseball bat.

Q. What made you think you had the right to get back at this guy?

A. I didn't. At that time I was so out of control, so jealous, I was doing something I had no business doing. I had no business there. I was twenty-two and I was -- I was an idiot. I'm still somewhat of an idiot, but I should have hung up the phone, let her go on with her life and went on with mine. But at that time so much stuff had piled up on top of me emotional wise that I wasn't in control of my emotions and I let them -- I let them run the show.

Q. After you got the baseball bat and the two quart jugs of gasoline, where did you go?

A. I drove to the apartment. I parked at the dead end way

up the hill. I came down the hill -- well, first I went in the bag and I pulled out some pliers. Pulled out the bat. Put two of the things in my jacket. I went down the hill. I went to Robin's car. I said, well, I'm not going to touch her car. I put the things on the ground, put the bat on the ground. I went to the phone box. Pulled out the pliers. Pulled the wire off. I said somebody might call the police, I said, but not them. I got the bat. I got the containers. I opened the containers. I took out my lighter. I went to the door and I tried to kick the door in, and I started screaming and screaming. I don't remember everything I said, but I said some pretty nasty stuff.

Q. Did anybody ever come to the door?

A. I heard -- I saw the light go on because as you walk up the steps, you have the door, the kitchen window, and the living room window. I heard the blinds go and I heard her say, That's him. I didn't hear a male voice. I was listening. I listened, I didn't hear anything. So I jumped off the steps. I left the containers on the steps. I ran around to the window. I saw Robin pull the blind up and she looked. And I started screaming at her. I jumped up and I broke the window with the baseball bat.

Q. What were some of the things you were yelling at Robin?

A. I said, Die, bitch, die. I told her, I said, Tell that punk ass motherfucker to come outside. Fight me like a man.

I said, I'm not going to let him do this. I can't remember everything I said because I was overly hysterical.

Q. What did you do to the car that you saw there that was not Robin's?

A. I couldn't figure out, they weren't coming -- why he wouldn't come outside. I had kicked the door in and it jammed, but I didn't know that until a lot later. I thought he was -- just maybe the police would come, I would go away. So I said, Oh, so you don't want to come outside. So I started smashing his car.

Q. Did you ever see anybody other than Robin?

A. I never saw Benny. I saw Robin one time, maybe twice, but I never saw Benny.

Q. So you never saw him and he never came out.

A. No. No. The door had jammed. I jumped back up on the porch and I had the open containers there. The first thing I did, I put the bat to the side. I started pouring gas on the bottom of the door because it was a little crack there. I poured gas on the window sill of the living room. I poured gas on the kitchen window sill. I set fire to it and I jumped off the steps after grabbing the bag.

Q. Why did you -- why did you set fire to the apartment, Marc?

A. Look back on this, I was out of control. I was -- in my mind at that time, which it makes no logical sense to me now,

you think about you get into an argument, you get emotional, and you overly react. I wanted him outside. I wanted to face him. I wanted to see -- I had my heart -- I knew it was Benny. I told her on the phone that's not some guy named Tim. I said, I know who that is. At the time I blamed him for breaking up my relationship. I wasn't as yet ready to accept the fact that it was me. And I felt like this guy came between us. This guy broke us up. It was his fault. It was her fault because she was supposed to have loved me.

But when you look back on it, it was the most juvenile of things, and I just -- I still don't -- I'm trying to understand a lot of the things I've done in my past and this is -- this is one of them.

Q. Did you ever get shot at?

A. After I jumped off -- I had broken the kitchen window somewhere in there. I had jumped off the porch step. I went to his car. I had one of the other containers. I started pouring gas all over his car, on the hood, tried to pour some inside, and I set fire to it and it caught my arm on fire. Next thing I know, I hear this what sounded like a bumble bee going at supersonic speed and it zipped past my ear. At the same time I heard a loud bang like a shot. I started ducking and started running. I ran and I dropped the bat. I dove into this ditch across the street and I kept saying to myself, He's shooting at me. He's shooting at me. And then if you

understand what I was trying to say, the sense that it made then which it makes no sense now, I said to myself, She told him to shoot at me. Looking back on it, I mean, that makes no sense to me now, but that's what flashed in my mind when I dove into the ditch.

Q. After that did you get in Mario's car?

A. After that I ran up the side of the road trying to make sure I didn't get hit if he kept shooting. Mario's car, if you remember the map, the street goes up, it was a dead end. I got in the car, drove down, jumped out, went and got the baseball bat. At that time the living room was -- it was flaming. It was flaming. And I just -- I thought -- I was scared they would come out. I did not really -- you know, if you're thinking, you don't do something like this to begin with. But the way I wasn't thinking, I'm thinking, well, he'll come outside. The whole apartment was on fire. I said, Shit. I jumped in the car, took off.

Q. Where did you go?

A. Actually, I didn't leave. I went up the street, I turned around, I went back. I thought -- I thought I had heard some yelling, screaming echoing off the back of the apartment. So I said, Well, sounds like she got out. I got back in the car. I'm at the top of the street. A different way. I drove off. Went through Vinton because I think we actually -- we live right on the Vinton/Roanoke line. I went, I drove to

another gas station. Looked at my jacket. I had burned my jacket. Had glass all over my jacket and my skin. I put gas in the car and I headed back to Charlotte.

Q. How did you feel on the way back to Charlotte?

A. I was scared because I didn't really know what had happened to her. I was angry because Benny never came out and in my heart I knew it was him but I never proved it to myself, you know. I felt like she had let him come between us and he was in there, but I never got to confront him. At the same time I had this conflicting emotion that was Robin okay and I did not know.

Q. You got back to Charlotte sometime in the early morning hours?

A. It started to like rain real bad on the way back so I had to stop in, I think Pulaski, Virginia. It's up on the mountain because you got to go over a mountain, come down a mountain to get to this area if you go straight up 81. I stopped and just -- I was shaking. Just shaking. And I was -- I started to -- it started to dawn on me that I had got myself into something huge. So I didn't get back until -- I tried to hustle because I knew that my brother had to be at work and I had told him I was going to the store. So I didn't even go home. I drove to his job on Billy Graham. I think he was working at U.S.Air -- I think he was working at Wendy's at the time. I pulled up and thought he might be there, but he

wasn't. It wasn't until maybe ten minutes later that my mom pulled up with him in my grandfather's car.

Q. When you got back to Charlotte, did you know that they were looking for you to try to arrest you?

A. When I got back that day, I parked my brother's car at his job. I got in the car with my mom after they pulled up and she -- she let me have it. She was cursing me, yelling at me. And I didn't say anything. When we got home, I said, you know, I'm not staying here. I got on the bus to my cousin's house. She lives all the way on east Charlotte -- on Monroe Road. So I went over there and I told her, I said, I just had to get away. I can't think. I got to think. We were sitting around smoking and my picture came on the news. That was that night.

Q. So the night after the firebombing, your picture was on the local news.

A. It was the same day.

Q. Your picture was on the news that you were wanted for a firebombing in Roanoke, Virginia.

A. It was on Channel 9.

Q. Did you think you were going to get arrested?

A. At that point I was scared, but I started listening to the reports and at that point I didn't know what I was going to do. But they said something that -- about Robin getting hurt. That -- that scared me more than anything because I

think, as you previous heard, we joked about us having one door in that apartment and who would jump first. And I always said that I would jump first or you could jump. She said, No, I wouldn't jump. I said, Well, I would jump and break your fall. I heard that she had got hurt and she had got burned and I started to get scared. I started to get worried that I had done more than I thought I had done. And I started to get angry because I said, Well, if she left me for this guy, I said, if he cared anything about her, wouldn't he have made sure she was okay? How did she get hurt, but the news said nothing about him getting hurt. So I had those conflicting emotions starting to happen again.

Q. Did you get arrested?

A. No, I didn't get arrested.

Q. Did you ever go sit and wait to get arrested?

A. There were certain times where after I -- I attempted to call her from Shawn's. I went -- I attempted to call her from Steve's. I attempted to call her from my house. But when I was at home, I told my mom, I said, Did any of my cousins ask me, Steve ask me, I said, I'm not going to run. I said, When they show up, I said, that's it.

I said, Steve, man, I said, one week we were celebrating I just come home. I said, Now you're getting ready to see me off, probably going to get thirty years or more. But I stayed at home a good deal. I visited with my cousin. I visited

with him. But I stayed home the majority of the time waiting for them to show up.

Q. You didn't turn yourself in?

A. The thing about that is they've been to my house multiple times. Sitting at home in my living room, they show up, I'm there. I wasn't as yet willing to just go to the police station because I knew it was the same thing as them showing up. They had never had any problem finding my apartment before. I was wondering why it was taking them so long.

Q. Now, after this incident were you relieved that you had gotten revenge on Robin and Benny?

A. No. Steve -- a couple of maybe -- I don't know if it was a week later, days later, his brother faxed him a newspaper report of the -- what happened and then I actually had it in print before my eyes what had happened to Robin. It made me sick. It made me sick to my stomach because I just couldn't picture that I had caused her burns. That I had hurt her like that. It was the difference between being out of control emotionally and when I had time to sit and think about what I had done. There was never any I got my revenge. It was a lot of fear, lot of anguish, but never any relief.

Q. Did you know -- or when did you know for the first time that your thoughts about who she was with were true that she was with Benny Greene?

A. I don't know if you know what it's like to think

something and really believe something yourself until someone can convince you otherwise. But that night I really believed it was him because Robin wouldn't just go and meet some new guy, some strange guy and bring him home. She wouldn't do that. It would have to be somebody she knew. And that made me just think that I knew it was him in my heart. My mind, well, a little sketchy. When I read that article and I saw the name Benjamin Greene, it was all new. It was fresh. It kind of made me angry. But when I kept reading and found out she was hurt, that's where I get the conflicting emotions.

Q. Now, Steve Austin has testified in here about trying to take you out to some clubs after that. Did you go to one club or several clubs, or tell us what was going on with Steve and you at that time.

A. Steve tried. Just say that. We went to this club on Freedom Drive called Champs, I believe. Maybe not Champs. The Arena is what it was when I first came home. That's where we met some ladies. The next thing he tried to get me to go out to the clubs. You know, we got dressed. We went out. We rode to this one that was right near uptown, the convention center, but I wouldn't get out the car. So I said, I just -- I said, Steve, I don't know. We went to his house and so we decided just to chill at his house. Drink some beer. That was the first and last time I got to drink like Killians Red and we talked, and he called some girls over and everything.

But, you know, I knew I was about to go to prison for about thirty years.

He said, I'm going to miss you, man.

I said, Well, I don't know. I did it to myself.

But the girls, I mean, he tried. You know, I love Robin.

Q.    Is that what was on your mind, Robin?

A.    That's all that was on my mind.

Q.    Now, when you -- after Steve had attempted to take you to a club, introduce you to somebody else, what were you feeling during the day and what was your day like after that?

A.    I started to -- the thought of going to prison started to really weigh on me. At first I was like, man, you know, I'm going to go to prison about thirty years. Arsonist. Attempted murder. But as time started to go by, I would see cousins, cousins would come over and try to say, You okay? You know, Are you going to go down and turn yourself in?

I said, Well, the police should have been here. I started to get, I guess it's depression because I've learned lately over the past couple years about what that stuff is. At this time I just didn't know. It was just a feeling. And I just started to be more and more down in the dumps. I might -- I would walk to my driveway. We have a split, like a Y and I would sit there and I'd go -- I'd look up and I'd just go where are they? Please come and get me because I don't

know what's starting to happen to me.

Q. And you're not working.

A. No.

Q. Are you out looking for work?

A. No. No.

Q. What was -- what was your major concern during that period of time?

A. I just needed to talk to somebody.

Q. Did you ever try to talk to Robin after the firebombing?

A. I called her, but her uncle Ray answered the phone.

Q. And what were you told?

A. I think at the time she might have still been in the hospital.

Q. Did you ever try to contact her at the hospital?

A. No.

Q. Did there come a time when you were able to talk to Robin at all during this period of time?

A. No.

Q. How often did you try?

A. I tried. Got my cousin to call. I called from Steve's. Maybe two to three times.

Q. Never were able to talk to her?

A. No.

Q. Sometime in May of 1996, you -- you went over to, I guess it's Freedom Drive to the pawnshop.

A.    Yes.

Q.    And you bought a shotgun.

A.    Yes.

Q.    Was that shotgun for snakes and varmints and that sort of stuff around your house?

A.    There was -- there was a lot of confliction in my mind. I started to have -- I started to have thoughts of suicide. But I was angry at myself because I knew I had tried before and not completed it.  This time I was -- I had made up my mind that I was serious.  I had hoped that by trying and thinking about this seriously, that God would listen and the police would show up and I would -- they would take me away. I said, well, if that happens, I can't lose, you know.  We've always had maybe one, two guns in the house.  So I could leave it there for that.  But that wasn't the real, real reason, you know.  That might have been something I told Holl, but I didn't really understand what he was saying.  My overwhelming feeling was of I can't go to prison.  I can't do real time. I'd rather die.

Q.    You went down there and you got a pump action the first time.

A.    Yes.

Q.    You used a false driver's license or identification card in Mario's name.

A.    Yes, sir.

Q. Why did you ever have that false document to begin with?

A. That goes back to when I moved to Roanoke. My probation officer hadn't yet, as you heard, put me on house arrest. We signed a lease in March of '95. My cousin had got out on bond, I believe, and I was still healing up, so I left. We did go to some of our -- I say our because Robin always went with me to appointments to my probation officer. But he never -- we had it planned that if he put me on house arrest, I would go home. I would go to work at Courtyard. Get my job back. And we would live apart for the six months or so. When he stopped calling, I missed a visit. I got worried and I think that was around the time we made a visit home one time. I snuck away my brother's -- some paperwork; and when I got back to Roanoke, I went -- I went to DMV and got a fake ID under his name because I said if I was in Robin's car or ever got carded, I did not want them to arrest me and extradite me for skipping on my probation. So I was kind of hiding out, I guess you could say.

Q. So it was to -- if the -- if there was such a warrant out for you for absconding or probation violation, that sort of stuff, and you got caught, you would be Mario Barnette as opposed to Marc Barnette.

A. Exactly because that was around the time when things were really difficult with our relationship. If I was just to leave, maybe take some time to get that situated, I feel like

that would have been the end. So I didn't want to leave and the best thing I thought at the time was to hide out a little bit longer.

Q. And so you get this pump action, you take it home. You took it back the next day.

A. Yeah. I had to wait for my mom to leave, then I -- because I was no longer allowed to touch my brother's car after what I did, as you can imagine. So I would tell my grandfather I needed to go to the store. So I went and I bought that gun and I believe I fired it once and it broke. The slide broke. So I got him to, you know, let me, you know, Poppa, I need to go to Lakeview store, or whatever. And I snuck back and told them it was broke.

Q. And they exchanged it for you?

A. He said, Well, we can't give you your money back. He said, That's our policy. And I felt like I was -- something hit me to say don't buy another gun. Buy a stereo or something. But I said no. I said, Well, let me see what you got. And that's when he pulled out the other gun.

Q. And that was the semi-automatic that you had?

A. That was the semi-automatic. That was the first time I had ever seen a semi-automatic shotgun.

Q. Okay. Took it back home.

A. Yes, sir.

Q. When did you saw the barrel off of it?

A.   I can't really recall the time.  It was maybe a week, maybe days later.  I hid the gun in my room in a fabric box which is a long, tall box that was under my bed.  So I hid it in there.  It was sometime, maybe a week and a half maybe at the maximum that went by, but I cannot recall how long it took before I decided to saw the gun.

Q.   Why did you hide it?

A.   Why did I hide the gun?

Q.   Yes.

A.   Because I didn't want anybody at my house to know I had that gun.

Q.   During this period of time, Marc, tell us as best you can what's going on in your mind mentally or emotionally.

A.   It's like a -- just a swirl of lots of different fantasies and ideas and weird thoughts.  At one point I'm saying to myself before I even got the gun, I thought I was going to hang myself.  After I got the gun, I thought I would just shoot myself.  And I thought about going to Roanoke and killing Robin and killing myself.  But those thoughts were also juxtaposed with any minute, any day the police are going to show up.  But I just had so many conflicting fantasies and thoughts and emotions that it was -- it was hurting me.  And the only way I felt like I could relieve that hurt, I started to drink more and more and more.

Q.   How much would you consume on a daily basis during this

period of time?

A.  I started drinking first thing in the morning.  I still had some Vodka left over.  I -- my grandfather, he'd go to the store.  He'd get, you know, get beer.  I'd tell him to get me -- get me whatever he wanted.  He'd pay for it.  I'd stay in my room.  And I'd just try to keep these thoughts away, these morbid fantasies about death and the final out, you know.  It felt almost like they were attacking me.  Like something was coming over me.

Q.  Why didn't you just pick up the phone, call the police?

A.  I wish I did.

Q.  Any reason why you didn't do that?

A.  I don't know.  I was fighting my own emotions.

Q.  Sawed the gun off.

A.  Yes, sir.

Q.  And both ends.

A.  Yes, sir.

Q.  What did you put around the stock end?

A.  As I started to -- started to think, things started to become clearer as far as knowing what a murder/suicide is.  Started to almost relate to stories I had heard of a guy doing that.  So now I felt like, well, if I was going to go, I wasn't going to walk down the middle of the street with some huge gun.  I started thinking about making it small.  Something like you see on TV.  Conceal it.  Make it easier to

conceal. So I sawed the ends down, wrapped hockey tape around it. At that point I hadn't put the flashlight on it yet.

Q. Had you test fired the gun in the sawed-off condition?

A. Yes, I had.

Q. Where had you done that?

A. Excuse me?

Q. Where had you done that?

A. Way in the back of the woods. We've got maybe eleven acres total, maybe seven. I'd taken it way in the back of the woods by a creek.

Q. Now, you had a gym bag or some sort of bag that you kept in your room there.

A. The significance of that bag is that was the bag that I would always pack when I would go see Robin.

Q. What had you been putting in that bag during the days or weeks leading up to all this?

A. I had shells, shotgun shells, crowbar, bolt cutters, little pen flashlight. Started collecting stuff thinking about what I actually would do if I got there; and if I got there, what would unfold. And it wasn't so much as a plan, it was so much just thinking what was going to happen. What would I need? How would I get to her? And I started to put those things in my bag.

Q. Do you remember when you taped the flashlight to the shotgun approximately?

A. It might have been the day before I left.

Q. And why the red lens?

A. I don't know if you heard about all the men in my family, but I was the first one to not join the service. Every male since -- well, before me has. And we'd sit around and listen to all the war stories from Nam to World War II to Korea. So I know a little bit about what some of my uncle talked about, lot of things he didn't talk about in Nam. I even had one of those flashlights, the army ranger type that has several different lenses.

Q. Okay. But you actually coated the lens yourself?

A. Yes, I coated that one.

Q. And was that part of the murder/suicide that was going through your head and how you were going to do it?

A. Yes.

Q. Play it out in your head?

A. Yes, it was.

Q. Friday, I guess Friday morning, the 21st or 22nd of June, you woke up, got this gym bag in your room with shells and things in it. How do you feel that morning when you wake up?

A. I had -- I had been drinking all day the day before. And when I rolled over, the first thing I did was took a drink of what was left. And I just felt -- it was -- it was -- I felt like it was 90 degrees. It was probably about noon. And I -- I just couldn't take it anymore.

JA1952

FORM FED ⊕ PENGAD · 1-800-631-6989

Q.   Did you think this was the day?

A.   Yes.  Something -- something just said today is the day I die.

Q.   Was this the day Robin was going to die?

A.   Yeah.

Q.   Tell us about that day up until the evening.  What was going on with you?

A.   Absolutely nothing.  I just stayed in my room.  Listened to music that just seemed to exacerbate the situation.  Just made me keep thinking about the hurt, pain I felt.  I just -- I wanted out.  I was through dealing.

Q.   The late afternoon, early evening, it gets to be dark.  You're in your room.  You're in the house.  What's going on in the other parts of the house?

A.   My uncle, he -- my uncle shows up for some reason.  And him and my mom's fiance, they were watching TV and I could hear them downstairs.  And I'm walking around my room and I'm just -- I'm ready to go.  And I go to my brother's room and it gets pretty late.  I'm talking to him.  Start playing video games with him.  And we just talked.  So I got up and I left and I stopped.  My uncle wanted to talk to me and I didn't know why he wanted to talk to me, but I didn't want to talk.  I went to my mom's room and she was getting ready for work.  She worked in the Westin downtown.  So I talked to her.  I said, I love you.

Q. What time did she go to work?

A. I don't -- I don't recall. It was later.

Q. Sometime in the evening, ten, eleven o'clock?

A. Yeah.

Q. How were you dressed?

A. I had on a -- Robin had bought me a -- maybe a Guess shirt or something. It was beige denim, some blue jeans that she bought, and shoes she bought.

Q. What did you do about midnight, 1 o'clock?

A. I just -- I think I went down, went got some more beer. Kept waiting for Jeff and John to leave. My mom was already gone. Grandfather was gone. I don't know if Mario was there. I think he might be gone. Jeff and John, they were going to go somewhere and they wanted me to go. I was waiting for them to leave.

Q. After they left, what did you do?

A. I threw some pants or something in a bag, shirts, got my gun, put it in the bag. I dumped the box with the rest of the shells in the bag. I went outside and looked around. There was nobody in sight. I started walking.

Q. Where were you going?

A. I didn't know really, but I was going to get to Roanoke.

Q. Didn't have a car, did you?

A. No.

Q. Was there any car around there that you could have used

that night?

A.    No.

Q.    You walked down to the intersection of West Boulevard and Billy Graham.  Describe that intersection for us.

A.    It's real wide.  It's four lanes.  Lot of lights.

Q.    That's the -- at that intersection is where your property -- your grandfather's property is, isn't it, right there in that intersection?

A.    Yes.

Q.    Which way do you walk after you get to that intersection?

A.    I used to -- I used to go to church on Morris Field, Morris Sanctuary.  I -- you know, I know that whole area, airport, Billy Graham, like the back of my hand.  It was really the only way to go.  There was just nothing down that way.  So I walked that way.

Q.    About a mile?

A.    About a mile.

Q.    Somewhere like that.

A.    About a block.

Q.    You walked up there.  What do you have with you?

A.    Got my bag had clothes in it.  Had my gun, shells.  All kinds of -- I don't know what all I put in that bag.  Just all kinds of stuff.

Q.    Marc, where did you ever get the idea that you had to

have a car that night?

A. When I left my driveway, everybody had left and I didn't know what I was going to do. I was going to get to Roanoke some way.

Q. Tell us again why you had to get to Roanoke that night.

A. I needed to get to Robin.

Q. Got up to the intersection of Morris Field and Billy Graham. When you got up there, where did you go?

A. When I got there, as I kept walking, it just seemed to get darker and darker and I was, you know, I was a little -- I was woozy, but I was -- I was set on doing something. As I got to the intersection, it was just nothing there. It was red lights and green lights. So I went and I knew that's where you turn into Morris Field and that's how I used to go to church. So I threw my bag over in the weeds, bushes right by the side of the road, opened my bag. I loaded my gun. And I crouched.

Q. What were you waiting for?

A. I was going to carjack somebody.

Q. Were you waiting for somebody to stop on Morris Field or Billy Graham or did it make any difference to you?

A. It couldn't -- if you've driven on Billy Graham, you know it's basically a freeway. Morris Field is two lanes, small. It's almost completely black when the light's not green. I kept watching cars come down Morris Field. One come down.

Another. That's when I said I was going to get a car.

Q. Were you waiting for a car with only one person?

A. I didn't know what to do. I just -- if it was one person, that would make it easier. I didn't really have a formulation plan, just to get a car. It was very base because the more I started to think, the more I started to waver. So I just -- however it was going to present itself. Whatever opportunity was going to present itself, I was going to take advantage of.

Q. Now, 1:00, 1:30 in the morning, you're there crouched down in the dark with a gun. What do you see coming down Morris Field?

A. It was like a black -- black car. I couldn't -- I couldn't make it out at that time. But he didn't pull -- he didn't pull all the way to the light. He didn't pull all the way to the intersection. Music was just blasting. And I couldn't really see in there. But at that time everything just seemed stopped. No traffic came on Billy Graham. No traffic came behind him. It just seemed like an eternity.

I'm sorry. I'm sorry. I know you don't believe me. I'm sorry. I'm sorry. I shouldn't never been there.

MS. ROSE: Well, objection, Your Honor.

THE COURT: Please answer the questions.

Q. Marc...

(Pause.)

FORM FED ⊛ PENGAD • 1-800-631-6989

**JA1957**

Q. Marc, would you tell us whether the window on the car was up or down?

A. It was down.

Q. What did you do at that time?

A. I ran -- I ran to the car. I put -- I put the gun in the window and I opened the door. I told him to get out. I said, Get out.

Q. Did he get out?

A. Yes, he did.

Q. What, if anything, did you do at that time?

A. I told -- I -- I told him to go that way. Go that way to where my bag was.

Q. Did you even know this person's name?

A. He was an innocent man. Never seen him before in my life.

Q. Did he follow your instructions?

A. Yes, he did.

Q. Where did you go? Where did you make him go?

A. I pointed him to where my bag was stashed. And it was by a culvert or something. I pointed him down that way. And before we got there, I told him, I said, Give me your wallet. He reached in his pocket, he pulled it out and threw it on the part of the culvert. I told him, I said, Go that way.

Q. Did he do what you told him to do?

A. Yes, he did.

Q. What was going through your head? What were you thinking?

A. I wasn't thinking, man. If I was thinking, I wouldn't been there.

Q. What were your next instructions or directions?

A. I told him to turn around.

Q. Did he say anything to you at that time, Marc?

A. He said, Don't shoot. He said, Don't hurt me.

Q. Back where y'all were standing in the culvert when he said, Don't shoot me --

A. I couldn't see anything. It was pitch black.

Q. Did you tell him to keep moving?

A. No. We were already so far in the woods, on the concrete, on a slope. He was somewhere in front of me. I kept looking back and looking back.

Q. Marc, did -- Marc, did you turn on your flashlight while you were in there?

A. No. Nothing. Nothing happened like you would think something is going to happen. It didn't happen like that. I couldn't even see him. I didn't even fumble for it. I had both of my hands on the gun. I didn't know if he was going to attack me or reach out. I didn't know if he was going to run. I just -- I was panicking.

Q. Marc, why not just tie this young man to a tree? You've got all the tools you need in the bag.

A. I just -- I wasn't thinking. It doesn't make sense. This is not some planned hit. I wasn't in it just -- I just wanted a car. And I just overreacted. I just thought he's going to stop me. He's going to stop me. I wasn't cold about it. I wasn't meticulous. I was just being a damn idiot. And I shot him for no damn reason. Innocent man. He didn't do nothing to me. Nothing. Not a damn thing to me. And I know his family seated here, they don't have a son no more because of me. I shot him for no reason. Out of fear and stupidity.

Q. Marc, how many times did you shoot the man?

A. I didn't even remember until they told me. I just pulled the trigger and pulled the trigger and pulled the trigger. I didn't even know if I hit him. If I did hit him, did I kill him? Did he live? I was just -- everything was swirling around. I just ran. I ran. I ran.

Q. Where did you go?

A. I grabbed -- I grabbed the bag. I grabbed his wallet. I got in the car and I fled. I just -- I turned around and I drove. I drove.

Q. Did you turn onto Billy Graham to go out to 85 and then to 77?

A. No. When I got to the car, I just -- I looked back. I think about this. The light must have changed because all of a sudden it started to lighten up and I couldn't figure out why back then. It was because traffic had started moving on

Billy Graham. So I turned around and I went back down the road, Morris Field.

Q. Went back down Morris Field?

A. Yes.

Q. Is that the way the car had come when you -- when it stopped there?

A. Yes.

Q. Now, when you got -- when you got down on Morris Field, did it intersect with Wilkinson?

A. Yes.

Q. Do you remember what you did when you got to that intersection?

A. I had the gun in the front seat. I had his wallet in the front seat. I looked at it. I took out the license and I looked at it and I read it.

Q. Is that the first time you knew the name of the man you had killed?

A. Yes.

Q. Now, as you got on Wilkinson, where were you heading?

A. All I could -- I was going to Roanoke.

Q. Pardon?

A. I was going to Roanoke.

Q. And that's where Robin was?

A. Yes.

Q. As you headed up -- or out Wilkinson, did you get on 77

north?

A.   Yes.

Q.   Did you ever stop as you were going up 77 north or 81, or however you went to Roanoke, to get some gas?

A.   I think so.

Q.   Do you remember -- do you remember whether you did stop, not stop, use the money from the wallet to get some gas?

A.   I did.

Q.   Do you remember where that was?

A.   No.

Q.   It's -- did you even know what time it was?

A.   No.

Q.   About how long would it normally take you to drive to Roanoke?

A.   Three hours plus.

Q.   Do you know how long it took you to get to Roanoke that day?

A.   A lot less.

Q.   And why was that?

A.   Just the way I was -- it's just the way I was driving.

Q.   Weren't you afraid to get caught for speeding?

A.   I've never been able to -- six years later I've still not been able to pinpoint all my feelings.  I think at some point I took my time and didn't, sometime I did, but a lot of that is still just not real clear.  Still trying to work through

some of the smaller details because it's not really the thing that's mostly on my mind about what happened that night -- or that morning.

MR. BENDER: Your Honor, this may be a good stopping point.

THE COURT: I had that in mind myself.

Members of the jury, we'll take a lunch break. Please remember the usual instructions. Keep an open mind about the case. We'll ask you to be back with us at quarter of two. That will give you almost an hour and a half. Thank you very much.

(Jury exited the courtroom.)

THE COURT: Mr. Bender.

MR. BENDER: Your Honor, Marc Barnette has every right as he's testifying and subjecting himself to cross examination to express remorse because that is a mitigating factor. That's one of the things about his character that this jury is entitled to receive and view it any way they want to. He has every right to do that. And that's what he was doing when the objection came.

THE COURT: I think that objection was directed at the fact that he had stopped answering questions as such.

MR. BENDER: Well, the --

THE COURT: And that's why it was appropriate for you to ask another question.

MR. BENDER: Well, I think -- and I submit that in this matter it's appropriate for him to express remorse if he chooses to do so.

THE COURT: I think he's done that at length.

MR. BENDER: The other matter I wanted to address the court about is if -- I assume that Ms. Rose will be cross examining him since she was the one who objected in this matter. That normally in federal court, the person who objects is the one who is either doing the examination or the cross examination. So I assume that Ms. Rose will be doing that in this matter?

THE COURT: Well, we'll see what the government proposes to do.

MR. BENDER: Okay.

THE COURT: All right.

(Lunch recess at 12:22 p.m.)

\* \* \*

Page 3129

IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF NORTH CAROLINA

CHARLOTTE DIVISION

COPY

UNITED STATES OF AMERICA          )
                                  )  CASE NO. 3:97CR23-V
     v.                           )  August 5, 2002
                                  )  Afternoon Session
AQUILIA MARCIVICCI BARNETTE,      )
          Defendant.              )

TRANSCRIPT OF SENTENCING HEARING

BEFORE THE HONORABLE RICHARD L. VOORHEES

UNITED STATES DISTRICT COURT JUDGE

APPEARANCES:

FOR THE GOVERNMENT:

     ANNE M. TOMPKINS, Esq.

     JILL WESTMORELAND ROSE, Esq.

     Assistant United States Attorney

     227 West Trade Street

     Suite 1700

     Charlotte, North Carolina  28202

FOR THE DEFENDANT:

     JEAN B. LAWSON, Esq.

     P.O. Box 4275

     Charlotte, North Carolina  28226

     HAROLD J. BENDER, Esq.

     200 North McDowell Street

     Charlotte, North Carolina  28204

Reported by:  Scott A. Huseby,

              Registered Professional Reporter,

              Certified Court Reporter,

Reported By: Scott A. Huseby, RPR
800-333-2082          Huseby, Inc., an A          rion  (704) 333-9889          Fax (704) 372-4593
Case 3:12-cv-00327-MOC  Document 104  Filed 09/23/15  Page 73 of 280
1107

JA1965

Page 3130

P R O C E E D I N G S

THE COURT: Are the parties ready to resume?

MR. BENDER: Yes, Your Honor.

THE COURT: Just for information of the attorneys, the Court invokes a rule about attorneys where there are more than one counsel restricting objections to one or the other that is the one who is doing the questioning, but the Court only invokes such a rule when it becomes bothersome that you have -- when the Court can't really tell who is functioning as the attorney on a particular witness. That hasn't happened yet in this trial on either side, so this is the first time it's come up. But I will continue to -- I will instruct counsel about that again if it becomes troublesome. May we have the jury, please.

(The jury returned to the courtroom.)

THE COURT: All right, you may resume.

MR. BENDER: Thank you, Your Honor.

BY MR. BENDER:

Q. Marc, tell us how you were dressed when you carjacked Donnie Allen's car.

A. I had on jeans and a tan shirt.

Q. And did you at any time change clothes?

A. No. They were in the bag, but I never wore

Reported By: Scott A. Huseby, RPR
800-333-2082    Huseby, Inc., an A...    ion (704) 333-0889    Fax (704) 372-4593
Case 3:12-cv-00327-MOC  Document 104  Filed 09/23/15  Page 74 of 280
1108

JA1966

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/5/2002

Page 3131

them.

Q. Okay. And were those the jeans and the tan shirt that Robin had given you?

A. Yes.

Q. There's been some testimony about you having a bald head or a shaved head --

A. Yes.

Q. -- when you were in Roanoke. Do you remember when you shaved your head?

A. I shaved it maybe a day or two before I left before that night.

Q. Okay. Tell us why you shaved your head.

A. As things kept getting worse and I was continually fighting the thought to do what I set out to do, I couldn't think straight. And I just kept looking at my hair. I had this long hair on my head and I just could not think, and the only thing I could think to do was to shave it off. So I shaved it and I took a razor and I shaved it off.

Q. Did you think that would help you think more clearly?

A. It sounds pretty stupid, but at the time that's exactly what I thought.

Q. Now, when you got to Roanoke after you'd stopped and gotten gas, had any idea of what time of the

Reported By: Scott A. Huseby, RPR
800-333-2082          Huseby, Inc., an A:          ion  (704) 333-9889
Case 3:12-cv-00327-MOC  Document 104  Filed 09/23/15  Page 75 of 280
1109

JA1967

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/5/2002

Page 3132

morning it was?

A. I had lost track of time.

Q. Where did you go first when you got to Roanoke?

A. I went straight to Robin's mom's house.

Q. And was that over on Louden Avenue?

A. Yes.

Q. And where did you park when you first got there?

A. When I first got there, I parked across the street behind the duplex that you saw in the pictures earlier.

Q. You parked on the side street?

A. No, I remember going to the duplex.

Q. Okay. And how long did you stay parked there on Louden or right nearby?

A. Until after I had saw Robin and saw Robin's mom. It wasn't until I welled up something inside of me to go to the house that I moved the car.

Q. When you say you saw Robin, did you have any idea what time it was, whether it was dark, light?

A. It was still twilight, kind of dark. The sun was not yet come up.

Q. And when you saw Robin the first time, where did you see her?

A. I saw her open the front door and let Marcie

Page 3133

out.

Q.    That's the dog that we know about?

A.    Yes, that's Robin's pet.

Q.    And that's a fenced in yard all the way around?

A.    Yes.

Q.    Okay.  Did you see her later get Marcie back in the house?

A.    I might have, I really don't recall.

Q.    Okay.  And you saw her mother, Bertha Williams?

A.    Yes, I did.

Q.    When did you see Bertha and what were the circumstances under you seeing her?

A.    After I saw Robin, I got real antsy and I started to doubt everything that I was there for.  It was almost seemed like just I was starting to get confused.  After a while, I sat there for a long time, I saw a brownish car pull up and I saw Bertha come out.  I think she had been on the porch already for a few minutes, sitting there.  And the car pulled up, and in my mind at the time, the only thing I felt was it was Bennie.  But she came off the porch and she went to the car.  It was Destiny, her grandbaby.  And she took her back in the house and she shut the door.

Q.    Okay.  And at that time was when you moved the car?

Reported By: Scott A. Huseby, RPR
800-333-2082          Huseby, Inc., an A        ion  (704) 333-9889          Fax (704) 372-4593
Case 3:12-cv-00327-MOC  Document 104  Filed 09/23/15  Page 77 of 280

JA1969

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/5/2002

Page 3134

A.    That's when I backed up, moved the car to the alleyway behind her house.

Q.    Is that someplace that you had parked before or knew it was back there?

A.    I knew it was back there, but I had never parked back there.

Q.    Why did you move your car to park it in that little alleyway behind the house?

A.    It was -- by that time, it was daybreak.  I had sobered up pretty well, and the distance I was from the house was pretty far.  I moved the car to get closer to the house.

Q.    And when you parked back there, what did you do next?

A.    I got out of the car.  I pulled the gun out of the bag.  I proceeded to just go in the back gate and move towards the house.

Q.    Okay.  You opened the back gate at the very rear of the property?

A.    Yes.

Q.    The chain link fence and walked in, and where did you go when you walked into the yard?

A.    I went and stood at the back corner where there is a kitchen window at the very back of the house, and I started to look around.  I started thinking about phone

Reported By: Scott A. Huseby, RPR
800-333-2082        Huseby, Inc., an        (704) 333-9889        Fax (704) 372-4593
Case 3:12-cv-00327-MOC   Document 104   Filed 09/23/15   Page 78 of 280
1112

JA1970

Page 3135

lines then. I didn't want anyone to stop me. I found the phone lines, I reached in my pocket, I pulled out some wire cutters and I cut the phone lines.

Q. And then did you approach the kitchen door?

A. I moved around towards the other side of the house to where the kitchen door was, and I sat there on the step for seemed like forever.

Q. What were you thinking?

A. Just my mind was a mess. My heart was just in my head banging and I just had the feeling like this is it, this is going to be the end. And I didn't know if I could do it, and I didn't know what to expect. I didn't know what was going to happen. I just felt like if I got in that door, I don't know what was going to happen.

Q. Did you try the kitchen door, try to open it?

A. I tried to open it.

Q. Did you try to kick it in?

A. No, I don't think. I might have pushed against it, but I just didn't put any force on it.

Q. Okay. Then what did you do?

A. I held the screen door back, placed the gun up to the door and I leaned against the screen door and grabbed the gun with both hands, I placed it near where the dead bolt was and just took some real deep breaths, and I started shooting inside the door.

Reported By: Scott A. Huseby, RPR
800-333-2082     Huseby, Inc., an Affiliate of Suburbion (704) 333-9889
Case 3:12-cv-00327-MOC   Document 104   Filed 09/23/15   Page 79 of 280
1113

JA1971

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/5/2002

Page 3136

Q.  Do you remember how many times you shot at the door?

A.  I think I just squeezed the trigger and emptied the gun.  It's only three shots, I believe.

Q.  And after you shot three times, did you have to kick the door or somehow force it open even after that?

A.  I did, but I just -- you know, it was -- everything was kind of just disjointed, kicked on the door.  I got in the door.  I just remember getting in, remember how.

Q.  Had you reloaded your gun at that time?

A.  Once I entered the home, I looked towards the kitchen area where I was facing.  I heard all of this commotion to my left, and I heard Robin say, I think it came from down the street.  And I looked outside and she was on the front porch holding the screen door open.  She was just about to come back inside, and I saw Robin's mom standing there.  That's when I started to reload.

Q.  And did you ever catch Robin's eye at that point?

A.  I looked kind of through her.  She was standing in the middle of the foyer area by the den entry, and I kind of looked over her shoulder.  And I saw Robin and she got a glimpse of me, and that's when Bertha had

Reported By: Scott A. Huseby, RPR
Huseby, Inc. an
800-333-2082   3:12-cv-00327-MOC   Document 104   Filed 09/23/15   Page 80 of 280   Fax (704) 372-4593
1114

JA1972

United States of America vs. Aquilia Marcivicci Barnette       3:97CR23-V
Proceedings Before Judge Richard L. Voorhees       8/5/2002

Page 3137

turned, looked at me and she told Robin to run.

Q.   Now, did you point that gun at Bertha and the baby?

A.   I don't remember.  I was reloading and I thought about it because I heard her say that, and I think it was unintentional, because when she told Robin to run, I ran out the back.

Q.   Which way did you run?

A.   The back.  I ran back out the way.  I wasn't going to go through Bertha.  I wasn't going to hurt Bertha.

Q.   And is there another gate on that chain link fence somewhere near the front?

A.   The front sidewalk runs right to the steps of the house, and you go through the gate from the street to get to the house.

Q.   Had Robin run through that gate?

A.   I heard the gate swing, bang.  I did not see her when I ran out the back.  So, I mean, I used to -- I slept at that house, spent a lot of time there.  I know the house like my own house, so I knew she ran out the front gate.

Q.   And did you run out that front gate also?

A.   Yes.

Q.   When was the next time you saw Robin after she

Case 3:12-cv-00327-MOC  Document 104  Filed 09/23/15  Page 81 of 280
1115

JA1973

United States of America vs. Aquilia Marcivicci Barnette    3:97CR23-V
Proceedings Before Judge Richard L. Voorhees    8/5/2002

Page 3138

ran out of the house?

A. When I finally got around the gate, I ran between her car and her mother's car. I looked up and I couldn't see, so I slowed down and I was looking around. I wasn't quite sure where she had run. I ran to the left around the duplex towards the intersection. As I ran through the grass, started to come up the hill, that's when I saw her come around the back of the duplex.

Q. And what did you do at that point?

A. I told her to come here. I started chasing her.

Q. Was she saying anything to you as you were chasing her?

A. No, she -- when she saw me, she bolted. And she slipped and she fell, and I was moving towards her at a very slow rate. She got up, she ran some more and she ran over the back of this hill on the street we were on. By the time she got over the hill, she slipped and fell into this person's yard.

Q. And how close were you to her at that point when she fell the second time?

A. I was probably about four, five people distance, person distance from her, maybe good 7, 8 feet because I was closing on her.

Reported By: Scott A. Huseby, RPR
800-333-2082    Huseby, Inc., an A~~~    ~~ ~~  ion  (704) 333-9889    Fax (704) 372-4593
Case 3:12-cv-00327-MOC   Document 104   Filed 09/23/15   Page 82 of 280
1116

JA1974

United States of America vs. Aquilia Marcivicci Barnette     3:97CR23-V
Proceedings Before Judge Richard L. Voorhees     8/5/2002

Page 3139

Q.    Marc, as you were running after Robin chasing her with that sawed-off shotgun, what were you thinking?

A.    I just -- I don't really -- I don't really understand the difference between then and now, the structure of the thought is just not the same.  I mean, I had emotions and feelings of getting to her.  I had fantasies of taking her with me, having her tell me it would be okay, taking me to find Bennie.  I had so much stuff running through my mind, there is -- it's just never one thing to pinpoint.  And it's just so much different from now, and it's not really -- I can't really explain it.  It's hard for me to explain what I was thinking, because once again, if I was, I don't think those situations would have occurred.

Q.    Now, Marc, after she fell the second time, when you were closing on her, did you ever grab her, were you ever able to get close enough to grab her?

A.    Yes, I did.

Q.    How did you grab her?  You've got the shotgun in both hands.

A.    She fell and she was in the grass.  I grabbed her by her right hand, I believe, and I pulled her.  I told her to get up.  I had the shotgun in my right hand. I was pulling her back across the hill with my right hand -- with my left hand with my -- the shotgun in my

Reported By: Scott A. Huseby, RPR
800-333-2082          Huseby, Inc., an A⎯⎯⎯ ⎯ ⎯ ⎯ :ion  (704) 333-9889          Fax (704) 372-4593
Case 3:12-cv-00327-MOC  Document 104  Filed 09/23/15  Page 83 of 280
1117

JA1975

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/5/2002

Page 3140

right hand.

Q. And then you -- where in relationship to that intersection at Louden and whatever street that is, how far up that hill had she gotten before you grabbed her?

A. She was -- had nearly run to the adjoining street. On the back of that duplex, it's a house with a driveway behind it. This house was sideways to the house where she had run and fell in the grass.

Q. Were you talking to Robin, was she talking to you, were you yelling at each other, what was going on as you grabbed her?

A. I remember grabbing her, pulling her. She was pulling, resisting. I kept telling her to come on. I said, you are going with me. She said, I'm not going with you. I said, you are coming with me, and she said no. And by this time, I could start to hear Bertha calling. We started to trek down the street, still in the middle of the street. I was trying to get her to go to the car with me. We were arguing. I told her I was going to kill her.

Q. And what did she respond when you said that you were going to kill her?

A. She said, you are not going to kill me.

Q. Then what happened?

A. I said that's okay, I said, because I got one

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/5/2002

Page 3141

for you and I got one for me.

Q. Marc, what happened after you said, I got one for you and I got one for me?

A. She snatched away from me and she tried to reach for the gun. Just when she reached for it, she almost got it, and I pulled back and that's when I shot her.

Q. Do you know where you shot her?

A. No.

Q. At that time?

A. No.

Q. What if anything did Robin say to you when you shot her at that time?

A. She didn't really say anything. She -- we were kind of parallel with where Bertha was coming in the street area. She turned, she lifted her arm up and I didn't think I shot her, and she started to run towards her mom.

Q. Then what happened?

A. I shot her in the back.

Q. Did Robin say anything as you shot her the second time?

A. She just fell.

Q. Where was her mother Bertha when you shot her in the back?

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/5/2002

Page 3142

A.  She was coming towards us.

Q.  Could you hear her screaming or yelling at you?

A.  Not until after Robin was laying there.

Q.  Did you see somebody on the porch with a telephone, the porch of the duplex?

A.  At that time, I had forgotten that there was somebody up there.  They told me, but I didn't remember. I had to think, really think about it because at that time, the whole time I was grabbing Robin and she was fighting me and I had her by the hair one time and then by the arm again, my focus was on her.  I couldn't see or sense too much going on around me.  Everything else outside of her -- the view of her was -- it was skewed, so I didn't remember that there was somebody up there on that porch.

Q.  Marc, at the time you shot and killed Robin, were you in love with Robin?

A.  I was very much in love with her.

Q.  What did you do after you shot her in the back?

A.  I panicked.  I saw Robin, I saw her get hit when I shot her and I saw blood.  It was just like everything was in slow motion.  I wanted to catch her. It seemed like I was just moving away and I was running.

Q.  Where were you running?

A.  I don't know, I was just running away.

Reported By: Scott A. Huseby, RPR
800-333-2082        Huseby, Inc., ar        aerion (704) 333-9889
Case 3:12-cv-00327-MOC  Document 104  Filed 09/23/15  Page 86 of 280
1120

JA1978

United States of America vs. Aquilia Marcivicci Barnette  3:97CR23-V
Proceedings Before Judge Richard L. Voorhees  8/5/2002

Page 3143

Q. How many shots did you have in that shotgun?

A. I don't recall.

Q. Why didn't you put the shotgun in your mouth, under your chin, up to your head and do what you had planned to do when you went up to Roanoke that day?

A. Because I panicked. I saw what that gun did, I saw it when it hit her and everything just froze, and I don't know why.

Q. Marc, is there anything you want to say to Robin's family at this point?

A. I don't understand how I got to this point because I know how much y'all loved Robin and I know how much she meant to you, and I hate myself for what I did to you. I just wish I could give her back because I know you miss her, and I'm so sorry. I'm very sorry.

Q. Marc, after you shot Robin in the back and you ran away, where did you go?

A. I just drove. I didn't know where I was going.

Q. Did you run in that little alleyway and get in the car?

A. Yes.

Q. And when you left Roanoke, do you even remember what route you took as you left Louden Avenue?

A. No.

Q. Did you get on the interstate?

Reported By: Scott A. Huseby, RPR
800-333-2082  Huseby, Inc. at  Merion (704) 333-9889
Case 3:12-cv-00327-MOC Document 104 Filed 09/23/15 Page 87 of 280
1121

JA1979

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/5/2002

Page 3144

A. Yes.

Q. And that's Interstate 81?

A. Yes.

Q. Which way did you head at that point, do you remember?

A. At the time, I just -- I got on the highway and I just kept driving. I didn't have a clue what was going to happen next.

Q. Did you continue to drive on the interstate?

A. Yes, I did.

Q. And did you have any idea where you were going, did you have any plan or purpose as to where you were going to end up?

A. No. I did not realize where I was until I reached I think Bristol, Tennessee.

Q. And did you continue to drive until you got to Knoxville?

A. Yes, I did.

Q. Any reason why you stopped in Knoxville, you got family there, friends, relatives?

A. No.

Q. What is going through your mind, Marc, as you are driving up 81, finally end up in Knoxville? You just murdered two people.

A. I just -- I did not know what to do, confusion,

Case 3:12-cv-00327-MOC  Document 104   Filed 09/23/15  Page 88 of 280
1122

United States of America vs. Aquilia Marcivicci Barnette    3:97CR23-V
Proceedings Before Judge Richard L. Voorhees    8/5/2002

Page 3145

I mean, hurt. I mean, I had so much going on, fear, I mean, worry. It was just -- I just didn't know what to do, what to do next. And then it just -- it dawned on me that I had panicked. I didn't shoot myself. I started to think about what I needed to do.

Q. What did you decide to do?

A. I decided that I was going to kill myself one way or the other.

Q. What is the first place you remember stopping after you got to Knoxville?

A. I had never been around there, but I got to this hardware store and I went in there and I said, okay, I'm going to find a way to do this, because I wasn't going to touch that gun again, not after I saw what happened to Robin. I just chickened out and didn't blow my brains out, which most days I wish I had.

Q. What were you looking for at the hardware store?

A. I just thought about carbon monoxide poisoning. I don't know where I got the idea or how it came to me, but that's why I went to the store, to buy a hose or whatever else and I was going to park that car and just that was going to be it.

Q. Were you able to find the hose at that hardware store?

Reported By: Scott A. Huseby, RPR
800-333-2082    Huseby, Inc., an    rion (704) 333-9889    Fax (704) 372-4593
Case 3:12-cv-00327-MOC  Document 104  Filed 09/23/15  Page 89 of 280
1123

JA1981

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/5/2002

Page 3146

A.   No.

Q.   What did you do after you couldn't find the hose at the hardware store?

A.   I left.  I think I got on a highway.  I had saw a mall when I came into the town, so I went there.  I drove around.  I was absolutely lost.  I was just running on fumes.  I pulled into a Sears, ran in, went to garden, whatever section, bought hose, went back out to the car.

Q.   Did you have some duct tape with you in the car?

A.   No, there was none in the car, I don't think.

Q.   Was that the only thing you got at the Sears was garden hose?

A.   You will have to refresh my memory.  I mean, some of the stuff like that, it's not as clear.  I did a lot of things and I don't always remember everything.  Some stuff gets left out.  I talked to a lot of people about this and sometimes I leave stuff out.  Sometimes, something else is added, but it's only because I didn't think about it.  So I got some duct tape.  I cannot remember at this time right now where.  I do remember getting the hose, but I did get some duct tape at some time.

Q.   Okay.  Did you also go to a pharmacy, a drug

Reported By: Scott A. Huseby, RPR
800-333-2082          Huseby, Inc., an /          rion  (704) 333-9889          Fax (704) 372-4593
Case 3:12-cv-00327-MOC   Document 104   Filed 09/23/15   Page 90 of 280
1124

JA1982

United States of America vs. Aquilia Marcivicci Barnette    3:97CR23-V
Proceedings Before Judge Richard L. Voorhees    8/5/2002

Page 3147

store to buy some over-the-counter pills?

A.    That did not happen that day or that night.

Q.    Okay.

A.    That happened on Sunday evening.  This was Saturday afternoon.

Q.    Where did you go with the hose and the duct tape?

A.    I stayed in the mall parking lot for quite some time.  I just sat there.  Things were starting to seep in, started reliving what had happened, the night with Donnie, seeing Robin.  I just sat there, and I didn't know where to go or what I was going to do.  I started cutting up hose and just looking around.  It's broad daylight, middle of the afternoon.  I'm thinking to myself, okay, where I'm going to do this.

Q.    What sort of plan did you have, if any?

A.    Just to park somewhere, put the hose in the pipe and go to sleep.

Q.    About what time, if you remember, what time did you leave that Sears parking lot?

A.    I had been sitting there thinking that nobody would come up to me.  Some security guard comes up and he bangs on the window.  Well, I didn't have the hose on the car, everything was inside, so I left and I left that area.  I knew I needed to find somewhere where this

Case 3:12-cv-00327-MOC   Document 104   Filed 09/23/15   Page 91 of 280
1125

JA1983

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/5/2002

Page 3148

could happen, but I was very paranoid because of what had happened that morning. I wanted it to get dark so there would be no chance of somebody finding me. So I think at that time I went to a movie theater parking lot where it was crowded, and I parked and I said I'm just going to sit here until it got dark.

Q. And did you do that?

A. Yes.

Q. After it got dark there in the movie theater parking lot, did you have any plan or idea as to where you might go next?

A. No. It got dark. I left that area because it was still the mall area, but it was somewhat adjacent. I left, got on the highway again. I got off on this exit. I just -- you know, I didn't know where I was. I drove. It was this two-lane road. I just took it, pulled into a subdivision. It was only maybe six houses total in the whole subdivision. I pulled all the way to the back of the subdivision, and there was just some brick, dirt. It was just like it was nothing there, like it was abandoned or it was either new.

Q. And then what did you do when you found this fairly deserted area?

A. I just thought about what I did, kept thinking about it, kept thinking about it, and I just said I got

United States of America vs. Aquilia Marcivicci Barnette 3:97CR23-V
Proceedings Before Judge Richard L. Voorhees 8/5/2002

Page 3149

to go. So I put the hose inside the pipe, cranked the car up, rolled the windows up and I tried to go to sleep.

Q. Were you able to go to sleep?

A. No. That first time, Saturday night, it was -- I don't know if it was the adrenaline or what it was or the thoughts continuously over in my head what had happened earlier that morning, but it just seemed like it was choking me, and I was fidgeting and I just -- I couldn't go to sleep.

Q. Did you use the duct tape on the tail pipe that night?

A. No. The hose that I bought was a garden hose. You didn't tape the pipe, all you had to do was slide it down into the pipe. It stopped any exhaust from coming out. All exhaust that came out goes through the hose.

Q. You couldn't go to sleep?

A. No.

Q. Was the carbon monoxide coming into the interior of the car?

A. Yes, it was -- it was fogging up the glass. It was this putrid smell. It's not what you smell if you stand at the back of a car. It's different when it's in that tight space and it was getting in my nose, was choking me, my eyes were burning and it was fogging the

Reported By: Scott A. Huseby, RPR
800-333-2082 Huseby, Inc., an / rion (704) 333-9889 Fax (704) 372-4593
Case 3:12-cv-00327-MOC Document 104 Filed 09/23/15 Page 93 of 280
1127

JA1985

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/5/2002

Page 3150

glass.  I stayed in that car I know for more than half an hour.

Q.  Did the carbon monoxide make you sleepy at all?

A.  It didn't make me sleepy that night, no.  Like I said, the thoughts of what happened just seemed to keep me agitated.  I kept feeling this -- these feelings.  Finally I got out of the car, I was coughing, just -- I said what is it, what is it, why is it that this is not working?  You hear about this all the time, it works, people put a pipe in and they go to sleep, but it did not happen.

Q.  Where did you go after you got out of the car, cleared your head, where did you go?

A.  At that time, I was trying to figure out why this wasn't working.  You see it on TV.  It works all the time.  I felt -- I was feeling this -- these feelings of just overwhelming pain.  Because of what I had done earlier that day, I felt like Robin and Donald's soul was just -- were attacking me and mad at me and they were not resting, and it just felt like I had to pray for them.  It was just this overwhelming feeling of needing to pray for them.

Q.  When did you take the South Carolina license tag off of Donald Allen's car and put the Tennessee tag on it?

Case 3:12-cv-00327-MOC  Document 104  Filed 09/23/15  Page 94 of 280
1128

Page 3151

A.    After I pulled the hose out of the pipe, I left.  And it's Saturday night, you know, I'm not thinking I can go find a church.  I'm thinking that I need to call home, I need to say good-bye, I need to go pray.  I just kept hearing Robin's voice saying you commit suicide, you are going to hell.  I kept thinking about what I had done to her and I might be going anyway, so I left.  And as I left that road, I'm just -- it's hard for me to explain the feelings because they were conflicting, but I knew I needed to be around for the next night.  And that's when I saw, I think it was a hotel, some hotel up on a hill and I pulled into that parking lot.  And that's when I switched -- well, took the tag off the car, because I needed to move around. These are the things that kind of just start coming to me and I started to do.

Q.    And you stole somebody's tag off of their car, a Tennessee tag?

A.    Yes, I did.

Q.    Put it on Donald Allen's car?

A.    Yes, I did.

Q.    And left his -- what did you do with his tag, did you leave it in the car or throw it away?

A.    I put it in the trunk.

Q.    When did you decide that the inspection sticker

Reported By: Scott A. Huseby, RPR
800-333-2082          Huseby, Inc., an /          rion (704) 333-9889          Fax (704) 372-4593
Case 3:12-cv-00327-MOC   Document 104   Filed 09/23/15   Page 95 of 280
1129

JA1987

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/5/2002

Page 3152

needed to be removed because nobody in Tennessee had inspection stickers?

A. I didn't notice the inspection sticker until the next day, late in the afternoon.

Q. Where did you sleep the night -- Saturday night, what was left of that Saturday night, where did you sleep?

A. I didn't sleep, I stayed in the car.

Q. Do you remember where you parked the car while you stayed in it?

A. I kept moving around. I felt -- the felling of paranoia was just everywhere. I didn't know -- I knew they were looking for me, they, you know, law enforcement, so I just kept moving around. I would go from one hotel parking lot, I stay, I leave there, I go to another hotel parking lot and kept moving around.

Q. Sunday morning arrives, you are still in the car?

A. Yes.

Q. You still have this need to go pray for the souls of Robin and Donnie?

A. You have to understand that that was the only thing driving me. I didn't feel right, as you shouldn't, doing what I did, and that was the one thing that I was driven to do at that time. I went from

Case 3:12-cv-00327-MOC  Document 104  Filed 09/23/15  Page 96 of 280
1130

JA1988

United States of America vs. Aquilia Marcivicci Barnette    3:97CR23-V
Proceedings Before Judge Richard L. Voorhees    8/5/2002

Page 3153

conflicting emotions to that one single thought, and that's just something at that point that I just had to do.

Q. And with that thought in mind, what did you do?

A. I don't know where I was. I had moved around, drove down some of these roads. Like I say, I don't know Knoxville. It's Sunday morning. I was raised in church. I saw two elderly black people in a car. Sunday morning, there is only one place you can be going. And I just, as corny as it sounds, whether you believe it or you don't, I felt like God was watching me and for some reason, I stumbled into these people. I knew to follow them. I followed them. They went right to the church.

Q. Did you go inside the church?

A. Yes, I did.

Q. Were you still dressed the same way?

A. Yes, I was.

Q. Did you have any blood on you, Robin's blood or anybody else's blood?

A. I had blood on my jeans from cutting my finger when I had tried to get in her back door. I didn't have -- at no point did I have anyone else's blood on me except for my own.

Q. Do you remember the name of the church that you

Reported By: Scott A. Huseby, RPR
800-333-2082    Huseby, Inc., an A        rion (704) 333-9889    Fax (704) 372-4593
Case 3:12-cv-00327-MOC   Document 104   Filed 09/23/15   Page 97 of 280
1131

JA1989

United States of America vs. Aquilia Marcivicci Barnette    3:97CR23-V
Proceedings Before Judge Richard L. Voorhees    8/5/2002

Page 3154

went to?

A.    I only remember because of the flyer I had that somebody handed me when I came in.  I think it's Calvary.

Q.    Where did you sit in the church?

A.    In the very, very back corner because of the way I was dressed, because of the guilt of everybody staring at me knowing exactly what I did.  If you do something like that to somebody, everyone you look at seems to know exactly what you did even if they've never seen me before.

Q.    What's the first thing you did when you got in the church and sat on the back row, Marc?

A.    I just started praying.  They were in the midst of the choir singing.  It was very, very emotional.  I just asked God to pray for Donnie, pray for Robin.  I didn't care what happened to me anymore, it just -- it didn't make it all right, it's just something was pulling at me, maybe it background or my past from growing up in church that this is something that I needed to do, I need to make amends some kind of way before I left this world.

Q.    After the service was over, what did you do?

A.    I left.  I didn't stay for the whole service. I left maybe midservice.  I left, found a gas station

Case 3:12-cv-00327-MOC   Document 104   Filed 09/23/15   Page 98 of 280
1132

JA1990

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/5/2002

Page 3155

not too far from there, and that's when I called home.

Q.    Who did you call?

A.    I called my mother.

Q.    Tell us what you told your mother and how she responded to you.

A.    She was -- she was very emotional.  She was crying.  She told me what the FBI agents had told her. I told her how sorry I was, told her how sorry I was.

Q.    Did your mother say anything to you that the FBI were looking for you in connection with Donnie Allen's death or carjacking or did she simply mention Robin's murder?

A.    She just mentioned Robin's.

Q.    After you talked to your mother, what idea or plan did you have after that?

A.    I told her I loved her and good-bye.  It reverted back to what I had told myself I had to do. She was near hysterical, but I hung up.  At the time, I just didn't know how I could face up to something like that, so I was going to go back to that same spot and this time, it was going to be over.

Q.    Was this the day that you went to the drug store or the pharmacy?

A.    On the way back to that place, you just have to get on the highway, by that time I had a little more

Reported By: Scott A. Huseby, RPR
800-333-2082    Huseby, Inc., an A_____ ___ __ __rion (704) 333-9889    Fax (704) 372-4593
Case 3:12-cv-00327-MOC  Document 104  Filed 09/23/15  Page 99 of 280
1133

JA1991

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/5/2002

Page 3156

familiarity with the highway and how it ran and that particular exit. There was a drug store or something. I stopped. I bought I think a box of sleeping pills and I said, my idiot logic that I was using at the time was, well, hey, you know, I just couldn't go to sleep, so sleeping pills will fix that and carbon monoxide will take care of the rest. So I bought something to drink to take the pills with and I made it back to that spot.

Q. What did you do when you got back to the same spot?

A. It was daytime this time. Because I had been there the night before, it was pretty much abandoned and this was almost a dead end at this -- since it was daylight, I could see that they were new houses because it wasn't dark anymore. And I grew up in some subdivisions at sometime in my life, so I know how new subdivisions go up and how they are. So it was daylight, I parked, and since I didn't really have a fear that somebody would come back there because now I could see where this area was.

Q. What did you do with the hose?

A. I put the hose -- slid it back inside the pipe, I put some tape on the hose part to keep it from coming out, got in the car, it had got dark, I took half of a box of sleeping pills, I rolled up the windows, and I

Reported By: Scott A. Huseby, RPR
800-333-2082          Huseby, Inc., an A~~~~ ~~ ~~~~ion (704) 333-9889
Case 3:12-cv-00327-MOC  Document 104  Filed 09/23/15  Page 100 of 280
1134

JA1992

United States of America vs. Aquilia Marcivicci Barnette    3:97CR23-V
Proceedings Before Judge Richard L. Voorhees    8/5/2002

Page 3157

drifted off.

Q. Something happened after that, Marc. Tell us what it was that kept you from doing what you set out to do.

A. I have told people this and, you know, I can understand the skepticism. I had the gun, but I didn't use it because I was fearful of it, seeing what had happened to Robin. I was a coward by not using it. But when I did this Sunday night, I was damn sure that this was it. I drifted off. And, you know, I care about what people believe, but in this instance, this is something that was very weird. I felt my body tingle, I saw white light, whether you -- you know, whoever believes it, that's fine. This -- that's what happened. The next thing I know, there is some guy, it's morning and he is banging, banging on the passenger side door. And he just opens the door, and he starts yelling at me, yelling at me up and down, and he goes back to the back of the car. And, I mean, I'm sitting there and I have come to and I'm going, this is not happening. I get out to see where he goes. He is at the back of the car and he pulls the hose out of the pipe, and he lifts the trunk lid and throws it in there. And he is telling me all of this stuff about you can't do this, you can't kill yourself. And I'm thinking, what is going on? No

Reported By: Scott A. Huseby, RPR
800-333-2082        Huseby, Inc., an A°°°°°° °°°°°°°°°°ion  (704) 333-9889        Fax (704) 372-4593
Case 3:12-cv-00327-MOC  Document 104  Filed 09/23/15  Page 101 of 280
1135

JA1993

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/5/2002

Page 3158

sooner than he says, you know, stand here, get some rest, it is the most weird -- one of the most weird things that happened, he just walks off, and that was the last I ever saw of him.

Q. And you got back in the car after that?

A. Yeah, I got out of there.

Q. Where did you go next after that?

A. I got -- you know, he disappeared somewhere through the bushes or something, and I still don't know where he came from, but I got out of there because I don't know who he was or where he came from. I got on the highway and was just driving, but I did not recognize this highway as the same place I came from so I got off again.

Q. Did you make a phone call?

A. Yeah. I -- I was -- you know, taking the totality of everything that happened in these past couple of days, I feel like I'm just losing. So I call -- and I can't call my mom back. She is -- you know, the police are there. FBI is there. I'm not going to call her. I call my cousin, and I just called her to try to help me.

Q. Was this Shonda?

A. That's Shonda Nero.

Q. What did Shonda tell you in that phone call?

Reported By: Scott A. Huseby, RPR
800-333-2082          Huseby, Inc., an Affiliate of Spherion  (704) 333-9889          Fax (704) 372-4593
Case 3:12-cv-00327-MOC  Document 104  Filed 09/23/15  Page 102 of 280
1136

JA1994

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/5/2002

Page 3159

A.   She was happy to hear from me, but she was very frantic and she was -- asked me, where are you, what are you doing?  I said -- you know, I started to cry and talk about what happened with Robin and Donnie.  And she said, just shut up.  She said, where are you?  And I said, I'm in Tennessee.  I said, I don't have any gas. And she said, I need you to come home.  I said, I don't have any gas.  And she said, I don't care.  She said, just drive.  She said, when you get wherever you are, you know, I will come meet you, or something she said about coming to meet me halfway or whatever.  And she said, just don't hurt yourself.  So I got in the car.  I started to get the gun and say no, can't go back, but I got in the car and I started to drive.

Q.   You headed to Charlotte?

A.   Yes, I did.

Q.   Did you know how to get back from Charlotte -- to Charlotte from where you were?

A.   No, because the highway I was on now, it was different than 81 when I came into Roanoke -- I mean, Knoxville.  All that happened is I started driving, I started seeing signs to Charlotte and I found out it was 40, but I still don't know how I got on 40.

Q.   Were you able to get back to Charlotte with the amount of gas you had in Donnie's car?

Reported By: Scott A. Huseby, RPR
800-333-2082          Huseby, Inc., an          rion (704) 333-9889          Fax (704) 372-4593
Case 3:12-cv-00327-MOC   Document 104   Filed 09/23/15   Page 103 of 280
1137

JA1995

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/5/2002

Page 3160

A.   Yes.  I don't know how, but yes.

Q.   When you got back to Charlotte, where did you go, what is the first thing you did?

A.   I went to her apartment.  I parked in the back of her apartment complex area which is off Monroe Road and Independence.

Q.   What did you do when you parked back there?  And I think the jury has probably seen the photographs of where you parked.

A.   I parked the car.  At this point, I'm thinking, you know, I got to turn myself in.  I don't know what is going to happen, but I need to be accountable for the things I did.  So I didn't want to leave anything in the car that somebody might take.  There was a dumpster behind it, made sure there was some stuff in the dumpster that kind of resembled whatever was in the car, put it in the dumpster, closed the dumpster.  I believe I locked the key in the car but I can't really remember, but I remember locking the car.  And then I headed towards my house.

Q.   And did you go see Shonda or did you just start walking?

A.   No.  Because I had talked to her on the phone, I felt like I kind of pulled her into this.  And I felt like if I went to her apartment, that she would be

Case 3:12-cv-00327-MOC  Document 104  Filed 09/23/15  Page 104 of 280
1138

JA1996

United States of America vs. Aquilia Marcivicci Barnette    3:97CR23-V
Proceedings Before Judge Richard L. Voorhees    8/5/2002

Page 3161

involved. So I started to walk and started to walk and think.

Q. Did you walk all the way back to 3413 West Boulevard?

A. Yes, I did.

Q. Did you spend the night anywhere?

A. No.

Q. When you got back to Jessie Cooper's house at 3413 West Boulevard, what if anything -- well, first of all, who did you see when you got there?

A. Well, I had walked some time, stopped, sat, walked a little bit. I had to get my thoughts in order. I did not go to my house until probably the next day since I had came into Charlotte around the evening time, so it was midafternoon by the time I got to my house. I went in through a couple of neighbor's back driveways, because I didn't know if the agents would be sitting in my driveway or police would be in my driveway or watching the driveway. So I went, and I think I went to the side or the back door. I saw my mom for the first time since Friday night.

Q. Who else was there?

A. I believe my brother Mario was there. Mom's fiance was there. I cannot recall if my grandfather was there or not.

Reported By: Scott A. Huseby, RPR
800-333-2082    Huseby, Inc., an    rion (704) 333-9889    Fax (704) 372-4593
Case 3:12-cv-00327-MOC  Document 104  Filed 09/23/15  Page 105 of 280
1139

JA1997

United States of America vs. Aquilia Marcivicci Barnette    3:97CR23-V
Proceedings Before Judge Richard L. Voorhees    8/5/2002

Page 3162

Q. Did you tell your mother everything that you had done on that Friday night and Saturday relating to Donnie Allen and Robin Williams?

A. No, she was still hysterical about what happened in Virginia, and I did not know how to tell her exactly everything I had done. So she was just fretting over me. I told her -- she told me she had been in contact. Of course, I knew she had been in contact from the day before. I said, I'm ready to turn myself in, I need to do what is right. And from then on, I just prepared myself to meet the FBI agents when they came to the house after she called them.

Q. Now, Marc, there was some testimony that when you -- when the agents and the police officers came out there to arrest you, you had a Bible in your hand?

A. (Nods head.)

Q. Was that for show or exactly why did you have that Bible in your hand?

A. Nothing that occurred those horrible 3 days was for show. I had a Bible in my hand because I was just praying for help. I dressed, cleaned myself up because that was the last time my family was ever going to see me a free man. I knew that this would be the last time I would be able to touch my mom, hug my mom, and I didn't want them to see me with blood on my jeans. And

Case 3:12-cv-00327-MOC  Document 104  Filed 09/23/15  Page 106 of 280
1140

JA1998

Page 3163

I just prepared myself to accept and face my responsibility.

Q. Now, Marc, the agents came out that day, put you in the back of the car, handcuffed you, took you to the FBI office first, didn't they?

A. Yes, sir.

Q. Told you of your rights, all of the things that police officers do and FBI agents do. Did you confess to them that you had killed Robin Williams?

A. Yes, I did.

Q. At that time, did they ask you about a missing person named Donnie Allen?

A. Yes, he did.

Q. Tell us what you told them when they first mentioned Donnie Allen.

A. I told them that I had the information but that I wanted my attorney to tell them and I would tell my attorney.

Q. But you didn't have an attorney at that time?

A. They told me I would not get an attorney until later, maybe a day or two after I had been processed and that they really needed to know now in case he was hurt, in case he was bound somewhere.

Q. And what did you do?

A. I did not understand my rights on that issue

Reported By: Scott A. Huseby, RPR
800-333-2082          Huseby, Inc., an Affiliate of Spherion  (704) 333-9889          Fax (704) 372-4593
Case 3:12-cv-00327-MOC  Document 104  Filed 09/23/15  Page 107 of 280
1141

JA1999

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/5/2002

Page 3164

because I was -- I wanted to tell them where he was, but I didn't know how to tell them. So I said, if you give me a piece of paper, I will show you, thinking -- I don't know what I was thinking, thinking that it made a difference.

Q. Did you either draw them a map or write out in your own handwriting where the location of Donnie Allen's body was?

A. I did both.

Q. And at that time, did someone ask you if you would take them to where Donnie Allen's body was?

A. Yes, he did.

Q. And tell us what happened with regard to them taking you out there to Morrisfield and Billy Graham.

A. They placed me in the back of the car that we had arrived in. And, I mean, these guys, 20 years, 15 years on the force, they know Charlotte like the back of their hands, but I was so nervous and confused that I was giving them directions every step of the way on how to get there, where to turn, where to go and what light, what light down is it. And it just didn't dawn on me that I was doing that, but they knew where I was referring to.

Q. When you got out there and you are in the back of either the agent's car or the police car, they

Case 3:12-cv-00327-MOC  Document 104  Filed 09/23/15  Page 108 of 280
1142

JA2000

Page 3165

stopped. What was your emotional condition at that point?

A. I was shaking, but I was very -- I just didn't know what to expect was going to happen. I looked over to my left and I saw at least maybe three or four unmarked cars, maybe two marked police cars. I can't really remember. I think one of the guys got out, went across the street, talked to a guy in a suit, came back. He asked me would I point -- I could not look over there for an extended period of time, but when I looked up and I pointed, I just -- I lost it. I started -- you know, became very emotional. I just kept picturing what happened that night, but I pointed over there.

Q. Did anybody ever come back to the car and tell you that they had found Donald Allen's body?

A. To the best of my knowledge, yes.

Q. After you sat out there for a while in the back of the car, did they take you back to the law enforcement center?

A. I was trying to calm myself. I wanted to stick my chin up and say I take full responsibility, I did something very horrible, but I was having a hard time calming myself down. So we left the area. People started to come. Cars started to pull up. I saw a helicopter. News van started to pull up. They said,

Case 3:12-cv-00327-MOC   Document 104   Filed 09/23/15   Page 109 of 280
1143

JA2001

United States of America vs. Aquilia Marcivicci Barnette    3:97CR23-V
Proceedings Before Judge Richard L. Voorhees    8/5/2002

Page 3166

let's get him out of here. So they pulled off and they went and got on Billy Graham, but I can't recall which way we went. Eventually we came back down to the old law enforcement center. And he said, Marc, he said, do you think you can identify the car? And I'm, you know, I had nothing to hide. I want them to know everything, every detail, so to me it was nothing. I said yes. He drove me to a parking garage and said is that it, and before I became upset, I said yes.

Q. Now, they took you from there into an interview room, do you remember that?

A. Yes.

Q. And at first, I believe you just sat there for a few minutes and then somebody came in to talk to you?

A. They closed the door, then they would open it. You had all of these guys walking around, looking in on me. I was sitting there, I was shaking like a leaf and he asked me, do you want something to drink and eat? Like, no. So many guys talked to me that day, I can only tell you maybe I remember one guy, but there were three, at the max three people in and out of that room. I can't remember everybody I talked to but maybe one guy.

MR. BENDER: Your Honor, at this time, I would like to play for the jury part of that videotaped

Reported By: Scott A. Huseby, RPR
800-333-2082    Huseby, Inc., an A          rion (704) 333-9889    Fax (704) 372-4593
Case 3:12-cv-00327-MOC  Document 104  Filed 09/23/15  Page 110 of 280
1144

JA2002

Page 3167

interview. This was identified by Mike Sanders.

THE COURT: Yes, sir.

MR. BENDER: The original is Defendant's Exhibit 1 in its entirety. The portion that we have is Defendant's Exhibit 1A, if we could play that at this time.

THE COURT: You may.

MR. BENDER: Your Honor, if this won't work, there is a TV with a video back in the back room, if I can just -- might be a good time to take a break and let me get it out and set it up so that --

THE COURT: All right, we will take our break at this time. Members of the jury, please remember the usual instructions. Thank you.

(The jury left the courtroom.)

THE COURT: I will ask counsel to report to me when you are ready as far as the technical preparation.

MR. BENDER: Yes, sir.

THE COURT: Thank you.

(Brief recess.)

THE COURT: Have the parties worked out the technical glitches?

MR. BENDER: I believe we have, Your Honor.

Reported By: Scott A. Huseby, RPR
800-333-2082    Huseby, Inc., an Affiliate of Suborion (704) 333-9889    Fax (704) 372-4593
Case 3:12-cv-00327-MOC Document 104 Filed 09/23/15 Page 111 of 280
1145

JA2003

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/5/2002

Page 3168

THE COURT: All right. May we have the jury, please.

THE COURT: All right.

MR. BENDER: For everybody's benefit, 1A is a 15-minute segment, but we are not even going to play all of that. We will just play a few minutes of it, if we could.

THE COURT: All right.

BY MR. BENDER:

Q. Marc, can you tell us what this is?

A. It looks like the interrogation room.

Q. Okay. And is that you sitting there with your hand over your face?

A. I believe so.

Q. Okay. Are these the two police officers that interviewed you that day?

A. The only one I remember is the one right there in the blue shirt.

(Tape played for the jury.)

MR. BENDER: Turn it off there.

BY MR. BENDER:

Q. Marc, is that you in the interview room during the first confession you made to the police that night?

A. I believe that was the first full confession, the second interview.

Page 3169

Q.    First interview occurred at the FBI office?

A.    Yeah.

Q.    Now, Marc, how old are you?

A.    29.

Q.    When were you born?

A.    July 7th, 1973.

Q.    Who is your mother?

A.    Sonia Barnette.

Q.    And were you born here in Charlotte?

A.    Yes, I was.

Q.    Who is Derrick Barnette?

A.    He's what in the past, probably since the ninth grade I've come to find out is my stepfather.  I thought he was my real father, but he is not.

Q.    And you have one brother, Mario?

A.    I have two, John McAllister as well as Mario.

Q.    John is the son of Sonia and John West?

A.    Yes.

Q.    Okay.  Was -- when you were born, was Derrick in the military?

A.    I believe actually when I was born he was in high school, but he enlisted in the military shortly after that.

Q.    And was that the Air Force?

A.    Yes, it was.

Reported By: Scott A. Huseby, RPR
800-333-2082       Huseby, Inc., an /          rion (704) 333-9889       Fax (704) 372-4593
Case 3:12-cv-00327-MOC   Document 104   Filed 09/23/15   Page 113 of 280
1147

JA2005

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees
3:97CR23-V
8/5/2002

Page 3170

Q. Do you remember living in Columbia, South Carolina with your Aunt Tessie and her husband?

A. Yes, I do.

Q. Was that at Fort Jackson?

A. Fort Jackson, South Carolina.

Q. Do you know where Derrick, your father, was at that time?

A. At that time he was serving a tour in Okinawa, Japan.

Q. So you and your mother, Sonia, were in Fort Jackson?

A. Yes.

Q. After your father, Derrick, came back to the states from his tour of duty in Okinawa, did you move back to Charlotte as a family?

A. Yes, we did.

Q. And where did you live at that time?

A. At that time I lived at 1137 Comstock Drive in Clanton Park.

Q. And was that Derrick's house, a house that Derrick had inherited from his mother?

A. Yes.

Q. And was that where you met your best friend, Steve Austin?

A. Yes.

Reported By: Scott A. Huseby, RPR
Huseby, Inc., an Affiliate of Soberion (704) 333-9889
800-333-2082          Fax (704) 372-4593
Case 3:12-cv-00327-MOC   Document 104   Filed 09/23/15   Page 114 of 280
1148

JA2006

Page 3171

Q.    And you and Steve became friends as a result of playing in the neighborhood together?

A.    Yes.

Q.    Did there come a time when Derrick was assigned or transferred to Minot, North Dakota?

A.    Yes, he was.

Q.    Did you and Sonia go with him?

A.    Yeah, I think we -- all of us went together.

Q.    Did that include Mario at that time?

A.    My recollection, I don't know, but he was there.  When he came, I'm not sure, if he was brought later.

Q.    Okay.  How long did you and the family stay at Minot, North Dakota?

A.    I'm thinking maybe a year, maybe more.  I'm not quite sure how long.  It seemed like --

Q.    Other than being very cold, do you have any memories of Minot, North Dakota?

A.    Other than there's only maybe two months of sun, it was just -- I kind of liked it.  Outside of the things that went on within the family, as far as turmoil, it wasn't all bad.

Q.    Did the turmoil begin in Minot, North Dakota, or was that your first memory of the turmoil?

A.    My first memories of Minot.

Reported By: Scott A. Huseby, RPR
800-333-2082          Huseby, Inc., an / ‾‾‾ ‾ ‾ ‾ rion  (704) 333-9889          Fax (704) 372-4593
Case 3:12-cv-00327-MOC   Document 104   Filed 09/23/15   Page 115 of 280
1149

JA2007

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/5/2002

Page 3172

Q. After the year that Derrick was assigned to the Air Force in Minot, did you come back to Charlotte?

A. Yes.

Q. And did you and Steve ever go to school together although you were neighbors?

A. Steve is two years older than me, so I always seemed to -- we seemed to just miss going to school with each other.

Q. What school did you go to after you came back to Charlotte?

A. I think I went to preschool in Minot, so when I came back, I went to Beverly Woods for kindergarten through third grade.

Q. Okay. And was there a time when you and some young girl got in trouble at Beverly Woods?

A. Yes, there was.

Q. What were y'all doing to get in trouble?

A. Oh, it was in the first grade. We had been playing around in class, so we did not get to go to the concert or whatever was going on in the gymnasium, the teacher made us stay in the classroom, so you leave a girl and a boy in a classroom in first grade age, we decided to explore birds and bees, to my teacher's surprise when she opened the door after the class came back.

Reported By: Scott A. Huseby, RPR
800-333-2082          Huseby, Inc., an /          rion (704) 333-9889          Fax (704) 372-4593
Case 3:12-cv-00327-MOC   Document 104   Filed 09/23/15   Page 116 of 280
1150

JA2008

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/5/2002

Page 3173

Q. You were basically playing doctor?

A. That's correct.

Q. Now, had you had any experience with sex or been exposed to anything like that through magazines or anything?

A. At that point it was only sneaking in my father's closet sneaking and looking at his Playboy magazines.

Q. Were you punished at school?

A. I was sent to the principal's office, as was the girl. The principal, Mr. Pangle, he pulls out this huge plexiglas paddle and I got a couple of licks.

Q. What happened when you got home?

A. He called my father right there in the office, which is the worst thing he could have done.

Q. What happened?

A. My father, he didn't give whippings, I got beatings, and that was one of the worst.

Q. What sort of beating would your father administer to you how would he beat you?

A. He used to come home from work. First he would scold me, yell at me, might smack me upside the head, he might punch me. Then he would tell me to go in my room, take off all of my clothes; and if I didn't, that pretty much made things doubly worse, so I would go in my room,

Reported By: Scott A. Huseby, RPR
800-333-2082    Huseby, Inc. an              rion  (704) 333-9889
Case 3:12-cv-00327-MOC   Document 104   Filed 09/23/15   Page 117 of 280

1151

JA2009

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/5/2002

Page 3174

take off all of my clothes. He had this leather belt almost like a shaving strap, is what it looked like to me, being that age and that small, and he is about 6'1", and he used to have this thing where he said, I'm going to beat you until I get tired, and that's exactly what he used to do.

Q. Now, what was going on with Derrick and your mother, Sonia, at that time?

A. Between the -- probably my second grade and fourth grade years was some of the worst fighting that I can remember. You name it, they fought over it, but it seemed that the recurrent thing that they always fought over was who was cheating on who, and that just -- I mean, it was some pretty bad fights.

Q. And were they physical fights as well as arguments over infidelity?

A. First, you know, you get the arguing, but it seemed to start from the time he get home, because I believe at that time she got home before he did, into the night, or it would maybe just start in the middle of the evening, even into the night. And, I mean, I don't think you could have got more physical unless they would have killed each other.

Q. What would you do with Mario when these fights started?

Reported By: Scott A. Huseby, RPR
800-333-2082          Huseby, Inc., an A---- ---- ---- ----ion (704) 333-9889          Fax (704) 372-4593

Case 3:12-cv-00327-MOC   Document 104   Filed 09/23/13   Page 118 of 280

1152

JA2010

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/5/2002

Page 3175

A.    I would lock him in the bedroom.

Q.    How much older are you than Mario?

A.    Four years.

Q.    Do you ever remember a time when Derrick hit your mother, Sonia, in the head with a hammer?

A.    Yes.

Q.    Okay.  Where were you when she got hit in the head with a hammer?

A.    I think I was in the kitchen and they were fighting over by the dining room table and I was screaming at them to stop fighting.

Q.    Did you ever see any blood on your mother?

A.    Yes.  She was bleeding, and he berated her and said, you know, you ain't bleeding, that's just lipstick, or something crazy.

Q.    Where did you go to the fourth grade?

A.    Beverly Woods ends at three, so I went to a school that was very close by, within walking distance.  Back then it was Barringer Elementary, I think it's an academy now.

Q.    Okay.  How was the home situation when you went to the fourth grade?

A.    Fourth grade was the worst.  It just got worse and worse.  You had periods of my mother trying to leave, my father not wanting her to leave.  He would

Reported By: Scott A. Huseby, RPR
Huseby, Inc., an Affiliate of Sabe---ion  (704) 333-9889         Fax (704) 372-4593
800-333-2082

Case 3:12-cv-00327-MOC   Document 104   Filed 09/23/15   Page 119 of 280
1153

JA2011

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/5/2002

Page 3176

take her keys.  He would do stuff to her car tires.

They fought all the time.  My -- abuse towards me seemed

to triple.  I got more and more beatings.  I started to

get punched, choked.  He messed my face up one time so

bad that I couldn't go to school for a week.  One time

he was beating me so bad that I ran out of house in my

underwear and I had nowhere to run so I hid under a

school bus, but he dragged me out and dragged me back in

the house.

Q.   Now, when you say your mother was wanting to

leave or threatening to leave, was that to go out and

party or leave for good?

A.   She threatened to leave for good, but there

were times when she just wanted to leave the house just

to get away from him.  But there were a lot of times

where she had got pretty much fed up to the point where

she wanted to start having a life outside of the life

with him or us.

Q.   And was there a time when you actually saw your

mother getting in a car with another man?

A.   Yes.  I -- if they started arguing, I --

sometimes if Mario wasn't there, if it was in the

afternoon, I kind of got tired of it, so I would run out

the back, and I had my favorite tree, which is, I guess

it's a eucalyptus or elm tree, and I would climb as high

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/5/2002

Page 3177

as I could, and you could hear them arguing and I could see the driveway. She left out of the driveway and walked down the street, and I could hear him yelling at her and it just -- it was a mess. I saw her go all the way down Comstock to where there is a street, I think called Darrell Lane, and I saw her get in the car with another man.

Q. Would there be nights when your mother would leave and not come home?

A. Yeah. It would be just me, Mario, my dad. We would just fix Sloppy Joe's and Kool Aid, and he would just sulk and we would sulk with him.

Q. Would there be times when Derrick would beg and cry for Sonia not to leave, not to go out with other men?

A. I remember this one instance, me and my brother were supposed to be sleeping, but we were woke up and it was just -- something was wrong. They were in the bedroom right across from ours, and I could hear my father crying and crying and crying and begging, and Mario was like, what are they doing, what are they doing. And I said, get back in the bed. So I shut the door and I snuck to the den and I watched him sit there and beg for her not to leave.

Q. Did she leave?

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/5/2002

Page 3178

A.    I can't recall.

Q.    Was there a time when you were on the school bus and you saw your mother and father stopped in the middle of the road fighting?

A.    One day -- you know, everybody in the neighborhood, I was the butt of the jokes, because my parents used to go at it, my dad used to beat my mom, so -- and I used to try to hide that, get mad at kids and stuff when they would talk about my family, so one day, you know, we were on the school bus, we were waiting, you know, get another stop, and my mother and father had -- were just leaving and they rounded at the corner, so just as my bus rounded the corner, we got on, I think Seaman Drive, and go down a hill, and my father had a very unique car, he had BMW 2002, bright orange, it was stopped in middle the street.  The school bus pulls up, and they were -- he was just punching her.  They were arguing and screaming, and the school bus driver had to go around, and all of the kids on the bus, since they know it's my car, they knew it was my parents, and they just looked at it, and it was just highly embarrassing.

Q.    If you brought home a report card that wasn't what Derrick thought you were capable of doing, what would happen?

A.    It was like I had done I don't know what to

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/5/2002

Page 3179

him, but he didn't just say, well, I'm going to punish you, put you on punishment, I got the same treatment that I got if I had done something horrible, and then he would put me in punishment on top of that. But the beatings for that were no different than if I had done something else.

Q. You were still beat with the belt?

A. He would beat me until -- I mean, he hit me in my face, mouth, back, scrotum, penis, I mean, legs. I had the biggest, reddest welts and cuts on me. I mean, he beat me until I was nothing but a crying mass of child, you know, I couldn't move, until he got tired.

Q. Where did you go in the fifth grade?

A. I think -- I went to Our Lady of Constellation.

Q. A Catholic school?

A. Yeah. You know, for some strange reason I was having trouble at school, so they thought it was my teachers, so they said, well, we will put him in private school and maybe he will straighten up.

Q. How was Catholic school?

A. It was the best.

Q. How did you get along with the strict discipline in Catholic school?

A. I mean, my father was a disciplinarian. It seemed to me that if I did anything outside of the

Reported By: Scott A. Huseby, RPR
Huseby, Inc., an A^ffili^t^ ^f S^b^rion (704) 333-9889
800-333-2082

Case 3:12-cv-00327-MOC   Document 104   Filed 09/23/15   Page 123 of 280
1157

JA2015

United States of America vs. Aquilia Marcivicci Barnette    3:97CR23-V
Proceedings Before Judge Richard L. Voorhees    8/5/2002

Page 3180

lines, I knew what was coming, so I tried not to step out of them, I did, so I got what he gave out. So when I went to school, since this was the school that he graduated from and they were very strict, they had the nuns running the class, some teachers, you got called to the nun's, mother superior's office for the smallest infraction. It was very good for me.

Q. The summer after your fifth grade, was that when Derrick and your mother, Sonia, separated?

A. Yeah. Things at home that year seemed to kind of cool off. It was almost like an ultimatum had been set somewhere, so there wasn't a lot of things going on at home. Somewhere towards the end of that year they announced to my brother and I that they were separating.

Q. And where did you go live?

A. I think he helped my mother get an apartment in Wendover Place Apartments, and that's where we relocated to.

Q. And who moved into the apartments over at Wendover?

A. It was just me, my brother, and my mom.

Q. Now, after you moved over to Wendover and your mother and father are separated, what was Sonia's conduct like?

A. I think they had been married for maybe nine

United States of America vs. Aquilia Marcivicci Barnette          3:97CR23-V
Proceedings Before Judge Richard L. Voorhees          8/5/2002

Page 3181

years, probably since she was in her teens, now she had her own place, she had her two kids, and my mom at first kept doing some of the responsible things that she had done while married to my father, she tried to furnish the home, make sure we got to school. She had a good job with State Farm. At first things were pretty okay.

Q. Okay. And then did there come time when things began to change insofar as your home life was concerned?

A. One day I just kind of noticed my mom, something was not right, and I asked her, curiously, were her and my father divorced, because they had told us they were just separated, and she broke down crying and said yes. From that point on she just spent a lot of time in her room until some of her girlfriends started to come over. After that she started to go out a lot and started to hang out with her girlfriends a lot more.

Q. And when she would go out at night, did y'all have a baby-sitter come in and stay with you?

A. No.

Q. What would happen?

A. I stayed home and watched Mario.

Q. About how old were you at that time?

A. 12.

Q. Would there be times when your mother would go

Reported By: Scott A. Huseby, RPR
800-333-2082          Huseby, Inc., an A⁓⁓⁓ ⁓⁓⁓ rion (704) 333-9889          Fax (704) 372-4593
Case 3:12-cv-00327-MOC   Document 104   Filed 09/23/15   Page 125 of 280
1159

JA2017

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/5/2002

Page 3182

out and not come back?

A. Yes.

Q. How often would that happen?

A. Every -- it was during the warmer months that she would go out, and sometimes she wouldn't come back until the next morning, sometimes it would be two days, one time it was maybe four days.

Q. Do you know if there was ever any time that Derrick came over there and -- when your mother had left you for a day or two and he took you?

A. I mean, there were so many times that I can't remember -- the instance that sticks out in my mind about that is one time my mom was gone out maybe that Friday evening, well, now it's Sunday afternoon, still no mom. My brother was playing with his friend named Drew down the block in the complex. I had saw them and told him, hey, that it's dark, you need to come home. Well, I'm sitting there -- excuse me, I'm sorry -- and the door, somebody is knocking at the door and I opened the door and it was Drew, and I said, Drew, where is Mario? He said, Mario, Mario got hit by a car. And I said, what? And he said, Mario got hit by a car. So I jumped in my jeans and ran out the door as fast as I could, ran maybe a mile, and -- because he told me where it was. And I got there, he was on the stretcher in the

Reported By: Scott A. Huseby, RPR
800-333-2082        Huseby, Inc., an        erion (704) 333-9889        Fax (704) 372-4593
Case 3:12-cv-00327-MOC  Document 104   Filed 09/23/15  Page 126 of 280
1160

JA2018

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/5/2002

Page 3183

ambulance, everybody was there. I rode with him to what I think is now CMC. And I still couldn't find my mom.

Q. Couldn't find your mother?

A. Nope.

Q. Were you able to get in touch with your aunt and have her come?

A. I had to get in touch with my aunt, my Aunt Tessie, to come out there; and if my memory serves me, I don't even think it might have been a Sunday, this might have been a Monday, because I think I called her at work.

Q. That is your Aunt Tessie?

A. That's my Aunt T. I still couldn't find my mother.

Q. You still couldn't find your mother at work?

A. No.

Q. During that period of time was your mother dating somebody named Al?

A. Yeah. She met this guy. This was probably her first boyfriend after my father, after the divorce, and she met some guy from Richmond, Virginia named Al, I can't remember his last time, but he was just no good.

Q. Did Al make your mother trade her car?

A. He used to take her out, take her out clubbing, this is when she kind of stopped hanging out with her

Reported By: Scott A. Huseby, RPR
800-333-2082      Huseby, Inc., an A........ .. ........ion (704) 333-9889      Fax (704) 372-4593

Case 3:12-cv-00327-MOC   Document 104   Filed 09/23/15   Page 127 of 280
1161

JA2019

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/5/2002

Page 3184

girlfriends and started hanging with him a lot more. Her behavior just got real weird. Her responsibleness disappeared. They would go off and hang out and be gone for two days. She had a very good job and a very sensible car. We had school clothes and everything. Once Al came, I think one of the first things he did was they were gone for two days, all of a sudden they showed back up, and it's maybe 8:00, 9:00 o'clock at night. You know, I don't know what to say, I'm mad, but she tells me, go look outside, go look outside. I go look outside, and she said, you see that, and I look and it's not the Chrysler New Yorker that she had been driving, she has got now a bright red, lipstick red 1984 Chevy Corvette.

Q. How many seats did that Chevy Corvette have?

A. Two.

Q. And how many people were in your family at that time?

A. Three.

Q. Did there come a time when you actually got evicted from your apartments on Wendover?

A. Yeah. Al, he disappeared. I stumbled across a whole bunch of checks, I don't know if they were bad checks or not, a bag of fake gold chains, I don't know what they were doing, but suddenly all of the money

Reported By: Scott A. Huseby, RPR
800-333-2082 Huseby, Inc., an rion (704) 333-9889 Fax (704) 372-4593
Case 3:12-cv-00327-MOC Document 104 Filed 09/23/15 Page 128 of 280
1162

JA2020

United States of America vs. Aquilia Marcivicci Barnette    3:97CR23-V
Proceedings Before Judge Richard L. Voorhees    8/5/2002

Page 3185

seemed to disappear. My mom couldn't pay the rent. She couldn't keep food in the refrigerator, so we had to move in the middle of the school year, of my eighth grade school year, and we had to find a place to stay. The only place we could stay was my Aunt Tessie's.

Q. Prior to being evicted and after Al left, was your mother into alcohol and drugs?

A. Yes. Before we got evicted out of Wendover, her habits had got real bad. And, you know, I was in denial about it and looking at it a certain way, trying not to see my mom in a certain light, but she wasn't just partying, she had picked up some bad habits, I think from Al, and the money wasn't going to just pay for the car, I think Al helped her develop a drug habit, and the drug at the time was just cocaine.

Q. Did you actually see evidence of that in the house?

A. Yeah. I would stumble across a plate with this white residue, cut straw, and, you know, I think everybody has seen Scar Face, you pretty much figure it out.

Q. So after you moved in with Aunt Tessie and Uncle Jeff, about how long was it -- how long did you live there?

A. Oh, we stayed there from springtime, I think

Case 3:12-cv-00327-MOC  Document 104  Filed 09/23/15  Page 129 of 280
1163

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/5/2002

Page 3186

this is 19, don't quote me, might be '85.  By the end of the summertime, I had made my aunt and uncle pretty sick of me, and they were pretty fed up with some of the stuff I was doing.

Q.   So where did you go?

A.   My mom found a house to rent on the -- some side of down I had never remembered being in, rented a house from a friend and we moved over there, which was Windsong Trails on Arrowood Road.

Q.   Was your mother, did she begin another relationship about that time?

A.   Prior to that, before we even left Wendover, she hooked up with this guy named Marc Regan.  I thought the world of him because he just seemed to have all of this money and all of these cars and stuff; but before we even moved out of my aunt's house, he was killed, so she hooked up with some guy named Tyrone who, I don't know if he had a job, he didn't have a car, but he did have a big drug habit.

Q.   Did you at any time learn that Marc Regan was one of the biggest drug dealers in the city of Charlotte?

A.   I think he was the biggest drug dealer in the city of Charlotte at that time.

Q.   What was your mother's reaction after Marc

Reported By: Scott A. Huseby, RPR
800-333-2082          Huseby, Inc., an A[illegible]ion  (704) 333-9889          Fax (704) 372-4593
Case 3:12-cv-00327-MOC  Document 104  Filed 09/23/15  Page 130 of 280
1164

JA2022

United States of America vs. Aquilia Marcivicci Barnette 3:97CR23-V
Proceedings Before Judge Richard L. Voorhees 8/5/2002

Page 3187

Regan was killed?

A. Because he came on to me as a real good guy, I really liked him, I envied him, I looked up to him; but when they told me that morning that he had been shot and killed in a money drug dispute, when my mom finally came home, because she didn't come home for a couple of days when the information came about, she called home to let me know, my cousin let me know, but she went into a spiral, a tailspin, and she didn't recover for some time after that.

Q. Were you going to Smith Junior High at that time?

A. When he was killed, it was summer time. I started at Smith. After she moved and got us a house, I started at Smith Junior High School for my ninth grade year.

Q. Any sports that you enjoyed, anything --

A. At that time I had ran track at Randolph, for the eighth grade year. So to keep myself busy, I went out for it at Smith Junior High, too.

Q. Sometime I guess around your 13th birthday, sometime around then, Derrick came and picked you up, you and Mario, took you to Steak and Ale for dinner?

A. Yes. This is before my 15th birthday. I'm 14 at this point.

United States of America vs. Aquilia Marcivicci Barnette

Proceedings Before Judge Richard L. Voorhees

3:97CR23-V

8/5/2002

Page 3188

Q. Okay.

A. I was at school and I had a track meet, and I am walking to the field, I don't think anything, it's just another day. I get to the field and I look and I see my father standing in the infield, his nice suit. He came all the way from Jersey, I guess. I don't know what's the occasion. At this point I don't have a clue about what he wants to talk to me about. I thought he was just here in town.

Well, you know, I had to try to show off, so I had to try to run at fast as I ever ran. So that night, you know, I went home on the bus. He said, I will be by to pick you and your brother up later. So this is February. I believe it's 1988.

Well, he came and picked us up and took us out. We went to Steak and Ale. I'm not really thinking about what he is here for. It's just a night out. But he said, you know, guys, I've got something I've got to tell you, and I just remember going to the salad bar, you know, ordering stuffed flounder, you know, details like that. I don't remember to this day him actually telling me that he was not my father. That's what he wanted to tells us, that DNA results said that he was not our father.

Q. And were the results true as to Mario as well?

Reported By: Scott A. Huseby, RPR
Huseby, Inc. an
800-233-2082                                        rion (704) 333-9889                    Fax (704) 372-4593

Case 3:12-cv-00327-MOC   Document 104   Filed 09/23/15   Page 132 of 280

1166

JA2024

United States of America vs. Aquilia Marcivicci Barnette    3:97CR23-V
Proceedings Before Judge Richard L. Voorhees    8/5/2002

Page 3189

A.    Yes.

Q.    What was your feeling after you learned who you thought was your father was not your father?

A.    You know, I had a great day up to that point, but everything after that was all downhill, gloom.  I remember going home, we had just come out of a big snow in Charlotte at that time.  I remember all of the lights being dark in the house, pulling back up everything seemed to be so slow, so dark, and after that I just -- something inside of me, I just really did not trust or care about my mother as much at that point.

Q.    Marc, do you know who your father is to this day?

A.    No.

Q.    Have you ever questioned your mother about it, asked her who your father is?

A.    I don't know how.

Q.    Did your mother ever tell you anything about the DNA or paternity test that Derrick had gotten?

A.    We took the test when I was maybe 11 or 12, around the time of the separation.  I think this is one of the things that prompted me to ask her were they divorced when I was around 12.  I remember going to this place way out nowhere and I remember my brother screaming, screaming when they put the needle in him,

Case 3:12-cv-00327-MOC   Document 104   Filed 09/23/15   Page 133 of 280
1167

JA2025

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/5/2002

Page 3190

because he is scared of needles, and I just remember being so angry at my father, because all my mother kept saying was, he is just doing this for Marcella, his is just doing this because of Marcella, I don't know why he is doing this, but it's got to be because of that woman.

Q. Who was Marcella?

A. That was the woman that my father had started dating and became engaged to. They are still married to this day, they have a son. He has been married probably since '86, '87 maybe.

Q. He was not living in Charlotte at that time?

A. At the time of the paternity test he was. At the time of the results, when he took us out that night, he was living in New Jersey.

Q. After your ninth grade at Smith Junior High School, where were you going to go in the tenth grade?

A. I was supposed to go to Olympic and I had my records set, my classes picked. I was going to study horticulture. They told us at the end of the year that people where I live were going to go to Providence. Providence was brand new, and I was going to be in the first class at Providence. So I had to switch some of my classes, but everybody in my neighborhood was like, yes, you know, we were going to Providence.

Q. Were you excited about that?

Case 3:12-cv-00327-MOC  Document 104  Filed 09/23/15  Page 134 of 280
1168

JA2026

United States of America vs. Aquilia Marcivicci Barnette                3:97CR23-V
Proceedings Before Judge Richard L. Voorhees                8/5/2002

Page 3191

A.    I cannot tell you how excited I was, because I didn't want to go to Olympic.

Q.    Did you ever go to Providence?

A.    Nope.

Q.    Why didn't you go to Providence?

A.    Well, apparently my mom lost her job and she didn't know what to do, same friends coming around, same old habits, same bad things, so she owed the woman we were renting from, even though we were family friends, a lot of money, we were maybe two months behind on rent. She no longer had the Vette, that got repo'd. She had a boyfriend who was doing nothing. Her sister said, hey, look, there is nothing happening for you in Charlotte, you need to come to Atlanta, you need to start fresh, make a change, so she came up with this great plan that, you know -- I didn't think she was serious until her sister sent her want ads in the mail. When I saw that, I didn't even want to give it to her, but I was -- she made the decision to move to Atlanta.

Q.    And when you moved to Atlanta, describe the living conditions when you first got down there.

A.    Before we left I went to stay with my Aunt Tessie then, see some old friends, didn't want to leave. She went down and got a job, got the U-Haul, moved our stuff, and then came back and got us. We got there, and

Case 3:12-cv-00327-MOC   Document 104   Filed 09/23/15   Page 135 of 280

JA2027

Page 3192

my aunt stayed in, it was a decent apartment, I think it was Pleasantdale, or something of that nature. It was a two bedroom, living room, dinette, kitchen, and that was it.

Q. Now, this isn't Aunt T, Aunt Tessie, you are living with, this is Shelia?

A. No. I stayed with Tessie before my mother came and got us. We had our big good-bye. Shelia is the baby sister of the three, and she was the one that lived in Atlanta. So we moved in with her while she was having a house built.

Q. Okay. And how many children did Sheila after have at that time?

A. Shelia was about to have her second child, Mikayla. She only had one previous child, which was my cousin, Ahmad. The only positive thing I got out of when we moved was I would spend more time with him, but it was, I can't tell you how devastating it was to be taken out of everything I knew and loved. Atlanta was completely alien to me, to say the least.

Q. Did there come a time fairly soon after that when Shelia's house was ready and y'all moved to Lithonia?

A. Yeah. We were staying in Norcross, Dunwoody, at first. They registered me in school not knowing if I

Reported By: Scott A. Huseby, RPR
800-333-2082        Huseby, Inc., an A        rion (704) 333-9889        Fax (704) 372-4593
Case 3:12-cv-00327-MOC   Document 104   Filed 09/23/15   Page 136 of 280
1170

JA2028

Page 3193

would go or not, but somewhere in, I think it's -- I think Mikayla was born in August, school starts, I think on the 9th, Mikayla was born, I think on the 12th, or 17th, I believe, so we moved to the house in Lithonia, which was further out in the suburbs from Norcross.

Q. And did you attend Lithonia High School?

A. I went there late because school had already started, but that was the first school that I actually attended.

Q. How did you fit in at that new high school?

A. Atlanta is completely different from Charlotte, to say the least. It's like somebody threw me in a fast moving river and I had to try to catch my breath.

Q. Did you feel out of place?

A. I was out of place. I talked with somewhat of a country accent; but compared to them I talk like I'm from New York. They asked me where I was from. I didn't know how to dress. It was just alien.

Q. Did you have a relationship with a young lady at the high school?

A. Yeah. The first person that I met that I kind of talked to that I liked was a guy, but he was a, you know, he was a jock and everything and he wanted to play football, he was new there. We went and hung out. We met this girl. She went to my school. I didn't really

Reported By: Scott A. Huseby, RPR
800-333-2082          Huseby, Inc., an A······· ·· ·······ion (704) 333-9889          Fax (704) 372-4593
Case 3:12-cv-00327-MOC   Document 104   Filed 09/23/15   Page 137 of 280
1171

JA2029

United States of America vs. Aquilia Marcivicci Barnette    3:97CR23-V
Proceedings Before Judge Richard L. Voorhees    8/5/2002

Page 3194

click with him.  I liked him, but he couldn't take Steve's place, so I kind of grasped onto a romantic relationship with this girl named Sheila Sullivan, and I spent probably 95 percent of my time with her.

Q.  Did there come a time that as a result of your relationship with Shelia Sullivan that you had to defend yourself with some other boys?

A.  Yes.  Towards the end of the school year I had this guy that had been chasing me throughout the school wanting to fight all the time, and I couldn't figure out why.  I questioned Shelia and she said she didn't know but he was trying to move in on her, she would tell him to leave her alone, but eventually he caught up to me. I kept ducking him.  He was the school bully, not one of them, but the school bully.  Eventually he caught up to me.

Q.  And did he beat you up?

A.  Not just him, but it was him and his cousin, Melvin, and they jumped me on my way home and they beat me up pretty bad.

Q.  Did you have to go to the hospital?

A.  I had to go to the hospital, got x-rays.  I didn't have to have surgery, but I had to stay out of school for probably maybe a week, week and a half.

Q.  And what happened with your relationship with

Case 3:12-cv-00327-MOC  Document 104  Filed 09/23/15  Page 138 of 280
1172

United States of America vs. Aquilia Marcivicci Barnette          3:97CR23-V
Proceedings Before Judge Richard L. Voorhees                       8/5/2002

Page 3195

Shelia after that?

A.  She kind of started showing not much interest in me, and I felt like it was just because I lost a fight.  I couldn't fight three guys, but she never explained how he wanted to fight me.

The next thing I know, we were drifting apart, and I didn't really understand that it was because of David, but somebody told me that she had actually been running around with David.  I refused to believe that, thinking that, no, you know, she loved me, you know. She was my best friend, my buddy.  I spent all of my time with her.  She was my anchor in Atlanta, trying to get my feet.  So at this time one day I look out of my math class first period and I see Sheila and she is leaving the school yard, leaving the campus.  The next day I found out why.

Q.  Did she actually leave with David that day?

A.  She left and went to David's cousin's house, who lived around the corner, and David was there with him.

Q.  Okay.  And did you later find that Sheila had been unfaithful to you and had had sex with David that day?

A.  Not only did I find out that she had had sex with David, but she had sex with David and his cousin

Case 3:12-cv-00327-MOC  Document 104  Filed 09/23/15  Page 139 of 280
1173

JA2031

United States of America vs. Aquilia Marcivicci Barnette    3:97CR23-V
Proceedings Before Judge Richard L. Voorhees    8/5/2002

Page 3196

that day. I found out that the next day when she didn't come to school.

Q. How did you feel about this relationship and what had happened in it?

A. That was the first time I had ever felt that. It made me feel horrible. It hurt real bad, but it was the first time I had ever felt that, a serious betrayal. It kind of vaguely felt like somebody that happened when I was a child, but I couldn't connect it. It was just a serious back stabbing, serious betrayal, with a lot of hurt and a lot of pain.

Q. How did you try to get rid of that pain?

A. I tried to kill myself.

Q. How did you try to do that?

A. Pills.

Q. Sleeping pills again, or for the first time?

A. I couldn't hear you.

Q. Was it sleeping pills?

A. I had some pills when I first moved to Atlanta, I don't know if it was the water or whatever, but I just broke out. My aunt took me to the dermatologist and I had some pills, but they all made me sick, and I mean, they made me violently sick. So I took every last one of them, knowing that whatever happened to my body I wouldn't be able to handle it and something would

Reported By: Scott A. Huseby, RPR
800-333-2082          Huseby, Inc., an A~~~~ ~ ~~ ~ ion (704) 333-9889          Fax (704) 372-4593
Case 3:12-cv-00327-MOC   Document 104   Filed 09/23/15   Page 140 of 280
1174

JA2032

United States of America vs. Aquilia Marcivicci Barnette 3:97CR23-V
Proceedings Before Judge Richard L. Voorhees 8/5/2002

Page 3197

happen.

Q. Did the EMT or the emergency people come and take care of you?

A. I had got Shelia on the phone, told her what I had done, asking her how could she do this. I knew what happened that day in that apartment. David's cousin told me everything that happened. And she tried to deny it. She said, what are you doing? I said, no, I can't take this, I can't take this, you were everything. So she just said, hold on, and she clicked over and she came back and she kept talking to me. No more than five minutes later EMT or paramedics walked around my house over to where I was sitting.

Q. After that episode and after that school year, did Sonia, your mother, actually get her own apartment and moved out of the house with Sheila?

A. At the end of the school year we got an apartment in a place called The Crossings.

Q. When you were living in the house in Lithonia, what was going on with Shelia and Sonia during that period of time?

A. After that house was built and Mikayla was born, this is '88, things were fine up until probably after Christmas. After Christmas, New Year's '99, there was a lot of going out, a lot of hiding in the bathroom

Reported By: Scott A. Huseby, RPR
800-333-2082       Huseby, Inc., an A          ·ion (704) 333-9889        Fax (704) 372-4593
Case 3:12-cv-00327-MOC   Document 104   Filed 09/23/15   Page 141 of 280
1175

JA2033

United States of America vs. Aquilia Marcivicci Barnette          3:97CR23-V
Proceedings Before Judge Richard L. Voorhees          8/5/2002

Page 3198

in Sheila's bedroom, and at the time I couldn't figure out what was going on, they were just acting weird.  And that's all I kind of remember.  It was starting to be -- funds were starting to be low.  It seemed to be something that I had seen before, but I couldn't put my finger on it because I spent so much of my time with Mikayla, my brother, and my little cousin Ahmad.

Q.    Same sort of thing, going out at night, not coming back?

A.    There was some of that where they would go out, maybe come back early the next day, but it was just more of a -- they were kind of whooping it up.  And they tried to hide it, but I kept the kids kind of behind me in the whole scheme of things, but I was witnessing what was going on.

Q.    Were there times when there might not be food in the house?

A.    Yes.  Little kids growing up, Ahmad, Mario, go outside and play and come back in and nothing to eat.  There was nothing I could do about it.  That's some of the things that happened.

Q.    In that apartment complex that you were talking about where your mother and you and Mario moved, was there any furniture in that apartment?

A.    We had a living room set that we had since she

Reported By: Scott A. Huseby, RPR
800-333-2082          Huseby, Inc., an Af~~~~~ ~~ ~~~~~~~ion  (704) 333-9889          Fax (704) 372-4593
Case 3:12-cv-00327-MOC   Document 104   Filed 09/23/15   Page 142 of 280
1176

JA2034

United States of America vs. Aquilia Marcivicci Barnette     3:97CR23-V
Proceedings Before Judge Richard L. Voorhees     8/5/2002

Page 3199

split up from my father, an old water bed that didn't work, and that was it.

Q. Did you have a bed?

A. No.

Q. Did Mario have a bed?

A. No.

Q. One day you saw somebody walking through the parking lot headed toward the swimming pool of that apartment. Did you find out who that was? Did you follow her over there?

A. Yeah. I followed her over to the swimming pool and we met and we talked. She later became the mother of my children, that was Tosha Herd at that time.

Q. Did you and Tosha fall in love?

A. At first it was a -- it was more lust, but we just instantly clicked. It was so deep the first night and we found out that we had so much in common. We had a lot in common as far as backgrounds and things like that. It was amazing.

Q. Did you share with her what had gone on in your life with your mother and your father and the abuse?

A. That was the first time I had opened up and found somebody that I could talk to. I didn't realize the things that I was carrying, but she just absorbed it and listened to it because she had gone through so much

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/5/2002

Page 3200

of the similar stuff, so she listened to me.

Q. That summer after you met Tosha, did you go visit Rick and his family, or Derrick and his family in New Jersey?

A. I met with Tosha. A lot of the things of bonding that happened with Tosha and I didn't happen until school started. I met Tosha like two or three days before I went to Jersey, and I stayed in Jersey, Philly, Charlotte, and just had this big summer break paid for like some by my mom, dad, grandfather. It wasn't until after I came back that Tosha and I really bonded and started hanging together a lot.

Q. What grade were you in at that time?

A. That was supposed to be my tenth grade year; but because of the things that happened with Shelia, I didn't go to school a lot at the end of my tenth grade year, so they had me in 11th grade, but I still had tenth grade English, which that's just the way the school system worked, so as soon as I finished tenth grade English, I could make up my 1th grade English, the next year I could go to 12th grade.

Q. And what grade was Tosha in?

A. Tosha was a subfreshman. She was supposed to be in the ninth grade, but she was in her eighth grade year.

Reported By: Scott A. Huseby, RPR
800-333-2082        Huseby, Inc., an Affiliate of Spherion  (704) 333-9889        Fax (704) 372-4593
Case 3:12-cv-00327-MOC   Document 104   Filed 09/23/15   Page 144 of 280
1178

JA2036

United States of America vs. Aquilia Marcivicci Barnette     3:97CR23-V
Proceedings Before Judge Richard L. Voorhees                    8/5/2002

Page 3201

Q.    And you say y'all began to bond?

A.    Yes.

Q.    What did that mean in terms of going to school, seeing each other, that sort of thing?

A.    That meant we stopped going to school for the most part. We went for a long time, but I carried over this sudden bad habit I had of skipping school, but it didn't seem bad, because with Tosha, we hung out, we would go down to Underground, we would ride the MARTA. We would just hang out all day long, and it seemed like nothing mattered but us two.

Q.    When you say bond, what does that mean to you?

A.    It's just something that you can't pull apart.

Q.    Did you ever see Tosha with another man?

A.    When we first started dating, I thought that I saw her with another guy.

Q.    Where did you think you saw her?

A.    I thought I saw him come out of her apartment when I had come home from school early in the afternoon, me and my best friend Kenny at that time.

Q.    Did you confront her with it?

A.    I went back to the house and Kenny said he was leaving, I called Tosha to the house, and that's the first time I ever hit a girl.

Q.    Did she fight back?

Case 3:12-cv-00327-MOC   Document 104   Filed 09/23/15   Page 145 of 280
1179

JA2037

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/5/2002

Page 3202

A. Yes, yes, Tosha did fight back.

Q. Now, when did you learn that Tosha was pregnant with your child?

A. I think it might have been March of 1990.

Q. What sort of discussions did y'all have that centered around her pregnancy?

A. We talked about -- at first we were scared, as anybody who is 16, 14, who gets pregnant. We discussed about having an abortion, because it didn't seem like we were going to get any help because of the kind of parents that we felt we had. My mother didn't seem to care until I brought that up, and her whole personna seemed to change and she was like, oh, no, that's not an option. So as we knew things would be better, our families would be supportive, I continued to good to school, Tosha kept going for a little bit, but then we both dropped out. We just talked about what was not going to happen to our children, which was the things that had happened to us growing up.

Q. How old was Tosha at that time?

A. When I met Tosha, she was 13, turning her 14th birthday. At this time she was still 14 when she got pregnant.

Q. Did you actually go with her to the prenatal care?

Reported By: Scott A. Huseby, RPR
800-333-2082          Huseby, Inc., an          arion (704) 333-9889          Fax (704) 372-4593
Case 3:12-cv-00327-MOC   Document 104   Filed 09/23/15   Page 146 of 280
1180

JA2038

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/5/2002

Page 3203

A.    I never missed prenatal, hospital tour, Lamaze class.  If I had to leave school, so what?  This was my baby girl coming into the world.  I had all of the ultrasounds.  I didn't miss anything.

Q.    Sometimes you actually would have to ride the bus?

A.    We rode the bus.  I mean, we lived in Lithonia. If you have ever been to Atlanta, you know that it's a suburban city.  You catch the 86 Lithonia to Atlanta, that takes 30 minutes; then you catch the MARTA train to God knows where we had to go, that takes another 30 minutes, and then you walk.  Everything is too spread out.

Q.    And your mother, Sonia, is the one that insisted that there not be an abortion?

A.    Yes.  We were getting desperate; but when I brought it to my mother's attention one day, she said, that's not an option.

Q.    Did you actually do something to get ready for the baby?

A.    I had to make a decision.  I had screwed up that school year so bad in 1990 that I had to figure out what I was going to do.  So I went and got a job, wanted to start saving money, I knew I needed income to take care of her, because I wasn't going to depend on people

Reported By: Scott A. Huseby, RPR
800-333-2082          Huseby, Inc., an          :rion  (704) 333-9889          Fax (704) 372-4593
Case 3:12-cv-00327-MOC   Document 104   Filed 09/23/15   Page 147 of 280
1181

JA2039

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/5/2002

Page 3204

who I didn't know if I could depend on in that situation. So I went and -- started going to Home Depot, started buying paint, started shopping for a crib, stroller, car seat, you name it. I went to take care of my business.

Q. When was your daughter born?

A. September 29th, 1990.

Q. Were you actually in the delivery room?

A. I helped calm Tosha down when she got the epidural. I was there -- I never left. They made me leave actually for a few hours, but I went in the waiting room, I slept, I would not leave her side. I fed her ice chips, everything. I think she was in labor for maybe 17 hours. When it was actually time for the birth, I helped with the birth, helped her breathe, helped her push.

Q. What was your feeling at that time?

A. Excitement, fear, trepidation.

Q. We have heard about a newspaper that you bought that day. This is Defendant's Exhibit 40. Can you identify that?

A. When Angelica was born, I was bouncing through the roof. I ran out, and I think one of my mom's friends had came by and brought me something to eat. And I looked and saw this Atlanta Journal and

Reported By: Scott A. Huseby, RPR
800-323-2082     Huseby, Inc., an       ion (704) 333-9889     Fax (704) 372-4593
Case 3:12-cv-00327-MOC  Document 104  Filed 09/23/15  Page 148 of 280
1182

JA2040

Page 3205

Constitution newsstand, and I just thought, you know, that would be great, if she would know what was going on in the world the day she was born, so I bought this newspaper for her.

Q. Is that newspaper for her?

A. That's Angelica's newspaper.

Q. After Angelica was born, did you and Tosha live together?

A. No. She still stayed in her apartment with her mother. I still stayed in between apartment and my aunt's house until my mom got her new apartment.

Q. Sometime after that did Tosha and Angelica move to Newnan, Georgia?

A. After Tosha got pregnant with little Marc.

Q. And how many years between Angelica and little Marc?

A. Oh, maybe only 15 months, maybe.

Q. And when she moved to Newnan, did you move down there with her?

A. Actually, no. She was pregnant for awhile, and Tosha's mother and I, we never got along. Her mother was a Jehovah's Witness and Tosha was possessed, as her mother would say, and she blamed a lot of it on me. So when she found out she was pregnant again, she said, that's it, you've got to find somewhere to go, I don't

Case 3:12-cv-00327-MOC   Document 104   Filed 09/23/15   Page 149 of 280

1183

JA2041

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/5/2002

Page 3206

care where. The only place Tosha could go was Newnan, Georgia. I at the time stayed with my aunt while Tosha was pregnant with little Marc, but she moved to Newnan while she was pregnant with him.

Q. Was it during the pregnancy of Angelica or the pregnancy of Marc that y'all had problems and you pushed her down on the sidewalk?

A. That was during her first trimester with Angelica.

Q. And was that as a result of you seeing her talk to some man or young man on the bus?

A. Yes.

Q. Okay. What sort of feelings did you have when you saw that that would cause you to push your pregnant wife down on the concrete?

A. We had been to Underground that day and had just a wonderful day, but this guy had went to school with us and he would always try to talk to Tosha and I hated him. When she saw me talk to this girl at the Five Points MARTA station, she slapped me. I didn't know what to do. But when we got on the bus and she started talking to him, she wouldn't talk to me, she ignored me, she paid me no attention, and it made me feel such a slight, I didn't know how to take it. It was embarrassing. I felt hurt. I didn't know -- I

Reported By: Scott A. Huseby, RPR
800-333-2082          Huseby, Inc., an A            rion (704) 333-9889          Fax (704) 372-4593
Case 3:12-cv-00327-MOC   Document 104   Filed 09/23/15   Page 150 of 280
1184

JA2042

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/5/2002

Page 3207

don't really know how to explain it.

Q. But you did push her down while she was pregnant?

A. Yes, I did.

Q. When did the two of you move in together in Newnan, Georgia?

A. Little Marc was born on New Year's Eve 1991. I was working for my mom at the time. The pressure was tremendous. She had moved back to Atlanta and was staying with her mother. Her mother was fine with it, as far as I know, but me and her couldn't get along. I knew that this was my responsibility. I was only working to find us a place to stay. I believe this is -- I'm 17 or 18 years old at the time, and I know that I have to find a place. So in March of '91, when Marc was approximately three months old at the time, I signed a lease in Newnan, Georgia, because it was the only place I could afford at the time, working on minimum wage and temp jobs.

Q. Okay. That was probably March of '92 if Angelica was born in September of '91?

A. Angelica was born in September of '90; Marc was born in December of '91, so he was about three months old at the time we moved in.

Q. So that was in March of '92 that y'all moved

Case 3:12-cv-00327-MOC   Document 104   Filed 09/23/15   Page 151 of 280

1185

JA2043

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/5/2002

Page 3208

in?

A.    It was March of '92 when we moved in.

Q.    Were you working at that time?

A.    I was still working for my mom at a temp service in Midtown Atlanta.  If they had a job, no matter where it was, hey, I will go get it.  But I didn't know what I was going to find.  I'm a high school dropout, got two kids.  Under Georgia law what we are married, common law, so my wife was unemployed, she was getting WIC, food stamps.  She wasn't getting a welfare check yet, so the only thing I could do, I wanted to be able to find a place close to the apartment, so I got a job at a fast food restaurant.  That's all I could find.

Q.    And was that Arby's?

A.    That was Arby's of Newnan.

Q.    Was that within walking distance of the apartment?

A.    6 minutes walking distance.

Q.    How long did y'all live under that arrangement?

A.    Not long, maybe another three months.

Q.    What happened that caused that relationship to go bad?

A.    I met a guy named Anthony Britt, and Tosha and I, we started having a lot of problems, bills.  You name it, we argued over it.  It got so much to the point

Reported By: Scott A. Huseby, RPR
800-333-2082          Huseby, Inc., an Affiliate of Subervion (704) 333-9889          Fax (704) 372-4593
Case 3:12-cv-00327-MOC   Document 104   Filed 09/23/15   Page 152 of 280
1186

JA2044

United States of America vs. Aquilia Marcivicci Barnette 3:97CR23-V
Proceedings Before Judge Richard L. Voorhees 8/5/2002

Page 3209

where when I would go to work, I would stay maybe an hour later than I had to, hang in the parking lot with some friends before I would go home just to make sure she was asleep because I didn't want to argue.

The only person that would wait up would be Jelly Bean, my daughter. She would wait and wait and wait. She wouldn't go to sleep until I got home. But it just kept going on, and I met a guy named Anthony, he was best friends with the guy next door, and we started hanging out and he introduced me to his half sister, which you met, who is pregnant now, Crystal Dennis.

Q. Were you also physically abusive to Tosha during these times?

A. I would come home at night. If she was awake, we would argue and I would smack her and we would fist fight, and sometimes the kids would see it, sometimes they would be asleep but they would wake up.

Q. Did you, shortly after that, begin seeing or going over to the apartment or the house of Crystal Dennis?

A. Yeah. I started to go and hang out there at night because I didn't want to fight in front of the kids, I didn't want to fight Tosha, I wanted things to work, but I started spending most of my late nights going over to Crystal's house playing cards and hanging

Reported By: Scott A. Huseby, RPR
800-333-2082 Huseby, Inc., an ⸺ rion (704) 333-9889 Fax (704) 372-4593
Case 3:12-cv-00327-MOC Document 104 Filed 09/23/15 Page 153 of 280
1187

JA2045

United States of America vs. Aquilia Marcivicci Barnette    3:97CR23-V
Proceedings Before Judge Richard L. Voorhees    8/5/2002

Page 3210

out with her family and I would come home at 2:00 in the morning just so I could avoid arguing or jumping on Tosha.

Q. And what was the Anthony Britt's role in all of this at this time?

A. I thought he introduced me to Crystal, just so -- you know, guys do that sort of thing, he didn't have respect for the family unit, and at that point neither did I. But I found out later that why I was over at Crystal's or I would call home from Arby's, Anthony would be at my apartment, and I started to put two and two together that the only reason he introduced me to her was so I wouldn't be there when he wanted to mess with Tosha.

MR. BENDER: Your Honor, I'm beginning to go into another relationship and I didn't know whether you wanted to stop at this point.

THE COURT: No, sir. I think we will move along just a few more minutes.

MR. BENDER: Okay.

BY MR. BENDER:

Q. Now, did you begin spending more and more time with Crystal Dennis than you did with Tosha?

A. Yes. I would spend almost every night, whether I worked or not, sometimes during the daytime. I would

Case 3:12-cv-00327-MOC   Document 104   Filed 09/23/15   Page 154 of 280
1188

JA2046

United States of America vs. Aquilia Marcivicci Barnette    3:97CR23-V
Proceedings Before Judge Richard L. Voorhees    8/5/2002

Page 3211

take her son and daughter out and ride around with me. I started pretty much ignoring Tosha because I felt no matter where I turned there would be Anthony, he would be coming around.

Q. Did you actually move out with Tosha or have Tosha move out?

A. After I got out of jail, the day I got out of jail from pleading guilty to the charges about the shooting with the aunt, I came straight home, I brought Crystal with me, and I told Tosha she had to leave because of the things that I had been hearing.

Q. You mentioned being in jail because of the shooting of Anthony Britt. The jury has heard testimony from, I think Detective Rigs about that involvement. Was it pretty much the way he told it?

A. Yeah. I mean, the only detail is that the rumor at the time was Tosha had sent Anthony to jump on me and he was playing both of them, telling Crystal things that I was about to tell her that I wanted to work it out with Tosha and I didn't have any interest in her past friendship. He threatened to kill me that night; and if you knew Anthony, he sold dope, he was one of the bad boys, and I thought he was serious. That's the only reason I shot him, is because him and the guys he was with were serious, the guys were telling him to

Reported By: Scott A. Huseby, RPR
800-333-2082    Huseby, Inc., an /    rion (704) 333-9889    Fax (704) 372-4593
Case 3:12-cv-00327-MOC   Document 104   Filed 09/23/15   Page 155 of 280
1189

JA2047

United States of America vs. Aquilia Marcivicci Barnette     3:97CR23-V
Proceedings Before Judge Richard L. Voorhees     8/5/2002

Page 3212

slap me and he said he was going to kill me, and I had tried to avoid him up to that point because I knew his reputation. That's the only thing different than that.

Q. How long did you spend in jail as a result of that shooting?

A. 28 days, until I pled guilty.

Q. Did Crystal ever come visit you while you were in jail?

A. I tried to get Tosha to come visit me, but she wouldn't. Crystal came up every weekend, she wrote me letters, she gave me money, took care of me. Every time I would call the house, I would get lip from Tosha. They would tell me that Anthony had been staying over there, he had basically moved into my apartment. She had brought her friend from Atlanta and she was dating Ant's friend and they were having a big ball. She let the phone get cut off, let the rent lapse, the light bill lapse. That's a lot of the reason that when I came home, I told her she had to leave, because she had let him move into my apartment.

Q. And did she move out at that time, that is, Tosha?

A. Yes, she did.

Q. Did she take your two children with her?

A. I thought that she was moving to her sister's

Case 3:12-cv-00327-MOC  Document 104  Filed 09/23/15  Page 156 of 280
1190

JA2048

United States of America vs. Aquilia Marcivicci Barnette                    3:97CR23-V
Proceedings Before Judge Richard L. Voorhees                              8/5/2002

Page 3213

apartment behind mine where I could see my kids, but she

didn't stay over there long, maybe a couple of weeks.

Then she moved and took the kids from that area and

moved to her grandmother's house where she had

previously stayed.

Q.    And shortly after that did Crystal Dennis move

in with you?

A.    About a week later she moved in.

Q.    And I believe Crystal Dennis had two children

by a prior relationship?

A.    Yes, she did.

Q.    And did they live with you, too?

A.    Yes, they did.

Q.    Tell us what the relationship was between you

and her children.

A.    It was -- I treated her children no different

than I treated mine, I took them to the park, I did

everything I could for them.  They had two different

fathers and they didn't get to see him that much.  They

were kind of like of aunt's elk, that's where they hung

out, those are the kinds of things they did.  She had

lived with one of them previously and he had beaten her

up pretty bad, and I knew that and I wanted to take care

of them, so at that time I just was -- it was great.

You know -- but the thing that happened was Tosha

Case 3:12-cv-00327-MOC  Document 104  Filed 09/23/15  Page 157 of 280
1191

JA2049

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/5/2002

Page 3214

started to spread a rumor that I loved Crystal's kids more than my own, which wasn't true. That's how good I treated them.

Q. Did you go back to work at Arby's, or were you not working at that time?

A. My manager was real cool. I explained to him what happened that night. He gave me my job back. I worked that job for a good couple of more months, until the summer months. Then I got another part-time job, so now I had three jobs, basically.

Q. What kind of bonding did you and Crystal have at that time?

A. There wasn't much bonding with Crystal. Crystal filled a need. I tried to bond with her kids more than her. I didn't want it to be over between Tosha and I. It was very devastating to how that ended. So Crystal and I, it was the physical thing. It was more important at that time with her. I needed somebody to be there for me, and that's what all it was.

Q. More of a sexual thing --

A. Basically.

Q. -- than love and the bonding?

A. Basically. I still loved Tosha at the time. It was physical.

Q. Was Crystal working also at that time?

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/5/2002

Page 3215

A. At that time, no, she wasn't. She had -- she was about to get ready to go back to school, but because she changed addresses, she couldn't go to Newnan High anymore, they told her she had to go way out to East Coweta High School. I wasn't too much out of school, so I told her -- you know, she got WIC, she got food stamps. There was no reason for her to go to work if she didn't want to. I had two jobs that I alternated between, Arby's and I got another job, and I told her that I needed to go back to school, so we started going to East Coweta together.

Q. Did you have a car?

A. I still had my all time favorite car, yes.

Q. Volkswagon Beetle?

A. Volkswagon Bug.

Q. And was that the way y'all had transportation back and forth to school?

A. Yes.

Q. How long did you and Crystal Dennis stay in school?

A. Maybe two weeks.

Q. Then what happened?

A. I couldn't pay my bills, make enough money. I needed to work day and nights, I couldn't just work night shift, so I told her I had to, quit and she

Reported By: Scott A. Huseby, RPR
800-333-2082          Huseby, Inc., an A⁻⁻⁻⁻ ⁻⁻ ⁻ rion (704) 333-9889          Fax (704) 372-4593
Case 3:12-cv-00327-MOC   Document 104   Filed 09/23/15   Page 159 of 280
1193

JA2051

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/5/2002

Page 3216

decided that she would quit, too, and get a job.

Q. Did she get a job?

A. Yes, she did.

Q. Where did she work?

A. She went to a temp service first, they placed her in a textile plant, and she stayed there for a good while.

Q. What shift was she working?

A. She alternated between day shift and evening shift.

Q. And what shift or shifts were you working?

A. Oh, I worked -- at that time I started working morning shift. I was working some night shifts at Blockbuster, so I was just basically work those two jobs, night and days.

Q. One day you were baby-siting her children, she was at work?

A. That didn't occur until after she moved out of the apartment. I helped her find her own apartment, because at that point, with me working and taking care of her kids, I wasn't taking care of mine, so she got an apartment in the complex adjacent to mine and she still worked at the same textile plant. And the night you are referring to by the child abuse occurred on a night where she worked the evening shift and got off at night.

United States of America vs. Aquilia Marcivicci Barnette       3:97CR23-V
Proceedings Before Judge Richard L. Voorhees       8/5/2002

Page 3217

Q.   Tell us what happened while you were there with her children.

A.   I had been going through the mix with going to see Tosha, and I had another girlfriend at the time, and me and Crystal would argue about my other girlfriend, people would tell her a lot of stuff.  So I was off that day, or I had worked early day shift and Crystal went to work that night.  I had the kids with me and I was baby-sitting them.  Cortez wouldn't finish his food and Nicki didn't really do anything at that point, so I sent them upstairs.  If you know Crystal's kids at that time, they were very rambunctious, so it got real quiet upstairs.  I go upstairs to see what is all the hush, and that's when I saw them together playing doctor, if you will.

Q.   And when you found them playing doctor, what did you do?

A.   I flew into a rage.  Something inside of me clicked or snapped, however you say it.  All the things that had been going on between Crystal and I, I had a lot of pressure; but when I saw that, I felt like they were -- it was aimed at me.  I don't know how to explain it, but that's just the way I felt.  So I grabbed a coat hanger out of the closet, a metal coat hanger, and I took Mario downstairs, told him to go downstairs, and I

Reported By: Scott A. Huseby, RPR
800-333-2082       Huseby, Inc., an A_____ ____ion (704) 333-9889       Fax (704) 372-4593
Case 3:12-cv-00327-MOC  Document 104  Filed 09/23/15  Page 161 of 280
1195

JA2053

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/5/2002

Page 3218

went behind him, and I started to just whip him and whip him. I went back upstairs and I whipped Nicki just a little bit. And I told them, I said, you two can't do that, you two are brother and sister. I said, and I think you two have been told about that before, when Crystal's mother had disciplined them for it. I said, I'm going to tell your mother when she gets home, and that's what happened.

Q. Did you go pick up Crystal?

A. Yeah. They -- I kept Mario downstairs with me, Nicki was upstairs. By the time it was time to pick up Crystal, we got in the car I had bought Crystal, because the bug wasn't running, so we drove out to her job, picked her up, and they were real quiet. And she said, hey, guys, what is going on? And I said, they got in trouble. She said, what did y'all do? I said, I will tell you when we get home. So we drove home. And I told her that they would tell her what happened.

Q. And did you?

A. They told her what had happened. I did not tell her about the coat hanger, because after I had done it, I realized what I had done. But I wanted to tell her at a later time and explain it to her how I got to that point. So I think maybe it was the next day, she -- it was a Friday, she sent them to stay with her

Case 3:12-cv-00327-MOC   Document 104   Filed 09/23/15   Page 162 of 280
1196

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/5/2002

Page 3219

mother and we just went about our workday and nothing happened that Friday.

Q. When did something happen with regard to her children?

A. The next day her mother Sylvia shows up with her aunt and her cousin and they -- it was right when we pulled up from picking her up from work again. They came in and said they were going to call the police on me, they had seen what I did to Mario and Nicki, how could I do that, why did she let me do that, and they said, we are going to send you to jail for child abuse.

Q. And you took her car and left?

A. I took the Toyota Corolla and I left. I said, I am not staying here. I said, you are going to let her take to me that way. I said, you didn't explain to her what happened. At the time I didn't -- I understood what I did; but when she came and she was accusing me of child abuse, I thought that if I could apologize, it would be okay, because I didn't fully understand that I was doing some of the same stuff that happened in my past, and I was not ready to hear it from somebody else. So I left and went to Sandy Springs in north Atlanta.

Q. And did you ever call back or get back in touch with Crystal?

A. That was the first day I called, talked to her,

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/5/2002

Page 3220

asked her why she had let her mom and her aunt accuse me of child abuse. I said, we need to talk. So I borrowed the keys to my aunt's truck and I went back to Newnan, and this is the next day, which I think is on a Sunday. Crystal's mom wasn't at home, so I picked her up from her mother's house and I took her to her apartment, and that's when we got into it and I attacked her about the child abuse and why she had let them call the police on me. I felt like she was doing something to me, even though it was me who was at fault.

Q. You said you attacked her. What did you do?

A. I punched her and I beat her up.

Q. When were you arrested on that charge?

A. I left her apartment, drove back, picked up the Toyota, stayed there for awhile, talked to her on the phone. She wanted her car. I didn't want to bring it back because I knew they would arrest me, but I said okay. As soon as I pulled into the projects where her mother stayed, I was arrested.

Q. And you were charged with felony child abuse at that time?

A. Yes.

Q. Did you go back to jail?

A. Yes.

Q. How long did you spend in jail this time?

Reported By: Scott A. Huseby, RPR
800-333-2082          Huseby, Inc., an /          rion (704) 333-9889          Fax (704) 372-4593
Case 3:12-cv-00327-MOC   Document 104   Filed 09/23/15   Page 164 of 280
1198

JA2056

Page 3221

A.    I can't recall.  It was January when this happened.  I think I was pled guilty and received probation in maybe March.

Q.    While you were in jail did Crystal come visit you?

A.    Yes, she did.

Q.    Did she bring her kids with her?

A.    Yes, she did.

Q.    Was there ever a time when you got to see your children --

A.    No.  Tosha and I had been falling out, if you will, back and forth.  Since now I had had Crystal live with me, we weren't on speaking terms.  She told me that I would never see the kids again.  She had me arrested for trespassing at one time for trying to come see Angelica, so Tosha and I were on absolutely nonspeaking terms.

Q.    After you got out jail and were placed on probation, could you move -- could you go back with Crystal in her apartment?

A.    They gave me probation, but I still couldn't get out because of the simple assault to her.  She gave some money to a mutual friend of ours to come bond me out, it was a $50 bond.  I went straight -- if you know where the jail is to where she lives, it's a three- to

Case 3:12-cv-00327-MOC   Document 104   Filed 09/23/15   Page 165 of 280
1199

JA2057

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/5/2002

Page 3222

five-minute walk. You can see the jail from the apartment. So I went straight back to the apartment, and her and Cortez, Mario, were there when I got there.

Q. But you couldn't stay there, could you?

A. No. I was there for maybe a good week. DSS had said that if I was allowed to come back, that they would take the kids. Her mother had told them that she was going to let me come back and say. She told me that her uncle was looking for me, her cousin was looking for me, and Mario's father was looking for me, and Jessica's father was looking for me. On top of that Anthony was ready to try to get me back, so he was looking for me also.

Q. While you were in jail, did you call Crystal repeatedly?

A. Yes. I called her until the phone got cut off because she didn't have any help paying her bills since I was locked up, so I called her at her mother's, and I talked to her sister sometime, her sister would tell me where she was.

Q. You said you couldn't stay at Crystal's house. Where did you go?

A. I got -- my girlfriend I had on the side, she got me a place to stay for the night, but I had nowhere to go. The only people in Newnan were my two kids and

Reported By: Scott A. Huseby, RPR
800-333-2082   Huseby, Inc. an   sion (704) 333-9889   Fax (704) 372-4593
Case 3:12-cv-00327-MOC   Document 104   Filed 09/23/15   Page 166 of 280
1200

JA2058

Page 3223

Tosha, and she had a boyfriend.  And like I said, we had a big falling out.  The only place I could go was back to Charlotte.

Q.    How did you get back to Charlotte?

A.    My family wired me some money through Western Union.  The friend girl I had was angry and she tried to get me to stay, but she didn't have any place for me to stay for any more than one night, so I told her, I said, I've got to go, I've got my bags, I bought a bus ticket and I caught a bus back to Charlotte.  That was March '93.

MR. BENDER:  Your Honor --

THE COURT:  It's 5:00, members of the jury.  We will take our break at this time.  Please keep an open mind about the case.  Remember the other instructions, avoid any discussions about it with anyone and avoid any publicity, if there is any, and that sort of thing.  Thank you very much.  It will  be 9:30 in the morning, as before.

(The jury left the courtroom.)

THE COURT:  Anything for the Court before we adjourn for the evening?

MR. BENDER:  No.

THE COURT:  Thank you.

* * *

Reported By: Scott A. Huseby, RPR
800-333-2082    Huseby, Inc., an A          ion  (704) 333-9889    Fax (704) 372-4593
Case 3:12-cv-00327-MOC  Document 104  Filed 09/23/15  Page 167 of 280
1201

JA2059

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION

UNITED STATES OF AMERICA ) DOCKET NO. 3:97-cr-23-V
)
vs. )
)
AQUILIA MARCIVICCI BARNETTE, ) VOLUME 17
) MORNING
Defendant. )
_____)

TRIAL PROCEEDINGS
BEFORE THE HONORABLE RICHARD L. VOORHEES
UNITED STATES DISTRICT COURT JUDGE
AUGUST 6, 2002

APPEARANCES:

On Behalf of the Government:

    ANNE M. TOMPKINS, ESQ.
    JILL WESTMORELAND ROSE, ESQ.
    227 West Trade Street, Suite 1700
    Charlotte, North Carolina

On Behalf of the Defendant:

    JEAN B. LAWSON, ESQ.
    P.O. Box 472106
    Charlotte, North Carolina

    HAROLD J. BENDER, ESQ.
    200 North McDowell Street
    Charlotte, North Carolina

               Cheryl A. Nuccio, RMR-CRR
               Official Court Reporter
             United States District Court
              Charlotte, North Carolina

TUESDAY MORNING, AUGUST 6, 2002

THE COURT: May we have the jury, please.

(Jury entered the courtroom.)

THE COURT: All right, sir. The jury is with us.

MR. BENDER: Thank you, Your Honor.

AQUILIA MARCIVICCI BARNETTE,

DIRECT EXAMINATION (Cont'd.)

BY MR. BENDER:

Q. Marc, yesterday when we ended, you had told us about getting some money from your mother to get on the bus from Noonan, Georgia, to come back to Charlotte. And did you do that?

A. Yes, sir. That's exactly what I did.

Q. And approximately when was that?

A. That was March of 1993.

Q. 1993 or -- and when you got back here, with whom did you live?

A. I stayed at the 3413 address on West Boulevard.

Q. Okay. Where was your mother and Mario at that time?

A. They were at the address along with my grandfather.

Q. Okay.

A. My mother -- my mother was a couple months pregnant at the time.

Q. Okay. And was her fiance John West living there at that time?

A.    He hadn't come back from Atlanta yet.

Q.    Were you able to find employment once you got back here?

A.    I went to work for Temp World when I first got back.

Q.    And how long did you work for Temp World?

A.    I didn't stay on the books long.  I went and found a waiting tables job, so I liked that money better.

Q.    And where was that?

A.    That was at Pizza Hut.

Q.    Now, your relationship with Tasha and the children had ended.  Your relationship with Crystal Dennis had ended.  Were you involved in any sort of relationship in Charlotte when you first got back?

A.    No.  No.

Q.    Did you later become involved in a relationship with someone here in Charlotte?

A.    Oh, yes.

Q.    And first of all, who was that and about when was that?

A.    That was Alesha Chambers.  That started spring break which is in April.  That was in 1993.

Q.    And how did you come to meet Alesha Chambers?

A.    I was hanging out with Steve.  We were, you know, partying.  Glad to be back home.  I went for a walk with his brother Darrell in his apartment complex over on South Boulevard.  There were a couple of girls on the stoop -- on the steps and we talked to them for a minute.  We left.  We

JA2062

came back on the way back. That's when I talked to her again. That's when we formally introduced ourselves. That's when I met Alesha.

Q. Did you exchange phone numbers or some way to get in touch with each other?

A. We exchanged phone numbers. Talked that night.

Q. And tell us how that relationship developed through the first few months.

A. Alesha was staying with her aunt for a while. When I met her, that's where I met her. She was at her aunt's house. So for the first couple months, I would go and see her because I would visit my best friend. Then she told me she really didn't stay there, she stayed somewhere else. I went to that address. We began dating, if you will. She was in high school with my brother. Thought she was kind of young, but she -- her mother didn't seem to care that she knew my age. Her mother seemed to like me at first. I thought it was because of my personality, but I found out it was something else.

Her mother fell on hard times because of that other issue that I -- you know, it was drugs. They had to leave because they were evicted out of their apartment. So Alesha had to move in with her -- one of her uncles. At the time her and her mother were having these big arguments about her stepfather who had just come home from prison. So Alesha ran

away, and that was the first day of trouble. And she wanted to come stay with me, but she couldn't stay at my house. I put her up in a hotel.

That was the first big sign of trouble because we were at my house that afternoon after we had checked out and the police showed up. Alesha's mother had sent the police to look for her and blamed me for taking her away. But all I had tried to do was tried to find a place for her to stay until she could get her mind together.

After that she pretty much ran away for good and she just told me she didn't want to go back to her mother because her mother continued to let her stepfather come back into their lives. She didn't want that. So I put her up in a hotel on the side of town where I was working at the time. I was still on the books at Temp World and they had me at a job for Electron, or whatever, and so I made enough money to be able to do that. So we stayed together for several weeks.

Q. Living in the motel?

A. Yes. I didn't want -- yeah, living in a motel. I didn't want to drive from west Charlotte to north Charlotte. I worked twelve-hour shifts. She didn't want to go back home and I didn't have anywhere else for her to stay so I got a hotel.

Q. And how was the relationship during that period of time?

A. At first it was okay. But then, you know, things started

happening.

Q. Now, when you say things started happening, tell us what started happening.

A. She wanted to get a job and so she got a second -- another job at this Bojangles place. I would take her to work sometimes. Sometimes she would just drive my car to work after I got off. I started to get suspicious about some of the things that I felt she was doing. I thought she might have been getting other guys' phone numbers and things like that. One day I found a phone number in her bag.

Q. And was that like in her purse when you say her bag?

A. She had a book bag at the time. She didn't have many clothes.

Q. So you were actually searching through her bag to find evidence of what you felt was infidelity on her part?

A. That's exactly what happened.

Q. And once you found what you believed to be evidence of her infidelity, what, if anything, did you do to Alesha?

A. I slapped her around. Pushed her around. Jumped on her.

Q. And did she acknowledge that she had been with other men during this relationship?

A. At that period of time she denied it.

Q. And did the relationship continue to deteriorate after that time?

A.   At that time something happened to my car so Alesha went to stay with a friend, this lady who let her pay room and board.  School was about to start.  I was no longer with Temp World.  I went and decided that I would try to find a little in-between job.  Alesha suggested that I come and work at Bojangles with her so we could spend some more time together while she was living with this lady.

Her mother eventually found out where she was staying and thought that I had put her up to it to not go back to where her mother was staying.  Eventually, she went and stayed back with her mom and that's when I worked with her at Bojangles and that's when things really started to get pretty bad.

Q.   So both of you were working at Bojangles together?

A.   Yes.

Q.   And when you say get really bad, did the abuse and violence continue and did it escalate?

A.   Off and on.  The things that increased it were she would openly flirt with the guys that we worked with there.  And I asked her, I said, You asked me to work here to be with you, but you're, you know, not really hiding the fact that you like this guy or that guy likes you.  So my jealousy really increased and I only stayed there for a week before I couldn't take it any more, and the violence towards her did increase.

Q.   What sort of things would you do for her -- or to her?

A.   I would hit on her.  I would hit on her.

**1208**

**JA2066**

Q. Would you ever allow Alesha to wear any sort of tight or revealing clothing?

A. No, I didn't like that. I felt like she wore her tightest jeans to work and flirt with those guys and that just -- it made me extremely jealous and I would tell her not to do it. Tell her not to wear makeup. Things like that.

Q. And how did she respond to all this, Marc?

A. She didn't really understand why I was saying that.

Q. And would that make you -- would it enrage you even more, make you even more jealous?

A. Yes, it would.

Q. Did there come a time when you actually physically took her from her -- her uncle's house or wherever she was staying at that time?

A. They had moved into another uncle's house. I remember talking to her on the phone trying to get the relationship back because as far as the dating relationship was concerned, it had ended after I left Bojangles. I hit on her too many times. I remember trying to get the dating girlfriend/ boyfriend relationship back and talking to her on the phone, and I felt like she was slighting me on the phone at night.

Q. What made you feel like, you know, she was slighting you?

A. She just really did not want to talk to me.

Q. Okay. You said you wanted the dating relationship back.

It had really gone away. Had y'all maintained a sexual relationship throughout even though there was no, quote, dating relationship?

A. The sexual relationship actually never ended until a few weeks before the trial for those charges in '94.

Q. And going back to when she really didn't want to talk to you on the phone, sort of snubbed you in a way, what did you do at that time?

A. I was supposed to be going to pick up my brother from work and on the way to picking him up from work, I went to the apartment where she was.

Q. What did you do when you got to the apartment?

A. I got out, parked the car behind the apartment. Went to the apartment. I banged on the door. Told her to come to the door. And I heard her in there laughing and giggling.

And she said, What do you want?

And I said, Open the door.

She wouldn't open the door. And I kept banging on the door and she just pretty much stopped talking to me through the door and she just kept talking on the phone.

Q. And how did that make you feel?

A. It just made me -- I couldn't understand -- at that time I couldn't understand how I had taken care of her, put her up, been there for her, tried to protect her from her mom. I felt like she was just totally disrespecting me and not giving me

JA2068

the kind of answers at the time I felt like I had deserved and I felt like she was -- she was hurting my feelings at the time and I didn't really understand why. But that's the kind of emotions that was starting to swell up inside of me.

Q. As a result of those emotions, what did you do?

A. I lost it. I started kicking on the door and I kicked it hard enough to where I kicked it in.

Q. And did you break the bolt dead off the door at that time?

A. The dead bolt stuck. The part around the door broke and then the dead bolt fell out.

Q. Once you got in the apartment, what did you do to Alesha?

A. I grabbed her. We started wrestling. She had a knife. I took the knife from her. Tried to choke her. Slapped her. She slapped me. We fought. I picked her up and told her if she wouldn't come with me, I would throw her off the balcony. Picked her up, took her to the balcony. She said, Okay. Okay. I dropped her back down. I grabbed her. She grabbed her coat and we ran out the apartment.

Q. Did you ever stuff anything in her mouth to keep her from screaming and yelling?

A. I don't recall. Could have happened, but I don't recall right now.

Q. Once you got her outside, did you put her in the car that

you were driving?

A.    I told her to stand by the door.  I went around to the driver's side and got in and popped the lock.  Told her to get in.

Q.    Did you have any weapon at that time?

A.    No.

Q.    Okay.  Once she got in the car, did you abuse her physically?

A.    No.

Q.    In the car?

A.    No.

Q.    Were you still yelling at her?

A.    No.

Q.    Arguing with her?

A.    No.

Q.    Was she arguing with you, anything like that?

A.    She was asking me why was I doing what I was doing, but we weren't arguing.

Q.    What did you want from Alesha when you broke in there and took her out?

A.    I wanted her to explain to me why all of a sudden I was no longer good enough.  That's the only thing that kept repeating in my mind.  I wanted her to talk to me and explain to me why she didn't want to date but she wanted to see me sometimes but she didn't want to be my girlfriend.

Q.   And were you able to find out the answers to those questions?

A.   Yes, I was.

Q.   Where did you take her?

A.   I took her -- I went to pick my brother up, which I was supposed to had been doing.  I picked him up.  Then I drove to my house.

Q.   Your brother Mario was working at that time?

A.   Yes, he was.

Q.   And where did you pick him up?

A.   On Wilkinson at the Checkers restaurant.

Q.   Did she say anything to your brother Mario about what had happened or did you explain to Mario what had happened?

A.   No.  We were -- we were kind of quietly talking at that point before we picked him up.  We sat there and she was just asking me why had I done what I had done.  And I kept questioning her as to why she was doing what she was doing.  It didn't make sense to me that what I had just done.  Mario came.  He got in the car.  He had to get in the passenger side and kind of squeeze behind her and sat in the back seat, and at that point she stopped talking.

Q.   Once you got to your grandfather's house at 3413 West Boulevard, what did you do with Alesha?

A.   It was muddy, real muddy.  This is an SUV I was driving.  I had got her to slide over to the driver's side of the seat

and I carried her to the kitchen doorsteps.

Q. Okay. Did y'all go in the house?

A. Yeah, we went in the house at that time.

Q. What room did you go in in the house?

A. The kitchen doorsteps -- steps to the kitchen door, that's where it leads to.

Q. How long did you have Alesha in your house that day?

A. I can't really put a number on it. More than fifteen minutes.

Q. Okay. Was it as long as an hour?

A. I can't say. Could have been.

Q. Okay.

A. But I can't say.

Q. And what were y'all doing in the house during that fifteen minutes to an hour?

A. My brother had went to take a shower and get ready for bed. Alesha and I were sitting in the corner of his room and I was trying to get her to explain to me why she had -- you know, at that time it doesn't make sense what she had done to me.

Q. You -- you had your own room upstairs, the loft.

A. Actually, at that time I did not have a room. I think the loft had stuff in it or somebody might have -- my mother's friend might have been staying there. And the side back room, I wasn't staying in that room at the time. So at that point I

didn't have a room.

Q. Okay. So you were sitting in Mario's room talking.

A. Yes.

Q. What occurred while y'all were sitting there talking?

A. I heard banging on the door. I got up, went to see who it was. I could see my -- my aunt going to the door. I saw the police and I left out of the back patio.

Q. Had you assaulted Alesha while you were in Marc's room?

A. Mario's room? No, I hadn't.

Q. Mario's room, I'm sorry.

A. No.

Q. So y'all were just in there talking at that time.

A. I was trying to get the explanation to kind of ease my conscience. I didn't understand what was going on between us. I knew she had started liking other guys. But I hadn't accepted that it was my physical violence towards her that had made her do so. So I was looking for answers. We just -- I was just talking to her.

Q. You went out the sliding glass door. Do you know what Alesha did?

A. No, I do not. I do not know what Alesha did.

Q. Where did you go?

A. Across the street.

Q. To Boulevard Homes?

A. Actually, Little Rock. Same area.

Q.    Later that same evening, did you call Alesha?

A.    Yes, I did.

Q.    Where was she at that time?

A.    I believe I called Jasper's apartment.  I think she was back there at the time.

Q.    Jasper was the uncle with whom she was staying at that time?

A.    Yes.

Q.    And what kind of conversation did you have with Alesha when you called her back?

A.    Well, I figured pretty much that the police would be there.  When she got on the phone, I was kind of suspicious, so I wanted to kind of see what was going on because Alesha, she's -- she's pretty smart, but I wanted to know what exactly was going on because I wanted to see if she would let on that the police were there or if she was -- might have been there by herself.

Q.    Were you crying on the phone?

A.    No, I was pretending to cry at that time.

Q.    Okay.  Now, did you -- after you talked to Alesha for a few minutes, did you talk to some police officer?

A.    When Alesha said let's meet, I kind of threw up a facade.  She let her -- she let her guard slip.  That let me know they were there.  So that's when I pretty much let her know that I knew that they had been there the whole time.

Common sense says if I kicked in a door, it was a crime scene, police would be there. But Alesha thought she could bait me in to turning myself in. I had wanted to talk to her alone; but since I knew they were there, I wasn't going for it. At that point I think Officer Joy might have got on the phone.

Q. What did you actually do after you talked to Officer Joy?

A. I stayed -- I stayed out. I did not go back home. I can't remember what happened that night, but I did not go back home.

Q. Why did you want to talk to Alesha alone?

A. Because I had just done something completely stupid and I wanted to apologize. I wanted to get her to understand I didn't want to hurt her. I only want to know why the -- she didn't want to be my girlfriend anymore after I felt like I had done so much for her and I had begun to really care about her a great deal. And I just wanted those -- I wanted an explanation.

Q. Okay. Sometime later were you arrested?

A. I wasn't arrested on those charges until the next incident.

Q. Okay. That was the one that occurred on September the 12th -- excuse me, November the 12th?

A. November the 12th, correct.

Q. Right. And Alesha Chambers has testified and told this

jury that when she got off the bus at South Boulevard to walk to the Bojangles on Woodlawn, that you were waiting for her.

A.    Yes.

Q.    Were you?

A.    Yes.

Q.    Okay.  Now, on this occasion you did have a weapon, didn't you?

A.    Yes.

Q.    Describe what kind of weapon you had.

A.    I took a knife out of my kitchen cabinet -- kitchen drawer.

Q.    When she got off the bus, what did you do as she walked towards her work at Bojangles?

A.    I grabbed her, grabbed her by the arm.  Kept badgering her, trying to get her to talk to me.  She kept asking me what was I doing there.  What did I want.  I kept telling her I wanted her to tell me why this was happening.  By the time we got to the back of Bojangles, same one I had worked at, I saw one of her managers, I think it was Jeff or Dave, come out of the back door.  He saw us.  And that's when I grabbed her.

Q.    And what did you do with the knife?

A.    I placed it in her back area and grabbed her and placed her in front of me and started to walk down the street with her.

Q.    Did you threaten to kill her?

A.    Yes.

Q.    And what was Alesha saying to you as you had the knife in her back and was threatening to kill her?

A.    She was just telling me to let her go.

Q.    And I guess, as Alesha testified to, some people came out of both of the TKTripps and the Bojangles at that time.

A.    At that time Jeff was already on the street.  Dave was following behind him.  Then the people from TKTripps came and that's when they surrounded me and I let her go.

Q.    Did you ever have the knife to her throat during this time?

A.    I honestly do not remember putting the knife to her throat.  I've been told that, but I really do not remember that.

Q.    And were you -- when you were surrounded, were you threatening those employees of TKTripps and Bojangles with the knife?

A.    I remember threatening Jeff because Jeff was one of the guys that I had been accusing Alesha of sleeping with.  I did not remember threatening anyone else but him because he was standing directly in front of me with a broomstick.

Q.    Pretty important to you at that time to be able to talk to Alesha and get some answers from her, wasn't it?

A.    Yes.  That's why I was there.

Q.    The police came on that occasion --

A.   Yes, they did.

Q.   -- did they not?

And were you arrested at that time?

A.   I was arrested at that time when they got there.

Q.   And were you served with a warrant for the prior incident?

A.   Yes.  I was charged with all charges.

Q.   On that one occasion.

A.   On that one day.

Q.   Okay.  So this didn't have anything to do with whether you were going to drop the charges from the prior -- whether she was going to drop the charges from the prior incident, was it?

A.   No.  This was just a continuance of what had happened the previous couple days.

Q.   Were you incarcerated as a result of the charges?

A.   Yes, I was.

Q.   And how long did you stay in jail?

A.   My family was able to make bond for me the day before Thanksgiving.

Q.   So what was that, about two weeks, ten days?

A.   About two weeks or ten days.

Q.   And once you got out, what was your relationship with Alesha like?

A.   You have to understand that through all this, the things

that I was trying to get out of Alesha was why she didn't want to continue the boyfriend/girlfriend relationship. The sexual relationship never stopped. I talked to Alesha while I was locked up. She told me that she and her mother had moved to north Charlotte and that she wasn't supposed to tell me where it was and the phone number, but she gave me the phone number anyway. The day I got out, I think that afternoon, that night I called her at work and she asked me to meet her uptown and so we continued on.

Q. You met her uptown.

A. Met her uptown that night I got out.

Q. Did y'all have sex that night?

A. Had sex that night uptown.

Q. And did the relationship, at least the sexual part of the relationship, did it continue after that?

A. Continued after that, yes.

Q. What about the dating or the boyfriend/girlfriend relationship?

A. She would not get into the dating boyfriend/girlfriend relationship. She had told me while I was in jail she had a boyfriend and that was why she didn't want to get back together. But with Alesha, you know, sex was fine, but she had a guy now. I saw him on a couple of occasions uptown. She described him to me. She went as far as to describe sex with him, not leaving out one detail. She, you know, just

described that we could not have that kind of relationship anymore, but anything else was fine as long as her mother and her brother didn't find out.

Q. How did that make you feel?

A. Cheap is the word that constantly comes to my mind. Worthless, because I thought at one time she had cared about me. She liked me enough that she wanted to have sex with me every other day, but now she had somebody else in her life as far as her boyfriend. I'm not the type of person where that's satisfying for me. I need a relationship setting, and with Alesha that's what I had needed. She just wasn't willing anymore.

Q. March of 1994, you and Alesha got into it again.

A. I can't recall. This is March of '94?

Q. I think it was March the 25th, 1994.

A. We had -- I had been -- okay. Yeah. I had been sneaking back and forth over to her mother's house and seeing her. I knew she was -- had a boyfriend. He lived -- she told me where he lived and she spent time with him. Sometimes she spent the nights. I was still trying to get the relationship back and get her to break up with him because it seemed to me like she spent all her time with me. So we got into it about that. And I mean, we had just finished having sex. And I just didn't feel like I should be -- I felt like I should have been her boyfriend. She was going to go see him that day and

I didn't like that. I didn't like it at all.

And I reached behind the back of the door and I pulled out a baseball bat and I just started swinging and I hit her in the hand and cut her hand open. Once I saw that, I dropped the bat and fell on the floor. And I was so torn up inside, I just -- I started balling and I couldn't stop. She -- she told me I had lost it. That's what happened that day.

Q. Did you assault her in any other way other than the bat? Did you hit her with your fist?

A. No.

Q. Or choke her or anything?

A. No. No. No. When I hit her in the hand, I wasn't trying to beat her. I was trying to scare her. When I hit her in the hand, it cut her hand. I dropped the bat after that. I didn't run. I just fell on the floor and started crying.

Q. Was there another time that you kicked in the door at Jasper Chambers'?

A. That was previous to that first time. What happened was the door was unlocked. I kicked up against it and turned the door, but it was already -- it wasn't locked or anything. I didn't break it down. It was open. That was when we had first had the breakup and she went back to stay with her mom at Jasper's and that's when I would call her and she would not talk and I thought in my mind at the time that they were

keeping her from talking to me. That's why I went down there that day. That was prior to the evening when she was home alone.

Q. Was there another time when you took Alesha against her will, put her into a car and had forced sex on her?

A. Yes.

Q. Tell us about that.

A. After what happened with the baseball bat, a couple weeks had went by. I believe the baseball bat happened early in March. So she was pretty much angry at me, but she still talked to me. So that gave me this kind of rare hope that maybe she would be forgiving and try to understand me.

I had been working on my car all day and talked to her at work. She said she was going -- getting off pretty late, at eleven. So I told her I would call her. But actually, I drove over there after working on this parts car, this junk car. I drove over there and was there when Jeff dropped her off. I went and stood on the steps with her. She told me to get off the steps because her brother would see. So we stood in the driveway. She was asking me how I got there. I told her I had been working on my car all day and I told her to come on. So we got in the car. I didn't force her. I didn't threaten her, tell her I had a gun. We sat in the car. She didn't think I wanted to take her with me. She thought I just wanted to talk.

**JA2082**

So I told her that I wanted to go to the store and she said, Well, I can't go, she said, because my mom will be home pretty soon. And that's one thing that she couldn't allow was to let her mom find out that she had been seeing me.

So I said, No, I'm, you know, hey, just going to the store. I'll bring you right back, but I was lying to her.

I drove to the store a long ways away, and the further away we got from her house, she kept asking me to take her back. And I said no. I said, Why? You don't want your boyfriend to find out that you're with me?

And she said, No, it's not that. She said, I don't want my mom to find out.

So I said, Well, I have to go check my voice mail. I need to go home. I made some kind of excuse. And I drove all the way to my house and parked in the driveway.

Q. And while you were parked there in the driveway, what happened?

A. I started talking about the night before when we were at the Motel 6 and how I enjoyed it. And she said she -- she was pretty angry because I had taken her from the house and she didn't want to leave. So we started arguing about that and the fact that the only reason I accuse her -- the only reason she didn't want to be there was because she didn't want her boyfriend to find out that she had been with me the night before. So I got cross with her and tried to have sex with

FORM FED  ⊛  PENGAD • 1-800-631-6989

**JA2083**

her. She rebuffed me. Said she wanted to go home. I said, Well, you just had sex with me last night. What's the difference about today? Why am I not good enough for you today?

So I grabbed her shirt and I ripped her shirt, strangled her with it. And she said, Okay. Okay. I'll have sex with you. And we had sex in the car.

Q. Not willingly.

A. No.

Q. Marc, you've talked to a lot of people through the years about this, police officers, psychologists, psychiatrists. You've never admitted that you had forced sex or raped Alesha, have you?

A. This is the first time I have -- I've been struggling with this for a long time because me and Alesha had sex almost every other day. And to me at that time by hearing her say yes, okay, I was -- I've been in constant denial that I forced her to have sex with me. But we even had sex two additional times that night and a week later, so that made it easier for me to deny that I had done that.

But I've been struggling with this. Last night I didn't sleep. I said to myself that there's no way that I can go before my jury and continue to deny something that happened and I've been fighting with myself. I've been bitter about it because some of the things I felt she done before and after

that night because it seemed to make it easier to make an excuse for her, but I made up my mind I could no longer make up an excuse about it. I could no longer deny what happened. That time, that instance I forced sex on her.

Q. Marc, after that you had voluntary sex a couple of other times that night. Did you finally call a cab and send her home?

A. No. I admitted to her why I had taken her. I wanted her to get caught. I wanted her mother to bust her. I wanted her boyfriend to find out that she had been seeing me and been having sex with me all these times because I felt like then she would have no choice but to come back. So I told her I still wasn't going to take her home. We had sex. She woke me up. Started kissing me. We had sex again. I went to sleep. By this time it was almost 6:30 in the morning. And she thought I would still take her home. I said no. I said, There's a phone book. I said, I'll get it for you. I said, You can call a cab, I said, because I want you to get caught. I said, I want him to know.

Q. And did you walk her down to the end of the driveway and put her in the cab?

A. Yeah. The damage control thing. I put her -- the cab actually could not find my driveway because it's completely dark. It's even worse to find at night. So I -- he passed by. I flagged him down with my -- that marble flashlight. He

pulled up. I gave her a hug, kissed her. Told her good luck because I knew her mother would be waiting for her when she got there, and I didn't think anything else about it.

Q. During the time that you had this relationship with Alesha, did you ever confide in her about what had happened in your home life as you were growing up and the beatings that you've suffered?

A. Earlier in the relationship when we stayed together, we spent so much time together. There were nights when I would just try to open up and talk to her to try to get her to understand that -- like the first instance where I hit her and chipped her tooth. I was trying to get her to understand that I was having issues about, you know, the way those things kind of happened to me growing up.

Q. And was she very supportive and comforting to you when you described those things?

A. At times she was. She seemed like she could understand because she -- her real father wasn't around and she was very quiet about that and she never really fully explained why, but there was something about that. So she seemed to understand.

Q. Okay. You went to trial on those earlier charges, didn't you?

A. Yes.

Q. And that was a jury trial.

A. Yes.

Q. And were you convicted of felonious restraint and a lesser included offense of kidnapping?

A. Yes.

Q. Okay. What was your sentence for that?

A. Probation.

Q. Who attended some or all of the days of that trial with you?

A. My mother was there for the most part. Robin came for the last two days.

Q. Robin Williams?

A. Robin Williams.

Q. So you had been -- by the time the trial had come around, you had gotten in this relationship with Robin Williams.

A. I met Robin in May. I was still seeing Alesha some. I wanted to keep her happy because I didn't know at the time what she would do when trial came. But at that time I was wholly into Robin and...

Q. She cared enough about you to come down for two days.

A. Yes.

Q. And be with you in that trial.

A. You know, going back and forth to Roanoke, I -- after that last incident, I didn't have sex for a while before I met Robin. And I told her, you know, when we met and we would get our pitcher, we would go out and have these talk sessions and talk all night, I told her about my past and told her about

all the things I went through, the things that were happening to me, the things I had done to these other girls, and I wanted her to understand and I started to tell her about my childhood. Robin was the greatest listener I had ever been with. She was there for me and she handled that.

Q. Marc, after you confessed in June of -- June the 25th, 1996, took the police to find Donnie Allen's body, you were placed in the Mecklenburg County Jail, were you not?

A. Yes.

Q. And you have been incarcerated from that day throughout.

A. Since June 25, 1996.

Q. Okay. Never been released on bond.

A. No.

Q. Continuously incarcerated.

A. Yes.

Q. We had somebody from the Coweta County Sheriff's Office come here and testify that according to their records, you had no disciplinary incidents while you were incarcerated in Coweta County on two separate occasions. Have you had any instance, disciplinary instance in the Mecklenburg County Jail during the period of time that you have been incarcerated?

A. Not one.

Q. At some point prior to the guilt/innocence phase of the trial, you were sent by the court to Butner, the federal facility at Butner, that is, the federal prison facility at

Butner for a psychiatric evaluation to determine your competence to stand trial. Do you remember that?

A. Yes, I do.

Q. And Dr. Sally Johnson was the person who evaluated you and found that you were competent to stand trial.

A. Yes.

Q. Do you remember about how long you were in the federal prison at Butner?

A. I think thirty days is the limit. I think I was there a little short of the time than that.

Q. You started out in seclusion there.

A. Yes.

Q. Were you able to, within that thirty days, move into general population?

A. Yes.

Q. General population means -- well, tell us what it means.

A. Again, in general population you are housed in a dorm style. You have rooms. Steel bunks. You're allowed to walk to the cafeteria to eat. You're allowed to walk a track, play basketball, visit the library, attend school. But you have to be in your unit at a certain time and you cannot move between units or between facilities. Only in certain periods of time can you do that. Have what they call controlled movement.

Q. And during that thirty days, did you have any infractions or disciplinary violations at all?

A.   No.

Q.   At some point you were sent, pending federal designation, you were sent to a prison in Virginia.  Do you remember that?

A.   Yes.  I was sent there waiting transfer to a federal facility.

Q.   Okay.  And about how long were you in a prison in Virginia?

A.   The first one that was changing over, they had us housed there from April to July of 1998.

Q.   During that period of time, did you have any violations or disciplinary infractions whatsoever?

A.   None.

Q.   And were you moved to another facility in Virginia or were you transferred to a federal prison?

A.   They were opening a new facility and they wanted federal inmates waiting for transfer housed there, called Sussex One State Prison.  It's kind of what they call a super max.  So I was housed there waiting to be transferred to a federal facility.

Q.   And while you were there, did you have any violations or disciplinary infractions whatsoever?

A.   None.

Q.   You were ultimately designated to the federal penitentiary in Terra Haute, Indiana.

A.   Yes.

Q. Were you not?

A. Yes, I was.

Q. And while you were at the federal facility in Terra Haute, Indiana, did you have any disciplinary infractions or any violations of rules whatsoever?

A. No, sir.

Q. When you first arrived at Terra Haute, describe -- and this was a special housing unit, describe the cell that you were in.

A. It's a six by eleven cell, steel bunks, concrete bottom bunk, toilet facility, steel chair, steel desk, window with bars and a screen mesh, and -- it's an old -- it was built in 1920. It's very old. It's very secure.

Q. And when you arrived there, this had a steel door as opposed to bars?

A. Yes. There's no bar door. This is a solid, very thick, two, three inches thick steel door. Small glass panes, wires.

Q. During the time or right after you arrived there, were you ever permitted out of your cell?

A. You get two showers a week and you can get an hour out of your cell a day to go to the metal cages to exercise if you choose to.

Q. Okay. So you were in that cell twenty-three hours a day?

A. Some days twenty-four.

1233

**JA2091**

Q. And that lasted about a year?

A. I was there from -- in the -- you mean locked down?

Q. Yeah.

A. Yeah, that lasted for a year.

Q. And at the end of that year, were you -- did you go into what the Bureau of Prisons calls phase two for that special housing unit?

A. For that type of unit they have three phases. I was in phase one for a year and I was allowed to graduate, so to speak, to phase two.

Q. And is that because of your good conduct and the way in which you conducted yourself in the prison?

A. That's what I was told is it allows you to move to phase two.

Q. And during that time you were in phase two, describe for us what that meant. Were you able to be out of your cell more than one hour a day?

A. They give you -- on the -- they switch it from an hour a day to three to four hours every other day. And they let you commingle with a maximum of three other inmates. So that's the only advantage. You can shower on those days so your shower increases from two days a week to maybe four out of seven days.

Q. Did you also become some sort of orderly for that special housing unit?

A. They only had -- they wanted to offer us an employment position, but they didn't know what they were going to do. So they had three positions available for somebody to clean the pod, paint, do laundry, make coffee for the inmates, sweep the back, shovel snow. Whatever around that unit was allowed. They called it orderly, and I was one chosen.

Q. And was that also because of the conduct you had exhibited there in that special housing unit?

A. Yes. They -- as an orderly, you are supervised by two corrections officers at a time and so they don't want what they call a trouble inmate. Someone who is going to do whatever they say do. So they picked me for that job.

Q. Do you have any special talents or hobbies that you enjoy?

A. The things that I used to enjoy, I used to do at home. It wasn't until being in that facility that year constant lock down where I had a lot of things on my mind, things that I had done to Robin's mom, her family and the Allen family, and I had a lot of time to think about that. So to help me to be able to put things in order and to sort my mind out, I wanted to try to do something that I hadn't done since high school, since before Tasha and I had met. So I started to sketch and draw to see if I still had it, and it helped -- it helps me think. When other guys are playing cards, smoking and talking junk and watching TV, I like to find a quiet spot and try to

let my mind think. So I started to draw.

They saw that I could draw so they said that they would try to get us some paint. So I started painting. It's the first time I painted since high school.

Q. What's been marked as Defendant's Exhibit Number 8. Can you identify Defendant's Exhibit Number 8?

A. This is a test, what you call a test for maybe a bigger canvas in the future. It's a Ferrari Testarossa, an old model. They used to race in the El Megilia (phonetic). It's one of the first Ferraris I ever painted.

Q. And did you have something to go by?

A. I had a -- I had some reference material from some of the magazines that a couple of guys get, so I used that as a reference.

Q. Okay.

MR. BENDER: Your Honor, at this time I would move for the introduction of Defendant's 8. Ask that it be passed to the jury.

THE COURT: Let it be admitted. You may pass it.

(Defendant's Exhibit Number 8 was received into evidence and published to the jury.)

Q. Defendant's Exhibit Number 9. Can you identify that?

A. This is another test. It's on cardboard, not canvas. It was to -- I was -- I had never worked with acrylic. I wanted to see what it did and how it applied itself to the material.

JA2094

So it's just a test with acrylic on cardboard.

Q. Okay. And this is also -- is this an open wheel race car?

A. It's a -- actually, that's -- since I used to follow racing, it's McLaren Williams' Formula 1 race car.

MR. BENDER: Your Honor, I would move the admission of Defendant's Exhibit Number 9 and ask that it be passed to the jury.

THE COURT: Let it be admitted.

(Defendant's Exhibit Number 9 was received into evidence and published to the jury.)

Q. Defendant's Exhibit Number 10. Can you identify that?

A. This is --

MS. HANKINS: You already have a Number 10.

MR. BENDER: Okay. Let's make this 11.

A. This was my last acrylic on canvas. It's an Aston Martin Vanquish set to debut, I think, this year. Just something I was trying to -- different -- trying to manipulate light.

Q. Okay.

MR. BENDER: Your Honor, move the introduction of Defendant's Exhibit Number 11 and ask that it be passed to the jury.

THE COURT: You may.

(Defendant's Exhibit Number 11 was received into evidence and published to the jury.)

Q. And Defendant's Exhibit Number 12. Can you identify Number 12?

A. This was the absolute first time I tried to paint. I found some reference material. And a guy that had done something similar, he kind of inspired me to do something positive instead of -- I was kind of feeling depressed. So I had heard he did acrylic on canvas and I tried it, and that's what came out after several months on lock down.

Q. Okay.

MR. BENDER: Your Honor, move the introduction of Defendant's Number 11 and ask that it be passed to the jury.

THE COURT: You may.

(Defendant's Exhibit Number 11 was received into evidence and published to the jury.)

MR. BENDER: May I approach again, Your Honor?

THE COURT: Yes, sir.

Q. Defendant's --

MR. BENDER: May I while they're looking, Your Honor?

A. Yes, sir.

Q. Okay. Defendant's Numbers 3, 5, 7, 4, and 6 -- I guess 3 through 7 -- are from a scrapbook that Tasha Tolbert identified as coming from her scrapbook. Number 3, can you identify that?

A. That's me holding Angelica at her -- that would have been

her first Christmas.

That's my cousin Michaela and that's my aunt Sheila.

Q. Okay. All right.

MR. BENDER: Your Honor, I'd move the introduction of Defendant's Number 3 and ask that it be passed to the jury.

THE COURT: Let it be admitted.

(Defendant's Exhibit Number 3 was received into evidence and published to the jury.)

Q. Take them in order here. Defendant's Number 4. Can you identify that from her scrapbook?

A. That's me holding a picture. That's a picture that she took of my mother, my brother, all of us trying to sit on Santa Claus's lap. That was -- that's still Angelica's first Christmas.

MR. BENDER: Your Honor, move the introduction of Defendant's Number 4 and ask that it be passed to the jury.

THE COURT: Let it be admitted.

(Defendant's Exhibit Number 4 was received into evidence and published to the jury.)

Q. Defendant's Number 5. Can you identify that from her scrapbook?

A. It's Angelica and her little brother.

Q. Is that little Marc?

A. That's Aquilia Marcivicci.

MR. BENDER: Move introduction of Defendant's Number 5 and ask that it be passed to the jury.

THE COURT: Let it be admitted.

(Defendant's Exhibit Number 5 was received into evidence and published to the jury.)

Q. Defendant's Number 6. Can you identify that?

A. That's my son and my daughter. Jelly Bean and Marc.

Q. That's a -- that's a little later picture than the one we just passed.

A. This is -- this is around the time, I believe, that Marc is maybe three or four. I was -- me and Robin were dating at this time when they were this age.

MR. BENDER: Move the introduction of Defendant's Number 6 and ask that it be passed to the jury.

THE COURT: Let it be admitted.

(Defendant's Exhibit Number 6 was received into evidence and published to the jury.)

Q. Defendant's Exhibit Number 7. Can you identify that from her scrapbook?

A. The top picture is more recent years. The middle picture is a picture I think I just saw. The side picture is something similar to what I just saw. The bottom picture is around the time that I lived at -- moved back to Charlotte, as well as the bottom two pictures.

Q. Okay.

MR. BENDER: Your Honor, move the introduction of Defendant's Number 7. Ask that it be passed to the jury.

THE COURT: Let it be admitted.

MR. BENDER: Thank you.

(Defendant's Exhibit Number 7 was received into evidence and published to the jury.)

Q. Marc, have you been able to establish some sort of relationship with your children in the past few months?

A. In the past few months I have. There was a time when I didn't think that it would ever again be possible because of the things that I had done to Tasha and the animosity we shared. She had dated a guy who she told me she was going to marry and she told me I would never see my kids again, and I believed her. And I set out and I thought I would just have to start all over again. And Robin was the first person who -- she was similar to Tasha. She listened to me and I thought we could maybe have a family. I thought Tasha hated my guts. But since we've been talking lately, talked to her last night, saw her last Thursday night, we found out that we didn't hate each other. That she's always kept me in the kids' lives and that she thought I had stopped loving her and the kids when Crystal moved in and that she actually thought that I loved Crystal and her kids. We had all this time all these years been listening to other people. But she made a promise to me years ago that no matter whatever happened to

either one of us, we would keep each other in the kids' lives and she's done that and now I talk to my kids.

My daughter is mad because she hasn't gotten a letter from me. She wrote me last week and I haven't written back fast enough. So she was upset with me last night.

My son, he just made football his first year out. He made running back. He's going to start. Talked to him last night about practice and hitting and pads.

And her husband, he's a great guy. She did marry him. They've been together for quite some time.

But my children -- I just don't know how to describe it. It's really -- it really hits me to know that I denied other people their children and I know what it feels like to not be able to hug your child, not be able to be there for ballet and football. And I just think about what I did to these other people and I don't know what I would do if somebody ever did it to my daughter and my son.

Q. Marc, when you wake up every morning, look at that steel door, the steel bars, what do you think about?

A. I think about what I did to Robin's mom, what I did to Mr. Allen, what I did to the Allen family, what I did that night. Every day. It's why I'm -- I've been put away. It's why I've been put on ice. I hurt those people. I took something very precious from them. And I don't -- I just struggle every day to try to think about why I did that.

MR. BENDER: Thank you, Marc. No further questions.

THE COURT: Okay. Members of the jury, we'll take our morning break at this time. Please remember the usual instructions. We'll call for you in about fifteen minutes. Thank you.

(Brief recess at 10:38 a.m.)

THE COURT: May we have the jury, please.

(The jury entered the courtroom.)

THE COURT: The jury is with us.

MS. ROSE: Thank you, Your Honor.

AQUILIA MARCIVICCI BARNETTE

CROSS-EXAMINATION

BY MS. ROSE:

Q. Mr. Barnette, last Wednesday Tasha Tolbert testified that you left them when your son was one month old and you never really looked back. Isn't that true?

A. No, ma'am.

Q. You didn't send any child support.

A. Yes, ma'am, I did.

Q. When did you send child support?

A. My child support checks were garnished from Arby's, from Blockbuster and from Courtyard Marriott. It was deducted through my checks.

Q. So that wasn't a voluntary payment; they were taken from

your checks by the state.

A. I wrote voluntary checks from my checking account on maybe only two occasions because they were taking the rest from my work checks.

Q. She testified she never heard from you at Christmas. Never heard from you at Thanksgiving. Never heard from you for the children's birthdays. You were gone.

A. After we split up, yes.

Q. But you really didn't establish a relationship, if you want to call it that, until about a month or so ago; is that true?

A. Yes, ma'am.

Q. I noticed that as you looked through some of the pictures of the defense exhibits -- if I may approach. I'm going to show you Defense Exhibit Number 6. I think you identified that earlier as just a picture of the kids, right?

A. That's my babies.

Q. You didn't know that this was a picture from the graduation because you weren't there, were you?

A. Unfortunately, I was not.

Q. Now, you've had an opportunity over several years to talk a lot about your childhood to various people, haven't you?

A. Yes, ma'am.

Q. And the version that you told the jury about yesterday is quite different from some of the other versions you've told

JA2102

about your childhood. Wouldn't you say that's a fair statement?

A. No, ma'am.

Q. Well, you told -- do you recall being interviewed by Dr. Johnson at Butner?

A. Yes, ma'am.

Q. And that was back in November and December of 1997; is that correct?

A. Yes, ma'am.

Q. And Dr. Johnson gathered your background information to put it together for a report to this court, and you told her a whole lot of information beginning with your background, lot of history and some testing and things were done. Do you recall all of that?

A. Yes. The interview with Dr. Johnson took several weeks; whereas, I only had one day with the jury so there's no way I could explain everything to them.

Q. Well, you -- so -- well, it appears that your testimony yesterday was a lot more detailed than that which you provided to Dr. Johnson. In fact, you told her during her interviews of you that your childhood -- or this is how she described it based upon what you said.

Mr. Barnette describes his early life in relatively positive terms, although he describes verbal bantering between his parents and some excessive alcohol use by his mother.

FORM FED ® PENGAD · 1-800-631-6989

1245

JA2103

That's not what you told the jury yesterday.

A. I think I elaborated a little.

Q. Well, it was important for you to tell Dr. Johnson everything because you were being evaluated for the court, weren't you?

A. Dr. Johnson, I believe, was one of the first psychiatrists I had ever opened up to so it was new for me. It's been several years since and I've been able to go into my mind and bring out sort of the demons of my childhood and explore them more.

Q. And you have been able, as you've talked to more and more psychiatrists, to go into your mind knowing you were going to be facing these twelve and really tell your story. You've been able to develop it over the course of time, haven't you?

A. Develop it as in?

Q. Fleshing it out.

A. It's -- my childhood is very difficult for me to talk about and at first I didn't want to talk about it because I didn't understand what it had to do with my later behavior. But as the time has passed, I've been able to be able to talk about it a little bit more.

Q. And you also spoke to -- later on you were interviewed by Dr. William Grant and Dr. Scott Duncan. Do you recall that as well?

A. That was more like an interrogation, yes.

Q. And you described to them that your father was strict about school behavior and that it was whenever you didn't meet his expectations that you got whippings.

A. Those were some of the things I got whippings for, yes.

Q. You said on a couple of occasions you had some welts and bruises and that he had punched you.

A. Yes.

Q. Do you remember telling them that?

But you never talked about being beaten while you were naked, did you?

A. No, ma'am.

Q. You never talked about him kicking you in the penis and the scrotum, did you?

A. I didn't say he kicked me. I said when he hit me with the belt, that's some of the area that I was hit in.

Q. You also didn't even mention excessive spanking until you were of school age because as it related to this interview, it was more toward your school performance and when you failed to do your chores at home.

A. Is that the question?

Q. Yes.

A. Could you repeat the question?

Q. You didn't tell them about getting spanked back in North Dakota. You described it as beginning at your school age.

A. I cannot recall everything I told Dr. Duncan. All I know

that he worked for the government, so I didn't have a really good trust, especially since he was a psychiatrist. I thought he was there to hurt me.

Q. Well, Dr. Johnson works at Butner. She's a psychiatrist.

A. Yes, but she doesn't work for the prosecution.

Q. They both work for Bureau of Prisons.

A. But it's not the prosecution. It's a different -- this is the court. You're the prosecution.

Q. Now -- well, you never did tell your psychiatrist, Dr. Howlitt, about being beaten naked or hit in the scrotum and the penis, did you?

A. But you have to realize that these are things that I've been trying to overcome as the time has gone by. It's not been easy to just tell the first person you meet, yeah, this is what happened. It took some time to build trust with some people.

Q. Now, do you recall your father testifying during the trial?

A. Which trial?

Q. The trial -- your case.

A. The guilt phase?

Q. Yes.

A. Okay. I remember him testifying.

Q. And do you recall him testifying that he did spank you,

but he never hit you in your face or intentionally anything above the legs. Do you recall your father's testimony to that effect?

A. I think I do.

Q. He never testified under questioning from your lawyers that he beat you until he was exhausted, that he beat you naked, and that's very different from the story that you told the jury yesterday, isn't it?

A. Yes, it is. Can I explain why I think that's different?

THE COURT: You may.

A. May I? The same thing occurred to me when I beat Crystal's children. I didn't at the time think it -- anything was wrong until later. And I have not yet been able to talk to my father about anything that happened between us in our childhood. It's still something that's very difficult. And I respected what he said because from his point of view, he didn't think he had done something. And I've never been able to tell him my side of it, what it was like to be beat like that.

Q. Your mother also testified during your trial as well. Do you recall that?

A. Yes, I do remember that. Some of it.

Q. And she testified that the problems with your father or that their relationship did not become abusive until you moved back to Charlotte.

A.    From where?

Q.    From North Dakota.

A.    I was a child.  Like I said yesterday, I think and I don't always recall.

Q.    And she indicated that your father's physical abuse really didn't begin until you were older, until you were about eight or nine years of age.  That's your mother's recollection.

A.    That would be her recollection.  Mine was different.

Q.    In fact, do you recall telling Dr. Dietz when you talked to him that when your parents separated, you really considered living with your father?

A.    I did.

Q.    But that you decided to live with your mother because she was less strict.

A.    I think I also told Dr. Dietz because I was fearful of my father because of the type of punishments he meted out.

Q.    You said, So when they separated, although I loved my father, I wanted him to stay, but I also wanted to go with my father.  But I knew that going with my father would have been a very, very strict upbringing.  So when he asked us, he gave us the choices to my brother and myself, I chose to go with my mother.  There would be a little more freedom because my mother wasn't as stern a parent as my father was.

A.    That's what I meant.

**1250**

**JA2108**

Q. Now, you say that now you've had a chance to reflect on things, to talk to a number of psychiatrists. You had opportunities both when you were convicted of beating the children in Georgia and then again of your assaults on Alesha to get counseling. In fact, the court ordered it on both those occasions and you didn't go, did you?

A. I recall them ordering it on the first occasion. But I didn't understand what it would be about, why did I need counseling, so I didn't go on that first occasion. I thought it was just, say, me disciplining children. That was 1993.

I don't recall being issued on the second time when I was given probation. As I recall, I was given intensive probation, supposedly supposed to be house arrest, and that was it.

Q. And also part of that was counseling because of the assaultive behavior. But you don't remember that?

A. Thad Johnson never once told me I had to have counseling.

Q. Well, you -- that's because you didn't go to your probation visits. You absconded probation; isn't that correct?

A. I believe I attended maybe four or five visits, two or three with Robin Williams. So I absconded towards the end of my probationary period, not towards the beginning.

Q. Now, one of the things that you talked about yesterday

about your relationship with Robin was infidelity. You said that was the biggest issue between you two.

A. Yes, it was.

Q. Other than that, that your relationship was a very good one.

A. Yes.

Q. That you felt it was healthy.

A. Yes.

Q. Loving.

A. Very much.

Q. But because of your distrust of her, you were very, very controlling.

A. Yes.

Q. You limited the amount of time she spent with her friends.

A. No.

Q. You allowed her freely to visit with her friends?

A. I actually used to get into it with Robin when we first moved in together. She would want to stay at home, rent a movie and just cuddle and snuggle. I would say you need to go out some, because when Steve would come down she'd tell me to go out. So that was one of the things we talked about in the beginning of our relationship that I used to do and I wasn't going to try to do it with her because I wanted it to last.

Q. So it would be your testimony that you gave Robin a

tremendous amount of freedom to be with her friends, to be with her family, to be with her coworkers. Is that your testimony?

A. That is correct.

Q. You detailed an occasion, however, yesterday where she went to a funeral with a group of friends and you couldn't stand it. You ended up following her, tracking her down and getting her out of the car at an intersection.

A. Yes.

Q. But that's not consistent with the freedoms that you're telling this jury you gave her.

A. You would be juxtaposing that one incident with the relationship as a whole?

Q. That's an example.

A. Oh, well, that would be only one instance that ever happened.

Q. And that I believe you testified yesterday that no matter what explanation she gave you for these supposed infidelities, you just couldn't accept them.

A. I don't know why, but I could not.

Q. And it didn't matter what she said, you were going to get angry, you were going to get abusive, and there was nothing she could do.

A. Actually, there was something she could do. As far as the incident that kept recurring was with Benjamin Johnson --

Benjamin Greene and I just had the feeling that -- well, I told her, I said, Robin, if you just tell me what is the deal with this guy. I felt like my emotions would have been satiated and we could have moved on.

Q. Didn't she tell you he was an old high school friend?

A. But I've met several of Robin's old high school friends, old boyfriends, even old lovers. He was the one guy she seemed to keep secret and that just seemed to eat at me and drive me crazy. Even one of her old boyfriends even worked for me one night. So he -- it kept being a thorn in the side of the relationship.

Q. To this day do you still think she was having a relationship with him?

A. I don't know. I feel more or less of a loss to what I did to Robin. I think that kind of falls by the wayside as to what happened. And it doesn't matter because I shouldn't have done what I did. That's where my feelings are.

Q. Did you hear Robin's own voice here in this courtroom as that tape was played where she described Benjamin Greene as her best friend?

A. Yes, I did. I have --

Q. You didn't believe it then either, did you?

A. Well, the thing about that is when me and Robin talked when we first met, we had gone down the litany of our so-called friends. So, you know, it rung that -- that's

something that rang back to the beginning part of our relationship when I described some of my quote, unquote, friends and she described some of her quote, unquote, friends. I just wish that I had listened then so none of this would have happened. That seems to be all that matters to me.

Q. But as as you became more and more possessive and more and more controlling, I mean it's almost torturous what you did to her; isn't that true?

A. I would agree to that.

Q. You were verbally abusive, weren't you?

A. That was the bulk of the relationship. I was very verbally abusive to her. Very emotional. Tried to make her cry. On a few occasions I would push her.

Q. You were mentally abusive because of those -- the constant inquisitions.

A. Yes, I was.

Q. You burned her.

A. Yes, I did.

Q. You disfigured her.

A. Yes, I did.

Q. For that time that she lived after you burned her, she's looking over her shoulder waiting for you to come back. That was torturing her, wasn't it?

A. Yes, I imagine it was.

Q. And then you took her and dragged her by her hair through

the street. That tortured her.

A. Yes, ma'am.

Q. Then you made her look down the barrel of your sawed-off shotgun. That tortured her.

A. Yes, ma'am.

Q. You made her beg for her life.

A. Yes, ma'am.

Q. As much as she loved her mother, you shot her right in front of her mother.

A. Yes, ma'am.

Q. You tortured that poor girl, didn't you?

A. Yes, ma'am.

Q. But you constantly said she was the one at fault.

A. The thinking back then doesn't make sense to me when I look at it.

Q. Well, that's your thinking now.

A. No.

Q. You still believe she was being unfaithful to you no matter what she said, no matter the words you heard here in this courtroom.

A. No. My thinking now is about what I did. I don't go back and think about whether or not she was with Benny. When you bring it to me now, yeah, it's fresh, but I don't dwell on that. I dwell on what happened and what I did to Bertha and what I did to Kenny and Sidney.

Q. You were -- while you were accusing Robin of being unfaithful, you were engaged in a sexual relationship, weren't you?

A. Yes. When I thought Robin had been cheating on me and she would never come clean, I thought that, well, what's good for the goose is good for the gander and I thought that would be the way to get back at her and so I cheated on her.

Q. And you brought Shirley Williams, a Camelot employee, over to your apartment, Robin's apartment and had sexual relations with her there, did you not?

A. Yes, we did.

Q. On the -- you talked a lot about suicide yesterday and you specifically said that on the day that you firebombed Robin and burned her, that you had tried to commit suicide earlier that day; is that correct?

A. Yes, ma'am.

Q. And I believe you said that it started with drinking some Vodka.

A. And sleeping pills.

Q. How much Vodka did you have?

A. I can't tell you. I couldn't even remember.

Q. Well, was it a little?

A. It was more than a little -- it was more than a lot.

Q. Did you finish the bottle?

A. I can't even remember.

Q. How many pills did you take?

A. I -- I had three boxes; but out of the three boxes, I can't recall how many pills I actually took. I vomited sometime before -- in the midst of arguing back and forth and harassing Robin on the phone. So -- but I cannot tell you how many I took.

Q. But you tried to commit suicide supposedly with pills before.

A. Yes, ma'am.

Q. And you knew -- you knew, I mean, obviously, it wasn't working.

A. The previous time I had tried, the EMT gave me some liquid that you drink and then you drink hot water after it. And because they were there, they said you have a choice: You can take this or you can go to the emergency room and we'll pump your stomach. So I started taking the liquid, drank the water, and I vomited. That's the previous time I had actually taken pills.

Q. And so on this occasion, you said you did throw up. About what time did that occur on that particular day or evening?

A. I cannot give you an exact time. It was late. Maybe early hours. But I'm not sure.

Q. But despite all the -- the lack of clarity that you have at this time, you were able to hear your brother come in. I

believe yesterday you described pretty particularly you heard the door open, the keys jingle, your brother slam the door, and you knew then you had a way to go to Robin.

A. Yes.

Q. You recall those particular details.

A. I can recall that, but that's not a specific time as to 12:30, 1:30. That's just something that happened in the house. I was the only one at home previous to him coming home.

Q. So you get in the car and you head for Roanoke.

A. Yes, ma'am.

Q. You're okay to do that. You're able to carry out that function. Get there safely.

A. I wouldn't say I was okay. I got there.

Q. And I think you described that trip to Roanoke. It's about a three and a half hour journey, isn't it?

A. Three plus.

Q. It's kind of an up and down the mountain trip.

A. Traveled it, drove it several times.

Q. The road is windy. It's not exactly an easy trip, is it?

A. I wouldn't say that. What do you mean by easy? It's Interstate Highway 81 is no different than 77 and it's wide. Takes you -- cuts through the mountains. It's just a highway.

FORM FED ® PENGAD • 1-800-631-6989

1259

JA2117

Q. And then you have to take some back roads down into the area towards Keswick.

A. No. Keswick sits off of Orange which is something like Independence. It's kind of wide. Four lanes, two on each side. Once you turn off of there, you cut through a residential neighborhood and the apartments sit right there.

Q. You got there fine, in the middle of the night, but not before making your stop at Wal-Mart.

A. Yes, ma'am, that's right.

Q. Now, yesterday was the first time we had heard about the purchase of the ball bat from Wal-Mart. You have not told anybody, none of the investigators, none of the psychiatrists anything about taking the time to stop and purchase that ball bat.

A. Yes. As I stated before yesterday, there's a lot of things that I had not thought about. There are certain issues that are constantly on my mind. Ask what happened. A lot of other details I had not previously remembered. So I have been trying to remember every detail so I could be as much forthright with you as possible.

Q. So you stop, you get the ball bat and you got your gas. You formulated your plan. Despite all the substances in your system, you formulate your plan. You go over there and carry it out.

A. Well, this is three, maybe four hours later. I wasn't

that inebriated at the time. I wouldn't say much as a plan as I was hurting, angry, and I was prepared to act out. The only plan was to get him and her outside of the apartment.

Q. Well, you got the items together that you needed. The jugs, the rags, the gas, the bat.

A. I discovered the transmission -- I think as I stated yesterday, fluid containers were already in the car when I stopped for gas when I noticed them. The only thing that I went to go get specifically for the act was the baseball bat.

Q. Well, you had to fill up the gas containers.

A. Mario didn't have much gas in the car. That's inconsequential.

Q. So you had all those things together. Were you able to -- you had your lighter. You had your clippers, your wire clippers. You had what you needed.

A. Well, like I stated yesterday, I had been working on Mario's car so he had all my tools, bunch of stuff in the back seat. The only thing I did go get for that act was the baseball bat.

Q. You get there, you get out, you clip the wires because you didn't want anybody to be able to call the police.

A. That's correct.

Q. And then you began your attack. You knew Robin was afraid of a fire in that apartment because you all had talked about it.

A.   We had talked about it.  We had joked about it.  And we talked about it, about what would happen.

Q.   Yesterday you described your activities on that evening as out of control.

A.   I was overreacting emotionally, yes.

Q.   But you were able to carry through with what you set out to do.  You did burn.  You did cut the wires.

A.   I did burn?  Is that -- I never said I set out to burn Robin.  I never said that.

Q.   Well, what did you think was going to happen when you lit fuel and threw it through the windows?

A.   I didn't know because I wasn't thinking.  I was acting out.  That's why I said I was out of control.  I think someone in control doesn't set fire to an apartment with one door and knowing that there's one way to get out.  So I wasn't -- I wasn't thinking.

Q.   So because you're not thinking, you're not responsible for what happened?

A.   I have never said I was not responsible for anything I've done.

Q.   But it's just that it wasn't premeditated and deliberated.

A.   That instance, no.

Q.   Poured the gas on the window sill as you described yesterday.

A. Yes.

Q. Didn't mean that to happen?

A. No, I did pour it on there. I never said I didn't mean to pour it on there. But I did not mean to set Robin on fire. I wanted Benny Greene to see there was a fire and to come outside so I could beat him up. That's why I was there.

Q. You destroyed the door so badly they couldn't get out.

A. I saw that in pictures later.

Q. Don't remember that, though, or that evening.

A. When I got there and I started kicking on the door, the door jammed. I did not know until I read the newspaper accounts that that's why they didn't come out. That night I didn't understand why they weren't coming out. I thought he -- when he shot at me that he shot from the door, but the door was jammed. That's why they had to go out the back way. I didn't find it out until later.

Q. So when -- so it's your testimony today that when you went there and started the fire, it was aimed at Benny.

A. It was aimed at Benny and Robin. I cannot say that she was not full partner what was happening that night. I was very upset with her as well as him and I screamed a lot of things that night at her as well, yes.

Q. And screaming die, bitch, die doesn't have anything to do with Benny Greene, does it?

A. As far as her being with Benny Greene, I think it has a

lot to do with it.

Q. You left there and went directly to your brother's employment.

A. I stopped at a gas station because I ran out of gas or something. Drove back to Charlotte.

Q. And you made it to your brother's work and eventually met your mother there.

A. I went to his job because I thought he would already been there. But he hadn't pulled up yet. They pulled up maybe five minutes after I had arrived.

Q. And when was it that you knew the police would be looking for you?

A. I felt they were going to be looking for me right then, but I wasn't absolutely positive until that night when I saw my face on Channel 9.

Q. And at that point is when you went down and turned yourself in.

A. No, ma'am, I did not.

Q. That thought was just beyond you as well. Were you out of control at that point as well? Just couldn't...

A. No, ma'am, I was not. I had calmed down a great deal and was now contemplating several issues.

Q. You testified that during that time you thought about Robin and that you were full of fear and anguish and sick to your stomach as you pictured her burns.

A.   I think I was referring to after the news accounts, they were referring to her being burned.  And after I had read the newspaper Steve had got faxed from his brother, I had a lot more emotions than that, but that's the best that I can describe.  It's hard for me to describe.

Q.   And out of that anguish and sickness to your stomach for what she was going through, you took a bunch of letters that she had written you, wrote horrible things on them and drove them up there and left them on her car.

A.   No, ma'am.  That -- the letters she was referring to, the first time I heard -- saw those letters was the last guilt phase trial.  I had not seen those letters since the last fight -- well, the last -- the middle fight with -- about Benny when we still lived together.

Q.   So you're saying you didn't take these letters and write on them and put them on her car?

A.   I wrote that stuff on those letters back in 1995.  I'm not saying they didn't get on that car.  But I wasn't the one who put them there.

Q.   Oh.  So whenever her brother goes to work, they're not on the car; comes back, they're on the car.  You're saying somebody else did that?

A.   The last person who had those letters was Robin, and I don't know who put those on the car.  It couldn't have been her, but I don't know who did it.

Q. These were letters to you from her. Why would she have had letters she sent to you?

A. That happened when I moved out. We had so much stuff, I left some stuff behind. Those were some of the missing items. Because if you look at what I wrote, that happened when we got into the fight about the Benny Greene phone number and she went to stay with her mother for a couple days. I wrote that stuff out; but the last time I saw those letters, they were in my upper drawer in my dresser.

Q. And they miraculously survived the fire you set and made it to her car. Is that your testimony?

A. I'm not saying they were left in that apartment. She could have taken them to her mother's house when she moved back in with her mother after our breakup. I don't know what happened to the letters. I was surprised to see them.

Q. So you didn't make a trip back to Roanoke. That's your testimony.

A. Oh, I did not.

Q. You, however, spent time at your cousin's.

A. I was at Shawn's and had her call, check on Robin. I spent time with Steve. Tried to get me out of the funk I was in. I was contemplating what was going to happen next thirty years after they picked me up.

Q. And during that time you were blaming Benny a lot for Robin's burns because...

1266

JA2124

A. I began to after reading the article. I still wasn't blaming myself. I was still saying to myself if he cared about her, if she picked him, how did she get hurt and he didn't get hurt? He didn't get a scrape. Robin got cut. Robin got scraped. Robin got burned. How did he get out of the apartment and not get hurt? So in the beginning, yes, I did.

Q. Now, it was during this time that you began to get more and more depressed, I believe you described yesterday.

A. There were periods of that, yes.

Q. So there were moments you were depressed and then you had moments of feeling normal.

A. It's hard to describe. I probably let the doctors say because I don't understand it fully.

Q. And you said that during that time that you began to drink and drink more.

A. Yes.

Q. But that was only on the bad days.

A. There were more of those than good ones.

Q. You would admit that it's not unusual for anybody to be upset after a breakup. That wasn't unique to you.

A. But the thing about my breakups, they seemed -- I seemed to be more sensitive to them. I seem to take them much, much harder. And this one was the -- one of the most devastating of all and I take my breakups hard for some reason. I don't

understand it, but I do.

Q. So your bad days, you began to drink more and more. And up to that time you had not been much of a drinker; is that a fair statement?

A. Social. Steve and I would get together, he has a keg refrigerator and we can get -- we could get wired up. Robin and I would go out to a place, our little place called McAdo's, share a pitcher. So social. But this started to turn into something else.

Q. And you testified that during this period of depression, you really weren't thinking about much of anything.

A. I was having the -- you know, it just seemed like anything because some thoughts come in, some thoughts wouldn't. It was just a depressive state.

Q. Now, as it came closer to June, you began to think more and more seriously about what you wanted to do to Robin.

A. Yes.

Q. That's when you got the bag that was significant to Robin, that being the one that you packed when you went to visit her.

A. Yes.

Q. And you began gathering things and putting them in the bag.

A. Yes.

Q. Because I believe, as you testified yesterday, you didn't

know what would happen once you got to Roanoke.

A. Yes.

Q. And you also testified that you didn't know what you would need when you got there.

A. Yes.

Q. So you were formulating your plan.

A. Yes.

Q. You said that on the morning of June 21st, 1996, the very first thing you did that morning was take a drink.

A. Yes.

Q. What were you drinking on that occasion?

A. I can't remember. It might have been beer. I don't think I had any more liquor at the time, but I'm not quite sure.

Q. Didn't take any pills at that time.

A. No, ma'am.

Q. Did you stay in your room most of the day?

A. Some most of the day, yes.

Q. At some point there was a lot of family around.

A. I recall my mother -- are you referring to the evening hours?

Q. Yes.

A. The evening hours I recall my mother being -- preparing for work. Mario was in his room. My mother's fiance and my uncle were right below me in the den area. Those are the only

family members I remember at that time.

Q. And you were living with your mother, your brother, and your grandfather at that time.

A. Yes. As well as my mother's fiance had now come home to help raise his son.

Q. And then the young boy was there as well.

A. Yes.

Q. Didn't talk to them about it?

A. I absolutely hid my feelings from my family at that time for several weeks.

Q. Did you continue to drink throughout the day?

A. Off and on, yes.

Q. At the end of the day, were you drunk?

A. I really can't express how I felt. I don't know if I was totally inebriated or was I just what you call buzzing, but at that time the drinking was just drinking. It wasn't pleasurable. It wasn't enjoyable. It didn't leave a whole lot of drunk feelings. I had just been drinking.

Q. I believe in one of your statements you said that throughout the course of that day that you'd had about a six pack. Is that a fair statement?

A. From morning all the way till before I left. Throughout the day.

Q. But you testified yesterday that when you left your home, you had no particular destination in mind.

A. Roanoke, I believe is what I stated.

Q. I believe you testified yesterday you had no destination in mind. You didn't know where you were going. Didn't know how you were going to get there. You just left and started walking.

A. In the scheme of things, I think it's known that I was going to Roanoke.

Q. You had your -- by that time your bag of tools with your shells, the handcuffs, the crowbar, the wire cutters.

A. Yes, ma'am, I did.

Q. Now -- and of course, your shotgun. How did you know how to saw off that shotgun and fashion it the way that you've done?

A. Shotgun barrel is only a metal pipe. Any plumber shaves a metal pipe. I think if you've watched any movie, I think you've seen a sawed-off shotgun. That's it.

Q. What about the stock and the way that you fashioned it and the taping?

A. I only sawed it off the same way I sawed off the front and put tape around it.

Q. And of course, taped on the flashlight.

A. Yes, ma'am.

Q. As you began walking on that particular evening, how did you decide which way to go?

A. As I stated yesterday, I went to church on Morris Field

Road. I know that area like the back of my hand. I know that intersection.

Q. And you knew it was dark.

A. It's dark when you come back home in the middle away from Bible study. It was dark that night.

Q. And your testimony yesterday was that when you reached the intersection of Billy Graham and Morris Field Road, that you were woozy and intent on doing something.

A. Yes, ma'am.

Q. What did you mean by woozy?

A. That's just like I tried to explain now the feeling. It's not like you're totally drunk. Maybe you're buzzing, but you have the emotional impact that's going on. So it's just a strange feeling. It's not something like where if I'm at the pub and I'm drinking, you have good feelings. This was mixed with very bad feelings.

Q. And your intent at that point was to kill somebody and get a car.

A. The intent right there was to carjack someone.

Q. You had your gun.

A. Yes, ma'am.

Q. And you dropped your bag off in the weeds, I believe is how you described it, and you began to crouch in the darkness.

A. Yes, ma'am.

Q. And wait. And despite this wooziness that you testified about, you were able to wait in a way with your gun effectively because nobody saw you, did they?

A. No, ma'am.

Q. You said you were wearing a white shirt as you sat there by the side of the road.

A. Cream colored shirt.

Q. Other cars had come by before Donnie, had they not?

A. Only a few.

Q. And as he pulled up, the window was down, wasn't it?

A. Yes, ma'am.

Q. How long did you have to wait for just the right car?

A. I cannot really honestly say how much time passed.

Q. I believe you told some of the investigators it was about thirty minutes. Does that seem accurate?

A. They wanted me to give them a number. That's the number I gave them. But still to this day I'm not comfortable with that number.

Q. Yesterday you testified, however, despite all this planning, despite your getting there, despite getting the gun, despite the waiting, that this was not a planned hit. Those were your words yesterday.

A. Yes, ma'am.

Q. You had your bag.

A. Yes, ma'am.

1273

JA2131

Q. You prepared the gun, prepared it well for nighttime.

A. Yes, ma'am.

Q. Had the flashlight on it.

A. Yes, ma'am.

Q. The gun was loaded.

A. Yes, ma'am.

Q. Had your spare shells.

A. Yes, ma'am.

Q. You were at a dark intersection.

A. Yes, ma'am.

Q. You're waiting in the dark.

A. Yes, ma'am.

Q. Crouching in the dark.

A. Yes, ma'am.

Q. Took Donnie from the car.

A. That was what I was there for and that's what was planned, to rob him for the car.

Q. You marched him down in that ditch.

A. Yes, ma'am.

Q. He did everything you told him.

A. Yes, ma'am, he did.

Q. Begged for his life.

A. Yes, ma'am.

Q. Now, you asked him for his wallet. You said he threw it on the ground.

A.    Yes, ma'am.

Q.    Yesterday when you were asked about shooting him, you said, I didn't know I'd hit him.  It was too dark to see.  Do you remember that?

A.    Yes, ma'am.  That's -- I was relating the feelings of what had happened that night.

Q.    But it wasn't too dark to find his wallet on the ground, was it?

A.    Donnie did not throw his wallet to where we were standing.  He threw it as we were entering the culvert.  That area was illuminated by the traffic on Billy Graham.  Where Donnie and I went was further down in the culvert.

Q.    You didn't have any problem finding his wallet despite your wooziness, despite the darkness.  You got what you needed.

A.    Yes, ma'am.

Q.    Did Donnie cry out when you shot him?

A.    He did not necessarily cry out.  It seemed like he exhaled breath.

Q.    Well, you heard Dr. Sullivan testify that the wounds that he received would have been very painful.  Shattering his arm, the bone in his arm, basically dislocating it from his body.  It would have been a very painful injury.  And you say he didn't cry out?

A.    He did not.  He -- it was almost like a moan.  But I did

not know where I had hit him because where we were standing, it was complete pitch black.

Q. And --

A. That's why I didn't know if I hit him or not because when I got shot, I cried out and that was with only a .32 hollow point. I had a shotgun and he did not cry out.

Q. Did you hear his body hit the ground?

A. No, ma'am. I was running at that point.

Q. Did you see him moving?

A. I could not see Donald Allen. If you look at the picture, the culvert, it's surrounded by high brush trees. That area is absolutely no light. Completely dark.

Q. You had your flashlight?

A. I didn't have it on.

Q. You had taken the time to put it on there, but you didn't have it on.

A. Reacting to what I was doing. The plan, as you call it, it didn't go as you say it was planned. I didn't cut on the light. I didn't use it for a certain purpose.

Q. Did you drag his body?

A. Absolutely not.

Q. You saw those pictures of the different places of the bloodstains. How did that happen? Did you leave him there alive enough to drag himself?

A. I don't know that. I left as soon as I shot him.

Q.   You were able to find the bag that you dropped off, pick it up, get your spare shells and your tools, the things you needed.  Found that, didn't you?

A.   Yes, ma'am.

Q.   And at this point are you still woozy and out of control?

A.   At this point it's -- I just feel my heart beating a tremendous deal.  It's a lot of nervousness.  They say something like adrenaline, and that may have been what it was.  The wooziness was still there, but not as sharp as the adrenaline when I ran back to the car.

Q.   And you headed for Roanoke at that point.

A.   Yes, ma'am.

Q.   You took the money from Donnie's wallet.

A.   Yes, ma'am.

Q.   At some point you stopped and bought gas.

A.   Yes, ma'am.

Q.   Where was that?

A.   I could not recall.  I still to this day try to remember where it was and I cannot.

Q.   Didn't pick up the phone, call 9-1-1 from an anonymous pay phone and say there's a man in the ditch down there, might be alive who's injured.  Didn't think about Donnie Allen at that point, did you?

A.   I wasn't thinking at all.

Q. No. You were thinking -- you were thinking about getting to Robin, weren't you? That was the next part of your plan.

A. That was the emotional situation I was going through from the git-go was get to Robin.

Q. What happened to the golf clubs that were in Donnie's car? Did you forget that detail?

A. No. At the time when I did my first interview, I told them, I still don't remember what I did with them.

Q. Did you pawn those in Knoxville to get yourself some more money?

A. No.

Q. Did you bring them home and pawn them?

A. No.

Q. Well, what happened to them?

A. I don't know. There would be a record if you pawned something. I've pawned stuff before. There -- I have never pawned Donnie's anything. When I came home and parked the car, everything that I had left was in the car. I turned myself in that day. I don't understand what you mean why I would pawn something after I killed a man. That's callous.

Q. You got something to drink when you stopped and got gas in Roanoke.

A. I don't remember that.

Q. You went directly to Ms. Williams' home.

A. Yes.

Q. You testified that as you sat there outside her home, you weren't thinking straight.

A. No.

Q. But yet you did, once you got there, you did exactly what you'd planned to do.

A. No.

Q. Oh, that's right. You didn't kill yourself.

A. That's true, also.

Q. You cut the phone wires so nobody could call for help.

A. Yes, ma'am.

Q. You rendered them helpless.

A. Yes, ma'am.

Q. You took away the only defense that that family was going to have whenever you blasted in the back door.

A. Yes, ma'am.

Q. Do you say that's not a plan?

A. You said what I had planned that -- it did not happen the way I had thought things were going to happen that day.

Q. Because you didn't kill yourself.

A. That is in addition to what else I had thought was going to happen that day.

Q. You -- you pulled the phone wires out before the fire, right?

A. Yes.

Q. It was the same thing: To render them defenseless.

A. Yes.

Q. You pulled the phone wires on Alesha Chambers at her house, we saw the photos of that, so she couldn't call law enforcement.

A. Yes.

Q. Do you remember that?

A. Yes.

Q. So pulling the phone wires on the Williams home was just part of the whole predatory plan that you had set up.

A. Yes.

Q. And isn't that just the reason you killed Donnie, so he couldn't call for help?

A. I'm still struggling to find out why I pulled the trigger. He give me everything I asked for.

Q. It was so he couldn't call the police and say my car had been stolen, so he couldn't call for help.

(No response.)

Q. Isn't that why you did it?

A. I'm still struggling with that.

Q. You said yesterday that you began to doubt what you were there for.

A. Yes.

Q. But you didn't turn back.

A. I almost did.

Q. But you didn't.

A. But I did not.

Q. Moved the car in a better position. Right?

A. Yes, ma'am, I did.

Q. You grabbed your gun.

A. Yes, ma'am, I did.

Q. You grabbed your spare shells.

A. Yes, ma'am.

Q. By the way, at what point did you reload the gun after killing Donnie?

A. I don't think that happened until I was at Bertha's back door.

Q. You said you sat on the steps at that point and thought about ending your life.

A. I had several thoughts, that being one.

Q. And I guess as you were thinking about that is when you reloaded the gun?

A. That might be possible. I cannot say yes.

Q. This suicide attempt was no different than any of the ones before and any that would follow. You always lived.

A. The thing about that is I was serious this time.

Q. So you loaded the gun instead of turning it on yourself. You blasted your way in their back door.

A. Yes, ma'am.

Q. Right?

And after you blasted your way in the back door shooting

all three shells that were in the gun, what's the next thing you did?

A. I heard Robin's mother. I heard Robin's voice. I turned to the left.

MS. ROSE: If I may approach the witness?

THE COURT: You may.

Q. I'm going to hand you Government's Exhibit Number 31E1. If you would take this, please. It belongs to you.

A. No, ma'am.

Q. If you would, I want you to show the jury something, please, sir.

A. I vowed never to touch that gun again and I will not.

Q. Well, tell us about how you reloaded this gun. You crafted it. This is your work. You need to take it and show the jury how you made it work.

A. That gun I used to kill people and I will not touch that gun again.

Q. Well, show us how you reloaded it while you're standing in Bertha Williams' kitchen, the brownies are cooling on the stove, she's screaming for her daughter to run for her life. Tell us how you reloaded it.

A. The shells go in the side and that's how I did it. I put the shells --

Q. Do you have to pull that back?

A. I don't remember.

Q. Do you have to pull this back and load them in one at a time?

A. I don't remember how you put them in. I think you might put them in through the bottom.

Q. Do you have to pull this back each time?

A. I don't know.

Q. Pardon?

A. I don't know. I think you put the shells in the bottom and then --

Q. Then what happens to them?

A. Then you pull the trigger.

Q. Okay. So you load them up from the bottom and nothing has to move to load them into the chamber. I mean, how does it work?

A. I don't recall. Simply because after I got to Tennessee, I put that gun in the trunk. Next time I put it in the dumpster. I did not want to see it again.

Q. Where did you have your spare shells that you used to reload in the kitchen?

A. I think when I left the car, I stuffed shells in my pockets.

Q. After you killed Robin, you went back to your car and you left town. Do you remember which way you left?

A. No, ma'am. I remember getting on 81. I think I might have hit Orange, but I got on 81.

Q.   Yesterday you told the jury that all you could think about at that point was suicide.

A.   I had a lot of thoughts, suicide being the main one.

Q.   Got this gun, some spare shells right there in the car with you.  But you weren't going to kill yourself with that gun, were you?

A.   Not after I saw Robin bleed all over herself.

Q.   I mean, you'd seen what a sawed-off shotgun can do to somebody.

A.   That was the first time I had seen it.

Q.   You'd seen the fear in Robin's face as she looked down the barrel back at you the first time you shot her.

A.   No, ma'am.

Q.   You know how frightening it was.

A.   I knew how frightening it was, but actually seeing that after I shot her, she turned away from me and started to go towards her mother, so I did not see her when I cowardly shot her in the back.

Q.   And you didn't want to do that to yourself.

A.   It frightened me terribly and I panicked.  I wish I hadn't.  I wish also I hadn't done any of this.

Q.   So instead of using the gun that you knew worked because you didn't want to look down the barrel end of it the way you had done to Robin, you for about the twenty-fourth time go and take some sleeping pills to kill yourself.

A.   Yes, ma'am.

Q.   That doesn't work as good as a gun, did it?

A.   No, ma'am.

Q.   So then you decided you were going to gas yourself for the first time.

A.   I gassed myself first.  I took sleeping pills and gas the second time.

Q.   But you weren't going to do that until you had a chance, as you said, to go offer prayers on behalf of those you had murdered.

A.   That happened after the first suicide attempt.

Q.   You took the time to call home and ask for forgiveness from your mother.

A.   That was before the last suicide attempt.

Q.   You didn't want to die without being able to tell her that you were sorry, did you?

A.   I wanted her to know that I love her and I wanted to say good-bye.

Q.   You wanted to tell your mother good-bye, didn't you?  And you wanted to tell her you loved her, didn't you?

A.   Yes, ma'am.

Q.   Donnie and Robin didn't get that chance, did they?

A.   No, ma'am.

Q.   But you made sure that you had it.

A.   Yes, ma'am.

Q. Despite all the adventures that you detailed, that you had over there in Knoxville, you made it back to Charlotte and got near your cousin's apartment and that's where you abandoned Donnie's car, correct?

A. The reason I parked his car where it was parked, there's not a lot of traffic back there. I know the patrols back there. I've spent time at my cousin's house. I knew they would find the car. That's why I parked it in that spot.

Q. Why didn't you just call the police?

A. I don't know. I wish I had. But like I said, I wish this never would have happened, either.

Q. And because you wanted to preserve the evidence of your crimes, you put them in a dumpster.

A. Yes.

Q. Instead of leaving them in a locked car.

A. Yeah. I felt somebody might steal the car, so I put them in the dumpster behind the car. I left shells in the car that matched shells in the bag. I didn't know what would happen to me at that point, if I would make it home, but I had to try.

Q. Now, did you contact your cousin or your mother first?

A. I contacted my mother first. That was on Sunday early. I contacted my cousin on Monday, Monday -- mid Monday, I believe.

Q. At that point you did not tell them anything about Donnie Allen.

A.    They had -- I called them for help.  They told me that they knew about Robin.  I did not have at that time the opportunity to tell them.  I wanted to fully explain it to them.

Q.    And the officers in fact are the ones that brought up Donnie Allen.

A.    No.

Q.    The officers said to you we have a car.

A.    You're referring to me?  I thought you were referring to my mother.

Q.    No.

A.    If you're referring to me.  In the process of the first interview when Womble was talking to me and I'm telling him about Robin, his next question to me was, Marc, we want you to help with a missing person.  He never gave me the opportunity to blurt it out.  I was simply answering everything they asked me.  That's why it came out like that.

Q.    You were getting ready to tell them; they just beat you to it.

A.    I was just following his instruction and his question at that time.

Q.    At that point you knew they had the car.  You knew they had your fingerprints in it.

A.    No, at that time I did not know they had the car.  He told me about the car after I took them to Donnie Allen's --

where he was.

Q. They showed you the car after that, but they told you that they had a missing persons report and that the car seen in Roanoke matched the description of the missing persons car. Isn't that how it happened?

A. Oh, yes, yes. Now I remember. Yes. But that doesn't say that they had the car. It says that it was identified as the same car.

Q. And I believe you described yesterday that you didn't really confess anything at that point. You just wrote corner of Billy Graham and Morris Field and slid it on a piece of paper across to them.

A. I was talking to Agent Womble and I didn't really know what to do about that, so I wrote it down. I drew a map. I did not think that they would allow me to go out there with them or ask me to take them out there with them. He didn't do that until afterwards.

Q. You told the jury that while -- despite all the violent acts of your life, beating up women for many years, children, shooting at people, that you've been a model prisoner while awaiting this sentencing.

A. There -- I don't have a girlfriend in prison. I don't have a relationship. I don't have that kind of surrounding, that relationship setting. It's just like when I was at home, if I wasn't involved in a relationship or relationship was

fine, never done anything to anybody.

Q. That's not what I asked you. I asked you about your behavior while awaiting this sentencing. You've been very good, haven't you?

A. You're talking about incarceration. That's what I'm referring to.

Q. And you're saying you've been good because you haven't been -- had a chance to be around women?

A. That's correct. In a relationship setting. We have female guards. I talk to them same way I talk to the male guards. They're all guards to me. But I don't have that romantic connection with anyone.

Q. And really, it's not a setting in which you could get into any kind of trouble, is it? It's pretty controlled in some ways.

A. Oh, no. You know, like I said, in phase two, when you go down to the day room and you've got four guys together, playing cards, you know, I've seen guys get into fights. If you're in the county jail where I've been -- there's one place where I was, it's called 5100. It's a unit. At one time we were having fights every day, and I just -- I don't get into that sort of thing, you know. That's not how I do my time.

Q. No, you just beat up girls.

A. I have a problem with abusing women.

Q. Now, the special confinement unit that you described

prior to your coming for your sentencing, that's not general prison population life.

A.    Only the phase two aspect is similar to general population.  And where I'm housed now, it's general population.

Q.    And general population life, I mean, allows you to do your artwork that the jury has seen.  In fact, they were nice enough to go and get you different mediums to use.  You said you tried the acrylics.  So you're able to follow through, do some of your artwork.

A.    That's not general population.  That was the maximum security lock down.  That's just one of the few things I had to be able to do.

Q.    In the general population, though, you get to do a whole lot more than that.  Like you said, when you were at Butner, that was kind of more a realistic setting.  You got to play basketball, right?

A.    I don't play basketball.  I said you could go to the gym.  I can't play basketball.

Q.    Or attend school.

A.    I am currently trying to get my G.E.D. where I was housed at.

Q.    And you can go to the library.  You talked about that a little bit.

A.    They have a law library where I went and studied some

law, where a lot of guys study law on their cases.

Q.    And of course, they have magazines and cable TV and other ways to entertain yourself throughout the day.

A.    I'm not a big TV person.  I like to read.

Q.    And of course --

THE COURT REPORTER:  I'm sorry?

THE WITNESS:  I said I'm not a big TV person.  I like to read.

Q.    And of course, you get your regular phone calls.

A.    Well, in general population they can have that.  Not where a lot of places I've been housed.  You have to have permission to get the call.  You're only allowed two calls a month.

Q.    Well, that was in the special confinement unit.

A.    Also at Butner before I was out in GP.

Q.    And then -- but you do get to call and talk to your family or, like you said, you're trying to build a relationship with your children now in the last month.

A.    Yes.  Where I'm housed at now in the county jail, you're allowed to use the phone when the pod hours are open.  I think we're open a total of six hours a day.

Q.    And of course, you can get a job while there in prison and make some money.

A.    If you stay out of trouble, you're allowed to work, make a little bit of income.  I think we make 50 cents an hour or

something like that.  You work maybe four hours a day.

Q.    And that money, then, can go into a canteen so you can buy things you like.  Whatever, candy bars or drinks or things that --

Q.    Well, there again, you have to understand me.  I don't eat junk food.  What I've been trying to do before I left was find some kind of way I could save up some money to be able to maybe, if I had been lucky enough to get contact with Tasha, wanted to be able to try to help the kids out.

Q.    Can you, when you're there, also get visitors?

A.    I haven't touched any of my family, just as I didn't allow Donnie and Robin to.  In the past six years every visit is behind glass and steel.  Since -- when I'm away from Charlotte, I was only lucky enough to see -- my father came to see me in Virginia.  Only since waiting and going through trial do I receive some visits.  My children recently and sometimes my mother.

Q.    But you can in general prison population have visitors. You can have a list of folks that can come see you and you can talk with them.  May not be a contact visit, but it's an opportunity to visit and see them; is that correct?

A.    Yeah, because I've been told I will never again have a contact visit.

        MS. ROSE:  Thank you.  I don't have any other questions.

MR. BENDER: Nothing further, Your Honor.

THE COURT: You may step down.

THE DEFENDANT: Thank you.

(Defendant stepped down.)

THE COURT: Do we have another witness?

MS. LAWSON: Yes, Your Honor. Derrick Barnette.

DERRICK BARNETTE,

being first duly sworn, was examined and testified as follows:

DIRECT EXAMINATION

BY MS. LAWSON:

Q. Good morning, Mr. Barnette. Would you please introduce yourself to the jury.

A. My name is Derrick Barnette.

Q. And how are you connected to Marc Barnette?

A. That's my son.

Q. Now, where do you live and work now, Mr. Barnette?

A. I live in Clinton, Maryland. I'm a postal worker.

Q. Are you married?

A. Yes, ma'am.

Q. Do you have any children or stepchildren?

A. I have two stepchildren and one biological child.

Q. Tell the jury first of all if you know Jesse Cooper?

A. Yes. That's Sonia's father. That's my first wife's father.

Q. And your first wife is Sonia Cooper, Marc's mother?

A. Right. That's correct.

Q. How did you meet Jesse Cooper?

A. He was the janitor at our -- at my high school.

Q. Which high school was that?

A. Harry P. Harding here in Charlotte.

Q. Do you know where Jesse Cooper is now?

A. He's in the hospital.

Q. How long has he been in there?

A. A couple of months, I believe.

Q. From what is he suffering, do you know?

A. I think he has cancer.

Q. Tell us about Jesse Cooper.

A. When I first met Jesse, I didn't know he was Sonia's father. I met Sonia when I was in the ninth grade. And when I went to high school, she would always say I have somebody watching you. And I met Jesse and I had already known him. But he was a nice guy and we talked in the hall between classes.

Q. What kind of person was he besides nice as you got to know him?

A. He was unique. Little eccentric. He had been -- in his conversation, he was kind of hard to understand unless you really got to know him because he would speak in a code. It was more or less a military code. He would talk about coming to -- in his camp and stilettos and just various conversations

like that. However, I did learn that he had a degree from North Carolina A&T State University where I had gone for a semester and he was a very educated man, but had been in the military and was experiencing some problems.

Q. Did you know whether or not he drank?

A. Yes. Every day. He liked his -- he used to call it PBR, Pabst Blue Ribbon. And I would take him to the store and bring him back and he would stay at home and he would drink his beer.

Q. At some point did you meet Sonia Cooper and start dating her?

A. Yes. I met her when I was in the ninth grade prior to going to high school.

Q. And where -- what grade was she in when you met?

A. She was in the seventh grade. I was in the ninth.

Q. Tell the jury about the Sonia Cooper you met when she was in the seventh grade.

A. Sonia was a real nice girl. She was cute. She was fairly smart. We could, you know, have conversations, you know, that even in the ninth grade about school. You know, what we had learned. Those types of conversations.

Q. Did you and she date when she was in the seventh grade?

A. Yes.

Q. Did you ever know her mother, Pearl Cooper?

A. Yes, I knew her mother. She was a nurse. She was much

like my mother. Concerned about the well-being of her children. Single mother. Just seemed to be a real good person. She had a good heart. She was a good person.

Q. Had she and Jesse divorced by the time you first started going with Sonia?

A. Yes.

Q. At some point did you and Sonia become sexually intimate?

A. Yes.

Q. How old was she or in what grade was she?

A. Probably about the eighth or the ninth grade. I was in high school.

Q. What was your relationship like other than being sexually intimate when you were first dating?

A. We could talk. We got along. We were a normal teenage couple, I guess. She felt more like a friend more so. We had been together for a while and, you know, we kind of understood each other.

Q. Are you saying that she felt like you were a friend or you felt like she was a friend?

A. I thought we were both friends, somebody I could communicate with.

Q. And that's in addition to your sexual relationship with her?

A. Yes.

JA2154

Q. At some point did Sonia become pregnant?

A. Yes.

Q. Were you told by anyone who the father of the baby was?

A. When she was pregnant and I think up until she had the baby, we had separated. We weren't together. And then -- well, maybe -- when she was pregnant we were spending some time together; but after she had the baby, we weren't together. And I was told that the baby looked like me, so I went over and looked at it and it was a cute baby, so...

Q. That was Marc?

A. That was Marc.

Q. Were you there when Marc was born? At the hospital.

A. No.

Q. And Marc was born when Sonia was fourteen.

A. Right.

Q. Where did Sonia and Marc go to live after they left the hospital?

A. They lived with her mother in Arrowwood and her stepfather. I believe they had gotten married.

Q. That would be Leroy?

A. Right. Brown.

Q. And at some point did -- what happened to -- between Leroy and Pearl Cooper?

A. One morning I got a phone call. It was Sonia. She had told me that Leroy Brown had shot her mother and that she

asked me to come down there. I got up and got in the bed with my mother and had a conversation with her. Just, you know, how did this happen? How could this happen? Why? And she, you know, comforted me. And I got another phone call from Sonia and I immediately got up and drove down there to her.

Q. Why did you get in bed with your mother and talk to her at that point?

A. I was young. I needed that support.

Q. So you were --

A. I just -- I just needed to be with her for that moment. And I think the phone call rang early and she asked me what it was about. So in the conversation with her, I just got in the bed with her and had that conversation.

Q. Did she give you consolation and support and help you figure out what to do for Sonia?

A. Yeah. She told me to go. But, you know, my questions were how could somebody do this and, you know, just go through the whole question thing.

Q. Do you know whether Leroy Brown was prosecuted for the murder of Pearl Cooper?

A. Yes, he was. I think he spent about five years in jail.

Q. Did Pearl die?

A. Yes, she did.

Q. And do you know how she died?

A. From shotgun wounds, I think one to the head and another

one maybe to the chest area. I'm not sure.

Q. Do you know if Sonia ever saw her mother's body there at the house?

A. I know her sister Sheila was the first one to find her and went in and got Sonia. And I'm not sure if she actually saw her or not, but it wasn't a good time.

Q. The murder occurred in the house while Sonia and Sheila were there?

A. Right. And they were surprised that they didn't even hear the gun shots. They were in the house when it occurred.

Q. Did Sonia change after that?

A. She didn't change outwardly, but you couldn't make any references to her mother. She would just break down at that point.

Q. Where did she go to live first after her mother's death?

A. I think she stayed with her father for a while and then she moved in with her oldest sister and brother-in-law.

Q. And they moved down to Ft. Jackson, South Carolina?

A. South Carolina. Yeah, he was in the military. He was in the army.

Q. Did you -- I'm sorry. Did you continue your relationship with Sonia?

A. Yes.

Q. And at some point did you enlist in the military?

A. Yes. I joined the air force.

Q. Was that before or after you married Sonia?

A. That was before.

Q. What made you ask Sonia to marry you?

A. I cared about her. I liked the family atmosphere. At a young age my mother and father separated when I was five years old. He wasn't there, but -- I mean, he wasn't physically there, but he was emotionally there and he would come by. And he lived in Philadelphia. He had some issues. He was an alcoholic for a while and then he just abruptly stopped drinking and had a good job. And we had a close relationship until the time he died.

Q. So you married Sonia because you wanted to have a family?

A. Yes. I've always wanted to have a family.

Q. At some point did you have another child?

A. Yes. Mario.

Q. How old was Marc when Mario was born?

A. I think they're about four years apart.

Q. Where were you living when Mario was born?

A. I was in Okinawa.

Q. Had you been on a tour of duty overseas for a substantial period of time?

A. I had left in August and I returned six months later. In, I think, February. Yeah, February.

Q. Tell the jury, please, what your relationship was like

**1300**

**JA2158**

with Sonia as the children were growing up.

A. We had a nice relationship. I left Omaha, Nebraska. We got married -- well, I was in Omaha and I was stationed there and then I asked Sonia to marry me. She said she would. So I came back to Charlotte. And as soon as I returned alone, I found out that I had orders to go to Okinawa. Well, that was about six months later. So I had promised her that I would come and get her and Vicci and we would, you know, be together for that period of time because the tour in Okinawa, I think, was eighteen months.

So we packed up the little bit of stuff we had. We didn't have any furniture. I got a TV and a cot from some friends of mine on base and I had a sleeping bag for Vicci. We had some pots and pans. And we would go out every pay day, buy food, you know, for the month. And it was a pretty fun time. I enjoyed it even though we didn't have anything. It was a pretty nice time.

Q. Did you beat her then?

A. Beg your pardon?

Q. Did you beat her then?

A. No. No.

Q. When did that start?

A. After we returned to Charlotte after I got out of the military. I'm -- I can't dance so I don't care to go out to clubs and clubs to me, you can't talk to people, so, you know,

if you can't dance, no need in going. And I'm not a real big drinker. When I was in the military, I drank enough. And it wasn't a problem but it was going to be a problem, so I stopped before I left.

Q. You started to tell the jury about you don't dance. What significance is that?

A. Well, when we got back, Sonia liked to go out and she's always liked to dance and go out. So, you know, being the kind of person I wanted to be, I said, well, you know, you go ahead. I can, you know, stay at home and keep the kids. I don't have a problem with that. You know, she's entitled to things that she liked to do.

Q. And how old was Marc when this was going on?

A. Maybe seven, eight.

Q. How often was she going out a week?

A. Every weekend or maybe every other weekend.

Q. How did that make you feel?

A. Well, at first it was okay. I didn't have a problem.

Q. What happened later?

A. She started to go more often with more, I guess, intensity of having the need to go versus, you know, I'm going out with some friends having a good time.

Q. How did that make you feel?

A. Not very good.

Q. How did you --

A. I had a friend of mine I would call and talk to late at night. You know, it got to the point where I could watch the cars go up the street and she would probably get out of one of them and then, you know, walk back to the house 2 or 3 o'clock in the morning. It wasn't a good feeling.

Q. What did you think was going on?

A. Well, she was probably seeing somebody else.

Q. Did you accuse her of that?

A. Of course.

Q. Did you interrogate her about it?

A. Yes.

Q. Were the children -- did you do this at home?

A. Yes.

Q. Were the children there?

A. Yes.

Q. Is that when physical violence began in your household?

A. More or less, yes.

Q. What kind of things did you do to Sonia and why did you do them?

A. I would ask her about what she was doing. Who she was doing it with. And, you know, the arguments pursued. You know, some ugly things were said. The children were there. Just questioned her about, you know, number one, why you got to go? Where you going? Who you going with? She said a couple times she was going with a neighbor and I would call

the neighbor's house and the neighbor said, Well, I haven't seen her. So, you know, that just intensified the situation.

Q. Did you know whether she was doing -- using alcohol or taking drugs at that point?

A. I knew she was drinking, you know, when she would go out to the club, but I never saw any other drug abuse.

Q. Were there times when you would beg her to stay home?

A. Yes.

Q. How would you do that?

A. I would ask her, you know. You know, we'd get right up out the bed and, you know, she started dressing. I said, Where you going? And I said, you know, why you can't stay at home? You know, you got a family here.

And I even made mention to the neighbor, which I went to school with was a friend of mine, I said, you know, if Tina had a friend, she wouldn't be hanging out with you, you know. She would be with her participating in, you know, their relationship. So it would just go on and on and on.

Q. Did you ever follow her?

A. No. I wanted to have somebody to follow her, but it never happened.

Q. What's the worst thing you ever did to Sonia?

A. Probably hit her in the head with a hammer.

Q. With a hammer?

A. Yes.

Q. When did that happen?

A. It was during one of the arguments we were having.

Q. During the arguments, would she push back or yell back or --

A. Oh, yeah. It was a two-way confrontational experience.

Q. Pushing?

A. Yeah.

Q. Slapping?

A. On occasion.

Q. Did she ever brandish a weapon against you?

A. I woke up one time, she had a frying pan over my head. Turned into sort of a joke. You know, I was just laying on the sofa. Hadn't done anything that time.

And I just asked her what -- I woke up and she's standing there with the frying pan. I says, What you going to do?

She said, I'm going to hit you with it.

Why? I mean, you know, so...

Q. Did you do anything to make her jealous?

A. Well, she accused me -- well, that was an understatement. We were riding in the car together and we had just bought a Saab and we were -- I pulled into the car wash and these two girls pulled up in front of me. Now, I had my family and her in the car. I didn't know them. And she got real upset with me, you know, just over that. So she was fairly jealous.

Q.   So did she accuse you of infidelity?

A.   Yes.

Q.   And at some point did it get to be too much for you all to be living together?

A.   Yes, it did.

Q.   How old was Marc when that happened?

A.   Maybe ten.  Let's see.  I got out of the military in '79.  We were together until about '84.  So he was about ten to twelve.

Q.   And so Mario would have been?

A.   Eight.

Q.   Eight.

A.   Or seven.  Somewhere in there.

Q.   Did the level of argument and violence in your household increase over time?

A.   Yes.  It steadily increased.

Q.   Now, during the times that you were in the household before you separated from Sonia, did you hit anybody else?

A.   I spanked the children, or Vicci.

Q.   By Vicci, you mean Marc?

A.   Yes.  I know him by Vicci.

Q.   He testified that you beat him with a belt.  Is that true?

A.   That's true.

Q.   He testified that his mother would go hide in the

bathroom when you were hitting him. Is that true?

A. Sometimes she was present. Sometimes she wouldn't be in the room. She didn't like it.

Q. She didn't like it when you beat him?

A. No.

Q. What did she do to stop you?

A. Nothing. She -- nothing. That I can remember.

Q. Did you have a couple of principles that you felt were really important to get Vicci to accept and follow?

A. Yeah. I'm real strong on education and not lying to me. Those two things I just don't tolerate.

Q. And did you talk to him about that?

A. Yes.

Q. Repeatedly?

A. Yes.

Q. And did you talk to Sonia about lying?

A. Yes, ma'am.

Q. Accused her of lying to you when she went out, stepped out on you?

A. Yes.

Q. If she denied being unfaithful to you, did you believe her?

A. No.

Q. Do you recall a time when Marc got caught playing doctor at school?

A. No, ma'am.

Q. When you and Sonia were together, did you hit Marc more or less or the same amount as Mario?

A. Less. I only spanked Mario one time.

Q. Why?

A. Because he was a different child. He did basically what he was told and he obeyed fairly much.

Q. After you separated, did you pay child support to Sonia for the children?

A. Yes.

Q. How much, do you recall?

A. I think it was $400 a month.

Q. And did she --

A. No, $400 every two weeks, I believe. I'm sorry.

Q. What kind of money were you making then?

A. Maybe $17 an hour.

Q. And what kind of money was she making then?

A. I'm not sure. She worked for State Farm.

Q. Was it your impression that she needed the child support that you were paying?

A. It got to that point. I wasn't late with the child support; and what I mean by late, I wasn't several weeks behind. And, you know, if the child support wasn't there on that day, I would get a phone call. I had moved to Philadelphia for my job and I didn't see if the money was

going toward the children and the household, but it was always there before the next payment was due.

Q. Did you begin to suspect that the money wasn't going to the children?

A. Yes.

Q. What made you suspect that?

A. The intensity of the phone calls. They became frequent within that week. You know, you say you was going to send it today. I don't have it by two days later, where is it? When you going to send it? And it was almost like she was using it to pay bills with versus using it to take care of the children.

Q. Did there come a time when you began to question whether Mario was your biological child?

A. Yes, ma'am.

Q. What brought that on?

A. We had separated. Some of these phone calls. I had did the math earlier. I had contacted some attorneys. None of them were willing to handle the case, I guess. But I did find one during the separation and divorce.

Q. Nobody was willing to handle a case where you would potentially determine that the children born into your marriage were not yours?

A. Right.

Q. Did they tell you why?

A. Well, I had one family attorney and he didn't want to get in between us. He was a friend of mine and a friend of Sonia and a friend of the family. So out of respect for that relationship, he didn't want to, you know, choose sides, I guess. So I respected that.

Q. As a result of whatever you filed in court, were Sonia and the children and you required to give blood for a paternity test?

A. Yes.

Q. And eventually, you learned that neither Mario nor Marc were your children; is that right?

A. That's correct.

Q. What did you do when you found that out?

A. I took Vicci and Mario out to dinner and I kind of explained to them before what had happened about the blood test and maybe some possibilities of what it could be and what it would mean. And during -- well, after dinner I told them that I was not their biological father, but I would always be their father because they didn't have any choice in this and this was not between me and them, it was between me and their mother.

Q. What specifically did you tell them about why you had the paternity test?

A. Like again, I said this is between me and your mother. This has nothing to do with you. But Vicci asked more

questions at that point because when I told him I wasn't his biological father, he reacted and it was subtle, but I got questions from him more than I got from Mario. And I told them, you know, me and your mother had to separate because we weren't getting along and it wasn't fair to you to be in this type of relationship.

And once the tests came back, I also mentioned that, you know, how would you feel if you were having a relationship and she was having children by, you know, somebody else. So I tried to explain it as well as I could at that time.

Q.   How old was Marc when you told that to him?

A.   Somewhere between nine and twelve.

Q.   Now, you, as a result of --

THE COURT:  Would this be just as good a time to break for lunch?

MS. LAWSON:  Yes, sir.  Yes, sir.

THE COURT:  All right.  Members of the jury, we'll do that.  Please remember the usual instructions.  Ask you to be back with us at 2 o'clock.  Thank you.

(Lunch recess at 12:30 p.m.)



**JA2170**

**JA2171**



RECEIVED

JUN 1 6 2003

US ATTORNEY'S
OFFICE
CHARLOTTE, NC

**JA2172**