# IN THE

# United States Court of Appeals

## FOR THE FOURTH CIRCUIT

---

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

v.

AQUILIA MARCIVICCI BARNETTE,

*Defendant-Appellant.*

---

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA AT CHARLOTTE

---

### JOINT APPENDIX - VOLUME V OF VII
### (Pages 2173 - 2671)

---

Gerald W. King, Jr.
FEDERAL PUBLIC DEFENDER
FOR THE WESTERN DISTRICT
OF NORTH CAROLINA
129 West Trade Street, Suite 300
Charlotte, NC 28202
704-374-0720
gerald_king@fd.org

*Counsel for Appellant*

Anthony Joseph Enright
OFFICE OF THE
UNITED STATES ATTORNEY
Western District of North Carolina
227 West Trade Street, Suite 1650
Charlotte, NC 28202
704-344-6222
usancw.appeals@usdoj.gov

*Counsel for Appellee*

Additional Counsel for Appellant on Inside Cover

Jacob H. Sussman
SOUTHERN COALITION FOR SOCIAL JUSTICE
P. O. Box 51280
Durham, NC 27717
704-277-3962
jsussman@scsj.org

Mark E. Olive
ATTORNEY AT LAW
320 West Jefferson Street
Tallahassee, FL 32301
850-224-0004
meolive@aol.com

*Counsel for Appellant*

# TABLE OF CONTENTS

## VOLUME V OF VII

JA Page

*Continued,* Exhibits to Response of the United States to Barnette's Motion Under 28 U.S.C. 2255 and Motion for an Evidentiary Hearing 2023.09.23:

Ex. 1g:   Joint Appendix Vol. IV of V [ECF105]........................................ 2173

           Resentencing Volume 17, August 6, 2002 (Afternoon) ........... 2183

           Resentencing Volume 18, August 7, 2002 (Morning).............. 2295

           Resentencing Volume 18, August 7, 2002 (Afternoon) ........... 2404

Ex. 1h:   Remainder of JA Vol IV of V [ECF106]...................................... 2423

           Resentencing Volume 19, August 8, 2002 (Morning).............. 2505

           Resentencing Volume 19, August 8, 2002 (Morning).............. 2597

## IN THE

# United States Court of Appeals

## FOR THE FOURTH CIRCUIT

## UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

v.

## AQUILIA MARCIVICCI BARNETTE,

*Defendant-Appellant.*

## ON APPEAL FROM THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA

### JOINT APPENDIX - VOLUME IV OF V
### (Pages 1312 - 1798)

<div style="display:flex"><div>

HAROLD J. BENDER
LAW OFFICE OF HAROLD J. BENDER
200 North McDowell Street
Charlotte, NC 28204
(704) 333-2169


MARK E. OLIVE
ATTORNEY AT LAW
320 West Jefferson Street
Tallahassee, FL 32301
(850) 224-0004

*Counsel for Appellant*

</div><div>

ROBERT J. CONRAD, JR.
UNITED STATES ATTORNEY
WESTERN DISTRICT OF NC
Suite 1700, Carillon Building
227 West Trade Street
Charlotte, NC 28202
(704) 344-6629


ANNE M. TOMPKINS
ASST. UNITED STATES ATTORNEY
WESTERN DISTRICT OF NC
Suite 1700, Carillon Building
227 West Trade Street
Charlotte, NC 28202
(704) 344-6222

*Counsel for Appellee*

</div></div>

**Additional Counsel Listed on Back of Cover**

LANTAGNE LEGAL PRINTING 801 East Main Street Suite 100 Richmond, Virginia 23219 (804) 644-0477
A Division of Lantagne Duplicating Services

Case 3:12-cv-00327-MOC   Document 105   Filed 09/23/15   Page 1 of 250

**JA2173**

JILL WESTMORELAND ROSE
ASSISTANT UNITED STATES ATTORNEY
WESTERN DISTRICT OF NORTH CAROLINA
100 Otis Street, Room 233
U.S. Courthouse Building
Asheville, North Carolina 28801
(828) 271-4661

**JA2174**

TABLE OF CONTENTS

Federal District Court Docket Sheet . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Indictment filed February 4, 1997 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 69

Guilty Verdict returned January 27, 1998 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 75

Defendant's Motion in Limine Regarding the Victim
Impact Statements, filed June 4, 2002 . . . . . . . . . . . . . . . . . . . . . . . . . . . . 76

Motion for Allocution by the Defendant, filed
June 4, 2002 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 78

Government's Response in Opposition to
Defense Motion in Limine to Prohibit
and/or Limit Victim Impact Evidence,
filed June 12, 2002 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 80

Government's Response to Motion for Allocution
by the Defendant, filed June 12, 2002 . . . . . . . . . . . . . . . . . . . . . . . . . . . . 89

Order Denying Defendant's Motion for Allocution,
entered June 18, 2002 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 93

Order Denying Defendant's Motion in Limine
regarding the Victim Impact Statements,
entered June 21, 2002 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 97

Motion for Relief Pursuant to *Ring v. Arizona*
filed July 2, 2002 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 100

Attachments:

Indictment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 103

1

**JA2175**

**JA2176**

Government's Notice of Intent to Seek
the Death Penalty, filed August 7, 1997 . . . . . . . . . . . . . . . . . . . . . . . . . . 110

Government's Reaffirmation of Intention
to Seek the Death Penalty, filed July 30, 2001 . . . . . . . . . . . . . . . . . . . . . 118

Defendant's Memorandum in Support of Motion
Regarding *Ring*, filed July 12, 2002 . . . . . . . . . . . . . . . . . . . . . . . . . . . 121

Government's Response to Defendant's Motion for
Relief Pursuant to *Ring v. Arizona*,
filed July 12, 2002 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 128

Voir Dire:

Prospective Juror Regina Sanders (888) . . . . . . . . . . . . . . . . . . . . . . . . . . 133

Prospective Juror Edwards (1014) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 148

Prospective Juror Karen Sanders (1071) . . . . . . . . . . . . . . . . . . . . . . . . 169

Prospective Juror Blakeney (1143) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 184

Prospective Juror Bryson (1239) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 205

Prospective Juror Donaldson (1289) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 224

Prospective Juror Campbell (1477) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 245

Prospective Juror Moore (1913) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 264

Prospective Juror Deana Stanford (1960) . . . . . . . . . . . . . . . . . . . . . . . . 281

Parties' exercise of peremptory challenges to the
prospective jurors, July 27, 2002 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 294

2

**JA2177**

**JA2178**

### Volume II

Resentencing Volume 12, July 29, 2002, (Morning) . . . . . . . . . . . . . . . . . . . . . . 372

Resentencing Volume 12, July 29, 2002 (Afternoon) . . . . . . . . . . . . . . . . . . . . 469

Resentencing Volume 13, July 30, 2002 (Morning) . . . . . . . . . . . . . . . . . . . . . 587

Resentencing Volume 13, July 30, 2002 (Afternoon) . . . . . . . . . . . . . . . . . . . . 687

Resentencing Volume 14, July 31, 2002 (Morning) . . . . . . . . . . . . . . . . . . . . . 773

### Volume III

Resentencing Volume 14, July 31, 2002 (Afternoon) . . . . . . . . . . . . . . . . . . . . . 845

Resentencing Volume 15, August 1, 2002 (Morning) . . . . . . . . . . . . . . . . . . . . . 959

Resentencing Volume 16, August 5, 2002 (Morning) . . . . . . . . . . . . . . . . . . . 1029

Resentencing Volume 16, August 5, 2002 (Afternoon) . . . . . . . . . . . . . . . . . . 1107

Resentencing Volume 17, August 6, 2002 (Morning) . . . . . . . . . . . . . . . . . . . 1202

### Volume IV

Resentencing Volume 17, August 6, 2002 (Afternoon) . . . . . . . . . . . . . . . . . . 1312

Resentencing Volume 18, August 7, 2002 (Morning) . . . . . . . . . . . . . . . . . . . 1424

Resentencing Volume 18, August 7, 2002 (Afternoon) . . . . . . . . . . . . . . . . . . 1533

Resentencing Volume 19, August 8, 2002 (Morning) . . . . . . . . . . . . . . . . . . . 1634

Resentencing Volume 19, August 8, 2002 (Afternoon) . . . . . . . . . . . . . . . . . . 1726

**JA2179**

**JA2180**

*Volume V*

Resentencing Volume 20, August 9, 2002 (Morning) .................... 1799

Resentencing Volume 20, August 9, 2002 (Afternoon) ................... 1822

Resentencing Proceedings, August 12, 2002 ........................... 1870

Resentencing Proceedings, August 13, 2002 ........................... 2017

Defendant Motion for Mistrial regarding victim
impact testimony, filed August 5, 2002 ......................... 2034

Written questions from the jurors filed August 13, 2002 ................. 2037

District Court Judge's answer to jurors' written question
filed August 13, 2002 ................................... 2038

Jury verdict form with reference to count 7, filed
August 13, 2002 ...................................... 2039

Jury verdict form with reference to count 8, filed
August 13, 2002 ...................................... 2057

Jury verdict form with reference to count 11, filed
August 13, 2002 ...................................... 2075

Judgment and Order imposing sentence, entered
August 20, 2002 ..................................... 2092

Defendant's Motion for New Trial, Arrest of Judgment
and Other Relief, filed August 20, 2002 ........................ 2097

Order Denying Defendant's Motion for New Trial,
Arrest of Judgment and Other Relief
entered September 9, 2002 ................................ 2149

4

Case 3:12-cv-00327-MOC   Document 105   Filed 09/23/15   Page 9 of 250

**JA2181**

Case 3:12-cv-00327-MOC   Document 105   Filed 09/23/15   Page 10 of 250

JA2182

Page 3337

IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF NORTH CAROLINA

CHARLOTTE DIVISION

COPY

UNITED STATES OF AMERICA  )

          ) CASE NO. 3:97CR23-V

  v.        ) August 6, 2002

          ) Afternoon Session

AQUILIA MARCIVICCI BARNETTE, )

   Defendant.    )

TRANSCRIPT OF SENTENCING HEARING

BEFORE THE HONORABLE RICHARD L. VOORHEES

UNITED STATES DISTRICT COURT JUDGE

APPEARANCES:

FOR THE GOVERNMENT:

  ANNE M. TOMPKINS, Esq.

  JILL WESTMORELAND ROSE, Esq.

  Assistant United States Attorney

  227 West Trade Street

  Suite 1700

  Charlotte, North Carolina  28202

FOR THE DEFENDANT:

  JEAN B. LAWSON, Esq.

  P.O. Box 4275

  Charlotte, North Carolina  28226

  HAROLD J. BENDER, Esq.

  200 North McDowell Street

  Charlotte, North Carolina  28204

Reported by:  Scott A. Huseby,

    Registered Professional Reporter,

    Certified Court Reporter,

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/6/2002

Page 3338

PROCEEDINGS

THE COURT:  May I have the jury, please.

MS. TOMPKINS:  Your Honor?

THE COURT:  Yes, excuse me.

MS. TOMPKINS:  I just wanted to state for the record that just a minute or two ago I received from defense counsel, it's not really a report, but it is what purports to be a report from Dr. Mark Cunningham, a witness for the defense, who will be testifying as an expert, I think -- I don't have the Court's order in front of me, but the Court had put out a schedule for reports to be generated and given to oppositional counsel which was clearly scheduled for well before the trial begins rather than on the day or day before the expert is going to be testifying.  Just for the record, I just wanted to let you know I just got it.

THE COURT:  What is the explanation for that?

MR. BENDER:  Your Honor, last Friday, I believe it was, maybe Thursday afternoon after court, Ms. Tompkins called me and said that she could not locate Dr. Cunningham's report and did I have a copy of it and she would come by and pick it up.  I gave her a copy at that time with some exhibits that, or slides, photocopies of slides we had used the last time.

Case 3:12-cv-00327-MOC   Document 105   Filed 09/23/13   Page 12 of 250
1313

JA2184

United States of America vs. Aquilia Marcivicci Barnette    3:97CR23-V
Proceedings Before Judge Richard L. Voorhees    8/6/2002

Page 3339

We received these I think this morning from Dr. Cunningham. We don't know how many of them we are going to use. She has his report, had his report some time ago. These are simply slides that he will use to illustrate his testimony.

I would also like to state for the record that we have requested but not received a formal report from the expert that the government is going to use, Dr. Dietz. The only thing we have seen has been a draft report. So we have -- as soon as we got them, we gave them to them. We don't know how many we are going to use out of that. We are still making that decision at this time.

THE COURT: Well, we need to try to break the logjam here. You say you don't have the report until today.

MS. TOMPKINS: Well, to clarify what Mr. Bender said, last Friday what I had from Dr. Cunningham was a page and a half letter to the Court that Dr. Cunningham had generated in the trial, which was not a report, rather a letter to the Court saying, I have expertise to testify, and copies of slides that he had used in a presentation.

I, in fact, had them, and have had them for as long as I have needed them. I thought that he had actually generated a report per se, these are my

Case 3:12-cv-00327-MOC Document 105 Filed 09/23/15 Page 13 of 250
1314

JA2185

United States of America vs. Aquilia Marcivicci Barnette

3:97CR23-V

Proceedings Before Judge Richard L. Voorhees

8/6/2002

Page 3340

findings, this is the conversation that I had with the defendant.

What Mr. Bender gave me was, in fact -- I thought there was something different. What Mr. Bender gave me was something that I already had, so I made my preparations based on that. Moments ago I got handed, I don't know, 50 pieces of paper which is wholly different, wholly different than the document that I have had in my possession for a year.

THE COURT: It's not slides, I take it.

MS. TOMPKINS: It is -- well, when he says slides, I think he means from a Power Point presentation. That's all there is. There is no actual report. It is copies of a Power Point presentation.

THE COURT: All right. We will reserve some attention for that for the future.

May we have the jury, please.

(The jury returned to the courtroom.)

THE COURT: The jury is with you. You may continue.

MS. LAWSON: Thank you, Your Honor.

DERRICK BARNETTE,

being previously duly sworn, was examined and testified as follows:

EXAMINATION

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/6/2002

Page 3341

BY MS. LAWSON:

Q. Mr. Barnette, you became a father for the first time when you were 16 years old, is that right?

A. That's correct.

Q. Did you try to be a good father?

A. Yes, ma'am.

Q. Tell the jury what you did to be a good father.

A. Being raised in a single family home, I also had a family structure, I had a grandfather and grandmother, and a mother. And like I said, my father was absentee, but he was present when I needed him to be. He also communicated with my mother.

In that structure I had mother, grandmother, grandfather, and a good background. As I tried to be a father, I tried to pass some of those same things on to me -- I mean, to my children. I mean, we had food in the house, we had transportation, car, lights, all of that good stuff. It was the basics.

When I got out of the military, I had a job for a little while, then I started to school and generated some income from military payments that they would pay for going to school.

Q. Were you aware that Marc had seen either yours or your brother-in-law, Jeff Nero's, Playboy magazines when he was very young?

Reported By: Scott A. Huseby, RPR
800-333-2082          Huseby, Inc., an Af          on  (704) 333-9889          Fax (704) 372-4593
Case 3:12-cv-00327-MOC  Document 131-6  Filed 09/23/15  Page 15 of 250

JA2187

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/6/2002

Page 3342

A.    No, I wasn't aware of that.

Q.    Tell the jury a little bit about how Sonia Barnette took care of the boys after you were separated and you were no longer living with her.  What do you know about that?

A.    After she left, I didn't know if we were going to get back together or not.  I kind of had a year where, you know, we would have a trial, I didn't tell her this, this was something that I kept to myself, and we would try to work it out.  I would call her; and if she said, I will call you back, that means I wouldn't get a phone call.

Q.    You would or would not?

A.    I would not.  You know, if she said, I will call you back, you know, I wouldn't see her anymore. One day I called her, one Saturday morning, it must have been about 8:00, 9:00 o'clock, and the children answered the phone.  I said, where is your mother?  And they said, she is not here.  I said okay.  So I called back about 11:00.  I had suspected that she was leaving them there alone, but I never questioned them about it.  I never felt that you should question children about adult's practices, so I told them to get dressed, I would be there in a minute.  So I went and picked them up, and we went home and we cooked and we played.  And I

JA2188

United States of America vs. Aquilia Marcivicci Barnette    3:97CR23-V
Proceedings Before Judge Richard L. Voorhees    8/6/2002

Page 3343

guess about 8:00, 9:00 o'clock I got a call from Sonia. It a general conversation, hey, how are you doing? I said, fine, okay, see you later, and hung up.

About an hour or two later I get another phone call and she is frantic because she hasn't seen the kids. And I said, when is the last time you saw them? And I got a vague answer about them going out to play and they didn't come in. And I tried to ask her some other questions to try to narrow it down to, you know -- but she never did. And I think she heard the kids in the background, and she says, they are over there with you? I said no, that was the TV. This went on for about another 30 minutes and then I told her I had them, and either she picked them up or I took them home.

Q. To the best of your knowledge, did she leave them alone at home on other occasions?

A. I felt like she did, but I never knew that for a fact.

Q. During the time that you were still living together when you were having some confrontations, do you recall ever fighting with her, arguing with her out in the street?

A. No, I don't recall arguing with her in the street. Maybe in the yard, if that, but mostly I believe they were contained to the house.

Reported By: Scott A. Huseby, RPR
800-333-2082      Huseby, Inc., an Aff...      ...n (704) 333-9889      Fax (704) 372-4593
Case 3:12-cv-00327-MOC   Document 105   Filed 09/23/15   Page 17 of 250
1318

JA2189

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/6/2002

Page 3344

Q.   Do you recall kicking in the front door?

A.   Yes.

Q.   What precipitated that?

A.   We were having our usual argument for the day, and for some reason I walked outside; and when I came back to get in, the door was locked and I had left my keys in the door. And when I kicked the door, it was a thin wooden door, I think it was more like a closet door, or it seemed to be, so it wasn't a real thick hard door, and I kicked it and my foot went right through it.

Q.   When Marc was a child, did you ever hit him when he was naked, hit him with a belt?

A.   Yes.

Q.   When you talked to the boys about the results of the paternity test, what did you tell them they should do in terms of finding out who their father or fathers were?

A.   I told them they should talk to their mother.

Q.   Do you know if she ever admitted to them who their fathers were?

A.   No.

Q.   When you stopped paying child support, and that was by court order, right --

A.   Right.

Q.   -- that you were relieved of that obligation?

Reported By: Scott A. Huseby, RPR
800-333-2082 Case 3:12-cv-0032Huseby, Inc. Document 105   Filed 09/23/15889 Page 18 of 250 (704) 372-4593
1319

JA2190

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/6/2002

Page 3345

A.    Right.

Q.    Did it occur to you that Sonia would have trouble maintaining herself and the two boys without that additional income?

A.    Yes.

Q.    Was it shortly after that that Sonia started dating unsavory men?

A.    I don't know.  I don't know who she dated.  I tried not to get involved in -- after she left I was relieved that she had gone; I tried not to get involved in what she was doing outside.

Q.    Did you know anything about what was going on with Marc down in Georgia and with Alicia Chambers?

A.    No.  I got a phone call one time from him when he was incarcerated when he had spanked the children with the coat hanger and --

Q.    If you would, tell the jury whether you knew anything about Marc getting arrested here and going to trial for what went on between him and Alicia Chambers.

A.    No, I don't know anything about that.

Q.    Now, how has all of this affected Mario Barnette?

A.    It's really hard to say how it really affects him, but he is deeply hurt.  This information -- once I told them that I was not their biological father, I

Reported By: Scott A. Huseby, RPR
800-333-2082                Huseby, Inc., an Affiliation                (704) 333-9889                Fax (704) 372-4593
Case 3:12-cv-00327-MOC   Document 105   Filed 09/23/15   Page 19 of 250
1320

JA2191

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/6/2002

Page 3346

never mentioned it again.  I always treated them the same.  I never brought it up again.  And I think just from listening to all of this information, it's not a good feeling.  I think he is emotionally hurt.

Q.   Did Mario and Marc always consider you to be their father?

A.   Yes.

Q.   What happened after Mario heard this in court today?

A.   He cried.  He broke down.  I had to talk to him.

MS. LAWSON:  No further questions.  Thank you.

THE WITNESS:  I beg your pardon?

MS. LAWSON:  No further questions.  Wait.  May I ask another question?

MS. TOMPKINS:  Yes.

BY MS. LAWSON:

Q.   Did you ever hit Marc with a coat hanger?

A.   No.  I used a belt.  I think when he was small I used a switch, but I wouldn't hit him with a coat hanger or extension cord.

MS. LAWSON:  No further questions.

CROSS-EXAMINATION

BY MS. TOMPKINS:

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/6/2002

Page 3347

Q. Mr. Barnette, education is important to you, is that right?

A. Yes, ma'am.

Q. And your mother was a teacher?

A. Yes, ma'am.

Q. And did she instill that in you?

A. It was important to her. You know, it was -- as all children, or some of my children have come up, they wanted to drop out of scoop, and she says, that's not an option.

Q. And that was -- that's something that you wanted to pass on to Marc and Mario?

A. Yeah. I think that's very important for a black family, to have a good education.

Q. And you went to college, correct?

A. I'm going to college now. I graduate in December.

Q. Congratulations.

A. Thank you.

Q. Now, and you have had good jobs, correct?

A. I have had this job since I separated from Sonia.

Q. What is that?

A. I work for the Postal Service.

Q. What do you do for the Postal Service?

Reported By: Scott A. Huseby, RPR
800-333-2082   Huseby, Inc. and Af...   on (704) 333-9889   Page 21   Fax (704) 372-4593
Case 3:12-cv-00327-MOC   Document 105   Filed 09/23/15   Page 21 of 250
1322

JA2193

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/6/2002

Page 3348

A. I'm a project manager.

Q. And you have been with them how many years?

A. Since '82.

Q. And before that it was the military?

A. Yes.

Q. How many years did you spend in the Air Force?

A. Four years.

Q. And you did your training in Texas, is that right?

A. That's correct.

Q. And then went to Nebraska?

A. Nebraska, Offit -- Omaha, Nebraska.

Q. And that was an 18-month deployment?

A. Right.

Q. And at that point you and Sonia were married, correct?

A. During that period we got married, just before I went to Okinawa, like six months before I went to Okinawa.

Q. And Sonia and Marc went to Nebraska with you?

A. Yes.

Q. And then your -- that was for 18 months?

A. That was for six months. They lived with me for six months.

Q. And then you next went to North Dakota?

Case 3:12-cv-00327-MOC Document 105 Filed 09/23/15 Page 22 of 250

United States of America vs. Aquilia Marcivicci Barnette                    3:97CR23-V
Proceedings Before Judge Richard L. Voorhees                               8/6/2002

Page 3349

A.    After Okinawa, yes.

Q.    That was after Okinawa?

A.    Yes.

Q.    So that was Marc, Mario, Sonia, and you?

A.    Right.

Q.    How long was that deployment?

A.    One year -- wait a minute.  One year.

Q.    Okay.  And after that you came back to Charlotte?

A.    That's correct.

Q.    And your mother had died and left you her home?

A.    That's correct.

Q.    And you all moved into that home?

A.    Yes.

Q.    At this point you had testified things were good in the family, things were good with Sonia?

A.    Yeah, they were pretty good when we first moved back.  You know, we were happy.

Q.    Marc was, what, about three or four at that point?

A.    No.  I think he was more like seven or eight or nine.

Q.    So he was seven or eight by the time you came back to Charlotte?

A.    Uh-huh.

Reported By: Scott A. Huseby, RPR
800-333-2082              Huseby, Inc., an Af          on  (704) 333-9889              Fax (704) 372-4593
Case 3:12-cv-00327-MOC  Document 105  Filed 09/23/15  Page 23 of 250
1324

JA2195

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/6/2002

Page 3350

Q. And up to that point, like you said, life was pretty good?

A. It was pretty good, yes.

Q. Family is very important to you, isn't that correct?

A. Yes.

Q. And you testified that you tried to be a good father?

A. (Nods head.)

Q. You took your family with you except for Okinawa?

A. That's correct.

Q. And so at -- when did things begin going bad with you and Sonia?

A. After we had been back for awhile, she was working, I was going to school, could have been peer pressure, you know. I heard things likes --

Q. When was that?

A. Right after we got back from North Dakota.

Q. Okay. Is that when you got your job with the Postal Service?

A. Well, I had some other jobs before that, but yes.

Q. Now, you just mentioned that you had, in disciplining Marc you had spanked him naked?

Reported By: Scott A. Huseby, RPR
Huseby, Inc., an A...ion
800-333-2082  Case 3:12-cv-00327-MOC  Document 105  Filed 09/23/15  Page 24 of 250  (704) 333-9889  Fax (704) 372-4593
1325

JA2196

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/6/2002

Page 3351

A.    Yes.

Q.    Now, you have never testified to that before, is that correct?

A.    That's correct.

Q.    At what age was Marc when you did that?

A.    Probably about seven to eight, somewhere in that area.

Q.    Was that a further punishment that you -- to humiliate him?

A.    It was intimidation.  The first punishment, and it's a stage, not that it's a planned stage, but I tried to get him to understand a couple of things, and this was another way of saying, if you don't do it, the punishment gets worse.

Q.    As he got older, did you continue doing that?

A.    No.

Q.    Now, when you testified in the trial, you used the term spanked.  Would you say that you spanked him?

A.    Yes.

Q.    Now, defense counsel asked you and framed the question in terms of did you beat him.  Would you characterize it as a spanking?

A.    I think all of those are interchangeable.

Q.    Okay.

A.    It just depends on your frame of reference.

Reported By: Scott A. Huseby, RPR
800-333-2082        Huseby, Inc., an Aff        n (704) 333-9889                Fax (704) 372-4593
Case 3:12-cv-00327-MOC   Document 105   Filed 09/23/15   Page 25 of 250
1326

JA2197

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees
3:97CR23-V
8/6/2002

Page 3352

Q. So when you testified previously that you spanked him using a belt or a switch, would that be accurate?

A. That's true.

Q. Okay. You had also previously testified that you had never hit him in the face or intentionally hit him above his legs, only on his butt. Would that be accurate?

A. That would be accurate.

Q. Now, you were asked previously and you testified previously that it was not a constant thing, you were not constantly disciplining Marc. Is that fair to say?

A. He was disciplined more than the other children.

Q. Would it be fair to say that Mario was a quieter child?

A. Yes.

Q. Would it be fair to say that Marc was disciplined when Marc transgressed the family rules?

A. Yes.

Q. And those family rules would be don't lie, do well in school?

A. That's true.

Q. Would you ever consider that you had spanked

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/6/2002

Page 3353

Marc without him transgressing a little?

A. No.

Q. Now, Marc testified about having been hit in the penis and scrotum. Do you have any recollection of that?

A. I have a vague recollection that I did it accidentally, not intentionally. Normally --

Q. Would that have been an isolated incident, if it happened?

A. When I spanked him, sometimes he would jump around in a circle, and it was more action just going around, but it's possible, and I do remember an incident where I did.

Q. All right. So that might have been an isolated incident?

A. It could have happened, yeah.

Q. Would you say that Mario -- you testified on direct that Mario pretty much did as he was told, is that right?

A. Pretty much.

Q. Now, when you and Sonia broke up, you didn't abandon Marc and Mario, did you?

A. It depends on what you mean by that.

Q. You have remained in their lives, isn't that correct?

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/6/2002

Page 3354

A. I have, but probably not as much as I should have.

Q. You did not walk away from them and said, you are not my biological children, isn't that correct?

A. You are correct.

Q. And when you did tell them that there was a court proceeding about that, you took them to a nice restaurant, Steak and Ale?

A. Uh-huh.

Q. Would it be fair to say that you were trying to be sensitive to the way that you broke them this news?

A. Yes.

Q. In fact, you haven't dwelled on it with them, have you?

A. It hasn't been an issue with me.

Q. Is that because you have remained their father?

A. That's correct.

Q. Okay. Now, with Sonia, you and Sonia had physical disputes, correct?

A. That's correct.

Q. But you don't remember having a fight out in the street?

A. Not in the street. Maybe in the yard. I don't recollect that particular fight, but it's possible. We had some pretty bad fights.

Reported By: Scott A. Huseby, RPR
800-333-2082   Huseby, Inc., an Aff...   (704) 333-9889   (704) 372-4593
Case 3:12-cv-00327-MOC   Document 105   Filed 09/23/25   Page 28 of 250
1329

JA2200

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/6/2002

Page 3355

Q.   And were many of those loud, verbal fights?

A.   Absolutely.

Q.   And as you have testified at times, you hit Sonia?

A.   That's correct.

Q.   And was that towards the end of your marriage?

A.   Yes, during the middle, toward the end.

Q.   And Marc was about in fifth grade when you all separated?

A.   It was '84, I believe.

Q.   And that year you all put Marc in private school, is that right?

A.   I don't know exactly when he was in private school.

Q.   Towards the end of your relationship with Sonia, Marc was taken out of public school and put in private school?

A.   I think it was the other way around, but I don't remember.  I think he started out in private school and then went to public school.

Q.   If there had been testimony that he went to Catholic school in the fifth grade, would that be accurate?

A.   I don't remember.  I just don't remember, I'm sorry.

Reported By: Scott A. Huseby, RPR
800-333-2082   Huseby, Inc., an Affi        n (704) 333-9889        Fax (704) 372-4593
Case 3:12-cv-00327-MOC  Document 105  Filed 09/23/15  Page 29 of 250
1330

JA2201

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/6/2002

Page 3356

Q.   And that was because you and Sonia were dissatisfied with the public schools for Marc?

A.   I had went to private school.  I think you get a good foundation from a private school.

Q.   And so y'all pulled Marc out of the public school and put him in private school?

A.   I don't remember.

Q.   But Marc went to private school?

A.   He did go to private school, I do know that, I can't remember when.

Q.   And, again, education is important to you?

A.   Absolutely.

Q.   And after you and Sonia separated, didn't you continue to go and see the boys?

A.   Not as often as I should.

Q.   Okay.  But you did?

A.   I left the door open for them because I didn't know what she was going to tell them after the test came back, and I wanted to leave that door open for whatever would happen.

Q.   Well, you told them that you would always be there for them?

A.   Absolutely.

Q.   And you, in fact, are?

A.   Yes.

Reported By: Scott A. Huseby, RPR
Huseby, Inc., an A    ion (704) 333-9889
800-333-2082    Fax (704) 372-4593
Case 3:12-cv-00327-MOC   Document 105   Filed 09/23/15   Page 30 of 250

1331

JA2202

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/6/2002

Page 3357

Q. You moved to Maryland?

A. Yes.

Q. Did you spend some time in Philadelphia?

A. Yes.

Q. Did Marc come and spend a summer with you in Philadelphia, or some time one summer?

A. I remember him being there, yes.

Q. And you've mentioned that when Marc moved to Georgia -- you obviously knew he moved to Georgia, isn't that right?

A. No. I knew he had gone, yes.

Q. Do you remember -- you have just testified that he had called you from the jail, so you knew that he was in some amount of trouble, correct?

A. Yes.

Q. Do you remember Marc contacting you about wanting a car?

A. Yes.

Q. And that you had offered to pay for half the car if he would go back to school, do you remember that?

A. Absolutely.

Q. And that was because that you wanted that to be incentive for Marc to get back in school?

A. That's correct.

Q. So even though he was in Georgia, he was in

Reported By: Scott A. Huseby, RPR
800-333-2082 Huseby, Inc. an Af ... on (704) 333-9889 Fax (704) 372-4593
Case 3:12-cv-00327-MOC Document 105 Filed 09/23/13 Page 31 of 250
1332

JA2203

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/6/2002

Page 3358

touch with you?

A. Somewhat.

Q. And saw you as a person that he could go to when he needed something like a car?

A. Not really.

Q. Well, he did come to you and say, dad, I need a car?

A. Yes. He came to me then, but there are stipulations to when I will help you. If you are helping yourself, you get from me; but if you are just begging, I can't help you.

Q. So you, in an effort to try to teach Marc, you said quid pro quo, I will do something for you if you do something for me?

A. Right.

Q. And that's you being a parent?

A. Right.

Q. Now, when Marc called you from jail in Georgia, what did he call you about, do you remember?

A. He called and he was talking to me about the situation he was in, and I gave him some advice.

MS. TOMPKINS: Thank you, Mr. Barnette. I don't have any further questions.

MS. LAWSON: If I may, Your Honor.

REDIRECT EXAMINATION

Reported By: Scott A. Huseby, RPR
800-333-2082    Huseby, Inc., an Aff    (704) 333-9889    Fax (704) 372-4593
Case 3:12-cv-00327-MOC   Document 105   Filed 09/23/15   Page 32 of 250
1333

JA2204

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/6/2002

Page 3359

BY MS. LAWSON:

Q. Mr. Barnette, did you go with Tosha and Marc's daughter, Angelica, to visit Marc in jail last Thursday?

A. I did.

Q. Was that before or after she testified in court?

A. That was after.

MS. LAWSON: No further questions. Thank you.

THE COURT: You may step down.

MS. LAWSON: We would call Mario Barnette, Your Honor.

MARIO V. BARNETTE, being first duly sworn, was examined and testified as follows:

DIRECT EXAMINATION

BY MS. LAWSON:

Q. Good afternoon. Would you tell the jury your name, please.

A. Mario Von Keith Barnette.

Q. Are you related to Marc Barnette?

A. Yes.

Q. Do you call him Marc or Vicci?

A. Marc.

Q. How old are you, Mario?

Reported By: Scott A. Huseby, RPR
800-333-2082 Case 3:12-cv-00327-MOC Document 105 Filed 09/23/15 Page 33 of 250 Fax (704) 372-4593
1334

JA2205

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/6/2002

Page 3360

A.    I'm 25 years old.

Q.    Where do you work?

A.    I work at Citel Corporation, an extension of On-Star, basically you push the button to get directions, reservations, things like that.

Q.    How long have you worked there?

A.    About one month from a year now.

Q.    And where do you live?

A.    At 3513 West Boulevard, Charlotte, North Carolina.

Q.    Is that with your mother, Sonia Barnette?

A.    Yes.

Q.    Who else lives in that house now?

A.    Presently it's me; my mother; her fiancee, John West; John Mack, which is her son; Pearl McKenzie, youngest daughter; and my grandfather, but he is actually in the hospital right now trying to recover from pancreatic cancer.

Q.    How long has your grandfather been in the hospital?

A.    Oh, wow.  I would say about six months roughly.

Q.    Has it mostly been at the VA Hospital in Salisbury?

A.    Yes.

Q.    Are you familiar with your grandfather, Jessie,

Reported By: Scott A. Huseby, RPR
Huseby, Inc., an All
1335

Case 3:12-cv-00337-MOC  Document 105   Filed 09/23/15   Page 34 of 250
800-333-2082                                    (704) 335-9889          Fax (704) 372-4593

JA2206

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/6/2002

Page 3361

telling a lot of war stories and talking in funny ways?

A.     Yes.  Me and my cousin basically grew up visiting my grandfather.  We call him Papa.  And the land that we live on presently is basically where the entire Cooper family was raised.  One house would get built, the sister, brother, whatever, would live there, the next one would come up.  So when we went to visit him, he was living in what was I believe previously his mother's house, but it was pretty run down.  He had had a cousin come down and put a screen on the front of it, and that's basically where he lived with his, as he put it, his carrasyn (phonetic) hill.  And he did have kind of a strange way of talking at first.  He calls his middle daughter, which is my mother, Sonar, which, you know, her name is Sonia, but that was kind of a word play for him.  Scotia was Tessie.  You know, he just had his own way of speaking.  His general dress would be, you know, army coat, looks like he basically just stepped off the boat, shades on, the eye patch, fully clothed, just kind of his own person, you know.

Q.     And did he teach you and Marc and your cousin how to shoot?

A.     Yes.  Coming from the military background with 7 acres of land out there, basically we discussed it with local police; and as far as I can remember, they

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/6/2002

Page 3362

said as long as we were a certain distance away from the road that it was considered private property. And ever since, wow, ever since I can first remember visiting my grandfather, we have always went out into the back. At first it started with hunting deer, we would go with cousins hunting squirrel, just hunting in general, and then it was basically practice shooting from there, had a scarecrow way back in the back that used to sit up about a good 50 yards away. And I actually learned to shoot a shotgun. That was my first gun I learned to shoot with.

But that has always been the norm to us. You know, my cousin learned. Basically anybody in the Cooper family that came up there, you know, just -- you would have family members and friends come out there with their guns to practice shooting there.

Steve has a 9 millimeter gun, and he has been out there several times, you know, brand new gun, wants to test it out, goes out in the back, shoots the gun. It was not a thing to us.

Q. Do you remember living together in the house where both parents were there with Barnette and your mother, Sonia?

A. Yes. That was in Comstock.

Q. What do you remember about any fighting between

Reported By: Scott A. Huseby, RPR
800-333-2082          Huseby, Inc., an Aff⁻ ⁻ ⁻ ⁻ ⁻n (704) 333-9889          Fax (704) 372-4593
Case 3:12-cv-00327-MOC   Document 195   Filed 09/23/15   Page 36 of 250
1337

JA2208

United States of America vs. Aquilia Marcivicci Barnette 3:97CR23-V
Proceedings Before Judge Richard L. Voorhees 8/6/2002

Page 3363

your parents?

A. I never visually saw any fighting. There was always a wall between us, and that was mainly because of my older brother, Marc. Any time any kind of inclination to a fight, maybe started with the bickering, or whatever the situation was, I was immediately rushed to the room. You know, it was in a calm manner, it wasn't like emergency vehicles or anything, but I was taken to the room, basically kept in a separate environment while on the other side of the wall I could hear the yelling escalating, sometimes thumping, not really knowing what it is, not seeing it for myself, but it would be me in the bedroom allowed to play with a toy of his that I always wanted to while he was on the other side with the parents doing I have no idea what.

Q. And it was Marc who would put you in that safe place?

A. Yes.

Q. How often would he have to put you in that safe place, do you remember?

A. As for frequency, I couldn't give a day by day or week by week basis. It almost became routine to the point where when it did escalate, sometimes I would go ahead and start walking to the room, knowing that's

Case 3:12-cv-00327-MOC Document 105 Filed 09/23/15 Page 37 of 250
1338

JA2209

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/6/2002

Page 3364

where he wanted me to go. And, I mean, there were times where the parents were telling me to go to the room, you know, in certain situation. But if they weren't, if they were already in the middle of it, it was definitely him rushing me into the room and shutting the door and telling me to stay in there until things calmed down.

Q. How did you feel when those fights were going on?

A. At first I used to get real worried that possibly my parents were -- I mean, if you could hear it, sometimes it sounds like they were going neck to neck with each other, you know, and it worried me a lot. You know, and knowing that my brother was there, I don't know why, but it kind of gave me a sense of security knowing that he was the mediator. It's strange when you think of it now, but at that time he was my big brother, so my big brother can take care of anything. And to see him putting me in that room and go out there with them was like everything is going to be okay because he is just a little kid but he is going to work something out and I will be allowed back out of the room.

Q. Did you know whether or not Marc got hit, beaten, slapped by your father?

A. Yeah. I knew he got some whippings. Usually it was due to schooling, maybe some kind of deviation,

United States of America vs. Aquilia Marcivicci Barnette       3:97CR23-V
Proceedings Before Judge Richard L. Voorhees       8/6/2002

Page 3365

you know, not respecting others, something along the general rules of the house, but he definitely was getting, you know, whippings for discipline.

Q.   Did you know whether or not there was any kind of instrument used on him or bare hands or belts, switches?

A.   I barely even remember simply because that -- what you are referring to just brings up a point about a belt.  This belt was used like the one time that I received discipline from my father, that I can remember, and I'm not meaning to go off into a tangent, but basically I was at home, he had went to the store or something like that.  Since I was by myself, he told me, do not answer the door for anyone, period, I don't care if you recognize them or what.  And the door knocks and the female on the outside says, it's Pat, and I'm thinking I've heard that name before and I let her in. Well, you know, my dad comes home, because he was only gone like a couple of minutes.  When he comes home, Pat was sitting in the living room and he was like, after the conversation and everything he comes in the room and he said, I told you not to open the door, you know, and he pulls out this belt, it's a black belt.  You know how your regular belt width is about like this (indicating) this is like double wide.  And instead of single holes,

Reported By: Scott A. Huseby, RPR
800-333-2082          Huseby, Inc., an Afl          on  (704) 333-9889          Fax (704) 372-4593
Case 3:12-cv-00327-MOC   Document 105   Filed 09/23/15   Page 39 of 250
1340

JA2211

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/6/2002

Page 3366

it has double holes on it, black with these little like metal holes where the belt, you know, clamps into it. And I received a beating for opening the door when I wasn't supposed to. And I can remember that being, quote, unquote, the belt, and I was fearful after one beating with it, so I definitely didn't want to go through it again.

Q. Did one or both of your parents ever use any other kind of disciplinary techniques on you?

A. Whippings for being bad, punishment for not getting good grades. For me it was basically not being able to go outside and play. But like I said, other than that one beating, for me, it was basically concentrate on the education; and if I didn't do as well as they knew I could, then it was basically no playing for that couple of days.

Q. Tell the jury, if you would, how your parents tried to get you to stop sucking your thumb.

A. Well, I don't know how I processed this, but to me it comes off as the only thing I can do is laugh about it; but when I tell other people, they seem to get this kind of crazy look on their face. I'm not sure how old I was, maybe five or six years old, and I had a bad habit of sucking my thumb. They used to tell me, no, don't, scold me, whatever the situation was. I just

Reported By: Scott A. Huseby, RPR
Huseby, Inc. (704) 372-4593
Case 3:12-cv-00327-MOC Document 105 Filed 04/23/15 Page 40 of 250

1341

JA2212

United States of America vs. Aquilia Marcivicci Barnette          3:97CR23-V
Proceedings Before Judge Richard L. Voorhees          8/6/2002

Page 3367

kept sucking my thumb. So one night I'm laying in the bed asleep, and it had to be about maybe midnight or 1:00, I don't know what time, I'm just asleep sucking my thumb. All of the sudden the door busts open, it's my mom and dad, and they were like kind of giggling, but they grabbed me, they put a blindfold on me and they bring me to the kitchen. So I'm blindfolded, I'm like, what is going on, what is going on. They turn on the kitchen lights, apparently, and pulled up the blindfold just a little bit and they have a chopper's block on the kitchen counter and they let me see this big butcher knife, and I was like oh, my God. I'm like I don't know if they are about to do this or not. But apparently they wanted me to see my thumb and the butcher knife. The would blindfold me and they bring the knife down on the chopping block. I'm screaming. I'm like, oh, I can't believe this. And they wrap my thumb up, put hot sauce all over it, wrapped it up and sent me back to bed, so I'm basically crying and sniffling and thinking they just cut my thumb off because I didn't stop sucking it. And eventually I came to my senses and I started wiggling my thumb, and I'm like, wait a minute. So I take it off and I'm like, hey, I've still got my thumb. And I suck my thumb and it has hot sauce on it. So I looked at it -- at the time that it happened, I looked

Case 3:12-cv-00327-MOC   Document 105   Filed 09/23/15   Page 41 of 250
1342

JA2213

United States of America vs. Aquilia Marcivicci Barnette    3:97CR23-V
Proceedings Before Judge Richard L. Voorhees    8/6/2002

Page 3368

at it like these people ain't playing, basically, you know, if you do something wrong, you missing fingers; but when I look back at it in retrospect, all I can do is really laugh, because, you know, it just -- when you look at that situation, you're just thinking, man, that was kind of drastic for just thumb sucking, but in actuality I just look at it and kind of take it in and keep going. That's what I've been doing basically my whole life.

Q. Mario, do you remember when your parents separated and you moved out of the home that you all had shared as a family?

A. Vaguely. During that whole situation from Comstock up until almost present day it has just been a rush of different situations happening back to back, but I do remember, I think we moved to Wendover Apartments after living in Comstock.

Q. Tell the jury about how you all were living after your dad and mom separated, in terms of your care and food and things of that, supervision, things of that nature.

A. Well, basically it started off with everything being okay. We were told that our parents were simply separated, and, you know, I'm thinking girlfriend, boyfriend break-up, after a while they will get back

United States of America vs. Aquilia Marcivicci Barnette          3:97CR23-V
Proceedings Before Judge Richard L. Voorhees                    8/6/2002

Page 3369

together, but the separation never -- I was expecting it to get back. You know, I was still getting frequent calls from my father checking up on us and stuff. The condition at the time was decent. I mean, we had food in the house, nice clothes, we were going to school on a regular basis. It was just the family without the father at the time, so it was okay.

Q.    Did things change?

A.    Eventually. Even I started to recognize the changes that my brother tried to protect me from seeing. He would go downstairs and the living room would be full of smoke and strangers. We don't know who these people are or why they are laughing so hard. You just kind of felt out of place in your own house, you know, that your mother and brother lived; and then when you go to the refrigerator and open it up, there is not much there. It started to get less and less. My mother at first, she did grocery shop, she did keep up things in the house, nice furniture, things like that. The furniture stayed nice. The beds stayed nice. The little airplane liquor bottles -- she had this little glass cart with four wheels on it that you could push, it was basically a mobile wet bar, that was nice. But as for the refrigerator, it went downhill. It went from being able to ask mom to buy you the special peanut butter and

Reported By: Scott A. Huseby, RPR
800-333-2082          Huseby, Inc., an Aff          'n  (704) 333-9889          Fax (704) 372-4593
Case 3:12-cv-00327-MOC   Document 105   Filed 09/23/15   Page 43 of 250
1344

JA2215

United States of America vs. Aquilia Marcivicci Barnette     3:97CR23-V
Proceedings Before Judge Richard L. Voorhees     8/6/2002

Page 3370

jelly swirled up in the jar to almost hoping and praying when you opened the refrigerator that there is something halfway decent to eat.

Q. What was Marc doing, if anything, to help you through this period?

A. Marc was trying to, I guess trying to keep me satisfied as a kid, not really worried about things in the house. He would give me the change out of his pocket to go walking up to the 7-11 store to get some junk food.

There was another supplement to us, and that was my, what I have always known as my grandmother, and my Aunt Mabel, these two people were my grandmother and my great aunt, just no questions asked. And we more and more frequently began to visit them. First it was on the weekends, then it started sometimes those weekends would roll over onto weekdays. But we would stay with my grandmother and my great aunt Mabel, and they would feed us. They knew I loved chicken. Any time it was time to go home, we basically had a care package, and that sometimes was meant to last until the next time we visited them, maybe as early as that next weekend. So that combined with my brother, didn't seem like much difference to me personally.

Q. The grandmother that you are referring to, is

United States of America vs. Aquilia Marcivicci Barnette    3:97CR23-V
Proceedings Before Judge Richard L. Voorhees    8/6/2002

Page 3371

that Derrick Barnette's mother?

A.    Yes.

Q.    At some point she died?

A.    No, no, not Derrick Barnette's mother, because I never knew her.  This was Hattie Adams, which I believe was my dad's great aunt.  They were both great aunts, but I called one grandma and the other one Aunt Mabel.

Q.    Were you ever told anything about how Derrick Barnette's mother died?

A.    I have been told that she was poisoned, I'm not sure with what, that one day they came in the house or she had left my grandfather, something to that extent, the next thing you know she is dead from poisoning.

Q.    Who told you that?

A.    I believe my mother did, if I'm not mistaken.

Q.    Now, did there come a time when you got hit by a car?

A.    Yeah.  One of the times when we were living in Wendover, I think I was about, I think I was about 10 -- no, I had to be about seven or eight, me and my friend Drew, one of my friends from the Wendover neighborhood, we had a thing about walking to the 7-11, as I just described.  On the way there there was a big oak tree standing there like this (indicating) and the road

United States of America vs. Aquilia Marcivicci Barnette    3:97CR23-V
Proceedings Before Judge Richard L. Voorhees    8/6/2002

Page 3372

continues past it.  You know, we looked past the oak tree, nothing's going on, looked the other way, nothing's going on, crossed the road, and I believe it was a tan Regal, hits me as I crossed the road.  They say I spun around the driver's side of the car, knocking off the mirror, I think I broke the glass and dented up the door before I hit the ground.

Shortly after that, I don't remember much other than the paramedic stabilizing me, putting me on the wooden board and my brother showing up.  Apparently he had ran, because he was huffing and puffing.  And I can remember all of these questions being asked to me before he came there, where do you live, I live at apartment such and such in Wendover Apartments.  You know, what is your mother's name, what is your father's name, you know, things like that.  So my brother came up and he took over the questioners until we get to the hospital.

When I got there, my Aunt T had met us there.  And I had talked to the doctor.  I think a couple of times they were telling me, man, I really messed that car up, but I didn't have anything wrong with me before my brother came in, and then they just kind of all left and went outside and started discussing whatever.  I believe my Aunt T took me home that night and shortly after my mom showed up.

Reported By: Scott A. Huseby, RPR
800-333-2082    Huseby, Inc. per Aff    (704) 333-9889    Fax (704) 372-4593
Case 3:12-cv-00327-MOC    Document 105    Filed 09/23/15    Page 46 of 250
1347

JA2218

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/6/2002

Page 3373

Q.    Had she been gone all day?

A.    I believe all weekend.  It was Martin Luther King's birthday, which is always a Monday and you are always out of school, and I don't think I had seen her the day before that, if I'm not mistaken.

Q.    Do you remember your mom getting a red Corvette?

A.    Oh, yeah.  I loved that car.  I think it was an '84 or '86 red Corvette, nice.  I got to ride in it one time.  Since it was only a two seater I had to sit in the hatch part, but she was definitely the talk of the town with that vehicle.  It was nice.

Q.    Before that did you have a family style car where you could all ride together?

A.    Chrysler New Yorker, I believe, short, square looking sedan.  I think it was that.

Q.    Do you remember anything about the men that your mother was associating with when you all were living away from Mr. Barnette?

A.    No other word than slim can come to mind when you think about the guys.  They were just barely outside of con men, just any -- you just had a bad vibe about them.  Even at the age I was, you would see these guys come in and their eyeballs would be yellowy, kind of shifty, never really spoke much to me, kind of just went

Reported By: Scott A. Huseby, RPR
800-333-2082 Case 3:12-cv-00527-MOC Huseby, Inc., an At Document 105 iom (704) 333-9889 Filed 09/23/15 Page 47 of 250 Fax (704) 372-4593
1348

JA2219

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/6/2002

Page 3374

straight to the back.  After awhile they come back and flopped on the couch.  I remember one had this thing about bringing merchandise in, always had some kind of bag or case with him.  I don't know, it was just kind of -- I never really paid attention to those guys because they never really paid attention to me.  They would come in, be there a couple of weeks, maybe a couple of months, then they would disappear.  That's all I really knew about them.

Q.   Did you and Marc ever talk about these men?

A.   I can remember talking about how I don't like them.  One of them tried to win me over by giving me a fake gold chain that I actually wore during a class picture, but I just didn't like them.  I didn't pay them any attention.  My dad was not these people and they really didn't want anything to do with me as far as I was concerned.

Q.   Do you recall the trip to the restaurant where Derrick Barnette told you and Marc that he wasn't your father?

A.   To a certain extent.  What I mean by that is I have only recently began to examine my memories of my family in specific, of course.

In this instance, I remember my dad picking us up, taking us to Steak and Ale on Woodlawn, sitting

Reported By: Scott A. Huseby, RPR
800-333-2082  Case 3:12-cv-00327-MOC  Document 105  Filed 09/23/15  Page 48 of 250  Fax (704) 372-4593
Huseby, Inc., Atlanta  (704) 333-9889
1349

JA2220

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/6/2002

Page 3375

down. I even remember the bread, great bread, the sweet bread with the butter on it. I don't remember what I had for dinner, but I remember afterwards, as the guys, as we called ourselves, the guys were sitting there kind of getting done, he dropped a pretty heavy load on us, he told us that he wasn't our biological father.

That's the first time I had ever heard the word biological used in that context the begin with, and after that it just kind of went blank. I remember him saying that he was going to be there, but it was almost as if I had paused for that second and then hit play afterwards, because as soon as he said he wasn't our biological father, he went into some kind of explanation. I was just sitting there numb, I mean, just astounded and just -- after he tried to explain it, like I said, it just went through and everything just stopped for a second, and it didn't really come back until he said, I'm still your father and I'm still going to be here for you, and I thought everything would be okay after that.

Q. After that happened did you and your family, your mother and brother, wind up moving to Georgia?

A. First we stayed a short stint with my Aunt Tessie and Aunt Conley, then I think we moved to Windsong Trails, I believe, and then we moved to Georgia

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3;97CR23-V
8/6/2002

Page 3376

after that.

Q. Do you know why you moved to Georgia?

A. Job opportunity was all I was ever told about that.

Q. Who did you move in with?

A. I'm sorry?

Q. Did you live with anybody when you first got to Georgia?

A. When we first moved to Georgia we lived with my Aunt Shelia, that was the youngest of the three sisters, Aunt Shelia and my little cousin, Ahmad.

Q. And was there anyone living in the household at that time?

A. Uncle Michael. But like I said, my Aunt Shelia and my Cousin Ahmad.

Q. Was Uncle Michael married to your Aunt Shelia?

A. I have never been sure of that even to this day if they were married or not.

Q. How were things in that household?

A. Once again, it looked great from the outside. I believe it was a two-bedroom household, and Ahmad was living in his own bedroom, so we had no space, because there was none. Basically me, Ahmad, and Marc stayed in one room and Aunt Shelia and Uncle Michael were in the master bedroom. It was better but worse. What I mean

Reported By: Scott A. Huseby, RPR
800-333-2082 Case 3:12-cv-00387-MOC Huseby, Inc., Document 105 Filed 09/33/15 89 Page 50 of 502 Fax (704) 372-4593
1351

JA2222

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/6/2002

Page 3377

by that, it was better because my cousin was there, so now there is another person, somebody else closer to my age to play with.

Q. How are the ages of you and Ahmad and Marc?

A. We are all four years apart. Marc is oldest, he is four years older than me, and I'm four years older than Ahmad.

Q. Go ahead, I'm sorry.

A. No problem. We played hee man, watched it on TV, all of that good stuff. Sometimes we would step out of the room and Marc would be in the living room. Sometimes we would step out and wouldn't nobody be out there. Sometimes we would step out and, you know, everybody was there. But basically that was the worst part, was because my mother almost became nonexistent. I don't know what she was thinking at the time, maybe because we were living with our aunt she can be the head of household now, I'm not sure, but it was still my brother basically guarding and providing for us, but now it was my cousin included with that.

Q. What were the adults doing when you said sometimes you would go out in the living room and there was no one there?

A. I never knew. I never knew, number one, where they are, when they were coming back, any of that. At

Case 3:12-cv-00327-MOC, Document 105 Filed 09/23/15 Page 51 of 236

1352

JA2223

United States of America vs. Aquilia Marcivicci Barnette    3:97CR23-V
Proceedings Before Judge Richard L. Voorhees    8/6/2002

Page 3378

first when we were living in, I believe it was in Windsong Trail, it really got to me, and it was kind of -- it's a really fucked up feeling to feel like nobody in the world cares for you. When we lived in Windsong, there were several days where I could come out of my room and that house would be completely empty, I mean, nobody, you know. And it was bad at first because you would scream and you would pitch fits and you would throw your stuff against the wall and when you got quiet, it was quiet again, nobody came asking you what is wrong, nobody came, you know, saying stop that or even disciplining you. It was nothing. You know, it was pretty bad.

But after then something in me just said, you know, if they are not -- if they are not going to be there all the time, you have to be there for yourself, and through that came a lot of patience, and I guess self-reliance, without over exaggerating on that. I couldn't go to the grocery store and spend $100 on groceries like I needed, but emotionally, I just went numb to everything after that.

Q.    What was -- when you did see the adults in the household, your mother, your Aunt Shelia, Michael, what did they do in the evenings?

A.    Go out.  Just as they came back around the

Reported By: Scott A. Huseby, RPR
800-333-2082    Huseby, Inc.    (704) 333-9889    Fax (704) 372-4593
Case 3:12-cv-00327-MOC Document 105    Filed 00/23/15    Page 52 of 250
1353

JA2224

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/6/2002

Page 3379

afternoon, when the nighttime came, they were getting prepared to go out again. That bed was always made up because it seemed like nobody ever slept it in. Me and Ahmad could come in, jump on the bed, and literally you could come back at midnight and still see the footprints on there.

These people just had a social life beyond belief, I guess, I'm not sure, but I know that you would see them sometimes in the afternoon and then you wouldn't see them until sometimes the next afternoon, and it just went like that.

Q. Did they dress in any particular way when they went out?

A. Oh, yeah. They had the leather skirts, the shoulder pads, because, you know, in '80's that was the thing, was the shoulder pads. In the '90's of course you had the bright contrasting colors and the stilettos to go with it. And, you know, I guess they had to get a couple of drinks before they went out to get tipsy or whatever the situation was, get yourself in that mood, the hair was always done. They looked great going out, all of them did.

Q. What was the food situation in the house?

A. You lucked out if you opened the freezer and saw some TV dinners. Me and my cousin -- my cousin

Reported By: Scott A. Huseby, RPR
Huseby, Inc., an Afi      on (704) 333-9889      Fax (704) 372-4593
800-333-2082  Case 3:12-cv-00327-MOC  Document 105  Filed 09/23/15  Page 53 of 250
1354

JA2225

United States of America vs. Aquilia Marcivicci Barnette          3:97CR23-V
Proceedings Before Judge Richard L. Voorhees          8/6/2002

Page 3380

Ahmad was like the main foundation for a lot of stuff. We helped each other through this just as much as my brother helped us through it. We had all of these ongoing jokes like, gee, I wonder what is for dinner and would kind of start laughing at each other, because a lot of times there wasn't anything for dinner, or very minimal. If it was, it was Salisbury steaks. I mean, I don't know if y'all ever had those TV dinner Salisbury steaks, but once a week is okay. When you start getting to it like every other day, you start mooing when you wake up in the morning. If it wasn't Salisbury steak, it was chicken. And that was just in between. Sometimes nothing, sometimes this, sometimes that.

Q.   Did you and Marc and Ahmad have a little game that you played with the adults in the household when they were going out?

A.   This is one of our other jokes that we had going between me and him. You come around the corner, and Aunt Shelia and mom would have their best outfits on and they would be about a couple of steps from headed out the door after saying bye kind of off in the distance, yelling bye. You kind of run around the corner and be like, where you going and look at each other and look back at you and say, the store. And at first we were real naive about it and used to say, oh,

Case 3:12-cv-00327-MOC   Document 105   Filed 09/23/15   Page 54 of 250
1355

JA2226

United States of America vs. Aquilia Marcivicci Barnette    3:97CR23-V
Proceedings Before Judge Richard L. Voorhees    8/6/2002

Page 3381

you going to the store, here is 25 cents, get me one of those Little Debbie cakes, I liked the Oatmeal cookies, Ahmad like the ziggy cakes, so we would go digging in our pockets or the piggybanks or whatever, here is a quarter, get me a Debbie cake. It hurt at first because they would come back the next day and there would be no Debbie cakes. And, you know, it was kind of painful at first again because you know that you could ride your bike to the store and get back in less than a day and it took them forever to get back and they always forgot your cakes. So as a form of protection between ourselves, when they said they were going to, quote, unquote, the store, you know, bring me back a Debbie cake and just kind of left it at that.

Q. How did Marc protect you and Ahmad through that period of time?

A. Well, this is after the apartment. Aunt Shelia had gotten out of the apartment, and I believe she had a house built or moved into a house in Lithonia, Georgia. That's when stuff started getting bad again. At the apartment he was simply taking care of us. I don't remember any major altercations there. In Lithonia it started getting worse again because -- well, I'm not sure why, I'm just not sure why. But altercations between him and Uncle Michael started to arise; and

Reported By: Scott A. Huseby, RPR
800-333-2082    Huseby, Inc., an Affi    n (704) 333-9889    Fax (704) 372-4593
Case 3:12-cv-00327-MOC Document 105 Filed 09/23/15 Page 55 of 250
1356

JA2227

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/6/2002

Page 3382

because of the fights between him and Uncle Michael, Aunt Shelia and my mom got belligerent to him, too, and there was one major circumstance where it was late at night, the next thing I know the door just whips open, it was almost like he had kicked it open or something. It was Uncle Michael. And everybody is accusing Marc of stealing money. Nobody knows. I mean, we are waking up out of our sleep. Marc was sleeping on the floor, me and Ahmad were sleeping on the bed. He gets up; and before anything, he looked back and recognizes we are up and he pushes kind of everything out of the door and shuts the door behind it and you hear just like royal rumble on the other side of that door, and I believe my cousin even went for a second of kind of opened the door to see what was going on. Marc pushed the door shut again. After then I can remember Marc basically being kicked out of the house just like that, he was gone, and then on it was basically me and Ahmad.

Q. Prior to that night were you aware of whether there was any drug use going on among the adults in that house?

A. I had a suspicion. But once again, I'm all of 12, 13. You know, you could put a mound of cocaine in front of me and I would think it was powdered sugar. So as for what was going on, I'm not sure, but there were a

Reported By: Scott A. Huseby, RPR
800-333-2082          Huseby, Inc., an Af          on  (704) 333-9889          Fax (704) 372-4593
Case 3:12-cv-00327-MOC  Document 105   Filed 09/23/15  Page 56 of 250
1357

JA2228

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/6/2002

Page 3383

lot of changes in the household, attitudes towards each other, secrecies. There was a sudden thing about my mom and Aunt Shelia and whoever was over at the time. Almost as soon as they came in the door they went in the bathroom and shut the door, and there was like a whole other world in there. I'm not sure what they were doing, so I can't say specifically. But I just don't know.

Q. After Marc was tossed out of the house -- prior to that you said he was sleeping on the floor. How long had that been going on?

A. Ever since we moved to the house. I mean, we alternated from the couch, but the couch had plastic on it, brand new furniture, it was like ivory white, so it had the plastic zipper covers on it. So if you didn't sleep on the couch, you basically slept on the floor. It was carpeted, though.

Q. Was there new furniture at the same time that you were eating Salisbury steak?

A. The new furniture was my Aunt Shelia's's furniture when we first moved in with her, so I'm not sure when she purchased that.

Q. After Marc left, do you know whether that's when he started going with Tosha?

A. I'm pretty sure. We heard about it. The

Reported By: Scott A. Huseby, RPR
800-333-2082       Huseby, Inc., an Aff          n (704) 333-9889          Fax (704) 372-4593
Case 3:12-cv-00327-MOC Document 105 Filed 09/23/15 Page 57 of 250
1358

JA2229

United States of America vs. Aquilia Marcivicci Barnette

Proceedings Before Judge Richard L. Voorhees

3:97CR23-V

8/6/2002

Page 3384

apartment complex that me and my mother moved into was the same one where he was basically staying with Tosha at, so the frequency of seeing my brother came to arise a little more, but you could definitely tell that most of his attention was directed at his girlfriend. I think that was across in the apartments in Lithonia; I'm not sure.

Q. Did Marc ever help you when you were choking?

A. Yes.

Q. Tell us about that.

A. That was in Windsong Trails. I remember going to the refrigerator after setting up some rock candy on the window. That's basically where you take the sugar water, add a little dye to it, stick a string in it. I learned that from school. But after doing that, it kind of made me thirsty, so I went and grabbed some water and some ice. And after I got done with the water, I was chewing on ice. And smart enough, I was kind of walking around the house at the same time and doing whatever, and it got lodged in my throat about halfway. And luckily -- I was already in another room, I think I was coming from my bedroom. The way the house is set up, you had to zigzag from the bedroom to the hall to the den to the living room. And my brother was sitting in the living room watching TV, and I came up to him,

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees
3:97CR23-V
8/6/2002

Page 3385

couldn't speak. I don't know what color I was at the time, if I was changing colors or not, but he looked at me, he asked me to say something, I couldn't speak, so he got behind me and did the heimlich maneuver and the ice cube came out. And, I mean, you know, people want to speculate, oh, but if you would have laid down and gave yourself the heimlich or waited until the ice melt, there is no telling. All I know is I thank him for saving my life in that minute.

Q. Did you know or did you ever meet Robin?

A. Robin Williams, yes.

Q. How did your brother feel about Robin, if you know?

A. From looking at him in other relationships, he definitely had a thing about devoting everything --

Q. I'm sorry, I'm having difficulty hearing you.

A. I'm sorry. I was saying from looking at him in other relationships, the outside view, he definitely had a thing about giving it all. And with Robin it seemed a lot easier for both of them. There was never, as far as what I saw when she visited, there were never any fights between them. I think she came down either during -- it was definitely during the Christmas season in which he had purchased her, I believe it was a full length leather coat, I'm not sure if he purchased her that then

Case 3:12-cv-00327-MOC  Document 105  Filed 09/23/15  Page 59 of 250
1360

JA2231

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/6/2002

Page 3386

or not, but he was proud of the relationship with her. It had been a long time since I had seen him happy, and he seemed to be making her happy as well.

Q. When you say he gave his relationships his all, what do you mean by that?

A. Ever since Tosha, my brother would basically fall off the face of the earth when it came to a girlfriend. I mean, it was just like this is where my focus is, and I could see how he would do that. But it happened from his first girlfriend to his last girlfriend, he gave everything that he could, and only in retrospect can I say maybe he gave too much, you know, but I'm not going to judge that.

Q. Do you visit Marc in the jail when he has been here?

A. Infrequently.

Q. Why is that?

A. I mean, there can be a million excuses for it, but what it really boils down to is I feel like this man has given me all he could, and he didn't have to, he was just my brother, not my father. I don't even know who my father is, you know. But he has given me everything that he could, and some of the simplest things I could do for him I failed him at, and I feel like I disappointed him so consistently. He can call me. He

Reported By: Scott A. Huseby, RPR
800-333-2082    Huseby, Inc., an Af    (704) 333-9889    Fax (704) 372-4593
Case 3:12-cv-00327-MOC   Document 105   Filed 09/23/15   Page 60 of 250
1361

JA2232

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/6/2002

Page 3387

has called me and asked me for magazine subscriptions, cut out pictures so he could use them as reference material when he was sketching or painting, the simplest tasks, and I never have the time for it, I never get around to it. I feel ashamed by that, that I just -- I just feel like I have disappointed him on a major level.

Q. Did you observe anything about Marc in the six or seven weeks before he killed Donald Allen and Robin Williams?

A. I observed Marc's withdrawal from the family. That's something that he would not do. The upstairs loft is another separation from the rest of the family. You can look down and see everybody but there was only one way up in which he had literally blocked off and put a sign up that said something to the extent of do not disturb, I need privacy.

You could hear him up there sometimes on the phone; but seeing him downstairs in the living room watching TV with everybody else, that kind of faded in the wind there.

He -- at first he tried. I believe he gave everything that he had to try to get back up, and the only reason I know that is because there is a car that my father gave me, a '78 Datsun 280Z, and that was my first car, I used it to go to work. And when he first

Reported By: Scott A. Huseby, RPR
800-333-2082       Huseby, Inc., an Aff       n (704) 333-9889       Fax (704) 372-4593
Case 3:12-cv-00327-MOC   Document 105   Filed 09/23/15   Page 61 of 250
1362

JA2233

United States of America vs. Aquilia Marcivicci Barnette    3:97CR23-V
Proceedings Before Judge Richard L. Voorhees    8/6/2002

Page 3388

got back, he would borrow that car almost on a daily basis because he was excited about this job interview that he was so close to getting. They had given him multiple interviews. And he would take my car, go out there, bring it back in time to pick me up from work, go up there again, whatever the situation is.

After that job went down, and I believe he said the girl got it because she had a high school education or a college degree or something like that, it was almost like you didn't see him again until that night, and that was kind of strange.

He started doing things I hadn't seen him do. He was adamant about telling me not to smoke or deal drugs, marijuana, anything, you know. He used to tell me, what are you going to do, years in prison for a couple of $10 sales, that doesn't make sense, you know.

Q.    Is that what he told you?

A.    That's what he told me.

Q.    As a way to teach you not to do that?

A.    To tell me basically don't do drugs, don't sell drugs. And then to see him smoking was strange. I had never seen my brother smoke. I don't know if he did it at clubs or whatever, but I had never seen him smoke. And he started borrowing cigarettes from my mom, and I was like -- the first time it happened I was kind of

Reported By: Scott A. Huseby, RPR
Huseby, Inc. an AL
800-333-2082    3:12-cv-00327-MOC  Document 105   Filed 09/23/15  Page 62 of 250    Fax (704) 372-4593
1363

JA2234

United States of America vs. Aquilia Marcivicci Barnette    3:97CR23-V
Proceedings Before Judge Richard L. Voorhees    8/6/2002

Page 3389

like, what is that, what are you doing?  I smoke, but
for him to smoke, it was just strange.  And I know what
my mom drinks, I know what John drinks, but there was
other beers sometimes located in the refrigerator, and I
didn't drink beer at the time so I wasn't worried about
it, but just little strange things that you never really
catch onto until it all came together.

And the night that happened breaks my heart,
because he was there.  I blame myself because he was
sitting right there in front of us; and if we would have
known anything, I would have protected him like he
protected me throughout my whole life and I would have
had to hold him down, beat him senseless, lock him in
the closet, you know, whatever the situation is to make
sure that he doesn't go through with anything that he
might feel in his heart was something that he had to do.
And we didn't, the family didn't.  Everybody was there,
but nobody knew.  And he went up there -- my grandfather
said he even saw him on West Boulevard when he was
pulling in the driveway.  Anybody, we all had a chance
to do something, and I feel like we all let him down as
well as him letting himself down and every life that he
has affected.

Q.    Do you know how he feels about what he did?

MS. TOMPKINS:  Objection.

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/6/2002

Page 3390

THE COURT: Sustained.

BY MS. LAWSON:

Q. Has he talked to you about how he feels about what he did?

MS. TOMPKINS: Objection.

THE COURT: Overruled.

THE WITNESS: He doesn't go into detail with me. Even the visitations, the few visitations that I have had with him, I will ask him about his well-being, you know, how are you doing. He will refer to something else. He doesn't -- you know, it's that buffer, that barrier again that says you don't need to know this. But, you know, you ask him, how are you holding up, you know, and he will say, how is your car doing? That's his kind of response to things to let you know that he is not going to let you.

Q. How do you feel about your brother?

A. I love him. I mean, he is -- at points in my life he was all that I had, so I just love him.

MS. LAWSON: Thank you. Answer any questions the government has.

CROSS-EXAMINATION

BY MS. ROSE:

Q. Mr. Barnette, I was looking through the transcript of your testimony from the trial here, and

800-333-2082    Case 3:12-cv-00327-MOC   Document 105   Filed 09/23/15   Page 64 of 250   Fax (704) 372-4593

United States of America vs. Aquilia Marcivicci Barnette          3:97CR23-V
Proceedings Before Judge Richard L. Voorhees          8/6/2002

Page 3391

you told us a lot of new information that you didn't testify about the first time.  Is that fair to say?

A.   That's correct.

Q.   You didn't talk about the thumb sucking discipline episode before, did you?

A.   No.

Q.   Or about the yellow shifty eyed men, that's new information as well?

A.   Yes.

Q.   As well as the descriptions of parties and the dressing up, you didn't talk about that before, did you?

A.   No.  I wasn't asked those questions.

Q.   And this was the first time we heard about the life saving story with the ice cube, that's new information, isn't it?

A.   Actually, I discussed that with the previous attorneys.  For whatever reason they felt the need not to discuss that in court.

Q.   You mean your attorney?

A.   My brother's attorneys from the previous trial, yes.

Q.   Now, you did, however, testify that in the early years it was a family atmosphere, there were good times, like holidays, we celebrated all of the holidays and went out together?

Case 3:12-cv-00327-MOC  Document 105  Filed 09/23/13  Page 65 of 250

United States of America vs. Aquilia Marcivicci Barnette

Proceedings Before Judge Richard L. Voorhees

3:97CR23-V

8/6/2002

Page 3392

A.   Yes.

Q.   At home you said that your parents argued but you were in your room, you described it mostly in happy terms at that time, do you recall that?

A.   From what I have seen, and that is exactly right.  From what I have known and from what I was able to see, it was happy times.  There was a time where my mother and father were tickling each other and we were all allowed to jump in and help tickle her feet.  There were happy times.

Q.   You described a very different time in Georgia. In fact, you testified previously, you described your brother during this time of Lithonia High School as being a track star?

A.   That's true.

Q.   And that it wasn't until he and your mother started arguing that he left the house and began to spend more time with Tosha?

A.   That situation in which he and my mother were arguing was mainly because of Uncle Michael accusing him of stealing the $500, as I said previously.  It was him, Aunt Shelia, and my mother all three basically on him.

Q.   But you didn't say that last time, you described it as between he and his mother?

A.   It was breezed over last time.  That's correct.

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/6/2002

Page 3393

Q.    Now, you said that from everything that you experienced that you have become a more patient and self-reliant person?

A.    Yes.

Q.    I think that's a good thing.  Are you going to school now or just working?

A.    I graduated high school.  Like I said, I'm working at Citel Corporation.

Q.    Very good.  You haven't been in any kind of trouble, you don't have any criminal history, do you?

A.    I have traffic incidents, yes.

Q.    Speed tickets, things like that?

A.    Exactly.

MS. ROSE:  All right, sir.  Thank you very much.

THE WITNESS:  Is that it?

THE COURT:  You may step down.  Members of the jury, we will take our afternoon break at this time.

(The jury left the courtroom.)

THE COURT:  Counsel should avoid using the term trial and should refer to an earlier proceeding or a guilt phase.  Do you understand?

MS. ROSE:  Yes, sir.

THE COURT:  Thank you.

(Brief recess.)

Reported By: Scott A. Huseby, RPR
800-333-2082          Huseby, Inc., an Af          on (704) 333-9889          Fax (704) 372-4593
Case 3:12-cv-00327-MOC  Document 105  Filed 09/23/15  Page 67 of 250
1368

JA2239

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/6/2002

Page 3394

THE COURT: May we have the jury, please.

(The jury returned to the courtroom.)

THE COURT: All right. The jury is with us.

MR. BENDER: I call Bob West.

BOBBY H. WEST,

being first duly sworn, was examined and testified as follows:

DIRECT EXAMINATION

Q. State your name, please.

A. Bobby H. West.

Q. And, Mr. West, where do you live?

A. I live at 6849 Woodhaven Road, Roanoke, Virginia, 24019.

Q. What is your occupation or profession?

A. I have a couple. I manage a couple of cemeteries in the Roanoke Valley. I'm also pastor of a church in Salem, and my wife and I have been involved in prison ministry since 1971.

Q. As a result of your and your wife's involvement in the prison ministry, did you come to know Marc Barnette?

A. Yes, I did.

Q. And this is Marc seated here?

A. Yes.

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/6/2002

Page 3395

Q. How did you come to know Marc Barnette?

A. Well, I probably spoke to him when he was imprisoned here in Virginia, but we had private conversations when he was moved to the U.S. penitentiary in Terre Haute, Indiana.

Q. Approximately how many times did you visit him when he was incarcerated in Virginia on his way to Terre Haute?

A. Well, several times, in waving and speaking to him as I walked past his housing unit. Our conversations were at length after he moved to Terre Haute.

Q. And did you and/or your wife actually travel to Terre Haute to continue in your prison ministry?

A. Yes, we do.

Q. In the special housing unit in Terre Haute, Indiana, were you able to visit with him and counsel with him?

A. We were.

Q. Describe the area in which you were able to visit or counsel with him.

A. Well, it's a cubical with a glass in between. He would be on one side of the cubical, and either my wife or I would be on the other side of the cubical. We would speak by phone.

Reported By: Scott A. Huseby, RPR
800-333-2082          Huseby, Inc., an A               ion (704) 333-9889          Fax (704) 372-4593
Case 3:12-cv-00327-MOC   Document 105   Filed 09/23/15   Page 69 of 250
1370

JA2241

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/6/2002

Page 3396

Q.   No actual contact?

A.   It was a noncontact visit.

Q.   Do you still consider that you are one of Marc spiritual advisors?

A.   Yes, I do.

Q.   Were you able to pray with him and read the Bible with him and those sorts of things?

A.   Yes, sir.

Q.   Do you believe that Marc is remorseful for what he did?

        MS. TOMPKINS:  Objection.

        THE COURT:  Overruled.

        BY MR. BENDER:

Q.   Go ahead, you can answer.

A.   Yes, I do.

Q.   And do you know whether or not Marc has ever been able to forgive himself for what he did?

A.   He has had a terrible time doing that.  We have talked at length about that, not only whether God would forgive him or not.  He talked about ever being forgiven by the families of the victims, and he had a hard time, and he may still be working through forgiving himself.

        MR. BENDER:  Thank you, sir.  I have nothing further.

        MS. TOMPKINS:  No questions.

Reported By: Scott A. Huseby, RPR
800-333-2082    Huseby, Inc., an Affiliate    1 (704) 333-9889    Fax (704) 372-4593
Case 3:12-cv-00327-MOC   Document 105   Filed 09/23/15   Page 70 of 250
1371

JA2242

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/6/2002

Page 3397

THE COURT: You may step down.

MR. BENDER: Your Honor, may Mr. West and his family be excused to go back to Virginia?

THE COURT: They may.

THE WITNESS: Thank you, Your Honor.

MR. BENDER: Your Honor, our next witness will be Dr. Seymour Halleck.

SEYMOUR L. HALLECK, being first duly sworn, was examined and testified as follows:

DIRECT EXAMINATION

BY MR. BENDER:

Q. State your name and spell your last name for us.

A. Seymour Leon Halleck. The last name is spelled H-A-L-L-E-C-K.

Q. Where do you live, Dr. Halleck?

A. I live in Chapel Hill, North Carolina, 500 Laurel Hill Road.

Q. And what is your profession?

A. I'm a psychiatrist.

Q. And how long have you been a psychiatrist?

A. I have been practicing psychiatry since 1953.

Q. And if you would, give us your educational background and any work that you have done in the past.

Reported By: Scott A. Huseby, RPR
800-333-2082    Huseby, Inc., an Aff_____n (704) 333-9889         Fax (704) 372-4593
Case 3:12-cv-00327-MOC  Document 105  Filed 09/23/15  Page 71 of 250
1372

JA2243

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/6/2002

Page 3398

A.    Beginning with college I entered at the University of Chicago in 1945, received my bachelor of philosophy from that institution in 1948.  At that time I entered medical school at the University of Chicago, and in 1950, in the middle of my medical school training, I received a bachelor of science degree in anatomy.  I received my M.D. from the University of Chicago in 1952.

Following that I entered the United States Public Health Service, where for the first year I was an intern in San Francisco.  During that time I had a little bit of contact with prison work, because I spent a little time delivering medical care at Alcatraz.

Following that I was assigned to the Federal Bureau of Prisons for two years of service with the Public Health Service, and that was at Springfield, Missouri, the medical center for federal prisoners.  I held many different jobs, including running the acute unit and chronic unit and taking care of people who at that time were called psychopathic deviants.

Upon leaving Springfield I entered psychiatric residency training at the Menninger School of Psychiatry, where I studied between 1955 and 1958.

In 1958 I took a job at the University of Wisconsin as an assistant professor, and held that job

Reported By: Scott A. Huseby, RPR
800-333-2082          Huseby, Inc.          (704) 333-9889          Fax (704) 372-4593
Case 3:12-cv-00327-MOC   Document 105   Filed 09/23/13   Page 72 of 250

1373

JA2244

United States of America vs. Aquilia Marcivicci Barnette    3:97CR23-V
Proceedings Before Judge Richard L. Voorhees    8/6/2002

Page 3399

almost continuously for 14 years, with the exception of about a year and a half in 1959 where I served as medical director for the State Division of Corrections and ran a state sex crimes program.

In 1972 I left the University of Wisconsin and came to the University of North Carolina as a professor, and I have had many different jobs there. I have been running an inpatient unit, I've been running crisis units, I ran the outreach program, I was assistant chairman, I was acting chairman, I was associate chairman at various points in my career there.

I resigned from my position there in September of 1995 and began a small practice of forensic psychiatry after that, which I have been doing almost exclusively since then.

Q. Would you tell the jury something about your past clinical experience?

A. Until I resigned from the university, I maintained an active clinical practice, so I was either running inpatient units and caring for very, very sick patients or seeing a whole lot of outpatients in psychotherapy, or very often doing both.

Q. Okay. And when you describe your clinical practice, that's actually meeting with patients in therapy or counseling?

Reported By: Scott A. Huseby, RPR
800-333-2082          Huseby, Inc., an Aff        on (704) 333-9889          Fax (704) 372-4593
Case 3:12-cv-00327-MOC   Document 105   Filed 09/23/15   Page 73 of 250
1374

JA2245

United States of America vs. Aquilia Marcivicci Barnette  3:97CR23-V
Proceedings Before Judge Richard L. Voorhees  8/6/2002

Page 3400

A.    Until 1995 I was very active in treating patients, meeting them in therapy and counseling.

Q.    Okay.  And what sort of teaching experiences have you had?

A.    I have taught at -- continually since 1958, and I also did some teaching as a resident at the University of Kansas for awhile.  But I have always had medical school classes continuously during that time.  And I have taught at two law schools.  I taught at the University of Wisconsin, really beginning in about 1958, until I left in 1972, and I taught at the law school at the University of North Carolina from 1972 until I retired in 1995.

Q.    What sort of experience have you had in the correctional area?

A.    I had the two years at Springfield, I had the years when I ran the Wisconsin correctional program, and I have had a lot of experience consulting to various correctional facilities.

Q.    Have you had any experience in any civil court proceedings?

A.    I have done a lot of civil work in the last five years, yes.

Q.    And have you had any experience in criminal cases?

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/6/2002

Page 3401

A. Yes, I have.

Q. Could you tell us about that?

A. I have done a large number of death penalty cases in the last seven or eight years.

Q. How about any honors or awards that you may have received?

A. In 1980 I received the Isaac Ray award for forensic psychiatry from the American Psychiatric Association. Earlier than that I had received the Sutherland award from the American Society of Criminology for contributions to theoretical criminology. I received a marshal award from the Menninger School of Psychiatry as a distinguished alumnus. And I just recently received an award from the American Academy of Psychiatry and Law called the Golden Apple Award, and I guess that's for being a good guy, but I was a founder of the Apple organization.

Q. Have you been published? Are you the author of any works?

A. I have published over 100 articles. I have written six books by myself and I have edited six other books.

MR. BENDER: Your Honor, at this time I would tender Dr. Halleck as an expert in the field or forensic psychiatry.

United States of America vs. Aquilia Marcivicci Barnette     3:97CR23-V
Proceedings Before Judge Richard L. Voorhees     8/6/2002

Page 3402

THE COURT: Okay. Members of the jury, the witness will be declared an expert. You will recall my instruction earlier. In short, I told you that when knowledge of a technical subject matter might be held for a jury, that is, a person having special training or experience within that technical field is permitted to state his or her opinion about matters within that field. Merely because such a witness expresses such an opinion, however, does not mean that you must accept that opinion. The same as with any other witness, it's up to you to decide whether to rely upon it.

BY MR. BENDER:

Q. Dr. Halleck, have you had occasion to interview Marc Barnette?

A. Yes.

Q. How many times have you interviewed Marc Barnette?

A. I interviewed him four times in 1997. I interviewed him in July, September, November, and December of 1997. I interviewed him on really four different occasions in 2002. I interviewed him on April 9th and April 10th, and I interviewed him again on June 13th and June 14th.

Q. And have you also been able to talk with members of his family or other persons?

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/6/2002

Page 3403

A.   Yes.  On June 14th I talked with Tosha Herd on the telephone for about 45 minutes, on June 14th I also talked with Sonia Barnette for about an hour in person, and on July 17th I spoke by telephone with Mr. Derrick Barnette.

Q.   Have you been able to review any other materials related to Marc Barnette?

A.   I reviewed a great deal of material.  Do you want me to read all of the material I reviewed?  Most of it relates to a previous proceeding and many psychiatric reports of the experts who have seen Mr. Barnette.  Do you want me to read that?

Q.   Not necessary.  But it would be fair to say that you have reviewed much documentation related to Marc Barnette and his present situation?

A.   I think I have reviewed most of the available documentation on this case.

Q.   Based on that do you have an opinion or a diagnosis as to Marc's condition?

A.   I believe he has several diagnoses, which I will list now.

Q.   Okay.

A.   I believe that between the beginning, or the first week in April of 1996 until about June 21st, and shortly thereafter as well, he suffered from a major

Case 3:12-cv-00327-MOC   Document 105   Filed 09/23/15   Page 77 of 250

United States of America vs. Aquilia Marcivicci Barnette    3:97CR23-V
Proceedings Before Judge Richard L. Voorhees    8/6/2002

Page 3404

depression. By that I mean he had symptoms in which we felt bad, sad, despondent, was tearful, for large parts of a day, for days at a time without interruption.

Secondly, he suffered from a withdrawal at that point. He lost interest in anything pleasurable, he lost interest in staying with friends or doing things that made him feel better. Even though he tried those things, they made no favorable impact on him. He lost appetite. He lost sleep. His energy diminished. He found it difficult to concentrate. He found himself increasingly restless and agitated. His sense of self-esteem was markedly diminished, and he became very down on himself, and he periodically had suicidal thoughts and suicidal impulses. So my major diagnosis which is most relevant to the crime was that he was suffering from a major depressive disorder, which is fairly common but a serious disorder.

The other diagnosis I made was a substance abuse disorder. There are two ways of describing substance difficulties in our diagnostic and statistical manual. One is substance dependence, and the other is substance abuse. Substance dependence means that you need more and more of the same element to keep your habit going, it's called tolerance, and substance dependence requires that you have both tolerance and withdrawal symptoms

Reported By: Scott A. Huseby, RPR
800-333-2082    Huseby, Inc., an Af___ ___ ___ ___ ion (704) 333-9889    Fax (704) 372-4593
Case 3:12-cv-00327-MOC   Document 105   Filed 09/23/15   Page 78 of 250
1379

JA2250

United States of America vs. Aquilia Marcivicci Barnette                3:97CR23-V
Proceedings Before Judge Richard L. Voorhees                8/6/2002

Page 3405

when you stop.  Now, I believe that Marc was probably a heavier drinker than he indicated this morning, but I do not believe that he had substance dependence.  I believe he had substance abuse, by which I mean that he sometimes drank too much and when we drank too much he would sometimes get in trouble and behave iridically.

In previously thinking about Marc, I wondered at times if he could have had what is called a bipolar disorder, which would be depression plus some kind of manicy behavior.  I looked again in 2002, and I could find no evidence that that disease really was developing or had been there.

I also looked at the possibility that as a child he may have had attention deficit hyperactivity disorder, that's something his son does have, and there were a few indications of it.  I could find no consistent reporting of the symptoms of that disorder by Marc, his mother, or his father, and by that I mean Marc would report one or two symptoms and his mother would report different symptoms, and his father would report different symptoms.  I think everybody agreed that he was somewhat hyperactive, but I did not feel like I could make a diagnosis of attention deficit hyperactivity disorder.

Now, in our diagnostic manual we have what we

Reported By: Scott A. Huseby, RPR
800-333-2082          Huseby, Inc., an A          ion (704) 333-9889          Fax (704) 372-4593
Case 3:12-cv-00327-MOC   Document 105   Filed 09/23/15   Page 79 of 250
1380

JA2251

Page 3406

call axes. The main diagnosis are put on axis one and personality disorders and developmental disorders are put on axis two. I felt that Marc had a very serious personality disorder, which is borderline personality disorder, and that was characterized by an enormous fear of abandonment. He was always fearful that people would leave him and try to keep people from abandoning him. He was very mixed up about people. At times he would over-idealize them and then he would put them down. He would assign something to be ideal for awhile and then he thought it was the worst thing in the world. And that is a phenomenon that that is common in borderline personality disorder, and it's called splitting.

He also showed rapid fluctuations in mood, and amazingly so even as a child. Both Tosha reports and his mother reports, and others have reported, that he would switch his mood in just a second, like turning on a light switch. He could be feeling happy and all of the sudden he would be extremely sad.

Marc also showed periodic preoccupation with suicidality. He showed impulsivity in a couple of areas, both with regard to sex and with regard to drugs. And he showed transient episodes of being paranoid, which is also a characteristic of people with borderline personality disorder.

Reported By: Scott A. Huseby, RPR
800-335-2082                    Huseby, Inc.                    (704) 372-4593
Case 3:12-cv-00327-MOC   Document 105   Filed 07/23/15   Page 80 of 250
1381

JA2252

United States of America vs. Aquilia Marcivicci Barnette    3:97CR23-V
Proceedings Before Judge Richard L. Voorhees    8/6/2002

Page 3407

And finally he showed a seventh characteristic, which is demonstrating a great deal of anger and rage.

Marc also had some characteristics of other personality disorders. He had some of the qualities of an antisocial personality disorder and some of the qualities of a narcissistic personality disorder, but for various reasons I did not feel those were as prominent as the borderline personality disorder diagnosis which I gave to Marc.

Although personality disorders are not usually viewed as being as severe as what we call axis one disorders, borderline personality disorder is an exception. People with borderline disorder function deeply. They often get severe depression. And since they get severe depression very often, it is in some ways worse than other people who get major depressive disorders. They often do not respond as well to medications. And there is a lot of recent research which indicates that borderline personality disorder people have a very serious and painful illness.

That essentially is my diagnosis.

Q. Okay. Dr. Halleck, do you have an opinion as to how Marc, the early parenting of his parents might have affected Marc as he was growing up?

A. I think it affected him in a variety of ways.

Reported By: Scott A. Huseby, RPR
800-333-2082   Huseby, Inc., an A   ion (704) 333-9889   Fax (704) 372-4593
Case 3:12-cv-00327-MOC   Document 105   Filed 09/23/15   Page 81 of 250
1382

JA2253

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/6/2002

Page 3408

I think it made it very difficult for him to feel loved, it made him frightened, it made him insecure, it made him untrusting. Later on it gave him identity problems, and coupled with the many other bad things that happened the Marc, ultimately made him more susceptible to depression, substance abuse, and borderline personality disorder and eventual violent behavior.

Q. Do you have an opinion as to whether or not the frequent moves the family made or his mother, Sonia, made may have affected him?

A. All of these things are cumulative. I think the moves in particular made it harder for him to make permanent acquaintances, made it harder for him to build relationships with people, diminished his self worth and made his life harder.

Q. How about an opinion as to whether the death of his grandmother, that is, Pearl, that Derrick described this morning, whether or not that had any effect on him?

A. I think that had a major effect on him. We have to remember that his mother was only 14 at the time, and she was really a child raising a child and the grandmother was having a significant role, apparently, in raising Marc. So with the grandmother's death, Marc not only lost one of the people that was parenting him, but Sonia had a profound reaction to her mother's death

Reported By: Scott A. Huseby, RPR
800-333-2082        Huseby, Inc. - an Af        (704) 331-9889        (704) 372-4593
Case 3:12-cv-00327-MOC Document 105   Filed 09/23/13   Page 82 of 250

1383

JA2254

United States of America vs. Aquilia Marcivicci Barnette    3:97CR23-V
Proceedings Before Judge Richard L. Voorhees    8/6/2002

Page 3409

and she became less effective as a parent.

Q. How about any effect that his father's abuse, that is Derrick Barnette's, abuse may have had on him?

A. I think that had a powerful effect on him, too, because you have to react to that with anger, you have to react to that with bad feelings about yourself, with a negative self concept, with feeling unloved, and there is ample evidence that child abuse, physical or sexual, leads to great difficulties in later life, both personality difficulties, more antisocial behavior, more susceptibility to depression.

I would like to say that in my interviews with both Mr. and Mrs. Barnette that I received rather powerful confirmation that these beatings had taken place. Sonia told me that when these things happened she felt so overwhelmed that she would usually run in the bathroom and she felt that the beatings were extremely excessive.

I talked to Mr. Barnette about it, and he did not feel that they were all of that excessive, but at the end of our interview on the telephone he did say that he had changed his mind over the years, that he was very young back then, that he now felt more mature and that he would do it differently now, and also expressed a great deal of regret that he had not brought Marc into

Reported By: Scott A. Huseby, RPR
800-333-2082    Huseby, Inc., an Af    on (704) 333-9889    Fax (704) 372-4593
Case 3:12-cv-00327-MOC  Document 105  Filed 09/23/15  Page 83 of 250
1384

JA2255

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/6/2002

Page 3410

his own home more.

Q. How about Derrick Barnette's absence, that is, him leaving the family after the separation and subsequent paternity test?

A. I think Marc had mixed feelings about that. Number one, I don't think he felt he would be beaten as much, but also I think he missed his father, and I think that he was quite devastated when he learned that the man that he loved in spite of all of the things that were going on was not his real father.

Q. The fact that Marc does not even today know who his father is, his mother won't even acknowledge to him, would that have any effect on him?

A. I think that continues to bother him a lot. As a matter of fact, Marc said one of the things that he wants from his mother right now is to simply acknowledge that somebody else was his father.

Q. And the violence that he saw, not only the violence that he suffered, but the violence he saw between Sonia and Derrick, would that have had any effect on him?

A. Again, in terms of making him feel angry or unloved or insecure, but I think also as simply a role model. He saw a lot of people hurting each other, he got hurt himself, it began to seem to him as if this was

Reported By: Scott A. Huseby, RPR
800-333-2082   Huseby, Inc. an A   ion (704) 333-9889   Fax (704) 372-4593
Case 3:12-cv-00327-MOC   Document 105   Filed 09/23/15   Page 84 of 250

1385

JA2256

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/6/2002

Page 3412

stress when you have a rod put in your hip and somebody shoots you and you have major surgery and your hand is somewhat disabled by it, too, so I think that was contributing to his demoralization at the time he got depressed.

Q. Did Marc Barnette have choices in this matter?

A. I viewed his choice at the time of his crime, and I would like to put all of the crimes together. I think the killing of Mr. Allen, the fire bombing, and the killing of Robin Williams are all kind of a part of the same turmoil he was going through, and I think his choice in that situation was either to walk away from the situation and go on with his life or kill these people.

Q. So he did have a choice?

A. He had a choice.

Q. Could you explain that a little bit more?

A. He had a choice, but I believe he had a hard choice. Of course, he knew what he was doing. I think he knew that he was committing a crime, he was motivated to commit the crime, he committed the crime in a somewhat rational way. What was irrational about it was that he made very little effort to avoid detection, which is unusual for a criminal. He made very little effort to get anything out of it. There was no robbery,

Reported By: Scott A. Huseby, RPR
800-333-2082     Huseby, Inc., an A        ion (704) 333-9889     Page 85     Fax (704) 372-4593
Case 3:12-cv-00327-MOC   Document 105   Filed 09/23/15   Page 85 of 250
1386

JA2257

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/6/2002

Page 3413

there was no sexual gratification in any of this, and basically he acted out a plan rationally based on irrational motivations. I felt that his motivations in doing this did not make sense to him, nor did they make sense to anyone else.

Q. When you say they were hard choices, can you give us an example of how Marc's choices were perhaps more difficult for him than --

A. I used an example in an article that I wrote about this, looking at choice in terms of availability of choice in terms of there being hard choices and easy choices.

And I tried to postulate a situation in which a number of people were asked to compete in a one mile race and looked at people with various kinds of handicaps to see how that might have influenced or compromised their choice. And if you look at a person who, let's say, just has a feeling of being anticompetitive or is phobic about running races, that person, the choice might be a little bit harder for them, but that's not very significant. On the other hand, if you look at a person who has an asthma problem and might have an asthmatic attack if he ran a race, running that race would be a fairly hard choice. If you look at a person who is running a high fever and has

Reported By: Scott A. Huseby, RPR
Huseby, Inc. an A
800-333-2082                                    333-9889        (704) 372-4593
Case 3:12-cv-00327-MOC  Document 105  Filed 09/23/15  Page 86 of 230
1387

JA2258

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/6/2002

Page 3414

infectious mononucleosis, for example, it would be a very hard choice. If he had a broken ankle or sprained ankle, he might be able to do it, but it would be a very hard choice. Finally, there is no choice. If you were a paraplegic, you could not do it. To put it in a more workday kind of situation, if I'm running a high fever and feel just awful but feel I have to go to work that day, I can go to work that day, but it's a hard choice. And I remember a personal event about 25 years year ago where I had a speaking engagement in Chicago and felt awful, headaches, fever. I finally went to the doctor, was diagnosed with infectious mononucleosis. And I said, what do I do about Chicago, I have to give a speech there? And the doctor said, if you think you can get there, go ahead. And I think he was wrong. I think I could have gotten there, but it would have been a very hard choice and very stupid choice, so I didn't go.

I think it's the same way with Marc, I think all of these things that have buttressed him, not buttressed him but bombarded him over the years, all of the stressful things that we have talked about it, have put him in a situation where he simply did not have the kind of the normal thinking to weigh the various choices and he was in a position where the choices available to him were extremely hard and difficult to make.

Reported By: Scott A. Huseby, RPR
800-333-2082          Huseby, Inc., an Af          on (704) 333-9889          Fax (704) 372-4593
Case 3:12-cv-00327-MOC   Document 105   Filed 09/23/15   Page 87 of 250
1388

JA2259

Page 3415

Most of us, if we felt betrayed by a loved one, we would be angry, we would get upset, and might go through a lot of rumination, as he did, but I think most of us would find it relatively easy and sane and sensible to walk away from the situation.

Marc did not have the strength to do that, because he was depressed, because he was really heavily influenced by substances at the time, and because of his personality, a severely disturbed person with a borderline personality disorder, and also all of the role modeling he had experienced.

Now, another way I try to conceptualize what happens to somebody who does this sort of thing is to try to look at it in terms of their going through benefit/risk evaluations of should I do it or shouldn't I do it, and I think Marc came up with really irrational benefits. And then in addition to that he exaggerated the benefit of the irrational benefit. Most of the things that he thought of were benefits were that people then know that I'm a real person, that I'm a real man, I have to get even with all of the people who betrayed me over the years, including his parents, I have to show the world that I'm somebody, that I'm not just a wimp. These are not rational motivations for killing somebody, but Marc began to see them more and

Reported By: Scott A. Huseby, RPR
800-333-2082                Huseby, Inc. an A...     (704) 372-4593
Case 3:12-cv-00327-MOC   Document 105   Filed 09/23/13   Page 88 of 250
1389

JA2260

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/6/2002

Page 3416

more as being rational.

In addition to that, he was impaired in his ability to evaluate the risks of the situation. And if you think about the risks, what are they? One risk obviously is you are going to kill somebody you love, and that's a terrible risk. Another risk is that your conscience is going to bother you because you know you are going to kill innocent people, and that too is a terrible risk. Another risk is that you are going to get arrested and that you are going to go to prison at the very least and that you are probably going to be executed. Another risk is that you really have broken faith with your religion and your God. And if you are religious, and I think Marc was, that there are consequences to that.

Now, what Marc did with those risks is he essentially put them aside, denied them, refused to face them, and diminished their power to deter him from what he did.

Q. Does Marc Barnette have a conscience?

A. I think he has a strong conscience. I think that has been very well evidenced yesterday, and certainly has been evidenced in all of the interactions I have had with him over the years. And I think his conscience is torturing him, and that's one of the risks

Reported By: Scott A. Huseby, RPR
800-333-2082          Huseby, Inc., an A[        on (704) 333-9889          Fax (704) 372-4593
Case 3:12-cv-00327-MOC   Document 105   Filed 09/23/15   Page 89 of 250
1390

JA2261

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/6/2002

Page 3417

I think most people would have anticipated. It's not just what you think of yourself. I think another risk which he underestimated was the risk of disgrace that he would have to get up like he did today and yesterday and talk about all of the terrible things that he did, and that disgrace would be known not only to himself, but to family and friends and other loved ones and to the whole world, and he just didn't factor that in.

Q. In your expert opinion, do you think this was a crime that was deterable by the death penalty?

MS. TOMPKINS: Objection.

THE COURT: Sustained.

BY MR. BENDER:

Q. Do you have an opinion as to whether this was the type of crime that was impulsive, planned?

A. I thought the crime had qualities of both impulsiveness and planning, but I thought it was irrational.

MR. BENDER: Okay. Thank you, Dr. Halleck.

CROSS-EXAMINATION

BY MS. ROSE:

Q. Good afternoon, Dr. Halleck. A lot of what you based your diagnosis on was the information that you received from the sources that you described but with

Reported By: Scott A. Huseby, RPR
800-323-2082        Huseby, Inc. an     ri  (704) 333-9889        Fax (704) 372-4593
Case 3:12-cv-00327-MOC   Document 105   Filed 09/23/13   Page 90 of 250
1391

JA2262

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/6/2002

Page 3418

these very detailed interviews with the defendant, his rendition of his life and his history, is that true?

A. I have read all of that, I've read all of the negative things that he has done as well, and I'm quite familiar with all of those.

Q. And did you use all of those things to base your diagnosis?

A. Yes.

Q. But a lot of it really did rely upon what the defendant told you?

A. A lot of it did, but there is sufficient collateral evidence that he was behaving in a seriously depressed way. Even as a child -- there are some things that I didn't get into that both Tosha and his mother report, that even as a young adolescent he would have frequent crying spells and he would get in the closet naked and cry. His mother certainly confirms most of the depressive symptomology that I have described, and I thought I heard Mario confirming the same thing here just a little while ago.

Q. You also reviewed Dr. Johnson's report, I believe?

A. Yes, I did.

Q. And, of course, what the defendant told her about his childhood was different than some of the other

Reported By: Scott A. Huseby, RPR
800-333-2082      Huseby, Inc., an A        ion, (704) 333-9889      Fax (704) 372-4593
Case 3:12-cv-00327-MOC   Document 105   Filed 09/23/15   Page 91 of 250
1392

JA2263

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/6/2002

Page 3419

sources?

A. There were some differences I thought, I didn't think they are greatly different, and I -- he was just getting his first introduction to revealing himself to somebody he perceived might be a hostile examiner, and he had been warned by his attorneys not to say too much to Dr. Johnson, so I think that it came out a little less, a little less darker than it actually was.

Q. But you know Dr. Johnson professionally and you certainly respect her professionally --

A. Oh, of course.

Q. -- and know that she is quite adept at interviewing defendants and making diagnoses, you are not casting aspersions on her abilities at all?

A. Not at all. I don't think Marc was being as open. I think Marc has become increasingly open as time passes. He also has a tendency sometimes to deny bad things. I think he denies the extent to which he drinks, and there are times that he wants to deny how bad things were with his family.

Q. Other than hearing his brother, Mario, today did you interview him prior to forming your diagnoses?

A. No.

Q. Did you interview Shonda Nero, his cousin with whom he was very close growing up?

United States of America vs. Aquilia Marcivicci Barnette       3:97CR23-V
Proceedings Before Judge Richard L. Voorhees       8/6/2002

Page 3420

A.   No, I did not.

Q.   Did you interview Tessie Nero, Shonda's aunt?

A.   No.

Q.   What about Sheila Cooper?

A.   No, I did not.

Q.   Did you speak with Crystal Dennis?

A.   No, I did not.

Q.   Or Alicia Chambers?

A.   I did not.

Q.   Did you visit either of the crime scenes?

A.   Yes.

Q.   The one in Charlotte?

A.   The one in Charlotte.

Q.   Clearly your diagnosis is going to be based upon the information that you received, isn't that true?

A.   Well, 99 percent of diagnosis is based on your interview with the patient, but it always helps to have collateral information, and it's there in this case.

Q.   Now, there was some evidence, based upon his records, that he was a pretty good student, bright student, and did pretty well in school?

A.   I don't think he was a good student at all.  I think he is very bright, but I don't think he was a very good student.

Q.   That he was involved in athletics and tended to

Reported By: Scott A. Huseby, RPR
800-333-2082    Huseby, Inc., an A       rim  (704) 333-9889    Page 93   Fax (704) 372-4593
Case 3:12-cv-00527-MOC-  Document 105   Filed 09/23/15   Page 93 of 250
1394

JA2265

United States of America vs. Aquilia Marcivicci Barnette    3:97CR23-V
Proceedings Before Judge Richard L. Voorhees    8/6/2002

Page 3421

excel at times in athletics even when he moved to Georgia?

A.    He ran track.

Q.    That he had hobbies?

A.    Yes.

Q.    And that his mother supplied him with art supplies and things that he needed to further his painting hobby, are you aware of that?

A.    Yes.

Q.    And that despite some of the difficulties that he has had with his mother, that she has always been there, that's where he always lived and he has always gone to his mother, isn't that true?

A.    Yes.  He loves his mother.

Q.    She helped him find jobs, she helped him write resumes for him, she's been there for him all the way through all of this?

A.    I don't believe she's been there for him all the way through.  I think he loves his mother but he also feels very betrayed by her.

Q.    Would you say that an individual in the defendant's position has motivation to distort the facts?

A.    That happens with anybody who is charged with a crime.  That happens.

Reported By: Scott A. Huseby, RPR
800-333-2082    3:12-cv-0032 HMC Inc. Document 105    Filed 09/23/19 Page 94 of 250    (704) 372-4593

1395

JA2266

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/6/2002

Page 3422

Q. And whenever someone is facing a severe penalty, a defendant is going to have an enhanced desire to shade the truth in their favor?

A. That's usually true.

Q. Haven't you in some of your writings described that when you are conducting an examination like the one that you have conducted on the defendant, that you must approach it with a lot of cynicism and look for the possibility that the defendant is lying, exaggerating, avoiding being defensive, or even malingering?

A. Of course, that's always true.

Q. You talked about the excessive alcohol on the night of the murders as the defendant reported to you.

A. Yes.

Q. Of course, that's something that could not be corroborated?

A. It couldn't be corroborated unless we got together all of the people who were with him during that time and they all counted how many beers he had.

Q. So you had to take his word for that?

A. Pretty much so.

Q. And you did not go up to Roanoke, did you?

A. No, I did not.

Q. You haven't experienced that drive from here to Roanoke at nighttime?

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/6/2002

Page 3423

A.    No, I have not.

Q.    The defendant testified that he had some good days and some bad days, and is that indicative of this major depressive disorder that you have diagnosed?

A.    Well, you are supposed to have two solid weeks of bad days to diagnose major depressive disorder.  I thought when I went over it with him in the past that sometimes it lasted for over two weeks without a good day.  I think other people got different answers from Marc.

Q.    And that's one of those things, really, that you couldn't corroborate, you had to take his word for that, that it was a two-week span, you had no way of determining that that, in fact, was accurate?

A.    Well, it also may be a trivial point, because the details of DSM IV are not written in stone and somebody can be very severely depressed and have a good day every now and then.

Q.    Were you here for the testimony of his friend, Steve Austin?

A.    No.

Q.    Where he talked about him getting out some, meeting girls, playing cards, going to some clubs?

A.    No.  But I heard Marc say that they tried to go out together and his heart just wasn't in it.

Case 3:12-cv-00327-MOC   Document 105   Filed 09/23/15   Page 96 of 250

JA2268

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/6/2002

Page 3424

Q.   Isn't it true, though, that a considerable number of defendants experience symptoms of depression before they commit a crime?

A.   I think a lot of defendants are depressed when they commit a crime, yes.

Q.   And that most become depressed in the course being arrested, indicted, put in jail?

A.   I think there is a depression that follows the arrest as well.

Q.   It's not uncommon amongst criminals to see this depression centering around the events?

A.   Well, there are two ways of looking at that. I think the depression sometimes plays a major role in the event happening, sometimes depression interferes with the person's ability to think clearly and logically and enhances the possibility of the crime taking place, and then there is always depression once you realize you are facing prison and/or death.

Q.   Do you feel like the defendant's depression affected his rational thought here?

A.   I think it led him to develop irrational motivation. In terms of carrying out a plan, it didn't affect him in that way. People can be very depressed and still work. People can be delusional and have false beliefs and still carry out criminal acts in a pretty

Reported By: Scott A. Huseby, RPR
800-333-2082          Huseby, Inc., an Af          on (704) 333-9889          Fax (704) 372-4593
Case 3:12-cv-00327-MOC  Document 105   Filed 09/23/15   Page 97 of 250
1398

JA2269

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/6/2002

Page 3425

rational way.

Q. So certainly the defendant's state of mind did not affect his ability to premeditate and deliberate these murders?

A. I don't think it did, no.

Q. You described that the defendant had biological defects in handling emotions that he was simply born with. Would you describe that?

A. I described that back at a previous hearing. And I thought these were probable, there was no definitive evidence that that existed.

Q. But you testified to that, I mean, what did you mean at the time?

A. I testified that generally people who develop borderline personality disorder and major depression do have some biological defects. That's a current belief.

Q. You said that depressive disorders are fairly common. About how common are they?

A. About 10 percent of the population at some time.

Q. And a breakup, that's a depressive event for anybody --

A. Usually.

Q. -- would that be fair to say?

A. It depends. There's various degrees of

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/6/2002

Page 3426

distress over it. Sometimes it only lasts a day or two and you wouldn't call it depression.

Q. Somebody who goes through a breakup of a meaningful relationship, that hurts longer than a day or two, wouldn't you say?

A. Well, it could hurt a lot, too, and there still may not be depression. There is the pain of losing somebody that you love, which is not the same as depression, which carries with it certain specific symptoms.

Q. You think about people who break up, they are going to lose sleep, they are going to lose their appetite, they are going to withdraw from their friends and family, those are things that we saw here with the defendant?

A. Again it depends on the degree for how long it lasts and what the severity of the symptoms are. Everybody will have a great deal of sadness when they are losing somebody they care about, but there have to be very specific things happening before you call it major depression.

Q. Depression would, however, be something very predictable, it would be a very predictable reaction to the fire bombing and knowing that the police are looking for you?

Reported By: Scott A. Huseby, RPR
800-333-2082 Case 3:12-cv-00327-MOC  Huseby, Inc., an A Document 105  ion (704) 333-9889  Filed 09/23/15  Page 99 of 250 Fax (704) 372-4593
1400

JA2271

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/6/2002

Page 3427

A. I think that would be predictable, yes.

Q. And I guess you said 10 percent of the population experiences depression --

A. That may be higher, I think, but it's at least 10 percent.

Q. So that's a pretty common malady?

A. Yes.

Q. And depression doesn't necessarily lead to violent behavior?

A. It usually doesn't.

Q. You mentioned that the DSM-4 is, of course, a diagnostic manual that you use to determine the defendant's diagnosis. One diagnosis you did not discuss was conduct disorder, and in looking at the DSM-3, it basically defines conduct disorder as repetitive or persistent pattern of behavior in which the basic rights of others are violated, isn't that a fair summary?

A. Are we talking about three or four?

Q. Four.

A. I think you are right.

Q. And according to that manual, you have to find three or more of certain criteria within a 12-month period, and let me tell you what those criteria are, you need to find three. One is bullies, threatens, or

Reported By: Scott A. Huseby, RPR
800-333-2082          Huseby, Inc., an A          ion (704) 333-9889          Fax (704) 372-4593
Case 3:12-cv-00327-MOC   Document 105   Filed 09/23/15   Page 100 of 250
1401

JA2272

United States of America vs. Aquilia Marcivicci Barnette          3:97CR23-V
Proceedings Before Judge Richard L. Voorhees          8/6/2002

Page 3428

intimidates others. Does that sound correct?

A. I can look at my manual, if you give me a second.

Q. I copied it, just tell me if this sounds correct. Number two, often initiates physical fights. Number three, has used a weapon that can cause serious bodily harm to others. That would include, on their list, a bat and a gun. Number four, has been physically cruel to people, has stolen while confronting a person. There are others on the list, but one of them listed is deliberately setting a fire with the intention of causing serious damage. Now that's five of the three that are required, but you did not diagnose that.

A. The conduct disorder is generally for children, and none of those things were present before age 15. You are talking about adult behavior. Those things might qualify him for antisocial personality disorder, but even antisocial personality disorder needs a diagnosis of conduct disorder, too, and that's a diagnosis of childhood.

Q. Now, there are a lot of people walking around on the face of this earth today who have had some significantly rough backgrounds, isn't that true?

A. Of course.

Q. And many people who have suffered physical

Reported By: Scott A. Huseby, RPR
800-333-2082          Huseby, Inc., an A          ion (704) 333-9889          Fax (704) 372-4593
Case 3:12-cv-00327-MOC Document 105 Filed 09/23/15 Page 101 of 250
1402

JA2273

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/6/2002

Page 3429

abuse --

A. Yes.

Q. -- out there in the world? Many people who have been exposed to drugs and alcohol use within their home, correct?

A. Sure.

Q. And they are now out committing any crimes. And there is a significant part of the population that has had something horrible happen to them that are not committing crimes?

A. True. But again, it is the cumulative nature of the many insults he experienced growing up as a child that makes him more likely to commit a crime.

Q. There are people who, once again, who have been subjected to all of these things, alcohol, drug abuse, child abuse, who do not become violent?

A. Oh, that's true.

Q. And who do not commit not one but two murders?

A. Certainly true. But again, the issue is of the difficulty of his choice. Some people facing difficult choices make the right choice. He faced an extremely difficult choice and made the wrong choice.

Q. Isn't it true that a history of past violence increases the probability that future violence will occur?

Reported By: Scott A. Huseby, RPR
800-333-2082 3:12-cv-00327-MOC Huseby, Inc., an A Filed 09/23/15 Page 102 of 250 Fax (704) 372-4593
1403

JA2274

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/6/2002

Page 3430

A. Yes.

Q. Can a psychiatrist's personal opinions affect the diagnosis?

A. I think that happens to a slight extent, yes.

Q. Do you think that personal opinions can affect your ability to find the offender responsible?

A. They may affect your ability to come up with a statement about responsibility. Your own personal opinions, however, should not influence the diagnosis you find. Let me say that another way. Two people might come up with the same diagnosis, but one person may say he is not responsible or insane and the other person may say that he is sane. I think that's a moot issue in this case, though, because nobody is saying that he is not responsible. I think he is responsible.

Q. But wouldn't that affect the way that you evaluate what you have learned?

A. I think you always have to be careful about what your prejudices are when you are evaluating any patient, and you do the very best you can to neutralize any biases you may have.

Q. And you are against the death penalty personally?

A. Yes.

Q. And you know this defendant is facing that

Reported By: Scott A. Huseby, RPR
800-333-2082        Huseby, Inc., an Af          on (704) 333-9889            Fax (704) 372-4593
Case 3:12-cv-00327-MOC   Document 105   Filed 09/23/15   Page 103 of 250
1404

JA2275

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/6/2002

Page 3431

punishment?

A.   Yes.

Q.   Do you recall an article that you wrote for the -- it's called A Critique of Current Psychiatric Roles in the Legal Process?  Do you recall writing that article?

A.   Vaguely, yes.

Q.   Page 397 of that article, Footnote 34, and in light, the system of justice would have to do away with the death penalty.  As long as we continue to execute people, psychiatrists and others will be tempted to purger themselves for humanitarian purposes.  Do you remember writing that, sir?

A.   I said that, yes.

          MS. ROSE:  I have no other questions.

               REDIRECT EXAMINATION

               BY MR. BENDER:

Q.   Dr. Halleck, on what grounds do you oppose the death penalty?

A.   The major grounds on which I oppose it has to do with my career.  I'm a physician, and I feel my job in the world is to try to help save lives, and I would find it very hard to assist in sending somebody to death.

          The other major reason I oppose it is because I

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/6/2002

Page 3432

do not believe it deters. There is lots of evidence that states that don't have the death penalty have lower death rates than states that do.

At any rate, there is no definitive evidence that the death penalty deters anything. I think it's obvious in the case of Marc Barnette that the death penalty would not and could not have deterred him. People with the same kind of illness as Marc are not deterable, and executing Marc would not deter people like him.

MR. BENDER: Okay. Thank you, Dr. Halleck.

THE COURT: You may step down.

MR. BENDER: Your Honor, may we excuse Dr. Halleck to go back to Chapel Hill?

THE COURT: With no objection, you may be excused.

THE WITNESS: Thank you.

MS. LAWSON: Your Honor, we call Ahmad Cooper, please.

AHMAD COOPER, being first duly sworn, was examined and testified as follows:

DIRECT EXAMINATION

BY MS. LAWSON:

Q. Good afternoon. Would you tell the jury your

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/6/2002

Page 3432

do not believe it deters. There is lots of evidence that states that don't have the death penalty have lower death rates than states that do.

At any rate, there is no definitive evidence that the death penalty deters anything. I think it's obvious in the case of Marc Barnette that the death penalty would not and could not have deterred him. People with the same kind of illness as Marc are not deterable, and executing Marc would not deter people like him.

MR. BENDER: Okay. Thank you, Dr. Halleck.

THE COURT: You may step down.

MR. BENDER: Your Honor, may we excuse Dr. Halleck to go back to Chapel Hill?

THE COURT: With no objection, you may be excused.

THE WITNESS: Thank you.

MS. LAWSON: Your Honor, we call Ahmad Cooper, please.

AHMAD COOPER, being first duly sworn, was examined and testified as follows:

DIRECT EXAMINATION

BY MS. LAWSON:

Q. Good afternoon. Would you tell the jury your

United States of America vs. Aquilia Marcivicci Barnette    3:97CR23-V
Proceedings Before Judge Richard L. Voorhees    8/6/2002

Page 3433

name, please.

A.    Ahmad Colinday Marc Cooper.

Q.    Where do you live, Mr. Cooper?

A.    I currently reside in Austell, Georgia, at Anderson Mill Road.

Q.    Do you know Marc Barnette?

A.    Yes, I do.  He is my older cousin.

Q.    How are you connected to him?  Who is your mother?

A.    My mother is Shelia Cooper, the youngest of the three sisters.

Q.    Did you know Marc Barnette before he moved into your mother's house down in Georgia?

A.    I did know him from when I used to visit, and I used to come up to Charlotte and visit when I was younger.

Q.    Is that when he was living with Jessie Cooper?

A.    I'm sorry, maybe I misunderstood the question.

Q.    Was he living with your grandfather, Jessie, or did you just visit him over there?

A.    Well, when I was younger, I visited him while he was still living with his mother and father.

Q.    When Marc and his family moved from Charlotte to Atlanta, did they move in with you?

A.    Yes, they did.

Case 3:12-cv-00327-MOC   Document 105   Filed 09/23/15   Page 107 of 250

1408

JA2279

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/6/2002

Page 3434

Q. Tell the jury what living in that household was like.

A. I guess in the beginning, I was personally very ecstatic, because like I always looked up to Mario and Marc, and it was just good to have them around for the first time, so I would have to say in the beginning it was good. When they first came, I was happy.

Q. Did Marc have a bed at that house?

A. No, he did not.

Q. Tell the jury how life in that household progressed over time.

A. Well, as I stated, when we all first started living together, I think I was very happy, and I think that was the mutual feeling in the household. And then I guess slowly you began to see how things started to deteriorate between the family.

Q. What kind of things made you think that there was deterioration?

A. I mean, first of all, there was a definite lack of communication between the adults and children in the house.

Q. Can you give us some examples?

A. Well, for an example, as things progressed in that house, a routine day -- on a routine day there would be a very slim chance that we would see our

United States of America vs. Aquilia Marcivicci Barnette    3:97CR23-V
Proceedings Before Judge Richard L. Voorhees    8/6/2002

Page 3435

parents.

Q. Who were the adults living in the house at that time?

A. The adults in the house were my mom, Shelia Cooper; and my aunt, Sonia Barnette; and my stepfather, Michael O'Neill.

Q. Tell the jury about some of the incidents that you recall while you were growing up about your mother and your stepfather going out.

A. Well, as I stated, it was always -- as time progressed they would just be there very infrequently, and I could recall waking up in the morning and they would be off to work and I could recall coming home from school and I would go outside and play and I would come home and Marc and Mario, we would all be there, Marc would make sure that we were fed and homework was done, and it was like my aunt and my mom and Mike would come in, and they may be there for 30 minutes to an hour, they would put on their best outfits and they were right back out the door and probably wouldn't see them until the next morning, if I did at all.

Q. How long was the longest period of time that you all were unsupervised?

A. I couldn't give one instance to say how long we were unsupervised; it happened with frequency.

Reported By: Scott A. Huseby, RPR
800-333-2082    Huseby, Inc., an Af            on (704) 333-9889    Fax (704) 372-4593
Case 3:12-cv-00327-MOC   Document 105   Filed 09/23/15   Page 109 of 250
1410

JA2281

United States of America vs. Aquilia Marcivicci Barnette     3:97CR23-V
Proceedings Before Judge Richard L. Voorhees     8/6/2002

Page 3436

Q.    How about food in the house?

A.    Food in the house deteriorated with the family.

Q.    Did you hear Mario testify about the Salisbury steaks?

A.    Yeah.  Definitely it went from being food in the fridge to TV dinners, and that's basically what it would consist of.  I guess they gave it to us because they were there so infrequently that the food they did buy they wanted to make sure we could make ourselves. There wasn't much of that to go around.  They maybe bought six at a time.

Q.    Did you notice any alcohol or drug consumption?

A.    I noticed definite alcohol consumption.  There was a lot of that.  There was suspicions about drug consumption, but I never saw any firsthand, but I had suspicions even as a child.

Q.    How much older is Marc than you?

A.    He is eight years older.

Q.    At some point you had a little sister.  What is her name?

A.    Her name is Mikayla O'Neill.

Q.    Did Marc take care of you, Mario, and Mikayla?

A.    Yes, he did.  She was born shortly after we moved into the house in Lithonia, Georgia, and he was very frequently the baby-sitter.

United States of America vs. Aquilia Marcivicci Barnette    3:97CR23-V
Proceedings Before Judge Richard L. Voorhees    8/6/2002

Page 3437

Q.    And in connection with that, did he change her diapers and take care of her?

A.    Naturally he did.

Q.    Did you all have a game about giving money to your parents to buy you cakes?

A.    Oh, I mean, when my mom and Aunt Sonia would go out, we would probably be in the back, Marc would be in the back talking on the phone, and me and Mario would probably be watching TV and playing the video game and we would run up into the front of the house because our room was the very last room in the house, and we would run up there and we would ask them where they are going and they would be very immaculently dressed and we would ask them if they would go get us a Star Crunch or an oatmeal pie, just a snack, candy.  You know, we liked a lot of junk food back then.

Q.    Did you get the candy or whatever it was that you asked for?

A.    I cannot ever recall ever for all the times we asked receiving it.  After awhile we pretty much assumed that they were pretty much not going to the store.

Q.    Did you and Marc and Mario ever talk about what was going on with the adults in your household?

A.    Me and Mario had conversations from time to time, but Marc did a pretty good job of making sure that

Reported By: Scott A. Huseby, RPR
800-333-2082         Huseby, Inc., an Al            ion  (704) 333-9889         Fax (704) 372-4593
Case 3:12-cv-00327-MOC   Document 105   Filed 09/23/15   Page 111 of 250
1412

JA2283

United States of America vs. Aquilia Marcivicci Barnette    3:97CR23-V
Proceedings Before Judge Richard L. Voorhees    8/6/2002

Page 3438

a lot of stuff went unseen in terms of what we saw.

Q.    How do you know that?

A.    There were just certain instances where there would be a lot of things going on in the house and Marc would make it a point to make sure that we never saw it.

Q.    Now, you graduated from high school?

A.    Yes, ma'am.

Q.    What are you doing now?

A.    I'm currently working at Dave and Buster's, cocktailing full-time, and I also go to school full-time at Chattahoochee Technical College.

Q.    What are you studying?

A.    Criminal justice.

Q.    Tell this jury what Marc has meant to you in your lifetime.

A.    Well, Marc has always been like my father figure.  He's someone that I have always looked up to, because I never knew my father until two years ago.  And my stepfather was very much an alcoholic and a drug addict, and he was never really around that much.  So Marc was definitely the person that I always looked up to, and he always gave my advice and helped me out, and he even does so to this day, because we write each other very frequently.  And it just really hurts to see him in this position, and I love him dearly.  It's just hard to

Reported By: Scott A. Huseby, RPR
800-333-2082    Huseby, Inc., an Af...    (704) 333-9889    Fax (704) 372-4593
Case 3:12-cv-00327-MOC   Document 105   Filed 09/23/15   Page 112 of 250
1413

JA2284

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/6/2002

Page 3439

express in words how much I love him.  It's just a very hard time.

Q.  Ahmad, you mentioned your real father.  So Michael O'Neill was not your father?

A.  No, he is not.

Q.  How did you find out about your father?

A.  How did I find out about my father?

Q.  Yes.

A.  I always knew that I had another father, but I had been estranged from him for some time due to extenuating circumstances between my mother and he.

Q.  So he found you or you found him?

A.  I found him.

Q.  What has your relationship with your father meant to you?

A.  I guess it kind of brings a sense of completion to you.  You feel like you know one side of yourself for so long; so when you meet your other side, you kind of feel complete for the first time, I guess I would say.  A lot of things I never understood, I can look at him and talk to him, and my older brothers that I have now, and I can see where that kind of makes sense.

MS. LAWSON:  Thank you.  No further questions.

MS. TOMPKINS:  I've got a few questions

Reported By: Scott A. Huseby, RPR
800-333-2082          Huseby, Inc., an Af          on (704) 333-9889          Fax (704) 372-4593
Case 3:12-cv-00327-MOC   Document 105   Filed 09/23/15   Page 113 of 250
1414

JA2285

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/6/2002

Page 3440

for you.

CROSS-EXAMINATION

BY MS. TOMPKINS:

Q.   How old are you now?

A.   20 years old.

Q.   So how old were you when Marc moved down to Atlanta?

A.   When they first moved to Atlanta, I believe I was six years old, going on seven.

Q.   How old was Marc?

A.   I believe he was 13 or 14 at the time.

Q.   And he went to high school down there, correct?

A.   Yes, ma'am.

Q.   Your mom, Sheila, she went down to Atlanta on a college scholarship, is that right?

A.   Initially, yes.

Q.   And what was she doing for a living?

A.   She worked when I was younger.  She worked part-time at a package -- at a liquor store, and she also worked at Georgia Power for some time.

Q.   Had she finished school by the time you were born?

A.   She never finished.

Q.   She went to college for some period of time?

A.   She went for maybe a year and a half, maybe

Case 3:12-cv-00327-MOC   Document 105   Filed 09/23/15   Page 114 of 250
1415

JA2286

United States of America vs. Aquilia Marcivicci Barnette    3:97CR23-V
Proceedings Before Judge Richard L. Voorhees    8/6/2002

Page 3441

two, but she got pregnant with me.

Q. And you all were living in an apartment, is that right, when they all moved down?

A. Yes, ma'am.

Q. Didn't you and Mario and Marc share a bedroom?

A. Yes, ma'am.

Q. And you were excited about having those guys around, correct?

A. I was excited about having them around initially.

Q. And you looked up to Marc?

A. Yes, ma'am.

Q. Things were good in the apartment at first?

A. As I said, initially.

Q. Okay. And did there come a time when Marc moved out of the apartment to be with his girlfriend?

A. There was an incident that came up where they requested that Marc leave, but I don't think he ever really left on his own accord.

Q. But Marc moved out?

A. Yes, ma'am.

Q. Did you know Natasha?

A. Yes, ma'am.

Q. Marc was 15 when Angelica was born, is that right?

Reported By: Scott A. Huseby, RPR
800-333-2082          Huseby, Inc., an Al          on (704) 333-9889          Fax (704) 372-4593
Case 3:12-cv-00327-MOC  Document 105  Filed 09/23/15  Page 115 of 250
1416

JA2287

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/6/2002

Page 3442

A. If I'm not mistaken, I believe so.

Q. So that was a year or two after he got down there?

A. I believe it was about two years after he had gotten down.

Q. And he and Natasha got a place of their own, correct?

A. Eventually.

Q. And Marc continued to go to high school, isn't that right?

A. Well, he dropped out after awhile, but he did continue for a couple of years, I believe.

Q. He got through the 11th grade, do you remember that?

A. I'm not quite sure if he got finished with the 11th grade or not.

Q. And when he went to high school, he was on the track team?

A. Yeah. He was a track star.

Q. Now, so you were around and aware, I'm supposing, when Marc's second child was born?

A. Yes, ma'am.

Q. And by that time he had moved out, sometime before that?

A. Yes, ma'am.

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees
3:97CR23-V
8/6/2002

Page 3443

Q. So he was there in the apartment for about two years, is that what you are saying?

A. Well, we didn't actually stay in that apartment. When they first moved down, we stayed in the apartment, and shortly thereafter we moved into a house in Lithonia, Georgia.

Q. In fact, your mom was building a house when they came down, isn't that right?

A. I'm not sure if the house was built, but plans were being made to move into a house.

Q. And y'all moved into the house together?

A. Yes, ma'am.

Q. And do you remember when -- were you around when Marc got together with Crystal Dennis?

A. I remember a time, meeting her a few times when I was in the city of Charlotte.

Q. You all had moved back to Charlotte?

A. Yes, ma'am, we had moved back to Charlotte in 1993.

Q. How old were you then?

A. I believe I was 13 or 14 years old at the time, maybe a little younger.

Q. So that incident that you are speaking of in Charlotte, was that Alicia Chambers, 1993?

A. Oh, yeah, Alicia Chambers, I'm sorry.

Reported By: Scott A. Huseby, RPR
800-333-2082          Huseby, Inc., an Aff          in (704) 333-9889          Fax (704) 372-4593
Case 3:12-cv-00327-MOC  Document 105  Filed 09/23/15  Page 117 of 250
1418

JA2289

United States of America vs. Aquilia Marcivicci Barnette    3:97CR23-V
Proceedings Before Judge Richard L. Voorhees    8/6/2002

Page 3444

Q. Were you aware that Marc went and spent some time in jail down in Georgia?

A. Yes, ma'am.

Q. Were you proud of him then?

A. Was I proud of him then?

Q. Yes.

A. No. I was worried about him.

Q. Were you worried about Crystal?

A. I don't ever recall meeting Crystal.

Q. Were you worried about Natasha?

A. Yes, I was very much worried about Natasha.

Q. Now, you mentioned that you all moved back up to Charlotte. Did the whole family unit move back up to Charlotte?

A. Aunt Sonia and Mario moved back up, Marc moved up shortly thereafter, and we moved back, by we I mean my mom, my sister, and my brother, later that year.

Q. And y'all moved into the house on West Boulevard?

A. Yes, ma'am, my grandfather's house.

Q. How long did you live there?

A. I believe we moved out around 1996, '97.

Q. All right. Marc talked about an Aunt Patty and Aunt Mabel. Do you know who those folks are?

A. Yes, ma'am.

Reported By: Scott A. Huseby, RPR
800-333-2082    Huseby, Inc., an Aff    n (704) 333-9889    Fax (704) 372-4593
Case 3:12-cv-00327-MOC  Document 105  Filed 09/23/15  Page 118 of 250
1419

JA2290

United States of America vs. Aquilia Marcivicci Barnette          3:97CR23-V
Proceedings Before Judge Richard L. Voorhees          8/6/2002

Page 3445

Q.   Were those also women that you knew?

A.   I had visited them a couple of times.

Q.   Okay.  Would it be fair to say that the family was pretty tight?

A.   No, it would not.

Q.   Okay.  So Marc's mom moving down to Atlanta to move in with her sister was not because she loved her sister?

A.   As it was explained to us, it was a job opportunity.

Q.   But she did move in with her sister?

A.   Yes, ma'am.

Q.   And then y'all moved up and moved in with Sonia and Shelia's father?

A.   Yes, ma'am.

Q.   So to that extent, the family unit stayed together?

A.   No.  Just because a family lives together doesn't mean that the family is together.

Q.   The family lived together?

A.   Yes, ma'am.

Q.   And Marc talked about having a loving relationship with Hattie and Mabel.  Do you remember those times?

A.   Yes.  Marc and Mario loved them very much.

Reported By: Scott A. Huseby, RPR
800-333-2082          Huseby, Inc., an A          ion  (704) 333-9889          Fax (704) 372-4593
Case 3:12-cv-00327-MOC   Document 105   Filed 09/23/15   Page 119 of 250
1420

JA2291

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/6/2002

Page 3446

Q. Did Jessie -- were you part of the group that he took out hunting?

A. I don't really recall that situation, but I do recall the first time I ever learned how to shoot a gun was on my grandfather's land.

Q. And that was the land on West Boulevard?

A. Yes, ma'am.

Q. And your grandfather taught you how to shoot?

A. Actually, my Aunt Sonia was the one who actually taught me to shoot.

Q. So you were not part of that group that Jessie Cooper taught to shoot?

A. Not that I can recall.

Q. Did y'all have Christmases, Thanksgiving, family get-togethers?

A. Christmas and Thanksgiving, usually.

Q. And how long did you live over there on West Boulevard?

A. From about '93 to '96, I believe.

Q. And what did you do when you left there?

A. We moved over off of Beatties Ford Road, right down the street from where I went to high school.

Q. When you say we, who was that?

A. We is my mother, Shelia Cooper; and my younger sister, Mikayla O'Neill; and my younger brother, Michael

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/6/2002

Page 3447

O'Neill, Jr.

Q. How old were you then?

A. I was just -- when we first moved there, I was on the verge of starting high school, so I may have been 14, about to turn 15.

Q. Now, when y'all were down in Atlanta and you talked about there being some -- no food in the fridge, that sort of thing, how old were you then?

A. As I stated, when all of this started going on with the food missing in the fridge, I was about seven or eight years old.

Q. And for how long did that go on?

A. For quite some time, but I couldn't give you a specific time frame, but it carried on for quite some time.

Q. For five years?

A. We didn't stay there for five years, but basically from the point it started until the point we moved, yes.

Q. How many years was that?

A. It was maybe three years.

Q. Was your mom working then?

A. To the best of my knowledge, yes.

Q. And you graduated from high school here in Charlotte, is that right?

Reported By: Scott A. Huseby, RPR
800-333-2082        Huseby, Inc., an A          ion (704) 333-9889        Fax (704) 372-4593
Case 3:12-cv-00327-MOC  Document 105  Filed 09/23/15  Page 121 of 250
1422

JA2293

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/6/2002

Page 3448

A.   Yes, ma'am.

Q.   And you're working full-time and going to school full-time?

A.   Yes, ma'am.

Q.   Where are you going to school?

A.   Chattahoochee Technical College.

Q.   And what are you studying?

A.   Criminal justice.

MS. TOMPKINS:   Thank you.   I have no further questions.

MS. LAWSON:   No questions.

THE COURT:   You may step down.   Members of the jury, we will take our evening recess.   Please remember the usual instructions.   We will see you in the morning at 9:30.   Thank you for your attention to the case.

(The jury left the courtroom.)

(Adjourned.)

I, Scott A. Huseby, do hereby certify that the foregoing transcript is a true and correct transcript.

SCOTT A. HUSEBY                                    DATE

Reported By: Scott A. Huseby, RPR
800-333-2082  Case 3:12-cv-00327-MOC  Huseby, Inc. Document 105  Filed 09/23/13  Page 122 of 250  Fax (704) 372-4593
1423

JA2294

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION

UNITED STATES OF AMERICA ) DOCKET NO. 3:97-cr-23-V
)
vs. )
)
AQUILIA MARCIVICCI BARNETTE, ) VOLUME 18
) MORNING
Defendant. )
_____ )

TRIAL PROCEEDINGS
BEFORE THE HONORABLE RICHARD L. VOORHEES
UNITED STATES DISTRICT COURT JUDGE
AUGUST 7, 2002

APPEARANCES:

On Behalf of the Government:

    ANNE M. TOMPKINS, ESQ.
    JILL WESTMORELAND ROSE, ESQ.
    227 West Trade Street, Suite 1700
    Charlotte, North Carolina

On Behalf of the Defendant:

    JEAN B. LAWSON, ESQ.
    P.O. Box 472106
    Charlotte, North Carolina

    HAROLD J. BENDER, ESQ.
    200 North McDowell Street
    Charlotte, North Carolina

          Cheryl A. Nuccio, RMR-CRR
          Official Court Reporter
          United States District Court
          Charlotte, North Carolina

FORM FED   PENGAD · 1-800-631-6989

WEDNESDAY MORNING, AUGUST 7, 2002

(Jury not present.)

THE COURT: Ms. Lawson.

MS. LAWSON: Thank you, Your Honor.

We just wanted to inform you that I think we're going to get to a point where there's going to be some dispute about admissibility of evidence, and I'm not sure whether you characterize it that way. It would be as to Dr. Cunningham. And we just wanted to alert you to that. We may need to hear that outside the presence of the jury so that you can determine when you'd like to hear it. We have other witnesses we can present and move forward. Dr. Cunningham would be our last witness.

THE COURT: Okay. What would you anticipate might be the nature of the dispute?

MS. TOMPKINS: I had informed the court yesterday at the afternoon break that I had received the report of Dr. Cunningham as the basis of his testimony in what I would contend to be a violation of the court's order under <u>Beckford</u>, that all reports generated by expert witnesses be provided to opposing party by June 25th. So I wanted to bring to the court's attention -- and, in fact, in the court's order it says, Failure of either party to provide the reports of his mental health examination in a timely manner as ordered by this court will result in forfeiture of the right to present

mental health testimony at trial.

Also, in a response filed by the defense -- well, to back it all up, in February of this year the government filed a motion asking for the defense to give notice whether or not they were going to file -- whether or not they were going to use mental health testimony. The court gave until April 15th to do so, and on April 15th they filed their response saying that Seymour Halleck, Dr. Mark Cunningham, Dr. Faye Sultan, and Dr. Sally Johnson are the intended expert witnesses. Their evaluations, opinions and reports are in possession of the government.

The report that the government has had in its possession is a report done by Dr. Mark Cunningham. And as late as last Friday when I went by Mr. Bender's office to get a copy of a report, it was -- the thing that I got from Mr. Bender was the same slide presentation that I've had in my possession for a long time. I had thought that Dr. Cunningham had done some kind of a traditional report. So I've had that. So as late as last Friday I was given a set of -- a power point presentation.

Yesterday I was given a package of sixty-two power point slides that, as I told the court yesterday, are 100 percent different than the report that I've had in my possession for a year. The purpose --

THE COURT: So there never was a traditional

FORM FED ● PENGAD · 1-800-631-6989

report.

MS. TOMPKINS: There -- well, that is his report. His testimony has been that is -- that is his report, his power point presentation. He does not do a traditional report as other psychiatrists and psychologists do. And what the government has been led to believe and what their preparation for cross examination and our preparation for rebuttal has been based on the presentation that we've had in our possession.

So the government simply wants to say that yesterday the package of information given to us about what Dr. Cunningham's testimony will be is completely different. It's a completely different topic. Our preparation and our expert rebuttal preparation has been a waste. And that -- it's the government's position that it's flaunting the court's order.

THE COURT: Well, when did the defense come into possession of these sixty pages of different power point presentation?

MS. LAWSON: Basically Monday, Your Honor. And if I can clarify this a little bit.

Dr. Cunningham at the first trial tendered a letter basically outlining the nature of his findings. In addition, he testified at the first proceeding.

The government, in our opinion, failed to present any evidence of future dangerousness during its case in

chief. We contend, therefore, that they're not entitled to rebut any kind of future dangerousness testimony unless we present it. Because the government failed to present that evidence, we don't intend to open that door and allow them to put on rebuttal evidence to rebut something we don't present.

The slides are illustrative. They're not -- they're exhibits. They're not his report. His testimony will be and is contained within the material provided by the defense in response to your order.

Your Honor, we made up two bound volumes of mental health expert testimony and reports and gave it to the government. In our response we said to them that the testimony would be consistent with what they said either in their testimony or in their reports. So they've had, you know, possession of that all this time. If they prepared for future dangerousness, that's -- that's their problem. What we intend to present doesn't relate to future dangerousness but as to the other aspects of Dr. Cunningham's written report and his testimony at the first trial.

THE COURT: It strikes me as somewhat arbitrary at this point to rely on an absence of future dangerousness testimony as an issue since Dr. Halleck talked about that issue.

MS. LAWSON: Only when elicited on cross examination by the government. He didn't talk about it at all in his

direct. And the government can't back door its way into rebutting testimony that hasn't been offered by the defense simply by trying to elicit it on cross examination.

THE COURT: I think that's a doubtful proposition. Even though his testimony may have been in response to cross, it's nevertheless testimony presented during the defense case which the government has an obligation as well as an opportunity to rebut. I think that's arbitrary to say that, well, just because it came in on cross, it's something the government can't respond to. The government, in other words, is bound by the answer.

MS. LAWSON: Well, the government -- I think the government elicited it for the purpose of curing the fact that they didn't present evidence of future dangerousness in their case.

THE COURT: Well, another factor is that the government's notice talked about future dangerousness as an aggravating factor. So there's no surprise to the defense in that respect.

MS. LAWSON: Well, that's true. But if they don't prove it in their case in chief, they have no right to rebut it.

MS. TOMPKINS: If I may respond, Your Honor. We've already been through that. They made a motion and the court denied it. Our future dangerousness testimony came in through

witnesses.

THE COURT: Right. I think one of the -- one of the things we will ask Dr. Cunningham to go into is -- in voir dire is when he had his sixty pages because, you know, the government -- that is, the defense has a right to attempt to hold back its case as long as possible, but not when you have -- but not in regard to psychological reports that had been ordered by the court to be disclosed.

MS. LAWSON: Your Honor, these sixty pages are not -- they're illustrative exhibits. His testimony would come in even without them, we contend.

THE COURT: But they do disclose what his line of opinion is and evidently there's been an effort here to sandbag the government on expert opinions, on an expert's professional opinions which is exactly what the reports are supposed to disclose. And it doesn't do to rely on semantics as to whether it's a pinpoint presentation or slide presentation or a traditional report or otherwise. The substance of it is what counts.

MS. LAWSON: Well, and the substance of it, I'm respectfully advising the court, was disclosed in Dr. Cunningham's report tendered to the government --

THE COURT: Well, I may have to examine that because you say that; the government says it's a whole different idea. I don't know right now. I just know that you two

disagree about it.

MS. LAWSON: Yes, sir.

THE COURT: All right. We'll go on with other testimony at this point.

(Jury entered the courtroom.)

THE COURT: Good morning, members of the jury.

THE JURY: Good morning.

THE COURT: You may call your witness.

MS. LAWSON: Thank you, Your Honor.

Call Terry Dorsey to the stand, please.

TERRY MICHAEL DORSEY,

being first duly sworn, was examined and testified as follows:

DIRECT EXAMINATION

BY MS. LAWSON:

Q.    Good morning, Mr. Dorsey.  How are you?

A.    Good morning.

Q.    Would you introduce yourself to the jury, please, and tell them what you do.

A.    My name is Terry Michael Dorsey.  I am a detention officer for the Mecklenburg County Jail.

Q.    How long have you worked there?

A.    Five years.

Q.    Do you know Marc Barnette, the person seated right here?

A.    Yes, I do.

Q.    Could you tell the jury what kind of an inmate he's

been.

A. Perfect. I mean, no problems, no hassles. Respectful, intelligent, and quiet.

MS. LAWSON: Thank you very much. Please answer any questions they have for you.

CROSS EXAMINATION

BY MS. ROSE:

Q. And you knew that he was brought to the Mecklenburg County Jail awaiting this sentencing hearing.

A. I didn't know at the time, no.

Q. That's why he's here.

A. Right now, yes. Yes.

MS. ROSE: Thank you.

MS. LAWSON: May Mr. Dorsey be released?

THE COURT: Yeah, he may be released.

MS. LAWSON: Thank you.

(Witness was excused.)

MS. LAWSON: Your Honor, we'd call Olandas Truesdale.

OLANDAS TRUESDALE,

being first duly sworn, was examined and testified as follows:

DIRECT EXAMINATION

BY MS. LAWSON:

Q. Good morning, Mr. Truesdale.

A. Good morning.

Q.  Would you please introduce yourself to the jury and tell them how you're employed.

A.  I'm Olandas Truesdale, and I'm a detention officer at Mecklenburg County Jail Central.

Q.  And how long have you worked there?

A.  Four years.

Q.  Do you know Marc Barnette?

A.  Yes, I do.

Q.  Would you tell the jury what kind of an inmate he has been.

A.  I would describe him as a mod -- a good model inmate.

Q.  Thank you very much.  Were you about to say something?

A.  No, ma'am.

MS. LAWSON:  Thank you.  Answer any questions they have, please.

MS. ROSE:  No questions.  Thank you, sir.

THE COURT:  You may step down.  You may be excused.

(Witness was excused.)

MS. LAWSON:  Your Honor, we'd call Tony Harrison, please.

TONY HARRISON,

being first duly sworn, was examined and testified as follows:

DIRECT EXAMINATION

BY MS. LAWSON:

Q.  Good morning.

A. Good morning.

Q. Would you please introduce yourself to the jury and tell them what you do.

A. Yes. My name is Tony Harrison. I'm a correctional officer, Mecklenburg County Sheriff's Department.

Q. How long have you worked in that capacity?

A. Six years.

Q. Do you know Marc Barnette?

A. Yes, I do.

Q. How do you know him? Through the jail?

A. Yes, through the jail.

Q. Would you tell the jury what kind of an inmate he has been.

A. Since I've known Mr. Barnette, he's been a role model inmate. He's followed all the orders and directives that are given at the Mecklenburg County Sheriff's Department.

MS. LAWSON: Thank you very much. Please answer any questions they have.

MS. ROSE: I have none, sir. Thank you very much.

MS. LAWSON: May he be released, Your Honor?

THE COURT: He may.

MS. LAWSON: Thank you.

(Witness was excused.)

MR. BENDER: Your Honor, our next witness is Bruce Ryherd, and I will get him out of the back room.

THE COURT: All right, sir.

BRUCE RYHERD,

being first duly sworn, was examined and testified as follows:

DIRECT EXAMINATION

BY MR. BENDER:

Q.   State your name and spell your last name, please, sir.

A.   My name is Bruce Ryherd, R-y-h-e-r-d.

Q.   And where do you live, Mr. Ryherd?

A.   Terre Haute, Indiana.

Q.   And what's your occupation or profession?

A.   I'm a correctional counselor with the Federal Bureau of Prisons.

Q.   And are you assigned to the United States Penitentiary at Terre Haute?

A.   Yes, I am.

Q.   How long have you been there?

A.   I have been at Terre Haute, Indiana, for fourteen years and eleven months.

Q.   Mr. Ryherd, do you know Marc Barnette?

A.   Yes, I do.

Q.   Is this Marc seated here?

A.   Yes, it is.

Q.   I believe Marc came to the special confinement unit at Terre Haute in July of 1999.

A.   That is correct.

Q. Okay. And tell us what phase one of that special confinement unit means.

A. The way the unit was set up, phase one inmates are those inmates that are recently received. They stay in phase one until they're -- they meet the criteria for phase two. They have to be in the unit for a minimum of twelve months. They have to maintain clear conduct while they're there. And they have to participate in recommended programs by the unit team.

Q. Okay. And in phase one, are all the people there locked down for twenty-three hours a day?

A. Yes.

Q. And so there's one hour a day that they are permitted recreational activity.

A. That's correct.

Q. And is that recreational activity alone or is it with other inmates?

A. They are afforded an opportunity to recreate with other inmates, but it's in segregated rec areas. In other words, there's more than one individual out, but they are maintained in separate recreation areas. They don't have any physical contact with each other.

Q. Okay. And during the one year that Marc was in phase one, how was his conduct?

A. He was not a management problem to us while he was housed in phase one. He was recommended for phase two upon which

**1436**

**JA2307**

time he met the criteria.

Q. Okay. The criteria, again, for moving to phase two was what?

A. He had to maintain at least twelve months clear conduct. He had to be in the unit for a period of twelve months, and participate in recommended programs.

Q. Okay. And so he met all those criteria.

A. Yes, he did.

Q. Was recommended for phase two.

A. Yes.

Q. And not all inmates in the special housing unit or special confinement unit are recommended for phase two, are they?

A. No.

Q. Now, although he was recommended, did he actually achieve phase two?

A. Yes, he did.

Q. Tell us a little bit about what phase two means.

A. Phase two allows those inmates that are progressed to that phase to recreate with other inmates that are in the phase. They're afforded a little bit more liberal activity time. There's an adjusted schedule to where they're afforded more recreation out of their cell. They're afforded an opportunity to rec with others.

Usually we -- what we did at the time that Marc was

there, two or three inmates were allowed to rec together in the recreation cage or recreation area that was established inside the unit. There was a period of leisure time in the evening that was established for the guys in phase two. A leisure activity center was established inside the unit in the larger rec area. And they were afforded an opportunity in the evening to come out, participate in board games, card games, and watch TV.

Q. Okay. And during the time that they're in phase two, they're also being watched or monitored by staff.

A. Correct.

Q. Okay.

A. At no time when any inmate is out within the confines of the unit or outside of his cell, they are constantly monitored by staff. There is a hundred percent staff supervision. So the unit is a controlled environment.

Q. Okay. And if an inmate were to violate some rule or have any infraction --

A. Right.

Q. -- would he go back to phase one?

A. If a staff member became aware that an inmate had committed a prohibited act in accordance with bureau prison policy, an incident report would be written. Then it would be followed up by an investigation by a member of the correctional services staff, usually a lieutenant or --

depending on the nature of the offense. Then what would happen is it would be referred to the UDC or the unit team, which is the Unit Disciplinary Committee. Then what they would do is based on the severity of the incident report, it could either go to our disciplinary hearing officer or the UDC could handle the report.

Once an inmate was found to have committed a prohibited act, he would be referred back to phase one and then his criteria for placement in phase two would start all over.

Q. Okay. What type of infraction or violation of the rules would cause this sort of report?

A. Well, it could be anything from assaulting a staff, attempting to introduce contraband into the institution by mail, by telephone, abuse of telephone privileges, being unsanitary, refusing an order, being insolent to a staff member. Just various things that they could be found to have done.

Q. Any type of back talk or refusing to obey an order would result in that?

A. Most definitely.

Q. And until Marc was brought back here for the purpose of this sentencing hearing, did he maintain clear conduct and was he in phase two throughout --

A. Yes, he was.

Q. -- the time he was there?

MR. BENDER: Okay. Thank you, Mr. Ryherd.

THE WITNESS: Okay.

CROSS EXAMINATION

BY MS. TOMPKINS:

Q.   Good morning.

A.   Good morning.

Q.   How many inmates are at the federal penitentiary at Terre Haute?

A.   How many total inmates?

Q.   Correct.

A.   Approximately fifteen hundred.

Q.   Fifteen hundred. And how many are in the special confinement unit?

A.   Currently there is twenty-four inmates in the special confinement unit at Terre Haute.

Q.   And while the defendant was in the special confinement unit, he was awaiting his sentencing hearing; is that correct?

A.   Yes.

Q.   Now, in what ways does the special confinement unit differ from the general population where the fifteen hundred are?

A.   In the fact that it is a totally controlled lock down unit. Any time an inmate is removed from his cell, he's under constant staff supervision. Depending upon the nature of the

-- of what is considered his custody level, he can be a two-man cover or three-man cover, i.e., meaning --

Q. What does that mean?

A. Well, meaning that two or three staff members must walk or escort the inmate wherever he goes: To the shower, to the recreation area, to a call out, and that type of thing.

Q. Okay. So in the special confinement unit, the folks that are there are closely monitored, correct?

A. Yes.

Q. And if there is any movement of a person in the special confinement unit, they are always monitored by or covered by at least two staff members.

A. Yes.

Q. They have minimal contact with other inmates, correct?

A. That is correct.

Q. So what is the spectrum of behavior on the special confinement unit?

A. As far as...

Q. From -- of your observations from bad behavior to good behavior. What are the possibilities for bad behavior?

A. That's only up to the individual, but for the most part the individuals that we've housed at the unit since I've been there have been very little of a discipline problem.

Q. And would that be because of the level of control on the special confinement unit?

A.   I believe so.

Q.   Is good behavior on the special confinement unit unusual?

A.   No.

Q.   It is the norm?

A.   Yes.

Q.   Now, the move to phase two, when inmates are given the opportunity, inmates move to phase two, correct?

A.   Uh-huh.

Q.   Are there inmates who decline to move to phase two?

A.   Yes.

Q.   Okay.

A.   There have been.

Q.   There have been.  Do most inmates move to phase two when eligible?

A.   If they meet the criteria and it's ultimately up to the unit team to make the recommendation based on the criteria and then it's ultimately up to the warden of the institution to decide whether that placement is appropriate.  But yes, for the most part they do progress.

Q.   And in your personal experience have most inmates moved from phase one to phase two if they so desired?

A.   Yes.

Q.   And earned it?

A.   Yes.

Q. So it's the norm to move to phase two.

A. Yes.

MS. TOMPKINS: Thank you. That's all the questions I have.

MR. BENDER: I have nothing further. Thank you, Mr. Ryherd.

THE COURT: You may step down and you may be excused.

(Witness was excused.)

MR. BENDER: Call Vicki Boyer.

VICKI BOYER,

being first duly sworn, was examined and testified as follows:

DIRECT EXAMINATION

BY MR. BENDER:

Q. State your name, please.

A. Vicki Boyer.

Q. Spell your last name for the court reporter.

A. B-o-y-e-r.

Q. Okay. Ms. Boyer, where do you live?

A. I live in Marshal, Illinois.

Q. Okay. What -- you are, I believe, employed at the United States Penitentiary in Terre Haute, Indiana?

A. I am.

Q. How long have you been there?

A. Sixteen years.

Q. And what is your current position?

A. I'm a case manager.

Q. Tell us what a case manager means.

A. A case manager is responsible for when they receive an inmate on their case load, recommending programs for them as far as substance abuse programs, financial responsibility, making recommendations to them. We're also responsible for doing any type of correspondence. Say an attorney or a Congressman or a family member writes in on that respective person, then we are responsible to answer correspondence for the warden's signature.

Q. And as such, are you familiar with Marc Barnette?

A. Yes, I am.

Q. And this is Marc right here.

A. It is.

Q. And were you his case manager?

A. Yes, I was.

Q. Now, Marc, I think, came to the special confinement unit in about July of 1999.

A. That's correct.

Q. During that period of time, what kind of inmate was he?

A. He was no disciplinary problem. He followed the recommendations of the unit team.

Q. And actually got to phase two --

A. He did.

Q. -- we've heard about.

And how did he do in phase two?

A. He was no problem in phase two.

Q. And I believe you helped him get some art supplies.

A. The recreation department was actually in charge of the art supplies, but the unit team worked with the recreation department in order to get that, yes.

Q. Okay. And somehow you found out that Marc enjoyed drawing art.

A. Yes, we did.

Q. And that was one of the recreational activities that he did?

A. That was one of the first recreational -- other than their physical recreation, that was one of the first activities we started in the unit.

Q. The jury has already seen these, but are these some of the paintings that Marc did while he was --

A. Yes, they are.

Q. -- in Terre Haute?

Q. I believe you described him as being quite talented.

A. He was very talented.

Q. Ms. Boyer, you are familiar as case manager with all of the Bureau of Prisons records pertaining to Marc when he was sent to USP, the penitentiary at Butner for evaluation.

A. That's correct.

Q. Didn't find any indication of any infraction, minor or otherwise while he was there.

A. No, there were no disciplinary infractions in his file.

Q. And also, as you look through the records, Ted Moretz was a staff psychologist, was he not?

A. Yes, he was.

Q. And his assessments --

MS. TOMPKINS: Objection to someone else's assessment.

THE COURT: Overruled.

MR. BENDER: Part of the records.

Q. His assessment of threat to others, the current potential for harm to others is judged to be low. You're familiar with that, aren't you?

A. I know there are documents in the file from Mr. Moretz. I know he made weekly rounds and talked to Mr. Barnette. But I -- I mean, without looking at it.

Q. Okay. I'll ask you to look at this and see if that doesn't refresh your recollection.

A. Those are the reports done by the psychology department, yes.

Q. Okay. And doesn't it say threat to others, potential is low?

A. Is judged to be low, yes.

Q. Thank you.

MR. BENDER: That's all. Thank you, ma'am.

CROSS EXAMINATION

BY MS. TOMPKINS:

Q. Ms. Boyer, the special confinement unit currently houses twenty-four inmates; is that right?

A. That's correct.

Q. And there are approximately fifteen hundred inmates in the general population?

A. That's correct.

Q. Okay. And the special confinement unit is not the general population, correct?

A. No, it's not.

Q. How many women work at the Terre Haute facility?

A. I'm going to guess and say around fifty.

Q. Okay. And those women have access to inmates clearly.

A. Yes, they do.

Q. Just like you had access to them.

A. Yes, they do.

MS. TOMPKINS: That's all the questions I have.

REDIRECT EXAMINATION

BY MR. BENDER:

Q. Have you ever felt threatened by Marc Barnette?

A. No, I have not.

MR. BENDER: Thank you.

THE COURT: You may step down and you may be

excused.

(Witness was excused.)

MR. BENDER: Your Honor, we now call Wally Buer.

WALTER W. BUER, JR.,

being first duly sworn, was examined and testified as follows:

DIRECT EXAMINATION

BY MR. BENDER:

Q. State your name, please, sir.

A. Walter W. Buer, Jr.

Q. And Mr. Buer, where do you live?

A. I live in Brighton, Missouri.

Q. Okay. I believe you're retired at this time, are you not?

A. From the Bureau of Prisons, that is correct.

Q. How long were you at the Bureau of Prisons?

A. Twenty-one years and nine months.

Q. And I believe your occupation or profession right now is a correctional consultant.

A. That is correct.

Q. And how long have you been doing that?

A. Approximately nine years.

Q. As such, do you keep current on the policies and manuals of the Bureau of Prisons?

A. Yes, sir, the ones that are released.

Q. Okay. At my request, did you do an estimate of the

custody classification for Marc Barnette?

A. I did.

MS. TOMPKINS: Well, objection as to expert testimony.

THE COURT: Overruled.

Q. Well, let me just go back. What were your duties at the Bureau of Prisons while you were employed there?

A. In 1968 I signed on as a case manager at Ashland, Kentucky. And two years later transferred over to the federal medical center in Springfield, Missouri, as a case manager. Part of the time there later on in my time at that place, I worked as a case management coordinator, and which essentially means reviewing the work of other case managers. And transferred after that as a staff instructor at Dallas for eighteen months. That was '74 to '76. Then after that time I transferred to the penitentiary at Terre Haute as case management coordinator and spent approximately eight years there. And later on at that time I was a camp administrator after that. Went out as associate warden to Tallahassee. After that I transferred to the regional office in Atlanta, Georgia. And after that I worked at the federal medical center in Springfield, Missouri, for a second tour.

Q. Okay. Now, at my request, did you prepare an estimate of his -- Marc's classification?

A. I did.

Q. And were you sent various materials of his jail and prison records, the offense report, and such items to do that?

A. Yes.

MR. BENDER: How do I do this so it doesn't come up in the jury box?

MS. TOMPKINS: Do you have a copy of that so I can look at it?

MR. BENDER: Yes.

(The document was tendered to Ms. Tompkins.)

MS. TOMPKINS: Your Honor, I'd like to be heard.

THE COURT: Okay. Members of the jury, we'll ask you to step out while we take up a legal matter. Thank you.

(Jury exited the courtroom.)

MS. TOMPKINS: Your Honor, this witness is about to, without the question being asked in opinion form, give an opinion as to the defendant's classification in prison based on his training and experience. This is, without them calling it expert testimony, expert testimony and this man is about to give his opinion. Never seen this. Never heard of this fella. And there's been no notice of this expert testimony.

THE COURT: Let me hear the question.

VOIR DIRE EXAMINATION

BY MR. BENDER:

Q. Well, what is inmate classification, Mr. Buer?

A.    Well, the classification that you asked me to report on has to do with both the security level and the custody assignment on a given inmate.  And that is derived from a manual by the Bureau of Prisons that specifies the criteria utilized in determining those classifications.

Q.    Okay.  And it's a form and you circle various matters such as type of detainer.  Give it however many points.

A.    Well, it's a worksheet.  When it's all -- when it's completed by the Bureau of Prisons, then it is printed out in a computer and it's in the electronic database that the Bureau of Prisons holds on each and every inmate.

THE COURT:  Well, so what you want him to state would be his opinion of what the classification of the defendant would be?

MR. BENDER:  No.  That he went through the worksheet used by the department -- Bureau of Prisons; and based upon the matters that were sent to him, he scored this out.

THE COURT:  All right.

MR. BENDER:  According to the score.

THE COURT:  Why would you not have access to the actual classification as opposed to this witness's estimate of what it would be?

MR. BENDER:  Well, we asked for the Bureau of Prisons records, Judge.  You remember that hassle.  We subpoenaed all of their records.  In looking through those

records, we can't find the classification. This worksheet that was scored are the computer printout. If the government has it, I'd like to see it and we can excuse Mr. Buer.

MS. TOMPKINS: We have the same records that we got from the Bureau of Prisons that the defense has. They're right here. We have -- we have the exact same thing. So whatever we got from BOP, they got from BOP. This -- we filed a notice of expert opinion, Dr. Peter Carlsen, who is an expert in Bureau of Prisons classification in anticipation of the witnesses from Bureau of Prisons who have previously testified. So they are on notice as the court orders us to put them that we are -- that we have a potential rebuttal witness about the defense -- about the defendant's prison classification. This is yet another sandbagging attempt by the defense to put an expert witness on and to put evidence in front of the jury with no notice, no voir dire, and asking those questions in innocuous forms.

But this is clearly, based on his training and experience and thirty years with the Bureau of Prisons, his opinion about the defendant's future classification.

THE COURT: All right. You're correct about that. However, the witness will be allowed to testify.

May we have the witness -- I mean, the jury back, please.

(Jury entered the courtroom.)

DIRECT EXAMINATION (Cont'd.)

BY MR. BENDER:

Q.   Mr. Buer, tell the jury what classification means in the Bureau of Prisons.

A.   Classification is basically a level of assignment in institutional levels.  There are approximately -- well, there's minimum, low, medium, and high security facilities, not to mention administrative.  And then there are levels of custody, community in -- or out, in, and maximum.  Both of those are computed by way of a program statement that gives specific instructions to the Bureau of Prisons for determining both of those assignments.

Q.   Okay.  And did you make such a worksheet for classification for Marc Barnette?

A.   Yes, sir, I did.

Q.   Is this -- is this that document?

A.   Yes.

Q.   Okay.  I believe it has across the top My Estimate.

A.   That is correct.

Q.   Okay.

        MR. BENDER:  Your Honor, we would mark this as Defendant's Exhibit Number 13.

        THE COURT:  You may.

        MR. BENDER:  And ask that it be admitted and shown to the jury.

THE COURT: You may do so.

(Defendant's Exhibit Number 13 was received into evidence and published to the jury.)

Q. Mr. Buer, would you go through the A portion at the top, identifying data, and tell us what that means.

A. Well, when these things are made up, the unit assignment and the date that the form is made is included. The individual's name, register number, and criminal history points.

Q. Okay. And no points are assessed for A, are they?

A. No.

Q. But the points begin at B, called the base scoring.

A. That is correct.

Q. Okay. And tell us what B1 is.

A. B1 is type of detainer. And in reviewing the materials I had available, I saw no pending charges from any other jurisdictions indicating there was a potential for further legal action.

Q. Okay. And so you scored a zero for that.

A. That is correct.

Q. Okay. And then severity of current offense. Based on the information you were provided, what score did Mr. Barnette receive?

A. Seven points. That would be greatest severity level. And there is a guideline in the appendix of the manual showing

that this case would be satisfied by the greatest severity.

Q. Okay. I believe 3 -- B4, if you would.

A. 4, type of prior commitment. He had serious, three points. That is determined not by the length of time he might have served, but by the seriousness of what is termed offense behavior; and the offense behavior in this instance, I believe, was assault of some form where by definition someone could be in fear of serious bodily harm or death. So that would qualify. Even though the term itself is relatively short, it would qualify as serious.

Q. Okay. Even though he received basically credit for time served, twenty-two days, I think, on one offense and --

A. Yes.

Q. -- some days on another, it's still a serious offense based on the type of offense that it was.

A. In this classification instruction, that is correct.

Q. Okay. Then B5, would you tell us about that.

A. History of escapes or attempts. In my review of the files, I found nothing that would suggest escape behavior.

Q. Okay. And then B6.

A. History of violence. And I don't remember the specific dates, but the way it -- in doing the evaluation, it was over five years ago since the most serious violence had occurred and I gave that a number six because it ranged in that, between the five and ten years. That does not count current

JA2326

offense.

Q. B7.

A. Precommitment status, which indicates whether the person was allowed on their own recognizance or voluntary surrender, so that was not applicable.

Q. Okay. And the voluntary surrender means that after receiving some term of imprisonment, they voluntarily surrendered to the prison.

A. That is correct.

Q. Okay. Had nothing to do with the -- turning themselves in or confessing. That sort of thing.

A. No.

Q. And then B8, you simply add up those numbers.

A. That is correct.

Q. Okay. So your estimate was a base score of sixteen.

A. Yes.

Q. Okay. And then custody scoring. What does that mean?

A. Custody scoring are those factors subsequent to confinement that are measured by policy and they relate mostly to conduct while in the institution, although the drug issue does not. And this is part of the determining information that is used in balance with the base score later on in the form.

Q. Okay. Now C1, percentage of time served, did you take into account that Mr. Barnette through this sentencing hearing

will either be sentenced to die or will receive life without the possibility of release?

A. When I did this, I did this with the life without the possibility of release as I indicated in my report.

Q. Right.

A. It just presumed that classification -- or that sentence.

Q. Okay. And life without the possibility of release in federal prison means exactly that, does it not?

A. That is correct.

Q. Okay. And C2, you gave a score of four.

A. Yes. In reviewing the documents, as near as I could find, there was no drug abuse history that was documented.

Q. And C3, mental or psychological stability.

A. The forms that I read indicated that he was getting along satisfactorily and so that was -- I just put that down as favorable.

Q. Okay. And type and number of most serious incident, what does that refer to?

A. Incident reports are reports for misconduct of some variety in which a person is found guilty, and there were none.

Q. Okay. Frequency of disciplinary reports.

A. It follows there were none. There is no frequency.

Q. Okay. C6 responsibility demonstrated. What's that

mean?

A. That basically relates to rapport with staff and fellow inmates as well as participation in the Inmate Financial Responsibility Program. And I found that he was, according to reports, he had participated in all of that as he was supposed to. So four or good based on the reports that I saw seemed appropriate.

Q. Okay. And C7, family or community ties.

A. I found no information about that specifically, but I did find another form within the context of the reports that indicated that the staff saw him as average or good in this area.

Q. Okay. And so you add those up and you come up -- you add B and C.

A. No.

Q. Okay.

A. No. The score for the custody total is one score and the other score is a different one.

Q. Okay. And then how do you -- how do you apply that on this document here?

A. Okay. This is called a matrix and in the matrix you go down -- this is -- anyway, his base score, which is seen on the left-hand side of the form, you find the range in which he would fall, which would be fourteen to twenty-two. Go over to -- I hit some kind of a button here. Go over to

twenty-seven, and in this form it came to a minus two. However, that is -- because of the way this printed up, that is an error on my part. It would be a minus one.

Q. Okay.

A. So anyway, that's where it would be is a minus one. Which the minus scoring is a recommendation by the form to decrease a custody level. There needs to be something here for clarification.

Q. Yes, sir.

A. In this matter of scoring, however, because up -- if you bring the top of the form back down because there is a governing issue up here when it relates to the two things. The greatest severity offense is a public safety factor, as well as sentence length. And the greatest severity offense level as it is viewed by the Bureau of Prisons would keep an individual basically out of a camp without further review by the regional office after it had been referred by the institution.

However, on sentence length regarding this issue, on life sentences it restricts the placement of an inmate to a high security facility which is otherwise a U.S. penitentiary. And that is critical because when you get down to the bottom of the form again and look at where I said security total, because of that arithmetic error that came to a fourteen, that would be a medium security scoring, arithmetic scoring.

However, in taking the scored security level with that public safety factor, it then overrides the arithmetic scoring and remains at the high level because that's how it is in the policy. That's what would be restricted. The only way that that would be changed is not something that could be done within the institution or by the warden, but there would have to be an agreement by the team and the warden that they would refer that to the regional office for some waiver. That is the provision and policy that a waiver can be -- can be done. But otherwise, this constraint in that kind of sentence is always there unless this has very high management level agreement that some waiver should be placed.

Q. And a high security classification is a United States penitentiary?

A. United States penitentiary, yes, sir.

Q. Okay. At any time would Marc Barnette ever be in a situation where there were not dual fencing and gun towers?

A. No, sir, I do not anticipate that at all.

MR. BENDER: Okay. Thank you. That's all I have.

CROSS EXAMINATION

BY MS. ROSE:

Q. You don't anticipate that, but you indicated that there are provisions by this waiver policy for that to happen.

A. Uh-huh. I mean -- are you asking a question?

Q. Yes, sir.

A.    Okay.  And what is it?

Q.    You said it's not likely for him to be outside of a penitentiary setting; however, there are provisions within the Bureau of Prisons guidelines for this waiver procedure.

A.    Okay.  Based on my experience in the system and based on what I've observed as a consultant with how the agency still works, the primary value here is public safety with the staff and the executives of the -- of this bureau.  There would have to be -- I don't even know what the compelling factors would be from my experience to move this kind of case to a low type of security facility.  I can't imagine it.  I mean, just based on what I know about how that would not happen.  This is not something that is going to go on by accident or without very high executive review.  And so with that, I have reasonable certainty that this would not happen.

Q.    And the reason is because given this classification, this arithmetic, the defendant is seen as a dangerous person.

A.    Well, he's got a -- yeah, he's got behavior here that they would not see as permissible to put him in a less secure setting.

Q.    And that's because prior violence, prior bad acts are the things that predict future behavior, right?  I mean, that's what this is based on.

A.    Well, you know, I guess if you want to go that way, yes.  But that's what all of this classification is and it will --

JA2332

it will tell you in the preamble of this that they have done the research so they predict this kind of thing. Therefore, when they are kept in a secure environment, the free world, if you want to put it that way, is safe from this individual. He's not going to be out there.

Q. And the environment in which -- in a high security penitentiary within the confines of that fence is not a twenty-four hour a day lock down.

A. No, ma'am.

Q. Tell us about --

A. Generally not.

Q. Tell us about the things that are available to those within the setting.

A. Okay. In a penitentiary setting, the movements are going to be controlled, meaning where they go from their units to their jobs or to food service for dining and all of that sort of thing. So there would be controlled movements within the context of this institution. There is a higher staff ratio to inmate in a high security facility.

What is available to them? Schools are available. Recreation is available. You know, eating in chow line is available to them. Those are some instances.

Q. Whatever magazine subscriptions as long as it's not obscene, they can get whatever magazines they want.

A. Well, I can't really address specifically to what

magazines they can get, but they can get mail, yes.

Q. They can send mail?

A. They can make phone calls -- supervised phone calls that are monitored, yes. The mail is shaken down before it is delivered to an inmate, so --

Q. And they have visitors?

A. Pardon?

Q. They have visitors?

A. Yes, ma'am.

Q. They can watch TV, play cards, play board games?

A. Yes, ma'am.

Q. And within that facility are socialized with other inmates.

A. That is correct. In the general population facility, you are right.

Q. And these are general population facilities.

A. The one as I believe he would be eligible for based on the classification as I see it, yes.

MS. ROSE: All right. Thank you, sir.

MR. BENDER: I have nothing further.

THE COURT: You may step down.

MR. BENDER: May he be excused?

THE COURT: You may be excused.

(Witness was excused.)

THE COURT: Call your next witness.

**1463**

**JA2334**

MS. LAWSON: Thank you, Your Honor. Call Dr. Ann Burgess.

ANN WOLBERT BURGESS,

being first duly sworn, was examined and testified as follows:

DIRECT EXAMINATION

BY MS. LAWSON:

Q. Good morning. Would you please tell the jury your name.

A. Yes. It's Ann Wolbert Burgess.

Q. And where do you live?

A. I live in West Newton, Massachusetts.

Q. And how are you employed?

A. I'm employed at the Boston College School of Nursing which is in Chestnut Hill, Massachusetts, as a professor of psychiatric nursing.

Q. Would you tell the jury, please, your education.

A. Yes. I have a bachelor of science degree in nursing from Boston University. I have a master of science degree in psychiatric nursing from the University of Maryland. And I have a doctor of nursing science degree in psychiatric nursing from Boston University, and that was in 1966.

Q. In addition to your education, would you tell them, please, your professional experience.

A. Yes. I have had professional experience both as a staff nurse and then I have -- currently have a clinical practice, but much of my time has been in academe, both at Boston

College, Boston University, and the University of Pennsylvania. Those are the three major universities I've been with.

I also have been a research supervisor on a metabolic depression unit at the Massachusetts Mental Health Center.

I have had administrative positions. I've been chair of the departments in which I've been. I've been interim dean of the School of Nursing at Boston University. I've been research -- director of nursing research at Boston University. And at University of Pennsylvania I was in psychiatric nursing what they call the van Ameringen chair.

THE COURT REPORTER: The van what?

THE WITNESS: Ameringen, A-m-e-r-i-n-g-e-n.

Q. Do you currently hold any positions or appointments other than the ones you've talked about?

A. My current positions are at Boston College as well as University of Pennsylvania. Those are the two positions I hold. I also have a private practice so that I do see patients.

Q. Do you treat patients?

A. I do treat patients, yes.

Q. And what is your background in terms of clinical treatment of people and your credentials for doing that?

A. In nursing we have a comparable position where you can be certified, and I am certified by the American Nurses

Association as a clinical specialist in psychiatric mental health nursing. I've been that since 1980.

In the state of Massachusetts, I also have what's called prescriptive authority, which means I can also prescribe medication for any clients, patients that I'm seeing.

So those are the clinical positions and duties that I have now.

Q. Tell the jury a little bit, please, about your work through your career in terms of domestic violence.

A. When I first went to Boston College, I joined with a sociologist, Linda Holmstrom, to begin to understand and to study the problems that women have as a result of being raped. So we had one of the first studies, it was a hospital based study, of women coming into the emergency room with a complaint that they had been raped.

Following that -- and that was back in the '70s when this was an issue that was just beginning to be addressed. The second major part, if you will, of my career had to do with presenting this material, teaching this material to law enforcement because there was a mandate out that law enforcement, especially at the FBI, needed to train their agents in the whole area of rape victimology.

Following this, the whole issue of domestic violence became an issue in the '80s. And so I became involved in that not only in terms of the research I was doing, but also had

the opportunity to be on a commission, the U.S. Attorney General William French Smith commissioned a task force to look at this problem of family violence throughout the country, and so we did that. The commission of twelve of us looked at that and we came up with recommendations for the U.S. Department of Justice of what they could do to try to teach and educate and research this problem more. So that was in the -- in -- about in the mid '80s that our publication came out.

And there was a second important part of my work in the domestic violence field and in 1996 there was a -- what's called the VAWA Act was passed, and that's Violence Against Women Act. And that called for more attention to the problem, but it also called for a survey of the research that had been done in the area. And the National Academy of Sciences was commissioned to do the report and I was fortunate enough to be asked to chair that committee so that we were able to look at all of the literature that is in the area of domestic violence and to come up with recommendations about where gaps were in the area of causes, consequences, prevention, and treatment.

Q.    In addition to reviewing the literature, Dr. Burgess, have you contributed to the literature?

A.    Yes. Specifically in the area of domestic violence I have been in the last, probably the last five or six years, been focused specifically on trying to understand the -- the domestic abuser. And so I've had two publications in the area

of looking at programs that are available if indeed somebody is charged and arrested for a domestic violence offense, that they would then go into a special program where there would be assessment so we could begin to understand that more. So I've had that opportunity and published in that.

And also have a contract with the Veterans Administration in Philadelphia to look at how their treatment teams are trying to understand whether there are any abusers within their population. So we're designing some survey tools to survey not only staff, but also the patients, the men that come in to the VA just for routine mental health consultation.

Q. In addition to research and publishing, do you also engage in treatment or counseling either for abusers or for victims of abuse?

A. Yes, for victims of abuse. My clinical practice has always been with victims. I have studied offenders. I certainly have evaluated offenders, but I have not treated offenders.

Q. Have you been qualified, Dr. Burgess, as an expert in domestic violence?

A. Yes, I have.

MS. LAWSON: Your Honor, at this point I would tender Dr. Burgess as an expert in domestic violence.

THE COURT: She'll be declared an expert in that

area. Members of the jury, you will remember the earlier instruction I gave you about how to treat the testimony of a person who is described as an expert.

Q. Dr. Burgess, let me also ask you what your contacts have been with the Federal Bureau of Investigation.

A. Yes. In the -- about the mid '70s after some of our publications came out on the rape victim, I was invited to the Behavioral Science Unit at Quantico, the FBI academy in Quantico, to begin to train in the area of rape victimology with not only the special agents themselves, but also with the national academy of -- they have a group that comes in as well as their agents.

In the capacity of doing that, had an opportunity to talk with them about some of the research and the possibility of doing research and really developed a colleague relationship with the behavioral science unit to study serial offenders. At that time that was their mandate: To understand serial sexual offenders. So we studied serial killers. We studied serial -- and that was led by John Douglas and Bob Ressler. Ken Lanning was looking at serial offenders in the child area, child molestors, child abductors, that area.

So those were the two major areas that I worked with probably over about a ten-year period, culminating in one of the projects that we felt was a major contribution to law enforcement was what we call the Crime Classification Manual

which is a way for law enforcement and researchers to talk about various crimes, much as the DSM in the psychiatric field, Diagnostic and Statistical Manual, so it is really a model after that to help law enforcement with talking about various crimes.

Q.   Dr. Burgess, the government in this case has retained a psychiatrist by the name of Park Dietz.  Do you know him?

A.   Yes.

Q.   He's here in the courtroom?

A.   Yes, I know Park Dietz.

Q.   How is your connection with Dr. Dietz through the FBI established?

A.   Well, one of the things I did with the FBI, they were -- would periodically ask for recommendations, for names for people who might be helpful to them in their work in a variety of ways.  And at the time I did know Dr. Dietz's work.  I respected his work.  And I recommended him as someone for them to consider.

Q.   Dr. Burgess, can you explain to the jury basically what domestic violence is.

A.   Okay.  Domestic violence -- let's start with violence because violence is something, we can define that.  Violence is the intentional aggressive act that injures somebody.  So that in itself is just defining violence.

Within violence you have a number of types of violence.

You can have physical violence where there's actual physical injury.

You can have psychological violence which very much is going to be verbal. The kinds of things that are said to people that are injurious. May not be certainly physically injurious, but certainly has a psychological impact.

And then you have sexual violence, sexual abuse is another type of abuse.

Those are the main in talking about violence.

Then when you move to the domestic, what does domestic piece mean? You can have stranger violence, and we're familiar with that where there's no relationship. A person commits a crime and there's no relationship.

But you also can have acquaintance violence where there is some kind of relationship.

And then you can have domestic violence where there is a relationship that is generally based on some type of -- it can be legal, as in a marriage. You can have partner violence or you can have common law violence, domestic. You can also have siblings. You can have sibling on sibling. Some way there is a connection through family is generally what is meant by domestic. Again, it's been expanded so it isn't just a legal relationship, but it can move into the common law or the cohabitating is sometimes what they call it. And sometimes people rather than domestic violence will call it relationship

violence. So there's been a variation, if you will, over the years of how it's described.

Q. Other than the character, you know, the identities of the people who perpetrate stranger violence and domestic violence, what defines domestic violence in terms of its origin, the conduct, things like that?

A. Well, first of all, I wish we knew more about the origins. But we do basically have research that's going on in three major areas connected with domestic violence. One is the biological area; second is sociological area; and third would be psychological area.

As far as the biological area, there's been a lot of activity and a lot of interest in this area. Nothing definitive, so I can't -- we can't say, well, you know, this causes this. But just some of the interesting research, some have said, well, maybe it's related to hormones. Maybe testosterone is a factor here because so many males seem to be more violent than females. But again, that hasn't been proven but it's being looked into.

Sometimes I think it's maybe in the nerve transmitters, the way information in our brain travels back and forth and carries, you know, certain information. So serotonin has been one nerve transmitter that there's been a lot of interest around.

And then you can have such things as maybe a blood

abnormality. There's been some looking at what's called hypoglycemia as a way when the body -- there's a lowering of that, does that in some way activate?

There also is -- don't forget biology is not just genetic. That is a factor. They do not have any gene that is necessarily responsible yet. But other factors in biology could be head injury. There's been a lot of interest as -- you know, could a lot of head injuries be a possible correlating factor? So that there has been that attempt in the biological area.

Sociologically there's been a lot of research and that is where they look at numbers. They will take surveys and they'll take statistics and they've looked at things like age. They've looked at things like gender. Males, age. They've looked at race as a factor. They've looked at poverty as a factor. They've looked at environmental features and periodically come out with various things. But again, nothing really definitive.

One of the major sociological factors that is described in the literature is called the cycle of violence; that there seems to be this, in domestic violence, a cycle that seems to carry on from generation to generation.

Then the third area that there is a lot of interest in is the psychological area and there's been a great deal of research that has looked at could possibly traumatic factors,

could abuse be a factor? Is there something that goes on in the development of infants and children and adolescents that may be a factor? So trauma and psychological abuse has been probably one of the more interesting areas. And that's been in the literature for quite a long time, dating way back to the 18 -- probably 1880s when it was noted that there's something about trauma. When the, what they call the stimulus barrier is broken, that there's something about trauma that keeps repeating itself. Again, that gets into the cycle of violence which does cross over into the sociological field.

So there have been a number of interesting areas to look at. They have not come up with a cause, so to speak, but there is a lot of interest and energy being put into studying the problem.

Q. In terms of the multi-generational violence, do you have an opinion to a degree of scientific certainty about whether multi-generational violence, spousal abuse, exists?

A. Yes.

Q. And what is that opinion?

A. Yes. It is my opinion that this does exist. This has, as I said, has a tradition and a history in the literature as well as certainly clinically that there -- the repetition, if you will, of certain patterns of behavior certainly are there. And that can be both individually case by case and that certainly is showing up empirically.

Q. Do you have an opinion to a reasonable degree of scientific certainty as to whether neglect contributes to domestic abuse in some cases?

A. Yes.

Q. And what is that opinion, please?

A. Neglect is really reaching the forefront of troubling areas. The neglect of a child, the neglect in various ways, doesn't have to be, you know, again, that -- there is a wide type. But neglect is looming as a major factor, and I -- my opinion is this is a critical factor.

Q. Now, you're not saying that everybody who's neglected becomes a perpetrator of domestic violence, are you?

A. No, I'm not at all.

Q. Okay.

A. Nor am I saying -- that's where one of the research areas is is that certainly you can even within the same family children that seem -- they seem to get what we call protective factors, that there is something that seems to protect and compensate for that or they're not targeted in a certain way. That there seems to be something in the dynamics.

And that's one other factor of when you have domestic violence, you have what we call dynamics. There are certain things within the relationship, that there can be tension and so forth, and that is very critical in looking at how it may be shown throughout the family to the children.

Q.   Dr. Burgess, do you know Marc Barnette?

A.   Yes, I do.

Q.   And did you hear a portion of his testimony and the testimony that followed that?

A.   I did.

Q.   You've been here yesterday and today.

A.   That's correct.

Q.   How much contact have you had with Marc Barnette?  Could you tell the jury about that.

A.   I had two days that I spent with Marc Barnette.  I spent July 14th and the 26th.  I came down twice and interviewed him here in Charlotte.

Q.   Did you mean June 14th and --

A.   Did I say June?  Yes, June.  June 14th.

Q.   And June the 26th.

A.   Yes.

Q.   Okay.  And where did you meet with him?

A.   I met with him in the jail.

Q.   In addition to talking to Marc, did you review records pertaining to Marc?

A.   Yes.  I reviewed --

Q.   Let me interrupt you just a second, if I could.

A.   Okay.

Q.   The -- do you have a list of the records?

A.   I do.

Q.    Starting with item number 2, would you list those records, please.

A.    Yes.  I have Mr. -- I reviewed Mr. Barnette's school records, his employment records, his medical records, and I reviewed all the material that had been prepared by Paul Williams and Cindy Maxwell.  Just keep reading?

Q.    Yes.

A.    I reviewed volume one and two of mental health expert reports and trial testimony, prison medical records, transcribed interview of Robin Williams dated 5/30/96, transcribed interview of Benjamin Spencer Greene dated 5/1/96.  I reviewed transcribed interviews by the Mecklenburg Police Department dated 6/25/96 and 6/28/96.  I also looked at videotaped and audiotaped copies of police interview.  I looked at all of the discovery materials, police reports and statements regarding the 11/12/93 incident at Bojangles.  And I also reviewed the police report on the 1974 homicide of Pearl Henderson Brown.

Q.    In addition, did you talk to any people other than Marc Barnette?

A.    I did.  I talked with his mother, Sonia Barnette, and I talked with his -- by telephone with his father, Derrick, and with his brother, Mario.

Q.    Did you also view the scene of the murder of Donald Allen?

A.   I did, yes.  I saw that, yes.

Q.   As well as the -- the Barnette home at the corner of Billy Graham Parkway?

A.   That's correct, I did that, yes.

Q.   Tell us what your purpose was in talking to Marc Barnette, reviewing these records, and interviewing these other sources.

A.   My purpose in interviewing both Marc Barnette as well as reviewing all the materials was to try to understand what had happened, to try to explain what had happened, how this had come to this point.  So that it gave me both official versions because I had official versions.  I also had the interview with Marc.  I had collateral information from how his father and his mother and his brother had known Marc growing up.  So that I try to get as complete a picture as possible with the intent to explain how this happened, why this happened in the best possible way I could.

Q.   Do you have an opinion to a reasonable degree of scientific certainty as to whether or not these murders were part of a domestic homicide?

A.   I do.

Q.   Would you tell the jury your opinion.

A.   My opinion is that it -- this is what is called a crime spree that lasted over an extended time period from April 30th through to June 26th, I think it was, of 1996 in which it

escalated over time, but it was all part of his attempt to reengage with his ex-girlfriend Robin Williams, and that all of the activities and the criminal activities that we see within that time frame is focused on his obsession to get to his ex-girlfriend to reunite with her.

Q.    Did you see any similarity in the events of -- between the firebombing and the murders in other conduct of Marc Barnette?

A.    Yes, I did.

Q.    Would you explain that, please.

A.    I really saw a clear pattern of this kind of -- not certainly to the degree, but this kind of obsessional need to reunite the relationship with prior girlfriends and his thinking. I think what's important here is his thinking and the way that he presents his thinking and the way that he talks to the young women is very, very similar. That he gets into this pattern of he gets into a good relationship, everything seems to be going well, and then gets into this thinking that there's infidelity, thinking that there's jealousy. All of those negative feelings come forward and then he starts to try to control the relationship, and that's where the physical abuse can come in. That's where the verbal abuse can come in. And it's always the cycle and it never gets resolved. It just goes from young woman to young woman, from girlfriend to girlfriend. Because what happens is the

girlfriend pulls away; and the more she pulls away, the more he tries to re-establish the relationship and it just doesn't work.

Q. To what extent does that behavior have its roots in the way Marc was raised and developed?

A. Well, I think it has its roots very much in the way he was raised and developed. And when we go and look at child development, one of the most important things that they say about children, infants and children, is to attach, is to bond, is to develop a good relationship with a caretaker. Usually that's going to be a mother or a father, or both. Other people, of course, can be important.

But what happened, when you look at his history, is that there are a number of serious failures in that. First of all, a major caretaker dies, the grandmother. Even though he's very young, it still for the child is going to be -- can be registered in memory at a nonverbal level because we know that children certainly do react. Don't necessarily be able to tell you about it, certainly can't tell you about it years later. But at any rate, the experience happened. There are multiple caretakers. Even as we've heard with the father in and out of the situation because of his military commitment and, you know, natural kinds of things that happen.

But that failure to bond, to attach is very much what is in the literature to explain why some people are unable to

take rejection, to separate without having enormous anger, which really is covering up feelings of sadness, of feeling unworthy, whatever the painful feelings are. It's the anger and the rage that you see.

And so I do think that the roots of this are in his early childhood development where attachment was real anxious attachment, if you will. The anxiety of who is going to be there for him; as well as being overly attached, if you will, because he wants so much to have and the need to have the girlfriend as an adult, of course, not as a child. The child's need for the mother is always important and that seems to have some serious deficits.

Q. You mean in Marc's case.

A. Correct, in Marc's case. His -- the attachment with his mother.

Q. To what extent has his need for attachment influenced Marc's behavior with his specific girlfriends and his reaction to that?

A. What he seems to do with each successive girlfriend is the pattern of things go well, but then he begins to get suspicious. He really -- the suspicion and the infidelity has been there from the, as we heard yesterday, the domestic violence where things are said, parents are challenging each other about issues of fidelity. So that becomes a theme.

He really becomes programmed. We all get programmed, if

you will, in our own families, but for Marc it's very clear that it's suspicion, it's paranoia, and it's this domestic violence as a theme.

And so with each successive girlfriend, when there is -- he gets close to her, it's almost like he has to start distrusting her because he can't tolerate the closeness. So even though he wants to love her, he really can't trust her. And that starts into maybe, you know, you're unfaithful, all the paranoia, all of those things. He finds little things in the relationship, and clearly this is not going to work in our adult -- or even in adolescent relationships. So the -- the only thing he knows to do is to become aggressive and physical to try to regain and re-establish that relationship.

Q. There's been testimony in this case from Crystal Dennis and Alesha Chambers that Marc didn't want them to wear makeup or dress in clothes that might make them attractive to other women (sic). How does that fit into this situation?

A. Well, that fits in very well with his need to control. Domestic violence, there is a coercive control in the relationship which, of course, is not a mutually receptive relationship. So he does these things that he thinks is going to make her not be attractive to other men. So it's still based on suspicion. The clothing, the makeup, that in no way make yourself attractive, is his thinking, so that any other man will be interested. So he thinks he can control that.

Which, of course, is faulty logic. But that's the way he tries to control her. And that's not unusual in the -- certainly the studies that I've done on batterers. That's a very common kind of position.

Q. Did you hear the testimony of Mario Barnette yesterday about the life that they led in Georgia with his mother and his aunt getting dressed up and going out?

A. I did.

Q. What significance is that to you in terms of evaluating Marc's behavior and personality structure?

A. Well, two things are important there. One is they're getting dressed up and going out and having -- obviously, looking like they're going to have a good time. So that says, well, you go outside, you don't stay inside to have a good time with us. So that's from a -- from a -- from a parent's standpoint.

I think the other second thing that was important is that they would not say where they were going. They might say they were going out to the store or something like that. So that could very much mislead a child. And they quickly, as we heard, caught on that that was not where they were going. But it really leaves the child with the emptiness, the sadness, those kinds of feelings. We're not -- you know, we're not as worthy and they were -- that clearly can be seen as emotional neglect.

Q.   You talked about his need to attach.  Is that what you call an attachment injury or relationship injury?

A.   Yes.  In the literature that is exactly what it's being called.  In other words, Donald Dutton is one of the foremost writers on that and Reid Meloy that talk about the pathology of attachment; that there is a definite failure in the ability.  Either they become overly or anxious in the attachment and so they're need to continue to re-establish a failed relationship is tried.

Q.   Do you have an opinion to a reasonable degree of scientific certainty whether the -- Marc's violence increased over time in terms of his domestic partners?

A.   Yes.

Q.   What is that?

A.   Yes, it did.  And again, this is not necessarily uncommon to see.  That the more something goes on, the more desperate somebody becomes, the more they're going to try their only way of handling it and by -- for Marc, this is to use physical aggression and to use other kinds of things to -- in a desperate attempt to try to regain the control.  So that definitely it did in my opinion escalate.  Especially when it isn't curtailed.  That's one of the important things that there are no limits set on it.  That's the purpose of either some kind of intervention, treatment, whatever, is to stop it, prevent it.  That didn't happen.

Q. You are -- well, there's been some testimony about an incident involving Alesha Chambers and her Uncle Jasper where Marc kicked in the door and ran into the room to get to Alesha and didn't seem to notice there was anybody else in the room. Are you familiar with that?

A. I am.

Q. Did you review the records?

A. I have.

Q. What -- of what significance is that to you in formulating your opinions about Marc and his condition?

A. Well, it is a -- it's an example of how obsessed he was, how, if you will, mission driven he was to get to the girlfriend, the ex-girlfriend. So that anybody that was in the way is just going to be pushed out, whether it's a door, whether it was a person, or whatever, because that's all he could think about in his, what I call his faulty logic of thinking that this is going to work because it never does, but he doesn't understand that. That's really his irrational thinking that by doing this, he's still going to somehow reclaim the relationship.

Q. Do you have an opinion, then, as to what Marc's purpose has been consistently in terms of going after his girlfriends?

A. Yes. His purpose has been -- and he says it quite clearly. Every time there is a breakup, he says, I just need

to go and talk with her. I just need to hear from her and explain. And I need her to tell me what happened. And again, he doesn't understand his behavior in the matrix of the relationship and he -- as I said, he says it quite clearly with each successive girlfriend.

So it's a repetitive, repetition kind of -- there's even a jargon term in psychiatry that calls it repetition compulsion. He just is compelled to do it over and over, the same thing.

Q. Now, you've mentioned treatment. What kind of treatment is appropriate for somebody who's exhibiting these kinds of symptoms or behaviors?

A. Oh, there is -- again, this is important. You try to get treatment the very minute there is any type of infraction. But it's difficult with young males. We find it even difficult with men that are arrested for battering. They have to be ordered into counseling because it is seen as such a nonmanly thing, or whatever you want.

But we clearly believe that there are such programs as anger management. Prime -- would have been a prime thing for Marc to have anger management. His impulsivity. His inability to put time between having a thought and acting because he just seems to act. That would be one. Certainly, the -- the counseling in terms of his early childhood would be important.

He has many things that I think he has suffered with that should have been addressed. One, certainly, a delayed grief reaction is something that I felt that he had. He really lost his father at a very critical age when he was a young adolescent and nobody really worked with him to help him understand all of that. So part of the acting out, if you will, is a cover over of the sadness and the grief. And in many ways lost his mother emotionally in that move to Florida -- to, I'm sorry, to Georgia.

So from a counseling standpoint, there were multiple times that you try to reach young people even at the school level. Sometimes they will try to identify a child that's in trouble when he had moved to that new school. That would be another opportunity.

Q. Now, the evidence is that Marc was ordered to go to something like an anger management program when he hit Crystal Dennis and her children. And he -- well, he didn't go.

A. Right.

Q. What is your perspective on that?

A. Well, my perspective is they have to go. That they have to be -- that it has to be mandated. It has to be followed up. You just can't say to somebody, well, you have to go into counseling. That rarely works. We have found that out in many, many areas. That isn't just with young teenagers. But he -- there should have been provisions to enforce this. We

JA2358

know so much more now than we did about domestic violence and that's critical to catch it early and to intervene and to stop it.

Q. How aware are domestic abusers of the fact that they've got a problem?

A. They're not aware. They use what we call very primitive defenses. They deny that there's a problem. It's not me; it's always somebody else. They project out. It's always her; that she did something or, you know -- I mean, they'll get into that kind of thing. So it's very hard. You have to work through the denial before you can actually get to any of the important issues.

Q. Do you have an opinion to a reasonable degree of scientific certainty as to whether at various points during his childhood Marc suffered from depression?

A. Yes. I do --

Q. What is that?

A. -- believe he suffered from depression. We have some indication in the record that he made some attempt, even though they seem very minor, but the point is it was -- there was an attempt and nobody talked with him. I think he was quite young, at about age eight. He certainly was older as a teenager when he makes some more attempts. And it's always critical to pay careful attention to that even though it seems like it really wasn't a big thing, like maybe he just took

some pills or so forth. It's very -- very critical to find out what is going on in a young child that even would make them think to do it even if it's a very weak attempt. So that we saw on the record at least two or three times when he's not even a teenager and then as a young teenager.

Q. Are you familiar with the episodes of going into Tasha Heard's closet and crying?

A. Yes. I -- yes, that -- he would come there and he would cry. I think the other important observation that is threaded throughout everybody's report is the crying. And that is unusual. It would be an important behavior to pick up and find out why was he crying? Why would this young boy be crying? And again, that example. There are others where when he is trying -- extracting from a relationship, that there would be periods of crying and then kind of pulling himself together.

So again, all of those -- there was also one other very important observation by a detective that had put in a very clear description of how troubled he saw Marc at -- one time and I guess it was with Alesha.

Q. Mario Barnette was raised in the same family and has no history of domestic violence. Can you address that?

A. Well, Mario was, don't forget, four years younger so we're looking at a critical time period of Marc in those, say, the first four years. Then Mario comes into the picture when

there starts to be some stability because the father's assignments, or whatever, the family starts moving because of the military. So that the father is in the home. The father does -- is strict. He certainly is a strict disciplinarian. And for Mario, that -- who also has the older brother, as Marc is an older brother, who also does play a protective role.

Yeah, he experiences things quite differently. That's not to say that he still doesn't have a lot of feelings and thoughts about it, but he doesn't act them out as we see later on for Marc.

So I would say the early years, those critical first four or five years were critical for -- for Marc that Mario did not share.

Q. Do you -- have you found any evidence whatsoever from the records or in your conversations with Marc and collateral sources, that anybody attempted to get any mental health assistance for Marc when he was growing up?

A. No, I don't see any active outreach for that and that's what you really look for, active outreach, which is what you generally have to have. I didn't see that.

Q. Okay. In reference to Marc's relationship with Robin Williams, how did the deterioration of that contribute to these tragedies?

A. The relationship started, as I understand it, quite -- quite fast. It was a very fast engagement, so to speak. But

then as the relationship developed, a major source of concern for Marc came up with this, what he -- what she described, what Robin Williams described as an old -- I guess old high school friend. Of course, given Marc's paranoia and his suspicion, he immediately thought that this was an old boyfriend, so that makes a slight difference. And then when he finds certain items of hers, it just flares up. The jealousy, the rage, the -- you're lying, you're not telling the truth. And that's when it starts into the final phase, if you will. First of all, they split up because he's becoming more and more, as we've seen with other relationships, more and more possessive and controlling and that isn't the way she wants a relationship.

So it culminates when they have separated with this new person being introduced. This is, I think, the first -- certainly a person that he can identify. He doesn't know it's this man. He asks her. Evidently doesn't give her the name and so then he says -- that's his, aha, you have lied to me. And that's what sets him into motion to go and talk with her and tries to do it in a very failed way, of course, with the firebombing. Again, his logic and how he puts it all together is very flawed.

And then when he's not caught in that next six weeks when he fully is expecting to be picked up, it doesn't happen. And he's just brooding and obsessing over this, has to find out.

And so he sets out on this course to find out and to ask her about it.

And of course, when we hear what he tells the police after he is apprehended is I just wanted to talk to her. I wanted her to tell me about it. I even wanted her to -- we'd go and see this Benny Greene. Again, it's that same scenario that we've heard over and over. But this time it was very intense. This time it had escalated and obviously what ended up in a double tragedy.

Q. What was the quality of Marc's thinking, his logic, his reasoning in that period of time after he broke up -- Robin broke up with him?

A. Well, his thinking, in my opinion, his logic is always flawed. This is not logical thinking. It's not rational thinking. It's really based on much of the way he's learned through the family of this infidelity, the suspicion, this paranoia. So he filters everything through that. He's never had a chance to really have anyone challenge him and say, you know, this doesn't make any sense. What is wrong? So that's what -- what occurs.

Q. Did his mother tell you anything about his hair and his thinking?

A. Yes. In this period of time when he is at home waiting, assuming that the police are going to pick him up because they knew where he lived, he shaved his hair. He shaved his head.

But the reason being he needed -- he couldn't think as clearly with the hair on his head. Now, again, that's a very illogical type of reason for shaving one's head; but to him, he had to do it. So it's almost that he just had to do it. It gives you an idea, I think, of the way he was thinking, how disturbed his thinking was at that point.

THE COURT: Okay. We'll need to take our break. Members of the jury, remember the usual instructions. Thank you.

(Brief recess at 11:20 a.m.)

THE COURT: Anything for the court before we begin?

MS. LAWSON: No, sir.

THE COURT: May we have the jury, please.

(Jury entered the courtroom.)

THE COURT: All right. The jury is with us.

ANN WOLBERT BURGESS

DIRECT EXAMINATION (Cont'd.)

BY MS. LAWSON:

Q. Dr. Burgess, in your experience and clinical judgment, does a person who abuses other people in a domestic violence situation enjoy perpetrating the abuse?

A. No. It's not been my experience that they enjoy perpetrating the abuse because they are doing it for different reasons. They are doing it to keep control of the individual and it's in that service that they're doing it. That's not

been in any -- certainly any of the studies we've done, that's never been alluded to.

There is a biological piece to the battering, if you will, so that there is a release of tension after they have inflicted this aggression and that is one of the explanations for the cycle of violence where they have the honeymoon phase and they go into the aggression, and then after that it goes back again to a more peaceful kind of plateau. But I can't think of any literature that suggests that they enjoy it.

Q. Now, there has been some testimony about Marc hitting Crystal Dennis's children with a coat hanger. You're familiar with that from your review of the records?

A. I am.

Q. Could you tell the jury what part that plays in all of this.

A. Well, the -- that plays -- again, that shows his programmed learning is -- when I asked him about it, he said, well, his father had disciplined him and so he was just disciplining these children. What he fails to take into consideration, again, the flawed logic, is these are small children, three and five, and the amount of injury, whatever there was there. But in his mind, his -- this was sanctioned. This was okay to do in his family.

Q. Would you have considered that an act other than within the domestic context?

FORM FED ⊕ PENGAD · 1-800-631-6989

A. No. I see this within the context because it is family. It's a caretaking type of role. It's not necessarily that he's related to these children, but he is being put into the caretaker role. So in that -- it's a domestic -- in my opinion a domestic situation.

Q. There's also been testimony about Anthony -- about Marc shooting a fellow by the name of Anthony Britt during a confrontation at some railroad tracks. Can you define that in terms of Marc's overall history of violence.

A. Right. My understanding is that's still within the context of a relationship. It's not like it's a stranger kind of thing. So again, it falls into that -- it certainly is not a direct relationship, but it has that need to defend and need to protect and that kind of context.

Q. So would you consider both the assault on Crystal's children and the shooting of Anthony Britt to be domestic type crimes?

A. I would, yes.

Q. What -- what drove Marc from the period before the firebombing through the end of this period, through the end of June?

A. Well, Marc has what we call clearly obsessional thinking. In other words, he gets very focused. Obsession, definition of that is it's a repetitive, intrusive thought that just keeps coming into the mind without the ability to

kind of put it out of the mind and it's persistent. And this is what happens. This is what gets into his mind and he doesn't have the ability to put it out of his mind or to substitute anything else. So the more he broods about it, the bigger it can become and the more intricate it becomes. So it's -- if you will, it's a very self-contained kind of thinking pattern that drives him to the tragedies that occurred.

Q. And is that obsessional thinking related to everything that he thinks about or to just a specific area?

A. No, he's just focused on this one area. This is the one driving thought in his head. I mean, we have had testimony that he really didn't do much of anything else when he's in this time period. He isolates himself. He isn't eating or sleeping. So he's just focused in on that.

Q. Now, there have been some questions about the fact that there are women in some prisons. Can you address that in terms of how it relates to Marc and his future?

A. Well, the issue of women is Marc gets into difficulty when it's in the context of some type of relationship, some kind of boy/girlfriend type of relationship. It's not in the context of doing -- you know, doing daily routine and things like that. So I don't see that there -- you can make any connection between the two. He does, as we've heard, follow orders well. Does what he's supposed to do when he's in a

structured setting. So we've been talking about how his thinking becomes when he's in an unstructured setting, when he's in the community. So I would say there's no connection.

MS. LAWSON: Thank you very much.

CROSS EXAMINATION

BY MS. TOMPKINS:

Q. Dr. Burgess, you talked a little bit at the beginning of your testimony about your various areas of expertise, correct?

A. Yes.

Q. And you have a great deal of expertise in rape trauma; is that right?

A. Correct.

Q. And in domestic violence.

A. Correct.

Q. Tell the jury about the trauma involved in being the victim of domestic violence.

A. Well, the trauma involved in being a victim, what we've seen in looking at, if you will, battered women is the difficulty that they have in extricating themselves from a relationship. And they certainly suffer in terms of the physical abuse, the psychological abuse, all of that. But again, because you've got this context of this relationship, it's just very, very hard -- one of the biggest difficulties we have when we're working with women is to help them

extricate -- remove themselves from the relationship to be able to get help for themselves and for their children. So that's -- I mean, it's certainly traumatic.

Q. And tell the jury about your expert opinion about the trauma involved with being a rape victim.

A. Well, the rape victim, again, you have to look at who is the assailant.

If it's a stranger, it's one type of issue that has to be worked through. Someone that didn't even know me, you know, does this to me.

When it's within a domestic situation, then you have the added problem of somebody who knows me and cares about me can do this to me.

So you have different what we call levels of trauma, but it's a tremendously, just in general, it's -- all the literature agrees certainly on my work that it's a devastating experience for a woman regardless of her age. It's very traumatic.

Q. Would you agree that family violence is a widespread problem?

A. I absolutely would and probably underestimated how widespread it is.

Q. Now, in your report that you prepared, you reviewed previous reports of other psychologists and psychiatrists, correct?

A.     Yes, I did.

Q.     You, though, however -- you're not a psychologist or a psychiatrist.

A.     No, I'm a psychiatric nurse.

Q.     You reviewed police reports.  You reviewed prior testimony of witnesses; is that correct?

A.     That's correct.

Q.     Now, in your report you give a factual rendition of the events that happened in this case, correct?

A.     Yes.

Q.     And is that based on both your review of the record and your interview with the defendant?

A.     Well, it's all of the materials, yes.

Q.     Okay.  So that's a yes?

A.     Yes.

Q.     Would you agree that when you're doing a forensic diagnosis, that having the facts correct would be important?

A.     Yes.

Q.     Would you also agree that inconsistencies in stories you resolved in favor of the defendant?

A.     Not necessarily.

Q.     Well --

A.     I guess it would depend on the inconsistency.

Q.     Okay.  In your report, you use the phrase that the defendant, quote, traveled to Knoxville, Tennessee, went to

church and twice attempted to take his own life.

A. Correct.

Q. Wouldn't it also be fair to say that he fled to Tennessee to evade the police and avoid detection?

A. I guess you could say that.

Q. Okay.

A. Fled, yes.

Q. Now, you didn't put in your rendition of the facts, did you, that the defendant while in Tennessee stole a Tennessee license plate and put it on his car to further avoid detection?

A. No, I did not, that's correct. I did not.

Q. Now, were you aware that the physical evidence related to the tail pipes did not -- was not corroborated, the physical evidence did not corroborate the defendant's story of having twice attempted suicide?

A. I understand that now, yes.

Q. Now, in your report you said that, quote, Barnette told police that he killed Robin Williams and he had killed Donnie Allen.

A. Yes.

Q. Now, are you aware that Barnette didn't tell the police about Donnie Allen until they told him that he was a suspect?

A. Well, as I understand his testimony yesterday, it came out in the context of the interview, that's correct.

**1500**

**JA2371**

Q. Okay. So after he was presented with evidence that he was a suspect in that case.

A. No. I believe it came out that they were investigating a missing person case and could he -- could he help them, is the way I remember the testimony.

Q. Correct. Right. They told him.

A. Well, they said they were investigating a missing person and could he help them, so I think he did help them.

Q. Okay. Now, you had mentioned in your report, quote, items recovered from the Honda included a June 23rd church bulletin, duct tape taken from the tail pipe, garden hose, and love letters.

A. Yes.

Q. Okay. You do realize that there was no duct tape taken from the tail pipes.

A. All right.

Q. Okay. And would you agree that you failed to mention that the other items that were recovered from that scene -- or from the car, actually, was a flashlight with a red colored lens matching the one on the shotgun and handcuffs?

A. Yes. That was in his bag, as I recall.

Q. Okay. From the car.

A. Oh, from the car.

Q. Do you understand or do you realize that from the vehicle shotgun shells, a second flashlight with the red colored lens

and handcuffs?

A.    Right.  Yes, I knew that was --

Q.    You didn't mention that in your report.

A.    Well, I had it that he took a bag and I didn't list all the items, that's correct.

Q.    Okay.  In fact, in your report you failed to mention at all that found in the dumpster was the sawed-off Winchester shotgun with the taped on flashlight, dark clothing, bolt cutter, and crowbar.

A.    No, I do have in the report where I call it a disorganized crime scene that the items that he discarded were found in the dumpster.  What I didn't do is itemize them all. I just lumped them together as items in the dumpster.

Q.    Let's talk about the disorganized crime scene.  That's a -- does that come from your crime classification manual?

A.    It's a term that the FBI use in looking -- going to a crime scene and looking at whether it's organized or disorganized.

Q.    And whether a crime scene is organized or disorganized sheds some light on the defendant's mental status at the time of the crime; is that right?

A.    It may or may not.  Depends on how it's going to be used.  But usually they're looking at it in terms of finding a suspect.

Q.    Okay.  But can it be used to recreate the defendant's

1502

JA2373

mental status in looking at how organized or disorganized the crime scene is?

A. Yes, they can.

Q. Now, wouldn't you agree that when -- if the defendant purchased a firearm using a fake ID a month before the murders took place -- in fact, did that twice -- that that would be a sign of organization?

A. Yes. And I have that as he has elements of structural organization to all of this. Yes, I did cover that.

Q. Now, would you agree that in the days before the crime, the defendant sawing off the barrel of a shotgun and sawing off the stock of the shotgun, attaching a flashlight and basically preparing a murder weapon would be an element of organization?

A. Yes.

Q. Now, would you agree that packing a bag in the days preceding the crime to put in potential tools that he may need as he formulated his plan to travel to Roanoke and murder Robin Williams, that would be evidence of organization?

A. No, I wouldn't add the murder of Robin Williams. I think that he clearly did pack a bag with all the items that we've just said and he intended to travel to Robin to see Robin Williams, yes.

Q. Well, would you agree that traveling to Roanoke to see Robin Williams, having murdered someone for their car, armed

with a shotgun and blasting his way into the home and chasing her would show some amount of intent to kill?

A. Well, it certainly shows mission. It certainly shows obsession. It certainly shows that he's intent to get to her. Yes, I agree it shows all of that. But we do have the report that he gives to the police afterwards that he still intended to confront her to find out why she was doing this to him so that there was built in to his statement another piece of time that never got played out because, of course, of what happened.

Q. Well, isn't it true that it never got played out because the defendant's approach to the Williams household was one of violence?

A. Well, one of the things that you do get into with domestic violence situations -- it's not only in our report, but in all kinds of literature -- is that there is this dynamic, that there is -- the amount of tension, of emotion that is contained in the confrontation plays a part in all of this, and that's what I was trying to say. That there is not necessarily this point A to point B with intent. It doesn't -- I don't see any evidence that it came through that way.

Q. Okay.

A. But rather, there were other thoughts in his mind that he wanted -- he wanted an explanation. He even wanted to go see this Benny Greene.

Q.   Now, would you agree, back to the organization versus disorganization, that walking eight-tenths of a mile to a dark intersection to lay in wait for a vehicle to carjack would be evidence of organization?

A.   Yeah, we've already said that.  I'm talking about the crime scene.

Q.   Okay.  So am I.

A.   I mean, back to that crime scene.  Yes, that certainly does.

Q.   All right.  Now -- and I'm talking about the Donnie Allen crime scene.

A.   I understand, yes.

Q.   Would you agree that waiting thirty minutes, up to thirty minutes for a vehicle to come by was organization -- an organized thought process?

A.   Well, he's waiting.

Q.   Yes.

A.   We don't really have what's in his thoughts at that point, but he's waiting.  So, yes, he's waiting.

Q.   Now, would you agree that marching Donnie Allen from his vehicle into the woods and shooting him three times was a purposeful organized act?

A.   Well, the way that that tragedy occurred is that there was an obstacle perceived by Marc and there was an opportunity.  Unfortunately, the opportunity the obstacle

FORM FED   PENGAD · 1-800-631-6989

overcame. And we did see some of his thinking about why he did that and --

Q. So are you --

A. -- overcame that.

Q. -- saying that Donnie Allen was collateral damage?

A. No, I didn't say that. I'm saying that he needed a car. That's the opportunity. That Donald Allen is part of that. Then gets us into the second part of the obstacle.

Q. Okay.

A. And that's -- that's where the tragedy occurred, yes.

Q. Now -- I'm sorry. Are you done?

A. I'm done.

Q. Would you agree that when Marc Barnette got to Roanoke after driving three and a half hours?

A. Yes.

Q. And that he waited at a place where he could see the Williams house but couldn't be seen, that that's evidence of organized thought?

A. Well, it's his mission. He's intent. He's got to get access to her. So in that context, yes. There certainly is some structural organization to it. But then when you get to the actual crime at that location is where it becomes very disorganized.

Q. Wouldn't you agree that cutting phone lines so that they couldn't call 9-1-1 is again an organized logical process?

A. Yes. Yes. He had done that before. That's right.

Q. And do you understand or would you agree that Mr. Barnette had to reload that shotgun several times in order to continue on his mission?

A. Yes. We heard that yesterday.

Q. And that that was -- that's evidence of organization, organized thought. I have fired all of my shotgun shells and now I need to reload.

A. Well, it's -- yes, it certainly is putting him into his mission position, yes, that's true.

Q. Wouldn't it be an organized thought process when he blasted his way into the house and confronted Bertha Williams, that he leveled the shotgun at her and threatened to kill her to get to Robin?

A. Right. He is going to get anyone in -- his mission is to get Robin so anybody in the path is in a very dangerous position. Yes, I agree. And that's moving him towards his confrontation with Robin, yes.

Q. Exactly. A thought process, an organized thought process --

A. No.

Q. -- I am trying to get to a person; get out of my way.

A. It's an irrational thought process the way he's doing it, but, yes, it is -- he's mission oriented. He's obsessed with getting there, that's correct, yes.

Q. And when the defendant saw Sonji Hill calling the police and pointed the shotgun at her to tell her to get off the phone, that was -- that was an organized thought in order to continue his mission.

A. True.

Q. Now -- and again, we've gone through, would you agree that fleeing the scene to another state, hiding the ownership of the vehicle outwardly by taking a license plate off, taking the inspection sticker off, would be evidence of an organized thought process to evade detection?

A. Well, he certainly is trying to get away from the scene. It does not show clear -- he doesn't get away with it. I mean, I think the important thing is when you're looking at disorganized versus organized, he very easily is caught. Everybody has seen him. He's in plain view. So he really doesn't even have to do any of that because there's not going to be any problem in getting him, and they essentially do. He certainly does some things to try to avoid detection, that's correct.

Q. Wouldn't you agree that --

A. But --

Q. I'm sorry, go ahead.

A. I was just going to say, in a disorganized crime scene, it's usually the police have a lot of difficulty in determining who's done it. Organized is where it's very

difficult for them. And this is a case where everybody knows who did it and they quickly do find his weapons.

Q. Wouldn't you agree that the people who witnessed, including Ms. Williams witnessed her daughter being murdered, they knew, and the 9-1-1 tape says Marc Barnette on it?

A. Correct.

Q. Would you agree with that?

A. Right.

Q. Now, nobody knew, wouldn't you agree, who killed Donnie Allen?

A. That's correct.

Q. And that Mr. Barnette's attempts to evade detection were specifically directed toward his association with Donnie Allen.

A. Yes.

Q. Okay. And that's why it's an organized thought process, is it not, that he was attempting to disassociate Marc Barnette with the Donnie Allen murder?

A. No. See, I wouldn't agree with that because it's so easily -- he completely cooperates the minute they say we're looking for this missing person. He does try some attempts to get himself -- he has to get back to Charlotte, so he does go through as you've just described.

Q. Well, he wasn't arrested in Tennessee, was he?

A. No. He was arrested in Charlotte.

Q. So he successfully evaded detection in Tennessee as he wished.

A. That's true.

Q. And when he drove back to Charlotte, he successfully evaded detection for a time.

A. Well, not a very long time.

Q. For twenty-four to thirty-six hours.

A. But they certainly knew where to locate him.

Q. But he wasn't arrested in Charlotte -- isn't it true, that he didn't, in fact, go to his home on West Boulevard when he got to Charlotte?

A. Not immediately, correct.

Q. In fact, he went to another place and dumped that car and hid the weapon.

A. Correct.

Q. So wouldn't you agree that's an organized crime scene?

A. No, I wouldn't agree it's an organized crime scene. A crime scene means -- it's a little different than what I think what you're --

Q. Okay. We'll agree to disagree on that.

A. Okay.

MS. LAWSON: She interrupted. Objection, Your Honor. She should finish her answer.

THE COURT: Well, just ask questions.

MS. TOMPKINS: Thank you, Your Honor.

Q.   Now, you reviewed, I'm sure, Robin's statement to police that she gave after the arson.

A.   I did.

Q.   Now, your report mentions Benny Greene several times. And in your report you refer to Benny Greene as Robin Williams' ex-boyfriend.

A.   Yes.

Q.   Would you agree that no where in any of the police reports or interviews is Benny Greene referred to as Robin Williams' ex-boyfriend?

A.   Right.  It's unclear ex -- well, friend, right.

Q.   So it's not unclear, is it?

A.   Well, in his mind.  In his mind it's a boyfriend.  In Marc's mind.

Q.   Okay.  So -- so that's one of the times where you took the defendant's word for it rather than the evidence in the case.

A.   Well, my point being, this was at the crux of the whole -- what gets played out is this Benny Greene.  So in his mind it's very important.  So, yes, I put it because it wouldn't make sense to just say this is just a -- why would he -- why else would he be so intent on getting that relationship clarified if he wasn't concerned that this was a boyfriend -- ex-boyfriend -- or current boyfriend?

Q.   So it makes sense for your report that he be typed as an

ex-boyfriend.

A.    Because -- right, because I'm trying to explain what happened.  You know, why he went on this crime spree.

Q.    Right.  But you agree that, in fact, Benny Greene was a nonromantic friend.

A.    That's my understanding from his testimony, correct, yes.

Q.    All right.  Now, in your factual rendition of the arson, you say that, quote, two small containers of gas had been poured on the window sills.

A.    Yes.

Q.    Now, you failed to mention, but are you aware that the defendant yelled, Die, bitch, die, as he threw Molotov cocktail like containers at the apartment?

A.    I understand that's what he said.  He's not quite clear what all he said, is my remembering of his testimony.  He said he could have even -- he didn't have clear memory of all the things, but I do remember that, correct, yes.

Q.    Okay.  And were you here for his testimony when he testified that he had, in fact, yelled, Die, bitch, die?

A.    Yes, I was.  I'm not sure I was here for the first day.

Q.    In your report you mentioned that, quote, after confessing to his mother and best friend, he waited at his mother's home for the police to arrest him, end quote.

A.    Yes.

Q. Okay. Now, did you review Steve Austin's testimony about Barnette's conduct in between the arson and the murder?

A. I think you need to refresh my memory.

Q. Well, let me just strike that. This is the -- this is in reference to after the arson and before the murder, you said in your report, quote, after confessing to his mother and best friend, he waited at his mother's home for the police to arrest him.

A. Yes.

Q. Okay. Now, are you aware that Steve Austin, the defendant's best friend, testified that in that period of time, they went out and partied and met girls and went to clubs?

A. I didn't hear that testimony, but I -- okay. Yes.

Q. And did you know that Steve Austin also testified that when he went out with Mr. Barnette, he didn't pick him up at the West Boulevard home; he, in fact, picked him up out on Independence Boulevard near Monroe Road and, in fact, dropped him off there. Are you aware of that?

A. I don't remember that detail.

Q. So it's possible, then, that in between the arson and the murder, that the defendant was, in fact, hiding out at his cousin's apartment rather than waiting at home to be arrested.

A. Well, obviously, he did other things over that six-week

period. I don't think that that was in the service of hiding out, I really don't. I really think that had the police come, they would have been able -- people knew where he was. So that -- I wouldn't agree that he was hiding out. He certainly was there.

Q. Okay. But it's certainly a possibility.

A. I don't know that it's a possibility. He fully expected to be apprehended.

Q. Now, isn't it true that a person who wants to turn themselves in can dial 9-1-1?

A. That's true.

Q. Are you also aware that in that period of time between the arson and the murders, that the defendant -- well, that cards written from Robin Williams to the defendant were found on Robin Williams' car at her brother's house?

A. Right. I heard that testimony yesterday.

Q. Okay. And you didn't --

A. So it's not clear how they get there, is my memory.

Q. Isn't it possible that the defendant took a trip to Roanoke and put those cards where he had scrawled derogatory sayings on them and put them on Robin's car? Is that a possibility?

A. Well, anything is possible, but that would have required him getting a car, going through the whole thing. How possible it is compared to how probable it is, I'm not sure.

Q. Now, as to Robin Williams' murder, your report says that when asked by police why he shot Robin, that Barnette tearfully told the police that he didn't know.

A. That was in the -- right, in one of the very early interviews, if I recall, yes.

Q. Now, are you aware that Barnette also told Officer Holl that after brooding about Robin, quote, my anger took over?

A. Yes. Oh, yes.

Q. And are you aware that Barnette told Dr. Sally Johnson that on the evening of June 21st, quote, I had never been that angry.

A. Yes. Yes. The anger is certainly surfacing, absolutely. That's what brooding is all about. And all of the content that's going on in his head and the irrational thinking, it's just brewing.

Q. All right. And are you aware that Barnette told Dr. Park Dietz that before he left his house that night that Donnie Allen was murdered and Robin Williams was murdered, he said, quote, I became more angry and more angry and more angry as the day went by. Then all I thought about why should I go after Benny Greene when Robin was the one who caused me all this pain. She lied to me. She betrayed me. She stabbed me in the back.

A. Yes, that is -- that's classic for his thinking of the suspiciousness, the paranoia, the domestic violence. That is

his thinking pattern, yes.

Q.    And anger is part --

A.    Yes, because anger covers over.  Anger is a good psychological defense against sadness, against disappointment, against loss, yes.

Q.    Okay.  Now, are you aware that the defendant told Dr. Dietz that on the night of the murder, he wanted revenge and that's what he set out to do?

A.    That's what he told Dr. Dietz, yes.  He told him that.

Q.    Now, you called in your report, your opinion section of your report, the criminal acts you called, quote, a symbolic reenactment of family and childhood patterns?

A.    Yes.

Q.    What part of the defendant's childhood patterns involved carjacking and murdering a man for his car?

A.    Those are the acts.  Don't forget thoughts precede actions.  And so what I am speaking about is the thinking process that goes on that drives behavior.  So the thinking patterns would be the suspiciousness, the paranoia, the domestic violence which has within it the sanction of acting violently when one is upset or one wants to correct a situation.  So that would be the thinking that then drives the subsequent behavior that we all have talked about.

Q.    All right.  What part of the defendant's childhood patterns involve the use of Molotov cocktails to try to burn

down an apartment?

A. Well, again, that's a thinking of how to do something harmful. I don't know enough about his experience with that to be able to comment on that. But he certainly wanted to injure. He certainly wanted to hurt.

Q. All right. Now, you reference -- you reference in your report and testified about events that happened before the defendant was born, correct?

A. Yes.

Q. Is it fair to say that the defendant's actions in this case were not reenactments of things that happened before he was born?

A. Well, there were -- there was the murder of the mother -- of the grandmother.

Q. Okay. In fact, that was after he was born.

A. Right.

Q. Okay.

A. Before he was born we have the generational aspect of the -- of the grandparents. Oh, before he was born. Well, we're looking at the patterns.

Q. Okay. My question is, is it fair to say that the defendant's actions in this case were not reenactments of things that happened before he was born?

A. Oh, before he was born. Well, I was really going for the one generation back.

JA2388

Q.    All right.

A.    So...

Q.    Now, you mentioned just now the grandmother who died when the defendant was ten months old.

A.    Yes.

Q.    Now, you mentioned on your direct testimony that the grandmother's death, the quote was:  Can be registered in memory at a nonverbal level.  Is that right?

A.    I don't think I meant about the murder.  What I was referring to was how memory is laid down in childhood before one develops the ability to verbalize and to remember.  That there is what we call implicit memory and there is explicit memory.  We all operate on explicit memory.  But implicit memory is what's there before there's no verbalization.  And it's very clear that there are reactions that people have and you can actually learn.  You can do condition learning through this.  And this is where the literature and the understanding of why early childhood experiences can impart on a child because of this implicit memory.  So that's what I was referring to.  Not the concept.  He learns the concept later on when he's older.  I mean, he knows now that his grandmother was murdered.  But at the time what registers is all of the upset in the caretaking arrangement because she was the primary caretaker.  All of a sudden she's gone.  You now have a fifteen or sixteen year old mother who now has to find a new

FORM FED ⊛ PENGAD • 1-800-631-6989

JA2389

place to live, so you know that that has affected her. And all of that can get transmitted to the child in a nonverbal way.

Q. What tests were performed on the defendant to make the determination that an event that happened when he was ten months old has -- had an impact on him?

A. Well, I'm just giving you the literature on memory implicit and explicit. And the literature that shows the implicit, we use a lot of -- it's actually how we deal with people who can't speak. In nursing we have to deal with stroke patients where there's been impairment to the memory and so we know that there are ways that you can reach people through the implicit memory. It has no language. It's one of our most primitive levels of memory.

Q. So no tests were performed on the defendant to make a determination about the impact of that event that happened when he was ten months old.

A. Well, we have all of the material on his inability, his attachment dysfunction. We have that. We don't have any tests. We just have his behavior.

Q. Okay. Now, isn't it important that in a person's childhood they are taught to tell the truth, to do their chores, to get a good education?

A. Yes. That's -- yes.

Q. All right. And that that should be encouraged rather

than discouraged.

A. Yes.

Q. Now, your report references that Derrick Barnette's discipline of the defendant as, quote, slapped, spanked or beat for any infraction, for example, poor grades or not filling the dog's water bowl, end quote, and that, quote, lying was not tolerated, correct?

A. Correct.

Q. Would you agree -- well, were you here for Derrick Barnette's testimony?

A. Yes.

Q. Okay. And do you recall that Mr. Barnette testified on cross examination that the spankings that he had given the defendant as a child were always directly related to transgressions of family rules?

A. Yes.

Q. Now, defendant -- the defendant in this case has reported inconsistently about his childhood exposure to violence, wouldn't you agree?

A. No, I don't think it's inconsistent. He did it way back in the very beginning in his first interview in the prison as I understand it. He talked about physical --

Q. Did you --

A. -- abuse.

Q. -- review the report of Dr. Sally Johnson which was

conducted in December of 1997?

A.    Yes.

Q.    And so you are aware that she reported that, quote, Mr. Barnette describes his early life in relatively positive terms.

A.    Well, I think that's true.  I think up until -- he did have a presence of some family life.  And a lot depends on how the question is asked and how the -- as we've already talked about, how the person writing the report is going to view it. And when his father and mother were in the home and up until he's about eleven, ten or eleven, I don't think that's a misrepresentation from him at the time he's being interviewed in the prison.  But I do believe he did say he -- there was some physical abuse and I'm not sure it's in Dr. Johnson's report.

Q.    Right.  All right.  Now, you testified -- or actually, in your report you said that when the family moved to Georgia,, quote, the home life was unstable.

A.    Yes.

Q.    Did you talk to Sheila Cooper, the defendant's aunt or -- yeah, defendant's aunt about life in Georgia?

A.    No, I didn't get an opportunity.

Q.    Did you review her testimony?

A.    I'm not sure I did.

Q.    Well, would you be surprised to know that she reported

that Marc was happy in Georgia. That he ran track on the school track team. That he danced a lot. That he liked art and drew a lot, and helped her baby-sit her children?

A. I would agree with that. I wouldn't disagree whatsoever. I think that that is the way that Marc would present himself and how others would see him, yes.

Q. Now, you also put in your report that when Marc -- when they moved down to Atlanta, that the defendant moved into, quote, big brother role of supervising Mario.

A. Yes.

Q. What other role would you have suspected a big brother would play?

A. Well, he moved into that role because, as we heard yesterday, the -- there was inconsistency with the mother being in the home. So he really assumed a major role, not just big brother. He really assumed -- I think that he minimizes the role of protector and father figure that he served not only for Mario but for his cousin. So I think he underestimates how important he was to those two young boys.

Q. Now, you talked in your report about Marc Barnette's relationships; is that right?

A. Yes.

Q. Now, where did you get the indication that the defendant had, quote, a wish to have a monogamous relationship?

A.    I heard that from -- I'm not sure if I can point chapter and verse, but he certainly told -- that was the intent is to have a -- certainly with Tasha, to have a monogamous relationship.  And that's what gets him into so much difficulty because he begins to get suspicious.  I mean, that's just his programmed learning of being able to trust the young women that he establishes a relationship with.

Q.    Well --

A.    He has said that.

Q.    -- did you review -- well, did you talk to Crystal Dennis or Natasha Heard or Alesha Chambers?

A.    No, I did not talk with him.

Q.    Well, are you aware that he himself was never monogamous in any of his relationships?

A.    Well, he does talk about that.  And one of the ways he rationalizes that is to -- he does to them what he believes is going on with them.  Again, that's very faulty thinking and logic.  But he does, I agree, yes.

Q.    Now, about Crystal Dennis.  In your report you adopted the defendant's story that he beat those children with a coat hanger because he caught them playing doctor.

A.    Well, that was -- right.  That's one version, yes.

Q.    Okay.

A.    And that's in my report, you're correct.

Q.    And clearly you're aware, then, that when interviewed by

police just after the crime happened, that he said that he had beaten the older boy because he wouldn't keep his shoelaces tied and couldn't remember why he had beaten the little girl.

A. Yes. I'm certainly aware that there are multiple versions of that by multiple people. So, yes, I'm aware of that.

Q. Well, aren't the multiple versions of that from the defendant?

A. Yes.

Q. Okay.

A. And I'm not sure Crystal is --

Q. Well, did you review the police reports?

A. Yes. Yes.

Q. And you understand --

A. So I saw --

Q. -- Crystal Dennis was not a witness to that crime.

A. Correct.

Q. So there is no version from Crystal Dennis.

A. Correct.

Q. And you're aware that the only versions of events of that crime came from the defendant.

A. Well, it's also what the children say.

Q. Well, are you aware --

A. My understanding was --

Q. -- that one of the children was two years old?

JA2395

A. Right. But there was an older -- my understanding is they were a little bit older. That there is some discrepancy in the age. I thought the children were a little bit older.

Q. Are you aware that there are no statements from the children?

A. To Crystal, to their mother? They made no statements to their mother.

Q. Correct.

A. Oh, okay. I thought there were.

Q. But you didn't account for in your report that there are different versions of that event coming from the defendant himself.

A. No, I didn't put in all the various versions. The point was he did abuse the children. That's in the report.

Q. Right.

A. And the -- and the motive for that is in there.

Q. But isn't a theme of your report that the defendant is reenacting childhood trauma?

A. What my explanation of that was is what he said, is that when children don't play by the rules, whatever, that -- because he was disciplined, he disciplined them. So it was a clear translation of what happened to him. That's not at all unusual.

Q. Well, are you aware that the defendant said -- has claimed that since he was beaten with a coat hanger by his

father, that's why he did that to those children?

A.    Yeah.   Oh, well, that's what he said, yes.   Marc said that.

Q.    And are you aware that Derrick Barnette has not corroborated that he ever beat the defendant with a coat hanger?

A.    Yes.   I remember he said he didn't remember ever doing that, so that's correct, yes.

Q.    And so there -- while the defendant wants that -- and maybe you do, too -- to be a reenactment of a childhood trauma, that childhood trauma never happened; isn't that right?

A.    I'm not saying that's a reenactment of a childhood trauma.   What I'm saying is that's a reenactment of what happened to him.   So that you -- you discipline children as you've been disciplined.   That's not unusual.   That's his thinking.   What differs is the level and the item used.

Q.    In your report you detail the defendant's relationships with various women in his life before Robin.

A.    Yes.

Q.    And you talked about Crystal Dennis a little bit.   And with Alesha Chambers, are you aware that the defendant admitted on the stand on Monday that he had, in fact, raped Alesha Chambers?

A.    I heard that.

Q. And you've got that in your report that police learned that Marc and Alesha had consensual sex and dropped the rape charge.

A. That's my understanding and that's -- yes, that that was a decision made by the police or prosecutor.

Q. Do you know that's factually inconsistent both with the police reports and the defendant's own testimony on Monday?

A. Well, his testimony Monday, I mean, we heard that, yes. And his explanation was that similar -- and this is again a very common characteristic in batterers or people who abuse in domestic situations is they do not see it as. And that the denial is very strong.

Q. All right. Now, in your report you note that the defendant had told you that he had -- that as of May of 1996, the defendant said he had jeopardized everything for nothing. He had abandoned his children. Skipped on probation. Used his brother's ID. But he had to talk to Robin.

A. Yes.

Q. Those are your words.

A. Well, I don't know if they're my words. Yes, I mean, that's in my report.

Q. Okay. Now, isn't it true that the defendant had abandoned his children five years earlier when he left Natasha Heard?

A. I think he's using abandonment in a very different sense

there. Yes, he certainly is not involved with his children, but the use of the word there is -- as he's making his decision or as he's moving towards this intent, this obsession to contact Robin Williams.

Q. Now, you had mentioned in your direct testimony about the defendant never getting any mental health treatment, correct?

A. I'm not aware of any, that's right.

Q. Now, you are aware, though, that when he was placed on probation after the felony child abuse conviction, that mental health treatment was ordered.

A. Yes.

Q. Okay. And that after his conviction for felonious restraint and breaking and entering in one of the incidents with Alesha Chambers, that mental health counseling was ordered.

A. It was ordered but not mandated and nobody comes out and does outreach to it. But I'm absolutely aware of that, yes, that he -- it was recommended. He never followed through. It was never any outreach, yes.

Q. All right.

A. I'm aware of that.

Q. But you're not suggesting that it's someone else's fault that the defendant didn't get counseling, are you?

A. I'm not suggesting that at all. I'm just suggesting that when you have juveniles, that there has to be in place a more

structured outreach, just as with batterers. We've learned that it's -- you have to -- they will not go to counseling on their own. That there has to be some other mechanism to get them to counseling. So, no, I'm not blaming anybody. I'm just saying this is a fact of how we have to set up programs to be able to intervene and to prevent family violence.

Q. Now, you also were aware that the defendant was not a juvenile when he committed his crimes against either Crystal Dennis's children or Alesha Chambers, correct? Those were both adult court convictions. Are you aware of that?

A. Right. I don't know what age. Right, yes.

Q. Well, he was twenty --

A. Okay.

Q. -- when he assaulted Alesha Chambers.

A. Right. Well, I will amend my statement to say there should be programs in place that go up the ladder in age similar as we have with batterers because many batterers are in their thirties and forties.

Q. Wouldn't you agree that probation that orders counseling would be one of those processes put in place to help someone?

A. Well, we have found that's not -- that's inadequate. That's not successful. That you have to do much more in outreach to get them into the programs to -- the denial is quite great. So I'm just saying that programs, this is one of the things that we found is a very difficult area.

Q. Are you aware that the defendant absconded supervision as soon as he was placed on probation; therefore, not allowing for anyone to follow up with him about his court-ordered counseling?

A. I think they knew where he lived. I'm not sure that that's -- I mean, there are other ways to put programs in place. But there have been successful ways of doing it.

Q. Well, are you --

A. That's all I'm suggesting. But, yes, I know that --

Q. Are you aware that the defendant actually moved to Roanoke, Virginia, not telling his probation officer that he, in fact, wasn't even living in the state anymore?

A. Right, yes. I'm aware of that.

Q. Now, in your report you use the phrase, quote, repetition compulsion?

A. Yes. That's a jargon term that's used in psychiatry.

Q. Now, are you suggesting that the defendant wasn't able to control his actions?

A. What I'm saying is the programming that he had in his head and his need to carry out this mission was what was driving the behavior. And in a psychological way, you can see this as repetition compulsion. That's what I was stating.

Q. All right.

A. And there is a psychological body of knowledge that does adhere to that.

Q. And that's a psychiatric jargon term?

A. Yeah. I mean, it's used in the field to explain a phenomenon that's very hard to explain without using those terms.

Q. Okay. Now, you also used the word programmed quite a few times in your narrative.

A. Yes.

Q. Are you suggesting that someone else was controlling the defendant's behavior?

A. No. I'm just saying that we all get programmed in various ways in the way we grow up in our families and we learn certain beliefs and certain ways of doing things, and that's what Marc learned in his family. So it's just, again, a term to describe how -- how we learn growing up and then play it out as adolescents and adults.

Q. In your report you state that, quote, he had the emotional and thinking capacity he had when he was eleven.

A. Yes.

Q. What psychological or psychiatric instrument did you use to test and measure the defendant in order to make that statement?

A. I made that statement because in severe trauma and in certain other kinds of cases we see a phenomenon that's called the clock stopped. And a lot of times people just don't move beyond -- psychologically. Obviously, they, you know, develop

otherwise. But it's the clock stopping. And I really feel that was such a major point in his life when the father and the mother and losing both and then the move and everything that happens after that is a traumatic change, and that was the reason that I used that. I didn't use any tests. This is --

Q. Okay.

A. -- strictly an interpretation that I made of his -- to try to explain what happened. Why he did what he did.

Q. You're aware, aren't you, that there is, in fact, no psychological or psychiatric tests that can be used to measure that?

A. We -- in psychological terms we look at behavior and then we have to go backwards in terms of trying to explain why people behave the way they do. What is their motive. I mean, that's really what psychology is all about. So it's just one explanation.

Q. All right. Now, are you --

THE COURT: Appears to be about time for lunch.

MS. TOMPKINS: Okay.

THE COURT: Members of the jury, we'll take our lunch break. Please recall the usual instructions as always. We'll see you at 2 o'clock.

(Lunch recess at 12:33 p.m.)

*     *     *

Page 3560

IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF NORTH CAROLINA

CHARLOTTE DIVISION

COPY

UNITED STATES OF AMERICA          )

                                  )    CASE NO. 3:97CR23-V

    v.                            )    August 7, 2002

                                  )    Afternoon Session

AQUILIA MARCIVICCI BARNETTE,      )

          Defendant.              )

          TRANSCRIPT OF SENTENCING HEARING

    BEFORE THE HONORABLE RICHARD L. VOORHEES

        UNITED STATES DISTRICT COURT JUDGE

APPEARANCES:

FOR THE GOVERNMENT:

      ANNE M. TOMPKINS, Esq.

      JILL WESTMORELAND ROSE, Esq.

      Assistant United States Attorney

      227 West Trade Street

      Suite 1700

      Charlotte, North Carolina  28202

FOR THE DEFENDANT:

      JEAN B. LAWSON, Esq.

      P.O. Box 4275

      Charlotte, North Carolina  28226

      HAROLD J. BENDER, Esq.

      200 North McDowell Street

      Charlotte, North Carolina  28204

Reported by:  Scott A. Huseby,

              Registered Professional Reporter,

              Certified Court Reporter,

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/7/2002

Page 3561

P R O C E E D I N G S

MS. LAWSON: Just for your information, Dr. Burgess will be our last witness before Dr. Cunningham, so whatever --

THE COURT: Dr. Cunningham will be allowed to testify. I will take up the issue of the violation of the rules at some appropriate point.

MS. LAWSON: He will not be allowed to testify?

THE COURT: He will be.

MS. LAWSON: Thank you, Your Honor.

THE COURT: I trust the jurors had a good lunch.

(Jurors nod heads.)

THE COURT: Okay. I believe you had a witness on the stand, continuation of Burgess on the stand.

BY MS. TOMPKINS:

Q. Dr. Burgess, I want to talk to you a few minutes about Donnie Allen. Are you aware that in your report, the only reference in your 12-page report about Donnie Allen is on Page 3 of your report, where you note that, quote, the fatal contact with Donald Allen was a result of Barnette's flawed logic, that Allen was both an opportunity and an obstacle to his reunion with

Reported By: Scott A. Huseby, RPR
800-333-2082        Huseby, Inc., an Aff        n (704) 333-9889        Fax (704) 372-4593
Case 3:12-cv-00327-MOC   Document 105   Filed 09/23/15   Page 233 of 250
1534

JA2405

Page 3562

Williams?

A. Yes. That's under the heading killings of Robin Williams and Donnie Allen. It is a full heading.

Q. All right. Now, and that is your only reference to Donald Allen in your full-page report?

A. I don't believe that's the only reference. The -- there is reference in terms of the dynamics and some of the conclusions, if you want me to read those to you?

Q. Well, in that heading of your report it says, killings of Robin Williams and Donald Allen. Your first sentence on that is, this is a domestic homicide, correct?

A. That's correct.

Q. Now, you are aware that there were two murders here?

A. That's correct.

Q. Okay. So are you saying that these are two domestic homicide?

A. No. I'm saying this is a domestic crime spree. This is a crime spree of which it is a domestic homicide, but the target is Robin Williams, the victim was Donald Allen. And the way the literature reads and the way it's written up in both the workplace violence literature as well as the domestic violence literature

800-333-3083  Case 3:12-cv-00327-MOC, Document 105  Filed 09/23/13-9889  Page 234 of 250  (704) 372-4593
1535

JA2406

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/7/2002

Page 3563

is that, as it says later in the report, that you can have both victims and a target and you are to identify the target as well as the victims, they are not to be used interchangeably.

Q. Clearly there are two homicides here?

A. That's correct.

Q. All right. And Robin Williams was a homicide victim, correct?

A. Yes. She was the target of Marc Barnette.

Q. And Donald Allen was a homicide victim, is that correct?

A. That's correct. He was a victim of Marc Barnette.

Q. So when said this is a domestic homicide, did you mean that these are two domestic homicides?

A. No. I meant that it's a crime spree involving domestic homicide of which there is a target and there is a victim.

Q. Well, about the crime spree, you are speaking of the time frame from the fire bombing to the murders?

A. Right, that's correct, April 30th to the 22nd of June.

Q. Are you aware that while the defendant was in this crime spree he applied for a job as a car salesman at Saturn?

United States of America vs. Aquilia Marcivicci Barnette 3:97CR23-V
Proceedings Before Judge Richard L. Voorhees 8/7/2002

Page 3564

A.    Yes, he had applied, I'm not sure it was within that -- he had applied for that, not received it, I think.  I don't have a time frame, but, yes, he had applied for a -- to be a car salesman at the Saturn dealership.

Q.    Are you aware that that was, in fact, during the duration of what you are terming the crime spree?

A.    Yes.  I don't have the precise date of his application to know whether it's within that, but I know that he was -- he had applied.

Q.    Okay.  And are you aware that during the time frame in which you are calling a crime spree that he went out with his friend Steve Austin and met girls at clubs?

A.    Yes.

Q.    And, in fact, he had met a particular girl from whom he had gotten a telephone number?

A.    Yes.  I believe I read that, yes.

Q.    All right.  Now, back to Donald Allen for a moment, are you aware that in your report, in your headings entitled, which form the bases for your opinion, that under family and childhood patterns, family stresses, that Marc Barnette's relationships, there is no point in your report in which you attempt to explain what impact any of those things had on Marc

United States of America vs. Aquilia Marcivicci Barnette    3:97CR23-V
Proceedings Before Judge Richard L. Voorhees    8/7/2002

Page 3565

Barnette's actions when he marched Donnie Allen into the wood and shot him three times?

A. Well, what I'm speaking to is the pattern behavior, his targeting, and that whole domestic scene. I don't specifically speak to that except in the last sentence on that section. Let me read it. It has, where it's very dangerous in these domestic situations for anybody that's in the vicinity. Again, it's a very similar situation to workplace violence, where you can have the abuser coming into the workplace and -- after a specific partner, ex-partner, and multiple people are in the vicinity and become victims, so that's my similarity there.

Q. So because Donald Allen had the misfortune of being in Marc Barnette's vicinity, he became a victim?

A. Well, the reason Donald Allen comes into this is he needed a car, so it was an opportunity to get the car, but it also became an obstacle to the way he was thinking at that particular point in time, from what his testimony says, in terms of being able to worry that he will be identified and stopped and all of that.

Q. So Donald Allen's murder was a means to an end, that end being Robin Williams' murder?

A. In the crime spree, yes.

MS. TOMPKINS: Thank you. No further

Reported By: Scott A. Huseby, RPR
800-333-2082    Huseby, Inc., an Aff...    n. (704) 333-9889    Fax (704) 372-4593
Case 3:12-cv-00327-MOC   Document 105   Filed 09/23/15   Page 237 of 250
1538

JA2409

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/7/2002

Page 3566

questions.

REDIRECT EXAMINATION

BY MS. LAWSON:

Q. Dr. Burgess, the questions you've been asked by Ms. Tompkins and your answers to them, do they in any way change the opinions or the testimony that you have given in this courtroom?

A. No, they do not.

Q. How long has the Federal Bureau of Investigation been requesting and using your services, the behavioral sciences unit?

A. Since the mid 1970's; 1975, I think.

Q. When was the most recent time?

A. I did a training on the advanced training group in April of this year.

MS. LAWSON: Thank you. No further questions.

THE COURT: You may step down. Call your next witness.

MS. LAWSON: Your Honor, we call Dr. Mark Cunningham. It will take him about five minutes to set up his equipment. Could we have that long to accomplish that, please.

THE COURT: All right. Members of the jury, if you will step out for about five minutes,

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/7/2002

Page 3567

please.  Thank you.

(The jury left the courtroom.).

THE COURT:  Mr. Bender, why couldn't you have done this during lunch?

MR. BENDER:  We didn't know how long they were going to take, Judge.

THE COURT:  Is this -- we couldn't have finished that last witness with these preparations already having been made?

MR. BENDER:  Perhaps we could have, but we didn't know how long the government was going to take.

THE COURT:  All right.  Let's take a five-minute recess.

(Brief recess.)

THE COURT:  Are the parties ready?

MS. LAWSON:  Yes, sir.

THE COURT:  Bring the jury.

(The jury returned to the courtroom.)

MS. LAWSON:  We would call Dr. Mark Cunningham.

MARK D. CUNNINGHAM,

being first duly sworn, was examined and testified as follows:

DIRECT EXAMINATION

BY MS. LAWSON:

Reported Bv: Scott A. Huseby, RPR
800-333-2082  Case 3:12-cv-00327-MOC-DCK  Document 105  Filed 09/23/15  Page 239 of 250  Fax (704) 372-4593

1540

JA2411

United States of America vs. Aquilia Marcivicci Barnette 3:97CR23-V
Proceedings Before Judge Richard L. Voorhees 8/7/2002

Page 3568

Q. Would you please tell the jury your name.

A. Mark Douglas Cunningham.

Q. What is your occupation?

A. I'm a clinical and forensic psychologist in private practice.

Q. How long have you been a psychologist?

A. About 24 years now.

Q. You mentioned that you have a clinical and forensic practice.

A. Yes, ma'am.

Q. Would you explain that?

A. Yes, ma'am. Clinical psychology is the evaluation and treatment of psychological disorders. Forensic psychology is the application of psychological research and techniques to legal issues, all the way from evaluating parental capabilities in child custody situations, psychological injuries in civil cases; in criminal court, things like competency to stand trial or mental state at time of offense, or sentencing determinations, such as are being considered today, any way that psychology as a science can help inform some issue that is before the Court.

Q. Where are you licensed to practice as a clinical psychologist?

A. I'm licensed as a psychiatrist in Texas,

Reported By: Scott A. Huseby, RPR
800-333-2082 3:12-cv-00327-MOC, Huseby, Inc., and Association (704)333-9889 Page 240 of 250 Fax (704) 372-4593
Document 105 Filed 09/23/15
1541

JA2412

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/7/2002

Page 3569

Louisiana, Arkansas, Tennessee, South Carolina, Indiana, Illinois, Colorado, Idaho, Oregon, New Mexico. There are 11 states. I may have left one out.

Q. Is your forensic practice national in scope?

A. Yes, ma'am, it is.

Q. And how long have you been licensed?

A. I was first licensed in Connecticut, I think in 1979 or 1980, so about 22 years.

Q. And where do you maintain your office?

A. My offices are in the Dallas area, in Lewisville.

Q. Now, have you -- you mentioned that you have had occasion to testify nationally. Is that in, among other things, capital sentencing proceedings?

A. Yes, ma'am, in federal and state cases.

Q. And how often have you testified over the past five years?

A. Over the last approximately five years I have testified in about 20 or 22 federal capital cases and about 50 or a little more state capital cases in various jurisdictions around the country.

Q. Could you give us some educational background, tell us how you were educated and where?

A. Yes, ma'am. I got my undergraduate degree from Abilene Christian College, that's now Abilene Christian

Reported By: Scott A. Huseby, RPR
Huseby, Inc., an Af
800-333-2082
(704) 333-9889
Fax (704) 372-4593
Case 3:12-cv-00327-MOC Document 105 Filed 09/23/15 Page 241 of 250
1542

JA2413

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/7/2002

Page 3570

University, with majors in mass communications and psychology. I graduated from there in 1973 with high honors.

I then attended graduate school at Oklahoma State University and a doctoral training program in clinical psychology that is accredited by the American Psychological Association as the clinical psychology doctoral training site and got both my masters and doctorate degrees in clinical psychology there.

I did a one-year clinical psychology internship at the National Naval Medical Center in Washington D.C., actually in Bethesda, Maryland, which is in suburban Washington, D.C., and was an active duty naval officer and psychology intern for that year and then was assigned as a staff clinical psychologist at the Naval Submarine Medical Center in Groton New London, Connecticut. At that time that was the primary Atlantic seaboard submarine base for the Navy, and was a psychologist there at that medical center for about three and a half years.

I did a couple of years of part-time post-doctoral training at Yale University while I was there in Connecticut.

I then took an academic position for a couple of years and have participated very actively in continuing

Case 3:12-cv-00327-MOC Document 105 Filed 09/23/13 Page 242 of 250

1543

JA2414

United States of America vs. Aquilia Marcivicci Barnette       3:97CR23-V
Proceedings Before Judge Richard L. Voorhees                   8/7/2002

Page 3571

education across my career, and across the last, about the last 10 years have been very intensively involved in forensic psychology, continuing education.

Q.   In terms of the forensic -- you are here in terms of your forensic practice, is that right?

A.   Yes, ma'am.  It's hard to get away from the training as a clinical psychologist and the years of primary practice that I did counseling people about their problems and evaluating their problems, and so that always illuminates how I look at things, in terms of how development ends up affecting people as adults and how disturbances in their psychological makeup end up coming out in behaviors that are destructive to them and other people.  It's all kind of the same -- the forensic psychology is the application of that knowledge.

Q.   Have you ever been published in the area of forensic psychology?

A.   Yes, ma'am, I have.

Q.   Tell us about that, please.

A.   Across the last four or five years I have had eight peer reviewed publications that I have been first author of or have coauthored, including one that's in press currently, that means it's past peer review but hasn't physically come out in the journal yet.  It's due

Reported By: Scott A. Huseby, RPR
800-333-2082se 3:12-cv-00327-MOC  Document 105  on (704) 333-9889  Page 243 of 250 372-4593
Huseby, Inc., an AF    Filed 09/23/15
1544

JA2415

out in about a month.

I am the first author of a book chapter that is also in press in the comprehensive handbook of psychology. It's a 12-volume series that is intended to represent psychology as it exists, kind of the state-of-the-art of the science at this point in time. Two of my reports that have been sanitized for identifying information have been published in a case book that just came out this last year as models or examples of forensic reports, one involving capital sentencing and another involving competency to be executed. And then there are some teaching points that have also been included in that volume that I authored. And then I have also written some invited papers at a -- of a scholarly nature but not of a peer reviewed stature.

Q. Are you licensed in any particular field in terms of psychology? Do you have a license?

A. I'm licensed as a psychologist in these states.

Q. And you have board certification?

A. Yes, ma'am. I'm board certified in forensic psychology by the American Board of Professional Psychology. That's the board certification organization that is recognized by the American Psychological Association, and that diplomate or board certification

Reported By: Scott A. Huseby, RPR
800-333-2082      Huseby, Inc., an AA      (704) 335-9889      Fax (704) 372-4593
Case 3:12-cv-00327-MOC   Document 105   Filed 09/23/15   Page 244 of 250
1545

JA2416

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/7/2002

Page 3573

status is with examination and a lot of ordeal. You can be boarded in clinical or counseling or school, industrial, neurophysch, family, a number of different specialty areas, including forensic psychology.

Q. How many board certified forensic psychologists are there in the United States?

A. In forensic psychology, fewer than 200.

Q. Do you teach any kind of continuing education for other psychologists to further their training and maintain their currency in training?

A. Yes, ma'am, I do. As a board certified forensic psychologist, I'm a fellow of the American Academy of Forensic Psychology, and one of the primary goals of the Academy is to elevate the standard of practice as it comes into the courtroom. That doesn't mean teaching psychologists how to be more persuasive or to be slicker, but it instead involves trying to equip them with the best perspective and knowledge available about what issue they are evaluating, and also helping them become aware of the best available research that can be brought to bear on those issues.

And on three or four occasions over the last several years I have given full day workshops under the auspices of the Academy on capital sentencing evaluation, teaching psychologists how to engage and

Reported By: Scott A. Huseby, RPR
800-333-7082 Huseby, Inc., an A. ion (704) 333-9889 Fax (704) 372-4593
Case 3:12-cv-00327-MOC Document 105 Filed 09/23/15 Page 245 of 250
1546

JA2417

United States of America vs. Aquilia Marcivicci Barnette          3:97CR23-V
Proceedings Before Judge Richard L. Voorhees          8/7/2002

Page 3574

conduct and what resources and research to bring to bear in those evaluations.

Q.   In addition to teaching do you also continue to take courses and advance your own knowledge in the area?

A.   Oh, yes, ma'am.

Q.   How do you do that?

A.   I do it by going to continuing education myself, and I'm a very active student and enjoy continuing to learn, and so I go to lots of workshops.

Q.   To what professional organizations do you belong that are relevant to your testimony here?

A.   As I said, I'm a fellow of the American Academy of Forensic Psychology; I'm a member of national, state, and local psychological associations; I'm listed in the national register of health service providers, which is sort of a review of clinical capabilities; I am also listed in what is called a CPQ, which is intended to ease psychologists moving between different licensing jurisdictions by serving as a clearinghouse for their credentials, that somebody has reviewed those and found them to be bona fide and so then can make that report to the various licensing agencies.

Q.   Now, Dr. Cunningham, you testify around the country in cases such as this.  Do you normally testify more for the defense or for the government?

Reported Bv: Scott A. Huseby, RPR
800-333-2082   Case 3:12-cv-00327-MOC  Document 105   Filed 04/23/15  Page 246 of 250   (704) 372-4593
1547

JA2418

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/7/2002

Page 3575

A.   In capital cases I have only been asked to perform evaluations or to come to testify by the defense.  I have never been asked by the government in a capital case.

Q.   Would you perform such an evaluation and testify if the government had you participate in an evaluation and asked you to testify?

A.   Oh, yes, ma'am.  I don't have a personal agenda or opinion about the death penalty and would be glad to consult with the government.

Q.   Have you ever conducted an evaluation that did not prevent the execution of a person?

A.   Oh, yes, ma'am.

Q.   Would you tell the jury about that?

MS. TOMPKINS:  Objection.

THE COURT:  Sustained.

BY MS. LAWSON:

Q.   Do you feel that you have been biased in performance of your duties in any way?

A.   No, ma'am.

MS. TOMPKINS:  Objection.

THE COURT:  Sustained.  Members of the jury, do not consider that last answer.

BY MS. LAWSON:

Q.   Dr. Cunningham, have we asked you to conduct an

Reported By: Scott A. Huseby, RPR
800-333-2082   Case 3:12-cv-00324-MOC   Document 105   Filed 09/23/13   Page 247 of 260   372-4593
1548

JA2419

United States of America vs. Aquilia Marcivicci Barnette       3:97CR23-V
Proceedings Before Judge Richard L. Voorhees       8/7/2002

Page 3576

evaluation of Marc Barnette?

A.   Yes, ma'am.

MS. LAWSON:   Your Honor, at this point we would ask that he be qualified as an expert in clinical and forensic psychology.

THE COURT:   He will be so declared, and the jury will remember the usual instructions that I have given in the case of each expert.   Thank you.

BY MS. LAWSON:

Q.   In the course of your evaluation did you prepare a report, a written two-page report of the issues that you felt were important?

A.   Yes, ma'am.

Q.   And would it be fair to say that you are addicted to Power Point presentations?

A.   Yes, ma'am, that's a fair characterization.

Q.   Let's get started with the number of visits you have had with Marc Barnette and the documents that you reviewed in connection with your testimony.

A.   Yes, ma'am.   I interviewed Marc Barnette on four different occasions, for a total of just over 18 hours of interview time.

I also interviewed his mother, Sonia; his father, Derrick; his brother, Mario; his aunt, Shelia; Steve Austin, his good friend; a Brian Ard, who was his

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/7/2002

Page 3577

supervisor at Camelot Music; Chanda Nero; Tony Harrison, who was at the Mecklenburg County Jail.

I interviewed police officer Elizabeth Joy, who had had contact with him associated with a couple of his arrests. I also interviewed, and some of these were by telephone because of the distances involved, I also had a telephone interview with Sally Johnson, who was the psychiatrist who was in charge of his evaluation at Butner, the federal medical facility, when he was evaluated there.

There were also some individuals that I attempted to contact that I made telephone calls to that either their numbers had been disconnected or I left messages with the answering machine and didn't hear back from, and that included Tina Davis, who was a family friend; Alicia Chambers; Crystal Dennis; Natasha Herd; and also Gene Barbour. And then there was a jailer, Greg Griffith, who I also attempted to contact. And then there was another jailer, Captain Allen Cobb, who I spoke to briefly and he was going to retrieve some records and get back with me and we didn't end up making contact. But those are the individuals who I interviewed directly.

In terms of records that I reviewed, I reviewed offense reports, transcripts of this and prior

Reported By: Scott A. Huseby, RPR
800-333-2082          Huseby, Inc., an Aff          m. (704) 333-9889          Fax (704) 372-4593
Case 3:12-cv-00327-MOC   Document 105   Filed 09/23/15   Page 249 of 250
F550

JA2421

United States of America vs. Aquilia Marcivicci Barnette    3:97CR23-V
Proceedings Before Judge Richard L. Voorhees    8/7/2002

Page 3578

proceedings, past mental health records and evaluations, including the Butner records as well as past testimony of experts, medical records, correctional records, school records, a suitcase full of records.

Q. In addition to all of that, have you been here in court since Monday?

A. Yes, ma'am.

Q. What conclusions have you drawn, just generally, before we get started, about Marc Barnette and his functioning, his development?

A. Marc Barnette's development was damaged by a number of fundamental factors, and that damage placed him at substantially greater risk for disturbed romantic relationships, for criminal activity, and for criminal violence in the community.

Q. Beginning with your Power Points, can you talk about what relationships -- before we do that, did Marc Barnette have a choice in what he did?

A. Oh, yes, ma'am.

Q. Could you explain that, please?

A. There is no indication that Marc Barnette was psychotic at the time of these offenses or that he was so mentally retarded or deficient that he did not know what he was doing. He recognized the wrongfulness of his behavior. He exercised volition or choice. If he

Reported By: Scott A. Huseby, RPR
800-33  Case 3:12-cv-00327HMOC Incoument 105  Filed 09/03/59889age 250 of 250 04) 372-4593
1551

JA2422

United States of America vs. Aquilia Marcivicci Barnette          3:97CR23-V
Proceedings Before Judge Richard L. Voorhees          8/7/2002

Page 3579

was not able to do those things, then we wouldn't be here, then he would be not guilty by reason of insanity. And so this is not really about did he have a choice, did he know right from wrong, but rather what shaped the choice, what shaped his value system, a concept not of criminal responsibility but rather moral culpability. And in that sense the critical issue is that we don't all have the same choice. He had a choice, not the same choice I would have, but the choice that you get after you get done with his development.

Q.   You have a series of slides in your machine that will help illustrate that, or at least illustrate your testimony today?

A.   Yes, ma'am. A critical issue in psychology associated with choice, here is the person and here are what we would consider to be the bad outcomes, psychological disorder, drug dependency and criminal activity, and the issue is how does this person get over here and how does choice operate in this person getting to these bad outcomes.

Well, if when you are growing up there is no family history of alcohol or drug dependence and there is no family history of psychological disorder and there is no developmental abandonment or instability, that's the foundation that your life is on, and typically here

Reported Bv: Scott A. Huseby, RPR
800-333-2082          Huseby, Inc., an Aff          (704) 333-9889          Fax (704) 372-4593
Case 3:12-cv-00327-MOC   Document 106   Filed 09/23/15   Page 1 of 249
1552

JA2423

United States of America vs. Aquilia Marcivicci Barnette          3:97CR23-V
Proceedings Before Judge Richard L. Voorhees                8/7/2002

Page 3580

is what is a part of that, you have an intact family where there is acceptance and affirmation, and a good deal of stability and predictability and structure, where there is consistency and your parents are doing the right thing, they are modeling positive values, not only in what they tell you, but in how they behave, and then you have sustained relationships with other stable peers and your choices then rest on top of this whole structure.

Now, if this is what your life looks like, you can still get to the bad outcomes, but it's quite a leap to get there, it's not easy to get to those bad outcomes.

If, though, you have a family history of substance dependence or psychological disorder, it's as if you've ramped this thing up just a little bit. And if there is model substance abuse, if folks in the home are drinking and drugging in front of you, that ramps it up some more; and if you have developmental trauma, abandonment, or instability, it ramps it up even more. Now, if somebody who is in this position begins to drink and drug themselves, it's almost as if you've put this things on rollers.

Of course, the problem is, if this is how you have grown up, then typically none of these are present

Reported By: Scott A. Huseby, RPR
Huseby, Inc., an Af
800-333-2082                                                        Fax (704) 372-4593
Case 3:12-cv-00327-MOC   Document 106   Filed 09/23/13   Page 2 of 249
1553

JA2424

Page 3581

in your life and instead you look more like this. Now, this person has a choice, not the same choice that I would have growing up like Leave It to Beaver. It's a choice that sits on this kind of ramp.

Now, the height of that ramp, the angle of it, is what we are looking at when we look at moral culpability, what kind of angle was the choice sitting on, because depending on what that slope is, those two people don't have the same life, they have a -- the same choices, and so that's a critical issue in terms of why we look at family background or how somebody was damaged.

Q. Isn't this sort of excusing behavior by blaming abuse?

A. Kind of an abuse excuse?

Q. Yes.

A. Not according to the United States Department of Justice, it's not.

Q. And you brought a slide about that?

A. Yes, ma'am. The U.S. Department of Justice is looking at this same kind of model as they try to prevent criminal violence in our society.

The Department of Justice has an agenda of reducing criminal violence in this country. One way to do that is to lock people up after the fact, after the

Case 3:12-cv-00327-MOC  Document 106  Filed 09/23/15  Page 3 of 249
1554

JA2425

Page 3582

crime, only then you already have a victim.  Much better if you can prevent that violence from happening in the first place.

And so the increasingly the Justice Department is trying to identify how that violence can be prevented. Now, they are looking at in these approaches processes that are going to interrupt what causes the problem behavior, and that is the language of the Justice Department, they are seeking to interrupt processes that cause this serious violent chronic early offending in the community.

And as they do that they identify -- the research talks about risk factors that increase the likelihood of delinquency and violence, and also protective factors that would buffer somebody from that occurring.  Now, that's critically important, because we look around and recognize that everybody that grows up and is physically abused or is neglected in some way or their parents divorce, clearly those people don't all go on to commit acts of criminal violence.

And so the question becomes how do we account for some people going on to criminal violence and others not.  And as the Justice Department looks at that, they are seeing this in terms of risk and protective factors and the relative balance of those, and the strongest

Reported By: Scott A. Huseby, RPR
800-333-2082   Case 3:12-cv-00327-MOC   Document 106   Filed 09/23/13   Page 4 of 249   (704) 372-4593
1555

JA2426

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/7/2002

Page 3583

prevention, then, is to decrease the risk factors and increase the protective ones.

Q. What are some examples of things that our society, at least our government, are implementing in order to reduce risk factors? Can you think of some, like Head Start or --

A. Yes, ma'am. Head Start, boys and girls clubs, youth sports grants to try to get kids involved in positive activities, family strengthening, interventions for single moms, public housing even, as you are trying to provide an economic floor for families so that they can have some stability, but increasingly things that are targeted toward kids at school with their recreation and supports for family systems.

Q. We have heard a lot of testimony about Marc in his early years, Dr. Burgess talked about the first couple of years.

A. Yes, ma'am.

Q. Do you have a slide about the risk factors in early childhood during those periods that you consider relevant to Marc?

A. Yes, ma'am. These are the factors that were identified by the Justice Department that are present. These increase the risk if they are present between conception and age 6, and I have listed all of the ones

Case 3:12-cv-00327-MOC    Document 106    Filed 09/23/15    Page 5 of 249
1556

JA2427

United States of America vs. Aquilia Marcivicci Barnette          3:97CR23-V
Proceedings Before Judge Richard L. Voorhees          8/7/2002

Page 3584

that were identified in this 1995 Department of Justice

study, and then I've put red check marks beside the risk

factors that were present in Marc's background.

Q. Starting with the first one that you have a red

check mark by, what information do you have that led you

to conclusions in your report about family history of

criminal behavior and substance abuse, as it relates

particularly to Marc?

A. The substance abuse is the alcohol abuse of his

mom, as well as descriptions that Marc, Mario, and Ahmad

had, things that sure looked like drug abuse, adults

going into the bathroom together and staying in there

for a long time, coming down and the room being full of

a funny smelling smoke, the descriptions of his mom's

pattern of drinking across his development, but

particularly in his early adolescent years when it

seemed to increase.

Q. What about family management problems, what

does that mean in this context?

A. Family management problems involve a number of

things. It means that the -- if you have a little child

that you don't have continuing predictable structure, if

you are moving from place to place, if the care of the

child is rotating between adults on an inconsistent

fashion, if the discipline in the home is erratic or

United States of America vs. Aquilia Marcivicci Barnette          3:97CR23-V
Proceedings Before Judge Richard L. Voorhees          8/7/2002

Page 3585

abusive, so that, for example, Marc' father was overdisciplining him or responding to him in an abusive fashion while his mother might not be present at all at times to supervise him or keep up with what he was doing, and so you have highly unstable management of the family. The financial management was erratic as well.

Q. Family conflict, what things did you take into consideration when you marked that with a red mark?

A. That involves the degree of conflict that was present between Derrick and Sonia, their chronic martial problems, also conflicts that were present parent to child in terms of Marc's really mixed feelings about his mama, as he loves her on one hand and yet she is going out and leaving him and there is not food in the refrigerator but yet she has money for a new dress to go out in, those kinds of things that represent a continuing climate of conflicting emotions and feelings and attitudes.

Q. Let me ask you this: What you are testifying about, do you give tests to determine this information to get to these risks factors, or how do you get to those?

A. These are not psychological diagnoses or psychological processes. These are simply descriptions of what the environment is, and that's based on what

Reported By: Scott A. Huseby, RPR
800-333-2082          Huseby, Inc., an Affi          n  (704) 333-9889          Fax (704) 372-4593
Case 3:12-cv-00327-MOC  Document 106  Filed 09/23/15  Page 7 of 249
1558

JA2429

United States of America vs. Aquilia Marcivicci Barnette          3:97CR23-V
Proceedings Before Judge Richard L. Voorhees          8/7/2002

Page 3586

descriptions are present for multiple individuals about what this was like. And so as I get reports from Mario and Ahmad, and Marc as well, and then mom and dad on some of it, they tend to minimize it, but they own some of this as well, then there are a number of people who are all confirming the historical accuracy of these.

Q. The last one, parental attitudes, tell us about that. What information have you learned about that?

A. A couple of pieces here. One of them involves mom's involvement in drug and alcohol abuse. As mom then is dating a guy that is described as a leading drug dealer. That conveys a condoning of criminal behavior as a lifestyle. If that's who you're dating, if that's who your boyfriend is in front of your children, that's an endorsement of that kind of attitude. So there is both direct modeling of substance abuse and also behavior by association that endorses it.

Q. Are you blaming Marc's mother for what he did?

A. No, ma'am. This is not a function of blame. It's a matter of trying to -- it's a matter of trying to account for how we ended up with the tragic loss of life of these two human beings, of Donnie and Robin, who did not deserve to die.

Now, typically somebody doesn't get to that all by themselves. I mean, they didn't grow up usually like

Reported By: Scott A. Huseby, RPR
800-333-2082   Case 3:12-cv-00327-MOC   Huseby, Inc. Document 106   Filed 09/23/15 (704) 333-9889 Page 8 of 249   Fax (704) 372-4593
1559

JA2430

United States of America vs. Aquilia Marcivicci Barnette     3:97CR23-V
Proceedings Before Judge Richard L. Voorhees     8/7/2002

Page 3587

Leave It to Beaver and one day just then go out and commit a double homicide. So when we try to account for how we got there, we're likely to encounter that there were a number of the critical people in this person's life who failed them along the way. Now, ultimately the choice they made was their own, but it wasn't a choice that they made in a vacuum.

Q. I imagine that your next slide is age 6 to someplace.

A. Yes, ma'am, it is.

Q. You have more red marks. Tell us about that slide.

A. Transition and mobility, particularly across Marc's first four years of life. He was bouncing from pillar to post with his mom, and I will talk about that in a few minutes. But he is there with his grandma in that household, then he goes to his dad's household, then back with grandma, then grandma is murdered herself, then they go back to dad's, then to sister Tessie, I think back to Charlotte. They are bouncing all over the place. And then when Sonia and Derrick get married, there are more moves that happen, so very unstable geographic situation across the early years of his life. That instability occurs again after his parents divorce when he is 11 and there is a shifting of

Reported By: Scott A. Huseby, RPR
Huseby, Inc., an Af      on (704) 333-9889
800-333-2082     Fax (704) 372-4593

Case 3:12-cv-00327-MOC   Document 106   Filed 09/23/15   Page 9 of 249

1560

JA2431

United States of America vs. Aquilia Marcivicci Barnette        3:97CR23-V
Proceedings Before Judge Richard L. Voorhees        8/7/2002

Page 3588

residences and schools.

Q. Well, a lot of people move, and they don't all wind up doing what Marc did.

A. Yes, ma'am. But two parts of that. First, if that's the only thing that is going on, is the moves, then it may not have a negative effect on you. If you are in the military, you've got two parents that love each other, it's a stable family, the military environment is familiar to you as well and you move once a year, that may not do anything but let you see lots of different parts of the country and help you learn to relate to people quickly.

If you are someone, though, who is socially vulnerable and it's not easy for you to make friends or if, in fact, your parents don't stay together and there's a lot of chaos at home and things are not very stable there and you have some other vulnerabilities, then that factor, along with many others, may, in fact, put you in harm's way.

Q. What is the next one you have checked?

A. Availability of firearms, which is a pretty widespread social vulnerability in this country, as is immediate portrayals of violence.

Others that we picked up on before, the family management problems, family conflict, criminal attitudes

Reported By: Scott A. Huseby, RPR
800-333-2082        Huseby, Inc.        (704) 333-9889        Fax (704) 372-4593
Case 3:12-cv-00327-MOC   Document 106   Filed 09/23/15   Page 10 of 249
1561

JA2432

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/7/2002

Page 3589

favorable toward crime and substance abuse. Ultimately he ends up failing in school and being truant and dropping out of school and having favorable attitudes toward delinquent, or at least violent behaviors himself in terms particularly of relationships in a domestic context.

Q. Now, there are some up there that you haven't checked. Are those -- is the risk factors, that thing that you have under Department of Justice model, is that everything that they list?

A. Yes, ma'am, I've listed all of the factors that this study identified, and then I've put red check marks by the ones that are present in his background, and he doesn't have all of the risk factors, he has a good many of them.

Q. Your next slide is what, adolescence to adulthood?

A. Well, that's this one. This is as far as we go, because we are just looking at what is formative up to adulthood.

The next slide looks at protective factors that were identified in this study, and those include -- they are grouped into different types.

For example, under individual characteristics, if you were female, that's an incredibly powerful

Reported By: Scott A. Huseby, RPR
800-333-2082          Huseby, Inc., an Affi          n  (704) 333-9889          Fax (704) 372-4593
Case 3:12-cv-00327-MOC   Document 116-206   Filed 09/23/15   Page 11 of 249
1562

JA2433

United States of America vs. Aquilia Marcivicci Barnette    3:97CR23-V
Proceedings Before Judge Richard L. Voorhees    8/7/2002

Page 3590

protective factor to keep you from going on into violent behavior yourself. It's not that girls are unaffected by being damaged when they're growing up; it's just that the damage ends up coming out in other ways. They become sexually active early, very early, end up dysfunctional relationships or are depressed or anxious or abuse drugs. They don't pick up a gun and hurt somebody in most instances.

If you are intelligent, and typically what we mean here is college bound intelligence, really bright and capable, then when you get to school, it's a place of great success for you and you get a lot of attention from your teachers and even if things are out of control at home, at school you really do well. Now, I have got a check mark beside this in Marc's life, but it maybe should be kind of a check minus. His IQ score as it's been measured is in the mid 90's range, between 92 and 98 in a full scale IQ score, and so he is just a little bit below or kind of right in the average range, and typically to view this as a protective factor we want to see somebody in the high average range, 115, 120, that kind of thing. But in fairness, he did have some intellectual capabilities, and so I identified that as a partial protective factor.

Positive social orientation means that you show

United States of America vs. Aquilia Marcivicci Barnette     3:97CR23-V
Proceedings Before Judge Richard L. Voorhees     8/7/2002

Page 3591

some inclination to be constructive and do the right thing.  For example, when Marc is a little kid up through kind of early adolescence, he sort of assumes a parent role in the family and is looking after his little brother and is looking after Ahmad then, a little bit later, and he is putting them in the back room and being protective of them, tried to keep up with them, get them in for their meals, look after them.  He is not just hitting the streets himself.  It's not like when he is 12 years old he is a junior drug dealer.  He is still at home trying to do the right thing.

Marc consistently seeks employment, again, not out robbing and selling drugs, but is trying to be gainfully employed and mostly brings the money home to support whatever household that he is a part of.  He even keeps seeking long-term relationships. Technically, they are not monogamous.  He still goes out on these women, but he keeps seeking a long-term love ideal relationship even if he cannot be entirely faithful there himself, so there is some indication of positive social orientation.

Resilient temperament is the notion that for whatever reason some people just bounce back really well.  If you have more than one child, you probably noticed that those kids were different from the moment

JA2435

United States of America vs. Aquilia Marcivicci Barnette    3:97CR23-V
Proceedings Before Judge Richard L. Voorhees    8/7/2002

Page 3592

they were born in terms of kind of how they could handle disruptions in their schedule or stresses or other things, and so that resilient temperament varies from person to person.

Social bonding to a positive role model, if you have a really powerful positive anchor, that can be so valuable for you. Had Marc's father stayed actively involved in his life, had they been in the same town and his dad was getting with him a couple of times a week across his adolescence, that might have been enough to have been the anchor that let him hold on in spite of some of these adversities.

Q. Excuse me, Dr. Cunningham, is that the case even though Marc perceived his father to be engaging in excessive or abusive discipline?

A. That excessive discipline history reduces the extent to which his dad can be this constructive person. He needed somebody in his life who was consistently there in a responsible, adult, caring, assertive, good citizen that loved him and was anchored to him. That's what they're talking about. If you have somebody like that, that can be a powerful protective factor. They can't be a thousand miles away and say, call me if you need me. They have got to be at hand to deliver something to you.

Reported By: Scott A. Huseby, RPR
800-333-2082    Case 3:12-cv-00324-MOC    Document 106    Filed 04/23/15    Page 14 of 249    (704) 372-4593
1565

JA2436

Page 3593

Q.    What about the things that were going on in the family between mother and father and his reactions to that that has some relevance to the family members and his father's role in his life?

A.    Well, the models that Marc had in his family of origin were not healthy in many ways. His parents were continuously suspicious of the other one being unfaithful and very actively accused each other of that infidelity on a chronic, ongoing basis. There was some reason for that. There is some evidence that, in fact, both of them were being unfaithful to the other one at least from time to time. Those accusations then rose to them being violent with each other, mutually violent, and ultimately his dad being more aggressive about that than his mom. So you didn't have folks present with him that we would consider to be, gee, I would like to send my kid to that house because there are some real positive models there.

Q.    And you have two check marks there for positive -- are those protective kinds of functions --

A.    To a very limited degree. I'm assuming, since he ran track, that there were likely some coaches that took some interest in him there, and he had a really good friend, Steve Austin, that has been a continuing lifelong friend, so there was a little bit of protection

Case 3:12-cv-00331-MOC Document 106 Filed 09/23/15 Page 15 of 249

JA2437

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/7/2002

Page 3594

from those.  There were not healthy beliefs and clear standards of behavior that promoted nonviolence and abstinence from drugs.  In fact, it was just the opposite.  And there were not effective early interventions.

Q.  Why did Marc need early interventions based on your review of the history and as you pointed out in your report?

A.  Very early when Sonia is a mother at 14 years old, that's a pretty obvious disaster waiting to happen, 14-year-olds just don't make very good mamas.  That's a time for some pretty intensive social intervention without a report to child welfare that somebody is being neglected -- when she is in the hospital and she is having a baby at 14, that's a need for an ongoing case worker to be assigned to this girl and this family to help her find some stability and some nurturance there. They needed to stay in one place and not get bounced all over the place.

I mean, it's tough when your father is psychiatrically and physically disabled, as Jessie was, and your mom has been murdered and you're 14, 15 years old and you have a baby.  We are already in harm's way. I mean, it's a case for a social work agency.  There is lots of intervention and support that is needed there.

United States of America vs. Aquilia Marcivicci Barnette     3:97CR23-V
Proceedings Before Judge Richard L. Voorhees     8/7/2002

Page 3595

Q. Are there any other interventions that you, in terms of his childhood, that you think would have been appropriate?

A. Oh, yes, ma'am. As there are domestic conflicts that are occurring, there was clearly a need for both of his parents to be in marital counseling and to be in anger management classes themselves.

I think they needed some parenting instruction. Marc needed to be involved in positive youth activities, in scouting, in athletics, in a boys and girls club.

There needed to be some interventions to keep Derrick plugged in after the divorce so that he was present emotionally in a more ongoing sort of way. Sonia essentially stopped being a parent in many ways when she went down to Atlanta and starts going out with Shelia much of the time.

So there are interventions and social supports that were needed for the parents, and then counseling assistance for Marc.

When his father told him that he was not his biological father, if there was ever a kid that needs to go to therapy at that point, it was Marc. When you are growing up in a family where the parents are beating each other up, gee, that's a kid that needs somebody to talk to. He is going to need some counseling

Reported By: Scott A. Huseby, RPR
800-333-2082   Huseby, Inc. an A..   (704) 333-9889   Fax (704) 372-4593
Case 3:12-cv-00327-MOC Document 106 Filed 09/23/13 Page 17 of 249

1568

JA2439

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/7/2002

Page 3596

assistance.

Q.   What about when Tosha would find him sitting in a closet naked crying?  I guess if you had seen that going on, what recommendation would you have made at that point for intervention?

A.   He needed to see a mental health professional on an ongoing and long-term basis, particularly with the history that would have been taken from him about what had happened to him up to that time.  It appears that he was significantly depressed on a somewhat fluctuating basis, whether there was some medication support that could have been helpful, certainly he needed some counseling support, needed lots of advising and intervention about the way he went about his relationships.

Q.   What do you have next that illustrates and backs up and explains your report?

A.   Well, this next slide is about a follow-up study that was done by the Department of Justice, this one much more extensive in reviewing all of the existing research virtually that had been done up to this time, and this time identifying individual -- breaking it up not by ages but instead by types of risk factors.

And so we identify individual factors.  Again, I have listed all of them and put check marks beside the

Reported By: Scott A. Huseby, RPR
800-333-2082  Huseby, Inc.  (704) 331-9888  (704) 372-4593
Case 3:12-cv-00327-MOC  Document 106  Filed 09/23/13  Page 18 of 243

1569

JA2440

United States of America vs. Aquilia Marcivicci Barnette 3:97CR23-V
Proceedings Before Judge Richard L. Voorhees 8/7/2002

Page 3597

ones that were present in Marc's history. You will notice this after these, some of them, there is a parentheses like here, X2-5. Some of the studies reported odds ratios. In other words, if the child were hyperactive, there is a two to five times greater likelihood of ending up in serious delinquency or violence by early adulthood just from that factor alone, regardless of what other factors are present.

And then very importantly, this Justice Department study identifies that the risks are cumulative, that it's not just one risk and another risk, but it's A plus B plus C; and as you add on risk factors, you are steadily increasing the likelihood of a criminally violent outcome.

The large group of factors, risk factors, that were present in Marc's life are these family factors, and I think that that has some relationship to why his violence has substantially been in a family setting.

Q. Before we go there you have some check marks under individual factors. Let's not skip anything here.

A. Yes, ma'am. The aggressiveness doesn't become apparent until Marc is a teenager and he begins to get involved in romantic relationships, and so I think the first thing that happens is the abuse of Tosha and some confrontations with males in the context of a

Reported By: Scott A. Huseby, RPR
800-333-2082        Huseby, Inc., an Afi        on (704) 333-9889        Fax (704) 372-4593
Case 3:12-cv-00327-MOC   Document 70-6   Filed 09/23/15   Page 19 of 249
1570

JA2441

United States of America vs. Aquilia Marcivicci Barnette    3:97CR23-V
Proceedings Before Judge Richard L. Voorhees                8/7/2002

Page 3598

relationship with a woman, early initiation of violent behavior. That refers to these, the beatings of Tosha, the violence that he had with his female partners. And he had beliefs that were -- that allowed that, that were consistent with it. Now, they are not beliefs that just hatched out of nowhere. These are beliefs that are a pretty natural product of growing up in a family system where the parents are mutually accusatory and are fighting and yelling and cussing and hitting each other. But he ends up being a product of that kind of belief system.

Q. Now, on aggressiveness, would that include the shooting of Anthony Britt? You are familiar with that?

A. Oh, yes, ma'am.

Q. Marc testified that it was essentially he felt threatened. Was that an act of aggressiveness that you are talking about, or some qualification?

A. First it's a problem that he was carrying a gun. The fact that he got in a fight with Anthony Britt is -- that I think would not be considered an act of early aggressiveness. That would just be a fight. That he is carrying a fun, that elevates it in aggressiveness.

Now, there is perhaps some reason why he is feeling vulnerable. He is of small stature, Anthony

United States of America vs. Aquilia Marcivicci Barnette    3:97CR23-V
Proceedings Before Judge Richard L. Voorhees    8/7/2002

Page 3599

Britt apparently has some reputation, and Anthony Britt even brings along a couple of friends in this intention. So I sympathize with the feeling threatened; but when he is this age and he is carrying a handgun, that is -- I think he is off this early aggressive indicator.

Q. Is there anything -- well, anything about the aggressiveness, at least when you are talking about youth violence, that is outside the scope of sort of family oriented domestic stuff?

A. In his life?

Q. Yes.

A. No, ma'am. I believe that all of the violence that is identified with Marc Barnette has a family connection to it, or a domestic connection. Much of it involves violence toward female partners. We have the shooting of Anthony Britt, which is about a domestic conflict. It's about their competition over Tosha.

There is an instance where he gets in a fight with a guy at school who was involved with, I think may have been involved with Tosha or one of the other girls that he was involved with.

The abuse of Crystal's children occurred again in a family context where he is operating essentially as a father figure, except he is there as a stepparent and doesn't have the same degree of legitimacy that you

Reported By: Scott A. Huseby, RPR
800-333-2082          Huseby, Inc., an Aff         n (704) 333-9889          Fax (704) 372-4593
Case 3:12-cv-00327-MOC  Document 206  Filed 09/23/15  Page 21 of 249

JA2443

United States of America vs. Aquilia Marcivicci Barnette 3:97CR23-V
Proceedings Before Judge Richard L. Voorhees 8/7/2002

Page 3600

might otherwise have, and that also has a family context.

So his life history of violence I see as being connected to these primary relationships, dysfunctional relationships with women and his behaviors within a family setting.

Q. Let's talk about the family factors now --

A. Yes, ma'am.

Q. -- the ones that you've checked. Tell us about those and how they apply to Marc and to your findings in your report.

A. Well, there are two types of child maltreatment that are present. There is actual abuse. Those are things like his father whipping him so that he leaves welts on him, or punching him. There is also one of mom's boyfriends, Al, who on occasion also punches Marc.

Another type of child maltreatment is neglect. As Sheila is leaving these children overnight while she goes out to clubs, even for a couple of days at a time disappearing, that is very obvious neglect.

Q. Did you mean Sheila or Sonia?

A. I'm sorry, Sonia. As Sonia is going out and leaving Marc, taking care of Mario overnight, you know, on one occasion where Derrick discovers that that's the case and goes over and picks up the kids, but it is

Reported By: Scott A. Huseby, RPR
800-333-2082  Huseby, Inc., an Af...   (704) 333-9889   Fax (704) 372-4593
Case 3:12-cv-00327-MOC  Document 106  Filed 09/23/13  Page 22 of 249
1573

JA2444

United States of America vs. Aquilia Marcivicci Barnette    3:97CR23-V
Proceedings Before Judge Richard L. Voorhees    8/7/2002

Page 3601

happening much more routinely after that, as they're down in Atlanta, as Mario testified to. So you have both abuse and neglect, and some of the neglect is earlier in his background.

The third type of child maltreatment involves this domestic violence that's happening in front of the child. That also is kind of a corruptive and vicarious violence experience.

Poor family management practices we have talked about. That's the lack of structure in the home, the lack of consistent discipline, low levels of parental involvement. This includes Sonia going out while dad and the kids are at home, which is not a good sign for a mom to do on a repeated, multi time a week basis. And then as she is -- when she and Sheila are going out together and they are leaving their children unattended overnight, or they just come in from work, change clothes, the kids go to the refrigerator and look for TV dinners and try to scavenge some food, that injures the child not only because the parent is not there, it's what it says about what kind of feeling does mom have for these kids. If you are a mama and you can go out and leave your kids like that, what does that say about the glue that is supposed to be there between you and this child. So that part is even more damaging than the

United States of America vs. Aquilia Marcivicci Barnette          3:97CR23-V
Proceedings Before Judge Richard L. Voorhees          8/7/2002

Page 3602

fact that the kids are having to scavenge.

Q.    In your report you talk about primary attachment instability.  Is that sort of the same thing that you are talking about here?

A.    Yes, ma'am.  At the point that -- by the time he is 11 years old and Sheila and Sonia are going out together, that is really past the zone of primary attachment that we are talking about.  The years of primary attachment that I'm mostly concerned about are zero to five.

The point is, though, when you've got a mama who is 14 years old, you are already concerned about her ability to attach in a positive way.  Then later, when mama is going out and leaving these kids like this unattended and not taking care of them, it makes you -- it gives you some inference about the poor quality of care.  If this how she is behaving when she is 26, what was the quality of care when she was 14 and 15?

Q.    What is the next one?

A.    Poor family bonding and family conflict. That's related to this attachment issue, the bonding is, dad ends up being absent across the first four years of his life, with the military and with being out of town as Sonia and Marc leave the community after the grandma is killed, the ongoing family conflicts that exist

Reported By: Scott A. Huseby, RPR
800-333-2082          Huseby, Inc.          (704) 333-9889          Fax (704) 372-4593
Case 3:12-cv-00327-MOC   Document 106   Filed 09/23/15   Page 24 of 249
1575

JA2446

United States of America vs. Aquilia Marcivicci Barnette     3:97CR23-V
Proceedings Before Judge Richard L. Voorhees     8/7/2002

Page 3603

between Derrick and Sonia.

Residential mobility I talked about, that was very extensive during the first four years of life and then picks up again after age 11. That has a plus, minus after it because some of the studies show that residential mobility is a risk factor, and other studies don't show that, and so it seems not to be just mobility alone but mobility in the presence of other risk factors.

Q. The next one is parental attitudes?

A. Yes, ma'am. And the next one is parent child separation, which you have from his father repeatedly across the first four years of his life. Then his father is substantially separated from his life after age 11 and then kind of -- his mother is physically present but emotionally absent, functionally absent, across the adolescent years as well.

Q. If these are family factors, how do you explain Mario, his development, and how he is now?

A. And that's a real good question, since they grow up in the same family setting. There are a number of differences that I would point out that I think may help account for why Mario's outcome has been better than Marc's.

Number one, Mario may have a different father.

Reported By: Scott A. Huseby, RPR
800-333-2082   Huseby, Inc., an A...   ...ion  (704) 333-9889   Page 25 of 249   Fax (704) 372-4593
Case 3:12-cv-00327-MOC   Document 106   Filed 09/23/15   Page 25 of 249
1576

JA2447

Page 3604

We only know that Derrick is not their father.  We don't know that they share the same father, and they were conceived four years apart from each other.  So they may share a different genetic heritage in terms of their dad.

During Marc's first four years of life, he's got a 14-year-old mama who is moving from pillar to post repeatedly and his dad is largely absent from his life.  First Sonia goes to live with her dad, then she goes out of state and lives with Tessie.  During that period of time, Derrick is only seeing Marc maybe three or four times a year, relatively brief visits.  Then Derrick goes off to the military and they don't see much at all during the time that he is in basic.  During the year or so that he is in Omaha, they are with him for six months of that, then his is gone again for a year, year and a half overseas to Okinawa.  So his dad is effectively absent during this early time of his life.  When Marc is born, though, dad is getting out of the military and he is present.  So Marc's first four years of life, he has his mom and dad there.  The relationship between them is going about as well as it does, and he has an 18-year-old mom, not a 14-year-old mom.

When he gets older, Mario has somebody who is bigger than he is helping run interference for him, who

Reported By: Scott A. Huseby, RPR
800-333-2082     Huseby, Inc., an Aff     n (704) 333-9889     Fax (704) 372-4593
Case 3:12-cv-00327-MOC  Document 106  Filed 09/23/15  Page 26 of 249
1577

JA2448

Page 3605

is taking him away from the domestic violence, who is helping him get his dinner, who is calling him in from the street. So he has some experience of security that there is somebody bigger than he is who is looking after him, as opposed to Marc who doesn't have that.

Let me add one other thing about that. Mario has not escaped clean from this, either. I asked Mario about whether he has been violent with his partners --

MS. TOMPKINS: Objection.

THE COURT: Sustained.

BY MS. LAWSON:

Q. Okay. What other factors are significant besides the two that you've got here?

A. This Justice Department study also identified school factors, peer related factors, and community neighborhood factors. Really the only ones that I saw that applied to Marc were these school related factors, and those in many ways are kind of a by-product of the chaotic family setting.

Q. You have a slide that talks about balancing --

A. Yes, ma'am.

Q. -- risk and stuff. Would you use that to illustrate your testimony about the risk factors and the factors that protect children?

A. Yes, ma'am. As we look at this Justice

Reported By: Scott A. Huseby, RPR
800-333-2082    Huseby, Inc. an Aff...    ...    (704) 333-9889    Fax (704) 372-4593
Case 3:12-cv-00327-MOC    Document 106    Filed 09/23/15    Page 27 of 249
1578

JA2449

Page 3606

Department research about the nature of cumulative risk factors, our cumulative protective factors, if you have lots of risk factors and not many protective factors, then your likelihood of violence in the community is becoming increasingly great.  It's a cumulative weight effect.

Alternatively, if you have lots of protective factors and not many risk factors, then your likelihood of violence is not very great.  And as we try to identify this notion of who is going to be violent in the community, it is substantially a function of balancing how much risk factor, how much protected factor by this Justice Department analysis.

Q.   Now, you talked about these factors in general --

A.   Yes, ma'am.

Q.   -- but how do -- do they apply directly to Marc and show us that slide.

A.   Yes, ma'am.

Q.   In what way?  Do you want to go back a second? You had a point to make with that, didn't you?

A.   Yes, ma'am.

Q.   Tell us why you brought that slide in.

A.   This is a function of, as we look again at this question of choice and what the Justice Department does

Reported By: Scott A. Huseby, RPR
800-333-2082          Huseby, Inc. an Aff.          (704) 333-9889          Fax (704) 372-4593
Case 3:12-cv-00327-MOC-DCK Document 106   Filed 09/23/15   Page 28 of 249

1579

JA2450

United States of America vs. Aquilia Marcivicci Barnette       3:97CR23-V
Proceedings Before Judge Richard L. Voorhees       8/7/2002

Page 3607

with choice in this analysis of risk, the bottom line is they don't address choice at all in their analysis of the risk and protective factors for serious violence by young adulthood.

The reason that they don't focus on choice I think is this: If you have lots of protective factors and not many risk factors, you mostly make good choices. And if you have lots of risk factors and not many protective factors, you are really at risk for bad choices.

Now, prevention doesn't do much good just to try to get somebody to tell them they need to make a better choice. Prevention involves rebalancing the scales so that folks make better choices, because you have reduced the risk factors and added on protective factors.

Q. You made a slide that illustrates the elements, the features in Marc's life that are specific to what you just talked about generally.

A. Yes, ma'am.

Q. That's next. Tell us about that.

A. As I looked at specific emotionally damaging factors beyond those that are kind of in conjunction with those that were described by the Department of Justice, those include a family legacy of dysfunction and domestic violence and domestic homicide, a teenage

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/7/2002

Page 3608

mother, chronic domestic conflict and observed violence, physical abuse, paternity disillusionment and abandonment by his father, his mother's neglect, substance abuse and corruptive attitude, emotional abuse, sexually traumatic exposures, disrupted peer relationships, and personal victimization.

Q. Are those the things that you saw in Marc's background?

A. Yes, ma'am.

Q. Explain the emotional abuse.

A. Emotional abuse is leaving the children unattended. It's telling them that you are going to the store when, in fact, you are going out for the evening. It's the fighting and violence in front of them. It's not scarring their body, and they may still be getting enough to eat, it's not like they are starved to death, but you are scarring this kid's soul by the way that you treat him.

Q. What evidence is there in Marc's history of sexually traumatic exposures?

A. There are a number of parts of that, and I'm not talking about him being molested. You can be injured in this sexual channel without somebody directly molesting you or fondling you.

The things that happened to him that were

Reported By: Scott A. Huseby, RPR
Huseby, Inc. 1-800-333-9898 (704) 372-4593
Case 3:12-cv-00327-MOC Document 106 Filed 09/23/15 Page 30 of 249

1581

JA2452

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/7/2002

Page 3609

damaging to him on this circuit I think involved at the age of five, six, seven, finding his uncle's pornography that is quite explicit and the depicting genital sexual acts between adults. In addition, the access to his father's Playboys.

Whether it's out of some of that exposure or out of the chronic accusations of infidelity that are happening between his parents, or an absence of supervision, he ends up sexually experimenting, kind of becoming sexually aware very early so that he is engaged in sex play with an older female cousin by the age of seven and first has penetration at about age 10, then is sexually active with peer females by the time he is 13 or so.

MS. TOMPKINS: Objection. There's been no evidence of that.

THE COURT: Members of the jury, don't consider that last remark.

BY MS. LAWSON:

Q. Personal victimization, Dr. Cunningham, why does that apply and in what way to Marc?

A. Well, that involves the instance where he was beaten up by several peers when he was a kid, and his mom described his attitude being different about that, including having less interest in school and greater

Reported By: Scott A. Huseby, RPR
Huseby, Inc., and Associates (704) 333-9889
800-333-2082                                                              Fax (704) 372-4593

Case 3:12-cv-00527-MOC, Document 106   Filed 09/23/15   Page 31 of 249

1582

JA2453

United States of America vs. Aquilia Marcivicci Barnette    3:97CR23-V
Proceedings Before Judge Richard L. Voorhees    8/7/2002

Page 3610

withdrawal.

The other primary victimization was when he was shot by his cousin, with going through his hand, shattering his femur, resulting in there being a rod in his leg. That's a very significant event when you think about being a young adult, late adolescent, young adult male who defines himself in terms of his physical body, and here Marc has been a track star and now it hurts for you to walk and you limp and you are self conscious, and then there is this reality that in your own home you can be shot by a relative. That changes your experience of yourself and the world around you.

Q. Now, being real candid about all of this, Marc inflicted a certain amount of those elements of on his girlfriends?

A. Yes, ma'am, he did.

Q. And not everybody who has these things happen to them wind up killing people?

A. That's correct. It's a -- part of it is a function of risk factors and protective factors. It's not unlike trying to explain why some kids get cancer and some kids don't. Sometimes the neighborhood will be built on top of the toxic waste dump. The way they figure it out is some kids start to get cancer. They don't all get cancer, maybe only one kid in ten does;

United States of America vs. Aquilia Marcivicci Barnette    3:97CR23-V
Proceedings Before Judge Richard L. Voorhees    8/7/2002

Page 3611

but the rate of cancer in the surrounding community is 1 in 500. That's why we know something toxic is coming out of the soil. That doesn't have to get to everybody in order for to us know that that is a significant risk factor. So these are things that placed him more at risk, that helped initiate this trajectory that ended so tragically.

Q. Were you here yesterday when Mario testified about being told that his other grandmother had been poisoned?

A. Yes, ma'am.

Q. Have you received that report from other people who you interviewed in connection with this evaluation?

A. Yes, ma'am.

Q. Who has told you that and do have some more information on this legacy?

A. Yes, ma'am. Do you want me to describe the specifics or talk about --

Q. Sure, and then relate it to.

A. Let me skip over this. In terms of the depth of his paternal grandmother -- I describe stepgrandmother because this is Derrick's mother and Derrick is technically not Marc's father, biological father, and so I have her identified as the stepgrandmother. She died when Derrick was in the Air

Reported By: Scott A. Huseby, RPR
800-333-2082    Huseby, Inc., an Affi          n (704) 333-9889          Fax (704) 372-4593
Case 3:12-cv-00327-MOC  Document 106  Filed 09/23/15  Page 33 of 249
1584

JA2455

United States of America vs. Aquilia Marcivicci Barnette    3:97CR23-V
Proceedings Before Judge Richard L. Voorhees    8/7/2002

Page 3612

Force, late in his tenure in the Air Force.  She died of a cerebral hemorrhage, apparently, at least that's what was believe, but the family believes and talked among each other that they thought, in fact, that she was poisoned by her boyfriend at that time.

Derrick described that being a concern that he had had.  Other family members described their belief in that as well, so that this is part of the -- it's part of the family belief system.  Whether she was poisoned or not, these kids are growing up with some thought in their mind that their dad's father was poisoned by their boyfriend.  They also have knowledge that their mom's mother was shot and killed by her boyfriend.  And so that's part of the legacy of who my family is, is that grandmas have been killed on both sides.

His maternal grandfather, Jesse Cooper, was a Korean war veteran who was physically and psychiatrically disabled and also alcoholic.  His maternal grandmother, Pearl Cooper, had chronic conflicts with Jesse in their marriage, they divorced in 1971 when Tonia was 13, and she then she is murdered by gunshot by her second husband in 1974 when Marc is about 10 months old.

Derrick's father, Tom Barnette, was described as an alcoholic.  Derrick's parents divorced when he was

Case 3:12-cv-00324-MOC Document 106   Filed 09/23/15   Page 34 of 249
1585

JA2456

United States of America vs. Aquilia Marcivicci Barnette 3:97CR23-V
Proceedings Before Judge Richard L. Voorhees 8/7/2002

Page 3613

five. His mom ends up dying suddenly or being poisoned. Then Derrick is only 16 himself when Marc is born, so he has a 16-year-old father and a 14-year-old mother. He and Sonia have chronic conflicts about her fidelity, and there are physical fights with her, including hitting her with a hammer on occasion. Sonia's 14 when Marc is born, she is engaged in loud fights and physical exchanges with Derrick. One of her boyfriends, Marc Regan, ends up being a homicide victim himself, and then she is abusing alcohol and drugs herself.

Q. I have got to skip over a couple of slides. Can you -- do they illustrate your testimony relative to your opinions about Marc Barnette?

A. Yes, ma'am.

Q. Can you back them up?

A. Let me go forward one and then back one, if I could. As we look at this family legacy, one aspect of the importance of this legacy is that a child is predisposed through heredity to substance and alcohol abuse, to psychological disorders, to personality disorders. Many ways just like with heart disease and high blood pressure, there are a lot of predispositions that have a genetic component to them. And in Marc's background, there is a genetic predisposition to substance dependence by history in his family members,

Reported By: Scott A. Huseby, RPR
Huseby, Inc., an A ... iom ...
800-333-2082 (704) 333-9889 Fax (704) 372-4593

Case 3:12-cv-00327-MOC Document 106 Filed 09/23/13 Page 35 of 249

1586

JA2457

United States of America vs. Aquilia Marcivicci Barnette          3:97CR23-V
Proceedings Before Judge Richard L. Voorhees          8/7/2002

Page 3614

and also to psychological or personality disorders.

Family history also makes a difference, because family behavior patterns and effects are multigenerational. That means that you can see the same pattern from generation to generation in many instances. Now, some of that is from what we call scripts. Those are kind of the ideas of how my life is supposed to go that I never even much stopped to think about. Like it just never occurred to me that I would get married before I was in my early 20's, because my parents didn't and no one else in the family did. I never really thought about going to college or not, because that was always part of the script in the family.

Now, in Marc's family the scripts involved relationship instability that goes back to his grandparents. It involved distrust and infidelity. He has got -- the man who killed Sonia's mom was pathologically jealous and domestically violent himself.

There is a script of premature parenting. Sonia was 14 when Marc was born, and her mother, Pearl, was 15 or 16 when Tessie, her first child, was born, and they think that her mother was also a teenager, but we couldn't get the records identified to anchor that, but you at least have grandma to mama, and then Marc becomes a parent in his mid teens as well, so you have this same

Reported By: Scott A. Huseby, RPR
Huseby, Inc.
800-333-2082          (704) 333-9889          Fax (704) 372-4593
Case 3:12-cv-00327-MOC   Document 106   Filed 09/23/15   Page 36 of 249
1587

JA2458

United States of America vs. Aquilia Marcivicci Barnette     3:97CR23-V
Proceedings Before Judge Richard L. Voorhees     8/7/2002

Page 3615

pattern one generation after another of premature

parenting, as well as parental neglect and abandonment

that goes back generations.

There is also modeling, which means that part of how you learn to be who are and how you relate to other people is by imitating what is going on in your family, by imitating your parents, and it's the sense of catching yourself and realizing that you are doing something exactly the way that your dad would do it or your mom would do it even without thinking about it. The modeling that he had was for domestic violence and for substance abuse and dependence, and for parental irresponsibility in many respects.

There is also what is called sequential damage, and that's the idea that if grandma wasn't there by death or by neglect and didn't do a very good job with mama, then when mama comes to adulthood or adolescence, she is damaged herself, and as good a job as she might like to do as a parent, she has been damaged, so she doesn't end up doing a very good job, she damages the next generation, she doesn't parent them effectively, so you see how this can go from generation to generation to generation as they sequentially damage one another. The sequential damage in this family system includes the substance dependence of parents and abandonment by

Reported By: Scott A. Huseby, RPR
800-333-2082     Huseby, Inc., an AI Communications Company     (704) 333-9889     Fax (704) 372-4593

Case 3:12-cv-00327-MOC, an AI Document 106    Filed 09/23/13    Page 37 of 249

1588

JA2459

United States of America vs. Aquilia Marcivicci Barnette          3:97CR23-V
Proceedings Before Judge Richard L. Voorhees                      8/7/2002

Page 3616

parents and also the death of a parent.

Q.    Does this illustrate the points in your report about corruptive modeling, is that what you are talking about?

A.    Yes, ma'am.  Corruptive modeling is in this area here, and also with these scripts, as generationally the adults in the family have interacted in an unstable way with this infidelity and distrust and violence and having babies at 15, 16 and neglect, all of that is having a corruptive influence on the value system and the personalities of the kids that are growing up in that system.

Q.    Now, Mario had some of the same scripts and modeling.  Let's talk again about Mario and how he did not do what Marc did.

          MS. TOMPKINS:  Objection to what Mario did.

          THE COURT:  Sustained.

          BY MS. LAWSON:

Q.    Mario didn't kill two people --

          MS. TOMPKINS:  Objection to what Mario did.

          THE COURT:  Sustained.  You will have to rephrase your question.

          BY MS. LAWSON:

Reported By: Scott A. Huseby, RPR
800-336-2092    Case 3:12-cv-00327-MOC   History Inc.   Document 106    Filed 09/23/15   (704) 333-9889   Page 38 of 249   Fax (704) 372-4593
1589

JA2460

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/7/2002

Page 3617

Q.    Did you hear -- I will just go forward.  Please show us your next slide and tell us how it relates to your report and your conclusions about Marc.

A.    Yes, ma'am.  This arena of -- the factor of primary disruptive attachments is I think this most important thing that helps understand Marc Barnette and accounts for his domestic violence and ultimately for his participation in this offense, and that's the idea that in those first four years of life he did not have a solid anchor to a parent figure who was present and nuturing in his life.

Now, that's just fundamentally important to the development of personality, and that's the foundation that everything else rests on.  We intuitively know that.  Even though you can't remember things that happen to you before the age of four, we are so terribly careful about our kids at that age and spend so much time loving them and holding them and interacting with them and trying to keep them on a regular schedule, and that's not just so that they won't be cranky, that's what is helping make them solid as people.  That's what is equipping them to care about and be able to love somebody else some day and have a stable personality themselves.  And so as that is fractured and disrupted in Marc' development, then in adolescence and early

Reported By: Scott A. Huseby, RPR
Huseby, Inc., an A           ion (704)       889
800-333-2082                                                          Page 39 of 245  372-4593
Case 3:12-cv-00327-MOC-  Document 106  Filed 09/23/15  Page 39 of 245
1590

JA2461

Page 3618

adulthood, when he tries to relate to other people and be close to them, he does it in a destructive way.

Now, the power of primary disruptive attachments here is something that psychology -- nobody in psychology really disagrees that family relationships and the quality of those early attachments are fundamental to how a child is going to value other members of society as an adult. That's the conclusion, even of the FBI's behavioral science unit as they studied a particular type of homicide, at the core of that, they found that these guys, that these perpetrators --

MS. TOMPKINS: Objection, no foundation.

THE COURT: Overruled.

THE WITNESS: They found in this research that at the core of the cause, the core ideology of this homicide was that they had faulty attachments, the family relationships were disturbed and the glue didn't stick between the members of the family the way it was supposed to.

THE COURT: You may ask another question.

BY MS. LAWSON:

Q. Do you have any other examples of disruptive primary attachments in Marc's life?

A. Yes, ma'am. We have talked about Sonia being

Reported By: Scott A. Huseby, RPR
800-336-2082    Case 3:12-cv-00032-RJC Document 106    Filed 09/23/15    Page 40 of 249    (704) 372-4593
1591

JA2462

Page 3619

14 and Derrick being 16. That was birth. Then from birth to age 10 months, Marc's care is shared by Sonia and Shelia and Pearl and also a baby-sitter that they had, and this is with Sonia being 14, 15 years old and going back to school. Marc's care is with a baby-sitter during the day. Sonia covers him for a few hours when she comes home from school, and then it looks like Pearl picks up in the evening hours.

Then at 10 months Pearl was murdered with Marc in the next room when this happens, not that he can remember Pearl being murdered, but that's now part of -- that's part of what you know about yourself and your family, that when you were 10 months old, your grandma was murdered in the next room.

Now, to the extent that Pearl was potentially his primary mama at that point -- if she was engaged in parenting like most moms would be of a 14- or 15-year-old, there is a good likelihood that she in an emotional way was Marc's mama. Now she is suddenly absent at a pretty critical juncture. At the very least we know that Sonia as a 14-, 15-year-old has lost her mama, and that's going to have an effect on what she can bring to bear in trying to take care of Marc.

Q. What is the next slide that you have that helps describe and demonstrate your findings in your report?

Case 3:12-cv-00327-MOC   Document 106   Filed 09/23/15   Page 41 of 249
1592

JA2463

Page 3620

A.   Well, when we look at what effect does that have on Sonia and her ability to be a mama or potentially on Marc if, in fact, he is losing his emotional mama at this age -- when a parent dies, it's not just one event, but it changes almost everything about the child's life, about Sonia's life.  It pervades most aspects of the child's life.  It reaches to the core of the way that he makes sense of the world around him.  And it's a potential long-term increased risk for all kinds of things, from psychological disorders to coping problems to depression, alcoholism, suicide, intimacy and autonomy, marital difficulties, criminal activity.  To have a parent taken from you in your developmental years before the age of 18 is a catastrophic blow.  And depending on what other risk factors you have present at that time is kind of going to determine just how much effect does it have.

Q.   Is this your construct in terms of this is your personal opinion of what happens when you have a potential increased risks?

A.   No, ma'am.  A lot of the slides have this little writing down at the bottom, and that represents the peer reviewed study or journal article or Justice Department source that these findings were taken from, so this is -- these are the findings of an article by

Page 3621

Finkelstein that was published in 1988 that is a review of the literature on what long-term effects -- they are reviewing the scientific studies that have been done up to this time regarding the long-term effects of a parent dying on you during your childhood.

Q.    What do you have next that illustrates your opinions expressed in your report?

A.    From age one to two, Sonia, Shelia, and Marc live with Jesse, that's her father, and Sonia goes back to high school.

Then from two to three Sonia, Sheila, and Marc live with her older sister, Tessie, and Sonia's brother-in-law, Jeff Nero, and Sonia goes back to high school.

Age three, Sonia and Marc join Derrick in base housing in Omaha for about six months.  Then Sonia and Marc come back to Jeff and Tessie's house while Derrick is overseas for a year, is gone again.

Then from age three to four Sonia and Marc are moving back and forth between Charlotte and Columbia.

At age four Derrick returns from Japan, and Sonia, Marc, and Mario join him in North Dakota.  That's the disruption that is happening across these formative first four years of life.

Q.    Now, where did you get the information that you

Reported By: Scott A. Huseby, RPR
800-333-2082    Huseby, Inc., an Afl    m  (704) 333-9889    Fax (704) 372-4593
Case 3:12-cv-00327-MOC  Document 190-106  Filed 09/23/15  Page 43 of 249
1594

JA2465

United States of America vs. Aquilia Marcivicci Barnette                    3:97CR23-V
Proceedings Before Judge Richard L. Voorhees                    8/7/2002

Page 3622

have given us here?

A.    This came from interviews of Sonia and Sheila and Marc and Mario and Derrick, and I'm piecing together a chronology of what was happening at different ages.

Q.    Okay.    Tell us -- show us the next slide.

A.    This is not the end of his attachment story. You can say okay, that's what happened from age four, but, gee, when he's four his dad joins the family and things are all different.    And, in fact, there was much more stability in many ways than this early period of time represented.    At least the same adults are physically present from day to day.

There were continued injuries, though, in this attachment process.    Between the ages of four and eleven Sonia didn't intervene during Derrick's extended beatings of Marc.    When I interviewed Sonia four years ago, she described that the beatings would sometimes last 15 or 20 minutes and she would go to the bathroom because it was so disturbing to her.    Now, usually you think about a spanking lasting 15 or 20 seconds, and she is talking about physical blows that are occurring across 15 or 20 minutes of time.

From age four to eleven Sonia, not initially, but with time, she starts going out by herself without Derrick to clubs once a week or every other week, and

Reported By: Scott A. Huseby, RPR
Huseby, Inc.
800-333-2082                                                          Fax (704) 372-4593

Case 3:12-cv-00327-MOC   Document 106   Filed 09/23/15   Page 44 of 249

1595

JA2466

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/7/2002

Page 3623

that gradually increases to several nights weekly. And then after they separate and when Marc and Sonia and Mario move down to Atlanta, then she repeatedly chooses clubbing and boyfriends and her own preferences in needs over the welfare of the kids, both in terms of leaving them unsupervised and also spending money on going out and outfits as opposed to groceries.

And then also an element in this disruptive attachment are what I describe as Sonia's pretense and Derrick's abandonment.

Q. Now, Derrick's abandonment, are you referring to his divorce or separation from Sonia or other factors that you think might have had some effect on primary attachments?

A. Well, the abusive discipline -- Derrick is kind of a mixed figure in Marc's life during the years before the divorce. On one hand there is this physical violence that is abusive in nature that's leaving bruises and welts. At the same time he is also doing things with Marc and is going places with him and is engaging him in fatherly kinds of activities, so you have got these two things that are happening at the same time. So there is some attach, although it's disturbed by the violence that's occurring between Derrick and mom and Derrick to Marc.

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/7/2002

Page 3624

The abandonment that I'm speaking of primarily, though, involves what happens after the divorce. Derrick has long thought that these children might not be his, particularly Mario, because he did the math and he was overseas when he is thinking that Sonia should have gotten pregnant with Mario. And so he has the paternity testing done and it identifies that neither of these children are his.

This creates a dilemma about what you are going to do. Do you tell these boys that? Do you tell them that you are not their biological father or not?

Now, the fact that he takes them to a nice restaurant to tell them about this in no way diminishes the enormous impact that that is for your dad to tell you that he is not really your dad.

Now, he tells them at that point that he still loves them, that nothing has changed, that he is still their father and he is going to be there for them, but the reality is that his participation in their life is fundamentally different after that. He doesn't pay child support. Now, after all, these are not his biological children.

MS. TOMPKINS: Objection to the narrative, nonresponsive to the question.

THE COURT: Members of the jury, we will

United States of America vs. Aquilia Marcivicci Barnette          3:97CR23-V
Proceedings Before Judge Richard L. Voorhees                         8/7/2002

Page 3625

take our break at this time, afternoon break.

(The jury left the courtroom.)

(Brief recess.)

THE COURT: One administrative matter. Doctor, when did you come up with your latest 60 or so page Power Point presentation?

THE WITNESS: Monday -- Tuesday morning I think is when I finally cut it down to the ones I was using. I came with the body of them Sunday night, and I cut them -- I did some more work on them on Monday and had the final set I think Tuesday morning.

THE COURT: So you are saying that they were in preparation over what period of time?

THE WITNESS: Over the past -- some of these I created but didn't use in 1998, and others of them I have been working on over the past, I think I did some several months ago and then some over the past couple of weeks, much of it in the last seven days.

THE COURT: Any questions on that?

BY MS. TOMPKINS:

Q. Dr. Cunningham, you've known that you were going to testify in this case for some time, correct?

A. Yes, ma'am.

Q. Two years or so?

A. You know, I can't remember when I was

Reported By: Scott A. Huseby, RPR
800-333-2082          Huseby, Inc., an Aff.          (704) 333-9889          Fax (704) 372-4593
Case 3:12-cv-00327-MOC   Document 106   Filed 09/23/15   Page 47 of 249

1598

JA2469

United States of America vs. Aquilia Marcivicci Barnette     3:97CR23-V
Proceedings Before Judge Richard L. Voorhees     8/7/2002

Page 3626

recontacted. By this defense team I was kind of informally retained I think in about March, but I was contacted by someone else earlier and had some sense that I might be back in this case.

Q. But you understand that the defense had notified the Court on April 15th of this year that you would, in fact, be an expert witness in this case?

A. Yes.

Q. Were you aware of a court order that required experts to produce their reports by June 25th, 2002?

A. No, ma'am.

Q. Defense counsel didn't tell you that there was a deadline for your report?

A. Not that I recall.

Q. And part of this presentation that you have been giving us today was prepared by that point, a portion of it?

A. Yes, ma'am. Some of these slides were already prepared prior to June 25th.

Q. And defense counsel clearly had spoken to you beforehand about the nature of your testimony today?

A. Yes and no. The anticipation had been that my testimony would largely be risk assessment, or at least that was the greater likelihood, but then advised me, I think when I came back out this last time in June that

800-333-2082     Huseby, Inc. - An Affiliate     (704) 333-9889     Fax (704) 372-4593
Case 3:12-cv-00327-MOC-DCK Document 106     Filed 09/23/13     Page 48 of 249
1599

JA2470

United States of America vs. Aquilia Marcivicci Barnette    3:97CR23-V
Proceedings Before Judge Richard L. Voorhees    8/7/2002

Page 3627

they definitely wanted me to work up -- I remember when I came out in July, July 8th, that there was a discussion about going ahead and working up mitigation for sure at that time, but I had been working on it to some extent before that time and had prepared some things back in 1998.

Q.   So part of it was done in 1998, you were refining the content of your presentation into June and early July?

A.   Yes, ma'am, even as late as this last weekend.

Q.   But you were never told by defense counsel that there was a pretrial deadline for your report?

A.   No, ma'am.

MS. TOMPKINS:  Okay.

THE COURT:  Any questions?

MS. LAWSON:  Yes, sir.

BY MS. LAWSON:

Q.   Dr. Cunningham, is this your report, this presentation?

A.   No, ma'am.

Q.   When did you write your report?

A.   I provided a report in January 1998, I think, January 14th.  I can look.

MS. TOMPKINS:  Do you have a copy of it there?  I'm sorry.

Reported By: Scott A. Huseby, RPR
800-333-2082    Huseby, Inc., an Al    on (704) 333-9889    Fax (704) 372-4593
Case 3:12-cv-00327-MOC  Document 106  Filed 09/23/15  Page 49 of 249
1600

JA2471

Page 3628

THE WITNESS: Yes, I do.

THE COURT: You may look at it.

MS. TOMPKINS: Can I mark it?

THE COURT: You may.

MS. TOMPKINS: Just for the purposes of this.

THE WITNESS: Watch your step.

BY MS. TOMPKINS:

Q. I will call it Government's Exhibit 100 for lack of a better word. And this is what you are purporting to be your report, is that correct?

A. Yes, ma'am.

Q. And that was completed in January of 1998?

A. That's correct.

MS. TOMPKINS: I'm not going to admit that again, but I will hand it up for the Court' perusal.

THE COURT: What we ought to do is make a copy of it so the doctor can have his copy.

MS. TOMPKINS: Would you give that to the clerk for the moment. Do you need a copy?

THE WITNESS: Only if I'm asked about it.

THE COURT: Any other questions?

MS. LAWSON: Yes, Your Honor.

BY MS. LAWSON:

Q. In that report, Dr. Cunningham, do you set out

Reported By: Scott A. Huseby, RPR
800-333-2082          Huseby, Inc., an A...          ...on (704) 333-0889          Fax (704) 372-4593
Case 3:12-cv-00327-MOC   Document 106   Filed 09/23/15   Page 50 of 249
1601

JA2472

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/7/2002

Page 3629

everything that you are testifying today in terms of your conclusions?

A.    In a general and summary fashion.  This is only a single paragraph, and it describes that there are multiple mitigating issues are present which are likely to be relevant to a jury in sentencing.  These include primary attachment instability and insecurity, childhood geographic instability, multigenerational domestic violence scripts, observed domestic jealousy and violence, paternal abandonment, corruptive modeling, vulnerability to alcohol abuse, depressive and posttraumatic symptoms, poor parental supervision and instruction, and other developmental factors.  These mitigating factors form a nexus to the instant offense.

So this describes in a very general fashion, certainly the presentation today is much more specific in elucidating these factors and includes some additional damaging developmental factors besides those that, I guess I'm referring to them here as other developmental factors.  There are some others that I have identified here that are specifically named that are not present in the report.

Q.    Is there any other report that you have made in connection with this case?

A.    There are affidavits that were filed in this

Reported By: Scott A. Huseby, RPR
800-333-2082          Huseby, Inc., an Affi          n  (704) 333-9889          Fax (704) 372-4593
Case 3:12-cv-00327-MOC  Document 106  Filed 09/23/15  Page 51 of 249
1602

JA2473

Page 3630

case. There is my testimony at the prior proceedings that I think mentions catathymic, chronic catathymic process, or homicide, but I don't recall another report.

Q. Now, you have -- some of these slides that you have got are static in that you use them almost every time you testify, is that right?

A. Yes, ma'am.

Q. For instance, the things from the Department of Justice where you talk about general development and risk factors?

A. Yes, ma'am. The slides about the factors that have been identified by the United States Department of Justice, I have used those in testimony in state and federal capital cases where I have talked about mitigation for over a year. They have different check marks on them. The scales I have used for some time. And as I talk about what the impact is of various damaging developmental factors, many of those also represent research studies that I have used in other state cases and other federal cases.

Q. And to your knowledge, do prosecutors have these actual slides, or the ones that you talked about that are static?

A. Yes, ma'am. My testimony is extraordinarily well-known to the office of the U.S. Attorney, because I

Reported By: Scott A. Huseby, RPR
800-333-2082   Huseby, Inc.   (704) 333-9889   Fax (704) 372-4593
Case 3:12-cv-00327-MOC   Document 106   Filed 09/23/13   Page 52 of 249
1603

JA2474

United States of America vs. Aquilia Marcivicci Barnette     3:97CR23-V
Proceedings Before Judge Richard L. Voorhees     8/7/2002

Page 3631

so routinely participate in federal capital cases. And I also have reason to believe that there is some pooling of information about what I'm testifying about between state and federal cases, because what happens in a federal case on cross will very quickly occur in the next state case that I'm in somewhere, so I get a sense that there may be some pooled information about my testimony in capital cases.

Q. You have no direct knowledge about whether this particular U.S. Attorney's office has that information?

A. No, ma'am, only that my routine experience is that there are many volumes of my testimony that are behind the U.S. Attorneys, assistant U.S. Attorneys that are questioning me or they refer to my testimony in other cases in ways that are quite consistent from one case to another.

THE COURT: We better not take any further time with it at this point. May we have the jury, please.

(The jury returned to the courtroom.)

THE COURT: The jury is with us.

MS. LAWSON: Thank you, Your Honor.

BY MS. LAWSON:

Q. Dr. Cunningham, when we broke off you were talking about Derrick's abandonment, and I think you

Reported By: Scott A. Huseby, RPR

800-333-2082    Huseby, Inc., an Af    on (704) 333-9889    Fax (704) 372-4593
Case 3:12-cv-00327-MOC Document 106 Filed 09/23/15 Page 53 of 249
1604

JA2475

Page 3632

were discussing child support.

A. Yes, ma'am. In the aftermath of the discussion at Steak and Ale where Marc and Mario are told by Derrick that he is not their biological father, he tells them that he is still going to be their emotional father and will still be there for them, but the relationship markedly changes after that.

One of things that happens is that he stops paying child support. Now, while he is not legally obligated to continue paying that, he's announced to them that he is still their father. And if you are somebody's father, then you are still involved in providing for their basic support. Now, that isn't that you provide for their basic support when they are kind of quid pro quo, when they are doing what you want them to, then you provide some support. As a father, you support your children's basic needs, and the part that you do the withholding on is the extra, do they get a TV in their room, what kind of access to a car do they get, what kind of spending money do they get, but you are making sure that they are supervised and educated and guided and there is some help with the rent and that kind of thing.

Now, Sonia, after this, is a single parent, and perhaps she doesn't very wisely disburse the money that

United States of America vs. Aquilia Marcivicci Barnette    3:97CR23-V
Proceedings Before Judge Richard L. Voorhees    8/7/2002

Page 3633

she has and her priorities perhaps are not what they should be, but there is simply not enough money to go around. And that translates for your sons, they don't have groceries in the house. And they don't have appropriate supervision and they don't have a consistent place to live that isn't a mixed family setting wherever all of the relatives have piled in together and you may have 10 people living in the house. So that withdrawal of financial support, on one hand you say, I'm still your father, but by the way, I'm not providing any substantial economic investment in your support from this day forward.

THE COURT: Wait for another question.

BY MS. LAWSON:

Q. You also talk about Sonia's pretense. Did you `make up a slide to illustrate your testimony and your report concerning that?

A. Yes, ma'am. Sonia's social presentation to the family is of being a committed wife and mother. That's the external appearance of things. Now, the reality is that there is false paternity, who she is represented to Derrick and the children is their biological father is not correct, that's a pretense. There is, in fact, infidelity as demonstrated by this false paternity, at the very least, as well as the clubbing and things.

United States of America vs. Aquilia Marcivicci Barnette 3:97CR23-V
Proceedings Before Judge Richard L. Voorhees 8/7/2002

Page 3634

There is open domestic conflict and fighting in front of Marc and Mario all the time while representing that this is a happy family, going out to clubs by herself without her husband, leaving the boys unattended when they get to Atlanta particularly. The supervision is inadequate. She is gone to clubs and is absent, and nobody is really looking after the kids and what they do. She is spending money on her lifestyle rather than on the bills, so that now they end up being evicted from their apartments and there is not a -- there isn't food in the refrigerator. That then causes recurrent household moves and puts them into a really chaotic household setting of moving from place to place or moving in with Shelia and having them changing partners that are in the house that include very marginal boyfriends. There is Al, who is described as a thug and a thief; and Mark Regan, who related in a nice way to the kids but was a major drug dealer.

Then as Marc is coming apart and is becoming involved in violent or delinquent behavior himself and the domestic violence, Sonia is covering for him. The police officer comes to the door, Officer Joy comes to the door, is asking whether or not Alicia is in the household, and Sonia says, no, that she is not, when, in fact, Alicia is sitting in a chair against the wall

Case 3:12-cv-00327-MOC Document 106 Filed 09/23/15 Page 56 of 249
800-333-2082 Huseby, Inc., an Aff 1607 n (704) 333-9889 Fax (704) 372-4593

JA2478

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/7/2002

Page 3635

inside the room. And so rather than seeing that this is a kid who is significantly at risk and needs some consequences brought to bear on him and also needs some treatment, she is covering for him.

The same thing happens when he is home after the fire bombing for six weeks. You would think at that point that you would call the police on your child before they ended up being caught in some kind of a sudden apprehension where there might be more violence or that you would be trying to bring some resources to bear instead of letting him not only sit and wait for the police himself, but become increasingly depressed in front of your eyes while you know that he has recently participated in a fire bombing. It's just baffling that there is this degree of inertia from people that would represent themselves as being --

MS. TOMPKINS: Objection unless he is expressing a professional opinion.

THE COURT: Sustained.

BY MS. LAWSON:

Q. What about neglect of interventions, is that essentially the same thing you were discussing?

A. Well, the interventions include getting him some counseling when Derrick tells Marc and Mario that he is not their dad or getting them involved in a boys

Case 3:12-cv-00327-MOC, Document 106   Filed 09/23/2019  Page 57 of 249

1608

JA2479

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/7/2002

Page 3636

and girls club program, getting counseling for him when he is participating in these domestically violent relationships.

Q. If Alicia Chambers Houston had come into the courtroom and testified that Sonia was a fake, is that consistent with what you are talking about here?

A. Yes, ma'am. I think that captures this falseness that puts Marc later at such risk, because then what he is presented with a female that he is vulnerable to who may, in fact, be loyal or caring about him, he has enormous distrust that what she is telling him he can't depend on. Well, it's understandable how you might learn that if what your dad has told you about loving you and being there for you you can't depend on and if mom has represented herself in this way while she has been somebody fundamentally different. How is it that he would learn to trust the woman that is in front of him?

Q. Your next slide has to do with maltreated children. Would you have -- can you just briefly tell us about this and what it shows?

A. Yes, ma'am. These are a couple of studies that are sponsored by the U.S. Department of Justice, and essentially what they show is that if you come from a background of maltreatment, of abuse and neglect, you

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/7/2002

Page 3637

are 20 to 25 percent more likely to end up being involved in criminal behavior or criminally violent behavior. It doesn't make you 100 percent likely. It increases your risk, though, significantly, about 20 or 25 percent.

Q. What is your next slide? Have we pretty well covered abandonment by father in your other slide?

A. Yes, ma'am. The only thing I might add is that as Sonia insists that the paternity tests were rigged, she leaves Marc and Mario to deal with this issue by themselves and then there is no shared reality of, okay, this is what happened, let me help you understand this. By denying it, Marc --

MS. TOMPKINS: Objection. There is no evidence of this.

THE COURT: Sustained. Members of the jury, don't consider that last comment.

BY MS. LAWSON:

Q. Do you know whether Sonia has ever affirmed the results of the paternity test?

A. Yes, ma'am.

Q. From whom did you get that information?

A. As I recall from Sonia. She described that the tests were rigged.

MS. TOMPKINS: Objection.

Page 3638

THE COURT: Sustained. Don't consider the last remark.

BY MS. LAWSON:

Q. Okay. Dr. Cunningham, you have another slide that discusses the literature about parental structure and what happens if it's insufficient?

A. Yes, ma'am, I do. There are two critical periods of time -- I guess three, when there is insufficient structure and supervision and discipline present in Marc's life.

Across the first four years of life, there is inconsistency in one person who is there on a caring, involved basis, and also there is not the degree of just environmental structure, you know, where you try to have your kids go sleep in the same bed at the same time with the same bed time ritual, with the same things that you do each day. That structure and routine is incredibly important to the formation of a healthy child.

And here is what happens: Children don't have much ability to structure themselves. They don't have good -- their brakes don't work so good, so you surround them with a lot of structure, a lot of predictability in their daily routine and very clear limits and discipline, and also the adults in their life behave in a very predictable fashion, that mom and dad act the

Reported By: Scott A. Huseby, RPR
800-333-2082   Case 3:12-cv-00327-MOC  Document 106   Filed 02/23/15   Page 60 of 240   Fax (704) 372-4593
1611

JA2482

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/7/2002

Page 3639

same way in an even routine, consistent sort of way, all of this structure around you, and what happens is over time that structure moves from the outside to the inside. And now you don't have to have mom at your elbow anymore, because mom is in your head.

The same sort of thing happens to you while you are in the military. That's why judges used to sentence delinquent kids to the Marines rather than prison. The idea was if you are in a highly structured context, that over a period of several years some of that structure will move from the outside to the inside and you will be able to control and direct your life more effectively.

1612

JA2483

United States of America vs. Aquilia Marcivicci Barnette    3:97CR23-V
Proceedings Before Judge Richard L. Voorhees    8/7/2002

Page 3640

Now, most of the time after somebody has been in the military you see some evidence of that. You can detect this is somebody who has been in the military. There is something about their bearing, some of that structure they never entirely shake.

Well, Marc doesn't have that kind of structure across the first four years of his life. Then when the routine is more consistent, you have got mom and dad in this chronic infidelity fight that they are in that is keeping their behavior all erratic.

Then in a very critical phase of early adolescence you don't have a male figure in the home to help set limits and mom bails out as a parent in terms of supervising. So now you don't have effective discipline during that phase.

Now, here's what happens when you don't have that structure around you that's there to move into the inside: There is grave risk to psychological health and positive socialization, self-control does not develop, and aggression can unfold. Children whose families fail to provide adequate supervision are more likely to exhibit delinquent behavior, and here's the bottom line, quite simply, lack of parental discipline and structure and consistency contributes to aggressiveness and predisposes to violence in the community. The notion

Reported By: Scott A. Huseby, RPR
800-333-2082    Case 3:12-cv-00324-MOC Document 106    Filed 09/23/13    Page 62 of 240    (704) 372-4593
1613

JA2484

United States of America vs. Aquilia Marcivicci Barnette                    3:97CR23-V
Proceedings Before Judge Richard L. Voorhees                    8/7/2002

Page 3641

that psychologists are opposed to discipline is entirely false, but it's very important that it's consistent and appropriate and with conventional even behavior and regular routines.

Q.    Dr. Cunningham, in your written report you include among your findings attachment instability, poor parental supervision, or something to that effect, domestic violence as things that are pertinent to Marc Barnette?

A.    Yes, ma'am, because we are trying to understand why doesn't he exert greater self-control, why does aggression erupt out of this person, where are the brakes.  Then the background of structure and discipline becomes very, very important to that consideration.

Q.    Does your next slide illustrate your contents of your report about that?

A.    Yes, ma'am.  This is a -- Marc Barnette behaves in an injurious way in the relationships, the close relationships of his life repeatedly, with Crystal, with Tosha, with Alicia, with Robin, so it becomes fundamentally important to identify where does this come from, this relationship disturbance that he has.

Now, the ability to relate to other people in a positive, caring way, in a healthy way, is not so much something that you see or that you learn about, it is

Reported ~ ~ ~ ~useby, RPR
800-333-2082    Huseby, Inc., an ~    ndin (704)/333-9889    Page 63 of 240(704) 372-4593
Case 3:12-cv-00327-MOC   Document 106   Filed 09/23/15   Page 63 of 240
1614

JA2485

Page 3642

more like something that you catch, that you absorb through your skin by living in that.

The way you learn how to be healthy in relationships is to be in healthy relationships as a kid; and when you don't catch it, when what you catch is violent and unstable and insecure, then that's how you behave on the other side. So this is kind of a description of, or a summary of the nature of relationship injuries to kind of recapitulate this, all the way from the youthfulness of his parents, which was a dramatic risk factor as he was starting out, to the shifts in care, in Sonia's mother's murder and the changes in residences, his dad's absence, mom's drinking and partying, he's physically abused by his father, Sonia and Derrick are fighting frequently with public fist fights and chronic accusations of infidelity. Then they divorce and there is the paternity testing. Then Derrick is inconsistently involved with the boys. Sonia starts partying extensively and spends little time caring for her kids, and then Sonia is involved with abusive, marginal men, including one that physically abuses the boys; Marc and Mario were also left with their great aunt Hattie and family friends so that Sonia was free to travel with a boyfriend; he is prematurely sexualized; the move with the kids down to Atlanta, so,

Reported By: Scott A. Huseby, RPR
800-333-2082          Huseby, Inc. an Aff...          ...(704) 337-9889          Fax (704) 372-4593
Case 3:12-cv-00327-MOC   Document 106   Filed 09/23/13   Page 64 of 249
1615

JA2486

United States of America vs. Aquilia Marcivicci Barnette — 3:97CR23-V
Proceedings Before Judge Richard L. Voorhees — 8/7/2002

Page 3643

again, a very vulnerable age; at the beginning of high school he is separated from the network of friends that he has had across his middle childhood. That is something that all of us try to keep from happening to our kids, because we are concerned about drugs and dropouts, and we would sure like for them to go into high school anchored to the healthy peers that they've had from earlier. So soon after he has lost his dad and his paternity, now he loses his friends and his mom substantially bails out in terms of being present.

Now, part of way he tries to address that is to make these premature commitments. He is getting involved in relationships that are -- that involve adult sexual activity of intercourse that he believes should be committed the way adults are committed to each other, and now as a kid he has children himself. Now that not only means that -- I mean, by definition the girl that you date when you are 16 you are going to break up with. It's supposed to be that way. She has got to date you and some other people to figure out who she is.

MS. TOMPKINS: Objection.

THE COURT: Sustained.

BY MS. LAWSON:

Q. To what extent do the premature commitments that you indicated exist apply to the offense for which

Reported By: Scott A. Huseby, RPR
800-333-2082 Huseby, Inc., in A... (704) 333-9889 Fax (704) 372-4593
Case 3:12-cv-00327-MOC Document 106 Filed 09/23/15 Page 65 of 249
1616

JA2487

United States of America vs. Aquilia Marcivicci Barnette      3:97CR23-V
Proceedings Before Judge Richard L. Voorhees      8/7/2002

Page 3644

this jury is considering sentencing of Marc Barnette?

A.    I think it has a very significant connection. These premature commitments that he seems to have little sense of, that he is dealing with a 15 year old, when those fall apart, he regards those as some sort of terrible injury and betrayal of him when they are just simple developmental things that happen to all of us. Everybody gets dumped by the girlfriend they had when they were 16 and she finds somebody else. But because he has gotten prematurely attached and thinks that this is the love of his life and the mama of his children, then when that very predictable thing happens, he takes that as a tremendous injury. When he gets to Robin and is now getting old enough to make that kind of commitment, he is carrying this sense that he has been betrayed and abused by these women all along. Then when it happens with her, she catches the rage and the distrust and the anger not only for these relationships, but for what happened with his mom and dad as well.

Q.    In your written report you say that these factors that you have discussed form a nexus to the instant offenses?

A.    Yes, ma'am.

Q.    Can you explain that?

A.    Well, it forms a nexus in, really in three

United States of America vs. Aquilia Marcivicci Barnette    3:97CR23-V
Proceedings Before Judge Richard L. Voorhees    8/7/2002

Page 3645

ways. These are things that would put somebody at greater risk for criminal activity and violence of all sorts. They are broad risk factors. They also are the sort of background that we would anticipate seeing in someone who is domestically violent, where there is a history then of attachment damage and they have grown up with modeling of domestic violence. And it also relates to a particular type of homicide process called catathymic homicide. So we've really got several aspects that this connects to, and several different types of offenses, the murder of a spouse, the murder/suicide that may occur in couples, and a catathymic homicide.

Q. Now, you are talking about the research that underlies your opinions and your testimony?

A. Yes, ma'am. There is some research about these that helps connect Marc Barnette's developmental experience with the sort of offense that gets carried out here.

Q. I imagine you have another slide that discusses this further?

A. Yes, ma'am. I try never to be without a slide. But to get a sense of the extent of this, 16 percent of murders occur within the family. Of those, four out of ten involve a spouse killing the other spouse. 29

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/7/2002

Page 3646

percent of female homicide victims in 1993 were killed by a current or former husband or boyfriend. So when a woman is killed, there is a one in three chance that she has been killed by a current or former intimate, this from the FBI's uniform crime report in 1993.

Q. Does your next slide deal with risk factors for homicide?

A. Risk factors for murder/suicide. And this is from an article from the American Journal of Psychiatry, the role of depression in couples involved in murder/suicide and homicide. These are the risk factors for a murder/suicide, and I have red check marks by the one --

MS. TOMPKINS: Objection to murder/suicide.

THE COURT: Overruled.

THE WITNESS: I have red check marks by the factors that I think were present in Marc Barnette and in his relationship with Robin.

There was evidence of depression in the six weeks, couple of months prior to this offense. There is a male who carries it out, who is living with a woman in a long-term relationship, that relationship is characterized by discord, physical abuse, frequent separations and reunions. There is the abuse of alcohol

Case 3:12-cv-00327-MOC Document 106 Filed 09/23/15 Page 68 of 249

1619

JA2490

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/7/2002

Page 3647

or previous depressive episodes and personality disorder, and there is premorbid jealousy. Those are risk factors for murder/suicide, and we see these same factors in Marc Barnette and in this relationship with Robin.

BY MS. LAWSON:

Q. Now, you mentioned catathymic homicide.

A. Yes, ma'am.

Q. Is that what label is applied to what happened here?

A. I think it's a label that applies. Catathymic homicide is a concept that first appears in the psychiatric literature in 1912 by a guy named Mayor. This isn't something knew, it's been around for 90 years. And it's not a diagnosis. It's a description of a particular type of process, of a particular type of homicide and how it unfolds. And these are the elements that are a part of this, as described by Revitch, who is one of the writers in this area, and also by Reid Meloy, who has written extensively about violent attachments and attachment -- criminal violence that has attachment disorder origins to it.

Now, when we look at a catathymic homicide, it's most likely to be carried out by a perpetrator, by a man with a disturbed attachment history. That's why this

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/7/2002

Page 3648

early bonding issue is so important. There is then an emotional bond or attachment that exists between the victim and the perpetrator. They are in a relationship with each other. There is then what is called an incubation stage that lasts anywhere from several days to a year or longer, and here is what is going on during the incubation stage. The future perpetrator's thoughts are obsessively preoccupied with the future victim. Their emotions are of depression, frustration, helplessness, and attention buildup. Their behavior may become kind of bizarre. So, for example, Marc Barnette is described as shaving his head, going out in the woods with a shotgun at night and almost playing a war games kind of thing, not coming down and socializing with the family, displaying behaviors that are unusual. Their thoughts become more disorganized and tangential. That thought content is pervaded by fantasies of murder and suicide.

Now, when the homicide wish occurs to them, they find it disturbing and uncomfortable, and so they try to put it out of their mind, to suppress it, but it keeps coming back. Their family or friends may be warned in some way, or there may be a cry for help. Marc Barnette certainly seems to be sending out calls for help all the way from this fire bombing and then going back home

Reported ~~ ~~ Huseby, RPR
800-333-2082  3:12-cv-00327-MOC  Document 106  Filed 09/23/15  Page 70 of 249  (704) 372-4593
1621

JA2492

United States of America vs. Aquilia Marcivicci Barnette          3:97CR23-V
Proceedings Before Judge Richard L. Voorhees          8/7/2002

Page 3649

where his family knows about it as well as his pretty disturbed behavior across that six weeks that would alert most family members that they have somebody who is in trouble. And then following the homicide there is a release of tension and a subsiding of the crisis.

Q. Now, you have prepared a slide that deals with the personality structure that contributes to this?

A. Yes, ma'am. This is the from the research of Reid Meloy, and he talked about the personality structure of the person who commits a catathymic homicide, that there is a history of damaged attachments, that they lack an integrated identity. That means a solid sense of who you are, separate from whoever you are attached to. That's part of what lets you weather a breakup without becoming homicidal or suicidal, that even though it hurts that this other person is not there, mostly I still feel okay. But when you don't have an integrated identity, when that other person leaves, it feels like they have taken your arm and leg with them, and so you are feeling actively maimed almost by them.

Now, in their personality structure, then, they are dependent, which is what you see Marc doing, that he attaches very suddenly to a new relationship or new acquaintance, he very quickly falls in love, but he also

Case 3:12-cv-00327-MOC-  Document 106   Filed 09/23/13   Page 71 of 249
1622

JA2493

Page 3650

feels pretty entitled about how they are supposed to treat him and what respect they're supposed to give him and not wearing makeup and accounting for their behavior and all kinds of things. There are alternating feelings of grandiosity, that means feeling like I'm somebody pretty special, and sensitivity to humiliation, that merely anything in that relationship context feels like I'm being put down or uncared for. There is a desire for be admired and taken care of but sensitivity to slight criticism or to slight threat, and that's this jealousy proneness.

Q. Dr. Cunningham, when you talked about that middle one, dependent and entitled, did you also mention narcissistic?

A. I'm sorry, the narcissistic is the entitled, kind of to be treated as if I'm somebody special and to feel really injured if somebody rejects me. It's not that I really do feel that great about myself. If I did, it wouldn't bother me so much if somebody leaves, so it's a false sense. I'm kind of like a blowfish, I'm expanded like I'm somebody special, but really inside I feel terribly vulnerable, and that's that sensitivity to criticism and rejection.

Q. You talk about the incubation period in a catathymic homicide.

Reported ⌐ ⌐ ⌐ ⌐ ⌐seby, RPR
800-333-2082  Case 3:12-cv-00327-MOC   Document 106   Filed 09/23/15   Page 72 of 249  (704) 372-4593
Huseby, Inc., an A⌐⌐ ⌐⌐⌐⌐⌐ ⌐⌐n (704) 333-9889  Fax
1623

United States of America vs. Aquilia Marcivicci Barnette          3:97CR23-V
Proceedings Before Judge Richard L. Voorhees          8/7/2002

Page 3651

A.    Yes, ma'am.

Q.    Is that a part and parcel of it?

A.    Yes, ma'am.

Q.    Did you find in your review of the evidence in this case and your evaluations evidence of incubation?

A.    Yes, ma'am, I did.

Q.    Would you share that with the jury?  Did you make a slide?

A.    Well, this is about what incubation involves, again from Reid Meloy, and here's the stages of it, and then I want to talk about Marc Barnette and the way that you see these same stages and what is happening to him across the period of time, particularly between the fire bombing and these tragic murders.

There is a devaluation of what once was and an idealization of what might have been, so there is a sense of, gee, this was the love of my life and then this sense of how can they treat me this way, what sort of person is this.  The victim is perceived as abandoning and, therefore, controlling the perpetrator. It's the idea that with their leaving they are actively humiliating me, they are making me somebody who is not worth very much, it feels like an active assault when all this person is doing is walking away.  The victim is perceived as a threat to their psyche, to their

Reported By: Scott A. Huseby, RPR
Huseby, Inc., (704) 333-9889
800-333-2082          Fax (704) 372-4593
Case 3:12-cv-00327-MOC   Document 106   Filed 09/23/15   Page 73 of 249
1624

JA2495

United States of America vs. Aquilia Marcivicci Barnette    3:97CR23-V
Proceedings Before Judge Richard L. Voorhees    8/7/2002

Page 3652

well-being, and in extreme cases a predator, who in a magnified and crazy sense is doing irreparable harm to the perpetrator. In a minute I will describe some of Marc Barnette's thought processes that he reported to me and to the medical staff at Butner that reflect this kind of thinking.

Options such as leaving the relationship are never consciously weighed. There is anxiety and depression that, mixed with homicidal/suicidal thoughts concerning this person. There is a homicide/suicide wish, either she must die or I must die, something has to give.

The violence then is considered to be affective. In other words, it's driven by all of this emotional turmoil. Now, that doesn't mean that there may not be considerable planning and premeditation. The act itself may be carried out in a very premeditated, organized way. What is driving it, though, is this surging, kind of crazy affect and thought process.

Q. You prepared another slide dealing with that?

A. Yes, ma'am. In terms of symptoms that I found to be present in Marc Barnette, to varying degrees across the several to six weeks between the fire bombing and the murders, there are a number of depressive symptoms, depressed mood, brooding rumination, sleep

Case 3:12-cv-00327-MOC Document 106 Filed 09/23/15 Page 74 of 249

JA2496

United States of America vs. Aquilia Marcivicci Barnette                     3:97CR23-V
Proceedings Before Judge Richard L. Voorhees                          8/7/2002

Page 3653

disturbance, appetite disturbance, reduced libido, not

absent libido, Steve Austin did take him out, but there

is not the degree of sexual drivenness that was present

before, loss of initiative, concentration deficits,

reduced self-esteem, diminished interests, social

withdrawal, suicidal thoughts, all of those being

symptomatic of depression, which is part of this

incubation stage in many cases.

           MS. LAWSON:  May I approach the witness,

Your Honor?

           THE COURT:  Yes.

           BY MS. LAWSON:

Q.  Let's proceed first, if that's all right.  Do

you have another slide on this issue?

A.  Yes, ma'am.  This simply describes the

specific -- it's a description of symptoms that go along

with the -- before I just listed them, and this is a

description of some of what was happening within each of

these categories.

Q.  Can you give just a brief summary of what those

are as applied to Marc's situation?

A.  You know, for example, brooding rumination,

which I will talk some more about.  He is in his room

reviewing cards, letters, pictures, mementos, he cries,

at night he turns on a red light, he stares, he drinks,

Reported By: Scott A. Huseby, RPR
800-333-2082        Huseby, Inc., an A...          ...ion (704) 333-9889             Fax (704) 372-4593
Case 3:12-cv-00327-MOC   Document 206   Filed 09/23/15   Page 75 of 249
1626

JA2497

Page 3654

he points a gun at himself in the mirror, puts it under his chin, walks into the woods pretending to be on --

MS. TOMPKINS: Objection, not in evidence.

THE COURT: Overruled. Members of the jury, you will have to remember the evidence in this regard, whether you recall it or otherwise.

THE WITNESS: These symptoms that I'm describing are principally based a detailed history that I took of him of depressive symptoms that he said -- I would talk to him about these different areas and said, what was going on with you. I have then taken that and organized it into different symptom components.

Social withdrawal, he did go out a couple of times with Steve Austin, but spent much of the time, his family described this as well, in his room, even putting a sign up for nobody to come upstairs to the loft, would come down to get his food, might eat there, might take it back up to his room, a much diminished interest in usual activities or socializing. Energy varied quite a bit, appetite reduced, having trouble sleeping. Those are all features that seem to have been a part of this.

BY MS. LAWSON:

Q. In connection with your opinions expressed, what have you got next for us to review?

A. I am describing here some of the irrational

Reported ~·· ᶜ~·· ᴬ ᴵᵁseby, RPR
800-3~~~~~3:12-cv-00327~~~~y, I~~~~~~t 106  Fil~~00~~~~~5-98~~ge 76 of 2~~   (704) 372-4593
1627

JA2498

Page 3655

brooding that was going on as I talked to him about, what was going through your mind.

Now, the parts of this that are in black are what I obtained from my interviews with him, the parts that are in blue are what were obtained by Dr. Sally Johnson from Butner federal medical center, as well as others that were treating, where they are capturing some of his language or perceptions.

Marc described, she is the only person I really explained myself to, how I felt deeply, everything. She really knew how I had been treated in my past relationships. I had put so much trust in one person. She threw it all back in my face and didn't give a damn about anything I had told her. This is kind of -- you see this way of sort of twisting what happened. She berated me in front of her family, my family, made me seem like a squatter. In the end she treated me like a dog when she kicked me out. To think I was so committed to one person and she could have been having an affair behind my back, had given himself to her body and soul. She was faking during the relationship, she deceived me, how did I let her play me like she did, she had lived a lie for two years and suckered me into another hopeless relationship that I thought was so meaningful, it turned out to just be a lie, we planned to marry, she had cut

JA2499

Page 3656

me open, I wasn't going to be laughed at anymore, how dare she take my life like that, she killed me, everything I had, the life I was leading, the place we stayed together, how comfortable I was, she destroyed all of that because she wasn't true to the relationship we had, everything was gone, she didn't deserve to be happy after she totally wiped her feet all over me, why do I have to die by myself.

That's this crazy rumination that is going on across this period of time, and it fits with the stages that we talked about and that Reid Meloy identified as being part of the thought processes of this catathymic incubation.

Q.   Dr. Cunningham, I'll show you Defendant's Exhibits 21 and 22 and ask you if those are duplicates of slides that you have just shown?

A.   Yes, ma'am, they are.

Q.   You had those made from those actual slides you have just shown?

A.   Yes, ma'am, I did.

MS. TOMPKINS:  Objection to the quotes from the defendant outside the context of the Butner record.  These are just --

THE COURT:  Members of the jury, we will take our evening recess at this time.  I'll ask you to

JA2500

United States of America vs. Aquilia Marcivicci Barnette          3:97CR23-V
Proceedings Before Judge Richard L. Voorhees          8/7/2002

Page 3657

be with us tomorrow morning at 9:30.  Please remember the usual instructions.  Thank you.

(The jury left the courtroom.)

THE COURT:  Let me see the slides.  Do you have more representations of what has been on the screen?

MS. LAWSON:  Just the last three or four, Your Honor.

THE COURT:  What is the purpose, what do you intend to do with them?

MS. LAWSON:  I intend to introduce them into evidence.

THE COURT:  What is the objection?

MS. TOMPKINS:  The objection is that it's apparently, although there is no quotation marks, there is a series of quotations from an interview that I don't believe is in evidence at this point.  If it says Butner records, there is no Butner records in evidence, and these are apparently quotations from the defendant, who has already testified.  And I don't know what the purpose of them are in the context of his testimony or his opinion.  It's simply an opportunity for the defense to put on self-serving statements of the defendant.  It seems to be outside of the context of the diagnosis or an expert opinion.  It's more of a narrative.

Reported By: Scott A. Huseby, RPR
800-333-2082                Huseby, Inc., an A...              (704) 333-9889                Fax (704) 372-4593
Case 3:12-cv-00327-MOC   Document 106   Filed 09/23/15   Page 79 of 249
1630

JA2501

United States of America vs. Aquilia Marcivicci Barnette    3:97CR23-V
Proceedings Before Judge Richard L. Voorhees    8/7/2002

Page 3658

MS. LAWSON: Your Honor, he testified that he reviewed the Butner records. There's been other testimony about the fact of -- elicited by the government about the fact that he was up at Butner on cross-examination, was he evaluated by Dr. Sally Johnson who was at Butner. He testified very clearly so that the jury would understand it that the material in blue was excerpted from the Butner records. And what these are are examples of what he has testified to in terms of evidence of this catathymic thought process. You know, clearly it's a basis for his opinion that this is a catathymic homicide.

MS. TOMPKINS: And he is demonstrating that, if the Court is going to let that in -- the things in black, clearly there doesn't appear to be any transcript or summary of the -- this witness's conversations with the defendant, but it's being portrayed to the jury, and I would just object to the cumulative nature of the defense putting that in in addition to having it in five-by-five quality here in front of them and putting it up yet again in a different format.

THE COURT: Well, I think he has established -- he has testified that the statements, I believe the ones in black are the ones that he took from

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/7/2002

Page 3659

the defendant.  Is that correct?

THE WITNESS:  That's correct, sir.

THE COURT:  And the ones in blue, you say came from Dr. Johnson?

THE WITNESS:  Yes, sir.  They are excerpted from the Butner records.  Most of those notes are from her.  It's possible there may be another -- that there are other folks writing in the chart who also quoted, things about his thought processes at the time.

THE COURT:  Well, do you want to put those in as substantive evidence?

MS. LAWSON:  As illustrative, Your Honor.

THE COURT:  Well, I will think about that.

MS. LAWSON:  We have a couple of the slides that are going to follow this.  I will be glad the tender them to the Court for review or a paper slide.

THE COURT:  You want to go over those? Let's see them.

MS. LAWSON:  These are slides that were already given to the government yesterday.

THE WITNESS:  Your Honor, can I put that up on the screen?

THE COURT:  Yes.

THE WITNESS:  I think you have one of

Reported P-- S---- A. H--seby, RPR
800-333-2082

Case 3:12-cv-00827-MOC, Document 106   Filed 09/23/15   Page 81 of 249

1632

(704) 372-4593

JA2503

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/7/2002

Page 3660

these. Ms. Lawson, I believe you have this one about the inner struggle that he is making regarding the pull to act on these thoughts and the attempt not to, and I believe there are two slides that describe that, again apart from Butner, apart from my interview with him, and then a second slide also about that inner struggle that he is engaged in. There is then a chart, actually this one, that describes how all of these things tie together all the way from the recurrent damaged attachment to the family legacy of domestic homicide through the processes of relationship that he engages in to this catathymic crisis zone, ultimately coming out in homicidal thoughts and, in this case, ultimately actions toward his female partner and toward Donnie as well.

THE COURT: So you want to put those in? And of course it -- I will hear from the parties in the morning if you have anything further to say about that.

(Adjourned.)

I, Scott A. Huseby, do hereby certify that the foregoing transcript is a true and correct transcript.

SCOTT A. HUSEBY                    DATE

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION

UNITED STATES OF AMERICA ) DOCKET NO. 3:97-cr-23-V
)
vs. )
)
AQUILIA MARCIVICCI BARNETTE, ) VOLUME 19
) MORNING
Defendant. )
_____)

TRIAL PROCEEDINGS
BEFORE THE HONORABLE RICHARD L. VOORHEES
UNITED STATES DISTRICT COURT JUDGE
AUGUST 8, 2002

APPEARANCES:

On Behalf of the Government:

    ANNE M. TOMPKINS, ESQ.
    JILL WESTMORELAND ROSE, ESQ.
    227 West Trade Street, Suite 1700
    Charlotte, North Carolina

On Behalf of the Defendant:

    JEAN B. LAWSON, ESQ.
    P.O. Box 472106
    Charlotte, North Carolina

    HAROLD J. BENDER, ESQ.
    200 North McDowell Street
    Charlotte, North Carolina

Cheryl A. Nuccio, RMR-CRR
Official Court Reporter
United States District Court
Charlotte, North Carolina

THURSDAY MORNING, AUGUST 8, 2002

THE COURT: Ms. Lawson.

MS. LAWSON: Yes, sir. We will shortly be concluding our evidence at the end of Dr. Cunningham's cross examination, and I wanted to move that the government not be permitted to elicit any future dangerousness testimony from Dr. Cunningham on the basis that we have not introduced that in our case in chief. We discussed that in connection with our Rule 29 motion.

THE COURT: Well, the court would -- the court, of course, denied the Rule 29 motion.

MS. LAWSON: Yes, sir.

THE COURT: Because the defendant's record and other evidence in the case taken as a whole indicated that the issue of future dangerousness remained in the case. The court would allow the motion in the sense that -- well, I'll hear from the government about it, but it may be that the remedy is to grant your request unless the government wants to call this witness as its own witness later.

Do you want to be heard on that?

MS. TOMPKINS: I do not wish to be heard, Your Honor.

THE COURT: That's what the court will do.

MS. LAWSON: Also, Your Honor, the government's questions of our witnesses have suggested that Marc Barnette

behaved himself well in custody because he was awaiting the sentencing hearing. But facts are that for a substantial period of time when he was in custody on death row, he had no hope or expectation of a new sentencing hearing. To allow the government to continue to make that implication to the jury would force us to illicit testimony to the effect that he had no hope because he was under a sentence of death, which, of course, would be problematic for us and improper. So I would ask that you instruct the government not to ask questions that make that suggestion.

THE COURT: Well, I'll ask the government to attempt to limit its questions in that regard so as not to put the defendant to a <u>Hobson's</u> choice.

MS. TOMPKINS: And we will do that. And would say to the court that the defense were the -- is the side that called those individuals to the stand to open that door.

THE COURT: Well, you're right about that. I think the -- I guess what you would do is attempt to limit your questions to the recent period.

MS. TOMPKINS: Yes, sir.

THE COURT: Without attempting -- getting into why.

Incidentally -- now, let's put on the record exactly what exhibits you wanted to put in evidence.

MS. LAWSON: Your Honor, they would be Exhibits 20, 21, 22, 23, 24, 25 which are the blowups of the slides that

FORM FED ® PENGAD • 1-800-631-6989

you saw yesterday. Do you want me to hand them up so you can examine them? They're a little bit cumbersome.

THE COURT: No, just bring them forward so I can see them a little bit better. Hold them up one at a time.

MS. LAWSON: Here's 20. Your Honor, this is the one on incubation.

THE COURT: That one will be admitted.

MS. LAWSON: Thank you.

MS. HANKINS: Is that 20?

THE COURT: But state the sub number as well.

MS. LAWSON: In terms of Exhibit 20, the --

THE COURT: Oh, they're all 20?

MS. LAWSON: No, Exhibit 20 is this one sheet.

THE COURT: Okay. 20 can come in.

MS. LAWSON: Thank you.

MR. BENDER: This is 21.

THE COURT: 21 can come in. Let me look at that.

MR. BENDER: Yes, sir.

THE COURT: No, that's a quotation or an alleged quotation from the defendant. It won't be allowed.

MR. BENDER: Okay.

THE COURT: 20 seemed to be a statement of some sort of factors.

MR. BENDER: 22 is --

THE COURT: That's additional alleged statements --

MR. BENDER: Yeah.

THE COURT: -- which will not be admitted.

MR. BENDER: Okay.

MS. LAWSON: 23 is similar, Your Honor.

THE COURT: That will not be admitted.

MS. LAWSON: 24 also are statements of the defendant.

THE COURT: Right. That will not be admitted.

MS. LAWSON: And let's see. 25 is a chart illustrating Dr. Cunningham's prospective testimony about --

THE COURT: That's a flow chart. That can be admitted.

MS. LAWSON: Thank you, Your Honor.

THE COURT: As to the ones that have alleged statements by the defendant, that would merely be confusing or misleading to the jury inasmuch as the defendant testified about his ruminations concerning the crimes and the other subject matters on those boards.

MR. BENDER: Your Honor, may I put on the record the ones that are not going to be admitted?

THE COURT: Yes.

MR. BENDER: Just so we'll all be sure.

THE COURT: Right.

MR. BENDER: That would be 21, 22, 23, and 24.

THE COURT: Right. This witness was allowed to

testify about those alleged statements as a basis for his opinion, but to admit them as freestanding evidence would put an improper focus on statements about which the defendant could have been examined and cross examined, but was not.

MS. LAWSON: Thank you, Your Honor.

THE COURT: Now, we have a jury matter. Ms. Calkins was approached by a juror, I believe, as relayed to my law clerk, Ms. Dannelly.

Would you tell us, Ms. Calkins, what happened.

MS. CALKINS: A juror approached me this morning and said -- asked if they could be readvised of keeping an open mind policy and not forming opinions. And I asked him if they've been discussing the case and he would not say. He just said that opinions are being formed.

THE COURT: Okay. Now, what's the pleasure of the parties about dealing with that? Can you tell us what juror that is?

MS. CALKINS: He's an alternate, I believe. George Evans.

THE COURT: Number 22?

MS. HANKINS: (Affirmative nod.)

THE COURT: He would be in the right front.

MS. LAWSON: What I'm not sure of, Your Honor, is if he's saying that he's forming an opinion or if other jurors are expressing opinions or if other jurors are saying they've

**1639**

**JA2510**

formed opinions. So it's not clear, and I don't know whether it's any clearer from what Ms. Calkins said, but I don't think that we have any choice but to -- for you to make some inquiry.

THE COURT: Let's bring Mr. Evans in, then.

DR. CUNNINGHAM: May I step down, Your Honor?

THE COURT: Yes, sir, please do.

CSO YELTON: Evans?

THE COURT: Evans. George Evans, number 22.

(Mr. Evans entered the courtroom.)

THE COURT: Just right there is fine in the jury box. That's fine. You can take a seat if you wish.

MR. EVANS: Okay.

THE COURT: You had some conversation, I believe, briefly with Ms. Calkins earlier this morning.

MR. EVANS: Yes.

THE COURT: The jury clerk out there.

MR. EVANS: Yes.

THE COURT: Could you tell us what the nature of your concern is.

MR. EVANS: It seems that we may be forming opinions early. You were saying to have an open mind.

THE COURT: Yes, sir.

MR. EVANS: And I was just concerned that maybe the open minds are closing, I don't know. It just seems like it.

THE COURT: All right. Well, now, is this indicated by things you hear in the jury room?

MR. EVANS: Yes.

THE COURT: And is it your --

MR. EVANS: Nothing -- it's nothing concrete. It's just as we leave here and go in there, it's just observations about the presentation. It's like, something like, I hope we can hurry up and get this over with. Something --

THE COURT: Something --

MR. EVANS: Someone was saying, I think we can do this in ten minutes.

THE COURT: Okay. Would it reach the level of debate or discussion, perhaps, in violation of the court's instructions not to discuss the case even with your fellow jurors?

MR. EVANS: Well, we haven't talked about it, but I didn't know -- I wouldn't think that -- it's not -- as far as I can tell, it's as if the minds are made up here. We go in there and the mind is made up or it seems like it is. As far as I can tell, no discussion in there, though, indicates that, yeah, I think that's right. It ought to go this way. It's like --

THE COURT: Well, would you say there's been discussion of evidence as -- like in particulars?

MR. EVANS: I don't know of anything in particular.

I haven't heard anything like that.

THE COURT: Okay. Will there be any questions from counsel?

MS. ROSE: No.

MR. BENDER: Yes. Yes, Your Honor, if I may.

Mr. Evans, just like in jury selection, just your honest feelings. And obviously, you have some because you brought it to our attention.

MS. TOMPKINS: Well, let me object.

THE COURT: Yeah. I don't want preambles. I just want questions.

MR. BENDER: Okay.

MS. TOMPKINS: And if the court could instruct that the questions not be leading so as to suggest an answer.

THE COURT: Exactly.

MR. BENDER: Okay. Who has been discussing the case or talking about it?

MS. TOMPKINS: Well, objection. He said no one had been discussing the case.

THE COURT: That is a leading question.

MR. BENDER: Judge, this is a serious issue and somehow we got to get to the bottom of it. I don't know how to do it other than --

THE COURT: All right. I'll ask the questions.

MR. BENDER: -- ask him.

THE COURT: Is there anything you can add as far as telling the court the nature of what -- first of all, is this something that has -- that just came up yesterday or the day before or...

MR. EVANS: It was after the -- I think it was in the third break of the day before the end of the day and one of them said something -- I don't remember which one it was now. He said something to the effect that -- that led me to think he had -- may have made up his mind and -- in a negative point of view. Something here he had seen. He just didn't agree with the testimony of the witness for the defense. That he felt like the guy was -- well, he just didn't believe the witness and so he was -- he was ready to make a determination now.

THE COURT: This is one juror.

MR. EVANS: As far as I could tell. That was just one. I was hoping that something like a -- read the juror's creed and be more thoughtful about what you're hearing and keep an open mind. I was hoping that would do it, but I don't know.

THE COURT: Well, so are you saying that that's essentially the only incident that causes you to come before the court in terms of --

MR. EVANS: Yes.

THE COURT: -- whether the court's instructions

might have been violated?

MR. EVANS:  Yes.

THE COURT:  All right, sir.  Thank you very much.

MR. BENDER:  Your Honor, may I?

THE COURT:  Yes.  Wait just one second.

MR. BENDER:  May I approach or write out a question for you to ask?

THE COURT:  Yes, sir, you may.

(The question was tendered to the court.)

THE COURT:  Okay.  This comment that you mentioned that another juror said, did he say that in the presence of other jurors other than you?

MR. EVANS:  I don't think anybody else heard it.

THE COURT:  Okay.  And if so, was there any response to it, whoever may have heard it?

MR. EVANS:  I don't remember saying anything.  I was just kind of shocked that -- at the -- it seemed a little bit more heavier with -- he was ready to get on with the show, so to speak.

THE COURT:  Get the case over with.

MR. EVANS:  Yes.

THE COURT:  That sort of thing.  All right.  Now, are you able to give us an idea who it was just so that we might perhaps speak with that individual?

MR. EVANS:  I don't know him by name or number.

THE COURT: Do you know which seat he's in?

MR. EVANS: No.

THE COURT: What we need to do is to find out who that is. You need to be able to identify -- you can identify the person by appearance, I guess.

MR. EVANS: Well, there are two of them here that look similar.

THE COURT: Yeah.

MR. EVANS: They have distinctions, but they do look similar. I guess if he was to say something else, I may be able to relate -- you know, connect it better. But right now I'm kind of confused as to which one it was now.

THE COURT: All right. So you're not sure which of the two it might be.

MR. EVANS: Not for sure.

THE COURT: Do you think you could give us both names or both -- somehow identify both of them?

MR. EVANS: Yes.

THE COURT: Okay.

MR. EVANS: But I'm not sure as to which one it is.

THE COURT: I understand that. But -- I wonder if you could step into the jury room with the marshal there and just decide, if you can, which two you're talking about. And then I'll let the marshal ask people for their juror numbers.

MR. EVANS: Okay.

THE COURT: So we would have a way to identify them. Can you do that?

MR. EVANS: I could try, yes.

MS. TOMPKINS: Your Honor, can we be heard before we single anybody out?

THE COURT: Yes.

MS. TOMPKINS: Outside the presence of the juror?

THE COURT: Yeah. Why don't you step into the anteroom there just momentarily and we'll get right back to you.

MS. ROSE: We have witnesses in there, Your Honor.

THE COURT: Okay. We could use that room.

And you understand we're just trying to deal with things that come up and see what would be appropriate in a given instance, but we very much appreciate your communicating with the court.

Okay. That room is available, then. Thank you, Mr. Evans.

(Mr. Evans exited the courtroom.)

THE COURT: You may be heard.

MS. TOMPKINS: Before we decide to bring in and single out particular jurors, what I would offer is that based on what Mr. Evans has reported to the court, there's been no deliberation. That the comments made by that juror have been predominantly about fatigue and he apparently made a comment

about this witness.

Jurors are allowed to think about the case. They're not allowed to deliberate about the case. There's nothing that says a juror can't formulate opinions as the case goes on. They are to keep an open mind and listen to the court's instructions at the end and then deliberate with their fellow jurors. They're not to be a blank slate and have zero thought process during the course of the trial.

THE COURT: Well, the concern is the court has asked them not to discuss the case --

MS. TOMPKINS: Yes.

THE COURT: -- even with fellow jurors.

MS. TOMPKINS: And it appears from Mr. Evans that there was no discussion. That a juror made a comment that was not responded to and it was a comment made out loud and heard by Mr. Evans only, apparently, and that there has been no deliberation, and I think that's the key. Are they discussing the case and deliberating? And Mr. Evans said no, they are not discussing the case. That juror made a comment about the witness that was left unresponded to.

I'm concerned about singling out jurors and that -- that the point can be made to all jurors in the case to keep an open mind and not deliberate, not talk amongst yourselves about the case until you've heard all the evidence and the court's instructions.

THE COURT: Okay. What say the defense counsel?

MS. LAWSON: Your Honor, Mr. Evans felt that whatever he heard was significant enough to bring it to Ms. Calkins' attention. And what he said was we may be forming opinions and open minds, in the plural, are closing. And that room is pretty small and Mr. Evans may not have noticed whether anyone else heard or repeated what this particular -- what this juror said. The phrase was hope we can get this over with, which indicates not only the formation of an opinion, but an intentional disregard of the evidence. And you've got to have an open mind to listen to the evidence and that's what you've told them to do.

I agree with Ms. Tompkins that it is a very difficult task to find out which jurors have violated your order. It may well be that it's worthwhile asking some of the female jurors if they've heard anything because that doesn't single anybody in particular out. I don't know how -- what to propose, but I think that we need to inquire into it further in order to assure a fair trial. But also that it be done in a way that not alarm the jurors or make them think that they're in some kind of trouble to the extent that they're not candid with Your Honor.

THE COURT: Well, I think you read into his comments a little more than is there. It does seem that one juror may have violated the court's instruction by way of stating

something that could be interpreted as a statement that he had made up his mind. So I thought if we could single out that juror, the defense would have an option to strike that juror at this point in favor of the alternate.

MS. TOMPKINS: And if I may, Your Honor --

THE COURT: And then -- yes.

MS. TOMPKINS: On striking that juror, I believe that's a -- what Mr. Evans has brought forward is jury fatigue and -- rather than I've made up my mind. Mr. Evans said that he wishes -- that juror wishes the case could be over, but that it's still possible for all jurors to have an open mind and listen to the evidence. Just because he has made his mind up or whatever he has done or formed opinions about the evidence as it comes in or a particular witness as it comes in, there's no prohibition to that. The only harm might be that he has said something in front of other jurors in an effort to begin the deliberation process.

I just think it's -- we're making -- you know, it's a little draconian to try to find out a juror who made a comment that could be interpreted many ways which apparently, at least from the government's point of view, is more about fatigue than it is about deliberation; that we've singled that person out and start picking people off the jury not knowing -- I don't know what -- how Mr. Evans has now been affected by that, so if we start taking people off the jury, then Mr.

Evans has now been involved in that same colloquy, so now we essentially lose Mr. Evans as a juror. And I think a curative instruction to the entire panel is an appropriate response.

MS. LAWSON: May I say one thing, Your Honor? In the notes I was taking when Mr. Evans was talking, he said this juror said, I think we can get this over with in ten minutes. That means he's ten minutes away from his decision and that's what is really alarming. He's ready to deliberate. He's ready to make a decision. And he may have already made that decision. It's not fatigue. It's I know what I'm going to do. And it's similar to comments in other cases where people make jokes going down the hall about this is dead man walking or -- it's of great concern.

And I don't think that Mr. Evans has been implicated in anything improper. In fact, he's gone above and beyond what a juror might think they have to do because he's reported it to you. So I don't think that disqualifies him in any way. He's done his duty. He's followed your instructions.

MS. TOMPKINS: Just so the record is clear, it's also possible that the interpretation of the ten minutes was this juror -- this witness could be taken care of in ten minutes. It's -- Mr. Evans doesn't know --

THE COURT: I think -- I think -- that's why I said she's reading too much into that.

Let's put this other juror, that is, Mr. Evans, back

in the jury room and call all of them back in here. I'll ask them if any of them are aware of any violations of the court's instructions and then I'll reinstruct them.

MR. BENDER: Excuse me. Your Honor, because of the serious nature of this matter and Mr. Evans' concerns, we would ask that you have him identify the two people and give us the opportunity to use strikes against one or both of those people.

THE COURT: All right. I'll do that.

MS. TOMPKINS: And I object. That would be unnecessary and that Mr. Evans is himself implicated.

MS. ROSE: Why don't we ask the panel. Bring them in, instruct them, and ask them has anybody made up their mind? Do not make -- do not make improper comments. If you have made up your mind, let us know. He's telling us his perceptions. I mean, he's speaking for thirteen or fourteen other people, fifteen other people. I mean, I think it's -- that's a draconian measure whenever we're not even sure that he perceived the right thing. You're taking one man's word for it. I think it's better to leave this panel together at this point, give them an instruction. Ask them, Your Honor. Ask them about it.

THE COURT: Okay. We'll follow through on the court's request that you bring in Mr. Evans to place him with the other jurors and we'll bring all the jurors back into the

courtroom.

MR. BENDER: Just so I'm -- just so I'm sure, we're not going to have -- now we're not going to have him identify --

THE COURT: No, sir. I think that's the worst course of the two we've looked at.

MR. BENDER: Well, let me just state for the record, group dynamics being what it is, you ask that question, nobody is going to raise their hand. Nobody is going to rat themselves out and say yeah.

THE COURT: Well, Judge Sessions and others in the past have asked this question every time the jury comes back into the courtroom and it seems to be something that can be effective.

MR. BENDER: I think it's probably being asked in the context of during the recess. Here we have a juror who is so concerned he brings this to the court's attention, and I think it needs to be -- something needs to be done about it.

THE COURT: Well, the brunt of what he said was that the -- his request to Ms. Calkins was that he thought it would be well to reinstruct the jury to keep an open mind, and that evidently is based on the one comment made to him by another juror. That does not appear to rise to the level of having tainted the jury.

Follow through, please.

MR. BENDER: One more request, Your Honor. Would you leave the door open for Mr. Evans or anyone else to bring to the court's attention any concerns they have? Obviously, Mr. Evans has done that. I'm afraid that now if we close that door, he won't feel comfortable coming back in and saying, oh, by the way, I heard another comment. So I don't know how you want to do that, but I think you ought to leave that door open for everybody or anybody to bring it to the court's attention.

THE COURT: All right. May we have the jury.

(Jury entered the courtroom.)

THE COURT: Good morning, members of the jury.

THE JURY: Good morning.

THE COURT: We have a long case and the progress here and at some point during the -- such a trial, the court -- that is, in this case, the sentencing phase, the court goes back to some of the things it said earlier to you. You've been instructed at some length about this, that and the other thing. And I thought I would ask you at this point if -- has any juror violated the court's instructions even inadvertently? If you would have an affirmative answer to that, just raise your hand and we'll deal with that at some appropriate time. Would there be anyone who would answer that question affirmatively?

(No response.)

THE COURT: And the second one would follow up with that one would be has anything happened to impair your ability to be a fair and impartial juror? Would anybody have an affirmative answer on that?

(No response.)

THE COURT: All right. Now, of course, if you needed to communicate with the court about anything, you can always send the court a note to let the court know about it.

And I'll go back over some of the things we've gone over before. That is to say, until the trial is completed, then, and you are deliberating, you are not to discuss this case with anyone, whether members of your family, people involved in the trial, or anyone else, and that includes your fellow jurors. If anyone approaches you and tries to discuss the trial or this phase of it with you, please let me know about that immediately.

And you must not read or listen to any news reports of the trial.

And finally, remember that any -- that you must not talk about anything with any person who is involved in the trial, even about something that has nothing to do with the trial.

Thank you very much for your attention to these instructions. That's just a little update for you.

I think you had a witness on the stand yesterday.

MS. LAWSON: Yes, Your Honor. Dr. Cunningham, please.

MARK CUNNINGHAM

DIRECT EXAMINATION (Cont'd.)

BY MS. LAWSON:

Q. Dr. Cunningham, yesterday afternoon when we left off you were talking about the incubation of a catathymic homicide.

THE COURT REPORTER: Of a what, I'm sorry? I didn't hear you.

MS. LAWSON: The incubation of a catathymic homicide.

THE COURT REPORTER: Catathymic?

MS. LAWSON: Uh-huh.

Q. Would you light up your screen and let's finish discussing this, please.

A. Yes, ma'am.

Q. Tell us about the incubation and what the process is according to the studies that you --

A. When we stopped yesterday, I was describing the sort of irrational brooding that was occurring with Marc across the weeks prior to these homicides.

You may recall that in discussing the aspects of that incubation stage, as Dr. Reid Meloy has described this catathymic homicide, and this was present in Marc's brooding ruminations. This idealization; devaluation of what once was;

idealization of what might have been. Robin was perceived as abandoning and controlling him. She was perceived as a threat, as if somehow she was being destructive to his psychological well-being, and almost like she was the one who was being assaultive in some emotional way toward him and doing great harm to him. With him constructing that in such a way as to make simply exiting that relationship difficult to weigh or even to bring to mind.

And also, last time I talked about -- or last night I talked about the depressive symptoms that were intermixed with this homicidal/suicidal thought. This kind of either she must die or I must die or both of us must die.

And also, the aspect of this that the violence is driven by this emotional turmoil, by this irrational brooding process. And while that's the driving force behind it, the way in which it's carried out may reflect a lot of planning and premeditation and organization in the way that that offense is carried out.

Q. What does affective, that a-f-f-e-c-t-i-v-e mean in --

A. That's a --

Q. -- (inaudible) terms?

A. That's a derivative of affect which means emotions. If someone goes in to rob a liquor store, that may be done in a relatively cool, calculated sort of way and it's instrumentally designed to get them money. They aren't going

in there because they're enraged or because they have some issue with the owner of the liquor store. It's just a vehicle to accomplish that criminal end. And so it's not affectively driven. It's just monetarily motivated.

Affective means that the driving force behind it is emotional in nature. Not profit oriented, but emotion oriented. And in this case this angry, paranoid, brooding, irrational process is what's fueling the action.

Now, when it's actually carried out, though, it isn't that the person just suddenly flies off on somebody. In this case they may be thinking about it, had been thinking about it for some time in advance and begins to make preparations or plans.

In that sense, I would disagree with Dr. Burgess who described these crime scenes as being of an unorganized type. As I look at these crime scenes and at these offenses, it has substantial organized presentation.

If we look at the first crime scene involving Donnie Allen, the -- the weapon is brought to the crime scene. Marc then waits for a period of time for a victim of vulnerability in terms of somebody who is in a car by themselves when other cars are not coming. The victim is approached in a way that maximizes the likelihood of surprising them and getting them out of the car. And Donnie is then taken away from the immediate place that he's encountered into a zone where he is

less visible and where there is less likely to be observation, either of the offense or of his body being found. And there is then a flight from that scene.

And all of those things go with an offense that -- and a crime scene that is relatively organized in nature.

Now, again, that doesn't -- that doesn't detract from the affective purpose of this which is to get a vehicle to act out in an irrational way toward Robin Williams. But that crime scene does have a lot of organized qualities to it.

When we get to the Robin Williams' crime scene, it also has many organized qualities to it, although it's somewhat mixed.

On the organized side, he observes the situation for a period of time before he enters into it and watches the house. The car is moved to a position behind the house, as I recall, in kind of an alley and is left running. Again, a weapon is brought to the scene. Entrance -- the phone lines are cut. The door is blasted open with the shotgun. And he then encounters -- attempts to encounter Robin Williams.

Now, the part of this that is less tightly organized is that while there is one agenda that has been carrying him toward killing her when he encounters her, if that's the sole purpose, then the easiest thing to do is to shoot her right there in that room or as he is chasing her to shoot her as she runs.

There seems to be another agenda that is present at the same time which involves trying to get her to talk to him, to leave with him so he can get answers. Much the same as he was seeking from Alesha some years before is he was trying to figure out how can you treat me this way? Don't you love me? Where is our relationship going? That sort of thing. So you have this sort of mixed agenda that occurs.

He is not taking steps toward disguising his identity and so ultimately his capture is almost certain, and that part, perhaps, is less organized in nature.

When he flees that scene, that also has some mixed elements to it. Obviously, he is trying to do some things that delay his capture. Things like leaving the scene; changing a license plate; scraping off the inspection sticker. I don't think they represent an attempt to permanently escape capture or else you don't go back to Charlotte and turn yourself in. But it is an attempt, it looks like, to delay his apprehension while he tries to figure out what he's going to do next, whether he's going to kill himself, sort of what to -- sort of what to do now.

But I think the larger weight of this is that these -- these crime scenes and much of his activity across this period of time is organized in nature.

The alcohol I think contributes, as it often does, in these -- across this incubation stage. It contributes to some

disorganization of thought and maybe reduces inhibitions to some degree. But he has not had so much to drink that day as to be intoxicated and does operate a motor vehicle and do some other things so that he is certainly not staggeringly intoxicated in any sense. There may be some disinhibition that this -- to help put this thing in motion, particularly at the point that he is encountering Donnie Allen. By the time gets to Robin several hours later, alcohol I think would be a minimal presence, if at all, in explaining this.

So I would disagree with Dr. Burgess in that sense. I think perhaps what she was alluding to is this -- this issue that the offense as -- the totality of the offenses from the firebombing through encountering Donnie Allen, taking his car and killing him and going to Robin's, that the totality of those is an affectively driven phenomena that is kind of irrational in its motivation. The way in which it's carried out, though, is relatively organized.

Q. Did you make a slide showing the symptoms or the things that were present in Marc that are related to this incubation?

A. To this -- yes. There's another part of the incubation stage that the literature talks about and that's the idea that the person struggles within themselves about this homicidal/suicidal impulse that's occurred to them. And again, these are extracted from my interviews with Marc as

well as from the Butner records from the time that he spent in the federal medical center there and was evaluated psychologically, psychiatrically.

The notes from Butner described: Terrorized with myself. I was not myself. Thought of turning myself in.

I was at war with myself. I felt like I was going over the edge. I was fighting with myself. This is from my own notes.

You know you can't do that. You know that's wrong and terrible.

Another part was saying, Look what she did to you. Look what Alicia did, what Crystal did, what Tasha did. That's that notion I was talking about last time of taking what are pretty typical adolescent relationship breakups and instability and making them profound betrayals of the -- what otherwise would have been the love of your life.

Look what people have done to me from birth on. I let people treat me bad all my life. You can't let people -- you can't keep letting people hurt you like this. They're laughing at you. Probably Robin is saying look how weak he is. Look what I did to him.

I couldn't take any more. I had to do something to prove to everybody that I'm not going to be pushed around anymore.

The next morning I would think: What happened last night? It was scary. And this is regarding those thoughts of

the preceding night. In the morning I wouldn't want to do anything to her. I was just angry with her, but not with the emotional intensity of the night before.

From the Butner notes: The thought of killing Robin scared him. Talked to mom. That he was losing it. She offered hospitalization or therapist. Didn't know if he could deal with it. Grew up in church. Knew Ten Commandments. Thought -- when thought crossed his mind, passing through, scary.

Something takes over your body, stuffs you in a corner, fights it. Then stronger force just takes over. Told myself you know better. Now feel -- now feeling feels to alien to me. It's like looking at a tape.

Night of offense: Stopped at the end of the driveway. Struggle within self about whether it was the right thing to do. You can turn back now but that part was getting weaker.

I just broke. I couldn't take any more. Felt evil come over me. Had never been that angry. Scared him.

So you see the struggle that again is talked about in the literature about this incubation stage, this phenomena of having these thoughts and fantasies and impulses that are disturbing and that the person tries to push away but that grow in strength over time.

THE COURT: Do you have another question, counsel?

MS. LAWSON: Yes, sir.

Q. What further things did you find in the literature about the catathymic homicide that are important?

A. I think this -- I think this captures -- let me see if there was another one that describes this. No, that captures the issues about both the irrational brooding that he was doing and the inner struggle and the depressive symptoms during that incubation stage.

Q. Can you use your highlighter to describe the process as shown on this illustration of your testimony?

A. Yes, ma'am. This is a flow chart that I developed to try to tie together the different elements of what had happened in his history and the tragic outcome in this case.

The -- there is this background that we've talked about in terms of recurrent damaged attachment. The instability and emotional absence of his mother; the death of his grandmother; the absence of his father; and the continued instability of attachments across his middle childhood.

And the expectation of that kind of recurrent damaged attachment would be both feelings of hurt and anger, and also a significant degree of kind of damaged personality, damaged emotional security, damaged sense of self that would make somebody very needy, to have somebody else to attach to, to -- in an attempt to make them whole.

Now, the other thing that's happening historically is this -- there's a family legacy of domestic homicide as a

script, a script of modeled domestic violence, the past relationship failures that he's carrying as evidence of folks that have abused him, and then his own past victimization of being beaten up when he was dating Sheila who preceded Tasha, as I recall, and also being shot by his cousin the year before this -- these capital offenses. And this -- these play out at a number of different levels in terms of what happens next.

Because he's needy as he goes into adolescence, he repeatedly becomes dependent on a female partner. That's where he goes to try to get some sense of well-being. As he's so dependent on that, though, on that girl, he feels enormously emotionally vulnerable. And sometimes that may be contributed to by behavior of the partner, and certainly that vulnerability is added to by his past experience with relationships in his family and with past romantic relationships.

His response to that emotional vulnerability is to shift into all these obsessive, jealous, controlling, violent behaviors. He becomes obsessively possessive. Wants to know where the girl is all the time. Doesn't want her wearing makeup. Is incredibly jealous and sensitive to any cue that she's being unfaithful. Begins to behave in a very controlling and demanding fashion. And that then is accompanied by physical abuse.

Now, the behavior of his partner may aggravate that

some. They're young as well and may be interested in somebody else, may even see somebody else, and that is not unusual at this stage of development with relationships.

Understandably, when he acts like that, the relationship simply can't continue and so it breaks down. When that happens, he then feels this enormous abandonment, anxiety and rejection. And really, at this point is when we start to enter this kind of catathymic zone. That out of his abandonment, anxiety and rejection, he then shifts to this obsessive preoccupation, depression, desperate futility, and rage that we saw acted out in some of the behaviors that he had toward Alesha as he kicks in her door, abducts her, holds her at knife point. You see the cycle in this zone.

And this is then accompanied by or results in suicidal impulses as an exit point out of this cycle and out of some contribution to depression as well, or towards some sort of homicidal, assaultive ideation, thoughts, impulses, fantasies toward a female partner.

Now, this is fuel by alcohol abuse in this zone.

Now, sometimes what happened is he would cycle through this. Sometimes what would happen in the past is that there would be some resolution of it. He might reconcile with this girl and start all over again. Or he might quickly find another partner to attach to and the cycle would start again.

In this case and in this instance, the tragic outcome as

we got to this point was the killing of Donnie Allen on the way to act out this homicidal fantasy, seek some reunion alternatively with Robin Williams.

Q. Let me show you, Dr. Cunningham, what we have marked as Defendant's Exhibit 25. Is 25 a replication of that slide you just showed us?

A. Yes, ma'am, it is.

Q. Okay. And Number 22 (sic), is that a replication of the slide that you also showed us yesterday --

A. Yes, ma'am.

Q. Dealing --

A. That describes symptoms of depression that he exhibited during this incubation stage.

Q. Thank you.

MS. LAWSON: Your Honor, move admission of these two.

THE COURT: They will be admitted.

MS. LAWSON: Thank you.

(Defendant's Exhibits Numbers 20 and 25 were received into evidence.)

Q. Dr. Cunningham, there has been some talk about inconsistent reports from Marc about his family history, abuse, things of that nature. Have you experienced, reviewing records and documents and -- in connection with Marc or with other people, that would give us some information about why

there are inconsistent responses?

A.   Yes, ma'am.

Q.   Okay.  Could you tell us about that, please.

A.   Let me deal with inconsistencies in Marc's descriptions initially and then describe some explanations or some hypotheses to consider in how to account for those.

As Marc is making reports to --

MS. TOMPKINS:  Objection to -- unless it's an expert opinion about whether or not defendant should be believed.

THE COURT:  Sustained.

Q.   How many times to your knowledge has Marc been evaluated?

A.   At least seven or eight times.

Q.   And have you reviewed all those evaluations?

A.   Yes, ma'am.

Q.   Have you reviewed the different statements that Marc has made, for instance, about the amount of abuse that he suffered?

A.   Yes, ma'am, I have.

Q.   Do those statements differ over and throughout those records?

A.   Yes and no.  They -- they all describe, by my best recollection, excessive discipline, abusive discipline from his father.  They vary in the details that are provided regarding that, and to some degree in the extent or the

frequency with which some of the behaviors are described.

So the answer is that he has pretty consistently described being treated abusively by his dad. The details of that and the extent of it vary depending on which report.

Q. Would they also vary depending on how much the examiner kept in their mind as opposed to what they wrote down?

A. Potentially.

MS. TOMPKINS: Objection.

THE COURT: Overruled.

A. Yes, ma'am. That's a factor that whatever is said is taken through the person who's hearing it.

Q. Dr. Cunningham, do you advertise your services?

A. No, ma'am.

MS. LAWSON: Thank you. No further questions.

CROSS EXAMINATION

BY MS. TOMPKINS:

Q. Dr. Cunningham, I'd like to conduct my cross examination of you in a question/answer format. Is that all right?

A. Yes, ma'am.

Q. Now, you stated on direct that in the past you've testified, I think, in twenty-two federal capital cases and fifty state capital cases.

A. Approximately. It's about twenty-two and just over fifty state cases.

Q. And all of those have been since 1994 when you testified

1668

**JA2539**

in the first capital case?

A. I believe I testified in my first capital case in 1995. I consulted on a case in 1994.

Q. All right. How many cases are you currently providing services for which the case has not gone to trial yet?

A. I don't know.

Q. Capital cases. Approximately?

A. I really don't have any sense of it. It is -- I know there's more than ten, but beyond that I really don't know.

Q. More than ten less than thirty?

A. I have no idea.

Q. Maybe more than thirty?

A. I'm not -- I'm not trying to hedge. I simply don't know. Sometimes I may get a call on a case and then never get another call about it or it may even be resolved without my being aware of it, and so I simply don't know how many there are.

Q. All right. How many capital cases did you testify in last year?

A. Again, it would be an estimate. I think about -- about twelve or so. But I don't -- I apologize, I didn't bring a list of that testimony with me. But I've testified about seventy times in the past -- in capital cases in the past five years, and I think it runs in the average of twelve or fourteen a year.

Q.  So you think the year before that you did twelve to fourteen?

A.  That's my best recollection.  Again, I -- it's kind of speculative because I don't have that list in front of me.

Q.  Now, you've been involved in this case since when?

A.  Since 1997.

Q.  And you interviewed the defendant for how many hours?

A.  Just over eighteen.

Q.  Some of those a few years ago and some of them more recently?

A.  That's correct.

Q.  And in your eighteen hours of interviews with the defendant, did you record those?

A.  No, ma'am.  I took very detailed notes.  I did not record it.

Q.  All right.  Did you prepare some kind of a transcript of those eighteen hours of interviews with the defendant?

A.  Not beyond my detailed notes.

Q.  Did you write out a summary of the defendant's statements?

A.  Not beyond the detailed notes.

Q.  And those detailed notes are for your personal use, correct?

A.  Yes, ma'am.

Q.  And they're not part of your report that you generated,

correct?

A.   The report is very brief.   The notes are very extensive. There is -- there's probably eighty or a hundred pages of notes.

Q.   Okay.   Those are your personal notes, correct?

A.   They're my notes of the interviews of him and anyone else that I talk to.

Q.   Okay.   And those are available to you in preparing for your testimony, correct?

A.   Yes, ma'am.

Q.   And they're not part of your public report as much as this is public.

A.   I'm not sure how to respond.   I guess depending on how discovery works, then the notes are with me here on the stand so -- and they were in 1998.   They're not hidden.

Q.   So if I wanted to go up there now and begin reading your eighty pages of notes about your eighteen hours of interviews with the defendant, I could sit here and do that now.

A.   Yes, ma'am.

Q.   Okay.   Rather than having prepared a summary or a transcript as part of your report to the court.

A.   Yes, ma'am.   The transcript -- summary was not requested of me.

Q.   So when you tell us what the defendant said, we would have to take your word for that rather than know the context

of those quotes from the defendant.

A.    In terms of the notes that I took, what was in black you would take my word for.  What's in blue is from the Butner records.

Q.    Okay.  And I'm talking about from your report.

A.    Yes, ma'am.

Q.    We wouldn't know what other things the defendant said or you haven't told us in the other eighty pages of your personal notes about the defendant's statements to you over eighteen hours.

A.    Not verbatim, no, ma'am.

Q.    Okay.  So you're telling us what you want us to know about what the defendant told you.

A.    I'm not sure that that accurately characterizes it.  I've tried to illustrate -- the only thing that I've used directly are quotes that illustrate his inner struggle and the kind of irrational brooding that was occurring because his words seem to best capture the quality of that better than me summarizing it.  As I've described other history from him and other individuals, I've treated most of that in a summary fashion rather than the person's precise words because that seemed to be the most efficient way of presenting a comprehensive picture.

Q.    Okay.  So in the -- so that we could be efficient, we don't know actually what the defendant said in those portions

where it says dot, dot, dot.

A. That's correct.

Q. Okay. Nor do we know what other things he might have said about anything.

A. That's correct.

Q. Okay. Now, you have a slide presentation, correct?

A. Yes, ma'am, to accompany my testimony.

Q. And you -- some of those slides or many of those slides, actually, you use in other cases that you testify in.

A. Yes, ma'am, some of those I have used before.

Q. Okay. And those are the cases, the twelve to fourteen cases per year that you testify in.

A. Yes, ma'am. I may not use those in every case, but for example, the risk factors identified by the Department of Justice, I have used those pretty routinely across the last year because they simply represent the best research currently on the connection between development and criminal violent outcome.

Q. Okay. Now, the first slide -- I'm not asking you to put it up. In fact, could you go ahead and take that down.

A. Oh, yes, ma'am.

Q. At the top of the chart it said choices.

A. The ramp.

Q. Right.

A. The top block of all those had choice resting on that

whole structure, yes, ma'am.

Q. Okay. And on direct you were asked did Marc Barnette have a choice, and your answer was, oh, yes, ma'am.

A. Yes, he did.

Q. Okay. Now, isn't it true that the defendant chose to use his brother's identification to buy two firearms?

A. Yes, ma'am.

Q. Isn't it true that he chose to saw off the barrel and the butt and tape a flashlight to the bottom of that shotgun?

A. Yes, ma'am.

Q. Okay. Isn't it true that he chose a dark intersection in which to lay in wait for an unsuspecting driver to arrive at that intersection to be carjacked?

A. Yes, ma'am.

Q. Isn't it true that he chose to walk Donnie Allen into the dark woods, turn him around and shoot him three times in the back?

A. Yes, ma'am.

Q. And isn't it true after he shot Donnie Allen he chose to lean down and pick up his wallet?

A. Yes, ma'am.

Q. And he chose to drive Donnie Allen's car to Roanoke, Virginia.

A. Yes, ma'am.

Q. And at which point he chose to lay in wait for Robin

Williams to wake up in the morning and shotgun his way into that home.

A.    Yes, he did.

Q.    And he chose to cut the phone lines so that Ms. Williams could not call 9-1-1 to assist her daughter who was being chased by Mr. Barnette with a shotgun.

A.    Yes, ma'am.

Q.    Okay.  And he chose to threaten the neighbor, Sonji Hill, when she was calling 9-1-1.

A.    That's correct.

Q.    All right.  And he chose to drag Robin through her -- by her hair and her arm through that neighborhood.

A.    Yes, he did.

Q.    And he chose to shoot Robin Williams twice in front of her mother, killing her.

A.    Yes, ma'am, he made all those choices.

Q.    All right.  Now, in the Department of Justice study that you -- much of your presentation is -- relies on, that study uses -- or identifies risk factors.

A.    Well, you've asked -- you've asked a compound question.  I find that to be a very important study, but my presentation also relies on many other pieces of scientific research.  And so that's an important one and I did discuss it.

Q.    Okay.  Let's talk about the DOJ study right now.

A.    Yes, ma'am.

Q.   The Department of Justice study identifies risk factors.

A.   Yes, it does.

Q.   And that's part of your presentation.

A.   Yes, ma'am.

Q.   And that was a study of, quote, Serious, violent, and chronic juvenile offenders.

A.   Yes, ma'am.

Q.   And that that study identified risk factors associated with serious, violent, and chronic juvenile offenders.

A.   Yes, ma'am.

Q.   And in your presentation you've attempted to provide this jury with an accurate description of the environment in which the defendant grew up.

A.   Yes, ma'am.

Q.   Okay.  And associate those risk factors with the defendant's environment.

A.   That's correct.

Q.   All right.  Now, weren't those risk factors developed to determine who might become a juvenile offender?

A.   Yes, ma'am.

Q.   Okay.

A.   By late juvenile, early adulthood, that's correct.

Q.   Okay.  Well, it's from the Department of Juvenile Justice, correct?

A.   Yes, ma'am.

Q. All right. Well, isn't it true that Marc Barnette has no juvenile criminal history?

A. I believe that's correct.

Q. Okay. So those factors didn't end up being very predictive, did they?

A. I think that they are. The context of these studies is to identify risk of serious violence in late adolescence or early adulthood.

Q. Okay. Even --

A. And that's --

Q. I'm sorry.

A. That's the tracking that the longitudinal studies take. And as you look at the continued follow-up, the interviews in the community and Widham study and others, they're tracking these folks on up into early adulthood. Often -- often the evidence of this is beginning in the teenage years --

Q. Okay. Let me --

A. -- and that's certainly the case with Marc.

Q. Let me stop you --

A. Yes, ma'am.

Q. -- just so that you can answer my questions specifically.

A. Yes, ma'am. I apologize.

Q. That study was entitled, The guide for implementing the comprehensive strategy for serious, violent, and chronic

juvenile offenders put out by the Juvenile Justice Bulletin, Office of Justice Programs, Office of Juvenile Justice and Delinquency Prevention.

A. That's correct.

Q. That was who put out the study, yes?

A. Yes, it is, but it's not targeted to folks that are --

Q. Dr. Cunningham --

A. -- less than fourteen years old.

Q. I'm asking you who put out the study.

MS. LAWSON: Can he explain his answer.

THE COURT: Let him answer the question.

Q. Okay. Did the --

A. That's the title of the study, but it's intended to identify individuals who are at risk in the late adolescent, early adult period. You're looking at a trajectory that often begins in teenage years and continues and is evident by early adulthood.

Q. Okay. Thanks. Now, you had a slide that talked about -- well, noting the study we've been talking about, Prevention approaches seek to interrupt the processes that cause behave -- problem behavior.

A. That's correct.

Q. All right. So is it your testimony that these risk factors cause violence?

A. That's the words of the Department of Justice: That

these risk factors are the processes that cause the problem behavior. Now, they don't cause it one hundred percent of the time, but they do have a significant -- a significant presence in increasing that risk and in that sense have a causative component.

Q. All right. Now, is it your testimony, then, that risk factors cause behavior?

A. They increase -- in many instances those are formative in nature. I guess it's like saying does cigarette smoking cause cancer? Well, it's a risk factor for it. That doesn't make it happen in every case and so it must not be the only variable that we can use to account for it. And yet to say that it has no causative contribution, that would be in error as well.

Q. Well --

A. And so this is -- when we talk about risk factors, you're talking about things that have a portion of the causative element.

Q. Okay. Well, would it be also accurate to say that the risk factors are associated with violence?

A. Yes, ma'am.

Q. Don't they start with looking at people who are already criminals, making a determination about their lives in order to try predict?

A. In some instances. In other instances they are tracking

these individuals as they go along and have some that have not been maltreated and some that have and track both groups over time.

Q. All right. So being male is a risk factor, correct?

A. Oh, yes, ma'am. That's the majority of criminal violence is perpetrated by males.

Q. All right. Now, does being male cause you to be violent or is it associated with being violent?

A. It's associated. It increases your risk.

Q. Okay. And family conflict is a risk factor.

A. Yes, ma'am.

Q. Okay. Does family conflict cause violence or is it associated with violence?

A. The two are potentially -- the two can be synonymous. As the risk increases, as the association increases, there is a causative element. So that if you have three types of family violence, family conflict, there's about 78 percent of those kids were violent in the community. If there was no family conflict, it was about 40 something.

Q. Right, so there's an association.

A. Yes, ma'am. It has a causative element to it.

Q. All right. But you're not saying, of course, that anybody who is male and has family conflict is going to murder two people, are you?

A. No, ma'am. They're at greater risk, but they're by no

means even likely to out of that background.

Q. All right. Now, it is true, though, however, isn't it, that every single one of the thousands of individuals incarcerated have risk factors?

A. Yes, ma'am. That's often how they got to prison.

Q. Now, in individualizing the defendant's life history to those risk factors, you gathered information from multiple sources.

A. Yes, ma'am.

Q. And it's important that the information that you use to prepare your report be accurate.

A. Yes, ma'am.

Q. And one of the slides that you talked about, it was risk factors in the community, conception to age six.

A. Yes, ma'am.

Q. And there was a list of things and you checked off a few of them.

A. Yes, ma'am.

Q. Now, one of the things that you checked off was family history of criminal behavior and substance abuse.

A. Yes, ma'am.

Q. Okay. And the -- in your testimony yesterday, you noted that -- you checked that off because of alcohol abuse by the mother, Sonia Barnette, that she was going out dressed up, going out with her sister and leaving the children.

A. She was doing that. She was also drinking to excess and was observed to be intoxicated, and evidence of drug abuse as well.

Q. And you actually gave the example of Mario Barnette's testimony about observing his mother leaving with the aunt and going out drinking.

A. Yes, ma'am.

Q. Now, you realize, don't you, that that example that you have given this jury was -- as reported by Mario Barnette and yourself occurred when the family was living in Atlanta and Marc was fourteen or fifteen years old.

A. Yes, ma'am, in that instance. Sonia was going out during the time that she was still married to Derrick across his childhood.

Q. Right.

A. And that is also described by Armad. Derrick Barnette described Sonia going out as well. So her alcohol abuse doesn't seem to be in serious question.

Q. My point is that you told this jury that that's a risk factor Marc Barnette had from conception to age six, and the examples that you're giving the jury to back up the fact that you're giving this risk factor to him happened well after the defendant -- in fact, the defendant was a teenager. Armad wasn't born yet.

A. I think that's a good point, and that may have been my

oversight. There is -- there are indications of Sonia going out to the clubs and abusing alcohol relatively early on. It becomes worse over time. And whether or not that aspect is included in the conception to age six or whether it simply shows up at six to adolescence, I think that's an arguable point.

Q. All right. So in that same conception to age six, you checked off family conflict.

A. Yes, ma'am.

Q. All right. Did you listen to Derrick Barnette's testimony that he and Sonia did not begin having conflict until Marc was about eight years old and they had moved back to Charlotte?

A. Yes, ma'am, I heard that.

Q. Okay. And that is -- but you've nevertheless given Mr. Barnette a family conflict risk factor from conception to six, notwithstanding the testimony of Derrick Barnette.

A. It's not a function of notwithstanding. There are a couple of elements that I would point to associated with that family conflict. One of them is that Derrick's discipline toward Marc was abusive in nature over an extended period of time, going back to his early childhood, and I think that has a family conflict component to it.

Derrick didn't suddenly do the math about Mario and his parenting -- whether he was the father of Mario at the time

that he leaves Sonia. That's something that was obvious at the time -- as he's deployed overseas and he's looking at the dates and when Mario was born. So that's something that's been present as an issue in this marriage from very early on.

Q. And I'm not quibbling -- well, I am quibbling, but my point to you is that you've given, haven't you, Mr. Barnette credit, if you will, for risk factors based on things you have determined to be present in his life at some point regardless of whether they're actually conception to six?

A. Well, let me continue the answer if I could. At age ten months --

Q. Well, I'll ask if you'll answer that question --

A. Well, I'm trying to.

Q. -- and then you can --

A. At age ten months his grandmother is murdered in a domestic violence incident in the home that he's living in. I think that also qualifies as family conflict.

Now, this guy was also abusive of her. You have his mother moving out of the house because she's unhappy about Pearl living with -- marrying and living with this guy. Now, that also qualifies as a context of family conflict prior to the age of six.

Q. All right.

A. She's then bouncing from pillar to post because she isn't entirely happy with where she's living. That qualifies as

family conflict.

Q. What my questions to you are is the examples that you've given the jury are not accurate in terms of other known evidence about Mr. Barnette's life. That's the point --

A. The examples that I gave --

Q. -- that I'm making with you, if you understand that.

A. The examples that I gave were intended to be illustrative and not comprehensive. Now, if I identified at conception to age six an example of conflict between the parents that in fact occurred after he was age six, then that's a fair criticism. I apologize for that. There is ample evidence of family conflict conception to age six in addition to whether or not what the degree of tension and conflict was between his parents at that age.

Q. Well, there are important differences, though, however, Dr. Cunningham, if I may take you to your next slide which was age six through adolescence where you give Mr. Barnette a check mark for transitions and mobility.

A. Yes, ma'am.

Q. Okay. And again, your example was the first four years of Mr. Barnette's life the family moved. Of course, which the first four years of his life are not age six to adolescence; isn't that correct?

A. Yes, ma'am. I don't think that was my complete answer in response to that item. I think I described that there was a

JA2556

good deal of transition, mobility early on and then there was another -- then there was a period of stability up to about age eleven. Then there is another period of significant mobility in the aftermath of the divorce.

Q. And isn't it true that transitions and mobility is not a risk factor zero to six because young, young children aren't affected by moves as much as children who are older?

A. No, ma'am, that's not correct.

Q. Well, it's not on the DOJ risk factors zero to six --

A. If you look --

Q. -- is it?

A. If you look at family management practices --

Q. Well --

A. -- as that --

Q. -- is it on the list from DOJ --

A. Yes, ma'am. I believe it fits under family management practices. The issue at a younger age is not simply geography, it's the loss of structure as this child is continually in a different family mix, in a different location, and in a different home. And as -- as you have significant instability at that age, it's not so much the mobility as the instability in family management.

Q. Now, you had given Marc Barnette a check mark for parental attitudes favorable toward and parental involvement in crime and substance abuse.

3715

A.   Yes, ma'am.

Q.   Again, did you hear Derrick Barnette's testimony that the two most important things he wanted to teach his young children were honesty and the importance of education?

A.   I heard that testimony.

Q.   Okay.  Would you -- well, strike that.

You also testified that Derrick Barnette left welts and bruises on the defendant.

A.   That's my understanding.

Q.   Okay.  Now, are you aware that he had previously testified under oath that when asked, Mr. Barnette, was your -- when you disciplined your son, Marc Barnette, did you leave welts and bruises, and his answer was no.

A.   That's correct.  Mr. Barnette's description of that is discrepant from other observers.

Q.   All right.  And in spite of evidence to the contrary, you still associated these risk factors with the defendant.

A.   Yes, ma'am.  I might turn to my interview with Derrick to see whether or not he identified to me that in fact he left welts and bruises as well.

Q.   What I'm talking about, Dr. Cunningham, is a statement made under oath, not an interview with you, and a statement he's made under oath in this courtroom.  So I'm not asking you to verify.  I'm asking you were you aware of statements that he's made under oath?

A. I was here in the courtroom. I don't recall whether he said that there were no welts and bruises that were left from the beatings that -- the whippings that Marc got. I don't recall his testimony precisely in that regard. The information that I obtained from other individuals in the family, and my recollection is perhaps him as well, is that it did leave welts and bruises.

Q. All right. But I'm reading to you from -- would you like to see it?

A. Is this his testimony of yesterday?

Q. This is his testimony from a prior hearing.

A. I wasn't in attendance then so I would need to see that. But the recollection that I have of it yesterday is unclear to what extent he acknowledged that there may have been welts and bruises.

Q. Okay. Now, have you accounted for Mr. Barnette's different stories?

A. If you'll let --

Q. As well as accounted for the defendant's different version of events?

A. I have some explanation of both, yes.

Q. Have you accounted for it in your findings?

A. Yes, ma'am, I've tried to take that into consideration.

Q. And in favor -- in the favor of Mr. Barnette.

A. No, ma'am. I would not at all dispute that Derrick's

description or characterization of his parenting is potentially at odds with the way other people might have observed that and perhaps at odds with how it would be -- how that would be evaluated from an external perspective.

Derrick says that he was there for Marc. When he's not paying child support, when he leaves it in the kids' hands to contact him, when a couple of years go by without contact, when Marc calls him from jail and there's no follow-up call --

Q.   Dr. Cunningham --

A.   -- that's not being there for your child as a father. So his perceptions of his own conduct may not be -- may not be particularly objective.

Q.   Were you here for his testimony wherein he discussed Mr. Barnette calling him from Georgia when he was in jail and...

A.   Yes, ma'am. I had a follow-up conversation with him then about what happened after that. Did you go to Georgia? Did you call him on the phone? Did you follow up with him to see if he got treatment?

Q.   Well --

A.   And the answer was --

Q.   -- is it true that Derrick Barnette has remained a part of Marc Barnette's life?

A.   In a peripheral sort of way. If he were a biological parent, his rights could have been terminated based on the degree of contact that he's had.

MS. TOMPKINS: Well, objection.

THE COURT: Sustained. Members of the jury, don't consider the last statement.

Q. All right. Let's move on. Isn't it possible that where -- you seem to be saying that Derrick Barnette may be minimizing his conduct. Is that -- I think you testified to that yesterday.

A. Yes, ma'am.

Q. Wouldn't it be fair to say that the defendant might have a tendency to maximize?

A. That potential is there. There's some of this that Derrick acknowledges himself that is an objective reality about how often there is contact or what degree of involvement he has in Marc's life.

Q. All right. Let's see, family legacy. You went through some amount of testimony about the family legacy.

A. Yes, ma'am.

Q. You called Jesse Cooper, quote, psychiatrically disabled.

A. Yes, ma'am.

Q. Okay. Now, what psychiatric tests did you perform on Jesse Cooper to make that determination?

A. I was advised of that by Sheila, his daughter --

Q. My question is what psychiatric tests did you perform on Jesse Cooper to make that determination?

A. I did not test Jesse Cooper.

Q. Okay. Thank you. You have a slide in that same family legacy slide that calls Tom Barnette, who is Derrick Barnette's father, Marc Barnette's grandfather, an alcoholic playboy.

A. That's correct.

Q. Now, did you review prior testimony in this case?

A. A great deal of it. I don't recall all of it, but I did review a great deal of prior testimony.

Q. Now, Tom Barnette is from Philadelphia, correct?

A. I don't recall.

Q. Well, would it surprise you that in prior testimony when he was asked, Did you ever see Marc Barnette at Christmas time, that his answer was, Yes, I did. I spent quite a bit of time going there those ages. I've forgotten now what age he flew over there on the plane, but he came over several times.

Okay. Would it surprise you to know that when asked, Did you know Marc when he was around the age of fourteen, that Tom Barnette stated, I believe at that time -- I don't know when they went to Atlanta, but it was after the divorce. But I can tell you this. He was interested in historical things and I took a week off to take him to the zoo, different places so he'd be able to explain to his classmates what he saw there and I was hoping that would stick because I thought he was very intelligent at that age and he wanted to do something in

life.

A. Yes, ma'am. I was not describing what role he had in Marc's life as a grandfather. I was describing what his presence was in Derrick's life early on in the early divorce of his family.

Q. And you just made the announcement to the jury that he's, quote, an alcoholic playboy.

A. That was my understanding from the interviews that had been done, the investigation.

Q. And I'm guessing those are your words.

A. No, ma'am. Those are words that were part of the psychosocial history investigation that was done four or five years ago.

Q. Okay. So they're the words of some other sort of psychologist, sociologist?

A. No. My perception was, and I need to look and see if they're in quotes, was that that was how he was characterized by members of that family, but I don't recall with certainty.

Q. So you -- we don't know who those people are or where that characterization came from --

A. Not specifically --

Q. -- correct?

A. -- no.

Q. Okay.

A. Or if it's -- they are -- I don't recall. It may be

specifically attributed, but I don't recall.

Q. Now, you've also testified several times about the grandmother who was allegedly poisoned, correct?

A. Potentially poisoned.

Q. Okay. But there are no police reports or corroborative information about whether or not that did or didn't happen.

A. No, ma'am. The critical issue is not whether it happened, but, rather, the presence of this as part of the history of this family. That people in the family believe it and the children have heard this.

Q. All right. Now, you testified yesterday one of your slides was about the relevance of a family's history or legacy over generations.

A. Yes, ma'am.

Q. And the first bullet point was the child is predisposed through heredity.

A. That's correct.

Q. Now, are you suggesting that Marc is a natural born killer?

A. No, ma'am. That's a mischaracterization. I think that he was at risk in a number of ways. I think he was at some risk for alcohol abuse. I think he was at risk for personality disorder, and for some affective instability, some borderline personality traits that are present in other members of the family. I think there are a number of

biological predispositions that are operating here.

Q.   All right.  Well, based on his heredity is there always a risk that he can kill someone?

A.   It's not so simple as a hereditary risk of killing somebody.  It's the -- the hereditary risks are four factors that put him on a trajectory that took him here.  The borderline personality traits that he has, I think, have a genetic -- a hereditary component.  When you take that kind of genetic personality predisposition and you mix it with early abandonment and attachment problems and other things that happened along the way, that helps take you to somebody who is domestically violent and who has a much more difficult time with relationships and is more likely to behave erratically and potentially violently in that relationship context.

Q.   You talked about parental death.  And am I correct that that relates to the defendant's grandmother who was killed when the defendant was ten months old?

A.   That's correct.

Q.   So are you telling this jury that the defendant's presence in the house when his grandmother was killed when he was ten months old was a contributing risk factor for the defendant killing Robin Williams and Donnie Allen?

A.   It's part of the family legacy of domestic homicide that your grandmother was killed.  I think another part of that is the knowledge that when that happened, you were just in the

next room. I mean, there's a sense that this wasn't something that happened a long time ago far, far away, but this happened pretty close to you.

Now, the part that is tied in addition to that knowledge is that a primary caretaker in his life was amputated at the age of ten months, and that is a potential substantial damage to a child's attachment development, particularly when the substitute or additional parent who is there is only fifteen years old.

Q. So little Destiny Williams who was in Ms. Bertha Williams' arms when the defendant shotgunned his way into the house and who Robin helped to take care of, is she now -- does she have a risk factor in her life because the defendant killed Robin Williams in her -- while she was in the house?

A. I think she is at greater risk for emotional or psychological problems in part from, again, the murder of a close family member. Now, depending on the extent of which -- and this now being part of what's traumatized this whole family system, and I would expect that that -- that does have the potential to reverberate through her life. Now, because she's female it's unlikely to be acted out in criminal violence, but this has not been a vitamin in her life. This is a -- that has been a destructive event.

Q. Murder/suicide. You realize this is a murder/murder, not a murder/suicide?

A. Yes, ma'am. I characterized this or talked about the research on murder/suicide because that seems to have been a part of the thought pattern and the fantasy that was being carried out, and his own reports of attempting suicide in the aftermath.

Q. All right. Now, in your slide on murder/suicide, you put case characteristic and had some check marks.

A. Yes, ma'am.

Q. And one of them was married or long-term relationship.

A. Yes, ma'am.

Q. Now, defendant didn't have a long-term relationship with Donnie Allen, did he?

A. Oh, no, ma'am.

Q. There was no physical abuse in the -- or history of physical abuse between Marc Barnette and Donnie Allen, was there?

A. No. That offense was in the service of the subsequent offense with Robin Williams that had some potential for murder/suicide.

Q. All right. So Donnie Allen had done nothing to provoke Marc Barnette into shooting him, correct?

A. Oh, no. And I wouldn't characterize that Robin Williams had provoked him into shooting. There's not something that -- I wouldn't ascribe this to them. But there was no relationship that Donnie Allen had as Robin did.

Q. So Donnie Allen's murder doesn't fit into the family legacy of domestic violence or modeled domestic violence or past relationship failure; is that right?

A. As I described yesterday, the risk factors that I've talked about are risk factors for violence in the community in general. They are specifically related in this case to a domestic homicide progression that Donnie Allen is caught up in.

Q. All right. Now, it's your goal, I guess, your purpose --

MS. LAWSON: Objection, Your Honor.

THE COURT: Rephrase your question.

MS. TOMPKINS: I'll start over again.

Q. Your testimony is in an effort to try to explain why Marc Barnette murdered Robin Williams and Donnie Allen; is that correct?

A. Yes, ma'am, it is intended to be explanatory.

Q. And isn't it true, Dr. Cunningham, that this is about Marc Barnette's choices?

A. Yes, ma'am, it is about his choices. Not the same choices that you or I would have, but the choices that he got after a lifetime of things that he didn't get a choice about. Then, yeah, at the offense then he's making lots of choices. This is about -- this is about the choices and about the slope of the ramp that those choices are made on.

Q. But you agree, as we started out by agreeing, that Marc

Barnette made choices; isn't that correct?

A.   Oh, yes, ma'am.  My ramp model has choices sitting on it.  It's just a function of what structure do those choices rest on.

Q.   And Marc Barnette made choices in this case.

A.   Yes, he did.

MS. TOMPKINS:  That's all the questions I have.

MS. LAWSON:  No further questions.

THE COURT:  You may step down.

THE WITNESS:  Thank you, sir.

(Witness stepped down.)

THE COURT:  Members of the jury, we'll take our morning break at this time.  Remember the usual instructions.  Thank you.

(Jury exited the courtroom.)

THE COURT:  The clerk had a question about the exhibits that were admitted or not admitted, so I'd ask you to try to straighten that out with her during the break.

Do I understand the defense evidence is concluded here?

MR. BENDER:  Yes.

I think the question was Defendant's Exhibit Number 1 which was the entire interview.

MS. HANKINS:  No, 22 and 25.  First thing this morning we said 20 and 25 were in.  22 was not allowed because

it was additional statements. And then the last two charts Ms. Lawson showed, she called them 22 and 25 and then Judge allowed 22. So --

MS. LAWSON: I think the problem is that the ink smeared on the exhibit number.

MR. BENDER: I think it's 20 and 25.

MS. LAWSON: Yes.

MS. HANKINS: Okay. Good.

MS. LAWSON: I'm sorry.

MS. HANKINS: That's correct.

THE COURT: Those are the nontestimony charts.

MS. LAWSON: That's right. It's just that the 20 smeared and it looked like a 22.

THE COURT: All right. So there are no more defense witnesses.

MR. BENDER: No more defense witnesses. If we could have a minute to make sure we've got all our exhibits entered in.

THE COURT: All right. You may do that during the break.

And will the government be offering rebuttal witnesses?

MS. ROSE: Yes, Your Honor. And we'll be prepared to go on with the evidence.

(Brief recess at 11:15 a.m.)

(Jury not present.)

THE COURT: Yes, sir.

MR. BENDER: Your Honor, I have given to the government, and I think I've tendered to your law clerk, the case of United States versus Stitt, S-t-i-t-t, which was a Fourth Circuit case decided in May of 2001. The citation is 250 F.3d 838.

The -- in the Stitt case, the Fourth Circuit pretty well defined what is rebuttal evidence and what is not. In that case they found victim impact was not rebuttal evidence because it didn't rebut anything pertaining to the life -- the good deeds of that defendant.

And I bring that to the court's attention because the posture we are in today is as a result of the government's rebuttal evidence as well as lack of surrebuttal evidence. So I am asking the court in an abundance of caution to proceed -- to have a voir dire as to the rebuttal witnesses that the government intends to call so that we can see -- and the court can make a determination.

THE COURT: Do you have any idea right now that the government intends to offer any victim impact evidence?

MS. LAWSON: Well, I don't know whether it's victim impact evidence. I understand Brian Ard is here who was the manager of Camelot. What does that rebut? What issue, mitigating circumstance or aggravating circumstance is that

going to rebut? We don't know.

THE COURT: Well, we'll hear from the government.

MS. ROSE: Well, I don't think we're going to be calling Brian Ard. Any rebuttal evidence we have relates to -- four of our five rebuttal witnesses relate to inconsistencies within the defendant's testimony that the government will be rebutting.

One from Camelot because the defendant described his tenure at Camelot and his leaving Camelot as being all based on a joking nature and the way he characterized his conduct there. We would rebut that characterization.

He also very clearly within his testimony indicated that he did not, through his controlling behavior, try to alienate Robin from her friends or take her away from folks or that she was not changed in her demeanor with her friends. We're not talking about -- talking about her good points. We're talking about her relationship with others as a result of her relationship with him.

THE COURT: Now, what witness are you talking about there?

MS. ROSE: That would be Angela Rosser.

THE COURT: Angela?

MS. ROSE: Rosser, R-o-s-s-e-r.

THE COURT: Now, what situation did she have with reference to the facts of the case?

MS. ROSE: Two things. The defendant testified -- gave a very specific circumstance during his direct testimony about a funeral that Robin went to of a friend's child and described his behavior related to taking Robin from either a reception after that funeral or something. It's the government's -- and he went on to say both then and particularly in my cross examination -- I think my question was, Is it your testimony that you did not remove her from her friends or would not allow her to spend time with her friends, and he said absolutely not. So she would be testifying as to the alienation of friends and the fear that Robin experienced whenever she spent more time with her friends than she was supposed to, and the particular incident that the defendant detailed about the funeral.

Shirley Williams is a very brief witness with whom the defendant had a sexual relationship during his time with Robin that he presented some testimony about. We would be rebutting that.

And then our two expert witnesses on BOP classification and Dr. Dietz.

That would be the government's rebuttal. Three civilians --

THE COURT: BOP classification and what else?

MS. ROSE: Dr. Dietz. The rebuttal evidence as to psychological testimony which was presented by their three

psychologists.

MR. BENDER: Judge, what -- what mitigating circumstance or aggravating circumstance is any of that except for the experts? What does it rebut?

In the -- Mr. Barnette during his testimony said that he had other relationships while he was with Robin. That simply goes to making him look bad and it doesn't rebut anything. There's not any mitigating circumstance to which that rebuts.

THE COURT: Well, I think it -- most of those fact witnesses go to the point of whether the defendant was under a great compulsion to be attached to Ms. Williams. And his behavior while an employee of Camelot is directly responsive to that.

MS. LAWSON: Your Honor, in terms of the behavior at Camelot Music, if I understand, the government intends to rebut Mr. Barnette's testimony about what led to his dismissal. That he basically testified that it was just horsing around as opposed to legitimate sexual harassment. Is that the objective of this witness's testimony?

MS. ROSE: That it goes to the attachment as to Robin. It also goes to the believability and credibility of a witness. I mean, the government can rebut -- or can show to the jury whether they should believe a witness based upon the evidence that they've heard and -- I mean, just as in this

case as in any other case. If the government has --

THE COURT: Well, you can't -- there's very specific rules about putting on witnesses to attack the credibility of other witnesses. I take it what you would be trying to do is to attack his version of the facts.

MS. ROSE: Exactly.

THE COURT: And that's legitimate.

MS. ROSE: Yes.

MS. LAWSON: May I just point out to the court that that is fairly prejudicial information. And at the last trial Mr. Ard testified on cross about the woman who had made the allegations of inappropriate sexual contact. You'll recall that Mr. Barnette said that they were horsing around. That it was not -- you know, he felt that it was not particularly offensive.

Mr. Ard was shown a picture. Question: The first picture is you and Joanna; is that right?

Answer: Correct.

Question: Kind of horsing around; is that correct?

Answer: Uh-huh.

Now, that corroborates Marc Barnette's testimony at least as to his perception and Mr. Ard's perception. Allowing the government to bring this man in to purportedly contradict Marc when basically he's saying the same thing, I think it's improper.

MS. ROSE: We're not calling Brian Ard.

MS. LAWSON: Who from Camelot Music, I'm sorry?

MS. ROSE: Joanna Baldwin who is the victim.

MS. LAWSON: Okay. Yet he's already testified to that and we already know that another witness who was there describes it as horsing around.

THE COURT: Well, the government is entitled to respond to that.

MS. LAWSON: Okay.

THE COURT: That's direct rebuttal and for an issue that the defendant thought appropriate on the defense case. So the court finds the purposes which have been tendered by the government are appropriate for rebuttal witnesses as indicated.

Let's have the jury, please.

MS. LAWSON: May we rest before the jury?

THE COURT: Yes, if you wish.

MS. LAWSON: And of course, we make our Rule 29 motion.

THE COURT: Yes. Thank you. Renewed and denied.

(Jury entered the courtroom.)

THE COURT: All right. The jury is with us.

Will there be any further evidence from the defense?

MR. BENDER: No, Your Honor. The defense rests.

THE COURT: All right, sir. Thank you.

Will there be rebuttal evidence from the government?

MS. ROSE: There will be rebuttal evidence. At this time the government will call Joanna Coleman.

JOANNA BALDWIN COLEMAN,

being first duly sworn, was examined and testified as follows:

DIRECT EXAMINATION

BY MS. ROSE:

Q. Hi. Would you introduce yourself to the jury, please, ma'am.

A. Joanna Baldwin Coleman.

Q. And where do you live?

A. Roanoke, Virginia.

Q. Did you attend college in Roanoke?

A. Yes, Roanoke College.

Q. Have you since graduated?

A. Yes. In 1998.

Q. Are you working?

A. Yes. I work for Ferrum College.

Q. What's your position there?

A. I'm the director of the annual fund.

Q. Now, while you were going through college, did you work to pay for your education?

A. Yes.

Q.    Where did you work?

A.    Camelot Music store.

Q.    There in Roanoke?

A.    Uh-huh.  And I worked full-time hours.

Q.    While full-time attending school as well?

A.    Yes.

Q.    Did -- while working at Camelot Music, did you meet the defendant, Marc Barnette?

A.    Yes.  He was the assistant manager.

Q.    When you were hired, was he the assistant manager?

A.    No.  He was a key holder, which is a level of management.

Q.    What does that mean?

A.    He had management responsibilities such as opening the store and taking care of the money, that type thing.  You would call in to Marc if you couldn't make it to work.  But at that point I think maybe -- I started late summer.  By the fall he was assistant manager.

Q.    You're going to have to speak up so the jurors can hear you.

A.    Okay.

Q.    You might need to lean.  Don't pull the microphone toward you.

A.    Okay.

Q.    You just might need to lean.

When did you -- what year did you begin -- what month and year did you begin work?

A. July 1995.

Q. Was the defendant already employed there when you were hired?

A. Yes.

Q. And it was later on that fall, then, that he became the key holder or assistant manager?

A. Yes.

Q. Did you see the defendant frequently at work?

A. I worked with Marc a lot because I mostly worked night shift because of college and he, for the most part, was there nights.

Q. Did he -- while working in management and prior to that time, was he involved in sales or helping customers?

A. Yes. Marc was excellent with customer service. He knew all types of music and he was very personable. People would come in, you know, just to see -- just ask Marc about different musicians, whatnot. So yes, he was very out in the store to be seen.

Q. He interacted well with those folks?

A. Extremely well. We had repeat customers that would come in and ask specifically for Marc. Marc brought in go-go music to the store which is something we had not carried before. Independent type music. He was always working with

customers. Trying to stay, you know, current.

Q. During the time that you worked with the defendant, describe how he treated you.

A. Marc was extremely friendly at first. He has a flirtatious nature. Is it okay to get into the whole --

MS. LAWSON: Objection, Your Honor.

THE COURT: You may pose a new question, counsel.

Q. During the time that you were working with the defendant, did he do some things that made you feel uncomfortable?

MS. LAWSON: Objection.

THE COURT: Overruled.

A. Yes. Marc was extremely friendly. So at first, within my first two weeks of working there, he would come to me and say, you know, why don't you meet me at Applebee's after work for a drink. I was nineteen at the time. At that point in the summer I had not started school yet and I lived an hour away. So as a condition of getting the job, I had to, you know, on my summer breaks, whatnot, or Christmas drive back and forth from Martinsville to work there. So I would say, well, you know, I'm heading home. And I really thought he was just being friendly at the time.

As the months progressed, he would make very sexual and lewd comments and -- like I said, started off pretty innocent with just meet me for drinks. By the end of it --

MS. LAWSON: Objection.

A. -- it was very vulgar.

MS. LAWSON: Objection.

THE COURT: Overruled.

Q. Describe for the jurors as it progressed over the months specifically what happened.

A. Marc harassed me. I'll just say it like that. Again, it started off with, you know, meet me for drinks. And then it moved into, you know, you look sexy today. You know, look at your rear in this outfit. There's so many things. I was too thin. I needed sex.

By the very end, you know, there was a progression by Christmas. He would say things like I needed his big dick in me.

MS. LAWSON: Objection.

THE COURT: Overruled.

Q. Go ahead.

A. I needed to be -- he'd tie me up. At that point -- at first, you know, I would talk about my boyfriend, things to kind of throw him off when he would talk about the drinks when I was still trying to figure out is he just being nice, is he harassing me. By the end, you know, I would barely speak to Marc. And Marc would come in and he would say, What the hell is wrong with you? We had a very hostile work relationship by the end. You know, I would come to work and just work my shift and go home and just try to speak with him as little as

possible. At that point I had a management position so I didn't really have to call on Marc for a lot. I could go in, do my job, and get out of there. And --

Q. Well, now, as he started saying more specifically sexual things to you, was it only a one-time occasion?

A. No. It was all the time. You know, it got to the point that pretty much every shift I worked. And it's hard for me looking back now to say why did I stay at a 5.20 an hour job, but, you know, I was going to a private school. My mom was a single parent secretary. I needed the money. And in my head -- you know, I didn't know Roanoke that well. I just thought this is the only place, you know, I can get a job as a college student. So I kept thinking if I ignore him --

MS. LAWSON: Objection.

A. -- talk about my boyfriend --

THE COURT: Overruled.

A. -- he'll leave me alone and eventually he'll get the hint and just go on and we'll just talk about work and, you know, this would be it.

Q. Did you see the statements that the defendant was making to you as joking?

A. No. No. No. I don't know how you can joke about, you know, by the end -- he was more funny at first. By the end, you know, we had a hostile -- tense, maybe hostile is not the right word, tense working relationship. So when he got into

the I needed a dick in me, or whatnot, you know, I think that was more -- you know, he wouldn't walk by and just say, you know, you need -- laughing and say something like that. It was more he had a stern voice then. It was more of a -- I won't say it was a threatening environment, but it was getting close to it. You know, it wasn't at all some fun and games type thing, you know.

Q. Did he ever bring Robin Williams into the store?

A. Yes. Robin came in a few times. She would come up to the counter. She never really said much. I remember her being a very pleasant person. Seemed very friendly. Shy, though. You know, she wasn't someone that would just come in and start talking to us.

Q. Did you eventually report what was happening?

A. Brian had called me --

Q. Who is Brian?

A. Brian Ard was the manager of the store, I'm sorry. He had called me over Christmas of that year -- that would be Christmas of '95 -- because some of the men in the store had noticed that there was some tension between Marc and me.

MS. LAWSON: Objection. Move to strike.

THE COURT: Overruled.

A. They had noticed there was some tension between the two of us. And Mark Tuck in particular had asked Brian Ard to come into the store unannounced to see if he could see some of

what was going on.

So Brian Ard called me. Again, I was on my Christmas break and had been driving back and forth. And said, you know, people are saying there's some tension with you and Marc and is there harassment? And I told him that, you know, Marc had bothered me at first. I still just wanted it to go away. I didn't want all this conflict. Again, I'm going to school full-time. I'm working full-time. I just wanted to make my money and go home. So I said I really felt like, you know, again, Marc had bothered me at first, but that it was going to blow over. It had blown over.

And it was in January that it really came out that it -- it just got worse. And so in January when Marc was fired.

Q. Was that based solely on what you had said?

A. No. Her name was Renee Worther, I believe --

MS. LAWSON: Objection.

THE COURT: Overruled.

A. -- had actually brought it to Brian's attention. Marc had slapped her on the rear and she had walked out that night. Thought about it, because I remember she said she was vacuuming. Marc had told her to vacuum. She had walked out that night. Thought about it. And she knew I was being harassed. And she told Brian again, Joanna is being harassed. She just will not say she's being harassed. And that next day Brian started calling everyone in the store in

and we let it -- we started talking about it. But again, I just wanted to avoid it. There were times -- I had a friend from high school come visit me during that Christmas break. He was just coming through the mall. And I could tell it bothered Marc that this guy --

MS. LAWSON: Objection. Nonresponsive.

THE COURT: Sustained. Ask a new question, please.

Q. Did you continue after -- after the defendant was fired, did you continue to work at Camelot?

A. Yes.

Q. Until you graduated?

A. Yes.

MS. ROSE: Thank you very much. I don't have any other questions.

THE WITNESS: Okay.

CROSS EXAMINATION

BY MS. LAWSON:

Q. Ms. Coleman, you're aware this is not a sex harassment case, is it?

A. Yes, I'm aware.

Q. And I believe you mentioned that at first it was friendly and playful.

A. I would say it was friendly. Playful is not -- it was friendly. We didn't joke back and forth. I would say it was friendly.

Q. He never laid his hands on you --

A. He touched my rear.

Q. -- in a sexual way.

Oh, okay. All right. You testified to that.

Let me ask you this. If Marc Barnette had taken the stand in this case --

A. Uh-huh.

Q. -- and testified voluntarily that he -- he said to an employee at Camelot Music that he needed -- or she needed to have his big black dick in me (sic), that that was the truth. Is that the truth?

A. That's absolutely the truth.

MS. LAWSON: Thank you. No further questions.

REDIRECT EXAMINATION

BY MS. ROSE:

Q. If he said he was joking, was that the truth?

A. He was not joking. I mean, he had me chopping up boxes in the back room when my friend came in. I mean, it was a tense environment. He didn't want even to have men in there talking to me. I chopped up boxes for probably six hours during Christmas when all these people are in the store because he was mad that another male talked to me. You know, we're not joking at this point. I mean, there was no -- no ifs, ands or buts. I was making Marc upset by talking to another male. He was going to punish me by making me chop

boxes all afternoon. You know, there was no joking. I was not -- you don't joke about things like that. You know, I'm sorry. I just -- it bothers me to even hear we could have been joking about such things. It was such a hard thing at the time. You know, I cried a lot. Even though I didn't come forward and say that he was harassing me at first, that doesn't mean that I went home and forgot about it. You know, every friend I had knew. I just didn't want to cause that kind of conflict at work. I just wanted to pay for my student loans and be able to stay in school. You know, that was my number one priority. So that's...

MS. ROSE: Thank you.

THE WITNESS: Thank you.

MS. LAWSON: No further questions.

THE COURT: You may step down.

THE WITNESS: Thank you.

(Witness stepped down.)

MS. ROSE: Government will call Shirley Williams

SHIRLEY PARKER,

being first duly sworn, was examined and testified as follows:

DIRECT EXAMINATION

BY MS. ROSE:

Q. Would you state your name, please, ma'am.

A. Shirley Parker.

THE COURT REPORTER: Shirley what?

THE WITNESS: Shirley Parker.

Q. Shirley Williams Parker?

A. Yes.

Q. Do you know the defendant seated over here, Marc Barnette?

A. Yes, I do.

Q. Where did you meet the defendant?

A. At the Camelot Music store at Valley View Mall in Roanoke, Virginia.

Q. When was that, if you remember?

A. I don't quite remember the year. But I -- I was sixteen at the time.

Q. How old are you now?

A. Twenty-three.

Q. Were you living in Roanoke at the time?

A. Yes, I was.

Q. And you said you met him at Camelot. Were you employed at Camelot when you met the defendant?

A. No, I wasn't.

Q. How did you meet him?

A. I went in looking for a tape or a CD and he came over to help me. And our conversation was based around the gospel music area. That's where I was looking for my tape or my CD. And I ended up asking for an application for a job.

Q. And did you, in fact, apply and get a job there at

Camelot?

A. Yes, I did.

Q. Was the defendant in management at the time?

A. I do believe he was.

Q. And how long did you work at Camelot?

A. For about a month. Just throughout the Christmas season.

Q. It was a temporary position?

A. Yes.

Q. During that time, describe how the defendant treated you.

A. We were on a business level at work. But then we had a friendship outside of work.

Q. And as a result of that friendship, did he take you on several occasions to Keswick Apartments?

A. Yes, he did.

Q. And while at Keswick Apartments, was anyone else there when he took you there?

A. No.

Q. While there, what happened?

A. We had sex. I can't remember how many times. Maybe once or twice on the two times that he did take me there.

MS. ROSE: All right. I don't have any other questions.

MR. BENDER: I don't have any questions.

1718

THE COURT: You may step down.

(Witness stepped down.)

MS. TOMPKINS: The government calls Angela Rosser.

ANGELA ROSSER,

being first duly sworn, was examined and testified as follows:

DIRECT EXAMINATION

BY MS. TOMPKINS:

Q. State your name, please, for the jury.

A. I'm sorry?

Q. State your name for the jury.

A. Angela Rosser.

Q. How old are you, Angela?

A. Twenty-nine.

Q. Where did you grow up?

A. Roanoke, Virginia.

Q. Did you grow up with Robin Williams?

A. Yes.

Q. Did you all ever work together?

A. No.

Q. You worked at one hospital; she worked at another?

A. Yes.

Q. Now, growing up in Roanoke around Robin, were you aware of a Saturday morning ritual that Robin had with her mother?

A. Yes.

Q. What was that?

MR. BENDER: Objection, Your Honor.

THE COURT: Overruled.

MR. BENDER: Victim impact.

MS. TOMPKINS: Well -- let me just ask my next question.

THE COURT: You may.

Q. After Robin began dating the defendant, was Robin -- do you know whether Robin adhered to that Saturday morning ritual she had with her mother?

A. Are you asking me did it change?

Q. Yes.

A. Yes.

Q. What was that change?

A. Well, they used to go out every Saturday morning and they done whatever it is that they done. We would get together in the evening time. Well, when that started -- when she stopped hanging with us in the evening, then I knew something had changed. Just her whole -- everything changed.

Q. Okay. When she began dating Marc Barnette, did -- do you know whether or not she stopped going out with her mom on Saturday morning?

A. I didn't know if she had stopped going with her mom, but I knew she had stopped going with us.

Q. Okay. And describe for the jury the change in your relationship with Robin when she started dating Marc

Barnette.

A.   Well, we used to go out every weekend when she didn't have to work.  That changed.  We used to talk just about every day.  That changed.  We communicated at work because she worked three to eleven and I was on the night shift.  That changed.  We just -- everything just stopped.  Immediately.

Q.   So you and Robin -- had you all had lots of contact before that?

A.   Uh-huh.

Q.   Do you know whether or not Marc Barnette encouraged Robin to maintain her relationships with her friends?

MR. BENDER:  Objection.

THE COURT:  Overruled.

A.   No, I don't know.  I just know that she said that he was --

MR. BENDER:  Objection.

THE COURT:  Overruled.

(Pause.)

THE COURT:  Go ahead.

Q.   Go ahead.

A.   He was not -- he didn't know a lot of people so that's why she spent a lot of time with him trying to get him to know people in Roanoke, but he didn't want to get to know us.

Q.   During the time that Robin and Marc Barnette dated, how much of Robin did you see, actually?

A.  I saw Robin very seldom.  The last time that we really got together is when my niece had died.

Q.  Okay.

A.  And she came to the funeral.

Q.  Did the defendant come to the funeral?

A.  No.

Q.  Okay.  Do you remember an incident after the funeral in which you had an encounter with the defendant, Mr. Barnette?

A.  Yes.

Q.  Describe that for the jury.

A.  Me and Robin and my cousin was going to the store and we had came to a stop sign.  And Marc was in front of us and she had ducked down in the seat.  And I asked her what's wrong, and she said she didn't want -- want -- she didn't want him to see her.  And she said, Just let him go.

Well, evidently, he had saw her when she ducked down because when he took a right, we kept straight.  He ended up right back behind us.  He had turned -- made another turn.

Q.  And this was after your niece's funeral?

A.  Uh-huh.

Q.  Where were y'all going?

A.  We was just going to the store.

Q.  Okay.

A.  And --

Q.  Do you know what car Mr. Barnette was in?

A. Robin's car.

Q. Okay. And what happened next?

A. She finally told us to pull over, and we did. And he -- he got out the car and he was screaming and crying and hollering, asking her why is she doing that to him? Why did she leave him?

She was telling him that we were just going to the store.

And he said, No, you weren't. You lied to me. You said that you wasn't going to go anywhere. And he was -- he just kept crying and hollering and crying.

And she got in the car -- she said, well -- he said, Let's go home. And she got in the car with him.

And I told her, you know, if he's going to act like that, don't go with him.

She said, No, it's all right. I'm going to go ahead and go home.

And when he -- when she got in the car, he took off doing every bit of 50. And I told my cousin to try to keep up with them. Well, by this time he ran a stop sign. Robin jumped out of the car while it was moving. She was rolling. And I pulled up behind her.

Then me and him got into it because I didn't understand why she was so scared and why did she jump out of the car. I knew he was going fast, but I felt like she was really scared

of him and that's why she done that. So me and him was arguing back and forth and he was telling me leave him alone. I mean, he was crying and he was jumping up and down telling me I don't understand; that I don't like him and that he didn't know anybody here.

And so I told Robin that she wasn't going to get back in the car with him.

And she was -- she said, No, it's okay.

She said -- I said, No, if you're going to go, I'm going to go with you because you're not going to get back in the car with him.

So we got -- I got in the car with them and we went back to her apartment. And they --

Q. Why did you do that?

A. Because I didn't want her to go by herself because she jumped out of a moving car. I felt like if she was scared, then I was going to be there for her.

So when we got back to her apartment, we waited in the living room and they were in the bedroom and he just -- you could just hear him crying from the other room.

Q. All right. Now, in your opinion, based on your observations on that date, did Marc Barnette try to find Robin in order to give her comfort on that day of your niece's funeral?

A. No.

MR. BENDER: Objection.

THE COURT: Overruled.

Q. You can answer that.

A. No.

MS. TOMPKINS: Thank you. That's all the questions I have.

MR. BENDER: I have no questions.

THE COURT: You may step down.

(Witness stepped down.)

MS. ROSE: Government will call Dr. Peter Carlson.

THE COURT: We'll take our lunch break at this time, members of the jury.

MS. ROSE: Okay.

THE COURT: And we'll ask you to be back with us, members of the jury, at 1:45. Give you an hour and a half.

Please keep an open mind about the case. Remember the other instructions. Thank you.

(Jury exited the courtroom.)

MR. BENDER: Excuse me.

THE COURT: Yes.

MR. BENDER: Before Dr. Carlson testifies, may I have his report?

MS. ROSE: He's not going to do any opinions.

MR. BENDER: Okay.

THE COURT: All right.

\*     \*     \*

Page 3755

IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF NORTH CAROLINA

CHARLOTTE DIVISION

UNITED STATES OF AMERICA )

) CASE NO. 3:97CR23-V

v. ) August 8, 2002

) Afternoon Session

AQUILIA MARCIVICCI BARNETTE, )

Defendant. )

TRANSCRIPT OF SENTENCING HEARING

BEFORE THE HONORABLE RICHARD L. VOORHEES

UNITED STATES DISTRICT COURT JUDGE

APPEARANCES:

FOR THE GOVERNMENT:

ANNE M. TOMPKINS, Esq.

JILL WESTMORELAND ROSE, Esq.

Assistant United States Attorney

227 West Trade Street

Suite 1700

Charlotte, North Carolina 28202

FOR THE DEFENDANT:

JEAN B. LAWSON, Esq.

P.O. Box 4275

Charlotte, North Carolina 28226

HAROLD J. BENDER, Esq.

200 North McDowell Street

Charlotte, North Carolina 28204

Reported by: Scott A. Huseby,

Registered Professional Reporter,

Certified Court Reporter,

Reported By: Scott A. Huseby, RPR
800-333-2082    Huseby, Inc., an Afl    an (704) 333-9889    Fax (704) 372-4593
Case 3:12-cv-00327-MOC   Document 106   Filed 09/23/15   Page 175 of 249
1726

JA2597

Page 3756

P R O C E E D I N G S.

THE COURT: Ms. Lawson?

MS. LAWSON: Yes, sir. We have reviewed the report. I understand the next and last witness for the government on rebuttal is Dr. Dietz.

MS. ROSE: He is not the next witness, but he will be a witness.

MS. LAWSON: Okay. And we've agreed to address this now so as to not create scheduling problems.

We contend that the information in his report, his proposed testimony, is not proper rebuttal. We have gone through the report, having heard all of the mental health testimony and the factual testimony and really cannot find any evidence that it differs in any material way or rebuts the testimony that's been heard in court.

The only purpose to present this would be to reiterate testimony about bad acts and things of that nature in front of the jury, which is improper rebuttal, particularly under the Stitt case.

What I would like to do, if it's all right with you, is give you a copy of the report so that you can look at it and allow me to go through it to demonstrate why what is in there is not rebuttal.

THE COURT: All right. Please hand it up.

Case 3:12-cv-00327-MOC    Document 106    Filed 09/23/15    Page 176 of 249

JA2598

United States of America vs. Aquilia Marcivicci Barnette    3:97CR23-V
Proceedings Before Judge Richard L. Voorhees    8/8/2002

Page 3757

MS. LAWSON:  Thank you.

THE COURT:  Thank you.

MS. LAWSON:  Do you want to read it first or go through it paragraph by paragraph?

THE COURT:  I will go through it.

MS. TOMPKINS:  I may be able to shortcut, Your Honor, that Dr. Dietz's testimony will be rebuttal in nature and it will be based on opinions that he has that will rebut opinions that have been put forth by defense experts, and the basis for those opinions is in part his interview with the defendant and his review of other documents, all of which is detailed in that report.

(Reviewing report)

THE COURT:  Okay.  Do you want to add anything to what you have said, Ms. Lawson?

MS. LAWSON:  Well --

THE COURT:  I have the report.  It appears to contain opinions that tend to rebut those of the previous experts presented by the defendant; and to the extent that it's necessary for him to go into aspects of the record that tend to support these opinions, he is entitled do that.

MS. LAWSON:  His opinion is that Mr. Barnette was not psychotic at the time of the offense;

Page 3758

there is no testimony that he was.

THE COURT: I heard testimony earlier that he was not psychotic.

MS. LAWSON: And --

THE COURT: And while that is not -- it doesn't mean that the government has to contradict an opponent witness at every turn to be rebuttal.

MS. LAWSON: Well, if I may point out, Your Honor, Pages 7, 8, 9, 10, and part of Page 11 are nothing more than recitations of information that's already in evidence and acknowledged by the defense witnesses.

THE COURT: Would that not have been an objection to your expert's testimony when he went through the aspects of Mr. Barnette's past and character at vast lengths in supporting his opinions, wouldn't that be the exact same thing that you offered your witness for the purpose of doing?

MS. LAWSON: Absolutely, but that means that it's not rebuttal.

THE COURT: No. It means it's a form of expert -- presentation of expert testimony that you evidently approved.

MS. LAWSON: Well, in terms of laying out and reciting stuff that's already in evidence from the

Reported By: Scott A. Huseby, RPR
800-333-2082 Huseby, Inc., an Af... ...on (704) 333-9889 Fax (704) 372-4593
Case 3:12-cv-00327-MOC Document 106 Filed 09/23/15 Page 178 of 249
1729

JA2600

other nonexpert witnesses.

THE COURT: And your witness not only put in things that were in evidence, but he based his opinions on many things that were not in evidence but were based on his own interviews --

MS. LAWSON: But --

THE COURT: -- and evidence from Ms. Johnson's interviews, which were not in evidence.

MS. LAWSON: But this material --

THE COURT: I don't mean to say these things by way of argument with you, but just to elicit that which you see as fundamental to your objection.

MS. LAWSON: Fundamental to our objection is that this provides the government with an opportunity to leave the last thing in the jury's mind those incidents that have already been testified to and acknowledged, and that purpose is not proper for rebuttal.

THE COURT: All right. The Court takes a view that that is not the purpose of these things. If the witness went to excessive lengths in that regard, I would certainly be cognizant of objections.

MS. LAWSON: There is just one other -- well, I don't have anything more on that. Thank you, Your Honor.

Reported By: Scott A. Huseby, RPR
800-333-2082     Huseby, Inc., an A1     ion (704) 333-9889     Fax (704) 372-4593
Case 3:12-cv-00327-MOC Document 106 Filed 09/23/15 Page 179 of 249
1730

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/8/2002

Page 3760

THE COURT: Thank you.

MR. BENDER: Excuse me, Judge.

THE COURT: Yes, sir.

MR. BENDER: I don't know whether they are intending to introduce the report or not. I don't think it's proper for them to introduce it. I think he can testify from it, but not to introduce it. I think it bolsters his credibility if they do.

But of concern to us is rebuttal is rebuttal. It is not the time to introduce new evidence, and there are things in here that have not been testified about that the government had every right to cross-examine whoever they wanted about these things; but to allow new evidence to come in through a rebuttal witness, I think is highly improper.

THE COURT: That would be correct, except to the extent that it involves the opinion, professional opinion of a witness and an appropriate basis for such an opinion.

MR. BENDER: Well, for instance, on Page 12, dates unknown, there's been no evidence of that --

THE COURT: Where are you?

MR. BENDER: Dates unknown on Page 12. Okay?

THE COURT: Well, of course, we don't know

Reported By: Scott A. Huseby, RPR
800-333-2082   Huseby, Inc., an Aff...   ...on  (704) 333-9889          Fax (704) 372-4593
Case 3:12-cv-00327-MOC   Document 106   Filed 09/23/15   Page 180 of 249

1731

JA2602

Page 3761

at this point what the government intends to do.  First

of all, does the government intend to attempt to offer

this entire report?

MS. TOMPKINS:  I was, yes, going to offer

the entire report.  As to the specific dates unknown,

Dr. Dietz references where that information came from,

and that was prior testimony of Sonia Barnette, and the

other one was Dr. Seymour Halleck's report.  So it's

referenced.  I'm not going to ask him specifically about

that.

So in general, let me say, that Dr. Dietz should

be allowed to testify about how his opinion differs from

defense experts, if it does, and what that opinion is

so that the new evidence that defense counsel doesn't

want -- doesn't think should be allowed in rebuttal is

simply this doctor's different opinion.

If there is a -- if there is something factual

there that is not in evidence, I will be happy to redact

a line that contains something not in evidence out of

the abundance of caution.  But I do also agree with the

Court that many, many things have -- were placed into

evidence by Dr. Cunningham for which there has been no

evidence placed in.  But if you have specific instances,

I would -- then let's talk about those individually.

MR. BENDER:  I do, and that being one.  In

Reported By: Scott A. Huseby, RPR
800-333-2082          Huseby, Inc., an Af                on (704) 333-9889          Fax (704) 372-4593
Case 3:12-cv-00327-MOC  Document 7126  Filed 09/23/15  Page 181 of 249

JA2603

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/8/2002

Page 3762

the next paragraph --

THE COURT: What is your objection, to the dates unknown statement?

MR. BENDER: Yeah, that whole thing. There has been no testimony about that. They could have asked Dr. Halleck when he was on the stand, they could have asked Marc Barnette when he was on the stand, but this is new evidence that's coming in, and I don't think it's going to alter his opinion to remove these things that are highly prejudicial and are new, not rebuttal information. If Marc Barnette said, no, I didn't do that, then --

THE COURT: As a factual matter, they are not rebuttal, and the Court will view that as an appropriate redaction, although it's still true that that may be the kind of thing that that witness would base his opinions upon.

MS. TOMPKINS: And that is correct. I mean, his opinion is going to be based on all of the things that he reviewed, including prior testimony, just like Dr. Cunningham's opinions were all of the things that he reviewed, which were numerous interviews with people who didn't testify, so their words got to be put into evidence through Dr. Cunningham without numerous objections by the government. In fact, I don't believe

United States of America vs. Aquilia Marcivicci Barnette    3:97CR23-V
Proceedings Before Judge Richard L. Voorhees    8/8/2002

Page 3763

we objected at all.

THE COURT:  Let's hear what other specifics Mr. Bender has in mind.

MR. BENDER:  Okay.  In the very next paragraph, 1989 through 1992, I think it's the third sentence, Ms. Herd told Drs. Grant and Duncan that Mr. Barnette pulled a gun, okay, and that --

MS. TOMPKINS:  Well, again, I have to say, Your Honor, that all of the experts testified based on their review of reports.  The government would be happy to put in the reports of Grant and Duncan and prior testimony of other witnesses upon which the witness relied.

If the objection is it's not in evidence, we can easily place that into evidence.  These are documents that Dr. Dietz reviewed.  I don't think I'm grasping the harm done, especially in light of Dr. Cunningham's lengthy testimony about conversations that he had with people who didn't testify.

THE COURT:  Okay.  That paragraph does not rise to the level of being supercilious and prejudicial to the defendant insofar as it provides a basis for a witness's opinion.

MR. BENDER:  I'm not talking about the whole paragraph.  I'm just talking about that one

Case 3:12-cv-00327-MOC  Document 106  Filed 09/23/15  Page 183 of 249
1734

Page 3764

sentence in there. The rest of the paragraph can stay, because there's been evidence of that. But, I mean, Natasha Herd came in here and was not questioned about this. And if she had said, yeah, you know, he shot at my sister, then -- but I don't think that changes Dr. Dietz's opinion, just to leave that thing out because there is no evidence of that.

MS. TOMPKINS: Well, I'm completely flabbergasted at defense counsel's insistence, in light of Dr. Cunningham's testimony, much of which was uncorroborated.

THE COURT: Well, you are right in that assertion that it's somewhat surprising.

MR. BENDER: Well, Judge, the --

THE COURT: On the other hand, he is making an objection and the Court will deal with the objection on its merits.

You object to the notion that Ms. Grant told two doctors that the defendant pulled a gun on her sister and her?

MR. BENDER: Right.

THE COURT: I would ask the government not to inquire into that --

MR. BENDER: Okay.

MS. TOMPKINS: I'm sorry.

Reported By: Scott A. Huseby, RPR
800-333-2082    Huseby, Inc., an Aff...    ...m (704) 333-9889    Fax (704) 372-4593
Case 3:12-cv-00327-MOC Document 106 Filed 09/23/15 Page 184 of 249
1735

JA2606

Page 3765

THE COURT:  -- out of deference to, or indulgence to the defendant, in terms of prejudice versus probative value.

MR. BENDER:  On Page 13, July 28, 1992, that whole --

THE COURT:  Where are you on 13?

MR. BENDER:  13, the top paragraph, July 28, 1992.  I mean, that's -- the reference to that is a criminal history chart prepared by the United States Attorney's Office, which I assume they are going to use in closing.  There's been no evidence of that.

MS. TOMPKINS:  You know --

THE COURT:  Wait a minute.  I'm looking at the paragraph entitled May 2.

MR. BENDER:  No.  July 28th, 1992 on Page 13.

THE COURT:  Oh, okay.  What is your objection to that?

MR. BENDER:  There is no evidence of that at all, nothing.  Ms. Herd was not asked about that, nobody was asked about it.

THE COURT:  Apparently it came from the chart prepared by the U.S. Attorney's Office.

MR. BENDER:  Right.

MS. TOMPKINS:  And, again, Your Honor, the

Reported By: Scott A. Huseby, RPR
800-333-2082        Huseby, Inc., an Affi··  · ·´ ·  ·  ·n  (704) 333-9889        Fax (704) 372-4593
Case 3:12-cv-00327-MOC  Document 106  Filed 09/23/15  Page 185 of 249
1736

JA2607

United States of America vs. Aquilia Marcivicci Barnette        3:97CR23-V
Proceedings Before Judge Richard L. Voorhees        8/8/2002

Page 3766

man's opinions are based on documents that he reviewed. His opinions are not based solely on evidence, clearly, just like Dr. Cunningham --

THE COURT:  All we are doing is cherry picking a few pieces of evidence that the defendant thinks are unduly prejudicial, and I'm being somewhat deferential to him in that respect.

MS. TOMPKINS:  Okay.

THE COURT:  So there is no point in bringing that up.  First of all, I'm not sure what the -- where this criminal history chart referred to here came from or what its origins are, what its basis is as prepared by the U.S. Attorney's Office, so there is no point in bringing that one out.

MR. BENDER:  Just two more, Judge.  On Page 15.

THE COURT:  All right.

MR. BENDER:  December 15, 1993.

THE COURT:  Same ruling.

MR. BENDER:  And the last one, on Page 16, January 1995.

MS. TOMPKINS:  I believe that's in evidence through the defendant.

MR. BENDER:  I beg to differ.  The defendant was asked did you do anything that would have

United States of America vs. Aquilia Marcivicci Barnette       3:97CR23-V
Proceedings Before Judge Richard L. Voorhees       8/8/2002

Page 3767

caused you to be shot by Ladon Barbour. He said, only report him to the police, that's all I did. He could have been cross-examined about that, he could have been asked, didn't you shoot into Ladon Barbour's car.

THE COURT: I'd ask the government not to go into that one.

MR. BENDER: Okay. Believe it or not, Judge, that's it.

MS. TOMPKINS: Now, in terms of being able to mark and introduce, I'll probably need some time to make redactions.

THE COURT: I beg your pardon?

MS. TOMPKINS: I will need to make redactions. Those are actually present in his -- you have a copy of his report and those are in, so --

THE COURT: Well, we will take up the admissibility of the report as redacted after the jury is dismissed.

MS. TOMPKINS: All right.

THE COURT: You can identify it at this point.

MS. TOMPKINS: May I have just a minute to speak with my expert to see whether or not what the Court's --

THE COURT: Right, you can do that,

Reported By: Scott A. Huseby, RPR
800-333-2082        Huseby, Inc., an Af̃ ...  ... 'on (704) 333-9889        Fax (704) 372-4593
Case 3:12-cv-00327-MOC   Document 106   Filed 09/23/15   Page 187 of 249
1738

JA2609

United States of America vs. Aquilia Marcivicci Barnette 3:97CR23-V
Proceedings Before Judge Richard L. Voorhees 8/8/2002

Page 3768

because obviously the effort would be to minimize any extraneous prejudicial effect to the defendant, at the same time your witness is entitled to state his opinions and the basis for them. And, of course, defense counsel has asserted that it wouldn't change the witness's opinion, but you can inquire of your witness whether that's the case.

MS. TOMPKINS: Thank you. If I could have two minutes.

THE COURT: Yes.

(Brief recess.)

MS. TOMPKINS: Thank you.

THE COURT: Are the parties ready to proceed?

MS. TOMPKINS: Yes.

MS. LAWSON: Yes.

THE COURT: May we have the jury.

(The jury returned to the courtroom.)

THE COURT: Welcome back, members of the jury. I believe the government would be offering a witness.

MS. ROSE: Yes. Dr. Peter Carlson, come on up, please, sir.

PETER M. CARLSON, being first duly sworn, was examined and testified as

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/8/2002

Page 3769

follows:

DIRECT EXAMINATION

BY MS. ROSE:

Q.    Dr. Carlson, would you please state your name?

A.    Peter M. Carlson.

Q.    And you are retired from the Bureau of Prisons, is that correct?

A.    Yes.  I retired in December, on December 31st of 1999 from the Federal Bureau of Prisons.

Q.    And how many years did you spend with the Federal Bureau of Prisons?

A.    30 years with the BOP.

Q.    If you would, just tell the members of the jury what your work history was there within the BOP.

A.    I served with the federal prison system from 1970 through 1999, began with the Bureau of Prisons as a case manager at the United States penitentiary at McNeal Island, Washington.

From there I served in positions in the central office of Washington and Dublin, California and Miami, Florida and in Atlanta, Georgia.  I became associate warden at the United States penitentiary in Atlanta.  I was there until 1983, and then I was transferred as warden to the federal prison in Duluth, Minnesota, served as warden at Duluth, subsequently served as

Reported By: Scott A. Huseby, RPR
800-333-2082          Huseby, Inc., an Aff⸱⸱  ⸱⸱ ⸱ ⸱on (704) 333-9889          Fax (704) 372-4593
Case 3:12-cv-00327-MOC  Document 406  Filed 09/23/15  Page 189 of 249

JA2611

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/8/2002

Page 3770

warden at Phoenix, Arizona, and at the federal medical center then in Rochester, Minnesota.

In 1993 I became the assistant director of the Federal Bureau of Prisons and served in that capacity and as regional director for the western region of the country until my retirement.

MS. ROSE: Given those qualifications, Your Honor, the government would tender Dr. Carlson as an expert in Bureau of Prisons classifications.

THE COURT: Okay. He will be declared an expert in that field, and members of the jury, you will recall the instruction I've given you earlier about dealing with expert witness testimony. Thank you.

BY MS. ROSE:

Q. Basically, if you would, tell us, what is the kind of mission of the Bureau of Prisons?

A. Well, officially the Federal Bureau of Prisons has a mission of protecting the public through the confinement of offenders, a mission of safe and secure housing of federal inmates in the federal facilities, and finally a mission of preparing individuals who are confined for the possibility of eventual release to their home communities.

Q. How is an inmate's classification determined?

A. An inmate is classified based on his

Reported By: Scott A. Huseby, RPR
800-333-2082        Huseby, Inc., an A1        ion (704) 333-9889        Fax (704) 372-4593
Case 3:12-cv-00327-MOC   Document 106   Filed 09/23/15   Page 190 of 249
1741

JA2612

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/8/2002

Page 3771

characteristics, his personal history and on the characteristics of the offense that he has been involved in. The entire classification system revolves around the individual inmate's personal background and then the matches made to the characteristics of the various institutions around the country, the federal facilities.

Q. In doing so, how do you determine where an inmate will be placed? I mean, isn't that the purpose of the classification system?

A. Yes. The purpose is to measure the individual offender's background, his security needs, and to try to match that to a correctional facility that offers the appropriate amount of security and to place the inmate generally as close to home as we can into an institution to which he is appropriately classified.

Q. And that is something that you consider for any inmate, the closest to their home, because why?

A. The agency tries to keep an inmate as close to home as feasible, as it's believed that facilitates the release process and successful return to one's home community.

Q. But let me ask you this: For someone who has received a life sentence, where could they be placed within the Bureau of Prisons?

A. Inmates serving life terms within the BOP are

Reported By: Scott A. Huseby, RPR
800-333-2082          Huseby, Inc., an A⁻⁻⁻  ⁻⁻ ⁻ ⁻ion  (704) 333-9889          Fax (704) 372-4593
Case 3:12-cv-00327-MOC   Document 174-26   Filed 09/23/15   Page 191 of 249

JA2613

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/8/2002

Page 3772

generally confined at high security penitentiaries. Regardless of how they score, regardless of their background, they would have a public safety factor that would override the scoring of the individual's classification. In this case a life sentence would mandate that the individual be confined in a high security institution.

Q. Are there any exceptions for that, or waivers?

A. Exceptions are made for that, but there is an established procedure that ensures that it is reviewed at the highest level of the agency.

The institution classification personnel, the case manager and the unit team, would begin that recommendation for valid reasons, they would make that recommendation through the local institution to the warden, and the warden would eventually, if he or she agreed, make that recommendation to the regional office.

Q. And when you were in the regional office, did that ever occur?

A. Yes. As regional director I approved a number of transfers to less secure institutions for high security offenders.

Q. Now, when one receives a life sentence, do they go into a general population?

A. Certainly. A life sentence does not preclude

Reported By: Scott A. Huseby, RPR
800-333-2082          Huseby, Inc., an A_____ __ ____ ion (704) 333-9889          Fax (704) 372-4593
Case 3:12-cv-00327-MOC  Document 106  Filed 09/23/15  Page 192 of 249

1743

JA2614

United States of America vs. Aquilia Marcivicci Barnette 3:97CR23-V
Proceedings Before Judge Richard L. Voorhees 8/8/2002

Page 3773

placement in an open population of the penitentiary.

Q. Would you describe the daily life of an inmate who is in the general population, having received a life sentence?

A. A typical day of an inmate in a penitentiary setting, that is, a high security setting, would be they would be housed in appropriate cells of the institution. They would be locked in their cell for the duration of the evening hours. That would be from approximately 10:00 p.m. until 6:30 the following morning. 6:30 of every day inmates are permitted to move to the dining room for their morning meal, after which there would be a work call in the institution. Every inmate is expected to work during their confinement and would be assigned an institution job. The inmates would then be required to work until the noon break, the noon meal. They would be allowed to gather in the dining room to eat and then return to their work assignment for the afternoon.

All inmates in every institution are then returned to their cell for a 4:00 p.m. count and then allowed to proceed to the dining room for their evening meal.

After the evening meal they have leisure time either in a cell house or in the recreation area, a

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/8/2002

Page 3774

recreation yard of the prison, or in the school of the institution until the institution is re-called in the evening, approximately 9:00 p.m., but that varies by facility, and they remain in their housing unit until the housing unit is locked down, usually at 10:00 p.m.

Q.   Now, what kind of jobs are offered within BOP?

A.   A wide variety of jobs are available to inmates within the correctional setting, ranging from work as a unit orderly, or a cleaner; work out on the recreation field, mowing grass; could be work in the dining room, preparing, serving, or cleaning in the dining room; and a percentage of inmates are allowed, selected to work in federal prison industries in the factories.

Q.   Now, there are recreation areas available?

A.   Yes, ma'am.

Q.   What kind of recreation areas?

A.   Recreation in a typical prison setting would be the full spectrum of recreation that you would see in any institutional setting, prison or otherwise, but it could be the ball fields, soccer, baseball.  There is always a track for aerobic activity.  Activities could be indoor, in terms of board games or watching television or playing cards, and activities include therapeutic programmatic activities.  Educational programs could also include going to school in the

United States of America vs. Aquilia Marcivicci Barnette     3:97CR23-V
Proceedings Before Judge Richard L. Voorhees     8/8/2002

Page 3775

evening, taking classes, that sort of thing.

Q. You can get a high school degree, college degree, all kinds of degrees?

A. Well, you can get a high school degree, an equivalent of a high school degree, through the GED program, and some institutions offer correspondence courses or occasional college classes if the inmate is willing to pay for those classes.

Q. And there are libraries as well with access to those materials?

A. Libraries are typical in every correctional facility I have worked, yes.

Q. In the daily movements, those individuals are not shackled or handcuffed or anything like that?

A. No. In the daily routine of any correctional facility, inmates are not shackled, unless they are placed in a special housing unit of one sort or another.

Q. They interact freely with one another?

A. They do.

Q. Build relationships with each other?

A. They do, yes.

Q. Now, one of the things that you talked about was placement near family. Are they allowed to visit with family members?

A. Yes. Every correctional facility operated by

Case 3:12-cv-00337-MOC Document 106 Filed 09/28/15 Page 195 of 249

1744 B

JA2617

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/8/2002

Page 3776

the Federal Bureau of Prisons has a visiting program where friends and loved ones are allowed to come into the facility on a fairly regular basis for visiting purposes.

Q. Are those contact visits?

A. They are contact visits in nearly all settings except for the very, very high secure settings, such as you would find at the administrative maximum facility in Florence, Colorado, in the special operations at Terra Haute for death row, and in a few unique controlled units, special units that we operate in specific institutions around the country.

Q. But the general population --

MR. BENDER: I would like to be heard, Your Honor.

THE COURT: Overruled.

BY MS. ROSE:

Q. But the general population, as you've described, of any general lifer is going to get contact visits with family?

A. Yes, that's correct.

Q. With what frequency, generally?

A. Visiting is limited by various institutions depending on their specific circumstance, frankly, how crowded the visiting room becomes, but it's fairly

Reported By: Scott A. Huseby, RPR
Huseby, Inc., an Aff.

Case 3:12-cv-00327-MOC Document 106 Filed 09/23/15 Page 196 of 249

800-333-2082                                  (704) 333-9889                                  Fax (704) 372-4593

1745

JA2618

Page 3777

typical for an inmate to be allowed one visit from each
visitor over a period of a month.

Q. Did you earlier describe that visitors could
come as much as possible if there is opportunity, like
you say, if there is not overcrowded in the visiting
room, if somebody wanted to come every day, that would
be a possibility?

A. That would be possible, yes.

Q. Whenever visitors are not there, are there
telephone facilities or other contact facilities for
inmates?

A. Telephones are available to inmates in all
correctional settings, with a couple of exceptions. All
telephone calls are to an approved list of individuals
that the staff has approved, all of these calls are
recorded.

Q. Once again, for the general population, those
are with whatever frequency is available?

A. That's correct, depending on what is available
time-wise in that specific institution. And since I
have retired, the agency has put in a timed parameter
over the course of every month for telephone calls, but
it's still a fairly open telephone system.

Q. They can, of course, send mail and receive
name?

Case 3:12-cv-00327-MOC  Document 106  Filed 09/23/15  Page 197 of 249
1746

JA2619

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/8/2002

Page 3778

A. Inmates certainly have access to mail privileges.

MS. ROSE: Nothing further. Thank you.

CROSS-EXAMINATION

BY MR. BENDER:

Q. Mr. Carlson, we are talking about life without the possibility of release, not just life in prison, do you understand that?

A. Yes, sir.

Q. Okay. And if this jury decides that Marc Barnette is to be sentenced to life without the possibility of release, there are three separate charges for which he will receive life without the possibility of release. Do you understand that?

A. I do, sir.

Q. Now, based on that, he would be placed in the highest security that the Bureau of Prisons has, wouldn't he?

A. Let me define those terms, sir. The highest security the Bureau of Prisons offers would be at the administrative maximum facility at Florence, Colorado. He would not be placed in that facility. He would be placed in a high security facility, a United States penitentiary.

Q. Which would be Marion, Illinois, for instance?

Reported By: Scott A. Huseby, RPR
800-333-2082 Case 3:12-cv-00327-MOC Huseby, Document 106 Filed 09/24/13 153-9880 Page 198 of 249 (704) 372-4593
1747

JA2620

United States of America vs. Aquilia Marcivicci Barnette                3:97CR23-V
Proceedings Before Judge Richard L. Voorhees                8/8/2002

Page 3779

A.   Actually, Marion and Florence penitentiaries are unique in the Bureau's classification system, and transferred to Marion or the administrative maximum at Florence are reserved for inmates who are extreme management problems within the agency.  There are a few inmates that have been directly placed into one of those institutions.  Mr. Barnette's case would not come close to the parameters of those cases.

Q.   But it would be a United States penitentiary?

A.   Yes.

Q.   Okay.  There would be a guard tower, walls --

A.   Every --

Q.   -- confratina wire?

A.   Every United States penitentiary has towers around the facility, not every USP has guard towers. Excuse me, has walls.  A number of the newer facilities have been constructed with the double fence lines.

Q.   Now, you have been sort of acting like maybe you are a little of soft on crime.  The Bureau of Prisons is not soft on crime or people who commit crimes, are they?

A.   No, sir, they surely are not.

Q.   And the purpose for these programs, whether it be recreation, taking college courses, is to try to allow the inmate to get a little value out of their

Reported By: Scott A. Huseby, RPR
800-333-2082   Huseby, Inc., an A... ...ion (704) 333-9889  Page 199 of 249   Fax (704) 372-4593
Case 3:12-cv-00327-MOC  Document 106   Filed 09/23/15  Page 199 of 249
1748

JA2621

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/8/2002

Page 3780

life, improve their situation somewhat, isn't it?

A.   That's correct, sir.

Q.   Okay.  And so these are offered for people who want to take advantage of it?

A.   They are.

Q.   And the better off your conduct is, perhaps the more opportunity you have to engage in the programs sponsored by the Bureau of Prisons?

A.   That's absolutely correct.

Q.   And that's what you want in the Bureau of Prisons, isn't it?

A.   That's correct.

Q.   You want model inmates?

A.   We do.

Q.   Somebody who is not going to create problems, right?

A.   Yes.

Q.   And if somebody is at a United States penitentiary and they have a violation or create some problem, the Bureau of Prisons can move them to Marion or super max in Colorado, can't they?

A.   They can and they do.  What is a little different about those two institutions is that they represent less than 1 percent of the prison population. An individual has to work very, very hard to earn his

Case 3:12-cv-00327-MOC  Document 106  Filed 09/23/15  Page 200 of 249

1749

JA2622

United States of America vs. Aquilia Marcivicci Barnette    3:97CR23-V
Proceedings Before Judge Richard L. Voorhees    8/8/2002

Page 3781

way to one of those institutions.

Q. Right. But the Bureau of Prisons has in place policies that mandate or dictate that for certain inmates, if they create some type of problem, that they go to a higher security level, don't they?

A. That's correct. If I could add to that, as assistant director of the agency, I sat on the panel that approved transfers. It was myself and another individual that approved transfers into Marion and into the administrative maximum facilities' control units, and those inmates had either seriously assaulted another inmate, killed another inmate, or seriously assaulted or killed a staff member. The other possibility was the individual could have presented an extreme escape risk. But those basically are the parameters for that small percentage of inmates placed there.

Q. But you also have other means of disciplining a prisoner rather than perhaps sending them to Marion or super max, don't you?

A. Yes, sir, we sure do.

Q. You can lock them up 23 hours a day --

A. Correct.

Q. -- in the penitentiary?

A. True.

Q. But what you are hoping for is the model inmate

Case 3:12-cv-00327-MOC   Document 106   Filed 09/23/15   Page 201 of 249
1750

JA2623

United States of America vs. Aquilia Marcivicci Barnette    3:97CR23-V
Proceedings Before Judge Richard L. Voorhees    8/8/2002

Page 3782

who takes advantage of whatever programs there might be and is no discipline problem whatsoever, that's what you hope for?

A. Yes, sir.

Q. Even in this case, when Marc Barnette will never ever be released, that's what you are hoping for?

A. That's correct.

Q. And the Bureau of Prisons will never release Marc Barnette, will they?

A. Depending --

MS. ROSE: Objection.

THE COURT: Overruled.

BY MR. BENDER:

Q. I mean, that's the law?

A. If, in fact, he has a nonreleasable sentence, the Bureau of Prisons will not knowingly release Mr. Barnette.

Q. And the only two sentences that this jury is considering is death or life without the possibility of parole?

A. Yes, sir.

Q. By law, he can't be released?

A. That's correct.

Q. The Bureau of Prisons isn't going to override the law or violate the law, are they?

Reported By: Scott A. Huseby, RPR
800-333-2082    Huseby, Inc.    1-800-333-9889    Fax (704) 372-4593
Case 3:12-cv-00327-MOC   Document 106   Filed 09/23/15   Page 202 of 249
1751

JA2624

United States of America vs. Aquilia Marcivicci Barnette    3:97CR23-V
Proceedings Before Judge Richard L. Voorhees    8/8/2002

Page 3783

A.    No, sir.

Q.    And when you consider model inmates, the people you are hoping will take advantage of these programs, not only are they a model inmate to the staff, courteous to the staff, do what is told, but they are also model inmates as they relate to other prisoners or inmates, isn't it?

A.    One would hope so, yes, sir.

Q.    Okay.  Now, you talked about mail.  Every piece of mail that is sent to an inmate is opened, is it not -- well, except for legal mail?

A.    That's correct.

Q.    So when an inmate gets mail, it's already been opened and somebody has already searched it?

A.    That's correct.

Q.    And when they talk on phones, the phones are monitored, that is, they are recorded, are they not?

A.    I would differentiate between recorded and monitored.  All telephone -- all outgoing telephone calls are recorded, not all are necessarily monitored, unless the individual inmate is on a hot list.

Q.    Right.  So every telephone call that is made from a Bureau of Prisons facility is recorded?

A.    That is correct, with the exception of legal calls that have been approved to one's counsel.

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/8/2002

Page 3784

Q. Now, you talked about the public safety factor. The public safety factor is found in the policy and procedures manual, isn't it?

A. Yes.

Q. Okay. And the security designation and classification manual, which is program statement 5100.07, determines the classification of an inmate, doesn't it?

A. That's correct.

Q. And you have already told us that someone with a life sentence without the possibility of release would be a high security?

A. Yes.

Q. And would always be a high security unless someone, the team managers, the unit managers, were to somehow recommend that that public safety factor be waived?

A. That's correct.

Q. Right?

A. Yes.

Q. Then if it were ever going to be waived, it would have to go to the associate warden and then the warden?

A. Yes.

Q. And then it would have to go to the regional

Case 3:12-cv-00327-MOC  Document 106  Filed 09/23/15  Page 204 of 249

1753

JA2626

Page 3785

office?

A.    Correct.

Q.    How many people have to sign off on a waiver of public safety factor?

A.    In the processing as it wins its way out of the institution or how many signatures are required for that waiver?

Q.    For that waiver.

A.    One signature, that of the regional director or his or her designee.

Q.    But that doesn't happen without the signatures and the approval or recommendation of some other people?

A.    Well, the staff members that recommend it and the staff members that process it.  They all have a sign-off process, yes.

Q.    Getting back to phone calls one minute, you can't receive phone calls as an inmate unless they are pre-planned and approved by some staff member?

A.    That's correct.

          MR. BENDER:  Thank you.  That's all.

          MS. ROSE:  Thank you.

          THE COURT:  You may step down.

          THE WITNESS:  Thank you, Your Honor.

          MS. TOMPKINS:  The government calls Dr. Park Dietz.

Reported By: Scott A. Huseby, RPR
800-333-2082          Huseby, Inc., an Al          ion (704) 333-9889          Fax (704) 372-4593
Case 3:12-cv-00327-MOC   Document 75-6   Filed 09/23/15   Page 205 of 249

JA2627

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/8/2002

Page 3786

PARK DIETZ, Ph.D.,

being first duly sworn, was examined and testified as follows:

DIRECT EXAMINATION

BY MS. TOMPKINS:

Q. Please state your name and spell it for the court reporter.

A. I'm Dr. Park Dietz, D-I-E-T-Z.

Q. What is your profession?

A. I'm a physician. I specialize in psychiatry, and my practice has been limited for many, many years to forensic psychiatry.

Q. What is a forensic psychiatrist?

A. A forensic psychiatrist is a psychiatrist who specializes in the application of the principles and practice of psychiatry to matters that are in dispute, typically legal questions.

Q. All right. What is your educational background?

A. I went to college at Cornell University in upstate New York and graduated with honors in psychology and a dual major in biology and psychology, and then I entered medical school and in 1975 received the M.D. degree from Johns Hopkins University School of Medicine in Baltimore, and the same year I also received a

Reported By: Scott A. Huseby, RPR
800-333-2082        Huseby, Inc., an Aff          m (704) 333-9889        Fax (704) 372-4593
Case 3:12-cv-00327-MOC   Document 106   Filed 09/23/15   Page 206 of 249
1755

JA2628

United States of America vs. Aquilia Marcivicci Barnette     3:97CR23-V
Proceedings Before Judge Richard L. Voorhees          8/8/2002

Page 3787

masters degree in public health from Johns Hopkins and by then had I think completed all of the course work toward a Ph.D. in sociology, and years later I wrote a dissertation and was awarded the Ph.D. also from Johns Hopkins.

Q. Have you received any training in a medical specialty?

A. Yes. At that time the route into psychiatry was that after medical school one did a three-year residency, and I did my first two years as assistant resident in psychiatry at the Johns Hopkins Hospital, and then I spent my third year as the resident and chief fellow in forensic psychiatry at the hospital of the University of Pennsylvania in Philadelphia, and that made me eligible to sit for the board examinations in psychiatry and become board certified.

Q. What positions have you held since completing your training?

A. Well, my first job after training starting in 1978 was as an assistant professor of psychiatry at the Harvard Medical School, and my first assignment there, though I was employed by one of the Harvard hospitals, McClain, which is a nice private hospital, my job was to go to a miserable maximum security forensic hospital about an hour away and to run the forensic program there

Reported By: Scott A. Huseby, RPR
800-333-2082          Huseby, Inc., an Aff. . . . . . . . on (704) 333-9889          Fax (704) 372-4593
Case 3:12-cv-00327-MOC   Document 106   Filed 09/23/15   Page 207 of 249
1756

JA2629

United States of America vs. Aquilia Marcivicci Barnette       3:97CR23-V
Proceedings Before Judge Richard L. Voorhees       8/8/2002

Page 3788

and try to make it a Harvard teaching hospital. We didn't do too well at making it a Harvard teaching hospital, but we did our best. I spent two years in that capacity.

Then I was fortunate enough to get out of that bad experience by being asked by the United States Attorney'S Office in Washington to be in charge of the evaluation of John Hinkley in connection with the charges arising against him for his attempt to assassinate President Regan and the others that he shot that day. And I spent about a year commuting between Washington and Boston working on that case and then returned to my teaching position and spent most of my fourth year at Harvard doing research on the relationship between mental disorder on the one hand and violent crime on the other.

At that point I received some job offers from other institutions and eventually selected one at the University of Virginia and moved to Charlottesville, Virginia to become an associate professor of law in the school of law and an associate professor of behavioral medicine and psychiatry in the school of medicine, and over the next six years I stayed there and was promoted to professor in both schools. And my responsibilities there were to train the fellows in forensic psychiatry,

Reported By: Scott A. Huseby, RPR
800-333-2082    Case 3:12-cv-00327-MOC-DCK Document 106   Filed 09/23/13  Page 208 of 249    (704) 372-4593
1757

JA2630

United States of America vs. Aquilia Marcivicci Barnette 3:97CR23-V
Proceedings Before Judge Richard L. Voorhees 8/8/2002

Page 3789

who were people who had applied to learn the subspecialty of forensic psychiatry. I was medical director of the university's institute of law psychiatry and public policy, which drafted legislation for the Commonwealth of Virginia and conducted research, and we operated a clinic there, a forensic psychiatry clinic that did evaluations of criminal defendants in a few civil cases, largely for the defense bar in Virginia, occasionally for prosecutors or out of state.

And during that time I received a grant from the National Institute of Justice to conduct what was the first research on what later became known as stalking, and we studied a very large number of cases and devised techniques of predicting which people are in contact with strangers, because we were looking mostly at stranger cases that would approach their target victims. And that was a major task for many years.

I also had a course load in law school and the normal assignments in medical school, and in law school I taught or co-taught courses in crimes of violence, psychiatry and law, psychiatry and criminal law, psychiatry and civil law, law and public health, law and medicine, and related areas.

Q. What -- did you have a teaching position at UCLA?

Case 3:12-cv-00327-MOC Document 106 Filed 09/23/15 Page 209 of 249

1758

JA2631

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/8/2002

Page 3790

A.   Yes.   Then I decided that I wanted to change the focus of what I was doing.   I had been an academic for 10 years since my training and a long time before that, and I decided that I wanted to spend more of my time consulting on cases, and I moved to southern California and I received an appointment at UCLA as clinical professor of psychiatry and bio behavioral sciences, and I have maintained that since that time.

And what I have done since then is to operate two consulting firms, both of which I began and lead.   One is called Threat Assessment Group, which I founded in 1987, and we provide workplace violence prevention services to employers, mostly large corporations, to some extent government agencies and celebrities and individuals, but primarily to large employers.

And the other firm is called Park Dietz and Associates, and it is today a group of 28 experts who consult to attorneys and courts in civil and criminal matters, and they are based all over the U.S. and Canada.   That's how I spend my time, between those two organizations.

Q.   Without going through an exhaustive list, have you conducted research and been published?

A.   Yes.   Well, I was very actively involved in research earlier in my career, and it's all been about

Reported By: Scott A. Huseby, RPR
Huseby, Inc., an A          ion   (704) 333-9889
800-333-2082                                         Fax (704) 372-4593

Case 3:12-cv-00327-MOC   Document 106   Filed 09/23/15   Page 210 of 249

1759

JA2632

United States of America vs. Aquilia Marcivicci Barnette     3:97CR23-V
Proceedings Before Judge Richard L. Voorhees     8/8/2002

Page 3791

protecting people from being harmed, that is, injury prevention of one kind or another, or about criminal violence or about destructive sexual behaviors. And I have published about a hundred items in the professional literature and very little for the general public, but a hundred some for the professionals.

Q. And briefly describe for the jury your professional experience with domestic violence and homicide.

A. Well, with respect to domestic violence, long ago when I treated patients I had occasion to treat some victims and a few offenders. Of course, I saw lots of offenders when evaluating a large number of people for the courts, and over the years have done countless evaluations of people charged with a domestic homicide, but the major ongoing activity I have is really preventing domestic violence when employers bring to us cases in which someone is being threatened or stalked by an intimate, my firm advises the employer on what to do to safely manage the case and to make sure that no one is injured. And we do that quite routinely. There is probably not a week that goes by that we are not handling a case that is very serious and making sure that no one gets hurt.

Q. Have you testified in court as an expert

Reported By: Scott A. Huseby, RPR
800-333-2082     Huseby, Inc., an Afl     )n (704) 333-9889     Fax (704) 372-4593
Case 3:12-cv-00327-MOC   Document 60   Filed 09/23/15   Page 211 of 249
1760

JA2633

United States of America vs. Aquilia Marcivicci Barnette   3:97CR23-V
Proceedings Before Judge Richard L. Voorhees                 8/8/2002

Page 3792

witness?

A.   Yes, I have.

Q.   How many times?

A.   I didn't answer the second part of your question about homicide experience.

Q.   All right.

A.   With respect to homicide, my initial experience had to do with another field altogether, forensic pathology.  When I was still a medical student, I had a lab at the medical examiner's office in Baltimore and I used to go to hot crime scenes with the ME's people while it was still a fresh scene and try to observe what the police did, what the forensic people did.  I spent about a year around the medical examiner's office involved in autopsies, and what they did -- since then my work has been psychiatric and I have evaluated a very large number of people who have been charged with every manner of homicide imaginable, and I consider it a major focus of my work.

Q.   How many times have you testified as an expert witness?

A.   More than a thousand, but many of those were early, very simple civil commitment proceedings, nothing quite as complex as this.

Q.   In cases such as this, about how many times

Reported By: Scott A. Huseby, RPR
800-333-2082          Huseby, Inc., an Aff⁀    ⁀⁀  ⁀on (704) 333-9889          Fax (704) 372-4593
Case 3:12-cv-00327-MOC   Document 106   Filed 09/23/15   Page 212 of 249
1761

JA2634

United States of America vs. Aquilia Marcivicci Barnette       3:97CR23-V
Proceedings Before Judge Richard L. Voorhees       8/8/2002

Page 3793

have you testified?

A. I'm not sure. I know that in the years that I have been functioning primarily as a private consultant it is on the order of six or a dozen times a year that I'm in court, so I would guess maybe 100, 200 cases.

Q. Were you retained as an expert in the case of Jeffery Dahmer?

A. Yes, I was.

Q. Were you retained as an expert in the case of Robert Bardo?

A. Yes.

Q. What, briefly, did Robert Bardo do?

A. He stalked several different entertainers and eventually killed a television actress named Rebecca Schaffer.

Q. For whom did you testify in that case?

A. For the defense.

Q. Did you work on the Susan Smith case, the woman who drowned her children in her car?

A. Yes.

Q. Did you work on the Ted Kaczynski case, the Unibomber?

A. Yes, I did.

Q. And were you an expert in the case of Andrea Yates, the woman who drowned her children in the

Case 3:12-cv-00327-MOC   Document 66   Filed 09/23/15   Page 213 of 249
1762

JA2635

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/8/2002

Page 3794

bathtub?

A.    Yes.

            MS. TOMPKINS:  Your Honor, at this time we would tender Dr. Dietz as an expert in forensic psychiatry.

            THE COURT:  He will be so declared. Members of the jury, you will remember the expert witness instruction.  Thank you.

            BY MS. TOMPKINS:

Q.    Dr. Dietz, what were you hired by the government to do?

A.    Well, to evaluate the available evidence by examining the defendant and by reviewing the records and the reports by other experts in order to determine why the defendant had done these offenses and to be able to evaluate the evidence that the defense would put on during this phase.

Q.    Did you review the opinions and reports of defense experts?

A.    I did.

Q.    Did you interview the defendant?

A.    Yes.

Q.    For how many hours?

A.    For the better part of two days, as I recall.

Q.    Did you audiotape that interview?

Reported By: Scott A. Huseby, RPR
800-333-2082          Huseby, Inc., an Aff          m (704) 333-9889          Fax (704) 372-4593
Case 3:12-cv-00327-MOC   Document 106   Filed 09/23/15   Page 214 of 249
1763

JA2636

United States of America vs. Aquilia Marcivicci Barnette    3:97CR23-V
Proceedings Before Judge Richard L. Voorhees    8/8/2002

Page 3795

A.    Yes, I did.

Q.    Was there a transcript made of that interview?

A.    Yes, and provided to both sides.

Q.    Did you prepare a written report?

A.    Yes, I did.

MS. TOMPKINS:  May I approach?

THE COURT:  Yes.

BY MS. TOMPKINS:

Q.    I'm going to show you what has been marked as Government's Exhibit 75 and ask you if you recognize that?

A.    This is a copy of my report in this case.

Q.    All right.  And is that a summary of both the -- your findings and the sources of information on which you based your findings?

A.    Yes, and my opinions.

Q.    And your opinions.

MS. TOMPKINS:  Your Honor, we would move to admit Government's Exhibit 75.

MR. BENDER:  Objection.

THE COURT:  It's been identified. Overruled.

MS. TOMPKINS:  Thank you.

BY MS. TOMPKINS:

Q.    Now, in terms of the sources of information,

United States of America vs. Aquilia Marcivicci Barnette     3:97CR23-V
Proceedings Before Judge Richard L. Voorhees     8/8/2002

Page 3796

did you review police reports related to both these two homicides and the defendant's prior criminal history?

A. Yes, I did.

Q. Did you review police reports and photographs related to the fire bombing?

A. Yes.

Q. Did you review the interviews of Robin Williams and Bennie Green about the fire bombing?

A. I did.

Q. Crime scene photographs from both crime scenes?

A. Yes.

Q. Interviews with the defendant and law enforcement?

A. Yes.

Q. And mental health evaluations done by other psychologists and psychiatrists, including Dr. Halleck, Dr. Cunningham, Dr. Duncan, Dr. Burgess?

A. I did not have Dr. Cunningham's report; but as to the others, yes.

Q. As to Dr. Halleck, based on your review of the documents that we have just discussed and your interview with the defendant, did you form diagnostic opinions about the defendant that differ from Dr. Halleck's?

A. To some extent, yes.

Q. Would you describe those for the jury?

Reported By: Scott A. Huseby, RPR
800-333-2082   Huseby, Inc., an Aff...   (704) 332-9880   Page 216 of 249   Fax (704) 372-4593
Case 3:12-cv-00327-MOC Document 106 Filed 09/23/13 Page 216 of 249
1765

JA2638

Page 3797

A.    Well, I think there are two areas where I think my opinions differ somewhat from Dr. Halleck's.  The first has to do with his opinion regarding depression.

I was here during the testimony of all of the defense witnesses in this phase and heard Dr. Halleck's testimony, and I understood him to say that the defendant had a major depression for period in April -- I'm sorry, yes, from April to June that included the time of these crimes.  And I agree with Dr. Halleck about what symptoms the defendant was experiencing, but there is an issue that makes me uncertain as to whether it's correct to call this a major depression, and that has to do with the defendant's drinking during that time.

In clinical practice one is cautioned not to make a diagnosis of depression while someone is still drinking heavily, because the effects of alcohol can't be distinguished from the effects of the illness that we call depression.  So that's why on admission to a hospital people first have to dry out and detox before they can be properly diagnosed as depressed.

And during the entire period when Mr. Barnette had the symptoms that could be depression or alcohol, he was drinking heavily.  He told me that drinking made him feel more depressed and more despondent.

Reported By: Scott A. Huseby, RPR
800-333-2082          Huseby, Inc., an Affi⸱⸱ ⸱ ⸱⸱ ⸱ ⸱ n (704) 333-9889          Fax (704) 372-4593
Case 3:12-cv-00327-MOC  Document 186  Filed 09/23/15  Page 217 of 249
1766

JA2639

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/8/2002

Page 3798

He had obvious reasons to be sad and depressed and to hang out in his room during that time, and that included having been dumped by Robin after he struck her, having been turned down for the job at the Saturn dealership, being sought by the police after he did the fire bombing, and it's not surprising that somebody would be nervous and upset and depressed when they had those events happen in their lives.

And he was drinking so heavily that I think it's very hard to tell whether it was a depressive illness or whether it's the drinking that made him feel the way he did and have the symptoms that he had.

And the other clue that it might be the drinking is that the symptoms resolved rather quickly with very little treatment once he was incarcerated and no longer had access to alcohol. So it could be a major depression, but it could also be excessive drinking over that period of time.

Q. And that was based on the defendant's own report about his consumption of alcohol, is that correct?

A. Yes.

Q. Were there any other parts of Dr. Halleck's testimony in which your expert opinion differed from his?

Reported By: Scott A. Huseby, RPR
800-333-2082      Huseby, Inc., an Aff⋯      ⋯n (704) 333-9889      Fax (704) 372-4593
Case 3:12-cv-00327-MOC   Document 106   Filed 09/23/15   Page 218 of 249
1767

JA2640

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/8/2002

Page 3799

A.    I think the second diagnostic issue has to do with the description of Mr. Barnette's personality. While I don't disagree with Dr. Halleck in finding him borderline personality disorder, because that's a diagnosis I, too, made, I also found elements of two other disturbances of personality.  One has been alluded to, but I don't think anybody diagnosed narcissistic personality disorder.  In my report I said that the defendant did have that particular condition.

And many of the signs and symptoms of it have been described here already.  They include a grandiose sense of self importance, that is, feeling that he is special; a lack of empathy for other people, not being sensitive to what it does to people when you beat them and what it does to people when you hit them with a coat hanger and what it does to people when you behave as he has toward people; fantasies of unlimited success and ideal love.  I think he had a notion of what love and a long-term relationship would be like that wasn't entirely realistic.  A sense of entitlement.  I think Dr. Cunningham already addressed the defendant having that.  I found Mr. Barnette in my interview to be haughty and arrogant with me, and I think that others have observed some of the same kind of behavior in their exams of him.  And that's a feature of this condition.

Reported By: Scott A. Huseby, RPR
800-333-2082       Huseby, Inc., an Affi              n  (704) 333-9889          Fax (704) 372-4593
Case 3:12-cv-00327-MOC  Document 106  Filed 09/23/15  Page 219 of 249
1768

JA2641

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/8/2002

Page 3800

And a tendency to exploit other people in his relationships with them is another feature of that condition. It doesn't take that many to make the diagnosis. He has more than enough for me to say that he has also got a narcissistic personality disorder as well as borderline.

And then the last personality set that I don't think has been described by the experts preceding me in much detail is that in his adult life Mr. Barnette has shown a great deal of antisocial behavior, a familiar pattern of antisocial conduct. And I would describe these as antisocial personality traits, and among the ones that he has had as an adult are deceitfulness, including lying and concealing his criminal conduct, and at least once feigning a suicide attempt. His failing to conform to social norms with respect to lawful behavior, such as taking women's cars without their permission, breaking and entering and other crimes; his consistent irresponsibility, such as not having consistently paid child support; his erratic work history; his being terminated for sexual harassment; his infidelity to each of his sexual partners; his impulsivity and failure to plan ahead; his reckless disregard for the safety of others, such as driving under the influence or setting fire to an occupied

Reported By: Scott A. Huseby, RPR
800-333-2082      Huseby, Inc., an Af    ion (704) 333-9889      Fax (704) 372-4593
Case 3:12-cv-00327-MOC  Document 106  Filed 09/23/15  Page 220 of 249
1769

JA2642

Page 3801

apartment building; and his irritability and aggressiveness, with a very long history of violence, extending back to early adulthood.

Q. Now, Dr. Dietz, Dr. Halleck expressed an opinion regarding whether or not there was a robbery component to these homicides. What is your opinion about that?

A. Of course there was a robbery involved in the Donnie Allen homicide, he robbed him of his car and he robbed him of his wallet, so --

Q. Does that differ from Dr. Halleck's opinion?

A. Yes. He said there was no robbery.

Q. Let me talk to you a minute about -- did you see Dr. Ann Burgess's testimony?

A. I did.

Q. Now, Dr. Burgess testified that in her opinion the defendant proceeded to Roanoke because he just wanted to talk to Robin. Based on your review of documents and the testimony and your interview of the defendant, did you form an opinion different from Dr. Burgess as to the defendant's motivation for traveling to Roanoke?

A. Yes, I did.

Q. And what is that?

A. Well, the most important difference with that

Reported By: Scott A. Huseby, RPR
800-333-2082 Huseby, Inc., an Affi... .... n (704) 333-9889 Fax (704) 372-4593
Case 3:12-cv-00327-MOC Document 106 Filed 09/23/15 Page 221 of 249
1770

JA2643

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/8/2002

Page 3802

opinion is that I think that he traveled to Roanoke to kill Benjamin Green and Robin Williams. And the idea that he wanted to talk to Robin isn't totally wrong. It's the most common thing that domestic offenders, including ones that kill their victims, say when they are arrested, they say, I just wanted to talk to her. But that's not true.

They want to do many things. Talking is one of them. Getting her back is another. In this case what he wanted to do and what he acknowledges having thought about doing was to kidnap her and make her take him to Benjamin Green, and he had already thought of killing Robin, he had thought of killing Benjamin. He had handcuffs with him. He tried to get her to go with him. He held her at gunpoint and ordered her to go with him, but she wouldn't do it. And he didn't have an opportunity to confront Benjamin Green or kill him. He settled for killing Robin.

Q. All right. Now, as to Dr. Cunningham, let's go to him for a minute, Dr. Cunningham showed a graphic at the end of his testimony, which has been marked and admitted as Government's Exhibit 25.

Now, Dr. Dietz, do you remember this graphic put on by Dr. Cunningham?

A. Yes, I do.

Reported By: Scott A. Huseby, RPR
800-333-2082    Huseby, Inc. an Affiliated ...    (704) 333-9889    Fax (704) 372-4593
Case 3:12-cv-00327-MOC   Document 106   Filed 09/23/15   Page 222 of 249
1771

JA2644

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/8/2002

Page 3803

Q. Now, using Defendant's Exhibit 25, would you agree that that accurately portrays the significant factors operating at the time of these homicides?

A. Well, I think a great deal of what is on here is -- has truth to it. I think there are many different ways one could phrase it, many different ways one could graph it out, and so it's not set in stone that it's done exactly this way, but the principal issue about what you have displayed here is that alcohol abuse is shown on the outside as worsening the things on the inside of that egg shaped diagram, but it's quite possible that it's equally accurate to say that after he was rejected by Robin Williams he began drinking and while drinking heavily worked himself up into a state of anger while he was experiencing the symptoms that anyone gets when they drink that much and then being that angry set on a course of action.

So I don't think that it's incorrect to characterize him as ruminating or being preoccupied or thinking constantly about the various things that he might do, but it's not necessarily accurate to call it obsessive preoccupation.

I suppose rage is extreme anger, I wouldn't quarrel with that. I think he was depressed; but whether that was secondary to the alcohol, I don't know.

Reported By: Scott A. Huseby, RPR
800-333-2082        Huseby, Inc., an Af‾ ‾ ‾ ‾ ion (704) 333-9889        Fax (704) 372-4593

Case 3:12-cv-00327-MOC   Document 172-26   Filed 09/23/15   Page 223 of 249

JA2645

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/8/2002

Page 3804

Q. What changes would you make to that document to in your opinion reflect factors on the defendant at the time of the homicides?

A. I think really the important things, since there is no question he was upset and angry and suffering from what looks like depression during that time, I don't argue with that, what I think is important to add here, however, is at the bottom of the diagram. The defendant told me and others that he was thinking of suicide. He told me and others that he was thinking of killing Robin Williams, which is the homicide, the ideation toward a female partner, but he also told me that he was thinking of -- I don't draw too well, I'm sorry; I'm drawing even worse -- he was thinking of killing Benjamin Green. I can't do it right.

Q. Okay, we will call that a G. There you go.

A. And he also told me that he was thinking of getting into a shoot-out with the police.

So he had a number of different things on his mind, and he would vacillate among them, should I kill Robin Williams, should I kill Benjamin Green, should I kill both of them, should I kill Robin and then myself, should I get into a shoot-out with the police and cause them to kill me. Those were all considerations that he had during this period of weeks that he was upset and

Case 3:12-cv-00327-MOC   Document 106   Filed 09/23/15   Page 224 of 249

1773

JA2646

United States of America vs. Aquilia Marcivicci Barnette       3:97CR23-V
Proceedings Before Judge Richard L. Voorhees       8/8/2002

Page 3805

drinking heavily.

Now --

Q. Now -- I'm sorry, go ahead. How does Donnie Allen fit into that?

A. He doesn't. Donnie Allen is not one of the people that he had been thinking about killing. He wasn't on that particular list.

On the night in question, however, he needed a car. And rather than wait to get hold of Mario's car or find another way to obtain transportation, he set in motion a plan to do a carjacking. And as Dr. Cunningham said, he did that in an organized way and had succeeded in obtaining control of the vehicle, had succeeded in obtaining the cash he would need for gasoline and incidentals, but then did something else, he committed an unnecessary additional crime, the homicide of Donnie Allen. And that doesn't fit into the rest of this.

Q. All right. Dr. Cunningham testified about catathymic homicide. Do you have an opinion about whether Donnie Allen's murder is a catathymic homicide?

A. I don't think that it's reasonable to refer to the murder of Donnie Allen as a catathymic homicide, because there was no relationship between them and because there is no period of brooding or incubation period about Donnie Allen.

Reported By: Scott A. Huseby, RPR
800-333-2082       Huseby, Inc., an Affi¨    ¯¯ ¨  ¨ n (704) 333-9889       Fax (704) 372-4593
Case 3:12-cv-00327-MOC   Document 106   Filed 09/23/15   Page 225 of 249
1774

JA2647

Page 3806

Donnie Allen's homicide is done for expediency and not for any of those emotional reasons that relate to the Robin Williams homicide.

Q. Do you have an opinion about whether or not Donnie Allen's homicide fits in with Dr. Cunningham's testimony?

A. I see it as a separate criminal act that isn't accounted for by the emotional state that explains why the defendant would have such anger and rage and jealousy and vengefulness towards Robin Williams.

Q. And would it be fair to say that Dr. Cunningham sees it as one motive?

A. I understood his testimony to be that that was something that he did on the way to Robin Williams.

Q. Let me get you to go back to Dr. Burgess for a minute. Dr. Burgess used the term programmed to describe how Marc Barnette's upbringing affected his behavior. Do you have an opinion on that statement based on your review of the record and your interview with the defendant?

A. Well, I think there is a sense in which it's not unreasonable to use the analogy that computers to talk about people acquiring some kinds of information, but it's a mistake to draw that analogy very far, because we are not computers. People differ from

Reported By: Scott A. Huseby, RPR
Huseby, Inc., an Affiliate...n (704) 333-9889
800-333-2082    Fax (704) 372-4593
Case 3:12-cv-00327-MOC  Document 106  Filed 09/23/15  Page 226 of 249
1775

JA2648

United States of America vs. Aquilia Marcivicci Barnette 3:97CR23-V
Proceedings Before Judge Richard L. Voorhees 8/8/2002

Page 3807

computers in their ability to think independently, to do things differently from what their surroundings may have taught them or even attempted to program them to do.

And so while it's true that Mr. Barnette's early life taught him some bad lessons, it's not the case that he didn't have alternatives available to him. His experiences of the world were not limited to those within his immediate family. He read. He watched TV. He knew other people. He had the opportunity to see that there are other ways of behaving besides the ones that he had observed, and I think that to call it programming is to attempt to portray human behavior as determined by heredity and environment and to deny the role of freewill in human action. And that, of course, is an old philosophical debate, is behavior determined or do people act freely, and there are elements of both in the way people really behave.

Q. Dr. Burgess also stated that the defendant's motive for violence was domestic in nature. Do you have any opinion about the defendant's motives for violence?

A. Well, I think a great deal of Mr. Barnette's motivation in his lifelong pattern of violence, I don't mean to say that he was violent his whole life, but during the years in which he was, in his adulthood, that he directed a great deal of it within domestic settings.

Reported By: Scott A. Huseby, RPR
800-333-2082 Huseby, Inc., an Af on (704) 333-9889 Fax (704) 372-4593
Case 3:12-cv-00327-MOC Document 106 Filed 09/23/15 Page 227 of 249
1776

JA2649

United States of America vs. Aquilia Marcivicci Barnette    3:97CR23-V
Proceedings Before Judge Richard L. Voorhees    8/8/2002

Page 3808

But there was a variety of motives toward that violence. Some of his violence was through anger. That's the single most common theme for his violence. Some of it was jealousy. Some of it was revenge when he thought people had hurt him. Some of it was fear, such as when he shot the man who had pushed him and threatened him. Some of it was because children wouldn't do what he wanted. And some of it was to intimidate a witness, because he didn't want Alicia to testify against him about the rape. Those are a number of different motives prior to these homicides.

And even in these homicides we see two very different motives. The Robin Williams homicide is a domestic homicide with anger and jealousy and revenge being all present, and anger being the dominant one. But the Donnie Allen homicide is a homicide of opportunity, of expediency. It was not necessary in order to get his transportation. He killed Donnie Allen in the course of a robbery and carjacking because he didn't want Donnie Allen to call the police, and that is not the same as a domestic homicide.

Q. All right. Now, in your opinion, Dr. Burgess had made the statement that this is a domestic homicide. In your opinion, was this one crime or two?

A. I believe that this was two crimes, the murder

Case 3:12-cv-00327-MOC   Document 106   Filed 09/23/15   Page 228 of 249
1777

Page 3809

of Donnie Allen and the murder of Robin Williams.

Q. And why is that important?

A. Well, one reason it's important is that this jury is being asked to sentence the defendant for each of those crimes. Another reason it's important is that two different lives were taken that night for two different reasons.

Q. And in your opinion, did these two murders have the same motive?

A. No. I believe that these two murders have different motives.

MS. TOMPKINS: Thank you, Dr. Dietz. That's all the questions I have.

THE COURT: Members of the jury, we will take our afternoon break at this time. You will remember the usual instructions. Thank you.

(The jury left the courtroom.)

(Brief recess.)

THE COURT: Mr. Bender?

MR. BENDER: Yes, Your Honor. At this time we would move for a mistrial on the basis that Dr. Peter Carlson, when he was testifying on direct, if memory serves me correctly, said, in response to a question by Ms. Rose, something to the effect of the special operations unit death row in Terre Haute,

Reported By: Scott A. Huseby, RPR
800-333-2082          Huseby, Inc., an Afl          )n  (704) 333-9889          Fax (704) 372-4593
Case 3:12-cv-00327-MOC   Document 106   Filed 09/23/15   Page 229 of 249
1778

JA2651

United States of America vs. Aquilia Marcivicci Barnette     3:97CR23-V
Proceedings Before Judge Richard L. Voorhees                 8/8/2002

Page 3810

Indiana, and we have been very, very careful, even the witnesses that came in from Terre Haute, to call it the special housing unit and special confinement unit, have never let anybody know that that was death row, and now it's out there. And I asked to be heard and Your Honor said no, and I would have made a motion for mistrial at that time. It's trying to unring a bell. We have been very careful about that matter.

THE COURT: The Court will deny the motion. He brought that up in response to a question having to do with the various facilities that were present in the various different places and it wasn't in a context that indicated the defendant had been on death row, so the motion will be denied.

The Court will deny the government's request to admit the expert's opinion as such in that its probative value is not outweighed by the prejudicial effect.

MS. TOMPKINS: Are you speaking of his report?

THE COURT: I'm talking about the report in toto. Okay. May we have the jury, please. The witness may retake the stand.

(The jury returned to the courtroom.)

THE COURT: Your witness. The witness and the jury is here.

Reported By: Scott A. Huseby, RPR
800-333-2082          Huseby, Inc., an Affi...      ...n (704) 333-9889          Fax (704) 372-4593
Case 3:12-cv-00327-MOC  Document 106  Filed 09/23/15  Page 230 of 249
1779

JA2652

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/8/2002

Page 3811

MR. BENDER:  Thank you, Your Honor.

CROSS-EXAMINATION

BY MR. BENDER:

Q.   Good afternoon, Dr. Dietz.

A.   Good afternoon.

Q.   Dr. Dietz, you testified that you spent a couple of -- the better part of two days interviewing Marc?

A.   Yes.  I think that's how long it was.

Q.   Okay.  You've reviewed a vast amount of documents in this matter?

A.   Pretty big.

Q.   And have you interviewed anyone else personally associated with this matter?

A.   No, I haven't.

Q.   None of Marc's family members or any of the victims?

A.   That's right.

Q.   Okay.  And I believe you can agree that reasonable minds may disagree on certain matters?

A.   Yes, certainly.

Q.   And I think you said that you and Dr. Halleck disagree in some respects but not in all respects?

A.   That's right, and not very much.

Q.   Right.  What you found as you went through this

Case 3:12-cv-00327-MOC  Document 78-6  Filed 09/23/15  Page 231 of 249

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/8/2002

Page 3812

was there was some evidence that Marc had made some prior threats to people, and particularly Robin, die, bitch, die, during the fire bombing --

A. That would be an example, yes.

Q. And also as you looked at this you found that there was some erratic behavior on Marc's part, didn't you? Let me give you an example, okay?

A. Sure.

Q. You heard testimony about him shaving his head because his thinking wasn't clear and he thought maybe he could think clearly if he shaved his head?

A. I heard that testimony.

Q. Okay. That's fairly erratic behavior, wouldn't you think?

A. Well, I wouldn't call it erratic behavior. If he shaved his head because he thought he couldn't think clearly, that would be significant and would show some distortion in his thinking. If he shaved his head for the reason that other killers I have examined have shaved their head, then it wouldn't be an example of that, it would be part of his plan to get a mission haircut.

Q. But you have no evidence of that?

A. Correct.

Q. And he was suffering from some depression, and

Reported By: Scott A. Huseby, RPR
800-333-2082          Huseby, Inc., an Aff"      ""   " )n (704) 333-9889          Fax (704) 372-4593
Case 3:12-cv-00327-MOC   Document 106   Filed 09/23/15   Page 232 of 249
1781

JA2654

United States of America vs. Aquilia Marcivicci Barnette          3:97CR23-V
Proceedings Before Judge Richard L. Voorhees                8/8/2002

Page 3813

the difference is how much.  Was it major depression or something less than that?

A.  Well, actually, it's not so much how much, because I agree about the symptoms that Dr. Halleck said.  The difference would be the cause.  Crying and lack of appetite and social withdrawal and so on, I believe he had, though I'm not sure he had them uninterrupted for two weeks or more.

The question is is that caused by an underlying depressive illness inherent in him as in 10 percent of the population or was that caused because he was drinking a lot for those weeks, and I don't think there is any way to tell which it was.  Though the evidence I cited tends to favor it being the drinking, you can't be sure.

Q.  Right.  But there was some depression?

A.  Either way he was having symptoms that look just like depression.

Q.  Guns have been involved in or at least were used in these two homicides, right?

A.  Yes.

Q.  And there was some testimony about maybe shooting guns in the 7 acres out on the home place?

A.  There was testimony about his learning to shoot from family, yes.

Case 3:12-cv-00327-MOC  Document 1706  Filed 09/23/15  Page 233 of 249

JA2655

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/8/2002

Page 3814

Q. All right. Some bit of paranoia?

A. I'm sorry?

Q. Was there some bit of paranoia, like afraid he was going to get caught if he walked up the road?

A. There was definitely more of a jealousy at various points in his life, which I think is an example of paranoia. It could be suspicious of your partner's infidelity and accusatory of her. That's a kind of paranoia. And the night of the crime, I think he was taking steps to avoid being prematurely stopped and so that's why he didn't walk up the side of the road, but I wouldn't call that paranoia to be careful where you walk with a bag with an unlawful firearm in it.

Q. But there was some aspect of paranoia present in his behavior?

A. I don't see it in his behavior, but in his account of what he thought, for him to believe that Robin had been lying to him and having an affair with Bennie Green and for him to think that about the other women in the past, I would call that an example of paranoia.

Q. And the jealousy, the rage, and I think Dr. Cunningham called it something obsessive, I forget what it was.

A. Preoccupation.

Reported By: Scott A. Huseby, RPR
800-333-2082     Huseby, Inc., an Affi          n (704) 333-9889          Fax (704) 372-4593
Case 3:12-cv-00327-MOC   Document 106   Filed 09/23/15   Page 234 of 249
1783

JA2656

Page 3815

Q.    Right, right, obsessive preoccupation, fixation, got to get to Robin, whether it's to kill she and Bennie Green or to talk to her, there was some sort of a fixation on her for what he perceived she had done to him?

A.    Well, I don't think it would be correct to say that there is a fixation, since he is thinking about many different things he might do during that period of time.  He isn't fixed on exactly what he is going to do. He keeps making decisions and changing his mind.  And even up to the time that he has got Robin at gunpoint, there is still several ways this could go, depending on how everything plays out.  So it's not a fixed purpose necessarily.  But it is true that during that time he is repetitively thinking about her and one of his thoughts is of killing her, killing Benjamin Green.

Q.    Right, his repetitive thought pattern was Robin, she is what is causing this problem I have --

A.    That's one of his thoughts.  And at other times he doesn't think that.  For example, when he wakes up and he hasn't been drinking and his blood alcohol level is down.  In one of Dr. Cunningham's examples he said to me, gee, why was I thinking that last night, I'm not as angry toward her now.

Q.    Okay.  Dr. Dietz, you have two consulting

Reported By: Scott A. Huseby, RPR
800-333-2082          Huseby, Inc., an Aff          )n (704) 333-9889          Fax (704) 372-4593
Case 3:12-cv-00327-MOC   Document 106   Filed 09/23/15   Page 235 of 249
1784

JA2657

Page 3816

firms.   One is the Park Dietz and Associates?

A.   Yes.

Q.   And are you the sole owner of the Park Dietz and Associates?

A.   I suppose my wife is an owner, too; but other than that, yes.

Q.   All right, okay.   And anybody else is either an independent contractor or an employee like a staff person or that sort of thing?

A.   Correct.

Q.   And you actually solicit and advertise, do you not?

A.   Well, I don't know what counts as advertising, but we do send out brochures to mailing lists of attorneys.   We have done that two or three times.   And we speak at a great many meetings of various kinds of attorneys and will sometimes have brochures there.   And we have a web site.   We have never paid for an ad.

Q.   Okay.   As a matter of fact, you sent me one of your letters and brochures, didn't you?

A.   If you belong to the National Association of Criminal Defense Lawyers, or whatever the group is called, then we did, we sent it to our mailing list.

Q.   You are not very picky, are you?

That's Defendant's Exhibit 26.   Can you identify

Case 3:12-cv-00327-MOC   Document 106   Filed 09/23/15   Page 236 of 249

1785

JA2658

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/8/2002

Page 3817

that?

A.    This is a cover letter from December 3rd of 2001, sent to that mailing list of defense lawyers.

Q.    So that's what you call a solicitation, whatever it is, that's what you send out, sort of a mass mailing?

A.    Yes.  You should have answered it.

(Laughter.)

Q.    Thank you.  You also have a group called the Death Threat Assessment Group, do you not?

A.    Yes.

Q.    And you are president, vice president, secretary and treasurer and sole shareholder in that?

A.    Yes.

Q.    Tell us again what that does.

A.    It provides services to primarily employers on workplace violence prevention.  There is some other things we do, but that's the major activity.

Q.    And Defendant's Exhibit 27, can you identify that?

A.    This is an old version of what we used to call the big brochure that sets forth generally what services were offered at the time.

Q.    Okay.  All right.  And you send that out, rather than to attorneys, to Fortune 500 companies,

Page 3818

large corporations, that sort of thing?

A.   We never had a mass mailing of this; but the nicer, newer one, we did.

Q.   Okay.   So I don't have the nicer, newer one.

MR. BENDER:   Your Honor, at this time I would move to introduce Defendant's Exhibits 26 and 27.

THE COURT:   Let them be admitted.

BY MR. BENDER:

Q.   In connection with the Threat Assessment Group, and it's reflected in that old brochure, there is something called murder 9:00 to 5:00 HBO that you and, was it your wife, was she the producer of that?

A.   No.

Q.   Okay.

A.   Neither my wife at the time nor I were producers of it.

Q.   Okay.   You are familiar with it, an HBO production?

A.   Yes, sure.

Q.   And you refer to it in there as one of the things that you were seen by, I think you said 20 million people, and it's about workplace violence?

A.   Yes, it is.

MR. BENDER:   Your Honor, I would like to have this marked as Defendant's Exhibit 28.

Reported By: Scott A. Huseby, RPR
Huseby, Inc., an Aff          n (704) 333-9889          Page 238 of 249
800-333-2082                                                    Fax (704) 372-4593
Case 3:12-cv-00327-MOC  Document 106  Filed 09/23/15  Page 238 of 249
1787

JA2660

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/8/2002

Page 3819

MS. TOMPKINS: Your Honor, we have an objection to the relevance.

THE COURT: Members of the jury, we will ask you to step out for a moment while we take up a legal matter.

(The jury left the courtroom.)

THE COURT: Please describe the exhibit.

MR. BENDER: Yes, Your Honor. It is Dr. Dietz's HBO called Murder 9:00 to 5:00, and it is a video of workplace violence and Dr. Dietz talks about that, and the questions I asked, which seemed innocuous -- well, let me ask Dr. Dietz to leave, if I could, while we argue this motion.

MS. TOMPKINS: Objection.

MR. BENDER: Could we have him sequestered while I make this motion?

THE COURT: I have no objection.

(Dr. Dietz leaves the courtroom.)

MR. BENDER: Your Honor, he describes the exact same things he described about Marc Barnette, threats, paranoia, fixation, jealousy, guns, all of which his group says they can prevent or that you ought to be aware of and that you ought -- and it ought to be able to prevent and you need to hire us to do that. Now, the relevance is, one, it's cross-examination; two

Reported By: Scott A. Huseby, RPR
800-333-2082                    Huseby, Inc., an A           ion (704) 333-9889           Fax (704) 372-4593
Case 3:12-cv-00327-MOC   Document 106   Filed 09/23/15   Page 239 of 249
1788

JA2661

United States of America vs. Aquilia Marcivicci Barnette     3:97CR23-V
Proceedings Before Judge Richard L. Voorhees          8/8/2002

Page 3820

is it's going to show that --

THE COURT: On cross-examination you can ask him about it -- but go on to your second point.

MR. BENDER: Okay. And at the very end he says, and we are talking about multiple homicides in the workplace, and at the very end when Dr. Dietz comes on and describes these things, he says, as he goes back through it, he says, these people are not evil, these people need help, they need to be treated with dignity and respect. Marc Barnette is not evil. He needs to be treated with respect and helped, and that's the whole purpose of this.

THE COURT: You are entitled to ask the witness about that.

MR. BENDER: Can I show it to him?

THE COURT: No. You can show it to him on voir dire. How long is the tape?

MR. BENDER: It's about 40 minutes.

THE COURT: Entirely out of order. Needless consumption of time, confusion of the jury, and misleading the jury, plus it's got a serious problem of relevance.

MR. BENDER: Your Honor, when he says these are the things I found about Marc, the same things that I find when I'm being paid by corporations.

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/8/2002

Page 3821

THE COURT: You can put -- I will let you put on his conclusion and let him explain it.

MR. BENDER: Well, it has -- without --

THE COURT: Whatever he says about it. But we are not going to spend the afternoon hearing a 40-minute tape about something that is not specifically domestic violence or another type of violence that's been identified here.

MR. BENDER: Well, Ann Burgess said this was very similar to workplace violence in her testimony.

THE COURT: You can ask Dr. Dietz about that.

THE COURT: What is the government's position on this?

MS. TOMPKINS: Your Honor, we would contend that it's not relevant, that it is a needless waste of time. If defense counsel wants to ask him about -- I don't know even know what this thing is about, but ask him questions rather than watching a video, but I would also contend that asking him or trying to correlate workplace violence to this, the crimes here in this sentencing hearing, is completely irrelevant and do not match up and he should not be allowed to ask him about his opinions on workplace violence related to the defendant. This is not a case

United States of America vs. Aquilia Marcivicci Barnette          3:97CR23-V
Proceedings Before Judge Richard L. Voorhees          8/8/2002

Page 3822

of workplace violence.

THE COURT:  He can ask that question on cross-examination.

MR. BENDER:  On direct examination Dr. Dietz said, with respect to this TAG group, Threat Assessment Group, he does it in preventing domestic violence in the workplace and he does it routinely. Those were his words.

THE COURT:  Right.  And you can go into any length you deem necessary within reason to cross-examine him about that.

MR. BENDER:  Well, can I cue it up to the last like five minutes?

THE COURT:  Yes, sir.

MS. TOMPKINS:  I object to playing a portion out of context.

THE COURT:  Well, all we are going to do right now is look at it for purposes of voir dire.

MR. BENDER:  The whole thing or just the last five --

THE COURT:  The last five minutes.

MS. TOMPKINS:  Should Dr. Dietz be present for this?

THE COURT:  Yes, bring Dr. Dietz in.

MR. BENDER:  Judge, I don't know how we

Reported By: Scott A. Huseby, RPR
800-333-2082          Huseby, Inc., an Aff¨ ⁻⁻⁻ ⁻ · n (704) 333-9889          Fax (704) 372-4593
Case 3:12-cv-00327-MOC   Document 106   Filed 09/23/15   Page 242 of 249
1791

JA2664

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/8/2002

Page 3823

are going to fast forward it to that point. Is there some way I can see a screen and tell when it --

THE COURT: For purposes of voir dire, Dr. Dietz, and out of the presence of the jury we will be showing the last five minutes or so of a tape that you heard Mr. Bender identify.

(Videotape is being played outside of the presence of the jury for purposes of voir dire of the witness.)

MS. TOMPKINS: Can you turn it down a little bit more so that the jury can't hear it?

Your Honor, while he is cueing that up, if I could comment, if the purpose is to show some sort of bias, it's not relevant. If Dr. Dietz has a bias, then the defense is allowed to expose that, and I'm not quite sure what kind of bias against the defendant that they are trying to expose.

THE COURT: I don't think they are trying to show bias. They are trying to show that he thought something different at a different time, I would assume, but we will ask Mr. Bender about that.

MR. BENDER: We've got it cued up. Would you like to see it now?

THE COURT: Yes. The witness may observe it also.

MR. BENDER: Sure.

Case 3:12-cv-00327-MOC   Document 406   Filed 09/23/15   Page 243 of 249

Page 3824

(Video played for the Court.)

MR. BENDER:  That's it.

THE COURT:  Counsel may cross-examine the witness appropriately with regard to that.

MR. BENDER:  Can I also show it?

THE COURT:  No, sir.  The record will show that the tape began as shown here in court for voir dire purposes with a screen that showed the name of Dr. Dietz.

May we have the jury, please.

MR. BENDER:  Your Honor, I would introduce that tape for the record.

THE COURT:  It will be introduced for purposes of completing the record but not as an exhibit for this trial.

MR. BENDER:  Right.

THE COURT:  Thank you.

(The jury returned to the courtroom.)

THE COURT:  All right, sir.  The jury is with us.

BY MR. BENDER:

Q.   Dr. Dietz, on direct examination you mentioned that this TAG group, Threat Assessment Group, is involved in preventing domestic violence in the workplace and that's what you routinely do, is that

Reported By: Scott A. Huseby, RPR
Huseby, Inc., an Affi          n (704) 333-9889          Fax (704) 372-4593
800-333-2082
Case 3:12-cv-00327-MOC   Document 106-3   Filed 09/23/15   Page 244 of 249
1793

JA2666

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/8/2002

Page 3825

correct?

A.    We -- almost right.  We don't do primary prevention of domestic violence.  What we do is to help employers deal with domestic violence in ways that protect their employees, and most typically that is that the employee is a victim who makes it known that she has obtained a restraining order against her abuser or that she feels frightened that her abuser will come to her workplace, and that's how we tend to learn of it, and then we manage it from there.

Q.    And the Murder 9:00 to 5:00 video that you did for HBO, you showed four individuals who had committed domestic violence in the workplace, didn't you?

A.    No.  We did four cases of workplace violence. None of them was domestic violence, but all four were serious violence.  One was a woman who shot her supervisor.  One was a man who stalked a woman who had no relationship with him and then did a mass murder in which he shot her and killed others.  One was a postal worker who did a mass murder at his workplace, no domestic element.  And the fourth one was a man who was trying to go to his workplace to do a mass murder but locked himself out of his car on the way and killed a couple of people at a fast food restaurant and committed suicide; again, no domestic element.

Reported By: Scott A. Huseby, RPR
Huseby, Inc., an Affi⸱⸱ ⸱⸱ ⸱ ⸱n (704) 333-9889

800-333-2082                                                    Fax (704) 372-4593

Case 3:12-cv-00327-MOC   Document 106   Filed 09/23/15   Page 245 of 249

1794

JA2667

Page 3826

Q.    But you also indicated that things for an employer to look for were threats, erratic behavior, firearms, fixation on coworker, depression, and paranoia, didn't you?

A.    The video does indicate that, and I support that.  The way that came to be is that I gave HBO a list of the 12 features that we had found associated with workplace mass murder, and they wanted to make it a list that was simpler, and we whittled it down to six.  We had debates about how much the public should be told about warning signs and how to contextualize that and eventually we resolved there would be a sensitive way to mention these six things for the public.

Q.    And at the end you showed little snippets of each one of these people who had killed strangers to get to -- to try to get to their primary object, which is their boss, their supervisor, and you said, this is not about evil, this is about getting people help and treating them with the dignity and respect that they deserve, each one of those people, didn't you?

A.    I said these cases are not about evil, they are about troubled people and so on.

              MR. BENDER:  Thank you.  That's all.

              MS. TOMPKINS:  No further questions.

              THE COURT:  You may step down.

Reported By: Scott A. Huseby, RPR
800-333-2082    Huseby, Inc. an / rion (704) 333-9889    Fax (704) 372-4593
Case 3:12-cv-00327-MOC-DCK Document 196   Filed 09/23/15   Page 246 of 249
1795

JA2668

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/8/2002

Page 3827

MS. TOMPKINS: That's the evidence for the government, Your Honor.

THE COURT: Will there be any surrebuttal from the defense?

MR. BENDER: Your Honor, may we have a moment --

THE COURT: Yes, sir, you may.

MR. BENDER: -- to talk about that?

THE COURT: Yes, you may. The jury may be at ease.

MR. BENDER: Your Honor, we will not put on any other evidence. Thank you.

THE COURT: Members of the jury, the Court told you earlier the order of business would include hearing the evidence and then we would have the arguments of the attorneys and also the charge of the Court, that is a set of instructions that would give you the law in the case. We propose to do that beginning Monday morning, so you will have tomorrow off and you will be free to go today.

Let me remind you of the instructions to keep an open mind about all of the issues in the case. Don't discuss it with anyone or comment on it or let anyone discuss it in your presence, including your fellow jurors. Don't do any research or visit any locations,

Reported By: Scott A. Huseby, RPR
800-333-2082          Huseby, Inc., an Aff              m (704) 333-9889          Fax (704) 372-4593
Case 3:12-cv-00327-MOC   Document 106   Filed 09/23/15   Page 247 of 249
1796

JA2669

United States of America vs. Aquilia Marcivicci Barnette    3:97CR23-V
Proceedings Before Judge Richard L. Voorhees    8/8/2002

Page 3828

and all of the other instructions I have given you.

Thank you very much for your attention to those. We

appreciate your attention to the evidence throughout

this fairly long trial, and we will see you on Monday

morning at 9:30. Thank you.

(The jury left the courtroom.)

THE COURT: Will there be suggestions for

the Court as to the holding of the charge conference

tomorrow from any of the attorneys?

MR. BENDER: Judge, I've been elected. We

would like to have some time this evening and maybe

tomorrow morning to put together a list of mitigating

circumstances. We've got it pretty much finished, but

probably need to put some finishing touches on it.

Could I suggest that maybe we start at 10:30 in the

morning?

THE COURT: 10:30 will be fine. And at

that time the Court will likely have a proposed set of

jury instructions and verdict sheet with everything but

the mitigating factors, although it may have the

mitigating factors from the previous proceeding --

MR. BENDER: Right.

THE COURT: -- simply as a starting place.

MR. BENDER: ·Yes, sir.

THE COURT: That will be in court, with

Reported By: Scott A. Huseby, RPR
800-338-2082    Huseby, Inc., an Aff...ent 106 ...n (704) 333-9889    Page 248 of 249    Fax (704) 372-4593
Case 3:12-cv-00327-MOC   Document 106   Filed 09/23/15   Page 248 of 249

1797

JA2670

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/8/2002

Page 3829

the defendant present, and we will take up instructions. It's very possible that we will have another one tomorrow afternoon, if we need a follow-up, the object being to put a final draft in place.  Thank you.

I, Scott A. Huseby, do hereby certify that the foregoing transcript is a true and correct transcript.

SCOTT A. HUSEBY                                    DATE

Reported By: Scott A. Huseby, RPR
Huseby, Inc., an Affi            n  (704) 333-9889
800-333-2082                                              Fax (704) 372-4593

JA2671