# IN THE

# United States Court of Appeals
## FOR THE FOURTH CIRCUIT

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

v.

AQUILIA MARCIVICCI BARNETTE,

*Defendant-Appellant.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA AT CHARLOTTE

## JOINT APPENDIX - VOLUME VI OF VII
### (Pages 2672 - 3263)

Gerald W. King, Jr.
FEDERAL PUBLIC DEFENDER
FOR THE WESTERN DISTRICT
OF NORTH CAROLINA
129 West Trade Street, Suite 300
Charlotte, NC 28202
704-374-0720
gerald_king@fd.org

*Counsel for Appellant*

Anthony Joseph Enright
OFFICE OF THE
UNITED STATES ATTORNEY
Western District of North Carolina
227 West Trade Street, Suite 1650
Charlotte, NC 28202
704-344-6222
usancw.appeals@usdoj.gov

*Counsel for Appellee*

Additional Counsel for Appellant on Inside Cover

Jacob H. Sussman
SOUTHERN COALITION FOR SOCIAL JUSTICE
P. O. Box 51280
Durham, NC 27717
704-277-3962
jsussman@scsj.org

Mark E. Olive
ATTORNEY AT LAW
320 West Jefferson Street
Tallahassee, FL 32301
850-224-0004
meolive@aol.com

*Counsel for Appellant*

# TABLE OF CONTENTS

# VOLUME VI OF VII

JA Page

*Continued,* Exhibits to Response of the United States to Barnette's Motion Under 28 U.S.C. 2255 and Motion for an Evidentiary Hearing 2023.09.23:

Ex. 1i:  Joint Appendix Vol V of V [ECF107] ........................................... 2672

Resentencing Volume 20, August 9, 2002 (Morning).............. 2682

Resentencing Volume 20, August 9, 2002 (Afternoon) ........... 2705

Resentencing Proceedings, August 12, 2002 ........................... 2753

Ex. 1j:  Remainder of JA Vol V of V [ECF108] 2872

Resentencing Proceedings, August 13, 2002 ........................... 2900

Defendant Motion for Mistrial regarding victim impact testimony, filed August 5, 2002 ................................................ 2917

Written questions from the jurors filed August 13, 2002 ......... 2920

District Court Judge's answer to jurors' written question filed August 13, 2002 2921 .............................................................................

Jury verdict form with reference to count 7, filed August 13, 2002 .................................................................. 2922

Jury verdict form with reference to count 8, filed August 13, 2002 .................................................................. 2940

Jury verdict form with reference to count 11, filed August 13, 2002 .................................................................. 2958

Judgment and Order imposing sentence, entered August 20, 2002 .................................................................. 2975

Defendant's Motion for New Trial, Arrest of Judgment and Other Relief, filed August 20, 2002 ......................................... 2980

Order Denying Defendant's Motion for New Trial, Arrest of
Judgment and Other Relief entered September 9, 2002 ........... 3032

Petitioner Aquilia Marcivicci Barnette's Reply with attached Exhibits
2016.04.04 [ECF118] ................................................................. 3038

Petitioner Aquilia Marcivicci Barnette's Supplemental
Motion to Vacate Under 28 U.S.C. 2255
2016.06.24 [ECF119] ................................................................. 3088

Order
2016.12.08 [ECF123] ................................................................. 3122

Order
2016.12.08 [ECF124] ................................................................. 3127

Order
2019.04.09 [ECF125] ................................................................. 3132

Response of the United States to Barnette's Supplemental 2255 Motion
2019.11.21 [ECF132] ................................................................. 3134

Petitioner Aquilia Marcivicci Barnette's Unopposed
Motion for Extension of Time to File a Reply Brief
2019.11.22 [ECF134] ................................................................. 3163

Petitioner Aquilia Marcivicci Barnette's Reply Brief in Support of
Supplemental Motion to Vacate Under 28 U.S.C. 2255
2020.20.20 [ECF136] ................................................................. 3168

Order
2021.03.12 [ECF137] ................................................................. 3193

Judgment in Case
2021.03.12 [ECF138] ................................................................. 3240

Notice of Appearance
2021.03.12 [ECF139] ................................................................. 3241

Motion to Alter and Amend Judgment Pursuant to
Rule 59(e) of the Federal Rules of Civil Procedure
   2021.04.09 [ECF140]  ...................................................................3246

Order
   2023.12.06 [ECF141] ................................................................ 3255

Notice of Appeal
   2024.02.05 [ECF142] ................................................................ 3261

## IN THE

# United States Court of Appeals

## FOR THE FOURTH CIRCUIT

## UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

v.

## AQUILIA MARCIVICCI BARNETTE,

*Defendant-Appellant.*

## ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF NORTH CAROLINA

## JOINT APPENDIX - VOLUME V OF V
### (Pages 1799 - 2151)

HAROLD J. BENDER
LAW OFFICE OF HAROLD J. BENDER
200 North McDowell Street
Charlotte, NC 28204
(704) 333-2169

ROBERT J. CONRAD, JR.
UNITED STATES ATTORNEY
WESTERN DISTRICT OF NC
Suite 1700, Carillon Building
227 West Trade Street
Charlotte, NC 28202
(704) 344-6629

MARK E. OLIVE
ATTORNEY AT LAW
320 West Jefferson Street
Tallahassee, FL 32301
(850) 224-0004

ANNE M. TOMPKINS
ASST. UNITED STATES ATTORNEY
WESTERN DISTRICT OF NC
Suite 1700, Carillon Building
227 West Trade Street
Charlotte, NC 28202
(704) 344-6222

*Counsel for Appellant*

*Counsel for Appellee*

**Additional Counsel Listed on Back of Cover**

LANTAGNE LEGAL PRINTING 801 East Main Street Suite 100 Richmond, Virginia 23219 (804) 644-0477
A Division of Lantagne Duplicating Services

Case 3:12-cv-00327-MOC   Document 107   Filed 09/23/15   Page 1 of 200

**JA2672**

JILL WESTMORELAND ROSE
ASSISTANT UNITED STATES ATTORNEY
WESTERN DISTRICT OF NORTH CAROLINA
100 Otis Street, Room 233
U.S. Courthouse Building
Asheville, North Carolina 28801
(828) 271-4661

JA2673

# TABLE OF CONTENTS

Federal District Court Docket Sheet . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Indictment filed February 4, 1997 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 69

Guilty Verdict returned January 27, 1998 . . . . . . . . . . . . . . . . . . . . . . . . . . . . 75

Defendant's Motion in Limine Regarding the Victim
Impact Statements, filed June 4, 2002 . . . . . . . . . . . . . . . . . . . . . . . . . . . . 76

Motion for Allocution by the Defendant, filed
June 4, 2002 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 78

Government's Response in Opposition to
Defense Motion in Limine to Prohibit
and/or Limit Victim Impact Evidence,
filed June 12, 2002 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 80

Government's Response to Motion for Allocution
by the Defendant, filed June 12, 2002 . . . . . . . . . . . . . . . . . . . . . . . . . . . 89

Order Denying Defendant's Motion for Allocution,
entered June 18, 2002 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 93

Order Denying Defendant's Motion in Limine
regarding the Victim Impact Statements,
entered June 21, 2002 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 97

Motion for Relief Pursuant to *Ring v. Arizona*
filed July 2, 2002 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 100

Attachments:

Indictment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 103

1

**JA2674**

**JA2675**

Government's Notice of Intent to Seek
the Death Penalty, filed August 7, 1997 . . . . . . . . . . . . . . . . . . . . . . . . . . . . 110

Government's Reaffirmation of Intention
to Seek the Death Penalty, filed July 30, 2001 . . . . . . . . . . . . . . . . . . . . . 118

Defendant's Memorandum in Support of Motion
Regarding *Ring*, filed July 12, 2002 . . . . . . . . . . . . . . . . . . . . . . . . . . . 121

Government's Response to Defendant's Motion for
Relief Pursuant to *Ring v. Arizona*,
filed July 12, 2002 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 128

Voir Dire:

Prospective Juror Regina Sanders (888) . . . . . . . . . . . . . . . . . . . . . . . . . . 133

Prospective Juror Edwards (1014) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 148

Prospective Juror Karen Sanders (1071) . . . . . . . . . . . . . . . . . . . . . . . . . 169

Prospective Juror Blakeney (1143) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 184

Prospective Juror Bryson (1239) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 205

Prospective Juror Donaldson (1289) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 224

Prospective Juror Campbell (1477) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 245

Prospective Juror Moore (1913) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 264

Prospective Juror Deana Stanford (1960) . . . . . . . . . . . . . . . . . . . . . . . . . 281

Parties' exercise of peremptory challenges to the
prospective jurors, July 27, 2002 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 294

2

**JA2676**

Case 3:12-cv-00327-MOC   Document 107   Filed 09/23/15   Page 6 of 200

**JA2677**

### *Volume II*

Resentencing Volume 12, July 29, 2002, (Morning) . . . . . . . . . . . . . . . . . . . . . . 372

Resentencing Volume 12, July 29, 2002 (Afternoon) . . . . . . . . . . . . . . . . . . . 469

Resentencing Volume 13, July 30, 2002 (Morning) . . . . . . . . . . . . . . . . . . . . 587

Resentencing Volume 13, July 30, 2002 (Afternoon) . . . . . . . . . . . . . . . . . . . 687

Resentencing Volume 14, July 31, 2002 (Morning) . . . . . . . . . . . . . . . . . . . . 773

### *Volume III*

Resentencing Volume 14, July 31, 2002 (Afternoon) . . . . . . . . . . . . . . . . . . . 845

Resentencing Volume 15, August 1, 2002 (Morning) . . . . . . . . . . . . . . . . . . . 959

Resentencing Volume 16, August 5, 2002 (Morning) . . . . . . . . . . . . . . . . . . 1029

Resentencing Volume 16, August 5, 2002 (Afternoon) . . . . . . . . . . . . . . . . . 1107

Resentencing Volume 17, August 6, 2002 (Morning) . . . . . . . . . . . . . . . . . . 1202

### *Volume IV*

Resentencing Volume 17, August 6, 2002 (Afternoon) . . . . . . . . . . . . . . . . . 1312

Resentencing Volume 18, August 7, 2002 (Morning) . . . . . . . . . . . . . . . . . . 1424

Resentencing Volume 18, August 7, 2002 (Afternoon) . . . . . . . . . . . . . . . . . 1533

Resentencing Volume 19, August 8, 2002 (Morning) . . . . . . . . . . . . . . . . . . 1634

Resentencing Volume 19, August 8, 2002 (Afternoon) . . . . . . . . . . . . . . . . . 1726

3

Case 3:12-cv-00327-MOC   Document 107   Filed 09/23/15   Page 7 of 200

**JA2678**

## Volume V

Resentencing Volume 20, August 9, 2002 (Morning) . . . . . . . . . . . . . . . . . . . 1799

Resentencing Volume 20, August 9, 2002 (Afternoon) . . . . . . . . . . . . . . . . . 1822

Resentencing Proceedings, August 12, 2002 . . . . . . . . . . . . . . . . . . . . . . . 1870

Resentencing Proceedings, August 13, 2002 . . . . . . . . . . . . . . . . . . . . . . . 2017

Defendant Motion for Mistrial regarding victim
impact testimony, filed August 5, 2002 . . . . . . . . . . . . . . . . . . . . . . . 2034

Written questions from the jurors filed August 13, 2002 . . . . . . . . . . . . . . . 2037

District Court Judge's answer to jurors' written question
filed August 13, 2002 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2038

Jury verdict form with reference to count 7, filed
August 13, 2002 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2039

Jury verdict form with reference to count 8, filed
August 13, 2002 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2057

Jury verdict form with reference to count 11, filed
August 13, 2002 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2075

Judgment and Order imposing sentence, entered
August 20, 2002 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2092

Defendant's Motion for New Trial, Arrest of Judgment
and Other Relief, filed August 20, 2002 . . . . . . . . . . . . . . . . . . . . . . . 2097

Order Denying Defendant's Motion for New Trial,
Arrest of Judgment and Other Relief
entered September 9, 2002 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2149

Case 3:12-cv-00327-MOC   Document 107   Filed 09/23/15   Page 9 of 200

**JA2680**

Case 3:12-cv-00327-MOC   Document 107   Filed 09/23/15   Page 10 of 200

**JA2681**

3830

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION

UNITED STATES OF AMERICA ) DOCKET NO. 3:97-cr-23-V
)
vs. )
)
AQUILIA MARCIVICCI BARNETTE, ) VOLUME 20
) MORNING
Defendant. )
_____)

CHARGE CONFERENCE
BEFORE THE HONORABLE RICHARD L. VOORHEES
UNITED STATES DISTRICT COURT JUDGE
AUGUST 9, 2002

APPEARANCES:

On Behalf of the Government:

    ANNE M. TOMPKINS, ESQ.
    JILL WESTMORELAND ROSE, ESQ.
    227 West Trade Street, Suite 1700
    Charlotte, North Carolina

On Behalf of the Defendant:

    JEAN B. LAWSON, ESQ.
    P.O. Box 472106
    Charlotte, North Carolina

    HAROLD J. BENDER, ESQ.
    200 North McDowell Street
    Charlotte, North Carolina

        Cheryl A. Nuccio, RMR-CRR
        Official Court Reporter
       United States District Court
        Charlotte, North Carolina

FRIDAY MORNING, AUGUST 9, 2002

(Jury not present.)

THE COURT: The court's in session for the purpose of discussing proposed jury instructions. The court has a set which is proposed. Because of printing problems, the automation specialist is printing those out at the present time.

Now, you've already been given a copy of proposed verdict sheets. Would there be any comments on those at this time?

MS. TOMPKINS: Do you want to go first?

MS. LAWSON: You go first.

MS. TOMPKINS: Okay. The government will jump to Unable to Reach a Unanimous Verdict.

THE COURT: Okay.

MS. TOMPKINS: And would cite the court --

THE COURT: Now, what page are you on?

MS. TOMPKINS: That is page 17 of...

THE COURT: Right.

MS. TOMPKINS: Okay. You have it?

THE COURT: I do.

MS. TOMPKINS: Citing Jones versus the United States, 527 U.S. 373, 1999 Supreme Court case.

In that case a similar jury instruction was argued for by the defendant and denied, and the Supreme Court

approved the denial of this jury instruction saying, quote, It concerned a procedural matter and was not one which should have been the subject of an instruction.

The court reasoned in that case that the jury was not misled about its role in the sentencing process. That the jury should be encouraged to fulfill its role to reach a unanimous verdict and that by -- the court said, and this is a quote, We have long been of the view that the very object of the jury system is to secure unanimity by comparison of views and by arguments among the jurors themselves. And that -- in fact, the <u>Allen</u> charge, which is commonly used when a jury is unable to be unanimous, speaks to the importance of a unanimous verdict.

And that the court also concluded that, quote, The government has a strong interest in having the jury express the conscience of the community on the ultimate question of life or death, and a charge to the jury of the sort proposed by petitioner might have the effect of undermining this strong governmental issue -- interest, that is.

THE COURT: All right. Is there any objection by the defendant to just remove that page?

MR. BENDER: Yes, Your Honor, because we believe that's a correct statement of the law. In the event that they are unable to reach a verdict, a sentence of life without the possibility of release will be -- will be entered by the

court, and that's what --

THE COURT: Well, I think she's not saying it isn't correct. She's saying that it isn't necessary.

MR. BENDER: We believe it is necessary to give them all the options that are provided for by the law.

THE COURT: Well, wouldn't you think Jones makes it at least optional?

MR. BENDER: If Jones does make it -- I'm not familiar with Jones. Well, I think it's a carjacking case, but I haven't read it in a while. But if Jones makes it optional, then we would implore the court to leave it in.

MS. TOMPKINS: And the government would again argue that Jones says, in fact, it undermines the core purpose of juries and that is to be unanimous.

Also, the Federal Death Penalty Act does not require a deadlock instruction, so -- they have put in a specific instruction that the jury not base its sentence on race, color, religious beliefs, natural origin or sex of the defendant or any victims. So they've specifically put in additional instructions that they think are important to the federal death penalty and they have left out purposefully, I would argue, a lack of unanimity instruction.

And I do believe that Jones specifically says, and the majority of the Supreme Court argued that this is an improper jury instruction. And that's -- well...

MR. BENDER: Your Honor, we believe that's a burden shifting. There are two ways in which a life sentence can and should be imposed. One is if it's unanimous life. And two is if it's not unanimous; in other words, if they fail to reach a unanimous decision, then a life without possibility of release sentence will be imposed. By eliminating this, we think it's improperly burden shifting to make us prove a higher standard than we need to.

THE COURT: Well, the court will have another look at the Jones case and consider that before we meet this afternoon.

MS. TOMPKINS: Can I ask just to cite another case for you to look at in your determination?

THE COURT: Let me -- I think there's more than one Jones case. Give me that earlier cite.

MS. TOMPKINS: It's 527 United States 373. It's a 1999 case under the Federal Death Penalty Act.

THE COURT: All right. And you have another cite?

MS. TOMPKINS: Yes. If you would look at 462 S.E.2d 25. It's a North Carolina Supreme Court case; cert. denied by the United States Supreme Court, which also has the same issue.

And a Fourth Circuit case, if you would, which is Green versus French, cited at 143 F.3d 865.

THE COURT: All right. Now, apparently the parties

FORM FED PENGAD · 1-800-631-6989

are both agreeable to leaving out any option to the jury about the defendant being sentenced as otherwise provided by law, as Judge Potter did.

MS. TOMPKINS: Yes. Although, I will say this. And this is also in the Jones case. That is a lawful instruction, but -- and in the Jones case the court said even if it's factually impossible, it's still in the statute and lawful. However, the government understanding that it's not a true possibility in the effort to tell this jury exactly what the actual facts are, we will concede and take that out.

THE COURT: All right. So that's -- that will be observed throughout the instructions, that that's -- that's not an option and won't be suggested as an option.

MS. TOMPKINS: And I just point out that the lawfulness of that instruction, because I think it mentions what the government's request to take out the lack of unanimity argument. Just leave it at that.

THE COURT: I'm sorry, say that again.

MS. TOMPKINS: I think -- the government's argument about taking out the instruction about a lack of unanimity dovetails with our effort to leave the decision with the jury and to tell the jury exactly, you know, what the facts are and what the law is and that both of those issues are talked about in the Jones case and I think they dovetail a little bit.

THE COURT: And evidently, you say that's the case

FORM FED ● PENGAD · 1-800-631-6989

even though the only unanimity requirement discussed in the statute -- well, take that back. The statute talks about unanimity in imposing the death penalty. It also talks about unanimity in imposing a life sentence. And the effect of those two recommendations by the jury is that the court is bound by them.

MS. TOMPKINS: Yes.

THE COURT: The statute also talks about this third option of sentencing according to law which is also a unanimous type of decision, but that's not going to be in play here. But the jury is told that unless they are unanimous in their recommendation for death, then there won't be a death sentence. In other words, the mitigation instructions, of course, discuss lack of unanimity there. In any event, we'll look at that issue further.

MR. BENDER: Your Honor, may I address --

THE COURT: Okay. Before we leave that earlier point, you'll be given a copy of proposed instructions from the court, and page 69, section 8.02 will have to be changed as a result of some of these discussions. So you can contemplate that there will be some editing, at least of that page, which is entitled Consequences of Deliberations.

Okay. Mr. Bender.

MS. LAWSON: Yes. Two other suggestions. I think they appear on each one of the three. On page 5...

THE COURT: Yes, sir.

MR. BENDER: And it may just be a spacing problem, if we can get "yes" and "no" on the same page.

THE COURT: You're right. We will handle that.

MR. BENDER: Okay. And also, as I count the lines, there are ten lines as opposed to twelve lines for the...

THE COURT: Oh. Well, I accept your math. Is that in the case of each of these options where they have to sign twelve times?

MR. BENDER: I believe it is, Judge.

THE COURT: All right. We'll see to that.

MR. BENDER: That's all I have for that.

THE COURT: Okay.

MS. TOMPKINS: Nothing further from the government.

THE COURT: All right. Then, of course, the defendant's revised mitigating factors will be inserted. The copies that you now have have the -- I believe the original trial mitigators.

MR. BENDER: Right. Judge, for the record, we would move to dismiss the aggravating factor of future dangerousness as we had previously done.

THE COURT: All right. Thank you. That motion will be denied.

Now, I propose to take up some of the defendant's proposed instructions. Has the defendant -- I mean, the

government looked at those?

MS. ROSE: Yes, Your Honor.

THE COURT: And do you -- the first one talks about the government's burden of proof. Now, as to that, the court proposes to use its standard instruction on reasonable doubt, which says it's a doubt based upon reason and common sense and that its meaning is no doubt clear to the jury, and I won't define it otherwise.

The government have any objection to that?

MS. TOMPKINS: No, sir.

THE COURT: And I assume the defendant does because the defendant proposed a more elaborate reasonable doubt instruction, but the court --

MR. BENDER: That's correct, Your Honor.

THE COURT: Okay. But the court will decline to give that one.

Now, Mitigating Factors Defined, does the government have any objection to that?

MS. TOMPKINS: If we could just have a moment.

(Pause.)

MS. TOMPKINS: I'm just taking a look at the court's version of that quickly.

(Pause.)

MS. TOMPKINS: We would ask the court to use 6.01 as proposed by the instructions handed out by the court rather

than the defendant's.

THE COURT: Okay. I'll give that consideration. Is there anything in particular that you would like to -- that you say is incorrect about the defendant's proposal?

MS. TOMPKINS: The line, Indeed, if a homicide was justified or excusable, a defendant would not be guilty or punishable for it, I think is misleading and confusing. Really, this is about what is a mitigating factor and not about a justifiable or excusable homicide, and I think it takes the jury away from the point of the instruction which is to tell them what is a mitigating factor. And that particular line, I think, takes it far afield.

THE COURT: All right. I'll consider that.

Now, then, Mitigating Factors to Consider. Of course, that will be taken off defendant's new list of -- list for this trial.

Any objection to the rest of that page?

MR. BENDER: Your Honor, I would only say that the last sentence where it says Part 4, I'm not sure what that is in the verdict sheet, but --

THE COURT: You're right. We'll certainly look at that to make sure. Thank you.

MS. TOMPKINS: Well, the government would object to the defense Mitigating Factors to Consider and ask the court to keep the instructions as the court has proposed. I think

it's, again, somewhat misleading and asks the jury to consider things that they're at this point -- it's not important for them. For example, This was a choice expressly made by Congress in enacting the capital punishment statute. It goes very far afield from the strict instructions for the process by which they are to make their decision. This isn't a philosophy of why we have mitigating factors and what Congress intended.

So I would ask the court to deny the defense version of Mitigating Factors to Consider and stay with the patterned instructions as being more directly to the point.

THE COURT: When you say patterned --

MS. TOMPKINS: When I say patterned, I think I'm talking about the ones that have been handed out by the court.

THE COURT: Right.

MS. TOMPKINS: And they may or may not be pattern.

THE COURT: We've been searching for something that is called patterned instructions --

MS. TOMPKINS: Which I'm now calling patterned instructions.

THE COURT: -- and aren't sure whether such a thing exists at the present time.

Okay. And then the next one, Death Penalty Must be Unanimous Beyond a Reasonable Doubt. Any objection from the

government?

MS. TOMPKINS: If I can have just one minute.

(Pause.)

MS. TOMPKINS: This is a -- an issue that we have gone through somewhat during jury selection and the court remembers I made numerous objections during jury selection. I think this is the one. What the defense wants to argue is that there is, as I've argued before, an extra step that even if you're persuaded that the aggravating factors, you must still be unanimously convinced beyond a reasonable doubt that they're serious to mandate a sentence of death.

And the sentence that I would object to is, Even if one juror -- if even one juror concludes that justice can be served by a sentence less than death, the jury cannot return a decision in favor of capital punishment.

What I would ask the court to do, and I'll have to look at the court's instructions, but that they not again lead the jury down the path of nonunanimity, but that what this -- the jury should be instructed that, obviously, and they will be instructed that their decision should be unanimous beyond a reasonable doubt as to aggravating factors. I again think that this points them down the path of what happens if there's a nonunanimous verdict. There's a straight forward way to say this to the jury and this isn't it.

THE COURT: Well, in terms of reasonable doubt as

referenced in that -- in the middle sentence -- actually, it's the first sentence, the statute talks about the government proving its aggravating factors by -- beyond a reasonable doubt. It doesn't expressly talk about the government proving its overall case beyond a reasonable doubt. And it doesn't expressly talk about mandating a sentence of death beyond a reasonable doubt.

What does the government say to that?

MS. TOMPKINS: Well, I think that there -- I'm not sure whether the court has it, but I think there's an instruction that will say they are never required to find -- to give the defendant the sentence of death. I think that covers that issue. Any verdict of the jury must be unanimous. This leads the jury to believe that only a death sentence needs to be unanimous. We would again be saying to the jury -- they are going to be charged with making a unanimous decision. And we are -- well, and of course, the government is arguing that they not be told or instructed as to the consequences of a nonunanimous verdict since that argues against the whole purpose of the jury system. And I think this shades into that issue that's covered in the Jones case.

I don't know what case they cite or whether this has ever been given in a death case. It wasn't in the last Barnette case, anyway.

JA2694

MR. BENDER: Well, Judge, it was submitted in the death case of <u>United States versus John Claud Oscar</u> in the Eastern District of Virginia, Norfolk Division. I do not know whether it was given in that case, but it was tendered and that's where it came from. I wish I had more to give you than that.

THE COURT: What was the defendant's name?

MR. BENDER: Oscar, O-s-c-a-r. The case number was 2:93-cr-131, from the Norfolk --

THE COURT: All right.

MR. BENDER: From the Norfolk Division of the Eastern District of Virginia.

THE COURT: Okay. I'll consider that request.

Then we have Life Option, No Requirement of Death Penalty.

MS. TOMPKINS: And on this the government would -- I think this was what I was citing, that the law allows for them to be instructed, I believe, that they're never required to impose a death sentence. I don't have any problem with that. It's the sentence that follows or the sentences that follow, the for examples, which the government would object to. But no objection to the first sentence.

THE COURT: You object to the examples.

MS. TOMPKINS: Yes.

THE COURT: And you have no objection to the closing

four lines, five lines.

MS. TOMPKINS: Pardon me?

THE COURT: The last four lines go on after the examples are given.

MS. TOMPKINS: I would -- what the government would propose is that this be a one-sentence instruction and that the rest of it doesn't add to that instruction. So for example all the way to the end we would object to.

MR. BENDER: Judge, that was an instruction also tendered in that very same case.

THE COURT: All right. Now, where -- in the last sentence it talks about I'm specifically required by law to advise you that you have this broad discretion. Are you able to say what law is referred to there?

MR. BENDER: Well, I think the statute gives them the -- as I think we probably argued about the first day is: Or even in the absence of mitigating, whether the aggravating factor or factors alone are sufficient to justify a sentence of death. They have the discretion to decide that.

THE COURT: That is correct. So the only --

MR. BENDER: Right.

THE COURT: -- issue here is how to express that. And that's what you are saying is the required by law reference.

MR. BENDER: Right. That even though you go through

JA2696

all that, it's really your decision.

THE COURT: All right. I'll consider that.

MS. TOMPKINS: If I may, Your Honor, on that point, I think that's the point that I was starting to argue before. If I can find it in the statute.

The defense has argued since the beginning of this case that that is an "and" rather than an "or" in the statute. The jury -- in the -- it says, Or, in the absence of mitigating factors, whether the aggravating factors alone are substantial enough to call for the imposition of the death penalty. It's not "and." It's not a -- that's not a two-part process. This is in 3593(e), I believe. Where it explains to the jury they're to consider whether all the aggravating factor or factors found to exist sufficiently outweigh the mitigating factors, or, in the absence of a mitigating factor, whether the aggravating factor or factors alone are sufficient to justify a sentence of death.

And defense counsel has been arguing that that's an "and." That they do that weighing process and then they have another step to say and you have to decide that the aggravating factors alone are enough. And the government argues that that's an "or" and that's in the event that the jury finds no mitigating factors to exist, they have to do some sort of weighing process with the aggravating factors alone. That that's only in the event that no mitigating

factors are found.

THE COURT: All right. I'll consider that argument as well.

Okay. Then we have the Unanimity Required Only for Death Sentence or Life Without Possibility of Release. Any objection to that?

MS. TOMPKINS: I think it's -- the language doesn't fit our actual circumstances of our case.

THE COURT: Well, I can fix that.

MS. TOMPKINS: And again, this goes back to the instructions on unanimity. I believe the Jones case would argue that this is not required and, in fact, might then cause to confuse the jury. And I would harkin back to my argument about, citing Jones, that -- and the Federal Death Penalty Act which does not require for there to be further instructions about unanimity or lack thereof. And this is what that does.

THE COURT: All right. Then there's the Weighing of the Aggravating and Mitigating Factors.

MR. BENDER: Judge, obviously, there's a second page that we just didn't -- didn't get copied, if you read the last sentence on that page.

THE COURT: Where it says what is called for in --

MR. BENDER: Yeah.

THE COURT: -- something. Yeah, that's true. I don't see that.

MR. BENDER: Yeah. I can fax it to everybody during the lunch recess.

THE COURT: Okay. If you'll do that.

MR. BENDER: Yeah.

MS. TOMPKINS: And if I could take a minute to look at the court's proposal of the court's 8.01.

(Pause.)

MS. TOMPKINS: And we would ask the court to use the court's proposal of 8.01, Weighing Aggravation and Mitigation, as being instructive to the jury about the law rather than -- rather than a -- the jury argument which the defense is open to argue to the jury in their closing argument. But as an instruction from the court, I think it's out of place and would ask the court to use the court's 8.01 for Weighing Aggravation and Mitigation.

THE COURT: All right. I'll consider your request there. And we'll look at Mr. Bender's second page when it comes in.

Okay. Then Life Option, No Requirement of Death Penalty. Any objection to that?

MS. TOMPKINS: That has already been addressed and I think they've already been instructed and there would be no necessity to reinstruct them on that.

THE COURT: Okay. Now, then, the government made certain proposed instructions. I just want to ask the defense

if you would like to highlight any of those to which you have an objection at this point?

MR. BENDER: Would you like for us to go through it?

THE COURT: Yes, I would, if you would care to.

MR. BENDER: Okay. On page 1.

THE COURT: Page 1.

MR. BENDER: In the second paragraph.

THE COURT: Okay.

MR. BENDER: Says, And sentencing phases.

THE COURT: Second paragraph, which begins During these proceedings?

MR. BENDER: Right.

THE COURT: Okay.

MR. BENDER: The last --

THE COURT: What line of that paragraph?

MR. BENDER: It's the very -- it's the line next to the last half sentence there.

THE COURT: Okay.

MR. BENDER: Original jury in the innocence and sentencing phases.

THE COURT REPORTER: I'm sorry, Mr. Bender, I didn't hear what you said.

MR. BENDER: I said, and sentencing phases, talking about the original jury. I think that needs to be...

THE COURT: Certainly that comes out.

MS. TOMPKINS: In fact, Your Honor, what we would propose is -- what I'd like to do, rather than spend a lot of time going through the government's proposal, is to look at the court's proposal which I think might ultimately -- I'm not abandoning our --

THE COURT: Right.

MS. TOMPKINS: -- instructions, but I think it might be not a good use of time to go through --

THE COURT: I think you may be right about that.

All right. Now, let me ask this. What about -- how much time do the parties say they would like for argument?

MR. BENDER: Do we have to be restricted?

THE COURT: I think it's -- I think it's advisable to put a time on it.

MR. BENDER: And --

THE COURT: Now, we don't cut people off in midsentence or midparagraph, but there should be some focus on how much time is going to be taken.

MR. BENDER: I just remark that in state court it's unlimited in this thing. But we believe that our side together should have three hours for us to split any way we choose.

THE COURT: That's a breathtaking request in a case where the facts have been rehearsed at great length by

numerous witnesses. It's not a long, technical case where a lot of the evidence needs to be marshalled. I mean, you should have plenty of time, but surely this -- a concern on your part that you'd wear the jury out trying to talk that long about it.

MR. BENDER: Oh, absolutely. Absolutely. We're cognizant of that. We're also cognizant of our responsibility where a man's -- where we hold a man's life in our hands. It's very -- it's a serious matter that we just can't give short script to. We may be able to do it in less time. I would hope that we would for everybody's sake, including the jury.

THE COURT: Of course, you're entitled to use your time as you see fit in terms of co-counsel participating.

MR. BENDER: Right.

THE COURT: What's the government say?

MS. TOMPKINS: We believe that we can do both of our arguments in two hours or less as an outside, and don't expect to take that much time.

THE COURT: I think the same statement can be made that the jury has heard, as I say, lengthy accounts of the crime, the two crimes and the two focuses of the crimes, North Carolina and Virginia, lengthy accounts about defendant's family history, lengthy accounts of the prior domestic events in the defendant's life. And I believe I'll give you both two

Case 3:12-cv-00327-MOC Document 107 Filed 09/23/15 Page 31 of 200

1819

JA2702

hours, but I think that is likely to wear thin on the patience of the jury, but that's my unsolicited advice about how long it should take to argue this case.

And as I say, if the defendant's counsel reach the two-hour point and ask for additional time, the court will give that consideration because I wouldn't want to cut off some important point that you feel should be made. But I also think that, as I've said before, there's an exhaustian factor that should be taken into account.

Anything else that occurs to you all that you want to take up right now before we adjourn?

And what I would propose to do is this afternoon at 2:30 give you a more complete proposal from the court, and that hopefully will be available to you before 2:30. Could even be e-mailed to your offices, I would think.

MS. TOMPKINS: Okay.

MR. BENDER: I will fax to the court and to you all the second page of what was omitted.

THE COURT: All right, sir.

MS. HANKINS: We'll need an original --

MR. BENDER: Oh, yeah.

MS. HANKINS: -- for the file.

MR. BENDER: But for their purposes I think a faxed copy will be okay for right now.

THE COURT: All right. Thank you.

3852

(Lunch recess.)

＊＊＊＊＊

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF NORTH CAROLINA

CERTIFICATE OF REPORTER

I certify that the foregoing transcript is a true and correct transcript from the record of proceedings in the above-entitled matter.

Dated this 9th day of August, 2002.

Cheryl A. Nuccio, RMR-CRR
Official Court Reporter

JA2704

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/9/2002

Page 3853

IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF NORTH CAROLINA

CHARLOTTE DIVISION

COPY

UNITED STATES OF AMERICA            )

                                    )    CASE NO. 3:97CR23-V

    v.                              )    August 9, 2002

                                    )    Afternoon Session

AQUILIA MARCIVICCI BARNETTE,        )

          Defendant.                )

          TRANSCRIPT OF SENTENCING HEARING

     BEFORE THE HONORABLE RICHARD L. VOORHEES

          UNITED STATES DISTRICT COURT JUDGE

APPEARANCES:

FOR THE GOVERNMENT:

     ANNE M. TOMPKINS, Esq.

     JILL WESTMORELAND ROSE, Esq.

     Assistant United States Attorney

     227 West Trade Street

     Suite 1700

     Charlotte, North Carolina  28202

FOR THE DEFENDANT:

     JEAN B. LAWSON, Esq.

     P.O. Box 4275

     Charlotte, North Carolina  28226

     HAROLD J. BENDER, Esq.

     200 North McDowell Street

     Charlotte, North Carolina  28204

Reported by:   Scott A. Huseby,

               Registered Professional Reporter,

               Certified Court Reporter,

Reported By: Scott A. Huseby, RPR
800-333-2082        Huseby, Inc., an Affiliate of Spherion  (704) 333-9889        Fax (704) 372-4593
Case 3:12-cv-00327-MOC  Document 107  Filed 09/23/15  Page 34 of 200
1822

JA2705

Page 3854

                    P R O C E E D I N G S

                (Charge Conference 2:30 p.m.)

(Charge conference held outside of the presence of the

                        jury.

          THE COURT:  I have signed the order

directing parties to maintain all exhibits, as we always

do these days.

     Have both of the parties gotten the email?

          MR. BENDER:  Yes, Your Honor.

          THE COURT:  Okay.  And, of course, the

part of the email that had to do with substantive

offenses, offense instructions remains the same as what

you were given this morning.

     And I received Mr. Bender's email about the

weighing of aggravating and mitigating factors.

     Let me ask first whether the government has any

objection to the Court's proposal.

          MS. TOMPKINS:  From the email?

          THE COURT:  Yes.

          MS. TOMPKINS:  Which we're actually now --

we don't have possession of it at the moment.  I don't

have it.

          THE COURT:  You didn't print it out?

          THE CLERK:  It's what I just handed you.

          MS. TOMPKINS:  Okay.  That's what she was

Page 3855

going back to get.

MS. LAWSON: And that's what you gave us this morning?

THE CLERK: No. What was in your chair when you came back from the break and what I just handed Anne was the same thing that was the email. It's the newest version.

MS. LAWSON: We are straight.

MS. TOMPKINS: What I would propose to do, as bad as this sounds, is to go through it page by page.

THE COURT: Well, that's okay. If you have any -- but do you have any comments? I mean, that's --

MS. TOMPKINS: Yes, we have comments, just on a -- just in general as we -- I think if we go through it page by page there will be many pages in which there will be no problems. We will probably come to pages where there may be grammatical issues, typographical issues, and then substantive issues.

THE COURT: Right. I have already caught a few typos and that sort of thing, and some duplication. But anyway, let's take the first six pages, starting with introductory remarks and going through direct and circumstantial evidence and credibility of witnesses.

Reported By: Scott A. Huseby, RPR
800-333-2082          Huseby, Inc., an Affiliate of Spherion  (704) 333-9889          Fax (704) 372-4593
Case 3:12-cv-00327-MOC   Document 107   Filed 09/23/15   Page 36 of 200
1824

JA2707

United States of America vs. Aquilia Marcivicci Barnette    3:97CR23-V
Proceedings Before Judge Richard L. Voorhees    8/9/2002

Page 3856

MS. LAWSON:  We are fine there, we have no comment.

MS. TOMPKINS:  No objection.

THE COURT:  And seven is exclusion of statements from the witness stand.  Eight talks about definitions.  Nine talks about videotape and audiotaped evidence.

MS. LAWSON:  There is something we would like bring to your attention on Page 10, Your Honor.

THE COURT:  Okay.

MS. LAWSON:  As you know, Paragraph Number 2 is intelligibly, audibly, and visually.  Of course, we showed that snippet of tape of Mr. Barnette in the interview room and it is probably not audible, so if you could take that out.

THE COURT:  Any problem from the government on that?

MS. TOMPKINS:  No.

THE COURT:  All right.  We will take 2 out.

MS. LAWSON:  Also Number 5, has the tape been edited or altered, obviously we introduced two versions of the tape, the actual tape and then the edited version, so we could take that out.

THE COURT:  Objection from the government?

Page 3857

MS. TOMPKINS:  No objection.

THE COURT:  Okay, that comes out.

MS. LAWSON:  Thank you.

THE COURT:  11 is impeachment by non-sworn prior statements.  And 12, I thought I would change that first sentence.  12 is prior inconsistent statements under oath, and I thought it should say, the first sentence, you will also recall that it was brought out that before this trial some of the witnesses, I'm going to say before this hearing, some of the witnesses made statements in a judicial proceeding, that is, under oath related to the subject matter of this sentencing hearing, and then it goes on from there as shown.  Any concern about that?

MS. LAWSON:  No, sir.

MS. TOMPKINS:  No.

THE COURT:  All right.  And in statement or conduct of the defendant, Page 13, I took out confession in each place where it appears, so it just says statement or admission.  Does that seem reasonable to all parties?

MS. LAWSON:  Yes.

MS. TOMPKINS:  Could I just have one moment on that?

THE COURT:  All right.  The only issue

United States of America vs. Aquilia Marcivicci Barnette 3:97CR23-V
Proceedings Before Judge Richard L. Voorhees 8/9/2002

Page 3858

that I had on that one was, second, if the defendant did make the statement, was it correct, and I haven't seen that before in a jury instruction and I wasn't sure where that came from and --

THE COURT: That comes from the Federal Judicial Center Pattern Jury Instructions, June 1982, Page 39.

MS. TOMPKINS: Okay then. No objection.

THE COURT: Who's going to take the FJC to task?

MS. TOMPKINS: Who am I to quibble.

THE COURT: 15 is defendant's testimony, impeachment by a prior conviction; and then 16, credibility of defendant as a witness.

MS. TOMPKINS: I have Pages 13 and 14. 13 is defendant's statements and then 14 is statement or conduct of defendant.

THE COURT: Right. I wanted to reverse those pages, so 13 is 14 and 14 is 13. In other words, take up voluntariness first and then correctness second.

MS. LAWSON: I'm still trying to find that page, because I'm working off of what we got this morning, but we don't contest the voluntariness of the statement.

THE COURT: I would be delighted to just

Page 3859

take that one out.

MS. TOMPKINS: I would agree, I think it is a little bit confusing.

THE COURT: It is. But that's one of those I threw out to the sharks to see if they'd bite.

MS. TOMPKINS: So 13 is out.

MR. BENDER: And they did.

THE COURT: And they did. All right. The old 14 is out, which is statement or conduct of defendant, so old 13 remains, defendant's statements. Thank you.

And then 15, impeachment by prior conviction; 16 credibility of defendant as a witness.

MS. TOMPKINS: Can we go back to 15 real quickly?

THE COURT: Yes. By the way, I don't intend to read any of the titles. They're just in there to get a handle on it.

MS. TOMPKINS: It says he's pleaded guilty to certain charges brought against him prior to 1996, and, in fact, in some of those he was found guilty. It's a small point, but he hasn't actually pleaded guilty to everything for which he has a prior criminal conviction, so if we could put in the defendant has been convicted of certain criminal charges.

Reported By: Scott A. Huseby, RPR
800-333-2082       Huseby, Inc., an Affiliate of Spherion  (704) 333-9889       Fax (704) 372-4593

Case 3:12-cv-00327-MOC  Document 107  Filed 09/23/15  Page 40 of 200
1828

JA2711

Page 3860

THE COURT: Is that agreeable to the government?

MS. TOMPKINS: To the defense.

MR. BENDER: How about both?

THE COURT: Has pleaded guilty or been convicted?

MR. BENDER: Right.

MS. TOMPKINS: That's fine.

THE COURT: All right. Now, the government -- I thought at this point this is where we would take up the arguments. In other words, I would like to say at least what I have already given there before the arguments just to get it out of the way, boilerplate type stuff, and then have jury arguments.

MS. TOMPKINS: Okay.

THE COURT: And then do the rest of the instructions starting with government's burden of proof. Now, do you have Page 17?

MR. BENDER: Yes.

MS. LAWSON: Is that --

THE COURT: Yeah, that tells the burden of proof. It says, the government has the burden of proving to you its contentions and any aggravating factors beyond a reasonable doubt, and I thought I would add, you will be instructed about this in more detail in

Case 3:12-cv-00327-MOC Document 907 Filed 09/23/15 Page 41 of 200
1829

JA2712

United States of America vs. Aquilia Marcivicci Barnette    3:97CR23-V
Proceedings Before Judge Richard L. Voorhees    8/9/2002

Page 3861

just a few minutes.  That's just to introduce the definition of reasonable doubt, which comes next.

Page 19 begins the introduction, and I thought I would, in each of these counts I would remind the jury that an indictment is not evidence.  And, for example, on Count 7 say, for ease of reference, Count 7 may be said to allege a crime of car jacking resulting in death, it alleges, and then read it, do that on each case, in each count.

MS. TOMPKINS:  Now, the only contention the government would have on that is it's no longer an allegation, so it doesn't really -- it does allege, but he has actually been convicted of.

THE COURT:  I realize that, and they are told that, but it just seems to me that it would be helpful to the jury to understand what was alleged, and they can also understand that there was a conviction.

MS. TOMPKINS:  Okay.

MS. LAWSON:  If Your Honor please, probably on Page 20, I have written all over the earlier version, but where you say you must now consider whether imposition of a sentence of death is justified, the third line down, it discusses the options to death or life imprisonment without the possibility of release, and then it's got, or a sentence as provided by law for

Reported By: Scott A. Huseby, RPR
Huseby, Inc., an Affiliate of Spherion  (704) 333-9889
800-333-2082    Fax (704) 372-4593

Case 3:12-cv-00327-MOC  Document 107  Filed 09/23/15  Page 42 of 200
1830

JA2713

United States of America vs. Aquilia Marcivicci Barnette     3:97CR23-V
Proceedings Before Judge Richard L. Voorhees                  8/9/2002

Page 3862

the commission of these crimes.

THE COURT: Right. I caught that, too. The words or a sentence provided by law come out.

MS. LAWSON: And then the next paragraph the same thing, the defendant be sentenced to a sentence as provided by law --

THE COURT: Right. That whole sentence comes out.

MS. LAWSON: And the bottom of the paragraph after that, aggravating factors and mitigating factors, these factors have to do with the circumstances of the crime.

THE COURT: Right. I thought we might just take that sentence out, you know, starting with these factors.

MS. TOMPKINS: Yeah.

MS. LAWSON: That makes it make sense.

THE COURT: Right, because that next sentence sort of mixes mitigators and aggravators, perhaps, so we will just take that sentence out.

MS. ROSE: The sentence beginning these factors?

THE COURT: Yes, beginning these factors and ending up and/or victims comes out.

Now, then on the top of Page 21, I thought it

Case 3:12-cv-00327-MOC   Document 107   Filed 09/23/15   Page 43 of 200
1831

JA2714

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/9/2002

Page 3863

better track the statute, if it says a mitigating factor is any aspect of the defendant's character, record, or background, any circumstances of the offense or any other, etcetera, just add the word record in there mainly, since that's what the statute says.

MS. TOMPKINS: In the paragraph that begins, the defendant has the burden of proving any mitigating factors, that paragraph talks about the preponderance of the evidence standard but doesn't use the preponderance of the evidence language. The language in that paragraph says, you need only to be convinced that it's more likely true than not true in order to find that it exists, and we don't you use that ever again, and I would suggest putting in the preponderance of the evidence language.

MR. BENDER: Is that defined somewhere else?

MS. TOMPKINS: It is defined somewhere else. My concern is that that's the only time we ever say more likely true than not true, just so that the jury understands that the standard in that is the preponderance of the evidence.

THE COURT: Suppose it says, you need only be convinced by the preponderance of the evidence or its greater weight that it is more likely true than not true

Reported By: Scott A. Huseby, RPR
800-333-2082    Huseby, Inc. an Affil.    (704) 372-4593
Case 3:12-cv-00327-MOC Document 107    Filed 09/23/15    Page 44 of 200
1832

JA2715

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/9/2002

Page 3864

in order to find that it exists, does that sound all
right?

MS. TOMPKINS: Okay.

MR. BENDER: Okay.

THE COURT: That ties it into the later
discussion about preponderance. Then Page 22, two
paragraphs, I thought I would take the second one out
because I will have already defined, talked about
credibility.

MS. TOMPKINS: In the 3.01 introduction,
the second paragraph, are you ahead of me on that?

THE COURT: I'm with you.

MS. TOMPKINS: Some of the legal
principles that you must apply in the sentencing
decision duplicate those you've --

THE COURT: That should just come out,
should it not?

MS. TOMPKINS: Yes. I guess we could take
out those first two sentences and begin with, the
instructions I'm giving you now are a complete set of
instructions on the law.

THE COURT: Right, okay. Anything about
24?

MS. TOMPKINS: No, sir.

THE COURT: 25?

Case 3:12-cv-00327-MOC Document 107 Filed 09/23/15 Page 45 of 200
1833

JA2716

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/9/2002

Page 3865

MR. BENDER: Judge, can we go back to 24 for a minute?

THE COURT: Yes, sir.

MR. BENDER: Before you may consider the imposition of the death penalty, I think it should read, the government must prove unanimously and beyond a reasonable doubt.

THE COURT: Well, that would be confusing, because the statute doesn't define an objective which the government must prove beyond a reasonable doubt except for aggravating factors. I could say, the burden of proof -- as far as age is concerned, I wouldn't see any difficulty in telling the jurors that they have to agree to that unanimously and beyond a reasonable doubt.

MS. TOMPKINS: That's just what it says --

THE COURT: It does say that.

MR. BENDER: But it has to be proven --

THE COURT: All right. I will say that --

MR. BENDER: -- by the government.

THE COURT: I will say that the government must prove to you unanimously and beyond a reasonable doubt that the defendant was 18, etcetera. Does that fix it?

MR. BENDER: Yes, sir.

THE COURT: 25.

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/9/2002

Page 3866

MS. TOMPKINS: 25 at 1B, the defendant intentionally inflicted serious bodily injury that resulted in the death of Donald Lee Allen, the instructions had, previous instructions used in the case had in parenthesis, describe predicate facts; and since they are not in there, it is sort of a nonsensical sentence as written. But I think you could insert in there, as consistently done the later, I think it says by shooting or by being shot to describe the serious bodily injury to Donald Lee Allen which resulted in his death, so if we would insert the phrase by being shot, something to that effect, to make that sentence make sense.

MR. BENDER: 1B or 1D?

THE COURT: B as in boy.

MR. BENDER: Right.

MS. LAWSON: And can I add to that? In 1A the government must prove that the defendant killed the victim, it should be proved beyond a reasonable doubt and unanimously.

THE COURT: Okay.

MS. LAWSON: Same the thing in 1B, the government must prove beyond a reasonable doubt. And if we have already put by shooting him, to save time and energy it would seem to be prudent to just delete the

Case 3:12-cv-00327-MOC  Document 107  Filed 09/23/15  Page 47 of 200
1835

JA2718

Page 3867

definition of serious bodily injury because it's already

established, so the rest --

MS. TOMPKINS: Well, this is the statutory

way that -- I don't know what you -- I don't want to

delete anything from that paragraph. I want to add to

the paragraph. One of the ways that they can find the

requisite mental intent is in this manner, and I would

ask that they be allowed to consider this, rather than

taking it away.

MS. LAWSON: The other concern I have is

it is not an aggravating factor alleged by the

government that this murder was especially heinous or

atrocious and cruel. I mean, it's not even a

nonstatutory aggravating factor. And to go on with that

sentence where you describe a consciousness of extreme

physical pain improperly injects that into this case,

and it's not an aggravating factor. We all know that he

died of a gunshot wound. That's really not a condition.

MS. TOMPKINS: It's not an aggravating

factor because it's under the finding of requisite

mental intent, and there are for ways in which the jury

can find requisite mental intent, 1B being one of those

four ways. We are not alleging it to be an aggravating

factor. We are alleging it to be proof of their finding

of requisite mental intent.

Case 3:12-cv-00327-MOC  Document 107  Filed 09/23/15  Page 48 of 200
1836

JA2719

Page 3868

MS. LAWSON: Well, substantial risk of death is sufficient, and I think that adding that other language is going to confuse the jury and may inflame them to the point that they return a verdict based on an unalleged aggravator.

MS. TOMPKINS: And this was, of course, in the original case and Dr. Sullivan testified as to this for this reason. This is one of the ways in which they can find the defendant had the requisite mental intent, so we are not putting it in there as an aggravating factor. It's in there for the purposes that the statute --

THE COURT: Well, now, you are not saying that it's in the statute, are you? 3591A, 2B just says, intentionally inflicted serious bodily injury that resulted in the death of the victim.

MS. TOMPKINS: That's correct, and that's what is in 1B.

THE COURT: 1 boy?

MS. TOMPKINS: Yes.

THE COURT: Right. But it goes on to define serious bodily injury. Suppose we stop that definition as follows, say serious bodily injury means a significant or considerable amount of injury which involves a substantial risk of death.

Case 3:12-cv-00327-MOC   Document 107   Filed 09/23/15   Page 49 of 200
1837

JA2720

United States of America vs. Aquilia Marcivicci Barnette          3:97CR23-V
Proceedings Before Judge Richard L. Voorhees                      8/9/2002

Page 3869

MS. LAWSON:  That's fine.

THE WITNESS:  Because really we are not talking about anything less than death.  There is not evidence --

MS. TOMPKINS:  Well, I will just object and move along.  I mean, that's what the definition of a serious bodily injury is if that completes the sentence.

THE COURT:  Well, if you take out -- just take out extreme physical pain, doesn't that accomplish your goal?  Because there is evidence of disfigurement and loss or impairment of a body member, organ, or mental faculty.

MS. LAWSON:  As Mr. Bender points out, he is dead.

THE COURT:  I recognize, but I think the government would be entitled -- in other words, if -- this is really not going to be an issue, I wouldn't think, but we will just take out that extreme physical pain.

MR. BENDER:  Judge, am I correct in understanding that they have to be unanimous as to any one of these?

THE COURT:  Yes.

MR. BENDER:  In other words, six can't find 1A and 6 can't find 1B and then come back and say,

Reported By: Scott A. Huseby, RPR
800-333-2082          Huseby, Inc., an Affiliate of Spherion  (704) 333-9889          Fax (704) 372-4593
Case 3:12-cv-00327-MOC  Document 107  Filed 09/23/15  Page 50 of 200

1838

JA2721

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/9/2002

Page 3870

we are unanimous?

THE COURT: No, right.

MR. BENDER: Okay. And I don't know whether that's covered; it may be.

MS. TOMPKINS: It is.

MS. LAWSON: Well, of course, on the second page of that in 1C it says, the government, in the fifth line, the government must prove unanimously and beyond a reasonable doubt.

THE COURT: All right.

MS. LAWSON: And the same thing with 1D, and I couldn't exactly figure out how to put that, because there is not the word proved, so I just thought we could add on at the end of that 1D, this must be proven to you unanimously and beyond a reasonable doubt.

MS. TOMPKINS: Just to avoid the umpteenth time of saying that, the jury is instructed that the government's burden of proof is and remains unanimous and beyond a reasonable doubt, so it's a little bit unnecessary, I think, every time you say the word proof, when it has to do with the government, that you reiterate that each and every time. They know that's our burden of proof for anything that we are alleging.

THE COURT: Well, go back to 25, we introduced those four subparagraphs by saying the

Reported By: Scott A. Huseby, RPR
Huseby, Inc., an Affiliate of Spherion (704) 333-9889

800-333-2082

Fax (704) 372-4593

JA2722

Page 3871

government alleges. I think right there I might say the government must prove unanimously and beyond a reasonable doubt any one of the following --

MS. TOMPKINS: That's perfect.

THE COURT: -- propositions as to a particular count under consideration. But in this case we are talking about Count 7, so --

MR. BENDER: Judge, I understand what the statute says with regard to 1D, but in the death of Donnie Allen, is that even applicable?

THE COURT: You are talking about one bravo?

MR. BENDER: No. One dog.

MS. TOMPKINS: That would be, in our terminology, reckless disregard for human life. I know where you are going with that, but it's actually --

MR. BENDER: Creates grave risk of death to a person other than one of the participants.

MS. TOMPKINS: That's not that. It's the next part of it which is the important part, which is that his acts constituted a reckless disregard for human life. It's not grave risk of harm to more than one person.

THE COURT: Yeah, that looks innocuous and tracks the language of the statute, so that will be

Reported By: Scott A. Huseby, RPR
800-333-2082          Huseby, Inc., an Affiliate of Spherion  (704) 333-9889          Fax (704) 372-4593
Case 3:12-cv-00327-MOC  Document 107  Filed 09/23/15  Page 52 of 200
1840

JA2723

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/9/2002

Page 3872

unchanged. We will move on to Page 27 then.

MS. TOMPKINS: At the top of 27 and, in fact, each time that we talk about statutory aggravating factors, rather than the first sentence, which says, if you unanimously fined beyond a reasonable doubt the existence of at least one or more of the requisite mental states, the old instructions last time actually said, if you unanimously find beyond a reasonable doubt that the defendant intentionally committed the murder of or intentionally committed acts resulting in the death of Donnie Allen in any of the manners described in the instruction number whatever, you must then proceed to determine whether the government has proven beyond a reasonable doubt, etcetera, rather than -- I think that's -- the use of the phrase requisite mental states, I think is terminology that they may not be understanding; and so rather than using that terminology, what the government would request is that we actually use the words.

THE COURT: I will consider that.

MR. BENDER: We object to that, Your Honor.

THE COURT: And that would be because?

MR. BENDER: Well, obviously you are going to explain to them they have to follow the law with

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/9/2002

Page 3873

regard to the mental state.

THE COURT: Right.

MR. BENDER: And then lead into it by saying, if you found the existence of one or more of the requisite mental states as found, that explains it to them.

THE COURT: Okay.

MS. LAWSON: Just below that, Your Honor, this particular one I think we need to insert unanimously in Line 3, proven unanimously and beyond a reasonable doubt. I don't think that it's possible to disregard that where there is not something in that same stretch that allows for, you know --

THE COURT: All right. I will consider your argument about that, Mr. Bender. That's a small matter, but we will think about it.

Anything else on 27? I wish y'all could figure out a way for me not to have to go through each count separately, but I don't -- I have seen other instructions that tried to group the intent as to several counts and group the age and group things, and I just don't think they are very clear and they are confusing.

All right. Anything on 28?

MS. LAWSON: Can we add unanimously and

Reported By: Scott A. Huseby, RPR
800-333-2082            Huseby, Inc., an Affiliate of Spherion  (704) 333-9889            Fax (704) 372-4593
Case 3:12-cv-00327-MOC  Document 107  Filed 09/23/15  Page 54 of 200
1842

JA2725

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/9/2002

Page 3874

beyond a reasonable doubt on that one?

THE COURT: Somewhere on Page 28?

MS. LAWSON: Yes. Where I did it is at the end, this must be proven to you unanimously and beyond a reasonable doubt.

THE COURT: Yes. That would be in the second line, in the second paragraph?

MS. LAWSON: Yes.

MS. TOMPKINS: Now, in this, and in each of the times in which we are talking about statutory aggravating factors, the terminology, the first aggravating factor contended for by the government, and that's awkward language, I believe, in the last jury instructions it said, one, the defendant committed the offense in Count 7 in the expectation of the receipt of anything of pecuniary value, so it just goes directly into it rather than saying the first contended for by the government. I think that language is just -- the whole terminology -- rather I would ask that it say, one, the defendant committed the offense in Count 7 in the expectation of the receipt of anything of pecuniary value and then go into, to wit, Honda automobile, Donald Allen's wallet and money and then go on to the second paragraph.

MS. LAWSON: I think the problem with that

Case 3:12-cv-00327-MOC Document 107 Filed 09/23/15 Page 55 of 200
1843

United States of America vs. Aquilia Marcivicci Barnette 3:97CR23-V
Proceedings Before Judge Richard L. Voorhees 8/9/2002

Page 3875

suggestion is that it takes out the fact that it's a contention of a party to the litigation. It contended to -- I mean, it could be advanced by the government or proposed by the government.

MS. TOMPKINS: It's different terminology than the instructions used for the, quote, unquote, contentions of the defense. It doesn't use that same -- when you get to the mitigating factors of the defendant it doesn't say the first mitigating factor contended for by the defense. That's why I just thought it would be cleaner to just go straight into it.

THE COURT: All right. I will think about that.

MS. TOMPKINS: And also, when we are referencing Donald Allen or Robin Williams, rather than say Allen, we would request that it say Donald Lee Allen consistently throughout the instructions.

THE COURT: All right.

MS. TOMPKINS: And each time -- I don't want to make the same argument again; but on the second aggravating factor, we would request that that be, two, the defendant committed the offense of car jacking; and if the Court can reference the jury instructions in the previous sentencing hearing, that's the format that we would wish to use, because I don't want to get up each

Page 3876

time and make the same argument over and over again.

THE COURT: All right. So you make -- you are contending for the same language --

MS. TOMPKINS: To introduce each of the aggravating factors.

THE COURT: -- essentially that Judge Potter used in each of these aggravating factors?

MS. TOMPKINS: Yes, sir.

THE COURT: Okay. All right, 29, 30, 31.

MS. LAWSON: On 31, Your Honor, Paragraph Number 2, there is a footnote note at the end of --

THE COURT: Okay. Let's kill that.

MS. LAWSON: And then there is a line at the bottom.

THE COURT: And we will kill that. Thank you.

MS. LAWSON: On the second page, Your Honor, the second paragraph, second line from the bottom of that paragraph, I propose that instead of saying existence of a statutory mitigating factor, it's the existence of any statutory mitigating factor.

THE COURT: Which paragraph?

MR. BENDER: 32, Page 32.

THE COURT: Oh, I see a little footnote, too. That comes out, too. Page 32?

Case 3:12-cv-00327-MOC   Document 107   Filed 09/23/15   Page 57 of 200

1845

JA2728

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/9/2002

Page 3877

MR. BENDER: Yes, sir.

THE COURT: Second paragraph.

MS. LAWSON: Yeah, second line from the bottom of that paragraph, the existence of a statutory mitigating factor, just replace A with any.

THE COURT: Any?

MS. LAWSON: Yes.

THE COURT: All right. Okay, 33.

MR. BENDER: These are not the ones that we submitted this morning.

THE COURT: No. We will have to do that.

MR. BENDER: Right.

THE COURT: We will just use them verbatim, I guess.

MR. BENDER: As were submitted this morning?

THE COURT: Yes.

MR. BENDER: At the end of this, Judge, we would like to ask for a preemptory instruction on some of those.

THE COURT: All right. Do you want to go over those?

MR. BENDER: Under statutory --

THE COURT: Let's see. Okay.

MR. BENDER: Statutory, Number 1, we would

Case 3:12-cv-00327-MOC  Document 107  Filed 09/23/15  Page 58 of 200

1846

JA2729

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/9/2002

Page 3878

ask for a preemptory instruction.

THE COURT:  Any objection --

MS. TOMPKINS:  Objection.

THE COURT:  -- from the government?

MS. TOMPKINS:  Yes, objection.

THE COURT:  Okay, I think there is evidence both ways on that.

MR. BENDER:  Nonstatutory, Number 1.

MS. TOMPKINS:  Objection.

THE COURT:  Okay.

MR. BENDER:  Number 2.

MS. TOMPKINS:  Objection.

THE COURT:  I think those are for the jury.

MR. BENDER:  Number 3.

MS. TOMPKINS:  Objection.

MR. BENDER:  I think even Dr. Dietz concluded that he had been abused by his father.

THE COURT:  I think the evidence is conflicting.  I mean, I agree the trend of the evidence -- for example, I believe Dr. Dietz did seem to concede that -- we have used the term excessive discipline, but that's not the same as abuse, necessarily.

MR. BENDER:  There is no -- I don't know

Reported By: Scott A. Huseby, RPR
Huseby, Inc., an Affiliate of Spherion  (704) 333-9889

800-333-2082

Fax (704) 372-4593

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/9/2002

Page 3879

of any evidence that he was not abused by his father.

THE COURT: Well, the jury heard Mr. Barnette, that is, the father, testify.

MR. BENDER: Right.

THE COURT: And he testified about what he did and didn't do, and I believe the jury is entitled to make up its mind as to his credibility. That's the best -- not necessarily the best evidence, but at least it's evidence. That could go either way, so I would leave that for the jury's determination.

MR. BENDER: Number 4.

MS. TOMPKINS: Objection.

THE COURT: I think that's a preemptory.

MS. TOMPKINS: Your Honor, I don't want to real argue it, but I don't think at all -- Mrs. Barnette didn't testify at all. There is room for the jury to make a consideration about whether hearing from that witness might have been good evidence of neglect, and I think that's, again, another consideration. It's a matter of degree.

THE COURT: It's essentially uncontradicted, though.

MS. TOMPKINS: Well, we would contend that defendant's own statements early to psychologists painted a picture of a childhood less than having been a

Reported By: Scott A. Huseby, RPR
Huseby, Inc., an Affiliate of Spherion (704) 333-9889

800-333-2082

Fax (704) 372-4593

Case 3:12-cv-00327-MOC Document 107 Filed 09/23/15 Page 60 of 200

1848

JA2731

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/9/2002

Page 3880

neglected child.

THE COURT: I think I will leave that one as a preemptory. I mean, some judges I have seen use of directed verdict or something, but I don't think that's appropriate. I could just direct the jury to find that but in the way of a preemptory instruction.

MR. BENDER: Number 7.

MS. TOMPKINS: Objection. Again, I think it's an issue for the jury.

THE COURT: I believe that's for the jury.

MR. BENDER: Number 8.

MS. TOMPKINS: Objection.

THE COURT: That's for the jury.

MR. BENDER: Number 9.

MS. TOMPKINS: Well, objection just on the --

THE COURT: That's for the jury.

MR. BENDER: Even Judge (sic) Dietz said he was experiencing a depressive episode.

THE COURT: But that's different from depression caused by alcohol, so that's why there's conflicting possibilities.

MR. BENDER: It's still depression. It was a depressive episode. The question was, was it caused by alcohol or was it caused by some sort of a

Reported By: Scott A. Huseby, RPR
Huseby, Inc., an Affiliate of Spherion (704) 333-9889
800-333-2082                                              Fax (704) 372-4593

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/9/2002

Page 3881

psychotic --

THE COURT: I make a distinction between a depressive episode, which implies that it came on the defendant, as contrasted from an alcohol-induced depression, so that's --

MR. BENDER: Number 10.

MS. TOMPKINS: I think 10 and 13 are similar; again, I think these are up to the jury to decide.

MR. BENDER: Is there any evidence to the contrary?

MS. TOMPKINS: Well, it's the language. Marc Barnette has had no infractions, behavioral infractions, while incarcerated, that's uncontested; but whether he does well in a structured environment is a wholly different proposition for a jury to consider. It's -- one of those is factual and the other one is subjective.

MR. BENDER: The testimony was uncontroverted that when he was in Catholic school, in a structured environment, he did very well, when he was incarcerated in a structured environment. There is no evidence to the contrary.

THE COURT: Well, I think the government is correct in saying that there's uncontradicted

Reported By: Scott A. Huseby, RPR
Huseby, Inc., an Affiliate of Spherion (704) 333-9889

800-333-2082

Fax (704) 372-4593

Case 3:12-cv-00327-MOC Document 107 Filed 09/23/15 Page 62 of 200
1850

JA2733

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/9/2002

Page 3882

evidence that he has done well in an incarcerated environment, but a structured environment is something that the jury could disagree about.

MR. BENDER: Number 11.

THE COURT: That would appear to be a preemptory.

MR. BENDER: Number 12.

MS. TOMPKINS: I would object to that.

THE COURT: That could be viewed either way, so I will deny that one.

MR. BENDER: Number 13.

MS. TOMPKINS: Again, I would object to that on the same grounds as 10.

THE COURT: All of the evidence is that he is a model prisoner.

MS. TOMPKINS: Model prisoner being a subjective -- what is uncontradicted is that he has had no behavioral infractions. Model prisoner is a subjective term on top of a fact that is subjective.

MR. BENDER: There was testimony using those exact words which was uncontroverted.

THE COURT: That's a preemptory. How about Marc Barnette has been a model prisoner?

MR. BENDER: That's fine.

MS. TOMPKINS: That's good.

Reported By: Scott A. Huseby, RPR
Huseby, Inc., an Affiliate of Spherion (704) 333-9889

800-333-2082

Fax (704) 372-4593

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/9/2002

Page 3883

THE COURT: Did you say that's fine?

MR. BENDER: Yes, sir.

THE COURT: All right. We will change that accordingly and give a preemptory on it.

MR. BENDER: Okay. Those would be the only ones that we would ask for a preemptory on.

THE COURT: All right, sir. Thank you. Let's see, we are back to --

MR. BENDER: 33.

THE COURT: -- 33 and 34, which will conform to the new submission by defendant.

MS. TOMPKINS: Those are the mitigators?

THE COURT: Then we go to 36.

MS. TOMPKINS: Yes.

MS. LAWSON: I have some requests, Your Honor.

THE COURT: All right.

MS. LAWSON: On 36, the last long paragraph that starts, if you unanimously conclude, what this misinstructs the jury on is their final determination, the last three lines, the aggravating factor or factors are themselves sufficient to justify a sentence of death. It mandates that you shall record your determination that death is justified on the special verdict form. You know, you go to that last

Case 3:12-cv-00327-MOC   Document 107   Filed 09/23/15   Page 64 of 200

1852

JA2735

United States of America vs. Aquilia Marcivicci Barnette                    3:97CR23-V
Proceedings Before Judge Richard L. Voorhees                    8/9/2002

Page 3884

process to determine whether in light of all of this you are going to sentence him to death. It skips that final decision. And the other thing is the next, the jury, we would like changed to a juror.

THE COURT: Say that last.

MS. LAWSON: It says the jury. We would like to change it to a juror. It's never required --

MS. TOMPKINS: And I would object to that. That's --

THE COURT: I think it's accurate to say a juror.

MS. TOMPKINS: That arguably is asking for a hung jury to say that a juror should do anything individually. The jury instructions speak to the jury as a group, not as individuals. All references to the jury are to the jury, and to say that is a suggestion that a juror should -- it sort of argues against the process of deliberation.

MS. LAWSON: But the statute requires that final determination, and that's got to be individual. That's why it says that.

MS. TOMPKINS: Well, this is a main point of contention that we have never gotten to the bottom of. Ms. Lawson believes that the law requires for that final deliberation; and if it was, then the statute

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/9/2002

Page 3885

would say, and rather than or, and the government

contends that it says or if you find no mitigating

factors or in the absence of a mitigating factor whether

the aggravating factor or factors alone are sufficient.

That is not an and.  If they find mitigating factors,

they conduct a weighing process.

If -- what Ms. Lawson wants to happen, it would

say and after doing that make one final determination on

the aggravating factors alone, but it doesn't say that.

It says find them both, if you find them both, then

weigh them; or in the absence of mitigating factors, you

can only look at the aggravating factors.  There is

nothing to weigh them against.  You must make your

determination about whether the aggravating factors

themselves are sufficient to call for the imposition of

death.  It's not and do this final step.  It's or.  If

you haven't found mitigating factors, you must do

something with the aggravating factors that you found,

and the thing that you do is determine if whether they

alone, since there are not mitigating factors to weigh

them against, are they themselves alone substantial

enough to call for the imposition of the death penalty.

MS. LAWSON:  But that ignores the balance

of the section of the statute.  Ones you get to where

Ms. Tompkins is talking about, then it says, based upon

Reported By: Scott A. Huseby, RPR
800-333-2082          Huseby, Inc., an Affiliate of Spherion  (704) 333-9889          Fax (704) 372-4593
Case 3:12-cv-00327-MOC  Document 107  Filed 09/23/15  Page 66 of 200
1854

JA2737

Page 3886

this consideration, the jury by unanimous vote, or if

there is no jury, shall recommend whether the defendant

should be sentenced to death, to life imprisonment

without the possibility of release.  I mean, you weigh

and you give the consideration, but you still have the

option.  That's 3593 E3 down at the bottom.

THE COURT:  Did you say E3?

MS. LAWSON:  Yes, sir.

THE COURT:  Well, you are referring to the

last sentence in E3.

MS. LAWSON:  Yes, Your Honor, that starts,

based upon this consideration.

THE COURT:  And what is your argument

about that?

MS. LAWSON:  Well, that after you get to

the point of whether the aggravating factors are

sufficient to justify a sentence of death, the jury, by

unanimous vote, shall recommend whether the defendant

should be sentenced to death or life imprisonment.

There is still a determination of whether, having gotten

to that point, whether death is the appropriate

punishment.  And, you know, this is what we talked about

the first day of jury selection, and I believe this is

what you instructed the potential jurors.

THE COURT:  Well, how about if we say the

Case 3:12-cv-00327-MOC   Document 85-7   Filed 09/23/15   Page 67 of 200
1855

**JA2738**

Page 3887

members of the jury are never required to vote for a sentence of death?

MS. LAWSON: That's fine. But, again, the lines above it, it seems to direct them to determine death simply because they found that the aggravating factors outweigh the mitigating factors, and it ignores that last sentence of the statute, that there is still discretion, it's a directed verdict or death.

MS. TOMPKINS: If that was the case, the special verdict form would have another question, which it does not, and the Fourth Circuit would have required that in United States versus Barnette, but the special verdict form does not say now that you have done your weighing process, take one further step.

THE COURT: Well, I think the statute ties the decision of the jury to the weighing process, because it says, based upon this consideration, referring to the weighing process, but to me the members of the jury are never to required to vote for a sentence of death conveys the thought that in doing the calculus of factors, aggravating and mitigating, if any, there is no required result.

MS. TOMPKINS: That's satisfactory to the government.

MS. LAWSON: I guess the thought we have,

Reported By: Scott A. Huseby, RPR
800-333-2082        Huseby, Inc., an Affiliate of Spherion (704) 333-9889        Fax (704) 372-4593
Case 3:12-cv-00327-MOC  Document 107  Filed 09/23/15  Page 68 of 200
1856

JA2739

United States of America vs. Aquilia Marcivicci Barnette 3:97CR23-V
Proceedings Before Judge Richard L. Voorhees 8/9/2002

Page 3888

Your Honor, on the members of the jury is that it again implies that unanimity is required, and in point of fact, a single juror -- each individual juror has to make that decision.

THE COURT: Well, I think that's clearly included within the unanimity requirement.

MS. LAWSON: Right. But the unanimity requirement seems to eradicate the individual juror's discretion.

THE COURT: Well, I contemplate that we will have a -- I will contemplate the arguments of the parties. What I would propose to do, by the way, is to put these into as much of a final form as we can sometime over the weekend and email them to you so that you will have the Court's final, or mostly final, proposal, subject to any last minute revelations by the parties.

MS. LAWSON: Your Honor, Page 37, are you there yet?

THE COURT: We are still on 37.

MS. LAWSON: The second line, if the jury determines that death is not justified, you shall proceed to determine whether the appropriate punishment is life without the possibility of release. You don't determine that. If you don't come back with death, it's

Case 3:12-cv-00327-MOC  Document 107  Filed 09/23/15  Page 69 of 200
1857

JA2740

United States of America vs. Aquilia Marcivicci Barnette     3:97CR23-V
Proceedings Before Judge Richard L. Voorhees           8/9/2002

Page 3889

automatically life.  What I recommend doing is you shall record your recommendation of life imprisonment without the possibility of release.

MS. TOMPKINS:  And I would object to that. They actually have a duty to unanimously decide one way or the other.

THE COURT:  Yeah, I agree with the government on that.  The statute does not talk about unanimity on the death penalty in lieu of which there is an automatic default sentence.  It specifically says, this is again where we were looking before, E3, the last sentence, shall recommend whether he should be sentenced to death, to life imprisonment without possibility of release, or some other lesser sentence.  Now, we are leaving off or some other lesser sentence by consent of the parties.  But it still says that the unanimous recommendation is submitted, either to death or to life imprisonment, and the default would be the failure to agree altogether, in other words, the failure to deliver a verdict, which, in fact, under the law would result in not a mistrial but a decision by the Court, but I think you all wanted to avoid telling the jury that -- well, you didn't -- both of you didn't say that, but --

MS. LAWSON:  I was going to say.

THE COURT:  That's an issue that appears

Reported By: Scott A. Huseby, RPR
800-333-2082     Huseby, Inc., an Affiliate of Spherion  (704) 333-9889     Fax (704) 372-4593
Case 3:12-cv-00327-MOC  Document 107  Filed 09/23/15  Page 70 of 200
1858

JA2741

United States of America vs. Aquilia Marcivicci Barnette      3:97CR23-V
Proceedings Before Judge Richard L. Voorhees                  8/9/2002

Page 3890

to be foreclosed by the -- not necessarily foreclosed, but answered by the Jones decision the Government cited this morning.

MR. BENDER: Judge, may I just interject right now?

THE COURT: Yes.

MR. BENDER: One of the issues on appeal in this matter was the failure of the Court to instruct on a non-unanimous decision, and that issue was not decided by the Fourth Circuit, although that was an issue that was presented. And the decision in Barnette was post Jones. Had the Fourth Circuit chosen to decide that issue post Jones, I think they would have said something about it. So I think that's an issue that is still ripe for consideration, and what -- the only thing that they finally got down to was in the event that -- the jury unanimously concludes that a sentence should be either death or life without the possibility of release but cannot agree on which one of these should be imposed the Court will sentence the defendant to life imprisonment without the possibility of release. And I think that issue is still open, and I think the Court may act in peril by foreclosing there, simply because the Jones decision was available to the Fourth Circuit, that was an issue that was before them; but because they

Page 3891

reversed it on other grounds, they didn't reach that.

THE COURT: Well, Jones goes a little farther than simply saying it's discretionary. It seems to say that it's contrary to the theory and practice of the jury system to instruct about a failure to agree. So my view is -- I will look at the Barnette case again to see if I can glean any instructiveness from it on this issue. But in the absence of a positive result there, the Court will submit the request for a unanimous verdict on death and a unanimous verdict on life --

MS. LAWSON: Your Honor --

THE COURT: -- and not advise the jury about what would happen in the event of a deadlock.

MS. LAWSON: Down on Page 37, Your Honor, it does talk about punishment as provided by law.

THE COURT: Right. That reference will be removed. It appears that that page should end about six lines up from the bottom where it says, shall record that determination on a special verdict form.

And if there is nothing further there, we will go on to 38.

MS. TOMPKINS: No issues on 38.

THE COURT: I beg your pardon?

MS. TOMPKINS: No issues on 38.

THE COURT: I think we would make the same

Case 3:12-cv-00327-MOC   Document 107   Filed 09/23/15   Page 72 of 200
1860

JA2743

Page 3892

adjustments that we did on the earlier when we talked about serious bodily injury.

MS. LAWSON:  Also insertion of beyond a reasonable doubt, I see three places, and unanimity.

THE COURT:  I will fix it the same way I intended to fix it earlier.

MS. TOMPKINS:  And I guess we can assume that for each time so we don't have to keep on doing it.

THE COURT:  That's correct, as to each count.

MS. TOMPKINS:  On 39 I wasn't sure at bottom of that page you had an instruction down there about intent --

THE COURT:  Right.

MS. TOMPKINS:  -- and I didn't know whether there was going to be a section where you were going to define terms, it's fine there.  I just wasn't sure whether there was a time when you were going to be defining terms, but I don't have any problem with its placement.

THE COURT:  If the parties would prefer the Court to give the usual instruction about knowledge and intent, I will be glad to do that.  There are a couple of places where knowledge and intent is referred to in the same manner as you see on the bottom of Page

Case 3:12-cv-00327-MOC   Document 107   Filed 09/23/15   Page 73 of 200
1861

JA2744

United States of America vs. Aquilia Marcivicci Barnette          3:97CR23-V
Proceedings Before Judge Richard L. Voorhees          8/9/2002

Page 3893

39.

MS. TOMPKINS:  Yes.

MR. BENDER:  Judge, perhaps you could insert that in your original comments to them before our argument.

THE COURT:  Okay, I will be glad to do that.  I will add that mental elements instruction.  Thank you.  Okay, 40.

MS. TOMPKINS:  40 is that same thing of the use of terminology of requisite mental states, rather than just jumping right in to --

THE COURT:  I will use the same analysis that I have come up with on the other one where you raised that question earlier.

MS. TOMPKINS:  Yes, sir.

THE COURT:  Okay.  41.

MS. LAWSON:  Is that the commission of the offense for pecuniary gain?

THE COURT:  Yes.

MS. LAWSON:  I thought I would mention it needs to be unanimously and beyond a reasonable doubt since we didn't have that in the first set of changes.  It's the second line of the second paragraph, the government must prove.

THE COURT:  Okay.

Case 3:12-cv-00327-MOC  Document 107  Filed 09/23/15  Page 74 of 200
1862

JA2745

United States of America vs. Aquilia Marcivicci Barnette    3:97CR23-V
Proceedings Before Judge Richard L. Voorhees    8/9/2002

Page 3894

MS. TOMPKINS: And just the use of Donald Lee Allen rather than just Allen.

THE COURT: Right, we will try to do that throughout.

42 -- well, we are off into 8. Anything about 8 that you want to throw in that's different from the way we dealt with it in 7?

MR. BENDER: I think it would be same, Judge.

THE COURT: I believe it would. I mean, you have victim impact, you have future violence, two people killed. Okay? And then as to Count 11.

MS. LAWSON: We have nothing until we get to 4.03E.

THE COURT: That's Page 54.

MR. BENDER: Judge, we are assuming that all of the changes in 7 would apply to 8 and 11.

THE COURT: Yes, unless there is some analytical reason not to, but I don't anticipate any.

MS. LAWSON: That's Page 54, Your Honor. Again, this is one of those ones that's different from the first one, and the first line of the second paragraph, government must prove and you insert unanimously and beyond a reasonable doubt.

THE COURT: Okay.

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/9/2002

Page 3895

MS. TOMPKINS: And in the first line of the instruction, the government would request that after the last word of that line, victim, that we put in, that is, Bertha Williams and Sonji Hill.

MS. LAWSON: That's fine.

THE COURT: S-O-N-J-I, right?

MS. TOMPKINS: S-O-N-J-I, yes.

THE COURT: H-I-L-L?

MS. TOMPKINS: Yes.

THE COURT: Okay. Then after we get through with the substantive counts, you have a duty to deliberate instruction on Page 69. Now, this consequences of deliberations on 68 needs work to be consistent with what I have already ruled.

MS. TOMPKINS: Can we talk about the expert witnesses? It comes before that on Page 64.

THE COURT: Well, let me back up here for clarity's sake. I have weighing aggravation and mitigation up to Page 62 and 63. Then we go into the other instructions. Experts belongs in the early part that I'm going to dispose of before you all argue, and the same with instruction regarding law enforcement witnesses. Now, the instruction regarding statements defendant made to investigating authorities, we have already taken that out earlier.

Case 3:12-cv-00327-MOC  Document 107  Filed 09/23/15  Page 76 of 200
1864

JA2747

United States of America vs. Aquilia Marcivicci Barnette          3:97CR23-V
Proceedings Before Judge Richard L. Voorhees                        8/9/2002

Page 3896

MS. LAWSON: And you took out where it starts into the rules of evidence, down in the last two paragraphs.

MR. BENDER: That whole thing is gone.

THE COURT: That whole instruction is gone. Do you want to make any comment on expert witnesses?

MS. TOMPKINS: In the first paragraph, the last line, it says, some of these witnesses were permitted to testify even though they did not actually witness any of the events. In fact, none of experts were witnesses to events, so I'm not sure that's an instructive line.

THE COURT: Why don't we just take that line out?

MS. LAWSON: Your Honor, the listing of expert witnesses, I'm sure it was just the names of them, perhaps an attempt to do it alphabetically, but it puts undue emphasis on the government's rebuttal witnesses, Carlson and Dietz, and I would suggest that it's obviously alphabetical or that they're listed there in order of appearance in trial.

THE COURT: We will do it in order of appearance.

MS. LAWSON: That would be, I believe, Dr.

United States of America vs. Aquilia Marcivicci Barnette  3:97CR23-V
Proceedings Before Judge Richard L. Voorhees  8/9/2002

Page 3897

Halleck, Dr. Burgess, Dr. Cunningham, and then Dr.

Carlson and Dr. Dietz.

THE COURT:  All right, those five.  Okay.
Anything else about experts?  Law enforcement witnesses?
Then we come to consequences of deliberations.  As I
said, that needs to be reworking to be consistent with
earlier rules.  What I would suggest there is the first
four lines, that's the first paragraph, remain the same
and leave in the last line, which says, the jury is
never required to impose a sentence of death, although
that may be changed a little bit.

MR. BENDER:  As it was earlier?

THE COURT:  Yes.

MR. BENDER:  Whatever that's going to
be --

THE COURT:  Right.

MR. BENDER:  Thank you.

THE COURT:  And the balance of that second
paragraph comes out.  Okay.  Anything on duty to
deliberate?

MS. TOMPKINS:  The government would ask
for the duty the deliberate instruction that Judge
Potter gave in the first trial, his number 8.03, which
is -- he has got in parenthesis under Allen charge to be
given when the jury is hanging, but it's longer and it

Page 3898

would be our preference to have that, if you don't mind me --

THE COURT: Do you have a preference? Your Honor, we prefer this one.

THE COURT: Okay. I will consider those arguments. I will consider those arguments. 70, justice without discrimination. Special verdict, Page 71. We will check those section numbers. Then there is one called defendant's previous trial, and that should say -- well, that isn't, of course, read to jury.

MS. TOMPKINS: You want to call it defendant's trial?

THE COURT: I mean, the caption isn't read to the jury.

MS. TOMPKINS: Oh, that's true. The government in this one, the last line of that says, you should not consider any of the statements you have heard regarding the previous proceeding in any way when you make your sentencing determination now except that you must accept the guilty verdicts reached in that guilt phase, and it is possible is that prior inconsistent statements were --

THE COURT: You are right, it should say except as to credibility determination or something.

MS. TOMPKINS: Yes.

Reported By: Scott A. Huseby, RPR
800-333-2082          Huseby, Inc., an Affiliate of Spherion  (704) 333-9889          Fax (704) 372-4593

JA2750

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/9/2002

Page 3899

THE COURT: I could leave that out or make that change. Does defense have any preference?

MR. BENDER: I would take out the whole thing.

MS. TOMPKINS: As long as -- I guess the point of this is that they have to accept the guilty verdict, so that part of the last sentence may be reworked.

MR. BENDER: If they don't know that now --

THE COURT: Yes. It says that in the second sentence, so we will take the last sentence out. Then I have a concluding instruction. Any comments about that?

MR. BENDER: Typo, first line of the sixth paragraph, they are for your own personal use.

THE COURT: Right, thank you. Anything further?

MR. BENDER: Judge, we would object to the Court's failure to use any of our proposed jury instructions.

THE COURT: Yes, sir, the record will so reflect.

MR. BENDER: Thank you. Judge, are we going to do anything with regard to the juror George

Case 3:12-cv-00327-MOC  Document 107  Filed 09/23/15  Page 80 of 200
1868

JA2751

United States of America vs. Aquilia Marcivicci Barnette     3:97CR23-V
Proceedings Before Judge Richard L. Voorhees     8/9/2002

Page 3900

Evans and his statements, or is that an issue already --

THE COURT: I believe that was resolved by the Court's renewed instruction.

MR. BENDER: Okay.

THE COURT: If there is nothing further, we will be emailing these things to you as soon as we get them worked up.

MR. BENDER: Will that also include the special verdict forms as well?

THE COURT: Yes, sir. Thank you.


I, Scott A. Huseby, do hereby certify that the foregoing transcript is a true and correct transcript.




SCOTT A. HUSEBY                                    DATE

Reported By: Scott A. Huseby, RPR
800-333-2082     Huseby, Inc., an Affiliate of Spherion  (704) 333-9889     Fax (704) 372-4593

Case 3:12-cv-00327-MOC   Document 107   Filed 09/23/15   Page 81 of 200
1869

JA2752

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/12/2002

Page 3901

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION

COPY

UNITED STATES OF AMERICA          )
                                  )  CASE NO. 3:97CR23-V
        v.                        )  August 12, 2002
                                  )
AQUILIA MARCIVICCI BARNETTE,      )
              Defendant.          )
            TRANSCRIPT OF SENTENCING HEARING
      BEFORE THE HONORABLE RICHARD L. VOORHEES
        UNITED STATES DISTRICT COURT JUDGE
APPEARANCES:
FOR THE government:
        ANNE M. TOMPKINS, Esq.
        JILL WESTMORELAND ROSE, Esq.
        Assistant United States Attorney
        227 West Trade Street
        Suite 1700
        Charlotte, North Carolina  28202

FOR THE DEFENDANT:
        JEAN B. LAWSON, Esq.
        P.O. Box 4275
        Charlotte, North Carolina  28226
        HAROLD J. BENDER, Esq.
        200 North McDowell Street
        Charlotte, North Carolina  28204
Reported by:  Steve S. Huseby,
                Registered Professional Reporter,
                Certified Court Reporter,

Reported By: Steve S. Huseby, RPR
800-333-2082          Huseby, Inc., an Affi·· · ⌐° · ·   ₁ (704) 333-9889          Fax (704) 372-4593
Case 3:12-cv-00327-MOC   Document 107   Filed 09/23/15   Page 82 of 200
1870

JA2753

United States of America vs. Aquilia Marcivicci Barnette

Proceedings Before Judge Richard L. Voorhees

3:97CR23-V

8/12/2002

Page 3902

PROCEEDINGS

(9:40 a.m.)

THE COURT: Good morning ladies and gentlemen. Have the attorneys had an opportunity to look at the technical changes the Clerk -- anything further about those jury instructions?

MR. BENDER: Your Honor, nothing about the jury instructions, but I did notice on the special verdict form --

THE COURT: Yes, sir.

MR. BENDER: -- it may not make any difference, I'm just concerned about some confusion. On page 13 of one of them, the directed verdict, number three, four, five, I don't know why they are numbered three, four and five as opposed to one, two, and three, because they are three, four and five on the other one. I wanted to bring that to the Court's attention.

THE COURT: Perhaps 14, 15 and 16.

MR. BENDER: Or another one, two, three.

THE COURT: Either way.

MR. BENDER: Yeah.

THE COURT: One, two, and three okay with the government?

MS. TOMPKINS: Yes, sir.

MS. LAWSON: There is one other issue I

Reported By: Steve S. Huseby, RPR

Huseby, Inc., an Affil~~iate of Sohar~~ (704) 333-9889

800-333-2082

Fax (704) 372-4593

Case 3:12-cv-00327-MOC   Document 107   Filed 09/23/15   Page 83 of 200

1871

JA2754

United States of America vs. Aquilia Marcivicci Barnette     3:97CR23-V
Proceedings Before Judge Richard L. Voorhees     8/12/2002

Page 3903

thought we ought to resolve beforehand. We have two charts and showed them to Ms. TOMPKINS and Ms. Rose and they object to one of them, and I thought if you could rule on that now.

THE COURT: Yes, it's a good idea to rule on anything that needs attention.

MS. LAWSON: May I approach?

THE COURT: This is one of your charts?

MS. LAWSON: Yes, basically sets out the hierarchy of burdens of proof.

THE COURT: What would the government say to that?

MS. TOMPKINS: Your Honor, the hierarchy of burden of proof is proof beyond a reasonable doubt or more probable than not. There is no burden of proof that's almost certain or quite probable, likely possible or best guess. There also are not burdens of proof within the law, and I think that's a confusing, misleading chart to show the jury. The Court will instruct them about the burdens of proof, the one that the government has and the one that the defendant has, and that's misleading.

MS. LAWSON: I will just point out that where it says more likely than not is equivalent language to preponderance of the evidence.

MS. TOMPKINS: I don't have any problem with this or this, it's the almost certain, quite probable, likely

Reported By: Steve S. Huseby, RPR
800-333-2082     Huseby, Inc., an Affiliate of Spherion  (704) 333-9889     Fax (704) 372-4593
Case 3:12-cv-00327-MOC   Document 107   Filed 09/23/15   Page 84 of 200
1872

JA2755

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/12/2002

Page 3904

possible and best guess that are not --

THE COURT: I think as long as counsel doesn't imply that anything other than reasonable doubt or more likely than not, it gives a legally recognized standard. In other words, the terms of your argument, it's time to talk about how probabilities aren't enough and that sort of thing, so you can do that, you can use your chart, but just don't imply that that's -- there are somehow legal recognitions to anything but the top one and the one that's recognized as a preponderance of the evidence.

MS. LAWSON: Thank you, Your Honor.

THE COURT: Okay. One other thing since we're on that subject, having to do with arguments, typically of course there's broad leeway given to argument. Sometimes attorneys inadvertently say something like I think or I believe, and of course personal belief is not appropriate for arguments, so try to avoid that.

Also, of course, you would want to avoid anything that would suggest a basis for decision other than what's in the facts and the law, and you've got plenty of leeway based on the law to argue the various things that you may want to argue. So that's no doubt recognized by all the attorneys.

Anything further before we bring the jury in for the first 20 pages of the instruction? And then we will go right into argument by the government and we will see how far

Reported By: Steve S. Huseby, RPR
800-333-2082          Huseby, Inc., an Affil---- -- ---------- (704) 333-9889          Fax (704) 372-4593

Case 3:12-cv-00327-MOC   Document 107   Filed 09/23/15   Page 85 of 200
1873

JA2756

Page 3905

we get as far as breaks go.  Thank you.

May we have the jury, please.

(Jury in at 9:34 a.m.)

THE COURT:  Good morning, members of the jury.  As I indicated to you the other day, the final items of business we have before deliberations would be the arguments of counsel and the instructions of the Court as to the law.

Now, what I would propose to do is give you some of the jury instructions at this time so that they won't all have to come at you at one time.  And then we will have the arguments of counsel and then the Court will give you the final portion of the jury instructions.

So, members of the jury, now that you have heard the evidence and will shortly hear the arguments of counsel, I'll instruct you as to some of the law that applies to this case.  First, I'll instruct you on some rules for jury consideration of cases of this type, including how to assess certain types of evidence and the credibility of witness, and then after the arguments I shall discuss the law of sentencing for this case, and following with the directions to guide your deliberations.  Can all of you hear me okay?

Now, it's your duty and your responsibility in this hearing to find the facts.  You may find those facts only from the evidence which has been presented during this sentencing hearing.  The evidence consist only of the

Page 3906

testimony of the various witnesses who have been called and sworn and testified in your presence, and the exhibits which have been admitted into evidence by the Court.

In reaching your decision as to the facts, it's your sworn duty to follow the law as the Court instruct you. You will apply the law as given you by the Court to the facts that you find from the evidence and reach your verdict accordingly. Counsel may quite properly refer to some of the governing rules of law in their arguments. If, however, any difference appears to you in the law as stated by counsel and that stated by the Court in these instructions, you are of course to be governed by these instructions. You're not to single out one instruction alone as stating the law but must consider all of the instructions as a whole. Also, you may not substitute or follow any personal or private notion or opinion as to what the law is or ought to be. You are required to perform these duties without bias, prejudice or sympathy for or against any party. The law does not permit jurors to decide cases on the basis of bias, prejudice, sympathy or any perceived public opinion, or on any basis other than solely upon the basis of the law and the facts that apply in this particular case.

Now, there are two types of evidence which a jury may properly assess in determining whether a party has met it's burden of proof. One is direct evidence such as the

Page 3907

testimony of an eyewitness.  The other is circumstantial evidence, the proof of a chain of circumstances leading to a conclusion sought to be established.  Circumstantial evidence is evidence of facts or circumstances from which the existence or nonexistence of other facts in controversy may be inferred.  As a general rule, the law makes no distinction between direct and circumstantial evidence.  It simply requires that the jury reach its conclusions based upon all the evidence in the case within the framework of the law as the Court instruct you.

Excuse me a second.  Now, then, where there is a question as to what took place at the various times and places, you must determine the credibility of the witnesses. The Court instructs you that you are the sole judges of the credibility of the witnesses and the weight that their testimony deserves.  And while there is no absolute or arbitrary guide or measure by which you determine the truthfulness or untruthfulness of a witness, the Court will point out to you certain general principles which you should consider as you pass upon this phase of the case.

Among the things you may properly consider in determining the credibility of the witnesses are first, whether the witness had any motive or reason for being truthful or untruthful; secondly, the witness's interest if any in the outcome of the case; third, whether there has

Reported By: Steve S. Huseby, RPR
800-333-2082                Huseby, Inc., an Affiliate of Spherion  (704) 333-9889                Fax (704) 372-4593
Case 3:12-cv-00327-MOC   Document 107   Filed 09/23/15   Page 88 of 200
1876

JA2759

United States of America vs. Aquilia Marcivicci Barnette   3:97CR23-V
Proceedings Before Judge Richard L. Voorhees   8/12/2002

Page 3908

appeared from the witness's attitude or conduct any bias, prejudice, or feeling which may cause that person's testimony to be influenced; next, whether the testimony bears the earmarks of truthfulness; next, to what extent if any it's corroborated or confirmed by other testimony which is not questioned, and to what extent if any it's corroborated or confirmed by known or admitted facts. You may also consider the intelligence and the mental capacity of the witness and the witness's opportunity to have accurate knowledge of the matters to which the person testifies.

I instruct you that you may believe all that a witness says or none, or believe part and disbelieve part. You may consider the interest which the witness may have in your verdict, the demeanor of the witness on the stand, the reasons for his or her testimony, and the means which the witness may have to know the things to which he or she has testified.

If you find a witness who's interested in your verdict, it's your duty to scrutinize that testimony closely, but after you have done so and if you find that he or she is telling the truth in whole or in part, then you would give that testimony the same weight you would that of a disinterested witness. It's your duty, members of the jury, to find the truth of this matter.

Now, during the trial I instructed you to exclude

Reported By: Steve S. Huseby, RPR
800-333-2082          Huseby, Inc., an Affi''   '' '' ' ' ' ι (704) 333-9889          Fax (704) 372-4593
Case 3:12-cv-00327-MOC   Document 107   Filed 09/23/15   Page 89 of 200
1877

JA2760

Page 3909

from consideration certain statements made from the witness stand. I remind you that it's your duty to follow that instruction and consider only the evidence which was duly allowed from the witnesses presented to you.

Now, from time to time in these instructions I will define certain terms that I use in the instructions. You are to apply these definitions as you consider the evidence, and if I do not define certain words you would assign to them their ordinary, everyday meaning.

Now, you've heard audiotape recorded evidence during the course of this trial. You've also seen typewritten transcripts of the tape-recordings which I believe were presented on a screen for you. Those transcripts undertook to identify the speakers engaged in the conversations. You were permitted to consider the transcripts for the limited purpose of helping you follow the conversation as you listened to the tape-recording and also to help you keep track of the speakers.

The transcript, however, is not evidence. The tape recording itself is the primary evidence of its own contents. You are specifically instructed that whether the transcripts correctly or incorrectly reflected the conversation or the identity of the speakers is entirely for you to decide based upon what you have heard here about the preparation of the transcripts and upon your own examination of the transcript

Reported By: Steve S. Huseby, RPR
800-333-2082                    Huseby, Inc., an Affi·· ·· ··· · ı (704) 333-9889                    Fax (704) 372-4593
Case 3:12-cv-00327-MOC   Document 107   Filed 09/23/15   Page 90 of 200
1878

JA2761

Page 3910

in relation to what you heard on the tape recording.

If you decide that the transcript is in any respect incorrect or unreliable, you should disregard it to that extent. Differences in meaning between what you heard in the recording and read in the transcript may be caused by such things as the inflexion in a speaker's voice. You should, therefore, rely only upon what you heard rather than what you read when there's a deference. You've also seen video tape recorded evidence during the course of this trial. It is not illegal to make the audio and videotape shown to you during the trial. The videotape, therefore, is a proper form of evidence as is an audiotape and may be considered by you just as any other evidence.

Now, in considering a videotape offered into evidence and shown to you, however, you should consider the following questions. First, does the tape fairly and accurately depict or illustrate the events and locations purportedly shown in light of the testimony you heard concerning these events and the circumstances surrounding the filming of the tape. Next, is it helpful to an understanding of any fact at issue in the case. And third, is the tape misleading or confusing in light of the circumstances surrounding its preparation. And lastly, have the speakers on the tape been adequately identified by believable evidence.

Reported By: Steve S. Huseby, RPR
800-333-2082            Huseby, Inc., an Af            on (704) 333-9889            Fax (704) 372-4593
Case 3:12-cv-00327-MOC   Document 07   Filed 09/23/15   Page 91 of 200
1879

JA2762

Page 3911

So after you have considered these questions, you may rely on the videotape as much or as little as you deem proper. Now, during the trial you heard the testimony of a number of people who were described to us as experts in various fields. These expert witnesses were Dr. Seymour Halleck, who is an expert in the area of forensic psychiatry; Dr. Ann Burgess, who is an expert in the area of domestic violence; Dr. Mark Cunningham, who is an expert in the area of forensic and clinical psychology; Dr. Peter Carlson, who is an expert in the area of Bureau of Prison classification, and Dr. Park Dietz, who is an expert in the area of forensic psychiatry.

Now, the degree of expertise is relative and is for you to evaluate. In other words, a person's training and experience may make him or her an expert in a technical field. The law allows that person to state an opinion here about matters within that field. Merely because that witness expresses an opinion, however, does not mean that you must accept the opinion at all events. The same as with all other witnesses, it's up to you to decide whether you believe the testimony and choose to rely upon it. Part of that decision will depend upon your judgment about whether his or her background of training and experience is sufficient to give the expert opinion that you heard. You must also decide whether his or her opinions were based on sound reasons,

Page 3912

judgment, common sense, and information.

Now, you heard testimony from various law enforcement personnel. The fact that a witness may be employed by the government as a unit -- excuse me, as a law enforcement official does not mean that his or her testimony is deserving of more or less consideration or greater or lesser weight than that of an ordinary witness. It's up to you to decide after weighing all of the evidence, in light of these instructions about the factors relevant to determining credibility, whether you accept the testimony of a law enforcement witness and what weight if any it deserves.

The testimony of a witness may be discredited or impeached by showing that he or she previously made statements which are inconsistent with his or her present testimony. The earlier contradictory statements if any are admissible only to impeach the credibility of the witness and not to establish the truth of these earlier statements. It's the province of the jury to decide the credibility if any to be given the testimony of a witness who has been impeached.

Now, if a witness is showing knowingly to have testified falsely concerning any material matter, you have a right to distrust such witness's testimony and other particulars, and you may reject all the testimony of that witness or give it such credibility as you may think it deserves.

Page 3913

You will also recall that it was brought out that before this hearing some of the witnesses made statements in a judicial proceeding, that is, under oath. Now, even though these statements were not made in this courtroom, they were made under oath at an earlier proceeding, and because of this you may consider these statements as if they were made at this trial and rely on them as much or as little as you think proper.

Now, you heard testimony that the defendant made statements to the police concerning the crimes for which you are to determine the appropriate sentence. When you consider this testimony, you should ask yourself these questions. First, did the defendant say the things the witness told you the defendant said. To answer this question you must decide if the witness is honest, has a good memory, and whether he or she accurately understood the defendant. Second, if the defendant did make the statement, was it correct. Here, you must consider all of the circumstances under which the statement was made, including the defendant's personal characteristics, and ask yourself whether a statement made under these circumstances is one you can rely upon. After you have answered these questions, you may rely upon the testimony about the statement as much or as little as you think proper.

You have heard evidence to the effect that the

Reported By: Steve S. Huseby, RPR
800-333-2082          Huseby, Inc., an Affiliate of Snherion  (704) 333-9889          Fax (704) 372-4593
Case 3:12-cv-00327-MOC   Document 107   Filed 09/23/15   Page 94 of 200
1882

JA2765

Page 3914

defendant pleaded guilty to or has been convicted of certain charges brought against him prior to 1996. Prior conviction of a crime that is a felony is one of the circumstances which you may consider in determining the credibility of a witness. The fact that the defendant was convicted of or pleaded guilty to certain earlier offenses, however, does not mean that he should receive any particular sentence in this case and must not be used as guilt of any prior crime as proof of any aggravating factor in this case. You should judge the testimony of the defendant, Aquilia Marcivicci Barnette, in the same manner as you judge the testimony of any other witness.

Now, the word knowingly as used in these instructions -- this is a definition -- as used in these instructions to describe the alleged mental state or state of mind of the defendant at any time means that he was conscious and aware of his action, realized what he was doing or what was happening around him and did not act because of ignorance, mistake, accident or other innocent reason. Knowledge may be proven by a defendant's conduct and by all the facts and circumstances surrounding the case.

Now, the term willfully as used in these instructions to describe the alleged state of mind of the defendant means that he knowingly performed an act or failed to act deliberately and intentionally or on purpose as

Reported By: Steve S. Huseby, RPR
800-333-2082          Huseby, Inc., an Aff---- -- --------n (704) 333-9889          Fax (704) 372-4593
Case 3:12-cv-00327-MOC   Document 107   Filed 09/23/15   Page 95 of 200
1883

JA2766

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/12/2002

Page 3915

contrasted with accidentally, carelessly or unintentionally.

The intent of a person or the knowledge that a person possesses at any given time may not ordinarily be proved directly because there's no way of directly scrutinizing the workings of the human mind. In determining the issue of what a person knew or what a person intended at a particular time, you may consider any statements made or acts done or omitted by that person and all other facts and circumstances received in evidence which may aid in your determination of that person's knowledge or intent.

You may infer but are certainly not required to infer that a person intends the natural and probable consequences of acts knowingly done or knowingly omitted. It's entirely up to you, however, to decide what facts to find from the evidence received during this trial.

Thank you very much for your attention to these instructions. Now, as I say, I'll give you the rest of them later on after the arguments.

Under our rules, the government has the first opportunity to state its arguments to you, and then the defendant will have the opportunity to make its arguments and respond to Government's arguments; and finally, the government will have an opportunity to respond to the defense arguments.

Is the government ready to proceed?

Reported By: Steve S. Huseby, RPR
800-333-2082          Huseby, Inc., an Aff"     ˜˜˙   ˙)n  (704) 333-9889          Fax (704) 372-4593
Case 3:12-cv-00327-MOC   Document 107   Filed 09/23/15   Page 96 of 200
1884

JA2767

United States of America vs. Aquilia Marcivicci Barnette    3:97CR23-V
Proceedings Before Judge Richard L. Voorhees    8/12/2002

Page 3916

MS. TOMPKINS:  Yes, sir.

THE COURT:  You may do so.

MS. TOMPKINS:  There's a lot that I could say about this case but I'm not going to say lot.  How could I possibly manage to do justice to the task of summarizing the lives and the deaths of Donnie Allen and Robin Williams.  I don't know.  I'm humbled by this responsibility.  But I do know that you can do this.  I know that you can do justice in this case.  And I stand before you right now and ask for justice on behalf of Donnie Allen and Robin Williams.  You know this case, and I'm not going to spend a lot of time repeating the facts.  Let me talk to you just a minute about Donnie Allen.

Donnie Allen lived at home with his parents McConnell, South Carolina.  He went to work every day, and in his spare time, he liked to spend time with his father.  They played golf together, they liked pitching horseshoes, and they liked to go hunting.  He loved shooting pool and he loved his car.  He was his father's best friend and he was his mother's miracle baby, and he was mature enough and thoughtful enough and caring enough to leave his life insurance to his sister Denise for the care of her handicapped son.  He had his whole life in front of him.  Donnie Allen lived to be 22.

Let me talk to you a little bit about Robin

Case 3:12-cv-00327-MOC   Document 107   Filed 09/23/15   Page 97 of 200
1885

JA2768

United States of America vs. Aquilia Marcivicci Barnette     3:97CR23-V
Proceedings Before Judge Richard L. Voorhees     8/12/2002

Page 3917

Williams. Robin lived at home with her mother. She worked at the local hospital, went to work every day. She went time with her lifelong friends in her hometown of Roanoke, Virginia. She loved spaghetti and she had lots of cousins. Robin had a smile that lit up a room. And even as the younger sister, she was a source of strength to her older brothers. She was her mother's best friend and she had her whole life in front of her. Robin Williams lived to be 23.

Now, they are not here today but we are, and we're here today because the defendant Marc Barnette made choices. Those were his choices made by a man, made as an adult. These choices were not programmed by his childhood and they were not destined to happen. These murders were not destined to happen. We're here because Aquilia Marcivicci Barnette chose to kill Donnie Allen and he chose to kill Robin Williams.

There are three charges and three separate sentencing decisions that you all will make in this case, and two of those charges relate to the murder of Donnie Allen. Those are Count 7 and Count 8. Count 7 is car-jacking resulting in death and Count 8 is the use of a firearm during that car-jacking that resulted in Donnie's death. And Count 11 relates to Robin Williams' murder, and that is the use of a firearm while violating the Interstate Domestic Violence Act that resulted in her death.

Reported By: Steve S. Huseby, RPR
800-333-2082          Huseby, Inc., an Affi‥ ‥ ‥ ‥ ‥ n (704) 333-9889          Fax (704) 372-4593
Case 3:12-cv-00327-MOC   Document 107   Filed 09/23/15   Page 98 of 200
1886

JA2769

United States of America vs. Aquilia Marcivicci Barnette          3:97CR23-V
Proceedings Before Judge Richard L. Voorhees          8/12/2002

Page 3918

I'm going to talk to you about the deliberation process because it's vitally important that you understand the deliberation process that you all will be called to go through during this extraordinarily important decision. The law doesn't send you back into that room to make a decision in a vacuum. The law doesn't send you back in that room to sit in silence and submit a secret ballot. There is a structure that the Court will inform you about that you will go through in your deliberation process and I trust that you will follow that process in your deliberations.

You will be given a special verdict form and that you will use that special verdict form to guide your decision making process in order to come back into this room with the unanimous decision. There are two questions that the special verdict form will ask you to answer before you get to the process of deciding on aggravating and mitigating factors, and I contend to you ladies and gentlemen that you will be able to answer those questions quickly.

The first is was the defendant 18 years old at the time of these crimes. And I contend to you ladies and gentlemen that's not a fact in contention in this case. The defendant's driver's license that he left on the scene at the arson shows his birthday to be 7-7-73. He was 22 at the time of these incidences and that's not a point of contention, so I ask you to answer that question yes.

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees
3:97CR23-V
8/12/2002

Page 3919

The second set of questions that you will answer are called requisite mental intent. Those are indications that the defendant intended to kill both Robin and Donnie. The government will present you on the special verdict form four different ways that you can find that requisite mental intent. The first, and I contend although you only need to find one of those unanimously and beyond a reasonable doubt, all four of them have been proven to you. The first is that the defendant intentionally killed Donald Allen and Robin Williams. Intentionally means knowingly, deliberately, willfully and on purpose. There is uncontroverted evidence in this case that these were intentional murders.

The second way that you can find that requisite mental intent is that the defendant intentionally inflicted serious bodily injury to both Donnie Allen and Robin Williams; again, uncontroverted evidence here and I would ask you to answer that question yes. The third way is that the defendant use lethal force in killing Donnie and Robin; the fact that Donnie Allen was shot at close range is an indication that lethal force was used, I would ask you to answer that question yes. And finally, the fourth way that you will find this requisite mental intent is that the defendant's conduct constituted a reckless disregard for human life.

And I will ask you to find all four of those

Reported By: Steve S. Huseby, RPR
800-333-2082          Huseby, Inc., an Affil·---- -- --------  (704) 333-9889          Fax (704) 372-4593
Case 3:12-cv-00327-MOC   Document 107   Filed 09/23/15   Page 100 of 200
1888

JA2771

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/12/2002

Page 3920

unanimously and beyond a reasonable doubt, and at that point you will move on to the consideration of the aggravating factors that have been presented by the government and the mitigating factors. You will consider aggravating factors that we have put forth in this case and that we contend call for the imposition of the death penalty. The defense has presented evidence of mitigating factors that any one or more of you could find by a preponderance of the evidence.

It is at this point that you will conduct that weighing process that we talked about during jury selection. The judge is not going to instruct you on how to do this weighing process. He's going to tell you that you shouldn't simply count the numbers, it's not mathematical; but I contend you to, ladies and gentlemen, that you should assess the quality of the evidence you heard in this courtroom in making your weighing decision. I point this out because I want you to compare the quality of the Government's evidence to the quality of the defendant's evidence. We didn't simply bring an investigator in here to just tell you what happened, that you would have to take his word for it. We had multiple witnesses come in to testify to you so that you could make the determination of what happened.

We brought you Benjamin Greene and Maude Hubbard in here to describe that arson to you, in addition to the police and fire personnel that responded to the scene. We brought

800-333-2082 Case 3:12-cv-00397-MOC Document 107 Filed 09/23/13 Page 101 of 200 Fax (704) 372-4593

1889

JA2772

United States of America vs. Aquilia Marcivicci Barnette                3:97CR23-V
Proceedings Before Judge Richard L. Voorhees                8/12/2002

Page 3921

you the defendant's best friend, Steve Austin, to tell you what he did in between the fire bottoming and the murders. We brought Earlene Thompson and Sonji Hill to describe that awful morning in June as well as the officers who responded.

We brought you Natasha Herd, Crystal Dennis, and Alicia Chambers to tell you the defendant's life-long history of violent behavior. But we didn't make you simply take their word for it, we brought you the police officers who told you about the police reports and eyewitnesses who came in here and told you, yes, that's, in fact, what happened.

So I ask you when you make your decision as to the weight you're going to give the aggravating and mitigating factors, consider the quality and type of evidence presented to you and contrast that with the defense. How many people did you hear about from the defense versus how many people heard from? Consider that as you're making your weighing decision.

Now, I'm now going to talk to you about the aggravating factors that relate to Donnie Allen. They relate to Counts 7 and 8, as I told you, the commission of a car-jacking that results in death and the use of a firearm in a car-jacking that results in death. And the first of those statutory factors that I want you to consider, that we're asking you to consider, is that this crime was committed with the expectation of receiving something of pecuniary value.

Reported By: Steve S. Huseby, RPR
800-333-2082          Huseby, Inc., an Affiliate of Spherion  (704) 333-9889          Fax (704) 372-4593
Case 3:12-cv-00327-MOC  Document 107  Filed 09/23/15  Page 102 of 200
1890

JA2773

United States of America vs. Aquilia Marcivicci Barnette     3:97CR23-V
Proceedings Before Judge Richard L. Voorhees     8/12/2002

Page 3922

And what that means is Donnie Allen was killed for his car, Donnie Allen was killed for the money in his wallet. Remember the defendant's own testimony, he told you when he left that house that night, that he was, I was going to car-jack somebody, that's what he said. He went out and he crouched in the tall grass and he waited for someone to car-jack, he needed a car and he needed money. There's no other explanation for Donnie Allen's murder, the defendant wanted what Donnie Allen had. So I ask you to find that unanimously and beyond a reasonable doubt.

The second aggravating factor I want you to consider is the use of substantial planning and premeditation. Marc Barnette didn't kill Donnie Allen on the spur of the moment. There was much, much thought and much, much planning that went into this crime. Marc Barnette planned where, when, and how this crime was going to take place. The defendant's own testimony showed you the amount of time that he spent planning and the choices he made in carrying this out. And in spite of Donnie Allen's pleas of please don't shoot me, please don't shoot me, the defendant shot him down in the dark woods and left him there conscious for up to five minutes waiting for his last breath to come.

Consider the choices that the defendant made in the weeks before this murder. He used his brother's name and a fraudulent Virginia ID to purchase the shotgun. He purchased

Reported By: Steve S. Huseby, RPR
800-333-2082     Huseby, Inc., an Aff           n (704) 333-9889     Fax (704) 372-4593
Case 3:12-cv-00327-MOC   Document 107   Filed 09/23/15   Page 103 of 200
1891

JA2774

United States of America vs. Aquilia Marcivicci Barnette 3:97CR23-V
Proceedings Before Judge Richard L. Voorhees 8/12/2002

Page 3923

that shotgun well before these murders. He took the first shotgun back, he fixed that flashlight to the pump action shotgun. He sawed off the barrel and sawed off the stock, and he told you he did it to make it easier to conceal. He chose the items he needed for his murder kit, handcuffs, screwdrivers, bolt cutters, an additional flashlight, and extra ammunition. He chose that dark intersection for that planned car-jacking where no one could see him. He crouched in the tall grass and he approached Donnie Allen's vehicle when no one else was around. And he chose to force Donnie Allen to walk that long walk down the culvert and into the dark woods where he shot him three times. This murder was well planned and brutally executed.

While the statutes define some aggravating factors that we have presented, there are other factors that we contend exist in this case and that call for the imposition of the death penalty, and they are the same for both Donnie and Robin.

The first is that there is the risk that the defendant would likely be a danger in the future. As our evidence has shown to you, ladies and gentlemen, the defendant has a proven track record of solving his problems through violence. He has had a violent history and a proven history. Use your common sense when you make your consideration here. What is the best predictor of future

Case 3:12-cv-00327-MOC Document 107 Filed 09/23/15 Page 104 of 200
1892

JA2775

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/12/2002

Page 3924

behavior? Past behavior. Marc Barnette solves problems through violence. Marc Barnette will continue to solve problems through violence. Even the defense's own witness said he had a hereditary predisposition for violence. Marc Barnette will be a danger in the future.

Another aggravating factor that we want you to consider is that there were multiple victims in this crime. Not only did Donnie Allen die, but hours later Robin Williams was murdered, and the existence of multiple victims is an aggravating factor that calls for the imposition of the death penalty.

And finally as to Donnie Allen, we want you to consider the aggravating factor of the harm that's caused to the Allen family as a result of Donnie's death. Remember back to the testimony of the Allen family as they expressed the pain and the hurt that will just never go away. Remember Bob Allen, Donnie's father, who told you that the first thing that he does every morning is say good morning to his buddy Donnie and that the last thing he does every night is tell him good night and I love you. That is a pain that will never go away, even six years later. Every family gathering that the Allen family has, every holiday, and every happy moment that they have is affected by the pain of Donnie's absence. I ask you to find each and every one of these aggravating factors unanimously and beyond a reasonable

Case 3:12-cv-00327-MOC Document 9-13 Filed 09/23/15 Page 105 of 200
1893

JA2776

United States of America vs. Aquilia Marcivicci Barnette 3:97CR23-V
Proceedings Before Judge Richard L. Voorhees 8/12/2002

Page 3925

doubt.

I want to talk to you about Robin Williams' murder contained in Count 11. The first aggravating factor the government contends we have proven to you unanimously and beyond a reasonable doubt is the creation of a grave risk of death to one or more persons in addition to Robin. Consider the other people that Marc Barnette put in harm's way when he got to Roanoke. Marc Barnette shotgunned his way into Ms. Williams' house and held the shotgun on her as she held her ten-month-old child, Destiny, grandchild, Destiny. At that moment Bertha Williams was in the zone of danger. The judge is going to describe the zone of danger. Certainly being -- facing the barrel of a shotgun puts you into the zone of danger.

Now, Marc Barnette then ran out after Robin out the front door; and if you remember the testimony of Sonji Hill, she was the lady who stood on her front porch calling 911, and you remember the 911 call that was abruptly cut short, and that was when the defendant pointed the shotgun at Sonji Hill and told her to hang up the motherfucking phone. And Sonji Hill told you that at that moment she thought she was going to be killed and she hung up that phone. Sonji Hill was in the zone of danger.

Moments later, when the defendant caught up with Robin as she struggled to get away from his grip and run

Case 3:12-cv-00327-MOC Document 107 Filed 02/23/15 Page 106 of 200
1894
JA2777

United States of America vs. Aquilia Marcivicci Barnette          3:97CR23-V
Proceedings Before Judge Richard L. Voorhees          8/12/2002

Page 3926

towards her mother, Marc Barnette shotgunned Robin Williams twice in her back as she ran towards her mother and Robin Williams fell at her mother's feet. And again at that moment Bertha Williams was in the zone of danger, and I'd ask you to find that aggravating factor unanimously and beyond a reasonable doubt.

The second statutory aggravating factor is substantial planning of premeditation. I contend to you, ladies and gentlemen, there has rarely been a more planned out murder than the murder of Robin Williams. This murder began on April 30, 1996, when Marc Barnette threw a malatal cocktail through her apartment window and yelled, die, bitch, die. That's when this murder started.

You're well aware of the overwhelming evidence through the Government's witnesses and threw the defendant's own words of the plan that he put in place and carried out, and again, the advanced purchase of the shotgun, the fire bombing being the first attempted murder, Marc Barnette even told you that he thought about Robin, thought about killing Robin in the weeks before he did, he brooded and got angrier and angrier until the night of June 21st and June 22nd. He stalked her in between the fire bombing and the murder. We showed you the cards that were placed on her car that was at her brother Sydney's house. He disavowed that, but ladies and gentlemen of the jury, who would know, who else would

Case 3:12-cv-00327-MOC  Document 107  Filed 09/23/15  Page 107 of 200
1895

JA2778

Page 3927

know where Robin's car was and where Sydney lived?  Marc Barnette was in Roanoke in between the fire bombing and the murder to stalk her and taunt her and put those cards on her car.  He took the wire cutters up there and cut the phone lines so that Bertha Williams couldn't even call for help as she watched her daughter's murderer track her down and drag her around the neighborhood.  He chased Robin Williams through the neighborhood, dragging her and shooting her so that she could not get loose.  Again, ladies and gentlemen, there's never been a more planned and premeditated murder than Marc Barnette's killing of Robin Williams, and I ask you to find that unanimously and beyond a reasonable doubt.

The other factors that we want you to consider and ask you to consider for the imposition of the death penalty are the same factors that I talked to you about in relation to Donnie Allen, and I contend you should also find these as they relate to Robin Williams:  One, that the defendant will likely be a danger in the future.  Again, his history of violence is a good predictor and a common sense predictor of his future behavior.  The existence of multiple victims, that not only that day was Robin killed, but Donnie was killed earlier, and lastly, the harm caused to the Williams family as a result of the loss of Robin.

Remember back to the tearful testimony of her brothers, Sydney and Kenny.  They talked about how Robin was

Reported By: Steve S. Huseby, RPR
800-333-2082          Huseby, Inc., an Aff          n  (704) 333-9889          Fax (704) 372-4593
Case 3:12-cv-00327-MOC   Document 107   Filed 09/23/15   Page 108 of 200
1896

JA2779

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/12/2002

Page 3928

the glue that held that family together and how much they miss her. Who could forget Bertha Williams' testimony about the joy of knowing Robin and the pain of living without her and losing her, of having her only little girl to be stuck at 23. Think about Bertha Williams who waits for the phone to ring at night at 11:00 when Robin used to call her when she got to work to let her know that she was okay. Think about how Bertha Williams must feel every day when she goes into her kitchen and sees those shotgun blasts in the walls of her kitchen reminding her of that awful day. Think of the weight that she carries on her shoulders when she walks out of her front porch and looks across the street to the spot where her child was gunned down before her very eyes. Consider the weight that rests on the shoulders of the Allen family and Ms. Williams when you consider the weight that you will give that aggravating factor. And I contend to you, ladies and gentlemen, that that will outweigh the mitigating factors.

Now, the defense put on evidence of mitigating factors, and I talked to you earlier about who you heard from and who you didn't hear from. You did hear from the defendant, and he gave you an exhaustive life history, told you about his childhood, his teenage years and his adult years with his girlfriends, including Robin, and I contend to you, ladies and gentlemen, that the defendant's testimony is so filled with misinformation that you simply can't believe

Reported By: Steve S. Huseby, RPR
800-333-2082          Huseby, Inc., an Affi                a (704) 333-9889                Fax (704) 372-4593
Case 3:12-cv-00327-MOC   Document 107   Filed 09/23/15   Page 109 of 200
1897

JA2780

United States of America vs. Aquilia Marcivicci Barnette     3:97CR23-V
Proceedings Before Judge Richard L. Voorhees     8/12/2002

Page 3929

it.  I contend to you, ladies and gentlemen, that those hours that Marc Barnette was on the witness stand is just where he likes to be, the center of attention.

He got to weave you a tale in which he was either the victim or the hero.  And I contend to you, ladies and gentlemen, that watching him testify gave you a good look at why a good woman like Robin Williams would have ever been with him.  Marc Barnette talks a good game.  I contend to you, ladies and gentlemen, that his testimony was slick and rehearsed and that Marc Barnette is a good artist.  He is a spin artist.

He presented him in different ways during his testimony.  The first of those ways that I'm going to talk to you about is Marc Barnette is a minimizer.  Marc Barnette minimized his own behavior.  Take, for example, the way he described being fired from Camelot Music for sexual harassment.  He told you it was a misunderstanding after a game of slap ass.  The defense didn't call any of the Camelot people to bolster that or corroborate that statement.  We brought you Joanna Coleman, who told you that was no game, that was not a joke.  It was a constant, unwanted harassment, it was aggressive and it was not fun.  The defendant spun the story the way he wanted you to hear it and hoped that you would accept that without explanation.

You heard plenty of evidence about the defendant's

Reported Bv: Steve S. Huseby, RPR
800-333-2082          Huseby, Inc., an Af          on  (704) 333-9889          Fax (704) 372-4593
Case 3:12-cv-00327-MOC   Document 107   Filed 09/23/15   Page 110 of 200
1898

JA2781

Page 3930

so-called suicide attempts, especially his alleged suicide attempts after he killed Donnie and Robin. The defendant wants you to believe that as a sign of his remorse. I contend, ladies and gentlemen, that it never happened. The physical evidence showed you that it never happened. Remember Officer Hohl who showed you that after the murders he took -- he cut off the tail pipes from Donnie Allen's car, after Mr. Barnette told him about these suicide attempts, and he did that because the physical evidence did not back up Marc Barnette's own contention that he had attempted suicide not once but twice. It never happened. He made that story up to make himself look better, to make you feel sorry for him, and to show you that that was some sign of remorse. With a loaded shotgun in the car, Marc Barnette could have easily killed himself if he had really intended to. And with his history of suicide gestures that never happened, don't find it, don't find that he was remorseful.

He told you that he went to church. How do we know? He has church bulletin in the car; but after what you've heard from him, how do you know if he went to church, and if he did, why? He wants you to believe he went to pray for the souls of the people he just murdered. And I contend to you, ladies and gentlemen, that his spin of his story began immediately.

The defendant told you that he didn't even know if

Reported By: Steve S. Huseby, RPR
800-333-2082        Huseby, Inc., an Afl        ›n (704) 333-9889        Fax (704) 372-4593
Case 3:12-cv-00327-MOC   Document 107   Filed 09/23/15   Page 111 of 200
1899

JA2782

United States of America vs. Aquilia Marcivicci Barnette       3:97CR23-V
Proceedings Before Judge Richard L. Voorhees       8/12/2002

Page 3931

he shot Donnie Allen. He wants to minimize his responsibility. Two witnesses told you that scientific evidence showed that Donnie Allen, the shots that killed Donnie Allen were fired from close range. Todd Nordolf, the firearms expert, said those shots were fired from five feet or closer. Dr. Sullivan, the medical examiner, told you that those shots were fired from three feet or closer. That is a close range shot. The defendant wants you to believe that he didn't know, because he doesn't want to hold himself responsible and he doesn't want you to hold him responsible. I contend to you, ladies and gentlemen, that his contention that he didn't know that he even shot Donnie is a pathetic attempt to hold himself less responsible, and don't believe it.

Dr. Sullivan talked about the painfulness of those injuries. One shot broke Donnie Allen's upper arm bone. One shot broke the ball and socket joint. One shot went through his lungs. That is a painful injury. And don't you know, ladies and gentlemen, that Donnie Allen would have cried out. Marc Barnette knew exactly what he had done, but he wants you to believe that he doesn't.

In other parts of his testimony Marc Barnette portrayed himself as a victim. He came in here and said that his father beat him until his arm was tired, that his father would beat him for no reason. The truth is, ladies and

Reported By: Steve S. Huseby, RPR
800-333-2082       Huseby, Inc., an Affil:---- -- ------- (704) 333-9889       Fax (704) 372-4593
Case 3:12-cv-00327-MOC   Document 107   Filed 09/23/15   Page 112 of 200
1900

JA2783

United States of America vs. Aquilia Marcivicci Barnette                    3:97CR23-V
Proceedings Before Judge Richard L. Voorhees                    8/12/2002

Page 3932

gentlemen, when the defendant started telling his story to psychologists in 1997, he described a relatively happy childhood. He consistently reported that he felt overdisciplined by his father but as time went on he got more and more savvy with the way he should tell his story to psychologists, and his story got better and better. Pretty soon that became justification for his felony child abuse conviction that he had done in Georgia, so pretty soon it became that Marc Barnette's father had beat him with a coat hanger. He got better and better, his story spun and spun.

You did get to hear from Derrick Barnette, and I contend to you, ladies and gentlemen, that he did not back up the defendant's story. The discipline that he said that he gave the defendant was based on transgression of the family rules, do well in school and don't lie, and it was always related to that and it was never with a coat hanger. But Marc Barnette wants you to see him as a victim.

Marc Barnette told you that his parents neglected him. Did Marc Barnette have an ideal childhood? No, but he had two parents who worked and he had two parents who cared enough about him that when he was not doing well in school, they pulled him out of the public school system and put him in private school. Ask yourself, ladies and gentlemen, where the neglect comes in.

Marc Barnette also portrayed himself at times

Case 3:12-cv-00327-MOC  Document 190-107  Filed 09/23/15  Page 113 of 200

JA2784

United States of America vs. Aquilia Marcivicci Barnette     3:97CR23-V
Proceedings Before Judge Richard L. Voorhees                 8/12/2002

Page 3933

during his testimony as a hero.  The defendant portrayed himself, when he described his relationship with his prior girlfriends, as rescuing them from their terrible lives.  He minimized his own testimony.  He minimized the fact that a life with Marc Barnette is a life of pain, physical pain and mental pain, physical pain because you're going to get hit, kicked, hit with a baseball bat, have a knife put to your neck, kidnapped, raped, and fire bombed.  That's what life was like with Marc Barnette.  And he casually admitted to you during his testimony that he had done these crimes, but every single time that he had made that admission he couched it in terms and shaded it in terms that they had all done something to bring that on.

Marc Barnette blames Bennie Greene for Robin's burns.  You remember Investigator Tony Rice who was in here who told you that during that confession he said how could Bennie have let this happen?  He minimizes the consequences of his own actions and blames Bennie Greene for the fact that Robin had to jump out of the window, never seeing, of course, his own personal responsibility.

Marc Barnette told you that he encouraged Robin to spend time with her friends and family.  Bertha Williams told you that when Marc came into Robin's life she stopped seeing her, they had a Saturday morning ritual where they went shopping and that stopped.

Case 3:12-cv-00327-MOC   Document 107   Filed 09/23/15   Page 114 of 200
1902

JA2785

United States of America vs. Aquilia Marcivicci Barnette   3:97CR23-V
Proceedings Before Judge Richard L. Voorhees   8/12/2002

Page 3934

Angela Rosser came in here and told you that she was best friends with Robin through life, that as soon as Marc got with her she never saw her again. And when she did, she said Marc was difficult to be around. Marc told the story of when Angela's niece died, that he was looking for Robin so that he could comfort her in her time of need. Angela Rosser came in here, ladies and gentlemen, and I contend to you that Angela Rosser told you what happened that day, that Marc Barnette was tracking Robin down and trying to find her, frightened her so much that Robin jumped out of a moving car and Angela Rosser had to follow them home to protect Robin. I contend to you, ladies and gentlemen, that the defendant spun his story in the hopes that you would believe what he had to say.

One of the most important ways that the defendant wants you to believe he is a hero relates to his brother, Mario. And why is it important that that terrible home life described in detail by the defendant and by Dr. Mark Cunningham, why is it important that they bolster that? I contend to you, ladies and gentlemen, if that home environment that was detailed by those two witnesses was so terrible, so terrible that it created Marc Barnette the cold blooded killer, why didn't it create Mario Barnette the cold blooded killer, so Marc had to tell stories of shielding his brother from his parents' fights, Marc Barnette the

Reported By: Steve S. Huseby, RPR
800-333-2082        Huseby, Inc., an A          ion  (704) 333-9889        Fax (704) 372-4593
Case 3:12-cv-00327-MOC  Document 107  Filed 09/23/15  Page 115 of 200
1903

JA2786

United States of America vs. Aquilia Marcivicci Barnette    3:97CR23-V
Proceedings Before Judge Richard L. Voorhees    8/12/2002

Page 3935

superhero. And to make that theory fit, I contend to you, ladies and gentlemen, that the defense bends over backwards to create an atmosphere that was so bad that created Marc but Marc was such a hero that he shielded that from Mario. They cannot have it both ways, they cannot have it both ways.

But even if you take their word for it without looking very closely at the facts, as bad as they portrayed it to be, the defendant was strong enough, thoughtful enough, and resourceful enough to protect his brother and his cousin from this harm. So how can he be that resourceful and thoughtful and at the same time be the creation of this environment that made him into a killer? The simple truth is Marc Barnette made choices as an adult.

I contend to you, ladies and gentlemen, that Marc Barnette has recreated his life story with the help of expert witnesses to try to create a psychological justification now for things that he did and choices that he made. I contend to you, ladies and gentlemen, that the clearest explanation of Marc came from Dr. Dietz, Marc Barnette is narcissistic, he sees himself as the center of the universe and all things revolve around him and his needs; if anything gets out of whack, he reacts violently.

You heard from defense expert witnesses. I contend to you, ladies and gentlemen, that was carefully orchestrated testimony, it was designed to have you not look too closely

Reported By: Steve S. Huseby, RPR
800-333-2082        Huseby, Inc., an A        ion  (704) 333-9889        Fax (704) 372-4593
Case 3:12-cv-00327-MOC   Document 107   Filed 09/23/15   Page 116 of 200
1904

JA2787

United States of America vs. Aquilia Marcivicci Barnette    3:97CR23-V
Proceedings Before Judge Richard L. Voorhees    8/12/2002

Page 3936

at the facts that they contend support their opinions. You got quick snapshots, you got uncorroborated information, and yet it always showed that Marc was not responsible for his choices.

Ask yourself when you consider their testimony, what do I know about the quality of information that they used to form their opinions? Dr. Mark Cunningham came in here and testified to an exhaustive family history. He made granted pronouncements about prior generations of relatives that he wants you to hold accountable for Marc's actions now that he made as an adult. He wants to accept at face value information that he bases his opinion on.

You only got to hear a couple of members of the Barnette family. You got to hear Derrick Barnette, and as I've told you before, I contend to you that Derrick Barnette does not fit into the profile that the defense experts wanted you to believe. I contend he came across as an intelligent and successful person whose discipline within the family was based, while it might have been overboard, it was still based on transgression of the rules and it was not as the defense wants you to believe. Dr. Cunningham conceded on cross-examination that the defendant may be the one with the tendency to maximize his childhood in order to make an excuse for his behavior.

You got to see Mario Barnette. They grew up in the

Case 3:12-cv-00327-MOC   Document 905-07   Filed 09/23/15   Page 117 of 200

JA2788

United States of America vs. Aquilia Marcivicci Barnette    3:97CR23-V
Proceedings Before Judge Richard L. Voorhees    8/12/2002

Page 3937

exact same environment, and Mario Barnette is a successful young man working and going to college. Do you know why? I contend to you, ladies and gentlemen, that Mario Barnette simply made different choices than Marc Barnette made. Ask yourself when you look at the defense expert witnesses what opportunity do you have to judge the credibility of those facts, who did you hear about that you didn't hear from. You heard a lot about Sonia Barnette. And according to the defense, she's the one to blame for Marc Barnette's actions. Ask yourself why didn't you hear from her, because they hope that you're going to simply take their word for who she is and how she is. You heard about her, but you didn't hear from her.

You heard about Tom Barnette, Derrick Barnette's father and Marc Barnette's grandfather. Dr. Cunningham called him, quote, an alcoholic playboy. Prior testimony on cross-examination revealed that -- had him coming up to Philadelphia, had the defendant coming to Philadelphia to visit Tom Barnette, who said that he had been taken to the zoo and taken around to historical sites because he wanted Marc to know the history of the city. You heard about him, but you didn't hear from him.

You heard about Jesse Cooper, the defendant's grandfather. This is a man who has apparently taken care of his extended family over the course of the years.

Reported By: Steve S. Huseby, RPR
800-333-2082    Huseby, Inc., an Affili---- -- ------- (704) 333-9889    Fax (704) 372-4593
Case 3:12-cv-00327-MOC   Document 107   Filed 09/23/15   Page 118 of 200
1906

JA2789

Page 3938

Dr. Cunningham labeled him as psychiatrically disabled.  What psychiatric tests had been conducted on Jesse Cooper?  None. They simply want you to believe at face value the formula that they contend excuses Marc Barnette's behavior.

Marc Barnette made choices.  The defense didn't give you the tools to find their mitigating factors.  Dr. Cunningham came in here with these so-called facts.  He had interviewed the defendant for 18 hours.  There's no tape. There's no transcript.  There's no way for us to know what the defendant said during those 18 hours, but he gave you ten or so quotes from the defendant and said, this is what he told me over 18 hours, but there was simply no way to know what was really said.

Ask yourself about the expert witnesses.  How helpful were their opinions?  The defense wants you to believe that the defendant is not responsible for the -- or couldn't appreciate the wrongfulness of his conduct.  That's their first mitigating factor.  And I urge you not to find that mitigating factor.  There has simple been no evidence that he did not appreciate the wrongfulness of his conduct.

I submit to you that you have heard nothing that the defendant did anything but make choices, deadly choices, choices for which he should now be held accountable.

The defense wants you to believe that his only choice was to strap a mag light onto a sawed off shotgun and

Case 3:12-cv-00327-MOC  Document 107  Filed 09/23/15  Page 119 of 200
1907

JA2790

United States of America vs. Aquilia Marcivicci Barnette    3:97CR23-V
Proceedings Before Judge Richard L. Voorhees    8/12/2002

Page 3939

crouch in the woods and wait for someone to car-jack, that his only choice was to march Donnie Allen into the woods and pump three shotgun blasts into his back, that his only choice was to drive to Roanoke, shotgun his way into that house and chase Robin down until he found her and kill her with two shotgun blasts. That was his only choice? Give me a break.

Contrast that, ladies and gentlemen, with the Government's expert, Dr. Park Dietz. Dr. Dietz looked you in the eye and said, Marc Barnette was not psychotic at the time of these crimes, Marc Barnette's choices were not predetermined by he childhood, childhood risk factors do not causes adult behavior, Marc Barnette's behavior was not programmed. He told you this was two crimes with two distinct motives, this was not a domestic homicide, and he told you that Marc Barnette has told so many stories in the past that it's not possible to know what happened. Plain language, plain opinions.

The defense is going to get up here and ask you to find various mitigating factors, and I ask you as you considering those to think carefully and thoughtfully first, has this been proven to me by a preponderance of the evidence. And I contend to you that there are mitigating factors that you simply should not find based upon that standard.

And secondly as you consider those, consider

Reported By: Steve S. Huseby, RPR
800-333-2082    Huseby, Inc., an Affi    n (704) 333-9889    Fax (704) 372-4593
Case 3:12-cv-00327-MOC   Document 107   Filed 09/23/15   Page 120 of 200
1908

JA2791

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/12/2002

Page 3940

carefully whether those mitigating factors have mitigating value. The Court is going to instruct you that you should find some of those mitigating factors to be true, but your primary role when you're in that deliberation room is to decide the weight, and I ask you to be very careful in doing so.

Ladies and gentlemen, in this case, with the help of law enforcement, with the help of the defendant's living victims, with the help of eyewitnesses, and with the help of the Allen family and the Williams family, Ms. Rose and I have done our job, and now we're asking you to do yours. We've all spoken for Robin and we've all spoken for Donnie, and now we're asking you to do the same. You are now their voice. Speak for Donnie and speak for Robin. Speak for the Williams family and speak for the Allen family. Speak with a strong, united voice to everyone who is listening, and speak to Marc Barnette and tell him that he is ultimately accountable, put your 12 voices together and speak the words of justice and sentence the defendant to death.

MS. LAWSON: Good morning. When we first came in here, Harold Bender and I told you that we, like you, were shocked and surprised and curious and wondering at these terrible crimes. We told you that what we wanted to do is what we could do to help you make a decision. We went and we looked and we talked to people and we talked to people who

Reported By: Steve S. Huseby, RPR
800-333-2082          Huseby, Inc., an Affi···  ·· ···  · ·  ·  a (704) 333-9889          Fax (704) 372-4593

Case 3:12-cv-00327-MOC   Document 107   Filed 09/23/15   Page 121 of 200
1909

JA2792

Page 3941

had more expertise in this area than we did and we thought that we had some explanation for you, not excuses, no excuses for Marc Barnette's crimes, but to help you understand what happened here so that you could make a just decision.

And you remember that when we were in jury selection, all of you said that you could consider a sentence of life imprisonment without the possibility of release for a man who had killed two people, Robin Williams, Donald Allen, planned murder, no self defense and no insanity, and that's where we are. He's guilty of that as described, but that's not the end of it. All of you knew that you would have to choose between two punishments, you'd have to choose between life in prison without the possibility of release or death. And what we set out to do is give you some tools that would help you understand. And I think we've just been called slick, but that's not our purpose. Our purpose is to help you understand and give you information.

What you need to understand first of all is Marc Barnette is sick, has been his entire life. All he wanted his entire life was love, and at the same time he repelled love. That's because, as Dr. Halleck told you, he has a borderline personality disorder. You see, who of us would want to be Marc Barnette? Think of it that way. Who among us would choose to be that way? When he was placed in the arms of his 14-year-old mother, she was of the same age that

Case 3:12-cv-00327-MOC   Document 107   Filed 09/23/15   Page 122 of 200
1910

JA2793

United States of America vs. Aquilia Marcivicci Barnette     3:97CR23-V
Proceedings Before Judge Richard L. Voorhees     8/12/2002

Page 3942

middle school students are out carrying around bags of flour to see that they don't want to become parents. She was troubled, undoubtedly troubled, as you've heard, unable to take care of a child and relying on her mother to provide the things that a child needs in order to love, in order to grow, in order to be intact. And those things didn't happen for him, and you know they didn't happen.

Who chose to raise him like that? Who chose to leave him in a position where he would get a borderline personality disorder? There's nobody who has disagreed that Marc Barnette had that borderline personality disorder. Dr. Halleck told you that it is a very serious and painful illness. And he grew up with that. He didn't choose it.

And Dr. Halleck, how can he be ridiculed when he has been practicing medicine and healing people since before most of the people in this room were born, since 1953. And he's seen Marc Barnette since 1997, and he came in here and he told you that Marc Barnette has for his whole life suffered from a serious disorder.

And what are the hallmarks of that disorder? Those are the things that you saw described not only by the doctors, all of them, including the Government's doctor, Dr. Dietz, but they also are proven to have existed throughout Marc Barnette's entire childhood.

I made some notes, but remember the evidence as you

Case 3:12-cv-00327-MOC   Document 107   Filed 09/23/15   Page 123 of 200

1911

JA2794

Page 3943

heard it, don't accept it from me, but you may remember some of these things. Dr. Halleck says that the borderline personality disorder is characterized by fear of abandonment, very mixed up about people, rapid fluctuations in mood, paranoia, difficult to feel loved, insecure, untrusting, identity problems, and susceptible to depression. Now, that's the definition of what Marc Barnette suffers from. Dr. Halleck told you that, Dr. Cunningham told you that, Dr. Dietz told you that.

Now, who else told you about that? Tasha Herd, he was insecure, he was jealous, he tried to be controlling. That's the Government's witness, and they want you to believe that we are just overreaching and making stuff up.

But you know there are good qualities to Marc Barnette notwithstanding what happened to him and the disorder that he suffered from. And you saw that again from the Government's witnesses. Tasha Herd, when they got together, he was good and loving and they cared about each other. And after a few months into this relationship when they were both so young, things went bad. He was jealous, he was controlling, he was insecure, he was paranoid about where she was, he feared abandonment. She saw that when she was 14 years old, and Dr. Halleck, in his 70's, told you that's Marc Barnette, not just now, but when he was a teenager. He didn't choose to be that way.

Reported By: Steve S. Huseby, RPR
800-333-2082            Huseby, Inc., an Affiliate of Spherion  (704) 333-9889            Fax (704) 372-4593
Case 3:12-cv-00327-MOC  Document 107  Filed 09/23/15  Page 124 of 200
1912
JA2795

United States of America vs. Aquilia Marcivicci Barnette          3:97CR23-V
Proceedings Before Judge Richard L. Voorhees          8/12/2002

Page 3944

Dr. Halleck told you, and Dr. Cunningham told you, and Dr. Dietz told you that Marc Barnette was depressed, seriously depressed at the time of these crimes. Now, you can't think that Marc Barnette thought that up as an excuse, because Tasha Herd told you, the Government's witness, told you that when he was a teenager and they were together, he would sit in the closet naked and crying. Is that normal? Is that the way you would want your children to be? There's plenty wrong with that young man, and he can be called narcissistic or whatever bad you want to say about him, but it's not right. And he didn't choose the suffering that must have led him to sit in a closet crying, he didn't choose not to be treated, and everything he did to Tasha Herd shows you how sick he was.

You don't choose to be like that, you don't choose to sit in a closet, you don't choose to have borderline personality disorder that is a very serious and painful disorder, according to Dr. Halleck. And Dr. Dietz agrees that he's got borderline personality disorder. It's not like there is controversy or conflict about that.

He goes to be with Crystal, and she told you, and these were her words, as I recall them, that things were great in the beginning, he cooked, he cleaned, he worked. Here's a young man who is trying to be right, he is trying to do good things. He's trying to be what every parent wants

Reported By: Steve S. Huseby, RPR
800-333-2082          Huseby, Inc., an Affi··· ·· ·· ··· ı (704) 333-9889          Fax (704) 372-4593
Case 3:12-cv-00327-MOC   Document 107   Filed 09/23/15   Page 125 of 200
1913

JA2796

United States of America vs. Aquilia Marcivicci Barnette        3:97CR23-V
Proceedings Before Judge Richard L. Voorhees                8/12/2002

Page 3945

their child to be.  He's trying to be a good partner to the women in his life.  And then things start happening that are not good.  His personality starts surfacing, notwithstanding his best efforts not to have that happen.  He didn't choose to have this borderline personality disorder.  What he chose, what he tried to choose was to be a good boyfriend, a good parent to Crystal's children, at least in the beginning, and then the paranoia and the jealousy that Dr. Halleck and Dr. Cunningham and Dr. Dietz tells you is a part of who he is, surfaces.  And he and Crystal have problems, he doesn't want her dressing up, he doesn't want her wearing make-up, he doesn't want her going out.

Now, where in the name of heaven did he learn what happens when women get dressed up and put on make-up and go out?  Does it harken back to when mom said, I'm going out to the store and the feelings that he had because of that?  Of course it does.  You know that.  You've got common sense. You rely on your reason and common sense in addition to the expert witnesses.  How can that not affect a child?  How can that not not shape who we are?  Of course it does.  You don't even need psychiatrists and psychologists to know that.  But it's there and they agree it's there.

And he hit Crystal's children with a coat hanger, he freely admitted that to you from the stand.  And you know what?  That was wrong.  You know what else?  It's a good

Reported By: Steve S. Huseby, RPR
800-333-2082            Huseby, Inc., an Affiliate of Spherion  (704) 333-9889            Fax (704) 372-4593
Case 3:12-cv-00327-MOC   Document 107   Filed 09/23/15   Page 126 of 200
1914

JA2797

United States of America vs. Aquilia Marcivicci Barnette    3:97CR23-V
Proceedings Before Judge Richard L. Voorhees    8/12/2002

Page 3946

thing he didn't use the weapon of choice in the house he grew up in, because it would have been a hammer or a frying pan. It's wrong, but you can see where that comes from.

So he's got this disorder and he moves on. He comes to Charlotte and he hooks up with Alicia Chambers. And he wants to be loved. They hook up, they are happy, things are going well. And because he has this inner whatever that tries to make himself be loved, he also pushes people away. You saw that with Crystal, with Tasha. He was such a proud father with Tasha. When Angelica was born, he went out and got the newspaper showing the date of her birth, he painted the nursery, he went to all the neonatal appointments. That's a young man who is trying to be normal. That's a young man who is trying to do right. And yet in each relationship, he falls apart, he loses it. His underlying personality disorder overwhelms what he is trying to do to do right. That's a tremendous conflict and has to be tremendously painful.

When he gets to Charlotte, he gets involved with Alicia. And by then the repercussions of everything he is doing really spiral out of control. Again, in the beginning, things are good, Alicia told you that, we don't need a psychiatrist to tell you that. He was trying.

Now, I don't know at what point things got bad between Marc and Alicia, but he hit her, which is what he had

Reported By: Steve S. Huseby, RPR
800-333-2082    Huseby, Inc., an Aff        n (704) 333-9889    Fax (704) 372-4593
Case 3:12-cv-00327-MOC  Document 157  Filed 09/23/15  Page 127 of 200
1915

JA2798

Page 3947

learned to do, what he had done in the past. The painful thing about that is that they kept getting back together, and I think it's pretty clear in Alicia's case, you may or may not agree, but in Alicia's case there was a certain amount of getting back together and mixed signals between Marc and Alicia. But the bottom line is that you could tell Marc was getting sicker and sicker. He continued to cry. He told you that. We didn't tell you that. Marc -- it was no surprise coming to you from Marc, because you already heard it from the Government's witnesses. He would become incoherent. He would become babbling when he was upset about this relationship issue. He continued to be jealous and possessive, and that's the borderline personality disorder. That's the product of how he is. And he didn't choose that.

What he wanted to choose was to do the right thing, to be a good mate, to be loved, and to love back. But it never ever happened. And when Alicia rejected him, as you might expect, given the way he was treating her, he didn't handle that at all well, did he? By Alicia's testimony, by Investigator Adama's testimony, he would do everything he could to get to Alicia, crying, begging on the telephone, please let's make up, please let me love you, please let's get together. A healthy person would have walked away, but not Marc Barnette, because in every relationship, the begging -- Crystal came in here and told you that while he

Reported By: Steve S. Huseby, RPR
800-333-2082          Huseby, Inc., an Aff          n (704) 333-9889          Fax (704) 372-4593
Case 3:12-cv-00327-MOC   Document 107   Filed 09/23/15   Page 128 of 200
1916

JA2799

United States of America vs. Aquilia Marcivicci Barnette       3:97CR23-V
Proceedings Before Judge Richard L. Voorhees       8/12/2002

Page 3948

was sitting in jail down in Georgia for hitting her kids, he was calling her mother's house all the time, several times a day, let's get back together, what's wrong. That's pathetic. And that's the product of an illness that he didn't choose.

And you can see how devastating that illness is. And as Dr. Halleck told you, that illness leads to a high susceptibility to depression, depression that sends you spiralling out of control, that sends him spiralling out of control.

Now, what happens with Alicia that lets you know how sick he is? In addition to the crying, the weeping, the incredible attempts to get back together when the rest of us know there's no chance of that, there is the business of November the 9th. November the 9th, when he rushes into her apartment, or where she is staying with her uncle, he carries her out of an apartment, knowing that she was on the phone. That's terrible behavior and it's out of control. He carries her to her mother's houses -- to his mother's house. And, of course, there nobody does anything about it. The police come, they charge him with felonious restraint, kidnapping, for taking her out, and three days later he's back. He wants to talk to Alicia, and it doesn't matter who is there, where he is, he needs to talk to Alicia. He goes to a Bojangle's, 4:00 o'clock in the afternoon with a knife and in broad daylight, in view of everyone, attempts to take her away to

Case 3:12-cv-00327-MOC   Document 107   Filed 09/23/15   Page 129 of 200

JA2800

United States of America vs. Aquilia Marcivicci Barnette        3:97CR23-V
Proceedings Before Judge Richard L. Voorhees        8/12/2002

Page 3949

talk to her.  He didn't stab her right there, although he behaved in a very frightening manner.  That's the borderline personality disorder that he didn't choose.  That's really crazy behavior.

And you heard Brent McCrickard come in here and tell you how he was swinging the knife at people who were trying to come to Alicia's aid.  That's not rational conduct, and you know that.  And you don't need a doctor to tell you that, but Dr. Cunningham told you how Marc Barnette can cycle because of his mood swings in and out of desperation, in and out of trying to figure out what to do, in and out of trying to be a good man while he can't, or has tremendous difficulty doing it.

Come March of the next year, you know from the police reports, from Alicia Chambers, and, in fact, from Marc Barnette, who has admitted all of this to you, he entered the home of Jasper Chambers, Alicia's uncle, and ran past several people to get to Alicia and he acted like he didn't even know they were there, totally oblivious to what else was around him, just like he was out at the Bojangles.  When he gets like that, he sees nothing and thinks of nothing but his destination.  He doesn't choose that.  Dr. Halleck told you how painful that is to be like that.

When he is convicted of felonious restraint, Marc is put on probation, but by then Marc had found the thing

Reported By: Steve S. Huseby, RPR
800-333-2082        Huseby, Inc., an Affiliate of Spherion (704) 333-9889        Fax (704) 372-4593
Case 3:12-cv-00327-MOC  Document 107  Filed 09/23/15  Page 130 of 200
1918

JA2801

Page 3950

that would solve all his problems, solve all his pain.  Her

name was Robin Williams.  And he loved her, and he preferred

to be with her than to stick around and be on probation.  And

that's wrong, but he found, once again, what he needed, which

was love, to love and be loved, to be part of a family.  And

so instead of staying on probation here, he went to Roanoke.

Now, you heard people talk about how Robin changed

when Marc went to Roanoke, and they blame it on him, and

that's understandable, because he has done these terrible

things.  But for him, Robin moved out of her mother's home to

be with him.  And you might want to suppose that maybe she

loved him enough to be with him all the time and she loved

him enough to spend time away from her friends to be with

him, and he loved her back and you know that.  You know that.

Now, Marc would get upset.  You heard Ms. Williams

talk about Marc being upset.  And you heard Angela Rosser

talk about how out of control Marc could get.  She came and

told you about Marc weeping in the street trying to get to

Robin, weeping in the street, something he has been doing

since he was a teenager.

He's got a very serious borderline personality

disorder that he did not choose.  And at times it got so bad

that the depression kicked in and he would be weeping in the

closet, on the telephone, and in the street.  And every bit

of that was related to his domestic partners, because you

Reported By: Steve S. Huseby, RPR
800-333-2082                    Huseby, Inc., an Affi¨ · ˹ˢ˹ · · n (704) 333-9889                    Fax (704) 372-4593
Case 3:12-cv-00327-MOC  Document 107  Filed 09/23/15  Page 131 of 200
1919

JA2802

United States of America vs. Aquilia Marcivicci Barnette          3:97CR23-V
Proceedings Before Judge Richard L. Voorhees                      8/12/2002

Page 3951

know he worked.  Steve Austin told you that he consistently kept a job.  Everybody who talked about that talked about him working at Camelot Music, at Bojangles, at other places.  He tried to do the right thing, and some of us succeed and some of us fail.

When Robin breaks up with him in early April of 1996, he comes home, and he is depressed, he is crying, he's not working, he's not succeeding in finding a job.  Those things don't pull you out of depression.  They make it worse.  And he's medicating his depression with alcohol, not something he's done before.  You will recall Crystal told you, no drugs, no drinking.  Mario told you that he began to notice he was drinking.  Marc told you he was drinking a lot.  And Dr. Cunningham told you that alcohol is a disinhibitor, it makes you less in control of your faculties, your decision making, and anybody who has seen anybody drinking heavily knows that, you don't need the doctors, but that's what they told you.

Marc goes through the same thing he's gone through with Tasha, with Crystal, with Alicia, when he is thinking about Robin.  He's up on the phone, they tell you, crying, trying to talk to her, weeping.

Now, you may not think that his weeping is real, but it's still a part of his personality.  That's the way he reacts to this kind of pain.  He's distressed.  He's upset.

Reported By: Steve S. Huseby, RPR
800-333-2082          Huseby, Inc., an Affiliate of Spherion  (704) 333-9889          Fax (704) 372-4593
Case 3:12-cv-00327-MOC  Document 107  Filed 09/23/15  Page 132 of 200
1920

JA2803

Page 3952

And as Dr. Halleck and Dr. Cunningham and Dr. Dietz told you, he was experiencing irrational, obsessive thoughts of Robin. Even Dr. Dietz, who says that he is narcissistic, also agrees with Dr. Halleck that he was experiencing major depression.

Now, Dr. Dietz didn't talk to Tasha or the Barnette family. He just read records. And he told you that although he and Dr. Halleck might disagree on the origin of the major depression, he was still suffering from those symptoms. He agreed that there was obsessional thought, repeated thinking about Robin and then thinking about what he would do because of the way he felt during this major depression. And he talked about how his thoughts keep changing, his plans keep changing, and that ties into a phrase that Marc used to use when he was on the stand. He said, my heart was beating in my head. Now, that's a sign of emotion that is out of control. It's a sign of emotion that goes from the heart into the brain. My heart is beating inside my head. And Dr. Dietz, Dr. Halleck, and Dr. Cunningham talk about the obsession, the intrusive thoughts, the constant thoughts. Dr. Dietz, the Government's expert, said, kept making decisions, kept changing his mind, ruminating, preoccupied, his thinking changing all of the time. He shaved his head so he could think better, remove the hair and somehow my mind will clear. He's not thinking better. He continues to think irrational thoughts.

United States of America vs. Aquilia Marcivicci Barnette          3:97CR23-V
Proceedings Before Judge Richard L. Voorhees                      8/12/2002

Page 3953

Now, he does have a lack of insight, he always has. You know from his relationships with Alicia and Tasha that he doesn't understand why people don't want to be around him. That's part of the narcissism, but that's a feature of his borderline personality disorder. The government's expert told you that, Dr. Dietz, and Dr. Dietz also said that he was a little bit haughty during their interview, but that's consistent with being a narcissistic personality, too. He didn't choose to have that. That's a feature of borderline personality disorder.

Now, Dr. Cunningham talked to you about a catathymic homicide. Marc is the perfect candidate to commit something like that. Catathymic homicide has been recognized as a process since the early 1900's, and it's where you have a family history of violence towards women, you have a need to attach, a desperation to stay attached, and you're not complete unless you are attached. And when you're not attached, the borderline personality disorder is extremely painful.

And in the past with Alicia and Crystal and Tasha, Marc Barnette got out of that cycle with nothing more than violence toward these women. And I'm not minimizing that, but that's what happened.

But with Robin he told you, I felt more complete than I had in my entire life. When Robin and he separated,

Reported By: Steve S. Huseby, RPR
Huseby, Inc., an Affiliate of Spherion  (704) 333-9889
800-333-2082                                                    Fax (704) 372-4593

Case 3:12-cv-00327-MOC   Document 107-2  Filed 09/23/15   Page 134 of 200
1922

JA2805

United States of America vs. Aquilia Marcivicci Barnette  3:97CR23-V
Proceedings Before Judge Richard L. Voorhees  8/12/2002

Page 3954

honestly his own fault, he was devastated. He went into that major depression in early April and he went out of control and he was unable to pull himself out of that catathymic phase, that A, that Dr. Dietz told you was basically correct. He was obsessed to get to Robin, and he didn't know why. And he didn't have a plan. He was either going to kill her or kill himself and her. He was going to get the police to kill him. He was going to take her to get Bennie Greene to come out so that he could talk to him or kill him. And these are all the thoughts that are swirling in that man's mind. And his thoughts were irrational. Dr. Dietz says, it's a significant distortion in thinking, out of control.

And as you heard from the Government's own witness, the man who has seen Jeffrey Dahlmer and the Unabomber and he's from California and he's a celebrity, Marc Barnette was out of control. And what he told you is that different doctors in good faith can disagree about what a person's mental state is. But you know from the facts that Marc Barnette believed that he had to get to Robin. That's depression and personality disorder and some disinhibition from alcohol. And he wasn't so drunk that he couldn't drive to Roanoke, but his thinking was looser, his controls were looser. And you remember Dr. Cunningham told you about that incubation period where he's literally at war with himself. I can't do this, I have to do it, I need to do it, doing it

Case 3:12-cv-00327-MOC Document 207 Filed 09/23/15 Page 135 of 200

1923

JA2806

United States of America vs. Aquilia Marcivicci Barnette 3:97CR23-V
Proceedings Before Judge Richard L. Voorhees 8/12/2002

Page 3955

is wrong. He's got a conscience. You have seen it. You have heard Dr. Halleck talk about it, about how tortured he is, I can't do it, I have to do it, please don't make me do it. That is a sick man.

All his violence through his life has been in the context of a domestic situation. He wants to love, he wants to be loved, and that didn't happen for him. And he didn't choose to be the person he is. He made choices for which you are going to punish him. But remember that part of that is something that he didn't choose. He chose his actions, there's no excuse, he's responsible and you're going to punish him. But there is mitigation in this because he didn't choose all of it.

And those are the things that you think about when you decide what punishment you're going to impose.

THE COURT: Ms. Lawson, would this be as good a time as any for a morning break?

MS. LAWSON: Sure.

THE COURT: All right. Members of the jury, please hold what you've got, keep an open mind about the case, please don't discuss it, and we will call for you in about 15 minutes. Thank you.

(Jury out at 11:05 a.m.)

(Brief recess.)

(Jury in at 11:29 a.m.)

Reported By: Steve S. Huseby, RPR
800-333-2082     Huseby, Inc., an Affiliate of Spherion (704) 333-9889     Fax (704) 372-4593
Case 3:12-cv-00327-MOC   Document 107   Filed 09/23/15   Page 136 of 200
1924

JA2807

Page 3956

THE COURT:  Ms. Lawson.

MS. LAWSON:  We were talking -- well, I was talking about Marc as these crimes unfolded.  We know he was depressed, by every expert, major depression.  We know he was having irrational thoughts.  We know his mind was cycling, changing his mind, having irrational thoughts, plans.  And by the time he committed the fire bombing, it's obvious that he had lost control.

He loved Robin, and he was so angry that she was with a man and he couldn't understand why she didn't want to be with him and he wanted to know and he wanted that man to come out.  He was lost, totally absorbed in his irrational thoughts.  When he came home from that and found out that the police were looking for him, not unexpectedly, and he didn't turn himself in.

By then Marc Barnette belonged either in a jail or a hospital.  He shouldn't have been out on the street.  He was living with his family and they didn't put him in a hospital.  He was dangerous to himself and to other people at that point.  He should have been committed.  Instead, he was left to ruminate in his room.

The only person who really recognized what was going on with him and tried to do something about it was Steve Austin, his friend.  Now, Steve may have been young enough at that point that he didn't know how bad off Marc

JA2808

United States of America vs. Aquilia Marcivicci Barnette          3:97CR23-V
Proceedings Before Judge Richard L. Voorhees          8/12/2002

Page 3957

was, but he knew he was bad enough off that he tried to take him out to clubs, tried to cheer him up, tried to introduce him to other girls. And as Marc told you, that just didn't interest him and he went back home. He was in the throws of what every doctor who came in here told you was a major depression.

Now, Ms. Tompkins talked about Marc lying to you. Somehow, I took his testimony to be among the most truthful, candid imaginable. He told you about things that he hadn't even admitted to other people.

Didn't that strike you as truthful? Did he strike you as perverse? You have to make up your own mind about that, because you're the judges of the credibility of the witnesses. But he told you, after hearing the testimony in this courtroom about Robin Williams' family finding cards that you have seen on the windshield of her car, after he's admitted to everything else, that he didn't do that. Now, why would he not admit that? It wasn't a crime to leave those on the windshield. I submit to you he was so sick by then that if he did it, he doesn't even remember it. Why would he not tell you that that happened? It's his handwriting. They found other cards in the car.

He was totally depressed and totally out of his mind in terms of being focused on Robin. And it was getting worse. And he went home and he should have been in the

Reported By: Steve S. Huseby, RPR
800-333-2082          Huseby, Inc., an Aff            n (704) 333-9889          Fax (704) 372-4593
Case 3:12-cv-00327-MOC   Document 103-6   Filed 09/23/15   Page 138 of 200
1926

JA2809

Page 3958

hospital, for his own protection and for the protection of others. But nobody either cared or noticed or did anything about it. And he was left ruminating, obsessing, and thinking.

Now, Dr. Burgess, Dr. Halleck, Dr. Cunningham, and Dr. Dietz all told you the same thing, he was focused on getting to Robin. And what he did -- and this is the only point where Dr. Dietz disagrees, and reasonable men can disagree, he says, reasonable professionals, men and women, is he wanted to get to Robin so badly that he used any means necessary to get to her, and Donald Allen, as Dr. Burgess told you, was an obstacle and an opportunity to get to Robin. An you can decide for yourselves whether Marc decided to go out and kill Donnie Allen or whether what he wanted, what he needed, because of his disordered thinking, was a car.

Now, Marc himself referred to the murder of Donnie Allen as senseless. While he was weeping on the stand about it and apologizing, he recognized that, as we all do, as senseless. But, you know, I was thinking about the word senseless, because we don't look at it too well, but it means without sense, and that's exactly where Marc Barnette was, he was operating on auto pilot and it was without sense. And as upsetting as that is, it fully describes Marc Barnette's mental state at that time.

Dr. Dietz told you that he's done a lot of

Reported By: Steve S. Huseby, RPR
800-333-2082        Huseby, Inc., an Aff        n (704) 333-9889        Fax (704) 372-4593
Case 3:12-cv-00327-MOC   Document 107   Filed 09/23/15   Page 139 of 200
1927

JA2810

Page 3959

workplace violence studies, he's an expert in it, and he told you about cases in which he's done a review of people who went barging into a workplace with a target, a person in mind, and on the way killed other people who were not involved at all, killed strangers to get to their target. Do you remember that testimony? And that's exactly what happened here. As tragic as it is, Marc Barnette had to get to Robin Williams. And the same thing that happened to Donnie Allen as has happened in other cases in which Dr. Dietz has been on review or involved.

You know what, you don't measure the value of a person's life by what you do to the person who took it. You measure it in terms of the memories and the joy that they brought other people and the quality of their life. That's how you measure it. You don't measure life by punishment.

Now, where we are here is making a decision about what to do with Marc Barnette. And the burden, as you heard, is on the government to prove to you beyond a reasonable doubt what they want you to do, which is to have him executed.

Now, Marc is guilty of this crime beyond a reasonable doubt, but that doesn't have anything to do with the decision you make here. What you have to decide here is whether the government has persuaded you beyond a reasonable doubt that Marc should be put to death.

Reported By: Steve S. Huseby, RPR
800-333-2082          Huseby, Inc., an Aff'''··· ·· ·······n (704) 333-9889          Fax (704) 372-4593
Case 3:12-cv-00327-MOC   Document 107   Filed 09/23/15   Page 140 of 200
1928

JA2811

United States of America vs. Aquilia Marcivicci Barnette 3:97CR23-V
Proceedings Before Judge Richard L. Voorhees 8/12/2002

Page 3960

And, you know, there are different ways of defining reasonable doubt, but this is one of them, you talk about the different kinds of thinking, decisions, issues that you think about when you're talking about reasonable doubt. You know, you may have all doubt, you may not know what to think. Reasonable doubt is the highest level of conviction that a person could have, and the Government's burden is to prove the things it has to prove, including the punishment that they are suggesting to you, beyond a reasonable doubt, more than the top of this chart, higher than the top of this chart. What they have to do is prove to each and every one of you beyond a reasonable doubt that death is the only appropriate punishment for Marc Barnette, particularly when considered with the alternate punishment of life without the possibility of release.

Now, we talk about Marc's violent behavior throughout his lifetime. In talking about it realistically, you know that every bit of that happened in the context of a domestic relationship. Well, he will never have another domestic relationship. He will never become involved with a woman to the point where he gets so attached and feels the needs that he's got to the extent that he becomes violent or hurts somebody. He's in a place where there's so much structure that doesn't happen. And you know that that's what his violence was tied to because you know that for the past

United States of America vs. Aquilia Marcivicci Barnette                3:97CR23-V
Proceedings Before Judge Richard L. Voorhees                8/12/2002

Page 3961

six years he not only hasn't hurt anybody, he hasn't stepped out of line. You know where his violence has been directed, Dr. Burgess talked to you about that, it comes from the domestic situation, and that won't exist ever again.

Now, when you talk about the process that you're going through, think of it as a line. You have to think about whether the government has proved to you aggravating circumstances or factors. Those are the things that they told you about, that Ms. Tompkins told you about in her opening argument.

And you have to just think about them, deliberate about them and decide whether the government has proven the existence of one or more of those to you beyond a reasonable doubt, up here, okay?

Then you consider mitigating circumstances. Now, those don't have to be proven to you beyond a reasonable doubt. They have to be proven by the preponderance of the evidence, more likely than not. So all of you can think about the mitigating circumstances, and you can not only decide whether they have been established to you more likely than not, but you don't have to be unanimous. So whereas for aggravating circumstances you have to be unanimous in finding them beyond a reasonable doubt, for the mitigating circumstances that will be advanced to you, you only have to find them by the preponderance of the evidence. Not only

Case 3:12-cv-00327-MOC   Document 107   Filed 09/23/15   Page 142 of 200
1930

United States of America vs. Aquilia Marcivicci Barnette        3:97CR23-V
Proceedings Before Judge Richard L. Voorhees                    8/12/2002

Page 3962

that, you don't have to be unanimous. If one of you finds a mitigating circumstance, you can consider that in your weighing process in your deliberations. And you give all these things weight and you make a decision, because here's the bottom line question here, and that is, what's the punishment going to be, what are you going to decide on? And this is where you weigh mitigating and aggravating.

And the burden is on the government here to prove to all of you and beyond a reasonable doubt that death is the only appropriate punishment when considered with life without the possibility of release, and that is a huge burden because they have got to prove it unanimously and beyond a reasonable doubt to get to death. And if they haven't satisfied you beyond a reasonable doubt and unanimously that death is the only appropriate punishment for this man, then you will impose a sentence of life imprisonment.

Now, do you see any reason why you need to go to death? Marc Barnette is not violent in a prison environment. His actions are the product of a debilitating, devastating mental illness, an underlying personality disorder coupled with major depression.

And Harold Bender will talk to you some more about some other mitigating factors, but mitigation is so important that you can make up your own mitigating factors. If from the evidence you think of something that hasn't even been

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees
3:97CR23-V
8/12/2002

Page 3963

suggested to you, there are blanks on the form to write it in. We may not have thought of what you may consider to be mitigating, but it's your decision and you develop your own mitigation from your thoughts and your ideas and what you believe about Marc.

But the bottom line is, you never ever have to vote for death. And in never doing that, if that's what you choose, you know that Marc Barnette will be sentenced to life imprisonment without the possibility of release in a federal penitentiary.

In a pretty short period of time, Judge Voorhees is going to read voluminous instructions to you. And I see some of you squinting. These instructions will tell you the law. They will tell you about the weighing mitigating and aggravating. They will tell you that the government must prove that this crime is so aggravated that it calls for imposition of the sentence of death. If they can't prove that, then the sentence will be life imprisonment without the possibility of release. But Judge Voorhees will tell you that it's your duty as jurors to consult with one another and to deliberate in an effort to reach agreement, if you can, without violence to individual judgment.

Each of you must decide the case for yourself but only after an impartial consideration of the evidence of the case with your fellow jurors. In the course of your

Case 3:12-cv-00327-MOC   Document 107   Filed 09/23/15   Page 144 of 200
1932

JA2815

United States of America vs. Aquilia Marcivicci Barnette          3:97CR23-V
Proceedings Before Judge Richard L. Voorhees          8/12/2002

Page 3964

deliberations, do not hesitate to reexamine your own views and change your opinion if you're convinced it's erroneous, but do not surrender your honest conviction as to the weight or effect of the evidence solely because of the opinion of your fellow jurors or for the mere purpose of reaching a verdict. You will hear that once during these instructions. You listen for it, because it's important, but also it signals that we're near the end of the instructions.

And three times during these instructions Judge Voorhees will tell you this, the members of the jury are never required to vote for a sentence of death. In other ways, in other words, when weighing mitigating and aggravating factors, if any, there is no required result.

The Government's burden is to convince, each and every one of you, to the certainty of beyond a reasonable doubt that death is the only punishment for Marc Barnette when considered with life without the possibility of release. If you are not satisfied of that unanimously, then his sentence will be life imprisonment without the possibility of release.

Each and every one of you need to make this decision for yourselves, without doing violence to your individual judgment. And it takes 12 people to sentence somebody to death. You have to be unanimous. And if you're not, don't let expediency or the desire to reach a verdict or

Page 3965

unreasonable concession to the other jurors against your own

will cause you to vote for anything but life imprisonment

without the possibility of release.

Thank you for your attention.

THE COURT: Members of the jury, we will take

our lunch break at this time, and ask you to be back with us

at half past the hour of 1:00, make that a quarter past.

That will give you an hour and a half. Thank you for your

attention to the case. Remember all of your usual

instructions. Thank you.

(Jury out at 11:46 a.m.)

(Lunch recess).

THE COURT: Ready for the jury.

(Jury in at 1:26 p.m.)

THE COURT: The jury is with us.

MR. BENDER: Thank you, Your Honor. May it

please the Court, ladies and gentlemen of the jury, what we

have gone through and what you have done since the very first

day you came in here and were oriented and heard the facts,

the brief overview of this case, what you heard about was a

senseless, irrational crime for which there is no legal

justification. If there were a legal justification, we

wouldn't be here, because the jury that got us to this point

may have found self-defense or legal insanity or some legal

justification that would not have caused us to be here, so

Reported By: Steve S. Huseby, RPR
800-333-2082          Huseby, Inc., an Affi··   ·· · · ı (704) 333-9889          Fax (704) 372-4593
Case 3:12-cv-00327-MOC   Document 107   Filed 09/23/15   Page 146 of 200
1934

JA2817

United States of America vs. Aquilia Marcivicci Barnette   3:97CR23-V
Proceedings Before Judge Richard L. Voorhees   8/12/2002

Page 3966

there is no legal justification for this senseless irrational

crime committed by Marc Barnette that resulted in tragic

consequences as you have heard, and heard from the very first

day you came in here.

But we believe that we can rely on reasonable men

and women in this process, and we believe that you are the

reasonable, responsible people you told us you were when we

questioned each of you, that you can take the irrational,

senseless, and emotional aspects of this case and look at it

reasonably. And I'm going to try in the few minutes I have

to help you do that as best I can.

First I want to look at all -- have you look at all

the times in which there was no intervention in this matter.

As Ms. Lawson told you, he was a sick man. He was

irrational. In some ways he was out of control. You've

heard all the descriptions of Marc. His family made no

intervention in this matter. Steve Austin tried his best in

his immature mind he could to take him out and get his mind

off of it. His church made no intervention in this matter.

There was no guidance counselor to intervene in this matter.

And you know what? Most regrettably, there was no

intervention by the Charlotte-Mecklenburg Police Department.

Now, we have been accused of being slick, not

bringing in Jesse Cooper, who at this very moment, as you

know, as you have heard, is lying on his death bed in a VA

Case 3:12-cv-00327-MOC   Document 187   Filed 09/23/15   Page 147 of 200
1935

JA2818

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/12/2002

Page 3967

hospital dying of pancreatic cancer. We didn't have any psychological testimony by Jesse Cooper, because you know what, Jesse Cooper gave part of his body and most of his mind in the service of this country, and you heard about that. So it's not fair and it's not just to accuse us of not bringing in Jesse Cooper in this matter.

This is not an issue of who is to blame. We know who is to blame. Everybody in this courtroom knows who's to blame. Marc Barnette is to blame. He is responsible for these crimes. And make no doubt about it, although he has accepted that responsibility, he is looking at, at best-case scenario, life without the possibility of release, a severe punishment. Some people think that is more severe than the death penalty.

Now, the government put up Dr. Peter Carlson to tell you about the classification, high severity classification, he's always going to be there, but they tried to minimize it. And I think I asked Dr. Carlson, you're not trying to imply or say to this jury that the Bureau of Prisons is soft on crime? Of course not was his response, of course not.

But let me just give you a way to think about life imprisonment without the possibility of release. Think for a moment about the nicest hotel you've ever stayed in, it could be a vacation spot, it could be a spa, it could be a Super 8.

Case 3:12-cv-00327-MOC   Document 107   Filed 09/23/15   Page 148 of 200
1936

JA2819

Page 3968

I don't know what it is. But you think for a moment of the nicest hotel you've ever stayed in. Now think about that door to your room is locked. You've got plush surroundings, a big bed, but that door is locked. Well, 7:00 in the morning somebody comes by and unlocks the door for you. And you look out the window, there are no bars on your window because it's a nice hotel, but you look out the window and you see people walking back and forth, going on their daily work, going to work, maybe even on their little cell phones talking. You can never walk that street. You will never be able to walk that street. Oh, you can walk the halls, because everybody else's door is unlocked, and you can walk the halls and you can chat to the other folks on that floor, but you can never go in the elevator, you can't go to the lobby. Oh, you've got room service, but you don't pick up the phone and call. The same man that unlocks your door in the morning brings you your tray of food, it's what he wants to bring you, not what you want. But you're in this really plush surrounding. But you're going to stay there for the rest of your life, every day for the rest of your life. And when night falls, somebody locks your door, puts you in that room.

Now, think a moment, while you're in that room locked up, of something bad you have done to somebody. It may just be an unkind word, something you did to a loved one

Reported By: Steve S. Huseby, RPR
800-333-2082            Huseby, Inc., an Affi_____ __ _____ (704) 333-9889            Fax (704) 372-4593

Case 3:12-cv-00327-MOC   Document 107   Filed 09/23/15   Page 149 of 200
1937

JA2820

United States of America vs. Aquilia Marcivicci Barnette    3:97CR23-V
Proceedings Before Judge Richard L. Voorhees    8/12/2002

Page 3969

that hurt them, not physically, but perhaps emotionally or mentally. You said something that you regretted to say to them. Now, when you wake up in the morning and you open your eyes in that very nice room, you've got to remember that hurt that you caused to that loved one, and that's going to stay with you every day for the rest of your life.

That is far better, that scenario is far better than anything Marc Barnette would ever know. His door is steel bars, he sleeps on a cot, a metal bunk, and he will do that for the rest of his life. And as he told you, when he wakes up every morning, and has for the last six years, and will do so for however long he lives, his first thought is what he did to Robin and her family and what he did to Donnie Allen and his family. And that is life without the possibility of release for Marc Barnette, and that is a severe, severe punishment.

Now, the judge, I believe, will tell you that when we're talking about mitigating circumstances, and that's this area right here with the preponderance of the evidence more likely than not on the chart, Ms. Lawson went through that and I don't need to go back through it, he will instruct you that three of the mitigating circumstances have been determined by the Court by the preponderance of the evidence.

If you all can't see that, just raise your hand. I assume everybody can see that. These are mitigating factors

Reported By: Steve S. Huseby, RPR
800-333-2082    Huseby, Inc., an Affi¨  ¨  ¨ n (704) 333-9889    Fax (704) 372-4593
Case 3:12-cv-00327-MOC  Document 107  Filed 09/23/15  Page 150 of 200
1938

JA2821

United States of America vs. Aquilia Marcivicci Barnette    3:97CR23-V
Proceedings Before Judge Richard L. Voorhees    8/12/2002

Page 3970

that reasonable minds cannot disagree about.  The Court has found that and has said all of the evidence indicates that this is found by the preponderance of the evidence, reasonable minds can't disagree about it, so you should mark your verdict form accordingly.

Number 1, Marc Barnette was neglected by his mother.  There's absolutely no doubt about that.  That's probably been proven up here, certainly by a preponderance of the evidence.  Think about the lack of furniture, no bed, no food, all the other things that you can think about that you've heard about, the neglect that went on in that household, staying out days at a time, partying, doing whatever it is that she did.  Think about the cherry red Corvette, that some man in her life, not Rick Barnette, not Derrick Barnette, but some other man in her life, convinced her that she had to get rid of the Chrysler New Yorker and get a cherry red Corvette.  If Sonia ever wanted to take the kids to school, which she didn't, she couldn't have, she didn't have enough seats for them.

We've been accused of not putting up Ms. Barnette.  She's here in the courtroom.  She's sat here every day and she has listened to all this.  She has listened to every word of it, and every word of it is true unfortunately, unfortunately.

Think about that in conjunction with the abuse that

Page 3971

was -- that he suffered at the hands of Derrick Barnette.
All of us are fathers, all of us are mothers.  God, I don't
want to come into court and I don't want to say the things
that I have got to say, but Derrick Barnette came up here and
said, yeah, I did hit him with my fist, I slapped him.  And
you know what?  For whatever reason, I took that belt with
the studs in it, or the holes in it, the metal, that Mario
described, and I whipped him.  And not only did I whip him,
he was naked and he was jumping around, and, yeah, I hit him
on his penis and his scrotum because he was jumping around.

Now, think about that.  That's one of the things
you're going to have to decide.  The Court hasn't decided
that, but that's one of them, was that he was abused by his
father.  And he was.  And he was.

And think about the story that Mario told you about
his thumb.  It happened to Mario, but it just goes to show
you what was going on in his family as Marc was growing up
and as Marc was trying his best in that environment to
protect Mario from this.  Mario said, the abuse I
experienced, the violence I experienced in that home was
behind the wall, it's on the other side of the wall.  It's on
the other side of the wall because Marc Barnette took him and
put him in his room and let him play with his favorite toys
so that he didn't have to grow up in this same kind of
environment.

Case 3:12-cv-00327-MOC   Document 107   Filed 09/23/15   Page 152 of 200

1940

JA2823

United States of America vs. Aquilia Marcivicci Barnette 3:97CR23-V
Proceedings Before Judge Richard L. Voorhees 8/12/2002

Page 3972

There was repeated violence, repeated violence. You know, think about, if you would, a young man, or any of you, as a young man, getting on the school bus with your friends, going off to class, the bus turns the corner and there in the middle of the street blocking the school bus are your mother and dad in that orange BMW that he described fighting each other. How embarrassing. How embarrassing to have that happen to you.

The other -- one of the other things that the judge will tell you has been found by a preponderance of the evidence, and you should so find, Marc Barnette turned himself in to the police.

Now, again, you've heard all of the testimony about that, he did, he came back, turned himself in, had his mother call and say, to the FBI, they came out there, knew where to go, apparently, came out there and he turned himself in. He accepted responsibility for what he had done. When he was initially questioned, he accepted responsibility.

They asked him about the missing person, Donnie Allen, and what does he do? He writes out on a piece of paper the diagram and the location. What else does he do? After he has given them the confession to what he did to Robin, they say, take us to show us where Donnie Allen's body is, and he does. He does. They drive him out there. He cooperated with the police. He turned himself in. He helped

Case 3:12-cv-00327-MOC   Document 107   Filed 09/23/15   Page 153 of 200
1941

JA2824

United States of America vs. Aquilia Marcivicci Barnette    3:97CR23-V
Proceedings Before Judge Richard L. Voorhees    8/12/2002

Page 3973

them locate Donnie Allen's body. And he confessed to them. He confessed to them. He told them exactly what happened.

The other thing that the judge will instruct you about in this regard is that reasonable minds cannot disagree that Marc Barnette was a model prisoner. Every piece of evidence that you've heard in this courtroom was that he has been. The people from Mecklenburg County jail, the three correctional officers that came in here, all told you and I think used the word model prisoner when they were talking to you, and there's never been any question about that. For six years, six long years, he has never, ever had even as much as a write-up. Think about that for a minute. Think about that.

In your Holiday Inn or Western or Four Seasons or Super 8 that you're in, think about how difficult it would be to live every day with people in that hallway that you have access to and never ever say a cross word to them. Can you do that at your work? Have you done that for the last six years at your work, at your home, at your church, went for six years with not even a cross word? Not only to the correction officer but to the inmates as well, the people you're sharing the hallway with. He functions in a structured environment, structured environment, functions well.

Now, think about the Catholic school. He went to

Reported By: Steve S. Huseby, RPR
800-333-2082    Huseby, Inc., an Affi'·-·- -· ·--·--- (704) 333-9889    Fax (704) 372-4593
Case 3:12-cv-00327-MOC  Document 107  Filed 09/23/15  Page 154 of 200
1942

JA2825

United States of America vs. Aquilia Marcivicci Barnette    3:97CR23-V
Proceedings Before Judge Richard L. Voorhees    8/12/2002

Page 3974

the Catholic school one year, I believe it was the fifth

grade. His response to that was, the best year I ever had,

the best year I ever had. Why? Because of the discipline,

the structure. He adapts well. He never had any write-ups

in the Catholic school, never got a whipping when he came

home because he had acted out in school, because the

structure and the discipline is what he was craving, it's

what he has been all along.

In the Mecklenburg County jail, he's in the general

population parts of the time. You've heard he's been locked

down 23 hours a day and out one, and that was for 12 months,

one hour. Can't get in much trouble there. But in the

Mecklenburg County jail, when you're in the general

population, I think he even said there were fights that went

on in general population, and he stayed away, never got in

any trouble, never had a single write-up. So he functions in

a structured environment. He has been and will continue to

be a model prisoner.

And I think Dr. Carlson may have said it best when

he said that what we hope and what we want are inmates who

are model inmates, we appreciate that, and we give them a

little more, we reward them just a little bit, you know, it

may be with allowing them to be an orderly, clean toilets,

sweep up the hall, but what we have found is that these

people have value in their lives. Even incarcerated for the

Reported By: Steve S. Huseby, RPR
800-333-2082        Huseby, Inc., an Aff⋯     ⋯ ⋯ ⋯ n (704) 333-9889        Fax (704) 372-4593
Case 3:12-cv-00327-MOC  Document 107  Filed 09/23/15  Page 155 of 200
1945

JA2826

Page 3975

rest of his life without the possibility of release, he has usefulness, he has value, will continue to have value.

You know, he did get to that phase two that we talked about, and while in phase two, this may not be your cup of tea, you may not like car pictures, but the young man has talent, the young man has usefulness, the young man has value. That's important. That is important because he will never be in society again. Marc Barnette has forfeited the right, his right to be in a free society, but he has not forfeited his right to be incarcerated for the rest of his life in whatever society that may be and whatever structure that may be.

He is a different man. He has demonstrated that. He is not the same man he was in the spring and summer of 1996. He is a different man. And he will continue to be that different man throughout what the rest of his life may be. He has shown remorse. He has shown remorse.

You know, I think it was Mike Sanders, one of the police officers, who came in and said when they took him out there to Morrisfield Drive and he pointed to where Donnie Allen's body was, he cried. He cried. Mike Sanders said he cried. We showed you the little snippet of the taped confession, wasn't very audible, but you could sure see Marc Barnette crying.

Of course, you know, they are going to get up here

Reported By: Steve S. Huseby, RPR
800-333-2082                Huseby, Inc., an Afl            n (704) 333-9889                Fax (704) 372-4593
Case 3:12-cv-00327-MOC   Document 107   Filed 09/23/15   Page 156 of 200
1944

JA2827

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/12/2002

Page 3976

and say, well, he cried because he got caught, he turned himself in, and of course part of that is for his own situation, of course it is, but part of that, and the major part of that, is remorse for what he did to Donnie Allen and Robin Williams and their family. And you saw it, and you heard it. You heard it and saw it right there. And he took responsibility and he said, I'm sorry, I am sorry. They didn't do anything to me, but I took them away from you, and for that I am deeply and truly sorry.

Bob West, oh, that all of us would have a spiritual advisor like Bob West. It would probably be a better place if all of us had the Bob Wests of the world in our spiritual body. Bob West goes to see him, drives from Roanoke, Virginia to Terre Haute to see him and help him, and Bob West says he has shown genuine remorse; he is struggling with forgiveness, he may never get that; but in his spirituality, he has shown remorse and he is struggling with forgiveness.

You saw him when Ms. Rose got up there, take this gun, show me how you load this gun. The last time I touched that gun, I killed two people. I've vowed never to touch that gun again. That's genuine remorse.

One of the other mitigating circumstances that you're going to be asked to consider is what impact, harmful impact, is this execution going to have on Mario and Angelica and little Marc, if you are permitted to consider that. You

Reported By: Steve S. Huseby, RPR
800-333-2082        Huseby, Inc., an Affil'  ·  ·  ·  · ⌐ ⌐ ·  ·  ·  ₁ (704) 333-9889        Fax (704) 372-4593

Case 3:12-cv-00327-MOC   Document 107   Filed 09/23/15   Page 157 of 200
1945

JA2828

Page 3977

heard Mario up here, and sure he's interested, he's his brother, but he loves him. He appreciates everything he did for him. He doesn't want to see him executed. He wants him to continue to be his big brother for whatever advice he may give him from that hell hole where he's going to be living. He wants it. He needs it. And you can ridicule all you want to the fact that Marc Barnette, when he took up with Crystal Dennis and all those other women and they were garnishing part of his wages when he was working, but he might have sent a check here or there or whatever, but he didn't support those kids, you know that, you've heard that. Maybe he thought he didn't deserve to, I don't know. But you know, you can ridicule the last month or six weeks where those children, Angelica, Marc, have tried to establish some kind of relationship with them. God bless Tasha Tollman, what a wonderful mother, what a wonderful person. She has kept these photographs, and you have seen them, to show her kids, this is who your daddy is. And, yeah, he doesn't send money, he doesn't attend the kindergarten graduation, he wasn't there when these pictures were made, he's your father, he's your father. And, you know, some of us, some folks, I should say, may have had absent fathers in their lives. And suddenly, as Ahamd Cooper, finds out, this is my father, and I'm a grown man, I'm 20 something years old, but you know what, I want to establish a relationship with that person,

Reported By: Steve S. Huseby, RPR
800-333-2082                    Huseby, Inc., an Affi¨ ¨ ¨ ¨ ¨ ¨ (704) 333-9889                    Fax (704) 372-4593
Case 3:12-cv-00327-MOC   Document 107   Filed 09/23/15   Page 158 of 200
1946

JA2829

Page 3978

Ahmad's words were it makes me complete, it makes me complete. That's what Marc and Angelica deserve. They want to have that relationship with their father, wherever he may be. They want to be able to correspond to him. They want to know him in whatever way, and it will be harmful to them if he's executed.

You know, the worst people, the Ted Kaczynski, the Susan Smiths, the Jeffrey Dahlmers, don't show remorse, they don't turn themselves in, they don't confess, they don't change their lives and the way in which they lead their lives, but Marc did all those things. He is not the worst of the worst.

Now, when you get back there, I hope I've touched all of the mitigating circumstances, I think I have in one way or the other, probably not by number, but you can take a look at them, but when you get back there and you start this weighing process and you think about how I feel inside about these mitigating circumstances and what it means to be a model prisoner, to be remorseful, to do the things I have tried to outline for you here and you feel because of all of those things, or any one of those things, that Marc should not suffer the ultimate punishment of death because I haven't been proven beyond a reasonable doubt that the only, only punishment appropriate in this case is death, that that other severe punishment is better and it's what I feel, then you

United States of America vs. Aquilia Marcivicci Barnette          3:97CR23-V
Proceedings Before Judge Richard L. Voorhees          8/12/2002

Page 3979

walk in your own shoes, as we talked to you about, and you let the others, respect them enough to walk in their shoes, and don't do it solely because of the opinion for the mere purpose of returning a verdict. Walk in your shoes, as you promised us that you would do, and allow the others to do the same.

The judge will tell you, and Ms. Lawson said three times, in his instructions, members of the jury are never required to vote for a sentence of death, never. And if anybody gets up here and says, it is your duty to sentence him to death, it is not. It is your duty to make the weighing process, to make the system work. It is never your duty to return one verdict or the other. So don't let anybody tell you that it is, because you're never required to vote for a sentence of death. It is your individual, personal decision in this matter.

Now, before I sit down, I've got to tell you about Park Dietz. You all remember Dr. Park Dietz, the celebrity psychologist, examined, evaluates all these people, he told you who they were, but he also has got this TAG Group, Threat Assessment Group, and the Murder 9:00 to 5:00, and the murder 9:00 to 5:00, as he said on the stand, is basically about domestic violence in the workplace. There are four people. These people are mass murderers. One of them is a postal worker, killed a couple of people, I think, innocent people.

Reported By: Steve S. Huseby, RPR
800-333-2082          Huseby, Inc., an Affiliate of Spherion  (704) 333-9889          Fax (704) 372-4593
Case 3:12-cv-00327-MOC  Document 107  Filed 09/23/15  Page 160 of 200
1948

JA2831

United States of America vs. Aquilia Marcivicci Barnette 3:97CR23-V
Proceedings Before Judge Richard L. Voorhees 8/12/2002

Page 3980

One of them killed seven people, injured four on his way through the building to get to the person that he wanted to get to, that he was fixated on, that he was paranoid about, that he was depressed about, that he had threatened, and then I think one of them had shot three people and one of them shot two and then committed suicide.

But anyway, in his Murder 9:00 to 5:00, all of that, the person who killed seven innocent people on his way to get to the domestic partner that he wanted, that person, according to Parker Dietz, is not evil. None of these people are evil. These people -- it's all about being in trouble, these are troubled people.

Marc Barnette is not an evil person. He was a very troubled young man who has changed his life for the better, because he has taken full responsibility, because he is remorseful, has changed his life and can be a better person than he is today in that structured environment. Because of all of those things, life is the just and appropriate punishment, and I'd ask you to so find and return your sentencing recommendation as life without the possibility of release.

I thank you for your time.

MS. ROSE: May it please the Court, members of the jury, the defendant has asked you to show him mercy; but when Donnie and Robin begged for mercy, he showed them none.

Reported By: Steve S. Huseby, RPR
800-333-2082        Huseby, Inc., an Aff¨ ¨ ¨   n (704) 333-9889        Fax (704) 372-4593
Case 3:12-cv-00327-MOC   Document 107   Filed 09/23/15   Page 161 of 200
1949

JA2832

United States of America vs. Aquilia Marcivicci Barnette                3:97CR23-V
Proceedings Before Judge Richard L. Voorhees                8/12/2002

Page 3981

He has asked you to consider his life, but he showed their lives no consideration. The defendant has said consider the fact that my life has value, but the value of life was not on his mind when he left his home on June 21st. He didn't leave his home thinking about life. He left his home with one thing on his mind, and that was to kill.

Now, the first aggravating factor you're going to consider is substantial planning and premeditation, and the substantial planning and premeditation for these murders began back in April. Back in April, he had made up his mind that if I can't have Robin, nobody will. So this is what he did. This is what he did to show Robin, if I can't have you, nobody will. He burned her home. And what was the effect of that? This was the effect of that. She was alive. She was disfigured, but she was alive. And that wasn't enough. He wanted her dead, because if he couldn't have her, nobody would. She lived.

And so he left Roanoke. He heard she lived. Her suffering wasn't enough. He began to formulate a plan to make sure that if he couldn't have her, nobody would. Thus begins the premeditation and deliberation. And you heard about it, how he got the gun, how he packed the bag with the tools he would need and how he went to the corner of Morrisfield and Billy Graham and waited to kill. He sat there crouching in the weeds, waiting for the right moment,

Reported By: Steve S. Huseby, RPR
800-333-2082          Huseby, Inc., an Affil'··· ·· ·· ··-··-··¬ (704) 333-9889          Fax (704) 372-4593

Case 3:12-cv-00327-MOC   Document 107   Filed 09/23/15   Page 162 of 200
1950

JA2833

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/12/2002

Page 3982

the right car, to kill. He had a plan, and he followed it. It was ruthless, it was calculated, and it was blood thirsty, but it was a plan and he followed it.

And when he was done with Donnie Allen, when he left Donnie in the ditch to rot, you know what he did then? He drove to Roanoke. And when he got to Roanoke, the scene at the Williams' home was like a commando attack on an enemy fort, only here it was the women and children he targeted, only here it was the women and children that would fall within his plan, and from the moment he stepped from Donnie's car, when he cut the phone wires and until the moment he got into the car and left, he was following his plan.

And it was that plan that brings us here, members of the jury, and that is why that aggravating factor of substantial planning and premeditation is so important. That's why it deserves a significant amount of weight, because it is the reason we're here. And that long time planning, the ruthless calculated, blood thirsty way that he carried out these murders shows you that he had the ability to plan, and that weighs mightily, mightily in favor of death.

You're also going to consider the aggravating factors specifically related to Donnie's murder of pecuniary gain. Pecuniary gain is killing a man because he has something that you want. Donnie Allen had something the

Reported By: Steve S. Huseby, RPR
Huseby, Inc., an Affili--- -- ------- (704) 333-9889        Fax (704) 372-4593
800-333-2082

Case 3:12-cv-00327-MOC   Document 107   Filed 09/23/15   Page 163 of 200
1951

JA2834

United States of America vs. Aquilia Marcivicci Barnette          3:97CR23-V
Proceedings Before Judge Richard L. Voorhees                    8/12/2002

Page 3983

defendant wanted. How chilling is it to think about pulling up to a red light in your city and a blood thirsty killer is crouched in the weeds with a gun waiting to kill you because you have something that they want. He wants your car and he wants your money. It's frightening. It's frightening to think that you would be killed for those reasons, and that's why pecuniary gain is a significant aggravating factor. It shows a reckless disregard for life.

But the defense says to you, he did not have the ability to appreciate the wrongfulness of his conduct. His capacity to appreciate the wrongness of his conduct was impaired. That's why they are mitigating factors.

But you've heard about free will. And if he was so sick, if he was so very sick that he couldn't think, that he couldn't plan, as they told you, we wouldn't be here. And as you heard from Dr. Halleck, the prisons are full of these borderline personality people. You know why? Because they are mean, ruthless killers. It doesn't mean you're crazy. What it says is that I have a choice. We heard that from everybody. It's about a choice.

And don't you forget about a human's free will. There's nobody that made the defendant do anything. It's free will. It's responsibility. And you've heard that you should consider the mitigating factor that the defendant has a history of untreated emotional problems.

Reported By: Steve S. Huseby, RPR
800-333-2082          Huseby, Inc., an Affi··· ·· · · ·  (704) 333-9889          Fax (704) 372-4593
Case 3:12-cv-00327-MOC   Document 107   Filed 09/23/15   Page 164 of 200
1952

JA2835

Page 3984

Now, we do know that he has a history of violent conduct, and we do know that because of his violent conduct he came into the court system twice. He was convicted of felonies twice. Twice the judge looked at him and said, society will not tolerate your violence. Twice the Court said to him, you must have counseling. He was ordered by the court to get counseling. And if he was in such pain, if he was in such suffering, why didn't he do what his probation officers asked him to on those occasions? If he was suffering as we have heard, why does he not get help when he was ordered to get it? No. It's free will. It's a conscious decision, and it's a choice.

And they say, well, you know, he's not going to have any women in prison. Donnie Allen was not involved in a relationship with the defendant. Anthony Britt was not involved in a relationship with the defendant. Sonji Hill was not involved in a relationship with the defendant. Those children were not involved in a domestic relationship with the defendant. That doesn't fly.

They also tell you about their mitigator of remorse. You heard the defendant testify, and I asked him, did you think, did you really think that Robin had something going on with Bennie? Do you still believe that? Yes. You heard Robin's sweet voice on that tape saying, Bennie is just a friend. I asked him, I said, you heard her, you heard her

Reported By: Steve S. Huseby, RPR
800-333-2082 Huseby, Inc., an Affi.            ı (704) 333-9889 Fax (704) 372-4593
Case 3:12-cv-00327-MOC Document 107 Filed 09/23/15 Page 165 of 200
1953

JA2836

United States of America vs. Aquilia Marcivicci Barnette   3:97CR23-V
Proceedings Before Judge Richard L. Voorhees   8/12/2002

Page 3985

say he's just a friend, don't you believe it? No. If he were remorseful, he would let go, but no, he couldn't have her, and nobody will. And that's why these people are dead.

You're going to hear about an aggravating factor related specifically to Robin's murder, and that's that other people were put within the harmful scope. Ms. TOMPKINS talked a little bit about that. But once again, it shows the abilities -- the defendant's ability to appreciate what was happening at that time, that whoever got in his way was in the harmful scope.

Fortunately for Bertha Williams he was distracted by the front door as Robin ran out. Sonji Hill obeyed his command when he pointed the gun at her and gave her an order. She went in the house. She told you, I went in the house because I thought he was going to shoot me. Those kinds of thoughts, those kind of actions, that kind of reckless disregard for life, members of the jury, are why these aggravating factors are so weighing.

The aggravating factor that we contend, submit to you, weighs more than all their mitigating factors together is that of victim impact, and that is the loss, the continuing loss and the effect on the living.

They say to you, what about his brother and his children, should he receive the death penalty? Members of the jury, he is a guilty man. He has been convicted of

Case 3:12-cv-00327-MOC   Document 107   Filed 09/23/15   Page 166 of 200
1954

JA2837

Page 3986

three, three crimes which carry the death penalty. He is a guilty man. Two innocent people were murdered, two innocent people were terrorized, two innocent people never got the chance that he got to tell their story. There is no comparison, and that deserves no weight.

Robin died, having survived his first attempt. She lived after the fire. And she spent the last six weeks of her life looking over her shoulder. And on June 22nd she fought her last battle with the defendant. How must it have felt to run from your home in terror? What must she have thought as she was chased by a killer? What was Robin thinking when she tripped and she fell and she was pulled to her feet by a killer? What was she thinking when she looked at her mother, the woman with whom she shared a bond and a special relationship, saw terror and helplessness in her mother's eyes, the girl who would have never hurt her mother, in her last living moments had to look at terror and haplessness in her mother's eyes? Consider that in your weighing process.

What was Robin thinking as she was shot through the back, through her heart, and as she fell dying at her mother's feet? Let's recall those moments.

(Whereupon, an audiotape played in open court).

MS. ROSE: Do you think Robin heard her mother call the name of Jesus? Do you think Robin heard the wail of

Case 3:12-cv-00327-MOC   Document 55-7   Filed 09/23/15   Page 167 of 200

1955

JA2838

Page 3987

a mother who has just witnessed her child's murder?  We will never know.  We can't know that.  But what we do know is that Bertha Williams will never be the same.  To lose a child is inexplicably dreadful, but to lose a child to a murder, to witness that murder is something I can't articulate, I can't imagine that loss, and none of you probably want to.  What is the impact on the living?  There is not one mitigator, nor do all their mitigators, outweigh that loss.

What is the impact on the Allen family as they sat by the phone waiting for a call, as they sat at home hoping that this wonderful young man would come home?  Imagine those moments, those days, those hours of wondering, where is my baby.  How can you measure that?  How can you measure that?

And even after his car was found, you heard Bob Allen tell you, we thought he might be still alive.  This was hope against all hope, the kind of hope that only a parent can hold out for.  And Bob Allen, knowing it had been hot, the very last thing he did on that Tuesday morning after Donnie's car was found on Monday night, was to get two jugs of cold water, because he thought Donnie might be tied up somewhere and be thirsty.  And he didn't know that he had driven by Donnie's body as it was in the ditch.

And what of the impact on the Allen family of the condition of their child's body?  Once they were finally able to say good-bye, the hot sun and the insects had destroyed

Reported By: Steve S. Huseby, RPR
800-333-2082            Huseby, Inc., an Affili~*~ ~f C~h~~i~~ (704) 333-9889            Fax (704) 372-4593
Case 3:12-cv-00327-MOC   Document 107   Filed 09/23/15   Page 168 of 200
1956

JA2839

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/12/2002

Page 3988

their son's body such that it could only be identified by dental records. Imagine that. Can you? Will you? And how do you weigh that whenever you go back to consider victim impact and the aggravating factors? How do you weigh that?

Life in prison. It's not life as we know it, but it's life. While the defendant is pursuing his hobby of painting his pictures, Donnie and Robin are in a dark and silent grave. When the defendant steps out into the recreation yard and feels sunshine on his face and breathes fresh air in his lungs, Donnie and Robin are in a dark and silent grave.

When the defendant's family and his minister come to visit him, to hug him, to show him love, Donnie and Robin are in dark and silent grave, and their families will never get that chance. Is that justice? Is that justice, members of the jury? Is that befitting of this crime? Is that punishment befitting of this crime?

And the defendant says, I will be thinking of them each and every moment. No, he won't. He'll be making plans, building relationships, seeing his family, friends, working, painting, living life, and Donnie and Robin are in a dark and silent grave. Why does he deserve more than they have? Is that justice? Why is he more deserving of fresh air and sunshine than Donnie and Robin who are in a dark and silent grave? Why is his life more valuable than those two precious

United States of America vs. Aquilia Marcivicci Barnette    3:97CR23-V
Proceedings Before Judge Richard L. Voorhees    8/12/2002

Page 3989

lives that he took?  Ask yourself if that is justice.

And when you go back there and you begin to weigh those aggravating and those mitigating factors, ask yourself this question, how much does a teardrop of a grieving parent weigh?  How much grief and sorrow is in a single teardrop?  Because there have been a lot shed for these two wonderful people, two innocent people.  Put that on your scales when you ask yourself what should we do.

And the judge is going to give you the law, and that law is going to guide you in your deliberations.  And you heard much about this weighing process and it is not a numbers factor.  It's weight.  It's impact.  It's the substantialness of those factors.

Now, I want you to think back to the day that you were selected as a juror.  Each of you was asked, can you render a verdict of death?  And each of you said yes.  The time has come.  The facts say that is the appropriate punishment.  The law says it is a justified punishment.  The defendant has been convicted of three, three offenses, and there's only a few within the law of the land that says, the death penalty is appropriate, and he's been convicted of three of them.

The death penalty is appropriate.  It's justified.  And the law of the land says it is applicable.  The defendant is deserving of no less.  The facts deserve no less.  Why?

Reported By: Steve S. Huseby, RPR
800-333-2082       Huseby, Inc., an Affiliate of Spherion  (704) 333-9889       Fax (704) 372-4593
Case 3:12-cv-00327-MOC  Document 107  Filed 09/23/15  Page 170 of 200
1958

JA2841

United States of America vs. Aquilia Marcivicci Barnette    3:97CR23-V
Proceedings Before Judge Richard L. Voorhees    8/12/2002

Page 3990

Why, members of the jury, would he deserve more than Donnie and Robin?

Anything less than the death penalty will be giving him a victory, a victory for what he has done, because he doesn't want the death penalty, and you will be giving him a victory in saying your life means more to us than these two.

Your verdict of death will bring justice to this community. Your verdict of death is going to bring peace to these families, and your verdict of death is final. It's finally going to put Donnie and Robin to rest. Do that.

THE COURT: Members of the jury, now that the arguments are concluded, I'll go ahead and ask you to take a break, and then we'll be able to get through all the instructions when you get back. So please continue to hold what you've got, keep an open mind about the case, and don't discuss it, and we will begin in approximately 10 to 15 minutes when you come back. Thank you very much.

(Jury out at 2:26 p.m.)

(Brief recess.)

THE COURT: Are the parties ready to resume and go forward with the instructions?

MR. BENDER: Yes.

THE COURT: The record will show that each juror will have a copy of the instructions to follow along as the Court reads them.

Reported By: Steve S. Huseby, RPR
800-333-2082          Huseby, Inc., an Affi          n (704) 333-9889          Fax (704) 372-4593
Case 3:12-cv-00327-MOC   Document 107   Filed 09/23/15   Page 171 of 200
1959

JA2842

United States of America vs. Aquilia Marcivicci Barnette  3:97CR23-V
Proceedings Before Judge Richard L. Voorhees  8/12/2002

Page 3991

May we have the jury, please.

(Jury in at 2:51 p.m.)

THE COURT: Members of the jury, there are currently 12 sets of those instructions in the jury box, and we're going to have four more here in just a minute. I would like to ask you to look on, in other words, pass them down enough so that several of you can use them two at a time and everybody will be able to follow. And as I say, shortly we'll have a copy for each of you.

Let's turn to Page 21. That's where we left off. And if any of you finds that a page is missing or something, please look on with your neighbor, but hopefully they are all in the proper order and present and accounted for. And I'll continue the instructions I was giving you earlier this morning on Page 21 here. Is everybody with me?

Okay. The government has the burden of proving to you its contentions and any aggravating factors beyond a reasonable doubt. You will be instructed about this in more detail in just a few minutes.

Now, the term reasonable doubt means just what it says, it's a doubt based upon reason and common sense. Its meaning is no doubt self-evident and understood by you, and the Court will not attempt to define the term further.

By the way, members of the jury, if you would rather just listen, you're free to do that, because you will

Reported By: Steve S. Huseby, RPR
800-333-2082  Huseby, Inc., an Affiliate of Snherion  (704) 333-9889  Fax (704) 372-4593
Case 3:12-cv-00327-MOC  Document 107  Filed 09/23/15  Page 172 of 200
1960

JA2843

United States of America vs. Aquilia Marcivicci Barnette 3:97CR23-V
Proceedings Before Judge Richard L. Voorhees 8/12/2002

Page 3992

have a copy of the instructions in the jury room with you with an index if you decided later during deliberations that you wanted to refer to something. But in any event, you have the option of reading or listening, whichever suits you best.

Now, then, members of the jury, the defendant has been found guilty of the offenses alleged in Count 7, 8, and 11 of the indictment. An indictment is not evidence. Now, those counts are as follows: Now, for ease of reference, Count 7 may be said to have alleged the crime of car-jacking resulting in death. Count 7 alleges as follows: On or about June 22, 1996, in Mecklenburg County, within the Western District of North Carolina, the defendant, Aquilia Marcivicci Barnette, with attempt to cause death or serious bodily harm, did knowingly, willfully, and unlawfully take by force, violence, and intimidation, that is, he shot to death and took from the person of Donald Lee Allen a motor vehicle which had been shipped, transported, and received in interstate foreign commerce, that is, a 1994 Honda Prelude, vehicle identification number as shown there on the page, in violation of Title 18, U.S. Code, Section 21193.

Like Count 7, Count 8 involves the death of Donald Lee Allen, but a different offense is charged, and the defendant was found guilty of both charges. Count 8 may be said to allege the crime of use of a firearm in a crime of violence, namely, car-jacking, resulting in death.

Reported By: Steve S. Huseby, RPR
800-333-2082 Huseby, Inc., an Affi··· ·· · · n (704) 333-9889 Fax (704) 372-4593
Case 3:12-cv-00327-MOC Document 61-07 Filed 09/23/15 Page 173 of 200
1961

JA2844

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees
3:97CR23-V
8/12/2002

Page 3993

Count 8 alleges as follows: On or about June -- the 22nd day of June, 1996, in Mecklenburg County, in the Western District of North Carolina, the defendant, Aquilia Marcivicci Barnette, knowingly used and carried a firearm, that is, a sawed off, Winchester semiautomatic shotgun during and in relation to a crime of violence for which he may be prosecuted in a court of the United States, that is, the car-jacking set forth in Count 7 above, and in the course of this violation caused the death of Donald Lee Allen through the use of a firearm, which killing is a murder as defined in Title 18, U.S. Code, Section 11-11, in that the defendant, with malice aforethought, did unlawfully kill Donald Lee Allen by shooting him with a firearm, willfully, deliberately, maliciously, and with premeditation, in violation of Title 18, U.S. Code, Section 924C1 and I21.

Count 11 may be said to allege the crime of use of a firearm in a crime of violence, namely, interstate domestic violence, resulting in death. Count 11 alleges as follows, on or about the 22nd day of June, 1996, in Mecklenburg County, in the Western District of North Carolina, and in the Western District of Virginia, the defendant, Aquilia Marcivicci Barnette, knowingly used and carried a firearm, that is, a sawed off Winchester semiautomatic shotgun during and in relation to a crime of violence for which he may be prosecuted in a court of the United States, that is, the act

Reported By: Steve S. Huseby, RPR
800-333-2082          Huseby, Inc., an Affi¹·⁻·· ·°°·'··⁻·⁻·⁻₁ (704) 333-9889          Fax (704) 372-4593
Case 3:12-cv-00327-MOC   Document 107   Filed 09/23/15   Page 174 of 200
1962

JA2845

Page 3994

of interstate domestic violence set forth in Count 10, and in the course of this violation caused the death of Robin Williams through the use of a firearm, which killing is a murder as defined in Title 18, U.S. Code, Section 11-11, in that the defendant, with malice aforethought, did unlawfully kill Robin Williams by shooting her with a firearm willfully, deliberately, maliciously, and with premeditation in violation of Title 18, U.S. Code, Section 924c1 and I21.

You must now consider whether imposition of a sentence of death is justified as to any one, two, or all three of those counts, or whether the defendant should be sentenced to life imprisonment without the possibility of release for commission of these crimes.

You must make this decision separately for each count. You are not required to make the same decision on each count, and your deliberations must be separate as to each count. The law leaves this decision exclusively to you, the jury. If you determine that the defendant should be sentenced to death or to life imprisonment without the possibility of release, the Court is required to impose that sentence.

I will now instruct you as to the process you must follow separately in making your verdict. This process must be followed as to each of Counts 7, 8, and 11 separately.

Now, two terms that you've already heard and will

Reported By: Steve S. Huseby, RPR
800-333-2082          Huseby, Inc., an Affil···· ·· ··········· (704) 333-9889          Fax (704) 372-4593
Case 3:12-cv-00327-MOC   Document 107   Filed 09/23/15   Page 175 of 200
1963

JA2846

Page 3995

hear throughout this phase of the case are aggravating

factors and mitigating factors.  The word aggravate means to

make worse or to make more offensive or to intensify.  The

word mitigate means to make less severe or to moderate.

An aggravating factor is a fact or circumstance

which would tend to support imposition of the death penalty.

A mitigating factor is any aspect of the defendant's

character, record, or background, any circumstance of the

offense, or any other relevant fact or circumstance which

might indicate that the defendant should not be sentenced to

death.

In the death penalty statute, aggravating factors

are listed.  These are called statutory aggravating factors.

As I instructed you earlier, before you may consider

imposition of the death penalty for any one, two, or all

three of Counts 7, 8, or 11, you must find that the

government proved at least one of these aggravating factors

specifically listed in the death penalty statute, and your

finding must be unanimous and beyond a reasonable doubt.

There also may be nonstatutory aggravating factors,

which are those specifically not set out in the death penalty

statute.  Again, your finding that any nonstatutory

aggravating factor exists must be unanimous and beyond a

reasonable doubt.

You must determine the existence or nonexistence of

Case 3:12-cv-00327-MOC   Document 107   Filed 09/23/15   Page 176 of 200
1964

JA2847

United States of America vs. Aquilia Marcivicci Barnette          3:97CR23-V
Proceedings Before Judge Richard L. Voorhees          8/12/2002

Page 3996

the aggravating factors separately for each of Counts 7, 8, and 11. You are not allowed to take an aggravating factor from one count and apply it to another count. You may not substitute or add any other factor in aggravation but must consider only those alleged by the government.

The defendant has the burden of proving any mitigating factors. However, there's a different standard of proof as to mitigating factors. You need not be convinced beyond a reasonable doubt about the existence of a mitigating factor. You need only be convinced by the preponderance of the evidence or its greater weight that it is more likely true than not true in order to find that it exists.

A unanimous finding is not required, and any one of you may find the existence of a mitigating factor. Now, if you have found that at least one statutory aggravating factor exists, you then must weigh the aggravating factor or factors you found to exist against any mitigating factors you found to exist to determine the appropriate sentence.

I will give you detailed instructions regarding the weighing of aggravating and mitigating factors before you begin your deliberations. However, I instruct you now that you must not simply count the number of aggravating and mitigating factors and reach a decision based upon which number is greater. You must consider the weight and the value of each factor.

Page 3997

In making all of the determinations you are required to make in the sentencing phase, you may consider any evidence that was presented during the sentencing hearing in which you just participated over the last several weeks.

Now, regardless of any opinion you may have as to what the law may be or should be, it would be a violation of your oaths as jurors to base your verdict upon any view of the law other than that given to you in these instructions. The instructions I am giving you now are a complete set of instructions on the law applicable to the sentencing decision. I have prepared them to ensure that you are clear in your duties at this extremely serious stage of the case.

I have also prepared special verdict forms, one as to each count, that you must complete. Now, the forms detail special findings you must make in this case and will help you perform your duties properly. Now, one comment that's not on your page there, I will be going through the instructions for each of the three counts separately. You will recognize a pattern as I go through these counts, but it will avoid confusion for me to go through them separately.

Now back on Page 28, before you may consider the imposition of the death penalty, the government must prove to you unanimously and beyond a reasonable doubt that the defendant was 18 years of age or older at the time of each of the offenses. If you unanimously make that finding, you

Reported By: Steve S. Huseby, RPR
800-333-2082          Huseby, Inc., an Affili⸱ ⸱ ⸱ ⸱ ⸱ ⸱ (704) 333-9889          Fax (704) 372-4593
Case 3:12-cv-00327-MOC  Document 107  Filed 09/23/15  Page 178 of 200
1966

JA2849

United States of America vs. Aquilia Marcivicci Barnette          3:97CR23-V
Proceedings Before Judge Richard L. Voorhees                    8/12/2002

Page 3998

should so indicate on the appropriate pages of the special verdict forms and continue in your deliberations. If you do not unanimously make that finding, you should so indicate on the appropriate pages of the special verdict forms and no further deliberations will be necessary as to any count or counts where that applies.

I will now instruct you as to the process you must follow with respect to your deliberations for each of Counts 7, 8, and 11. Before you may consider the imposition of the death penalty for the commission of Count 7, you must also unanimously find beyond a reasonable doubt that the defendant intentionally killed or committed acts resulting in the death of Donald Lee Allen in one or more of the manners described below.

If you unanimously make at least one of these findings as to the murder of Donald Lee Allen in Count 7, you should so indicate on the appropriate page of the verdict sheet form and continue your deliberations. If you do not unanimously make at least one of these findings as to the murder of Donald Lee Allen in Count 7, you should so indicate on the appropriate page of the special verdict form and no further deliberations will be necessary as to Count 7.

The government must prove unanimously and beyond a reasonable doubt any one of the following contentions as to the murder of Donald Lee Allen in Count 7: 1A, the defendant

Reported By: Steve S. Huseby, RPR
800-333-2082          Huseby, Inc., an Affi          n (704) 333-9889          Fax (704) 372-4593
Case 3:12-cv-00327-MOC   Document 67   Filed 09/23/15   Page 179 of 200
1967

JA2850

Page 3999

intentionally killed Donald Lee Allen.  To establish that the defendant intentionally killed the victim, the government must show that the defendant killed the victim with a conscious desire to cause the victim's death.  And 1B, the defendant intentionally inflicted serious bodily injury that resulted in the death of Donald Lee Allen.  Here, the government must prove that the defendant deliberately caused serious injury to the victim's body which in turn caused the victim's death.  Serious bodily injury means a significant or considerable amount of injury which involves a substantial risk of death, unconsciousness, protracted and obvious disfigurement, or protracted loss or impairment of a body member or mental faculty.

And the next one, the third one, the defendant intentionally participated in an act contemplating that the life of a person would be taken or intending that lethal force would be used in connection with a person other than one of the participants in the offense and the victim, Donald Lee Allen, died as a result.

The government must prove that the defendant deliberately shot Donald Lee Allen with a conscious desire that the victim be killed or that lethal force be employed against the victim.  The phrase lethal force means an act or acts of violence capable of causing death.

And the fourth one is that the defendant

Reported By: Steve S. Huseby, RPR
800-333-2082          Huseby, Inc., an Affil'--- -f C-b----n (704) 333-9889          Fax (704) 372-4593
Case 3:12-cv-00327-MOC   Document 107   Filed 09/23/15   Page 180 of 200
1968

JA2851

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/12/2002

Page 4000

intentionally and specifically engaged in an act of violence, knowing that the act created a grave risk of death to a person other than one of the participants in the offense, such that participation in the act constituted a reckless disregard for human life and Donald Lee Allen died as a direct result of the act by shooting.

Now, intent or knowledge may be proved like anything else. You may consider any statements made and acts done by the defendant and all the facts and circumstances in evidence which may aid in a determination of defendant's knowledge or intent. You may but are not required to infer that a person intends the natural and probable consequences of acts knowingly done or knowingly omitted. You will recall the Court's earlier instruction on knowledge and intent which was a little bit longer than the one I gave you right there.

Now, if you unanimously find beyond a reasonable doubt the existence of at least one or more of the requisite mental states as discussed in the previous section, you must then proceed to determine whether the government has proven unanimously and beyond a reasonable doubt the existence of any of the following alleged statutory aggravation -- excuse me, aggravating factors with respect to the same murder in Count 7.

Now, in this case the government has alleged as statutory aggravating factors as to Count 7 first that the

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/12/2002

Page 4001

defendant committed the offense in Count 7 in the expectation of the receipt of something of pecuniary value; second, that the defendant committed the offense after substantial planning and premeditation to cause the death of Donald Lee Allen. The law permits you to consider and discuss at this point only statutory aggravating factors specifically claimed by the government which the government alleges exist as to Count 7.

Now, the first aggravating factor contended for by the government is the defendant committed the offense in Count 7 in the expectation of the receipt of anything of pecuniary value, namely, a Honda automobile and Donald Lee Allen's wallet and money.

To establish that a defendant committed an offense in the expectation of the receipt of anything of pecuniary value, the government must prove unanimously and beyond a reasonable doubt in essence that the defendant committed the offense in the expectation of anything in the form of money, property, or anything else having some economic value, benefit, or advantage.

There's no requirement that the government prove that something of pecuniary value actually changed hands. The words receipt or expectation of receipt should be given their ordinary, everyday meaning, which includes obtaining or expecting to obtain something. In this case, the government

Reported By: Steve S. Huseby, RPR
800-333-2082          Huseby, Inc., an Affili---- -- -------  (704) 333-9889          Fax (704) 372-4593
Case 3:12-cv-00327-MOC   Document 107   Filed 09/23/15   Page 182 of 200
1970

JA2853

United States of America vs. Aquilia Marcivicci Barnette          3:97CR23-V
Proceedings Before Judge Richard L. Voorhees          8/12/2002

Page 4002

alleges that the pecuniary gain is the expectation of taking Donald Lee Allen's motor vehicle and the victim Donald Lee Allen's wallet and money.

Now, the second aggravating factor the government contends for is that the defendant committed the offense of car-jacking resulting in death as charged in Count 7 after substantial planning and premeditation to cause the death of Donald Lee Allen.

Planning means mentally formulating a method for doing something or achieving some end. Premeditation means thinking or deliberating about something and deciding whether to do it beforehand. Substantial planning and premeditation means a considerable or significant amount of planning, and premeditation above and beyond the minimum required for the commission of the offense alleged in Count 7.

If the government does not satisfy each of you beyond a reasonable doubt that at least one of these statutory aggravating factors exists for Count 7 in the murder of Donald Lee Allen, you should enter a finding to that effect as to that particular count of the special verdict form, and no further deliberations as to that particular count will be necessary.

In the event that you unanimously find that the government has proven beyond a reasonable doubt the existence of at least one of the statutory aggravating factors with

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/12/2002

Page 4003

respect to the murder of Donald Lee Allen in Count 7, please enter that finding on the appropriate page of the special verdict form and continue your deliberations.

It would be necessary for you to make that unanimous finding as to the same allegation of aggravating factor. It wouldn't do for you to -- in other words, a unanimous verdict as to one aggravating factor means 12 voting with respect to that factor.

Now, then, you must then consider whether the government has proven the existence of any nonstatutory or miscellaneous aggravating factors as to Count 7 in the murder of Donald Lee Allen.

As in the case for statutory aggravating factors, you must unanimously agree that the government has proven beyond a reasonable doubt the existence of any of the alleged and nonstatutory aggravating factors before you may consider such factors in your deliberations on the appropriate punishment for the defendant in this case.

The law permits you to consider and discuss only those aggravating factors specifically claimed by the government with respect to Count 7 and listed below. You are not free to consider any other facts in aggravation which you conceive of on your own.

The nonstatutory aggravating factors that the government has alleged in this case as to Count 7 are, first,

Case 3:12-cv-00327-MOC  Document 107  Filed 09/23/15  Page 184 of 200

1972

JA2855

Page 4004

the defendant caused harm to the family of Donald Lee Allen as a result of the impact of the killing on the family of Donald Lee Allen; and second, the defendant is likely to commit criminal acts of violence in the future which would be a continuing and serious threat to society; third, the defendant intentionally killed two people in that in addition to killing Donald Lee Allen, the defendant also killed Robin Williams.

In the event that you unanimously find that the government has proved beyond a reasonable doubt the existence of any of these nonstatutory aggravations with respect to Count 7, please enter that finding on the appropriate page of the special verdict form and continue in your deliberations. Even if you do not find the existence of any nonstatutory aggravating factors, you should continue your deliberations as to Count 7.

Now, before you may consider the appropriate punishment for the commission of Count 7, you must consider whether the defendant has established the existence of mitigating factors. A mitigating factor is any fact about the defendant's life, background, record, or character, or about the circumstances surrounding the intentional killing of Donald Lee Allen, or any other relevant fact which would suggest, in fairness, that a sentence of death is not justified.

JA2856

Page 4005

Now, unlike aggravating factors, which you must unanimously find proved beyond a reasonable doubt in order for you to consider them in your deliberation, the law does not require unanimity with regard to mitigating factors. Any juror may find the existence of a mitigating factor and then must consider it in this case. Also, unlike aggravating factors, you do not need to find the existence of any statutory mitigating factor before you can proceed to determine the existence of any nonstatutory mitigating factor.

It is the defendant's burden to establish any mitigating factors, but only by a preponderance of the evidence. This is a lesser standard of proof under the law than proof beyond a reasonable doubt. The factor is established by a preponderance of the evidence if its existence is shown to be more likely so than not so. In other words, a preponderance of the evidence means such evidence as when considered and compared with that opposed to it produces in your mind the belief that what is sought to be established is more likely than not true.

In a special verdict form relating to mitigating factors, you are asked to report the total number of jurors that find a particular mitigating factor established by a preponderance of the evidence.

The statutory mitigating factors which the

Reported By: Steve S. Huseby, RPR
800-333-2082                    Huseby, Inc., an Affi¹⁻⁻ ⁻ ⁻ ⁻ ⁻ ⁻ ⁻ ⁻ ¹ (704) 333-9889                    Fax (704) 372-4593
Case 3:12-cv-00327-MOC   Document 107   Filed 09/23/15   Page 186 of 200
1974

JA2857

Page 4006

defendant asserts he has proven by a preponderance of the evidence are as follows; one, the defendant's capacity to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of the law was significantly impaired regardless of whether the capacity was so impaired as to constitute a defense to the charge; and second, the other factors in the defendant's childhood, background or character mitigate against imposition of the death sentence.

The nonstatutory mitigating factors which the defendant asserts he has proved by a preponderance of the evidence are as follows:  One, Marc Barnette has accepted full responsibility for his actions; two, Marc Barnette has remorse; three, Marc Barnette was abused by his father; four, Marc Barnette was affected by growing up in a family environment of violence, drugs and alcohol abuse; five, Marc Barnette had repeated exposure to violence in the home; six, Marc Barnette attempted to protect his brother, Marion, from the damaging effects of parental violence and neglect; seven, untreated emotional problems; eight, at the time of these crimes Marc Barnette was experiencing a depressive episode; nine, Marc Barnette does well in a structured environment; ten, Marc Barnette cooperated with police; eleven, Marc Barnette can serve a useful purpose to others in a prison environment; twelve, at the time of these offenses, Marc Barnette was experiencing irrational and obsessive thoughts;

Reported By: Steve S. Huseby, RPR
800-333-2082          Huseby, Inc., an Affi··  · ·· · · ı (704) 333-9889          Fax (704) 372-4593
Case 3:12-cv-00327-MOC  Document 1975  Filed 09/23/15  Page 187 of 200

JA2858

Page 4007

and thirteen, Marc Barnette's brother and children will be harmed by his execution.

On the special verdict form you are asked to identify any mitigating factors, nonstatutory or statutory, that any of you finds has been proved by a preponderance of the evidence. That would be factors in addition to the ones that are listed in 1 through 13 there and that any of you finds has been proved as indicated by the preponderance of the evidence.

Now, in addition there are three nonstatutory mitigating factors which the Court instructs you to find; one, Marc Barnette was neglected by his mother; two, Marc Barnette turned himself into police; and three, Marc Barnette has been a model prisoner. The Court instructs you that these three mitigating factors have been established by a preponderance of the evidence and you should so indicate on the verdict form.

Excuse me just a second. With respect to Count 7, if you have found at least one of the four requisite mental states and the existence of at least one statutory aggravating factor and the existence or absence of any statutory and nonstatutory mitigating factors, you will then engage in a weighing process of the statutory and nonstatutory aggravating factors and any statutory and nonstatutory mitigating factors as to Count 7.

Reported By: Steve S. Huseby, RPR
800-333-2082          Huseby, Inc., an Affi¨¨¨¨ ¨f ¨¨¨¨¨¨¨¨ (704) 333-9889          Fax (704) 372-4593
Case 3:12-cv-00327-MOC  Document 107  Filed 09/23/15  Page 188 of 200
1976

JA2859

Page 4008

In determining the appropriate sentence, all of you must weigh the aggravating factor or factors that you unanimously found to exist as to Count 7, whether statutory or nonstatutory, and each of you must weigh any statutory and nonstatutory mitigating factors that you individually found to exist as to Count 7.

In engaging in the weighing process, you must avoid any influence of passion, prejudice, or undue sympathy. Your deliberations should be based upon the evidence you have seen and heard and the law on which I have instructed you.

The process of weighing aggravating and mitigating factors against each other, or weighing aggravating factors alone, if there are no mitigating factors, in order to determine the proper punishment is not a mechanical or mathematical process. In other words, you should not simply count the number of aggravating and mitigating factors and each -- and reach a decision based on which number is greater, you should consider the weight and value of each factor.

The law contemplates that different factors may be given different weights or values by different jurors, thus you may find that one mitigating factor outweighs all aggravating factors combined or that the aggravating factor or factors proven do not standing alone justify imposition of a sentence of death. Each individual juror is to decide what

Case 3:12-cv-00327-MOC  Document 127  Filed 09/23/15  Page 189 of 200
1977

JA2860

Page 4009

weight or value is to be given to a particular factor in your decision making process.

The members of the jury are never required to vote for a sentence of death. In other words, in the process of weighing aggravating factors and mitigating factors, if any, there is no required result. If you unanimously conclude that the aggravating factor or factors found to exist sufficiently outweigh any mitigating factor or factors found to exist such that a sentence of death is justified as to Count 7, or in the absence of any mitigating factors that the aggravating factor or factors are in themselves sufficient to justify a sentence of death, you shall record your determination that death is justified on the special verdict form.

On the other hand, if you do not so conclude, then you would answer no to this issue on the special verdict form and then go on to the next issue, which asks if based on this weighing process you have unanimously determined that a sentence of life imprisonment without a possibility of release should be imposed as to Count 7.

I will now instruct you as to the process you must follow with respect to your deliberations for Count 8. And you'll recognize some familiarity as I go through this with what I already instructed you concerning Count 7.

Before you may consider the imposition of the death

Case 3:12-cv-00327-MOC   Document 107   Filed 09/23/15   Page 190 of 200

1978

JA2861

Page 4010

penalty for the commission of Count 8, you must also unanimously find as to that specific count beyond a reasonable doubt that the defendant intentionally killed or committed acts resulting in the death of Donald Lee Allen in one or more of the manners described below.

If you unanimously make at least one of these findings as to the murder of Donald Lee Allen in Count 8, you should so indicate on the appropriate page of the special verdict form and continue your deliberations. If you do not unanimously make at least one of these findings as to the murder of Donald Lee Allen in Count 8, you should so indicate on the appropriate page of the special verdict form and no further deliberations will be necessary as to Count 8.

The government must prove unanimously and beyond a reasonable doubt that any of the following contentions as to the murder of Donald Lee Allen. In Count 8, you must find any of these four, and the first one the government alleges is the defendants intentionally killed Donald Lee Allen. To establish that the defendant intentionally killed the victim, the government must prove that the defendant killed the victim with a conscious desire to cause the victim's death; secondly, the government (sic) intentionally inflicted serious bodily injury that resulted in the death of Donald Lee Allen. The government must prove that the defendant deliberately caused serious injury to the victim's body which

Reported By: Steve S. Huseby, RPR
800-333-2082          Huseby, Inc., an Aff‾ ‾ ‾ ‾ n (704) 333-9889          Fax (704) 372-4593
Case 3:12-cv-00327-MOC   Document 107   Filed 09/23/15   Page 191 of 200
1979

JA2862

United States of America vs. Aquilia Marcivicci Barnette        3:97CR23-V
Proceedings Before Judge Richard L. Voorhees        8/12/2002

Page 4011

in turn caused the victim's death.

Serious bodily injury means a significant or considerable amount of injury which involved a substantial risk of death, unconsciousness, protracted, and obvious disfigurement or protractive loss or impairment of a body member, organ, or mental faculty.

And 1C, the defendant intentionally participated in an act contemplating that the life of a person would be taken or intending that lethal force would be used in connection with a person other than one of the participants in the offense and the victim, Donald Lee Allen, died as a result.

The government must prove that the defendant deliberately shot Donald Lee Allen with a conscious desire that the victim be killed or that lethal force be employed against the victim. The phrase lethal force means an act or acts of violence capable of causing death.

And fourth, the defendant intentionally and specifically engaged in an act of violence knowing that the act created a grave risk of death to a person other than one of the participants in the offense, such that participation in the act constituted a reckless disregard for human life and Donald Lee Allen died as a direct result of the act by shooting. And you will recall the Court's earlier instructions on knowledge and intent.

Now, if you unanimously find beyond a reasonable

Page 4012

doubt the existence of at least one of the requisite mental states as discussed in the previous section, you must then determine and proceed to determine whether the government has proven unanimously and beyond a reasonable doubt the existence of any of the following alleged statutory aggravating factors with respect to the same murder in Count 8.

In this case the government has alleged as statutory aggravating factors as to Count 8, first, that defendant committed the offense in Count 8 in expectation of the receipt of something of pecuniary value; and second, the defendant committed the offense in Count 8 after substantial planning and premeditation to cause the death of Donald Lee Allen.

The Court permits you to consider and discuss at this point only statutory aggravating factors. That would mean these two specifically claimed by the government, which the government alleges exist as to Count 8.

The first aggravating factor contended for by the government is the defendant committed the offense in Count 8 in the expectation of the receipt of anything of pecuniary value, namely a Honda automobile and Donald Lee Allen's wallet and money. You will recall the Court's earlier instruction as to what pecuniary value means, because what is there at the second paragraph of Page 44 is identical to what

Reported By: Steve S. Huseby, RPR
800-333-2082          Huseby, Inc., an Affil---- -- ------- (704) 333-9889          Fax (704) 372-4593
Case 3:12-cv-00327-MOC   Document 107   Filed 09/23/15   Page 193 of 200
1981

JA2864

United States of America vs. Aquilia Marcivicci Barnette    3:97CR23-V
Proceedings Before Judge Richard L. Voorhees    8/12/2002

Page 4013

I read to you earlier with respect to Count 7.

So moving on to Page 45, the second aggravating factor that the government contends is that the defendant committed the offense of use of a firearm in a crime of violence, namely, car-jacking resulting in death as charged in Count 8 after substantial planning and premeditation to cause the death of Donald Lee Allen.

Planning means mentally formulating a method for doing something or achieving some end. Premeditation means thinking or deliberating about something and deciding whether to do it beforehand. Substantial planning and premeditation means a considerable or significant amount of planning and premeditation above and beyond the minimum required for the commission of the offense described in Count 8.

Now, if the government does not satisfy each of you beyond a reasonable doubt that at least one of these statutory aggravating factors exists for Count 8, you should enter a finding to that effect as to that count, that is, Count 8, on the special verdict form and no further deliberations as to that count will be necessary.

In the event that you unanimously find that the government has proven beyond a reasonable doubt the existence of at least one of the statutory aggravating factors with respect to the murder of Donald Lee Allen in Count 8, please enter that finding on the special verdict form and continue

Reported By: Steve S. Huseby, RPR
800-333-2082          Huseby, Inc., an Affi'        (704) 333-9889          Fax (704) 372-4593
Case 3:12-cv-00327-MOC   Document 107   Filed 09/23/15   Page 194 of 200
1982

JA2865

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/12/2002

Page 4014

your deliberations.

You must then consider whether the government has proved the existence of any nonstatutory or miscellaneous aggravating factors as to Count 8. As in the case for statutory aggravating factors, you must unanimously agree that the government has proved beyond a reasonable doubt the existence of any of the alleged nonstatutory aggravating factors before you may consider such factors in your deliberations on the appropriate punishment for the defendant as to this count.

The law permits you to consider and discuss only those aggravating factors specifically claimed by the government with respect to Count 8 and listed below. You are not free to consider any other facts in aggravation which you conceive of on your own.

The nonstatutory aggravating factors that the government has alleged in this case as to Count 8 are that, one, the defendant caused harm to the family of Donald Lee Allen as a result of the impact of the killing on the family of Donald Lee Allen; second, the defendant is likely to commit criminal acts of violence in the future which would be a continuing and serious threat to society; and third, that the defendant intentionally killed two people in that in addition to killing Donald Lee Allen, the defendant also killed Robin Williams.

Reported By: Steve S. Huseby, RPR
800-333-2082          Huseby, Inc., an Affil··········· (704) 333-9889          Fax (704) 372-4593
Case 3:12-cv-00327-MOC   Document 107   Filed 09/23/15   Page 195 of 200
1983

JA2866

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/12/2002

Page 4015

In the event that you unanimously find that the government has proved beyond a reasonable doubt the existence of any of these nonstatutory aggravating factors with respect to Count 8, please enter that finding on the appropriate page of the special verdict form and continue your deliberations.

Even if you do not find the existence of any nonstatutory aggravating factors, you should continue your deliberations as to Count 8.

Before you may consider the appropriate punishment for the commission of Count 8, you must consider whether the defendant has established the existence of any mitigating factors. A mitigating factor -- you'll recall, you heard earlier, the Court has instructed you to find three mitigating factors, so, of course, at least three of them have been established.

Going on then, a mitigating factor is any fact about the defendant's life, background, record, or character, or about the circumstances surrounding the intentional killing of Donald Lee Allen, or any other relevant fact that would suggest in fairness that a sentence of death is not justified.

Now, unlike aggravating factors which you must unanimously find proved beyond a reasonable doubt, in order for you to consider them in your deliberations, the law does not require unanimity with regard to mitigating factors. And

Reported By: Steve S. Huseby, RPR
800-333-2082 Case 3:12-cv-00327-MOC Huseby, Inc., an Aff Document 107 Filed (704) 333-9869 09/23/15 Page 196 of 200 Fax (704) 372-4593

1984

JA2867

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/12/2002

Page 4016

any juror may find the existence of a mitigating factor and then must consider it in this case. Also, unlike aggravating factors, you do not need to find the existence of any statutory mitigating factor before you can proceed to determine the existence of any nonstatutory mitigating factor.

It is the defendant's burden to establish any mitigating factors, but only by a preponderance of the evidence. This is a lesser standard of proof under the law than proof beyond a reasonable doubt.

A factor is established by a preponderance of the evidence if its existence is shown to be more likely so than not so. In other words, a preponderance of the evidence means such evidence as when considered and compared with that opposed to it produces in your mind a belief that what is sought to be established is more likely than not true.

In the special verdict form relating to mitigating factors, you are asked to report the total number of jurors that find a particular mitigating factor established by a preponderance of the evidence.

The statutory mitigating factors which the defendant asserts he has proved by a preponderance of the evidence are, first, the defendant's capacity to appreciate the wrongfulness of his conduct or conform his conduct to the requirements of the law was significantly impaired,

Reported By: Steve S. Huseby, RPR
Huseby, Inc., an Affil· · · · ·f ° · ·· · · (704) 333-9889          Fax (704) 372-4593
800-333-2082

Case 3:12-cv-00327-MOC  Document 187  Filed 09/23/15  Page 197 of 200
1985

JA2868

Page 4017

regardless of whether the capacity was so impaired as to constitute a defense to the charge.

Secondly, the other factors in the defendant's childhood, background or character, mitigate against imposition of the death penalty, excuse me, the death sentence. The nonstatutory mitigating factors which the defendant asserts he has proved by a preponderance of the evidence are as follows: One, Marc Barnette has accepted full responsibility for his actions; two, he has remorse; three, he was abused by his father; and four, he was affected by growing up in a family environment of violence, drugs and alcohol abuse; and fifth, he had repeated exposure to violence in the home; sixth, he attempted to protect his brother, Mario, from the damaging effects of parental violence and neglect; seven, he had a history of untreated emotional problems. At the time of these crimes, Marc Barnette was experiencing a depressive episode. Marc Barnette does well in a structured environment. Marc Barnette cooperated with police. Marc Barnette can serve a useful purpose to others in a prison environment. At the time of these offense, Marc Barnette was experiencing irrational and obsessive thoughts; and thirteen, his brother and children will be harmed by his execution.

Now, on the special verdict form you are asked to identify any mitigating factors, statutory or nonstatutory,

Case 3:12-cv-00327-MOC   Document 107   Filed 09/23/15   Page 198 of 200
1986

JA2869

Page 4018

that any of you finds has been proved by a preponderance of the evidence. And there's also a space there to put in mitigating factors that any of you finds has been proved by a preponderance of the evidence, whether the defendant listed it or not.

In addition, there are three nonstatutory mitigating factors which the Court instructs you to find; one, Marc Barnette was neglected by his mother; two, he turned himself in to police; and three, he has been a model prisoner. The Court instructs you that these three mitigating factors have been proven by a preponderance of the evidence, and you should so indicate on the form.

Now, with respect to Count 8, if you have found at least one of the four requisite mental states and the existence of at least one statutory aggravating factor and then gone on to determine the existence or absence of any statutory or nonstatutory mitigating factor, you will then engage in a weighing process of the statutory and nonstatutory aggravating factors and any statutory and nonstatutory mitigating factors as to Count 8.

In determining the appropriate sentence, all of you must weigh the aggravating factor or factors that you unanimously found to exist as to Count 8, whether statutory or nonstatutory, and each of you must weigh any statutory and nonstatutory mitigating factors that you individually found

JA2870

United States of America vs. Aquilia Marcivicci Barnette    3:97CR23-V
Proceedings Before Judge Richard L. Voorhees    8/12/2002

Page 4019

to exist as to Count 8.

In engaging in the weighing process, you must avoid any influence of passion, prejudice, or undue sympathy. Your deliberations should be based upon the evidence you have seen and heard and the law on which I have instructed you.

The process of weighing aggravating and mitigating factors against each other or weighing aggravating factors alone, if there are no mitigating factors, in order to determine the proper punishment is not a mechanical or mathematical process. In other words, you should not simply count the number of aggravating and mitigating factors and reach a decision based upon which number is greater. You should consider the weight and value of each factor.

The law contemplates that different factors may be given different weights or values by different jurors, thus you may find that one mitigating factor outweighs all aggravating factors combined, or that the aggravating factor or factors proven do not, standing alone, justify an imposition of a sentence of death.

Each individual juror is to decide what weight or value is to be given to a particular factor in your decision making process. The members of the jury are never required to vote for a sentence of death. In other words, in the process of weighing aggravating factors and mitigating factors, if any, there is no required result.

Reported By: Steve S. Huseby, RPR
800-333-2082    Huseby, Inc., an Affi------ -- --------  (704) 333-9889    Fax (704) 372-4593
Case 3:12-cv-00327-MOC   Document 107   Filed 09/23/15   Page 200 of 200
1988

JA2871

United States of America vs. Aquilia Marcivicci Barnette    3:97CR23-V
Proceedings Before Judge Richard L. Voorhees    8/12/2002

Page 4020

If you unanimously conclude that the aggravating factor or factors found to exist sufficiently outweigh any mitigating factor or factors found to exist such that a sentence of death is justified as to Count 8, or in the absence of any mitigating factors that the aggravating factor or factors are in themselves sufficient to justify a sentence of death, you shall record your determination that death is justified on the special verdict form.

On the other hand, if you do not so conclude, then you would answer no to this issue on the special verdict form and then go on to the next issue, which asks if, based on this weighing process, you have unanimously determined that a sentence of life in prison without the possibility of release should be imposed as to Count 8.

Excuse me just a moment.

MR. BENDER:  May we be heard just one moment?

THE COURT:  Yes.  Members of the jury, don't go on looking at the instructions, although you can look back over some of them.  But just be at ease for a moment and I'll speak to counsel at the side-bar.  Excuse us.

(Side bar outside the presence of the jury as follows:)

MR. BENDER:  As to Counts 8 and 11, you have omitted the first element, which is the age, you do it as to Count 7; and since the special verdict form in each one of them first element has age, I think I you need to go back.

Case 3:12-cv-00327-MOC  Document 108  Filed 09/23/15  Page 1 of 166
1989

JA2872

United States of America vs. Aquilia Marcivicci Barnette          3:97CR23-V
Proceedings Before Judge Richard L. Voorhees          8/12/2002

Page 4021

THE COURT: I'll remind the jury that the age has to be found as to each count.

MR. BENDER: Okay. That's the only thing I saw.

THE COURT: Right, thank you.

(Side bar concluded).

THE COURT: Thank you, members of the jury. Okay. For those of you following along, we're on Page 53. I'll now instruct you as to the process you must follow with respect to your deliberations for Count 11.

And by the way, you'll recall, of course, that before you go on with any of these counts, 7, 8, or 11, you would have to make the finding as to the defendant's age being at least 18, that is, 18 or more, before you would go on. But if you have found that, and the jury form, that is, the special verdict form, goes through that process for you, in a sequence as to each count, before you may consider the imposition of the death penalty for the commission of Count 11, after you consider age, you must also unanimously, as to that specific count, find beyond a reasonable doubt that the defendant intentionally killed or committed acts resulting in the death of Robin Williams in one or more of the manners described below.

If you unanimously make at least one of these findings as to the murder of Robin Williams in Count 11, you

Reported By: Steve S. Huseby, RPR
800-333-2082          Huseby, Inc., an Affi          n (704) 333-9889          Fax (704) 372-4593
Case 3:12-cv-00327-MOC   Document 108   Filed 09/23/15   Page 2 of 166
1990

JA2873

Page 4022

should so indicate on the appropriate page of the special verdict form and continue your deliberations. If you do not unanimously make at least one of the findings as to the murder of Robin Williams in Count 11, you should so indicate on the appropriate page of the special verdict form and no further deliberations will be necessary as to Count 11.

Now, the government must prove unanimously and beyond a reasonable doubt any one of the following contentions as to the murder of Robin Williams in Count 11, and all the jurors would have to make that unanimous finding as to -- finding as to any one of these mental states that you must find before it can be considered established.

First, the defendant intentionally killed Robin Williams. To establish that the defendant intentionally killed this victim, the government must prove that the defendant killed the victim with a conscious desire to cause the victim's death; secondly, the defendant intentionally inflicted serious bodily injury that resulted in the death of Robin Williams by shooting. The government must prove that the defendant deliberately caused serious injury to the victim's body which in turn caused the victim's death. Serious bodily injury means a significant or considerable amount of injury which involves a substantial risk of death, unconsciousness, protracted and obvious disfigurement, or protracted loss or impairment of a body member, organ, or

Page 4023

mental faculty; and third, the defendant intentionally participated in an act contemplating that the life of a person would be taken or intending that lethal force would be used in connection with a person other than one of the participants in the events and the victim, Robin Williams, died as a result.

The government must prove that the defendant deliberately shot Robin Williams with a conscious desire that the victim be killed or that lethal force be employed against the victim. The phrase lethal force means an act or acts of violence capable of causing death.

And the fourth one alleged is as follows, the defendant intentionally and specifically engaged in an act of violence, knowing that the act created a grave risk of death to a person other than one of the participants in the events such that participation in the act constituted a reckless disregard for human life, and Robin Williams died as a direct result of the act by shooting. You will recall this Court's earlier instruction about knowledge and intent.

If you unanimously find beyond a reasonable doubt the existence of at least one of the requisite mental states as found and discussed in the previous section, you must then proceed to determine whether the government has proven beyond a reasonable doubt unanimously the existence of any of the following alleged statutory aggravating factors with respect

Reported By: Steve S. Huseby, RPR
800-333-2082     Huseby, Inc., an Affi~~~~ ~~ ~~~~~~~~~ (704) 333-9889     Fax (704) 372-4593
Case 3:12-cv-00327-MOC  Document 108  Filed 09/23/15  Page 4 of 166
1992

JA2875

Page 4024

to the murder in Count 11: In this case the government has alleged as statutory aggravating factors as to Count 11 that in the commission of the offense in Count 11 the defendant knowingly created a grave risk of death to one or more persons in addition to the intended victim; and second, the defendant committed the offense in Count 11 after substantial planning and premeditation to cause the death of Robin Williams. The law permits you to consider and discuss at this point only statutory aggravating factors specifically claimed by the government which the government alleges exist as to Count 11.

The first aggravating factor contended for by the government is in the commission of the offense in Count 11 the defendant knowingly created a grave risk of death to one or more persons in addition to the intended victim, namely Bertha Williams and Sonji Hill.

To establish the existence of this factor, the government must prove unanimously and beyond a reasonable doubt that the defendant knowingly created a grave risk of death to one or more persons in addition to the victim of the offense in committing the offense. Persons in addition to the victims includes innocent bystanders in the zone of danger created by the defendant's acts, but does not include other participants in the offense, if any.

Grave risk of death means a significant and

Case 3:12-cv-00327-MOC  Document 108  Filed 09/23/15  Page 5 of 166

1993

JA2876

United States of America vs. Aquilia Marcivicci Barnette    3:97CR23-V
Proceedings Before Judge Richard L. Voorhees    8/12/2002

Page 4025

considerable possibility that another person might be killed. Knowingly creating such a risk means that the defendant was conscious and aware that his conduct in the course of committing the offense might have this result. In other words, the defendant had reckless disregard or extreme indifference for human life. You will recall the Court's earlier instruction as to knowledge and intent.

Now, the second aggravating factor for which the government contends is that the defendant committed the offense of use of a firearm in a crime of violence, namely, interstate domestic violence resulting in death as charged in Count 11 after substantial planning and premeditation to cause the death of Robin Williams.

Planning means mentally formulating a method for doing something or achieving some end. Premeditation means thinking or deliberating about something and deciding whether to do it beforehand. Substantial planning and premeditation means a considerable or significant amount of planning and premeditation above and beyond the minimum required for the commission of the offense described in Count 11.

If the government does not satisfy each of you beyond a reasonable doubt that at least one of these statutory aggravating factors exists for Count 11, you should enter a finding to that effect as to that particular count, that is, Count 11, on the special verdict form, and no

Reported By: Steve S. Huseby, RPR
800-333-2082    Huseby, Inc., an Aff⋯  ⋯ ⋯ ⋯ n (704) 333-9889    Fax (704) 372-4593
Case 3:12-cv-00327-MOC  Document 108  Filed 09/23/15  Page 6 of 166
1994

JA2877

United States of America vs. Aquilia Marcivicci Barnette     3:97CR23-V
Proceedings Before Judge Richard L. Voorhees     8/12/2002

Page 4026

further deliberation as to that count will be necessary.

In the event that you unanimously find that the government has proven beyond a reasonable doubt the existence of at least one of the statutory aggravating factors with respect to the murder of Robin Williams in Count 11, please enter that finding on the special verdict form and continue your deliberations.

You must then consider whether the government has proven the existence of any nonstatutory or miscellaneous aggravating factors as to Count 11. As in the case for statutory aggravating factors, you must unanimously agree that the government has proven beyond a reasonable doubt the existence of any of the alleged nonstatutory aggravating factors before you may consider such factors in your deliberations on the appropriate punishment for defendant in this case as to Count 11.

The Court permits you to consider and discuss only those aggravating factors specifically claimed by the government with respect to Count 11 and listed below. You are not free to consider any other facts in aggravation which you conceive of on your own.

The nonstatutory aggravating factors that the government has alleged in this case as to Count 11 are that, one, the defendant caused harm to the family of Robin Williams as a result of the impact of the killing on the

Case 3:12-cv-00327-MOC  Document 108  Filed 09/23/15  Page 7 of 166
1995

JA2878

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/12/2002

Page 4027

family of Robin Williams; second, the defendant is likely to commit criminal acts of violence in the future which would be a continuing and serious threat to society; and third, the defendant intentionally killed two people in that in addition to killing Robin Williams, the defendant also killed Donald Lee Allen.

In the event that you unanimously find that the government has proved beyond a reasonable doubt the existence of any of these nonstatutory aggravating factors with respect to Count 11, please enter that finding on the appropriate page of the special verdict form and continue your deliberations. Even if you do not find the existence of any nonstatutory aggravating factors, you should continue your deliberations as to Count 11.

Before you may consider the appropriate punishment for the commission of Count 11, you must consider whether the defendant has established the existence of any mitigating factors. A mitigating factor is any fact about the defendant's life, background, record, or character, or about the circumstances surrounding the intentional killing of Robin Williams or any other relevant fact that would suggest in fairness that a sentence of death is justified or that a lesser sentence is the appropriate -- let me see if that reads correctly -- that's a typo there, which we'll have to fix for you, because it should say is not justified. So let

United States of America vs. Aquilia Marcivicci Barnette    3:97CR23-V
Proceedings Before Judge Richard L. Voorhees    8/12/2002

Page 4028

me read that sentence over correctly.

A mitigating factor is any fact about the defendant's life, background, record, or character, or about the circumstances surrounding the intentional killing of Robin Williams or any other relevant fact that would suggest in fairness that a sentence of death is not justified, and that's where we will stop that sentence.

Now, then, unlike aggravating factors, which you must unanimously find proved beyond a reasonable doubt, in order for you to consider them in your deliberations, the law does not require unanimity with regard to mitigating factors. Any juror may find the existence of a mitigating factor and must consider it in this case. Also, unlike aggravating factors, you do not need to find the existence of any statutory mitigating factor before you can proceed to determine the existence of any nonstatutory mitigating factor.

It is the defendant's burden to establish any mitigating factors, but only by a preponderance of the evidence. This is a lesser standard of proof under the law than proof beyond a reasonable doubt. A factor is established by a preponderance of the evidence if its existence is shown to be more likely so than not so. In other words, a preponderance of the evidence means such evidence as when considered and compared with that opposed to

Page 4029

it produces in your mind the belief that what is sought to be established is more likely than not true. In Part 5 of the special verdict form relating to mitigating factors, you are asked to report the total number of jurors that find a particular mitigating factor established by a preponderance of the evidence.

Excuse me just a minute, please.

Page 61, the statutory mitigating factors which the defendant asserts he has proved by a preponderance of the evidence are, first, the defendant's capacity to appreciate the wrongfulness of his conduct or to conform his conduct to the requirement of the law was significantly impaired regardless of whether the capacity was so impaired as to constitute a defense to the charge; second, the other factors in the defendant's childhood, background, or character mitigate against imposition of the death sentence.

The nonstatutory mitigating factors which the defendant asserts he has proved by a preponderance of the evidence are as follows: First, Marc Barnette has accepted full responsibility for his actions; second, he has remorse; third, he was abused by his father; fourth, he was affected by growing up in a family environment of violence, drugs and alcohol abuse; fifth, he has repeated exposure to violence in the home; sixth, he attempted to protect his brother, Mario, from the damaging effects of parental violence and neglect;

Reported By: Steve S. Huseby, RPR
800-333-2082          Huseby, Inc., an Affil' ' ' ' ' ' (704) 333-9889          Fax (704) 372-4593
Case 3:12-cv-00327-MOC   Document 108   Filed 09/23/15   Page 10 of 166
1998

JA2881

United States of America vs. Aquilia Marcivicci Barnette          3:97CR23-V
Proceedings Before Judge Richard L. Voorhees                     8/12/2002

Page 4030

and seven, he had a history of untreated emotional problems; eight, at the time of these crimes, Marc Barnette was experiencing a depressive episode; nine, Marc Barnette does well in a structured environment; ten, he cooperated with police; eleven, Marc Barnette can serve a useful purpose to others in a prison environment; twelve, at the time of these offenses, he was experiencing irrational and excessive thoughts; and thirteen, Marc Barnette's brother and children would be harmed by his execution.

Now, on the special verdict form, you are asked to identify any mitigating factors, statutory or nonstatutory, that any of you find has been proved by a preponderance of the evidence. You also will have a place to enter any mitigating factors which you find have been proved by a preponderance of the evidence and which occurred to you but are not listed in the list of the defendant's contentions.

In addition, there are three nonstatutory mitigating factors which the Court instructs you to find; first, Marc Barnette was neglected by his mother; second, he turned himself in to police; third, he has been a model prisoner. And the Court instructs you that these three mitigating factors have been proven by a preponderance of the evidence and you should so indicate on the verdict form.

Now, with respect to Count 11, if you have found at least one of the four requisite mental states, and, of

Case 3:12-cv-00327-MOC   Document 108   Filed 09/23/15   Page 11 of 166
1999

JA2882

Page 4031

course, the requisite age that I spoke about earlier, and the existence of at least one statutory aggravating factor and the existence or absence of any statutory and nonstatutory mitigating factor, you will then engage in a weighing process of the statutory and nonstatutory aggravating factors, and any statutory and nonstatutory mitigating factors as to Count 11.

In determining the appropriate sentence, all of you must weigh the aggravating factor or factors that you unanimously found to exist as to Count 11, whether statutory or nonstatutory, and each of you must weigh any statutory and nonstatutory mitigating factors that you individually found to exist as to Count 11.

In engaging in the weighing process, you must avoid any influence of passion, prejudice, or undue sympathy. Your deliberations should be based upon the evidence you have seen and heard and the law on which I have instructed you.

The process of weighing aggravating and mitigating factors against each other, or weighing aggravating factors alone, if there are no mitigating factors, in order to determine the proper punishment is not a mechanical or mathematical process. In other words, you should not simply count the number of aggravating and mitigating factors and reach a decision based upon which number is greater. You should consider the weight and value of each factor.

Reported By: Steve S. Huseby, RPR
800-333-2082     Huseby, Inc., an Affi`` `` `` `` ı (704) 333-9889     Fax (704) 372-4593
Case 3:12-cv-00327-MOC  Document 108  Filed 09/23/15  Page 12 of 166
2000

JA2883

Page 4032

The law contemplates that different factors may be given different weights or values by different jurors, thus you may find that one mitigating factor outweighs all aggravating factors combined or that the aggravating factor or factors proven do not standing alone justify imposition of a sentence of death. Each individual juror is to decide what weight or value is to be given to a particular factor in your decision making process.

The members of the jury are never required to vote for a sentence of death. In other words, in the process of weighing aggravating factors and mitigating factors, if any, there is no required result.

If you unanimously conclude that the aggravating factor or factors found to exist sufficiently outweigh any mitigating factor or factors found to exist such that a sentence of death is justified as to Count 11, or in the absence of any mitigating factors that the aggravating factor or factors are in themselves sufficient to justify a sentence of death, you shall record your determination that death is justified on the special verdict form.

On the other hand, if you do not so conclude, then you would and no to that issue on the special verdict form and then go on to the next issue, which asks if based upon this weighing process you have unanimously determined that a sentence of life in prison without the possibility of release

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/12/2002

Page 4033

should be imposed as to Count 11.

Now, at the end of your deliberations, if you unanimously recommend that the defendant be sentenced to death or to life imprisonment without the possibility of release, or any or all of Count 7, 8, or 11, the Court is required to impose that sentence accordingly. The recommendation does not have to be consistent with each count. As I said earlier, the members of the jury are never required to vote for a sentence of death. In other words, in the process of weighing aggravating factors and mitigating factors, if any, there is no required result.

Now, Section 6 on each verdict form provides space to record your verdict as to the appropriate and justified sentence for the defendant. Any verdict must represent the considered judgment of each juror. In order to return a verdict, it is necessary that each juror agree thereto. In other words, your voting must be unanimous before it can be said that a verdict has been reached and the questions posed to you in Count 6 -- that is, in Section 6 of the verdict form.

Now, it is your duty as jurors to consult with one another and to deliberate in an effort to reach agreement if you can do so without violence to individual judgment.

Each of you must decide the case for yourself, but only after an impartial consideration of the evidence in the

Reported By: Steve S. Huseby, RPR
800-333-2082          Huseby, Inc., an Aff          n (704) 333-9889          Fax (704) 372-4593
Case 3:12-cv-00327-MOC   Document 108   Filed 09/23/15   Page 14 of 166
2002

JA2885

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/12/2002

Page 4034

case with your fellow jurors.

In the course of your deliberations do not hesitate to reexamine your own views and change your opinion if convinced it is erroneous, but do not surrender your honest conviction as to the or effect of the evidence solely because of the opinion of your fellow jurors or for the mere purpose of returning a verdict.

Remember at all times you are not partisans, you are judges, judges of the facts. Your sole interest is to seek the truth from the evidence in the case and within the framework of the law as I have given it to you.

Now, in your consideration of whether the death sentence is justified for the commission of Count 7, 8, and 11, you shall not consider the race, color, religious beliefs, national origin, or sex of either the defendant or the victims. You are not to recommend a sentence of death unless you have concluded that you would recommend a sentence of death for the crime in question no matter what the race, color, religious belief, national origin, or sex of either the defendant or any victims might have been.

To emphasize the importance of this consideration, section Roman numeral seven of the special verdict form contains a certification statement. Each juror should carefully read the statement and sign in the appropriate place if the statement accurately reflects the manner in

Reported By: Steve S. Huseby, RPR
800-333-2082          Huseby, Inc., an Affiliate of Suberion  (704) 333-9889          Fax (704) 372-4593
Case 3:12-cv-00327-MOC   Document 108   Filed 09/23/15   Page 15 of 166
2003

JA2886

Page 4035

which each of you reached your decision.

Excuse me just a second.

Thank you, members of the jury. I have prepared three forms, each entitled special verdict form, to assist you during your deliberations. You are required to record your determinations on these forms. You will see that there is a special verdict form for each of Counts 7, 8, and 11. Remember, your deliberations must be separate as to the possible punishment for each of Counts 7, 8, and 11.

Section 1 of the special verdict forms contains space to record your written findings on defendant's age, and it also has instructions as to whether to go forward or not depending on how you find, and those instructions are throughout the verdict form. Section 2 on each form contains space to record your written findings on the requisite mental state. Section 3 on each form contains space to record your written findings on statutory aggravating factors. And Section 4 on each form contains space to record your written findings on nonstatutory aggravating factors. Section 5 on each special verdict form contains space to record your written findings on mitigating factors. Section 6 provides space to record your verdict. And Section 7 is your certificate concerning justice without discrimination.

You or the foreperson are each required to sign each decision form in accordance with the instructions on the

Reported By: Steve S. Huseby, RPR
800-333-2082 Huseby, Inc., an Affi'' ' '°' ' n (704) 333-9889 Fax (704) 372-4593
Case 3:12-cv-00327-MOC Document 108 Filed 09/23/15 Page 16 of 166
2004

JA2887

Page 4036

form.  And the instructions on the form, of course, are mandatory and you are required to follow that process according to how you find and in accordance with the instructions.

Now, during the course of this sentencing hearing, you have heard that the defendant was tried earlier in the guilt phase.  Specifically, you heard that during the guilt phase of this case, the defendant was found guilty of Count 7, 8, and 11, in addition to numerous other counts.  That is true.  As a result of the guilty verdicts for Counts 7, 8, and 11, you are here to determine the appropriate sentence for the defendant.  The defendant and the government are entitled, however, to have you decide this case solely on the evidence that has come before you in this sentencing phase.

Now, if you should desire to communicate with me at any time during your deliberations, please write down your message or question and pass the note to the marshal, who will bring it to my attention.  I shall not -- excuse me, I shall respond as promptly as possible either in writing or by having you return to the courtroom so that I can address you orally.  I caution you, however, that any message or question you might send, you should not, in that message you should not tell me any details of your deliberations or how any jury member is leaning in his or her decision.

It is proper, again, to have a final caution,

Case 3:12-cv-00327-MOC   Document 108   Filed 09/23/15   Page 17 of 166

2005

JA2888

Page 4037

nothing that I as the presiding judge has said in these instructions or nothing that I have said or done during this trial has been said or done to suggest to you what I think your decision should be. What your decision should be is your exclusive duty and responsibility.

Now, members of the jury, you've heard the evidence and the arguments of counsel for both sides. It's your duty to remember the evidence, whether it was called to your attention or not; and if your recollection of the evidence differs from that of the attorneys, you are to rely solely upon your recollection of the evidence in your deliberations. If you made notes during the trial, remember they are for your own personal use. If you did not take notes, remember it's your responsibility to recall the evidence. You cannot give the responsibility to recall evidence to someone who took notes.

We depend upon the judgment of all members of the jury. You must all remember the evidence in this case. The Court instructs that as soon as you reach the jury room, before beginning deliberation, I suggest this, that you select one of your members to serve as the foreperson. This individual has the same vote as the rest of the jurors but simply serves to preside over the discussions. As soon as you have reached a verdict on all three counts, you will return to the courtroom and your foreperson will, on request,

Case 3:12-cv-00327-MOC   Document 108   Filed 09/23/15   Page 18 of 166
2006

JA2889

United States of America vs. Aquilia Marcivicci Barnette    3:97CR23-V
Proceedings Before Judge Richard L. Voorhees    8/12/2002

Page 4038

hand the verdict sheet to the clerk.

Now, during the trial several items were received into evidence as exhibits. You will not be taking the exhibits into the jury room with you at the start, because I'm not sure that you will need them. If after you have begun your discussions of the case you think it would be helpful to have any of the exhibits with you in the jury room, have the foreperson send me a note asking for them. And if you want to hear or see any tapes, we would bring you back into the courtroom to use the equipment located here.

Would there be any request for a side-bar at this time?

MR. BENDER: Yes, Your Honor.

THE COURT: Members of the jury, if you'll excuse us for a moment, and once again you may be at ease. Thank you.

(Side bar out of the presence of the jury.)

MR. BENDER: First of all, with regard to Page 60, the typographical error, is that going to be fixed before the instructions?

THE COURT: Yes. What we're going to do is collect all 16 sets and then -- right now, and then slip-sheet them and then send 12 back into the jury room. And she's already got the -- Ashlyn already has the --

MR. BENDER: On our --

Page 4039

THE COURT: There's the way it looks now (indicating).

MR. BENDER: On our Count 11, the statutory aggravating factor I think is incorrect.

MS. TOMPKINS: It's supposed to be grave risk of death, more than one person for pecuniary gain.

THE COURT: You're quite right. So we'll have to fix that before they begin.

MR. BENDER: Before they begin deliberating.

THE COURT: We'll tell them that.

MR. BENDER: Why don't we just take a short break while we do that.

THE COURT: Yeah, we can do that.

MS. ROSE: They can select their foreperson when we send them back.

THE COURT: What's that?

MS. ROSE: We could let them go, send it back after they return to the room or something.

THE CLERK: It won't take but a second.

MR. BENDER: I suggest we take a short recess but not let them deliberate or anything, bring them out when we all are sure that that's what needs to be done.

THE COURT: Anything further?

MR. BENDER: Did you intend to review the actual verdict sheet? I don't believe that's necessary.

Case 3:12-cv-00327-MOC   Document 108   Filed 09/23/15   Page 20 of 166
2008

JA2891

Page 4040

THE COURT: I don't think so. I think it's self-explanatory.

THE CLERK: Will you tell me again? I didn't hear what you said.

MS. TOMPKINS: It's supposed to be grave risk of death.

THE COURT: We want to do that. And, of course, we'll show it to you before we -- what I thought I would do is after the break send them out with their instructions and have a verdict sheet as corrected and send the alternates into -- I thought we would send the alternates home with the usual instructions not to talk about it, everything that we usually tell them, and tell them we'll call them if we need to, and then I would tell the regular jurors to go back and start deliberations at least to the point of selecting a foreman and/or foreperson, and then at that time decide whether or not they want to break for the evening and start fresh in the morning or continue on until they advise us they are ready for an evening break. Okay.

(Side bar concluded.)

THE COURT: Members of the jury, we will have one more short break before you begin your deliberations. It will be less than 10 minutes. We will invite you to leave your jury instructions there on the chair and we will fix that one page that had the error in it, and then we will

Case 3:12-cv-00327-MOC  Document 408  Filed 09/23/15  Page 21 of 166

2009

JA2892

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/12/2002

Page 4041

bring you back out in less than 10 minutes and we'll have you deliberating after that.

So go ahead and take a break, don't talk about the case, continue to remember all the other instructions.

(Jury out at 4:10 p.m.)

THE COURT: Court is now back in session. I believe we have corrected the error on Page 60 of the instructions and corrected Pages 6 and 7 of the verdict sheet.

Anything further before we bring the jury back to move on?

MR. BENDER: No, Your Honor.

MS. ROSE: No.

THE COURT: We are waiting for the instructions.

Okay. May we have the jury, please.

(Jury in at 4:26 p.m.)

THE COURT: Okay. Members of the jury, I believe each of you now has a -- there are 12 sets of instructions there, I believe. What I would ask you to do now is take the case and see how you will find. Except given the hour, let me make a suggestion, that is, that you might want to go back to the jury room, the 12 of you, and pick your foreperson and then advise the Court that you would like to start in the morning fresh. That would seem to be an

Reported By: Steve S. Huseby, RPR
800-333-2082         Huseby, Inc., an Affiliate of Spherion  (704) 333-9889         Fax (704) 372-4593
Case 3:12-cv-00327-MOC   Document 108   Filed 09/23/15   Page 22 of 166
2010

JA2893

United States of America vs. Aquilia Marcivicci Barnette    3:97CR23-V
Proceedings Before Judge Richard L. Voorhees    8/12/2002

Page 4042

appropriate decision, if that's the pleasure of the jury, otherwise, you would deliberate and let me know later on in the evening when you are ready to take a break until tomorrow.

Is that clear enough? Thank you very much. And the alternates will stay with us here for just a minute and I'll speak to you separately. If you all would just kind of come around to the front of the jury box so everyone else can go out. Thank you.

(Jury out at 4:28 p.m.)

THE COURT: Let me speak to you gentlemen then. As you know, it's a very important function for alternates to serve as members of a jury, as you have done up until now, and we're going to continue to need your services between now and the time that the jury actually returns a verdict. The importance of that, as you can understand, is that if for some reason one of the jurors became ill or had a family emergency or was unable for any reason, if up to four jurors might have a situation like that, then you would be available and ready to step in and continue the deliberations of the jury. In that event we would, of course, tell the jury to begin its deliberations all over so that the alternates could participate from the beginning.

So, again, thank you very much for your attention to the case, for your readiness and willingness to serve

Page 4043

should you be called upon to do so, and for your attention to the evidence throughout. But we are going to let you go on home at this point, with the same instructions we sent you home with overnight each day during this trial, and that would be that until the trial is completed, then you are not to -- and we will call and advise you if, in fact, it does get completed, or, of course, if we need you to step into the jury, then we will advise you of that by telephone also.

So you are not to discuss this case with anyone, with members of your family, people involved in the trial or anyone else, including your fellow jurors. If anyone approaches you about the case and tries to discuss it notwithstanding the Court's instructions, you should let me know about that immediately.

Also you must not read or listen to any news reports of the trial. That's especially important as trials come to a close, so just don't turn -- I would suggest that you not even turn on the radio in your car or not watch any TV overnight, and also -- yeah, you can go ahead and tell them we will be with them in just a moment.

Okay. And I would suggest that you not read any newspapers until you know what your situation is with respect to this trial, avoid looking at any headlines, if there are any, that sort of thing, should there be any newspapers out on the street.

Reported By: Steve S. Huseby, RPR
800-333-2082                Huseby, Inc., an Affi'···· ·f ···'····'··· (704) 333-9889                Fax (704) 372-4593
Case 3:12-cv-00327-MOC  Document 108  Filed 09/23/15  Page 24 of 166
2012

JA2895

United States of America vs. Aquilia Marcivicci Barnette          3:97CR23-V
Proceedings Before Judge Richard L. Voorhees                      8/12/2002

Page 4044

And finally remember, don't do any research about the case or do any investigation, and keep an open mind about it, because until you go in to deliberations, it would not be appropriate to make your mind up about any particular issue in the case.

Do all of you understand, or do you have any questions for the Court?

JUROR:  So we're to call back?

THE COURT:  No, sir.  We'll call you.  Feel free to call back at any time and speak to the clerk, if you want to know the status of the case, but otherwise we'll let you know when we may need you.  We'll call you in any event should there be a decision by the jurors.  Thank you again.  You're free to go at this time.

JUROR:  I have things in the jury room.

THE COURT:  Why don't you let these jurors come back in, and then you all can go back to the jury room and pick out your personal items and go on out that way.

(Jury in at 4:32 p.m.)

THE COURT:  Okay.  Members of the jury, I take it you would like to start fresh in the morning, is that correct?

JUROR:  Yes.

THE COURT:  Who will be speaking for the jury?

JUROR:  (Indicating).

Reported By: Steve S. Huseby, RPR
800-333-2082          Huseby, Inc., an Affi          n (704) 333-9889          Fax (704) 372-4593
Case 3:12-cv-00327-MOC  Document 108  Filed 09/23/15  Page 25 of 166
2013

JA2896

United States of America vs. Aquilia Marcivicci Barnette    3:97CR23-V
Proceedings Before Judge Richard L. Voorhees    8/12/2002

Page 4045

THE COURT:   Thank you again for your attention to the case, the evidence, the instructions, the arguments. Let me remind you again about the overnight instructions. Until the deliberations are completed, you're not to discuss the case with anyone, whether members of your family, people involved in the trial, or anyone else, including your fellow jurors, so just don't comment on it or discuss it and tell people that might ask about it that you would -- you're free to talk about it after it's over but not before.

Also, please avoid any news accounts of the case, should there be any. As the case comes to a close, you have to be particularly careful. I would suggest that you just not play the radio in your car, not watch any TV, and avoid any newspapers between now and the time the deliberations are complete.

And keep an open mind about the case, of course, overnight until you get back with your jurors and begin deliberating and making up your minds as instructed.

Thanks again for your attention to all of these things. Remember all of the instructions I've given you, and we'll see you tomorrow morning at 9:30. What you will do tomorrow at 9:30, come in and we will assemble here as we always do and then we will just send you right out. Thank you.

MR. BENDER:   Excuse me.

Reported By: Steve S. Huseby, RPR
800-333-2082    Huseby, Inc., an Aff    n (704) 333-9889    Fax (704) 372-4593
Case 3:12-cv-00327-MOC   Document 108   Filed 09/23/15   Page 26 of 166

2014

JA2897

United States of America vs. Aquilia Marcivicci Barnette          3:97CR23-V
Proceedings Before Judge Richard L. Voorhees          8/12/2002

Page 4046

THE COURT: Yes, sir.

MR. BENDER: Are they going to be taking home anything with them or leaving it here?

THE COURT: Yeah, the clerk is going to collect the instructions and the verdict sheet. Thank you.

(Jury out at 4:34 p.m.)

THE COURT: Anything for the Court before we recess for the evening?

MR. BENDER: Just in the presence of Marc Barnette, we had two side-bar conferences, one was with regard to the age element and the Court needed to reinstruct or further instruct the jury about that. That's all that happened at that one. The second one was with regard to the typographical error on Page 60 and also with regard to statutory -- pardon me, statutory aggravating circumstances on Count 11, there was a problem with that, it didn't --

THE COURT: Right, the draft of the instructions that we were proposing to give to the jury had a pecuniary object aggravator when it should have been the -- now I've forgotten.

MR. BENDER: Risk of harm to more than one person. That's all that happened.

THE COURT: Yeah, that's correct, and the record will also reflect there were no additional objections at the end of the Court's instructions aside from what's of

United States of America vs. Aquilia Marcivicci Barnette     3:97CR23-V

Proceedings Before Judge Richard L. Voorhees     8/12/2002

record earlier in the matter. Thank you very much.

MR. BENDER: In the event that I need to re-object to failing to instruct on my proposed --

THE COURT: Yes, sir, we consider those objections to be established in the record but to the -- if they are renewed, then they are also denied. Thank you very much.

MR. BENDER: Thank you.

(Court adjourned, 4:37 p.m.)


I, STEVEN S. HUSEBY, do hereby certify that the foregoing transcript is a true and correct transcript.




STEVEN S. HUSEBY                    DATE

Case 3:12-cv-00327-MOC Document 108 Filed 09/23/15 Page 28 of 166

2016

JA2899

United States of America vs. Aquilia Marcivicci Barnette    3:97CR23-V
Proceedings Before Judge Richard L. Voorhees                8/13/2002

Page 4048

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION

COPY

UNITED STATES OF AMERICA        )
                                )  CASE NO. 3:97CR23-V
        v.                      )  August 13, 2002
                                )
AQUILIA MARCIVICCI BARNETTE,    )
            Defendant.          )

TRANSCRIPT OF SENTENCING HEARING
BEFORE THE HONORABLE RICHARD L. VOORHEES
UNITED STATES DISTRICT COURT JUDGE

APPEARANCES:

FOR THE GOVERNMENT:
        ANNE M. TOMPKINS, Esq.
        JILL WESTMORELAND ROSE, Esq.
        Assistant United States Attorney
        227 West Trade Street
        Suite 1700
        Charlotte, North Carolina   28202

FOR THE DEFENDANT:
        JEAN B. LAWSON, Esq.
        P.O. Box 4275
        Charlotte, North Carolina   28226
        HAROLD J. BENDER, Esq.
        200 North McDowell Street
        Charlotte, North Carolina   28204

Reported by:  Steve S. Huseby,
                Registered Professional Reporter,
                Certified Court Reporter,

Case 3:12-cv-00327-MOC   Document 108   Filed 09/23/15   Page 29 of 166
2017

JA2900

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/13/2002

Page 4049

PROCEEDINGS

(9:34 a.m.)                                          09:33:32

09:33:32

THE COURT:  Are all the jurors here?                09:33:36

MR. BENDER:  Your Honor, before we bring the        09:33:40
jury in, at this time I would move for a motion for a        09:33:41
mistrial based upon improper argument of Ms. Rose yesterday;  09:33:44
one, it did not rebut our argument; two, it went well beyond  09:33:49
the plain, brief glimpse of life.  It was basically an        09:33:55
argument on victim impact, and so we ask at this time that    09:34:02
you grant us a mistrial.                                       09:34:10

THE COURT:  All right, the motion will be           09:34:14
denied.  May we have the jury, please.                        09:34:16

(Jury in at 9:35 a.m.)                              09:34:43

THE COURT:  Good morning, members of the jury.     09:34:59
You now have your jury instructions, the Clerk will hand you  09:35:03
your verdict sheet on the way out and you're ready to         09:35:06
deliberate.  Thank you very much, you may proceed to do that  09:35:10
at this time.                                                  09:35:14

(Jury out at 9:36 a.m.)                             09:35:19

THE COURT:  When the jury comes back with its       09:35:46
findings, I presume it would be in order to dismiss the jury,  09:35:51
assuming the verdict is in order, and proceed to sentencing.   09:35:57
The Court will examine the verdict sheet before anything else  09:36:03
happens when the jury comes out and make sure it's in proper   09:36:07

Case 3:12-cv-00327-MOC   Document 108   Filed 09/23/15   Page 30 of 166
2018

JA2901

Page 4050

form.

Anyone have any different ideas about how to proceed in that manner?

MR. BENDER:  No, Your Honor.

MS. TOMPKINS:  No, sir.

THE COURT:  I do want to thank counsel for the hard work you've put into this case, your commitment to a high level of professional standards.  All right.

THE CLERK:  All rise.

(Court recessed at 9:36 a.m.)

(Court resumed at 11:36 a.m.)

THE COURT:  Ms. Dannelly will hand you a proposed answer to the jury's question.

Any objection?

MR. BENDER:  Yes.

THE COURT:  Say it, please.

MR. BENDER:  I think Your Honor needs to include the instructions on page 31, the law permits you to consider and discuss at this point only statutory aggravating factors specifically claimed by the Government which the Government alleges as to Count 7.  My recollection is that the note was that it included the to cause the death and I think your response should be simply that the only thing that you can consider is that it was to cause the death.

THE COURT:  All right.  That objection will be

Reported By: Steve S. Huseby, RPR
800-333-2082    Huseby, Inc., an Affiliate of Spherion  (704) 333-9889    Fax (704) 372-4593

JA2902

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/13/2002

Page 4051

overruled.

MS. TOMKINS: Just for the record, there's no objection by the Government to the Court's --

THE COURT: Thank you. Now, Mr. Bender, did you have some item you wanted to bring up about the jury taking breaks?

MR. BENDER: No, I simply suggested that during the point that this question was under consideration, that perhaps the Court should respond in some way like, you know, we are considering your -- I'm meeting with the attorneys and considering your question, why don't you take your mid-morning break, and just as a response to them, let them know that we are considering their question. That was the only thing --

THE COURT: Have they asked about a break yet?

THE BAILIFF: No, sir.

THE COURT: We'll let them continue but we'll keep in mind your question should we have further contact with the jury.

MR. BENDER: Thank you.

(Court in recess at 11:48 a.m.)

(Court resumed at 12:31 p.m.)

THE COURT: Are the parties ready the send the jury on to lunch?

MR. BENDER: Yes, Your Honor.

Reported By: Steve S. Huseby, RPR
800-333-2082     Huseby, Inc., an Affiliate of Spherion (704) 333-9889     Fax (704) 372-4593

Case 3:12-cv-00327-MOC   Document 108   Filed 09/23/15   Page 32 of 166
2020

JA2903

Page 4052

THE COURT: All right, let me have the jury. 12:30:36

(Jury in at 12:32 p.m.) 12:31:06

THE COURT: Members of the jury, I guess you 12:31:19
got my note about lunch; is that satisfactory? 12:31:20

THE JURORS: Yes, sir. 12:31:26

THE COURT: We'll send you on then, and please 12:31:26
suspend your deliberations until we get you back into court 12:31:29
after lunch and then we'll send you to deliberate, so hold 12:31:32
what you got and keep an open mind between now and then. 12:31:36
Think about an hour would be appropriate? We'll contemplate 12:31:40
you being back with us then at 1:30, thank you. 12:31:44

(Jury out at 12:32 p.m.) 12:31:52

(Lunch recess). 12:31:52

THE COURT: Can we have the jury. 13:35:37

THE BAILIFF: Yes, sir. 13:35:43

(Jury in at 1:37 p.m.) 13:36:19

THE COURT: I see all the members of the jury 13:36:21
are accounted for; did you all have a good lunch? 13:36:22

THE JURORS: Yes, sir, thank you. 13:36:26

THE COURT: It may seem like a formality, but 13:36:28
it's necessary, and we will just send you back in and say 13:36:31
move along. Thank you. 13:36:33

(Jury out at 12:37 p.m.) 13:36:42

THE COURT: Anything for the Court at this 13:37:09
point? 13:37:11

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/13/2002

Page 4053

MR. BENDER: Judge, just one thing. These   13:37:13

paintings that were introduced into evidence, could we go and   13:37:16

take those to Kinko's and get a color copy made and   13:37:20

substitute that for the original?   13:37:24

THE COURT: Any objection by the Government?   13:37:28

MS. ROSE: None.   13:37:30

THE COURT: Okay.   13:37:31

(Court in recess, 1:38 p.m.)   13:37:41

(Court back in session, 5:12 p.m.)   15:30:21

THE COURT: Are the parties ready to receive   17:12:01

the verdict?   17:12:03

MR. BENDER: Yes, sir.   17:12:07

MS. TOMPKINS: Yes, sir.   17:12:07

THE COURT: May we have the jury, please.   17:12:11

(Jury in at 5:13 p.m.)   17:12:31

THE COURT: Okay, Juror Number 2, I believe   17:12:47

you are the foreperson.   17:12:49

JUROR: Yes, sir.   17:12:52

THE COURT: Has this jury reached the verdict?   17:12:52

JUROR: Yes, sir.   17:12:55

THE COURT: Was it unanimous with the   17:12:55

decisions put to the jury's attention?   17:12:56

JUROR: Yes, sir.   17:12:59

THE COURT: And did you enter the verdict on   17:12:59

the verdict form?   17:13:00

United States of America vs. Aquilia Marcivicci Barnette       3:97CR23-V

Proceedings Before Judge Richard L. Voorhees       8/13/2002

Page 4054

JUROR: Yes, sir.      17:13:01

THE COURT: And have all the jurors signed as    17:13:01
indicated by the instructions?    17:13:04

JUROR: Yes, sir.    17:13:05

THE COURT: Thank you. Let me ask the Clerk,    17:13:06
if you will receive the verdict form.    17:13:08

Excuse me, members of the jury, while I go over    17:13:26
this form. You may be at ease.    17:13:29

(Brief pause.)    17:13:29

THE COURT: Members of the jury, if you'll    17:20:37
excuse us for a minute, I'll ask you counsel to step to the    17:20:38
side bar and I'll talk to them in a minute and be right back.    17:20:42
Thank you.    17:20:46

(Side bar outside the jury's presence as follows:)    17:23:59

THE COURT: We're on the record in the    17:23:59
anteroom next to the courtroom. The only thing that I notice    17:23:59
in the verdict sheet, they answered it in regular form. They    17:23:59
did answer yes to the death sentence question on all three    17:23:59
cases, and there were various mitigating factors found. The    17:23:59
age was 18 in each case and all four mental states were found    17:23:59
in each case. The majority of the aggravating factors were    17:23:59
found and both statutory aggravating factors in each case.    17:23:59

One of the aggravating factors, future violence    17:23:59
danger, they answered no, though, to that one, and the other    17:23:59
ones were all yes. But as to -- for example, here's number    17:23:59

Case 3:12-cv-00327-MOC  Document 108  Filed 09/23/15  Page 35 of 166

2023

JA2906

Page 4055

seven and you can see they answered section A for the death    17:23:59

sentence.  In all three cases, they did not do anything with    17:23:59

section B, and it would appear to me that that would not be a    17:23:59

matter that we would need to send them back for.    17:23:59

MS. ROSE:  No.    17:23:59

MR. BENDER:  I don't think so.    17:23:59

THE COURT:  They correctly perceived that they    17:23:59

have done their job because they have answered it.    17:23:59

MR. BENDER:  Yeah.    17:23:59

THE COURT:  That being the case, now, would    17:23:59

there be a request to pole the jury?    17:23:59

MS. LAWSON:  Yes.    17:23:59

MR. BENDER:  And if we may just suggest that    17:23:59

you just go to page 16 or 17, whatever the death is, and say    17:23:59

unanimous recommendation was death and then pole them as to    17:23:59

that instead of going through all of the pages.    17:23:59

MS. ROSE:  Yes.    17:23:59

THE COURT:  Is that agreeable to all parties?    17:23:59

MR. BENDER:  Yes.    17:23:59

MS. ROSE:  Yes.    17:23:59

MR. BENDER:  We're going to make a    17:23:59

recommendation that he be expedited to Terra Haute.    17:23:59

THE COURT:  Right, I will enter that on the    17:23:59

record at the conclusion of the other matters, so if I    17:23:59

forget, remind me.    17:23:59

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/13/2002

Page 4056

MR. BENDER: That thank you. 17:23:59

MS. TOMPKINS: Thank you. 17:23:59

(Side bar concluded). 17:23:59

THE COURT: Now, members of the jury, the Court having received your verdict forms, it's our usual procedure to pole the jury, and we will do that at this time. 17:24:24

Juror Number 1, the verdict as to -- well, let me do it this way, I'll read this verdict from section 6, or I believe 7, sub A, based upon consideration of whether the aggravating factor or factors found to exist sufficiently outweigh any mitigating factor or factors found to exist to justify a sentence of death, or in the absence of any mitigating factor or whether the aggravating factors are of themselves sufficient to justify a sentence of death, we recommend by unanimous vote that a sentence of death shall be imposed for the killing of Donnie Lee Allen as to count 7. 17:25:01

So Juror Number One, is that your verdict and is it still your verdict? 17:25:08

MS. LAWSON: Yes, sir. 17:25:09

THE COURT: Juror Number Two, is that your verdict and still your verdict? 17:25:12

MS. LAWSON: Yes, sir. 17:25:14

THE COURT: An Juror Number Three, is that your verdict and still your verdict? 17:25:17

JUROR: Yes, sir. 17:25:19

Reported By: Steve S. Huseby, RPR
800-333-2082     Huseby, Inc., an Affiliate of Spherion  (704) 333-9889     Fax (704) 372-4593

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/13/2002

Page 4057

THE COURT: And Juror Number Four, is that your verdict and still your verdict? — 17:25:20 / 17:25:21

JUROR: Yes, sir. — 17:25:23

THE COURT: And Juror Number Five, is that your verdict and still your verdict? — 17:25:23 / 17:25:24

JUROR: Yes, sir. — 17:25:27

THE COURT: And Juror Number Six, is that verdict and still your verdict? — 17:25:27 / 17:25:28

JUROR: Yes, sir. — 17:25:30

THE COURT: And Juror Number Seven, is that your verdict and still your verdict? — 17:25:31 / 17:25:32

JUROR: Yes, sir. — 17:25:33

THE COURT: Juror Number Eight, is that your verdict and still your verdict? — 17:25:34 / 17:25:35

JUROR: Yes, sir. — 17:25:37

THE COURT: Juror Number Nine, is that your verdict and still your verdict? — 17:25:37 / 17:25:39

JUROR: Yes, sir. — 17:25:40

THE COURT: Juror Number Ten, is that your verdict and still your verdict? — 17:25:41 / 17:25:42

JUROR: Yes, sir. — 17:25:43

THE COURT: Juror Number 11, is that your verdict and still your verdict? — 17:25:44 / 17:25:46

JUROR: Yes, sir. — 17:25:47

THE COURT: Juror Number 12, is that your — 17:25:48

Case 3:12-cv-00327-MOC Document 108 Filed 09/23/15 Page 38 of 166
2026

JA2909

Page 4058

verdict and still your verdict?    17:25:50

JUROR:  Yes, sir.    17:25:51

THE COURT:  All right, sir.  Now, members of    17:25:53
the jury, with reference to the verdict in Count 8, based    17:25:58
upon consideration of whether the aggravating factor or    17:26:07
factors sufficiently outweigh any mitigating factor or    17:26:11
factors found to justify a sentence of death, or in the    17:26:15
absence of any mitigating factors whether the aggravating    17:26:19
factors in themselves are sufficient to justify a sentence of    17:26:21
death, we recommend by unanimous vote that a sentence of    17:26:24
death shall be imposed for the killing of Donnie Lee Allen as    17:26:27
to Count 8, and you answered that issue yes.    17:26:31

And of course, you have all signed that, but I'll    17:26:36
also poll you about it.  I'll ask you then, Juror Number One,    17:26:40
is that your verdict and is it still your verdict?    17:26:43

JUROR:  Yes, sir.    17:26:46

THE COURT:  Juror Number Two, is that your    17:26:47
verdict and still your verdict?    17:26:48

JUROR:  Yes, sir.    17:26:49

THE COURT:  Juror Number Three, is that your    17:26:49
verdict and still your verdict?    17:26:51

JUROR:  Yes, sir.    17:26:52

THE COURT:  Juror Number Four, is that your    17:26:53
verdict and still your verdict?    17:26:58

JUROR:  Yes, sir.    17:26:58

Reported By: Steve S. Huseby, RPR
Huseby, Inc., an Affiliate of Spherion  (704) 333-9889
800-333-2082    Fax (704) 372-4593

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/13/2002

Page 4059

THE COURT: Juror Number Five, is that your    17:26:58
verdict and still your verdict.    17:26:58

JUROR: Yes, sir.    17:27:01

THE COURT: Juror Number Six, is that your    17:27:01
verdict and still your verdict?    17:27:02

JUROR: Yes, sir.    17:27:03

THE COURT: Juror Number Seven, is that your    17:27:03
verdict and still your verdict?    17:27:05

JUROR: Yes, sir.    17:27:06

THE COURT: Juror Number Eight, is that your    17:27:07
verdict and still your verdict?    17:27:08

JUROR: Yes, sir.    17:27:10

THE COURT: Juror Number Nine, is that your    17:27:10
verdict and still your verdict?    17:27:12

JUROR: Yes, sir.    17:27:13

THE COURT: Juror Number Ten, is that your    17:27:14
verdict and still your verdict?    17:27:14

JUROR: Yes, sir.    17:27:16

THE COURT: Juror Number 11, is that your    17:27:17
verdict and still your verdict?    17:27:18

JUROR: Yes, sir.    17:27:20

THE COURT: Juror Number 12, is that your    17:27:21
verdict and still your verdict?    17:27:23

JUROR: Yes, sir.    17:27:23

THE COURT: All right. Now, members of the    17:27:26

Case 3:12-cv-00327-MOC   Document 108   Filed 09/23/15   Page 40 of 166
2028

JA2911

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/13/2002

Page 4060

jury, with reference to Count 11, the answer posed -- I mean  17:27:37

the question posed was based upon consideration of whether  17:27:41

the aggravating factor or factors found to exist sufficiently  17:27:44

outweigh any mitigating factor or factors found to exist to  17:27:48

justify a sentence of death, or in the absence of any  17:27:52

mitigating factors whether the aggravating factors are in  17:27:55

themselves sufficient to justify a sentence of death, we  17:27:59

recommend by unanimous vote that a sentence of death shall be  17:28:02

imposed for the killing of Robin Williams as to Count 11, and  17:28:04

you answered that issue yes.  17:28:09

And I'll ask you by way of polling, likewise, Juror  17:28:11

Number one is that your verdict and is it still your verdict?  17:28:17

JUROR: Yes, sir.  17:28:20

THE COURT: Juror Number Two, is that your  17:28:20

verdict and still your verdict?  17:28:22

JUROR: Yes, sir.  17:28:23

THE COURT: Juror Number Three, is that your  17:28:24

verdict and still your verdict?  17:28:25

JUROR: Yes, sir.  17:28:26

THE COURT: Juror Number Four, is that your  17:28:27

verdict and still your verdict?  17:28:29

JUROR: Yes, sir.  17:28:29

THE COURT: Juror Number Five, is that your  17:28:30

verdict and still your verdict?  17:28:32

JUROR: Yes, sir.  17:28:33

JA2912

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/13/2002

Page 4061

THE COURT: Juror Number Six, is that your verdict and still your verdict? — 17:28:34 / 17:28:35

JUROR: Yes, sir. — 17:28:36

THE COURT: Juror Number Seven, is that your verdict and still your verdict? — 17:28:37 / 17:28:40

JUROR: Yes, sir. — 17:28:41

THE COURT: And Juror Number Eight, is that your verdict and still your verdict? — 17:28:41 / 17:28:43

JUROR: Yes, sir. — 17:28:45

THE COURT: Juror Number Nine, is that your verdict and still your verdict? — 17:28:46 / 17:28:47

JUROR: Yes, sir. — 17:28:48

THE COURT: Juror Number Ten, is that your verdict and still your verdict? — 17:28:49 / 17:28:50

JUROR: Yes, sir. — 17:28:52

THE COURT: Juror Number 11, is that your verdict and still your verdict? — 17:28:52 / 17:28:54

JUROR: Yes, sir. — 17:28:55

THE COURT: Juror Number 12, is that your verdict and still your verdict? — 17:28:56 / 17:28:58

JUROR: Yes, sir. — 17:28:59

THE COURT: Will there be anything further before the jury is discharged? — 17:29:10 / 17:29:11

MR. BENDER: No, Your Honor. — 17:29:16

THE COURT: Members of the jury, I want to — 17:29:17

Reported By: Steve S. Huseby, RPR
Huseby, Inc., an Affiliate of Spherion (704) 333-9889
800-333-2082                                      Fax (704) 372-4593

Case 3:12-cv-00327-MOC   Document 108   Filed 09/23/15   Page 42 of 166
2030

JA2913

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/13/2002

Page 4062

thank you profusely and sincerely for the hard work you put into this case. It's been two weeks plus of trial and evidence and other time that you have spent with us doing questionnaires and answering questions in jury selection; we very much appreciate your service as citizens who came forward from your places of work and your homes to do the work of the courts.

You are discharged from this case, and we have no further cases for your attention in this term. Now, I asked you in the past not to talk about the case, but as I indicated once the case is over, it's your option now if someone wants to talk about the case, you're free to answer any questions or talk about it as you see fit, but you're under no obligation to do so. It's entirely up to you.

So again, thank you very much. If you have any questions about the jury service, feel free to call the telephone number you've been given and speak to the Clerk about it, and we will ask that the marshal escort the jurors as appropriate.

(Jury out at 5:31 p.m.)

THE COURT: I've asked the Clerk to go back and collect any forms or instructions that may be in the jury room. The Clerk will be handling the verdict, they will be filed with the Court.

I will now ask if the defendant wants to say

Reported By: Steve S. Huseby, RPR
800-333-2082          Huseby, Inc., an Affiliate of Spherion  (704) 333-9889          Fax (704) 372-4593

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/13/2002

Page 4063

anything to the Court. 17:31:57

THE WITNESS: I would just like to thank my 17:31:58 counsel, I think they did a terrific job, I'm very pleased. 17:32:00 I'd like to thank my mother for being here every day without 17:32:06 fail to support me, and that's it. 17:32:10

THE COURT: All right, sir. Thank you. 17:32:13 Anything further then before the Court imposes a sentence? 17:32:14

MS. TOMPKINS: No, sir. 17:32:18

MS. ROSE: No, sir. 17:32:19

THE COURT: In Case Number 3:97CR23-V, the 17:32:20 Court will impose a sentence of death as to Count 7, 8 and 17:32:25 11. 17:32:30

Anything further before we adjourn? 17:32:31

MR. BENDER: Yes, sir. 17:32:35

THE COURT: I remember what you had asked. I 17:32:36 will ask the marshal service to make every effort to expedite 17:32:39 the defendant's return to Terra Haute as opposed to any 17:32:42 extended layover here in the Mecklenburg County jail. Does 17:32:47 that take care of it then? 17:32:52

MR. BENDER: Your Honor, we would respectfully 17:32:55 give notice of appeal. 17:32:56

THE COURT: Yes, sir, notice of appeal will be 17:32:58 recorded, and I'm sure you'll follow through with written 17:33:00 notice in due time. 17:33:02

MR. BENDER: Thank you. 17:33:04

Case 3:12-cv-00327-MOC   Document 108   Filed 09/23/15   Page 44 of 166
2032

JA2915

United States of America vs. Aquilia Marcivicci Barnette
Proceedings Before Judge Richard L. Voorhees

3:97CR23-V
8/13/2002

Page 4064

THE COURT: All right. 17:33:04

(Proceedings adjourned, 5:34 p.m.) 17:33:18

I, Steve S. Huseby, do hereby certify that the foregoing transcript is a true and correct transcript.

STEVE S. HUSEBY                           DATE

Reported By: Steve S. Huseby, RPR
800-333-2082     Huseby, Inc., an Affiliate of Spherion  (704) 333-9889          Fax (704) 372-4593

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION
Docket No. 3:97CR-23

F L E D
IN COURT
CHARLOTTE, N. C.

AUG 5 2002

U. S. DISTRICT COURT
W. DIST. OF N. C.

UNITED STATES OF AMERICA )
)
v. ) **MOTION FOR MISTRIAL**
)
AQUILIA MARCIVICCI BARNETTE, )
Defendant. )
_____ )

NOW COMES the Defendant, by and through his attorneys, and moves the Court that an Order for Mistrial be entered in this trial for the following reasons:

1. During the victim impact evidence, previously objected to by the Defendant, the prosecution was permitted to put on Bertha Williams, the mother of the victim, Robin Williams.

2. Bertha Williams, during her testimony became understandably emotional when discussing her daughter's life. However, during her emotional testimony, she turned to the Defendant and asked repeatedly, "why did you have to kill Robin? Why did you have to kill my baby"?, or words to that effect.

3. The rationale articulated in *Payne v. Tennessee*, 501 U.S. 808 (1991) is to allow a "brief glimpse" in the life of the victim to show the victim's "uniqueness as an individual human being." Id. 828

4. The emotional display and the question to the Defendant, goes well beyond the brief glimpse permitted by *Payne*. "To the extent that a

Case 3:12-cv-00327-MOC Document 108 Filed 02/23/16 Page 46 of 166
2034

JA2917

death sentence is based upon emotion, it is, of course,

unconstitutional", *Gardener v. Florida* 430 U.S. 349, 357 (1977).

Based on the foregoing, the Defendant moves the Court that a mistrial be

ordered in this matter to insure that the Defendant's sentence is not based upon

emotion.

This the _5_ day of August, 2002.

Harold J. Bender
200 N. McDowell Street
Charlotte, NC 28204
(704) 333-2169

Jean B. Lawson
PO Box 472106
Charlotte, NC 28247
(704) 341-1865

Attorneys for BARNETTE

## CERTIFICATE OF SERVICE

I, Harold J. Bender, do hereby certify that I have served a copy of the foregoing **Motion for Mistrial** upon the following by hand delivering to:

Ms. Anne Tompkins
Assistant United States Attorney
United States Attorney's Office
Suite 1700, Carillon Building
227 West Trade Street
Charlotte, North Carolina 28202

This the 5 day of August, 2002.

HAROLD J. BENDER
Bender & Barnett
200 North McDowell Street
Charlotte, North Carolina 28204
Telephone: 704/333-2169

2036

JA2919

p.6

## III. Statutory Agg. Factors
## Wording of # 2

"to" cause the death - does this
mean he planned the carjacking
to cause the death

or are we considering wether
he planned the carjacking
"which" caused the death

FILED
IN COURT
CHARLOTTE, N.C.

AUG 1 3 2002

U. S. DISTRICT COURT
W. DIST. OF N. C.

8-13-02     Case : 3:97CR23-V

(To the foreperson: please read this aloud to all the jurors.)

Members of the jury: Your question asks as follows:

"P. 6   III. Statutory Agg. Factors
Wording of #2"

'To' cause the death - does this mean he planned the carjacking **to cause the death**

or are we considering whether he planned the carjacking 'which' caused the death?"

As I understand it, you are asking for an interpretation of the language in #2, page 6,which reads:
"Do you, the jury, unanimously find that the government has proven beyond a reasonable doubt
that the defendant committed the offense in Count Seven after substantial planning and
premeditation to cause the death of Donald Lee Allen?"

It appears that this question might arise as to this alleged aggravating factor as to all three counts,
because the government has alleged the planning and premeditation factor as to each count. For
purposes of this answer, however, I shall assume we are talking about Count Seven.

To answer the question in your note, I would suggest that you read the language of #2, page 6,
carefully and give the words their ordinary, everyday meanings. The focus here is whether the
offense happened after, or in consequence of, substantial planning and premeditation. Note that
#2 refers to "the offense in Count Seven". It might be helpful to re-read the language of Count
Seven of the indictment as shown toward the top of page 23 of your jury instructions. Also, re-
read the instruction which pertains to #2 as shown on page 33 of the jury instructions.

I would make the same suggestion as to this particular aggravating factor for all three counts in
which it is alleged.

Please let me know if there are further questions. Thank you.

Judge Voorhees

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
Case Number: 3:97CR-23-V

UNITED STATES OF AMERICA    )
                           )
v.                         )
                           )
                           )
                           )
AQUILIA MARCIVICCI BARNETTE, )
Defendant                  )
_____)

**SPECIAL VERDICT FORM REGARDING THE PUNISHMENT TO BE IMPOSED
UPON THE DEFENDANT FOR THE KILLING OF DONALD LEE ALLEN
WITH REFERENCE TO COUNT SEVEN**

I.    **AGE OF DEFENDANT**

Instructions: Answer "YES" or "NO".

1. Do you, the jury, unanimously find that the government has established beyond a

reasonable doubt that the defendant was eighteen years of age or older at the time of the offense

in Count Seven?

<div align="right">YES ___

NO _____</div>

_Diane R. Edwards_
FOREPERSON

Instructions: If you answered "NO" with respect to the determination in Section I, then

stop your deliberations, cross out Sections II, III, IV, V and VI of this form, and proceed to

Section VII. Each juror should then carefully read the statement in Section VII, and sign in the

1

appropriate place if the statement accurately reflects the manner in which he or she reached his or her decision. You should then advise the Court that you have reached a decision.

If you answered "YES" with respect to the determination in Section I, then proceed to Section II which follows.

2

**2040**

**JA2923**

## II. REQUISITE MENTAL STATE

Instructions: For each of the following, answer "YES" or "NO".

1. As to the charge in Count Seven, do you, the jury, unanimously find that the government has proven beyond a reasonable doubt that the defendant intentionally killed Donald Lee Allen?

YES ✓

NO _____

*Diane R Edwards*
FOREPERSON



2. As to the charge in Count Seven, do you, the jury, unanimously find that the government has proven beyond a reasonable doubt that the defendant intentionally inflicted serious bodily injury which resulted in the death of Donald Lee Allen?

YES ✓

NO _____

*Diane R Edwards*
FOREPERSON

3

Case 3:12-cv-00327-MOC  Document 108  Filed 09/23/15  Page 53 of 166

2041

JA2924

3. As to the charge in Count Seven, do you, the jury, unanimously find that the government has proven beyond a reasonable doubt that the defendant intentionally engaged in conduct intending that Donald Lee Allen be killed and/or that lethal force be employed against Donald Lee Allen which resulted in the death of Donald Lee Allen?

YES ✓

NO _____


FOREPERSON

4. As to the charge in Count Seven, do you, the jury, unanimously find that the government has proven beyond a reasonable doubt that the defendant intentionally engaged in conduct which the defendant knew would create a grave risk of death to a person, other than one of the participants in the offense, and resulted in the death of Donald Lee Allen?

YES ✓

NO _____

FOREPERSON

Instructions: If you answered "NO" with respect to all of the determinations in this section, then stop your deliberations, cross out Sections III, IV, V and VI of this form, and proceed to Section VII. Each juror should carefully read the statement in Section VII, and sign in the appropriate place if the statement accurately reflects the manner in which he or she reached his or her decision. You should then advise the Court that you have reached a decision.

If you answered "YES" with respect to any one or more of the determinations in Section

4

JA2925

II, then proceed to Section III which follows.

5

Case 3:12-cv-00327-MOC Document 108 Filed 09/23/15 Page 55 of 166
**2043**

**JA2926**

## III. STATUTORY AGGRAVATING FACTORS

Instructions: For each of the following, answer "YES" or "NO",

1. Do you, the jury, unanimously find that the government has proven beyond a reasonable doubt that the defendant committed the offense in Count Seven in the expectation of the receipt of something of pecuniary value?

<div align="right">

YES __✓__

NO _____

</div>

*Diane R Edwards*
FOREPERSON

2. Do you, the jury, unanimously find that the government has proven beyond a reasonable doubt that the defendant committed the offense in Count Seven after substantial planning and premeditation to cause the death of Donald Lee Allen?

<div align="right">

YES __✓__

NO _____

</div>

*Diane R Edwards*
FOREPERSON

Instructions: If you answered "NO" with respect to both of the statutory aggravating factors in this Section III, then stop your deliberations, cross out Sections IV, V and VI of this form, and proceed to Section VII of this form. Each juror should then carefully read the statement in Section VII, and sign in the appropriate place if the statement accurately reflects the manner in which he or she reached his or her decision. You should then advise the Court that you have reached a decision.

If you found the requisite age in Section I, the requisite mental state in Section II and

6

Case 3:12-cv-00327-MOC Document 108 Filed 09/23/15 Page 56 of 166

**2044**

**JA2927**

answered "YES" with respect to one or both of the statutory aggravating factors in this Section

III, then proceed to Section IV which follows.

7

Case 3:12-cv-00327-MOC   Document 108   Filed 09/23/15   Page 57 of 166

**2045**

**JA2928**

## IV. NON-STATUTORY AGGRAVATING FACTORS – COUNT SEVEN

Instructions: For each of the following, answer "YES" or "NO".

1. Do you, the jury, unanimously find that the government has proven beyond a reasonable doubt that the defendant caused harm to the family of Donald Lee Allen as a result of the impact of the killing on the family of Donald Lee Allen?

YES ✓

NO _____

*Diane R Edwards*
FOREPERSON

2. Do you, the jury, unanimously find that the government has proven beyond a reasonable doubt that the defendant is likely to commit criminal acts of violence in the future which would be a continuing and serious threat to society?

YES _____

NO ✓

*Diane R Edwards*
FOREPERSON

3. Do you, the jury, unanimously find that the government has proven beyond a reasonable doubt that the defendant intentionally killed two people in that in addition to killing Donald Lee Allen, the defendant also killed Robin Williams?

YES ✓

NO _____

*Diane R Edwards*
FOREPERSON

8

**JA2929**

Instructions: Regardless of whether you answered "YES" or "NO" with respect to the three non-statutory aggravating factors in this Section IV, then proceed to Section V, which follows.

9

## V. MITIGATING FACTORS

Instructions: For each of the following mitigating factors, in the space provided, indicate the number of jurors who have found the existence of that mitigating factor to be proven by the preponderance of the evidence as to Count Seven.

A finding with respect to a mitigating factor may be made by one or more of the members of the jury, and any member of the jury who finds the existence of a mitigating factor must consider such [a] factor[s] established in considering whether or not a sentence of death shall be imposed, regardless of the number of other jurors who agree that the factor has been established.

The statutory mitigating factors which the defendant contends have been proved by a preponderance of the evidence are:

1. The defendant's capacity to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of the law was significantly impaired, regardless of whether the capacity was so impaired as to constitute a defense to the charge.

Number of jurors who so find __0__.

2. The other factors in the defendant's childhood, background or character mitigate against imposition of the death sentence.

Number of jurors who so find __11__.

The non-statutory factor[s] in the defendant's background or character, the circumstances of the crime[s], or other relevant facts or circumstances as mitigation which the defendant

10

Case 3:12-cv-00327-MOC Document 108 Filed 09/23/15 Page 60 of 166
2048

JA2931

contends have been proven by the preponderance of the evidence are as follows:

    1. Marc Barnette has accepted full responsibility for his actions.

Number of jurors who so find ____1____.

    2. Marc Barnette has remorse.

Number of jurors who so find ____1____.

    3. Marc Barnette was abused by his father.

Number of jurors who so find ____1____.

    4. Marc Barnette was affected by growing up in a family environment of violence, drugs and alcohol abuse.

Number of jurors who so find ____12____.

    5. Marc Barnette had repeated exposure to violence in the home.

Number of jurors who so find ____12____.

    6. Marc Barnette attempted to protect his brother, Mario, from the damaging effects of parental violence and neglect.

Number of jurors who so find ____12____.

11

Case 3:12-cv-00327-MOC   Document 108   Filed 09/23/15   Page 61 of 166

2049

7. Marc Barnette had a history of untreated emotional problems.

Number of jurors who so find ___9___.

8. At the time of these crimes, Marc Barnette was experiencing a depressive episode.

Number of jurors who so find ___0___.

9. Marc Barnette does well in a structured environment.

Number of jurors who so find ___2___.

10. Marc Barnette cooperated with police.

Number of jurors who so find ___12___.

11. Marc Barnette can serve a useful purpose to others in a prison environment.

Number of jurors who so find ___12___.

12. At the time of these offenses, Marc Barnette was experiencing irrational and obsessive thoughts.

Number of jurors who so find ___6___.

13. Marc Barnette's brother and children will be harmed by his execution.

Number of jurors who so find ___0___.

12

In addition, there are three non-statutory mitigating factors which the Court instructs you to find. The Court instructs you that these three mitigating factors have been proven by the preponderance of the evidence and you should so indicate on this verdict form:

1. Marc Barnette was neglected by his mother.

Number of jurors who so find 12.

2. Marc Barnette turned himself in to police.

Number of jurors who so find 12.

3. Marc Barnette has been a model prisoner.

Number of jurors who so find 12.

The following extra spaces are provided to write in additional mitigating factors, if any, found by any one or more jurors. If none, write "NONE" and line out the extra spaces with a large "X". If more space is needed, write "CONTINUED" and use the reverse side of this page.

None

Number of jurors who so find ________.



Number of jurors who so find _____.

Number of jurors who so find _____.

Number of jurors who so find _____.

Instructions: Regardless of whether or not you chose to write in additional mitigating factors and findings in Section V above, proceed to Section VI and Section VII which follow.

14

Case 3:12-cv-00327-MOC   Document 108   Filed 09/23/15   Page 64 of 166

2052

JA2935

## VI. DETERMINATION

Based upon consideration of whether the aggravating factor or factors found to exist as to Count Seven sufficiently outweigh any mitigating factor or factors found to exist to justify a sentence of death, or in the absence of any mitigating factors, whether the aggravating factor or factors as to Count Seven are in themselves sufficient to justify a sentence of death, indicate your recommendation using either the following form A or B.

15

2053

JA2936

## A. <u>Death Sentence</u>

Based upon consideration of whether the aggravating factor or factors found to exist

sufficiently outweigh any mitigating factor or factors found to exist to justify a sentence of death,

or in the absence of any mitigating factors, whether the aggravating factor(s) are in themselves

sufficient to justify a sentence of death, we recommend by unanimous vote that a sentence of

death shall be imposed for the killing of Donald Lee Allen as to Count Seven.

YES ___12___

NO _____

If you answer "YES", sign your names here, and then proceed to Section VII. If you answer

"NO", the foreperson alone should sign, and you should proceed to Section VI (B):

FOREPERSON

Date: ___August___ __13__, 2002

16

Case 3:12-cv-00327-MOC   Document 108   Filed 09/23/15   Page 66 of 166

2054

JA2937

## B. Sentence of Life in Prison Without Possibility of Release

Based upon consideration of whether the aggravating factors found to exist sufficiently outweigh any mitigating factor or factors found to exist to justify a sentence of death, or in the absence of any mitigating factors, whether the aggravating factor or factors are in themselves sufficient to justify a sentence of death, we recommend by unanimous vote that a sentence of life in prison without possibility of release shall be imposed for the killing of Donald Lee Allen in Count Seven.

YES _____

NO _____

If you answer "YES", sign your names here, and then proceed to Section VII. If you answer "NO", the foreperson alone should sign, and you should proceed to Section VII:

_____ _____

_____ _____

_____ _____

_____ _____

_____ _____

FOREPERSON

Date: _____ \_\_\_\_\_, 2002

17

JA2938

## VII    CERTIFICATION

By signing below, each juror certifies that consideration of the race, color, religious beliefs, national origin, or sex of the defendant or the victim was not involved in reaching his or her individual decision, and that the individual juror would have made the same recommendation regarding a sentence for the crime in question no matter what the race, color, religious beliefs, national origin or sex of the defendant or the victim might have been.

_(juror signatures)_

FOREPERSON

Date: ___August___  __13__ , 2002

WHEN THE JURY HAS COMPLETED ITS WORK AS TO EACH COUNT AND FILLED OUT THE VERDICT SHEETS ACCORDINGLY, THE JURY WILL RETURN TO THE COURTROOM.

18

Case 3:12-cv-00327-MOC   Document 108   Filed 09/23/15   Page 68 of 166

**2056**

**JA2939**

UNITED STATES OF AMERICA )
)
v. )
)
)
AQUILIA MARCIVICCI BARNETTE, )
Defendant )
_____ )

FILED

MAR 1 5 2002

## SPECIAL VERDICT FORM REGARDING THE PUNISHMENT TO BE IMPOSED UPON THE DEFENDANT FOR THE KILLING OF DONALD LEE ALLEN WITH REFERENCE TO COUNT EIGHT

### I. AGE OF DEFENDANT

Instructions: Answer "YES" or "NO".

1. Do you, the jury, unanimously find that the government has established beyond a reasonable doubt that the defendant was eighteen years of age or older at the time of the offense in Count Eight?

YES ✓

NO _____

_Janet R. Edwards_
FOREPERSON

Instructions: If you answered "NO" with respect to the determination in Section I, then stop your deliberations, cross out Sections II, III, IV, V and VI of this form, and proceed to Section VII. Each juror should then carefully read the statement in Section VII, and sign in the

1

appropriate place if the statement accurately reflects the manner in which he or she reached his or her decision. You should then advise the Court that you have reached a decision.

If you answered "YES" with respect to the determination in Section I, then proceed to Section II which follows.

2

Case 3:12-cv-00327-MOC Document 108 Filed 09/23/15 Page 70 of 166

**2058**

**JA2941**

## II. REQUISITE MENTAL STATE

Instructions: For each of the following, answer "YES" or "NO".

1. As to the charge in Count Eight, do you, the jury, unanimously find that the government has proven beyond a reasonable doubt that the defendant intentionally killed Donald Lee Allen?

YES ✓

NO _____

_Diane R Edwards_
FOREPERSON

2. As to the charge in Count Eight, do you, the jury, unanimously find that the government has proven beyond a reasonable doubt that the defendant intentionally inflicted serious bodily injury which resulted in the death of Donald Lee Allen?

YES ✓

NO _____

_Diane R Edwards_
FOREPERSON

3

2059

JA2942

3. As to the charge in Count Eight, do you, the jury, unanimously find that the government has proven beyond a reasonable doubt that the defendant intentionally engaged in conduct intending that Donald Lee Allen be killed <u>and/or</u> that lethal force be employed against Donald Lee Allen which resulted in the death of Donald Lee Allen?

YES ✓

NO _____

*Diane R Edwards*
FOREPERSON

4. As to the charge in Count Eight, do you, the jury, unanimously find that the government has proven beyond a reasonable doubt that the defendant intentionally engaged in conduct which the defendant knew would create a grave risk of death to a person, other than one of the participants in the offense, and resulted in the death of Donald Lee Allen?

YES ✓

NO _____

*Diane R Edwards*
FOREPERSON

Instructions: If you answered "NO" with respect to all of the determinations in this section, then stop your deliberations, cross out Sections III, IV, V and VI of this form, and proceed to Section VII. Each juror should carefully read the statement in Section VII, and sign in the appropriate place if the statement accurately reflects the manner in which he or she reached his or her decision. You should then advise the Court that you have reached a decision.

4

**JA2943**

If you answered "YES" with respect to any one or more of the determinations in Section II, then proceed to Section III which follows.

5

### III. STATUTORY AGGRAVATING FACTORS

<u>Instructions</u>: For each of the following, answer "YES" or "NO",

1. Do you, the jury, unanimously find that the government has proven beyond a reasonable doubt that the defendant committed the offense in Count Eight in the expectation of the receipt of something of pecuniary value?

YES ✓

NO _____



FOREPERSON

2. Do you, the jury, unanimously find that the government has proven beyond a reasonable doubt that the defendant committed the offense in Count Eight after substantial planning and premeditation to cause the death of Donald Lee Allen?

YES ✓

NO _____

FOREPERSON

<u>Instructions</u>: If you answered "NO" with respect to both of the statutory aggravating factors in this Section III, then stop your deliberations, cross out Sections IV, V and VI of this form, and proceed to Section VII of this form. Each juror should then carefully read the statement in Section VII, and sign in the appropriate place if the statement accurately reflects the manner in which he or she reached his or her decision. You should then advise the Court that you have reached a decision.

If you found the requisite age in Section I, the requisite mental state in Section II and

6

**JA2945**

answered "YES" with respect to one or both of the statutory aggravating factors in this Section III, then proceed to Section IV which follows.

7

2063

JA2946

## IV.   NON-STATUTORY AGGRAVATING FACTORS – COUNT EIGHT

Instructions: For each of the following, answer "YES" or "NO".

1. Do you, the jury, unanimously find that the government has proven beyond a reasonable doubt that the defendant caused harm to the family of Donald Lee Allen as a result of the impact of the killing on the family of Donald Lee Allen?

<div align="right">

YES ✓

NO _____

</div>

*Diane R Edwards*
FOREPERSON

2. Do you, the jury, unanimously find that the government has proven beyond a reasonable doubt that the defendant is likely to commit criminal acts of violence in the future which would be a continuing and serious threat to society?

<div align="right">

YES _____

NO ✓

</div>

*Diane R Edwards*
FOREPERSON

3. Do you, the jury, unanimously find that the government has proven beyond a reasonable doubt that the defendant intentionally killed two people in that in addition to killing Donald Lee Allen, the defendant also killed Robin Williams?

<div align="right">

YES ✓

NO _____

</div>

*Diane R Edwards*
FOREPERSON

8

Instructions: Regardless of whether you answered "YES" or "NO" with respect to the three non-statutory aggravating factors in this Section IV, then proceed to Section V, which follows.

9

Case 3:12-cv-00327-MOC   Document 108   Filed 09/23/15   Page 77 of 166

**2065**

**JA2948**

## V.  MITIGATING FACTORS

Instructions: For each of the following mitigating factors, in the space provided, indicate the number of jurors who have found the existence of that mitigating factor to be proven by the preponderance of the evidence as to Count Eight.

A finding with respect to a mitigating factor may be made by one or more of the members of the jury, and any member of the jury who finds the existence of a mitigating factor must consider such [a] factor[s] established in considering whether or not a sentence of death shall be imposed, regardless of the number of other jurors who agree that the factor has been established.

The statutory mitigating factors which the defendant contends have been proved by a preponderance of the evidence are:

1. The defendant's capacity to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of the law was significantly impaired, regardless of whether the capacity was so impaired as to constitute a defense to the charge.

Number of jurors who so find ___0___.

2. The other factors in the defendant's childhood, background or character mitigate against imposition of the death sentence.

Number of jurors who so find ___11___.

The non-statutory factor[s] in the defendant's background or character, the circumstances of the crime[s], or other relevant facts or circumstances as mitigation which the defendant

10

Case 3:12-cv-00327-MOC   Document 108   Filed 09/23/15   Page 78 of 166
**2066**

**JA2949**

contends have been proven by the preponderance of the evidence are as follows:

1. Marc Barnette has accepted full responsibility for his actions.

Number of jurors who so find ___1___.

2. Marc Barnette has remorse.

Number of jurors who so find ___1___.

3. Marc Barnette was abused by his father.

Number of jurors who so find ___1___.

4. Marc Barnette was affected by growing up in a family environment of violence, drugs and alcohol abuse.

Number of jurors who so find ___12___.

5. Marc Barnette had repeated exposure to violence in the home.

Number of jurors who so find ___12___.

6. Marc Barnette attempted to protect his brother, Mario, from the damaging effects of parental violence and neglect.

Number of jurors who so find ___12___.

11

7. Marc Barnette had a history of untreated emotional problems.

Number of jurors who so find ___9___.

8. At the time of these crimes, Marc Barnette was experiencing a depressive episode.

Number of jurors who so find ___0___.

9. Marc Barnette does well in a structured environment.

Number of jurors who so find ___2___.

10. Marc Barnette cooperated with police.

Number of jurors who so find ___12___.

11. Marc Barnette can serve a useful purpose to others in a prison environment.

Number of jurors who so find ___12___.

12. At the time of these offenses, Marc Barnette was experiencing irrational and obsessive thoughts.

Number of jurors who so find ___6___.

13. Marc Barnette's brother and children will be harmed by his execution.

Number of jurors who so find ___0___.

12

In addition, there are three non-statutory mitigating factors which the Court instructs you to find. The Court instructs you that these three mitigating factors have been proven by the preponderance of the evidence and you should so indicate on this verdict form:

1. Marc Barnette was neglected by his mother.

Number of jurors who so find __*12*__.

2. Marc Barnette turned himself in to police.

Number of jurors who so find __*12*__.

3. Marc Barnette has been a model prisoner.

Number of jurors who so find __*12*__.

The following extra spaces are provided to write in additional mitigating factors, if any, found by any one or more jurors. If none, write "NONE" and line out the extra spaces with a large "X". If more space is needed, write "CONTINUED" and use the reverse side of this page.

__. __*None*_____

_____

Number of jurors who so find _____.

13

Case 3:12-cv-00327-MOC   Document 108   Filed 09/23/15   Page 81 of 166

2069

JA2952



Number of jurors who so find _____.

Number of jurors who so find _____.

Number of jurors who so find _____.

Instructions: Regardless of whether or not you chose to write in additional mitigating factors and findings in Section V above, proceed to Section VI and Section VII which follow.

14

Case 3:12-cv-00327-MOC   Document 108   Filed 09/23/15   Page 82 of 166

**2070**

**JA2953**

## VI. DETERMINATION

Based upon consideration of whether the aggravating factor or factors found to exist as to Count Eight sufficiently outweigh any mitigating factor or factors found to exist to justify a sentence of death, or in the absence of any mitigating factors, whether the aggravating factor or factors as to Count Eight are in themselves sufficient to justify a sentence of death, indicate your recommendation using either the following form A or B.

15

Case 3:12-cv-00327-MOC Document 108 Filed 09/23/15 Page 83 of 166

2071

JA2954

## A.    <u>Death Sentence</u>

Based upon consideration of whether the aggravating factor or factors found to exist

sufficiently outweigh any mitigating factor or factors found to exist to justify a sentence of death,

or in the absence of any mitigating factors, whether the aggravating factor(s) are in themselves

sufficient to justify a sentence of death, we recommend by unanimous vote that a sentence of

death shall be imposed for the killing of Donald Lee Allen as to Count Eight.

<div align="right">

YES    <u>  i     </u>

NO    <u>        </u>

</div>

If you answer "YES", sign your names here, and then proceed to Section VII.  If you answer

"NO", the foreperson alone should sign, and you should proceed to Section VI (B):

FOREPERSON

Date: _____ , 2002

16

**B. Sentence of Life in Prison Without Possibility of Release**

Based upon consideration of whether the aggravating factors found to exist sufficiently outweigh any mitigating factor or factors found to exist to justify a sentence of death, or in the absence of any mitigating factors, whether the aggravating factor or factors are in themselves sufficient to justify a sentence of death, we recommend by unanimous vote that a sentence of life in prison without possibility of release shall be imposed for the killing of Donald Lee Allen in Count Eight.

<div align="right">

YES _____

NO _____

</div>

If you answer "YES", sign your names here, and then proceed to Section VII. If you answer "NO", the foreperson alone should sign, and you should proceed to Section VII:

_____          _____

_____          _____

_____          _____

_____          _____

_____          _____

                                 _____
                                 FOREPERSON

Date: _____ _____, 2002

17

**2073**

**JA2956**

## VII CERTIFICATION

By signing below, each juror certifies that consideration of the race, color, religious beliefs, national origin, or sex of the defendant or the victim was not involved in reaching his or her individual decision, and that the individual juror would have made the same recommendation regarding a sentence for the crime in question no matter what the race, color, religious beliefs, national origin or sex of the defendant or the victim might have been.

_[signature]_                          _[signature]_

_[signature]_                          _[signature]_

_[signature]_                          _[signature]_

_[signature]_                          _[signature]_

_[signature]_                          _[signature]_

_[signature]_                          _[signature]_

                                        FOREPERSON

Date: _August_ _13_, 2002

WHEN THE JURY HAS COMPLETED ITS WORK AS TO EACH COUNT AND FILLED OUT THE VERDICT SHEETS ACCORDINGLY, THE JURY WILL RETURN TO THE COURTROOM.

18

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
Case Number: 3:97CR-23-V

UNITED STATES OF AMERICA )
)
v. )
)
)
)
AQUILIA MARCIVICCI BARNETTE, )
Defendant )
)
_____ )

AUG 1 3 2002

## SPECIAL VERDICT FORM REGARDING THE PUNISHMENT TO BE IMPOSED UPON THE DEFENDANT FOR THE KILLING OF ROBIN WILLIAMS WITH REFERENCE TO COUNT ELEVEN

### I. AGE OF DEFENDANT

Instructions: Answer "YES" or "NO".

1. As to the charge in Count Eleven, do you, the jury, unanimously find that the government has established beyond a reasonable doubt that the defendant was eighteen years of age or older at the time of the offense?

YES ✓

NO _____

*Diane R Edwards*
FOREPERSON

Instructions: If you answered "NO" with respect to the determination in Section I, then stop your deliberations, cross out Sections II, III, IV, V and VI of this form, and proceed to Section VII. Each juror should then carefully read the statement in Section VII, and sign in the

1

appropriate place if the statement accurately reflects the manner in which he or she reached his or her decision. You should then advise the Court that you have reached a decision.

If you answered "YES" with respect to the determination in Section I, then proceed to Section II which follows.

2

**2076**

**JA2959**

## II. REQUISITE MENTAL STATE

Instructions: For each of the following, answer "YES" or "NO".

1. As to the charge in Count Eleven, do you, the jury, unanimously find that the government has proven beyond a reasonable doubt that the defendant intentionally killed Robin Williams?

YES ✓

NO _____

_Diane R Edwards_
FOREPERSON

2. As to the charge in Count Eleven, do you, the jury, unanimously find that the government has proven beyond a reasonable doubt that the defendant intentionally inflicted serious bodily injury which resulted in the death of Robin Williams?

YES ✓

NO _____

_Diane R Edwards_
FOREPERSON

3

3. As to the charge in Count Eleven, do you, the jury, unanimously find that the government has proven beyond a reasonable doubt that the defendant intentionally engaged in conduct intending that Robin Williams be killed and/or that lethal force be employed against Robin Williams which resulted in the death of Robin Williams?

YES ✓

NO _____

_Diane R Edwards_
FOREPERSON

4. As to the charge in Count Eleven, do you, the jury, unanimously find that the government has proven beyond a reasonable doubt that the defendant intentionally engaged in conduct which the defendant knew would create a grave risk of death to a person, other than one of the participants in the offense, and resulted in the death of Robin Williams?

YES ✓

NO _____

_Diane R Edwards_
FOREPERSON

Instructions: If you answered "NO" with respect to all of the determinations in this section, then stop your deliberations, cross out Sections III, IV, V and VI of this form, and proceed to Section VII. Each juror should carefully read the statement in Section VII, and sign in the appropriate place if the statement accurately reflects the manner in which he or she reached his or her decision. You should then advise the Court that you have reached a decision.

4

If you answered "YES" with respect to any one or more of the determinations in Section II, then proceed to Section III which follows.

5

2079

JA2962

### III. STATUTORY AGGRAVATING FACTORS

Instructions: For each of the following, answer "YES" or "NO",

1. Do you, the jury, unanimously find that the government has proven beyond a reasonable doubt that the defendant committed the offense in Count Eleven while knowingly creating a grave risk of death to one or more persons in addition to the intended victim, namely, Bertha Williams and Sonji Hill?

YES ✓

NO _____

___Diane R Edwards___
FOREPERSON

2. Do you, the jury, unanimously find that the government has proven beyond a reasonable doubt that the defendant committed the offense in Count Eleven after substantial planning and premeditation to cause the death of Robin Williams?

YES ✓

NO _____

___Diane R Edwards___
FOREPERSON

Instructions: If you answered "NO" with respect to both of the statutory aggravating factors in this Section III, then stop your deliberations, cross out Sections IV, V and VI of this form, and proceed to Section VII of this form. Each juror should then carefully read the statement in Section VII, and sign in the appropriate place if the statement accurately reflects the manner in which he or she reached his or her decision. You should then advise the Court that you have reached a decision.

6

If you found the requisite age in Section I, the requisite mental state in Section II and answered "YES" with respect to one or both of the statutory aggravating factors in this Section III, then proceed to Section IV which follows.

7

## IV.  NON-STATUTORY AGGRAVATING FACTORS – COUNT ELEVEN

Instructions: For each of the following, answer "YES" or "NO".

1. Do you, the jury, unanimously find that the government has proven beyond a reasonable doubt that the defendant caused harm to the family of Robin Williams as a result of the impact of the killing on the family of Robin Williams?

YES ✓

NO _____

_Diane R Edwards_
FOREPERSON

2. Do you, the jury, unanimously find that the government has proven beyond a reasonable doubt that the defendant is likely to commit criminal acts of violence in the future which would be a continuing and serious threat to society?

YES _____

NO ✓

_Diane R Edwards_
FOREPERSON

3. Do you, the jury, unanimously find that the government has proven beyond a reasonable doubt that the defendant intentionally killed two people in that in addition to killing Robin Williams, the defendant also killed Donald Lee Allen?

YES ✓

NO _____

_Diane R Edwards_
FOREPERSON

8

**JA2965**

Instructions: Regardless of whether you answered "YES" or "NO" with respect to the three non-statutory aggravating factors in this Section IV, then proceed to Section V, which follows.

9

2083

JA2966

## V.   MITIGATING FACTORS

Instructions: For each of the following mitigating factors, in the space provided, indicate the number of jurors who have found the existence of that mitigating factor to be proven by the preponderance of the evidence as to Count Eleven.

A finding with respect to a mitigating factor may be made by one or more of the members of the jury, and any member of the jury who finds the existence of a mitigating factor must consider such [a] factor[s] established in considering whether or not a sentence of death shall be imposed, regardless of the number of other jurors who agree that the factor has been established.

The statutory mitigating factors which the defendant contends have been proved by a preponderance of the evidence are:

1. The defendant's capacity to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of the law was significantly impaired, regardless of whether the capacity was so impaired as to constitute a defense to the charge.

Number of jurors who so find ___*0*___.

2. The other factors in the defendant's childhood, background or character mitigate against imposition of the death sentence.

Number of jurors who so find ___*11*___.

The non-statutory factor[s] in the defendant's background or character, the circumstances of the crime[s], or other relevant facts or circumstances as mitigation which the defendant

10

Case 3:12-cv-00327-MOC   Document 108   Filed 09/23/15   Page 96 of 166

2084

JA2967

contends have been proven by the preponderance of the evidence are as follows:

1. Marc Barnette has accepted full responsibility for his actions.

Number of jurors who so find _____1_____.

2. Marc Barnette has remorse.

Number of jurors who so find _____1_____.

3. Marc Barnette was abused by his father.

Number of jurors who so find _____1_____.

4. Marc Barnette was affected by growing up in a family environment of violence, drugs and alcohol abuse.

Number of jurors who so find _____12_____.

5. Marc Barnette had repeated exposure to violence in the home.

Number of jurors who so find _____12_____.

6. Marc Barnette attempted to protect his brother, Mario, from the damaging effects of parental violence and neglect.

Number of jurors who so find _____12_____.

11

JA2968

7. Marc Barnette had a history of untreated emotional problems.

Number of jurors who so find ___9___.

8. At the time of these crimes, Marc Barnette was experiencing a depressive episode.

Number of jurors who so find ___0___.

9. Marc Barnette does well in a structured environment.

Number of jurors who so find ___2___.

10. Marc Barnette cooperated with police.

Number of jurors who so find ___12___.

11. Marc Barnette can serve a useful purpose to others in a prison environment.

Number of jurors who so find ___12___.

12. At the time of these offenses, Marc Barnette was experiencing irrational and obsessive thoughts.

Number of jurors who so find ___6___.

13. Marc Barnette's brother and children will be harmed by his execution.

Number of jurors who so find ___0___.

12

In addition, there are three non-statutory mitigating factors which the Court instructs you to find. The Court instructs you that these three mitigating factors have been proven by the preponderance of the evidence and you should so indicate on this verdict form:

1.  Marc Barnette was neglected by his mother.

Number of jurors who so find ___/2___.


2.  Marc Barnette turned himself in to police.

Number of jurors who so find ___/2___.


3.  Marc Barnette has been a model prisoner.

Number of jurors who so find ___/2___.


The following extra spaces are provided to write in additional mitigating factors, if any, found by any one or more jurors. If none, write "NONE" and line out the extra spaces with a large "X". If more space is needed, write "CONTINUED" and use the reverse side of this page.

___.  None _____

Number of jurors who so find _____.

13

Case 3:12-cv-00327-MOC   Document 108   Filed 09/23/15   Page 99 of 166
2087

JA2970



Number of jurors who so find _____.

Number of jurors who so find _____.

Number of jurors who so find _____.

Instructions: Regardless of whether or not you chose to write in additional mitigating factors and findings in Section V above, proceed to Section VI and Section VII which follow.

14

Case 3:12-cv-00327-MOC   Document 108   Filed 09/23/15   Page 100 of 166

2088

JA2971

## VI.  DETERMINATION

Based upon consideration of whether the aggravating factor or factors found to exist as to Count Eleven sufficiently outweigh any mitigating factor or factors found to exist to justify a sentence of death, or in the absence of any mitigating factors, whether the aggravating factor or factors as to Count Eleven are in themselves sufficient to justify a sentence of death, indicate your recommendation using either the following form A or B.

15

Case 3:12-cv-00327-MOC   Document 108   Filed 09/23/15   Page 101 of 166

2089

JA2972

## A. Death Sentence

Based upon consideration of whether the aggravating factor or factors found to exist sufficiently outweigh any mitigating factor or factors found to exist to justify a sentence of death, or in the absence of any mitigating factors, whether the aggravating factor(s) are in themselves sufficient to justify a sentence of death, we recommend by unanimous vote that a sentence of death shall be imposed for the killing of Robin Williams as to Count Eleven.

YES    ✓

NO    _____

If you answer "YES", sign your names here, and then proceed to Section VII. If you answer "NO", the foreperson alone should sign, and you should proceed to Section VI (B):

_____      _____

_____      _____

_____      _____

_____      _____

_____      _____

                               _____
                               FOREPERSON

Date: __August__ __13__, 2002

16

**B.** <u>**Sentence of Life in Prison Without Possibility of Release**</u>

Based upon consideration of whether the aggravating factors found to exist sufficiently outweigh any mitigating factor or factors found to exist to justify a sentence of death, or in the absence of any mitigating factors, whether the aggravating factor or factors are in themselves sufficient to justify a sentence of death, we recommend by unanimous vote that a sentence of life in prison without possibility of release shall be imposed for the killing of Robin Williams as to Count Eleven.

YES _____

NO _____

If you answer "YES", sign your names here, and then proceed to Section VII. If you answer "NO", the foreperson alone should sign, and you should proceed to Section VII:

_____  _____

_____  _____

_____  _____

_____  _____

_____  _____

_____  _____

FOREPERSON

Date: _____  \_\_\_\_\_, 2002

17

Case 3:12-cv-00327-MOC   Document 108   Filed 09/23/15   Page 103 of 166

JA2974

FILED
CHARLOTTE, N. C.

AUG 2 0 2002

U. S. DISTRICT COURT
W. DIST. OF N. C.

UNITED STATES OF AMERICA )
)
)
)
)                                        JUDGMENT AND ORDER
)
AQUILIA MARCIVICCI BARNETTE,             )
            Defendant                    )
_____)

Pursuant to the jury verdict, returned on January 27, 1998, finding the Defendant guilty

on all eleven counts of the Indictment; and pursuant to the jury verdict, returned on August 13,

2002, recommending the imposition of the death penalty on Counts Seven, Eight and Eleven of

the Indictment, the Court will now impose sentence on said counts, which are more particularly

described as follows:

**Count Seven**: Carjacking in violation of 18 U.S.C. § 2119(3), offense concluded June 22,

1996.

**Count Eight**: First Degree Murder by Use of a Firearm in violation of 18 U.S.C. §§

924(c)(1) & (i)2(1), offense concluded June 22, 1996.

**Count Eleven**: First Degree Murder by Use of a Firearm in violation of 18 U.S.C. §§

924(c)(1) & (i)2(1), offense concluded June 22, 1996.

Pursuant to the Federal Death Penalty Act of 1994, Title 18 U.S.C. §§ 3591-3595 and the

Special Findings of the jury, returned on August 13, 2002, and the jury's unanimous vote

recommending that the Defendant shall be sentenced to death, it is the Judgment of the Court that

the Defendant Aquilia Marcivicci Barnette is sentenced to death on each of Counts 7, 8 and 11 of

the Indictment.

/ s—

**JA2975**

Pursuant to the provisions of 18 U.S.C. § 3596, IT IS ORDERED that the Defendant is committed to the custody of the Attorney General of the United States until exhaustion of the procedures for appeal of the judgment of conviction and for review of the sentence.

When the sentence is to be implemented, the Attorney General shall release the Defendant to the custody of the United States Marshal, who shall supervise the implementation of the sentence in the manner prescribed by law of the State of North Carolina.

In the event the Defendant is released from prison, a five year term of supervised release is ordered. Within 72 hours of release from custody of the Bureau of Prisons, the Defendant shall report in person to the probation office in the district to which the Defendant is released.

This the _20_ day of August, 2002.

RICHARD L. VOORHEES
UNITED STATES DISTRICT COURT JUDGE

JA2976

FILED
CHARLOTTE, N.C.

FEB 2 0 1998

U.S. DISTRICT COURT
W. DIST. OF N.C.

UNITED STATES OF AMERICA

v.                                                                    JUDGMENT AND ORDER

AQUILIA MARCIVICCI BARNETTE

Pursuant to the jury verdict, returned on January 27, 1998, finding the Defendant guilty on all eleven counts of the Indictment, the Defendant is adjudged guilty of each of the following offenses:

| Title & Section | Nature of Offense | Date Offense Concluded | Count Number |
|---|---|---|---|
| 18 U.S.C. §§ 2261(a)(1) & 2261(b) | Interstate Domestic Violence | April 30, 1996 | 1 |
| 18 U.S.C. § 924(c)(1) | Use & Carry a Firearm During Crime of Violence | April 30, 1996 | 2 |
| 18 U.S.C. § 844(h)(1) | Arson in Commission of a Felony | April 30, 1996 | 3 |
| 18 U.S.C. §§ 922(a)(6) & 924 | Providing False Information To Acquire a Firearm | May 21, 1998 | 4 |
| 26 U.S.C. §§ 5861(f) & 5871 | Making a Firearm | June 22, 1996 | 5 |
| 18 U.S.C. §§ 922(g)(1) & 924 | Felon in Possession of A Firearm | June 22, 1996 | 6 |
| 18 U.S.C. § 2119(3) | Carjacking | June 22, 1996 | 7 |

| 18 U.S.C. §§ 924(c)(1) & (i)2(1) | First Degree Murder by Use of a Firearm | June 22, 1996 | 8 |
| 18 U.S.C. § 2312 | Interstate Transportation Of Stolen Vehicle | June 22, 1996 | 9 |
| 18 U.S.C. §§ 2261(a)(1) & 2261(b)(1) | Interstate Domestic Violence | June 22, 1996 | 10 |
| 18 U.S.C. §§ 924(c)(1) & (i)2(1) | First Degree Murder by Use of a Firearm | June 22, 1996 | 11 |

Pursuant to the Sentencing Reform Act of 1984, it is the judgment of the Court that the Defendant, Aquilia Marcivicci Barnette is hereby committed to the custody of the Bureau of Prisons to be imprisoned as follows:

**Count 6: LIFE;**

**Count 10:** LIFE to be served <u>concurrently</u> with Count 6;

**Count 1:** 240 Months to be served <u>concurrently</u> with Count 6;

**Counts 4, 5, & 9:** 120 Months each count to run <u>concurrently</u> with each other and with Count 1;

**Count 2:** 360 Months to run <u>consecutively</u> to all other Counts; and

**Count 3:** 180 Months to run <u>consecutively</u> to all other Counts, resulting in a total sentence of **Life Imprisonment, plus 540 Months <u>consecutive</u>**.

As to Counts 7, 8, and 11, the Court has previously sentenced the Defendant to death on each Count in accordance with the recommendation of the jury.

2

Case 3:12-cv-00327-MOC Document 209-8 Filed 09/23/15 Page 107 of 166

Pursuant to the Federal Death Penalty Act of 1994, Title 18 U.S.C. §§ 3591-3595 and the Special Findings of the jury, returned on February 10, 1998, and the jury's unanimous vote recommending that the Defendant shall be sentenced to death, it is the Judgment of the Court that the Defendant Aquilia Marcivicci Barnette is sentenced to death on each of Counts 7, 8, and 11 of the Indictment.

Pursuant to the provisions of 18 U.S.C. § 3596, IT IS ORDERED that the Defendant is committed to the custody of the Attorney General of the United States until exhaustion of the procedures for appeal of the judgment of conviction and for review of the sentence.

When the sentence is to be implemented, the Attorney General shall release the Defendant to the custody of the United States Marshal, who shall supervise the implementation of the sentence in the manner prescribed by law of the State of North Carolina.

As required by 18 U.S.C. § 3013, IT IS ORDERED that the Defendant shall pay a Special Assessment of $100.00 for each Count for a total of $800.00 which shall be due and payable immediately.

In the event the Defendant is released from prison, a five year term of supervised release is ordered. Within 72 hours of release from custody of the Bureau of Prisons, the Defendant shall report in person to the probation office in the district to which the Defendant is released.

Dated this _____ day of February, 1998.

BY THE COURT:

ROBERT D. POTTER, SENIOR JUDGE

3

Case 3:12-cv-00327-MOC   Document 108   Filed 09/23/15   Page 108 of 166

2096

JA2979

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | Docket No. 3:97CR-23 |
| v. | ) | |
| | ) | |
| AQUILIA MARCIVICCI BARNETTE, | ) | |
| Defendant | ) | |
| | ) | |

## MOTION FOR NEW TRIAL, ARREST OF JUDGMENT AND OTHER RELIEF

NOW COMES the defendant, by and through counsel, and pursuant to Rules 33 and 34 of the Federal Rules of Criminal Procedure, respectfully moves that the Court grant the defendant a new trial, or vacate the sentences of death imposed herein on August 13, 2002 and impose sentences of Life Imprisonment without Possibility of Release. In support of this Motion, the undersigned advance the following:

1. On July 2, 2002, the defendant filed his Motion for Relief pursuant to Ring v. Arizona, ____ U.S.____, 122 S.Ct. 2428 (June 24, 2002) and Apprendi v. New Jersey, 530 U.S. 466, 120 S.Ct.2348, 147 L.Ed.2d 435 (2000). This Motion was filed thirteen (13) days before the defendant's sentencing hearing was scheduled to start. A copy of the Motion is attached as Exhibit 1 and incorporated herein by reference.

2. In the Motion, the defendant sought the following:

(a) that the Court strike the government's Notice of Intent to Seek the Death Penalty;

(b) that the Court impose non-aggravated sentences due to the constitutional insufficiency of the government's attempt to secure aggravated sentences;

(c) that the Court deem the Death Notice to be not properly pled and void due to lack of inclusion in the Indictment;

(d) that the Court prohibit the government from introducing aggravating circumstances to the jury; and

(e) for such other relief as is justified and appropriate.

3. On July 12, 2002, the government filed a "Response to Defendant's Motion for Relief Pursuant to Ring v. Arizona." A copy of the government's Response is attached as Exhibit 2. The defense contends that the government's pleading is unresponsive to the issues raised by the defendant's Motion.

4. After July 15, 2002, during jury selection proceedings in this case, this Court issued an oral order denying the relief sought by the defendant.

5. On July 22, 2002, the United States government filed a pleading in the case of United States of America v. Zacarias Moussaoui, Criminal No. 01-455-A (ED VA) which substantially adopted the position taken by the defendant here respecting the constitutional necessity of grand jury indictment on any aggravating factors required by law to authorize imposition of the death penalty, See United States of America v. Zacarias Moussaoui, supra, "Government's Opposition to Standby Counsel's Supplemental Memorandum in Support of Motion to Dismiss Government's Notice of Intent to Seek a Sentence of Death" in the case. In this very significant case, in which pleadings are likely approved at high levels in the United States Department of Justice, the government argues persuasively that Ring v. Arizona *does* apply to capital sentencing, and asserts that it secured re-indictment of Mr. Moussaoui so as to comply

**JA2981**

with Ring. A copy of the Government's Memorandum is attached as Exhibit 3, and may be found at http://notablecases.vaed.uscourts.gov/1:01-cr-00455/docs/66899/0.pdf.[1]

6. On August 13, 2002, the jury concluded the sentencing hearing by recommending that the defendant be sentenced to death on all three counts submitted to it by the Court. Pursuant to 18 USC Section 3594, the Court imposed three death sentences upon the defendant.

7. In light of the government's apparent reassessment of the applicability of Ring to federal capital sentencing proceedings through the Indictment Clause of the Fifth Amendment, the undersigned request that the Court reconsider its denial of the defendant's Motion for Relief under Ring, and grant the relief sought. In the alternative, and consistent with the mandate of Ring, the undersigned request that the Court issue an order, pursuant to Rule 34 of the Federal Rules of Criminal Procedure, arresting the sentences of death because the indictment fails to allege essential elements of the offense of capital or death-eligible murder (the alleged statutory aggravating factors), and/or

---

[1]The Government's Moussaoui submission states that "the Court's ruling [in Ring] that aggravating factors are viewed as elements of the offense, which require jury determination, suggests that the Court is likely to find that the Indictment Clause mandates submission of aggravating factors to the grand jury. See Ring, 122 S. Ct. at 2439 ("If a State makes an increase in a defendant's authorized punishment contingent on the finding of a fact, that fact – no matter how the State labels it – must be found by a jury beyond a reasonable doubt."); id. at 2443 ("Because Arizona's enumerated aggravating factors operate as the 'functional equivalent of an element of a greater offense,' . . . the Sixth Amendment requires that they be found by a jury."); see also United States v. Cotton, 122 S. Ct. 1781, 1783 (May 20, 2002) (in federal prosecutions, any fact increasing the maximum punishment "must also be charged in the indictment.")."

JA2982

because the Court lacked jurisdiction to hold a capital sentencing hearing before a jury in the absence of a constitutionally-sufficient allegation of statutory aggravating circumstances in the indictment.

In making this request, the defendant does not concede that the Federal Death Penalty Act may be rendered constitutional under Ring by means of the remedy selected by the government in Moussaoui--namely, the securing of a superseding indictment in which statutory aggravating factors are re-designated as "elements" of capital murder. On the contrary, he submits that the designation by Congress of such allegations as mere sentencing factors can only be corrected by Congress, and the FDPA is therefore facially unconstitutional under Ring and the Indictment Clause of the Fifth Amendment. The issue is academic here, however, since (unlike in Moussaoui) no such superceding indictment has been sought or obtained in this case. Instead, over his timely objection, cf. United States v. Cotton, 122 S. Ct. 1781 (2002), the defendant has clearly received a sentence--death--which exceeds the maximum sentence of life imprisonment allowable under the offenses actually made out by the indictment.

FOR ANY OR ALL OF THE REASONS SET FORTH HEREIN, the defendant requests that the Court reconsider its ruling on the Defendant's Motion for Relief Pursuant to Ring v. Arizona, and rule that the defendant's sentencing hearing—and the death sentences produced by it -- are invalid under the Indictment Clause of the Fifth Amendment. The defendant further requests that the Court impose a sentence of Life Imprisonment Without the Possibility of Release on each of the three counts submitted to the jury, inasmuch as that is the only punishment possible under indictments that fail to allege any capital aggravating circumstances.

Respectfully submitted on this the 20th day of August, 2002.

*Jean B. Lawson*

Jean B. Lawson
PO Box 472106
Charlotte, NC 28247
(704) 341-1865

*Harold J. Bender JBL*

Harold J. Bender
200 N. McDowell Street
Charlotte, NC 28204
(704) 333-2169

ATTORNEYS FOR AQUILIA MARCIVICCI BARNETTE

JA2984

# NOTE:

# THIS IS A PARTIALLY SCANNED DOCUMENT.

# PLEASE SEE THE CASE FILE FOR ATTACHMENTS, EXHIBITS, AFFIDAVITS OR OTHER MATERIAL WHICH HAS NOT BEEN SCANNED.

JA2985

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION
3:97CR-23-1-V

02 JUL 17 PM 4: 24

| | |
|---|---|
| UNITED STATES OF AMERICA ) | **SUPPLEMENT TO DEFENDANT'S** |
| ) | **MEMORANDUM IN SUPPORT** |
| v. ) | **OF MOTION REGARDING *RING*** |
| ) | |
| AQUILIA MARCIVICCI BARNETTE, ) | |
| Defendant. ) | |

**NOW COMES** the Defendant, by and through counsel, and tenders this supplementary information to the Court in support of the defense contention that the Defendant's constitutional rights are violated by this sentencing hearing wherein the government seeks to place alleged "aggravating factors" before the jury in the absence of a grand jury indictment charging those circumstances.

The government recognizes the constitutional requirement that aggravating circumstances be alleged in an indictment by a grand jury. As evidence of this acknowledgment, the defense tenders the superceding indictments in *United States v. Moussaoui* (01-455-A; EDVA) and *United States v. Fell* (2:01CR12-01; DVt) (Exhibits 1 and 2) wherein the government specifically sought and obtained superceding grand jury true bills containing allegations of aggravating factors charged for sentencing purposes

Respectfully submitted, this the ___17___ day of July, 2002.

_____
Harold J. Bender
200 N. McDowell Street
Charlotte, NC 28204
(704) 333-2169

_____
Jean B. Lawson
PO Box 472106
Charlotte, NC 28247
(704) 341-1865

ATTORNEYS FOR AQUILIA MARCIVICCI BARNETTE

# CERTIFICATE OF SERVICE

I, Harold J. Bender, do hereby certify that I have served a copy of the foregoing

Supplement to Defendant's Memorandum in Support of Motion Regarding *Ring* upon

the following by depositing a copy of the same in the United States Mail, postage prepaid, and

addressed to:

Ms. Anne Tompkins
Assistant United States Attorney
United States Attorney's Office
Suite 1700, Carillon Building
227 West Trade Street
Charlotte, North Carolina 28202

This the __7__ day of July, 2002.

Harold J. Bender
Bender, Barnett & Falls
200 North McDowell Street
Charlotte, North Carolina 28204
704-333-2169
Attorney for Defendant BARNETTE

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF VIRGINIA

ALEXANDRIA DIVISION

| UNITED STATES OF AMERICA | ) | CRIMINAL NO. 01-455-A |
|---|---|---|
| | ) | |
| | ) | Conspiracy to Commit Acts of Terrorism |
| -v- | ) | Transcending National Boundaries |
| | ) | (18 U.S.C. §§ 2332b(a)(2) & (c)) |
| | ) | (Count One) |
| ZACARIAS MOUSSAOUI, | ) | |
| a/k/a "Shaqil," | ) | Conspiracy to Commit Aircraft Piracy |
| a/k/a "Abu Khalid al Sahrawi," | ) | (49 U.S.C. §§ 46502(a)(1)(A) and (a)(2)(B)) |
| | ) | (Count Two) |
| Defendant. | ) | |
| | ) | Conspiracy to Destroy Aircraft |
| | ) | (18 U.S.C. §§ 32(a)(7) & 34) |
| | ) | (Count Three) |
| | ) | |
| | ) | Conspiracy to Use Weapons of Mass |
| | ) | Destruction |
| | ) | (18 U.S.C. § 2332a(a)) |
| | ) | (Count Four) |
| | ) | |
| | ) | Conspiracy to Murder United States |
| | ) | Employees |
| | ) | (18 U.S.C. §§ 1114 & 1117) |
| | ) | (Count Five) |
| | ) | |
| | ) | Conspiracy to Destroy Property |
| | ) | (18 U.S.C. §§ 844(f), (i), (n)) |
| | ) | (Count Six) |

JULY 2002 TERM - AT ALEXANDRIA

SUPERSEDING INDICTMENT

THE GRAND JURY CHARGES THAT:

Case 3:12-cv-00327-MOC   Document 108   Filed 09/23/15   Page 117 of 166

2105

JA2988

<u>COUNT ONE</u>
(Conspiracy to Commit Acts of Terrorism Transcending National Boundaries)

<u>Background: al Qaeda</u>

1.      At all relevant times from in or about 1989 until the date of the filing of this

Indictment, an international terrorist group existed which was dedicated to opposing non-Islamic

governments with force and violence. This organization grew out of the "mekhtab al khidemat"

(the "Services Office") organization which had maintained offices in various parts of the world,

including Afghanistan, Pakistan (particularly in Peshawar), and the United States. The group

was founded by Usama Bin Laden and Muhammad Atef, a/k/a "Abu Hafs al Masry," together

with "Abu Ubaidah al Banshiri," and others. From in or about 1989 until the present, the group

called itself "al Qaeda" ("the Base"). From 1989 until in or about 1991, the group (hereafter

referred to as "al Qaeda") was headquartered in Afghanistan and Peshawar, Pakistan. In or about

1991, the leadership of al Qaeda, including its "<u>emir</u>" (or prince) Usama Bin Laden, relocated to

the Sudan. Al Qaeda was headquartered in the Sudan from approximately 1991 until

approximately 1996 but still maintained offices in various parts of the world. In 1996, Usama

Bin Laden and other members of al Qaeda relocated to Afghanistan. At all relevant times, al

Qaeda was led by its <u>emir,</u> Usama Bin Laden. Members of al Qaeda pledged an oath of

allegiance (called a "<u>bayat</u>") to Usama Bin Laden and al Qaeda. Those who were suspected of

collaborating against al Qaeda were to be identified and killed.

2.      Bin Laden and al Qaeda violently opposed the United States for several reasons.

First, the United States was regarded as an "infidel" because it was not governed in a manner

consistent with the group's extremist interpretation of Islam. Second, the United States was

2

viewed as providing essential support for other "infidel" governments and institutions, particularly the governments of Saudi Arabia and Egypt, the nation of Israel, and the United Nations organization, which were regarded as enemies of the group. Third, al Qaeda opposed the involvement of the United States armed forces in the Gulf War in 1991 and in Operation Restore Hope in Somalia in 1992 and 1993. In particular, al Qaeda opposed the continued presence of American military forces in Saudi Arabia (and elsewhere on the Saudi Arabian peninsula) following the Gulf War. Fourth, al Qaeda opposed the United States Government because of the arrest, conviction and imprisonment of persons belonging to al Qaeda or its affiliated terrorist groups or those with whom it worked. For these and other reasons, Bin Laden declared a jihad, or holy war, against the United States, which he has carried out through al Qaeda and its affiliated organizations.

3. One of the principal goals of al Qaeda was to drive the United States armed forces out of Saudi Arabia (and elsewhere on the Saudi Arabian peninsula) and Somalia by violence. Members of al Qaeda issued fatwahs (rulings on Islamic law) indicating that such attacks were both proper and necessary.

4. Al Qaeda functioned both on its own and through some of the terrorist organizations that operated under its umbrella, including: Egyptian Islamic Jihad, which was led by Ayman al-Zawahiri, and at times, the Islamic Group (also known as "el Gamaa Islamia" or simply "Gamaa't"), and a number of jihad groups in other countries, including the Sudan, Egypt, Saudi Arabia, Yemen, Somalia, Eritrea, Djibouti, Afghanistan, Pakistan, Bosnia, Croatia, Albania, Algeria, Tunisia, Lebanon, the Philippines, Tajikistan, Azerbaijan, Malaysia, Singapore, Indonesia, and the Kashmiri region of India and the Chechnyan region of Russia. Al Qaeda also

3

JA2990

maintained cells and personnel in a number of countries to facilitate its activities, including in Kenya, Tanzania, the United Kingdom, Germany, Canada, Malaysia, and the United States.

5. Al Qaeda had a command and control structure which included a majlis al shura (or consultation council) which discussed and approved major undertakings, including terrorist operations. Al Qaeda also had a "military committee" which considered and approved "military" matters.

6. Usama Bin Laden and al Qaeda also forged alliances with the National Islamic Front in the Sudan and with representatives of the government of Iran, and its associated terrorist group Hizballah, for the purpose of working together against their perceived common enemies in the West, particularly the United States.

7. Since at least 1989, until the filing of this Indictment, Usama Bin Laden and the terrorist group al Qaeda sponsored, managed, and/or financially supported training camps in Afghanistan, which camps were used to instruct members and associates of al Qaeda and its affiliated terrorist groups in the use of firearms, explosives, chemical weapons, and other weapons of mass destruction. In addition to providing training in the use of various weapons, these camps were used to conduct operational planning against United States targets around the world and experiments in the use of chemical and biological weapons. These camps were also used to train others in security and counterintelligence methods, such as the use of codes and passwords, and to teach members and associates of al Qaeda about traveling to perform operations. For example, al Qaeda instructed its members and associates to dress in "Western" attire and to use other methods to avoid detection by security officials. The group also taught its

4

members and associates to monitor media reporting of its operations to determine the effectiveness of their terrorist activities.

8. Since in or about 1996, Usama Bin Laden and others operated al Qaeda from their headquarters in Afghanistan. During this time, Bin Laden and others forged close relations with the Taliban in Afghanistan. To that end, Bin Laden informed other al Qaeda members and associates outside Afghanistan of their support of, and alliance with, the Taliban. Bin Laden also endorsed a declaration of jihad (holy war) issued by the "Ulema Union of Afghanistan."

### The September 11 Hijackers

9. On September 11, 2001, co-conspirators Mohamed Atta, Abdul Aziz Alomari, Wail al-Shehri, Waleed al-Shehri, and Satam al-Suqami hijacked American Airlines Flight 11, bound from Boston to Los Angeles, and crashed it into the North Tower of the World Trade Center in New York. (In this Indictment, each hijacker will be identified with the flight number of the plane he hijacked.)

10. On September 11, 2001, co-conspirators Marwan al-Shehhi, Fayez Ahmed, a/k/a "Fayez Banihammad," Ahmed al-Ghamdi, Hamza al-Ghamdi, and Mohand al-Shehri hijacked United Airlines Flight 175, bound from Boston to Los Angeles, and crashed it into the South Tower of the World Trade Center in New York.

11. On September 11, 2001, co-conspirators Khalid al-Midhar, Nawaf al-Hazmi, Hani Hanjour, Salem al-Hazmi, and Majed Moqed hijacked American Airlines Flight 77, bound from Virginia to Los Angeles, and crashed it into the Pentagon.

5

JA2992

12. On September 11, 2001, co-conspirators Ziad Jarrah, Ahmed al-Haznawi, Saeed al-Ghamdi, and Ahmed al-Nami hijacked United Airlines Flight 93, bound from Newark to San Francisco, and crashed it in Pennsylvania.

### The Defendant

13. ZACARIAS MOUSSAOUI, a/k/a "Shaqil," a/k/a "Abu Khalid al Sahrawi," was born in France of Moroccan descent on May 30, 1968. Before 2001 he was a resident of the United Kingdom. MOUSSAOUI held a masters degree from Southbank University in the United Kingdom and traveled widely.

### MOUSSAOUI's Supporting Conspirators

14. Ramzi Bin al-Shibh, a/k/a "Ahad Sabet," a/k/a "Ramzi Mohamed Abdellah Omar," was born in Yemen on May 1, 1972. He entered Germany in or about 1995 and afterwards lived in Hamburg, where he shared an apartment with hijacker Mohammed Atta (#11) in 1998 and 1999. Bin al-Shibh also was employed with Atta as a warehouse worker at a computer company in Hamburg.

15. Mustafa Ahmed al-Hawsawi, a/k/a "Mustafa Ahmed," was born in Jeddah, Saudi Arabia on August 5, 1968.

### The Charge

16. From in or about 1989 until the date of the filing of this Indictment, in the Eastern District of Virginia, the Southern District of New York, and elsewhere, the defendant, ZACARIAS MOUSSAOUI, a/k/a "Shaqil," a/k/a "Abu Khalid al Sahrawi," with other members and associates of al Qaeda and others known and unknown to the Grand Jury, unlawfully, wilfully and knowingly combined, conspired, confederated and agreed to kill and maim persons

6

Case 3:12-cv-00327-MOC   Document 108   Filed 09/23/15   Page 122 of 166

**2110**

**JA2993**

within the United States, and to create a substantial risk of serious bodily injury to other persons by destroying and damaging structures, conveyances, and other real and personal property within the United States, in violation of the laws of States and the United States, in circumstances involving conduct transcending national boundaries, and in which facilities of interstate and foreign commerce were used in furtherance of the offense, the offense obstructed, delayed, and affected interstate and foreign commerce, the victim was the United States Government, members of the uniformed services, and officials, officers, employees, and agents of the governmental branches, departments, and agencies of the United States, and the structures, conveyances, and other real and personal property were, in whole or in part, owned, possessed, and leased to the United States and its departments and agencies, resulting in the deaths of thousands of persons on September 11, 2001.

## Overt Acts

In furtherance of the conspiracy, and to effect its objects, the defendant, and others known and unknown to the Grand Jury, committed the following overt acts:

## The Provision of Guesthouses and Training Camps

1. At various times from at least as early as 1989, Usama Bin Laden, and others known and unknown, provided and supported training camps and guesthouses in Afghanistan, including camps known as al Farooq, Khalden, Derunta, Khost, Siddiq, and Jihad Wal, for the use of al Qaeda and its affiliated groups.

## The Training

2. At various times from at least as early as 1990, unindicted co-conspirators, known and unknown, provided military and intelligence training in various areas, including

7

Case 3:12-cv-00327-MOC  Document 108  Filed 09/23/15  Page 123 of 166

2111

JA2994

Afghanistan, Pakistan, and the Sudan, for the use of al Qaeda and its affiliated groups, including the Egyptian Islamic Jihad.

### Financial and Business Dealings

3. At various times from at least as early as 1989 until the date of the filing of this Indictment, Usama Bin Laden, and others known and unknown, engaged in financial and business transactions on behalf of al Qaeda, including, but not limited to: purchasing land for training camps; purchasing warehouses for storage of items, including explosives; purchasing communications and electronics equipment; transferring funds between corporate accounts; and transporting currency and weapons to members of al Qaeda and its associated terrorist organizations in various countries throughout the world.

### The Efforts to Obtain Nuclear Weapons and Their Components

4. At various times from at least as early as 1992, Usama Bin Laden, and others known and unknown, made efforts to obtain the components of nuclear weapons.

### The Fatwahs Against American Troops in Saudi Arabia and Yemen

5. At various times from in or about 1992 until the date of the filing of this Indictment, Usama Bin Laden, working together with members of the fatwah committee of al Qaeda, disseminated fatwahs to other members and associates of al Qaeda that the United States forces stationed on the Saudi Arabian peninsula, including both Saudi Arabia and Yemen, should be attacked.

### The Fatwah Against American Troops in Somalia

6. At various times from in or about 1992 until in or about 1993, Usama Bin Laden, working together with members of the fatwah committee of al Qaeda, disseminated fatwahs to

8

**JA2995**

other members and associates of al Qaeda that the United States forces stationed in the Horn of Africa, including Somalia, should be attacked.

### The Fatwah Regarding Deaths of Nonbelievers

7. On various occasions, an unindicted co-conspirator advised other members of al Qaeda that it was Islamically proper to engage in violent actions against "infidels" (nonbelievers), even if others might be killed by such actions, because if the others were "innocent," they would go to paradise, and if they were not "innocent," then they deserved to die.

### The August 1996 Declaration of War

8. On or about August 23, 1996, a Declaration of Jihad indicating that it was from the Hindu Kush mountains in Afghanistan entitled, "Message from Usamah Bin-Muhammad Bin-Laden to His Muslim Brothers in the Whole World and Especially in the Arabian Peninsula: Declaration of Jihad Against the Americans Occupying the Land of the Two Holy Mosques; Expel the Heretics from the Arabian Peninsula" was disseminated.

### The February 1998 Fatwah Against American Civilians

9. In February 1998, Usama Bin Laden endorsed a fatwah under the banner of the "International Islamic Front for Jihad on the Jews and Crusaders." This fatwah, published in the publication Al-Quds al-'Arabi on February 23, 1998, stated that Muslims should kill Americans - including civilians - anywhere in the world where they can be found.

### Bin Laden Endorses the Nuclear Bomb of Islam

10. On or about May 29, 1998, Usama Bin Laden issued a statement entitled "The Nuclear Bomb of Islam," under the banner of the "International Islamic Front for Fighting the

9

JA2996

Jews and the Crusaders," in which he stated that "it is the duty of the Muslims to prepare as much force as possible to terrorize the enemies of God."

#### Usama Bin Laden Issues Further Threats in June 1999

11. In or about June 1999, in an interview with an Arabic-language television station, Usama Bin Laden issued a further threat indicating that all American males should be killed.

#### Usama Bin Laden Calls for "Jihad" to Free Imprisoned Terrorists

12. In or about September 2000, in an interview with an Arabic-language television station, Usama Bin Laden called for a "jihad" to release the "brothers" in jail "everywhere."

#### MOUSSAOUI Trains at Al Qaeda Training Camp

13. In or about April 1998, ZACARIAS MOUSSAOUI was present at the al Qaeda-affiliated Khalden Camp in Afghanistan.

#### The German Cell

14. Beginning in and about 1998, Ramzi Bin al-Shibh, Mohammed Atta (#11), Marwan al-Shehhi (#175), and Ziad Jarrah (#93), and others, formed and maintained an al Qaeda terrorist cell in Germany.

#### Hijackers Travel to the United States

15. On or about January 15, 2000, Khalid al-Midhar (#77) and Nawaf al-Hazmi (#77) traveled from Bangkok, Thailand, to Los Angeles, California.

#### Hijackers Receive Flight Training

16. On or about June 3, 2000, Mohammed Atta (#11) traveled to the United States from Prague, Czech Republic.

10

JA2997

17. In or about early July 2000, Mohammed Atta (#11) and Marwan al-Shehhi (#175) visited the Airman Flight School in Norman, Oklahoma.

18. Between in or about July 2000 and in or about December 2000, Mohammed Atta (#11) and Marwan al-Shehhi (#175) attended flight training classes at Huffman Aviation in Venice, Florida.

### Money is Moved to the Hijackers

19. On or about June 29, 2000, $5,000 was wired from the United Arab Emirates ("UAE") to Marwan al-Shehhi (#175) in Manhattan.

20. On or about July 18, 2000, $10,000 was wired from UAE into a Florida SunTrust bank account in the names of Mohammed Atta (#11) and Marwan al-Shehhi (#175).

21. On or about July 26, 2000, in Germany, Ramzi Bin al-Shibh wired money to Marwan al-Shehhi (#175) in Florida.

22. On or about August 7, 2000, $9,500 was wired from UAE into a Florida SunTrust bank account in the names of Mohammed Atta (#11) and Marwan al-Shehhi (#175).

23. On or about August 29, 2000, $20,000 was wired from UAE into a Florida SunTrust bank account in the names of Mohammed Atta (#11) and Marwan al-Shehhi (#175).

24. On or about September 17, 2000, $70,000 was wired from UAE into a Florida SunTrust bank account in the names of Mohammed Atta (#11) and Marwan al-Shehhi (#175).

### Jarrah (#93) Attempts to Enroll Bin al-Shibh in Flight Training Courses

25. On or about May 17, 2000, in Germany, Ramzi Bin al-Shibh applied for a visa to travel to the United States, listing a German telephone number ("German Telephone #1".) This visa application was denied.

11

JA2998

26. On or about June 15, 2000, in Germany, Ramzi Bin al-Shibh applied for a visa to travel to the United States. This visa application was denied.

27. In or about August 2000, Ziad Jarrah (#93) attempted to enroll Ramzi Bin al-Shibh in a flight school in Florida.

28. On or about August 14, 2000, Ramzi Bin al-Shibh arranged to wire money from his account in Germany to the account of a flight training school in Florida.

29. On or about September 15, 2000, in Yemen, Ramzi Bin al-Shibh applied for a visa to travel to the United States, listing a residence in Hamburg, Germany. This visa application was denied in September 2000.

30. On or about October 25, 2000, in Germany, Ramzi Bin al-Shibh applied for a visa to travel to the United States. This visa application was denied.

### Bin al-Shibh Sends Money to al-Shehhi (#175)

31. On or about September 25, 2000, in Hamburg, Germany, Ramzi Bin al-Shibh sent money via wire transfer to Marwan al-Shehhi (#175) in Florida.

### MOUSSAOUI Inquires About Flight Training

32. On or about September 29, 2000, ZACARIAS MOUSSAOUI contacted Airman Flight School in Norman, Oklahoma using an e-mail account he set up on September 6 with an internet service provider in Malaysia.

33. In or about October 2000, ZACARIAS MOUSSAOUI received letters from Infocus Tech, a Malaysian company, stating that MOUSSAOUI was appointed Infocus Tech's marketing consultant in the United States, the United Kingdom, and Europe, and that he would receive, among other things, an allowance of $2500 per month.

12

JA2999

### Atta (#11) Purchases Flight Training Equipment

34. On or about November 5, 2000, Mohammed Atta (#11) purchased flight deck videos for the Boeing 747 Model 200, Boeing 757 Model 200, and other items from a pilot store in Ohio ("Ohio Pilot Store").

### Bin al-Shibh Travels to London

35. Between on or about December 2 and December 9, 2000, Ramzi Bin al-Shibh traveled from Hamburg, Germany, to London, England.

### MOUSSAOUI Travels from London to Pakistan

36. On or about December 9, 2000, ZACARIAS MOUSSAOUI flew from London, England, to Pakistan.

### Atta (#11) Purchases More Flight Training Equipment

37. On or about December 11, 2000, Mohammed Atta (#11) purchased flight deck videos for the Boeing 767 Model 300ER and the Airbus A320 Model 200 from the Ohio Pilot Store.

### Flight Training and Exercise

38. Between in or about January 2001 and March 2001, Hani Hanjour (#77) attended pilot training courses in Phoenix, Arizona, including at Pan Am International Flight Academy.

39. Between on or about February 1, 2001, and on or about February 15, 2001, Mohammed Atta (#11) and Marwan al-Shehhi (#175) took a flight check ride around Decatur, Georgia.

40. In or about February 2001, Mohammed Atta (#11) and Marwan al-Shehhi (#175) attended a health club in Decatur, Georgia.

13

Case 3:12-cv-00327-MOC   Document 108   Filed 09/23/15   Page 129 of 166

2117

JA3000

## MOUSSAOUI Comes to the United States

41.    On or about February 7, 2001, ZACARIAS MOUSSAOUI flew from Pakistan to London, England.

42.    On or about February 23, 2001, ZACARIAS MOUSSAOUI flew from London, England, to Chicago, Illinois, declaring at least $35,000 cash to U.S. Customs, and then from Chicago to Oklahoma City, Oklahoma.

43.    On or about February 26, 2001, ZACARIAS MOUSSAOUI opened a bank account in Norman, Oklahoma, depositing approximately $32,000 cash.

44.    Between on or about February 26, 2001, and on or about May 29, 2001, ZACARIAS MOUSSAOUI attended the Airman Flight School in Norman, Oklahoma, ending his classes early.

## Nawaf al-Hazmi (#77) Purchases Flight Training Equipment

45.    On or about March 19, 2001, Nawaf al-Hazmi (#77) purchased flight deck videos for the Boeing 747 Model 400, the Boeing 747 Model 200 and the Boeing 777 Model 200, and another video from the Ohio Pilot Store.

## MOUSSAOUI Joins a Gym

46.    In or about March 2001, ZACARIAS MOUSSAOUI joined a gym in Norman, Oklahoma.

## Hijackers Travel to and Within the United States

47.    On or about April 1, 2001, Nawaf al-Hazmi (#77) was in Oklahoma.

48.    Between on or about April 23, 2001, and on or about July 19, 2001, Satam al-Suqami (#11), Waleed al-Shehri (#11), Ahmed al-Ghamdi (#175), Majed Moqed (#77), Marwan

14

2118

JA3001

al-Shehhi (#175), Mohammed Atta (#11), Ahmed al-Nami (#93), Hamza al-Ghamdi (#175), Mohald al-Shehri (#175), Wail al-Shehri (#11), Ahmed al-Haznawi (#93), Fayez Ahmed (#175), and Salem al-Hazmi (#77) traveled from various points in the world to the United States.

### MOUSSAOUI Contacts a Commercial Flight School

49. On or about May 23, 2001, ZACARIAS MOUSSAOUI contacted an office of the Pan Am International Flight Academy in Miami, Florida, via e-mail.

### Hijackers Open Bank Accounts

50. In Summer 2001, Fayez Ahmed (#175), Saeed al-Ghamdi (#93), Hamza al-Ghamdi (#175), Waleed al-Shehri (#11), Ziad Jarrah (#93), Satam al-Suqami (#11), Mohand al-Shehri (#175), Ahmed al-Nami (# 93), and Ahmed al-Haznawi (#93) each opened a Florida SunTrust bank account with a cash deposit.

### Other Hijackers Attend Gym Training

51. Between in or about May and in or about July 2001, in Florida, Ziad Jarrah (#93) joined a gym and took martial arts lessons, which included instruction in kickboxing and knife fighting.

52. In or about June 2001, in Florida, Waleed al-Shehri (#11), Marwan al-Shehhi (#175) and Satam al-Suqami (#11) joined a gym.

### MOUSSAOUI Purchases Flight Training Equipment

53. On or about June 20, 2001, ZACARIAS MOUSSAOUI purchased flight deck videos for the Boeing 747 Model 400 and the Boeing 747 Model 200 from the Ohio Pilot Store.

15

JA3002

<u>Al-Hawsawi and Fayez Ahmed (#175) Open UAE Bank Accounts</u>

54.     On or about June 23, 2001, Mustafa Ahmed al-Hawsawi used a cash deposit to open a checking account at a Standard Chartered Bank branch in Sharjah, UAE, and an ATM account in connection with the checking account.

55.     On or about June 25, 2001, at the same Standard Chartered Bank branch in Sharjah, UAE, Fayez Ahmed (#175) used a cash deposit to open a checking account and also opened a savings account. Fayez Ahmed also opened an ATM and a VISA card account in connection with the checking account.

56.     On or about June 25, 2001, Mustafa Ahmed al-Hawsawi opened a savings account at the Standard Chartered Bank and a VISA card account on the same account.

<u>Atta (#11) Purchases a Knife</u>

57.     On or about July 8, 2001, Mohammed Atta (#11) purchased a knife in Zurich, Switzerland.

<u>MOUSSAOUI Pays for Flight Lessons</u>

58.     On or about July 10 and July 11, 2001, ZACARIAS MOUSSAOUI made credit card payments to the Pan Am International Flight Academy for a simulator course in commercial flight training.

<u>Fayez Ahmed (#175) Gives Al-Hawsawi Control Over UAE Account</u>

59.     On or about July 18, 2001, Fayez Ahmed (#175) gave power of attorney to Mustafa Ahmed al-Hawsawi for Fayez Ahmed's Standard Chartered Bank accounts in UAE.

60.     On or about July 18, 2001, using his power of attorney, Al-Hawsawi picked up Fayez Ahmed's VISA and ATM cards in UAE.

16

**JA3003**

61. Between on or about July 18 and on or about August 1, 2001, Mustafa Ahmed al-Hawsawi caused Fayez Ahmed's VISA card to be shipped from UAE to Fayez Ahmed in Florida. (The VISA card was then used for the first time on August 1, 2001, in Florida.)

### Jarrah (#93) Travels to Germany

62. On or about July 25, 2001, Ziad Jarrah (#93) traveled from the United States to Germany.

### Bin al-Shibh Moves Money to MOUSSAOUI from UAE

63. Between on or about July 29 and August 4, 2001, in Norman, Oklahoma, ZACARIAS MOUSSAOUI made several telephone calls from public telephones to a number in Duesseldorf, Germany ("German Telephone # 2").

64. On or about July 30 and 31, 2001, in Hamburg, Germany, Ramzi Bin al-Shibh, using the name "Ahad Sabet," received two wire transfers, totaling approximately $15,000, from "Hashim Abdulrahman" in UAE.

65. On or about August 1 and 3, 2001, Ramzi Bin al-Shibh, using the name "Ahad Sabet," wired approximately $14,000 to ZACARIAS MOUSSAOUI in Oklahoma from train stations in Duesseldorf and Hamburg, Germany.

### MOUSSAOUI Purchases Knives

66. On or about August 3, 2001, ZACARIAS MOUSSAOUI purchased two knives in Oklahoma City, Oklahoma.

### Jarrah (#93) Returns to the United States from Germany

67. On or about August 4, 2001, Ziad Jarrah (#93) traveled from Germany to the United States.

17

JA3004

<u>MOUSSAOUI Travels from Oklahoma to Minnesota</u>

68. On or about August 10 and August 11, 2001, ZACARIAS MOUSSAOUI was driven from Oklahoma to Minnesota.

<u>MOUSSAOUI Takes Commercial Flying Lessons in Minnesota</u>

69. On or about August 13, 2001, in Minneapolis, Minnesota, ZACARIAS MOUSSAOUI paid approximately $6,800 in cash to the Pan Am International Flight Academy.

70. Between on or about August 13 and on or about August 15, 2001, ZACARIAS MOUSSAOUI attended the Pan Am International Flight Academy in Minneapolis, Minnesota, for simulator training on the Boeing 747 Model 400.

<u>MOUSSAOUI Possesses Knives and Other Items</u>

71. On or about August 16, 2001, ZACARIAS MOUSSAOUI possessed, among other things:

- two knives;

- a pair of binoculars;

- flight manuals for the Boeing 747 Model 400;

- a flight simulator computer program;

- fighting gloves and shin guards;

- a piece of paper referring to a handheld Global Positioning System receiver and a camcorder;

- software that could be used to review pilot procedures for the Boeing 747 Model 400;

18

-   a notebook listing German Telephone #1, German Telephone #2, and the name "Ahad Sabet;"

-   letters indicating that MOUSSAOUI is a marketing consultant in the United States for Infocus Tech; and

-   a hand-held aviation radio.

MOUSSAOUI Lies to Federal Agents

72.   On or about August 17, 2001, ZACARIAS MOUSSAOUI, while being interviewed by federal agents in Minneapolis, attempted to explain his presence in the United States by falsely stating that he was simply interested in learning to fly.

Jarrah (#93) Undertakes "Check Ride" At Flight School

73.   On or about August 17, 2001, Ziad Jarrah (#93) undertook a "check ride" at a flight school in Fort Lauderdale, Florida.

A Co-Conspirator Calls Fayez Ahmed From Germany

74.   On or about August 18, 2001, a co-conspirator made a telephone call from Germany to Fayez Ahmed (#175) in Florida.

Final Preparations for the Coordinated Air Attack

75.   On or about August 22, 2001, Fayez Ahmed (#175) used his VISA card in Florida to obtain approximately $4,900 cash, which had been previously deposited into his Standard Chartered Bank account in UAE.

76.   On or about August 22, 2001, in Miami, Florida, Ziad Jarrah (#93) purchased a Global Positioning System ("GPS"), other GPS related equipment, and schematics for 757

19

Case 3:12-cv-00327-MOC   Document 108   Filed 09/23/15   Page 135 of 166

2123

JA3006

cockpit instrument diagrams. (GPS allows an individual to navigate to a position using coordinates pre-programmed into the GPS unit.)

77. On or about August 25, 2001, Khalid al-Midhar and Majed Moqed purchased with cash tickets for American Airlines Flight 77, from Virginia to Los Angeles, California, scheduled for September 11, 2001.

78. On or about August 26, 2001, Waleed al-Shehri and Wail al-Shehri made reservations on American Airlines Flight 11, from Boston, Massachusetts, to Los Angeles, California, scheduled for September 11, 2001, listing a telephone number in Florida ("Florida Telephone #1") as a contact number.

79. On or about August 27, 2001, reservations for electronic, one-way tickets were made for Fayez Ahmed and Mohand al-Shehri, for United Airlines Flight 175, from Boston, Massachusetts, to Los Angeles, California, scheduled for September 11, 2001, listing Florida Telephone Number #1 as a contact number.

80. On or about August 27, 2001, Nawaf al-Hazmi and Salem al-Hazmi booked flights on American Airlines Flight 77.

81. On or about August 28, 2001, Satam al-Suqami purchased a ticket with cash for American Airlines Flight 11.

82. On or about August 28, 2001, Mohammed Atta and Abdulaziz Alomari reserved two seats on American Airlines Flight 11, listing Florida Telephone #1 as a contact number.

83. On or about August 29, 2001, Ahmed al-Ghamdi and Hamza al-Ghamdi reserved electronic, one-way tickets for United Airlines Flight 175.

20

84. On or about August 29, 2001, Ahmed al-Haznawi purchased a ticket on United Airlines Flight 93 from Newark, New Jersey, to San Francisco, California, scheduled for September 11, 2001.

85. On or about September 3, 2001, in Hamburg, Germany, Ramzi Bin al-Shibh, using the name "Ahad Sabet," received approximately $1500 by wire transfer from "Hashim Ahmed" in UAE.

86. On or about September 5, 2001, Ramzi Bin al-Shibh traveled from Dusseldorf, Germany, to Madrid, Spain, and did not return to Germany.

87. On or about September 6, 2001, Satam al-Suqami (#11) and Abdulaziz Alomari (#11) flew from Florida to Boston.

### The Hijackers Return Excess Money to Al-Hawsawi in UAE

88. On or about September 4, 2001, Mohammed Atta (#11) sent a FedEx package from Florida to UAE.

89. On or about September 5, 2001, Fayez Ahmed (#175) wired approximately $8,000 from his Florida SunTrust account to the Standard Chartered Bank account over which Al-Hawsawi had power of attorney.

90. On or about September 8, 2001, an Arab male retrieved the package from Mohammed Atta (#11) at FedEx in Dubai, UAE.

91. On September 8, 2001, Mohammed Atta (#11) wired $2,860 to "Mustafa Ahmed" in UAE.

92. On September 8, 2001, Mohammed Atta (#11) wired $5,000 to "Mustafa Ahmed" in UAE.

21

JA3008

93. On September 9, 2001, Waleed M. al-Shehri (#11) wired $5,000 to "Ahamad Mustafa" in UAE.

94. On September 10, 2001, Marwan al-Shehhi (#175) wired $5,400 to "Mustafa Ahmad" in UAE.

95. On September 11, 2001, in UAE, approximately $16,348 was deposited into Al-Hawsawi's Standard Chartered Bank account.

96. On September 11, 2001, in UAE, at about 9:22 a.m. local time (the early morning hours of Eastern Daylight Time), Mustafa Ahmed al-Hawsawi moved approximately $6,534 from the $8,000 in Fayez Ahmed's (#175) Standard Chartered Bank account into his own account, using a check dated September 10, 2001, and signed by Fayez Ahmed; Al-Hawsawi then withdrew approximately $1,361, nearly all the remaining balance in Ahmed's account, by ATM cash withdrawal.

97. On September 11, 2001, in UAE, approximately $40,871 was prepaid to a VISA card connected to Al-Hawsawi's Standard Chartered Bank account.

### The September 11, 2001 Terrorist Attacks

98. On September 11, 2001, the hijackers possessed a handwritten set of final instructions for a martyrdom operation on an airplane using knives.

99. On September 11, 2001, Mohammed Atta (#11) and Abdulaziz Alomari (#11) flew from Portland, Maine, to Boston, Massachusetts.

100. On September 11, 2001, Mohammed Atta (#11) possessed operating manuals for the Boeing 757 and 767, pepper spray, knives, and German travel visas.

22

101. On September 11, 2001, Ziad Jarrah (#93) possessed flight manuals for Boeing 757 and 767 aircraft.

102. On September 11, 2001, Mohammed Atta, Abdul Aziz Alomari, Satam al-Suqami, Waleed al-Shehri, and Wail al-Shehri hijacked American Airlines Flight 11, a Boeing 767, which had departed Boston at approximately 7:55 a.m. They flew Flight 11 into the North Tower of the World Trade Center in Manhattan at approximately 8:45 a.m., causing the collapse of the tower and the deaths of thousands of persons.

103. On September 11, 2001, Hamza al-Ghamdi, Fayez Ahmed, Mohand al-Shehri, Ahmed al-Ghamdi, and Marwan al-Shehhi hijacked United Airlines Flight 175, a Boeing 767, which had departed from Boston at approximately 8:15 a.m. They flew Flight 175 into the South Tower of the World Trade Center in Manhattan at approximately 9:05 a.m., causing the collapse of the tower and the deaths of thousands of persons.

104. On September 11, 2001, Khalid al-Midhar, Majed Moqed, Nawaf al-Hazmi, Salem al-Hazmi, and Hani Hanjour hijacked American Airlines Flight 77, a Boeing 757, which had departed from Virginia bound for Los Angeles, at approximately 8:10 a.m. They flew Flight 77 into the Pentagon in Virginia at approximately 9:40 a.m., causing the deaths of 189 persons.

105. On September 11, 2001, Saeed al-Ghamdi, Ahmed al-Nami, Ahmed al-Haznawi, and Ziad Jarrah hijacked United Airlines Flight 93, a Boeing 757, which had departed from Newark, New Jersey bound for San Francisco at approximately 8:00 a.m. After resistance by the passengers, Flight 93 crashed in Somerset County, Pennsylvania at approximately 10:03 a.m., killing all on board.

23

JA3010

<u>Al-Hawsawi Flees the U.A.E. for Pakistan</u>

106. On or about September 11, 2001, Mustafa Ahmed al-Hawsawi left the U.A.E. for Pakistan.

107. On or about September 13, 2001, the supplemental VISA card connected to Al-Hawsawi's account was used to make six ATM withdrawals in Karachi, Pakistan.

<u>A Co-Conspirator Calls On Muslims To Fight The United States</u>

108. On or about October 7, 2001, in Afghanistan, Ayman al-Zawahiri called on Muslims to join the battle against the United States.

<u>Bin Laden Praises The September 11 Attack And Threatens More Attacks</u>

109. On or about October 7, 2001, in Afghanistan, Usama Bin Laden praised the September 11 attack, and vowed that the United States would not "enjoy security" before "infidel armies leave" the Saudi Gulf.

<u>A Co-Conspirator Solicits Violence Against United States Nationals</u>

110. On or about October 10, 2001, Sulieman Abu Ghaith announced, on behalf of al Qaeda, that all Muslims had a duty to attack United States targets around the world. (In violation of Title 18, United States Code, Sections 2332b(a)(2) and 2332b(c).)

24

Case 3:12-cv-00327-MOC   Document 108   Filed 09/23/15   Page 140 of 166

**2128**

**JA3011**

<u>COUNT TWO</u>
(Conspiracy to Commit Aircraft Piracy)

1. The allegations contained in Count One are repeated.

2. From in or about 1989 until the date of the filing of this Indictment, in the Eastern District of Virginia, the Southern District of New York, and elsewhere, the defendant, ZACARIAS MOUSSAOUI, a/k/a "Shaqil," a/k/a "Abu Khalid al Sahrawi," and other members and associates of al Qaeda and others known and unknown to the Grand Jury, unlawfully, wilfully and knowingly combined, conspired, confederated and agreed to commit aircraft piracy, by seizing and exercising control of aircraft in the special aircraft jurisdiction of the United States by force, violence, threat of force and violence, and intimidation, and with wrongful intent, with the result that thousands of people died on September 11, 2001.

<u>Overt Acts</u>

3. In furtherance of the conspiracy, and to effect its illegal objects, the defendant, and others known and unknown to the Grand Jury, committed the overt acts set forth in Count One of this Indictment, which are fully incorporated by reference.

(In violation of Title 49, United States Code, Sections 46502(a)(1)(A) and (a)(2)(B).)

25

<u>COUNT THREE</u>
(Conspiracy to Destroy Aircraft)

1.      The allegations contained in Count One are repeated.

2.      From in or about 1989 until the date of the filing of this Indictment, in the Eastern District of Virginia, the Southern District of New York, and elsewhere, the defendant, ZACARIAS MOUSSAOUI, a/k/a "Shaqil," a/k/a "Abu Khalid al Sahrawi," and other members and associates of al Qaeda and others known and unknown to the Grand Jury, unlawfully, wilfully and knowingly combined, conspired, confederated and agreed to willfully destroy and wreck aircraft in  acts of violen   _inst and incap: ate individuals on such aii iaft, so as likely to e. danger   safety of such aircr:  : : g : t   : ousands of persons on September 11, 2001.

<u>Acts</u>

3.      In furtherance of the conspiracy, and to effect its illega. o._cts, the defenuant, and others known and unknown to the  :  Jury, commi. ted the overt acts set forth in Count One of this I      whic' : fully incorporated by reference.

(In violation of Title 18,     :

26

Case 3:12-cv-00327-MOC  Document 108  Filed 09/23/15  Page 142 of 166

**2130**

JA3013

<u>COUNT FOUR</u>
(Conspiracy to Use Weapons of Mass Destruction)

1. The allegations contained in Count One are repeated.

2. From in or about 1989 until the date of the filing of this Indictment, in the Eastern District of Virginia, the Southern District of New York, and elsewhere, the defendant, ZACARIAS MOUSSAOUI, a/k/a "Shaqil," a/k/a "Abu Khalid al Sahrawi," and other members and associates of al Qaeda and others known and unknown to the Grand Jury, unlawfully, wilfully and knowingly combined, conspired, confederated and agreed to use weapons of mass destruction, namely, airplanes intended for use as missiles, bombs, and similar devices, and other weapons of mass destruction, without lawful authority against persons within the United States, with the results of such use affecting interstate and foreign commerce, and against property that was owned, leased and used by the United States and by departments and agencies of the United States, with the result that thousands of people died on September 11, 2001.

<u>Overt Acts</u>

3. In furtherance of the conspiracy, and to effect its illegal objects, the defendant, and others known and unknown to the Grand Jury, committed the overt acts set forth in Count One of this Indictment, which are fully incorporated by reference.

(In violation of Title 18, United States Code, Section 2332a(a).)

27

Case 3:12-cv-00327-MOC   Document 108   Filed 09/23/15   Page 143 of 166

**2131**

**JA3014**

## COUNT FIVE
(Conspiracy to Murder United States Employees)

1.    The allegations contained in Count One are repeated.

2.    From in or about 1989 until the date of the filing of this Indictment, in the Eastern District of Virginia, the Southern District of New York, and elsewhere, the defendant, ZACARIAS MOUSSAOUI, a/k/a "Shaqil," a/k/a "Abu Khalid al Sahrawi," and other members and associates of al Qaeda and others known and unknown to the Grand Jury, unlawfully, wilfully and knowingly combined, conspired, confederated and agreed to kill officers and employees of the United States and agencies and branches thereof, while such officers and employees were engaged in, and on account of, the performance of their official duties, and persons assisting such employees in the performance of their duties, in violation of Section 1114 of Title 18, United States Code, including members of the Department of Defense stationed at the Pentagon.

## Overt Acts

3.    In furtherance of the conspiracy, and to effect its illegal objects, the defendant, and others known and unknown to the Grand Jury, committed the overt acts set forth in Count One of this Indictment, which are fully incorporated by reference.

(In violation of Title 18, United States Code, Sections 1114 and 1117.)

28

JA3015

<u>COUNT SIX</u>
(Conspiracy to Destroy Property of the United States)

1. The allegations contained in Count One are repeated.

2. From in or about 1989 until the date of the filing of this Indictment, in the Eastern District of Virginia, the Southern District of New York, and elsewhere, the defendant, ZACARIAS MOUSSAOUI, a/k/a "Shaqil," a/k/a "Abu Khalid al Sahrawi," and other members and associates of al Qaeda and others known and unknown to the Grand Jury, unlawfully, wilfully and knowingly combined, conspired, confederated and agreed to maliciously damage and destroy, by means of fire and explosives, buildings, vehicles, and other real and personal property used in interstate and foreign commerce and in activities affecting interstate and foreign commerce, and buildings, vehicles, and other personal and real property in whole and in part owned and possessed by, and leased to, the United States and its departments and agencies, and as a result of such conduct directly and proximately caused the deaths of thousands of persons on September 11, 2001, including hundreds of public safety officers performing duties as a direct and proximate result of the said damage and destruction.

<u>Overt Acts</u>

3. In furtherance of the conspiracy, and to effect its illegal objects, the defendant, and others known and unknown to the Grand Jury, committed the overt acts set forth in Count One of this Indictment, which are fully incorporated by reference.

(In violation of Title 18, United States Code, Sections 844(f), (i), and (n).)

29

Case 3:12-cv-00327-MOC   Document 108   Filed 09/23/15   Page 145 of 166

**JA3016**

## Notice of Special Findings

a. The allegations of Counts One, Two, Three, and Four of this Indictment are hereby realleged as if fully set forth herein and incorporated by reference.

b. As to Counts One, Two, Three, and Four of this Indictment, the defendant ZACARIAS MOUSSAOUI:

(1) was more than 18 years of age at the time of the offense. (Title 18, United States Code, Section 3591(a));

(2) participated in an act, contemplating that the life of a person would be taken or intending that lethal force would be used in connection with a person, other than one of the participants in the offense, and the victims died as a direct result of the act. (Title 18, United States Code, Section 3591(a)(2)(C));

(3) intentionally and specifically engaged in an act of violence, knowing that the act created a grave risk of death to a person, other than one of the participants in the offense, such that participation in the act constituted a reckless disregard for human life and the victims died as a direct result of the act. (Title 18, United States Code, Section 3591(a)(2)(D));

(4) in committing the offenses described in Counts One, Two, Three, and Four, knowingly created a grave risk of death to one or more persons in addition to the victims of the offense. (Title 18, United States Code, Section 3592(c)(5));

(5) committed the offenses described in Counts One, Two, Three, and Four in an especially heinous, cruel, and depraved manner in that they involved torture and

30

Case 3:12-cv-00327-MOC   Document 108   Filed 09/23/15   Page 146 of 166

**2134**

**JA3017**

serious physical abuse to the victims. (Title 18, United States Code, Section 3592(c)(6)); and,

(6) committed the offenses described in Counts One, Two, Three, and Four after substantial planning and premeditation to cause the death of a person and commit an act of terrorism. (Title 18, United States Code, Section 3592(c)(9)).

(Pursuant to Title 18, United States Code, Sections 3591 and 3592).


_____

FOREPERSON


/s/ _____
MICHAEL CHERTOFF
ASSISTANT ATTORNEY GENERAL

---

/s/ _____
PAUL J. McNULTY
UNITED STATES ATTORNEY
ROBERT A. SPENCER
DAVID J. NOVAK
ASSISTANT UNITED STATES ATTORNEYS
EASTERN DISTRICT OF VIRGINIA


/s/ _____
JAMES B. COMEY
UNITED STATES ATTORNEY
KENNETH M. KARAS
ASSISTANT UNITED STATES ATTORNEY
SOUTHERN DISTRICT OF NEW YORK


31

JA3018

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF VERMONT

UNITED STATES OF AMERICA  )  *DE~ThTY* r~~j(
        V.  )  Crim. No. 2:01CR12~01
                )
                  (18 U.S.C. §~ 2, 922(g);
DONALD FELL  )  924(c); 1201(a) & 2119)

## SUPERSEDING INDICTMENT

The grand jury charges:

1. On or about November 27, 2000, inside the residence of Debra Fell in Rutland, Vermont, the defendant DONALD FELL and Robert Lee killed Debra Fell and Charles Conway by stabbing them with knives and slashing their throats.

2. After the killings, FELL and Lee decided to flee from Rutland and left the residence to search for a vehicle. They were armed with a Mossberg 12-gauge shotgun.

3. In the pre-dawn hours of November 27, FELL and Lee accosted Teresca King, who had driven a 1996 Plymouth Neon automobile from her home in North Clarendon, Vermont to her job at the Price Chopper supermarket in downtown Rutland. FELL and Lee commandeered King's vehicle at shotgun-point and abducted Mrs. King.

4. Thereafter, FELL and Lee drove Mrs. King from Vermont to New York

State. A few hours after the carjacking and kidnapping, in Dutchess County, New York, FELL and Lee intentionally killed Mrs. King by punching and kicking her in

**JA3020**

the head and by smashing her head with rocks. They abandoned her body at the murder scene.

5. After killing Mrs. King, FELL and Lee drove in her automobile to Wilkes-Barre, Pennsylvania and then on to Clarksville, Arkansas where, on November 30, 2000, they were stopped by law enforcement authorities and arrested.

6. Mrs. King's 1996 Plymouth Neon automobile was manufactured outside the state of Vermont.

2

JA3021

COUNT 1

7.     The grand jury repeats and realleges paragraphs 1-6 of this indictment.

8.     On or about November 27, 2000, in the District of Vermont, the defendant DONALD FELL, with intent to cause death and serious bodily harm, took by force and violence and by intimidation from the person and presence of Teresca King a 1996 Plymouth Neon automobile, a motor vehicle that had been transported, shipped and received in interstate and foreign commerce, and the death of Teresca King resulted from such taking of the automobile.

(18 U.S.C. §§ 2119(3) & 2)

3

JA3022

COUNT 2

9. The grand jury repeats and realleges paragraphs 1-6 of this indictment.

10. On or about November 27, 2000, in the District of Vermont and elsewhere, the defendant DONALD FELL unlawfully seized, kidnapped, abducted and carried away Teresca King and held her for ransom, reward and otherwise, and willfully transported h~r, while she was alive, in interstate commerce from the State of Vermont to the State of New York, resulting in the death of Teresca King.

(18 U.S.C. §~ 1201 (a) (1) & 2)

4

2140

JA3023

COUNT 3

11.   The grand jury repeats and realleges paragraphs 1-6 of this indictment.

12.   On or about November 27, 2000, in the District of Vermont and elsewhere, the defendant DONALD FELL knowingly possessed and brandished a firearm, specifically a Mossberg 12-gauge shotgun, in furtherance of crimes of violence for which they may be prosecuted in a court of the United States, namely, carjacking and kidnapping in violation of 18 U.S.C. §§ 2119 and 1201.

(18 U.S.C. 8§ 924(c) (1) (A) (ii) & 2)

5

JA3024

13.   The grand jury repeats and realleges paragraphs 1-6 of this indictment.

14.   On or about and between November 27, 2000 and November 30, 2000, in the District of Vermont and elsewhere, the defendant DONALD FELL, who was a fugitive from justice, transported a firearm, to wit, a Mossberg 12-gauge shotgun, in interstate commerce between th~ State of Vermont and the State of Arkansas.

(18 U.S.C. ~§ 922(g) (2) & 2)

6

JA3025

15. The grand jury repeats and realleges the accusations of Counts 1 and 2 of this indictment.

16. As to Counts 1 and 2, the defendant DONALD FELL was 18 years of age or older at the time of the offenses.

    a. was 18 years of age or older at the time of the offenses.

    b. intentionally killed Teresca King (18 U.S.C. ~ 3591 (a) (2) (A))

    c. intentionally inflicted serious bodily injury that resulted in the death of Teresca King (18 U.S.C. $. 3591 (a) (2) (B)).

    d. intentionally participated in one or more acts, contemplating that the life of a person would be taken or intending that lethal force would be used in connection with a person, other than a participant in the offense, and Teresca King died as a direct result of such act or acts (18 U.S.C. § 3591 (a) (2)(C))

    e. intentionally and specifically engaged in one or more acts of violence, knowing that the act or acts created a grave risk of death to a person, other than one of the participants in the offense, such that participation in such act or acts constituted a reckless disregard for human life, and Teresca King died as a direct result of such act or acts (18 U.S.C. § 3591(a) (2) (D)).

    f. caused the death of Teresca King during the commission

6

**2143**

**JA3026**

of a violation of 18 U.S.C. § 1201 (kidnapping) (18 U.S.C. § 3592(c) (1)).

g.  committed the offense in an especially heinous, cruel,

or depraved manner in that it involved serious

physical abuse to Teresca King (18 U.S.C. §

3592(c) (6))

h.  intentionally killed or attempted to kill more than one person in a

single criminal episode (18 U.S.C. § 3592 (c) (16))

A TRUE BILL


~a~~eZ≤V
FOREPERSON

<?& 4 ~~?1~(
PETER W. HALL (GLW & WBD)
United States Attorney

Rutland, Vermont
July 8, 2002

6

Case 3:12-cv-00327-MOC   Document 108   Filed 09/23/15   Page 156 of 166

**2144**

**JA3027**

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF VERMONT


UNITED STATES OF AMERICA

      v.                     )Crim. No. 2:01CR12-01


DONALD FELL

### SUPPLEMENTAL NOTICE OF INTENT TO SEEK DEATH PENALTY

The United States of America, by and through its attorney, Peter W. Hall, United States Attorney for the District of Vermont, notifies the defendant Donald Fell, the Court and defendant's counsel that, in the event the defendant is convicted under Counts 1 and/or 2 of the Superseding Indictment, relating to the death of Teresca King, the United States will seek the sentence of death.

The Government believes that the circumstances are such that if the defendant is convicted of either of those offenses, a sentence of death is justified. At a death penalty hearing, the Government will prove the threshold culpability factors and statutory aggravating factors as set forth in the Superseding Indictment. In addition, the Government will prove the following aggravating factors identified under 18 U.S.C. § 3593 (a)

    1.   Donald Fell participated in the abduction of Teresca King to facilitate his escape from the area in which he and an accomplice had committed a double murder. This factor applies to both Counts 1 and 2.

    2.   Donald Fell participated in the murder of Teresca King to prevent

2

Case 3:12-cv-00327-MOC   Document 145-08   Filed 09/23/15   Page 157 of 166

**JA3028**

her from reporting the kidnapping and carjacking to authorities. This factor applies to both Counts 1 and 2.

3. Donald Fell participated in the murder of Teresca King after substantia premeditation to commit the crime of carjacking. This factor applies to both Counts 1 and 2.

4. As reflected by the victim's personal characteristics as an individual human being and the impact of the offense on the victim and the victim's family, the defendant caused loss, injury and harm to the victim and the victim's family, see Payne v. Tennessee, 501 U.S. 808, 825-27 (1991), including but not limited to the following:

(a) Infliction of distress on the victim. During the four-hour interval between her kidnapping and murder, Teresca King suffered extreme anxiety and emotional suffering.

(b) Impact of the offense on the family of the victim. The kidnapping and murder of Teresca King have caused the King family extreme emotional suffering, and the victim's family has suffered severe and irreparable harm.

This factor, non-statutory aggravating factor number 4, applies to both Counts 1 and 2.

2

Dated at Burlington, in the District of Vermont, this 8th. day of July, 2002.


Respectfully submitted,

UNITED STATES OF AMERICA


PETER W. HALL
United States Attorney

3

**JA3030**

## CERTIFICATE OF SERVICE

I, JeanineM. W. Blais, Secretary to the U.S. Attorney and the Criminal Chief for the United

States Attorney's Office for the District of Vermont, do hereby certify that I have served a copy

of the foregoing SUPPLEMENTAL NOTICE OF INTENT TO SEEK DEATH

PENALTY on the Defendant by mailing a copy thereof to Alexander Bunin, Federal Public

Defender and Gene V. Primomo, Assistant Federal Public Defender at 39 North Pearl Street, ₅th

Floor, Albany, New York 12207 and Paul S. Volk, P.O. Box 8, Burlington, VT *05402-0465;* counsel for the

defendant, this 8th day of July, 2002.

JEANNE M.W. BLAIS
Secy. to USA & Criminal Chief
U.S. Attorney's Office
P.O. Box 570
Burlington, VI' 05402

3

Case 3:12-cv-00327-MOC   Document 108   Filed 09/23/15   Page 160 of 166
2148

JA3031

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
Case Number: 3:97CR-23-V

| UNITED STATES OF AMERICA | ) | |
|---|---|---|
| | ) | **F I L E D**<br>CHARLOTTE, N. C. |
| | ) | |
| | ) ORDER | ⸱ᷤ⸱P 0 9 2002 |
| | ) | |
| AQUILIA MARCIVICCI BARNETTE, | ) | U. S. DISTRICT COURT |
| Defendant | ) | W. DIST. OF N. C. |
| | ) | |

This matter is before the Court upon Defendant's Motion that the Court grant Defendant a

new trial or vacate the three death sentences imposed on August 13, 2002 and impose sentences

of Life Imprisonment without Possibility of Release. Defendant makes his Motion pursuant to

Rules 33 and 34 of the Federal Rules of Criminal Procedure. In this Motion, Defendant reiterates

the arguments he presented in support of his July 2, 2002 Motion for Relief pursuant to *Ring v.*

*Arizona,* ___ U.S. ___, 122 S.Ct. 2428 (June 24, 2002). That Motion for Relief was denied by

oral order of this Court on July 29, 2002.

Defendant argues that *Ring* applies to federal capital sentencing proceedings, and

therefore the Federal Death Penalty Act is facially unconstitutional under *Ring* and the Fifth

Amendment's Indictment Clause. Thus, Defendant argues that because the indictment in this

case fails to allege essential elements of the offense of capital or death-eligible murder (the

alleged statutory aggravating factors were set forth in the Government's Notice of Intent to Seek

the Death Penalty), and/or because the Court lacked jurisdiction to hold a capital sentencing

hearing before a jury without a constitutionally-sufficient allegation of statutory aggravating

circumstances in the indictment, this Court should reconsider its denial of Defendant's earlier

Motion for Relief under *Ring.*

**2149**

**JA3032**

In support, Defendant cites the government's decision in *United States v. Zacarias Moussaoui*, Criminal No. 01-455-1 (E.D. VA) to secure a re-indictment of Mr. Moussaoui subsequent to the *Ring* decision. That case is non-binding on this Court. Furthermore, this Court considered the government's use of a superceding indictment in the *Moussaoui* case when, on July 29, 2002, it denied Defendant's Motion for Relief under *Ring*. The *Ring* decision declared Arizona's death penalty statutory scheme unconstitutional because the trial judge and not the jury makes factual findings during sentencing as to the presence or absence of aggravating factors. However, "Ring's claim is tightly delineated: He contends only that the Sixth Amendment required jury findings on the aggravating circumstances asserted against him ... Ring does not contend that his indictment was constitutionally defective." *Ring* at 2437, FN4. It is the position of this Court that the *Ring* decision in itself does not find the Federal Death Penalty Act facially unconstitutional. The *Ring* decision is a narrow one and does not reach the issue of whether, under the Federal Death Penalty Act, the aggravating factors must be alleged in the indictment. Under the Federal statutory scheme, the jury makes the ultimate factual findings as to the presence or absence of both statutory and non-statutory aggravating factors, which complies with the Supreme Court's decision in *Ring*.

Pursuant to F.R.CR.P. 33, this Court may grant Defendant's motion for a new trial "if the interests of justice so require". Pursuant to F.R.CR.P. 34, this Court "shall arrest judgment if the indictment ... does not charge an offense or if the court was without jurisdiction of the offense charged." This Court finds that the interests of justice do not require granting a new trial pursuant to the Rule 33. In addition, this Court finds that the indictment in this case sufficiently alleged the elements of the offenses charged. This Court clearly had jurisdiction over the re-sentencing hearing in accordance with the Federal Death Penalty Act and the Constitution, and

JA3033

will not arrest judgment in this case.

It is THEREFORE ORDERED that Defendant's Motion New Trial, Arrest of Judgment and Other Relief is hereby DENIED.

This the 5th day of September, 2002.

RICHARD L. VOORHEES
UNITED STATES DISTRICT COURT JUDGE

2151

JA3034

**JA3035**

**JA3036**



JA3037

| | |
|---|---|
| UNITED STATES OF AMERICA | |
| vs. | DEATH PENALTY § 2255 |
| AQUILIA MARCIVICCI BARNETTE | |

### PETITIONER AQUILIA MARCIVICCI BARNETTE'S REPLY

Aquilia Marcivicci "Marc" Barnette, through undersigned counsel, files this reply to the government's response [Doc. 98] (hereinafter "Govt. Brief") to Mr. Barnette's Initial Motion for Relief Pursuant to 28 U.S.C. § 2255 [Doc. 48] and Motion for Evidentiary Hearing [Doc. 73]. Mr. Barnette reiterates his request for an evidentiary hearing on all disputed issues of fact. He further reserves the right to amend his § 2255 motion and related pleadings in support of a hearing.

**I.      THE GOVERNMENT'S RESPONSE FAILS TO ADEQUATELY REBUT MR. BARNETTE'S CLAIMS THAT HIS SENTENCING HEARING WAS UNCONSTITUTIONAL.**

Mr. Barnette's § 2255 motion and pleadings in support of an evidentiary hearing explain how and why trial counsel's performance prior to and during his resentencing in 2002 was constitutionally deficient and further details how competent counsel would have uncovered and used compelling mitigating evidence that probably would have persuaded one or more fully-informed jurors to spare Mr. Barnette's life. *See* Claims I and VIII. The § 2255 motion and pleadings in support of an evidentiary hearing also set forth additional constitutional violations that require relief from his sentences of death. *See* Claims II-VIII. Mr. Barnette's claims and request for a hearing is supported by numerous affidavits and declarations of former members of

1

**JA3038**

Mr. Barnette's defense team, experts, family, and friends, as well as records that were never collected or reviewed by trial counsel. This wealth of information describes, among other things, Mr. Barnette's excruciatingly troubling and complicated background and family history, the true depth of the physical and emotional abuse he suffered as a child, his positive character traits that were often masked by substantial psychiatric impairments, and the extent of his positive adjustment to incarceration. The government fails to sufficiently contest or rebut this information, that competent trial counsel should have developed and used it to avoid a death sentence, and the reasonable probability of a different result with effective counsel. As a result of these errors, Mr. Barnette's sentencing jury was misinformed, misled, and without sufficient information to properly weigh the mitigating circumstances of Mr. Barnette's life.

## II. THE SCOPE OF REPLY OF THIS REPLY.

Much of the government's response simply reflects its disagreement with the factual and/or legal basis of Mr. Barnette's § 2255 motion and request for an evidentiary hearing. It is not counsels' intention here to repeat each and every claim presented in the original motion or request for a hearing. Instead, counsel will focus on particular areas of legal and/or factual dispute that, in counsels' judgment, require specific attention by way of a reply.

## III. AN EVIDENTIARY HEARING IS REQUIRED.

When, as here, a petitioner files a motion to vacate or set aside under § 2255, an evidentiary hearing *must* be granted "unless the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief." 28 U.S.C. § 2255. Based on the § 2255 petition and subsequent pleadings and exhibits filed in this case, it is clear that Mr. Barnette has presented a number of colorable constitutional claims showing disputed facts. *See United States v. Magini*, 973 F.2d 261, 264 (4th Cir. 1992) ("A federal court in a habeas

2

**JA3039**

proceeding *must* hold an evidentiary hearing when the petitioner alleges facts which, if true, would entitle her to relief.") (emphasis added). Conclusive negation is a high bar. *See, e.g., United States v. Auten*, 632 F.2d 478, 482 (5th Cir. 1980) (documents suggesting, but not proving, that Government had failed to disclose all impeachment information about its witness were sufficient to trigger a hearing). If the petitioner's "specific and detailed factual assertions … cannot be said to be incredible," and, if true, would entitle him to relief, the function of 28 U.S.C. § 2255 can be served only by affording a hearing. *See Machibroda v. United States*, 368 U.S. 487, 495-496 (1962). When district courts have failed to hold evidentiary hearings to resolve factual disputes cases in § 2255 actions, the Fourth Circuit has reversed. *See, e.g., United States v. Diaz*, No. 13-6952, 547 F. App'x 303, 304, 2013 WL 6246774 (4th Cir. Dec. 4, 2013) (holding that district court "abused its discretion in concluding, without an evidentiary hearing, that Diaz did not direct counsel to file a notice of appeal"); *United States v. Mitchell*, No. 11-6711, 484 F. App'x 744, 745, 2012 WL 2365895 (4th Cir. Jun. 22, 2012) (holding that district court abused its discretion by failing to hold an evidentiary hearing as was required to make the factual findings necessary for resolving petitioner's § 2255 motion); *United States v. O'Quinn*, No. 05-6412, 166 F. App'x 697, 698, 2006 WL 372430 (4th Cir. Feb. 16, 2006) (vacating and remanding because factual dispute existed that required evidentiary hearing on claim of ineffective assistance of counsel).

An evidentiary hearing is mandatory here because almost all of Mr. Barnette's claims concern events that took place outside the Court's presence and that do not appear in the trial record. In such circumstances, only an evidentiary hearing can ensure a fair and reliable determination of the underlying facts. *See Machibroda,* 368 U.S. at 494-95 (hearing necessary where movant's allegations primarily concern "occurrences outside the courtroom and upon

3

**JA3040**

which the record [can], therefore, cast no real light"); *United States v. White*, 366 F.3d 291, 302 (4th Cir. 2004) (same); *Armienti v. United States*, 234 F.3d 820, 825 (2nd Cir. 2000) (a hearing is ordinarily required where the movant's claims depend on "actions taken by counsel outside the [trial judge's] presence"). Because ineffective assistance of counsel claims "involve[] off-the-record interactions" involving trial counsel and other members of the defense team, they typically "cannot be determined by examining the motion, files, and records" alone. *Chang v. United States*, 250 F.3d 79, 85 (2nd Cir. 2001) (citation omitted). This is particularly true where, as here, the Government alleges that defense counsel acted according to a "strategy." *See United States v. Hayes*, 532 F.3d 349, 355 (5th Cir. 2008) (absent a hearing, there is "no way to analyze [counsel's] potential strategy"); *United States v. Culverhouse*, 507 F.3d 888, 898 (5th Cir. 2007) (remanding for hearing, because without a hearing, court could only make "hindsight guesses" regarding counsel's strategy).

In its response, the government repeatedly denies—without submitting any evidence—that Mr. Barnette's trial counsel performed deficiently. By contrast, Mr. Barnette submitted sworn affidavits and declarations. The conflict between Mr. Barnette's detailed allegations, supported by sworn evidence, and the Government's unsupported denials cannot be resolved against Mr. Barnette without a hearing. *See Peavy v. United States,* 31 F.3d 1341, 1346 (6th Cir. 1994) (where affidavit supported the movant's claims, and Government offered no "evidence in support of its position," Government's "unverified responses … were plainly inadequate" to justify denying relief without a hearing). As the Supreme Court has held, the purpose of § 2255 is to ensure that petitioners with legitimate claims are not barred from relief. *See Barefoot v. Estelle,* 463 U.S. 880, 888 (1983) (courts "need not, and should not … fail to give non-frivolous claims of constitutional error the careful attention that they deserve");

4

**JA3041**

*Blackledge v. Allison,* 431 U.S. 63, 72 (1977) ("[A]rrayed against the interest in finality is the very purpose of the writ of habeas corpus to safeguard a person's freedom from detention in violation of constitutional guarantees.").

The Fourth Circuit has made clear, repeatedly, that under these circumstances an evidentiary hearing is required. *See, e.g., United States v. White*, 366 F.3d 291, 300 (4th Cir. 2004) (remanding for an evidentiary hearing in case where government never offered any sworn denial of petitioner's allegation; "an attorney's unsworn argument does not constitute evidence, and the Government has offered no affidavit, deposition, sworn statement, or other direct evidence" to rebut the petitioner's claims); *United States v. Witherspoon*, 211 F.3d 923, 927 (4th Cir. 2000) (remanding for an evidentiary hearing because "it is not clear from counsel's affidavit whether counsel disputes the facts alleged by [the movant]"); *United States v. Young*, 644 F.2d 1008, 1113 (4th Cir. 1981) (remanding for an evidentiary hearing because "[t]he record does not disclose the necessary facts to answer [the] question" that would otherwise justify relief).

IV. **THE GOVERNMENT'S BRIEF MISSTATES THE TRIAL RECORD, MISCONSTRUES THE BREADTH OF MITIGATING EVIDENCE, AND INCORRECTLY SUGGESTS DEFERRING TO TRIAL COUNSEL'S DECISIONS THAT WERE UNINFORMED AND UNREASONABLE.**

A. **The Government's Brief's References to the Trial Record Do Not Support Its Claims.**

The government's brief repeatedly, but incorrectly, claims that "[m]ost of what [Mr. Barnette] contends his attorneys ought to have investigated, developed, or introduced was, in fact, introduced by his attorneys, or it is cumulative." [Govt. Brief at 54] These arguments are simply unsupported by the record.

5

**JA3042**

*1. The jury did not hear readily available information about the abuse Barnette suffered at the hands of his father.*

For example, the government's brief misstates the record by claiming that "[t]he jury heard ample evidence Barnette was abused by his father." [Govt. Brief at 58] Yet during the trial the government made precisely the opposite argument when it objected to a peremptory finding that the evidence established that Mr. Barnette had been abused by his father. [Govt. Ex. 1 at 1847] This Court agreed that the evidence was at best "conflicting" and perhaps did not rise to the level of showing "abuse":

> I think the evidence is conflicting. I mean, I agree the trend of the evidence – for example, I believe Dr. Dietz did seem to concede that – we have used the term excessive discipline, but that's not the same as abuse, necessarily.

[Govt. Ex. 1 at 1298] When trial counsel pressed the point, the Court further noted:

> And [Derrick Barnette] testified about what he did and didn't do, I believe the jury is entitled to make up its mind as to his credibility. *That's the best – not necessarily the best evidence, but at least it's evidence. That could go either way,* so I would leave that for the jury's determination.

[Govt. Ex. 1 at 1848 (emphasis added)] Evidence that "could go either way" is not the equivalent of "ample evidence" that Mr. Barnette was abused by his father." Indeed, the jury all but fully rejected (11 jurors out of 12) that Mr. Barnette had been abused by his father. [Stetler Declaration ¶ 87, Bates No. 61]

*2. The jury did not hear readily available information about Jesse Cooper, a significant caretaker in Barnette's life.*

The government's brief similarly misstates the record by claiming that "Barnette's attorneys presented substantial evidence about Jesse Cooper, his experience during the Korean War, the way he acted and the role he played in the lives of Barnette and his brother, and what they perceived about him through the testimony of [Marc] Barnette, Derrick Barnette, and Mario Barnette." [Govt. Brief at 55] The record upon which the government relies does not support this

6

argument. For example, the government's brief suggests that Derrick Barnette explained to the jury "Jessie Cooper's history and daily behavior." [Govt. Brief at 60] Yet Derrick Barnette's actual testimony—which barely spanned one-and-a-half pages of transcript—provided scant information about Jesse Cooper. Instead, Derrick Barnette merely told the jury that Jesse Cooper "was unique" and a "[l]ittle eccentric," that he "would speak in a code [that] was more or less a military code," and that he drank Pabst Blue Ribbon. These descriptors of Jesse Cooper went completely unexplained and unexplored by trial counsel, leaving the jury with nothing useful or informative. [Govt. Ex. 1 at 1294-95]

Similarly, trial counsel did not present "substantial" information about Jesse Cooper through Marc Barnette or Mario Barnette. Marc Barnette testified for less than one page about his grandfather. From him the jury learned that Jesse was "elderly," "frail," had been "pronounced … dead" during the Korean War, and was disabled thereafter. [Govt. Ex. 1 at 1040-41]  Mario Barnette shared that Jesse Cooper lived in a "pretty run down" house, called family members by nicknames, and dressed in an army coat and wore an eye patch. Without follow-up or further explanation, Mario Barnette shared that Jesse Cooper was "just kind of his own person." [Govt. Ex. 1 at 1336]

As expert Russell Stetler explains, "There was no hint of psychiatric or physical disability [concerning Jesse Cooper] from [the testimony of] either Derrick or Mario." [Stetler Declaration ¶ 82, Bates No. 194] Completely omitted from what the jury heard about this important person in Marc Barnette's life was the fact that Jesse Cooper "had been traumatized during the war; upon his return home, he exhibited symptoms consistent with Posttraumatic Stress Disorder (PTSD); he then became an alcoholic, apparently at least in part in an attempt to self-medicate those symptoms." As Dr. Richard Dudley reports, according to Marc Barnette's mother, Sonia, "her

7

**JA3044**

father 'lived in that war for the rest of his life.'" [Dudley Report ¶ 9, Bates No. 210] The jury heard none of this important information about a key figure in Mr. Barnette's upbringing. [Rowles Mitigation Report, Bates Nos. 232-259; Jesse Cooper: Military Records, Bates Nos. 5156-5253]

Trial counsel's failures were unreasonable. It was clear that trial counsel were aware that Jesse Cooper had a traumatic experience in the Korean War and that it disabled him. Yet they failed to conduct a reasonably thorough investigation in order to actually understand what had occurred and why it was significant. They failed to obtain Jesse Cooper's military and medical background, and failed to investigate how that background, and its impact on him, manifested and affected others, including Mr. Barnette.

Moreover, what defense counsel seemingly sought to introduce about Jesse Cooper was sharply undercut by their own failures to conduct a proper investigation and provide their experts with readily available information. Dr. Mark Cunningham, who testified during Mr. Barnette's resentencing 2002, explains:

> My review of the materials from post-conviction counsel makes clear that there were important pieces of information trial counsel had never shared with or provided to me. This information includes, but is not limited to, Cessie Alfonso's expert report; Jesse Cooper's medical and military records; and access to many social history witnesses (who apparently were readily available in 2002) and the important mitigating and mental health information they had to share. Because I did not have this information in 2002, the expert opinion I provided to Mr. Barnette's sentencing jury was unknowingly incomplete and rendered me vulnerable to damaging impeachment by the government. For example, because trial counsel did not provide me with this available information, my testimony in 2002 about … the scope and significance of Jesse Cooper's combat trauma (Korea) and post-traumatic stress symptoms … was incomplete.

[Affidavit of Cunningham ¶ 11, Bates No. 14846]

**JA3045**

> 3. *The jury did not hear readily available information about the murder of Pearl Cooper and its affect on Barnette's mother and his own upbringing.*

The government's brief similarly misstates what the jury learned about the murder of Marc Barnette's maternal grandmother, Pearl Cooper. [Govt. Brief at 56] Any comparison between what trial counsel presented concerning Pearl Cooper with what a reasonable investigation would have produced lays bare just how insufficient trial counsel's efforts were. Mr. Barnette's jury knew nothing about Pearl's status in the family, her break-up with Jesse Cooper, the impact of the divorce on the family, family suspicions long-held of Lloyd Brown (who would eventually kill her), the disturbing details of how she was killed and her body discovered, and how the murder shook Sonia and the family. [Brief in Support at 31-37]

Rather than receive a full and informed accounting of this seminal event, Mr. Barnette's jury was simply told the following:

| Trial Counsel: | And at some point – what happened to – between Leroy [sic] and Pearl Cooper? |
|---|---|
| Derrick Barnette: | One morning I got a phone call. It was Sonia. She had told me that Leroy Brown [sic] had shot her mother and that she asked me to come down there. I got up and got in the bed with my mother and had a conversation with her. Just, you know, how did this happen? How could this happen? Why? And she, you know, comforted me. And I got another phone call from Sonia and I immediately got up and drove down there to her. |

[Govt. Ex. 1 at 1297-98]

In terms of the significance of Pearl's murder, trial counsel elicited only the following from Derrick Barnette:

| Trial Counsel: | Did Sonia change after [the murder]? |
|---|---|

9

**JA3046**

<table>
<tr><td>Derrick Barnette:</td><td>She didn't change outwardly, but you couldn't make any references to her mother. She would just break down at that point.</td></tr>
</table>

[Govt. Ex. 1 at 1343]

With regard to the defense experts, trial counsel's efforts to educate the jury about this seminal event was similarly unavailing—a direct consequence of their unreasonably insufficient investigation.

<table>
<tr><td>Trial Counsel:</td><td>How about an opinion as to whether the death of his grandmother, that Derrick described this morning, whether or not that had any effect on [Marc Barnette]?</td></tr>
<tr><td>Dr. Halleck:</td><td>I think that had a major effect on him. We have to remember that his mother was only 14 at the time, and she was really a child raising a child and the grandmother was having a significant role, apparently, in raising Marc. So with the grandmother's death, Marc not only lost one of the people that was parenting him, but Sonia had a profound reaction to her mother's death and she became less effective as a parent.</td></tr>
</table>

[Govt. Ex. 1 at 1383-84]

<table>
<tr><td>Dr. Cunningham:</td><td>Then at 10 months Pearl was murdered with Marc in the next room when this happens, not that he can remember Pearl being murdered, but that's now part of – that's part of what you know about yourself and your family, that when you were 10 months old, your grandma was murdered in the next room.</td></tr>
</table>

[Govt. Ex. 1 at 1592]

It is insufficient the jury to have heard that "Sonia had a profound reaction to her mother's death and she became less effective as a parent" but not be provided with *any* information to support that claim—especially when such evidence was readily available. The evidence provided in post-conviction demonstrates clearly how and why this trauma was unmistakably significant. [Brief in Support at 31-37] Moreover, it cannot be claimed that this

10

JA3047

decision *not* to provide the jury with this information was reasonable and informed strategy. [Lawson Affidavit, Bates No. 14861; Alfonso Affidavit ¶ 9, Bates No. 2]

> 4. *The jury did not hear readily available information about Sonia Cooper's claims that Derrick Barnette "rigged" paternity tests and how that affected Barnette.*

The government's brief is also incorrect when it asserts that Sonia Cooper's claims "that Derrick was Barnette's father and in denial about the paternity results" were put before the jury. [Govt. Brief at 59] Notably, the government previously argued that trial counsel put forward "no evidence of this." During resentencing, Dr. Cunningham tried to testify about Sonia's insistence that the paternity tests were rigged, and how that left Mr. Barnette and his brother "to deal with this issue by themselves," resulting in "no shared reality of, okay, this is what happened, let me help you understand this." Because trial counsel had not adequately developed or presented this information, the prosecution successfully objected to this testimony because "[t]here is *no evidence of this*." [Govt. Ex. 1 at 1610-11 (emphasis added)] Mr. Barnette's post-conviction filings make clear there was powerful information about the paternity issue that trial counsel knew or should have known, but they failed to adequately develop this information.[1] As Dr. Cunningham explains:

> My review of the materials from post-conviction counsel makes clear that there were important pieces of information trial counsel had never shared with or provided to me. … Because I did not have this information in 2002, the expert opinion I provided to Mr. Barnette's sentencing jury was unknowingly incomplete and rendered me vulnerable to damaging impeachment by the government. For example, because trial counsel did not provide me with this available information, my testimony in 2002 about Sonia Cooper's denial of Derrick's paternity test results and the impact that had on Marc Barnette … was incomplete.

[Affidavit of Cunningham ¶ 11, Bates No. 14846]

---

[1] *See*, *e.g.*, Alfonso Affidavit ¶ 12-14, Bates No. 3; Burgess Affidavit ¶ 19, Bates Nos. 54-55; Johnson Affidavit ¶¶ 20, 22, Bates No. 92.

11

**JA3048**

5. *The jury did not hear readily available information about the abuse and neglect Barnette suffered during his childhood.*

The government's brief further misstates the trial record with respect to Sonia Barnette and what the jury heard about her parenting. Indeed, at resentencing, the prosecution challenged the sufficiency of the defense evidence concerning the neglect suffered by Mr. Barnette during his childhood, stressing in particular the failure of the defense to call his mother to testify. As the prosecution argued:

> Mrs. Barnette didn't testify at all. There is room for the jury to make a consideration about whether hearing from that witness might have been good evidence of neglect, and I think that's, again, another consideration. It's a matter of degree … [W]e would contend that defendant's own statements early to psychologists painted a picture of a childhood less than having been a neglected child.

[Govt. Ex. 1 at 1848-49] As noted above, the jury all but completely rejected the mitigating factor that Mr. Barnette had been abused by his father. [Stetler Declaration ¶ 87, Bates No. 61]

6. *The government has no response to the fact that trial counsel knowingly provided Barnette's experts with faulty and incomplete information—and never informed the experts that they were doing so.*

The government's brief also failed to provide a credible response to Mr. Barnette's undisputed assertions that the experts in his case relied on faulty information. Trial counsel themselves told this Court that the mitigation investigation done at the first trial was "superficial and not-sufficiently in depth to enable the formation of a cohesive theory of mitigation," and that it contained "misinformation." [2002 Resentencing: Ex Parte Filings, Bates No. 366] *Despite this knowledge, trial counsel unreasonably had their experts rely on that very same information at Mr. Barnette's resentencing.* The government's brief overlooks this fact—and the fact that trial counsel unreasonably withheld the work produced by their replacement mitigation specialist from their experts. [Doc. 74 at 80-81; Cunningham Affidavit ¶ 10, Bates No. 14846]

12

**JA3049**

The government also offers faulty logic in an effort to gloss over the fundamental problem that trial counsel failed in their duties to properly investigate, develop, follow-up on, and present readily available mitigating evidence. For example, the government suggests that it is unimportant that trial counsel failed to contact Dr. Sally Johnson and provide her with accurate information about Mr. Barnette's background prior to the 2002 resentencing because "the expert witnesses that Barnette did call reviewed Johnson's work with Barnette, interviewed Johnson, and presented opinions to the jury based on information in Dr. Johnson's report." [Govt. Brief at 76-77]

This circular reasoning endorses nothing more than a classic case of "garbage in, garbage out," and fails to grasp the problem with experts relying on faulty, incomplete, and inaccurate information. *See United States v. Esquivel-Rios*, 725 F.3d 1231, 1237 (10th Cir. 2013) ("What goes into the database will much affect the reasonableness of a search relying on it: garbage in, garbage out (GIGO)."). For example, Dr. Halleck was cross-examined by the government about the fact that Dr. Johnson had previously reported that Mr. Barnette described his childhood "in relatively positive terms." [Govt. Ex. 1 at 1521] The government's brief fails to address the fact that Dr. Johnson now agrees that her information about Mr. Barnette's background was "sparse and less comprehensive than seen in many capital cases[.]" Thus, Dr. Halleck was put in a position where his opinion and credibility were undermined because trial counsel plied him with inaccurate and incomplete information. To be sure, the information that was available—but not developed or shared by trial counsel—was significant. Had this information been made available to Dr. Johnson, not only would have Dr. Halleck's opinion been more credible, but Dr. Johnson could have and would have testified favorably. [Johnson Affidavit ¶¶ 11, 17, 20-22, 25 Bates Nos. 90-93]

13

**JA3050**

**B. The Government Incorrectly Argues for Limitless Deference to Trial Counsel's Decisions.**

The government seeks to brush aside Mr. Barnette's evidence of trial counsel's deficient performance by repeatedly arguing that seemingly limitless deference is due to trial counsel's strategic decision-making. Deference to the reasonable and informed decision-making of trial counsel extends only that far—to the point that the decisions were *reasonable* and *informed*—and not, as here, where trial counsel concedes that choices made were not, in fact, reasonably informed or strategic. *See Winston v. Pearson*, 683 F.3d 489, 504 (4th Cir. 2012) ("Yet deference to the decisions of counsel is not limitless. Attorneys have a duty to investigate their client's case so as to enable them to make professional decisions that merit distinction as 'informed legal choices.'") (quoting *Elmore v. Ozmint,* 661 F.3d 783, 858 (4th Cir. 2011)). Indeed, the "usual deference to tactical decisions is not relevant" when the decisions are based on "information that was faulty because of … ineffective investigatory steps." *Profitt v. Waldron*, 831 F.2d 1245, 1249 (5th Cir. 1987).

The government does not—and indeed they cannot—contest the following un-informed acts and omissions by Mr. Barnette's trial counsel. For example:

- Ms. Lawson "never considered" and did not recall ever discussing with co-counsel, Harold Bender, whether to have any mental health expert assess or evaluate Mr. Barnette's trial testimony. This was despite the fact that she was aware that an expert could "opine to the jury about a defendant's confession or demeanor." [Lawson Affidavit ¶ 23, Bates No. 97]

- Ms. Lawson did not coordinate or suggest conversations or meetings between a key defense expert, Ann Burgess, and any other social history witnesses, despite knowing that such access would have been important to Dr. Burgess' expert opinion. This failure to provide Dr. Burgess with such access resulted in the expert having unduly incomplete and inaccurate information. As Ms. Lawson explains, "Some of the social history information … provided to Dr. Burgess, including information about Mr. Barnette's prior relationships, came from Sindy Maxwell's work on the first trial – the same work [trial counsel] had previously concluded and told the court was poorly done and deficient." Trial counsel further failed to coordinate any information sharing

between Dr. Burgess—whose opinion relied upon an accurate and fulsome understanding of Mr. Barnette's background—and Cessie Alfonso, who provided trial counsel with a mitigation report (one week after Dr. Burgess submitted her report). [Lawson Affidavit ¶¶ 26-27, Bates No. 98]

- Trial counsel never provided Dr. Mark Cunningham or Dr. Seymour Halleck with Cessie Alfonso's mitigation report or informed either expert that Sindy Maxwell's social history investigation (upon which they both relied) was, in trial counsel's view, incomplete and inaccurate. Consequently, both experts relied on the incomplete and inaccurate background information compiled by Ms. Maxwell from Mr. Barnette's first trial. [Lawson Affidavit ¶¶ 32-33, Bates Nos. 99-100; Cunningham Affidavit ¶ 10, Bates Nos. 14846]

- Although they had good reason to believe it was significant and important, trial counsel never collected Jessie Cooper's medical or military records or other information about his combat injuries or commendations. [Lawson Affidavit ¶ 34, Bates No. 100]

- Although they themselves told the Court that Mr. Barnette's prior relationships with other women was critically important to understand, trial counsel did not interview, and did not direct their investigators or experts to interview, a number of key witnesses (such as Sheila Sullivan, Tameka Hunter, and Kowana Dozier). [Lawson Affidavit ¶ 29, Bates No. 99]

- Trial counsel was aware that focusing on Sonia Barnette's "own grief, trauma, and abuse, and how that impacted her, could have been powerful mitigating evidence," yet they failed to develop or present any of that information to the jury, and failed to ask any of the experts to focus on those issues. [Lawson Affidavit ¶¶ 21, 35 Bates No. 97, 100]

- After trial counsel told this Court that the first investigation (from the 1998 trial) had been "superficial and non-sufficiently in depth to enable the formation of a cohesive theory of mitigation," trial counsel knew—but did nothing about the fact—that their new mitigation specialist interviewed only 12 people (including Mr. Barnette) and failed to interview a slew of witnesses who had previously testified or been identified as "potential mitigation witnesses" (such as Sheila Sullivan, Tameka Hunter, and Kowana Dozier). [Lawson Affidavit ¶¶ 8, 37 Bates No. 95, 100-01]

The failure of Mr. Barnette's trial counsel to perform the aforementioned duties and develop readily available information for presentation to the jury was unreasonable and deserves no deference. These issues and investigative avenues that were abandoned, or not pursued, were not particularly complicated or complex. Take, for example, the failure to obtain Jesse Cooper's

15

**JA3052**

military records. As the Fourth Circuit has made clear, "Counsel were obligated 'to be familiar with readily available documents necessary to an understanding of [Barnette's] case[.]'" *Winston*, 683 F.3d at 505 (quoting *Hyman v. Aiken,* 824 F.2d 1405, 1416 (4th Cir.1987)). By neglecting to review Cooper's military records and present them to the jury, and instead unreasonably rely on Mr. Barnette—the defendant—to inform the jury about his grandfather's military service and psychological condition, trial counsel wholly abdicated their responsibility to present a full and accurate profile of Mr. Barnette's life.

These failures are all the more pronounced given the outcome of the first trial in 1998. As noted by expert Russell Stetler, a number of important "red flags" were evidenced from the 1998 penalty proceeding upon which trial counsel should have revisited.

> The 1998 sentencing proceeding in Mr. Barnette's case was itself full of "red flags": the trauma experienced by Mr. Barnette's teenager mother when her mother was shot and killed by her step-father; the combat trauma experienced by Mr. Barnette's maternal grandfather, Jessie Cooper, in the Korean War and its impact on his civilian life; the beatings Derrick inflicted on young Marc for bad grades in school; the impact of the divorce of Derrick and Sonia; Mr. Barnette's hospitalization in Georgia after a brutal beating; the track coach who recognized Mr. Barnette's potential and may have had an outsider's insights into his situation at home; the shooting of Mr. Barnette by his cousin when he returned to North Carolina; Mr. Barnette's suicide attempt as a teenager; and his chronic crying spells, from the time he was with Natasha Heard (sobbing in the closet) until the period after the break-up with Robin Williams (when his mother and Aunt Sheila observed him crying on the telephone). Events that were superficially described needed to be explored in depth. What was the impact of her mother's murder on Sonia? How did her mother's death affect Sonia's ability to care for her son? After the grandmother died, who looked after ten-month-old Marc while Sonia attended school? What did the military and Veterans Administration records document about Jessie Cooper's wounds and post-war functioning? How did Mr. Barnette do in school? What did teachers and coaches know about his home situation? Did he come to school hungry or with visible bruises? Who could confirm the physical maltreatment by his father? What did police reports and medical records say about the incidents when Mr. Barnette was victimized as a teenager? The 1998 proceedings provided a roadmap for follow-up investigation.

[Stetler Declaration ¶ 54, Bates No. 175]  Despite the "roadmap for follow-up investigation,"

trial counsel for Mr. Barnette at resentencing inexplicably failed to reasonably explore these issues.

The existence of "red flags" and the need for the follow-up investigation was not lost on trial counsel. Indeed, the August 28, 2001 *ex parte* filing by Ms. Lawson and Ms. Rauscher establishes this fact. As Mr. Lawson explained:

> Based on our work in the case up to that point, which constituted a review of the first trial transcript, Mr. Barnette's criminal record, and discovery, we wrote that "an approach different from that used in his first sentencing hearing [was] warranted." We believed that the first defense team tried to minimize the features of Marc Barnette's relationships with other women, and, in some instances, sought to blame the women for any difficulties that existed. It was our belief that we would need to address those prior relationships head on, and have a far better understanding of them than what the first defense team had or presented to the jury.

> Based on our review of the case materials as of August 28, 2001, it was also apparent that the first defense team presented a "disjointed" sentencing case. As we explained in the *ex parte* Statement of Defense Contentions: "[W]itnesses were unprepared for cross-examination. The investigation was superficial and not sufficiently in depth to enable the formation of a cohesive theory of mitigation."

[Lawson Affidavit ¶¶ 7-8, Bates Nos. 94-101]

The Supreme Court has consistently stressed the importance of reasonably pursuing leads. In *Wiggins v. Smith*, nothing that trial counsel had uncovered suggested that mitigation would be fruitless: "To the contrary, the many red flags … would have prompted a reasonable attorney to conduct additional investigation." 539 U.S. 510, 525 (2003). Similarly, in *Rompilla v. Beard*, the Supreme Court noted that counsel "could not have reasonably ignored mitigation evidence or red flags because they were unexpected." 545 U.S. 374, 391 (2005). Here, trial counsel was clearly on notice about "red flags" and fruitful leads, but inexplicably failed to reasonably pursue them.

17

**JA3054**

The government's brief naively suggests that trial counsel was not unreasonable in how it handled Mr. Barnette's own testimony since "the risks associated with his testimony gave him little to lose." [Govt. Brief at 86] As the post-conviction evidence makes clear, trial counsel failed miserably to reasonably consider the effect of Mr. Barnette's putative testimony. [Doc. 74 at 85-88] Despite the fact that trial counsel should have been aware that a prior expert had reported that Mr. Barnette "rigidly adheres to thinking patterns that center around justification of his actions," which consequently "does not allow him to accept that his actions will be seen as problematic," [Tyson Report, Bates Nos. 14773-14774] trial counsel failed to take any reasonable steps to deal with that evident problem. Trial counsel should have also been aware that a separate expert had previously reported that Mr. Barnette had "developed significant perceptual and cognitive distortions," and that "[t]hese perceptual inaccuracies … bred behavior grossly inappropriate to social situations." [Sultan Report, Bates Nos. 14770-14772] Despite this obvious "red flag," trial counsel failed to consult with a single expert about the risks of having Mr. Barnette testify. [Lawson Affidavit ¶¶ 22-23, Bates Nos. 94-101; Alfonso Affidavit ¶ 23, Bates Nos. 1-5, Burgess Affidavit ¶ 22, Bates Nos. 51-55] This failure is patently unreasonable. As Dr. Cunningham explains:

> I was aware that Mr. Barnette testified on his own behalf at his resentencing trial. Trial counsel never sought my advice or insights in 2002 about putting Mr. Barnette on the stand as a witness. Had trial counsel asked my opinion, I would have told them that although Mr. Barnette expressed genuine remorse for what he had done, he had tremendously limited insight into his own behaviors and was likely to be unable to properly display his remorse when confronted with the stress of examination and cross examination. Indeed, I would have told trial counsel that I would anticipate that Mr. Barnette's testimony would likely come across to a jury as self-serving and unsympathetic.

[Cunningham Affidavit ¶ 14, Bates No. 14847]

The government, which now seeks to defend trial counsel's unthinking decision, took full advantage of the situation at trial. Indeed, prosecutors asserted, without challenge or rebuttal, that "[Mr. Barnette's] testimony [was] so filled with misinformation that you simply can't believe it. I contend to you, ladies and gentlemen, that those hours that Marc Barnette was on the witness stand is just where he likes to be, the center of attention." He was nothing more than a "spin artist." [Govt. Ex. 1 at 1897-98]

Unsurprisingly, the jury all but fully rejected any notion that Mr. Barnette was conveying acceptance of responsibility and remorse. [Stetler Declaration ¶ 87, Bates No. 61; 2002 Resentencing: Bates No. 318, 336, 354]

**C.**  **The Government's Assertion That Investigative Paths Not Taken Were Based On Strategic Avoidance of "Double-Edged" Evidence Has No Basis.**

When forced to concede that information was not investigated, developed, or introduced, the government's brief pivots and argues that such information would have been "a double-edged sword or of little to no mitigating value." [Govt. Brief at 54] These arguments include the following:

- Evidence concerning the impact of Pearl Cooper's murder on other family members was "a double-edged sword" because it would risk reminding the jury of the experiences of the victims' families. [Govt. Brief at 57]

- Evidence that revealed an accurate and complete picture of Mr. Barnette's relationship with Netoisha Tolbert was a "double-edged sword" because it would undercut his assertion that he had remorse and had accepted "full responsibility" for his actions. [Govt. Brief at 66]

- Evidence of Barnette's continuing relationships with his family while in prison "would have cut both ways" because it would risk reminding the jury that the two victims would not have the opportunity to have children or watch them grow up. [Govt. Brief at 84-85]

- Evidence that revealed an accurate and complete picture of Mr. Barnette's relatively healthy female relationships "was also a double-edged sword [in] that [it] presented a significant risk of undermining other more powerful mitigating evidence," might have

19

**JA3056**

"risked suggesting that Barnette could have maintained a similarly healthy relationship with Robin Williams," and could have risked weakening his argument against future dangerousness. [Govt. Brief at 68]

- Dr. Ann Burgess' expert opinion that Mr. Barnette's criminal conduct was attributable to a psychotic episode and a mental health crisis was "double-edged" because it would have "risked undermining Barnette's defense against the future-dangerousness aggravating factor." [Govt. Brief at 72-73]

These arguments have no merit. Deference to trial counsel's decisions cannot be afforded when counsel has not undertaken a reasonable investigation or made a reasonable decision about what evidence to pursue and present. The Sixth Amendment "imposes upon counsel a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Gray v. Branker*, 529 F.3d 220, 229 (4th Cir. 2008). Absent this reasonableness, no deference is due.

Trial counsel confirms that any failure to investigate and present evidence about Pearl Cooper's death and the affect it had on family members was not because of any concern about "a double-edged sword." [Lawson Affidavit, Bates No. 14861] This evidence, with which experts were never provided and about which Mr. Barnette's jury never learned, would have provided the jury with needed insight and a connection between the horror of Pearl Cooper's murder and Sonia's resulting difficulties.

Trial counsel also confirms that any failure to investigate and present an accurate and complete picture of Mr. Barnette's relationship with Netoisha Tolbert was not because of any concern about "a double-edged sword." [Lawson Affidavit, Bates No. 14861] This evidence, with which experts were never provided and about which Mr. Barnette's jury never learned, would have made clear that Mr. Barnette was not, contrary to trial counsel's own misguided and misinformed arguments, a batterer.

**JA3057**

Trial counsel confirms that any failure to develop and present evidence of Mr. Barnette's continuing relationships with his family while in prison was not because of any concern about "a double-edged sword." [Lawson Affidavit, Bates No. 14861] This evidence, with which experts were never provided and about which Mr. Barnette's jury never learned, would have given the jury evidence to support the argument that Mr. Barnette's execution would adversely affect those he continued to relate with while in prison. In the absence of this and other information, *none* of the jurors found that Mr. Barnette's brother and children would be "harmed by his execution." [2002 Resentencing: Bates No. 319, 337, 355] This wholesale rejection is particularly noteworthy in light of the fact that at least nine jurors at Mr. Barnette's first trial in 1998 found that his mother, brother, and children would be "harmed by the emotional trauma of his execution." [2002 Resentencing: Bates. Nos. 286, 302]

There was no reasonable and informed strategic basis for trial counsel's failure to develop and present evidence of Mr. Barnette's continuing relationships with his family while in prison. Indeed, Dr. Cunningham had initially been retained by trial counsel to provide testimony that would address Mr. Barnette's adjustment in prison. Yet inexplicably trial counsel failed to elicit any such testimony from Dr. Cunningham, who explains that he was "willing and able to testify at Mr. Barnette's resentencing trial in 2002 about his positive adjustment to prison and his lack of disciplinary issues, and how it was consistent with [Dr. Cunningham's] expectations for his future adjustment." [Cunningham Affidavit ¶¶ 8, 12, Bates Nos. 14845-14846]

Trial counsel also confirms that any failure to develop and present evidence of Mr. Barnette's relatively healthy relationships with other females was not because of any concern about "a double-edged sword." [Lawson Affidavit, Bates No. 14861] This evidence, with which experts were never provided and about which Mr. Barnette's jury never learned, would have

21

revealed an accurate and complete picture of Mr. Barnette's relatively healthy relationships. Further, as noted above, it would have fundamentally changed the damaging—and inaccurate— picture presented by the defense expert, Ann Burgess.

Trial counsel also confirms that any failure to develop and present evidence that Mr. Barnette's criminal conduct was attributable to a psychotic episode and a mental health crisis was not because of any concern about "a double-edged sword." [Lawson Affidavit, Bates No. 14861] This evidence, with which experts were never provided and about which Mr. Barnette's jury never learned, would have also provided an expert explanation for his behavior and apparent inability to control and modulate his reactions.[2] This powerful mental health evidence would have also provided direct support for multiple mitigating factors. Given the significance of such evidence, there is a reasonable probability that a competent lawyer would have introduced it at sentencing. On this particular record, it would have revealed no additional negative factors to the jury and would have had virtually no downside for defense strategy. *See Wiggins v. Smith,* 539 U.S. 510, 535 (2003); *see also Gray v. Branker*, 529 F.3d 220, 236, 2008 WL 2502144 (4th Cir. 2008) ("[E]vidence of Gray's mental impairment would not have conflicted with the mitigation strategy pursued by the defense, which was essentially that Gray was a good father, son, and community member. The mental health evidence would surely have provided a significant boost to Gray's mitigation case." (internal citation omitted)).

---

[2] In the absence of this and other information about his mental health, none of the jurors found that Mr. Barnette's mental health, and his "capacity to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of the law was significantly impaired, regardless of whether the capacity was so impaired as to constitute a defense to the charge," [2002 Resentencing: Bates. Nos. 317, 335, 353] only two jurors found that he did well in a structured environment, and only six jurors found that, at the time of the offenses, Mr. Barnette was "experiencing irrational and obsessive thoughts." [2002 Resentencing: Bates No. 319, 337, 355]

22

**JA3059**

Thus, it is inescapable that in each of the instances listed above, trial counsel failed to undertake a reasonable investigation before deciding *not* to explore or present the information. Ms. Lawson makes this point clear:

> Any shortcomings or deficiencies in our investigation on behalf of Marc Barnette had nothing to do with any concern that the information we would learn or present might be "double-edged" or more aggravating than mitigating. We could not determine what could possibly be a "double-edged sword" until we knew what the information was in the first place.
>
> Any failure to provide our experts with any information was not done in an effort to shield our experts from information that we thought might possibly be detrimental to our case or their opinions.
>
> If any of our experts had suggested to us that Marc had been suffering from a significant mental health crisis at or around the time of the crimes—including, but not limited to, that he may have been psychotic or suffering from a mood disorder—I would not have been concerned that such information would have been a "double-edged sword" or of little to no mitigating value. Instead, I would have considered such information to be valuable and mitigating.

[Lawson Affidavit ¶¶ 4-6, Bates No. 14861]

The government strains mightily to "credit plausible strategic judgments" to trial counsel where there exists no rational or reasonable basis to do so. By taking this approach, the government is repeating a course of action that has been previously rejected by the Supreme Court. In *Wiggins v. Corcoran*, 288 F.3d 629, 642 (4th Cir. 2002) *rev'd sub nom. Wiggins v. Smith*, 539 U.S. 510 (2003), the Fourth Circuit took the position the government is taking here: that available social history evidence that trial counsel failed to investigate, develop, and present was not necessarily mitigating. *Id.* In so doing, the Fourth Circuit noted that "[t]he best course for a federal habeas court is to credit plausible strategic judgments in the trial of a [capital] case." *Id.* at 642-43 (citing *Bunch v. Thompson,* 949 F.2d 1354, 1364 (4th Cir.1991)).

**JA3060**

The Supreme Court reversed the Fourth Circuit in *Wiggins* because of its unduly parsimonious assessment of the value of the mitigating evidence trial counsel failed to investigate, develop, and introduce. 539 U.S. 510 (2003). In doing so, the Supreme Court roundly rejected the position being taken in this action by the government:

> Given both the nature and the extent of the abuse petitioner suffered, we find there to be a reasonable probability that a competent attorney, aware of this history, would have introduced it at sentencing in an admissible form. While it may well have been strategically defensible upon a reasonably thorough investigation to focus on Wiggins' direct responsibility for the murder, the two sentencing strategies are not necessarily mutually exclusive. Moreover, given the strength of the available evidence, a reasonable attorney might well have chosen to prioritize the mitigation case over the direct responsibility challenge, particularly given that Wiggins' history contained little of the double edge we have found to justify limited investigations in other cases.

539 U.S. at 535 (citing *Burger v. Kemp,* 483 U.S. 776 (1987); *Darden v. Wainwright,* 477 U.S. 168 (1986)).

Here, the post-conviction record makes clear that trial counsel never undertook and/or completed a "reasonably thorough investigation" based upon which they could have made a "strategically defensible" decision.

**D.   The Government's Brief Incorrectly Casts Blame at the Feet of Defense Experts.**

The government's brief repeatedly casts blame for identified shortcomings in the defense investigation and presentation on the defense experts who testified during Mr. Barnette's resentencing. For example, the government's brief argues that Dr. Ann Burgess "did her own work to develop her opinions," and both Dr. Mark Cunningham and Dr. Seymour Halleck "had the benefit of their own work and other materials from the 2002 proceedings." [Govt. Brief at 73, 74]

24

**JA3061**

This argument completely misses the point and misapprehends the responsibilities of trial counsel in a capital proceeding. None of the experts in question were aware that trial counsel had roundly criticized and rejected the work of Sindy Maxwell—and that, nevertheless, trial counsel provided that same information to them and asked them to rely upon it. [Doc. 48 at 64-71]

As Dr. Cunningham explains:

> During the first trial [in 1998], I was provided family and background information that had been compiled by Sindy Maxwell. I was never told by Ms. Lawson, Mr. Bender, or anyone else from Mr. Barnette's defense team that his new lawyers believed and had told the Court ahead of trial-that the work produced by Ms. Maxwell was "superficial and not-sufficiently in depth." Because the defense lawyers never suggested to me that I should question the accuracy or completeness of the information I had previously been given about Mr. Barnette's background, I did not have any reason to question it.

[Cunningham Affidavit ¶ 10, Bates Nos. 14846]

And Dr. Burgess, having now been provided with information developed during post-conviction, attests that her "earlier findings, opinions, and testimony were badly marred by inaccurate and incomplete information with which trial counsel provided me," and which she never had reason to question. [Burgess Affidavit ¶ 9, Bates Nos. 52]

While post-conviction counsel has confirmed that Dr. Cunningham and Dr. Burgess were similarly situated in this regard—they were both provided with inaccurate and incomplete information and never told by trial counsel to question the quality of the information—the same would appear to hold true for Dr. Seymour Halleck. Although efforts to speak with Dr. Halleck have been unsuccessful,[3] all available evidence makes clear that Dr. Halleck was provided the same information and same instructions as the other trial experts. [Doc. 74 at 79-82] In the face of this evidence the government's brief fails to explain how these experts could have divined trial counsel's failures. *See Gray v. Branker*, 529 F.3d 220, 239 (4th Cir. 2008).

---

[3] *See* Diamond Affidavit, Bates No. 14862; Rowles Affidavit, Bates No. 14863-14864.

25

**V.  MR. BARNETTE WAS PREJUDICED BY TRIAL COUNSEL'S DEFICIENT PERFORMANCE.**

In the penalty phase of a capital case, the prejudice inquiry is not a rote cataloging exercise where a court merely ensures that counsel presented some testimony on each potential area of mitigation. Instead, the Court must evaluate the totality of the available mitigation evidence—both that presented at trial and at the collateral proceedings. *See Williams v. Taylor,* 529 U.S. 362, 397–98 (2000). If "the available mitigating evidence, taken as a whole, 'might well have influenced the jury's appraisal' of [the defendant's] moral culpability," then prejudice has been shown. *Wiggins,* 539 U.S. at 538; *see also Cone v. Bell,* 556 U.S. 449, 475 (2009) (noting that prejudice can occur if the evidence, "viewed cumulatively," may have led to a different decision). This Court must consider that "[s]ome errors will have had a pervasive effect on the inferences to be drawn from the evidence, altering the entire evidentiary picture, and some will have had an isolated, trivial effect." *Strickland*, at 695-696.

Further, in making that determination, the Supreme Court has directed habeas courts to look at not only the evidence trial counsel failed to uncover, but also what further effort by reasonable attorneys in their role as advocates would have produced with the evidence. *See Rompilla*, 545 U.S. at 391–92 (describing chain of evidence a defense lawyer at the time could have developed following reasonable investigation); *see also Kyles v. Whitley*, 514 U.S. 419, 438, 441 (1995) ("reasonable probability" standard looks at cumulative effect of "disclosure of suppressed evidence to competent counsel").

The government's brief's position as to prejudice is overly simplistic and fundamentally flawed. Indeed, the government suggests that so long as one trial witness testified about one historical event or fact, no habeas relief is possible despite the fact that post-conviction counsel later establishes that the historical event or fact as reported to the jury was materially inaccurate

26

**JA3063**

or incomplete. This argument, which endorses the notion that it is acceptable for "the defense team [to] exist[] on paper, but not in reality," is unsupportable. [Stetler Declaration ¶ 61, Bates No. 180]

The evidence that Mr. Barnette's trial counsel unreasonably ignored and failed to investigate would have painted a vastly different evidentiary picture for the jury. *See Wiggins,* 539 U.S. at 538 (asking whether "the available mitigating evidence, taken as a whole, might well have influenced the jury's appraisal"). Accordingly, a sufficient showing of prejudice has been made.

## CONCLUSION

For the foregoing reasons, and those asserted in Mr. Barnette's § 2255 motion, pleadings filed in support of an evidentiary hearing, exhibits filed thereto, Mr. Barnette, through counsel, respectfully prays this Court to:

1. Grant Petitioner's Initial Motion for Relief Pursuant to 28 U.S.C. § 2255 [Doc. 48] and vacate his sentence of death;

2. Authorize Petitioner to conduct discovery of facts, witnesses, documents, and evidence that will support the allegations of this petition;

3. Grant Petitioner's Motion for Evidentiary Hearing [Doc. 73] and conduct a hearing on the allegations of his petition; and

4. Enter such other order as this Court deems just and equitable.

27

**JA3064**

Dated: April 4, 2016

/s/ Mark E. Olive
N.C. State Bar No. 10615
LAW OFFICES OF MARK OLIVE
320 W. Jefferson Street
Tallahassee, FL 32301
850-224-0004 (tel)
850-224-3331 (fax)
meolive@aol.com

/s/ Jacob H. Sussman
N.C. Bar No. 31821
TIN FULTON WALKER & OWEN PLLC
301 East Park Avenue
Charlotte, NC 28203
704-338-1220 (tel)
704-338-1312 (fax)
jsussman@tinfulton.com

/s/ Ross Richardson
Ross Richardson
FEDERAL DEFENDERS OF WESTERN
 NORTH CAROLINA, INC.
129 West Trade Street, Suite 300
Charlotte, NC 28202
704-374-0720 (tel)
704-374-0722 (fax)
ross_richardson@fd.org

**JA3065**

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that he has served the foregoing motion with the Clerk of Court using the CM/ECF system, which will send notification of such filing to:

Anthony J. Enright
anthony.enright@usdoj.gov

Dated: April 4, 2016

/s/ Jacob H. Sussman
Counsel for Mr. Barnette

29

**JA3066**

# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA
## CHARLOTTE DIVISION
### CIVIL ACTION NO.: 3:12-CV-327-RLV

UNITED STATES OF AMERICA

vs.

AQUILIA MARCIVICCI BARNETTE

**DEATH PENALTY § 2255**

## INDEX OF EXHIBITS

| Bates No. | Description |
|---|---|
| 14845-14860 | Post-Conviction Affidavit: Dr. Mark Cunningham |
| 14861 | Post-Conviction Affidavit: Jean Lawson |
| 14862 | Post-Conviction Affidavit: Chad Diamond |
| 14863-14864 | Post-Conviction Affidavit: Zachary Rowles |

**JA3067**

## Affidavit of Mark D. Cunningham, Ph.D., ABPP

I, Mark D. Cunningham, Ph.D., ABPP, appearing before the undersigned and being duly sworn or affirmed, state the following:

1. I am over the age of 18 and competent to testify to the following facts.

2. I have a Bachelor of Arts degree from Abilene Christian University in Abilene, Texas. I received a Master Degree and Ph.D. from Oklahoma State University with a specialty in Clinical Psychology. I did a one year clinical psychology internship with the National Naval Medical Center in Bethesda, Maryland while I was on active duty as a naval officer. I then did a couple of years of post-doctoral training at Yale University School of Medicine in New Haven, Connecticut.

3. I am board certified in clinical psychology and forensic psychology by the American Board of Forensic Psychology, a specialty board of the American Board of Professional Psychology (ABPP). My current curriculum vitae is attached to this affidavit as Exhibit A.

4. I was appointed to provide expert risk assessment evaluation and possible testimony to assist the defense of Aquilia Marcivicci "Marc" Barnette on December 8, 1997. My subsequent evaluation identified factors that could be considered in mitigation. As reflected in my report dated 01/09/98, these mitigation-related perspectives overlapped and/or supplemented my findings regarding violence risk assessment for prison.

5. I testified on February 4, 1998 at the sentencing phase of Mr. Barnette's capital trial in Charlotte, North Carolina. At that time, I was accepted by the Court as an expert in the field of forensic psychology involving risk assessment at capital sentencings.

6. I was prepared to testify as a surrebutal witness in response to the testimony of the prosecution's testifying expert, Dr. Scott Duncan, but was not called to the stand. I later submitted an affidavit about what I was prepared to testify about in response to Dr. Duncan's testimony. That affidavit is attached hereto as Exhibit B.

7. I re-opened a case file on Marc Barnette in March 2002. I did this after speaking with Mr. Barnette's new attorneys, Harold Bender and Jean Lawson, about possibly providing expert testimony at Mr. Barnette's resentencing trial.

8. During Mr. Barnette's first trial, the primary focus of my testimony was on the issue of violence risk assessment for prison. For resentencing, Ms. Lawson and Mr. Bender asked to me address mitigation in addition to violence risk assessment for prison. Ultimately, defense counsel elected to not elicit testimony from me regarding violence risk assessment for prison. Defense counsel also did not have me testify about Mr. Barnette's adjustment to prison between the time of his conviction and the resentencing.

Bates No. 14845

**JA3068**

9. For purposes of preparing this affidavit, I have reviewed my files and testimony from my involvement in Mr. Barnette's 1998 trial and his 2002 resentencing. I have also reviewed additional information provided by post-conviction counsel that was not previously made available to me, including: Dr. Richard Dudley's post-conviction mental health report; Zachary Rowles' post-conviction mitigation report; Cessie Alfonso's mitigation report that she prepared for trial counsel in 2002; affidavits executed by various witnesses (both lay and expert) in the post-conviction litigation; and pleadings filed on behalf of Mr. Barnette in support of federal habeas corpus relief.

10. During the first trial, I was provided family and background information that had been compiled by Sindy Maxwell. I was never told by Ms. Lawson, Mr. Bender, or anyone else from Mr. Barnette's defense team that his new lawyers believed—and had told the Court ahead of trial—that the work produced by Ms. Maxwell was "superficial and not-sufficiently in depth." Because the defense lawyers never suggested to me that I should question the accuracy or completeness of the information I had previously been given about Mr. Barnette's background, I did not have any reason to question it. I have since been informed by Mr. Barnette's post-conviction counsel that his own trial counsel questioned the credibility of that information, and I have reviewed information from post-conviction counsel that calls into question the completeness of the information I had previously been told to rely upon.

11. My review of the materials from post-conviction counsel makes clear that there were important pieces of information trial counsel had never shared with or provided to me. This information includes, but is not limited to, Cessie Alfonso's expert report; Jesse Cooper's medical and military records; and access to many social history witnesses (who apparently were readily available in 2002) and the important mitigating and mental health information they had to share. Because I did not have this information in 2002, the expert opinion I provided to Mr. Barnette's sentencing jury was unknowingly incomplete and rendered me vulnerable to damaging impeachment by the government. For example, because trial counsel did not provide me with this available information, my testimony in 2002 about (a) Sonia Cooper's denial of Derrick's paternity test results and the impact that had on Marc Barnette, (b) the scope and significance of Jesse Cooper's combat trauma (Korea) and post-traumatic stress symptoms, (c) the details of Marc Barnette's healthy, non-violent relationships, and (d) the abuse Marc Barnette endured at home was incomplete.

12. Had I been asked, I would have been willing and able to testify at Mr. Barnette's resentencing trial in 2002 about his positive adjustment to prison and his lack of disciplinary issues, and how it was consistent with my expectations for his future adjustment.

13. My evaluations of Mr. Barnette in 1998 and 2002 identified that he had suffered from longstanding affective instability and in the months preceding the capital

2

Case 3:12-cv-00327-MOC   Document 118-2   Filed 04/04/16   Page 2 of 20
Bates No. 14846

**JA3069**

offenses, had exhibited symptoms consistent with a mood disorder. I was aware in 1998 and 2002 of Dr. Seymor Halleck's 1997-1998 diagnosis that Mr. Barnette suffered from a Major Depressive Disorder; and also that Mr. Barnette was treated with antidepressant medication (though not diagnosed with a mood disorder per se) during his evaluation at the Health Services Division, Federal Correctional Institution in Butner, North Carolina in 1997. I am aware the Dr. Park Dietz found mixed evidence for a Major Depressive Disorder in Mr. Barnette. I have reviewed the report of Dr. Richard Dudley dated 11-19-14 and find that he makes a strong case for Mr. Barnette was suffering from a longstanding major mood disorder at the time of the offense.

14. I was aware that Mr. Barnette testified on his own behalf at his resentencing trial. Trial counsel never sought my advice or insights in 2002 about putting Mr. Barnette on the stand as a witness. Had trial counsel asked my opinion, I would have told them that although Mr. Barnette expressed genuine remorse for what he had done, he had tremendously limited insight into his own behaviors and was likely to be unable to properly display his remorse when confronted with the stress of examination and cross examination. Indeed, I would have told trial counsel that I would anticipate that Mr. Barnette's testimony would likely come across to a jury as self-serving and unsympathetic.

Mark D. Cunningham

Date 3/21/16

Affirmed and subscribed before me on this the 21st day of MARCH, 2016 in

SEATTLE, WASHINGTON

Notary Public

Notary Public
State of Washington
WENDY C MAN
MY COMMISSION EXPIRES
November 14, 2019

My commission expires: NOVEMBER 14, 2019

3

Case 3:12-cv-00327-MOC   Document 118-2   Filed 04/04/16   Page 3 of 20
Bates No. 14847
**JA3070**

# MARK D. CUNNINGHAM, PH.D., ABPP

*Board Certified in Clinical Psychology - Board Certified in Forensic Psychology*
*American Board of Professional Psychology*

Medical Dental Building, 509 Olive Way, Suite 703
Seattle, Washington  98101

737-210-8336
mdc@markdcunningham.com

*Licensed psychologist: Alabama #1564, Arizona #3662, Arkansas #98-17P, Colorado #2305, Delaware #B1-0001047,*

*Florida #PY8347, Idaho #PSY-379, Illinois #071-006010, Indiana #20041376A, Louisiana #794, Nevada #PY0625,*

*New Mexico #0768, New York #017111-1 [inactive], Oregon #1333, Pennsylvania #PS016942,*

*Tennessee #2255, Texas #22351, Washington #PY60207411*

## CURRICULUM VITAE
Updated 03-09-16

## EDUCATION

**Postdoctoral:**        Yale University School of Medicine, New Haven, Connecticut
NIMH-sponsored training program, two years (part-time)

**Internship:**        National Naval Medical Center, Bethesda, Maryland
Specialty:  Clinical Psychology, one year (APA accredited)

**Graduate:**        Oklahoma State University, Stillwater, Oklahoma
*Doctor of Philosophy*
*Master of Science*
Specialty:  Clinical Psychology (APA accredited)

**Undergraduate:**        Abilene Christian University, Abilene, Texas
*Bachelor of Arts*
Majors: Psychology, Mass Communications

## BOARD CERTIFICATIONS

Clinical Psychology: American Board of Clinical Psychology, a specialty board of the American
Board of Professional Psychology (ABPP), Diploma #6462

Forensic Psychology: American Board of Forensic Psychology, a specialty board of the American
Board of Professional Psychology (ABPP), Diploma #4551

## PROFESSIONAL PRACTICE

*Current:*
Clinical and Forensic Psychologist, independent practice
Research Scientist

*Previous:*
Clinical Psychologist (Lieutenant, MSC, USNR), Naval Submarine Medical Center, CT
(three years post-doctoral)

## AWARDS, DECORATIONS, AND DISTINCTIONS

***For Research and Scholarship:***

*American Psychological Association Award for Distinguished Contributions to Research in Public Policy* – annual award bestowed for distinguished empirical and/or theoretical contribution to research in public policy, either through a single extraordinary achievement or a lifetime of work, 2006 recipient.

*Texas Psychological Association Award for Outstanding Contribution to Science* – annual award in recognition of significant scientific contribution in the discovery and development of new information, empirical or otherwise, to the body of psychological knowledge, 2005 recipient.

*American Psychology-Law Society Book Award* – annual award given to a scholarly book devoted to psychology and law issues to recognize outstanding scholarship in psychology and law, 2016 shared recipient [*Forensic Assessments in Criminal and Civil Law: A Handbook for Lawyers,* chapter author].

***For Contributions to Science and Practice***

*National Register of Health Service Psychologists Alfred M. Wellner, Ph.D. Lifetime Achievement Award* – annual award that is the highest honor bestowed on a Registrant by the National Register to commemorate numerous and significant contributions to psychology during a distinguished career, 2012 co-recipient.

*Fellow, American Psychological Association (Division 41: American Psychology-Law Society)* – distinction reflecting outstanding and uncommon contributions having national impact on the science and practice of psychology, 2007 election.

*National Association of Sentencing Advocates John Augustus Award* - annual award bestowed for outstanding contributions to the profession of sentencing advocacy, 2004 recipient.

*Navy Commendation Medal* – decoration for meritorious service as a clinical psychologist, Naval Submarine Medical Center, United States Navy. The Commendation Medal may be awarded to service members who, while serving in any capacity with the Navy or Marine Corps, distinguish themselves by heroism, outstanding achievement or meritorious service. To be awarded for meritorious service, the service must be outstanding and worthy of special recognition.

***Other Fellow distinctions:***

*Fellow, American Academy of Clinical Psychology* – distinction reflecting diplomate in clinical psychology by the American Board of Professional Psychology.

*Fellow, American Academy of Forensic Psychology* – distinction reflecting diplomate in forensic psychology by the American Board of Professional Psychology.

Case 3:12-cv-00327-MOC   Document 118-2   Filed 04/04/16   Page 5 of 20
Bates No. 14849
**JA3072**

*Education and training honors:*

*Al Brown Memorial Award* – award bestowed for outstanding achievement, National Institute of Mental Health (NIMH) Sex Therapy Training Program, Yale University School of Medicine.

*Magna cum Laude* - Bachelor of Arts, Abilene Christian University.

## CURRENT PROFESSIONAL LICENSES

*Licensed Psychologist:*

| | | |
|---|---|---|
| Alabama #1564 | Arizona #3662 | Arkansas #98-17P |
| Colorado #2305 | Delaware #B1-0001047 | Florida #PY8347 |
| Idaho #PSY-379 | Illinois #071-006010 | Indiana #20041376A |
| Louisiana #794 | Nevada #PY0625 | New Mexico #0768 |
| New York #017111-1 [inactive] | | Oregon #1333 |
| Pennsylvania #PS016942 | Tennessee #2255 | Texas #22351 |
| Washington #PY60207411 | | |

## PRIOR ACADEMIC APPOINTMENTS

Psychology Department Assistant Professor, two years post-USNR
Hardin-Simmons University, Abilene, Texas

Psychology Department Instructor, three years (part-time, contemporaneous with USNR service):
Old Dominion University (U.S. Submarine Base Extension);
Mohegan Community College, Norwich, Connecticut

Psychology Department Graduate Teaching Assistant, three years (part-time):
Oklahoma State University, Stillwater, Oklahoma

## PROFESSIONAL AFFILIATIONS

American Psychological Association – *Fellow* (Division 41)

American Board of Professional Psychology – *Diplomate (clinical, forensic)*
American Academy of Clinical Psychology - *Fellow*
American Academy of Forensic Psychology - *Fellow*
Workshop faculty, 1998-2008
ABFP examiner, 1996-2006

National Register of Health Service Psychologists #30073
Interjurisdictional Practice Certificate (IPC) #1303
Association of State and Provincial Psychology Boards
Texas Psychological Association

Case 3:12-cv-00327-MOC   Document 118-2   Filed 04/04/16   Page 6 of 20
Bates No. 14850
**JA3073**

American Psychology Law Society (AP-LS)
American Association for Intellectual and Developmental Disabilities
American Correctional Association  (ACA)
International Association for Correctional and Forensic Psychology (IACFP)

## SCHOLARSHIP AND RESEARCH

*Books and edited volumes:*

1. Cunningham, M. D. (2010).  *Evaluation for capital sentencing*.  A volume in the *Oxford best practices in forensic mental health assessment* series, Series Editors: A. Goldstein, T. Grisso, and K. Heilbrun. New York: Oxford University Press.

2. Cunningham, M. D. (Ed.) (2009). Capital sentencing (special issue). *Journal of Psychiatry and Law, 37 (2-3)*.

*Chapters in edited books:*

3. Cunningham, M. D. (*under review*). Institutional violence and misconduct. In R. D. Morgan (Ed.), *The Sage encyclopedia of criminal psychology*. Thousand Oaks, CA: Sage Publishing.

4. Cunningham, M. D. (*under review*). Competency for execution. In R. D. Morgan (Ed.), *The Sage encyclopedia of criminal psychology*. Thousand Oaks, CA: Sage Publishing.

5. Cunningham, M. D. (2016).  Forensic psychology evaluations at capital sentencing. In R. Jackson and R. Roesch (Eds.), *Learning forensic assessment: Research and practice (International perspectives on forensic mental health)*. *2nd edition* (pp. 202-228). New York: Routledge, Taylor & Francis Group.

6. Macvaugh, G. S., Cunningham, M. D., & Tassé, M. J. (2015). Professional issues in *Atkins* assessments. In E. Polloway, (Ed.), *The death penalty and intellectual disability*. Washington: American Association on Intellectual and Developmental Disabilities.

7. Cunningham, M. & Sorensen, J. (2014). Future dangerousness. In J.R. Acker, C. Lanier, & R. Bohm (Eds.) *America's experiment with capital punishment: Reflections on the past, present and future of the ultimate penal sanction, 3rd edition* (pp. 289-307). Durham, NC: Carolina Academic Press.

6. Cunningham, M. D., & Goldstein, A. M. (2013). Sentencing determinations in death penalty cases. In R. Otto (Ed.), *Forensic psychology* (vol. 11 of 12). I. Weiner (Ed.), *Handbook of psychology, 2nd edition* (pp. 473-514). New York: John Wiley & Sons.

7. Cunningham, M. D. (2013). Evaluations at capital sentencing. In R. Roesch and P. Zapf (Eds.), *Forensic assessments in criminal and civil law: A handbook for lawyers* (pp.103-117). New York: Oxford University Press.

Case 3:12-cv-00327-MOC   Document 118-2   Filed 04/04/16   Page 7 of 20
Bates No. 14851
**JA3074**

8. Cunningham, M. D. (2013). Death-sentenced inmates. In L. Gideon (Ed.), *Special needs offenders in correctional institutions.* Thousand Oaks, CA: Sage Publications.

9. Cunningham, M. D. (2008). Competency to waive appeals. In B. L. Cutler (Ed.), *Encyclopedia of psychology and law* (pp. 123-125). Thousand Oaks, CA: Sage Publications.  doi:10.4135/9781412959537.n48

10. Cunningham, M. D. (2008). Institutional misconduct among capital murderers. In M. DeLisi and P. J. Conis (Eds.), *Violent offenders: Theory, research, public policy, and practice* (pp. 237-253). Boston: Jones & Bartlett Publishers.

11. Cunningham, M. D. (2008).  Forensic psychology evaluations at capital sentencing. In R. Jackson (Ed.), *Learning forensic assessment (International perspectives on forensic mental health)* (pp. 211-238). New York: Routledge, Taylor & Francis Group.

12. Cunningham, M. D., & Goldstein, A. M. (2003). Sentencing determinations in death penalty cases. In A. Goldstein (Ed.), *Forensic psychology* (vol. 11 of 12) (pp. 407-436). I. Weiner (Ed.), *Handbook of psychology*. New York: John Wiley & Sons.

*Articles in peer-reviewed journals:*

13. Cunningham, M. D., Reidy, T. J., & Sorensen, J. R. (2015, December 28). Wasted resources and gratuitous suffering: The failure of a security rationale for death row. *Psychology, Public Policy, and Law*. Advance online publication. http://dx.doi.org/10.1037/law0000072

14. Hanlon, R., Brook, M., Demery, J. A., & Cunningham, M. D. (2015). Domestic homicide: Neuropsychological profiles of murderers who kill family members and intimate partners. *Journal of Forensic Sciences,* online. doi: 10.1111/1556-4029.12908

15. Reidy, T. J., Sorensen, J. R., & Cunningham, M. D. (2013). Probability of criminal acts of violence: A test of jury predictive accuracy. *Behavioral Sciences and the Law, 31,* 286-305. doi:10.1002/bsl.2064

16. Reidy, T. J., Sorensen, J. R., & Cunningham, M. D. (2012). Community violence to prison assault: A test of the behavior continuity hypothesis. *Law and Human Behavior, 36*(4), 356-363. doi:10:1037/h0093934

17. Sorensen, J. R., Cunningham, M. D., Vigen, M. P., & Woods, S. O. (2011). Serious assaults on prison staff: A descriptive analysis. *Journal of Criminal Justice, 39,* 143-150. doi:10.1016/j.jcrimjus.2011.01.002

18. Cunningham, M. D., Sorensen, J. R., Vigen, M. P., & Woods, S. O. (2011). Correlates and actuarial models of assaultive prison misconduct among violence-predicted capital offenders. *Criminal Justice and Behavior, 38* (1), 5-25. doi:10.1177/0093854810384 830

---

Case 3:12-cv-00327-MOC   Document 118-2   Filed 04/04/16   Page 8 of 20

Bates No. 14852

**JA3075**

19. Cunningham, M. D., Sorensen, J. R., Vigen, M. P., & Woods, S. O. (2011). Life and death in the Lone Star State: Three decades of violence predictions by capital juries. *Behavioral Sciences & the Law, 29* (1), 1-22. doi:10:1002/bsl.963

20. Cunningham, M. D., & Tassé, M. (2010). Looking to science rather than convention in adjusting IQ scores when death is at issue. *Professional Psychology: Research and Practice, 41* (5)*,* 413-419. doi:10.1037/a0020226

21. Cunningham, M. D., Sorensen, J. R., Vigen, M. P., & Woods, S. O. (2010). Inmate homicides: Killers, victims, motives, and circumstances. *Journal of Criminal Justice, 38* (4)*,* 348-358. doi:10.1016/j.jcrimjus.2010.03.008

22. Cunningham, M. D., & Sorensen, J. R. (2010). Improbable predictions at capital sentencing: Contrasting prison violence outcomes. *Journal of the American Academy of Psychiatry and the Law, 38* (1)*,* 61-72.

23. Sorensen, J. R., & Cunningham, M. D. (2010). Conviction offense and prison violence: A comparative study of murderers and other offenders. *Crime & Delinquency, 56* (1)*,* 103-125. doi:10.1177/0011128707307175

24. Cunningham, M. D., Sorensen, J. R., & Reidy, T. J. (2009). Capital jury decision-making: The limitations of predictions of future violence. *Psychology, Public Policy, and Law, 15* (4), 223-256*.* doi:10.1037/a0017296

25. Cunningham, M. D. (2009). Introduction to special issue: Progress, perspectives, and best practices in capital sentencing evaluations. *Journal of Psychiatry and Law, 37* (2-3)*,* 125-130.

26. Macvaugh, G., & Cunningham, M. D. (2009). *Atkins v. Virginia*: Implications and recommendations for forensic practice. *Journal of Psychiatry and Law, 37* (2-3)*,* 131-187.

27. Sorensen, J. R., & Cunningham, M. D. (2009). Once a killer always a killer? Prison misconduct of former death-sentenced inmates in Arizona. *Journal of Psychiatry and Law*, *37* (2-3)*,* 237-267.

28. Kuanliang, A., Sorensen, J. R., & Cunningham, M. D. (2008). Juvenile inmates in an adult prison system: Rates disciplinary misconduct and violence. *Criminal Justice and Behavior, 35* (9), 1186-1201. doi:10.1177/0093854808322744

29. Cunningham, M. D., Reidy, T. J., & Sorensen, J. R. (2008). Assertions of "future dangerousness" at federal capital sentencing: Rates and correlates of subsequent prison misconduct and violence. *Law and Human Behavior*, *32* (1)*,* 46-63. doi:10.1007/s10979-007-9107-7

30. Cunningham, M. D., & Sorensen, J. R. (2007). Capital offenders in Texas prisons: Rates, correlates, and an actuarial analysis of violent misconduct. *Law and Human Behavior, 31*, 553-571.  doi:10.1007/s10979-006-9079-z

Case 3:12-cv-00327-MOC   Document 118-2   Filed 04/04/16   Page 9 of 20
Bates No. 14853

**JA3076**

31. Cunningham, M. D., & Sorensen, J. R. (2007). Predictive factors for violent misconduct in close custody. *Prison Journal, 87* (2), 241-253. doi:10.1177/0032885507303752

32. Sorensen, J. R., & Cunningham, M. D. (2007). Operationalizing risk: The influence of measurement choice on the prevalence and correlates of violence among incarcerated murderers. *Journal of Criminal Justice, 35*, 546-555. doi:10.1016/j.jcrimjus.2007.07.007

33. Cunningham, M. D. (2006). Dangerousness and death: A nexus in search of science and reason. *American Psychologist, 61* (8), 828-839. doi:10.1037/0003-066X.61.8.827

34. Cunningham, M. D. (2006). Informed consent in capital sentencing evaluations: Targets and content. *Professional Psychology: Research and Practice, 37* (5), 452-459. doi:10.1037/0735-7028.37.5.452

35. Cunningham, M. (2006). Special issues in capital sentencing. In Conroy, M. A., Lyons, P. M., Jr., & Kwartner, P. P. (Eds.). *Forensic mental health services in Texas* [special issue, electronic version]. *Applied Psychology in Criminal Justice, 2* (3), 205-236.

36. Cunningham, M. D., & Sorensen, J. R. (2006). Actuarial models for assessment of prison violence risk: Revisions and extensions of the Risk Assessment Scale for Prison (RASP). *Assessment, 13* (3), 253-265. doi:10.1177/1073191106287791

37. Cunningham, M. D., & Sorensen, J. R. (2006). Nothing to lose? A comparative examination of prison misconduct rates among life-without-parole and other long-term high security inmates. *Criminal Justice and Behavior, 33* (6), 683-705. doi:10.1177/0093854806288273

38. Cunningham, M. D., Reidy, T. J., & Sorensen, J. R. (2005). Is death row obsolete? A decade of mainstreaming death-sentenced inmates in Missouri. *Behavioral Sciences & the Law, 23,* 307-320. doi:10.1002/bsl.608

39. Cunningham, M. D., Sorensen, J. R., & Reidy, T. J. (2005). An actuarial model for assessment of prison violence risk among maximum security inmates. *Assessment, 12* (1), 40-49. doi:10.1177/1073191104272815

40. Cunningham, M. D., Sorensen, J. R., & Reidy, T. J. (2004). Revisiting future dangerousness revisited: Response to DeLisi and Munoz. *Criminal Justice Policy Review, 15* (3), 365-376. doi:10.1177/0887403404266462

41. Shuman, D. W., Cunningham, M. D., Connell, M. A., & Reid, W. H. (2003). Interstate forensic psychology consultations: A call for reform and proposal for a model rule. *Professional Psychology: Research and Practice, 34* (3), 233-239. doi:10.1037/0735-7028.34.3.233

42. Cunningham, M. D., & Reidy, T .J. (2002). Violence risk assessment at federal capital sentencing: Individualization, generalization, relevance, and scientific standards. *Criminal Justice and Behavior, 29*(5), 512-537. doi:10.1177/009385402236731

Case 3:12-cv-00327-MOC   Document 118-2   Filed 04/04/16   Page 10 of 20
Bates No. 14854

**JA3077**

43. Cunningham, M. D., & Vigen, M. P. (2002). Death row inmate characteristics, adjustment, and confinement: A critical review of the literature. *Behavioral Sciences & the Law, 20* (1-2), 191-210. doi:10.1002/bsl.473

44. Cunningham, M. D., & Reidy, T. J. (2001). A matter of life or death:  Special considerations and heightened practice standards in capital sentencing evaluations. *Behavioral Sciences & the Law, 19* (4), 473-490. doi:10.1002/bsl.460

45. Reidy, T. J., Cunningham, M. D., & Sorensen, J. (2001).  From death to life: Prison behavior of former death row inmates in Indiana. *Criminal Justice and Behavior, 28* (1)*,* 62-82.   doi:10.1177/0093854801028001003

46. Cunningham, M. D., & Reidy, T. J. (1999).  Don't confuse me with the facts:  Common errors in violence risk assessment at capital sentencing. *Criminal Justice and Behavior, 26* (1), 20-43.  doi:10.1177/0093854899026001002

47. Cunningham, M. D., & Vigen, M. P. (1999).  Without appointed counsel in capital postconviction proceedings: The self-representation competency of Mississippi death row inmates.  *Criminal Justice and Behavior, 26* (3), 293-321. doi:10.1177/0093854899026003002

48. Cunningham, M. D., & Reidy, T. J. (1998).  Antisocial personality disorder and psychopathy: Diagnostic dilemmas in classifying patterns of antisocial behavior in sentencing evaluations. *Behavioral Sciences & the Law, 16* (3)*,* 333-351.|

49. Cunningham, M. D., & Reidy, T. J. (1998).  Integrating base rate data in violence risk assessments at capital sentencing.  *Behavioral Sciences & the Law, 16* (1), 71-95.

*Articles in edited law reviews:*

50. Lyon, A. D., & Cunningham, M. D. (2006) Reason not the need: Does the lack of compelling state interest in maintaining a separate death row make it unlawful? *American Journal of Criminal Law, 33* (1), 1-30.

*Case reports, teaching points, profiles, and other commentary:*

51. Cunningham, M. D. (*under review*). Third party presence - attorneys [ethics case commentary]. In G. Pirelli, R. Beattey, and P. Zapf (Eds.), *The ethical practice of forensic psychology: A casebook.* New York: Oxford.

52. Cunningham, M. D. (*under review*). Addressing multiple psycholegal questions in a single evaluation [ethics case commentary]. In G. Pirelli, R. Beattey, and P. Zapf (Eds.), *The ethical practice of forensic psychology: A casebook.* New York: Oxford.

53. Cunningham, M. D. (2014). Report on capital sentencing [case report]. In K. Heilbrun, D. DeMatteo, S. Brooks Holliday, and C. LaDuke (Eds.), *Forensic mental health assessment:  A casebook, 2nd Edition* (136-144).  New York: Oxford.

54. Cunningham, M. D. (2011). [Professional profile]. In C. R. Bartol and A. M. Bartol (Eds.), *Introduction to Forensic Psychology: Research and Application, 3rd Edition* (177-179). Thousand Oaks, CA: Sage.

55. Cunningham, M. D. (2010). [Professional profile].  In R. M. Regoli and J. D. Hewitt, *Exploring criminal justice: The essentials*. Boston: Jones & Bartlett Publishers.

56. Cunningham, M. D. (2007) Capital violence risk assessment [case report]. In Mary A. Conroy and D. Murrie, *Forensic assessment of violence risk: A guide for risk assessment and risk management* (287-290). New York: John Wiley & Sons.

57. Cunningham, M. D. (2002). Capital sentencing [case report]. In K. Heilbrun, G. Marczyk, and D. DeMatteo, *Forensic mental health assessment:  A casebook* (152-171). New York: Oxford University Press.

58. Cunningham, M. D. (2002). Competence to be executed [case report]. In K. Heilbrun, G. Marczyk, and D. DeMatteo, *Forensic mental health assessment:  A casebook* (96-114). New York: Oxford University Press.

59. Cunningham, M. D. (2002). How do you evaluate the accuracy of different sources of third-party information? [teaching point]. In K. Heilbrun, G. Marczyk, and D. DeMatteo, *Forensic mental health assessment:  A casebook* (171-173).  New York: Oxford University Press.

60. Cunningham, M. D. (2002). Why and how do you attribute information to sources in a forensic mental health assessment? [teaching point].  In K. Heilbrun, G. Marczyk, and D. DeMatteo, *Forensic mental health assessment:  A casebook* (114-115).  New York: Oxford University Press.

***Articles in professional periodicals:***

61. Cunningham, M. D. (2001). Bias in capital sentencing evaluations [invited opinion column]. *American Psychology and Law Society News, 21, 2,* 8-9.

62. Cunningham, M. D., & Reidy, T. J. (1998).  Antisocial personality disorder vs. psychopathy as diagnostic tools. *Prosecutor's Brief: California District Attorneys Association, 20,* 9-11.

## INVITED SCHOLARLY SYMPOSIA / ADDRESSES

1. Deadly error: The inability of capital juries to predict future violence. XXXIII International Congress on Law and Mental Health. Amsterdam, Netherlands, July 2013.

2. Who is the death penalty for? Determining who lives and who dies at capital sentencing. Goldman Trust Colloquium. Oklahoma State University, Stillwater, Oklahoma, February 2013.

Case 3:12-cv-00327-MOC   Document 118-2   Filed 04/04/16   Page 12 of 20
Bates No. 14856
**JA3079**

3. Sources of vicarious traumatization in death penalty cases. In the symposium: "The cost of being an expert: Vicarious traumatization and forensic psychologists," with William E. Foote, Ph.D., Alan M. Goldstein, Ph.D., Dawn Hughes, Ph.D., and Julie Brovko, American Psychology-Law Society Annual Conference. Miami, Florida, March 2011.

4. Have credentials will travel: Questions and answers regarding interjurisdictional practice. Symposium with Solomon M. Fulero, Ph.D., Alex M. Siegel, Ph.D., Joseph Rollo, Ph.D., and Joel A. Dvoskin, Ph.D., American Psychology-Law Society Annual Conference. San Antonio, Texas, March 2009.

5. How research can inform death penalty determinations. Invited address. Sam Houston State University: Spring Colloquium. Huntsville, Texas, February 2009.

6. Informed consent: Essential consultations with attorneys in death penalty cases. Invited seminar for doctoral psychology students. Sam Houston State University. Huntsville, Texas, February 2009.

7. The role of the forensic psychologist in death penalty litigation. Presenter. American Academy of Forensic Psychology: Workshop Series. San Francisco, California, May 2008.

8. Death penalty on trial. Symposium with Joel Dvoskin, Ph.D., Solomon Fulero, Ph.D., & Christopher Slobogin, J.D., Ph.D., American Psychological Association 115th Annual Convention. San Francisco, California, August 2007.

9. Implications of developmental research for juvenile adjudications. Invited address. Alabama Council of Community Mental Health Boards, Southern Poverty Law Center: 33rd annual conference. Birmingham, Alabama, May 2007.

10. The role of the forensic psychologist in death penalty litigation. Presenter. American Academy of Forensic Psychology: Workshop Series. San Diego, California, January 2007.

11. Dangerousness and death: A nexus in search of science and reason. Invited award address, American Psychological Association 114th Annual Convention. New Orleans, Louisiana, August 2006.

12. The role of the forensic psychologist in death penalty litigation. Presenter. American Academy of Forensic Psychology: Workshop Series. La Jolla, California, March 2005.

13. Informed consent in forensic evaluations. Symposium with Mary Connell, Ph.D., William Foote, Ph.D., & Daniel Shuman, J.D., American Psychology-Law Society Annual Conference. LaJolla, California, March 2005.

14. Psychological evaluations in death penalty litigation. Presenter. Texas Psychological Association, Pre-convention workshop. Dallas, Texas, November 2003.

Case 3:12-cv-00327-MOC   Document 118-2   Filed 04/04/16   Page 13 of 20
Bates No. 14857
**JA3080**

15. The role of the forensic psychologist in death penalty litigation. Presenter. American Academy of Forensic Psychology: Workshop Series. Cincinnati, Ohio, September 2003.

16. Competency to be executed. Symposium with Stanley Brodsky, Ph.D. & Patricia Zapf, Ph.D., American Psychology-Law Society Annual Conference. Austin, Texas, March 2002.

17. The role of the forensic psychologist in death penalty litigation. Presenter. American Academy of Forensic Psychology: Workshop Series. San Diego, California, February 2002.

18. The role of the forensic psychologist in death penalty litigation. Presenter. American Academy of Forensic Psychology: Workshop Series. Monterey, California, January 2000.

19. Psychological expertise and criminal justice. Panel member. American Psychological Association / American Bar Association Conference. Washington, DC, October 1999.

20. The role of the forensic psychologist in death penalty litigation. Presenter. American Academy of Forensic Psychology: Workshop Series. Austin, Texas, February 1999.

21. The role of the forensic psychologist in death penalty litigation. Presenter. American Academy of Forensic Psychology: Workshop Series. Milwaukee, Wisconsin, March 1998.


**EDITORIAL**

Consulting editor: *Assessment* (2006-2016)
Editorial board: *Open Access Journal of Forensic Psychology* (2009- )
Guest editor: *Journal of Psychiatry and Law* (special issue, 2009)
Ad hoc reviewer: *American Psychologist: 2015*
           *Behavioral Sciences & the Law:* 2004, 2007, 2008, 2009, 2010, 2013
           *Criminal Justice and Behavior:* 2009, 2011
           *Criminal Justice Policy Review:* 2006
           *Criminal Justice Review:* 2008
           *Criminology:* 2011
           *Journal of Criminal Justice:* 2010, 2012
           *Journal of Forensic Psychology Practice:* 2009
           *Justice Quarterly:* 2009, 2011, 2013, 2014, 2015
           *Law & Human Behavior:* 2004
           *Personality Disorders: Theory, Research, and Treatment*: 2009
           *Psychological Assessment:* 2010, 2012, 2013, 2014
           *Psychology, Public Policy, and the Law:* 2009, 2010, 2011, 2012
           *Southwest Journal of Criminal Justice:* 2007
           *The Prison Journal:* 2012
           *Violence and Victims:* 2014, 2015
           *Women & Criminal Justice:* 2015

Case 3:12-cv-00327-MOC  Document 118-2  Filed 04/04/16  Page 14 of 20
Bates No. 14858
**JA3081**

Pre-publication book manuscript reviewer: John Wiley & Sons, Inc. (2007)
Professional Resource Press (2003)
Taylor & Francis (proposal, 2010)


**TESTIMONY BEFORE COMMISSIONS AND LEGISLATIVE COMMITTEES**

Texas State Senate, Criminal Justice Committee, 79th Legislative Session, Austin, 2005
Texas State Senate, Criminal Justice Committee, 78th Legislative Session, Austin, 2003
Illinois Governor's Commission on Capital Sentencing, Chicago, 2002


**AMICI CURIAE**

*Consultation and assistance in preparation of:*

Brief of *Amici Curiae* [Tassé, M., Everington, C., Salekin, K., Olley, J., Cunningham, M., Macvaugh, G., American Association on Intellectual and Developmental Disabilities] in Support of Warren Lee Hill, Jr.'s Petition for Writ of Habeas Corpus, in the Supreme Court of the United States (2013).

Brief of the *Amici Curiae*, Texas Psychological Association and Texas Appleseed in Support of Appellant, *Noah Espada vs. The State of Texas*, in the Court of Criminal Appeals of Texas at Austin (2007).

Brief of *Amicus Curiae*, American Psychological Association in Support of Defendant-Appellant, *U.S. v. Sherman Lamont Fields* in the United States Court of Appeals for the Fifth Circuit (2005).

*Cited as authority:*

Brief of *Amici Curiae*, Corrections Experts, in Support of Petitioner, in *Alfred Prieto v. Harold Clark, Director, A. David Robinson, Deputy Director, and E. Pearson, Warden*, No. 15-31, in the Supreme Court of the United States (2015), on Petition for a Writ of Certiorari to the United States Court of Appeals for the Fourth Circuit.

Brief of *Amici Curiae*, American Association on Intellectual and Developmental Disabilities (AAIDD), and ARC of the United States, in Support of the Petition for a Writ of Certiorari in *Juan Lizcano v. Texas*, No. 15-65, in the Supreme Court of the United States (2015) on Petition for a Writ of Certiorari to the Court of Criminal Appeals of Texas.

Brief of *Amici Curiae*, American Psychological Association, American Psychiatric Association, American Academy of Psychiatry and Law, Florida Psychological Association, National Association of Social Workers, and National Association of Social Workers Florida Chapter in Support of Petitioner in *Freddie Lee Hall v Florida*, No 12-10882, in the Supreme Court of the United States (2013).

---

Curriculum Vitae


Case 3:12-cv-00327-MOC   Document 118-2   Filed 04/04/16   Page 15 of 20
Bates No. 14859

**JA3082**

Brief as *Amici Curiae*, Capacity for Justice, Disability Rights Texas, Texas Appleseed, and the National Alliance on Mental Illness of Texas in Support of Petitioner, *Billie Wayne Coble*, in the Supreme Court of the United States on Petition for a Writ of Certiorari to the Texas Court of Criminal Appeals, No. 10-1271 (2011)

Case 3:12-cv-00327-MOC   Document 118-2   Filed 04/04/16   Page 16 of 20
Bates No. 14860

**JA3083**

<u>**Affidavit of Jean Lawson**</u>

I, Jean Lawson, appearing before the undersigned and being duly sworn or affirmed, state the following:

1. I am over the age of 18 and competent to testify to the following facts.

2. I previously executed an affidavit on December 8, 2014 in connection with Marc Barnette's capital post-conviction litigation.

3. In my earlier affidavit, I referenced a number of issues and investigative leads that I and my co-counsel had identified as necessary to explore in preparation for Marc's resentencing trial in 2002. We wanted to explore these issues and leads because we believed we would learn valuable mitigating information.

4. Any shortcomings or deficiencies in our investigation on behalf of Marc Barnette had nothing to do with any concern that the information we would learn or present might be "double-edged" or more aggravating than mitigating. We could not determine what could possibly be a "double-edged sword" until we knew what the information was in the first place.

5. Any failure to provide our experts with any information was not done in an effort to shield our experts from information that we thought might possibly be detrimental to our case or their opinions.

6. If any of our experts had suggested to us that Marc had been suffering from a significant mental health crisis at or around the time of the crimes—including, but not limited to, that he may have been psychotic or suffering from a mood disorder—I would not have been concerned that such information would have been a "double-edged sword" or of little to no mitigating value. Instead, I would have considered such information to be valuable and mitigating.

_Jean B. Lawson_
Jean Lawson

_3/31/16_
Date

Affirmed and subscribed before me on this the _31_ day of _March_, 2016 in Mecklenburg County, North Carolina

_Steven Arant_
Notary Public
My commission expires: _6-29-2016_

1

Case 3:12-cv-00327-MOC   Document 118-2   Filed 04/04/16   Page 17 of 20
Bates No. 14861
**JA3084**

# AFFIDAVIT OF CHAD DIAMOND

I, Chad Diamond, appearing before the undersigned and being duly sworn or affirmed, state the following:

1. I am over the age of 18 and competent to testify to the following facts.

2. I am an attorney in Charlotte, North Carolina. I am currently in private practice.

3. From April 2012 to March 2013, I was an Assistant Federal Defender at the Federal Defender's Office of Western North Carolina. In that capacity, I worked with post-conviction counsel Jake Sussman and Mark Olive on *United States v. Aquilia Marcivicci Barnette.*

4. During that time, I assisted Mr. Sussman and Mr. Olive with contacting the expert witnesses who testified on Mr. Barnette's behalf during his 1998 trial and 2002 resentencing for the purpose of obtaining copies of their case files. This would be the first step before later interviewing the expert, if possible.

5. In June and July 2012, I tried to contact each expert witness who had testified for Mr. Barnette.

6. One of the experts I tried to contact was Dr. Seymour Halleck. Dr. Halleck previously evaluated Mr. Barnette, testified at Mr. Barnette's 1998 trial, and testified again at his 2002 resentencing.

7. In or around late June or early July of 2012, I called a telephone number listed for Dr. Halleck's office. I was informed by his office manager that Dr. Halleck had retired, that he had destroyed all his files, including his file from the Barnette case, and that he was unavailable to discuss the matter further.

I swear or affirm that the information in the foregoing paragraphs is true to the best of my knowledge.

_____    4/1/16
Chad Diamond                 Date

Affirmed and subscribed before me on this the 1st day of Apr. , 2016 in Mecklenburg County, North Carolina.

_____
Notary Public

My commission expires: 1-24-2020

MARIE S. GARFIELD
Notary Public
Mecklenburg County
My Commission Expires
01/24/2020
NORTH CAROLINA

<u>**Affidavit of Zachary Rowles**</u>

I, Zachary Rowles, appearing before the undersigned and being duly sworn or affirmed, state the following:

1. I am over the age of 18 and competent to testify to the following facts.

2. I am a Mitigation Specialist employed by the Center for Death Penalty Litigation in Durham, North Carolina.

3. I began working as a mitigation specialist in *USA v Aquilia Marcivicci Barnette* in 2012 after being contacted by one of Mr. Barnette's post-conviction attorneys, Jacob Sussman.

4. Post-conviction counsel asked me to contact Dr. Seymour Halleck, who previously evaluated Mr. Barnette, and testified at Mr. Barnette's 1998 trial and his 2002 resentencing.

5. To date, my efforts to speak with Dr. Halleck have been unsuccessful.

6. During the course of my efforts to speak with Dr. Halleck, I have learned that he is 86 years old and living in an apartment on Cedar Club Circle in Chapel Hill, NC. This is an apartment associated with The Cedars of Chapel Hill. The website for The Cedars of Chapel Hill states that they are a "Continuing Care Retirement Community."

7. On February 4, 2016, I searched the North Carolina Medical Board website which revealed that Dr. Halleck's medical license expired in 2013.

8. On February 4, 2016, I called a number indicated by a background search to be Dr. Halleck's phone number. A woman answered. I asked for Dr. Halleck and started to explain who I was. She told me I would need to call back another time. I attempted to continue the conversation to ask when would be a good time to do that but she did not respond and the call was disconnected.

9. On March 15, 2016, I went to the address I had for Dr. Halleck at The Cedars. His apartment door was answered by a painter who informed me that Dr. Halleck was not there. The apartment was cleared out for the painting and the painter did not know if Dr. Halleck would be returning to live in the apartment. The painter showed me a sign affixed to the inside of the door indicating that Dr. Halleck is not to be woken up, and with instructions about calling a nurse and checking his pulse and blood pressure.

10. On March 15, 2016, I spoke to a resident in the same apartment building at The Cedars. He informed me that Dr. Halleck had a stroke a couple months ago and has since moved to a more intensive assisted living facility in Raleigh, NC.

1

11.　　On March 15, 2016, I spoke with a woman at concierge in the main building of The Cedars who said she thought the Hallecks had moved away on March 10, 2016. She directed me to the main office for more information. A woman in the main office said she could not give me any information about Dr. Halleck's current contact information.

I swear or affirm that the information in the foregoing paragraphs is true to the best of my knowledge.

_____　　　　3/31/16
Zachary Rowles　　　　　　　　　　　　　Date

Affirmed and subscribed before me on this the 31st day of March , 2016 in Mecklenburg County, North Carolina.

_____
Notary Public

My commission expires: 1-24-2020

MARIE S. GARFIELD
Notary Public
Mecklenburg County
My Commission Expires
01/24/2020
NORTH CAROLINA

2

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>vs.<br><br>AQUILIA MARCIVICCI BARNETTE | <u>DEATH</u> <u>PENALTY</u> <u>§ 2255</u> |

**PETITIONER AQUILIA MARCIVICCI BARNETTE'S
SUPPLEMENTAL MOTION TO VACATE UNDER 28 U.S.C. § 2255**

Aquilia Marcivicci Barnette, through undersigned counsel, hereby files a supplemental motion to set aside the judgments against him on Counts 1, 2, 3, 8, 10, and 11 in case number 3:97CR23-RV, pursuant to 28 U.S.C. § 2255. As explained below, those convictions must be vacated in light of the Supreme Court's recent decisions in *Johnson v. United States,* 135 S. Ct. 2551 (2015) and *Welch v. United States,* 136 S. Ct. 1257 (2016).

**INTRODUCTION**

On January 27, 1998, Mr. Barnette was convicted of interstate domestic violence, in violation of 18 U.S.C. §§ 2261(a)(1) & (b) (Count 1); use of a destructive device during and in relation to a crime of violence, in violation of 18 U.S.C. § 924(c)(1) (Count 2); using and carrying fire and explosive materials during commission of a felony, in violation of 18 U.S.C. § 844(h)(1) (Count 3); making a false statement in connection with the purchase of a firearm, in violation of 18 U.S.C. §§ 922(a)(6) & 924 (Count 4); making a firearm by sawing off the barrel of a shotgun without complying with the provisions of the National Firearms Act, in violation of 26 U.S.C. §§ 5821, 5822, 5861(f)

**JA3088**

& 5871 (Count 5); possession of a firearm after having been convicted of a felony, in violation of 18 U.S.C. §§ 922(g)(1) & 924 (Count 6); carjacking resulting in death, in violation of 18 U.S.C. § 2119(3) (Count 7); first-degree murder by use of a firearm, in violation of 18 U.S.C. §§ 924(c)(1) & (i)(1) (Count 8); transporting a stolen vehicle in interstate commerce, in violation of 18 U.S.C. § 2312 (Count 9); interstate domestic violence, in violation of 18 U.S.C. §§ 2261(a)(1) & (b) (Count 10); and first-degree murder by use of a firearm, in violation of 18 U.S.C. §§ 924(c)(1) & (i)(1) (Count 11). Mr. Barnette was sentenced to death on Counts 7, 8, and 11. The death sentence was imposed pursuant to sentencing provisions specific to each statute of conviction. The applicable sentencing provision with respect to the § 924(c) convictions in Counts 8 and 11 was 18 U.S.C. § 924(j).

With respect to Counts 1, charging Mr. Barnette with interstate domestic violence, in violation of 18 U.S.C. § 2261, the Government did not indicate what crime it was alleging as the "crime of violence" Mr. Barnette had committed. Instead, the indictment alleged only facts—that the crime of violence was the "firebomb[ing of] Robin William's occupied apartment and an automobile parked in her driveway causing bodily injury to her." Similarly, with respect to Count 10, also charging Mr. Barnette with interstate domestic violence, in violation of § 2261, the Government also failed to indicate what crime it was alleging as the predicate "crime of violence." Again, the Government alleged only specific facts—here, that the crime of violence was that Mr. Barnette "shot and killed Robin Williams causing bodily injury and death to her."

On June 26, 2015, the Supreme Court held in *Johnson* that the residual clause of the Armed Career Criminal Act ("ACCA"), 18 U.S.C. § 924(e), is unconstitutionally void

**JA3089**

for vagueness. That clause, the Court held, cannot constitutionally define a "crime of violence" for purposes of the ACCA's sentence-enhancing provisions. *See Johnson,* 135 S. Ct. at 2557. On April 18, 2016, the Supreme Court held that *Johnson* announced a new substantive rule that applies retroactively to cases on collateral review, including Mr. Barnette's case. *Welch v. United States,* 136 S. Ct. at 1265.

As detailed herein, based on the Court's interpretation of the residual clause of § 924(e), it follows that the residual clause of § 924(c), the statute under which Mr. Barnette was convicted on Counts 2, 8, and 11, must also be deemed unconstitutionally void for vagueness. Indeed, after *Johnson,* both federal carjacking under 18 U.S.C. § 2119 and federal interstate domestic violence categorically fail to qualify as a "crime of violence." Therefore, Mr. Barnette's § 924(c) convictions on Counts 2, 8, and 11, and their attendant sentences, are invalid.

The Court's interpretation of the residual clause of § 924(e) must also render the unconstitutional the residual clause of 18 U.S.C. § 16(b), the federal statutory provision that defines "crime of violence" when it is used in statutes other than § 924. This is relevant to Mr. Barnette's case because he was convicted of crimes under 18 U.S.C. § 2261 which, like § 924(c) and (e), requires a finding that the defendant committed a predicate crime of violence and incorporates the statutory definition of 18 U.S.C. § 16. Thus, following *Johnson*, Mr. Barnette's convictions on Counts 1 and 10 are also invalid.

Further, as detailed below, it follows that Mr. Barnette's convictions and sentences on Counts 1, 2, 3, 10, and 11—each which rests on a finding of a "crime of violence" which should now be deemed invalid —must also be vacated.

**JA3090**

**A.     Conviction and First Sentencing.**

On January 27, 1998, a jury found Mr. Barnette guilty on all counts of the Indictment. At sentencing, the jury recommended that Mr. Barnette be sentenced to death on Counts Seven, Eight, and Eleven. On February 10, 1998, this Court entered a judgment sentencing Mr. Barnette to death. The Court also imposed sentences on the other eight counts, which resulted in a total sentence of life imprisonment, plus 540 months to be served consecutively.

**B.     Direct Appeal, Resentencing, and Subsequent Direct Appeal.**

Mr. Barnette's direct appeal to the United States Court of Appeals for the Fourth Circuit resulted in the reversal of the sentences of death on Counts Seven, Eight, and Eleven, and his case was remanded for resentencing. *United States v. Barnette*, 211 F.3d 803 (4th Cir. 2000). Following a new penalty phase trial in 2002, a jury again imposed the death penalty as to Counts Seven, Eight, and Eleven. On direct appeal, Mr. Barnette's new death sentences were affirmed. *United States v. Barnette*, 390 F.3d 775 (4th Cir. 2004).

**C.     *Batson/Miller-El* Litigation.**

On May 15, 2005, Mr. Barnette filed a Petition for a Writ of Certiorari with the United States Supreme Court. Soon thereafter, the Supreme Court decided *Miller-El v. Dretke*, 545 U.S. 231 (2005). A supplemental petition for a writ of certiorari was filed on Mr. Barnette's behalf in light of *Miller-El*. The Supreme Court thereafter granted the supplemental petition, vacated the judgment of the Fourth Circuit, and remanded the case in light of *Miller-El. Barnette v. United States*, 546 U.S. 803 (2005). Following remand to

4

the Fourth Circuit, Mr. Barnette sought to remand the case to the District Court. After supplemental briefing on the issue, the Fourth Circuit entered an order granting his motion to remand the case to the District Court.

After additional briefing, an *in camera* review of jury questionnaires, and an additional hearing on the matter, the District Court refused to provide copies of the jury questionnaires to defense counsel. The Court then issued an Order on May 20, 2010, finding no *Batson* violation by the government, and further ruling that Mr. Barnette was not entitled to discovery under the Jencks Act. *United States v. Barnette*, Case No. 3:97CR23, 2010 WL 2085312 (W.D.N.C. May 20, 2010). Mr. Barnette appealed this Court's Order to the Fourth Circuit Court of Appeals.

Following oral argument on January 27, 2011, the Fourth Circuit issued a published opinion affirming the District Court's ruling. *United States v. Barnette*, 644 F.3d 192 (4th Cir. 2011). On March 19, 2012, the United States Supreme Court denied Mr. Barnette's Petition for a Writ of Certiorari. *Barnette v. United States*, 132 S.Ct. 1740 (Mar. 19, 2012).

**D.     Current § 2255 Litigation.**

On April 3, 2012, a sealed motion to appoint counsel for Defendant was filed. [Case No. 3:97CR23, Doc. 682]. On May 23, 2012, the Court appointed the undersigned, *nunc pro tunc* to April 3, 2012, as counsel in this capital § 2255 proceeding. [Doc. 1]

On March 15, 2013, the government filed its Notice of Government Stipulation to Extend Deadline for Filing Motion Under 28 U.S.C. § 2255 [Doc. 32], and stated as follows:

**JA3092**

> NOW COMES the United States, through the U.S. Attorney's Office for the Western District of North Carolina and undersigned counsel, and hereby files this notice of its consent and considered, intentional, affirmative decision to waive, forfeit and/or relinquish any statute of limitations defense regarding the extension of Defendant Aquilia Marcivicci Barnette's § 2255 filing deadline from March 19, 2013 to June 19, 2013. *See Wood v. Milyard*, 132 S. Ct. 1826, 1835 (2012); *see also Day v. McDonough*, 547 U.S. 198, 202 (2006). The government's consent and waiver is strictly limited to a three (3) month extension of the limitations period from March 19, 2013 to June 19, 2013 for Mr. Barnette to file a § 2255 motion.

*Id*. at 1.

On June 19, 2013, Mr. Barnette timely filed his § 2255 motion. [Doc. 48] On December 22, 2014, Mr. Barnette timely filed his motion for an evidentiary hearing on his § 2255 motion. [Doc. 73] On September 23, 2015, the government filed its opposition to Mr. Barnette's § 2255 motion and motion for an evidentiary hearing. [Doc. 98] On April 4, 2016, Mr. Barnette filed his reply brief in support of his motion for an evidentiary hearing. [Doc. 118] These matters are currently pending before the Court.

### E.      *Johnson v. United States.*

On June 26, 2015, the Supreme Court issued its decision in *Johnson,* 135 S. Ct. 2551. With *Johnson,* the Supreme Court overruled *Sykes v. United States,* 131 S. Ct. 2267 (2011), and *James v. United States,* 550 U.S. 192 (2007), finding ACCA's residual clause too vague to provide adequate notice under the Due Process Clause of the Fifth Amendment.

Specifically, *Johnson* held that "the indeterminacy of the wide-ranging inquiry required by the residual clause both denies fair notice and invites arbitrary enforcement by judges," therefore "[i]ncreasing a defendant's sentence under the clause denies due process of law." *Johnson,* 135 S. Ct. at 2557.

**F.** *Welch v. United States.*

After *Johnson* was decided*,* federal prisoners throughout the country sought to challenge ACCA-enhanced sentences, as well as convictions and sentences imposed under materially indistinguishable residual clauses, such as those in 18 U.S.C. § 16(b) and in 18 U.S.C. § 924(c). This led to conflict over whether *Johnson* announced a new substantive rule, which would apply retroactively to cases on collateral review, or whether it only announced a new procedural rule, which would not necessarily apply retroactively.

On April 18, 2016, the Supreme Court resolved the issue, finding *Johnson*'s rule substantive and thus applicable retroactively to cases on collateral review. *Welch,* 136 S. Ct. at 1265. After *Johnson* and *Welch,* Mr. Barnette's § 924(c) and § 2261 convictions, and the sentences imposed for them, cannot be sustained. Moreover, convictions under § 924(c) are necessary elements for convictions under § 924(j) and their attendant sentences. Thus, the § 924(j) convictions and sentences can likewise not stand.

 Given this circumstance, Mr. Barnette is filing the instant motion in order raise these supplemental arguments as part of his ongoing § 2255 litigation.

**ARGUMENT**

**I.     IN LIGHT OF *JOHNSON,* MR. BARNETTE'S CONVICTIONS ON COUNTS 1, 2, 3, 8, 10, AND 11 ARE INVALID AND THEY, ALONG WITH THEIR ATTENDANT TERM-OF-YEAR SENTENCES, AND ALL OF THE DEATH SENTENCES IMPOSED, MUST BE VACATED.**

As noted above, on January 27, 1998, Mr. Barnette was convicted of interstate domestic violence, in violation of 18 U.S.C. §§ 2261(a)(1) & (b) (Count 1); use of a destructive device during and in relation to a crime of violence, in violation of 18 U.S.C. § 924(c)(1) (Count 2); using and carrying fire and explosive materials during commission

7

**JA3094**

of a felony, in violation of 18 U.S.C. § 844(h)(1) (Count 3); making a false statement in connection with the purchase of a firearm, in violation of 18 U.S.C. §§ 922(a)(6) & 924 (Count 4); making a firearm by sawing off the barrel of a shotgun without complying with the provisions of the National Firearms Act, in violation of 26 U.S.C. §§ 5821, 5822, 5861(f) & 5871 (Count 5); possession of a firearm after having been convicted of a felony, in violation of 18 U.S.C. §§ 922(g)(1) & 924 (Count 6); carjacking resulting in death, in violation of 18 U.S.C. § 2119(3) (Count 7); first-degree murder by use of a firearm, in violation of 18 U.S.C. §§ 924(c)(1) & (i)(1) (Count 8); transporting a stolen vehicle in interstate commerce, in violation of 18 U.S.C. § 2312 (Count 9); interstate domestic violence, in violation of 18 U.S.C. §§ 2261(a)(1) & (b) (Count 10); and first-degree murder by use of a firearm, in violation of 18 U.S.C. §§ 924(c)(1) & (i)(1) (Count 11). Mr. Barnette was sentenced to death on Counts 7, 8, and 11. The death sentence was imposed pursuant to sentencing provisions specific to each statute of conviction. The applicable sentencing provision with respect to the § 924(c) convictions in Counts 8 and 11 was 18 U.S.C. § 924(j).

The counts of which Mr. Barnette was convicted under 18 U.S.C. § 2261 and under 18 U.S.C. § 924(c) both require determinations that he committed a "crime of violence," as one of the elements necessary to prove the violation. Section 924(c) contains a definition of "crime of violence;" § 2261 incorporates the definition of "crime of violence" found in 18 U.S.C. § 16. The two definitions are identical. They define a crime of violence as:

> (a)   an offense that has as an element the use, attempted use, or threatened use of physical force against the person or property of another, or

**JA3095**

(b)      any other offense that is a felony and that, by its nature, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense.

The first clause of this definition is commonly referred to as the "force" or "elements" clause; the second is commonly referred to as the "residual" clause.

The residual clause of § 924(c) and of § 16(b) is materially indistinguishable from the residual clause of the Armed Career Criminal Act (the ACCA) that the Supreme Court in *Johnson* deemed unconstitutionally vague. *See Johnson,* 135 S. Ct. at 2557. Indeed, at least three federal courts of appeals have applied *Johnson* to invalidate the residual clause of 18 U.S.C. § 16(b). *See United States v. Gonzalez-Longoria,* 813 F.3d 225, 235 (5th Cir. 2016); *United States v. Vivas-Ceja,* 808 F.3d 719, 722 (7th Cir 2015); *Dimayo v. Lynch,* 803 F.3d 1110, 1117-20 (9th Cir. 2015). And relying on those circuits' reasoning, at least two district courts have held § 924(c)'s residual clause to be void for vagueness as well. *See United States v. Lattanaphom,* No. 2:99-00433, __ F. Supp. 3d __, 2016 WL 393545, at *3-*4 (E.D. Cal. Feb. 2, 2016); *United States v. Edmundson,* PWG–13–15, __ F. Supp. 3d __, 2015 WL 9582736, at *3 (D. Md. Dec. 30, 2015).

As explained below, these cases compel the same result in Mr. Barnette's case. Because § 924(c)'s and § 16(b)'s residual clauses must be considered void for vagueness, those clauses cannot constitutionally define a "crime of violence" for purposes of convictions obtained under statutes employing either statutory definition.

Furthermore, none of the predicate crimes Mr. Barnette was convicted of categorically qualifies as a "crime of violence" under the remaining force clause, as explained in detail below.

9

**JA3096**

**A. Section 924(c)'s and § 16(b)'s residual clauses are materially identical to ACCA's residual clause and therefore like ACCA's clause are unconstitutionally void for vagueness.**

The ACCA, 18 U.S.C. § 924(e), provides for an enhanced penalty for individuals convicted of possessing a firearm after sustaining three or more convictions for a "serious drug offense" or a "violent felony." ACCA's definition of "violent felony" includes the residual clause struck down in *Johnson,* a clause that is materially indistinguishable from that in § 924(c)'s and § 16(b)'s residual clause. The ACCA provides:

> Any crime punishable by imprisonment for a term exceeding one year . . . that –
>
> (i) Has as an element the use, attempted use, or threatened use against the person of another, or
>
> *(ii)* Is burglary, arson, or extortion, involves use of explosives, *or otherwise involves conduct that presents a serious potential risk of physical injury to another.*

18 U.S.C. § 924(e)(2)(B) (emphasis added).

The residual clauses in both Section 924(c) and 16(b) suffer from the same flaws that rendered ACCA's residual clause unconstitutionally vague under the required categorical approach. As with ACCA's residual clause, both of these other residual clauses also "require courts to assess the hypothetical risk posed by an abstract generic version of the offense." *Welch v. United States,* 136 S. Ct. at 1262. "The 'indeterminacy of the wide-ranging inquiry' made the residual clause more unpredictable and arbitrary in its application than the Constitution allows." *Id.* (quoting *Johnson,* 135 S. Ct. at 2557).

The constitutional guarantee of due process, the *Johnson* Court found, cannot tolerate "condemn[ing] someone to prison for 15 years to life," the punishment prescribed under ACCA, based upon "so shapeless a provision." *Johnson,* 135 S. Ct. at

2560. Likewise, due process cannot tolerate condemning a person to death based upon the equally shapeless residual clauses found in both § 924(c) and 16(b).

Moreover, courts have already invalidated the residual clause of 18 U.S.C § 16(b) following *Johnson. See United States v. Gonzalez-Longoria,* 813 F.3d 225 (5th Cir. 2016); *United States v. Vivas-Ceja,* 808 F.3d 719 (7th Cir. 2015); *Dimayo v. Lynch,* 803 F.3d 1110 (9th Cir. 2015). Still further, at least two district courts have considered § 924(c)'s residual clause and have found it void for vagueness in light of *Johnson. See United States v. Lattanaphom,* No. 2:99-00433, __ F. Supp. 3d __, 2016 WL 393545 (E.D. Cal. Feb. 2, 2016); *United States v. Edmundson,* PWG–13–15, __ F. Supp. 3d __, 2015 WL 9582736 (D. Md. Dec. 30, 2015).

**1.** ***Johnson* expressly overruled the "ordinary case" approach to determining whether a felony qualifies as a "crime of violence."**

The Supreme Court began its analysis in *Johnson* by noting that the so-called categorical approach mandates the use of a two-step framework to determine whether a crime is a violent felony within the meaning of ACCA. *See Johnson,* 135 S. Ct. at 2557, 2562. As the Seventh Circuit described it: "In the first step, the court must determine 'the kind of conduct that the crime involves in the ordinary case' as opposed to the facts on the ground in the defendant's … case." *Vivas-Ceja,* 808 F.3d at 721 (quoting *Johnson,* 135 S. Ct. at 2557). The second step also depends on the ordinary case. Specifically, the "court must gauge whether that ordinary case of the crime presents a serious potential risk of physical injury." *Id.*

But this required approach to ACCA's residual clause "conspire[d] to make it unconstitutionally vague." *Johnson,* 135 S. Ct. at 2557. The first step is problematic, the *Johnson* Court explained, because too much uncertainty exists about what constitutes the

11

**JA3098**

"ordinary case" of a crime. *Id.* "[T]he residual clause offers no reliable way to choose between [] competing accounts of what 'ordinary' … involves." *Id.* at 2558. In fact, the Court explained further, statistical analysis of reported cases, Google, and gut instinct are all equally unreliable in identifying the "ordinary case." *Id.* at 2557 (quoting *United States v. Mayer,* 560 F.3d 948, 952 (9th Cir. 2009) (Kozinski, C.J., dissenting from denial of rehearing *en banc*)).

The second step, too, is fatally flawed because even if the "ordinary case" could indeed be determined, there would still be too much "uncertainty about how much risk it takes" before such "ordinary case" should be deemed sufficiently serious to be categorized as a violent felony. *Vivas-Ceja,* 808 F.3d at 722 (citing *Johnson,* 135 S. Ct. at 2558).

Significantly, the Court's critique of the second step did not turn on the type of risk specified in ACCA's invalidated residual clause, namely, the "serious potential risk of *physical* injury." Rather, as with the first step, the Court's analysis turned on the shapeless "ordinary case" inquiry: "It is one thing to apply an imprecise 'serious potential risk' standard to real-world facts; it is quite another to apply it to a judge-imagined [ordinary case] abstraction." *Johnson,* 135 S. Ct. at 2558. Risk assessment, the Court made clear, is not inherently unconstitutional. *See id.* at 2561. But because risk assessment under ACCA's residual clause is based not on the facts of the actual case but on the amorphous "ordinary case," the clause is unconstitutionally vague. The indeterminacy, unpredictability, and arbitrariness inherent in the "ordinary case" analysis is simply more than the Due Process Clause can bear, held the Court. *Id.* at 2558.

**JA3099**

*Johnson* thus upended not just ACCA's residual clause, but the "ordinary case" analysis compelled by such a statutory framework. In other words, the only way to apply the residual clause is to use the "ordinary case" analysis, and the "ordinary case" analysis is impossible to apply in a constitutional manner.

**2. For the reasons identified in *Johnson,* § 924(c)(3)(B) and § 16(b) also are also unconstitutionally vague.**

Notwithstanding that § 924(c)'s and § 16(b)'s residual clauses are not a mirror image of ACCA's, the clauses are functionally the same. The difference in exact wording does not affect the constitutional analysis that shows both to be void for vagueness.

For one thing, courts regularly equate ACCA's "violent felony" definition with other statutes defining crimes of violence, including 18 U.S.C. § 16(b), which as noted above is identical to § 924(c)(3)(B). *See, e.g., Chambers v. United States,* 555 U.S. 122, 133 n.2 (2009) (Alito, J., concurring) (collecting cases); *Roberts v. Holder,* 745 F.3d 928, 930-31 (8th Cir. 2014) (using both ACCA cases and § 16(b) cases to define the same "ordinary case" analysis).

Further, although the risk at issue in ACCA is risk of injury while the risk at issue in § 924(c) and in § 16(b) is that physical force will be used, both statutes require that risk be assessed via the "ordinary case" method. It is this analytical framework that infects both statutes with a due process problem.

Under § 924(c) and § 16(b), just as under ACCA, courts must follow the same two-step process. First, the court must envision the "ordinary case" embodied by a felony. Second, the court must assess the quantum of risk posed by such "ordinary case." As the Fourth Circuit explained in the context of reviewing the § 16(b):

> [E]very set of conceivable facts covered by first-degree burglary does not have to present a serious risk of injury for it to qualify as a crime of violence. It is sufficient if "the conduct encompassed by the elements of the offense, in the ordinary case, presents a serious potential risk of injury to another." *James,* 550 U.S. at 208. As long as an offense is of a type that, *by its nature,* presents a substantial risk that physical force against the person or property of another may be used, it satisfies the requirements of 18 U.S.C. § 16(b).

*United States v. Avila,* 770 F.3d 1100, 1107 (4th Cir. 2014) (emphasis added). *See also Gonzalez-Longoria,* 813 F.3d at 235; *Vivas-Ceja,* 808 F.3d at 722; *Dimayo,* 803 F.3d at 1116-17.

It follows that the same analysis applies to the identical residual clause of § 924(c). *See, e.g., United States v. Fuerte,* 805 F.3d 485, 498 (4th Cir. 2015) (applying the "ordinary case" inquiry to the § 924(c) residual clause). Section 924(c)'s residual clause, just like that of § 16(b) and ACCA, suffers from the "double indeterminacy" the *Johnson* Court held the Due Process Clause cannot tolerate. *See Edmundson,* 2015 WL 9311983, at *4.

Indeed, in the course of litigating *Johnson,* the United States conceded that the residual clauses contained in ACCA and § 16(b) (and necessarily in the identical § 924(c)) pose the same problem:

> Although Section 16 refers to the risk that force will be used rather than that injury will occur, it is equally susceptible to petitioner's central objection to the residual clause. Like the ACCA, Section 16 requires a court to identify the ordinary case of the commission of the offense and to make a commonsense judgment about the risk of confrontations and other violent encounters.

*Johnson v. United States,* No. 13-7120, Supplemental Brief of Respondent United States at 22-23 (available at 2015 WL 1284964) (Mar. 30, 2015).

14

**JA3101**

The United States was correct in its analysis, and this Court should hold it here to the same concession.

In sum, § 924(c) and § 16(b), like ACCA, require courts to apply "ordinary case" analysis to assess the risk involved in a predicate offense. Because this analysis involves the same flawed steps that brought down the ACCA residual clause, neither § 924(c)(3)(B) nor § 16(b) can survive constitutional scrutiny.

**B.    The Force Clause Analysis.**

**1. The categorical approach applies to determining whether an offense qualifies as a "crime of violence" under the force clause.**

Because statutes cannot be considered crimes of violence using the unconstitutionally void residual clause definition, a crime can only be legitimately deemed a crime "of violence" if it satisfies the remaining force clause. In determining whether an offense qualifies as a "crime of violence" under the force clause of § 924(c) or of § 16, courts must employ the categorical approach. *See Descamps v. United States,* 133 S. Ct. 2276, 2283 (2013). This approach requires that courts "look only to the statutory definitions—*i.e.*, the elements—of a defendant's [offense] and not to the particular facts underlying [the offense]." *Id.* In addition, under the categorical approach, an offense can only qualify as a "crime of violence" if all of the criminal conduct covered by a statute, including the least culpable conduct, matches or is narrower than the "crime of violence" definition. *See, e.g., United States v. Torres-Villalobos,* 487 F.3d 607, 616 (8th Cir. 2007); *see also United States v. Torres-Miguel,* 701 F.3d 165, 167 (4th Cir. 2012). If the most innocuous conduct penalized by a statute does not constitute a "crime of violence," then the statute categorically fails to qualify as a "crime of violence."

Given this, an offense will qualify as a "crime of violence" under the force clause of § 924(c) only if it has, as an element, the use, attempted use, or threatened use of "physical force" against another person. 18 U.S.C. § 924(c)(3)(A). "Physical force," in turn, has two requirements. First, "physical force" must involve *violent* force—that is, "strong physical force," which is "capable of causing physical pain or injury to another person." *Johnson*, 559 U.S. at 140. Second, the use of such force "must be intentional, not just reckless or negligent." *United States v. Dixon,* 805 F.3d 1193, 1197 (9th Cir. 2015); *see also Leocal v. Ashcroft,* 543 U.S. 1, 12-13 (2004).

It is not enough that the statute includes some requirement of specific intent, such as the intent to deprive a person of property, or even the intent to cause injury. To qualify as a crime of violence under the "force" or "elements" clause, the statute must have as a required element the intent to *use* strong physical force.

Moreover, unless "the full range of conduct" covered by charged predicate requires "violent force," it simply cannot qualify as a "crime of violence" under § 16(b)'s force clause. *Torres-Miguel*, 701 F.3d at 171. And it makes no difference, even if the possibility of violating the statute without violent force is small.

The Court in *Torres-Miguel* could not have made this clearer. The Government in that case argued that there was no "realistic probability" that the defendant could have violated the California terroristic threats statute in question without threatening violent physical force. *Id.* at 170-71. The Fourth Circuit, however, held that the "realistic probability" test did not apply to the force clause; therefore, the defendant had no burden to show a "realistic probability" that the terroristic threats statute could be violated without a threat of violent physical force. *Id.* Because a possibility—no matter how

**JA3103**

slim—existed that one could be prosecuted under the statute without a threat of violent force, the Fourth Circuit found that the prior offense categorically failed to qualify as a "crime of violence." *Id*. This Court should find the same with respect to the predicate crimes of which Mr. Barnette was convicted.

In sum, under the due process principles articulated in *Johnson*, neither the § 924(c) nor the § 16(b) residual clause can be used to support a conviction on the counts for which Mr. Barnette was convicted. And none of the predicate crimes Mr. Barnette was convicted of, as the sections that follow will demonstrate, qualifies as a crime of violence can satisfy the remaining force or elements clause.

    **C.**    **Counts 1 and 10 Cannot Be Sustained Because 18 U.S.C. § 16(b)'s Residual Clause is Unconstitutionally Vague and the Alleged Offenses Do Not Meet the Definition of § 16(a)'s Force Clause.**

Counts 1 and 10 of Mr. Barnette's indictment in this case charged him with interstate domestic violence in violation of 18 U.S.C. §§ 2261(a)(1) and (b). Specifically, Count 1 alleged that Mr. Barnette:

> Did travel across a state line … with the intent to injure, harass, and intimidate an intimate partner, Robin Williams, and in the course and as a result of such travel intentionally committed a crime of violence, that is, did firebomb Robin Williams' occupied apartment and an automobile parked in her driveway causing bodily injury to her.

> In violation of Title 18, United States Code, Sections 2261(a)(1) and 2261(b).

Count 10 of the indictment alleged that Mr. Barnette:

> Did travel across a state line … with the intent to injure, harass, and intimidate an intimate partner, Robin Williams, and in the course and as a result of such travel intentionally committed a crime of violence, that is, shot and killed Robin Williams causing bodily injury and death to her.

> In violation of Title 18, United States Code, Sections 2261(a)(1) and 2261(b).

**JA3104**

As noted above, the definition of crime of violence to be employed in connection with § 2261(a)(1) is contained in 18 U.S.C. §16. Because the federal definition of a "crime of violence" includes a residual clause—§ 16(b)—that is materially identical to § 924(e), no matter what crimes of violence might have been alleged under Counts 1 and 10, they could not legally qualify as crimes of violence under the unconstitutional residual clause. Thus, they must be analyzed under the remaining force clause.

1. **Because the indictment on Counts 1 and 10 fails to allege *any* statutory crime the government contended was violated, this Court cannot presume that a crime *might* have been alleged that would have satisfied the force clause.**

In Mr. Barnette's case, the language of the indictment for Counts 1 and 10 fails to identify what crime of violence the Government claims he committed, and instead simply describes a set of facts that include violent acts. Such a recitation of facts without an alleged crime leaves this Court unable to apply a categorical approach to the elements of the predicate crime. Under these circumstances, the Court cannot speculate as to what statutory violation the Government could have charged or intended to charge. The Court must instead simply find that the Government has failed to show that Mr. Barnette committed any crime that would have been deemed a crime of violence under the force clause.

For these reasons, this Court must vacate the convictions for Counts 1 and 10, and the sentences imposed under § 2261(b).

**D. Counts 2 and 11, Both of Which Presuppose Convictions Under Either Count 1 or 10, Must Likewise Be Deemed Invalid.**

Because this Court must vacate Mr. Barnette's convictions for Counts 1 and 10, it must also vacate his convictions on Counts 2 and 11. Count 2 charges him with using and

18

**JA3105**

carrying a firearm, during and in relation to a crime of violence, that being "the act of interstate domestic violence as set forth in Count 1." If Count 1 is vacated, as it legally must be, Count 2 must fail, as well.

Count 11 charges Mr. Barnette with knowingly using and carrying a firearm, during and in relation to a crime of violence, that being "the act of interstate domestic violence as set forth in Count 10." If Count 10 is vacated, as it legally must be, Count 11 must fail, as well.

> **1. Even if, under Counts 2 and 11, this Court were to analyze separately the elements of interstate domestic violence to determine if an element *other than* the "crime of violence" element in § 2261 satisfied the force clause, the Court would still have to conclude that none of the remaining elements satisfies the force clause.**

In addition to the element in § 2261 that the defendant be found to have committed a "crime of violence," § 2261(a) also requires that he or she travel "with the intent to kill, injure, harass or intimidate" an intimate partner. The most innocuous conduct that could satisfy this element is acting with the intent to intimidate.

> **2. "Inten[ding] to intimidate" does not require the use, attempted use, or threatened use of violent physical force.**

"Intending to intimidate," which constitutes one of the means by which someone can satisfy the first element of the interstate domestic violence clause, does not require the use of violent physical force or the intent to threaten the use of violent physical force. Federal cases interpreting the federal bank robbery statute (18 U.S.C. § 2113(a))—which also has an intimidation element—are also instructive here. These cases uniformly hold that intimidation occurs when "an ordinary person in the [victim's position] reasonably could infer a threat of bodily harm from the defendant's acts." *United States v. Woodrop*,

**JA3106**

86 F.3d 359, 364 (4th Cir. 1996) (emphasis added); *see also United States v. Pickar*, 616 F.3d 821, 825 (8th Cir. 2010) (same); *United States v. Kelley*, 412 F.3d 1240, 1241 (11th Cir. 2005) (same); *United States v. Yockel*, (same); *United States v. Higdon*, 832 F.3d 312, 315 (5th Cir. 1987) (same). Thus, the fact that the defendant has to intend to intimidate the victim does not mean that the defendant has to intend to threaten any physical force—let alone violent physical force—to place the victim in fear.

For example, in *United States v. Yockel,* 320 F.3d 818, 824 (8th Cir. 2003), the Eighth Circuit upheld the defendant's bank robbery conviction under § 2113(a) even though there was no evidence he intended to put the teller *in fear of injury*. *Yockel,* 320 F.3d at 821. The defendant never made any sort of physical movement towards the teller, nor did he display any sort of weapon. In fact, the evidence failed to establish that he claimed to have a weapon, or even gave any appearance of possessing a weapon. *See id.* The Eighth Circuit nevertheless found the "intimidation" element satisfied, making clear that the element requires neither the use or threat of violent force nor the intentional use or threat of force. *See id.*

A defendant thus may be found guilty of interstate domestic violence without any evidence that he used violent physical force, or threatened to use violence physical force. All the government must prove is that the defendant intended to intimidate the victim and that, whatever the defendant's manner of doing this, the victim reasonably feared injury from the defendant's actions, whether or not the defendant intended to create that fear.

Indeed, a defendant could intimidate her victim by threatening to take away his necessary medication, or by taking his car keys and throwing them out of reach so he has no means of leaving a remote location late at night, or by asking if he would like it if his

20

children were locked in a room without a means to call him. These are all forms of intentional intimidation involving acts that do not constitute or threaten use of violent force.

Because this element of interstate domestic violence criminalizes conduct that does not require an intentional threat of violent physical force, it cannot qualify as a "crime of violence" under § 924(c)'s force clause.

Thus, if the other element necessary to prove interstate domestic violence—the crime alleged to be a "crime of violence"—no longer qualifies as such because of the invalidation of the residual clause, no other element of § 2261 fills in the gap by satisfying the force clause. Under such a circumstance, § 2261 does not constitute a valid crime of violence such that it can support a conviction under § 924(c).

This is the case at hand. Accordingly, Mr. Barnette's convictions on Counts 2 and 11 must fail.

### E. Count 8 Cannot Be Sustained Because Federal Carjacking Under 18 U.S.C. § 2119 Does Not Qualify as a "Crime of Violence."

Mr. Barnette's conviction in Count 8 for using or carrying a firearm during and in relation to a "crime of violence" is void because the "crime of violence" element cannot be satisfied here, either. After *Johnson,* the predicate offense of carjacking cannot, as a matter of law, qualify as a "crime of violence" for purposes of § 924(c). As explained herein, federal bank robbery under 18 U.S.C. § 2119 categorically fails to qualify as a predicate "crime of violence" under § 924(c) because it does not meet the definition of the force clause and because, as explained *supra*, the unconstitutional residual clause cannot define a valid federal crime.

21

**1. Carjacking under 18 U.S.C. § 2119 does not qualify as a "crime of violence" under the force clause of § 924(c)(3) because it can be violated without the use, attempted use, threatened use of violent physical force and without the intentional use, attempted use, or threatened use of the same.**

As explained *supra* with regard to § 2261 and using the same rationale, 18 U.S.C. § 2119 categorically fails to qualify as a crime of violence under § 924(c)'s force clause because it may be committed by intimidation as well as by the use of force. Carjacking, as defined by 18 U.S.C. § 2119 categorically fails to qualify as a "crime of violence" because it can be accomplished by "intimidation," which (1) does not require the use, attempted use, or threatened use of violent physical force and (2) does not require the intentional use, attempted use, or threatened use of the same.

This analysis proceeds in much the same fashion as the analysis did of intimidation under the interstate domestic violence statute except that, whereas interstate domestic violence requires that the defendant "intend to intimidate," the carjacking statute requires only that the defendant *actually* intimidate, and there need be no proof that he intended to do so. As such, federal cases interpreting the federal bank robbery statute (18 U.S.C. § 2113(a)) – which has an identical intimidation element – are also instructive here. As noted above, these cases uniformly hold that intimidation occurs when "an ordinary person in the [victim's position] reasonably could infer a threat of bodily harm from the defendant's acts." *United States v. Woodrop*, 86 F.3d 359, 364 (4th Cir. 1996) (emphasis added); *see also United States v. Pickar*, 616 F.3d 821, 825 (8th Cir. 2010) (same); *United States v. Kelley*, 412 F.3d 1240, 1241 (11th Cir. 2005) (same); *United States v. Yockel*, 320 F.3d 818, 824 (8th Cir. 2003) (same); *United States v. Higdon*, 832 F.3d 312, 315 (5th Cir. 1987) (same). No reason exists why this same

**JA3109**

definition of "intimidation" should not apply here. Applying this "intimidation" definition here, carjacking can never qualify as a "crime of violence."

### 2. Carjacking does not require the use, attempted use, or threatened use of violent physical force.

As noted in conjunction with the intimidation element of the interstate domestic violence statute, the act of placing another in fear of bodily harm, at best, constitutes a threat of physical injury to another, which plainly does not require the use or threatened use of "violent force" against another. *See United States v. Torres-Miguel*, 701 F.3d 165, 167 (4th Cir. 2012), in which the Fourth Circuit unequivocally held that the threat of any physical injury, even "serious bodily injury or death," does not necessarily require the use of physical force – let alone "violent force."

As noted *supra,* , at issue in *Torres-Miguel* was the defendant's prior conviction for the California offense of willfully threatening to commit a crime which "will result in death or great bodily injury to another." 701 F.3d at 168 (citing Cal. Penal Code § 422(a)) (emphasis added). The specific question in the case was whether the statute had an element equating to a threat of "violent force" under the force clause of U.S.S.G. § 2L1.2 – a clause that is identical in all relevant respects to the § 924(c)(3)(A) force clause. *Id*. Despite the "death or great bodily injury" element in the California statute, the Fourth Circuit found that the offense was missing a "violent force" element, and thus, could never qualify as a "crime of violence" under the force clause. *Id*. at 168 69. The Court held that "[a]n offense that results in physical injury, but does not involve the use or threatened use of force, simply does not meet the Guidelines definition of crime of violence." *Id*. at 168. The Court, in strong words, proclaimed that "of course, a crime may result in death or serious injury without involving use of physical force." *Id*.

**JA3110**

(emphasis added).

The Court, relying on several appellate decisions from various Circuits, reasoned that there are many ways in which physical injury—even death—can result without use of "violent force." *Id*. at 168-69. "For example, as the Fifth Circuit has noted, a defendant can violate statutes like § 422(a) by threatening to poison another, which involves no use or threatened use of force." *Torres-Miguel*, 701 F.3d at 168-69 (citing *United States v. Cruz-Rodriguez*, 625 F.3d 274, 276 (5th Cir. 2010)).

In reaching its decision, the *Torres-Miguel* Court also relied on the Second Circuit's decision in *Chrzanoski v. Ashcroft*, 327 F.3d 188, 194 (2d Cir. 2003). In that case at issue was whether a prior Connecticut conviction for third degree assault qualified as a "crime of violence" under the force clause. The Connecticut statute "require[s] the state to prove that the defendant had intentionally caused physical injury." *Chrzanoski*, 327 F.3d at 193. Nonetheless, the "Second Circuit [] held that [the statute] does not constitute a crime of violence … because there is a difference between causation of an injury, which is all that the Connecticut statute [] required, and an injury's causation by the use of physical force." *Torres-Miguel*, 701 F.3d at 169 (citing *Chrzanoski*, 327 F.3d at 194) (internal quotation marks omitted).

The Second Circuit explained that "an individual could be convicted of intentional assault in the third degree for injury caused not by physical force, but by guile, deception, or even deliberate omission." *Chrzanoski*, 327 F.3d at 195. The Court elaborated that "human experience suggests numerous examples of intentionally causing physical injury without the use of force, such as a doctor who deliberately withholds vital medicine from a sick patient" or someone who causes physical impairment by placing a

Case 3:12-cv-00327-MOC   Document 119   Filed 06/24/16   Page 24 of 34

tranquilizer in the victim's drink. *Id*. at 195-56.

For even further support, in *Torres-Miguel*, 701 F.3d at 169, the Fourth Circuit embraced the Tenth Circuit's decision in *United States v. Perez-Vargas*, 414 F.3d 1282, 1287 (10th Cir. 2005). In that case, the Tenth Circuit "explained that although the Colorado [third degree assault] statute required [an act causing] bodily injury, imposing that injury does not necessarily include the use or threatened use of physical force as required by the Guidelines and so the Colorado crime was not categorically a crime of violence under U.S.S.G. § 2L1.2." *Torres-Miguel*, 701 F.3d at 169 (citing *Perez-Vargas*, 414 F.3d at 1287) (internal quotation marks omitted). The Tenth Circuit reasoned that "several examples [exist] of third degree assault that would not use or threaten the use of physical force: … intentionally placing a barrier in front of a car causing an accident, or intentionally exposing someone to hazardous chemicals." *Perez-Vargas*, 414 F.3d at 1286.

Therefore, *Torres-Miguel* and all the other cases discussed above command that carjacking, which can be accomplished by putting another in fear of bodily harm, does not require "violent force." If threat of serious bodily injury or death does not equal violent force, then certainly, "bodily harm" does not. Indeed, a defendant can place another in fear of bodily harm by threatening to poison that person if he does not turn over his car to the defendant, to release hazardous chemicals into the car, to place a barrier in front of the car if the person attempts to drive off, or to lock the person up in the car on a hot day—some of the very examples that the Fourth Circuit in *Torres-Miguel* as well as the other Courts mentioned above held do not constitute "violent force."

Because "the full range of conduct" covered by the carjacking statute does not

Case 3:12-cv-00327-MOC   Document 119   Filed 06/24/16   Page 25 of 34

**JA3112**

require "violent force," it simply cannot qualify as a "crime of violence" under § 924(c)(3)'s force clause. *Torres-Miguel*, 701 F.3d at 171. And it makes no difference, even if the possibility of violating the carjacking statute without violent physical force is slim. Because the possibility exists, this Court cannot legally find that carjacking is a "crime of violence." Indeed, in *Torres-Miguel*, the Court did not cite to a single case in which an offense under the California threat statute was violated with the threat of poisoning or some other non-violent force; yet, the Fourth Circuit still found that because the elements of the offense left open the possibility that one could be prosecuted under the statute for the use of non-violent force, the prior offense categorically failed to qualify as a "crime of violence." *Id*. at 171. The Court should find the same here with respect to the carjacking statute, which leaves open the same possibility.

In sum, federal carjacking fails to qualify as a "crime of violence" under the § 924(c)(3)(A) force clause for two independent reasons. First, the statute does not require a threat of violent force. Second, the statute does not require the intentional threat of violent force.

### F. Because Count 1 Must Be Vacated, Mr. Barnette's Conviction in Count 3 Under § 844(h)(1) Cannot Be Sustained.

On January 27, 1998, the Honorable Robert D. Potter, Senior U.S. District Court Judge, instructed Mr. Barnette's jury with respect to Count 3, in pertinent part:

> Now, you may find the defendant guilty of Count 3 if you find him guilty as charged in Count number 1, and that he knowingly used fire and explosive materials or carried an explosive in the commission of that offense.

Transcript, Jan. 27, 1998 at 666.

Because Count 1 must be vacated, as explained *supra*, Count 3 cannot stand.

**MR. BARNETTE IS ENTITLED TO RELIEF UNDER 28 U.S.C. § 2255 BECAUSE HIS CLAIM UNDER *JOHNSON* IS COGNIZABLE AND TIMELY.**

   A.    **Mr. Barnette's Claim is Cognizable Under § 2255(a).**

A federal prisoner may obtain relief under 28 U.S.C. § 2255(a) if his conviction "was imposed in violation of the Constitution or laws of the United States," or is in excess of this Court's jurisdiction. Mr. Barnette's convictions on Counts 1, 2, 3, 8, 10, and 11 violate the Due Process Clause of the Fifth Amendment, violate federal law, and exceed this Court's jurisdiction. This Court therefore should grant him relief on the claims raised in this supplemental petition under § 2255(a).

As explained above, Mr. Barnette's convictions on Counts 1, 2, 3, 8, 10, and 11 all fail because they depend on an unconstitutionally vague "residual clause." Further, as also explained above, federal carjacking under 18 U.S.C. § 2119 and federal interstate domestic violence under of 18 U.S.C. §§ 2261(a)(1) and 2261(b) cannot satisfy § 924(c)'s or § 16's force clause. Mr. Barnette's indictment therefore failed to state an offense under § 2261 or § 924(c), and Mr. Barnette now stands convicted of offenses that are no longer criminal. Given this, his convictions, and the sentences—including sentences of death attendant upon these convictions—violate the laws of the United States and result in a fundamental miscarriage of justice. This is precisely the type of error that is cognizable under § 2255(a). *See Davis v. United States,* 417 U.S. 333, 346-47 (1974) (holding that when an intervening decision establishes that a prisoner was convicted of "an act that the law [no longer] make[s] criminal," "such a circumstance 'inherently results in a complete miscarriage of justice and presents exceptional circumstances' that justify relief under § 2255"). Third, Mr. Barnette's convictions

27

**JA3114**

exceed this Court's jurisdiction because the indictment, in part, affirmatively alleged conduct that is outside that statute's reach. *See United States v. Brown,* 752 F.3d 1344, 1347 (11th Cir. 2014) (a jurisdictional defect exists "when the indictment affirmatively alleges conduct that does not constitute a crime at all because that conduct falls outside the sweep of the charging statute"); *United States v. Barboa,* 777 F.3d 1420, 1423 n.3 (10th Cir. 1985).

### B. Mr. Barnette's Motion for Relief is Timely.

Section 2255(f) requires that § 2255 motions be filed within a one-year limitations period. That period runs from the latest applicable triggering event. 28 U.S.C. § 2255(f). Among these triggers is "the date on which the right asserted was initially recognized by the Supreme Court, if that right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review." *Id.*

The Supreme Court decided *Johnson* on June 26, 2015. Mr. Barnette has filed this application within one year of that date. Further, on April 18, 2016, the Supreme Court expressly made *Johnson*'s new rule retroactively applicable to cases on collateral review. *Welch v. United States,* 136 S. Ct. 1257, 1265 (2016). This motion therefore is timely filed.

### III. IN ADDITION TO VACATING THE SENTENCES IMPOSED ON ALL OF THE COUNTS FOR WHICH THE CONVICTIONS HAVE BEEN VACATED, MR. BARNETTE'S DEATH SENTENCE ON COUNT 7 MUST ALSO BE VACATED AND HE MUST BE GRANTED RESENTENCING BY A JURY.

Mr. Barnette was sentenced to death on three separate counts: Counts 7, 8, and 11. On Count 7, Mr. Barnette was sentenced to death under 18 U.S.C. § 2119(3). On Counts 8 and 11, he was sentenced to death under 18 U.S.C. § 924(i) (redesignated § 924(j)).

**JA3115**

As discussed, after *Johnson,* Mr. Barnette's death sentences on Counts 8 and 11 must fall because they rely on his having been convicted of use of a firearm in relation to crimes of violence under § 924(c), which, as explained above, must be found invalid pursuant to *Johnson.* But that is not all. The invalidation of Mr. Barnette's § convictions under §§ 2261 and 924(c) requires that he be resentenced on Count 7, as well.

When a defendant has been convicted and sentenced on multiple charged offenses, one of which subsequently is invalidated, he must be resentenced on the valid conviction "unless it can be ascertained from the record that a trial court's sentence on a valid conviction was not affected" by the invalid offense. *Bourgeois v. Whitley,* 784 F.2d 718, 721 (5th Cir. 1986). The Eighth Circuit has explained that "the critical issue" in this inquiry "is whether the sentence imposed [on the valid count] might have been different if the sentencing judge had known at the time of the sentencing that … conviction [on another count] was invalid." *James v. United States,* 476 F.2d 936, 937 (8th Cir. 1973) (per curiam); *United States v. Starr,* No. 13–2191, 603 F. App'x 517, 518 (8th Cir. Mar. 11, 2015) (per curiam) (quoting *James*).

This principle applies with equal force in the case of jury sentencing. The record in Mr. Barnette's case shows at least a reasonable likelihood that the inclusion of the unconstitutional counts influenced the jury's decision to sentence him to death. For example, Mr. Barnette's jury was allowed to consider not just that he participated in a carjacking in which a death resulted, but that this carjacking was a "crime of violence." The jury was told that this "crime of violence" was so egregious that using a gun in connection with it amounted to a separate federal felony that qualified for a separate potential basis for a death sentence. And yet that so-called "crime of violence" was not a

**JA3116**

crime at all, and should never have been presented to the jury at all, during either stage of Mr. Barnette's original trial and at resentencing.

Even worse, under the sentencing provision attached to § 924(c), 18 U.S.C. § 924(j), the jury was directed to consider whether Mr. Barnette committed "murder," and acted "with malice aforethought." That state of mind is widely understood by the general public to involve evil, depravity, and wanton disregard for the value of human life.[1]

Given the likelihood that invalid convictions influenced the jury's sentencing verdict on the remaining valid count, this Court must order that Mr. Barnette be resentenced by a jury. As the Supreme Court recently made clear in *Hurst v. Florida,* 136 S. Ct. 616 (2016), the Sixth Amendment requires that a jury, and not the court, determine whether a defendant should be sentenced to death. *Hurst,* 136 S. Ct. at 624. The Supreme Court was unequivocal: "The Sixth Amendment protects a defendant's right to an impartial jury. This right required Florida to base [the defendant's] death sentence on a jury's verdict, not a judge's factfinding." *Id.*

After *Hurst,* any death sentence rendered by a court is unconstitutional. An appellate or post-conviction court that finds non-structural error in the defendant's death sentence therefore must remand for a new penalty phase before a jury. It may not engage in *post hoc* reweighing, or otherwise make its own determination about whether the defendant deserves a death sentence. To the extent any prior Supreme Court decisions,

---

[1] Merriam-Webster's online dictionary provides the following "legal definition of malice:

> a: the intention or desire to cause harm . . . to another through an unlawful or wrongful act without justification or excuse;
> b: wanton disregard for the rights of others or for the value of human life;
> c: an improper or evil motive or purpose . . . ;
> d: actual malice.

http://www.merriam-webster.com/dictionary/malice#legalDictionary (last visited on June 24, 2016).

Case 3:12-cv-00327-MOC   Document 119   Filed 06/24/16   Page 30 of 34

**JA3117**

such as *Brown v. Sanders,* 546 U.S. 212, 224-25 (2006), *Stringer v. Black,* 503 U.S. 222, 237 (1992), or *Clemons v. Mississippi,* 494 U.S. 738, 745-46 (1990), authorized such judicial refashioning of a compromised death sentence, *Hurst* necessarily overrules them.

What is more, given the unparalleled need for reliability in capital sentencing, allowing Mr. Barnette's death sentence on Count 7 to stand despite the jury's exposure to the invalid count and its prejudicial elements, would necessarily implicate the Eighth Amendment. The Supreme Court's decision in *Johnson v. Mississippi,* 486 U.S. 576 (1988), provides an instructive analogy. There, the Court held that when a prior conviction used as aggravation in support of a death sentence has subsequently been overturned, the defendant's death sentence violates the Eighth Amendment. As the Court explained, "[t]he fundamental respect for humanity underlying the Eighth Amendment's prohibition against cruel and unusual punishment gives rise to a special need for reliability in the determination that death is the appropriate punishment in any capital case." *Id.* at 584 (citations and internal quotations omitted).

Because the petitioner's prior conviction in *Johnson v. Mississippi* was invalid, the Court deemed it "apparent that the [prior] conviction provided no legitimate support for the death sentence imposed on petitioner." *Id.* at 585. Equally apparent, the Court said, was "that the use of that conviction in the sentencing hearing was prejudicial." *Id.*

And while the prosecutor had repeatedly pointed to the prior conviction in his closing argument, the Supreme Court said the now-voided conviction's use as aggravation would have violated the Eighth Amendment no matter what. "Even without express argument, there would be a possibility that the jury's belief the petitioner had been convicted of a prior felony would be 'decisive' in the 'choice between a life

31

sentence and a death sentence.'" *Id.* (quoting *Gardner v. Florida,* 430 U.S. 349, 359 (1977)).

The same principles apply here. The unconstitutional convictions under Counts 1, 2, 3, 8, 10, and 11 convictions had a profoundly prejudicial impact on Mr. Barnette's case as a whole, and undermine confidence in his death sentence on Count 7.

Indeed, Mr. Barnette likely was prejudiced even before his case ever reached the jury. When the Department of Justice considered whether to authorize the death penalty against Mr. Barnette prior to his initial trial and later prior to resentencing, it was presented with an indictment alleging not one but three capital offenses, including two capital § 924(c) counts. The Department's capital-case review process was almost certainly skewed by the presence of the unconstitutional charge just as the jury's sentencing decision was skewed in *Johnson v. Mississippi.*

Thus, this Court should vacate Mr. Barnette's sentences under Counts 1, 2, 3, 8, 10, and 11 in their entirety and order that he be resentenced by a jury on Count 7 alone.

## CONCLUSION AND PRAYER FOR RELIEF

For all the reasons set forth above, Mr. Barnette respectfully asks this Court to vacate his convictions and sentences as set forth above and grant the following further relief:

(1) That this Court remand this case for a new penalty phase trial on Count 7 alone.

(2) That this Court grant him leave to amend this motion, including by submitting a supplemental memorandum of law to support it.

(3) Any other relief that may be necessary to correct Mr. Barnette's invalid conviction and sentence.

32

**JA3119**

Dated: June 24, 2016

/s/ Mark E. Olive
N.C. State Bar No. 10615
LAW OFFICES OF MARK OLIVE
320 W. Jefferson Street
Tallahassee, FL 32301
850-224-0004 (tel)
850-224-3331 (fax)
meolive@aol.com

/s/ Jacob H. Sussman
N.C. Bar No. 31821
TIN FULTON WALKER & OWEN PLLC
301 East Park Avenue
Charlotte, NC 28203
704-338-1220 (tel)
704-338-1312 (fax)
jsussman@tinfulton.com

/s/ Ross Richardson
Ross Richardson
FEDERAL DEFENDERS OF WESTERN
 NORTH CAROLINA, INC.
129 West Trade Street, Suite 300
Charlotte, NC 28202
704-374-0720 (tel)
704-374-0722 (fax)
ross_richardson@fd.org

33

**JA3120**

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that he has served the foregoing motion with the Clerk of Court using the CM/ECF system, which will send notification of such filing to:

Anthony J. Enright
anthony.enright@usdoj.gov

Dated: June 24, 2016

/s/ Jacob H. Sussman
Counsel for Mr. Barnette

**JA3121**

| | |
|---|---|
| AQUILIA MARCIVICCI BARNETTE, | ) |
| | ) |
| Petitioner, | ) |
| | ) |
| vs. | ) |
| | ) **ORDER** |
| UNITED STATES OF AMERICA, | ) |
| | ) |
| Respondent. | ) |
| _____ | ) |

**THIS MATTER** is before the Court upon Respondent's unopposed Motion to hold

Petitioner Aquilia Marcivicci Barnette's supplemental Motion to Vacate, Set Aside and Correct

Sentence under 28 U.S.C. § 2255 in abeyance.  (Doc. No. 121.)  Also before the Court is

Barnette's unopposed Motion to stay his entire § 2255 Motion to Vacate.  (Doc. No. 122.)

## I.    RELEVANT PROCEDURAL HISTORY

On January 27, 1998, Barnette was convicted of interstate domestic violence, in violation

of 18 U.S.C. §§ 2261(a)(1) & (b) (Count 1); use of a destructive device during and in relation to

a crime of violence, in violation of 18 U.S.C. § 924(c)(1) (Count 2); using and carrying fire and

explosive materials during commission of a felony, in violation of 18 U.S.C. § 844(h)(1) (Count

3); making a false statement in connection with the purchase of a firearm, in violation of 18

U.S.C. §§ 922(a)(6) & 924 (Count 4); making a firearm by sawing off the barrel of a shotgun

without complying with the provisions of the National Firearms Act, in violation of 26 U.S.C. §§

5821, 5822, 5861(f) & 5871 (Count 5); possession of a firearm after having been convicted of a

felony, in violation of 18 U.S.C. §§ 922(g)(1) & 924 (Count 6); carjacking resulting in death, in

violation of 18 U.S.C. § 2119(3) (Count 7); first-degree murder by use of a firearm, in violation

**JA3122**

of 18 U.S.C. §§ 924(c)(1) & (i)(1) (Count 8); transporting a stolen vehicle in interstate commerce, in violation of 18 U.S.C. § 2312 (Count 9); interstate domestic violence, in violation of 18 U.S.C. §§ 2261(a)(1) & (b) (Count 10); and first-degree murder by use of a firearm, in violation of 18 U.S.C. §§ 924(c)(1) & (i)(1) (Count 11).  He was sentenced to death on Counts 7, 8, and 11.

After direct appeal, remand, a second sentencing proceeding, and subsequent protracted appeal, Barnette filed a Motion to Vacate under § 2255, on June 19, 2013.  (Doc. No. 48.)  On June 24, 2016, Barnette filed a Supplemental § 2255 Motion to Vacate seeking relief pursuant to the Supreme Court's decisions in Johnson v. United States, 135 S. Ct. 2551 (2015) and Welch v. United States, 136 S. Ct. 1257 (2016).  (Doc. No. 119.)

In response, the Government filed the instant unopposed motion to hold Barnette's supplemental Motion to Vacate in abeyance.  (Doc. No. 121.)  Barnette subsequently filed the instant motion to hold his entire § 2255 Motion to Vacate in abeyance.  (Doc. No. 122.)

## II.    DISCUSSION

In Johnson, the Supreme Court held that the residual clause of the Armed Career Criminal Act ("ACCA"), 18 U.S.C. § 924(e), is unconstitutionally vague.  135 S. Ct. at 2558. Under the ACCA, a defendant faces a sentence of no less than 15 years in prison if he has three qualifying prior convictions for either a "violent felony" or a "serious drug offense," and those convictions are "committed on occasions different from one another."  § 924(e)(1).  The ACCA defines a "violent felony" as any crime punishable by imprisonment for a term exceeding one year that:

(i)      has as an element the use, attempted use, or threatened use of physical force against the person of another; or

(ii)     is burglary, arson, or extortion, involves use of explosives, *or otherwise involves*

**JA3123**

*conduct that presents a serious potential risk of physical injury to another*.

§ 924(e)(2)(B)(i)(ii) (emphasis added).  The italicized closing words of § 924(e)(2)(B)(ii) constitute the ACCA's residual clause.  See Johnson, 135 S. Ct. at 2556.  Thus, a defendant who was sentenced to a mandatory minimum term based on a prior conviction that satisfies only the residual clause of the "violent felony" definition of the ACCA is entitled to relief from his sentence.  In Welch, the Supreme Court held that the ruling in Johnson applies retroactively to cases on collateral review.  136 S. Ct. at 1268.

Barnette was not convicted under § 924(e).  However, the counts of which he was convicted under 18 U.S.C. § 2261 (Counts 1 and 10) and under 18 U.S.C. § 924(c) (Counts 2, 8, and 11) both require determinations that he committed a "crime of violence," as one of the elements necessary to prove the violation.  Section 924(c) contains a definition of "crime of violence;" § 2261 incorporates the definition of "crime of violence" found in 18 U.S.C. § 16, see Leocal v. Ashcroft, 543 U.S. 1, 6-7 (2004).  The two definitions are identical.  They define a crime of violence as:

(a) an offense that has as an element the use, attempted use, or threatened use of physical force against the person or property of another, or

(b) any other offense that is a felony and that, by its nature, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense.

§ 16(a)-(b); § 924(c)(3)(A)-(B).  The first clause of this definition is commonly referred to as the "force" or "elements" clause; the second is commonly referred to as the "residual" clause.

Barnette contends that the residual clause of § 924(c) and of § 16(b) is materially indistinguishable from the residual clause of the ACCA that the Supreme Court deemed unconstitutionally vague.  See Johnson, 135 S. Ct. at 2557.  He argues further that, after

**JA3124**

Johnson, both federal carjacking, 18 U.S.C. § 2119, and federal interstate domestic violence, § 2261, the predicate offenses for two of his death penalty counts, fail to qualify as "crime[s] of violence" and that those counts, among others, must be vacated.

Respondent moves to hold these matters in abeyance pending a decision by the Fourth Circuit Court of Appeals in United States v. Ali, No. 15-4433, and United States v. Simms, No. 15-4640. Both appellants contend that, under Johnson, the residual clause of § 924(c)'s definition of "crime of violence," see § 924(c)(3)(B), is unconstitutionally vague. (Resp't's Mot. to Stay 2, Doc. No. 121.) After Respondent filed the instant Motion, the United States Supreme Court granted certiorari in Lynch v. Dimaya, No. 15-1498, to address "[w]hether 18 U.S.C. 16(b), as incorporated into the Immigration and Nationality Act's provisions governing an alien's removal from the United States, is unconstitutionally vague." See Pet'r's Br., Lynch v. Dimaya, 2016 WL 6768940 (U.S. filed Nov. 14. 2016). The Fourth Circuit has since stayed action in Ali, pending a decision by the Supreme Court in Dimaya. See Order, Ali, No. 15-4433, (4th Cir. filed Oct. 4, 2016), ECF No. 82. At least six of Barnette's convictions, including two death-eligible counts, depend upon the definition of "crime of violence" under § 16 or § 924(c).

For his part, Barnette moves to place this entire action in abeyance. Barnette does not argue that Johnson applies to his conviction for carjacking resulting in death, 18 U.S.C. § 2119(3) (Count 7). He does argue, however, that in the event his other convictions and death sentences are vacated under Johnson, his death sentence for Count 7 also must be vacated. Without going into the details or merits of Barnette's arguments on this matter, the Court concedes that, if nothing else, vacation of judgment in his other death penalty-related convictions would have to be incorporated into the prejudice

**JA3125**

analysis required by some of Barnette's other§ 2255 claims related to Count 7.

Notwithstanding the age of this case, the Court finds that in the interest of judicial economy, it is appropriate to grant both Motions. In light of the Fourth Circuit's decision to hold Ali in abeyance pending a decision by the Supreme Court in Dimaya, the Court will grant Respondent's Motion with modification.

**IT IS, THEREFORE, ORDERED THAT:**

1. Respondent's unopposed "Motion to Place Supplemental Motion under 28 U.S.C. § 2255 in Abeyance" (Doc. No. 121) is **GRANTED**, with the modification stated herein;

2. Petitioner's unopposed Motion to Stay (Doc No. 122) is **GRANTED**;

3. Action in the above-captioned case is stayed and held in abeyance pending a decision by the United States Supreme Court in Lynch v. Dimaya, No. 15-1498, or the Fourth Circuit Court of Appeals in United States v. Simms, No. 15-4640, [1] whichever is issued later; and

4. Respondent shall have 60 days from the date on which the later of the two decisions is issued to file an answer, motion, or other response to Barnette's Supplemental Motion to Vacate (Doc. No. 119).

Signed: December 8, 2016

Richard L. Voorhees
United States District Judge

---

[1] The Fourth Circuit has not ordered that Simms, No. 15-4640, be held in abeyance. Therefore, the Court anticipates the Fourth Circuit's opinion on whether § 924(c)'s residual clause is unconstitutionally vague before the Supreme Court issues a decision in Dimaya.

**JA3126**

## THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA
## CHARLOTTE DIVISION
## 3:12cv327-V
## (3:97cr23)

| | | |
|---|---|---|
| AQUILIA MARCIVICCI BARNETTE, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| vs. | ) | |
| | ) | **ORDER** |
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Respondent. | ) | |
| _____ | ) | |

**THIS MATTER** is before the Court upon Respondent's unopposed Motion to hold

Petitioner Aquilia Marcivicci Barnette's supplemental Motion to Vacate, Set Aside and Correct

Sentence under 28 U.S.C. § 2255 in abeyance.  (Doc. No. 121.)  Also before the Court is

Barnette's unopposed Motion to stay his entire § 2255 Motion to Vacate.  (Doc. No. 122.)

### I.      RELEVANT PROCEDURAL HISTORY

On January 27, 1998, Barnette was convicted of interstate domestic violence, in violation

of 18 U.S.C. §§ 2261(a)(1) & (b) (Count 1); use of a destructive device during and in relation to

a crime of violence, in violation of 18 U.S.C. § 924(c)(1) (Count 2); using and carrying fire and

explosive materials during commission of a felony, in violation of 18 U.S.C. § 844(h)(1) (Count

3); making a false statement in connection with the purchase of a firearm, in violation of 18

U.S.C. §§ 922(a)(6) & 924 (Count 4); making a firearm by sawing off the barrel of a shotgun

without complying with the provisions of the National Firearms Act, in violation of 26 U.S.C. §§

5821, 5822, 5861(f) & 5871 (Count 5); possession of a firearm after having been convicted of a

felony, in violation of 18 U.S.C. §§ 922(g)(1) & 924 (Count 6); carjacking resulting in death, in

violation of 18 U.S.C. § 2119(3) (Count 7); first-degree murder by use of a firearm, in violation

**JA3127**

of 18 U.S.C. §§ 924(c)(1) & (i)(1) (Count 8); transporting a stolen vehicle in interstate commerce, in violation of 18 U.S.C. § 2312 (Count 9); interstate domestic violence, in violation of 18 U.S.C. §§ 2261(a)(1) & (b) (Count 10); and first-degree murder by use of a firearm, in violation of 18 U.S.C. §§ 924(c)(1) & (i)(1) (Count 11). He was sentenced to death on Counts 7, 8, and 11.

After direct appeal, remand, a second sentencing proceeding, and subsequent protracted appeal, Barnette filed a Motion to Vacate under § 2255, on June 19, 2013. (Doc. No. 48.) On June 24, 2016, Barnette filed a Supplemental § 2255 Motion to Vacate seeking relief pursuant to the Supreme Court's decisions in Johnson v. United States, 135 S. Ct. 2551 (2015) and Welch v. United States, 136 S. Ct. 1257 (2016). (Doc. No. 119.)

In response, the Government filed the instant unopposed motion to hold Barnette's supplemental Motion to Vacate in abeyance. (Doc. No. 121.) Barnette subsequently filed the instant motion to hold his entire § 2255 Motion to Vacate in abeyance. (Doc. No. 122.)

## II.   DISCUSSION

In Johnson, the Supreme Court held that the residual clause of the Armed Career Criminal Act ("ACCA"), 18 U.S.C. § 924(e), is unconstitutionally vague. 135 S. Ct. at 2558. Under the ACCA, a defendant faces a sentence of no less than 15 years in prison if he has three qualifying prior convictions for either a "violent felony" or a "serious drug offense," and those convictions are "committed on occasions different from one another." § 924(e)(1). The ACCA defines a "violent felony" as any crime punishable by imprisonment for a term exceeding one year that:

    (i)      has as an element the use, attempted use, or threatened use of physical force against the person of another; or

    (ii)     is burglary, arson, or extortion, involves use of explosives, *or otherwise involves*

*conduct that presents a serious potential risk of physical injury to another*.

§ 924(e)(2)(B)(i)(ii) (emphasis added). The italicized closing words of § 924(e)(2)(B)(ii) constitute the ACCA's residual clause. See Johnson, 135 S. Ct. at 2556. Thus, a defendant who was sentenced to a mandatory minimum term based on a prior conviction that satisfies only the residual clause of the "violent felony" definition of the ACCA is entitled to relief from his sentence. In Welch, the Supreme Court held that the ruling in Johnson applies retroactively to cases on collateral review. 136 S. Ct. at 1268.

Barnette was not convicted under § 924(e). However, the counts of which he was convicted under 18 U.S.C. § 2261 (Counts 1 and 10) and under 18 U.S.C. § 924(c) (Counts 2, 8, and 11) both require determinations that he committed a "crime of violence," as one of the elements necessary to prove the violation. Section 924(c) contains a definition of "crime of violence;" § 2261 incorporates the definition of "crime of violence" found in 18 U.S.C. § 16, see Leocal v. Ashcroft, 543 U.S. 1, 6-7 (2004). The two definitions are identical. They define a crime of violence as:

(a) an offense that has as an element the use, attempted use, or threatened use of physical force against the person or property of another, or

(b) any other offense that is a felony and that, by its nature, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense.

§ 16(a)-(b); § 924(c)(3)(A)-(B). The first clause of this definition is commonly referred to as the "force" or "elements" clause; the second is commonly referred to as the "residual" clause.

Barnette contends that the residual clause of § 924(c) and of § 16(b) is materially indistinguishable from the residual clause of the ACCA that the Supreme Court deemed unconstitutionally vague. See Johnson, 135 S. Ct. at 2557. He argues further that, after

**JA3129**

Johnson, both federal carjacking, 18 U.S.C. § 2119, and federal interstate domestic violence, § 2261, the predicate offenses for two of his death penalty counts, fail to qualify as "crime[s] of violence" and that those counts, among others, must be vacated.

Respondent moves to hold these matters in abeyance pending a decision by the Fourth Circuit Court of Appeals in United States v. Ali, No. 15-4433, and United States v. Simms, No. 15-4640. Both appellants contend that, under Johnson, the residual clause of § 924(c)'s definition of "crime of violence," see § 924(c)(3)(B), is unconstitutionally vague. (Resp't's Mot. to Stay 2, Doc. No. 121.) After Respondent filed the instant Motion, the United States Supreme Court granted certiorari in Lynch v. Dimaya, No. 15-1498, to address "[w]hether 18 U.S.C. 16(b), as incorporated into the Immigration and Nationality Act's provisions governing an alien's removal from the United States, is unconstitutionally vague." See Pet'r's Br., Lynch v. Dimaya, 2016 WL 6768940 (U.S. filed Nov. 14. 2016). The Fourth Circuit has since stayed action in Ali, pending a decision by the Supreme Court in Dimaya. See Order, Ali, No. 15-4433, (4th Cir. filed Oct. 4, 2016), ECF No. 82. At least six of Barnette's convictions, including two death-eligible counts, depend upon the definition of "crime of violence" under § 16 or § 924(c).

For his part, Barnette moves to place this entire action in abeyance. Barnette does not argue that Johnson applies to his conviction for carjacking resulting in death, 18 U.S.C. § 2119(3) (Count 7). He does argue, however, that in the event his other convictions and death sentences are vacated under Johnson, his death sentence for Count 7 also must be vacated. Without going into the details or merits of Barnette's arguments on this matter, the Court concedes that, if nothing else, vacation of judgment in his other death penalty-related convictions would have to be incorporated into the prejudice

analysis required by some of Barnette's other§ 2255 claims related to Count 7.

Notwithstanding the age of this case, the Court finds that in the interest of judicial economy, it is appropriate to grant both Motions.  In light of the Fourth Circuit's decision to hold Ali in abeyance pending a decision by the Supreme Court in Dimaya, the Court will grant Respondent's Motion with modification.

**IT IS, THEREFORE, ORDERED THAT:**

1. Respondent's unopposed "Motion to Place Supplemental Motion under 28 U.S.C. § 2255 in Abeyance" (Doc. No. 121) is **GRANTED**, with the modification stated herein;

2. Petitioner's unopposed Motion to Stay (Doc No. 122) is **GRANTED**;

3. Action in the above-captioned case is stayed and held in abeyance pending a decision by the United States Supreme Court in Lynch v. Dimaya, No. 15-1498, or the Fourth Circuit Court of Appeals in United States v. Simms, No. 15-4640, [1] whichever is issued later; and

4. Respondent shall have 60 days from the date on which the later of the two decisions is issued to file an answer, motion, or other response to Barnette's Supplemental Motion to Vacate (Doc. No. 119).

Signed: December 8, 2016

Richard L. Voorhees
United States District Judge

---

[1] The Fourth Circuit has not ordered that Simms, No. 15-4640, be held in abeyance.  Therefore, the Court anticipates the Fourth Circuit's opinion on whether § 924(c)'s residual clause is unconstitutionally vague before the Supreme Court issues a decision in Dimaya.

**JA3131**

**THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION
3:12-cv-00327-MOC
(3:97-cr-00023-MOC-1)**

AQUILIA MARCIVICCI BARNETTE,    )
                                       )
      **Petitioner,**             )
                                       )
**vs.**                                      )
                                     )        **ORDER**
UNITED STATES OF AMERICA,       )
                                       )
      **Respondent.**          )
_____)

THIS MATTER is before the Court upon the United States' Motion to continue the stay of these 28 U.S.C. § 2255 proceedings until the United States Supreme Court decides United States v. Davis, No. 18-431. (Doc. No. 126.) Petitioner does not oppose the Motion. (Doc. No. 126 at 2.)

On December 8, 2016, the Court entered an Order holding this action in abeyance pending decisions by the United States Supreme Court in Lynch v. Dimaya, No. 15-1498, decided sub nom Sessions v. Dimaya, 138 S.Ct. 1204 (2018), and the Fourth Circuit Court of Appeals in United States v. Simms, No. 15-4640. (Doc. No. 124.) On November 9, 2018, the Court granted the United States 60 days to respond to Petitioner's supplemental motion to vacate after the Fourth Circuit's decision in United States v. Simms, No. 15-4640, "becomes final after en banc review." (Doc. No. 125.) The Supreme Court granted a petition for a writ of certiorari in Davis on the same question considered by Simms —whether the residual clause of the definition of "crime of violence" in 18 U.S.C. § 924(c)(3)(B)— is unconstitutionally vague. And the Fourth Circuit stayed its mandate in Simms pending the Supreme Court's decision in Davis. Order, United States v. Simms, No. 15-4640 (Feb. 4, 2019), Doc. No. 92.

1

**JA3132**

The United States requests that this action remain in abeyance until the Supreme Court issues its decision in <u>Davis</u>. The United States also seeks 60 days after the Supreme Court issues its decision to respond to Petitioner's supplemental § 2255 Motion. For good cause shown and with the consent of opposing counsel, the Motion shall be granted.

**IT IS, THEREFORE, ORDERED** that the United States' Motion to continue the stay of these proceedings until the United States Supreme Court decides <u>United States v. Davis</u>, No. 18-43 (Doc. No. 126) is **GRANTED**. The United States shall have 60 days after the Supreme Court issues its decision to respond to Petitioner's supplemental Motion to Vacate.

Signed: April 8, 2019

Max O. Cogburn Jr
United States District Judge

**JA3133**

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION
CIVIL NO. 3:12CV327
(3:97-CR-23)

AQUILIA MARCIVICCI BARNETTE, )
                                  )

       Movant,                 )

                                    )

vs.                               )

                                    )

UNITED STATES OF AMERICA,   )

                                    )

       Respondent.       )

_____ )

## RESPONSE OF THE UNITED STATES TO
## <u>BARNETTE'S SUPPLEMENTAL 2255 MOTION</u>

**JA3134**

# TABLE OF CONTENTS

I.      BACKGROUND ........................................................................1

        A. ............................................................Barnette murders two victims. ...............................................................................1

        B. .......A jury convicts Barnette of eleven counts and sentences him to death on three of them. .......................................................1

        C. ......... Barnette files his 2255 motion and, several years later, seeks leave to amend it...................................................................4

II.     DISCUSSION .......................................................................7

        A. . This Court should apply the concurrent-sentence doctrine and decline to consider Barnette's supplemental motion...............................................................................8

        B. Barnette's challenges to his convictions on counts 1 and 10 are untimely, procedurally barred, and unrelated to the constitutional rights recognized in *Johnson*, *Dimaya*, and *Davis*..............................................................14

               1...... Barnette's challenges to his convictions on counts 1 and 10 are untimely.......................................................15

               2.. Even if they were timely under section 2255's statute of limitations, Barnette's procedural default would preclude him from raising his arguments......... 17

        C. Barnette's challenges to counts 2, 3, and 11, fail as a matter of law for the same reasons, among others. ...........................20

        D. Binding precedent forecloses Barnette's challenge to count 8..................................................................................23

        E. ........The errors Barnette alleges in his supplemental motion would be harmless in any event. ...............................24

III.    CONCLUSION ...................................................................25

ii

The United States respectfully requests that this Court deny Aquilia Marcivicci Barnette's request for leave to amend his 2255 motion with the claims in his July 2016 supplemental motion. That motion seeks to challenge 6 of Barnette's 11 convictions. Each of Barnette's new claims fails as a matter of law for multiple reasons. And the outcome of his arguments would make no practical difference — he does not challenge his capital conviction on count seven, and the record makes clear that Barnette would have received the death penalty in any event. Barnette is, therefore, not entitled to relief on any of his new claims, and an amendment of Barnette's 2255 motion including them would be futile.

## I.    BACKGROUND

### A.    Barnette murders two victims.

In 1996, Barnette murdered two victims. *Response of United States to Barnette's 2255 Motion and Motion for Evid. Hr'g* (Doc. No. 98, 3:12CV327), Sept. 23, 2015 (hereinafter "*2015 Response*"), at 2–11. He firebombed Robin Williams's home in April of 1996, screaming "die, bitch, die," after she ended their relationship. *Id.* at 2–5. In June, after gathering weapons and making plans, he took Donald Allen's car at gunpoint and then shot him to death. *Id.* at 5–8. He used the car to drive to Robin's home in Virginia, where he chased her and shot her to death in front of her mother and others. *Id.* at 10.

### B.    A jury convicts Barnette of eleven counts and sentences him to death on three of them.

A grand jury in the Western District of North Carolina indicted Barnette in February of 1997. Ex. 1, at 69–74. It charged him with 11 offenses against the

**JA3136**

United States.  Ex. 1, at 69–74.[1]

The first 3 counts of the indictment charged Barnette with offenses he committed in April of 1996, when he firebombed Robin's apartment.  *Id.* at 69–70. Count 1 charged Barnette with violating the Violence Against Women Act by "intentionally" committing a crime of violence — "firebomb[ing] Robin Williams's occupied apartment and an automobile parked in her driveway causing bodily injury to her" — when traveling in interstate commerce with intent to kill, injure, harass, or intimidate an intimate partner, 18 U.S.C. §§ 2261(a)(1), (b).  *Id.* at 69. Count 2 charged Barnette with using and carrying a firearm in the form of a destructive device during and in relation to a crime of violence — the "act of interstate domestic violence" set "forth in Count One," 18 U.S.C. § 924(c).  *Id.* Count 3 charged Barnette with using and carrying fire and explosive materials to commit an act of interstate domestic violence, 18 U.S.C. §§ 844(h)(1), 2261.  *Id.*

Counts 4 through 6 charged Barnette with efforts to procure and modify firearms between the time that he firebombed Robin's apartment and the time he returned to kill her.  *Id.* at 70–71.  Count 4 charged Barnette with making a false statement in connection with the acquisition of a firearm, 18 U.S.C. §§ 922(a)(6), 924.  *Id.*  Count 5 charged Barnette with making a firearm without complying with requirements of the National Firearms Act, 26 U.S.C. §§ 5821, 5822, 5861(f), 5871.  *Id.* at 71.  And Count 6 charged Barnette with possession of a firearm by a

---

[1] "Ex. 1" refers to Exhibit 1 filed with the United States' September 2015 response to Barnette's 2255 motion and motion for an evidentiary hearing.  (Docs. No. 99–108, 3:12CV327).

2

**JA3137**

convicted felon, 18 U.S.C. §§ 922(g)(1), 924. *Id.*

The remaining 5 counts charged Barnette with crimes on the day that he murdered Donald Allen and Robin Williams. Count 9 charged Barnette with transporting a stolen motor vehicle in interstate commerce, 18 U.S.C. § 2312. *Id.* at 72–73. And count 10 charged him again with violating the Violence Against Women Act by "intentionally" committing a crime of violence — "sh[ooting] and kill[ing] Robin Williams causing bodily injury and death to her" — when traveling in interstate commerce with intent to kill, injure, harass, or intimidate an intimate partner, 18 U.S.C. §§ 2261(a)(1), (b). *Id.* at 73.

Counts 7, 8, and 11 gave rise to the death sentences that Barnette challenges in his original 2255 motion. Exh. 1, at 2054, 2072, 2090, 2092. Count 7 charged Barnette with carjacking resulting in death, 28 U.S.C. § 2119(3). Exh. 1, at 72. Count 8 charged Barnette with first degree murder of Donald Allen by use of a firearm during and in relation to a crime of violence — the carjacking described in count 7, 18 U.S.C. § 924(c)(1), (i)(2)(1). *Id.* And count 11 charged Barnette with first-degree murder of Robin Williams by use of a firearm during and in relation to a crime of violence — the act of interstate domestic violence described in count ten, 18 U.S.C. §§ 924(c)(1), (i)(2)(i). *Id.* at 72–73.

A "jury found Barnette guilty on all 11 counts in the indictment" in 1998. *United States v. Barnette*, 211 F.3d 803, 810 (4th Cir. 2000). "No witnesses at trial disputed the facts of the crimes." *Id.* And the Fourth Circuit affirmed Barnette's conviction "in all respects." *Id.* at 826.

3

**JA3138**

After the Fourth Circuit remanded for resentencing on his capital counts, the jury returned a verdict of death on each of Barnette's three capital counts. Ex. 1, at 2023, 2054, 2072, 2090. The Fourth Circuit originally affirmed that sentence in 2004. *United States v. Barnette*, 390 F.3d 775, 812 (4th Cir. 2004). The United States Supreme Court vacated that decision and remanded in the light of its decision about the method of analyzing claims of discrimination in juror selection, *Miller-El v. Dretke*, 545 U.S. 231 (2005). *United States v. Barnette*, 644 F.3d 192, 196, 205 (4th Cir. 2011). After additional proceedings in this Court, the Fourth Circuit again affirmed Barnette's death sentences in May of 2011. *Id.* The Supreme Court denied certiorari on March 19, 2012. *Barnette v. United States*, 565 U.S. 1263 (2012).

**C.     Barnette files his 2255 motion and, several years later, seeks leave to amend it.**

"A 1-year period of limitation" applies to 2255 motions, which ordinarily runs from "the date on which the judgment of conviction becomes final." 28 U.S.C. § 2255(f)(1). The parties entered a tolling stipulation extending "the limitations period from March 19, 2013 to June 19, 2013 for Mr. Barnette to file a § 2255 motion." *Stipulation* (Doc. No. 32, 3:12CV327), at 1.

On June 19, 2013, the last day of the ordinary limitations period, Barnette filed the 2255 motion currently before this Court. *2255 Mot.* (Doc. No. 48, 3:12CV327). Barnette challenged his death sentence but did not challenge his criminal convictions. *2255 Mot.* 1; *Petitioner's Brief in Support of Motion for*

4

*Evidentiary Hearing*, Dec. 22, 2014 (Doc. No. 74, 3:12-CV-327), at 1.

More than three years later, on June 24, 2016, Barnette filed what he styled as a "supplemental motion to vacate under 28 U.S.C. § 2255," accompanied by a request for leave to amend his motion. (Doc. No. 119, 3:12CV327), at 32. He asserts that the "supplemental motion" is timely because it asserts rights initially recognized by the United States Supreme Court in *Johnson v. United States*, 135 S. Ct. 2551 (2015). *Supp. Mot.* 28. And the date on which the Supreme Court initially recognizes a new retroactive rule restarts the limitations period for claims asserting that rule. 28 U.S.C. § 2255(f)(3); *Supp. Mot.* 28.

Barnette's supplemental motion seeks to challenge, for the first time, 6 of Barnette's 11 convictions, including 2 of the 3 for which he received the death penalty. *Supp. Mot.* 1. The jury convicted Barnette of counts 1 and 10 for violations of the Violence Against Women Act, an element of which is a "crime of violence," 18 U.S.C. § 2261(a) (1996), defined in 18 U.S.C. § 16. And the jury convicted Barnette of counts 2, 8, and 11, for using and carrying a firearm during and in relation to a "crime of violence," 18 U.S.C. § 924(c)(1), defined in 18 U.S.C. § 924(c)(3).

The Supreme Court has recently addressed the definitions of "crime of violence" relevant to Barnette's convictions and held parts of those definitions unconstitutionally vague. Both 18 U.S.C. § 16 and 18 U.S.C. § 924(c)(3) define the term "crime of violence" in two parts. The first part, known as the force clause, includes offenses that have "as an element the use, attempted use, or

5

**JA3140**

threatened use of physical force against the person or property of another."  18

U.S.C. §§ 16(a), 924(c)(3)(A).  The second part, the residual clause, includes an

offense that, "by its nature, involves a substantial risk that physical force against

the person or property of another may be used in the course of committing the

offense."  18 U.S.C. §§ 16(b), 924(c)(3)(B).  The Supreme Court held in *Sessions v.

Dimaya* that the residual clause of section 16(b) is unconstitutionally vague.  138

S. Ct. 1204, 1210 (2018).  And the Court held in *United States v. Davis* that the

residual clause of "§ 924(c)(3)(B) is unconstitutionally vague."  139 S. Ct. 2319,

2336 (2019).  Offenses that meet the requirements of the "force clause" continue

to qualify as a "crime of violence."  *See United States v. Mathis*, 932 F.3d 242, 265

(4th Cir. 2019).

Although Barnette challenges his convictions for counts 1 and 10, he does

not allege that he was improperly convicted of a violation of the Violence Against

Women Act predicated on an offense that qualifies as a "crime of violence" only

under that term's residual clause.  *Supp. Mot.* 17–18.  Instead he alleges that the

"language of the indictment" was defective because it alleges a "set of facts that

include violent acts" instead of a specific "predicate crime," leaving the court

unable to apply the "categorical approach."  *Id.* at 18.

Barnette contends that the alleged infirmity in counts 1 and 10 requires

the reversal of his convictions on counts 2 and 11.  *Id.* at 18–21.  Counts 2 and 11

both charge violations of section 924(c).  Ex. 1, at 70, 73.  The counts allege the

predicate "crime of violence" to be the "act[s] of interstate domestic violence"

6

**JA3141**

alleged in counts 1 and 10, respectively. *Id.*

Barnette also seeks to extend his theory about count one to his conviction on count 3, for using "fire or an explosive to commit any felony which may be prosecuted in a court of the United States." 18 U.S.C. § 844(h)(1). He contends that if his conviction under count one must be vacated, his conviction on count 3 also "cannot stand." *Supp. Mot.* 26.

Finally, Barnette contends that his conviction under section 924(c) on count 8 is infirm. *Supp. Mot.* 21–26. He contends that the predicate "crime of violence" for that count — carjacking, 18 U.S.C. § 2119 — no longer qualifies as a crime of violence under the force clause. *Id.*

## II. DISCUSSION

This Court should deny Barnette's request for leave to amend his 2255 motion. Motions for leave to amend a 2255 motion should be denied when the amendment would be "futile." *United States v. Pittman*, 209 F.3d 314, 317 (4th Cir. 2000). An amendment is futile to the extent that it presents matters that "would be subject to dismissal." *Gohier v. Enright*, 186 F.3d 1216, 1218 (10th Cir. 1999); *U.S. ex rel. Ahumada v. NISH*, 756 F.3d 268, 274 (4th Cir. 2014). And a 2255 motion warrants "dismiss[al] without a hearing" if "the petitioner's allegations, accepted as true, would not entitle the petitioner to relief." *Engleen v. United States*, 68 F.3d 238, 240 (8th Cir. 1995); *see Hill v. Ozmint*, 339 F.3d 187, 201 (4th Cir. 2003) (habeas petitioner "obliged to allege 'facts that, if true, would entitle him to relief.'" (emphasis in original)).

7

The claims Barnette seeks to present in his supplemental motion would, as a matter of law, not entitle him to relief under section 2255. At the outset, Barnette does not challenge his capital conviction on count 7 for which he received the death penalty. Because even successful challenges to his other counts will make no practical difference, this Court has discretion under the concurrent-sentence doctrine to decline to consider them. If it does consider them, it should reject them as a matter of law. Barnette's challenges to counts 1 and 10 have nothing to do with the recent residual-clause decisions by the Supreme Court, are untimely, and are barred by Barnette's procedural default. Because those challenges fail as a matter of law, so do his challenges to counts 2, 3, and 11, which rely on the same rationale. Fourth Circuit precedent forecloses Barnette's challenge to count 8. And, if this Court held invalid any or all of the convictions Barnette challenges, the errors would be harmless. Because Barnette's claims in his supplemental motion would not entitle him to any relief, this Court should not allow him to amend his 2255 motion to present them.

## A. This Court should apply the concurrent-sentence doctrine and decline to consider Barnette's supplemental motion.

Even if this Court were to conclude that all of the convictions Barnette seeks to challenge in his supplemental motion are invalid, he would remain convicted of a capital offense for which he was sentenced to death. The jury sentenced him to death on count 7 for carjacking resulting in death. And Barnette does not challenge the validity of his conviction on count 7. *See Supp.*

8

**JA3143**

*Mot.* 32.  The Fourth Circuit has, moreover, held that carjacking, "18 U.S.C. § 2119," remains a "crime of violence" under the force clause of 18 U.S.C. § 924(c)(3)(A).  *United States v. Evans*, 848 F.3d 242, 244 (4th Cir. 2017).  This binding precedent forecloses Barnette's challenge to his capital conviction on count 8.  *Cf. Supp. 2255 Mot.* 21–26.  Even if this Court held Barnette's other convictions invalid, Barnette would remain convicted on counts 7 and 8 and sentenced to death.

"The 'concurrent sentence doctrine' authorizes" this Court to leave the validity of Barnette's other challenged convictions and sentences "unreviewed." *United States v. Charles*, 932 F.3d 153, 155 (4th Cir. 2019).  That doctrine applies when a defendant is subject to another sentence that "is valid and carries the same or greater duration of punishment so long as there is *no substantial possibility* that the unreviewed sentence will adversely affect the defendant or, stated otherwise, so long as it can be foreseen *with reasonable certainty* that the defendant will suffer no adverse collateral consequences by leaving it unreviewed." *Id.* (emphasis in original).

Barnette is subject to indisputably valid capital convictions on counts 7 and 8, and the death sentences he received for those two counts are the "same" as or "greater" than what he received for any of his other convictions.  *Id.*  No substantial possibility exists that a decision by this court not to review Barnette's other convictions would adversely affect him.  This court can, therefore, apply the concurrent sentence doctrine and deny as futile Barnette's motion for leave to

9

amend his 2255 motion.

The concurrent-sentence doctrine ordinarily "cannot be applied to avoid reaching a defendant's challenge to one of his federal *convictions.*" *Id.* at 160. A statute, 18 U.S.C. § 3013, imposes a special monetary assessment for each count of conviction. *Id.* And "other collateral consequences" — such as delayed "eligibility for parole" or an "increased sentence under a recidivist statute for a future offense" — often attach to ordinary convictions. *Id.* (quoting *Rutledge v. United States*, 517 U.S. 292, 302 (1996)). Accordingly, courts ordinarily cannot say "*with reasonable certainty* that the defendant will suffer no adverse collateral consequences" if a conviction is left "unreviewed." *Id.* at 155 (emphasis in original).

The convictions Barnette challenges, however, are not ordinary. They are accompanied by a valid conviction that received a death sentence. If those other convictions go unreviewed, Barnette will not face "delay" in any determination of "eligibility for parole." *Charles*, 932 F.3d at 160. He will never be eligible for parole. Nor will he be at greater risk for "an increased sentence" for a "future offense." *Id.* He is already subject to the most serious penalty. Although he may well have paid a special assessment for each of his convictions, he cannot obtain relief from this special assessment — a monetary penalty — in a motion under 28 U.S.C. § 2255. "[S]pecial assessments are not reviewable in habeas corpus proceedings." *Gardner v. Warden Lewisburg USP*, 845 F.3d 99, 104 (3d Cir. 2017). Simply put, Barnette will suffer no "adverse collateral consequences" if

10

this Court declines to consider his challenges to counts 1, 2, 3, 10, or 11, or even his challenge to count 8. *Id.* (declining to consider collateral attack on convictions by defendant who received "other life sentences" that would remain undisturbed).

Barnette's contention that he suffered prejudice at sentencing from his other convictions does not come close to undermining this Court's discretion to apply the concurrent-sentence doctrine. *Cf. Supp. Mot.* 29–32. The only information to which the sentencing jury was exposed that he alleges to be prejudicial consists of an instruction that "carjacking was a 'crime of violence'" and an instruction to "consider whether Mr. Barnette committed 'murder,' and acted 'with malice aforethought.'" *Id.* at 29–30. This argument is baseless for a number of reasons.

The most basic flaw in Barnette's prejudice argument is that it concerns instructions that the jury heard in connection with count 8, Ex. 1, at 1962, a count that remains valid under binding circuit precedent. *Evans*, 848 F.3d at 244. The sentencing jury, in other words, *properly* heard that Barnette had been convicted of using and carrying a firearm during and in relation to a "crime of violence . . . that is[] the carjacking set forth in Count 7." Ex. 1 at 1962. And it *properly* heard that Barnette had, in the course of that violation, "caused the death of Donald Lee Allen through the use of a firearm, which killing is a murder . . . in that the defendant, with malice aforethought, did unlawfully kill Donald Lee Allen by shooting him with a firearm, willfully, deliberately,

11

**JA3146**

maliciously, and with premeditation." *Id.*[2]

Even if similar instructions were somehow improperly before the jury, nothing close to a substantial possibility exists that the jury would have declined to return a verdict of death on any of Barnette's capital counts. On count 7, the validity of which Barnette does not dispute, the jury unanimously found that Barnette "intentionally killed Donald Lee Allen." Ex. 1, at 2041. It unanimously found that Barnette "intentionally inflicted serious bodily injury" which resulted in his death. *Id.* It unanimously found that Barnette engaged in "substantial planning and premeditation to cause the death of Donald Lee Allen." *Id.* at 2044. It found that Barnette also "intentionally killed" another person — Robin Williams — "in addition to killing Donald Lee Allen." *Id.* at 2046. And it unanimously recommended "that a sentence of death shall be imposed for the killing of Donald Lee Allen as to Count Seven." *Id.* at 2054. These uncontested findings alone refute any possibility that the jury would have reached a different verdict had it not been told that Barnette committed a "crime of violence" or heard the term "malice aforethought." *Cf. Supp. Mot.* 29–31.

Perhaps more importantly, the jury heard overwhelming and uncontroverted evidence of Barnette's conduct that was both violent and malicious in every sense of the word. *2015 Response* 2–11, 14–24, 104–06. The

---

[2] The sentencing jury was not the same jury that considered Barnette's guilt. Because Barnette does not include citations in support of the assertion, it is not clear what portion of the record he is referring to when he says that the jury was directed "to *consider* whether Mr. Barnette committed 'murder,' and acted 'with malice aforethought.'" *Supp. Mot.* 2255 30 (emphasis added).

12

jury heard that Barnette drove to Roanoke, cut the telephone lines of Robin Williams's house, and firebombed the only exit while she and Benjamin Greene were inside. The jury heard that Barnette yelled to Robin, "[D]ie, bitch, die," and "you're going to die tonight. I'm going to kill you." *Id.* at 104. The jury heard that Robin escaped with severe burns, and while she attempted to recover, Barnette went out with friends, visited clubs, met girls, and drank. *Id.* It also heard that Barnette purchased a shotgun, sawed off the barrel, and assembled materials, planning and preparing to return to Roanoke to kill. *Id.* The jury heard that Barnette lied in wait for Donald Allen's blue Honda Prelude, and that even after Allen gave the car and his wallet up willingly, Barnette shot him multiple times. *Id.* The jury heard that Barnette followed his plan to drive to Roanoke with the shotgun and fired it into the door of the kitchen where Barnette's mother had been standing with her eight-month-old grandchild, baking brownies for a church bake sale. *Id.* And the jury heard that Barnette calmly chased, dragged, shot, and killed Robin Williams in front of Robin's mother, threatening multiple neighbors along the way. *Id.*

In addition to the firebombing and murders that Barnette carried out with extensive premeditation, the jury heard testimony about an extraordinary amount of violence that Barnette carried out against other women and those around them. *Id.* at 104–05. The jury heard that Barnette beat the mother of his children, Natasha Tolbert, while she was pregnant, slamming her against the concrete. *Id.* at 105. The jury heard that Barnette beat the children of Crystal

13

Dennis, cutting them open, and that he shot Dennis's brother. *Id.* at 105. And the jury heard that Barnette threatened Alesha Chambers at knifepoint, beat her with a baseball bat, cut her, kidnapped her, and raped her. *Id.* at 105.

This Court can conclude with confidence that the instructions Barnette contends render his challenged convictions prejudicial did not influence the jury's decision to impose the death penalty. Because the resolution of Barnette's claims presented in his supplemental motion will have no practical effect, this Court should decline to consider them and reject his request for leave to amend his 2255 motion.

> **B.** **Barnette's challenges to his convictions on counts 1 and 10 are untimely, procedurally barred, and unrelated to the constitutional rights recognized in *Johnson*, *Dimaya*, and *Davis*.**

The challenges Barnette presents in his supplemental motion to counts 1 and 10 fail as a matter of law in any event. As mentioned previously, *see* Section I, *supra*, Barnette argues that counts 1 and 10 are infirm because his 1997 indictment alleges a "set of facts that include violent acts" instead of following the "categorical approach" which requires a "predicate crime." *Id.* at 18. Although a timely version of this argument might have a ring of plausibility, Barnette raises it decades too late. The Supreme Court and the Fourth Circuit held that 18 U.S.C. § 16's definition of "crime of violence" required the categorical approach years before Barnette's criminal judgment became final. *Leocal v. Ashcroft*, 543 U.S. 1, 7 (2004); *Garcia v. Gonzales*, 455 F.3d 465, 468 (4th Cir. 2006). His

14

argument is untimely because he has no basis for raising it more than a year after the deadline for his original 2255 motion. He was also required to raise it during his criminal case and on direct appeal, and his procedural default precludes him from doing so now.

**1. Barnette's challenges to his convictions on counts 1 and 10 are untimely.**

Barnette's challenges to his convictions on counts 1 and 10 are untimely. He was required to bring those challenges within the "1-year period of limitation" that began on "the date on which [his] judgment of conviction became final." 28 U.S.C. § 2255(f)(1). That date, after the parties' three-month tolling stipulation, was June 19, 2013. Barnette's supplemental motion, which he filed in June of 2016, is more than three years too late for these claims. *See Zack v. Tucker*, 704 F.3d 917, 924 (11th Cir. 2013) (en banc) (statute of limitations operates on a claim-by-claim basis).

Contrary to what Barnette contends, *Supp. 2255 Mot.* 28, the basis for his challenge to counts 1 and 10 does not receive the benefit of the limitations-period trigger of 28 U.S.C. § 2255(f)(3). That subsection restarts the limitations period on "the date on which the right asserted was initially recognized by the Supreme Court, if that right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review." 28 U.S.C. § 2255(f)(3). The "right . . . initially recognized by the Supreme Court," *id.*, in *Johnson* was the right not to have a criminal sentence "increased . . . under the residual clause of

15

**JA3150**

the Armed Career Criminal Act." *Johnson*, 135 S. Ct. at 2563.  The rights initially recognized in *Dimaya* and *Davis* are the rights not to be convicted under the residual clauses of section 16 and section 924(c), respectively.  *Dimaya*, 138 S. Ct. at 1210; *Davis*, 139 S. Ct. at 2336.

None of the residual-clause decisions from the Supreme Court in recent years initially recognized the right that Barnette asserts — to be charged with a "crime of violence" in accordance with the "categorical approach" instead of with a "set of facts that include violent acts."  *Supp. Mot.* 18.  The Supreme Court initially recognized that section 16 requires the categorical approach in 2004, in *Leocal*.  543 U.S. at 7.  *See Davis*, 139 S. Ct. at 2326 ("[O]ur precedent under § 16's residual clause required courts to use the categorical approach to determine whether an offense qualified as a crime of violence." (citing *Leocal*, 543 U.S. at 7, 10)).  Because *Leocal* was decided before Barnette's criminal judgment became final, it does not affect the limitations period.  28 U.S.C. § 2255(f).

Barnette's suggestion that nonconformity with the categorical approach somehow requires the conclusion that Barnette was convicted under the residual clause of 18 U.S.C. section 16(b), *Supp. 2255 Mot.* 18, is baseless.  The force clause, 18 U.S.C. § 16(a), and the residual clause, § 16(b), have *both* required the categorical approach for at least the past decade and a half.  *Leocal*, 543 U.S. at 381.  And the "set of facts that include violent acts" alleged in the indictment — Barnette's intentionally firebombing Robin Williams's occupied apartment causing bodily injury to her, and Barnette's intentionally shooting and killing

16

**JA3151**

Robin causing bodily injury and death, Ex. 1, at 69, 73 — plainly include the "use, attempted use, or threatened use of force," 18 U.S.C. § 16(a). *See United States v. Reid*, 861 F.3d 523, 527 (4th Cir. 2017) (knowingly and willfully inflicting bodily injury requires the use of force). That the indictment alleged these facts instead of a specific code provision simply has nothing to do with the rights recognized in *Johnson*, *Dimaya*, or *Davis*.

Indeed, Barnette's allegation of error in counts 1 and 10 is no stronger because of *Johnson*, *Dimaya*, or *Davis*, than it was when he filed his initial 2255. Whether the argument was strong or weak, he could have argued those convictions were out of conformity with the "categorical approach," *Supp. Mot.* 18, in 2013, along with the many other arguments he made in his 107-page 2255 motion. Barnette chose not to include that argument in his timely 2255 motion, and recent cases about the residual clause do not open the door for him to raise it now.

Barnette's challenge to his convictions on counts 1 and 10 are untimely. This Court should reject his challenge on that basis.

> **2.    Even if they were timely under section 2255's statute of limitations, Barnette's procedural default would preclude him from raising his arguments.**

Even if Barnette's new claims complied with section 2255's limitations period, his failure to raise them both during his criminal case and on direct appeal would preclude him from raising them now. *See Bousley v. United States*, 523 U.S. 614, 621 (1998). The Supreme Court has held that Barnette can raise

17

his procedurally defaulted claim on collateral review "only" if he can "first demonstrate either 'cause' and actual 'prejudice'" or that he is "actually innocent." *Id.* at 622. Barnette cannot meet either of these two requirements. *Id.*

Barnette cannot establish the cause necessary to overcome his procedural default. Cause requires a "factor external to the defense" that impeded his attorney's efforts to comply with the requirement that he timely raise objections. *Davila v. Davis*, 137 S. Ct. 2058, 2065 (2017). No external factor limited Barnette's attorneys' ability to raise the arguments he seeks to raise in his supplemental 2255 motion. That Barnette's arguments would have been unlikely to succeed would not be enough, even if the arguments would have been futile. *Whiteside v. United States*, 775 F.3d 180, 185 (4th Cir. 2014) (en banc). But Barnette has not identified any precedent that would have foreclosed his arguments. Although he has alleged various forms of ineffective assistance of counsel, a failure to raise the arguments Barnette presents in his supplemental 2255 motion is not among them. In short, Barnette has not and cannot establish cause for his failure to raise his claim earlier.

Even if he could somehow establish cause, Barnette would remain unable to establish the requisite "actual prejudice." *Bousley*, 523 U.S. at 622 (cleaned up). Had Barnette successfully argued during his criminal case that his indictment on counts 1 and 10 was required to conform to the categorical approach, the United States would undoubtedly have obtained a superseding indictment. Count 1 arose out of Barnette's firebombing of Robin Williams in her

18

**JA3153**

home, while armed with a bat and screaming "die, bitch, die," *Barnette*, 390 F.3d at 780. Count 10 arose out of Barnette's later intentional killing of Robin Williams with a gun. *Id.* at 782. "Crimes of violence" include state-law offenses, *see Dimaya*, 138 S. Ct. at 1211; *Leocal*, 543 U.S. at 4. Evidence in the record establishes that the United States could have charged any number of specific predicate offenses under Virginia law that qualify as crimes of violence under the force clause, including, most obviously, murder and attempted murder. *United States v. Villegas*, 777 F. App'x 660, 661 (4th Cir. 2019) (unpublished decision) (holding attempted murder under Virginia law to qualify as a crime of violence under the force clause); *United States v. Mathis*, 932 F.3d 242, 265 (4th Cir. 2019) (holding murder under Virginia law to qualify as a crime of violence under the force clause). The evidence in support of these charges would have been the same and would have remained overwhelming. Barnette, therefore, cannot establish that his failure to raise his challenge to counts 1 and 10 during his criminal case "worked to his actual and substantial disadvantage." *Murray v. Carrier*, 477 U.S. 478, 494 (1986) (cleaned up); *see also Strickler v. Greene*, 527 U.S. 263, 295 (1999) (explaining that prejudice requires "a reasonable probability that his conviction or sentence would have been different" absent the alleged error).

Nor can Barnette establish "actual innocence" as required to overcome his procedural default. *Bousley*, 523 U.S. at 624. Barnette has the burden to "demonstrate that, in light of all the evidence, it is more likely than not that no reasonable juror would have convicted him." *Id.* (cleaned up). "'[A]ctual

19

**JA3154**

innocence' means factual innocence, not mere legal insufficiency." *Id.* The record, which includes Barnette's confession and admission in court that he crossed state lines to firebomb Robin in her home, screaming for her to die, and later crossed state lines again to shoot her to death in front of her mother and others, *2015 Response* 18, 25; *Barnette,* 390 F.3d at 780, would preclude Barnette from meeting his burden to establish actual innocence of the Violence Against Women Act. *See Schriro v. Landrigan,* 550 U.S. 465, 474 (2007).

### C. Barnette's challenges to counts 2, 3, and 11, fail as a matter of law for the same reasons, among others.

This court should also reject Barnette's challenges to counts 2, 3, and 11, for the same reasons that it should reject his challenges to counts 1, and 10. Barnette's challenges to counts 2, 3, and 11 ask this Court to hold that those counts fail automatically if Barnette is entitled to relief from counts 1 and 10. *Supp. Mot.* 18–19, 26. By the same reasoning, because he is *not* entitled to relief from counts 1 and 10, he is also not entitled to relief from counts 2, 3, and 11. The same statute of limitations and procedural-default doctrine apply, and they preclude relief for the reasons described above.

Barnette's challenges to counts 2 and 11 also fail for an additional reason, which Barnette's supplemental motion anticipates, *see Supp. Mot.* 19–21. Both of those counts allege use and carriage of a firearm during and in relation to a "crime of violence" under section 924(c). Ex. 1 at 69, 73. And both of them allege "act[s] of interstate domestic violence" under 18 U.S.C. § 2261(a)(1), as set forth

20

**JA3155**

in counts 1 and 10, respectively, to be the predicate "crime[s] of violence."  *Id.*

Offenses under section 2261(a) categorically qualify as predicate "crimes of violence" under section 924(c).  One element of the offense, of course, is itself a "crime of violence."  18 U.S.C. § 2261 (1996).  But even without that requirement, the elements of the offense would necessarily include the "use, attempted use, or threatened use of physical force against the person or property of another."  18 U.S.C. § 924(c)(3)(A).  The elements of the offense require proof that the defendant (1) "travel[ed] across a State line"; (2) harbored "the intent to injure, harass, or intimidate" his "spouse or intimate partner"; (3) "intentionally commit[ted] a crime"; and (4) "thereby caus[ed] bodily injury" to the spouse or intimate partner he intended to injure, harass, or intimidate.  18 U.S.C. § 2261(a) (1996).

Apart from section 2261's own requirement of a "crime of violence," the offense requires that the defendant undertake significant acts, including committing a crime; that he harbor specific "intent to injure, harass, or intimidate" his victim; and then he actually "caus[e] bodily injury" to that victim. 18 U.S.C. § 2261(a).  The force clause requires only the actual, attempted, or threatened use of "force *capable* of causing physical pain or injury to another person."  *Stokeling v. United States*, 139 S. Ct. 544, 553 (2019) (emphasis added). The clause "does not require any particular degree of likelihood or probability that the force used will cause physical pain or injury; only potentiality."  *Id.* at 554.  "[H]itting, slapping, shoving, grabbing, pinching, biting, and hair pulling,"

21

**JA3156**

therefore, all suffice. *Id.* (quoting *United States v. Castleman*, 572 U.S. 157, 182 (2014) (Scalia, J., concurring)). Intentional conduct like that prescribed by the Violence Against Women Act, which actually causes injury, well meets this requirement, particularly when coupled with a specific intent to harm the person injured. *See Reid*, 861 F.3d at 527; *United States v. Townsend*, 886 F.3d 441, 447 (4th Cir. 2018).

Fourth Circuit precedent forecloses Barnette's argument that section 2261's inclusion of a specific intent to "intimidate" makes the offense broader than what the force clause requires. Barnette contends that the term "intimidate" mirrors the intimidation element of the "federal bank robbery statute," 18 U.S.C. § 2113(a). The Fourth Circuit, however, has specifically held that bank robbery *does* qualify as a crime of violence under the force clause, *United States v. McNeal*, 818 F.3d 141, 152 (4th Cir. 2016). "Intimidation," the court explained, "means the threat of force." *Id.* at 153 (quoting *United States v. Jones*, 932 F.2d 624, 625 (7th Cir. 1991)).

More importantly, Barnette's argument ignores the other requirements of the statute. A defendant must not only "inten[d] to injure, harass, or intimidate" his victim. 18 U.S.C. § 2261(a). He must also intentionally commit a crime that actually "caus[es] bodily injury" to that victim. 18 U.S.C. § 2261(a). No "realistic probability" exists, *United States v. Drummond*, 925 F.3d 681, 688 (4th Cir. 2019), that a person could commit these elements without intentional conduct he knows to be at least "capable of causing physical pain or injury to another

22

**JA3157**

person." *Stokeling*, 139 S. Ct. at 553. No realistic probability exists, therefore, that the offense would apply to any person who does not use, attempt, or threaten force.

### D. Binding precedent forecloses Barnette's challenge to count 8.

Barnette's challenge to his conviction for first-degree murder by use and carriage of a firearm during and in relation to a "crime of violence" in the form of carjacking also fails as a matter of law. At the outset, Barnette's challenge is barred by his procedural default. *See* Section II.B.2, *supra*. He cannot establish cause to overcome that default because nothing external to the defense prevented him from raising his challenge during his criminal case or on direct appeal. He cannot establish prejudice because his argument is meritless, as explained below. And he cannot establish actual innocence because a jury found him guilty of the offense in the light of overwhelming evidence.

In addition to being barred by Barnette's procedural default, Barnette's challenge to count 8 fails on the merits under the Fourth Circuit's decision in *United States v. Evans*, 848 F.3d 242, 244 (4th Cir. 2017). As mentioned above, *see* Section II.A., *supra*, *Evans* held that the federal carjacking offense that served as the predicate for Barnette's count 8 categorically qualifies as a "crime of violence" under the force clause. 848 F.3d at 246 & n.3, 247–48. The validity of the residual clause is therefore irrelevant to the validity of his conviction on count 8. *Cf. Br. of Appellant* 21–26.

23

**JA3158**

**E.   The errors Barnette alleges in his supplemental motion would be harmless in any event.**

Finally, even if this Court were to hold any or all of the convictions Barnette challenges invalid, the errors would be harmless.  The harmless-error rule relates closely to the concurrent-sentence doctrine but involves a different formulation.  *Charles*, 932 F.3d at 158–59.  Errors on collateral review — even the most serious kind — do not warrant relief unless they "had a substantial and injurious effect or influence" on the outcome of the proceedings.  *United States v. Smith*, 723 F.3d 510, 518 (4th Cir. 2013).

As discussed above, Barnette does not challenge his capital conviction on count seven, and the record makes clear that he would have received the death penalty regardless of the status of the other convictions that he challenges.  *See* Section II.A., *supra*.  Even on direct review, where the standard for harmlessness is much more stringent and the burden rests firmly with the United States, the Fourth Circuit has repeatedly held that an error is harmless when the record makes clear that the defendant would receive the same total sentence in any event.  *United States v. Mills*, 917 F.3d 324, 330 (4th Cir. 2019); *United States v. McDonald*, 850 F.3d 640, 644–45 (4th Cir. 2017); *United States v. Shrader*, 675 F.3d 300, 315 (4th Cir. 2012).  When a defendant receives a sentence under the advisory Sentencing Guidelines regime, the harmless-error rule applies so long as the sentence is substantively reasonable.  *Mills*, 917 F.3d at 330.  Barnette instead received his death sentence consistently with the substantive and

24

procedural requirements for the death penalty, and his death sentence was affirmed after thorough consideration by this Court and the Fourth Circuit. *Barnette*, 644 F.3d at 217.

Because the record makes clear that Barnette would have received the death penalty regardless of the outcome of the challenges to his convictions he presents in his supplemental motion, he is not entitled to relief on that motion. This court should, therefore, reject as futile Barnette's motion for leave to amend his 2255 motion.

## III.   CONCLUSION

Each of the claims that Barnette seeks to present in his supplemental 2255 motion fails as a matter of law.  And because the record makes clear that he would have received the death penalty in any event, none of those claims would entitle him to relief even if they had merit or could be considered at this stage. The United States, therefore, respectfully requests that this Court deny as futile Barnette's motion for leave to amend his 2255 motion.

RESPECTFULLY SUBMITTED, this 21st day of November, 2019.

R. ANDREW MURRAY
UNITED STATES ATTORNEY

/s/Anthony J. Enright
Assistant United States Attorney
United States Attorney's Office
227 West Trade Street, Suite 1650
Charlotte, North Carolina 28202
(704) 344-6222 (phone)

25

**JA3160**

(704) 344-6629 (fax)
anthony.enright@usdoj.gov

26

**JA3161**

## CERTIFICATE OF SERVICE

I certify that on this 21st of November, 2019, I caused to be served a copy of the foregoing motion to be served on counsel for Barnette via electronic case filing

s/ANTHONY J. ENRIGHT
Assistant United States Attorney

27

**JA3162**

# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA
## CHARLOTTE DIVISION
## CIVIL ACTION NO.: 3:12-CV-327-MOC

| | |
|---|---|
| UNITED STATES OF AMERICA | |
| vs. | **DEATH PENALTY § 2255** |
| AQUILIA MARCIVICCI BARNETTE | |

## PETITIONER AQUILIA MARCIVICCI BARNETTE'S UNOPPOSED MOTION FOR EXTENSION OF TIME TO FILE A REPLY BRIEF

Aquilia Marcivicci Barnette, through undersigned counsel, respectfully requests an extension of time to file his reply to the government's response [Doc. 132] to Mr. Barnette's Supplemental Motion to Vacate [Doc. 119]. Pursuant to the Local Civil Rule 7.1(e), Mr. Barnette's reply is due within seven (7) days of the date that the response is served, or November 21, 2019. Under the circumstances here, Mr. Barnette, through undersigned counsel, respectfully requests an extension of time until February 22, 2020 (or ninety days from today). The government has been consulted and does not object to this request.

As the Court is aware, Mr. Barnette's Supplemental Motion to Vacate was originally filed on June 24, 2016. The motion challenges the validity of a majority of the counts in Mr. Barnette's indictment. The Court held Mr. Barnett's motion in abeyance until the U.S. Supreme Court decided *United States v. Davis* on June 24, 2019. In *Davis*, the Court held that the residual clause of section 924(c) is unconstitutionally vague. 139 S. Ct. 2319, 2336 (2019).

**JA3163**

Subsequent to the U.S. Supreme Court's ruling in *Davis*, the government requested multiple extensions of time to file its response, in large measure due to the issues presented here and the fact that similar legal challenges are being litigated simultaneously across the country.

The issues in Mr. Barnette's motion are complex and massively significant given Mr. Barnette's convictions and death sentences. As noted, the federal courts, including the U.S. Supreme Court, have been actively wrestling with these issues concerning the proper interpretation of the several federal statutes and predicate offenses involved. Undersigned counsel also respectively face deadlines and carry significant professional responsibilities in other matters that further justify additional time to prepare a reply on behalf of Mr. Barnette.

In light of the issues presented and circumstances detailed above, Mr. Barnette, through undersigned counsel, respectfully request an extension of time to file a reply brief until February 22, 2020.

Dated: November 22, 2019      /s/ Mark E. Olive
N.C. State Bar No. 10615
LAW OFFICES OF MARK OLIVE
320 W. Jefferson Street
Tallahassee, FL 32301
850-224-0004 (tel)
850-224-3331 (fax)
meolive@aol.com

/s/ Jacob H. Sussman
N.C. Bar No. 31821
P.O. Box 79225
Waverly, MA 02479
704-277-3962 (tel)
jakesussmanlaw@gmail.com

<u>**CERTIFICATE OF SERVICE**</u>

The undersigned hereby certifies that he has served the foregoing motion with the Clerk of Court using the CM/ECF system, which will send notification of such filing to:

Anthony J. Enright
anthony.enright@usdoj.gov

Dated: November 22, 2019

/s/ Jacob H. Sussman
Counsel for Mr. Barnette

3

**JA3165**

# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA
### CHARLOTTE DIVISION
### CIVIL ACTION NO.: 3:12-CV-327-MOC

| | |
|---|---|
| AQUILIA MARCIVICCI BARNETTE | |
| vs. | **<u>ORDER</u>** |
| UNITED STATES | |

**THIS MATTE**R is before the Court upon Petitioner's unopposed motion for extension of time to respond to Respondent's response (Doc. No. 132) to Petitioner's Motion to Vacate (Doc. No. 119). The reply currently is due on November 28, 2019.

Petitioner seeks an extension to file a reply until February 22, 2020. Respondent does not oppose the Motion.

For the reasons stated in the Motion and for good cause shown, **IT IS HEREBY ORDERED** that Petitioner's first motion for extension of time (Doc. No. 133) to reply to Respondent's response (Doc. No. 132) is **GRANTED**.

**IT IS FURTHER ORDERED** that Petitioner shall have up to and including February 22, 2020, to file a reply.

Signed:

_____
Max O. Cogburn, Jr.
United States District Judge

**JA3166**

2

**JA3167**

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>vs.<br><br>AQUILIA MARCIVICCI BARNETTE | __DEATH PENALTY § 2255__ |

### PETITIONER AQUILIA MARCIVICCI BARNETTE'S REPLY BRIEF IN SUPPORT OF SUPPLEMENTAL MOTION TO VACATE UNDER 28 U.S.C. § 2255

The government recognizes, as it must, that *Sessions v. Dimaya*, 138 S. Ct. 1204 (2018) and *United States v. Davis*, 139 S. Ct. 2319 (2019) hold that no offense can *ever* qualify as a "crime of violence" under the residual clauses of section 16 and section 924(c), respectively. [Doc. 132: Govt. Response at 16] Accordingly, Mr. Barnette's standalone claims that his § 2261 and § 924(c) convictions are void under the residual clause require this Court to vacate his convictions on counts 1, 2, 3, 8, 10, and 11, if the Court determines—as it must, after conducting a prejudice analysis—that the charged predicate crimes also fail to qualify as crimes of violence under the "force" or "elements" definitions found in these statutes.[1]

### I.    Mr. Barnette's standalone *Dimaya/Davis* claims are not procedurally defaulted.

Mr. Barnette has raised a straightforward, standalone *Dimaya/Davis* claim alleging that his § 2261 and § 924(c) convictions are void under the residual clause.

---

[1] As noted in Mr. Barnette's Supplemental Motion to Vacate [Doc. 119], § 2261 incorporates the definition of "crimes of violence" found in 18 U.S.C. § 16(b). The residual clause of § 16(b) was invalidated in *Dimaya*. To avoid confusion, Mr. Barnette refers here to the definition as if it was directly found in § 2261.

*See Dimaya*, 138 S. Ct. at 1210; *Davis*, 139 S. Ct. at 2336. *Dimaya* and *Davis* invalidated the residual clauses encompassed by § 2261 and § 924(c), respectively; hence, no offense can *ever* qualify as a "crime of violence" under those clauses. *See Davis*, 139 S. Ct. at 2323 ("In our constitutional order, a vague law is no law at all."); *see also Johnson v. United States*, 135 S. Ct. 2551, 2557 (2015) ("the indeterminacy of the wide-ranging inquiry required by the residual clause both denies fair notice and invites arbitrary enforcement by judges"). Accordingly, this Court must acknowledge that Mr. Barnette cannot be guilty of the § 2261 or § 924(c) crimes charged in counts 1, 2, 3, 8, 10, and 11 under the residual clause.

Once the Court makes the necessary determination that Mr. Barnette's convictions cannot stand under the now-invalidated residual clause—which the government has conceded [Govt. Response at 6]—all that remains is for the court to determine the issue of prejudice, *i.e.,* that the predicate offenses with which Mr. Barnette was charged were not definable as "crimes of violence" under the alternate definition found in § 2261 and § 924(c)—the so-called "force" or "elements" clause—which requires that the predicate offense have "as an element" the use, or threat of use, of strong physical force, the so-called "force" or "elements" clause. In conducting this prejudice analysis, the law requires that courts apply current substantive law. *See Lockhart v. Fretwell*, 506 U.S. 364, 371-72 (1993) (concluding that the prejudice showing in a § 2255 proceeding may be made with the benefit of the law at the time the claim is litigated). As Mr. Barnette argued in his Supplemental Motion to Vacate and reiterates below, the predicate crimes with which he was charged in counts 1, 2, 3, 8, 10, and 11 do not constitute crimes of violence under the force clause because none of them requires "as an

**JA3169**

element" the use, or threat of use, of strong physical force. [Doc. 119: Supplemental Motion to Vacate at 18-19, 26][2]

In its attempt to convince this Court that Mr. Barnette has somehow procedurally defaulted these claims, however, the government tries to re-frame Mr. Barnette's pleading by asserting that Mr. Barnette's claim is grounded in a right to be charged with a "crime of violence" in accordance with the "categorical approach," a right initially recognized under section 16 in *Leocal*. 543 U.S. at 7. [Govt. Response at 14] This is simply incorrect. Mr. Barnette's pleading argues that no crime charged in counts 1, 2, 3, 8, 10, and 11 constituted a "crime of violence" because the residual clauses of section 2261 (counts 1, 3, 10) and section 924(c) (counts 2, 8, 11) are unconstitutionally void under *Dimaya* and *Davis*. *Leocal* did not speak to the constitutionality of the residual clause. Only *Johnson, Dimaya*, and *Davis* did. The government's argument, therefore, is unavailing.

It is only in the context of the necessary prejudice analysis that Mr. Barnette relies on cases of statutory interpretation to demonstrate that federal interstate domestic violence fails to qualify as a "crime of violence" under the force clauses contained in § 2261 and § 924(c). This argument "is not an independent claim." *In re Adams*, 825 F.3d 1283, 1286 (11th Cir. 2016). *See also id.* at 1285-1286 (defendant's argument that state burglary offense did not qualify under the ACCA enumerated offenses clause under *Descamps v. United States*, 133 S. Ct. 2276 (2013)—a case of statutory interpretation— was not a "standalone" claim subject to §2255(h)(2) requirements; rather defendant's

---

[2] Briefly, interstate domestic violence does not require as an element the use of strong physical force but itself relies on the incorporation of charged predicate crimes. The indictment in Mr. Barnette's case fails to identify specific crimes as these predicates, so these predicate crimes do not—*cannot*—supply the necessary force elements, either.

3

**JA3170**

successive § 2255 claim challenging the ACCA residual clause was based on *Johnson*, which satisfied the § 2255(h)(2) gatekeeping requirements). Whether an offense qualifies under the remaining § 924(c) or section 16's force clause is a question of prejudice. If an offense qualifies as "crime of violence" under one of these remaining provisions, then a petitioner has not demonstrated prejudice resulting from the *Johnson* error.

Importantly, when conducting prejudice analysis on collateral review, a court must apply the current substantive law that exists today. *See Lockhart v. Fretwell*, 506 U.S. 364, 371-72 (1993) (concluding that the prejudice showing in a § 2255 proceeding may be made with the benefit of the law at the time the claim is litigated).

Several post-*Johnson* cases illustrate this point well. For example, in *In re Adams*, 825 F.3d 1283 (11th Cir. 2016), the Eleventh Circuit authorized a *Johnson* § 2255 challenge to the defendant's ACCA sentence. Specifically, in that case, the petitioner argued that his Florida burglary conviction was no longer a "violent felony" under the ACCA residual clause after *Johnson*. The petitioner also argued that in light of *Descamps v. United States*, 133 S. Ct. 2276 (2013), the burglary conviction was no longer a "generic burglary" under the remaining ACCA enumerated offense clause. Even though the Court concluded that *Descamps* itself was not a "new rule of constitutional law" that satisfied the § 2255(h)(2) procedural requirements, the Court held that § 2255 relief was not barred. *Id.* at 1286. The Court reasoned that the petitioner did not assert "*Descamps* as a standalone claim … Although *Descamps* bears on this case, it is not an independent claim that is itself subject to [§ 2255(h) requirements]." *Id.* Rather, the petitioner's independent claim was a *Johnson* claim because it was that case—not *Descamps*—that satisfied the gatekeeping requirements of 28 U.S.C. § 2255(h)(2) and opened the door for him to seek

4

relief from his ACCA sentence. *Id.* In so holding, the Court made plain that the relevance of *Descamps* and its impact on the remaining enumerated offenses clause of the ACCA was relevant only to the prejudice analysis—an analysis that is not constrained by § 2255 procedural requirements.

Numerous other courts have applied analogous reasoning to hold the same. *See United States v. Harris*, 205 F. Supp.3d 651, 665 (M.D. Penn. 2016) ("We reject the government's argument that Defendant's challenge to the burglary conviction is untimely or that Defendant's motion is really an untimely *Descamps* claim. His 2255 motion is properly based on *Johnson* (2015), as he has shown … that two prior convictions, escape and resisting arrest, could only have been based on the now-defunct residual clause, and thus, can no longer be considered predicate offenses. Having shown that he properly invoked *Johnson* (2015), Defendant can proceed to establish that his prior convictions do not qualify him as a[n] [armed career criminal] under the ACCA under the elements clause or enumerated-offenses clause"); *United States v. Winston*, 207 F. Supp.3d 669, 672 n.1 (W.D. Va. 2016) ("The Government's procedural attack on Defendant's petition as focusing solely on *Johnson I* is likely better understood as a substantive argument that—even after receiving the benefit of *Johnson II*—Defendant has not suffered prejudice, because his conviction nonetheless falls within the force clause); *Diaz v. United States*, 2016 WL 4524785, at *5 (W.D.N.Y. Aug. 30, 2016) (petitioner's standalone claim was the 2015 decision in *Johnson* (*i.e.*, *Johnson II*); government's argument that his prior conviction no longer qualified as "violent felony" under the ACCA force clause in light of *Johnson I* was question of prejudice not independently subject to § 2255 requirements).

This prejudice determination, in turn, must be made employing current case law. *See Lockhart v. Fretwell*, 506 U.S. 364, 371-72 (1993) (prejudice showing in § 2255 claim may be made with the benefit of the law at the time the claim is litigated); *Mosby v. Senkowksi*, 470 F.3d 515, 524 (2d Cir. 2006) ("[T]he Supreme Court has held that current law should be applied retroactively for purposes of determining whether a party has demonstrated prejudice under Strickland's second prong."); *United States v. Ladwig*, 192 F. Supp.3d 1153 (E.D. Wa. 2016) (in § 2255 case predicated on *Johnson*, the question of whether defendant's prior conviction qualifies under remaining force or enumerated offenses clause must be determined by "current case law").

In other words, given the government's (necessary) concession that, after *Dimaya* and *Davis*, Mr. Barnette's convictions for § 2261 and § 924(c) charges cannot rest on the residual clause definition of "crimes of violence," the only remaining issue is whether the "crime of violence" element is satisfied under the force clause. This is an issue of prejudice—not a separate claim—under which this Court must apply current law. Under current categorical approach law, *Descamps* and *Mathis v. United States*, 136 S. Ct. 2243 (2016), tell us that the "crime of violence" element *cannot* be satisfied under the force clause unless the government conclusively establishes that the defendant was convicted of an offense that required as an element the use of force. The government cannot do that here with respect to counts 1, 2, 3, 8, 10, and 11 because the indictment fails altogether to

6

**JA3173**

allege as a predicate any specific statute Mr. Barnette violated.[3] This makes it a legal impossibility for the government to satisfy its burden of demonstrating that the predicate "crime" has an element that requires the use of force.

Because Mr. Barnette's claims are based on *Dimaya* and *Davis*, and he brought these claims in a timely fashion, they have been properly raised and are not procedurally defaulted.

**II.    Additionally, procedural default does not apply due to a jurisdictional defect.**

Even if the prejudice analysis Mr. Barnette has advanced were determined to be a claim in its own right, the government's assertion that Mr. Barnette's claims are procedurally defaulted fails because jurisdictional defects "cannot be waived and are not subject to procedural default." *Sapia v. United States*, 433 F.3d 212, 216 (2d Cir. 2005); *McCoy v. United States*, 266 F.3d 1245, 1249 (11th Cir. 2001) (same). *See also United States v. Cotton*, 535 U.S. 625, 630 (2002) (noting that "subject-matter jurisdiction, because it involves a court's power to hear a case, can never be forfeited or waived. Consequently, defects in subject-matter jurisdiction require correction regardless of whether the error was raised in district court.").

A jurisdictional defect exists "when the indictment affirmatively alleges conduct that does not constitute a crime at all because that conduct falls outside of the sweep of

---

[3] Concerning Mr. Barnette's challenge to count 8 of his indictment, which was raised in his Supplemental Motion to Vacate in 2016, the Fourth Circuit has subsequently held that carjacking in violation of 18 U.S.C. § 2119 is a crime of violence under § 924(c)'s force clause. *See United States v. Evans*, 848 F.3d 242, 247 (4th Cir. 2017). Accordingly, Mr. Barnette does not address the claim further here. However, despite this holding, Mr. Barnette continues to contend that no element of 18 U.S.C. 2119 requires the intentional use of strong physical force, as argued in his initial brief. [Doc. 119: Supplemental Motion to Vacate at 21-26]

the charging statute." *United States v. Brown*, 752 F.3d 1344, 1352 (11th Cir. 2014) (quoting *United States v. Peter*, 310 F.3d 709, 714 (11th Cir. 2002)). When such a defect exists, "proof of the alleged conduct, no matter how overwhelming, would [bring] it no closer to showing the crime charged than would … no proof at all." *Peter*, 310 F.3d at 715. "The problem [with such defect] is not that the government failed to allege a fact or an element that would have made the indictment's criminal charge complete. Instead, 'it is that the Government affirmatively alleged a specific course of conduct that is outside of the reach of the [statute charged.]'" *Brown*, 752 F.3d at 1352 (quoting *Peter*, 301 F.3d at 715)).

Here, the district court had no jurisdiction over the § 2261 and § 924(c) counts against Mr. Barnette because the charges affirmatively alleged conduct that post-*Johnson/Dimaya/Davis* is outside the sweep of both statutes. *See United States v. St. Hubert*, 883 F.3d 1319, 1326 (11th Cir. 2018) ("district court is without jurisdiction to accept a guilty plea to a 'non-offense'") (citation omitted). For example, count 1 alleged Mr. Barnette "committed a crime of violence" while "in the course of and as a result of" traveling across a state line. As detailed in Mr. Barnette's Supplemental Motion to Vacate, under the categorical approach, interstate domestic violence under § 2261, a defendant may be found guilty of interstate domestic violence without any evidence that he used violent physical force, or threatened to use violence physical force, no matter what the real world facts were in the case. [Doc. 119: Supplemental Motion to Vacate at 19-21] The same analysis holds true with respect to counts 2, 3, 8, 10, and 11: the conduct alleged therein is "outside the reach" of both § 2261 and § 924. *See Peter*, 310 F.3d at 715. Therefore, the indictment fails to state an offense, and Mr. Barnette's § 2261

and § 924(c) convictions are nullities. This jurisdictional defect is not an error that can be defaulted.

### III. Procedural default would be excused due to ineffective assistance of counsel at trial and on direct appeal.

Mr. Barnette's trial counsel (at both his original trial and resentencing trial) and his appellate counsel (on both direct appeals) failed to argue that the indictment charged Mr. Barnette with conduct outside the reach of both § 2261 and § 924(c). These failures constitute deficient performance and prejudiced Mr. Barnette, thus satisfying both prongs of *Strickland v. Washington*, 466 U.S. 668 (1984). Thus, to the extent that the government argues Mr. Barnette's claims for relief are defaulted, there is sufficient cause and prejudice to excuse the default. *See United States v. Frady*, 456 U.S. 152, 167-68 (1982).

### IV. Procedural default would also be excused due to Mr. Barnette's actual innocence under counts 1, 2, 3, 8, 10, and 11.

Litigants may seek relief under § 2255 despite procedural default if barring them from such a pursuit would result in a miscarriage of justice. *See United States v. Johnson*, 410 F.3d 137, 151 (4th Cir. 2005). A proper showing of 'actual innocence' is sufficient to satisfy the 'miscarriage of justice' requirement." *Wolfe v. Johnson*, 565 F.3d 140, 160 (4th Cir. 2009) (explaining the meaning of "miscarriage of justice" in the context of procedural default).

To establish actual innocence of a count of conviction, a petitioner must demonstrate that "in light of all the evidence," "it is more likely than not that no reasonable juror would have convicted him." *Bousley v. United States,* 523 U.S. 614, 623 (1998) (quoting *Schlup v. Delo*, 513 U.S. 298, 327-328 (1995) (internal quotation marks

**JA3176**

omitted). The courts of appeals have uniformly held that this showing is satisfied when an intervening change in the law establishes that a petitioner has been "convicted for conduct not prohibited by law." *Alaimalo v. United States*, 645 F.3d 1042, 1047 (9th Cir. 2011); *see also United States v. Adams,* 814 F.3d 178, 183 (4th Cir. 2016) (petitioner was actually innocent of his felon-in-possession conviction because intervening Fourth Circuit precedent established that he was no longer a felon); *Vosgien v. Persson,* 742 F.3d 1131, 1134 (9th Cir. 2014) ("One way a petitioner can demonstrate actual innocence is to show in light of subsequent case law that he cannot, as a matter of law, have committed the alleged crime."); *Phillips v. United States,* 734 F.3d 573, 582 (6th Cir. 2013) ("One way to establish factual innocence is to show an intervening change in the law that establishes the petitioner's actual innocence.") (internal quotation marks and citation omitted); *United States v. Tyler*, 732 F.3d 241, 246 (3rd Cir. 2014) ("A petitioner can establish that no reasonable juror would have convicted him by demonstrating an intervening change in law that rendered his conduct non-criminal"); *United States v. Avery,* 719 F.3d 1080, 1085 (9th Cir. 2013) ("The government concedes that Avery is actually innocent of honest services fraud in light of [*Skilling v. United States*, 561 U.S. 358 (2010)] which confined the reach of the offense to paradigmatic cases of bribes and kickbacks") (citation and internal quotation marks omitted); *Martin v. Perez*, 319 F.3d 799, 804 (6th Cir. 2003) (Supreme Court's intervening decision in *Jones v. United States,* 529 U.S. 848 (2000), which narrowed the interstate commerce element of arson, rendered defendant actually innocent of arson); *Reyes-Requena v. United States,* 243 F.3d 893, 903 (5th Cir. 2001) ("Courts have framed the actual innocence factor differently but the core

idea is that the petitioner may have been imprisoned for conduct that was not prohibited by law."); *Jeffers v. Chandler*, 253 F.3d 827, 831 (5th Cir. 2001) (same).[4]

Of particular note is the Fourth Circuit's decision in *United States v. Adams,* 814 F.3d 178 (4th Cir. 2016). In that case, Adams argued that in light of intervening Fourth Circuit precedent, he was actually innocent of his conviction for being a felon in possession in violation of 18 U.S.C. § 922(g). *Id*. at 183. Specifically, he claimed that after *United States v. Simmons*, 649 F.3d 237 (4th Cir. 2011)—which redefined the meaning of "felony" under § 922(g)—none of his prior convictions could qualify as "felonies." *Id.* In turn, he asserted that the "felon" element of § 922(g) could no longer be satisfied, and hence, he was actually innocent. *Id.*

The government responded that "although Adams may no longer be legally convicted of a violation of § 922(g) after *Simmons*, he remains, nonetheless, somehow still factually guilty." *Adams*, 814 F.3d at 183. In so arguing, the government cited to the Supreme Court's decision in *Bousley*, which held that "actual innocence" means "factual innocence, not mere legal insufficiency." 523 at 623. However, the Fourth Circuit flatly rejected the government's argument upon concluding that "Adams, has indeed, shown 'factual innocence' as contemplated by *Bousley*." *Adams,* 814 F.3d at 183. The Fourth Circuit explained that Adams is factually innocent "because he has shown that it impossible for the government to prove one of the required elements of a § 922(g)(1) charge—that the defendant was a convicted felon at the time of the offense. This is so because [in light of *Simmons*] Adams was 'in fact' not a felon." *Id.*

---

[4] These decisions are all consistent with the Supreme Court's reasoning in *Davis v. United States,* 417 U.S. 333, 346-47 (1974), which held that when intervening precedent renders conduct that once criminal no longer criminal, it "inherently results in a complete miscarriage of justice."

11

**JA3178**

Likewise, Mr. Barnette is factually innocent of the § 2261 and § 924(c) offenses for which he was convicted. An essential element of each of counts 1, 2, 3, 8, 10, and 11 is an underlying "crime of violence." As detailed herein, the Supreme Court's rulings in *Dimaya* and *Johnson* effectively invalidated the definition of "crime of violence" in the residual clauses of Section 16 and § 924(c), respectively. Because there is no underlying "crime of violence" in these counts, there are no facts under which he could have been convicted for those charged offenses. In other words, "it is impossible for the government to prove one of the required elements of [the § 924(c)] charge." *Adams*, 814 F.3d at 183.

Indeed, several district court judges have relied on precisely this reasoning to abrogate § 924(c) offenses after *Johnson*. *See*, *e.g.*, *Royer v. United States*, 2018 WL 3676905, at *9 (E.D. Va. Aug. 2, 2018) ("Section 924(c) criminalizes using or carrying a firearm during and in relation to a crime of violence or possessing a firearm in furtherance of a crime of violence, and Royer's argument is that when his co-defendants used, carried, or possessed firearms, they were not, in fact, committing a crime of violence. *Therefore, Royer has appropriately presented a claim of actual innocence*.") (emphasis added); *Duhart v. United States,* 2016 WL 4720424, at *4 (S.D. Fla. Sept. 9, 2016) (finding actual innocence where petitioner's "§ 924(c) conviction relies on the fact that he was convicted of a predicate 'crime of violence' when he was actually not"); *United States v. Meza*, 2018 WL 2048899, at *7 (D. Mont. May 2, 2018) ("A defendant who uses a firearm during and in relation to a crime that is neither a 'crime of violence' nor a 'drug trafficking crime' has not, in fact, violated § 924(c)" and therefore is "actually innocent"); *United States v. Birdinground*, 2018 WL 3242294, at *10 (D. Mont. July 3, 2018) ("Birdinground is actually innocent. . . . A defendant who uses or carries a

12

firearm during and in relation to a crime that is neither a 'crime of violence' nor a 'drug trafficking crime' has not, in fact, violated § 924(c).").

This Court should hold the same here. Because Mr. Barnette was convicted of conduct that is no longer criminal, he is actually innocent of the offenses for which he was convicted in counts 1, 2, 3, 8, 10, and 11, and the procedural default raised by the government does not apply.

**V.     Statute of limitations would also be excused due to Mr. Barnette's actual innocence under counts 1, 2, 3, 8, 10, and 11.**

In *McQuiggin v. Perkins,* 569 U.S. 383 (2013), the Supreme Court held that AEDPA's one-year statute of limitations must be excused when the petitioner is actually innocent of the offense of conviction which he is challenging on collateral review. This "fundamental miscarriage of justice exception" is necessary to ensure "that federal constitutional errors do not result in the incarceration of innocent persons." *Id.* at 392 (citation omitted).

For the reasons stated above, because Mr. Barnette was convicted of conduct that is no longer criminal, he is actually innocent of the offenses for which he was convicted in counts 1, 2, 3, 8, 10, and 11. Therefore, his § 2255 petition is timely.

**VI.    Mr. Barnette's sentences of death under counts 7 and 8 must be vacated because there is a possibility that at least one juror considered Mr. Barnette's unconstitutional convictions in voting for death.**

**a.   The Eighth Amendment and the Due Process Clause require Mr. Barnette to receive a new sentencing hearing.**

The Supreme Court has held that resentencing is required in a non-capital case where the original sentence was informed by a conviction that has subsequently been invalidated. *See United States v. Tucker*, 404 U.S. 443 (1972). Sixteen years later, the

**JA3180**

Supreme Court similarly held that where "there is a possibility" that an invalid conviction has informed a death sentence, the Eighth Amendment requires resentencing. *See Johnson v. Mississippi*, 486 U.S. 578, 583 (1988). The Court in *Johnson* emphasized that allowing for this possibility is inconsistent with the Eighth Amendment's "special need for reliability in the determination that death is the appropriate punishment." *Id.* at 584 (internal quotations and citations omitted). Mr. Barnette's Supplemental Motion to Vacate discusses a number of other cases in which resentencing was required because of the possibility that, in determining the original sentence, a judge or jury considered a subsequently invalidated conviction. [Doc. 119: Supplemental Motion to Vacate at 29-30]

The "possibility" standard means that resentencing is required unless it can be established that the sentencer did not consider the invalid conviction in determining the sentence. This standard applies with special force in capital cases given the heightened need for reliability imposed by the Eighth Amendment. *See Mills v. Maryland*, 486 U.S. 367, 383-84 (1988). Importantly, under the possibility standard, resentencing is required when there is a possibility that an invalid conviction influenced even a single juror to recommend death. *See Johnson*, 486 U.S. at 586; *Kubat v. Thieret*, 867 F.2d 351, 373 (7th Cir. 1989) (finding a violation of petitioner's Eighth and Fourteenth Amendment rights based on the "substantial possibility that one or more" jurors was influenced by an erroneous jury instruction); *cf. Wiggins v. Smith*, 539 U.S. 510, 537 (2003) (recognizing that, to satisfy the prejudice requirement for a claim of ineffective effective assistance of counsel, a petitioner must show "a reasonable probability that at least one juror would

have struck a different balance.") (citations omitted); *Buck v. Davis,* 137 S. Ct. 759, 776 (2017) (same).[5]

Here, as in *Johnson*, *Tucker,* and the other cases discussed in the Supplemental Motion to Vacate, there is unquestionably a possibility that Mr. Barnette's multiple unconstitutional convictions influenced at least one juror to recommend death. It would, in fact, be entirely speculative—indeed, counterintuitive—to conclude that the jury set aside and disregarded what it had been instructed about concerning Mr. Barnette's underlying convictions when it sought to make the decision between life and death during the penalty phase. *See Johnson*, 486 U.S. at 586 (even without the prosecutor's argument to consider the invalid conviction, "there would be a possibility that the jury's belief that petitioner had been convicted of a prior felony would be decisive in the choice between a life and a death sentence") (internal citation and quotations omitted); *Wren v. United States*, 540 F.2d 643, 644 (4th Cir. 1975) ("In short, to terminate further inquiry, the district judge must be able to say either from recollection or reconstruction that had he known at the time of sentencing that the earlier convictions were invalid, he would have nevertheless imposed the same sentence."); *Bourgeois v. Whitley*, 784 F.2d 718, 721 (5th Cir. 1986) (resentencing required "unless it can be ascertained from the record that a trial

---

[5] As in *Johnson*, other cases of ineffective assistance of counsel, including *Wiggins* and *Buck*, require resentencing where a constitutional error may have affected a single juror's decision to recommend death. Notably, though, the legal standard for establishing prejudice in the reliance-on-an-invalid conviction context under *Johnson* is *less stringent* than the standard for establishing prejudice in the ineffective assistance of counsel context. Under *Johnson*, as explained above, a capital defendant need only show a possibility that an invalid conviction affected at least one juror's decision to recommend death, whereas a capital defendant claiming ineffective assistance must show a reasonable probability that counsel's deficient performance did so. "A 'reasonable probability' [for the purposes of an ineffective assistance claim] is a higher standard than *Johnson's* 'possibility.'" *Powell v. Kelly*, 531 F. Supp. 2d 695, 732 n.40 (E.D. Va. 2008).

Case 3:12-cv-00327-MOC   Document 136   Filed 02/20/20   Page 15 of 25

**JA3182**

court's sentence on a valid conviction was not affected" by the invalid conviction); *cf. Mills*, 486 U.S. at 384 ("The possibility that petitioner's jury conducted its task improperly certainly is great enough to require resentencing.").

In light of what the jury heard and what the Court instructed the jury to consider in deciding the question of punishment, there is indisputably a possibility that Mr. Barnette's invalid convictions affected at least one juror's decision to recommend death. To conclude otherwise—that is, to conclude that the jury "undoubtedly" would have delivered the same verdict in the absence of those unconstitutional convictions—would entail rank speculation and thus would be unconstitutionally "callous." *Tucker*, 404 U.S. at 449 n.8. That is especially so given that this is a capital case necessitating heightened reliability in sentencing. *Johnson*, 486 U.S. at 584. Under *Tucker*, *Johnson*, and related cases, the invalidation of Mr. Barnette's convictions in counts 1, 2, 3, 8, 10, and 11, necessitates a new sentencing hearing.

**b. The Sixth Amendment requires that weighing of aggravating and mitigating factors is fact-finding that must be done by a jury, not a judge.**

As noted in Mr. Barnette's Supplemental Motion for Relief, the Sixth Amendment requires that a jury, and not the court, determine whether a defendant should be sentenced to death. *See Hurst v. Florida*, 136 S. Ct. 616, 624 (2016) ("The Sixth Amendment protects a defendant's right to an impartial jury. This right required Florida to base [the defendant's] death sentence on a jury's verdict, not a judge's factfinding."); *see also Ring v. Arizona*, 536 U.S. 584 (2002). After *Hurst*, any death sentence rendered by a court is unconstitutional. A post-conviction court may not engage in *post hoc*

reweighing, or otherwise make its own determination about whether the defendant deserves a death sentence.

### c. The "concurrent sentence" doctrine does not apply here.

The invalidation of Mr. Barnette's convictions and sentences on counts 1, 2, 3, 8, 10, and 11 requires a new sentencing hearing. Under the plain terms of § 2255, the invalidation of Mr. Barnette's convictions and sentences in those counts obligates the Court to either "correct" Mr. Barnette's total sentence or "resentence" him on the remaining counts. Because it is impossible to conclude that the jury's vote for death was wholly unaffected by their own consideration of the invalid counts, a re-sentencing on the remaining counts is necessary. *See Johnson v. Mississippi*, 486 U.S. 578 (1988).

The government contends that even if that Mr. Barnette's convictions under counts 1, 2, 3, 8, 10, and 11 are unlawful, this Court should not disturb his concurrent sentence on the remaining counts. The government relies on the "concurrent sentence doctrine" in arguing as such. This doctrine "provides that, if a defendant is given concurrent sentences on several counts and the [sentence] on one count is found to be valid, an appellate court need not consider the validity of the [sentence] on the other counts." *In re Davis,* 829 F.3d 1297, 1299 (11th Cir. 2016) (citation omitted). The government cannot benefit from this doctrine in this case.

It is important to note at the outset the Supreme Court's hesitancy with the concurrent sentence doctrine. In *Benton v. Maryland*, the Supreme Court suggested that the concurrent sentence doctrine's only "continuing validity" is as a "rule of judicial convenience." 395 U.S. 784, 791 (1969). The Court further complained that no precedent gave "a satisfactory explanation for the concurrent sentence doctrine." *Id.* at 789. And the

Court cautioned that "whatever the underlying justifications for the doctrine, it seems clear to us that it cannot be taken to state a jurisdictional rule." *Id*. at 789-90.

Consistent with this warning, it is well settled that the concurrent sentence doctrine only applies if leaving the prison term on the unchallenged count of conviction undisturbed would result in no "adverse collateral consequences" for the defendant. *United States v. Beckham*, 2016 WL 4402827, at *3 (E.D. Wash. 2016) (citing *Benton*, 395 U.S. 784); *see also United States v. Truong Dihn Huns*, 629 F.2d 908, 931 (4th Cir. 1980) (same). To be clear, this means the government has a heavy burden to affirmatively show that the "defendant will suffer no harm" if the sentences on the unchallenged counts of conviction are kept in tact. *United States v. Hill*, 859 F.2d 325, 326 (4th Cir. 1988); *see also Willits v. United States*, 182 F. Supp.3d 1278, 1281 (M.D. Fla. 2016) ("The Government bears the burden of proving that no collateral consequences will follow" from applying the concurrent sentence doctrine); *United States v. Davis*, 730 F.2d 669, 671 n.2 (11th Cir. 1984) (declining to apply the concurrent sentence doctrine because "the government made no affirmative showing that the likelihood of harm to the defendant in the form of adverse collateral consequences was so remote as to be insignificant"). Even if the government meets this burden, the Court has discretion not to apply the doctrine. *See Davis*, 730 F.2d at 671 n.2; *United States v. Mullens*, 583 F.3d 134, 142 (5th Cir. 1978).

The government cannot satisfy its heavy burden under the collateral sentence doctrine because it cannot prove that the jury's sentencing decision on the remaining capital counts was not informed by convictions contained in counts 1, 2, 3, 8, 10, and 11, as well as its consideration of death on counts 8 and 11. In other words, the government

18

cannot demonstrate that absent the unlawful § 2261 and § 924(c) convictions, Mr. Barnette's sentence on count 7 would remain the same. In fact, this Court must assume the opposite: that Mr. Barnette suffered "adverse collateral consequences" from the unlawful counts 1, 2, 3, 8, 10, and 11.

The Eleventh Circuit's decision in a non-capital case, *In re Davis*, 829 F.3d 1297, 1300 (11th Cir. 2016), is very instructive. In *Davis*, the defendant was sentenced to both a 327-month ACCA term on a felon-in-possession count, and a separate-but-concurrent 327-month term on a federal drug conspiracy offense. *Id*. The defendant subsequently challenged his ACCA status based on *Johnson v. United States*, 135 S. Ct. 2551 (2015). The government argued that the defendant's concurrent sentence on the drug count was "unrelated" to his ACCA sentence, and therefore, that sentence should go undisturbed under the concurrent sentence doctrine. *Id*. at 1299. The Eleventh Circuit flatly rejected the government's argument, concluding that "this is not a case where the applicant's non-ACCA sentence was unrelated to his ACCA status." *Id*. The Court elaborated that "[t]o the contrary, the judge sentenced Davis based on a single Sentencing Guidelines range for Davis's ACCA violation combined with his conspiracy crime. The judge's sentencing decision was therefore no doubt informed by the Davis's ACCA designation, which means Davis may have suffered 'adverse collateral consequences' if his ACCA sentence turns out to be unlawful." *Id*. at 1299-1300.

Likewise, in *United States v. Beckham*, the district court similarly rejected the government's concurrent case doctrine argument. In that case, the defendant was sentenced to a 188-month ACCA term on a felon in possession of a firearm count and a separate-but-concurrent 188-month term on a federal drug count. 2016 WL 4402827, at

**JA3186**

*3. However, the court rejected the application of the concurrent sentence doctrine. *Id*. The court reasoned that "the Sentencing Guidelines calculation in this case was a single calculation grouping both counts of conviction together. The court consulted the Guidelines in deciding whether to accept the plea agreement." *Id*. Thus, the court concluded that "[t]his court's sentencing decision on the drug count was no doubt informed by Petitioner's ACCA designation. Accordingly, it is not clear Petitioner did not suffer adverse collateral legal consequences from the unlawful sentence." *Id*.; *see also Willits*, 182 F. Supp.3d at 1281-83 (refusing to apply the concurrent sentence doctrine in case where defendant's unlawful ACCA sentence was concurrent with prison term on federal drug count).

Under the express terms of 18 U.S.C. § 2255, the invalidation of counts 1, 2, 3, 8, 10, and 11 presents the Court with two options: "resentence" Mr. Barnette or "correct" his sentence. *See United States v. Hadden*, 475 F.3d 652, 661, 667 (4th Cir. 2007) ("the end result of a successful § 2255 proceeding must be the vacatur of the prisoner's unlawful sentence (and perhaps one or more of his convictions) and one of the following: (1) the prisoner's release, (2) the grant of a future new trial to the prisoner, (3) a new sentence, be it imposed by (a) a resentencing or (b) a corrected sentence.").

A sentence correction is an "arithmetical, technical or mechanical" exercise that entails no "reevaluation of the appropriateness of [the defendant's] original sentence." *United States v. Flack*, 941 F.3d 238, 241 (6th Cir. 2019); *see also United States v. Palmer*, 854 F.3d 39, 47-48 (D.C. Cir. 2017); Fed. R. Crim P. 35 (sentence correction is limited to corrections of "arithmetical, technical, or other clear error"). A resentencing, by contrast, requires such a re-evaluation. In a non-death case, that re-evaluation

**JA3187**

necessarily entails a trial court revisiting the 18 U.S.C. § 3553(a) factors. *Flack*, 941 F.3d at 241; *Palmer*, 854 F.3d at 47. In a death case, it necessarily entails a jury revisiting the life/death determination under 18 U.S.C. §§ 3591 – 3593 in the first instance.

In crafting a remedy for Mr. Barnette's meritorious challenges to his unlawful convictions under counts 1, 2, 3, 8, 10, and 11, the Court must satisfy the purpose of Section 2255, which is to "place the defendant in exactly the *same* position he would have been had there been no error in the first instance." *United States v. Louthian*, 771 Fed. Appx. 208, 209 (4th Cir. 2019) (quoting *United States v. Hadden*, 475 F.3d  661, 665 (4th Cir. 2007) (emphasis in original). A mere sentence correction will not put Mr. Barnette in "exactly the same position he would have been" at sentencing had there been no error. That is because it is impossible to conclude with any confidence that the sentencing jury was wholly unaffected in its life-or-death determination by the instructions they received before sentencing deliberations. For example, the jury was instructed to accept findings of guilt based on unlawful counts in the indictment. *See* 8/12/02 Tr. 3992 ("Now, then, members of the jury, the defendant has been found guilty of the offense[] alleged in Count … 11 of the indictment."). The jury also received multiple pages worth of instructions about count 11—the only capital count concerning Robin Williams, Mr. Barnette's ex-girlfriend, which under *Johnson* is unlawful. It would therefore be inappropriate—as well as impossible—for the Court here to step into the shoes of the jury and draw that conclusion by way of a mere "correction" of Mr. Barnette's sentence.

Indeed, the only remedy that will put Mr. Barnette in the same position he would have been had there been no illicit counts 1, 2, 3, 8, 10, and 11 is a full re-sentencing on

**JA3188**

the non-invalidated capital counts. That is especially so because in this case, a death penalty case, the need for "reliable decisionmaking" in sentencing is "acute." *Deck v. Missouri*, 544 U.S. 622, 632 (2005). Indeed, in a non-capital case, in the wake of the invalidation of a § 924(c) conviction, the need for scrupulously reliable sentencing customarily results in full re-sentencing, rather than sentence correction, under the sentencing package doctrine. It is unfathomable that the same result would not obtain in a capital case like Mr. Barnette's.

A judge's determination of the appropriate sentence in a multi-count conviction case and the jury's life-or-death decision in a capital case are both holistic endeavors. *Compare United States v. Ventura*, 864 F.3d 301, 309 (4th Cir. 2017) ("The sentencing package doctrine accounts for the holistic approach that a district court should employ when sentencing a defendant convicted of multiple offenses.") *with* 8/12/02 Tr. 3997 (instruction to Mr. Barnette's jury that "[i]n making all of the determinations you are required to make in the sentencing phase, you may consider any evidence that was presented during the sentencing hearing in which you just participated over the last several weeks."). Thus, just as the sentencing package doctrine recognizes that "merely excising the mistaken sentence for one count won't put the defendant in the same position as if no error had been made," *Brown*, 879 F.3d at 1239, merely excising Mr. Barnette's invalid convictions and death sentence for count 11 will not put him in the same position as if the jury had never considered and deliberated about them. But putting him in the same position is what the habeas corpus statute requires. *See Louthian*, 771 Fed. Appx. at 209 (citing *Hadden*, 475 F.3d at 665).

In fact, in this case, full resentencing is even more essential and more appropriate than in the typical non-capital sentencing package context. That is because "[t]he fundamental respect for humanity underlying the Eighth Amendment's prohibition against cruel and unusual punishment gives rise to a special need for reliability in the determination that death is the appropriate punishment in any capital case." *Johnson*, 486 U.S. at 584 (internal citation and quotations omitted); *see also Deck*, 544 U.S. at 632. But there is another reason: in this case, a death penalty case, a jury, rather than a judge, drove the sentencing determination.

When a Section 924(c) conviction is invalidated in a non-capital case, the sentencing package doctrine applies as a matter of course to require full resentencing. That is so even though the district court itself imposed the original sentence and arguably could "correct" that total sentence, without resentencing, based on its presumptive knowledge of whether and how the invalidated conviction influenced the sentence. By contrast, in a capital case, the district court has no knowledge of whether the invalidated conviction affected a death sentence: the jury, not the court, made the critical sentencing determination. Inasmuch as the sentencing package doctrine prophylactically obligates a district court to conduct a resentencing as a matter of course in the wake of the invalidation of one Section 924(c) conviction, even though the district court itself determined the entire original sentence, it would be anomalous and illogical for a district court simply to correct a sentence, without a new sentencing hearing, in the wake of the invalidation of multiple convictions in a death penalty case—including a capital count upon which the death penalty was returned by a jury.

**JA3190**

## CONCLUSION

For the foregoing reasons, as well as those set forth in Mr. Barnette's prior briefing, the convictions and sentences on counts 1, 2, 3, 8, 10, and 11 should be vacated, Mr. Barnette's remaining sentences should be vacated and set aside, and Mr. Barnette should be granted a resentencing on the remaining counts of conviction.

Dated: February 20, 2020

/s/ Mark E. Olive
N.C. State Bar No. 10615
LAW OFFICES OF MARK OLIVE
320 W. Jefferson Street
Tallahassee, FL 32301
850-224-0004 (tel)
850-224-3331 (fax)
meolive@aol.com

/s/ Jacob H. Sussman
N.C. Bar No. 31821
P.O. Box 79225
Waverly, MA 02479
857-242-6740 (tel)
jakesussmanlaw@gmail.com

**JA3191**

# CERTIFICATE OF SERVICE

The undersigned hereby certifies that he has served the foregoing motion with the Clerk of Court using the CM/ECF system, which will send notification of such filing to:

Anthony J. Enright
anthony.enright@usdoj.gov

Dated: February 20, 2020

/s/ Jacob H. Sussman
Counsel for Mr. Barnette

**JA3192**

AQUILIA MARCIVICCI BARNETTE,    )
    )
    Petitioner,    )
    )
v.    )    __ORDER__
    )
UNITED STATES OF AMERICA,    )
    )
    Respondent.    )
_____ )

**THIS MATTER** is before the Court upon Petitioner Aquilia Marcivicci Barnette's motion to vacate sentence filed pursuant to 28 U.S.C. § 2255 on June 19, 2013 (Doc. 48), motion for evidentiary hearing filed on December 22, 2014 (Doc. 73), and motion to supplement the motion to vacate, filed on June 24, 2016. (Doc. 119). For the reasons set forth below, the motions are denied.

## I.    PROCEDURAL HISTORY

This Court sentenced Petitioner to death following his conviction for various crimes relating to the murder of his ex-girlfriend, Robin Williams, in Roanoke, Virginia, and the carjacking and murder of Donald Lee Allen in Charlotte, North Carolina. United States v. Barnette, Case No. 3:97-cr-23. Petitioner first attempted to kill Williams by firebombing her apartment in Roanoke in April 1996, causing her to suffer second and third-degree burns. Following his return to Charlotte, Petitioner later purchased a shotgun which he used to carjack and murder Allen shortly before midnight on June 21, 1996, before driving on to Roanoke. After arriving at the home of Williams' mother, Petitioner entered the home and fired shots, chased Williams out of the home, and ultimately shot and killed Williams in front of her mother.

1

JA3193

Petitioner was convicted of the following 11 counts: (1) interstate domestic violence in violation of 18 U.S.C. § 2261(a) & (b); (2) use of a destructive device (firebomb), during a crime of violence in violation of 18 U.S.C. § 924(c)(1); (3) using and carrying fire and explosive materials during commission of felony, in violation of 18 U.S.C. § 844(h)(1); (4) making a false statement during the purchase of a firearm, in violation of 18 U.S.C. § 922(a)(6) & 924; (5) making a firearm by sawing off shotgun without complying with National Firearms Act, in violation of 26 § 5821, 5822, 5861(f), 5871; (6) possessing a firearm after having been convicted of a felony, in violation of 18 U.S.C. § 922(g)(1) & 924; (7) commission of carjacking resulting in death, in violation of 18 U.S.C. § 2119(3); (8) using and carrying firearm during crime of violence (carjacking) resulting in death, in violation of 18 U.S.C. § 924(c)(1) & (i)2(1); (9) transporting stolen vehicle in interstate commerce, in violation of 18 U.S.C. § 2312; (10) interstate domestic violence, in violation of 18 U.S.C. § 2261(a)(1) & (b)(1); and (11) using and carrying a firearm during crime of violence (interstate domestic violence) resulting in death, in violation of 18 U.S.C. § 924(c)(1) & (i)2(1). No witnesses disputed the facts at trial and Petitioner was found guilty of all 11 counts. Following a separate penalty phase trial, the jury recommended a death sentence on Counts 7, 8, and 11, with an aggregate term of life imprisonment on the remaining non-capital counts.

The Fourth Circuit Court of Appeals affirmed Petitioner's convictions but vacated the death sentence and remanded for resentencing due to the Court's refusing to allow expert surrebuttal testimony during the penalty phase. United States v. Barnette, 211 F.3d 803, 825-826 (4th Cir. 2000). Following a second penalty phase trial in 2002, Petitioner was again sentenced to death on Counts 7, 8, and 11, which the appellate court affirmed. United States v. Barnette, 390 F.3d 775 (4th Cir. 2004). Upon certiorari review, the Supreme Court vacated Petitioner's death

sentence and remanded the matter for further consideration in light of <u>Miller-El v. Dretke</u>,[1] 545 U.S. 231, 125 S.Ct. 2317, 162 L.Ed.2d 196 (2005). <u>Barnette v. United States</u>, 546 U.S. 803, 126 S.Ct. 92, 163 L.Ed.2d 32 (2005). Following a limited hearing and in camera review of jury questionnaires and notes, this Court reaffirmed its ruling that the prosecution's peremptory strikes did not constitute any <u>Batson</u> violation. The Fourth Circuit affirmed the decision, <u>United States v. Barnette</u>, 644 F.3d 192 (4th Cir. 2011), and the U.S. Supreme Court denied certiorari review. <u>Barnette v. United States</u>, 565 U.S. 1263, 132 S.Ct. 1740, 182 L.Ed.2d 534 (2012).

On June 19, 2013, Petitioner filed his motion to vacate sentence pursuant to 28 U.S.C. § 2255, raising the following claims: 1) ineffective assistance of counsel; 2) improperly conducted <u>Batson</u> proceeding; 3) misconduct related to the jury; 4) constitutional violation resulting from decision to federally prosecute; 5) prosecutorial violations; 6) unconstitutionality of federal death penalty; 7) unconstitutionality of manner of federal execution; and 8) cumulative error. (Doc. 48). Petitioner seeks an evidentiary hearing on his motion. (Doc. 73). On June 24, 2016, Petitioner moved to supplement his motion with additional claims challenging his convictions in Counts 1, 2, 3, 8, 10, and 11. (Doc. 119).

These matters have been fully briefed and are now ripe for disposition.

## II.     STANDARD OF REVIEW

A prisoner convicted of a federal offense may collaterally attack a conviction or sentence under the following four grounds: 1) the sentence was imposed in violation of the Constitution or laws of the United States; 2) the court was without jurisdiction to impose the sentence; 3) the sentence was in excess of the maximum authorized by law; or 4) the sentence is otherwise subject to collateral attack. 28 U.S.C. § 2255(a). Section § 2255 is designed to correct fundamental errors

---

[1] The Supreme Court clarified the procedure for evaluation of claims of purposeful discrimination during jury selection under <u>Batson v. Kentucky</u>, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986).

which would "inherently result[ ] in a complete miscarriage of justice." <u>United States v. Addonizio</u>, 442 U.S. 178, 185, 99 S.Ct. 2235, 60 L.Ed.2d 805 (1979)(quoting <u>Hill v. United States</u>, 368 U.S. 424, 428, 82 S.Ct. 468, 471, 7 L.Ed.2d 417 (1962)).  In a § 2255 proceeding, the petitioner bears the burden of proving his claims by a preponderance of the evidence.  <u>Miller v. United States</u>, 261 F.2d 546, 547 (4th Cir. 1958).

### III. DISCUSSION

#### A. Necessity for Evidentiary Hearing

The court need not hold an evidentiary hearing on a § 2255 motion if "the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief." 28 U.S.C. § 2255(b).  The determination of whether to hold an evidentiary hearing is ordinarily left to the sound discretion of the court.  <u>Raines v. United States</u>, 423 F.2d 526, 530 (4th Cir. 1970). "Evidentiary hearings on § 2255 petitions are the exception, not the norm, and there is a heavy burden on the petitioner to demonstrate an evidentiary hearing is warranted."  <u>Moreno-Morales v. United States</u>, 334 F.3d 140, 145 (1st Cir. 2003).  Upon review of Petitioner's § 2255 claims and the record, the Court concludes that an evidentiary hearing is not required. Accordingly, Petitioner's motion for an evidentiary hearing (Doc. 73) is denied.

#### B. Initial § 2255 Claims

##### 1. <u>Ineffective Assistance of Counsel</u>

Petitioner's ineffective assistance claims are directed at his trial counsel for the 2002 resentencing penalty phase trial.

###### a. Legal Standard

The right to counsel guaranteed by the Sixth Amendment includes the "right to the effective assistance of counsel."  <u>Strickland v. Washington</u>, 466 U.S. 668, 686, 104 S.Ct. 2052, 80

4

**JA3196**

L.Ed.2d 674 (1984)(quoting <u>McMann v. Richardson</u>, 397 U.S. 759, 771 n. 14, 90 S.Ct. 1441, 1449, n. 14, 25 L.Ed.2d 763 (1970)).  To successfully challenge a conviction under § 2255 based on ineffective assistance of counsel, a petitioner must satisfy the two-prong test set forth in <u>Strickland</u>, which requires the petitioner show that: (1) "counsel's representation fell below an objective standard of reasonableness," and (2) counsel's deficient performance prejudiced the defense.  <u>Strickland</u>, 466 U.S. at 688, 692.

The first prong requires that petitioner show that counsel's performance was deficient by articulating specific acts or omissions that fell "outside the wide range of professionally competent assistance." <u>Id.</u> at 690.  However, when reviewing these alleged acts or omissions, courts must give substantial deference to counsel's strategic judgments. <u>Id.</u> at 691.  This requires the presumption that counsel "rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." <u>Burt v. Titlow</u>, 571 U.S. 12, 22, 134 S.Ct. 10, 187 L.Ed. 348 (2013)(quoting <u>Strickland</u>, 466 U.S. at 690).  The petitioner must show "that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment."  <u>Harrington v. Richter</u>, 562 U.S. 86, 104, 131 S.Ct. 770, 178 L.Ed.2d 624 (2011)(quoting <u>Strickland</u>, 466 U.S. at 687)).

To establish prejudice under the second prong, the petitioner must demonstrate that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." <u>Strickland</u>, at 694.  The petitioner must show that counsel's error worked to his "actual and substantial disadvantage," not merely that it created a "possibility of prejudice." <u>Satcher v. Pruett</u>, 126 F.3d 561, 572 (4th Cir.1997)(quoting <u>Murray v. Carrier</u>, 477 U.S. 478, 494, 106 S.Ct. 2639, 2648 (1986)).

**JA3197**

The court need not analyze both prongs if petitioner makes "an insufficient showing on one." <u>Debreus v. United States</u>, 2012 WL 3686250, *3 (D.S.C. Aug. 24, 2012)(citing <u>Strickland</u>, 466 U.S. at 697)). Failure to satisfy either prong is fatal to a petitioner's claim. <u>Fields v. Attorney Gen. of Maryland</u>, 956 F.2d 1290, 1297 (4th Cir. 1992)).

**b.      Failure to Conduct Adequate Investigation**

Petitioner alleges that trial counsel failed to adequately investigate and pursue readily available and important mitigating information about Petitioner's background.

**(i). Misuse of Investigative Resources**

Petitioner states that a serious reinvestigation into his background was warranted after counsel informed the Court in an *ex parte* filing that the social history presented at the 1998 trial was "superficial and not-sufficiently in depth." (Doc. 48, p. 63, Doc. 364, p.5, sealed). In the filing, counsel informed the Court of the defense's need to obtain a new mitigation specialist due to the first mitigation specialist's failure to develop rapport with Petitioner's family and friends and critical omissions in her background investigation. <u>Id.</u> However, despite having obtained a new mitigation specialist and private investigator in preparation for the resentencing trial, Petitioner now accuses trial counsel of making the same mistakes by failing to investigate and present adequate mitigation evidence.

Petitioner argues that trial counsel failed to use and supervise their new mitigation specialist, Cessie Alfonso. Petitioner alleges that counsel failed to ask Alfonso to speak with Petitioner's former girlfriends, failed to present sufficient evidence of Petitioner's prior relationships, ignored Alfonso's suggestions about powerful areas of mitigation, did not receive Alfonso's psycho-social report until one week before jury selection, and failed to provide defense experts with a copy of Alfonso's report. Petitioner claims this resulted in a significant amount of

6

**JA3198**

mitigating evidence not being shared with defense experts or presented to the jury.

Failure to conduct an "adequate investigation in preparing for the sentencing phase of a capital trial" may constitute ineffective assistance. Emmett v. Kelly, 474 F.3d 154, 161 (4th Cir. 2007)(citing Rompilla v. Beard, 545 U.S. 374, 380, 125 S.Ct 2456, 162 L.Ed. 2d 360 (2005)). However, "Strickland does not require counsel to investigate every conceivable line of mitigating evidence no matter how unlikely the effort would be to assist the defendant at sentencing." Id. (citing Wiggins v. Smith, 539 U.S. 510, 533, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003)). Nor does Strickland "impose a constitutional requirement that counsel uncover every scrap of evidence that could conceivably help their client." Id. (citing Tucker v. Ozmint, 350 F.3d 433, 442 (4th Cir. 2003)).

The record reflects that Petitioner presented a significant amount of mitigating evidence at trial. The defense concentrated their efforts on Petitioner's family background and upbringing, as well as his exposure to domestic violence, substance abuse, and neglect. In total, Petitioner presented thirteen witnesses. During his own testimony, Petitioner admitted responsibility for the murders of Williams and Allen, described the crimes in detail, and expressed remorse. (Transcript, p. 1095-1122, 1242).[2] Petitioner and other witnesses described his past relationships, including his relationship with Williams prior to and leading up to the firebombing of her apartment and murder. (Transcript, p. 1032-1074, 1171-1230, 1360-1364, 1479-1497, 1570-1573, 1616-1617, 1628-29).

---

[2] Citations to the trial transcript are taken from the Joint Appendix (Volume I-V) filed in the appeal from Petitioner's 2002 sentence, United States v. Barnette, Record No. 02-20, docketed in Case 3:97-cr-00023, Doc. 639-643, and identified by Bates number.

7

**JA3199**

Family members who testified for the defense included Petitioner's younger brother Mario Barnette, cousin Ahmad Cooper, and stepfather Derrick Barnette. Mario described Petitioner's childhood, witnessing violent fights between their parents, and Petitioner shielding Mario from the abuse. He also discussed the impact of their parents' separation and their mother's substance abuse, partying, and neglect. (Transcript, p. 1334-1365). Witnesses described the lack of care given to Petitioner and his brother, how they were left unsupervised, and how the boys slept on the floor and were often without food. (Transcript, p. 1159-1165, 1176-1177, 1409-1413, 1422, 1574-1575, 1595-1596, 1606-1607). The jury heard testimony regarding Derrick Barnette's abuse of Petitioner and Petitioner's mother, as well as Petitioner and his brother learning that Derrick Barnette was not their biological father and the detrimental effect of this news. (Transcript, p. 1151-1158, 1166-1168, 1304-1310, 1319-1321, 1338-1341, 1349-1350, 1384-1385, 1568, 1573, 1595, 1597, 1605). Also included in Petitioner's mitigation testimony were descriptions of his maternal grandparents, Jesse and Pearl Cooper. Jesse Cooper sustained combat injuries in the Korean War, leading to psychological issues and alcohol dependency. Following their divorce, Pearl Cooper was later murdered by her second husband. Testimony included the devastating effects of this murder on Petitioner's mother Sonia, and her sister. (Transcript, p. 1041-1042, 1293-99, 1336-1337, 1383-84, 1567, 1585, 1592-93).

Petitioner called three expert witnesses—Dr. Ann Burgess (domestic violence expert), Dr. Mark Cunningham (clinical and forensic psychologist), and Dr. Seymour Halleck (forensic psychiatry expert). These experts testified about Petitioner's background and mental health and explained how Petitioner's violent behaviors were associated with his domestic relationships. (Transcript, p. 1496-1497, 1572-1573). This testimony also explained Petitioner's diagnosis of borderline personality disorder as being characterized by fear of abandonment and fluctuations in

8

**JA3200**

mood, in addition to depression, withdrawal, substance abuse disorder, and signs of antisocial and narcissistic personality disorders. (Transcript, p 1381-1385, 1479-1497, 1551-1573, 1619-1623). Finally, the defense's mitigation presentation also included testimony concerning Petitioner's positive adjustment to prison and lack of disciplinary problems, and the rekindling of his relationships with his family and children. (Transcript, p. 1231-1242, 1432-1463, 1496-1497).

Upon review of the mitigation evidence presented by trial counsel, the Court concludes that the record contradicts Petitioner's assertions that counsel failed to investigate and present adequate mitigation evidence to the jury. To follow-up on the mitigation investigation that was performed for the first trial, counsel obtained a new mitigation specialist and investigator, and presented a significant amount of mitigating testimony as described above. This presentation included a thorough social history of Petitioner, as well as testimony from Petitioner himself, other witnesses, and experts regarding his past relationships. Petitioner cannot support his claim that trial counsel committed any errors by failing to task the mitigation specialist with speaking with Petitioner's former girlfriends. As discussed in subsection (e) below, the defense experts conducted their own interviews and review of records. Petitioner cannot establish that the defense experts did not review sufficient materials on which to base their opinions.

Considering the mitigation evidence presented at trial, Petitioner cannot show that counsel's actions fell below an objective standard of reasonableness. Petitioner is also unable to establish that he suffered prejudice as he cannot point to any omitted evidence that would have likely changed the outcome of trial had counsel introduced it. Therefore, this claim is denied.

### (ii). Failure to Re-interview 1998 Trial Witnesses

Petitioner claims counsel was ineffective for failing to re-interview certain witnesses who were either previously interviewed and/or previously testified at the 1998 trial.

**JA3201**

Petitioner alleges his childhood friend Steve Austin (witness for the Government at both the 1998 and 2002 trials) could have testified: 1) that Petitioner would retreat to Austin's home to sleep in order to avoid the chaos in his own home; 2) that Petitioner looked after Austin who suffered from sickle-cell anemia; 3) about circumstances leading up to Petitioner's move to Georgia after his parents' separation; 4) about Austin's visit with Petitioner in jail prior to the 2002 trial; and 5) the depth of their friendship.

Petitioner alleges these family members could have offered the following testimony: 1) Jean Nduly (cousin), as to the effect of Pearl Cooper's murder on Petitioner and his mother, the chaos of Petitioner's childhood home, her care of Petitioner when he was an infant, the aftermath of fights between Sonia and Derrick Barnette, and her interactions with Petitioner; 2) Jeff Nero (uncle), as to the abuse and neglect in Petitioner's childhood home, Petitioner and his mother moving in with his family after the murder of Pearl Cooper, the effect of Pearl Cooper's murder on Petitioner's mother, and his interactions with Petitioner; and 3) Shonda Nero (cousin), as to the chaos and violence experienced by Petitioner growing up and his past relationships with women. Petitioner also includes stepfather John West in this list but does not state what testimony West could have provided.

Petitioner claims that counsel should have re-interviewed Brian Ard, Petitioner's former boss at Camelot Records in Roanoke, Virginia, who fired Petitioner following sexual harassment allegations in 1996. Petitioner claims that Ard could have testified as to his observations of Petitioner and Robin Williams, Petitioner's promotion to Assistant Manager, how Petitioner maintained a good relationship with Ard following his termination and provided job references, and how Ard kept a picture of Petitioner's children on his office wall.

10

**JA3202**

Petitioner alleges counsel failed to re-interview former girlfriend Crystal Dennis, who testified for the Government at both the 1998 and 2002 trials. Dennis testified about an altercation between Petitioner and her half-brother Anthony Britt in May 1992, after Britt started dating Natasha Tolbert, the mother of Petitioner's children. Petitioner states that counsel could have elicited testimony that 1) Dennis' relationship with Petitioner was platonic until he was released from jail; 2) Petitioner believed Tolbert's had intensified her romantic relationship with Britt during the time Petitioner was in jail; 3) Petitioner's mood swings were inexplicable; 4) Petitioner made an effort to return to high school; and 5) the fathers of Dennis' children threatened Petitioner.

Whether to call witnesses is a decision by counsel "which the courts do not second-guess." Williams v. Carter, 76 F.3d 199, 200 (8th Cir.1996)(citing Sherrill v. Wyrick, 524 F.2d 186, 188, 190 (8th Cir.1975)). Courts should afford great deference to this strategic decision. United States v. Terry, 366 F.3d 312, 317 (4th Cir. 2004). "[C]omplaints of uncalled witnesses are not favored, because the presentation of testimonial evidence is a matter of trial strategy and because allegations of what a witness would have testified are largely speculative." Buckelew v. United States, 575 F.2d 515, 521 (5th Cir.1978). "[T]he failure to investigate everyone whose name happens to be mentioned by the defendant does not suggest ineffective assistance." Huffington v. Nuth, 140 F.3d 572, 580 (4th Cir. 1998)(quoting Gray v. Lucas, 677 F.2d 1086, 1093 n.5 (5th Cir. 1982)).

Petitioner cannot show counsel was ineffective for failing to re-interview and elicit testimony from the above listed witnesses. Significant testimony concerning Petitioner's childhood and background was provided by Petitioner, his stepfather Derrick Barnette, brother Mario, cousin Ahmad Cooper, as well as Petitioner's expert witnesses. Their testimony included the murder of Petitioner's grandmother and its effect on Petitioner's mother, as well as Petitioner's

11

domestic relationships, including his relationship with Williams. (Transcript, p. 1032-1074, 1171-1230, 1293-99, 1335-1367, 1383-1384, 1479-1497, 1570-1573, 1592-93, 1628-29, 1684). Petitioner's own testimony included a description of his relationship with Crystal Dennis and the altercation with Anthony Britt. (Transcript, p. 1186-1201). Petitioner's expert witnesses testified at length regarding Petitioner's upbringing and its effect on him, as well as his mood swings and mental health. (Transcript, p. 1372-1391, 1464-1497, 1541-1633, 1655-1668). Petitioner, corrections employees, and experts also testified about Petitioner's positive adjustment to prison. (Transcript, p. 1231-1235, 1432-1463, 1496-1497).

Petitioner's assertions about what these witnesses might have testified to is speculative, not to mention that most of this additional testimony would have been cumulative. See Hedrick v. True, 443 F.3d 342, 353 (4th Cir.2006)(counsel not ineffective for failing to call additional mitigation witnesses where testimony would have been duplicative). Petitioner cannot establish that it was unreasonable for counsel not to re-interview these witnesses or that had counsel done so, it would have resulted in a different outcome at trial. Therefore, this claim is denied.

<div align="center">

**c. Failure to Use Information Developed by Mitigation Specialist**

</div>

Petitioner argues that counsel received important information from the interviews conducted by mitigation specialist Cessie Alfonso but did not follow up on Alfonso's work or share information with defense experts or the jury. Based upon Alfonso's interviews, Petitioner claims that counsel could have elicited the following testimony from Natasha Tolbert, mother of Petitioner's children: 1) her recollections of first meeting Petitioner; 2) her belief that Petitioner was very troubled; 3) neglect by Petitioner's mother and her dismissiveness of Tolbert's concerns; and 4) Petitioner's turbulent mood swings.

<div align="center">

12

</div>

<div align="center">

**JA3204**

</div>

Petitioner alleges that Alfonso advised that the background of Petitioner's mother, Sonia Barnette, was critically important. Petitioner contends that counsel should have presented evidence of the aftermath of Sonia's parents' divorce, subsequent murder of her mother and the effect of those events on her and her sister, Jesse Cooper's Korean War experience and trauma, becoming a young mother, her abusive marriage to Derrick Barnette, her neglect of Petitioner and his brother, and her issues with drugs and alcohol. Petitioner also complains that counsel failed to introduce evidence about Petitioner learning Derrick Barnette was not the biological father of he and his brother, his mother's denial, and how it was well-known that Larry Wright was likely Petitioner's father. Petitioner claims counsel could have called Larry Wright to testify that it was a significant possibility that he might be Petitioner's father.

Petitioner cannot show that counsel was deficient in failing to present every detail revealed in Alfonso's investigation. As previously discussed, Petitioner presented a wealth of mitigating evidence, including testimony from witnesses, experts, and Petitioner himself concerning his life history and background. Counsel cross-examined Natasha Tolbert about meeting Petitioner, her observations of the neglect of Petitioner and his brother, and Petitioner's mental health. (Transcript, p. 835-844). Numerous witnesses testified about Petitioner's mother and her parents Jesse and Pearl Cooper, as well as the issue of Petitioner's unknown paternity. Petitioner cannot demonstrate counsel was ineffective for not calling Larry Wright to testify when it was pure speculation as to whether Wright is Petitioner's biological father. There is no evidence to indicate that counsel ignored or omitted any critical information. Petitioner cannot show that counsel was deficient with regard to the information gathered by Alfonso, nor can Petitioner show that he suffered prejudice. Therefore, this claim is denied.

13

**JA3205**

#### d. Failure to Interview Additional Mitigation Witnesses

Petitioner claims that counsel was ineffective for failing to interview numerous additional witnesses that counsel knew or should have known possessed mitigating evidence. Petitioner states that counsel failed to interview former girlfriends Sheila Sullivan, Temeka Hunter, Kowana Dozier, Beth Durant, and Ayanna Brewer-Beasley, who could have testified that their relationships with Petitioner were non-violent. Petitioner states that additional testimony could have been introduced that Sullivan was unfaithful to Petitioner, that Petitioner was assaulted by a fellow teenager with whom Sullivan later cheated, and that Petitioner attempted suicide following their relationship. Petitioner also states that counsel failed to interview childhood neighbors Wendy Sharpe, Regena Nero, and Delores Hart, who could have testified about Petitioner's chaotic childhood, the fighting between Petitioner's parents, the neglect of Petitioner and his brother, and Petitioner's grandparents, Jesse and Pearl Cooper.

As set forth above, there was substantial mitigation testimony presented at trial and Petitioner cannot show that these additional witnesses would have provided critical testimony that would have affected the outcome of trial. Petitioner's assertions as to the subject of their potential testimony is speculative. The jury heard extensive testimony regarding Petitioner's past relationships—including Petitioner's own description of his relationship with Sheila Sullivan and his suicide attempt following their break-up. Substantial testimony was also presented to the jury concerning Petitioner's background and childhood, the abuse and neglect he suffered at the hands of Sonia and Derrick Barnette, and the murder of his grandmother Pearl Cooper and its effects on the family. Additional testimony from these witnesses would have been cumulative. Counsel was not deficient for declining to interview these additional witnesses and Petitioner cannot show he suffered any prejudice. Petitioner cannot satisfy Strickland and therefore, this claim is denied.

14

**JA3206**

Petitioner claims trial counsel failed to provide defense experts with important mitigation and mental health information by having them rely on the investigative work from the mitigation specialist employed for the 1998 trial. Petitioner also alleges that trial counsel was ineffective for failing to impeach the Government's expert witness, Dr. Park Dietz, and for failing to call Dr. Sally Johnson to testify.

**(i).** **Dr. Seymour Halleck & Dr. Mark Cunningham**

Petitioner alleges that due to counsel's failure to provide readily available information, forensic psychiatrist Dr. Seymour Halleck abandoned an earlier suspicion from his 1997 report that Petitioner might also suffer from a mood disorder in addition to his diagnosis of Borderline Personality Disorder. Petitioner states that his former girlfriend, Natasha Tolbert, informed mitigation specialist Cessie Alfonso that she tried to tell Petitioner's mother that something was wrong with him and that Petitioner's mood swings were so dramatic she did not feel she could leave his side. However, Petitioner states that this information was not provided to the defense experts.

Petitioner submits a report from Dr. Richard Dudley, a psychiatrist retained by postconviction counsel, who Petitioner claims could now testify at an evidentiary hearing that Petitioner also suffered from a serious and independent mood disorder. (Doc. 74-6, p.1-15, ¶69). Petitioner states that Dudley's testimony shows that Petitioner's behavior was not simply "reactive" but was "powerfully and uncontrollably driven by a genetic etiology." (Doc. 48, p. 66).

As to forensic psychologist Dr. Mark Cunningham, Petitioner argues that counsel's failure to provide information from the mitigation specialist exposed him to impeachment. Petitioner states that the mitigation specialist urged counsel to consider the impact of Jesse Cooper's combat

injuries and mental health issues and that counsel's failure to introduce Cooper's military and medical records left the defense vulnerable to attacks. Petitioner cites to an instance where the Government attacked Cunningham's credibility for relying on an assessment by Jesse Cooper's daughter that Cooper was "psychiatrically disabled." (Transcript, p. 1690-1691). Petitioner cites another where the Court sustained a lack of evidence objection to Dr. Cunningham's testimony that Petitioner's mother "insists that the paternity tests were rigged." (Transcript, p. 1610).

Petitioner cannot establish that counsel was ineffective for failing to provide Dr. Halleck with the information from Natasha Tolbert contained in Alfonso's report regarding Tolbert's observations and concerns about Petitioner's mood swings. Petitioner's assertions are speculative, and he provides no affidavit or evidence from Dr. Halleck to state that this information would have altered his opinion. The record reflects that Dr. Halleck conducted his own interviews of Petitioner—four in 1997 and four in 2002, as well as interviewed Natasha Tolbert, Derrick Barnette and Sonia Barnette prior to the 2002 trial, in addition to reviewing a wealth of records. (Transcript, p. 1377-1378). Dr. Halleck testified as to Petitioner's fluctuations in mood as well as Petitioner's family background, including abuse by his stepfather, the murder of his grandmother and its effect on his mother, his exposure to violence, and Petitioner's discovery that Derrick Barnette was not his biological father. (Transcript, p. 1381-1385).

Petitioner's assertion that a new expert, Richard Dudley, could now testify that Petitioner suffered from an independent mood disorder is of no consequence. "A postconviction petition does not show ineffective assistance merely because it presents a new expert opinion that is different from the theory used at trial." Waldrop v. State, 987 So.2d 1186, 1193 (Ala. Crim. App. 2007)(citing State v. Combs, 652 N.E. 2d 205, 213 (1994)). "It will nearly always be possible in cases involving the basic human emotions to find one expert witness who disagrees with another

16

**JA3208**

and to procure an affidavit to that effect from the second prospective witness." <u>Waye v. Murray</u>, 884 F.2d 765, 766-67 (4th Cir. 1989). Petitioner can show no ineffectiveness on part of counsel for failing to provide information to Dr. Halleck or that he suffered any prejudice.

Petitioner also cannot establish that counsel was ineffective for failing to introduce the medical and mental health records of Jesse Cooper or for Dr. Cunningham receiving a sustained lack of evidence objection for his statement about Sonia Barnette's paternity test suspicions. Dr. Cunningham testified that he interviewed Petitioner several times for more than 18 hours, as well as interviewed Sonia Barnette, Derrick Barnette, Mario Barnette, Sheila Cooper, Steve Austin, Brian Ard, Shanda Nero, Tony Harrison, police officer Elizabeth Joy, and Dr. Sally Johnson. (Transcript, p. 1549-1550). Dr. Cunningham conducted an extensive records review, including medical and mental health records, school records, trial transcripts—what he termed "a suitcase full of records." (Transcript, p. 1550-1551).

Petitioner submits a post-conviction affidavit from Dr. Cunningham, stating that trial counsel did not share Cessie Alfonso's mitigation report, Jesse Cooper's medical or military records, or provide access to other social history witnesses.[3] (Doc. 118-2, p. 2, ¶11). Dr. Cunningham states that because he did not have this information, his expert opinion was unknowingly incomplete and rendered him vulnerable to impeachment. <u>Id.</u> However, Dr. Cunningham does not state how his opinion would have changed had he been provided with additional information from trial counsel. Dr. Cunningham also acknowledges that Dr. Dudley makes a strong case in his post-conviction report that Petitioner was suffering from a longstanding mood disorder but stops short of changing his opinion or diagnosis. (Doc. 118-2, p. 2, ¶13).

---

[3] Dr. Cunningham's post-conviction affidavit is submitted upon his review of trial testimony, as well as post-conviction materials including reports of Dr. Richard Dudley and Zachary Rowles, mitigation report of Cessie Alfonso, and pleadings and affidavits filed in this post-conviction proceeding. (Doc. 118-2, p. 2, ¶9).

Petitioner cannot establish counsel was ineffective for not providing the defense experts with more information, nor can Petitioner demonstrate that a different outcome would have resulted had counsel done so. As such, Petitioner fails to establish any ineffective assistance on part of counsel and therefore, this claim is denied.

### (ii). Dr. Ann Burgess

Petitioner claims that counsel's failure to provide experts with readily available information resulted in a highly aggravating and inaccurate diagnosis by Dr. Ann Burgess, Petitioner's domestic violence expert. Petitioner states that Dr. Burgess was not provided with Cessie Alfonso's mitigation report or interview summaries, which prevented her from having a complete picture of Petitioner's family history. Petitioner states that Dr. Burgess was unaware of the trauma caused to Sonia Barnette following her parents' divorce and her mother's subsequent murder, the extent of Jesse Cooper's combat trauma and alcoholism, the manner in which Petitioner's paternity was handled, the fact that Petitioner would run away to neighbors' homes as a child, and the complete picture of Petitioner's relationships, including that they did not fit the "pattern" of violence she described at trial. Dr. Burgess testified that Petitioner was involved in a "crime spree" that extended from the firebombing of Robin Williams' residence to the murders of Williams and Donald Allen, reflecting a pattern with his relationships and a cycle of violence which was rooted in the way he was raised and developed. (Transcript, p. 1478-1482). However, Petitioner alleges that had she been supplied with the report, it would have materially affected her expert opinion.

Dr. Burgess states that she would now testify differently after having reviewed Alfonso's mitigation report, along with the post-conviction report from Dr. Richard Dudley and post-conviction mitigation report from Zachary Rowles. (Doc. 74-3, p. 1-5). She says her prior

emphasis on multi-generational violence was misplaced and that she would now opine that Petitioner was experiencing a "psychotic episode" and "mental health crisis," as well as suffered from a mood disorder. (Doc. 74-3, p. 1-5, ¶11). [4]

Petitioner cannot demonstrate that trial counsel was ineffective for failing to provide Dr. Burgess with Cessie Alfonso's report. Trial counsel Jean Lawson states in her post-conviction affidavit that Alfonso did not provide her mitigation report to defense counsel until one week after Dr. Burgess submitted her report. (Doc. 74-3, p. 48, ¶27). Dr. Burgess conducted her own extensive investigation, including review of Petitioner's school, employment, medical and other records, mental health reports, testimony from the 1998 trial, prison records, interviews, trial transcripts, and police reports. (Transcript, p. 1477). She also interviewed Petitioner twice in 2002, as well as interviewed Sonia Barnette, Derrick Barnette, and Mario Barnette. (Transcript, p. 1476-1477). Dr. Burgess also spoke with Alfonso on one occasion. (Doc. 74-2, p. 3, ¶17). Petitioner cannot establish that counsel's poor performance caused any omissions in her investigation. Additionally, Dr. Burgess' new opinion that Petitioner suffered a "psychotic episode" would contradict forensic psychologist expert Dr. Mark Cunningham, who testified that there was no indication Petitioner was psychotic at the time of his crimes. (Transcript, p. 1551-1552).

Based on the foregoing, Petitioner cannot establish that counsel was constitutionally deficient for not ensuring Dr. Burgess was provided with Alfonso's report, nor can he demonstrate that he suffered prejudice. Therefore, this claim is denied.

---

[4] Dr. Burgess bases her new opinion not only on Alfonso's report, but also the post-conviction reports of Zachary Rowles and Dr. Richard Dudley, which were previously unavailable. (Doc. 74-3, p. 1-5, ¶8).

**JA3211**

The Government called as a rebuttal expert forensic psychiatrist Dr. Park Dietz, who disagreed with the defense experts' opinions that Petitioner's violent activities were confined to domestic relationships or motivated by domestic violence. (Transcript, p. 1776-1778).

Petitioner accuses counsel of ineffective assistance for failing to impeach Dr. Dietz concerning false testimony he provided a few months prior in the high-profile case against Andrea Yates, a Texas mother who drowned her children in the bathtub and claimed insanity as a defense to the crimes. Petitioner states that Dr. Dietz testified that he was a consultant for the television program "Law & Order" and that Yates "got the idea to drown her children from an episode of "Law & Order" in which a mother was acquitted on an insanity defense after drowning her children in a bathtub." (Doc. 48, p. 72).[5] However, it was later revealed that Dr. Dietz had provided false testimony, as no such episode of "Law & Order" ever produced. The prosecution abandoned its death penalty request and Yates was found guilty in March 2002. However, Yates' murder convictions were overturned in 2005 and she was found not guilty by reason of insanity.

Petitioner argues that due to the timing of the disclosure in the Yates case, trial counsel should have been able to discover Dietz's false testimony and use it for impeachment. In the alternative, Petitioner argues that this should also be a Brady/Giglio claim against the Government due to the Government's failure to disclose this information to trial counsel.

Petitioner cannot establish that counsel was ineffective for failing to impeach Dr. Dietz with respect to his testimony in the Yates trial. "Defense counsel constantly must decide what questions to ask and how much time to spend on a particular witness. These are precisely the types

---

[5] In its decision reversing Yates' convictions, the First District Court of Appeals of Texas noted that while "Dr. Dietz did not suggest in his testimony that Yates used the plot of the show to plan killing her children," the prosecution did so by suggesting in its closing argument that Yates patterned her actions after the "Law & Order" episode. Yates v. State, 171 S.W.3d 215, 218-222 (Tex. App. 2005).

20

of tactical decisions a court is not supposed to second guess." <u>Higgs v. United States</u>, 711 F.Supp.2d 479, 515 (D. Md. 2010)(citing <u>Byram v. Ozmint</u>, 339 F.3d 203, 209 (4th Cir. 2003)).

Petitioner presents no evidence to show that any members of the defense team had knowledge of Dr. Dietz's false testimony in the Yates trial or that they acted unreasonably by failing to discover this line of impeachment.  Both trial counsel Jean Lawson and investigator Jan Barefoot stated in their post-conviction affidavits that they investigated Dr. Dietz's background, with Attorney Lawson noting that she spent a great deal of time reviewing testimony from prior cases in which he testified.  (Doc. 74-2, p. 15, ¶6; Doc. 74-3, p. 49, ¶30).  Petitioner cannot demonstrate he suffered prejudice because he cannot show that had trial counsel impeached Dr. Dietz regarding his false testimony, that it would have resulted in a different outcome at trial.  As such, Petitioner cannot satisfy either prong of <u>Strickland.</u>

Additionally, Petitioner presents nothing to suggest that the Government was aware of Dietz's false testimony, and therefore cannot establish any <u>Brady</u>/<u>Giglio</u> claim.  Based on the foregoing, this claim is denied.

### (iv). Dr. Sally Johnson

Petitioner asserts that counsel was ineffective for failing to consult with and call as a witness Dr. Sally Johnson, a forensic psychiatrist employed at the Federal Correctional Institution at Butner, North Carolina, who was previously appointed to evaluate Petitioner and testified in the 1998 trial as to Petitioner's competency.  Petitioner argues that had counsel called Dr. Johnson as a witness, she would have been able to testify to a number of mitigating issues featured in her 1998 testimony, including Petitioner's positive institutional adjustment, expressions of remorse, and mental illness.

Petitioner cannot establish that counsel was ineffective for failing to call Dr. Sally Johnson as a witness.  The decision to call witnesses is a classic tactical decision, not to be second-guessed.  Sampson v. United States, 2001 WL 34563140, *5 (W.D.N.C. July 25, 2001)(citing Strickland, 466 U.S. at 689).  The record reflects that the jury heard substantial testimony concerning Petitioner's institutional adjustment, mental health issues, and remorse from Petitioner himself and from other witnesses, including correctional employees and experts.

Dr. Johnson testified at the first trial and counsel was therefore aware of the substance of her testimony.  See Alexander v. United States, 2009 WL 1542550, *4 (D.Md. May 28, 2009)(counsel not ineffective for choosing not to call witness in second trial that previously testified in first trial, as counsel was aware of substance of testimony and strategic decision not to call witness should be upheld).  The experts called by the defense also reviewed Dr. Johnson's report as part of their investigations.  (Transcript, p. 1392, 1515, 1520-1521, 1628).  As such, Petitioner cannot establish that counsel was ineffective for failing to call Dr. Johnson as a witness, nor can Petitioner establish that he suffered prejudice because of counsel's decision not to call Dr. Johnson.  Therefore, this claim is denied.

### f.      Failure to Advise Petitioner Not to Testify

Petitioner claims that trial counsel was ineffective for failing to advise him not to testify, failing to properly prepare him to testify, and failing to frame his testimony in the context of his mental health issues.  Petitioner argues that in testifying about his role in the charged crimes, prior relationships, and his upbringing, he essentially served as his own mitigation specialist.  Petitioner states that due to his mental health issues, portions of his testimony were inaccurate and highly aggravating, leading the Government to characterize him as a "spin artist."

22

**JA3214**

An ineffective assistance of counsel claim regarding counsel's failure to inform a defendant of his right to testify (or not testify) must satisfy the two-prong test set forth in <u>Strickland</u>. <u>Sexton v. French</u>, 163 F.3d 874, 882 (4th Cir. 1998). However, the Fourth Circuit has cautioned that counsel's advice on whether a client should testify "is a paradigm of the type of tactical decision that cannot be challenged as evidence of ineffective assistance." <u>Carter v. Lee</u>, 283 F.3d 240, 249 (4th Cir. 2002)(quoting <u>Hutchins v. Garrison</u>, 724 F.2d 1425, 1436 (4th Cir. 1983)).

As discussed at length above, significant mitigation evidence was presented to the jury on behalf of the defense, including numerous mitigation witnesses. The jury heard lengthy testimony regarding Petitioner's mental health issues and background, so Petitioner cannot contend that he served as his own mitigation specialist. The presentation of mitigation evidence and witnesses, along with Petitioner's own testimony, was undoubtedly part of the defense team's strategy and efforts to persuade the jury not to impose a death sentence. In light of the overwhelming evidence against Petitioner, it was not unreasonable for the defense to decide the jury should hear from Petitioner himself. As indicated by the jury verdict, the jury did find in Petitioner's favor as to several of the mitigating factors. (Case 3:97-cr-00023; Docs. 596-598).

Petitioner provides nothing more than conclusory allegations that counsel was ineffective for failing to advise him not to testify. Petitioner has put forth nothing to support his claims that counsel's conduct fell outside the range of professional standards. <u>See</u> <u>United States v. Terry</u>, 366 F.3d 312, 316 (4th Cir. 2004)("[C]onclusory allegations are insufficient to establish the requisite prejudice under <u>Strickland</u>). Petitioner cannot establish counsel's performance fell below an objective standard of reasonableness or that if he had not testified, it would have changed the outcome of trial. Therefore, this claim is denied.

**Failure to Investigate and Present Evidence Regarding Institutional Adjustment/Meaningful Relationships**

Petitioner alleges that counsel was ineffective for failing to investigate and present additional evidence regarding his positive adjustment to prison. Petitioner states that counsel made a gaping omission by failing to explain to the jury that Petitioner's mental health issues and mood disorders were better controlled and managed in prison, and that counsel should have presented expert testimony as to Petitioner's positive response to structure. Petitioner also states that counsel failed to present evidence showing he maintained and developed meaningful relationships with family and friends since his imprisonment. Petitioner argues these witnesses could have testified about his connectedness with his half siblings, how he would send family members artwork, and his interest in maintaining his relationship with Natasha Tolbert and their two children.

Petitioner cannot establish that counsel was ineffective for failing to present additional evidence regarding his positive adjustment to prison. The record reflects that there was ample testimony regarding Petitioner's adjustment to prison. Petitioner himself testified about his positive adjustment and good behavior, as well as how he became employed as a prison orderly. (Transcript, p. 1231-1235). Numerous corrections employees were called by the defense and testified as to Petitioner's lack of disciplinary problems, and there was expert testimony explaining that his positive adjustment was due to the fact that his difficulties and violence arose in the context of domestic relationships. (Transcript, p. 1432-1463, 1496-1497, 1572). Dr. Burgess explained that Petitioner's misconduct was limited to the context of domestic relationships, stating that he "[d]oes what he's supposed to do when he's in a structured setting." (Transcript, p. 1496-1497).

Petitioner also fails to demonstrate that counsel was ineffective for failing to present additional testimony regarding his personal relationships after imprisonment. Natasha Tolbert testified that Petitioner corresponded with her after he went to prison and that she had taken their

24

**JA3216**

kids to visit him. (Transcript, p. 833-834, 841-842). Petitioner testified to reestablishing his relationship with his children and his recent correspondence with them. (Transcript, p. 1241-1242). Petitioner's stepfather Derrick Barnette testified that he had recently accompanied Natasha Tolbert and Petitioner's daughter to visit him a week before trial, and Petitioner's brother testified he had also visited his brother. (Transcript, p. 1334, 1361).

Based on the foregoing, Petitioner cannot establish that counsel was ineffective for failing to call additional witnesses to testify as to Petitioner's prison adjustment and maintaining his personal relationships. There was sufficient testimony on these issues and counsel cannot be deemed ineffective for failing to call witnesses to give cumulative testimony. See United States v. Dehlinger, 740 F.3d 315, 324-325 (4th Cir. 2014). Therefore, this claim is denied.

### h. Failure to Request Continuance

Petitioner argues that trial counsel were ineffective for failing to move to continue the penalty phase trial despite being unprepared and needing additional time. Petitioner claims they were scrambling on the eve of and during trial to uncover information that should have been investigated and developed well in advance. Petitioner cites to jail visitation records and states that in the six and a half months before trial, Attorney Jean Lawson met with Petitioner three times for a total of five hours and forty-five minutes, and that there were no visits between Petitioner and Attorney Claire Rauscher (who later withdrew and was replaced by Attorney Harold Bender), investigators, or experts. Petitioner also alleges that counsel delayed in requesting expert and investigative funding, in conferring with those involved in the 1998 trial, and in preparing for trial due to other cases and responsibilities.

Petitioner cites to a February 26, 2002 *ex parte* hearing regarding the defense's budgetary needs, wherein Attorney Bender informed the Court that the defense team had been "burning the

25

**JA3217**

midnight oil" in preparation for trial, stating "[w]e don't want this case continued." (Case 3:97-cr-00023; Doc. 688, p. 2-3, sealed). Petitioner states that Attorney Bender had no basis for making this promise, as the defense's mitigation investigation was barely underway, experts had not yet been engaged, and counsel was failing to adequately supervise the defense's mitigation specialist. Petitioner alleges that the defense's preparation fell short and resulted in disorganization and an absence of coherent strategy.

Petitioner's opinion regarding counsel's performance cannot support an ineffective assistance claim. "[T]he trial lawyers, in every case could have done something more or something different. So, omissions are inevitable. But, the issue is not what is possible or 'what is prudent or appropriate, but only what is constitutionally compelled'." Chandler v. United States, 218 F.3d 1305, 1313 (11th Cir. 2000)(quoting Burger v. Kemp, 483 U.S. 776, 794, 107 S.Ct. 3114, 97 L.Ed.2d 638 (1987)). See also United States v. Mayo, 646 F.2d 369, 375 (9th Cir. 1981)(difference of opinion as to trial tactics does not constitute deficient performance).

As discussed above, defense counsel gathered and presented a wealth of mitigation evidence on Petitioner's behalf concerning his background and mental health. This presentation clearly involved strategic decision-making regarding what information to present to the jury. Attorney Bender's statement to the Court that the defense did not wish to seek a continuance indicates the defense felt they were adequately preparing for and able to try the case. The entirety of Attorney Bender's statement to the Court was as follows:

> "...The trial date is scheduled for July 15th, 2002. And in order for us to get ready for that, we have literally been burning the midnight oil. We don't want this case continued. We're not going to ask for this case to be continued. I don't think Your Honor wants it continued -- --in any way. And I don't think the client wants it to be continued. And I'm sure the government doesn't. So in order to get ready and adequately prepare, we have got to spend an inordinate amount of time. We have already spent a great deal of time. Every Saturday and Sunday since I've been appointed I've done something in this case, whether it's reading the transcript or

26

**JA3218**

> reviewing discovery, you know, reading testimony of witnesses, trying to determine which witnesses we're going to call, meeting with experts and the family. We've done that on several Saturdays. So in order to prepare adequately, we're just going to have to spend the time necessary to get it ready, and that -- that is one of the reasons for the case budget..."

(Case 3:97-cr-00023; Doc. 688, p. 2-3, sealed). There is nothing in the record that indicates defense counsel were unprepared during trial or struggling to proceed. Attorneys Lawson and Rauscher were appointed on February 13, 2001, and Attorney Bender was appointed to replace Rauscher on January 14, 2002. Jury selection began on July 15, 2002 and counsel had many months in which to prepare. Given that this was a re-trial of the sentencing phase, counsel already had a previous record available from which to work. The defense team's review of materials included "18 boxes of files from prior counsel, 15 volumes of transcripts from the first trial, and one box of discovery." (Doc. 74-4, p. 29, ¶ 5). Defense counsel also hired a second mitigation specialist and an investigator for assistance with their preparations. (Doc. 74-3, p. 45, ¶10).

Petitioner's claims are conclusory and speculative and lack factual support to establish ineffectiveness on part of trial counsel. Petitioner does not explain how counsel's actions resulted in disorganization or an absence of strategy. Petitioner provides no facts showing how counsel was unprepared and fails to demonstrate that counsel's actions or inactions affected the outcome of Petitioner's trial. Petitioner is unable to establish he suffered prejudice as he cannot show that his trial would have resulted in a different outcome had counsel requested a continuance. As such, he cannot satisfy Strickland and this claim is therefore denied.

### i.      Failure to Maintain and Preserve Files

Petitioner argues that trial counsel's failure to maintain and preserve files gives rise to a constitutional violation. During a September 17, 2012 *ex parte* hearing, former trial counsel Harold Bender, who was semi-retired at the time, acknowledged on the record that he was the last among Petitioner's counsel to possess trial files and that he had been unable to locate them. (Doc.

27

**JA3219**

17, p. 1). Petitioner states that while Attorney Bender produced approximately 300 pages prior to his March 2013 death, Petitioner claims approximately 40 to 50 boxes of files have not yet been located. (Doc. 48, p. 4, n. 1).

Following the hearing, this Court ordered the Government to provide to Petitioner's habeas counsel all discovery previously disclosed to Petitioner's 1998 and 2002 trial counsel, including witness statements, statements and documents produced pursuant to the Federal Rules of Criminal Procedure or the Federal Rules of Evidence, all <u>Brady</u> material, and correspondence between the prosecution and defense. (Doc. 17). The Government provided a diskette to Petitioner with over 3,000 pages of materials in November 2012, followed by nineteen additional diskettes of materials in March 2013. (Doc. 64). Petitioner filed a motion seeking additional discovery from the Government, which the Court denied for lack of good cause. (Docs. 51, 62).

In light of the efforts made to provide Petitioner with complete records, Petitioner cannot articulate how he has been prejudiced by failing to receive Attorney Bender's trial files, nor can he describe how he has been unable to pursue his § 2255 claims. Petitioner has filed a lengthy § 2255 motion with numerous grounds, as well as a motion seeking to add additional claims.

A § 2255 proceeding enables the petitioner to collaterally attack his or her sentence. Here, Petitioner attacks an act of trial counsel that occurred well after the trial and sentencing. Petitioner cannot establish that trial counsel's failure to preserve and maintain files had any effect on the outcome of his trial and sentencing, and therefore, this claim is not appropriate under <u>Strickland</u> or § 2255. <u>See</u> <u>Johnson v. United States</u>, 2010 WL 1252674, *6 (W.D.N.C. Mar. 23, 2010)(counsel's failure to produce files to petitioner for habeas purposes cannot support ineffective assistance claim, as there is no right to counsel in post-conviction proceedings).

<div align="center">28</div>

<div align="center">**JA3220**</div>

Petitioner's claim that trial counsel was ineffective for failing to preserve or maintain files is without merit and therefore, this claim is denied.

### j.     Additional Ineffective Assistance Grounds

On pages 85-87 of his motion, Petitioner sets forth a laundry list of thirty-one additional claims of ineffective assistance against trial counsel.  However, Petitioner provides insufficient allegations of fact in support of these claims.  These vague and unsupported allegations amount to nothing more than general assertions and warrant no relief.  See United States v. Dyess, 730 F.3d 354, 359 (4th Cir. 2013)(vague and conclusory allegations contained in a § 2255 petition may be disposed of without further investigation by the court).  Therefore, these claims are denied.

Petitioner further alleges that trial counsel's ineffective performance caused him prejudice because the totality of the mitigating evidence presented created "a reasonable probability that at least one juror would have struck a different balance."  However, as set forth above, Petitioner has failed to demonstrate any ineffective performance on part of trial counsel.  Therefore, this claim is also denied.

### 2.     *Batson* Proceeding

Following Petitioner's appeal from the second penalty phase trial, the Supreme Court vacated his death sentence and remanded the matter for a Batson hearing.  Barnette v. United States, 546 U.S. 803, 126 S.Ct. 92, 163 L.Ed.2d 32 (2005).  This Court conducted a limited hearing and in camera review of jury questionnaires and found no Batson violation.  That decision was affirmed on appeal, United States v. Barnette, 644 F.3d 192 (4th Cir. 2011), and the U.S. Supreme Court denied certiorari review.  Barnette v. United States, 565 U.S. 1263, 132 S.Ct. 1740, 182 L.Ed.2d 534 (2012).

29

**JA3221**

Petitioner now complains that the Court denied his request at the <u>Batson</u> hearing for the jury questionnaires and the Government's annotated copies. In reviewing the issues, the Court ordered the Government to submit unredacted copies of its questionnaires for in camera review. (3:97-cr-23, Docs. 645, Doc. 649). Petitioner argues this prevented him from accessing the most important sources of evidence to support his <u>Batson</u> claim on appeal and that trial counsel should have insisted that the questionnaires be included in the appellate record.

This Court previously denied Petitioner's request for discovery on this claim, noting that it failed as a matter of law, as the <u>Batson</u> proceeding had been upheld on appeal. (Doc. 62, p. 7-8). <u>United States v. Barnette</u>, 644 F.3d 192, 196 (4th Cir. 2011).[6] The Supreme Court denied certiorari review. <u>Barnette v. United States</u>, 565 U.S. 1263, 132 S.Ct. 1740, 182 L.Ed.2d 534 (2012).

A petitioner "will not be allowed to recast, under the guise of collateral attack, questions fully considered [on direct appeal]." <u>Boeckenhaupt v. United States</u>, 537 F.2d 1182, 1183 (4th Cir. 1976). The <u>Batson</u> hearing was reviewed on direct appeal, with the appellate court finding no error. Petitioner cannot support this ineffective assistance claim and he is foreclosed from attempting to re-litigate this issue. Therefore, this claim is denied.

### 3.    <u>Misconduct Related to Jury</u>

Petitioner argues that his constitutional rights were violated due to misconduct related to the jury. Petitioner asserts that during the 2002 penalty phase trial, a juror raised a concern that other jurors were forming, or had formed, opinions about whether Petitioner should receive the death penalty prior to the Court's final instructions. Petitioner also states that the misconduct included: 1) improper consideration of matters extraneous to the trial, 2) improper racial attitudes which infected the deliberations of the jury, 3) false or misleading responses by jurors, 4) improper

---

[6] Although the Fourth Circuit did find that the Court erred in denying Petitioner clean copies of the original juror questionnaires, it found the error harmless. <u>United States v. Barnette</u>, 644 F.3d 192, 212-213 (4th Cir. 2011).

**JA3222**

biases of jurors which infected their deliberations, 5) improper exposure to the prejudicial opinions of third parties, 6) improper communications with third parties, 7) improper communications with U.S. Marshals, 8) improper *ex parte* communications, and 9) improperly prejudging the guilt and penalty phases of trial. Petitioner elaborates no further and states this claim requires additional discovery.

This Court previously denied Petitioner's motion seeking to interview the jurors on this issue. (Doc. 50). The Court reviewed the record and the inquiry conducted at trial and found that the pre-deliberation remarks made by one juror and overheard by another juror did not fall into the category of "extraneous, prejudicial information or outside influence" necessary to justify juror interviews. (Doc. 50, p. 3). The juror's remarks came seven days into the sentencing trial and appeared to have been in reaction to testimony which immediately preceded it. There was no evidence the juror had any prior bias against Petitioner or acquired any extrinsic information prejudicial to Petitioner. Id. at 3-4.

The remainder of Petitioner's allegations are conclusory and he sets forth no facts to support his claims of misconduct related to the jury. Therefore, this claim is denied.

### 4.     Decision to Prosecute in Federal Court

Petitioner claims that the Government's decision to federally prosecute him violated his constitutional rights because it resulted in a significant reduction in the number of African Americans in the jury pool. Petitioner states that the decision to prosecute in federal court resulted in 4% fewer African Americans in the jury pool because federal jurors are pulled only from voter registration lists, while state jurors are pulled from both voter and driver's license lists. Therefore, Petitioner maintains that a state court prosecution would have unlikely resulted in a death sentence.

The Government has broad prosecutorial discretion, so long as it "has probable cause to believe that the accused committed an offense defined by statute" and the decision is not "deliberately based upon an unjustifiable standard such as race, religion, or other arbitrary classification." Rowsey v. Lee, 327 F.3d 335, 342-343 (4th Cir. 2003)(quoting Bordenkircher v. Hayes, 434 U.S. 357, 364, 98 S.Ct. 663, 54 L.Ed.2d 604 (1978)). "Absent clear evidence that a prosecutor's choice in forum was motivated by an unjustifiable standard, prosecutorial discretion stands." Moore v. United States, 2012 WL 3078932, *4 (E.D. Pa., July 30, 2012)(citing United States v. Armstrong, 517 U.S. 456, 465, 116 S.Ct. 1480, 134 L.Ed.2d 687 (1996)).

To establish a prima facie case that violation of the fair-cross-section requirement occurred, one must show that "(1) a group qualifying as 'distinctive' (2) is not fairly and reasonably represented in jury venires, and (3) 'systematic exclusion' in the jury-selection process accounts for the underrepresentation." Berghuis v. Smith, 559 U.S. 314, 327, 130 S.Ct. 1382, 176 L.Ed.2d 249 (2010)(citing Duren v. Missouri, 439 U.S. 357, 364, 99 S.Ct. 664, 58 L.Ed.2d 579 (1979)). "[T]he selection of a petit jury from a representative cross-section of the community is an essential component of the Sixth Amendment right to a jury trial." Taylor v. Louisiana, 419 U.S. 522, 528, 95 S.Ct. 692, 42 L.Ed.2d 690 (1975). However, "the Constitution does not require that the juror selection process be a statistical mirror of the community; it is sufficient that the selection be 'in terms of a fair cross-section' gathered without active discrimination." United States v. Cecil, 836 F.2d 1431, 1445 (4th Cir.1988).

Petitioner fails to show that the Government's decision to federally prosecute him was racially motivated. Petitioner previously sought discovery on this claim, which this Court denied on grounds that Petitioner failed to make a prima facie showing that the decision to federally prosecute him violated his constitutional rights. (Doc. 62, p. 9-11). The Court held that Petitioner

would need to show that the source from which the Western District of North Carolina drew eligible jurors in 2002 systematically excluded African Americans and was not representative of the community. (Doc. 62, p. 9-10). The Court explained that "[j]uries in all four divisions of the Western District of North Carolina are selected according to the District Jury Selection Plan in which potential jurors are randomly selected from the voter registration lists ("VRLs") of the division where the trial is held." Id. The Court noted that "Congress has expressly sanctioned the use of VRLs as the source for jury selection in federal courts." Id. (citing Cecil, 836 F.2d at 1445; 28 U.S.C. § 1863(b)(2). See also United States v. McGrady, 173 F.3d 426, *2–3 (4th Cir.1999)(unpublished table decision)(finding no fair cross-section violation in use of VRLs by the Western District of North Carolina as source for jury selection).

The Court also held that Petitioner failed to provide information regarding the percentage of African Americans registered to vote in Charlotte where he was tried, the percentage of those eligible to vote but who had not registered, or any factual support for his claim that African Americans were unfairly represented. (Doc. 62, p. 10). Petitioner did not allege that North Carolina "systemically" or "intentionally" excluded African Americans by its voter registration procedures, nor that the Court purposefully misapplied or violated the rules or procedures of its own District Jury Selection Plan in order to exclude eligible African Americans from jury pools in this District or the Charlotte Division. Id.

Based on the foregoing, Petitioner's claim is denied.

### 5. Unconstitutionality of Death Penalty

Petitioner challenges the death penalty as unconstitutional on grounds that it is sought in a discriminatory manner based upon race and geography. Petitioner cites two Department of Justice studies from 1988 through 2001, which he claims show that the federal death penalty has been

**JA3225**

disproportionately sought against persons of color and residents of the South.

This Court previously addressed this claim in its review of Petitioner's motion for discovery. (Doc. 62, p. 13-14). Petitioner acknowledged at that time that he had not provided sufficient evidence to prove a constitutional violation and sought discovery related to this claim. (Doc. 51, p. 14-15). However, the Court concluded that Petitioner made no showing that as a death-eligible defendant he was treated differently from persons of other races who engaged in similar conduct and that statistical studies cited by Petitioner did not constitute sufficient evidence to support his discrimination claims. (Doc. 62, p. 13-14). The Court also noted that Petitioner failed to make a credible showing that "the decisionmakers in *his* case acted with discriminatory purpose." Id. at 13 (citing McClesky v. Kemp, 481 U.S. 279, 292, 107 S.Ct. 1756, 95 L.Ed.2d 262 (1987)(emphasis original)). In McClesky, the Supreme Court held that reliance on statistical data alone cannot prove discriminatory intent in support of an equal protection claim brought by a capital defendant. Id.

Because Petitioner provides nothing more than statistical studies, he has not demonstrated that the decisionmakers in his case acted with discriminatory purpose. Therefore, this claim is denied.

### 6. Federal Execution and Eighth Amendment

Petitioner claims that the manner in which the Bureau of Prisons will carry out his execution violates the Eighth Amendment. However, Petitioner briefs this argument no further, noting that his challenge is not yet ripe as it may appropriately be raised in a 42 U.S.C. §1983 action. The Government agrees. Therefore, this claim warrants no relief and is denied.

**JA3226**

### 7. Cumulative Effect of Errors

Petitioner asserts that he is entitled to relief due to the cumulative effect of the errors raised in his motion to vacate. However, as set forth above, Petitioner's claims of error are without merit. Generally, if none of a defendant's claims warrants relief individually, a court will decline to reverse for cumulative error. United States v. Basham, 561 F.3d 302, 330 (4th Cir. 2009). Therefore, this claim is denied.

### C. Petitioner's Motion to Supplement

On June 24, 2016, more than three years after the filing of his § 2255 Motion to Vacate, Petitioner moved to supplement his motion with additional claims challenging his convictions in counts 1, 2, 3, 8, 10, and 11, in light of recent U.S. Supreme Court decisions in Johnson v. United States, 576 U.S. 591, 135 S.Ct. 2551, 192 L.Ed.2d 569 (2015) and Welch v. United States, 136 S.Ct. 1257, 194 L.Ed.2d 387 (2016). (Doc. 119).

Federal Rule of Civil Procedure 15 governs the amendments of § 2255 motions and provides that a party may amend their pleading once as a matter of course at any time before a responsive pleading is served or they must otherwise seek leave of court or obtain written consent from the adverse party. Fed. R. Civ. P. 15(a). Leave to amend "shall be freely given when justice so requires." United States v. Pittman, 209 F.3d 314, 317 (4th Cir. 2000). However, courts may deny leave to amend when the amendment would be prejudicial to the opposing party, there has been bad faith on part of the moving party, or the amendment would be futile. Edwards v. City of Goldsboro, 178 F.3d 231, 242 (4th Cir. 1999)(citing Johnson v. Oroweat Foods Co., 785 F.2d 503, 509 (4th Cir. 1986)).

35

**JA3227**

In <u>Johnson</u>, the Supreme Court declared the residual clause of the Armed Career Criminal Act ("ACCA"), 18 U.S.C. § 924(e), to be unconstitutionally vague and held that the imposition of an enhanced sentence under ACCA's residual clause violated due process. <u>Johnson v. United States</u>, 576 U.S. 591, 135 S.Ct. 2551, 192 L.Ed.2d 569 (2015). Shortly thereafter, the Supreme Court held in <u>Welch</u> that the rule set forth in <u>Johnson</u> was substantive and applied retroactively to cases on collateral review. <u>Welch v. United States</u>, 136 S.Ct. 1257, 194 L.Ed.2d 387 (2016).

Petitioner's convictions for counts 2, 8, and 11 fall under 18 U.S.C. § 924(c). Section § 924(c) defines the term "crime of violence" using two clauses, the "elements" or "force" clause and the "residual" clause. The force clause includes any felony that "has as an element the use, attempted use, or threatened use of physical force against the person or property of another." 18 U.S.C. § 924(c)(3)(A). Similar to § 924(e), the residual clause includes any felony "that by its nature, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense." 18 U.S.C. § 924(c)(3)(B).

Petitioner's convictions in counts 1 and 10 under 18 U.S.C. § 2261 incorporate the definition of "crime of violence" found in 18 U.S.C. § 16(b), which is identical to the definition in § 924(c). The counts under which Petitioner was convicted under 18 U.S.C. § 2261 and 18 U.S.C. § 924(c) impose an enhanced sentence due to the commission of offense acts during a "a crime of violence" and require determinations that he committed a "crime of violence" as one of the elements necessary to prove the violation.

Both the Government and Petitioner moved for a stay pending decisions by the Fourth Circuit in <u>United States v. Ali</u>, No. 15-4433 and <u>United States v. Simms</u>, No. 15-4640 regarding the constitutionality of § 924(c)'s definition of "crime of violence." (Docs. 121, 122). Shortly

36

**JA3228**

thereafter, the U.S. Supreme Court granted certiorari review in <u>Lynch v. Dimaya</u>, No. 15-1498 to address whether the residual clause of 18 U.S.C. § 16(b) was also unconstitutionally vague, and the Fourth Circuit issued a stay in <u>Ali</u> pending the <u>Dimaya</u> decision.  On December 8, 2016, this Court granted a stay pending Supreme Court decisions in <u>Dimaya</u> and/or <u>Simms</u>, noting that at least six of Petitioner's convictions depend upon the definition of "crime of violence" under 18 U.S.C. § 16(b) or § 924(c).  (Doc. 123).

On April 17, 2018, the Supreme Court issued its decision in <u>Sessions v. Dimaya</u>, 138 S.Ct. 1204, 200 L.Ed.2d 549 (2018), extending its ruling in <u>Johnson</u> and holding that the residual clause of the definition of "crime of violence" in 18 U.S.C. § 16(b) is unconstitutionally vague. Subsequently, on June 24, 2019, the Supreme Court held in <u>United States v. Davis</u>, 139 S.Ct. 2319, 204 L.Ed.2d 757 (2019) that the residual clause of 18 U.S.C. § 924(c)(3)(B) is also unconstitutionally vague.

Following <u>Davis</u>, the Government filed its Response to Petitioner's motion to supplement on November 21, 2019. (Doc. 132).  Petitioner filed his Reply on February 20, 2020. (Doc. 136).

### 2.    **Timeliness**

The Government asserts that Petitioner's supplemental claims are untimely because he was required to bring his claims within one year of the judgment becoming final as provided by 28 U.S.C. § 2255(f)(1).  Petitioner contends that his motion to supplement is timely under § 2255(f)(3) because it asserts rights initially recognized in <u>Johnson</u> and retroactive under <u>Welch</u>.  Section § 2255(f)(3) allows the statute of limitations to start running from "the date on which the right asserted was initially recognized by the Supreme Court, if that right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review."  28 U.S.C. § 2255(f)(3).

Petitioner's supplemental motion initially sought to challenge the residual clauses of § 924(c) and § 16(b), which were subsequently addressed by the Supreme Court in <u>Davis</u> and <u>Dimaya</u> several years after the filing of the supplemental motion. The pending court decisions on this issue and connection to <u>Johnson</u> is what prompted both Petitioner and the Government to move for a stay, which this Court granted. (Docs. 121-123).

Petitioner's motion to supplement also challenges his § 924(c) and § 2261 convictions for failing to constitute crimes of violence under the force clause, and he contends these claims are timely under <u>Dimaya</u> and <u>Davis</u>. These claims were included with the other grounds in his supplemental motion and within one year of the <u>Johnson</u> decision. As such, this Court will not dismiss Petitioner's motion to supplement as untimely filed.

### 3. Procedural Default

The Government argues that Petitioner's challenges to his convictions in counts 1 and 10 are barred by procedural default because Petitioner's argument that the language in the indictment fails to conform to the categorical approach should have been raised during his criminal case. Because Petitioner's challenges to counts 2, 3, and 11 rely upon the same rationale, the Government argues they too are barred by procedural default.

A § 2255 motion "may not do service for an appeal" and claims that should have been raised at trial or on appeal are procedurally defaulted unless an exception applies. <u>United States v. Frady</u>, 456 U.S. 152, 165, 102 S.Ct. 1584, 71 L.Ed.2d 816 (1982). To overcome a procedural default, a petitioner must show either (1) "cause" and "actual prejudice" resulting from the errors complained of, or (2) that a "miscarriage of justice" would result from refusal to entertain the collateral attack. <u>United States v. Mikalajunas</u>, 186 F.3d 490, 492-93 (4th Cir. 1999)(citing <u>United States v. Frady</u>, 456 U.S. 152, 167-68, 102 S.Ct. 1584, 71 L.Ed.2d 816 (1982)). "Cause" for procedural default exists "where a constitutional claim [was] so novel that its legal basis [was] not

38

**JA3230**

reasonably available to counsel." <u>Reed v. Ross</u>, 468 U.S. 1, 16, 104 S.Ct. 2901, 82 L.Ed.2d 1 (1984). "Actual prejudice" is shown by demonstrating that the error worked to petitioner's "actual and substantial disadvantage," rather than just creating a "possibility of prejudice." <u>Satcher v. Pruett</u>, 126 F.3d 561, 572 (4th Cir. 1997)(quoting <u>Murray v. Carrier</u>, 477 U.S. 478, 494, 106 S.Ct. 2639, 91 L.Ed.2d 397 (1986)). To show that a "miscarriage of justice" would result from the court's failure to entertain the collateral attack, the movant must show "actual innocence by clear and convincing evidence." <u>United States v. Mikalajunas</u>, 186 F.3d at 493.

Petitioner's supplemental motion challenges the residual clauses of § 924(c) and § 16(b) following the Supreme Court decisions in <u>Johnson</u> and <u>Welch</u>, and later addressed by <u>Dimaya</u> and <u>Davis</u>. The supplemental motion also challenges his § 924(c) and § 2261 convictions for failing to constitute crimes of violence under the force clause. Petitioner argues that his supplemental claims are not procedurally defaulted because he has raised a jurisdictional defect as well as timely and straightforward challenges under <u>Davis</u> and <u>Dimaya</u>.

It is arguable that Petitioner's challenges were not previously available in light of the <u>Johnson</u> and <u>Welch</u> decisions, and later decisions in <u>Dimaya</u> and <u>Davis</u>. Even if Petitioner has demonstrated cause, he cannot show the necessary prejudice or actual innocence required to excuse any procedural default. Petitioner's § 924(c) and § 16(b) convictions are valid under the force clause and his challenges fail as a matter of law. See section 4, *infra*. Petitioner cannot show any likelihood that his convictions would have been different absent the alleged error, nor can he establish actual innocence in light of the overwhelming evidence presented at trial. Petitioner's supplemental claims seeking to challenge his convictions in counts 1, 2, 3, 10 and 11 under the force clause are therefore procedurally defaulted from collateral view.

**JA3231**

Assuming *arguendo* that Petitioner's supplemental claims are not procedurally defaulted, his challenges to his convictions fail as a matter of law on the merits.

Petitioner's supplemental motion challenges the residual clauses of § 924(c) and § 16(b). However, the holdings in <u>Davis</u> and <u>Dimaya</u> make clear that convictions under § 924(c) or § 16(b) may now stand only if the underlying offense qualifies as a crime of violence under the "force" or "elements" clause. <u>Bost v. United States</u>, 2020 WL 2041340, *2 (W.D.N.C. Apr. 28, 2020). This requires a determination of whether the predicate crime had, as an element, "the use, attempted use, or threatened use of physical force against the person or property of another." 18 U.S.C. § 924(c)(3)(A). The "physical force" must be "capable of causing physical pain or injury to another person" and must be "intentional." <u>Johnson</u>, 559 U.S. at 140; <u>United States v. Dixon</u>, 805 F.3d 1193, 1197 (9th Cir. 2015).

To determine whether a predicate offense underlying a § 924(c) conviction falls within the force clause, the court looks to the elements of the "ordinary case" of such offense. <u>In re Irby</u>, 858 F.3d 231, 234 (4th Cir. 2017). Whether an offense qualifies as a crime of violence requires application of the categorical approach or the modified categorial approach depending on nature of the offense. <u>Davis</u>, 139 S.Ct. at 2325-26.

The categorical approach applies to statutes that set out a "single (or 'indivisible') set of elements" and "focuses on the elements of the prior offense rather than the conduct underlying the conviction." <u>United States v. Mathis</u>, 932 F.3d 242, 264 (4th Cir. 2019)(quoting <u>United States v. Cabrera-Umanzor</u>, 728 F.3d 347, 350 (4th Cir. 2013)). "In short, [courts] look to the statutory definition of the offense in question, as opposed to the particular facts underlying the conviction." <u>United States v. Davila-Felix</u>, 667 F.3d 47, 56 (1st Cir. 2011). A predicate crime can

only qualify as a "crime of violence" if all of the criminal conduct covered by a statute, including the least culpable conduct, matches or is narrower than the "crime of violence" definition.  United States v. Torres-Miguel, 701 F.3d 165, 167 (4th Cir. 2012).

On the other hand, the modified categorical approach applies to a narrow range of cases involving statutes with "alternative elements" as they are 'divisible' and "compris[e] multiple, alternative versions of the crime." Descamps v. United States, 570 U.S. 254, 261-262, 133 S.Ct. 2276, 186 L.Ed.2d 438 (2013)(citing Taylor v. United States, 495 U.S. 575, 602, 110 S.Ct. 2143, 109 L.Ed.2d 607 (1990)); Castillo v. United States, 2020 WL 1490727, *5 (W.D.N.C Mar. 24, 2020).  Under the modified categorical approach, the court may look to a limited set of documents such as the indictment, jury instructions, or plea colloquy to determine what crime and with what elements a defendant was convicted.  Id.

Petitioner argues that none of the predicate crimes of which he was convicted categorically qualify as  "crimes of violence" under the force or elements clause.  However, the Court finds that Petitioner's claims are without merit and fail as a matter of law.  Therefore, allowing Petitioner leave to supplement his claims would be futile.

### a.    Counts 1 and 10

Petitioner first challenges counts 1 and 10, which charged him with interstate domestic violence under § 2261 as follows:

Count 1 charged that on or about April 30, 1996, Petitioner

> did travel across a state line, that is, did transport himself from Charlotte, North Carolina to Roanoke Virginia with the intent to injure, harass, and intimidate an intimate partner, Robin Williams, and in the course and as a result of such travel intentionally committed a crime of violence, that is, did firebomb Robin Williams' occupied apartment and an automobile parked in her driveway causing bodily injury to her.  In violation of Title 18, United States Code, Sections 2261(a)(1) and 2261(b).

Count 10 charged that on or about June 22, 1996, Petitioner

41

**JA3233**

did travel across a state line, that is, did transport himself from Charlotte, North Carolina to Roanoke, Virginia with the intent to injure, harass, and intimidate an intimate partner, Robin Williams, and in the course and as a result of such travel intentionally committed a crime of violence, that is, shot and killed Robin Williams causing bodily injury and death to her.  In violation of Title 18, United States Code, Sections 2261(a)(1) and 2261(b).

Petitioner argues that in both counts, the Government failed to indicate what crime it was alleging as the predicate "crime of violence," and instead, alleged only specific facts (i.e. that the crime of violence in count 1 was the "firebomb[ing] of Robin Williams' occupied apartment and an automobile..." and in count 10, that the crime of violence was that Petitioner "shot and killed Robin Williams...").  Petitioner states that this "recitation of facts without an alleged crime leaves this Court unable to apply a categorical approach to the elements of the predicate crime." (Doc. 119, p. 18).  Petitioner adds that because "[c]ounts 1 and 10 fails to allege *any* statutory crime that the government contended was violated, this Court cannot presume that a crime *might* have been alleged that would have satisfied the force clause."  Id. (emphasis original).

Petitioner challenges the indictment because it fails to include a specific code provision. However, this argument is without merit and is not supported by the Dimaya or Davis decisions. The crimes described in count 1 (firebombing Williams' residence causing injury to her) and count 10 (shooting and killing Williams) satisfy the force clause in requiring the intentional use of force capable of causing physical pain or injury sufficient to uphold Petitioner's convictions.  A plain reading of the subsequent counts 2 and 11 make clear the statutory code provisions referenced in counts 1 and 10.  Petitioner's complaint that the code provisions are not listed is not characteristic of the "force clause" challenges as contemplated by recent case law.  Petitioner cites no on-point authority in support of his argument.  Instead, Petitioner is challenging the language of the

42

**JA3234**

indictment, which, as discussed in Section 3, *supra*, should have been raised in his criminal proceeding. Therefore, this claim fails as a matter of law.

### b. Counts 2 and 11

Petitioner argues that counts 2 and 11 are also invalid because they presuppose convictions under counts 1 and 10. Counts 2 and 11 charged Petitioner with knowingly using and carrying a firearm during and in relation to a "crime of violence," with the acts of interstate domestic violence in counts 1 and 10 to be the predicate "crimes of violence."

Count 2 charged that on or about April 30, 1996, Petitioner

> knowingly used and carried a firearm, that is a destructive device, consisting of a bottle filled with flammable liquid, during and in relation to a crime of violence for which he may be prosecuted in a court of the United States, that is, an act of interstate domestic violence in violation of Title 18, United States Code, Section 2261 as set forth in Count One. In violation of Title 18, United States Code, Section 924(c)(1).

Count 11 charged that on or about June 22, 1996, Petitioner

> knowingly used and carried a firearm, that is a sawed-off Winchester semi-automatic shotgun, during and in relation to a crime of violence, for which he may be prosecuted in a court of the United States, that is the act of interstate domestic violence set forth in Count Ten above, and in the course of this violation caused the death of Robin Williams, through the use of a firearm, which killing is a murder as defined in Title 18, United States Code, Section 1111, in that the defendant, with malice aforethought, did unlawfully kill Robin Williams by shooting her with the firearm willfully, deliberately, maliciously, and with premeditation. In violation of Title 18, United States Code, Sections 924(c)(1) and (i)(2)(1).

Petitioner contends that because counts 1 and 10 should be vacated as argued above, counts 2 and 11 fail. Petitioner also alleges that aside from the "crime of violence" element in § 2261, none of the remaining elements satisfies the force clause. Petitioner points out that § 2261(a) requires the defendant travel "with the intent to kill, injure, harass or intimidate," which Petitioner asserts does not qualify as a "crime of violence" under the force clause. Petitioner claims that intending to "intimidate" attempts to criminalize conduct that does not require an intentional threat

**JA3235**

of violent physical force.  In support, Petitioner argues that the federal bank robbery statute, 18 U.S.C. § 2113(a), has a similar intimidation element.

Petitioner's argument that counts 2 and 11 automatically fail because counts 1 and 10 should be vacated is insufficient.  As discussed above, Petitioner's challenge to counts 1 and 10 are without merit.  Petitioner's claim that his convictions fail because § 2261 criminalizes conduct that does not require an intentional threat of physical force also is without merit.  The statute under which Petitioner was convicted, 18 U.S.C. § 2261(a)(1), states:

> A person who travels across a State line. . . with the intent to injure, harass, or intimidate that person's spouse or intimate partner, and who, in the course of or as a result of such travel, intentionally commits a crime of violence and thereby causes bodily injury to such spouse or intimate partner, shall be punished as provided in subsection (b).

The statute imposes its own requirement that the defendant cause bodily injury.  See United States v. Jacobs, 2020 WL 3421765, *11 (E.D. Ky. June 22, 2020)(the "bodily injury requirement [of § 2261] at a minimum connotes the use of physical force" thereby sufficient to constitute a crime of violence under § 924(c)(3)'s force clause).  Petitioner's reliance on the federal bank robbery statute is misplaced, as the Fourth Circuit has held in United States v. McNeal that bank robbery under 18 U.S.C. § 2113(a) is a "crime of violence" within the meaning of the force clause of 18 U.S.C. § 924(c)(3), as "intimidation entails a threat to use violent physical force, and not merely a threat to cause bodily injury."  United States v. McNeal, 818 F.3d 141, 156-157 (4th Cir. 2016).

Based on the foregoing, § 2261(a) qualifies as a crime of violence and satisfies the force clause requirement.  Therefore, Petitioner's claim is without merit and fails as a matter of law.

### c.    Count 3

Petitioner alleges that because Count 1 must be vacated as argued earlier, his conviction in Count 3 for § 844(h)(1) cannot be sustained.

44

**JA3236**

Count 3 charged that on or about the 30th day of April, 1996, Petitioner

> knowingly used and carried fire and explosive materials, to commit an act of interstate domestic violence in violation of Title 18, United States Code, Section 2261, a felony prosecutable in a court of the United States. In violation of Title 18, United States Code, Section 844(h)(1).

However, for the reasons discussed above, Petitioner's arguments with regard to Count 1 are without merit. Therefore, this claim fails as a matter of law.

### d. Count 8

Count 8 charged that on or about June 22, 1996, Petitioner

> knowingly used and carried a firearm, that is a sawed-off Winchester semi-automatic shotgun, during and in relation to a crime of violence, for which he may be prosecuted in a court of the United States, that is, the carjacking set forth in Count Seven above, and in the course of this violation caused the death of Donald Lee Allen, through the use of a firearm, which killing is a murder as defined in Title 18, United States Code, Section 1111, in that the defendant, with malice aforethought, did unlawfully kill Donald Lee Allen by shooting him with the firearm, willfully, deliberately, maliciously, and with premeditation. In violation of Title 18, United States Code, Sections 924(c)(1) and (i)2(1).

Petitioner argues that the predicate offense of carjacking under 18 U.S.C. § 2119 cannot qualify as a "crime of violence" under § 924(c) because it can be violated by intimidation and without the intentional use, attempted use, or threatened use of violent force. However, the Fourth Circuit has held that carjacking under 18 U.S.C. § 2119 qualifies as a "crime of violence" under the force clause of 18 U.S.C. § 924(c). United States v. Evans, 848 F.3d 242, 247-248 (4th Cir. 2017). Evans held that the term "intimidation" as used in the statute "means a threat of violent force" and includes a threat of violent force to satisfy the force clause requirement. Id. Therefore, this claim fails as a matter of law.

45

**JA3237**

### e.    Count 7

Petitioner was convicted in count 7 of carjacking resulting in death in violation of 18 U.S.C. § 2119(3). Petitioner argues that because the claims raised in his motion to supplement require the vacation of his convictions in counts 1, 2, 3, 8, 10, and 11, then his conviction and death sentence for count 7 must also be vacated. Petitioner asserts that there is a reasonable likelihood that the inclusion of unconstitutional counts influenced the jury's decision to sentence him to death. However, because the Court has concluded Petitioner's challenges to counts 1, 2, 3, 8, 10, and 11 fail as a matter of law as discussed above, Petitioner's challenge to count 7 is without merit. Therefore, this claim also fails as a matter of law.

### 5.    Concurrent Sentence Doctrine/Harmless Error

The Government contends that this Court should decline to consider Petitioner's motion to supplement because it is futile under the concurrent sentence doctrine and harmless error rule. Where a defendant is serving concurrent sentences and one is shown to be valid, the court may decline to pass upon the validity of the other conviction with a showing the defendant will suffer no harm letting both the valid conviction and unreviewed conviction stand. United States v. Hill, 859 F.2d 325, 326 (4th Cir. 1988). The Government states that because Petitioner does not challenge the validity of his conviction and death sentence in count 7, that conviction would still stand, and any error would be harmless even if his other counts were invalidated.

Regardless of the potential applicability of the concurrent sentence doctrine, this Court has reviewed Petitioner's motion to supplement and determined that his proposed supplemental claims fail as a matter of law and that leave to amend should be denied. See Section 4, *supra*. As such, the Court need not address the Government's request to apply the concurrent sentence doctrine/harmless error rule.

46

**JA3238**

## IV.    CONCLUSION

For the reasons set forth above, the Court denies Petitioner's motion to supplement (Doc. 119), motion for evidentiary hearing (Doc. 73), and motion to vacate sentence filed pursuant to 28 U.S.C. § 2255 (Doc. 48).

The Court further finds that Petitioner has not made a substantial showing of a denial of a constitutional right as required for issuance of a certificate of appealability pursuant to 28 U.S.C. § 2253(c)(2).  Miller-El v. Cockrell, 537 U.S. 322, 336-38, 123 S.Ct. 1029, 154 L.Ed.2d 931 (2003)(in order to satisfy §2253(c), a petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong); Slack v. McDaniel, 529 U.S. 473, 484, 120 S.Ct. 1595, 146 L.Ed.2d 542 (2000)(holding that when relief is denied on procedural grounds, a petitioner must establish both that the correctness of the dispositive procedural ruling is debatable, and that the petition state a debatably valid claim of the denial of a constitutional right).

**IT IS, THEREFORE, ORDERED** that:

1. Petitioner's Motion to Vacate Sentence under 28 U.S.C. § 2255 (Doc. 48) is DENIED.

2. Petitioner's Motion to Supplement (Doc. 119) is DENIED.

3. Petitioner's Motion for Evidentiary Hearing (Doc. 73) is DENIED.

4. This Court declines to issue a certificate of appealability.

**IT IS SO ORDERED.**

Signed: March 12, 2021

Max O. Cogburn Jr
United States District Judge

47

**JA3239**

# United States District Court
## Western District of North Carolina
## Charlotte Division

| | | |
|---|---|---|
| **Aquilia Marcivicci Barnette,** | ) | JUDGMENT IN CASE |
| | ) | |
| Petitioner(s), | ) | 3:12-cv-00327-MOC |
| | ) | 3:97-cr-00023-MOC |
| vs. | ) | |
| | ) | |
| **USA,** | ) | |
| Respondent(s). | ) | |

DECISION BY COURT. This action having come before the Court and a decision having been rendered;

IT IS ORDERED AND ADJUDGED that Judgment is hereby entered in accordance with the Court's March 12, 2021 Order.

March 12, 2021

Frank G. Johns, Clerk
United States District Court

**JA3240**

# IN THE DISTRICT COURT OF THE UNITED STATES
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA
## CHARLOTTE DIVISION
### (3:97-cr-23)

**AQUILIA MARCIVICCI BARNETTE,**

    **Petitioner,**

**vs.**

**UNITED STATES OF AMERICA,**

    **Respondent.**

**DOCKET NO. 3:12-cv-327**

**THIS IS A CAPITAL CASE**

## NOTICE OF APPEARANCE

Gerald Wesley King, Jr., hereby enters his notice of appearance as counsel for the petitioner, Aquilia Marcivicci Barnette. Mr. King is Chief of the newly-created Capital Habeas for the Fourth Circuit and an Assistant Federal Public Defender for the Western District of North Carolina. While not yet admitted to the North Carolina bar[1], Mr. King is authorized to appear and be heard in this action, in which the Office of the Federal Public Defender has been appointed, pursuant to this Court's standing order *In the Matter of Special Admission of Attorneys Employed by the Office of the Federal Public Defender For The Western District Of North Carolina*, Misc. 3:18MC32 (Jan 30, 2019) (Attachment A). Mr. King has more than sixteen years of experience in federal capital habeas proceedings and appeals and is a member in good standing of every court in which he is admitted to practice. He has read and agrees to abide by the Local Rules of this Court and the Rules of Professional Conduct of the North Carolina State Bar, and he will accept the discipline of this Court in the same manner as an attorney regularly admitted to its Bar.

---

[1]Mr. King is preparing his comity application to the North Carolina College of Bar Examiners.

**JA3241**

Respectfully submitted,

/s/Gerald W. King, Jr.
Gerald W. King, Jr.
Chief, Fourth Circuit Capital Habeas Unit
Federal Public Defender
Western North Carolina, Inc.
129 W. Trade Street, Suite 300
Charlotte, NC 28202
Telephone: (704) 374-0720
Fax: (704) 374-0722
E-mail: gerald_king@fd.org

*Attorney for Aquilia Marcivicci Barnette*

DATE: March 24, 2021

**JA3242**

<p style="text-align:center">**CERTIFICATE OF SERVICE**</p>

I hereby certify that I have served a copy of the attached **NOTICE OF APPEARANCE**

with the Clerk of Court using the CM/ECF system, which will send notification of such filing to:

Anthony J. Enright

anthony.enright@usdoj.gov

Respectfully submitted:

*/s/Gerald W. King, Jr.*
Gerald W. King, Jr.
Chief, Fourth Circuit Capital Habeas Unit
Federal Public Defender
Western North Carolina, Inc.
129 W. Trade Street, Suite 300
Charlotte, NC 28202
Telephone: (704) 374-0720
Fax: (704) 374-0722
E-mail: gerald_king@fd.org

*Attorney for Aquilia Marcivicci Barnette*

DATE: March 24, 2021

<p style="text-align:center">**JA3243**</p>

# ATTACHMENT A

Case 3:12-cv-00327-MOC   Document 139-1   Filed 03/24/21   Page 1 of 2

JA3244

# IN THE UNITED STATES DISTRICT COURT

## FOR THE WESTERN DISTRICT OF NORTH CAROLINA
## CHARLOTTE DIVISON

### MISC. 3:18MC32

**In the Matter of:**

**SPECIAL ADMISSION OF ATTORNEYS**
**EMPLOYED BY THE OFFICE OF THE FEDERAL PUBLIC DEFENDER**
**FOR THE WESTERN DISTRICT OF NORTH CAROLINA**

**FOR GOOD CAUSE SHOWN,**

**IT IS ORDERED** that any attorney employed by the Federal Public Defender for the Western District of North Carolina may be appear and be heard in any action in which the Office of the Federal Public Defender has been appointed without formal or general admission to the North Carolina State Bar. Any attorney who appears in this Court pursuant to such order shall read and agree to abide by the Local Rules of this Court and the Rules of Professional Conduct of the North Carolina State Bar and to accept the discipline of this Court in the same manner as an attorney regularly admitted to the Bar of this Court.

As approved at an Executive Session of the Board of Judges on the 7th day of November 2018.

This _30th_ day of January 2019.

Frank D. Whitney
Chief United States District Judge

Case 3:21-cv-00032-GCW Document 82-1 Filed 01/04/21 Page 2 of 2

**JA3245**

# IN THE DISTRICT COURT OF THE UNITED STATES
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA
### CHARLOTTE DIVISION
#### (3:97-cr-23)

**AQUILIA MARCIVICCI BARNETTE,**

    Petitioner,

    vs.

**UNITED STATES OF AMERICA,**

    Respondent.

**DOCKET NO. 3:12-cv-327**

**THIS IS A CAPITAL CASE**

## MOTION TO ALTER AND AMEND JUDGMENT PURSUANT TO RULE 59(e) OF THE FEDERAL RULES OF CIVIL PROCEDURE

Petitioner Aquilia Marcivicci Barnette, by and through undersigned counsel and pursuant to Rule 59(e) of the Federal Rules of Civil Procedure, respectfully moves this Court to alter and amend its judgment (D.138) and accompanying order (D.137, "The Order") of March 12, 2021, denying, inter alia, his supplemental motion pursuant to 28 U.S.C. § 2255 to vacate his convictions and sentences for violations of 18 U.S.C. §§ 2261, 924(c), and 844(h)(1). (D.119) Mr. Barnette respectfully submits that this Court should reconsider its adjudication of that motion, which neither cites nor comports with Supreme Court precedent in *Shepard v. United States*, 544 U.S. 13, 21 (2005). For cause, Mr. Barnette shows the following:

1

**JA3246**

## I.    Course of Proceedings and Relevant Facts

Mr. Barnette was convicted of intertwined counts that require a "crime of violence" as a predicate for conviction, including: Counts 1 and 2, which charged him with interstate domestic violence in violation of 18 U.S.C. § 2261; Counts 2 and 10, which charged him with the use of a destructive device (firebomb) and a firearm during a crime of violence in violation of 18 U.S.C. § 924(c); and Count 3, which charged him with a violation of 18 U.S.C. § 844(h)(1) for using and carrying fire and explosive materials during the commission of the Section 2261 interstate domestic violence charged in Count 1.[1]

Sections 924(c) and 2261 share the identical definition of their predicate "crime of violence"—the former expressly, and the latter through its incorporation of Section 16(b). That definition originally provided two alternative clauses: a "force" or "elements" clause, which applies to any felony that has as "an element" the use, attempted use, or threatened use of strong physical force; and a "residual clause" that applied to any felony "that, by its nature, involves a substantial risk that

---

[1]Mr. Barnette's supplemental motion to vacate also challenged Count 8 of his indictment, which charged him with carjacking in violation of 18 U.S.C. § 2119. As this Court noted, the Fourth Circuit has concluded that carjacking is a crime of violence under § 924(c)'s force clause. *See United States v. Evans*, 848 F.3d 242, 247 (4th Cir. 2017). Mr. Barnette does not address that claim in this motion, but maintains, and will contend on appeal, that no element of 18 U.S.C. 2119 requires the intentional use of strong physical force, as argued in his initial motion. *See also* D.119:21-26.

2

**JA3247**

physical force against the person or property of another may be used in the course of committing the offense."

On June 24, 2016, Mr. Barnette moved this Court to set aside his Section 2261, 924(c), and 844(h)(1) convictions and sentences in light of the Supreme Court's decision in *Johnson v. United States*, 135 S. Ct. 2551 (2015), which held that Section 924(e)'s residual clause for the Armed Career Criminal Act's definition of "crime of violence" was unconstitutionally vague. (D.119)[2] "[B]ased on the Court's interpretation of the residual clause of § 924(e)," Mr. Barnette argued that the residual clauses of § 924(c) and 18 U.S.C. § 16(b) "must also be deemed unconstitutionally void for vagueness," and, as none of the predicate crimes for these offenses would categorically qualify as a crime of violence under their surviving "force" or "elements" clause, of those statutes, his convictions and sentences must be vacated.

The Government's response to this motion was stayed several times as the Supreme Court took up and struck down the residual clauses that Mr. Barnette challenged—first Section 16(b)'s, in *Sessions v. Dimaya*, 138 S. Ct. 1204 (2018), followed by Section 924(c)'s, in *United States v. Davis*, 139 S. Ct. 2319 (2019). (D.121-127) When filed, the Government's response recognized that, per *Dimaya*

---

[2] Mr. Barnette also relied upon the Supreme Court's decision in *Welch v. United States*, 136 S. Ct. 1257, 1265 (2016), which found *Johnson*'s rule substantive and retroactively applicable to cases on collateral review.

**JA3248**

and *Davis,* no offense can ever qualify as a "crime of violence" under the residual clauses of Sections 16 and section 924(c). (D.132:16)  On February 20, 2020, Mr. Barnette submitted a reply in support of his motion, detailing how "the charged predicate crimes also fail to qualify as crimes of violence under the 'force' or 'elements' definitions found in these statutes," and again moved this Court to vacate his convictions and sentences.  (D.136)

In denying Mr. Barnette's motion, this Court acknowledged that "convictions under § 924(c) or § 16(b) may now stand only if the underlying offense qualifies as a crime of violence under the 'force' or 'elements' clause," but found that Mr. Barnette's "challenges to his convictions fail as a matter of law on the merits" and denied him leave to supplement his claims as "futile." D.137:40-41.

## II.    Argument

### A. The Predicate "Crime of Violence" for Mr. Barnette's Section 2261 Convictions is Uncertain, Rendering Them Invalid Per *Shepard*

The Order appears to apply a modified categorical approach in determining whether Mr. Barnette's predicate offenses qualified as a crime of violence, relying heavily upon the sets of facts presented by the individual counts of his indictment. D.137:41 (citing *Castillo v. United States*, 2020 WL 1490727, *5 (W.D.N.C Mar. 24, 2020) (modified categorical approach allows court to look to limited documents such as indictment, jury instructions, or plea colloquy to determine crime and elements of conviction)).  But those facts—and, indeed, the indictment as a whole—

are inadequate to discern either the crime or elements intended with the required certainty.

As Mr. Barnette argued in his supplemental motion, "the language of the indictment" for the Section 2261 violations charged in Counts 1 and 10 "fail to identify what crime of violence the Government claims he committed[.]" D.119:18. Instead, each of these counts merely "describes a set of facts that include violent acts." D.119:18. These counts cite no statutory provision that would identify the crime of violence. Nor do they cross-reference other counts in the indictment that would detail the predicate crime charged. With no specific predicate crime identified, this Court simply cannot know with certainty which statutory violation the Government intended to charge, much less apply any categorical approach to its elements.

The Order, however, concluded that "[a] plain reading of the subsequent counts 2 and 11"—Mr. Barnette's 924(c) convictions—"make clear the statutory code provisions referenced in counts 1 and 10." D.119:18. But Counts 1 and 10 "referenced" no "statutory code provisions" whatsoever. And the set of facts they describe make no reference to the elements of a crime of violence per Section 924(c).

The Order's reading of Counts 2 and 11 is not "plain" at all; it reflects this Court's assessment that they sufficiently fit the set of facts described in Counts 1 and 10. But the Supreme Court's has made clear that the Order's best guess as to

5

**JA3250**

what the Government intended is not sufficient to sustain Mr. Barnette's convictions and sentences. As *Shepard* states explicitly, the record must establish with "certainty" that the defendant was "necessarily" convicted of an offense that qualifies as a "crime of violence." 544 U.S. at 21. Accordingly, in cases where the record does not establish which of multiple offenses the jury might have found as the predicate, the conviction cannot be sustained if even *one* of the possible predicates is not categorically a crime of violence.

## B. Invalidating Counts 1 and 10 Invalidates Counts 2 and 11

For their part, Counts 2 and 11 do *not* provide the predicate crimes of violence for Counts 1 and 10; rather, they take *their* predicate crimes of violence from Counts 1 and 10. The predicate crime of violence charged in Count 2 is "the act of interstate domestic violence as set forth in Count 1"; for Count 11, it is "the act of interstate domestic violence as set forth in Count 10." Given this interdependence, the invalidation of Counts 1 and 10 would necessarily invalidate Counts 2 and 11, for which they are explicitly identified as predicate offenses. And, as the Order sustained Counts 1 and 10 only through reasoning that is incompatible with *Shepard*, that is the outcome required here.

## C. Count 3 is Expressly Premised upon Count 1 and is Thus Invalid

As Mr. Barnette's supplemental motion argued, the trial court expressly premised his conviction for this offense on his conviction on Count 1. D.119:26

6

**JA3251**

(quoting Transcript, Jan. 27, 1998 at 666: "you may find the defendant guilty of Count 3 if you find him guilty as charged in Count number 1, and that he knowingly used fire and explosive materials or carried an explosive in the commission of that offense.") Accordingly, if this Court were to amend its adjudication and invalidate Count 1 in light of *Shepard*, Count 3 must be invalidated as well.

## III.  CONCLUSION

For the foregoing reasons, the Court should alter and amend its judgment, grant Mr. Barnette leave to supplement his Section 2255 motion, and grant habeas corpus relief.

Respectfully submitted,

*/s/Gerald W. King, Jr.*
Gerald W. King, Jr.
Chief, Fourth Circuit Capital Habeas Unit
Federal Public Defender
Western North Carolina, Inc.
129 W. Trade Street, Suite 300
Charlotte, NC 28202
Telephone: (704) 374-0720
Fax: (704) 374-0722
gerald_king@fd.org

*/s/ Mark E. Olive*
N.C. State Bar No. 10615
LAW OFFICES OF MARK OLIVE
320 W. Jefferson Street
Tallahassee, FL 32301
850-224-0004 (tel)
850-224-3331 (fax)
meolive@aol.com

7

**JA3252**

/s/ *Jacob H. Sussman*
N.C. Bar No. 31821
P.O. Box 12718
Charlotte, NC 28220
704-277-3962 (tel)
jakesussmanlaw@gmail.com

*Attorney for Aquilia Marcivicci Barnette*

DATE: April 9, 2021

8

**JA3253**

<div align="center">**CERTIFICATE OF SERVICE**</div>

I hereby certify that I have served a copy of the attached **NOTICE OF APPEARANCE** with the Clerk of Court using the CM/ECF system, which will send notification of such filing to:

Anthony J. Enright

anthony.enright@usdoj.gov

<div align="center">Respectfully submitted:</div>

*/s/Gerald W. King, Jr.*
Gerald W. King, Jr.
Chief, Fourth Circuit Capital Habeas Unit
Federal Public Defender
Western North Carolina, Inc.
129 W. Trade Street, Suite 300
Charlotte, NC 28202
Telephone: (704) 374-0720
Fax: (704) 374-0722
E-mail: gerald_king@fd.org

*Attorney for Aquilia Marcivicci Barnette*

DATE: April 9, 2021

<div align="center">9</div>

<div align="center">**JA3254**</div>

# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA
### CHARLOTTE DIVISION
### 3:12-cv-327
### (3:97-cr-23)

AQUILIA MARCIVICCI BARNETTE, )
                                )
      **Petitioner,**        )
                                )      <u>**ORDER**</u>
**v.**                             )
                                )
**UNITED STATES OF AMERICA,**  )
                                )
      **Respondent.**      )
_____)

      **THIS MATTER** is before the Court upon Petitioner's Motion to Alter and Amend Judgment Pursuant to Rule 59(e) of the Federal Rules of Civil Procedure. [Doc. 140]. For the reasons set forth below, the motion is denied.

## I.     PROCEDURAL HISTORY

      This Court sentenced Aquilia Marcivicci Barnette ("Petitioner") to death on January 27, 1998 following his 11-count conviction for various crimes relating to the murder of his ex-girlfriend, Robin Williams, in Roanoke, Virginia, and the carjacking and murder of Donald Lee Allen in Charlotte, North Carolina. <u>United States v. Barnette</u>, Case No. 3:97-cr-23 (W.D.N.C.). Following a lengthy appeal process that concluded in 2012, Petitioner filed his Motion to Vacate Sentence pursuant to 28 U.S.C. §2255 in this Court on June 19, 2013. [Doc. 48]. On June 24, 2016, Petitioner moved to supplement his § 2255 Motion to Vacate with additional claims. [Doc. 119]. On March 12, 2021, this Court entered an Order denying Petitioner's Motion to Vacate and Motion to Supplement. [Doc. 137]. Petitioner now takes issue with this Court's Order denying his Motion to Supplement and moves this Court to alter and amend judgment pursuant to Fed. R. Civ. P. 59(e). [Doc. 140].

**JA3255**

## II.     STANDARD OF REVIEW

A court has the discretion to alter or amend a judgment pursuant to a motion brought under Rule 59(e) no later than 28 days after entry of the judgment. Fed. R. Civ. P. 59(e). Such motions shall be granted only in very narrow circumstances: "(1) to accommodate an intervening change in controlling law; (2) to account for new evidence not available at trial; or (3) to correct a clear error of law or prevent manifest injustice." Hill v. Braxton, 277 F.3d 701, 708 (4th Cir. 2002)(quoting Collison v. Intn'l Chemical Workers Union, 34 F.3d 233, 236 (4th Cir.1994)). "Rule 59(e) motions may not be used to make arguments that could have been made before the judgment was entered." Id. It is the movant's burden to establish one of these three grounds in order to obtain relief. Loren Data Corp. v. GXS, Inc., 501 F. App'x 275, 285 (4th Cir. 2012).

## III.    DISCUSSION

Petitioner's motion to supplement sought to add additional claims to his § 2255 motion challenging his convictions in counts 1, 2, 3, 10, and 11.[1] Counts 1 and 10 charged Petitioner with interstate domestic violence under 18 U.S.C. §2261(a) & (b) as follows:

> On or about April 30, 1996. . . [Petitioner] did travel across a state line, that is, did transport himself from Charlotte, North Carolina to Roanoke Virginia with the intent to injure, harass, and intimidate an intimate partner, Robin Williams, and in the course and as a result of such travel intentionally committed a crime of violence, that is, did firebomb Robin Williams' occupied apartment and an automobile parked in her driveway causing bodily injury to her. In violation of Title 18, United States Code, Sections 2261(a)(1) and 2261(b). (Count 1).

> On or about June 22, 1996. . . [Petitioner] did travel across a state line, that is, did transport himself from Charlotte, North Carolina to Roanoke, Virginia with the intent to injure, harass, and intimidate an intimate partner, Robin Williams, and in the course and as a result of such travel intentionally committed a crime of violence, that is, shot and killed Robin Williams causing bodily injury and death to her. In violation of Title 18, United States Code, Sections 2261(a)(1) and 2261(b). (Count 10).

---

[1] Petitioner's motion to supplement also sought to add claims challenging his conviction in count 8. However, Petitioner does address count 8 in his Rule 59(e) motion. [Doc. 140 at 2, n.1].

**JA3256**

Counts 2 and 11 charged Petitioner with knowingly using and carrying a firearm during and in relation to a "crime of violence" in violation of 18 U.S.C. § 924(c), with the predicate crimes of violence being those acts alleged in counts 1 and 10:

> On or about April 30, 1996. . . [Petitioner] knowingly used and carried a firearm, that is a destructive device, consisting of a bottle filled with flammable liquid, during and in relation to a crime of violence for which he may be prosecuted in a court of the United States, that is, an act of interstate domestic violence in violation of Title 18, United States Code, Section 2261 as set forth in Count One. In violation of Title 18, United States Code, Section 924(c)(1). (Count 2).

> On or about June 22, 1996. . . [Petitioner] knowingly used and carried a firearm, that is a sawed-off Winchester semi-automatic shotgun, during and in relation to a crime of violence, for which he may be prosecuted in a court of the United States, that is the act of interstate domestic violence set forth in Count Ten above, and in the course of this violation caused the death of Robin Williams, through the use of a firearm, which killing is a murder as defined in Title 18, United States Code, Section 1111, in that the defendant, with malice aforethought, did unlawfully kill Robin Williams by shooting her with the firearm willfully, deliberately, maliciously, and with premeditation. In violation of Title 18, United States Code, Sections 924(c)(1) and (i)(2)(1). (Count 11).

Count 3 charged Petitioner with using and carrying fire and explosive materials during the commission of a felony (interstate domestic violence) in violation of 18 U.S.C. § 844(h)(1):

> On or about the 30th day of April, 1996. . . [Petitioner] knowingly used and carried fire and explosive materials, to commit an act of interstate domestic violence in violation of Title 18, United States Code, Section 2261, a felony prosecutable in a court of the United States. In violation of Title 18, United States Code, Section 844(h)(1). (Count 3).

Petitioner qualified for enhanced sentencing under the Armed Career Criminal Act, 18 U.S.C. § 924(e). The convictions in counts 1 and 10 under the Violence Against Women Act, 18 U.S.C. § 2261 require a predicate "crime of violence" as defined in 18 U.S.C. § 16(b). The convictions in counts 2 and 11 for using and carrying a firearm under 18 U.S.C. § 924(c) also require the act to be done during and in relation to a "crime of violence."

Petitioner sought to supplement his § 2255 motion to vacate with claims alleging that his conviction on counts 1, 2, 3, 10, and 11 are invalid because none of the predicate crimes for these offenses qualify as "crimes of violence" under the force or elements clause of 18 U.S.C. § 924(c).

3

**JA3257**

[2] [Doc. 119]. Petitioner argued that the indictment on counts 1 and 10 fail to identify any statutory crime of violence the Government claims Petitioner committed, and instead, "simply describes a set of facts that include violent acts." [Doc. 119 at 18]. Petitioner argued that by not listing the specific code provisions, this left "the Court unable to apply a categorical approach to the elements of the predicate crime," and that the Court "cannot speculate as to what statutory violation the Government could have charged or intended to charge."[3] [Id.]. Because counts 2, 3, and 11 presuppose convictions under counts 1 and 10, Petitioner argued that they should also be invalidated. [Doc. 119 at 18-19, 26].

The Court denied Petitioner's motion to supplement on grounds that leave to amend would be futile because the proposed supplemental claims were barred by procedural default and should have been raised in his criminal case. [Doc. 137 at 38-39]. The Court then explained that even if they were not procedurally barred, they failed as a matter of law. [Id. at 40-46]. The Court found no merit to Petitioner's claim that counts 1 and 10 were invalid because they did not include specific code provisions. The Court noted that the crimes described in count 1 (firebombing Williams' residence causing injury to her) and count 10 (shooting and killing Williams) satisfied the force clause in requiring the intentional use of force capable of causing physical pain or injury. [Id. at 42]. The Court rejected Petitioner's argument that counts 2, 11, and 3 automatically fail because they presuppose convictions under counts 1 and 10. [Id. at 43-45].

---

[2] This requires a determination of whether the predicate crime had, as an element, "the use, attempted use, or threatened use of physical force against the person or property of another." 18 U.S.C. § 924(c)(3)(A). The force must be "capable of causing physical pain or injury to another person." United States v. Evans, 848 F.3d 242, 245 (4th Cir. 2017)(citing Johnson v. United States, 559 U.S. 133, 140 (2010)).

[3] "To determine whether a crime requires the use, attempted use, or threatened use of violent force, courts generally apply a categorical approach or modified categorical approach depending on whether the statute is indivisible or divisible." Whitfield v. United States, 2017 WL 4369487, *4 (W.D.N.C. October 2, 2017). The categorical approach applies to indivisible statutes and "focuses on the *elements* of the prior offense rather than the *conduct* underlying the conviction." United States v. Cabrera-Umanzor, 728 F.3d 347, 350 (4th Cir. 2013)(emphasis original).

4

**JA3258**

Petitioner now moves the Court under Fed. R. Civ. P. 59(e) to alter and amend the order denying his motion to supplement. [Doc. 140]. Petitioner reiterates his argument that the set of facts presented in counts 1 and 10 of the indictment "are inadequate to discern either the crime or elements intended with the required certainty." [Id. at 4-5]. Petitioner complains that these counts cite no statutory provision nor cross-reference other counts to identify the predicate crime of violence. [Id. at 5]. Petitioner takes issue with this Court's prior conclusion that "[a] plain reading of the subsequent counts 2 and 11 make clear the statutory code provisions referenced in counts 1 and 10." [Doc. 137 at 42]. Petitioner also argues that the Court's "best guess as to what the Government intended" is insufficient to comply with Supreme Court precedent requiring the record establish with certainty that the defendant was "necessarily" convicted of an offense qualifying as a crime of violence. [Doc. 140 at 6].

Petitioner's Rule 59 motion raises essentially the same argument as his motion to supplement. Petitioner does not present any evidence that was previously unavailable to him, nor does he set forth any intervening change in applicable law or show that a clear error of law has been made by the Court that would result in a manifest injustice if the Court did not amend its previous Order.

The Court properly found that the Petitioner's proposed supplemental claims challenging the language in the indictment were procedurally barred and should have been brought in his criminal proceeding. To the extent they were not procedurally barred, the Petitioner provided no legal authority to support his argument that his convictions in counts 1, 2, 3, 10 and 11 should be invalidated because of the language used in the indictment. The factual allegations set forth in the indictment include acts that require the intentional use of force capable of causing physical pain or injury. Petitioner fails to show that the manner in which the indictment was drafted somehow

5

**JA3259**

leads to uncertainty as to the predicate crimes charged or casts doubt on whether Petitioner was convicted of offenses that qualify as crimes of violence. Petitioner provides no legal authority to convince this Court that its Order denying leave to supplement was in error. Petitioner fails to show the existence of limited circumstances under which a Rule 59(e) motion may be granted. Therefore, Petitioner's motion shall be denied.

## IV. CONCLUSION

For the reasons set forth above, Petitioner's Motion to Alter and Amend Judgment [Doc. 140] is denied. The Court finds that Petitioner has not made a substantial showing of a denial of a constitutional right as required for issuance of a certificate of appealability pursuant to 28 U.S.C. § 2253(c)(2). Miller-El v. Cockrell, 537 U.S. 322, 336-38 (2003)(in order to satisfy §2253(c), a petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong); Slack v. McDaniel, 529 U.S. 473, 484 (2000)(when relief is denied on procedural grounds, a petitioner must establish both that the correctness of the dispositive procedural ruling is debatable, and that the petition states a debatably valid claim of the denial of a constitutional right).

**IT IS, THEREFORE, ORDERED** that:

1. Petitioner's Motion to Alter and Amend Judgment [Doc. 140] is **DENIED**.

2. The Court declines to issue a certificate of appealability.

**IT IS SO ORDERED.**

Signed: December 6, 2023

Max O. Cogburn Jr
United States District Judge

6

AQUILIA MARCIVICCI BARNETTE,  )
                                    )
             Petitioner,    )
                                    )
    v.                   )         NOTICE OF APPEAL
                                    )
UNITED STATES OF AMERICA,    )
                                    )
             Respondent.  )
_____)

       Notice is hereby given that Petitioner, Aquilia Marivicci Barnette, through counsel, hereby appeals to the United States Court of Appeals for the Fourth Circuit from: the order (D.137) and the clerk's judgment (D.138) of March 12, 2021, denying his motion pursuant to 28 U.S.C. § 2255 to vacate, set aside or correct sentence, denying his motion to supplement, and denying him an evidentiary hearing; and its order (D.141) of December 6, 2023, denying his motion to alter or amend that judgment.

                              Respectfully submitted,

                              */s/Gerald W. King, Jr.*
                              Gerald W. King, Jr.
                              N.C. State Bar No. 59129
                              Chief, Capital Habeas Unit for the Fourth Circuit
                              Federal Public Defender for the
                              Western District of North Carolina
                              129 W. Trade Street, Suite 300
                              Charlotte, NC 28202
                              Telephone: (704) 374-0720
                              Fax: (704) 374-0722
                              E-mail: gerald_king@fd.org

                              */s/ Mark E. Olive*
                              N.C. State Bar No. 10615
                              LAW OFFICES OF MARK OLIVE
                              320 W. Jefferson Street

**JA3261**

Tallahassee, FL 32301
Telephone: 850-224-0004
Fax: 850-224-3331
E-mail: meolive@aol.com

*/s/ Jacob H. Sussman*
N.C. State Bar No. 31821
P.O. Box 12718
Charlotte, NC 28220
Telephone: 704-277-3962
E-mail: jakesussmanlaw@gmail.com

*Attorneys for Aquilia Marcivicci Barnette*

This the 5<sup>th</sup> day of February 2024.

# <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on February 5, 2024, I electronically filed the forgoing Notice of Appeal with the Clerk of Court using the CM/ECF system, which will send notification of such filing to:

Anthony J. Enright
anthony.enright@usdoj.gov

<u>*/s/Gerald W. King, Jr.*</u>
Gerald W. King, Jr.
N.C. State Bar No. 59129
Chief, Capital Habeas Unit for the Fourth Circuit
Federal Public Defender for the
Western District of North Carolina
129 W. Trade Street, Suite 300
Charlotte, NC 28202
Telephone: (704) 374-0720
Fax: (704) 374-0722
E-mail: gerald_king@fd.org

*Attorney for Aquilia Marcivicci Barnette*

February 5, 2024

**JA3263**